SmBus, DUPFILER, APPEAL, APPEAL_NAT

# U.S. Bankruptcy Court
## Southern District of Texas (Houston)
## Bankruptcy Petition #: 23-34815

*Date filed:* 12/05/2023
*341 meeting:* 01/10/2024

*Assigned to:* Bankruptcy Judge Jeffrey P Norman
Chapter 11
Voluntary
Asset

**Debtor**
**Galleria 2425 Owner, LLC**
1001 West Loop South 700
Houston, TX 77027
HARRIS-TX
Tax ID / EIN: 36-4896738

represented by **Reese W Baker**
Baker & Associates
950 Echo Lane
Suite 300
Houston, TX 77024
713-869-9200
Fax : 713-869-9100
Email: courtdocs@bakerassociates.net

**James Q. Pope**
The Pope Law Firm
6161 Savoy Drive
Ste 1125
Houston, TX 77036
713-449-4481
Email: ecf@thepopelawfirm.com

**Jeffrey W Steidley**
Steidley Law Firm
3000 Weslayan
Ste 200
Houston, TX 77027
713-523-9595
Email: Jeff@texlaw.us

*Defendant*
**Azeemeh Zaheer**

represented by **Rodney Lee Drinnon**
McCathern Houston
2000 West Loop South
Suite 1850
Houston, TX 77027
832-533-8689
Fax : 832-213-4842
Email: rdrinnon@mccathernlaw.com

*Trustee*
**Christopher R Murray**
Jones Murray LLP
602 Sawyer St
Ste 400
Houston, TX 77007
832-529-1999

represented by **Kyung Shik Lee**
Kyung S. Lee PLLC
4723 Oakshire Drive
Apt. B
Houston, TX 77027
713-301-4751
Email: kslee50@gmail.com

**Christopher R Murray**
Jones Murray LLP
602 Sawyer St
Ste 400
Houston, TX 77007
832-529-1999
Fax : 832-529-3393
Email: chris@jonesmurray.com

**Christopher R Murray**
Jones Murray LLP
602 Sawyer Street
Suite 400
Houston, TX 77007
832-529-1999
Email: chris@jonesmurray.com

**R. J. Shannon**
Shannon & Lee LLP
2100 Travis Street, STE 1525
Houston, TX 77002
713-714-5770
Email: rshannon@shannonleellp.com

000002

| | |
|---|---|
| ***U.S. Trustee***<br>**US Trustee**<br>Office of the US Trustee<br>515 Rusk Ave<br>Ste 3516<br>Houston, TX 77002<br>713-718-4650 | represented by **Jana Smith Whitworth**<br>Office of United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002<br>(713) 718-4650<br>Fax : (713) 718-4670<br>Email: jana.whitworth@usdoj.gov |

| Filing Date | # | Docket Text |
|---|---|---|
| 12/05/2023 | 1 (8 pgs) | Chapter 11 Voluntary Petition Non-Individual Fee Amount $1738 Filed by Galleria 2425 Owner, LLC. Chapter 11 Plan (Small Business) due by 06/3/2024. (Pope, James) (Entered: 12/05/2023) |
| 12/05/2023 | 2 (3 pgs) | Notice of Appearance and Request for Notice Filed by Charles Clayton Conrad Filed by on behalf of National Bank of Kuwait, S.A.K.P., New York Branch (Conrad, Charles) (Entered: 12/05/2023) |
| 12/05/2023 | 3 (1 pg) | MOTION to Appear Pro Hac Vice for Patrick E. Fitzmaurice (Fee Paid: $100, receipt number A24909074) Filed by Creditor National Bank of Kuwait, S.A.K.P., New York Branch (Conrad, Charles) (Entered: 12/05/2023) |
| 12/05/2023 | 4 (1 pg) | MOTION to Appear Pro Hac Vice for Kwame O. Akuffo (Fee Paid: $100, receipt number A24909092) Filed by Creditor National Bank of Kuwait, S.A.K.P., New York Branch (Conrad, Charles) (Entered: 12/05/2023) |
| 12/06/2023 | 5 (9 pgs; 2 docs) | Adversary case 23-03259. Nature of Suit: (02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy))) Notice of Removal Azeemeh Zaheer, Naissance Galleria, LLC. Fee Amount $350 (Attachments: # 1 Exhibit 1) (Castanon, Cynthia) (Entered: 12/06/2023) |
| 12/06/2023 | 6 (1 pg) | Order Granting Motion To Appear pro hac vice as to Kwame O. Akuffo. (Related Doc # 4) Signed on 12/6/2023. (MarioRios) (Entered: 12/06/2023) |
| 12/06/2023 | 7 (1 pg) | Order Denying Motion To Appear pro hac vice (Related Doc # 3) Signed on 12/6/2023. (MarioRios) (Entered: 12/06/2023) |
| 12/06/2023 | 8 (2 pgs) | Order to Debtor in Possession and Setting Status Conference Hearing Signed on 12/6/2023 (Related document(s):1 Voluntary Petition (Chapter 11)) **Status conference to be held on 2/7/2024 at 11:00 AM at Houston, Courtroom 403 (JPN).** (MarioRios) (Entered: 12/06/2023) |
| 12/06/2023 | 9 (2 pgs) | Meeting of Creditors Chapter 11 for Non-Individual Debtor Set 341(a) meeting to be held on 1/10/2024 at 09:30 AM at US Trustee Houston Teleconference. Last day to object to dischargeability under section 523 is 3/11/2024. Proofs of Claims due by 4/9/2024. Government |

| | | |
|---|---|---|
| | | Proof of Claim due by 6/3/2024. (Whitworth, Jana) (Entered: 12/06/2023) |
| 12/06/2023 | ●10<br>(4 pgs) | Amended Petition (Filed By Galleria 2425 Owner, LLC ). (Pope, James) (Entered: 12/06/2023) |
| 12/06/2023 | ●11<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Reese W Baker Filed by on behalf of Galleria 2425 Owner, LLC (Baker, Reese) (Entered: 12/06/2023) |
| 12/07/2023 | ●12<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Rodney Lee Drinnon Filed by on behalf of Rodney Drinnon (Drinnon, Rodney) (Entered: 12/07/2023) |
| 12/07/2023 | ●13<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Susan R. Fuertes Filed by on behalf of Harris County, ATTN: Property Tax Division (Fuertes, Susan) (Entered: 12/07/2023) |
| 12/08/2023 | ●14<br>(2 pgs) | Second MOTION to Appear Pro Hac Vice for Patrick E. Fitzmaurice (Fee Paid: $100, receipt number A24918442) Filed by National Bank of Kuwait, S.A.K.P., New York Branch (Conrad, Charles) (Entered: 12/08/2023) |
| 12/08/2023 | ●15<br>(312 pgs; 3 docs) | Motion to Transfer Case To Another District. Objections/Request for Hearing Due in 21 days. Filed by Creditor National Bank of Kuwait, S.A.K.P., New York Branch (Attachments: # 1 Exhibit A - Conrad Declaration # 2 Exhibit B - Proposed Order) (Conrad, Charles) (Entered: 12/08/2023) |
| 12/08/2023 | ●16<br>(8 pgs; 2 docs) | Motion to Shorten Time (related document(s):15 Motion to Transfer Case), in addition to Motion to Limit Notice (related document(s):15 Motion to Transfer Case). Filed by Creditor National Bank of Kuwait, S.A.K.P., New York Branch (Attachments: # 1 Exhibit A - Proposed Order) (Conrad, Charles) (Entered: 12/08/2023) |
| 12/08/2023 | ●17<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):6 Order on Motion to Appear pro hac vice) No. of Notices: 1. Notice Date 12/08/2023. (Admin.) (Entered: 12/08/2023) |
| 12/08/2023 | ●18<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):7 Order on Motion to Appear pro hac vice) No. of Notices: 1. Notice Date 12/08/2023. (Admin.) (Entered: 12/08/2023) |
| 12/08/2023 | ●19<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):8 Order Setting Hearing) No. of Notices: 1. Notice Date 12/08/2023. (Admin.) (Entered: 12/08/2023) |
| 12/09/2023 | ●20<br>(4 pgs) | BNC Certificate of Mailing - Meeting of Creditors. (Related document(s):9 Meeting of Creditors Chapter 11 for Non-Individual Debtor Set) No. of Notices: 32. Notice Date 12/09/2023. (Admin.) (Entered: 12/09/2023) |
| 12/11/2023 | ●21<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Stephen Wayne Sather Filed by on behalf of Galleria 2425 Owner, LLC (Sather, Stephen) (Entered: 12/11/2023) |

| | | |
|---|---|---|
| 12/11/2023 | 22 (2 pgs) | Order Denying Motion To Transfer Case ct(Related Doc # 15), Denying Motion to Shorten Time (Related Doc # 16) Signed on 12/11/2023. (TraceyConrad) (Entered: 12/11/2023) |
| 12/11/2023 | 23 (4 pgs) | Notice of Appearance and Request for Notice Filed by Tara L Grundemeier Filed by on behalf of Houston ISD, Houston Community College System, City of Houston (Grundemeier, Tara) (Entered: 12/11/2023) |
| 12/11/2023 | 24 (91 pgs; 9 docs) | Emergency Motion , Motion for Relief from Stay . Fee Amount $199. Filed by Creditor Rodney Drinnon (Attachments: # 1 Proposed Order # 2 Affidavit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Exhibit # 7 Exhibit # 8 Exhibit) (Drinnon, Rodney) (Entered: 12/11/2023) |
| 12/12/2023 | 25 (1 pg) | Order Denying Emergency Consideration and Setting Expedited Hearing Signed on 12/12/2023 (Related document(s):24 Emergency Motion for Relief From Stay **Hearing scheduled for 12/19/2023 at 12:00 PM at Houston, Courtroom 403 (JPN).** (TraceyConrad) (Entered: 12/12/2023) |
| 12/12/2023 | 26 (4 pgs) | Notice *of Order Setting Expedited Hearing.* (Related document(s):24 Emergency Motion, Motion for Relief from Stay) Filed by Rodney Drinnon (Drinnon, Rodney) (Entered: 12/12/2023) |
| 12/13/2023 | 27 (2 pgs) | Order Granting Motion To Appear pro hac vice (Related Doc # 14) Signed on 12/13/2023. (MarioRios) (Entered: 12/13/2023) |
| 12/13/2023 | 28 (2 pgs) | Withdraw Document (Filed By Galleria 2425 Owner, LLC ).(Related document(s):21 Notice of Appearance) (Sather, Stephen) (Entered: 12/13/2023) |
| 12/13/2023 | 29 (4 pgs) | Notice of Appearance and Request for Notice Filed by Stephen Wayne Sather Filed by on behalf of Galleria 2425 Owner, LLC (Sather, Stephen) Modified on 12/14/2023 (MarioRios). THIS ENTRY WAS FILED IN ERROR AND HAS BEEN CORRECTED AS 30. (Entered: 12/13/2023) |
| 12/13/2023 | 30 (4 pgs) | Notice of Appearance and Request for Notice Filed by Stephen Wayne Sather Filed by on behalf of 2425 WL, LLC (Sather, Stephen) Modified on 12/14/2023 (MarioRios). (Entered: 12/13/2023) |
| 12/13/2023 | 31 (2 pgs) | Notice of Appearance and Request for Notice Filed by James Robert MacNaughton Filed by on behalf of 2425 West Loop, LLC (MacNaughton, James) (Entered: 12/13/2023) |
| 12/13/2023 | 32 (4 pgs) | BNC Certificate of Mailing. (Related document(s):22 Order on Motion To Transfer Case) No. of Notices: 2. Notice Date 12/13/2023. (Admin.) (Entered: 12/13/2023) |
| 12/14/2023 | 33 (15 pgs; 3 docs) | Emergency Motion *For Use of Cash Collateral* Filed by Debtor Galleria 2425 Owner, LLC (Attachments: # 1 Proposed Order # 2 Exhibit Proposed Budget) (Baker, Reese) (Entered: 12/14/2023) |
| 12/14/2023 | 34 (10 pgs; 3 docs) | Emergency Motion *OF DEBTOR TO DETERMINE ADEQUATE ASSURANCE UTILITY PAYMENTS* Filed by Debtor Galleria 2425 |

000005

| | | |
|---|---|---|
| | | Owner, LLC (Attachments: # 1 Proposed Order # 2 Exhibit Average Utility Costs) (Baker, Reese) (Entered: 12/14/2023) |
| 12/14/2023 | 35<br>(5 pgs) | Witness List (Filed By Rodney Drinnon ).(Related document(s):24 Emergency Motion, Motion for Relief From Stay) (Drinnon, Rodney) (Entered: 12/14/2023) |
| 12/14/2023 | 36<br>(229 pgs; 11 docs) | Exhibit List (Filed By Rodney Drinnon ).(Related document(s):24 Emergency Motion, Motion for Relief From Stay) (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Exhibit # 7 Exhibit # 8 Exhibit # 9 Exhibit # 10 Exhibit) (Drinnon, Rodney) (Entered: 12/14/2023) |
| 12/14/2023 | 37<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):25 Order Setting Hearing) No. of Notices. 2. Notice Date 12/14/2023. (Admin.) (Entered: 12/14/2023) |
| 12/15/2023 | 38<br>(2 pgs) | Order Setting Hearing Signed on 12/15/2023 (Related document(s):33 Emergency Motion, 34 Emergency Motion **Hearing scheduled for 12/18/2023 at 02:30 PM at Houston, Courtroom 403 (JPN).** (MarioRios) (Entered: 12/15/2023) |
| 12/15/2023 | 39<br>(31 pgs; 4 docs) | Notice *OF HEARING ON DEBTORS EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING THE USAGE OF CASH COLLATERAL AND DEBTORS MOTION TO DETERMINE ADEQUATE ASSURANCE UTILITY PAYMENTS.* (Related document(s):38 Order Setting Hearing) Filed by Galleria 2425 Owner, LLC (Attachments: # 1 Order of hearing # 2 Motions filed # 3 Exhibit A) (Baker, Reese) (Entered: 12/15/2023) |
| 12/15/2023 | 40<br>(75 pgs; 6 docs) | Witness List, Exhibit List (Filed By Galleria 2425 Owner, LLC ). (Related document(s):24 Emergency Motion, Motion for Relief From Stay) (Attachments: # 1 Exhibit 2d Amended Petition # 2 Exhibit 5th Amended Petition # 3 Exhibit 6th Amended Petition # 4 Exhibit Docket sheet state court case # 5 Exhibit Active Parties in state court case) (Baker, Reese) (Entered: 12/15/2023) |
| 12/15/2023 | 41<br>(56 pgs; 6 docs) | Exhibit List (Filed By Galleria 2425 Owner, LLC ).(Related document(s):24 Emergency Motion, Motion for Relief From Stay, 40 Witness List, Exhibit List) (Attachments: # 1 Exhibit First Amended Petition # 2 Exhibit Third Amended Petition # 3 Exhibit Email to Drinnon # 4 Exhibit Letter to 281st Court # 5 Exhibit Response to TCPA motion) (Baker, Reese) (Entered: 12/15/2023) |
| 12/15/2023 | 42<br>(160 pgs; 7 docs) | Omnibus Objection *to (I) Debtor's Emergency Motion for Interim and Final Orders Authorizing the Usage of Cash Collateral, and (II) Debtor's Motion to Determine Adequate Assurance Utility Payments* (related document(s):33 Emergency Motion, 34 Emergency Motion). Filed by Galleria 2425 Owner, LLC (Attachments: # 1 Exhibit A Loan Agreement # 2 Exhibit B Promissory Note # 3 Deed of Trust # 4 Exhibit D Payoff Statement # 5 Exhibit E Proofs of Claim (23-60036) # 6 Exhibit F Proposed Order) (Conrad, Charles) (Entered: 12/15/2023) |
| 12/15/2023 | 43<br>(9 pgs; 4 docs) | Witness List, Exhibit List (Filed By Galleria 2425 Owner, LLC ). (Related document(s):33 Emergency Motion, 34 Emergency Motion) (Attachments: # 1 Exhibit Budget for Cash Collateral # 2 Exhibit |

| | | |
|---|---|---|
| | | Utilities # 3 Exhibit Declaration of Ali Choudhri (Baker, Reese) (Entered: 12/15/2023) |
| 12/15/2023 | 44 (158 pgs; 7 docs) | Omnibus Objection *to (I) Debtor's Emergency Motion for Interim and Final Orders Authorizing the Usage of Cash Collateral, and (II) Debtor's Motion to Determine Adequate Assurance Utility Payments* (related document(s):33 Emergency Motion, 34 Emergency Motion). Filed by National Bank of Kuwait, S.A.K.P., New York Branch (Attachments: # 1 Exhibit A Loan Agreement # 2 Exhibit B Promissory Note # 3 Exhibit C Deed of Trust # 4 Exhibit D Payoff Statement # 5 Exhibit E Proofs of Claim (23-60036) # 6 Exhibit F Proposed Order) (Conrad, Charles) (Entered: 12/15/2023) |
| 12/15/2023 | 45 (444 pgs; 9 docs) | Witness List, Exhibit List (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ).(Related document(s):38 Order Setting Hearing, 39 Notice, 44 Objection) (Attachments: # 1 Loan Agreement # 2 Promissory Note # 3 Deed of Trust # 4 Payoff Statement # 5 Proofs of Claim (23-60036) # 6 Rent-Roll Jan-June 2023 # 7 Hearing Transcript (redacted) 9-2-23 (23-60036) # 8 Hearing Transcript 11-1-23 (23-60036)) (Conrad, Charles). (Entered: 12/15/2023) |
| 12/15/2023 | 46 (4 pgs) | BNC Certificate of Mailing. (Related document(s):27 Order on Motion to Appear pro hac vice) No. of Notices: 2. Notice Date 12/15/2023. (Admin.) (Entered: 12/15/2023) |
| 12/16/2023 | 47 (6 pgs) | Certificate *Amended Certificate of Service re Omnibus Objection (ECF No. 44)* (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ).(Related document(s):44 Objection) (Conrad, Charles) (Entered: 12/16/2023) |
| 12/17/2023 | 48 (4 pgs) | BNC Certificate of Mailing. (Related document(s):38 Order Setting Hearing) No. of Notices: 3. Notice Date 12/17/2023. (Admin.) (Entered: 12/17/2023) |
| 12/18/2023 | 49 (1054 pgs; 3 docs) | Adversary case 23-03263. Nature of Suit: (01 (Determination of removed claim or cause)) Notice of Removal Galleria 2425 Owner LLC. Fee Amount $350 (Attachments: # 1 State Court Pleadings # 2 Additional State Court Pleadings) (Pope, James) (Entered: 12/18/2023) |
| 12/18/2023 | 50 (3 pgs) | Notice of Appearance and Request for Notice Filed by Ryan Steinbrunner Filed by on behalf of National Bank of Kuwait, S.A.K.P., New York Branch (Steinbrunner, Ryan) (Entered: 12/18/2023) |
| 12/18/2023 | 51 (4 pgs) | Notice *of Motion for Use of Cash Collateral*. (Related document(s):33 Emergency Motion) Filed by Galleria 2425 Owner, LLC (Baker, Reese) (Entered: 12/18/2023) |
| 12/18/2023 | 52 (4 pgs) | Amended Notice *of Withdrawal of Motion to Use Cash Collateral*. (Related document(s):51 Notice) Filed by Galleria 2425 Owner, LLC (Baker, Reese) (Entered: 12/18/2023) |
| 12/18/2023 | 53 (3 pgs; 2 docs) | Balance Sheet (Filed By Galleria 2425 Owner, LLC ). (Attachments: # 1 Exhibit Profit and Loss) (Baker, Reese) (Entered: 12/18/2023) |
| 12/18/2023 | 54 (2 pgs) | Proposed Order RE: *Order on Adequate Assurances for Utilities* (Filed By Galleria 2425 Owner, LLC ).(Related document(s):34 Emergency |

| | | Motion) (Baker, Reese) (Entered: 12/18/2023) |
|---|---|---|
| 12/18/2023 | 🌐 55 (1 pg) | Withdraw Document (Filed By Galleria 2425 Owner, LLC ).(Related document(s):51 Notice, 52 Notice) (Baker, Reese) (Entered: 12/18/2023) |
| 12/18/2023 | 🌐 56 (4 pgs) | Withdraw Document (Filed By Galleria 2425 Owner, LLC ).(Related document(s):33 Emergency Motion) (Baker, Reese) (Entered: 12/18/2023) |
| 12/18/2023 | 🌐 57 | Courtroom Minutes. Time Hearing Held: 2:30. Appearances: Reese Baker and James Pope for the Debtor, Patrick Fitzmaurice and Ryan Steinbrunner for National Bank of Kuwait, Jana Whitworth for the US Trustee, Robert MacNaughton for 2425 West Loop, LLC. Stephen Sather for 2425 WL. LLC. (Related document(s):34 Emergency Motion to Determine Adequate Assurance Utility Payments) Objection filed. Scarlet McGeorge sworn. Direct and cross examination conducted by counsel. Debtor exhibit 34-2 was admitted. Debtor to file a revised proposed order. (TraceyConrad) (Entered: 12/18/2023) |
| 12/18/2023 | 🌐 58 (3 pgs) | Proposed Order RE: *Order on Utility Deposits (after hearing)* (Filed By Galleria 2425 Owner, LLC ).(Related document(s):34 Emergency Motion) (Baker, Reese) (Entered: 12/18/2023) |
| 12/18/2023 | 🌐 59 (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 12/18/2023 2:30:03 PM ]. File Size [ 14512 KB ]. Run Time [ 00:30:14 ]. (admin). (Entered: 12/18/2023) |
| 12/18/2023 | 🌐 60 (3 pgs) | Order Granting Emergency Motion to Determine Adequate Assurance (Related Doc # 34) Signed on 12/18/2023. (MarioRios) (Entered: 12/18/2023) |
| 12/19/2023 | 🌐 61 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Expedited (7 days)) by National Bank of Kuwait, S.A.K.P., New York Branch / Ryan Steinbrunner. This is to order a transcript of Hearing, December 18, 2023 before Judge Jeffrey P. Norman. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ). (Steinbrunner, Ryan) Electronically Forwarded to Veritext Legal Solutions on 12/19/2023. Estimated Date of Completion: 12/26/2023. Modified on 12/19/2023 (BenjaminRomero). (Entered: 12/19/2023) |
| 12/19/2023 | 🌐 62 (1 pg) | Order Granting Motion For Relief From Stay (Related Doc # 24) Signed on 12/19/2023. (MarioRios) (Entered: 12/19/2023) |
| 12/20/2023 | 🌐 63 (4 pgs; 2 docs) | Motion to Extend Deadline to File Schedules or Provide Required Information Filed by Debtor Galleria 2425 Owner, LLC (Attachments: # 1 Proposed Order) (Baker, Reese) (Entered: 12/20/2023) |
| 12/20/2023 | 🌐 64 (1 pg) | Order Denying Motion To Extend Deadline to File Schedules or Provide Required Information (Related Doc # 63) Signed on 12/20/2023. (MarioRios) (Entered: 12/20/2023) |
| 12/20/2023 | 🌐 65 (5 pgs) | BNC Certificate of Mailing. (Related document(s):60 Order on Emergency Motion) No. of Notices: 3. Notice Date 12/20/2023. |

000008

| | | |
|---|---|---|
| | | (Admin.) (Entered: 12/20/2023) |
| 12/21/2023 | 🌐 66 (3 pgs) | BNC Certificate of Mailing. (Related document(s):62 Order on Emergency Motion) No. of Notices: 3. Notice Date 12/21/2023. (Admin.) (Entered: 12/21/2023) |
| 12/22/2023 | 🌐 67 (17 pgs; 6 docs) | Application to Employ Reese Bake as Attorney. Objections/Request for Hearing Due in 21 days. Filed by Debtor Galleria 2425 Owner, LLC Hearing scheduled for 1/31/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Exhibit Rule 2014 # 2 Exhibit Rule 2016 # 3 Exhibit Disclosures # 4 Exhibit Rates # 5 Proposed Order) (Baker, Reese) (Entered: 12/22/2023) |
| 12/22/2023 | 🌐 68 (2 pgs) | Notice of Appearance and Request for Notice Filed by Howard Marc Spector Filed by on behalf of CC2 TX, LLC (Spector, Howard) (Entered: 12/22/2023) |
| 12/22/2023 | 🌐 69 (4 pgs) | BNC Certificate of Mailing. (Related document(s):64 Order on Motion to Extend Deadline to File Schedules) No. of Notices: 31. Notice Date 12/22/2023. (Admin.) (Entered: 12/22/2023) |
| 12/23/2023 | 🌐 70 (80 pgs; 3 docs) | Schedule A/B: Property for Non-Individual *And Schedules D, E/F, G, H and Statement of Financial Affairs* (Filed By Galleria 2425 Owner, LLC ). (Attachments: # 1 Exhibit SOFA Exhibit 3 # 2 Exhibit SOFA Exhibit 4) (Baker, Reese) (Entered: 12/23/2023) |
| 12/26/2023 | 🌐 71 (29 pgs; 2 docs) | Transcript RE: hearing held on 12/18/23 before Judge JEFFREY P. NORMAN. Transcript is available for viewing in the Clerk's Office. Within 21 days, parties are advised to comply with privacy requirements of Fed. R. Bank. P. 9037, ensuring that certain protected information is redacted from transcripts prior to their availability on PACER. Filed by Transcript access will be restricted through 03/25/2024. (VeritextLegalSolutions) (Entered: 12/26/2023) |
| 12/27/2023 | 🌐 72 (706 pgs; 12 docs) | Motion to Convert Case from Chapter 11 to Chapter 7 . Fee Amount $15. Filed by Creditor National Bank of Kuwait, S.A.K.P., New York Branch Hearing scheduled for 1/31/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Exhibit A Conrad Declaration # 2 Conrad Declaration Exhibit 1 # 3 Conrad Declaration Exhibit 2 # 4 Conrad Declaration Exhibit 3 # 5 Conrad Declaration Exhibit 4 # 6 Conrad Declaration Exhibit 5 # 7 Conrad Declaration Exhibit 6 # 8 Conrad Declaration Exhibit 7 # 9 Conrad Declaration Exhibit 8 # 10 Conrad Declaration Exhibit 9 # 11 Exhibit B Proposed Order) (Conrad, Charles) (Entered: 12/27/2023) |
| 12/28/2023 | 🌐 73 (4 pgs) | BNC Certificate of Mailing. (Related document(s):71 Transcript) No. of Notices: 4. Notice Date 12/28/2023. (Admin.) (Entered: 12/28/2023) |
| 01/03/2024 | 🌐 74 (4 pgs) | Certificate *Amended Certificate of Service* (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ).(Related document(s):72 Motion to Convert Case from Chapter 11 to Chapter 7) (Conrad, Charles) (Entered: 01/03/2024) |
| 01/04/2024 | 🌐 75 (4 pgs) | Notice *Notice of Hearing*. (Related document(s):72 Motion to Convert Case from Chapter 11 to Chapter 7) Filed by National Bank of Kuwait, S.A.K.P., New York Branch (Conrad, Charles) (Entered: 01/04/2024) |

| 01/10/2024 | ⬤ 76 (1 pg) | Equity Security Holders (Filed By Galleria 2425 Owner, LLC ). (Baker, Reese) (Entered: 01/10/2024) |
| --- | --- | --- |
| 01/12/2024 | ⬤ 77 (7 pgs; 2 docs) | Objection *Limited Objection of National Bank of Kuwait, S.A.K.P., New York Branch to Application to Employ Attorneys* (related document(s):67 Application to Employ). Filed by National Bank of Kuwait, S.A.K.P., New York Branch (Attachments: # 1 Proposed Order) (Conrad, Charles) (Entered: 01/12/2024) |
| 01/19/2024 | ⬤ 78 (8 pgs) | Response (related document(s):72 Motion to Convert Case from Chapter 11 to Chapter 7). Filed by 2425 WL, LLC (Sather, Stephen) (Entered: 01/19/2024) |
| 01/22/2024 | ⬤ 79 (13 pgs; 2 docs) | Debtor-In-Possession Monthly Operating Report for Filing Period ending 12/31/2023, $9448 disbursed (Filed By Galleria 2425 Owner, LLC ). (Attachments: # 1 Exhibit Bank account statement) (Baker, Reese) (Entered: 01/22/2024) |
| 01/22/2024 | ⬤ 80 (260 pgs; 12 docs) | Response (related document(s):72 Motion to Convert Case from Chapter 11 to Chapter 7). Filed by Galleria 2425 Owner, LLC (Attachments: # 1 Exhibit 1 Amendment to Galleria 2425 JV # 2 Exhibit 1B Replacement agreement # 3 Exhibit 3 Email on Sonder lease # 4 Exhibit 4 Presentation of NBK and Sonder lease # 5 Exhibit 5 Effective ownership # 6 Exhibit 5A Michael Carter email # 7 Exhibit 6 Internal Notes NBK # 8 Exhibit Jetall paying rent # 9 Exhibit 8 Grove transcript # 10 Exhibit 9 Motion to inspect and statements # 11 Exhibit 10 Hearing transcript involving Tang) (Baker, Reese) (Entered: 01/22/2024) |
| 01/24/2024 | ⬤ 81 (10 pgs; 3 docs) | Application to Employ Robert Norris as Accountant. Objections/Request for Hearing Due in 21 days. Filed by Debtor Galleria 2425 Owner, LLC Hearing scheduled for 2/21/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order # 2 Exhibit Declaration of Robert Norris) (Baker, Reese) (Entered: 01/24/2024) |
| 01/25/2024 | ⬤ 82 (11 pgs; 2 docs) | Certificate *of Service* (Filed By Galleria 2425 Owner, LLC ).(Related document(s):81 Application to Employ) (Attachments: # 1 mailing matrix) (Baker, Reese) (Entered: 01/25/2024) |
| 01/25/2024 | ⬤ 83 (37 pgs; 6 docs) | Motion for Expedited Consideration (related document(s):72 Motion to Convert Case from Chapter 11 to Chapter 7, 75 Notice)., Motion *National Bank of Kuwait, S.A.K.P., New York Branch's Expedited Motion for Service of Subpoena by U.S. Marshal's Office* Filed by Creditor National Bank of Kuwait, S.A.K.P., New York Branch (Attachments: # 1 Exhibit A Proposed Order # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E) (Conrad, Charles) (Entered: 01/25/2024) |
| 01/26/2024 | ⬤ 84 (7 pgs) | Order Authorizing Service of Subpoena by U.S. Marshal's Office Signed on 1/26/2024 (Related document(s):83 Motion for Expedited Consideration, Generic Motion) (MarioRios) (Entered: 01/26/2024) |
| 01/26/2024 | ⬤ 85 (5 pgs) | Objection - *The United States Trustee's Limited Objection and Reservation of Rights to Debtor's Application to Employ Attorneys* |

| | | |
|---|---|---|
| | | *[ECF 67]* (related document(s):67 Application to Employ). Filed by US Trustee (Whitworth, Jana) (Entered: 01/26/2024) |
| 01/28/2024 | 86 (10 pgs) | BNC Certificate of Mailing. (Related document(s):84 Generic Order) No. of Notices: 4. Notice Date 01/28/2024. (Admin.) (Entered: 01/28/2024) |
| 01/29/2024 | 87 (1003 pgs; 47 docs) | Witness List, Exhibit List (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ).(Related document(s):67 Application to Employ, 72 Motion to Convert Case from Chapter 11 to Chapter 7, 75 Notice) (Attachments: # 1 Exhibit 1 # 2 Exhibit 1.1 # 3 Exhibit 1.2 # 4 Exhibit 1.3 # 5 Exhibit 1.4 # 6 Exhibit 2 # 7 Exhibit 2.1 # 8 Exhibit 2.2 # 9 Exhibit 2.3 # 10 Exhibit 2.4 # 11 Exhibit 2.5 # 12 Exhibit 2.6 # 13 Exhibit 2.7 # 14 Exhibit 3 # 15 Exhibit 4 # 16 Exhibit 5 # 17 Exhibit 6 # 18 Exhibit 7 # 19 Exhibit 8 # 20 Exhibit 9 # 21 Exhibit 10 # 22 Exhibit 11 # 23 Exhibit 12 # 24 Exhibit 13 # 25 Exhibit 14 # 26 Exhibit 15 # 27 Exhibit 16 # 28 Exhibit 17 # 29 Exhibit 18 # 30 Exhibit 19 # 31 Exhibit 20 # 32 Exhibit 21 # 33 Exhibit 22 # 34 Exhibit 23 # 35 Exhibit 24 # 36 Exhibit 25 # 37 Exhibit 26 # 38 Exhibit 27 # 39 Exhibit 28 # 40 Exhibit 29 # 41 Exhibit 30 # 42 Exhibit 31 # 43 Exhibit 32 # 44 Exhibit 33 # 45 Exhibit 34 # 46 Exhibit 35) (Conrad, Charles) (Entered: 01/29/2024) |
| 01/29/2024 | 88 (644 pgs; 31 docs) | Witness List, Exhibit List (Filed By Galleria 2425 Owner, LLC ).(Related document(s):72 Motion to Convert Case from Chapter 11 to Chapter 7) (Attachments: # 1 Exhibit 1 Projections # 2 Exhibit 3 Internal Notes of NBK # 3 Exhibit 4 Amendment to Galleria 2425 JV # 4 Exhibit 5 Replacement of Zaheer # 5 Exhibit 6 Suitable replacement # 6 Exhibit 7 Include Sonder lease in appraisal # 7 Exhibit 8 Michael Carter email # 8 Exhibit 10 Jetall paying rent # 9 Exhibit 11 Groves vs Dalio case # 10 Exhibit 12 Motion to inspect # 11 Exhibit 13 Transcript before Judge Lopez # 12 Exhibit 14 Funds for operation # 13 Exhibit 17A Expungement # 14 Exhibit 17B Expungement # 15 Exhibit 17C Expungement # 16 Exhibit 18 Lease Agreement tenant # 17 Exhibit 19 Divorce appeal order # 18 Exhibit 20 Brochure of building # 19 Exhibit 21 Cushman Wakefield appraisal # 20 Exhibit 22 Michael Carter affidavit # 21 Exhibit 23 Deposition of Michael Carter # 22 Exhibit 24 Carter email on effective equity owner # 23 Exhibit 25 Vaxanix Bio # 24 Exhibit 26 Email from Zaheer # 25 Exhibit 27A Information on IWG # 26 Exhibit 27A1 Information on IWG # 27 Exhibit 28 Presentation on Sonder lease # 28 Exhibit 29 Change in Ownership of Galleria # 29 Exhibit 30 Request to Keep Zaheer # 30 Exhibit 31 Email on standstill agreement) (Baker, Reese) (Entered: 01/29/2024) |
| 01/29/2024 | 89 (13 pgs) | Omnibus Reply *In support of Motion Pursuant to 11 USC 1112(b) to Convert Chapter 11 Case to Chapter 7* (related document(s):72 Motion to Convert Case from Chapter 11 to Chapter 7). Filed by National Bank of Kuwait, S.A.K.P., New York Branch (Conrad, Charles) (Entered: 01/29/2024) |
| 01/30/2024 | 90 (404 pgs; 12 docs) | Witness List, Exhibit List (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ).(Related document(s):87 Witness List, Exhibit List) (Attachments: # 1 Exhibit 37 (Exhibit 36 to be filed under seal) # 2 Exhibit 38 # 3 Exhibit 39 # 4 Exhibit 40 # 5 Exhibit 41 # 6 Exhibit 42 # 7 Exhibit 42.1 # 8 Exhibit 43 # 9 Exhibit 43.1 # 10 Exhibit 43.2 # 11 Exhibit 43.3) (Conrad, Charles) (Entered: 01/30/2024) |

| | | |
|---|---|---|
| 01/30/2024 | 🔵 91<br>(9 pgs; 3 docs) | Debtor-In-Possession Monthly Operating Report for Filing Period ending 12/31/2023, $60220 disbursed (Filed By Galleria 2425 Owner, LLC ). (Attachments: # 1 Exhibit Bank statement # 2 Exhibit Income report) (Baker, Reese) (Entered: 01/30/2024) |
| 01/30/2024 | 🔵 92<br>(6 pgs; 2 docs) | Motion to Seal *Settlement Agreement and Other Confidential Documents* Filed by Creditor National Bank of Kuwait, S.A.K.P., New York Branch (Attachments: # 1 Exhibit A Proposed Order) (Conrad, Charles) (Entered: 01/30/2024) |
| 01/30/2024 | 🔵 93<br>(221 pgs; 7 docs) | Sealed Document *Confidential Settlement Agreement* (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ). (Attachments: # 1 ECF 90-1 Exhibit 37 # 2 ECF 90-2 Exhibit 38 # 3 ECF 90-3 Exhibit 39 # 4 ECF 90-4 Exhibit 40 # 5 ECF 90-7 Exhibit 42.1 # 6 ECF 90-8 Exhibit 43) (Conrad, Charles) (Entered: 01/30/2024) |
| 01/30/2024 | 🔵 94<br>(4 pgs) | Response (related document(s):72 Motion to Convert Case from Chapter 11 to Chapter 7). Filed by Galleria 2425 Owner, LLC (Baker, Reese) (Entered: 01/30/2024) |
| 01/30/2024 | 🔵 95<br>(24 pgs) | Chapter 11 Plan of Reorganization Filed by Galleria 2425 Owner, LLC. (Baker, Reese) (Entered: 01/30/2024) |
| 01/30/2024 | 🔵 96<br>(43 pgs) | Disclosure Statement Filed by Galleria 2425 Owner, LLC. (Baker, Reese) (Entered: 01/30/2024) |
| 01/31/2024 | 🔵 97 | Courtroom Minutes. Time Hearing Held: 11:00. Appearances: Reese Baker for the debtor, Jana Whitworth for the US Trustee,. (Related document(s):67 Application to Employ, 72 Motion to Convert Case from Chapter 11 to Chapter 7) Arguments heard on Application to Employ. National Bank of Kuwait opposed to the application and requested to know who is paying Mr. Baker. Application is Abated until Mr. Baker discloses who is paying him. Once the Court receives this information, the Court will set a response deadline and reset the application for hearing. Evidentiary hearing held on the Motion to Convert. Opening Statements made. Dward Darjean sworn. Direct and cross examination conducted. No cross examination by Mr. Bank. Debtor reserved their rights to recall the witness. Bank exhibits at ECF No 87-24 and 87-39 were admitted. Ali Choudhri sworn. Direct and cross examination conducted. No cross by Mr. Baker. Debtor to recall the witness. National Bank of Kuwait rest. Oral motion by Mr. Baker to Deny the Motion to Convert. Oral motion was Denied by the Court. Ali Choudhri recalled by Mr Baker. Direct and cross examination conducted. Exhibits at ECF No. 88-1 was admitted as a projection, 90-9, 90-7, 87-2 and 88-18 were admitted. Faisal Shah sworn and questioned by the Court and counsel. Closing arguments heard. The Court announced a finding for the record. The Court will prepare and enter an order. Chapter 11 Trustee to be appointed. (TraceyConrad) (Entered: 01/31/2024) |
| 01/31/2024 | 🔵 98<br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (3-Day) by National Bank of Kuwait S.A.K.P., New York Branch / Charles Conrad. This is to order a transcript of Hearing, January 31, 2024 before Judge Jeffrey P. Norman. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ). (Conrad, Charles) Electronically forwarded to Veritext Legal Solutions on |

| | | |
|---|---|---|
| | | 2/1/2024. Estimated completion date: 2/4/2024. Modified on 2/1/2024 (AaronJackson). (Entered: 01/31/2024) |
| 01/31/2024 | 🔵 99 (1 pg) | Order Abating Motion to Convert Case to Chapter 7 and Appointing Chapter 11 Trustee. (Related Doc # 72). Trustee Signed on 1/31/2024. (MarioRios) (Entered: 01/31/2024) |
| 02/01/2024 | 🔵 100 (1 pg) | Order Abating Application to Employ (Related Doc # 67) Signed on 2/1/2024. (MarioRios) (Entered: 02/01/2024) |
| 02/01/2024 | 🔵 101 (1 pg) | Order Mooting Motion To Seal (Related Doc # 92) Signed on 2/1/2024. (MarioRios) (Entered: 02/01/2024) |
| 02/01/2024 | 🔵 102 (1 pg) | Order Abating Rulings Signed on 2/1/2024 (Related document(s):81 Application to Employ, 95 Chapter 11 Plan, 96 Disclosure Statement) (MarioRios) (Entered: 02/01/2024) |
| 02/01/2024 | 🔵 103 (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 1/31/2024 10:59:34 AM ]. File Size [ 29079 KB ]. Run Time [ 01:00:35 ]. (admin). (Entered: 02/01/2024) |
| 02/01/2024 | 🔵 104 (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 1/31/2024 12:01:20 PM ]. File Size [ 10768 KB ]. Run Time [ 00:22:26 ]. (admin). (Entered: 02/01/2024) |
| 02/01/2024 | 🔵 105 (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 1/31/2024 12:26:47 PM ]. File Size [ 49448 KB ]. Run Time [ 01:43:01 ]. (admin). (Entered: 02/01/2024) |
| 02/01/2024 | 🔵 106 (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 1/31/2024 2:19:40 PM ]. File Size [ 63063 KB ]. Run Time [ 02:11:23 ]. (admin). (Entered: 02/01/2024) |
| 02/02/2024 | 🔵 107 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Ali Choudhri. This is to order a transcript of Hearing, 1/31/2024 before Judge Jeffrey P. Norman. Court Reporter/Transcriber: Veritext Legal Solutions. (BrendaLacy) Copy request electronically forwarded to Veritext Legal Solutions on 2/2/2024. Estimated completion date is 2/3/2024. Modified on 2/2/2024 (DanielBerger). (Entered: 02/02/2024) |
| 02/03/2024 | 🔵 108 (4 pgs) | BNC Certificate of Mailing. (Related document(s):99 Order on Motion to Convert Case to Chapter 7) No. of Notices: 32. Notice Date 02/03/2024. (Admin.) (Entered: 02/03/2024) |
| 02/03/2024 | 🔵 109 (4 pgs) | BNC Certificate of Mailing. (Related document(s):100 Order on Application to Employ) No. of Notices: 4. Notice Date 02/03/2024. (Admin.) (Entered: 02/03/2024) |
| 02/03/2024 | 🔵 110 (4 pgs) | BNC Certificate of Mailing. (Related document(s):102 Generic Order) No. of Notices: 4. Notice Date 02/03/2024. (Admin.) (Entered: 02/03/2024) |

| | | |
|---|---|---|
| 02/03/2024 | 🔘 111<br>(3 pgs) | BNC Certificate of Mailing. (Related document(s):101 Order on Motion to Seal) No. of Notices: 1. Notice Date 02/03/2024. (Admin.) (Entered: 02/03/2024) |
| 02/05/2024 | 🔘 112<br>(5 pgs) | Notice *of Process Receipt and Return of service of subpoena to testify: Ali Choudhri*. (FrancesCarbia) (Entered: 02/06/2024) |
| 02/07/2024 | 🔘 113<br>(4 pgs) | Disclosure of Compensation of Attorney for Debtor (Filed By Galleria 2425 Owner, LLC ). (Baker, Reese) (Entered: 02/07/2024) |
| 02/09/2024 | 🔘 114<br>(11 pgs; 2 docs) | Emergency Motion *of THE UNITED STATES TRUSTEE FOR ORDER APPROVING APPOINTMENT OF CHRISTOPHER R. MURRAY AS CHAPTER 11 TRUSTEE (in compliance with the Order entered at ECF 99)* Filed by U.S. Trustee US Trustee (Attachments: # 1 Proposed Order [proposed] Order Approving Appt) (Whitworth, Jana) (Entered: 02/09/2024) |
| 02/09/2024 | 🔘 115<br>(12 pgs; 2 docs) | Motion for Relief from Stay *to Liquidate Claims in Pending Proceeding*. Fee Amount $199. Filed by Creditor Sonder USA Inc. Hearing scheduled for 2/28/2024 at 09:30 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order) (Wilson, Broocks) (Entered: 02/09/2024) |
| 02/09/2024 | 🔘 116<br>(1 pg) | Order Granting Emergency Motion Appointing Christopher Murray (Related Doc # 114) Signed on 2/9/2024. (MarioRios) (Entered: 02/09/2024) |
| 02/09/2024 | 🔘 117<br>(4 pgs) | US Trustee's Notice *of Appointment of Christopher R. Murray as Chapter 11 Trustee*. (Whitworth, Jana) (Entered: 02/09/2024) |
| 02/11/2024 | 🔘 118<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):116 Order on Emergency Motion) No. of Notices: 4. Notice Date 02/11/2024. (Admin.) (Entered: 02/11/2024) |
| 02/11/2024 | 🔘 119<br>(7 pgs) | BNC Certificate of Mailing. (Related document(s):117 US Trustee's Notice) No. of Notices: 32. Notice Date 02/11/2024. (Admin.) (Entered: 02/11/2024) |
| 02/12/2024 | 🔘 120<br>(33 pgs; 4 docs) | Application to Employ Shannon & Lee LLP as Bankruptcy Counsel to Chapter 11 Trustee. Objections/Request for Hearing Due in 21 days. Filed by Trustee Christopher Murray Hearing scheduled for 3/14/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Exhibit A - Engagement Letter # 2 Exhibit B - Shannon Declaration # 3 Proposed Order) (Shannon, R. J.) (Entered: 02/12/2024) |
| 02/13/2024 | 🔘 121<br>(2 pgs) | Bond *of Chapter 11 Trustee of $300,000* (Murray, Christopher) (Entered: 02/13/2024) |
| 02/20/2024 | 🔘 122<br>(3 pgs) | Stipulation By Christopher Murray and Sonder USA Inc. to Continue Hearing and Extend Response Deadline regarding Sonder USA Inc.'s Motion to Modify the Stay to Allow Liquidation of Claim. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Christopher Murray ).(Related document(s):115 Motion for Relief From Stay) (Shannon, R. J.) (Entered: 02/20/2024) |

| | | |
|---|---|---|
| 02/20/2024 | 🌐 123<br>(3 pgs) | Stipulation and Agreed Order Setting Hearing Signed on 2/20/2024 (Related document(s):115 Motion for Relief From Stay) **Hearing scheduled for 3/27/2024 at 09:30 AM at Houston, Courtroom 403 (JPN).** (MarioRios) (Entered: 02/20/2024) |
| 02/22/2024 | 🌐 124<br>(6 pgs) | BNC Certificate of Mailing. (Related document(s):123 Order Setting Hearing) No. of Notices: 5. Notice Date 02/22/2024. (Admin.) (Entered: 02/22/2024) |
| 03/08/2024 | 🌐 125<br>(3 pgs) | Order Granting Application to Employ (Related Doc # 120) Signed on 3/8/2024. (MarioRios) (Entered: 03/08/2024) |
| 03/10/2024 | 🌐 126<br>(6 pgs) | BNC Certificate of Mailing. (Related document(s):125 Order on Application to Employ) No. of Notices: 6. Notice Date 03/10/2024. (Admin.) (Entered: 03/11/2024) |
| 03/15/2024 | 🌐 127<br>(8 pgs) | Motion for 2004 Examination. Filed by Debtor Galleria 2425 Owner, LLC (Baker, Reese) (Entered: 03/15/2024) |
| 03/15/2024 | 🌐 128<br>(7 pgs) | Motion for 2004 Examination. Filed by Debtor Galleria 2425 Owner, LLC (Baker, Reese) (Entered: 03/15/2024) |
| 03/15/2024 | 🌐 129<br>(8 pgs) | Amended Motion for 2004 Examination. Filed by Debtor Galleria 2425 Owner, LLC (Baker, Reese) (Entered: 03/15/2024) |
| 03/15/2024 | 🌐 130<br>(7 pgs) | Amended Motion for 2004 Examination. Filed by Debtor Galleria 2425 Owner, LLC (Baker, Reese) (Entered: 03/15/2024) |
| 03/20/2024 | 🌐 131<br>(12 pgs) | Operating Report for Filing Period January 2024, $112.00 disbursed (Filed By Christopher R Murray ). (Murray, Christopher) (Entered: 03/20/2024) |
| 03/20/2024 | 🌐 132<br>(9 pgs) | Operating Report for Filing Period February 2024, $0.00 disbursed (Filed By Christopher R Murray ). (Murray, Christopher) (Entered: 03/20/2024) |
| 03/20/2024 | 🌐 133<br>(33 pgs; 4 docs) | Emergency Motion - *Trustee's Emergency Motion for Interim and Final Orders Authorizing the Use of Cash Collateral* Filed by Trustee Christopher R Murray (Attachments: # 1 Exhibit A - Budget # 2 Proposed Order (Interim) # 3 Proposed Order (Final)) (Shannon, R. J.) (Entered: 03/20/2024) |
| 03/20/2024 | 🌐 134<br>(42 pgs; 9 docs) | Motion to Quash *Rule 2004 Examination Notices re 129 130* Filed by Creditor National Bank of Kuwait, S.A.K.P., New York Branch (Attachments: # 1 Exhibit A Proposed Order # 2 Conrad Declaration ISO Motion # 3 Exhibit 1 # 4 Exhibit 2 # 5 Exhibit 3 # 6 Exhibit 4 # 7 Exhibit 5 # 8 Exhibit 6 to be filed under seal) (Conrad, Charles) (Entered: 03/20/2024) |
| 03/20/2024 | 🌐 135<br>(6 pgs) | Motion to Seal *National Bank of Kuwait's Motion to File Under Seal Settlement Agreement* Filed by Creditor National Bank of Kuwait, S.A.K.P., New York Branch (Conrad, Charles) (Entered: 03/20/2024) |
| 03/20/2024 | 🌐 136<br>(16 pgs) | Sealed Document *Exhibit 6 to Conrad Declaration [134-8]* (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ). (Conrad, |

| | | |
|---|---|---|
| | | Charles) (Entered: 03/20/2024) |
| 03/20/2024 | 🔵 137<br>(1 pg) | Order Setting Hearing Signed on 3/20/2024 (Related document(s):133 Emergency Motion for Interim and Final Orders Authorizing the Use of Cash Collateral) **Hearing scheduled for 3/22/2024 at 09:45 AM at telephone and video conference.** (trc4) (Entered: 03/20/2024) |
| 03/20/2024 | 🔵 138<br>(3 pgs) | Stipulation By Christopher R Murray and Sonder USA Inc.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Christopher R Murray ).(Related document(s):115 Motion for Relief From Stay) (Shannon, R. J.) (Entered: 03/20/2024) |
| 03/21/2024 | 🔵 139<br>(1 pg) | Order Granting Motion To Quash (Related Doc # 134) Signed on 3/21/2024. (mar4) (Entered: 03/21/2024) |
| 03/21/2024 | 🔵 140<br>(3 pgs) | Second Stipulation and Agreed Order Continuing Hearing Signed on 3/21/2024 (Related document(s):115 Motion for Relief From Stay) **Hearing scheduled for 5/1/2024 at 09:30 AM at Houston, Courtroom 403 (JPN).** (mar4) (Entered: 03/21/2024) |
| 03/21/2024 | 🔵 141<br>(1 pg) | Order Granting Motion To Seal (Related Doc # 135) Signed on 3/21/2024. (mar4) (Entered: 03/21/2024) |
| 03/21/2024 | 🔵 142<br>(6 pgs) | Certificate *of Service regarding Order Setting Hearing* (Filed By Christopher R Murray ).(Related document(s):133 Emergency Motion, 137 Order Setting Hearing) (Shannon, R. J.) (Entered: 03/21/2024) |
| 03/21/2024 | 🔵 143<br>(541 pgs; 18 docs) | Witness List, Exhibit List (Filed By Christopher R Murray ).(Related document(s):133 Emergency Motion) (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Exhibit # 7 Exhibit # 8 Exhibit # 9 Exhibit # 10 Exhibit # 11 Exhibit # 12 Exhibit # 13 Exhibit # 14 Exhibit # 15 Exhibit # 16 Exhibit # 17 Exhibit) (Shannon, R. J.) (Entered: 03/21/2024) |
| 03/21/2024 | 🔵 144<br>(4 pgs) | Objection *of Certain Taxing Authorities to the Trustee's Emergency Motion for Interim and Final Orders Authorizing the Use of Cash Collateral* (related document(s):133 Emergency Motion). Filed by City of Houston, Houston Community College System, Houston ISD (Andresen, Jeannie) (Entered: 03/21/2024) |
| 03/21/2024 | 🔵 145<br>(36 pgs; 3 docs) | Motion *for Entry of an Order (A) Authorizing the Trustee to Enter into an Agreement with Jones Lang LaSalle Americas, Inc. to Serve as Property Manager and (B) Granting Related Relief* Filed by Trustee Christopher R Murray Hearing scheduled for 4/24/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Exhibit A - JLL Agreement # 2 Proposed Order) (Shannon, R. J.) (Entered: 03/21/2024) |
| 03/21/2024 | 🔵 146<br>(3 pgs; 2 docs) | Ex Parte Motion to Expedite Hearing (related document(s):145 Generic Motion). Filed by Trustee Christopher R Murray (Attachments: # 1 Proposed Order) (Shannon, R. J.) (Entered: 03/21/2024) |
| 03/22/2024 | 🔵 147<br>(5 pgs) | Objection (related document(s):133 Emergency Motion). Filed by 2425 WL, LLC (Sather, Stephen) (Entered: 03/22/2024) |

| | | |
|---|---|---|
| 03/22/2024 | ⬤ 148<br>(17 pgs; 2 docs) | Adversary case 24-03043. Nature of Suit: (21 (Validity, priority or extent of lien or other interest in property)),(14 (Recovery of money/property - other)) Complaint by 2425 WL, LLC against National Bank of Kuwait, S.A.K.P., New York Branch. Fee Amount $350 (Attachments: # 1 Exhibit Adverary Cover Sheet) (Sather, Stephen) (Entered: 03/22/2024) |
| 03/22/2024 | ⬤ 149<br>(8 pgs) | Objection *TO CHAPTER 11 TRUSTEES MOTION TO USE CASH COLLATERAL* (related document(s):133 Emergency Motion). Filed by Galleria 2425 Owner, LLC (Baker, Reese) (Entered: 03/22/2024) |
| 03/22/2024 | ⬤ 150<br>(79 pgs; 11 docs) | Witness List, Exhibit List (Filed By Galleria 2425 Owner, LLC ). (Related document(s):133 Emergency Motion) (Attachments: # 1 Exhibit 1 Settlement Terms by NBK # 2 Exhibit 2 Proposed Budget # 3 Exhibit 3 Letter of Passman Jones # 4 Exhibit 4 Phllips letter # 5 Exhibit 5 Vaxanix lease terms # 6 Exhibit 6 Phoenix lease # 7 Exhibit 7 2425 WL, LLC Proof of claim # 8 Exhibit 8 Deed of Trust of 2425 WL, LLC # 9 Exhibit 9 Affidavit of JLL officer # 10 Exhibit 10 Letter to trustee) (Baker, Reese) (Entered: 03/22/2024) |
| 03/22/2024 | ⬤ 151<br>(1 pg) | Notice of Appearance and Request for Notice Filed by Ali Choudhri (th4) (Entered: 03/22/2024) |
| 03/22/2024 | ⬤ 152<br>(1 pg) | Order Setting Hearing Signed on 3/22/2024 (Related document(s):146 Motion to Expedite Hearing) **Hearing scheduled for 3/26/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (mar4). Related document(s) 145 Motion *for Entry of an Order (A) Authorizing the Trustee to Enter into an Agreement with Jones Lang LaSalle Americas, Inc. to Serve as Property Manager and (B) Granting Related Relief* filed by Trustee Christopher R Murray. Modified on 3/27/2024 (MarioRios). (Entered: 03/22/2024)** |
| 03/22/2024 | ⬤ 153 | Courtroom Minutes. Time Hearing Held: 9:45. Appearances: Reese Baker for the Debtor, Patrick Fitzmaurice, Andrew Troop and Charles Conrad for National Bank of Kuwait, Jana Whitworth for the US Trustee, Stephen Sather for 2425W LLC, John Dillman and Jeannie Andresen for Various Counties, RJ Shannon for the Trustee, and Ali Choudhri for self. (Related document(s):133 Emergency Motion For Interim Use of Cash Collatera) Objections filed by the Debtor, Taxing Authorities, and 2425WLLC. Opening statements made. Trustee exhibits at ECF No. 143-3,4,7,8,9, and 10 were admitted. Christopher Murray sworn. Direct and cross examination conducted. Parties rest. The Court will enter the proposed order at docket [133-2]. A Final Cash Collateral hearing will be set for April 5, 2024 at 9:00 am. The hearing on ECF No. 145 will reset to the same date and time. (trc4) (Entered: 03/22/2024) |
| 03/22/2024 | ⬤ 154<br>(7 pgs) | Interim Order Authorizing Cash Collateral and Setting Hearing Signed on 3/22/2024 (Related document(s):133 Emergency Motion) **Hearing scheduled for 4/5/2024 at 09:00 AM at Houston, Courtroom 403 (JPN).** (mar4) (Entered: 03/22/2024) |
| 03/22/2024 | ⬤ 155<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):137 Order Setting Hearing) No. of Notices: 5. Notice Date 03/22/2024. (Admin.) (Entered: 03/23/2024) |

| | | |
|---|---|---|
| 03/23/2024 | ⊙ 156 (4 pgs) | BNC Certificate of Mailing. (Related document(s):139 Order on Motion To Quash) No. of Notices: 5. Notice Date 03/23/2024. (Admin.) (Entered: 03/23/2024) |
| 03/23/2024 | ⊙ 157 (6 pgs) | BNC Certificate of Mailing. (Related document(s):140 Order Setting Hearing) No. of Notices: 5. Notice Date 03/23/2024. (Admin.) (Entered: 03/23/2024) |
| 03/23/2024 | ⊙ 158 (3 pgs) | BNC Certificate of Mailing. (Related document(s):141 Order on Motion to Seal) No. of Notices: 1. Notice Date 03/23/2024. (Admin.) (Entered: 03/23/2024) |
| 03/24/2024 | ⊙ 159 (4 pgs) | BNC Certificate of Mailing. (Related document(s):152 Order Setting Hearing) No. of Notices: 6. Notice Date 03/24/2024. (Admin.) (Entered: 03/24/2024) |
| 03/24/2024 | ⊙ 160 (10 pgs) | BNC Certificate of Mailing. (Related document(s):154 Order Setting Hearing) No. of Notices: 6. Notice Date 03/24/2024. (Admin.) (Entered: 03/24/2024) |
| 03/25/2024 | ⊙ 161 (2 pgs) | Summons Service Executed on National Bank of Kuwait, S.A.K.P., New York Branch 3/25/2024. (Sather, Stephen) (Entered: 03/25/2024) |
| 03/28/2024 | ⊙ 162 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Ali Choudhri. This is to order a transcript of Proceedings held on 3/22/2024 before Judge Jeffrey P. Norman. Court Reporter/Transcriber: Access Transcripts. (mew4) Electronically forwarded to Access Transcripts, LLC on 3/28/2024. Estimated completion date: 3/29/2024. Modified on 3/28/2024 (AaronJackson). (Entered: 03/28/2024) |
| 04/01/2024 | ⊙ 163 (31 pgs; 2 docs) | First Amended Chapter 11 Plan Filed by Galleria 2425 Owner, LLC. (Attachments: # 1 Exhibit Projections) (Baker, Reese) (Entered: 04/01/2024) |
| 04/01/2024 | ⊙ 164 (50 pgs; 2 docs) | Disclosure Statement Filed by Galleria 2425 Owner, LLC. (Attachments: # 1 Exhibit Projections) (Baker, Reese) (Entered: 04/01/2024) |
| 04/02/2024 | ⊙ 165 (39 pgs; 2 docs) | Transcript RE: Emergency Motion for Interim Use of Cash Collateral held on 3/22/24 before Judge Jeffrey P. Norman. Transcript is available for viewing in the Clerk's Office. Within 21 days, parties are advised to comply with privacy requirements of Fed. R. Bank. P. 9037, ensuring that certain protected information is redacted from transcripts prior to their availability on PACER. Filed by Transcript access will be restricted through 07/1/2024. (AccessTranscripts) (Entered: 04/02/2024) |
| 04/02/2024 | ⊙ 166 (1 pg) | Order Setting Hearing Signed on 4/2/2024 (Related document(s):164 Disclosure Statement **Hearing scheduled for 5/3/2024 at 09:30 AM at Houston, Courtroom 403 (JPN).** (mar4) (Entered: 04/02/2024) |
| 04/02/2024 | ⊙ 167 (6 pgs) | Objection *to Final Cash Collateral Order* (related document(s):133 Emergency Motion). Filed by 2425 WL, LLC (Sather, Stephen) (Entered: 04/02/2024) |

| | | |
|---|---|---|
| 04/02/2024 | 168 (10 pgs) | Objection *OF GALLERIA 2425 OWNER, LLC TO CHAPTER 11 TRUSTEES MOTION TO USE CASH COLLATERAL AND APPLICATION TO EMPLOY JONES LANG LASALLE AMERICAS, INC. AS THE PROPERTY MANAGER* (related document(s):133 Emergency Motion, 145 Generic Motion). Filed by Galleria 2425 Owner, LLC (Baker, Reese) (Entered: 04/02/2024) |
| 04/03/2024 | 169 (1 pg) | **Order on Hearing on April 5, 2024.** Signed on 4/3/2024 (Related document(s):133 Emergency Motion, 145 Generic Motion) (mar4) (Entered: 04/03/2024) |
| 04/03/2024 | 170 (20 pgs; 4 docs) | Witness List (Filed By City of Houston, Houston Community College System, Houston ISD ).(Related document(s):133 Emergency Motion, 144 Objection) (Attachments: # 1 Exhibit 1 - City of Houston POC # 2 Exhibit EXH 2 - Houston ISD POC # 3 Exhibit EXH 3 - Houston Comm College POC) (Andresen, Jeannie) (Entered: 04/03/2024) |
| 04/03/2024 | 171 (579 pgs; 21 docs) | Witness List, Exhibit List (Filed By Christopher R Murray ).(Related document(s):133 Emergency Motion, 145 Generic Motion) (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Exhibit # 7 Exhibit # 8 Exhibit # 9 Exhibit # 10 Exhibit # 11 Exhibit # 12 Exhibit # 13 Exhibit # 14 Exhibit # 15 Exhibit # 16 Exhibit # 17 Exhibit # 18 Exhibit # 19 Exhibit # 20 Exhibit) (Shannon, R. J.) (Entered: 04/03/2024) |
| 04/03/2024 | 172 (27 pgs; 3 docs) | Notice *of Revised Proposed Final Cash Collateral Order*. (Related document(s):133 Emergency Motion, 145 Generic Motion) Filed by Christopher R Murray (Attachments: # 1 Exhibit A - Redline of Proposed Final Cash Collateral Order # 2 Exhibit B - Revised Proposed Final Cash Collateral Order) (Shannon, R. J.) (Entered: 04/03/2024) |
| 04/03/2024 | 173 (1000 pgs; 48 docs) | Witness List, Exhibit List (Filed By Galleria 2425 Owner, LLC ). (Related document(s):133 Emergency Motion, 145 Generic Motion) (Attachments: # 1 Exhibit 1 # 2 Exhibit 3 Internal Notes # 3 Exhibit 4 # 4 Exhibit 5 # 5 Exhibit 6 # 6 Exhibit 7 # 7 Exhibit 8 # 8 Exhibit 10 # 9 Exhibit 11 # 10 Exhibit 12 # 11 Exhibit 13 # 12 Exhibit 14 # 13 Exhibit 15 # 14 Exhibit 15A # 15 Exhibit 16 # 16 Exhibit 16A # 17 Exhibit 17A # 18 Exhibit 17B # 19 Exhibit 17C # 20 Exhibit 18 # 21 Exhibit 19 # 22 Exhibit 20 # 23 Exhibit 21 # 24 Exhibit 22 # 25 Exhibit 23 # 26 Exhibit 24 # 27 Exhibit 25 # 28 Exhibit 26 # 29 Exhibit Exh 27 # 30 Exhibit 27A # 31 Exhibit 27A 1 # 32 Exhibit 27B # 33 Exhibit 28 # 34 Exhibit 29 # 35 Exhibit 30 # 36 Exhibit 31 # 37 Exhibit 33 # 38 Exhibit 36 # 39 Exhibit 37 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42 # 43 Exhibit 43 # 44 Exhibit 44 # 45 Exhibit 45 # 46 Exhibit 46 # 47 Exhibit 47) (Baker, Reese) (Entered: 04/03/2024) |
| 04/03/2024 | 174 (53 pgs; 3 docs) | Witness List, Exhibit List (Filed By Galleria 2425 Owner, LLC ). (Related document(s):133 Emergency Motion, 145 Generic Motion, 173 Witness List, Exhibit List) (Attachments: # 1 Exhibit 39 # 2 Exhibit 48) (Baker, Reese) (Entered: 04/03/2024) |
| 04/04/2024 | 175 (4 pgs; 3 docs) | MOTION to Appear Pro Hac Vice for Jack Rose (Fee Paid: $100, receipt number A25191348) Filed by Attorney Jack Rose Hearing scheduled for 4/10/2024 at 11:00 AM at Houston, Courtroom 403 |

| | | |
|---|---|---|
| | | (JPN). (Attachments: # 1 Exhibit Federal bar # 2 Exhibit State bar) (Baker, Reese) (Entered: 04/04/2024) |
| 04/04/2024 | 176 (1 pg) | Order Granting Motion To Appear pro hac vice for Jack J Rose (Related Doc # 175) Signed on 4/4/2024. (mar4) (Entered: 04/04/2024) |
| 04/04/2024 | 177 (20 pgs; 2 docs) | Omnibus Reply - *Trustee's Omnibus Reply to Objections to Cash Collateral Motion and Motion to Enter into JLL Agreement* (related document(s):133 Emergency Motion, 145 Generic Motion). Filed by Christopher R Murray (Attachments: # 1 Exhibit A) (Shannon, R. J.) (Entered: 04/04/2024) |
| 04/04/2024 | 178 (7 pgs) | Response (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ).(Related document(s):167 Objection, 168 Objection) (Conrad, Charles) (Entered: 04/04/2024) |
| 04/04/2024 | 179 (16 pgs; 2 docs) | Notice *OF REVISED PROPOSED CASH COLLATERAL ORDER FILED BY GALLERIA 2425 OWNER, LLC AND 2425 WL, LLC.* (Related document(s):133 Emergency Motion) Filed by Galleria 2425 Owner, LLC (Attachments: # 1 Proposed Order) (Baker, Reese) (Entered: 04/04/2024) |
| 04/04/2024 | 180 (4 pgs) | BNC Certificate of Mailing. (Related document(s):165 Transcript) No. of Notices: 5. Notice Date 04/04/2024. (Admin.) (Entered: 04/04/2024) |
| 04/04/2024 | 181 (4 pgs) | BNC Certificate of Mailing. (Related document(s):166 Order Setting Hearing) No. of Notices: 5. Notice Date 04/04/2024. (Admin.) (Entered: 04/04/2024) |
| 04/05/2024 | 182 (2 pgs) | Notice *of Intended Demonstrative Exhibit*. (Related document(s):133 Emergency Motion, 145 Generic Motion, 179 Notice) Filed by Christopher R Murray (Shannon, R. J.) (Entered: 04/05/2024) |
| 04/05/2024 | 183 | Courtroom Minutes. Time Hearing Held: 9:00. Appearances: RJ Shannon for the Trustee, Reese Baker for the Debtor, Jack Rose for 2425WL,LLC, Patrick Fitzmaurice for National Bank of Kuwait, Jeannie Andresen for Harris County, et al., Stephen Sather for 2425WL, LLC., Robert MacNaughton for 2425 West Loop, LLC. (Related document(s):133 Emergency Motion to Approve Cash Collateral, 145 Motion For Entry of Order) No opposition to 145. Relief requested is granted. The Court will sign the proposed order. Evidentiary hearing held on 133. Arguments heard. Chris Murray sworn. Direct and cross examination conducted. Trustee exhibits 171-1 thru 171-5, 171-10 thru 171-15 were admitted. Closing statement made. Matter taken under advisement. (trc4) (Entered: 04/05/2024) |
| 04/05/2024 | 184 (2 pgs) | Order Granting Trustee's Motion For Entry of an Order (A) Authorizing the Trustee to Ener into an Agreement with Jones Lang Lasalle Americas, Inc. to Serve as Property Manager and (B) Granting Related Relief (Related Doc # 145) Signed on 4/5/2024. (trc4) (Entered: 04/05/2024) |
| 04/05/2024 | 185 (1 pg) | PDF with attached Audio File. Court Date & Time [ 4/5/2024 8:59:45 AM ]. File Size [ 36998 KB ]. Run Time [ 01:17:05 ]. (admin). (Entered: 04/05/2024) |

| | | |
|---|---|---|
| 04/05/2024 | 🔵 186<br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (3-Day) by National Bank of Kuwait, S.A.K. P., New York Branch / Charles Conrad. This is to order a transcript of Hearing, April 5, 2024 before Judge Jeffrey P. Norman. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ). (Conrad, Charles) Electronically Forwarded to Veritext Legal Solutions on 04/09/2024. Estimated Date of Completion: 04/12/2024. Modified on 4/9/2024 (BenjaminRomero). (Entered: 04/05/2024) |
| 04/05/2024 | 🔵 187<br>(10 pgs) | Final Order Authorizing the Trustee to Use Cash Collateral (Related Doc # 133) Signed on 4/5/2024. (trc4) (Entered: 04/05/2024) |
| 04/05/2024 | 🔵 188<br>(50 pgs; 2 docs) | Motion For Sale of *Real Property* Free and Clear of Liens as Described in Section 363(f). Objections/Request for Hearing Due in 21 days. Fee Amount $199. Filed by Trustee Christopher R Murray Hearing scheduled for 5/1/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order) (Shannon, R. J.) (Entered: 04/05/2024) |
| 04/05/2024 | 🔵 189<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):169 Generic Order) No. of Notices: 5. Notice Date 04/05/2024. (Admin.) (Entered: 04/05/2024) |
| 04/06/2024 | 🔵 190<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):176 Order on Motion to Appear pro hac vice) No. of Notices: 5. Notice Date 04/06/2024. (Admin.) (Entered: 04/06/2024) |
| 04/07/2024 | 🔵 191<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):184 Generic Order) No. of Notices: 5. Notice Date 04/07/2024. (Admin.) (Entered: 04/07/2024) |
| 04/07/2024 | 🔵 192<br>(13 pgs) | BNC Certificate of Mailing. (Related document(s):187 Order on Emergency Motion) No. of Notices: 5. Notice Date 04/07/2024. (Admin.) (Entered: 04/07/2024) |
| 04/09/2024 | 🔵 193<br>(4 pgs) | Certificate *Of Service* (Filed By Galleria 2425 Owner, LLC ).(Related document(s):166 Order Setting Hearing) (Baker, Reese) (Entered: 04/09/2024) |
| 04/10/2024 | 🔵 194<br>(24 pgs) | Chapter 11 Plan of Reorganization Filed by National Bank of Kuwait, S.A.K.P., New York Branch. (Conrad, Charles) (Entered: 04/10/2024) |
| 04/10/2024 | 🔵 195<br>(46 pgs) | Disclosure Statement Filed by National Bank of Kuwait, S.A.K.P., New York Branch. (Conrad, Charles) (Entered: 04/10/2024) |
| 04/10/2024 | 🔵 196<br>(47 pgs; 3 docs) | Motion for Approval *Motion for Entry of Order (I) Conditionally Approving Disclosure Statement; (II) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (III) Establishing Plan and Disclosure Statement Objection and Reply Deadlines and Related Procedures, (IV) Approving the Solicitation Procedures, (V) Approving the Combined Hearing Notice, and (VI) Granting Related Relief.* Objections/Request for Hearing Due in 21 days. Filed by Creditor National Bank of Kuwait, S.A.K.P., New York Branch (Attachments: # 1 Exhibit A - Proposed Order # 2 Service List) (Conrad, Charles) (Entered: 04/10/2024) |

| 04/10/2024 | 🔵 197<br>(46 pgs; 2 docs) | Notice *of Proposed Stalking Horse Agreement*. (Related document(s):188 Motion for Sale of Property) Filed by Christopher R Murray (Attachments: # 1 Exhibit A - Stalking Horse Agreement) (Shannon, R. J.) (Entered: 04/10/2024) |
| 04/11/2024 | 🔵 198<br>(1 pg) | Order Setting Hearing Signed on 4/11/2024 (Related document(s):195 Disclosure Statement, 196 Motion for Approval) **Hearing scheduled for 4/25/2024 at 02:30 PM at Houston, Courtroom 403 (JPN).** (mar4) Modified on 4/11/2024 (MarioRios). (Entered: 04/11/2024) |
| 04/12/2024 | 🔵 199<br>(6 pgs) | Declaration re: *Unsworn Declaration of Mailing* (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ).(Related document(s):198 Order Setting Hearing) (Conrad, Charles) (Entered: 04/12/2024) |
| 04/12/2024 | 🔵 200<br>(6 pgs) | Declaration re: *Unsworn Declaration of Mailing* (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ).(Related document(s):196 Motion for Approval) (Conrad, Charles) (Entered: 04/12/2024) |
| 04/12/2024 | 🔵 201<br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Ali Choudri. This is to order a transcript of Motion hearing on 4/5/24 before Judge Jeffrey P. Norman. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Ali Choudri ). (cmk4) Copy request electronically forwarded to Veritext Legal Solutions on 4/15/2024. Estimated completion date is 4/16/2024. Modified on 4/15/2024 (DanielBerger). (Entered: 04/12/2024) |
| 04/12/2024 | 🔵 202<br>(50 pgs; 2 docs) | Transcript RE: held on 04/05/24 before Judge Jeffrey P. Norman. Transcript is available for viewing in the Clerk's Office. Within 21 days, parties are advised to comply with privacy requirements of Fed. R. Bank. P. 9037, ensuring that certain protected information is redacted from transcripts prior to their availability on PACER. Filed by Transcript access will be restricted through 07/11/2024. (VeritextLegalSolutions) (Entered: 04/12/2024) |
| 04/13/2024 | 🔵 203<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):198 Order Setting Hearing) No. of Notices: 5. Notice Date 04/13/2024. (Admin.) (Entered: 04/13/2024) |
| 04/14/2024 | 🔵 204<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Kyung Shik Lee Filed by on behalf of Christopher R Murray (Lee, Kyung) (Entered: 04/14/2024) |
| 04/17/2024 | 🔵 205<br>(32 pgs; 4 docs) | Application to Employ Hilco Real Estate, LLC as Real Estate Broker. Objections/Request for Hearing Due in 21 days. Filed by Trustee Christopher R Murray Hearing scheduled for 5/15/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Exhibit 1 - Kaup Declaration # 2 Exhibit 2 - Engagement Agreement # 3 Proposed Order) (Shannon, R. J.) (Entered: 04/17/2024) |
| 04/17/2024 | 🔵 206<br>(4 pgs; 2 docs) | Ex Parte Motion to Expedite Hearing (related document(s):188 Motion for Sale of Property, 205 Application to Employ). Filed by Trustee Christopher R Murray (Attachments: # 1 Proposed Order) (Shannon, R. J.) (Entered: 04/17/2024) |

| | | |
|---|---|---|
| 04/17/2024 | 207<br>(7 pgs; 2 docs) | Motion to Continue Hearing On (related document(s):196 Motion for Approval). Filed by Creditor 2425 WL, LLC (Attachments: # 1 Proposed Order) (Sather, Stephen) (Entered: 04/17/2024) |
| 04/17/2024 | 208<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):202 Transcript) No. of Notices: 5. Notice Date 04/17/2024. (Admin.) (Entered: 04/17/2024) |
| 04/18/2024 | 209<br>(5 pgs) | Objection *TO TRUSTEES MOTION FOR EXPEDITED HEARING* (related document(s):206 Motion to Expedite Hearing). Filed by 2425 WL, LLC (Sather, Stephen) (Entered: 04/18/2024) |
| 04/18/2024 | 210<br>(14 pgs; 2 docs) | Motion For Sale of *Estate's Claims against Sonder USA Inc. and Sonder Canada, Inc.* Free and Clear of Liens as Described in Section 363(f). Objections/Request for Hearing Due in 21 days. Fee Amount $199. Filed by Trustee Christopher R Murray Hearing scheduled for 5/15/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order) (Shannon, R. J.) (Entered: 04/18/2024) |
| 04/18/2024 | 211<br>(5 pgs) | Motion to Withdraw as Attorney. Objections/Request for Hearing Due in 21 days. Filed by Creditor 2425 WL, LLC Hearing scheduled for 5/15/2024 at 11:00 AM at telephone and video conference. (Rose, Jack) (Entered: 04/18/2024) |
| 04/18/2024 | 212<br>(1 pg) | Order Setting Hearing Signed on 4/18/2024 (Related document(s):207 Motion to Continue/Reschedule Hearing) **Hearing scheduled for 4/22/2024 at 02:00 PM at Houston, Courtroom 403 (JPN).** (mar4) (Entered: 04/18/2024) |
| 04/18/2024 | 213<br>(1 pg) | Order Granting Motion to Expedite 206 and Setting Hearing Signed on 4/18/2024 (Related document(s):205 Application to Employ) **Hearing scheduled for 5/1/2024 at 11:00 AM at Houston, Courtroom 403 (JPN).** (mar4) Modified on 4/18/2024 (MarioRios). (Entered: 04/18/2024) |
| 04/18/2024 | 214<br>(8 pgs; 2 docs) | Response *Statement in Response to* (related document(s):207 Motion to Continue/Reschedule Hearing). Filed by National Bank of Kuwait, S.A.K.P., New York Branch (Attachments: # 1 Mailing Matrix) (Conrad, Charles) (Entered: 04/18/2024) |
| 04/19/2024 | 215<br>(4 pgs) | Certificate *of Service for Order Setting Hearing* (Filed By 2425 WL, LLC ).(Related document(s):207 Motion to Continue/Reschedule Hearing, 212 Order Setting Hearing) (Sather, Stephen) (Entered: 04/19/2024) |
| 04/19/2024 | 216<br>(8 pgs) | Motion to Reconsider (related document(s):133 Emergency Motion, 187 Order on Emergency Motion). Filed by Creditor 2425 WL, LLC (Sather, Stephen) (Entered: 04/19/2024) |
| 04/19/2024 | 217<br>(9 pgs; 2 docs) | Notice *of Supplemental Declaration of Eric Kaup in Support of the Trustee's Application to Employ Hilco Real Estate, LLC as Real Estate Broker Effective as of April 15, 2024.* (Related document(s):205 Application to Employ) Filed by Christopher R Murray (Attachments: # 1 Exhibit A - Supplemental Kaup Declaration) (Shannon, R. J.) (Entered: 04/19/2024) |

| | | |
|---|---|---|
| 04/19/2024 | 218 (4 pgs) | Certificate *of Service re Order Setting Hearing [ECF No. 213]* (Filed By Christopher R Murray ).(Related document(s):205 Application to Employ, 206 Motion to Expedite Hearing, 213 Order Setting Hearing) (Shannon, R. J.) (Entered: 04/19/2024) |
| 04/19/2024 | 219 (2 pgs) | Notice of Appearance and Request for Notice Filed by Melissa S Hayward Filed by on behalf of Hayward PLLC (Hayward, Melissa) (Entered: 04/19/2024) |
| 04/20/2024 | 220 (9 pgs) | Operating Report for Filing Period March 2024, $134,901.84 disbursed (Filed By Christopher R Murray ). (Murray, Christopher) (Entered: 04/20/2024) |
| 04/20/2024 | 221 (4 pgs) | BNC Certificate of Mailing. (Related document(s):212 Order Setting Hearing) No. of Notices: 5. Notice Date 04/20/2024. (Admin.) (Entered: 04/20/2024) |
| 04/20/2024 | 222 (4 pgs) | BNC Certificate of Mailing. (Related document(s):213 Order Setting Hearing) No. of Notices: 5. Notice Date 04/20/2024. (Admin.) (Entered: 04/20/2024) |
| 04/22/2024 | 223 (1 pg) | Order Denying Motion To Reconsider (Related Doc # 216) Signed on 4/22/2024. (mar4) (Entered: 04/22/2024) |
| 04/22/2024 | 224 (1 pg) | Order Denying Form of Order 210-1 Signed on 4/22/2024 (Related document(s):210 Motion for Sale of Property) (mar4) (Entered: 04/22/2024) |
| 04/22/2024 | 225 | Courtroom Minutes. Time Hearing Held: 2:00. Appearances: RJ Shannon for the Trustee, Reese Baker for the Debtor, Patrick Fitzmaurice for the NBK, Stephen Sather for 2425 WLoop, LLC. (Related document(s):207 Motion to Continue/Reschedule Hearing) Arguments heard. Matter taken under advisement. The Court will enter an order. (trc4) (Entered: 04/22/2024) |
| 04/22/2024 | 226 (8 pgs; 2 docs) | Amended Motion to Reconsider (related document(s):187 Order on Emergency Motion). Filed by Creditor 2425 WL, LLC Hearing scheduled for 5/22/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order) (Sather, Stephen) (Entered: 04/22/2024) |
| 04/22/2024 | 227 (1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 4/22/2024 2:02:38 PM ]. File Size [ 2512 KB ]. Run Time [ 00:05:14 ]. (admin). (Entered: 04/22/2024) |
| 04/22/2024 | 228 (2 pgs) | Order on Motion to Continue Hearing Signed on 4/22/2024 (Related document(s):207 Motion to Continue/Reschedule Hearing) (mar4) (Entered: 04/22/2024) |
| 04/23/2024 | 229 (4 pgs) | Disclosure of Compensation of Attorney for Debtor (Filed By Galleria 2425 Owner, LLC ). (Baker, Reese) (Entered: 04/23/2024) |
| 04/23/2024 | 230 (3 pgs) | Stipulation By Christopher R Murray and Sonder USA Inc. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Christopher R Murray ).(Related |

| | | |
|---|---|---|
| | | document(s):115 Motion for Relief From Stay) (Shannon, R. J.) (Entered: 04/23/2024) |
| 04/24/2024 | 231<br>(3 pgs) | Third Stipulation and Order Setting Hearing Signed on 4/24/2024 (Related document(s):115 Sonder USA Inc's Motion for Relief From Stay) **Hearing scheduled for 6/5/2024 at 09:30 AM at Houston, Courtroom 403 (JPN).** (mar4) (Entered: 04/24/2024) |
| 04/24/2024 | 232<br>(20 pgs; 3 docs) | Response/Objection Filed by Galleria 2425 Owner, LLC. (Related document(s):195 Disclosure Statement, 196 Motion for Approval) (Attachments: # 1 Exhibit A Information from Jerry Alexander # 2 Exhibit A1 Fact sheet on Jerry Alexander) (Baker, Reese) (Entered: 04/24/2024) |
| 04/24/2024 | 233<br>(7 pgs) | Objection (related document(s):196 Motion for Approval). Filed by 2425 WL, LLC (Sather, Stephen) (Entered: 04/24/2024) |
| 04/24/2024 | 234<br>(5 pgs) | Response/Objection Filed by Ali Choudhri. (Related document(s):195 Disclosure Statement) (dm4) (Entered: 04/24/2024) |
| 04/24/2024 | 235<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):223 Order on Motion To Reconsider) No. of Notices: 6. Notice Date 04/24/2024. (Admin.) (Entered: 04/24/2024) |
| 04/24/2024 | 236<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):224 Generic Order) No. of Notices: 6. Notice Date 04/24/2024. (Admin.) (Entered: 04/24/2024) |
| 04/24/2024 | 237<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):228 Generic Order) No. of Notices: 6. Notice Date 04/24/2024. (Admin.) (Entered: 04/24/2024) |
| 04/25/2024 | 238<br>(8 pgs) | Omnibus Reply Filed by National Bank of Kuwait, S.A.K.P., New York Branch. (Related document(s):194 Chapter 11 Plan, 195 Disclosure Statement, 196 Motion for Approval, 232 Response/Objection, 233 Objection, 234 Response/Objection) (Troop, Andrew) (Entered: 04/25/2024) |
| 04/25/2024 | 239<br>(2 pgs) | Order Regarding Approval of Disclosure Statement and Motion for Entry of Order Signed on 4/25/2024 (Related document(s):195 Disclosure Statement, 196 Motion for Approval) (mar4) (Entered: 04/25/2024) |
| 04/26/2024 | 240<br>(17 pgs; 2 docs) | Motion *of Chapter 11 Trustee for An Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Trustee* Filed by Trustee Christopher R Murray Hearing scheduled for 6/5/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order) (Shannon, R. J.) (Entered: 04/26/2024) |
| 04/26/2024 | 241<br>(10 pgs) | Notice *of Rule 2004 Examination of National Bank of Kuwait, S.A.K.P., New York Branch*. Filed by Christopher R Murray (Shannon, R. J.) (Entered: 04/26/2024) |
| 04/26/2024 | 242<br>(11 pgs) | Objection (related document(s):188 Motion for Sale of Property). Filed by 2425 WL, LLC (Sather, Stephen) (Entered: 04/26/2024) |

| | | |
|---|---|---|
| 04/26/2024 | ⊙243<br>(9 pgs; 2 docs) | Objection *TO CHAPTER 11 TRUSTEES MOTION FOR ENTRY OF AN ORDER: (I) APPROVING PROCEDURES FOR THE SALE OF PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIM AND ENCUMBRANCES; (II) SCHEDULING AN AUCTION; (III) AUTHORIZING ENTRY INTO THE STALKING HORSE PURCHASE AGREEMENT; (IV) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES; (V) APPROVING FORM OF NOTICE; AND (VI) GRANTING RELATED RELIEF* (related document(s):188 Motion for Sale of Property). Filed by Galleria 2425 Owner, LLC (Attachments: # 1 Exhibit Hilco Agreement) (Baker, Reese) (Entered: 04/26/2024) |
| 04/26/2024 | ⊙244<br>(21 pgs; 2 docs) | Objection to Claim Number 14 by Claimant National Bank of Kuwait. National Bank of Kuwait with request for valuation of security, payment of fully secured claims, and modification of undersecured claims.. Hearing scheduled for 6/18/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order) (Sather, Stephen) (Entered: 04/26/2024) |
| 04/26/2024 | ⊙245<br>(6 pgs) | BNC Certificate of Mailing. (Related document(s):231 Order Setting Hearing) No. of Notices: 6. Notice Date 04/26/2024. (Admin.) (Entered: 04/26/2024) |
| 04/27/2024 | ⊙246<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):239 Generic Order) No. of Notices: 6. Notice Date 04/27/2024. (Admin.) (Entered: 04/27/2024) |
| 04/28/2024 | ⊙247<br>(248 pgs; 6 docs) | Omnibus Reply *to Objections to the Bid Procedures Motion* (related document(s):188 Motion for Sale of Property). Filed by Christopher R Murray (Attachments: # 1 Exhibit A - April 5, 2024, Hearing Transcript # 2 Exhibit B - Proposal Forwarded by Ali Choudhri # 3 Exhibit C - June 7, 2023, State Court Hearing Transcript # 4 Exhibit D - April 12, 2023, State Court Hearing Transcript # 5 Exhibit E - Proposed HST Lease) (Shannon, R. J.) (Entered: 04/28/2024) |
| 04/28/2024 | ⊙248<br>(295 pgs; 10 docs) | Witness List, Exhibit List (Filed By Christopher R Murray ).(Related document(s):188 Motion for Sale of Property) (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Exhibit # 7 Exhibit # 8 Exhibit # 9 Exhibit) (Shannon, R. J.) (Entered: 04/28/2024) |
| 04/29/2024 | ⊙249<br>(2 pgs) | Witness List, Exhibit List (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ).(Related document(s):188 Motion for Sale of Property, 205 Application to Employ) (Conrad, Charles) (Entered: 04/29/2024) |
| 04/29/2024 | ⊙250<br>(758 pgs; 40 docs) | Witness List, Exhibit List (Filed By Galleria 2425 Owner, LLC ). (Related document(s):188 Motion for Sale of Property, 205 Application to Employ) (Attachments: # 1 Exhibit 1 Projections # 2 Exhibit 1A Updated projections # 3 Exhibit 3 internal notes of NBK for loan # 4 Exhibit 4 Amendment to Galleria 2425 JV # 5 Exhibit 5 Replacement of Zaheer # 6 Exhibit 6 Email on suitable replacement # 7 Exhibit 7 Email on Sonder lease in appraisal # 8 Exhibit 8 Email from Michael Carter # 9 Exhibit 10 Jetall paying rent # 10 Exhibit 11 Groves vs Dalio documents # 11 Exhibit 12 Motion to Inspect documents # 12 Exhibit 13 Transcript Judge Lopez and Tang # 13 Exhibit 14 Funds for operation # 14 Exhibit 14A unredacted funds for operation # 15 Exhibit 17A Expungement order # 16 Exhibit 17 B Expungement order # 17 Exhibit 17C Expungement order # 18 Exhibit 18 Metswall lease # 19 Exhibit 19 Divorce appeal order # 20 Exhibit 21 Cushman Wakefield |

| | | |
|---|---|---|
| | | appraisal # 21 Exhibit 22 Michael Carter affidavit # 22 Exhibit 23 Deposition of Mic # 23 Exhibit 24 Email from Michael Carter # 24 Exhibit 25 Vaxanix # 25 Exhibit 26 Email from Zaheer # 26 Exhibit 27 Management IWG # 27 Exhibit 27 A Information on IWG # 28 Exhibit 28 Presentation of NBK # 29 Exhibit 29 Change of Ownership # 30 Exhibit 30 Email on Zaheer # 31 Exhibit 31 Email from Michael Carter on standstill agreement # 32 Exhibit 32 2425 WL Offer # 33 Exhibit 33 Confidentiality Agreement Hilco # 34 Exhibit 34A Jerry Alexander information # 35 Exhibit 34B Jerry Alexander fact sheet # 36 Exhibit 35 Offer to purchase NBK claims # 37 Exhibit 36 Settlement Agreement # 38 Exhibit 37 Formation of QB Loop Property # 39 Exhibit 38 Offer to purchase note) (Baker, Reese) (Entered: 04/29/2024) |
| 04/29/2024 | 🌐 251 (284 pgs; 12 docs) | Witness List, Exhibit List (Filed By Galleria 2425 Owner, LLC ). (Related document(s):188 Motion for Sale of Property, 205 Application to Employ) (Attachments: # 1 Exhibit 39 Letter of intent # 2 Exhibit Proposed lease for Vananix # 3 Exhibit 41 Valuation by BassVal # 4 Exhibit 42 Adversary proceeding # 5 Exhibit 43 Offer to purchase # 6 Exhibit 44 Letter from Wetwiska to Pilbury # 7 Exhibit 45 Email from buyer # 8 Exhibit 46 Wetwitska letter June 2023 # 9 Exhibit 47 Purchase Agreement # 10 Exhibit 48 Hunan ShaShang Trading lease proposal # 11 Exhibit 49 Letter from Choudhri to Pilsbury) (Baker, Reese) (Entered: 04/29/2024) |
| 04/29/2024 | 🌐 252 (23 pgs) | Amended Chapter 11 Plan Filed by 2425 WL, LLC, Galleria 2425 Owner, LLC. (Related document(s):95 Chapter 11 Plan) (Sather, Stephen) (Entered: 04/29/2024) |
| 04/29/2024 | 🌐 253 (42 pgs) | Amended Disclosure Statement Filed by 2425 WL, LLC, Galleria 2425 Owner, LLC. (Related document(s):164 Disclosure Statement) (Sather, Stephen) (Entered: 04/29/2024) |
| 04/29/2024 | 🌐 254 (29 pgs) | Order Approving Motion For Sale of Property under Section 363(b) (Related Doc # 188) Signed on 4/29/2024. (mar4) (Entered: 04/29/2024) |
| 04/29/2024 | 🌐 255 (32 pgs; 3 docs) | Response/Objection Filed by National Bank of Kuwait, S.A.K.P., New York Branch. (Related document(s):163 Amended Chapter 11 Plan, 164 Disclosure Statement, 252 Amended Chapter 11 Plan, 253 Amended Disclosure Statement) (Attachments: # 1 Exhibit A - Proposed Order # 2 Service List) (Conrad, Charles) (Entered: 04/29/2024) |
| 04/29/2024 | 🌐 256 (10 pgs; 3 docs) | Objection (related document(s):205 Application to Employ). Filed by Galleria 2425 Owner, LLC (Attachments: # 1 Exhibit Declaration of Choudhri # 2 Exhibit Confidentiality Agreement) (Baker, Reese) (Entered: 04/29/2024) |
| 04/30/2024 | 🌐 257 (2 pgs) | Order Granting Application to Employ (Related Doc # 205) Signed on 4/30/2024. (mar4) (Entered: 04/30/2024) |
| 05/01/2024 | 🌐 258 (3 pgs) | Witness List, Exhibit List (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ).(Related document(s):164 Disclosure Statement, 166 Order Setting Hearing, 253 Amended Disclosure Statement) (Conrad, Charles) (Entered: 05/01/2024) |
| 05/01/2024 | 🌐 259 (442 pgs; 20 docs) | Witness List, Exhibit List (Filed By Galleria 2425 Owner, LLC ). (Related document(s):253 Amended Disclosure Statement) (Attachments: # 1 Exhibit 1 Plan # 2 Exhibit 2 Disclosure Statement # 3 |

|  |  |  |
|---|---|---|
|  |  | Exhibit 3 Cushman Wakefield appraisal # 4 Exhibit 4 Presentation # 5 Exhibit 5 2425 WL Offer to buy # 6 Exhibit 6 Hilco agreement # 7 Exhibit 7 Offer to purchase # 8 Exhibit 8 Letter of intent # 9 Exhibit 9 Proposed lease Vananix # 10 Exhibit 10 Appraisal # 11 Exhibit 11 Wetwiska letter # 12 Exhibit 12 Purchase Agreement # 13 Exhibit 13 Hunan SanShang lease # 14 Exhibit 14 Letter Choudhri to Pilsbury # 15 Exhibit 15 Proof of funds # 16 Exhibit 16 Metswall lease # 17 Exhibit 17 Jerry Alexander statement # 18 Exhibit 18 Jerry Alexander fact statement # 19 Exhibit 19 Vananix lease) (Baker, Reese) (Entered: 05/01/2024) |
| 05/01/2024 | ○ 260 (7 pgs) | Notice *National Bank of Kuwait, S.A.K.P., New York Branch's Notice of Election Pursuant to 11 U.S.C. 1111(b) and Fed. R. Bankr. P. 3014*. (Related document(s):252 Amended Chapter 11 Plan) Filed by National Bank of Kuwait, S.A.K.P., New York Branch (Conrad, Charles) (Entered: 05/01/2024) |
| 05/01/2024 | ○ 261 (32 pgs) | BNC Certificate of Mailing. (Related document(s):254 Order on Motion for Sale of Property under Section 363(b)) No. of Notices: 6. Notice Date 05/01/2024. (Admin.) (Entered: 05/01/2024) |
| 04/29/2024 | ○ 262 (7 pgs) | Objection (related document(s):205 Application to Employ). Filed by Ali Choudhri (jld4) (Entered: 05/02/2024) |
| 05/02/2024 | ○ 263 (1 pg) | Order Regarding Hybrid Hearing and Amended Disclosure Statement. Order Signed on 5/2/2024 (Related document(s):253 Amended Disclosure Statement) (mar4) (Entered: 05/02/2024) |
| 05/02/2024 | ○ 264 (3 pgs) | Notice *of Bid Deadline and Auction with the Sale of Property*. (Related document(s):254 Order on Motion for Sale of Property under Section 363(b)) Filed by Christopher R Murray (Shannon, R. J.) (Entered: 05/02/2024) |
| 05/02/2024 | ○ 265 (10 pgs; 2 docs) | Notice *of Bid Procedures*. (Related document(s):254 Order on Motion for Sale of Property under Section 363(b)) Filed by Christopher R Murray (Attachments: # 1 Exhibit A - Bid Procedures (As of May 2, 2024)) (Shannon, R. J.) (Entered: 05/02/2024) |
| 05/02/2024 | ○ 266 (5 pgs) | Notice *of Assumption and Assignment Procedures*. (Related document(s):254 Order on Motion for Sale of Property under Section 363(b)) Filed by Christopher R Murray (Shannon, R. J.) (Entered: 05/02/2024) |
| 05/02/2024 | ○ 267 (15 pgs; 2 docs) | Response/Objection Filed by National Bank of Kuwait, S.A.K.P., New York Branch. (Related document(s):252 Amended Chapter 11 Plan, 253 Amended Disclosure Statement) (Attachments: # 1 Exhibit A Proposed Order) (Conrad, Charles) (Entered: 05/02/2024) |
| 05/02/2024 | ○ 268 (6 pgs) | Certificate *Amended Certificate of Service* (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ).(Related document(s):267 Response/Objection) (Conrad, Charles) (Entered: 05/02/2024) |
| 05/02/2024 | ○ 269 (5 pgs) | BNC Certificate of Mailing. (Related document(s):257 Order on Application to Employ) No. of Notices: 6. Notice Date 05/02/2024. (Admin.) (Entered: 05/02/2024) |

| | | |
|---|---|---|
| 05/03/2024 | 🌐270<br>(30 pgs; 2 docs) | Objection to Claim Number 13,14 by Claimant National Bank of Kuwait. National Bank of Kuwait with request for valuation of security, payment of fully secured claims, and modification of undersecured claims.. Hearing scheduled for 6/18/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order) (Sather, Stephen) (Entered: 05/03/2024) |
| 05/03/2024 | 🌐271<br>(1 pg) | Order Granting Motion To Withdraw As Attorney (Related Doc # 211) Signed on 5/3/2024. (mar4) (Entered: 05/03/2024) |
| 05/03/2024 | ⬤272 | Courtroom Minutes. Time Hearing Held: 9:30. Appearances: Reese Baker for the debtor, Dierdre Brown for Ali Chaudhary, Kyung Lee for Trustee Chris Murray, Robert MacNaughton for 2425 West Loop LLC, Andrew Troop, Charles Conrad and Patrick Fitzmaurice for National Bank of Kuwait. (Related document(s):253 Amended Disclosure Statement) Arguments heard. Matter taken under advisement. (trc4) (Entered: 05/03/2024) |
| 05/03/2024 | 🌐273<br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 5/3/2024 9:29:48 AM ]. File Size [ 15247 KB ]. Run Time [ 00:31:46 ]. (admin). (Entered: 05/03/2024) |
| 05/03/2024 | 🌐274<br>(1 pg) | Order Vacating Order Signed on 5/3/2024 (Related document(s):239 Generic Order) (mar4) (Entered: 05/03/2024) |
| 05/03/2024 | 🌐275<br>(3 pgs) | Order Denying Approval Of Disclosure Statement Signed on 5/3/2024 (Related document(s):253 Amended Disclosure Statement) (mar4) (Entered: 05/03/2024) |
| 05/03/2024 | 🌐276<br>(1 pg) | Order and Notice Approving Disclosure Statement 194 Setting Confirmation Hearing and deadlines. Signed on 5/3/2024 (Related document(s):252 Amended Chapter 11 Plan **Confirmation hearing to be held on 6/7/2024 at 09:30 AM at Houston, Courtroom 403 (JPN).** (mar4) (Entered: 05/03/2024) |
| 05/03/2024 | 🌐277<br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Expedited (7 days)) by National Bank of Kuwait, S.A.K.P., New York Branch / Charles Conrad. This is to order a transcript of Hearing held May 3, 2024 before Judge Jeffrey P. Norman. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ). (Conrad, Charles) Electronically Forwarded to Veritext Legal Solutions on 05/07/2024. Estimated Date of Completion: 05/14/2024. Modified on 5/7/2024 (BenjaminRomero). (Entered: 05/03/2024) |
| 05/04/2024 | 🌐278<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):263 Generic Order) No. of Notices: 6. Notice Date 05/04/2024. (Admin.) (Entered: 05/04/2024) |
| 05/05/2024 | 🌐279<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):274 Order Vacating Order) No. of Notices: 42. Notice Date 05/05/2024. (Admin.) (Entered: 05/05/2024) |
| 05/05/2024 | 🌐280<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):271 Order on Motion to Withdraw as Attorney) No. of Notices: 6. Notice Date 05/05/2024. (Admin.) (Entered: 05/05/2024) |

| | | |
|---|---|---|
| 05/05/2024 | 281 (6 pgs) | BNC Certificate of Mailing. (Related document(s):275 Order Denying Approval Of Disclosure Statement) No. of Notices: 6. Notice Date 05/05/2024. (Admin.) (Entered: 05/05/2024) |
| 05/05/2024 | 282 (4 pgs) | BNC Certificate of Mailing. (Related document(s):276 Order Setting Hearing) No. of Notices: 6. Notice Date 05/05/2024. (Admin.) (Entered: 05/05/2024) |
| 05/06/2024 | 283 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Ali Choudhri. This is to order a transcript of Proceedings held on 05/03/2024 before Judge Jeffrey P. Norman. Court Reporter/Transcriber: Trinity Transcription Services. (mew4) Electronically Forwarded to Original Transcription Company, Veritext Legal Solutions on 05/07/2024. Estimated Date of Completion: 05/08/2024. Modified on 5/7/2024 (BenjaminRomero). (Entered: 05/06/2024) |
| 05/06/2024 | 284 (242 pgs; 2 docs) | Objection to Claim Number 13,14 by Claimant National Bank of Kuwait. National Bank of Kuwait. Hearing scheduled for 6/18/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order) (Sather, Stephen) (Entered: 05/06/2024) |
| 05/06/2024 | 285 (5 pgs) | Objection to Confirmation of Plan Filed by City of Houston, Houston Community College System, Houston ISD. (Related document(s):252 Amended Chapter 11 Plan) (Andresen, Jeannie) (Entered: 05/06/2024) |
| 05/06/2024 | 286 (5 pgs) | Objection to Confirmation of Plan Filed by City of Houston, Houston Community College System, Houston ISD. (Related document(s):194 Chapter 11 Plan) (Andresen, Jeannie) (Entered: 05/06/2024) |
| 05/06/2024 | 287 (2 pgs) | Notice of Appeal filed. (related document(s):187 Order on Emergency Motion, 223 Order on Motion To Reconsider). Fee Amount $298. Appellant Designation due by 05/20/2024. (Sather, Stephen) (Entered: 05/06/2024) |
| 05/07/2024 | 288 (7 pgs; 2 docs) | Motion to Continue Hearing On (related document(s):194 Chapter 11 Plan). Filed by Creditor 2425 WL, LLC (Attachments: # 1 Proposed Order) (Sather, Stephen) (Entered: 05/07/2024) |
| 05/07/2024 | 289 (13 pgs; 3 docs) | Emergency Motion *National Bank of Kuwait's Emergency Motion to Dismiss 2425 WL, LLC's Amended Motion for Reconsideration of the Final Cash Collateral Order [ECF #226]* Filed by Creditor National Bank of Kuwait, S.A.K.P., New York Branch (Attachments: # 1 Exhibit A Proposed Order # 2 Service List) (Conrad, Charles) (Entered: 05/07/2024) |
| 05/07/2024 | 290 (97 pgs; 8 docs) | Declaration re: *Unsworn Declaration of Mailing* (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ).(Related document(s):276 Order Setting Hearing) (Attachments: # 1 Exhibit A Disclosure Statement # 2 Exhibit B NBK Chapter 11 Plan # 3 Exhibit C Form Ballot # 4 Exhibit D Confirmation Hearing Notice # 5 Exhibit E Unimpaired Claims Notice of Non-Voting Status # 6 Exhibit F Impaired Claims Notice of Non-Voting Status # 7 Exhibit G Mailing List) (Conrad, Charles) (Entered: 05/07/2024) |
| 05/07/2024 | 291 (1 pg) | Order Granting Motion to Dismiss Amended Motion for Reconsideration 226 Signed on 5/7/2024 (Related document(s):289 |

| | | |
|---|---|---|
| | | Emergency Motion) (mar4) (Entered: 05/07/2024) |
| 05/08/2024 | 🔵292<br>(1 pg) | Order Denying Motion To Continue/Reschedule Hearing On(Related Doc # 288) Signed on 5/8/2024. (mar4) (Entered: 05/08/2024) |
| 05/08/2024 | 🔵293<br>(15 pgs; 3 docs) | Motion to Strike. Objections/Request for Hearing Due in 21 days (related document(s):284 Objection to Claim). Filed by Creditor National Bank of Kuwait, S.A.K.P., New York Branch (Attachments: # 1 Exhibit A Proposed Order # 2 Service List) (Conrad, Charles) (Entered: 05/08/2024) |
| 05/08/2024 | 🔵294<br>(13 pgs; 3 docs) | Motion to Expedite Hearing (related document(s):293 Motion to Strike). Filed by Creditor National Bank of Kuwait, S.A.K.P., New York Branch (Attachments: # 1 Exhibit A Proposed Order # 2 Service List) (Conrad, Charles) (Entered: 05/08/2024) |
| 05/08/2024 | 🔵295<br>(25 pgs; 2 docs) | Transcript RE: trial held on 5/3/24 before Judge JEFFREY P. NORMAN. Transcript is available for viewing in the Clerk's Office. Within 21 days, parties are advised to comply with privacy requirements of Fed. R. Bank. P. 9037, ensuring that certain protected information is redacted from transcripts prior to their availability on PACER. Filed by Transcript access will be restricted through 08/6/2024. (VeritextLegalSolutions) (Entered: 05/08/2024) |
| 05/08/2024 | 🔵296<br>(13 pgs) | Amended Notice of Appeal filed. (related document(s):187 Order on Emergency Motion, 223 Order on Motion To Reconsider). Fee Amount $298. Appellant Designation due by 05/22/2024. (Sather, Stephen) (Entered: 05/08/2024) |
| 05/08/2024 | 🔵297 | Election to Appeal to District Court . (Sather, Stephen) (Entered: 05/08/2024) |
| 05/08/2024 | 🔵298<br>(7 pgs; 2 docs) | Amended Motion to Continue Hearing On (related document(s):194 Chapter 11 Plan). Filed by Creditor 2425 WL, LLC Hearing scheduled for 5/15/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order) (Sather, Stephen) (Entered: 05/08/2024) |
| 05/09/2024 | 🔵299<br>(1 pg) | Order Granting Motion to Expedite 294 and Setting Hearing Signed on 5/9/2024 (Related document(s):293 Motion to Strike, 298 Motion to Continue/Reschedule Hearing) **Hearing scheduled for 5/13/2024 at 01:00 PM at Houston, Courtroom 403 (JPN).** (mar4) Modified on 5/9/2024 (MarioRios). (Entered: 05/09/2024) |
| 05/09/2024 | 🔵300<br>(1 pg) | Clerk's Notice of Filing of an Appeal. On 05/06/2024, 2425 WL, LLC filed a notice of appeal. The appeal has been assigned to U.S. District Judge Keith P Ellison, Civil Action 4:24cv1746. Parties notified (Related document(s):287 Notice of Appeal) (bwl4) (Entered: 05/09/2024) |
| 05/09/2024 | 🔵301<br>(1 pg) | Clerk's Notice of Filing of an Amended Appeal. On 05/08/2024, 2425 WL, LLC filed a notice of appeal. The appeal has been assigned to U.S. District Judge Keith P Ellison, Civil Action 4:24cv1746. Parties notified (Related document(s):296 Notice of Appeal) (bwl4) (Entered: 05/09/2024) |

| 05/09/2024 | 302 (28 pgs) | Amended Chapter 11 Plan Filed by 2425 WL, LLC, Galleria 2425 Owner, LLC. (Related document(s):95 Chapter 11 Plan) (Sather, Stephen) (Entered: 05/09/2024) |
|---|---|---|
| 05/09/2024 | 303 (49 pgs) | Disclosure Statement Filed by 2425 WL, LLC, Galleria 2425 Owner, LLC. (Sather, Stephen) (Entered: 05/09/2024) |
| 05/09/2024 | 304 (4 pgs) | Notice *of Hearing*. (Related document(s):298 Motion to Continue/Reschedule Hearing) Filed by 2425 WL, LLC (Sather, Stephen) (Entered: 05/09/2024) |
| 05/09/2024 | 305 (8 pgs; 2 docs) | Motion to Expedite Hearing (related document(s):303 Disclosure Statement). Filed by Creditor 2425 WL, LLC (Attachments: # 1 Proposed Order) (Sather, Stephen) (Entered: 05/09/2024) |
| 05/09/2024 | 306 (7 pgs) | Certificate *Certificate of Service re Court's Order Setting Hearings* (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ). (Related document(s):299 Order Setting Hearing) (Conrad, Charles) (Entered: 05/09/2024) |
| 05/09/2024 | 307 (4 pgs) | BNC Certificate of Mailing. (Related document(s):291 Generic Order) No. of Notices: 6. Notice Date 05/09/2024. (Admin.) (Entered: 05/09/2024) |
| 05/09/2024 | 308 (2 pgs) | Objection (related document(s):210 Motion for Sale of Property). Filed by Sonder USA Inc. (Wilson, Broocks) (Entered: 05/09/2024) |
| 05/10/2024 | 309 (1 pg) | Order Granting Motion 305 in Part and Setting Hearing Signed on 5/10/2024 (Related document(s):303 Disclosure Statement) **Status conference to be held on 5/24/2024 at 09:00 AM at Houston, Courtroom 403 (JPN).** (mar4) (Entered: 05/10/2024) |
| 05/10/2024 | 310 (3 pgs) | Witness List, Exhibit List (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ).(Related document(s):293 Motion to Strike) (Conrad, Charles) (Entered: 05/10/2024) |
| 05/10/2024 | 311 (4 pgs) | Certificate *of Service* (Filed By 2425 WL, LLC ).(Related document(s):309 Order Setting Hearing) (Sather, Stephen) (Entered: 05/10/2024) |
| 05/10/2024 | 312 (66 pgs; 3 docs) | Response (related document(s):293 Motion to Strike). Filed by 2425 WL, LLC (Attachments: # 1 Exhibit # 2 Exhibit) (Sather, Stephen) (Entered: 05/10/2024) |
| 05/10/2024 | 313 (13 pgs; 3 docs) | Response *Verified Statement in Response to Amended Motion to Continue Hearing on Confirmation of Plan Filed by National Bank of Kuwait* (related document(s):298 Motion to Continue/Reschedule Hearing). Filed by National Bank of Kuwait, S.A.K.P., New York Branch (Attachments: # 1 Exhibit A - Proposed Order # 2 Service List) (Conrad, Charles) (Entered: 05/10/2024) |
| 05/10/2024 | 314 (4 pgs) | BNC Certificate of Mailing. (Related document(s):292 Order on Motion to Continue/Reschedule Hearing) No. of Notices: 6. Notice Date 05/10/2024. (Admin.) (Entered: 05/10/2024) |

| | | |
|---|---|---|
| 05/11/2024 | 🔵 315<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):295 Transcript) No. of Notices: 6. Notice Date 05/11/2024. (Admin.) (Entered: 05/11/2024) |
| 05/11/2024 | 🔵 316<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):299 Order Setting Hearing) No. of Notices: 6. Notice Date 05/11/2024. (Admin.) (Entered: 05/11/2024) |
| 05/11/2024 | 🔵 317<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):300 Clerk's Notice of Filing of an Appeal) No. of Notices: 6. Notice Date 05/11/2024. (Admin.) (Entered: 05/11/2024) |
| 05/11/2024 | 🔵 318<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):301 Clerk's Notice of Filing of an Appeal) No. of Notices: 6. Notice Date 05/11/2024. (Admin.) (Entered: 05/11/2024) |
| 05/12/2024 | 🔵 319<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):309 Order Setting Hearing) No. of Notices: 6. Notice Date 05/12/2024. (Admin.) (Entered: 05/12/2024) |
| 05/13/2024 | 🔵 320<br>(34 pgs; 4 docs) | Witness List, Exhibit List (Filed By Christopher R Murray ).(Related document(s):210 Motion for Sale of Property) (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit) (Shannon, R. J.) (Entered: 05/13/2024) |
| 05/13/2024 | 🔵 321<br>(1 pg) | Order Denying Motion To Strike (Related Doc # 293) Signed on 5/13/2024. (mar4) (Entered: 05/13/2024) |
| 05/13/2024 | 🔵 322<br>(2 pgs) | Witness List, Exhibit List (Filed By Sonder USA Inc. ).(Related document(s):210 Motion for Sale of Property) (Wilson, Broocks) (Entered: 05/13/2024) |
| 05/13/2024 | ⚫ 323 | Courtroom Minutes. Time Hearing Held: 1:00. Appearances: Reese Baker for the Debtor, Stephen Sather for WL LLC, RJ Shannon for the Trustee, Patrick Fitzmaurice for National Bank of Kuwait. (Related document(s):298 Motion to Continue/Reschedule Hearing) Parties agreed to reset confirmation hearing to June 17, 2024 at 9:00 am. The Court will enter an order. (trc4) (Entered: 05/13/2024) |
| 05/13/2024 | 🔵 324<br>(1 pg) | Order Setting Hearing Signed on 5/13/2024 (Related document(s):194 Chapter 11 Plan, **Hearing scheduled for 6/17/2024 at 09:00 AM at Houston, Courtroom 403 (JPN).** (mar4) (Entered: 05/13/2024) |
| 05/13/2024 | 🔵 325<br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 5/13/2024 12:59:45 PM ]. File Size [ 1392 KB ]. Run Time [ 00:02:54 ]. (admin). (Entered: 05/13/2024) |
| 05/13/2024 | 🔵 326<br>(13 pgs; 3 docs) | Notice *of Revised Proposed Order*. (Related document(s):210 Motion for Sale of Property, 224 Generic Order) Filed by Christopher R Murray (Attachments: # 1 Exhibit A - Revised Proposed Order # 2 Exhibit B - Redline of Revised Proposed Order) (Shannon, R. J.) (Entered: 05/13/2024) |
| 05/13/2024 | 🔵 327<br>(10 pgs; 2 docs) | Motion to Vacate. Objections/Request for Hearing Due in 21 days (related document(s):254 Order on Motion for Sale of Property under Section 363(b)). Filed by Debtor Galleria 2425 Owner, LLC Hearing scheduled for 6/18/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). |

| | | (Attachments: # 1 Proposed Order) (Baker, Reese) (Entered: 05/13/2024) |
|---|---|---|
| 05/14/2024 | 🔵 328<br>(13 pgs; 3 docs) | Declaration re: *Unsworn Declaration of Mailing* (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ).(Related document(s):194 Chapter 11 Plan, 290 Declaration, 324 Order Setting Hearing) (Attachments: # 1 Exhibit A - Amended Confirmation Hearing Notice # 2 Exhibit B - Mailing List) (Conrad, Charles) (Entered: 05/14/2024) |
| 05/14/2024 | 🔵 329<br>(2 pgs) | Notice *of Withdrawal of Counsel for Ali Choudhri*. Filed by Ali Choudhri (Brown, Deirdre) (Entered: 05/14/2024) |
| 05/14/2024 | 🔵 330<br>(12 pgs; 3 docs) | Motion to Vacate. Objections/Request for Hearing Due in 21 days (related document(s):205 Application to Employ). Filed by Debtor Galleria 2425 Owner, LLC Hearing scheduled for 6/18/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order Denying employment # 2 Proposed Order Vacating Order) (Baker, Reese). Related document(s) 257 Order on Application to Employ. Modified on 5/15/2024 (MarioRios). (Entered: 05/14/2024) |
| 05/15/2024 | 🔵 331<br>(3 pgs) | Order Denying Motion To Vacate (Related Doc # 330) Signed on 5/15/2024. (mar4) (Entered: 05/15/2024) |
| 05/15/2024 | 🔵 332<br>(18 pgs; 4 docs) | Notice *Second Notice of Revised Proposed Order Regarding Sale of Claims Against Sonder*. (Related document(s):210 Motion for Sale of Property) Filed by Christopher R Murray (Attachments: # 1 Proposed Order Exhibit A - Second Revised Proposed Order # 2 Proposed Order Exhibit B - Redline to Original Proposed Order # 3 Proposed Order Exhibit C - Redline to First Revised Proposed Order) (Murray, Christopher) (Entered: 05/15/2024) |
| 05/15/2024 | 🔵 333 | Courtroom Minutes. Time Hearing Held: 11:00. Appearances: RJ Shannon for the Trustee, Stephen Sather for 2425 WLLC, Mack Wilson for Sonder, Andrew Troop for NBK, and Ali Choudhri for self/ pro se. (Related document(s):210 Motion for Sale of Property) Evidentiary hearing held. Chris Murray sworn. Direct and cross examination conducted. Arguments heard. Relief requested is granted. The Court will sign the proposed order at docket #332-1. (trc4) (Entered: 05/15/2024) |
| 05/15/2024 | 🔵 334<br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 5/15/2024 11:12:50 AM ]. File Size [ 257 KB ]. Run Time [ 00:00:32 ]. (admin). (Entered: 05/15/2024) |
| 05/15/2024 | 🔵 335<br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 5/15/2024 11:30:08 AM ]. File Size [ 689 KB ]. Run Time [ 00:01:26 ]. (admin). (Entered: 05/15/2024) |
| 05/15/2024 | 🔵 336<br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 5/15/2024 11:40:46 AM ]. File Size [ 13223 KB ]. Run Time [ 00:27:33 ]. (admin). (Entered: 05/15/2024) |
| 05/15/2024 | 🔵 337<br>(4 pgs) | Order Granting Motion For Sale of Property under Section 363(b) (Related Doc # 210) Signed on 5/15/2024. (mar4) (Entered: 05/15/2024) |

| 05/15/2024 | 338<br>(2 pgs) | Order Granting Motion in Part / Order on Motion for New Trial (Related Doc # 327) Signed on 5/15/2024. (mar4) (Entered: 05/15/2024) |
|---|---|---|
| 05/15/2024 | 339<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):321 Order on Motion to Strike) No. of Notices: 6. Notice Date 05/15/2024. (Admin.) (Entered: 05/15/2024) |
| 05/15/2024 | 340<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):324 Order Setting Hearing) No. of Notices: 6. Notice Date 05/15/2024. (Admin.) (Entered: 05/15/2024) |
| 05/16/2024 | 341<br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Expedited (7 days)) by National Bank of Kuwait, S.A.K.P., New York Branch / Charles Conrad. This is to order a transcript of Hearing on May 13, 2024 before Judge Jeffrey P. Norman. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ). (Conrad, Charles) Transcript request electronically forwarded to Veritext Legal Solutions on 05/20/2024. Estimated Transcript Completion Date: 05/27/2024. Modified on 5/20/2024 (DMcKinnieRichardson). (Entered: 05/16/2024) |
| 05/16/2024 | 342<br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Expedited (7 days)) by National Bank of Kuwait, S.A.K.P., New York Branch / Charles Conrad. This is to order a transcript of Hearing on May 15, 2024 before Judge Jeffrey P. Norman. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ). (Conrad, Charles) Transcript request electronically forwarded to Veritext Legal Solutions on 05/20/2024. Estimated Transcript Completion Date: 05/27/2024. Modified on 5/20/2024 (DMcKinnieRichardson). (Entered: 05/16/2024) |
| 05/17/2024 | 343<br>(21 pgs; 3 docs) | Response/Objection Filed by National Bank of Kuwait, S.A.K.P., New York Branch. (Related document(s):302 Amended Chapter 11 Plan, 303 Disclosure Statement) (Attachments: # 1 Exhibit A Proposed Order # 2 Service List) (Troop, Andrew) (Entered: 05/17/2024) |
| 05/17/2024 | 344<br>(27 pgs; 3 docs) | Motion to Vacate. Objections/Request for Hearing Due in 21 days (related document(s):276 Order Setting Hearing). Filed by Debtor Galleria 2425 Owner, LLC Hearing scheduled for 7/9/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Exhibit Objection to NBK Disclosure Statement # 2 Proposed Order) (Baker, Reese) (Entered: 05/17/2024) |
| 05/17/2024 | 345<br>(7 pgs) | BNC Certificate of Mailing. (Related document(s):331 Order on Motion to Vacate) No. of Notices: 40. Notice Date 05/17/2024. (Admin.) (Entered: 05/17/2024) |
| 05/17/2024 | 346<br>(6 pgs) | BNC Certificate of Mailing. (Related document(s):338 Order on Motion to Vacate) No. of Notices: 40. Notice Date 05/17/2024. (Admin.) (Entered: 05/17/2024) |
| 05/17/2024 | 347<br>(7 pgs) | BNC Certificate of Mailing. (Related document(s):337 Order on Motion for Sale of Property under Section 363(b)) No. of Notices: 6. Notice Date 05/17/2024. (Admin.) (Entered: 05/17/2024) |

| | | |
|---|---|---|
| 05/20/2024 | ⬤ 348<br>(6 pgs; 2 docs) | Motion to Extend Time *to Respond to Objections to Disclosure STatement* Filed by Creditor 2425 WL, LLC (Attachments: # 1 Proposed Order) (Sather, Stephen) (Entered: 05/20/2024) |
| 05/20/2024 | ⬤ 349<br>(1 pg) | Order Granting Motion to Extend Time. **Deadline is Extended to 5:00 PM on May 21, 2024.** (Related Doc # 348) Signed on 5/20/2024. (mar4) (Entered: 05/20/2024) |
| 05/20/2024 | ⬤ 350<br>(13 pgs) | Notice *of Intent to Take Deposition of Charles Murray, Trustee*. Filed by 2425 WL, LLC (Sather, Stephen) (Entered: 05/20/2024) |
| 05/20/2024 | ⬤ 351<br>(14 pgs) | Notice *of Intent to Take Deposition of National Bank of Kuwait*. Filed by 2425 WL, LLC (Sather, Stephen) (Entered: 05/20/2024) |
| 05/20/2024 | ⬤ 352<br>(59 pgs; 2 docs) | Motion *for Authority to Purse Claims on Behalf of the Estate* Filed by Creditor 2425 WL, LLC Hearing scheduled for 6/18/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order) (Sather, Stephen) (Entered: 05/20/2024) |
| 05/20/2024 | ⬤ 353<br>(30 pgs; 2 docs) | Motion *to Prohibit Credit Bidding by National Bank of Kuwait* Filed by Creditors 2425 WL, LLC, Ali Choudhri Hearing scheduled for 6/18/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order) (Sather, Stephen) (Entered: 05/20/2024) |
| 05/21/2024 | ⬤ 354<br>(14 pgs) | Operating Report for Filing Period April 2024, $72,710.85 disbursed (Filed By Christopher R Murray ). (Murray, Christopher) (Entered: 05/21/2024) |
| 05/21/2024 | ⬤ 355<br>(1 pg) | Order Resetting Hearing Signed on 5/21/2024 (Related document(s):353 Generic Motion) **Hearing rescheduled for 6/17/2024 at 09:00 AM at Houston, Courtroom 403 (JPN).** (mar4) (Entered: 05/21/2024) |
| 05/21/2024 | ⬤ 356<br>(1 pg) | Order Resetting Hearing Signed on 5/21/2024 (Related document(s):352 Generic Motion) **Hearing rescheduled for 7/1/2024 at 09:00 AM at Houston, Courtroom 403 (JPN).** (mar4) (Entered: 05/21/2024) |
| 05/21/2024 | ⬤ 357<br>(1 pg) | Order Denying Motion (Related Doc # 240) Signed on 5/21/2024. (mar4) (Entered: 05/21/2024) |
| 05/21/2024 | ⬤ 358<br>(6 pgs; 2 docs) | Emergency Motion *to Extend Time to Respond to Objection to Disclosure Statement filed by National Bank of Kuwait* Filed by Creditor Ali Choudhri (Attachments: # 1 Proposed Order) (dm4) (Entered: 05/21/2024) |
| 05/21/2024 | ⬤ 359<br>(3 pgs) | Order Denying Motion To Vacate (Related Doc # 344) Signed on 5/21/2024. (mar4) (Entered: 05/21/2024) |
| 05/21/2024 | ⬤ 360<br>(8 pgs; 2 docs) | Emergency Motion *to Extend Time to Respond* Filed by Creditor Ali Choudhri (Attachments: # 1 Proposed Order) (bli4) (Entered: 05/21/2024) |
| 05/21/2024 | ⬤ 361<br>(8 pgs; 2 docs) | Statement *National Bank of Kuwait, S.A.K.P., New York Branch's Statement Regarding Emergency Motion to Extend Time to Respond to Objection to Disclosure Statement filed by National Bank of Kuwait* |

000036

| | | |
|---|---|---|
| | | (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ). (Related document(s):358 Emergency Motion, 360 Emergency Motion) (Attachments: # 1 Service List) (Troop, Andrew) (Entered: 05/21/2024) |
| 05/21/2024 | ⊙362 (1 pg) | Order Denying Emergency Motion (Related Doc # 360) Signed on 5/21/2024. (mar4) (Entered: 05/21/2024) |
| 05/21/2024 | ⊙363 (6 pgs) | Certificate *Of Service* (Filed By 2425 WL, LLC ).(Related document(s):352 Generic Motion, 353 Generic Motion) (Sather, Stephen) Modified on 5/21/2024 (ChrisKrus). (Entered: 05/21/2024) |
| 05/21/2024 | ⊙364 (12 pgs) | *Response to Objections to Disclosure Statement filed by National Bank of Kuwait*. Filed by 2425 WL, LLC (Sather, Stephen) (Entered: 05/21/2024) |
| 05/21/2024 | ⊙365 (24 pgs) | Fourth Amended Chapter 11 Plan Filed by 2425 WL, LLC, Galleria 2425 Owner, LLC. (Sather, Stephen) (Entered: 05/21/2024) |
| 05/21/2024 | ⊙366 (129 pgs) | Amended Disclosure Statement Filed by 2425 WL, LLC, Galleria 2425 Owner, LLC. (Related document(s):303 Disclosure Statement) (Sather, Stephen) (Entered: 05/21/2024) |
| 05/21/2024 | ⊙367 (69 pgs; 3 docs) | Notice *of Redlined Fourth Amended Joint Plan and Redlined Disclosure Statement for Fourth Amended Joint Plan*. (Related document(s):309 Order Setting Hearing) Filed by 2425 WL, LLC, Galleria 2425 Owner, LLC (Attachments: # 1 Redlined Fourth Amended Joint Plan # 2 Redlined Disclosure Statement for Fourth Amended Joint Plan) (Sather, Stephen) (Entered: 05/21/2024) |
| 05/22/2024 | ⊙368 (1 pg) | Order Canceling Status Conference and Requiring Repleading Signed on 5/22/2024 (Related document(s):303 Disclosure Statement) (mar4) (Entered: 05/22/2024) |
| 05/22/2024 | ⊙369 (4 pgs) | BNC Certificate of Mailing. (Related document(s):349 Order on Motion to Extend Time) No. of Notices: 6. Notice Date 05/22/2024. (Admin.) (Entered: 05/22/2024) |
| 05/23/2024 | ⊙370 (1 pg) | Notice of Deficiency Regarding a Bankruptcy Appeal (Related document(s):287 Notice of Appeal, 296 Notice of Appeal) (bwl4) (Entered: 05/23/2024) |
| 05/23/2024 | ⊙371 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Ordinary (30 days)) by Chyna Christensen. This is to order a transcript of Trustee Emergency Motion for Interim & Final Orders Authorizing Use of Cash Collateral & Ex Parte Motion to Expedite Hearing on 04/05/2024 before Judge Jeffrey P. Norman. Court Reporter/Transcriber: Access Transcripts (Filed By 2425 WL, LLC ). (Sather, Stephen) Copy request electronically forwarded to Veritext Legal Solutions on 5/24/2024. Estimated completion date is 6/24/2024. Modified on 5/24/2024 (DanielBerger). (Entered: 05/23/2024) |
| 05/23/2024 | ⊙372 (7 pgs) | BNC Certificate of Mailing. (Related document(s):359 Order on Motion to Vacate) No. of Notices: 40. Notice Date 05/23/2024. (Admin.) (Entered: 05/23/2024) |

| | | |
|---|---|---|
| 05/23/2024 | ● 373<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):355 Order Setting Hearing) No. of Notices: 6. Notice Date 05/23/2024. (Admin.) (Entered: 05/23/2024) |
| 05/23/2024 | ● 374<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):356 Order Setting Hearing) No. of Notices: 6. Notice Date 05/23/2024. (Admin.) (Entered: 05/23/2024) |
| 05/23/2024 | ● 375<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):357 Generic Order) No. of Notices: 6. Notice Date 05/23/2024. (Admin.) (Entered: 05/23/2024) |
| 05/23/2024 | ● 376<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):362 Order on Emergency Motion) No. of Notices: 6. Notice Date 05/23/2024. (Admin.) (Entered: 05/23/2024) |
| 05/24/2024 | ● 377<br>(109 pgs) | Fifth Amended Chapter 11 Plan Filed by 2425 WL, LLC, Galleria 2425 Owner, LLC. (Related document(s):95 Chapter 11 Plan) (Sather, Stephen) (Entered: 05/24/2024) |
| 05/24/2024 | ● 378<br>(129 pgs) | Disclosure Statement Filed by 2425 WL, LLC, Galleria 2425 Owner, LLC. (Sather, Stephen) (Entered: 05/24/2024) |
| 05/24/2024 | ● 379<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):368 Generic Order) No. of Notices: 6. Notice Date 05/24/2024. (Admin.) (Entered: 05/24/2024) |
| 05/27/2024 | ● 380<br>(3 pgs) | Appellant Designation of Contents For Inclusion in Record On Appeal (related document(s):287 Notice of Appeal, 296 Notice of Appeal). (Sather, Stephen) (Entered: 05/27/2024) |
| 05/28/2024 | ● 381<br>(12 pgs; 2 docs) | Motion To Stay Pending Appeal (related document(s):337 Order on Motion for Sale of Property under Section 363(b))., Emergency Motion Filed by Creditor Sonder USA Inc. (Attachments: # 1 Proposed Order) (Wilson, Broocks) (Entered: 05/28/2024) |
| 05/28/2024 | ● 382<br>(6 pgs; 2 docs) | Transcript RE: hearing held on 5/13/24 before Judge JEFFREY P. NORMAN. Transcript is available for viewing in the Clerk's Office. Within 21 days, parties are advised to comply with privacy requirements of Fed. R. Bank. P. 9037, ensuring that certain protected information is redacted from transcripts prior to their availability on PACER. Filed by Transcript access will be restricted through 08/26/2024. (VeritextLegalSolutions) (Entered: 05/28/2024) |
| 05/28/2024 | ● 383<br>(26 pgs; 2 docs) | Transcript RE: hearing held on 5/15/24 before Judge JEFFREY P. NORMAN. Transcript is available for viewing in the Clerk's Office. Within 21 days, parties are advised to comply with privacy requirements of Fed. R. Bank. P. 9037, ensuring that certain protected information is redacted from transcripts prior to their availability on PACER. Filed by Transcript access will be restricted through 08/26/2024. (VeritextLegalSolutions) (Entered: 05/28/2024) |
| 05/28/2024 | ● 384<br>(1 pg) | Order Approving Disclosure Statement and Setting Hearing on Confirmation Signed on 5/28/2024 (Related document(s):378 Disclosure Statement) **Confirmation hearing to be held on 6/17/2024** |

| | | |
|---|---|---|
| | | **at 09:00 AM at Houston, Courtroom 403 (JPN).** Last day to Object to Confirmation 6/10/2024. (trc4) (Entered: 05/28/2024) |
| 05/28/2024 | ⬤385<br>(1 pg) | Order Setting Hearing Signed on 5/28/2024 (Related document(s):381 Motion To Stay Pending Appeal) **Hearing scheduled for 6/4/2024 at 10:00 AM at Houston, Courtroom 403 (JPN).** (trc4) (Entered: 05/28/2024) |
| 05/29/2024 | ⬤386<br>(4 pgs) | Certificate *of Service* (Filed By Sonder USA Inc. ).(Related document(s):385 Order Setting Hearing) (Wilson, Broocks) (Entered: 05/29/2024) |
| 05/29/2024 | ⬤387<br>(2 pgs) | Notice of Appeal filed. (related document(s):337 Order on Motion for Sale of Property under Section 363(b)). Fee Amount $298. Appellant Designation due by 06/12/2024. (Wilson, Broocks) (Entered: 05/29/2024) |
| 05/29/2024 | ⬤388 | Election to Appeal to District Court *regarding Sonder USA Inc.'s Notice of Appeal*. (Wilson, Broocks) (Entered: 05/29/2024) |
| 05/29/2024 | ⬤389<br>(6 pgs) | Objection (related document(s):381 Motion To Stay Pending Appeal, Emergency Motion). Filed by 2425 WL, LLC (Sather, Stephen) (Entered: 05/29/2024) |
| 05/29/2024 | ⬤390<br>(3 pgs) | Response *and Limited Objection to Sonder USA Inc.'s Motion to Modify the Stay to Allow Liquidation of Claim* (related document(s):115 Motion for Relief From Stay). Filed by Christopher R Murray (Shannon, R. J.) (Entered: 05/29/2024) |
| 05/30/2024 | ⬤391<br>(4 pgs) | Certificate *of Service* (Filed By 2425 WL, LLC ).(Related document(s):377 Amended Chapter 11 Plan, 378 Disclosure Statement, 384 Order Approving Disclosure Statement) (Sather, Stephen) (Entered: 05/30/2024) |
| 05/30/2024 | ⬤392<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):384 Order Approving Disclosure Statement) No. of Notices: 40. Notice Date 05/30/2024. (Admin.) (Entered: 05/30/2024) |
| 05/30/2024 | ⬤393<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):385 Order Setting Hearing) No. of Notices: 6. Notice Date 05/30/2024. (Admin.) (Entered: 05/30/2024) |
| 05/31/2024 | ⬤394<br>(4 pgs) | Certificate *of Service (Amended)* (Filed By 2425 WL, LLC ).(Related document(s):377 Amended Chapter 11 Plan, 378 Disclosure Statement, 384 Order Approving Disclosure Statement) (Sather, Stephen) (Entered: 05/31/2024) |
| 05/31/2024 | ⬤395<br>(4 pgs; 2 docs) | Motion to Withdraw as Attorney. Objections/Request for Hearing Due in 21 days. Filed by Defendant Azeemeh Zaheer (Attachments: # 1 Proposed Order) (Drinnon, Rodney) (Entered: 05/31/2024) |
| 05/31/2024 | ⬤396<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):382 Transcript) No. of Notices: 6. Notice Date 05/31/2024. (Admin.) (Entered: 05/31/2024) |
| 05/31/2024 | ⬤397 | BNC Certificate of Mailing. (Related document(s):383 Transcript) No. |

| | | |
|---|---|---|
| | (4 pgs) | of Notices: 6. Notice Date 05/31/2024. (Admin.) (Entered: 05/31/2024) |
| 06/03/2024 | ⬤ 398<br>(1 pg) | Clerk's Notice of Filing of an Appeal. On 05/29/2034, Sonder USA Inc. filed a notice of appeal. The appeal has been assigned to U.S. District Judge Keith P Ellison, Civil Action 24cv02073. Parties notified (Related document(s):387 Notice of Appeal) (hl4) (Entered: 06/03/2024) |
| 06/03/2024 | ⬤ 399<br>(1 pg) | Order Denying Motion To Withdraw As Attorney (Related Doc # 395) Signed on 6/3/2024. (trc4) (Entered: 06/03/2024) |
| 06/03/2024 | ⬤ 400<br>(515 pgs; 10 docs) | Exhibit List, Witness List (Filed By Sonder USA Inc. ).(Related document(s):385 Order Setting Hearing) (Attachments: # 1 Exhibit 1 - Sonder POC # 2 Exhibit 2 - NBK Plan # 3 Exhibit 3 - Motion to Sell # 4 Objection to NBK Claim # 5 Exhibit 5 - Revised Sale Order Notice (5.13) # 6 Exhibit 6 - ECF 336 # 7 Exhibit 7 - Sale Order # 8 Exhibit 8 - Debtor's Plan # 9 Exhibit 9 - Notice of Appeal) (Wilson, Broocks) (Entered: 06/03/2024) |
| 06/03/2024 | ⬤ 401<br>(12 pgs) | Objection to Confirmation of Plan Filed by 2425 WL, LLC. (Related document(s):194 Chapter 11 Plan) (Sather, Stephen) (Entered: 06/03/2024) |
| 06/03/2024 | ⬤ 402<br>(255 pgs; 15 docs) | Objection to Claim Number 7 by Claimant *2425 WL LLC* Hearing scheduled for 7/24/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order # 2 Declaration of Christopher R. Murray # 3 Exhibit A - 2425 WL Deed of Trust # 4 Exhibit B - Foreign Registration Application # 5 Exhibit C - NBK Loan Agreement # 6 Exhibit D - NBK Note # 7 Exhibit E - NBK Deed of Trust # 8 Exhibit F - NBK Assignment of Leases and Rents # 9 Exhibit G - Sworn Document Transferring Tax Lien # 10 Exhibit H - Tax Lien Contract # 11 Exhibit I - Galleria 2425 JV Company Agreement # 12 Exhibit J - Galleria 2425 JV Unanimous Consent # 13 Exhibit K - 2425 WL Promissory Note # 14 Exhibit L - Settlement Statement for 2018 Transaction) (Shannon, R. J.) (Entered: 06/03/2024) |
| 06/03/2024 | ⬤ 403<br>(35 pgs; 5 docs) | Objection to Claim Number 21,22 by Claimant *Ali Choudhri* Hearing scheduled for 7/24/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order # 2 Declaration of Christopher R. Murray # 3 Exhibit A - Assignment from Choudhri to NBK # 4 Exhibit B - Confidential Settlement Agreement) (Shannon, R. J.) (Entered: 06/03/2024) |
| 06/03/2024 | ⬤ 404<br>(9 pgs; 3 docs) | Objection to Claim Number 23,24 by Claimant *Jetall Capital, LLC* Hearing scheduled for 7/24/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order # 2 Declaration of Christopher R. Murray) (Shannon, R. J.) (Entered: 06/03/2024) |
| 06/03/2024 | ⬤ 405<br>(221 pgs; 9 docs) | Adversary case 24-03117. Nature of Suit: (13 (Recovery of money/property - 548 fraudulent transfer)),(14 (Recovery of money/property - other)), (91 (Declaratory judgment)),(81 (Subordination of claim or interest)) Complaint by Christopher Murray against Jetall Companies, Inc.. Fee Amount $350 (Attachments: # 1 Adversary Coversheet # 2 Exhibit A - Jetall Lease with Amendments # 3 Exhibit B - 2018 Deed to Debtor # 4 Exhibit C - Settlement Statement to 2018 Transaction # 5 Exhibit D - NBK Loan Agreement # 6 Exhibit E - NBK Note # 7 Exhibit F - NBK Deed of Trust # 8 Exhibit |

| | | G - NBK Assignment of Leases and Rents) (Shannon, R. J.) (Entered: 06/03/2024) |
|---|---|---|
| 06/03/2024 | 🔵 406 (7 pgs; 2 docs) | Motion to Continue Hearing On (related document(s):194 Chapter 11 Plan, 377 Amended Chapter 11 Plan). Filed by Creditor 2425 WL, LLC Hearing scheduled for 6/4/2024 at 10:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order) (Sather, Stephen) (Entered: 06/03/2024) |
| 06/03/2024 | 🔵 407 (7 pgs; 2 docs) | Motion to Continue Hearing On (related document(s):284 Objection to Claim). Filed by Creditor 2425 WL, LLC Hearing scheduled for 6/4/2024 at 10:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order) (Sather, Stephen) (Entered: 06/03/2024) |
| 06/03/2024 | 🔵 408 (4 pgs) | *Response to Sonder USA Inc's Emergency Motion for Limited Stay Pending Appeal* (related document(s):381 Motion To Stay Pending Appeal, Emergency Motion). Filed by Christopher R Murray (Shannon, R. J.) (Entered: 06/03/2024) |
| 06/03/2024 | 🔵 409 (21 pgs) | Response/Objection Filed by Galleria 2425 Owner, LLC. (Related document(s):194 Chapter 11 Plan) (Baker, Reese) (Entered: 06/03/2024) |
| 06/03/2024 | 🔵 410 (6 pgs) | Objection to Confirmation of Plan Filed by Arin-Air Inc.. (Related document(s):377 Amended Chapter 11 Plan) (Cerasuolo, Gary) (Entered: 06/03/2024) |
| 06/04/2024 | 🔵 411 (44 pgs; 9 docs) | Witness List, Exhibit List (Filed By Christopher R Murray ).(Related document(s):381 Motion To Stay Pending Appeal, Emergency Motion, 406 Motion to Continue/Reschedule Hearing, 407 Motion to Continue/Reschedule Hearing) (Attachments: # 1 Exhibit 1 -NYS Department of State, Division of Corporations Entity Information for 2425 WL LLC # 2 Exhibit 2 - NYS Department of State, Division of Corporations Filing History for 2425 WL LLC # 3 Exhibit 3 - Certified Copy of Articles of Organization of 2425 WL LLC # 4 Exhibit 4 - Certified Copy of Certificate of Publication of 2425 WL LLC # 5 Exhibit 5 - Certified Copy of Special Warranty Deed from 2425 WL LLC to Galleria 2425 Owner, LLC # 6 Exhibit 6 - Settlement Statement Regarding 2018 Sale of Property from 2425 WL LLC to Galleria 2425 Owner, LLC # 7 Exhibit 7 - Debtor's Original Petition [ECF No. 1] # 8 Exhibit 8 - Debtor's Amended Petition [ECF No. 10]) (Shannon, R. J.) (Entered: 06/04/2024) |
| 06/04/2024 | 🔵 412 (1 pg) | Order Striking Hearings On(Related Doc # 406 and # 407) Signed on 6/4/2024. (trc4) (Entered: 06/04/2024) |
| 06/04/2024 | 🔵 413 (7 pgs; 2 docs) | *Emergency Motion for Continuance of Confirmation Hearings* Filed by Creditor 2425 WL, LLC (Attachments: # 1 Proposed Order) (Sather, Stephen) (Entered: 06/04/2024) |
| 06/04/2024 | 🔵 414 (7 pgs; 2 docs) | *Emergency Motion for Continuance of Hearing on Objection to Claiim of National Bank of Kuwait* Filed by Creditor 2425 WL, LLC (Attachments: # 1 Proposed Order) (Sather, Stephen) (Entered: 06/04/2024) |

| | | |
|---|---|---|
| 06/04/2024 | 🔵415<br>(1 pg) | Order Striking Emergency Motions (Related Doc # 413), Striking Emergency Motion (Related Doc # 414) Signed on 6/4/2024. (trc4) (Entered: 06/04/2024) |
| 06/04/2024 | 🔵416 | Courtroom Minutes. Time Hearing Held: 10:00. Appearances: Broocks Wilson for Sonder USA, RJ Shannon for the Trustee, Stephen Sather for 2425WL, Reese Baker for the Debtor, Charles Conrad and Andrew Troop for NBK. (Related document(s):381 Emergency Motion To Stay Pending Appeal) Arguments heard. Sonder exhibits at docket 400-1 thru 400-9 were admitted. Matter taken under advisement. (trc4) (Entered: 06/04/2024) |
| 06/04/2024 | 🔵417<br>(1 pg) | 🔊 PDF with attached Audio File. Court Date & Time [ 6/4/2024 9:59:46 AM ]. File Size [ 6104 KB ]. Run Time [ 00:12:43 ]. (admin). (Entered: 06/04/2024) |
| 06/04/2024 | 🔵418<br>(1 pg) | Order Setting Hearing Signed on 6/4/2024 (Related document(s): 406 and 407 Motions to Continue) **Status conference on Objection to Claim 284 to be held on 6/18/2024 at 11:00 AM at Houston, Courtroom 403 (JPN).** Parties ordered to confer and determine confirmation hearing date. (trc4) (Entered: 06/04/2024) |
| 06/04/2024 | 🔵419<br>(1 pg) | Order Denying Stay Pending Appeal (Related Doc # 381) Signed on 6/4/2024. (trc4) (Entered: 06/04/2024) |
| 06/04/2024 | 🔵420<br>(7 pgs; 2 docs) | Amended Motion to Withdraw as Attorney. Objections/Request for Hearing Due in 21 days. Filed by Defendant Azeemeh Zaheer Hearing scheduled for 7/9/2024 at 11:00 AM at Houston, Courtroom 403 (JPN). (Attachments: # 1 Proposed Order) (Drinnon, Rodney) (Entered: 06/04/2024) |
| 06/04/2024 | 🔵421<br>(2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Expedited (7 days)) by Broocks "Mack" Wilson. This is to order a transcript of Hearing May 15, 2024 before Judge Jeffrey P. Norman. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Sonder USA Inc. ). (Lim, Lloyd) Copy request electronically forwarded to Veritext Legal Solutions on 06/06/24. Transcript estimated date of completion: 06/13/24. Modified on 6/6/2024 (DMcKinnieRichardson). (Entered: 06/04/2024) |
| 06/04/2024 | 🔵422<br>(369 pgs; 13 docs) | Witness List (Filed By 2425 WL, LLC ).(Related document(s):353 Generic Motion) (Attachments: # 1 Exhibit 1: Claim 13 # 2 Exhibit 2: Claim 14 # 3 Exhibit 3: Amended Objection to Claims of Natinal Bank of Kuwait # 4 Exhibit 4: Second Amended Petition # 5 Exhibit 5: Motion for Entry of Order Authorizing Creditor to Pursue Estate Claims # 6 Exhibit 6: Letter from Stephen Sather to Christopher Murray # 7 Exhibit 7: Complaint in Adv. Non. 23-6009 # 8 Exhibit 8: Information from Jerry Alexander # 9 Exhibit 9: Fact Sheet from Jerry Alexander # 10 Exhibit 10: Email from RJ Shannon # 11 Exhibit 11: Notice of Rule 2004 Exam of National Bank of Kuwait # 12 Exhibit 12: Final Order on Motion for Use of Cash Collateral) (Sather, Stephen) (Entered: 06/04/2024) |
| 06/04/2024 | 🔵423<br>(7 pgs; 3 docs) | Notice of Appeal filed. (related document(s):276 Order Setting Hearing, 359 Order on Motion to Vacate). Fee Amount $298. Appellant Designation due by 06/18/2024. (Attachments: # 1 Exhibit 276 Order |

| | | |
|---|---|---|
| | | Approving Disclosure Statement # 2 Exhibit 359 Order Denying Motion) (Baker, Reese) (Entered: 06/04/2024) |
| 06/05/2024 | 424 | Courtroom Minutes. Time Hearing Held: 9:30. Appearances: Mack Wilson for Sonder USA, Reese Baker for the Debtor, RJ Shannon for the Trustee. (Related document(s):115 Motion for Relief From Stay) Parties agreed to continue this matter. **Hearing rescheduled for 7/9/2024 at 09:30 AM at Houston, Courtroom 403 (JPN).** Stay to remain in effect. (trc4) (Entered: 06/05/2024) |
| 06/05/2024 | 425 (1 pg) | PDF with attached Audio File. Court Date & Time [ 6/5/2024 9:29:46 AM ]. File Size [ 1793 KB ]. Run Time [ 00:03:44 ]. (admin). (Entered: 06/05/2024) |
| 06/05/2024 | 426 | Election to Appeal to District Court . (bwl4) (Entered: 06/05/2024) |
| 06/05/2024 | 427 (1 pg) | Clerk's Notice of Filing of an Appeal. On 06/04/2024, Galleria 2425 Owner, LLC filed a notice of appeal. The appeal has been assigned to U.S. District Judge Keith P Ellison, Civil Action 4:24cv2111. Parties notified (Related document(s):423 Notice of Appeal) (bwl4) (Entered: 06/05/2024) |
| 06/05/2024 | 428 (18 pgs; 2 docs) | Notice - *Ballot Summary regarding the Chapter 11 Plan of Liquidation of the Debtor by National Bank of Kuwait S.A.K.P., New York Branch*. (Related document(s):194 Chapter 11 Plan, 195 Disclosure Statement, 276 Order Setting Hearing) Filed by Christopher R Murray (Attachments: # 1 Exhibit A - Ballots Actually Received by Close of Business on June 3, 2024) (Shannon, R. J.) (Entered: 06/05/2024) |
| 06/05/2024 | 429 (6 pgs) | Appellee Designation of Contents for Inclusion in Record of Appeal (related document(s):287 Notice of Appeal, 296 Notice of Appeal). (Shannon, R. J.) (Entered: 06/05/2024) |
| 06/05/2024 | 430 (10 pgs; 2 docs) | Response (related document(s):284 Objection to Claim). (Attachments: # 1 Exhibit A - Proposed Order) (Conrad, Charles) (Entered: 06/05/2024) |
| 06/05/2024 | 431 (4 pgs) | BNC Certificate of Mailing. (Related document(s):399 Order on Motion to Withdraw as Attorney) No. of Notices: 6. Notice Date 06/05/2024. (Admin.) (Entered: 06/05/2024) |
| 06/05/2024 | 432 (4 pgs) | BNC Certificate of Mailing. (Related document(s):398 Clerk's Notice of Filing of an Appeal) No. of Notices: 6. Notice Date 06/05/2024. (Admin.) (Entered: 06/05/2024) |
| 06/06/2024 | 433 (4 pgs) | BNC Certificate of Mailing. (Related document(s):412 Order on Motion to Continue/Reschedule Hearing) No. of Notices: 7. Notice Date 06/06/2024. (Admin.) (Entered: 06/06/2024) |
| 06/06/2024 | 434 (4 pgs) | BNC Certificate of Mailing. (Related document(s):415 Order on Emergency Motion) No. of Notices: 7. Notice Date 06/06/2024. (Admin.) (Entered: 06/06/2024) |
| 06/06/2024 | 435 (4 pgs) | BNC Certificate of Mailing. (Related document(s):418 Order Setting Hearing) No. of Notices: 7. Notice Date 06/06/2024. (Admin.) |

| | | |
|---|---|---|
| | | (Entered: 06/06/2024) |
| 06/06/2024 | ⬇ 436<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):419 Order on Motion To Stay Pending Appeal) No. of Notices: 7. Notice Date 06/06/2024. (Admin.) (Entered: 06/06/2024) |
| 06/07/2024 | ⬇ 437<br>(3 pgs) | Notice - *Contract & Cure Schedule*. (Related document(s):254 Order on Motion for Sale of Property under Section 363(b), 266 Notice) Filed by Christopher R Murray (Shannon, R. J.) (Entered: 06/07/2024) |
| 06/07/2024 | ⬇ 438<br>(16 pgs; 6 docs) | Certificate *of Service regarding Assumption & Assignment Notice, Contract & Cure Schedule, and Notice of Plans of Reorganization* (Filed By Christopher R Murray ).(Related document(s):254 Order on Motion for Sale of Property under Section 363(b), 266 Notice, 437 Notice) (Attachments: # 1 Exhibit 1 - Notice of Assumption and Assignment Procedures 266 # 2 Exhibit 2 - Contract and Cure Schedule # 3 Exhibit 3 - Notice of Plans of Reorganization Proposed in Bankruptcy Case # 4 Exhibit 4 - U.S.P.S. Service List # 5 Exhibit 5 - Email Service List) (Shannon, R. J.) (Entered: 06/07/2024) |
| 06/07/2024 | ⬇ 439<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by Mark Edwin Smith Filed by on behalf of 2425 WL, LLC (Smith, Mark) (Entered: 06/07/2024) |
| 06/07/2024 | ⬇ 440<br>(30 pgs; 4 docs) | Objection *National Bank of Kuwait, S.A.K.P., New York Branch's Limited Objection to Motion to Continue Hearings on Confirmation of Plan Filed by National Bank of Kuwait and Joint Plan Proposed by 2425 WL, LLC and Debtor, and Sale of Property* (related document(s):406 Motion to Continue/Reschedule Hearing). Filed by National Bank of Kuwait, S.A.K.P., New York Branch (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Service List) (Troop, Andrew) (Entered: 06/07/2024) |
| 06/07/2024 | ⬇ 441<br>(7 pgs) | Additional Attachments Re: *SUPPLEMENT TO EMERGENCY MOTION TO CONTINUE HEARING ON CONFIRMATION OF PLAN FILED BY NATIONAL BANK OF KUWAIT AND JOINT PLAN PROPOSED BY 2425 WL, LLC AND DEBTOR* (related document(s):406 Motion to Continue/Reschedule Hearing) (Filed By 2425 WL, LLC ).(Related document(s):406 Motion to Continue/Reschedule Hearing) (Smith, Mark) (Entered: 06/07/2024) |
| 06/07/2024 | ⬇ 442<br>(8 pgs; 2 docs) | Additional Attachments Re: *AMENDED SUPPLEMENT TO EMERGENCY MOTION TO CONTINUE HEARING ON CONFIRMATION OF PLAN FILED BY NATIONAL BANK OF KUWAIT AND JOINT PLAN PROPOSED BY 2425 WL, LLC AND DEBTOR* (related document(s):406 Motion to Continue/Reschedule Hearing) (Filed By 2425 WL, LLC ).(Related document(s):406 Motion to Continue/Reschedule Hearing) (Attachments: # 1 Exhibit A) (Smith, Mark) (Entered: 06/07/2024) |
| 06/07/2024 | ⬇ 443<br>(8 pgs; 2 docs) | Additional Attachments Re: *SECOND AMENDED SUPPLEMENT TO EMERGENCY MOTION TO CONTINUE HEARING ON CONFIRMATION OF PLAN FILED BY NATIONAL BANK OF KUWAIT AND JOINT PLAN PROPOSED BY 2425 WL, LLC AND DEBTOR* (related document(s):406 Motion to Continue/Reschedule Hearing, 441 Additional Attachments, 442 Additional Attachments) (Filed By 2425 WL, LLC ).(Related document(s):406 Motion to Continue/Reschedule Hearing, 441 Additional Attachments, 442 |

| | | |
|---|---|---|
| | | Additional Attachments) (Attachments: # 1 Exhibit A) (Smith, Mark) (Entered: 06/07/2024) |
| 06/07/2024 | 🔘 444<br>(37 pgs; 5 docs) | Adversary case 24-03120. Nature of Suit: (02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy))) Notice of Removal Ali Choudhri. Fee Amount $350 (Attachments: # 1 Exhibit A Docket Sheet # 2 Exhibit B Original Petition # 3 Exhibit C Amended Petition # 4 Exhibit D Second Amended Petition) (Conrad, Charles) (Entered: 06/07/2024) |
| 06/07/2024 | 🔘 445<br>(2 pgs) | Notice of Appearance and Request for Notice Filed by David Neal Stern Filed by on behalf of 2425 WL, LLC (Stern, David) (Entered: 06/07/2024) |
| 06/07/2024 | 🔘 446<br>(4 pgs) | BNC Certificate of Mailing. (Related document(s):427 Clerk's Notice of Filing of an Appeal) No. of Notices: 7. Notice Date 06/07/2024. (Admin.) (Entered: 06/07/2024) |
| 06/09/2024 | 🔘 447<br>(8 pgs; 2 docs) | Additional Attachments Re: *National Bank of Kuwait, S.A.K.P., New York Branch's Supplement To Its Limited Objection to Motion to Continue Hearings on Confirmation of Plan Filed by National Bank of Kuwait and Joint Plan Proposed by 2425 WL, LLC and the Debtor, and Sale of Property* (related document(s):440 Objection) (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ).(Related document(s):440 Objection) (Attachments: # 1 Exhibit A - Proposed Order) (Conrad, Charles) (Entered: 06/09/2024) |
| 06/09/2024 | 🔘 448<br>(15 pgs; 3 docs) | Emergency Motion *National Bank of Kuwait, S.A.K.P., New York Branch's Emergency Motion to (I) Vacate Order Approving 2425 WL, LLC and Debtor's Disclosure Statement, (II) Suspend Solicitation of Votes, and (III) Cancel Confirmation Hearing* Filed by Creditor National Bank of Kuwait, S.A.K.P., New York Branch (Attachments: # 1 Exhibit A Proposed Order # 2 Service List) (Conrad, Charles) (Entered: 06/09/2024) |
| 06/09/2024 | 🔘 449<br>(6 pgs) | Certificate *Supplemental Certificate of Service* (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ).(Related document(s):447 Additional Attachments) (Conrad, Charles) (Entered: 06/09/2024) |
| 06/10/2024 | 🔘 450<br>(1 pg) | Order Setting Response Deadline Signed on 6/10/2024 (Related document(s):448 Emergency Motion) (mar4) (Entered: 06/10/2024) |
| 06/10/2024 | 🔘 451<br>(1 pg) | Order Denying Motion To Continue/Reschedule Hearing On(Related Doc # 406) Signed on 6/10/2024. (mar4) (Entered: 06/10/2024) |
| 06/10/2024 | 🔘 452<br>(2 pgs) | Status Report (Filed By Christopher R Murray ).(Related document(s):254 Order on Motion for Sale of Property under Section 363(b)) (Murray, Christopher) (Entered: 06/10/2024) |
| 06/10/2024 | 🔘 453<br>(5 pgs) | Objection to Confirmation of Plan Filed by CC2 TX, LLC. (Related document(s):377 Amended Chapter 11 Plan) (Spector, Howard) (Entered: 06/10/2024) |
| 06/10/2024 | 🔘 454<br>(5 pgs) | Objection to Confirmation of Plan Filed by CC2 TX, LLC. (Related document(s):194 Chapter 11 Plan) (Spector, Howard) (Entered: |

000045

| | | |
|---|---|---|
| | | 06/10/2024) |
| 06/10/2024 | ⊙455<br>(30 pgs; 6 docs) | Objection (related document(s):353 Generic Motion). Filed by National Bank of Kuwait, S.A.K.P., New York Branch (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D Proposed Order # 5 Service List) (Conrad, Charles) (Entered: 06/10/2024) |
| 06/10/2024 | ⊙456<br>(4 pgs) | Disclosure of Compensation of Attorney for Debtor (Filed By Galleria 2425 Owner, LLC ). (Baker, Reese) (Entered: 06/10/2024) |
| 06/10/2024 | ⊙457<br>(25 pgs; 3 docs) | Response/Objection Filed by National Bank of Kuwait, S.A.K.P., New York Branch. (Related document(s):377 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit A Proposed Order # 2 Service List) (Conrad, Charles) (Entered: 06/10/2024) |
| 06/10/2024 | ⊙458<br>(2 pgs) | Notice *Of Appearance*. Filed by Galleria 2425 Owner, LLC (Steidley, Jeffrey) (Entered: 06/10/2024) |
| 06/10/2024 | ⊙459<br>(3 pgs) | Objection to Confirmation of Plan Filed by Christopher R Murray. (Related document(s):377 Amended Chapter 11 Plan, 378 Disclosure Statement) (Shannon, R. J.) (Entered: 06/10/2024) |
| 06/10/2024 | ⊙460<br>(8 pgs; 2 docs) | Objection *to Galleria 2524 Owner, LLC and 2425 WL, LLC's Proposed Chapter 11 Plan*. Filed by Rodney Drinnon (Attachments: # 1 Proposed Order) (Drinnon, Rodney) (Entered: 06/10/2024) |
| 06/10/2024 | ⊙461<br>(3 pgs) | Notice of Appearance and Request for Notice Filed by Patrick L Hughes Filed by on behalf of Landry's Inc. (Hughes, Patrick) (Entered: 06/10/2024) |
| 06/10/2024 | ⊙462<br>(4 pgs) | Objection to Confirmation of Plan Filed by Harris County, ATTN: Property Tax Division. (Related document(s):377 Amended Chapter 11 Plan) (Fuertes, Susan) (Entered: 06/10/2024) |
| 06/10/2024 | ⊙463<br>(14 pgs; 3 docs) | Emergency Motion *OF GALLERIA 2425 OWNER, LLC (i) TO PROHIBIT CREDIT BIDDING BY NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH (NBK), (ii) TO CONTINUE AUCTION SALE OF PROPERTY AT 2425 WEST LOOP SOUTH, (iii) TO ALLOW 2425 WL, LLC TO PURSUE CLAIMS AGAINST NBK, AND (iv) OTHER MATTERS* Filed by Debtor Galleria 2425 Owner, LLC (Attachments: # 1 Proposed Order # 2 Exhibit 1 Email from attorney for trustee) (Baker, Reese) (Entered: 06/10/2024) |
| 06/10/2024 | ⊙464<br>(476 pgs; 12 docs) | Emergency Motion *to Compel National Bank of Kuwait to Produce a Prepared Witness(es) and for Other Relief* Filed by Creditor 2425 WL, LLC (Attachments: # 1 Exhibit Exhibit 1 # 2 Exhibit Exhibit 3 Exhibit Exhibit 3 # 4 Exhibit Exhibit 4 # 5 Exhibit Exhibit 5 # 6 Exhibit Exhibit 6 # 7 Exhibit Exhibit 7 # 8 Exhibit Exhibit 8 # 9 Exhibit Exhibit 9 # 10 Proposed Order Proposed Order # 11 Service List) (Smith, Mark) (Entered: 06/10/2024) |
| 06/11/2024 | ⊙465<br>(1 pg) | Order Denying Emergency Motion (Related Doc # 464) Signed on 6/11/2024. (mar4) (Entered: 06/11/2024) |
| 06/11/2024 | ⊙466<br>(1 pg) | Order Denying Emergency Motion (Related Doc # 463) Signed on 6/11/2024. (mar4) (Entered: 06/11/2024) |

000046

| | | |
|---|---|---|
| 06/11/2024 | ⬤467<br>(148 pgs; 18 docs) | Emergency Motion *of the Trustee for Protective Order, or in the Alternative, to Quash and Related Relief* Filed by Trustee Christopher R Murray (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Exhibit A - Notice of Proposed Deposition # 4 Exhibit B - Notice of June 6 Deposition # 5 Exhibit C - June 5, 2024, Communications # 6 Exhibit D - Email Cancelling June 6 Deposition # 7 Exhibit E - Notification Email Indicating A. Choudhri Accessing Trustee's Production # 8 Exhibit F - Trustee's Notice of Deposition of 2425 WL LLC # 9 Exhibit G - Trustee's Notice of Deposition of the Debtor # 10 Exhibit H - Trustee's Deposition Subpoena re 2425 WL LLC # 11 Exhibit I - Trustee's Document Subpoena re 2425 WL LLC # 12 Exhibit J - Trustee's Deposition Subpoena re Debtor # 13 Exhibit K - Trustee's Document Subpoena re Debtor # 14 Exhibit L - May 16, 2024, Communication re Trustee's Availability # 15 Exhibit M - June 10, 2024, Communication re Rescheduling Deposition # 16 Exhibit N - June 10, 2024, at 11:42 p.m. Email Sending Notice of Proposed Deposition # 17 Exhibit O - June 11, 2024, Email re Alternative Arrangements) (Shannon, R. J.) (Entered: 06/11/2024) |
| 06/11/2024 | ⬤468<br>(2 pgs) | Order Granting in Part and Setting Hearing Signed on 6/11/2024 (Related document(s):467 Emergency Motion **Hearing scheduled for 6/17/2024 at 09:00 AM at Houston, Courtroom 403 (JPN).** (mar4) (Entered: 06/11/2024) |
| 06/11/2024 | ⬤469<br>(20 pgs; 4 docs) | Emergency Motion *Emergency Verified Motion to Authorize National Bank of Kuwait, S.A.K.P., New York Branch to Vote on Galleria 2425 Owner, LLC and 2425 WL, LLC's Fifth Amended Joint Chapter 11 Plan of Reorganization* Filed by Creditor National Bank of Kuwait, S.A.K.P., New York Branch (Attachments: # 1 Exhibit A Ballots # 2 Exhibit B Proposed Order # 3 Service List) (Troop, Andrew) (Entered: 06/11/2024) |
| 06/11/2024 | ⬤470<br>(7 pgs) | Notice *Notice of Intent to Adduce Testimony from a Remote Location by Telephone and Video Technology.* (Related document(s):377 Amended Chapter 11 Plan) Filed by National Bank of Kuwait, S.A.K.P., New York Branch (Troop, Andrew) (Entered: 06/11/2024) |
| 06/11/2024 | ⬤471<br>(7 pgs) | Notice *Notice of Intent to Adduce Testimony from a Remote Location by Telephone and Video Technology.* (Related document(s):377 Amended Chapter 11 Plan) Filed by National Bank of Kuwait, S.A.K.P., New York Branch (Troop, Andrew) (Entered: 06/11/2024) |
| 06/12/2024 | ⬤472<br>(1 pg) | Order Setting Hearing and to Show Cause Signed on 6/12/2024 (Related document(s):469 Emergency Motion to Authorize National Bank of Kuwait, SAKP, New York Branch to vote on Fifth Amended Plan **Hearing scheduled for 6/14/2024 at 10:00 AM at Houston, Courtroom 403 (JPN).** (trc4) (Entered: 06/12/2024) |
| 06/12/2024 | ⬤473<br>(7 pgs) | Notice *Notice of Hearing.* (Related document(s):469 Emergency Motion, 472 Order Setting Hearing) Filed by National Bank of Kuwait, S.A.K.P., New York Branch (Troop, Andrew) (Entered: 06/12/2024) |
| 06/12/2024 | ⬤474<br>(2 pgs) | Withdraw Document (Filed By 2425 WL, LLC ).(Related document(s):377 Amended Chapter 11 Plan, 378 Disclosure Statement) (Stern, David) (Entered: 06/12/2024) |

| 06/12/2024 | ⊙ 475<br>(6 pgs) | Response (Filed By 2425 WL, LLC ).(Related document(s):448 Emergency Motion) (Stern, David) (Entered: 06/12/2024) |
| --- | --- | --- |
| 06/12/2024 | ⊙ 476<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):450 Generic Order) No. of Notices: 7. Notice Date 06/12/2024. (Admin.) (Entered: 06/12/2024) |
| 06/12/2024 | ⊙ 477<br>(5 pgs) | BNC Certificate of Mailing. (Related document(s):451 Order on Motion to Continue/Reschedule Hearing) No. of Notices: 7. Notice Date 06/12/2024. (Admin.) (Entered: 06/12/2024) |
| 06/12/2024 | ⊙ 478<br>(5 pgs; 2 docs) | Notice *of Intent to Adduce Testimony from a Remote LOcation by Telephone and Video Technology*. Filed by 2425 WL, LLC (Attachments: # 1 Service List) (Smith, Mark) (Entered: 06/12/2024) |
| 06/12/2024 | ⊙ 479<br>(5 pgs; 2 docs) | Notice *OF INTENT TO ADDUCE TESTIMONY FROM A REMOTE LOCATION BY TELEPHONE AND VIDEO TECHNOLOGY*. Filed by 2425 WL, LLC (Attachments: # 1 Service List) (Smith, Mark) (Entered: 06/12/2024) |
| 06/12/2024 | ⊙ 480<br>(5 pgs; 2 docs) | Notice *OF INTENT TO ADDUCE TESTIMONY FROM A REMOTE LOCATION BY TELEPHONE AND VIDEO TECHNOLOGY*. Filed by 2425 WL, LLC (Attachments: # 1 Service List) (Smith, Mark) (Entered: 06/12/2024) |
| 06/12/2024 | ⊙ 481<br>(5 pgs; 2 docs) | Notice *OF INTENT TO ADDUCE TESTIMONY FROM A REMOTE LOCATION BY TELEPHONE AND VIDEO TECHNOLOGY*. Filed by 2425 WL, LLC (Attachments: # 1 Service List) (Smith, Mark) (Entered: 06/12/2024) |
| 06/12/2024 | ⊙ 482<br>(5 pgs; 2 docs) | Notice *OF INTENT TO ADDUCE TESTIMONY FROM A REMOTE LOCATION BY TELEPHONE AND VIDEO TECHNOLOGY*. Filed by 2425 WL, LLC (Attachments: # 1 Service List) (Smith, Mark) (Entered: 06/12/2024) |
| 06/12/2024 | ⊙ 483<br>(5 pgs; 2 docs) | Notice *OF INTENT TO ADDUCE TESTIMONY FROM A REMOTE LOCATION BY TELEPHONE AND VIDEO TECHNOLOGY*. Filed by 2425 WL, LLC (Attachments: # 1 Service List) (Smith, Mark) (Entered: 06/12/2024) |
| 06/12/2024 | ⊙ 484<br>(5 pgs; 2 docs) | Notice *OF INTENT TO ADDUCE TESTIMONY FROM A REMOTE LOCATION BY TELEPHONE AND VIDEO TECHNOLOGY*. Filed by 2425 WL, LLC (Attachments: # 1 Service List) (Smith, Mark) (Entered: 06/12/2024) |
| 06/13/2024 | ⊙ 485<br>(5 pgs; 2 docs) | Notice *OF INTENT TO ADDUCE TESTIMONY FROM A REMOTE LOCATION BY TELEPHONE AND VIDEO TECHNOLOGY*. Filed by 2425 WL, LLC (Attachments: # 1 Service List) (Smith, Mark) (Entered: 06/13/2024) |
| 06/13/2024 | ⊙ 486<br>(5 pgs; 2 docs) | Notice *OF INTENT TO ADDUCE TESTIMONY FROM A REMOTE LOCATION BY TELEPHONE AND VIDEO TECHNOLOGY*. Filed by 2425 WL, LLC (Attachments: # 1 Service List) (Smith, Mark) (Entered: 06/13/2024) |

| | | |
|---|---|---|
| 06/13/2024 | ⬤487<br>(5 pgs; 2 docs) | Notice *OF INTENT TO ADDUCE TESTIMONY FROM A REMOTE LOCATION BY TELEPHONE AND VIDEO TECHNOLOGY.* Filed by 2425 WL, LLC (Attachments: # 1 Service List) (Smith, Mark) (Entered: 06/13/2024) |
| 06/13/2024 | ⬤488<br>(5 pgs; 2 docs) | Notice *OF INTENT TO ADDUCE TESTIMONY FROM A REMOTE LOCATION BY TELEPHONE AND VIDEO TECHNOLOGY.* Filed by 2425 WL, LLC (Attachments: # 1 Service List) (Smith, Mark) (Entered: 06/13/2024) |
| 06/13/2024 | ⬤489<br>(5 pgs; 2 docs) | Notice *OF INTENT TO ADDUCE TESTIMONY FROM A REMOTE LOCATION BY TELEPHONE AND VIDEO TECHNOLOGY.* Filed by 2425 WL, LLC (Attachments: # 1 Service List) (Smith, Mark) (Entered: 06/13/2024) |
| 06/13/2024 | ⬤490<br>(5 pgs; 2 docs) | Notice *OF INTENT TO ADDUCE TESTIMONY FROM A REMOTE LOCATION BY TELEPHONE AND VIDEO TECHNOLOGY.* Filed by 2425 WL, LLC (Attachments: # 1 Service List) (Smith, Mark) (Entered: 06/13/2024) |
| 06/13/2024 | ⬤491<br>(5 pgs; 2 docs) | Notice *OF INTENT TO ADDUCE TESTIMONY FROM A REMOTE LOCATION BY TELEPHONE AND VIDEO TECHNOLOGY.* Filed by 2425 WL, LLC (Attachments: # 1 Service List) (Smith, Mark) (Entered: 06/13/2024) |
| 06/13/2024 | ⬤492<br>(5 pgs; 2 docs) | Notice *OF INTENT TO ADDUCE TESTIMONY FROM A REMOTE LOCATION BY TELEPHONE AND VIDEO TECHNOLOGY.* Filed by 2425 WL, LLC (Attachments: # 1 Service List) (Smith, Mark) (Entered: 06/13/2024) |
| 06/13/2024 | ⬤493<br>(5 pgs; 2 docs) | Notice *OF INTENT TO ADDUCE TESTIMONY FROM A REMOTE LOCATION BY TELEPHONE AND VIDEO TECHNOLOGY.* Filed by 2425 WL, LLC (Attachments: # 1 Service List) (Smith, Mark) (Entered: 06/13/2024) |
| 06/13/2024 | ⬤494<br>(1 pg) | Order Mooting Emergency Motion (Related Doc # 469) Signed on 6/13/2024. (mar4) (Entered: 06/13/2024) |
| 06/13/2024 | ⬤495<br>(1 pg) | Order Mooting Emergency Motion (Related Doc # 448) Signed on 6/13/2024. (mar4) (Entered: 06/13/2024) |
| 06/13/2024 | ⬤496<br>(12 pgs; 2 docs) | Exhibit List (Filed By Arin-Air Inc. ).(Related document(s):410 Objection to Confirmation of the Plan) (Attachments: # 1 Exhibit Exhibit 1) (Cerasuolo, Gary) (Entered: 06/13/2024) |
| 06/13/2024 | ⬤497<br>(11 pgs; 4 docs) | Exhibit List (Filed By City of Houston, Houston Community College System, Houston ISD ).(Related document(s):194 Chapter 11 Plan, 285 Objection to Confirmation of the Plan, 286 Objection to Confirmation of the Plan, 377 Amended Chapter 11 Plan) (Attachments: # 1 Exhibit 1 - City of Houston Tax Statement # 2 Exhibit 2 - Houston ISD Statement # 3 Exhibit 3 - HCCS Statement) (Andresen, Jeannie) (Entered: 06/13/2024) |
| 06/13/2024 | ⬤498<br>(360 pgs; 24 docs) | Witness List, Exhibit List (Filed By Christopher R Murray ).(Related document(s):194 Chapter 11 Plan, 353 Generic Motion) (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Exhibit |

| | | |
|---|---|---|
| | | # 7 Exhibit # 8 Exhibit # 9 Exhibit # 10 Exhibit # 11 Exhibit # 12 Exhibit # 13 Exhibit # 14 Exhibit # 15 Exhibit # 16 Exhibit # 17 Exhibit # 18 Exhibit # 19 Exhibit # 20 Exhibit # 21 Exhibit # 22 Exhibit # 23 Exhibit) (Shannon, R. J.) (Entered: 06/13/2024) |
| 06/13/2024 | 🌐 499 (3038 pgs; 92 docs) | Witness List, Exhibit List (Filed By Galleria 2425 Owner, LLC ). (Related document(s):194 Chapter 11 Plan, 353 Generic Motion) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34 # 35 Exhibit 35 # 36 Exhibit 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42 # 43 Exhibit 44 # 44 Exhibit 45 # 45 Exhibit 46 # 46 Exhibit 47 # 47 Exhibit 48 # 48 Exhibit 49 # 49 Exhibit 50 # 50 Exhibit 51 # 51 Exhibit 52 # 52 Exhibit 53 # 53 Exhibit 54 # 54 Exhibit 55 # 55 Exhibit 56 # 56 Exhibit 57 # 57 Exhibit 58 # 58 Exhibit 59 # 59 Exhibit 60 # 60 Exhibit 61 # 61 Exhibit 62 # 62 Exhibit 63 # 63 Exhibit 64 # 64 Exhibit 65 # 65 Exhibit 66 # 66 Exhibit 67 # 67 Exhibit 68 # 68 Exhibit 69 # 69 Exhibit 70 # 70 Exhibit 71 # 71 Exhibit 72 # 72 Exhibit 73 # 73 Exhibit 74 # 74 Exhibit 75 # 75 Exhibit 76 # 76 Exhibit 77 # 77 Exhibit 78 # 78 Exhibit 79 # 79 Exhibit 80 # 80 Exhibit 81 # 81 Exhibit 82 # 82 Exhibit 83 # 83 Exhibit 84 # 84 Exhibit 85 # 85 Exhibit 86 # 86 Exhibit 87 # 87 Exhibit 88 # 88 Exhibit 89 # 89 Exhibit 90 # 90 Exhibit 91 # 91 Exhibit 92) (Baker, Reese) (Entered: 06/13/2024) |
| 06/13/2024 | 🌐 500 (636 pgs; 16 docs) | Exhibit List (Filed By 2425 WL, LLC ). (Attachments: # 1 EXHIBIT 1 # 2 EXHIBIT 2 # 3 EXHIBIT 3 # 4 EXHIBIT 4 # 5 EXHIBIT 5 # 6 EXHIBIT 6 # 7 EXHIBIT 7 # 8 EXHIBIT 8 # 9 EXHIBIT 9 # 10 EXHIBIT 10 # 11 EXHIBIT 11 # 12 EXHIBIT 12 # 13 EXHIBIT 13 # 14 EXHIBIT 14 # 15 EXHIBIT 15) (Smith, Mark) (Entered: 06/13/2024) |
| 06/13/2024 | 🌐 501 (1298 pgs; 22 docs) | Witness List, Exhibit List (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ).(Related document(s):194 Chapter 11 Plan) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22) (Troop, Andrew) (Entered: 06/13/2024) |
| 06/13/2024 | 🌐 502 (6 pgs) | Witness List (Filed By Jetall Companies, Inc. ). (MacGeorge, Jennifer) (Entered: 06/13/2024) |
| 06/13/2024 | 🌐 503 (1177 pgs; 25 docs) | Exhibit List (Filed By 2425 WL, LLC ).(Related document(s):500 Exhibit List) (Attachments: # 1 EXHIBIT 16 # 2 EXHIBIT 17 # 3 EXHIBIT 18 # 4 EXHIBIT 19 # 5 EXHIBIT 20 # 6 EXHIBIT 21 # 7 EXHIBIT 22 # 8 EXHIBIT 23 # 9 EXHIBIT 24 # 10 EXHIBIT 25 # 11 EXHIBIT 26 # 12 EXHIBIT 27 # 13 EXHIBIT 28 # 14 EXHIBIT 30 # 15 EXHIBIT 31 # 16 EXHIBIT 32 # 17 EXHIBIT 33 # 18 EXHIBIT 34 # 19 EXHIBIT 35 # 20 EXHIBIT 36 # 21 EXHIBIT 37 # |

| | | |
|---|---|---|
| | | 22 EXHIBIT 38 # 23 EXHIBIT 39 # 24 EXHIBIT 40) (Smith, Mark) (Entered: 06/13/2024) |
| 06/13/2024 | ● 504 (1238 pgs; 54 docs) | Exhibit List (Filed By 2425 WL, LLC ).(Related document(s):500 Exhibit List, 503 Exhibit List) (Attachments: # 1 EXHIBIT 41 # 2 EXHIBIT 42 # 3 EXHIBIT 43 # 4 EXHIBIT 44 # 5 EXHIBIT 45 # 6 EXHIBIT 46 # 7 EXHIBIT 47 # 8 EXHIBIT 48 # 9 EXHIBIT 49 # 10 EXHIBIT 50 # 11 EXHIBIT 51 # 12 EXHIBIT 52 # 13 EXHIBIT 53 # 14 EXHIBIT 54 # 15 EXHIBIT 55 # 16 EXHIBIT 56 # 17 EXHIBIT 57 # 18 EXHIBIT 58 # 19 EXHIBIT 59 # 20 EXHIBIT 60 # 21 EXHIBIT 61 # 22 EXHIBIT 62 # 23 EXHIBIT 63 # 24 EXHIBIT 64 # 25 EXHIBIT 65 # 26 EXHIBIT 66 # 27 EXHIBIT 67 # 28 EXHIBIT 68 # 29 EXHIBIT 69 # 30 EXHIBIT 70 # 31 EXHIBIT 71 # 32 EXHIBIT 72 # 33 EXHIBIT 73 # 34 EXHIBIT 74 # 35 EXHIBIT 75 # 36 EXHIBIT 76 # 37 EXHIBIT 77 # 38 EXHIBIT 78 # 39 EXHIBIT 79 # 40 EXHIBIT 80 # 41 EXHIBIT 81 # 42 EXHIBIT 82 # 43 EXHIBIT 83 # 44 EXHIBIT 84 # 45 EXHIBIT 85 # 46 EXHIBIT 86 # 47 EXHIBIT 87 # 48 EXHIBIT 88 # 49 EXHIBIT 89 # 50 EXHIBIT 90 # 51 EXHIBIT 91 # 52 EXHIBIT 92 # 53 EXHIBIT 29) (Smith, Mark) (Entered: 06/13/2024) |
| 06/13/2024 | ● 505 (145 pgs; 17 docs) | Witness List, Exhibit List (Filed By Christopher R Murray ).(Related document(s):467 Emergency Motion, 468 Order Setting Hearing) (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Exhibit # 7 Exhibit # 8 Exhibit # 9 Exhibit # 10 Exhibit # 11 Exhibit # 12 Exhibit # 13 Exhibit # 14 Exhibit # 15 Exhibit # 16 Exhibit) (Shannon, R. J.) (Entered: 06/13/2024) |
| 06/13/2024 | ● 506 (10 pgs; 2 docs) | Emergency Motion *to Cancel Plan Confirmation Hearing Scheduled for June 17, 2024, For Failure to Comply With Service Obligations* Filed by Creditor 2425 WL, LLC (Attachments: # 1 Proposed Order) (Stern, David) (Entered: 06/13/2024) |
| 06/13/2024 | ● 507 (1 pg) | Order Denying Emergency Motion (Related Doc # 506) Signed on 6/13/2024. (mar4) (Entered: 06/13/2024) |
| 06/13/2024 | ● 508 (216 pgs; 8 docs) | Witness List, Exhibit List (Filed By National Bank of Kuwait, S.A.K.P., New York Branch ).(Related document(s):353 Generic Motion) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Troop, Andrew) (Entered: 06/13/2024) |
| 06/13/2024 | ● 509 (6 pgs) | Exhibit List, Witness (Filed By Ali Choudhri ). (srh4) (Entered: 06/13/2024) |
| 12/05/2023 | ● | Notice of Appearance and Request for Notice Filed by Jana Smith Whitworth (Whitworth, Jana) (Entered: 12/05/2023) |
| 12/07/2023 | ● | Previous case filed in the Southern District of Texas, Case Number 23-60036. (DanielBerger) (Entered: 12/07/2023) |
| 12/09/2023 | | Receipt of Voluntary Petition (Chapter 11)( 23-34815) [misc,volp11] (1738.00) Filing Fee. Receipt number A24920843. Fee amount $1738.00. (U.S. Treasury) (Entered: 12/09/2023) |
| 12/11/2023 | | Receipt of Motion for Relief From Stay( 23-34815) [motion,mrlfsty] ( 199.00) Filing Fee. Receipt number A24923992. Fee amount $ 199.00. |

| | | (U.S. Treasury) (Entered: 12/11/2023) |
|---|---|---|
| 12/27/2023 | | Receipt of Motion to Convert Case from Chapter 11 to Chapter 7( 23-34815) [motion,mcnv7] ( 15.00) Filing Fee. Receipt number A24955152. Fee amount $ 15.00. (U.S. Treasury) (Entered: 12/27/2023) |
| 01/10/2024 | ⚬ | Meeting of Creditors Held. Debtor appeared and participated by and through its designated representatives, Dward Darjean and Ali Choudhri. Hearing concluded on January 10, 2024. (Related document(s):9 Meeting of Creditors Chapter 11 for Non-Individual Debtor Set) (Whitworth, Jana) (Entered: 01/10/2024) |
| 01/11/2024 | ⚬ | Adversary Case 4:23-ap-3259 Closed. (MarioRios) (Entered: 01/11/2024) |
| 02/09/2024 | | Receipt of Motion for Relief From Stay( 23-34815) [motion,mrlfsty] ( 199.00) Filing Fee. Receipt number A25065762. Fee amount $ 199.00. (U.S. Treasury) (Entered: 02/09/2024) |
| 03/22/2024 | ⚬ | Hearing Reset On (Related document(s): Hearing rescheduled for 4/5/2024 at 09:00 AM at Houston, Courtroom 403 (JPN). (mar4). Related document(s) 145 Motion *for Entry of an Order (A) Authorizing the Trustee to Enter into an Agreement with Jones Lang LaSalle Americas, Inc. to Serve as Property Manager and (B) Granting Related Relief* filed by Trustee Christopher R Murray. Modified on 3/27/2024 (MarioRios). (Entered: 03/22/2024) |
| 04/05/2024 | | Receipt of Motion for Sale of Property( 23-34815) [motion,msale363] ( 199.00) Filing Fee. Receipt number A25196356. Fee amount $ 199.00. (U.S. Treasury) (Entered: 04/05/2024) |
| 04/18/2024 | | Receipt of Motion for Sale of Property( 23-34815) [motion,msale363] ( 199.00) Filing Fee. Receipt number A25223343. Fee amount $ 199.00. (U.S. Treasury) (Entered: 04/18/2024) |
| 05/07/2024 | | Receipt of Notice of Appeal( 23-34815) [appeal,ntcapl] ( 298.00) Filing Fee. Receipt number A25268108. Fee amount $ 298.00. (U.S. Treasury) (Entered: 05/07/2024) |
| 05/08/2024 | | Receipt of Notice of Appeal( 23-34815) [appeal,ntcapl] ( 298.00) Filing Fee. Receipt number A25273118. Fee amount $ 298.00. (U.S. Treasury) (Entered: 05/08/2024) |
| 05/29/2024 | | Receipt of Notice of Appeal( 23-34815) [appeal,ntcapl] ( 298.00) Filing Fee. Receipt number A25321310. Fee amount $ 298.00. (U.S. Treasury) (Entered: 05/29/2024) |
| 06/10/2024 | ⚬ | ENTRY MADE FOR ADMINISTRATIVE PURPOSES Hearing Set On (Related document(s):378 Disclosure Statement) **Hearing scheduled for 6/17/2024 at 09:00 AM at Houston, Courtroom 403 (JPN). See also ECF#384.** (mar4) (Entered: 06/10/2024) |
| 06/10/2024 | ⚬ | Hearing Set On (Related document(s):194 Chapter 11 Plan, 377 Amended Chapter 11 Plan) Hearing scheduled for 6/17/2024 at 09:00 AM at Houston, Courtroom 403 (JPN). (mar4) (Entered: 06/10/2024) |

| | | |
|---|---|---|
| 06/10/2024 | | Receipt of Notice of Appeal( 23-34815) [appeal,ntcapl] ( 298.00) Filing Fee. Receipt number A25348842. Fee amount $ 298.00. (U.S. Treasury) (Entered: 06/10/2024) |

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

_____ Southern District of Texas _____

Case number (if known): _____   Chapter ___11___

☐ Check if this is an
   amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

06/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | |
|---|---|
| **1. Debtor's name** | Galleria 2425 Owner, LLC |

| | |
|---|---|
| **2. All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names, and *doing business as names* | _____<br>_____<br>_____<br>_____ |

| | |
|---|---|
| **3. Debtor's federal Employer Identification Number (EIN)** | 3  6 – 4  8  9  6  7  3  8 |

**4. Debtor's address**

**Principal place of business**

1001 West Loop South
Number      Street

Houston, TX 77027
City                              State      ZIP Code

Harris
County

**Mailing address, if different from principal place of business**

_____
Number        Street

_____
City                    State    ZIP Code

**Location of principal assets, if different from principal place of business**

_____
Number        Street

_____
City                    State    ZIP Code

| | |
|---|---|
| **5. Debtor's website (URL)** | _____ |

**6. Type of debtor**

☐ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☑ Other. Specify:     Limited Liability Company

Debtor      Galleria 2425 Owner, LLC                                   Case number *(if known)*
              Name

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. §101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. §781(3))

☑ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See
http://www.uscourts.gov/four-digit-national-association-naics-codes .
   5   3   1   1

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first subbox. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box

*Check one:*

☐ Chapter 7

☐ Chapter 9

☑ Chapter 11. *Check all that apply:*

☑ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☐ No

☑ Yes. District  Southern District of Texas   When  7/5/2023    Case number  23-60036
                                                          MM / DD / YYYY

District _____  When _____ Case number _____
                                        MM / DD / YYYY

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☑ No

☐ Yes. Debtor _____  Relationship _____

District _____  When _____
                                                  MM / DD / YYYY

Case number, if known _____

Official Form 201                     **Voluntary Petition for Non-Individuals Filing for Bankruptcy**                     000055           page **2**

Debtor    Galleria 2425 Owner, LLC

Name

Case number *(if known)*

| 11. Why is the case filed in *this district*? | *Check all that apply:* |
|---|---|

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes.   Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** *(Check all that apply.)*

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____

Number          Street

_____

City                                State    ZIP Code

**Is the property insured?**

☐ No

☐ Yes.   Insurance agency _____

Contact name _____

Phone _____

## Statistical and administrative information

**13. Debtor's estimation of available funds?**

*Check one:*

☐ Funds will be available for distribution to unsecured creditors.

☑ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

☑ 1-49        ☐ 50-99          ☐ 1,000-5,000    ☐ 5,001-10,000    ☐ 25,001-50,000   ☐ 50,000-100,000

☐ 100-199    ☐ 200-999        ☐ 10,001-25,000                      ☐ More than 100,000

**15. Estimated assets**

☐ $0-$50,000                  ☐ $1,000,001-$10 million      ☐ $500,000,001-$1 billion

☐ $50,001-$100,000           ☑ $10,000,001-$50 million     ☐ $1,000,000,001-$10 billion

☐ $100,001-$500,000          ☐ $50,000,001-$100 million    ☐ $10,000,000,001-$50 billion

☐ $500,001-$1 million        ☐ $100,000,001-$500 million   ☐ More than $50 billion

Debtor    Galleria 2425 Owner, LLC                                 Case number *(if known)* _____

Name

---

**16. Estimated liabilities**

- [ ] $0-$50,000
- [ ] $50,001-$100,000
- [ ] $100,001-$500,000
- [ ] $500,001-$1 million

- [ ] $1,000,001-$10 million
- [ ] $10,000,001-$50 million
- [x] $50,000,001-$100 million
- [ ] $100,000,001-$500 million

- [ ] $500,000,001-$1 billion
- [ ] $1,000,000,001-$10 billion
- [ ] $10,000,000,001-$50 billion
- [ ] More than $50 billion

---

### Request for Relief, Declaration, and Signatures

**WARNING --**    Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

- The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

- I have been authorized to file this petition on behalf of the debtor.

- I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   12/05/2023
                 MM/ DD/ YYYY

**X**   /s/ Dward Darjean                                Dward Darjean
Signature of authorized representative of debtor           Printed name

Title                       Manager

---

**18. Signature of attorney**

**X**            /s/ James Q. Pope            Date   12/05/2023
Signature of attorney for debtor                            MM/ DD/ YYYY

  James Q. Pope
Printed name

  The Pope Law Firm
Firm name

  6161 Savoy Drive 1125
Number       Street

  Houston                           TX        77036
City                                 State       ZIP Code

  (713) 449-4481                 jamesp@thepopelawfirm.com
Contact phone                        Email address

  24048738                     TX
Bar number                       State

---

| Fill in this information to identify the case: |
| --- |
| Debtor name                 Galleria 2425 Owner, LLC |
| United States Bankruptcy Court for the: <br>                 Southern District of Texas |
| Case number (if known): _____ |

☐ Check if this is an amended filing

## Official Form 204

# Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider*, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | 2425 WL, LLC <br> 13498 Pond Springs Rd. <br> Austin, TX 78729 | | | | $25,092,415.80 | $17,500,000.00 | $7,592,415.80 |
| 2 | Ali Choudhry <br> 1001 West Loop South 700 <br> Houston, TX 77027 | | | | | | $960,000.00 |
| 3 | Ash Automated Control Systems, LLC <br> PO Box 1113 <br> Fulshear, TX 77441 | | HVAC Repair | | | | $1,548.31 |
| 4 | Caz Creek Lending <br> 118 Vintage Park Blvd No. W <br> Houston, TX 77070 | | Tax Lien | | $800,238.37 | $17,500,000.00 | $800,238.37 |
| 5 | Cirro Electric <br> PO Box 60004 <br> Dallas, TX 75266 | | | | | | $27,000.00 |
| 6 | City of Houston <br> PO Box 1560 <br> Houston, TX 77251 | | | | | | $7,500.00 |
| 7 | CNA Insurance Co <br> PO Box 74007619 <br> Chicago, IL 60674 | | | | | | $63,216.48 |
| 8 | Datawatch Systems <br> 4520 East West Highway 200 <br> Bethesda, MD 20814 | | | | | | $18,626.10 |

000058

Debtor ___Galleria 2425 Owner, LLC_____        Case number *(if known)* _____
          Name

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 9 | Firetron<br>PO Box 1604<br>Stafford, TX 77497 | | | | | | $30,040.34 |
| 10 | First Insurance Funding<br>450 Skokie Blvd<br>Northbrook, IL 60062 | | | | | | $5,507.36 |
| 11 | Gulfstream Legal Group<br>1300 Texas St<br>Houston, TX 77002 | | | | | | $57,799.06 |
| 12 | Harris County Tax Assessor<br>PO Box 4622<br>Houston, TX 77210 | | | | $957,825.16 | $17,500,000.00 | $957,825.16 |
| 13 | HNB Construction, LLC<br>521 Woodhaven<br>Ingleside, TX 78362 | | | | | | $58,207.11 |
| 14 | Lexitas<br>PO Box Box 734298 Dept 2012<br>Dallas, TX 75373 | | | | | | $2,813.33 |
| 15 | MacGeorge Law Firm<br>2921 E 17th St Blgd D Suite 6<br>Austin, TX 78702 | | | | | | $34,445.48 |
| 16 | National Bank of Kuwait<br>299 Park Ave. 17th Floor<br>New York, NY 10171 | | | Disputed | $26,000,000.00 | $17,500,000.00 | $26,000,000.00 |
| 17 | Nationwide Security<br>2425 W Loop S 300<br>Houston, TX 77027 | | | | | | $32,549.70 |
| 18 | Nichamoff Law Firm<br>2444 Times Blvd 270<br>Houston, TX 77005 | | | | | | $46,984.22 |
| 19 | TKE<br>3100 Interstate North Cir SE 500<br>Atlanta, GA 30339 | | | | | | $57,881.13 |
| 20 | Zindler Cleaning Service Co<br>2450 Fondren 113<br>Houston, TX 77063 | | | | | | $2,110.88 |

Official Form 204          Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

IN RE: **Galleria 2425 Owner, LLC**                                   CASE NO

                                                                      CHAPTER **11**


**VERIFICATION OF CREDITOR MATRIX**


The above named Debtor hereby verifies that the attached list of creditors is true and correct to the best of his/her knowledge.


Date _____12/05/2023_____      Signature _____/s/ Dward Darjean_____
                                                                      Dward Darjean, Manager

**2425 WL, LLC**
13498 POND SPRINGS RD.
AUSTIN, TX 78729

**ADT**
PO BOX 382109
PITTSBURGH, PA 15251

**ALI CHOUDHRY**
1001 WEST LOOP SOUTH 700
HOUSTON, TX 77027

**ASH AUTOMATED CONTROL SYSTEMS, LLC**
PO BOX 1113
FULSHEAR, TX 77441

**CAZ CREEK LENDING**
118 VINTAGE PARK BLVD NO. W
HOUSTON, TX 77070

**CFI MECHANICAL, INC**
6109 BRITTMOORE RD
HOUSTON, TX 77041

**CIRRO ELECTRIC**
PO BOX 60004
DALLAS, TX 75266

**CITY OF HOUSTON**
PO BOX 1560
HOUSTON, TX 77251

**CNA INSURANCE CO**
PO BOX 74007619
CHICAGO, IL 60674

**COMCAST**
PO BOX 60533
CITY OF INDUSTRY, CA 91716

**DATAWATCH SYSTEMS**
4520 EAST WEST HIGHWAY 200
BETHESDA, MD 20814

**ENVIRONMENTAL COALITION INC**
PO BOX 1568
STAFFORD, TX 77497

**FERGUSON FACILITIES SUPPLIES**
PO BOX 200184
SAN ANTONIO, TX 78220

**FIRETRON**
PO BOX 1604
STAFFORD, TX 77497

**FIRST INSURANCE FUNDING**
450 SKOKIE BLVD
NORTHBROOK, IL 60062

**GULFSTREAM LEGAL GROUP**
1300 TEXAS ST
HOUSTON, TX 77002

**HARRIS COUNTY TAX ASSESSOR**
PO BOX 4622
HOUSTON, TX 77210

**HNB CONSTRUCTION, LLC**
521 WOODHAVEN
INGLESIDE, TX 78362

**KINGS 111 EMERGENCY COMMUNICATIONS**
751 CANYON DRIVE, SUITE 100
COPPELL, TX 75019

**LEXITAS**
PO BOX BOX 734298 DEPT 2012
DALLAS, TX 75373

**LOGIX FIBER NETWORKS**
PO BOX 734120
DALLAS, TX 75373

**MACGEORGE LAW FIRM**
2921 E 17TH ST BLGD D SUITE 6
AUSTIN, TX 78702

**MUELLER WATER TREATMENT**
1500 SHERWOOD FOREST DR.
HOUSTON, TX 77043

**NATIONAL BANK OF KUWAIT**
299 PARK AVE. 17TH FLOOR
NEW YORK, NY 10171

**NATIONWIDE SECURITY**
2425 W LOOP S 300
HOUSTON, TX 77027

**NICHAMOFF LAW FIRM**
2444 TIMES BLVD 270
HOUSTON, TX 77005

**TKE**
3100 INTERSTATE NORTH CIR SE 500
ATLANTA, GA 30339

**WASTE MANAGEMENT**
PO BOX 660345
DALLAS, TX 75266

**ZINDLER CLEANING SERVICE CO**
2450 FONDREN 113
HOUSTON, TX 77063

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 06, 2023

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

IN RE:                             §
                                   §        **CASE NO: 23-34815**
**GALLERIA 2425 OWNER, LLC,**      §
                                   §
Debtor.                            §
                                   §        **CHAPTER 11**
                                   §

### ORDER TO DEBTOR-IN-POSSESSION IN A SMALL BUSINESS
### CASE AND SETTING STATUS CONFERENCE

Upon the filing of this case under the provisions of Chapter 11 of the Bankruptcy Code, and pursuant to the authority granted the Court by 11 U.S.C. Section 105 authorizing the entry of such orders as may be necessary to carry out the provisions of the Bankruptcy Code,

**IT IS ORDERED** that, pursuant to 11 U.S.C. Section 1101(1), the above named Debtor, as a debtor-in-possession ("Debtor"), shall continue in possession of its estate and, pursuant to 11 U.S.C. Sections 1107(a) and 1108, shall continue the operation of its business and management of its property until further order of this Court;

**IT IS FURTHER ORDERED** that in connection with the operation of said business, the Debtor:

(1) **Bank Accounts.** Shall close all bank accounts maintained on the date of the filing of the petition. All funds on deposit to the credit of the Debtor in said accounts on such date shall be transferred to new accounts to be opened by the Debtor. Deposits are to be made only in accounts within a depository approved by the United States Trustee.

(2) **Withholding Taxes; Employees.** Shall segregate and hold separate and apart from all other funds any and all monies withheld from employees or collected from others for taxes, including social security taxes, under the laws of the United States or any state or subdivision thereof and to deposit, as required by law, all monies withheld from employees for social security and federal income tax withholdings.

(3) **Withholdings; Others.** Shall deposit or pay promptly to any state or political subdivision thereof any and all monies required to be withheld or collected from others subsequent to the petition date, on such basis as may be required by the laws or ordinances of such state or political subdivision.

(4) **Closure of Books; New Books of Account.** Shall close and preserve its pre-petition books and accounts and open and maintain new books of account showing all income and expenditures, receipts and disbursements of the Debtor during the Chapter 11 proceeding.

(5) **Pre-petition Debts.** Shall not pay any debt or obligation incurred prior to the filing of the petition unless payment of such debt is specifically authorized by the Court.

(6) **Use of Cash Collateral.** A debtor in possession may not use "cash collateral" without the consent of the secured party or authorization by this court. All cash collateral is to be

1 / 2

deposited in a separate account pending the entry of a court order with respect to its disposition.

(7) **Ordinary Course of Business.**  Shall not sell, lease, or otherwise dispose of property nor enter into any transaction outside of the ordinary course of business unless specifically authorized by this Court.  The Debtor may buy and sell merchandise, supplies and other property in the ordinary course of business necessary and essential for its operation and to render and obtain services.

(8) **Insurance.**  Shall keep the property of the estate insured at a level equal to the value of such property and shall pay such premiums as may be or become due thereon.

(9) **Monthly Reports.**  Shall on or before the 20th day of each month file the Monthly Operating Report for the prior calendar month with the Clerk of this Court in Houston and, in addition, submit one copy to the Houston office of the United States Trustee and one copy to the Unsecured Creditors' Committee.  The report shall be filed using Official Form B 425C.

(10) **Administrative Expenses.**  Shall take all steps reasonably necessary to prevent the incurring of administrative expenses the payment of which will not be possible from funds which can be generated during the proceeding, and shall take all steps necessary to prevent any depletion or potential depletion of property of the estate, and shall immediately advise this Court and the United States Trustee if the continued operation of the business of the Debtor may not be in the best interest of the creditors or the Debtor.

     **IT IS FURTHER ORDERED** that not later than one hundred eighty (180) days after the date of entry of the Order for Relief herein, the Debtor shall file (a) a disclosure statement pursuant to 11 U.S.C. Section 1125, and (b) a plan of reorganization pursuant to 11 U.S.C. Sections 1121 and 1123.

     **IT IS FURTHER ORDERED** that the debtor in possession, counsel for the debtor in possession, and the United States Trustee, shall appear before the undersigned in **Courtroom 403, United States Courthouse, 515 Rusk St., Houston, Texas at 11:00 a.m. on February 7, 2024**, for the purpose of a status conference concerning the actions taken and progress made toward confirmation of a plan of reorganization. Any other party in interest may appear and participate in such status conference.

    SIGNED 12/06/2023

                             Jeffrey Norman
                             United States Bankruptcy Judge

2 / 2

| Fill in this information to identify the case: |
|---|

United States Bankruptcy Court for the:

Southern District of Texas

Case number (if known): __23-34815__   Chapter __11__

☑ Check if this is an
amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy          06/22

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.**

| 1. Debtor's name | Galleria 2425 Owner, LLC |
|---|---|

**2. All other names debtor used in the last 8 years**

Include any assumed names, trade names, and *doing business as names*

**3. Debtor's federal Employer Identification Number (EIN)**   3  6 – 4  8  9  6  7  3  8

**4. Debtor's address**

**Principal place of business**

1001 West Loop South
Number          Street

Houston, TX 77027
City                          State      ZIP Code

Harris
County

**Mailing address, if different from principal place of business**

Number          Street

City                          State      ZIP Code

**Location of principal assets, if different from principal place of business**

Number          Street

City                          State      ZIP Code

**5. Debtor's website (URL)**

**6. Type of debtor**

☐ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☑ Other. Specify:   Limited Liability Company

| Debtor | Galleria 2425 Owner, LLC | Case number (if known) | 23-34815 |
|---|---|---|---|
| | Name | | |

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☑ <span style="color:red">Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))</span>

☐ Railroad (as defined in 11 U.S.C. §101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. §781(3))

☐ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See
http://www.uscourts.gov/four-digit-national-association-naics-codes .
   5   3   1   1

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first subbox. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box

*Check one:*

☐ Chapter 7

☐ Chapter 9

☑ Chapter 11. *Check **all** that apply:*

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☐ No

☑ Yes. District  Southern District of Texas   When  7/5/2023   Case number  23-60036
                                                              MM / DD / YYYY

   District _____   When _____   Case number _____
                     MM / DD / YYYY

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☑ No

☐ Yes. Debtor _____   Relationship _____

   District _____   When _____
                     MM / DD / YYYY

   Case number, if known _____

Official Form 201          Voluntary Petition for Non-Individuals Filing for Bankruptcy                    000065          page 2

Debtor     Galleria 2425 Owner, LLC                      Case number *(if known)*     23-34815
         Name

| | |
|---|---|
| **11. Why is the case filed in *this district*?** | *Check all that apply:*<br><br>☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.<br><br>☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district. |
| **12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?** | ☑ No<br>☐ Yes.   Answer below for each property that needs immediate attention. Attach additional sheets if needed.<br><br>**Why does the property need immediate attention?** *(Check all that apply.)*<br>☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.<br>    What is the hazard? _____<br>☐ It needs to be physically secured or protected from the weather.<br>☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).<br>☐ Other _____<br>**Where is the property?** _____<br>    Number      Street<br><br>_____<br>    City                State     ZIP Code<br>**Is the property insured?**<br>☐ No<br>☐ Yes.   Insurance agency _____<br>            Contact name _____<br>            Phone _____ |

## Statistical and administrative information

| | |
|---|---|
| **13. Debtor's estimation of available funds?** | *Check one:*<br>☐ Funds will be available for distribution to unsecured creditors.<br>☑ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors. |

**14. Estimated number of creditors**

☑ 1-49    ☐ 50-99        ☐ 1,000-5,000    ☐ 5,001-10,000        ☐ 25,001-50,000    ☐ 50,000-100,000
☐ 100-199   ☐ 200-999     ☐ 10,001-25,000                      ☐ More than 100,000

**15. Estimated assets**

☐ $0-$50,000            ☐ $1,000,001-$10 million        ☐ $500,000,001-$1 billion
☐ $50,001-$100,000      ☑ $10,000,001-$50 million      ☐ $1,000,000,001-$10 billion
☐ $100,001-$500,000      ☐ $50,000,001-$100 million     ☐ $10,000,000,001-$50 billion
☐ $500,001-$1 million      ☐ $100,000,001-$500 million    ☐ More than $50 billion

Debtor    Galleria 2425 Owner, LLC                                           Case number *(if known)*     23-34815
       Name

| **16. Estimated liabilities** | ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
|---|---|---|---|
| | ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| | ☐ $100,001-$500,000 | ☑ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| | ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

## Request for Relief, Declaration, and Signatures

**WARNING --**    Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

- ■   The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.
- ■   I have been authorized to file this petition on behalf of the debtor.
- ■   I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   12/06/2023
                 MM/ DD/ YYYY

**X**   /s/ Dward Darjean                              Dward Darjean
     Signature of authorized representative of debtor             Printed name

Title                 Manager

**18. Signature of attorney**

**X**              /s/ James Q. Pope             Date   12/06/2023
     Signature of attorney for debtor                         MM/ DD/ YYYY

   James Q. Pope
   Printed name

   The Pope Law Firm
   Firm name

   6161 Savoy Drive 1125
   Number        Street

   Houston                         TX      77036
   City                                State     ZIP Code

   (713) 449-4481                  jamesp@thepopelawfirm.com
   Contact phone                        Email address

   24048738                        TX
   Bar number                        State

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-34815 (JPN) |
| GALLERIA 2425 Owner, LLC | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | § | |

## NATIONAL BANK OF KUWAIT, S.A.K.P, NEW YORK BRANCH'S MOTION TO TRANSFER CASE INTRA-DISTRICT

---

**NOTICE PURSUANT TO LOCAL RULE 9013-1**

This pleading requests relief that may be adverse to your interests.

If no timely response is filed within 21 days from the date of service, the relief requested herein may be granted without a hearing being held.

A motion to shorten has been filed contemporaneously with this Motion. If the Court considers this Motion on an expedited basis, then you will have less than 21 days to answer. If you object to the requested relief or if you believe that the motion to shorten is not warranted, you should file an immediate response.

A timely filed response is necessary for a hearing to be held.

---

TO THE HONORABLE JEFFREY P. NORMAN, U.S. BANKRUPTCY JUDGE:

National Bank of Kuwait, S.A.K.P. New York Branch ("NBK"), files this motion to transfer this chapter 11 case (the "Motion") to the Honorable Christopher M. Lopez. As support for the Motion, NBK submits the *Declaration of Charles C. Conrad* ("Conrad Decl.") attached as **Exhibit A** and represents as follows.

### JURISDICTION AND VENUE

1.     The Court has jurisdiction over this matter under 28 U.S.C. §§ 157(b)(2) and 1334. Venue is proper under 28 U.S.C. § 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2) upon which the Court has authority to enter a final order granting the relief

requested.  The bases for the relief requested is Rule 1014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rule") and Rule 1014-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Local Rules").

<div align="center">

**RELIEF REQUESTED**

</div>

2.	NBK seeks entry of an order in the form attached as **Exhibit B** (the "Proposed Order") transferring this chapter 11 case to the Honorable Christopher M. Lopez of this Court.

<div align="center">

**INTRODUCTION**

</div>

3.	This case should be transferred immediately to the Honorable Christopher M. Lopez because he is familiar with the Debtor, having dismissed its previous chapter 11 bankruptcy case just 37 days ago on November 1, 2023.  As the Debtor's chapter 11 petition shows, the previous bankruptcy case was filed in this Court under Case No. 23-60036. The case was assigned to Judge Lopez who presided over multiple hearings and conferences in the matter and heard evidence about the Debtor's financial affairs, management and business operations.  On his own motion, Judge Lopez dismissed the prior bankruptcy case after expressing serious concerns, among other things, about the Debtors' financial position and lack of an independent fiduciary to make decisions for the Debtor and its estate.  Thus, transferring this chapter 11 case to Judge Lopez is necessary and appropriate as it avoids the need for this Court to familiarize itself about the Debtor through evidence already presented before Judge Lopez and would result in the efficient administration of the Debtor's estate by reducing costs and promoting judicial economy.  The relief requested will not prejudice the Debtor because the Motion is timely and the intra-district transfer is merely a change from one courtroom to another in the same courthouse.

<div align="center">

2

</div>

<center>**BACKGROUND**</center>

**A.      Debtor's Chapter 22 Bankruptcy**

4.      On December 5, 2023, the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  As of the date of hereof, no trustee, examiner or official committee of unsecured creditors has been appointed.  This is the Debtor's second bankruptcy filing in five months; the first bankruptcy case was filed on July 5, 2023 and dismissed on November 1, 2023[1] under the case caption *In re Galleria 2425 Owner, LLC*, Case No. 23-60036 (CML) (Bankr. S.D.Tx. 2023) ("*Galleria I*").[2]

5.      The Debtor originally designated itself improperly as a "small business debtor" instead of a "single of asset real estate" ("SARE") as in *Galleria I*.  The chapter 11 petition was amended only after NBK sent a Rule 11 letter urging Debtor's counsel to promptly correct the "small business debtor" designation considering that the Debtor acknowledged its SARE status in multiple filings in *Galleria I* and counsel knew or should have known of that designation after appearing for the Debtor the day *Galleria I* was dismissed.

**B.      Honorable Christopher M. Lopez's Familiarity with the Debtor**

6.      *Galleria I* was filed in this Court's Victoria Division, and the Judge Lopez was assigned to the case and presided over several hearings at which he received evidence concerning the Debtor's business and its assets and liabilities.  The Debtor's sole asset is certain real property located at 2425 West Loop South, Houston, Texas 77027 (the "Property"), and the Debtor generates substantially all of its supposed income from its operation of the Property.  The Debtor's direct membership interests are held by Galleria 2425 JV LLC ("Galleria JV"), and both the Debtor and Galleria JV are purportedly under common ownership and control of the Debtor's principal,

---

[1]  *See* Conrad Decl., Ex. 1, *Order Dismissing Case*.

[2]  *See* Conrad Decl., Ex. 2, *Galleria I*'s voluntary chapter 11 petition.

<center>3</center>

Mr. Ali Choudhri ("Mr. Choudhri").  Mr. Choudhri also owns and controls Jetall Companies, Inc. ("Jetall"), which purportedly manages the Property under a property management agreement. Jetall maintains an office at the Property pursuant to a lease between it and the Debtor but does not pay any rent under that lease.

7.      In May 2018, NBK loaned the Debtor approximately $51.6 million to acquire the Property obtaining a first-lien deed of trust on the Property.  In April 2020, the Debtor defaulted on the loan after failing to make required interest payments.  Since that time, there has been significant state court litigation by the Debtor to thwart NBK from exercising its contractual rights to foreclose given Debtor's multiple defaults of the loan documents.  In this underlying state court litigation, the 281st Judicial District Court of Harris County, Texas ("281st District Court") had ordered that NBK could foreclose on July 5, 2023, and within minutes before NBK's scheduled foreclosure sale of the Property, Debtor filed *Galleria I*.[3]  On July 20, 2023, NBK filed a motion to dismiss *Galleria I*, which was heard on September 22, 2023.  At the September 22 hearing, Judge Lopez heard evidence from Mr. Choudhri and the Debtor's property manager, Dward Darjean, and testimony regarding the Debtor's financial affairs and operations, including rent from the Property and the Debtor's leases and tenants, and NBK's history with the Debtor.

8.      After a full-day hearing, Judge Lopez denied the motion to dismiss without prejudice but expressed serious concerns about the Debtor's financial position, ability to pay NBK interest as required under section 362(d)(3)(B) of the Bankruptcy Code, lack of an independent

---

[3]   Notably, this second bankruptcy filing by the Debtor was likewise made minutes before NBK's scheduled foreclosure sale of the Property on December 5, 2023.

000071

fiduciary to manage and make decisions for the Debtor,[4] and Mr. Choudhri's dual role as a creditor and owner of the Debtor, which presented conflicts that cannot be fixed.[5]

9.      Judge Lopez held subsequent status conferences in *Galleria I* on October 12 and November 1, 2023.   During the November 1 conference, Judge Lopez, on his own motion, dismissed *Galleria I.*  Prior to dismissing the case, Judge Lopez reiterated his previously expressed concerns concerning the Debtor's financial position, failure to commence interest payments to NBK, and the lack of an independent fiduciary to make decisions for the Debtor.[6]  Among other things, in dismissing *Galleria I* Judge Lopez noted: (i) that the Debtor lacked enough capital to fund the case and make interest payments to NBK, (ii) its proposed plan was likely not feasible, (iii) the case was likely administratively insolvent, (iv) Mr. Choudhri's control of affiliated entities made it difficult for the Debtor to run its operations, and (v) the Debtor's proposed plan relied on Mr. Choudhri's decision to contribute equity under the proposed plan, but this was not  market tested and violated the absolute priority rule.[7]

---

[4]   *See* Conrad Decl., Ex.3 Sept. 22, 2023 Hr'g Tr.

[5]   *See* Conrad Decl., Ex. 3 at 119:12-24; 121-22:25-7; 124-25:23-14 (The Court : "[If] [s]omebody disagrees with Mr. Choudhri in connection with the assets of the estate. Who makes that call? Nobody. So we're going to, it's a fundamental problem. The largest -- one of the largest unsecured creditors, at least on the Schedules. I'm not saying he's done anything bad. I don't know, Mr. Choudhri. I'm just looking at what I'm looking at. A large -- The largest unsecured creditor with almost a million dollar claim. Now -- was also on some other papers. So who's going to make decisions about what's in the best interest of the Debtor to file a plan? There's a fundamental problem with this case. I'm not sure it can be fixed. And that's where we're going. . . .  I'm like, and I'm really uncomfortable. It's driving all of these problems that I have with the budget, which is, you know, is rent supposed to be free for Jetall? Is it, you know, are they not supposed to be collected 19,000, you know, is the $19,000 fee really a pass through fee? I don't trust what I'm seeing. And it makes me uncomfortable that I don't have an independent party telling me these answers. . . .I'm just telling you I'm uncomfortable with the lack of transparency. And I'm not saying it's there, but there's -- we don't have an independent here, and I don't know how to proceed. And it's going to flow. It's going to get worse as my inquiry goes on.  And I'm going to get more and more uncomfortable because we haven't talked about feasibility of a plan. . . . I don't trust the numbers. I don't trust the books. I don't have a true independent who can tell me what we've got going on here.").

[6]   *See* Conrad Decl., Ex. 4 Nov. 1, 2023 Hr'g Tr.

[7]   *See* Conrad Decl., Ex. 4 at 64-66:8-7; 68:19-23 ("The Court: The Court's already held a hearing on a motion to dismiss the case based upon, among other things, the amount of money it would take to continue this case. The Court denied it based on the evidence presented to the Court at the time. . . But for this case to continue there's going to have to be a lot of money. I'm going to have to require NBK to get paid interest. There's just not enough

000072

10.     After the ruling, the Court noted the Debtor's previous case "was filed in Victoria. In connection with this I don't see a connection with Victoria as well. . . . And I'd just note that if this case does get refiled I think the Houston Division is probably the right division based upon the way the local rules have now been amended to read." Conrad Decl., Ex. 4 at 68-69 22-9.

C.     **Post-*Galleria I* Bankruptcy**

11.     The Debtor did not appeal Judge Lopez's dismissal of *Galleria I*.  A few days after Judge Lopez's dismissal of *Galleria I*, on November 10, 2023, NBK re-noticed the Property for foreclosure on December 5, 2023.  The Debtor then filed several state court applications including a temporary restraining order before the 281st District Court along with several requests for a temporary restraining order before the ancillary judges in Harris County, Texas in an effort to enjoin NBK from proceeding with the December 5 foreclosure sale of the Property.  Each of these requests was denied.

12.     The Debtor thereafter filed an appeal of the 281st District Court's denial of the temporary injunction, sought a writ of injunction, and filed an emergency motion to stay with the Fourteenth Court of Appeals.  The Fourteenth Court of Appeals quickly denied all of the Debtor's requests and dismissed its appeal on December 4, 2023.  The Debtor then sought a writ of injunction and filed an emergency motion to stay to the Supreme Court of Texas, but each of these requests was also denied.  Following these denials, Debtor set an emergency hearing on an amended request for temporary injunction with the 281st District Court on December 5, 2023 at

---

money in the budget, this Debtor is going to run out of money really fast. . . The only way this case survives is if I don't require NBK to be paid any interest on that loan pending the resolution of State Court matters, the matters of plan confirmation, and I'm unwilling to do that, which makes this case immediately administratively insolvent. . . . The Debtor has filed a plan but that plan cannot proceed, not with all the pending allegations that are going, not with all the required time and cost that would be existent, including a market test of what the Debtor's proposing to do, which is to allow the equity interest in this Debtor to proceed to an insider. And I mentioned on the first day that that would need to be market tested because it involves an insider, and there's a lot of fights going on. . . . This Debtor doesn't have enough money to pay even a half a month of interest on the secured loan and it would take until early 2024 to go deal with that. I'm dismissing this case effective today under Section 1112(b) for cause.").

8:30 a.m. (CT).  Before the 281st District Court issued its decision, the Debtor filed this second bankruptcy case within minutes of the foreclosure sale that was scheduled to begin at 10 a.m. (CT).

<div align="center">**BASIS FOR RELIEF**</div>

**A.      Intra-District Transfer**

13.      Local Rule 1014-1 provides that "[o]n motion of a party in interest or on its own motion, the judge may transfer a case, an adversary proceeding, or a contested proceeding to another judge or division in this district."  The rule allows the Court to reassign cases to judges in the same division but provides no guidance on the legal standard of review.  Absent such standard, the Court may rely on Bankruptcy Rule 1014, which allows the Court to transfer a case after determining that "transfer is in the interest of justice or for the convenience of the parties."

14.      The interest of justice factor looks at the venue in which the estate can be most efficiently administered, the venue that will promote judicial economy and efficiency, the parties' ability to receive a fair disposition, and a state's interest in having local controversies decided within its borders.  *See In re Crosby Nat'l Golf Club, LLC*, 534 B.R. 888, 890-91 (Bankr. N.D. Tex. 2015).  Courts evaluating "interest of justice" also consider whether a debtor has engaged in abusive forum shopping, and will transfer a case if the court finds such abuse.  *In re Lazaro*, 128 B.R. 168, 174 (Bankr. W.D. Tex. 1991).  Finally, the convenience of the parties' factor looks at the proximity of creditors of every kind to the Court, the proximity of the debtor to the Court, the proximity of witnesses necessary to the administration of the estate, the location of the assets, the economic administration of the estate, and the necessity for ancillary administration if bankruptcy should result. *See In re Commonwealth Oil Ref. Co., Inc.*, 596 F.2d 1239, 1241 (5th Cir. 1979).

<div align="center">7</div>

**B.**     **This Chapter 11 Case Should be Transferred to the Honorable Christopher M. Lopez**

15.     The interest of justice and convenience of the parties' factors warrant transfer of this case to Judge Lopez.  As detailed above, Judge Lopez is already familiar with the Debtor, its business, corporate structure and management, and the disputes between the Debtor and NBK.  For four months, Judge Lopez presided over *Galleria I* and held multiple hearings and conferences regarding the Debtor's business operations and financial affairs, efforts to prevent NBK from foreclosing the Property, and heard evidence from Mr. Choudhri and Mr. Darjean on behalf of the Debtor, and from Michael Carter on behalf NBK.

16.      While NBK does not dispute this Court's ability to preside over this case in a just and efficient manner, transfer is appropriate to avoid the need for this Court to familiarize itself with this parties' history and the Debtor's financial affairs, operations and management through additional evidence already presented in *Galleria I*.  Judicial economy would be served also by transferring the case as it would result in significant cost savings for all parties, including the Debtor and its estate and other parties-in-interest from having to file documents to apprise this Court of their issues, all of which, again, were addressed in *Galleria I* and heard by Judge Lopez. The Debtor and its creditors will not be prejudiced by reassignment because Judge Lopez sits in the Houston Division and the Motion is timely.

17.     For the foregoing reasons, the NBK requests that this chapter 11 case be transferred to Judge Lopez.

<div align="center">

**NOTICE**

</div>

18.     Notice of this Motion has been provided to: (a) the Office of the United States Truste for the Southern District of Texas; (b) counsel to Naissance Galleria, LLC; (c) proposed

<div align="center">

8

</div>

counsel to the Debtor; (d) any party that has requested notice pursuant to Bankruptcy Rule 2002. NBK submits that no other or further notice is required.

<u>**C**ONCLUSION</u>

WHEREFORE, NBK requests that the Court enter the proposed order granting (i) the relief requested in the Motion and (iii) other relief as is just and proper.

DATED: December 8, 2023            **PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Charles C. Conrad*
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010-1028
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

-   *and*   -

Andrew M. Troop  (Bar No. MA547179)
Patrick E. Fitzmaurice*
Kwame O. Akuffo**
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

*\*Pro hac vice* pending
\*\*Admitted *pro hac vice*

***Counsel for National Bank of Kuwait, S.A.K.P., New York Branch***

9

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on December 8, 2023, a true and correct copy of this document was served via the Court's CM/ECF system on the Debtor and its counsel of record and all others who are deemed to have consented to ECF electronic service, and also by mailing, first class, postage prepaid, to each of the parties on the attached mailing matrix.

*/s/ Charles C. Conrad*
Charles C. Conrad

10

## Exhibit A

**Declaration of Charles C. Conrad**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 23-34815 (JPN)** |
| **GALLERIA 2425 Owner, LLC** | § | |
| | § | **Chapter 11** |
| Debtor. | § | |
| | § | |

---

**DECLARATION OF CHARLES C. CONRAD IN SUPPORT OF**
**NATIONAL BANK OF KUWAIT, S.A.K.P, NEW YORK BRANCH'S**
**MOTION TO TRANSFER CASE INTRA-DISTRICT**

---

Pursuant to 28 U.S.C. § 1746, I, Charles C. Conrad, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct:

1.      I am a partner at the law firm of Pillsbury Winthrop Shaw Pittman LLP, counsel to National Bank of Kuwait, S.A.K.P. New York Branch, as administrative agent and secured lender.

2.      I am duly admitted to practice before the United States Court of Appeals for the Fifth Circuit, United States District Court for the Northern District of Texas, United States District Court for the Southern District of Texas, United States District Court for the Western District of Texas, and the United States District Court for the Eastern District of Texas.

3.      I submit this declaration in support of the *National Bank of Kuwait, S.A.K.P. New York Branch's Motion to Transfer Case Intra-District*.

4.      Attached as <u>**Exhibit 1**</u> is a true and correct copy of the *Order Dismissing Case* filed in *In re Galleria 2425 Owner, LLC*, Case No. 23-60036 (CML).

5.      Attached as <u>**Exhibit 2**</u> is a true and correct copy of the Chapter 11 Petition filed in *In re Galleria 2425 Owner, LLC*, Case No. 23-60036 (CML).

6.      Attached as **<u>Exhibit 3</u>** is a true and correct copy of the September 22, 2023 Hearing

Transcript.

7.      Attached as **<u>Exhibit 4</u>** is a true and correct copy of the November 1, 2023 Hearing

Transcript.

Dated: December 8, 2023                                          */s/ Charles C. Conrad*
      Houston, Texas                                        Charles C. Conrad

**<u>Exhibit 1</u>**

**Order Dismissing Case**

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

November 01, 2023

Nathan Ochsner, Clerk

**UNITED STATED BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 23-60036 |
| GALLERIA 2425 OWNER LLC, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | CHAPTER 11 |

<u>**ORDER DISMISSING CASE**</u>

Pursuant to Sections 105(a) and 1112(b) of the Bankruptcy Code, this case is dismissed for cause for the reasons stated on the record at the November 1, 2023 hearing. The Court also finds for the reasons stated on the record that appointment of an examiner or a chapter 11 trustee, or conversion to chapter 7 are not in the best interest of the estate and its creditors. And there is not a reasonable likelihood of confirming a chapter 11 plan.

Signed: November 01, 2023

_____
Christopher Lopez
United States Bankruptcy Judge

000082

**<u>Exhibit 2</u>**

**Galleria  2425  Owner, LLC Chapter 11 Petition**

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

SOUTHERN DISTRICT OF TEXAS

Case number *(if known)* _____  Chapter **11**

☐ Check if this an
amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

06/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | |
|---|---|---|
| 1. | **Debtor's name** | **Galleria 2425 Owner LLC** |
| 2. | **All other names debtor used in the last 8 years** Include any assumed names, trade names and *doing business as* names | |
| 3. | **Debtor's federal Employer Identification Number** (EIN) | **36-4896738** |

4. **Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| **1001 West Loop South 700** **Houston, TX 77027** | |
| Number, Street, City, State & ZIP Code | P.O. Box, Number, Street, City, State & ZIP Code |
| **Harris** | **Location of principal assets, if different from principal place of business** |
| County | |
| | Number, Street, City, State & ZIP Code |

5. **Debtor's website** (URL) _____

6. **Type of debtor**

■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____

000084

| Debtor | Galleria 2425 Owner LLC | | Case number (*if known*) | |
|---|---|---|---|---|
| | Name | | | |

**7.** **Describe debtor's business**    A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

■ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☐ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See
http://www.uscourts.gov/four-digit-national-association-naics-codes.

    5311

**8.** **Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check all that apply:*

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.** **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**
If more than 2 cases, attach a separate list.

■ No.

☐ Yes.

| | District | | When | | Case number | |
|---|---|---|---|---|---|---|
| | District | | When | | Case number | |

---

| Debtor | Galleria 2425 Owner LLC | Case number (*if known*) | |
|---|---|---|---|
| | Name | | |

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

■ No
☐ Yes.

List all cases. If more than 1, attach a separate list

| Debtor | _____ | Relationship | _____ |
|---|---|---|---|
| District | _____ When _____ | Case number, if known | _____ |

**11. Why is the case filed in *this district*?**

*Check all that apply:*

■ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

■ No
☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____
Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency _____
Contact name _____
Phone _____

---

**■ Statistical and administrative information**

**13. Debtor's estimation of available funds**

*Check one:*

☐ Funds will be available for distribution to unsecured creditors.

■ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ■ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ☐ 200-999 | | |

**15. Estimated Assets**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ■ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

**16. Estimated liabilities**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |

---

| Debtor | **Galleria 2425 Owner LLC** | Case number (*if known*) |
|---|---|---|
| | Name | |

☐ $50,001 - $100,000          ☐ $10,000,001 - $50 million         ☐ $1,000,000,001 - $10 billion

☐ $100,001 - $500,000          ■ $50,000,001 - $100 million      ☐ $10,000,000,001 - $50 billion

☐ $500,001 - $1 million          ☐ $100,000,001 - $500 million     ☐ More than $50 billion

| Debtor | Galleria 2425 Owner LLC | Case number (*if known*) | |
|---|---|---|---|
| | Name | | |

| | **Request for Relief, Declaration, and Signatures** |
|---|---|

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **July  5, 2023**
                MM / DD / YYYY

**X**   **/s/ Dward Darjean**                         **Dward Darjean**
       Signature of authorized representative of debtor           Printed name

Title    **Manager**

**18. Signature of attorney**

**X**   **/s/ Melissa S. Hayward**             Date   **July  5, 2023**
       Signature of attorney for debtor                     MM / DD / YYYY

**Melissa S. Hayward**
Printed name

**Hayward PLLC**
Firm name

**7600 Burnet Road, Suite 530**
**Austin, TX 78757**
Number, Street, City, State & ZIP Code

Contact phone   **214-755-7100**       Email address    **mhayward@haywardfirm.com**

**24044908 TX**
Bar number and State

000088

<u>**Exhibit 3**</u>

**September 22, 2023 Hearing Transcript**

000089

1            IN THE UNITED STATES BANKRUPTCY COURT

2          FOR THE SOUTHERN DISTRICT OF TEXAS

3               HOUSTON DIVISION

4  IN RE:                §   CASE NO. 23-60036-11
                            §   HOUSTON, TEXAS
5  GALLERIA 2425 OWNER, LLC,   §   FRIDAY,
                            §   SEPTEMBER 22, 2023
6        DEBTOR.        §   11:09 A.M. TO 6:18 P.M.

7

8               **CASH COLLATERAL HEARING AND**
                 **MOTION TO DISMISS CASE**
   **(PARTIAL TRANSCRIPT -- SEALED PORTIONS ARE REDACTED)**

9

10       BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
            UNITED STATES BANKRUPTCY JUDGE

11

12

13   APPEARANCES:             SEE NEXT PAGE

14   ELECTRONIC RECORDING OFFICER: R. SALDANA
                         ZILDE COMPEAN

15

16

17

18

19

20            TRANSCRIPTION SERVICE BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, LLC
             935 Eldridge Road, #144
22            Sugar Land, TX 77478
              281-277-5325
23          www.judicialtranscribers.com

24

25    Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

2

1                          **APPEARANCES:**

2


3   FOR THE DEBTOR:              HAYWARD PLLC
                                Melissa S. Hayward, Esq.
4                               10501 N. Central Expressway
                                Suite 106
5                               Dallas, TX  75231
                                972-755-7100
6

7   FOR NATIONAL BANK OF KUWAIT,
    S.A.K.P., NEW YORK BRANCH:   PILLSBURY WINTHROP SHAW
8                                PITTMAN, LLP
                                Patrick E. Fitzmaurice, Esq.
9                               31 West 52nd St.
                                New York, NY  10019
10                               212-858-1171

11


12  FOR THE US TRUSTEE:          OFFICE OF US TRUSTEE
                                Jayson B. Ruff, Esq.
13                               515 Rusk St., Ste. 3516
                                Houston, TX  77002
14                               713-718-4650

15


16  (Please also see Electronic Appearances.)

17

18

19

20

21

22

23

24

25

3

1                          **INDEX**

2

3   WITNESS:          Direct      Cross      Redirect      Recross

4   ALI CHOUDHRI
      By Ms. Hayward     27        –          100           –
5     By Mr. Fitzmaurice –          66         –            106
      By the Court       93
6
    DWARD DARJEAN
7     By Ms. Hayward     109       –          –             –
      By Mr. Fitzmaurice –         111        –             –
8     By the Court       113

9   MICHAEL CROSBY CARTER:
      By Mr. Fitzmaurice 132       –          –             –
10
    ALI CHOUDHRI
11    By Ms. Hayward     148       –          –             –
      By Mr. Fitzmaurice –         151        –             –
12    By the Court       165

13

14  EXHIBITS:                      Marked    Offered     Received

15

16  CLOSINGS:
      By Mr. Fitzmaurice           171
17    By Ms. Hayward               174

18  RULING:                        193

19
                                 ***
20

21

22

23

24

25

4

1      **HOUSTON, TEXAS; FRIDAY, SEPTEMBER 22, 2023; 11:09 A.M.**

2            THE COURT OFFICER:  All rise.

3            THE COURT:  Good morning, everyone.  This is Judge

4      Lopez.  Today is September 22nd.  I'm going to call the

5      11:00 a.m. case.  There are about eight people on the line.

6      I'm going to see if we can just do this where we keep

7      everything unmuted.

8            The case that I'm calling is 23-60036, Galleria

9      2425 Owner, LLC here in connection with a motion to dismiss

10     and continuation of cash collateral.  I'll take appearances

11     in the courtroom.  If anyone wishes to make an appearance on

12     the phone, I'd ask that you just please wait and give me an

13     opportunity, and then I'll turn to you.

14           Why don't I take appearances in the courtroom?

15           MS. HAYWARD:  Good morning, Your Honor.  Melissa

16     Hayward and Ruth Van Meter of Hayward, PLLC, here on behalf

17     of the Debtor, it's a pleasure to be in your courtroom in

18     person for the first time.

19           THE COURT:  Thank you.  And you caught a good day.

20     Weather's not too bad in Houston.

21           MS. HAYWARD:  I'm still a little sweaty, Your

22     Honor.

23           THE COURT:  Good morning.

24           MR. FITZMAURICE:  Good morning, Your Honor.

25     Patrick Fitzmaurice and Charles Conrad from Pillsbury

1  Winthrop Shaw Pittman for National Bank of Kuwait.  The

2  Debtor's secured creditor.  Also happens to be my first time

3  in front of Your Honor.  And so I appreciate.

4             THE COURT:  No, It's a pleasure.  Thank you.

5             MR. FITZMAURICE:  And also, Your Honor, on the

6  phone is our colleague from New York, Kwame Akuffo.  Your

7  Honor, granted his pro hac vice motion earlier on in this

8  case.  I just wanted to note his appearance for the Record,

9  as well.

10            THE COURT:  Okay.  Great.  Thank you.

11            Mr. Ruff, I see you there.  Good morning.

12            MR. RUFF:  Yes.  Good morning, Your Honor.  Jayson

13  Ruff for the US Trustee's office.

14            THE COURT:  Okay.  Anyone else wish to make an

15  appearance?

16        (No audible response.)

17            THE COURT:  And there's no need to hit five star.

18  The line is completely unmuted.  Just please keep your phone

19  on mute if you're dialing in to listen.

20            All right.  I would want to return things to you

21  and kind of tell me where we are.

22            MS. HAYWARD:  Yes, thank you.  So, Your Honor, we

23  have, as Your Honor noted, two matters here today.  We have

24  a motion to dismiss the bankruptcy case, as well as our

25  final cash collateral hearing.  There are some housekeeping

1  matters I think we would like to address before we get into

2  it.

3        THE COURT:  Okay

4        MS. HAYWARD:  As Your Honor has seen, there is a

5  confidential settlement agreement that is very much at issue

6  in this case.  Some pleadings have been filed under seal.

7  And so I think we -- that confidential settlement agreement

8  will likely be discussed here today with respect to the

9  motion to dismiss.

10        So I think from a housekeeping standpoint,

11  Mr. Fritzmaurice and I just wanted to bring that issue to

12  the Court's attention.  We're not sure who all the parties

13  are that are on the phone or on the WebEx.  And so to the

14  extent that, you know, portions of this hearing may need to

15  be sealed as that settlement gets discussed.  Just wanted to

16  get Your Honor's --

17        THE COURT:  Are you comfortable with the folks in

18  the courtroom?

19        MS. HAYWARD:  Yes, Your Honor.  The folks in the

20  courtroom are all either client or all client

21  representatives or attorneys.

22        THE COURT:  Okay.  What are your thoughts,

23  Counsel?

24        MR. FITZMAURICE:  So, Your Honor, it may be the

25  case that the parties ultimately have a dispute about

1  whether or not the stay agreement should be sealed.  The

2  fact is, as we stand here today, there is a motion to seal

3  the settlement agreement.  The agreement, by its terms,

4  would, I think, require that these proceedings, at least as

5  it relates to the agreement, be sealed.  And so for purposes

6  of our hearing today, we certainly have no objection and

7  agree with Counsel that the proceedings, at least as it

8  relates to the settlement agreement, should be sealed.

9        THE COURT:  Okay.  I am -- what I think will do

10  is, you can do this one of two ways, right?  We can just --

11  I can just mute the line and parties can just talk, and we

12  don't have to put anything on the screen.  Or you all can

13  just talk about the settlement agreement without talking

14  about it.  You know, there's a couple of different ways we

15  can do this.  I don't particularly have a preference.

16        MR. FITZMAURICE:  If Your Honor doesn't mind, our

17  suggestion would be, as it relates to the two motions, that

18  we would proceed with the motion to dismiss first.  I would

19  suggest that if Your Honor is inclined to grant that motion,

20  then cash collateral doesn't matter.

21        THE COURT:  Well no, I got to go the opposite way,

22  and I'll just tell you why, I'm being honest.  I want to

23  understand if we have a case, and maybe we do, maybe we

24  don't.  I'm not saying one thing, but I'm looking at MORs,

25  and I'm looking at -- I need to understand where we are in

8

1  terms of cash and what's going on.  We -- I don't want to
2  take them separately.  I need to just kind of understand
3  kind of where we are just doing bankruptcy routine 101 stuff
4  here, and then we can kind of take up the motion to dismiss,
5  so.
6          MR. FITZMAURICE:  So -- I'm sorry.
7          THE COURT:  No, no, no.  I appreciate it.
8          MR. FITZMAURICE:  Thank you, Your Honor.  Then
9  with respect to that, at least I would suggest that we take
10 Your Honor's first suggestion, which is that when the time
11 comes to discuss the settlement agreement, I would
12 anticipate that there would be significant discussion
13 concerning its contents, as opposed to the talk about it
14 without talking about it.  I'm not sure that we're able to
15 do that.
16         THE COURT:  Okay
17         MR. FITZMAURICE:  So I suggest that we then
18 perhaps just mute the courtroom.  I don't know that we need
19 to display anything for the purposes of the screen --
20         THE COURT:  Or if you do, you know if there's a
21 doc you want me to see, we can just deal with everything in
22 the courtroom.  I can just mute the line.
23         MS. HAYWARD:  Your Honor, I think that we're doing
24 this a little bit old school today.  We all have binders.
25         THE COURT:  Okay.

1              MS. HAYWARD:  Paper documents.

2              THE COURT:  Okay.  All right, let's just proceed

3    that way.  I've got it, with the agreement of the parties.

4    I -- if you're comfortable with the folks in the courtroom,

5    there's no need to put anything on the screen or anything.

6    I'm not a big fan of kind of sealing, but I think we can --

7    I can mute the line and then kind of go from there.

8              MR. FITZMAURICE:  And just to note our agreement

9    for the Record with Ms. Hayward that the folks in the

10   courtroom are either attorneys for the parties or party

11   representatives.  So certainly no issue, and we wouldn't

12   have any issue at all with also with respect to Mr. Ruff

13   from the US Trustee's Office, I'm not sure if there's a way

14   for him to participate in the hearing when that issue is

15   discussed or not --

16             MR. RUFF:  I will.

17             MR. FITZMAURICE:  -- but the technology may be

18   hitting us in that regard.

19             THE COURT:  I'll leave that up to him to kind of

20   figure out what he wants to do.

21             And Mr. Ruff, you don't need to answer.  I'm just

22   giving you flexibility.  If you show up, I'm not going to

23   kick you out.

24        (Laughter)

25             MR. RUFF:  Okay.  Thank you, Your Honor.  I'll sit

1    tight for now.

2         THE COURT:  Okay.  And I will stipulate to you

3    that on the -- just so that you're comfortable, Don Mago and

4    Abby Emery are my law clerks, and they're on video.  So

5    that's who the -- that's who that is there.  So, okay.

6         Can we just talk any housekeeping in terms of

7    docs, in terms of agreement on exhibits and things of that

8    nature, or where do we stand on that?

9         MS. HAYWARD:  Your Honor, I don't know that we've

10   had any agreements on exhibits.  I think we'll just take

11   them up as they come.

12        THE COURT:  Okay.  That works for me.

13        MR. FITZMAURICE:  Your Honor, once, I'm happy to

14   spend two minutes.  We can talk about it now is that, or we

15   can, as Ms. Hayward says, take them up as they come.

16        THE COURT:  Why don't we just talk about it at the

17   10,000-foot level, kind of where the case is and kind of

18   what's been filed and things are going on?  And if you find

19   it helpful, if not, we'll just go old school, and you can

20   prove up your evidence as we go.

21        MS. HAYWARD:  Sure, Your Honor.  So the Debtor has

22   filed.  We have an exhibit -- Witness and Exhibit List for

23   today's hearings.  Those -- and may I approach, Your Honor,

24   with some --

25        (Pause in the proceedings.)

1          THE COURT:  Sure.  Is -- just confirm that you all

2     have a copy of one.

3          MR. FITZMAURICE:  Yes, Your Honor.  Thank you.

4          THE COURT:  Okay.  Thank you.

5          MS. HAYWARD:  Thank you, Your Honor.  And so with

6     respect to the exhibits that we have put submission to the

7     Court on, Your Honor, the first exhibit would be the budget,

8     the six months budget that we filed.  I think this was filed

9     back when we had originally set the final cash collateral

10    hearing, shortly after the case was filed.  Your Honor may

11    recall this case was filed on July 5th.  So it's been

12    pending a little bit more than two months.  Exhibit 2 would

13    be the interim order authorizing cash collateral.  I can't

14    imagine there would be any objection to that exhibit.

15         MR. FITZMAURICE:  Is it easier to just talk about

16    the ones that we -- I don't know -- that we necessarily have

17    objections, but that we want to just discuss?   Is that

18    easier for you, I don't want to --

19         MS. HAYWARD:  Discuss as far as?

20         MR. FITZMAURICE:  Well, so that with respect to

21    the --

22         MS. HAYWARD:  Yeah.  Come join me.

23         MR. FITZMAURICE:  Your Honor, with respect to the

24    exhibits on the -- on the Debtor's list, we don't have any

25    issue with any of them except for two.  One is Exhibit

1    No. 5, which is the plan.  The plan was filed last night.

2    We haven't had any time to review it.  We don't know the

3    purposes for which the Debtor seeks to introduce it today.

4    And so, at least for --

5            THE COURT:  So plan's not in.  Okay?  If they want

6    to prove it, and they can try to do it in other ways.  Okay.

7            MR. FITZMAURICE:  And then with respect to the

8    Exhibit 7, which is leases, there are two leases, I think

9    it's two, which are not signed by the Debtor.  And so to the

10   extent that those are being --

11           THE COURT:  Five and seven, they've got approval.

12           MR. FITZMAURICE:  Well, there are some -- there

13   are leases that are fully executed.  And so our issue is

14   only with respect to -- those are with respect to the lease

15   with --

16           THE COURT:  Why don't I -- I'm just not going to

17   admit -- I don't want -- I just want to admit seven, but as

18   it comes up, maybe we can -- you can just let me know if

19   you're okay with that one, and we can.  Okay?

20           MR. FITZMAURICE:  Certainly, Your Honor thank you.

21           THE COURT:  Okay.

22           MR. FITZMAURICE:  And as to the balance.  We don't

23   have --

24           MS. HAYWARD:  Okay.

25           THE COURT:  So if I'm -- I got it right.  One

1   through 10.  There were 10 exhibits.  Five and seven.  Seven

2   may -- portions of it may come in uncontested, but we'll

3   cross those bridges as we get there.  Depending on which

4   ones we are.  Okay.

5            MR. FITZMAURICE:  So since we're talking about

6   exhibits, may we talk about ours as well, Your Honor --

7            THE COURT:  It's fine with me.

8            MR. FITZMAURICE:  May I approach?

9            THE COURT:  Yeah, of course.

10       (Pause in the proceedings.)

11            THE COURT:  Okay.  You have, let's see, 11

12   exhibits, right?

13            MR. FITZMAURICE:  We do, Your Honor.

14            THE COURT:  Oh, no, 12.  Sorry, 12 exhibits.

15   There may be some overlap, but just from that say about

16   any --

17            MS. HAYWARD:  Yes, Your Honor.  Well, we would

18   object to the Declarations as hearsay.  So that would be

19   Exhibit 1, Your Honor.  No objection to the loan agreement,

20   loan documents.

21            THE COURT:  One and two --

22            MS. HAYWARD:  Three.

23            THE COURT:  Wait, hold on. Just -- let's just go.

24   One is out.

25            MS. HAYWARD:  One we object to is --

1           THE COURT:  Okay, two?

2           MS. HAYWARD:  Two, no objection.  That's the loan

3   document.

4           THE COURT:  Okay.

5           MS. HAYWARD:  Loan agreement.  Three is the

6   promissory note.  No objection.  Four is the deed of trust.

7   No objection.

8           THE COURT:  Four is -- wait, hold on.  I'm seeing

9   four as --

10          MR. FITZMAURICE:  These are the exhibits to the

11  Declaration --

12          MS. HAYWARD:  Oh, okay, Your Honor I think --

13          MR. FITZMAURICE:  That numbering is a little --

14          MS. HAYWARD:  Okay.  Your Honor, I apologize.  I

15  was confused about the binder, the way it was set up.  So --

16          MR. FITZMAURICE:  If I may, Your Honor?  If I may,

17  Exhibit 1 --

18          THE COURT:  That makes two of us.

19          MR. RUFF:  Okay.

20          MR. FITZMAURICE:  Exhibit 1, Your Honor, is the --

21  is a Declaration with exhibits.  Those exhibits being the

22  loan documents.

23          THE COURT:  Got it.

24          MR. FITZMAURICE:  So I think the Declaration

25  portion of Exhibit 1 there is an objection to, but the loan

1   documents portion there is not.

2           MS. HAYWARD:  Correct.

3           THE COURT:  So maybe we can just do this this way

4   then.  As to the exhibits to Declaration one, what are you

5   okay with?

6           MS. HAYWARD:  Two, three, and four, Your Honor.

7           THE COURT:  Okay, so that's --

8           MS. HAYWARD:  I'm sorry.  Two and three.

9           THE COURT:  So, loan agreement, promissory note.

10          MS. HAYWARD:  Yes.

11          THE COURT:  Okay.  And what about deed of trust?

12          MS. HAYWARD:  The deed of trust is fine, Your

13  Honor.

14          THE COURT:  Okay.

15          MS. HAYWARD:  I guess four looks to be a loan

16  payoff statement, we would object to that.  We could prove

17  that up.

18          THE COURT:  Okay.

19          MS. HAYWARD:  Exhibit 5 is actually the same as

20  the Debtor's Exhibit 10.

21          THE COURT:  Okay.  Are you okay with just

22  admitting just to make it easier?

23          MS. HAYWARD:  Yes.

24          THE COURT:  Okay.

25          MS. HAYWARD:  Yes, Your Honor.

1          THE COURT:  Okay.  And then now we're getting into

2   then I guess what is now Exhibit 2.

3          MS. HAYWARD:  So Exhibit 2, Your Honor, again,

4   same objection to the Declaration.

5          THE COURT:  Okay.

6          MS. HAYWARD:  No objection to the assignment.

7   It's actually shown on, I guess 2.1, 2.1 we'll call it.

8          THE COURT:  Okay.  So 2.1 is okay?

9          MS. HAYWARD:  Yes, Your Honor.

10          THE COURT:  Okay.

11          MS. HAYWARD:  2.2 is okay.

12          THE COURT:  Okay.

13          MS. HAYWARD:  2.3, Your Honor, is the confidential

14   settlement agreement.

15          THE COURT:  Okay.

16          MS. HAYWARD:  So, no objection to the admission of

17   that exhibit under seal.

18          THE COURT:  Admitted as such.

19          MS. HAYWARD:  Exhibit 4 is a transcript of a

20   hearing.  We object on hearsay grounds.

21          THE COURT:  Okay.  Exhibit 4 is out.

22          MS. HAYWARD:  Exhibit 5 is a State Court

23   proceeding, I think Your Honor can take notice of pleadings

24   on file in other cases.  So I'm not sure that I have an

25   objection to it being offered as a proceeding in another

 1   case.

 2          THE COURT:  You're okay with it for the fact that

 3   something was filed, but not necessarily the truth of the

 4   matter asserted therein?

 5          MS. HAYWARD:  Yes, Your Honor.  Yes.

 6          THE COURT:  Okay.

 7          MS. HAYWARD:  This is our document, so.

 8          THE COURT:  No.  All right.  Oh, it's your

 9   document.  I got it.  Okay.

10          MS. HAYWARD:  This our pleading.

11          THE COURT:  Oh, got it.

12          MS. HAYWARD:  Same for six.  Also, our pleading.

13          THE COURT:  That's in.

14          MS. HAYWARD:  Seven, objection.

15          THE COURT:  Okay

16          MS. HAYWARD:  Eight are the Schedules, obviously

17   no objection to those, Your Honor.

18          THE COURT:  Okay.

19          MS. HAYWARD:  Nine, I believe, is going to be the

20   same as Debtor's exhibit.  Although Debtor's exhibit may

21   have more months.

22          MR. FITZMAURICE:  I think the Debtor's exhibit has

23   more months (indiscernible).

24          MS. HAYWARD:  Okay.  Slew of nine.  Okay.  So the

25   nine, Your Honor would be replaced with Debtor's Exhibit, I

1  believe, 9 --

2          THE COURT:  Okay

3          MS. HAYWARD:  -- 8.

4          THE COURT:  So 9 is not in.  We're just going to

5  go with the other one.  Okay, okay.

6          MS. HAYWARD:  Then moving on to Exhibit 3.

7  Objection.  I don't -- I think you attached the wrong

8  document to your --

9          THE COURT:  Oh, 3 is out.  What about 4?

10         MS. HAYWARD:  4, Schedules.  No objection.  5 is

11  our motion for cash collateral.  No objection.  6 is

12  Mr. Choudhri's Declaration in support of cash collateral.

13  No objection.  7 is our response to the motion to dismiss.

14  No objection.  8 is the July Monthly Operating Report.  No

15  objection.  9 is the -- is a profit and loss statement

16  covering months January through June.  So the six months

17  repetition and no objection.

18         THE COURT:  Okay.

19         MS. HAYWARD:  10 are bank statements, Your Honor.

20  I'm not sure the relevance of, but -- so I think I would ask

21  that counsel prove those up.

22         THE COURT:  Okay.

23         MS. HAYWARD:  11, Your Honor, is also -- it looks

24  like detail.  These are documents that were produced.

25         THE COURT:  Okay

1            MS. HAYWARD:  I'm in discovery again, it's a

2    lengthy document.  I'm not sure that they are relevant.  So

3    we will allow -- I think that you will need to prove those

4    up.

5            THE COURT:  Okay

6            MS. HAYWARD:  12, Your Honor, is the cash

7    collateral budget.  I think 12 is actually a compilation of

8    the Debtor's original Witness and Exhibit List.

9            THE COURT:  Okay.

10           MS. HAYWARD:  And it's actually duplicative of

11   what's already in the Debtor's exhibits.

12           THE COURT:  Okay

13           MS. HAYWARD:  So I think we can go off the

14   Debtor's exhibits on that one.

15           THE COURT:  All right.  Then there's something on

16   the back of this?

17           MS. HAYWARD:  Yes, Your Honor.  That's a Debtor

18   Exhibit 3 -- 4.

19           THE COURT:  That's the final order.  There are

20   pictures back here.

21           MS. HAYWARD:  Yes, that's Exhibit 4.  Debtor's

22   Exhibit 4, which has already been admitted.

23           THE COURT:  Okay, great.  Okay.  I just -- oh,

24   yes, yes, yes.  I see it.  Okay.

25           MR. FITZMAURICE:  Your Honor, just two responses.

1   One, objection to the bank records.  Those are the Debtor's

2   bank records.

3            THE COURT:  You can prove them up.  I'm just --

4   we're just going to go, I'm just -- which ones we agree on.

5   The other ones you can prove up.

6            MR. FITZMAURICE:  And with respect to the

7   transcript, Your Honor, we would submit that that's a

8   statement of a party opponent.

9            THE COURT:  I know, just bring it up in the

10  (indiscernible) whenever we need it.  We'll just take it up.

11  I'm just getting this flat agreement now.

12           MS. HAYWARD:  Thank you, Your Honor.

13           THE COURT:  Okay.  All righty.

14           MS. HAYWARD:  How would you like Your Honor to

15  proceed?  Would Your Honor like opening statements?   Would

16  Your Honor like go straight to the witnesses or --

17           THE COURT:  I want to go -- I want to talk

18  about --

19           MS. HAYWARD:  -- hear from the Debtor.

20           THE COURT:  I want to talk cash collateral first.

21           MS. HAYWARD:  Yes, Your Honor.

22           THE COURT:  What would be helpful for me to --

23  because I know we did a little bit of this at the beginning

24  of the case.  Can you explain to me a little bit about the

25  corporate structure of a Debtor, who owns it?

1            MS. HAYWARD:  Yes, Your Honor.  Sure.  And what I

2   would do Your Honor, I would point Your Honor the MDK's

3   exhibits -- I'm not sure that's right.  So the Debtor, Your

4   Honor, is an LLC.  It is 100 percent owned by an entity that

5   is by another entity higher up that chain.  There is a

6   mezzanine link debt, and there are several other entities.

7   Ultimately, the beneficial owner would be Mr. Choudhri --

8            THE COURT:  Okay

9            MS. HAYWARD:  -- who is sitting here, and I'll

10  have you rise, Mr. Choudhri, and introduce you to the Court.

11  Mr. Choudhri is the primary principle of the Debtor,

12  ultimately.

13            THE COURT:  Okay.

14            MS. HAYWARD:  And so that's kind of the structure

15  of the Debtor.

16            THE COURT:  Who owns Jetall?  And how does

17  Jetall --

18            MS. HAYWARD:  Mr. Choudhri owns Jetall and Jetall

19  is the property management company that oversees.  So

20  Mr. Choudhri has a portfolio of met real estate throughout

21  Houston and some other areas.  Jetall is Mr. Choudhri's

22  company that operates the real estate.  And so Jetall is the

23  company that handles --

24            THE COURT:  Property manager for this --

25            MS. HAYWARD:  Property manager for this particular

1  property, that's correct.  That's right.

2          THE COURT:  And he probably manages some other

3  properties as well.

4          MS. HAYWARD:  That's right, Your Honor.

5          THE COURT:  And then the individual who signed the

6  petition --

7          MS. HAYWARD:  Your Honor, Mr. Dward Darjean is

8  here.

9          THE COURT:  Okay

10         MS. HAYWARD:  And he is the operations side of

11 Jetall.  So he is the person who's actually the boots on the

12 ground out at the property dealing with maintenance issues.

13 So he's more on the operations of the building with Jetall.

14         THE COURT:  Okay, okay, okay.  And so when his

15 check comes from Jetall?

16         MS. HAYWARD:  Yes, Your Honor.

17         THE COURT:  Okay.  As part of the property

18 management, he's the operator --

19         MS. HAYWARD:  Yes, Your Honor.

20         THE COURT:  -- who's on the ground?  Got it.

21         MS. HAYWARD:  Yes, Your Honor.

22         THE COURT:  Okay.  Does the Debtor have employees

23 itself?

24         MS. HAYWARD:  The Debtor itself does not have

25 employees.  All of the employees are at the Jetall level.

23

1  Now the Debtor may have a couple of janitorial people that

2  it issues checks to on a 1099 basis, but they're not W-2

3  employees, Your Honor.  So the employees are at the Jetall

4  level.

5          THE COURT:  Got it.

6          MS. HAYWARD:  And if Your Honor would like to see,

7  so the building we're talking about is Exhibit 4.

8          THE COURT:  Okay.  Oh, I've seen the building.  As

9  I saw the building earlier, I probably drove past it a bunch

10  of times.

11         MS. HAYWARD:  I stayed in a hotel right next to it

12  last night.  And I will tell Your Honor, it's a lovely

13  building. Mr. Choudhri will certainly explain to Your Honor,

14  but it was designed by the same person who designed the

15  Louvre.

16         THE COURT:  So who is then your client?  Who do

17  you take direction from?

18         MS. HAYWARD:  Primarily Mr. Choudhri.

19         THE COURT:  Okay.

20         MS. HAYWARD:  Yes, I take direction from

21  Mr. Choudhri.

22         THE COURT:  Does the Debtor have independent

23  (indiscernible) who -- are decisions made at the Debtor

24  level?

25         MS. HAYWARD:  Well, I think decisions are made --

1   It depends on the decision.

2         THE COURT:  I got it.  I'm sorry.  That was a

3   really bad question.  Just kind of on an operational basis.

4   This (indiscernible).  All right.  There have to be

5   decisions made at the kind of the corporate level from --

6   for -- or at the management level.  At this level, who makes

7   those decisions?  Is it Mr. Choudhri and anyone else, or is

8   it Mr. Choudhri alone?

9         MS. HAYWARD:  So I think it's Mr. Choudhri with

10  his team.  So Jetall has, you know, many employees.  It has

11  counsel -- in-house counsel, it has in-house accounting, it

12  has bookkeeping, things like that.  So there's a whole team

13  within Jetall.  And so each person sort of has their

14  specific role, right?  Mr. Darjean is the person that would

15  be in charge of property repair-type issues, and things

16  along those lines.  And Mr. Choudhri is sort of you know at

17  the top.

18        MS. HAYWARD:  Okay.  I know.  I'm just trying to

19  get a sense of -- okay, that's what I need to know.  Thank

20  you.  I'm just trying to get a sense of the 10,000-foot

21  level so just I can understand.

22        MS. HAYWARD:  Sure Your Honor and I know this is

23  kind of our first real --

24        THE COURT:  Yeah

25        MS. HAYWARD:  -- evidentiary hearing.  So I

1   understood there's some background that you know will be

2   very helpful.  And so if Your Honor would like opening

3   statements, we certainly can.  Otherwise, I'm happy to just

4   put Mr. Choudhri on the stand and we can go forward.

5           THE COURT:  I don't need any opening statements.

6   We can just get right to it.  I've read the pleadings and I

7   appreciate everyone's pleadings.  I've read everything

8   that's been on the docket that's been filed and on the

9   docket.  Obviously, I'll only consider the evidence today,

10  but I thank the parties.  I do appreciate a little bit of

11  background just to make sure that I'm -- I've got it there,

12  but you know, you can dive right into the issues then.  I'm

13  comfortable with where we are and kind of where we need to

14  go.

15          MS. HAYWARD:  Okay, perfect.

16          THE COURT:  Okay

17          MS. HAYWARD:  Well, thank you, Your Honor, for

18  that.  Then the Debtor would call Mr. Ali Choudhri to the

19  stand.

20          THE COURT:  Okay, Mr. Choudhri, why don't you --

21  why not -- you can take a seat right there.  And can you

22  raise your right hand, sir?

23          Do you swear to tell the truth, the whole truth,

24  and nothing but the truth?

25          THE WITNESS:  Yes

1        (Witness sworn.)

2             THE COURT:  Okay.  Let the Record reflect that the

3   witness has been duly sworn in.  You can have a seat, sir.

4             MS. HAYWARD:  Your Honor, may I approach the

5   witness with an exhibit binder?

6             THE COURT:  Yes, you may.

7             Mr. Choudhri, I would just ask -- sometimes

8   lawyers object and use statements.  I just ask that you give

9   me an opportunity to resolve the objection, and I'll let you

10  know if you can answer the question or if someone else has

11  to answer -- ask in a different question.  Okay?

12            THE WITNESS:  Yes, Your Honor.

13            THE COURT:  And if at any time you need a break or

14  anything, just let me know.  Okay.

15            THE WITNESS:  Can I use the restroom?

16            THE COURT:  You want to --

17            THE WITNESS:  I can wait.  I'm sorry.

18            THE COURT:  No, no, no, no.  I -- we can take a

19  few minutes if it now makes sense.  I would -- just know

20  you've been officially sworn in, so you can't talk to anyone

21  about your testimony.  So why don't we just take five

22  minutes and --

23            THE WITNESS:  (Indiscernible).

24            THE COURT:  No, no, it's completely fine.  I --

25  just required me to give you the speech now before.  So

1   we'll take a break.  I'm just going to stand up here.  I'll

2   stay up here, and we'll start at 11:40.

3              MS. HAYWARD:  Thank you, Your Honor.

4         (Court in recess from 11:34:10 a.m. to 11:39:23 a.m.)

5              THE COURT:  Let me just get started.  We're back

6   on the Record in what I'll call "Galleria 2425."

7                       DIRECT EXAMINATION

8   BY MS. HAYWARD:

9   Q    Good morning, Mr. Choudhri.

10  A    Good morning.

11  Q    Mr. Choudhri, would you introduce yourself to the

12  Court?

13  A    Yes.  My name is Ali Choudhri.

14  Q    Okay.  Mr. Choudhri, how old are you?

15  A    43.

16  Q    A couple of months older than me, right?

17  A    I think about a year.  Yeah.

18  Q    Almost a year.  Mr. Choudhri, what's your primary

19  occupation?

20  A    Investments, real estate development.  That's been all

21  what I've done since I can remember.

22  Q    Okay.  Let's talk about sort of your educational

23  history.

24  A    Sure.

25  Q    So where did you grow up?

1  A    I've been in Houston, Texas since I was three years

2  old.  My father came to Houston in 1983.  He acquired a

3  chemical plant and invested in real estate.  And I followed

4  his footsteps in the early '90s.  When I was about 12 I

5  would tag along with him to the RTC and SNL sales and I

6  learned the business from my father and then got into buying

7  and selling real estate.  I went to University of Houston

8  and been in real estate full time since '95.  I would say

9  officially since '98.  That's when I turned 18, but

10 unofficially since '95.

11 Q    Okay.  And so did your father sort of mentor you as to

12 how to be involved in real estate?  Buy, sell?

13 A    Yes.  My father was my mentor.  And I learned from him

14 and grew up in the business with him.  And so, yes.

15 Q    Okay.  And while you were learning from your father,

16 did your father have a large real estate portfolio?

17 A    He was very active.  Yes, he was very active in real

18 estate.  He was educated from the UK, London, England.  And

19 we worked together, and we were basically best friends until

20 he passed in 2012.

21 Q    Okay.  So your father passed away in 2012?

22 A    Yes.

23 Q    And after your father passed away, did you sort of take

24 the reins of the real estate?

25 A    Yes.

1   Q    Okay.  And did you -- what's your -- so you said you

2   went to the University of Houston?

3   A    Yes.

4   Q    Okay.  Do you have any other college degrees or

5   graduate degrees?

6   A    No graduate degrees.  I've just basically -- just did

7   business -- business management.  Took a lot of hours even

8   after that, architectural classes and probably an extra 100

9   hours that I didn't need on top of the 120 hours required.

10  Just auditing classes on top of that.  But it was business

11  management.  No graduate degrees.

12  Q    Okay.  You heard the Court ask some questions about

13  Jetall.

14  A    Yes

15  Q    So tell me a little bit about what Jetall is.

16  A    Jetall is a management company.  It means -- it has a

17  meaning.  It's a cast.  It's our family cast.  We're on a

18  cast system.  And it means chief.  A lot of people think

19  it's Jet all, but it -- Jetall is just one word.  And it's

20  something that is a heritage of my dad.  And it -- is the

21  property management development aspect.  It buys, sells,

22  manages, develops leases of real estate.  We've bought and

23  acquired, you know, dozens of buildings and stabilized them

24  and this particular property I got involved in over ten

25  years ago.

1   Q    Do you have a broker's license, Mr. Choudhri?

2   A    Not me personally, but we have a company that does have

3   a -- Jetall it has a brokerage license as well through a

4   record broker.  That's typically how it works.

5   Q    Okay.  Let's talk about the 2425 building.

6   A    Okay.

7   Q    Let's -- I'm going to ask you to turn to Exhibit 4.

8   A    Yes.

9   Q    All right.  Can you sort of -- well, let's talk.  So

10  when did you first become involved with the building?

11  A    It was around 2013, maybe even as early as 2012.  It

12  was owned by a fund, PCCP, and they were at the end of their

13  fund cycle, and they had to sell, and their largest tenant

14  was moving out.  Blue Cross Blue Shield.  You probably saw a

15  sign on top of the building.  It said Blue Cross Blue

16  Shield.  And they had occupied the bulk of the building, and

17  they were moving out back in 2012-13-time timeframe when I

18  acquired it.

19  Q    And so when you acquired -- well, so what entity

20  acquired the building in 2012-13.

21  A    It was an entity, 2425 West Loop, LLC --

22  Q    Okay

23  A    -- acquired the building.

24  Q    All right.

25  A    Jetall signed the contract and assigned it over to an

1   SPE which was 2425.

2   Q    Okay.  And just so I know, and the Court knows what an

3   SPE is, but just for purposes of the Record, what does SPE

4   mean?

5   A    Single Purpose Entity.

6   Q    And so 2425 was originally owned by 2425, I think you

7   said West Loop, but could it also have been WL LLC.

8   A    Subsequently, yes.  It was, 2425 WL LLC.  Yes.

9   Q    Okay.  And so talk a little bit about I guess once you

10  first got involved with the building in '12 what it was

11  like?

12  A    The building -- The entire building was a call center

13  for Blue Cross Blue Shield, and it was very Art Deco.  But

14  the building had great bones because it was designed by a

15  very famous architect, the father of modern architecture.

16  His name is or was I.M. Pei.  He passed at 103 years old.

17  He's designed two buildings in Houston only.  One of them is

18  the JPMorgan Tower, which is the tallest building in Texas,

19  and the other one is 2425 West Loop.

20          So it had -- the building had great bones, great

21  location, but it had a lot of -- lots of issues.  Elevators

22  were not functional, it wasn't sprinklered, it -- and the

23  biggest tenant had -- was basically moving out.  So it was

24  in essence an empty building.

25          And so we ended up completely renovating the

1    building, spent a significant amount of funds in the

2    building to putting in brand-new state-of-the-art

3    destination dispatch elevators, upgraded lobbies, restrooms,

4    sprinklers, X, Y, Z, whatnot, and we're able to get it

5    leased up and get it significantly stabilized with a tenant

6    that owned about 800 stores -- over 800 stores.  A tenant

7    called -- the main tenant in the building that moved in was

8    their parent company, Stage Stores.  They were on the New

9    York Stock Exchange at the time.  They owned Haley Royal,

10   Bells, Goody's, Gordmans.  And they had 800 stores and about

11   13,000 employees.  So this was their headquarters that we

12   were able to lend them and move them in.

13   Q    Okay.  Would you recall when Stage moved into the

14   building?

15          MR. FITZMAURICE:  So, Your Honor, objection.  I

16   understand granting some leeway to the Debtor to present

17   their case.  None of this has anything to do with the

18   Debtor.  This is about the predecessor.  We're here on the

19   Debtor's use of cash collateral.

20          THE COURT:  I'll allow a little bit, but at some

21   point, Ms. Hayward, get to it.

22          MS. HAYWARD:  Yes, Your Honor.

23          MR. FITZMAURICE:  Thank you.  Your Honor.

24          THE COURT:  It's all right.

25   BY MS. HAYWARD:

1  Q     So, Stage -- So how many floors is Stage?

2  A     Nine floors.

3  Q     Nine floors, okay.  And what happened to Stage?

4  A     COVID happened.  COVID was a major factor.  They were

5  going through a conversion to -- they had to deal with

6  Amazon where they're trying to convert their stores to off

7  price.  They are in small town America at 800 or 800 stores.

8  And in May 2020, they filed for bankruptcy.

9  Q     Did they reject the lease for the building?

10 A     Yes.

11 Q     And so what happened to the vacancy at the building?

12 A     The majority of the building was vacant.  And the

13 occupancy I would guess was around 10 percent at that time.

14 We had another tenant that didn't move in that had signed a

15 company called Sonder, that had signed -- I'd signed them up

16 for three floors where they were converting the building to

17 boutique hotel apartments.  Sonder is a company by Bezos

18 Expeditions, which is Jeff Bezos's family office investment.

19 So it was a startup.  And they were interested in converting

20 the building.  And then when COVID happened, literally

21 everything kind of came to a screeching halt and the

22 building was pretty much empty, and I had to -- we worked

23 hard to lease it up.

24 Q     All right.  Let's back up a little bit.  Okay.  So at

25 some point, let's talk about how did this Debtor obtain the

1  building?

2  A    This Debtor obtained the building in 2018 from the

3  other entity 2425 WL that basically provided the equity and

4  the funding at closing.

5  Q    Okay.  Let me ask you this:  Why did this Debtor

6  acquire the building?

7          MR. FITZMAURICE:  Objection, Your Honor.

8  Relevance to the Debtor's use of cash collateral?

9          THE COURT:  Yeah.  I'm more into the money.  I'm

10  kind of where we are and --

11          MS. HAYWARD:  Okay.  Your Honor.

12          THE COURT:  But --

13          MS. HAYWARD:  I mean, this goes to -- this is the

14  start of the MBK relationship, which is why I was going.

15          THE COURT:  I'll give you a leeway, but

16  essentially we're going to have to -- reason I'm allowing

17  this a little bit is that we're getting into -- I don't want

18  to repeat this if we ever get into the motion to dismiss

19  stuff.  But I do agree, at some point we need to get to the

20  budget.

21          MS. HAYWARD:  Okay.  Your Honor, if I can

22  certainly just focus on cash collateral, I guess I was --

23          THE COURT:  No, no, no.  I'll let you kind of go

24  to where we're going, but that's the emphasis.  So I'll let

25  you.

 1          MS. HAYWARD:  So does Your Honor anticipate, then

 2   I guess we'll have a hearing on cash collateral and then --

 3          THE COURT:  You know, I --

 4          MS. HAYWARD:  A different hearing on a motion to

 5   dismiss rather than do it all in one.

 6          THE COURT:  I really want to know what's going on

 7   with the money.

 8          MS. HAYWARD:  Okay.  Very good Your Honor.

 9          THE COURT:  To kind of understand things.

10          MS. HAYWARD:  Okay.

11   BY MS. HAYWARD:

12   Q    Well, so, Mr. Choudhri, so it sounds like after the

13   Stage Stores filed bankruptcy, the building became pretty

14   vacant.  Let's talk about sort of, I guess historically, the

15   financials of the building from COVID until now.  Can you

16   give the Court a little bit of an idea of, you know, what it

17   looked like when Stage Stores filed bankruptcy leading up to

18   where we are now?

19   A    Absolutely.  It was significantly negative cash flow,

20   and it was a tough market, but we were able to secure

21   tenants' prospects that, unfortunately, we didn't get as

22   fast as we wanted because there's reasons.  And I can go

23   into those reasons, or I can just --

24   Q    I just kind of --

25   A    Okay.  Sorry.  Yeah.  I don't want to go off.

1    Q    Yeah.  Let's just try to kind of give sort of a more

2    global picture of sort --

3    A    Sure.

4    Q    -- of what has happened since COVID --

5    A    Sure.

6    Q    -- to where we are now.

7    A    Kind of high level despite the challenges.  And there

8    were many challenges, we've been able to lease up the

9    building significantly.  We've moved into a company called

10   DC Partners, St Christopher Holdings, they're a developer in

11   Houston.  They built -- they own the Thompson Hotel.

12   They're building the Allen, and they're one of the largest

13   EB 5 groups.

14          So I was able to pursue them and bring them into

15   the building.  They've leased an entire floor, which is

16   27,000 square feet on a 10-year lease.  That's a new deal

17   we've done.  There's another co-working business that's

18   owned by a group of physicians.  They own a lot of ER

19   centers, and they've -- they've taken space in the building.

20   And we've renewed several tenants.  And we've also signed

21   leases with other groups like Bankable Equity.  And Metwall

22   is another tenant --

23   Q    And Mr. Choudhri, I'm going to ask you to turn to

24   Debtor's Exhibit 8.

25              THE COURT:  And let me just note, if we get into

1   the document that we said we weren't going to deal with, one

2   thing I can do, and I want you to think about this, is I can

3   mute the entire line and just unmute Mr. Ruff's line, but we

4   can put nothing on.  That may work.  He doesn't have to come

5   up here --

6             MS. HAYWARD:  No, that would be --

7             THE COURT:  And I can control that.  So if we end

8   up having to go there, that's probably what I think I may

9   do.  And just mute everyone's line.  And have Mr. Ruff

10  unmute.  And I can control who's listening.  And it would

11  the only line that we have, and it's almost kind of like the

12  same thing, I -- just giving everyone the option on that.

13            MS. HAYWARD:  Sure, Your Honor

14            THE COURT:  Okay.

15            MR. FITZMAURICE:  That seems sensible.

16            MS. HAYWARD:  Yeah, I think that works just fine,

17  Your Honor.

18            THE COURT:  Thank you.

19  BY MS. HAYWARD:

20  Q    All right.  Mr. Choudhri, I'm showing you Exhibit 8.

21  Are these the Debtor's rent rolls?

22  A    Yes, ma'am.  Looks like it.

23  Q    Okay.  And so these are rent rolls, it looks like from

24  January through September.  Can you just -- in looking at

25  these, you know, how has the Debtor progressed in leasing up

1  the building over the last, you know, this year?

2  A    It has been significantly leased up.  Our occupancy is

3  over 50 percent.  Before, we were around 10.  It's gone up

4  over 100,000 square feet of lease up.  And we also have

5  additional leases like Regis and IWG, which is the parent

6  company of Regis.  They were actually in the building before

7  many years ago, and they're now interested in coming back.

8  So we're -- we've significantly leased up the building.

9  I've personally moved into the building to support it and

10  physically be there and be available at a whim's notice to

11  show space and showcase the space in the building.  And it's

12  really worked.  That's how we were able to, I believe, land

13  a lot of these tenants.

14  Q    Okay.  And so when you say you personally moved in, who

15  is you?

16  A    My, or the management company.  And we've always been

17  supportive to being flexible, to leasing up the space and

18  kind of like -- if you have like a, you know, if you're like

19  a model home kind of environment where someone can come in,

20  and they can see the space and see what it could be, and

21  it's a showroom.

22  Q    Okay.  And so with respect to Jetall, which is the

23  management company, right?

24  A    Yes, ma'am.

25  Q    Okay.  (Coughs)  Excuse me, Your Honor.  So with

1  respect to Jetall then.  Jetall -- does Jetall have a lease

2  with the Debtor?

3  A    It does.

4  Q    Okay.  And historically, how has that lease worked?

5  A    It's been a flexible lease to basically put tenants

6  first.  So Jetall had signed a lease around 2015 in the

7  building, and there was a tenant that wanted to move in, a

8  tenant called Verbex.  It's a kind of crypto exchange

9  company, and they took some space, but they didn't take the

10  entire floor.  And so Jetall made -- basically gave them the

11  space.

12          So -- and then when they actually -- unfortunately

13  didn't fulfill and move in, Jetall signed -- we signed a

14  lease with a company called Sonder.  And Sonder wanted the

15  eighth floor, and they took three floors in the building and

16  COVID occurred and they -- that's a claim we do have against

17  Sonder to collect on that.  So then there was -- so Jetall

18  is basically trying to support the building and float it

19  around to support it in any way it can.

20  Q    Let's look a little bit at the cash collateral budget

21  that was submitted in this case.

22          Sorry, Your Honor.  Something --

23          THE COURT:  No worries.

24          MS. HAYWARD:  -- set my allergies off a little

25  bit.

 1              THE COURT:  I'm sorry.  What was the --

 2   BY MS. HAYWARD:

 3   Q    That would be -- let's look at Exhibit 1.  Okay.  Can

 4   we just walk a little bit through sort of these operating

 5   expenses and what they are?

 6   A    Sure.  Service contracts, payroll, you know, something

 7   else I want to mention that Jetall actually advanced payroll

 8   because the building at, you know, at certain points could

 9   you know -- just for years there was negative cash flow.  So

10   I personally and Jetall funded things that were necessary.

11   So the --

12   Q    Well let's take, for example, I see on this budget,

13   there's administration costs.  You see that at the very

14   bottom?

15   A    Yes.

16   Q    Okay.  And so who -- it looks like there's detail

17   talking about property manager, assistant property manager,

18   are those -- who are those employees of?

19   A    Jetall companies advances the employees for and

20   historically has, as well.

21   Q    Okay.  Has Jetall been charging management fees or been

22   paid management fees for managing this property?

23   A    I don't believe so.  I believe there may be some

24   management fees historically that are accounted for.  I

25   don't believe they've been paid for that, what's owed.

1   Q    Is there a management agreement with Jetall?

2   A    Yes.

3   Q    Under that management agreement does Jetall or is

4   Jetall typically entitled to charge commissions with respect

5   to rental space?

6             MR. FITZMAURICE:  Your Honor, objection, best

7   evidence rule.  We should be able to look at the management

8   agreement for its contents.  Otherwise, we are trying to

9   testify from memory as to what the contract says.

10            THE COURT:  We're about one or two questions away

11  from there.  I agree with you.  He can answer.

12            THE WITNESS:  There -- when we bring, or you know,

13  bring leases in management, we're entitled to that.  But we

14  have not collected.

15  BY MS. HAYWARD:

16  Q    Are there management fees in the cash collateral budget

17  that's shown as Exhibit 1?

18  A    No.  We've not put any management --

19  Q    Okay.

20  A    -- fees on (indiscernible).

21  Q    With respect to the amounts that are shown in Exhibit 1

22  of these amounts.  Are any of these amounts something that's

23  not directly related to the maintenance or repair of the

24  building?

25  A    Absolutely not.

1  Q     Now you see the rental income from August through

2  December that's projected rental income.  We see a jump, I

3  guess, in September to October.  Why is that?

4  A     Because there are leases that are starting to pay in

5  this environment and really, office world, you're going to

6  have a lease and you're going to have abatement of rent.

7  And then the rents kick in for new tenants typically.

8  Tenants cannot get rent concessions and -- or use TI's as

9  credits for rents, things like that.  So once that burns

10  off, then the rent starts coming in.  So we're on an upward

11  projection of more revenue coming in than was there.  So the

12  building is significantly more leased than it was before.

13  Q     And as far as you know, looking at, I guess, these

14  numbers.  Has the Debtor -- I believe you said the Debtor is

15  in negotiations with Regis, for example.  Has the Debtor

16  entered -- is the Debtor have any new leases that are going

17  to further increase revenue?

18  A     Yes, the Debtor has signed -- the Debtor has a lease

19  signed by Bankable Equities, which is an insurance company

20  and they've taken the entire sixth floor.  DC Partners does

21  have a right of first refusal on contiguous floors and

22  they've stated that they're not pursuing or not going to

23  waive that.  So that is a new lease.  There is a restaurant

24  lounge on the lobby floor and there's other restaurants that

25  we've talked to, some steakhouses that are interested in

 1  ground level.

 2           So we -- the plan is to really make this building

 3  not just office, but truly mixed use where you have

 4  restaurants, retail and office.  So there's more of an

 5  experience, more of an ecosystem.  And it's in phase two of

 6  the River Oaks District is right behind the building and

 7  that's happening as well.  So that's a big positive.  And

 8  then there's parking revenue that's coming in as well in the

 9  future based on new leases that are being done and that have

10  been done. So we have actual leases that are signed, that

11  weren't signed before since the last few months actually.

12  Q    And I'm going to ask you to turn to Exhibit 7, if you

13  would, Mr. Choudhri.  What is Exhibit 7?

14  A    Exhibit 7 is a tenant, Ghassan Yasser TBA Boho Lounge.

15  This is --

16  Q    Well, Exhibit 7 is pretty --

17  A    Oh.

18  Q    -- bulky.

19  A    Okay.  Oh, I see what you -- okay, so Exhibit 7 has

20  several leases within Exhibit 7.  So -- but the first lease

21  on top is a new lease for the restaurant space on the first

22  floor.

23  Q    Okay.  And this is the Boho lease?

24  A    Yes.

25  Q    Okay.  And then if you would turn to sort of the back,

ALI CHOUDHRI - DIRECT BY MS. HAYWARD                    44

1  you'll see that there's some page numbers on the bottom left

2  side of each page.

3  A    Yes, ma'am.

4  Q    If you'll turn to page No. 000449.

5  A    Okay.  Sorry.  Just bear with me.  Okay.  I'm here.

6  Q    Okay.  What is 000449?

7  A    This a new lease we have for Level 6, for the sixth

8  floor, called Bankable Equity.

9  Q    Okay.

10 A    Is an insurance company.

11 Q    And how much space is this new lease taking?

12 A    27,000 square feet.

13 Q    Okay.  And under this lease -- so is that an entire

14 floor?

15 A    It is an entire floor.

16 Q    When was this lease -- when did the tenant sign this

17 lease?

18 A    It's been under negotiation for a while, but it was

19 signed last week.

20      MS. HAYWARD:  Your Honor, we would move for the

21 admission of Exhibit 7, which is copies of the various

22 leases tenants that have signed -- that tenants have signed

23 with respect to the property.

24      MR. FITZMAURICE:  So, Your Honor, we object with

25 respect to the two leases that we've talked about.  They're

1   not leases that are signed by the Debtor, and they are not

2   enforceable obligations by their terms with respect to the

3   remaining leases, the signatures, and with those two as

4   well, but also with respect to the other leases.  The

5   execution of those leases by the tenants hasn't been

6   established.  And so we object to this exhibit.

7                THE COURT:  What's your response, Counsel?

8                MS. HAYWARD:  Well, Your Honor, I think the

9   witness has testified that these are the leases.  I can

10  certainly walk through each lease and talk about whether or

11  not it's been executed by the tenant.

12               THE COURT:  Yeah.  But you have a copy of the

13  executed version or not?  You've just giving me an executed

14  version.

15               MS. HAYWARD:  I'm sorry.  Do I have?

16               THE COURT:  Do you have it?  In other words, what

17  you're going to try -- are you going to try to authenticate

18  the document by saying it's been signed by the other party?

19               MS. HAYWARD:  Yes.

20               THE COURT:  Even though there's not a signature

21  here?

22               MS. HAYWARD:  It's been signed by the tenant, Your

23  Honor.

24               THE COURT:  It's -- I'm saying that it's not been

25  signed by the other party, right?

1            MS. HAYWARD:  The Debtor?

2            THE COURT:  Yeah.  You're saying it hasn't been

3   signed by the Debtor?   The version that I'm looking at

4   here.

5            MS. HAYWARD:  Correct.  The version you're looking

6   at has not been signed yet by the Debtor.  But what --

7   they're being offered to show that the Debtor has these

8   leases in place that can -- that are supporting the

9   property, Your Honor.

10           THE COURT:  I'm not sure they're supporting

11  anything at this point.  If they're unsigned, what am I

12  doing?  What am I looking at?

13           MS. HAYWARD:  Well, first off, Your Honor, we're

14  only talking -- there's only two leases in here.  Those are

15  the brand-new leases.

16           THE COURT:  Okay.

17           MS. HAYWARD:  All right.  So --

18           THE COURT:  Why don't we separate them?

19           MS. HAYWARD:  Okay, let's separate them.  The new

20  leases.  So if we take out of Exhibit 7, I guess.

21           THE COURT:  Well, I guess maybe the way of doing

22  this is, for the leases that are here.  I can admit the fact

23  that there are signed leases dated as of this date, but have

24  no legal effect, right?  I -- or to my knowledge, or I can

25  admit that there's something here, but not that the other

1  side is actually signed, that the Debtor has actually signed

2  these or intends to sign them.  I think is the way to --

3           MR. FITZMAURICE:  I think with respect to the Boho

4  lease and the Bankable lease, I agree with you, Your Honor.

5  Our objection is to the extent these exhibits are offered to

6  prove that this is an enforceable obligation and that is

7  revenue that the Debtor is entitled to as a result of those

8  leases.  Given the fact that they're not executed, we would

9  have -- oh, I'm sorry.

10           THE COURT:  I think parties can argue to the legal

11  effect of them, right?

12           MR. FITZMAURICE:  Yes Your Honor

13           THE COURT:  But they -- they're signed by one

14  side.  Maybe we'll do that.  To the extent that the document

15  has -- in 7 has not been fully executed by both parties and

16  the ones that are -- those two leases that are unexecuted.

17  They say what they say, but they remain unsigned.  I don't

18  have fully signed copies.  So the legal effect of those

19  documents will be for me to determine as a matter of law.

20           MR. FITZMAURICE:  Thank you, Your Honor.  And with

21  respect to the remaining leases, I don't think that the

22  Debtor can establish the witnesses' familiarity with the

23  signatures of the tenants to prove up that those are, in

24  fact, the tenants' signatures on those leases.  I would

25  submit that to the extent that those other leases are signed

1  by the Debtor, the Debtor can presumably prove up its part

2  of that lease.  But it's not clear that it can establish

3  that the tenant's signature.

4         MS. HAYWARD:  Your Honor, respectfully, the Debtor

5  doesn't -- the Debtor can authenticate the leases, as these

6  are the leases that the Debtor has with respect to these

7  properties that are the business records of the Debtors,

8  they were pulled through --

9         THE COURT:  Why don't you just prove up the

10  business record exception?

11         MS. HAYWARD:  Okay, but they -- but we're talking

12  authenticity here, right?

13         THE COURT:  I think you can --

14         MS. HAYWARD:  That's a different issue.

15         THE COURT:  No, no.  But I think he can -- I think

16  these documents have been properly authenticated.  I think

17  the question is, are they admissible now?

18  BY MS. HAYWARD:

19  Q    Mr. Choudhri, these documents within Exhibit 7, are

20  these documents that Galleria 2425 Owner LLC would maintain

21  in the regular course of its business?

22  A    Yes.  And I've signed these leases.

23  Q    Okay.  Are these documents or these leases -- the

24  leases that govern the various tenants that are currently

25  occupying the property or in the process of beginning their

1  occupation of the property?

2  A    Yes.

3  Q    Are these leases something that at the very core, I

4  guess, of 2425's business?

5  A    Yes.

6  Q    The leases they are these the signed copies of the

7  leases that Jetall maintains in its files?

8  A    Yes.  And these two new leases are also executed.

9  Q    Who typically has been executing these leases?

10 A    Typically, I'll execute them or an authorized manager

11 will.  And this is what we keep in our books and records of

12 leases and operating agreements and contracts.

13          MS. HAYWARD:  Again, Your Honor would move for the

14 admission of Exhibit 7.

15          MR. FITZMAURICE:  Your Honor, objection.  We think

16 that the Debtor has established that these are Jetall's

17 books and records that Jetall maintains.  I don't know that

18 Debtor has established that it maintains them in the

19 ordinary course of its business --

20          UNIDENTIFIED MALE:  It's all bullshit.

21          THE COURT:  Well.

22          MS. HAYWARD:  What?

23          THE COURT:  Hold on a second, folks.

24          THE COURT:  I'm going to remind everyone, if

25 you're on the line, you're dialing into Federal Court.  And

1   I will treat it as if you're speaking in my courtroom.  I

2   don't know -- no idea who spoke, but the level of disrespect

3   that was just shown to this Court and to this process, I'm

4   muting the line.  And if I find out who it is, I'm going to

5   subpoena them in here to really explain to me who they think

6   they are.  You don't have open phone lines in my courtroom,

7   being able to say those kind of words.

8            So whoever it is, I don't know what you're talking

9   about.  I don't even know if you're dialing into this

10  hearing.  But I assure you, if I find out who you are,

11  you're coming in, and we're going to have a conversation

12  about what you said.  I'm muting the line and I -- my

13  sincere apologies to the parties.  I don't know what's going

14  on, but it won't be tolerated.  I'm muting the line.

15           Mr. Ruff, why don't you just unmute the line?  Why

16  don't you just hit five star?

17      (Conference muted.)

18           THE COURT:  That's it.

19           Mr. Ruff, did I get you?

20           MR. RUFF:  You did, Your Honor.  Thank you.

21           THE COURT:  Okay.  My law clerks are on the line,

22  hit five star.

23           Okay, let's proceed.

24           MS. HAYWARD:  Thank you, Your Honor, that's the

25  most exciting thing that might happen today.

1        MR. FITZMAURICE:  So again, I apologize for

2   interrupting.

3        THE COURT:  No.

4        MR. FITZMAURICE:  I just want to make sure that

5   the objection gets resolved before we continue.

6        MS. HAYWARD:  Yes.

7        THE COURT:  No, no, I'm going to overrule the

8   objection.  They come in.

9        MR. FITZMAURICE:  Thank you.

10  BY MS. HAYWARD:

11  Q    Mr. Choudhri, do you believe that the amounts that are

12  listed in the Debtor's six-month budget, which is attached,

13  which is Exhibit 1 here --

14  A    One?

15  Q    -- are necessary to the preservation of the building

16  and the tenancy of the building?

17  A    Yes.  Yes, ma'am.

18  Q    What happens -- what could happen if the Debtor didn't

19  pay for elevator maintenance, for example?

20  A    That's life and safety.  It's a basic requirement that

21  we need to operate and run the building.

22  Q    Okay.  Are there any expenses that are listed in this

23  budget that you would not consider to be necessary to the

24  operation of the building?

25  A    No.

1          MS. HAYWARD:  Your Honor, may I have a moment to

2     confer with co-counsel, please?

3          THE COURT:  Yes, please.

4        (Pause in the proceedings.)

5          MS. HAYWARD:  And Your Honor, I just want to be

6     clear that this testimony is just for cash collateral,

7     rather than getting into the motion to dismiss.

8          THE COURT:  Yeah.  Yeah, it is.

9          MS. HAYWARD:  Okay.  Your Honor, then at this

10    point, I would pass the witness.

11         THE COURT:  Okay.  We need to talk about the

12    budget.  And we haven't talked about the budget,

13    Ms. Hayward.  We haven't talked about the budget.  And I'm

14    concerned about the budget.

15         MS. HAYWARD:  Exhibit 1, Your Honor.

16         THE COURT:  Whenever you're talking about for the

17    next couple of months, I'm concerned about the budget or

18    where the money or how accurate the budget is.

19         MS. HAYWARD:  Okay, Your Honor.

20         THE COURT:  In other words, the proposed cash

21    collateral order seeks to provide a replacement lein, right?

22         MS. HAYWARD:  Yes, Your Honor.

23         THE COURT:  Right.  When I look at the MOR that

24    was filed last month, I look at the EMOA that was filed this

25    month.  I'm having trouble understanding or reconciling the

1  budgets that's been attached with the MORs that have been on

2  file and how they work.

3          In other words, you take out 20,000 of cash, which

4  no one has done for the utilities yet, which my order

5  requires.  We've got a really big fight ahead of us.  And I

6  don't understand where the money's coming from to pay for

7  that and then also to pay adequate protection to the secured

8  creditor.

9          MS. HAYWARD:  Well, Your Honor, right now we have,

10 you know, the cash collateral budget proposed for

11 replacement liens as the property gets leased up.

12 Obviously, revenue --

13         THE COURT:  But it didn't work last month.

14         MS. HAYWARD:  I'm sorry, Your Honor.

15         THE COURT:  It didn't work, right?  In terms of

16 what was projected, in terms of what was actually provided.

17 It didn't work.  You look at the MOR.  The MOR showed that

18 the Debtor had -- your July MOR didn't coincide with what

19 this budget shows.

20         MS. HAYWARD:  Well, Your Honor, the July MOR was

21 covering July 5th.

22         THE COURT:  Through the end of the day.

23         MS. HAYWARD:  Through the end of the month.

24         THE COURT:  Right.

25         MS. HAYWARD:  So rents typically would come in

1  pre-petition.  So the July MOR is only covering post-

2  petition.

3          THE COURT:  But it only showed what you covered,

4  right?  In other words, your budget, even looking at August,

5  how much money do you have now?  It's all in -- it's all in

6  evidence.  I can ask Mr. Choudhri all of these questions.

7  But I don't understand how the budget works and how this

8  Debtor with the carve out.  And I'm concerned about the

9  level of money and the level of fight that we're going to

10  have and whether this Debtor really has enough cash.

11          MS. HAYWARD:  Well, Your Honor, I think that the

12  Debtor's plan obviously comes into play there, which

13  includes a substantial cash infusion.

14          THE COURT:  Right.  But now we're never going to

15  get into corporate governance issues.  And I'm really

16  concerned about those two.

17          MS. HAYWARD:  Corporate governance issues, Your

18  Honor?

19          THE COURT:  Uh-huh.  And I don't want to get into

20  it, but I'm concerned.

21          MS. HAYWARD:  Okay.  Well, Your Honor, I think

22  that --

23          THE COURT:  It's going to cause me to talk about

24  the settlement agreement.

25          MS. HAYWARD:  Yes, Your Honor.

 1              THE COURT:  And who's --

 2              MS. HAYWARD:  Well, and that's why, you know, I

 3  think a lot of this is sort of intertwined.

 4              THE COURT:  Let's just talk cash.  Let's just

 5  assume cash.  How do you -- what's the adequate protection?

 6  I don't see it -- I don't see the replacement actually

 7  replacing.  In other words, there's a cash position that has

 8  to be preserved.  And so use of cash -- but they have to be

 9  adequately protected.  And I don't see it, and I don't see

10  that plus the carve out.  I don't see how the Debtor has

11  enough cash.

12              MS. HAYWARD:  Well, Your Honor, the adequate --

13              THE COURT:  What's your opinion?

14              MS. HAYWARD:  The adequate protection to the

15  lender, again, we're not spending cash on an ancillary.

16  We're not spending cash on things that the lender itself

17  wouldn't have to spend cash on.

18              THE COURT:  But they're still entitled to adequate

19  protection.

20              MS. HAYWARD:  They're entitled to adequate

21  protection of their interest, right?

22              THE COURT:  Uh-huh.

23              MS. HAYWARD:  But to the extent that we're

24  spending cash on things that maintain the value of their

25  underlying collateral.

1              THE COURT:  Right.

2              MS. HAYWARD:  And preserving the value of that

3    collateral and the property, then that is adequately

4    protecting.

5              THE COURT:  So why don't we look at the budget and

6    then talk about them?  Why don't we -- why don't we look at

7    your current budget?

8              MS. HAYWARD:  Okay.  Your Honor, the current

9    budget is Exhibit 1.

10             THE COURT:  So tell me how that reconciles with

11   your MORs.

12             MS. HAYWARD:  Your Honor, we've only filed --

13             THE COURT:  Let's just take the one, the most

14   recent one that you filed.

15             MS. HAYWARD:  Your Honor, I would have to pull it

16   up on my computer.

17             THE COURT:  I understand.

18             MS. HAYWARD:  I don't have it in front of me.

19             THE COURT:  I understand.

20             This is what Mr. Choudhri is going to have to

21   testify to.  What's on the MOR and then compare it to what's

22   here?

23             MS. HAYWARD:  Yes, Your Honor.

24             THE COURT:  I don't want you resting your case.

25             MS. HAYWARD:  Yes, Your Honor.  I appreciate.

1  Your Honor, may we take maybe a five-minute break, so I can

2  get set up with my laptop --

3          THE COURT:  Yeah.

4          MS. HAYWARD:  -- on the Wi-Fi.  And --

5          THE COURT:  I think that's appropriate.  It could

6  do.  You still have to talk about -- all right.  We can take

7  the break, but I want to talk about a couple of things.  I

8  want to talk about the secured creditor's debt.  I want to

9  talk about who's liable on that debt.  And then I want to

10  understand how this flows through the cash collateral order.

11          MS. HAYWARD:  Okay, Your Honor.

12          THE COURT:  That's -- I'm trying to be as open and

13  transparent as I can.  I want to take up cash collateral

14  first.  I want to understand how this really works in terms

15  of getting to the fight about the plan and if that's where

16  -- if that's where this is ultimately going to go and who's

17  going to fund that fight and how the fight continues.

18          I also -- and I have to think about in connection

19  with a motion to dismiss.  Who's looking at claims against

20  the estate may have against other parties.  And how that's

21  going to work from a corporate governance standpoint, from

22  the estate standpoint.

23          I don't want to go there, but we got to kind of

24  think about it because I think about how you get there.  And

25  then, when you get there, what you're trying to do.  And I

 1  don't want to put anyone in a bad position because I don't

 2  know what I don't know.  I just know what certain documents

 3  that are into evidence say.  And I need to think about all

 4  of that.

 5          And I think maybe we should all be thinking about

 6  a lot of things up front before we kind of get there.  But

 7  for now, I'm just thinking money, your MORs, the cash

 8  position that the Debtor has.  And then the proposed

 9  administrative burn that's going to happen to get there.

10  The proposed cash position that the Debtor has now.  What

11  we're really doing -- I don't want to get to the end of it

12  and then figure out that there's not enough cash to pay

13  administrative expenses.  And I'm really concerned about

14  that.

15          MS. HAYWARD:  Well, and I appreciate that, Your

16  Honor.

17          THE COURT:  And at the same time give -- and at

18  the same time -- I'm not worried about US Trustee fees.

19  I'll let Mr. Ruff fight about that.  But I'm concerned about

20  admin expenses, and I'm thinking about replacement lanes.  I

21  thought it was going to be a replacement lane and there's a

22  carve out for fees in connection with a real dispute that

23  could come, right?  I need to kind of understand to make

24  sure on the front end that you're really going to -- I don't

25  want you getting to the end and figuring out.

1          There wasn't anything there, or it wasn't as much

2    there.  Because if you hire, and you get to -- and you do --

3    you get hired to do work, you got to get paid.  And I don't

4    want to be in a position where that ever gets questioned.

5    At the same time, I don't want to find myself at the end of

6    a 60 days, and find myself where we're not.  The cash

7    position is kind of where it's trending.  And then there's

8    really been no replacement lane and the cash essentially is

9    gone because it went to pay for administrative expenses,

10   which I think would be appropriate.

11          MS. HAYWARD:  Your Honor, I --

12          THE COURT:  I'm just being honest with you.

13          MS. HAYWARD:  And I hear, Your Honor.

14          THE COURT:  I'm just thinking about this because

15   this is -- you know, we're talking about experts, and this

16   is going to be a real right evaluation, right?  Is what your

17   plan calls for?  And we don't need to get there.  And I'm

18   not here to try playing conformation issues and whether a

19   plan is feasible, not feasible, I don't know.  Those fights

20   are -- those are fights for another day.  The question is,

21   as we look now, is there something that can get you to the

22   ultimate dispute that you need to have?  And I need you to

23   think about of where we are going.

24          I just don't want you leaving without answering my

25   questions.  And I'm trying to be as transparent as possible,

1  not because I think you're doing anything bad or losing.

2  It's just on my mind as I walk out.  And I'd rather you know

3  what's on my mind.  And they know so that everybody can

4  answer the question.  So I need to really focus on cash

5  collateral issues.

6          So why don't we just take a few minutes.

7  Mr. Choudhri, I'd remind you that you're still under oath,

8  and you're not to discuss your testimony with anyone during

9  this time.

10         And when don't we just take a few minutes, now's

11 not the time for argument.  But I do need him to answer some

12 questions about the budget and kind of where things go.  I

13 have a full opportunity to cross, and I need -- those are

14 the questions that I'm going to ask, and I might as well --

15 I don't want to blindside anyone with questions as I start

16 talking about MORs and stuff.

17         MS. HAYWARD:  Sure, Your Honor

18         THE COURT:  Okay.  All right.  Thank you.

19     (Court in recess from 12:23:17 p.m. to 12:34:52 p.m.)

20         THE COURT:  Mr. Choudhri, come on up.  Thank you.

21         I remind you that you're still under oath.  Okay.

22         MS. HAYWARD:  Thank you, Your Honor.  Your Honor,

23 I just -- I guess I'm pulling -- I pulled the Monthly

24 Operating Report that was filed yesterday, Your Honor.  And

25 obviously, that is not included as an exhibit for today.  So

1  I'm not sure how to address the Court's concerns with it

2  other than to say that I believe that the monies that came

3  in, actually surpassed the budget.

4           THE COURT:  Okay.

5           MS. HAYWARD:  So but I'm happy to --

6           THE COURT:  No, no I mean, let's -- If those are

7  the questions that you have then I'm comfortable proceeding.

8  You can cross him.

9               DIRECT EXAMINATION (CONT'D)

10  BY MS. HAYWARD:

11  Q    Okay.  Mr. Choudhri, with respect to -- I guess you've

12  heard the Court's -- some of the Court's concerns regarding

13  you know the Debtor and the Debtor's operations and the

14  protection of the bank.  With respect to the Debtor's

15  current cash position, does the Debtor currently have cash

16  to operate and pay the expenses for the building?

17  A    Yes.

18  Q    And with respect to any potential deficiencies, are you

19  or is Jetall willing to fund any potential deficiencies that

20  may exist until the time that we get to a plan?

21  A    Yes, I'm prepared to do that.

22  Q    Okay, would you --

23  A    And I've done that in the past.

24  Q    Okay.  Have -- with respect to any deficiencies in cash

25  that may exist going forward, are you or Jetall -- well, I

1    guess so -- you say you've been doing that in the past.

2    What do you mean by that?

3    A    In the past, we've advanced payroll, we've advanced --

4    and you know, there's been sometimes repairs that were

5    needed in the past, and we funded that to get to where we

6    are, to get the building leased up, and we're above 50

7    percent where before we're at 10 percent.  So now the

8    revenues coming in to catch up.

9    Q    Okay.  With respect to the Court's concerns about

10   administrative expense claims, just generally speaking, will

11   Jetall be willing to fund any type of Debtor-in-Possession

12   loan that would be fully subordinated in this case?

13   A    Yes.

14   Q    Would you or Jetall be willing to fund, I guess, monies

15   that might be needed to get us to confirmation?

16   A    Absolutely.  Yes.

17   Q    Would you be willing to fund those monies as capital

18   rather than as debt?

19   A    Yes.

20   Q    Is it important to you to maintain this asset and hold

21   on to this building?

22   A    Yes, it's important to be successful and pay -- you

23   know, pay the creditors and get this asset stabilized.  That

24   is extremely important.  And I've done it before and I've

25   been working hard.  We're getting to that finish line now.

1  Q    Okay and what's your understanding of did the Debtor

2  collect all of the rents last month?

3  A    Yes.

4  Q    Okay.  And did the Debtor's collection of rents last

5  month -- out of those collections, compare with the budget?

6  A    We've surpassed the budget.  I believe the budget was

7  about 128,000.  I believe we've collected 170.  Again, I'm

8  going off of memory, but I'm guessing it's around 177,000.

9  Q    Is that including both July and August?

10  A    I --

11  Q    And if you don't know that's fine.

12  A    Yeah.  You know, I know the first month wasn't the

13  whole month.  And then we have tenants that are now starting

14  to pay rent, so more revenue is going to trickle in the next

15  month -- in two months.  Based on the escalations in the

16  rent schedule.

17  Q    Okay.  So explain that please, if you would.

18  A    So for example, you sign a lease with a tenant.

19  They'll -- and it's the market, you know tenants will expect

20  sometimes three months, six months, a year in our rent

21  abatement.  And so when you sign a lease, sometimes that has

22  to burn off till they start paying rents.  And there's also

23  things like commissions that we haven't, you know, even

24  charged for just so we could get, you know, get the tenants

25  and make it successful.  And get the operation -- you know,

1  reorganized and restructured so it is successful.  And I

2  think we achieved that with the plan.

3  Q    Okay.  Do you believe that -

4  A    I'm hopeful we will achieve that with the plan

5  (indiscernible).

6  Q    Do you believe that the payment of expenses with

7  respect to the building helps or hurts the value of the

8  building?

9  A    It absolutely helps.  It preserves it and adds value.

10  Increases the value.  And as we are -- as we're increasing

11  occupancy, it's adding more and more value and the expenses

12  are pretty fixed.  I mean they're going to be there, so it

13  dissipates the -- as revenue goes up, the expenses are

14  dissipated over more occupancy, right?  Before we had very

15  little occupancy.  Now we've raised the occupancy.  So

16  that's offsetting the expenses.

17  Q    Okay.  When you say the expenses -- do the expenses

18  tend to go up with respect to, as new leases are in place?

19         MR. FITZMAURICE:  Objection to form, Your Honor.

20  We're all talking here in generalities about what could

21  happen in theory, what generally happens with respect to the

22  real estate industry.  Generally we've got specific leases.

23  We have specific -- we would have specific terms about --

24         THE COURT:  Yeah, I agree.

25         MS. HAYWARD:  I'll move on.  Thank you, Your

1   Honor.

2            Your Honor, at this time, I'll pass the witness

3   for Cross, too.

4            THE COURT:  Okay.  Thank you.

5            And in terms of timing, I've got a -- why don't

6   you go for about 20 minutes?   I got a hearing at 1:00 that

7   shouldn't last too long maybe -- and then maybe you all can

8   start thinking about when you want to take a lunch break or

9   if you want to or not.  I don't care.  Just let me know kind

10  of how much -- what you all want to do.

11           MS. HAYWARD:  Yes

12           THE COURT:  Okay.  Thank you.

13           MR. FITZMAURICE:  So I'll just ask Mr. Choudhri to

14  keep that binder there, and I'm going to have another one

15  for you.

16           THE COURT:  Okay.

17                      CROSS-EXAMINATION

18  BY MR. FITZMAURICE:

19  Q    Good afternoon, Mr. Choudhri.

20  A    Good afternoon.

21  Q    I'd like to direct your attention to Exhibit 1, the

22  Debtor's Exhibit 1.

23  A    Yes.

24  Q    Which is the bud -- the projected budget for the

25  future?

1  A    Yes.

2  Q    And in particular, the increase in rent that's

3  forecasted between September and October.  Do you see that,

4  sir?

5  A    Yes.

6  Q    Is that increase in rent associated with the proposed

7  lease with Bankable?

8  A    I would have to look and compare.  But the Bankable

9  lease is fully executed.

10  Q    Well --

11         THE COURT:  Maybe I can ask you that this way,

12  though, there is an increase of -- from 128 to 229.  What is

13  that attributed to?

14         THE WITNESS:  That's attributed to when leases

15  turn on, Your Honor.  So we have a tenant that has free rent

16  that's burning off that's been in the building.

17         THE COURT:  You know which one?

18         THE WITNESS:  GalloWorks.

19         THE COURT:  Okay.

20         THE WITNESS:  And that's a tenant that they have

21  so much free rent and that rent burns off.

22  BY MR. FITZMAURICE:

23  Q    All right.  So --

24  A    So I think the projection may be even -- the true

25  projection is going to be higher or the reality is going to

1  be higher.

2  Q    We have the exhibit in front of us.  So I'd like you to

3  turn to that portion of Exhibit 7 in the Debtor's binder

4  that's in front of you, which is like the leases, and to the

5  page that has the little numbers 452.

6  A    4 --

7          THE COURT:  Is there a way we can get it?

8  Someone can tell me which one we're going to -- is there a

9  Bates label on the bottom?

10         MR. FITZMAURICE:  Oh, yes.  I'm sorry, Your Honor.

11  That's what I was referring to.  So they're on the left-hand

12  side and it's 00452.

13         THE COURT:  And Mr. Choudhri, that sounds like

14  it's going way towards the back.

15         THE WITNESS:  Okay.

16         THE COURT:  And then --

17         THE WITNESS:  What would help if you have the rent

18  roll, that would also help me.

19         THE COURT:  All right.  You just get to answer

20  questions, Mr. Choudhri.

21         THE WITNESS:  Sorry, Your Honor.  I apologize.

22         THE COURT:  No worries.

23         MR. FITZMAURICE:  I was trying to cross-reference.

24         THE WITNESS:  444, what?

25         MR. FITZMAURICE:  452

1          THE WITNESS:  Yes, sir.

2          THE COURT:  Okay.

3          THE WITNESS:  Yes, sir.

4   BY MR. FITZMAURICE:

5   Q    On this page, this is -- this document --

6   A    452.  Yes, sorry.

7   Q    And this is a copy of the proposed lease with Bankable,

8   correct?

9   A    This is a signed lease.

10  Q    This lease is not signed by the Debtor, is it?

11  A    It is.

12  Q    So I'm going to ask you to look at the page that is

13  473.

14  A    Yes, sir.  Okay, 47- -- okay.

15  Q    Is there a signature by the Debtor on that page?

16  A    Not here.  But I have -- we have a fully executed

17  lease.

18  Q    So I'm going to move to strike the reference to the

19  fully executed lease since this is the exhibit that we have

20  in front of us.

21          THE COURT:  Sustained.

22  BY MR. FITZMAURICE:

23  Q    Going back, Mr. Choudhri to Page 452.

24  A    Yes, sir.

25  Q    Section 1F.

1   A    Yes, sir.

2   Q    There's a chart with lease payments there.  Do you see

3   that?

4   A    Yes, sir.

5   Q    And for the period October 1st, 2023, and

6   September 30th, 2024, monthly rent is $101,250?

7   A    Yes, sir.

8   Q    Okay.  So I'd like you, please, to go back to Exhibit 1

9   which is the budget.

10  A    Yes, sir.  Exhibit 1.  Okay.

11  Q    And I'd like you to look at the difference between the

12  October rent and the September rent -- excuse me.  The

13  September revenue and the October revenue.

14  A    Yes.

15  Q    How much is that?

16  A    September is 128,329.  October is 229,579.

17  Q    And is that difference $101,250?

18  A    That sounds about right.  Yes.

19  Q    Okay.  So does that suggest to you the difference is

20  attributable to the proposed lease with Bankable?

21  A    I would have to confirm by looking at the rent roll

22  because there's other leases, too.  So I can't, but there is

23  an increase based on lease-up.

24  Q    All right.  And the increase is the exact amount of the

25  rent that's listed in the Bankable lease, correct?

1  A    101,250.  It's pretty close, yes.  About 100 and --

2  yeah, I would say it's pretty close about 100,000.

3  Q    So please look at Page 456 of Exhibit 7.

4  A    Okay

5  Q    This is a second -- I'm looking for Section 6 of the

6  proposed Bankable lease.

7  A    Okay.

8  Q    This provision gives the tenant the right to leave the

9  property at any time in its sole discretion, correct?

10 A    This gives the landlord an option to relocate the

11 tenant within a different floor because sometimes we have

12 tenants that -- like Bechtel was interested in the entire

13 building.

14        Give me one second.

15 Q    And if it's helpful, I'll direct your attention to

16 the --

17 A    The last sentence or the second last.

18 Q    Yes, sir.

19 A    Yes, that's what this says.  Tenant's option may

20 relocate to another building with 90-day written notice to

21 landlord.  Tenants shall pay the same.  But I believe that

22 there is a -- I believe there is a condition that has to be

23 met for that.

24 Q    There is no condition here in this sentence, is there,

25 sir?

1  A     No, there's not.

2  Q     And the property that's located at 1001 West Loop

3  South, are you affiliated with that property?

4  A     Yes.

5  Q     And how about the property located at 50 Briar Hollow?

6  A     Yes.

7  Q     Okay.  So this tenant can leave one property you

8  control.  Go to another property that you control in its

9  sole discretion, right?

10 A     Again, I don't think this is the -- I know that we

11 ended up -- on our final deal, we ended up with a landlord

12 right, not a tenant right.  But that's what this says.  This

13 does say tenant may relocate, that is what this says.  But

14 I'm not.  I know the version that there's one lease, and it

15 is fully executed with Bankable.  And it does not give

16 outside the landlord the right.

17         MR. FITZMAURICE:  All right.  So again, Your Honor

18 move to strike the portions of the answer that deal with

19 proposed terms that are not included in the evidence that's

20 before the Court.

21         THE COURT:  No, I'm going to overrule it.  He's

22 going to say, what he is going to say, right?  I don't --

23 overruled.  What's his name, sir?

24         MR. FITZMAURICE:  Thank you, Your Honor.

25 BY MR. FITZMAURICE:

1  Q    Mr. Choudhri, let's talk about Jetall.

2           THE COURT:  Can I just ask a question, then?

3  Just based on what you're saying, are you saying that

4  there's a different version of this lease agreement?  Or

5  that there is a lease agreement with a different language

6  that may be executed?

7           THE WITNESS:  Yes, Your Honor.

8           THE COURT:  Okay.

9           THE WITNESS:  I know that we did -- this rings a

10 bell.  And we did have a landlord unilateral right, not a

11 tenant unilateral right.  That was in there because the

12 tenant initially wanted to go to a different building.  I

13 was able to steer them to this building.

14          THE COURT:  Okay.  Thank you.

15 BY MR. FITZMAURICE:

16 Q    Mr. Choudhri, you said earlier, I believe that one of

17 the things that Jetall does is, it funds payroll for the

18 Debtor; is that right?

19 A    Yes, sir.

20 Q    The Debtor doesn't have any employees.  Does it?

21 A    Well, that is true.  Maybe I misspoke in the word

22 payroll, but it costs -- administrative costs like a

23 property manager.  So when -- as the management company we

24 advance funds, and we've done that and so Jetall has done

25 that for the benefit of the Debtor.  But it hasn't paid --

1  technically payroll they're like, you know, employees of

2  Jetall, not -- the Debtor doesn't have employees.  So I just

3  want -- Jetall does have some W-2 like there's cleaning

4  staff technicians.  Jetall pays the engineers, and the

5  assistant engineers, the HVAC technicians, you know property

6  manager, assistant property manager for the building.

7  Q    Those people are all Jetall employees, right?

8  A    Yes, sir.

9  Q    Okay.  Thank you.  And Jetall is a tenant in the

10 property, but doesn't pay any rent, correct?

11 A    It has a lease.  But it -- but the rents have not come

12 due yet.  It has some concessions, but it's always been

13 flexible to be physically there to lease up the building.

14 That's been its priority.

15 Q    And Jetall's original lease for the property did

16 require Jetall to pay rent, didn't it?

17 A    And it did.  And it was also OTI and it didn't because

18 there was a tenant that was larger and Jetall was an

19 impediment to that larger tenant.  So then Jetall let the

20 larger tenant take the space.

21 Q    And in exchange, the lease was amended to remove any

22 rental -- rent payment obligation from Jetall, right?

23 A    As long as that tenant was paying, yes, sir.

24 Q    Is that tenant paying right now?

25 A    No, that tenant did not.  That's the whole Sonder

1  lawsuit where there's --

2  Q    And Jetall's always continuing not to pay rent?

3  A    The lease is here, and Jetall's abiding by the lease

4  that it has.  And there is free rent that does burn off just

5  like any other tenant.  That's in the lease with Jetall.

6  Q    Who negotiated that lease on behalf of the Debtor?

7  A    Who negotiated that lease?  That lease was negotiated

8  on behalf of Jetall.

9  Q    That's who.

10 A    And that's the lease that I signed, and I negotiated in

11 the Bank of Kuwait got the lease as well before it was --

12          THE COURT:  Just want to make sure we're having

13 one question, one answer.

14          MR. FITZMAURICE:  I apologize

15          THE COURT:  No worries.

16 BY MR. FITZMAURICE:

17 Q    I'm sorry.  Please continue your answer.

18 A    Sorry about that.  No, I have a bad habit of rambling,

19 and I've got to stop.  I've been advised that.  I'm going to

20 stop.  I get real nervous, and I keep going.  So I'm sorry.

21 I'm going to go.

22 Q    No worries about it.  You did pretty well yesterday.

23 A    Yes, you're very kind and polite, and I appreciate you

24 being very respectful.  Thank you.

25 Q    With respect to the Jetall lease, is it fair to say

1  that the lease was negotiated with you on both sides of the

2  transaction?

3  A    That is true.

4  Q    And that's also true with the amendment of the lease to

5  reduce the rental payment obligation to zero, correct?

6  A    The rental payment was not reduced to zero.  There is a

7  rental obligation, and we've been fulfilling it based on the

8  lease.

9  Q    And that rental obligation currently is for zero rent

10 that you paid.

11 A    Until -- I believe the rent starts, I think in October

12 or November.  Under the lease, I have to look at the -- what

13 the lease says in the schedule.  But Jetall has always been

14 flexible.  And I want to be very clear that -- and I'm still

15 saying that we're very flexible to leasing -- our priority

16 is leasing up the building.  I'm just physically there.  And

17 I moved my office and my team there, so I can be more

18 successful by leasing up the building.  And it's actually

19 paid off because we've leased the building up over 100,000

20 square feet from where it was about a year ago.

21 Q    Well, if you look at the budget, that's Debtor's

22 Exhibit No. 1 for October, November, December.  The rental

23 income is the same as it is for October.  And we just saw

24 that was fully attributable to the Bankable lease.  Right,

25 sir?

 1          MS. HAYWARD:  Objection.  Misstates the evidence.

 2          THE COURT:  Sustained.  You can ask it.  Why don't

 3  you ask another question, Counsel?

 4          MR. FITZMAURICE:  Thank you, Your Honor.

 5          THE COURT:  Is the Jetall lease in 7 somewhere.

 6          MR. FITZMAURICE:  It is not, Your Honor.

 7          THE COURT:  Okay.  Thank you.

 8  BY MR. FITZMAURICE:

 9  Q    Sir, I'm going to ask you to -- you can go ahead and

10  close the Debtor book.

11  A    Yes, sir.

12  Q    And open the other one.

13  A    Okay.

14  Q    So I'm going to ask you, sir, to please turn to -- I

15  apologize in advance.  There was admittedly a confusing

16  numbering system that we utilized here, but Exhibit 2-8,

17  which are the -- some of the Debtor's filings in this case.

18  A    2-8?

19  Q    2-8.

20          THE COURT:  You know, it might be easier if you

21  can find it for the witness.

22          MR. FITZMAURICE:  May I?

23          THE COURT:  Yeah, go ahead.  And I can look over

24  your shoulder and figure out what that means, too.

25          Ah, got it.

1  BY MR. FITZMAURICE:

2  Q    Okay.  That's right.  If you look through Exhibit 2-8

3  -- and I apologize, this is going to be even further

4  confusing.  There are numbers that are across the top of the

5  page.  And it starts with -- is this -- yes, so the front

6  page of the exhibit will say Exhibit 8, Michael Carter's

7  Declaration. And then there's a sticker on the bottom right

8  that says NBK Exhibit 2-8.

9  A    Yes, sir.

10 Q    Okay.

11 A    And we -- I guess we can talk about this, but it's

12 okay.

13 Q    And so if you look at the next page, you'll see across

14 the top there are some numbers, and it starts with one of

15 19, et cetera.

16 A    Yes, I see that.

17 Q    And if you continue on through after we get through the

18 19, we'll start with one of 15.

19 A    One of --

20 Q    So if you continue going back further into the exhibit.

21 A    One of 15 --

22 Q    One of 15.  And then I will ask you to look at the

23 page, that is 2 of 15.

24 A    15 of 19.

25 Q    No, sorry.  2 of 15.  If you keep going through the

1  exhibit.

2  A    Two of 15.  I'm sorry.  Okay.  You said two of 15.

3  Yeah.

4  Q    And I just want to make sure that the Court has been

5  able to find it as well.

6  A    Yes.  Sorry.

7            THE COURT:  No, that meant me.  Oh, I got you.

8  I'm here.

9  BY MR. FITZMAURICE:

10 Q    So sir, is this the, a portion of the Debtor's

11 Statement of Financial Affairs that were filed in this case?

12 A    Yes.

13 Q    An exhibit.  I'm sorry.  Section 4 of the Statement of

14 Financial affairs lists payments to insiders.

15 A    Yes.

16 Q    And those payments in the year prior to bankruptcy were

17 $422,253.01?

18 A    Yes.

19 Q    Okay.  And if we look at the last page of this

20 particular exhibit.

21 A    Last page, okay, 15 of 15.

22 Q    15 of 15.

23 A    Yes.

24 Q    There's a list of what those payments were and who they

25 were made to.

1  A    Yes.

2  Q    Jetall, we've talked about -- and that's an entity that

3  you control, correct?

4  A    It is.

5  Q    And then there are two others.  Galleria 2425 JV.

6  A    Yes.

7  Q    That's an entity that either directly or indirectly

8  owns equity in the Debtor?

9  A    Yes.

10 Q    And then, Galleria Loop Noteholder.  Is that also an

11 entity that directly or indirectly owns an equity in the

12 Debtor?

13 A    No, sir.  So you have Galleria 2425, LLC.  That's the

14 Debtor.  And then you have Galleria 2425 JV, that's the

15 owner of the Debtor.  That's the equity of the Debtor.

16 Q    What relation, if any, does Galleria Loop Noteholder

17 have to the Debtor?

18 A    It doesn't.

19 Q    Who, on behalf of the Debtor, is investigating the

20 potential for the recovery of these claims on behalf of the

21 Estate?

22 A    I --

23 Q    Let me ask you a different question.  Is there any

24 person on behalf of the Debtor who is investigating the

25 possibility of recovering the amounts that are listed here

1    on Exhibit 4 to the Statement of Financial Affairs from the

2    recipients of these payments in the year prior to

3    bankruptcy?

4    A    I'm not aware.  I mean, other than there are, for

5    example, like if there's a manager or an HVAC technician

6    that needs to put a part or do something, then they're paid

7    and then there, you know, Jetall's advance funds and that

8    has been reimbursed not completely.  But a lot of that is

9    what that is.  There's -- I mean, there's a lot more that

10   Jetall is advanced as far as like payroll and administrative

11   costs and things that have -- that it's not been like

12   paying, you know, janitorial and paying other expenses that

13   have been --

14   Q    Is the answer to my question, no one is investigating

15   the potential to recover the amount -- these payments that

16   are listed on Exhibit 4 to the Statement of Financial

17   Affairs.

18   A    I honestly -- I don't know the answer to that. This is

19   something you did bring up yesterday, and we did discuss it

20   with Counsel.  And this is something we are going through

21   the accounting on, which actually is significantly higher of

22   what was advanced.

23           MR. FITZMAURICE:  Your Honor, cognizant of the

24   time.  I just want to ask how Your Honor wants us to

25   proceed.  Should we continue a little further?  Should we

 1  break now for your 1:00 o'clock?

 2          THE COURT:  You tell me whenever you think you are

 3  at a good stopping point.

 4          MR. FITZMAURICE:  This is as reasonable a place as

 5  any.

 6          THE COURT:  Okay.  How much time do you think you

 7  all need?

 8          MR. FITZMAURICE:  To continue --

 9          THE COURT:  Yeah.

10          MR. FITZMAURICE:  Mr. Choudhri, I'm just thinking

11  now in terms of getting you all some lunch and stuff, do you

12  think we can pick back up at 1:45?  Is that fair?   Okay.

13          THE WITNESS:  Yes, Your Honor

14          THE COURT:  I'll remind you that you're still

15  under oath, and you're just -- discuss with no one your

16  testimony, but you're certainly welcome to get something to

17  eat.  Right.  Thank you.

18          THE WITNESS:  Thank you, Your Honor.

19          THE COURT:  All righty.  I'm going to now unmute

20  the line entirely.

21      (Court in recess from 1:02:19 p.m. to 1:48:41 p.m.)

22          THE COURT:  Okay, Mr. Ruff, why don't you hit five

23  star?

24          MR. AKUFFO:  Good afternoon, Your Honor

25          THE COURT:  Okay.  Thank you.  Mr. Akuffo, who is

1    -- is he a lawyer, one of you?

2            MR. FITZMAURICE:  Yes, Your Honor, he is our

3    associate.

4            THE COURT:  Okay, if you want to he can -- Akuffo,

5    if you want to hit five star, I can unmute your line as

6    well.

7            All right, 486 number.  Who's this?

8        (No audible response.)

9            THE COURT:  486 number.  Who is this?

10           MS. HAYWARD:  Your Honor, may I step out for a --

11           THE COURT:  Of course.

12           Mr. Choudhri, good afternoon.

13           Okay, we are back on the Record in Galleria 2425.

14           Mr. Choudhri, I remind you that you're still under

15    oath, and we're ready to proceed with cross-examination.

16           THE WITNESS:  Thank you, Your Honor.

17           THE COURT:  Thank you.

18               CROSS-EXAMINATION (CONTINUED)

19    BY: MR. FITZMAURICE

20    Q   Good afternoon, Mr. Choudhri.

21    A   Good afternoon.

22    Q   I'd like you to refer, please, to Exhibit 1.  And this

23    is again in the Debtor's book.  This is the budget.

24           THE COURT:  Is that the white binder?

25           MR. FITZMAURICE:  Yes, it is, Your Honor.

1           THE COURT:  Okay.

2   BY MR. FITZMAURICE:

3   Q    This budget is intended to account, isn't it, sir, for

4   all of the future property related expenses that were owed

5   -- that are projected to be owed for the remainder of the

6   year 2023?

7   A    Yes, I would believe so.

8   Q    How much are the annual property taxes for the

9   property?

10  A    Around 600,000.

11  Q    And those -- there's no allocation for taxes on

12  Exhibit 1.  This budget is there, sir.

13          MS. HAYWARD:  Objection, Your Honor.  I've got to

14  figure out how to say this objection, but I think it is a

15  legal issue in that property taxes 2023 or pre-petition

16  debt.

17          THE COURT:  I think I can just allow overall --

18  I'm going to allow just a question that there's nothing in

19  here about taxes.  Whether it should be or not is a whole

20  other issue.  But I think that there's nothing in here about

21  taxes.

22          MR. FITZMAURICE:  Yes, Your Honor.

23          THE COURT:  Okay.

24          MR. FITZMAURICE:  The parties can reserve rights

25  and argue implications, but the point being --

1          THE COURT:  Got it.  Okay.

2          THE WITNESS:  That is correct.

3   BY MR. FITZMAURICE:

4   Q    And it's true, sir, that in the years prior to the

5   Debtor's bankruptcy filing, it had not been paying property

6   taxes, correct?

7   A    Well, it had --

8   Q    Had not?

9   A    It had.  It had also taken tax loans, as well.

10  Q    So the property taxes for the years 2019 and 2020 were

11  not paid, such that tax liens accrued against the property,

12  correct?

13  A    Yes, that's correct.

14  Q    And for 2021, as well, correct?

15  A    Yes.

16  Q    And the amounts of those tax liens are listed on the

17  Debtor's Schedules?

18  A    Yes, sir.

19  Q    I'm going to ask you to please take a look at Exhibit 8

20  in that same binder, which is the rent roll.

21  A    Okay.

22  Q    You have that in front of you, sir?

23  A    Yes, sir.

24  Q    And you'll notice if you turn it sideways, like I see

25  that you have, that there are numbers in black type on the

1    bottom of the page.  I'm going to ask you to look at Page 6.

2              THE COURT:  Will that be 006, sir?

3              MR. FITZMAURICE:  Yes, Your Honor.

4              THE COURT:  Okay.

5              MR. FITZMAURICE:  Thank you.

6              THE COURT:  Thank you.  No, no, thank you.

7    BY MR. FITZMAURICE:

8    Q    You have that in front of you, sir?

9    A    Yes.

10   Q    Is this rent roll -- the amounts that are listed there

11   for rent?  Is that based on cash actually received?

12   A    Yes.

13   Q    And so for June 2023, St. Christopher Holdings paid the

14   Debtors $65,940.71?

15   A    Should be.  Yes.

16   Q    And is that the --

17   A    The rent rules are based on the leases.  So I want to

18   correct about actual -- the rent rules based on the leases

19   that we have.

20   Q    So they're not based on cash actually received?

21   A    I believe they are.  But sometimes some tenants aren't,

22   you know, exactly punctual at times as well.  But that --

23   but rent rolls are generally -- can be printed out.  And it

24   should be based on the rents coming in.  Yes.

25        Like for example, I know St. Christopher Holdings,

1  which is DC Partners.  They had some commissions that were

2  burned off last -- earlier when they signed the lease, but

3  they've now been paying the 65,940 a month.  And like

4  GalloWorks, they're not paying until their rent turns on,

5  which is not -- seems like until maybe December, which is

6  140,000 a month.

7          MR. FITZMAURICE:  I'll move to strike that

8  testimony.  There was no question pending.

9          THE COURT:  Sustained.

10 BY MR. FITZMAURICE:

11 Q    Sorry.  I'm going to ask you to shift to the other book

12 that you have in front of you.  Exhibit -- the Tab

13 Number 11.

14 A    Yeah.

15 Q    If you go to the first page of that, you'll see there's

16 a -- it's a virtual sticker, NBK Exhibit Number 11.

17 A    Yes.

18 Q    Okay

19          THE COURT:  Mr. Choudhri, can I ask you, what is

20 the -- to the extent you know, and I don't want you to

21 guess, do you know how much as of the petition date, we have

22 tax liability for 2019, 2020 and 2021 was?

23          THE WITNESS:  I have to look.

24          THE COURT:  Okay.  No, no, if you don't know, I

25 don't want you to guess.  Thank you.

1        THE WITNESS:  There were tax liens I'd transferred

2   over to the bank.

3   BY MR. FITZMAURICE:

4   Q    But -- I'm going to ask you again just to look at

5   Number 11.  If you -- unfortunately these pages are not

6   numbered.  But if you turn to what I believe is the sixth

7   page --

8   A    11.

9   Q    -- in number 11.

10  A    Okay.  One, two, three, four, five, six.  Yes.

11  Q    Just to make sure that we're looking at the same thing.

12  Do you have a copy of a check from St. Christopher Holdings

13  to the Debtor?

14  A    I don't see one.

15  Q    A little bit on.

16  A    Oh, later.  Yes.

17  Q    And on the top right of the page, it has a Number

18  31939, and the very top --

19  A    Yes sir

20  Q    -- right of the page.

21  A    Yes.

22        MR. FITZMAURICE:  Let's pause and make sure the

23  Court was able to find it as well.  Thank you, Your Honor.

24  BY MR. FITZMAURICE:

25  Q    This is the rent -- this is the check by which

1   St. Christopher Holdings paid its due rent; isn't that

2   right, sir?

3   A    Yes.

4   Q    And this is not 65,000 and some change as shown on the

5   rent roll.  That was Exhibit 8 in the Debtor's book of

6   exhibits, correct?

7   A    Correct.  I think that there's an offset on some lobby

8   work that their company did.

9            MR. FITZMAURICE:  So just again, move to strike

10  the portion of the response after, correct?

11           THE COURT:  Sustained.

12  BY MR. FITZMAURICE:

13  Q    So Mr. Choudhri, I'm going to ask you to turn again to

14  the exhibit that is the Debtor's Financial Statements and

15  Schedules.  We looked at it earlier.

16  A    Exhibit 1?

17  Q    This is in your NBK book.

18  A    Okay

19  Q    It is Exhibit 8 to the Carter Declaration.

20  A    Yes, I'm here.

21  Q    And then again referring to the numbers on the top, the

22  numbers in blue across the top of the page.  Referring to

23  Pages 7 of 19 and 8 of 19.

24  A    Yes.

25  Q    And this is a copy of the Schedule that the Debtor's

1  filed of the secured claims against the property, correct?

2  A    Yes.

3  Q    Okay.  And in Section 2.1, that's your entity, correct,

4  sir?   That was the seller of the property to the Debtor.

5  A    That's the -- yes.

6  Q    And in 2.2 has Greek lending.  That's a -- that is an

7  entity that financed the tax liens?

8  A    Yes.

9  Q    And then looking at Section 2.3, the Harris County

10 Assessors.

11 A    Yes.

12 Q    And as we talked about yesterday, my mental math is not

13 terrific.  But if you add up those two amounts in Column A,

14 it's about $1.7 million in prior year taxes accrued against

15 the property; is that correct?

16 A    It's 1.7 --

17 Q    And some change.

18 A    99.  Yeah.  Yes.

19        THE COURT:  How do you get there again, Counsel?

20        MR. FITZMAURICE:  So, Your Honor, Section 2.2 of

21 the secured creditor schedule has Greek lending 800,000.

22        THE WITNESS:  That's the tax lien.

23        MR. FITZMAURICE:  And that's a financing of tax

24 liens.  And then the assessor in the two point --

25 BY MR. FITZMAURICE:

1  Q    The amounts that are listed here on the secured

2  creditor schedule.  Those amounts do not include the tax

3  liens that were previously assigned to -- I'm going to

4  withdraw that question.

5           MR. FITZMAURICE:  And Your Honor, the next

6  question on the next line of questioning, potentially --

7  tangentially, at least, relates to issues concerning the

8  settlement agreement.  And so just I want to be overly

9  cautious on that point.

10          THE COURT:  No, I appreciate it.  We comfortable

11 in the courtroom.

12          MS. HAYWARD:  Yes, sure.

13          THE COURT:  Okay.  Nothing is to be shown on the

14 screen.  The only line that is unmuted is Mr. Ruff, and I've

15 unmuted the line for my law clerks.  That's it.  Those are

16 the only two lines, and I can assure the parties of that.

17 So we can take comfort that the line and no one -- if

18 anybody comes in, will stop immediately.  Any questioning.

19 Okay?

20          MR. FITZMAURICE:  Thank you, Your Honor.

21          THE COURT:  Okay.

22 BY MR. FITZMAURICE:

23 Q    So, again, the numbers that we just looked at on the

24 Debtor's, the claim -- the secured creditor claims.  Those

25 amounts for tax liens do not include the tax liens that were

 1   assigned to National Bank of Kuwait under the settlement

 2   agreement, correct?

 3   A    Yes, that is correct.

 4          MR. FITZMAURICE:  Just on that point, Your Honor.

 5   That's it.  That was my -- and if I may have just 30

 6   seconds, Your Honor, to confirm?

 7          THE COURT:  Yeah.  Of course.  It's all right.

 8       (Pause in the proceedings.)

 9          MR. FITZMAURICE:  A couple of very brief

10   questions.

11          THE COURT:  Okay.

12   BY MR. FITZMAURICE:

13   Q    The proposed leases with Boho and Bankable, when did

14   the Debtor receive those from the tenants?

15   A    When?

16   Q    Yes.

17   A    We received those leases, I would think about

18   negotiating the Boho lease for a while now because they've

19   been working with their architect for a number of months.

20   We received that lease this week signed and then Bankable, I

21   believe was last week or sometime maybe early this week,

22   leading to the point it was signed.  It was something that

23   had been negotiated for some time.

24   Q    So those leases were received, or those proposed leases

25   were received by the Debtor just this week, a couple of days

1  before today's hearing?

2  A    I believe that's when they were -- they were signed.

3  Yes, sir.

4  Q    And as we discussed earlier, the projected potential

5  revenue from the Bankable lease is the source of the

6  Debtor's proposed increased revenue on the budget.  That's

7  reflected as Exhibit 1 in the Debtor's Exhibit 1, correct?

8          MS. HAYWARD:  Objection.  Misstates the evidence.

9          THE COURT:  He can answer.  Overruled.

10         THE WITNESS:  I don't believe that's accurate,

11  because we have another lease that we've been negotiating

12  that we're figuring if we're putting them on Level 2 or

13  Level 6.  That is also a signed lease, we actually didn't

14  put it on, because they may go to a different floor.  And so

15  when we did the projections, we did the best we could at the

16  time based on what we were.

17         MR. FITZMAURICE:  Again, I'll move to strike the

18  evidence that -- the portion that the response that relates

19  to that information, that's not in evidence.

20         THE COURT:  Sustained.

21         THE WITNESS:  I'm sorry.

22  BY MR. FITZMAURICE:

23  Q    Let's look at Exhibit -- let's look at again,

24  Exhibit 1, the difference between the -- I'm sorry.  I'll

25  let you find it, sir.

1  A    Exhibit 1.

2  Q    Exhibit 1 in the Debtor's book.

3  A    The white?

4  Q    Yes.

5  A    Okay.

6  Q    The difference between the rent income in September and

7  the rental income in October is exactly the same as the

8  monthly rent for October.  That's listed in the draft

9  proposed Bankable lease that's included as part of

10 Exhibit 7.

11 A    Okay.  Yes.

12         MR. FITZMAURICE:  Nothing further, Your Honor.

13         THE COURT:  Just have a couple of questions.

14                        EXAMINATION

15         THE COURT:  When I look at the budget -- let me go

16 to the budget.

17         MR. FITZMAURICE:  Exhibit 1.

18         THE COURT:  So I don't see here.  These are the

19 amounts, right?  Where on this budget does it reflect

20 expenses paid to the property manager or does it, Jetall?

21         THE WITNESS:  It does not.

22         THE COURT:  It does not

23         THE WITNESS:  We are not charging.

24         THE COURT:  You're not charging?  Okay.  Where

25 does it reflect budgeting for professional fees?   If it

1    does or it doesn't.

2            THE WITNESS:  I believe that would be

3    administration.

4            THE COURT:  Right.  Under administration.  Where

5    do you see that line?  I apologize.  Oh, administration.

6    The 19,000?

7            THE WITNESS:  Yes, sir.

8            THE COURT:  That seems to see under the notes that

9    it's for all this other stuff.  That's what administration

10   was property manager, assistant property manager.  That's

11   what got me a little confused, is that you said you didn't

12   -- weren't paying Jetall, but maybe I misunderstood.

13   Corporate history --

14           THE WITNESS:  Sure.

15           THE COURT:  -- for 19,000 there.

16           THE WITNESS:  So the 19,000, Your Honor, is for

17   the -- just, so I'm clear, we're not paying any management

18   fees.  So if you hire Hines or CBRE, they get a management

19   fee.  But we are bearing the cost of engineers and property

20   managers.

21           THE COURT:  Kind of pass-through cost.

22           THE WITNESS:  Yes, sir.  That's all that is.

23           THE COURT:  Okay.  No, no, no.  I just wanted to

24   make sure that I understood.  You're not getting a fee.

25           THE WITNESS:  No, yeah.  Zero fees.

 1              THE COURT:  But there are -- there could be an

 2    amount paid to Jetall but Jetall isn't paying out certain

 3    kind of A&R or assistant property manager or accounting

 4    admin assistant.

 5              THE WITNESS:  Correct.  For example, we have like

 6    an engineer that we share the cost to break it down.  So we

 7    have a HVAC engineer, for example, and so we pay him and

 8    then and then that's a pass-through.

 9              THE COURT:  Okay.

10              THE WITNESS:  That they're doing work for the

11    Debtor through the management company.

12              THE COURT:  Got it.

13              MR. FITZMAURICE:  Your Honor, I'm sorry to

14    interrupt, but just with respect to the witness testimony.

15    We have some (indiscernible) we refer to the Debtor --

16              THE COURT:  Sorry.

17              MR. FITZMAURICE:  -- or to the Jetall.

18              THE WITNESS:  Yeah.  So the Debtor Jetall

19    companies, it's paying the HVAC techs, maintenance

20    engineers, you know, the accountant.  And then that's -- I'm

21    sorry about we -- you're right.  So that's Jetall companies,

22    but that is a cost -- a straight cost that the Debtor is

23    paying to cover those costs.

24              THE COURT:  Sorry, can you explain that again?   I

25    just want to make sure I'm following you.

1              THE WITNESS:  So there's staff that's there,

2    that's managing the building.  And that pass, it's a

3    straight pass-through so that they're employees of Jetall

4    and then, but it's a cost for the Debtor, right?   So it's,

5    you know, you have to --

6              THE COURT:  The cost -- money.  Yeah.

7              THE WITNESS:  But no fees.  It's just a direct

8    cost.  The exact cost what to run the building -- to run the

9    Debtor or the Debtor's asset, which is the building.

10             THE COURT:  So if there's a conflict between

11   Jetall and the Debtor, who makes that decision.  And who

12   solely works for the Debtor in terms of management?  Is that

13   -- would that be you?

14             THE WITNESS:  So, yes.

15             THE COURT:  You're wearing multiple hats.  And I

16   understand that because you run multiple businesses is what

17   you do.  And I don't -- I understand that's the way the

18   industry works.  But if there was a decision to be made on

19   behalf of the estate, who then makes it?

20             THE WITNESS:  The --

21             THE COURT:  On behalf of this Debtor Galleria

22   2425.  Like where does the buck stop in terms of decision-

23   making?

24             THE WITNESS:  The buck would stop with me.

25             THE COURT:  Okay.

1          THE WITNESS:  In terms of decisions, it's SSP, and

2     it's -- my entity manages it, Your Honor.

3          THE COURT:  Are you owed money by the Debtor?

4          THE WITNESS:  Yes.

5          THE COURT:  How much?

6          THE WITNESS:  I don't have the exact number.  I

7     know it's about nine.  There was a bond that had to be paid

8     and there were principal pay downs that had to be paid in

9     advance those.  I believe it's about 960,000.

10         THE COURT:  Okay.

11         THE WITNESS:  And there's funds owed to Jetall

12    from before.

13         THE COURT:  And how much do you think that is?

14         THE WITNESS:  It's quite a bit.  I --

15         THE COURT:  Is it in the Schedules anywhere, do

16    you think?  I wouldn't expect -- I wouldn't -- I don't want

17    you flipping through documents.  Just if you know.  You

18    know, I'm just asking.

19         THE WITNESS:  My team helps with this, so I don't

20    know if it's in here.

21         THE COURT:  No, no, no.  If you don't know, you

22    don't know.  I don't want you --

23         THE WITNESS:  I know there's a proof of claim that

24    we're supposed to be working on.

25         THE COURT:  Okay.  And I don't want you to talk

1  about any conversations with your client or anything like

2  that.  So who represents Jetall?  If anyone?

3          THE WITNESS:  Yes, we have Counsel for Jetall,

4  James Pope.

5          THE COURT:  All right.  Counsel -- and who

6  represents -- Okay.  Anyone who represents you individually?

7          THE WITNESS:  I have a different --

8          THE COURT:  I apologize.  That's a really bad

9  question.  If anyone represent you in connection with this

10 case?

11         THE WITNESS:  No, Your Honor.

12         THE COURT:  Okay.  No, no, I'm just asking.  I'm

13 just trying to get some --

14         THE WITNESS:  Sorry.

15         THE COURT:  No, no, no, no.  I apologize.  I

16 should ask better questions.

17         THE WITNESS:  I should have better answers.

18         THE COURT:  No, no, no, no.

19         THE WITNESS:  I'm so sorry.

20         THE COURT:  You're being honest.  I appreciate it.

21         And how much free cash do you think the Debtor

22 has?  Which cash do you think the Debtor has on hand right

23 now?  The last time you checked.

24         THE WITNESS:  Maybe a couple of hundred thousand

25 dollars.

1          THE COURT:  A couple of hundred thousand?

2          THE WITNESS:  Yes, sir.

3          MS. HAYWARD:  Your Honor, I think that's probably

4   a question better sent to Mr. Darjean, who's sort of more in

5   the operations and also on the Debtor's witness list.

6          THE COURT:  No, no, I can -- if he doesn't know,

7   he doesn't know.  I just --

8          THE WITNESS:  And we have some anticipated funds

9   that are coming in pretty soon.

10          THE COURT:  Who does the accounting for the

11   Debtor?

12          THE WITNESS:  We've used Anderson tax, but

13   bookkeeping is being handled by Scarlett.

14          THE COURT:  I'm sorry.  Who's that?

15          THE WITNESS:  A bookkeeper.

16          THE COURT:  A bookkeeper.  Was she with Jetall?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Okay.  So it's in-house.

19          THE WITNESS:  In-house, but we have outside CPA

20   firms that go through what we do.

21          THE COURT:  Okay.  Anyone working on the Debtor

22   now -- for the Debtor's books now, any of these outside

23   consultants?

24          THE WITNESS:  We've talked about that to bring

25   outside consultants in, but because of the bankruptcy, we

1    haven't incurred that yet.

2           THE COURT:  Understood.  Okay.  Thank you very

3    much.

4           Do you have any more questions for this witness?

5           MS. HAYWARD:  Just a few, Your Honor.

6           THE COURT:  Okay, Sure.

7                     REDIRECT EXAMINATION

8    BY MS. HAYWARD:

9    Q    Mr. Choudhri, I'm going to ask you to turn to

10   Exhibit 7.

11   A    Yes.

12          MS. HAYWARD:  I'm sorry, Your Honor.  In the white

13   binder.

14          THE COURT:  Okay.

15   BY MS. HAYWARD:

16   Q    And would you turn to the document that's Bates number

17   000418

18   A    418.

19   Q    Yes.

20   A    Okay.

21   Q    What is that, Mr. Choudhri?

22   A    This is a lease.

23   Q    Whose lease?

24   A    Between 2425 and Jetall that was executed.

25   Q    Okay.  And I'll ask you to turn a few pages back to

1   000408.

2   A     408.

3   Q     Yes.

4   A     Okay.

5   Q     Okay.  And then what are these?  And just that page in

6   the next couple of pages.

7   A     These are amendments to the lease.

8   Q     Okay.  So earlier when the Court asked whether the

9   Jetall lease was included in the exhibit and the answer was

10  no; was that accurate?

11  A     No.

12          THE COURT:  Which page is it?

13          MS. HAYWARD:  Sorry, Your Honor.  Zero.  So the

14  lease itself starts on 00416.

15          THE COURT:  Ah, thank you.

16          MS. HAYWARD:  And then the amendments are actually

17  in front of the lease.

18          THE COURT:  What's the latest amendment?

19          MS. HAYWARD:  The latest amendment, I believe, is

20  the third, Your Honor.

21          THE COURT:  Right.

22          MS. HAYWARD:  Which is on 1, 2 --000412

23          THE COURT:  412?

24          MS. HAYWARD:  Yes.

25          THE COURT:  That'd be -- perfect.  Thank you.

1   BY MS. HAYWARD:

2   Q    And Mr. Choudhri, I'm also going to ask you now to turn

3   to 000456

4   A    456?

5   Q    Yes.  And I want to look at the relocation termination

6   language that Counsel showed you earlier.

7   A    Yes.

8   Q    Okay.  What was the landlord's purpose in including

9   language like that in a lease?

10            MR. FITZMAURICE:  Objection, Your Honor.

11   Relevance.  The purpose of the --

12            THE COURT:  No, no.  I don't want you to testify.

13   I'm just asking you --

14            MR. FITZMAURICE:  I object to relevance.

15            THE COURT:  What's --

16            MS. HAYWARD:  Your Honor, Counsel made an issue of

17   this provision being in a lease.  And so to the extent that

18   there's a business reason for this provision to be in the

19   lease, I think that counsel has opened the door to that and

20   made it relevant.

21            THE COURT:  Yeah, I agree.  You can answer.

22            MR. FITZMAURICE:  Thank you, Your Honor.

23            THE WITNESS:  So it's been my experience that, for

24   example, this building has always had large tenants like

25   Blue Cross Blue Shield that had the majority of the building

1    and Stage Stores.  And so there are some large tenants out

2    there which historically we had like that 100 or 200,000

3    square feet, big chunks.  And so we want to always maintain

4    flexibility to relocate a tenant within the building or have

5    the -- you know, or have the ability to -- for example,

6    Bechtel did have interest in the past for the entire

7    building.  Then our predicament is, what do we do with the

8    tenants that are there for getting a better credit, tenant

9    like Bechtel?  So we've -- and we did something similar in

10   the DC Partners lease as well, where we put a termination

11   relocation option.  That would be the landlord within the

12   building.

13            MR. FITZMAURICE:  But Your Honor.  We've just

14   objected move to strike (indiscernible).

15            THE COURT:  Overruled.

16   BY MS. HAYWARD:

17   Q    Mr. Choudhri, has -- does the Debtor have projections

18   with respect to the property and how it is anticipated to

19   perform going forward?

20   A    Yes.

21   Q    Were those projections included as part of the Debtor's

22   plan of reorganization?

23   A    Yes.  According to Chapter 11 plan.

24   Q    Did those projections account for the new leases that

25   the Debtor has been able to procure since it filed

1   bankruptcy?

2   A    Yes.

3   Q    And with respect to those new leases that the Debtor

4   has been able to procure since it filed for bankruptcy, how

5   long have those leases been in negotiations for?

6            MR. FITZMAURICE:  Objection Your Honor.

7   Relevance.  Your Honor had previously indicated we're not

8   trying confirmation of plan or feasibility of the

9   prospective cash collateral and --

10           THE COURT:  I'm going to allow it.  But we are

11  talking about contracts that aren't signed in this deal,

12  right?

13           MS. HAYWARD:  Your Honor, the exhibits are not

14  signed by the Debtor.  I mean --

15           THE COURT:  We will have whatever legal relevance

16  they have as opposed to this and in connection with the use

17  of cash collateral.  But I don't have a signed copy.

18           THE WITNESS:  I'm sorry, your question.  I

19  apologize.

20  BY MS. HAYWARD:

21  Q    Does the Debtor intend to sign the leases?

22  A    I have signed the leases -- I have signed leases.  And

23  the ones that I signed on those two are not here.  And the

24  Jetall lease does have a schedule of payments that are going

25  to turn on soon as well that are here.

1   Q    And is Jetall on a position to make those payments?

2   A    Yes.

3   Q    Is Jetall in a position to fund this bankruptcy case as

4   needed to get to the point of plan confirmation if needed?

5   A    Absolutely.  And I'm personally fully committed and

6   have been for since the building has been empty.  Now we've

7   leased it upward at the -- at the --

8   Q    And --

9   A    -- 10 yard line.

10          MR. FITZMAURICE:  So Your Honor, the same

11   objection and the same motion to strike in terms of where --

12          THE COURT:  We're going to get to all of it.  I

13   just want it all to come in.

14          MR. FITZMAURICE:  Thank you, Your Honor.

15          THE COURT:  I'm okay with it.

16          THE WITNESS:  Sorry, I'll stop.

17   BY MS. HAYWARD:

18   Q    And -- with respect to --

19          THE COURT:  Go ahead.

20   BY MS. HAYWARD:

21   Q    With respect to the items listed on the budget, are

22   those items necessary to maintain the current tenancy,

23   that's at the building?

24   A    Yes.

25   Q    Does the current tenancy being at the building impact

1  the value of the building and the bank's collateral?

2  A    Yes.

3  Q    To the extent that the tenants of the building are

4  unhappy because the building falls into disrepair or

5  maintenance isn't being paid for, do you believe that would

6  increase or decrease the value of the building?

7  A    The building is in disrepair and the tenants aren't

8  happy with decreased value.

9           MS. HAYWARD:  Pass the witness.

10          THE COURT:  Any additional questions?

11          MR. FITZMAURICE:  Your Honor, just with respect to

12  two items that Your Honor asked about.

13          THE COURT:  Either you got questions for him or

14  not?

15          MR. FITZMAURICE:  I do, Your Honor.

16          THE COURT:  Okay.

17          MR. FITZMAURICE:  Thank you.

18                     RECROSS-EXAMINATION

19  BY MR. FITZMAURICE:

20  Q    Mr. Choudhri, you recall that the Court asked you

21  whether you were owed any money by the Debtor?

22  A    Yes.

23  Q    And does the Debtor include on its Schedules a general

24  unsecured claim for you of $960,000?

25  A    I believe so, yes, sir.

1  Q    And does it also include a secured claim of about

2  $24 million for, 2425 WL LLC?

3  A    Not for me, but --

4  Q    For that entity?

5  A    For that -- yes, sir.  Which was on the closing

6  statement with NBK back in 18.

7         MR. FITZMAURICE:  So again, Your Honor, objection

8  to --

9         THE COURT:  It's okay.  I'm going to allow it.

10         MR. FITZMAURICE:  Thank you, Your Honor.

11 BY MR. FITZMAURICE:

12 Q    You recall the Court also asked you whether or not you

13 were personally represented in connection with this matter.

14 Do you recall that?

15 A    Yes.

16 Q    You recall yesterday I took your deposition?

17 A    Yes, sir.

18 Q    And there was an attorney who was present in that -- in

19 the deposition room, Mr. Pope?

20 A    Yes.

21 Q    And you recall that I suggested that he should be

22 excused.

23 A    Later he left.

24 Q    During your deposition, he stayed, correct?

25 A    But he came in and then he left.

1  Q    Because he said he represented you personally, right?

2  A    He does represent me and he represents Jetall.

3            MR. FITZMAURICE:  Nothing further, Your Honor.

4            THE COURT:  Okay.  Thank you.  Okay, sir, thank

5  you very much for your time.

6            THE WITNESS:  Thank you.

7        (Witness steps down.)

8            THE COURT:  Wait until about 3:00 I've got a short

9  matter that'll last ten minutes and 15 minutes.  Maybe we

10  can go until 3:00, take a break, and then keep going.

11            MS. HAYWARD:  Okay, Your Honor.

12            Debtor calls Mr. Dward Darjean.

13            THE COURT:  Mr. Darjean, come on up.  Is it okay

14  if the binders stay up there for Mr. Darjean?

15            MS. HAYWARD:  Oh, yes.

16            THE COURT:  I just want to be sure the parties are

17  okay with that.  Okay.

18            But the folks who are going to come into the surge

19  line matter, I'm going to take it up at 3:00 p.m., surge a

20  line at 3:00 p.m.  Thank you.

21            Mr. Darjean, you please raise your right hand.  Do

22  you swear to tell the truth, the whole truth, and nothing

23  but the truth?

24            THE WITNESS:  Yes

25        (Witness sworn.)

1            THE COURT:  Okay.  Please have a seat.  Well, just

2   let the Record note that the witness has been duly sworn in.

3                      DIRECT EXAMINATION

4   BY MS. HAYWARD:

5   Q    Good afternoon, Mr. Darjean.

6   A    Hello.

7   Q    Would you please introduce yourself to the Court?

8   A    Yes.  My name is Dward Darjean.

9   Q    And Mr. Darjean, how are you employed?

10  A    By Jetall.

11  Q    And what do you do for Jetall?

12  A    Operations manager, property management.

13  Q    Okay.  So tell the Court a day in the life of Dward

14  Darjean.

15  A    My focus is on the tenants.  Making sure that they're

16  -- they're happy and comfortable and willing and ready to

17  pay rent.  So that entails making sure that the building is

18  comfortable, temperature, taking care of any emergencies,

19  plumbing leaks.  Anything.  I deal directly with the

20  tenants.  They all have my cell phone number.

21  Q    And with respect to the Debtor's Monthly Operating

22  Reports, who prepares those?

23  A    I do.

24  Q    And how do you prepare those?

25  A    I have a template that I use, and then I get printouts

DWARD DARJEAN - DIRECT BY MS. HAYWARD                    110

1    of the bank statements and I physically write out the

2    template using the bank statements.

3    Q    And do you know how much cash the Debtor had on hand as

4    of the end of August?

5    A    The end of August, I think it was -- we collected 144k.

6    We spent 66 approximately -- with the previous month's

7    balance, I think it's approximately 134k, something like

8    that.

9    Q    And you said how much did the Debtor collected rent in

10   August?

11   A    144, I think.  144,000.

12   Q    And Mr. Darjean, I'll have you look to -- in the white

13   binder, if you would go to Exhibit 1?

14   A    Okay.

15   Q    Are you familiar with the expenses that are listed on

16   Exhibit 1?

17   A    Yes.

18   Q    And in your opinion, are these expenses necessary in

19   order to continue the operation of the business or the

20   building and maintain the tenant base?

21   A    Yes.

22   Q    What happens if the Debtor doesn't pay its utilities?

23   A    The building could be shut down.

24   Q    What happens if the Debtor doesn't pay for janitorial?

25   A    The tenants will not be happy.

DWARD DARJEAN - DIRECT BY MS. HAYWARD                    111

1  Q    What happens if the Debtor doesn't pay for elevator

2  repairs and maintenance?

3  A    Technically, the Fire Marshal's Department can shut the

4  building down.

5  Q    So in your opinion, are these expenses necessary to

6  preserve the value of the property?

7  A    Yes.

8        MS. HAYWARD:  Pass the witness.

9        THE COURT:  Thank you.

10        Cross.

11                    CROSS-EXAMINATION

12  BY MR. FITZMAURICE:

13  Q    Good afternoon, sir.

14  A    Good afternoon.

15  Q    How much of your time is spent working for the Debtor,

16  as opposed to other properties that are managed by Jetall?

17  A    About 33 percent.

18  Q    So about a third for the Debtor.  Two-thirds for other

19  properties?

20  A    Correct.

21  Q    With respect to the other employees of Jetall who are

22  involved in the operation of the Debtor's business at the

23  property, how much of their time -- is there a rough

24  estimate you can give the Court of how much of their time is

25  spent at the Debtor's property versus other properties?

1          MS. HAYWARD:  Objection.  Outside the scope.

2          THE COURT:  Overruled.

3          THE WITNESS:  I'm sorry, could you ask it again.

4   BY MR. FITZMAURICE:

5   Q    Yeah.  It was a bad question.

6   A    It's okay

7   Q    For those other employees of Jetall who do work for the

8   Debtor.  Do you have a rough idea that you can give to the

9   Court how much of their time is spent on the Debtor's

10  property versus other properties that are managed by Jetall?

11  A    It's all different depending on -- you mentioned Jetall

12  employees -- I manage the maintenance technicians.  So I'd

13  say about the same as I spend.  About a third on 2425.

14  Q    Who is responsible for allocating the costs of those

15  services between the Debtor and the other entities that

16  Jetall manages?

17  A    The cost of the services?   Which services?

18  Q    But you've been in the courtroom this afternoon, and

19  you heard that Mr. Choudhri testify concerning the pass-

20  through costs, that Jetall incurs that the Debtor is paying.

21  A    Okay.

22  Q    Did you recall hearing that?

23  A    Yes.

24  Q    Okay.  So who determines how much of those pass-through

25  costs are charged to the Debtor as opposed to other entities

DWARD DARJEAN - EXAMINATION BY THE COURT                    113

1 | that Jetall manages?

2 | A    We have an in-house bookkeeper, maybe.  And -- but I

3 | don't know for sure if she could make decisions on what goes

4 | where.  I don't handle the finances.

5 |         MR. FITZMAURICE:  Thank you.  Nothing further.

6 |                         EXAMINATION

7 |         THE COURT:  So how do you receive a paycheck?

8 | When you receive a paycheck, who does it come from, and what

9 | does it say on the check?

10 |        THE WITNESS:  It comes through the payroll company

11 | paychecks, but Jetall

12 |        THE COURT:  like an ADT, but then the name of the

13 | actual --

14 |        THE WITNESS:  Jetall.

15 |        THE COURT:  Jetall?

16 |        THE WITNESS:  Jetall Companies.

17 |        THE COURT:  And do you see your -- does your

18 | paycheck come from -- how do you know how much you got paid

19 | from managing this property in terms of the work that you're

20 | doing?

21 |        THE WITNESS:  No, it's just -- I have a salary.

22 |        THE COURT:  Have a salary.  Okay.  And what other

23 | work do you do?  Can you just kind of describe to me what

24 | you do on a day-to-day basis?

25 |        THE WITNESS:  Sure, sure.

1              THE COURT:  Just for this center.  I should have

2    asked you a better question.  Just for this center.

3              THE WITNESS:  Sure, I can even give specific

4    examples from today, but my main role is to make sure that,

5    Number 1, the temperature in the building is comfortable.

6    So I actually have my maintenance technician come in at

7    5:00 o'clock in the morning.  Sometimes overnight the HVAC

8    system might catch up to itself and trip off.

9              THE COURT:  Got it.

10             THE WITNESS:  So some mornings the temperature

11   could be uncomfortable.  So we start really early in the

12   morning checking the temperature.

13             THE COURT:  Thank you.

14   And anything else?  Who -- if you had a tenant,

15   and you pick any one of them doesn't pay their rent, who is

16   like responsible for going after the tenant and making sure

17   that rent is paid?  Does that fall within your --

18             THE WITNESS:  Yes.  Sometimes, yes.

19             THE COURT:  Okay

20             THE WITNESS:  They -- everybody in the house knows

21   that I have a good relationship with the tenants, so if

22   something is behind, I have a nice way of going in and

23   getting the money.

24             THE COURT:  How long have you been doing this job?

25             THE WITNESS:  15 years.

1          THE COURT:  Oh, wow.  That's fantastic.  If

2   something -- well, assuming if something breaks down, and if

3   there's something goes wrong with the HVAC or something,

4   it's your job to then go find -- get the appropriate folks

5   to kind of come in --

6          THE WITNESS:  Correct.  Yes.

7          THE COURT:  To make sure that everything goes --

8          THE WITNESS:  Correct.

9          THE COURT:  Okay.  Thank you very much, sir.

10          THE WITNESS:  No problem.

11          THE COURT:  Oh, go ahead.

12      (Witness steps down.)

13          MS. HAYWARD:  Your Honor, with that the Debtor

14   rests.

15          THE COURT:  Okay.

16          MS. HAYWARD:  On cash collateral.

17          THE COURT:  Okay

18          MR. FITZMAURICE:  In terms of the presentation of

19   evidence, Your Honor, nothing further.  We submit that if

20   the Court would like -- if the Court would be aided, we

21   suggest some argument (indiscernible).

22          THE COURT:  I want to interrupt you.  I just want

23   to make sure the record was closed with respect to cash

24   collateral.

25          MS. HAYWARD:  Yes, Your Honor.  The Record is

116

1   closed with respect to cash collateral.

2           THE COURT:  Okay.  Oh.  All right, let's proceed

3   to the other argument now.  I'm ready, I just want -- we

4   needed to have a clean record on this because I need to know

5   exactly what you're asking to do and what you're willing to

6   do.  We're going to have to proceed again, with respect to

7   their organization, I can give you thoughts on cash

8   collateral, but I'm --

9           MR. FITZMAURICE:  Your Honor, it's the --

10          THE COURT:  Let me just kind -- just let me just

11  get this out.

12          I'm concerned about the lack of independence that

13  the Debtor has.  And it just flows through the entire case.

14  I'm concerned about the amount of cash that the Debtor has

15  or intends to go.  I understand that there are potentially

16  signed leases, but the record before me shows that those

17  leases aren't here.

18          So I've got a budget that shows that it could go

19  up, but it doesn't.  I have a Debtor who's controlled as of

20  now.  Maybe you can move me around, too.  I have a Debtor

21  whose primary decision maker is someone who sits largest --

22  potentially the largest unsecured creditor.

23          Looking at that, an unsecured creditor is now

24  saying that they're willing to the extent that there's any

25  shortfalls to the budget, that they're willing to fund it.

1    I also have that same individual is also the owner of one of

2    the largest creditors, not just unsecured creditors

3    personally.

4            I don't know who represents the estate and how --

5    I'm concerned about the independence and how the estate can

6    conduct itself.

7            I think no one can fault you, Ms. Hayward. You put

8    on a hell of a presentation and the work shows.  I'm

9    concerned about the budget.  I don't -- I think the budget

10   shows what can be projected.  But it doesn't provide

11   adequate protection subject to the carve out.  I don't think

12   there's enough cash to justify a carve out in this case, and

13   I don't want to proceed without one.

14           MS. HAYWARD:  Your Honor, may I address that?

15           THE COURT:  I'm also concerned about -- yeah.  No,

16   no, absolutely.

17           MS. HAYWARD:  So and I know --

18           THE COURT:  I'm just going to -- I'm really

19   concerned about the lack of independence, and who you would

20   need to bring in.  You can make it independent and then

21   really get to the budget, and it's going to hit it hard.

22   But I've got to make a decision today based upon the

23   evidence that I've got, and I'm really concerned about that,

24   Ms. Hayward.

25           MS. HAYWARD:  Okay.  Well, Your Honor, I would --

118

1   first let me address the administrative expenses in the

2   carve out side of things.  I know I have not practiced much

3   in front of Your Honor.

4           THE COURT:  No, no.  I mean, but money is money,

5   right?

6           MS. HAYWARD:  Sure, Your Honor.  But I will also

7   say that my business model throughout my career, since

8   leaving big law has always been to try to preserve and save

9   Debtors.  And so most of my cases, I tend to receive my fees

10  through a payment plan -- through a plan.

11          And so that's -- I just want Your Honor to be

12  aware of that.  And I appreciate, Your Honor, being

13  concerned about the payment of you know administrative fees

14  in this case.  But to the extent that, you know, I am more

15  than happy to not include a carve out of fees with respect

16  to cash collateral budget, I guess is my point on that.

17          THE COURT:  What happens when we -- you're

18  essentially using the cash collateral budget to also show

19  that you're going to provide adequate protection.  The

20  extent of diminution of their extent, their collateral, and

21  the building, right?  It's all.  And we're here on cash

22  collateral.  But you can kind of hear.

23          MS. HAYWARD:  Sure.

24          THE COURT:   Normally you would get interest.

25          MS. HAYWARD:  Well, to the extent there's a

1    diminution in the value of the collateral, right?

2              THE COURT:  All right

3              MS. HAYWARD:  But the -- this money --

4              THE COURT:  I got three years of no-tax payments.

5              MS. HAYWARD:  Yes, Your Honor.  We also have you

6    know, that is -- we also have COVID, right?  Which has

7    affected, obviously, the office industry and office

8    buildings.

9              THE COURT:  Right.  Now I'm back to my

10   independence principle.

11             MS. HAYWARD:  Well, Your Honor, I would respect --

12             THE COURT:  If somebody disagrees with

13   Mr. Choudhri in connection with the assets of the estate,

14   who makes that call?  Nobody.  So we're going to it's a

15   fundamental problem.  The largest -- one of the largest

16   unsecured creditors, at least on the Schedules.  I'm not

17   saying he's done anything bad.  I don't know Mr. Choudhri.

18   I'm just looking at what I'm looking at.  A large -- the

19   largest unsecured creditor with almost a million dollar

20   claim.  Now -- was also on some other papers.

21             So who's going to make decisions about what's in

22   the best interest of the Debtor to file a plan?  There's a

23   fundamental problem with this case.  I'm not sure it can be

24   fixed.  And that's where we're going.  You want to get to

25   where you're going.  And it presumes the fact that where

 1   we're going is the way we should go.  And I don't have

 2   confidence in the independence of those decisions.

 3          MS. HAYWARD:  Your Honor, I guess I would

 4   respectfully submit that the counter to that argument is

 5   that the fact that Mr. Choudhri is an unsecured creditor,

 6   doesn't that give credence to --

 7          THE COURT:  Makes me more uncomfortable?

 8          MS. HAYWARD:  But doesn't that -- isn't the

 9   counter to that there's more motivation to make sure that

10   unsecured creditors get paid in this case?

11          THE COURT:  No, it tells me there's a conflict.

12          MS. HAYWARD:  I'm not sure, Your Honor.

13          THE COURT:  There's a conflict -- makes me feel

14   like there's a conflict that we can't reconcile today.  In

15   other words, right?  The largest -- never heard of an

16   unsecured creditor.  A large unsecured creditor, making

17   decisions about what the plan looks like and whether that's

18   the best course of action for a Debtor in connection with a

19   case.  I don't know.  And then we start looking at other

20   documents that will get into, it makes me even more

21   uncomfortable.

22          MS. HAYWARD:  Well Your --

23          THE COURT:  But you've done a fantastic job, and

24   you don't need me to tell you that you already know it.

25          There's a conflict here.  I'm like, and I'm really

121

1   uncomfortable.  It's driving all of these problems that I

2   have with the budget, which is, you know, is rent supposed

3   to be free for Jetall?  Is it, you know, are they not

4   supposed to be collected 19,000, you know, is the $19,000

5   fee really a pass-through fee?  I don't trust what I'm

6   seeing.  And it makes me uncomfortable that I don't have an

7   independent party telling me these answers.

8            I got two folks who work for a property management

9   company.  One of them is the owner.  But I've got another

10  one who's running a property management company who's about

11  as honest as they come.  They're working for 15 years.  I've

12  got no reason to doubt anything he's saying.

13           I have no reason to doubt what Mr. Choudhri is

14  saying, but it does raise the problem.  I don't -- I'm

15  uncomfortable with the information that I'm receiving.

16           I've got two leases that haven't been signed.

17  I've got a Debtor who's paying 19,000 a month to a

18  management company on pass-through.  They're also there

19  rent-free.  But there's a lease that says they're supposed

20  to pay rent.  I'm uncomfortable with the lack of

21  independence here.

22           There's not a party -- an independent fiduciary,

23  who's just working for the estate.  And I -- so it's hard

24  for me to trust the numbers.  It's hard for me to trust the

25  numbers.  It's hard for me to trust.  You know, I think

1    there's going to be enough cash and that the replacement

2    lien really works.  I'm uncomfortable.

3            I'm uncomfortable and I don't want to create a

4    situation where you're banking on cash to pay for you in

5    connection with a plan.  I don't want that.  That's

6    uncomfortable.  That's not the way 327 and 330 work.  It's

7    accrued on the books they're going to have to pay it or if

8    somebody else comes on, they're going to have to pay it.

9            I don't know.  It's the problem I've got, and it's

10   going to flow through everything today.  And I don't know --

11   it only gets more complicated as we get to the next chapter,

12   which is why I wanted to see if the first chapter worked.

13           MS. HAYWARD:  And I understand Your Honor's

14   concern.  I guess the only thing I can say in response to

15   that is that, you know, I think it's pretty common,

16   especially when you have real estate ventures such as this,

17   right?  Where you're going to have these types of issues.

18   It's common in bankruptcies where --

19           THE COURT:  No, it's not common to have, at least

20   in my experience, but your experience may be different.

21   Maybe all the million-dollar claims are legit and they have

22   to be paid.  Maybe all the payments to Jetall are fine.

23   Maybe you don't have the doc that we can't discuss on the

24   files.  That's what makes everything different.

25           You don't have the largest -- one of the largest

123

1   unsecured creditors. There is always got to be a layer of

2   independence in there.

3            Yes, sometimes they own the company, but there's

4   someone who manages that I can look to and say, who's

5   investigating everything?  Who's telling me that this plan

6   is the right plan?  You know, is the plan, the right plan?

7   I don't know.  It depends on who you -- whose perspective

8   you're looking at, right?  That's the -- I don't know if

9   it's in the best interest of the estate because the estate

10  doesn't have someone who I can look to, who you can look to,

11  to say this is in the best interest of the estate to propose

12  this plan as drafted.  I don't know.  That's the problem

13  we've got, right?  And it's --

14           MS. HAYWARD:  But doesn't any plan that proposes

15  something to creditors?  Unsecured creditors, building

16  creditors, creditors scheduled who are owned money --

17           THE COURT:  Talking about a plan that pays Crims

18  (phonetic) that proposes them, pays other creditors

19  unsecured, and then an unknown investor who's affiliated

20  with those parties are going to -- it's going to come in and

21  make an investment, right?

22           MS. HAYWARD:  Correct.

23           THE COURT:  I don't know if that's the best thing

24  or not.  I know it works for them.

25           MS. HAYWARD:  Well, the alternative would be that

124

1  the bank forecloses on the property and then --

2          THE COURT:  Maybe that's what -- I don't know.

3  Maybe that's what's in the best interest of the estate.

4  That's what I'm saying.  I don't have someone.  And

5  Mr. Darjean certainly can't tell me that based upon what he

6  just told me.  He cannot testify to that plan --

7          MS. HAYWARD:  Correct.

8          THE COURT:  -- based upon what he did.  But he

9  signed it.  He signed a document now, right?  He's now under

10 penalty of perjury for signing a plan.

11         If he can honestly say these things, Mr. Darjean

12 it's been put in a very bad position.  I like him.  I think

13 he's honest.  He's a manager.  You can't testify to

14 feasibility of a plan or that the release is in here.  The

15 proposed compromises are that these proposed classes are

16 appropriate.  He manages three properties he's got.  We --

17 there's a lack of independence here.  And I'm uncomfortable

18 with it.

19         And I don't want to start opening doors where I

20 start making payments and then -- statements, and then folks

21 start quoting me in other pleadings and other courts.  I'm

22 not doing that because I'm not finding anything.  And

23 everybody better be really clear about that.  I'm just

24 telling you I'm uncomfortable with the lack of transparency.

25 And I'm not saying it's there, but there's -- we don't have

1  an independent here, and I don't know how to proceed.

2  And it's going to flow.  It's going to get worse as my

3  inquiry goes on.  And I'm going to get more and more

4  uncomfortable because we haven't discussed what we need to

5  discuss.  We haven't talked about feasibility of a plan.

6          I know you've been working really hard, and I'm

7  trying to be as open and honest as I can.

8          MS. HAYWARD:  And I appreciate Your Honor's

9  comments.

10          THE COURT:  I don't know how to proceed.  I think

11  you all you need to tell me what you want, what you need or

12  what the alternative is if I say no.  I don't trust the

13  numbers.  I don't trust the books.  I don't have a true

14  independent who can tell me what we've got going on here.  I

15  don't know if -- you all are going to have to tell me what

16  to do.  I assure you all that no one believes more in the

17  power of a Debtor to have an effort to reorganize than me.

18  I can assure everyone of that.

19          I believe firmly in the ability of a Debtor to

20  reorganize and Debtor having a fair shot and the automatic

21  stay protecting that right and property of the estate,

22  giving a Debtor a breathing spell to reorganize.  I firmly

23  believe that Debtors should have a breathing spell and an

24  opportunity to reorganize and have a shot to put together

25  whatever they think is in the best interest of the estate.

126

1          I believe professionals who do work should be paid

2    for their work.  I think sometimes predators run the risk of

3    sometimes moving too quickly without giving Debtors an

4    opportunity.

5          I believe at the same time, the estate has to have

6    independence.  That's what makes the process work.  There

7    has to be someone who the Court can look to.  I think I've

8    got to be able to resolve these conflicts that I see, and

9    I'm not comfortable proceeding without resolving the

10   conflicts and don't want folks to take.  I don't want more

11   folks to really think about taking the stand.  And I'm not

12   sure Mr. Choudhri should take the stand, but if he wants to,

13   he can talk about the other stuff.  I'm comfortable with him

14   talking about cash.

15         Maybe there's a conflict there.  Maybe his lawyer

16   should be here.  I don't know.  I don't want him testifying

17   unless he knows fully aware.  Maybe there are no risks.  I'm

18   just making all this up.  But certainly, I'm concerned about

19   lack of independence in the conflicts that I'm seeing here.

20   I don't know what to do.

21         MS. HAYWARD:  Your Honor, I know, Your Honor, has

22   a 3:00 o'clock.  Perhaps this would be a good time to recess

23   and allow me to discuss with my client some of the Court's

24   comments.

25         THE COURT:  It's a 3:00 o'clock after I finish.

1    We're just going to take up the other one.  We will put

2    Mr. Choudhri, back on the stand.  If that's what you choose

3    to call, or you choose to call.  I'll let you put your

4    evidence on.  But the Record is closed as to the cash

5    collateral.  I'll rule on that, and then we'll take up the

6    other one.

7            I didn't want -- reason I did it that way is I

8    didn't want, one, I wanted to just make sure people were

9    aware of my concerns before we started.  I don't want to

10   blindside anyone and, two, I don't want there to be a murky

11   record as to what I'm looking at for cash collateral and

12   then blend it all in.  So things that have nothing to do

13   with cash collateral get discussed in one way or another.

14           Yeah, let's just take a 10-minute break, and then

15   I'll call the 3:00 o'clock.  I'm told the 3:00 o'clock will

16   last 15 minutes.  Parties are more than welcome to stay in

17   here.  If you want to leave, you're more than welcome to.  I

18   will start back up in this one.

19           Well, why don't I finish?  And then my goal is

20   3:25.  But we'll see.  You know, things are always

21   uncontested until somebody shows up at a hearing, so I don't

22   know what I'll look at.

23           Okay.  Thank you.

24           MS. HAYWARD:  Thank you, Your Honor.

25           MR. FITZMAURICE:  Thank you.

```
 1              THE COURT OFFICER:  All rise

 2        (Court in recess from 2:52:18 p.m. to 3:23:42 p.m.)

 3              THE COURT OFFICER:  All rise.

 4              THE COURT:  Please be seated.

 5              MS. HAYWARD:  Your Honor, may I go get -- knock on

 6   the conference room?

 7              THE COURT:  Please be seated.  I'm doing double

 8   duty today.

 9        (Pause in the proceedings.)

10              MR. FITZMAURICE:  Apologies for being late, Your

11   Honor.

12              THE COURT:  Oh, no, no, no.  I said, like around

13   3:30.  There's no.

14              Okay.  Wait.  I'm going to mute the line again.

15        (Conference muted.)

16              THE COURT:  Okay.  Just give me a second.  Let me

17   turn on my camera.

18              Okay, Ms. Hayward, how do you wish to proceed?

19              MS. HAYWARD:  Your Honor, I think we do wish to

20   proceed today.

21              THE COURT:  Okay.

22              MS. HAYWARD:  I have heard Your Honor's comments.

23              THE COURT:  Okay.

24              MS. HAYWARD:  I think.  All I can say is that it

25   is very clear that this Debtor and Mr. Choudhri wants to
```

1   fight to try to save this asset.

2            And I hear the Court's comments, and I think that

3   there are ways to potentially address them that we can

4   continue talking toward.  But ultimately, in the end of the

5   day, the question is, is this a reorganizable Debtor, right?

6   Is there a plan here that's in the best interest of the

7   estate?  Is there something that is good for all creditors

8   of the estate?

9            I believe that Mr. Choudhri would be willing to

10  subordinate debt to insiders under any plan.  I believe that

11  Mr. Choudhri would also be willing to appoint a chief

12  restructuring officer to act as sort of the independent

13  fiduciary with respect to how this case proceeds and to cede

14  control of the Debtor's decision-making abilities with

15  respect to this bankruptcy.

16           All I can say, though, is that there is a plan on

17  file that provides for payment of property creditors in

18  full, which is about $300,000.  There's a plan on file that

19  has new money coming in to fund.  The continued operations

20  of this property while it gets stabilized.

21           And I guess the only other thing I would say to

22  Your Honor, I heard, Your Honor, about valuation issues.  I

23  don't know whether there are valuation issues here, at least

24  with respect to the property the Debtor is relying on in

25  appraisal and appraised value at this point.

1          So there may not be an issue as to the value.  And

2   there's also no issue and no question that this property,

3   you know, the secured debt is not worth the value, the

4   property, right?  The property is they are underwater,

5   meaning this the NBK's debt, the property is worth less than

6   what they are owed, irrespective of the number that's used.

7          And so the question I also agree with Your Honor,

8   that I believe strongly in a Debtor's right to reorganize

9   strongly in being able to utilize the Bankruptcy Code.

10          THE COURT:  Who represents the Debtor?

11          MS. HAYWARD:  Who represents the Debtor?   I

12   represent the Debtor.

13          THE COURT:  You are the lawyer for the Debtor.

14          MS. HAYWARD:  Right, Right.  Well, I'm sorry.

15   When you said who represents --

16          THE COURT:  I appreciate.  That's a fair question.

17          MS. HAYWARD:  Who represents the Debtor?

18          THE COURT:  I mean, right now, as we sit here

19   right now.

20          MS. HAYWARD:  Right now, as we sit here today,

21   it's Mr. Choudhri.  It's Mr. Choudhri.

22          THE COURT:  All right.  Let's get him on the

23   stand.

24          MS. HAYWARD:  Okay.

25          THE COURT:  Mr. Choudhri, why don't you come on

1    back up?

2              Before we -- just to be clear, whenever we talk

3    about the issue that -- someone let me know, I'm just going

4    to play it safe, Mr. Ruff, and I'm just going to -- I'm just

5    going to mute this line.  I just want to be super, super,

6    super careful.  Make sure I don't do anything.

7              Mr. Choudhri, let me have you raise your right

8    hand?  Do you swear to tell the truth, the whole truth, and

9    nothing but the truth?

10              THE WITNESS:  Yes.

11         (Witness sworn.)

12              THE COURT:  Okay.  Note that the witness has been

13    duly sworn.  Thank you.

14              MR. FITZMAURICE:  So, Your Honor, are you

15    intending for us to go in our motion to dismiss?  Our first

16    witness would be Mr. Carter.  It's the extent of our

17    proceeding currently what they looking at -- sorry, adjust

18    the microphone.

19              THE COURT:  No, no.  Maybe I should, you know --

20              MR. FITZMAURICE:  It's the extent that we're going

21    to -- we have -- again for the Record, Your Honor, all of

22    the same concerns that Your Honor does with respect to cash

23    collateral.

24              THE COURT:  I just want to talk in terms of

25    evidence, I need to -- shut me down on this one.  Or is he

1  up?   How are you calling those?

2         MR. FITZMAURICE:  We are calling Mr. Carter as

3  our --

4         THE COURT:  I'm so sorry.  I'm going to have you

5  sit down.  I'm so sorry.  I'm so sorry.

6         Where is Mr. Carter?  Here, Mr. Carter.  That's

7  who I should have called.  I apologize.  I had Choudhri in

8  my head, and I should have called Carter.  I apologize.

9  Just go ahead and have a seat.

10         Are you all okay with proceeding?

11         MR. FITZMAURICE:  We are, Your Honor

12         THE COURT:  Okay.  All right.  Mr. Carter, why

13  don't you come on up?  Let me have you raise your right

14  hand.

15         Do you swear to tell the truth, the whole truth,

16  and nothing but the truth?

17         THE WITNESS:  I do.

18      (Witness sworn.)

19         THE COURT:  Okay.  Have a seat, please.

20         You all okay with the binder still being up here?

21         MR. FITZMAURICE:  Yes.  Your Honor, thank you.

22                    DIRECT EXAMINATION

23  BY MR. FITZMAURICE:

24  Q    And Mr. Carter, I suspect that I'll be asking you

25  predominantly about the binder with the black cover.

1  A    Okay.

2  Q    You have two in front of you.  One with a white cover

3  and one with a -- one with a black cover.

4            Mr. Carter, can you state your full name for the

5  Record, please?

6  A    Michael Crosby Carter.

7  Q    And are you currently employed, Mr. Carter?

8  A    Yes.

9  Q    Who are you employed by?

10  A    National Bank of Kuwait, New York Branch.

11  Q    Any connection with your employment for National Bank

12  of Kuwait, New York Branch, are you familiar with an entity

13  called Galleria 2425 Owner LLC?

14  A    Yes.

15  Q    How are you familiar with that entity?

16  A    I'm the account officer on that loan.

17  Q    Is it okay with you if I refer to Galleria 2425 Owner

18  LLC as the Debtor for purposes of your testimony today?

19  A    Yes.

20  Q    If I say the Debtor, you understand that's what I'm

21  referring to.

22            Okay.  And then are -- so you are National Bank of

23  Kuwait, New York Branches particularly the loan officer?

24  A    Yes.

25  Q    And National Bank of Kuwait, New York Branch extended

MICHAEL CROSBY CARTER - REDIRECT BY MR. FITZMAURICE          134

1  that loan to the Debtor.

2  A    Yes.

3  Q    And I'm going to ask you, please, to turn to in the

4  black binder the document that is at Exhibit 1.

5  A    Exhibit 1 or the --

6  Q    The end of that.

7  A    -- Declaration.

8  Q    So if you look at the bottom right-hand corner, you

9  should see a yellow sticker, and it should say NBK Exhibit

10 No. 1.

11 A    Yes.

12 Q    You recognize that document?

13 A    Yes.

14 Q    What is it?

15 A    This was my Declaration

16 Q    And you signed this Declaration on July 20th, 2023?

17 A    Yes.

18 Q    And it was submitted to the Court here in connection

19 with the National Bank of Kuwait's motion to dismiss the

20 Debtor's bankruptcy case?

21 A    Yes.

22 Q    You know, the factual information that is included in

23 the Declaration, do you know that information to be true of

24 your own personal knowledge?

25 A    Yes.

1  Q    Did you review books and records of the National Bank

2  of Kuwait in connection with preparing the Declaration that

3  is Exhibit No. 1?

4  A    Yes.

5  Q    And then again, you believe all of the contents of

6  Exhibit No. 1 to be true?

7  A    Yes.

8  Q    I'm going to ask you, please, to turn to the document

9  that is marked as Exhibit No. 2.

10 A    The promissory note?

11 Q    So let me see.  Let's walk through this together,

12 because as you may have heard this morning, our,

13 unfortunately, our numbering system was not a monument of

14 clarity.

15 A    All right.

16 Q    So Exhibit No. 1 is your Declaration that we just

17 reviewed, and it has attached to it five exhibits which you

18 will see tabs on the side one, two, three, four, five.  And

19 then after you get to Number 5, the next tab, admittedly

20 confusingly, is two.

21 A    I got you.

22 Q    And then if we turn to that, you'll see on the bottom

23 right-hand corner, there's a yellow sticker that says NBK

24 Exhibit No. 2.  Do you see that?

25 A    Yes.

1  Q     You recognize this document?

2  A     Yes.

3  Q     What is it?

4  A     This was a Statement that was also filed.

5  Q     And is this a Declaration that you submitted, in this

6  case, on September 15th of this year?

7  A     Yes.

8  Q     And do you believe the contents of -- sorry, withdrawn.

9        Do you know the contents of this Declaration to be true

10 from your own personal knowledge?

11 A     Yes.

12 Q     Did you review the bank's books and records in

13 connection with the preparation of this Declaration?

14 A     Yes.

15 Q     Your Honor, I offer the Exhibit 1 and 2 for evidence.

16            THE COURT:  Any objection?

17            MS. HAYWARD:  Your Honor, there's hearsay.  On

18 this -- they're out-of-court statements offered for the

19 truth of the matter asserted.   This witness (indiscernible)

20 testify, but Declarations by him are not admissible.  It's

21 hearsay.

22            THE COURT:  I agree.  Proceed.

23 BY MR. FITZMAURICE:

24 Q     Are you aware, Mr. Carter, of a loan that exists

25 between National Bank of Kuwait as Lender and the Debtor as

1  borrower?

2  A     Yes.

3  Q     Do you know when that loan was entered into?

4  A     May of 2018.

5  Q     Do you know generally what the terms of that loan are?

6  A     Well, they there was a loan for roughly 52 million and

7  change for five years.

8          MS. HAYWARD:  Your Honor, may I?  Since, Your

9  Honor, has sustained the objection.  May we remove the

10  Declarations from the exhibit binder in front of the witness

11  so that he may not rely upon them and part of his testimony?

12          THE COURT:  You can't look at the Declaration,

13  sir.  You can't look at your Declaration.  You can only

14  answer the questions that are in front of you.

15          THE WITNESS:  Okay.

16          THE COURT:  All right.  So close the binder.

17  Unless the witness -- and unless you're pointing him to

18  another exhibit, he can't look at the -- so you can answer

19  the question.

20  BY MR. FITZMAURICE:

21  Q     So are you familiar, Mr. Carter, with the terms of the

22  loan between NBK and the Debtor?

23  A     It was a loan for roughly, over 52 million for five

24  years.

25  Q     It was a five-year term?

1  A    Yes.

2  Q    Do you know what the payment terms were?

3  A    I'm not sure what you're asking.

4  Q    Was the Debtor under the terms of the loan, was the

5  Debtor required to make principal and interest payments?

6          MS. HAYWARD:  Objection.  Best evidence rule.  The

7  loan documents speak for themselves.

8          THE COURT:  He can answer if he knows.

9          THE WITNESS:  Well, it had monthly interest.  And

10 it was a, what we call a bullet loan pay to maturity.

11 BY MR. FITZMAURICE:

12 Q    Did the Debtor comply with those payment terms?

13 A    Up until roughly March, April of 2020.

14 Q    What happened in March or April of 2020?

15 A    Stopped making payments.  There was an interest reserve

16 that had been established at the closing, and then those --

17 that interest reserve was tapped on a monthly basis until

18 those funds expired in roughly April of 2021.  And we did

19 not receive any payments after that.

20 Q    And what, if anything, did the bank do as a result of

21 the Debtor's default under the loan?

22 A    We sent a default notice, acceleration, and eventually

23 we filed for foreclosure.

24 Q    Was the bank successful at that time in foreclosing on

25 the property?

1  A    No, it was put off through filings by the borrower with

2  the Court.

3  Q    Were the claims relating to those filings by the

4  borrower, where those eventually are resolved by the

5  parties?

6  A    Not sure what you're referring to.

7  Q    Let me ask it to you this way:  Did the parties

8  ultimately enter into a settlement agreement?

9  A    The parties did ultimately come to a settlement

10 agreement.

11        MR. FITZMAURICE:  So I think, Your Honor, at this

12 point, we're going to talk about the terms of that

13 agreement.

14        THE COURT:  Okay.  Just give me one moment.  I am

15 (indiscernible) yourself.  And want no one to listen to

16 anything else.  No one should be able to listen to what you

17 talk about.  I need all the audio (indiscernible), right?

18        Mr. Ruff, can you hear anything I'm saying?

19     (No audible response.)

20        THE COURT:  All right.  Mr. Ruff, can you hear me?

21     (No audible response.)

22        THE COURT:  Can you hear me, Mr. Ruff?  Okay, hold

23 on a second.  Put a thumbs up if you can hear me.  Can you

24 hear me now?  Can you hear me now, Mr. Ruff?

25     (No audible response.)

1          THE COURT:  Don, if you're on, Abby, if you're on,

2  if you can hear me?  Okay.  That's how we're proceeding.

3          (REDACTED SEALED portion from 3:39 p.m. to 4:05 p.m.)

4          (Court in recess from 3:53:42 p.m. to 4:05:14 p.m.)

5          THE COURT OFFICER:  All rise.

6          THE COURT:  Just so we are all on the same page,

7  Ms. Hayward, the line is completely open, so everybody can

8  hear what we are saying right now.

9          MS. HAYWARD:  Okay, thank you, Your Honor.

10          THE COURT:  Okay

11          MR. FITZMAURICE:  At this point, Your Honor, the

12  Debtor would call Mr. Choudhri to the stand.

13          THE COURT:  Okay.  Mr. Choudhri, come on up.

14  Mr. Choudhri, just so we have a clean Record, let me have

15  you raise your right hand for the third time.

16          Do you swear to tell the truth, the whole truth,

17  and nothing but the truth?

18          THE WITNESS:  Yes.

19      (Witness sworn.)

20          THE COURT:  Okay.  And I will note that

21  Mr. Choudhri has been super sworn in for the Record.

22          MS. HAYWARD:  Third time's the charm, Your Honor.

23          THE COURT:  Yes, exactly right.  He is all the way

24  covered on the swearing.  Okay.

25                      DIRECT EXAMINATION

1  BY MS. HAYWARD:

2  Q    All right.  Good afternoon, Mr. Choudhri.

3       Mr. Choudhri, I want to talk to you a little bit about

4  the Debtor's plan of reorganization in this case.  Can you,

5  in broad term, sort of describe what the Debtor is proposing

6  as a plan?

7  A    The Debtor is proposing to fund at least 2.5 million as

8  new equity paying the secured paying the unsecureds.

9  Q    Do you know how much the unsecured creditors are

10 getting paid?  Generally speaking, under the Debtor's plan?

11 A    I believe the -- it's about 300,000 and within the next

12 for the trades.  And then there's a total of about $10

13 million, I think it adds up to about ten, $10 million.  And

14 then the secured is getting paid with the property value.

15 Q    Okay.  When you say a total of $10 million, so do you

16 recall how the plan structures payments to unsecured?

17 A    I don't have the plan in front of me and I don't have a

18 -- we have a projection and -- and a budget built into it.

19 Q    Okay.  And how are payments made monthly?  Quarterly,

20 annually.  Do you recall?

21 A    I believe they're made quarterly.  Quarterly payments

22 and the taxes are paid.

23 Q    Do you recall -- I mean generally speaking, the

24 property as it sits today, and as it sits within the next

25 ten months, does the property project the cash flow?

1  A    Yes.

2  Q    Within the next ten months?

3  A    Yes.

4  Q    Do you agree with or do you know whether there's a

5  necessity for --

6  A    Actually, I want to clarify that.  I believe that it's,

7  and I'm going off of memory, and I'm sorry.  If I had the

8  plan, I could better describe it in front of me.  I believe

9  it starts shooting off lots of cash flow, positive cash flow

10 in month 17 or 18, if I'm not mistaken.

11 Q    Would you agree with me, or is there a need for funding

12 in order to get the property to stabilization?

13 A    Yes

14 Q    Why is that?

15 A    Based on the occupancy of the building and to lease up

16 the building and carry it as the tenants start paying in the

17 and the rents start coming in because there's a stair step.

18 Q    And with respect to the valuation of the building, the

19 Debtor has used a valuation of, I believe -- or where did

20 the Debtor's valuation come from?

21 A    We reviewed two appraisals from the -- from the Bank of

22 Kuwait, the Commission, Cushman Wakefield.  And I believe

23 one might have been for around 16 and the other one was for

24 around 18.  So I believe we had put on at 17, I think it was

25 18.6 and 16, and we picked 17.5.

1  Q    I'm going to ask you to turn to Exhibit 10 in the white

2  binder in front of you.

3  A    Yes.

4  Q    Is this NBK's appraisal as of May 3rd, 2023?

5  A    Yes.

6  Q    And is this the basis of the Debtor's valuation of the

7  property?

8  A    Yes.

9  Q    And I'll ask you to turn to page which is 00005 of the

10 appraisal.

11 A    Yes.

12 Q    Can you see that according to the appraisal, what is

13 the market value as is?

14 A    18.6 million.

15 Q    Is that the number the Debtor used in its plan?

16 A    Yes.  It used 18.6 in the plan, but it used a slightly

17 different number on the Schedules.

18 Q    Where's the money coming to fund the equity that -- the

19 new equity contribution that's required to get the property

20 to where it's currently cash flowing?

21 A    From family members and affiliates that have deposited

22 funds in an account for this -- for this investment.

23 Q    Mr. Choudhri, why are you willing to propose a plan and

24 put $2.5 million of new money into this Debtor to save this

25 property?

1      MR. FITZMAURICE:  Objection.  Ms. Hayward puts the

2  witness testimony concerning the source of financing for the

3  Debtor.

4      MS. HAYWARD:  Okay.  Let me -- I'll rephrase.

5      THE COURT:  I'll sustain that.  Okay.

6      MS. HAYWARD:  I'll rephrase.

7  BY MS. HAYWARD:

8  Q    Mr. Choudhri, why are you or your affiliated friends

9  and family and affiliates willing to put an additional

10 $2.5 million into this Debtor to fund a plan and go forward?

11 A    Because it will maximize the value for the estate and

12 what the Creditors get.  And there's lots of value once it's

13 stabilized, and it'll shoot off lots of cash upon

14 stabilization.  And so even the Cushman appraisal has a

15 $51 million prospective value on stabilization.  So I think

16 the value will go up.  And the Creditors will be paid, the

17 unsecureds along with the secured.

18 Q    And if -- well.  Let me ask you --

19     THE COURT:  When you say the unsecureds are going

20 to get paid.  What do you mean by that?

21     THE WITNESS:  I'm going personally behind at the

22 end of the line for any --

23     THE COURT:  No, no.  I'm just asking when you mean

24 the unsecureds are going to get paid, what are you what do

25 you mean by that?

 1              THE WITNESS:  There's unsecured creditors that

 2    have a list that I can --

 3              THE COURT:  Do you mean just generally all

 4    unsecured creditors?

 5              THE WITNESS:  Yes, Your Honor.

 6              THE COURT:  Okay.  Thank you very much.  I just

 7    wanted to make sure that I was -- okay.  Thank you.

 8              THE WITNESS:  I think there's six classes, if I

 9    recall, on the plan, and I'm going off memory.

10              THE COURT:  No, no, no.  I just.  I just want to

11    make sure that we were all operating on the same

12    information.  Thank you.

13    BY MS. HAYWARD:

14    Q    Do unsecured trade under the plan are creditors who

15    have claims that are related to providing maintenance or

16    repairs or things respecting the property?

17    A    They get paid 100 percent.

18    Q    Okay.  And what about the rest of the unsecured

19    creditors?

20    A    They get paid every, I believe, it's based on payments

21    that are made from the cash flow that the building will get

22    based on the leases.

23    Q    And do you know how much that class of creditors will

24    be paid under the plan?  If you know if you don't, I don't

25    want you to guess.

1  A    I know.  I just don't remember it exactly.  If it's

2  possible, I can have a copy of the --

3  Q    Okay.

4  A    Sorry.

5  Q    It's all right.

6  A    What I recall was around -- sorry.

7  Q    Now, Mr. Choudhri, I'm going to ask you to look at

8  Exhibit 6.

9  A    Yes.

10  Q    What is Exhibit 6?

11  A    Exhibit 6 is a lawsuit, it's an adversary against the

12  Bank of Kuwait on behalf of the Debtor.

13  Q    And in general terms, high-level terms, what is the

14  Debtor's allegation about?  What is the basis of this

15  lawsuit?   What does this lawsuit allege?

16  A    Breach of the settlement agreement.

17  Q    Okay.

18  A    And banks interferes.  But for theirs, we would have

19  been able to 100 percent pay them the settlement amount.

20  Can I talk about this?

21  Q    Okay.  Wait until I ask a question.

22  A    Sorry.  Just on the -- and if you want me to hit the

23  button, just let me know when it's done.

24  Q    Yeah, let's -- Your Honor.  I think this is probably an

25  appropriate time to hit the button.

```
 1            THE COURT:  All right.  It's time to hit the

 2   button time, folks.  Hold on.  Well I want my law clerks to

 3   (indiscernible), I'm going to mute this line, confirm that

 4   as we start to talk that you can't hear anything.  If at any

 5   point you do hear any of this discussion, let me know

 6   immediately.  Okay?

 7            Mr. Ruff, can you hear me?  Okay.  Thank you.

 8   Let's proceed.

 9            (REDACTED SEALED portion from 4:15:56 p.m. to 4:17:30

10   p.m.)

11   BY MS. HAYWARD:

12   Q   Mr. Choudhri, with respect to the adversary proceeding

13   that's been filed and in general terms, but without

14   disclosing actual confidential information from the

15   settlement agreement, what is the Debtor allege that NBK has

16   done?

17   A   The Debtor alleges that but for their interference, we

18   and the Debtor would have been successful in paying the full

19   settlement amount.  And I can get into a lot more details if

20   you want to (indiscernible).

21   Q   Well, I just -- I want more of, like a high level.  You

22   know, what exactly does the Debtor believe NBK did to

23   interfere with its attempts to perform under the settlement

24   agreement?

25            THE WITNESS:  Your Honor, I would like to --
```

1          THE COURT:  All right.  It would be time.

2          THE WITNESS:  (Indiscernible).

3          THE COURT:  Okay, we're muted.

4      (REDACTED SEALED portion from 4:18:28 p.m. to 4:20:51

5  p.m.)

6          THE COURT:  We're back live.

7          MS. HAYWARD:  Thank you, Your Honor.

8                      DIRECT EXAMINATION

9  BY MS. HAYWARD:

10  Q    Mr. Choudhri, does the Debtor allege that NBK has

11  engaged in a pattern of interfering with the Debtor's

12  ability to operate the property and pay debt?

13  A    Absolutely.

14  Q    Okay.

15  A    Absolutely.

16  Q    Mr. Choudhri, if it's necessary to get a plan confirmed

17  in this case.  Are you and entities that you control willing

18  to subordinate debt and not receive payment under a plan?

19  A    Yes.

20  Q    Are you and your entities willing to waive debt in

21  order to get a plan confirmed in this case if that's

22  required?

23  A    Yes.

24  Q    Are you and your entities willing to appoint an

25  independent third party to come in and make decisions with

1  respect to this bankruptcy case on behalf of the Debtor?

2  A    Yes.

3  Q    Are you willing to fund that?

4  A    Yes.

5  Q    Are you willing to fund the expenses associated with

6  the property for the next few months until such time as we

7  get to plan confirmation?

8  A    Yes.

9  Q    And in funding those amounts, would you be willing to

10  subordinate the repayment of any amounts funded to after the

11  plan term?

12  A    Yes.

13  Q    Would you be willing to include any of those amounts as

14  equity contributions rather than as loans?

15  A    Yes.

16  Q    So basically, are you saying that you're willing to do

17  what it takes to try to save this property?

18  A    Yes, I'm willing.  I've worked very hard, and I'm

19  willing to do whatever it takes.  And we've finally gotten

20  lease up and momentum to where we're very close, and I

21  believe the plan that we've presented is very feasible and

22  we're open to doing what it takes to make it work.

23  Q    Mr. Choudhri, why -- do you believe that the Debtor has

24  a real dispute with the NBK?

25  A    Absolutely.

1  Q    Has the Debtor had a real dispute with NBK for quite

2  some time?

3  A    Yes.  And I can get into that, too.

4  Q    As the Debtor manufactured a dispute against NBK to try

5  to move forward?

6  A    Absolutely not.  Absolutely not.

7  Q    Why did the Debtor file this case?

8  A    Just to protect and restructure the property, to

9  restructure the Debtor, and to stop NBK with their agenda

10 since the issue started of taking the property.

11 Q    Does the Debtor allege or believe that NBK wishes to

12 take control of the property?

13 A    They want the property.  Mr. Barrera (phonetic) told me

14 they want the property from Kuwait.  They want this

15 property.

16        MR. FITZMAURICE:  Your Honor, I (indiscernible).

17        MS. HAYWARD.  I think it was an admission of a

18 party opponent.

19        THE COURT:  I don't know what it is.  It just says

20 what it says.  It's just an unsupported allegation.

21        MS. HAYWARD:  And I'll pass the witness.

22        THE COURT:  Thank you.

23        Proceed to Cross-Examination.

24        MR. FITZMAURICE:  Thank you, Your Honor.

25                    CROSS-EXAMINATION

1  BY MR. FITZMAURICE:

2  Q    Good afternoon, Mr. Choudhri.

3  A    Afternoon.

4  Q    I'd like you to -- If you don't already have it, please

5  open in front of you the Exhibit Number 6, the complaint.

6  A    Yes.

7  Q    You are personally a plaintiff in this complaint,

8  correct?

9  A    Yes.

10  Q    And so is the mezzanine lender as well?

11  A    Yes.

12  Q    And the claims that are asserted in the complaint those

13  are the same claims that the Debtor has been asserting

14  against National Bank of Kuwait for the past several years,

15  right?

16  A    No.

17  Q    And those are the same claims that were released in the

18  settlement agreement, right?

19  A    No.

20  Q.   So some of them are the same claims that were released

21  in the settlement agreement, right?

22  A    I'm not sure if there are some -- there are claims from

23  -- that led up to that and then claims that came after that.

24  Q    All of the claims that would exist that predate the

25  settlement agreement were released by the settlement

1  agreement, correct?

2          MS. HAYWARD:  Objection.  Calls for a legal

3  conclusion.

4          THE COURT:  Sustained.

5  BY MR. FITZMAURICE:

6  Q   Mr. Choudhri, I'd ask you to take a look, please, at --

7          THE COURT:  Before you leave, can somebody just

8  explain to me who is, just so we have a clear record,

9  Mason's Galleria LLC?  Can -- Mr. Choudhri, can you tell me

10 who that is?

11         THE WITNESS:  That is the mezzanine lender for the

12 JV, which the JV is the Galleria Owner.  Then you have the

13 JV LLC, and then you have Mason's Galleria, which is a

14 mezzanine lender.

15         THE COURT:  And what is the connection between --

16 do you have any connection to the mezzanine lender?

17         THE WITNESS:  Yes.

18         THE COURT:  And what is your connection with the

19 mezzanine lender?

20         THE WITNESS:  I'm the managing member.

21         THE COURT:  You're the managing member of the

22 mezzanine lender?

23         THE WITNESS:  Yes.

24         THE COURT:  Okay.  Thank you.

25 BY MR. FITZMAURICE:

1  Q    Sir, I'd like you to please look at Exhibit B to the --

2  I'm sorry.  So again, both Exhibit 6, the Exhibit's --

3  A    The adversary complaint.

4  Q    -- Exhibit B to the adversary complaint.

5        THE COURT:  Can you just tell me what -- took the

6  first page of that?  Oh, it's Exhibit B.

7        MR. FITZMAURICE:  Oh, it's -- if you're referring

8  to the Bates numbers at the bottom, it's 000038.

9        THE COURT:  38?

10        MR. FITZMAURICE:  38.

11        THE COURT:  Okay.

12        MR. FITZMAURICE:  Thank you.

13        THE COURT:  Thank you.  I'm just trying to -- yes,

14  make it a little easier on both of our eyes.

15        MR. FITZMAURICE:  Sorry.

16        THE COURT:  No, no.  Go ahead.

17  BY MR. FITZMAURICE:

18  Q    Do you recognize this document, Mr. Choudhri?

19  A    Yes.

20  Q    What is it?

21  A    This is a letter of agreement between Caldwell Soames

22  and Galleria 2425 Owner LLC.

23  Q    Is Caldwell Soames the hedge fund that you referred to

24  earlier?

25  A    Yes.

1  Q    And you assert that the National Bank of Kuwait

2  interfered with the Debtor's ability to close this

3  transaction?

4  A    Correct.  And with other transactions as well.

5  Q    Let's focus on this transaction.  The terms of the

6  transaction were that an entity affiliated with Caldwell

7  Soames was going to acquire the property, is that right?

8  A    That is -- that is correct.

9  Q    Was the valuation of the property about $100 million?

10 A    The appraisal when the property was fully stabilized

11 was 101 million by the Bank of Kuwait.

12 Q    And that was in 2018, right?

13 A    I believe it was in 2019 before -- pre-COVID.  You're

14 right.  This is pre-COVID.

15 Q    What I'm asking is the valuation of the property for

16 purposes of the Soames Caldwell -- Soames Caldwell -- the

17 Caldwell Soames transaction, the value of the property was

18 $100 million, correct?

19 A    I don't know if that's the value of the property.  This

20 deal was acquiring 45 -- I'm sorry, 55 percent.  There

21 wasn't a value for the -- actually, I think there is a value

22 in it's north of that.  So it's 35 million in funds paid

23 now.  And then the Debtor or the, you know, 24 -- 25 would

24 carry 40 million for 20 years at 7 percent.  And then the

25 borrower would retain 45 percent, and they would also lease

1   and take over, you know, several floors.  And they have a

2   company that are moving from California to Houston that

3   would occupy the building.  That's an affiliate of the fund.

4   Q    So Caldwell Soames is going to pay $35 million in cash?

5   A    Yes.

6   Q    It was going to -- there would be a $40 million note

7   that would be owed to the Debtor payable 7 percent per year.

8   A    Yes.

9   Q    And the Debtor was going to retain 45 percent of the

10  equity in the property?

11  A    Correct.

12  Q    And this was as of January of 2023?

13  A    Yes.

14  Q    And this was the transaction that the bank interfered

15  with.

16  A    This was -- the fact that the information was

17  disclosed, and I can get more.  But this is a transaction.

18  It is not the transaction.

19  Q    The Caldwell Soames had a diligence period before

20  closing any transaction, correct?

21  A    They had anticipated -- they were supposed to close in

22  by the end of Feb.

23  Q    So I'll refer you, sir, to Section 3 of this letter.

24  A    Yes, sir.

25  Q    3(a), Caldwell Soames has a 30-day period to negotiate

1   A    That's correct.

2   Q    And then 3(c), during that period, Galleria will

3   reasonably accommodate the representative appointed by CSI

4   to inspect the records and accounts of Galleria?

5   A    Correct.

6   Q    Okay.  And that was -- that inspection was during the

7   30-day period after this contract was supposedly signed?

8   A    Yes.

9   Q    Okay.  Please look at Exhibit 10.  That's the

10  appraisal.

11  A    Okay.

12  Q    And referring to the Bates Page 0005.

13  A    Yes, I'm here.

14  Q    The appraisal indicates that as is value of the

15  property is $18.6 million, correct?

16  A    Correct.

17  Q    And the as is value of just the land with the building

18  removed was more, correct?

19  A    Yes.

20  Q    If you turn the Page 0007.

21  A    Okay.

22  Q    Do you see that there's a reference to a prior

23  valuation?

24  A    I'm not, but I do recall the bank had a prior

25  valuation.

1  Q    So Page 0007 --

2  A    Yes, the top of it.

3  Q    -- on the left-hand side, it says changes from prior

4  valuation.

5  A    Yes.

6  Q    Do you see that text on the left-hand column, sir?

7  A    Yes.

8  Q    Second paragraph -- end of the second paragraph, the

9  September 20, 2021 valuation reflected a change from the

10 April 19, 2020 -- 2021 valuation?

11 A    Correct.

12 Q    And that was down $2.3 million?

13 A    Yes.

14 Q    The September 20, 2021 value was 20.4 million

15 A    Yes, that's what this says.

16 Q    And is it -- your actually -- is it actually your

17 testimony that with the property worth somewhere between 20

18 and $18 million, that Caldwell Soames is going to pay $100

19 million for it?

20 A    The valuation is based on the buyer, based on leasing,

21 and they were taking space in the building.  We also had

22 Microsoft toward the building.  And if Microsoft did sign

23 the lease, the building would be worth $150 million.  So

24 it's subjected to the buyer and what their purposes are.

25 And if the building is fully leased up, it's obviously worth

ALI CHOUDHRI - CROSS BY MR. FITZMAURICE                    158

1    more, just like when it was leased up, it was appraised for

2    over 100 million.

3    Q    Microsoft did not lease the entire building, did they?

4    A    And that's one of our historical issues about lease

5    approvals in the past.

6    Q    With respect to the State Court disputes between the

7    parties, do you recall that in sometime in March of this

8    year, the National Bank of Kuwait posted the property for

9    foreclosure?

10          MS. HAYWARD:  Objection, Your Honor.  Beyond the

11   scope, I'm not sure that I addressed the State Court

12   proceedings at all in my direct.

13          THE COURT:  You can respond.

14          MR. FITZMAURICE:  Well, Your Honor, there was

15   significant testimony about the State Court proceedings

16   between the parties.  That was that there was significant

17   testimony concerning the State Court proceedings, the

18   litigation, the nature of the claims between the parties.

19          THE COURT:  What's the question again you were

20   asking?

21          MR. FITZMAURICE:  Did NBK post the property for

22   foreclosure in March of 2021?  The next -- the next question

23   relates to the proceeding that was filed as a result of

24   that.

25          MS. HAYWARD:  Your Honor, I limited my questions

1    to the adversary proceeding that was filed.  I believe those

2    questions were with respect to Mr. Carter's testimony.

3            THE COURT:  Yeah, I think that's right.  I'll

4    sustain the objection.

5    BY MR. FITZMAURICE:

6    Q    Do you know if the Debtor told the State Court Judge

7    that NBK should be allowed to foreclose on the property if

8    the settlement payment wasn't made by July 3rd?

9            MS. HAYWARD:  Objection.  Beyond the scope.

10           THE COURT:  I'm going to overrule that.  You can

11   answer.

12           THE WITNESS:  No.  I'm aware that the bank did

13   post the property for foreclosure in May.  And the Court

14   allowed us more time and the bank, I believe -- I believe.

15   And, but after the property was posted and passed several

16   people when the property was publicly posted were told by

17   emails by Pillsbury that the property will be posted in July

18   and that that created another problem with our

19   (indiscernible) viable and effective marketability of the

20   property when buyers were told it was going to be posted in

21   the future.

22   Q    Do you know who Jim Wetwiska is?

23   A    Yes, he's with Akin Gump.

24   Q    He's Counsel for the Debtor?

25   A    Yes.

1  Q    And did he tell the Court that if and -- that if the

2  Debtor had more time to raise the settlement funds, that any

3  issues with respect to the disclosure of the settlement

4  terms would be cured?

5  A    No.

6  Q    Did Mr. Wetwiska also tell the State Court that if the

7  Debtor did not sell the property -- excuse me, that if the

8  Debtor did not come up with the funds, the settlement funds

9  by July 3rd, that the Court should throw them out?

10 A    There was conversations not exactly that.  And I can --

11 I can -- like if you allow me to tell you what I remember.

12 Q    I'd ask you to just answer the question, sir.

13 A    I recall that -- I'm trying to answer the question

14 without rambling, and I have a bad habit again.  So your

15 question is, did Jim Wetwiska tell the Court that we could

16 be thrown out if we didn't make the settlement payment along

17 those lines?

18 Q    By July 3rd?

19 A    And I believe there was a conversation in April about

20 that.  And then the problem was -- is when the sale was

21 passed, as people were told to sell, would be posted again

22 and that that is -- that created issues.

23 Q    And in fact, the State Court specifically authorized

24 NBK to post the property for foreclosure in July of 2023; is

25 that right?

ALI CHOUDHRI - CROSS BY MR. FITZMAURICE                161

1  A    That was after they had told buyers that they -- that

2  they -- I feel like I can't get out and explain it right.

3  So I'm struggling with your question.

4  Q    Let me ask you a different one and maybe that would be

5  helpful.  In the April hearing, did the State Court

6  specifically authorize National Bank of Kuwait to post the

7  property for foreclosure in July?

8  A    I don't recall that exactly, but I believe it was --

9  that the State Court said that if we didn't make the

10 payment, that the bank would be allowed to move forward.

11 And then when we went back, and we had the buyers and we --

12 and they posted, and then they told the buyers they're going

13 to post in the future, and they passed that.  And the judge

14 says that they couldn't have done that.  And that's what

15 created the issues.

16 Q    Well, and in fact, the State Court Judge specifically

17 authorized the National Bank of Kuwait to post the property

18 on June 13th, 2023, in order to comply with the state notice

19 requirements in the Texas State Foreclosure Statute; is that

20 right?

21 A    I -- yes, I think that is correct.  But I do want to --

22 I won't clarify.  Sorry.

23 Q    Yes.  Those rules require 21 days --

24 A    Twenty-one days

25 Q    -- foreclosure.

1  A    First Tuesday of the month.  Yes, sir.

2  Q    And for July the 1st Tuesday of the month was the 4th,

3  correct?

4  A    Yes

5  Q    And so the sale was scheduled for the morning of the

6  5th.  I'm sorry, the morning of Wednesday, July 5th, as the

7  next day?

8  A    I recall what the judge said that they shouldn't tell

9  people they're going to post before they post after they

10  passed the May sale.

11  Q    The Court specifically authorized the National Bank of

12  Kuwait to post the property for foreclosure in June of this

13  year, correct?

14  A    No, I don't remember.  It's possible -- I think the one

15  -- the state --

16         MR. FITZMAURICE:  Your Honor, may I just confer

17  for one moment?

18         THE COURT:  Of course.

19     (Pause in the proceedings.)

20  BY MR. FITZMAURICE:

21  Q    So unfortunately, sir, I'm going to have to ask you to

22  look through the confusing NBK binder one more time.

23  A    Yes, sir.

24  Q    So let's -- I apologize for this, but let's do it

25  together to make sure that we get to the same spot.  If you

1  open up the binder, the first one is Tab 1, which is the

2  Carter Declaration.  There are then five exhibits to that.

3  And then after number five, you come to Exhibit No. 2, the

4  first page of which --

5  A    Is it the first two or the second two?

6  Q    So on the -- if you look at the -- if you go back to

7  that --

8            THE COURT:  I think the second two.

9            MR. FITZMAURICE:  The second to the little yellow

10 sticker says --

11           THE WITNESS:  2-2?

12           MR. FITZMAURICE:  -- Exhibit Number 2.  And then

13 I'm looking for Exhibit 2-4.

14           THE COURT:  So maybe the third.

15           THE WITNESS:  Okay.  This is a transcript.

16 BY MR. FITZMAURICE:

17 Q    This is a transcript of the proceedings in the State

18 Court on April 12th, 2023.  You look at the first page of

19 it.

20 A    Yes.

21           MR. FITZMAURICE:  Your Honor, this -- yeah.  I'm

22 -- exactly what I'm about to do.  Your Honor, the transcript

23 indicates on its face that it's sealed.  And I'm going to

24 ask the witness about the contents of some of the

25 information here, so we may have to hit the button.

ALI CHOUDHRI - CROSS BY MR. FITZMAURICE                    164

1          THE COURT:  Okay.

2          (REDACTED SEALED portion from 4:42:31 p.m. to 4:44:15

3    p.m.)

4          THE COURT:  Okay.  Thank you.

5    BY MR. FITZMAURICE:

6    Q    And so, Your Honor, I would like to -- Mr. Choudhri,

7    please direct your attention to Page 45 of the -- and do you

8    see on Page 45 of the transcript, there's a reference to

9    Mr. Wetwiska?

10   A    Mr. Wetwiska, yes.

11   Q    Yes.  And here on Page 45, isn't Mr. Wetwiska telling

12   the Court that the Debtor needs 60 to 90 additional days --

13          THE COURT:  No, no, no.

14          MR. FITZMAURICE:  For impeachment purposes, Your

15   Honor?

16          MS. HAYWARD:  Objection.

17          MR. FITZMAURICE:  Your Honor, the witness

18   testified this did not happen.

19          THE COURT:  But you haven't offered -- you haven't

20   told me why you're doing this, right?  Now you just read

21   from a document where we were using the document to refresh

22   recollection.  Now you're doing it for impeachment.  But

23   we're -- you've got to kind of tell me what you're doing

24   because it doesn't flow naturally from the last question.

25          MR. FITZMAURICE:  I apologize, Your Honor.  And so

1  just to be clear.

2          THE COURT:  I think that's what I'm saying.  We're

3  standing up.  Probably beat you to the punch.

4          MS. HAYWARD:  Thank you, Your Honor.

5          THE COURT:  Go ahead.

6          MR. FITZMAURICE:  To be clear, Your Honor,

7  offering this portion of Exhibit 45 -- I'm sorry, this

8  portion of Page 45 of NBK Exhibit 2.4 for impeachment

9  purposes.

10          THE COURT:  But for what question?  Didn't it pass

11  already?

12          MR. FITZMAURICE:  I asked the witness whether or

13  not Mr. Wetwiska made certain statements to the Court.  He

14  said no.

15          MS. HAYWARD:  Objection misstates the witness's

16  testimony.

17          THE COURT:  I'm going to sustain the objection.

18  We can move on with that.  There's none of that's going to

19  move me one way or the other.

20          MR. FITZMAURICE:  Thank you, Your Honor.

21          THE COURT:  All right.  I just have a couple of

22  questions for you, Mr. Choudhri, and these are clarifying

23  questions.

24                         EXAMINATION

25          BY THE COURT:  Can you just restate what is your

1   connection with Caz Creek Holdings II LLC, if any?

2           THE WITNESS:  There are no connections other than,

3   Your Honor, in the past that when there were --

4           THE COURT:  Can you just speak into the mic?  I

5   want to make sure that we can hear you.

6           THE WITNESS:  Sorry.

7           THE COURT:  I apologize.

8           THE WITNESS:  There is no connection other than

9   Caz Creek is owned by the Hunt companies.  It's also known

10  as Tax-Ez.  They do tax loans, and so they made tax loans.

11          THE COURT:  Got it.

12          THE WITNESS:  And then I acquired -- so they

13  wouldn't because folks were trying to buy those tax loans

14  from tax loans from Caz Creek, and then I assigned them to

15  the Bank of Kuwait.

16          THE COURT:  So when -- so what's your -- what was

17  your involvement in the preparation of the plan that was on

18  file?  The Chapter 11 plan that got filed.  Did you have any

19  involvement in that?

20          THE WITNESS:  I did.

21          THE COURT:  Okay.  So the plan describes a secured

22  claim by Caz Creek for about $698,000 --

23          THE WITNESS:  Yes.

24          THE COURT:  -- right?  Is that a debt that will be

25  paid to Caz Creek or to another entity?  That's why I'm

1  getting a little -- I know something got assigned that, and

2  I was just trying to make sure that I was clear about kind

3  of what was happening.

4              THE WITNESS:  I know, it's kind of confusing.  So

5  there are prior years of taxes and tax liens that are not on

6  the Schedules because those were -- those were tax loans

7  that I bought.  And then I assign those to the bank under

8  the settlement agreement.  The settlement agreement has --

9              THE COURT:  Hold on.  What you're talking about

10 the settlement agreement?

11             THE WITNESS:  Sorry.

12             THE COURT:  Go ahead.  Got it.  So that's not the

13 698 that --

14             THE WITNESS:  No, that's not --

15             THE COURT:  The 698, is there any connection?

16             THE WITNESS:  Zero.

17             THE COURT:  Okay.

18             THE WITNESS:  No connection.  That's a --

19             THE COURT:  That's a completely separate --

20             THE WITNESS:  That's --

21             THE COURT:  -- tax payment?

22             THE WITNESS:  That's a tax loan that was obtained.

23             THE COURT:  Okay.

24             THE WITNESS:  And, but there were prior years that

25 I bought, and then I assigned them over to the Bank of

 1  Kuwait.

 2           THE COURT:  Perfect.  Thank you.

 3           And then the entity 2425 WL LLC, any connection

 4  with that entity?

 5           THE WITNESS:  That's an entity I have an interest

 6  in.

 7           THE COURT:  Okay.  And what is your interest in

 8  that entity?

 9           THE WITNESS:  I hold a majority interest in that

10  entity.

11           THE COURT:  Okay.

12           THE WITNESS:  That entity on the closing

13  statement, when the -- when --

14           THE COURT:  No.  I just need -- I'm just trying to

15  make sure that I have everything in my --

16           THE WITNESS:  Yeah.

17           THE COURT:  Okay.

18           THE WITNESS:  2425 is, is the entity that will be

19  subordinate under -- that will be -- that's something

20  we're --

21           THE COURT:  So the --

22           THE WITNESS:  Sorry.

23           THE COURT:  No, no, no.

24           THE WITNESS:  I keep talking, sorry.

25       (Pause in the proceedings.)

1          THE COURT:  What, to your knowledge, was

2    Mr. Darjean's knowledge or involvement in the preparation of

3    the plan, if any?  I don't want to get into any

4    conversations with the Debtor, with your Counsel -- or I

5    should say I don't.

6          THE WITNESS:  Well, it was a collective team

7    effort with the Counsel, with Mr. Darjean, with Scarlett.

8    We have a CPA that we work with.  That's, you know --

9          THE COURT:  The in-house CPA?

10          THE WITNESS:  Yes.

11          THE COURT:  Okay.

12          THE WITNESS:  Yes, Your Honor.  And then we also

13    have -- We'll rely on Anderson.  I've used Anderson Tax, but

14    it was me, Mr. Darjean, Counsel in putting together the plan

15    and --

16          THE COURT:  And what is Mr. Darjean's role as the

17    manager of Galleria 2425?

18          THE WITNESS:  He signed leases, he manages day-to-

19    day.  He's been -- my dad hired him a long time ago.  He's

20    been a representative and a manager for various entities

21    where he's -- has very good customer service and has run

22    companies.

23          THE COURT:  My understanding is that he's an

24    employee of Jetall?

25          THE WITNESS:  Yes, sir.  Okay.  That is correct.

1          THE COURT:  Okay.

2          THE WITNESS:  He's had other roles, but that has

3   been his primary role.

4          THE COURT:  Okay.  Thank you.

5          Just want to make sure that there are a number of

6   entities and some of them have, you know, closing letters or

7   close.  And I just want to make sure that I'm following, and

8   I have a clear understanding of every entity.  And just to

9   be -- you don't have -- see this is the part I help you out.

10  You don't have to add anything.  I just -- That was me

11  saying that's why I'm asking these questions.  That wasn't a

12  question for you.  It's just more of a statement.

13         Thank you very much.  I have no questions.  No

14  further questions.

15         Counsel, do you have any additional questions?

16         MS. HAYWARD:  No, Your Honor.

17         THE COURT:  Okay.  Thank you.

18         Okay.  Thank you very much for your time, sir.

19     (Witness steps down.)

20         MS. HAYWARD:  With that, Your Honor, the Debtor,

21  rests.

22         THE COURT:  Okay.  Thank you very much.

23         All right.  Why don't you give me close?  I'll

24  give you a few minutes if you want to close, Counsel.

25         MR. FITZMAURICE:  Thank you, Your Honor.  Patrick

1   Fitzmaurice from Pillsbury.

2           THE COURT:  The line is completely unmuted.  I

3   just want to make sure that we were all clear about when we

4   talked about stuff.  If you want me to hit the button, I'll

5   hit the button at a certain point.  But maybe we can just do

6   it at a very specific time and kind of have it there.  Okay?

7           MR. FITZMAURICE:  I'll do that.  Your Honor, I

8   have notes in front of me, so I'll know when I'm getting to

9   an appropriate spot.

10                  CLOSING BY MR. FITZMAURICE

11          MR. FITZMAURICE:  Again, Patrick Fitzmaurice from

12  Pillsbury for National Bank of Kuwait.

13          The National Bank of Kuwait believes that the

14  Debtor's case should be -- the bankruptcy case should be

15  dismissed because it does not serve a valid reorganizational

16  purpose.  Instead, the case exists for the sole purpose of

17  allowing the Debtor to remain in possession of the property

18  to enrich the Debtor's principal at creditors' expense.

19          Your Honor heard evidence today concerning the

20  loan that was entered into between the parties.  The loan

21  was five years interest only, loan funded an interest

22  reserve account at closing.  In April of 2020, the Debtor

23  short-paid the interest that was due and didn't make another

24  payment, and has not made another payment on account of the

25  loan since that time.  The National Bank of Kuwait applied

172

1   the interest reserve until that was exhausted in March of

2   2020 -- 2021, as was its right.  The bank then began

3   enforcement proceedings.

4           State Court litigation ensued between the parties.

5   That litigation was resolved by virtue of the settlement

6   agreement that was entered into in August of 2022.

7           At this point, I'll pause, Your Honor.  I'm about

8   to talk about some of the terms of the agreement.

9           (REDACTED SEALED portion from 4:54:06 p.m. to 4:59:00

10  p.m.)

11          MR. FITZMAURICE:  But, Your Honor, the Debtor

12  filed an adversary proceeding just before the hearing today.

13  The adversary proceeding asserts claims that are released by

14  the settlement agreement.

15          THE COURT:  Well, why do you say that?  What

16  claim would be released?

17          MR. FITZMAURICE:  Your Honor, may I

18  (indiscernible) pick up?

19          THE COURT:  Sure.

20      (Pause in the proceedings.)

21          MR. FITZMAURICE:  Well, let me say it this way,

22  Your Honor, because I would -- looking at the causes section

23  of the complaint, they appear to relate to post-settlement

24  conduct.  The allegations throughout the complaint relate to

25  pre-settlement conduct, and there are no viable claims with

1    respect to those allegations.

2         THE COURT:  Do you believe that there could be

3    some stuff that's in there that could be subject to the

4    waiver?

5         MR. FITZMAURICE:  That's right, Your Honor.

6         THE COURT:  Okay.  Go ahead.  I just wanted to

7    make sure.  Thank you.

8         MR. FITZMAURICE:  I submit, Your Honor, that what

9    has happened here is that the Debtor got an incredibly

10   generous proposal from the bank that failed to live.  It

11   failed to comply with it.  It brought litigation in State

12   Court.  It lost that litigation, making exactly the same

13   arguments.

14        THE COURT:  Go ahead.

15        MR. FITZMAURICE:  Making exactly the same

16   arguments it seeks to make here and is effectively just

17   asking Your Honor for a do-over to bring the State Court

18   litigation that it lost here in the hopes that this Court

19   would give it a different result.  That's not a valid

20   reorganizational purpose.  It's not an appropriate use of

21   Chapter 11.  It's not an appropriate use of this Court.

22        Happy to answer any questions Your Honor has.

23        THE COURT:  No questions.  Thank you very much.

24        MS. HAYWARD:  Thank you, Your Honor.  Melissa

25   Hayward on behalf of the Debtor.

174

```
1                    CLOSING BY MS. HAYWARD
2            MS. HAYWARD:  I'm going to start by saying that
3    the Debtor hasn't lost any State Court litigation.  There
4    were TRO requests that courts adjudicated, but the ultimate
5    merits of claims have never been determined by the State
6    Court vis-à-vis the Debtor (indiscernible).  So the idea
7    that the Debtor has lost litigation, some sort of res
8    judicata that this has been determined by a Court is simply
9    not accurate.
10           We're here today because this Debtor is struggling
11   and trying to protect its asset.  And I told the Court that
12   I believe very strongly in the Debtor's ability to
13   reorganize, and I believe very strongly in the provisions of
14   the Bankruptcy Code, including 506 and the treatment of
15   creditors.  I believe very strongly that a Debtor should
16   have a fighting chance as long as it's within the bounds of
17   the Bankruptcy Code.
18           So let's turn to -- and I'm going to focus
19   primarily on the motion to dismiss, because that's sort of
20   what carries the day here.  And so we have a motion to
21   dismiss in which NBK alleges that it was this case was filed
22   in bad faith.  And NBK looks to *Little Creek* and cites to
23   all the various factors.
24           And I would submit to the Court that *Little Creek*,
25   which was decided prior to Congress's creation of a single
```

1   asset real estate case, that the idea -- I know of very few

2   single asset real estate cases that are filed, that are not

3   filed on the eve of a foreclosure.  Typically, that is the

4   cause of a single asset case.

5          And so I don't dispute that this Debtor filed this

6   case to stop this foreclosure.  I don't dispute that this

7   Debtor has been involved in litigation with NBK for a very

8   long time.  But that doesn't mean that the litigation has no

9   merit.  That doesn't mean that the Debtor isn't entitled to

10  its day in court.  And I will say to the Court and I will

11  use broad terms, but I will say that clearly some of the

12  disputes between the Debtor and NBK had merit because

13  there's a settlement agreement.

14         Now was this case filed in bad faith or was this

15  case filed for a valid reorganization purpose?  Here, there

16  is a plan on file.  That plan provides value to the estate.

17  It allows the Court to determine the amount of NBK's secured

18  claim.  It allows new equity money to come in to prop up

19  this building and keep tenants happy, allow Mr. Darjean to

20  continue his great relationships with the tenants that he

21  has developed over decades.

22         There is a plan that provides full payment to

23  trade creditors who are with respect to the property.  There

24  is a plan that provides a substantial multi-million dollar

25  return to the unsecured creditors other than the property.

176

1           Your Honor has heard from Mr. Choudhri today that

2    he's willing to do what it takes because he loves this

3    building.  Right or wrong --

4           THE COURT:  He also doesn't want to get sued by

5    the estate, right?

6           MS. HAYWARD:  Your Honor, that's assuming that

7    there are claims and causes of action by the estate against

8    Mr. Choudhri.

9           THE COURT:  I totally agree.  But who's going to

10   look at them?

11          MS. HAYWARD:  Well, Your Honor, NBK is perfectly

12   capable of looking at them.

13          THE COURT:  So you're telling me the estate

14   shouldn't look at it?

15          MS. HAYWARD:  No, Your Honor.  I'm not saying that

16   the estate shouldn't look at.

17          THE COURT:  So who looks at it on behalf of the

18   estate?

19          MS. HAYWARD:  Well, Your Honor, I look at them on

20   behalf of the estate, for one --

21          THE COURT:  You can.

22          MS. HAYWARD:  -- but I certainly can't make

23   decisions.

24          THE COURT:  Who makes -- who analyzes Chapter 5

25   causes of action?

```
 1              MS. HAYWARD:  Well, Your Honor --
 2              THE COURT:  Who is going to authorize you to look
 3   at that and spend the money to go do it?  I'm not saying
 4   there's anything there.  I don't know.
 5              MS. HAYWARD:  Well, Your Honor, I guess --
 6              THE COURT:  Who analyzes that?  Where's the
 7   independence?
 8              MS. HAYWARD:  And I hear Your Honor on that.  And
 9   again, I think that the Debtor is more than -- Mr. Choudhri
10   will appoint somebody to do that, if that's what --
11              THE COURT:  If that secured creditor who's going
12   to appoint somebody to then analyze claims looking at them
13   and then pay for it, that's what you're asking, right?
14   You're saying Mr. Choudhri is going to pay for someone who
15   he selects to then analyze claims against him?
16              MS. HAYWARD:  Well, Your Honor, it can be --
17              THE COURT:  Or against any of his other entities.
18              MS. HAYWARD:  It can be a third-party selection.
19   I mean, that's --
20              THE COURT:  Who's paying for it?
21              MS. HAYWARD:  Mr. Choudhri stated he would.
22              THE COURT:  That's the problem, right?  Well, it's
23   tricky.  That's conflicts.
24              MS. HAYWARD:  Is it a conflict that because
25   Mr. Choudhri --
```

178

1          THE COURT:  Or is the best thing for me to do to

2   appoint a Chapter 11 Trustee?

3          MS. HAYWARD:  To look into perhaps an Examiner,

4   Your Honor?

5          THE COURT:  No, I didn't say examine.  I said a

6   Chapter 11 Trustee.  Who's running?  Where's the

7   independence that this estate has?  I'm not saying the

8   estate should sue Mr. Choudhri.  Mr. Choudhri hadn't told me

9   anything that warrants me jumping out there.

10          What I'm saying is there are -- your largest

11  unsecured creditor is also who has -- who has been paid over

12  $400,000 as an insider, listed on the Schedules, party to

13  one of the largest secured creditors, is also now willing to

14  fund a plan.  I don't -- I'm telling you, I'm just

15  conflicted as to where we are and what we're doing here.

16          MS. HAYWARD:  And I hear you.

17          THE COURT:  And I don't know if this is in the

18  best interest of the estate.  I don't know if I don't know

19  if the management should be managing.  Maybe they should,

20  but I don't know.  There's three years of tax debt on these

21  books.  Is that a good decision or not?  I don't -- what I'm

22  saying is I don't know what I don't know, but I don't have

23  anybody who can tell me they're going to go look at this

24  stuff and make determinations as to what is really in the

25  best interest of the estate.  I don't have it and I don't

1    know -- I don't know.  The lawsuit could have merit.  Could

2    have a lot of merit.

3             MS. HAYWARD:  Well, I'm --

4             THE COURT:  I just -- I'm concerned about the

5    conflicts here.

6             MS. HAYWARD:  And I hear Your Honor on that.

7             THE COURT:  An adversary proceeding in which two

8    out of the three parties, are all entities are owned by

9    Mr. Choudhri.  Who's representing the estate in that

10   lawsuit?   Is that the estate initiated the lawsuit?

11            Who made the decision on behalf of the estate to

12   file the adversary?   That's the problem that we've got.  I

13   don't know.  I don't know if the Debtor should be a part of

14   the adversary.  Maybe they should, maybe they shouldn't.  I

15   don't have an independent.  I do know that everywhere

16   Mr. Choudhri drafts the plan, Mr. Choudhri is involved in

17   the drafting of the plan.  The largest unsecured creditor,

18   an insider, is drafting the plan.

19            MS. HAYWARD:  Your Honor, insiders are always

20   involved in drafting the plans.

21            THE COURT:  No, no, no.  Not potential cause of

22   action.  No, not like this.  No, they don't.

23            MS. HAYWARD:  Your Honor, I mean, is the issue

24   that Mr. Choudhri is a creditor?

25            THE COURT:  There's a lot going on.

1          MS. HAYWARD:  I mean, because if Mr. Choudhri is

2   being a creditor is the problem, then -- but Mr. Choudhri is

3   also equity, right?  So equity typically will be controlling

4   a Debtor-in-Possession.  So I understand what the Court is

5   saying, but I also struggle with it.

6          THE COURT:  No, you don't.  Ms. Hayward, we don't

7   have an independent.  We don't have an independent here.  We

8   don't have any independents here.  That's what different

9   that's the difference between this case and every other

10  case.  That's the difference between this case and every

11  other case of this size and magnitude.

12         Smaller cases, I got it.  You know, you got a

13  small Debtor who's involved and they may owe him this kind

14  of money, but management, Debtor, finances, everything

15  involves.  I don't feel comfortable.  I don't feel

16  comfortable with the books.  I don't feel comfortable with

17  anything that I'm seeing.  This -- we got a problem here,

18  and I'm not comfortable.

19         MS. HAYWARD:  And I hear, Your Honor, and I don't

20  know how to remedy that.

21         THE COURT:  In other words, you know, did

22  Mr. Choudhri draft the plan?  I don't even want to put

23  Mr. Darjean on the stand.  I didn't want to.  He's a good

24  man.

25         Oh, did the Debtor -- is this plan is in the best

181

1  interest?  I don't know.  But maybe that's not the test for

2  today either, right?  It doesn't mean that you have to --

3  all that is for another day.

4           The question is:  Is there a plan capable?  Do we

5  get from A to B?  And the question is who's going to pay for

6  it?  And you're telling me that it's the largest unsecured

7  creditor who's going to make an equity infusion into it.

8  He's willing to do it.  I'm not comfortable with that.

9           MS. HAYWARD:  For current equity he's willing to

10  do it.  Again, I struggle with this concept that there's a

11  difference between because he's a creditor or because he's

12  equity.

13          THE COURT:  Is there a potential causes of action

14  against Mr. Choudhri?  He's involved in every one of these

15  pieces of litigation.  He signed documents.  He's also

16  suing.  This isn't it -- this is more.

17          MS. HAYWARD:  Your Honor, how is this any

18  different from any other business in which equity is

19  controlling the Debtor?

20          THE COURT:  How many times do you have a

21  confidential settlement agreement involving three parties?

22  Two out of the three are involved with this amount of money.

23  Causes of actions is flowing.  What this case does benefit

24  for sure is allow current equity to try to keep the company.

25  That's what this plan is designed to do.

1             MS. HAYWARD:  Yes, Your Honor.

2             THE COURT:  Is that in the best interest of the

3    estate?  I don't know.  We don't have an independent here.

4    This is different than Subchapter 5.  Single asset real

5    estate case and I got it.  But there are conflicts

6    everywhere, and I'm concerned about the conflicts.

7             I'm concerned about what I've heard about why

8    we're here and how we got here because that's what makes

9    this case different.  I got it.  You're telling me that a

10   single asset, real estate market went bad, COVID went bad.

11   The company went in.  The current owner is there.  He's an

12   equity holder.  I got it.  Is that what we have here?

13            MS. HAYWARD:  Well, what Your Honor heard is that

14   COVID happened, and the largest tenant filed for bankruptcy.

15   The building was vacant.  I mean, obviously, the financial

16   struggles of the Debtor are understandable in light of the

17   current financial situation of the world and the posture of

18   where things were.  I mean, so it shouldn't be surprising

19   that this Debtor has not cash flowed for a while.  And when

20   Stage Stores, which occupies the vast majority of the

21   building, files bankruptcy and rejects that lease, you have

22   a vacant building.

23            THE COURT:  That's not what this Debtor filed.

24   That's not why you all told me this Debtor filed.

25            MS. HAYWARD:  No, no, no.  That's not why this

183

1  Debtor filed today.  But that is when Your Honor says we

2  look back to 2020, 2021, 2022 tax debt.  We look back, we

3  see that there is a vacant -- there's property that's been

4  largely vacant for a long time, and the Debtor has

5  endeavored to lease that property up.  There are costs

6  associated with that.  The Debtor has carried those costs,

7  or at least the equity of the Debtor has carried those

8  costs.

9           THE COURT:  Was it right for Jetall to make

10  payments to itself and not pay any of its taxes?

11           MS. HAYWARD:  But, Your Honor, there's no --

12           THE COURT:   On behalf of the property management

13  company?

14           MS. HAYWARD:  But there's no testimony -- there's

15  no evidence here before this Court as to what those payments

16  were for.

17           THE COURT:  I didn't say they were

18  (indiscernible).

19           MS. HAYWARD:  Those payments could have been for,

20  you know, the HVAC guy.  Those payments -- so, again, we're

21  making assumptions.

22           THE COURT:  I'm not making any assumptions.  I'm

23  just asking why for three years there hasn't been any tax

24  payments.

25           MS. HAYWARD:  Because the property has been

1    operating at a loss.

2            THE COURT:  That's not what you're telling me

3    today.

4            MS. HAYWARD:  That is what I'm telling.  Your

5    Honor, I am absolutely saying the property has been

6    operating at a loss.  The property -- the plan requires

7    $2.5 million of new equity to come in order to get the

8    property to cash flow.  The property clearly operates at a

9    loss.  The tax loans was a way to finance and avoid having

10   to pay giant amounts because you can get tax loans right to

11   and pay interest on them.

12           THE COURT:  Sure.

13           MS. HAYWARD:  So it is a type of financing, a type

14   of capital financing.  So I don't -- it's not any -- this is

15   something that's pretty common, I think, in the single asset

16   real estate world, especially in a COVID world where you

17   have an office building that's struggling with its vacancy

18   rates.

19           THE COURT:  Yeah.

20           MS. HAYWARD:  And so, Your Honor, I submit to the

21   Court that I hear Your Honor's issues.  I do.  I hear Your

22   Honor's concerns.  But we're here today on a motion to

23   dismiss whether this case was filed in bad faith and whether

24   or not there's a prospect of reorganization.  I would submit

25   to the Court that the answer to both of those questions is

1  no.

2        The case was not filed in bad faith.  The case was

3  filed to maintain the property, allow current equity a

4  fighting chance to save the property from foreclosure, and

5  it was filed and there is a viable plan on file.  Now,

6  whether that viable plan on file ultimately gets confirmed

7  is a fight for another day.  But --

8        THE COURT:  You have the cash, Ms. Hayward.  What

9  if I deny the motion, but don't let you use any cash?   What

10  are you going to do?

11        MS. HAYWARD:  Mr. Choudhri is going to have to

12  decide whether he's going to fund money into the Debtor.

13        THE COURT:  I'm not letting Mr. Choudhri put any

14  money into this estate until I have independence.  It's not

15  going to happen.  Either we have independence or we don't.

16  That's the problem that you've got.  And I keep saying it,

17  and I'm not saying you've done anything.  You've been you've

18  been as admirable as they come, but no one is going to put a

19  dollar into this estate until there's independence, until I

20  know why it is.  If Mr. Choudhri puts money in, he's going

21  to say he's going to be certainly entitled to certain rights

22  in connection with putting up the money.

23        MS. HAYWARD:  What if Mr. Choudhri decides that he

24  believes this much in this property, and he cares this much

25  about this property that he is willing to put in capital.

1  That is not an admin claim, that is not a claim against the

2  estate.  It is simply equity.

3          THE COURT:  The real question is whether, not

4  really dismissal, but whether to appoint a Chapter 11

5  Trustee.  That gets Mr. Ruff involved.  And then he goes and

6  finds somebody, but then they start running the business.

7  And that's the problem.  I'm not sure that makes sense.  I'm

8  not sure it's in the best interests of the estate.  That

9  gives me independence.

10          MS. HAYWARD:  Well, if Your Honor appoints a

11  Chapter 11 Trustee, then there is no money, right?

12          THE COURT:  I don't know who's going to pay for

13  it.

14          MS. HAYWARD:  That's right.  Then there is no

15  money.

16          THE COURT:  Then we're back to dismissal or

17  conversion.  I don't think conversion gives me independence.

18  I'm not sure that makes much sense either.  That's where we

19  are.  We got a problem here.

20          I see your point, but it feels different.  It is

21  different.  And a single asset owner putting in -- coming

22  in, putting a company into bankruptcy to save a foreclosure

23  and wants a chance to try to pay off.  Is that -- this is

24  different because the owner is also the manager.  He also is

25  also one of the largest secured creditors.  He also -- the

1   owner is also party to a settlement agreement.  That's not

2   typical.

3           MS. HAYWARD:  Your Honor, I respectfully think

4   when you're dealing with companies like Jetall and real

5   estate people, right, Gene Phillips in Dallas with

6   Transcontinental, I mean, this is real estate investors.

7   This is sort of a model, right?  I mean, this is not

8   uncommon for a real estate investor who has a portfolio of

9   real estate assets to have an insider management company.

10          THE COURT:  Completely agree.

11          MS. HAYWARD:  It's not uncommon for them to have

12  funded money and be owed money.

13          THE COURT:  Completely agree.

14          MS. HAYWARD:  It's not uncommon for them to fight

15  for their equity.  So I really.  I hear you, Your Honor.

16  But I respectfully disagree that this is different from any

17  other typical conglomerate type real -- single real estate

18  -- asset real estate case where ultimately equity is the one

19  making decisions.  Equity is the one proposing and deciding

20  what the plan looks like.  Whether they're owed money by the

21  Debtor or not, debt gets subordinated to insiders all the

22  time.  So the fact that Mr. Choudhri is a creditor --

23          THE COURT:  Okay.  But someone's going to have to

24  investigate claims here.  No getting around it.  I don't

25  know what's going to do it.  I'm not comfortable.  I'm not

1   saying there's anything there, but someone has to look,

2   someone has to look under in every case.  And I got it.

3   Sometimes there's no need to investigate in real estate

4   conglomerate cases.  You don't have the hair that this case

5   has.  There are potential claims and causes of action.

6   There's no one to look at them.  And that gives me some

7   concern.  I don't know what I don't know, and I'm concerned.

8           MS. HAYWARD:  Well, the Debtor, I think, has the

9   obligation to analyze causes of action, clearly.  And Your

10  Honor knows from private practice that much of the work of a

11  plan, for example, is also done through counsel.  Much of

12  that investigation is done with counsel, and there has to be

13  disclosures and a Disclosure Statement regarding.

14          Now we're talking about transfers to a management

15  company that are listed and disclosed in a SOFA.  That is

16  not something uncommon when you have an insider management

17  company.  And I understand Your Honor, I hear Your Honor,

18  but also when there is a plan in place that provides

19  substantial value to creditors.  Many times Debtors,

20  especially closely held Debtors that are -- have common

21  management and insider management, do not pursue those.  And

22  they put enough money in.

23          This plan has 2.5 million coming in and proposes

24  millions of dollars of payments over a ten-year term to

25  creditors.  And there can be no question that this Debtor

1   has not cash flowed for a very long time.

2              THE COURT:  Yes.

3              MS. HAYWARD:   I mean, that is the evidence before

4   the Court.  The evidence before the Court is that Stage

5   Stores filed bankruptcy at the beginning of COVID, and it

6   destroyed the vacancy at the property and that it has been

7   slowly been built up.

8              THE COURT:  It's a different story.  There's a

9   different story here and you know it if you're really good.

10             MS. HAYWARD:  Your Honor, the different story,

11  there's no evidence to the different story.  There's no

12  evidence.  This is conjecture to a different story.

13             THE COURT:  (Indiscernible).

14             MS. HAYWARD:  There's nothing before this Court

15  right now other than $400,000 paid to a management company,

16  a property management company for a Debtor that has been

17  managing this property.

18             THE COURT:  Do you really want me to go there?

19  Do you really want me to go there?

20             Is that really all there is?

21             MS. HAYWARD:  Your Honor only knows what Your

22  Honor knows, right?

23             THE COURT:  Sure.

24             MS. HAYWARD:  That's presented in the Court.

25             THE COURT:  Oh, no, I'm not talking about it.  I'm

1    just throwing my stuff on the Record.

2            MS. HAYWARD:  No, no, no, no.  And that's what I'm

3    saying.  But Your Honor, on the Record, only gets what

4    parties present to you on the Record.

5            THE COURT:  That's all I got.  It's all I'm

6    talking about.

7            MS. HAYWARD:  And there are always more details

8    that don't come in.  There are always more stories to be

9    told.  Your Honor gets a snapshot today in a few hours of a

10   dispute that has been going on for a very long time.  And so

11   I just -- I would ask Your Honor to keep that in mind when

12   Your Honor makes a decision here today.

13           That what Your Honor has before you are leases,

14   Your Honor has a property that appears to be improving.

15   Your Honor has a property.  Your Honor can clearly see.  I

16   mean, even just if Your Honor takes Mr. Dward's testimony

17   here today -- Mr. Darjean's testimony.  This property has

18   been -- there are people that care about this property.

19   There are people who have been trying to keep this property.

20           This is -- when Your Honor looks to the evidence,

21   Your Honor sees that there is a dispute between the Debtor

22   and its secured creditor that, yes, this property is managed

23   by insiders.  Yes, there's a lot of debt with respect to

24   this property, but that's no different than what's going on

25   with every single office building across this country.

1          THE COURT:  That's where we disagree.  I only know

2    what I only know, right?

3          MS. HAYWARD:  Yes, Your Honor.

4          THE COURT:  And you can't make that statement,

5    either.  It's going to stick to the Record.  I mean, where

6    you can have the cash to get to the next 60 days and find

7    somebody who's independent.  Where's that money coming from?

8    And it's not coming from Mr. Choudhri.  Tell me where the

9    money is going to come from.

10          MS. HAYWARD:  Money to fund the property and money

11    to fund an independent person to review, I mean, Your Honor,

12    the only money available is from equity.  I mean, that's --

13          THE COURT:  And why not?

14          MS. HAYWARD:  So if equity is not able to pay

15    for --

16          THE COURT:  Likely

17          MS. HAYWARD:  An independent person, then there it

18    -- Your Honor has posed a question that has no answer or at

19    least no acceptable answer that I can give.

20          THE COURT:  I don't know who's looking out for

21    Galleria 2425.  I know who's looking out for equity.  But I

22    don't know who's looking out for Galleria 2425.  That's the

23    problem I've got.  I don't know who's looking out for

24    Galleria 2425.  Every transaction that's being described in

25    this plan benefits not just the insider at 2425, but other

1   entities related to Galleria 2425 that are owned by

2   Mr. Choudhri, right?   It's different.   Right?

3           MS. HAYWARD:   Why?   I'm not sure I understand Your

4   Honor's -- Mr. Choudhri stated that he would subordinate or

5   waive all of that.

6           THE COURT:   He didn't say that.   He would -- yes,

7   he would.   Owed him $1 million.   I would subordinate a

8   million dollar claim if I got to keep a company, too.   It's

9   -- in other words, maybe the $2 million ought to be coming

10  from other places, and maybe they shouldn't.   But Debtors

11  have to be Debtors.   I don't have independence here.   I'm

12  troubled.   I'm just telling you, I'm troubled.

13          MS. HAYWARD:   And Your Honor, I hear Your Honor on

14  that.   And I guess the only thing I can say is that in every

15  small business case or closely held --

16          THE COURT:   And I deal with a bunch of them.

17          MS. HAYWARD:   -- there's never that independence.

18  It's always the Debtor being controlled by equity.   It is

19  always equity making decisions.   And so I just -- I struggle

20  to see how this is any different.

21          THE COURT:   Okay.   Thank you.

22          Does anyone else wish to address the Court?

23          MR. FITZMAURICE:   Nothing further from National

24  Bank of Kuwait, Your Honor.

25          THE COURT:   Okay.   Maybe about 10 minutes.   I'll

193

1   come back at 5:45, and I'll give you a decision.  Thank you.

2            THE COURT OFFICER:  All rise.

3        (Court in recess from 5:26:55 p.m. to 5:57:01 p.m.)

4            THE COURT OFFICER:  All rise.

5            THE COURT:  Please be seated.

6                        COURT'S RULING

7            THE COURT:  All righty.  Appreciate everyone's

8   arguments.  I appreciate the patience of everyone here.  I'm

9   going to take -- answer.  I'll talk about both motions at

10  the same time.  The motion to dismiss the case filed at --

11  in connection filed by the Bank of Kuwait in connection with

12  this case, I'm going to find there's been proper notice and

13  consideration of the -- of the motion before the Court, as

14  well as the final cash collateral -- final use of cash

15  collateral.  We're talking about case Number 23-60036.  The

16  original motion was filed on July 20th.

17            There's been more than proper notice.  Numerous

18  stipulations between the parties.  I'm going to find that

19  this is a core proceeding under 28 USC 157.  Court has

20  jurisdiction under 28 USC 1334.

21            The Court has considered the evidence presented

22  before the Court, and I'm going to talk a little bit about

23  the motion to dismiss and then dovetail into the cash

24  collateral motion.  I'm going to cite a little law and then

25  we'll kind of get into the evidence.  The Movant here

194

1   basically seeks dismissal of the bankruptcy cases under

2   Section 1112(b) of the Bankruptcy Court -- Bankruptcy Code.

3          The Court has authority to -- says that the Code

4   says the Court shall dismiss the case under cause unless the

5   Court determines that the appointment of a Trustee under

6   Section 11404 or an Examiner is in the best interest of the

7   estate.  1112(b)(4) contains what's considered a non-

8   exclusive list of what constitutes cause for purposes of

9   dismissal.

10          But the Fifth Circuit in the *Little Creek*

11   decision, Fifth Circuit, 1986 case 7791068, and also note

12   that the *Humble Place Joint Venture*, 936 F.2d 814, Fifth

13   Circuit 1991 case, basically says the term cause gives the

14   Court flexibility to Bankruptcy Courts and can include a

15   finding that a filing has been in bad faith.  So that's kind

16   of where we are.

17          The textual definition just provides cause in and

18   of itself.  It provides the Court flexibility after a Movant

19   has satisfied initial burden of a prima facie showing of a

20   lack of good faith and the burden would shift to the Debtor

21   to demonstrate good faith.

22          There's also been a lot of talk -- also inside and

23   outside of this District in connection with using the term

24   valid reorganization purpose, or if there is a good faith,

25   there's a valid bankruptcy purpose.  That's the term some

1   courts have used.  There's been a lot of that discussion in

2   connection with *Arrow* and *LTL* in terms of kind of the

3   standard.  If I do find that there's cause, the Code

4   determines that I got to dismiss the case unless the

5   appointment of an Examiner is in the best interest of the

6   estate.

7           So we didn't turn to the evidence that was

8   presented to the Court.  The Court has considered in

9   connection with the motion to dismiss the event presented by

10  Mr. Carter.  Mr. Carter testified as to a lack of payment

11  that has been made in connection with this, and there's a

12  settlement agreement that is public that's in connection

13  with an adversary of the terms of it are under seal.  I'm

14  just saying that this area is public knowledge that there

15  was a settlement between Mr. Choudhri, the mezzanine lender,

16  and the Debtor here and the bank.

17          And then there was a default.  And there have been

18  -- there's been testimony and I haven't seen any evidence of

19  it.  But there was testimony about TROs that were entered in

20  connection and that the bankruptcy case was precipitated

21  upon July 3rd deadline to make a payment.  If not, there

22  would be a foreclosure on July 5th.  And that's kind of

23  where we are.

24          Mr. Carter testified primarily about the debt and

25  his understanding about the debt and their desire about what

1   he would do if -- which would be seek to foreclose.

2          That was the evidence that was presented here in

3   connection with this.  I thought Mr. Carter was incredibly

4   credible and there certainly is an outstanding debt.  It's

5   also reflected in the Debtor's Statement of Financial

6   Affairs that there is a debt owed to the bank and that there

7   is a tax lien that as well and other secured debt.  The

8   Court itself inquired about Chapter 5 causes of action,

9   expressed concerns about independence in a -- in this case

10  and whether there is someone truly looking out for the

11  estate.

12          Testimony that the Court heard on behalf of

13  Galleria 2425 noted that there is a plan on file and the

14  plan does propose to treat all classes of claims in

15  connection with the case and as well as make an equity

16  infusion by a third party who is an affiliate of -- I think

17  for me, there may be -- the Record is unclear to me whether

18  it's an affiliate of Mr. Choudhri and Mr. Jetall or Jetall.

19          But I think -- I'm not sure it might be a

20  distinction without a difference.  I just know for the

21  Record that I'm just very well the Court is hazy on it, but

22  it's an affiliate of one -- of either Mr. Choudhri or

23  Jetall.  So there's also issues, matters represented with

24  respect to the use of cash collateral.  There's a budget.

25  The Court expressed concerns about the budget.  And that's

1  kind of the scope of the evidence.

2       So I don't -- but I don't think there's any

3  dispute that there were State Court litigation and that

4  there was a settlement agreement to pay a sum and that sum

5  was not paid.  And then the Debtor filed for bankruptcy and

6  the bank was entitled to seek foreclosure.

7       And there's a plan on file that has been signed.

8  There's also litigation and adversary proceeding that has

9  been commenced.  The question is, you know, is there a

10  bankruptcy purpose, right?  Let me just use that to the

11  extent that constitutes cause as a factor.

12       I note a couple of things.  I pushed Ms. Hayward

13  on transparency in connection with this case.  I don't have

14  any evidence of fraud.  I don't have any evidence of -- I

15  don't have anything that just jumps out and says, boy,

16  things have gotten bad.  And I got someone who didn't pay --

17  a couple of folks who didn't pay and they don't deny it.  I

18  don't have fraud or strong allegations of fraud.

19       Well, what I would call bigger fraud or little

20  fraud.  And there's no -- there -- I don't have evidence as

21  well of gross mismanagement by the management company.

22  There certainly is something to be looked at if Jetall is

23  not paying rent.  Maybe they're supposed to, maybe they're

24  not.

25       I think Mr. Darjean, he hasn't done anything

198

1    wrong.  I haven't heard anything that he's been doing

2    anything.  There are payments to insiders.  I don't have any

3    evidence that any of that constitutes bad faith or sometimes

4    those -- as there's testimony, at least on the Record, that

5    those payments could be the result of pass-through.  I don't

6    know if it's true or not, but they don't have anything that

7    just because there were a number of payments and I do know

8    that there are -- they're in -- the sequence of them seems

9    to signify that there are certain pace that in and of

10   itself.

11          Probably something Mr. Ruff will ask for at the

12   341 hearing and stuff.  And I'm not sure I don't have

13   evidence that there's been just flat out fraud here or

14   mismanagement.  So you know, when I look at bankruptcy

15   purpose that the Debtor is proposing is saying -- they're

16   saying they want to put a plan together.  And then they want

17   to -- they put one.  They want to kind of go relatively

18   quickly and try to get a hearing and see if they want to go.

19          If there's is a bankruptcy purpose, I think

20   foreclosure -- failure to file on the eve of foreclosure in

21   and of itself, can certainly be looked at.  It feels like in

22   some instances this is a two-party dispute, but in some

23   instances, it's not.  There's a tax lien out there and it

24   has significant funds.  I am concerned about the lack of

25   payment for it and why it wasn't paid.  And I haven't heard

1   an answer.

2         I didn't get any testimony elicited that it was

3   mismanagement on behalf of -- or that there was some

4   litigation tactic or something.  I'm just making something

5   up.  I didn't hear anything.  I just know it wasn't paid.

6   But that's all I've got.

7         So I don't have enough evidence to dismiss this

8   case at this time.  I'm going to say a couple of things.  I

9   think there's a -- when you look at the *Little Creek*

10   factors, to the extent that I don't think there's cause and

11   I just want to be really careful with -- there's certainly

12   history here.  But I don't think that there's sufficient

13   cause.  And I got a lot of flexibility here.

14         Maybe there's something there, but maybe there's

15   not.  That's what I've got to kind of -- I'm going to go

16   there.  There are certainly factors, but I think factors in

17   every case are different.  I think we just have to kind of

18   look at that and say what it is.

19         I think Mr. Carter testified credibly that there

20   is a debt.  There's a debt owed and that the debt has not

21   been paid and that there was a settlement agreement and that

22   there was a default under the settlement agreement and the

23   Debtor filed for bankruptcy.  All right, that's what I've

24   got.

25         I do have that Jetall is everywhere.  And

1  Mr. Choudhri is everywhere on these documents in some sense

2  or another.  I don't have enough today to get me

3  comfortable, but when it comes to -- so I'm going to deny

4  the motion to dismiss without prejudice.

5         If I find out that I get uncomfortable and say

6  what you already know, that I'm already on edge.  I won't

7  hesitate to convert the case or do something on my own and I

8  have the authority to do it.

9         We're just not there.  We had enough today.  There

10  is a plan on file, but no one challenged the plan.  No one

11  challenged the filing.  It's in the pleadings, but it's not

12  in evidence in terms of the ability to make the payments and

13  the feasibility.  None of that got challenged.

14         Oh, I know I've got to rule based upon the

15  evidence that's in front of me.  I do need you all to think

16  about a couple of things.  I think cash collateral continues

17  to give me a great amount of concern.  I think the use of

18  cash collateral should be restricted only to the necessary

19  cost to maintain the estate.  It's not going to be a carve

20  out and I won't approve a carve out.  And that gives me a

21  lot of concern.

22         Let's say what -- I don't know how anybody's going

23  to -- I don't even want to talk about litigation in the

24  adversary proceeding until someone tells me how it's going

25  to get paid.

1          We talk a lot about Mr. Choudhri putting in more
2   money and whether he's comfortable doing that.  I thought
3   about that, a lot.  And here's what I'm willing to do.
4   Mr. Choudhri can put in the money, if he wants to.  But I
5   think you all got to get comfortable with one thing for me,
6   and I'm not going to move off of this because I think it's
7   the right answer under the Code.  The Debtor is proposing a
8   plan in which there's equity, in an equity infusion of
9   $2.5 million.  That's got to get market tested by an
10  independent person.

11          I don't know if somebody wants to come in and put
12  a lot of money.  And if they do, someone's going to have to
13  tell me.  You may say.  But that's what I think that's the
14  interesting part.  I think that's going to come on your end.
15  Someone is going to have to market-test this.  You know, no
16  one's just going to get a free ride to come get to run this
17  plan up because I don't know if this time.

18          Maybe somebody wants to put $10 million.  Maybe
19  somebody wants to buy this building.  Maybe they think
20  Jetall should run the building.  Maybe they think they
21  shouldn't.  I don't know.  I'm just saying that if equity is
22  going to get wiped out and somebody is going to come in and
23  get put $2.5 million, I know somebody's going to have to
24  really market test that for me and tell me that that's
25  really that can be done.

202

1           And then somebody's going to have to prove to me,
2    and if there's an 1111(b) election that may or may not come,
3    that those payments can get made under the plan and that
4    this case really can -- this plan really can be feasible.
5    But the market testing by an independent, I'm not
6    compromising on that because I think that's what the Code
7    would demand.
8           If equity is not receiving anything and if
9    creditors aren't getting paid 100 percent in full.  That's
10   the price of it.  Creditors aren't going to get paid in full
11   and somebody's going to put in money.
12          We got to get the most.  And if somebody wants to
13   buy this building and I don't know if anybody does,
14   everything may be negotiated, but somebody's going to have
15   to convince me that this is market tested.  And if
16   somebody's going to have to convince me that there's enough
17   money to fund even potential litigation and just see what
18   that feels like, a State Court litigation to me when I got
19   there.
20          So this case continues, but the case continues
21   under really tight timelines and under really strict costs.
22   And I don't like the position that I put you in.  I just
23   don't.  I don't like the position I put others in.
24          I do know as we get closer to the 90 days, they
25   didn't raise it, but someone's going to have to start

1  talking about interest payments and where this goes on the

2  debt.  If this case -- I know there's a plan on file and I

3  know what the Code says.  I got to make sure if we get there

4  in the next two months that there's really, really a good

5  market test, and a true independent looked at this.

6          You know, somebody wants to go buy this.  I don't

7  know if they do or not, but there's an estate here.  And

8  that's going to be the challenge.  I think that's where I

9  think the true independence would come from here and not

10 whether this Chapter 5 cause of action.  I think people can

11 look into that, Mr. Ruff give us 341.  He's got his set of

12 questions and I don't get involved in 341 US Trustee stuff.

13         But I think we all need to meet in the next 30

14 days and kind of see where we are.  And I'll let my case

15 manager get a date for you all.

16         So I got -- things have broken down the

17 communication for obvious reasons.  And I think some people

18 are really going to do what I -- what I'm talking about

19 doing, what I'm talking about, what I think the Code

20 requires.  I think it's going to require communication, at

21 least between the lawyers.  That's at least for the next

22 30 days.  Everyone's in it.

23         You-all can sit around and fight whether there's

24 going to be a valuation fight or not.  But I do have

25 unsecured creditors that aren't going to get paid in full.

1    And that's the challenge of the plan.  They weren't -- I'm

2    just telling you now.  That's inside and outside of 1111B.

3    It's going to have to get a good test and you're going to

4    have to figure out how to do that and get me comfortable

5    that it's truly, truly, truly independent and it says

6    someone is going to let people know that there's a building

7    that people can put a lot of money into and figure out what

8    they want to do.

9         Maybe nobody shows up.  But if somebody does, then

10   I think it's going to create a market and maybe the market

11   is there, maybe it's not.  That's why I just need to -- I

12   don't know what I don't know.  But I do know based on the

13   evidence today, it's not enough cause to dismiss this case.

14   But I do know we're going have to really look at those

15   payments and that's probably going to require a level of

16   transparency.

17        And maybe we can all meet in about 30 days and see

18   what this case really goes in the same way.  It's just a --

19   It's an extension.  I don't really know what I'm going to do

20   yet, but I do know what I'm not doing today.  And that's

21   dismissing the case on the use of cash collateral.

22        I think I'm looking at your budget.

23      (Pause in the proceedings.)

24        THE COURT:  This budget works.  But if you start

25   firing up the adversary, it doesn't.  And that's the problem

 1   you got.

 2          MS. HAYWARD:  I'm sorry.  Your Honor, I didn't

 3   hear that.

 4          THE COURT:  If you start firing up stuff on the

 5   adversary and start really pushing, and we start getting

 6   into scheduling and fights about the adversary proceeding.

 7   And then the budget, in my opinion, doesn't work.  And

 8   that's so -- that's why I'm saying we need to take a look in

 9   the next 30 days and I -- that's going to require you to do

10   real work.  That's going to require other people to do real

11   work.

12          And that's why I'm saying you-all need to -- I'm

13   not asking you to agree.  What I am asking is over the next

14   30 days how this can be done independently reviewed.  To

15   determine whether it's an independent assessment that needs

16   to get done.  And I'm not talking about just Chapter 5.  I'm

17   talking about just the plan that you have on file, if you

18   really want to go, and you want to go at a fast pace.

19   That's the thing that you're going to have to really look

20   into.

21          And you will also going to have to convince me

22   that anything you're giving up, that you look at it, and it

23   makes sense, to give up.

24          So that's my ruling.  You-all have a good day.

25          MS. HAYWARD:  Thank you, Your Honor.

1          THE COURT CLERK:  All rise.

2       (Proceeding adjourned at 6:18:32 p.m.)

3                    *  *  *  *  *

4           *I certify that the foregoing is a correct*

5    *transcript to the best of my ability produced from the*

6    *electronic sound recording of the proceedings in the above-*

7    *entitled matter.*

8    */S/ MARY D. HENRY*

9    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

10   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

11   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

12   *JTT TRANSCRIPT #67707 REDACTED*

13   *DATE:  OCTOBER 20, 2023*

14

15

16

17

18

19

20

21

22

23

24

25

## Exhibit 4

**November 1, 2023 Hearing Transcript**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 23-60036-11 |
| | § | HOUSTON, TEXAS |
| GALLERIA 2425 OWNER, LLC, | § | WEDNESDAY, |
| | § | NOVEMBER 1, 2023 |
| DEBTOR. | § | 10:04 A.M. TO 11:40 A.M. |

**STATUS CONFERENCE**

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                          SEE NEXT PAGE

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

**APPEARANCES:**

| | |
|---|---|
| FOR DEBTOR, GALLERIA 2425 OWNER, LLC: | HAYWARD, PLLC<br>Melissa S. Hayward, Esq.<br>10501 N. Central Expressway<br>Suite 106<br>Dallas, TX 75231<br>972-755-7100 |
| FOR NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH: | PILLSBURY WINTHROP SHAW PITTMAN<br>Charles C. Conrad, Esq.<br>909 Fannin Street,<br>Suite 2000<br>Houston, TX 77010<br>713-276-7626 |
| | PILLSBURY WINTHROP SHAW PITTMAN<br>Patrick Fitzmaurice, Esq.<br>Kwame Akuffo, Esq.<br>31 West 52nd Street<br>New York NY 10016<br>212-858-1171 |
| FOR THE US TRUSTEE: | OFFICE OF THE US TRUSTEE<br>Jayson B. Ruff, Esq.<br>515 Rusk Avenue, Suite 3516<br>Houston, TX 77002<br>713-718-4650 |
| FOR ARI CHOUDHRI: | AKIN GUMP STRAUSS HAUER & FELD<br>Jim Wetwiska, Esq.<br>1111 Louisiana Street<br>44th Floor<br>Houston, TX 77002<br>713-220-5899 |
| FOR NAISSANCE GALLERIA, LLC: | ATTORNEY AT LAW<br>David Tang, Esq.<br>9801 Westheimer Road<br>Houston, TX 77042<br>832-287-3227 |
| | THE POPE LAW FIRM<br>James Q. Pope, Esq.<br>6161 Savoy Drive, Suite 1125<br>Houston, TX 77036<br>713-449-4481 |
| ALSO PRESENT: | Sarah Cox |

1          **HOUSTON, TEXAS; WEDNESDAY, NOVEMBER 1, 2023; 10:04 A.M.**

2               THE COURT:  All right.  Good morning, everyone.

3     This is Judge Lopez.  I'm going to call the 10:00 a.m. case.

4     Today is November 1, you know, 23-60036, Galleria 2425 Owner,

5     LLC, here on a status conference, an application to employ,

6     and I'm sure other stuff.  Why don't we just take appearances

7     in the courtroom, and then we'll continue?

8               MS. HAYWARD:  Good morning, Your Honor.  Melissa

9     Hayward here for the Debtor.

10              THE COURT:  Okay.  Good morning, Mr. Hayward.  Good

11    to see you.

12              Mr. Ruff, good morning.

13              MR. RUFF:  Good morning, Your Honor.  Jayson Ruff on

14    behalf of the United States Trustee.

15              THE COURT:  Good morning.

16              MR. CONRAD:  Good morning, Your Honor.  Charles

17    Conrad on behalf of National Bank of Kuwait, along with

18    (indiscernible).

19              THE COURT:  Good morning to both of you.

20              MR. WETWISKA:  Good morning, Your Honor.  I'm Jim

21    Wetwiska, Akin Gump.  I am here for Mr. Choudhri, and I don't

22    know if I'll need to speak, not speak today.  But as I've

23    witnessed in this proceeding and other proceedings that some

24    of these lawyers are involved in, you don't know how things

25    are going to unfold.  So I'm just here today --

4

1          THE COURT:  In his personal capacity?

2          MR. WETWISKA:  In his personal capacity.  And I've

3     represented him in his personal capacity in the underlying --

4     well, not in his personal capacity, but I was involved in the

5     underlying lawsuit.

6          THE COURT:  The State Court litigation?

7          MR. WETWISKA:  Yes.

8          THE COURT:  Okay.

9          MR. WETWISKA:  So in the State Court litigation

10    between Galleria 2425 and the Bank of Kuwait.

11         THE COURT:  Oh, that underlying lawsuit.

12         MR. WETWISKA:  That underlying case.

13         THE COURT:  Got it.

14         MR. WETWISKA:  So I'm --

15         THE COURT:  There's another one out there with

16    Naissance and I just wanted to be sure --

17         MR. WETWISKA:  Exactly.

18         THE COURT:   -- just wanted to make sure I was

19    clear.

20         MR. WETWISKA:  I'm not involved in the Naissance and

21    I'm not a counsel for Naissance, and frankly I see that there

22    is competing people claiming they are counsel for Naissance,

23    which is a motion that was filed yesterday too.

24         THE COURT:  Yeah.

25         MR. WETWISKA:  So I may be able to get some

5

1    clarification of that also.

2              THE COURT:  Okay.  Perfect.  Thank you very much.

3              MR. WETWISKA:  Thank you, Your Honor.

4              THE COURT:  Anyone else on the line with to make an

5    appearance?

6              MR. TANG:  Your Honor, this is David Tang for

7    Naissance Galleria.  I'm just observing today, but I saw

8    Mr. Wetwiska make an appearance.  So I'm just observing, but

9    if the Court has any questions regarding the Naissance part of

10   it today, I'm here to answer it if you need me, Your Honor.

11             THE COURT:  Thank you very much.  I do have a couple

12   of questions.

13             MR. TANG:  Yes, Your Honor.

14             THE COURT:  You know, we're just here on a status

15   conference on some of this stuff and so I need to kind of

16   understand.

17             Anyone else wish to make an appearance?

18             MS. COX:  Sarah Cox, Your Honor, appearing on behalf

19   of (indiscernible).

20             THE COURT:  Okay.  Good morning.

21             Anyone else?

22             MR. FITZMAURICE:  Good morning, Your Honor.  Patrick

23   Fitzmaurice also on the line from Pillsbury for National Bank

24   of Kuwait.  And also on the line with me is my colleague,

25   Kwame Akuffo also from Pillsbury for National Bank of Kuwait.

6

1              THE COURT:  All right.  Good morning.

2              Okay.  Why don't we -- yes, that's the smart thing,

3       why don't I turn things over to you, Ms. Hayward.  Good

4       morning.

5              MS. HAYWARD:  Your Honor, I love to be in control.

6          (Laughter.)

7              MS. HAYWARD:  Well, Your Honor, I guess we're here

8       on both the status conference and obviously my contested

9       employment application.

10             THE COURT:  Uh-huh.

11             MS. HAYWARD:  So I'm not sure how Your Honor wishes

12      to take up those issues.

13             THE COURT:  Why don't we talk status conference

14      first.

15             MS. HAYWARD:  Sure.

16             THE COURT:  I have thoughts on your employment

17      application and -- but maybe we can just kind of just talk at

18      the 10,000 foot level kind of where things are and --

19             MS. HAYWARD:  Very well.

20             THE COURT:   -- and how this -- anyway, yeah, why

21      don't we.

22             MS. HAYWARD:  So from the Debtor's perspective, you

23      know, we are in a Chapter 11 bankruptcy.  We are looking to

24      move forward and confirm a plan of reorganization.  So we have

25      filed that plan, we have filed a disclosure statement and we

1    have a setting on the disclosure statement for November 29.

2            THE COURT:  Right.  But I said you couldn't go

3    forward, the plan as proposed, because you have -- you've got

4    to be able to market test it.  So how do plan on proceeding?

5            MS. HAYWARD:  Well, Your Honor, I guess --

6            THE COURT:  In other words, I'm not letting you put

7    that out there without it being market tested.

8            MS. HAYWARD:  When Your Honor says market tested,

9    I'm a little unclear as to --

10           THE COURT:  In other words, there's an equity

11   contribution in there that -- there has to be disclosure as to

12   how you reach that number in the analysis that was done to

13   reach it.

14           MS. HAYWARD:  Your Honor, it's not an equity -- I

15   mean it's not -- it's not purchasing -- I mean there is no

16   equity.  Right?  We have a debtor --

17           THE COURT:  If he retains the ownership.  Right?

18   Right?  There's an absolutely priority rule.  Right?

19           MS. HAYWARD:  Yes, Your Honor.

20           THE COURT:  We all know it applies -- so how does --

21   how does Choudhri own the entity?  That's the essence.  Right?

22   So he's essentially going to make a contribution.

23           MS. HAYWARD:  Well, I believe the way the plan's

24   structured there's a new entity that's coming in --

25           THE COURT:  Right.

8

1          MS. HAYWARD:   -- to take over the equity.

2          THE COURT:  Right.

3          MS. HAYWARD:  But the --

4          THE COURT:  So tell me -- tell me where that number

5     comes from.

6          MS. HAYWARD:  The number comes from is because

7     that's the amount needed to fund the plan.

8          THE COURT:  That's why I'm saying.  So but is there

9     someone that's willing to put more.  In other words, that's

10    why I'm saying, is it market tested.

11         MS. HAYWARD:  Well, to put more for what purpose I

12    guess.  The money --

13         THE COURT:  A provided rate of distribution.

14         MS. HAYWARD:  Well, if that's --

15         THE COURT:  In other words, if somebody wants to go

16    out and buy this entity, put money in to control it, how do --

17    who's the -- who's the -- that's what I said at the last

18    hearing, who's the right -- who's the owner.  Right?  Why does

19    someone get to choose the amount of money that they need to

20    put in just to fund it, and you're going to own a building

21    that everyone is saying is worth a lot of money.  Right?  So

22    what are you -- so in other words that has to get market

23    tested.

24         MS. HAYWARD:  Well, Your Honor, I guess the building

25    everyone is saying is worth $18 million.  Right?

9

1    THE COURT:  Uh-huh.

2    MS. HAYWARD:  So it's worth less than -- and so --

3    THE COURT:  But everybody's saying it's worth 18

4    million now but in other words why -- I'm not letting anyone -

5    - you don't just get to come in as a new buyer to come in and

6    say, Here's what's going to get to come in without that piece

7    getting market tested.  In every Chapter 11 case somebody

8    wants to come in and buy the entity, buy the equity of the

9    company, it's got to get market tested.

10   And so here in this case we don't -- we didn't have

11   a robust procedure, we're having someone come in and they're

12   saying, Here's how much it's going to cost to run it, I got

13   that, I'm not disputing the number, but maybe they want to put

14   more money in, maybe there's -- there has to be a process

15   where it gets market tested.

16   MS. HAYWARD:  Isn't that process a competing plan,

17   or --

18   THE COURT:  No.

19   MS. HAYWARD:   -- something along those lines?

20   THE COURT:  No, no, because the Debtor -- how are

21   you going to put together a competing plan when you're the

22   only one that can propose one?

23   MS. HAYWARD:  Well, that's certainly a fair point,

24   Your Honor, at this point.

25   THE COURT:  I'm also really concerned about the

1    adversary.  And I will tell you, why don't I just get to it, I

2    think your -- I think your retention application could have

3    used additional disclosure, but I'm not sure based upon

4    everything that I've read, and maybe people can convince me

5    otherwise, that that creates such a conflict that I think you

6    should be disqualified.

7            I think it would have been good to know that, you

8    know, there was an entity that filed and that you may have had

9    a connection with, some even tangential connection with an

10   entity that filed in the Western District, and that entity

11   being listed.  I think I'd like to know what most judges want

12   to know about all that stuff on the front end so that you can

13   avoid stuff on the back end.  But you did disclose in a

14   sentence that there were other connections.  I just think that

15   sometimes it's probably even easier to just say, by the way,

16   one of them is one that filed in the Western District so

17   that --

18           MS. HAYWARD:  Understood.

19           THE COURT:  And I think -- I think you've been, as

20   you've always been, incredibly straight up and very

21   forthcoming with the Court.  So I don't question your

22   credibility, I don't question what you put on paper.  Whether

23   that influences you one way or the other, right, is a question

24   that we would need to decide.

25           But I think the lack of disclosure itself I'm not

11

1      sure is disqualifying.  It's not like -- you said it, you just

2      didn't say it in such a -- in a more robust way and I think it

3      probably could have suffered from that.

4            But I'm more concerned -- in other words, at today's

5      hearing if someone could tell me that because that sentence

6      wasn't in there and that somehow you were hiding it, someone's

7      going to have to really tell me that you were hiding it

8      intentionally, and that, you know, bad things were

9      consequences of it.  You know, it would have to be a really

10     strong allegation for me to get really uncomfortable on 327

11     grounds.

12            Okay?  I've just got --

13            MS. HAYWARD:  Sure, Your Honor.

14            THE COURT:  -- so I'll say that up front.

15            MS. HAYWARD:  Yeah, and I appreciate that, Your

16     Honor, and I think in my original application I disclosed that

17     I had represented --

18            THE COURT:  No, no, you did.

19            MS. HAYWARD:   -- you know, other single asset real

20     estate entities in their own Chapter 7 and --

21            THE COURT:  There are --

22            MS. HAYWARD:   -- Chapter 11 case.

23            THE COURT:   -- yeah, there I am.  I'm more

24     concerned about the amount of cash that this Debtor has.  It's

25     gone up for sure when you look at the MORs.

1    I'm concerned about the amount of cash that this

2    Debtor has.  The adversary itself, I was really concerned

3    about Mr. Pope's letter that he wrote back.  I'm really, you

4    know, I'm really concerned about some of the statements

5    Mr. Pope made, and if it turns out to be true, and I've got --

6    I have questions, maybe Mr. Tang and others can answer them

7    for me, when the State Court litigation was filed, the timing

8    between the hearing that the State Court had and when the

9    adversary proceeding was filed.

10    In other words, I got it, I know why this case was

11    filed, there was a foreclosure scheduled.

12    There's someone that needs to put their phone on

13    mute, it sounds like there's an ambulance in the back.  If

14    that's you, that's you.

15    There was an adversary -- I know why this case was

16    filed.

17    Folks, if that's you with an ambulance in the back,

18    which tells me that you're likely in New York because I grew

19    up there --

20    (Laughter.)

21    THE COURT:   -- put your phone on mute.  It's not

22    that complicated.  Hold on a second --

23    (Pause in the proceedings.)

24    THE COURT:  There was a -- I know why this case was

25    filed, and there was an adversary proceeding started in this

13

1     court on September 19.  I know who you represented, so that's

2     not really my --  but Naissance is a party to that lawsuit,

3     but Naissance also has filed -- or --

4          MS. HAYWARD:  Right.

5          THE COURT:   -- again, depending on who controls

6     Naissance also started a State Court action, and I don't know

7     when the State Court action started.  But presumably there was

8     a hearing which then prompted the State Court to then kind of

9     tweak a proposed order and issue a temporary injunction.

10         MS. HAYWARD:  Yes, Your Honor.

11         THE COURT:  I want to know when that State Court

12    hearing started and when that hearing was held. That helps me

13    understand it because there was an adversary started at 5:49

14    p.m. on September 19.  What I need to understand is when that

15    State Court hearing was held.  Was it held on the 20th, was it

16    held on the 19th that someone held a hearing and said, We

17    better get something in before the Judge rules.  Those are 2

18    different issues, so I just need to understand the timing of

19    when that hearing occurred.

20         I'm muting all the lines because -- hold on a

21    second.  There's a 917 number, I've un-muted you, if there's

22    another party that wishes to be heard?

23         (No audible response.)

24         THE COURT:  But you've got to place your phone on

25    mute if un-mute you.

14

1          So as part of this status conference I need to

2    understand when that State Court lawsuit was filed and who

3    were the lawyers representing I guess the opposition to -- I

4    forgot Mr. Tang's client's name -- oh, there it is --

5          MS. HAYWARD:  Well, let me back up, Your Honor.  My

6    understanding is that the lawsuit was actually filed by

7    Naissance under Mr. Choudhri's control to obtain a temporary

8    restraining order against Azeema Zahire (phonetic) --

9          THE COURT:  Okay.

10          MS. HAYWARD:  -- from representing that she --

11          THE COURT:  Was the owner.

12          MS. HAYWARD:  -- was the owner.  Right.  And so

13    there was -- and Mr. Pope is here, he can certainly speak to

14    this, but --

15          THE COURT:  Mr. Pope, why don't you come on up?

16          MS. HAYWARD:  -- Jerry Alexander I believe was the

17    lawyer representing Naissance in that State Court action.  The

18    Court had a hearing I believe and then the TI was issued the

19    day that --

20          THE COURT:  When was the hearing held, Mr. Pope?

21          (Pause in the proceedings.)

22          MR. POPE:  Okay.  It lasted for a few days, the TI

23    hearing was held on I think it was the 5th --

24          THE COURT:  When did it end?

25          MR. POPE:  The 7th of September.

15

1          THE COURT:  It ended on September 7?

2          MR. POPE:  It ended on September 7, Your Honor.  But

3     we had competing requests for injunctive relief.  If I can

4     back it up just a little so you could have some context.  We

5     were in efforts to protect the building and went down and

6     sought a temporary retraining order in State Court.  While

7     there, and I was representing the Galleria 2425 in that

8     application for a temporary restraining order.

9          THE COURT:  There's a couple of them, which one, the

10    JD?

11         MS. HAYWARD:  This Debtor.

12         THE COURT:  This Debtor.

13         MR. POPE:  Oh, this debtor, Your Honor.

14         THE COURT:  Okay.

15         MS. HAYWARD:  This was to stop the foreclosure that

16    NBK and those did.

17         THE COURT:  Ah.  Got it.  Got it.  Okay.

18         MR. POPE:  Okay.  And I was representing the Debtor

19    at that time.  While present at that hearing it was -- we had

20    to come back another day, David Tang appeared on behalf of

21    Naissance claiming an interest in the Debtor and also

22    attempting to stop the foreclosure by way of his own temporary

23    restraining order.  That was the first time we had any notice

24    that there was someone else claiming an interest in Naissance,

25    let alone claiming that Naissance had an interest in the

1    Debtor.

2             So once we left that proceeding we did some digging

3    on the Harris County District Clerk and found out that David

4    Tang had not only appeared in that case, but had filed 2 other

5    lawsuits on behalf of Naissance suing 2 other entities.  One

6    was suing the Bank of Kuwait, so there's a Naissance versus

7    Bank of Kuwait happening in the State Court, then there's 1

8    Naissance versus Brad Parker in the State Court -- in State

9    Court right now also.  Each had -- 1 had been filed in June, 1

10   in July.

11            THE COURT:  No, Brad Parker is -- does he have -- is

12   it just an independent lawsuit or is it something connecting

13   with --

14            MS. HAYWARD:  It's connected here, Your Honor.

15   There's, like I said, a lot of water under this bridge.

16            THE COURT:  Okay.  So Brad Parker --

17            MS. HAYWARD:  Mr. Parker was the -- if Your Honor

18   has looked at some of the exhibits and part of the

19   employment --

20            THE COURT:  I know the name rang a bell.

21            MS. HAYWARD:  Yes, he was the person who assigned

22   his interest to Mr. Choudhri in 2019.

23            THE COURT:  Okay, got it, got it, got it, got it,

24   got it.  Yeah, okay.  Thank you.

25            MR. POPE:  So those things were happening.  So once

1    we found out those things were happening and in light of the

2    assignment that we knew that we had that said Mr. Choudhri had

3    the control of Naissance, we then went and filed an

4    application for temporary restraining order against Azeema

5    Zahire, because during that hearing as we're observing she

6    mentions that she has opened bank accounts in the name of

7    Naissance recently, after being silent for years, after having

8    other litigation happening that included NBK, that included

9    the other parties where Naissance had come up and who owns

10   Naissance had come up for years.

11         Unfortunately for Mr. Tang and his client, when they

12   showed up for the application for emergency TRO, it happened

13   to be in front of Judge Weems who had also been presiding over

14   the matters with NBK and she was familiar with the Naissance

15   issue and told Mr. Tang, I am not inclined to believe you that

16   your client has any control over Naissance because we've been

17   here for years.

18         Where was she when they attempted to foreclose,

19   where was she when Mr. Choudhri was throwing all of his money

20   toward this Debtor to protect it and preserve it, where was

21   she when he was making the building better, where was she when

22   he was doing all these things to make this Debtor in the

23   position where it can actually sustain itself and propose a

24   confirmable plan, where was she?  It appeared that she had

25   been lurking in the shadows until Mr. Choudhri spends all his

18

1    hard earned time and money getting it together and then pops

2    up and says, Hey, I have some type of control.

3            They even tried to do a motion to show authority

4    against us in the State Court action recently, to which we

5    replied and said no.  that temporary injunction did not grant

6    Azeema Zahire any control.  It merely did its best, as poorly

7    drafted as it is, to preserve the status quo.

8            THE COURT:  Poorly drafted enough to get the

9    control.

10           MR. POPE:  It doesn't give the control.

11           THE COURT:  Well, it says she can't -- you all can't

12   do anything without here.

13           MR. POPE:  It does not change ownership, it does not

14   change who the managing member is.

15           THE COURT:  No, but it just -- it tells me that

16   there has to be a fight about that at some point.

17           MR. POPE:  There is a fight, and the judge set a

18   trial for January to finish that fight, and the judge denied

19   the motion to show authority.

20           THE COURT:  So --

21           MR. POPE:  I have a copy of that --

22           THE COURT:  No, no, no, I know that -- well, I

23   didn't know that, but what I'm saying is I agree with you, it

24   just says one cannot go forward -- you can't take any actions

25   without her --

19

1        MR. POPE:  Which is what --

2        THE COURT:  That's why I was trying to figure out

3   why this was -- in other words, yet the Court indicated -- so

4   the court hearings end on the 7th, is that right, somewhere

5   around the 9th, 7th?

6        MR. POPE:  That's correct.  But she took her time

7   putting an order in because we had also a competing TI she had

8   to decide if she was going to hear, we had motions to

9   disqualify (indiscernible) --

10       THE COURT:  Right.  But I'm saying, in other words

11  she didn't -- she didn't rule from the bench, she just said --

12  she took the matter under advisement and then issued something

13  on the 21st?

14       MR. POPE:  Issued something on the 21st.  And we

15  assumed, because we had been asking several times that she not

16  enter any order for either party until she heard our competing

17  temporary injunction.  She did agree on the Record that we

18  still had our temporary injunction, we had only defended

19  against Azeema Zahire's request for relief.  And our hearing

20  on our temporary injunction is actually set now for November

21  13.  We have been waiting to have that happen.

22       THE COURT:  What are you requesting in your

23  competing TI?

24       MR. POPE:  We're requesting in our competing TI that

25  her attorneys and Ms. Azeema Zahire quits doing what they're

20

1    doing now, showing up in Bankruptcy Court and claiming that

2    she has an ownership interest, claiming that they continue to

3    open bank accounts.

4              THE COURT:  Why don't people have the ability to

5    come into court and claim stuff before me?  I don't understand

6    what that means.

7              MR. POPE:  Well, in the same sense that they would

8    like for us to not file any adversary proceedings without her

9    permission, we don't think they should be filing any lawsuits

10   or proceedings, making any declarations when that --

11             THE COURT:  Do you think 2 wrongs make it right?

12             MR. POPE:  No, and that's why we have done nothing

13   else.  Once the judge issued that order --

14             THE COURT:  But you're asking a party not to avail

15   itself, or not to -- you're asking a State Court to say, Don't

16   come -- don't do anything in front of Lopez is what you're

17   asking.

18             MR. POPE:  Well, what I'm asking is that we have our

19   opportunity to finish adjudicating that issue in the State

20   Court proceeding.

21             THE COURT:  Mr. Pope, did you understand what you

22   just said?  Did you really understand what you just said?  I

23   think you want an order preventing someone from making an

24   argument, and what if I say come in, are they -- do they --

25   are they just -- are you going to tell me that State Court's

1   going to stop me from telling someone to come in if I have

2   questions?

3           MR. POPE:  Let me -- let me correct what I'm saying.

4   I may have worded it very poorly.

5           THE COURT:  Okay.

6           MR. POPE:  Because what I'm saying is not that they

7   can't come here and make an argument before Your Honor.  What

8   we don't want is they filed 2 State Court actions already in

9   addition.  We want to make sure they're not out there filing

10  any other State Court actions in the name of Naissance.  We're

11  not certain if that's happening or not, you know, we don't

12  know what they're doing.

13          THE COURT:  You're saying someone has to ultimately

14  adjudicate the Naissance issue and everything ought to pause

15  until the Naissance issue is -- I guess the ownership of

16  Naissance is resolved.

17          MR. POPE:  Right.  In the same sense that we're here

18  airing our concerns about who controls, I believe they can air

19  their concerns about who controls, but as far as filing

20  lawsuits --

21          THE COURT:  But you all filed a lawsuit knowing that

22  a judge could rule the other way, in front of me.

23          MR. POPE:  We did, Your Honor, before --

24          THE COURT:  I'm just saying, right, so whether it

25  was a TI.  So and then it gets issued and then no one informs

1    me.  I've got to wait for another party to come into court to

2    tell me that there's a State Court order out there.  I've got

3    to wait for NBK to come in and tell me that there's a State

4    Court order saying that you all can't proceed without a third

5    party.  That's what happened.

6           That is exactly what happened, and that's what

7    troubles me.  Right?  Like how come, you know, how come you

8    didn't come in here -- you, who appear in front of me all the

9    time, how come you didn't come in here and write a letter and

10   say, Judge, full disclosure to the Court, this adversary

11   proceeding, we're going to have to have at least a status

12   conference on it because this order got issued and it affects

13   my ability to proceed, to do anything in connection with my

14   client.  But I've got to wait for NBK to file something a

15   couple of days later to then come and tell me, and you weren't

16   even at -- it just -- I don't understand that.  That's what

17   troubles me.

18           I agree with you somebody's going to have to decide

19   the issue.  And you all are writing letters back and forth

20   about what can happen and what can't happen, but no one is

21   coming in front of me saying, Here's how we're going to decide

22   the issue, here's what we're going to do.  And that's --

23   that's disappointing to me.

24           Mr. Ruff, anybody reach out to you about when this

25   issue got issued?  Like knowing -- knowing --

1          MR. RUFF:  No.

2          THE COURT:  -- it's the --

3          MR. RUFF:  No, Your Honor.

4          THE COURT:  -- it's just --

5          MR. RUFF:  We saw it when it was filed with the

6     Court.

7          THE COURT:  Yeah.  And so I mean to me that's

8     different than the issue in front of -- the issue with

9     Ms. Hayward's application where she writes a sentence and

10    someone is saying, Well, hey, you could have said more.  But

11    you said something, you certainly disclosed that you

12    represented -- you haven't hid anything from me.

13         I just feel like that part is just -- I'm not sure

14    it's -- I don't know what to do with the adversary but we

15    can't go forward with it until somebody decides the issue, I

16    agree with you there.  But now I'm stuck with an adversary

17    proceeding where nothing can happen because a State Court has

18    to finally adjudicate the issue, because it won't be me.

19         There's not money in this estate to go adjudicate that

20    issue.  The estate maybe has 100 grand in there, minus Ms. --

21    minus about 135 in cash.  Someone still needs to back out the

22    utility deposit that I've asked for for months.  Now we take

23    out 20 something grand, you've got 100 grand, back out

24    Ms. Hayward's work.  I don't know.  Can't prosecute the

25    adversary proceeding, so what do we do?  I don't want to spend

24

1    a whole lot of time on the Hayward application, I want to

2    spend the time on, assuming we get past that, what am I

3    looking at?  I'm looking at a case that can't go forward on

4    any front.

5              MS. HAYWARD:  Your Honor, well --

6              THE COURT:  I'm not letting you go forward on plan

7    confirmation because if the Naysmith (phonetic 10:27:28] issue

8    gets decided the other way, and maybe the State Court says

9    more than what she -- maybe more than what she or he said

10   before.  And maybe Naysmith -- I don't know, maybe Naissance

11   comes back and says more.

12             I don't know where -- I don't know what I don't

13   know, I just know that this case freezes and then it creates

14   an issue as to what happens.  Do I let the building just sit

15   out there and like control -- or what do we do with this case.

16   That's the real crux of the issue.  That's the real crux, and

17   who's going to start paying interest on the loan?  Now we've

18   got to start getting into adequate protection issues.

19             MR. RUFF:  Your Honor, I've been thinking a lot of

20   the same thing.  Jayson Ruff on behalf of the United States

21   Trustee's office just for the Record.  I've been thinking a

22   lot of the same things, and I mean I don't --

23             THE COURT:  Let me just correct, I keep saying

24   Naysmith, I've been thinking of the Heissman trophy recently.

25   It's Naissance, Naissance, Naissance, Naissance, Naissance --

25

1          (Laughter.)

2          MR. RUFF:  I'd rather be thinking about football,

3     Your Honor.

4          I don't know how this case moves forward quite

5     frankly, and depending on what happens today we very well may

6     just make it a little easy for Your Honor and file a motion to

7     dismiss or convert depending on, you know, where we're at.  If

8     the Debtor -- if I am able to convince Your Honor today that,

9     you know, on my motion and the Debtor's without counsel, then

10    maybe we can stage it as -- or the Court can set a show cause

11    in a short period of time ahead to allow the Debtor to get

12    replacement counsel if that happens.

13         Either way, Your Honor, I think we have a bunch of

14    issues that make this case very, very difficult to go forward

15    because at the end of the day you take the counsel issue out

16    of it, I don't think this estate has an independent fiduciary

17    acting on its behalf.  What we have is, and some of that

18    evidence has come out in prior hearings and I think some of

19    the evidence will come out today, is we have Mr. Choudhri at

20    the end of the road who's pulling the strings for the mezz

21    lender, for the Debtor, for the Debtor's management company,

22    for interrelated parties, and -- but we don't have anybody

23    who's just deciding solely for the Debtor.

24         We don't have a chief restructuring -- we don't have

25    a trustee that's just looking out for the interests of the

1    Debtor alone and not thinking how do they impact the equity

2    and the equity alone.  I don't know how we get around that

3    given where we're at and what we've already learned in this

4    case from prior hearings, from evidence that has been put into

5    the Record in prior hearings.

6              THE COURT:  Ms. Hayward would tell me that if that's

7    the case, then there can be no single asset real estate cases.

8    That's what she's going to say.  I don't even have to look at

9    her, I don't what she's going to say because at some point

10   you've got the owner of Sam's Pizza, right, Sam is running the

11   show and so, you know, you -- Sam is an independent fiduciary,

12   Sam's got -- right?  Sam may own the building and so Sam's

13   Pizza may own the building and so Sam's -- the only thing

14   Sam's got is the building and so you've got Sam.  But that's

15   the case.

16             MS. HAYWARD:  Your Honor, I think we engaged in this

17   discussion at the hearing on the motion to dismiss that --

18             THE COURT:  I am also right that Sam doesn't get to

19   tell me, I'm going to form a new entity and then that new

20   entity's going to put this amount of money in and that's what

21   I'm going to go forward on the plan and everybody can vote on

22   it because I've structured it in a way that the plan works.

23             MR. RUFF:  Your Honor, if I may, every case --

24             THE COURT:  Right.  Sam in a SubChapter 5 went up

25   and put all of his disposal income for the next 3 to 5 years

1    to go pay off debt, unless Sam can convince me that NBK's debt
2    isn't good, but that's litigation that Sam then got in this
3    budget.
4              MR. RUFF:  Your Honor, again, if I may, every case
5    is unique and has its own facts and circumstances.  I'm not
6    trying to say that every single asset real estate case where
7    you just have an owner and it's just a small thing or whatever
8    can't file and confirm a plan.  That's not at all what I'm
9    saying.  I'm talking about the --
10             THE COURT:  I know.
11             MR. RUFF:   -- unique facts and circumstances --
12             THE COURT:  The unique facts and circumstances --
13             MR. RUFF:   -- of this case.
14             THE COURT:   -- of this case is that Sam can't, in
15   my hypo Sam can't pay the rent.
16             MR. RUFF:  Correct.
17             THE COURT:  Sam can't pay the loan while the case is
18   pending, because that's a big loan that's at issue.  And in
19   this case --
20             MR. RUFF:  And I think Your Honor's --
21             THE COURT:   -- Galleria wants to unwind a really
22   severely prejudiced -- this isn't like I admit that I owe 50
23   million bucks, this is there's issues related to the 50
24   million and I need to have a full out litigation on it, and at
25   the same time layered on top of it I have a party -- or

28

1    there's a temporary injunction where the -- where someone
2    theoretically could pull the plug on this entire case and who
3    owns that entity who controls the string will ultimately be
4    decided by a State Court and I don't know when.  That's the
5    problem I've got with this case, and that could be early 2024.
6    And I'm not keeping this case going, I'm not keeping -- I'm
7    not going to confirm a plan knowing that ownership is a
8    dispute.  Can't go forward on that.  Right?

9         Can't go forward on an adversary proceeding with
10   Naissance, and I can't keep NBK out there without any payments
11   on their loan, not even any interest on adequate protection.
12   But the minute that opens up, the minute I start settling
13   scheduling this case gets really expensive and this case
14   becomes administratively insolvent before we even know
15   anything.

16        In other words, this case really needs to get the
17   issues that are before this Court, and then the other thing is
18   I don't decide any of that stuff.  Somebody's going to have to
19   decide all that stuff, but it's already teed up in front of a
20   State Court who's already set hearings.

21        Therein I think lies the issue.  I think it's the --
22   I agree with you, it's the factors, it's the layer and
23   ownership and fights about it and I don't want to -- I don't
24   want to -- Naissance's owner, who it is I don't know.
25   Mr. Tang's client has a dispute with Mr. Choudhri.  I don't

1    know who's right or wrong, I haven't heard a thing, I don't
2    know what is going on.

3         I know that there's State Courts who are hearing it.
4    Right?  It's a little troubling in an order that someone says
5    that a check could be fraud but that doesn't mean it is.  It
6    means she just said, I'm going to issue -- she or he issued a
7    temporary order and said, We're going to come back and figure
8    it out.  Right?  Just means that let's just freeze things,
9    that's what -- that's what the State Court did was just kind
10   of freeze stuff and say, Okay, nobody can do anything on their
11   own, which is why you're coming in saying, By the way, that
12   means you too, to the other side.  That means you all can't do
13   anything either.

14        And I've got someone who wrote a disclosure
15   statement that I'm sure if I put on the stand would be
16   uncomfortable answering questions about the disclosure
17   statement and so I'm -- but he's a really good person and I
18   don't want to do that.  But if I asked him the intricate parts
19   on what 1129 stand for, he'd be a really good person who would
20   have a really hard time answering those questions and the
21   intricacies and the treatment of certain creditors under a
22   plan, and I don't want to subject that individual to that
23   stuff.

24        My gut tells me I need to dismiss this case and
25   allow you all to refile it when those issues get resolved, and

30

1    you all can fight in the State Court and let that go away and
2    let this case refile in the Houston Division and everybody can
3    kind of tee it up when it's ready.

4            And I don't want to make findings, I think -- I
5    don't think -- Ms. Hayward's an excellent lawyer, I don't want
6    to take that issue up, and I think she would win anyway.  I
7    don't think -- I think you would win on a retention
8    application fight.  I think it's just 70 grand and a whole lot
9    of stuff to happen, and I can't deal -- I can't touch this
10   till 2024, but NBK is stuck out there without the ability to
11   do that, no one's going to pay interest on that loan, it's way
12   too much.

13           Can't proceed on the adversary.  But I would need to
14   proceed on the adversary, and I can't put out a plan -- how do
15   I decide what a plan issue is when Naissance -- the State
16   Court could come back and say, You know what, Azeema runs
17   everything, and she's going to file something after plan
18   confirmation and then come back and say, Hey, by the way, I
19   didn't want to do any of this.  We've got problems.

20           MR. RUFF:  Your Honor, I think you're correct on
21   that and I think you're 100 percent correct on the market
22   testing.  How do you get -- you can't just, the owner, say,
23   I'm going to pay this for it and not -- I mean how does that
24   serve the interest of the other creditors who are losing?
25   Someone else might be able to come in and say, Well, no, I'll

31

1       take more for it.  NBK might say, No, I would love to be able

2       to credit bid on the property and just take the property,

3       because it is a single asset real estate case, that is the

4       asset.

5                THE COURT:  And they're saying like, By the way,

6       like I own this thing already.

7                MR. RUFF:  Right.

8                THE COURT:  Yeah, it's just layered in.  But the

9       ultimately person who -- the question is who do they negotiate

10      with?  While this issue gets decided who does NBK deal with.

11      Right?  Who does any creditor deal with?  Who does

12      Mr. Choudhri deal with, you know, and me?

13               Like who has -- who has the ultimate authority here

14      is a real issue and I don't want to -- you know, the last

15      thing I want is to try something in front of me where people

16      then come out and put people on the stand but what they're

17      really trying is the fight in front of State Court.  That's

18      going to trouble me to death, and that's what you don't want

19      either.

20               They're going to -- because Mr. Choudhri's going to

21      hit the stand and then it's going to be -- but really what --

22      the questions that somebody could ask him have everything to

23      do with nothing in front of me, it's to try to get stuff so

24      they can role a transcript out there and say, This is what

25      happened in State Court, and vice versa.

32

1          That's where we're headed, because the lawsuit

2     that's going to get tried isn't the one that's going to deal

3     with plan confirmation.  It's going to deal with -- or in

4     connection with this case.  Everybody's going to try to look

5     for gems that they can then run into a State Court in

6     connection with the Naissance fight.  And I don't feel like

7     doing that.

8          I think you've got real good lawyers and I think

9     everybody ought to just preserve their rights and run this --

10     and go to State Court and figure out where things go.

11     Conversion doesn't make any sense to me.  I'm not going -- and

12     a poor trustee's going to get stuck here in this situation

13     where we are.

14          I don't know if Mr. Tang's client's right or wrong,

15     but I do think you have your day in court.  Go have your day

16     in court and if you all run the show and the State Court gives

17     you the building, come file in the Houston Division and we'll

18     start this all over again.

19          But I don't know where we are now.  I'm troubled.

20     And the amount of cash, you hear my thoughts on the plan.

21     Maybe another judge will disagree with me, but that's the way

22     I feel about the -- if you're going to -- if you're going to

23     come out there and ask that, then I think at least in either

24     in a disclosure statement or in something in connection with

25     the plan you've got to tell me and it's got to be based more

1      than here's what it's going to take to wind it down.

2               If no one else wants it, I get it, that makes

3      perfect sense.  But if there's a fight about it, then I think

4      people need to have that fight.  And I don't know who's going

5      to fund it, you know.

6               MR. RUFF:  Well, just given the way things have

7      gone, Your Honor, I don't think it would be a consensual plan

8      at this point and, at least as proposed, and so that's why

9      it's an issue.

10              THE COURT:  Oh.

11              MS. HAYWARD:  Your Honor, may I just clarify --

12              THE COURT:  Yeah, maybe I ought to stay quiet and

13     just allow you just to talk, I've been talking a lot here.

14              MS. HAYWARD:  I just want to clarify a couple of

15     points.

16              THE COURT:  Okay.

17              MS. HAYWARD:  Number 1, right now Naissance doesn't

18     control anything with respect to this Debtor.

19              THE COURT:  Agree.

20              MS. HAYWARD:  Okay.  There is a dispute as to

21     whether Mr. Tang can -- actually represents Naissance.  Right?

22              THE COURT:  Correct.

23              MS. HAYWARD:  There is a dispute as to who the

24     proper parties are with respect to Naissance.  So that issue -

25     - and that issue is going to be decided in the State Court --

34

1          THE COURT:  Uh-huh.

2          MS. HAYWARD:   -- notwithstanding we've got these

3   new lawyers purporting to represent Naissance now coming into

4   this Court filing motions, filing proofs of claim, making

5   demands.  I certainly understand that Naissance cannot move

6   forward with the adversary, but the Debtor can.

7          THE COURT:  Yeah, but here's the problem is that the

8   allegation is fraud by check, or fraud, not fraud by check,

9   fraud.  Right?  That someone signed something fraudulently and

10  it involves Mr. Choudhri.  If it were true that Mr. Choudhri

11  filed a lawsuit where Mr. Pope was representing him and it

12  was -- I'm not saying Mr. Pope would have known about it, but

13  I would have to open up such an inquiry to find out.  If it

14  turned out that that were true, I would stop everything

15  because you -- the Debtor would then have -- the Debtor would

16  have causes of action.

17          It's just going to get really confusing.  There's

18  really serious allegations in there.  Right?  It's not just

19  default under a loan agreement, there's -- there are

20  allegations of fraud, and I think I would have -- if that were

21  the case, based upon the allegations that are made in the

22  adversary proceeding, I may myself have a duty to report

23  certain things, to start inquiries on my own, and I don't feel

24  like doing that.  I don't think I'm -- I don't think I'm there

25  yet (indiscernible) have to figure that out.

1          In other words, if somebody's -- if Mr. Pope filed

2    an adversary proceeding on behalf of Choudhri and Naissance,

3    and it turns out that, and I don't know if it's true or not,

4    I'm using it, if it turns out that the assignment was

5    fraudulently made, now I've got something filed under 9011 in

6    my court where someone claimed to have authority to do

7    something, and that's gets really uncomfortable so we can't

8    proceed, the Debtor can't proceed, Mr. Choudhri can't proceed

9    until I figure out the answer to that question.

10         Those are serious allegations in there, and I don't

11   want to -- I'm not trying a lawsuit with Mr. Choudhri involved

12   if Mr. Choudhri filed something with -- and if Naissance is

13   wrong about your allegations about Mr. Choudhri, then I have

14   to deal with them too.

15         MS. HAYWARD:  Well, Your Honor, it's not Naissance

16   making those allegations.  Right?  It's Ms. Zahire.

17         THE COURT:  Ms. Zahire, you're right.

18         MS. HAYWARD:  It's Ms. Zahire.

19         THE COURT:  If Ms. Zahire came into may court on

20   allegations like that, then I'd have to deal with that too.

21   That, in other words -- but I can't act like someone didn't

22   just say certain things in open court, in Federal Court, and

23   act like I can't -- I have to deal with it.  But there's

24   strong allegations about what happens and the good faith of

25   the filing of the case and if a -- filing of a plan.  It's

36

1        gets fairly complicated because whoever controls Naissance,

2        they technically control certain things that happen in this

3        case.

4                     MS. HAYWARD:  Maybe.

5                     THE COURT:  Maybe.  No, I --

6                     MS. HAYWARD:  Maybe.

7                     THE COURT:   -- agree with you, maybe.

8                     MS. HAYWARD:  Maybe, but there's a lot of steps that

9        have to happen to get to that endgame.  Right?  And --

10                    THE COURT:  Maybe.

11                    MS. HAYWARD:  Maybe.

12                    THE COURT:  In other words --

13                    MS. HAYWARD:  And --

14                    THE COURT:   -- what I'm saying is if -- and I don't

15       know if there is or not, and again, I don't -- it's just a

16       really serious allegation that has to get resolved and I think

17       the State Court is already looking into it and is in the best

18       position to resolve it.  But if that gets resolved in a

19       certain way, then this case gets really bad.

20                    MR. CONRAD:  (Indiscernible) on behalf of the bank

21       (indiscernible) a little bit.  I don't know if you can hear me

22       okay or not.

23                    THE COURT:  All right.

24                    MR. CONRAD:  But Charles Conrad on behalf of

25       National Bank of Kuwait.  Just to correct what Ms. Hayward

1        said, I think she said that Naissance isn't involved in this

2        at all.  It's really a fight -- again, we're not involved in

3        this, we're the ones that found -- or was tracking that State

4        Court litigation on the Harris County Court's website, found

5        that an injunction was issued and of course we brought it to

6        the Court's attention.

7                But Naissance as I understand it is the

8        (indiscernible) and its just a question about like who

9        controls it.  Right?  There's an assignment, or purported

10       assignment --

11               THE COURT:  Whether there's $16 million down on the

12       books or not.

13               MR. CONRAD:  Exactly.  But in -- but whether or not

14       they can foreclose on it, but it's who controls it.  And

15       Mr. Choudhri, you know, she right, she filed a lawsuit, or

16       Mr. Pope did back in July, you know, on behalf of Naissance

17       against Ms. Zahire saying that I stopped acting on behalf of

18       Naissance.  But now Ms. Zahire claims that that assignment

19       that Mr. Choudhri relied upon he gave that to us too in, you

20       know, negotiation of the settlement agreement we entered into

21       a year ago.

22               THE COURT:  What I'm saying --

23               MR. CONRAD:  But that was so we -- so --

24               THE COURT:  -- it seems to me everybody ought to

25       keep their powder dry and not use anything that I say in a

1    transcript one way or the other, to be used one way or the

2    other, because that's what I'm saying, I don't know what I

3    don't know.  And I want to be very clear, if anyone were to

4    run to a State Court and say, Lopez insinuated anything, this

5    is the sentence that you quote and say, Lopez is not saying

6    anything one way or the other.  I don't know what I don't

7    know.

8            But I know everybody ought to keep their powder dry

9    and go fight about this issue in State Court to determine what

10   it is because I can't proceed with this case.  I have a $60

11   million loan, does it exist or not?  How do I confirm a plan

12   one way or the other whether that debt exists and then what's

13   the treatment of this claim, whether it gets resolved or not.

14   But that issue will not be resolved because either the debt

15   exists or it doesn't.  It's not an amount -- I can determine

16   the number, someone's got to determine whether it exists or

17   not.

18           Because if Mr. Choudhri's right and that debt

19   doesn't exist, then I will enforce it as a non-enforceable --

20   you know, I can then look at that, I can make that call.  But

21   litigating about what that is, the State Court's already

22   dealing with that and I don't want to -- I don't want to

23   insinuate anything or to imply anything, and I don't know if

24   Ms. Zahire is right or wrong, but I do know things get dicey

25   if I get involved, and it doesn't -- I don't need to.  But the

39

1      problem is this case cannot proceed.  How do I deal with a $60

2      million debt, how do I deal with your client's debt, how do I

3      deal with the adversary proceeding, how do I deal with any of

4      this?

5             And that's not me skirting the disclosure issues

6      that Ms. Hayward -- I just think -- I've told Ms. Hayward, and

7      I think you should say more.  Right?  But that doesn't mean --

8      that doesn't disqualify you.  I'm not saying -- the trustee

9      hasn't put on any evidence.  Maybe what the trustee's going to

10     try and say -- is going to make me say -- drop my jaw and say,

11     You got it.

12            I don't know.  I'm just saying assuming she wins,

13     I've still got to deal with a really big problem which is what

14     does tomorrow look like.  And I'd rather deal with -- and I'm

15     going to have to deal with tomorrow one way or the other,

16     whether it's -- if they have no counsel or if she shows up

17     tomorrow or this Debtor shows up with counsel tomorrow, I

18     don't know, I just know that I'm going to have to deal with

19     this issue regardless of who is the lawyer representing the

20     Debtor one way or the other, whether it's Ms. Hayward or not.

21     I'm just dealing with the 10,000 foot -- the 10,000 issue.

22            MR. CONRAD:  Your Honor, you're spot on.  Sometimes

23     I take the path of least resistance, and if I have a corporate

24     debtor with no counsel, then --

25            THE COURT:  No, but --

40

1              MR. CONRAD:   -- it's easier to get a case dismissed

2       but --

3              THE COURT:   -- you have a job to do too.

4              MR. CONRAD:   -- ultimate -- well, that too, and

5       ultimately I just think this case should be dismissed.  The

6       Naissance thing is important not just for the debt, Your

7       Honor.  If the Naissance -- depending on which way it goes,

8       Naissance is actually purportedly one of the members, although

9       I know it's in dispute, one of the members of the direct

10      owner, the Galleria 2425 JV --

11             THE COURT:  JV.

12             MR. CONRAD:   -- of the Debtor.  So the whole

13      authorization of the bankruptcy even being filed is at risk --

14             THE COURT:  Oh, I know that.

15             MR. CONRAD:   -- depending on how that outcome --

16             THE COURT:  But the people -- and again, I'll say

17      this too, I agree with you, I also recognize, which I know

18      Ms. Hayward didn't tell me, is that a lot of times people for

19      bankruptcy and people get to fight about, you know, whether I

20      was the proper party that should have filed it or not, and the

21      cases continue and courts can resolve that issue.  Right?  I

22      get that.  That happens all the time in cases, and we see it

23      all the time.

24             But I agree with you, it's a complicating factor.  I

25      just can't confirm a plan.  I would have to decide that issue

41

1       to then determine whether I can confirm the plan.  I'd have to

2       decide the ability to file issue, proper filing issue before

3       the --

4                MR. CONRAD:  Which would necessarily I think need a

5       determination on the Naissance, we'll just call it the

6       Naissance dispute --

7                THE COURT:  But that doesn't mean --

8                MR. CONRAD:   -- that's going on in the State Court.

9                THE COURT:   -- and that doesn't mean that at the

10      time that the case was filed that anyone did anything wrong

11      either.  Right?  Because later a court could determine that.

12      I don't want anyone to imply that Ms. Hayward, you know,

13      signed a document that was improper or that she shouldn't

14      have.  I'm not implying that at all.  I'm being really clear

15      about that.  Now I can be quoted on that.

16               MS. HAYWARD:  Thank you, Judge.

17               THE COURT:  I can decide that issue.  Right?  You

18      know people --

19               MS. HAYWARD:  But, Your Honor, we're conflating

20      different entities.

21               THE COURT:  No, no, I agree.

22               MS. HAYWARD:  I mean Naissance does not -- the

23      Naissance entity up here that Mr. Tang purportedly represents,

24      Mr. Pope has represented, does not own an interest in the

25      Debtor, does not own an interest in the JV.

1          THE COURT:  It's collateral.  Right?

2          MS. HAYWARD:  It's collateral, right.  So there's

3     no issue as to whether the Debtor had authority to file.

4          THE COURT:  Agree.

5          MS. HAYWARD:  Okay.  The Debtor had authority to --

6          THE COURT:  Yeah, that's why I'm going there.

7          MS. HAYWARD:  Yeah.  So I just -- I want to make

8     clear that Naissance, as the US Trustee just --

9          THE COURT:  Yeah, yeah, that's right.  And they

10     hadn't foreclosed on their collateral --

11          MS. HAYWARD:  Right.

12          THE COURT:   -- so you don't own it --

13          MS. HAYWARD:  So they don't own -- this entity does

14     not own an interest in any of the Debtor upstream.  And so I

15     just want to make sure --

16          THE COURT:  Wait, no, no, no --

17          MS. HAYWARD:   -- that the Record's clear on that so

18     that, you know, the issue is not -- there should not be an

19     issue as to whether this Debtor had authority to file the

20     case.

21          THE COURT:  Yeah.

22          MR. RUFF:  Well --

23          MR. CONRAD:  That's not exactly clear, Your Honor.

24          THE COURT:  No, no, no, but what I'm saying is I --

25          MR. RUFF:  It's an issue --

43

```
1            THE COURT:  What I'm saying is --
2            MR. RUFF:   -- it's unclear.
3            THE COURT:   -- what I can say with confidence based
4    upon what I know, I don't -- I think you all -- there's issues
5    about where Naissance sits and what they're doing and what
6    they have control over, and whether there's a $60 million debt
7    that's owed by this Debtor or not, I think that's an issue.
8    In other words, you know, whether there was a cancellation of
9    debt, did the assignment cancel debt and all that stuff.
10   There was a loan --
11           MS. HAYWARD:  But it wasn't debt to the Debtor, Your
12   Honor.
13           THE COURT:  I know, but there's issues --
14           MS. HAYWARD:  So the Debtor would never owe that
15   debt.
16           THE COURT:  The mezz debt?
17           MS. HAYWARD:  Right.  The mezz debt is at a higher
18   level, the Debtor does not have any privity --
19           THE COURT:  No, no, no, but what I'm saying is but
20   then -- but in other words if the debt exists, then they would
21   have a right to foreclose on their collateral, don't you
22   think?
23           MS. HAYWARD:  Which is the JV, higher up.
24           THE COURT:  Right?  But then --
25           MS. HAYWARD:  Right?
```

44

1          THE COURT:   -- but then that could -- essentially
2    it could have a domino effect that could come find me.  I
3    agree with you, this case can -- this case -- those debts are
4    at a higher level.
5          MS. HAYWARD:  And would never trickle down to the
6    Debtor.
7          THE COURT:  That I don't know.  I don't know about
8    that.  But you may be right about that.  I just don't have
9    evidence about that one way or the other.
10          MS. HAYWARD:  Right.  But I mean but that's -- I
11    mean it's a mezz debt that is secured by equity interests in
12    entities above the deck.
13          MR. CONRAD:  That's not correct.  It's a debt
14    secured by equity in the Debtor itself.  So the Debtor has --
15          THE COURT:  That's what you're -- that's what I'm
16    saying, I don't know --
17          MR. CONRAD:  Right.
18          THE COURT:   -- because people have been fighting
19    about that and I don't know the answer to that question.
20    That's an issue that would have to get -- someone would have
21    to make a call about whether is this Debtor involved in that
22    collateral package one way or the other.  I don't know, that's
23    a secured creditor fight that people can have --
24          MR. WETWISKA:  That's --
25          THE COURT:   -- people have that all the time.

45

1      Right?

2                  MS. HAYWARD:  Sure.

3                  THE COURT:  Is this part of the DIP package or not.

4                  Counsel, I know you wanted to say something.

5                  MR. WETWISKA:  But, no, Your Honor, it's just that

6      this Galleria 2425 who NBK has been dealing with in litigation

7      for over 2 years, and throughout that entire 2-year time

8      period Ms. -- what's her last name, Azeema Zahire never

9      stepped up into that lawsuit to say, Oh, hey, I have something

10     to do with Naissance and Naissance doesn't want to go forward

11     or Naissance has some issue with Galleria 2425.

12                 Okay.  That's for a 2-year time period, and that's

13     because Mr. Choudhri, who's my client, was spending money out

14     of his own pocket to fund the building during COVID, to fund

15     the building during '21, '22 and through '23, and spent a lot

16     of money that NBK was well aware of.  Okay.  NBK entered into

17     a settlement agreement with 2425.  All right.  Well aware of

18     all of that NBK made those choices.  And then things happened

19     after that settlement agreement was signed.  Still not with

20     Azeema showing up and saying Naissance is going to do

21     something.

22                 THE COURT:  Uh-huh.

23                 MR. WETWISKA:  I will say by the way none of that

24     happens.  Now Mr. Tang and Mr. Drinnon, who have a 10-year

25     history of litigation against Mr. Choudhri, it's very

46

1       personal.  You heard Mr. Drinnon in the last hearing say he

2       gets hired because he has some speciality in suing

3       Mr. Choudhri.  That's what he said on the Record.

4                   THE COURT:  I remember.

5                   MR. WETWISKA:  And that's because he represents

6       Asama Abdulateef (phonetic) who has -- whatever personal

7       issues between Mr. Choudhri and Mr. Abdulateef have been going

8       back to 2009.  My point that I'm getting to, Your Honor, is

9       this is just flame throwing.  What is happening here is

10      Mr. Tang and Mr. Drinnon are like, Oh, wait, we have -- let's

11      throw onto the fire, let's create these issues, let's get

12      Azeema, and unfortunately the Court doesn't have all the

13      background.

14                  THE COURT:  But here's the question, do I need all

15      the background or do I realize that this Debtor has 50 grand

16      or, you know, 90 grand and these issues are going to swallow

17      it all up --

18                  MR. WETWISKA:  No, but I don't -- and I don't think

19      that's the case because I don't think these issues are going

20      to swallow it up.

21                  THE COURT:  Well, let me just -- I -- well, that's -

22      - you and I can just disagree on that --

23                  MR. WETWISKA:  Well, the --

24                  THE COURT:   -- because I don't think I can keep

25      this case going, as a matter of bankruptcy law I think they've

1    got to pay interest to that secured creditor while the case is

2    going, and that's going to swallow it up in a month, month and

3    a half.  You won't make it to 2024 if I say you've got to pay

4    interest to that secured creditor while this -- while these

5    issues get resolved.  Because I'm not letting that plan go

6    forward --

7              MR. WETWISKA:  But what --

8              THE COURT:  -- because you've got to market test

9    it.  In other words, math wins on this one.

10             MR. WETWISKA:  Okay.  Well, if it's -- it can be

11   market tested, we can do it, but let me ask the Court this

12   question, we may not have power but what if there is at least

13   some court ordered mediation with respect to --

14             THE COURT:  I don't order mediation among parties, I

15   just don't.  I don't.  I don't force them in large cases,

16   small cases, medium cases.  I don't force people --

17             MR. WETWISKA:  It's just that --

18             THE COURT:  -- to mediation.

19             MR. WETWISKA:  -- this one issue is because someone

20   says it's not their signature after 4 years --

21             THE COURT:  I'm not so --

22             MR. WETWISKA:  -- is now throwing a wrench --

23             THE COURT:  -- it's not.  There's been a wrench --

24             MR. WETWISKA:  -- in what would otherwise --

25             THE COURT:  -- I guess what I've been saying is

48

1      there's been a wrench since the beginning of this case on

2      money.  Well before they showed up.  This plan can't go

3      forward.  And the problem is, is that the litigation now can't

4      go forward.  I agree with you, there's a wrench, but the

5      wrench got thrown -- the State Court has said nothing can

6      happen, and that's what I mean.

7           The State Court issued the order, that's what froze

8      everything in my opinion.  It complicated everything.  The

9      State Court freezing -- I agree, she doesn't have power, but

10     no one can do anything without her now.

11          MR. CONRAD:  And our concern is the freezing, like

12     how long.  I mean I know the trial setting --

13          THE COURT:  I can't --

14          MR. CONRAD:   -- according to Mr. Pope is in

15     January.

16          THE COURT:   -- in other words now I have cash

17     collateral issues.

18          MR. CONRAD:  Right.  And it could be, you know,

19     continued, there could be an appeal, I mean this could be --

20          THE COURT:  I have adequate protection issues of the

21     building itself and the loan.

22          MS. HAYWARD:  But, Your Honor, to the extent that

23     Ms. Zahire or anyone else want to come in and try to bid for

24     the equity in the Debtor, I mean that is certainly something

25     available to people to do.  But the timing here is clearly

1        suspect.

2                    THE COURT:  On a lot of fronts.

3                    MS. HAYWARD:  On a lot of fronts.  But the timing

4        here between NBK, and I'll represent to Your Honor that this

5        is something that would come out through discovery, but I'm

6        not sure that NBK and these lawyers here aren't working

7        together --

8                    MR. WETWISKA:  That's ridiculous.

9                    MS. HAYWARD:   -- to get to where we are right now.

10       And --

11                   THE COURT:  They may be.  I don't know.

12                   MS. HAYWARD:  But that -- but that's a problem, Your

13       Honor.  A problem because we have lawyers who we don't know

14       whether they actually represent the entities they're

15       purporting to represent.

16                   THE COURT:  That's what they say about you,

17       Ms. Hayward.

18                   MS. HAYWARD:  Well --

19                   THE COURT:  That's the problem.  Right?

20                   MS. HAYWARD:  But --

21                   THE COURT:  Right?  In other words, they're saying

22       who is -- who is representing Galleria 2425 Owner and who's

23       looking for loss -- litigation.  Are they -- who is looking

24       for potential causes of action on behalf of Galleria 2425,

25       who's analyzing those potential lawsuits?

50

1          MS. HAYWARD:  Your Honor, I am, and I filed one on

2     behalf of the Debtor against NBK.

3          THE COURT:  Yeah, all right.  You know where I'm

4     going.  I don't want to go there.

5          MS. HAYWARD:  But Your Honor stated at the last

6     hearing there was no (indiscernible).  Your Honor had a list

7     of payments disclosing a SOFA to a management company.  There

8     was no evidence of fraud presented to the Court.  There was no

9     evidence of wrongdoing presented to the Court.  That's where

10    we go back to, and here we are now at a status conference

11    later and it's like those same issues keep percolating even

12    though there's no evidence in the Record of any of it.

13         Again, this idea -- of course Mr. Choudhri controls

14    this Debtor.  This is a single asset case, it's a family-run

15    business, and there's no reason why this Debtor shouldn't be

16    able to try to reorganize.  Your Honor recognized that trying

17    to save equity is a valid reorganization purpose.  And, you

18    know, I've got all of these creditors now coming in here and

19    trying to throw wrenches into things, and I understand.  But

20    there are mechanisms under the Bankruptcy Code to address

21    these issues.

22         And if Your Honor wants and equity auction, we can

23    do an equity auction.

24         THE COURT:  You don't have the money for it, to

25    continue that plus the litigation, plus they're going to have

51

1   to get interest if we do all that.  That's the problem.

2           MS. HAYWARD:  Your Honor, we have a plan on file --

3           THE COURT:  Your plan --

4           MS. HAYWARD:   -- that is confirmable in my

5   opinion --

6           THE COURT:  I understand you think --

7           MS. HAYWARD:   -- if it's market -- if we market

8   test it with Your Honor.

9           THE COURT:  Who's going to pay for that market

10  testing while you pay interest to that secured creditor?

11          MS. HAYWARD:  Well, Your Honor, I don't believe the

12  Code states that interest -- as long as a plan is on file, it

13  has to be confirmed within a certain amount of time.

14          THE COURT:  Oh, no, no, but, yeah, but you --

15          MS. HAYWARD:  Right?

16          THE COURT:  You're -- how are -- Ms. Hayward, I --

17          Folks, I -- you filed a plan that has a number on a

18  wind down issue.  If you try that issue, it would require

19  market testing.  Market testing would require several months

20  to market test, so you would have to then not just reach out

21  to 1 party, you would have to then reach it, figure something

22  out like hire a realtor, like go out and really shop this

23  thing and figure out, Anybody want this building, and what are

24  you willing to pay for it.

25          And in the meantime someone would have to pay -- I

52

1    would require NBK to get paid during that period, at least

2    interest on the loan.  Like we're not -- this isn't like a 30-

3    day plan.  It just can't happen that way.  I know it got filed

4    really fast, because I know that's what the Code says, and you

5    were smart and you got in there, you had to pay interest so

6    you didn't -- but how do you then -- but your plan isn't

7    seeking to pay them.

8         Your plan isn't, you know, I'm going to sell the

9    assets to someone.  You're selling it for wind down value, for

10   wind down costs is exactly what you're doing.  In other words,

11   Choudhri's entity is going to put up -- and there's nothing

12   wrong with that, I'm not saying he did anything wrong, what

13   I'm saying is somebody's putting up an amount of money, so

14   what it would take to get through this case.  Right?  To wind

15   this issue.

16        There's a pot of money in there.  The question is,

17   is someone willing to put more in there and how do we then

18   resolve all of these issues until that goes there.  I'm

19   looking at the pledge agreement too, and that pledge agreement

20   has a lot of issues in there as to what is collateral or not,

21   102-5.  There's a lot of issues to get fought, and 50, you

22   know, 70 grand, how many grand's going to get taken for 1

23   month of interest to your client?

24             MS. HAYWARD:  Your Honor --

25             THE COURT:  I don't have anything to qualify it in

53

1    State Court issues.  I don't know.  There's just a lot of
2    confusing stuff, and my gut tells me that I need to dismiss
3    this case and let you all go figure this out in State Court,
4    because there's not enough here, and there's real concerns
5    that I have, and the concerns that I have are going to cost a
6    lot of time and money to address, and I'd rather let everybody
7    go to State Court, figure all these issues out and take it
8    there because NBK's going to need interest payments if we're
9    going to go really sort all this out.

10          And I don't know if we have the time or money to do
11   it.  That's the issue.  We were already on the verge of no
12   cash on the interest and we're going to get into adequate
13   protection on a building with no loan payments with an entity
14   that hasn't been paid in a long time.  You're going to run out
15   of money real fast, and that's the question.

16          I'm not saying they need to go foreclose.  I mean
17   whatever rights people have under state law they have, and I
18   don't want to cast dispersions one way or the other, or make
19   any -- make findings one way or the other.  But it just seems
20   to me that you just look at the big picture issue.

21          I don't -- and I don't want somebody coming back to
22   me, because I would really dismiss it out hand -- outright,
23   that this Debtor didn't have a right to file and Ms. Hayward
24   did anything wrong.  I think that would be a silly waste of
25   time and money.  I wouldn't even hear it.  I wouldn't even

54

1    hear the lawsuit, I'd just dismiss it right away.  I wouldn't

2    even take it up.  The question of that would be ridiculous to

3    me based upon everything that I know.

4            I just think you all need to go to State Court and

5    go decide the Naissance issue, go decide the State Court

6    issues, the issues I think Mr. Choudhri deserves.  He's got

7    obviously a great lawyer and I think these issues can get

8    sorted out in State Court one way or the other.  But this

9    bankruptcy case is going to essentially be on freeze for the

10   next 5 months until I decide some of these issues.

11           Did someone file something in my court that implies

12   other stuff?  Did someone represent to me that they were the

13   mezz lender under oath and they really weren't the mezz -- in

14   control of the mezz lender?  I don't know how I proceed

15   without that, without going forward.

16           Those are like serious allegations, and I think they

17   were set in front of me, but I don't -- but I don't -- right

18   now I've got to like deal with stuff like this and I can't go

19   forward without it.  So I think the easiest thing for me to do

20   is to protect everyone and just dismiss the case.  You know, I

21   think the case can -- you know, if parties want to come back

22   after this issue is decided, file it in the Houston Division

23   and a judge can take it up.

24           But right now there's nothing to do and I'm going to

25   freeze everything anyway, so I don't know -- I don't know what

55

1      people are -- what people could do.  We can't go forward.

2                  MS. HAYWARD:  Your Honor, may I just make a --

3                  THE COURT:  Yeah --

4                  MS. HAYWARD:   -- a couple of points?

5                  THE COURT:  Yeah, absolutely.

6                  MS. HAYWARD:  Okay.  Number 1, I hear Your Honor

7      about the market testing.  I'm not sure that I quite agree

8      with it respectfully --

9                  THE COURT:  I understand.

10                 MS. HAYWARD:   -- in that this is a cram down plan

11     based on collateral value and undisputed collateral value.

12     Right?  We have a building that has an appraisal that NBK

13     commissioned that sets a value of that building.

14                 MR. CONRAD:  Okay.  Can I rebut that real quick?

15                 THE COURT:  No, no, no --

16                 MR. CONRAD:  That's not --

17                 THE COURT:   -- what -- let me -- I know people have

18     to -- but let me just throw a hypothetical at you.  Okay?

19                 MS. HAYWARD:  Yes, Your Honor.

20                 THE COURT:  Say someone comes in and says, I want to

21     pay 50 million bucks, I'm just making up a number, 100

22     million --

23                 MS. HAYWARD:  Okay.

24                 THE COURT:   -- bucks, okay, I'm making up a number.

25                 MS. HAYWARD:  Then Your Honor's going to value the

1          building.

2                    THE COURT:  No, no, but I'm saying but who --

3          somebody has to go out there and figure out whether someone

4          wants to put more money in, because then that pays them more,

5          even if -- even under a cram down plan they get paid, they get

6          paid more of their money.  Right?  In other words there's a

7          cram down plan and if you're going to cram someone down,

8          you're not going to pay them 100 percent on the effective

9          date, then to me you've got to market test because you can't

10         just say, Here's the value of the collateral, here's how much

11         money somebody's going to put in, either you want it, you've

12         got to put more in.

13                   It's got to be market tested.  Maybe someone wants

14         to pay the -- maybe the -- someone has to look out for the

15         estate and say, I want to pay my creditors as much as

16         possible, here's an amount of money that, right, yeah, you're

17         crammed down under, you know, 506 crams you down and you just

18         lose on that point, but boy, I've got you 70 percent and not

19         the other part.

20                   MS. HAYWARD:  But, Your Honor, if that's the case,

21         then it goes to the value of the collateral.  Right?  I mean

22         Your Honor decides the value of the collateral and typically

23         you have --

24                   THE COURT:  And the --

25                   MS. HAYWARD:   -- competing appraisals.

57

1           THE COURT:  You have competing appraisals, right.

2    But who's then going to determine the amount of money that --

3    who owns this thing at the end of the day?

4           MS. HAYWARD:  Well, but again, that's why the plan -

5    - the plan proposes, as filed, right --

6           THE COURT:  Uh-huh.

7           MS. HAYWARD:   -- bifurcate the debt to NBK --

8           THE COURT:  Uh-huh.

9           MS. HAYWARD:   -- and to put $2-1/2 million in t

10   stabilize the building and then millions of dollars get paid

11   to creditors from --

12          THE COURT:  What if somebody wants to put 10 in,

13   what if somebody wants to put more money in?  In other words

14   how do we know --

15          MS. HAYWARD:  But the Bankruptcy Code doesn't -- I

16   mean that's why the -- that's a competing plan, isn't it --

17          THE COURT:  It's not --

18          MS. HAYWARD:   -- Judge?

19          THE COURT:   -- no.  No.  No.

20          MS. HAYWARD:  How is that -- that's a competing --

21   because the money going in is not the money going to

22   creditors.  The money going in is what's needed to fund the

23   plan.  The plan proposes certain treatment to creditors.

24          THE COURT:  What's NBK's distribution under the

25   plan?

58

1          MS. HAYWARD:  I don't know off the --

2          THE COURT:  Assuming you win on everything.

3          MS. HAYWARD:   -- off the top of my head I don't,

4     but it's --

5          THE COURT:  Less than full?

6          MS. HAYWARD:  Less than -- no, under and 1111(b)

7     election we believe it does pay them in the full amount of

8     the --

9          THE COURT:  I don't know --

10         MS. HAYWARD:   -- settled debt.

11         THE COURT:   -- they get to choose 1111(b) election,

12     so let's just say there's no 1111(b) election.

13         MS. HAYWARD:  Okay.  It still pays them -- it pays

14     the full value of their secured claim certainly.

15         THE COURT:  Over how many years?

16         MS. HAYWARD:  Your Honor, I've slept a little bit

17     since I prepared the plan, but I don't think it's --

18         THE COURT:  I haven't slept in 3 weeks.

19         MS. HAYWARD:  I have no doubt, Your Honor.  Your

20     Honor, I can pull a number --

21         THE COURT:  No, I'm just saying -- say somebody

22     wants to come in and say, I want to pay it, I want to pay it

23     all now.

24         MS. HAYWARD:  Your Honor, I think it was a 10-year

25     interest --

59

1          THE COURT:  10-year.  Say somebody wants to come in

2     and pay it in 2?  Right?  Like that's the -- it's -- that's

3     the point, you've got to -- you can't just propose, Here's

4     what we're going to do and here's -- my insider entity is

5     going to own this company, but --

6          MS. HAYWARD:  But --

7          THE COURT:   -- Ms. Hayward, you're never going to

8     get me there.  You're never going to get me there, and I know

9     I'm right on this one.  We can just agree to disagree.  But I

10    know that this case can't go forward as drafted, and I know

11    that they'd be entitled to interest to it while this issue

12    gets decided.

13          And I'm not even going to ask the questions about

14    decisions that were made in connection with the settlement.

15    There's just so many things, so many questions that I would

16    have to get decided.  Right?  There's a settlement agreement,

17    someone puts in a lot of money, but then also doesn't pay a

18    lot of taxes, decisions that were made then just -- there's

19    just so much going on, we're just never going to get there in

20    a month, month and a half.

21          I'm looking at the, Page 2.  Let me just take a look

22    at something.

23          (Pause in the proceedings.)

24          THE COURT:  Well, I think whoever they are I think

25    under 1112 the Court, on request of a party-in-interest, but

1    105 says -- 105 says that nothing prevents the Court from

2    considering things based on the circumstances, where we are,

3    where the Court finds itself is Galleria 2425 Owner, LLC was

4    filed on July 5 to avoid a foreclosure.  Nothing wrong with

5    that, it happens all the time in Bankruptcy Court.

6         Based upon the Court's review the petition was filed

7    by the manager, of course heard no evidence that the manager

8    didn't have authority, corporate authority to file.  The

9    manager then filed a disclosure statement and a plan.

10        MS. HAYWARD:  Your Honor, I believe Mr. Choudhri

11   signed the disclosure statement.

12        THE COURT:  Mr. Choudhri signed the disclosure

13   statement.  Are you sure about that?  Let's find out.  I'm

14   going to look it up real quick.  Disclosure statement.

15        (Pause in the proceedings.)

16        THE COURT:  Oh, he sure did.  I take that back.

17   Mr. Choudhri filed, the owner, the manager.  Well, I guess

18   there's 2 managers.

19        MS. HAYWARD:  Yes, Your Honor.

20        THE COURT:  Is the manager who filed --

21        MS. HAYWARD:  Your Honor, the corporate resolution

22   that was signed prior to the petition date pointed to both

23   Mr. Choudhri and Mr. Darjeen (phonetic) as the managers of

24   the -- and is designated officers for purposes of the

25   bankruptcy filing.

1          THE COURT:  All right.  No, I find nothing wrong

2     with that based upon what I have in front of me.  Mr. Darjeen

3     filed the plan, signed the plan.

4          MS. HAYWARD:  Yes, Your Honor.

5          THE COURT:  I don't want to ask that -- I think -- I

6     like Mr. Darjeen a lot.  Mr. Darjeen I think is a good man and

7     I'm not going to ask him.  When the petition was filed by

8     Mr. Darjeen, Mr. Darjeen filed a Chapter 11 plan.  And I'm

9     sure he's well familiar with the intricacies of that Chapter

10    11 plan and everything in it and what the Section 1129

11    standards are in connection with plan confirmation.  I'm sure

12    he's well familiar with that.

13         Mr. Choudhri filed the disclosure statement.  The

14    Debtor filed with approximately, I don't know, $56,000 worth

15    of cash.  As of the last MOR filed the Debtor probably has

16    135,000 in cash minus 20,000, a little over 20,000 that the

17    Debtor is required for a utility deposit that is still -- to

18    my knowledge has not been provided yet to utilities, which

19    means that the lights could be shut off at any moment.  But

20    that's a quick remedy.

21         State Court, in an unrelated case involving

22    Ms. Zahire and Naissance and Mr. Choudhri, issued a temporary

23    injunction on September 21, not allowing a party to an

24    adversary proceeding to proceed.  So it's like there are

25    additional matters set before the status -- I mean if there is

1    a question as to who owns Naissance, Naissance is a lender to

2    Galleria 2425 JV, LLC.  There's a dispute about who the owner

3    is and whether there were statements made.

4            There was an assignment under fraud.  The Court

5    makes no findings about that one way or the other, just based

6    on the temporary injunction, that's what it says.  I would

7    note that there were statements made in this Court in

8    connection with the cash collateral hearing as to whether that

9    was the case or not as well.

10           There's a pledge agreement as well, and the

11   underlying loan between Naissance and Galleria 2425, at least

12   on its face purports to provide this Debtor as 100 percent of

13   it being the collateral, 100 percent equity interest as

14   collateral on its face.  Whether parties can dispute that or

15   not, I'm just saying what it says on its face.

16           So the Court finds itself, whether there's going to

17   be additional hearings in adversary between Galleria 2425.

18   Naissance is a defendant in this case, but it can't proceed

19   because the other Naissance, Ms. Zahire, has indicated, at

20   least verbally to this Court, that they don't intend to

21   proceed with the adversary and have filed a motion confirming

22   that they can proceed in another court to exercise their

23   rights under the temporary injunction.

24           So the underlying adversary proceed that is pending

25   before the Court -- well, that just breaches the confidential

1    settlement agreement between NBK and other -- the Debtor and

2    other parties, tortious interference with business relation,

3    fraudulent inducement, so it's really serious, and a

4    fraudulent conveyance action.  There's not enough money to

5    proceed with that lawsuit based upon where the Court is, and

6    administrative costs, and I believe in lawyers who do good

7    work and have followed the Code should be paid.

8              This case quickly runs into a situation where there

9    is a plan on file, there's a disclosure statement on file,

10   this Court is not comfortable proceeding with that with --

11   based on all the issues that are proceeding in this case.

12   There are issues about ownership of the Debtor's parent which

13   may or may not affect the underlying lawsuit here.  It sounds

14   like there was a freeze put in by the State Court.

15             But there's time and then there's money.  There

16   would need to be a judicial determination, a contested

17   confirmation hearing.  And litigation, the litigation can't

18   continue which freezes the Court.  There would need to be a

19   contested confirmation hearing.  And there's not enough money

20   to do all of that.

21             And there's State Court issues involving fraud.

22   This Court could take them up.  But really the State Court's

23   already in the best position to deal with many of these

24   issues, and the parties are essentially asking the Court to

25   allow them to proceed in State Court.  Whether Ms. Zahire has

64

1    any right to anything, whether she's done everything right, I

2    don't -- I have no idea and are making no findings one way or

3    the other about what Ms. Zahire's rights are.  If it turns out

4    that she didn't have a right to do any of what she did, that's

5    going to be a real problem, and I think the State Court would

6    be in a position to address those issues here.

7         (Pause in the proceedings.)

8         THE COURT:  The Court's already held a hearing on a

9    motion to dismiss the case based upon, among other things, the

10    amount of money it would take to continue this case.  The

11    Court denied it based on the evidence presented to the Court

12    at the time.

13         NBK now seeks and files objections along with the

14    United States Trustee as to whether Ms. Hayward's qualified to

15    serve as Debtor's counsel under Section 327 of the Bankruptcy

16    Code.  The Court has not taken that issue up.

17         But for this case to continue there's going to have

18    to be a lot of money.  I'm going to have to require NBK to get

19    paid interest.  There's just not enough money in the budget,

20    this Debtor is going to run out of money really fast.  And the

21    Court's in the position where it's going to have to take it

22    all, or none, even if we're going to take it up all and deal

23    with allegations where somebody has made a representation to

24    this Court, or potentially made -- maybe say potentially made

25    representations to this Court that could be really tricky.

1   Interest on the loan to NBK at the non-default rate

2   is about $353,000 a month.  On the default based on the

3   evidence presented at the cash collateral, it was about

4   $447,000 a month.  The only way this case survives is if I

5   don't require NBK to be paid any interest on that loan pending

6   the resolution of State Court matters, the matters of plan

7   confirmation, and I'm unwilling to do that, which makes this

8   case immediately administratively insolvent.

9   No way this place could proceed.  The Court would

10  have to deal with serious allegations that were made in this

11  Court.  The Court would have to deal with whether there's

12  certain debt, whether this Debtor is subject to certain -- is

13  collateral under the debt, who the owner, who controls the

14  parent, what the parent wants to do, a lot going on here.

15  The allegations that are alleged, the Court would

16  have to really do a lot of finding and it would require a lot

17  more investigation.  I don't know.  Mr. Choudhri's involved in

18  litigation at the State Court level involving Naissance

19  alleging some strong allegations, I don't need to get into

20  them because I don't want to, but here Mr. Choudhri is listed

21  as an unsecured creditor to the tune of $960,000.  He also

22  controls a number of entities that are owed nmoney, and

23  Mr. Darjon (sic) filed these under penalty of perjury,

24  assuming he did his diligence.  He's a good man.

25  The Debtor has filed a plan but that plan cannot

1    proceed, not with all the pending allegations that are going,

2    not with all the required time and cost that would be

3    existent, including a market test of what the Debtor's

4    proposing to do, which is to allow the equity interest in this

5    Debtor to proceed to an insider.  And I mentioned on the first

6    day that that would need to be market tested because it

7    involves an insider, and there's a lot of fights going on.

8    And all that tells me is there would need to be funds payable

9    to deal with that litigation, and all it's going to eat into

10   is potential recovery.

11          A lot of investigations that would need to happen.

12   I think in closed cases, especially with the amount of money

13   involved and the amount of time and money involved, someone

14   would need to get me comfortable that they've looked into

15   these issues to make sure that unsecured claims are due and

16   proper, that they shouldn't be questioned, the amount of any

17   of them.

18          I raised a lot of issues about preference claims,

19   and I think they don't need to be brought in every case.  I

20   think someone just has to look at them to see what the issue

21   is there.  The issue here is that the allowed Class 7, the

22   allowed interest of the equity and interest on it are going to

23   be cancelled and they're going to be reissued to a new equity

24   holder based on a $2.5 million contribution.  For $2.5 million

25   you could own this company.

1          And that's what they want to go forward on, and I'm

2     not going to allow them to do it.  Where did that number come

3     from?  Based on this, is there a better number out there?  Is

4     there someone willing to put more money in to pay unsecured

5     creditors more money, general unsecured claims.  This milks

6     large general unsecured claims here as well.

7          This isn't a 2-party dispute.  There's a lot of

8     parties involved in this case, and I don't think you can do

9     any of that, and we can't get there without paying any

10    interest on at least several months of interest to Bank of

11    Kuwait.  I would have to revisit my entire cash collateral

12    order, I would have to revisit adequate protection to a

13    secured creditor while the State Court litigation plays itself

14    out, while allegations about fraud are taken out, some of

15    which could play -- find themselves here in front of this

16    Court based on representations that were made to me.

17         All of that, the timing of this case, the fact that

18    a plan could not even be considered until well into early

19    2024, the fact that I would require -- if to do that I would

20    require interest payments to be going to the secured creditor,

21    not just because this is a single asset real estate case, as

22    you can file a plan where you could pay interest, but in this

23    case based on all these allegations and all this confusion and

24    all this -- and the investigations that would need to go

25    forward, the secured creditor I think would be entitled to a

1    plan, because you can't confirm this plan quickly.

2         You can't get quickly to plan confirmation based

3    upon the issues that I've identified.  And there would have to

4    be investigations.  All right.  Some Court's going to have to

5    do it.  The State Court's already taking it up.  And this

6    Debtor is in no position to pay one month, or even a half a

7    month of interest to secured creditor.  Secured creditor

8    hadn't been paid in quite some time.

9         I don't -- before the Court spends the time and the

10   expense questioning, and I would note that the only way

11   secured creditor -- you know, while the Court spends the time

12   and the money taking up lawyer fees where Ms. Hayward would

13   have to defend herself, and I believe in her success, will

14   have a right to be paid.

15        Maybe she wins, maybe she loses.  If she loses, then

16   this case gets immediately dismissed, I've got to give --

17   because to then take time to go find new counsel, and you

18   still have to pay interest.  But if Ms. Hayward wins they've

19   now taken enough money.  This Debtor doesn't have enough money

20   to pay even a half a month of interest on the secured loan and

21   it would take until early 2024 to go deal with that.

22        I'm dismissing this case effective today under

23   Section 1112(b) for cause.  I would also note that this case

24   was filed in Victoria.  In connection with this I don't see a

25   connection with Victoria as well.  The cost to transfer this

69

1    case to the Houston Division and potentially assign the Chief

2    Judge to go find a new -- yeah, I'd still would need to pay

3    interest.  There's a lot of moving pieces here.

4           Maybe I would have transferred it to myself, I'd

5    note that, that I think I have the ability to do that in

6    certain cases.  And I'd just note that if this case does get

7    refiled I think the Houston Division is probably the right

8    division based upon the way the local rules have now been

9    amended to read.  I find nothing wrong with the filing.  I

10   find Ms. Hayward and done nothing wrong.

11          I don't think Mr. Pope has done anything wrong, but

12   I would tell Mr. Pope, I hold you in great regard.  I think

13   you've got to come to me and tell me if something gets filed

14   on, because I hold you in such high regard.  You appear in

15   front of me routinely, that means you've got to show up and

16   tell me stuff when stuff happens sooner.  I don't like hearing

17   it from third parties.  It makes me wonder stuff.  But

18   sometimes it's just a timing issue, so I don't want to read

19   too much into that.

20          This case cannot proceed without interest being paid

21   based on the investigation.  And I know I'm repeating myself.

22   I'm just stressing the issues here.

23          I make no finding about Mr. Choudhri, I make no

24   finding about Ms. Zahire.  Everybody has their rights.  I'm

25   going to let you all deal with this stuff in State Court.

1        The Court comes back, I make no findings about the

2   settlement agreement, the validity of the settlement

3   agreement, where things stand and who has a right to and what

4   the circumstances were, whether the allegations in the

5   adversary proceeding had merit, whether they have no merit,

6   the circumstances why payments weren't made during the

7   pandemic, why tax claims were allowed to accrue at such a

8   level, whether people could have done more.  I know the

9   lawyers didn't do anything wrong, and I'll leave it there.

10       I've never done this, I hope to never do it again,

11  but I think it's the right call in connection with this case,

12  and so that's my ruling, I've done it on my own.

13       MS. HAYWARD:  Your Honor, may the Debtor request

14  that Your Honor defer entry of an order for 10 days to see if

15  the parties can reach a resolution on the Naissance issue to

16  allow this case to move forward?

17       THE COURT:  No, I'm going to issue my order, and

18  then I'm going to let you all -- if you reach something, just

19  file something and ask me to reconsider, and I'll do it.

20       MS. HAYWARD:  I would also, Your Honor, just so that

21  the Record is very clear, I apologize --

22       THE COURT:  Uh-huh.

23       MS. HAYWARD:   -- that to the extent that --

24       THE COURT:  That was a contact issue, that wasn't me

25  rolling my eyes or anything, I was just -- I apologize, I know

1    it made you --

2              MS. HAYWARD:  Great, Your Honor.  I thought you were

3    rolling your eyes at me and I was going to stop.

4              THE COURT:  No, no, no, I appreciate it.  No, no,

5    no, no, I appreciate it.  That was just a contact issue.  I

6    apologize, I want to be really clear about that.

7              MS. HAYWARD:  I just want, for the Record, to say

8    that to the extent that -- and I appreciate Your Honor's

9    concern about payment of fees in this case, but one thing I

10   will tell Your Honor is that I have committed to this case and

11   so I see that as my risk.  Okay.  And I just want to make sure

12   the Record reflects that.  Number 2 --

13             THE COURT:  I agree.  No, I know, you're -- you

14   don't -- you don't abandon ship.  I know that about you, and I

15   know that you would have done your -- fulfilled your ethical,

16   and what you would consider to be your duty to your clients.

17   I'm doing this, not you.

18             MS. HAYWARD:  Yes, I understand, Your Honor.  I also

19   believe I take cases that -- I believe in justice.  Okay.  I

20   believe in justice and I fight for justice.  I also want to

21   point out that to the extent that interest payments were

22   required to be paid to NBK, there's obviously a dispute as to

23   the amount of that debt.  And so the $350,000 number that Your

24   Honor has stated I believe would be based upon a calculation

25   of the stated loan documents rather than the settlement

1    amount --

2              THE COURT:  No, no, no, I agree.

3              MS. HAYWARD:   -- which would be very different.

4              THE COURT:  I agree.  I agree with you there.  I'm

5    just saying when you're dealing with a debtor who has like

6    100,000 in cash maybe, I don't know, let's just say 110, that

7    number's going to get swallowed up in a month or 2 regardless

8    of what it is, and that doesn't even allow for admin costs to

9    be considered.  I agree with you, the loan documents say 350

10   and there was a settlement agreement, but people are fighting

11   about the settlement agreement, where there's interference

12   about the settlement agreement.

13             I've got to come up with a number one way, and I'm

14   not letting lawyers -- I've got it, lawyers take their risk

15   and I'm not -- those are administrative costs as well of the

16   estate and the answer isn't zero while -- say that number --

17   say we've even allocated 80,000, 100,000 under the settlement

18   agreement, you -- one month it's still done.

19             MS. HAYWARD:  Unless, Your Honor, someone is willing

20   to put in additional money to fund that to get to

21   confirmation, which I believe we stated at the motion to

22   dismiss hearing that Mr. Choudhri was willing to fund money to

23   keep this case going.

24             THE COURT:  Right.  But that's going to require then

25   looking into Choudhri.  And that's what I mean, it's a

1       revolving door.

2               MS. HAYWARD:  Your Honor, I will tell the Court that

3       Mr. Choudhri here has nothing to hide, and welcomes his --

4               THE COURT:  I'm not saying he does.

5               MS. HAYWARD:   -- day in court.

6               THE COURT:  I'm not saying he doesn't.  I'm not

7       saying he does, I'm not saying he doesn't.  I just think it's

8       required in every case, especially with -- there's a case

9       where unsecured creditors are going to get paid X amount, and

10      you have an unsecured creditor -- an insecure claim for

11      $960,000 stated on the books.  I think somebody gets to look

12      at that.

13              MS. HAYWARD:  Well, Your Honor --

14              THE COURT:   And it just makes your request -- plus

15      potential preference issues, plus -- and they could all be

16      legit is what I'm saying.  But now there's allegations of

17      fraud flowing out there and there's allegations of other stuff

18      going on.  It just takes a lot of time and money to get to the

19      right answer, that's what I mean.  That's all I'm saying.  I'm

20      not implying anything.

21              I don't want anyone to run to a State Court and say,

22      Lopez is implying -- I'm just saying all of that takes time

23      and money, and the minute I start opening up the door and

24      saying, What are the admin costs in this case, what is NBK

25      supposed to get paid, we've run out of money and it happens in

1    the nmonth of November.  What are we doing?  We don't get to

2    plan confirmation, plus the market testing that I'm going to

3    require, plus a contested confirmation.  It just -- you look

4    at it, there's -- the minute I open up interest on any amount

5    you're done, this case is administratively proceeding.

6         And the adversary proceeding cannot proceed, which

7    has really strong allegations that may be Mr. Choudhri wins

8    all or them.  I can't -- Naissance I don't know whether they

9    would come in or not, but the Debtor and Mr. Choudhri maybe

10   they win all of that stuff.  I don't know.  But there's got to

11   be money for it though.

12        MS. HAYWARD:  Understood, Your Honor.  I also just

13   want to point out that under the plan unsecured creditors are

14   getting paid.  All of the claims with respect to the building

15   are paid in full early in the plan --

16        THE COURT:  Uh-huh.

17        MS. HAYWARD:   -- and then the Debtor is paying

18   another several million dollars on account of the NBK

19   deficiency and the other creditor claims that are out there.

20        THE COURT:  Uh-huh.

21        MS. HAYWARD:  Plus paying NBK monthly.

22        THE COURT:  For 10 years.

23        MS. HAYWARD:  Yes, but with an amortization, it's

24   not --

25        THE COURT:  No, no, I agree.

75

1          MS. HAYWARD:  -- it's not, you know --

2          THE COURT:  But what I'm saying --

3          MS. HAYWARD:  -- negative amortization.

4          THE COURT:  That's what I'm saying, it's the 2.5

5     mil.  Right?  But if somebody injects 10 million, you've got a

6     whole different animal.

7          MS. HAYWARD:  Well, I get Your Honor, I hear that

8     that's Your Honor's position, I don't -- I respectfully

9     disagree.

10         THE COURT:  I know you do.

11         MS. HAYWARD:  I mean I think that under the Code I'm

12    entitled to bifurcate claims and come up with a plan that

13    proposes something to pay creditors.

14         THE COURT:  I just think when you -- you know, but

15    you talk to insiders.  We're talking about what happens to the

16    equity interest, I'm not talking about bifurcation of claims,

17    I'm talking about equity interest.

18         MS. HAYWARD:  Yes, Your Honor, and equity --

19    somebody is coming in and willing to fund the $2-1/2 million

20    that is needed in order for the building to be stabilized.  So

21    they are fronting the payments that are going to creditors.

22    If Your Honor looks at the projections --

23         THE COURT:  No, I'm looking at all that.

24         MS. HAYWARD:  -- the building runs at a deficit for

25    the next 2 years.

1     THE COURT:  Well --

2     MS. HAYWARD:  So that's the --

3     THE COURT:   -- we're just going to agree to

4 disagree, Ms. Hayward.  I got it, it's -- I'm not saying --

5 it's really smart, it's just not market tested.  It's really

6 smart on paper, it checks all the boxes.  This checks -- it

7 checks all the boxes.  I got you.  You're going to run out of

8 money.  You won't get there.  You won't get to plan

9 confirmation.  You can't even survive on a contested plan

10 confirmation based on the amount of money that we've got here.

11 You don't.  You don't, because they're going to have pay

12 interest till we get there.

13    I'm going to have to figure out what's happening in

14 the adversary proceeding.  And if somebody lied to me on the

15 stand, I'm not saying anybody did, but if somebody did, it

16 turns out that something happened, somebody lied to me on the

17 stand, things get really uncomfortable around here.  And I

18 think everybody ought to go figure all that stuff out in State

19 Court.

20    And I don't put any weight to what Mr. Drinnon told

21 me.  I don't put any weight to what Mr. Tang told me.  I don't

22 put any weight to anything else.  I haven't taken a lick of

23 evidence.  It's just like a pleading, people get to say stuff.

24 I take it seriously though.  We have to think of it here, but

25 that's not happening.  Those are allegations that the lawyers

1    have ethical duties to make statements in front of Court that

2    are based on ethical duties, but I don't know.

3         But we -- somebody's going to have to then tell me,

4    We looked at insider claims based on all these allegations and

5    we find no evidence, somebody's going to have to -- like

6    that's what happens in cases.  That's what I mean, somebody's

7    going to have to tell me, I looked at the insider issues and,

8    yeah, I'm aware of all these allegations that are being made

9    and we think they're clean.

10        That's what I mean, somebody's got to do that.

11   That's the independent fiduciary part.  And I'm not saying you

12   haven't done it, I'm saying that's what would be required for

13   me to then make the finding that the plan was filed in good

14   faith and without, by any means, forbidden by law.  And I

15   can't make that finding because that's going to require time

16   and money, again, because there's allegations out there and

17   I've got to -- someone's going to have to deal with them, and

18   it could be me, or someone's going to have present a report to

19   me or some testimony.  And they did, maybe Mr. Darjon is the

20   guy to do it.  That's going to require time and money and

21   that's going to require interest, that's what I mean so.

22        MS. HAYWARD:  Then I would ask Your Honor to enter

23   an order that the Debtor must come up with -- either file some

24   kind of subordinated DIP motion or something and start paying

25   interest in a certain amount.  I mean, again, Your Honor,

1      we're trying to save this asset.

2           THE COURT:  No, I know, and you can --

3           MS. HAYWARD:  If this case gets dismissed because of

4      Mr. Tang and Mr. Drinnon --

5           THE COURT:  It's not being dismissed for Mr. Tang

6      and Mr. Drinnon, it's dismissed -- it's being dismissed for

7      far more than that.  If that's the case, you haven't heard me.

8      I'm saying we -- it's going to take time and money to resolve

9      a lot of issues, and it's entirely based on me saying no

10     interest to NBK.  Not 1, not 1, not 1/2, not 100, not 200

11     grand, nothing.

12          And if that's the case, then no money -- no

13     administrative costs to you, or to anyone else who works on

14     this case.  Or to anyone else who would be hired to provide

15     valuation testimony.  And I'm unwilling to do that.  I'm

16     unwilling to do that.  And the plan proposes, you know, that

17     an insider is going to receive -- is going to make a $2-1/2

18     million contribution and they're going to get the equity.  And

19     that's going to require some time and work to get me

20     comfortable.

21          If that's the case, then that's going to require

22     interest payments.   People are entitled to adequate

23     protection.  And everything hinges on me holding everything

24     and not doing anything until I decide this issue, and we run

25     out of money really fast, and I'm unwilling to do it.

1        So you have my reasons, they'll be on the Record,

2   and I'll just enter an order saying for the reasons stated on

3   the Record this case is dismissed.  And it's not about

4   Mr. Tang, it's about the allegations.  It's about allegations,

5   it's about interest, time, market testing under a plan, a

6   lawyer who's willing to go out there and risk not being paid,

7   but that doesn't mean that there's not an administrative

8   expense.

9        I don't know.  And I do know we can't proceed on the

10  adversary because of Naissance, and that issue has to get

11  resolved.  And I have an adversary proceeding right now where

12  all 3 are still there, and that can't proceed.  There's a

13  State Court injunction saying Naissance can't proceed.  I

14  don't -- why don't you all go fight about it.  Maybe they come

15  back -- it's just a freeze, but you can't -- but the problem

16  is they freeze the whole thing because they're involved in it.

17       So that's my ruling.  Thank you.

18       UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

19  (Hearing adjourned 11:40 a.m.)

20

21

22

23

24

25                      *  *  *  *  *

80

1          *I certify that the foregoing is a correct transcript*

2     *to the best of my ability produced from the electronic sound*

3     *recording of the proceedings in the above-entitled matter.*

4     */S./  MARY D. HENRY*

5     *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

6     *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

7     *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

8     *JTT TRANSCRIPT #67838*

9     *DATE FILED:  NOVEMBER 7, 2023*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Exhibit B

**Proposed Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 23-34815 (JPN)** |
| **GALLERIA 2425 Owner, LLC** | § | |
| | § | **Chapter 11** |
| **Debtor.** | § | |
| | § | |

## ORDER GRANTING INTRA-DISTRICT TRANSFER

Upon the motion (the "<u>Motion</u>") of NBK[1] requesting entry of an order transferring the above-captioned chapter 11 case to the Honorable Christopher M. Lopez in this Court; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue of this Motion being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and adequate notice of, and the opportunity for a hearing on, the Motion having been given; and it appearing that no other or further notice need be provided; and this Court having found that the relief requested in the Motion and provided for herein is in the best interest of the Debtor and its creditors, and other parties in interest; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon the record herein, and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      Pursuant to Local Rule 1014-1, in the interest of justice and for the convenience of parties, the above-captioned chapter 11 case shall proceed in this Court before the Honorable Christoper M. Lopez.  The case number will remain unchanged.

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

2.      The Court shall retain jurisdiction with respect to all matters arising from or related to implementation or interpretation of this Order.

Signed: December _____, 2023

_____
Jeffery P. Norman
United States Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 23-34815 (JPN)** |
| **GALLERIA 2425 Owner, LLC** | § | |
| | § | **Chapter 11** |
| Debtor. | § | |
| | § | |

---

**MOTION TO SHORTEN AND LIMIT THE NOTICE AND OBJECTION PERIOD**
**REGARDING NATIONAL BANK OF KUWAIT, S.A.K.P, NEW YORK**
**BRANCH'S MOTION TO TRANSFER CASE INTRA-DISTRICT**

---

<div style="border:1px solid black">

NOTICE PURSUANT TO LOCAL RULE 9013-1

This pleading requests relief that may be adverse to your interests.

If no timely response is filed within 21 days from the date of service, the relief requested herein may be granted without a hearing being held.

A timely filed response is necessary for a hearing to be held.

Expedited relief has been requested. If the Court considers the Motion on an expedited basis, then you will have 21 days to answer.  If you object to the requested relief or if you believe that the expedited consideration is not warranted you should file an immediate response.

</div>

TO THE HONORABLE JEFFREY P. NORMAN, U.S. BANKRUPTCY JUDGE:

National Bank of Kuwait, S.A.K.P. New York Branch ("NBK"), files this motion to shorten (the "Motion to Shorten") and represents as follows.

#### JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157(b)(2) and 1334. Venue is proper under 28 U.S.C. § 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2) upon which the Court has authority to enter a final order granting the relief

requested.  The bases for the relief requested is Part 4 of the Court Procedures/Practice Guide (the "Court Procedures").

<div align="center">

**RELIEF REQUESTED**

</div>

2.      NBK seeks entry of an order in the form attached as Exhibit A (the "Proposed Order") shortening the notice and objection periods with respect to *National Bank of Kuwait, S.A.K.P. New York Branch's Motion to Transfer Case Intra-District* (the "Transfer Motion") so that it may be heard on December 15, 2023 with the objection deadline on December 14, 2023.

<div align="center">

**BASIS FOR RELIEF**

</div>

3.      Local 9013-1(b) provides parties must file and serve a response to any motion within 21 days of service.  However, the Court Procedures provides that "[p]arties may also request by separate motion an expedited hearing on any motion/application if a shortened response time is required but the motion/application is not an emergency.  In these situations, the initial motion should be self-calendared with a normal notice period as required above. The Court will review any motion for expedited hearing and determine an appropriate hearing date." Court Procedures at 4.  The Federal Rules of Bankruptcy Procedure are in accord, providing that "the court for cause shown may in its discretion with or without motion or notice order the period reduced." Fed. R. Bankr. P. 9006(c).

4.      Here, cause exists to expedite consideration of the Transfer Motion, the reasons for which are hereby incorporated and relied upon as a basis for this Motion to Shorten. Currently, the Court has set a status conference in this case for February 7, 2024.  *See* ECF No. 8.  NBK believes that any status conference is appropriate before Judge Lopez instead given that

<div align="center">

2

</div>

he presided over *Galleria I*,[1] which is related to this case.  Thus, shortening the notice and objection periods will allow the Court to address the Transfer Motion immediately and consider whether Judge Lopez is best suited to preside over any status conference and hearings regarding the Debtor and its estate.

5.      For the foregoing reasons, the Motion to Shorten should be granted.

<div align="center">N<small>OTICE</small></div>

6.      Notice of this Motion to Shorten has been provided to: (a) the Office of the United States Truste for the Southern District of Texas; (b) counsel to Naissance Galleria, LLC; (c) proposed counsel to the Debtor; (d) any party that has requested notice pursuant to Bankruptcy Rule 2002.  NBK submits that no other or further notice is required.

<div align="center">C<small>ONCLUSION</small></div>

WHEREFORE, NBK requests that the Court enter the Proposed Order attached as Exhibit A: granting (i) the relief requested herein and (iii) such other relief as is just and proper.

---

[1]  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Transfer Motion.

DATED: December 8, 2023

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Charles C. Conrad*
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010-1028
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

-   *and*   -

Andrew M. Troop  (Bar No. MA547179)
Patrick E. Fitzmaurice*
Kwame O. Akuffo**
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

\*\*Pro hac vice\* pending
\*\*Admitted *pro hac vice*

**Counsel for National Bank of Kuwait, S.A.K.P., New York Branch**

000383

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on December 8, 2023, a true and correct copy of this document was served via the Court's CM/ECF system on the Debtor and its counsel of record and all others who are deemed to have consented to ECF electronic service, and also by mailing, first class, postage prepaid, to each of the parties on the attached mailing matrix.

<div align="right">

*/s/ Charles C. Conrad*
Charles C. Conrad

</div>

## Exhibit A

**Proposed Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 23-34815 (JPN)** |
| **GALLERIA 2425 Owner, LLC** | § | |
| | § | **Chapter 11** |
| Debtor. | § | |
| | § | |

## ORDER GRANTING MOTION TO SHORTEN

Upon consideration of the Motion to Shorten the time for notice to consider and the objection period regarding the Motion and; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Court Procedures[2]; and pursuant to Rule 9006-1(e) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware; and the Court having determined that granting the relief requested in the Motion to Shorten is appropriate; and it appearing that due and adequate notice of the Motion to Shorten has been given under the circumstances, and that no other or further notice need be given; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1. The Motion to Shorten is **GRANTED** with respect to the Motion;

2. The Motion shall be heard on **December _____, 2023**;

3. Objections to the relief requested in the Motion, if any, shall be filed on **December _____, 2023**.

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion to Shorten.

4.      The Court shall retain jurisdiction with respect to all matters arising from or
related to the implementation or interpretation of this Order.


Signed: December _____, 2023                    _____

                                                Jeffery P. Norman
                                                United States Bankruptcy Judge

000387

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 11, 2023

Nathan Ochsner, Clerk

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 23-34815** |
| **GALLERIA 2425 OWNER, LLC,** | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | **CHAPTER 11** |
| | § | |

## ORDER DENYING MOTION TO TRANSFER CASE

This matter is before the Court on the Motion to Transfer Case Intra-District (ECF No. 15) and the Motion to Shorten and Limit the Notice and Objection Period Regarding National Bank of Kuwait, S.A.K.P., New York Branch's Motion to Transfer Case Intra-District (ECF No. 16) filed by counsel for National Bank of Kuwait, S.A.K.P., New York Branch. For the following reasons, the motions are denied.

First, the movant failed to self-calendar the initial motion as required by this Court's procedures.[1] Further, the Motion to Shorten is not certified for its accuracy as required by this Court's procedures.[2] The Court also notes that the language required by BLR 9013-1[3] in the Motion to Shorten is incorrect. Additionally, both motions contain a certificate of service that states that "a true and correct copy of this document was served via the Court's CM/ECF system on the Debtor and its counsel of record and all others who are deemed to have consented to ECF electronic service, and also by mailing, first class, postage prepaid, to each of the parties on the attached mailing matrix." However, neither motion contained an attached mailing matrix. Bankruptcy Local Rule 9013-1(f) requires that the certificate of service contain the name and address of those served.[4] As such, the motions are procedurally deficient.

Finally, and importantly, the Court has conferred regarding the requested relief. Given current case weighting and calendars any transfer of this case is not possible.[5] As such, the requested relief is denied.

---

[1] "Parties may also request by separate motion an expedited hearing on any motion/application if a shortened response time is required but the motion/application is not an emergency. In these situations, the initial motion should be self-calendared with a normal notice period as required above."

[2] "The motion seeking an emergency hearing must be certified for its accuracy by the party seeking the emergency relief or by its counsel."

[3] "Emergency (or expedited) relief has been requested. If the Court considers the motion on an emergency (or expedited) basis, then you will have **less than** 21 days to answer. If you object to the requested relief or if you believe that the emergency (or expedited) consideration is not warranted, you should file an immediate response."

[4] The Bankruptcy Local Rules can be found at https://www.txs.uscourts.gov/page/bankruptcy-local-rules.

[5] The Southern District of Texas Bankruptcy Courts currently have a vacant judge position. This has required the reassignment of cases and increased case loads across all Judges.

   **THEREFORE, IT IS ORDERED** that the Motion to Transfer Case Intra-District (ECF No. 15) and the Motion to Shorten and Limit the Notice and Objection Period Regarding National Bank of Kuwait, S.A.K.P., New York Branch's Motion to Transfer Case Intra-District (ECF No. 16) are denied.

   SIGNED 12/11/2023

_____

Jeffrey Norman
United States Bankruptcy Judge

2 / 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | |
| **GALLERIA 2425 OWNER LLC,** | **Case No. 23-34815**<br>**Chapter 11** |
| Debtor. | |

### DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING THE USAGE OF CASH COLLATERAL

## Emergency Relief is requested by December 15, 2023.

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

**Emergency relief has been requested. If the Court considers the motion on an emergency basis, then you will have less than 21 days to answer. If you object to the requested relief or if you believe that the emergency consideration is not warranted, you should file an immediate response.**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Galleria 2425 Owner LLC (the "Debtor"), debtor-in-possession in the above-captioned bankruptcy case, files this *Debtor's Motion Interim and Final Orders Authorizing It to Use Cash Collateral* (the "Motion"), in support of which the Debtor would respectfully show as follows:

## I.      JURISDICTION AND VENUE

1.      The Court has jurisdiction of this Motion under 28 U.S.C. § 1334, and this Motion constitutes a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this Court under 28 U.S.C. § 1408 and 1409.

## II.      BACKGROUND

2.      The Debtor commenced the case on December 5, 2023 (the "Petition Date") by filing a petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

3.      The Debtor continues to operate its business as debtor-in-possession under sections 1107 and 1108 of the Bankruptcy Code. The Court has not appointed a trustee or examiner in this case.

4.      The Debtor's primary asset is a Class A office building located at 2425 West Loop South, Houston, Texas 77027(the "Property").  The Property is fully covered by commercial property and liability insurance.

5.      As of the Petition Date, the Debtor was allegedly indebted to National Bank of Kuwait, S.A.K.P., New York Branch ("NBK") pursuant to a loan made to the Debtor by NBK (the "Loan").

6.      As of the Petition Date, the Debtor was also allegedly indebted to 2425 WL, LLC ("2425 WL"), Caz Creek Lending ("Caz Creek") and Harris County, Texas (Harris County including the City of Houston, the independent school district, and various other entities included

within Harris County)("Harris County")(NBK, 2425 WL, Caz Creek and Harris County, collectively at times, the "Secured Creditors").

7.      The Debtor's source of operating funds is generated by the operation of the Property, specifically, rental and other income from tenants at the Property collected by or for the benefit of the Debtor.

8.      By virtue of the Loan Documents referenced above, the Secured Creditors may or do assert liens or encumbrances on the Debtor's assets, including the rents received from tenants of the Property, which constitute cash collateral pursuant to Section 363(a) of the Bankruptcy Code.

9.      The Debtor requires the use of the Secured Creditors' cash collateral to continue the operation of the Property and will suffer irreparable and immediate harm if it is not granted the relief requested herein.  An immediate and critical need exists for the Debtor to obtain funds in order to continue operating the Property, and without such funds, the Debtor will not be able to pay its direct operating expenses, maintain the Property, or obtain goods and services needed to carry on its business during this sensitive period in a manner that will avoid irreparable harm to the Debtor's estate.  The Debtor's ability to use Secured Creditors' Cash Collateral is vital to the confidence of the Debtor's tenants, vendors, and suppliers of goods and services to the Property and to the preservation and maintenance of the going concern value of the Debtor's estate.

10.      Pursuant to Section 363 of the Bankruptcy Code, the Debtor is requesting authority to use cash collateral to satisfy its normal and necessary operating expenses.  A budget reflecting the Debtor's projected monthly normal and necessary costs is attached hereto as Exhibit A (the "Budget").  Absent the authority to use the amounts set forth in the budget, the Debtor will be unable to operate and maintain the Property and therefore successfully reorganize.

11.      By this Motion, the Debtor requests (a) interim authority to use the cash collateral

("Cash Collateral") in accordance with the terms and conditions set forth herein, the proposed Budget, and the proposed Order (the "Interim Order"); (b) authority to use Cash Collateral on an interim basis; and (c) the granting of adequate protection to any secured creditor holding an interest in cash collateral pursuant to Sections 361 and 363 of the Bankruptcy Code.

### III.   ARGUMENT AND AUTHORITIES

12.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  The Debtor requires the use of Cash Collateral to fund its day-to-day operations.  Indeed, absent such relief, the Debtor's business will be brought to an immediate halt, with damaging consequences for the Debtor and its estate and creditors as well as the Property's tenants.

13.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by [a debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code sets forth the forms of adequate protection which may be provided, which include periodic cash payments, additional liens, replacement liens, and other forms of relief.  11 U.S.C. § 361.  What constitutes adequate protection must be decided on a case-by-case basis, though the Fifth Circuit has set forth certain criteria that should be considered, including "the value of the collateral . . . the likelihood that the collateral will depreciate or appreciate over time, whether insurance coverage is adequate, whether property taxes are being paid, and the prospects for the successful reorganization of the debtor's affairs."[1]

---

[1] In re Mendoza, 111 F.3d 1264, 1272 (5th Cir. 1997); In re Las Torres Development L.L.C, 413 B.R. 687, 697 (Bankr. S.D. Tex. 2009); see also MNBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396 (10th Cir. 1987); Martin v. U.S. (In re Martin), 761 F.2d 472 (8th Cir. 1985); In re Shaw Indus., Inc., 300 B.R. 861, 865 (Bankr. W.D.

The main focus is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.[2]

14.     As adequate protection, the Debtor proposes to provide the following adequate protection to the Secured Creditors to the extent of any diminution in the value of their respective collateral:

>   a. superpriority claims, pursuant to sections 361(2), 363(c)(2), 364(d)(1), 503(b)(1), 507(a)(2) and 507(b) of the Bankruptcy Code with such superpriority claims to be senior to all other postpetition superpriority claims, subject to a carve-out for professional fees and fees owed to the United States Trustee as reflected in the budget; and
>
>   b. replacement liens on all property now owned or hereafter acquired by the Debtor, with such liens to be subordinate only to the liens of any applicable taxing authority, and subject to a carve-out for professional fees and fees owed to the United States Trustee in accordance with the budget.

15.     Any Secured Creditor's interest in cash collateral will be protected by the adequate protection set forth above, as the Debtor will continue to generate new accounts receivable and purchase new inventory in the ordinary course of their business.

16.     Under FED. R. BANKR. P. 4001, the Court may not enter a final order granting this Motion before 14 days after service of this Motion. The Debtor therefore requests that the Court enter an interim order authorizing the use of cash collateral under FED. R. BANKR. P. 4001(b)(2) as soon as possible, and then set this Motion for a final hearing.

---

Pa. 2003).

[2] *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 554 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

## IV.    PRAYER

WHEREFORE, the Debtor respectfully requests that the Court enter an order granting this Motion, authorizing the Debtor to use cash collateral on the terms set forth in this Motion, and granting the Debtor such other relief to which it is entitled.

Dated: December 14, 2023.

Respectfully submitted,

*/s/Reese W. Baker*
Reese W. Baker
Texas Bar No. 01587700
Nikie Marie Lopez-Pagan
TX Bar No. 24090233
Baker & Associates
950 Echo Lane, Suite 300
Houston, Texas 77024
713-869-9200
713-869-9100 (fax)
**PROPOSED COUNSEL FOR THE DEBTOR**

## CERTIFICATE OF EMERGENCY

The undersigned on behalf of the Debtor certifies that an emergency hearing is necessary. Utilities must be paid or the utilities will be shut off. The possible shut off date is currently December 15, 2023.  The Debtor must have utilities for continuing the electricity, water, elevators, access, internet and other critical services.  Cash collateral is needed to make the utility deposit.  A hearing is requested by 3:00 pm on Friday, December 15, 2023.

/s/  *Reese W. Baker*
Reese W. Baker

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on December 14, 2023, a true and correct copy of the foregoing document was delivered to the Electronic Filing Service for the United States Bankruptcy Court for the Southern District of Texas and also served upon the attached service list via U.S. mail and/or CM/ECF on December 14, 2023.

/s/ *Reese W. Baker*
Reese W. Baker

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | |
| **GALLERIA 2425 OWNER LLC,** | **Case No. 23-34815** |
| | **Chapter 11** |
| Debtor. | |

## INTERIM ORDER AUTHORIZING
## DEBTOR TO USE CASH COLLATERAL

**CAME ON** for consideration on this date *Debtor's Emergency Motion for Interim and Final Orders Authorizing the Debtor to Use Cash Collateral* (the "Motion") filed by Galleria 2425 Owner LLC (the "Debtor"), the debtor-in-possession in the above-captioned bankruptcy case.

Upon consideration of the Motion, the Court finds that all required parties have been served with notice thereof and that the Motion is well-taken and that the relief sought therein should be, and hereby is, **GRANTED**. Accordingly, it is hereby found that:

1.      On December 5, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") electing treatment Chapter 11, commencing its above-styled bankruptcy case.

2.      The Debtor continues to operate and manage its business as "debtor in possession" pursuant to sections 1182 and 1184 of the Bankruptcy Code.

3.      This Court has jurisdiction over this case and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

4.      The Debtor's primary asset is a Class A office building located at 2425 West Loop South, Houston, Texas 77027(the "Property").  The Property is fully covered by commercial property and liability insurance.

5.     As of the Petition Date, the Debtor was allegedly indebted to National Bank of Kuwait, S.A.K.P., New York Branch ("NBK") pursuant to a loan made to the Debtor by NBK (the "Loan").  As of the Petition Date, the Debtor was also allegedly indebted to 2425 WL, LLC ("2425 WL"), Caz Creek Lending ("Caz Creek") and Harris County, Texas (Harris County including the City of Houston, the independent school district, and various other entities included within Harris County)("Harris County")(NBK, 2425 WL, Caz Creek and Harris County, collectively at times, the "Secured Creditors").

6.     The Debtor's rents that it collects each month with respect to the Property constitute cash collateral (the "Cash Collateral") pursuant to Section 363(a) of the Bankruptcy Code.

7.     The Debtor requires the use of cash collateral to continue the operation of its business and will suffer irreparable and immediate harm if it is not granted the relief requested herein.  An immediate and critical need exists for the Debtor to obtain funds in order to continue operating the Property, and without such funds, the Debtor will not be able to pay its direct operating expenses, maintain the Property, or obtain goods and services needed to carry on its business during this sensitive period in a manner that will avoid irreparable harm to the Debtor's estate. The Debtor's ability to use Cash Collateral is vital to the confidence of the Debtor's tenants, vendors, and suppliers of goods and services to the Property and to the preservation and maintenance of the going concern value of the Debtor's estate.

8.     The value of the Cash Collateral may diminish as the Debtor operates and uses and expends Cash Collateral, and creditors with a secured interest in Cash Collateral are entitled to adequate protection of their respective interests in the Debtor's use of Cash Collateral.

9.     Good cause has been shown for the entry of this Order.  The Court finds that the notice to the U.S. Trustee and the Debtor's creditors was sufficient under the circumstances.  Entry of this Order is justified and appropriate under the circumstance and is in the best interest of the estate.

IT IS THEREFORE ORDERED AND ADJUDGED as follows:

10.     **Use of Cash Collateral**.  The Debtor is hereby authorized in the interim to use Cash Collateral only in the amounts and for the expenses and disbursements set forth in the Budget, and Cash Collateral shall not be used for any other purpose or in any other amount, subject to the Budget Variance as defined below.   The Debtor shall not incur expenses nor use Cash Collateral in an amount that exceeds by more than ten percent (10%) the total expenses provided in the Budget ("Budget Variance") without first obtaining consent or approval of this Court.

11.     **Replacement Liens**.  As adequate protection to any creditor alleging an interest in Cash Collateral, and except as otherwise provided herein, to the extent that Debtor's use of Cash Collateral results in a decrease in the value of a Secured Creditor's valid and unavoidable interest in such property, such Secured Creditor is hereby granted a perfected replacement lien, security interest, and claim ("Replacement Liens") on all property now owned or hereafter acquired by the Debtor  (the "Replacement Collateral") to the extent of any diminution in the value of such respective property.

Such Replacement Liens shall be subordinate only to the Carve-Out (as defined below).

12.     **507(b) Claim**.  As adequate protection to any creditor with a valid and unavoidable interest in Cash Collateral, such creditor is hereby granted an administrative claim ("507(b) Claim") with priority as specified under Section 507(b) of the Code, subject to the payment of the Carve Out (as defined below), equal to all other administrative expenses and administrative claims of any kind under Sections 503 or 507 to the extent there shall be a difference between: (i) the value of the Cash Collateral as of the Petition Date, and (ii) the aggregate value of the Cash Collateral, effective as of the date such 507(b) Claim is determined.  Notwithstanding anything to the contrary in this Order, the liens and superpriority claims granted herein are subject and subordinate to a carve-out of funds (the "Carve Out") for the following administrative expenses:

(a) all fees and expenses incurred by the Debtor's professionals that are allowed by the Court pursuant to the Bankruptcy Code (the "Professionals"); (b) statutory liens of ad valorem taxing authorities; and (c) quarterly fees owed to the United States Trustee. Amounts actually paid to the Professionals shall not be subject to disgorgement in order to satisfy in whole or in part an administrative claim provided herein.

13.     **No Lien Upon Avoidance Actions**.  The Replacement Liens do not extend to the Debtor's transfer or lien avoidance rights and claims under Sections 544, 545, 547, 548, 549 or 550 of the Code or funds received from same.

14.     **Priority of Replacement Liens.**   The Replacement Liens shall be prior and senior to any other security interest, interest, encumbrance, right or lien in the Replacement Collateral, subject only to: (i) the valid and perfected pre-petition lien and security interests of a creditor in such Replacement Collateral existing as of the Petition Date; (ii) statutory liens of ad valorem taxing authorities; and (iii) the payment of the Carve Out.

15.     **Perfection of Liens**.   The Replacement Liens and the 507(b) Claim are, and shall be, valid, perfected, enforceable and effective as of the Petition Date without the need for any further action by the Debtor, any Secured Creditor with an interest in Cash Collateral, or the necessity of execution or filing of any instruments or agreements.  This Order and the Replacement Liens, rights, 507(b) Claim, and other protections granted herein do not waive, restrict, or alter the validity, extent, priority, perfected status, or scope of the pre-petition liens, security interests, priorities, rights of set-off, remedies, or claims of any creditor.

16.     **Terms of Use of Cash Collateral**.  The Debtor is authorized to use Cash Collateral in accordance with this Order until the earlier of the following (the "Termination Date"): (i) five business days after notice by a creditor with an interest in Cash Collateral to the Debtor of any "Termination Event" as described below, unless within such five-day period the Debtor has cured

such Termination Event or unless waived by such creditor, (ii) the date of the dismissal of Debtor's bankruptcy case or the conversion of Debtor's bankruptcy case to a case under Chapter 7 of the Code, or (iii) the date of  appointment of a trustee in Debtor's bankruptcy case.  Each of the following events constitute a "Termination Event":  (i) any material failure of Debtor to comply with this Order; (ii) the failure by Debtor to pay when due operating expenses incurred after the Petition Date; (iii) the failure by the Debtor to maintain property, casualty and liability insurance; (iv) the occurrence of the effective date or consummation date of a plan of reorganization for Debtor; (v) the entry by this Court or any other court of an order reversing, staying, or vacating this Order or amending, supplementing, or otherwise modifying in any material manner the protections granted to Debtor in this Order; or (vi) the entry by this Court of an order granting relief from the automatic stay imposed by Section 362 of the Code to any entity other than Debtor that permits such entity to exercise foreclosure or disposition rights with respect to the Cash Collateral, or Replacement Collateral.  Upon the Termination Date, Debtor shall cease using Cash Collateral unless the Debtor obtains either written consent to further use Cash Collateral or an authorizing order of the Court is entered after notice and an opportunity for hearing.

17.   **Protection of Existing Collateral.**  Collateral, including Cash Collateral, shall not be used or sold other than in the ordinary course unless the Debtor obtains the approval of this Court.

18.   **Notice.**  Within five business days after entry of this Order, Debtor's counsel shall serve a copy of this Order on all of the following parties: (a) the Office of the United States Trustee; (b) National Bank of Kuwait, S.A.K.P., New York Branch; (c) all Secured Creditors known to the Debtor who have or may assert liens against the Debtor's assets; and (d) all parties-in interest who have filed a notice of appearance.

19.   **Final Hearing.**  A final hearing on the Motion shall be held on **\_\_\_\_, 202\_\_\_ at \_\_\_\_**

**_.m.**  The Debtor shall provide notice of such final hearing on the parties listed in the Notice paragraph above.  Such notice shall be deemed sufficient pursuant to Rule 4001 of the Federal  Rules of Bankruptcy Procedure. No further notice of the Motion is necessary.

Signed:_____


_____
Jeffrey P. Norman
United States Bankruptcy Judge

**PREPARED AND SUBMITTED BY:**

Reese W. Baker
Baker & Associates
950 Echo Lane, Suite 300
Houston, Texas 77024
713-869-9200
713-869-9100 (fax)
**PROPOSED COUNSEL FOR THE DEBTOR**

**BUDGET ON FOLLOWING PAGE**

**12/1/2023 Budget**

| | Dec 5-Dec 17 | Dec 18-Jan 3 |
|---|---|---|
| **Operating Expenses** | | |
| **Service Contract** | | |
| Smart Office Automation | | $650.00 |
| Culligan of Houston | $40.00 | |
| **Fire Safety** | | |
| ADT | $506.18 | |
| Logix Fiber Network | $323.42 | |
| Kings 111 Emergey Communications | | |
| Datawatch | | $1,490.81 |
| **Repairs & Maintenance** | | |
| TK Elevator Maintenance | $3,542.25 | |
| Ferguson Facilities | $807.32 | $615.47 |
| Maintenance Crew | $3,201.91 | $4,531.71 |
| Supplies (Various Stores) | $500.00 | $650.00 |
| **Security** | | |
| Nationwide Security | $3,511.63 | $3,511.63 |
| **Cleaning & Maintenance** | | |
| Janitorial 7th Floor | | $2,225.00 |
| Janitorial other floors | | $2,376.00 |
| **Utilities** | | |
| Cirro electric | $22,928.87 | |
| City of Houston water | $6,126.47 | |
| **Insurance** | | |
| CNA Insurance (Prop Ins) | | |
| Capital Premium (GL) | $1,885.57 | |
| **Telephone & Internet** | | |
| ATT Internet | | $329.00 |
| Phone | | $903.64 |
| **Other Expense** | | |
| Mueller Water Treatment | | $475.00 |
| Waste Management | | $472.06 |
| Misc | $500.00 | $500.00 |
| **Property Manager** | $2,214.84 | $3,199.19 |
| **Asst Property Manager** | $1,687.50 | $2,437.47 |
| **Admin Asst** | $1,406.25 | $2,031.23 |
| **Accounting A/R A/P** | $2,812.50 | $4,062.46 |
| **Accounting Data Entry** | $424.14 | $612.64 |
| | | |
| | | |
| **Total Operating Expenses** | **$52,418.85** | **$31,073.31** |

### 12/1/2023 Budget

| | Dec 5-Dec 17 | Dec 18-Jan 3 |
|---|---|---|
| **Operating Expenses** | | |
| **Service Contract** | | |
| Smart Office Automation | | $650.00 |
| Culligan of Houston | $40.00 | |
| **Fire Safety** | | |
| ADT | $506.18 | |
| Logix Fiber Network | $323.42 | |
| Kings 111 Emergey Communications | | |
| Datawatch | | $1,490.81 |
| **Repairs & Maintenance** | | |
| TK Elevator Maintenance | $3,542.25 | |
| Ferguson Facilities | $807.32 | $615.47 |
| Maintenance Crew | $3,201.91 | $4,531.71 |
| Supplies (Various Stores) | $500.00 | $650.00 |
| **Security** | | |
| Nationwide Security | $3,511.63 | $3,511.63 |
| **Cleaning & Maintenance** | | |
| Janitorial 7th Floor | | $2,225.00 |
| Janitorial other floors | | $2,376.00 |
| **Utilities** | | |
| Cirro electric | $22,928.87 | |
| City of Houston water | $6,126.47 | |
| **Insurance** | | |
| CNA Insurance (Prop Ins) | | |
| Capital Premium (GL) | $1,885.57 | |
| **Telephone & Internet** | | |
| ATT Internet | | $329.00 |
| Phone | | $903.64 |
| **Other Expense** | | |
| Mueller Water Treatment | | $475.00 |
| Waste Management | | $472.06 |
| Misc | $500.00 | $500.00 |
| Property Manager | $2,214.84 | $3,199.19 |
| Asst Property Manager | $1,687.50 | $2,437.47 |
| Admin Asst | $1,406.25 | $2,031.23 |
| Accounting A/R A/P | $2,812.50 | $4,062.46 |
| Accounting Data Entry | $424.14 | $612.64 |
| | | |
| | | |
| **Total Operating Expenses** | **$52,418.85** | **$31,073.31** |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **In re:** | |
| **GALLERIA 2425 OWNER LLC,** | **Case No. 23-34815**<br>**Chapter 11** |
| **Debtor.** | |

## DEBTOR'S MOTION TO DETERMINE
## ADEQUATE ASSURANCE UTILITY PAYMENTS

### EMERGENCY HEARING REQUESTED BY DECEMBER 15, 2023

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Galleria 2425 Owner LLC (the "Debtor"), debtor-in-possession in the above-captioned bankruptcy case, and files this *Motion to Determine Adequate Assurance Utility Payments* (the "Motion"), in support of which it would respectfully show as follows:

### I.     JURISDICTION AND VENUE

2.      The Court has jurisdiction of this Motion under 28 U.S.C. § 1334, and this Motion constitutes a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this Court under 28 U.S.C. § 1408 and 1409.  The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105(a) and 366.

## II.   <u>BACKGROUND</u>

3.     The Debtor commenced the case on December 5, 2023 (the "Petition Date") by filing a petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

4.     The Debtor continues to operate its business as debtor-in-possession under sections 1107 and 1108 of the Bankruptcy Code. The Court has not appointed a trustee or examiner in this case.

5.     The Debtor owns real property located at 2425 West Loop South, Houston, Texas 77027(the "Property").  The Property is the Debtor's "single asset real estate" within the meaning of Bankruptcy Code § 101(51B).

6.     Various different utility providers supply the Property with electricity, communications, water, and natural gas service, all of which are listed on **Exhibit A**, attached hereto (the "Utilities").  The Debtor intends to remain current on all of its post-petition obligations to the Utilities by timely paying them from cash reserves and newly generated revenue.

## III.   <u>ARGUMENT AND AUTHORITIES</u>

7.     11 U.S.C. § 366(a) provides:

Except as provided in subsections (b) and (c) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt is owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

8.     11 U.S.C. § 366(c)(2) provides, in pertinent part, that:

with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility.

9.     By this Motion, the Debtor respectfully requests the Court enter an order:

a.     prohibiting Utilities from altering, refusing, or discontinuing service to the Debtor;

b.     authorizing and approving the amount and method by which the Debtor proposes to furnish its Utilities with adequate assurance of payment for post-petition utility service; and

c.     determining that the proposed adequate assurance of payment for post-petition utility service provided for herein is "adequate" within the scope and meaning of 11 U.S.C. § 366.

10.     The Debtor proposes the following adequate assurance of payment for the Utilities with respect to the Debtor's post-petition utility service:

a.     The Debtor will timely pay for all post-petition utility service pursuant to the terms of the invoices and billing statements generated by the Utilities in the ordinary course of business.

b.     To the extent that a Utility wishes to receive an adequate assurance deposit, such Utility may request same by sending written notice to Debtor's counsel via email at courtdocs@bakerassociates.net.   Any Utility that requests an adequate assurance deposit will be entitled to a cash deposit equal to the average monthly amount due the Utility (each a "Deposit"), payable in four consecutive, equal, monthly installments beginning in December of 2023. The Deposits to be made hereunder, as shown on **Exhibit A**, are estimated to total approximately $35,800.00.

c.     The acceptance of a Deposit by a Utility will be deemed an acknowledgment and admission from such Utility that such Deposit comprises adequate assurance of payment satisfactory to the Utility for purposes of section 366 of the Bankruptcy Code.

d.     If a Utility maintains more than one account with respect to the Property, the failure to pay for post-petition utility service with respect to one account shall

not be deemed a failure to pay or "cross-default" with respect to any other account, provided that such other account is being paid. Each failure to pay, each requirement of a Deposit, and the ability to alter, refuse, or discontinue service will arise only on a per-account basis.

e.    To the extent that a Utility provides post-petition service that is unpaid by the Debtor, such Utility shall be entitled to an administrative claim, pursuant to 11 U.S.C. §§ 503(b)(1) and 507(a)(1), payable pursuant to a plan of reorganization or such earlier date as determined by the Court.

11.    The Debtor submits that the availability of the Deposit upon request, together with the assurance that the Debtor will be able to pay for future utility service in the ordinary course of business and the inclusion of such amounts in the Debtor's budget, provides adequate assurance of payment of post-petition utility service sufficient to satisfy the requirements imposed by section 366 of the Bankruptcy Code.

12.    If any Utility believes that additional assurance of payment is required, it may request such assurance in writing from the Debtor through the Debtor's undersigned counsel. The Debtor shall attempt to resolve such requests consensually; provided, however, that if the Debtor determines that the request is not reasonable, the Debtor may request a hearing before this Court to determine the adequacy of assurance of payment made to the requesting utility pursuant to section 366(c)(3)(A).

13.    This Motion does not seek to preclude any Utility from seeking a reasonable modification of the Debtor's adequate assurance proposal, nor from seeking additional deposits or other security necessary to provide adequate assurance of payment for post-petition utility service, after notice and hearing, pursuant to 11 U.S.C. §366. This Motion does, however, seek to be a timely request that no Utility seeking to enforce section 366(c)(2) of the Bankruptcy Code

terminate service without proper notice and an opportunity for a hearing.

14.     The Debtor represents that it will continue to pay post-petition obligations, including invoices for utility service, when due. If any delay in payment occurs, the Deposit and the protections proposed herein provide adequate assurance of payment to each of the Debtor's Utilities. If a Utility feels at risk, it may request an adequate assurance deposit and negotiate for more security with the Debtor, and absent an agreement, may file a motion with the Court seeking additional measures of protection and/or security than provided herein.

## IV.     PRAYER

WHEREFORE, the Debtor respectfully requests this Court to enter an Order (i) granting the Motion, (ii) directing the Utilities to continue providing utility service to the Debtor without interruption; (iii) authorizing and approving the amount and method by which the Debtor proposes to furnish their Utilities with adequate assurance of payment for post-petition utility service (iv) determining that the proposed adequate assurance of payment for post-petition utility service provided herein is "adequate" within the scope and meaning of 11 U.S.C. § 366; and (v) awarding the Debtor such other and further relief as may be just and proper.

Dated: December 14, 2023.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/Reese W. Baker
Reese W. Baker
Texas Bar No. 01587700
Sonya Kapp
TX Bar No. 11095395
Nikie Marie Lopez-Pagan
TX Bar No. 24090233
Baker & Associates
950 Echo Lane, Suite 300
Houston, Texas 77024
713-869-9200
713-869-9100 (fax)
**PROPOSED COUNSEL FOR THE DEBTOR**

</div>

## **CERTIFICATE OF EMERGENCY**

The undersigned on behalf of the Debtor certifies that an emergency hearing is necessary. Utilities must be paid or the utilities will be shut off. The possible shut off date is currently December 15, 2023. The Debtor must have utilities for continuing the electricity, water, elevators, access, internet and other critical services. Cash collateral is needed to make the utility deposit. A hearing is requested by 3:00 pm on Friday, December 15, 2023.

<div style="margin-left: 40%;">

/s/  Reese W. Baker
Reese W. Baker

</div>

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 14, 2023, a true and correct copy of the foregoing document was delivered to the Electronic Filing Service for the United States Bankruptcy Court for the Southern District of Texas and also served upon the attached service list via U.S. mail and/or CM/ECF on December 14, 2023.

<div style="margin-left: 40%;">

/s/  Reese W. Baker
Reese W. Baker

</div>

## Service List

ADT Commercial
PO Box 382109
Pittsburgh, PA 15251

ADT Commercial
c/o CT Corporation System
1999 Bryan St., Ste. 900
Dallas, TX 75201-3136

Datawatch
PO Box 79845
Baltimore, MD 21279

Cirro Energy
PO Box 2229
Houston, TX 77252-2229

Datawatch
c/o Cogency Global Inc.
1601 Elm St., Ste. 4360
Dallas, TX 75201

Cirro Energy
c/o CT Corporation System
1999 Bryan St., Ste. 900
Dallas, TX 75201-3136

Logix Fiber Networks
PO Box 734120
Dallas, TX 75373

City of Houston
PO Box 1560
Houston, TX 77251-1560

Logix Fiber Networks
c/o Corporation Service Company
dba CSC-Lawyers Incorporating Service
Company
211 E. 7th Street, Ste. 620
Austin, TX 78701

Kings 111
751 Canyon Dr Ste 100
Coppell, TX 75019

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | |
| **GALLERIA 2425 OWNER LLC,** | **Case No. 23-34815**<br>**Chapter 11** |
| **Debtor.** | |

**ORDER GRANTING DEBTOR'S MOTION TO DETERMINE
ADEQUATE ASSURANCE UTILITY PAYMENTS**

Before the Court is the *Motion to Determine Adequate Assurance Utility Payments* (the "Motion"), which was filed by Galleria 2425 Owner LLC (the "Debtor") on December 14, 2023. The Court finds that the Motion was properly served pursuant to the Federal and Local Rules of Bankruptcy Procedure and that it contained the appropriate notice to creditors pursuant to LBR 9013-1(b).  The Court finds that no objection or other written response to the Motion has been timely filed by any party. Due to the failure of any party to file a timely written response, the allegations contained in the Motion stand unopposed and, therefore, the Court finds that good cause exists for the entry of the following order.

 **IT IS THEREFORE ORDERED** that the Motion is **GRANTED**.

 **IT IS FURTHER ORDERED** that no utility may alter, refuse, terminate, or discontinue utility service to, or discriminate against, the Debtor on the basis of the commencement of this chapter 11 case or on account of outstanding pre-petition invoice or require additional assurance of payment, other than as provided herein, as a condition to the Debtor receiving such utility services.

 **IT IS FURTHER ORDERED** that the Debtor shall timely pay for all post-petition utility services pursuant to the terms of the invoices and billing statements generated by the utility companies in the ordinary course of business, splitting the pre- and post-petition portions where applicable on a pro rata basis.

 **IT IS FURTHER ORDERED** that, if a utility company maintains more than one account for the Debtor, the failure to pay for post-petition utility services with respect to one account shall not be deemed a failure to pay or "cross-default" with respect to any other account, provided that such other account is being paid. Each failure to pay, each requirement of a deposit, and the ability to alter, refuse or discontinue service shall arise on a per account basis.

 **IT IS FURTHER ORDERED** that, to the extent that a utility company provides post-petition services that are unpaid, such utility company shall be entitled to an administrative

claim, pursuant to 11 U.S.C. §§ 503(b)(1) and 507(a)(1), payable pursuant to a plan of reorganization or such earlier date as determined by the Court.

**IT IS FURTHER ORDERED** that a Utility may request an adequate assurance deposit by sending written notice to Debtor's counsel via email at courtdocs@bakerassociates.net  Any Utility that requests an adequate assurance deposit will be entitled to a cash deposit equal to the average monthly amount due the Utility, and Debtor is permitted to pay the deposits described in Exhibit A attached hereto to the utility companies described therein, and each such deposit is deemed an acknowledgement by that utility that the deposit is adequate assurance of payment as provided for by section 366 of the Bankruptcy Code.

**IT IS FURTHER ORDERED** that the above-described deposits may be funded in four equal monthly installments, with the first payment to be paid on the first day of the month following the Debtor's receipt of written notice from a Utility requesting an adequate assurance deposit and on the first day of each subsequent month until the deposit is paid in full.

**IT IS FURTHER ORDERED** that the Debtor's offer of adequate assurance of payment contained above, together with any pre-petition deposits, if any, are hereby deemed adequate assurance of payment for purposes of section 366 of the Bankruptcy Code.

**IT IS FURTHER ORDERED** that nothing contained herein shall preclude any utility from subsequently seeking a reasonable modification of the adequate assurance proposal, or  from seeking additional deposits or other security necessary to provide adequate assurance of payment, after notice and hearing, pursuant to 11 U.S.C. §366(b).

**IT IS FURTHER ORDERED** that no utility company seeking to enforce section 366(c)(2) of the Bankruptcy Code may terminate service without proper notice and an opportunity for a hearing.

**IT IS FURTHER ORDERED** that, notwithstanding anything herein to the contrary, the authority granted herein is subject to any requirement and/or limitation imposed upon the Debtor under any Court order regarding the use of cash collateral and/or any approved budget contained therein.  Nothing contained herein shall, or shall be deemed to, modify, amend, or alter such order or approved budget.

**IT IS FURTHER ORDERED** that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

DATED:_____

_____
JEFFREY P. NORMAN
UNITED STATES BANKRUPTCY JUDGE

## AVERAGE MONTHLY UTILITIES

**Properties:** 2425 West Loop - 2425 West Loop South Houston, TX 77027
**Based on recent months**

| Payee Name | Amount Payable |
|---|---|
| **2425 West Loop - 2425 West Loop South Houston, TX 77027** | |
| Cirro Energy | 25,000.00 |
| City of Houston Water | 8,200.00 |
| Datawatch Systems | 1,490.81 |
| Logix Fiber Networks | 323.42 |
| ADT Commercial (equipment lease, fire monitoring, et | 85.00 |
| ATT Internet | 300.00 |
| Kings 111 (billed quarterly about $1090 per quarter) | 350.00 |
| | **35,749.23** |

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 15, 2023

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 23-34815** |
| **GALLERIA 2425 OWNER, LLC,** | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | **CHAPTER 11** |
| | § | |

## ORDER SETTING HEARING

This matter is before the Court on the Debtor's Emergency Motion for Interim and Final Orders Authorizing the Usage of Cash Collateral (ECF No. 33) and Debtor's Motion to Determine Adequate Utility Payments  (ECF No. 34). The movant seeks emergency consideration by today, December 15, 2023, at 3:00 p.m. This Chapter 11 case was filed on December 5, 2023, and the instant motion was filed on December 14, 2023, at the end of the day. Counsel has had nine days to file an emergency motion to use cash collateral. Given the ample time counsel had to file this motion, he should not expect a next day hearing. The Court will consider the instant motions on an emergency basis but is not able to set them for hearing today. Additionally, the debtor must file either complete schedules or a 2023 Profit and Loss Statement (from 1/1/2023 to filing date) and a filing date balance sheet by noon on Monday, December 18, 2023.

Further, the Court notes that the Debtor's Motion to Determine Adequate Utility Payments did not contain the word emergency in the title as required by this Court's procedures.[1] Future motions that do not comply with this Court's procedures will be denied as procedurally deficient.

Therefore, hearing is set on the Debtor's Emergency Motion for Interim and Final Orders Authorizing the Usage of Cash Collateral (ECF No. 33) and Debtor's Motion to Determine Adequate Utility Payments  (ECF No. 34) at 2:30 p.m. on December 18, 2023, in Courtroom 403, United States Courthouse, 515 Rusk St., Houston, Texas. The movant shall serve a copy of this order on all affected parties within 24 hours and file a certificate of service; **or** file and serve a hearing notice within 24 hours, which must include the response deadline.

---

[1] The Court Procedures can be found at the following website: http://www.txs.uscourts.gov/page/united-states-bankruptcy-judge-jeffrey-p-norman.

000415

      **Parties should reference the Court's website for in person hearing requirements as there are new trial and hearing procedures.**[2]

      **SO ORDERED**.

    SIGNED 12/15/2023

Jeffrey Norman
United States Bankruptcy Judge

---

[2] https://www.txs.uscourts.gov/page/united-states-bankruptcy-judge-jeffrey-p-norman

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **In re:** | |
| **GALLERIA 2425 OWNER LLC,** | **Case No. 23-34815**<br>**Chapter 11** |
| **Debtor.** | |

## NOTICE OF HEARING ON DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING THE USAGE OF CASH COLLATERAL AND DEBTOR'S MOTION TO DETERMINE ADEQUATE ASSURANCE UTILITY PAYMENTS

Please take notice that the (1) Debtor's Emergency Motion for Interim and Final Order Authorizing the Usage of Cash Collateral and (2) Debtor's Motion to Determine Adequate Assurance Utility Payment hearings has been set for **December 18, 2023 at 2:30 p.m.**

**The Hearing will be held at the Federal Courthouse, 515 Rusk Ave, in Courtroom 403, Houston, Texas 77002.**

**FROM THE WEBSITE OF JUDGE NORMAN:**

All NON-EVIDENTIARY, UNCONTESTED OR UNOPPOSED EVIDENTIARY hearings will be held on a HYBRID BASIS. Parties may appear either remotely or in person unless the Court orders otherwise. Remote appearances shall be made both by video and telephone.

All EVIDENTIARY, CONTESTED OR OPPOSED trials or hearings will be held IN PERSON unless a hybrid trial or hearing is consented to by all parties. Parties shall at least two business day prior to any scheduled evidentiary hearing file a stipulation with an order seeking a hybrid trial or hearing. The Court will then, if approved, enter the order for a hybrid trial or hearing. Hybrid trials or hearings are NOT available if the Court has previously ordered in person appearance.

https://www.txs.uscourts.gov/page/united-states-bankruptcy-judge-jeffrey-p-norman

**Parties are additionally instructed:**

The dial in number for hearings before Judge Norman is 832-917-1510 and the conference room number is 174086 and

For video, parties are to utilize the **GoToMeeting** web-based application and enter conference code: judgenorman

**A copy of the order, copy of docket item #33 and # 34 are attached.**

000417

Dated: December 15, 2023

Respectfully submitted,

*/s/Reese W. Baker*
Reese W. Baker
Texas Bar No. 01587700
Nikie Marie Lopez-Pagan
TX Bar No. 24090233
Baker & Associates
950 Echo Lane, Suite 300
Houston, Texas 77024
713-869-9200
713-869-9100 (fax)
**PROPOSED COUNSEL FOR THE DEBTOR**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 15, 2023, a true and correct copy of the foregoing document, Debtor's Emergency Motion for Interim and Final Order Authorizing the Usage of Cash Collateral filed at docket # 33 and Debtor's Motion to Determine Adequate Assurance Utility Payment filed at docket #34 was delivered to the Electronic Filing Service for the United States Bankruptcy Court for the Southern District of Texas and also served upon the attached service list via U.S. mail and/or CM/ECF on December 15, 2023.

The undersigned hereby certifies that on December 15, 2023, a true and correct copy of the foregoing document, Debtor's Emergency Motion for Interim and Final Order Authorizing the Usage of Cash Collateral filed at docket # 33 and Debtor's Motion to Determine Adequate Assurance Utility Payment filed at docket #34, was delivered via email to the following:

CC2 TX, LLC
Howard Marc Spector    hspector@spectorcox.com

2425 West Loop, LLC
James Robert MacNaughton    robert@porterpowers.com

H.N. B. Construction
Malcolm Deon Dishongh    malcolm@dishonghlaw.com

*/s/  Reese W. Baker*
Reese W. Baker

000418

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 15, 2023

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 23-34815** |
| **GALLERIA 2425 OWNER, LLC,** | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | **CHAPTER 11** |
| | § | |

<u>**ORDER SETTING HEARING**</u>

This matter is before the Court on the Debtor's Emergency Motion for Interim and Final Orders Authorizing the Usage of Cash Collateral (ECF No. 33) and Debtor's Motion to Determine Adequate Utility Payments (ECF No. 34). The movant seeks emergency consideration by today, December 15, 2023, at 3:00 p.m. This Chapter 11 case was filed on December 5, 2023, and the instant motion was filed on December 14, 2023, at the end of the day. Counsel has had nine days to file an emergency motion to use cash collateral. Given the ample time counsel had to file this motion, he should not expect a next day hearing. The Court will consider the instant motions on an emergency basis but is not able to set them for hearing today. Additionally, the debtor must file either complete schedules or a 2023 Profit and Loss Statement (from 1/1/2023 to filing date) and a filing date balance sheet by noon on Monday, December 18, 2023.

Further, the Court notes that the Debtor's Motion to Determine Adequate Utility Payments did not contain the word emergency in the title as required by this Court's procedures.[1] Future motions that do not comply with this Court's procedures will be denied as procedurally deficient.

Therefore, hearing is set on the Debtor's Emergency Motion for Interim and Final Orders Authorizing the Usage of Cash Collateral (ECF No. 33) and Debtor's Motion to Determine Adequate Utility Payments (ECF No. 34) at 2:30 p.m. on December 18, 2023, in Courtroom 403, United States Courthouse, 515 Rusk St., Houston, Texas. The movant shall serve a copy of this order on all affected parties within 24 hours and file a certificate of service; **or** file and serve a hearing notice within 24 hours, which must include the response deadline.

---

[1] The Court Procedures can be found at the following website: http://www.txs.uscourts.gov/page/united-states-bankruptcy-judge-jeffrey-p-norman.

1 / 2

     **Parties should reference the Court's website for in person hearing requirements as there are new trial and hearing procedures.**[2]

     **SO ORDERED**.

    SIGNED 12/15/2023

                                     Jeffrey Norman
                                     United States Bankruptcy Judge

---

[2] https://www.txs.uscourts.gov/page/united-states-bankruptcy-judge-jeffrey-p-norman

2 / 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | |
| **GALLERIA 2425 OWNER LLC,** | **Case No. 23-34815**<br>**Chapter 11** |
| Debtor. | |

**DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL
ORDERS AUTHORIZING THE USAGE OF CASH COLLATERAL**

## Emergency Relief is requested by December 15, 2023.

**This motion seeks an order that may adversely affect you. If you oppose the
motion, you should immediately contact the moving party to resolve the
dispute. If you and the moving party cannot agree, you must file a response
and send a copy to the moving party. You must file and serve your response
within 21 days of the date this was served on you. Your response must state why
the motion should not be granted. If you do not file a timely response, the relief
may be granted without further notice to you. If you oppose the motion and
have not reached an agreement, you must attend the hearing. Unless the
parties agree otherwise, the court may consider evidence at the hearing and
may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

**Emergency relief has been requested. If the Court considers the motion on an
emergency basis, then you will have less than 21 days to answer. If you object
to the requested relief or if you believe that the emergency consideration is not
warranted, you should file an immediate response.**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Galleria 2425 Owner LLC (the "Debtor"), debtor-in-possession in the above-captioned bankruptcy case, files this *Debtor's Motion Interim and Final Orders Authorizing It to Use Cash Collateral* (the "Motion"), in support of which the Debtor would respectfully show as follows:

## I.     **JURISDICTION AND VENUE**

1.     The Court has jurisdiction of this Motion under 28 U.S.C. § 1334, and this Motion constitutes a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this Court under 28 U.S.C. § 1408 and 1409.

## II.     **BACKGROUND**

2.     The Debtor commenced the case on December 5, 2023 (the "Petition Date") by filing a petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

3.     The Debtor continues to operate its business as debtor-in-possession under sections 1107 and 1108 of the Bankruptcy Code. The Court has not appointed a trustee or examiner in this case.

4.     The Debtor's primary asset is a Class A office building located at 2425 West Loop South, Houston, Texas 77027(the "Property").  The Property is fully covered by commercial property and liability insurance.

5.     As of the Petition Date, the Debtor was allegedly indebted to National Bank of Kuwait, S.A.K.P., New York Branch ("NBK") pursuant to a loan made to the Debtor by NBK (the "Loan").

6.     As of the Petition Date, the Debtor was also allegedly indebted to 2425 WL, LLC ("2425 WL"), Caz Creek Lending ("Caz Creek") and Harris County, Texas (Harris County including the City of Houston, the independent school district, and various other entities included

within Harris County)("Harris County")(NBK, 2425 WL, Caz Creek and Harris County, collectively at times, the "Secured Creditors").

7.  The Debtor's source of operating funds is generated by the operation of the Property, specifically, rental and other income from tenants at the Property collected by or for the benefit of the Debtor.

8.  By virtue of the Loan Documents referenced above, the Secured Creditors may or do assert liens or encumbrances on the Debtor's assets, including the rents received from tenants of the Property, which constitute cash collateral pursuant to Section 363(a) of the Bankruptcy Code.

9.  The Debtor requires the use of the Secured Creditors' cash collateral to continue the operation of the Property and will suffer irreparable and immediate harm if it is not granted the relief requested herein.  An immediate and critical need exists for the Debtor to obtain funds in order to continue operating the Property, and without such funds, the Debtor will not be able to pay its direct operating expenses, maintain the Property, or obtain goods and services needed to carry on its business during this sensitive period in a manner that will avoid irreparable harm to the Debtor's estate.  The Debtor's ability to use Secured Creditors' Cash Collateral is vital to the confidence of the Debtor's tenants, vendors, and suppliers of goods and services to the Property and to the preservation and maintenance of the going concern value of the Debtor's estate.

10. Pursuant to Section 363 of the Bankruptcy Code, the Debtor is requesting authority to use cash collateral to satisfy its normal and necessary operating expenses.  A budget reflecting the Debtor's projected monthly normal and necessary costs is attached hereto as Exhibit A (the "Budget").  Absent the authority to use the amounts set forth in the budget, the Debtor will be unable to operate and maintain the Property and therefore successfully reorganize.

11. By this Motion, the Debtor requests (a) interim authority to use the cash collateral

("Cash Collateral") in accordance with the terms and conditions set forth herein, the proposed Budget, and the proposed Order (the "Interim Order"); (b) authority to use Cash Collateral on an interim basis; and (c) the granting of adequate protection to any secured creditor holding an interest in cash collateral pursuant to Sections 361 and 363 of the Bankruptcy Code.

## III.     ARGUMENT AND AUTHORITIES

12.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The Debtor requires the use of Cash Collateral to fund its day-to-day operations. Indeed, absent such relief, the Debtor's business will be brought to an immediate halt, with damaging consequences for the Debtor and its estate and creditors as well as the Property's tenants.

13.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by [a debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code sets forth the forms of adequate protection which may be provided, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis, though the Fifth Circuit has set forth certain criteria that should be considered, including "the value of the collateral . . . the likelihood that the collateral will depreciate or appreciate over time, whether insurance coverage is adequate, whether property taxes are being paid, and the prospects for the successful reorganization of the debtor's affairs."[1]

---

[1] In re Mendoza, 111 F.3d 1264, 1272 (5th Cir. 1997); In re Las Torres Development L.L.C, 413 B.R. 687, 697 (Bankr. S.D. Tex. 2009); see also MNBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396 (10th Cir. 1987); Martin v. U.S. (In re Martin), 761 F.2d 472 (8th Cir. 1985); In re Shaw Indus., Inc., 300 B.R. 861, 865 (Bankr. W.D.

The main focus is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.[2]

14.     As adequate protection, the Debtor proposes to provide the following adequate protection to the Secured Creditors to the extent of any diminution in the value of their respective collateral:

      a.  superpriority claims, pursuant to sections 361(2), 363(c)(2), 364(d)(1), 503(b)(1), 507(a)(2) and 507(b) of the Bankruptcy Code with such superpriority claims to be senior to all other postpetition superpriority claims, subject to a carve-out for professional fees and fees owed to the United States Trustee as reflected in the budget; and

      b.  replacement liens on all property now owned or hereafter acquired by the Debtor, with such liens to be subordinate only to the liens of any applicable taxing authority, and subject to a carve-out for professional fees and fees owed to the United States Trustee in accordance with the budget.

15.     Any Secured Creditor's interest in cash collateral will be protected by the adequate protection set forth above, as the Debtor will continue to generate new accounts receivable and purchase new inventory in the ordinary course of their business.

16.     Under FED. R. BANKR. P. 4001, the Court may not enter a final order granting this Motion before 14 days after service of this Motion.  The Debtor therefore requests that the Court enter an interim order authorizing the use of cash collateral under FED. R. BANKR. P. 4001(b)(2) as soon as possible, and then set this Motion for a final hearing.

---

Pa. 2003).

[2] *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 554 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

## IV.    PRAYER

WHEREFORE, the Debtor respectfully requests that the Court enter an order granting this Motion, authorizing the Debtor to use cash collateral on the terms set forth in this Motion, and granting the Debtor such other relief to which it is entitled.

Dated: December 14, 2023.

Respectfully submitted,

*/s/Reese W. Baker*
Reese W. Baker
Texas Bar No. 01587700
Nikie Marie Lopez-Pagan
TX Bar No. 24090233
Baker & Associates
950 Echo Lane, Suite 300
Houston, Texas 77024
713-869-9200
713-869-9100 (fax)
**PROPOSED COUNSEL FOR THE DEBTOR**

## CERTIFICATE OF EMERGENCY

The undersigned on behalf of the Debtor certifies that an emergency hearing is necessary. Utilities must be paid or the utilities will be shut off. The possible shut off date is currently December 15, 2023.  The Debtor must have utilities for continuing the electricity, water, elevators, access, internet and other critical services.  Cash collateral is needed to make the utility deposit.  A hearing is requested by 3:00 pm on Friday, December 15, 2023.

/s/  *Reese W. Baker*
Reese W. Baker

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on December 14, 2023, a true and correct copy of the foregoing document was delivered to the Electronic Filing Service for the United States Bankruptcy Court for the Southern District of Texas and also served upon the attached service list via U.S. mail and/or CM/ECF on December 14, 2023.

/s/  *Reese W. Baker*
Reese W. Baker

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | |
| **GALLERIA 2425 OWNER LLC,** | **Case No. 23-34815** <br> **Chapter 11** |
| Debtor. | |

## INTERIM ORDER AUTHORIZING
## DEBTOR TO USE CASH COLLATERAL

**CAME ON** for consideration on this date *Debtor's Emergency Motion for Interim and Final Orders Authorizing the Debtor to Use Cash Collateral* (the "Motion") filed by Galleria 2425 Owner LLC (the "Debtor"), the debtor-in-possession in the above-captioned bankruptcy case.

Upon consideration of the Motion, the Court finds that all required parties have been served with notice thereof and that the Motion is well-taken and that the relief sought therein should be, and hereby is, **GRANTED**. Accordingly, it is hereby found that:

1. On December 5, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") electing treatment Chapter 11, commencing its above-styled bankruptcy case.

2. The Debtor continues to operate and manage its business as "debtor in possession" pursuant to sections 1182 and 1184 of the Bankruptcy Code.

3. This Court has jurisdiction over this case and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

4. The Debtor's primary asset is a Class A office building located at 2425 West Loop South, Houston, Texas 77027(the "Property"). The Property is fully covered by commercial property and liability insurance.

5.      As of the Petition Date, the Debtor was allegedly indebted to National Bank of Kuwait, S.A.K.P., New York Branch ("NBK") pursuant to a loan made to the Debtor by NBK (the "Loan").  As of the Petition Date, the Debtor was also allegedly indebted to 2425 WL, LLC ("2425 WL"), Caz Creek Lending ("Caz Creek") and Harris County, Texas (Harris County including the City of Houston, the independent school district, and various other entities included within Harris County)("Harris County")(NBK, 2425 WL, Caz Creek and Harris County, collectively at times, the "Secured Creditors").

6.      The Debtor's rents that it collects each month with respect to the Property constitute cash collateral (the "Cash Collateral") pursuant to Section 363(a) of the Bankruptcy Code.

7.      The Debtor requires the use of cash collateral to continue the operation of its business and will suffer irreparable and immediate harm if it is not granted the relief requested herein.  An immediate and critical need exists for the Debtor to obtain funds in order to continue operating the Property, and without such funds, the Debtor will not be able to pay its direct operating expenses, maintain the Property, or obtain goods and services needed to carry on its business during this sensitive period in a manner that will avoid irreparable harm to the Debtor's estate. The Debtor's ability to use Cash Collateral is vital to the confidence of the Debtor's tenants, vendors, and suppliers of goods and services to the Property and to the preservation and maintenance of the going concern value of the Debtor's estate.

8.      The value of the Cash Collateral may diminish as the Debtor operates and uses and expends Cash Collateral, and creditors with a secured interest in Cash Collateral are entitled to adequate protection of their respective interests in the Debtor's use of Cash Collateral.

9.      Good cause has been shown for the entry of this Order.  The Court finds that the notice to the U.S. Trustee and the Debtor's creditors was sufficient under the circumstances.  Entry of this Order is justified and appropriate under the circumstance and is in the best interest of the estate.

IT IS THEREFORE ORDERED AND ADJUDGED as follows:

10.     **Use of Cash Collateral**.  The Debtor is hereby authorized in the interim to use Cash Collateral only in the amounts and for the expenses and disbursements set forth in the Budget, and Cash Collateral shall not be used for any other purpose or in any other amount, subject to the Budget Variance as defined below.  The Debtor shall not incur expenses nor use Cash Collateral in an amount that exceeds by more than ten percent (10%) the total expenses provided in the Budget ("Budget Variance") without first obtaining consent or approval of this Court.

11.     **Replacement Liens**.  As adequate protection to any creditor alleging an interest in Cash Collateral, and except as otherwise provided herein, to the extent that Debtor's use of Cash Collateral results in a decrease in the value of a Secured Creditor's valid and unavoidable interest in such property, such Secured Creditor is hereby granted a perfected replacement lien, security interest, and claim ("Replacement Liens") on all property now owned or hereafter acquired by the Debtor  (the "Replacement Collateral") to the extent of any diminution in the value of such respective property.

Such Replacement Liens shall be subordinate only to the Carve-Out (as defined below).

12.     **507(b) Claim**.  As adequate protection to any creditor with a valid and unavoidable interest in Cash Collateral, such creditor is hereby granted an administrative claim ("507(b) Claim") with priority as specified under Section 507(b) of the Code, subject to the payment of the Carve Out (as defined below), equal to all other administrative expenses and administrative claims of any kind under Sections 503 or 507 to the extent there shall be a difference between: (i) the value of the Cash Collateral as of the Petition Date, and (ii) the aggregate value of the Cash Collateral, effective as of the date such 507(b) Claim is determined.  Notwithstanding anything to the contrary in this Order, the liens and superpriority claims granted herein are subject and subordinate to a carve-out of funds (the "Carve Out") for the following administrative expenses:

(a) all fees and expenses incurred by the Debtor's professionals that are allowed by the Court pursuant to the Bankruptcy Code (the "Professionals"); (b) statutory liens of ad valorem taxing authorities; and (c) quarterly fees owed to the United States Trustee. Amounts actually paid to the Professionals shall not be subject to disgorgement in order to satisfy in whole or in part an administrative claim provided herein.

13.     **No Lien Upon Avoidance Actions**.  The Replacement Liens do not extend to the Debtor's transfer or lien avoidance rights and claims under Sections 544, 545, 547, 548, 549 or 550 of the Code or funds received from same.

14.     **Priority of Replacement Liens.**   The Replacement Liens shall be prior and senior to any other security interest, interest, encumbrance, right or lien in the Replacement Collateral, subject only to: (i) the valid and perfected pre-petition lien and security interests of a creditor in such Replacement Collateral existing as of the Petition Date; (ii) statutory liens of ad valorem taxing authorities; and (iii) the payment of the Carve Out.

15.     **Perfection of Liens**.    The Replacement Liens and the 507(b) Claim are, and shall be, valid, perfected, enforceable and effective as of the Petition Date without the need for any further action by the Debtor, any Secured Creditor with an interest in Cash Collateral, or the necessity of execution or filing of any instruments or agreements.  This Order and the Replacement Liens, rights, 507(b) Claim, and other protections granted herein do not waive, restrict, or alter the validity, extent, priority, perfected status, or scope of the pre-petition liens, security interests, priorities, rights of set-off, remedies, or claims of any creditor.

16.     **Terms of Use of Cash Collateral**.  The Debtor is authorized to use Cash Collateral in accordance with this Order until the earlier of the following (the "Termination Date"): (i) five business days after notice by a creditor with an interest in Cash Collateral to the Debtor of any "Termination Event" as described below, unless within such five-day period the Debtor has cured

such Termination Event or unless waived by such creditor, (ii) the date of the dismissal of Debtor's bankruptcy case or the conversion of Debtor's bankruptcy case to a case under Chapter 7 of the Code, or (iii) the date of appointment of a trustee in Debtor's bankruptcy case. Each of the following events constitute a "Termination Event": (i) any material failure of Debtor to comply with this Order; (ii) the failure by Debtor to pay when due operating expenses incurred after the Petition Date; (iii) the failure by the Debtor to maintain property, casualty and liability insurance; (iv) the occurrence of the effective date or consummation date of a plan of reorganization for Debtor; (v) the entry by this Court or any other court of an order reversing, staying, or vacating this Order or amending, supplementing, or otherwise modifying in any material manner the protections granted to Debtor in this Order; or (vi) the entry by this Court of an order granting relief from the automatic stay imposed by Section 362 of the Code to any entity other than Debtor that permits such entity to exercise foreclosure or disposition rights with respect to the Cash Collateral, or Replacement Collateral. Upon the Termination Date, Debtor shall cease using Cash Collateral unless the Debtor obtains either written consent to further use Cash Collateral or an authorizing order of the Court is entered after notice and an opportunity for hearing.

17. **Protection of Existing Collateral.** Collateral, including Cash Collateral, shall not be used or sold other than in the ordinary course unless the Debtor obtains the approval of this Court.

18. **Notice.** Within five business days after entry of this Order, Debtor's counsel shall serve a copy of this Order on all of the following parties: (a) the Office of the United States Trustee; (b) National Bank of Kuwait, S.A.K.P., New York Branch; (c) all Secured Creditors known to the Debtor who have or may assert liens against the Debtor's assets; and (d) all parties-in interest who have filed a notice of appearance.

19. **Final Hearing.** A final hearing on the Motion shall be held on ____, 202___ at ____

**_.m.** The Debtor shall provide notice of such final hearing on the parties listed in the Notice paragraph above. Such notice shall be deemed sufficient pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure. No further notice of the Motion is necessary.

Signed:_____

_____
Jeffrey P. Norman
United States Bankruptcy Judge

**PREPARED AND SUBMITTED BY:**

Reese W. Baker
Baker & Associates
950 Echo Lane, Suite 300
Houston, Texas 77024
713-869-9200
713-869-9100 (fax)
**PROPOSED COUNSEL FOR THE DEBTOR**

**BUDGET ON FOLLOWING PAGE**

## 12/1/2023 Budget

| | Dec 5-Dec 17 | Dec 18-Jan 3 |
|---|---|---|
| **Operating Expenses** | | |
| **Service Contract** | | |
| Smart Office Automation | | $650.00 |
| Culligan of Houston | $40.00 | |
| **Fire Safety** | | |
| ADT | $506.18 | |
| Logix Fiber Network | $323.42 | |
| Kings 111 Emergey Communications | | |
| Datawatch | | $1,490.81 |
| **Repairs & Maintenance** | | |
| TK Elevator Maintenance | $3,542.25 | |
| Ferguson Facilities | $807.32 | $615.47 |
| Maintenance Crew | $3,201.91 | $4,531.71 |
| Supplies (Various Stores) | $500.00 | $650.00 |
| **Security** | | |
| Nationwide Security | $3,511.63 | $3,511.63 |
| **Cleaning & Maintenance** | | |
| Janitorial 7th Floor | | $2,225.00 |
| Janitorial other floors | | $2,376.00 |
| **Utilities** | | |
| Cirro electric | $22,928.87 | |
| City of Houston water | $6,126.47 | |
| **Insurance** | | |
| CNA Insurance (Prop Ins) | | |
| Capital Premium (GL) | $1,885.57 | |
| **Telephone & Internet** | | |
| ATT Internet | | $329.00 |
| Phone | | $903.64 |
| **Other Expense** | | |
| Mueller Water Treatment | | $475.00 |
| Waste Management | | $472.06 |
| Misc | $500.00 | $500.00 |
| **Property Manager** | $2,214.84 | $3,199.19 |
| **Asst Property Manager** | $1,687.50 | $2,437.47 |
| **Admin Asst** | $1,406.25 | $2,031.23 |
| **Accounting A/R A/P** | $2,812.50 | $4,062.46 |
| **Accounting Data Entry** | $424.14 | $612.64 |
| | | |
| | | |
| **Total Operating Expenses** | **$52,418.85** | **$31,073.31** |

## 12/1/2023 Budget

| | Dec 5-Dec 17 | Dec 18-Jan 3 |
|---|---|---|
| **Operating Expenses** | | |
| **Service Contract** | | |
| Smart Office Automation | | $650.00 |
| Culligan of Houston | $40.00 | |
| **Fire Safety** | | |
| ADT | $506.18 | |
| Logix Fiber Network | $323.42 | |
| Kings 111 Emergey Communications | | |
| Datawatch | | $1,490.81 |
| **Repairs & Maintenance** | | |
| TK Elevator Maintenance | $3,542.25 | |
| Ferguson Facilities | $807.32 | $615.47 |
| Maintenance Crew | $3,201.91 | $4,531.71 |
| Supplies (Various Stores) | $500.00 | $650.00 |
| **Security** | | |
| Nationwide Security | $3,511.63 | $3,511.63 |
| **Cleaning & Maintenance** | | |
| Janitorial 7th Floor | | $2,225.00 |
| Janitorial other floors | | $2,376.00 |
| **Utilities** | | |
| Cirro electric | $22,928.87 | |
| City of Houston water | $6,126.47 | |
| **Insurance** | | |
| CNA Insurance (Prop Ins) | | |
| Capital Premium (GL) | $1,885.57 | |
| **Telephone & Internet** | | |
| ATT Internet | | $329.00 |
| Phone | | $903.64 |
| **Other Expense** | | |
| Mueller Water Treatment | | $475.00 |
| Waste Management | | $472.06 |
| Misc | $500.00 | $500.00 |
| Property Manager | $2,214.84 | $3,199.19 |
| Asst Property Manager | $1,687.50 | $2,437.47 |
| Admin Asst | $1,406.25 | $2,031.23 |
| Accounting A/R A/P | $2,812.50 | $4,062.46 |
| Accounting Data Entry | $424.14 | $612.64 |
| | | |
| | | |
| **Total Operating Expenses** | **$52,418.85** | **$31,073.31** |

000435

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | |
| | Case No. 23-34815 |
| **GALLERIA 2425 OWNER LLC,** | Chapter 11 |
| Debtor. | |

## DEBTOR'S MOTION TO DETERMINE
## ADEQUATE ASSURANCE UTILITY PAYMENTS

**EMERGENCY HEARING REQUESTED BY DECEMBER 15, 2023**

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Galleria 2425 Owner LLC (the "Debtor"), debtor-in-possession in the above-captioned bankruptcy case, and files this *Motion to Determine Adequate Assurance Utility Payments* (the "Motion"), in support of which it would respectfully show as follows:

### I.    JURISDICTION AND VENUE

2.    The Court has jurisdiction of this Motion under 28 U.S.C. § 1334, and this Motion constitutes a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this Court under 28 U.S.C. § 1408 and 1409. The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105(a) and 366.

## II.    **BACKGROUND**

3.      The Debtor commenced the case on December 5, 2023 (the "Petition Date") by filing a petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

4.      The Debtor continues to operate its business as debtor-in-possession under sections 1107 and 1108 of the Bankruptcy Code. The Court has not appointed a trustee or examiner in this case.

5.      The Debtor owns real property located at 2425 West Loop South, Houston, Texas 77027(the "Property").  The Property is the Debtor's "single asset real estate" within the meaning of Bankruptcy Code § 101(51B).

6.      Various different utility providers supply the Property with electricity, communications, water, and natural gas service, all of which are listed on **Exhibit A**, attached hereto (the "Utilities").  The Debtor intends to remain current on all of its post-petition obligations to the Utilities by timely paying them from cash reserves and newly generated revenue.

## III.    **ARGUMENT AND AUTHORITIES**

7.      11 U.S.C. § 366(a) provides:

Except as provided in subsections (b) and (c) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt is owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

8.      11 U.S.C. § 366(c)(2) provides, in pertinent part, that:

with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility.

9.      By this Motion, the Debtor respectfully requests the Court enter an order:

a.      prohibiting Utilities from altering, refusing, or discontinuing service to the Debtor;

b.   authorizing and approving the amount and method by which the Debtor proposes to furnish its Utilities with adequate assurance of payment for post-petition utility service; and

c.   determining that the proposed adequate assurance of payment for post-petition utility service provided for herein is "adequate" within the scope and meaning of 11 U.S.C. § 366.

10.   The Debtor proposes the following adequate assurance of payment for the Utilities with respect to the Debtor's post-petition utility service:

a.   The Debtor will timely pay for all post-petition utility service pursuant to the terms of the invoices and billing statements generated by the Utilities in the ordinary course of business.

b.   To the extent that a Utility wishes to receive an adequate assurance deposit, such Utility may request same by sending written notice to Debtor's counsel via email at courtdocs@bakerassociates.net.    Any Utility that requests an adequate assurance deposit will be entitled to a cash deposit equal to the average monthly amount due the Utility (each a "Deposit"), payable in four consecutive, equal, monthly installments beginning in December of 2023. The Deposits to be made hereunder, as shown on **Exhibit A**, are estimated to total approximately $35,800.00.

c.   The acceptance of a Deposit by a Utility will be deemed an acknowledgment and admission from such Utility that such Deposit comprises adequate assurance of payment satisfactory to the Utility for purposes of section 366 of the Bankruptcy Code.

d.   If a Utility maintains more than one account with respect to the Property, the failure to pay for post-petition utility service with respect to one account shall

not be deemed a failure to pay or "cross-default" with respect to any other account, provided that such other account is being paid. Each failure to pay, each requirement of a Deposit, and the ability to alter, refuse, or discontinue service will arise only on a per-account basis.

e.    To the extent that a Utility provides post-petition service that is unpaid by the Debtor, such Utility shall be entitled to an administrative claim, pursuant to 11 U.S.C. §§ 503(b)(1) and 507(a)(1), payable pursuant to a plan of reorganization or such earlier date as determined by the Court.

11.    The Debtor submits that the availability of the Deposit upon request, together with the assurance that the Debtor will be able to pay for future utility service in the ordinary course of business and the inclusion of such amounts in the Debtor's budget, provides adequate assurance of payment of post-petition utility service sufficient to satisfy the requirements imposed by section 366 of the Bankruptcy Code.

12.    If any Utility believes that additional assurance of payment is required, it may request such assurance in writing from the Debtor through the Debtor's undersigned counsel. The Debtor shall attempt to resolve such requests consensually; provided, however, that if the Debtor determines that the request is not reasonable, the Debtor may request a hearing before this Court to determine the adequacy of assurance of payment made to the requesting utility pursuant to section 366(c)(3)(A).

13.    This Motion does not seek to preclude any Utility from seeking a reasonable modification of the Debtor's adequate assurance proposal, nor from seeking additional deposits or other security necessary to provide adequate assurance of payment for post-petition utility service, after notice and hearing, pursuant to 11 U.S.C. §366. This Motion does, however, seek to be a timely request that no Utility seeking to enforce section 366(c)(2) of the Bankruptcy Code

terminate service without proper notice and an opportunity for a hearing.

14.     The Debtor represents that it will continue to pay post-petition obligations, including invoices for utility service, when due. If any delay in payment occurs, the Deposit and the protections proposed herein provide adequate assurance of payment to each of the Debtor's Utilities. If a Utility feels at risk, it may request an adequate assurance deposit and negotiate for more security with the Debtor, and absent an agreement, may file a motion with the Court seeking additional measures of protection and/or security than provided herein.

## IV.    <u>PRAYER</u>

WHEREFORE, the Debtor respectfully requests this Court to enter an Order (i) granting the Motion, (ii) directing the Utilities to continue providing utility service to the Debtor without interruption; (iii) authorizing and approving the amount and method by which the Debtor proposes to furnish their Utilities with adequate assurance of payment for post-petition utility service (iv) determining that the proposed adequate assurance of payment for post-petition utility service provided herein is "adequate" within the scope and meaning of 11 U.S.C. § 366; and (v) awarding the Debtor such other and further relief as may be just and proper.

Dated: December 14, 2023.

Respectfully submitted,

/s/Reese W. Baker
Reese W. Baker
Texas Bar No. 01587700
Sonya Kapp
TX Bar No. 11095395
Nikie Marie Lopez-Pagan
TX Bar No. 24090233
Baker & Associates
950 Echo Lane, Suite 300
Houston, Texas 77024
713-869-9200
713-869-9100 (fax)
**PROPOSED COUNSEL FOR THE DEBTOR**

## CERTIFICATE OF EMERGENCY

The undersigned on behalf of the Debtor certifies that an emergency hearing is necessary. Utilities must be paid or the utilities will be shut off. The possible shut off date is currently December 15, 2023. The Debtor must have utilities for continuing the electricity, water, elevators, access, internet and other critical services. Cash collateral is needed to make the utility deposit. A hearing is requested by 3:00 pm on Friday, December 15, 2023.

/s/ Reese W. Baker
Reese W. Baker

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 14, 2023, a true and correct copy of the foregoing document was delivered to the Electronic Filing Service for the United States Bankruptcy Court for the Southern District of Texas and also served upon the attached service list via U.S. mail and/or CM/ECF on December 14, 2023.

/s/ Reese W. Baker
Reese W. Baker

## Service List

ADT Commercial
PO Box 382109
Pittsburgh, PA 15251

ADT Commercial
c/o CT Corporation System
1999 Bryan St., Ste. 900
Dallas, TX 75201-3136

Datawatch
PO Box 79845
Baltimore, MD 21279

Cirro Energy
PO Box 2229
Houston, TX 77252-2229

Datawatch
c/o Cogency Global Inc.
1601 Elm St., Ste. 4360
Dallas, TX 75201

Cirro Energy
c/o CT Corporation System
1999 Bryan St., Ste. 900
Dallas, TX 75201-3136

Logix Fiber Networks
PO Box 734120
Dallas, TX 75373

City of Houston
PO Box 1560
Houston, TX 77251-1560

Logix Fiber Networks
c/o Corporation Service Company
dba CSC-Lawyers Incorporating Service
Company
211 E. 7th Street, Ste. 620
Austin, TX 78701

Kings 111
751 Canyon Dr Ste 100
Coppell, TX 75019

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | |
| **GALLERIA 2425 OWNER LLC,** | **Case No. 23-34815**<br>**Chapter 11** |
| Debtor. | |

## ORDER GRANTING DEBTOR'S MOTION TO DETERMINE ADEQUATE ASSURANCE UTILITY PAYMENTS

Before the Court is the *Motion to Determine Adequate Assurance Utility Payments* (the "Motion"), which was filed by Galleria 2425 Owner LLC (the "Debtor") on December 14, 2023. The Court finds that the Motion was properly served pursuant to the Federal and Local Rules of Bankruptcy Procedure and that it contained the appropriate notice to creditors pursuant to LBR 9013-1(b). The Court finds that no objection or other written response to the Motion has been timely filed by any party. Due to the failure of any party to file a timely written response, the allegations contained in the Motion stand unopposed and, therefore, the Court finds that good cause exists for the entry of the following order.

**IT IS THEREFORE ORDERED** that the Motion is **GRANTED**.

**IT IS FURTHER ORDERED** that no utility may alter, refuse, terminate, or discontinue utility service to, or discriminate against, the Debtor on the basis of the commencement of this chapter 11 case or on account of outstanding pre-petition invoice or require additional assurance of payment, other than as provided herein, as a condition to the Debtor receiving such utility services.

**IT IS FURTHER ORDERED** that the Debtor shall timely pay for all post-petition utility services pursuant to the terms of the invoices and billing statements generated by the utility companies in the ordinary course of business, splitting the pre- and post-petition portions where applicable on a pro rata basis.

**IT IS FURTHER ORDERED** that, if a utility company maintains more than one account for the Debtor, the failure to pay for post-petition utility services with respect to one account shall not be deemed a failure to pay or "cross-default" with respect to any other account, provided that such other account is being paid. Each failure to pay, each requirement of a deposit, and the ability to alter, refuse or discontinue service shall arise on a per account basis.

**IT IS FURTHER ORDERED** that, to the extent that a utility company provides post-petition services that are unpaid, such utility company shall be entitled to an administrative

claim, pursuant to 11 U.S.C. §§ 503(b)(1) and 507(a)(1), payable pursuant to a plan of reorganization or such earlier date as determined by the Court.

**IT IS FURTHER ORDERED** that a Utility may request an adequate assurance deposit by sending written notice to Debtor's counsel via email at courtdocs@bakerassociates.net  Any Utility that requests an adequate assurance deposit will be entitled to a cash deposit equal to the average monthly amount due the Utility, and Debtor is permitted to pay the deposits described in Exhibit A attached hereto to the utility companies described therein, and each such deposit is deemed an acknowledgement by that utility that the deposit is adequate assurance of payment as provided for by section 366 of the Bankruptcy Code.

**IT IS FURTHER ORDERED** that the above-described deposits may be funded in four equal monthly installments, with the first payment to be paid on the first day of the month following the Debtor's receipt of written notice from a Utility requesting an adequate assurance deposit and on the first day of each subsequent month until the deposit is paid in full.

**IT IS FURTHER ORDERED** that the Debtor's offer of adequate assurance of payment contained above, together with any pre-petition deposits, if any, are hereby deemed adequate assurance of payment for purposes of section 366 of the Bankruptcy Code.

**IT IS FURTHER ORDERED** that nothing contained herein shall preclude any utility from subsequently seeking a reasonable modification of the adequate assurance proposal, or  from seeking additional deposits or other security necessary to provide adequate assurance of payment, after notice and hearing, pursuant to 11 U.S.C. §366(b).

**IT IS FURTHER ORDERED** that no utility company seeking to enforce section 366(c)(2) of the Bankruptcy Code may terminate service without proper notice and an opportunity for a hearing.

**IT IS FURTHER ORDERED** that, notwithstanding anything herein to the contrary, the authority granted herein is subject to any requirement and/or limitation imposed upon the Debtor under any Court order regarding the use of cash collateral and/or any approved budget contained therein.  Nothing contained herein shall, or shall be deemed to, modify, amend, or alter such order or approved budget.

**IT IS FURTHER ORDERED** that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

DATED:_____

_____
JEFFREY P. NORMAN
UNITED STATES BANKRUPTCY JUDGE

## AVERAGE MONTHLY UTILITIES

**Properties:** 2425 West Loop - 2425 West Loop South Houston, TX 77027
**Based on recent months**

| Payee Name | Amount Payable |
|---|---|
| **2425 West Loop - 2425 West Loop South Houston, TX 77027** | |
| Cirro Energy | 25,000.00 |
| City of Houston Water | 8,200.00 |
| Datawatch Systems | 1,490.81 |
| Logix Fiber Networks | 323.42 |
| ADT Commercial (equipment lease, fire monitoring, et | 85.00 |
| ATT Internet | 300.00 |
| Kings 111 (billed quarterly about $1090 per quarter) | 350.00 |
| | **35,749.23** |

000445

Label Matrix for local noticing
0541-4
Case 23-34815
Southern District of Texas
Houston
Fri Dec 15 10:50:02 CST 2023

2425 WL, LLC
2425 West Loop South 11th floor
Houston, TX 77027-4304

City of Houston
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

Galleria 2425 Owner, LLC
1001 West Loop South 700
Houston, TX 77027-9084

(p)HARRIS COUNTY ATTORNEY'S OFFICE
P O BOX 2928
HOUSTON TX 77252-2928

Houston Community College System
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

Houston ISD
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

National Bank of Kuwait, S.A.K.P., New York

4
United States Bankruptcy Court
PO Box 61010
Houston, TX 77208-1010

2425 WL, LLC
13498 Pond Springs Rd.
Austin, TX 78729-4422

ADT
PO Box 382109
Pittsburgh, PA 15251-8109

Ali Choudhry
1001 West Loop South 700
Houston, TX 77027-9084

Ash Automated Control Systems, LLC
PO Box 1113
Fulshear, TX 77441-2013

CFI Mechanical, Inc
6109 Brittmoore Rd
Houston, TX 77041-5610

CNA Insurance Co
PO Box 74007619
Chicago, IL 60674-7619

Caz Creek Lending
118 Vintage Park Blvd No. W
Houston, TX 77070-4095

Cirro Electric
PO Box 60004
Dallas, TX 75266

City of Houston
PO Box 1560
Houston, TX 77251-1560

Comcast
PO Box 60533
City of Industry, CA 91716-0533

Datawatch Systems
4520 East West Highway 200
Bethesda, MD 20814-3382

Environmental Coalition Inc
PO Box 1568
Stafford, TX 77497-1568

Ferguson Facilities Supplies
PO Box 200184
San Antonio, TX 78220-0184

Firetron
PO Box 1604
Stafford, TX 77497-1604

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062-7917

Gulfstream Legal Group
1300 Texas St
Houston, TX 77002-3509

HNB Construction, LLC
521 Woodhaven
Ingleside, TX 78362-4678

Harris County Tax Assessor
PO Box 4622
Houston, TX 77210-4622

Kings 111 Emergency Communications
751 Canyon Drive, Suite 100
Coppell, TX 75019-3857

Lexitas
PO Box Box 734298 Dept 2012
Dallas, TX 75373-4298

Logix Fiber Networks
PO Box 734120
Dallas, TX 75373-4120

000446

MacGeorge Law Firm
2921 E 17th St Blgd D Suite 6
Austin, TX 78702-1572

Mueller Water Treatment
1500 Sherwood Forest Dr.
Houston, TX 77043-3899

National Bank of Kuwait
299 Park Ave. 17th Floor
New York, NY 10171-0023

Nationwide Security
2425 W Loop S 300
Houston, TX 77027-4205

Nichamoff Law Firm
2444 Times Blvd 270
Houston, TX 77005-3253

TKE
3100 Interstate North Cir SE  500
Atlanta, GA 30339-2296

US Trustee
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002-2604

Waste Management
PO Box 660345
Dallas, TX 75266-0345

Zindler Cleaning Service Co
2450 Fondren 113
Houston, TX 77063-2314

James Q. Pope
The Pope Law Firm
6161 Savoy Drive
Ste 1125
Houston, TX 77036-3343

Reese W Baker
Baker & Associates
950 Echo Lane
Suite 300
Houston, TX 77024-2824

Rodney Drinnon
McCathern Houston
2000 W Loop S
Ste. 1850
Houston, TX 77027-3744

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Harris County, ATTN: Property Tax Division
Harris County Attorney's Office
P.O. Box 2928
Houston, TX 77252-2928 United States

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)2425 West Loop, LLC

End of Label Matrix
Mailable recipients    41
Bypassed recipients     1
Total                  42

000447

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-34815 (JPN) |
| **GALLERIA 2425 Owner, LLC** | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | § | |

---

**NATIONAL BANK OF KUWAIT, S.A.K.P, NEW YORK BRANCH'S**
**OMNIBUS OBJECTION TO (I) DEBTOR'S EMERGENCY MOTION**
**FOR INTERIM AND FINAL ORDERS AUTHORIZING THE USAGE**
**OF CASH COLLATERAL, AND (II) DEBTOR'S MOTION TO**
**DETERMINE ADEQUATE ASSURANCE UTILITY PAYMENTS**

---

**TO THE HONORABLE JEFFREY P. NORMAN, U.S. BANKRUPTCY JUDGE:**

National Bank of Kuwait, S.A.K.P. New York Branch ("NBK") objects to the *Debtor's Emergency Motion for Interim and Final Orders Authorizing the Usage of Cash Collateral* (the "Cash Collateral Motion") [ECF No. 33] and the *Debtor's Motion to Determine Adequate Assurance Utility Payments* (the "Utilities Motion") [ECF No. 34].  The Debtor is a serial filer, whose first chapter 11 case was just recently dismissed, and nothing has changed to provide any hope that the Debtor can adequately protect NBK for the use of its cash collateral or pay its continuing to accrue real property taxes and other expenses. Under these circumstances, and others as described below, NBK's secured claim is not adequately protected nor can it be, and both the Cash Collateral Motion and Utilities Motion should be denied.  In further support of these objections, NBK respectfully represents as follows.

**Overview of NBK's Secured Loan and the Debtor's Previous Bankruptcy Case**

1.      On May 23, 2018, NBK loaned the Debtor approximately $51,675,000 (the "Loan") to acquire real property and improvements commonly known as 2425 West Loop South Houston,

Texas 77027 (the "Property").  Loan Agreement § 2.1.  The Loan is secured by, among other things, a first-priority lien on the Property, and proceeds thereof, and is evidenced by the (i) Loan Agreement between NBK and the Debtor dated May 23, 2018 (the "Loan Agreement"),[1] (ii) Promissory Note dated May 23, 2018 executed by the Debtor and payable to NBK (the "Note"),[2] and (iii) Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing dated May 23, 2018, recorded at record number RP2018-235600 in the Real Property Records of Harris County, Texas[3] (the "Deed of Trust" and together with the Loan Agreement, the Note and all documents relating to the Loan, the "Loan Documents").

2.      Pursuant to the Deed of Trust, the Loan is secured by, among other things: (i) the Property, as well as all Improvements and Chattels (each as defined in the Deed of Trust); (ii) all Leases in respect of the Property; (iii) all monies, bank accounts, accounts receivables, contract rights, other rights and any other intangible assets relating to the rental, operation and ownership of the Property; and (iv) all proceeds and replacements of the foregoing and of the other mortgaged property.  *See* Deed of Trust at 2-3.

3.      The Note had a five-year term and provided for interest only payments with principal due at maturity, May 23, 2023.  Note § 1.  Among other things, the Loan Agreement required the Debtor to use loan proceeds to fund the Interest Reserve Account, as defined thereunder, in the amount of $2.5 million and pay costs and expenses incurred in connection with the closing of the Loan.  *See* Loan Agreement § 5.32.  The Interest Reserve Account was funded on or around the Closing Date with a deposit of a portion of the proceeds of the Loan.  The Loan Agreement also required the Debtor to pay or reimburse NBK for all actual costs and expenses

---

[1] The Loan Agreement is attached as Exhibit A.
[2] The Note is attached as Exhibit B.
[3] The Deed of Trust is attached as Exhibit C.

(including reasonable third-party attorneys' fees and disbursements) incurred in connection with, among other things, enforcing the obligations or collecting payments due from the Debtor in respect of the Loan.  *See* Loan Agreement § 16.4.

4.      Upon the occurrence and continuation of an Event of Default, the Loan Documents permit NBK to accelerate the Loan (*see* Loan Agreement § 10.2; Deed § 2.01), and exercise all rights and remedies provided for in the Loan Documents, including, without limitation, foreclosing on the Property (*see* Loan Agreement § 10.2; Deed § 2.01).

5.      On April 1, 2020, the Debtor defaulted on the Loan by failing to make the required payment of interest due that day; instead the Debtor made only a partial payment. The Debtor did not make any further interest payments (and has not made any principal payments) after April 1, 2020.  After the Debtor's default, on each payment date NBK applied the funds in the Interest Reserve Account to pay interest due until the account was depleted on March 6, 2021.  On June 29, 2021, NBK sent a letter to the Debtor informing the Debtor of the existence of an Event of Default under the Loan Documents and notifying the Debtor, among other things, of NBK's intent to accelerate the Loan if the default was not cured by July 12, 2021. Various litigation maneuvers occurred for almost the next twelve months.

6.      In August 2022, the Debtor, NBK, the Debtor's principal, Ali Choudhri and Naissance Galleria, LLC (an entity Mr. Choudhri's claims to own by assignment from its original owner) entered into a confidential settlement agreement that, among other things, allowed the Debtor to pay off the loan in a discounted amount provided that such payment was made on or before a specified payment date. The Debtor defaulted under the settlement agreement by failing to comply with its payment terms.

7.      On March 28, 2023, NBK filed a request in state court to have a receiver appointed over the Property until it could be sold at public auction. On April 11, 2023, the day before the hearing on NBK's receivership motion, the Debtor filed a request for a temporary restraining order (TRO(s)) in state court seeking to prevent the court from appointing a receiver and to stop the pending foreclosure. On April 12, 2023, at the hearing on NBK's receivership motion, and in response to arguments by Debtor's counsel, the state court gave the Debtor an additional 105 days from the specified payment date to July 3, to make the required payment to NBK under the settlement agreement. During that period, however, the Debtor was required to make three payments of $80,000 each to NBK, and the state court directed that any failure to make such payments would entitle NBK to foreclose.

8.      The Debtor failed to make the $80,000 payment due on June 15, 2023, and NBK noticed the Property for foreclosure on July 5, 2023 (the "Initial Petition Date"). The Debtor filed two more requests for TROs seeking to prevent that foreclosure, each of which was rejected by the state court.  Shortly before the July 5 foreclosure sale, the Debtor filed its first bankruptcy case.

9.      On July 24, 2023, NBK moved to dismiss the Debtor's initial bankruptcy case because it was filed in bad faith (to prevent foreclosure of the Property) and the Debtor had no reasonable hope of a successful reorganization. At the September 22, 2023 hearing on NBK's motion to dismiss, Judge Lopez denied the motion without prejudice, noting:

> There's a fundamental problem with this case.  I'm not sure it can be fixed.  And that's where we're going. . . .
>
> I'm like, and I'm really uncomfortable.  It's driving all of these problems that I have with the budget, which is, you know, is rent supposed to be free for Jetall?  Is it, you know, are they not supposed to be collected 19,000, you know, is the $19,000 fee really a pass through fee?  I don't trust what I'm seeing.  And it makes me uncomfortable that I don't have an independent party telling me these answers. . . .

4

I'm just telling you I'm uncomfortable with the lack of transparency. And I'm not saying it's there, but there's -- we don't have an independent here, and I don't know how to proceed. And it's going to flow.   It's going to get worse as my inquiry goes on . . . . We haven't talked about feasibility of a plan. . . .

I don't trust the numbers. I don't trust the books. I don't have a true independent who can tell me what we've got going on here.

I do have that Jetall is everywhere. And Mr. Choudhri is everywhere on these documents in some sense or another. I don't have enough today to get me comfortable, but when it comes to -- so I'm going to deny the motion to dismiss without prejudice. If I find out that I get uncomfortable and say what you already know that I'm already on edge. I won't hesitate to convert the case or do something on my own and I have the authority to do it. . . .

So this case continues, but the case continues under really tight timelines and under really strict costs. And I don't like the position that I put you in. I just don't. I don't like the position I put others in. I do know as we get closer to the 90 days, they didn't raise it. But someone's going to have to start talking about interest payments and where this goes on that. If this case – I know there's a plan on file and I know what the Code says. I got to make sure if we get there in the next two months. That is really, really a good market test, and in true independent looked at this. . . .

And maybe we can all meet in about 30 days and see what this case really goes in the same way. It's just a – It's an extension. I don't really know what I'm going to do yet, but I do know what I'm not doing today.

Case No. 23-60036, Sept. 22, 2023 Hr'g Tr. at 118-19:16; 215:5-12; 217:18-23-8; 219:19-22.

*See* ECF No. 15, *Declaration of Charles C. Conrad*, Exhibit 3.

    10.    At a November 1, 2023 status conference, Judge Lopez on his own motion

dismissed the Debtor's first bankruptcy case noting:

THE COURT: The Court's already held a hearing on a motion to dismiss the case based upon, among other things, the amount of money it would take to continue this case. The Court denied it based on the evidence presented to the Court at the time. . . . But for this case to continue there's going to have to be a lot of money. I'm going

<u>to have to require NBK to get paid interest</u>. There's just not enough money in the budget, this Debtor is going to run out of money really fast. . . . The only way this case survives is if I don't require NBK to be paid any interest on that loan pending the resolution of State Court matters, the matters of plan confirmation, and I'm unwilling to do that, <u>which makes this case immediately administratively insolvent</u>. . . .

This Debtor doesn't have enough money to pay even a half a month of interest on the secured loan and it would take until early 2024 to go deal with that. <u>I'm dismissing this case effective today under Section 1112(b) for cause.</u>

Case No, 23-60036, Nov. 1, 2023 Hr'g Tr. at 64-65:8-8; 68:19-23.  *See* ECF No. 15, *Declaration of Charles C. Conrad*, Exhibit 4.

11.     After dismissal of the first bankruptcy case, NBK noticed the Property for foreclosure on December 5, 2023. Prior to that scheduled foreclosure sale, the Debtor filed several additional requests for TROs in state court, all of which were denied, and appealed those denials through the state court system, including a request to the Texas Supreme Court; all of those appeals were likewise denied.  On December 5, 2023 (the "<u>Second Petition Date</u>"), just minutes before the scheduled foreclosure sale of the Property, the Debtor filed this second bankruptcy case.

12.     As of the Initial Petition Date, the Debtor owed NBK $63,552,988.79 under the Loan Documents consisting of:[4]

|  |  |
|---|---|
| Unpaid Principal Balance: | $51,675,000.00 |
| Past Due Interest at Default Rate: | $8,521,760.78 |
| Unreimbursed Legal Fees: | $4,318,187.09 |
| Credits | $(961,959.08) |
| **TOTAL AMOUNT DUE:** | $63,552,988.79 |

---

[4]  The Payoff Statement is attached as <u>Exhibit D</u>.  The payoff amount is provided for illustrative purposes, and NBK reserves the right to supplement the amount as permitted under the Loan Documents to reflect additional fees and costs incurred since the Initial Petition Date.

## The Debtor Cannot Satisfy the Requirements for Use of Cash Collateral

*A.    Standard for Use of Cash Collateral*

13.    A debtor may not use cash collateral absent consent of each entity that has an interest in cash collateral unless "the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2)(B).  Under section 363(e) of the Bankruptcy Code, the court may grant this permission only if each entity that has an interest in such cash collateral is "adequately protected."  11 U.S.C. § 363(e) (stating that "on request of an entity that has an interest in property used . . . by the trustee, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest").  The debtor bears the burden of proving that it can adequately protect the secured creditor's interest in the cash collateral.  11 U.S.C. § 363(p); *see also In re Energy Partners, Ltd.*, 409 B.R. 211, 235-37 (Bankr. S.D. Tex. 2009) (denying use of cash collateral based on debtor's failure to demonstrate the secured creditor was adequately protected).

*B.    The Debtor Has Not and Can Not Provide Adequate Protection*

14.    The Debtor has not met its burden here. The proposed adequate protection package consists of superpriority claims and "replacement liens on all property now owned or hereafter acquired by the Debtor," subject to a carve-out for professional fees and United States Trustee fees.  Cash Collateral Motion at 14.  Although NBK previously consented to a similar package in the first bankruptcy case, consent is required each time a debtor seeks to use a secured creditor's cash collateral, and NBK does not consent on this second trip through bankruptcy.  Nothing has changed.  The Debtor cannot provide adequate protection and there is not enough money available to the Debtors to meet payments required to be made under the Bankruptcy Code..

000454

15.     NBK has a prepetition first lien on all of the Debtor's assets, including rent proceeds from the Property, and giving a secured lender a replacement lien on assets it already has a lien on is illusory and not adequate protection.  *See In re LTAP US, LLLP*, No. 10-14125 (KG), 2011 WL 671761, at *3 (Bankr. D. Del. Feb. 18, 2011) (denying cash collateral motion for lack of adequate protection and holding that "[p]roviding [the secured creditor] with a replacement lien on assets against which it already has a lien is illusory. Debtor must provide [the secured creditor] with additional collateral, and there is none."); 3 Collier on Bankruptcy ¶ 364.05 (16th ed. 2022) ("Providing a lender with a replacement lien on assets on which it already has a lien is illusory and will not support an adequate protection finding."). Further, the proposed replacement lien is deficient because section 552 of the Bankruptcy Code does not affect NBK's lien on postpetition rent proceeds to the extent provided for under the parties' security agreement. *See* 11 U.S.C § 552(b)(2) (secured lender's security interest in rents extends to postpetition rent).

16.     Granting superpriority claims is also not adequate protection because a claim under section 507(b) of the Bankruptcy Code is intended to redress a failure of adequate protection and is not itself an independent form of adequate protection.  *See In re UAL Corp.*, No. 02 B 48191 (ERW), 2005 WL 3118411, at *6 n.1 (Bankr. N.D. Ill. Nov. 21, 2005) ("This prohibition [on administrative expense allowances as adequate protection], however, is only against the prospective use of an administrative expense allowance to provide adequate protection. In order to redress a failure of adequate protection, the court is specifically authorized under [section] 507(b) to award an allowance of an administrative expense.").

C.     *Other Objectionable Provisions in the Proposed Interim Order and Budget Issues*

17.     NBK does not consent to a carve out from its blanket lien on all of the Debtor's assets for payment of professionals.  A carve out is a consensual construct, and the "[t]he default rule in bankruptcy is . . . that administrative expenses are paid out of the estate and not by the

secured creditors of the debtor." *In re Grimland, Inc.*, 243 F.3d 228, 233 (5th Cir. 2001).  Thus, neither the Debtor nor the Court can impose a carve out for payment of professionals on NBK without its consent.  *See In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1396 (5th Cir. 1986) ("[T]he concept of adequate protection … 'is derived from the fifth amendment protection of property interests . . . . The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain.'") (quoting H.R. REP. No. 95-595, 338-39 (1977)); *In re White Glove, Inc.*, No. 98-12493 (DWS), 1998 WL 731611, at *6 (Bankr. E.D. Pa. Oct. 14, 1998) (Although "[c]arve outs are . . . common in Chapter 11 cases in favor of debtor's attorneys as part of cash collateral agreements," "*it is essential to note that the carve out is a product of agreement between the secured party and the beneficiary of the carve out*." [emphasis added]).

18.     As NBK will provide in further detail in due course, the Debtor has not paid any interest on the Loan in nearly three years and, in the first bankruptcy case, the Debtor failed to make section 362(d)(3)(B) mandated interest payments to NBK 90 days after the Initial Petition Date.  Given the lack of payment in years and significant fees and costs expended by NBK in attempting to exercise its rights and remedies under the Loan Documents, it is appropriate for NBK to protect its collateral from further diminution in value arising from any payment of professional fees and expenses under a carve out provision.

19.     In addition, the Debtor's proposed budget does not include any projection of income of over the next 30 days or account for the 2023 property taxes due at the end of January. *See* Tex. Prop. Tax Code. § 32.01(a).  Because the proposed budget does not contain projected revenue to demonstrate that revenue exceeds the projected expenses, NBK's collateral position could be eroding quickly before the Debtor is even required to make interest payments to NBK

9

under the Bankruptcy Code.  Also, according to the Harris County Appraisal District, the 2023 property taxes are estimated to be $587,554.00.[5]  Thereafter, all unpaid property taxes become delinquent and penalties and interest are added to the original base tax amount until taxes are paid. *See id.* § 31.02(a). The Debtor has not paid property taxes in almost five years[6] and, upon information and belief, taxing units assess a 12% interest rate on unpaid property taxes.[7]  In short, there is no assurance that the 2023 property taxes will be paid under the proposed budget thus further eroding NBK's collateral position as unpaid property taxes prime NBK's lien on the Property.

D.     *In the Alternative, the Court Should Condition Use of Cash Collateral on Provision of Adequate Protection*

20.     If the Court decides to permit the use of any NBK cash collateral, the Court should condition that use on the following:

a.   The Debtor must submit a revised budget showing projected monthly rent income.

b.   The Debtor must provide a report comparing the Debtor's actual revenue and expenses for the prior six months as compared to the projected revenue and disbursements for future months reflected in a revised budget. This report should disclose the Debtor's cash position as of the end of each of the past six months.

c.   The Debtor must provide copies of (i) all executed leases for the Property, (ii) bank account statements from July 1, 2023 to the Second Petition Date, including all checks, wires, and deposit documents, (iii) all invoices for "repair and maintenance" and invoices for the same expenses over the past six months, (iv) any

---

[5]  *See* https://harris.trueprodigy-taxtransparency.com/taxTransparency/property/192847/0.
[6]  The Debtor has not paid off any property taxes since 2019.
[7]  *See* Proofs of Claim Nos. 3-1 and 4-1 filed in Case No. 23-60036 attached as Exhibit E.

10

000457

tax assessments on the Property, (v) any documents showing the Debtor's efforts to market the Property for sale or to tenants, (vi) the Debtor's tax returns from 2020 through 2022, (vii) any agreement to reduce, abate or defer rent, and (viii) an accounting of (i) the use of rent income from January 1, 2023 through the Second Petition Date, and (ii) adequate assurance deposits from the Initial Petition Date.

d.   Subject to section 362(d)(3)(B) of the Bankruptcy Code, the Debtor should commence monthly interest payments to NBK in an amount equal to interest at the non-default rate under the Loan Documents on the value of NBK's interest in the Property within fifteen (15) days after approval of an interim cash collateral order.

e.   The Debtor shall not make payments to any insider or affiliate or any other entity affiliated with the Debtor's principal Mr. Choudhri.

f.   The Debtor shall not incur expenses nor use cash collateral in an amount that exceeds by more than five percent (5%) of the total expenses provided in the Budget without NBK's written consent or court approval.

g.   The Debtor shall not use cash collateral to pay any estate professional fees and expenses or to investigate or prosecute any claims or causes of action against NBK.

h.   NBK shall not be limited or prohibited by any interim cash collateral order or otherwise from seeking additional adequate protection for the use of cash collateral or any other appropriate relief.  Further, nothing in any interim cash collateral order shall modify any terms or rights of NBK under the Loan Documents.

i.   The conditions specified herein should not constitute a waiver of any pre-petition default(s) or event(s) of default under the Loan Documents.

E.    *The Debtor Should Establish a Segregated Account for Adequate Assurance Deposits*

21.    The Debtor proposes to make timely payments for utility services, and the estimated bill for such services is $35,800, about $10,000 less than the estimated utilities bill in the first bankruptcy case. Utilities Motion at 10.  As a condition for granting the Utilities Motion, the Debtor should increase the adequate assurance deposit to $45,800 and establish a segregated adequate assurance account to ensure that adequate assurance is offered to utility providers.

## <u>Conclusion</u>

WHEREFORE, NBK requests that the Court enter the proposed order attached as <u>Exhibit F</u> (i) denying the Cash Collateral Motion and the Utilities Motion to the extent that adequate assurance is not increased and a segregated account is not established for adequate assurance deposits, and (ii) granting such other relief as the Court deems just and proper.

000459

DATED: December 15, 2023

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Charles C. Conrad*
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010-1028
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

-   *and*   -

Andrew M. Troop (Bar No. MA547179)
Patrick E. Fitzmaurice*
Kwame O. Akuffo*
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

*Admitted *pro hac vice*

**Counsel for National Bank of Kuwait, S.A.K.P., New York Branch**

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 15, 2023, a true and correct copy of this document was served via the Court's CM/ECF system on the Debtor and its counsel of record and all others who are deemed to have consented to ECF electronic service, and also by mailing, first class, postage prepaid, to each of the parties on the attached mailing matrix.

*/s/ Charles C. Conrad*
Charles C. Conrad

13

Label Matrix for local noticing
0541-4
Case 23-34815
Southern District of Texas
Houston
Fri Dec 15 16:57:42 CST 2023

2425 WL, LLC
2425 West Loop South 11th floor
Houston, TX 77027-4304

City of Houston
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

Galleria 2425 Owner, LLC
1001 West Loop South 700
Houston, TX 77027-9084

(p)HARRIS COUNTY ATTORNEY'S OFFICE
P O BOX 2928
HOUSTON TX 77252-2928

Houston Community College System
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

Houston ISD
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

National Bank of Kuwait, S.A.K.P., New York

4
United States Bankruptcy Court
PO Box 61010
Houston, TX 77208-1010

2425 WL, LLC
13498 Pond Springs Rd.
Austin, TX 78729-4422

ADT
PO Box 382109
Pittsburgh, PA 15251-8109

Ali Choudhry
1001 West Loop South 700
Houston, TX 77027-9084

Ash Automated Control Systems, LLC
PO Box 1113
Fulshear, TX 77441-2013

CFI Mechanical, Inc
6109 Brittmoore Rd
Houston, TX 77041-5610

CNA Insurance Co
PO Box 74007619
Chicago, IL 60674-7619

Caz Creek Lending
118 Vintage Park Blvd No. W
Houston, TX 77070-4095

Cirro Electric
PO Box 60004
Dallas, TX 75266

City of Houston
PO Box 1560
Houston, TX 77251-1560

Comcast
PO Box 60533
City of Industry, CA 91716-0533

Datawatch Systems
4520 East West Highway 200
Bethesda, MD 20814-3382

Environmental Coalition Inc
PO Box 1568
Stafford, TX 77497-1568

Ferguson Facilities Supplies
PO Box 200184
San Antonio, TX 78220-0184

Firetron
PO Box 1604
Stafford, TX 77497-1604

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062-7917

Gulfstream Legal Group
1300 Texas St
Houston, TX 77002-3509

HNB Construction, LLC
521 Woodhaven
Ingleside, TX 78362-4678

Harris County Tax Assessor
PO Box 4622
Houston, TX 77210-4622

Kings 111 Emergency Communications
751 Canyon Drive, Suite 100
Coppell, TX 75019-3857

Lexitas
PO Box Box 734298 Dept 2012
Dallas, TX 75373-4298

Logix Fiber Networks
PO Box 734120
Dallas, TX 75373-4120

000461

MacGeorge Law Firm
2921 E 17th St Blgd D Suite 6
Austin, TX 78702-1572

Mueller Water Treatment
1500 Sherwood Forest Dr.
Houston, TX 77043-3899

National Bank of Kuwait
299 Park Ave. 17th Floor
New York, NY 10171-0023

Nationwide Security
2425 W Loop S 300
Houston, TX 77027-4205

Nichamoff Law Firm
2444 Times Blvd 270
Houston, TX 77005-3253

TKE
3100 Interstate North Cir SE  500
Atlanta, GA 30339-2296

US Trustee
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002-2604

Waste Management
PO Box 660345
Dallas, TX 75266-0345

Zindler Cleaning Service Co
2450 Fondren 113
Houston, TX 77063-2314

James Q. Pope
The Pope Law Firm
6161 Savoy Drive
Ste 1125
Houston, TX 77036-3343

Reese W Baker
Baker & Associates
950 Echo Lane
Suite 300
Houston, TX 77024-2824

Rodney Drinnon
McCathern Houston
2000 W Loop S
Ste. 1850
Houston, TX 77027-3744

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Harris County, ATTN: Property Tax Division
Harris County Attorney's Office
P.O. Box 2928
Houston, TX 77252-2928 United States

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)2425 West Loop, LLC

End of Label Matrix
Mailable recipients    41
Bypassed recipients     1
Total                  42

000462

## **Exhibit A**

Loan Agreement

LOAN AGREEMENT

Dated as of May 23, 2018

among

GALLERIA 2425 OWNER, LLC,

as Borrower,

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH,

as Administrative Agent,

and

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, and certain other lenders who
may now or later be made party hereto,

collectively, as Lenders

000464

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS; PRINCIPLES OF CONSTRUCTION ........................................................... 1

    Section 1.1. Definitions ......................................................................................... 1
    Section 1.2. Interpretation .................................................................................. 12

ARTICLE II GENERAL TERMS ...................................................................................... 13

    Section 2.1. Loan Commitment; Extension ......................................................... 13
    Section 2.2. Interest Rate and Loan Payments..................................................... 13
    Section 2.3. Usury Savings ................................................................................. 14

ARTICLE III CONDITIONS PRECEDENT ....................................................................... 14

    Section 3.1. Representations and Warranties; Compliance with Conditions.......... 14
    Section 3.2. Delivery of Loan Documents; Title Policy; Due Diligence Items....... 14
    Section 3.3. Related Documents ......................................................................... 16
    Section 3.4. Organizational Documents ............................................................. 16
    Section 3.5. Opinions of Counsel ....................................................................... 16
    Section 3.6. Taxes and Other Charges ............................................................... 16
    Section 3.7. Completion of Proceedings............................................................. 16
    Section 3.8. Payments ....................................................................................... 16
    Section 3.9. Transaction Costs .......................................................................... 16
    Section 3.10. No Material Adverse Change ........................................................ 16
    Section 3.11. Leases .......................................................................................... 17
    Section 3.12. Tenant Estoppel Certificate........................................................... 17
    Section 3.13. SNDA .......................................................................................... 17
    Section 3.14. Tax Lot........................................................................................ 17
    Section 3.15. Borrower's and Guarantor's Financials ......................................... 17
    Section 3.16. Acquisition of Property.................................................................. 17
    Section 3.17. Further Documents ....................................................................... 17
    Section 3.18. Interest Reserve Deposit................................................................ 17

ARTICLE IV REPRESENTATIONS AND WARRANTIES.................................................. 17

    Section 4.1. Organization................................................................................... 17
    Section 4.2. Status of Borrower ......................................................................... 18
    Section 4.3. Validity of Documents .................................................................... 18
    Section 4.4. No Conflicts ................................................................................... 18
    Section 4.5. Litigation ....................................................................................... 18
    Section 4.6. Agreements .................................................................................... 18
    Section 4.7. Solvency......................................................................................... 19
    Section 4.8. Full and Accurate Disclosure ......................................................... 19
    Section 4.9. ERISA Compliance......................................................................... 19
    Section 4.10. Not a Foreign Person .................................................................... 20
    Section 4.11. Enforceability............................................................................... 20
    Section 4.12. Business Purposes......................................................................... 20
    Section 4.13. Compliance................................................................................... 20
    Section 4.14. Financial Information.................................................................... 20
    Section 4.15. Illegal Activity .............................................................................. 20
    Section 4.16. Separate Tax and Zoning Lot........................................................ 20

# TABLE OF CONTENTS
continued

Section 4.17. Federal Reserve Regulation ..................................................................... 20
Section 4.18. Investment Company Act ......................................................................... 21
Section 4.19. No Change in Facts or Circumstances; Disclosure ................................. 21
Section 4.20. Special Purpose Entity ............................................................................. 21
Section 4.21. Intellectual Property ................................................................................. 21
Section 4.22. Embargoed Person .................................................................................... 21
Section 4.23. Patriot Act ................................................................................................ 22
Section 4.24. No Contractual Obligations ..................................................................... 22
Section 4.25. Shareholders of Borrower ........................................................................ 22
Section 4.26. Survival .................................................................................................... 23
Section 4.27. Leases ....................................................................................................... 23
Section 4.28. Landmark Status ...................................................................................... 23
Section 4.29. Broker ....................................................................................................... 23

ARTICLE V COVENANTS ........................................................................................................ 23

Section 5.1. Existence; Compliance With Legal Requirements ................................... 23
Section 5.2. Maintenance and Use of Project .............................................................. 24
Section 5.3. Waste ........................................................................................................ 24
Section 5.4. Taxes and Other Charges ........................................................................ 24
Section 5.5. Litigation .................................................................................................. 26
Section 5.6. Access to the Project ............................................................................... 27
Section 5.7. Notice of Default ..................................................................................... 27
Section 5.8. Cooperate in Legal Proceedings ............................................................. 27
Section 5.9. Performance of Obligations ..................................................................... 27
Section 5.10. Awards; Insurance Proceeds ................................................................... 27
Section 5.11. Financial Reporting ................................................................................. 27
Section 5.12. Estoppel Statement .................................................................................. 28
Section 5.13. Management of Project ............................................................................ 28
Section 5.14. Liens ......................................................................................................... 29
Section 5.15. Debt Cancellation .................................................................................... 29
Section 5.16. Zoning ...................................................................................................... 29
Section 5.17. ERISA ...................................................................................................... 30
Section 5.18. No Joint Assessment ............................................................................... 30
Section 5.19. Alterations ................................................................................................ 30
Section 5.20. Reciprocal Easement Agreement ............................................................ 30
Section 5.21. Notices ...................................................................................................... 30
Section 5.22. Curing ....................................................................................................... 30
Section 5.23. Limitation on Securities Issuances ......................................................... 31
Section 5.24. Limitations on Distributions ................................................................... 31
Section 5.25. Contractual Obligations .......................................................................... 31
Section 5.26. Additional Indebtedness .......................................................................... 31
Section 5.27. Restrictions on Leasing ........................................................................... 31
Section 5.28. Debt Service Coverage Ratio .................................................................. 32
Section 5.29. Loan-to-Value Ratio ................................................................................ 33
Section 5.30. UCC Searches .......................................................................................... 33
Section 5.31. Updated/New Appraisal ........................................................................... 33
Section 5.32. Interest Reserve Account ......................................................................... 33
Section 5.33. Mezzanine Loan ...................................................................................... 34

## TABLE OF CONTENTS
continued

ARTICLE VI ENTITY COVENANTS ................................................................................. 34

    Section 6.1. Single Purpose Entity/Separateness ........................................................ 34
    Section 6.2. Change of Name, Identity or Structure .................................................... 35
    Section 6.3. Business and Operations ......................................................................... 36

ARTICLE VII NO SALE OR ENCUMBRANCE ............................................................... 36

    Section 7.1. Transfer Definitions ................................................................................ 36
    Section 7.2. No Sale/Encumbrance.............................................................................. 36
    Section 7.3. Administrative Agent's Rights ................................................................ 37
    Section 7.4. Assumption .............................................................................................. 37

ARTICLE VIII INSURANCE; CASUALTY; CONDEMNATION; RESTORATION ........... 37

    Section 8.1. Insurance ................................................................................................. 37
    Section 8.2. Insurance Escrow; Payment by Administrative Agent ............................... 41
    Section 8.3. Casualty .................................................................................................. 42
    Section 8.4. Condemnation .......................................................................................... 44

ARTICLE IX INTENTIONALLY OMITTED .................................................................... 45

ARTICLE X EVENTS OF DEFAULT; REMEDIES .......................................................... 45

    Section 10.1. Event of Default ..................................................................................... 45
    Section 10.2. Remedies................................................................................................ 48

ARTICLE XI REPLACEMENT OF LENDERS ................................................................. 48

ARTICLE XII SECONDARY MARKET; ASSIGNMENT; PARTICIPATION ................... 49

    Section 12.1. Assignment; Participation ...................................................................... 49
    Section 12.2. Intralinks ............................................................................................... 51

ARTICLE XIII AGENT ..................................................................................................... 51

    Section 13.1. Appointment, Powers and Immunities..................................................... 51
    Section 13.2. Reliance by Administrative Agent .......................................................... 53
    Section 13.3. Purchase of Disapproving Lender's Interest ........................................... 53
    Section 13.4. Rights of Administrative Agent as Lender .............................................. 54
    Section 13.5. Indemnification...................................................................................... 54
    Section 13.6. Non-Reliance on Administrative Agent and Other Lenders ..................... 55
    Section 13.7. Failure to Act ......................................................................................... 55
    Section 13.8. Action by Administrative Agent ............................................................. 55
    Section 13.9. Successor Administrative Agent ............................................................. 56
    Section 13.10. Sharing ................................................................................................ 56
    Section 13.11. Pro Rata Treatment and Payments ........................................................ 56
    Section 13.12. Lenders Pro Rata Shares ...................................................................... 57
    Section 13.13. Disbursement of Proceeds by Administrative Agent............................... 57
    Section 13.14. Amendments Concerning Agency Function .......................................... 58
    Section 13.15. Events of Default ................................................................................. 58
    Section 13.16. Defaulting Lender ................................................................................ 59
    Section 13.17. Servicing Fee ....................................................................................... 61

# TABLE OF CONTENTS
continued

ARTICLE XIV INDEMNIFICATIONS ..................................................................................... 61

    Section 14.1. General Indemnification .......................................................................... 61
    Section 14.2. Intangible Tax Indemnification ............................................................... 61
    Section 14.3. ERISA Indemnification ........................................................................... 61
    Section 14.4. Survival .................................................................................................... 62

ARTICLE XV NOTICES ...................................................................................................... 62

    Section 15.1. Notices ..................................................................................................... 62

ARTICLE XVI FURTHER ASSURANCES ......................................................................... 62

    Section 16.1. Replacement and Corrective Documents.................................................. 62
    Section 16.2. Further Acts, Etc ...................................................................................... 63
    Section 16.3. Changes in Tax, Debt, Credit and Documentary Stamp Law ................... 63
    Section 16.4. Expenses .................................................................................................. 64

ARTICLE XVII WAIVERS ................................................................................................... 64

    Section 17.1. Remedies Cumulative; Waivers............................................................... 64
    Section 17.2. Modification, Waiver in Writing .............................................................. 64
    Section 17.3. Delay Not a Waiver ................................................................................. 65
    Section 17.4. Trial by Jury............................................................................................. 65
    Section 17.5. Waiver of Notice...................................................................................... 65
    Section 17.6. Remedies of Borrower .............................................................................. 65
    Section 17.7. Waiver of Marshalling of Assets ............................................................. 65
    Section 17.8. Waiver of Statute of Limitations .............................................................. 66
    Section 17.9. Waiver of Counterclaim........................................................................... 66

ARTICLE XVIII GOVERNING LAW ................................................................................. 66

    Section 18.1. Choice of Law.......................................................................................... 66
    Section 18.2. Severability.............................................................................................. 67
    Section 18.3. Preferences .............................................................................................. 68

ARTICLE XIX MISCELLANEOUS ..................................................................................... 68

    Section 19.1. Survival .................................................................................................... 68
    Section 19.2. Administrative Agent's Discretion ........................................................... 68
    Section 19.3. Headings .................................................................................................. 68
    Section 19.4. Cost of Enforcement ................................................................................ 68
    Section 19.5. Schedule Incorporated ............................................................................. 68
    Section 19.6. Offsets, Counterclaims and Defenses ...................................................... 68
    Section 19.7. No Joint Venture or Partnership; No Third Party Beneficiaries ............... 69
    Section 19.8. Publicity.................................................................................................. 70
    Section 19.9. Conflict; Construction of Documents; Reliance ...................................... 70
    Section 19.10. Actions, Approvals and Determinations................................................. 70
    Section 19.11. Entire Agreement................................................................................... 71
    Section 19.12. Certain Additional Rights of Lenders .................................................... 71
    Section 19.13. Counterparts........................................................................................... 71

iv

**TABLE OF CONTENTS**
continued

EXHIBIT A - Borrower's Organizational Structure

EXHIBIT B - Form of Assignment and Assumption Agreement

SCHEDULE 13.12 - Amount of Loan Attributable to Lender

SCHEDULE 15.1 - Lenders' Offices, Addresses for Notices

v

<u>LOAN AGREEMENT</u>

THIS LOAN AGREEMENT dated as of May 23, 2018 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "<u>Agreement</u>"), among (1) GALLERIA 2425 OWNER, LLC, a Delaware limited liability company, having an address at 3139 W Holcombe Blvd #845, Houston, Texas 77025 ("<u>Borrower</u>"), (2) the Lenders (as hereinafter defined), and (3) NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch, having an address at 299 Park Avenue, New York, New York 10171, as administrative and collateral agent for the Lenders (in such capacity, and together with its successors and assigns, "<u>Administrative Agent</u>").

RECITALS:

WHEREAS, Lenders have agreed to make a certain $51,675,000.00 loan to Borrower (the "<u>Loan</u>"); and

WHEREAS, the Loan shall be (i) governed by this Agreement, (ii) evidenced by the Note (as hereinafter defined), and (iii) secured by the Deed of Trust (as hereinafter defined).

NOW THEREFORE, in consideration of the making of the Loan by the Lenders and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

ARTICLE I
DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1. <u>Definitions</u>. For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"<u>Access Laws</u>" shall mean, collectively, the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all other federal, state and local laws, regulations, rules, statutes, ordinances, orders and decrees related to handicapped access, including, without limitation, the American with Disabilities Act Accessibility Guidelines for Buildings and Facilities.

"<u>Action Notice</u>" shall have the meaning set forth in <u>Section 13.15</u> hereof.

"<u>Actual Proceeds</u>" shall have the meaning set forth in <u>Section 8.3</u> hereof.

"<u>Administrative Agent Loan Documents</u>" shall have the meaning set forth in <u>Section 13.1</u> hereof.

"<u>Affiliate</u>" shall mean, as to any specified Person, (a) any Person that directly or indirectly through one or more intermediaries Controls, is Controlled by or is under common Control with such Person, (b) any Person owning or controlling 10% or more of the outstanding voting securities of or other ownership interests in such Person, (c) any officer, director, partner, employee or member (direct or indirect and no matter how remote) of such Person, (d) if such Person is an individual, any entity for which such Person directly or indirectly acts as an officer, director, partner, owner employee or member, (e) any entity in which such Person (together with the members of his family if the Person in question is an individual) owns, directly or indirectly through one or more intermediaries an interest in any class of stock (or other beneficial interest in such entity) of 10% or more, (f) any immediate family member of such Person, (g) with respect to any Borrower or Guarantor, any other Borrower or Guarantor, or (h) with respect to any Borrower or Guarantor, any direct or indirect owner of an interest in such Borrower or Guarantor.

"Affiliated Manager" shall have the meaning set forth in Section 7.1 hereof.

"Agent Discretion Standard" shall have the meaning set forth in Section 13.15 hereof.

"Annex" shall have the meaning set forth in Section 4.23 hereof.

"Applicable Percentage" shall have the meaning set forth in Section 8.3 hereof.

"Appraised Value" shall have the meaning set forth in Section 5.29 hereof.

"Approving Lenders" shall have the meaning set forth in Section 13.3 hereof.

"Assignee" shall have the meaning set forth in Section 12.1 hereof.

"Assignment of Agreements, Licenses, Permits and Contracts" shall mean the Assignment of Agreements, Licenses, Permits and Contracts dated as of the Closing Date, made by Borrower to Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Interest Rate Agreement" shall mean, with respect to any Interest Rate Protection Product entered into between Borrower and a third-party, an Assignment of Interest Rate Agreement made by Borrower to Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Leases and Rents" shall mean the absolute assignment by Borrower to Administrative Agent of the Property Income with respect to the Property and the Project pursuant to that certain Absolute Assignment of Leases and Rents dated as of the Closing Date made by Borrower to Administrative Agent, on behalf of Lenders, encumbering the Project, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Award" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Project.

"Balance" shall have the meaning set forth in Section 8.3 hereof.

"Benefit Plan" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA, Section 412 of the Internal Revenue Code or Section 302 or 303 of ERISA, that is or, within any of the preceding six (6) plan years was, sponsored, maintained or contributed to by Borrower or any of its Subsidiaries or ERISA Affiliates (or by any Person that was an ERISA Affiliate within the last six (6) years), or with respect to which Borrower or any of its Subsidiaries or ERISA Affiliates has any liability, whether actual or contingent.

"Benefit Plan Investor" shall mean any of the following: (a) an "employee benefit plan" (within the meaning of Section 3(3) of ERISA), whether or not it is subject to ERISA and including governmental and foreign plans, (b) a "plan" as defined in Section 4975 of the Internal Revenue Code of 1986, as amended, or (c) a Person whose underlying assets include "plan assets" of the foregoing by reason of investment by an employee benefit plan or plan in such Person.

"Borrower Materials" shall have the meaning set forth in Section 12.2 hereof.

"Borrower Members" shall have the meaning set forth in Section 4.1 hereof.

2

"Borrower Operating Agreement" shall mean Borrower's Amended and Restated Limited Liability Company Agreement dated as of May 23, 2018, as the same may hereafter be amended in accordance with the terms and provisions hereof.

"Business Day" shall have the meaning set forth in the Note.

"Casualty" shall have the meaning set forth in Section 8.3 hereof.

"Closing Date" shall mean the date hereof.

"Condemnation" shall mean a temporary or permanent taking by any Governmental Authority as the result, in lieu or in anticipation, of the exercise of the right of condemnation or eminent domain, of all or any part of the Project, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Project or any part thereof.

"Consented Assignee" shall have the meaning set forth in Section 12.1 hereof.

"Contractual Obligation" shall mean as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking, to which such Person is a party or by which it or any of its property is bound, or any provision of the foregoing.

"Control" shall have the meaning set forth in Section 7.1 hereof.

"Control Account Agreement" means that certain Control Account Agreement dated as of May 18, 2018 and effective as of the Closing Date, entered into by and among Borrower, Administrative Agent and Frost Bank, a Texas state bank, with respect to Borrower's deposit account, as more particularly described therein.

"Coverage Advance" shall have the meaning set forth in Section 13.11 hereof.

"Creditors' Rights Laws" shall mean with respect to any Person any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"DSCR" shall have the meaning set forth in Section 5.28 hereof.

"DSCR Threshold" shall have the meaning set forth in Section 5.28 hereof.

"Debt" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note, together with all interest accrued and unpaid thereon and all other sums due to Lenders in respect of the Loan under the Note, this Agreement, the Deed of Trust or any other Loan Document.

"Debt Service" shall mean, with respect to any particular period of time, scheduled interest and principal payments under the Note and/or this Agreement.

"Debt Service Payments" shall have the meaning set forth in Section 13.12 hereof.

"Deed of Trust" shall mean that certain Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing dated as of the Closing Date made by Borrower to Salima Umatiya, as trustee, for the benefit of Administrative Agent, on behalf of Lenders, in the principal amount of $51,675,000.00, encumbering the Project, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>Default</u>" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"<u>Defaulting Lender</u>" shall have the meaning set forth in <u>Section 13.16</u> hereof.

"<u>Defaulting Lender's Interest</u>" shall have the meaning set forth in <u>Section 13.16</u> hereof.

"<u>Disapproving Lenders</u>" shall have the meaning set forth in <u>Section 13.3</u> hereof.

"<u>Dollars</u>" or "<u>$</u>" shall mean lawful money of the United States of America.

"<u>Eligible Assignee</u>" shall have the meaning set forth in <u>Section 12.1</u> hereof.

"<u>Embargoed Person</u>" shall have the meaning set forth in <u>Section 4.22</u> hereof.

"<u>Engineering Report</u>" shall mean any written report resulting from the property condition assessments of the Project delivered to Administrative Agent in connection with the Loan.

"<u>Environmental Indemnity Agreement</u>" shall mean that certain Environmental Indemnity Agreement dated as of the Closing Date made by Borrower and Guarantor in favor of Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>Environmental Report</u>" shall mean any written report resulting from the environmental site assessments of the Project delivered to Administrative Agent in connection with the Loan.

"<u>ERISA</u>" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and any successor statutes thereto and applicable regulations issued pursuant thereto in temporary or final form.

"<u>ERISA Affiliate</u>" shall mean any trade or business (whether or not incorporated) that, together with Borrower, is treated as a single employer under Section 414(b), (c), (m) or (o) of the Internal Revenue Code.

"<u>ERISA Event</u>" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Benefit Plan (other than an event for which the 30 day notice period is waived); (b) a failure to satisfy the minimum funding standards of Section 412 of the Internal Revenue Code or Section 302 of ERISA, whether or not waived; (c) the filing pursuant to Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standards with respect to any Benefit Plan; (d) a failure to make any required installment under Section 430(j) of the Internal Revenue Code with respect to any Benefit Plan; (e) a failure to make any required contribution to a Multiemployer Plan when due; (f) the incurrence by Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Benefit Plan; (g) the receipt by Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Benefit Plan or Benefit Plans or to appoint a trustee to administer any Benefit Plan; (h) the incurrence by Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Benefit Plan or Multiemployer Plan; (i) the receipt by Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability; (j) a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, or in endangered or critical status within the meaning of Section 432 of the Internal Revenue Code or Title IV of ERISA; (k) a determination that any Benefit Plan is in "at risk" status (as defined in Section 430 of the Internal Revenue Code or Section 303 of ERISA); or (l) the imposition of a

4

Lien under the Internal Revenue Code or ERISA on the assets of Borrower, any Subsidiary or any ERISA Affiliate, or Borrower or any Subsidiary or ERISA Affiliate has been notified in writing that such a Lien will be imposed on the assets of Borrower, Subsidiary or ERISA Affiliate.

"Event of Default" shall have the meaning set forth in Section 10.1 hereof.

"Excess Funds" shall have the meaning set forth in Section 8.3 hereof.

"Existing Leases" means (i) the Key Tenant Lease, (ii) the Jetall Lease, (iii) the Regus Lease, (iv) Official Lease Agreement, dated October 3, 2012, by and between G3 Visas & Passports, Inc., as tenant, and Borrower, as successor-in-interest to Seller, as landlord, as amended by First Amendment to Lease Agreement, (v) Lease Agreement, dated November 1, 2014, by and between PEM Offshore, Inc., a Texas corporation, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, as amended by First Amendment to Lease Agreement, (vi) Lease Agreement, dated November 1, 2014, by and between PrimeLending, a PlainsCapital Company, a Texas Corporation, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, as amended by First Amendment to Lease Agreement, (vii) Lease Agreement, dated December 2016, by and between SIBS International, Inc. a Texas corporation, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, (viii) Lease Agreement, dated November 1, 2014, by and between Uptown Cosmetic and Implant Dentistry/Dr. Robert Velasco, DDS, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, (ix) Lease Agreement, dated December 1, 2015, by and between Vasso's Bar and Grill, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, and (x) Lease Agreement, dated January 1, 2015, by and between Wallis State Bank, as tenant, and Borrower, as successor-in-interest to Seller, as landlord; as each has been and may hereafter be amended, extended, restated and assigned in accordance with the terms and provisions of this Agreement.

"FATCA" shall mean (i) Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to the foregoing and (ii) any similar law adopted by any non-U.S. Governmental Authority pursuant to an intergovernmental agreement between such non-U.S. jurisdiction and the United States.

"Federal Funds Rate" shall mean, for any day, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to NBK on such day on such transactions as determined by Administrative Agent.

"Fee Letter" shall mean that certain Fee Letter dated as of the Closing Date between Borrower and NBK.

"Financial Statements" shall have the meaning set forth in Section 5.11 hereof.

"Governmental Authority" shall mean any court, board, agency, department, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, municipal, city, town, special district or otherwise) whether now or hereafter in existence.

"Guarantor" shall mean Bradley Parker, an individual.

"Guaranty" shall mean that certain Guaranty, dated as of the Closing Date, made by Guarantor for the benefit of Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Indemnified Liabilities" shall have the meaning set forth in Section 14.1 hereof.

"Indemnified Parties" shall mean (a) Lenders, (b) Administrative Agent, (c) any prior owner or holder of the Loan or Participations in the Loan, (d) any servicer or prior servicer of the Loan, (e) any Participant or Assignee or any prior Participant or Assignee of the Loan, (f) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Participant or Assignee or other third party, (g) any receiver or other fiduciary appointed in a foreclosure or other Creditors' Rights Laws proceeding, (h) any officers, directors, shareholders, partners, member, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing, and (i) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Deed of Trust.

"Inspector" shall have the meaning set forth in Section 8.3 hereof.

"Insurance Certificates" shall have the meaning set forth in Section 8.1(b) hereof.

"Insurance Premiums" shall have the meaning set forth in Section 8.1(b) hereof.

"Insurance Proceeds" shall have the meaning set forth in Section 8.3 hereof.

"Intercreditor Agreement" shall mean that certain Intercreditor Agreement, dated as of the Closing Date, by and between Administrative Agent, Lenders and Mezzanine Lender.

"Interest Rate" shall have the meaning set forth in the Note.

"Interest Rate Protection Products" shall mean any interest rate hedging agreement(s) relating to the Loan entered into by Borrower, any Lender or any Affiliate of any Lender, including, without limitation, any Transaction (as defined in any ISDA Master Agreement), and any interest rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or index swap or option bond, note or bill option, interest rate option, forward foreign exchange transaction, cap, collar, or floor transaction, currency swap, cross currency swap, swap option, currency option, or any similar transaction, including, without limitation, under any ISDA Master Agreement, entered into by Borrower, any Lender or any affiliate of Lenders.

"Interest Reserve Account" shall have the meaning set forth in Section 3.18 hereof.

"Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Involuntary Rate" shall have the meaning set forth in the Note.

"ISDA Master Agreement" shall mean any Master Agreement published by the International SWAP Dealers Association, Inc. or commonly used by swap dealers, as the same may be amended by any Lender or any Affiliate of such Lender.

"Jetall Lease" shall mean that certain Lease Agreement dated April 1, 2016 by and between Jetall Companies, Inc., as tenant, and Borrower, as successor-in-interest to Seller, as landlord.

4161624-v7\CHIDMS1

"<u>Judgment Amount</u>" shall have the meaning set forth in <u>Section 13.15</u> hereof.

"<u>Key Principal</u>" shall mean, collectively, Azeemeh Zaheer, an individual, and NCRE.

"<u>Key Tenant</u>" shall mean Specialty Retailers, Inc., a Texas corporation.

"<u>Key Tenant Lease</u>" shall mean that certain Office Lease Agreement, dated as of May 27, 2015, by and between Key Tenant and Borrower, as successor-in-interest to Seller, as landlord.

"<u>Lease</u>" shall mean the Existing Leases and any lease entered into by Borrower, as landlord, for all or any portion of the Project.

"<u>Legal Requirements</u>" shall mean all statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower or the Project or any part thereof, or the construction, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses, authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting Borrower or the Project or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Project or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"<u>Lender Interest Rate</u>" shall have the meaning set forth in <u>Section 13.11</u> hereof.

"<u>Lender(s)</u>" shall mean, individually and collectively, any financial institution that either (a) is listed on the signature pages hereof as a "Lender" or (b) from time to time becomes a party hereto pursuant to the terms and provisions of this Agreement, in each case together with its successors.

"<u>Lien</u>" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Project, any portion thereof or any interest therein, including, without limitation, any conditional sale or the title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanics', materialmens' and other similar liens and encumbrances.

"<u>Loan</u>" shall have the meaning set forth in the Recitals.

"<u>Loan Documents</u>" shall mean, collectively, this Agreement, the Note, the Deed of Trust, the Assignment of Leases and Rents, the Guaranty, the Environmental Indemnity Agreement, the Assignment of Agreements, Licenses, Permits and Contracts, the Subordination of Management Agreement, the Fee Letter, the Intercreditor Agreement, the Control Account Agreement, any Assignment of Interest Rate Agreement entered into after the Closing Date and any and all other documents, agreements and certificates executed and/or delivered in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time. Loan Documents shall also include any Interest Rate Protection Product or ISDA Master Agreement.

"<u>Losses</u>" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement of whatever kind or nature (including, but not limited to, legal fees and other costs of defense).

"<u>LTVR</u>" shall have the meaning set forth in <u>Section 5.29</u> hereof.

"<u>LTVR Threshold</u>" shall have the meaning set forth in <u>Section 5.29</u> hereof.

"<u>Management Agreement</u>" shall mean, with respect to the Project, that certain Property Management Agreement dated on or about the Closing Date by and between Borrower and Manager, pursuant to which such Manager is to provide management, leasing and other services with respect to the Project, as the same may be amended, restated, replaced, supplemented or otherwise modified in accordance with the terms of this Agreement.

"<u>Manager</u>" shall mean (a) Boxer Property Management Corporation, a Texas corporation, (b) a Qualified Manager, or (c) any other management organization prior to whose employment as manager of the Project, such employment shall have been approved by Administrative Agent, which approval shall not be unreasonably delayed, conditioned or denied.

"<u>Material Lease</u>" shall mean (i) the Key Tenant Lease, (ii) the Regus Lease, (iii) the Jetall Lease, and (iv) any Lease which (A) individually or in the aggregate (with respect to such Tenant and its Affiliates) cover more than 20,000 square feet of the Improvements, (B) provide the Tenant under such Lease with an option or other preferential right to purchase all or any portion of the Project, or (C) the Tenant under such Lease is an Affiliate of the Borrower.

"<u>Maturity Date</u>" shall have the meaning set forth in the Note.

"<u>Maximum Rate</u>" shall have the meaning set forth in the Note.

"<u>Mezzanine Borrower</u>" shall mean the Sole Member.

"<u>Mezzanine Lender</u>" shall mean Naissance Galleria, LLC, a Cayman Islands limited liability company.

"<u>Mezzanine Loan</u>" shall mean the $16,100,000 loan made by Mezzanine Lender to Mezzanine Borrower, secured by the Mezzanine Pledge Agreement.

"<u>Mezzanine Loan Agreement</u>" shall mean that certain Mezzanine Loan Agreement, dated as of the Closing Date, by and between Mezzanine Lender and Mezzanine Borrower.

"<u>Mezzanine Loan Documents</u>" shall have the meaning given to the term "Loan Documents" in the Mezzanine Loan Agreement.

"<u>Mezzanine Pledge Agreement</u>" shall mean that certain Pledge and Security Agreement, dated as of the Closing Date, by and between Mezzanine Borrower and Mezzanine Lender.

"<u>Multiemployer Plan</u>" shall mean a multiemployer plan as defined in Section 3(37) of ERISA as to which Borrower or any ERISA Affiliate contributes or, within the last six (6) years, contributed or had any obligation to contribute or otherwise has any obligation or liability, whether actual or contingent.

"<u>NCRE</u>" shall mean Naissance Capital Real Estate, LLC, a Delaware limited liability company.

"<u>NBK</u>" shall mean National Bank of Kuwait, S.A.K.P., New York Branch.

"<u>Net Operating Income</u>" shall mean the difference between:

(a)     the sum of (i) actual rent collections for the period in question from Tenants and other Persons paying rent to Borrower *plus* (ii) any miscellaneous income actually received by Borrower from the Project. Net Operating Income shall not include any amounts paid by a Tenant under any Lease, including without limitation, the Existing Leases, for reimbursement of operating costs and expenses (including Taxes); <u>and</u>

8

(b)      actual operating expenses for the period in question (not including non-recurring expenses such as leasing commissions, tenant improvement costs, bonuses paid to managers for turning over space at the Project, and other renovation expenses), other than: (i) Debt Service due under the Note and (ii) all operating costs and expenses (including Taxes) payable by a Tenant under any Lease, including, without limitation, the Existing Leases. Any refunds or rebates to operating expenses are to be applied and credited against the applicable operating expenses for the period that such operating expenses were incurred.

"Note" shall mean that certain Promissory Note dated as of the Closing Date in the original principal amount of the Loan made by Borrower to Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"OECD" shall mean the Organization for Economic Cooperation and Development.

"OFAC" shall mean the Office of Foreign Assets Control, Department of the Treasury.

"Organizational Documents" shall mean, as to any Person, the certificate of incorporation and by-laws with respect to a corporation; the articles of organization (or the equivalent of such items under applicable state law) and operating agreement with respect to a limited liability company; the certificate of limited partnership and partnership agreement with respect to a limited partnership, or any other organizational or governing documents of such Person.

"Other Charges" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Project, now or hereafter levied or assessed or imposed against the Project or any part thereof.

"Participant" shall have the meaning set forth in Section 12.1 hereof.

"Participations" shall have the meaning set forth in Section 12.1 hereof.

"Patriot Act" shall have the meaning set forth in Section 4.23 hereof.

"Permitted Encumbrances" shall mean, with respect to the Project, collectively, (a) Liens, if any, for Taxes imposed by any Governmental Authority not yet due and payable or delinquent, (b) Liens for Taxes being contested in accordance with Section 5.4(d), (c) Liens, if any, for mechanics, materialmen or laborers which are fully bonded over in accordance with Section 5.4(c), (d) Liens set forth on Schedule B of the Title Policy, and (e) such other encumbrances as Administrative Agent has approved or may approve in writing in Administrative Agent's sole and absolute discretion.

"Permitted Transfers" shall mean the following:

(a)      a Lease entered into in accordance with the terms and conditions of the Loan Documents;

(b)      provided that no Event of Default shall then exist and be continuing, any transfer, Sale or Pledge of an interest in Borrower or any Restricted Party to any Person provided that:

(i)      such transfer shall not (x) cause the transferee (other than Key Principal), together with its Affiliates, to acquire Control of Borrower or Sole Member or to acquire or increase its direct or indirect interest in Borrower or in Sole Member to an amount which equals or exceeds forty-nine percent (49%) of the equity interests in Borrower or Sole Member, or (y) result in Borrower or Sole Member no longer being Controlled by Key Principal;

4161624-v7\CHIDMS1

(ii)　　after giving effect to such Transfer, Key Principal(s) shall continue to Control the day to day operations of Borrower and continue to own at least 51% of all equity interests (direct or indirect) in Borrower; and

(iii)　　Borrower shall continue to be a single purpose entity in accordance with Section 6.1 and Sole Member shall continue to be the sole managing member of Borrower;

(c)　　provided that no Event of Default shall then exist and be continuing, a transfer for estate planning purposes of any Key Principal's direct or indirect interests in Borrower to the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal, or to a trust for the benefit of such Key Principal or for the benefit of the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal so long as immediately following such transfer, Key Principals continue to Control the day to day operations of Borrower.

"Person" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any other entity, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Pre-Approved Accounting Firm" shall mean Pannell Kerr Forster of Texas, P.C.

"Plans" shall have the meaning set forth in Section 8.3 hereof.

"Platform" shall have the meaning set forth in Section 12.2 hereof.

"Policies" shall have the meaning set forth in Section 8.1(b) hereof.

"Policy" shall have the meaning set forth in Section 8.1(b) hereof.

"Prepayment Premium" shall have the meaning set forth in the Note.

"Prohibited Transfer" shall have the meaning set forth in Section 7.2(a) hereof.

"Project" shall mean the Property and that certain 281,590 rentable square foot office building located at the Property, and all other buildings and structures thereon, and all easements, rights, privileges and appurtenances (including, without limitation, any air or development rights, if any) thereunto belonging or in any way appurtenant, and all of the estate, right, title, interest, claim or demand whatsoever of Borrower therein, and all estates, rights, titles, interests, privileges, tenements, hereditaments, and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Property, either in law or in equity, in possession or expectancy, now or hereafter acquired.

"Property" shall mean that certain parcel of land located at 2425 West Loop South, City of Houston, County of Harris, State of Texas.

"Property Income" shall mean all rents, income, issues, profits, security deposits and other benefits to which Borrower may now or hereafter be entitled from the Project.

"Provided Information" shall have the meaning set forth in Section 12.1 hereof.

"Pro Rata Share" shall have the meaning set forth in Section 13.12 hereof.

4161624-v7\CHIDMS1

"PSA" shall mean the Contract of Sale dated as of April 16, 2018 by and between Sole Member and Seller, as assigned by Sole Member to Borrower pursuant to that certain Assignment and Assumption of Contract dated as of the Closing Date.

"Purchase Price" shall have the meaning set forth in Section 13.3 hereof.

"Qualified Manager" shall mean a property manager which (i) is a reputable and experienced professional management company having at least five (5) years' experience in the management of commercial properties with similar uses as the Project and in the jurisdiction in which the Project is located, (ii) has, for at least three (3) years prior to its proposed engagement as "Manager", managed at least five (5) properties of the same property type, quality and size as the Project, and (iii) is not the subject of a bankruptcy or similar insolvency proceeding. For the avoidance of doubt, an Affiliate of the Manager initially named in this Agreement shall be deemed to be a "Qualified Manager" for purposes of this Agreement.

"Regus Lease" shall mean the Lease Agreement dated February 29, 1995, as amended by Amendment No. 1 to Lease Agreement dated July 28, 1997, Amendment No. 2 to Lease Agreement dated February 26, 2001, Amendment No. 3 to Lease Agreement effective as of January 1, 2005, Amendment No. 4 to Lease Agreement effective as of October 3, 2011, Amendment No. 5 to Lease Agreement effective as of October 3, 2011, Amendment No. 6 to Lease Agreement effective as of September 11, 2012 and Amendment No. 7 to Lease Agreement effective as of November 15, 2012, by and between RGN-Houston XXXIX, as successor-in-interest to Abby Executive Suites, West Loop, Inc. and Abby Office Centers, Uptown, Ltd., as tenant, and Borrower, as successor-in-interest to Seller, as landlord.

"Required Lenders" shall have the meaning set forth in Section 13.2 hereof.

"Restoration Account" shall have the meaning set forth in Section 8.3 hereof.

"Restoration Work" shall have the meaning set forth in Section 8.3 hereof.

"Restricted Party" shall have the meaning set forth in Section 7.1 hereof.

"Sale or Pledge" shall have the meaning set forth in Section 7.1 hereof.

"Seller" shall mean 2425 West Loop, LP, a Texas limited partnership.

"Servicer" shall have the meaning set forth in Section 12.1 hereof.

"Servicing Fee" shall have the meaning set forth in Section 13.17 hereof.

"SNDA" shall mean a Subordination, Non-Disturbance and Attornment Agreement.

"Sole Member" shall mean Galleria 2425 JV, LLC, a Delaware limited liability company, the sole member of Borrower.

"State" shall mean, with respect to the Project, the state in which the Project or any part thereof is located, and with respect to Borrower, the state of Borrower's organization.

"Subordination of Management Agreement" shall mean, during such time as a Management Agreement may be in place, that certain Assignment and Subordination of Management Agreement among Administrative Agent, Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Subsidiary" shall mean any corporation, partnership, limited liability company or other entity in which a Person holds an equity interest which is more than twenty percent (20%) of the equity classes issued by such entity.

"Syndication" shall have the meaning set forth in Section 12.1 hereof.

"Taxes" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied, assessed, or imposed against the Project (or any part thereof).

"Telecom Leases" shall mean leases with telecommunications providers or their affiliates or agents for the installation and maintenance of communication equipment, including, without limitation, antennas, at the Property.

"Tenant" shall mean any Person leasing, subleasing or otherwise occupying any portion of the Project under a Lease or other occupancy agreement with Borrower or any predecessor-in-interest to Borrower.

"Term" shall have the meaning set forth in the Note.

"Title Company" shall have the meaning set forth in Section 3.2 hereof.

"Title Policy" shall have the meaning set forth in Section 3.2 hereof.

"UCC" or "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in the State.

"West Loop" shall mean Galleria West Loop Investments II, LLC, a Texas limited liability company.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.2. Interpretation. Unless the context of this Agreement otherwise clearly requires, the following rules of construction shall apply to this Agreement and each of the Loan Documents:

(a)    Number; Inclusion. To the extent the context so requires, references to the plural include the singular, references to the singular include the plural, and references to the part include the whole; "or" has the inclusive meaning represented by the phrase "and/or"; and "including" has the meaning represented by the phrase "including, without limitation,";

(b)    Determination. References to "determination" of or by Administrative Agent or Lenders shall be deemed to include good-faith estimates by Administrative Agent or Lenders (in the case of quantitative determinations), and good-faith beliefs by Administrative Agent or Lenders (in the case of qualitative determinations), and such determination shall be conclusive absent manifest error;

(c)    Construction. This Agreement and all other Loan Documents shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement and all such other Loan Documents to be drafted. If any words or phrases in this Agreement or any other Loan Document shall have been stricken out or otherwise eliminated, whether or not any other words or phrases have been added, this Agreement and all such other Loan Documents shall be construed as if the words or phrase so stricken out or otherwise eliminated were never included herein or therein and no implication or inference shall be drawn from the fact that said words or phrases were so stricken out or otherwise eliminated;

12

(d)      Agent's or Lenders Discretion and Consent. Whenever Administrative Agent or Lenders are granted the right herein or in any Loan Document to make any decision or determination, to exercise any right, remedy or power or otherwise to act in its or their sole discretion or to grant or withhold consent, such right shall be exercised in good faith utilizing generally accepted commercial practices for transactions similar to the transaction that is the subject matter of this Agreement or such Loan Document (as the case may be);

(e)      Documents Taken as a Whole. The words "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement or in any Loan Document refer to this Agreement or such Loan Document as a whole and not to any particular provision of this Agreement or such Loan Document;

(f)      Headings. The section and other headings contained in this Agreement or any Loan Document and the table of contents (if any) preceding this Agreement or any Loan Document are for reference purposes only and shall not control or affect the construction of this Agreement or such Loan Document or the interpretation thereof in any respect;

(g)      Implied References to this Agreement. Article, section, subsection, clause, schedule and exhibit references are to this Agreement unless otherwise specified;

(h)      Persons. Reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Agreement or by such Loan Document, as the case may be, and reference to a Person in a particular capacity excludes such Person in any other capacity;

(i)      Modifications to Documents. Reference to any agreement (including this Agreement and any Loan Document, together with the schedules and exhibits hereto or thereto), document or instrument means such agreement, document or instrument as amended, modified, replaced, substituted for, superseded or restated at the relevant time;

(j)      From, To and Through. Relative to the determination of any period of time, "from" means "from and including," "to" means "to but excluding," and "through" means "through and including"; and

(k)      Shall; Will. References to "shall" and "will" are intended to have the same meaning.

<div align="center">ARTICLE II<br>GENERAL TERMS</div>

Section 2.1. Loan Commitment; Extension.

(a)      Subject to the terms, provisions, covenants and conditions of this Agreement, Lenders shall make the Loan to Borrower in an amount equal to FIFTY ONE MILLION SIX HUNDRED SEVENTY FIVE THOUSAND AND NO/100THS DOLLARS ($51,675,000.00).

(b)      The Loan shall be secured by the Deed of Trust, the Assignment of Leases and Rents, and the other Loan Documents.

(c)      Borrower shall use the proceeds of the Loan to (i) partially finance Borrower's acquisition of the Project, (ii) make a deposit into the Interest Reserve Account, and (iii) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Administrative Agent.

Section 2.2. Interest Rate and Loan Payments.

<div align="center">13</div>

(a)      The Loan shall bear interest at the per annum rates set forth in the Note.

(b)      Borrower hereby agrees to make principal and interest payments as set forth in the Note.

(c)      All payments to be made by Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by Borrower hereunder and under the other Loan Documents shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's office in Dollars and in immediately available funds not later than 2:00 p.m. EST on the date specified herein. All payments received by the Administrative Agent after 2:00 p.m. EST shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

Section 2.3.  Usury Savings. This Agreement and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lenders to either civil or criminal liability as a result of being in excess of the Maximum Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Rate, the Interest Rate or the Involuntary Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Rate and all previous payments in excess of the Maximum Rate shall be deemed to have been payments in reduction of principal, without premium, and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lenders for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

ARTICLE III
CONDITIONS PRECEDENT

The obligation of Lenders to enter into this Agreement and make the Loan hereunder is subject to the fulfillment by Borrower and Guarantor or waiver by Administrative Agent of the following conditions precedent no later than the Closing Date.

Section 3.1.  Representations and Warranties; Compliance with Conditions. The representations and warranties of Borrower and Guarantor contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date, and Administrative Agent shall have determined that no Default or an Event of Default shall have occurred and be continuing nor shall any Default or Event of Default occur immediately following the Closing Date and Borrower and Guarantor shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on its part to be observed or performed.

Section 3.2.  Delivery of Loan Documents; Title Policy; Due Diligence Items.

(a)      Deed of Trust, Loan Agreement, Note and Guaranty. Administrative Agent shall have received (i) from Borrower fully executed and acknowledged counterparts of the Deed of Trust and Assignment of Leases and Rents, and evidence that the Uniform Commercial Code financing statement has been delivered to the Title Company for recording and/or filing, in the judgment of Administrative

14

4161624-v7\CHIDMS1
000483

Agent, so as to effectively create upon such recording and/or filing valid and enforceable Liens upon the Project, of first priority, in favor of Lenders, and (ii) from Borrower and Guarantor, as applicable, fully executed counterparts of this Agreement, the Note, the Guaranty and all of the other Loan Documents.

(b)     Policy; Title Policy. Administrative Agent shall have received a paid title insurance policy (the "Title Policy"), in the amount of the Deed of Trust, issued by a title company(ies) (the "Title Company") acceptable to Administrative Agent and dated as of the Closing Date. Such Title Policy shall (A) provide coverage for the full amount of the Loan, (B) insure Lenders that the Deed of Trust insured by such Title Policy creates a valid, perfected lien on the Project of first priority and that Borrower is the sole owner of a valid fee estate in and to the Project, free and clear of all exceptions from coverage other than the standard exceptions and exclusions from coverage, (C) provide full coverage against mechanics' liens (filed and inchoate), (D) contain such endorsements and affirmative coverages as Administrative Agent may reasonably request, and (E) name Administrative Agent as the insured. The Title Policy shall be assignable. Administrative Agent also shall have received evidence that all premiums in respect of such Title Policy have been paid.

(c)     Survey. Administrative Agent shall have received a current title survey for the Property, certified to the Title Company and Lenders and their successors and assigns, in form and content satisfactory to Administrative Agent and prepared by a professional and properly licensed land surveyor satisfactory to Administrative Agent. Such survey shall reflect the same legal description contained in the Title Policy referred to in Section 3.2(b) hereof and shall include, among other things, a metes and bounds description of the real property comprising part of the Project satisfactory to Administrative Agent. The surveyor's seal shall be affixed to the survey and the surveyor shall provide a certification for the survey in form and substance acceptable to Administrative Agent.

(d)     Insurance. Administrative Agent shall have received copies of the certificates of insurance for the Policies required hereunder, together with such Acord forms as Administrative Agent shall require, satisfactory to Administrative Agent in Administrative Agent's sole and absolute discretion, and, evidence of the payment of all Insurance Premiums payable for the existing policy period.

(e)     Encumbrances. Borrower shall have taken or caused to be taken such actions in such a manner so that Lenders have a valid and perfected first Lien as of the Closing Date on the Project and Administrative Agent shall have received satisfactory evidence thereof, subject to Permitted Encumbrances.

(f)     Lien Searches. Borrower shall have delivered to Administrative Agent certified search results pertaining to Borrower, Guarantor and such other Persons as reasonably required by Administrative Agent for state and federal tax liens, bankruptcy, judgment, litigation and state and local UCC filings.

(g)     Environmental Report. Administrative Agent shall have received an Environmental Report in respect of the Project, which report shall be satisfactory to Administrative Agent in all respects.

(h)     Engineering Report. Administrative Agent shall have received an Engineering Report in respect of the Project, which report shall be satisfactory to Administrative Agent in all respects (including, without limitation, indicating that there exists no material deferred maintenance at the Project).

(i)     Appraisal. Administrative Agent shall have received an appraisal for the Project, which appraisal shall be prepared by an MAI appraiser and satisfactory in form and substance to Administrative Agent (including, without limitation, providing for a loan-to-value ratio of not greater than

fifty-three and seven-tenths percent (53.7%), based on (i) the "as-is" value of the Project and (ii) the original principal balance of the Loan).

(j)    [Intentionally Omitted]

Section 3.3. <u>Related Documents</u>. Each additional document not specifically referenced herein, but relating to the transactions contemplated herein, shall have been duly authorized, executed and delivered by all parties thereto and at Administrative Agent's written request, Administrative Agent shall have received and approved certified copies thereof.

Section 3.4. <u>Organizational Documents</u>. Administrative Agent shall have received (a) certified copies of all Organizational Documents related to Borrower and Guarantor, as applicable, which must be acceptable to Administrative Agent, in Administrative Agent's sole and absolute discretion, and (b) such other evidence of the formation, structure, existence and/or good standing of Borrower and Guarantor and such other Persons as Administrative Agent may request, in Administrative Agent's sole and absolute discretion, including, without limitation, good standing or existence certificates, resolutions authorizing the entering into of the Loan and the granting of the Deed of Trust and incumbency certificates as may be requested by Administrative Agent.

Section 3.5. <u>Opinions of Counsel</u>. Administrative Agent shall have received opinions of counsel with respect to (i) formation, existence and good standing of Borrower and Guarantor, as applicable, (ii) due execution, authority, enforceability of the Loan Documents, and (iii) such other matters as Administrative Agent may reasonably require. All such opinions shall be in form, scope and substance reasonably satisfactory to Administrative Agent and Lenders' counsel in their sole and absolute discretion.

Section 3.6. <u>Taxes and Other Charges</u>. Borrower shall have paid all Taxes and Other Charges (including any in arrears) relating to the Project.

Section 3.7. <u>Completion of Proceedings</u>. All corporate and other proceedings taken or to be taken in connection with the transactions contemplated by this Agreement and other Loan Documents and all documents incidental thereto shall be satisfactory in form and substance to Administrative Agent, and Administrative Agent shall have received all such counterpart original or certified copies of such documents as Administrative Agent may reasonably request.

Section 3.8. <u>Payments</u>. All payments, deposits or escrows required to be made or established by Borrower under this Agreement, the Note and the other Loan Documents on or before the Closing Date shall have been paid.

Section 3.9. <u>Transaction Costs</u>. Except as otherwise expressly provided herein, Borrower shall have paid or reimbursed Administrative Agent and Lenders for all reasonable third party out of pocket expenses actually incurred in connection with the underwriting, negotiation, and closing of the Loan, including, without limitation, title insurance premiums and other title company charges; registration, filing and similar fees, taxes and charges; transfer, deed, stamp, mortgage recording or documentary taxes or similar fees or charges; actual costs of third-party reports, including, without limitation, environmental studies, credit reports, appraisals, surveys, underwriting and origination expenses; and all reasonable legal fees and expenses charged by counsel to Lenders and Administrative Agent.

Section 3.10. <u>No Material Adverse Change</u>. There shall have been no material adverse change in the financial condition or business condition of the Project, Borrower or any other Person contributing to the operating income and operations of the Project since the date of the most recent financial statements and/or other information delivered to Administrative Agent. The income and expenses of the Project, the occupancy and leases thereof, and all other features of the transaction shall be as represented to Lenders

and Administrative Agent without material adverse change. Neither Borrower nor Guarantor shall be the subject of any bankruptcy, reorganization, or insolvency proceeding.

Section 3.11. <u>Leases</u>. Administrative Agent shall have received copies of all Leases affecting the Project, which shall be satisfactory in form and substance to Administrative Agent.

Section 3.12. <u>Tenant Estoppel Certificate</u>. Administrative Agent shall have received, or shall receive within fifteen (15) Business Days of the Closing Date, a tenant estoppel certificate from each Tenant under a Material Lease, addressed to Administrative Agent, in form and substance satisfactory to Administrative Agent in all respects. Failure by Borrower to deliver such tenant estoppel certificates within such time period shall constitute an Event of Default.

Section 3.13. <u>SNDA</u>. Administrative Agent shall have received, or shall receive within fifteen (15) days of the Closing Date, an SNDA executed by Key Tenant with respect to the Key Tenant Lease, in form and substance satisfactory to Administrative Agent in all respects. Failure by Borrower to deliver such SNDA within such time period shall constitute an Event of Default.

Section 3.14. <u>Tax Lot</u>. Administrative Agent shall have received evidence that the Property constitutes one or more separate tax lots, which evidence shall be satisfactory to Administrative Agent in all respects.

Section 3.15. <u>Borrower's and Guarantor's Financials</u>. Administrative Agent shall have received copies of Borrower's and Guarantor's most recent financial statements.

Section 3.16. <u>Acquisition of Property</u>. Administrative Agent shall have received evidence of the purchase price for the Project to be paid by Borrower and evidence that Borrower invested, upon acquisition of the Project, the required equity.

Section 3.17. <u>Further Documents</u>. Administrative Agent or Administrative Agent's counsel shall have received such other and further approvals, opinions, documents and information as Administrative Agent or Administrative Agent's counsel may have requested in form and substance satisfactory to Administrative Agent and Administrative Agent's counsel.

Section 3.18. <u>Interest Reserve Deposit</u>. Borrower shall have established a deposit account in the name of Borrower with Administrative Agent (the "<u>Interest Reserve Account</u>"), into which Borrower shall have deposited an amount equal to $2,500,000.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lenders and Administrative Agent as of the Closing Date that:

Section 4.1. <u>Organization</u>. Borrower (a) has been duly organized and is validly existing and in good standing with requisite power and authority to own its properties and to transact the businesses in which it is now engaged, (b) is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, businesses and operations, (c) possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its properties and to transact the businesses in which it is now engaged, and the sole business of Borrower is the ownership and management of the Project, and (d) has full power, authority and legal right to mortgage the Project pursuant to the terms of the Loan Documents and has full power, authority and legal right to keep and observe all of the terms of the Loan Documents to which it is a party. Borrower represents and warrants that the chart attached hereto as <u>Exhibit A</u> sets forth an accurate listing

17

of the direct and indirect owners of all of the equity interests in Borrower (the "Borrower Members"). For the avoidance of doubt, "Borrower Members" shall include Sole Member, NCRE and West Loop.

Section 4.2. Status of Borrower. Borrower's exact legal name is correctly set forth on the first page of this Agreement, on the Deed of Trust, and on any UCC-1 Financing Statements filed in connection with the Loan. Borrower is an organization of the type specified on the first page of this Agreement. Borrower is organized under the laws of the State of Delaware and authorized to do business under the laws of the State of Texas. Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less, the entire period of the existence of Borrower) the address of Borrower set forth on the first page of this Agreement. Borrower may designate a change of principal place of business and chief executive office by written notice to Administrative Agent by certified mail, return receipt requested, postage prepaid, at least thirty (30) days before such change of principal place of business and chief executive office is to become effective.

Section 4.3. Validity of Documents. Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents. This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Borrower and Guarantor, as applicable, and constitutes the legal, valid and binding obligations of Borrower and Guarantor, as applicable, enforceable against Borrower and Guarantor, as applicable, in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

Section 4.4. No Conflicts. The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower and Guarantor, as applicable, will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower and Guarantor, as applicable, pursuant to the terms of any agreement or instrument to which Borrower and Guarantor is a party or by which any of Borrower's or Guarantor's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or Guarantor or any of Borrower's or Guarantor's properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower and Guarantor, as applicable, of this Agreement or any of the other Loan Documents has been obtained and is in full force and effect.

Section 4.5. Litigation. To the best of Borrower's knowledge, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to Borrower's knowledge, threatened against or affecting Borrower, Guarantor or the Project, which actions, suits or proceedings, if determined against Borrower, Guarantor or the Project, could materially adversely affect the condition (financial or otherwise) or business of Borrower or Guarantor or the condition or ownership of the Project.

Section 4.6. Agreements. Neither Borrower nor Guarantor is a party to any agreement or instrument or subject to any restriction which would materially and adversely affect Borrower, such Guarantor or the Project, or Borrower's or such Guarantor's business, properties or assets, operations or condition, financial or otherwise. To Borrower's and Guarantor's actual knowledge, neither Borrower nor Guarantor are in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which Borrower or

Guarantor is a party or by which Borrower, Guarantor or the Project is bound. Borrower has no material financial obligations under any agreement or instrument to which Borrower is a party or by which Borrower or the Project is otherwise bound, other than (a) obligations incurred in the ordinary course of the ownership, leasing and operation of the Project and (b) obligations under the Loan Documents.

Section 4.7. <u>Solvency</u>. Neither Borrower nor Guarantor has entered into the transaction or executed the Note, this Agreement, the Guaranty or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor, and Borrower and Guarantor have each received reasonably equivalent value in exchange for their respective obligations under such Loan Documents. No petition in bankruptcy has been filed against Borrower or Guarantor in the last ten years, and neither Borrower nor Guarantor in the last ten years has made an assignment for the benefit of creditors or taken advantage of any Creditors' Rights Laws. Neither Borrower nor Guarantor is contemplating either the filing of a petition by it under any Creditors' Rights Laws or the liquidation of all or a major portion of Borrower's or such Guarantor's assets or property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against Borrower or Guarantor.

Section 4.8. <u>Full and Accurate Disclosure</u>. No material statement of fact made by or on behalf of Borrower or Guarantor in this Agreement or in any of the other Loan Documents or in any other document or certificate delivered by or on behalf of Borrower or Guarantor contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no material fact presently known to Borrower or Guarantor which has not been disclosed to Administrative Agent and Lenders which adversely affects, nor as far as Borrower or the applicable Guarantor can reasonably foresee, might adversely affect, the Project or the business, operations or condition (financial or otherwise) of Borrower or Guarantor.

Section 4.9. <u>ERISA Compliance</u>.

(a)     Borrower covenants, represents and warrants that (i) Borrower is not and will not be a Benefit Plan Investor, (ii) neither Borrower nor any of its Subsidiaries or ERISA Affiliates maintains or contributes to, or has at any time maintained or contributed to, or has any liability, whether actual or contingent, under, a plan subject to Section 302 or Title IV of ERISA or to Section 412 of the Internal Revenue Code, (iii) neither Borrower nor any of its Subsidiaries or ERISA Affiliates has ever contributed to or had an obligation to contribute to any Multiemployer Plan. None of the Benefit Plans are part of, or have at any time been part of, a multiple employer welfare arrangement, as that term is defined in Section 3(40) of ERISA, (iv) no Benefit Plan is or was at any time a multiple employer plan, as described in Section 413(c) of the Internal Revenue Code or Sections 4063 or 4064 of ERISA, and (v) neither Borrower nor any of its Subsidiaries or ERISA Affiliates has ever contributed to or had an obligation to contribute to any such plan.

(b)     No ERISA Event has occurred or is reasonably expected to occur. No employee welfare benefit plan within the meaning of §3(1) or §3(2)(B) of ERISA of Borrower or any Subsidiary, provides benefit coverage subsequent to termination of employment except as required by Title I, Part 6 of ERISA or applicable state insurance laws. Each Benefit Plan is in material compliance with ERISA, the Internal Revenue Code and any applicable law. Each Benefit Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service for all required amendments regarding its qualification thereunder that considers the law changes incorporated in the plan sponsor's most recently expired remedial amendment cycle determined under the provisions of Rev. Proc. 2007-44, and nothing has occurred subsequent to the issuance of such termination letter which would prevent, or cause the loss of, such qualification.

Section 4.10. <u>Not a Foreign Person</u>. Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the Internal Revenue Code.

Section 4.11. <u>Enforceability</u>. The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or Guarantor including, without limitation, the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and neither Borrower nor Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect thereto. No Default or Event of Default exists under or with respect to any Loan Document.

Section 4.12. <u>Business Purposes</u>. The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

Section 4.13. <u>Compliance</u>. To the best of Borrower's knowledge, and other than as contained in any searches requested by or on behalf of Administrative Agent in connection with the Loan, Borrower and the Project, and the use and operation of the Project, comply in all material respects with all Legal Requirements, including, without limitation, building ordinances and codes and the Americans with Disabilities Act. To the best of Borrower's knowledge, neither Borrower nor Guarantor is in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority and neither Borrower nor Guarantor has received any written notice of any such default or violation. There has not been committed by Borrower or Guarantor or, to Borrower's knowledge, any other Person in occupancy of or involved with the operation or use of the Project any act or omission affording any Governmental Authority the right of forfeiture as against the Project or any part thereof or any monies paid in performance of Borrower's or Guarantor's obligations under any of the Loan Documents.

Section 4.14. <u>Financial Information</u>. All financial data, including, without limitation, the balance sheets, statements of cash flow, and statements of income and operating expense, that have been delivered to Administrative Agent in respect of Borrower, Guarantor and/or to Borrower's knowledge the Project (a) are true, complete and correct in all material respects as of the date of such information, (b) accurately represent the financial condition of Borrower, Guarantor and/or the Project, as applicable, as of the date of such reports, and (c) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with a modified accrual accounting method or such other method satisfactory to Administrative Agent throughout the periods covered, except as disclosed therein. Borrower has no contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a material adverse effect on the Project or the current and/or intended operation thereof, except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of the Borrower, Guarantor or, to Borrower's knowledge, the Project from that set forth in said financial statements.

Section 4.15. <u>Illegal Activity</u>. No portion of the Project has been or shall be purchased by Borrower with proceeds of any illegal activity and no part of the proceeds of the Loan will be used in connection with any illegal activity.

Section 4.16. <u>Separate Tax and Zoning Lot</u>. The Property constitutes a distinct parcel or parcels for purposes of zoning and of taxes, assessments and impositions (public or private) and are not otherwise considered as part of a larger single lot which includes property other than the Property for purposes of zoning or of taxes, assessments or impositions (public or private).

Section 4.17. <u>Federal Reserve Regulation</u>. Borrower shall use the proceeds of the Loan for the purposes set forth in <u>Section 2.1(c)</u> hereof and not for any illegal activity. No part of the proceeds of the

Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or prohibited by the terms and conditions of this Agreement or the other Loan Documents.

Section 4.18. <u>Investment Company Act</u>. Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) [Reserved]; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

Section 4.19. <u>No Change in Facts or Circumstances; Disclosure</u>. All information submitted by Borrower, Guarantor or Borrower's or Guarantor's agents to Administrative Agent and in all financial statements, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are accurate, complete and correct in all material respects as of the date of such item. There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or might materially and adversely affect the Project or the business operations or the financial condition of Borrower or Guarantor. Borrower and Guarantor have disclosed to Administrative Agent all material facts and have not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading. With respect to any representations, warranties, or statements of fact which are specifically qualified in this Agreement as being true and correct to the best of Borrower's knowledge, the representation and warranty set forth in this <u>Section 4.19</u> shall be, to the best of Borrower's knowledge, true and correct as of the Closing Date.

Section 4.20. <u>Special Purpose Entity</u>. Borrower meets all of the requirements of <u>Article VI</u> hereof as of the Closing Date.

Section 4.21. <u>Intellectual Property</u>. All trademarks, trade names and service marks necessary to the business of Borrower as presently conducted or as Borrower contemplates conducting Borrower's business are in good standing and, to the extent of Borrower's actual knowledge, uncontested. To the best of Borrower's knowledge, Borrower has not infringed, is not infringing, and has not received notice of infringement with respect to asserted trademarks, trade names and service marks of others. To Borrower's knowledge, there is no infringement by others of trademarks, trade names and service marks of Borrower.

Section 4.22. <u>Embargoed Person</u>. To the best of Borrower's knowledge, as of the Closing Date and at all times throughout the term of the Loan, including after giving effect to any transfers of interests permitted pursuant to the Loan Documents or the Mezzanine Loan Documents, (a) none of the funds or other assets of Borrower or Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any Person or government subject to trade restrictions under U.S. law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower (whether directly or indirectly), is prohibited by law or the Loan made by Lenders is in violation of law ("<u>Embargoed Person</u>"); (b) no Embargoed Person has any interest of any nature whatsoever in Borrower with the result that the investment in Borrower (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the funds of Borrower have been derived from any unlawful activity with the result that the investment in Borrower (whether directly or indirectly) is prohibited by law or the Loan is in violation of law.

Section 4.23. <u>Patriot Act</u>. All capitalized words and phrases and all defined terms used in the USA Patriot Act of 2001, 107 Public Law 56 (October 26, 2001) and in other statutes and all orders, rules and regulations of the United States government and its various executive departments, agencies and offices related to the subject matter of the Patriot Act, including Executive Order 13224 effective September 24, 2001 (collectively referred to in this Section only as the "<u>Patriot Act</u>") are incorporated into this Section. Each of Borrower and Borrower Members hereby represent and warrant that (a) Borrower, Guarantor and Borrower Members and each and every Person affiliated with Borrower, or that to Borrower's or Borrower Members' knowledge has an economic interest in Borrower or Borrower Members, or, to Borrower's or Borrower Members' knowledge, that has or shall have an interest in the transaction contemplated by this Agreement or in the Project or shall participate, in any manner whatsoever, in the Loan, is, to the extent required so that the Loan in not in violation of applicable Legal Requirements, <u>and</u> (b) Borrower, Guarantor and each Person actively involved in the management of Borrower or the Project is: (i) not a "blocked" Person listed in the Annex to Executive Order Nos. 12947, 13099 and 13224 and all modifications thereto or thereof (the "<u>Annex</u>"); (ii) in full compliance with the requirements of the Patriot Act and all other requirements contained in the rules and regulations of the OFAC; (iii) to the extent applicable, operated under policies, procedures and practices, if any, that are in compliance with the Patriot Act and available to Administrative Agent for Administrative Agent's review and inspection during normal business hours and upon reasonable prior notice; (iv) not in receipt of any notice from the Secretary of State or the Attorney General of the United States or any other department, agency, or office of the United States claiming a violation or possible violation of the Patriot Act; (v) not listed as a Specially Designated Terrorist or as a "blocked" Person on any lists maintained by the OFAC pursuant to the Patriot Act or any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of the OFAC issued pursuant to the Patriot Act or on any other list of terrorists or terrorist organizations maintained pursuant to the Patriot Act; (vi) not a Person who has been determined by competent authority to be in violation of any of the prohibitions contained in the Patriot Act; and (vii) not controlled by or now acting or will in the future act for or on behalf of any Person named in the Annex or any other list promulgated under the Patriot Act or any other Person who has been determined to be in violation of the prohibitions contained in the Patriot Act. Borrower covenants and agrees that in the event Borrower or Guarantor receives any notice that Borrower (or any of Borrower's beneficial owners), Guarantor or any other Person related to or affiliated with Borrower, Guarantor or the Project become listed on the Annex or any other list promulgated under the Patriot Act or is indicted, arraigned, or custodially detained on charges involving money laundering or predicate crimes to money laundering, Borrower shall immediately notify Administrative Agent. It shall be an Event of Default hereunder if Borrower or any other party to any Loan Document becomes listed on any list promulgated under the Patriot Act or is indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering.

Section 4.24. <u>No Contractual Obligations</u>. Other than the Loan Documents, the Mezzanine Loan Documents, the Borrower Operating Agreement, the Management Agreement, the Existing Leases, the PSA pursuant to which Borrower is acquiring the Property, and certain Contractual Obligations to operate and manage the Project that are necessary and customary for properties similar to the Project, as of the date of this Agreement, Borrower is not subject to any Contractual Obligations and has not entered into any agreement, instrument or undertaking by which Borrower or Borrower's assets are bound, or has incurred any indebtedness (other than the Loan), and prior to the date of this Agreement, Borrower has not entered into any Contractual Obligation, or any agreement, instrument or undertaking by which it or its assets are bound or incurred any indebtedness (other than the Loan).

Section 4.25. <u>Shareholders of Borrower</u>. One hundred percent (100%) of the membership interests of Borrower are owned by the Sole Member.

Section 4.26. <u>Survival</u>. Borrower acknowledges and agrees that, unless expressly provided otherwise, all of the representations and warranties of Borrower and Guarantor set forth in this Agreement and in the other Loan Documents shall survive for so long as any portion of the Debt remains owing to Lenders. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower and Guarantor shall be deemed to have been relied upon by Lenders notwithstanding any investigation heretofore or hereafter made by Lenders or on its behalf.

Section 4.27. <u>Leases</u>. As of the Closing Date, there are no Leases pursuant to which any Person other than Borrower has any right, title or interest in the Project other than under the Existing Leases.

Section 4.28. <u>Landmark Status</u>. No portion of the Project is designated by or registered with any governmental authority as historic or landmark buildings or any other similar designation or registration and Borrower shall not attempt or cooperate to obtain or effect any such designation or registration.

Section 4.29. <u>Broker</u>. Borrower represents and warrants to Administrative Agent and Lenders that Borrower has not dealt with any broker with respect to the transaction contemplated hereby and, by accepting the Loan, Borrower agrees forever to indemnify and hold Administrative Agent and Lenders harmless from and against any and all claims or suits for compensation, commissions, fees or otherwise (and all Losses related thereto) that may be asserted or made by any broker or Person claiming to have dealt with or to have been employed by Borrower or Borrower's representatives in connection with the brokering of the Loan.

ARTICLE V
COVENANTS

From the Closing Date and until repayment of the Debt in full and performance in full of all obligations of Borrower and Guarantor under the Loan Documents or the earlier release of the Lien of the Deed of Trust (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lenders that:

Section 5.1. <u>Existence; Compliance With Legal Requirements</u>.

(a)     Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply in all material respects with all Legal Requirements applicable to Borrower and the Project. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording any Governmental Authority the right of forfeiture as against the Project or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

(b)     Borrower agrees that the Project shall at all times comply, to the extent applicable, with the Access Laws in all material respects. Notwithstanding any provisions set forth herein or in any other documents regarding Administrative Agent's approval or alterations of the Project, Borrower shall not alter the Project in any manner which would increase Borrower's responsibilities for compliance with the applicable Access Laws in any material respect without the prior written approval of Administrative Agent. The foregoing shall apply to tenant improvements constructed by Borrower or by any of Borrower's Tenants. Administrative Agent may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer or other Person acceptable to Administrative Agent. Borrower agrees to give prompt notice to Administrative Agent of the receipt by Borrower of any complaints related to violations of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

23

(c)     Notwithstanding any other provision of this Section, Borrower shall not be deemed to be in default solely by reason of Borrower's failure to comply with any applicable Legal Requirement so long as, in Administrative Agent's judgment, each of the following conditions is satisfied: (i) Borrower is engaged in and diligently pursuing in good faith administrative or judicial proceedings appropriate to contest the validity or amount of such law, rule regulation or order; (ii) Borrower's compliance with such law, rule, regulation or order would necessarily and materially prejudice Borrower's prospects for success in such proceedings; (iii) noncompliance with any such law, rule, regulation or order will not result in the loss or forfeiture of the Project or any other collateral for the Loan or any interest of Administrative Agent therein or result in any fines or other punitive actions or any insurance coverage; and (iv) Borrower deposits with Administrative Agent, as security for any payment or performance which may ultimately be required, a sum equal to the amount of any fine, assessment or charge plus the interest, penalties, and other costs which Administrative Agent reasonably estimates are likely to become payable if Borrower's contest is unsuccessful. If Administrative Agent determines that any one or more of such conditions is not satisfied or is no longer satisfied, Borrower shall comply with the law, rule regulation or order in question, within thirty (30) days after Administrative Agent gives notice of such determination.

Section 5.2. <u>Maintenance and Use of Project</u>. Borrower shall maintain the Project in a good and safe condition and repair. The improvements and the Borrower's personal property required for the use of the Project shall not be removed, demolished or materially altered without the written consent of Administrative Agent; *provided*, *however*, that Administrative Agent's consent shall not be required (a) in connection with any removal, demolition or alteration permitted to be made by a Tenant under an Existing Lease without Borrower's consent under the applicable Existing Lease, or required to be made by Borrower under an Existing Lease, and (b) as otherwise set forth in <u>Section 5.19</u>. If under applicable zoning provisions the use of all or any portion of the Project is or shall become a nonconforming use, Borrower shall not cause or permit the nonconforming use to be discontinued or the nonconforming improvement to be abandoned without the express written consent of Administrative Agent. Borrower shall not establish any condominium or cooperative regime with respect to the Project without the prior written consent of Administrative Agent, nor shall Borrower initiate, join in or consent to any change in any private restrictive covenant, zoning ordinance or other public or private restrictions, limiting or defining the uses which may be made of the Project or any portion thereof.

Section 5.3. <u>Waste</u>. Borrower shall not commit or suffer any intentional material waste of the Project or make any change in the use of the Project which shall in any way invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Project or the security for the Loan. Borrower shall not, without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Project, regardless of the depth thereof or the method of mining or extraction thereof, except as may be required by law or in accordance with the orders of any Governmental Authorities having jurisdiction thereof.

Section 5.4. <u>Taxes and Other Charges</u>.

(a)     Borrower shall pay, or cause to be paid, all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Project or any part thereof as the same become due and payable. Borrower shall furnish to Administrative Agent receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent. Borrower shall not suffer and shall promptly pay and discharge or bond any Lien or charge whatsoever which may be or become a Lien or charge against the Project, and shall pay for all utility services provided to the Project prior to delinquency.

(b)     Borrower shall not be obligated to make any deposit for Taxes as hereinafter provided until (i) Administrative Agent makes demand therefor following a Default and (A) any Tenant under a Material Leases is not paying such Taxes in accordance with the terms and provisions of its respective Material Lease, or (B) any Tenant under a Material Lease is in default under such Material Lease, or (ii) the continuance of an Event of Default hereunder of under any of the other Loan Documents. Upon the occurrence of the events described in clauses (i) and (ii) of the immediately preceding sentence, Borrower shall pay to Administrative Agent, upon the request of Administrative Agent, at the time of each payment of an installment of interest and/or principal under the Note, an additional amount which, together with all other such monthly payments, is sufficient to discharge the obligations for payment of Taxes and Other Charges one (1) month prior to the date the same shall become due. The determination of the amount so payable and of the fractional part thereof to be deposited with Administrative Agent, so that the aggregate of such deposits shall be sufficient for this purpose, shall be made by Administrative Agent in Administrative Agent's sole but reasonable discretion. Such amounts shall be held by Administrative Agent not as a trust fund and without interest (except as may be required by law) and shall be applied to the payment of the obligations in respect of which such amounts were deposited, in such order or priority as Administrative Agent shall determine, on or before the respective dates on which the same or any of them would become delinquent. During the continuance of an Event of Default, the balance of any such amounts held by Administrative Agent may be used and applied for any purpose authorized pursuant to this Agreement or any other Loan Document, including, without limitation, payment of the Debt in any order Administrative Agent may deem appropriate. If, one (1) month prior to the date any of the aforementioned Taxes or Other Charges may be paid without interest or penalty, the amounts then on deposit shall be insufficient for the payment of such obligation in full, Borrower shall, within ten (10) days after demand, deposit the amount of the deficiency with Administrative Agent. Nothing herein contained shall be deemed to affect any right or remedy of Administrative Agent or Lenders under any provisions of this Agreement or the Deed of Trust or of any statute or rule of law to pay any such amount and to add the amount so paid, together with interest at the Involuntary Rate, to the Debt. So long as Administrative Agent requires Borrower to pay Administrative Agent the deposits provided for in this paragraph and for so long as Borrower complies therewith, the obligation for direct payment of Taxes and Other Charges set forth in <u>Subsection 5.4(a)</u> hereof shall be suspended. Notwithstanding anything to the contrary contained herein, Administrative Agent shall not require Borrower to make such deposits for water and sewer charges if such charges are calculated on a metered basis.

(c)     Borrower shall pay or bond so as to remove as a lien of record, from time to time when the same shall become due, all lawful claims and demands of mechanics, materialmen, laborers, and others which, if unpaid, might result in, or permit the creation of, a lien on the Project or any part thereof, or on the revenues, rents, issues, income and profits arising therefrom and in general will do or cause to be done everything necessary so that the Liens of the Deed of Trust shall be fully preserved, at the sole cost and expense of Borrower and without expense to Administrative Agent or Lenders.

(d)     Notwithstanding any other provision of this Section, Borrower shall not be deemed to be in default solely by reason of Borrower's failure to pay any Taxes so long as, in Administrative Agent's sole judgment, reasonably exercised, each of the following conditions is satisfied:

(i)     Borrower or a Tenant is engaged in and diligently pursuing in good faith administrative or judicial proceedings appropriate to contest the validity or amount of such Tax;

(ii)     [Intentionally Omitted];

(iii)    Nonpayment of such Tax will not result in the loss or forfeiture of any property encumbered by the Deed of Trust or any of the other Loan Documents or any interest of Administrative Agent therein; and

(iv)    Borrower deposits with Administrative Agent, as security for such payment which may ultimately be required, a sum equal to the amount of the disputed Taxes plus the interest, penalties, and other costs which Administrative Agent reasonably estimates are likely to become payable if Borrower's contest is unsuccessful.

If Administrative Agent determines, in Administrative Agent's sole judgment, reasonably exercised, that any one or more of such conditions is not satisfied or is no longer satisfied, Borrower shall pay the Tax in question, together with any interest and penalties thereon, within ten (10) days after Administrative Agent gives notice of such determination.  After Administrative Agent has received evidence of such payment, Administrative Agent shall release any security held for such payment of Taxes pursuant to Section 5.4(d)(iv).

(e)    Borrower shall pay any taxes, except income, gross receipts and other taxes determined by reference to the amount of interest and other sums payable under the Loan Documents, imposed on Administrative Agent or Lenders by reason of Administrative Agent's or Lenders' ownership of this Agreement, the Note or the Deed of Trust as a result of any change in Legal Requirements (or any change in the application, interpretation or enforcement of existing Legal Requirements) effected after the date of this Agreement, provided that the Administrative Agent or applicable Lender shall at the time be assessing such taxes upon all of its similarly situated borrowers; provided further that Borrower shall not be required to pay any U.S. federal withholding taxes imposed under FATCA as a result of the failure by a Lender to comply with the applicable provisions of FATCA.

(f)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Accordingly, prior to the date that any Lender becomes a party hereto, such Lender shall deliver to the Borrower such certificates, documents or other evidence, as required by the IRS Code or Treasury Regulations issued pursuant thereto (including Internal Revenue Service Forms W-9, W-8ECI, W-8BEN, W-8BEN-E, W-8EXP and W-8IMY as applicable, or appropriate successor forms), properly completed, currently effective and duly executed by such Lender establishing that payments to it hereunder and under the Note are (i) not subject to United States Federal backup withholding tax and (ii) not subject to United States Federal withholding tax under the Internal Revenue Code.  Each such Lender shall (x) deliver further copies of such forms or other appropriate certifications on or before the date that any such forms expire or become obsolete and after the occurrence of any event requiring a change in the most recent form delivered to the Borrower and (y) obtain such extensions of the time for filing, and renew such forms and certifications thereof, as may be reasonably requested by the Borrower.

Section 5.5. Litigation. Borrower shall give prompt written notice to Administrative Agent of any litigation or governmental proceedings pending or threatened in writing against Borrower or Guarantor which might materially adversely affect Borrower's condition (financial or otherwise) or business or the Project of which Borrower has knowledge.

Section 5.6. <u>Access to the Project</u>. Borrower shall permit agents, representatives and employees of Administrative Agent and Lenders to inspect the Project or any part thereof at reasonable hours upon reasonable advance written notice, except in the event of an emergency, in which case no advance notice is necessary.

Section 5.7. <u>Notice of Default</u>. Borrower shall promptly advise Administrative Agent of (a) any material adverse change in the condition (financial or otherwise) of Borrower or the Project, (b) the occurrence of an Event of Default under any Loan Document or (c) an "Event of Default" under any Mezzanine Loan Document (as defined therein).

Section 5.8. <u>Cooperate in Legal Proceedings</u>. Borrower shall, at Borrower's sole cost and expense, cooperate fully with Administrative Agent and Lenders with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lenders hereunder or any rights obtained by Lenders under any of the other Loan Documents and, in connection therewith, permit Administrative Agent and Lenders, at Administrative Agent's or Lenders' sole election, to participate in any such proceedings.

Section 5.9. <u>Performance of Obligations</u>. Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision to be observed and performed by Borrower under this Agreement and the other Loan Documents and any other agreement or instrument affecting or pertaining to the Project and any amendments, modifications or changes thereto.

Section 5.10. <u>Awards; Insurance Proceeds</u>. Borrower shall cooperate with Lenders in obtaining for Lenders the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Project in accordance with the terms and provisions of the Loan Documents, and Administrative Agent and Lenders shall be reimbursed for any reasonable, third party expenses incurred in connection therewith (including attorneys' fees and disbursements) out of such Awards or Insurance Proceeds.

Section 5.11. <u>Financial Reporting</u>.

(a) Borrower shall keep proper books of record and account with respect to the Project and its leases and subleases, in accordance with a modified accrual accounting method or such other method satisfactory to Administrative Agent and in a manner acceptable to Administrative Agent, in Administrative Agent's sole and reasonable discretion.

(b) Borrower shall furnish to Administrative Agent the following:

(i) within ninety (90) days after the close of each fiscal or calendar year of Borrower, as applicable, annual financial statements audited by a "Big Four" accounting firm, the Pre-Approved Accounting Firm, or other independent certified public accountant acceptable to Administrative Agent, which financial statements shall include, without limitation, a balance sheet, a statement of income and expenses, and a projected profit and loss statement for the next fiscal or calendar year, as applicable, disclosing all earnings and expenses with respect to Borrower and the Project (collectively, the "<u>Financial Statements</u>"), together with a certificate from an officer of Borrower certifying that such annual Financial Statements fairly present the financial condition of Borrower and the Project;

(ii) within forty-five (45) days after the close of each quarter of its fiscal year, a quarterly statement including a balance sheet and statement of profits and losses with respect to the Project;

(iii) copies of any operating statements or the like when Borrower is required to submit such information to any Governmental Authority;

4161624-v7\CHIDMS1

(iv)　promptly following any request therefor, copies of any notices described in Section 101(j) of ERISA that Borrower or any of its Subsidiaries or ERISA Affiliates may provide with respect to any Benefit Plan, copies of any documents described in Section 101(k) of ERISA that Borrower or any of its Subsidiaries or ERISA Affiliates may request with respect to any Multiemployer Plan, copies of any notices described in Section 101(1) of ERISA that Borrower or any of its Subsidiaries or ERISA Affiliates may request with respect to any Multiemployer Plan and any information that Borrower or any of its Subsidiaries or ERISA Affiliates may request with respect to any Multiemployer Plan in connection with Section 4221(e) of ERISA; provided, that if Borrower or any of its Subsidiaries or ERISA Affiliates has not requested such documents or notices from the administrator or sponsor of the applicable Benefit Plan or Multiemployer Plan, Borrower, the Subsidiary or the ERISA Affiliate, as applicable, shall promptly, upon the request of Administrative Agent, make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof; and

(v)　such other information respecting the business, properties or the condition or operations, financial or otherwise, of Borrower and/or the Project as Administrative Agent may from time to time reasonably request.

(c)　All Financial Statements and other deliverables of Borrower required under this Section 5.11 shall be (i) prepared in accordance with generally accepted accounting principles or such other method satisfactory to Administrative Agent, (ii) delivered in duplicate, and (iii) certified by Borrower as being true, complete and correct.

Section 5.12. Estoppel Statement. After request by Administrative Agent, Borrower shall within fifteen (15) Business Days furnish Administrative Agent with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the rate of interest on the Note, (iii) the unpaid principal amount of the Note, (iv) the date installments of interest were last paid, (v) any offsets or defenses to the payment of the Debt, if any, and (vi) that the Note, this Agreement, the Deed of Trust and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification. In the event any Governmental Authority requires the same, Lenders shall deliver a similar statement to Borrower.

Section 5.13. Management of Project. In the event a Management Agreement shall be in effect at any time, Borrower hereby covenants and agrees as follows:

(a)　Borrower shall (i) promptly perform and observe all of the covenants required to be performed and observed by Borrower under the Management Agreement and do all things necessary to preserve and to keep unimpaired Borrower's material rights thereunder; (ii) promptly notify Administrative Agent of any material default under the Management Agreement of which Borrower is aware; (iii) promptly deliver to Administrative Agent a copy of any notice of default or other material notice received by Borrower under the Management Agreement; and (iv) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement.

(b)　If at any time, (i) a Manager shall become insolvent or a debtor in a bankruptcy proceeding, (ii) an Event of Default has occurred and is continuing or (iii) a default has occurred and is continuing under the Management Agreement and Borrower has the right thereunder to terminate the Management Agreement on account thereof, Borrower shall, at the request of Administrative Agent, terminate the applicable Management Agreement upon thirty (30) days prior notice to such Manager and replace such Manager with a Qualified Manager (without the need for the approval of Administrative

28

Agent) or a manager selected by Borrower and approved in writing by Administrative Agent, in Administrative Agent's reasonable discretion.

(c)     Borrower shall not, without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld, (i) surrender, terminate or cancel the Management Agreement or otherwise replace any Manager or enter into any other management agreement with respect to the Project; (ii) reduce or consent to the reduction of the term of the Management Agreement; (iii) increase or consent to the increase of the amount of any charges under the Management Agreement; or (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Management Agreement in any material respect. In the event that Borrower replaces a Manager at any time during the term of Loan pursuant to this subsection, such Manager shall be approved by Administrative Agent in writing.

(d)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Manager initially named in this Agreement may (i) transfer its interest in any Management Agreement for the management of the Project to any Affiliate of such Manager, (ii) transfer shares or equity interests in Manager or Manager's equity owners (including, without limitation, the issuance of treasury stock, or the creation or issuance of a new class of stock or membership interests, in either case in the context of an initial public offering or in the context of a subsequent offering of equity securities), (iii) sell all or substantially all of such Manager's assets, and (iv) merge or consolidate with another entity without, in each case, the approval of Administrative Agent or the same constituting an Event of Default under this Agreement; *provided*, *however*, if any of the actions described in clauses (ii), (iii) or (iv) shall cause such Manager to be unable to perform the functions required to be performed and observed by Manager under the Management Agreement, Borrower shall, at the request of Administrative Agent, terminate the applicable Management Agreement upon thirty (30) days prior notice to such Manager and replace such Manager with a Qualified Manager (without the need for the approval of Administrative Agent) or a manager selected by Borrower and approved in writing by Administrative Agent, in Administrative Agent's reasonable discretion.

(e)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the resignation, removal or replacement of Manager shall not be an Event of Default under this Agreement or require the approval of Administrative Agent so long as Borrower shall appoint or retain a substitute Manager that is a Qualified Manager.

Section 5.14. Liens. Borrower shall not, without the prior written consent of Administrative Agent, create, incur, assume or suffer to exist any Lien on any portion of the Project or permit any such action to be taken, other than the Permitted Encumbrances, the Deed of Trust, the Assignment of Leases and Rents and any other liens created by the Loan Documents. Neither Borrower nor any other Person shall take any action that would impair the Lien created under this Agreement, the Deed of Trust or any other Loan Document.

Section 5.15. Debt Cancellation. Borrower shall not cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business, other than rent abatements or concessions in the ordinary course of business.

Section 5.16. Zoning. Borrower shall not initiate or affirmatively consent to any zoning classification or reclassification of any portion of the Project or seek any variance under any existing or future zoning ordinance or use or permit the use of any portion of the Project in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Administrative Agent.

Section 5.17. <u>ERISA</u>. Borrower covenants and agrees to deliver to Administrative Agent such certifications or other evidence from time to time throughout the term of the Loan, as reasonably requested by Administrative Agent that Borrower is not and will not be a Benefit Plan Investor.

Section 5.18. <u>No Joint Assessment</u>. Borrower shall not suffer, permit or initiate the joint assessment of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

Section 5.19. <u>Alterations</u>. Administrative Agent's prior written approval shall be required in connection with any material alterations to any improvements at or on the Project, except for (a) alterations to Tenant spaces required to be undertaken by Borrower under a Lease, or permitted to be undertaken by such Tenant without Borrower's consent under its Lease, (b) alterations required by Legal Requirements, and (c) ordinary non-structural improvements, alterations and maintenance and structural repairs, the cost of which is $750,000 or less (in the aggregate in any twelve (12) month period). With respect to an Existing Lease, to the extent that Administrative Agent's prior approval is required under this <u>Section 5.19</u>, Administrative Agent shall grant or withhold its consent to any alterations proposed thereunder subject to the standard of consent applicable to the landlord under the applicable Existing Lease.

Section 5.20. <u>Reciprocal Easement Agreement</u>. Borrower shall not enter into any reciprocal easement agreement without Administrative Agent's prior written consent.

Section 5.21. <u>Notices</u>. Borrower shall give notice, or cause notice to be given, to Administrative Agent promptly upon the occurrence, or the receipt of notice, of:

(a)     any Event of Default or, to Borrower's knowledge, any event that would with the giving of notice or passage of time would constitute an Event of Default;

(b)     any default or event of default under any Contractual Obligation of Borrower that, to the knowledge of Borrower, could reasonably be expected to have a material adverse effect on Borrower, the ability of Borrower to perform Borrower's obligations under the Loan Documents or the rights and remedies of Lenders under the Loan Documents;

(c)     any material litigation or proceeding affecting Borrower, Guarantor or the Project but only to the extent such litigation could be reasonably expected to have a material adverse effect on Borrower, Guarantor or the Project, the ability of Borrower or Guarantor to perform their obligations under the Loan Documents or the rights and remedies of Lenders under the Loan Documents;

(d)     a change in the business, operations or financial or other condition or prospects of Borrower or Guarantor which could reasonably be expected to have a material adverse effect on Borrower the ability of Borrower or such Guarantor to perform Borrower's or such Guarantor's obligations under the Loan Documents or the rights and remedies of Administrative Agent and Lenders under the Loan Documents; or

(e)     any ERISA Event.

Section 5.22. <u>Curing</u>. Administrative Agent and Lenders shall have the right, but shall not have the obligation, following ten (10) days' notice to Borrower and an opportunity to cure, to exercise Borrower's rights to satisfy or fully bond over any Liens, claims or judgments against the Project. Borrower shall reimburse Lenders and Administrative Agent on demand for any and all actual costs

30

incurred by Lenders or Administrative Agent in connection with satisfying any Liens, claims or judgments against the Project.

Section 5.23. <u>Limitation on Securities Issuances</u>. None of Borrower or any of Borrower Members shall issue any additional membership interests or other securities, other than those that have been issued as of the Closing Date to the extent that such issuance would violate the provisions of <u>Section 7.2</u>, without the prior written consent of Administrative Agent, which consent may be withheld by Administrative Agent in Administrative Agent's sole and absolute discretion. For the avoidance of doubt, this <u>Section 5.23</u> shall not apply to the issuance, reissuance or replacement of certificates evidencing membership interests existing as of the Closing Date in accordance with the Mezzanine Loan Documents.

Section 5.24. <u>Limitations on Distributions</u>. Following the occurrence and during the continuance of (i) an Event of Default or (ii) a default by Borrower or the Key Tenant under the Key Tenant Lease, Borrower shall not make any distributions to Sole Member or any Borrower Members or any other Person. Except as aforesaid, there shall be no limitation on the making of any distributions to Borrower Members so long as no Event of Default or default under the Key Tenant Lease shall have occurred and be continuing.

Section 5.25. <u>Contractual Obligations</u>. Other than the Loan Documents, the Mezzanine Loan Documents, the Borrower Operating Agreement (and the membership interests in Borrower issued pursuant thereto) and the other documents described in <u>Section 4.24</u>, neither Borrower nor any of Borrower's assets shall be subject to any Contractual Obligations, and Borrower shall not enter into any agreement, instrument or undertaking by which Borrower or Borrower's assets are bound, other than those Contractual Obligations to operate, manage and Lease the Project that are necessary and customary for properties similar to the Project.

Section 5.26. <u>Additional Indebtedness</u>. Except as provided in <u>Section 6.1(g)</u> hereof, Borrower shall not suffer or incur any additional debt, obligations as lessee under a capitalized lease or contingent liabilities without the prior written consent of Administrative Agent, which consent may be withheld by Administrative Agent in Administrative Agent's sole and absolute discretion.

Section 5.27. <u>Restrictions on Leasing</u>. Borrower shall (i) not execute a Material Lease which shall not have been submitted to and approved by Administrative Agent except for Telecom Leases, (ii) not alter, modify or change the terms of any Material Lease except in the ordinary course of business and provided such alteration, modification or change does not have a material adverse financial effect on Borrower, (iii) not give any consent or exercise any option unless required by the terms of any Lease approved by Administrative Agent, (iv) not cancel or terminate any Material Lease or accept a surrender or tenant buyout thereof except in the event of default by the Tenant thereunder, (v) not consent to any assignment of or subletting under any Material Lease, unless the same shall be in accordance with its terms and such terms have been approved by Administrative Agent, (vi) not collect any of the rents, income and profits arising or accruing under any Leases or from the Project for more than one (1) month in advance of the time when the same shall become due, (vii) not execute any other assignment of Borrower's interest in the Leases or any assignment of rents arising or accruing from the Leases or from the Project; (viii) observe and promptly and faithfully perform or cause to be performed all of the covenants, conditions and agreements contained in all Leases in all material respects, (ix) at all times do all things reasonably necessary in the exercise of sound business judgment to compel performance by the lessee under each Lease of all obligations, covenants and agreements by such lessee to be performed thereunder, (x) not do or permit to be done anything to materially impair the security of any Lease, (xi) at Administrative Agent's request, assign and transfer to Administrative Agent any and all subsequent Leases upon all or any part of the Project, and (xii) execute and deliver at the reasonable request of Administrative Agent all such further assurances and assignments in the Project as Administrative Agent

31

shall from time to time require. None of the foregoing restrictions set forth in clauses (i) through (vii) of this Section shall be done or suffered to be done without in each instance obtaining the prior written consent of Administrative Agent, and any of such acts done without the prior written consent of Administrative Agent shall be null and void.  For purposes of clarity, the Existing Leases and the terms therein have been approved by Administrative Agent.

(a)     <u>Tenant Estoppel Certificates</u>. Borrower shall deliver to Administrative Agent upon the written request of Administrative Agent (made not more often than once in any calendar year), an updated tenant estoppel certificate from any Tenant at the Project addressed to Administrative Agent, in form and substance satisfactory to Administrative Agent in all respects.

(b)     <u>Copies of Leases</u>. Within ten (10) Business Days of any such request, Borrower shall submit to Administrative Agent or Administrative Agent's counsel true and complete copies of all Leases for the Project including all amendments thereto or extensions thereof, and any guarantees thereof.

(c)     <u>Subordination and Attornment</u>. Each Lease hereafter entered into shall be subordinate to the lien of the Deed of Trust, to all advances under the Deed of Trust and to any renewals, extensions, modifications or consolidations thereof, and shall provide that, in the event of the enforcement by Lenders of the remedies provided for by law, by this Agreement or by the Deed of Trust, the lessee thereunder shall, upon request of any Person succeeding to the interest of Borrower as a result of such enforcement, automatically become the lessee of and shall attorn to said successor in interest, without change in the terms or other provisions of such Lease; *provided*, *however*, that said successor in interest shall not be bound by (i) any payment of rent or additional rent for more than one (1) month in advance, except prepayments in the nature of security for the performance by said lessee of its obligations under said Lease, or (ii) any amendment or modification of the Lease made without the consent of Administrative Agent or such successor in interest, unless such consent is not required pursuant to this <u>Section 5.27</u>. Each Lease shall also provide that, upon request by said successor in interest, such lessee shall execute and deliver an instrument or instruments confirming such attornment.  Administrative Agent, on behalf of Lenders, shall enter into a commercially reasonable SNDA with Tenants under future Leases upon request, from time to time.

Section 5.28. <u>Debt Service Coverage Ratio</u>.

(a)     At all times during the term of the Loan, the Project must maintain a minimum debt service coverage ratio ("<u>DSCR</u>") of 1.20:1.00 ("<u>DSCR Threshold</u>"). The DSCR shall be tested on an annual basis commencing on December 31, 2018 and on each December 31 thereafter during the term of the Loan. The DSCR shall be calculated as the ratio of (i) Net Operating Income for the prior twelve-month period immediately preceding the measurement date, *to* (ii) actual scheduled principal and interest payments under the Loan for the prior trailing twelve-month period immediately preceding the measurement date. With respect to the calculation of DSCR as aforesaid, until the first (1st) anniversary of the Closing Date, Debt Service and Net Operating Income shall be calculated on the basis of actual Debt Service and Net Operating Income for such partial year period and such amounts shall be annualized by Administrative Agent for purposes of calculating the DSCR.

(b)     The certificate of Administrative Agent as to any DSCR calculation shall, absent manifest error, be final, conclusive and binding on Borrower.

(c)     If, on any annual measurement date, the DSCR is below the DSCR Threshold, Borrower may, at Borrower's option, pay down the Loan (without payment of any Prepayment Premium) by an amount necessary for Borrower to effectively achieve the DSCR Threshold immediately following delivery of such pay down (any amount so paid down may not be reborrowed). Borrower shall deliver the pay down to Administrative Agent within fifteen (15) days following notice from Administrative Agent

that such DSCR Threshold has not been met. Borrower's failure to deliver the pay down within such time period such that DSCR Threshold is achieved shall be an Event of Default.

Section 5.29. <u>Loan-to-Value Ratio</u>.

(a)     The Project must maintain a maximum loan-to-value ratio ("<u>LTVR</u>") of 60.0% ("<u>LTVR Threshold</u>") at all times. The LTVR shall be tested by Administrative Agent on an annual basis, commencing on December 31, 2018 and on each December 31 thereafter during the term of the Loan, and shall be calculated as the ratio of (i) the outstanding principal balance under the Loan *to* (ii) the Appraised Value of the Project. For the purpose of this covenant, "<u>Appraised Value</u>" shall mean the market value of the Project according to the latest FIRREA appraisal performed by an appraiser appointed by Borrower and reasonably acceptable to Administrative Agent, which appraisals shall be performed annually by December 31st of each calendar year.

(b)     The certificate of Administrative Agent as to any LTVR calculation shall, absent manifest error, be final, conclusive and binding on Borrower.

(c)     If, on any annual measurement date, the LTVR exceeds the LTVR Threshold, Borrower may, at Borrower's option, pay down the Loan (without payment of any Prepayment Premium) by an amount necessary for Borrower to effectively achieve the LTVR Threshold immediately following delivery of such pay down (any amount so paid down may not be reborrowed). Borrower shall deliver the pay down to Administrative Agent within fifteen (15) days following notice from Administrative Agent that the LTVR Threshold has not been achieved. Borrower's failure to deliver the pay down within such time period such that LTVR Threshold is achieved shall be an Event of Default.

Section 5.30. <u>UCC Searches</u>. Borrower and Guarantor hereby agree that Administrative Agent shall have the right to order UCC, judgment and lien searches against Borrower and Guarantor at any time at Borrower's sole cost and expense. Borrower shall also be responsible for all actual out-of-pocket costs incurred by Administrative Agent to continue the UCC-1 Financing Statements delivered by Borrower in favor of Administrative Agent from time to time.

Section 5.31. <u>Updated/New Appraisal</u>. Borrower hereby acknowledges and agrees that Borrower shall order (or, at Administrative Agent's election, Administrative Agent may order) an updated or new appraisal of the Project (a) annually, in connection with Administrative Agent's test of the LTVR Threshold, at Borrower's sole cost and expense, (b) upon the occurrence of an Event of Default, at Borrower's sole cost and expense, and (c) at any other time, at Administrative Agent's sole cost and expense. Any such appraisal shall be performed by an appraiser appointed by Borrower and reasonably acceptable to Administrative Agent, and Administrative Agent may from time to time require that the appraiser who performs a particular appraisal be different than the appraiser who performed the prior appraisal.

Section 5.32. <u>Interest Reserve Account</u>. Borrower shall maintain the Interest Reserve Account for the term of the Loan, which Interest Reserve Account shall be under the sole dominion and control of Administrative Agent. The Interest Reserve Account shall have a title evidencing the foregoing in a manner reasoning acceptable to Administrative Agent. Borrower hereby grants to Administrative Agent, for the benefit of Lenders, a first-priority security interest in the Interest Reserve Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Administrative Agent, for the benefit of Lenders, a perfected first priority security interest in the Interest Reserve Account. All costs and expenses for establishing and maintaining the Interest Reserve Account (or any successor thereto) shall be paid by Borrower. All monies now or hereafter deposited into the Interest Reserve Account shall be deemed additional security for the Debt. Borrower shall not alter or modify the Interest Reserve Account without the prior written consent of Administrative Agent.

Borrower shall not draw upon the Interest Reserve Account during the term of the Loan (for the purpose of making interest payments or otherwise).   Upon the occurrence of an Event of Default due to Borrower's failure to timely make any interest payment, Administrative Agent shall apply funds on deposit in the interest reserve against amounts owing to Lenders under this Agreement, and shall notify Borrower whether sufficient funds were available in the Interest Reserve Account to cure such Event of Default. For the avoidance of doubt, Borrower shall be required to make separate interest payments pursuant to the terms of the Note, regardless of whether there are funds in the Interest Reserve Account on deposit with Administrative Agent.

Section 5.33. <u>Mezzanine Loan</u>.   Borrower shall not cause, suffer or permit Mezzanine Borrower to enter into any cancellation, termination, modification, change, supplement, restatement, alteration or amendment of any Mezzanine Loan Document. Without limitation of any other covenant set forth in this Agreement, Borrower shall deliver to Administrative Agent, within two (2) Business Days, any notice of default or other material notice, statement or report given or received by any party under the Mezzanine Loan Documents.

ARTICLE VI
ENTITY COVENANTS

Section 6.1. <u>Single Purpose Entity/Separateness</u>. Until the Debt has been paid in full, Borrower represents, warrants and covenants that Borrower has not and shall not:

(a)       engage in any business or activity other than the ownership of the Project and any activities incidental thereto;

(b)       acquire or own any assets other than (i) the Project, and (ii) such incidental personal property as may be necessary for the ownership of the Project;

(c)       merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(d)       fail to observe all organizational formalities or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable Legal Requirements of the jurisdiction of its organization or formation, or amend, modify, terminate or fail to comply with the provisions of its Organizational Documents;

(e)       form or own any Subsidiary or make any investment in any Person;

(f)       commingle its assets with the assets of any other Person;

(g)       incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation) other than (i) the Loan and/or (ii) trade and operational indebtedness incurred in the ordinary course of business with trade creditors, provided such indebtedness is (A) unsecured, (B) not evidenced by a note, (C) on commercially reasonable terms and conditions, and (D) due not more than ninety (90) days past the date incurred and paid on or prior to such date;

(h)       fail to maintain its records, books of account, bank accounts, financial statements, accounting records and other entity documents separate and apart from those of any other Person;

(i)       enter into any contract or agreement with any general partner, member, shareholder, principal, guarantor of the obligations of Borrower or any Affiliate of the foregoing, except

34

upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arm's length basis with unaffiliated third parties;

(j)      maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(k)      assume or guaranty the debts of any other Person, hold itself out to be responsible for the debts of any other Person, or otherwise pledge its assets for the benefit of any other Person or hold out its credit as being available to satisfy the obligations of any other Person, provided however, that this subsection (k) shall not be deemed to prohibit Borrower from pledging assets to secure its own obligations as required or permitted by the Loan Documents;

(l)      make (i) any loans or (ii) any advances (except with respect to distributions to its shareholders, partners or members, as applicable, which are not otherwise prohibited under this Agreement) to any Person;

(m)      fail to file its own tax returns or file a consolidated federal income tax return with any Person (unless prohibited or required, as the case may be, by applicable Legal Requirements);

(n)      fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or fail to correct any known misunderstanding regarding its separate identity;

(o)      fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; *provided*, *however*, in no event shall this subsection (o) require any equity owner to make additional capital contributions to Borrower (it being acknowledged, however, that a failure of Borrower to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations shall be a Default hereunder irrespective of such equity owner's lack of an obligation to make additional capital contributions to Borrower);

(p)      (i) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any Creditors' Rights Laws (unless filed by Administrative Agent), (ii) seek or consent to the appointment of a receiver, liquidator or any similar official, (iii) take any action that might cause such entity to become insolvent, or (iv) make an assignment for the benefit of creditors;

(q)      fail to allocate shared expenses (including, without limitation, shared office space and services performed by an employee of an Affiliate) among the Persons sharing such expenses and to use separate invoices and checks;

(r)      fail to remain solvent or pay its own liabilities (including, without limitation, salaries of its own employees) only from its own funds; *provided*, *however*, in no event shall this subsection (r) require any equity owner to make additional capital contributions to Borrower (it being acknowledged, however, that a failure of Borrower to remain solvent or pay its own liabilities (including, without limitation, salaries of its own employees) only from its own funds shall be a Default hereunder irrespective of such equity owner's lack of an obligation to make additional capital contributions to Borrower); and

(s)      acquire obligations or securities of its partners, members, shareholders or other affiliates, as applicable.

Section 6.2.  <u>Change of Name, Identity or Structure</u>. Borrower shall not change or permit to be changed (a) Borrower's name, (b) Borrower's identity (including Borrower's trade name or names), (c)

Borrower's principal place of business set forth on the first page of this Agreement, the Deed of Trust or any UCC-1 Financing Statements, (d) the corporate, partnership, limited liability company or other organizational structure of Borrower, (e) Borrower's state of organization, or (f) Borrower's organizational identification number, without in each case notifying Administrative Agent of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Administrative Agent. In addition, Borrower shall not change or permit to be changed any Organizational Documents of such person if such change would adversely impact the covenants set forth in Section 6.1 hereof. Borrower shall execute and deliver to Administrative Agent, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement amendment reasonably required by Administrative Agent to establish or maintain the validity, perfection and priority of the security interest granted herein. At the request of Administrative Agent, Borrower shall execute a certificate in form satisfactory to Administrative Agent listing the trade names under which Borrower intends to operate under, and representing and warranting that Borrower does business under no other trade name. If Borrower does not now have an organizational identification number and later obtains one, or if the organizational identification number assigned to Borrower subsequently changes, Borrower shall promptly notify Administrative Agent of such organizational identification number or change.

Section 6.3. <u>Business and Operations</u>. Borrower shall remain in good standing under the laws of each State as, and to the extent, the same are required for the ownership, maintenance, management and operation of the Project. Borrower shall not enter into any line of business other than the ownership of the Project and ancillary purposes in connection therewith, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business.

<div align="center">

ARTICLE VII
NO SALE OR ENCUMBRANCE

</div>

Section 7.1. <u>Transfer Definitions</u>. For purposes of this <u>Article VII</u>, an "<u>Affiliated Manager</u>" shall mean any managing agent in which Borrower, Guarantor or any Affiliate of such Persons has directly or indirectly, any legal, beneficial or economic interest; "<u>Control</u>" shall mean, for any Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise; "<u>Restricted Party</u>" shall mean Borrower, any Affiliated Manager, or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, any Affiliated Manager, or any non-member manager; and a "<u>Sale or Pledge</u>" shall mean a voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, lien, pledge, assignment, grant of any options with respect to, or any other transfer or disposition of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) a legal or beneficial interest.

Section 7.2. <u>No Sale/Encumbrance</u>.

(a)     Other than Permitted Transfers, until the Debt is paid in full, Borrower shall not cause or permit a Sale or Pledge of the Project or any part thereof or any legal or beneficial interest therein nor permit a Sale or Pledge of an interest in any Restricted Party (in each case, a "<u>Prohibited Transfer</u>") without the prior written consent of Administrative Agent, which shall not be unreasonably withheld, conditioned or delayed.

(b)     A Prohibited Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Project or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Project for other than

<div align="center">36</div>

actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in Borrower's right, title and interest in and to any leases or any rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general or limited partner or any profits or proceeds relating to such partnership interests or the creation or issuance of new partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of any member or any profits or proceeds relating to such membership interest; (vi) if a Restricted Party is a trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; (vii) the removal or the resignation of a Manager (including, without limitation, an Affiliated Manager) other than in accordance with Section 5.13 hereof.

Section 7.3. Administrative Agent's Rights. Administrative Agent reserves the right to condition the consent to a Prohibited Transfer requested hereunder upon (a) a modification of the terms hereof and an assumption of the Note and the other Loan Documents as so modified by the proposed transferee, (b) receipt of payment of a transfer fee equal to $5,000 and all of Lenders' and Administrative Agent's out-of-pocket expenses actually incurred in connection with such Prohibited Transfer, (c) to the extent applicable to such proposed transferee, the proposed transferee's continued compliance with the covenants set forth in this Agreement (including, without limitation, the covenants in Article VI and the other Loan Documents), (d) a new manager for the Project and a new management agreement satisfactory to Administrative Agent (if applicable), and (e) the satisfaction of such other conditions and/or legal opinions as Administrative Agent shall determine in Administrative Agent's reasonable discretion to be in the interest of Lenders. All reasonable expenses incurred by Lenders and Administrative Agent shall be payable by Borrower whether or not Administrative Agent consents to the Prohibited Transfer. Lenders shall not be required to demonstrate any actual impairment of Lenders' security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Prohibited Transfer made without Administrative Agent's prior written consent. This provision shall apply to each and every Prohibited Transfer, whether or not Administrative Agent has consented to any previous Prohibited Transfer.

Section 7.4. Assumption. Other than as expressly permitted in this Agreement, Borrower hereby acknowledges and agrees that no transfer of all or any portion of the Project to, and the related assumption of the Loan by, any Person shall be permitted under this Agreement.

ARTICLE VIII
INSURANCE; CASUALTY; CONDEMNATION; RESTORATION

Section 8.1. Insurance.

(a)     Borrower shall obtain and maintain at all times policies of insurance as follows:

(i)     comprehensive "all risk" or "special causes of loss" insurance, including, without limitation, fire, flood, earthquake, terrorism, vandalism, malicious mischief and such other hazards as may be reasonably specified by Administrative Agent for the mutual benefit of Borrower and Administrative Agent and which is customarily maintained for like properties, including the improvements and the fixtures (other than trade fixtures) at the Project, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations,

underground utilities and footings) and provided that earthquake and flood may have a sub limit reasonably acceptable to Administrative Agent; (B) containing a replacement cost endorsement and an agreed amount endorsement with respect to such improvements and fixtures (other than trade fixtures) and/or an endorsement waiving all coinsurance provisions; (C) providing for no deductible in excess of $100,000 or such other amount reasonably acceptable to Administrative Agent, for all such insurance coverage; and (D) if any of the improvements or the use of the Project shall at any time constitute legal nonconforming structures or uses, providing coverage for contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements and containing an "Ordinance or Law Coverage" or "Enforcement" endorsement. In addition, Borrower shall obtain, or cause to be obtained: (x) if any portion of the improvements is currently or at any time in the future located in a "special flood hazard area" designated by the Federal Emergency Management Agency, flood hazard insurance in an amount equal to $10,000,000 in excess of the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended; and (y) earthquake insurance in amounts and in form and substance reasonably satisfactory to Administrative Agent as determined by a probable maximum loss study or other acceptable assessment of expected maximum loss, not to exceed the amount of indebtedness, in the event the Project is located in an area with a high degree of seismic risk provided that the insurance pursuant to clauses (x) and (y) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this subsection (i) and further provided that regardless of the flood or seismic zone, Administrative Agent may require reasonable limits of insurance covering such risks;

(ii)     Commercial General Liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Project, with such insurance (A) to be on the so-called "occurrence" form with a general aggregate limit of not less than $2,000,000 per location and a per occurrence limit of not less than $1,000,000; (B) to continue at not less than the aforesaid limit until required to be changed by Administrative Agent in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations; (3) independent contractors; and (4) contractual liability;

(iii)    loss of rents insurance or business income insurance, as applicable, (A) covering all risks required to be covered by the insurance provided for in subsection (i) above; (B) which provides that after the physical loss to the improvements and fixtures (other than trade fixtures) occurs, the loss of rents or income, as applicable, will be insured until such completion of Restoration and notwithstanding that the policy may expire prior to the end of such period; and (C) which contains an extended period of indemnity endorsement which provides that after the physical loss to the improvements and personal property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of at least six (6) months from the date that the Project is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period. The amount of such loss of rents or business income insurance, as applicable, shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross income from the Project for the succeeding period of coverage required above. All proceeds payable to Lenders pursuant to this subsection shall be held by Lenders and shall be applied to the obligations secured by the Loan Documents with any remaining balance promptly payable to Borrower; *provided*, *however*, that nothing herein contained shall be deemed to relieve Borrower of Borrower's obligations to pay the obligations secured by the Loan Documents on the respective dates of payment provided for in the Note, this Agreement and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such loss of rents or business income insurance, as applicable;

(iv)      at all times during which structural construction, demolition, structural repairs or structural alterations are being made with respect to the improvements, and only if the property coverage form does not otherwise apply,

(A)      owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy;

(B)      the insurance provided for in subsection (i) above written in a so-called Builder's Risk Completed Value form (1) on a non-reporting basis, (2) against "all risks" insured against pursuant to subsection (i) above, (3) including permission to occupy the Project, (4) with an agreed amount endorsement waiving co-insurance provisions, and (5) including coverage for so-called "soft costs" and delayed completion loss of income; and

(C)      Borrower shall ensure, or cause to be insured, that the general contractor maintains (1) commercial general liability coverage, including products and completed operations coverage that shall be continuously renewed for the statutory period during which claims can be made following completion of the project, (2) automobile liability insurance (including owned, hired and non-owned liability) and (3) umbrella/excess liability insurance with no less than $25,000,000, or such other amount reasonably acceptable to Administrative Agent, in limits per occurrence and in the annual aggregate per project, and in addition Borrower shall ensure, or cause to be insured, that all trade contractors provide similar liability insurance coverage with umbrella liability limits that are commensurate with the risks presented by their operations at the site as determined by the general contractor. All parties engaged in work on the improvements or on any restoration shall maintain any workers' compensation and employer's liability insurance required by law in force for all workers on the job. A certificate of insurance shall be issued to Borrower and Administrative Agent, naming each as Additional Insured (except with respect to workers' compensation and employer's liability), and evidencing all insurance required in this subsection. Borrower and Administrative Agent shall be named as Additional Insured with respect to the general contractor's ongoing operations and completed operations by endorsements satisfactory to Administrative Agent. Such insurance shall be primary and any other insurance maintained by the additional insured shall be excess only and not contributing with this insurance;

(v)      workers' compensation, subject to the statutory limits of the State, and employer's liability insurance in respect of any work or operations on or about the Project, or in connection with the Project or its operation (if applicable);

(vi)      comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Administrative Agent on terms consistent with the commercial property insurance policy required under subsection (i) above;

(vii)      excess liability insurance in an amount not less than $25,000,000 per occurrence and in the aggregate per location, or such other amount reasonably acceptable to Administrative Agent, per occurrence and per location, on terms consistent with the commercial general liability insurance required under subsection (ii) above; and

(viii)      upon sixty (60) days' written notice, such other reasonable insurance and in such reasonable amounts as Administrative Agent from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Project located in or around the region in which the Project is located.

(b)        All insurance provided for in <u>Section 8.1(a)</u> hereof shall be obtained under valid and enforceable policies (collectively, the "<u>Policies</u>" or in the singular, the "<u>Policy</u>"), and shall be in such forms and in such amounts as required above, and shall be subject to the reasonable approval of Administrative Agent as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the State and having a claims paying ability rating of "A" or better by at least two rating agencies (one of which shall be S&P) and/or a general policy rating of "A" or better and a financial class of VIII or better by A.M. Best Company, Inc.; *provided*, *however*, any insurance company with a rating below A:X must have a positive or stable outlook according to A.M. Best Company, Inc. The Policies described in <u>Section 8.1(a)</u> hereof shall designate Administrative Agent and Lenders and their successors and assigns as mortgagee, additional insured and/or loss payee as deemed appropriate by Administrative Agent. Borrower shall deliver to Administrative Agent certificates evidencing renewal of the Policies (such certificates, the "<u>Insurance Certificates</u>") and renewal policies accompanied by evidence satisfactory to Administrative Agent of payment of the premiums due with respect to the policies (the "<u>Insurance Premiums</u>"), within thirty (30) days after the expiration dates of such Policies.

(c)        Any blanket property insurance Policy shall specifically allocate to the Project the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Project in compliance with the provisions of <u>Section 8.1(a)</u> hereof.

(d)        All Policies provided for or contemplated by <u>Section 8.1(a)</u> hereof shall, in the case of Policies providing for (i) property damage, boiler and machinery, terrorism, flood and earthquake insurance, provide that the loss thereunder shall be payable to Administrative Agent, as mortgagee and loss payee, and (ii) commercial general liability insurance, name Administrative Agent as additional insured.

(e)        All Policies provided for in <u>Section 8.1(a)</u> hereof shall contain clauses or endorsements to the effect that:

(i)        no act or negligence of Borrower or anyone acting for or on behalf of Borrower or of any Tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance with respect to Administrative Agent and Lenders;

(ii)        the property damage insurance Policies, including boiler and machinery, earthquake, flood and terrorism, if separately provided, shall not be materially changed (other than to increase the coverage provided thereby) or canceled without at least thirty (30) days' prior written notice to Administrative Agent and any party named therein as an additional insured;

(iii)        the issuers thereof shall give written notice to Administrative Agent if the Policies have not been renewed ten (10) Business Days prior to their expiration;

(iv)        Administrative Agent and Lenders shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder, provided that the insurer need not waive the requirement that the premium be paid in order for a claim to be paid and further shall provide that Administrative Agent (for the benefit of Lender) is permitted to make payments to effect the continuation of such policy upon notice of cancellation due to non-payment of premiums;

(v)        the Policies do not contain an exclusion for acts of terrorism; and

(vi)       any claim or defense any property damage insurance company may have against Borrower to deny payment of any claim by Borrower thereunder shall not be effective against Administrative Agent and Lenders (and affirmatively providing that the insurance company will pay the proceeds of such Policy to Administrative Agent notwithstanding any claim or defense of the insurance company against Borrower) and such Policies shall also contain a standard "Waiver of Subrogation" endorsement.

(f)       If at any time Administrative Agent is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Administrative Agent shall have the right, upon not less than five (5) Business Days' notice to Borrower (except in the event of an emergency or an imminent lapse or loss of insurance coverage), to take such action as Administrative Agent deems necessary to protect Lenders' interest in the Project, including, without limitation, obtaining such insurance coverage as Administrative Agent in Administrative Agent's reasonable discretion deems appropriate. All premiums incurred by Administrative Agent or Lenders in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Administrative Agent upon demand and shall bear interest at the Involuntary Rate.

(g)       Borrower shall not take out separate insurance concurrent in form or contributing (in the event of a loss) to the insurance required to be maintained under this Section 8.1. Borrower may, however, carry, or permit Tenants to carry, insurance for the Project in addition to required insurance, but only if such additional insurance: (i) does not violate or entitle the carrier to assert any defense or disclaim any primary coverage under any required insurance; (ii) mutually benefits Borrower or Tenants, as the case may be, and Administrative Agent, as their interests may appear; and (iii) otherwise complies with this Agreement; *provided*, *however*, Administrative Agent reserves the right to approve any insurance provided by any other Tenant.   Notwithstanding the foregoing, Administrative Agent hereby acknowledges that the insurance coverages held by the Tenants as of the Closing Date are acceptable to Administrative Agent.

Section 8.2. Insurance Escrow; Payment by Administrative Agent. Borrower shall not be obligated to make any deposit or payment for insurance premium payment obligations, as hereinafter provided, until Administrative Agent makes demand therefor following an Event of Default and (i) any Tenant under a Material Lease is not paying such premiums in accordance with the terms and provisions of its respective Lease, or (ii) any Tenant under a Material Lease is in default under such Lease. Subject to the foregoing, upon notice from Administrative Agent, Administrative Agent shall have the right to require that Borrower pay to Administrative Agent at the time of each payment of an installment of interest and/or principal under the Note, an additional amount sufficient to discharge the premium payment obligations under this Article VIII when they become due. The determination of the amount so payable and of the fractional part thereof to be deposited with Administrative Agent, so that the aggregate of such deposits shall be sufficient for this purpose, shall be made by Administrative Agent in Administrative Agent's reasonable discretion. Such amounts shall be held by Administrative Agent not as a trust fund and without interest (except as required by applicable law) and shall be applied to the payment of the obligations in respect of which such amounts were deposited, in such order or priority as Administrative Agent shall reasonably determine, on or before the respective dates on which the same or any of them would become due. After acceleration of the Debt, the balance of any such amounts held by Administrative Agent may be used and applied for any purpose authorized pursuant to Article II of the Deed of Trust and Section 10.2 hereof including, without limitation, payment of the Debt in any order Administrative Agent may deem appropriate. If, one (1) month prior to the date any of the aforementioned obligations are due, the amounts then on deposit shall be insufficient for the payment of such obligation in full, Borrower shall, within ten (10) days after written demand, deposit the amount of the deficiency with Administrative Agent. Nothing herein contained shall be deemed to affect any right or

41

remedy of Administrative Agent or Lenders under any provisions of this Agreement or of any statute or rule of law to pay any such amount and to add the amount so paid, together with interest at the Involuntary Rate, to the Debt.

Section 8.3. <u>Casualty</u>. If the Project shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "<u>Casualty</u>"), Borrower shall give prompt notice of such damage to Administrative Agent and Administrative Agent shall have the right to join Borrower in adjusting any loss. In addition, after the entry of any decree of foreclosure of the Deed of Trust, any purchaser at foreclosure sale or the decree creditor, as the case may be, shall also have the right to join in the adjustment of any such losses. Any moneys received as payment for any loss under any such insurance (the "<u>Insurance Proceeds</u>") shall be paid, subject to the terms of the Existing Leases, over to Administrative Agent to be applied, at Administrative Agent's option, either to (i) prepayment of the Note and other sums due under the Loan Documents or (ii) to the extent reasonably practicable, the reimbursement of Borrower from time to time of expenses incurred by Borrower in connection with the restoration of the Project ("<u>Restoration Work</u>") upon terms otherwise satisfactory to Administrative Agent. Administrative Agent and Lenders shall have the right to participate in the adjustment of all claims for Insurance Proceeds. Borrower shall promptly commence and diligently prosecute the restoration of the Project whether or not the Insurance Proceeds are made available to Borrower. Borrower shall pay all costs of such restoration whether or not such costs are covered by insurance. Provided and on condition that no Event of Default has occurred and is continuing, any prepayment of the Debt by application of Insurance Proceeds shall not be subject to any Prepayment Premium, however, Borrower shall be obligated to pay any breakage costs or other similar losses incurred or suffered by Administrative Agent and Lenders as a result of such prepayment.

Notwithstanding the foregoing, and subject to the terms of subsection (f) hereof, if Administrative Agent agrees to make the Insurance Proceeds, less the reasonable and actual out-of-pocket cost, if any, to Administrative Agent of obtaining and disbursing such Insurance Proceeds (including, without limitation, reasonable attorneys' fees and disbursements and costs allocable to inspecting the Restoration Work and the Plans) for the repair and restoration of the Project ("<u>Actual Proceeds</u>") available to the Borrower (not by way of application against and readvancement of loan funds under the Deed of Trust but solely as a security fund from which to reimburse Borrower for or permit Borrower to pay directly the costs of such repair and restoration), then Administrative Agent shall make the Actual Proceeds available to Borrower and Borrower shall complete the Restoration work in accordance with the following terms, provisions and conditions:

(a)     If the Project should be damaged or destroyed by fire or other casualty, Borrower shall promptly upon insurance settlement, which settlement shall be diligently pursued by Borrower, commence the Restoration Work. Administrative Agent shall, subject to the terms of Subsection (b) below, deposit the proceeds of settlement in an interest-bearing account (the "<u>Restoration Account</u>") in a branch of any federally-insured bank as Administrative Agent may determine, in Administrative Agent's sole and absolute discretion. Borrower shall, as provided below, pay or cause to be paid all expenses in connection with such repair and restoration of the Project so that the Project, at all times, shall be and remain free and clear from any and all Liens.

(b)     If the Insurance Proceeds are less than or equal to $750,000, Administrative Agent shall deliver such Insurance Proceeds to Borrower to perform the Restoration Work. If the Insurance Proceeds are greater than $750,000, Administrative Agent shall make 90% of the Actual Proceeds available to Borrower as provided in subsection (c) below and the final 10% of the Actual Proceeds (the "<u>Balance</u>") available to Borrower as provided in subsection (d) below. Borrower shall utilize such Actual Proceeds only for the purposes of performing the Restoration Work and for no other purpose whatsoever, except as hereinafter set forth. If the estimated costs of the Restoration Work shall exceed the Actual Proceeds, the difference (the "<u>Excess Funds</u>") shall be deposited in the Restoration

Account. Such Excess Funds shall be applied toward the Restoration Work prior to the application of the Actual Proceeds, all in accordance with the disbursement procedures hereinafter provided. Any unexpended Actual Proceeds remaining after completion of the Restoration Work shall be paid over to Borrower, provided no Event of Default exists or is continuing.

(c)     Any Actual Proceeds held by Administrative Agent shall be paid by Administrative Agent to Borrower from time to time as the Restoration Work progresses, subject to the following terms, provisions and conditions:

(i)     If the Restoration Work is structural or if the cost of the Restoration Work is reasonably estimated to exceed $750,000, the Restoration Work shall be supervised by a registered architect or engineer and inspected by a consultant engaged by Administrative Agent at the sole cost and expense of Borrower (the "Inspector"). Before Borrower commences any Restoration Work, other than temporary Restoration Work to protect property or prevent interference with business, Administrative Agent shall have been furnished with and shall have approved (which approval shall not be unreasonably withheld or delayed) (i) an estimate of the cost of the Restoration Work accompanied by an architect's certification as to such costs and (ii) appropriate plans and specifications ("Plans") for the Restoration Work, it being nevertheless understood that said Plans shall provide for Restoration Work so that, upon completion thereof, the Project shall be comparable in character and equal in value and general utility to the Project prior to the damage or destruction. Borrower shall furnish Administrative Agent with evidence satisfactory to Administrative Agent that all portions of the Project so restored and/or repaired and their contemplated use fully comply with all Legal Requirements;

(ii)     Each request for payment shall be made upon seven (7) days' prior notice to Administrative Agent and shall be accompanied by certificates to be made by the Inspector or, if none shall be required, by an officer of Borrower, stating (aa) that all of the Restoration Work completed has been done in compliance with the approved Plans, if any be required under subsection (c)(i) above, and all Legal Requirements, (bb) that the sum requested is justly required to reimburse Borrower for payments by Borrower, or is justly due to the contractor, subcontractors, materialmen, laborers, engineers, architects or other Persons rendering services or materials for the Restoration Work (giving a brief description of such services and materials), and that (prior to the final completion of the Restoration Work) the requested payment does not exceed the greater of (x) the amount of the requested payment less the retainage required pursuant to the applicable general contract or subcontract or (y) 90% of the value of the Restoration Work performed which is the subject of the requested payment (hereinafter called the "Applicable Percentage") and that all sums previously paid out by Administrative Agent do not exceed the Applicable Percentage of the aggregate value of the Restoration Work done to the date of such certificate, (cc) that if the sum requested is to cover payment relating to repair and restoration of personal property required or relating to the Project, that title to the personal property items covered by the request for payment is vested in Borrower and (dd) that the amount of Actual Proceeds remaining in the hands of Administrative Agent shall be sufficient upon completion of the Restoration Work to pay for the same in full free and clear of Liens. Additionally, each request for payment shall contain a statement signed by an officer or authorized signatory of Borrower approving both the Restoration Work done to date and the Restoration Work covered by the request for payment in question; and

(iii)     Each request shall be accompanied by (aa) invoices or receipts, (bb) waivers of lien reasonably satisfactory to Administrative Agent covering that part of the Restoration Work for which payment or reimbursement is being requested and (cc) if required by Administrative Agent, a search prepared by the Title Company or other evidence satisfactory to Administrative Agent that there has not been filed with respect to the Project any mechanic's or other lien or instrument for the retention of title in respect of any part of the Restoration Work not discharged of record, or that will not be discharged in connection with the requested payment, by payment, bonding or otherwise. If available,

43

Administrative Agent may, at Administrative Agent's option, require an endorsement to the Title Policy insuring the continued priority of the lien of the Deed of Trust as to all sums advanced hereunder, such endorsement to be paid for by Borrower.

(d)     The Balance shall be paid to Borrower only after the Restoration Work has been fully completed and within seven (7) days following the furnishing by Borrower to Administrative Agent of (i) a copy of any certificate or certificates required by law to render occupancy and full operation of the Project legal and (ii) a certification by the Inspector, if applicable, as to completion in accordance with the approved Plans and Legal Requirements and an architect's certificate of completion in the form of AIA-G703.

(e)     At all times during the conduct of the Restoration Work, Borrower shall, at Borrower's sole cost and expense, obtain and cause to be maintained workmen's compensation and public liability insurance in amounts necessary to protect Borrower, Administrative Agent and Lenders from all liabilities, damages, claims or demands arising out of any accident or occurrence causing injury or death to any Person or property whatsoever. All insurance shall be with responsible insurance companies, licensed and authorized to transact business in the State of Texas and shall be written in forms, amounts and by companies reasonably satisfactory to Administrative Agent. The originals or certified copies of all Policies, together with original certificates or evidence thereof, shall be delivered to Administrative Agent. Renewals of such Policies shall be delivered to Administrative Agent at least ten (10) days before any such Policies shall expire. Nothing contained herein shall relieve Borrower from any requirement of this Agreement regarding the insuring of the Project.

(f)     Notwithstanding the terms and provisions of subsections (b), (c) and (d) hereof, in the event that (i) Borrower fails to commence the Restoration Work or to proceed diligently and continuously to completion of the Restoration Work, subject to force majeure delays, within twelve (12) months from the date the Project was damaged or destroyed, (ii) the damage or destruction occurs during the last six (6) months of the term of the Note, unless, in Administrative Agent's reasonable judgment, the required Restoration Work is capable of being completed by not later than ninety (90) days prior to the Maturity Date, (iii) the required Restoration Work is not capable of being completed within eighteen (18) months from the date the Project was damaged or destroyed, in Administrative Agent's reasonable judgment (provided rent or business interruption insurance is in effect for the entire period of reconstruction), or (iv) an Event of Default is continuing, the terms, provisions and condition of subsections (b), (c) and (d) hereof shall not apply and Administrative Agent's option as to the application of Insurance Proceeds shall continue to apply. During the continuance of an Event of Default, Insurance Proceeds may be applied by Administrative Agent in any manner determined by Administrative Agent in its sole and absolute discretion.

Section 8.4. Condemnation. Borrower shall promptly give Administrative Agent notice of the actual or threatened commencement of any proceeding for the Condemnation of the Project of which Borrower has knowledge and shall deliver to Administrative Agent copies of any and all papers served in connection with such proceedings. Administrative Agent and Lenders may participate in any such proceedings, and Borrower shall from time to time deliver to Administrative Agent all instruments requested by Administrative Agent to permit such participation. Borrower shall, at Borrower's sole cost and expense, diligently prosecute any such proceedings, and shall consult with Administrative Agent, Administrative Agent's attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. In the event of such condemnation proceedings, the Award payable is hereby assigned to and shall be paid to Administrative Agent. Administrative Agent shall be under no obligation to question the amount of any such Award and may accept the same in the amount in which the same shall be paid. The proceeds of any Award so received shall (except for a temporary taking the Award for which shall be paid over to Borrower), at the option of Administrative Agent, and in the absence of an

44

Event of Default, either be (i) applied to the prepayment of the Note and other sums due under the Loan Documents, or (ii) to the extent reasonably practicable, paid over to Borrower from time to time for expenses incurred by Borrower in the restoration of the Project and upon terms otherwise satisfactory to Administrative Agent, in Administrative Agent's sole and absolute discretion. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lenders, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lenders shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. To the extent the Project can be restored or repaired following any condemnation, and to the extent Borrower shall be entitled or permitted to do the same, if the Project or any portion thereof is taken by a condemning authority, Borrower shall promptly commence and diligently prosecute the restoration of the Project whether or not such Award is made available to Borrower. If the Project is sold, through foreclosure or otherwise, prior to the receipt by Lenders of the Award, Lenders shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt. Notwithstanding anything to the contrary contained herein, to the extent that the Project can be restored or repaired following any condemnation, as determined by Required Lenders in their sole and absolute good faith discretion, the awards or proceeds from any such condemnation shall be disbursed and paid over to Borrower in the same manner as set forth in Section 8.3 hereof with respect to Insurance Proceeds.

ARTICLE IX
INTENTIONALLY OMITTED

ARTICLE X
EVENTS OF DEFAULT; REMEDIES

Section 10.1. Event of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a)      if any portion of the Debt is not paid within five (5) days after the date the same is due, or if the entire Debt is not paid on or before the Maturity Date;

(b)      if Borrower shall fail to pay any other sum hereunder or under any of the other Loan Documents when and as the same shall become due and payable and such failure shall not be cured within fifteen (15) days after notice from Administrative Agent;

(c)      if the Policies are not kept in full force and effect, or if the Insurance Certificates or certified copies of the Policies are not delivered to Administrative Agent as provided in Section 8.1 hereof;

(d)      if Borrower breaches any covenant with respect to itself contained in Article VI hereof or if Borrower breaches any covenant contained in Article VII hereof, and same is not cured, if capable of being cured, within thirty (30) days after notice;

(e)      if any representation or warranty of any Person comprising Borrower or Guarantor, or with respect to, Borrower, Guarantor or any member, general partner, principal or beneficial owner of Borrower, made herein, in any other Loan Document, or in any certificate, report, financial statement or other instrument or document furnished to Administrative Agent at the time of the

closing of the Loan or during the term of the Loan shall have been false or misleading in any material respect when made;

(f)      if (i) Borrower or Guarantor shall commence any case, proceeding or other action (A) under any Creditors' Rights Laws, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Borrower or Guarantor shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower or Guarantor any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) other than an involuntary proceeding commenced by Administrative Agent or any Lender, there shall be commenced against Borrower or Guarantor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) Borrower or Guarantor shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) Borrower or Guarantor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

(g)      if there should occur a default which is not cured within the applicable grace or cure period, if any, under any other deed of trust encumbering all or part of the Project regardless of whether any such other deed of trust is prior or subordinate to the Deed of Trust or upon default in the performance of any term, provision, covenant or condition, which is not cured within the applicable grace or cure period, if any, under the notes evidencing such deeds of trust or any other documents executed in connection therewith; it being further agreed by Borrower that an Event of Default hereunder shall constitute an event of default under any such other deed of trust in respect of the Project held by Administrative Agent;

(h)      if Borrower shall be in default beyond applicable notice and grace periods under any other loan or financing arrangement between Borrower and any Lender, whether now or hereafter existing;

(i)      if any federal tax lien is filed against Borrower, Guarantor, Borrower Members or the Project and same is not discharged of record or bonded within thirty (30) days after the same is filed;

(j)      if a judgment is filed against Borrower, Guarantor, Borrower Members or the Project which (x) is in excess of $500,000 or (y) in the reasonable judgment of Administrative Agent would materially interfere with such Person's ability to perform its obligations under the Loan Documents to which it is a party, and which is not stayed, vacated, bonded or discharged within thirty (30) days after the same is filed;

(k)      if any Lien is filed or recorded against the Project or any interest therein *with the consent of Borrower* (but without the consent of Administrative Agent), and such Lien is not released within a period of five (5) days of the filing or recording thereof;

(l)      with the exception of Permitted Encumbrances, if any Lien is filed or recorded against the Project or any interest therein without the consent of Borrower or Administrative Agent and such Lien is not removed, discharged or bonded to the satisfaction of Administrative Agent within thirty (30) days of such filing or recording;

46

(m)  if Borrower, Guarantor or any Borrower Member shall breach any of the terms of:

  (i)  Section 5.14 (Liens);

  (ii)  Section 5.19 (Alterations);

  (iii)  Section 5.21 (Notices);

  (iv)  Section 5.23 (Limitations on Securities Issuances);

  (v)  Section 5.24 (Limitations on Distributions);

  (vi)  Section 5.25 (Contractual Obligations);

  (vii)  Section 5.26 (Additional Indebtedness);

  (viii)  Section 5.27 (Restrictions on Leasing);

  (ix)  Section 5.28 (Debt Service Coverage Ratio);

  (x)  Section 5.29 (Loan-to-Value Ratio);

  (xi)  Section 7.2 (No Sale/Encumbrance)

(n)  [Reserved.];

(o)  if Borrower or Guarantor shall continue to be in default under any other term, covenant or condition of this Agreement or any of the Loan Documents for more than ten (10) days after notice from Administrative Agent in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Administrative Agent in the case of any other default, provided that if such default cannot reasonably be cured within such thirty (30)-day period and Borrower or the applicable Guarantor shall have commenced to cure such default within such thirty (30)-day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30)-day period shall be extended for so long as it shall require Borrower or the applicable Guarantor in the exercise of due diligence to cure such default, it being agreed that no such extension shall (i) apply in the event of a default under Section 5.4 or Section 8.1 of this Agreement or (ii) be for a period in excess of one hundred (100) days in the aggregate;

(p)  if a default should occur under any Interest Rate Protection Product entered into by Borrower;

(q)  if there shall occur a default or event of default under the Guaranty which is not cured within any applicable grace or cure period, if any, or the Guaranty shall fail for any reason to be in full force of effect;

(r)  if there shall occur a default or event of default under the Environmental Indemnity Agreement which is not cured within any applicable grace or cure period, if any, or the Environmental Indemnity Agreement shall fail for any reason to be in full force of effect;

(s)  if an ERISA Event shall have occurred that, in the opinion of the Administrative Agent, when taken together with all other ERISA Events that have occurred, results in or could reasonably be expected to result in liability to Borrower in excess of $500,000;

(t)      if Borrower shall file a notice limiting the maximum principal amount that may be secured by the Deed of Trust to a sum less than the maximum principal amount set forth in <u>Section 3.12</u> thereof; or

(u)      if there shall be an Event of Default under the Mezzanine Loan Agreement or any other Mezzanine Loan Document by Mezzanine Borrower or any other Person obligated thereunder.

Section 10.2. <u>Remedies</u>.

(a)      Upon the occurrence of an Event of Default (other than an Event of Default described in <u>Section 10.1(f)</u> hereof) and at any time thereafter that such Event of Default is continuing Administrative Agent and/or Lenders may, in addition to any other rights or remedies available to Administrative Agent or Lenders pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Administrative Agent or Lenders deem advisable to protect and enforce Lenders' rights against Borrower, Guarantor and in the Project, including, without limitation, declaring the Debt to be immediately due and payable, and Administrative Agent and/or Lenders may enforce or avail themselves of any or all rights or remedies provided in the Loan Documents and may exercise all the rights and remedies of a secured party under the UCC, as adopted and enacted by the State where the Project is located, against Borrower, Guarantor and the Project, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in <u>Section 10.1(f)</u> hereof, the Debt and all other obligations of Borrower and Guarantor hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

(b)      Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Administrative Agent or Lenders against Borrower or Guarantor under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or Guarantor or at law or in equity may be exercised by Lenders at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Administrative Agent or Lenders shall have commenced any foreclosure proceeding or other action for the enforcement of Lenders' rights and remedies under any of the Loan Documents with respect to the Project. Any such actions taken by Administrative Agent or Lenders shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Administrative Agent or Lenders may determine in Administrative Agent's or Lenders' sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Administrative Agent or Lenders permitted by law, equity or contract or as set forth herein or in the other Loan Documents.

ARTICLE XI
REPLACEMENT OF LENDERS

If Borrower is entitled to replace a Lender pursuant to the Note (i.e., pursuant to (i) subsection (e) of the section titled "Increased Costs", or (ii) the section titled "Illegality"), Borrower may, upon notice to such Lender and Administrative Agent, replace such Lender by causing such Lender to assign its rights and obligations under this Agreement and the Note to one or more Eligible Assignees reasonably acceptable to Borrower and Administrative Agent. Borrower shall or shall cause the replacement lender to pay in full all principal, interest, fees and other amounts owing to such Lender through the date of replacement. The Lender being replaced and the replacement lender shall execute and deliver an Assignment and Assumption Agreement in the form attached hereto as <u>Exhibit B</u>. A Lender shall not be required to make any such assignment if, prior thereto, as a result of a waiver by such Lender or otherwise,

48

the circumstances entitling the Borrower to require such assignment cease to apply. If a Lender being replaced refuses to execute and deliver such Assignment and Assumption Agreement or otherwise comply with this Article XI, such Lender hereby appoints Administrative Agent as its attorney-in-fact to do so on such Lender's behalf. Administrative Agent shall distribute an amended Schedule 13.12, which shall thereafter be incorporated into this Agreement, to reflect adjustments to Lenders and their respective amount of the Loan.

ARTICLE XII
SECONDARY MARKET; ASSIGNMENT; PARTICIPATION

Section 12.1. Assignment; Participation.

(a)     Any non-Defaulting Lender (as defined in Section 13.16 hereof) may at any time grant to one or more parties (each a "Participant") participating interests in its Pro Rata Share (as hereinafter defined) of the Loan (the "Participations") and Lenders may syndicate the Loan ("Syndication"). In the event of any such grant by a Lender of a Participation to a Participant, such Lender shall remain responsible for the performance of such Lender's obligations hereunder, and Borrower and Administrative Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder. Any agreement pursuant to which any Lender may grant a Participation shall provide that such Lender shall retain the sole right and responsibility to enforce the obligations of Borrower, as the case may be, hereunder and under any other Loan Document, including, without limitation, the right to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document.

(b)     A Lender may at any time assign (x) to any Eligible Assignee with the consent of Administrative Agent, which consent shall not be unreasonably delayed, conditioned or denied, (y) to any other party with the consent of Administrative Agent, which consent may be withheld by Administrative Agent in Administrative Agent's sole and absolute discretion; *provided*, *however*, that as long as no Event of Default has occurred and is continuing, Borrower's consent shall also be required for an assignment pursuant to clauses (x) and (y) (each such assignee set forth in (x) and (y) above, a "Consented Assignee"), or (z) without such consent, to one or more Eligible Assignees which are affiliates, subsidiaries or a parent of a Lender (each Consented Assignee or subsidiary, affiliate or parent bank or institution, an "Assignee") all or a proportionate part of all of such Lender's rights and obligations under this Agreement and the Note, and such Assignee shall assume rights and obligations, pursuant to an Assignment and Assumption Agreement substantially in the form annexed hereto as Exhibit B and made a part hereof executed by such Assignee and the assigning Lender (duplicate executed originals of which shall be delivered to Borrower to the extent available). Upon (i) execution and delivery of such instrument, (ii) payment by such Assignee to the assigning Lender of an amount equal to the purchase price agreed between such Lender and such Assignee and (iii) with respect to a Consented Assignee, payment by such Assignee to Administrative Agent of a fee, for Administrative Agent's own account, in the amount of $5,000, such Assignee shall be a party to this Agreement and shall have all the rights and obligations of a Lender as set forth in such Assignment and Assumption Agreement, and the assigning Lender shall be released from such Lender's obligations hereunder to a corresponding extent, and no further consent or action by any party shall be required. If the Assignee is not incorporated under the laws of the United States or a state thereof, it shall, prior to the first date on which interest or fees are payable hereunder for its account, deliver to Borrower and Administrative Agent certification reasonably acceptable to Borrower as to exemption from deduction or withholding of any United States federal income taxes. Borrower shall not be required to reimburse any Lender for taxes or reimburse any Lender for any withholding due to such Lender's failure to deliver such certification, or due to the validity of such certification. Notwithstanding anything contained herein to the contrary, no Lender shall have the right to assign less than $5,000,000 of such Lender's interest under this Agreement and the other Loan

Documents. For the purposes hereof, an "Eligible Assignee" shall mean any of (a) a commercial bank organized under the laws of the United States, or any state thereof or the District of Columbia, and having total assets in excess of $1,000,000,000; (b) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof or the District of Columbia, and having a net worth of at least $100,000,000, calculated in accordance with generally accepted accounting principles; (c) a commercial bank organized under the laws of any other country which is a member of the OECD, or a political subdivision of any such country and having total assets in excess of $1,000,000,000, provided that such bank is acting through a branch or agency located in the country in which it is organized or another country which is also a member of the OECD; (d) the central bank of any country which is a member of the OECD; (e) any other assignee that, in the reasonable judgment of Administrative Agent, is a reputable institutional investor with substantial experience in lending and originating loans similar to the Loan, or in purchasing, investing in or otherwise holding such loans, having a financial net worth of at least $100,000,000 and (f) any non-Defaulting Lender or any affiliate, subsidiary or parent of any non-Defaulting Lender. Neither Borrower, Guarantor nor any Affiliate or Subsidiary of Borrower or Guarantor shall be Eligible Assignee or Participant. Notwithstanding anything to the contrary contained herein, any Lender may at any time pledge or assign a security interest in all or any portion of its rights under the Loan, the Note and the other Loan Documents to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations under the Loan, the Note or any other Loan Document or substitute any such pledgee or assignee for such Lender as a party to the Loan, the Note or any Loan Document.

(c)     Borrower, Guarantor, Administrative Agent and Lenders shall execute such modifications to the Loan Documents as shall, in the reasonable judgment of Administrative Agent, be necessary or desirable in connection with assignments in accordance with the foregoing provisions of this Section 12.1 and which do not adversely affect Borrower or Guarantor or Borrower's or Guarantor's obligations or rights under the Loan Documents (other than to a *de minimis* extent).

(d)     Any Lender may at any time assign all or any portion of such Lender's rights under this Agreement and the Note to a Federal Reserve Bank. No such assignment shall release the transferor Lender from its obligations hereunder.

(e)     Borrower recognizes that in connection with a Lender's selling of Participations or making of assignments, any or all documentation, financial statements, appraisals and other data, or copies thereof, relevant to Borrower, Guarantor or the Loan may be exhibited to and retained by any such Participant or Assignee or prospective Participant or Assignee. Borrower hereby consents to the release of any and all Borrower information to such parties, and holds Administrative Agent and Lenders harmless from any and all liability due to the release of Borrower's financial information by Administrative Agent or any Lender to any such party. Administrative Agent and Lenders shall instruct such Participant or Assignee to keep such information confidential but Administrative Agent and Lenders shall have no liability if such Participant or Assignee fails to do so.

(f)     Borrower and Guarantor agree to cooperate with Lenders in connection with any sale or transfer of the Loan, Syndication or any Participation created pursuant to this Article XII. At the request of the holder of the Note and, to the extent not already required to be provided by Borrower or Guarantor under this Agreement, Borrower and Guarantor shall take such reasonable actions for the benefit of, and use reasonable efforts to provide information not in the possession of, the holder of the Note in order to satisfy the market standards (which may include such holder's delivery of information with respect to Borrower, Guarantor and the Project to any Participant or Assignee or prospective Participant or Assignee) to which the holder of the Note customarily adheres or which may be reasonably required in the marketplace in connection with such sales or transfers, including, without limitation, to:

50

(i)      provide (x) updated financial, budget and other information with respect to the Project, Borrower, Guarantor and Manager and (y) modifications and/or updates to the appraisals, market studies, Environmental Reports (including Phase I reports and, if appropriate, Phase II reports) of the Project obtained in connection with the making of the Loan (all of the foregoing being referred to as the "Provided Information"), together, if customary, with appropriate verification and/or consents of the Provided Information;

(ii)      make non-material changes to the Organizational Documents of Borrower, Guarantor or its principals;

(iii)      upon reasonable prior notice, permit site inspections, appraisals, market studies and other due diligence investigations of the Project, as may be reasonably requested by the holder of the Note or as may be necessary in connection with the Participations or Syndications;

(iv)      make the representations and warranties with respect to the Project, Borrower, Guarantor, Manager and the Loan Documents as such Persons have made in the Loan Documents and such other representations and warranties with respect to the Project, Borrower, Guarantor and Manager, as may be reasonably requested by the holder of the Note;

(v)      execute such amendments to the Loan Documents as may be requested by the holder of the Note including, without limitation, bifurcation of the Loan into two or more components and/or separate notes and/or creating a senior/subordinate note structure; *provided*, *however*, that Borrower and Guarantor shall not be required to modify or amend any Loan Document if such modification or amendment would (x) change the interest rate or the stated maturity set forth in the Note, except in connection with a bifurcation of the Loan which may result in varying fixed interest rates and amortization schedules, but which shall have the same initial weighted average coupon of the original Note, (y) in the reasonable judgment of Borrower modify or amend any other economic term of the Loan, or (z) in the reasonable judgment of Borrower or Guarantor increase Borrower's or Guarantor's obligations and liabilities under the Loan Documents, other than to a *de minimis* extent; and

(vi)      have reasonably appropriate personnel participate in a bank meeting and/or presentation for the potential Participants or Lenders.

(g)      At the option of Lenders, the Loan may be serviced by a servicer/trustee selected by Lenders ("Servicer") and Lenders may delegate all or any portion of Lenders' responsibilities under this Agreement and the other Loan Documents to such servicer/trustee pursuant to a servicing agreement between Lenders and such servicer/trustee. Lenders shall provide Borrower with notice of same. At no time shall there be more than one (1) Servicer.

(h)      All third party costs and expenses incurred by Borrower, Guarantor or Lenders in connection with Borrower's or Guarantor's complying with the requests and requirements made under this Article XII shall be paid by Lenders (and not by Borrower).

Section 12.2.  Intralinks. Borrower hereby acknowledges that Administrative Agent will make available to Lenders all information provided by or on behalf of Borrower or Guarantor hereunder or under the other Loan Documents (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks® or another similar electronic system (the "Platform").

ARTICLE XIII
AGENT

Section 13.1.  Appointment, Powers and Immunities.

(a)     Each Lender hereby designates, appoints and authorizes Administrative Agent to act as agent hereunder and under the other Loan Documents to which Administrative Agent is a party in its capacity as Administrative Agent (this Agreement and such other Loan Documents, the "Administrative Agent Loan Documents") with such powers as are specifically delegated to Administrative Agent by the terms of this Agreement and such Loan Documents, together with such other powers as are reasonably incidental thereto. Administrative Agent (a) shall have no duties or responsibilities except those expressly set forth in this Agreement and in the other Administrative Agent Loan Documents, and shall not by reason of this Agreement or any other Administrative Agent Loan Document be a trustee or fiduciary for any of Lenders; (b) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose Administrative Agent to liability or that is contrary to any Loan Document or applicable law; (c) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity; (d) shall not be responsible to Lenders for or have any duty to ascertain or inquire into (i) any recitals, statements, representations or warranties contained in this Agreement, any other Administrative Agent Loan Document, or in any certificate or other document referred to or provided for in, or received by any Lenders under, this Agreement or any other Administrative Agent Loan Document, (ii) the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Administrative Agent Loan Document or any other document referred to or provided for herein or therein, (iii) any failure by Borrower to perform any of such party's obligations hereunder or thereunder, or (iv) the satisfaction of any condition set forth herein, other than to confirm receipt of items expressly required to be delivered to Administrative Agent; and (e) shall not be responsible to Lenders for any action taken or omitted to be taken by Administrative Agent hereunder or under any other Administrative Agent Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith, except for Administrative Agent's own gross negligence or willful misconduct or the failure of Administrative Agent to follow the directions of the Required Lenders or all of the Lenders, as the case may be, as provided for herein.

(b)     To the extent that any action is to be taken, any information is to be delivered to or by any Lender, any determination is to be made, or any consent is to be given or withheld by any Lender, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Administrative Agent or any successor agent thereto at the direction of the Required Lenders or all of the Lenders, as the case may be, as provided for herein.

(c)     Administrative Agent may employ agents and attorneys-in-fact and shall not be responsible for the negligence or misconduct of any such agents or attorneys-in-fact selected by Administrative Agent in good faith. Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by Administrative Agent. Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory provisions of this Section 13.1 shall apply to any such sub-agent and to the Affiliates of Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

(d)       Administrative Agent may deem and treat the payee of any note as the holder thereof for all purposes hereof unless and until Administrative Agent shall have been notified of the assignment thereof.

Section 13.2. <u>Reliance by Administrative Agent</u>. Administrative Agent shall be entitled to rely upon, and shall incur no liability under or in respect of any of the Loan Documents by acting upon, any certification, consent, warranty, notice or other paper, instrument or communication (including any thereof by telephone, telecopy, e-mail, telex, telegram or cable) believed by Administrative Agent in good faith to be genuine and authentic and to have been signed or sent by or on behalf of the proper Persons, and upon advice and statements of legal counsel, independent accountants or other experts selected by Administrative Agent in good faith. As to any matters not expressly provided for by this Agreement or any other Administrative Agent Loan Document, Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder or thereunder in accordance with instructions given by Lenders holding sixty-six and two-thirds percent (66 2/3%) or more of the outstanding principal balance of the Loan (the "<u>Required Lenders</u>"), and such instructions of Administrative Agent and any action taken or not taken pursuant thereto shall be binding on all Lenders. Notwithstanding anything contained herein to the contrary, the consent of all of the Lenders (other than a Defaulting Lender) shall be required before Administrative Agent may take or not take any action with respect to the following:

(a)       any increase or decrease in the total principal amount of the Loan;

(b)       reductions in any interest rate (other than default rate interest) applicable to the Loan or any fees (other than late fees) required under this Agreement or any other Loan Document;

(c)       the extension of the Maturity Date of the Note or the due date of any payment due under the Note (other than default interest or late fees);

(d)       the release of all or substantially all of the Project (except as provided for herein and in the other Loan Documents);

(e)       the release of Borrower or Guarantor from Borrower's or such Guarantor's obligations under this Agreement or any other Loan Document; and

(f)       any amendment or modification of any of the provisions of <u>Article XII</u> or this <u>Article XIII</u>.

In the event Administrative Agent sends a notice to any Lender recommending any action (or inaction) to be taken under this Agreement or any other Loan Document and such Lender does not respond to Administrative Agent within ten (10) Business Days of the date of Administrative Agent's notice to such Lender, such Lender shall be deemed to have consented to the action (or inaction) being recommended by Administrative Agent.

Section 13.3. <u>Purchase of Disapproving Lender's Interest</u>.

(a)       In the event Administrative Agent makes a recommendation to Lenders to take any action requiring unanimous consent pursuant to <u>Section 13.2</u> hereof (which recommendation may be made at any time and for any number of times), and one or more Lenders approve such recommendation (the "<u>Approving Lenders</u>") and one or more Lenders disapprove such recommendation (the "<u>Disapproving Lenders</u>"), one or more of the Approving Lenders shall have the right (but not the obligation), in such Approving Lender's sole and absolute discretion, to purchase the interest of the Disapproving Lender in full within thirty (30) days of such disapproval, upon the payment to Administrative Agent of all principal, accrued interest, default interest (but not the payment of any

applicable prepayment premium) due to such Disapproving Lender hereunder, and all amounts advanced by such Disapproving Lender as protective advances under the Deed of Trust as of the date of sale (collectively, the "Purchase Price"), whereupon such Disapproving Lender shall accept payment. In such event, and concurrently with the payment of the Purchase Price, such Disapproving Lender shall assign all of such Disapproving Lender's right, title and interest in and to the Loan and the Loan Documents to the Approving Lender purchasing such Disapproving Lender's interest, without recourse, representation, warranty or covenant, express or implied, of any kind or nature whatsoever, except that such Disapproving Lender has not assigned or encumbered such Lender's rights in the Loan and the Loan Documents.

(b)     Any sale pursuant to Section 13.3(a) hereof shall be made pursuant to documents reasonably satisfactory to Administrative Agent and the purchasing Approving Lender which shall provide, among other things, that the purchasing Approving Lender shall assume all of the obligations of such Disapproving Lender thereafter accruing under the Loan Documents and indemnify such Disapproving Lender from any claims or causes of actions that may arise after the closing date of such sale in connection with the Loan Documents (other than any claims or causes of action that may arise or be brought by Borrower or any third party as the result of the gross negligence or willful misconduct of such Disapproving Lender). The purchasing Approving Lender's right to purchase such Disapproving Lender's interest may be exercised by notice to Administrative Agent of the purchasing Approving Lender's intention to do so and payment by wire transfer of the Purchase Price.

(c)     If there is more than one Approving Lender that elects to purchase a Disapproving Lender's interest in the Loan, Administrative Agent shall apportion such Disapproving Lender's interest among such Approving Lenders in proportion to their Pro Rata Share.

Section 13.4.   Rights of Administrative Agent as Lender. With respect to its interest in the Loan, Administrative Agent in its capacity as a Lender hereunder shall have the same rights and powers hereunder as any other Lender and may exercise the same as though it were not acting as Administrative Agent, and the terms "Lender" and "Lenders" shall include Administrative Agent in its capacity as a Lender. Administrative Agent and Administrative Agent's affiliates may (without having to account therefor to any Lender) accept deposits from, lend money to (on a secured or unsecured basis), and generally engage in any kind of banking, trust or other business with Borrower (and any of Borrower Affiliates) as if it were not acting as Administrative Agent. Lenders and Lenders' Affiliates may (without having to account therefor to any other Lender or Administrative Agent) accept deposits from, lend money to (on a secured or unsecured basis), and generally engage in any kind of banking, trust or other business with Borrower (and any affiliates of them) as if it were not acting as Lender hereunder.

Section 13.5.   Indemnification.

(a)     Lenders agree to indemnify Administrative Agent (to the extent not reimbursed by Borrower and Guarantor hereunder and without limiting any obligations of Borrower hereunder) ratably, in accordance with their Pro Rata Shares, for any and all reasonable costs, fees, expenses, advances, interest, payments and claims of any kind and nature whatsoever that may be imposed on or incurred by Administrative Agent arising out of or by reason of any investigation or in any way relating to or arising out of this Agreement or the transactions contemplated hereby (including, without limitation, the actual out-of-pocket costs and expenses that Administrative Agent is obligated to pay hereunder) or the servicing, administration and/or enforcement of the Loan, this Agreement and/or the Loan Documents (collectively, "Costs") provided that no Lender shall be liable for any of the foregoing Costs to the extent such Costs arise from the gross negligence or willful misconduct of Administrative Agent (as determined by a court of competent jurisdiction from which all appeal has been exhausted) or the failure of Administrative Agent to follow the directions of the Required Lenders or all of the Lenders, as the case

54

may be. The foregoing indemnity shall survive the payment of the obligations owing hereunder and the termination or non-renewal of this Agreement.

(b)     Any request by Administrative Agent for reimbursement of Costs shall be in the form of a certificate from Administrative Agent to each Lender as to the nature and amount for which Administrative Agent claims reimbursement from Lenders pursuant to this Section 13.5. Any such request shall include reasonable evidence that such Costs meet the criteria set forth in Subsection 13.5(a) hereof and have been incurred by Administrative Agent.

(c)     Any Costs which are required to be reimbursed by Lenders to Administrative Agent in accordance with this Section 13.5 and which are not reimbursed to Administrative Agent within three (3) Business Days after demand therefor in accordance with Subsection 13.5(b) hereof shall accrue interest at the Federal Funds Rate from and after the fourth (4th) Business Day after the date that such reimbursement request was made through and including the date of reimbursement by such Lender.

(d)     Any Costs which are subsequently recovered from Borrower or any other Person shall be returned to each Lender in proportion to the Pro Rata Share of said Costs previously remitted by each Lender to Administrative Agent.

Section 13.6. Non-Reliance on Administrative Agent and Other Lenders. Each Lender agrees that such Lender has, independently and without reliance on Administrative Agent or any of the other Lenders, and based on such documents and information as such Lender has deemed appropriate, made such Lender's own credit analysis of Borrower and has made such Lender's own decision to enter into this Agreement and the other Loan Documents and that such Lender shall, independently and without reliance upon Administrative Agent or any of the other Lenders, and based on such documents and information as such Lender shall deem appropriate at the time, continue to make such Lender's own analysis and decisions in taking or not taking action under this Agreement and the other Loan Documents. Other than determining whether payments due to Administrative Agent under the Loan Documents have in fact been made, Administrative Agent shall not be required to keep itself informed as to the performance or observance by Borrower of any term or provision of this Agreement or any of the other Loan Documents or any other document referred to as provided for herein or therein or to inspect the properties or books of Borrower. Administrative Agent shall provide each Lender with any information received by Administrative Agent from Borrower which is required to be provided to Lenders hereunder and with a copy of any notice of default received by Administrative Agent from Borrower or any Lender. Except for notices, reports and other documents expressly required to be furnished to Lenders by Administrative Agent hereunder or under any other Administrative Agent Loan Document, Administrative Agent shall not have any duty or responsibility to provide any Lender with any other credit or other information concerning the affairs, financial condition or business of Borrower that may come into the possession of Administrative Agent.

Section 13.7. Failure to Act. Except for action expressly required of Administrative Agent hereunder or under any of the other Administrative Agent Loan Documents, Administrative Agent shall in all cases be fully justified in failing or refusing to act hereunder and thereunder unless Administrative Agent shall receive further assurances to Administrative Agent's complete satisfaction from Lenders of their indemnification obligations under Section 13.5 hereof against any and all liability and expense that may be incurred by Administrative Agent by reason of Administrative Agent taking or continuing to take or failing to take any such action.

Section 13.8. Action by Administrative Agent. Each of the entities comprising Lenders hereby appoints Administrative Agent and each of the other Lenders as agent and bailee for the purpose of perfecting the security interests in and liens upon the Project, in accordance with Article 9 of the Uniform

Commercial Code in effect in the State where the Project is located or the State where Borrower is organized, can be perfected only by possession (or where the security interest of a secured party with possession has priority over the security interest of another secured party). Each Lender hereby appoints Administrative Agent as such Lender's attorney-in-fact for the purpose of executing the Loan Documents (other than this Agreement) on such Lender's behalf.

Section 13.9. <u>Successor Administrative Agent</u>. Administrative Agent may resign as Administrative Agent upon thirty (30) days' written notice to Lenders. If Administrative Agent resigns under this Agreement, Lenders (other than the Lender which is the Administrative Agent resigning) shall appoint from among the other Lenders a successor agent for Lenders. If no successor agent is appointed prior to the effective date of the resignation of Administrative Agent, Administrative Agent may appoint, after consulting with Lenders (other than the Lender which is the Administrative Agent resigning), a successor agent from among such other Lenders. Upon the acceptance by the Lender so selected of such Lender's appointment as successor agent hereunder, such successor agent shall succeed to all of the rights, powers and duties of the retiring Administrative Agent and the term "Administrative Agent" as used herein and in the other Loan Documents shall mean such successor agent and the retiring Administrative Agent's appointment, powers and duties as Administrative Agent shall be terminated. After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this <u>Article XIII</u> shall inure to such retiring Administrative Agent's benefit as to any actions taken or omitted by such retiring Administrative Agent while such retiring Administrative Agent was Administrative Agent under this Agreement. If no successor agent has accepted appointment as Administrative Agent by the date which is thirty (30) days after the date of a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nonetheless thereupon become effective and Lenders shall perform all of the duties of Administrative Agent hereunder until such time, if any, as the Lenders (other than the Lender which has resigned as Administrative Agent) appoint a successor agent as provided for above. The resigning Administrative Agent shall have continuing liability for any act of gross negligence or willful misconduct committed by Administrative Agent during the period such Administrative Agent was the Administrative Agent under this Agreement.

Section 13.10. <u>Sharing</u>. If at any time or times any Lender shall receive (i) by payment, foreclosure, setoff or otherwise, any proceeds of the Project or other collateral or any payments with respect to the obligations of Borrower to such Lender arising under, or relating to, this Agreement or any of the Loan Documents except for any such proceeds or payments received by such Lender from Administrative Agent or otherwise pursuant to the terms of this Agreement, or (ii) payments from Administrative Agent hereunder in excess of such Lender's ratable portion of the relevant distributions by Administrative Agent hereunder, such Lender shall promptly turn the same over to Administrative Agent, in kind, and with such endorsements as may be required to negotiate the same to Administrative Agent, or in same day funds, as applicable, for the account of all of the Lenders and for application to the obligations hereunder in accordance with the applicable provisions of this Agreement.

Section 13.11. <u>Pro Rata Treatment and Payments</u>.

(a) <u>Funding by Lenders; Presumption by Administrative Agent</u>. With respect to any advance required or deemed necessary by Administrative Agent under this Agreement or any other Loan Document (each, a "<u>Coverage Advance</u>"), Administrative Agent shall give each Lender not less than three (3) Business Days' notice by telephone and facsimile specifying the amount of the Coverage Advance, the date of the Coverage Advance and each Lender's Pro Rata Share of such Coverage Advance. Each Lender shall wire transfer to Administrative Agent immediately available federal funds equal to such Lender's Pro Rata Share of each Coverage Advance by 11:00 a.m. (New York City time) on the day of the Coverage Advance as set forth in the notice. Unless Administrative Agent shall have received notice from a Lender prior to the proposed date of any Coverage Advance that such Lender will not make

4161624-v7\CHIDMS1

available to Administrative Agent such Lender's Pro Rata Share of such Coverage Advance, Administrative Agent may assume that such Lender has made such Pro Rata Share available on such date in accordance with this Section and may, in reliance upon such assumption, make available to Borrower a corresponding amount. In such event, if a Lender has not in fact made its Pro Rata Share of the applicable Coverage Advance available to Administrative Agent, then the applicable Lender and Borrower severally agree to pay to Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to Borrower to but excluding the date of payment to Administrative Agent, at (i) in the case of a payment to be made by such Lender, a rate (the "Lender Interest Rate") equal to the greater of (x) the sum of (1) the Federal Funds Rate in effect from time to time and (2) one percent (1%) per annum and (y) a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation, and (ii) in the case of a payment to be made by Borrower, the Interest Rate. If Borrower and such Lender shall pay such interest to Administrative Agent for the same or an overlapping period, Administrative Agent shall promptly remit to Borrower the amount of such interest paid by Borrower for such period. If such Lender pays its Pro Rata Share of the applicable Coverage Advance to Administrative Agent, then the amount so paid shall constitute such Lender's Pro Rata Share of the applicable Coverage Advance. Any payment by Borrower shall be without prejudice to any claim Borrower may have against a Lender that shall have failed to make such payment to Administrative Agent.

(b)　　Notices. Notices to each Lender shall be delivered in accordance with the terms and provisions of Section 15.1 hereof.

Section 13.12. Lenders Pro Rata Shares. Each Lender shall be entitled to receive, and Administrative Agent shall transfer to each Lender, each Lender's Pro Rata Share of all payments received and collected by Administrative Agent pursuant to the Loan Documents on account of principal and interest (collectively, "Debt Service Payments") and other sums, whether received from Borrower or any third party, excluding, however, any sums payable to Administrative Agent on account of expenses incurred by Administrative Agent for which Borrower is obligated to reimburse Administrative Agent pursuant to the Loan Documents to the extent that any Lender has not made a payment on account thereof pursuant to Section 13.5 hereof. For the purposes hereof, "Pro Rata Share" means, with respect to any Lender, the percentage obtained by dividing (a) the principal amount of the Loan attributable to such Lender as set forth on Schedule 13.12 annexed hereto and made a part hereof, as adjusted for any repayments of principal received by such Lender pursuant to this Agreement, by (b) the then outstanding aggregate principal amount of the Loan.

Section 13.13. Disbursement of Proceeds by Administrative Agent.

(a)　　Administrative Agent shall hold each Lender's Pro Rata Share of any proceeds payable under the Loan, however received, as agent of and in trust for each of such Lenders subject to each of such Lenders' rights with respect thereto as herein set forth.

(b)　　All sums received and collected by Administrative Agent pursuant to the Loan Documents on account of Debt Service Payments and other sums which are collected by 11:00 a.m. (New York City time) shall be paid to each Lender on the date of collection; all such sums collected by Administrative Agent after 11:00 a.m. (New York City time) shall be paid to each Lender on or before the next succeeding Business Day. Administrative Agent shall allocate and disburse to each Lender all payments received in proportion to each Lender's Pro Rata Share. All payments made by Administrative Agent to Lenders shall be made by deposit of immediately available funds pursuant to the wiring instructions set forth on the signature page hereof or as otherwise set forth in a written notice delivered from any Lender to Administrative Agent.

(c)     Unless Administrative Agent shall have received notice from Borrower prior to the date on which any payment is due to Administrative Agent for the account of the Lenders hereunder that Borrower will not make such payment, Administrative Agent may assume that Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption and pursuant to the foregoing paragraphs, distribute to the Lenders the amount due. In such event, if Borrower has not in fact made such payment or for any reason such payment is required to be returned to Borrower or paid to any other Person pursuant to any bankruptcy or insolvency law, any sharing clause in the Loan Documents or otherwise, then each of the Lenders severally agrees to repay to Administrative Agent forthwith on demand the amount so distributed to such Lender, without interest thereon, unless Administrative Agent is required to return such amount with interest thereon, in which case, with interest thereon at the Lender Interest Rate for each day from and including the date such amount is distributed to such Lender to but excluding the date of payment to Administrative Agent, unless such payment was made as a result of the gross negligence or willful misconduct of Administrative Agent, in which case Lenders shall not pay any interest on such payment.

(d)     The transfer of funds to any Lender by Administrative Agent is made on a nonrecourse basis. Administrative Agent shall have no duty or obligation whatsoever to make any payments to any Lender except from corresponding payments received by Administrative Agent from Borrower or any other Person pursuant to the Loan Documents.

Section 13.14.  Amendments Concerning Agency Function.  Notwithstanding anything to the contrary contained in this Agreement, Administrative Agent shall not be bound by any waiver, amendment, supplement or modification of this Agreement or any other Loan Document which affects Administrative Agent's duties, rights, and/or functions hereunder or thereunder unless Administrative Agent shall have given Administrative Agent's prior written consent thereto.

Section 13.15.  Events of Default.

(a)     Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Event of Default unless and until Administrative Agent has received written notice from a Lender or Borrower specifying such Event of Default.

(b)     In the event of the occurrence of an Event of Default and if Administrative Agent, in Administrative Agent's sole and absolute discretion, determines that any action is to be taken by Administrative Agent on behalf of Lenders in connection therewith, Administrative Agent shall send a notice (the "Action Notice") to each Lender recommending a course of action (which may include a recommendation to refrain from taking any action) and Lenders shall promptly consult in good faith to either confirm Administrative Agent's suggested course of action (or inaction) or to arrive at a course of action which shall be mutually acceptable to all Lenders in their reasonable discretion. Such course of action shall address, amongst other issues, (i) the exercise of remedies and the manner in which a foreclosure or additional remedies shall be conducted, (ii) the interests of all of the Lenders at a foreclosure sale or auction and whether Lenders or their nominees shall succeed to title to the Project or any other collateral and (iii) issues pertaining to the operation, management, maintenance, leasing and/or the sale of the Project or any other collateral. Administrative Agent shall promptly and diligently implement any such agreed upon course of action (or inaction) on behalf of Lenders. Notwithstanding anything to the contrary contained herein, if Lenders are unable to agree on a course of action (or inaction) within ten (10) Business Days of the date of the Action Notice, Administrative Agent shall have the right (but not the obligation), upon notice to Lenders, to take such course of action (or refrain from taking such action) as Administrative Agent deems appropriate and Administrative Agent may continue to proceed on such course of action, or refrain from taking such action, until Administrative Agent receives notice to the contrary from the Required Lenders ("Agent Discretion Standard"). Provided and on condition that

Administrative Agent has acted in accordance with this <u>Subsection 13.15(b)</u> and the Agent Discretion Standard, Lenders hereby acknowledge and agree that Administrative Agent shall have no obligation to take any action unless failure to do so would be grossly negligent or rise to the level of willful misconduct.

(c)     Provided that Lenders have agreed to a foreclosure or auction in accordance with <u>Subsection 13.15(b)</u> hereof (or Administrative Agent has exercised the Agent Discretion Standard), upon a foreclosure sale or auction and subject to the terms and provisions of this Agreement, Administrative Agent shall have the right to bid at the foreclosure sale or auction on behalf of Lenders. Any bid entered by Administrative Agent in an amount not in excess of the total indebtedness due under the Note plus expenses and all other amounts which are recoverable from the proceeds of the sale (collectively, the "<u>Judgment Amount</u>") shall be deemed to have been entered on behalf and for the benefit of Lenders, and, if such bid is the successful bid, Administrative Agent shall cause a referee's deed (as to the Project) or the applicable title instrument (as to all other collateral) to be issued to Administrative Agent (or Administrative Agent's nominee) in trust for Lenders, and Administrative Agent (or Administrative Agent's nominee) shall hold title subject to the terms and provisions of <u>Subsection 13.15(d)</u> and <u>Subsection 13.15(e)</u> hereof on behalf of, and as trustee for, Lenders.

(d)     Administrative Agent and Lender hereby acknowledge and agree that if title to (i) the Project or (ii) any other collateral is obtained by Administrative Agent (or Administrative Agent's nominee) for the benefit of Administrative Agent and Lenders, such asset(s) shall not be held as a permanent investment, but shall be marketed and sold as soon as possible, taking into account then current economic and market conditions. Subject to <u>Subsection 13.15(b)</u> hereof, each Lender shall, upon demand therefor from time to time, contribute such Lender's Pro Rata Share of all costs, fees and expenses (including, without limitation, attorney's fees and disbursements) suffered or incurred by Administrative Agent (or Administrative Agent's nominee) in connection with the operation, management, maintenance, leasing and/or sale of all or any part of the Project or any other collateral. Funds received from the ownership, operation or sale of the Project or any other collateral (net of operating expenses or transaction costs in connection with such ownership, operation or sale) shall constitute Debt Service Payments and shall be applied first, to reimburse Administrative Agent for any Costs, and thereafter, in accordance with <u>Section 13.13</u> hereof. Lenders shall consult with Administrative Agent and attempt to determine a mutually acceptable course of action relating to, but not limited to, the management, operation and leasing of the Project and any other collateral as well as the sale of the Project and any other collateral; *provided*, *however*, if Lenders cannot agree on a mutually acceptable course of action, Administrative Agent shall have the right (but not the obligation) to apply the Agent Discretion Standard upon notice to Lenders.

(e)     Notwithstanding anything to the contrary contained herein, each Lender shall have the right to enter a bid in an amount in excess of the Judgment Amount and, if such bid is the successful bid, such Lender shall acquire the Project or other collateral, as the case may be, for such Lender's own account and, provided and on the condition that the non-bidding party is, by not later than the date of delivery to the bidding party (or such bidding party's nominee) of the referee's deed or other title instrument, paid in full all amounts owed to the non-bidding party under the Loan and this Agreement, the non-bidding party shall have no further interest in the Project or other collateral, as the case may be, and the terms and provisions of <u>Subsection 13.15(b)</u> hereof shall be null and void and of no further force or effect.

Section 13.16. <u>Defaulting Lender</u>.

(a)     In addition to the rights and remedies that may be available to Administrative Agent or Borrower under this Agreement or applicable law, if at any time any Lender has not performed such Lender's obligations under this Agreement or any of the other Loan Documents (a "<u>Defaulting</u>

Lender") and such default continues for twenty (20) days after notice, such Defaulting Lender's right to participate in the administration of the Loan, this Agreement and the other Loan Documents, including, without limitation, any right to vote in respect of, to consent to or to direct any action or inaction of Administrative Agent or to be taken into account in the calculation of the Required Lenders, shall be suspended while such Lender remains a Defaulting Lender. If any Lender is a Defaulting Lender because such Lender has failed to make timely payment to Administrative Agent of any amount required to be paid to Administrative Agent hereunder, in addition to other rights and remedies which Administrative Agent or Borrower may have under the immediately preceding provisions or otherwise, Administrative Agent shall be entitled (i) to collect interest from such Defaulting Lender on such delinquent payment for the period from the date on which the payment was due until the date on which the payment is made at the Lender Interest Rate, (ii) to withhold or setoff and to apply in satisfaction of the defaulted payment and any related interest, any amounts otherwise payable to such Defaulting Lender under this Agreement or any other Loan Document until such defaulted payment and related interest has been paid in full and such default no longer exists and (iii) to bring an action or suit against such Defaulting Lender in a court of competent jurisdiction to recover the defaulted amount and any related interest. Any amounts received by Administrative Agent in respect of a Defaulting Lender shall not be paid to such Defaulting Lender and shall be held uninvested by Administrative Agent and either applied against the purchase price of such Defaulting Lender's interest in the Loan under Subsection 13.16(b) hereof or paid to such Defaulting Lender upon the default of such Defaulting Lender being cured.

(b)     Any Lender that is not a Defaulting Lender shall have the right, but not the obligation, in such Lender's sole and absolute discretion, to acquire all of a Defaulting Lender's interest in the Loan (the "Defaulting Lender's Interest") during the continuance of the applicable default. Upon any such purchase, the Defaulting Lender's Interest and the Defaulting Lender's rights hereunder (but not the Defaulting Lender's liability in respect thereof or under the Loan Documents or this Agreement to the extent the same relate to the period prior to the effective date of the purchase) shall terminate on the date of purchase, and the Defaulting Lender shall promptly execute all documents reasonably requested to surrender and transfer such interest to the purchaser thereof, including an assignment substantially in form and substance as set forth in Exhibit B annexed hereto and made a part hereof. The purchase price for the Defaulting Lender's Interest shall be equal to the amount of the principal balance of the Loan outstanding and owed by Borrower to the Defaulting Lender. The purchaser shall pay to the Defaulting Lender in immediately available funds on the date of such purchase the principal of and accrued and unpaid interest and fees with respect to the Defaulting Lender's Interest (it being understood that such accrued and unpaid interest and fees may be paid pro rata to the purchasing Lender and the Defaulting Lender by the Administrative Agent at a subsequent date upon receipt of payment of such amounts from Borrower). Prior to payment of such purchase price to a Defaulting Lender, Administrative Agent shall apply against such purchase price any amounts retained by Administrative Agent pursuant to the last sentence of Subsection 13.16(a) hereof. The Defaulting Lender shall be entitled to receive amounts owed to such Defaulting Lender by Borrower under the Loan Documents which accrued prior to the date of the default by the Defaulting Lender, to the extent the same are received by Administrative Agent from or on behalf of Borrower. There shall be no recourse against any Lender or Administrative Agent for the payment of such sums except to the extent of the receipt of payments from any other party or in respect of the Loan.

(c)     Nothing contained in this Section 13.16 or elsewhere in this Agreement shall release or in any way limit a Defaulting Lender's obligations as a Lender hereunder and/or under any other of the Loan Documents. Further, a Defaulting Lender shall indemnify and hold harmless Borrower, Administrative Agent and each of the non-Defaulting Lenders from any claim, loss, or costs incurred by Borrower, Administrative Agent and/or the non-Defaulting Lenders as a result of a Defaulting Lender's failure to comply with the requirements of this Agreement, including, without limitation, any and all additional losses, damages, costs and expenses (including, without limitation, attorneys' fees and

disbursements) incurred by Borrower, Administrative Agent and/or any Lender as a result of and/or in connection with (i) any enforcement action brought by Borrower and/or Administrative Agent against a Defaulting Lender and (ii) any action brought against Borrower, Administrative Agent and/or Lenders by a Defaulting Lender. The indemnification provided above shall survive any termination of this Agreement.

Section 13.17. <u>Servicing Fee</u>. Administrative Agent shall be entitled, on a monthly basis, to a servicing fee in an amount to be determined by Administrative Agent based on a percentage of the outstanding principal balance of the Loan (the "<u>Servicing Fee</u>"). Lenders hereby irrevocably authorize Administrative Agent to deduct the Servicing Fee monthly from the Debt Service Payments to be made to Administrative Agent.

<div align="center">

ARTICLE XIV
INDEMNIFICATIONS

</div>

Section 14.1. <u>General Indemnification</u>. Borrower shall indemnify, defend and hold harmless the Indemnified Parties, or Borrower shall cause the Indemnified Parties to be indemnified, defended and held harmless, from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any accident, injury to or death of Persons or loss of or damage to property occurring in, on or about the Project or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Project or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Project or any part thereof; (d) any failure of the Project to be in compliance with any applicable Legal Requirements or (e) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the Loan (collectively, the "<u>Indemnified Liabilities</u>"); *provided*, *however*, that Borrower shall not have any obligation to Lenders hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of Administrative Agent or Lenders. To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Lenders. Administrative Agent agrees that, so long as the Existing Leases shall continue to be in full force and effect, Borrower's indemnification, defense and holding harmless obligations to the Indemnified Parties under this <u>Section 14.1</u> may be satisfied by the applicable Tenants under the corresponding obligations of the Existing Leases; *provided*, *however*, the foregoing shall not act to, or be deemed to, release, relinquish or relieve Borrower from Borrower's obligations to indemnify the Indemnified Parties in accordance with the terms of this <u>Section 14.1</u> to the extent that the Tenant(s) fail, refuse, delay or are otherwise unable or unwilling to do so.

Section 14.2. <u>Intangible Tax Indemnification</u>. Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any stamp or similar intangible tax on the making of the Deed of Trust, the Note or any of the other Loan Documents, excluding, for purposes of clarity, any income, franchise or other similar taxes, or U.S. federal withholding taxes imposed under FATCA as a result of the failure by a Lender to comply with the applicable provisions of FATCA.

Section 14.3. <u>ERISA Indemnification</u>. Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation,

<div align="center">61</div>

defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Administrative Agent's sole and absolute discretion) that Administrative Agent or Lenders may incur, directly or indirectly, as a result of a default under <u>Section 4.9</u> or <u>Section 5.17</u> hereof.

Section 14.4. <u>Survival</u>. The obligations and liabilities of Borrower under this <u>Article XIV</u> shall fully survive indefinitely notwithstanding any termination, satisfaction, or assignment of the Deed of Trust.

<div align="center">

ARTICLE XV

NOTICES

</div>

Section 15.1. <u>Notices</u>. All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested, or (b) expedited prepaid overnight delivery service, either commercial or United States Postal Service, with proof of attempted delivery, addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section):

| | |
|---|---|
| If to Lenders: | See address and telephone number specified for such Lender on <u>Schedule 15.1</u> |
| If to Administrative Agent: | National Bank of Kuwait, S.A.K.P., New York Branch<br>299 Park Avenue<br>New York, New York 10171<br>Attention: Corporate Finance |
| With a copy to: | Baker & McKenzie LLP<br>300 E. Randolph St., Suite 5000<br>Chicago, Illinois 60601<br>Attention: Mona Dajani, Esq. |
| If to Borrower: | Galleria 2425 Owner, LLC<br>3139 W Holcombe Blvd #845<br>Houston, Texas  77025<br>Attention: Azeemeh Zaheer |
| With copies to: | Polsinelli<br>2950 Harwood Street, Suite 2100<br>Dallas, Texas 75201<br>Attention: Brian Bullard, Esq. |

A notice shall be deemed to have been given: (i) in the case of hand delivery, at the time of delivery; (ii) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; or (iii) in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day.

<div align="center">

ARTICLE XVI

FURTHER ASSURANCES

</div>

Section 16.1. <u>Replacement and Corrective Documents</u>. Upon receipt of an affidavit of an officer of Administrative Agent as to the loss, theft, destruction or mutilation of the Note or any other Loan

<div align="center">62</div>

Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Document, Borrower and Guarantor shall issue, in lieu thereof, a replacement Note or other Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor. Borrower and Guarantor hereby consent and agree that in the event that any of the Loan Documents misstate or inaccurately reflect the true and correct terms and provisions of the Loan and said misstatement or inaccuracy is due to the unilateral mistake on the part of Lenders or Administrative Agent, mutual mistake on the part of any of Administrative Agent, Lenders, Borrower and Guarantor or clerical error, then in such event Borrower and Guarantor shall, within thirty (30) days after written request of Administrative Agent and in order to correct such misstatement or inaccuracy, execute such new documents as Administrative Agent may deem necessary to remedy said inaccuracy or mistake.

Section 16.2. <u>Further Acts, Etc</u>. Subject to <u>Article XII</u> hereof, Borrower and Guarantor shall, at the cost and expense of Borrower and Guarantor, and without expense to Lenders or Administrative Agent, do, execute, acknowledge and deliver all and every further acts, deeds, conveyances, assignments, security agreements, control agreements, notices of assignments, transfers and assurances as Administrative Agent shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lenders the rights hereby granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower or Guarantor may be or may hereafter become bound to convey or assign to Lenders, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing or registering of the Deed of Trust, or for complying with all Legal Requirements. Borrower and Guarantor, on demand, shall deliver, and in the event Borrower or Guarantor shall fail to so deliver, hereby authorizes Administrative Agent to file, in the name of Borrower and Guarantor, one or more financing statements and financing statement amendments to evidence more effectively, perfect and maintain the priority of the security interest of Lenders in the Project. Borrower and Guarantor grant to Lenders and Administrative Agent an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lenders or Administrative Agent at law and in equity, including, without limitation, such rights and remedies available to Lenders or Administrative Agent pursuant to this <u>Section 16.2</u>.

Section 16.3. <u>Changes in Tax, Debt, Credit and Documentary Stamp Law</u>.

(a)     If any law is enacted or adopted or amended after the date of this Agreement which deducts the Debt from the value of the Project for the purpose of taxation with the result that taxes are imposed on the Lenders, Borrower shall pay the tax, with interest and penalties thereon, if any, other than U.S. federal withholding taxes imposed under FATCA as a result of the failure by a Lender to comply with the applicable provisions of FATCA. If Lenders are advised by counsel chosen by Lenders that the payment of such tax by Borrower would be unlawful or taxable to Lenders (unless any such tax is reimbursed by Borrower) or unenforceable or provides the basis for a defense of usury then Lenders shall have the option by written notice of not less than one hundred twenty (120) days to declare the Debt immediately due and payable. Borrower shall not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Project, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Project, or any part thereof, for real estate or personal property tax purposes by reason of the Deed of Trust or the Debt if such claim, credit or deduction has the effect of imposing a tax on Lenders. If such claim, credit or deduction shall be required by law, Lenders shall have the option, by written notice of not less than one hundred twenty (120) days, to declare the Debt immediately due and payable.

(b)     If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, the Deed of Trust, or any

of the other Loan Documents or impose any other tax or charge on the same, Borrower shall pay for the same, with interest and penalties thereon, if any.

Section 16.4. <u>Expenses</u>. Borrower covenants and agrees to pay or reimburse, as applicable, Lenders and Administrative Agent upon receipt of written notice from Administrative Agent for all actual costs and expenses (including reasonable third party attorneys' fees and disbursements) incurred by Administrative Agent and Lenders in accordance with this Agreement in connection with (a) the preparation, negotiation, execution and delivery of this Agreement, the Deed of Trust and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower and Guarantor (including, without limitation, any opinions reasonably requested by Administrative Agent as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Project); (b) Borrower's and Guarantor's ongoing performance of and compliance with Borrower's and Guarantor's agreements and covenants contained in this Agreement, the Deed of Trust and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (c) [Reserved.] (d) subject to <u>Article XII</u> hereof, the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents; (e) securing Borrower's and Guarantor's compliance with any requests reasonably made pursuant to the provisions of this Agreement; (f) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Administrative Agent all required legal opinions, and other similar expenses reasonably incurred in creating and perfecting the Lien in favor of Lenders pursuant to this Agreement, the Deed of Trust and the other Loan Documents; (g) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower or Guarantor, this Agreement, the other Loan Documents, the Project, or any security given for the Loan; and (h) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Project or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings.

<div align="center">ARTICLE XVII<br/>WAIVERS</div>

Section 17.1. <u>Remedies Cumulative; Waivers</u>. The rights, powers and remedies of Administrative Agent and Lenders under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Administrative Agent or Lenders may have against Borrower or Guarantor pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lenders' rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lenders may determine in Lenders' sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower or Guarantor shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

Section 17.2. <u>Modification, Waiver in Writing</u>. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower or Guarantor therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower or

<div align="center">64</div>

Guarantor shall entitle Borrower or such Guarantor to any other or future notice or demand in the same, similar or other circumstances.

Section 17.3. <u>Delay Not a Waiver</u>. Neither any failure nor any delay on the part of Administrative Agent or Lenders in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Administrative Agent and Lenders shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 17.4. <u>Trial by Jury</u>. BORROWER, ADMINISTRATIVE AGENT AND LENDERS EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, ADMINISTRATIVE AGENT AND LENDERS, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF LENDERS, ADMINISTRATIVE AGENT AND BORROWER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER, ADMINISTRATIVE AGENT AND LENDERS.

Section 17.5. <u>Waiver of Notice</u>. Borrower and Guarantor shall not be entitled to any notices of any nature whatsoever from Administrative Agent or Lenders except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Administrative Agent or Lenders to Borrower and Guarantor and except with respect to matters for which Borrower or Guarantor is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice. Borrower hereby expressly waives the right to receive any notice from Administrative Agent or Lenders with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Administrative Agent or Lenders to Borrower.

Section 17.6. <u>Remedies of Borrower</u>. In the event that a claim or adjudication is made that Administrative Agent or Lenders or Administrative Agent's or Lenders' agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Administrative Agent, Lenders or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that Administrative Agent, Lenders and Administrative Agent's and Lenders' agents shall not be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Administrative Agent or Lenders have acted reasonably shall be determined by an action seeking declaratory judgment. Administrative Agent and Lenders agrees that, in such event, it shall cooperate in expediting any action seeking injunctive relief or declaratory judgment.

Section 17.7. <u>Waiver of Marshalling of Assets</u>. To the fullest extent permitted by law, Borrower for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower and

other Persons with interests in Borrower, and of the Project, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lenders under the Loan Documents to a foreclosure of the Deed of Trust for the collection of the Debt without any prior or different resort for collection or of the right of Lenders to the payment of the Debt out of the net proceeds of the Project in preference to every other claimant whatsoever.

Section 17.8. <u>Waiver of Statute of Limitations</u>. Borrower hereby expressly waives and releases, to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its other obligations set forth in the Loan Documents.

Section 17.9. <u>Waiver of Counterclaim</u>. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lenders or Administrative Agent or Lenders' or Administrative Agent's agents.

<div align="center">

ARTICLE XVIII
GOVERNING LAW

</div>

Section 18.1. <u>Choice of Law</u>.

(i) THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDERS AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT THE DEED OF TRUST, THE ASSIGNMENT OF LEASES AND RENTS AND THE OTHER LOAN DOCUMENTS (OTHER THAN WITH RESPECT TO LIENS AND SECURITY INTERESTS IN PROPERTY WHOSE PERFECTION AND PRIORITY IS COVERED BY ARTICLE 9 OF THE UCC (INCLUDING, WITHOUT LIMITATION, THE ACCOUNTS) WHICH SHALL BE GOVERNED BY THE LAW OF THE JURISDICTION APPLICABLE THERETO IN ACCORDANCE WITH SECTIONS 9-301 THROUGH 9-307 OF THE UCC AS IN EFFECT IN THE STATE OF NEW YORK) SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROJECT IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE

LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW EXCEPT AS SPECIFICALLY SET FORTH ABOVE.

(ii)       ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ADMINISTRATIVE AGENT, ANY LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY AT ADMINISTRATIVE AGENT'S OR LENDERS' OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:

> Capitol Services, Inc.
> 1218 Central Avenue, Suite 100
> Albany, NY 12205

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS TOGETHER WITH WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. BORROWER (I) SHALL GIVE PROMPT NOTICE TO ADMINISTRATIVE AGENT OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

(iii)       Borrower, Administrative Agent and Lenders hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably submit to the exclusive jurisdiction of any New York State or Federal court sitting in New York County over any suit, action or proceeding arising out of or relating to this Agreement, and each such party hereby agrees and consents that, in addition to any methods of service of process provided for under applicable law, all service of process in any such suit, action or proceeding in any New York State or Federal court sitting in New York County may be made by certified or registered mail, return receipt requested, directed to such party at the address indicated on the first page of this Agreement or in Section 15.1 hereof, as applicable, and service so made shall be complete three (3) days after the same shall have been so mailed.

Section 18.2. Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 18.3. <u>Preferences</u>. Lenders shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower or Guarantor hereunder in connection with any payment deemed to be fraudulent or an impermissible preference payment under applicable Legal Requirements. To the extent Borrower or Guarantor makes a payment or payments to Lenders, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Creditors' Rights Laws, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lenders.

<div align="center">ARTICLE XIX<br>MISCELLANEOUS</div>

Section 19.1. <u>Survival</u>. This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the entering into by Lenders of this Agreement and the execution and delivery to Lenders of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower shall inure to the benefit of the successors and assigns of Lenders.

Section 19.2. <u>Administrative Agent's Discretion</u>. Whenever pursuant to this Agreement, Administrative Agent exercises any right given to Administrative Agent to approve or disapprove, or any arrangement or term is to be satisfactory to Administrative Agent, the decision of Administrative Agent to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the reasonable discretion of Administrative Agent.

Section 19.3. <u>Headings</u>. The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 19.4. <u>Cost of Enforcement</u>. In the event (a) that the Deed of Trust is foreclosed in whole or in part, (b) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or Guarantor or any of Borrower Members, Borrower's constituent Persons or Subsidiaries or an assignment by Borrower or Guarantor or any of Borrower Members, Borrower's constituent Persons or Subsidiaries for the benefit of its creditors, or (c) Lenders exercise any of its other remedies under this Agreement or any of the other Loan Documents, Borrower shall be chargeable with and agrees to pay all costs of collection and defense, including attorneys' fees and costs, incurred by Lenders, Administrative Agent or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

Section 19.5. <u>Schedule Incorporated</u>. The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 19.6. <u>Offsets, Counterclaims and Defenses</u>. Any assignee of Lenders' interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower or Guarantor may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower or such Guarantor in any action or proceeding brought by any

such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

Section 19.7. <u>No Joint Venture or Partnership; No Third Party Beneficiaries</u>.

(a)       Borrower, Administrative Agent and Lenders intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower, Guarantor, Administrative Agent and Lenders nor to grant Administrative Agent or Lenders any interest in the Project other than that of secured party, Lenders or lender. Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably waives and relinquishes all claims, demands, counterclaims and/or defenses alleging the existence of any partnership, joint venture or other fiduciary relationship between Administrative Agent or Lenders and Borrower and Borrower shall hold Lenders, Administrative Agent, Lenders' and Administrative Agent's successors and assigns, harmless from and against any and all losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments and any other fees, costs and expenses that Administrative Agent or Lenders may sustain as a result of any such allegation by any Person whatsoever.

(b)       This Agreement and the other Loan Documents are solely for the benefit of Lenders, Administrative Agent and Borrower and Guarantor and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lenders, Administrative Agent and Borrower and Guarantor any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lenders to enter into this Agreement and make the financial accommodations provided for hereunder are imposed solely and exclusively for the benefit of Lenders and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lenders will refuse to enter into this Agreement or make the financial accommodations provided for hereunder in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Administrative Agent or Lenders if, in Administrative Agent's or Lenders' sole discretion, Administrative Agent or Lenders deem it advisable or desirable to do so.

(c)       The shareholders, general partners, members, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Project, and Lenders are relying solely upon such expertise and business plan in connection with the ownership and operation of the Project.

(d)       Notwithstanding anything to the contrary contained herein, Lenders are not undertaking the performance of any obligations with respect to any agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents of Borrower.

(e)       By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lenders or Administrative Agent pursuant to this Agreement, the Deed of Trust, the Note or the other Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lenders and Administrative Agent shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lenders or Administrative Agent.

(f)       Borrower and Guarantor recognize and acknowledge that in accepting this Agreement, the Note, the Deed of Trust and the other Loan Documents, Lenders are expressly and primarily relying on the truth and accuracy of the representations and warranties set forth in <u>Article IV</u> of

69

this Agreement without any obligation to investigate the Project and notwithstanding any investigation of the Project by Administrative Agent; that such reliance existed on the part of Lenders prior to the date hereof, that the warranties and representations are a material inducement to Lenders in entering into this Agreement and making the financial accommodations provided for hereunder; and that Lenders would not be willing to enter into this Agreement and make the financial accommodations provided for hereunder and accept this Agreement, the Note, the Deed of Trust and the other Loan Documents in the absence of the warranties and representations as set forth in Article IV of this Agreement.

Section 19.8. Publicity. All news releases, publicity or advertising by Borrower, Guarantor or Borrower's Affiliates through any media intended to reach the general public which refers to the Loan, Lenders, or any of Lenders' Affiliates shall be subject to the prior written approval of Administrative Agent, not to be unreasonably withheld. Administrative Agent and Lenders shall be permitted to make any news, releases, publicity or advertising by Lenders or Lenders' Affiliates through any media intended to reach the general public which refers to the Loan, the Project, Borrower, Guarantor and Borrower's Affiliates without the approval of Borrower or any such Persons in a "tombstone", advertisement or other written description or loan summary in an industry periodical, journal or newspaper or at industry events or conferences, provided that such references are limited to the following matters: (i) the principal amount of the Loan, (ii) the term of the Loan, (iii) the location of the Project, (iv) whether the interest rate of the Loan is fixed or variable and (v) the identity of Borrower. All other news-releases, publicity or advertising by Lenders shall be subject to Borrower's prior written approval, which approval shall not be unreasonably withheld or delayed. Borrower also agrees that Lenders and Administrative Agent may share any information pertaining to the Loan with third-parties in connection with the sale or transfer of the Loan or any Participations thereof.

Section 19.9. Conflict; Construction of Documents; Reliance. In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Administrative Agent or Lenders or any parent, subsidiary or Affiliate of Administrative Agent or Lenders. Lenders shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lenders of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lenders' or Administrative Agent's exercise of any such rights or remedies. Borrower acknowledges that Lenders engage in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

Section 19.10. Actions, Approvals and Determinations. Wherever in this Agreement it is provided that (a) as a condition precedent to Borrower's undertaking certain action, Borrower shall be required to obtain Administrative Agent's consent or approval or (b) Administrative Agent shall have the right to make a determination (including, without limitation, a determination as to whether a matter is satisfactory to Administrative Agent), or if Borrower shall request that Administrative Agent or Lenders take any action, then, unless expressly provided to the contrary in the applicable provision of this Agreement, the decision whether to grant such consent or approval or to take the requested action, or the determination in question, shall be in the sole and exclusive discretion of Administrative Agent and Lenders and shall be

final and conclusive. Wherever in this Agreement it is stated that any consent or approval shall not be unreasonably withheld or that a determination to be made by Administrative Agent or Lenders shall be subject to a specified standard, then, if a court of competent jurisdiction determines, without right to further appeal, that the consent or approval shall be deemed granted or the standard shall be deemed met, as the case may be, then Administrative Agent or Lenders, at the request of Borrower, shall deliver to Borrower written confirmation thereof. The obtaining of such consent or approval or determination that such standard has been met shall be Borrower's sole and exclusive remedy with respect to the subject matter of this section, and under no circumstance shall Administrative Agent or Lenders, or Administrative Agent's or Lenders' counsel or anyone else acting or purporting to act on Administrative Agent's or Lenders' behalf have any liability (whether in damages or otherwise) with respect thereto. In any instance in which Borrower requests, or any Loan Document provides, that Administrative Agent or Lenders shall consider granting Administrative Agent's or Lenders' consent or approval or making a determination or taking some other action, Borrower shall, upon demand, pay all actual out-of-pocket costs, expenses and reasonable attorneys' fees and disbursements incurred by Administrative Agent and Lenders in connection therewith.

Section 19.11. <u>Entire Agreement</u>. This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written between Borrower, Administrative Agent and Lenders are superseded by the terms of this Agreement and the other Loan Documents.

Section 19.12. <u>Certain Additional Rights of Lenders</u>. Notwithstanding anything which may be contained in this Agreement to the contrary, Lenders shall have:

(a)    the right to designate any party to receive payment of all fees, costs and expenses otherwise payable to Lenders under this Agreement or the other Loan Documents;

(b)    the right to routinely consult with and advise Borrower's, management regarding the significant business activities and business and financial developments of Borrower. Consultation meetings should occur on a regular basis with Administrative Agent or Lenders having the right to call special meetings at any reasonable times;

(c)    the right, without restricting any other right of Administrative Agent or Lenders under this Agreement (including any similar right), to restrict, upon the occurrence and continuance of an Event of Default, Borrower's payments of management consulting director or similar fees to affiliates of Borrower (or their personnel); and

(d)    the right, without restricting any other rights of Administrative Agent or Lenders under this Agreement (including any similar right), to restrict the transfer to voting interests in Borrower held by its shareholders, members or partners (as the case may be), and the right to restrict the transfer of interests in such shareholder, member or partner (as the case may be), except for any transfer that is expressly permitted hereunder.

Section 19.13. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed to be an original, and all such counterparts together constitute but one and the same agreement. In addition, the parties may execute separate signature pages, and such signature pages (and/or signature pages which have been detached from one or more duplicate original copies of this Agreement) may be combined and attached to one or more copies of this Agreement so that such copies shall contain the signatures of all of the parties hereto.

[balance of page intentionally left blank]

71

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

<div align="center">

BORROWER:

**GALLERIA 2425 OWNER, LLC**,
a Delaware limited liability company

By:    Galleria 2425 JV, LLC,
       a Delaware limited liability company,
       its sole member

       By:    Naissance Capital Real Estate, LLC,
              a Delaware limited liability company,
              its Managing Member

       By: _____
       Name: Azeemeh Zaheer
       Title:  Managing Member

</div>

[SIGNATURES CONTINUE ON NEXT PAGE]

ADMINISTRATIVE AGENT AND LENDER:

**NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH**, a banking corporation organized under the laws of Kuwait, acting through its New York branch

By:
Name:
Title:

Arlette Kittaneh
Executive Manager

By:
Name:     Michael G. McHugh
Title:      Executive Manager

[Signature Page to Loan Agreement]

000542

EXHIBIT A

BORROWER'S ORGANIZATIONAL STRUCTURE

[see attached]



EXHIBIT B

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of the ____ day of _____, 20__, made by and between [NAME OF ASSIGNING BANK] ("Assignor") and [NAME OF ASSIGNEE] ("Assignee").

Preliminary Statement

1.      This Agreement relates to that certain Loan Agreement (as the same may be amended from time to time, the "Loan Agreement") dated as of May 23, 2018 made by and among (1) Galleria 2425 Owner, LLC, a Delaware limited liability company ("Borrower"), (2) the lender(s) party thereto (each, a "Lender" and collectively, "Lenders"), and (3) National Bank of Kuwait, S.A.K.P., New York Branch ("Administrative Agent"). All capitalized terms not otherwise defined herein shall have the respective meanings set forth in the Loan Agreement.

2.      Subject to the terms and conditions set forth in the Loan Agreement, Assignor has a pro-rata share of the Loan equal to _____ percent (_____%) in an aggregate principal amount of $_____ ("Assignor's Loan Commitment").

3.      The aggregate outstanding principal amount under Assignor's Loan Commitment at the commencement of business on the date hereof is $_____,

4.      Assignor desires to assign to Assignee all of the rights of Assignor under the Loan Agreement and the other Loan Documents (as defined in the Loan Agreement) in respect of a portion of Assignor's Loan Commitment, such portion being in an amount equal to $_____, which relates to a Pro-Rata Share of the Loan of _____ percent (_____%) (the "Assigned Loan Commitment"); and Assignee desires to accept assignment of such rights and assume the corresponding obligations from Assignor on such terms.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, the parties hereto agree as follows:

SECTION 1.  Assignment. Assignor hereby assigns and sells to Assignee all of the rights of Assignor under the Loan Agreement and the other Loan Documents in and to the Assigned Loan Commitment, and Assignee hereby accepts such assignment from Assignor and assumes all of the obligations of Assignor under the Loan Agreement and the other Loan Documents with respect to the Assigned Loan Commitment. Upon the execution and delivery hereof by Assignor, Assignee, Administrative Agent and the payment of the amount specified in Section 2 hereof required to be paid on the date hereof, (1) Assignee shall, as of the commencement of business on the date hereof, succeed to the rights and obligations of a Lender under the Loan Agreement and the other Loan Documents with a Pro-Rata Share of the Loan equal to the percentage applicable to the Assigned Loan Commitment and (2) the Pro-Rata Share of Assignor shall, as of the commencement of business on the date hereof, be reduced correspondingly and Assignor released from its obligations under the Loan Agreement and the other Loan Documents to the extent such obligations have been assumed by Assignee. Assignor represents and warrants that it (x) owns the Assigned Loan Commitment free and clear of all liens and other encumbrances and (y) is legally authorized to enter into and perform this Agreement. Except as provided in the immediately preceding sentence, the assignment provided for herein shall be without representation or warranty by, or recourse to, Assignor.

Exh. B-1

SECTION 2.  <u>Payments</u>.  As consideration for the assignment and sale contemplated in Section 1 hereof, Assignee shall pay to Assignor on the date hereof, in immediately available funds, an amount equal to $_____. Each of Assignor and Assignee hereby agrees that if it receives any amount under the Loan Agreement or any of the other Loan Documents which is for the account of the other party hereto, it shall receive the same for the account of such other party to the extent of such other party's interest therein and shall promptly pay the same to such other party.

SECTION 3.  <u>Consents; Notices</u>.  If required pursuant to <u>Article XII</u> or <u>Article XIII</u> of the Loan Agreement, this Agreement is conditioned upon the consent of Administrative Agent. The execution of this Agreement by Administrative Agent is evidence of this consent. Assignee has designated its address for notices below.

SECTION 4.  <u>Non-Reliance on Assignor</u>.  Assignor makes no representation or warranty in connection with, and shall have no responsibility with respect to, the solvency, financial condition, or statements of Borrower or any other party to any Loan Document, or the validity and enforceability of the obligations of Borrower or any other party to a Loan Document in respect of the Loan Agreement or any other Loan Document. Assignee acknowledges that it has, independently and without reliance on Assignor, and based on such documents and information as it has deemed appropriate, made its own analysis of the collateral for the Loan, credit analysis of Borrower and decision to enter into this Agreement and will continue to be responsible for making its own independent appraisal of the collateral for the Loan and of the business, affairs and financial condition of Borrower and the other parties to the Loan Documents.

SECTION 5.  <u>Governing Law</u>.  This Agreement shall be governed by, and construed and enforced in accordance with the Laws of the State of New York without reference to principles of conflicts of law.

SECTION 6.  <u>Counterparts</u>.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

SECTION 7.  <u>Certain Representations and Agreements by Assignee</u>.  Assignee represents that it is legally authorized to enter into and perform this Agreement. In addition, Assignee hereby represents that it is entitled to receive any payments to be made to it under the Loan Agreement or hereunder without the withholding of any tax and agrees to furnish the evidence of such exemption as specified therein and otherwise to comply with the provisions of the Loan Agreement and the other Loan Documents.

SECTION 8.  <u>Reliance By Borrower</u>.  This Agreement shall be binding upon, enforceable by and inure to the benefit of Borrower, its successors and assigns.

[balance of page intentionally left blank]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first above written.

ASSIGNOR:

By: _____
    Name:
    Title:

ASSIGNEE:

By: _____
    Name:
    Title:

Assignee's Address for Notices:

[Assignee]
[Address]
Attention: _____
Telephone: (___) _____

ADMINISTRATIVE AGENT:

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch

By: _____
    Name:
    Title:

SCHEDULE 13.12

Amount of Loan Attributable to Lender

| Lender | Amount of Loan Attributable to Lender |
|--------|----------------------------------------|
| NBK | $51,675,000.00 |

Sched. 13.12-1

SCHEDULE 15.1

Lenders' Offices, Addresses for Notices

| If to NBK: | National Bank of Kuwait, S.A.K.P., New York Branch<br>299 Park Avenue<br>New York, New York 10171<br>Attention: Corporate Finance |
|---|---|
| With a copy to: | Baker & McKenzie LLP<br>300 E. Randolph St., Suite 5000<br>Chicago, IL 60601<br>Attention: Mona Dajani, Esq. |

**<u>Exhibit B</u>**

Promissory Note

<u>PROMISSORY NOTE</u>

$51,675,000.00                                                                    Date: May 23, 2018

THIS PROMISSORY NOTE (this "<u>Note</u>") made as of May 23, 2018, by GALLERIA 2425 OWNER, LLC, a Delaware limited liability company, having an address at 3139 W Holcombe Blvd #845, Houston, Texas 77025 ("<u>Borrower</u>"), to NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch, having an office at 299 Park Avenue, New York, New York 10171, as administrative and collateral agent (in such capacity, together with its successors and assigns, "<u>Administrative Agent</u>") for the Lenders (as defined in the Loan Agreement referred to below). *Capitalized terms used but not defined in this Note shall have the meanings assigned to them in the Loan Agreement.*

1.   <u>Covenant to Pay</u>

FOR VALUE RECEIVED, without grace, except as expressly provided for herein and in the Loan Agreement, Borrower does hereby covenant and promise to pay to the order of Administrative Agent, on behalf of Lenders, at Administrative Agent's office at 299 Park Avenue, New York, New York 10171 or at such other place as Administrative Agent may designate to Borrower in writing from time to time, in legal tender of the United States, the principal amount of FIFTY ONE MILLION SIX HUNDRED AND SEVENTY-FIVE THOUSAND AND 00/100 DOLLARS ($51,675,000.00) (the "<u>Principal Balance</u>"), together with interest on the unpaid portion of said Principal Balance at the applicable Interest Rate (as hereinafter defined) calculated in accordance with the terms hereof, from the date the Principal Balance is advanced to Borrower until the Principal Balance and all interest accrued thereon shall be fully paid. The period from the date hereof through and including the Maturity Date is hereinafter referred to as the "<u>Term</u>."  "<u>Maturity Date</u>" means May 23, 2023.

2.   <u>Interest Rate</u>

(a)      During the Term, the rate at which interest shall be calculated under this Note (the "<u>Interest Rate</u>") shall be:

i. Commencing on May 24, 2018 and including May 28, 2018, the Interest Rate shall be a rate equal to the sum of (i) 2.75% (the "<u>Interest Rate Markup</u>") <u>plus</u> (ii) the Weekly LIBOR Rate (as hereinafter defined) as of two (2) London Business Days (as hereinafter defined) prior to the date hereof;

ii.  Commencing on May 29, 2018 through and including May 31, 2021, the Interest Rate shall be a fixed rate equal to five and sixty-four hundredths percent (5.64%) per annum (the "<u>Fixed Rate</u>");

iii.  Commencing on June 1, 2021 and continuing on the first (1st) day of each LIBOR Period (as hereinafter defined) thereafter, as applicable (each, a "<u>Rate Adjustment Date</u>"), the Interest Rate shall be recalculated to an adjustable rate equal to the sum of (i) the Interest Rate Markup <u>plus</u> (ii) the LIBOR Rate (as hereinafter defined) for the applicable LIBOR Period (as hereinafter defined) as of two (2) London Business Days (as hereinafter defined) prior to each applicable Rate Adjustment Date.

(b)    Borrower hereby acknowledges and agrees that Borrower shall not have more than three (3) LIBOR contracts outstanding at any one time during the Term.

(c)    During the Term, the LIBOR Period shall be a period of 30 days, except as adjusted pursuant to the definition of "LIBOR Period."

(d)    The certificate of Administrative Agent as to any Interest Rate and the interest amounts payable by Borrower pursuant thereto shall, absent manifest error, be final, conclusive and binding on Borrower.

(e)    As used herein, the following terms shall have the indicated meanings:

<u>Alternate Rate</u> - a per annum rate equal to (i) the Interest Rate Markup *plus* (ii) the Prime Rate (as hereinafter defined) *less* (iii) one percent (1%).

<u>Business Day</u> - a day other than (i) a Saturday, Sunday or (ii) other day on which commercial banks in New York, New York are authorized or required by law to close.

<u>LIBOR Period</u> - the period commencing on June 1, 2021 or any Rate Adjustment Date (as the case may be) and ending on, as applicable, the day immediately prior to the next succeeding payment date or the day immediately prior to the payment date of the calendar month that is one (1) month thereafter; <u>provided</u>, <u>however</u>, that if a payment date would occur on a day that is not a Business Day, the LIBOR Period to which such payment date relates shall be extended to the day immediately prior to the next succeeding Business Day. To the extent that the preceding clause results in the extension of a LIBOR Period, Administrative Agent shall have the right (but not the obligation) to shorten or extend, respectively, the succeeding LIBOR Period so that it shall end on a day that numerically corresponds to the intended payment date indicated in this Note and minimize breakage and/or avoid early termination of

any LIBOR contract; provided, however, that no LIBOR Period shall extend beyond the earlier to occur of (i) the Maturity Date or (ii) the date the Loan is otherwise due and payable pursuant to the terms and provisions hereof.  For the avoidance of doubt, the intended payment date is the first calendar day of each calendar month.

LIBOR Rate - the rate per annum (rounded upward, if necessary, to the nearest 1/1000 of 1%) at which United States Dollar deposits are offered in the London interbank market as displayed on the Bloomberg L.P., page "BBAM" or any page that replaces BBAM, two (2) London Business Days prior to the first day of the applicable LIBOR Period, for deposits in immediately available funds, in lawful money of the United States, of amounts substantially comparable to the outstanding Principal Balance for the LIBOR Period, divided by a percentage equal to 100% minus the stated maximum rate of all reserves required to be maintained against "Eurocurrency Liabilities" as specified in Regulation D (or against any other category of liabilities which includes deposits by reference to which the interest rate on LIBOR-based loans is determined) on such date to any member bank of the Federal Reserve System. Notwithstanding any provision above, the practice of rounding to determine the LIBOR Rate may be discontinued at any time in Administrative Agent's sole discretion.  Notwithstanding the foregoing, in no event shall the LIBOR Rate be less than 0%.

London Business Day - any day on which dealings in United States dollar deposits are carried on by banking institutions in the London interbank market.

Prime Rate - a fluctuating interest rate per annum which shall at all times be equal to the rate of interest announced publicly by NBK in New York from time to time, as NBK's prime rate. In the event NBK does not announce its prime rate, the Prime Rate shall be the prime rate as set forth in *The Wall Street Journal* from time to time.

Regulation D - Regulation D of the Board of Governors of the Federal Reserve System as in effect from time to time, including, without limitation, any successor or other regulation or official interpretation of said Board of Governors relating to reserve requirements applicable to member banks of the Federal Reserve System.

Weekly LIBOR Rate - the rate per annum (rounded upward, if necessary, to the nearest 1/1000 of 1%) at which United States Dollar deposits are offered in the London interbank market as displayed on the Bloomberg L.P., page "BBAM" or any page that replaces BBAM, two (2) London Business Days prior to the date hereof, for deposits in immediately available funds, in lawful money of the United States, of amounts substantially comparable to the outstanding Principal Balance for a one week period, divided by a percentage equal to 100% minus the stated maximum rate of all reserves

3

required to be maintained against "Eurocurrency Liabilities" as specified in Regulation D (or against any other category of liabilities which includes deposits by reference to which the interest rate on LIBOR-based loans is determined) on such date to any member bank of the Federal Reserve System. Notwithstanding any provision above, the practice of rounding to determine the LIBOR Rate may be discontinued at any time in Administrative Agent's sole discretion.  Notwithstanding the foregoing, in no event shall the LIBOR Rate be less than 0%.

3.   <u>Increased Costs</u>

(a)   If, after the date of this Note, any change in applicable law or regulation or in the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof (whether or not having the force of law), and which change is applicable generally to other financial institutions (each, a "<u>Change in Law</u>"), shall (i) change the basis of taxation of payments to any Lender of the Principal Balance or interest due and owing under this Note or any fees or other amounts payable hereunder (other than changes in respect of taxes imposed on the overall net income of such Lender), (ii) subject any Lender to any tax of any kind whatsoever with respect to this Note or the Loan, or (iii) impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of or credit extended by any Lender or shall impose on any Lender any other condition affecting this Note, and the result of any of the foregoing shall or would be to increase the cost to any Lender of making or maintaining the Loan or to reduce the amount of any sum received or receivable by any Lender hereunder (whether of principal, interest or otherwise), Administrative Agent may, at any time, notify Borrower of the additional amount required to compensate such Lender for such increased cost or reduced amount and Borrower shall pay to Administrative Agent on behalf of such Lender such additional amount or amounts as shall compensate such Lender for such additional costs incurred or reduction suffered.

(b)   If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such capital or on the capital of such Lender's holding company, if any, as a consequence of such Lender's participation in the Loan to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to Borrower shall be conclusive absent manifest error. Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than six (6) months prior to the date that such Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     Any Lender affected by increased costs as set forth above shall use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any portion of the Loan affected by such event, provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding such increased costs.  If the affected Lender is not able to avoid such increased costs by designating another lending office, then Borrower shall have the right to replace the affected Lender with a new Lender in accordance with the terms and provisions of the Loan Documents.

(f)     The Increased Cost provisions of this Note shall be without duplication of the provisions of Section 5.4 or Section 16.3 of the Loan Agreement.

4.     Illegality

If Administrative Agent shall notify Borrower that the introduction of, or any change in, or in the interpretation of, any law or regulation makes it unlawful, or any central bank or other Governmental Authority asserts that it is unlawful, for any Lender to perform such Lender's obligations hereunder, then Borrower shall either (i) prepay in full the entire unpaid Debt within ninety days (such date to be adjusted to minimize or avoid breakage) after notice from Administrative Agent, without Prepayment Premium or yield maintenance of any kind or (ii) replace the affected Lender with a new Lender in accordance with the terms and provisions of the Loan Documents. In addition, if Administrative Agent notifies Borrower that by reason of circumstances affecting the London interbank market for United States dollar deposits there does not exist adequate and reasonable means for ascertaining the LIBOR Rate for any LIBOR Period, then, commencing on the last day of the then existing LIBOR Period therefor, the Interest Rate

shall automatically be and remain at the per annum rate at all times equal to the Alternate Rate, which Interest Rate shall be adjusted concurrently with each adjustment in the Alternate Rate until Administrative Agent shall notify Borrower that the circumstances causing the suspension of the use of the LIBOR Rate no longer exist.

5.      Calculation of Interest

        Interest shall be computed on the basis of actual days over a three hundred sixty (360) day calendar year (except that interest computed by reference to the Alternate Rate shall be computed on the basis of a three hundred sixty five (365) day calendar year, or a three hundred sixty six (366) day calendar year in a leap year) and shall continue to accrue and be payable on the outstanding Principal Balance to but excluding the date of repayment thereof in full.

6.      Payment of Indebtedness

        Borrower shall make payments of interest under this Note as follows and said payments shall be applied upon receipt thereof:

        (a)      Interest shall be paid monthly, in arrears, on the first Business Day (i) of each calendar month, if the applicable Interest Rate for such payment is the Fixed Rate in accordance with Section 2(a)(i) above; or (ii) following the applicable one (1)-month LIBOR Period (which payment date, for the avoidance of doubt, is intended to be the first calendar day of each calendar month, subject to adjustment in accordance with the definition of LIBOR Period), for the period of such LIBOR Period, if the applicable Interest Rate for such payment is being calculated with reference to the LIBOR Rate in accordance with Section 2(a)(ii) above; notwithstanding the foregoing, interest for the period commencing on the date hereof and ending on May 31, 2018 shall be paid in advance on the date hereof; and

        (b)      On the Maturity Date the entire unpaid Principal Balance, together with all interest accrued thereon and all other Debt, shall be due and payable and repaid in full.

7.      Security

        This Note is governed and/or secured by, inter alia, the following documents, each dated as of the date hereof: (i) that certain Loan Agreement made by and among Borrower, Administrative Agent and Lenders (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement"), (ii) that certain Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing made by Borrower to Salima Umatiya, as trustee, for the

benefit of Administrative Agent (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Deed of Trust"), encumbering the premises known as and located at 2425 West Loop South, City of Houston, State of Texas (the "Property"), (iii) that certain Absolute Assignment of Leases and Rents made by Borrower for the benefit of Administrative Agent encumbering the Property (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Assignment of Leases"), and (iv) those certain other documents defined as "Loan Documents" in the Loan Agreement, which documents specify various defaults upon the happening of which all sums due and owing under this Note may be declared immediately due and payable.

8.    Prepayment

(a)    Provided no Event of Default exists, Borrower shall have the right to prepay the Principal Balance, in whole, or in part (but if in part, then in minimum increments of $100,000 (or $1,000,000 if an Interest Rate Protection Product in the form of an interest rate swap is then in effect)), upon not less than thirty (30) days' prior written notice (the "Prepayment Notice") to Administrative Agent specifying the date on which prepayment is to be made (the "Prepayment Date") and the amount of any such prepayment (the "Prepayment Amount"). On the Prepayment Date, Borrower shall pay (i) the Prepayment Amount, (ii) interest accrued and unpaid on the Prepayment Amount to and including the last day of the month in which the Prepayment Date occurs, (iii) in the event the Prepayment Amount equals the entire outstanding Principal Balance, all other unpaid Debt, (iv) the cost of unwinding, modifying or terminating any Interest Rate Protection Product then in effect ("Unwinding Costs"), and (v) the then applicable Prepayment Premium (as hereinafter defined). As used herein, "Prepayment Premium" shall mean: (A) if all or any portion of the Debt is prepaid within the first twelve (12) months following the date hereof, an amount equal to 1.50% of the amount so prepaid, and (B) if all or any portion of the Debt is prepaid within the period from and after the date which is twelve (12) months following the date hereof but before the date which is twenty-four (24) months following the date hereof, an amount equal to 1.00% of the amount so prepaid. If all or any portion of the Debt is prepaid after the date which is twenty-four (24) months following the date hereof, no Prepayment Premium shall be due.

(b)    If any Prepayment Notice is given, the entire Prepayment Amount specified therein (together with the applicable Prepayment Premium, Unwinding Costs and all other sums referred to above) shall be due and payable on the Prepayment Date set forth therein.

(c)    Any partial prepayment made hereunder shall be applied against the Principal Balance in inverse order of maturity (i.e., so as to reduce the final payments of principal due and owing hereunder

and not result in any reduction in or deferment of the monthly payments of principal due and owing hereunder).

(d)     Payment of the entire outstanding Principal Balance following an acceleration of the same shall be deemed to be a voluntary prepayment to which the Prepayment Premium and Unwinding Costs shall be applicable.

(e)     Notwithstanding any other provision of this Section, no Prepayment Premium shall be payable with respect to any prepayment occurring as a result of the application of any Insurance Proceeds or Awards under the Loan Agreement.

9.     <u>Waivers</u>

Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably (i) waives presentment and demand for payment, notice of dishonor, protest and notice of protest of this Note, (ii) agrees to pay all costs of collection when incurred by Administrative Agent and Lenders, including, but not limited to, reasonable attorneys' fees and disbursements (which costs may be added to the amount due under this Note and be receivable therewith) and (iii) agrees to perform and comply with each of the terms, provisions, covenants and conditions contained in this Note, the Loan Agreement, the Deed of Trust and any of the other Loan Documents on the part of Borrower to be observed or performed.

10.     <u>No Release</u>

No (a) release by Administrative Agent of any portion of the Mortgaged Property (as defined in the Deed of Trust) or any other collateral being held as security for the payment by Borrower of the Debt, (b) granting by Administrative Agent of an extension of time for payment of this Note, or any installment thereof, or (c) alteration, amendment or waiver of any term, provision, covenant or condition of this Note or any Loan Document shall release, discharge, modify, change or affect the liability of Borrower under this Note or any of the other Loan Documents. The right to plead any and all statutes of limitations as a defense to any demand on this Note, or any guaranty hereof, or any agreement to pay the same, or any demand secured by the Deed of Trust, or any and all obligations and liabilities arising out of or in connection with this Note, the Loan Agreement or any of the other Loan Documents, is expressly waived by Borrower, and any endorsers and/or guarantors of this Note, to the fullest extent permitted by law.

11.     <u>Writings</u>

4153909-v7\CHIDMS1

000558

This Note may not be waived, changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

12.     Event of Default

It is hereby expressly agreed that the entire Debt shall, then or at any time thereafter, without notice (except as may be provided herein, in the Loan Agreement or in the Deed of Trust), become immediately due and payable at the option of Administrative Agent on the happening of any Event of Default and, in such event, the Deed of Trust may be foreclosed. All of the terms, provisions, covenants and conditions contained in the Loan Agreement, the Deed of Trust, the Assignment of Leases and the other Loan Documents which are to be kept and performed by Borrower are hereby made part of this Note to the same extent and with the same force and effect as if they were fully set forth in this Note. Failure to exercise such option or any other rights Administrative Agent may, in the event of any such Event of Default, be entitled to, shall not constitute a waiver of the right to exercise such option or any other rights in the event of any subsequent Event of Default, whether of the same or different nature.

13.     Late Charge

If any sum payable under this Note (but excluding, however, the final installment of the Principal Balance) is not paid within five (5) days of its due date, Borrower shall pay upon demand a late payment charge ("Late Charge") of two cents ($.02) for each dollar ($1) of such unpaid sum to defray the expenses incurred by Administrative Agent or Lenders in handling and processing such delinquent payment, and such amount shall be secured by the Deed of Trust and the Loan Documents. Nothing contained herein shall be deemed to constitute a waiver or modification of the due date on which such sums are due and payable.

14.     Involuntary Rate

In addition to any Late Charge which may be due under this Note, if the Debt is declared immediately due and payable by Administrative Agent pursuant to the provisions of this Note or any of the Loan Documents, or if any installment of principal or interest is not paid when due, or if the Debt is not paid in full on the Maturity Date, or if any other Event of Default shall have occurred, Borrower shall thereafter pay interest on the Principal Balance from the date of any of such events, as the case may be, until the date the installment of interest or principal is paid, the Debt is paid in full, or until such Event of Default is cured, at a rate (the "Involuntary Rate") equal to the lesser of (i) the Prime Rate plus two percent (2%) per annum or (ii) the Maximum Rate (as hereinafter defined), provided that there shall be no

9

automatic reduction to the Maximum Rate if Borrower is barred by law from availing itself in any action or proceeding of the defense of usury or if Borrower is barred or exempted from the operation of any law limiting the amount of interest that may be paid for the Loan or use of money or in the event this transaction, because of its amount or purpose or for any other reason, is exempt from the operation of any statute limiting the amount of interest that may be paid for the Loan or use of money.

15.     Maximum Rate

In the event the interest provisions or any exactions provided for herein or in the Loan Agreement, the Deed of Trust or in any of the other Loan Documents shall result, because of the monthly reduction of principal or for any other reason, at any time during the Term in an effective rate of interest which, for any month, transcends the limit of the usury or any other law applicable to the Loan (the "Maximum Rate"), all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice between or by any party hereto, be applied in reduction of the Principal Balance immediately upon receipt of such moneys by Administrative Agent with the same force and effect as though Borrower had specifically designated such extra sums to be so applied to reduction of the Principal Balance and Administrative Agent had agreed to accept such extra payment(s) as a premium-free prepayment, provided that no Prepayment Premium shall be payable in connection with any such reduction of the Principal Balance. In no event shall any agreed to or actual exaction as consideration for the Loan transcend the limits imposed or provided by the law applicable to this transaction or Borrower in the jurisdiction in which the land is located for the use or detention of money or for forbearance in seeking its collection.

16.     Application of Payments

If at any time Administrative Agent receives from Borrower a payment or prepayment in an amount that is less than all amounts then due, Administrative Agent may apply that payment or prepayment to amounts then due in any manner and in any order determined by Administrative Agent, in Administrative Agent's sole and absolute discretion. Borrower agrees that neither Administrative Agent's acceptance of a payment or prepayment from Borrower in an amount that is less than all amounts then due, nor Administrative Agent's application of such payment or prepayment in the manner authorized in the immediately preceding sentence, shall be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.

17.     Notices

4153909-v7\CHIDMS1

000560

All notices, demands, requests, consents and other communications which are required or permitted to be given under this Note shall be sufficiently given when given as set forth in the Loan Agreement.

18.     Applicable Law

This Note shall be construed in accordance with and be governed by the laws of the State of New York without reference to principles of conflicts of law. Borrower hereby agrees to submit to personal jurisdiction in all state and federal courts located in the State and County of New York in any action or proceeding relating to this Note, the Loan Agreement, the Deed of Trust or any of the other Loan Documents. In furtherance of such agreement, Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably appoints Capitol Services, Inc., having an address at 1218 Central Avenue, Suite 100, Albany, NY 12205, as general agent ("Agent") for Borrower for receipt of service of process in any such action or proceeding (and Administrative Agent may make service upon Borrower and/or such Agent). Service of any summons and complaint or other process in any such action or proceeding and any notice of sale or other notices may be made upon Borrower and/or Agent by registered or certified mail, return receipt requested, Borrower and Agent hereby waiving personal service thereof, or as may otherwise be permitted by law.

19.     Waiver of Trial By Jury

Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Note, the Loan Agreement, the Deed of Trust or any of the other Loan Documents.

20.     Right to Transfer Note

Administrative Agent and Lenders may transfer this Note and their rights hereunder in accordance with Article XII of the Loan Agreement.

21.     Purchase of Note.

In lieu of prepaying the Note in whole, Borrower shall have the right to purchase this Note, and the liens securing same ("Lender's Liens") upon not less than thirty (30) days' prior written notice to Lender, specifying the date on which such purchase is to occur (the "Note Purchase Date"). The purchase price for the Note shall be an amount equal to the Prepayment Amount that Borrower would be required to pay pursuant to Section [__] if prepaying the Note in whole on the Note Purchase Date. For the avoidance of doubt, the purchase price shall include then-current Principal Balance, accrued but unpaid

11

4153909-v7\CHIDMS1

000561

interest, any applicable Prepayment Premium, Unwinding Costs, Late Charges or other charges owing on the Note, plus any other Debt or amounts owed to Administrative Agent or Lenders pursuant to the terms of the Loan Documents as of such Note Purchase Date, as reasonably determined by Administrative Agent. Upon receipt of such amounts, Administrative Agent and Lender shall execute and deliver to Borrower a recordable assignment of note and lien instrument ("Note Assignment") with respect to the Note and Lender's Liens being acquired.  The purchase of the Note by Borrower shall be on an as-is basis, other than as expressly set forth in the Note Assignment, which representations and warranties shall be limited to the principal balance of the Note, and that Lender is the owner and holder of the Note and Lender's Liens, subject to no liens or security interests in favor of any third party, and has the full legal right and authority to sell the Note and Lender's Liens.  It is expressly acknowledged and agreed by Borrower that the right granted in this Note is a right to purchase the Note and Loan in full and not in part, and, if the Loan is evidenced by more than one promissory note, Borrower shall not acquire one note without acquiring all notes evidencing the Loan, and Lender shall not sell or assign its interest in one note without selling or assigning its interest in all notes evidencing the Loan.  Prior to assigning, granting a participation in or syndication all or any part of the Note, Lender agrees to provide Borrower thirty (30) Business Days' prior notice thereof.

22.   <u>Joint and Several</u>

If Borrower consists of more than one person or party, the obligations and liabilities of each such person or party hereunder shall be joint and several.

23.   <u>Power</u>

Borrower (and the undersigned representatives of Borrower, if any) represents that Borrower has full power, authority and legal right to execute and deliver this Note and that the payment of the Debt constitutes a valid and binding obligation of Borrower.

24.   <u>Form</u>

Whenever used in this Note, the singular number shall include the plural, the plural the singular, and the words "Lender(s)", "Borrower" and "Administrative Agent" shall include their respective successors and assigns.

25.   <u>Right of Set Off</u>

If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted

by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of Borrower against any and all of the obligations of Borrower now or hereafter existing under this Note, the Loan Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Note, the Loan Agreement or any other Loan Document and although such obligations of Borrower are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender and its respective Affiliates under this paragraph are in addition to other rights and remedies (including other rights of setoff) that such Lender or its respective Affiliates may have. Each Lender agrees to notify Borrower and Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

26.     <u>Construction</u>

This Note shall be construed without regard to any presumption or other rule requiring construction against the party causing this Note to be drafted. To the extent any term herein conflicts with any term of the Loan Agreement, the Loan Agreement shall control.

27.     <u>Administrative Agent</u>

To the extent that any action is to be taken, any information is to be delivered to or by Lenders, any determination is to be made, or any consent is to be given or withheld by Lenders, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Administrative Agent or any successor agent thereto.

28.     <u>Heirs, Successors and Assigns</u>

All of the terms, provisions, covenants and conditions of this Note shall apply to, bind and inure to the benefit of, the heirs, executors, administrators, successors and assigns of Borrower, Lenders and Administrative Agent, respectively.

[balance of page intentionally left blank]

13

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the day and year first above written.

BORROWER:

**GALLERIA 2425 OWNER, LLC,**
a Delaware limited liability company

By:    Galleria 2425 JV, LLC,
        a Delaware limited liability company,
        its sole member

        By:    Naissance Capital Real Estate, LLC,
                a Delaware limited liability company,
                its Managing Member

                By: _____
                Name: Azeemeh Zaheer
                Title:  Managing Member

**<u>Exhibit C</u>**

Deed of Trust

RP-2018-235600
05/30/2018  ER  $124.00

THIS INSTRUMENT WAS PREPARED BY
AND UPON RECORDING RETURN TO:

Baker & McKenzie LLP
300 E. Randolph St., Suite 5000
Chicago, IL 60601
Attention: Mona Dajani, Esq.

AFTER RECORDING RETURN TO:
**TransAct** TITLE

GF #: 12000490

<u>DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND PROFITS, SECURITY
AGREEMENT AND FIXTURE FILING</u>

by

GALLERIA 2425 OWNER LLC, a Delaware limited liability company,
whose address is 3139 W Holcombe Blvd #845, Houston, Texas 77025,
Grantor,

to

Salima Umatiya,
with an address of 245 Commerce Green Blvd., Suite 151, Sugar Land, TX 77478,
Trustee,

for the benefit of

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation
organized under the laws of Kuwait, acting through its New York branch, as administrative and
collateral agent,

whose address is having an office at 299 Park Avenue, New York, New York 10171,
Beneficiary

THIS DEED OF TRUST IS ALSO A FIXTURE FILING UNDER SECTION 9.502(b) OF THE
TEXAS BUSINESS AND COMMERCE CODE.

000566

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND PROFITS, SECURITY AGREEMENT AND FIXTURE FILING

THIS DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND PROFITS, SECURITY AGREEMENT AND FIXTURE FILING made as of May 23, 2018 made by GALLERIA 2425 OWNER LLC, a Delaware limited liability company, having an address at 3139 W Holcombe Blvd #845, Houston, Texas 77025 ("Grantor"), in favor of Salima Umatiya, an individual, having an address at 245 Commerce Green Blvd., Suite 151, Sugar Land, TX 77478 (together with its successors and assigns, "Trustee"), as Trustee for the benefit of NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch, having an office at 299 Park Avenue, New York, New York 10171, as administrative and collateral agent (in such capacity, together with its successors and permitted assigns, "Beneficiary") for the Lenders (as defined in the Loan Agreement referred to below).

### WITNESSETH:

A.    Lenders are this day making a term loan to Grantor in the principal amount of $51,675,000.00 (the "Loan"), which loan shall be governed by that certain Loan Agreement dated of even date herewith made by and among Grantor, Beneficiary and Lenders (as the same may be amended, restated or otherwise modified from time to time, the "Loan Agreement");

B.    Beneficiary is the holder of a Promissory Note (as the same may be amended, restated, consolidated, split, severed or otherwise modified from time to time, the "Note"), dated as of even date herewith, given by Grantor, as maker, to Beneficiary, as payee, in the original principal amount of $51,675,000.00; and

C.    Beneficiary has requested, and Grantor has agreed, to secure Grantor's obligations under the Note by giving Beneficiary a first priority lien encumbering the Mortgaged Property (as hereinafter defined).

### CERTAIN DEFINITIONS

Unless the context otherwise specifies or requires, the following terms shall have the meanings herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms.

"Chattels" means all fixtures, fittings, appliances, apparatus, equipment, machinery and articles of personal property and additions thereto and replacements thereof (other than those owned by lessees, contractors or licensees), now or at any time hereafter affixed to, attached to, placed upon, or used in any way in connection with the complete and comfortable present or future use, enjoyment, occupancy or operation of the Improvements on the Premises.

"Debt" shall mean the outstanding principal amount set forth in, and evidenced by, the Loan Agreement and the Note, together with all interest accrued and unpaid thereon and all other sums due to Administrative Agent or Lenders in respect of the Loan under the Note, the Loan Agreement, this Deed of Trust or any other Loan Document.

"Deed of Trust" means this Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing, as the same may be amended, restated, consolidated, split, severed or otherwise modified from time to time.

"Deed of Trust Amount" means the maximum principal amount secured by this Deed of Trust as of the date hereof, i.e., $51,675,000.00.

"Events of Default" means the events and circumstances described as such in Section 2.01 hereof.

"Improvements" means all structures or buildings, and replacements thereof, to be erected or now or hereafter located upon the Premises, including all equipment, apparatus, machinery and fixtures of every kind and nature whatsoever forming part of said structures or buildings.

"Loan" means the $51,675,000.00 loan governed by the Loan Agreement, evidenced by the Note and secured by this Deed of Trust.

"Premises" means all that certain plot, piece or parcel of land situated, lying and being in the City of Houston, County of Harris and State of Texas, described on **Exhibit A** annexed hereto and made a part hereof, including all of the Improvements, easements, rights, privileges and appurtenances (including, without limitation, any air or development rights) thereunto belonging or in anywise appertaining, and all of the estate, right, title, interest, claim or demand whatsoever of Grantor therein and in the rights-of-way, gores of land, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, tenements, hereditaments, and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining thereto, either in law or in equity, in possession or expectancy, now or hereafter acquired.

All terms of this Deed of Trust which are not defined above shall have the meaning set forth elsewhere in this Deed of Trust or, if not set forth in the Deed of Trust, in the Loan Agreement.

NOW, THEREFORE, Grantor, in consideration of the premises and in order to secure the payment of the Debt and any sums due under any Interest Rate Protection Product and the performance and observance of all of the provisions of this Deed of Trust, the Loan Agreement, the Note and the other Loan Documents, hereby irrevocably GRANTS, TRANSFERS, CONVEYS, CONFIRMS, PLEDGES and ASSIGNS, all of its present and future estate, rights, title, interest and claim, either in law or in equity, of, in and to the following property (collectively, the "Mortgaged Property"), whether now owned or held or hereafter acquired, to Trustee for the benefit of Beneficiary, TO HAVE AND TO HOLD, IN TRUST FOR THE BENEFIT OF BENEFICIARY UPON THE STATUTORY CONDITION AND WITH THE STATUTORY POWER OF SALE:

(i)    the Premises;

(ii)   the Improvements;

(iii)  the Chattels;

(iv)   all proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims, including, without limitation, proceeds of insurance and condemnation awards, and all rights of Grantor to refunds of real estate taxes and assessments and the reasonable attorney's fees, costs and disbursements incurred by Beneficiary or Lenders in connection with the collection of such award or payment;

(v)    all Leases now or hereafter entered into and all right, title and interest of Grantor thereunder, including, without limitation, cash or securities deposited thereunder to secure performance

2

4162651-v5\CHIDMS1

000568

by the Tenants of their obligations thereunder, whether such cash or securities are to be held until the expiration of the terms of such Leases or applied to one or more of the installments of rent coming due immediately prior to the expiration of such terms, including, further, the right during the continuance of an Event of Default, to receive and collect the rents thereunder;

(vi)   all proceeds of (or return of any unearned premiums on) any insurance policies covering all or any part of the Premises, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof, for damage to the Premises;

(vii)   all monies, funds, bank accounts, deposit accounts, accounts receivable, contract rights, other rights and any other intangible assets derived from or related to the rental, operation or ownership of the Premises or any part thereof, and all the agreements, instruments or documents evidencing or relating to any of the same, whether or not identified to or known by Beneficiary or Lenders;

(viii)   all trade names, trademarks, logos, copyrights, good will and books and records relating to or used in connection with the operation of the Mortgaged Property or any part thereof;

(ix)   to the extent assignable, all contracts from time to time executed by Grantor or any manager or agent on Grantor's behalf relating to the ownership, management, leasing, sale, marketing, construction, maintenance, repair, operation, occupancy or financing of the Mortgaged Property or any part thereof and all agreements relating to the purchase or Lease of any portion of same; all consents, licenses, building permits, certificates of occupancy and other governmental approvals relating to construction, completion, occupancy, use or operation of the Mortgaged Property or any part thereof; and all drawings, plans, specifications and similar or related items relating to the Mortgaged Property;

(x)   all so-called "air rights," bulk development rights, floor area, floor area ratio, zoning rooms and other rights and privileges now or hereafter appurtenant to the Premises and Improvements or any part thereof, as defined in, under or with respect to the zoning and building codes or ordinances of all applicable jurisdictions and the regulations and interpretations thereunder or thereof, whether or not transferable, and any or all of the same that may now or hereafter be acquired for use with the Premises or Improvements; and

(xi)   all proceeds and replacements of and substitutions for all or any of the foregoing.

As to any of the Mortgaged Property aforesaid which does not form a part and parcel of the real estate, this Deed of Trust is and is hereby deemed to be, as well, a Security Agreement under the Uniform Commercial Code for the purpose of creating hereby a security interest in such property, which is hereby granted to Beneficiary as "Secured Party" (as said quoted term is defined in the Uniform Commercial Code), securing the Debt and all other obligations set forth herein.

TO HAVE AND TO HOLD unto Beneficiary, its successors and assigns forever and Grantor does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND the title to the Mortgaged Property unto Trustee.

ARTICLE I.
REPRESENTATIONS, WARRANTIES AND COVENANTS OF GRANTOR

Grantor represents, warrants and covenants as follows:

SECTION 1.01. Title; No Encumbrances. Grantor warrants title to the Mortgaged Property subject to no lien, charge or encumbrance except such encumbrances as are listed as exceptions to title in the Title Policy; that Grantor owns the Chattels free and clear of liens and claims; and that this Deed of Trust is and shall remain a valid first priority lien on the Mortgaged Property subject only to the exceptions

3

4162651-v5\CHIDMS1

referred to above. Grantor has full power and lawful authority to mortgage the Mortgaged Property in the manner and form herein done or intended hereafter to be done. Grantor shall preserve such title, and shall forever warrant and defend the same to Beneficiary and Grantor shall forever warrant and defend the validity and priority of the lien hereof against the claims of all persons and parties whomsoever.

SECTION 1.02. Related Mortgage Documents; Further Assurances. Grantor shall, at Grantor's sole cost and expense, and without expense to Beneficiary, do, execute, acknowledge and deliver all and every such further agreements, documents, acts, deeds, conveyances, mortgages, estoppel certificates, financing statements, continuation statements, assignments, notices of assignment, subordinations, transfers and assurances as Beneficiary shall from time to time reasonably require, for the better clarifying, assuring, conveying, assigning, transferring and confirming unto Beneficiary the property and rights hereby conveyed or assigned or intended now or hereafter so to be, or which Grantor may be or may hereafter become bound to convey or assign to Beneficiary, or for carrying out the intention or facilitating the performance of the terms, provisions, covenants and conditions of this Deed of Trust, or for filing, registering or recording this Deed of Trust or any of the other Loan Documents and, on demand, shall execute and deliver, and hereby authorizes Beneficiary to execute and file in Grantor's name, to the extent Beneficiary may lawfully do so, one or more financing statements, continuation statements, chattel mortgages or comparable Deed of Trusts, to evidence more effectively the lien of this Deed of Trust upon the Chattels.

SECTION 1.03. Filing and Recording of Mortgage Documents.

(a)   Recording. Grantor forthwith upon the execution and delivery of this Deed of Trust, and thereafter from time to time, shall cause this Deed of Trust and any Deed of Trust creating a lien or evidencing the lien of this Deed of Trust and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien of this Deed of Trust upon, and the interest of Beneficiary in, the Mortgaged Property, provided that no such instrument of further assurance shall materially increase the obligations of Grantor under this Deed of Trust.

(b)   Recording Fees. Grantor shall pay all filing, registration or recording fees, and all expenses incident to the execution and acknowledgment of this Deed of Trust, any mortgage supplemental hereto, any Deed of Trust or financing statement with respect to the Chattels, and any instrument of further assurance or continuation, and all federal, state, county, and municipal stamp taxes and other taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Loan Agreement, the Note, this Deed of Trust, any mortgage supplemental hereto, any Deed of Trust or financing statement with respect to the Chattels or any instrument of further assurance or continuation.

SECTION 1.04. Manner of Payment. Grantor shall punctually pay the principal and interest and all other sums to become due in respect of the Note at the time and place and in the manner specified in the Note, according to the true intent and meaning thereof, all in any coin or currency of the United States of America which at the time of such payment shall be legal tender for the payment of public and private debts.

SECTION 1.05. Compliance With Law.

(a)   Grantor shall comply with all laws, regulations, rules, statutes, ordinances, orders and decrees of any federal, state and local governmental authority or court applicable to the Mortgaged Property or any part thereof (including, without limitation, all applicable zoning, environmental, and energy-related laws and Access Laws (as hereinafter defined)) (collectively, "Legal Requirements").

4

4162651-v5\CHIDMS1

RP-2018-235600

(b)      (i) Grantor agrees that the Premises shall at all times comply to the extent applicable with the requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all other federal, state and local laws, regulations, rules, statutes, ordinances, orders and decrees related to handicapped access including, without limitation, the American with Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively, "<u>Access Laws</u>").

(ii)      Notwithstanding any provisions set forth herein or in any other documents regarding Beneficiary's approval or alterations of the Premises, Grantor shall not alter the Premises in any manner which would increase Grantor's responsibilities for compliance with the applicable Access Laws without the prior written approval of Beneficiary. The foregoing shall apply to tenant improvements constructed by Grantor or by any of Grantor's Tenants. Beneficiary may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer, or other person acceptable to Beneficiary.

(iii)      Grantor agrees to give prompt notice to Beneficiary of the receipt by Grantor of any complaints related to violations of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

(c)      Notwithstanding any other provision of this <u>Section 1.05</u>, Grantor shall not be deemed to be in default solely by reason of Grantor's failure to comply with any Legal Requirements as aforesaid so long as, in Beneficiary's sole judgment, reasonably exercised, each of the following conditions is satisfied:

(i)      Grantor is engaged in and diligently pursuing in good faith administrative or judicial proceedings appropriate to contest the validity or amount of such Legal Requirements;

(ii)      [Intentionally Omitted];

(iii)      Noncompliance with any such Legal Requirements will not result in the loss or forfeiture of any property encumbered hereby or any interest of Beneficiary therein or result in any fines or other punitive actions or the loss of any insurance coverage; and

(iv)      Grantor deposits with Beneficiary, as security for any payment or performance which may ultimately be required, a sum equal to the amount of any fine, assessment or charge plus the interest, penalties, and other costs which Beneficiary estimates are likely to become payable if Grantor's contest is unsuccessful.

If Beneficiary determines, in Beneficiary's sole judgment, reasonably exercised, that any one or more of such conditions is not satisfied or is no longer satisfied, Grantor shall comply with the Legal Requirements in question, within fifteen (15) days after Beneficiary gives notice of such determination.

SECTION 1.06. <u>Future Acquisitions</u>. All right, title and interest of Grantor in and to all extensions, improvements, betterments, renewals, substitutions and replacements of, and all additions and appurtenances to, the Mortgaged Property, hereafter acquired by or released to Grantor, or constructed, assembled or placed by Grantor on the Mortgaged Property, and all conversions of the security constituted thereby, immediately upon such acquisition, release, construction, assembling, placement or conversion, as the case may be, and in each such case, without any further mortgage, conveyance, assignment or other act by Grantor, shall become subject to the lien of this Deed of Trust as fully and completely, and with the same effect, as though now owned by Grantor and specifically described in the granting clause hereof, but at any and all times Grantor shall execute and deliver to Beneficiary any and all such further assurances, mortgages, conveyances or assignments thereof as Beneficiary may

5

RP-2018-235600

reasonably require for the purpose of expressly and specifically subjecting the same to the lien of this Deed of Trust.

SECTION 1.07. Beneficiary's Right To Cure Defaults. If Grantor shall fail to perform or comply with any of the representations, warranties and covenants contained in Sections 1.01, 1.03 or elsewhere herein, then upon five (5) days' notice to Grantor (which notice shall not be required to be delivered in the event of an emergency), Beneficiary may make advances to perform the same on its behalf, and all sums so advanced, with interest at the Involuntary Rate, shall immediately be due from Grantor to Beneficiary, and shall be added to the Debt and shall be secured by this Deed of Trust. The provisions of this Section 1.07 shall not prevent any default in the observance of any of the representations, warranties and covenants contained in said Sections 1.01, 1.03 or elsewhere herein from constituting an Event of Default.

SECTION 1.08. Legal Proceedings. Whether or not an Event of Default has occurred and exists, Beneficiary shall have the right, but not the duty or obligation, to intervene or otherwise participate in, prosecute or defend at any legal or equitable proceedings (including, without limitation, any eminent domain proceedings) which, in Beneficiary's reasonable discretion, affect the Mortgaged Property, the Leases or any of the rights created hereunder the reasonable out-of-pocket cost of which shall be reimbursed by Grantor to Beneficiary and shall be secured by this Deed of Trust.

SECTION 1.09. Assignment of Leases. Grantor hereby absolutely and unconditionally assigns and transfers to Beneficiary the Leases and the Property Income. Grantor shall not otherwise assign, transfer or encumber in any manner the Leases or the Property Income or any portion thereof. Grantor shall have a license to collect and use the Property Income as the same becomes due and payable and to amend, supplement or modify the Leases in accordance with and as permitted under the Loan Agreement and to exercise Grantor's rights thereunder, so long as no Event of Default is continuing, but may not collect any Property Income more than thirty (30) days in advance of the date the same becomes due. The assignment in this Section 1.09 shall constitute an absolute and present assignment of the Leases and the Property Income, and not an assignment for security, and the existence or exercise of the Grantor's conditional license to collect Property Income shall not operate to subordinate this assignment to any subsequent assignment. The exercise by Beneficiary or Trustee of any of its rights or remedies under this Section 1.09 shall not be deemed or construed to make Beneficiary or Trustee a mortgagee-in-possession.

SECTION 1.10. Insurance. Grantor agrees, at Grantor's sole cost and expense, to keep the Mortgaged Property insured, at all times throughout the term of this Deed of Trust, in accordance with Article VIII of the Loan Agreement.

## ARTICLE II.
### EVENTS OF DEFAULT AND REMEDIES

SECTION 2.01. Events of Default. If an Event of Default shall occur and is continuing under the Loan Agreement, then, and in every such case Beneficiary, Lenders and/or Trustee may exercise any remedy available at law or in equity, including, but not limited to, those listed below and those listed in the Loan Agreement and the other Loan Documents, in such sequence and in such combination as Beneficiary may determine in Beneficiary's sole and absolute discretion:

(a)    Acceleration. Upon the occurrence of any Event of Default, the entire principal amount of the indebtedness evidenced by the Note and all other Debt together with accrued interest thereon at the Involuntary Rate shall, subject to the terms of the Loan Agreement and the Note, at the option of Beneficiary exercised while such Event of Default is continuing, without demand or notice of any kind to Grantor or any other person, become immediately due and payable. All the provisions of the Loan Agreement are incorporated herein for all purposes as if set forth in full herein.

6

RP-2018-235600

RP-2018-235600

(b) <u>Remedies Cumulative</u>. No remedy or right of Beneficiary hereunder or under the Loan Agreement, the Note or any of the other Loan Documents, or otherwise, or available under applicable law or in equity, shall be exclusive of any other right or remedy, but each such remedy or right shall be in addition to every other remedy or right now or hereafter existing under any such document or under applicable law or in equity. No delay in the exercise of, or omission to exercise, any remedy or right accruing on any Event of Default shall impair any such remedy or right or be construed to be a waiver of any such Event of Default or an acquiescence therein, nor shall it affect any subsequent Event of Default of the same or a different nature. Every such remedy or right may be exercised concurrently or independently, and when and as often as may be deemed expedient by Beneficiary. All obligations of Grantor, and all rights, powers and remedies of Beneficiary, expressed herein shall be in addition to, and not in limitation of, those provided by law or in equity or in the Loan Agreement, the Note or any other Loan Documents or any other written agreement or instrument relating to any of the Debt or any security therefor.

(c) <u>Foreclosure; Appointment of Receiver</u>.

(i) <u>Non-Judicial Foreclosure</u>. If the unpaid principal amount of or interest on the Debt or any part thereof shall have become due and payable (whether at maturity or as an installment of combined principal and/or interest or by reason of any prepayment requirement or by declaration or acceleration or otherwise) and shall not have been paid, Beneficiary or other holder of the Note may proceed with foreclosure by directing Trustee or his successor or substitute in trust to proceed as hereafter authorized to sell, assign, transfer and deliver the whole or, from time to time, any part of the Mortgaged Property, or any interest in any part thereof, by advertisement and sale in accordance with applicable law. Trustee shall execute and deliver to the purchaser at any such sale a trustee's deed conveying the property so sold, but without any covenant or warranty, expressed or implied. The recitals in such trustee's deed of any matters or facts shall be prima facie proof of the truthfulness thereof. Any Person, including Beneficiary, may bid at the sale. Trustee shall apply the proceeds of the sale in the following order:

*First*: To the payment of the costs and expenses of such sale (including the charges of advertising, sale and conveyance, including a commission to Trustee then acting, any amounts necessary to pay impositions or prior liens, the cost of evidence of title and the costs and expenses, if any, of taking possession of, retaining custody over, repairing, managing, operating, maintaining and preserving the Mortgaged Property or any part thereof prior to such sale), all reasonable costs and expenses incurred by Trustee, Beneficiary or any other Person in obtaining or collecting any insurance proceeds, condemnation awards or other amounts received by Beneficiary, all reasonable costs and expenses of any receiver of the Mortgaged Property or any part thereof, and any taxes, assessments, impositions or other charges or expenses prior to the security interest or lien of this Deed of Trust, which Trustee or Beneficiary may consider it necessary or desirable to pay;

*Second*: To the payment of all amounts of principal and interest (including post-petition interest to the extent such interest is a liability) at the time due and payable on the Debt outstanding at the time (whether due by reason of maturity or by prepayment or by declaration or acceleration or otherwise), including interest at the Involuntary Rate on any overdue principal and (to the extent permitted under applicable law) on any overdue interest;

*Third*: The balance, if any, held by Trustee after payment in full of all amount referred to in subdivisions *First* and *Second*, above, shall be paid to the Person or Persons entitled to receive such proceeds.

(ii) <u>Judicial Foreclosure</u>. If an Event of Default is continuing, Beneficiary at any time may, at its election, proceed at law or in equity or otherwise to enforce the payment of the Debt

4162651-v5\CHIDMS1

000573

in accordance with the terms hereof and thereof and to foreclose the lien of this Deed of Trust as against all or any part of the Mortgaged Property and to have the same sold under the judgment or decree of a court of competent jurisdiction. Beneficiary shall be entitled to recover in such proceedings all reasonable costs incident thereto, including reasonable trustee's fees and reasonable attorneys' fees and expenses in such amounts as may be fixed by the court.

        (iii)   <u>Appointment of Receiver</u>. If an Event of Default is continuing, Beneficiary shall, as a matter of right and without regard to the adequacy of any security for the indebtedness secured hereby or the solvency of Grantor, be entitled to the appointment of a receiver for all or any part of the Mortgaged Property, whether such receivership be incidental to a proposed sale of the Mortgaged Property or otherwise, and Grantor hereby consents to the appointment of such a receiver and will not oppose any such appointment.

        (d)   <u>Possession of the Premises; Remedies for Leases and Rents</u>. Grantor hereby waives all right to the possession, income, and rents of the Premises during the continuance of any Event of Default, and Beneficiary is hereby expressly authorized and empowered, at and following any such occurrence, to enter into and upon and take possession of the Premises or any part thereof. If any Event of Default is continuing, then, whether before or after institution of legal proceedings to foreclose the lien of this Deed of Trust or before or after the sale thereunder, Beneficiary shall be entitled, in its sole and absolute discretion, to do all or any of the following: (i) enter and take actual possession of the Premises, the Property Income, the Leases and other Mortgaged Property relating thereto or any part thereof personally, or by its agents or attorneys, and exclude Grantor therefrom; (ii) with or without process of law, enter upon and take and maintain possession of all of the documents, books, records, papers and accounts of Grantor relating thereto; (iii) as attorney-in-fact or agent of Grantor, or in its own name as mortgagee and under the powers herein granted, hold, operate, manage and control the Premises, the Property Income, the Leases and other Mortgaged Property relating thereto and conduct the business, if any, thereof either personally or by its agents, contractors or nominees, with full power to use such measures, legal or equitable, as in its sole and absolute discretion or in the discretion of its successors or assigns may be deemed proper or necessary to enforce the payment of the Property Income, the Leases and other Mortgaged Property relating thereto (including actions for the recovery of rent, actions in forcible detainer and actions in distress of rent); (iv) cancel or terminate any Lease or sublease for any cause or on any ground which would entitle Grantor to cancel the same; (v) elect to disaffirm any Lease or sublease made subsequent hereto or subordinated to the lien hereof; (vi) make all necessary or proper repairs, decorations, renewals, replacements, alterations, additions, betterments and improvements to the Premises that, in its discretion, may seem appropriate; (vii) insure and reinsure the Mortgaged Property for all risks incidental to Beneficiary's possession, operation and management thereof; and (viii) receive all such Property Income and proceeds, and perform such other acts in connection with the management and operation of the Mortgaged Property, as Beneficiary in its discretion may deem proper, Grantor hereby granting Beneficiary full power and authority to exercise each and every one of the rights, privileges and powers contained herein at any and all times while any Event of Default is continuing without notice to Grantor or any other Person. Beneficiary, in the exercise of the rights and powers conferred upon it hereby, shall have full power to use and apply the Property Income to the payment, in such order as Beneficiary may determine, of or on account of any one or more of the following: (a) to the payment of the operating expenses of the Premises, including the actual out-of-pocket cost of management and leasing thereof (which shall include reasonable compensation to Beneficiary and its agents or contractors, if management be delegated to agents or contractors, and it shall also include lease commissions and other compensation and expenses of seeking and procuring tenants and entering into leases), established claims for damages, if any, and premiums on insurance hereinabove authorized; (b) to the payment of taxes, charges and special assessments, the out-of-pocket costs of all repairs, decorating, renewals, replacements, alterations, additions, betterments and improvements of the Mortgaged Property,

<div align="center">8</div>

including the out-of-pocket cost from time to time of installing, replacing or repairing the Mortgaged Property, and of placing the Mortgaged Property in such condition as will, in the judgment of Beneficiary, make it readily rentable; and (c) to the payment of any Debt. The entering upon and taking possession of the Premises, or any part thereof, and the collection of any Property Income and the application thereof as aforesaid shall not cure or waive any Event of Default theretofore or thereafter occurring or affect any notice of Default hereunder or invalidate any act done pursuant to any such Event of Default or notice, and, notwithstanding continuance in possession of the Premises or any part thereof by Beneficiary or a receiver and the collection, receipt and application of the Property Income, Beneficiary shall be entitled to exercise every right provided for in this Deed of Trust or by law or in equity during the continuance of an Event of Default. Any of the actions referred to in this Section 2.01(d) may be taken by Beneficiary irrespective of whether any notice of Default has been given hereunder and without regard to the adequacy of the security for the indebtedness hereby secured.

(e)     Personal Property. If any Event of Default is continuing, Beneficiary may exercise from time to time any rights and remedies available to it under the Loan Documents or applicable law upon default in payment of indebtedness, including, without limitation, those available to a secured party under the Uniform Commercial Code of the state where the goods are located. Grantor shall, promptly upon request by Beneficiary, assemble the Mortgaged Property and make it available to Beneficiary at such place or places, reasonably convenient for both Beneficiary and Grantor, as Beneficiary shall designate. Grantor hereby expressly waives, to the fullest extent permitted by applicable law, any and all notices, advertisements, hearings, or process of law in connection with the exercise by Beneficiary of any of its rights and remedies while an Event of Default is continuing. If any notification of intended disposition of the Mortgaged Property is required by law, such notification, if mailed, shall be deemed reasonably and properly given if mailed by registered or certified mail, return receipt requested, at least ten (10) business days before such disposition, postage prepaid, addressed to Grantor either at the address shown below or at any other address of Grantor appearing on the records of Beneficiary. Without limiting the generality of the foregoing, whenever there exists an Event of Default hereunder, Beneficiary may, with respect to so much of the Mortgaged Property as is personal property under applicable law, to the fullest extent permitted by applicable law, without further notice, advertisement, hearing or process of law of any kind, (i) notify any Person obligated on the Mortgaged Property to perform directly for Beneficiary its obligations thereunder, (ii) enforce collection of any portion of the Mortgaged Property by suit or otherwise, and surrender, release or exchange all or any part thereof or compromise or extend or renew for any period (whether or not longer than the original period) any obligations of any nature of any party with respect thereto, (iii) endorse any checks, drafts or other writings in the name of Grantor to allow collection of the Mortgaged Property, (iv) take control of any proceeds of the Mortgaged Property, (v) enter upon any premises where any of the Mortgaged Property may be located and take possession of and remove such Mortgaged Property and render all or any part of the Mortgaged Property unusable, all without being responsible for loss or damage, (vi) sell any or all of the Mortgaged Property, free of all rights and claims of Grantor therein and thereto, at any lawful public or private sale and on such terms as Beneficiary deems advisable and (vii) bid for and purchase any or all of the Mortgaged Property at any such public or private sale. Any proceeds of any disposition by Beneficiary of any of the Mortgaged Property may be applied by Beneficiary to the payment of expenses in connection with the Mortgaged Property, including attorneys' fees and legal expenses, and any balance of such proceeds shall be applied by Beneficiary toward the payment of such portion of the Debt and in such order of application as Beneficiary may from time to time elect. Without limiting the foregoing, Beneficiary may exercise from time to time any rights and remedies available to it under the Uniform Commercial Code or other applicable law as in effect from time to time or otherwise available to it under applicable law. Grantor hereby expressly waives presentment, demand, notice of dishonor, protest and notice of protest in connection with the Note and, to the fullest extent permitted by applicable law, any and all other notices, demands, advertisements, hearings or process of law in connection with the exercise by Beneficiary of

9

RP-2018-235600

000575

any of its rights and remedies hereunder. Grantor hereby constitutes Beneficiary its attorney-in-fact with full power of substitution to take possession of the Mortgaged Property while any Event of Default is continuing and, as Beneficiary in its sole and absolute discretion deems necessary or proper, to execute and deliver all instruments required by Beneficiary to accomplish the disposition of the Mortgaged Property; this power of attorney is a power coupled with an interest and is irrevocable while any portion of the Debt is outstanding. Grantor shall remain liable for any deficiency resulting from the sale of the Mortgaged Property and shall pay such deficiency forthwith upon demand, and Beneficiary's right to recover such deficiency shall not be impaired by the sale or other disposition of the Mortgaged Property without required notice. Expenses of retaking, holding, preparing for sale, selling or the like will first be paid from the proceeds before the balance will be applied toward any portion of the Debt.

(f)     No Liability on Beneficiary or Lenders. Either Beneficiary or Trustee may cure any breach or default of Grantor, and if it chooses to do so in connection with any such cure, Beneficiary or Trustee may also enter the Premises and/or do any and all other things which it may in its sole and absolute discretion consider necessary and appropriate to protect the security of this Deed of Trust. Such other things may include, without limitation: appearing in and/or defending any action or proceeding which purports to affect the security of, or the rights or powers of Beneficiary or Trustee under, this Deed of Trust; paying, purchasing, contesting or compromising any encumbrance, charge, lien or claim of lien which in Beneficiary's or Trustee's sole judgment is or may be senior in priority to this Deed of Trust, such judgment of Beneficiary or Trustee to be conclusive as among the parties to this Deed of Trust; obtaining insurance and/or paying any premiums or charges for insurance required to be carried under the Loan Agreement; otherwise caring for and protecting any and all of the Premises; and/or employing counsel, accountants, contractors and other appropriate persons to assist Beneficiary or Trustee. Beneficiary and Trustee may take any of the actions permitted hereunder either with or without giving notice to any person. Notwithstanding anything contained herein, Beneficiary shall not be obligated to perform or discharge, and does not hereby undertake to perform or discharge, any obligation, duty or liability of Grantor, whether hereunder, under any third party agreements or otherwise. Neither Beneficiary nor Lenders shall have responsibility for the control, care, management or repair of the Premises (including, but not limited to, use, storage, manufacture, discharge or transportation of hazardous waste or substances including, without limitation, Hazardous Materials (as defined in the Environmental Indemnity Agreement), by Grantor) or be responsible or liable for any negligence in the management, operation, upkeep, repair or control of the Premises resulting in loss, injury or death to any tenant, licensee, employee, stranger or other Person. No liability shall be enforced or asserted against Beneficiary or Lenders in its exercise of the powers granted to it under this Deed of Trust, and Grantor expressly waives and releases any such liability. Should Beneficiary or Lenders incur any such liability, loss or damage under any third party agreements or under or by reason hereof, or in the defense of any claims or demands, Grantor agrees to reimburse Beneficiary or Lenders within five (5) Business Days upon demand for the full amount thereof, including costs, expenses and attorneys' fees. Such sums shall bear interest at the Involuntary Rate from the date of each such amount is due by Beneficiary or Lenders and shall be paid by Grantor to Beneficiary forthwith upon demand by Beneficiary, and shall be secured by this Deed of Trust, and Beneficiary shall have, in addition to any other right or remedy of Beneficiary, the same rights and remedies in the event of non-payment of any such sums by Grantor as in the case of a default by Grantor in the payment of any installment of principal or interest due and payable under the Loan Agreement.

<div align="center">ARTICLE III.<br>MISCELLANEOUS</div>

SECTION 3.01. Severability. In the event any one or more of the provisions contained in this Deed of Trust, the Loan Agreement or the Note shall for any reason be held to be invalid, illegal or

<div align="center">10</div>

4162651-v5\CHIDMS1

000576

unenforceable in any respect, such invalidity, illegality, or unenforceability shall, at the option of Beneficiary, not affect any other provision of this Deed of Trust, but this Deed of Trust shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein or therein.

SECTION 3.02. Notices. All notices hereunder and under any applicable law pertaining hereto shall be in writing and shall be deemed sufficiently given or served for all purposes when delivered as provided for in the Loan Agreement.

SECTION 3.03. Heirs, Successors and Assigns. All of the grants, covenants, terms, provisions and conditions of this Deed of Trust shall run with the land and shall apply to, bind and inure to the benefit of, the heirs, executors, administrators, successors and assigns of Grantor, the heirs, executors, administrators, successors and assigns of Trustee, and the heirs, executors, administrators, successors and assigns of Beneficiary.

SECTION 3.04. Counterparts. This Deed of Trust may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same deed of trust.

SECTION 3.05. Future Mortgage Taxes. In the event of the passage after the date of this Deed of Trust of any law of the State of Texas deducting from the value of real property for the purpose of taxation any lien or encumbrance thereon or changing in any way the laws for the taxation of mortgages or debts secured by mortgages for state or local purposes or the manner of the collection of any such taxes, and imposing a tax, either directly or indirectly, on this Deed of Trust, the Loan Agreement, the Note or the Debt, Grantor shall, if permitted by law, pay any tax imposed as a result of any such law within the statutory period or within fifteen (15) days after demand by Beneficiary, whichever is less; *provided, however*, that if, in the opinion of the attorneys for Beneficiary, Grantor is not permitted by law to pay such taxes, Beneficiary shall have the right, at Beneficiary's option, to declare the Debt due and payable, without prepayment premium, on a date specified in a prior notice to Grantor of not less than thirty (30) days.

SECTION 3.06. Stamp Tax. If at any time the United States of America, any state thereof or any governmental subdivision of any such state, shall require revenue or other stamps to be affixed to the Loan Agreement, the Note or this Deed of Trust, Grantor shall pay for the same, with interest and penalties thereon, if any.

SECTION 3.07. Cover Sheet. The information set forth on the cover of this Deed of Trust is hereby incorporated herein.

SECTION 3.08. Governing Law.

(a)   THIS DEED OF TRUST WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY GRANTOR TO BENEFICIARY IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS DEED OF TRUST AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES (I) THE PROVISIONS FOR THE CREATION,

11

RP-2018-235600

PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS (OTHER THAN WITH RESPECT TO LIENS AND SECURITY INTERESTS IN PROPERTY WHOSE PERFECTION AND PRIORITY IS COVERED BY ARTICLE 9 OF THE UCC (INCLUDING, WITHOUT LIMITATION, THE ACCOUNTS) WHICH SHALL BE GOVERNED BY THE LAW OF THE JURISDICTION APPLICABLE THERETO IN ACCORDANCE WITH SECTIONS 9-301 THROUGH 9-307 OF THE UCC AS IN EFFECT IN THE STATE OF NEW YORK) AND (II) THE ENFORCEMENT OF THE RIGHTS CREATED BY THE ABSOLUTE ASSIGNMENT OF LEASES AND RENTS OF EVEN DATE HEREWITH SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE MORTGAGED PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW AND EXCEPT AS SET FORTH IN THE IMMEDIATELY PRECEDING SENTENCE, GRANTOR HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS DEED OF TRUST AND THE NOTE, AND THIS DEED OF TRUST AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)       ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST GRANTOR OR BENEFICIARY ARISING OUT OF OR RELATING TO THE DEBT OR THIS DEED OF TRUST MAY AT BENEFICIARY'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND GRANTOR WAIVES ANY OBJECTIONS WHICH GRANTOR MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GRANTOR HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. GRANTOR DOES HEREBY DESIGNATE AND APPOINT:

> Capitol Services, Inc.
> 1218 Central Avenue, Suite 100
> Albany, NY 12205

AS GRANTOR'S AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON GRANTOR'S BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO GRANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GRANTOR, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. GRANTOR (I) SHALL GIVE PROMPT NOTICE TO BENEFICIARY OF ANY CHANGED ADDRESS OF GRANTORS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF GRANTOR'S AUTHORIZED

12

4162651-v5\CHIDMS1

AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

SECTION 3.09. Joint and Several Liability. If Grantor consists of more than one person or party, the obligations and liabilities of each such person or party hereunder shall be joint and several.

SECTION 3.10. Variable Rate. The Note contains provisions for a variable rate of interest, and reference to such provisions is made hereby.

SECTION 3.11. Purchase Money Deed of Trust. Grantor hereby agrees and acknowledges that Grantor borrowed the Deed of Trust Amount to finance Grantor's purchase of the Mortgaged Property.

SECTION 3.12. Maximum Secured Amount/Future Advances. This Deed of Trust shall secure the payment of any amounts advanced from time to time under the Loan Documents, or under other documents stating that such advances are secured hereby, whether such advances are obligatory or to be made at the option of the Lenders, or otherwise, to the same extent as if such future advances were made on the date of the execution of this Deed of Trust, although there may be no advance made at the time of execution of this Deed of Trust and although there may be no indebtedness outstanding at the time any advance is made. The lien of this Deed of Trust shall be valid as to any and all future obligations and Debt arising under or in connection with this Deed of Trust from the time of its filing for record in the recorder's or registrar's office of the county in which the Premises is located, which future obligations and Debt shall have the same priority as if all such future obligations and Debt were made on the date of execution hereof. Nothing in this Section or in any other provision of this Deed of Trust shall be deemed an obligation on the part of Beneficiary to make any future advances of any sort. At all times, regardless of whether any loan proceeds have been disbursed, this Deed of Trust shall secure (in addition to any loan proceeds disbursed from time to time) the payment of any and all expenses and advances due to or incurred by Beneficiary in connection with the Debt to be secured hereby and which are to be reimbursed by Grantor under the terms of this Deed of Trust. The total amount of indebtedness may increase or decrease from time to time, as provided in the Loan Agreement. This Deed of Trust is intended to and shall be valid and have priority over all subsequent liens and encumbrances, including statutory liens, excepting solely taxes and assessments levied on the Premises.

SECTION 3.13. Interest Rate Protection Product. Grantor acknowledges and agrees that any amounts now or hereafter due and owing from Grantor to Beneficiary arising from or in connection with any Interest Rate Protection Product, now existing or hereafter entered into between Grantor and Beneficiary, and any out-of-pocket costs incurred by Beneficiary in connection therewith, including, without limitation, any interest, expenses, fees, penalties or other charges associated with any obligations undertaken by Beneficiary to hedge or offset Beneficiary's obligations pursuant to such Interest Rate Protection Product, or the termination of any such obligations, shall be (i) deemed additional interest and/or a related expense (to be determined in the sole discretion of Beneficiary) due in connection with the principal amount of the Debt secured by this Deed of Trust, (ii) included (in the manner described above) as part of the Debt secured by this Deed of Trust, and secured by this Deed of Trust to the full extent thereof, and (iii) included in any judgment in any proceeding instituted by Beneficiary or its agents against Grantor for foreclosure of this Deed of Trust or otherwise.

SECTION 3.14. Administrative Agent. To the extent that any action is to be taken, any information is to be delivered to or by Lenders, any determination is to be made, or any consent is to be given or withheld by Lenders, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Beneficiary, as administrative agent under the Loan Agreement or any successor agent thereto.

13

4162651-v5\CHIDMS1

RP-2018-235600

SECTION 3.15. Acts by Trustee. At any time upon written request of Beneficiary, payment of its fees and (in case of full reconveyance, for cancellation and retention) presentation of this Deed of Trust and the appropriate instruments evidencing the Debt for endorsement and without affecting the liability of any person for the payment of the Debt, Trustee may: (a) consent to the making of any map or plat of the Premises; (b) join in granting any easement or creating any restriction thereon; (c) join in any subordination or other agreement affecting this Deed of Trust or the lien or charge thereof; or (d) reconvey, without warranty, all or any part of the Premises, as provided in **Section 3.20** hereof. The recitals in any reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof. Grantor agrees to pay a reasonable trustee's fee for full or partial reconveyance, together with a recording fee if Trustee, at its option, elects to record said reconveyance. Trustee may resign by instrument in writing filed in the office of county clerk or applicable recorder or registrar of deeds in which this Deed of Trust shall have been recorded or filed.

SECTION 3.16. Successor Trustee. In the event of the resignation, refusal or inability of Trustee to act or at the option of Beneficiary, with or without any reason, Beneficiary is authorized either in its own name or through an attorney or attorney-in-fact appointed for the purpose by written instrument duly recorded and without any formality other than a designation in writing of a successor or substitute trustee, to appoint a successor or substitute trustee who shall thereupon become vested with and succeed to all the rights, title and powers given to Trustee herein named, the same as if the successor or substitute trustee had been named original Trustee herein; and such right to appoint a successor or substitute trustee shall exist as often as and whenever Beneficiary desires.

SECTION 3.17. Covenants of Trustee. Trustee covenants faithfully to perform the trust herein created, being liable, however, only for its own gross negligence or misconduct and that of the employees and agents of Trustee.

SECTION 3.18. Employment of Agents. Trustee, or anyone acting in its stead, shall have, in its discretion, authority to employ all proper agents and attorneys in the execution of this trust and in the conducting of any sale made pursuant to the terms hereof, and to pay for such services rendered out of the proceeds of the sale of the Premises, should any be realized; and if no sale be made or if the proceeds of sale be insufficient to pay the same, then Grantor hereby undertakes and agrees to pay the costs of such services rendered to Trustee. Trustee may rely on any document believed by it in good faith to be genuine. All money received by Trustee shall, until used or applied as herein provided, be held in trust, but need not be segregated (except to the extent required by law), and Trustee shall not be liable for interest thereon.

SECTION 3.19. Indemnification of Trustee or Beneficiary. If Trustee or Beneficiary shall be made a party to or shall intervene in any action or proceeding affecting the Premises or the title thereto, or the interest of Trustee or Beneficiary under this Deed of Trust, except for any action or proceeding arising out of the willful misconduct or, to the extent prohibited by law, the gross negligence of Trustee or Beneficiary, Trustee and Beneficiary shall be reimbursed by Grantor, immediately and without demand, for all reasonable costs, charges and attorneys' fees incurred by them or any of them in any case, and the same shall become so much additional indebtedness secured hereby.

SECTION 3.20. Defeasance. Upon full payment of all indebtedness secured hereby and satisfaction of the entire Debt in accordance with their respective terms and at the time and in the manner provided, and when Beneficiary and Lenders have no further obligation to make any advance, or extend any credit hereunder, under the Note or any of the other Loan Documents, Beneficiary shall request Trustee in writing to reconvey the Premises, and shall surrender this Deed of Trust and all notes and instruments evidencing the Debt to Trustee. When Trustee receives Beneficiary's written request for reconveyance and all fees and other sums owing to Trustee by Grantor, Trustee shall reconvey the

14

4162651-v5\CHIDMS1

RP-2018-235600

Premises, or so much of it as is then held under this Deed of Trust, without warranty to the person or persons legally entitled to it. Such person or persons shall pay any costs of recordation. In the reconveyance, the grantee may be described as "the person or persons legally entitled thereto," and the recitals of any matters or facts shall be conclusive proof of their truthfulness absent manifest error. Neither Beneficiary nor Trustee shall have any duty to determine the rights of persons claiming to be rightful grantees of any reconveyance.

SECTION 3.21. Maximum Interest. It is expressly stipulated and agreed to be the intent of Grantor and Beneficiary at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on the Debt (or applicable United States federal law to the extent that it permits Beneficiary to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If the applicable law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to the Note, any of the Loan Documents or any other communication or writing by or between Grantor and Beneficiary related to the Debt or to the transaction or transactions that are the subject matter of the Loan Documents, (ii) contracted for, charged, taken, reserved or received by reason of Beneficiary's exercise of the option to accelerate the maturity of the Note and/or any other portion of the Debt, or (iii) Grantor will have paid or Beneficiary will have received by reason of any voluntary prepayment by Grantor of the Note and/or any other portion of the Debt, then it is Grantor's and Beneficiary's express intent that all amounts charged in excess of the maximum amount of interest permissible by applicable law (the "Maximum Lawful Rate") shall be automatically cancelled, ab initio, and all amounts in excess of the Maximum Lawful Rate theretofore collected by Beneficiary shall be credited on the principal balance of the Note and/or any other portion of the Debt (or, if the Note and all other Debt have been or would thereby be paid in full, refunded to Grantor), and the provisions of the Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; *provided*, *however*, if the Note has been paid in full before the end of the stated term of the Note, then Grantor and Beneficiary agree that Beneficiary shall, with reasonable promptness after Beneficiary discovers or is advised by Grantor that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to Grantor and/or credit such excess interest against any other portion of the Debt then owing by Grantor to Beneficiary. Grantor hereby agrees that as a condition precedent to any claim seeking usury penalties against Beneficiary, Grantor will provide written notice to Beneficiary, advising Beneficiary in reasonable detail of the nature and amount of the violation, and Beneficiary shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Grantor or crediting such excess interest against the Note and/or any other portion of the Debt then owing by Grantor to Beneficiary. All sums contracted for, charged, taken, reserved or received by Beneficiary for the use, forbearance or detention of any of the Debt, including any portion of the Debt evidenced by the Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the stated term of the Note and/or any other portion of the Debt (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of the Note and/or any other portion of the Debt does not exceed the Maximum Lawful Rate from time to time in effect and applicable to the Note and/or any other portion of the Debt for so long as any portion of the Debt is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Beneficiary to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

SECTION 3.22. STATE SPECIFIC PROVISIONS

15

RP-2018-235600

(a) <u>Inconsistencies</u>. In the event of any inconsistencies between the terms and conditions of this Article and the other provisions of this instrument, the terms and conditions of this Article shall control and be binding.

(b) <u>Section 1.09</u> is amended by adding the following:

Without in any way limiting or restricting any of Beneficiary's rights, benefits or privileges hereunder, Beneficiary and Grantor hereby expressly agree that Beneficiary shall be entitled to all of the rights, benefits and privileges provided for in the Texas Assignment of Rents Act, Chapter 64 of the Texas Property Code, as amended from time to time.

(c) During the continuance of an Event of Default, it shall thereupon be the duty of the above named Trustee, or its successor or substitute, as hereinafter provided, to enforce this trust at the request of Beneficiary (which request shall be presumed) and to sell the Mortgaged Property with or without first having taken possession of the same and in whole or in part, as the Trustee, or its successor or substitute, may elect (all rights to a marshalling of assets of Grantor being expressly waived hereby) to the highest bidder for cash at public auction at the county courthouse of any County in which the Mortgaged Property is situated, in the area of such courthouse designated for real property foreclosure sales in accordance with applicable law (or in the absence of any such designation, in the area set forth in the notice of sale hereinafter described) on the first Tuesday of any month between the hours of 10:00 A.M. and 4:00 P.M. (commencing at the time stated in the hereinafter described notice of sale or not later than three hours after that time), after giving notice of the time, place and terms of sale and the Mortgaged Property to be sold by (i) the Trustee, or its successor or substitute, or any authorized agent of the foregoing filing a copy of the notice thereof in the office of the County Clerk of each County where the Mortgaged Property is situated and by posting written or printed notice thereof at least twenty-one (21) days preceding the date of said sale at the County Courthouse door of each County where the Mortgaged Property is located, and (ii) the holder of the Debt secured by this Deed of Trust or any authorized agent of such holder, at least twenty-one (21) days preceding the date of said sale, serving written notice of such proposed sale by certified mail on each debtor obligated to pay the Debt secured by this Deed of Trust evidenced by the Notes according to the records of Beneficiary. Service of such notice to each debtor shall be completed upon deposit of the notice enclosed in a postpaid wrapper, properly addressed to each debtor at the most recent address as shown by the records of Beneficiary, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service. After such sale, the Trustee, or its successor or substitute, shall make due conveyance with general warranty to the purchaser or purchasers and the Grantor binds itself, its heirs, assigns, executors, administrators, successors and legal representatives to warrant and forever defend the title of such purchaser or purchasers. Any abstract of title to the Mortgaged Property furnished in connection with the Loan shall be delivered and become the property of the purchaser at said sale. In the event a foreclosure hereunder shall be commenced by the Trustee or its substitute or successor, Beneficiary may at any time before the sale of the Mortgaged Property, direct the said Trustee, or its successor or substitute, to abandon the sale, and may then institute suit for the collection of the Notes and the other secured indebtedness, and for the foreclosure of this Deed of Trust. It is agreed that if Lender should institute a suit for the collection of the Note or any other secured indebtedness and for the foreclosure of this Deed of Trust, Beneficiary may at any time before the entry of a final judgment in said suit dismiss the same, and require the Trustee, its substitute or successor to sell the Mortgaged Property in accordance with the provisions of this Deed of Trust.

(d) With respect to the Personal Property, Beneficiary is hereby irrevocably appointed the true and lawful attorney of the Grantor (coupled with an interest), in its name and stead, to

16

4162651-v5\CHIDMS1

000582

make all necessary conveyances, assignments, transfers and deliveries of the Personal Property, and for that purpose Beneficiary may execute all necessary instruments of conveyance, assignment, transfer and delivery, and may substitute one or more persons with such power, Grantor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Notwithstanding the foregoing, Grantor, if so requested by Beneficiary, shall ratify and confirm any such sale or sales by executing and delivering to Lender or to such purchaser or purchasers all such instruments as may be advisable, in the judgment of Beneficiary, for such purpose, and as may be designated in such request.  To the extent permitted by law, any such sale or sales made under or by virtue of this Section 3.22(d) shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law, or in equity, of Grantor in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Grantor and against any and all persons claiming or who may claim the same, or any part thereof, from, through or under Grantor.  Upon any sale made under or by virtue of this Section 3.22(d), Trustee, or its successor or substitute, or Beneficiary may, to the extent permitted by law, bid for and acquire the Mortgaged Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the debt secured by this Deed of Trust the net sales price after deducting therefrom the expenses of the sale and the cost of the auction and any other sums which Beneficiary is authorized to deduct by law or under this Deed of Trust.  At any sale pursuant to this Section 3.22(d), whether made under power herein granted, the Texas Property Code, the Texas Business and Commerce Code, or any other legal enactment, or by virtue of any judicial proceeding or any other legal right, remedy or recourse, it shall not be necessary for Beneficiary or Trustee, or its successor or substitute, to be physically present, or to have constructive possession of, the Mortgaged Property, and the title to and right of possession of any such property shall pass to the purchaser thereof as completely as if the same had been actually presented and delivered to the purchaser at such sale.

(e)      During the continuance of an Event of Default, Beneficiary shall have the right and option to proceed with foreclosure in satisfaction of such item or items by directing the Trustee, or its successor or substitute as hereinafter provided, to proceed as if under a full foreclosure, conducting the sale as herein provided, and without declaring the whole debt secured by this Deed of Trust due, and provided that if sale is made because of default as hereinabove mentioned, such sale may be made subject to the unmatured part of the Note and the Debt secured by this Deed of Trust, and it is agreed that such sale, if so made, shall not in any manner affect any other obligations secured by this Deed of Trust, but as to such other obligations this Deed of Trust and the liens created hereby shall remain in full force and effect just as though no sale had been made under the provisions of this Section 3.22(e).  It is further agreed that several sales may be made hereunder without exhausting the right of sale for any other breach of any of the obligations secured hereby, it being the purpose to provide for a foreclosure and sale of the Mortgaged Property for any matured portion of any of the Debt secured hereby or other items provided for herein without exhausting the power to foreclose and to sell the Mortgaged Property for any other part of the debt secured hereby whether matured at the time or subsequently maturing.

(f)      The Trustee, or its successor or substitute, hereunder shall have the right to sell the Mortgaged Property in whole or in part and in such parcels and order as he may determine, and the right of sale hereunder shall not be exhausted by one or more sales, but successive sales may be had until all of the Mortgaged Property has been legally sold.  In the event any sale hereunder is not completed or is defective in the opinion of Beneficiary or the holder of any part of the Debt secured hereby, such sale shall not exhaust the power of sale hereunder, and Beneficiary or such holder shall have the right to cause a subsequent sale or sales to be made by the Trustee or any successor or substitute Trustee.  Likewise, Beneficiary on behalf of Lender may become the purchaser at any such sale if it is the highest bidder, and shall have the right, after paying or accounting for all costs of said sale or sales, to credit the amount of the bid upon the amount of the debt secured hereby, in lieu of cash payment.

<div align="center">17</div>

4162651-v5\CHIDMS1

RP-2018-235600

(g)    It shall not be necessary for the Trustee, or its successor or substitute, to have constructively in its possession any part of the real or personal property covered by this Deed of Trust, and the title and right of possession of said property shall pass to the purchaser or purchasers at any sale hereunder as fully as if the same had been actually present and delivered. Likewise, on foreclosure of this Deed of Trust whether by power of sale herein contained or otherwise, Grantor or any person claiming any part of the Mortgaged Property by, through or under Grantor, shall not be entitled to a marshalling of assets or a sale in inverse order of alienation.

(h)    The recitals and statements of fact contained in any notice or in any conveyance to the purchaser or purchasers at any sale hereunder shall be prima facie evidence of the truth of such facts, and all prerequisites and requirements necessary to the validity of any such sale shall be presumed to have been performed.

(i)    Any sale under the powers granted by this Deed of Trust shall be a perpetual bar against Grantor, its heirs, successors, assigns and legal representatives.

(j)    In the event of a foreclosure under the powers granted by this Deed of Trust, Grantor, and all other persons in possession of any part of the Mortgaged Property shall be deemed tenants at will of the purchaser at such foreclosure sale and shall be liable for a reasonable rental for the use of the Mortgaged Property; and if any such tenants refuse to surrender possession of the Mortgaged Property upon demand, the purchaser shall be entitled to institute and maintain the statutory action of forcible entry and detainer and procure a writ of possession thereunder, and Grantor expressly waives all damages sustained by reason thereof.

(k)    To the extent permitted under applicable law, Grantor shall not, and will not, apply for, avail itself of, insist upon or plead or in any manner claim or take advantage of any appraisement, homestead, valuation, stay, extension or exemption laws, or any so called "*Moratorium Laws*", now existing or hereafter enacted, in order to prevent or hinder the enforcement or foreclosure of this Deed of Trust, but hereby waives the benefit of such laws. Grantor, for itself and all who may claim through or under Grantor, waives any and all right to have the property and estates comprising the Mortgaged Property marshaled upon any foreclosure of the lien hereof and agrees that any court having jurisdiction to foreclose such lien may order the Mortgaged Property sold as an entirety. Grantor hereby expressly waives any and all rights of reinstatement and redemption, if any, from sale pursuant to a foreclosure of this Deed of Trust on behalf of Grantor, and each and every person claiming by, through or under Grantor. The waiver of statutory rights contained set forth above specifically includes a waiver of all provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time). In the event an interest in any of the Mortgaged Property is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code, and to the extent permitted by law, Beneficiary shall be entitled to seek a deficiency judgment from Grantor, any guarantor of the debt secured by this Deed of Trust and any other party obligated on obligations secured hereby (each an "Obligor") equal to the difference between the amount owing on the obligations secured hereby and the amount for which the Mortgaged Property was sold pursuant to judicial or nonjudicial foreclosure sale. Grantor expressly recognizes that this section constitutes a waiver of the above cited provisions of the Texas Property Code which would otherwise permit Grantor and other persons against whom recovery of deficiencies is sought independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Mortgaged Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Grantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Mortgaged Property for

RP-2018-235600

18

purposes of calculating deficiencies owed by Grantor or any other Obligor against whom recovery of a deficiency is sought.

(l)      To the extent, notwithstanding the provisions of <u>Section 3.22(k)</u> above, Section 51.003 of the Texas Property Code, or any amendment thereto or judicial interpretation thereof, requires that the "fair market value" of the Mortgaged Property shall be determined as of the foreclosure date in order to enforce a deficiency against Grantor or any other party liable for the repayment of the obligations secured by this Deed of Trust, the term "fair market value" shall include those matters required by law and shall also include the additional factors as follows:

(i)      The Mortgaged Property is to be valued "AS IS, WHERE IS" and "WITH ALL FAULTS" and there shall be no assumption of restoration of or refurbishment of the Mortgaged Property after the date of foreclosure;

(ii)      There shall be an assumption of a prompt resale of the Mortgaged Property for an all cash sales price by the purchaser at the foreclosure so that no extensive holding period should be factored into the determination of "fair market value" of the Mortgaged Property;

(iii)      An offset to the fair market value of the Mortgaged Property, as determined hereunder, shall be made by deducting from such value the reasonable estimated closing costs relating to the sale of the Mortgaged Property including but not limited to brokerage commissions, title policy expenses, tax prorations, escrow fees, and other common charges which are incurred by a seller of real property similar to the Mortgaged Property; and

(iv)      After consideration of the factors required by law and those required above (including the addition of any income to be generated by the Mortgaged Property), an additional discount factor shall be calculated based upon the estimated time it will take to effectuate a sale of the Mortgaged Property so that the "fair market value" as so determined is discounted to be as of the date of the foreclosure of the Mortgaged Property.

(m)      The Mortgaged Property forms no part of any property owned, used or claimed by Grantor as a residence or business homestead and is not exempt from forced sale under the laws of the State of Texas. Grantor hereby disclaims and renounces each and every claim to the Mortgaged Property as a homestead.

(n)      Pursuant to the Uniform Commercial Code, this Deed of Trust shall be effective as a Financing Statement filed as a fixture filing from the date of its filing for record covering and including any and all fixtures of every kind and type affixed to all or any portion of the Property or forming part of all or any portion of the Improvements. The name and address of Borrower, as debtor, and Lender (where information concerning the security interest granted hereby may be obtained), as secured party, are as set forth on the first page of this Deed of Trust. The above described goods are or are to become fixtures related to the Property and the Improvements of which Borrower is record title owner. This Deed of Trust shall also be effective as a financing statement covering minerals or the like (including oil and gas) and accounts subject to Section 9.103(e) of the Uniform Commercial Code, as amended.

(o)      **EACH OF THE PARTIES HERETO SPECIFICALLY ACKNOWLEDGES AND AGREES (i) THAT IT HAS A DUTY TO READ THIS DEED OF TRUST AND THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS HEREOF, (ii) THAT IT HAS IN FACT READ THIS DEED OF TRUST AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS DEED OF TRUST, (iii) THAT IT HAS BEEN REPRESENTED BY LEGAL COUNSEL OF ITS**

19

RP-2018-235600

CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS DEED OF TRUST AND HAS RECEIVED THE ADVICE OF SUCH COUNSEL IN CONNECTION WITH ENTERING INTO THIS DEED OF TRUST, AND (iv) THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS DEED OF TRUST PROVIDE FOR (A) CERTAIN WAIVERS AND FOR (B) THE ASSUMPTION BY ONE PARTY OF, AND/OR RELEASE OF THE OTHER PARTY FROM, CERTAIN LIABILITIES THAT SUCH PARTY MIGHT OTHERWISE BE RESPONSIBLE FOR UNDER THE LAW. EACH PARTY HERETO FURTHER AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY SUCH PROVISIONS OF THIS DEED OF TRUST ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT SUCH PROVISIONS ARE NOT "CONSPICUOUS."

NOTICE PURSUANT TO SECTION 26.02(e) OF THE TEXAS BUSINESS AND COMMERCE CODE:  THE NOTE, THIS DEED OF TRUST AND THE OTHER SECURITY DOCUMENTS CONSTITUTE A WRITTEN LOAN AGREEMENT (AS DEFINED IN SECTION 26(a)(2) OF THE TEXAS BUSINESS AND COMMERCE CODE, AS AMENDED) AND REPRESENT THE FINAL AGREEMENT AND UNDERSTANDING BETWEEN THE BENEFICIARY, THE LENDERS AND THE OTHER RESPECTIVE PARTIES HERETO AND THERETO AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS BETWEEN SUCH PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR CONTEMPORANEOUS OR SUBSEQUENT AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

### NOTICE OF INDEMNIFICATION

(p)   GRANTOR AND BENEFICIARY EACH HEREBY ACKNOWLEDGE AND AGREE THAT THIS DEED OF TRUST CONTAINS CERTAIN INDEMNIFICATION OBLIGATIONS AND COVENANTS.

[remainder of page intentionally left blank]

RP-2018-235600

4162651-v5\CHIDMS1

20

IN WITNESS WHEREOF, this Deed of Trust has been duly executed by Grantor as of the day first above written.

GRANTOR:

**GALLERIA 2425 OWNER, LLC,**
a Delaware limited liability company

By:   Galleria 2425 JV, LLC,
     a Delaware limited liability company,
     its sole member

     By:   Naissance Capital Real Estate, LLC,
          a Delaware limited liability company,
          its Managing Member

          By: _____
          Name: Azeemeh Zaheer
          Title:  Managing Member

RP-2018-235600

[Signature Page to Deed of Trust]

000587

## ACKNOWLEDGMENT

STATE OF _Texas_ )

COUNTY OF _Harris_ )ss.

On _May 20_, 2018 before me _Shelina Jamani_ personally appeared _Azeemeh Zaheer_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person, whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____ (Seal)

SHELINA JAMANI
Notary Public, State of Texas
Comm. Expires 05-09-2019
Notary ID 128607783

RP-2018-235600

[Signature Page to Deed of Trust]

000588

EXHIBIT A
PROPERTY DESCRIPTION

Real property in the City of Houston, County of Harris and State of Texas, described as follows:

Tract 1: Fee Tract

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING;

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM. WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X"

[Exhibit A - Property Description]

RP-2018-235600

FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

NOTE: WE ARE PROHIBITED FROM INSURING ANY INACCURACY IN STATEMENT AS TO THE QUANTITY OF LAND CONTAINED WITHIN THE BOUNDARIES OF THE LAND DESCRIBED IN SCHEDULE A.

TRACT 2 EASEMENT TRACT: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND GRANTED BY VI IAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385 ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X" FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF BEGINNING;

[Exhibit A - Property Description]

RP-2018-235600

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61 FEET ALONG THE NORTHERLY LINE OF TRACT 1 TO AN "X" SET ON THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE NORTHERLY LINE OF TRACT 1, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085 SQUARE FEET OF LAND MORE OR LESS.

TRACT 3 EASEMENT TRACT: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE SOUTHERN BOUNDARY LINE OF TRACT 1, SAID EASEMENT CREATED AND GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING, WHENCE THE SOUTHEAST CORNER OF TRACT 1 BEARS NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE SOUTHERLY LINE OF TRACT 1, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP;

[Exhibit A - Property Description]

RP-2018-235600

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE SOUTHWEST CORNER FOR TRACT 1 FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND AT THE SOUTHEAST CORNER OF TRACT 1;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG THE A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

TRACT 4 EASEMENT TRACT: 28 FOOT ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT 1, CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT 1;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

[Exhibit A - Property Description]

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

TRACT 5 EASEMENT TRACT: 5 FOOT STORM SEWER EASEMENT

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT UN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS

[Exhibit A - Property Description]

RP-2018-235600

RP-2018-235600

RP-2018-235600

\# Pages 29

05/30/2018 08:41 AM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

STAN STANART

COUNTY CLERK

Fees   $124.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.

COUNTY CLERK
HARRIS COUNTY, TEXAS

## **Exhibit D**

Payoff Statement



**National Bank of Kuwait** SAKP
*New York Branch*
299 Park Ave. 17th Fl.
New York  NY  10171
USA

| | |
|---|---|
| **TEL** | **212-303-9800** |
| **FAX** | **212-319-8269** |
| **ABA** | **026-000-217** |
| **SWIFT** | **NBOKUS33** |

<div align="center">

**LOAN PAYOFF STATEMENT**

</div>

**February 6, 2023**

**To:**      GALLERIA 2425 OWNER, LLC

Scarlet MacGeorge          (scarlet.M@jetallcompanies.com)

Ali                              Ali @ Jetall <ali@jetallcompanies.com>

Jennifer MacGeorge          (jennifer@jetallcompanies.com)

                              NYCorpBankingGrp@nbkny.com

**RE:**      **GALLERIA 2425 OWNER, LLC**
             <u>USD 51.675MM 5 Year Term Loan</u>

**Dear All,**

 The total  amount due to repay the loan in full, effective March 1, 2023, is $61,714,063.38.   If repayment were to occur after March 1, 2023, please adjust the amount due by the per diem interest amount of $13,995.31 for each day beyond March 1, 2023.


 Please remit payment via the wiring instructions noted below.


<u>Wiring Instructions</u>
**Bank Name:**         **Bank of America New York:**
**Swift Code:**        **BOFAUS3N**
**ABA/Routing No.:**   **026009593**
**Account Name:**      **National Bank of Kuwait, New York**
**Bank Account #**     **6550705334**
**Swift Code:**        **NBOKUS33**
**F/O:**               **National Bank of Kuwait, Grand Cayman Branch**
**Ref Account No.:**   **500-550103-103**
**Attention:**         **Loan Operations Department**
**Reference:**         **Galleria 2425 Owner, LLC**

Should you have any questions concerning the above, please contact the undersigned at (212) 303-9820

Regards,


**Robert Looft**                              **Craig Kennedy**
**National Bank of Kuwait**                   **National Bank of Kuwait**
**Loan Operations Supervisor**               **Head of Operations**
**Tel: (212) 303-9820**                       **Tel: (212) 303-9827**
**Email: robert.looft@nbkny.com**            **Email: craig.kennedy@nbkny.com**

## <u>Exhibit E</u>

Proofs of Claim Nos. 3-1 and 4-1
(Case No. 23-60036; *In re: Galleria 2425 Owner LLC*;
U.S. Bankruptcy Court for the Southern District of Texas)

| Fill in this information to identify the case: |
| --- |
| Debtor 1 **GALLERIA 2425 OWNER LLC** |
| Debtor 2 (Spouse, if filing) |
| United States Bankruptcy Court for the: **Southern District of TX** |
| Case number **23-60036 -** Chapter **11** |

## Official Form 410
# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or **redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. **Do not send original documents**; they may be destroyed after scanning.  If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both 18 U. S. C §§ 152, 157 and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| **1. Who is the current creditor?** | <u>    City of Houston    </u><br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| --- | --- |
| **2. Has this claim been acquired from someone else?** | ☒ No<br>☐ Yes  From whom? _____ |
| **3. Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?     Where should payments to the creditor be sent? (If different)<br><br>LINEBARGER GOGGAN BLAIR & SAMPSON, LLP    CITY OF HOUSTON<br>PO BOX 3064                               PO BOX 4576<br>HOUSTON, TX 77253-3064          HOUSTON, TX 77210-4576<br>(713) 844-3400<br><br>houston_bankruptcy@lgbs.com<br><br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ |
| **4. Does this claim amend one already filed?** | ☒ No<br>☐ Yes  Claim number on court claims registry (if known) _____     Filed On: _____ |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No<br>☐ Yes  Who made the earlier filing? _____ |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
| --- | --- |

| **6. Do you have any** | ☐ No |
| --- | --- |

| number you use to identify the debtor? | ☒ Yes  Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ <br><br>**SEE ATTACHED EXHIBITS** |
|---|---|
| **7. How much is the claim?** | $  **412,849.57**    Does this amount include interest or other charges? <br><br> ☐  No <br><br> ☒  Yes  Attach statement itemizing interest, fees, expenses or other charges required <br> by Bankruptcy Rule 3001(c)(2)(A). |
| **8. What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. <br><br> Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). <br><br> Limit disclosing information that is entitled to privacy, such as health care information. <br><br> <div align="center">**AD VALOREM TAXES**</div> |
| **9. Is all or part of the claim secured?** | ☐  No <br><br> ☒  Yes  The claim is secured by a lien on property. <br><br> **Nature of property:** <br><br> ☒  Real Estate. If claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this Proof of Claim. <br> ☐  Motor Vehicle <br> ☐  Other. Describe:  _____**SEE ATTACHED EXHIBITS**_____ <br><br> **Basis for perfection:**  Secured by Tax Lien §§ 32.01 and 32.05 of the Texas Property Tax Code. Secured claim to extent of collateral value. Unsecured Priority claim [11 U.S.C. 507 (a)(8)] to extent of any shortfall in collateral value and for personal liability.  Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.) <br><br> **Value of property:**         $  **SEE ATTACHED EXHIBITS** <br> **Amount of the claim that is secured:**    $  **412,849.57** <br><br> **Amount of the claim that is unsecured:** $_____   (The sum of the secured and unsecured amounts should match the amount in line 7.) <br><br> **Amount necessary to cure any default as of the date of the petition:** $   **412,849.57** <br><br> **Annual Interest Rate** (when case was filed)   **12%** <br> ☒  Fixed <br> ☐  Variable |
| **10. Is this claim based on a lease?** | ☒  No <br><br> ☐  Yes  Amount necessary to cure any default as of the date of the petition. $_____ |
| **11. Is this claim subject to a right of setoff?** | ☒  No <br><br> ☐  Yes  Identify the property: _____ |
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. 507(a)?** <br><br> A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒  No <br><br> ☐  Yes  *Check all that apply:*                    **Amount entitled to priority** <br><br> ☐  Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).                                   $_____ <br><br> ☐  Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).        $_____ <br><br> ☐  Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier.   $_____ |

| | 11 U.S.C § 507(a)(4). | |
|---|---|---|
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

**If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.**

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other co-debtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  September 1, 2023

**/s/Jeannie Andresen**

**Print the name of the person who is completing and signing this claim:**

Name :  **Jeannie Andresen**

Title :  **Attorney  TXBN  24086239**

Company :  **LINEBARGER GOGGAN BLAIR & SAMPSON, LLP**
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address :  **PO BOX 3064**
**HOUSTON, TX 77253-3064**
**(713) 844-3400**                    **houston_bankruptcy@lgbs.com**



**ANN HARRIS BENNETT**
**HARRIS COUNTY TAX ASSESSOR-COLLECTOR**
**1001 PRESTON, SUITE 100**
**HOUSTON, TEXAS 77002**   2023 EST = 170,886.61

| Certified Owner: | | Print Date: | Legal Description: |
|---|---|---|---|
| | | 09/01/2023 | TR 31D |
| **GALLERIA 2425 OWNER LLC** | | **Printed By:** | ABST 836 W WHITE |
| **11509 S LOU AL DR** | | LBNTALL | |
| **HOUSTON, TX 77024-2707** | | | |

| | **2022 Value:** | $32,017,204 | **Legal Acres:** 2.4455 |
|---|---|---|---|
| **Account No: 045-140-006-0400** | **APPR. DIST#:** | 0451400060400 | **Parcel Address:** 2425 W LOOP S |
| As of Date: 07/05/2023 | | | |

| Year | Tax Units | Base Tax Due | IF PAID BY END OF MONTH JULY 2023 | | IF PAID BY END OF MONTH AUGUST 2023 | | IF PAID BY END OF MONTH SEPTEMBER 2023 | |
|---|---|---|---|---|---|---|---|---|
| | | | Penalties & Interest | Total | Penalties & Interest | Total | Penalties & Interest | Total |
| 2022 | 61 9150 | $170,886.61 | $71,076.35 | $241,962.96 | $73,126.63 | $244,013.24 | $75,176.91 | $246,063.52 |
| | **TOTAL AMOUNT DUE:** | **$170,886.61** | $71,076.35 | **$241,962.96** | $73,126.63 | **$244,013.24** | $75,176.91 | **$246,063.52** |

**Tax Unit Codes:**
**61**   City of Houston   **9150**   Returned Item Fee

*IF YOU ARE 65 YEARS OF AGE OR OLDER OR ARE DISABLED AND THE PROPERTY DESCRIBED IN THIS DOCUMENT IS YOUR RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE APPRAISAL DISTRICT REGARDING ANY ENTITLEMENT YOU MAY HAVE TO A POSTPONEMENT IN THE PAYMENT OF THESE TAXES.*

IF THE PROPERTY DESCRIBED IN THIS DOCUMENT IS YOUR RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE HARRIS COUNTY TAX ASSESSOR-COLLECTOR'S OFFICE REGARDING A RIGHT YOU MAY HAVE TO ENTER INTO AN INSTALLMENT AGREEMENT DIRECTLY WITH THE HARRIS COUNTY TAX ASSESSOR-COLLECTOR'S OFFICE FOR THE PAYMENT OF THESE TAXES.

## Partial Statement: Other Years and Tax Units may be due

## THE TAXES ON THIS PROPERTY ARE DELINQUENT. THE PROPERTY IS SUBJECT TO A LIEN FOR THE DELINQUENT TAXES. IF THE DELINQUENT TAXES ARE NOT PAID, THE LIEN MAY BE FORECLOSED.

-------------------------------------------------------------------------------- ✂

**Detach at the perforation and return this coupon with your payment. Keep top part for your records.**   33.v1.64   Page 1 of 1

Print Date: **09/01/2023**

**PLEASE NOTE YOUR ACCOUNT NUMBER ON YOUR CHECK AND MAKE CHECKS PAYABLE TO:**

**APPR. DIST#:** 0451400060400

**ANN HARRIS BENNETT**
**HARRIS COUNTY TAX ASSESSOR-COLLECTOR**
**P.O. BOX 4622**
**HOUSTON, TEXAS 77210-4622**   **PAYMENT COUPON**



*0451400060400*

**045-140-006-0400**
**GALLERIA 2425 OWNER LLC**   TOTAL = 412,849.57
**11509 S LOU AL DR**
**HOUSTON, TX 77024-2707**

| If Paid By | Amount Due |
|---|---|
| JUL 2023 | $241,962.96 |
| AUG 2023 | $244,013.24 |
| SEP 2023 | $246,063.52 |
| Amount Paid: | $_____.__ |

0451400060400S 2022 024196296 024401324 024606352 000000000 000601

| Fill in this information to identify the case: |
|---|

Debtor 1 **GALLERIA 2425 OWNER LLC**

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: **Southern District of TX**

Case number **23-60036 -** Chapter **11**

Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. **Do not send original documents**; they may be destroyed after scanning.  If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both 18 U. S. C §§ 152, 157 and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

| **1. Who is the current creditor?** | <u>Houston ISD</u><br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
|---|---|
| **2. Has this claim been acquired from someone else?** | ☒ No<br>☐ Yes  From whom? _____ |
| **3. Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?      Where should payments to the creditor be sent? (If different)<br><br>LINEBARGER GOGGAN BLAIR & SAMPSON, LLP    HOUSTON ISD<br>PO BOX 3064                          PO BOX 4576<br>HOUSTON, TX 77253-3064        HOUSTON, TX 77210-4576<br>(713) 844-3400<br><br>houston_bankruptcy@lgbs.com<br><br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ |
| **4. Does this claim amend one already filed?** | ☒ No<br>☐ Yes  Claim number on court claims registry (if known) _____    Filed On: _____ |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No<br>☐ Yes  Who made the earlier filing? _____ |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|
| **6. Do you have any** | ☐ No |

| | |
|---|---|
| number you use to identify the debtor? | ☒ Yes  Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___<br>**SEE ATTACHED EXHIBITS** |
| **7. How much is the claim?** | $ __**802,311.18**__   Does this amount include interest or other charges?<br><br>☐ No<br><br>☒ Yes  Attach statement itemizing interest, fees, expenses or other charges required<br>        by Bankruptcy Rule 3001(c)(2)(A). |
| **8. What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>**AD VALOREM TAXES** |
| **9. Is all or part of the claim secured?** | ☐ No<br><br>☒ Yes  The claim is secured by a lien on property.<br><br>**Nature of property:**<br><br>☒ Real Estate. If claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this Proof of Claim.<br>☐ Motor Vehicle<br>☐ Other. Describe:  _____**SEE ATTACHED EXHIBITS**_____<br><br>**Basis for perfection:**  __Secured by Tax Lien §§ 32.01 and 32.05 of the Texas Property Tax Code. Secured claim to extent of collateral value. Unsecured Priority claim [11 U.S.C. 507 (a)(8)] to extent of any shortfall in collateral value and for personal liability.__  Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:**      $  __**SEE ATTACHED EXHIBITS**__<br>**Amount of the claim that is secured:**   $  __**802,311.18**__<br>**Amount of the claim that is unsecured:** $_____   (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:**  $___ __**802,311.18**__<br><br>**Annual Interest Rate** (when case was filed)  __12%__<br>☒ Fixed<br>☐ Variable |
| **10. Is this claim based on a lease?** | ☒ No<br><br>☐ Yes  Amount necessary to cure any default as of the date of the petition. $_____ |
| **11. Is this claim subject to a right of setoff?** | ☒ No<br><br>☐ Yes  Identify the property: _____ |
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒ No<br><br>☐ Yes  *Check all that apply:*                                    **Amount entitled to priority**<br><br>☐ Domestic support obligations (including alimony and child support) under<br>   11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).                        $_____<br>☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services<br>   for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $_____<br>☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before<br>   the bankruptcy petition is filed or the debtor's business ends, whichever is earlier.  $_____ |

|  | 11 U.S.C. § 507(a)(4). | |
|---|---|---|
|  | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
|  | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
|  | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
|  | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:  Sign Below

| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>**If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.**<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box*<br><br>☐ I am the creditor.<br>☒ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other co-debtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date  September 1, 2023<br><br>**/s/Jeannie Andresen**<br><br>**Print the name of the person who is completing and signing this claim:**<br><br>Name :   **Jeannie Andresen**<br><br>Title :   **Attorney  TXBN  24086239**<br><br>Company :  **LINEBARGER GOGGAN BLAIR & SAMPSON, LLP**<br>           Identify the corporate servicer as the company if the authorized agent is a servicer.<br><br>Address :  **PO BOX 3064**<br>           **HOUSTON, TX 77253-3064**<br>           **(713) 844-3400**          **houston_bankruptcy@lgbs.com** |



**ANN HARRIS BENNETT**
**HARRIS COUNTY TAX ASSESSOR-COLLECTOR**
**1001 PRESTON, SUITE 100**
**HOUSTON, TEXAS 77002**

2023 EST = 332,082.44

| | |
|---|---|
| **Certified Owner:** | **Print Date:** 09/01/2023 **Legal Description:** TR 31D ABST 836 W WHITE |
| **GALLERIA 2425 OWNER LLC** **11509 S LOU AL DR** **HOUSTON, TX 77024-2707** | **Printed By:** LBNTALL |

| | | |
|---|---|---|
| **Account No: 045-140-006-0400** | **2022 Value:** $32,017,204 | **Legal Acres:** 2.4455 |
| | **APPR. DIST#:** 0451400060400 | **Parcel Address:** 2425 W LOOP S |
| **As of Date:** 07/05/2023 | | |

| Year | Tax Units | Base Tax Due | IF PAID BY END OF MONTH JULY 2023 | | IF PAID BY END OF MONTH AUGUST 2023 | | IF PAID BY END OF MONTH SEPTEMBER 2023 | |
|---|---|---|---|---|---|---|---|---|
| | | | Penalties & Interest | Total | Penalties & Interest | Total | Penalties & Interest | Total |
| 2022 | 1 | $332,082.44 | $138,146.30 | $470,228.74 | $142,131.28 | $474,213.72 | $146,116.28 | $478,198.72 |
| **TOTAL AMOUNT DUE:** | | **$332,082.44** | $138,146.30 | **$470,228.74** | $142,131.28 | **$474,213.72** | $146,116.28 | **$478,198.72** |

**Tax Unit Codes:**

| 1 | Houston I.S.D. |
|---|---|

*IF YOU ARE 65 YEARS OF AGE OR OLDER OR ARE DISABLED AND THE PROPERTY DESCRIBED IN THIS DOCUMENT IS YOUR RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE APPRAISAL DISTRICT REGARDING ANY ENTITLEMENT YOU MAY HAVE TO A POSTPONEMENT IN THE PAYMENT OF THESE TAXES.*

IF THE PROPERTY DESCRIBED IN THIS DOCUMENT IS YOUR RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE HARRIS COUNTY TAX ASSESSOR-COLLECTOR'S OFFICE REGARDING A RIGHT YOU MAY HAVE TO ENTER INTO AN INSTALLMENT AGREEMENT DIRECTLY WITH THE HARRIS COUNTY TAX ASSESSOR-COLLECTOR'S OFFICE FOR THE PAYMENT OF THESE TAXES.

# Partial Statement: Other Years and Tax Units may be due

## THE TAXES ON THIS PROPERTY ARE DELINQUENT. THE PROPERTY IS SUBJECT TO A LIEN FOR THE DELINQUENT TAXES. IF THE DELINQUENT TAXES ARE NOT PAID, THE LIEN MAY BE FORECLOSED.

-------------------------------------------------------------------------------------------------- ✂

**Detach at the perforation and return this coupon with your payment. Keep top part for your records.**

33.v1.64    Page 1 of 1

**Print Date:** 09/01/2023

**PLEASE NOTE YOUR ACCOUNT NUMBER ON YOUR CHECK AND MAKE CHECKS PAYABLE TO:**

**APPR. DIST#:** 0451400060400

ANN HARRIS BENNETT
HARRIS COUNTY TAX ASSESSOR-COLLECTOR
P.O. BOX 4622
HOUSTON, TEXAS 77210-4622

**PAYMENT COUPON**

\* 0 4 5 1 4 0 0 0 6 0 4 0 0 \*

045-140-006-0400
GALLERIA 2425 OWNER LLC
11509 S LOU AL DR
HOUSTON, TX 77024-2707

TOTAL = 802,311.18

| If Paid By | Amount Due |
|---|---|
| JUL 2023 | $470,228.74 |
| AUG 2023 | $474,213.72 |
| SEP 2023 | $478,198.72 |
| **Amount Paid:** | $_____.__ |

0451400060400**5** 2022 047022874 047421372 047819872 000000000    000605

## **Exhibit F**

Proposed Order

000606

**N THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **GALLERIA 2425 Owner, LLC** | § | **Case No. 23-34815 (JPN)** |
| | § | |
| **Debtor.** | § | **Chapter 11** |
| | § | |

---

**ORDER ON (I) DEBTOR'S EMERGENCY MOTION**
**FOR INTERIM AND FINAL ORDERS AUTHORIZING THE USAGE**
**OF CASH COLLATERAL, AND (II) DEBTOR'S MOTION TO**
**DETERMINE ADEQUATE ASSURANCE UTILITY PAYMENTS**

---

CAME ON FOR CONSIDERATION *Debtor's Emergency Motion for Interim and Final Orders Authorizing the Usage of Cash Collateral* (the "Cash Collateral Motion") [ECF No. 33] and the *Debtor's Motion to Determine Adequate Assurance Utility Payments* (the "Utilities Motion") [ECF No. 34] (collectively, the "Motions") on December 18, 2023.  Having considered the Motions, any responses or objections to the Motions, the record in this matter, and all other evidence before it, and after due deliberation, the Court finds that good cause exists to deny the Motions.  Accordingly, it is ORDERED that, for the reasons stated on the record, the Cash Collateral Motion and the Utilities Motion are DENIED.

Signed: _____

_____
**Honorable Jeffrey P. Norman**
**United States Bankruptcy Judge**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 23-34815 (JPN)** |
| **GALLERIA 2425 Owner, LLC** | § | |
| | § | **Chapter 11** |
| **Debtor.** | § | |
| | § | |

---

**NATIONAL BANK OF KUWAIT, S.A.K.P, NEW YORK BRANCH'S**
**OMNIBUS OBJECTION TO (I) DEBTOR'S EMERGENCY MOTION**
**FOR INTERIM AND FINAL ORDERS AUTHORIZING THE USAGE**
**OF CASH COLLATERAL, AND (II) DEBTOR'S MOTION TO**
**DETERMINE ADEQUATE ASSURANCE UTILITY PAYMENTS**

---

**TO THE HONORABLE JEFFREY P. NORMAN, U.S. BANKRUPTCY JUDGE:**

National Bank of Kuwait, S.A.K.P. New York Branch ("NBK") objects to the *Debtor's Emergency Motion for Interim and Final Orders Authorizing the Usage of Cash Collateral* (the "Cash Collateral Motion") [ECF No. 33] and the *Debtor's Motion to Determine Adequate Assurance Utility Payments* (the "Utilities Motion") [ECF No. 34]. The Debtor is a serial filer, whose first chapter 11 case was just recently dismissed, and nothing has changed to provide any hope that the Debtor can adequately protect NBK for the use of its cash collateral or pay its continuing to accrue real property taxes and other expenses. Under these circumstances, and others as described below, NBK's secured claim is not adequately protected nor can it be, and both the Cash Collateral Motion and Utilities Motion should be denied. In further support of these objections, NBK respectfully represents as follows.

**Overview of NBK's Secured Loan and the Debtor's Previous Bankruptcy Case**

1. On May 23, 2018, NBK loaned the Debtor approximately $51,675,000 (the "Loan") to acquire real property and improvements commonly known as 2425 West Loop South Houston,

Texas 77027 (the "Property").  Loan Agreement § 2.1.  The Loan is secured by, among other things, a first-priority lien on the Property, and proceeds thereof, and is evidenced by the (i) Loan Agreement between NBK and the Debtor dated May 23, 2018 (the "Loan Agreement"),[1] (ii) Promissory Note dated May 23, 2018 executed by the Debtor and payable to NBK (the "Note"),[2] and (iii) Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing dated May 23, 2018, recorded at record number RP2018-235600 in the Real Property Records of Harris County, Texas[3] (the "Deed of Trust" and together with the Loan Agreement, the Note and all documents relating to the Loan, the "Loan Documents").

2.       Pursuant to the Deed of Trust, the Loan is secured by, among other things: (i) the Property, as well as all Improvements and Chattels (each as defined in the Deed of Trust); (ii) all Leases in respect of the Property; (iii) all monies, bank accounts, accounts receivables, contract rights, other rights and any other intangible assets relating to the rental, operation and ownership of the Property; and (iv) all proceeds and replacements of the foregoing and of the other mortgaged property.  *See* Deed of Trust at 2-3.

3.       The Note had a five-year term and provided for interest only payments with principal due at maturity, May 23, 2023.  Note § 1.  Among other things, the Loan Agreement required the Debtor to use loan proceeds to fund the Interest Reserve Account, as defined thereunder, in the amount of $2.5 million and pay costs and expenses incurred in connection with the closing of the Loan.  *See* Loan Agreement § 5.32.  The Interest Reserve Account was funded on or around the Closing Date with a deposit of a portion of the proceeds of the Loan.  The Loan Agreement also required the Debtor to pay or reimburse NBK for all actual costs and expenses

---

[1] The Loan Agreement is attached as Exhibit A.
[2] The Note is attached as Exhibit B.
[3] The Deed of Trust is attached as Exhibit C.

(including reasonable third-party attorneys' fees and disbursements) incurred in connection with, among other things, enforcing the obligations or collecting payments due from the Debtor in respect of the Loan.  *See* Loan Agreement § 16.4.

4.      Upon the occurrence and continuation of an Event of Default, the Loan Documents permit NBK to accelerate the Loan (*see* Loan Agreement § 10.2; Deed § 2.01), and exercise all rights and remedies provided for in the Loan Documents, including, without limitation, foreclosing on the Property (*see* Loan Agreement § 10.2; Deed § 2.01).

5.      On April 1, 2020, the Debtor defaulted on the Loan by failing to make the required payment of interest due that day; instead the Debtor made only a partial payment. The Debtor did not make any further interest payments (and has not made any principal payments) after April 1, 2020.  After the Debtor's default, on each payment date NBK applied the funds in the Interest Reserve Account to pay interest due until the account was depleted on March 6, 2021.  On June 29, 2021, NBK sent a letter to the Debtor informing the Debtor of the existence of an Event of Default under the Loan Documents and notifying the Debtor, among other things, of NBK's intent to accelerate the Loan if the default was not cured by July 12, 2021. Various litigation maneuvers occurred for almost the next twelve months.

6.      In August 2022, the Debtor, NBK, the Debtor's principal, Ali Choudhri and Naissance Galleria, LLC (an entity Mr. Choudhri's claims to own by assignment from its original owner) entered into a confidential settlement agreement that, among other things, allowed the Debtor to pay off the loan in a discounted amount provided that such payment was made on or before a specified payment date. The Debtor defaulted under the settlement agreement by failing to comply with its payment terms.

3

7.       On March 28, 2023, NBK filed a request in state court to have a receiver appointed over the Property until it could be sold at public auction. On April 11, 2023, the day before the hearing on NBK's receivership motion, the Debtor filed a request for a temporary restraining order (TRO(s)) in state court seeking to prevent the court from appointing a receiver and to stop the pending foreclosure. On April 12, 2023, at the hearing on NBK's receivership motion, and in response to arguments by Debtor's counsel, the state court gave the Debtor an additional 105 days from the specified payment date to July 3, to make the required payment to NBK under the settlement agreement. During that period, however, the Debtor was required to make three payments of $80,000 each to NBK, and the state court directed that any failure to make such payments would entitle NBK to foreclose.

8.       The Debtor failed to make the $80,000 payment due on June 15, 2023, and NBK noticed the Property for foreclosure on July 5, 2023 (the "Initial Petition Date"). The Debtor filed two more requests for TROs seeking to prevent that foreclosure, each of which was rejected by the state court.  Shortly before the July 5 foreclosure sale, the Debtor filed its first bankruptcy case.

9.       On July 24, 2023, NBK moved to dismiss the Debtor's initial bankruptcy case because it was filed in bad faith (to prevent foreclosure of the Property) and the Debtor had no reasonable hope of a successful reorganization. At the September 22, 2023 hearing on NBK's motion to dismiss, Judge Lopez denied the motion without prejudice, noting:

> There's a fundamental problem with this case.  I'm not sure it can be fixed.  And that's where we're going. . . .
>
> I'm like, and I'm really uncomfortable.  It's driving all of these problems that I have with the budget, which is, you know, is rent supposed to be free for Jetall?  Is it, you know, are they not supposed to be collected 19,000, you know, is the $19,000 fee really a pass through fee?  I don't trust what I'm seeing.  And it makes me uncomfortable that I don't have an independent party telling me these answers. . . .

000611

I'm just telling you I'm uncomfortable with the lack of transparency. And I'm not saying it's there, but there's -- we don't have an independent here, and I don't know how to proceed. And it's going to flow.   It's going to get worse as my inquiry goes on . . . . We haven't talked about feasibility of a plan. . . .

I don't trust the numbers. I don't trust the books. I don't have a true independent who can tell me what we've got going on here.

I do have that Jetall is everywhere. And Mr. Choudhri is everywhere on these documents in some sense or another. I don't have enough today to get me comfortable, but when it comes to -- so I'm going to deny the motion to dismiss without prejudice. <u>If I find out that I get uncomfortable and say what you already know that I'm already on edge. I won't hesitate to convert the case or do something on my own and I have the authority to do it</u>. . . .

So this case continues, but the case continues under really tight timelines and under really strict costs. And I don't like the position that I put you in. I just don't. I don't like the position I put others in. I do know as we get closer to the 90 days, they didn't raise it. But someone's going to have to start talking about interest payments and where this goes on that. If this case – I know there's a plan on file and I know what the Code says. <u>I got to make sure if we get there in the next two months. That is really, really a good market test, and in true independent looked</u> at this. . . .

<u>And maybe we can all meet in about 30 days and see what this case really goes in the same way. It's just a – It's an extension</u>. I don't really know what I'm going to do yet, but I do know what I'm not doing today.

Case No. 23-60036, Sept. 22, 2023 Hr'g Tr. at 118-19:16; 215:5-12; 217-18:23-8; 219:19-22.

*See* ECF No. 15, *Declaration of Charles C. Conrad*, Exhibit 3.

10. At a November 1, 2023 status conference, Judge Lopez on his own motion dismissed the Debtor's first bankruptcy case noting:

THE COURT: The Court's already held a hearing on a motion to dismiss the case based upon, among other things, the amount of money it would take to continue this case. The Court denied it based on the evidence presented to the Court at the time. . . . But for this case to continue there's going to have to be a lot of money. <u>I'm going</u>

5

> <u>to have to require NBK to get paid interest</u>. There's just not enough
> money in the budget, this Debtor is going to run out of money really
> fast. . . . The only way this case survives is if I don't require NBK
> to be paid any interest on that loan pending the resolution of State
> Court matters, the matters of plan confirmation, and I'm unwilling
> to do that, <u>which makes this case immediately administratively
> insolvent</u>. . . .
>
> This Debtor doesn't have enough money to pay even a half a month
> of interest on the secured loan and it would take until early 2024 to
> go deal with that. <u>I'm dismissing this case effective today under
> Section 1112(b) for cause</u>.

Case No, 23-60036, Nov. 1, 2023 Hr'g Tr. at 64-65:8-8; 68:19-23.  *See* ECF No. 15, *Declaration*

*of Charles C. Conrad*, Exhibit 4.

11.     After dismissal of the first bankruptcy case, NBK noticed the Property for

foreclosure on December 5, 2023. Prior to that scheduled foreclosure sale, the Debtor filed several

additional requests for TROs in state court, all of which were denied, and appealed those denials

through the state court system, including a request to the Texas Supreme Court; all of those appeals

were likewise denied.  On December 5, 2023 (the "<u>Second Petition Date</u>"), just minutes before the

scheduled foreclosure sale of the Property, the Debtor filed this second bankruptcy case.

12.     As of the Initial Petition Date, the Debtor owed NBK $63,552,988.79 under the

Loan Documents consisting of:[4]

| | |
|---|---|
| Unpaid Principal Balance: | $51,675,000.00 |
| Past Due Interest at Default Rate: | $8,521,760.78 |
| Unreimbursed Legal Fees: | $4,318,187.09 |
| Credits | $(961,959.08) |
| **TOTAL AMOUNT DUE:** | $63,552,988.79 |

---

[4] The Payoff Statement is attached as <u>Exhibit D</u>.  The payoff amount is provided for illustrative purposes, and NBK
   reserves the right to supplement the amount as permitted under the Loan Documents to reflect additional fees and
   costs incurred since the Initial Petition Date.

## The Debtor Cannot Satisfy the Requirements for Use of Cash Collateral

*A.     Standard for Use of Cash Collateral*

13.     A debtor may not use cash collateral absent consent of each entity that has an interest in cash collateral unless "the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2)(B).  Under section 363(e) of the Bankruptcy Code, the court may grant this permission only if each entity that has an interest in such cash collateral is "adequately protected."  11 U.S.C. § 363(e) (stating that "on request of an entity that has an interest in property used . . . by the trustee, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest"). The debtor bears the burden of proving that it can adequately protect the secured creditor's interest in the cash collateral.  11 U.S.C. § 363(p); *see also In re Energy Partners, Ltd.*, 409 B.R. 211, 235-37 (Bankr. S.D. Tex. 2009) (denying use of cash collateral based on debtor's failure to demonstrate the secured creditor was adequately protected).

*B.     The Debtor Has Not and Can Not Provide Adequate Protection*

14.     The Debtor has not met its burden here. The proposed adequate protection package consists of superpriority claims and "replacement liens on all property now owned or hereafter acquired by the Debtor," subject to a carve-out for professional fees and United States Trustee fees.  Cash Collateral Motion at 14.  Although NBK previously consented to a similar package in the first bankruptcy case, consent is required each time a debtor seeks to use a secured creditor's cash collateral, and NBK does not consent on this second trip through bankruptcy.  Nothing has changed.  The Debtor cannot provide adequate protection and there is not enough money available to the Debtors to meet payments required to be made under the Bankruptcy Code..

000614

15.     NBK has a prepetition first lien on all of the Debtor's assets, including rent proceeds from the Property, and giving a secured lender a replacement lien on assets it already has a lien on is illusory and not adequate protection.  *See In re LTAP US, LLLP*, No. 10-14125 (KG), 2011 WL 671761, at *3 (Bankr. D. Del. Feb. 18, 2011) (denying cash collateral motion for lack of adequate protection and holding that "[p]roviding [the secured creditor] with a replacement lien on assets against which it already has a lien is illusory. Debtor must provide [the secured creditor] with additional collateral, and there is none."); 3 Collier on Bankruptcy ¶ 364.05 (16th ed. 2022) ("Providing a lender with a replacement lien on assets on which it already has a lien is illusory and will not support an adequate protection finding."). Further, the proposed replacement lien is deficient because section 552 of the Bankruptcy Code does not affect NBK's lien on postpetition rent proceeds to the extent provided for under the parties' security agreement. *See* 11 U.S.C § 552(b)(2) (secured lender's security interest in rents extends to postpetition rent).

16.     Granting superpriority claims is also not adequate protection because a claim under section 507(b) of the Bankruptcy Code is intended to redress a failure of adequate protection and is not itself an independent form of adequate protection.  *See In re UAL Corp.*, No. 02 B 48191 (ERW), 2005 WL 3118411, at *6 n.1 (Bankr. N.D. Ill. Nov. 21, 2005) ("This prohibition [on administrative expense allowances as adequate protection], however, is only against the prospective use of an administrative expense allowance to provide adequate protection. In order to redress a failure of adequate protection, the court is specifically authorized under [section] 507(b) to award an allowance of an administrative expense.").

C.     *Other Objectionable Provisions in the Proposed Interim Order and Budget Issues*

17.     NBK does not consent to a carve out from its blanket lien on all of the Debtor's assets for payment of professionals.  A carve out is a consensual construct, and the "[t]he default rule in bankruptcy is . . . that administrative expenses are paid out of the estate and not by the

000615

secured creditors of the debtor." *In re Grimland, Inc.*, 243 F.3d 228, 233 (5th Cir. 2001). Thus, neither the Debtor nor the Court can impose a carve out for payment of professionals on NBK without its consent. *See In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1396 (5th Cir. 1986) ("[T]he concept of adequate protection ... 'is derived from the fifth amendment protection of property interests . . . . The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain.'") (quoting H.R. REP. No. 95-595, 338-39 (1977)); *In re White Glove, Inc.*, No. 98-12493 (DWS), 1998 WL 731611, at *6 (Bankr. E.D. Pa. Oct. 14, 1998) (Although "[c]arve outs are . . . common in Chapter 11 cases in favor of debtor's attorneys as part of cash collateral agreements," "*it is essential to note that the carve out is a product of agreement between the secured party and the beneficiary of the carve out*." [emphasis added]).

18. As NBK will provide in further detail in due course, the Debtor has not paid any interest on the Loan in nearly three years and, in the first bankruptcy case, the Debtor failed to make section 362(d)(3)(B) mandated interest payments to NBK 90 days after the Initial Petition Date. Given the lack of payment in years and significant fees and costs expended by NBK in attempting to exercise its rights and remedies under the Loan Documents, it is appropriate for NBK to protect its collateral from further diminution in value arising from any payment of professional fees and expenses under a carve out provision.

19. In addition, the Debtor's proposed budget does not include any projection of income of over the next 30 days or account for the 2023 property taxes due at the end of January. *See* Tex. Prop. Tax Code. § 32.01(a). Because the proposed budget does not contain projected revenue to demonstrate that revenue exceeds the projected expenses, NBK's collateral position could be eroding quickly before the Debtor is even required to make interest payments to NBK

9

000616

under the Bankruptcy Code.  Also, according to the Harris County Appraisal District, the 2023 property taxes are estimated to be $587,554.00.[5]  Thereafter, all unpaid property taxes become delinquent and penalties and interest are added to the original base tax amount until taxes are paid. *See id.* § 31.02(a). The Debtor has not paid property taxes in almost five years[6] and, upon information and belief, taxing units assess a 12% interest rate on unpaid property taxes.[7]  In short, there is no assurance that the 2023 property taxes will be paid under the proposed budget thus further eroding NBK's collateral position as unpaid property taxes prime NBK's lien on the Property.

D.   *In the Alternative, the Court Should Condition Use of Cash Collateral on Provision of Adequate Protection*

20.   If the Court decides to permit the use of any NBK cash collateral, the Court should condition that use on the following:

a.   The Debtor must submit a revised budget showing projected monthly rent income.

b.   The Debtor must provide a report comparing the Debtor's actual revenue and expenses for the prior six months as compared to the projected revenue and disbursements for future months reflected in a revised budget. This report should disclose the Debtor's cash position as of the end of each of the past six months.

c.   The Debtor must provide copies of (i) all executed leases for the Property, (ii) bank account statements from July 1, 2023 to the Second Petition Date, including all checks, wires, and deposit documents, (iii) all invoices for "repair and maintenance" and invoices for the same expenses over the past six months, (iv) any

---

[5]   *See* https://harris.trueprodigy-taxtransparency.com/taxTransparency/property/192847/0.
[6]   The Debtor has not paid off any property taxes since 2019.
[7]   *See* Proofs of Claim Nos. 3-1 and 4-1 filed in Case No. 23-60036 attached as Exhibit E.

10

tax assessments on the Property, (v) any documents showing the Debtor's efforts to market the Property for sale or to tenants, (vi) the Debtor's tax returns from 2020 through 2022, (vii) any agreement to reduce, abate or defer rent, and (viii) an accounting of (i) the use of rent income from January 1, 2023 through the Second Petition Date, and (ii) adequate assurance deposits from the Initial Petition Date.

d.   Subject to section 362(d)(3)(B) of the Bankruptcy Code, the Debtor should commence monthly interest payments to NBK in an amount equal to interest at the non-default rate under the Loan Documents on the value of NBK's interest in the Property within fifteen (15) days after approval of an interim cash collateral order.

e.   The Debtor shall not make payments to any insider or affiliate or any other entity affiliated with the Debtor's principal Mr. Choudhri.

f.   The Debtor shall not incur expenses nor use cash collateral in an amount that exceeds by more than five percent (5%) of the total expenses provided in the Budget without NBK's written consent or court approval.

g.   The Debtor shall not use cash collateral to pay any estate professional fees and expenses or to investigate or prosecute any claims or causes of action against NBK.

h.   NBK shall not be limited or prohibited by any interim cash collateral order or otherwise from seeking additional adequate protection for the use of cash collateral or any other appropriate relief.  Further, nothing in any interim cash collateral order shall modify any terms or rights of NBK under the Loan Documents.

i.   The conditions specified herein should not constitute a waiver of any pre-petition default(s) or event(s) of default under the Loan Documents.

E.      *The Debtor Should Establish a Segregated Account for Adequate Assurance Deposits*

21.     The Debtor proposes to make timely payments for utility services, and the estimated bill for such services is $35,800, about $10,000 less than the estimated utilities bill in the first bankruptcy case. Utilities Motion at 10.  As a condition for granting the Utilities Motion, the Debtor should increase the adequate assurance deposit to $45,800 and establish a segregated adequate assurance account to ensure that adequate assurance is offered to utility providers.

## Conclusion

WHEREFORE, NBK requests that the Court enter the proposed order attached as Exhibit F (i) denying the Cash Collateral Motion and the Utilities Motion to the extent that adequate assurance is not increased and a segregated account is not established for adequate assurance deposits, and (ii) granting such other relief as the Court deems just and proper.

12

DATED: December 15, 2023

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Charles C. Conrad*
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010-1028
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

-   *and*   -

Andrew M. Troop (Bar No. MA547179)
Patrick E. Fitzmaurice*
Kwame O. Akuffo*
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

*Admitted *pro hac vice*

**Counsel for National Bank of Kuwait, S.A.K.P., New York Branch**

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 15, 2023, a true and correct copy of this document was served via the Court's CM/ECF system on the Debtor and its counsel of record and all others who are deemed to have consented to ECF electronic service, and also by mailing, first class, postage prepaid, to each of the parties on the attached mailing matrix.

*/s/ Charles C. Conrad*
Charles C. Conrad

000620

## **Exhibit A**

Loan Agreement

LOAN AGREEMENT

Dated as of May 23, 2018

among

GALLERIA 2425 OWNER, LLC,

as Borrower,

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH,

as Administrative Agent,

and

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, and certain other lenders who may now or later be made party hereto,

collectively, as Lenders

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS; PRINCIPLES OF CONSTRUCTION .......................................................... 1

    Section 1.1. Definitions ............................................................................................................... 1

    Section 1.2. Interpretation ........................................................................................................ 12

ARTICLE II GENERAL TERMS ............................................................................................................ 13

    Section 2.1. Loan Commitment; Extension .............................................................................. 13

    Section 2.2. Interest Rate and Loan Payments ......................................................................... 13

    Section 2.3. Usury Savings ...................................................................................................... 14

ARTICLE III CONDITIONS PRECEDENT ............................................................................................ 14

    Section 3.1. Representations and Warranties; Compliance with Conditions ............................ 14

    Section 3.2. Delivery of Loan Documents; Title Policy; Due Diligence Items ........................ 14

    Section 3.3. Related Documents ............................................................................................... 16

    Section 3.4. Organizational Documents .................................................................................... 16

    Section 3.5. Opinions of Counsel ............................................................................................ 16

    Section 3.6. Taxes and Other Charges ..................................................................................... 16

    Section 3.7. Completion of Proceedings ................................................................................... 16

    Section 3.8. Payments .............................................................................................................. 16

    Section 3.9. Transaction Costs ................................................................................................. 16

    Section 3.10. No Material Adverse Change .............................................................................. 16

    Section 3.11. Leases ................................................................................................................. 17

    Section 3.12. Tenant Estoppel Certificate ................................................................................ 17

    Section 3.13. SNDA ................................................................................................................. 17

    Section 3.14. Tax Lot .............................................................................................................. 17

    Section 3.15. Borrower's and Guarantor's Financials .............................................................. 17

    Section 3.16. Acquisition of Property ...................................................................................... 17

    Section 3.17. Further Documents ............................................................................................. 17

    Section 3.18. Interest Reserve Deposit. ................................................................................... 17

ARTICLE IV REPRESENTATIONS AND WARRANTIES .................................................................... 17

    Section 4.1. Organization .......................................................................................................... 17

    Section 4.2. Status of Borrower ............................................................................................... 18

    Section 4.3. Validity of Documents ......................................................................................... 18

    Section 4.4. No Conflicts ......................................................................................................... 18

    Section 4.5. Litigation ............................................................................................................. 18

    Section 4.6. Agreements .......................................................................................................... 18

    Section 4.7. Solvency .............................................................................................................. 19

    Section 4.8. Full and Accurate Disclosure ............................................................................... 19

    Section 4.9. ERISA Compliance .............................................................................................. 19

    Section 4.10. Not a Foreign Person ......................................................................................... 20

    Section 4.11. Enforceability .................................................................................................... 20

    Section 4.12. Business Purposes .............................................................................................. 20

    Section 4.13. Compliance ........................................................................................................ 20

    Section 4.14. Financial Information ......................................................................................... 20

    Section 4.15. Illegal Activity ................................................................................................... 20

    Section 4.16. Separate Tax and Zoning Lot ............................................................................. 20

## TABLE OF CONTENTS
continued

Section 4.17. Federal Reserve Regulation ....................................................................... 20
Section 4.18. Investment Company Act .......................................................................... 21
Section 4.19. No Change in Facts or Circumstances; Disclosure ..................................... 21
Section 4.20. Special Purpose Entity .............................................................................. 21
Section 4.21. Intellectual Property .................................................................................. 21
Section 4.22. Embargoed Person ..................................................................................... 21
Section 4.23. Patriot Act ................................................................................................. 22
Section 4.24. No Contractual Obligations ....................................................................... 22
Section 4.25. Shareholders of Borrower .......................................................................... 22
Section 4.26. Survival ..................................................................................................... 23
Section 4.27. Leases ........................................................................................................ 23
Section 4.28. Landmark Status ....................................................................................... 23
Section 4.29. Broker ....................................................................................................... 23

ARTICLE V COVENANTS ............................................................................................... 23

Section 5.1. Existence; Compliance With Legal Requirements ....................................... 23
Section 5.2. Maintenance and Use of Project ................................................................. 24
Section 5.3. Waste ........................................................................................................... 24
Section 5.4. Taxes and Other Charges ............................................................................ 24
Section 5.5. Litigation ..................................................................................................... 26
Section 5.6. Access to the Project ................................................................................... 27
Section 5.7. Notice of Default ......................................................................................... 27
Section 5.8. Cooperate in Legal Proceedings .................................................................. 27
Section 5.9. Performance of Obligations ......................................................................... 27
Section 5.10. Awards; Insurance Proceeds ...................................................................... 27
Section 5.11. Financial Reporting .................................................................................... 27
Section 5.12. Estoppel Statement .................................................................................... 28
Section 5.13. Management of Project .............................................................................. 28
Section 5.14. Liens .......................................................................................................... 29
Section 5.15. Debt Cancellation ...................................................................................... 29
Section 5.16. Zoning ....................................................................................................... 29
Section 5.17. ERISA ........................................................................................................ 30
Section 5.18. No Joint Assessment .................................................................................. 30
Section 5.19. Alterations .................................................................................................. 30
Section 5.20. Reciprocal Easement Agreement ............................................................... 30
Section 5.21. Notices ....................................................................................................... 30
Section 5.22. Curing ........................................................................................................ 30
Section 5.23. Limitation on Securities Issuances ............................................................ 31
Section 5.24. Limitations on Distributions ...................................................................... 31
Section 5.25. Contractual Obligations ............................................................................. 31
Section 5.26. Additional Indebtedness ............................................................................ 31
Section 5.27. Restrictions on Leasing ............................................................................. 31
Section 5.28. Debt Service Coverage Ratio ..................................................................... 32
Section 5.29. Loan-to-Value Ratio .................................................................................. 33
Section 5.30. UCC Searches ............................................................................................ 33
Section 5.31. Updated/New Appraisal ............................................................................. 33
Section 5.32. Interest Reserve Account ........................................................................... 33
Section 5.33. Mezzanine Loan ......................................................................................... 34

**TABLE OF CONTENTS**
continued

ARTICLE VI ENTITY COVENANTS ................................................................................34

    Section 6.1. Single Purpose Entity/Separateness ...............................................34
    Section 6.2. Change of Name, Identity or Structure .........................................35
    Section 6.3. Business and Operations ................................................................36

ARTICLE VII NO SALE OR ENCUMBRANCE .............................................................36

    Section 7.1. Transfer Definitions .......................................................................36
    Section 7.2. No Sale/Encumbrance ....................................................................36
    Section 7.3. Administrative Agent's Rights .......................................................37
    Section 7.4. Assumption .....................................................................................37

ARTICLE VIII INSURANCE; CASUALTY; CONDEMNATION; RESTORATION ...........37

    Section 8.1. Insurance ........................................................................................37
    Section 8.2. Insurance Escrow; Payment by Administrative Agent ..................41
    Section 8.3. Casualty .........................................................................................42
    Section 8.4. Condemnation ................................................................................44

ARTICLE IX INTENTIONALLY OMITTED ...................................................................45

ARTICLE X EVENTS OF DEFAULT; REMEDIES .......................................................45

    Section 10.1. Event of Default ...........................................................................45
    Section 10.2. Remedies......................................................................................48

ARTICLE XI REPLACEMENT OF LENDERS ..............................................................48

ARTICLE XII SECONDARY MARKET; ASSIGNMENT; PARTICIPATION ...................49

    Section 12.1. Assignment; Participation ............................................................49
    Section 12.2. Intralinks .......................................................................................51

ARTICLE XIII AGENT ...................................................................................................51

    Section 13.1. Appointment, Powers and Immunities..........................................51
    Section 13.2. Reliance by Administrative Agent ................................................53
    Section 13.3. Purchase of Disapproving Lender's Interest .................................53
    Section 13.4. Rights of Administrative Agent as Lender ....................................54
    Section 13.5. Indemnification.............................................................................54
    Section 13.6. Non-Reliance on Administrative Agent and Other Lenders .........55
    Section 13.7. Failure to Act ................................................................................55
    Section 13.8. Action by Administrative Agent ...................................................55
    Section 13.9. Successor Administrative Agent ...................................................56
    Section 13.10. Sharing .......................................................................................56
    Section 13.11. Pro Rata Treatment and Payments .............................................56
    Section 13.12. Lenders Pro Rata Shares ............................................................57
    Section 13.13. Disbursement of Proceeds by Administrative Agent...................57
    Section 13.14. Amendments Concerning Agency Function ................................58
    Section 13.15. Events of Default ........................................................................58
    Section 13.16. Defaulting Lender .......................................................................59
    Section 13.17. Servicing Fee ..............................................................................61

4161624-v7\CHIDMS1

**TABLE OF CONTENTS**
continued

ARTICLE XIV INDEMNIFICATIONS ............................................................................. 61

    Section 14.1. General Indemnification ........................................................ 61
    Section 14.2. Intangible Tax Indemnification ............................................. 61
    Section 14.3. ERISA Indemnification ......................................................... 61
    Section 14.4. Survival .................................................................................. 62

ARTICLE XV NOTICES ................................................................................................... 62

    Section 15.1. Notices ................................................................................... 62

ARTICLE XVI FURTHER ASSURANCES ...................................................................... 62

    Section 16.1. Replacement and Corrective Documents................................ 62
    Section 16.2. Further Acts, Etc ................................................................... 63
    Section 16.3. Changes in Tax, Debt, Credit and Documentary Stamp Law .................. 63
    Section 16.4. Expenses ................................................................................ 64

ARTICLE XVII WAIVERS ............................................................................................... 64

    Section 17.1. Remedies Cumulative; Waivers............................................. 64
    Section 17.2. Modification, Waiver in Writing ........................................... 64
    Section 17.3. Delay Not a Waiver ............................................................... 65
    Section 17.4. Trial by Jury .......................................................................... 65
    Section 17.5. Waiver of Notice.................................................................... 65
    Section 17.6. Remedies of Borrower ........................................................... 65
    Section 17.7. Waiver of Marshalling of Assets ........................................... 65
    Section 17.8. Waiver of Statute of Limitations ........................................... 66
    Section 17.9. Waiver of Counterclaim........................................................ 66

ARTICLE XVIII GOVERNING LAW .............................................................................. 66

    Section 18.1. Choice of Law ....................................................................... 66
    Section 18.2. Severability ............................................................................ 67
    Section 18.3. Preferences ............................................................................ 68

ARTICLE XIX MISCELLANEOUS ................................................................................. 68

    Section 19.1. Survival .................................................................................. 68
    Section 19.2. Administrative Agent's Discretion ........................................ 68
    Section 19.3. Headings ................................................................................ 68
    Section 19.4. Cost of Enforcement .............................................................. 68
    Section 19.5. Schedule Incorporated .......................................................... 68
    Section 19.6. Offsets, Counterclaims and Defenses .................................... 68
    Section 19.7. No Joint Venture or Partnership; No Third Party Beneficiaries ................. 69
    Section 19.8. Publicity ................................................................................ 70
    Section 19.9. Conflict; Construction of Documents; Reliance .................... 70
    Section 19.10. Actions, Approvals and Determinations .............................. 70
    Section 19.11. Entire Agreement................................................................. 71
    Section 19.12. Certain Additional Rights of Lenders .................................. 71
    Section 19.13. Counterparts......................................................................... 71

iv

**TABLE OF CONTENTS**
continued

EXHIBIT A - Borrower's Organizational Structure

EXHIBIT B - Form of Assignment and Assumption Agreement

SCHEDULE 13.12 - Amount of Loan Attributable to Lender

SCHEDULE 15.1 - Lenders' Offices, Addresses for Notices

v

<u>LOAN AGREEMENT</u>

THIS LOAN AGREEMENT dated as of May 23, 2018 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "<u>Agreement</u>"), among (1) GALLERIA 2425 OWNER, LLC, a Delaware limited liability company, having an address at 3139 W Holcombe Blvd #845, Houston, Texas 77025 ("<u>Borrower</u>"), (2) the Lenders (as hereinafter defined), and (3) NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch, having an address at 299 Park Avenue, New York, New York 10171, as administrative and collateral agent for the Lenders (in such capacity, and together with its successors and assigns, "<u>Administrative Agent</u>").

RECITALS:

WHEREAS, Lenders have agreed to make a certain $51,675,000.00 loan to Borrower (the "<u>Loan</u>"); and

WHEREAS, the Loan shall be (i) governed by this Agreement, (ii) evidenced by the Note (as hereinafter defined), and (iii) secured by the Deed of Trust (as hereinafter defined).

NOW THEREFORE, in consideration of the making of the Loan by the Lenders and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

ARTICLE I
DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1. <u>Definitions</u>. For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"<u>Access Laws</u>" shall mean, collectively, the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all other federal, state and local laws, regulations, rules, statutes, ordinances, orders and decrees related to handicapped access, including, without limitation, the American with Disabilities Act Accessibility Guidelines for Buildings and Facilities.

"<u>Action Notice</u>" shall have the meaning set forth in <u>Section 13.15</u> hereof.

"<u>Actual Proceeds</u>" shall have the meaning set forth in <u>Section 8.3</u> hereof.

"<u>Administrative Agent Loan Documents</u>" shall have the meaning set forth in <u>Section 13.1</u> hereof.

"<u>Affiliate</u>" shall mean, as to any specified Person, (a) any Person that directly or indirectly through one or more intermediaries Controls, is Controlled by or is under common Control with such Person, (b) any Person owning or controlling 10% or more of the outstanding voting securities of or other ownership interests in such Person, (c) any officer, director, partner, employee or member (direct or indirect and no matter how remote) of such Person, (d) if such Person is an individual, any entity for which such Person directly or indirectly acts as an officer, director, partner, owner employee or member, (e) any entity in which such Person (together with the members of his family if the Person in question is an individual) owns, directly or indirectly through one or more intermediaries an interest in any class of stock (or other beneficial interest in such entity) of 10% or more, (f) any immediate family member of such Person, (g) with respect to any Borrower or Guarantor, any other Borrower or Guarantor, or (h) with respect to any Borrower or Guarantor, any direct or indirect owner of an interest in such Borrower or Guarantor.

"Affiliated Manager" shall have the meaning set forth in Section 7.1 hereof.

"Agent Discretion Standard" shall have the meaning set forth in Section 13.15 hereof.

"Annex" shall have the meaning set forth in Section 4.23 hereof.

"Applicable Percentage" shall have the meaning set forth in Section 8.3 hereof.

"Appraised Value" shall have the meaning set forth in Section 5.29 hereof.

"Approving Lenders" shall have the meaning set forth in Section 13.3 hereof.

"Assignee" shall have the meaning set forth in Section 12.1 hereof.

"Assignment of Agreements, Licenses, Permits and Contracts" shall mean the Assignment of Agreements, Licenses, Permits and Contracts dated as of the Closing Date, made by Borrower to Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Interest Rate Agreement" shall mean, with respect to any Interest Rate Protection Product entered into between Borrower and a third-party, an Assignment of Interest Rate Agreement made by Borrower to Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Leases and Rents" shall mean the absolute assignment by Borrower to Administrative Agent of the Property Income with respect to the Property and the Project pursuant to that certain Absolute Assignment of Leases and Rents dated as of the Closing Date made by Borrower to Administrative Agent, on behalf of Lenders, encumbering the Project, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Award" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Project.

"Balance" shall have the meaning set forth in Section 8.3 hereof.

"Benefit Plan" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA, Section 412 of the Internal Revenue Code or Section 302 or 303 of ERISA, that is or, within any of the preceding six (6) plan years was, sponsored, maintained or contributed to by Borrower or any of its Subsidiaries or ERISA Affiliates (or by any Person that was an ERISA Affiliate within the last six (6) years), or with respect to which Borrower or any of its Subsidiaries or ERISA Affiliates has any liability, whether actual or contingent.

"Benefit Plan Investor" shall mean any of the following: (a) an "employee benefit plan" (within the meaning of Section 3(3) of ERISA), whether or not it is subject to ERISA and including governmental and foreign plans, (b) a "plan" as defined in Section 4975 of the Internal Revenue Code of 1986, as amended, or (c) a Person whose underlying assets include "plan assets" of the foregoing by reason of investment by an employee benefit plan or plan in such Person.

"Borrower Materials" shall have the meaning set forth in Section 12.2 hereof.

"Borrower Members" shall have the meaning set forth in Section 4.1 hereof.

"Borrower Operating Agreement" shall mean Borrower's Amended and Restated Limited Liability Company Agreement dated as of May 23, 2018, as the same may hereafter be amended in accordance with the terms and provisions hereof.

"Business Day" shall have the meaning set forth in the Note.

"Casualty" shall have the meaning set forth in Section 8.3 hereof.

"Closing Date" shall mean the date hereof.

"Condemnation" shall mean a temporary or permanent taking by any Governmental Authority as the result, in lieu or in anticipation, of the exercise of the right of condemnation or eminent domain, of all or any part of the Project, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Project or any part thereof.

"Consented Assignee" shall have the meaning set forth in Section 12.1 hereof.

"Contractual Obligation" shall mean as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking, to which such Person is a party or by which it or any of its property is bound, or any provision of the foregoing.

"Control" shall have the meaning set forth in Section 7.1 hereof.

"Control Account Agreement" means that certain Control Account Agreement dated as of May 18, 2018 and effective as of the Closing Date, entered into by and among Borrower, Administrative Agent and Frost Bank, a Texas state bank, with respect to Borrower's deposit account, as more particularly described therein.

"Coverage Advance" shall have the meaning set forth in Section 13.11 hereof.

"Creditors' Rights Laws" shall mean with respect to any Person any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"DSCR" shall have the meaning set forth in Section 5.28 hereof.

"DSCR Threshold" shall have the meaning set forth in Section 5.28 hereof.

"Debt" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note, together with all interest accrued and unpaid thereon and all other sums due to Lenders in respect of the Loan under the Note, this Agreement, the Deed of Trust or any other Loan Document.

"Debt Service" shall mean, with respect to any particular period of time, scheduled interest and principal payments under the Note and/or this Agreement.

"Debt Service Payments" shall have the meaning set forth in Section 13.12 hereof.

"Deed of Trust" shall mean that certain Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing dated as of the Closing Date made by Borrower to Salima Umatiya, as trustee, for the benefit of Administrative Agent, on behalf of Lenders, in the principal amount of $51,675,000.00, encumbering the Project, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Default" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"Defaulting Lender" shall have the meaning set forth in Section 13.16 hereof.

"Defaulting Lender's Interest" shall have the meaning set forth in Section 13.16 hereof.

"Disapproving Lenders" shall have the meaning set forth in Section 13.3 hereof.

"Dollars" or "$" shall mean lawful money of the United States of America.

"Eligible Assignee" shall have the meaning set forth in Section 12.1 hereof.

"Embargoed Person" shall have the meaning set forth in Section 4.22 hereof.

"Engineering Report" shall mean any written report resulting from the property condition assessments of the Project delivered to Administrative Agent in connection with the Loan.

"Environmental Indemnity Agreement" shall mean that certain Environmental Indemnity Agreement dated as of the Closing Date made by Borrower and Guarantor in favor of Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Environmental Report" shall mean any written report resulting from the environmental site assessments of the Project delivered to Administrative Agent in connection with the Loan.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and any successor statutes thereto and applicable regulations issued pursuant thereto in temporary or final form.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with Borrower, is treated as a single employer under Section 414(b), (c), (m) or (o) of the Internal Revenue Code.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Benefit Plan (other than an event for which the 30 day notice period is waived); (b) a failure to satisfy the minimum funding standards of Section 412 of the Internal Revenue Code or Section 302 of ERISA, whether or not waived; (c) the filing pursuant to Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standards with respect to any Benefit Plan; (d) a failure to make any required installment under Section 430(j) of the Internal Revenue Code with respect to any Benefit Plan; (e) a failure to make any required contribution to a Multiemployer Plan when due; (f) the incurrence by Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Benefit Plan; (g) the receipt by Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Benefit Plan or Benefit Plans or to appoint a trustee to administer any Benefit Plan; (h) the incurrence by Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Benefit Plan or Multiemployer Plan; (i) the receipt by Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability; (j) a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, or in endangered or critical status within the meaning of Section 432 of the Internal Revenue Code or Title IV of ERISA; (k) a determination that any Benefit Plan is in "at risk" status (as defined in Section 430 of the Internal Revenue Code or Section 303 of ERISA); or (l) the imposition of a

4

Lien under the Internal Revenue Code or ERISA on the assets of Borrower, any Subsidiary or any ERISA Affiliate, or Borrower or any Subsidiary or ERISA Affiliate has been notified in writing that such a Lien will be imposed on the assets of Borrower, Subsidiary or ERISA Affiliate.

"Event of Default" shall have the meaning set forth in Section 10.1 hereof.

"Excess Funds" shall have the meaning set forth in Section 8.3 hereof.

"Existing Leases" means (i) the Key Tenant Lease, (ii) the Jetall Lease, (iii) the Regus Lease, (iv) Official Lease Agreement, dated October 3, 2012, by and between G3 Visas & Passports, Inc., as tenant, and Borrower, as successor-in-interest to Seller, as landlord, as amended by First Amendment to Lease Agreement, (v) Lease Agreement, dated November 1, 2014, by and between PEM Offshore, Inc., a Texas corporation, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, as amended by First Amendment to Lease Agreement, (vi) Lease Agreement, dated November 1, 2014, by and between PrimeLending, a PlainsCapital Company, a Texas Corporation, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, as amended by First Amendment to Lease Agreement, (vii) Lease Agreement, dated December 2016, by and between SIBS International, Inc. a Texas corporation, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, (viii) Lease Agreement, dated November 1, 2014, by and between Uptown Cosmetic and Implant Dentistry/Dr. Robert Velasco, DDS, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, (ix) Lease Agreement, dated December 1, 2015, by and between Vasso's Bar and Grill, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, and (x) Lease Agreement, dated January 1, 2015, by and between Wallis State Bank, as tenant, and Borrower, as successor-in-interest to Seller, as landlord; as each has been and may hereafter be amended, extended, restated and assigned in accordance with the terms and provisions of this Agreement.

"FATCA" shall mean (i) Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to the foregoing and (ii) any similar law adopted by any non-U.S. Governmental Authority pursuant to an intergovernmental agreement between such non-U.S. jurisdiction and the United States.

"Federal Funds Rate" shall mean, for any day, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to NBK on such day on such transactions as determined by Administrative Agent.

"Fee Letter" shall mean that certain Fee Letter dated as of the Closing Date between Borrower and NBK.

"Financial Statements" shall have the meaning set forth in Section 5.11 hereof.

"Governmental Authority" shall mean any court, board, agency, department, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, municipal, city, town, special district or otherwise) whether now or hereafter in existence.

"Guarantor" shall mean Bradley Parker, an individual.

"Guaranty" shall mean that certain Guaranty, dated as of the Closing Date, made by Guarantor for the benefit of Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Indemnified Liabilities" shall have the meaning set forth in Section 14.1 hereof.

"Indemnified Parties" shall mean (a) Lenders, (b) Administrative Agent, (c) any prior owner or holder of the Loan or Participations in the Loan, (d) any servicer or prior servicer of the Loan, (e) any Participant or Assignee or any prior Participant or Assignee of the Loan, (f) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Participant or Assignee or other third party, (g) any receiver or other fiduciary appointed in a foreclosure or other Creditors' Rights Laws proceeding, (h) any officers, directors, shareholders, partners, member, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing, and (i) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Deed of Trust.

"Inspector" shall have the meaning set forth in Section 8.3 hereof.

"Insurance Certificates" shall have the meaning set forth in Section 8.1(b) hereof.

"Insurance Premiums" shall have the meaning set forth in Section 8.1(b) hereof.

"Insurance Proceeds" shall have the meaning set forth in Section 8.3 hereof.

"Intercreditor Agreement" shall mean that certain Intercreditor Agreement, dated as of the Closing Date, by and between Administrative Agent, Lenders and Mezzanine Lender.

"Interest Rate" shall have the meaning set forth in the Note.

"Interest Rate Protection Products" shall mean any interest rate hedging agreement(s) relating to the Loan entered into by Borrower, any Lender or any Affiliate of any Lender, including, without limitation, any Transaction (as defined in any ISDA Master Agreement), and any interest rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or index swap or option bond, note or bill option, interest rate option, forward foreign exchange transaction, cap, collar, or floor transaction, currency swap, cross currency swap, swap option, currency option, or any similar transaction, including, without limitation, under any ISDA Master Agreement, entered into by Borrower, any Lender or any affiliate of Lenders.

"Interest Reserve Account" shall have the meaning set forth in Section 3.18 hereof.

"Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Involuntary Rate" shall have the meaning set forth in the Note.

"ISDA Master Agreement" shall mean any Master Agreement published by the International SWAP Dealers Association, Inc. or commonly used by swap dealers, as the same may be amended by any Lender or any Affiliate of such Lender.

"Jetall Lease" shall mean that certain Lease Agreement dated April 1, 2016 by and between Jetall Companies, Inc., as tenant, and Borrower, as successor-in-interest to Seller, as landlord.

"Judgment Amount" shall have the meaning set forth in Section 13.15 hereof.

"Key Principal" shall mean, collectively, Azeemeh Zaheer, an individual, and NCRE.

"Key Tenant" shall mean Specialty Retailers, Inc., a Texas corporation.

"Key Tenant Lease" shall mean that certain Office Lease Agreement, dated as of May 27, 2015, by and between Key Tenant and Borrower, as successor-in-interest to Seller, as landlord.

"Lease" shall mean the Existing Leases and any lease entered into by Borrower, as landlord, for all or any portion of the Project.

"Legal Requirements" shall mean all statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower or the Project or any part thereof, or the construction, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses, authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting Borrower or the Project or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Project or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"Lender Interest Rate" shall have the meaning set forth in Section 13.11 hereof.

"Lender(s)" shall mean, individually and collectively, any financial institution that either (a) is listed on the signature pages hereof as a "Lender" or (b) from time to time becomes a party hereto pursuant to the terms and provisions of this Agreement, in each case together with its successors.

"Lien" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Project, any portion thereof or any interest therein, including, without limitation, any conditional sale or the title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanics', materialmens' and other similar liens and encumbrances.

"Loan" shall have the meaning set forth in the Recitals.

"Loan Documents" shall mean, collectively, this Agreement, the Note, the Deed of Trust, the Assignment of Leases and Rents, the Guaranty, the Environmental Indemnity Agreement, the Assignment of Agreements, Licenses, Permits and Contracts, the Subordination of Management Agreement, the Fee Letter, the Intercreditor Agreement, the Control Account Agreement, any Assignment of Interest Rate Agreement entered into after the Closing Date and any and all other documents, agreements and certificates executed and/or delivered in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time. Loan Documents shall also include any Interest Rate Protection Product or ISDA Master Agreement.

"Losses" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement of whatever kind or nature (including, but not limited to, legal fees and other costs of defense).

"LTVR" shall have the meaning set forth in Section 5.29 hereof.

"LTVR Threshold" shall have the meaning set forth in Section 5.29 hereof.

"Management Agreement" shall mean, with respect to the Project, that certain Property Management Agreement dated on or about the Closing Date by and between Borrower and Manager, pursuant to which such Manager is to provide management, leasing and other services with respect to the Project, as the same may be amended, restated, replaced, supplemented or otherwise modified in accordance with the terms of this Agreement.

"Manager" shall mean (a) Boxer Property Management Corporation, a Texas corporation, (b) a Qualified Manager, or (c) any other management organization prior to whose employment as manager of the Project, such employment shall have been approved by Administrative Agent, which approval shall not be unreasonably delayed, conditioned or denied.

"Material Lease" shall mean (i) the Key Tenant Lease, (ii) the Regus Lease, (iii) the Jetall Lease, and (iv) any Lease which (A) individually or in the aggregate (with respect to such Tenant and its Affiliates) cover more than 20,000 square feet of the Improvements, (B) provide the Tenant under such Lease with an option or other preferential right to purchase all or any portion of the Project, or (C) the Tenant under such Lease is an Affiliate of the Borrower.

"Maturity Date" shall have the meaning set forth in the Note.

"Maximum Rate" shall have the meaning set forth in the Note.

"Mezzanine Borrower" shall mean the Sole Member.

"Mezzanine Lender" shall mean Naissance Galleria, LLC, a Cayman Islands limited liability company.

"Mezzanine Loan" shall mean the $16,100,000 loan made by Mezzanine Lender to Mezzanine Borrower, secured by the Mezzanine Pledge Agreement.

"Mezzanine Loan Agreement" shall mean that certain Mezzanine Loan Agreement, dated as of the Closing Date, by and between Mezzanine Lender and Mezzanine Borrower.

"Mezzanine Loan Documents" shall have the meaning given to the term "Loan Documents" in the Mezzanine Loan Agreement.

"Mezzanine Pledge Agreement" shall mean that certain Pledge and Security Agreement, dated as of the Closing Date, by and between Mezzanine Borrower and Mezzanine Lender.

"Multiemployer Plan" shall mean a multiemployer plan as defined in Section 3(37) of ERISA as to which Borrower or any ERISA Affiliate contributes or, within the last six (6) years, contributed or had any obligation to contribute or otherwise has any obligation or liability, whether actual or contingent.

"NCRE" shall mean Naissance Capital Real Estate, LLC, a Delaware limited liability company.

"NBK" shall mean National Bank of Kuwait, S.A.K.P., New York Branch.

"Net Operating Income" shall mean the difference between:

(a)       the sum of (i) actual rent collections for the period in question from Tenants and other Persons paying rent to Borrower *plus* (ii) any miscellaneous income actually received by Borrower from the Project. Net Operating Income shall not include any amounts paid by a Tenant under any Lease, including without limitation, the Existing Leases, for reimbursement of operating costs and expenses (including Taxes); and

(b)     actual operating expenses for the period in question (not including non-recurring expenses such as leasing commissions, tenant improvement costs, bonuses paid to managers for turning over space at the Project, and other renovation expenses), other than: (i) Debt Service due under the Note and (ii) all operating costs and expenses (including Taxes) payable by a Tenant under any Lease, including, without limitation, the Existing Leases. Any refunds or rebates to operating expenses are to be applied and credited against the applicable operating expenses for the period that such operating expenses were incurred.

"Note" shall mean that certain Promissory Note dated as of the Closing Date in the original principal amount of the Loan made by Borrower to Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"OECD" shall mean the Organization for Economic Cooperation and Development.

"OFAC" shall mean the Office of Foreign Assets Control, Department of the Treasury.

"Organizational Documents" shall mean, as to any Person, the certificate of incorporation and by-laws with respect to a corporation; the articles of organization (or the equivalent of such items under applicable state law) and operating agreement with respect to a limited liability company; the certificate of limited partnership and partnership agreement with respect to a limited partnership, or any other organizational or governing documents of such Person.

"Other Charges" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Project, now or hereafter levied or assessed or imposed against the Project or any part thereof.

"Participant" shall have the meaning set forth in Section 12.1 hereof.

"Participations" shall have the meaning set forth in Section 12.1 hereof.

"Patriot Act" shall have the meaning set forth in Section 4.23 hereof.

"Permitted Encumbrances" shall mean, with respect to the Project, collectively, (a) Liens, if any, for Taxes imposed by any Governmental Authority not yet due and payable or delinquent, (b) Liens for Taxes being contested in accordance with Section 5.4(d), (c) Liens, if any, for mechanics, materialmen or laborers which are fully bonded over in accordance with Section 5.4(c), (d) Liens set forth on Schedule B of the Title Policy, and (e) such other encumbrances as Administrative Agent has approved or may approve in writing in Administrative Agent's sole and absolute discretion.

"Permitted Transfers" shall mean the following:

(a)     a Lease entered into in accordance with the terms and conditions of the Loan Documents;

(b)     provided that no Event of Default shall then exist and be continuing, any transfer, Sale or Pledge of an interest in Borrower or any Restricted Party to any Person provided that:

(i)     such transfer shall not (x) cause the transferee (other than Key Principal), together with its Affiliates, to acquire Control of Borrower or Sole Member or to acquire or increase its direct or indirect interest in Borrower or in Sole Member to an amount which equals or exceeds forty-nine percent (49%) of the equity interests in Borrower or Sole Member, or (y) result in Borrower or Sole Member no longer being Controlled by Key Principal;

4161624-v7\CHIDMS1

000636

(ii)     after giving effect to such Transfer, Key Principal(s) shall continue to Control the day to day operations of Borrower and continue to own at least 51% of all equity interests (direct or indirect) in Borrower; and

(iii)     Borrower shall continue to be a single purpose entity in accordance with Section 6.1 and Sole Member shall continue to be the sole managing member of Borrower;

(c)     provided that no Event of Default shall then exist and be continuing, a transfer for estate planning purposes of any Key Principal's direct or indirect interests in Borrower to the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal, or to a trust for the benefit of such Key Principal or for the benefit of the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal so long as immediately following such transfer, Key Principals continue to Control the day to day operations of Borrower.

"Person" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any other entity, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Pre-Approved Accounting Firm" shall mean Pannell Kerr Forster of Texas, P.C.

"Plans" shall have the meaning set forth in Section 8.3 hereof.

"Platform" shall have the meaning set forth in Section 12.2 hereof.

"Policies" shall have the meaning set forth in Section 8.1(b) hereof.

"Policy" shall have the meaning set forth in Section 8.1(b) hereof.

"Prepayment Premium" shall have the meaning set forth in the Note.

"Prohibited Transfer" shall have the meaning set forth in Section 7.2(a) hereof.

"Project" shall mean the Property and that certain 281,590 rentable square foot office building located at the Property, and all other buildings and structures thereon, and all easements, rights, privileges and appurtenances (including, without limitation, any air or development rights, if any) thereunto belonging or in any way appurtenant, and all of the estate, right, title, interest, claim or demand whatsoever of Borrower therein, and all estates, rights, titles, interests, privileges, tenements, hereditaments, and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Property, either in law or in equity, in possession or expectancy, now or hereafter acquired.

"Property" shall mean that certain parcel of land located at 2425 West Loop South, City of Houston, County of Harris, State of Texas.

"Property Income" shall mean all rents, income, issues, profits, security deposits and other benefits to which Borrower may now or hereafter be entitled from the Project.

"Provided Information" shall have the meaning set forth in Section 12.1 hereof.

"Pro Rata Share" shall have the meaning set forth in Section 13.12 hereof.

"PSA" shall mean the Contract of Sale dated as of April 16, 2018 by and between Sole Member and Seller, as assigned by Sole Member to Borrower pursuant to that certain Assignment and Assumption of Contract dated as of the Closing Date.

"Purchase Price" shall have the meaning set forth in Section 13.3 hereof.

"Qualified Manager" shall mean a property manager which (i) is a reputable and experienced professional management company having at least five (5) years' experience in the management of commercial properties with similar uses as the Project and in the jurisdiction in which the Project is located, (ii) has, for at least three (3) years prior to its proposed engagement as "Manager", managed at least five (5) properties of the same property type, quality and size as the Project, and (iii) is not the subject of a bankruptcy or similar insolvency proceeding. For the avoidance of doubt, an Affiliate of the Manager initially named in this Agreement shall be deemed to be a "Qualified Manager" for purposes of this Agreement.

"Regus Lease" shall mean the Lease Agreement dated February 29, 1995, as amended by Amendment No. 1 to Lease Agreement dated July 28, 1997, Amendment No. 2 to Lease Agreement dated February 26, 2001, Amendment No. 3 to Lease Agreement effective as of January 1, 2005, Amendment No. 4 to Lease Agreement effective as of October 3, 2011, Amendment No. 5 to Lease Agreement effective as of October 3, 2011, Amendment No. 6 to Lease Agreement effective as of September 11, 2012 and Amendment No. 7 to Lease Agreement effective as of November 15, 2012, by and between RGN-Houston XXXIX, as successor-in-interest to Abby Executive Suites, West Loop, Inc. and Abby Office Centers, Uptown, Ltd., as tenant, and Borrower, as successor-in-interest to Seller, as landlord.

"Required Lenders" shall have the meaning set forth in Section 13.2 hereof.

"Restoration Account" shall have the meaning set forth in Section 8.3 hereof.

"Restoration Work" shall have the meaning set forth in Section 8.3 hereof.

"Restricted Party" shall have the meaning set forth in Section 7.1 hereof.

"Sale or Pledge" shall have the meaning set forth in Section 7.1 hereof.

"Seller" shall mean 2425 West Loop, LP, a Texas limited partnership.

"Servicer" shall have the meaning set forth in Section 12.1 hereof.

"Servicing Fee" shall have the meaning set forth in Section 13.17 hereof.

"SNDA" shall mean a Subordination, Non-Disturbance and Attornment Agreement.

"Sole Member" shall mean Galleria 2425 JV, LLC, a Delaware limited liability company, the sole member of Borrower.

"State" shall mean, with respect to the Project, the state in which the Project or any part thereof is located, and with respect to Borrower, the state of Borrower's organization.

"Subordination of Management Agreement" shall mean, during such time as a Management Agreement may be in place, that certain Assignment and Subordination of Management Agreement among Administrative Agent, Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Subsidiary" shall mean any corporation, partnership, limited liability company or other entity in which a Person holds an equity interest which is more than twenty percent (20%) of the equity classes issued by such entity.

"Syndication" shall have the meaning set forth in Section 12.1 hereof.

"Taxes" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied, assessed, or imposed against the Project (or any part thereof).

"Telecom Leases" shall mean leases with telecommunications providers or their affiliates or agents for the installation and maintenance of communication equipment, including, without limitation, antennas, at the Property.

"Tenant" shall mean any Person leasing, subleasing or otherwise occupying any portion of the Project under a Lease or other occupancy agreement with Borrower or any predecessor-in-interest to Borrower.

"Term" shall have the meaning set forth in the Note.

"Title Company" shall have the meaning set forth in Section 3.2 hereof.

"Title Policy" shall have the meaning set forth in Section 3.2 hereof.

"UCC" or "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in the State.

"West Loop" shall mean Galleria West Loop Investments II, LLC, a Texas limited liability company.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.2. Interpretation. Unless the context of this Agreement otherwise clearly requires, the following rules of construction shall apply to this Agreement and each of the Loan Documents:

(a)     Number; Inclusion. To the extent the context so requires, references to the plural include the singular, references to the singular include the plural, and references to the part include the whole; "or" has the inclusive meaning represented by the phrase "and/or"; and "including" has the meaning represented by the phrase "including, without limitation,";

(b)     Determination. References to "determination" of or by Administrative Agent or Lenders shall be deemed to include good-faith estimates by Administrative Agent or Lenders (in the case of quantitative determinations), and good-faith beliefs by Administrative Agent or Lenders (in the case of qualitative determinations), and such determination shall be conclusive absent manifest error;

(c)     Construction. This Agreement and all other Loan Documents shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement and all such other Loan Documents to be drafted. If any words or phrases in this Agreement or any other Loan Document shall have been stricken out or otherwise eliminated, whether or not any other words or phrases have been added, this Agreement and all such other Loan Documents shall be construed as if the words or phrase so stricken out or otherwise eliminated were never included herein or therein and no implication or inference shall be drawn from the fact that said words or phrases were so stricken out or otherwise eliminated;

(d)    <u>Agent's or Lenders Discretion and Consent</u>. Whenever Administrative Agent or Lenders are granted the right herein or in any Loan Document to make any decision or determination, to exercise any right, remedy or power or otherwise to act in its or their sole discretion or to grant or withhold consent, such right shall be exercised in good faith utilizing generally accepted commercial practices for transactions similar to the transaction that is the subject matter of this Agreement or such Loan Document (as the case may be);

(e)    <u>Documents Taken as a Whole</u>. The words "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement or in any Loan Document refer to this Agreement or such Loan Document as a whole and not to any particular provision of this Agreement or such Loan Document;

(f)    <u>Headings</u>. The section and other headings contained in this Agreement or any Loan Document and the table of contents (if any) preceding this Agreement or any Loan Document are for reference purposes only and shall not control or affect the construction of this Agreement or such Loan Document or the interpretation thereof in any respect;

(g)    <u>Implied References to this Agreement</u>. Article, section, subsection, clause, schedule and exhibit references are to this Agreement unless otherwise specified;

(h)    <u>Persons</u>. Reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Agreement or by such Loan Document, as the case may be, and reference to a Person in a particular capacity excludes such Person in any other capacity;

(i)    <u>Modifications to Documents</u>. Reference to any agreement (including this Agreement and any Loan Document, together with the schedules and exhibits hereto or thereto), document or instrument means such agreement, document or instrument as amended, modified, replaced, substituted for, superseded or restated at the relevant time;

(j)    <u>From, To and Through</u>. Relative to the determination of any period of time, "from" means "from and including," "to" means "to but excluding," and "through" means "through and including"; and

(k)    <u>Shall; Will</u>. References to "shall" and "will" are intended to have the same meaning.

ARTICLE II
GENERAL TERMS

Section 2.1. <u>Loan Commitment; Extension</u>.

(a)    Subject to the terms, provisions, covenants and conditions of this Agreement, Lenders shall make the Loan to Borrower in an amount equal to FIFTY ONE MILLION SIX HUNDRED SEVENTY FIVE THOUSAND AND NO/100THS DOLLARS ($51,675,000.00).

(b)    The Loan shall be secured by the Deed of Trust, the Assignment of Leases and Rents, and the other Loan Documents.

(c)    Borrower shall use the proceeds of the Loan to (i) partially finance Borrower's acquisition of the Project, (ii) make a deposit into the Interest Reserve Account, and (iii) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Administrative Agent.

Section 2.2. <u>Interest Rate and Loan Payments</u>.

(a)    The Loan shall bear interest at the per annum rates set forth in the Note.

(b)    Borrower hereby agrees to make principal and interest payments as set forth in the Note.

(c)    All payments to be made by Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by Borrower hereunder and under the other Loan Documents shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's office in Dollars and in immediately available funds not later than 2:00 p.m. EST on the date specified herein. All payments received by the Administrative Agent after 2:00 p.m. EST shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

Section 2.3. Usury Savings. This Agreement and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lenders to either civil or criminal liability as a result of being in excess of the Maximum Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Rate, the Interest Rate or the Involuntary Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Rate and all previous payments in excess of the Maximum Rate shall be deemed to have been payments in reduction of principal, without premium, and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lenders for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

ARTICLE III
CONDITIONS PRECEDENT

The obligation of Lenders to enter into this Agreement and make the Loan hereunder is subject to the fulfillment by Borrower and Guarantor or waiver by Administrative Agent of the following conditions precedent no later than the Closing Date.

Section 3.1. Representations and Warranties; Compliance with Conditions. The representations and warranties of Borrower and Guarantor contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date, and Administrative Agent shall have determined that no Default or an Event of Default shall have occurred and be continuing nor shall any Default or Event of Default occur immediately following the Closing Date and Borrower and Guarantor shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on its part to be observed or performed.

Section 3.2. Delivery of Loan Documents; Title Policy; Due Diligence Items.

(a)    Deed of Trust, Loan Agreement, Note and Guaranty. Administrative Agent shall have received (i) from Borrower fully executed and acknowledged counterparts of the Deed of Trust and Assignment of Leases and Rents, and evidence that the Uniform Commercial Code financing statement has been delivered to the Title Company for recording and/or filing, in the judgment of Administrative

14

Agent, so as to effectively create upon such recording and/or filing valid and enforceable Liens upon the Project, of first priority, in favor of Lenders, and (ii) from Borrower and Guarantor, as applicable, fully executed counterparts of this Agreement, the Note, the Guaranty and all of the other Loan Documents.

(b)     Policy; Title Policy. Administrative Agent shall have received a paid title insurance policy (the "Title Policy"), in the amount of the Deed of Trust, issued by a title company(ies) (the "Title Company") acceptable to Administrative Agent and dated as of the Closing Date. Such Title Policy shall (A) provide coverage for the full amount of the Loan, (B) insure Lenders that the Deed of Trust insured by such Title Policy creates a valid, perfected lien on the Project of first priority and that Borrower is the sole owner of a valid fee estate in and to the Project, free and clear of all exceptions from coverage other than the standard exceptions and exclusions from coverage, (C) provide full coverage against mechanics' liens (filed and inchoate), (D) contain such endorsements and affirmative coverages as Administrative Agent may reasonably request, and (E) name Administrative Agent as the insured. The Title Policy shall be assignable. Administrative Agent also shall have received evidence that all premiums in respect of such Title Policy have been paid.

(c)     Survey. Administrative Agent shall have received a current title survey for the Property, certified to the Title Company and Lenders and their successors and assigns, in form and content satisfactory to Administrative Agent and prepared by a professional and properly licensed land surveyor satisfactory to Administrative Agent. Such survey shall reflect the same legal description contained in the Title Policy referred to in Section 3.2(b) hereof and shall include, among other things, a metes and bounds description of the real property comprising part of the Project satisfactory to Administrative Agent. The surveyor's seal shall be affixed to the survey and the surveyor shall provide a certification for the survey in form and substance acceptable to Administrative Agent.

(d)     Insurance. Administrative Agent shall have received copies of the certificates of insurance for the Policies required hereunder, together with such Acord forms as Administrative Agent shall require, satisfactory to Administrative Agent in Administrative Agent's sole and absolute discretion, and, evidence of the payment of all Insurance Premiums payable for the existing policy period.

(e)     Encumbrances. Borrower shall have taken or caused to be taken such actions in such a manner so that Lenders have a valid and perfected first Lien as of the Closing Date on the Project and Administrative Agent shall have received satisfactory evidence thereof, subject to Permitted Encumbrances.

(f)     Lien Searches. Borrower shall have delivered to Administrative Agent certified search results pertaining to Borrower, Guarantor and such other Persons as reasonably required by Administrative Agent for state and federal tax liens, bankruptcy, judgment, litigation and state and local UCC filings.

(g)     Environmental Report. Administrative Agent shall have received an Environmental Report in respect of the Project, which report shall be satisfactory to Administrative Agent in all respects.

(h)     Engineering Report. Administrative Agent shall have received an Engineering Report in respect of the Project, which report shall be satisfactory to Administrative Agent in all respects (including, without limitation, indicating that there exists no material deferred maintenance at the Project).

(i)     Appraisal. Administrative Agent shall have received an appraisal for the Project, which appraisal shall be prepared by an MAI appraiser and satisfactory in form and substance to Administrative Agent (including, without limitation, providing for a loan-to-value ratio of not greater than

fifty-three and seven-tenths percent (53.7%), based on (i) the "as-is" value of the Project and (ii) the original principal balance of the Loan).

        (j)      [Intentionally Omitted]

        Section 3.3.  <u>Related Documents</u>. Each additional document not specifically referenced herein, but relating to the transactions contemplated herein, shall have been duly authorized, executed and delivered by all parties thereto and at Administrative Agent's written request, Administrative Agent shall have received and approved certified copies thereof.

        Section 3.4.  <u>Organizational Documents</u>. Administrative Agent shall have received (a) certified copies of all Organizational Documents related to Borrower and Guarantor, as applicable, which must be acceptable to Administrative Agent, in Administrative Agent's sole and absolute discretion, and (b) such other evidence of the formation, structure, existence and/or good standing of Borrower and Guarantor and such other Persons as Administrative Agent may request, in Administrative Agent's sole and absolute discretion, including, without limitation, good standing or existence certificates, resolutions authorizing the entering into of the Loan and the granting of the Deed of Trust and incumbency certificates as may be requested by Administrative Agent.

        Section 3.5.  <u>Opinions of Counsel</u>. Administrative Agent shall have received opinions of counsel with respect to (i) formation, existence and good standing of Borrower and Guarantor, as applicable, (ii) due execution, authority, enforceability of the Loan Documents, and (iii) such other matters as Administrative Agent may reasonably require. All such opinions shall be in form, scope and substance reasonably satisfactory to Administrative Agent and Lenders' counsel in their sole and absolute discretion.

        Section 3.6.  <u>Taxes and Other Charges</u>. Borrower shall have paid all Taxes and Other Charges (including any in arrears) relating to the Project.

        Section 3.7.  <u>Completion of Proceedings</u>. All corporate and other proceedings taken or to be taken in connection with the transactions contemplated by this Agreement and other Loan Documents and all documents incidental thereto shall be satisfactory in form and substance to Administrative Agent, and Administrative Agent shall have received all such counterpart original or certified copies of such documents as Administrative Agent may reasonably request.

        Section 3.8.  <u>Payments</u>. All payments, deposits or escrows required to be made or established by Borrower under this Agreement, the Note and the other Loan Documents on or before the Closing Date shall have been paid.

        Section 3.9.  <u>Transaction Costs</u>. Except as otherwise expressly provided herein, Borrower shall have paid or reimbursed Administrative Agent and Lenders for all reasonable third party out of pocket expenses actually incurred in connection with the underwriting, negotiation, and closing of the Loan, including, without limitation, title insurance premiums and other title company charges; registration, filing and similar fees, taxes and charges; transfer, deed, stamp, mortgage recording or documentary taxes or similar fees or charges; actual costs of third-party reports, including, without limitation, environmental studies, credit reports, appraisals, surveys, underwriting and origination expenses; and all reasonable legal fees and expenses charged by counsel to Lenders and Administrative Agent.

        Section 3.10.  <u>No Material Adverse Change</u>. There shall have been no material adverse change in the financial condition or business condition of the Project, Borrower or any other Person contributing to the operating income and operations of the Project since the date of the most recent financial statements and/or other information delivered to Administrative Agent. The income and expenses of the Project, the occupancy and leases thereof, and all other features of the transaction shall be as represented to Lenders

and Administrative Agent without material adverse change. Neither Borrower nor Guarantor shall be the subject of any bankruptcy, reorganization, or insolvency proceeding.

Section 3.11. Leases. Administrative Agent shall have received copies of all Leases affecting the Project, which shall be satisfactory in form and substance to Administrative Agent.

Section 3.12. Tenant Estoppel Certificate. Administrative Agent shall have received, or shall receive within fifteen (15) Business Days of the Closing Date, a tenant estoppel certificate from each Tenant under a Material Lease, addressed to Administrative Agent, in form and substance satisfactory to Administrative Agent in all respects. Failure by Borrower to deliver such tenant estoppel certificates within such time period shall constitute an Event of Default.

Section 3.13. SNDA. Administrative Agent shall have received, or shall receive within fifteen (15) days of the Closing Date, an SNDA executed by Key Tenant with respect to the Key Tenant Lease, in form and substance satisfactory to Administrative Agent in all respects. Failure by Borrower to deliver such SNDA within such time period shall constitute an Event of Default.

Section 3.14. Tax Lot. Administrative Agent shall have received evidence that the Property constitutes one or more separate tax lots, which evidence shall be satisfactory to Administrative Agent in all respects.

Section 3.15. Borrower's and Guarantor's Financials. Administrative Agent shall have received copies of Borrower's and Guarantor's most recent financial statements.

Section 3.16. Acquisition of Property. Administrative Agent shall have received evidence of the purchase price for the Project to be paid by Borrower and evidence that Borrower invested, upon acquisition of the Project, the required equity.

Section 3.17. Further Documents. Administrative Agent or Administrative Agent's counsel shall have received such other and further approvals, opinions, documents and information as Administrative Agent or Administrative Agent's counsel may have requested in form and substance satisfactory to Administrative Agent and Administrative Agent's counsel.

Section 3.18. Interest Reserve Deposit. Borrower shall have established a deposit account in the name of Borrower with Administrative Agent (the "Interest Reserve Account"), into which Borrower shall have deposited an amount equal to $2,500,000.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lenders and Administrative Agent as of the Closing Date that:

Section 4.1. Organization. Borrower (a) has been duly organized and is validly existing and in good standing with requisite power and authority to own its properties and to transact the businesses in which it is now engaged, (b) is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, businesses and operations, (c) possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its properties and to transact the businesses in which it is now engaged, and the sole business of Borrower is the ownership and management of the Project, and (d) has full power, authority and legal right to mortgage the Project pursuant to the terms of the Loan Documents and has full power, authority and legal right to keep and observe all of the terms of the Loan Documents to which it is a party. Borrower represents and warrants that the chart attached hereto as Exhibit A sets forth an accurate listing

17

of the direct and indirect owners of all of the equity interests in Borrower (the "Borrower Members"). For the avoidance of doubt, "Borrower Members" shall include Sole Member, NCRE and West Loop.

Section 4.2. <u>Status of Borrower</u>. Borrower's exact legal name is correctly set forth on the first page of this Agreement, on the Deed of Trust, and on any UCC-1 Financing Statements filed in connection with the Loan. Borrower is an organization of the type specified on the first page of this Agreement. Borrower is organized under the laws of the State of Delaware and authorized to do business under the laws of the State of Texas. Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less, the entire period of the existence of Borrower) the address of Borrower set forth on the first page of this Agreement. Borrower may designate a change of principal place of business and chief executive office by written notice to Administrative Agent by certified mail, return receipt requested, postage prepaid, at least thirty (30) days before such change of principal place of business and chief executive office is to become effective.

Section 4.3. <u>Validity of Documents</u>. Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents. This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Borrower and Guarantor, as applicable, and constitutes the legal, valid and binding obligations of Borrower and Guarantor, as applicable, enforceable against Borrower and Guarantor, as applicable, in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

Section 4.4. <u>No Conflicts</u>. The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower and Guarantor, as applicable, will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower and Guarantor, as applicable, pursuant to the terms of any agreement or instrument to which Borrower and Guarantor is a party or by which any of Borrower's or Guarantor's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or Guarantor or any of Borrower's or Guarantor's properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower and Guarantor, as applicable, of this Agreement or any of the other Loan Documents has been obtained and is in full force and effect.

Section 4.5. <u>Litigation</u>. To the best of Borrower's knowledge, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to Borrower's knowledge, threatened against or affecting Borrower, Guarantor or the Project, which actions, suits or proceedings, if determined against Borrower, Guarantor or the Project, could materially adversely affect the condition (financial or otherwise) or business of Borrower or Guarantor or the condition or ownership of the Project.

Section 4.6. <u>Agreements</u>. Neither Borrower nor Guarantor is a party to any agreement or instrument or subject to any restriction which would materially and adversely affect Borrower, such Guarantor or the Project, or Borrower's or such Guarantor's business, properties or assets, operations or condition, financial or otherwise. To Borrower's and Guarantor's actual knowledge, neither Borrower nor Guarantor are in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which Borrower or

18

4161624-v7\CHIDMS1

000645

Guarantor is a party or by which Borrower, Guarantor or the Project is bound. Borrower has no material financial obligations under any agreement or instrument to which Borrower is a party or by which Borrower or the Project is otherwise bound, other than (a) obligations incurred in the ordinary course of the ownership, leasing and operation of the Project and (b) obligations under the Loan Documents.

        Section 4.7. <u>Solvency</u>. Neither Borrower nor Guarantor has entered into the transaction or executed the Note, this Agreement, the Guaranty or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor, and Borrower and Guarantor have each received reasonably equivalent value in exchange for their respective obligations under such Loan Documents. No petition in bankruptcy has been filed against Borrower or Guarantor in the last ten years, and neither Borrower nor Guarantor in the last ten years has made an assignment for the benefit of creditors or taken advantage of any Creditors' Rights Laws. Neither Borrower nor Guarantor is contemplating either the filing of a petition by it under any Creditors' Rights Laws or the liquidation of all or a major portion of Borrower's or such Guarantor's assets or property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against Borrower or Guarantor.

        Section 4.8. <u>Full and Accurate Disclosure</u>. No material statement of fact made by or on behalf of Borrower or Guarantor in this Agreement or in any of the other Loan Documents or in any other document or certificate delivered by or on behalf of Borrower or Guarantor contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no material fact presently known to Borrower or Guarantor which has not been disclosed to Administrative Agent and Lenders which adversely affects, nor as far as Borrower or the applicable Guarantor can reasonably foresee, might adversely affect, the Project or the business, operations or condition (financial or otherwise) of Borrower or Guarantor.

        Section 4.9. <u>ERISA Compliance</u>.

        (a)      Borrower covenants, represents and warrants that (i) Borrower is not and will not be a Benefit Plan Investor, (ii) neither Borrower nor any of its Subsidiaries or ERISA Affiliates maintains or contributes to, or has at any time maintained or contributed to, or has any liability, whether actual or contingent, under, a plan subject to Section 302 or Title IV of ERISA or to Section 412 of the Internal Revenue Code, (iii) neither Borrower nor any of its Subsidiaries or ERISA Affiliates has ever contributed to or had an obligation to contribute to any Multiemployer Plan. None of the Benefit Plans are part of, or have at any time been part of, a multiple employer welfare arrangement, as that term is defined in Section 3(40) of ERISA, (iv) no Benefit Plan is or was at any time a multiple employer plan, as described in Section 413(c) of the Internal Revenue Code or Sections 4063 or 4064 of ERISA, and (v) neither Borrower nor any of its Subsidiaries or ERISA Affiliates has ever contributed to or had an obligation to contribute to any such plan.

        (b)      No ERISA Event has occurred or is reasonably expected to occur. No employee welfare benefit plan within the meaning of §3(1) or §3(2)(B) of ERISA of Borrower or any Subsidiary, provides benefit coverage subsequent to termination of employment except as required by Title I, Part 6 of ERISA or applicable state insurance laws. Each Benefit Plan is in material compliance with ERISA, the Internal Revenue Code and any applicable law. Each Benefit Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service for all required amendments regarding its qualification thereunder that considers the law changes incorporated in the plan sponsor's most recently expired remedial amendment cycle determined under the provisions of Rev. Proc. 2007-44, and nothing has occurred subsequent to the issuance of such termination letter which would prevent, or cause the loss of, such qualification.

Section 4.10. <u>Not a Foreign Person</u>. Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the Internal Revenue Code.

Section 4.11. <u>Enforceability</u>. The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or Guarantor including, without limitation, the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and neither Borrower nor Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect thereto. No Default or Event of Default exists under or with respect to any Loan Document.

Section 4.12. <u>Business Purposes</u>. The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

Section 4.13. <u>Compliance</u>. To the best of Borrower's knowledge, and other than as contained in any searches requested by or on behalf of Administrative Agent in connection with the Loan, Borrower and the Project, and the use and operation of the Project, comply in all material respects with all Legal Requirements, including, without limitation, building ordinances and codes and the Americans with Disabilities Act. To the best of Borrower's knowledge, neither Borrower nor Guarantor is in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority and neither Borrower nor Guarantor has received any written notice of any such default or violation. There has not been committed by Borrower or Guarantor or, to Borrower's knowledge, any other Person in occupancy of or involved with the operation or use of the Project any act or omission affording any Governmental Authority the right of forfeiture as against the Project or any part thereof or any monies paid in performance of Borrower's or Guarantor's obligations under any of the Loan Documents.

Section 4.14. <u>Financial Information</u>. All financial data, including, without limitation, the balance sheets, statements of cash flow, and statements of income and operating expense, that have been delivered to Administrative Agent in respect of Borrower, Guarantor and/or to Borrower's knowledge the Project (a) are true, complete and correct in all material respects as of the date of such information, (b) accurately represent the financial condition of Borrower, Guarantor and/or the Project, as applicable, as of the date of such reports, and (c) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with a modified accrual accounting method or such other method satisfactory to Administrative Agent throughout the periods covered, except as disclosed therein. Borrower has no contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a material adverse effect on the Project or the current and/or intended operation thereof, except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of the Borrower, Guarantor or, to Borrower's knowledge, the Project from that set forth in said financial statements.

Section 4.15. <u>Illegal Activity</u>. No portion of the Project has been or shall be purchased by Borrower with proceeds of any illegal activity and no part of the proceeds of the Loan will be used in connection with any illegal activity.

Section 4.16. <u>Separate Tax and Zoning Lot</u>. The Property constitutes a distinct parcel or parcels for purposes of zoning and of taxes, assessments and impositions (public or private) and are not otherwise considered as part of a larger single lot which includes property other than the Property for purposes of zoning or of taxes, assessments or impositions (public or private).

Section 4.17. <u>Federal Reserve Regulation</u>. Borrower shall use the proceeds of the Loan for the purposes set forth in <u>Section 2.1(c)</u> hereof and not for any illegal activity. No part of the proceeds of the

<div align="center">20</div>

Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or prohibited by the terms and conditions of this Agreement or the other Loan Documents.

Section 4.18. <u>Investment Company Act</u>. Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) [Reserved]; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

Section 4.19. <u>No Change in Facts or Circumstances; Disclosure</u>. All information submitted by Borrower, Guarantor or Borrower's or Guarantor's agents to Administrative Agent and in all financial statements, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are accurate, complete and correct in all material respects as of the date of such item. There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or might materially and adversely affect the Project or the business operations or the financial condition of Borrower or Guarantor. Borrower and Guarantor have disclosed to Administrative Agent all material facts and have not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading. With respect to any representations, warranties, or statements of fact which are specifically qualified in this Agreement as being true and correct to the best of Borrower's knowledge, the representation and warranty set forth in this <u>Section 4.19</u> shall be, to the best of Borrower's knowledge, true and correct as of the Closing Date.

Section 4.20. <u>Special Purpose Entity</u>. Borrower meets all of the requirements of <u>Article VI</u> hereof as of the Closing Date.

Section 4.21. <u>Intellectual Property</u>. All trademarks, trade names and service marks necessary to the business of Borrower as presently conducted or as Borrower contemplates conducting Borrower's business are in good standing and, to the extent of Borrower's actual knowledge, uncontested. To the best of Borrower's knowledge, Borrower has not infringed, is not infringing, and has not received notice of infringement with respect to asserted trademarks, trade names and service marks of others. To Borrower's knowledge, there is no infringement by others of trademarks, trade names and service marks of Borrower.

Section 4.22. <u>Embargoed Person</u>. To the best of Borrower's knowledge, as of the Closing Date and at all times throughout the term of the Loan, including after giving effect to any transfers of interests permitted pursuant to the Loan Documents or the Mezzanine Loan Documents, (a) none of the funds or other assets of Borrower or Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any Person or government subject to trade restrictions under U.S. law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower (whether directly or indirectly), is prohibited by law or the Loan made by Lenders is in violation of law ("<u>Embargoed Person</u>"); (b) no Embargoed Person has any interest of any nature whatsoever in Borrower with the result that the investment in Borrower (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the funds of Borrower have been derived from any unlawful activity with the result that the investment in Borrower (whether directly or indirectly) is prohibited by law or the Loan is in violation of law.

Section 4.23. <u>Patriot Act</u>. All capitalized words and phrases and all defined terms used in the USA Patriot Act of 2001, 107 Public Law 56 (October 26, 2001) and in other statutes and all orders, rules and regulations of the United States government and its various executive departments, agencies and offices related to the subject matter of the Patriot Act, including Executive Order 13224 effective September 24, 2001 (collectively referred to in this Section only as the "<u>Patriot Act</u>") are incorporated into this Section. Each of Borrower and Borrower Members hereby represent and warrant that (a) Borrower, Guarantor and Borrower Members and each and every Person affiliated with Borrower, or that to Borrower's or Borrower Members' knowledge has an economic interest in Borrower or Borrower Members, or, to Borrower's or Borrower Members' knowledge, that has or shall have an interest in the transaction contemplated by this Agreement or in the Project or shall participate, in any manner whatsoever, in the Loan, is, to the extent required so that the Loan in not in violation of applicable Legal Requirements, <u>and</u> (b) Borrower, Guarantor and each Person actively involved in the management of Borrower or the Project is: (i) not a "blocked" Person listed in the Annex to Executive Order Nos. 12947, 13099 and 13224 and all modifications thereto or thereof (the "<u>Annex</u>"); (ii) in full compliance with the requirements of the Patriot Act and all other requirements contained in the rules and regulations of the OFAC; (iii) to the extent applicable, operated under policies, procedures and practices, if any, that are in compliance with the Patriot Act and available to Administrative Agent for Administrative Agent's review and inspection during normal business hours and upon reasonable prior notice; (iv) not in receipt of any notice from the Secretary of State or the Attorney General of the United States or any other department, agency, or office of the United States claiming a violation or possible violation of the Patriot Act; (v) not listed as a Specially Designated Terrorist or as a "blocked" Person on any lists maintained by the OFAC pursuant to the Patriot Act or any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of the OFAC issued pursuant to the Patriot Act or on any other list of terrorists or terrorist organizations maintained pursuant to the Patriot Act; (vi) not a Person who has been determined by competent authority to be in violation of any of the prohibitions contained in the Patriot Act; and (vii) not controlled by or now acting or will in the future act for or on behalf of any Person named in the Annex or any other list promulgated under the Patriot Act or any other Person who has been determined to be in violation of the prohibitions contained in the Patriot Act. Borrower covenants and agrees that in the event Borrower or Guarantor receives any notice that Borrower (or any of Borrower's beneficial owners), Guarantor or any other Person related to or affiliated with Borrower, Guarantor or the Project become listed on the Annex or any other list promulgated under the Patriot Act or is indicted, arraigned, or custodially detained on charges involving money laundering or predicate crimes to money laundering, Borrower shall immediately notify Administrative Agent. It shall be an Event of Default hereunder if Borrower or any other party to any Loan Document becomes listed on any list promulgated under the Patriot Act or is indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering.

Section 4.24. <u>No Contractual Obligations</u>. Other than the Loan Documents, the Mezzanine Loan Documents, the Borrower Operating Agreement, the Management Agreement, the Existing Leases, the PSA pursuant to which Borrower is acquiring the Property, and certain Contractual Obligations to operate and manage the Project that are necessary and customary for properties similar to the Project, as of the date of this Agreement, Borrower is not subject to any Contractual Obligations and has not entered into any agreement, instrument or undertaking by which Borrower or Borrower's assets are bound, or has incurred any indebtedness (other than the Loan), and prior to the date of this Agreement, Borrower has not entered into any Contractual Obligation, or any agreement, instrument or undertaking by which it or its assets are bound or incurred any indebtedness (other than the Loan).

Section 4.25. <u>Shareholders of Borrower</u>. One hundred percent (100%) of the membership interests of Borrower are owned by the Sole Member.

Section 4.26. <u>Survival</u>. Borrower acknowledges and agrees that, unless expressly provided otherwise, all of the representations and warranties of Borrower and Guarantor set forth in this Agreement and in the other Loan Documents shall survive for so long as any portion of the Debt remains owing to Lenders. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower and Guarantor shall be deemed to have been relied upon by Lenders notwithstanding any investigation heretofore or hereafter made by Lenders or on its behalf.

Section 4.27. <u>Leases</u>. As of the Closing Date, there are no Leases pursuant to which any Person other than Borrower has any right, title or interest in the Project other than under the Existing Leases.

Section 4.28. <u>Landmark Status</u>. No portion of the Project is designated by or registered with any governmental authority as historic or landmark buildings or any other similar designation or registration and Borrower shall not attempt or cooperate to obtain or effect any such designation or registration.

Section 4.29. <u>Broker</u>. Borrower represents and warrants to Administrative Agent and Lenders that Borrower has not dealt with any broker with respect to the transaction contemplated hereby and, by accepting the Loan, Borrower agrees forever to indemnify and hold Administrative Agent and Lenders harmless from and against any and all claims or suits for compensation, commissions, fees or otherwise (and all Losses related thereto) that may be asserted or made by any broker or Person claiming to have dealt with or to have been employed by Borrower or Borrower's representatives in connection with the brokering of the Loan.

ARTICLE V
COVENANTS

From the Closing Date and until repayment of the Debt in full and performance in full of all obligations of Borrower and Guarantor under the Loan Documents or the earlier release of the Lien of the Deed of Trust (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lenders that:

Section 5.1. <u>Existence; Compliance With Legal Requirements</u>.

(a) Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply in all material respects with all Legal Requirements applicable to Borrower and the Project. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording any Governmental Authority the right of forfeiture as against the Project or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

(b) Borrower agrees that the Project shall at all times comply, to the extent applicable, with the Access Laws in all material respects. Notwithstanding any provisions set forth herein or in any other documents regarding Administrative Agent's approval or alterations of the Project, Borrower shall not alter the Project in any manner which would increase Borrower's responsibilities for compliance with the applicable Access Laws in any material respect without the prior written approval of Administrative Agent. The foregoing shall apply to tenant improvements constructed by Borrower or by any of Borrower's Tenants. Administrative Agent may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer or other Person acceptable to Administrative Agent. Borrower agrees to give prompt notice to Administrative Agent of the receipt by Borrower of any complaints related to violations of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

(c)      Notwithstanding any other provision of this Section, Borrower shall not be deemed to be in default solely by reason of Borrower's failure to comply with any applicable Legal Requirement so long as, in Administrative Agent's judgment, each of the following conditions is satisfied: (i) Borrower is engaged in and diligently pursuing in good faith administrative or judicial proceedings appropriate to contest the validity or amount of such law, rule regulation or order; (ii) Borrower's compliance with such law, rule, regulation or order would necessarily and materially prejudice Borrower's prospects for success in such proceedings; (iii) noncompliance with any such law, rule, regulation or order will not result in the loss or forfeiture of the Project or any other collateral for the Loan or any interest of Administrative Agent therein or result in any fines or other punitive actions or any insurance coverage; and (iv) Borrower deposits with Administrative Agent, as security for any payment or performance which may ultimately be required, a sum equal to the amount of any fine, assessment or charge plus the interest, penalties, and other costs which Administrative Agent reasonably estimates are likely to become payable if Borrower's contest is unsuccessful. If Administrative Agent determines that any one or more of such conditions is not satisfied or is no longer satisfied, Borrower shall comply with the law, rule regulation or order in question, within thirty (30) days after Administrative Agent gives notice of such determination.

Section 5.2. <u>Maintenance and Use of Project</u>. Borrower shall maintain the Project in a good and safe condition and repair. The improvements and the Borrower's personal property required for the use of the Project shall not be removed, demolished or materially altered without the written consent of Administrative Agent; *provided*, *however*, that Administrative Agent's consent shall not be required (a) in connection with any removal, demolition or alteration permitted to be made by a Tenant under an Existing Lease without Borrower's consent under the applicable Existing Lease, or required to be made by Borrower under an Existing Lease, and (b) as otherwise set forth in <u>Section 5.19</u>. If under applicable zoning provisions the use of all or any portion of the Project is or shall become a nonconforming use, Borrower shall not cause or permit the nonconforming use to be discontinued or the nonconforming improvement to be abandoned without the express written consent of Administrative Agent. Borrower shall not establish any condominium or cooperative regime with respect to the Project without the prior written consent of Administrative Agent, nor shall Borrower initiate, join in or consent to any change in any private restrictive covenant, zoning ordinance or other public or private restrictions, limiting or defining the uses which may be made of the Project or any portion thereof.

Section 5.3. <u>Waste</u>. Borrower shall not commit or suffer any intentional material waste of the Project or make any change in the use of the Project which shall in any way invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Project or the security for the Loan. Borrower shall not, without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Project, regardless of the depth thereof or the method of mining or extraction thereof, except as may be required by law or in accordance with the orders of any Governmental Authorities having jurisdiction thereof.

Section 5.4. <u>Taxes and Other Charges</u>.

(a)      Borrower shall pay, or cause to be paid, all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Project or any part thereof as the same become due and payable. Borrower shall furnish to Administrative Agent receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent. Borrower shall not suffer and shall promptly pay and discharge or bond any Lien or charge whatsoever which may be or become a Lien or charge against the Project, and shall pay for all utility services provided to the Project prior to delinquency.

(b)    Borrower shall not be obligated to make any deposit for Taxes as hereinafter provided until (i) Administrative Agent makes demand therefor following a Default and (A) any Tenant under a Material Leases is not paying such Taxes in accordance with the terms and provisions of its respective Material Lease, or (B) any Tenant under a Material Lease is in default under such Material Lease, or (ii) the continuance of an Event of Default hereunder of under any of the other Loan Documents. Upon the occurrence of the events described in clauses (i) and (ii) of the immediately preceding sentence, Borrower shall pay to Administrative Agent, upon the request of Administrative Agent, at the time of each payment of an installment of interest and/or principal under the Note, an additional amount which, together with all other such monthly payments, is sufficient to discharge the obligations for payment of Taxes and Other Charges one (1) month prior to the date the same shall become due. The determination of the amount so payable and of the fractional part thereof to be deposited with Administrative Agent, so that the aggregate of such deposits shall be sufficient for this purpose, shall be made by Administrative Agent in Administrative Agent's sole but reasonable discretion. Such amounts shall be held by Administrative Agent not as a trust fund and without interest (except as may be required by law) and shall be applied to the payment of the obligations in respect of which such amounts were deposited, in such order or priority as Administrative Agent shall determine, on or before the respective dates on which the same or any of them would become delinquent. During the continuance of an Event of Default, the balance of any such amounts held by Administrative Agent may be used and applied for any purpose authorized pursuant to this Agreement or any other Loan Document, including, without limitation, payment of the Debt in any order Administrative Agent may deem appropriate. If, one (1) month prior to the date any of the aforementioned Taxes or Other Charges may be paid without interest or penalty, the amounts then on deposit shall be insufficient for the payment of such obligation in full, Borrower shall, within ten (10) days after demand, deposit the amount of the deficiency with Administrative Agent. Nothing herein contained shall be deemed to affect any right or remedy of Administrative Agent or Lenders under any provisions of this Agreement or the Deed of Trust or of any statute or rule of law to pay any such amount and to add the amount so paid, together with interest at the Involuntary Rate, to the Debt. So long as Administrative Agent requires Borrower to pay Administrative Agent the deposits provided for in this paragraph and for so long as Borrower complies therewith, the obligation for direct payment of Taxes and Other Charges set forth in Subsection 5.4(a) hereof shall be suspended. Notwithstanding anything to the contrary contained herein, Administrative Agent shall not require Borrower to make such deposits for water and sewer charges if such charges are calculated on a metered basis.

(c)    Borrower shall pay or bond so as to remove as a lien of record, from time to time when the same shall become due, all lawful claims and demands of mechanics, materialmen, laborers, and others which, if unpaid, might result in, or permit the creation of, a lien on the Project or any part thereof, or on the revenues, rents, issues, income and profits arising therefrom and in general will do or cause to be done everything necessary so that the Liens of the Deed of Trust shall be fully preserved, at the sole cost and expense of Borrower and without expense to Administrative Agent or Lenders.

(d)    Notwithstanding any other provision of this Section, Borrower shall not be deemed to be in default solely by reason of Borrower's failure to pay any Taxes so long as, in Administrative Agent's sole judgment, reasonably exercised, each of the following conditions is satisfied:

(i)    Borrower or a Tenant is engaged in and diligently pursuing in good faith administrative or judicial proceedings appropriate to contest the validity or amount of such Tax;

(ii)    [Intentionally Omitted];

(iii)     Nonpayment of such Tax will not result in the loss or forfeiture of any property encumbered by the Deed of Trust or any of the other Loan Documents or any interest of Administrative Agent therein; and

(iv)     Borrower deposits with Administrative Agent, as security for such payment which may ultimately be required, a sum equal to the amount of the disputed Taxes plus the interest, penalties, and other costs which Administrative Agent reasonably estimates are likely to become payable if Borrower's contest is unsuccessful.

If Administrative Agent determines, in Administrative Agent's sole judgment, reasonably exercised, that any one or more of such conditions is not satisfied or is no longer satisfied, Borrower shall pay the Tax in question, together with any interest and penalties thereon, within ten (10) days after Administrative Agent gives notice of such determination.  After Administrative Agent has received evidence of such payment, Administrative Agent shall release any security held for such payment of Taxes pursuant to Section 5.4(d)(iv).

(e)     Borrower shall pay any taxes, except income, gross receipts and other taxes determined by reference to the amount of interest and other sums payable under the Loan Documents, imposed on Administrative Agent or Lenders by reason of Administrative Agent's or Lenders' ownership of this Agreement, the Note or the Deed of Trust as a result of any change in Legal Requirements (or any change in the application, interpretation or enforcement of existing Legal Requirements) effected after the date of this Agreement, provided that the Administrative Agent or applicable Lender shall at the time be assessing such taxes upon all of its similarly situated borrowers; provided further that Borrower shall not be required to pay any U.S. federal withholding taxes imposed under FATCA as a result of the failure by a Lender to comply with the applicable provisions of FATCA.

(f)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Accordingly, prior to the date that any Lender becomes a party hereto, such Lender shall deliver to the Borrower such certificates, documents or other evidence, as required by the IRS Code or Treasury Regulations issued pursuant thereto (including Internal Revenue Service Forms W-9, W-8ECI, W-8BEN, W-8BEN-E, W-8EXP and W-8IMY as applicable, or appropriate successor forms), properly completed, currently effective and duly executed by such Lender establishing that payments to it hereunder and under the Note are (i) not subject to United States Federal backup withholding tax and (ii) not subject to United States Federal withholding tax under the Internal Revenue Code.  Each such Lender shall (x) deliver further copies of such forms or other appropriate certifications on or before the date that any such forms expire or become obsolete and after the occurrence of any event requiring a change in the most recent form delivered to the Borrower and (y) obtain such extensions of the time for filing, and renew such forms and certifications thereof, as may be reasonably requested by the Borrower.

Section 5.5. Litigation. Borrower shall give prompt written notice to Administrative Agent of any litigation or governmental proceedings pending or threatened in writing against Borrower or Guarantor which might materially adversely affect Borrower's condition (financial or otherwise) or business or the Project of which Borrower has knowledge.

Section 5.6. <u>Access to the Project</u>. Borrower shall permit agents, representatives and employees of Administrative Agent and Lenders to inspect the Project or any part thereof at reasonable hours upon reasonable advance written notice, except in the event of an emergency, in which case no advance notice is necessary.

Section 5.7. <u>Notice of Default</u>. Borrower shall promptly advise Administrative Agent of (a) any material adverse change in the condition (financial or otherwise) of Borrower or the Project, (b) the occurrence of an Event of Default under any Loan Document or (c) an "Event of Default" under any Mezzanine Loan Document (as defined therein).

Section 5.8. <u>Cooperate in Legal Proceedings</u>. Borrower shall, at Borrower's sole cost and expense, cooperate fully with Administrative Agent and Lenders with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lenders hereunder or any rights obtained by Lenders under any of the other Loan Documents and, in connection therewith, permit Administrative Agent and Lenders, at Administrative Agent's or Lenders' sole election, to participate in any such proceedings.

Section 5.9. <u>Performance of Obligations</u>. Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision to be observed and performed by Borrower under this Agreement and the other Loan Documents and any other agreement or instrument affecting or pertaining to the Project and any amendments, modifications or changes thereto.

Section 5.10. <u>Awards; Insurance Proceeds</u>. Borrower shall cooperate with Lenders in obtaining for Lenders the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Project in accordance with the terms and provisions of the Loan Documents, and Administrative Agent and Lenders shall be reimbursed for any reasonable, third party expenses incurred in connection therewith (including attorneys' fees and disbursements) out of such Awards or Insurance Proceeds.

Section 5.11. <u>Financial Reporting</u>.

(a)     Borrower shall keep proper books of record and account with respect to the Project and its leases and subleases, in accordance with a modified accrual accounting method or such other method satisfactory to Administrative Agent and in a manner acceptable to Administrative Agent, in Administrative Agent's sole and reasonable discretion.

(b)     Borrower shall furnish to Administrative Agent the following:

(i)     within ninety (90) days after the close of each fiscal or calendar year of Borrower, as applicable, annual financial statements audited by a "Big Four" accounting firm, the Pre-Approved Accounting Firm, or other independent certified public accountant acceptable to Administrative Agent, which financial statements shall include, without limitation, a balance sheet, a statement of income and expenses, and a projected profit and loss statement for the next fiscal or calendar year, as applicable, disclosing all earnings and expenses with respect to Borrower and the Project (collectively, the "<u>Financial Statements</u>"), together with a certificate from an officer of Borrower certifying that such annual Financial Statements fairly present the financial condition of Borrower and the Project;

(ii)     within forty-five (45) days after the close of each quarter of its fiscal year, a quarterly statement including a balance sheet and statement of profits and losses with respect to the Project;

(iii)     copies of any operating statements or the like when Borrower is required to submit such information to any Governmental Authority;

27

(iv)      promptly following any request therefor, copies of any notices described in Section 101(j) of ERISA that Borrower or any of its Subsidiaries or ERISA Affiliates may provide with respect to any Benefit Plan, copies of any documents described in Section 101(k) of ERISA that Borrower or any of its Subsidiaries or ERISA Affiliates may request with respect to any Multiemployer Plan, copies of any notices described in Section 101(1) of ERISA that Borrower or any of its Subsidiaries or ERISA Affiliates may request with respect to any Multiemployer Plan and any information that Borrower or any of its Subsidiaries or ERISA Affiliates may request with respect to any Multiemployer Plan in connection with Section 4221(e) of ERISA; provided, that if Borrower or any of its Subsidiaries or ERISA Affiliates has not requested such documents or notices from the administrator or sponsor of the applicable Benefit Plan or Multiemployer Plan, Borrower, the Subsidiary or the ERISA Affiliate, as applicable, shall promptly, upon the request of Administrative Agent, make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof; and

(v)      such other information respecting the business, properties or the condition or operations, financial or otherwise, of Borrower and/or the Project as Administrative Agent may from time to time reasonably request.

(c)      All Financial Statements and other deliverables of Borrower required under this Section 5.11 shall be (i) prepared in accordance with generally accepted accounting principles or such other method satisfactory to Administrative Agent, (ii) delivered in duplicate, and (iii) certified by Borrower as being true, complete and correct.

Section 5.12. Estoppel Statement. After request by Administrative Agent, Borrower shall within fifteen (15) Business Days furnish Administrative Agent with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the rate of interest on the Note, (iii) the unpaid principal amount of the Note, (iv) the date installments of interest were last paid, (v) any offsets or defenses to the payment of the Debt, if any, and (vi) that the Note, this Agreement, the Deed of Trust and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification. In the event any Governmental Authority requires the same, Lenders shall deliver a similar statement to Borrower.

Section 5.13. Management of Project. In the event a Management Agreement shall be in effect at any time, Borrower hereby covenants and agrees as follows:

(a)      Borrower shall (i) promptly perform and observe all of the covenants required to be performed and observed by Borrower under the Management Agreement and do all things necessary to preserve and to keep unimpaired Borrower's material rights thereunder; (ii) promptly notify Administrative Agent of any material default under the Management Agreement of which Borrower is aware; (iii) promptly deliver to Administrative Agent a copy of any notice of default or other material notice received by Borrower under the Management Agreement; and (iv) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement.

(b)      If at any time, (i) a Manager shall become insolvent or a debtor in a bankruptcy proceeding, (ii) an Event of Default has occurred and is continuing or (iii) a default has occurred and is continuing under the Management Agreement and Borrower has the right thereunder to terminate the Management Agreement on account thereof, Borrower shall, at the request of Administrative Agent, terminate the applicable Management Agreement upon thirty (30) days prior notice to such Manager and replace such Manager with a Qualified Manager (without the need for the approval of Administrative

Agent) or a manager selected by Borrower and approved in writing by Administrative Agent, in Administrative Agent's reasonable discretion.

(c)     Borrower shall not, without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld, (i) surrender, terminate or cancel the Management Agreement or otherwise replace any Manager or enter into any other management agreement with respect to the Project; (ii) reduce or consent to the reduction of the term of the Management Agreement; (iii) increase or consent to the increase of the amount of any charges under the Management Agreement; or (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Management Agreement in any material respect. In the event that Borrower replaces a Manager at any time during the term of Loan pursuant to this subsection, such Manager shall be approved by Administrative Agent in writing.

(d)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Manager initially named in this Agreement may (i) transfer its interest in any Management Agreement for the management of the Project to any Affiliate of such Manager, (ii) transfer shares or equity interests in Manager or Manager's equity owners (including, without limitation, the issuance of treasury stock, or the creation or issuance of a new class of stock or membership interests, in either case in the context of an initial public offering or in the context of a subsequent offering of equity securities), (iii) sell all or substantially all of such Manager's assets, and (iv) merge or consolidate with another entity without, in each case, the approval of Administrative Agent or the same constituting an Event of Default under this Agreement; *provided*, *however*, if any of the actions described in clauses (ii), (iii) or (iv) shall cause such Manager to be unable to perform the functions required to be performed and observed by Manager under the Management Agreement, Borrower shall, at the request of Administrative Agent, terminate the applicable Management Agreement upon thirty (30) days prior notice to such Manager and replace such Manager with a Qualified Manager (without the need for the approval of Administrative Agent) or a manager selected by Borrower and approved in writing by Administrative Agent, in Administrative Agent's reasonable discretion.

(e)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the resignation, removal or replacement of Manager shall not be an Event of Default under this Agreement or require the approval of Administrative Agent so long as Borrower shall appoint or retain a substitute Manager that is a Qualified Manager.

Section 5.14. <u>Liens</u>. Borrower shall not, without the prior written consent of Administrative Agent, create, incur, assume or suffer to exist any Lien on any portion of the Project or permit any such action to be taken, other than the Permitted Encumbrances, the Deed of Trust, the Assignment of Leases and Rents and any other liens created by the Loan Documents. Neither Borrower nor any other Person shall take any action that would impair the Lien created under this Agreement, the Deed of Trust or any other Loan Document.

Section 5.15. <u>Debt Cancellation</u>. Borrower shall not cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business, other than rent abatements or concessions in the ordinary course of business.

Section 5.16. <u>Zoning</u>. Borrower shall not initiate or affirmatively consent to any zoning classification or reclassification of any portion of the Project or seek any variance under any existing or future zoning ordinance or use or permit the use of any portion of the Project in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Administrative Agent.

Section 5.17. <u>ERISA</u>. Borrower covenants and agrees to deliver to Administrative Agent such certifications or other evidence from time to time throughout the term of the Loan, as reasonably requested by Administrative Agent that Borrower is not and will not be a Benefit Plan Investor.

Section 5.18. <u>No Joint Assessment</u>. Borrower shall not suffer, permit or initiate the joint assessment of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

Section 5.19. <u>Alterations</u>. Administrative Agent's prior written approval shall be required in connection with any material alterations to any improvements at or on the Project, except for (a) alterations to Tenant spaces required to be undertaken by Borrower under a Lease, or permitted to be undertaken by such Tenant without Borrower's consent under its Lease, (b) alterations required by Legal Requirements, and (c) ordinary non-structural improvements, alterations and maintenance and structural repairs, the cost of which is $750,000 or less (in the aggregate in any twelve (12) month period). With respect to an Existing Lease, to the extent that Administrative Agent's prior approval is required under this <u>Section 5.19</u>, Administrative Agent shall grant or withhold its consent to any alterations proposed thereunder subject to the standard of consent applicable to the landlord under the applicable Existing Lease.

Section 5.20. <u>Reciprocal Easement Agreement</u>. Borrower shall not enter into any reciprocal easement agreement without Administrative Agent's prior written consent.

Section 5.21. <u>Notices</u>. Borrower shall give notice, or cause notice to be given, to Administrative Agent promptly upon the occurrence, or the receipt of notice, of:

(a)     any Event of Default or, to Borrower's knowledge, any event that would with the giving of notice or passage of time would constitute an Event of Default;

(b)     any default or event of default under any Contractual Obligation of Borrower that, to the knowledge of Borrower, could reasonably be expected to have a material adverse effect on Borrower, the ability of Borrower to perform Borrower's obligations under the Loan Documents or the rights and remedies of Lenders under the Loan Documents;

(c)     any material litigation or proceeding affecting Borrower, Guarantor or the Project but only to the extent such litigation could be reasonably expected to have a material adverse effect on Borrower, Guarantor or the Project, the ability of Borrower or Guarantor to perform their obligations under the Loan Documents or the rights and remedies of Lenders under the Loan Documents;

(d)     a change in the business, operations or financial or other condition or prospects of Borrower or Guarantor which could reasonably be expected to have a material adverse effect on Borrower the ability of Borrower or such Guarantor to perform Borrower's or such Guarantor's obligations under the Loan Documents or the rights and remedies of Administrative Agent and Lenders under the Loan Documents; or

(e)     any ERISA Event.

Section 5.22. <u>Curing</u>. Administrative Agent and Lenders shall have the right, but shall not have the obligation, following ten (10) days' notice to Borrower and an opportunity to cure, to exercise Borrower's rights to satisfy or fully bond over any Liens, claims or judgments against the Project. Borrower shall reimburse Lenders and Administrative Agent on demand for any and all actual costs

incurred by Lenders or Administrative Agent in connection with satisfying any Liens, claims or judgments against the Project.

Section 5.23. <u>Limitation on Securities Issuances</u>. None of Borrower or any of Borrower Members shall issue any additional membership interests or other securities, other than those that have been issued as of the Closing Date to the extent that such issuance would violate the provisions of <u>Section 7.2</u>, without the prior written consent of Administrative Agent, which consent may be withheld by Administrative Agent in Administrative Agent's sole and absolute discretion. For the avoidance of doubt, this <u>Section 5.23</u> shall not apply to the issuance, reissuance or replacement of certificates evidencing membership interests existing as of the Closing Date in accordance with the Mezzanine Loan Documents.

Section 5.24. <u>Limitations on Distributions</u>. Following the occurrence and during the continuance of (i) an Event of Default or (ii) a default by Borrower or the Key Tenant under the Key Tenant Lease, Borrower shall not make any distributions to Sole Member or any Borrower Members or any other Person. Except as aforesaid, there shall be no limitation on the making of any distributions to Borrower Members so long as no Event of Default or default under the Key Tenant Lease shall have occurred and be continuing.

Section 5.25. <u>Contractual Obligations</u>. Other than the Loan Documents, the Mezzanine Loan Documents, the Borrower Operating Agreement (and the membership interests in Borrower issued pursuant thereto) and the other documents described in <u>Section 4.24</u>, neither Borrower nor any of Borrower's assets shall be subject to any Contractual Obligations, and Borrower shall not enter into any agreement, instrument or undertaking by which Borrower or Borrower's assets are bound, other than those Contractual Obligations to operate, manage and Lease the Project that are necessary and customary for properties similar to the Project.

Section 5.26. <u>Additional Indebtedness</u>. Except as provided in <u>Section 6.1(g)</u> hereof, Borrower shall not suffer or incur any additional debt, obligations as lessee under a capitalized lease or contingent liabilities without the prior written consent of Administrative Agent, which consent may be withheld by Administrative Agent in Administrative Agent's sole and absolute discretion.

Section 5.27. <u>Restrictions on Leasing</u>. Borrower shall (i) not execute a Material Lease which shall not have been submitted to and approved by Administrative Agent except for Telecom Leases, (ii) not alter, modify or change the terms of any Material Lease except in the ordinary course of business and provided such alteration, modification or change does not have a material adverse financial effect on Borrower, (iii) not give any consent or exercise any option unless required by the terms of any Lease approved by Administrative Agent, (iv) not cancel or terminate any Material Lease or accept a surrender or tenant buyout thereof except in the event of default by the Tenant thereunder, (v) not consent to any assignment of or subletting under any Material Lease, unless the same shall be in accordance with its terms and such terms have been approved by Administrative Agent, (vi) not collect any of the rents, income and profits arising or accruing under any Leases or from the Project for more than one (1) month in advance of the time when the same shall become due, (vii) not execute any other assignment of Borrower's interest in the Leases or any assignment of rents arising or accruing from the Leases or from the Project; (viii) observe and promptly and faithfully perform or cause to be performed all of the covenants, conditions and agreements contained in all Leases in all material respects, (ix) at all times do all things reasonably necessary in the exercise of sound business judgment to compel performance by the lessee under each Lease of all obligations, covenants and agreements by such lessee to be performed thereunder, (x) not do or permit to be done anything to materially impair the security of any Lease, (xi) at Administrative Agent's request, assign and transfer to Administrative Agent any and all subsequent Leases upon all or any part of the Project, and (xii) execute and deliver at the reasonable request of Administrative Agent all such further assurances and assignments in the Project as Administrative Agent

shall from time to time require. None of the foregoing restrictions set forth in clauses (i) through (vii) of this Section shall be done or suffered to be done without in each instance obtaining the prior written consent of Administrative Agent, and any of such acts done without the prior written consent of Administrative Agent shall be null and void.  For purposes of clarity, the Existing Leases and the terms therein have been approved by Administrative Agent.

(a)     <u>Tenant Estoppel Certificates</u>. Borrower shall deliver to Administrative Agent upon the written request of Administrative Agent (made not more often than once in any calendar year), an updated tenant estoppel certificate from any Tenant at the Project addressed to Administrative Agent, in form and substance satisfactory to Administrative Agent in all respects.

(b)     <u>Copies of Leases</u>. Within ten (10) Business Days of any such request, Borrower shall submit to Administrative Agent or Administrative Agent's counsel true and complete copies of all Leases for the Project including all amendments thereto or extensions thereof, and any guarantees thereof.

(c)     <u>Subordination and Attornment</u>. Each Lease hereafter entered into shall be subordinate to the lien of the Deed of Trust, to all advances under the Deed of Trust and to any renewals, extensions, modifications or consolidations thereof, and shall provide that, in the event of the enforcement by Lenders of the remedies provided for by law, by this Agreement or by the Deed of Trust, the lessee thereunder shall, upon request of any Person succeeding to the interest of Borrower as a result of such enforcement, automatically become the lessee of and shall attorn to said successor in interest, without change in the terms or other provisions of such Lease; *provided*, *however*, that said successor in interest shall not be bound by (i) any payment of rent or additional rent for more than one (1) month in advance, except prepayments in the nature of security for the performance by said lessee of its obligations under said Lease, or (ii) any amendment or modification of the Lease made without the consent of Administrative Agent or such successor in interest, unless such consent is not required pursuant to this <u>Section 5.27</u>. Each Lease shall also provide that, upon request by said successor in interest, such lessee shall execute and deliver an instrument or instruments confirming such attornment.  Administrative Agent, on behalf of Lenders, shall enter into a commercially reasonable SNDA with Tenants under future Leases upon request, from time to time.

Section 5.28. <u>Debt Service Coverage Ratio</u>.

(a)     At all times during the term of the Loan, the Project must maintain a minimum debt service coverage ratio ("<u>DSCR</u>") of 1.20:1.00 ("<u>DSCR Threshold</u>"). The DSCR shall be tested on an annual basis commencing on December 31, 2018 and on each December 31 thereafter during the term of the Loan. The DSCR shall be calculated as the ratio of (i) Net Operating Income for the prior twelve-month period immediately preceding the measurement date, *to* (ii) actual scheduled principal and interest payments under the Loan for the prior trailing twelve-month period immediately preceding the measurement date. With respect to the calculation of DSCR as aforesaid, until the first (1st) anniversary of the Closing Date, Debt Service and Net Operating Income shall be calculated on the basis of actual Debt Service and Net Operating Income for such partial year period and such amounts shall be annualized by Administrative Agent for purposes of calculating the DSCR.

(b)     The certificate of Administrative Agent as to any DSCR calculation shall, absent manifest error, be final, conclusive and binding on Borrower.

(c)     If, on any annual measurement date, the DSCR is below the DSCR Threshold, Borrower may, at Borrower's option, pay down the Loan (without payment of any Prepayment Premium) by an amount necessary for Borrower to effectively achieve the DSCR Threshold immediately following delivery of such pay down (any amount so paid down may not be reborrowed). Borrower shall deliver the pay down to Administrative Agent within fifteen (15) days following notice from Administrative Agent

that such DSCR Threshold has not been met. Borrower's failure to deliver the pay down within such time period such that DSCR Threshold is achieved shall be an Event of Default.

Section 5.29. <u>Loan-to-Value Ratio</u>.

(a)     The Project must maintain a maximum loan-to-value ratio ("<u>LTVR</u>") of 60.0% ("<u>LTVR Threshold</u>") at all times. The LTVR shall be tested by Administrative Agent on an annual basis, commencing on December 31, 2018 and on each December 31 thereafter during the term of the Loan, and shall be calculated as the ratio of (i) the outstanding principal balance under the Loan *to* (ii) the Appraised Value of the Project. For the purpose of this covenant, "<u>Appraised Value</u>" shall mean the market value of the Project according to the latest FIRREA appraisal performed by an appraiser appointed by Borrower and reasonably acceptable to Administrative Agent, which appraisals shall be performed annually by December 31st of each calendar year.

(b)     The certificate of Administrative Agent as to any LTVR calculation shall, absent manifest error, be final, conclusive and binding on Borrower.

(c)     If, on any annual measurement date, the LTVR exceeds the LTVR Threshold, Borrower may, at Borrower's option, pay down the Loan (without payment of any Prepayment Premium) by an amount necessary for Borrower to effectively achieve the LTVR Threshold immediately following delivery of such pay down (any amount so paid down may not be reborrowed).  Borrower shall deliver the pay down to Administrative Agent within fifteen (15) days following notice from Administrative Agent that the LTVR Threshold has not been achieved. Borrower's failure to deliver the pay down within such time period such that LTVR Threshold is achieved shall be an Event of Default.

Section 5.30. <u>UCC Searches</u>. Borrower and Guarantor hereby agree that Administrative Agent shall have the right to order UCC, judgment and lien searches against Borrower and Guarantor at any time at Borrower's sole cost and expense. Borrower shall also be responsible for all actual out-of-pocket costs incurred by Administrative Agent to continue the UCC-1 Financing Statements delivered by Borrower in favor of Administrative Agent from time to time.

Section 5.31. <u>Updated/New Appraisal</u>. Borrower hereby acknowledges and agrees that Borrower shall order (or, at Administrative Agent's election, Administrative Agent may order) an updated or new appraisal of the Project (a) annually, in connection with Administrative Agent's test of the LTVR Threshold, at Borrower's sole cost and expense, (b) upon the occurrence of an Event of Default, at Borrower's sole cost and expense, and (c) at any other time, at Administrative Agent's sole cost and expense.  Any such appraisal shall be performed by an appraiser appointed by Borrower and reasonably acceptable to Administrative Agent, and Administrative Agent may from time to time require that the appraiser who performs a particular appraisal be different than the appraiser who performed the prior appraisal.

Section 5.32. <u>Interest Reserve Account</u>.  Borrower shall maintain the Interest Reserve Account for the term of the Loan, which Interest Reserve Account shall be under the sole dominion and control of Administrative Agent.  The Interest Reserve Account shall have a title evidencing the foregoing in a manner reasoning acceptable to Administrative Agent.  Borrower hereby grants to Administrative Agent, for the benefit of Lenders, a first-priority security interest in the Interest Reserve Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Administrative Agent, for the benefit of Lenders, a perfected first priority security interest in the Interest Reserve Account.  All costs and expenses for establishing and maintaining the Interest Reserve Account (or any successor thereto) shall be paid by Borrower.  All monies now or hereafter deposited into the Interest Reserve Account shall be deemed additional security for the Debt.  Borrower shall not alter or modify the Interest Reserve Account without the prior written consent of Administrative Agent.

Borrower shall not draw upon the Interest Reserve Account during the term of the Loan (for the purpose of making interest payments or otherwise).  Upon the occurrence of an Event of Default due to Borrower's failure to timely make any interest payment, Administrative Agent shall apply funds on deposit in the interest reserve against amounts owing to Lenders under this Agreement, and shall notify Borrower whether sufficient funds were available in the Interest Reserve Account to cure such Event of Default. For the avoidance of doubt, Borrower shall be required to make separate interest payments pursuant to the terms of the Note, regardless of whether there are funds in the Interest Reserve Account on deposit with Administrative Agent.

Section 5.33. <u>Mezzanine Loan</u>.  Borrower shall not cause, suffer or permit Mezzanine Borrower to enter into any cancellation, termination, modification, change, supplement, restatement, alteration or amendment of any Mezzanine Loan Document. Without limitation of any other covenant set forth in this Agreement, Borrower shall deliver to Administrative Agent, within two (2) Business Days, any notice of default or other material notice, statement or report given or received by any party under the Mezzanine Loan Documents.

ARTICLE VI
ENTITY COVENANTS

Section 6.1. <u>Single Purpose Entity/Separateness</u>. Until the Debt has been paid in full, Borrower represents, warrants and covenants that Borrower has not and shall not:

(a) engage in any business or activity other than the ownership of the Project and any activities incidental thereto;

(b) acquire or own any assets other than (i) the Project, and (ii) such incidental personal property as may be necessary for the ownership of the Project;

(c) merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(d) fail to observe all organizational formalities or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable Legal Requirements of the jurisdiction of its organization or formation, or amend, modify, terminate or fail to comply with the provisions of its Organizational Documents;

(e) form or own any Subsidiary or make any investment in any Person;

(f) commingle its assets with the assets of any other Person;

(g) incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation) other than (i) the Loan and/or (ii) trade and operational indebtedness incurred in the ordinary course of business with trade creditors, provided such indebtedness is (A) unsecured, (B) not evidenced by a note, (C) on commercially reasonable terms and conditions, and (D) due not more than ninety (90) days past the date incurred and paid on or prior to such date;

(h) fail to maintain its records, books of account, bank accounts, financial statements, accounting records and other entity documents separate and apart from those of any other Person;

(i) enter into any contract or agreement with any general partner, member, shareholder, principal, guarantor of the obligations of Borrower or any Affiliate of the foregoing, except

upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arm's length basis with unaffiliated third parties;

(j)        maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(k)        assume or guaranty the debts of any other Person, hold itself out to be responsible for the debts of any other Person, or otherwise pledge its assets for the benefit of any other Person or hold out its credit as being available to satisfy the obligations of any other Person, provided however, that this subsection (k) shall not be deemed to prohibit Borrower from pledging assets to secure its own obligations as required or permitted by the Loan Documents;

(l)        make (i) any loans or (ii) any advances (except with respect to distributions to its shareholders, partners or members, as applicable, which are not otherwise prohibited under this Agreement) to any Person;

(m)        fail to file its own tax returns or file a consolidated federal income tax return with any Person (unless prohibited or required, as the case may be, by applicable Legal Requirements);

(n)        fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or fail to correct any known misunderstanding regarding its separate identity;

(o)        fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; *provided*, *however*, in no event shall this subsection (o) require any equity owner to make additional capital contributions to Borrower (it being acknowledged, however, that a failure of Borrower to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations shall be a Default hereunder irrespective of such equity owner's lack of an obligation to make additional capital contributions to Borrower);

(p)        (i) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any Creditors' Rights Laws (unless filed by Administrative Agent), (ii) seek or consent to the appointment of a receiver, liquidator or any similar official, (iii) take any action that might cause such entity to become insolvent, or (iv) make an assignment for the benefit of creditors;

(q)        fail to allocate shared expenses (including, without limitation, shared office space and services performed by an employee of an Affiliate) among the Persons sharing such expenses and to use separate invoices and checks;

(r)        fail to remain solvent or pay its own liabilities (including, without limitation, salaries of its own employees) only from its own funds; *provided*, *however*, in no event shall this subsection (r) require any equity owner to make additional capital contributions to Borrower (it being acknowledged, however, that a failure of Borrower to remain solvent or pay its own liabilities (including, without limitation, salaries of its own employees) only from its own funds shall be a Default hereunder irrespective of such equity owner's lack of an obligation to make additional capital contributions to Borrower); and

(s)        acquire obligations or securities of its partners, members, shareholders or other affiliates, as applicable.

Section 6.2. <u>Change of Name, Identity or Structure</u>. Borrower shall not change or permit to be changed (a) Borrower's name, (b) Borrower's identity (including Borrower's trade name or names), (c)

Borrower's principal place of business set forth on the first page of this Agreement, the Deed of Trust or any UCC-1 Financing Statements, (d) the corporate, partnership, limited liability company or other organizational structure of Borrower, (e) Borrower's state of organization, or (f) Borrower's organizational identification number, without in each case notifying Administrative Agent of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Administrative Agent. In addition, Borrower shall not change or permit to be changed any Organizational Documents of such person if such change would adversely impact the covenants set forth in <u>Section 6.1</u> hereof. Borrower shall execute and deliver to Administrative Agent, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement amendment reasonably required by Administrative Agent to establish or maintain the validity, perfection and priority of the security interest granted herein. At the request of Administrative Agent, Borrower shall execute a certificate in form satisfactory to Administrative Agent listing the trade names under which Borrower intends to operate under, and representing and warranting that Borrower does business under no other trade name. If Borrower does not now have an organizational identification number and later obtains one, or if the organizational identification number assigned to Borrower subsequently changes, Borrower shall promptly notify Administrative Agent of such organizational identification number or change.

Section 6.3. <u>Business and Operations</u>. Borrower shall remain in good standing under the laws of each State as, and to the extent, the same are required for the ownership, maintenance, management and operation of the Project. Borrower shall not enter into any line of business other than the ownership of the Project and ancillary purposes in connection therewith, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business.

<div align="center">

ARTICLE VII
NO SALE OR ENCUMBRANCE

</div>

Section 7.1. <u>Transfer Definitions</u>. For purposes of this <u>Article VII</u>, an "<u>Affiliated Manager</u>" shall mean any managing agent in which Borrower, Guarantor or any Affiliate of such Persons has directly or indirectly, any legal, beneficial or economic interest; "<u>Control</u>" shall mean, for any Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise; "<u>Restricted Party</u>" shall mean Borrower, any Affiliated Manager, or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, any Affiliated Manager, or any non-member manager; and a "<u>Sale or Pledge</u>" shall mean a voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, lien, pledge, assignment, grant of any options with respect to, or any other transfer or disposition of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) a legal or beneficial interest.

Section 7.2. <u>No Sale/Encumbrance</u>.

(a)     Other than Permitted Transfers, until the Debt is paid in full, Borrower shall not cause or permit a Sale or Pledge of the Project or any part thereof or any legal or beneficial interest therein nor permit a Sale or Pledge of an interest in any Restricted Party (in each case, a "<u>Prohibited Transfer</u>") without the prior written consent of Administrative Agent, which shall not be unreasonably withheld, conditioned or delayed.

(b)     A Prohibited Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Project or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Project for other than

<div align="center">36</div>

actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in Borrower's right, title and interest in and to any leases or any rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general or limited partner or any profits or proceeds relating to such partnership interests or the creation or issuance of new partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of any member or any profits or proceeds relating to such membership interest; (vi) if a Restricted Party is a trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; (vii) the removal or the resignation of a Manager (including, without limitation, an Affiliated Manager) other than in accordance with Section 5.13 hereof.

Section 7.3. Administrative Agent's Rights. Administrative Agent reserves the right to condition the consent to a Prohibited Transfer requested hereunder upon (a) a modification of the terms hereof and an assumption of the Note and the other Loan Documents as so modified by the proposed transferee, (b) receipt of payment of a transfer fee equal to $5,000 and all of Lenders' and Administrative Agent's out-of-pocket expenses actually incurred in connection with such Prohibited Transfer, (c) to the extent applicable to such proposed transferee, the proposed transferee's continued compliance with the covenants set forth in this Agreement (including, without limitation, the covenants in Article VI and the other Loan Documents), (d) a new manager for the Project and a new management agreement satisfactory to Administrative Agent (if applicable), and (e) the satisfaction of such other conditions and/or legal opinions as Administrative Agent shall determine in Administrative Agent's reasonable discretion to be in the interest of Lenders. All reasonable expenses incurred by Lenders and Administrative Agent shall be payable by Borrower whether or not Administrative Agent consents to the Prohibited Transfer. Lenders shall not be required to demonstrate any actual impairment of Lenders' security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Prohibited Transfer made without Administrative Agent's prior written consent. This provision shall apply to each and every Prohibited Transfer, whether or not Administrative Agent has consented to any previous Prohibited Transfer.

Section 7.4. Assumption. Other than as expressly permitted in this Agreement, Borrower hereby acknowledges and agrees that no transfer of all or any portion of the Project to, and the related assumption of the Loan by, any Person shall be permitted under this Agreement.

ARTICLE VIII
INSURANCE; CASUALTY; CONDEMNATION; RESTORATION

Section 8.1. Insurance.

(a)     Borrower shall obtain and maintain at all times policies of insurance as follows:

(i)     comprehensive "all risk" or "special causes of loss" insurance, including, without limitation, fire, flood, earthquake, terrorism, vandalism, malicious mischief and such other hazards as may be reasonably specified by Administrative Agent for the mutual benefit of Borrower and Administrative Agent and which is customarily maintained for like properties, including the improvements and the fixtures (other than trade fixtures) at the Project, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations,

4161624-v7\CHIDMS1

underground utilities and footings) and provided that earthquake and flood may have a sub limit reasonably acceptable to Administrative Agent; (B) containing a replacement cost endorsement and an agreed amount endorsement with respect to such improvements and fixtures (other than trade fixtures) and/or an endorsement waiving all coinsurance provisions; (C) providing for no deductible in excess of $100,000 or such other amount reasonably acceptable to Administrative Agent, for all such insurance coverage; and (D) if any of the improvements or the use of the Project shall at any time constitute legal nonconforming structures or uses, providing coverage for contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements and containing an "Ordinance or Law Coverage" or "Enforcement" endorsement. In addition, Borrower shall obtain, or cause to be obtained: (x) if any portion of the improvements is currently or at any time in the future located in a "special flood hazard area" designated by the Federal Emergency Management Agency, flood hazard insurance in an amount equal to $10,000,000 in excess of the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended; and (y) earthquake insurance in amounts and in form and substance reasonably satisfactory to Administrative Agent as determined by a probable maximum loss study or other acceptable assessment of expected maximum loss, not to exceed the amount of indebtedness, in the event the Project is located in an area with a high degree of seismic risk provided that the insurance pursuant to clauses (x) and (y) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this subsection (i) and further provided that regardless of the flood or seismic zone, Administrative Agent may require reasonable limits of insurance covering such risks;

(ii)     Commercial General Liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Project, with such insurance (A) to be on the so-called "occurrence" form with a general aggregate limit of not less than $2,000,000 per location and a per occurrence limit of not less than $1,000,000; (B) to continue at not less than the aforesaid limit until required to be changed by Administrative Agent in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations; (3) independent contractors; and (4) contractual liability;

(iii)     loss of rents insurance or business income insurance, as applicable, (A) covering all risks required to be covered by the insurance provided for in subsection (i) above; (B) which provides that after the physical loss to the improvements and fixtures (other than trade fixtures) occurs, the loss of rents or income, as applicable, will be insured until such completion of Restoration and notwithstanding that the policy may expire prior to the end of such period; and (C) which contains an extended period of indemnity endorsement which provides that after the physical loss to the improvements and personal property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of at least six (6) months from the date that the Project is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period. The amount of such loss of rents or business income insurance, as applicable, shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross income from the Project for the succeeding period of coverage required above. All proceeds payable to Lenders pursuant to this subsection shall be held by Lenders and shall be applied to the obligations secured by the Loan Documents with any remaining balance promptly payable to Borrower; *provided*, *however*, that nothing herein contained shall be deemed to relieve Borrower of Borrower's obligations to pay the obligations secured by the Loan Documents on the respective dates of payment provided for in the Note, this Agreement and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such loss of rents or business income insurance, as applicable;

38

(iv)      at all times during which structural construction, demolition, structural repairs or structural alterations are being made with respect to the improvements, and only if the property coverage form does not otherwise apply,

(A)      owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy;

(B)      the insurance provided for in subsection (i) above written in a so-called Builder's Risk Completed Value form (1) on a non-reporting basis, (2) against "all risks" insured against pursuant to subsection (i) above, (3) including permission to occupy the Project, (4) with an agreed amount endorsement waiving co-insurance provisions, and (5) including coverage for so-called "soft costs" and delayed completion loss of income; and

(C)      Borrower shall ensure, or cause to be insured, that the general contractor maintains (1) commercial general liability coverage, including products and completed operations coverage that shall be continuously renewed for the statutory period during which claims can be made following completion of the project, (2) automobile liability insurance (including owned, hired and non-owned liability) and (3) umbrella/excess liability insurance with no less than $25,000,000, or such other amount reasonably acceptable to Administrative Agent, in limits per occurrence and in the annual aggregate per project, and in addition Borrower shall ensure, or cause to be insured, that all trade contractors provide similar liability insurance coverage with umbrella liability limits that are commensurate with the risks presented by their operations at the site as determined by the general contractor. All parties engaged in work on the improvements or on any restoration shall maintain any workers' compensation and employer's liability insurance required by law in force for all workers on the job. A certificate of insurance shall be issued to Borrower and Administrative Agent, naming each as Additional Insured (except with respect to workers' compensation and employer's liability), and evidencing all insurance required in this subsection. Borrower and Administrative Agent shall be named as Additional Insured with respect to the general contractor's ongoing operations and completed operations by endorsements satisfactory to Administrative Agent. Such insurance shall be primary and any other insurance maintained by the additional insured shall be excess only and not contributing with this insurance;

(v)      workers' compensation, subject to the statutory limits of the State, and employer's liability insurance in respect of any work or operations on or about the Project, or in connection with the Project or its operation (if applicable);

(vi)      comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Administrative Agent on terms consistent with the commercial property insurance policy required under subsection (i) above;

(vii)      excess liability insurance in an amount not less than $25,000,000 per occurrence and in the aggregate per location, or such other amount reasonably acceptable to Administrative Agent, per occurrence and per location, on terms consistent with the commercial general liability insurance required under subsection (ii) above; and

(viii)      upon sixty (60) days' written notice, such other reasonable insurance and in such reasonable amounts as Administrative Agent from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Project located in or around the region in which the Project is located.

39

(b)      All insurance provided for in <u>Section 8.1(a)</u> hereof shall be obtained under valid and enforceable policies (collectively, the "<u>Policies</u>" or in the singular, the "<u>Policy</u>"), and shall be in such forms and in such amounts as required above, and shall be subject to the reasonable approval of Administrative Agent as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the State and having a claims paying ability rating of "A" or better by at least two rating agencies (one of which shall be S&P) and/or a general policy rating of "A" or better and a financial class of VIII or better by A.M. Best Company, Inc.; *provided*, *however*, any insurance company with a rating below A:X must have a positive or stable outlook according to A.M. Best Company, Inc. The Policies described in <u>Section 8.1(a)</u> hereof shall designate Administrative Agent and Lenders and their successors and assigns as mortgagee, additional insured and/or loss payee as deemed appropriate by Administrative Agent. Borrower shall deliver to Administrative Agent certificates evidencing renewal of the Policies (such certificates, the "<u>Insurance Certificates</u>") and renewal policies accompanied by evidence satisfactory to Administrative Agent of payment of the premiums due with respect to the policies (the "<u>Insurance Premiums</u>"), within thirty (30) days after the expiration dates of such Policies.

(c)      Any blanket property insurance Policy shall specifically allocate to the Project the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Project in compliance with the provisions of <u>Section 8.1(a)</u> hereof.

(d)      All Policies provided for or contemplated by <u>Section 8.1(a)</u> hereof shall, in the case of Policies providing for (i) property damage, boiler and machinery, terrorism, flood and earthquake insurance, provide that the loss thereunder shall be payable to Administrative Agent, as mortgagee and loss payee, and (ii) commercial general liability insurance, name Administrative Agent as additional insured.

(e)      All Policies provided for in <u>Section 8.1(a)</u> hereof shall contain clauses or endorsements to the effect that:

(i)      no act or negligence of Borrower or anyone acting for or on behalf of Borrower or of any Tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance with respect to Administrative Agent and Lenders;

(ii)      the property damage insurance Policies, including boiler and machinery, earthquake, flood and terrorism, if separately provided, shall not be materially changed (other than to increase the coverage provided thereby) or canceled without at least thirty (30) days' prior written notice to Administrative Agent and any party named therein as an additional insured;

(iii)      the issuers thereof shall give written notice to Administrative Agent if the Policies have not been renewed ten (10) Business Days prior to their expiration;

(iv)      Administrative Agent and Lenders shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder, provided that the insurer need not waive the requirement that the premium be paid in order for a claim to be paid and further shall provide that Administrative Agent (for the benefit of Lender) is permitted to make payments to effect the continuation of such policy upon notice of cancellation due to non-payment of premiums;

(v)      the Policies do not contain an exclusion for acts of terrorism; and

(vi)      any claim or defense any property damage insurance company may have against Borrower to deny payment of any claim by Borrower thereunder shall not be effective against Administrative Agent and Lenders (and affirmatively providing that the insurance company will pay the proceeds of such Policy to Administrative Agent notwithstanding any claim or defense of the insurance company against Borrower) and such Policies shall also contain a standard "Waiver of Subrogation" endorsement.

(f)      If at any time Administrative Agent is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Administrative Agent shall have the right, upon not less than five (5) Business Days' notice to Borrower (except in the event of an emergency or an imminent lapse or loss of insurance coverage), to take such action as Administrative Agent deems necessary to protect Lenders' interest in the Project, including, without limitation, obtaining such insurance coverage as Administrative Agent in Administrative Agent's reasonable discretion deems appropriate. All premiums incurred by Administrative Agent or Lenders in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Administrative Agent upon demand and shall bear interest at the Involuntary Rate.

(g)      Borrower shall not take out separate insurance concurrent in form or contributing (in the event of a loss) to the insurance required to be maintained under this Section 8.1. Borrower may, however, carry, or permit Tenants to carry, insurance for the Project in addition to required insurance, but only if such additional insurance: (i) does not violate or entitle the carrier to assert any defense or disclaim any primary coverage under any required insurance; (ii) mutually benefits Borrower or Tenants, as the case may be, and Administrative Agent, as their interests may appear; and (iii) otherwise complies with this Agreement; *provided*, *however*, Administrative Agent reserves the right to approve any insurance provided by any other Tenant.   Notwithstanding the foregoing, Administrative Agent hereby acknowledges that the insurance coverages held by the Tenants as of the Closing Date are acceptable to Administrative Agent.

Section 8.2. Insurance Escrow; Payment by Administrative Agent. Borrower shall not be obligated to make any deposit or payment for insurance premium payment obligations, as hereinafter provided, until Administrative Agent makes demand therefor following an Event of Default and (i) any Tenant under a Material Lease is not paying such premiums in accordance with the terms and provisions of its respective Lease, or (ii) any Tenant under a Material Lease is in default under such Lease. Subject to the foregoing, upon notice from Administrative Agent, Administrative Agent shall have the right to require that Borrower pay to Administrative Agent at the time of each payment of an installment of interest and/or principal under the Note, an additional amount sufficient to discharge the premium payment obligations under this Article VIII when they become due. The determination of the amount so payable and of the fractional part thereof to be deposited with Administrative Agent, so that the aggregate of such deposits shall be sufficient for this purpose, shall be made by Administrative Agent in Administrative Agent's reasonable discretion. Such amounts shall be held by Administrative Agent not as a trust fund and without interest (except as required by applicable law) and shall be applied to the payment of the obligations in respect of which such amounts were deposited, in such order or priority as Administrative Agent shall reasonably determine, on or before the respective dates on which the same or any of them would become due. After acceleration of the Debt, the balance of any such amounts held by Administrative Agent may be used and applied for any purpose authorized pursuant to Article II of the Deed of Trust and Section 10.2 hereof including, without limitation, payment of the Debt in any order Administrative Agent may deem appropriate. If, one (1) month prior to the date any of the aforementioned obligations are due, the amounts then on deposit shall be insufficient for the payment of such obligation in full, Borrower shall, within ten (10) days after written demand, deposit the amount of the deficiency with Administrative Agent. Nothing herein contained shall be deemed to affect any right or

41

remedy of Administrative Agent or Lenders under any provisions of this Agreement or of any statute or rule of law to pay any such amount and to add the amount so paid, together with interest at the Involuntary Rate, to the Debt.

Section 8.3. <u>Casualty</u>. If the Project shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "<u>Casualty</u>"), Borrower shall give prompt notice of such damage to Administrative Agent and Administrative Agent shall have the right to join Borrower in adjusting any loss. In addition, after the entry of any decree of foreclosure of the Deed of Trust, any purchaser at foreclosure sale or the decree creditor, as the case may be, shall also have the right to join in the adjustment of any such losses. Any moneys received as payment for any loss under any such insurance (the "<u>Insurance Proceeds</u>") shall be paid, subject to the terms of the Existing Leases, over to Administrative Agent to be applied, at Administrative Agent's option, either to (i) prepayment of the Note and other sums due under the Loan Documents or (ii) to the extent reasonably practicable, the reimbursement of Borrower from time to time of expenses incurred by Borrower in connection with the restoration of the Project ("<u>Restoration Work</u>") upon terms otherwise satisfactory to Administrative Agent. Administrative Agent and Lenders shall have the right to participate in the adjustment of all claims for Insurance Proceeds. Borrower shall promptly commence and diligently prosecute the restoration of the Project whether or not the Insurance Proceeds are made available to Borrower. Borrower shall pay all costs of such restoration whether or not such costs are covered by insurance. Provided and on condition that no Event of Default has occurred and is continuing, any prepayment of the Debt by application of Insurance Proceeds shall not be subject to any Prepayment Premium, however, Borrower shall be obligated to pay any breakage costs or other similar losses incurred or suffered by Administrative Agent and Lenders as a result of such prepayment.

Notwithstanding the foregoing, and subject to the terms of subsection (f) hereof, if Administrative Agent agrees to make the Insurance Proceeds, less the reasonable and actual out-of-pocket cost, if any, to Administrative Agent of obtaining and disbursing such Insurance Proceeds (including, without limitation, reasonable attorneys' fees and disbursements and costs allocable to inspecting the Restoration Work and the Plans) for the repair and restoration of the Project ("<u>Actual Proceeds</u>") available to the Borrower (not by way of application against and readvancement of loan funds under the Deed of Trust but solely as a security fund from which to reimburse Borrower for or permit Borrower to pay directly the costs of such repair and restoration), then Administrative Agent shall make the Actual Proceeds available to Borrower and Borrower shall complete the Restoration work in accordance with the following terms, provisions and conditions:

(a)     If the Project should be damaged or destroyed by fire or other casualty, Borrower shall promptly upon insurance settlement, which settlement shall be diligently pursued by Borrower, commence the Restoration Work. Administrative Agent shall, subject to the terms of Subsection (b) below, deposit the proceeds of settlement in an interest-bearing account (the "<u>Restoration Account</u>") in a branch of any federally-insured bank as Administrative Agent may determine, in Administrative Agent's sole and absolute discretion. Borrower shall, as provided below, pay or cause to be paid all expenses in connection with such repair and restoration of the Project so that the Project, at all times, shall be and remain free and clear from any and all Liens.

(b)     If the Insurance Proceeds are less than or equal to $750,000, Administrative Agent shall deliver such Insurance Proceeds to Borrower to perform the Restoration Work. If the Insurance Proceeds are greater than $750,000, Administrative Agent shall make 90% of the Actual Proceeds available to Borrower as provided in subsection (c) below and the final 10% of the Actual Proceeds (the "<u>Balance</u>") available to Borrower as provided in subsection (d) below. Borrower shall utilize such Actual Proceeds only for the purposes of performing the Restoration Work and for no other purpose whatsoever, except as hereinafter set forth. If the estimated costs of the Restoration Work shall exceed the Actual Proceeds, the difference (the "<u>Excess Funds</u>") shall be deposited in the Restoration

Account. Such Excess Funds shall be applied toward the Restoration Work prior to the application of the Actual Proceeds, all in accordance with the disbursement procedures hereinafter provided. Any unexpended Actual Proceeds remaining after completion of the Restoration Work shall be paid over to Borrower, provided no Event of Default exists or is continuing.

      (c)      Any Actual Proceeds held by Administrative Agent shall be paid by Administrative Agent to Borrower from time to time as the Restoration Work progresses, subject to the following terms, provisions and conditions:

      (i)      If the Restoration Work is structural or if the cost of the Restoration Work is reasonably estimated to exceed $750,000, the Restoration Work shall be supervised by a registered architect or engineer and inspected by a consultant engaged by Administrative Agent at the sole cost and expense of Borrower (the "Inspector"). Before Borrower commences any Restoration Work, other than temporary Restoration Work to protect property or prevent interference with business, Administrative Agent shall have been furnished with and shall have approved (which approval shall not be unreasonably withheld or delayed) (i) an estimate of the cost of the Restoration Work accompanied by an architect's certification as to such costs and (ii) appropriate plans and specifications ("Plans") for the Restoration Work, it being nevertheless understood that said Plans shall provide for Restoration Work so that, upon completion thereof, the Project shall be comparable in character and equal in value and general utility to the Project prior to the damage or destruction. Borrower shall furnish Administrative Agent with evidence satisfactory to Administrative Agent that all portions of the Project so restored and/or repaired and their contemplated use fully comply with all Legal Requirements;

      (ii)      Each request for payment shall be made upon seven (7) days' prior notice to Administrative Agent and shall be accompanied by certificates to be made by the Inspector or, if none shall be required, by an officer of Borrower, stating (aa) that all of the Restoration Work completed has been done in compliance with the approved Plans, if any be required under subsection (c)(i) above, and all Legal Requirements, (bb) that the sum requested is justly required to reimburse Borrower for payments by Borrower, or is justly due to the contractor, subcontractors, materialmen, laborers, engineers, architects or other Persons rendering services or materials for the Restoration Work (giving a brief description of such services and materials), and that (prior to the final completion of the Restoration Work) the requested payment does not exceed the greater of (x) the amount of the requested payment less the retainage required pursuant to the applicable general contract or subcontract or (y) 90% of the value of the Restoration Work performed which is the subject of the requested payment (hereinafter called the "Applicable Percentage") and that all sums previously paid out by Administrative Agent do not exceed the Applicable Percentage of the aggregate value of the Restoration Work done to the date of such certificate, (cc) that if the sum requested is to cover payment relating to repair and restoration of personal property required or relating to the Project, that title to the personal property items covered by the request for payment is vested in Borrower and (dd) that the amount of Actual Proceeds remaining in the hands of Administrative Agent shall be sufficient upon completion of the Restoration Work to pay for the same in full free and clear of Liens. Additionally, each request for payment shall contain a statement signed by an officer or authorized signatory of Borrower approving both the Restoration Work done to date and the Restoration Work covered by the request for payment in question; and

      (iii)      Each request shall be accompanied by (aa) invoices or receipts, (bb) waivers of lien reasonably satisfactory to Administrative Agent covering that part of the Restoration Work for which payment or reimbursement is being requested and (cc) if required by Administrative Agent, a search prepared by the Title Company or other evidence satisfactory to Administrative Agent that there has not been filed with respect to the Project any mechanic's or other lien or instrument for the retention of title in respect of any part of the Restoration Work not discharged of record, or that will not be discharged in connection with the requested payment, by payment, bonding or otherwise. If available,

Administrative Agent may, at Administrative Agent's option, require an endorsement to the Title Policy insuring the continued priority of the lien of the Deed of Trust as to all sums advanced hereunder, such endorsement to be paid for by Borrower.

(d)    The Balance shall be paid to Borrower only after the Restoration Work has been fully completed and within seven (7) days following the furnishing by Borrower to Administrative Agent of (i) a copy of any certificate or certificates required by law to render occupancy and full operation of the Project legal and (ii) a certification by the Inspector, if applicable, as to completion in accordance with the approved Plans and Legal Requirements and an architect's certificate of completion in the form of AIA-G703.

(e)    At all times during the conduct of the Restoration Work, Borrower shall, at Borrower's sole cost and expense, obtain and cause to be maintained workmen's compensation and public liability insurance in amounts necessary to protect Borrower, Administrative Agent and Lenders from all liabilities, damages, claims or demands arising out of any accident or occurrence causing injury or death to any Person or property whatsoever. All insurance shall be with responsible insurance companies, licensed and authorized to transact business in the State of Texas and shall be written in forms, amounts and by companies reasonably satisfactory to Administrative Agent. The originals or certified copies of all Policies, together with original certificates or evidence thereof, shall be delivered to Administrative Agent. Renewals of such Policies shall be delivered to Administrative Agent at least ten (10) days before any such Policies shall expire. Nothing contained herein shall relieve Borrower from any requirement of this Agreement regarding the insuring of the Project.

(f)    Notwithstanding the terms and provisions of subsections (b), (c) and (d) hereof, in the event that (i) Borrower fails to commence the Restoration Work or to proceed diligently and continuously to completion of the Restoration Work, subject to force majeure delays, within twelve (12) months from the date the Project was damaged or destroyed, (ii) the damage or destruction occurs during the last six (6) months of the term of the Note, unless, in Administrative Agent's reasonable judgment, the required Restoration Work is capable of being completed by not later than ninety (90) days prior to the Maturity Date, (iii) the required Restoration Work is not capable of being completed within eighteen (18) months from the date the Project was damaged or destroyed, in Administrative Agent's reasonable judgment (provided rent or business interruption insurance is in effect for the entire period of reconstruction), or (iv) an Event of Default is continuing, the terms, provisions and condition of subsections (b), (c) and (d) hereof shall not apply and Administrative Agent's option as to the application of Insurance Proceeds shall continue to apply. During the continuance of an Event of Default, Insurance Proceeds may be applied by Administrative Agent in any manner determined by Administrative Agent in its sole and absolute discretion.

Section 8.4. Condemnation. Borrower shall promptly give Administrative Agent notice of the actual or threatened commencement of any proceeding for the Condemnation of the Project of which Borrower has knowledge and shall deliver to Administrative Agent copies of any and all papers served in connection with such proceedings. Administrative Agent and Lenders may participate in any such proceedings, and Borrower shall from time to time deliver to Administrative Agent all instruments requested by Administrative Agent to permit such participation. Borrower shall, at Borrower's sole cost and expense, diligently prosecute any such proceedings, and shall consult with Administrative Agent, Administrative Agent's attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. In the event of such condemnation proceedings, the Award payable is hereby assigned to and shall be paid to Administrative Agent. Administrative Agent shall be under no obligation to question the amount of any such Award and may accept the same in the amount in which the same shall be paid. The proceeds of any Award so received shall (except for a temporary taking the Award for which shall be paid over to Borrower), at the option of Administrative Agent, and in the absence of an

Event of Default, either be (i) applied to the prepayment of the Note and other sums due under the Loan Documents, or (ii) to the extent reasonably practicable, paid over to Borrower from time to time for expenses incurred by Borrower in the restoration of the Project and upon terms otherwise satisfactory to Administrative Agent, in Administrative Agent's sole and absolute discretion. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lenders, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lenders shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. To the extent the Project can be restored or repaired following any condemnation, and to the extent Borrower shall be entitled or permitted to do the same, if the Project or any portion thereof is taken by a condemning authority, Borrower shall promptly commence and diligently prosecute the restoration of the Project whether or not such Award is made available to Borrower. If the Project is sold, through foreclosure or otherwise, prior to the receipt by Lenders of the Award, Lenders shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt. Notwithstanding anything to the contrary contained herein, to the extent that the Project can be restored or repaired following any condemnation, as determined by Required Lenders in their sole and absolute good faith discretion, the awards or proceeds from any such condemnation shall be disbursed and paid over to Borrower in the same manner as set forth in Section 8.3 hereof with respect to Insurance Proceeds.

<div style="text-align:center">

ARTICLE IX
INTENTIONALLY OMITTED

ARTICLE X
EVENTS OF DEFAULT; REMEDIES

</div>

Section 10.1. Event of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a) if any portion of the Debt is not paid within five (5) days after the date the same is due, or if the entire Debt is not paid on or before the Maturity Date;

(b) if Borrower shall fail to pay any other sum hereunder or under any of the other Loan Documents when and as the same shall become due and payable and such failure shall not be cured within fifteen (15) days after notice from Administrative Agent;

(c) if the Policies are not kept in full force and effect, or if the Insurance Certificates or certified copies of the Policies are not delivered to Administrative Agent as provided in Section 8.1 hereof;

(d) if Borrower breaches any covenant with respect to itself contained in Article VI hereof or if Borrower breaches any covenant contained in Article VII hereof, and same is not cured, if capable of being cured, within thirty (30) days after notice;

(e) if any representation or warranty of any Person comprising Borrower or Guarantor, or with respect to, Borrower, Guarantor or any member, general partner, principal or beneficial owner of Borrower, made herein, in any other Loan Document, or in any certificate, report, financial statement or other instrument or document furnished to Administrative Agent at the time of the

<div style="text-align:center">45</div>

closing of the Loan or during the term of the Loan shall have been false or misleading in any material respect when made;

(f)　　if (i) Borrower or Guarantor shall commence any case, proceeding or other action (A) under any Creditors' Rights Laws, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Borrower or Guarantor shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower or Guarantor any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) other than an involuntary proceeding commenced by Administrative Agent or any Lender, there shall be commenced against Borrower or Guarantor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) Borrower or Guarantor shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) Borrower or Guarantor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

(g)　　if there should occur a default which is not cured within the applicable grace or cure period, if any, under any other deed of trust encumbering all or part of the Project regardless of whether any such other deed of trust is prior or subordinate to the Deed of Trust or upon default in the performance of any term, provision, covenant or condition, which is not cured within the applicable grace or cure period, if any, under the notes evidencing such deeds of trust or any other documents executed in connection therewith; it being further agreed by Borrower that an Event of Default hereunder shall constitute an event of default under any such other deed of trust in respect of the Project held by Administrative Agent;

(h)　　if Borrower shall be in default beyond applicable notice and grace periods under any other loan or financing arrangement between Borrower and any Lender, whether now or hereafter existing;

(i)　　if any federal tax lien is filed against Borrower, Guarantor, Borrower Members or the Project and same is not discharged of record or bonded within thirty (30) days after the same is filed;

(j)　　if a judgment is filed against Borrower, Guarantor, Borrower Members or the Project which (x) is in excess of $500,000 or (y) in the reasonable judgment of Administrative Agent would materially interfere with such Person's ability to perform its obligations under the Loan Documents to which it is a party, and which is not stayed, vacated, bonded or discharged within thirty (30) days after the same is filed;

(k)　　if any Lien is filed or recorded against the Project or any interest therein *with the consent of Borrower* (but without the consent of Administrative Agent), and such Lien is not released within a period of five (5) days of the filing or recording thereof;

(l)　　with the exception of Permitted Encumbrances, if any Lien is filed or recorded against the Project or any interest therein without the consent of Borrower or Administrative Agent and such Lien is not removed, discharged or bonded to the satisfaction of Administrative Agent within thirty (30) days of such filing or recording;

(m)     if Borrower, Guarantor or any Borrower Member shall breach any of the terms of:

     (i)     Section 5.14 (Liens);

     (ii)     Section 5.19 (Alterations);

     (iii)     Section 5.21 (Notices);

     (iv)     Section 5.23 (Limitations on Securities Issuances);

     (v)     Section 5.24 (Limitations on Distributions);

     (vi)     Section 5.25 (Contractual Obligations);

     (vii)     Section 5.26 (Additional Indebtedness);

     (viii)     Section 5.27 (Restrictions on Leasing);

     (ix)     Section 5.28 (Debt Service Coverage Ratio);

     (x)     Section 5.29 (Loan-to-Value Ratio);

     (xi)     Section 7.2 (No Sale/Encumbrance)

(n)     [Reserved.];

(o)     if Borrower or Guarantor shall continue to be in default under any other term, covenant or condition of this Agreement or any of the Loan Documents for more than ten (10) days after notice from Administrative Agent in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Administrative Agent in the case of any other default, provided that if such default cannot reasonably be cured within such thirty (30)-day period and Borrower or the applicable Guarantor shall have commenced to cure such default within such thirty (30)-day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30)-day period shall be extended for so long as it shall require Borrower or the applicable Guarantor in the exercise of due diligence to cure such default, it being agreed that no such extension shall (i) apply in the event of a default under Section 5.4 or Section 8.1 of this Agreement or (ii) be for a period in excess of one hundred (100) days in the aggregate;

(p)     if a default should occur under any Interest Rate Protection Product entered into by Borrower;

(q)     if there shall occur a default or event of default under the Guaranty which is not cured within any applicable grace or cure period, if any, or the Guaranty shall fail for any reason to be in full force of effect;

(r)     if there shall occur a default or event of default under the Environmental Indemnity Agreement which is not cured within any applicable grace or cure period, if any, or the Environmental Indemnity Agreement shall fail for any reason to be in full force of effect;

(s)     if an ERISA Event shall have occurred that, in the opinion of the Administrative Agent, when taken together with all other ERISA Events that have occurred, results in or could reasonably be expected to result in liability to Borrower in excess of $500,000;

(t)     if Borrower shall file a notice limiting the maximum principal amount that may be secured by the Deed of Trust to a sum less than the maximum principal amount set forth in <u>Section 3.12</u> thereof; or

(u)     if there shall be an Event of Default under the Mezzanine Loan Agreement or any other Mezzanine Loan Document by Mezzanine Borrower or any other Person obligated thereunder.

Section 10.2. <u>Remedies</u>.

(a)     Upon the occurrence of an Event of Default (other than an Event of Default described in <u>Section 10.1(f)</u> hereof) and at any time thereafter that such Event of Default is continuing Administrative Agent and/or Lenders may, in addition to any other rights or remedies available to Administrative Agent or Lenders pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Administrative Agent or Lenders deem advisable to protect and enforce Lenders' rights against Borrower, Guarantor and in the Project, including, without limitation, declaring the Debt to be immediately due and payable, and Administrative Agent and/or Lenders may enforce or avail themselves of any or all rights or remedies provided in the Loan Documents and may exercise all the rights and remedies of a secured party under the UCC, as adopted and enacted by the State where the Project is located, against Borrower, Guarantor and the Project, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in <u>Section 10.1(f)</u> hereof, the Debt and all other obligations of Borrower and Guarantor hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

(b)     Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Administrative Agent or Lenders against Borrower or Guarantor under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or Guarantor or at law or in equity may be exercised by Lenders at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Administrative Agent or Lenders shall have commenced any foreclosure proceeding or other action for the enforcement of Lenders' rights and remedies under any of the Loan Documents with respect to the Project. Any such actions taken by Administrative Agent or Lenders shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Administrative Agent or Lenders may determine in Administrative Agent's or Lenders' sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Administrative Agent or Lenders permitted by law, equity or contract or as set forth herein or in the other Loan Documents.

ARTICLE XI
REPLACEMENT OF LENDERS

If Borrower is entitled to replace a Lender pursuant to the Note (i.e., pursuant to (i) subsection (e) of the section titled "Increased Costs", or (ii) the section titled "Illegality"), Borrower may, upon notice to such Lender and Administrative Agent, replace such Lender by causing such Lender to assign its rights and obligations under this Agreement and the Note to one or more Eligible Assignees reasonably acceptable to Borrower and Administrative Agent.  Borrower shall or shall cause the replacement lender to pay in full all principal, interest, fees and other amounts owing to such Lender through the date of replacement.   The Lender being replaced and the replacement lender shall execute and deliver an Assignment and Assumption Agreement in the form attached hereto as <u>Exhibit B</u>.  A Lender shall not be required to make any such assignment if, prior thereto, as a result of a waiver by such Lender or otherwise,

48

the circumstances entitling the Borrower to require such assignment cease to apply.  If a Lender being replaced refuses to execute and deliver such Assignment and Assumption Agreement or otherwise comply with this Article XI, such Lender hereby appoints Administrative Agent as its attorney-in-fact to do so on such Lender's behalf.  Administrative Agent shall distribute an amended Schedule 13.12, which shall thereafter be incorporated into this Agreement, to reflect adjustments to Lenders and their respective amount of the Loan.

<div align="center">

ARTICLE XII
SECONDARY MARKET; ASSIGNMENT; PARTICIPATION

</div>

Section 12.1. Assignment; Participation.

(a)      Any non-Defaulting Lender (as defined in Section 13.16 hereof) may at any time grant to one or more parties (each a "Participant") participating interests in its Pro Rata Share (as hereinafter defined) of the Loan (the "Participations") and Lenders may syndicate the Loan ("Syndication"). In the event of any such grant by a Lender of a Participation to a Participant, such Lender shall remain responsible for the performance of such Lender's obligations hereunder, and Borrower and Administrative Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder. Any agreement pursuant to which any Lender may grant a Participation shall provide that such Lender shall retain the sole right and responsibility to enforce the obligations of Borrower, as the case may be, hereunder and under any other Loan Document, including, without limitation, the right to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document.

(b)      A Lender may at any time assign (x) to any Eligible Assignee with the consent of Administrative Agent, which consent shall not be unreasonably delayed, conditioned or denied, (y) to any other party with the consent of Administrative Agent, which consent may be withheld by Administrative Agent in Administrative Agent's sole and absolute discretion; *provided*, *however*, that as long as no Event of Default has occurred and is continuing, Borrower's consent shall also be required for an assignment pursuant to clauses (x) and (y) (each such assignee set forth in (x) and (y) above, a "Consented Assignee"), or (z) without such consent, to one or more Eligible Assignees which are affiliates, subsidiaries or a parent of a Lender (each Consented Assignee or subsidiary, affiliate or parent bank or institution, an "Assignee") all or a proportionate part of all of such Lender's rights and obligations under this Agreement and the Note, and such Assignee shall assume rights and obligations, pursuant to an Assignment and Assumption Agreement substantially in the form annexed hereto as Exhibit B and made a part hereof executed by such Assignee and the assigning Lender (duplicate executed originals of which shall be delivered to Borrower to the extent available). Upon (i) execution and delivery of such instrument, (ii) payment by such Assignee to the assigning Lender of an amount equal to the purchase price agreed between such Lender and such Assignee and (iii) with respect to a Consented Assignee, payment by such Assignee to Administrative Agent of a fee, for Administrative Agent's own account, in the amount of $5,000, such Assignee shall be a party to this Agreement and shall have all the rights and obligations of a Lender as set forth in such Assignment and Assumption Agreement, and the assigning Lender shall be released from such Lender's obligations hereunder to a corresponding extent, and no further consent or action by any party shall be required. If the Assignee is not incorporated under the laws of the United States or a state thereof, it shall, prior to the first date on which interest or fees are payable hereunder for its account, deliver to Borrower and Administrative Agent certification reasonably acceptable to Borrower as to exemption from deduction or withholding of any United States federal income taxes. Borrower shall not be required to reimburse any Lender for taxes or reimburse any Lender for any withholding due to such Lender's failure to deliver such certification, or due to the validity of such certification. Notwithstanding anything contained herein to the contrary, no Lender shall have the right to assign less than $5,000,000 of such Lender's interest under this Agreement and the other Loan

<div align="center">49</div>

Documents. For the purposes hereof, an "Eligible Assignee" shall mean any of (a) a commercial bank organized under the laws of the United States, or any state thereof or the District of Columbia, and having total assets in excess of $1,000,000,000; (b) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof or the District of Columbia, and having a net worth of at least $100,000,000, calculated in accordance with generally accepted accounting principles; (c) a commercial bank organized under the laws of any other country which is a member of the OECD, or a political subdivision of any such country and having total assets in excess of $1,000,000,000, provided that such bank is acting through a branch or agency located in the country in which it is organized or another country which is also a member of the OECD; (d) the central bank of any country which is a member of the OECD; (e) any other assignee that, in the reasonable judgment of Administrative Agent, is a reputable institutional investor with substantial experience in lending and originating loans similar to the Loan, or in purchasing, investing in or otherwise holding such loans, having a financial net worth of at least $100,000,000 and (f) any non-Defaulting Lender or any affiliate, subsidiary or parent of any non-Defaulting Lender. Neither Borrower, Guarantor nor any Affiliate or Subsidiary of Borrower or Guarantor shall be Eligible Assignee or Participant. Notwithstanding anything to the contrary contained herein, any Lender may at any time pledge or assign a security interest in all or any portion of its rights under the Loan, the Note and the other Loan Documents to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations under the Loan, the Note or any other Loan Document or substitute any such pledgee or assignee for such Lender as a party to the Loan, the Note or any Loan Document.

(c)     Borrower, Guarantor, Administrative Agent and Lenders shall execute such modifications to the Loan Documents as shall, in the reasonable judgment of Administrative Agent, be necessary or desirable in connection with assignments in accordance with the foregoing provisions of this Section 12.1 and which do not adversely affect Borrower or Guarantor or Borrower's or Guarantor's obligations or rights under the Loan Documents (other than to a de minimis extent).

(d)     Any Lender may at any time assign all or any portion of such Lender's rights under this Agreement and the Note to a Federal Reserve Bank. No such assignment shall release the transferor Lender from its obligations hereunder.

(e)     Borrower recognizes that in connection with a Lender's selling of Participations or making of assignments, any or all documentation, financial statements, appraisals and other data, or copies thereof, relevant to Borrower, Guarantor or the Loan may be exhibited to and retained by any such Participant or Assignee or prospective Participant or Assignee. Borrower hereby consents to the release of any and all Borrower information to such parties, and holds Administrative Agent and Lenders harmless from any and all liability due to the release of Borrower's financial information by Administrative Agent or any Lender to any such party. Administrative Agent and Lenders shall instruct such Participant or Assignee to keep such information confidential but Administrative Agent and Lenders shall have no liability if such Participant or Assignee fails to do so.

(f)     Borrower and Guarantor agree to cooperate with Lenders in connection with any sale or transfer of the Loan, Syndication or any Participation created pursuant to this Article XII. At the request of the holder of the Note and, to the extent not already required to be provided by Borrower or Guarantor under this Agreement, Borrower and Guarantor shall take such reasonable actions for the benefit of, and use reasonable efforts to provide information not in the possession of, the holder of the Note in order to satisfy the market standards (which may include such holder's delivery of information with respect to Borrower, Guarantor and the Project to any Participant or Assignee or prospective Participant or Assignee) to which the holder of the Note customarily adheres or which may be reasonably required in the marketplace in connection with such sales or transfers, including, without limitation, to:

50

(i)       provide (x) updated financial, budget and other information with respect to the Project, Borrower, Guarantor and Manager and (y) modifications and/or updates to the appraisals, market studies, Environmental Reports (including Phase I reports and, if appropriate, Phase II reports) of the Project obtained in connection with the making of the Loan (all of the foregoing being referred to as the "Provided Information"), together, if customary, with appropriate verification and/or consents of the Provided Information;

(ii)      make non-material changes to the Organizational Documents of Borrower, Guarantor or its principals;

(iii)     upon reasonable prior notice, permit site inspections, appraisals, market studies and other due diligence investigations of the Project, as may be reasonably requested by the holder of the Note or as may be necessary in connection with the Participations or Syndications;

(iv)     make the representations and warranties with respect to the Project, Borrower, Guarantor, Manager and the Loan Documents as such Persons have made in the Loan Documents and such other representations and warranties with respect to the Project, Borrower, Guarantor and Manager, as may be reasonably requested by the holder of the Note;

(v)      execute such amendments to the Loan Documents as may be requested by the holder of the Note including, without limitation, bifurcation of the Loan into two or more components and/or separate notes and/or creating a senior/subordinate note structure; *provided*, *however*, that Borrower and Guarantor shall not be required to modify or amend any Loan Document if such modification or amendment would (x) change the interest rate or the stated maturity set forth in the Note, except in connection with a bifurcation of the Loan which may result in varying fixed interest rates and amortization schedules, but which shall have the same initial weighted average coupon of the original Note, (y) in the reasonable judgment of Borrower modify or amend any other economic term of the Loan, or (z) in the reasonable judgment of Borrower or Guarantor increase Borrower's or Guarantor's obligations and liabilities under the Loan Documents, other than to a *de minimis* extent; and

(vi)     have reasonably appropriate personnel participate in a bank meeting and/or presentation for the potential Participants or Lenders.

(g)     At the option of Lenders, the Loan may be serviced by a servicer/trustee selected by Lenders ("Servicer") and Lenders may delegate all or any portion of Lenders' responsibilities under this Agreement and the other Loan Documents to such servicer/trustee pursuant to a servicing agreement between Lenders and such servicer/trustee. Lenders shall provide Borrower with notice of same. At no time shall there be more than one (1) Servicer.

(h)     All third party costs and expenses incurred by Borrower, Guarantor or Lenders in connection with Borrower's or Guarantor's complying with the requests and requirements made under this Article XII shall be paid by Lenders (and not by Borrower).

Section 12.2. Intralinks. Borrower hereby acknowledges that Administrative Agent will make available to Lenders all information provided by or on behalf of Borrower or Guarantor hereunder or under the other Loan Documents (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks® or another similar electronic system (the "Platform").

ARTICLE XIII
AGENT

Section 13.1. Appointment, Powers and Immunities.

(a)     Each Lender hereby designates, appoints and authorizes Administrative Agent to act as agent hereunder and under the other Loan Documents to which Administrative Agent is a party in its capacity as Administrative Agent (this Agreement and such other Loan Documents, the "Administrative Agent Loan Documents") with such powers as are specifically delegated to Administrative Agent by the terms of this Agreement and such Loan Documents, together with such other powers as are reasonably incidental thereto. Administrative Agent (a) shall have no duties or responsibilities except those expressly set forth in this Agreement and in the other Administrative Agent Loan Documents, and shall not by reason of this Agreement or any other Administrative Agent Loan Document be a trustee or fiduciary for any of Lenders; (b) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose Administrative Agent to liability or that is contrary to any Loan Document or applicable law; (c) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity; (d) shall not be responsible to Lenders for or have any duty to ascertain or inquire into (i) any recitals, statements, representations or warranties contained in this Agreement, any other Administrative Agent Loan Document, or in any certificate or other document referred to or provided for in, or received by any Lenders under, this Agreement or any other Administrative Agent Loan Document, (ii) the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Administrative Agent Loan Document or any other document referred to or provided for herein or therein, (iii) any failure by Borrower to perform any of such party's obligations hereunder or thereunder, or (iv) the satisfaction of any condition set forth herein, other than to confirm receipt of items expressly required to be delivered to Administrative Agent; and (e) shall not be responsible to Lenders for any action taken or omitted to be taken by Administrative Agent hereunder or under any other Administrative Agent Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith, except for Administrative Agent's own gross negligence or willful misconduct or the failure of Administrative Agent to follow the directions of the Required Lenders or all of the Lenders, as the case may be, as provided for herein.

(b)     To the extent that any action is to be taken, any information is to be delivered to or by any Lender, any determination is to be made, or any consent is to be given or withheld by any Lender, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Administrative Agent or any successor agent thereto at the direction of the Required Lenders or all of the Lenders, as the case may be, as provided for herein.

(c)     Administrative Agent may employ agents and attorneys-in-fact and shall not be responsible for the negligence or misconduct of any such agents or attorneys-in-fact selected by Administrative Agent in good faith. Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by Administrative Agent. Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory provisions of this Section 13.1 shall apply to any such sub-agent and to the Affiliates of Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

(d)     Administrative Agent may deem and treat the payee of any note as the holder thereof for all purposes hereof unless and until Administrative Agent shall have been notified of the assignment thereof.

Section 13.2. <u>Reliance by Administrative Agent</u>. Administrative Agent shall be entitled to rely upon, and shall incur no liability under or in respect of any of the Loan Documents by acting upon, any certification, consent, warranty, notice or other paper, instrument or communication (including any thereof by telephone, telecopy, e-mail, telex, telegram or cable) believed by Administrative Agent in good faith to be genuine and authentic and to have been signed or sent by or on behalf of the proper Persons, and upon advice and statements of legal counsel, independent accountants or other experts selected by Administrative Agent in good faith. As to any matters not expressly provided for by this Agreement or any other Administrative Agent Loan Document, Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder or thereunder in accordance with instructions given by Lenders holding sixty-six and two-thirds percent (66 2/3%) or more of the outstanding principal balance of the Loan (the "<u>Required Lenders</u>"), and such instructions of Administrative Agent and any action taken or not taken pursuant thereto shall be binding on all Lenders. Notwithstanding anything contained herein to the contrary, the consent of all of the Lenders (other than a Defaulting Lender) shall be required before Administrative Agent may take or not take any action with respect to the following:

(a)     any increase or decrease in the total principal amount of the Loan;

(b)     reductions in any interest rate (other than default rate interest) applicable to the Loan or any fees (other than late fees) required under this Agreement or any other Loan Document;

(c)     the extension of the Maturity Date of the Note or the due date of any payment due under the Note (other than default interest or late fees);

(d)     the release of all or substantially all of the Project (except as provided for herein and in the other Loan Documents);

(e)     the release of Borrower or Guarantor from Borrower's or such Guarantor's obligations under this Agreement or any other Loan Document; and

(f)     any amendment or modification of any of the provisions of <u>Article XII</u> or this <u>Article XIII</u>.

In the event Administrative Agent sends a notice to any Lender recommending any action (or inaction) to be taken under this Agreement or any other Loan Document and such Lender does not respond to Administrative Agent within ten (10) Business Days of the date of Administrative Agent's notice to such Lender, such Lender shall be deemed to have consented to the action (or inaction) being recommended by Administrative Agent.

Section 13.3. <u>Purchase of Disapproving Lender's Interest</u>.

(a)     In the event Administrative Agent makes a recommendation to Lenders to take any action requiring unanimous consent pursuant to <u>Section 13.2</u> hereof (which recommendation may be made at any time and for any number of times), and one or more Lenders approve such recommendation (the "<u>Approving Lenders</u>") and one or more Lenders disapprove such recommendation (the "<u>Disapproving Lenders</u>"), one or more of the Approving Lenders shall have the right (but not the obligation), in such Approving Lender's sole and absolute discretion, to purchase the interest of the Disapproving Lender in full within thirty (30) days of such disapproval, upon the payment to Administrative Agent of all principal, accrued interest, default interest (but not the payment of any

53

applicable prepayment premium) due to such Disapproving Lender hereunder, and all amounts advanced by such Disapproving Lender as protective advances under the Deed of Trust as of the date of sale (collectively, the "Purchase Price"), whereupon such Disapproving Lender shall accept payment. In such event, and concurrently with the payment of the Purchase Price, such Disapproving Lender shall assign all of such Disapproving Lender's right, title and interest in and to the Loan and the Loan Documents to the Approving Lender purchasing such Disapproving Lender's interest, without recourse, representation, warranty or covenant, express or implied, of any kind or nature whatsoever, except that such Disapproving Lender has not assigned or encumbered such Lender's rights in the Loan and the Loan Documents.

(b)     Any sale pursuant to Section 13.3(a) hereof shall be made pursuant to documents reasonably satisfactory to Administrative Agent and the purchasing Approving Lender which shall provide, among other things, that the purchasing Approving Lender shall assume all of the obligations of such Disapproving Lender thereafter accruing under the Loan Documents and indemnify such Disapproving Lender from any claims or causes of actions that may arise after the closing date of such sale in connection with the Loan Documents (other than any claims or causes of action that may arise or be brought by Borrower or any third party as the result of the gross negligence or willful misconduct of such Disapproving Lender). The purchasing Approving Lender's right to purchase such Disapproving Lender's interest may be exercised by notice to Administrative Agent of the purchasing Approving Lender's intention to do so and payment by wire transfer of the Purchase Price.

(c)     If there is more than one Approving Lender that elects to purchase a Disapproving Lender's interest in the Loan, Administrative Agent shall apportion such Disapproving Lender's interest among such Approving Lenders in proportion to their Pro Rata Share.

Section 13.4.  Rights of Administrative Agent as Lender. With respect to its interest in the Loan, Administrative Agent in its capacity as a Lender hereunder shall have the same rights and powers hereunder as any other Lender and may exercise the same as though it were not acting as Administrative Agent, and the terms "Lender" and "Lenders" shall include Administrative Agent in its capacity as a Lender. Administrative Agent and Administrative Agent's affiliates may (without having to account therefor to any Lender) accept deposits from, lend money to (on a secured or unsecured basis), and generally engage in any kind of banking, trust or other business with Borrower (and any of Borrower Affiliates) as if it were not acting as Administrative Agent. Lenders and Lenders' Affiliates may (without having to account therefor to any other Lender or Administrative Agent) accept deposits from, lend money to (on a secured or unsecured basis), and generally engage in any kind of banking, trust or other business with Borrower (and any affiliates of them) as if it were not acting as Lender hereunder.

Section 13.5.  Indemnification.

(a)     Lenders agree to indemnify Administrative Agent (to the extent not reimbursed by Borrower and Guarantor hereunder and without limiting any obligations of Borrower hereunder) ratably, in accordance with their Pro Rata Shares, for any and all reasonable costs, fees, expenses, advances, interest, payments and claims of any kind and nature whatsoever that may be imposed on or incurred by Administrative Agent arising out of or by reason of any investigation or in any way relating to or arising out of this Agreement or the transactions contemplated hereby (including, without limitation, the actual out-of-pocket costs and expenses that Administrative Agent is obligated to pay hereunder) or the servicing, administration and/or enforcement of the Loan, this Agreement and/or the Loan Documents (collectively, "Costs") provided that no Lender shall be liable for any of the foregoing Costs to the extent such Costs arise from the gross negligence or willful misconduct of Administrative Agent (as determined by a court of competent jurisdiction from which all appeal has been exhausted) or the failure of Administrative Agent to follow the directions of the Required Lenders or all of the Lenders, as the case

54

may be. The foregoing indemnity shall survive the payment of the obligations owing hereunder and the termination or non-renewal of this Agreement.

(b)     Any request by Administrative Agent for reimbursement of Costs shall be in the form of a certificate from Administrative Agent to each Lender as to the nature and amount for which Administrative Agent claims reimbursement from Lenders pursuant to this Section 13.5. Any such request shall include reasonable evidence that such Costs meet the criteria set forth in Subsection 13.5(a) hereof and have been incurred by Administrative Agent.

(c)     Any Costs which are required to be reimbursed by Lenders to Administrative Agent in accordance with this Section 13.5 and which are not reimbursed to Administrative Agent within three (3) Business Days after demand therefor in accordance with Subsection 13.5(b) hereof shall accrue interest at the Federal Funds Rate from and after the fourth (4th) Business Day after the date that such reimbursement request was made through and including the date of reimbursement by such Lender.

(d)     Any Costs which are subsequently recovered from Borrower or any other Person shall be returned to each Lender in proportion to the Pro Rata Share of said Costs previously remitted by each Lender to Administrative Agent.

Section 13.6. Non-Reliance on Administrative Agent and Other Lenders. Each Lender agrees that such Lender has, independently and without reliance on Administrative Agent or any of the other Lenders, and based on such documents and information as such Lender has deemed appropriate, made such Lender's own credit analysis of Borrower and has made such Lender's own decision to enter into this Agreement and the other Loan Documents and that such Lender shall, independently and without reliance upon Administrative Agent or any of the other Lenders, and based on such documents and information as such Lender shall deem appropriate at the time, continue to make such Lender's own analysis and decisions in taking or not taking action under this Agreement and the other Loan Documents. Other than determining whether payments due to Administrative Agent under the Loan Documents have in fact been made, Administrative Agent shall not be required to keep itself informed as to the performance or observance by Borrower of any term or provision of this Agreement or any of the other Loan Documents or any other document referred to as provided for herein or therein or to inspect the properties or books of Borrower. Administrative Agent shall provide each Lender with any information received by Administrative Agent from Borrower which is required to be provided to Lenders hereunder and with a copy of any notice of default received by Administrative Agent from Borrower or any Lender. Except for notices, reports and other documents expressly required to be furnished to Lenders by Administrative Agent hereunder or under any other Administrative Agent Loan Document, Administrative Agent shall not have any duty or responsibility to provide any Lender with any other credit or other information concerning the affairs, financial condition or business of Borrower that may come into the possession of Administrative Agent.

Section 13.7. Failure to Act. Except for action expressly required of Administrative Agent hereunder or under any of the other Administrative Agent Loan Documents, Administrative Agent shall in all cases be fully justified in failing or refusing to act hereunder and thereunder unless Administrative Agent shall receive further assurances to Administrative Agent's complete satisfaction from Lenders of their indemnification obligations under Section 13.5 hereof against any and all liability and expense that may be incurred by Administrative Agent by reason of Administrative Agent taking or continuing to take or failing to take any such action.

Section 13.8. Action by Administrative Agent. Each of the entities comprising Lenders hereby appoints Administrative Agent and each of the other Lenders as agent and bailee for the purpose of perfecting the security interests in and liens upon the Project, in accordance with Article 9 of the Uniform

Commercial Code in effect in the State where the Project is located or the State where Borrower is organized, can be perfected only by possession (or where the security interest of a secured party with possession has priority over the security interest of another secured party). Each Lender hereby appoints Administrative Agent as such Lender's attorney-in-fact for the purpose of executing the Loan Documents (other than this Agreement) on such Lender's behalf.

Section 13.9. <u>Successor Administrative Agent</u>. Administrative Agent may resign as Administrative Agent upon thirty (30) days' written notice to Lenders. If Administrative Agent resigns under this Agreement, Lenders (other than the Lender which is the Administrative Agent resigning) shall appoint from among the other Lenders a successor agent for Lenders. If no successor agent is appointed prior to the effective date of the resignation of Administrative Agent, Administrative Agent may appoint, after consulting with Lenders (other than the Lender which is the Administrative Agent resigning), a successor agent from among such other Lenders. Upon the acceptance by the Lender so selected of such Lender's appointment as successor agent hereunder, such successor agent shall succeed to all of the rights, powers and duties of the retiring Administrative Agent and the term "Administrative Agent" as used herein and in the other Loan Documents shall mean such successor agent and the retiring Administrative Agent's appointment, powers and duties as Administrative Agent shall be terminated. After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this <u>Article XIII</u> shall inure to such retiring Administrative Agent's benefit as to any actions taken or omitted by such retiring Administrative Agent while such retiring Administrative Agent was Administrative Agent under this Agreement. If no successor agent has accepted appointment as Administrative Agent by the date which is thirty (30) days after the date of a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nonetheless thereupon become effective and Lenders shall perform all of the duties of Administrative Agent hereunder until such time, if any, as the Lenders (other than the Lender which has resigned as Administrative Agent) appoint a successor agent as provided for above. The resigning Administrative Agent shall have continuing liability for any act of gross negligence or willful misconduct committed by Administrative Agent during the period such Administrative Agent was the Administrative Agent under this Agreement.

Section 13.10. <u>Sharing</u>. If at any time or times any Lender shall receive (i) by payment, foreclosure, setoff or otherwise, any proceeds of the Project or other collateral or any payments with respect to the obligations of Borrower to such Lender arising under, or relating to, this Agreement or any of the Loan Documents except for any such proceeds or payments received by such Lender from Administrative Agent or otherwise pursuant to the terms of this Agreement, or (ii) payments from Administrative Agent hereunder in excess of such Lender's ratable portion of the relevant distributions by Administrative Agent hereunder, such Lender shall promptly turn the same over to Administrative Agent, in kind, and with such endorsements as may be required to negotiate the same to Administrative Agent, or in same day funds, as applicable, for the account of all of the Lenders and for application to the obligations hereunder in accordance with the applicable provisions of this Agreement.

Section 13.11. <u>Pro Rata Treatment and Payments</u>.

(a)    <u>Funding by Lenders; Presumption by Administrative Agent</u>. With respect to any advance required or deemed necessary by Administrative Agent under this Agreement or any other Loan Document (each, a "<u>Coverage Advance</u>"), Administrative Agent shall give each Lender not less than three (3) Business Days' notice by telephone and facsimile specifying the amount of the Coverage Advance, the date of the Coverage Advance and each Lender's Pro Rata Share of such Coverage Advance. Each Lender shall wire transfer to Administrative Agent immediately available federal funds equal to such Lender's Pro Rata Share of each Coverage Advance by 11:00 a.m. (New York City time) on the day of the Coverage Advance as set forth in the notice. Unless Administrative Agent shall have received notice from a Lender prior to the proposed date of any Coverage Advance that such Lender will not make

available to Administrative Agent such Lender's Pro Rata Share of such Coverage Advance, Administrative Agent may assume that such Lender has made such Pro Rata Share available on such date in accordance with this Section and may, in reliance upon such assumption, make available to Borrower a corresponding amount. In such event, if a Lender has not in fact made its Pro Rata Share of the applicable Coverage Advance available to Administrative Agent, then the applicable Lender and Borrower severally agree to pay to Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to Borrower to but excluding the date of payment to Administrative Agent, at (i) in the case of a payment to be made by such Lender, a rate (the "Lender Interest Rate") equal to the greater of (x) the sum of (1) the Federal Funds Rate in effect from time to time and (2) one percent (1%) per annum and (y) a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation, and (ii) in the case of a payment to be made by Borrower, the Interest Rate. If Borrower and such Lender shall pay such interest to Administrative Agent for the same or an overlapping period, Administrative Agent shall promptly remit to Borrower the amount of such interest paid by Borrower for such period. If such Lender pays its Pro Rata Share of the applicable Coverage Advance to Administrative Agent, then the amount so paid shall constitute such Lender's Pro Rata Share of the applicable Coverage Advance. Any payment by Borrower shall be without prejudice to any claim Borrower may have against a Lender that shall have failed to make such payment to Administrative Agent.

(b)       Notices. Notices to each Lender shall be delivered in accordance with the terms and provisions of Section 15.1 hereof.

Section 13.12. Lenders Pro Rata Shares. Each Lender shall be entitled to receive, and Administrative Agent shall transfer to each Lender, each Lender's Pro Rata Share of all payments received and collected by Administrative Agent pursuant to the Loan Documents on account of principal and interest (collectively, "Debt Service Payments") and other sums, whether received from Borrower or any third party, excluding, however, any sums payable to Administrative Agent on account of expenses incurred by Administrative Agent for which Borrower is obligated to reimburse Administrative Agent pursuant to the Loan Documents to the extent that any Lender has not made a payment on account thereof pursuant to Section 13.5 hereof. For the purposes hereof, "Pro Rata Share" means, with respect to any Lender, the percentage obtained by dividing (a) the principal amount of the Loan attributable to such Lender as set forth on Schedule 13.12 annexed hereto and made a part hereof, as adjusted for any repayments of principal received by such Lender pursuant to this Agreement, by (b) the then outstanding aggregate principal amount of the Loan.

Section 13.13. Disbursement of Proceeds by Administrative Agent.

(a)       Administrative Agent shall hold each Lender's Pro Rata Share of any proceeds payable under the Loan, however received, as agent of and in trust for each of such Lenders subject to each of such Lenders' rights with respect thereto as herein set forth.

(b)       All sums received and collected by Administrative Agent pursuant to the Loan Documents on account of Debt Service Payments and other sums which are collected by 11:00 a.m. (New York City time) shall be paid to each Lender on the date of collection; all such sums collected by Administrative Agent after 11:00 a.m. (New York City time) shall be paid to each Lender on or before the next succeeding Business Day. Administrative Agent shall allocate and disburse to each Lender all payments received in proportion to each Lender's Pro Rata Share. All payments made by Administrative Agent to Lenders shall be made by deposit of immediately available funds pursuant to the wiring instructions set forth on the signature page hereof or as otherwise set forth in a written notice delivered from any Lender to Administrative Agent.

(c)     Unless Administrative Agent shall have received notice from Borrower prior to the date on which any payment is due to Administrative Agent for the account of the Lenders hereunder that Borrower will not make such payment, Administrative Agent may assume that Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption and pursuant to the foregoing paragraphs, distribute to the Lenders the amount due. In such event, if Borrower has not in fact made such payment or for any reason such payment is required to be returned to Borrower or paid to any other Person pursuant to any bankruptcy or insolvency law, any sharing clause in the Loan Documents or otherwise, then each of the Lenders severally agrees to repay to Administrative Agent forthwith on demand the amount so distributed to such Lender, without interest thereon, unless Administrative Agent is required to return such amount with interest thereon, in which case, with interest thereon at the Lender Interest Rate for each day from and including the date such amount is distributed to such Lender to but excluding the date of payment to Administrative Agent, unless such payment was made as a result of the gross negligence or willful misconduct of Administrative Agent, in which case Lenders shall not pay any interest on such payment.

(d)     The transfer of funds to any Lender by Administrative Agent is made on a nonrecourse basis. Administrative Agent shall have no duty or obligation whatsoever to make any payments to any Lender except from corresponding payments received by Administrative Agent from Borrower or any other Person pursuant to the Loan Documents.

Section 13.14.  <u>Amendments Concerning Agency Function</u>. Notwithstanding anything to the contrary contained in this Agreement, Administrative Agent shall not be bound by any waiver, amendment, supplement or modification of this Agreement or any other Loan Document which affects Administrative Agent's duties, rights, and/or functions hereunder or thereunder unless Administrative Agent shall have given Administrative Agent's prior written consent thereto.

Section 13.15.  <u>Events of Default</u>.

(a)     Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Event of Default unless and until Administrative Agent has received written notice from a Lender or Borrower specifying such Event of Default.

(b)     In the event of the occurrence of an Event of Default and if Administrative Agent, in Administrative Agent's sole and absolute discretion, determines that any action is to be taken by Administrative Agent on behalf of Lenders in connection therewith, Administrative Agent shall send a notice (the "<u>Action Notice</u>") to each Lender recommending a course of action (which may include a recommendation to refrain from taking any action) and Lenders shall promptly consult in good faith to either confirm Administrative Agent's suggested course of action (or inaction) or to arrive at a course of action which shall be mutually acceptable to all Lenders in their reasonable discretion. Such course of action shall address, amongst other issues, (i) the exercise of remedies and the manner in which a foreclosure or additional remedies shall be conducted, (ii) the interests of all of the Lenders at a foreclosure sale or auction and whether Lenders or their nominees shall succeed to title to the Project or any other collateral and (iii) issues pertaining to the operation, management, maintenance, leasing and/or the sale of the Project or any other collateral. Administrative Agent shall promptly and diligently implement any such agreed upon course of action (or inaction) on behalf of Lenders. Notwithstanding anything to the contrary contained herein, if Lenders are unable to agree on a course of action (or inaction) within ten (10) Business Days of the date of the Action Notice, Administrative Agent shall have the right (but not the obligation), upon notice to Lenders, to take such course of action (or refrain from taking such action) as Administrative Agent deems appropriate and Administrative Agent may continue to proceed on such course of action, or refrain from taking such action, until Administrative Agent receives notice to the contrary from the Required Lenders ("<u>Agent Discretion Standard</u>"). Provided and on condition that

Administrative Agent has acted in accordance with this <u>Subsection 13.15(b)</u> and the Agent Discretion Standard, Lenders hereby acknowledge and agree that Administrative Agent shall have no obligation to take any action unless failure to do so would be grossly negligent or rise to the level of willful misconduct.

(c)     Provided that Lenders have agreed to a foreclosure or auction in accordance with <u>Subsection 13.15(b)</u> hereof (or Administrative Agent has exercised the Agent Discretion Standard), upon a foreclosure sale or auction and subject to the terms and provisions of this Agreement, Administrative Agent shall have the right to bid at the foreclosure sale or auction on behalf of Lenders. Any bid entered by Administrative Agent in an amount not in excess of the total indebtedness due under the Note plus expenses and all other amounts which are recoverable from the proceeds of the sale (collectively, the "<u>Judgment Amount</u>") shall be deemed to have been entered on behalf and for the benefit of Lenders, and, if such bid is the successful bid, Administrative Agent shall cause a referee's deed (as to the Project) or the applicable title instrument (as to all other collateral) to be issued to Administrative Agent (or Administrative Agent's nominee) in trust for Lenders, and Administrative Agent (or Administrative Agent's nominee) shall hold title subject to the terms and provisions of <u>Subsection 13.15(d)</u> and <u>Subsection 13.15(e)</u> hereof on behalf of, and as trustee for, Lenders.

(d)     Administrative Agent and Lender hereby acknowledge and agree that if title to (i) the Project or (ii) any other collateral is obtained by Administrative Agent (or Administrative Agent's nominee) for the benefit of Administrative Agent and Lenders, such asset(s) shall not be held as a permanent investment, but shall be marketed and sold as soon as possible, taking into account then current economic and market conditions. Subject to <u>Subsection 13.15(b)</u> hereof, each Lender shall, upon demand therefor from time to time, contribute such Lender's Pro Rata Share of all costs, fees and expenses (including, without limitation, attorney's fees and disbursements) suffered or incurred by Administrative Agent (or Administrative Agent's nominee) in connection with the operation, management, maintenance, leasing and/or sale of all or any part of the Project or any other collateral. Funds received from the ownership, operation or sale of the Project or any other collateral (net of operating expenses or transaction costs in connection with such ownership, operation or sale) shall constitute Debt Service Payments and shall be applied first, to reimburse Administrative Agent for any Costs, and thereafter, in accordance with <u>Section 13.13</u> hereof. Lenders shall consult with Administrative Agent and attempt to determine a mutually acceptable course of action relating to, but not limited to, the management, operation and leasing of the Project and any other collateral as well as the sale of the Project and any other collateral; *provided*, *however*, if Lenders cannot agree on a mutually acceptable course of action, Administrative Agent shall have the right (but not the obligation) to apply the Agent Discretion Standard upon notice to Lenders.

(e)     Notwithstanding anything to the contrary contained herein, each Lender shall have the right to enter a bid in an amount in excess of the Judgment Amount and, if such bid is the successful bid, such Lender shall acquire the Project or other collateral, as the case may be, for such Lender's own account and, provided and on the condition that the non-bidding party is, by not later than the date of delivery to the bidding party (or such bidding party's nominee) of the referee's deed or other title instrument, paid in full all amounts owed to the non-bidding party under the Loan and this Agreement, the non-bidding party shall have no further interest in the Project or other collateral, as the case may be, and the terms and provisions of <u>Subsection 13.15(b)</u> hereof shall be null and void and of no further force or effect.

Section 13.16. <u>Defaulting Lender</u>.

(a)     In addition to the rights and remedies that may be available to Administrative Agent or Borrower under this Agreement or applicable law, if at any time any Lender has not performed such Lender's obligations under this Agreement or any of the other Loan Documents (a "<u>Defaulting</u>

Lender") and such default continues for twenty (20) days after notice, such Defaulting Lender's right to participate in the administration of the Loan, this Agreement and the other Loan Documents, including, without limitation, any right to vote in respect of, to consent to or to direct any action or inaction of Administrative Agent or to be taken into account in the calculation of the Required Lenders, shall be suspended while such Lender remains a Defaulting Lender. If any Lender is a Defaulting Lender because such Lender has failed to make timely payment to Administrative Agent of any amount required to be paid to Administrative Agent hereunder, in addition to other rights and remedies which Administrative Agent or Borrower may have under the immediately preceding provisions or otherwise, Administrative Agent shall be entitled (i) to collect interest from such Defaulting Lender on such delinquent payment for the period from the date on which the payment was due until the date on which the payment is made at the Lender Interest Rate, (ii) to withhold or setoff and to apply in satisfaction of the defaulted payment and any related interest, any amounts otherwise payable to such Defaulting Lender under this Agreement or any other Loan Document until such defaulted payment and related interest has been paid in full and such default no longer exists and (iii) to bring an action or suit against such Defaulting Lender in a court of competent jurisdiction to recover the defaulted amount and any related interest. Any amounts received by Administrative Agent in respect of a Defaulting Lender shall not be paid to such Defaulting Lender and shall be held uninvested by Administrative Agent and either applied against the purchase price of such Defaulting Lender's interest in the Loan under Subsection 13.16(b) hereof or paid to such Defaulting Lender upon the default of such Defaulting Lender being cured.

(b)        Any Lender that is not a Defaulting Lender shall have the right, but not the obligation, in such Lender's sole and absolute discretion, to acquire all of a Defaulting Lender's interest in the Loan (the "Defaulting Lender's Interest") during the continuance of the applicable default. Upon any such purchase, the Defaulting Lender's Interest and the Defaulting Lender's rights hereunder (but not the Defaulting Lender's liability in respect thereof or under the Loan Documents or this Agreement to the extent the same relate to the period prior to the effective date of the purchase) shall terminate on the date of purchase, and the Defaulting Lender shall promptly execute all documents reasonably requested to surrender and transfer such interest to the purchaser thereof, including an assignment substantially in form and substance as set forth in Exhibit B annexed hereto and made a part hereof. The purchase price for the Defaulting Lender's Interest shall be equal to the amount of the principal balance of the Loan outstanding and owed by Borrower to the Defaulting Lender. The purchaser shall pay to the Defaulting Lender in immediately available funds on the date of such purchase the principal of and accrued and unpaid interest and fees with respect to the Defaulting Lender's Interest (it being understood that such accrued and unpaid interest and fees may be paid pro rata to the purchasing Lender and the Defaulting Lender by the Administrative Agent at a subsequent date upon receipt of payment of such amounts from Borrower). Prior to payment of such purchase price to a Defaulting Lender, Administrative Agent shall apply against such purchase price any amounts retained by Administrative Agent pursuant to the last sentence of Subsection 13.16(a) hereof. The Defaulting Lender shall be entitled to receive amounts owed to such Defaulting Lender by Borrower under the Loan Documents which accrued prior to the date of the default by the Defaulting Lender, to the extent the same are received by Administrative Agent from or on behalf of Borrower. There shall be no recourse against any Lender or Administrative Agent for the payment of such sums except to the extent of the receipt of payments from any other party or in respect of the Loan.

(c)        Nothing contained in this Section 13.16 or elsewhere in this Agreement shall release or in any way limit a Defaulting Lender's obligations as a Lender hereunder and/or under any other of the Loan Documents. Further, a Defaulting Lender shall indemnify and hold harmless Borrower, Administrative Agent and each of the non-Defaulting Lenders from any claim, loss, or costs incurred by Borrower, Administrative Agent and/or the non-Defaulting Lenders as a result of a Defaulting Lender's failure to comply with the requirements of this Agreement, including, without limitation, any and all additional losses, damages, costs and expenses (including, without limitation, attorneys' fees and

disbursements) incurred by Borrower, Administrative Agent and/or any Lender as a result of and/or in connection with (i) any enforcement action brought by Borrower and/or Administrative Agent against a Defaulting Lender and (ii) any action brought against Borrower, Administrative Agent and/or Lenders by a Defaulting Lender. The indemnification provided above shall survive any termination of this Agreement.

Section 13.17. <u>Servicing Fee</u>. Administrative Agent shall be entitled, on a monthly basis, to a servicing fee in an amount to be determined by Administrative Agent based on a percentage of the outstanding principal balance of the Loan (the "<u>Servicing Fee</u>"). Lenders hereby irrevocably authorize Administrative Agent to deduct the Servicing Fee monthly from the Debt Service Payments to be made to Administrative Agent.

<div align="center">

ARTICLE XIV
INDEMNIFICATIONS

</div>

Section 14.1. <u>General Indemnification</u>. Borrower shall indemnify, defend and hold harmless the Indemnified Parties, or Borrower shall cause the Indemnified Parties to be indemnified, defended and held harmless, from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any accident, injury to or death of Persons or loss of or damage to property occurring in, on or about the Project or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Project or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Project or any part thereof; (d) any failure of the Project to be in compliance with any applicable Legal Requirements or (e) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the Loan (collectively, the "<u>Indemnified Liabilities</u>"); *provided*, *however*, that Borrower shall not have any obligation to Lenders hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of Administrative Agent or Lenders. To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Lenders. Administrative Agent agrees that, so long as the Existing Leases shall continue to be in full force and effect, Borrower's indemnification, defense and holding harmless obligations to the Indemnified Parties under this <u>Section 14.1</u> may be satisfied by the applicable Tenants under the corresponding obligations of the Existing Leases; *provided*, *however*, the foregoing shall not act to, or be deemed to, release, relinquish or relieve Borrower from Borrower's obligations to indemnify the Indemnified Parties in accordance with the terms of this <u>Section 14.1</u> to the extent that the Tenant(s) fail, refuse, delay or are otherwise unable or unwilling to do so.

Section 14.2. <u>Intangible Tax Indemnification</u>. Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any stamp or similar intangible tax on the making of the Deed of Trust, the Note or any of the other Loan Documents, excluding, for purposes of clarity, any income, franchise or other similar taxes, or U.S. federal withholding taxes imposed under FATCA as a result of the failure by a Lender to comply with the applicable provisions of FATCA.

Section 14.3. <u>ERISA Indemnification</u>. Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation,

<div align="center">61</div>

defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Administrative Agent's sole and absolute discretion) that Administrative Agent or Lenders may incur, directly or indirectly, as a result of a default under Section 4.9 or Section 5.17 hereof.

Section 14.4. Survival. The obligations and liabilities of Borrower under this Article XIV shall fully survive indefinitely notwithstanding any termination, satisfaction, or assignment of the Deed of Trust.

<div align="center">

ARTICLE XV

NOTICES

</div>

Section 15.1. Notices. All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested, or (b) expedited prepaid overnight delivery service, either commercial or United States Postal Service, with proof of attempted delivery, addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section):

| | |
|---|---|
| If to Lenders: | See address and telephone number specified for such Lender on Schedule 15.1 |
| If to Administrative Agent: | National Bank of Kuwait, S.A.K.P., New York Branch<br>299 Park Avenue<br>New York, New York 10171<br>Attention: Corporate Finance |
| With a copy to: | Baker & McKenzie LLP<br>300 E. Randolph St., Suite 5000<br>Chicago, Illinois 60601<br>Attention: Mona Dajani, Esq. |
| If to Borrower: | Galleria 2425 Owner, LLC<br>3139 W Holcombe Blvd #845<br>Houston, Texas  77025<br>Attention: Azeemeh Zaheer |
| With copies to: | Polsinelli<br>2950 Harwood Street, Suite 2100<br>Dallas, Texas 75201<br>Attention: Brian Bullard, Esq. |

A notice shall be deemed to have been given: (i) in the case of hand delivery, at the time of delivery; (ii) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; or (iii) in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day.

<div align="center">

ARTICLE XVI

FURTHER ASSURANCES

</div>

Section 16.1. Replacement and Corrective Documents. Upon receipt of an affidavit of an officer of Administrative Agent as to the loss, theft, destruction or mutilation of the Note or any other Loan

<div align="center">62</div>

Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Document, Borrower and Guarantor shall issue, in lieu thereof, a replacement Note or other Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor. Borrower and Guarantor hereby consent and agree that in the event that any of the Loan Documents misstate or inaccurately reflect the true and correct terms and provisions of the Loan and said misstatement or inaccuracy is due to the unilateral mistake on the part of Lenders or Administrative Agent, mutual mistake on the part of any of Administrative Agent, Lenders, Borrower and Guarantor or clerical error, then in such event Borrower and Guarantor shall, within thirty (30) days after written request of Administrative Agent and in order to correct such misstatement or inaccuracy, execute such new documents as Administrative Agent may deem necessary to remedy said inaccuracy or mistake.

Section 16.2. Further Acts, Etc. Subject to Article XII hereof, Borrower and Guarantor shall, at the cost and expense of Borrower and Guarantor, and without expense to Lenders or Administrative Agent, do, execute, acknowledge and deliver all and every further acts, deeds, conveyances, assignments, security agreements, control agreements, notices of assignments, transfers and assurances as Administrative Agent shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lenders the rights hereby granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower or Guarantor may be or may hereafter become bound to convey or assign to Lenders, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing or registering of the Deed of Trust, or for complying with all Legal Requirements. Borrower and Guarantor, on demand, shall deliver, and in the event Borrower or Guarantor shall fail to so deliver, hereby authorizes Administrative Agent to file, in the name of Borrower and Guarantor, one or more financing statements and financing statement amendments to evidence more effectively, perfect and maintain the priority of the security interest of Lenders in the Project. Borrower and Guarantor grant to Lenders and Administrative Agent an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lenders or Administrative Agent at law and in equity, including, without limitation, such rights and remedies available to Lenders or Administrative Agent pursuant to this Section 16.2.

Section 16.3. Changes in Tax, Debt, Credit and Documentary Stamp Law.

(a)     If any law is enacted or adopted or amended after the date of this Agreement which deducts the Debt from the value of the Project for the purpose of taxation with the result that taxes are imposed on the Lenders, Borrower shall pay the tax, with interest and penalties thereon, if any, other than U.S. federal withholding taxes imposed under FATCA as a result of the failure by a Lender to comply with the applicable provisions of FATCA. If Lenders are advised by counsel chosen by Lenders that the payment of such tax by Borrower would be unlawful or taxable to Lenders (unless any such tax is reimbursed by Borrower) or unenforceable or provides the basis for a defense of usury then Lenders shall have the option by written notice of not less than one hundred twenty (120) days to declare the Debt immediately due and payable. Borrower shall not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Project, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Project, or any part thereof, for real estate or personal property tax purposes by reason of the Deed of Trust or the Debt if such claim, credit or deduction has the effect of imposing a tax on Lenders. If such claim, credit or deduction shall be required by law, Lenders shall have the option, by written notice of not less than one hundred twenty (120) days, to declare the Debt immediately due and payable.

(b)     If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, the Deed of Trust, or any

of the other Loan Documents or impose any other tax or charge on the same, Borrower shall pay for the same, with interest and penalties thereon, if any.

Section 16.4. <u>Expenses</u>. Borrower covenants and agrees to pay or reimburse, as applicable, Lenders and Administrative Agent upon receipt of written notice from Administrative Agent for all actual costs and expenses (including reasonable third party attorneys' fees and disbursements) incurred by Administrative Agent and Lenders in accordance with this Agreement in connection with (a) the preparation, negotiation, execution and delivery of this Agreement, the Deed of Trust and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower and Guarantor (including, without limitation, any opinions reasonably requested by Administrative Agent as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Project); (b) Borrower's and Guarantor's ongoing performance of and compliance with Borrower's and Guarantor's agreements and covenants contained in this Agreement, the Deed of Trust and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (c) [Reserved.] (d) subject to <u>Article XII</u> hereof, the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents; (e) securing Borrower's and Guarantor's compliance with any requests reasonably made pursuant to the provisions of this Agreement; (f) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Administrative Agent all required legal opinions, and other similar expenses reasonably incurred in creating and perfecting the Lien in favor of Lenders pursuant to this Agreement, the Deed of Trust and the other Loan Documents; (g) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower or Guarantor, this Agreement, the other Loan Documents, the Project, or any security given for the Loan; and (h) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Project or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings.

<div align="center">

ARTICLE XVII
WAIVERS

</div>

Section 17.1. <u>Remedies Cumulative; Waivers</u>. The rights, powers and remedies of Administrative Agent and Lenders under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Administrative Agent or Lenders may have against Borrower or Guarantor pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lenders' rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lenders may determine in Lenders' sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower or Guarantor shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

Section 17.2. <u>Modification, Waiver in Writing</u>. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower or Guarantor therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower or

<div align="center">64</div>

Guarantor shall entitle Borrower or such Guarantor to any other or future notice or demand in the same, similar or other circumstances.

Section 17.3. Delay Not a Waiver. Neither any failure nor any delay on the part of Administrative Agent or Lenders in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Administrative Agent and Lenders shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 17.4. Trial by Jury. BORROWER, ADMINISTRATIVE AGENT AND LENDERS EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, ADMINISTRATIVE AGENT AND LENDERS, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF LENDERS, ADMINISTRATIVE AGENT AND BORROWER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER, ADMINISTRATIVE AGENT AND LENDERS.

Section 17.5. Waiver of Notice. Borrower and Guarantor shall not be entitled to any notices of any nature whatsoever from Administrative Agent or Lenders except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Administrative Agent or Lenders to Borrower and Guarantor and except with respect to matters for which Borrower or Guarantor is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice. Borrower hereby expressly waives the right to receive any notice from Administrative Agent or Lenders with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Administrative Agent or Lenders to Borrower.

Section 17.6. Remedies of Borrower. In the event that a claim or adjudication is made that Administrative Agent or Lenders or Administrative Agent's or Lenders' agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Administrative Agent, Lenders or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that Administrative Agent, Lenders and Administrative Agent's and Lenders' agents shall not be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Administrative Agent or Lenders have acted reasonably shall be determined by an action seeking declaratory judgment. Administrative Agent and Lenders agrees that, in such event, it shall cooperate in expediting any action seeking injunctive relief or declaratory judgment.

Section 17.7. Waiver of Marshalling of Assets. To the fullest extent permitted by law, Borrower for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower and

other Persons with interests in Borrower, and of the Project, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lenders under the Loan Documents to a foreclosure of the Deed of Trust for the collection of the Debt without any prior or different resort for collection or of the right of Lenders to the payment of the Debt out of the net proceeds of the Project in preference to every other claimant whatsoever.

Section 17.8. <u>Waiver of Statute of Limitations</u>. Borrower hereby expressly waives and releases, to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its other obligations set forth in the Loan Documents.

Section 17.9. <u>Waiver of Counterclaim</u>. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lenders or Administrative Agent or Lenders' or Administrative Agent's agents.

ARTICLE XVIII
GOVERNING LAW

Section 18.1. <u>Choice of Law</u>.

(i)     THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDERS AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT THE DEED OF TRUST, THE ASSIGNMENT OF LEASES AND RENTS AND THE OTHER LOAN DOCUMENTS (OTHER THAN WITH RESPECT TO LIENS AND SECURITY INTERESTS IN PROPERTY WHOSE PERFECTION AND PRIORITY IS COVERED BY ARTICLE 9 OF THE UCC (INCLUDING, WITHOUT LIMITATION, THE ACCOUNTS) WHICH SHALL BE GOVERNED BY THE LAW OF THE JURISDICTION APPLICABLE THERETO IN ACCORDANCE WITH SECTIONS 9-301 THROUGH 9-307 OF THE UCC AS IN EFFECT IN THE STATE OF NEW YORK) SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROJECT IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE

LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW EXCEPT AS SPECIFICALLY SET FORTH ABOVE.

(ii)      ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ADMINISTRATIVE AGENT, ANY LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY AT ADMINISTRATIVE AGENT'S OR LENDERS' OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:

Capitol Services, Inc.
1218 Central Avenue, Suite 100
Albany, NY 12205

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS TOGETHER WITH WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. BORROWER (I) SHALL GIVE PROMPT NOTICE TO ADMINISTRATIVE AGENT OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

(iii)     Borrower, Administrative Agent and Lenders hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably submit to the exclusive jurisdiction of any New York State or Federal court sitting in New York County over any suit, action or proceeding arising out of or relating to this Agreement, and each such party hereby agrees and consents that, in addition to any methods of service of process provided for under applicable law, all service of process in any such suit, action or proceeding in any New York State or Federal court sitting in New York County may be made by certified or registered mail, return receipt requested, directed to such party at the address indicated on the first page of this Agreement or in Section 15.1 hereof, as applicable, and service so made shall be complete three (3) days after the same shall have been so mailed.

Section 18.2. Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 18.3. <u>Preferences</u>. Lenders shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower or Guarantor hereunder in connection with any payment deemed to be fraudulent or an impermissible preference payment under applicable Legal Requirements. To the extent Borrower or Guarantor makes a payment or payments to Lenders, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Creditors' Rights Laws, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lenders.

ARTICLE XIX
MISCELLANEOUS

Section 19.1. <u>Survival</u>. This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the entering into by Lenders of this Agreement and the execution and delivery to Lenders of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower shall inure to the benefit of the successors and assigns of Lenders.

Section 19.2. <u>Administrative Agent's Discretion</u>. Whenever pursuant to this Agreement, Administrative Agent exercises any right given to Administrative Agent to approve or disapprove, or any arrangement or term is to be satisfactory to Administrative Agent, the decision of Administrative Agent to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the reasonable discretion of Administrative Agent.

Section 19.3. <u>Headings</u>. The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 19.4. <u>Cost of Enforcement</u>. In the event (a) that the Deed of Trust is foreclosed in whole or in part, (b) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or Guarantor or any of Borrower Members, Borrower's constituent Persons or Subsidiaries or an assignment by Borrower or Guarantor or any of Borrower Members, Borrower's constituent Persons or Subsidiaries for the benefit of its creditors, or (c) Lenders exercise any of its other remedies under this Agreement or any of the other Loan Documents, Borrower shall be chargeable with and agrees to pay all costs of collection and defense, including attorneys' fees and costs, incurred by Lenders, Administrative Agent or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

Section 19.5. <u>Schedule Incorporated</u>. The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 19.6. <u>Offsets, Counterclaims and Defenses</u>. Any assignee of Lenders' interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower or Guarantor may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower or such Guarantor in any action or proceeding brought by any

such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

        Section 19.7.  No Joint Venture or Partnership; No Third Party Beneficiaries.

        (a)     Borrower, Administrative Agent and Lenders intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower, Guarantor, Administrative Agent and Lenders nor to grant Administrative Agent or Lenders any interest in the Project other than that of secured party, Lenders or lender. Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably waives and relinquishes all claims, demands, counterclaims and/or defenses alleging the existence of any partnership, joint venture or other fiduciary relationship between Administrative Agent or Lenders and Borrower and Borrower shall hold Lenders, Administrative Agent, Lenders' and Administrative Agent's successors and assigns, harmless from and against any and all losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments and any other fees, costs and expenses that Administrative Agent or Lenders may sustain as a result of any such allegation by any Person whatsoever.

        (b)     This Agreement and the other Loan Documents are solely for the benefit of Lenders, Administrative Agent and Borrower and Guarantor and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lenders, Administrative Agent and Borrower and Guarantor any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lenders to enter into this Agreement and make the financial accommodations provided for hereunder are imposed solely and exclusively for the benefit of Lenders and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lenders will refuse to enter into this Agreement or make the financial accommodations provided for hereunder in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Administrative Agent or Lenders if, in Administrative Agent's or Lenders' sole discretion, Administrative Agent or Lenders deem it advisable or desirable to do so.

        (c)     The shareholders, general partners, members, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Project, and Lenders are relying solely upon such expertise and business plan in connection with the ownership and operation of the Project.

        (d)     Notwithstanding anything to the contrary contained herein, Lenders are not undertaking the performance of any obligations with respect to any agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents of Borrower.

        (e)     By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lenders or Administrative Agent pursuant to this Agreement, the Deed of Trust, the Note or the other Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lenders and Administrative Agent shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lenders or Administrative Agent.

        (f)     Borrower and Guarantor recognize and acknowledge that in accepting this Agreement, the Note, the Deed of Trust and the other Loan Documents, Lenders are expressly and primarily relying on the truth and accuracy of the representations and warranties set forth in Article IV of

this Agreement without any obligation to investigate the Project and notwithstanding any investigation of the Project by Administrative Agent; that such reliance existed on the part of Lenders prior to the date hereof, that the warranties and representations are a material inducement to Lenders in entering into this Agreement and making the financial accommodations provided for hereunder; and that Lenders would not be willing to enter into this Agreement and make the financial accommodations provided for hereunder and accept this Agreement, the Note, the Deed of Trust and the other Loan Documents in the absence of the warranties and representations as set forth in Article IV of this Agreement.

Section 19.8. Publicity. All news releases, publicity or advertising by Borrower, Guarantor or Borrower's Affiliates through any media intended to reach the general public which refers to the Loan, Lenders, or any of Lenders' Affiliates shall be subject to the prior written approval of Administrative Agent, not to be unreasonably withheld. Administrative Agent and Lenders shall be permitted to make any news, releases, publicity or advertising by Lenders or Lenders' Affiliates through any media intended to reach the general public which refers to the Loan, the Project, Borrower, Guarantor and Borrower's Affiliates without the approval of Borrower or any such Persons in a "tombstone", advertisement or other written description or loan summary in an industry periodical, journal or newspaper or at industry events or conferences, provided that such references are limited to the following matters: (i) the principal amount of the Loan, (ii) the term of the Loan, (iii) the location of the Project, (iv) whether the interest rate of the Loan is fixed or variable and (v) the identity of Borrower. All other news-releases, publicity or advertising by Lenders shall be subject to Borrower's prior written approval, which approval shall not be unreasonably withheld or delayed. Borrower also agrees that Lenders and Administrative Agent may share any information pertaining to the Loan with third-parties in connection with the sale or transfer of the Loan or any Participations thereof.

Section 19.9. Conflict; Construction of Documents; Reliance. In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Administrative Agent or Lenders or any parent, subsidiary or Affiliate of Administrative Agent or Lenders. Lenders shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lenders of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lenders' or Administrative Agent's exercise of any such rights or remedies. Borrower acknowledges that Lenders engage in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

Section 19.10. Actions, Approvals and Determinations. Wherever in this Agreement it is provided that (a) as a condition precedent to Borrower's undertaking certain action, Borrower shall be required to obtain Administrative Agent's consent or approval or (b) Administrative Agent shall have the right to make a determination (including, without limitation, a determination as to whether a matter is satisfactory to Administrative Agent), or if Borrower shall request that Administrative Agent or Lenders take any action, then, unless expressly provided to the contrary in the applicable provision of this Agreement, the decision whether to grant such consent or approval or to take the requested action, or the determination in question, shall be in the sole and exclusive discretion of Administrative Agent and Lenders and shall be

final and conclusive. Wherever in this Agreement it is stated that any consent or approval shall not be unreasonably withheld or that a determination to be made by Administrative Agent or Lenders shall be subject to a specified standard, then, if a court of competent jurisdiction determines, without right to further appeal, that the consent or approval shall be deemed granted or the standard shall be deemed met, as the case may be, then Administrative Agent or Lenders, at the request of Borrower, shall deliver to Borrower written confirmation thereof. The obtaining of such consent or approval or determination that such standard has been met shall be Borrower's sole and exclusive remedy with respect to the subject matter of this section, and under no circumstance shall Administrative Agent or Lenders, or Administrative Agent's or Lenders' counsel or anyone else acting or purporting to act on Administrative Agent's or Lenders' behalf have any liability (whether in damages or otherwise) with respect thereto. In any instance in which Borrower requests, or any Loan Document provides, that Administrative Agent or Lenders shall consider granting Administrative Agent's or Lenders' consent or approval or making a determination or taking some other action, Borrower shall, upon demand, pay all actual out-of-pocket costs, expenses and reasonable attorneys' fees and disbursements incurred by Administrative Agent and Lenders in connection therewith.

Section 19.11. <u>Entire Agreement</u>. This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written between Borrower, Administrative Agent and Lenders are superseded by the terms of this Agreement and the other Loan Documents.

Section 19.12. <u>Certain Additional Rights of Lenders</u>. Notwithstanding anything which may be contained in this Agreement to the contrary, Lenders shall have:

(a)     the right to designate any party to receive payment of all fees, costs and expenses otherwise payable to Lenders under this Agreement or the other Loan Documents;

(b)     the right to routinely consult with and advise Borrower's, management regarding the significant business activities and business and financial developments of Borrower. Consultation meetings should occur on a regular basis with Administrative Agent or Lenders having the right to call special meetings at any reasonable times;

(c)     the right, without restricting any other right of Administrative Agent or Lenders under this Agreement (including any similar right), to restrict, upon the occurrence and continuance of an Event of Default, Borrower's payments of management consulting director or similar fees to affiliates of Borrower (or their personnel); and

(d)     the right, without restricting any other rights of Administrative Agent or Lenders under this Agreement (including any similar right), to restrict the transfer to voting interests in Borrower held by its shareholders, members or partners (as the case may be), and the right to restrict the transfer of interests in such shareholder, member or partner (as the case may be), except for any transfer that is expressly permitted hereunder.

Section 19.13. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed to be an original, and all such counterparts together constitute but one and the same agreement. In addition, the parties may execute separate signature pages, and such signature pages (and/or signature pages which have been detached from one or more duplicate original copies of this Agreement) may be combined and attached to one or more copies of this Agreement so that such copies shall contain the signatures of all of the parties hereto.

[balance of page intentionally left blank]

71

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

**GALLERIA 2425 OWNER, LLC**,
a Delaware limited liability company

By:   Galleria 2425 JV, LLC,
      a Delaware limited liability company,
      its sole member

      By:   Naissance Capital Real Estate, LLC,
            a Delaware limited liability company,
            its Managing Member

            By: _____
            Name: Azeemeh Zaheer
            Title: Managing Member

[SIGNATURES CONTINUE ON NEXT PAGE]

[Signature Page to Loan Agreement]

<u>ADMINISTRATIVE AGENT AND LENDER</u>:

**NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH**, a banking corporation organized under the laws of Kuwait, acting through its New York branch

By:
Name:
Title:

Arlette Kittaneh
Executive Manager

By:
Name:      Michael G. McHugh
Title:      Executive Manager

[Signature Page to Loan Agreement]

EXHIBIT A

BORROWER'S ORGANIZATIONAL STRUCTURE

[see attached]



# The Galleria – Houston, Texas (Master Chart)



EXHIBIT B

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of the ____ day of _____, 20__, made by and between [NAME OF ASSIGNING BANK] ("Assignor") and [NAME OF ASSIGNEE] ("Assignee").

Preliminary Statement

1.     This Agreement relates to that certain Loan Agreement (as the same may be amended from time to time, the "Loan Agreement") dated as of May 23, 2018 made by and among (1) Galleria 2425 Owner, LLC, a Delaware limited liability company ("Borrower"), (2) the lender(s) party thereto (each, a "Lender" and collectively, "Lenders"), and (3) National Bank of Kuwait, S.A.K.P., New York Branch ("Administrative Agent"). All capitalized terms not otherwise defined herein shall have the respective meanings set forth in the Loan Agreement.

2.     Subject to the terms and conditions set forth in the Loan Agreement, Assignor has a pro-rata share of the Loan equal to _____ percent (_____%) in an aggregate principal amount of $_____ ("Assignor's Loan Commitment").

3.     The aggregate outstanding principal amount under Assignor's Loan Commitment at the commencement of business on the date hereof is $_____,

4.     Assignor desires to assign to Assignee all of the rights of Assignor under the Loan Agreement and the other Loan Documents (as defined in the Loan Agreement) in respect of a portion of Assignor's Loan Commitment, such portion being in an amount equal to $_____, which relates to a Pro-Rata Share of the Loan of _____ percent (_____%) (the "Assigned Loan Commitment"); and Assignee desires to accept assignment of such rights and assume the corresponding obligations from Assignor on such terms.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, the parties hereto agree as follows:

SECTION 1.  Assignment. Assignor hereby assigns and sells to Assignee all of the rights of Assignor under the Loan Agreement and the other Loan Documents in and to the Assigned Loan Commitment, and Assignee hereby accepts such assignment from Assignor and assumes all of the obligations of Assignor under the Loan Agreement and the other Loan Documents with respect to the Assigned Loan Commitment. Upon the execution and delivery hereof by Assignor, Assignee, Administrative Agent and the payment of the amount specified in Section 2 hereof required to be paid on the date hereof, (1) Assignee shall, as of the commencement of business on the date hereof, succeed to the rights and obligations of a Lender under the Loan Agreement and the other Loan Documents with a Pro-Rata Share of the Loan equal to the percentage applicable to the Assigned Loan Commitment and (2) the Pro-Rata Share of Assignor shall, as of the commencement of business on the date hereof, be reduced correspondingly and Assignor released from its obligations under the Loan Agreement and the other Loan Documents to the extent such obligations have been assumed by Assignee. Assignor represents and warrants that it (x) owns the Assigned Loan Commitment free and clear of all liens and other encumbrances and (y) is legally authorized to enter into and perform this Agreement. Except as provided in the immediately preceding sentence, the assignment provided for herein shall be without representation or warranty by, or recourse to, Assignor.

SECTION 2. <u>Payments</u>. As consideration for the assignment and sale contemplated in Section 1 hereof, Assignee shall pay to Assignor on the date hereof, in immediately available funds, an amount equal to $\underline{\hspace{3cm}}$. Each of Assignor and Assignee hereby agrees that if it receives any amount under the Loan Agreement or any of the other Loan Documents which is for the account of the other party hereto, it shall receive the same for the account of such other party to the extent of such other party's interest therein and shall promptly pay the same to such other party.

SECTION 3. <u>Consents; Notices</u>. If required pursuant to <u>Article XII</u> or <u>Article XIII</u> of the Loan Agreement, this Agreement is conditioned upon the consent of Administrative Agent. The execution of this Agreement by Administrative Agent is evidence of this consent. Assignee has designated its address for notices below.

SECTION 4. <u>Non-Reliance on Assignor</u>. Assignor makes no representation or warranty in connection with, and shall have no responsibility with respect to, the solvency, financial condition, or statements of Borrower or any other party to any Loan Document, or the validity and enforceability of the obligations of Borrower or any other party to a Loan Document in respect of the Loan Agreement or any other Loan Document. Assignee acknowledges that it has, independently and without reliance on Assignor, and based on such documents and information as it has deemed appropriate, made its own analysis of the collateral for the Loan, credit analysis of Borrower and decision to enter into this Agreement and will continue to be responsible for making its own independent appraisal of the collateral for the Loan and of the business, affairs and financial condition of Borrower and the other parties to the Loan Documents.

SECTION 5. <u>Governing Law</u>. This Agreement shall be governed by, and construed and enforced in accordance with the Laws of the State of New York without reference to principles of conflicts of law.

SECTION 6. <u>Counterparts</u>. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

SECTION 7. <u>Certain Representations and Agreements by Assignee</u>. Assignee represents that it is legally authorized to enter into and perform this Agreement. In addition, Assignee hereby represents that it is entitled to receive any payments to be made to it under the Loan Agreement or hereunder without the withholding of any tax and agrees to furnish the evidence of such exemption as specified therein and otherwise to comply with the provisions of the Loan Agreement and the other Loan Documents.

SECTION 8. <u>Reliance By Borrower</u>. This Agreement shall be binding upon, enforceable by and inure to the benefit of Borrower, its successors and assigns.

[balance of page intentionally left blank]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first above written.

ASSIGNOR:


By: _____
    Name:
    Title:


ASSIGNEE:


By: _____
    Name:
    Title:

Assignee's Address for Notices:


[Assignee]
[Address]
Attention: _____
Telephone: (___) _____


ADMINISTRATIVE AGENT:

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch


By: _____
    Name:
    Title:

SCHEDULE 13.12

Amount of Loan Attributable to Lender

| Lender | Amount of Loan Attributable to Lender |
|--------|----------------------------------------|
| NBK | $51,675,000.00 |

SCHEDULE 15.1

Lenders' Offices, Addresses for Notices

If to NBK:                          National Bank of Kuwait, S.A.K.P., New York Branch
                                    299 Park Avenue
                                    New York, New York 10171
                                    Attention: Corporate Finance

With a copy to:                     Baker & McKenzie LLP
                                    300 E. Randolph St., Suite 5000
                                    Chicago, IL 60601
                                    Attention: Mona Dajani, Esq.

## **Exhibit B**

Promissory Note

<u>PROMISSORY NOTE</u>

$51,675,000.00                                                    Date: May 23, 2018

THIS PROMISSORY NOTE (this "<u>Note</u>") made as of May 23, 2018, by GALLERIA 2425 OWNER, LLC, a Delaware limited liability company, having an address at 3139 W Holcombe Blvd #845, Houston, Texas 77025 ("<u>Borrower</u>"), to NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch, having an office at 299 Park Avenue, New York, New York 10171, as administrative and collateral agent (in such capacity, together with its successors and assigns, "<u>Administrative Agent</u>") for the Lenders (as defined in the Loan Agreement referred to below). *Capitalized terms used but not defined in this Note shall have the meanings assigned to them in the Loan Agreement.*

1.   <u>Covenant to Pay</u>

FOR VALUE RECEIVED, without grace, except as expressly provided for herein and in the Loan Agreement, Borrower does hereby covenant and promise to pay to the order of Administrative Agent, on behalf of Lenders, at Administrative Agent's office at 299 Park Avenue, New York, New York 10171 or at such other place as Administrative Agent may designate to Borrower in writing from time to time, in legal tender of the United States, the principal amount of FIFTY ONE MILLION SIX HUNDRED AND SEVENTY-FIVE THOUSAND AND 00/100 DOLLARS ($51,675,000.00) (the "<u>Principal Balance</u>"), together with interest on the unpaid portion of said Principal Balance at the applicable Interest Rate (as hereinafter defined) calculated in accordance with the terms hereof, from the date the Principal Balance is advanced to Borrower until the Principal Balance and all interest accrued thereon shall be fully paid. The period from the date hereof through and including the Maturity Date is hereinafter referred to as the "<u>Term</u>."  "<u>Maturity Date</u>" means May 23, 2023.

2.   <u>Interest Rate</u>

(a)      During the Term, the rate at which interest shall be calculated under this Note (the "<u>Interest Rate</u>") shall be:

i. Commencing on May 24, 2018 and including May 28, 2018, the Interest Rate shall be a rate equal to the sum of (i) 2.75% (the "<u>Interest Rate Markup</u>") <u>plus</u> (ii) the Weekly LIBOR Rate (as hereinafter defined) as of two (2) London Business Days (as hereinafter defined) prior to the date hereof;

ii.   Commencing on May 29, 2018 through and including May 31, 2021, the Interest Rate shall be a fixed rate equal to five and sixty-four hundredths percent (5.64%) per annum (the "Fixed Rate");

iii.   Commencing on June 1, 2021 and continuing on the first (1st) day of each LIBOR Period (as hereinafter defined) thereafter, as applicable (each, a "Rate Adjustment Date"), the Interest Rate shall be recalculated to an adjustable rate equal to the sum of (i) the Interest Rate Markup plus (ii) the LIBOR Rate (as hereinafter defined) for the applicable LIBOR Period (as hereinafter defined) as of two (2) London Business Days (as hereinafter defined) prior to each applicable Rate Adjustment Date.

(b)   Borrower hereby acknowledges and agrees that Borrower shall not have more than three (3) LIBOR contracts outstanding at any one time during the Term.

(c)   During the Term, the LIBOR Period shall be a period of 30 days, except as adjusted pursuant to the definition of "LIBOR Period."

(d)   The certificate of Administrative Agent as to any Interest Rate and the interest amounts payable by Borrower pursuant thereto shall, absent manifest error, be final, conclusive and binding on Borrower.

(e)   As used herein, the following terms shall have the indicated meanings:

Alternate Rate - a per annum rate equal to (i) the Interest Rate Markup *plus* (ii) the Prime Rate (as hereinafter defined) *less* (iii) one percent (1%).

Business Day - a day other than (i) a Saturday, Sunday or (ii) other day on which commercial banks in New York, New York are authorized or required by law to close.

LIBOR Period - the period commencing on June 1, 2021 or any Rate Adjustment Date (as the case may be) and ending on, as applicable, the day immediately prior to the next succeeding payment date or the day immediately prior to the payment date of the calendar month that is one (1) month thereafter; provided, however, that if a payment date would occur on a day that is not a Business Day, the LIBOR Period to which such payment date relates shall be extended to the day immediately prior to the next succeeding Business Day. To the extent that the preceding clause results in the extension of a LIBOR Period, Administrative Agent shall have the right (but not the obligation) to shorten or extend, respectively, the succeeding LIBOR Period so that it shall end on a day that numerically corresponds to the intended payment date indicated in this Note and minimize breakage and/or avoid early termination of

2

any LIBOR contract; provided, however, that no LIBOR Period shall extend beyond the earlier to occur of (i) the Maturity Date or (ii) the date the Loan is otherwise due and payable pursuant to the terms and provisions hereof.  For the avoidance of doubt, the intended payment date is the first calendar day of each calendar month.

LIBOR Rate - the rate per annum (rounded upward, if necessary, to the nearest 1/1000 of 1%) at which United States Dollar deposits are offered in the London interbank market as displayed on the Bloomberg L.P., page "BBAM" or any page that replaces BBAM, two (2) London Business Days prior to the first day of the applicable LIBOR Period, for deposits in immediately available funds, in lawful money of the United States, of amounts substantially comparable to the outstanding Principal Balance for the LIBOR Period, divided by a percentage equal to 100% minus the stated maximum rate of all reserves required to be maintained against "Eurocurrency Liabilities" as specified in Regulation D (or against any other category of liabilities which includes deposits by reference to which the interest rate on LIBOR-based loans is determined) on such date to any member bank of the Federal Reserve System. Notwithstanding any provision above, the practice of rounding to determine the LIBOR Rate may be discontinued at any time in Administrative Agent's sole discretion.  Notwithstanding the foregoing, in no event shall the LIBOR Rate be less than 0%.

London Business Day - any day on which dealings in United States dollar deposits are carried on by banking institutions in the London interbank market.

Prime Rate - a fluctuating interest rate per annum which shall at all times be equal to the rate of interest announced publicly by NBK in New York from time to time, as NBK's prime rate. In the event NBK does not announce its prime rate, the Prime Rate shall be the prime rate as set forth in *The Wall Street Journal* from time to time.

Regulation D - Regulation D of the Board of Governors of the Federal Reserve System as in effect from time to time, including, without limitation, any successor or other regulation or official interpretation of said Board of Governors relating to reserve requirements applicable to member banks of the Federal Reserve System.

Weekly LIBOR Rate - the rate per annum (rounded upward, if necessary, to the nearest 1/1000 of 1%) at which United States Dollar deposits are offered in the London interbank market as displayed on the Bloomberg L.P., page "BBAM" or any page that replaces BBAM, two (2) London Business Days prior to the date hereof, for deposits in immediately available funds, in lawful money of the United States, of amounts substantially comparable to the outstanding Principal Balance for a one week period, divided by a percentage equal to 100% minus the stated maximum rate of all reserves

3

required to be maintained against "Eurocurrency Liabilities" as specified in Regulation D (or against any other category of liabilities which includes deposits by reference to which the interest rate on LIBOR-based loans is determined) on such date to any member bank of the Federal Reserve System. Notwithstanding any provision above, the practice of rounding to determine the LIBOR Rate may be discontinued at any time in Administrative Agent's sole discretion.  Notwithstanding the foregoing, in no event shall the LIBOR Rate be less than 0%.

3.   Increased Costs

(a)     If, after the date of this Note, any change in applicable law or regulation or in the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof (whether or not having the force of law), and which change is applicable generally to other financial institutions (each, a "Change in Law"), shall (i) change the basis of taxation of payments to any Lender of the Principal Balance or interest due and owing under this Note or any fees or other amounts payable hereunder (other than changes in respect of taxes imposed on the overall net income of such Lender), (ii) subject any Lender to any tax of any kind whatsoever with respect to this Note or the Loan, or (iii) impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of or credit extended by any Lender or shall impose on any Lender any other condition affecting this Note, and the result of any of the foregoing shall or would be to increase the cost to any Lender of making or maintaining the Loan or to reduce the amount of any sum received or receivable by any Lender hereunder (whether of principal, interest or otherwise), Administrative Agent may, at any time, notify Borrower of the additional amount required to compensate such Lender for such increased cost or reduced amount and Borrower shall pay to Administrative Agent on behalf of such Lender such additional amount or amounts as shall compensate such Lender for such additional costs incurred or reduction suffered.

(b)     If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such capital or on the capital of such Lender's holding company, if any, as a consequence of such Lender's participation in the Loan to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

4

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to Borrower shall be conclusive absent manifest error. Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than six (6) months prior to the date that such Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     Any Lender affected by increased costs as set forth above shall use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any portion of the Loan affected by such event, provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding such increased costs.  If the affected Lender is not able to avoid such increased costs by designating another lending office, then Borrower shall have the right to replace the affected Lender with a new Lender in accordance with the terms and provisions of the Loan Documents.

(f)     The Increased Cost provisions of this Note shall be without duplication of the provisions of Section 5.4 or Section 16.3 of the Loan Agreement.

4.     <u>Illegality</u>

If Administrative Agent shall notify Borrower that the introduction of, or any change in, or in the interpretation of, any law or regulation makes it unlawful, or any central bank or other Governmental Authority asserts that it is unlawful, for any Lender to perform such Lender's obligations hereunder, then Borrower shall either (i) prepay in full the entire unpaid Debt within ninety days (such date to be adjusted to minimize or avoid breakage) after notice from Administrative Agent, without Prepayment Premium or yield maintenance of any kind or (ii) replace the affected Lender with a new Lender in accordance with the terms and provisions of the Loan Documents. In addition, if Administrative Agent notifies Borrower that by reason of circumstances affecting the London interbank market for United States dollar deposits there does not exist adequate and reasonable means for ascertaining the LIBOR Rate for any LIBOR Period, then, commencing on the last day of the then existing LIBOR Period therefor, the Interest Rate

shall automatically be and remain at the per annum rate at all times equal to the Alternate Rate, which Interest Rate shall be adjusted concurrently with each adjustment in the Alternate Rate until Administrative Agent shall notify Borrower that the circumstances causing the suspension of the use of the LIBOR Rate no longer exist.

5.      Calculation of Interest

Interest shall be computed on the basis of actual days over a three hundred sixty (360) day calendar year (except that interest computed by reference to the Alternate Rate shall be computed on the basis of a three hundred sixty five (365) day calendar year, or a three hundred sixty six (366) day calendar year in a leap year) and shall continue to accrue and be payable on the outstanding Principal Balance to but excluding the date of repayment thereof in full.

6.      Payment of Indebtedness

Borrower shall make payments of interest under this Note as follows and said payments shall be applied upon receipt thereof:

(a)     Interest shall be paid monthly, in arrears, on the first Business Day (i) of each calendar month, if the applicable Interest Rate for such payment is the Fixed Rate in accordance with Section 2(a)(i) above; or (ii) following the applicable one (1)-month LIBOR Period (which payment date, for the avoidance of doubt, is intended to be the first calendar day of each calendar month, subject to adjustment in accordance with the definition of LIBOR Period), for the period of such LIBOR Period, if the applicable Interest Rate for such payment is being calculated with reference to the LIBOR Rate in accordance with Section 2(a)(ii) above; notwithstanding the foregoing, interest for the period commencing on the date hereof and ending on May 31, 2018 shall be paid in advance on the date hereof; and

(b)     On the Maturity Date the entire unpaid Principal Balance, together with all interest accrued thereon and all other Debt, shall be due and payable and repaid in full.

7.      Security

This Note is governed and/or secured by, inter alia, the following documents, each dated as of the date hereof: (i) that certain Loan Agreement made by and among Borrower, Administrative Agent and Lenders (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement"), (ii) that certain Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing made by Borrower to Salima Umatiya, as trustee, for the

benefit of Administrative Agent (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Deed of Trust"), encumbering the premises known as and located at 2425 West Loop South, City of Houston, State of Texas (the "Property"), (iii) that certain Absolute Assignment of Leases and Rents made by Borrower for the benefit of Administrative Agent encumbering the Property (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Assignment of Leases"), and (iv) those certain other documents defined as "Loan Documents" in the Loan Agreement, which documents specify various defaults upon the happening of which all sums due and owing under this Note may be declared immediately due and payable.

8.    Prepayment

(a)    Provided no Event of Default exists, Borrower shall have the right to prepay the Principal Balance, in whole, or in part (but if in part, then in minimum increments of $100,000 (or $1,000,000 if an Interest Rate Protection Product in the form of an interest rate swap is then in effect)), upon not less than thirty (30) days' prior written notice (the "Prepayment Notice") to Administrative Agent specifying the date on which prepayment is to be made (the "Prepayment Date") and the amount of any such prepayment (the "Prepayment Amount"). On the Prepayment Date, Borrower shall pay (i) the Prepayment Amount, (ii) interest accrued and unpaid on the Prepayment Amount to and including the last day of the month in which the Prepayment Date occurs, (iii) in the event the Prepayment Amount equals the entire outstanding Principal Balance, all other unpaid Debt, (iv) the cost of unwinding, modifying or terminating any Interest Rate Protection Product then in effect ("Unwinding Costs"), and (v) the then applicable Prepayment Premium (as hereinafter defined). As used herein, "Prepayment Premium" shall mean: (A) if all or any portion of the Debt is prepaid within the first twelve (12) months following the date hereof, an amount equal to 1.50% of the amount so prepaid, and (B) if all or any portion of the Debt is prepaid within the period from and after the date which is twelve (12) months following the date hereof but before the date which is twenty-four (24) months following the date hereof, an amount equal to 1.00% of the amount so prepaid. If all or any portion of the Debt is prepaid after the date which is twenty-four (24) months following the date hereof, no Prepayment Premium shall be due.

(b)    If any Prepayment Notice is given, the entire Prepayment Amount specified therein (together with the applicable Prepayment Premium, Unwinding Costs and all other sums referred to above) shall be due and payable on the Prepayment Date set forth therein.

(c)    Any partial prepayment made hereunder shall be applied against the Principal Balance in inverse order of maturity (i.e., so as to reduce the final payments of principal due and owing hereunder

and not result in any reduction in or deferment of the monthly payments of principal due and owing hereunder).

(d)      Payment of the entire outstanding Principal Balance following an acceleration of the same shall be deemed to be a voluntary prepayment to which the Prepayment Premium and Unwinding Costs shall be applicable.

(e)      Notwithstanding any other provision of this Section, no Prepayment Premium shall be payable with respect to any prepayment occurring as a result of the application of any Insurance Proceeds or Awards under the Loan Agreement.

9.      <u>Waivers</u>

Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably (i) waives presentment and demand for payment, notice of dishonor, protest and notice of protest of this Note, (ii) agrees to pay all costs of collection when incurred by Administrative Agent and Lenders, including, but not limited to, reasonable attorneys' fees and disbursements (which costs may be added to the amount due under this Note and be receivable therewith) and (iii) agrees to perform and comply with each of the terms, provisions, covenants and conditions contained in this Note, the Loan Agreement, the Deed of Trust and any of the other Loan Documents on the part of Borrower to be observed or performed.

10.      <u>No Release</u>

No (a) release by Administrative Agent of any portion of the Mortgaged Property (as defined in the Deed of Trust) or any other collateral being held as security for the payment by Borrower of the Debt, (b) granting by Administrative Agent of an extension of time for payment of this Note, or any installment thereof, or (c) alteration, amendment or waiver of any term, provision, covenant or condition of this Note or any Loan Document shall release, discharge, modify, change or affect the liability of Borrower under this Note or any of the other Loan Documents. The right to plead any and all statutes of limitations as a defense to any demand on this Note, or any guaranty hereof, or any agreement to pay the same, or any demand secured by the Deed of Trust, or any and all obligations and liabilities arising out of or in connection with this Note, the Loan Agreement or any of the other Loan Documents, is expressly waived by Borrower, and any endorsers and/or guarantors of this Note, to the fullest extent permitted by law.

11.      <u>Writings</u>

8

This Note may not be waived, changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

12.     Event of Default

It is hereby expressly agreed that the entire Debt shall, then or at any time thereafter, without notice (except as may be provided herein, in the Loan Agreement or in the Deed of Trust), become immediately due and payable at the option of Administrative Agent on the happening of any Event of Default and, in such event, the Deed of Trust may be foreclosed. All of the terms, provisions, covenants and conditions contained in the Loan Agreement, the Deed of Trust, the Assignment of Leases and the other Loan Documents which are to be kept and performed by Borrower are hereby made part of this Note to the same extent and with the same force and effect as if they were fully set forth in this Note. Failure to exercise such option or any other rights Administrative Agent may, in the event of any such Event of Default, be entitled to, shall not constitute a waiver of the right to exercise such option or any other rights in the event of any subsequent Event of Default, whether of the same or different nature.

13.     Late Charge

If any sum payable under this Note (but excluding, however, the final installment of the Principal Balance) is not paid within five (5) days of its due date, Borrower shall pay upon demand a late payment charge ("Late Charge") of two cents ($.02) for each dollar ($1) of such unpaid sum to defray the expenses incurred by Administrative Agent or Lenders in handling and processing such delinquent payment, and such amount shall be secured by the Deed of Trust and the Loan Documents. Nothing contained herein shall be deemed to constitute a waiver or modification of the due date on which such sums are due and payable.

14.     Involuntary Rate

In addition to any Late Charge which may be due under this Note, if the Debt is declared immediately due and payable by Administrative Agent pursuant to the provisions of this Note or any of the Loan Documents, or if any installment of principal or interest is not paid when due, or if the Debt is not paid in full on the Maturity Date, or if any other Event of Default shall have occurred, Borrower shall thereafter pay interest on the Principal Balance from the date of any of such events, as the case may be, until the date the installment of interest or principal is paid, the Debt is paid in full, or until such Event of Default is cured, at a rate (the "Involuntary Rate") equal to the lesser of (i) the Prime Rate plus two percent (2%) per annum or (ii) the Maximum Rate (as hereinafter defined), provided that there shall be no

automatic reduction to the Maximum Rate if Borrower is barred by law from availing itself in any action or proceeding of the defense of usury or if Borrower is barred or exempted from the operation of any law limiting the amount of interest that may be paid for the Loan or use of money or in the event this transaction, because of its amount or purpose or for any other reason, is exempt from the operation of any statute limiting the amount of interest that may be paid for the Loan or use of money.

15.    Maximum Rate

In the event the interest provisions or any exactions provided for herein or in the Loan Agreement, the Deed of Trust or in any of the other Loan Documents shall result, because of the monthly reduction of principal or for any other reason, at any time during the Term in an effective rate of interest which, for any month, transcends the limit of the usury or any other law applicable to the Loan (the "Maximum Rate"), all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice between or by any party hereto, be applied in reduction of the Principal Balance immediately upon receipt of such moneys by Administrative Agent with the same force and effect as though Borrower had specifically designated such extra sums to be so applied to reduction of the Principal Balance and Administrative Agent had agreed to accept such extra payment(s) as a premium-free prepayment, provided that no Prepayment Premium shall be payable in connection with any such reduction of the Principal Balance. In no event shall any agreed to or actual exaction as consideration for the Loan transcend the limits imposed or provided by the law applicable to this transaction or Borrower in the jurisdiction in which the land is located for the use or detention of money or for forbearance in seeking its collection.

16.    Application of Payments

If at any time Administrative Agent receives from Borrower a payment or prepayment in an amount that is less than all amounts then due, Administrative Agent may apply that payment or prepayment to amounts then due in any manner and in any order determined by Administrative Agent, in Administrative Agent's sole and absolute discretion. Borrower agrees that neither Administrative Agent's acceptance of a payment or prepayment from Borrower in an amount that is less than all amounts then due, nor Administrative Agent's application of such payment or prepayment in the manner authorized in the immediately preceding sentence, shall be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.

17.    Notices

All notices, demands, requests, consents and other communications which are required or permitted to be given under this Note shall be sufficiently given when given as set forth in the Loan Agreement.

18.      Applicable Law

This Note shall be construed in accordance with and be governed by the laws of the State of New York without reference to principles of conflicts of law. Borrower hereby agrees to submit to personal jurisdiction in all state and federal courts located in the State and County of New York in any action or proceeding relating to this Note, the Loan Agreement, the Deed of Trust or any of the other Loan Documents. In furtherance of such agreement, Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably appoints Capitol Services, Inc., having an address at 1218 Central Avenue, Suite 100, Albany, NY 12205, as general agent ("Agent") for Borrower for receipt of service of process in any such action or proceeding (and Administrative Agent may make service upon Borrower and/or such Agent). Service of any summons and complaint or other process in any such action or proceeding and any notice of sale or other notices may be made upon Borrower and/or Agent by registered or certified mail, return receipt requested, Borrower and Agent hereby waiving personal service thereof, or as may otherwise be permitted by law.

19.      Waiver of Trial By Jury

Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Note, the Loan Agreement, the Deed of Trust or any of the other Loan Documents.

20.      Right to Transfer Note

Administrative Agent and Lenders may transfer this Note and their rights hereunder in accordance with Article XII of the Loan Agreement.

21.      Purchase of Note.

In lieu of prepaying the Note in whole, Borrower shall have the right to purchase this Note, and the liens securing same ("Lender's Liens") upon not less than thirty (30) days' prior written notice to Lender, specifying the date on which such purchase is to occur (the "Note Purchase Date"). The purchase price for the Note shall be an amount equal to the Prepayment Amount that Borrower would be required to pay pursuant to Section [__] if prepaying the Note in whole on the Note Purchase Date. For the avoidance of doubt, the purchase price shall include then-current Principal Balance, accrued but unpaid

interest, any applicable Prepayment Premium, Unwinding Costs, Late Charges or other charges owing on the Note, plus any other Debt or amounts owed to Administrative Agent or Lenders pursuant to the terms of the Loan Documents as of such Note Purchase Date, as reasonably determined by Administrative Agent. Upon receipt of such amounts, Administrative Agent and Lender shall execute and deliver to Borrower a recordable assignment of note and lien instrument ("Note Assignment") with respect to the Note and Lender's Liens being acquired.  The purchase of the Note by Borrower shall be on an as-is basis, other than as expressly set forth in the Note Assignment, which representations and warranties shall be limited to the principal balance of the Note, and that Lender is the owner and holder of the Note and Lender's Liens, subject to no liens or security interests in favor of any third party, and has the full legal right and authority to sell the Note and Lender's Liens.  It is expressly acknowledged and agreed by Borrower that the right granted in this Note is a right to purchase the Note and Loan in full and not in part, and, if the Loan is evidenced by more than one promissory note, Borrower shall not acquire one note without acquiring all notes evidencing the Loan, and Lender shall not sell or assign its interest in one note without selling or assigning its interest in all notes evidencing the Loan.  Prior to assigning, granting a participation in or syndication all or any part of the Note, Lender agrees to provide Borrower thirty (30) Business Days' prior notice thereof.

22.     Joint and Several

        If Borrower consists of more than one person or party, the obligations and liabilities of each such person or party hereunder shall be joint and several.

23.     Power

        Borrower (and the undersigned representatives of Borrower, if any) represents that Borrower has full power, authority and legal right to execute and deliver this Note and that the payment of the Debt constitutes a valid and binding obligation of Borrower.

24.     Form

        Whenever used in this Note, the singular number shall include the plural, the plural the singular, and the words "Lender(s)", "Borrower" and "Administrative Agent" shall include their respective successors and assigns.

25.     Right of Set Off

        If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted

by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of Borrower against any and all of the obligations of Borrower now or hereafter existing under this Note, the Loan Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Note, the Loan Agreement or any other Loan Document and although such obligations of Borrower are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender and its respective Affiliates under this paragraph are in addition to other rights and remedies (including other rights of setoff) that such Lender or its respective Affiliates may have. Each Lender agrees to notify Borrower and Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

26.     <u>Construction</u>

This Note shall be construed without regard to any presumption or other rule requiring construction against the party causing this Note to be drafted. To the extent any term herein conflicts with any term of the Loan Agreement, the Loan Agreement shall control.

27.     <u>Administrative Agent</u>

To the extent that any action is to be taken, any information is to be delivered to or by Lenders, any determination is to be made, or any consent is to be given or withheld by Lenders, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Administrative Agent or any successor agent thereto.

28.     <u>Heirs, Successors and Assigns</u>

All of the terms, provisions, covenants and conditions of this Note shall apply to, bind and inure to the benefit of, the heirs, executors, administrators, successors and assigns of Borrower, Lenders and Administrative Agent, respectively.

<center>[balance of page intentionally left blank]</center>

<center>13</center>

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the day and year first above written.

<div style="margin-left:40%;">

BORROWER:

**GALLERIA 2425 OWNER, LLC,**
a Delaware limited liability company

By:   Galleria 2425 JV, LLC,
       a Delaware limited liability company,
       its sole member

       By:   Naissance Capital Real Estate, LLC,
            a Delaware limited liability company,
            its Managing Member

            By: _____
            Name: Azeemeh Zaheer
            Title: Managing Member

</div>

[Signature Page to Promissory Note]

## **Exhibit C**

Deed of Trust

RP-2018-235600
05/30/2018  ER  $124.00

THIS INSTRUMENT WAS PREPARED BY
AND UPON RECORDING RETURN TO:

Baker & McKenzie LLP
300 E. Randolph St., Suite 5000
Chicago, IL 60601
Attention: Mona Dajani, Esq.

AFTER RECORDING RETURN TO:
Trans**Act** TITLE

GF #: 12000490

<u>DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND PROFITS, SECURITY
AGREEMENT AND FIXTURE FILING</u>

by

GALLERIA 2425 OWNER LLC, a Delaware limited liability company,
whose address is 3139 W Holcombe Blvd #845, Houston, Texas 77025,
Grantor,

to

Salima Umatiya,
with an address of 245 Commerce Green Blvd., Suite 151, Sugar Land, TX 77478,
Trustee,

for the benefit of

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation
organized under the laws of Kuwait, acting through its New York branch, as administrative and
collateral agent,

whose address is having an office at 299 Park Avenue, New York, New York 10171,
Beneficiary

THIS DEED OF TRUST IS ALSO A FIXTURE FILING UNDER SECTION 9.502(b) OF THE
TEXAS BUSINESS AND COMMERCE CODE.

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

<u>DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND PROFITS, SECURITY AGREEMENT AND FIXTURE FILING</u>

THIS DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND PROFITS, SECURITY AGREEMENT AND FIXTURE FILING made as of May 23, 2018 made by GALLERIA 2425 OWNER LLC, a Delaware limited liability company, having an address at 3139 W Holcombe Blvd #845, Houston, Texas 77025 ("Grantor"), in favor of Salima Umatiya, an individual, having an address at 245 Commerce Green Blvd., Suite 151, Sugar Land, TX 77478 (together with its successors and assigns, "Trustee"), as Trustee for the benefit of NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch, having an office at 299 Park Avenue, New York, New York 10171, as administrative and collateral agent (in such capacity, together with its successors and permitted assigns, "Beneficiary") for the Lenders (as defined in the Loan Agreement referred to below).

WITNESSETH:

A.     Lenders are this day making a term loan to Grantor in the principal amount of $51,675,000.00 (the "Loan"), which loan shall be governed by that certain Loan Agreement dated of even date herewith made by and among Grantor, Beneficiary and Lenders (as the same may be amended, restated or otherwise modified from time to time, the "Loan Agreement");

B.     Beneficiary is the holder of a Promissory Note (as the same may be amended, restated, consolidated, split, severed or otherwise modified from time to time, the "Note"), dated as of even date herewith, given by Grantor, as maker, to Beneficiary, as payee, in the original principal amount of $51,675,000.00; and

C.     Beneficiary has requested, and Grantor has agreed, to secure Grantor's obligations under the Note by giving Beneficiary a first priority lien encumbering the Mortgaged Property (as hereinafter defined).

CERTAIN DEFINITIONS

Unless the context otherwise specifies or requires, the following terms shall have the meanings herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms.

"Chattels" means all fixtures, fittings, appliances, apparatus, equipment, machinery and articles of personal property and additions thereto and replacements thereof (other than those owned by lessees, contractors or licensees), now or at any time hereafter affixed to, attached to, placed upon, or used in any way in connection with the complete and comfortable present or future use, enjoyment, occupancy or operation of the Improvements on the Premises.

"Debt" shall mean the outstanding principal amount set forth in, and evidenced by, the Loan Agreement and the Note, together with all interest accrued and unpaid thereon and all other sums due to Administrative Agent or Lenders in respect of the Loan under the Note, the Loan Agreement, this Deed of Trust or any other Loan Document.

4162651-v5\CHIIDMS1

000725

"Deed of Trust" means this Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing, as the same may be amended, restated, consolidated, split, severed or otherwise modified from time to time.

"Deed of Trust Amount" means the maximum principal amount secured by this Deed of Trust as of the date hereof, i.e., $51,675,000.00.

"Events of Default" means the events and circumstances described as such in Section 2.01 hereof.

"Improvements" means all structures or buildings, and replacements thereof, to be erected or now or hereafter located upon the Premises, including all equipment, apparatus, machinery and fixtures of every kind and nature whatsoever forming part of said structures or buildings.

"Loan" means the $51,675,000.00 loan governed by the Loan Agreement, evidenced by the Note and secured by this Deed of Trust.

"Premises" means all that certain plot, piece or parcel of land situated, lying and being in the City of Houston, County of Harris and State of Texas, described on Exhibit A annexed hereto and made a part hereof, including all of the Improvements, easements, rights, privileges and appurtenances (including, without limitation, any air or development rights) thereunto belonging or in anywise appertaining, and all of the estate, right, title, interest, claim or demand whatsoever of Grantor therein and in the rights-of-way, gores of land, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, tenements, hereditaments, and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining thereto, either in law or in equity, in possession or expectancy, now or hereafter acquired.

All terms of this Deed of Trust which are not defined above shall have the meaning set forth elsewhere in this Deed of Trust or, if not set forth in the Deed of Trust, in the Loan Agreement.

NOW, THEREFORE, Grantor, in consideration of the premises and in order to secure the payment of the Debt and any sums due under any Interest Rate Protection Product and the performance and observance of all of the provisions of this Deed of Trust, the Loan Agreement, the Note and the other Loan Documents, hereby irrevocably GRANTS, TRANSFERS, CONVEYS, CONFIRMS, PLEDGES and ASSIGNS, all of its present and future estate, rights, title, interest and claim, either in law or in equity, of, in and to the following property (collectively, the "Mortgaged Property"), whether now owned or held or hereafter acquired, to Trustee for the benefit of Beneficiary, TO HAVE AND TO HOLD, IN TRUST FOR THE BENEFIT OF BENEFICIARY UPON THE STATUTORY CONDITION AND WITH THE STATUTORY POWER OF SALE:

(i)     the Premises;

(ii)    the Improvements;

(iii)   the Chattels;

(iv)    all proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims, including, without limitation, proceeds of insurance and condemnation awards, and all rights of Grantor to refunds of real estate taxes and assessments and the reasonable attorney's fees, costs and disbursements incurred by Beneficiary or Lenders in connection with the collection of such award or payment;

(v)     all Leases now or hereafter entered into and all right, title and interest of Grantor thereunder, including, without limitation, cash or securities deposited thereunder to secure performance

2

4162651-v5\CHIDMS1

RP-2018-235600

by the Tenants of their obligations thereunder, whether such cash or securities are to be held until the expiration of the terms of such Leases or applied to one or more of the installments of rent coming due immediately prior to the expiration of such terms, including, further, the right during the continuance of an Event of Default, to receive and collect the rents thereunder;

(vi)     all proceeds of (or return of any unearned premiums on) any insurance policies covering all or any part of the Premises, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof, for damage to the Premises;

(vii)     all monies, funds, bank accounts, deposit accounts, accounts receivable, contract rights, other rights and any other intangible assets derived from or related to the rental, operation or ownership of the Premises or any part thereof, and all the agreements, instruments or documents evidencing or relating to any of the same, whether or not identified to or known by Beneficiary or Lenders;

(viii)     all trade names, trademarks, logos, copyrights, good will and books and records relating to or used in connection with the operation of the Mortgaged Property or any part thereof;

(ix)     to the extent assignable, all contracts from time to time executed by Grantor or any manager or agent on Grantor's behalf relating to the ownership, management, leasing, sale, marketing, construction, maintenance, repair, operation, occupancy or financing of the Mortgaged Property or any part thereof and all agreements relating to the purchase or Lease of any portion of same; all consents, licenses, building permits, certificates of occupancy and other governmental approvals relating to construction, completion, occupancy, use or operation of the Mortgaged Property or any part thereof; and all drawings, plans, specifications and similar or related items relating to the Mortgaged Property;

(x)     all so-called "air rights," bulk development rights, floor area, floor area ratio, zoning rooms and other rights and privileges now or hereafter appurtenant to the Premises and Improvements or any part thereof, as defined in, under or with respect to the zoning and building codes or ordinances of all applicable jurisdictions and the regulations and interpretations thereunder or thereof, whether or not transferable, and any or all of the same that may now or hereafter be acquired for use with the Premises or Improvements; and

(xi)     all proceeds and replacements of and substitutions for all or any of the foregoing.

As to any of the Mortgaged Property aforesaid which does not form a part and parcel of the real estate, this Deed of Trust is and is hereby deemed to be, as well, a Security Agreement under the Uniform Commercial Code for the purpose of creating hereby a security interest in such property, which is hereby granted to Beneficiary as "Secured Party" (as said quoted term is defined in the Uniform Commercial Code), securing the Debt and all other obligations set forth herein.

TO HAVE AND TO HOLD unto Beneficiary, its successors and assigns forever and Grantor does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND the title to the Mortgaged Property unto Trustee.

ARTICLE I.
REPRESENTATIONS, WARRANTIES AND COVENANTS OF GRANTOR

Grantor represents, warrants and covenants as follows:

SECTION 1.01. Title; No Encumbrances. Grantor warrants title to the Mortgaged Property subject to no lien, charge or encumbrance except such encumbrances as are listed as exceptions to title in the Title Policy; that Grantor owns the Chattels free and clear of liens and claims; and that this Deed of Trust is and shall remain a valid first priority lien on the Mortgaged Property subject only to the exceptions

3

4162651-v5\CHIDMS1

referred to above. Grantor has full power and lawful authority to mortgage the Mortgaged Property in the manner and form herein done or intended hereafter to be done. Grantor shall preserve such title, and shall forever warrant and defend the same to Beneficiary and Grantor shall forever warrant and defend the validity and priority of the lien hereof against the claims of all persons and parties whomsoever.

SECTION 1.02. Related Mortgage Documents; Further Assurances. Grantor shall, at Grantor's sole cost and expense, and without expense to Beneficiary, do, execute, acknowledge and deliver all and every such further agreements, documents, acts, deeds, conveyances, mortgages, estoppel certificates, financing statements, continuation statements, assignments, notices of assignment, subordinations, transfers and assurances as Beneficiary shall from time to time reasonably require, for the better clarifying, assuring, conveying, assigning, transferring and confirming unto Beneficiary the property and rights hereby conveyed or assigned or intended now or hereafter so to be, or which Grantor may be or may hereafter become bound to convey or assign to Beneficiary, or for carrying out the intention or facilitating the performance of the terms, provisions, covenants and conditions of this Deed of Trust, or for filing, registering or recording this Deed of Trust or any of the other Loan Documents and, on demand, shall execute and deliver, and hereby authorizes Beneficiary to execute and file in Grantor's name, to the extent Beneficiary may lawfully do so, one or more financing statements, continuation statements, chattel mortgages or comparable Deed of Trusts, to evidence more effectively the lien of this Deed of Trust upon the Chattels.

SECTION 1.03. Filing and Recording of Mortgage Documents.

(a)     Recording. Grantor forthwith upon the execution and delivery of this Deed of Trust, and thereafter from time to time, shall cause this Deed of Trust and any Deed of Trust creating a lien or evidencing the lien of this Deed of Trust upon the Chattels and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien of this Deed of Trust upon, and the interest of Beneficiary in, the Mortgaged Property, provided that no such instrument of further assurance shall materially increase the obligations of Grantor under this Deed of Trust.

(b)     Recording Fees. Grantor shall pay all filing, registration or recording fees, and all expenses incident to the execution and acknowledgment of this Deed of Trust, any mortgage supplemental hereto, any Deed of Trust or financing statement with respect to the Chattels, and any instrument of further assurance or continuation, and all federal, state, county, and municipal stamp taxes and other taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Loan Agreement, the Note, this Deed of Trust, any mortgage supplemental hereto, any Deed of Trust or financing statement with respect to the Chattels or any instrument of further assurance or continuation.

SECTION 1.04. Manner of Payment. Grantor shall punctually pay the principal and interest and all other sums to become due in respect of the Note at the time and place and in the manner specified in the Note, according to the true intent and meaning thereof, all in any coin or currency of the United States of America which at the time of such payment shall be legal tender for the payment of public and private debts.

SECTION 1.05. Compliance With Law.

(a)     Grantor shall comply with all laws, regulations, rules, statutes, ordinances, orders and decrees of any federal, state and local governmental authority or court applicable to the Mortgaged Property or any part thereof (including, without limitation, all applicable zoning, environmental, and energy-related laws and Access Laws (as hereinafter defined)) (collectively, "Legal Requirements").

4

4162651-v5\CHIDMS1

(b)    (i) Grantor agrees that the Premises shall at all times comply to the extent applicable with the requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all other federal, state and local laws, regulations, rules, statutes, ordinances, orders and decrees related to handicapped access including, without limitation, the American with Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively, "<u>Access Laws</u>").

(ii)    Notwithstanding any provisions set forth herein or in any other documents regarding Beneficiary's approval or alterations of the Premises, Grantor shall not alter the Premises in any manner which would increase Grantor's responsibilities for compliance with the applicable Access Laws without the prior written approval of Beneficiary. The foregoing shall apply to tenant improvements constructed by Grantor or by any of Grantor's Tenants. Beneficiary may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer, or other person acceptable to Beneficiary.

(iii)    Grantor agrees to give prompt notice to Beneficiary of the receipt by Grantor of any complaints related to violations of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

(c)    Notwithstanding any other provision of this <u>Section 1.05</u>, Grantor shall not be deemed to be in default solely by reason of Grantor's failure to comply with any Legal Requirements as aforesaid so long as, in Beneficiary's sole judgment, reasonably exercised, each of the following conditions is satisfied:

(i)    Grantor is engaged in and diligently pursuing in good faith administrative or judicial proceedings appropriate to contest the validity or amount of such Legal Requirements;

(ii)    [Intentionally Omitted];

(iii)    Noncompliance with any such Legal Requirements will not result in the loss or forfeiture of any property encumbered hereby or any interest of Beneficiary therein or result in any fines or other punitive actions or the loss of any insurance coverage; and

(iv)    Grantor deposits with Beneficiary, as security for any payment or performance which may ultimately be required, a sum equal to the amount of any fine, assessment or charge plus the interest, penalties, and other costs which Beneficiary estimates are likely to become payable if Grantor's contest is unsuccessful.

If Beneficiary determines, in Beneficiary's sole judgment, reasonably exercised, that any one or more of such conditions is not satisfied or is no longer satisfied, Grantor shall comply with the Legal Requirements in question, within fifteen (15) days after Beneficiary gives notice of such determination.

SECTION 1.06. <u>Future Acquisitions</u>. All right, title and interest of Grantor in and to all extensions, improvements, betterments, renewals, substitutions and replacements of, and all additions and appurtenances to, the Mortgaged Property, hereafter acquired by or released to Grantor, or constructed, assembled or placed by Grantor on the Mortgaged Property, and all conversions of the security constituted thereby, immediately upon such acquisition, release, construction, assembling, placement or conversion, as the case may be, and in each such case, without any further mortgage, conveyance, assignment or other act by Grantor, shall become subject to the lien of this Deed of Trust as fully and completely, and with the same effect, as though now owned by Grantor and specifically described in the granting clause hereof, but at any and all times Grantor shall execute and deliver to Beneficiary any and all such further assurances, mortgages, conveyances or assignments thereof as Beneficiary may

5

4162651-v5\CHIDMS1

000729

reasonably require for the purpose of expressly and specifically subjecting the same to the lien of this Deed of Trust.

SECTION 1.07. Beneficiary's Right To Cure Defaults. If Grantor shall fail to perform or comply with any of the representations, warranties and covenants contained in Sections 1.01, 1.03 or elsewhere herein, then upon five (5) days' notice to Grantor (which notice shall not be required to be delivered in the event of an emergency), Beneficiary may make advances to perform the same on its behalf, and all sums so advanced, with interest at the Involuntary Rate, shall immediately be due from Grantor to Beneficiary, and shall be added to the Debt and shall be secured by this Deed of Trust. The provisions of this Section 1.07 shall not prevent any default in the observance of any of the representations, warranties and covenants contained in said Sections 1.01, 1.03 or elsewhere herein from constituting an Event of Default.

SECTION 1.08. Legal Proceedings. Whether or not an Event of Default has occurred and exists, Beneficiary shall have the right, but not the duty or obligation, to intervene or otherwise participate in, prosecute or defend at any legal or equitable proceedings (including, without limitation, any eminent domain proceedings) which, in Beneficiary's reasonable discretion, affect the Mortgaged Property, the Leases or any of the rights created hereunder the reasonable out-of-pocket cost of which shall be reimbursed by Grantor to Beneficiary and shall be secured by this Deed of Trust.

SECTION 1.09. Assignment of Leases. Grantor hereby absolutely and unconditionally assigns and transfers to Beneficiary the Leases and the Property Income. Grantor shall not otherwise assign, transfer or encumber in any manner the Leases or the Property Income or any portion thereof. Grantor shall have a license to collect and use the Property Income as the same becomes due and payable and to amend, supplement or modify the Leases in accordance with and as permitted under the Loan Agreement and to exercise Grantor's rights thereunder, so long as no Event of Default is continuing, but may not collect any Property Income more than thirty (30) days in advance of the date the same becomes due. The assignment in this Section 1.09 shall constitute an absolute and present assignment of the Leases and the Property Income, and not an assignment for security, and the existence or exercise of the Grantor's conditional license to collect Property Income shall not operate to subordinate this assignment to any subsequent assignment. The exercise by Beneficiary or Trustee of any of its rights or remedies under this Section 1.09 shall not be deemed or construed to make Beneficiary or Trustee a mortgagee-in-possession.

SECTION 1.10. Insurance. Grantor agrees, at Grantor's sole cost and expense, to keep the Mortgaged Property insured, at all times throughout the term of this Deed of Trust, in accordance with Article VIII of the Loan Agreement.

ARTICLE II.
EVENTS OF DEFAULT AND REMEDIES

SECTION 2.01. Events of Default. If an Event of Default shall occur and is continuing under the Loan Agreement, then, and in every such case Beneficiary, Lenders and/or Trustee may exercise any remedy available at law or in equity, including, but not limited to, those listed below and those listed in the Loan Agreement and the other Loan Documents, in such sequence and in such combination as Beneficiary may determine in Beneficiary's sole and absolute discretion:

(a)    Acceleration. Upon the occurrence of any Event of Default, the entire principal amount of the indebtedness evidenced by the Note and all other Debt together with accrued interest thereon at the Involuntary Rate shall, subject to the terms of the Loan Agreement and the Note, at the option of Beneficiary exercised while such Event of Default is continuing, without demand or notice of any kind to Grantor or any other person, become immediately due and payable. All the provisions of the Loan Agreement are incorporated herein for all purposes as if set forth in full herein.

6

RP-2018-235600

(b)    Remedies Cumulative. No remedy or right of Beneficiary hereunder or under the Loan Agreement, the Note or any of the other Loan Documents, or otherwise, or available under applicable law or in equity, shall be exclusive of any other right or remedy, but each such remedy or right shall be in addition to every other remedy or right now or hereafter existing under any such document or under applicable law or in equity. No delay in the exercise of, or omission to exercise, any remedy or right accruing on any Event of Default shall impair any such remedy or right or be construed to be a waiver of any such Event of Default or an acquiescence therein, nor shall it affect any subsequent Event of Default of the same or a different nature. Every such remedy or right may be exercised concurrently or independently, and when and as often as may be deemed expedient by Beneficiary. All obligations of Grantor, and all rights, powers and remedies of Beneficiary, expressed herein shall be in addition to, and not in limitation of, those provided by law or in equity or in the Loan Agreement, the Note or any other Loan Documents or any other written agreement or instrument relating to any of the Debt or any security therefor.

(c)    Foreclosure; Appointment of Receiver.

(i)    Non-Judicial Foreclosure. If the unpaid principal amount of or interest on the Debt or any part thereof shall have become due and payable (whether at maturity or as an installment of combined principal and/or interest or by reason of any prepayment requirement or by declaration or acceleration or otherwise) and shall not have been paid, Beneficiary or other holder of the Note may proceed with foreclosure by directing Trustee or his successor or substitute in trust to proceed as hereafter authorized to sell, assign, transfer and deliver the whole or, from time to time, any part of the Mortgaged Property, or any interest in any part thereof, by advertisement and sale in accordance with applicable law. Trustee shall execute and deliver to the purchaser at any such sale a trustee's deed conveying the property so sold, but without any covenant or warranty, expressed or implied. The recitals in such trustee's deed of any matters or facts shall be prima facie proof of the truthfulness thereof. Any Person, including Beneficiary, may bid at the sale. Trustee shall apply the proceeds of the sale in the following order:

First: To the payment of the costs and expenses of such sale (including the charges of advertising, sale and conveyance, including a commission to Trustee then acting, any amounts necessary to pay impositions or prior liens, the cost of evidence of title and the costs and expenses, if any, of taking possession of, retaining custody over, repairing, managing, operating, maintaining and preserving the Mortgaged Property or any part thereof prior to such sale), all reasonable costs and expenses incurred by Trustee, Beneficiary or any other Person in obtaining or collecting any insurance proceeds, condemnation awards or other amounts received by Beneficiary, all reasonable costs and expenses of any receiver of the Mortgaged Property or any part thereof, and any taxes, assessments, impositions or other charges or expenses prior to the security interest or lien of this Deed of Trust, which Trustee or Beneficiary may consider it necessary or desirable to pay;

Second: To the payment of all amounts of principal and interest (including post-petition interest to the extent such interest is a liability) at the time due and payable on the Debt outstanding at the time (whether due by reason of maturity or by prepayment or by declaration or acceleration or otherwise), including interest at the Involuntary Rate on any overdue principal and (to the extent permitted under applicable law) on any overdue interest;

Third: The balance, if any, held by Trustee after payment in full of all amount referred to in subdivisions First and Second, above, shall be paid to the Person or Persons entitled to receive such proceeds.

(ii)    Judicial Foreclosure. If an Event of Default is continuing, Beneficiary at any time may, at its election, proceed at law or in equity or otherwise to enforce the payment of the Debt

7

RP-2018-235600

in accordance with the terms hereof and thereof and to foreclose the lien of this Deed of Trust as against all or any part of the Mortgaged Property and to have the same sold under the judgment or decree of a court of competent jurisdiction. Beneficiary shall be entitled to recover in such proceedings all reasonable costs incident thereto, including reasonable trustee's fees and reasonable attorneys' fees and expenses in such amounts as may be fixed by the court.

(iii) <u>Appointment of Receiver</u>. If an Event of Default is continuing, Beneficiary shall, as a matter of right and without regard to the adequacy of any security for the indebtedness secured hereby or the solvency of Grantor, be entitled to the appointment of a receiver for all or any part of the Mortgaged Property, whether such receivership be incidental to a proposed sale of the Mortgaged Property or otherwise, and Grantor hereby consents to the appointment of such a receiver and will not oppose any such appointment.

(d) <u>Possession of the Premises; Remedies for Leases and Rents</u>: Grantor hereby waives all right to the possession, income, and rents of the Premises during the continuance of any Event of Default, and Beneficiary is hereby expressly authorized and empowered, at and following any such occurrence, to enter into and upon and take possession of the Premises or any part thereof. If any Event of Default is continuing, then, whether before or after institution of legal proceedings to foreclose the lien of this Deed of Trust or before or after the sale thereunder, Beneficiary shall be entitled, in its sole and absolute discretion, to do all or any of the following: (i) enter and take actual possession of the Premises, the Property Income, the Leases and other Mortgaged Property relating thereto or any part thereof personally, or by its agents or attorneys, and exclude Grantor therefrom; (ii) with or without process of law, enter upon and take and maintain possession of all of the documents, books, records, papers and accounts of Grantor relating thereto; (iii) as attorney-in-fact or agent of Grantor, or in its own name as mortgagee and under the powers herein granted, hold, operate, manage and control the Premises, the Property Income, the Leases and other Mortgaged Property relating thereto and conduct the business, if any, thereof either personally or by its agents, contractors or nominees, with full power to use such measures, legal or equitable, as in its sole and absolute discretion or in the discretion of its successors or assigns may be deemed proper or necessary to enforce the payment of the Property Income, the Leases and other Mortgaged Property relating thereto (including actions for the recovery of rent, actions in forcible detainer and actions in distress of rent); (iv) cancel or terminate any Lease or sublease for any cause or on any ground which would entitle Grantor to cancel the same; (v) elect to disaffirm any Lease or sublease made subsequent hereto or subordinated to the lien hereof; (vi) make all necessary or proper repairs, decorations, renewals, replacements, alterations, additions, betterments and improvements to the Premises that, in its discretion, may seem appropriate; (vii) insure and reinsure the Mortgaged Property for all risks incidental to Beneficiary's possession, operation and management thereof; and (viii) receive all such Property Income and proceeds, and perform such other acts in connection with the management and operation of the Mortgaged Property, as Beneficiary in its discretion may deem proper, Grantor hereby granting Beneficiary full power and authority to exercise each and every one of the rights, privileges and powers contained herein at any and all times while any Event of Default is continuing without notice to Grantor or any other Person. Beneficiary, in the exercise of the rights and powers conferred upon it hereby, shall have full power to use and apply the Property Income to the payment, in such order as Beneficiary may determine, of or on account of any one or more of the following: (a) to the payment of the operating expenses of the Premises, including the actual out-of-pocket cost of management and leasing thereof (which shall include reasonable compensation to Beneficiary and its agents or contractors, if management be delegated to agents or contractors, and it shall also include lease commissions and other compensation and expenses of seeking and procuring tenants and entering into leases), established claims for damages, if any, and premiums on insurance hereinabove authorized; (b) to the payment of taxes, charges and special assessments, the out-of-pocket costs of all repairs, decorating, renewals, replacements, alterations, additions, betterments and improvements of the Mortgaged Property,

8

including the out-of-pocket cost from time to time of installing, replacing or repairing the Mortgaged Property, and of placing the Mortgaged Property in such condition as will, in the judgment of Beneficiary, make it readily rentable; and (c) to the payment of any Debt. The entering upon and taking possession of the Premises, or any part thereof, and the collection of any Property Income and the application thereof as aforesaid shall not cure or waive any Event of Default theretofore or thereafter occurring or affect any notice of Default hereunder or invalidate any act done pursuant to any such Event of Default or notice, and, notwithstanding continuance in possession of the Premises or any part thereof by Beneficiary or a receiver and the collection, receipt and application of the Property Income, Beneficiary shall be entitled to exercise every right provided for in this Deed of Trust or by law or in equity during the continuance of an Event of Default. Any of the actions referred to in this <u>Section 2.01(d)</u> may be taken by Beneficiary irrespective of whether any notice of Default has been given hereunder and without regard to the adequacy of the security for the indebtedness hereby secured.

(e)     <u>Personal Property</u>. If any Event of Default is continuing, Beneficiary may exercise from time to time any rights and remedies available to it under the Loan Documents or applicable law upon default in payment of indebtedness, including, without limitation, those available to a secured party under the Uniform Commercial Code of the state where the goods are located. Grantor shall, promptly upon request by Beneficiary, assemble the Mortgaged Property and make it available to Beneficiary at such place or places, reasonably convenient for both Beneficiary and Grantor, as Beneficiary shall designate. Grantor hereby expressly waives, to the fullest extent permitted by applicable law, any and all notices, advertisements, hearings, or process of law in connection with the exercise by Beneficiary of any of its rights and remedies while an Event of Default is continuing. If any notification of intended disposition of the Mortgaged Property is required by law, such notification, if mailed, shall be deemed reasonably and properly given if mailed by registered or certified mail, return receipt requested, at least ten (10) business days before such disposition, postage prepaid, addressed to Grantor either at the address shown below or at any other address of Grantor appearing on the records of Beneficiary. Without limiting the generality of the foregoing, whenever there exists an Event of Default hereunder, Beneficiary may, with respect to so much of the Mortgaged Property as is personal property under applicable law, to the fullest extent permitted by applicable law, without further notice, advertisement, hearing or process of law of any kind, (i) notify any Person obligated on the Mortgaged Property to perform directly for Beneficiary its obligations thereunder, (ii) enforce collection of any portion of the Mortgaged Property by suit or otherwise, and surrender, release or exchange all or any part thereof or compromise or extend or renew for any period (whether or not longer than the original period) any obligations of any nature of any party with respect thereto, (iii) endorse any checks, drafts or other writings in the name of Grantor to allow collection of the Mortgaged Property, (iv) take control of any proceeds of the Mortgaged Property, (v) enter upon any premises where any of the Mortgaged Property may be located and take possession of and remove such Mortgaged Property and render all or any part of the Mortgaged Property unusable, all without being responsible for loss or damage, (vi) sell any or all of the Mortgaged Property, free of all rights and claims of Grantor therein and thereto, at any lawful public or private sale and on such terms as Beneficiary deems advisable and (vii) bid for and purchase any or all of the Mortgaged Property at any such public or private sale. Any proceeds of any disposition by Beneficiary of any of the Mortgaged Property may be applied by Beneficiary to the payment of expenses in connection with the Mortgaged Property, including attorneys' fees and legal expenses, and any balance of such proceeds shall be applied by Beneficiary toward the payment of such portion of the Debt and in such order of application as Beneficiary may from time to time elect. Without limiting the foregoing, Beneficiary may exercise from time to time any rights and remedies available to it under the Uniform Commercial Code or other applicable law as in effect from time to time or otherwise available to it under applicable law. Grantor hereby expressly waives presentment, demand, notice of dishonor, protest and notice of protest in connection with the Note and, to the fullest extent permitted by applicable law, any and all other notices, demands, advertisements, hearings or process of law in connection with the exercise by Beneficiary of

9

RP-2018-235600

any of its rights and remedies hereunder. Grantor hereby constitutes Beneficiary its attorney-in-fact with full power of substitution to take possession of the Mortgaged Property while any Event of Default is continuing and, as Beneficiary in its sole and absolute discretion deems necessary or proper, to execute and deliver all instruments required by Beneficiary to accomplish the disposition of the Mortgaged Property; this power of attorney is a power coupled with an interest and is irrevocable while any portion of the Debt is outstanding. Grantor shall remain liable for any deficiency resulting from the sale of the Mortgaged Property and shall pay such deficiency forthwith upon demand, and Beneficiary's right to recover such deficiency shall not be impaired by the sale or other disposition of the Mortgaged Property without required notice. Expenses of retaking, holding, preparing for sale, selling or the like will first be paid from the proceeds before the balance will be applied toward any portion of the Debt.

(f)     No Liability on Beneficiary or Lenders. Either Beneficiary or Trustee may cure any breach or default of Grantor, and if it chooses to do so in connection with any such cure, Beneficiary or Trustee may also enter the Premises and/or do any and all other things which it may in its sole and absolute discretion consider necessary and appropriate to protect the security of this Deed of Trust. Such other things may include, without limitation: appearing in and/or defending any action or proceeding which purports to affect the security of, or the rights or powers of Beneficiary or Trustee under, this Deed of Trust; paying, purchasing, contesting or compromising any encumbrance, charge, lien or claim of lien which in Beneficiary's or Trustee's sole judgment is or may be senior in priority to this Deed of Trust, such judgment of Beneficiary or Trustee to be conclusive as among the parties to this Deed of Trust; obtaining insurance and/or paying any premiums or charges for insurance required to be carried under the Loan Agreement; otherwise caring for and protecting any and all of the Premises; and/or employing counsel, accountants, contractors and other appropriate persons to assist Beneficiary or Trustee. Beneficiary and Trustee may take any of the actions permitted hereunder either with or without giving notice to any person. Notwithstanding anything contained herein, Beneficiary shall not be obligated to perform or discharge, and does not hereby undertake to perform or discharge, any obligation, duty or liability of Grantor, whether hereunder, under any third party agreements or otherwise. Neither Beneficiary nor Lenders shall have responsibility for the control, care, management or repair of the Premises (including, but not limited to, use, storage, manufacture, discharge or transportation of hazardous waste or substances including, without limitation, Hazardous Materials (as defined in the Environmental Indemnity Agreement), by Grantor) or be responsible or liable for any negligence in the management, operation, upkeep, repair or control of the Premises resulting in loss, injury or death to any tenant, licensee, employee, stranger or other Person. No liability shall be enforced or asserted against Beneficiary or Lenders in its exercise of the powers granted to it under this Deed of Trust, and Grantor expressly waives and releases any such liability. Should Beneficiary or Lenders incur any such liability, loss or damage under any third party agreements or under or by reason hereof, or in the defense of any claims or demands, Grantor agrees to reimburse Beneficiary or Lenders within five (5) Business Days upon demand for the full amount thereof, including costs, expenses and attorneys' fees. Such sums shall bear interest at the Involuntary Rate from the date of each such amount is due by Beneficiary or Lenders and shall be paid by Grantor to Beneficiary forthwith upon demand by Beneficiary, and shall be secured by this Deed of Trust, and Beneficiary shall have, in addition to any other right or remedy of Beneficiary, the same rights and remedies in the event of non-payment of any such sums by Grantor as in the case of a default by Grantor in the payment of any installment of principal or interest due and payable under the Loan Agreement.

### ARTICLE III.
### MISCELLANEOUS

SECTION 3.01. Severability. In the event any one or more of the provisions contained in this Deed of Trust, the Loan Agreement or the Note shall for any reason be held to be invalid, illegal or

10

RP-2018-235600

unenforceable in any respect, such invalidity, illegality, or unenforceability shall, at the option of Beneficiary, not affect any other provision of this Deed of Trust, but this Deed of Trust shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein or therein.

SECTION 3.02. Notices. All notices hereunder and under any applicable law pertaining hereto shall be in writing and shall be deemed sufficiently given or served for all purposes when delivered as provided for in the Loan Agreement.

SECTION 3.03. Heirs, Successors and Assigns. All of the grants, covenants, terms, provisions and conditions of this Deed of Trust shall run with the land and shall apply to, bind and inure to the benefit of, the heirs, executors, administrators, successors and assigns of Grantor, the heirs, executors, administrators, successors and assigns of Trustee, and the heirs, executors, administrators, successors and assigns of Beneficiary.

SECTION 3.04. Counterparts. This Deed of Trust may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same deed of trust.

SECTION 3.05. Future Mortgage Taxes. In the event of the passage after the date of this Deed of Trust of any law of the State of Texas deducting from the value of real property for the purpose of taxation any lien or encumbrance thereon or changing in any way the laws for the taxation of mortgages or debts secured by mortgages for state or local purposes or the manner of the collection of any such taxes, and imposing a tax, either directly or indirectly, on this Deed of Trust, the Loan Agreement, the Note or the Debt, Grantor shall, if permitted by law, pay any tax imposed as a result of any such law within the statutory period or within fifteen (15) days after demand by Beneficiary, whichever is less; *provided, however*, that if, in the opinion of the attorneys for Beneficiary, Grantor is not permitted by law to pay such taxes, Beneficiary shall have the right, at Beneficiary's option, to declare the Debt due and payable, without prepayment premium, on a date specified in a prior notice to Grantor of not less than thirty (30) days.

SECTION 3.06. Stamp Tax. If at any time the United States of America, any state thereof or any governmental subdivision of any such state, shall require revenue or other stamps to be affixed to the Loan Agreement, the Note or this Deed of Trust, Grantor shall pay for the same, with interest and penalties thereon, if any.

SECTION 3.07. Cover Sheet. The information set forth on the cover of this Deed of Trust is hereby incorporated herein.

SECTION 3.08. Governing Law.

(a)    THIS DEED OF TRUST WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY GRANTOR TO BENEFICIARY IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS DEED OF TRUST AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES (I) THE PROVISIONS FOR THE CREATION,

11

RP-2018-235600

PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS (OTHER THAN WITH RESPECT TO LIENS AND SECURITY INTERESTS IN PROPERTY WHOSE PERFECTION AND PRIORITY IS COVERED BY ARTICLE 9 OF THE UCC (INCLUDING, WITHOUT LIMITATION, THE ACCOUNTS) WHICH SHALL BE GOVERNED BY THE LAW OF THE JURISDICTION APPLICABLE THERETO IN ACCORDANCE WITH SECTIONS 9-301 THROUGH 9-307 OF THE UCC AS IN EFFECT IN THE STATE OF NEW YORK) AND (II) THE ENFORCEMENT OF THE RIGHTS CREATED BY THE ABSOLUTE ASSIGNMENT OF LEASES AND RENTS OF EVEN DATE HEREWITH SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE MORTGAGED PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW AND EXCEPT AS SET FORTH IN THE IMMEDIATELY PRECEDING SENTENCE, GRANTOR HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS DEED OF TRUST AND THE NOTE, AND THIS DEED OF TRUST AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST GRANTOR OR BENEFICIARY ARISING OUT OF OR RELATING TO THE DEBT OR THIS DEED OF TRUST MAY AT BENEFICIARY'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND GRANTOR WAIVES ANY OBJECTIONS WHICH GRANTOR MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GRANTOR HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. GRANTOR DOES HEREBY DESIGNATE AND APPOINT:

Capitol Services, Inc.
1218 Central Avenue, Suite 100
Albany, NY 12205

AS GRANTOR'S AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON GRANTOR'S BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO GRANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GRANTOR, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. GRANTOR (I) SHALL GIVE PROMPT NOTICE TO BENEFICIARY OF ANY CHANGED ADDRESS OF GRANTORS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF GRANTOR'S AUTHORIZED

12

4162651-v5\CHIDMS1

AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

SECTION 3.09. Joint and Several Liability. If Grantor consists of more than one person or party, the obligations and liabilities of each such person or party hereunder shall be joint and several.

SECTION 3.10. Variable Rate. The Note contains provisions for a variable rate of interest, and reference to such provisions is made hereby.

SECTION 3.11. Purchase Money Deed of Trust. Grantor hereby agrees and acknowledges that Grantor borrowed the Deed of Trust Amount to finance Grantor's purchase of the Mortgaged Property.

SECTION 3.12. Maximum Secured Amount/Future Advances. This Deed of Trust shall secure the payment of any amounts advanced from time to time under the Loan Documents, or under other documents stating that such advances are secured hereby, whether such advances are obligatory or to be made at the option of the Lenders, or otherwise, to the same extent as if such future advances were made on the date of the execution of this Deed of Trust, although there may be no advance made at the time of execution of this Deed of Trust and although there may be no indebtedness outstanding at the time any advance is made. The lien of this Deed of Trust shall be valid as to any and all future obligations and Debt arising under or in connection with this Deed of Trust from the time of its filing for record in the recorder's or registrar's office of the county in which the Premises is located, which future obligations and Debt shall have the same priority as if all such future obligations and Debt were made on the date of execution hereof. Nothing in this Section or in any other provision of this Deed of Trust shall be deemed an obligation on the part of Beneficiary to make any future advances of any sort. At all times, regardless of whether any loan proceeds have been disbursed, this Deed of Trust shall secure (in addition to any loan proceeds disbursed from time to time) the payment of any and all expenses and advances due to or incurred by Beneficiary in connection with the Debt to be secured hereby and which are to be reimbursed by Grantor under the terms of this Deed of Trust. The total amount of indebtedness may increase or decrease from time to time, as provided in the Loan Agreement. This Deed of Trust is intended to and shall be valid and have priority over all subsequent liens and encumbrances, including statutory liens, excepting solely taxes and assessments levied on the Premises.

SECTION 3.13. Interest Rate Protection Product. Grantor acknowledges and agrees that any amounts now or hereafter due and owing from Grantor to Beneficiary arising from or in connection with any Interest Rate Protection Product, now existing or hereafter entered into between Grantor and Beneficiary, and any out-of-pocket costs incurred by Beneficiary in connection therewith, including, without limitation, any interest, expenses, fees, penalties or other charges associated with any obligations undertaken by Beneficiary to hedge or offset Beneficiary's obligations pursuant to such Interest Rate Protection Product, or the termination of any such obligations, shall be (i) deemed additional interest and/or a related expense (to be determined in the sole discretion of Beneficiary) due in connection with the principal amount of the Debt secured by this Deed of Trust, (ii) included (in the manner described above) as part of the Debt secured by this Deed of Trust, and secured by this Deed of Trust to the full extent thereof, and (iii) included in any judgment in any proceeding instituted by Beneficiary or its agents against Grantor for foreclosure of this Deed of Trust or otherwise.

SECTION 3.14. Administrative Agent. To the extent that any action is to be taken, any information is to be delivered to or by Lenders, any determination is to be made, or any consent is to be given or withheld by Lenders, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Beneficiary, as administrative agent under the Loan Agreement or any successor agent thereto.

13

4162651-v5\CHIDMS1

SECTION 3.15. Acts by Trustee. At any time upon written request of Beneficiary, payment of its fees and (in case of full reconveyance, for cancellation and retention) presentation of this Deed of Trust and the appropriate instruments evidencing the Debt for endorsement and without affecting the liability of any person for the payment of the Debt, Trustee may: (a) consent to the making of any map or plat of the Premises; (b) join in granting any easement or creating any restriction thereon; (c) join in any subordination or other agreement affecting this Deed of Trust or the lien or charge thereof; or (d) reconvey, without warranty, all or any part of the Premises, as provided in Section 3.20 hereof. The recitals in any reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof. Grantor agrees to pay a reasonable trustee's fee for full or partial reconveyance, together with a recording fee if Trustee, at its option, elects to record said reconveyance. Trustee may resign by instrument in writing filed in the office of county clerk or applicable recorder or registrar of deeds in which this Deed of Trust shall have been recorded or filed.

SECTION 3.16. Successor Trustee. In the event of the resignation, refusal or inability of Trustee to act or at the option of Beneficiary, with or without any reason, Beneficiary is authorized either in its own name or through an attorney or attorney-in-fact appointed for the purpose by written instrument duly recorded and without any formality other than a designation in writing of a successor or substitute trustee, to appoint a successor or substitute trustee who shall thereupon become vested with and succeed to all the rights, title and powers given to Trustee herein named, the same as if the successor or substitute trustee had been named original Trustee herein; and such right to appoint a successor or substitute trustee shall exist as often as and whenever Beneficiary desires.

SECTION 3.17. Covenants of Trustee. Trustee covenants faithfully to perform the trust herein created, being liable, however, only for its own gross negligence or misconduct and that of the employees and agents of Trustee.

SECTION 3.18. Employment of Agents. Trustee, or anyone acting in its stead, shall have, in its discretion, authority to employ all proper agents and attorneys in the execution of this trust and in the conducting of any sale made pursuant to the terms hereof, and to pay for such services rendered out of the proceeds of the sale of the Premises, should any be realized; and if no sale be made or if the proceeds of sale be insufficient to pay the same, then Grantor hereby undertakes and agrees to pay the costs of such services rendered to Trustee. Trustee may rely on any document believed by it in good faith to be genuine. All money received by Trustee shall, until used or applied as herein provided, be held in trust, but need not be segregated (except to the extent required by law), and Trustee shall not be liable for interest thereon.

SECTION 3.19. Indemnification of Trustee or Beneficiary. If Trustee or Beneficiary shall be made a party to or shall intervene in any action or proceeding affecting the Premises or the title thereto, or the interest of Trustee or Beneficiary under this Deed of Trust, except for any action or proceeding arising out of the willful misconduct or, to the extent prohibited by law, the gross negligence of Trustee or Beneficiary, Trustee and Beneficiary shall be reimbursed by Grantor, immediately and without demand, for all reasonable costs, charges and attorneys' fees incurred by them or any of them in any case, and the same shall become so much additional indebtedness secured hereby.

SECTION 3.20. Defeasance. Upon full payment of all indebtedness secured hereby and satisfaction of the entire Debt in accordance with their respective terms and at the time and in the manner provided, and when Beneficiary and Lenders have no further obligation to make any advance, or extend any credit hereunder, under the Note or any of the other Loan Documents, Beneficiary shall request Trustee in writing to reconvey the Premises, and shall surrender this Deed of Trust and all notes and instruments evidencing the Debt to Trustee. When Trustee receives Beneficiary's written request for reconveyance and all fees and other sums owing to Trustee by Grantor, Trustee shall reconvey the

14

4162651-v5\CHIDMS1

RP-2018-235600

Premises, or so much of it as is then held under this Deed of Trust, without warranty to the person or persons legally entitled to it. Such person or persons shall pay any costs of recordation. In the reconveyance, the grantee may be described as "the person or persons legally entitled thereto," and the recitals of any matters or facts shall be conclusive proof of their truthfulness absent manifest error. Neither Beneficiary nor Trustee shall have any duty to determine the rights of persons claiming to be rightful grantees of any reconveyance.

SECTION 3.21. Maximum Interest. It is expressly stipulated and agreed to be the intent of Grantor and Beneficiary at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on the Debt (or applicable United States federal law to the extent that it permits Beneficiary to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If the applicable law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to the Note, any of the Loan Documents or any other communication or writing by or between Grantor and Beneficiary related to the Debt or to the transaction or transactions that are the subject matter of the Loan Documents, (ii) contracted for, charged, taken, reserved or received by reason of Beneficiary's exercise of the option to accelerate the maturity of the Note and/or any other portion of the Debt, or (iii) Grantor will have paid or Beneficiary will have received by reason of any voluntary prepayment by Grantor of the Note and/or any other portion of the Debt, then it is Grantor's and Beneficiary's express intent that all amounts charged in excess of the maximum amount of interest permissible by applicable law (the "Maximum Lawful Rate") shall be automatically cancelled, ab initio, and all amounts in excess of the Maximum Lawful Rate theretofore collected by Beneficiary shall be credited on the principal balance of the Note and/or any other portion of the Debt (or, if the Note and all other Debt have been or would thereby be paid in full, refunded to Grantor), and the provisions of the Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if the Note has been paid in full before the end of the stated term of the Note, then Grantor and Beneficiary agree that Beneficiary shall, with reasonable promptness after Beneficiary discovers or is advised by Grantor that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to Grantor and/or credit such excess interest against any other portion of the Debt then owing by Grantor to Beneficiary. Grantor hereby agrees that as a condition precedent to any claim seeking usury penalties against Beneficiary, Grantor will provide written notice to Beneficiary, advising Beneficiary in reasonable detail of the nature and amount of the violation, and Beneficiary shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Grantor or crediting such excess interest against the Note and/or any other portion of the Debt then owing by Grantor to Beneficiary. All sums contracted for, charged, taken, reserved or received by Beneficiary for the use, forbearance or detention of any of the Debt, including any portion of the Debt evidenced by the Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the stated term of the Note and/or any other portion of the Debt (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of the Note and/or any other portion of the Debt does not exceed the Maximum Lawful Rate from time to time in effect and applicable to the Note and/or any other portion of the Debt for so long as any portion of the Debt is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Beneficiary to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

SECTION 3.22. STATE SPECIFIC PROVISIONS

(a) <u>Inconsistencies</u>. In the event of any inconsistencies between the terms and conditions of this Article and the other provisions of this instrument, the terms and conditions of this Article shall control and be binding.

(b) <u>Section 1.09</u> is amended by adding the following:

Without in any way limiting or restricting any of Beneficiary's rights, benefits or privileges hereunder, Beneficiary and Grantor hereby expressly agree that Beneficiary shall be entitled to all of the rights, benefits and privileges provided for in the Texas Assignment of Rents Act, Chapter 64 of the Texas Property Code, as amended from time to time.

(c) During the continuance of an Event of Default, it shall thereupon be the duty of the above named Trustee, or its successor or substitute, as hereinafter provided, to enforce this trust at the request of Beneficiary (which request shall be presumed) and to sell the Mortgaged Property with or without first having taken possession of the same and in whole or in part, as the Trustee, or its successor or substitute, may elect (all rights to a marshalling of assets of Grantor being expressly waived hereby) to the highest bidder for cash at public auction at the county courthouse of any County in which the Mortgaged Property is situated, in the area of such courthouse designated for real property foreclosure sales in accordance with applicable law (or in the absence of any such designation, in the area set forth in the notice of sale hereinafter described) on the first Tuesday of any month between the hours of 10:00 A.M. and 4:00 P.M. (commencing at the time stated in the hereinafter described notice of sale or not later than three hours after that time), after giving notice of the time, place and terms of sale and the Mortgaged Property to be sold by (i) the Trustee, or its successor or substitute, or any authorized agent of the foregoing filing a copy of the notice thereof in the office of the County Clerk of each County where the Mortgaged Property is situated and by posting written or printed notice thereof at least twenty-one (21) days preceding the date of said sale at the County Courthouse door of each County where the Mortgaged Property is located, and (ii) the holder of the Debt secured by this Deed of Trust or any authorized agent of such holder, at least twenty-one (21) days preceding the date of said sale, serving written notice of such proposed sale by certified mail on each debtor obligated to pay the Debt secured by this Deed of Trust evidenced by the Notes according to the records of Beneficiary. Service of such notice to each debtor shall be completed upon deposit of the notice enclosed in a postpaid wrapper, properly addressed to each debtor at the most recent address as shown by the records of Beneficiary, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service. After such sale, the Trustee, or its successor or substitute, shall make due conveyance with general warranty to the purchaser or purchasers and the Grantor binds itself, its heirs, assigns, executors, administrators, successors and legal representatives to warrant and forever defend the title of such purchaser or purchasers. Any abstract of title to the Mortgaged Property furnished in connection with the Loan shall be delivered and become the property of the purchaser at said sale. In the event a foreclosure hereunder shall be commenced by the Trustee or its substitute or successor, Beneficiary may at any time before the sale of the Mortgaged Property, direct the said Trustee, or its successor or substitute, to abandon the sale, and may then institute suit for the collection of the Notes and the other secured indebtedness, and for the foreclosure of this Deed of Trust. It is agreed that if Lender should institute a suit for the collection of the Note or any other secured indebtedness and for the foreclosure of this Deed of Trust, Beneficiary may at any time before the entry of a final judgment in said suit dismiss the same, and require the Trustee, its substitute or successor to sell the Mortgaged Property in accordance with the provisions of this Deed of Trust.

(d) With respect to the Personal Property, Beneficiary is hereby irrevocably appointed the true and lawful attorney of the Grantor (coupled with an interest), in its name and stead, to

16

4162651-v5\CHIDMS1

RP-2018-235600

make all necessary conveyances, assignments, transfers and deliveries of the Personal Property, and for that purpose Beneficiary may execute all necessary instruments of conveyance, assignment, transfer and delivery, and may substitute one or more persons with such power, Grantor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Notwithstanding the foregoing, Grantor, if so requested by Beneficiary, shall ratify and confirm any such sale or sales by executing and delivering to Lender or to such purchaser or purchasers all such instruments as may be advisable, in the judgment of Beneficiary, for such purpose, and as may be designated in such request.   To the extent permitted by law, any such sale or sales made under or by virtue of this Section 3.22(d) shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law, or in equity, of Grantor in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Grantor and against any and all persons claiming or who may claim the same, or any part thereof, from, through or under Grantor.  Upon any sale made under or by virtue of this Section 3.22(d), Trustee, or its successor or substitute, or Beneficiary may, to the extent permitted by law, bid for and acquire the Mortgaged Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the debt secured by this Deed of Trust the net sales price after deducting therefrom the expenses of the sale and the cost of the auction and any other sums which Beneficiary is authorized to deduct by law or under this Deed of Trust.  At any sale pursuant to this Section 3.22(d), whether made under power herein granted, the Texas Property Code, the Texas Business and Commerce Code, or any other legal enactment, or by virtue of any judicial proceeding or any other legal right, remedy or recourse, it shall not be necessary for Beneficiary or Trustee, or its successor or substitute, to be physically present, or to have constructive possession of, the Mortgaged Property, and the title to and right of possession of any such property shall pass to the purchaser thereof as completely as if the same had been actually presented and delivered to the purchaser at such sale.

(e)   During the continuance of an Event of Default, Beneficiary shall have the right and option to proceed with foreclosure in satisfaction of such item or items by directing the Trustee, or its successor or substitute as hereinafter provided, to proceed as if under a full foreclosure, conducting the sale as herein provided, and without declaring the whole debt secured by this Deed of Trust due, and provided that if sale is made because of default as hereinabove mentioned, such sale may be made subject to the unmatured part of the Note and the Debt secured by this Deed of Trust, and it is agreed that such sale, if so made, shall not in any manner affect any other obligations secured by this Deed of Trust, but as to such other obligations this Deed of Trust and the liens created hereby shall remain in full force and effect just as though no sale had been made under the provisions of this Section 3.22(e).  It is further agreed that several sales may be made hereunder without exhausting the right of sale for any other breach of any of the obligations secured hereby, it being the purpose to provide for a foreclosure and sale of the Mortgaged Property for any matured portion of any of the Debt secured hereby or other items provided for herein without exhausting the power to foreclose and to sell the Mortgaged Property for any other part of the debt secured hereby whether matured at the time or subsequently maturing.

(f)   The Trustee, or its successor or substitute, hereunder shall have the right to sell the Mortgaged Property in whole or in part and in such parcels and order as he may determine, and the right of sale hereunder shall not be exhausted by one or more sales, but successive sales may be had until all of the Mortgaged Property has been legally sold.  In the event any sale hereunder is not completed or is defective in the opinion of Beneficiary or the holder of any part of the Debt secured hereby, such sale shall not exhaust the power of sale hereunder, and Beneficiary or such holder shall have the right to cause a subsequent sale or sales to be made by the Trustee or any successor or substitute Trustee.  Likewise, Beneficiary on behalf of Lender may become the purchaser at any such sale if it is the highest bidder, and shall have the right, after paying or accounting for all costs of said sale or sales, to credit the amount of the bid upon the amount of the debt secured hereby, in lieu of cash payment.

4162651-v5\CHIDMS1

(g)     It shall not be necessary for the Trustee, or its successor or substitute, to have constructively in its possession any part of the real or personal property covered by this Deed of Trust, and the title and right of possession of said property shall pass to the purchaser or purchasers at any sale hereunder as fully as if the same had been actually present and delivered. Likewise, on foreclosure of this Deed of Trust whether by power of sale herein contained or otherwise, Grantor or any person claiming any part of the Mortgaged Property by, through or under Grantor, shall not be entitled to a marshalling of assets or a sale in inverse order of alienation.

(h)     The recitals and statements of fact contained in any notice or in any conveyance to the purchaser or purchasers at any sale hereunder shall be prima facie evidence of the truth of such facts, and all prerequisites and requirements necessary to the validity of any such sale shall be presumed to have been performed.

(i)     Any sale under the powers granted by this Deed of Trust shall be a perpetual bar against Grantor, its heirs, successors, assigns and legal representatives.

(j)     In the event of a foreclosure under the powers granted by this Deed of Trust, Grantor, and all other persons in possession of any part of the Mortgaged Property shall be deemed tenants at will of the purchaser at such foreclosure sale and shall be liable for a reasonable rental for the use of the Mortgaged Property; and if any such tenants refuse to surrender possession of the Mortgaged Property upon demand, the purchaser shall be entitled to institute and maintain the statutory action of forcible entry and detainer and procure a writ of possession thereunder, and Grantor expressly waives all damages sustained by reason thereof.

(k)     To the extent permitted under applicable law, Grantor shall not, and will not, apply for, avail itself of, insist upon or plead or in any manner claim or take advantage of any appraisement, homestead, valuation, stay, extension or exemption laws, or any so called "*Moratorium Laws*", now existing or hereafter enacted, in order to prevent or hinder the enforcement or foreclosure of this Deed of Trust, but hereby waives the benefit of such laws. Grantor, for itself and all who may claim through or under Grantor, waives any and all right to have the property and estates comprising the Mortgaged Property marshaled upon any foreclosure of the lien hereof and agrees that any court having jurisdiction to foreclose such lien may order the Mortgaged Property sold as an entirety. Grantor hereby expressly waives any and all rights of reinstatement and redemption, if any, from sale pursuant to a foreclosure of this Deed of Trust on behalf of Grantor, and each and every person claiming by, through or under Grantor. The waiver of statutory rights contained set forth above specifically includes a waiver of all provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time). In the event an interest in any of the Mortgaged Property is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code, and to the extent permitted by law, Beneficiary shall be entitled to seek a deficiency judgment from Grantor, any guarantor of the debt secured by this Deed of Trust and any other party obligated on obligations secured hereby (each an "Obligor") equal to the difference between the amount owing on the obligations secured hereby and the amount for which the Mortgaged Property was sold pursuant to judicial or nonjudicial foreclosure sale. Grantor expressly recognizes that this section constitutes a waiver of the above cited provisions of the Texas Property Code which would otherwise permit Grantor and other persons against whom recovery of deficiencies is sought independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Mortgaged Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Grantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Mortgaged Property for

RP-2018-235600

18

000742

purposes of calculating deficiencies owed by Grantor or any other Obligor against whom recovery of a deficiency is sought.

(l)     To the extent, notwithstanding the provisions of <u>Section 3.22(k)</u> above, Section 51.003 of the Texas Property Code, or any amendment thereto or judicial interpretation thereof, requires that the "fair market value" of the Mortgaged Property shall be determined as of the foreclosure date in order to enforce a deficiency against Grantor or any other party liable for the repayment of the obligations secured by this Deed of Trust, the term "fair market value" shall include those matters required by law and shall also include the additional factors as follows:

(i)     The Mortgaged Property is to be valued "AS IS, WHERE IS" and "WITH ALL FAULTS" and there shall be no assumption of restoration of or refurbishment of the Mortgaged Property after the date of foreclosure;

(ii)     There shall be an assumption of a prompt resale of the Mortgaged Property for an all cash sales price by the purchaser at the foreclosure so that no extensive holding period should be factored into the determination of "fair market value" of the Mortgaged Property;

(iii)     An offset to the fair market value of the Mortgaged Property, as determined hereunder, shall be made by deducting from such value the reasonable estimated closing costs relating to the sale of the Mortgaged Property including but not limited to brokerage commissions, title policy expenses, tax prorations, escrow fees, and other common charges which are incurred by a seller of real property similar to the Mortgaged Property; and

(iv)     After consideration of the factors required by law and those required above (including the addition of any income to be generated by the Mortgaged Property), an additional discount factor shall be calculated based upon the estimated time it will take to effectuate a sale of the Mortgaged Property so that the "fair market value" as so determined is discounted to be as of the date of the foreclosure of the Mortgaged Property.

(m)     The Mortgaged Property forms no part of any property owned, used or claimed by Grantor as a residence or business homestead and is not exempt from forced sale under the laws of the State of Texas. Grantor hereby disclaims and renounces each and every claim to the Mortgaged Property as a homestead.

(n)     Pursuant to the Uniform Commercial Code, this Deed of Trust shall be effective as a Financing Statement filed as a fixture filing from the date of its filing for record covering and including any and all fixtures of every kind and type affixed to all or any portion of the Property or forming part of all or any portion of the Improvements. The name and address of Borrower, as debtor, and Lender (where information concerning the security interest granted hereby may be obtained), as secured party, are as set forth on the first page of this Deed of Trust. The above described goods are or are to become fixtures related to the Property and the Improvements of which Borrower is record title owner. This Deed of Trust shall also be effective as a financing statement covering minerals or the like (including oil and gas) and accounts subject to Section 9.103(e) of the Uniform Commercial Code, as amended.

(o)     **EACH OF THE PARTIES HERETO SPECIFICALLY ACKNOWLEDGES AND AGREES (i) THAT IT HAS A DUTY TO READ THIS DEED OF TRUST AND THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS HEREOF, (ii) THAT IT HAS IN FACT READ THIS DEED OF TRUST AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS DEED OF TRUST, (iii) THAT IT HAS BEEN REPRESENTED BY LEGAL COUNSEL OF ITS**

19

RP-2018-235600

CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS DEED OF TRUST AND HAS RECEIVED THE ADVICE OF SUCH COUNSEL IN CONNECTION WITH ENTERING INTO THIS DEED OF TRUST, AND (iv) THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS DEED OF TRUST PROVIDE FOR (A) CERTAIN WAIVERS AND FOR (B) THE ASSUMPTION BY ONE PARTY OF, AND/OR RELEASE OF THE OTHER PARTY FROM, CERTAIN LIABILITIES THAT SUCH PARTY MIGHT OTHERWISE BE RESPONSIBLE FOR UNDER THE LAW. EACH PARTY HERETO FURTHER AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY SUCH PROVISIONS OF THIS DEED OF TRUST ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT SUCH PROVISIONS ARE NOT "CONSPICUOUS."

NOTICE PURSUANT TO SECTION 26.02(e) OF THE TEXAS BUSINESS AND COMMERCE CODE: THE NOTE, THIS DEED OF TRUST AND THE OTHER SECURITY DOCUMENTS CONSTITUTE A WRITTEN LOAN AGREEMENT (AS DEFINED IN SECTION 26(a)(2) OF THE TEXAS BUSINESS AND COMMERCE CODE, AS AMENDED) AND REPRESENT THE FINAL AGREEMENT AND UNDERSTANDING BETWEEN THE BENEFICIARY, THE LENDERS AND THE OTHER RESPECTIVE PARTIES HERETO AND THERETO AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS BETWEEN SUCH PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR CONTEMPORANEOUS OR SUBSEQUENT AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

### NOTICE OF INDEMNIFICATION

(p)     GRANTOR AND BENEFICIARY EACH HEREBY ACKNOWLEDGE AND AGREE THAT THIS DEED OF TRUST CONTAINS CERTAIN INDEMNIFICATION OBLIGATIONS AND COVENANTS.

[remainder of page intentionally left blank]

RP-2018-235600

4162651-v5\CHIDMS1

IN WITNESS WHEREOF, this Deed of Trust has been duly executed by Grantor as of the day first above written.

GRANTOR:

**GALLERIA 2425 OWNER, LLC,**
a Delaware limited liability company

By:   Galleria 2425 JV, LLC,
      a Delaware limited liability company,
      its sole member

      By:   Naissance Capital Real Estate, LLC,
            a Delaware limited liability company,
            its Managing Member

            By: _____
            Name: Azeemeh Zaheer
            Title:  Managing Member

RP-2018-235600

[Signature Page to Deed of Trust]

000745

### ACKNOWLEDGMENT

STATE OF _Texas_ )
                          )ss.
COUNTY OF _Harris_ )

On _May 20,_ 2018 before me _Shelina Jamani_ personally appeared _Azeemeh Zaheer_,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person, whose
name is subscribed to the within instrument and acknowledged to me that he executed the same in his
authorized capacity, and that by his signature on the instrument the person or the entity upon behalf of
which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _Jama_          (Seal)

SHELINA JAMANI
Notary Public, State of Texas
Comm. Expires 05-09-2019
Notary ID 128607783

RP-2018-235600

[Signature Page to Deed of Trust]

000746

EXHIBIT A
PROPERTY DESCRIPTION

Real property in the City of Houston, County of Harris and State of Texas, described as follows:

Tract 1: Fee Tract

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING:

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM. WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X"

[Exhibit A - Property Description]

FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

NOTE: WE ARE PROHIBITED FROM INSURING ANY INACCURACY IN STATEMENT AS TO THE QUANTITY OF LAND CONTAINED WITHIN THE BOUNDARIES OF THE LAND DESCRIBED IN SCHEDULE A.

TRACT 2 EASEMENT TRACT: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND GRANTED BY VI IAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385 ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X" FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF BEGINNING;

[Exhibit A - Property Description]

000748

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61 FEET ALONG THE NORTHERLY LINE OF TRACT 1 TO AN "X" SET ON THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE NORTHERLY LINE OF TRACT 1, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085 SQUARE FEET OF LAND MORE OR LESS.

TRACT 3 EASEMENT TRACT: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE SOUTHERN BOUNDARY LINE OF TRACT 1, SAID EASEMENT CREATED AND GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING, WHENCE THE SOUTHEAST CORNER OF TRACT 1 BEARS NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE SOUTHERLY LINE OF TRACT 1, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP;

[Exhibit A - Property Description]

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE SOUTHWEST CORNER FOR TRACT 1 FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND AT THE SOUTHEAST CORNER OF TRACT 1;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG THE A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

TRACT 4 EASEMENT TRACT: 28 FOOT ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT 1, CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT 1;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

[Exhibit A - Property Description]

RP-2018-235600

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

TRACT 5 EASEMENT TRACT: 5 FOOT STORM SEWER EASEMENT

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT UN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS

[Exhibit A - Property Description]

RP-2018-235600

# Pages 29

05/30/2018 08:41 AM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

STAN STANART

COUNTY CLERK

Fees   $124.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.

*Stan Stanart*

COUNTY CLERK
HARRIS COUNTY, TEXAS

RP-2018-235600

000752

## **Exhibit D**

Payoff Statement



**National Bank of Kuwait** SAKP

*New York Branch*

299 Park Ave. 17th Fl.

New York  NY  10171

USA

| | |
|---|---|
| **TEL** | **212-303-9800** |
| **FAX** | **212-319-8269** |
| **ABA** | **026-000-217** |
| **SWIFT** | **NBOKUS33** |

## LOAN PAYOFF STATEMENT

**February 6, 2023**

**To:**       GALLERIA 2425 OWNER, LLC

Scarlet MacGeorge          (scarlet.M@jetallcompanies.com)

Ali          Ali @ Jetall <ali@jetallcompanies.com>

Jennifer MacGeorge          (jennifer@jetallcompanies.com)

          NYCorpBankingGrp@nbkny.com

**RE:**       **GALLERIA 2425 OWNER, LLC**

          <u>USD 51.675MM 5 Year Term Loan</u>

**Dear All,**

 The total  amount due to repay the loan in full, effective March 1, 2023, is $61,714,063.38.   If repayment were to occur after March 1, 2023, please adjust the amount due by the per diem interest amount of $13,995.31 for each day beyond March 1, 2023.


 Please remit payment via the wiring instructions noted below.


<u>Wiring Instructions</u>

| | |
|---|---|
| **Bank Name:** | **Bank of America New York:** |
| **Swift Code:** | **BOFAUS3N** |
| **ABA/Routing No.:** | **026009593** |
| **Account Name:** | **National Bank of Kuwait, New York** |
| **Bank Account #** | **6550705334** |
| **Swift Code:** | **NBOKUS33** |
| **F/O:** | **National Bank of Kuwait, Grand Cayman Branch** |
| **Ref Account No.:** | **500-550103-103** |
| **Attention:** | **Loan Operations Department** |
| **Reference:** | **Galleria 2425 Owner, LLC** |

Should you have any questions concerning the above, please contact the undersigned at (212) 303-9820

Regards,


**Robert Looft**                                        **Craig Kennedy**

**National Bank of Kuwait**                      **National Bank of Kuwait**

**Loan Operations Supervisor**                **Head of Operations**

**Tel: (212) 303-9820**                            **Tel: (212) 303-9827**

**Email: robert.looft@nbkny.com**         **Email: craig.kennedy@nbkny.com**

000754

**<u>Exhibit E</u>**

Proofs of Claim Nos. 3-1 and 4-1
(Case No. 23-60036; *In re: Galleria 2425 Owner LLC*;
U.S. Bankruptcy Court for the Southern District of Texas)

| Fill in this information to identify the case: |
| --- |
| Debtor 1   **GALLERIA 2425 OWNER LLC** |
| Debtor 2 (Spouse, if filing) |
| United States Bankruptcy Court for the:   **Southern District of TX** |
| Case number **23-60036 -** Chapter **11** |

## Official Form 410
# Proof of Claim
04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or **redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. **Do not send original documents**; they may be destroyed after scanning.  If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both 18 U. S. C §§ 152, 157 and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |
| **1. Who is the current creditor?** | <u>    City of Houston    </u><br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| **2. Has this claim been acquired from someone else?** | ☒ No<br>☐ Yes  From whom? _____ |
| **3. Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?        Where should payments to the creditor be sent? (If different)<br><br>LINEBARGER GOGGAN BLAIR & SAMPSON, LLP     CITY OF HOUSTON<br>PO BOX 3064                                                             PO BOX 4576<br>HOUSTON, TX 77253-3064                                   HOUSTON, TX 77210-4576<br>(713) 844-3400<br><br>houston_bankruptcy@lgbs.com<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ |
| **4. Does this claim amend one already filed?** | ☒ No<br>☐ Yes  Claim number on court claims registry (if known) _____        Filed On: _____ |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No<br>☐ Yes  Who made the earlier filing? _____ |
| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
| **6. Do you have any** | ☐ No |

| | |
|---|---|
| **number you use to identify the debtor?** | ☒ Yes  Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___<br><br>**SEE ATTACHED EXHIBITS** |
| **7. How much is the claim?** | $ __$412,849.57__  Does this amount include interest or other charges?<br><br>☐ No<br><br>☒ Yes  Attach statement itemizing interest, fees, expenses or other charges required<br>       by Bankruptcy Rule 3001(c)(2)(A). |
| **8. What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br><div align="center">**AD VALOREM TAXES**</div> |
| **9. Is all or part of the claim secured?** | ☐ No<br><br>☒ Yes  The claim is secured by a lien on property.<br><br>    **Nature of property:**<br><br>    ☒ Real Estate. If claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this Proof of Claim.<br>    ☐ Motor Vehicle<br>    ☐ Other. Describe: ____**SEE ATTACHED EXHIBITS**____<br><br>    **Basis for perfection:**  __Secured by Tax Lien §§ 32.01 and 32.05 of the Texas Property Tax Code. Secured claim to extent of collateral value. Unsecured Priority claim [11 U.S.C. 507 (a)(8)] to extent of any shortfall in collateral value and for personal liability.__  Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>    **Value of property:**     $ __SEE ATTACHED EXHIBITS__<br>    **Amount of the claim that is secured:**   $ __$412,849.57__<br><br>    **Amount of the claim that is unsecured:** $_____  (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>    **Amount necessary to cure any default as of the date of the petition:** $___ __$412,849.57__<br><br>    **Annual Interest Rate** (when case was filed) __12%__<br>    ☒ Fixed<br>    ☐ Variable |
| **10. Is this claim based on a lease?** | ☒ No<br><br>☐ Yes  Amount necessary to cure any default as of the date of the petition. $_____ |
| **11. Is this claim subject to a right of setoff?** | ☒ No<br><br>☐ Yes  Identify the property: _____ |
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒ No<br><br>☐ Yes  *Check all that apply:*                                **Amount entitled to priority**<br><br>    ☐ Domestic support obligations (including alimony and child support) under<br>       11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).                              $_____<br>    ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services<br>       for personal, family, or household use. 11 U.S.C. § 507(a)(7).        $_____<br>    ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before<br>       the bankruptcy petition is filed or the debtor's business ends, whichever is earlier.  $_____ |

|  | 11 U.S.C § 507(a)(4). | |
|--|--|--|
|  | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
|  | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
|  | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
|  | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:  Sign Below

| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571. | *Check the appropriate box*<br><br>☐ I am the creditor.<br>☒ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other co-debtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date  September 1, 2023<br><br>**/s/Jeannie Andresen**<br><br>**Print the name of the person who is completing and signing this claim:**<br><br>Name :    **Jeannie Andresen**<br><br>Title :     **Attorney  TXBN  24086239**<br><br>Company :  **LINEBARGER GOGGAN BLAIR & SAMPSON, LLP**<br>**Identify the corporate servicer as the company if the authorized agent is a servicer.**<br><br>Address :   **PO BOX 3064**<br>**HOUSTON, TX 77253-3064**<br>**(713) 844-3400**          **houston_bankruptcy@lgbs.com** |



**ANN HARRIS BENNETT**
**HARRIS COUNTY TAX ASSESSOR-COLLECTOR**
**1001 PRESTON, SUITE 100**
**HOUSTON, TEXAS 77002**

2023 EST = 170,886.61

| Certified Owner: | | |
|---|---|---|
| **GALLERIA 2425 OWNER LLC** | **Print Date:** 09/01/2023 | **Legal Description:** |
| **11509 S LOU AL DR** | | TR 31D |
| **HOUSTON, TX 77024-2707** | **Printed By:** LBNTALL | ABST 836 W WHITE |
| | **2022 Value:** $32,017,204 | **Legal Acres:** 2.4455 |
| **Account No: 045-140-006-0400** | **APPR. DIST#:** 0451400060400 | **Parcel Address:** 2425 W LOOP S |
| **As of Date:** 07/05/2023 | | |

| Year | Tax Units | Base Tax Due | IF PAID BY END OF MONTH JULY 2023 | | IF PAID BY END OF MONTH AUGUST 2023 | | IF PAID BY END OF MONTH SEPTEMBER 2023 | |
|---|---|---|---|---|---|---|---|---|
| | | | Penalties & Interest | Total | Penalties & Interest | Total | Penalties & Interest | Total |
| 2022 | 61 9150 | $170,886.61 | $71,076.35 | $241,962.96 | $73,126.63 | $244,013.24 | $75,176.91 | $246,063.52 |
| | **TOTAL AMOUNT DUE:** | **$170,886.61** | $71,076.35 | **$241,962.96** | $73,126.63 | **$244,013.24** | $75,176.91 | **$246,063.52** |

**Tax Unit Codes:**
**61** City of Houston **9150** Returned Item Fee

*IF YOU ARE 65 YEARS OF AGE OR OLDER OR ARE DISABLED AND THE PROPERTY DESCRIBED IN THIS DOCUMENT IS YOUR RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE APPRAISAL DISTRICT REGARDING ANY ENTITLEMENT YOU MAY HAVE TO A POSTPONEMENT IN THE PAYMENT OF THESE TAXES.*

IF THE PROPERTY DESCRIBED IN THIS DOCUMENT IS YOUR RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE HARRIS COUNTY TAX ASSESSOR-COLLECTOR'S OFFICE REGARDING A RIGHT YOU MAY HAVE TO ENTER INTO AN INSTALLMENT AGREEMENT DIRECTLY WITH THE HARRIS COUNTY TAX ASSESSOR-COLLECTOR'S OFFICE FOR THE PAYMENT OF THESE TAXES.

## Partial Statement: Other Years and Tax Units may be due

## THE TAXES ON THIS PROPERTY ARE DELINQUENT. THE PROPERTY IS SUBJECT TO A LIEN FOR THE DELINQUENT TAXES. IF THE DELINQUENT TAXES ARE NOT PAID, THE LIEN MAY BE FORECLOSED.

-------------------------------------------------------------------------------✂

**Detach at the perforation and return this coupon with your payment. Keep top part for your records.**                33.v1.64   Page 1 of 1

**Print Date:** 09/01/2023

**PLEASE NOTE YOUR ACCOUNT NUMBER ON YOUR CHECK AND MAKE CHECKS PAYABLE TO:**

**APPR. DIST#:** 0451400060400

**ANN HARRIS BENNETT**
**HARRIS COUNTY TAX ASSESSOR-COLLECTOR**
**P.O. BOX 4622**
**HOUSTON, TEXAS 77210-4622**          **PAYMENT COUPON**



*0 4 5 1 4 0 0 0 6 0 4 0 0*

**045-140-006-0400**
**GALLERIA 2425 OWNER LLC**
**11509 S LOU AL DR**          TOTAL = 412,849.57
**HOUSTON, TX 77024-2707**

| If Paid By | Amount Due |
|---|---|
| JUL 2023 | $241,962.96 |
| AUG 2023 | $244,013.24 |
| SEP 2023 | $246,063.52 |
| **Amount Paid:** | $_____.__ |

0451400060400S 2022 024196296 024401324 024606352 000000000  000759

| Fill in this information to identify the case: |
|---|
| Debtor 1 **GALLERIA 2425 OWNER LLC** |
| Debtor 2 (Spouse, if filing) |
| United States Bankruptcy Court for the: **Southern District of TX** |
| Case number **23-60036 -** Chapter **11** |

Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. **Do not send original documents**; they may be destroyed after scanning.  If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both 18 U. S. C §§ 152, 157 and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|
| **1. Who is the current creditor?** | <u>Houston ISD</u><br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| **2. Has this claim been acquired from someone else?** | ☒ No<br>☐ Yes  From whom? _____ |
| **3. Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?　　　Where should payments to the creditor be sent? (If different)<br><br>LINEBARGER GOGGAN BLAIR & SAMPSON, LLP　　HOUSTON ISD<br>PO BOX 3064　　　　　　　　　　　　　　　　　　PO BOX 4576<br>HOUSTON, TX 77253-3064　　　　　　　　　　　HOUSTON, TX 77210-4576<br>(713) 844-3400<br><br>houston_bankruptcy@lgbs.com<br><br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ |
| **4. Does this claim amend one already filed?** | ☒ No<br>☐ Yes  Claim number on court claims registry (if known) 　　　　　　　Filed On: _____ |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No<br>☐ Yes  Who made the earlier filing? _____ |
| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
| **6. Do you have any** | ☐ No |

| number you use to identify the debtor? | ☒ Yes Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___<br>**SEE ATTACHED EXHIBITS** |
|---|---|
| **7. How much is the claim?** | $ __$802,311.18__ Does this amount include interest or other charges?<br>☐ No<br>☒ Yes Attach statement itemizing interest, fees, expenses or other charges required<br>by Bankruptcy Rule 3001(c)(2)(A). |
| **8. What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as health care information.<br>**AD VALOREM TAXES** |
| **9. Is all or part of the claim secured?** | ☐ No<br>☒ Yes The claim is secured by a lien on property.<br>**Nature of property:**<br>☒ Real Estate. If claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this Proof of Claim.<br>☐ Motor Vehicle<br>☐ Other. Describe: ___**SEE ATTACHED EXHIBITS**___<br>**Basis for perfection:** __Secured by Tax Lien §§ 32.01 and 32.05 of the Texas Property Tax Code. Secured claim to extent of collateral value. Unsecured Priority claim [11 U.S.C. 507 (a)(8)] to extent of any shortfall in collateral value and for personal liability.__ Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br>**Value of property:** $ __SEE ATTACHED EXHIBITS__<br>**Amount of the claim that is secured:** $__$802,311.18__<br>**Amount of the claim that is unsecured:**$_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br>**Amount necessary to cure any default as of the date of the petition:** $___$802,311.18__<br>**Annual Interest Rate** (when case was filed) __12%__<br>☒ Fixed<br>☐ Variable |
| **10. Is this claim based on a lease?** | ☒ No<br>☐ Yes Amount necessary to cure any default as of the date of the petition. $_____ |
| **11. Is this claim subject to a right of setoff?** | ☒ No<br>☐ Yes Identify the property: _____ |
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. 507(a)?**<br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒ No<br>☐ Yes *Check all that apply:*      **Amount entitled to priority**<br>☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $_____<br>☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $_____<br>☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier.   $_____ |

| | 11 U.S.C § 507(a)(4). | |
|---|---|---|
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

**Part 3:** **Sign Below**

| | |
|---|---|
| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>**If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.**<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box*<br><br>☐ I am the creditor.<br>☒ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other co-debtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date  September 1, 2023<br><br>**/s/Jeannie Andresen**<br><br>**Print the name of the person who is completing and signing this claim:**<br><br>Name :   **Jeannie Andresen**<br><br>Title :    **Attorney  TXBN  24086239**<br><br>Company :  **LINEBARGER GOGGAN BLAIR & SAMPSON, LLP**<br>           Identify the corporate servicer as the company if the authorized agent is a servicer.<br><br>Address :  **PO BOX 3064**<br>           **HOUSTON, TX 77253-3064**<br>           **(713) 844-3400**              **houston_bankruptcy@lgbs.com** |



**ANN HARRIS BENNETT**
**HARRIS COUNTY TAX ASSESSOR-COLLECTOR**
**1001 PRESTON, SUITE 100**
**HOUSTON, TEXAS 77002**

2023 EST = 332,082.44

| Certified Owner: | | | Print Date: | Legal Description: |
|---|---|---|---|---|
| **GALLERIA 2425 OWNER LLC** | | | 09/01/2023 | TR 31D |
| **11509 S LOU AL DR** | | | **Printed By:** | ABST 836 W WHITE |
| **HOUSTON, TX 77024-2707** | | | LBNTALL | |

| | **2022 Value:** | $32,017,204 | **Legal Acres:** 2.4455 |
| **Account No: 045-140-006-0400** | **APPR. DIST#:** | 0451400060400 | **Parcel Address:** 2425 W LOOP S |

As of Date: 07/05/2023

| Year | Tax Units | Base Tax Due | IF PAID BY END OF MONTH JULY 2023 | | IF PAID BY END OF MONTH AUGUST 2023 | | IF PAID BY END OF MONTH SEPTEMBER 2023 | |
|---|---|---|---|---|---|---|---|---|
| | | | Penalties & Interest | Total | Penalties & Interest | Total | Penalties & Interest | Total |
| 2022 | 1 | $332,082.44 | $138,146.30 | $470,228.74 | $142,131.28 | $474,213.72 | $146,116.28 | $478,198.72 |
| **TOTAL AMOUNT DUE:** | | **$332,082.44** | $138,146.30 | **$470,228.74** | $142,131.28 | **$474,213.72** | $146,116.28 | **$478,198.72** |

**Tax Unit Codes:**

1    Houston I.S.D.

*IF YOU ARE 65 YEARS OF AGE OR OLDER OR ARE DISABLED AND THE PROPERTY DESCRIBED IN THIS DOCUMENT IS YOUR RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE APPRAISAL DISTRICT REGARDING ANY ENTITLEMENT YOU MAY HAVE TO A POSTPONEMENT IN THE PAYMENT OF THESE TAXES.*

IF THE PROPERTY DESCRIBED IN THIS DOCUMENT IS YOUR RESIDENCE HOMESTEAD, YOU SHOULD CONTACT THE HARRIS COUNTY TAX ASSESSOR-COLLECTOR'S OFFICE REGARDING A RIGHT YOU MAY HAVE TO ENTER INTO AN INSTALLMENT AGREEMENT DIRECTLY WITH THE HARRIS COUNTY TAX ASSESSOR-COLLECTOR'S OFFICE FOR THE PAYMENT OF THESE TAXES.

## Partial Statement: Other Years and Tax Units may be due

## THE TAXES ON THIS PROPERTY ARE DELINQUENT. THE PROPERTY IS SUBJECT TO A LIEN FOR THE DELINQUENT TAXES. IF THE DELINQUENT TAXES ARE NOT PAID, THE LIEN MAY BE FORECLOSED.

---------------------------------------------------------------------------------------------------------------- ✂

**Detach at the perforation and return this coupon with your payment. Keep top part for your records.**          33.v1.64    Page 1 of 1

Print Date: **09/01/2023**

**PLEASE NOTE YOUR ACCOUNT NUMBER ON YOUR CHECK AND MAKE CHECKS PAYABLE TO:**

**APPR. DIST#:** 0451400060400

ANN HARRIS BENNETT
HARRIS COUNTY TAX ASSESSOR-COLLECTOR
P.O. BOX 4622
HOUSTON, TEXAS 77210-4622

**PAYMENT COUPON**

* 0 4 5 1 4 0 0 0 6 0 4 0 0 *

045-140-006-0400
GALLERIA 2425 OWNER LLC
11509 S LOU AL DR
HOUSTON, TX 77024-2707

TOTAL = 802,311.18

| If Paid By | Amount Due |
|---|---|
| JUL 2023 | $470,228.74 |
| AUG 2023 | $474,213.72 |
| SEP 2023 | $478,198.72 |
| **Amount Paid:** | $_____.__ |

0451400060400S 2022 047022874 047421372 047819872 000000000  000763

## **Exhibit F**

Proposed Order

**N THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **GALLERIA 2425 Owner, LLC** | § | **Case No. 23-34815 (JPN)** |
| | § | |
| **Debtor.** | § | **Chapter 11** |
| | § | |

---

**ORDER ON (I) DEBTOR'S EMERGENCY MOTION
FOR INTERIM AND FINAL ORDERS AUTHORIZING THE USAGE
OF CASH COLLATERAL, AND (II) DEBTOR'S MOTION TO
DETERMINE ADEQUATE ASSURANCE UTILITY PAYMENTS**

---

CAME ON FOR CONSIDERATION *Debtor's Emergency Motion for Interim and Final Orders Authorizing the Usage of Cash Collateral* (the "Cash Collateral Motion") [ECF No. 33] and the *Debtor's Motion to Determine Adequate Assurance Utility Payments* (the "Utilities Motion") [ECF No. 34] (collectively, the "Motions") on December 18, 2023.  Having considered the Motions, any responses or objections to the Motions, the record in this matter, and all other evidence before it, and after due deliberation, the Court finds that good cause exists to deny the Motions.   Accordingly, it is ORDERED that, for the reasons stated on the record, the Cash Collateral Motion and the Utilities Motion are DENIED.

Signed: _____

_____
**Honorable Jeffrey P. Norman
United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **In re:** | |
| **GALLERIA 2425 OWNER LLC,** | **Case No. 23-34815**<br>**Chapter 11** |
| **Debtor.** | |

## DEBTOR'S NOTICE OF WITHDRAWAL OF EMERGENCY MOTION
## FOR THE USAGE OF CASH COLLATERAL
### [Docket #33]

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Galleria 2425 Owner LLC (the "Debtor"), debtor-in-possession in the above-captioned bankruptcy case, files this Notice of Withdrawal of the Debtor's Motion to Use Cash Collateral (the "Motion"), and would respectfully show as follows:

1.      The Debtor commenced the case on December 5, 2023 (the "Petition Date") by filing a petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2.      The Debtor continues to operate its business as debtor-in-possession under sections 1107 and 1108 of the Bankruptcy Code.

3.      The Debtor's primary asset is a Class A office building located at 2425 West Loop South, Houston, Texas 77027 (the "Property").  The Property is fully covered by commercial property and liability insurance.  The Debtor is in the process of obtaining renewal insurance so the insurance does not lapse.

4.      The Debtor filed an emergency motion to use cash collateral on December 14, 2023, at docket #33.  National Bank of Kuwait, S.A.K.P., New York Branch ("NBK"), filed an objection to the use of cash collateral.

5.      In an effort to move this case forward, **the Debtor is withdrawing the motion to use**

**cash collateral at docket #33 without prejudice at this time**.

6.      The costs to maintain the Property will be funded by a non-debtor entity.

7.      The Debtor will maintain all rents and cash collateral in the current account.  A separate account will be established by the Debtor for funds used to fund the operations of the Property.

8.      The Debtor has removed a state court case involving the NBK at adversary proceeding 23-03263.

9.      The Debtor does need and is not withdrawing the motion for determining adequate utility payments at docket #34 ("Utility Motion").  The funds for the Utility Motion will be paid by a non-debtor entity.

10.      The Debtor anticipates filing a plan by early January of 2024.

11.      The Debtor is interviewing persons that may be engaged (subject to the approval of this court) as a chief restructuring officer.

12.      The Debtor will be filing shortly a motion to engage an accountant.

Dated: December 18, 2023.

Respectfully submitted,

*/s/Reese W. Baker*
Reese W. Baker
Texas Bar No. 01587700
Nikie Marie Lopez-Pagan
TX Bar No. 24090233
Baker & Associates
950 Echo Lane, Suite 300
Houston, Texas 77024
713-869-9200
713-869-9100 (fax)
**PROPOSED COUNSEL FOR THE DEBTOR**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on December 18, 2023, a true and correct copy of the foregoing document was delivered to the Electronic Filing Service for the United States Bankruptcy Court for the Southern District of Texas.

/s/  *Reese W. Baker*
Reese W. Baker

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **In re:** | |
| **GALLERIA 2425 OWNER LLC,** | **Case No. 23-34815**<br>**Chapter 11** |
| **Debtor.** | |

**DEBTOR'S NOTICE OF WITHDRAWAL OF EMERGENCY MOTION**
**FOR THE USAGE OF CASH COLLATERAL**
**[Docket #33]**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Galleria 2425 Owner LLC (the "Debtor"), debtor-in-possession in the above-captioned bankruptcy case, files this Notice of Withdrawal of the Debtor's Motion to Use Cash Collateral (the "Motion"), and would respectfully show as follows:

1.      The Debtor commenced the case on December 5, 2023 (the "Petition Date") by filing a petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2.      The Debtor continues to operate its business as debtor-in-possession under sections 1107 and 1108 of the Bankruptcy Code.

3.      The Debtor's primary asset is a Class A office building located at 2425 West Loop South, Houston, Texas 77027 (the "Property").  The Property is fully covered by commercial property and liability insurance.  The Debtor is in the process of obtaining renewal insurance so the insurance does not lapse.

4.      The Debtor filed an emergency motion to use cash collateral on December 14, 2023, at docket #33.  National Bank of Kuwait, S.A.K.P., New York Branch ("NBK"), filed an objection to the use of cash collateral.

5.      In an effort to move this case forward, **the Debtor is withdrawing the motion to use**

**cash collateral at docket #33 without prejudice at this time**.

6.     The costs to maintain the Property will be funded by a non-debtor entity.

7.     The Debtor will maintain all rents and cash collateral in the current account.  A separate account will be established by the Debtor for funds used to fund the operations of the Property.

8.     The Debtor has removed a state court case involving the NBK at adversary proceeding 23-03263.

9.     The Debtor does need and is not withdrawing the motion for determining adequate utility payments at docket #34 ("Utility Motion").  The funds for the Utility Motion will be paid by a non-debtor entity.

10.     The Debtor anticipates filing a plan by early January of 2024.

11.     The Debtor is interviewing persons that may be engaged (subject to the approval of this court) as a chief restructuring officer.

12.     The Debtor will be filing shortly a motion to engage an accountant.

Dated: December 18, 2023.

Respectfully submitted,

*/s/Reese W. Baker*
Reese W. Baker
Texas Bar No. 01587700
Nikie Marie Lopez-Pagan
TX Bar No. 24090233
Baker & Associates
950 Echo Lane, Suite 300
Houston, Texas 77024
713-869-9200
713-869-9100 (fax)
**PROPOSED COUNSEL FOR THE DEBTOR**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on December 18, 2023, a true and correct copy of the foregoing document was delivered to the Electronic Filing Service for the United States Bankruptcy Court for the Southern District of Texas.

/s/  *Reese W. Baker*

Reese W. Baker

| Galleria 2425 O ner, LLC | | |
| --- | --- | --- |
| Balance Sheet | | |
| As o  December 5, 2023 | | |
| | | |
| | **Total** | |
| **ASSETS** | | |
| **Current Assets** | | |
| **Ban  Accounts** | | |
| Business Chec in  - Operatin | 7,153.82 | |
| Deposits and Prepayments | 1 1,348.41 | |
| Petty Cash | 0.00 | |
| Trust Acct  0    - 3 | 0.00 | |
| **Total Ban  Accounts** | **22 ,502.23** | |
| **Accounts Recei able** | | |
| Accounts Recei able | 105,250.00 | |
| **Total Accounts Recei able** | **05,250.00** | |
| **Other Current Assets** | | |
| | | |
| | | |
| **Total Ad anced Client Costs** | **0.00** | |
| | | |
| | 0.00 | |
| Uncate ori ed Asset | 0.00 | |
| Undeposited  unds | 0.00 | |
| **Total Other Current Assets** | **0.00** | |
| **Total Current Assets** | **333,752.23** | |
| **i ed Assets** | | |
| **i ed Assets** | | |
| Real Property | 17,500,000.00 | |
| urniture and  i tures | | |
| Le al Te ts | | |
| Phones | | |
| So t are | | |
| **Total  i ed Assets** | **7,500,000.00** | |
| **Total  i ed Assets** | **7,500,000.00** | |
| **TOTAL ASSETS** | **7, 33,752.23** | |
| **LIABILITIES AND E  UITY** | | |
| Liabilities | 0.00 | |
| Current Liabilities | 0.00 | |
| **Accounts Payable** | | |
| Accounts Payable - Operatin | 1,341,959.94 | |
| **Total Accounts Payable** | **,34 ,959.94** | |
| **Other Current Liabilities** | | |
| Client Trust Liability | | |
| irm  unds | | |
| IOLTA Interest | | |

000774

| | | |
|---|---:|---|
| **Total Client Trust Liability** | **0.00** | |
| **PPP LOAN** | 0.00 | |
| **Total Other Current Liabilities** | **0.00** | |
| **Total Current Liabilities** | **,34 ,959.94** | |
| **Lon -Term Liabilities** | 52,850,479.33 | |
| **Lon -Term Liabilities** | 25,092,415.80 | |
| **Total Lon -Term Liabilities** | **77,942, 95. 3** | |
| **Total Liabilities** | **79,2 4, 55.07** | |
| **E uity** | | |
| | | |
| | | |
| **Openin  Balance E uity** | | |
| **Shareholder Distributions** | | |
| **Net Income** | | |
| **Total E uity** | **0.00** | |
| **TOTAL LIABILITIES AND E UITY** | **79,2 4, 55.07** | |
| | | |
| | | |
| | | |
| Sub ect to re isions and re iew by CPA | | |
| The amounts of the debt are in dispute | | |

## 2425 W
*e r 2023*

### Pro it and Loss Report

| | an-23 | eb-23 | Mar-23 | Apr-23 | May-23 | un-23 | ul-23 | Au -23 | Sep-23 | Oct-23 | No -23 | Dec -5 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rent Income | $12,35.93 | $192,8.39 | $127,403.74 | $127,4 7.50 | $127,444.55 | $90,815.04 | $123,207.9 | $149,723.10 | $137,90.45 | $97,530.08 | $121,985.11 | $112,810.23 |
| **Net Sales** | 2,35.93 | 92,.39 | 27,403.74 | 27,4 7.50 | 27,444.55 | 90,.04 | 23,207.9 | 49,723.0 | 37,90.45 | 97,530.0 | 2,9 5. | 2,0.23 |
| **Cost o Goods Sold** | | | | | | | | | | | | |
| Materials | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Labor | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| O erhead | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Total Cost o Goods Sold** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Gross Pro it** | 2,35.93 | 92,.39 | 27,403.74 | 27,4 7.50 | 27,444.55 | 90,.04 | 23,207.9 | 49,723.0 | 37,90.45 | 97,530.0 | 2,9 5. | 2,0.23 |
| **Operatin E penses** | | | | | | | | | | | | |
| Ser ice Contract | $559.04 | $14.07 | $1,419.33 | $11.57 | $1,320.54 | $11.57 | $0.00 | $579.1 | $588.53 | $820.7 | $27.02 | |
| Fire Safety | | $333.82 | $2,571.33 | $1,915.07 | $5,390.47 | $451.15 | $401.24 | $5,480.55 | $1,8 5.70 | $1,900.41 | $1,091.34 | |
| Repairs Maintenance | $595.92 | $7,720.39 | $24,331.18 | $1,181.58 | $35,851.39 | $11,543.0 | $1,25.9 | $15,579.21 | $13,22.47 | $31,440.04 | $3,97.38 | $5,470.9 |
| Security | $8,504. | $4,084.27 | $12,234.14 | $2,9 3.89 | $7,44.52 | $4,557.33 | $4,109.17 | $11,854.4 | $11,1.58 | $14,285.17 | $3,934.89 | $3,810.40 |
| Cleaning Maintenance | $13,5.23 | $8,1.0 | $7,990.17 | $ .709.8 | $10,743.14 | $9,842.28 | $2,182.20 | | | | | |
| Broker Commissions | $5,940.71 | $5,940.71 | $5,940.71 | $5,940.71 | $89,925.71 | | | | | | | |
| Professional Fees | | $2,383.15 | $8,8 4.82 | $4,5 4.42 | $20,3.25 | $12,835.00 | $31,700.00 | $0.00 | $0.00 | $0.00 | $83,1 1.71 | |
| tilities | $5,155.91 | $28,1 3.21 | $27,78.55 | $34,21.75 | $25,572.81 | $32,5 1.33 | $32,81.81 | $37,53.24 | $31,482.8 | $35,074.55 | $7,982.04 | |
| Insurance | $1,381.84 | $5,7 1.73 | $17,27.1 | $33,908.38 | $1,381.84 | $17,32.1 | $17,27.1 | $17,79.1 | $17,47.1 | | $1,885.57 | |
| Telephone Internet | $233.11 | | $228.45 | $48.28 | $248.34 | $0.00 | $50.75 | $1,145. | $1,145. | $1,145.92 | $259.10 | $903.4 |
| Other Expense | $2,833.99 | $35.00 | | $475.00 | $950.00 | | | $507.00 | $1,912.00 | $1,053.00 | $09.00 | |
| Fire Damage | | | | | | | | | $1,978.3 | | | |
| Management Fee Admin | $0.00 | $0.00 | $15,2 5.09 | $5,09.15 | $0.00 | $10,195.5 | $15,000.00 | $0.00 | $0.00 | $0.00 | | |
| Administration | | | | | | | | $19,385.87 | $19,385.87 | $19,385.87 | $19,385.87 | |
| Licenses Permits | $407.29 | | | $809.71 | $595.27 | $908.55 | | | | $450.00 | | |
| **Total Operatin E penses** | 99,277.70 | 3,097.95 | 5,0 9.09 | 5,0 4.93 | 200, 05.5 | 99,30.43 | 05,34.74 | 29,42.27 | 2,59.92 | 3,50.9 | 52,45.34 | 3,0 9.25 |
| **Operatin Pro it Loss** | 27,079.23 | 9,7.44 | - 57,.35 | - 30,597.43 | - 72,.0 | - ,.39 | 7,372.95 | 20,294.3 | ,04.53 | - 40,97. | - 30,.23 | 99,790.9 |
| dd f er e | | | | | | | | | | | | |
| Interest Income | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Other Income | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Pro it Loss Be ore Ta es** | 27,079.23 | 9,7.44 | - 57,.35 | - 30,597.43 | - 72,.0 | - ,.39 | 7,372.95 | 20,294.3 | ,04.53 | - 40,97. | - 30,.23 | 99,790.9 |
| Less Distributions | | | | | | | | | | | | |
| **Net Pro it Loss** | 27,079.23 | 9,7.44 | - 57,.35 | - 30,597.43 | - 72,.0 | - ,.39 | 7,372.95 | 20,294.3 | ,04.53 | - 40,97. | - 30,.23 | 99,790.9 |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 23-34815** |
| **Galleria 2425 Owner, LLC.** | § | |
| **Debtor.** | § | **Chapter 11** |

### NOTICE OF WITHDRAWAL OF DEBTOR'S NOTICE OF WITHDRAWAL OF EMERGENCY MOTION FOR THE USAGE OF CASH COLLATERAL [Docket #33]

Galleria 2425 Owner, LLC., files this notice of withdrawal of DEBTOR'S NOTICE OF WITHDRAWAL OF EMERGENCY MOTION FOR THE USAGE OF CASH COLLATERAL filed at Docket #51 and filed docket # 52.

Dated: December 18, 2023

Respectfully submitted,

/s/Reese W. Baker
Reese W. Baker
Texas Bar No. 01587700
950 Echo Lane, Suite # 300
Houston, Texas 77024
(713)869-9200
(713) 869-9100 Fax
Attorney for Debtor

000777

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **In re:** | |
| **GALLERIA 2425 OWNER LLC,** | **Case No. 23-34815**<br>**Chapter 11** |
| **Debtor.** | |

## DEBTOR'S NOTICE OF WITHDRAWAL OF EMERGENCY MOTION
## FOR THE USAGE OF CASH COLLATERAL
### [Docket #33]

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Galleria 2425 Owner LLC (the "Debtor"), debtor-in-possession in the above-captioned bankruptcy case, files this Notice of Withdrawal of the Debtor's Motion to Use Cash Collateral (the "Motion"), and would respectfully show as follows:

1. The Debtor commenced the case on December 5, 2023 (the "Petition Date") by filing a petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2. The Debtor continues to operate its business as debtor-in-possession under sections 1107 and 1108 of the Bankruptcy Code.

3. The Debtor's primary asset is a Class A office building located at 2425 West Loop South, Houston, Texas 77027 (the "Property"). The Property is fully covered by commercial property and liability insurance. The Debtor is in the process of obtaining renewal insurance so the insurance does not lapse.

4. The Debtor filed an emergency motion to use cash collateral on December 14, 2023, at docket #33. National Bank of Kuwait, S.A.K.P., New York Branch ("NBK"), filed an objection to the use of cash collateral.

5. In an effort to move this case forward, **the Debtor is withdrawing the motion to use**

**cash collateral at docket #33 without prejudice at this time**.

6.      The costs to maintain the Property will be funded by a non-debtor entity.

7.      The Debtor will maintain all rents and cash collateral in the current account.   A separate account will be established by the Debtor for funds used to fund the operations of the Property.

8.      The Debtor has removed a state court case involving the NBK at adversary proceeding 23-03263.

9.      The Debtor does need and is not withdrawing the motion for determining adequate utility payments at docket #34 ("Utility Motion").   The funds for the Utility Motion will be paid by a non-debtor entity.

10.     The Debtor anticipates filing a plan by early January of 2024.

11.     The Debtor is interviewing persons that may be engaged (subject to the approval of this court) as a chief restructuring officer.

12.     The Debtor will be filing shortly a motion to engage an accountant.

   Dated: December 18, 2023.

                                        Respectfully submitted,

                                        */s/Reese W. Baker*
                                        Reese W. Baker
                                        Texas Bar No. 01587700
                                        Nikie Marie Lopez-Pagan
                                        TX Bar No. 24090233
                                        Baker & Associates
                                        950 Echo Lane, Suite 300
                                        Houston, Texas 77024
                                        713-869-9200
                                        713-869-9100 (fax)
                                        **PROPOSED COUNSEL FOR THE DEBTOR**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on December 18, 2023, a true and correct copy of the foregoing document was delivered to the Electronic Filing Service for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Reese W. Baker*
Reese W. Baker