# UNITED STATES BANKRUPTCY COURT

## Southern District of Texas

PDF FILE WITH AUDIO FILE ATTACHMENT

2023-34815

Galleria 2425 Owner, LLC

| | |
|---|---|
| Case Type : | bk |
| Case Number : | 2023-34815 |
| Case Title : | Galleria 2425 Owner, LLC |
| Audio Date\Time: | 12/18/2023 2:30:03 PM |
| Audio File Name : | 4bk2023-34815_20231218-143003.mp3 |
| Audio File Size : | 14512 KB |
| Audio Run Time : | [00:30:14] (hh:mm:ss) |

**Help using this file:**

An audio file is embedded as an attachment in this PDF document. To listen to the file, click the Attachments tab or the Paper Clip icon.  Select the Audio File and click Open.

**MPEG Layer-3 audio coding technology from Fraunhofer IIS and Thomson.**

**This digital recording is a copy of a court proceeding and is provided as a convenience to the public.  In accordance with 28 U.S.C. § 753 (b) "[n]o transcripts of the proceedings of the court shall be considered as official except those made from the records certified by the reporter or other individual designated to produce the record."**

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 18, 2023

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | |
| **GALLERIA 2425 OWNER LLC,** | **Case No. 23-34815**<br>**Chapter 11** |
| Debtor. | |

**ORDER GRANTING DEBTOR'S MOTION TO DETERMINE
ADEQUATE ASSURANCE UTILITY PAYMENTS**

Before the Court is the *Motion to Determine Adequate Assurance Utility Payments* (the "Motion"), which was filed by Galleria 2425 Owner LLC (the "Debtor") on December 15, 2023. The Court finds that the Motion was properly served pursuant to the Federal and Local Rules of Bankruptcy Procedure and that it contained the appropriate notice to creditors pursuant to LBR 9013-1(b). The Court finds that good cause exists for the entry of the following order.

**IT IS THEREFORE ORDERED** that the Motion is **GRANTED**.

1. **IT IS FURTHER ORDERED** that no utility may alter, refuse, terminate, or discontinue utility service to, or discriminate against, the Debtor on the basis of the commencement of this chapter 11 case or on account of outstanding pre-petition invoice or require additional assurance of payment, other than as provided herein, as a condition to the Debtor receiving such utility services.

2. **IT IS FURTHER ORDERED** that the Debtor shall timely pay for all post-petition utility services pursuant to the terms of the invoices and billing statements generated by the utility companies in the ordinary course of business, splitting the pre-and post-petition portions where applicable on a pro rata basis.

3. **IT IS FURTHER ORDERED** that, if a utility company maintains more than one account for the Debtor, the failure to pay for post-petition utility services with respect to one account shall not be deemed a failure to pay or "cross-default" with respect to any other account, provided that such other account is being paid. Each failure to pay, each requirement of a deposit, and the ability to alter, refuse or discontinue service shall arise on a per account basis.

4. **IT IS FURTHER ORDERED** that, to the extent that a utility company provides post-petition services that are unpaid, such utility company shall be entitled to an administrative claim, pursuant to 11 U.S.C. §§ 503(b)(1) and 507(a)(1), payable pursuant to a plan of reorganization or such earlier date as determined by the Court.

5.  **IT IS FURTHER ORDERED** that the Debtor shall make deposits with the utility companies below in the amounts below:

| | |
|---|---|
| Cirro Energy | $35,000.00 |
| City of Houston Water | $12,000.00 |
| Datawatch Systems | $1,500.00 |
| Logix Networks | $1,500.00 |
| ADT Commercial (equipment lease, fire) | $100.00 |
| ATT Internet | $300.00 |
| Kings 111 | $100.00 |

6.  **IT IS FURTHER ORDERED** that the above-described deposits must be sent to the utility companies at the addresses listed on the mailing matrix or such other address as to insure delivery of the deposit for this motion within the next three (3) business days.

7.  **IT IS FURTHER ORDERED** that the Debtor's deposits with the Utilities in the amounts as set forth above is deemed adequate assurance of payment for purposes of section 366 of the Bankruptcy Code.

8.  **IT IS FURTHER ORDERED** that nothing contained herein shall preclude any utility from subsequently seeking a reasonable modification of the adequate assurance proposal, or from seeking additional deposits or other security necessary to provide adequate assurance of payment, after notice and hearing, pursuant to 11 U.S.C. §366(b).

9.  **IT IS FURTHER ORDERED** that so long as the above deposits are made to the Utility companies by December 21, 2023, no utility company seeking to enforce section 366(c)(2) of the Bankruptcy Code may terminate service without proper notice and an opportunity for a hearing.

[Remainder of this page is intentionally left blank]

10. **IT IS FURTHER ORDERED** that, notwithstanding anything herein to the contrary, the authority granted herein is subject to any requirement and/or limitation imposed upon the Debtor under any Court order regarding the use of cash collateral and/or any approved budget contained therein.  Nothing contained herein shall, or shall be deemed to, modify, amend, or alter such order or approved budget. The Debtor has informed the court that it will not use cash collateral for the payments of the deposits.

11. **IT IS FURTHER ORDERED** that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**Signed:** December 18, 2023

Jeffrey P. Norman
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| Galleria 2425 Owner, LLC | § | Case No. 23-34815-H5-11 |
| | § | |
| Debtor | § | |
| | § | |

### APPLICATION TO EMPLOY ATTORNEYS

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

Please take notice that a hearing for the Application to Employ Attorneys is scheduled for **January 31, 2024, at 11:00** a.m., in Courtroom 403, 515 Rusk St. Houston, TX.

**Evidentiary hearings will be held in person at the Federal Courthouse, 515 Rusk Ave, Judge Norman in Courtroom 403, Houston, Texas 77002.**

**Parties may view the hearing electronically.  To view electronically, parties must follow the instructions set forth on Judge Norman's web page located at:**

https://www.txs.uscourts.gov/page/united-states-bankruptcy-judge-jeffrey-p-norman

**Parties are additionally instructed:**

The dial in number for hearings before Judge Norman is 832-917-1510 and the conference room number is 174086 and

For video observation, parties are to utilize the **GoToMeeting** web-based application and enter conference code:  judgenorman

Application to Employ                                                                                     Page  1

**Electronic participation in evidentiary hearings is no longer permitted by Judge Norman.**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Galleria 2425 Owner, LLC ("Galleria" or "Debtor"), hereby files this Application to Employ Attorneys ("Application") on its behalf and respectfully represents as follows:

1. Galleria filed a voluntary petition for relief on December 5, 2023, under Chapter 11 of Title 11, United States Code 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code").

2. The Galleria case is pending before the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

3. Galleria is a limited liability company with offices in Houston, Texas.

4. Reese Baker and Baker & Associates took over case on December 6, 2023.

5. To perform the legal services required in connection with this chapter 11 case, the Debtor desires to employ Reese W. Baker and Baker & Associates ("Baker") to act as the attorney for the Debtor in all matters arising in or related to this case, and to designate Reese W. Baker as the attorney in charge, effective as of the date hereof. Mr. Baker's address is 950 Echo Lane, Ste 300, Houston, Texas 77024.

6. The professional services to be rendered on behalf of the Debtor by Baker in this case include all legal services arising in or related to the captioned Chapter 11 case, including, without limitation the following:

   a. Analysis of the financial situation, and rendering advice and assistance to the Debtor;

   b. Advising the Debtor with respect to its duties as debtor;

   c. Preparation and filing of all appropriate petitions, schedules of assets and liabilities, statements of affairs, answers, motions and other legal papers;

   d. Representation of the Debtor at the first meeting of creditors and such other services as may be required during the course of the bankruptcy proceedings;

e.   Representing the Debtor in all proceedings before the Court and in any other judicial or administrative proceeding where the rights of the Debtor may be litigated or otherwise affected, including all adversary proceedings in which the Debtor is a plaintiff, defendant or otherwise a party or party in interest;

f.   Preparation and filing of a Disclosure Statement (if required) and Chapter 11 Plan of Reorganization; and

g.   Assistance to the Debtor in any matters relating to or arising out of the captioned case.

7.   Except as described, to the best of Debtor's knowledge, neither Baker nor any other person associated with Baker has any other connection with the Debtor, Debtor's creditors, or any other parties in interest, or the attorneys and accountants for such creditors, or other parties in interest, the United States Trustee, or any person employed in the office of the United States Trustee.  To the best of the Debtor's knowledge, neither Baker nor any other person associated with Baker holds or represents any interest adverse to Debtor's estate in the matter on which Baker is to be engaged by Debtor and Baker, is a "disinterested person" within the meaning of Section 101(14) of the Bankruptcy Code. Exhibit A attached to the Application is Baker's Unsworn Declaration under §327 and Rule 2014.

8.   For legal services rendered in the above-captioned case, the Debtor has agreed to compensate Baker in accordance with its normal billing practices.  The current hourly rates for services rendered by Baker in this proceeding are set forth on the attachments. Additionally, the Debtor has agreed to pay for the reasonable and necessary expenses incurred in rendering legal services to the Debtor, including, but not limited to, postage, photocopying, long distance charges, depositions, and filing fees.  Pursuant to the Bankruptcy Code, the fees of Baker together with its necessary disbursements and expenses, constitute administrative expenses of Debtor's estates in such amounts as may be allowed by the Court.  In compliance with Section 329 of the Bankruptcy Code and Bankruptcy Rule

2016, attached as Exhibit B to the Application is Baker's disclosure regarding his compensation agreement with the Debtor.

9.  Baker received from Galleria Loop Note Holder, LLC, a non-debtor, the amount of $15,000.00 on November 17, 2023, prior to the filing of the case as a retainer for the Debtor.  Baker applied $1,738.00 for filing fees and to the payment of pre-petition fees and other expenses.   The remaining amount will be held in Baker's IOLTA account pending further court order or compliance with Local Rule 2016-1(b) for application of retainers, if necessary.

10.  The chapter 11 post-petition payments to Baker are projected to be made by the Debtor or the owner of the Debtor.  The owner of the Debtor has guaranteed the payments of the fees and expenses of the Debtor to Baker.

11.  Another person or entity has agreed to deposit with the Firm additional amounts each month of approximately the fees for the services provided.  The funds deposited with the Firm will be held in one of the Firm's trust accounts and will be applied to post-petition invoices upon approval by the Bankruptcy Court, if necessary, or compliance with Local Rule 2016-1(b).

12.  The Debtor selected Baker because of its reputation and experience in bankruptcy matters.  Such employment is necessary and in the best interest of Debtor and its estate.

13.  Baker is duly admitted to practice before the United States District Court for the Southern District of Texas.

14.  The Office of the United States Trustee has been provided with a copy of this Application.

15.  No previous application for the relief requested herein has been made to this or any other Court.

   **WHEREFORE,** Debtor requests the entry of an order that (i) authorizes the Debtor, Galleria 2425 Owner, LLC, to employ, and that the Court appoint, Reese W. Baker and Baker & Associates, as attorneys for the Debtor and to approve the designation of Reese W. Baker as the attorney in charge; (ii) subject to

further Court approval as to amounts, compensate Reese W. Baker in accordance with its normal billing

practice and to reimburse such law firm for its necessary disbursements and expenses; (iii) authorize the

Debtor to deposit with Baker and Baker to retain in the IOLTA account monthly deposits, subject to court

approval for application to the unpaid fees and expenses or compliance with Local Rule 2016-1(b), and

(iv) grant the Debtor such and further relief as is just and equitable.

Dated: December 21, 2023

Respectfully submitted,

By: */s/ Reese W. Baker*
Reese W. Baker
Tx Bar No. No.01587700
950 Echo Lane Ste. 300
Houston, TX 77024
(713) 869-9200
(713) 869-9100 (Fax)

Galleria 2425 Owner, LLC
Approved by Ali Choudhri for the Debtor

## CERTIFICATE OF SERVICE

I certify that on or about December 21, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas including the United States Trustee.

*/s/ Reese W. Baker*
Reese W. Baker

000790

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| Galleria 2425 Owner, LLC | § | Case No. 23-34815-H5-11 |
| | § | |
| Debtor | § | |
| | § | |

## UNSWORN DECLARATION OF DISINTERESTEDNESS OF COUNSEL TO THE DEBTOR UNDER PENALTY OF PERJURY PURSUANT TO 11 U.S.C. §327(a) AND BANKRUPTCY RULE 2014

Reese W. Baker ("Baker"), submits this unsworn declaration of disinterestedness of counsel to the Debtor under penalty of perjury pursuant to 11 U.S.C. § 327(a) and Bankruptcy Rule 2014.  Baker declares:

1.    "I am an attorney at law duly licensed to practice in the State of Texas and admitted to practice in this court.

2.    "My mailing address is 950 Echo Lane, Suite 300, Houston, Texas 77024.

3.    "I am an attorney who specializes in bankruptcy and bankruptcy litigation matters.  I have the skill and expertise to render advice to the Debtor with respect to all bankruptcy and civil litigation issues related to its Chapter 11 case.

4.    "Baker received from Galleria Loop Note Holder, LLC, the amount of $15,000 on November 17, 2023, prior to the filing of the chapter 11 case.  Baker applied $1,738.00 for filing fees and for the payment of pre-petition fees and other expenses.   The remainder will be held in the IOLTA account of the Firm.

5.    "The Debtor has agreed to deposit with the Firm amounts each month of approximately the fees for the services provided, to the extent funds are available.  The funds deposited with the Firm will be held in one of the Firm's trust accounts and will be applied to post-petition

invoices upon approval by the Bankruptcy Court, if necessary, or no objection to the application of the amounts in accordance with Local Rule 2016-1(b).  The owner of the Debtor has guaranteed payment of the fees and expenses of the Debtor.

6.  "To the best of my knowledge, except as indicated on an additional disclosure, neither I nor any other person associated with me has represented or otherwise dealt with, or is now representing and otherwise dealing with, any entity that is or may consider itself a creditor, or other party in interest in connection with the Debtor's Chapter 11 case.  Except as set forth on an additional attachment (if any) or herein, I do not have any other connection with the Debtor, the Debtor's creditors, or any other parties in interest, or the attorneys and accountants for such creditors, or other parties in interest, the United States Trustee, or any person employed in the office of the United States Trustee.  I am a "disinterested person" within the meaning of Section 101(14) of the Bankruptcy Code.

7.  "To the best of my knowledge, neither I nor any other person associated with me represents or holds any interest adverse to the Debtor or his estate or has any interest materially adverse to the interest of any class of Debtor's creditors or other parties in interest.

8.  "I declare under penalty of perjury that the foregoing is true and correct."

Executed on December 19, 2023

By: */s/ Reese W. Baker*
Reese W. Baker
Tx Bar No. No.01587700
950 Echo Lane Ste. 300
Houston, TX 77024
(713) 869-9200
(713) 869-9100 (Fax)

**THIS UNSWORN DECLARATION IS MADE UNDER PENALTY OF PERJURY**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

IN RE:                                   §
                                         §
Galleria 2425 Owner, LLC                 §              Case No: 23-34815-H5-11
                                         §
Debtor                                   §

**STATEMENT OF ATTORNEY FOR PETITIONER**
**PURSUANT TO BANKRUPTCY RULE 2016(b)**

The undersigned, pursuant to Bankruptcy Rule 2016(b), states that:

1.      I, Reese W. Baker ("Baker"), am an attorney whose address is 950 Echo Lane, Suite

        300, Houston, Texas 77024.  I am the proposed attorney for Galleria 2425 Owner,

        LLC (the "Debtor") in this case.

2.      I or an attorney in the Firm initially met or conferred with the owner an entity that

        is the owner of the Debtor, Ali Choudhri, in November of 2023, regarding a

        possible bankruptcy case for the Debtor.

3.      Galleria Loop Note Holder, LLC deposited with Baker the amount of $15,000.00

        on November 17, 2023, prior to the filing of the case for the benefit of the Debtor.

        Baker applied $1,738.00 for filing fees and for the payment of pre-petition fees and

        other expenses. The remaining amounts will be held in the IOLTA account of the

        Firm pending application to additional fees and if necessary, court approval.

4.      The chapter 11 post-petition payments to Baker are projected to be made by the

        Debtor.

5.      The Debtor or another entity on behalf of the Debtor has agreed to deposit with the

        Firm amounts each month of approximately the fees for the services provided.  The

funds deposited with the Firm will be held in one of the Firm's trust accounts and will be applied to post-petition invoices upon approval by the Bankruptcy Court., if necessary.

6.     The post-petition payments to Baker are projected to be made by the Debtor or another entity on behalf of the Debtor. The owner of the Debtor has guaranteed payment of the fees and expenses of the Debtor.

7.     The compensation paid or agreed to be paid by the Debtor to Baker is as follows:

a.     For post-petition legal services, the Debtor has agreed to compensate Baker in accordance with its normal billing practices. Additionally, the Debtor has agreed to pay for reasonable and necessary expenses incurred in rendering legal services to the Debtor, including, but not limited to, postage, photocopying, faxing, messenger services, long distance charges, depositions, legal research, and filing fees.  Pursuant to the Bankruptcy Code, the fees of Baker, together with its necessary disbursements and expenses, will constitute administrative expenses of the Debtor's estate in such amounts as may be allowed by the Bankruptcy Court.

b.     Attached as Exhibit A are the billing rates for attorneys and paralegals at Baker from the contract.

10.     The services rendered or to be rendered include the following:

A.     Analysis of the financial situation, and rendering advice and assistance to the Debtor;

B.     Advising the Debtor with respect to its duties as a debtor;

C.     Preparation and filing of all appropriate petitions, schedules of assets and liabilities, statements of affairs, answers, motions and other legal papers;

D.     Representation of the Debtor at the first meeting of creditors and such other services as may be required during the course of the bankruptcy proceedings;

000794

        E.      Representing the Debtor in all proceedings before the Court and in any other judicial or administrative proceeding where the rights of the Debtor may be litigated or otherwise affected, including without limitation, any and all adversary proceedings;

        F.      Preparation and filing of a Disclosure Statement and Chapter 11 Plan of Reorganization; and

        G.      Assistance to the Debtor in any matters relating to or arising out of the captioned case.

11.      The undersigned further states that he has not shared or agreed to share with any person, other than with the members and employees of Baker (including "of counsel" attorneys), any compensation or reimbursement to be paid to Baker by the Debtor for the fees set forth above in connection with this case.

DATED:  December 19, 2023

                        Respectfully submitted,

                        */s/ Reese W. Baker*
                        Reese W. Baker
                        TX Bar No. No.01587700
                        Baker & Associates
                        950 Echo Lane, Ste. 300
                        Houston, TX 77024
                        (713) 869-9200
                        (713) 869-9100 (Fax)

**EXHIBIT "A"**

**BAKER & ASSOCIATES**
**FEE/RATE SCHEDULE**

<u>Attorneys</u>

| | | |
|---|---|---|
| Reese W. Baker | RWB | $525 |
| Sonya Kapp | SK | $475 |
| Nikie Marie Lopez-Pagan | NL | $450 |

<u>Paralegals</u>

| | | |
|---|---|---|
| Tammy Chandler | TC | 145 |
| Margaret Hunt | MH | 145 |
| Alfredo Cruz | AC | 150 |
| Stephanie Del Toro | SDT | 145 |
| Jennifer Hunt | JH | 145 |
| Maria Jimenez | MJ | 145 |
| Gabby Martinez | GM | 150 |
| Susanne Taylor | ST | 175 |

## DISCLOSURES OF THE FIRM
Galleria 2425 Owner, LLC

1.  Representation of or otherwise dealing with, or situations where the firm is now representing or otherwise dealing with, any entity that is or may consider itself a creditor of the debtors:

The following entities are creditors and counsel for the debtor may have other cases involving such entities:

      ADT
      Ash Automated Control Systems, LLC
      Caz Creek Lending
      CFI Mechanical, Inc
      Cirro Electric
      City of Houston Water Department
      CNA Insurance Co
      CNA Insurance Company
      Comcast
      Datawatch Systems
      Environmental Coalition Inc
      Ferguson Facilities Supplies
      Firetron
      First Insurance Funding
      G3 Global Services LLC
      Harris County Tax Assessor
      Lexitas
      Logix Fiber Networks
      Mueller Water Treatment
      National Bank of Kuwait
      Nationwide Investigations & Security Inc
      Nationwide Security
      SIBS International Inc
      Smart Office Solutions
      SprintCom Inc
      St. Christopher Holdings GP LLC
      T&R Mechanical
      TKE
      UL Therapy
      Uptown Cosmetic and Implant Dentistry
      Waste Management
      Zindler Cleaning Service Co

Counsel for the Debtor does not represent any of the creditors of the Debtor.  Counsel for the Debtor does not represent any of the creditors of the Debtor.

2.      Connections with the Debtor, the Debtor's creditors, or any other parties in interest, or the attorneys and accountants for such creditors, or other parties in interest

The firm is representing debtors in other cases where certain creditors of the debtor may also be creditors of other clients of the Firm.  The Firm may have involvement with the entities or persons listed above.

The Firm does not maintain a central list of creditors in cases so the Firm cannot notify this Court of each creditor in this case that may be a creditor in another case where the firm represents the debtor (not the debtor in this case).

**BAKER & ASSOCIATES**
**FEE/RATE SCHEDULE**

<u>Attorneys</u>

| | | |
|---|---|---|
| Reese W. Baker | RWB | $525 |
| Sonya Kapp | SK | $475 |
| Nikie Marie Lopez-Pagan | NL | $450 |

<u>Paralegals</u>

| | | |
|---|---|---|
| Tammy Chandler | TC | 145 |
| Alfredo Cruz | AC | 150 |
| Stephanie Del Toro | SDT | 145 |
| Jennifer Hunt | JH | 145 |
| Maria Jimenez | MJ | 145 |
| Gabby Martinez | GM | 150 |
| Susanne Taylor | ST | 175 |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| Galleria 2425 Owner, LLC | § | Case No. 23-34815-H5-11 |
| | § | |
| Debtor | § | |

**ORDER AUTHORIZING EMPLOYMENT OF**
**REESE W. BAKER AND BAKER & ASSOCIATES**

**CAME ON FOR CONSIDERATION** the Application of Galleria 2425 Owner,  LLC ("Debtor") Debtor-in-possession in the above-captioned Chapter 11 case, for authority to employ Reese W. Baker and Baker & Associates ("Baker") as counsel for legal services in connection with its bankruptcy case, and to designate Reese W. Baker as attorney in charge, and adequate notice of such Application having been given, the Court finds as follows: that Baker holds or represents no interest adverse to Debtor's estate in the matters on which it is employed; that Baker is a disinterested person within the meaning of 11 U.S.C. § 101(14); that the designation of Reese W. Baker as the attorney in charge should be approved; and that the employment of Baker on the terms and conditions set forth in the application is necessary and in the best interest of Debtor and its estate.  The rates of Baker are attached to the Motion as an exhibit.  It is therefore,

**ORDERED** that the Debtor shall be and hereby is authorized to employ, and the Court hereby appoints, the law firm of Baker & Associates as Debtor's counsel for legal services in connection with this bankruptcy case and any adversary proceedings effective as of the date of the filing of this chapter 11 case.  It is further

**ORDERED** that Reese W. Baker shall be, and hereby is, designated as attorney in charge for these matters.  It is further

**ORDERED** that subject to further court approval as to amounts, and upon fee application, Debtor shall be, and hereby is, authorized to compensate Baker in accordance with its normal billing practice and to reimburse Baker for its necessary disbursement and expenses.  The allowed fees, disbursements and expenses of Baker shall constitute administrative expenses of the Debtor's estate.  It is further

**ORDERED** that Baker shall provide ten-business-days' notice to the Debtor, the U.S. Trustee, and any official committee before any increases in the rates set forth in the Application are implemented and shall file such notice with the Court. The U.S. Trustee retains all rights to object to any rate increase in accordance with the reasonableness standard set forth in section 330 of the Bankruptcy Code, and the Court retains the right to review any rate increase pursuant to section 330 of the Bankruptcy Code.  It is further

**ORDERED** that Baker shall not charge a markup to the Debtor with respect to fees billed by contract attorneys who are hired by Baker to provide services to the Debtor and shall ensure that any such contract attorneys are subject to conflict checks and disclosures in accordance with the requirements of the Bankruptcy Code and Bankruptcy Rules.  It is further

**ORDERED** that Baker shall use its reasonable efforts to avoid any duplication of services provided by any of the Debtor's other retained professionals in these chapter 11 cases.  It is further

**ORDERED** that to the extent there is inconsistency between the terms of the Baker Declaration, the Application, the Engagement Letter and this Order, the terms of this Order shall govern.  It is further

**ORDERED** that the Debtor may deposit with the Firm amounts of approximately the fees for the services provided for the prior month and such deposits are hereby authorized pursuant to Local Rule 2016-1(b), subject to the Debtor having approval to use cash collateral.  Alternatively,

another non-debtor entity may deposit such amounts with the Firm.  The Firm must file a notice

of receipt of such deposit(s).  The funds held by the Firm will be held in one of the Firm's trust

accounts.  The Firm may file a notice to apply the funds received from the Debtor to the fees and

expenses owed by the Debtor and such funds may be applied to post-petition invoices if no

objection is filed within 21 days of the filing of such notice to apply in compliance with Local

Rule 2016-1(b).  It is further

   **ORDERED** that the Debtor and Baker are authorized to take all actions necessary to

effectuate the relief granted pursuant to this Order in accordance with the Application.  It is further

   **ORDERED** that the Court retains jurisdiction with respect to all matters arising from or

related to the implementation of this Order.  It is further

   **ORDERED** that Baker may submit interim fee applications every 30 days.

Signed this _____ day of _____, 2023

_____
Jeffrey P. Norman
United States Bankruptcy Judge

Submitted By:

Reese W. Baker
Baker & Associates
Tx Bar No. No.01587700
950 Echo Lane Ste 300
Houston, Texas 770024
(713) 869-9200
(713) 869-9100 (Fax)

| Fill in this information to identify the case: |
|---|
| Debtor name _____ Galleria 2425 Owner, LLC _____ |
| United States Bankruptcy Court for the: _____ Southern District of Texas _____ |
| Case number (if known): _____ 23-34815-H5-11 _____ |

☐ Check if this is an
amended filing

## Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors       12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

| | Declaration and signature |
|---|---|

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☑ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☑ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☑ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☑ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☑ *Schedule H: Codebtors* (Official Form 206H)

☑ *A Summary of Assets and Liabilities for Non-Individuals* (Official Form 206A-Summary)

☐ *Amended Schedule* _____

☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☐ Other document that requires a declaration _____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  __12/22/2023__          X  _____
            MM/ DD/ YYYY                    Signature of individual signing on behalf of debtor

DocuSigned by:
*Dward Darjean*
F771A38D78374AE...

                              __Dward Darjean__
                              Printed name

                              __Manager__
                              Position or relationship to debtor

Official Form B202                    Declaration Under Penalty of Perjury for Non-Individual Debtors                    000803

DocuSign Envelope ID: 20E23392-C96F-4D05-8EF7-E5CE305A1E30

| Fill in this information to identify the case: |
|---|
| Debtor name          Galleria 2425 Owner, LLC |
| United States Bankruptcy Court for the:     Southern District of Texas |
| Case number (if known):     23-34815-H5-11 |

☐ Check if this is an amended filing

## Official Form 204

# Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider*, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Caz Creek Lending 118 Vintage Park Blvd No. W Houston, TX 77070 | | Tax Lien | | $800,238.37 | $17,500,000.00 | $800,238.37 |
| 2 | Cirro Electric PO Box 60004 Dallas, TX 75266 | | Electricity provider | | | | $22,928.00 |
| 3 | City of Houston Po Box 1560 Houston, TX 77251-1560 | | | | $544,604.20 | $17,500,000.00 | $544,604.20 |
| 4 | City of Houston Water Department PO Box 1560 Houston, TX 77251 | | Water | | | | $6,126.00 |
| 5 | Datawatch Systems 4520 East West Highway 200 Bethesda, MD 20814 | | Services | Disputed | | | $22,990.00 |
| 6 | Firetron PO Box 1604 Stafford, TX 77497 | | Services | | | | $30,040.34 |
| 7 | First Insurance Funding 450 Skokie Blvd Northbrook, IL 60062 | | | | | | $5,507.36 |
| 8 | Gulfstream Legal Group 1300 Texas St Houston, TX 77002 | | Legal services | Disputed Unliquidated | | | $57,799.06 |

000804

Debtor ___Galleria 2425 Owner, LLC_____ Case number *(if known)* ___23-34815-H5-11___
          Name

| # | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 9 | Hayward PLLC<br>10501 N Central Expy Ste 106<br>Dallas, TX 75231-2203 | | Legal fees | | | | $97,193.00 |
| 10 | HNB Construction, LLC<br>521 Woodhaven<br>Ingleside, TX 78362 | | Services | Disputed Unliquidated | | | $84,853.00 |
| 11 | Houston Community College System<br>c/o Tara Grundemeier Linebarger, Groggan, Blair & Sampson<br>Po Box 3064<br>Houston, TX 77253-3064 | | Ad Valorem tax lien | | $97,110.05 | $17,500,000.00 | $97,110.05 |
| 12 | Houston Independent School District<br>P.O. Box 4668<br>Houston, TX 77210 | | Ad valorem | | $979,200.35 | $17,500,000.00 | $979,200.35 |
| 13 | Lexitas<br>PO Box Box 734298 Dept 2012<br>Dallas, TX 75373 | | Services | | | | $2,771.75 |
| 14 | National Bank of Kuwait<br>299 Park Ave. 17th Floor<br>New York, NY 10171 | | Deed of Trust | Contingent Disputed Unliquidated | $63,552,988.00 | $17,500,000.00 | $63,552,988.00 |
| 15 | National Bank of Kuwait<br>Charles C. Conrad Pillsbury Winthrop Shaw Pittsman, LLP<br>909 Fannin St, Ste 2000<br>Houston, TX 77010 | | Tax lien assignments - subject to offsets and claims. Tax lien assignments were part of breached settlement agreement. | Contingent Disputed Unliquidated | $1,696,384.00 | $17,500,000.00 | $1,696,384.00 |
| 16 | Nationwide Security<br>2425 W Loop S 300<br>Houston, TX 77027 | | Services | | | | $32,549.70 |
| 17 | Nichamoff Law Firm<br>2444 Times Blvd 270<br>Houston, TX 77005 | | Legal services | | | | $46,984.22 |
| 18 | T&R Mechanical<br>21710 White Oak Dr<br>Conroe, TX 77306-8848 | | | | | | $4,216.34 |
| 19 | TKE<br>3100 Interstate North Cir SE 500<br>Atlanta, GA 30339 | | Elevator maintenance and repair | | | | $76,935.35 |

| | Zindler Cleaning Service Co | | | | | | | $4,221.00 |

DocuSign Envelope ID: 20E23392-C96F-4DD5-8EF7-E3CE305A1E30
2430 Fondren
Houston, TX 77063

| Fill in this information to identify the case: | |
|---|---|
| Debtor Name   **Galleria 2425 Owner, LLC** | |
| United States Bankruptcy Court for the:   **Southern**   District of   **Texas** | |
| | (State) |
| Case number (If known):   **23-34815-H5-11** | ☐ Check if this is an amended filing |

## Official Form 206A/B

# Schedule A/B: Assets — Real and Personal Property                    12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

| Part 1: | Cash and cash equivalents |
|---|---|

1. Does the debtor have any cash or cash equivalents?

   ☐ No. Go to Part 2.
   ☑ Yes. Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | Current value of debtor's interest |
|---|---|

2. **Cash on hand** _____

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|
| 3.1. **Regions Bank** | **Checking account** | ___ ___ ___ ___ | **$56,652.35** |

4. **Other cash equivalents** *(Identify all)*

   4.1 _____ _____
   4.2 _____ _____

5. **Total of Part 1** | **$56,652.35** |

   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

| Part 2: | Deposits and prepayments |
|---|---|

6. Does the debtor have any deposits or prepayments?

   ☐ No. Go to Part 3.
   ☑ Yes. Fill in the information below.

| | Current value of debtor's interest |
|---|---|

7. **Deposits, including security deposits and utility deposits**

   Description, including name of holder of deposit

   7.1 **Security Deposits from Tenants - $173,561.20 not held** | **$0.00** |

| Debtor | Galleria 2425 Owner, LLC | | Case number *(if known)* | 23-34815-H5-11 |
| | Name | | | |

---

8. **Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**

Description, including name of holder of prepayment

8.1 _____   _____

8.2 _____   _____

9. **Total of Part 2**

Add lines 7 through 8. Copy the total to line 81.                                   **$0.00**

---

**Part 3:    Accounts receivable**

10. **Does the debtor have any accounts receivable?**

☐ No. Go to Part 4.

☑ Yes. Fill in the information below.

| | | | | Current value of debtor's interest |
|---|---|---|---|---|

11. **Accounts receivable**

11a. 90 days old or less:    **$68,645.62**    -    **unknown**    =.....→    **$68,645.62**
     face amount           doubtful or uncollectible accounts

11b. Over 90 days old:    _____    -    _____    =.....→    _____
     face amount           doubtful or uncollectible accounts

12. **Total of Part 3**

Current value on lines 11a + 11b = line 12. Copy the total to line 82.          **$68,645.62**

---

**Part 4:    Investments**

13. **Does the debtor own any investments?**

☑ No. Go to Part 5.

☐ Yes. Fill in the information below.

| | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|

14. **Mutual funds or publicly traded stocks not included in Part 1**

Name of fund or stock:

14.1 _____    _____    _____

14.2 _____    _____    _____

15. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

Name of entity:                          % of ownership:

15.1 _____    _____    _____

15.2 _____    _____    _____

16. **Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

Describe:

16.1 _____    _____    _____

---

| Debtor | Galleria 2425 Owner, LLC | | Case number *(if known)* | 23-34815-H5-11 |
| --- | --- | --- | --- | --- |
| | Name | | | |

16.2 _____  _____  _____

17. **Total of Part 4**
Add lines 14 through 16. Copy the total to line 83.     [_____]

| Part 5: | **Inventory, excluding agriculture assets** |
| --- | --- |

18. **Does the debtor own any inventory (excluding agriculture assets)?**
☑ No. Go to Part 6.
☐ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
| --- | --- | --- | --- | --- |
| 19. **Raw materials** | MM / DD / YYYY | | | |
| 20. **Work in progress** | MM / DD / YYYY | | | |
| 21. **Finished goods, including goods held for resale** | MM / DD / YYYY | | | |
| 22. **Other inventory or supplies** | MM / DD / YYYY | | | |

23. **Total of Part 5**
Add lines 19 through 22. Copy the total to line 84.    [_____]

24. **Is any of the property listed in Part 5 perishable?**
☑ No
☐ Yes

25. **Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**
☑ No
☐ Yes. Book value _____ Valuation method _____ Current value _____

26. **Has any of the property listed in Part 5 been appraised by a professional within the last year?**
☑ No
☐ Yes

| Part 6: | **Farming and fishing-related assets (other than titled motor vehicles and land)** |
| --- | --- |

27. **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**
☑ No. Go to Part 7.
☐ Yes. Fill in the information below.

Debtor    <u>Galleria 2425 Owner, LLC</u>                                      Case number *(if known)* <u>23-34815-H5-11</u>
     Name

| | General description | Net book value of debtor's interest<br><br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 28. | **Crops—either planted or harvested** | _____ | _____ | _____ |
| 29. | **Farm animals** *Examples:* Livestock, poultry, farm-raised fish | _____ | _____ | _____ |
| 30. | **Farm machinery and equipment** (Other than titled motor vehicles) | _____ | _____ | _____ |
| 31. | **Farm and fishing supplies, chemicals, and feed** | _____ | _____ | _____ |
| 32. | **Other farming and fishing-related property not already listed in Part 6** | _____ | _____ | _____ |
| 33. | **Total of Part 6**<br>Add lines 28 through 32. Copy the total to line 85. | | | _____ |

34. **Is the debtor a member of an agricultural cooperative?**

   ☑ No

   ☐ Yes. Is any of the debtor's property stored at the cooperative?

       ☐ No

       ☐ Yes

35. **Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**

   ☑ No

   ☐ Yes.  Book value _____  Valuation method _____  Current value _____

36. **Is a depreciation schedule available for any of the property listed in Part 6?**

   ☑ No

   ☐ Yes

37. **Has any of the property listed in Part 6 been appraised by a professional within the last year?**

   ☑ No

   ☐ Yes

| Part 7: | Office furniture, fixtures, and equipment; and collectibles |
|---|---|

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

   ☐ No. Go to Part 8.

   ☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest<br><br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|

39. **Office furniture**

| Debtor | Galleria 2425 Owner, LLC | | Case number *(if known)* | 23-34815-H5-11 |
| | Name | | | |

| | Other entities own furniture, equipment | | unknown | | unknown |
|---|---|---|---|---|---|
| 40. | **Office fixtures** | | | | |
| 41. | **Office equipment, including all computer equipment and communication systems equipment and software** | | | | |
| 42. | **Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | | |
| | 42.1 | | | | |
| | 42.2 | | | | |
| | 42.3 | | | | |

43. **Total of Part 7**

Add lines 39 through 42. Copy the total to line 86.

44. **Is a depreciation schedule available for any of the property listed in Part 7?**

☑ No

☐ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**

☑ No

☐ Yes

**Part 8:     Machinery, equipment, and vehicles**

46. **Does the debtor own or lease any machinery, equipment, or vehicles?**

☑ No. Go to Part 9.

☐ Yes. Fill in the information below.

| General description<br><br>Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | Net book value of debtor's interest<br><br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 47. **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| 47.1 | | | |
| 47.2 | | | |
| 47.3 | | | |
| 47.4 | | | |
| 48. **Watercraft, trailers, motors, and related accessories** Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels | | | |
| 48.1 | | | |
| 48.2 | | | |

DocuSign Envelope ID: 20E22392-C96F-4D05-8EF7-FCE305A1E30

| Debtor | Galleria 2425 Owner, LLC | | Case number *(if known)* | 23-34815-H5-11 |
|---|---|---|---|---|
| | Name | | | |

| 49. | **Aircraft and accessories** | | | |
|---|---|---|---|---|
| | 49.1 _____ | _____ | _____ | _____ |
| | 49.2 _____ | _____ | _____ | _____ |

| 50. | **Other machinery, fixtures, and equipment (excluding farm machinery and equipment)** | | | |
|---|---|---|---|---|
| | _____ | _____ | _____ | _____ |

51. **Total of Part 8**

Add lines 47 through 50. Copy the total to line 87.

| _____ |
|---|

52. **Is a depreciation schedule available for any of the property listed in Part 8?**

☑ No

☐ Yes

53. **Has any of the property listed in Part 8 been appraised by a professional within the last year?**

☑ No

☐ Yes

| **Part 9:** | **Real property** |
|---|---|

54. **Does the debtor own or lease any real property?**

☐ No. Go to Part 10.

☑ Yes. Fill in the information below.

55. **Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property<br>Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building), if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest<br><br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1 **Real Property / 2425 West Loop South Houston, TX 77027** | Fee Simple | unknown | **Value based on appraisal of property by Cushman and Wakefield dated May 3, 2023 for the National Bank of Kuwait** | $17,500,000.00 |

56. **Total of Part 9**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88.

| $17,500,000.00 |
|---|

57. **Is a depreciation schedule available for any of the property listed in Part 9?**

☑ No

☐ Yes

58. **Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☐ No

☑ Yes

| **Part 10:** | **Intangibles and intellectual property** |
|---|---|

| Debtor | Galleria 2425 Owner, LLC | Case number *(if known)* | 23-34815-H5-11 |
|---|---|---|---|
| | Name | | |

---

**59.** **Does the debtor have any interests in intangibles or intellectual property?**

☐ No. Go to Part 11.
☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **60.** Patents, copyrights, trademarks, and trade secrets | | | |
| | _____ | _____ | _____ |
| **61.** Internet domain names and websites | | | |
| | _____ | _____ | _____ |
| **62.** Licenses, franchises, and royalties | | | |
| Elevator, fire alarm, occupancy permits - City of Houston Permits | unknown | | $100.00 |
| **63.** Customer lists, mailing lists, or other compilations | | | |
| | _____ | _____ | _____ |
| **64.** Other intangibles, or intellectual property | | | |
| | _____ | _____ | _____ |
| **65.** Goodwill | | | |
| | _____ | _____ | _____ |

**66.** Total of Part 10

Add lines 60 through 65. Copy the total to line 89.

| | $100.00 |
|---|---|

**67.** **Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C. §§ 101(41A) and 107)**?**

☑ No
☐ Yes

**68.** **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**

☑ No
☐ Yes

**69.** **Has any of the property listed in Part 10 been appraised by a professional within the last year?**

☑ No
☐ Yes

| **Part 11:** | **All other assets** |
|---|---|

**70.** **Does the debtor own any other assets that have not yet been reported on this form?**

Include all interests in executory contracts and unexpired leases not previously reported on this form.

☐ No. Go to Part 12.
☑ Yes. Fill in the information below.

| | Current value of debtor's interest |
|---|---|

Debtor    __Galleria 2425 Owner, LLC_____    Case number *(if known)* __23-34815-H5-11__
          Name

---

71.  **Notes receivable**

Description (include name of obligor)

_____    _____ – _____ = ➡   _____
                           Total face amount    doubtful or uncollectible amount

72.  **Tax refunds and unused net operating losses (NOLs)**

Description (for example, federal, state, local)

_____   Tax year _____   _____

_____   Tax year _____   _____

_____   Tax year _____   _____

73.  **Interests in insurance policies or annuities**

_____                         _____

74.  **Causes of action against third parties (whether or not a lawsuit has been filed)**

  Claims against the National Bank of Kuwait including, but not limited to, lender liability, conspiracy and breach of contract.                                                                          unknown

Nature of claim        _____

Amount requested       _____ unknown

  Claims, including but not limited to, breach of contract against Sonder (former tenant)            unknown

Nature of claim        _____

Amount requested       _____ unknown

  Potential disputes/breach of contract claims with current tenants regarding leases            unknown

Nature of claim        _____

Amount requested       _____ unknown

  Claims and causes of action against Azeemeh Zaheer, Osama Abdulatiff, Rodney Drinnon and/or David Tang            unknown

Nature of claim        Claims include, but not limited to, breach of duty, fraud, conspiracy, RICO, disparagement, tortuous interference with contract, tortuous interference with business relationships, and other claims and causes of action

Amount requested       _____ unknown

75.  **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

_____

Nature of claim        _____

Amount requested       _____

76.  **Trusts, equitable or future interests in property**

_____                                 _____

77.  **Other property of any kind not already listed** *Examples:* Season tickets, country club membership

_____                                 _____

---

| Debtor | Galleria 2425 Owner, LLC | Case number *(if known)* | 23-34815-H5-11 |
|--------|--------------------------|--------------------------|----------------|
|        | Name                     |                          |                |

---

78. **Total of Part 11**
    Add lines 71 through 77. Copy the total to line 90.

79. **Has any of the property listed in Part 11 been appraised by a professional within the last year?**

    ☑ No
    ☐ Yes

---

**Part 12:     Summary**

In Part 12 copy all of the totals from the earlier parts of the form.

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $56,652.35 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $0.00 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $68,645.62 | |
| 83. **Investments.** *Copy line 17, Part 4.* | | |
| 84. **Inventory.** *Copy line 23, Part 5.* | | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | unknown | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | | |
| 88. **Real property.** *Copy line 56, Part 9*......................................................... ➜ | | $17,500,000.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $100.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + unknown | |
| 91. **Total.** *Add lines 80 through 90 for each column*...........................91a. | $125,397.97 | + 91b. $17,500,000.00 |
| 92. **Total of all property on Schedule A/B.** Lines 91a + 91b = 92. .................................................... | | $17,625,397.97 |

```
Fill in this information to identify the case:

Debtor name    Galleria 2425 Owner, LLC

United States Bankruptcy Court for the:    Southern    District of    Texas
                                                                  (State)
Case number (if known):    23-34815-H5-11
```

☐ Check if this is an
   amended filing

Official Form 206D

# Schedule D: Creditors Who Have Claims Secured by Property          12/15

**Be as complete and accurate as possible.**

1. **Do any creditors have claims secured by debtor's property?**
   ☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.
   ☑ Yes. Fill in all of the information below.

| Part 1: | List Creditors Who Have Secured Claims |
|---|---|

2. **List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

| | Column A<br>**Amount of claim**<br>Do not deduct the value of collateral. | Column B<br>**Value of collateral that supports this claim** |
|---|---|---|

| **2.1** Creditor's name | Describe debtor's property that is subject to a lien | $25,092,415.80 | $17,500,000.00 |
|---|---|---|---|

**2.1**

**Creditor's name**
2425 WL, LLC

**Creditor's mailing address**
13498 Pond Springs Rd.
Austin, TX 78729

**Creditor's email address, if known**

**Date debt was incurred**          May 2018

**Last 4 digits of account number**    __ __ __ __

**Do multiple creditors have an interest in the same property?**
☐ No
☑ Yes. Specify each creditor, including this creditor, and its relative priority.

   **1) 2425 WL, LLC**; 2) National Bank of Kuwait; 3) Caz Creek Lending; 4) National Bank of Kuwait ; 5) Houston Independent School District; 6) Houston Community College System; 7) City of Houston

**Describe debtor's property that is subject to a lien**
Real Property

**Describe the lien**
Second lien mortgage

**Is the creditor an insider or related party?**
☐ No
☑ Yes

**Is anyone else liable on this claim?**
☑ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H).

**As of the petition filing date, the claim is:**
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

3. **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.**          $92,762,940.77

| Debtor | Galleria 2425 Owner, LLC | Case number (if known) 23-34815-H5-11 |
|---|---|---|
| | Name | |

## Part 1: Additional Page

**Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page.**

| | Column A<br>**Amount of claim**<br>Do not deduct the value of collateral. | Column B<br>**Value of collateral that supports this claim** |
|---|---|---|

**2.2**

**Creditor's name**

Caz Creek Lending

**Creditor's mailing address**

118 Vintage Park Blvd No. W

Houston, TX 77070

**Creditor's email address, if known**

_____

**Date debt was incurred** _____

**Last 4 digits of account number** __ __ __ __

**Do multiple creditors have an interest in the same property?**

☐ No

☑ Yes. Have you already specified the relative priority?

   ☐ No.  Specify each creditor, including this creditor, and its relative priority.

   _____

   ☑ Yes. The relative priority of creditors is specified on lines _2.1_

**Describe debtor's property that is subject to a lien**

Real Property

**Describe the lien**

Tax Lien

**Is the creditor an insider or related party?**

☑ No

☐ Yes

**Is anyone else liable on this claim?**

☑ No

☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H).

**As of the petition filing date, the claim is:**

Check all that apply.

☐ Contingent

☐ Unliquidated

☐ Disputed

| $800,238.37 | $17,500,000.00 |
|---|---|

| Debtor | Galleria 2425 Owner, LLC | Case number (if known) | 23-34815-H5-11 |
|---|---|---|---|
| | Name | | |

| **Part 1:** | **Additional Page** | *Column A*<br>**Amount of claim**<br>Do not deduct the value<br>of collateral. | *Column B*<br>**Value of collateral<br>that supports this<br>claim** |
|---|---|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page.

**2.3**

**Creditor's name**

City of Houston

**Creditor's mailing address**

Po Box 1560

Houston, TX 77251-1560

**Creditor's email address, if known**

_____

**Date debt was incurred** _____

**Last 4 digits of account number** __ __ __ __

**Do multiple creditors have an interest in the same property?**

☐ No

☑ Yes. Have you already specified the relative priority?

   ☐ No.  Specify each creditor, including this creditor, and its relative priority.

   _____

   ☑ Yes. The relative priority of creditors is specified on lines  2.1

**Describe debtor's property that is subject to a lien**

Real Property

**Describe the lien**

_____

**Is the creditor an insider or related party?**

☑ No

☐ Yes

**Is anyone else liable on this claim?**

☑ No

☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H).

**As of the petition filing date, the claim is:**

Check all that apply.

☐ Contingent

☐ Unliquidated

☐ Disputed

$544,604.20     $17,500,000.00

| Debtor | Galleria 2425 Owner, LLC | | Case number (if known) | 23-34815-H5-11 |
|---|---|---|---|---|
| | Name | | | |

| **Part 1:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the
previous page.

**Column A**
**Amount of claim**
Do not deduct the value
of collateral.

**Column B**
**Value of collateral that supports this claim**

### 2.4  Creditor's name

Houston Community College System

**Creditor's mailing address**

c/o Tara Grundemeier
Linebarger, Groggan, Blair &
Sampson

Po Box 3064

Houston, TX 77253-3064

**Creditor's email address, if known**

**Date debt was incurred**

**Last 4 digits of account number**  ___  ___  ___  ___

**Do multiple creditors have an interest in the same property?**

☐ No
☑ Yes. Have you already specified the relative priority?

   ☐ No.  Specify each creditor, including this creditor, and its relative priority.

   ☑ Yes. The relative priority of creditors is specified on lines  2.1

**Describe debtor's property that is subject to a lien**

Real Property

$97,110.05

$17,500,000.00

**Describe the lien**

Ad Valorem tax lien

**Is the creditor an insider or related party?**

☑ No
☐ Yes

**Is anyone else liable on this claim?**

☑ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H).

**As of the petition filing date, the claim is:**

Check all that apply.

☐ Contingent
☐ Unliquidated
☐ Disputed

| Debtor | Galleria 2425 Owner, LLC | Case number (if known) | 23-34815-H5-11 |
|---|---|---|---|
| | Name | | |

---

| **Part 1:** | **Additional Page** |
|---|---|

| | Column A<br>**Amount of claim**<br>Do not deduct the value<br>of collateral. | Column B<br>**Value of collateral**<br>**that supports this**<br>**claim** |
|---|---|---|

**Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page.**

---

**2.5**

**Creditor's name**

Houston Independent School District

**Creditor's mailing address**

P.O. Box 4668

Houston, TX 77210

**Creditor's email address, if known**

_____

**Date debt was incurred** _____

**Last 4 digits of account number** __ __ __ __

**Do multiple creditors have an interest in the same property?**

☐ No

☑ Yes. Have you already specified the relative priority?

   ☐ No. Specify each creditor, including this creditor, and its relative priority.

   _____

   ☑ Yes. The relative priority of creditors is specified on lines 2.1

**Describe debtor's property that is subject to a lien**

Real Property

**Describe the lien**

Ad valorem

**Is the creditor an insider or related party?**

☑ No

☐ Yes

**Is anyone else liable on this claim?**

☑ No

☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H).

**As of the petition filing date, the claim is:**

Check all that apply.

☐ Contingent

☐ Unliquidated

☐ Disputed

|  |  |
|---|---|
| $979,200.35 | $17,500,000.00 |

---

| Debtor | Galleria 2425 Owner, LLC | Case number (if known) | 23-34815-H5-11 |
|---|---|---|---|
| | Name | | |

| **Part 1:** | **Additional Page** |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page.

*Column A*
**Amount of claim**
Do not deduct the value of collateral.

*Column B*
**Value of collateral that supports this claim**

**2.6** **Creditor's name**

National Bank of Kuwait

**Creditor's mailing address**

299 Park Ave. 17th Floor

New York, NY 10171

**Creditor's email address, if known**

_____

| Date debt was incurred | 05/23/2018 |
|---|---|

Last 4 digits of account number     __ __ __ __

**Do multiple creditors have an interest in the same property?**

☐ No
☑ Yes. Have you already specified the relative priority?

    ☐ No.  Specify each creditor, including this creditor, and its relative priority.

    _____

    ☑ Yes. The relative priority of creditors is specified on lines  2.1

**Describe debtor's property that is subject to a lien**

Real Property

**Describe the lien**

Deed of Trust

**Is the creditor an insider or related party?**

☑ No
☐ Yes

**Is anyone else liable on this claim?**

☑ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H).

**As of the petition filing date, the claim is:**

Check all that apply.

☑ Contingent
☑ Unliquidated
☑ Disputed

$63,552,988.00          $17,500,000.00

**Remarks:** Claim subject to offset and claims for damages; Debtor has significant claims against the NBK for wrongful actions and breach of contract

Debtor    Galleria 2425 Owner, LLC                      Case number (if known) 23-34815-H5-11

Name

---

| **Part 1:** | **Additional Page** | Column A **Amount of claim** Do not deduct the value of collateral. | Column B **Value of collateral that supports this claim** |
|---|---|---|---|

**Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page.**

**2.7**   **Creditor's name**

National Bank of Kuwait

**Creditor's mailing address**

Charles C. Conrad Pillsbury
Winthrop Shaw Pittsman, LLP

909 Fannin St, Ste 2000

Houston, TX 77010

**Creditor's email address, if known**

_____

**Date debt was incurred** _____

**Last 4 digits of account number** __ __ __ __

**Do multiple creditors have an interest in the same property?**

☐ No

☑ Yes. Have you already specified the relative priority?

     ☐ No.   Specify each creditor, including this creditor, and its relative priority.

     _____

     ☑ Yes. The relative priority of creditors is specified on lines _2.1_

**Describe debtor's property that is subject to a lien**

Real Property

**Describe the lien**

Tax lien assignments - subject to offsets and claims. Tax lien assignments were part of breached settlement agreement.

**Is the creditor an insider or related party?**

☑ No
☐ Yes

**Is anyone else liable on this claim?**

☑ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H).

**As of the petition filing date, the claim is:**
Check all that apply.

☑ Contingent
☑ Unliquidated
☑ Disputed

| | |
|---|---|
| $1,696,384.00 | $17,500,000.00 |

DocuSign Envelope ID: 20E22392-C96F-4DD5-8EF7-E3CE305A1E30

000824

Debtor    Galleria 2425 Owner, LLC                                          Case number (if known) 23-34815-H5-11
_____
Name

| Part 2: | List Others to Be Notified for a Debt Already Listed in Part 1 |

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to be notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| 2425 WL, LLC<br>60 West 2nd St.<br>Freeport, NY 11746 | Line 2. _1_ | __ __ __ __ |
| Linebarger Goggan & Blair<br>P.O. Box 3064<br>Houston, TX 77253 | Line 2. _3_ | __ __ __ __ |
| Linebarger Goggan & Blair<br>P.O. Box 3064<br>Houston, TX 77253 | Line 2. _5_ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |
| | Line 2. __ | __ __ __ __ |

000825

DocuSign Envelope ID: 20E22392-C96F-4D05-8EF7-E1CE305A1E30

DocuSign Envelope ID: 20E23392-C96F-4D05-8EF7-FCE305A1F30

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor name | Galleria 2425 Owner, LLC |
| United States Bankruptcy Court for the: | Southern District of Texas |
| Case number (if known): | 23-34815-H5-11 |

☐ Check if this is an
amended filing

## Official Form 206E/F

# Schedule E/F: Creditors Who Have Unsecured Claims
**12/15**

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

### Part 1: List All Creditors with PRIORITY Unsecured Claims

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507)
   ☑ No. Go to Part 2.
   ☐ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part.** If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

| | | Total claim | Priority amount |
|---|---|---|---|
| **2.1** | Priority creditor's name and mailing address | | |

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Date or dates debt was incurred**

**Basis for the claim:**

**Last 4 digits of account number** ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

**Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) ___

| | | | |
|---|---|---|---|
| **2.2** | Priority creditor's name and mailing address | | |

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Date or dates debt was incurred**

**Basis for the claim:**

**Last 4 digits of account number** ___ ___ ___ ___

**Is the claim subject to offset?**
☐ No
☐ Yes

**Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) ___

000827

| Debtor | Galleria 2425 Owner, LLC | | Case number *(if known)* | 23-34815-H5-11 |
|---|---|---|---|---|
| | Name | | | |

## Part 2: List All Creditors with NONPRIORITY Unsecured Claims

3. **List in alphabetical order all of the creditors with nonpriority unsecured claims.** If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

| | | **Amount of claim** |
|---|---|---|

**3.1** Nonpriority creditor's name and mailing address

2425 West Loop LLC dba Metwall Design Solutions LLC

2425 West Loop S Ste 800

Houston, TX 77027-4214

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

Remarks: Disputes over tenant improvements and other matters

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☑ Unliquidated
☑ Disputed

Basis for the claim: Lease payments

Is the claim subject to offset?
☑ No
☐ Yes

Amount of claim: unknown

---

**3.2** Nonpriority creditor's name and mailing address

ADT

PO Box 382109

Pittsburgh, PA 15251

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Contract

Is the claim subject to offset?
☑ No
☐ Yes

Amount of claim: $1,487.00

---

**3.3** Nonpriority creditor's name and mailing address

Ali Choudhri

1001 West Loop South 700

Houston, TX 77027

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Additional amounts owed for tax liens

Is the claim subject to offset?
☑ No
☐ Yes

Amount of claim: $6,771,235.00

---

**3.4** Nonpriority creditor's name and mailing address

Ash Automated Control Systems, LLC

PO Box 1113

Fulshear, TX 77441

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: HVAC Repair

Is the claim subject to offset?
☑ No
☐ Yes

Amount of claim: $1,548.31

DocuSign Envelope ID: 20E22392-C96F-4DD5-8EF7-E3CE305A1F30

| Debtor | Galleria 2425 Owner, LLC | Case number (if known) | 23-34815-H5-11 |
|---|---|---|---|
| | Name | | |

## Part 2: Additional Page

**3.5** Nonpriority creditor's name and mailing address

**CFI Mechanical, Inc**

6109 Brittmoore Rd

Houston, TX 77041

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☑ No
☐ Yes

$668.44

---

**3.6** Nonpriority creditor's name and mailing address

**Cirro Electric**

PO Box 60004

Dallas, TX 75266

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Electricity provider

Is the claim subject to offset?
☑ No
☐ Yes

$22,928.00

---

**3.7** Nonpriority creditor's name and mailing address

City of Houston Water Department

PO Box 1560

Houston, TX 77251

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Water

Is the claim subject to offset?
☑ No
☐ Yes

$6,126.00

---

**3.8** Nonpriority creditor's name and mailing address

CNA Insurance Co

PO Box 74007619

Chicago, IL 60674

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

Remarks:
Insurance costs will be upcoming. All costs for insurance paid on filing date

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Insurance

Is the claim subject to offset?
☑ No
☐ Yes

$0.00

---

| Debtor | Galleria 2425 Owner, LLC | Case number *(if known)* | 23-34815-H5-11 |
|--------|--------------------------|--------------------------|----------------|
|        | Name                     |                          |                |

---

**Part 2:** Additional Page

---

**3.9** Nonpriority creditor's name and mailing address

Comcast

PO Box 60533

City of Industry, CA 91716

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  Internet and similar services

Is the claim subject to offset?
☑ No
☐ Yes

$300.00

---

**3.10** Nonpriority creditor's name and mailing address

Datawatch Systems

4520 East West Highway 200

Bethesda, MD 20814

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

**Remarks:** Disputed as to amounts owed.

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☑ Disputed

Basis for the claim:  Services

Is the claim subject to offset?
☑ No
☐ Yes

$22,990.00

---

**3.11** Nonpriority creditor's name and mailing address

Environmental Coalition Inc

PO Box 1568

Stafford, TX 77497

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☑ Unliquidated
☑ Disputed

Basis for the claim:  Pest Control

Is the claim subject to offset?
☑ No
☐ Yes

$800.85

---

**3.12** Nonpriority creditor's name and mailing address

Ferguson Facilities Supplies

PO Box 200184

San Antonio, TX 78220

Date or dates debt was incurred _____

Last 4 digits of account number __ __ __ __

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  Services

Is the claim subject to offset?
☑ No
☐ Yes

$2,001.00

---

DocuSign Envelope ID: 20E22392-C96F-4D05-8EF7-F3CE305A1E30

| Debtor | Galleria 2425 Owner, LLC | Case number (if known) | 23-34815-H5-11 |
|---|---|---|---|
| | Name | | |

---

### Part 2: Additional Page

**3.13** | Nonpriority creditor's name and mailing address

**Firetron**

PO Box 1604

Stafford, TX 77497

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

**As of the petition filing date, the claim is:** $30,040.34
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

**Is the claim subject to offset?**
☑ No
☐ Yes

---

**3.14** | Nonpriority creditor's name and mailing address

**First Insurance Funding**

450 Skokie Blvd

Northbrook, IL 60062

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

**As of the petition filing date, the claim is:** $5,507.36
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**Is the claim subject to offset?**
☑ No
☐ Yes

---

**3.15** | Nonpriority creditor's name and mailing address

**Gulfstream Legal Group**

1300 Texas St

Houston, TX 77002

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

**As of the petition filing date, the claim is:** $57,799.06
*Check all that apply.*
☐ Contingent
☑ Unliquidated
☑ Disputed

**Basis for the claim:** Legal services

**Is the claim subject to offset?**
☑ No
☐ Yes

---

**3.16** | Nonpriority creditor's name and mailing address

**Hayward PLLC**

10501 N Central Expy Ste 106

Dallas, TX 75231-2203

Date or dates debt was incurred _____

Last 4 digits of account number ___ ___ ___ ___

**As of the petition filing date, the claim is:** $97,193.00
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Legal fees

**Is the claim subject to offset?**
☑ No
☐ Yes

---

| Debtor | Galleria 2425 Owner, LLC | Case number *(if known)* | 23-34815-H5-11 |
|---|---|---|---|
| | Name | | |

### Part 2:   Additional Page

**3.17**

Nonpriority creditor's name and mailing address

**HNB Construction, LLC**

**521 Woodhaven**

**Ingleside, TX 78362**

Date or dates debt was incurred  _____

Last 4 digits of account number  ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☑ Unliquidated
☑ Disputed

Basis for the claim:  Services

Is the claim subject to offset?
☑ No
☐ Yes

$84,853.00

---

**3.18**

Nonpriority creditor's name and mailing address

**Jetall Companies Inc.**

**2425 West Loop S Ste 1100**

**Houston, TX 77027-4210**

Date or dates debt was incurred  _____

Last 4 digits of account number  ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  Commissions and payments

Is the claim subject to offset?
☑ No
☐ Yes

$2,204,801.00

---

**3.19**

Nonpriority creditor's name and mailing address

**Kings 111 Emergency Communications**

**751 Canyon Drive, Suite 100**

**Coppell, TX 75019**

Date or dates debt was incurred  _____

Last 4 digits of account number  ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☑ No
☐ Yes

$315.95

---

**3.20**

Nonpriority creditor's name and mailing address

**Lexitas**

**PO Box Box 734298 Dept 2012**

**Dallas, TX 75373**

Date or dates debt was incurred  _____

Last 4 digits of account number  ___ ___ ___ ___

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:  Services

Is the claim subject to offset?
☑ No
☐ Yes

$2,771.75

| Debtor | Galleria 2425 Owner, LLC | Case number (if known) | 23-34815-H5-11 |
|---|---|---|---|
| | Name | | |

**Part 2:** Additional Page

**3.21** Nonpriority creditor's name and mailing address
Logix Fiber Networks
PO Box 734120
Dallas, TX 75373

Date or dates debt was incurred
Last 4 digits of account number ___ ___ ___ ___

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

Is the claim subject to offset?
☑ No
☐ Yes

$323.42

**3.22** Nonpriority creditor's name and mailing address
Mueller Water Treatment
1500 Sherwood Forest Dr.
Houston, TX 77043

Date or dates debt was incurred
Last 4 digits of account number ___ ___ ___ ___

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: _____

Is the claim subject to offset?
☑ No
☐ Yes

$950.00

**3.23** Nonpriority creditor's name and mailing address
Nationwide Security
2425 W Loop S 300
Houston, TX 77027

Date or dates debt was incurred
Last 4 digits of account number ___ ___ ___ ___

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

Is the claim subject to offset?
☑ No
☐ Yes

$32,549.70

**3.24** Nonpriority creditor's name and mailing address
Nichamoff Law Firm
2444 Times Blvd 270
Houston, TX 77005

Date or dates debt was incurred
Last 4 digits of account number ___ ___ ___ ___

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Legal services

Is the claim subject to offset?
☑ No
☐ Yes

$46,984.22

DocuSign Envelope ID: 20E22392-C96F-4D05-8FF7-FCE305A1F30

| Debtor | Galleria 2425 Owner, LLC | | Case number *(if known)* | 23-34815-H5-11 |
|---|---|---|---|---|
| | Name | | | |

## Part 2: Additional Page

| 3.25 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $1,877.00 |
|---|---|---|---|
| | Smart Office Solutions | ☐ Contingent ☐ Unliquidated ☐ Disputed | |
| | 6623 Theall Rd | | |
| | Houston, TX 77066-1213 | Basis for the claim: Services | |
| | Date or dates debt was incurred _____ | Is the claim subject to offset? | |
| | Last 4 digits of account number ___ ___ ___ ___ | ☑ No ☐ Yes | |

| 3.26 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $4,216.34 |
|---|---|---|---|
| | T&R Mechanical | ☐ Contingent ☐ Unliquidated ☐ Disputed | |
| | 21710 White Oak Dr | | |
| | Conroe, TX 77306-8848 | Basis for the claim: _____ | |
| | Date or dates debt was incurred _____ | Is the claim subject to offset? | |
| | Last 4 digits of account number ___ ___ ___ ___ | ☑ No ☐ Yes | |

| 3.27 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $76,935.35 |
|---|---|---|---|
| | TKE | ☐ Contingent ☐ Unliquidated ☐ Disputed | |
| | 3100 Interstate North Cir SE 500 | | |
| | Atlanta, GA 30339 | Basis for the claim: Elevator maintenance and repair | |
| | Date or dates debt was incurred _____ | Is the claim subject to offset? | |
| | Last 4 digits of account number ___ ___ ___ ___ | ☑ No ☐ Yes | |

| 3.28 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $456.00 |
|---|---|---|---|
| | Waste Management | ☐ Contingent ☐ Unliquidated ☐ Disputed | |
| | PO Box 660345 | | |
| | Dallas, TX 75266 | Basis for the claim: Trash services | |
| | Date or dates debt was incurred _____ | Is the claim subject to offset? | |
| | Last 4 digits of account number ___ ___ ___ ___ | ☑ No ☐ Yes | |

| Debtor | **Galleria 2425 Owner, LLC** | Case number *(if known)* | **23-34815-H5-11** |
|---|---|---|---|
| | Name | | |

---

**Part 2:** **Additional Page**

| 3.29 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: | $4,221.00 |
|---|---|---|---|

**Zindler Cleaning Service Co**

**2450 Fondren 113**

**Houston, TX 77063**

As of the petition filing date, the claim is: $4,221.00

*Check all that apply.*

☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** _____

**Date or dates debt was incurred** _____

**Last 4 digits of account number** ___ ___ ___ ___

**Is the claim subject to offset?**
☑ No
☐ Yes

Debtor    **Galleria 2425 Owner, LLC**                    Case number *(if known)*    **23-34815-H5-11**
          Name

| Part 4: | Total Amounts of the Priority and Nonpriority Unsecured Claims |
|---|---|

5.    Add the amounts of priority and nonpriority unsecured claims.

|  |  | Total of claim amounts |
|---|---|---|
| 5a. **Total claims from Part 1** | 5a. | $0.00 |
| 5b. **Total claims from Part 2** | 5b. **+** | $9,481,879.09 |
| 5c. **Total of Parts 1 and 2**<br>Lines 5a + 5b = 5c. | 5c. | $9,481,879.09 |

Fill in this information to identify the case:

Debtor name _____Galleria 2425 Owner, LLC_____

United States Bankruptcy Court for the:
_____Southern District of Texas_____

Case number (if known): _____23-34815-H5-11_____ Chapter ___11___

☐ Check if this is an
amended filing

## Official Form 206G

# Schedule G: Executory Contracts and Unexpired Leases                          12/15

**Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, numbering the entries consecutively.**

1.  Does the debtor have any executory contracts or unexpired leases?

☐ No. Check this box and file this form with the court with the debtor's other schedules. There is nothing else to report on this form.

☑ Yes. Fill in all of the information below even if the contracts or leases are listed on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B).

| 2. List all contracts and unexpired leases | | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|---|
| **2.1** | State what the contract or lease is for and the nature of the debtor's interest | Lease (tenant)- 2425 West Loop South LLC | 2425 West Loop LLC dba Metwall Design Solutions LLC |
| | | Contract to be ASSUMED | 2425 West Loop S Ste 800 |
| | State the term remaining | 25 months | Houston, TX 77027-4214 |
| | List the contract number of any government contract | | |
| **2.2** | State what the contract or lease is for and the nature of the debtor's interest | Agreement | 2425 WL, LLC |
| | | Contract to be ASSUMED | 13498 Pond Springs Rd |
| | State the term remaining | 0 months | Austin, TX 78729-4422 |
| | List the contract number of any government contract | | |
| **2.3** | State what the contract or lease is for and the nature of the debtor's interest | Commercial lease | Bankable Equities |
| | | Contract to be ASSUMED | 2425 West Loop S Ste 600 |
| | State the term remaining | 57 months | Houston, TX 77027-4203 |
| | List the contract number of any government contract | | |
| **2.4** | State what the contract or lease is for and the nature of the debtor's interest | Commercial lease | Boho Lounge |
| | | Contract to be ASSUMED | 2425 West Loop S # 100 |
| | State the term remaining | 59 months | Houston, TX 77027-4205 |
| | List the contract number of any government contract | | |

| Debtor | Galleria 2425 Owner, LLC | Case number *(if known)* | 23-34815-H5-11 |
|---|---|---|---|
| | Name | | |

### Additional Page if Debtor Has More Executory Contracts or Unexpired Leases

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page.

| List all contracts and unexpired leases | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|

**2.5**
State what the contract or lease is for and the nature of the debtor's interest: Property Insurance
Contract to be ASSUMED
State the term remaining: 0 months
List the contract number of any government contract:

CNA Insurance Company
PO Box BOX 74007619
Chicago, IL 60674

**2.6**
State what the contract or lease is for and the nature of the debtor's interest: Lease (tenant)
Contract to be ASSUMED
State the term remaining: 12 months
List the contract number of any government contract:

Eyebrows 4UTX LLC
2425 West Loop S # 340b
Houston, TX 77027-4205

**2.7**
State what the contract or lease is for and the nature of the debtor's interest: Liability Insurance
State the term remaining: 0 months
List the contract number of any government contract:

First Insurance Funding
450 Skokie Blvd.
Northbrook, IL 60062

**2.8**
State what the contract or lease is for and the nature of the debtor's interest: Lease (tenant)
Contract to be ASSUMED
State the term remaining: 48 months
List the contract number of any government contract:

G3 Global Services LLC
2425 West Loop S Ste 310
Houston, TX 77027-4208

**2.9**
State what the contract or lease is for and the nature of the debtor's interest: lease(tenant)- 4th Floor
Contract to be ASSUMED
State the term remaining: 0 months
List the contract number of any government contract:

Galloworks
2425 West Loop S # 400
Houston, TX 77027-4205

**2.10**
State what the contract or lease is for and the nature of the debtor's interest: Lease (tenant) -5h floor
Contract to be ASSUMED
State the term remaining: 96 months
List the contract number of any government contract:

Galloworks
2425 West Loop S # 400
Houston, TX 77027-4205

| Debtor | Galleria 2425 Owner, LLC | Case number (if known) | 23-34815-H5-11 |
|--------|--------------------------|------------------------|----------------|
| | Name | | |

### Additional Page if Debtor Has More Executory Contracts or Unexpired Leases

**Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page.**

| List all contracts and unexpired leases | | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|---|
| **2.11** | State what the contract or lease is for and the nature of the debtor's interest | Property Management Agreement | Jetall Companies Inc. |
| | | Contract to be ASSUMED | 2425 West Loop S Ste 1100 |
| | State the term remaining | 0 months | Houston, TX 77027-4210 |
| | List the contract number of any government contract | | |
| **2.12** | State what the contract or lease is for and the nature of the debtor's interest | Lease (tenant) | Jetall Companies Inc. |
| | | Contract to be ASSUMED | 2425 West Loop S Ste 1100 |
| | State the term remaining | 105 months | Houston, TX 77027-4210 |
| | List the contract number of any government contract | | |
| **2.13** | State what the contract or lease is for and the nature of the debtor's interest | Lease (tenant) | Kudrath Enterprises PLLC |
| | | Contract to be ASSUMED | 2425 West Loop S Ste 350 |
| | State the term remaining | 33 months | Houston, TX 77027-4208 |
| | List the contract number of any government contract | | |
| **2.14** | State what the contract or lease is for and the nature of the debtor's interest | Confidential settlement agreement | National Bank of Kuwait S.A.K.P. |
| | | | Charles C. Conrad Pillsbury Winthrop Shaw Pittsman, LLP |
| | State the term remaining | 0 months | 909 Fannin St, Ste 2000 |
| | List the contract number of any government contract | | Houston, TX 77010 |
| **2.15** | State what the contract or lease is for and the nature of the debtor's interest | Lease (tenant) | Nationwide Investigations & Security Inc |
| | | Contract to be ASSUMED | 2425 West Loop S Ste 300 |
| | State the term remaining | 8 months | Houston, TX 77027-4207 |
| | List the contract number of any government contract | | |
| **2.16** | State what the contract or lease is for and the nature of the debtor's interest | Commercial lease | Shah Sloan LLC |
| | | Contract to be ASSUMED | 2425 West Loop S 501, 503 and 523 |
| | State the term remaining | 114 months | Houston, TX 77027-4205 |
| | List the contract number of any government contract | | |

| Debtor | Galleria 2425 Owner, LLC | Case number *(if known)* | 23-34815-H5-11 |
|---|---|---|---|
| | Name | | |

### Additional Page if Debtor Has More Executory Contracts or Unexpired Leases

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page.

| List all contracts and unexpired leases | | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|---|
| **2.17** | State what the contract or lease is for and the nature of the debtor's interest | Lease (tenant)-not moved in and not paid deposit - status uncertain | SIBS International Inc |
| | | | 2425 West Loop S # 900 |
| | State the term remaining | 120 months | Houston, TX 77027-4205 |
| | List the contract number of any government contract | | |
| **2.18** | State what the contract or lease is for and the nature of the debtor's interest | Lease (tenant) | SprintCom Inc |
| | | Contract to be ASSUMED | Rooftop |
| | State the term remaining | 0 months | |
| | List the contract number of any government contract | | |
| **2.19** | State what the contract or lease is for and the nature of the debtor's interest | Lease (tenant) | St. Christopher Holdings GP LLC |
| | | Contract to be ASSUMED | 2425 West Loop S 700 |
| | State the term remaining | 120 months | Houston, TX 77027-4205 |
| | List the contract number of any government contract | | |
| **2.20** | State what the contract or lease is for and the nature of the debtor's interest | Commerical lease | UL Therapy |
| | | Contract to be ASSUMED | 2425 West Loop S Ste 315 |
| | State the term remaining | 22 months | Houston, TX 77027-4211 |
| | List the contract number of any government contract | | |
| **2.21** | State what the contract or lease is for and the nature of the debtor's interest | Lease (tenant) | Uptown Cosmetic and Implant Dentistry |
| | | Contract to be ASSUMED | 2425 West Loop S Ste 333 |
| | State the term remaining | 0 months | Houston, TX 77027-4211 |
| | List the contract number of any government contract | | |

DocuSign Envelope ID: 20E23392-C96F-4D05-8EF7-FCE305A1E30

| Fill in this information to identify the case: | |
|---|---|

Debtor name **Galleria 2425 Owner, LLC**

United States Bankruptcy Court for the: **Southern** District of **Texas**
(State)

Case number (If known): **23-34815-H5-11**

☐ Check if this is an
amended filing

## Official Form 206H

# Schedule H: Codebtors
12/15

**Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.**

**1. Does the debtor have any codebtors?**

☑ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

☐ Yes

**2.** In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, **Schedules D-G.** Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

| Column 1: **Codebtor** | | Column 2: **Creditor** | |
|---|---|---|---|
| Name | Mailing address | Name | Check all schedules that apply: |
| 2.1 | Street <br><br> City        State        ZIP Code | | ☐ D <br> ☐ E/F <br> ☐ G |
| 2.2 | Street <br><br> City        State        ZIP Code | | ☐ D <br> ☐ E/F <br> ☐ G |
| 2.3 | Street <br><br> City        State        ZIP Code | | ☐ D <br> ☐ E/F <br> ☐ G |
| 2.4 | Street <br><br> City        State        ZIP Code | | ☐ D <br> ☐ E/F <br> ☐ G |
| 2.5 | Street <br><br> City        State        ZIP Code | | ☐ D <br> ☐ E/F <br> ☐ G |

Official Form 206H                     **Schedule H: Codebtors**                     page 1 of __2__

000841

Debtor  __Galleria 2425 Owner, LLC__                     Case number (if known) __23-34815-H5-11__
          Name

| | **Additional Page if Debtor Has More Codebtors** |
|---|---|

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. |
|---|

| | Column 1: **Codebtor** | | Column 2: **Creditor** | |
|---|---|---|---|---|
| | **Name** | **Mailing address** | **Name** | *Check all schedules that apply:* |
| 2.6 | _____ | _____ <br> Street <br> _____ <br> _____ <br> City        State        ZIP Code | _____ | ☐ D <br> ☐ E/F <br> ☐ G |

Official Form 206H                     **Schedule H: Codebtors**                     page __2__ of __2__

| Fill in this information to identify the case: |
|---|
| Debtor name          Galleria 2425 Owner, LLC |
| United States Bankruptcy Court for the: <br>          Southern District of Texas |
| Case number (if known):    23-34815-H5-11      Chapter __11__ |

☐ Check if this is an amended filing

## Official Form 206Sum

# Summary of Assets and Liabilities for Non-Individuals

12/15

**Part 1:** **Summary of Assets**

1. **Schedule A/B: Assets–Real and Personal Property** (Official Form 206A/B)

   1a. **Real Property:**
   Copy line 88 from *Schedule A/B*.................................................................................
   
   $17,500,000.00

   1b. **Total personal property:**
   Copy line 91A from *Schedule A/B*.............................................................................
   
   $125,397.97

   1c. **Total of all property:**
   Copy line 92 from *Schedule A/B*...............................................................................
   
   $17,625,397.97

**Part 2:** **Summary of Liabilities**

2. **Schedule D: Creditors Who Have Claims Secured by Property** (Official Form 206D)
   Copy the total dollar amount listed in Column A, *Amount of claim*, from line 3 of *Schedule D*.................
   
   $92,762,940.77

3. **Schedule E/F: Creditors Who Have Unsecured Claims** (Official Form 206E/F)

   3a. **Total claim amounts of priority unsecured claims:**
   Copy the total claims from Part 1 from line 5a of *Schedule E/F*.......................................................
   
   $0.00

   3b. **Total amount of claims of non-priority amount of unsecured claims:**
   Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F*......................................................
   
   **+**   $9,481,879.09

4. **Total liabilities**...........................................................................................................
   Lines 2 + 3a + 3b
   
   $102,244,819.86

Fill in this information to identify the case:

| | |
|---|---|
| Debtor name | Galleria 2425 Owner, LLC |
| United States Bankruptcy Court for the: | Southern District of Texas |
| Case number (if known): | 23-34815-H5-11 |

☐ Check if this is an amended filing

## Official Form 207

# Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy    04/22

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).

## Part 1:  Income

1.  **Gross revenue from business**

☐ None

| Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | | | Sources of revenue<br>Check all that apply | Gross revenue<br>(before deductions and exclusions) |
|---|---|---|---|---|
| From the beginning of the fiscal year to filing date: | From 01/01/2023<br>MM/ DD/ YYYY | to   Filing date | ☑ Operating a business<br>☐ Other _____ | $856,837.58 |
| For prior year: | From 01/01/2022<br>MM/ DD/ YYYY | to   12/31/2022<br>MM/ DD/ YYYY | ☑ Operating a business<br>☐ Other _____ | $875,514.69 |
| For the year before that: | From 01/01/2021<br>MM/ DD/ YYYY | to   12/31/2021<br>MM/ DD/ YYYY | ☑ Operating a business<br>☐ Other _____ | $907,227.41 |

2.  **Non-business revenue**

Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

☑ None

| | | | Description of sources of revenue | Gross revenue from each source<br>(before deductions and exclusions) |
|---|---|---|---|---|
| From the beginning of the fiscal year to filing date: | From 01/01/2023<br>MM/ DD/ YYYY | to   Filing date | _____ | _____ |
| For prior year: | From 01/01/2022<br>MM/ DD/ YYYY | to   12/31/2022<br>MM/ DD/ YYYY | _____ | _____ |
| For the year before that: | From 01/01/2021<br>MM/ DD/ YYYY | to   12/31/2021<br>MM/ DD/ YYYY | _____ | _____ |

000844

Debtor    Galleria 2425 Owner, LLC                                Case number (if known)    23-34815-H5-11
          Name

| Part 2: | List Certain Transfers Made Before Filing for Bankruptcy |

**3.  Certain payments or transfers to creditors within 90 days before filing this case**

List payments or transfers—including expense reimbursements—to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $7,575. (This amount may be adjusted on 4/01/25 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☐ None

| Creditor's name and address | Dates | Total amount or value | Reasons for payment or transfer<br>*Check all that apply* |
|---|---|---|---|
| 3.1. See SOFA Exhibit 3<br>Creditor's name<br><br>Street<br><br><br>City          State    ZIP Code | _____ | $450,670.25 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☑ Other _____ |

**4.  Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or co-signed by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $7,575. (This amount may be adjusted on 4/01/25 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☐ None

| Insider's name and address | Dates | Total amount or value | Reasons for payment or transfer |
|---|---|---|---|
| 4.1. See SOFA Exhibit 4<br>Creditor's name<br><br>Street<br><br><br>City          State    ZIP Code | _____ | $329,263.00 | |
| **Relationship to debtor** | | | |
| 4.2. Dward Darjean<br>Creditor's name<br>2425 West Loop S Ste 1100<br>Street<br><br>Houston, TX 77027-4210<br>City          State    ZIP Code | 01/06/2023 | $150.00 | Reimbursement of expenses |
| **Relationship to debtor**<br>Manager | | | |

Official Form 207            **Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**            page **2**

Debtor    Galleria 2425 Owner, LLC      Case number *(if known)*    23-34815-H5-11
      Name

**5. Repossessions, foreclosures, and returns**

List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

☑ None

| Creditor's name and address | Description of the property | Date | Value of property |
|---|---|---|---|
| 5.1. _____ <br> Creditor's name <br> _____ <br> Street <br> _____ <br> _____ <br> City   State   ZIP Code | _____ | _____ | _____ |

**6. Setoffs**

List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

☑ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|
| 6.1. _____ <br> Creditor's name <br> _____ <br> Street <br> _____ <br> _____ <br> City   State   ZIP Code | _____ <br> XXXX– __ __ __ __ | _____ | _____ |

| Part 3: | Legal Actions or Assignments |
|---|---|

**7. Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**

List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☐ None

| Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| 7.1. Galleria 2425 Owner, LLC v. National Bank of Kuwait, S.A.K.P. <br><br> **Case number** <br> 2021-63370 | Claims including, but not limited to, breach of duty, fraud, conspiracy, RICO, disparagement, breach of confidential settlement agreement, tortuous interference with contract, tortuous interference with business relationships, and other claims and causes of action | 281st Judicial District Court, Harris County, Texas <br> Name <br> 201 Caroline St. 14th Fl. <br> Street <br><br> Houston, TX 77002 <br> City    State    ZIP Code | ☑ Pending <br> ☐ On appeal <br> ☐ Concluded |

Debtor    Galleria 2425 Owner, LLC                                    Case number *(if known)*    23-34815-H5-11
                     Name

| 7.2. | Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| | Jetall Companies, 1001 WL, LLC, Galleria 2425 Owner LLC, BDFI LLC, Ali Choudri, Brad Parker and Assemah Zafeer v. Sonder USA, Inc, | Civil | 61st Judicial District Court, Harris County, Texas <br> Name <br><br> 201 Caroline St. 9th Fl. <br> Street <br><br> Houston, TX 77002 <br> City          State      ZIP Code | ☑ Pending <br> ☐ On appeal <br> ☐ Concluded |
| | **Case number** <br> 2021-09675 | | | |

| 7.3. | Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| | Galleria 2425 Owner LLC v National Bank of Kuwait S.A.K.P.. a New York Branch and George M. Lee | Claims including, but not limited to, breach of duty, fraud, conspiracy, RICO, disparagement, breach of confidential settlement agreement, tortuous interference with contract, tortuous interference with business relationships, and other claims and causes of action | 11th Judicial District Court, Harris County, Texas <br> Name <br><br> 201 Caroline St. 9th Floor <br> Street <br><br> Houston, TX 77002 <br> City          State      ZIP Code | ☐ Pending <br> ☐ On appeal <br> ☑ Concluded |
| | **Case number** <br> 2021-63370 | | | |

| 7.4. | Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| | George M. Lee v Galleria 2425 Owner, LLC | Civil | 11th Judicial District Court, Harris County, Texas <br> Name <br><br> 201 Caroline St. 9th Floor <br> Street <br><br> Houston, TX 77002 <br> City          State      ZIP Code | ☐ Pending <br> ☐ On appeal <br> ☑ Concluded |
| | **Case number** <br> 2019-89764 | | | |

| 7.5. | Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| | Naissance Galleria, LLC vs National Bank of Kuwait, S.A.K.P. | Case filed by David Tang for Naissance Galleria- Breach of contract | 129th Judicial District Court of Harris County <br> Name <br><br> 201 Caroline St 10th Floor <br> Street <br><br> Houston, TX 77002 <br> City          State      ZIP Code | ☑ Pending <br> ☐ On appeal <br> ☐ Concluded |
| | **Case number** <br> 2023-41091 | | | |

| 7.6. | Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| | Naissance Galleria, LLC vs Brad Parker | Case filed by David Tang for Naissance Galleria- Breach of contract | 157th Harris County District Court <br> Name <br><br> 201 Caroline St <br> Street <br><br> Houston, TX 77002-1901 <br> City          State      ZIP Code | ☑ Pending <br> ☐ On appeal <br> ☐ Concluded |
| | **Case number** <br> 2023-39006 | | | |

| 7.7. | Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| | Galleria 2425 Owner LLC vs National Bank of Kuwait | Claims including, but not limited to, breach of duty, fraud, conspiracy, RICO, disparagement, breach of confidential settlement agreement, tortuous interference with contract, tortuous interference with business relationships, and other claims and causes of action | Federal Bankruptcy Court<br>Name<br><br>515 Rusk St # 403<br>Street<br><br>Houston, TX 77002-2600<br>City                State        ZIP Code | ☑ Pending<br>☐ On appeal<br>☐ Concluded |
| | **Case number** | | | |
| | 2023-22748 | | | |

| 7.8. | Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| | Naissance Galleria LLC vs Zaheer | Case filed by David Tang for Naissance Galleria- Breach of contract; removed to federal bankruptcy court as adversary 23-03259. | 80th Judicial District Court, Harris County, Texas<br>Name<br><br>201 Caroline St. 9th Fl<br>Street<br><br>Houston, TX 77002<br>City                State        ZIP Code | ☑ Pending<br>☐ On appeal<br>☐ Concluded |
| | **Case number** | | | |
| | 2023-43755 | | | |

**8.    Assignments and receivership**

List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

☑ None

| 8.1. | Custodian's name and address | Description of the property | Value |
|---|---|---|---|
| | Custodian's name | | Court name and address |
| | Street | **Case title** | Name |
| | | | Street |
| | City        State    ZIP Code | **Case number** | |
| | | | City        State    ZIP Code |
| | | **Date of order or assignment** | |

| **Part 4:** | **Certain Gifts and Charitable Contributions** |
|---|---|

**9.    List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000**

☑ None

Debtor    Galleria 2425 Owner, LLC                                    Case number *(if known)*    23-34815-H5-11
          Name

| 9.1. | Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|---|

Recipient's name
_____

Street
_____

_____
City              State     ZIP Code

Recipient's relationship to debtor
_____

## Part 5:  Certain Losses

**10.  All losses from fire, theft, or other casualty within 1 year before filing this case.**

☐ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss | Date of loss | Value of property lost |
|---|---|---|---|
| | If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received. | | |
| | List unpaid claims on Official Form 106A/B (*Schedule A/B: Assets – Real and Personal Property*). | | |
| 10.1. September 2022 | 200.000 | underground water leak | Loss value in excess of insurance |

## Part 6:  Certain Payments or Transfers

**11.  Payments related to bankruptcy**

List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☐ None

| 11.1. | Who was paid or who received the transfer? | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| | Hayward PLLC | Attorney Fees | 07/03/2023 | $30,000.00 |
| | **Address** | Attorney Fees | 11/08/2023 | $20,000.00 |
| | 7600 Brunett Road, Ste 530 | | | |
| | Street | | | |
| | Austin, TX 78757 | | | |
| | City              State     ZIP Code | | | |
| | **Email or website address** | | | |
| | mhayward@hayward.com | | | |
| | **Who made the payment, if not debtor?** | | | |

| 11.2. | Who was paid or who received the transfer? | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| | Baker & Associates | attorney fee | 12/07/2023 | $20,000.00 |

| Address |
|---|
| 950 Echo Lane, Suite 300 |
| Street |
| |
| Houston, TX 77024 |
| City      State    ZIP Code |

| Email or website address |
|---|
| courtdocs@bakerassociates.net |

| Who made the payment, if not debtor? |
|---|
| 2401 Fountainview HO |

**12. Self-settled trusts of which the debtor is a beneficiary**

List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.

Do not include transfers already listed on this statement.

☑ None

| 12.1. | Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|---|
| | | | | |

| Trustee |
|---|
| |

**13. Transfers not already listed on this statement**

List any transfers of money or other property—by sale, trade, or any other means—made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☑ None

| 13.1. | Who received the transfer? | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|---|
| | | | | |

| Address |
|---|
| |
| Street |
| |
| City      State    ZIP Code |

| Relationship to debtor |
|---|
| |

Debtor     Galleria 2425 Owner, LLC        Case number *(if known)*    23-34815-H5-11

        Name

| Part 7: | Previous Locations |
|---|---|

**14. Previous addresses**

List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

☑ Does not apply

| Address | Dates of occupancy |
|---|---|
| 14.1. _____ <br> Street <br><br><br> _____ <br> City    State    ZIP Code | From _____ To _____ |

| Part 8: | Health Care Bankruptcies |
|---|---|

**15. Health Care bankruptcies**

Is the debtor primarily engaged in offering services and facilities for:
—diagnosing or treating injury, deformity, or disease, or
—providing any surgical, psychiatric, drug treatment, or obstetric care?

☑ No. Go to Part 9.

☐ Yes. Fill in the information below.

| Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|
| 15.1. _____ <br> Facility name <br><br> _____ <br> Street <br><br> _____ <br> City   State   ZIP Code | _____ <br><br> **Location where patient records are maintained**(if different from facility address). If electronic, identify any service provider. <br> _____ | _____ <br><br> **How are records kept?** <br><br> *Check all that apply:* <br> ☐ Electronically <br> ☐ Paper |

| Part 9: | Personally Identifiable Information |
|---|---|

**16. Does the debtor collect and retain personally identifiable information of customers?**

☑ No.

☐ Yes. State the nature of the information collected and retained. _____

     Does the debtor have a privacy policy about that information?

     ☐ No

     ☐ Yes

**17. Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b) or other pension or profit-sharing plan made available by the debtor as an employee benefit?**

☑ No. Go to Part 10.

Debtor    Galleria 2425 Owner, LLC                   Case number *(if known)*    23-34815-H5-11

Name

☐ Yes. Does the debtor serve as plan administrator?

     ☐ No. Go to Part 10.

     ☐ Yes. Fill in below:

| Name of plan | Employer identification number of the plan |
|---|---|
| _____ | EIN: __ __ – __ __ __ __ __ __ __ |

     Has the plan been terminated?

     ☐ No

     ☐ Yes

---

**Part 10:**   **Certain Financial Accounts, Safe Deposit Boxes, and Storage Units**

**18. Closed financial accounts**

Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?
Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

☑ None

| Financial institution name and address | Last 4 digits of account number | Type of account | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|
| 18.1 _____<br>Name<br>_____<br>Street<br>_____<br>City   State   ZIP Code | XXXX– __ __ __ __ | ☐ Checking<br>☐ Savings<br>☐ Money market<br>☐ Brokerage<br>☐ Other<br>_____ | _____ | _____ |

**19. Safe deposit boxes**

List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

☑ None

| Depository institution name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|
| 19.1 _____<br>Name<br>_____<br>Street<br>_____<br>City   State   ZIP Code | _____<br>_____<br>**Address**<br>_____<br>_____ | _____<br>_____<br>_____<br>_____ | ☐ No<br>☐ Yes |

**20. Off-premises storage**

List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

☑ None

Debtor    Galleria 2425 Owner, LLC              Case number *(if known)*    23-34815-H5-11
         Name

| 20.1 | Facility name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|---|
| | | | | ☐ No |
| | Name | | | ☐ Yes |
| | Street | | | |
| | | **Address** | | |
| | City    State    ZIP Code | | | |

---

**Part 11:**    **Property the Debtor Holds or Controls That the Debtor Does Not Own**

**21. Property held for another**

List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

☑ None

| Owner's name and address | Location of the property | Description of the property | Value |
|---|---|---|---|
| | | | |
| Name | | | |
| Street | | | |
| | | | |
| City    State    ZIP Code | | | |

---

**Part 12:**    **Details About Environmental Information**

For the purpose of Part 12, the following definitions apply:

- ■ *Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).

- ■ *Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.

- ■ *Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

**22. Has the debtor been a party in any judicial or administrative proceeding under any environmental law?** Include settlements and orders.

☑ No

☐ Yes. Provide details below.

| Case title | Court or agency name and address | Nature of the case | Status of case |
|---|---|---|---|
| | | | ☐ Pending |
| **Case number** | Name | | ☐ On appeal |
| | Street | | ☐ Concluded |
| | City    State    ZIP Code | | |

**23. Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?**

☑ No

☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|
| Name | Name | | |
| Street | Street | | |
| City    State    ZIP Code | City    State    ZIP Code | | |

**24. Has the debtor notified any governmental unit of any release of hazardous material?**

☑ No

☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|
| Name | Name | | |
| Street | Street | | |
| City    State    ZIP Code | City    State    ZIP Code | | |

## Part 13:  Details About the Debtor's Business or Connections to Any Business

**25. Other businesses in which the debtor has or has had an interest**

List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

☑ None

| Business name and address | Describe the nature of the business | Employer Identification number<br>Do not include Social Security number or ITIN. |
|---|---|---|
| 25.1. | | EIN: __ __ – __ __ __ __ __ __ __ |
| Name | | **Dates business existed** |
| Street | | From _____ To _____ |
| City    State    ZIP Code | | |

**26. Books, records, and financial statements**

26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.

☐ None

| Name and address | Dates of service |
|---|---|
| 26a.1. Scarlet MacGeorge - Jetall Companies Inc. <br> Name <br><br> 2425 West Loop S Ste 1100 <br> Street <br><br> Houston, TX 77027-4210 <br> City            State            ZIP Code | 2022- <br> From present        To _____ |
| Name and address | Dates of service |
| 26a.2. Hines Property Management <br> Name <br><br> 2800 Post Oak Blvd <br> Street <br><br> Houston, TX 77056 <br> City            State            ZIP Code | From 2019 - 2021    To _____ |
| Name and address | Dates of service |
| 26a.3. Michael Chang <br> Name <br><br> Street <br><br> City            State            ZIP Code | From 2021        To 2022 |

26b.  List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial
      statement within 2 years before filing this case.

☐ None

| Name and address | Dates of service |
|---|---|
| 26b.1. Hines Property Management <br> Name <br><br> 2800 Post Oak Blvd <br> Street <br><br> Houston, TX 77056 <br> City            State            ZIP Code | From 2019-2021    To _____ |
| Name and address | Dates of service |
| 26b.2. Scarlet McGeorge - Jetall Companies Inc. <br> Name <br><br> 2425 West Loop S Ste 1100 <br> Street <br><br> Houston, TX 77027-4210 <br> City            State            ZIP Code | 2022- <br> From present        To _____ |

26c.  List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☐ None

Debtor    Galleria 2425 Owner, LLC                                    Case number *(if known)*    23-34815-H5-11
          Name

| 26c.1. | Name and address | If any books of account and records are unavailable, explain why |
|---|---|---|
| | Scarlet McGeorge - Jetall Companies Inc. | |
| | Name | |
| | 2425 West Loop S Ste 1100 | |
| | Street | |
| | | |
| | Houston, TX 77027-4210 | |
| | City          State          ZIP Code | |

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

☑ None

| 26d.1. | Name and address |
|---|---|
| | _____ |
| | Name |
| | _____ |
| | Street |
| | _____ |
| | _____ |
| | City          State          ZIP Code |

**27. Inventories**

Have any inventories of the debtor's property been taken within 2 years before filing this case?

☑ No

☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|
| _____ | _____ | _____ |

| | Name and address of the person who has possession of inventory records |
|---|---|
| 27.1. | _____ |
| | Name |
| | _____ |
| | Street |
| | _____ |
| | _____ |
| | City          State          ZIP Code |

**28.** List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Ali Choudhri | 1001 West Loop South, Ste 700 Houston, TX 77027 | Manager, Ownership of holding company | 100.00% |
| Dward Darjean | 2425 West Loop S Ste 1100 Houston, TX 77027-4210 | Manager, | 0.00% |

**29.** Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?

☑ No

☐ Yes. Identify below.

Debtor    Galleria 2425 Owner, LLC                                                    Case number (if known)    23-34815-H5-11
         Name

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
|------|---------|-----------------------------------|-------------------------------------------------|
|      |         |                                   | From _____ <br> To _____ |

**30. Payments, distributions, or withdrawals credited or given to insiders**

Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☐ No

☑ Yes. Identify below.

| Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|-------------------------------|------------------------------------------------------|-------|--------------------------------|
| 30.1. Dward Darjean <br> Name <br><br> 2425 West Loop S Ste 1100 <br> Street <br><br> Houston, TX 77027-4210 <br> City                State      ZIP Code | $150 | 01/06/2023 | Expense reimbursement |
| **Relationship to debtor** | | | |
| | | | |

**31. Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

☐ No

☑ Yes. Identify below.

| Name of the parent corporation | Employer Identification number of the parent corporation |
|-------------------------------|----------------------------------------------------------|
| Galleria 2425 JV LLC | EIN: 8 2 – 5 2 0 0 9 3 2 |

**32. Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

☑ No

☐ Yes. Identify below.

| Name of the pension fund | Employer Identification number of the pension fund |
|--------------------------|----------------------------------------------------|
| | EIN: _ _ – _ _ _ _ _ _ _ |

---

**Part 14:    Signature and Declaration**

---

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____ 12/22/2023 _____
MM/ DD/ YYYY

X _____                Printed name _____ Dward Darjean _____
    F771A38D78374AE...
Signature of individual signing on behalf of the debtor

Official Form 207          Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy          000857          page **14**

Debtor  Galleria 2425 Owner, LLC _____          Case number *(if known)* _____23-34815-H5-11_____
Name

Position or relationship to debtor _____Manager_____


**Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?**

☑ No

☐ Yes

000858

**2425 West Loop LLC dba
Metwall Design Solutions LLC**
2425 West Loop S Ste 800
Houston, TX 77027-4214

**2425 WL, LLC**
13498 Pond Springs Rd.
Austin, TX 78729

**2425 WL, LLC**
60 West 2nd St.
Freeport, NY 11746

**2425 WL, LLC**
13498 Pond Springs Rd
Austin, TX 78729-4422

**ADT**
PO Box 382109
Pittsburgh, PA 15251

**Ali Choudhri**
1001 West Loop South 700
Houston, TX 77027

**Ash Automated Control
Systems, LLC**
PO Box 1113
Fulshear, TX 77441

**Bankable Equities**
2425 West Loop S Ste 600
Houston, TX 77027-4203

**Boho Lounge**
2425 West Loop S # 100
Houston, TX 77027-4205

**Caz Creek Lending**
118 Vintage Park Blvd No. W
Houston, TX 77070

**CFI Mechanical, Inc**
6109 Brittmoore Rd
Houston, TX 77041

**Cirro Electric**
PO Box 60004
Dallas, TX 75266

**City of Houston**
Po Box 1560
Houston, TX 77251-1560

**City of Houston Water Department**
PO Box 1560
Houston, TX 77251

**CNA Insurance Co**
PO Box 74007619
Chicago, IL 60674

**CNA Insurance Company**
PO Box BOX 74007619
Chicago, IL 60674

DocuSign Envelope ID: 20E22392-C96F-4D05-8EF7-E1CE305A1E30

**Comcast**
PO Box 60533
City of Industry, CA 91716

**Datawatch Systems**
4520 East West Highway 200
Bethesda, MD 20814

**Environmental Coalition Inc**
PO Box 1568
Stafford, TX 77497

**Eyebrows 4UTX LLC**
2425 West Loop S # 340b
Houston, TX 77027-4205

**Ferguson Facilities Supplies**
PO Box 200184
San Antonio, TX 78220

**Firetron**
PO Box 1604
Stafford, TX 77497

**First Insurance Funding**
450 Skokie Blvd
Northbrook, IL 60062

**First Insurance Funding**
450 Skokie Blvd.
Northbrook, IL 60062

DocuSign Envelope ID: 20E23392-C96F-4D05-8EF7-F1CE305A1E30

**G3 Global Services LLC**

2425 West Loop S Ste 310
Houston, TX 77027-4208

**Galloworks**

2425 West Loop S # 400
Houston, TX 77027-4205

**Gulfstream Legal Group**

1300 Texas St
Houston, TX 77002

**Hayward PLLC**

10501 N Central Expy Ste 106
Dallas, TX 75231-2203

**HNB Construction, LLC**

521 Woodhaven
Ingleside, TX 78362

**Houston Community College System**

c/o Tara Grundemeier
Linebarger, Groggan, Blair & Sampson
Po Box 3064
Houston, TX 77253-3064

**Houston Independent School District**

P.O. Box 4668
Houston, TX 77210

**Jetall Companies Inc.**

2425 West Loop S Ste 1100
Houston, TX 77027-4210

DocuSign Envelope ID: 20E22392-C96F-4D05-8EF7-E3CE305A1F30

**Kings 111 Emergency Communications**
751 Canyon Drive, Suite 100
Coppell, TX 75019

**Kudrath Enterprises PLLC**
2425 West Loop S Ste 350
Houston, TX 77027-4208

**Lexitas**
PO Box Box 734298 Dept 2012
Dallas, TX 75373

**Linebarger Goggan & Blair**
P.O. Box 3064
Houston, TX 77253

**Logix Fiber Networks**
PO Box 734120
Dallas, TX 75373

**Metwall Design Solutions LLC**
10931 Day Rd
Houston, TX 77043-4901

**Mueller Water Treatment**
1500 Sherwood Forest Dr.
Houston, TX 77043

**National Bank of Kuwait**
299 Park Ave. 17th Floor
New York, NY 10171

**National Bank of Kuwait**

Charles C. Conrad Pillsbury Winthrop
Shaw Pittsman, LLP
909 Fannin St, Ste 2000
Houston, TX 77010

**National Bank of Kuwait
S.A.K.P.**

Charles C. Conrad Pillsbury Winthrop
Shaw Pittsman, LLP
909 Fannin St, Ste 2000
Houston, TX 77010

**Nationwide Investigations &
Security Inc**

2425 West Loop S Ste 300
Houston, TX 77027-4207

**Nationwide Security**

2425 W Loop S 300
Houston, TX 77027

**Nichamoff Law Firm**

2444 Times Blvd 270
Houston, TX 77005

**Shah Sloan LLC**

2425 West Loop S 501, 503 and 523
Houston, TX 77027-4205

**SIBS International Inc**

2425 West Loop S # 900
Houston, TX 77027-4205

**Smart Office Solutions**

6623 Theall Rd
Houston, TX 77066-1213

DocuSign Envelope ID: 20E23392-C96F-4D05-8EF7-ECE305A1E30

**SprintCom Inc**

Rooftop

**St. Christopher Holdings GP LLC**

2425 West Loop S 700
Houston, TX 77027-4205

**T&R Mechanical**

21710 White Oak Dr
Conroe, TX 77306-8848

**TKE**

3100 Interstate North Cir SE 500
Atlanta, GA 30339

**UL Therapy**

2425 West Loop S Ste 315
Houston, TX 77027-4211

**Uptown Cosmetic and Implant Dentistry**

2425 West Loop S Ste 333
Houston, TX 77027-4211

**Waste Management**

PO Box 660345
Dallas, TX 75266

**Zindler Cleaning Service Co**

2450 Fondren 113
Houston, TX 77063

## Payments in 90 days          SOFA Exh 3

2425 West Loop - 2425 West Loop South Houston, TX 77027
**Date Range:** 09/05/2023 to 12/05/2023

| Bank Account | Payee Name | Check # | Check Date | Payment Amount | | Amount |
|---|---|---|---|---|---|---|
| Galleria 2425 Owner, LLC - 8002 | CNA Insurance | 8002 Regic | 09/05/2023 | 16,270.77 | | |
| | | | | | Property Insurance | 16,270.77 |
| Galleria 2425 Owner, LLC - 8002 | City of Houston Water | 8002 Regic | 09/06/2023 | 8,140.52 | | |
| | | | | | Water | 8,140.52 |
| Galleria 2425 Owner, LLC - 8002 | Waste Management | 1012 | 09/06/2023 | 563.84 | | |
| | | | | | Waste Removal | 563.84 |
| Galleria 2425 Owner, LLC - 8002 | TK Elevator Corporation | 1013 | 09/06/2023 | 3,542.25 | | |
| | | | | | Elevator Inspection a | 3,542.25 |
| Galleria 2425 Owner, LLC - 8002 | Smart Office Automation | 1014 | 09/06/2023 | 574.46 | | |
| | | | | | Equipment Rental | 574.46 |
| Galleria 2425 Owner, LLC - 8002 | Mueller Water Conditioning I | 1015 | 09/06/2023 | 475.00 | | |
| | | | | | Water Treatment | 475.00 |
| Galleria 2425 Owner, LLC - 8002 | ADT Commercial | 1016 | 09/06/2023 | 86.16 | | |

000866

| | | | | | Fire and Security Mo | 86.16 |
|---|---|---|---|---|---|---|
| Galleria 2425 Owner, LLC - 8002 | Ferguson Facilities Supply | 1017 | 09/06/2023 | 691.13 | | |
| | | | | | Janitorial Expense | 691.13 |
| Galleria 2425 Owner, LLC - 8002 | Zindler Service Co, Inc | 1018 | 09/06/2023 | 2,110.88 | | |
| | | | | | Janitorial Expense | 2,110.88 |
| Galleria 2425 Owner, LLC - 8002 | Maria Cristina Leos Rico | 1019 | 09/08/2023 | 1,200.00 | | |
| | | | | | Janitorial Expense | 1,200.00 |
| Galleria 2425 Owner, LLC - 8002 | Nemecio Alfonso Garcia Villa | 1020 | 09/08/2023 | 1,200.00 | | |
| | | | | | Janitorial Expense | 1,200.00 |
| Galleria 2425 Owner, LLC - 8002 | Nationwide Investigation & S | 1021 | 09/08/2023 | 4,158.97 | | |
| | | | | | Security Service | 4,158.97 |
| Galleria 2425 Owner, LLC - 8002 | RingCentral | 1022 | 09/08/2023 | 896.87 | | |
| | | | | | Telephone and Interr | 896.87 |
| Galleria 2425 Owner, LLC - 8002 | First Insurance Funding | 8002 Regic | 09/12/2023 | 1,376.84 | | |
| | | | | | Property Insurance | 1,376.84 |
| Galleria 2425 Owner, LLC - 8002 | Comcast Business | 1023 | 09/12/2023 | 248.79 | | |
| | | | | | Telephone and Interr | 248.79 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Galleria 2425 Owner, LLC - 8002 | T & R Mechanical, Inc | 1024 | 09/14/2023 | 9,791.21 | | |
| | | | | | HVAC (Heat, Ventilat | 9,791.21 |
| Galleria 2425 Owner, LLC - 8002 | Mueller Water Conditioning I | 3774 | 09/14/2023 | 475.00 | | |
| | | | | | Water Treatment | 475.00 |
| Galleria 2425 Owner, LLC - 8002 | Mueller Water Conditioning I | 3774 | 09/14/2023 | 475.00 | | |
| | | | | | Water Treatment | 475.00 |
| Galleria 2425 Owner, LLC - 8002 | Mueller Water Conditioning I | 3774 | 09/14/2023 | 475.00 | | |
| | | | | | Water Treatment | 475.00 |
| Galleria 2425 Owner, LLC - 8002 | Nationwide Investigation & S | 1025 | 09/14/2023 | 3,611.22 | | |
| | | | | | Security Service | 3,611.22 |
| Galleria 2425 Owner, LLC - 8002 | Culligan of Houston | 1026 | 09/14/2023 | 63.56 | | |
| | | | | | Water | 49.49 |
| | | | | | Equipment Rental | 14.07 |
| Galleria 2425 Owner, LLC - 8002 | ADT Commercial | 1027 | 09/14/2023 | 81.19 | | |
| | | | | | Fire and Security Re| | 81.19 |
| Galleria 2425 Owner, LLC - 8002 | The Filter Man, LLC | 1028 | 09/15/2023 | 1,978.36 | | |
| | | | | | Fire Damage 2425 W | 1,978.36 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Galleria 2425 Owner, LLC - 8002 | Octavio Carranza | 1029 | 09/15/2023 | 3,336.46 | | |
| | | | | | General Maintenance | 3,336.46 |
| Galleria 2425 Owner, LLC - 8002 | Carlos Arroyo | 1030 | 09/15/2023 | 2,427.01 | | |
| | | | | | General Maintenance | 2,427.01 |
| Galleria 2425 Owner, LLC - 8002 | Ricky Delarosa | 1031 | 09/15/2023 | 136.00 | | |
| | | | | | General Maintenance | 136.00 |
| Galleria 2425 Owner, LLC - 8002 | U Plumb It | M/C | 09/15/2023 | 77.92 | | |
| | | | | | Plumbing | 77.92 |
| Galleria 2425 Owner, LLC - 8002 | Ricky Delarosa | 1032 | 09/20/2023 | 510.00 | | |
| | | | | | General Maintenance | 510.00 |
| Galleria 2425 Owner, LLC - 8002 | Maria Cristina Leos Rico | 1033 | 09/21/2023 | 1,200.00 | | |
| | | | | | Janitorial Expense | 1,200.00 |
| Galleria 2425 Owner, LLC - 8002 | Nemecio Alfonso Garcia Villa | 1034 | 09/21/2023 | 1,200.00 | | |
| | | | | | Janitorial Expense | 1,200.00 |
| Galleria 2425 Owner, LLC - 8002 | Cirro Energy | 8002 Regio | 09/22/2023 | 23,292.67 | | |
| | | | | | Electricity | 23,292.67 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Galleria 2425 Owner, LLC - 8002 | Ricky Delarosa | 1035 | 09/29/2023 | 1,147.50 | | |
| | | | | | General Maintenance | 1,147.50 |
| Galleria 2425 Owner, LLC - 8002 | Carlos Arroyo | 1036 | 09/29/2023 | 2,208.63 | | |
| | | | | | General Maintenance | 2,208.63 |
| Galleria 2425 Owner, LLC - 8002 | Octavio Carranza | 1037 | 09/29/2023 | 3,133.01 | | |
| | | | | | General Maintenance | 3,133.01 |
| Galleria 2425 Owner, LLC - 8002 | Datawatch Systems | 1042 | 09/30/2023 | 1,382.55 | | |
| | | | | | Fire and Security Mo | 1,382.55 |
| Galleria 2425 Owner, LLC - 8002 | Logix Fiber Networks | 1043 | 09/30/2023 | 315.80 | | |
| | | | | | Fire and Security Mo | 315.80 |
| Galleria 2425 Owner, LLC - 8002 | Meyerland Glass & Mirror Cc | 1044 | 09/30/2023 | 211.09 | | |
| | | | | | Interior Repairs | 211.09 |
| Galleria 2425 Owner, LLC - 8002 | Bank Fee | 8002 Regic | 09/30/2023 | 12.00 | | |
| | | | | | Bank Fees | 12.00 |
| Galleria 2425 Owner, LLC - 8002 | Ferguson Facilities Supply | 1038 | 10/02/2023 | 952.61 | | |
| | | | | | Janitorial Expense | 757.93 |
| | | | | | Janitorial Expense | 194.68 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Galleria 2425 Owner, LLC - 8002 | Zindler Service Co, Inc | 1039 | 10/02/2023 | 2,110.88 | | |
| | | | | | Janitorial Expense | 2,110.88 |
| Galleria 2425 Owner, LLC - 8002 | Nationwide Investigation & S | 1041 | 10/02/2023 | 4,905.89 | | |
| | | | | | Security Service | 497.95 |
| | | | | | Security Service | 4,407.94 |
| Galleria 2425 Owner, LLC - 8002 | Carrillo's Flooring | 1045 | 10/02/2023 | 1,650.00 | | |
| | | | | | Flooring | 1,650.00 |
| Galleria 2425 Owner, LLC - 8002 | Acme Hardware | Octavio pai | 10/02/2023 | 42.22 | | |
| | | | | | Door, Locks, Signs | 42.22 |
| Galleria 2425 Owner, LLC - 8002 | Jetall Companies, Inc | 8002 Regic | 10/02/2023 | 19,395.87 | | |
| | | | | | Administrative | 19,395.87 |
| Galleria 2425 Owner, LLC - 8002 | Department of State Health : | 1046 | 10/04/2023 | 450.00 | | |
| | | | | | Licenses and Permits | 450.00 |
| Galleria 2425 Owner, LLC - 8002 | Nemecio Alfonso Garcia Vill | 1047 | 10/06/2023 | 1,200.00 | | |
| | | | | | Janitorial Expense | 1,200.00 |
| Galleria 2425 Owner, LLC - 8002 | Maria Cristina Leos Rico | 1048 | 10/06/2023 | 1,200.00 | | |
| | | | | | Janitorial Expense | 1,200.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Galleria 2425 Owner, LLC - 8002 | Nationwide Investigation & S | Applied to ( | 10/06/2023 | 712.78 | | |
| | | | | | Security Service | 712.78 |
| Galleria 2425 Owner, LLC - 8002 | Nationwide Investigation & S | Applied to r | 10/06/2023 | 4,407.94 | | |
| | | | | | Security Service | 4,407.94 |
| Galleria 2425 Owner, LLC - 8002 | Culligan of Houston | 1049 | 10/10/2023 | 14.07 | | |
| | | | | | Equipment Rental | 14.07 |
| Galleria 2425 Owner, LLC - 8002 | TK Elevator Corporation | 1050 | 10/10/2023 | 3,542.25 | | |
| | | | | | Elevator Inspection a | 3,542.25 |
| Galleria 2425 Owner, LLC - 8002 | Mueller Water Conditioning I | 1051 | 10/10/2023 | 475.00 | | |
| | | | | | Water Treatment | 475.00 |
| Galleria 2425 Owner, LLC - 8002 | Ferguson Facilities Supply | 1052 | 10/10/2023 | 1,018.74 | | |
| | | | | | Janitorial Expense | 1,018.74 |
| Galleria 2425 Owner, LLC - 8002 | Datawatch Systems | 1053 | 10/10/2023 | 1,490.81 | | |
| | | | | | Fire and Security Mo | 1,490.81 |
| Galleria 2425 Owner, LLC - 8002 | ADT Commercial | 1054 | 10/10/2023 | 86.16 | | |
| | | | | | Fire and Security Mo | 86.16 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Galleria 2425 Owner, LLC - 8002 | Ricky Delarosa | 1055 | 10/11/2023 | 153.00 | | |
| | | | | | General Maintenance | 153.00 |
| Galleria 2425 Owner, LLC - 8002 | Prime Restoration | 1056 | 10/12/2023 | 4,000.00 | | |
| | | | | | Fire Damage 2425 W | 4,000.00 |
| Galleria 2425 Owner, LLC - 8002 | Ricky Delarosa | 1057 | 10/12/2023 | 1,504.50 | | |
| | | | | | General Maintenance | 1,504.50 |
| Galleria 2425 Owner, LLC - 8002 | Jetall Companies, Inc | 8002 Regic | 10/12/2023 | 19,395.87 | | |
| | | | | | Administrative | 19,395.87 |
| Galleria 2425 Owner, LLC - 8002 | Carlos Arroyo | 1058 | 10/13/2023 | 2,076.90 | | |
| | | | | | General Maintenance | 2,076.90 |
| Galleria 2425 Owner, LLC - 8002 | Octavio Carranza | 1059 | 10/13/2023 | 3,172.22 | | |
| | | | | | General Maintenance | 3,172.22 |
| Galleria 2425 Owner, LLC - 8002 | T & R Mechanical, Inc | 1060 | 10/18/2023 | 12,901.24 | | |
| | | | | | HVAC (Heat, Ventilat | 12,901.24 |
| Galleria 2425 Owner, LLC - 8002 | T & R Mechanical, Inc | 1061 | 10/18/2023 | 13,093.24 | | |
| | | | | | HVAC (Heat, Ventilat | 13,093.24 |

000873

| | | | | | | |
|---|---|---|---|---|---|---|
| Galleria 2425 Owner, LLC - 8002 | U.S. Trustees | 1062 | 10/19/2023 | 578.00 | | |
| | | | | | Other | 578.00 |
| Galleria 2425 Owner, LLC - 8002 | Maria Cristina Leos Rico | 1063 | 10/20/2023 | 1,200.00 | | |
| | | | | | Janitorial Expense | 1,200.00 |
| Galleria 2425 Owner, LLC - 8002 | Nemecio Alfonso Garcia Villa | 1064 | 10/20/2023 | 1,200.00 | | |
| | | | | | Janitorial Expense | 1,200.00 |
| Galleria 2425 Owner, LLC - 8002 | City of Houston Water | 8002 Regic | 10/20/2023 | 9,511.72 | | |
| | | | | | Water | 9,511.72 |
| Galleria 2425 Owner, LLC - 8002 | RingCentral | 1065 | 10/23/2023 | 896.87 | | |
| | | | | | Telephone and Interr | 896.87 |
| Galleria 2425 Owner, LLC - 8002 | Cirro Energy | 8002 Regic | 10/23/2023 | 25,512.26 | | |
| | | | | | Electricity | 25,512.26 |
| Galleria 2425 Owner, LLC - 8002 | Smart Office Automation | 1066 | 10/23/2023 | 806.69 | | |
| | | | | | Equipment Rental | 806.69 |
| Galleria 2425 Owner, LLC - 8002 | Nationwide Investigation & S | 1067 | 10/23/2023 | 4,258.56 | | |
| | | | | | Security Service | 4,258.56 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Galleria 2425 Owner, LLC - 8002 | Waste Management | 1068 | 10/23/2023 | 457.35 | | |
| | | | | | Waste Removal | 457.35 |
| Galleria 2425 Owner, LLC - 8002 | Logix Fiber Networks | 1069 | 10/23/2023 | 323.44 | | |
| | | | | | Fire and Security Mo | 323.44 |
| Galleria 2425 Owner, LLC - 8002 | Comcast Business | 1070 | 10/23/2023 | 249.05 | | |
| | | | | | Telephone and Interr | 249.05 |
| Galleria 2425 Owner, LLC - 8002 | Culligan of Houston | 1071 | 10/23/2023 | 50.57 | | |
| | | | | | Water | 50.57 |
| Galleria 2425 Owner, LLC - 8002 | Meyerland Glass & Mirror Cc | 1072 | 10/24/2023 | 211.09 | | |
| | | | | | Door, Locks, Signs | 211.09 |
| Galleria 2425 Owner, LLC - 8002 | Ricky Delarosa | 1073 | 10/25/2023 | 136.00 | | |
| | | | | | General Maintenance | 136.00 |
| Galleria 2425 Owner, LLC - 8002 | Colaco Engineers | 1074 | 10/30/2023 | 4,800.00 | | |
| | | | | | Fire Damage 2425 W | 4,800.00 |
| Galleria 2425 Owner, LLC - 8002 | Octavio Carranza | 1075 | 10/31/2023 | 3,194.97 | | |
| | | | | | General Maintenance | 3,194.97 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Galleria 2425 Owner, LLC - 8002 | Ricky Delarosa | 1076 | 10/31/2023 | 1,853.00 | | |
| | | | | | General Maintenance | 1,853.00 |
| Galleria 2425 Owner, LLC - 8002 | Carlos Arroyo | 1077 | 10/31/2023 | 2,722.30 | | |
| | | | | | General Maintenance | 2,722.30 |
| Galleria 2425 Owner, LLC - 8002 | Jetall Companies, Inc | 8002 Regic | 11/02/2023 | 19,395.87 | | |
| | | | | | Administrative | 19,395.87 |
| Galleria 2425 Owner, LLC - 8002 | Kings 111 Emergency Comn | 3774 | 11/02/2023 | 1,091.34 | | |
| | | | | | Fire and Security Mo | 1,091.34 |
| Galleria 2425 Owner, LLC - 8002 | Nemecio Alfonso Garcia Vill: | 1078 | 11/03/2023 | 1,200.00 | | |
| | | | | | Janitorial Expense | 1,200.00 |
| Galleria 2425 Owner, LLC - 8002 | Maria Cristina Leos Rico | 1079 | 11/03/2023 | 1,200.00 | | |
| | | | | | Janitorial Expense | 1,200.00 |
| Galleria 2425 Owner, LLC - 8002 | Goodman-Gable-Gould | 1080 | 11/06/2023 | 15,000.00 | | |
| | | | | | Fire Damage 2425 W | 15,000.00 |
| Galleria 2425 Owner, LLC - 8002 | ADT Commercial | 1081 | 11/06/2023 | 1,271.91 | | |
| | | | | | Fire Damage 2425 W | 1,271.91 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Galleria 2425 Owner, LLC - 8002 | Matias J Adrogue, PLLC | 8002 Regic | 11/06/2023 | 20,000.00 | | |
| | | | | | Legal | 20,000.00 |
| Galleria 2425 Owner, LLC - 8002 | City of Houston Water | 8002 Regic | 11/06/2023 | 7,891.67 | | |
| | | | | | Water | 7,891.67 |
| Galleria 2425 Owner, LLC - 8002 | Hayward PLLC | 8002 Regic | 11/09/2023 | 20,000.00 | | |
| | | | | | Legal | 20,000.00 |
| Galleria 2425 Owner, LLC - 8002 | Bay Area Pumps, Inc. | 1084 | 11/09/2023 | 811.88 | | |
| | | | | | HVAC (Heat, Ventila | 811.88 |
| Galleria 2425 Owner, LLC - 8002 | Bay Area Pumps, Inc. | 1085 | 11/09/2023 | 2,814.50 | | |
| | | | | | HVAC (Heat, Ventila | 2,814.50 |
| Galleria 2425 Owner, LLC - 8002 | VFS Global Services (USA), | 1086 | 11/09/2023 | 2,520.67 | | |
| | | | | | Clearing Account | 2,520.67 |
| Galleria 2425 Owner, LLC - 8002 | VFS Global Services (USA), | 1087 | 11/09/2023 | 3,416.11 | | |
| | | | | | Clearing Account | 3,416.11 |
| Galleria 2425 Owner, LLC - 8002 | Mueller Water Conditioning I | 8002 Regic | 11/09/2023 | 475.00 | | |
| | | | | | Water Treatment | 475.00 |

| Galleria 2425 Owner, LLC - 8002 | Sign Age, Inc | 1088 | 11/09/2023 | 350.00 | | |
|---|---|---|---|---|---|---|
| | | | | | Door, Locks, Signs | 350.00 |
| Galleria 2425 Owner, LLC - 8002 | Ferguson Facilities Supply | 1089 | 11/13/2023 | 1,425.95 | | |
| | | | | | Janitorial Expense | 64.39 |
| | | | | | Janitorial Expense | 194.63 |
| | | | | | Janitorial Expense | 1,166.93 |
| Galleria 2425 Owner, LLC - 8002 | Passman & Jones | 8002 Regic | 11/15/2023 | 20,000.00 | | |
| | | | | | Legal | 20,000.00 |
| Galleria 2425 Owner, LLC - 8002 | Octavio Carranza | 1090 | 11/15/2023 | 3,192.50 | | |
| | | | | | General Maintenance | 3,192.50 |
| Galleria 2425 Owner, LLC - 8002 | Ricky Delarosa | 1091 | 11/15/2023 | 1,914.25 | | |
| | | | | | General Maintenance | 1,914.25 |
| Galleria 2425 Owner, LLC - 8002 | Carlos Arroyo | 1092 | 11/15/2023 | 2,487.81 | | |
| | | | | | General Maintenance | 2,487.81 |
| Galleria 2425 Owner, LLC - 8002 | Bowen, Miclette & Britt | 8002 Regic | 11/15/2023 | 1,885.57 | | |
| | | | | | Property Insurance | 1,885.57 |
| Galleria 2425 Owner, LLC - 8002 | Nemecio Alfonso Garcia Villa | 1093 | 11/17/2023 | 1,320.00 | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | Janitorial Expense | 1,320.00 |
| Galleria 2425 Owner, LLC - 8002 | Maria Cristina Leos Rico | 1094 | 11/17/2023 | 1,320.00 | | |
| | | | | | Janitorial Expense | 1,320.00 |
| Galleria 2425 Owner, LLC - 8002 | Culligan of Houston | 1095 | 11/20/2023 | 117.39 | | |
| | | | | | Equipment Rental | 12.26 |
| | | | | | Water | 90.37 |
| | | | | | Equipment Rental | 14.76 |
| Galleria 2425 Owner, LLC - 8002 | Matias J Adrogue, PLLC | 8002 Regic | 11/20/2023 | 20,000.00 | | |
| | | | | | Legal | 20,000.00 |
| Galleria 2425 Owner, LLC - 8002 | Nationwide Investigation & S | 1096 | 11/20/2023 | 1,434.17 | | |
| | | | | | Security Service | 1,434.17 |
| Galleria 2425 Owner, LLC - 8002 | Nationwide Investigation & S | Applied to I | 11/20/2023 | 2,500.72 | | |
| | | | | | Security Service | 2,500.72 |
| Galleria 2425 Owner, LLC - 8002 | U.S. Trustees | 8002 Regic | 11/21/2023 | 134.00 | | |
| | | | | | Other | 134.00 |
| Galleria 2425 Owner, LLC - 8002 | Kathleen Miller | 1097 | 11/28/2023 | 1,530.00 | | |
| | | | | | Legal | 1,530.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Galleria 2425 Owner, LLC - 8002 | Oasis Paychex | 8002 Regic | 11/29/2023 | 22,067.16 | | |
| | | | | | Administrative | 22,067.16 |
| Galleria 2425 Owner, LLC - 8002 | Kathleen Miller | 1099 | 11/30/2023 | 1,631.71 | | |
| | | | | | Legal | 1,631.71 |
| Galleria 2425 Owner, LLC - 8002 | Comcast Business | 1100 | 11/30/2023 | 259.10 | | |
| | | | | | Telephone and Interr | 259.10 |
| Galleria 2425 Owner, LLC - 8002 | Maria Cristina Leos Rico | 1101 | 12/01/2023 | 1,320.00 | | |
| | | | | | Janitorial Expense | 1,320.00 |
| Galleria 2425 Owner, LLC - 8002 | Nemecio Alfonso Garcia Vill: | 1102 | 12/01/2023 | 1,320.00 | | |
| | | | | | Janitorial Expense | 1,320.00 |
| Galleria 2425 Owner, LLC - 8002 | Ricky Delarosa | 1103 | 12/04/2023 | 194.25 | | |
| | | | | | General Maintenance | 194.25 |
| Galleria 2425 Owner, LLC - 8002 | RingCentral | 1104 | 12/04/2023 | 903.64 | | |
| | | | | | Telephone and Interr | 903.64 |
| Galleria 2425 Owner, LLC - 8002 | Polk Mechanical Company L | 1105 | 12/04/2023 | 5,470.96 | | |
| | | | | | HVAC (Heat, Ventilat | 5,470.96 |

| | | | | | |
|---|---|---|---|---|---|
| Galleria 2425 Owner, LLC - 8002 | Nationwide Investigation & S | Applied to I | 12/04/2023 | 3,810.40 | |
| | | | | | Security Service | 3,810.40 |

**Total**                                                      **450,670.25**

| Payment made | | SOFA Exhibit 4 |
|---|---|---|
| | | |
| Date | Amount | Recipient |
| 1/26/23 | $5,000.00 | Jetall |
| 1/27/23 | $20,850.02 | Jetall |
| 2/2/23 | $4,000.00 | Jetall |
| 2/3/23 | $65,000.00 | Jetall |
| 2/24/23 | $15,000.00 | Jetall |
| 3/3/23 | $5,054.28 | Jetall |
| 3/29/23 | $5,096.15 | Jetall |
| 4/3/23 | $6,100.00 | Jetall |
| 4/12/23 | $5,096.15 | Jetall |
| 4/26/23 | $13,725.67 | Jetall |
| 4/27/23 | $1,750.00 | Jetall |
| 6/12/23 | $20,000.00 | Jetall |
| 6/13/23 | $10,195.56 | Jetall |
| 7/3/23 | $15,000.00 | Jetall |
| July to Nov | $19,395.87 | Jetall |
| 11/2/23 | $4,000.00 | Jetall |
| 11/8/23 | $20,000.00 | Jetall |
| 11/10/23 | $30,000.00 | Jetall |
| 11/13/23 | $25,000.00 | Jetall |
| 11/14/23 | $25,000.00 | Jetall |
| 11/17/23 | $4,000.00 | Jetall |
| 12/5/23 | $10,000.00 | Jetall |
| | | |
| | | |

```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3                                   )  CASE NO:  23-34815-jpn
                                     )
 4    GALLERIA 2425 OWNER, LLC,      )  Houston, Texas
                                     )
 5           Debtor.                 )  Monday, December 18, 2023
                                     )
 6                                   )  2:30 p.m. to 3:00 p.m.
      ------------------------------)
 7

 8                              HEARING

 9           BEFORE THE HONORABLE JEFFREY P. NORMAN
                  UNITED STATES BANKRUPTCY JUDGE
10

11    APPEARANCES:

12    For the Debtor:          REESE W. BAKER
                               Baker & Associates
13                             950 Echo Lane, Suite 300
                               Houston, TX 77024
14
                               JAMES Q. POPE
15                             The Pope Law Firm
                               6161 Savoy Drive, Suite 1125
16                             Houston, TX 77036

17    For the National:        PATRICK FITZMAURICE
      Bank of Kuwait, S.A.K.P  Pillsbury Winthrop Shaw Pittman LLP
18    New York Branch:         909 Fannin, Suite 2000
                               Houston, TX 77010
19
      For 2425 WL, LLC:        STEPHEN WAYNE SATHER
20                             Barron Newburger, P.C.
                               7320 N. Mopac Expressway
21                             Suite 4000
                               Austin, TX 78731
22
      2425 West Loop, LLC:     JAMES ROBERT MACNAUGHTON
23                             Porter & Powers PLLC
                               5900 Memorial Drive, Suite 305
24                             Houston, TX 77027

25
```

```
 1    For Trustee:            JANA SMITH WHITWORTH
                              Office of the United States Trustee
 2                            515 Rusk Street, Suite 3516
                              Houston, TX 77002
 3
      Court Reporter:         TRACEY CONRAD
 4
      Courtroom Deputy:       TRACEY CONRAD
 5
      Transcribed by:         Veritext Legal Solutions
 6                            330 Old Country Road, Suite 300
                              Mineola, NY 11501
 7                            Tel: 800-727-6396

 8

 9
      Proceedings recorded by electronic sound recording;
10    Transcript produced by transcription service.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                            INDEX

2    WITNESSES            DIRECT    CROSS    REDIRECT    RECROSS

3    SCARLET MACGEORGE    8         14/18/19

4

5

6

7    EXHIBITS                                RECEIVED

8    Debtor's Exhibit 34-2    Utilities Statement    9

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              HOUSTON, TEXAS; MONDAY, DECEMBER 18, 2023; 2:30 PM

 2                          (Call to Order)

 3              CLERK:  All rise.

 4              THE COURT:  Please be seated.  All right.  Good

 5    afternoon.  It's 2:30 p.m., and we are back on the record

 6    with the only case at 2:30.  It's Galleria 2425 Owner LLC.

 7    Appearances, please.

 8              MR. BAKER:  Good afternoon, Your Honor.  Reese

 9    Baker on behalf of the Debtor.

10              THE COURT:  Good afternoon, Mr. Baker.

11              MR. POPE:  Good morning, Your Honor.  James Pope,

12    P-O-P-E, also on behalf of the Debtor.

13              THE COURT:  Mr. Pope.

14              MR. FITZMAURICE:  Good afternoon, Your Honor.

15    Patrick Fitzmaurice and Ryan Steinbrunner from Pillsbury for

16    the Debtor Secured Creditor National Bank of Kuwait.

17              THE COURT:  Thank you, Mr. Fitzmaurice.  All

18    right.

19              MR. SATHER:  Stephen Sather appearing on behalf of

20    the 2524 WL, LLC.

21              THE COURT:  Mr. Sather, if you want to make an

22    appearance going forward, you need to appear by video.

23    Otherwise, you don't get to appear.  Thank you.

24              MR. SATHER:  Thank you, Your Honor.  I will.

25              THE COURT:  Go ahead, sir.
```

1                    MR. MACNAUGHTON:  Robert MacNaughton on behalf of

2      2425 West Loop, LLC not related to Mr. Sather's client or

3      the Debtor, a tenant Creditor.

4                    THE COURT:  Thank you, sir.

5                    MS. WHITWORTH:  Good afternoon, Judge.  Jana

6      Whitworth on behalf of the United States Trustee.

7                    THE COURT:  Thank you, Ms. Whitworth.  All right.

8      As I understand it, Mr. Baker, you've --

9                    MR. BAKER:  I'm sorry.  I think I heard you, but

10     I'm not sure.

11                   THE COURT:  You withdrew the motion to freeze the

12     cash collateral.  Is that correct?

13                   MR. BAKER:  That is correct.

14                   THE COURT:  All right.  And so all we have before

15     us today is the utilities motion?

16                   MR. BAKER:  That is correct.

17                   THE COURT:  All right.  So what's the status of

18     the utilities motion?

19                   MR. BAKER:  I am not exactly sure.  The

20     understanding I had is that we -- National Bank of Kuwait

21     wanted to know where the money is coming from, the terms,

22     and some other information about it.  So other than that,

23     I'm not sure there was a -- I don't know if there's a

24     disagreement or not after that.

25                   THE COURT:  Okay.  All right.  That's fine.  So

1    why don't I hear from Mr. Fitzmaurice and we'll go from

2    there?  And I might state for the record that there's a

3    prior ruling on the motion to transfer, and I promised I'd

4    try to give this back to Judge Lopez, and he didn't want it.

5    Okay?  Go ahead.

6          MR. FITZMAURICE:  Thank you very much again.

7    Patrick Fitzmaurice from Pillsbury for the National Bank of

8    Kuwait.  We don't disagree with the concept of making sure

9    that the utilities get paid.  After all, it protects our

10   collateral.  We do have a number of questions concerning the

11   utilities payment that remain unanswered.  In particular,

12   with respect to the current request to pay the utilities,

13   who's paying them, and under what terms?

14         Where's the money coming from?  Is it an equity

15   contribution of some kind?  Is it debt contribution of some

16   kind?  Is it intended to be senior or junior to our lien?

17   Just a number of questions about where the money's coming

18   from, what the -- how the Debtor is going to pay it back, if

19   at all.

20         We also have questions about the money that was

21   set aside for utilities in the prior bankruptcy case.  There

22   was a utilities motion in that case.  The budget that was

23   presented there did call for the payment of utilities.

24   However, the motion says that there was a shutoff notice

25   with a shutoff date of this past Friday the 15th.

1          So does that mean that the utilities haven't been

2     paid over the last few months?  If so, where did that money

3     go that was set aside from the prior bankruptcy case to pay

4     those utilities?  So we just have a number of unanswered

5     questions about the -- about utilities that we want -- you

6     know, we'd like to have answered.  And then we have some --

7     to the extent that Your Honor wants to hear about this now,

8     we can give later the form of order that the Debtor has

9     submitted.  We have some issues with that as well.

10          THE COURT:  All right.  Let's do this.  Mr. Baker,

11     why don't you call a witness?  You can provide information

12     to me.

13          MR. BAKER:  Okay.

14          THE COURT:  And then they will cross-examine and

15     we'll see if there's any unanswered questions at that point

16     in time.  Who do you want to call?

17          MR. BAKER:  Scarlet MacGeorge at this time.

18          THE COURT:  Ms. MacGeorge, would you please come

19     to the microphone and be sworn?  And then I will have you

20     sit down and we'll go from there.  Ms. MacGeorge, please

21     raise your right hand to be sworn.  Do you swear or affirm

22     to tell the truth, the whole truth, and nothing but the

23     truth, so help you God?

24          THE WITNESS:  Yes, sir.

25          THE COURT:  All right.  Please be seated then.

1    Thank you.  As soon as she's seated you may proceed.

2              MR. BAKER:  All right.

3                  DIRECT EXAMINATION OF SCARLET MACGEORGE

4    BY MR. BAKER:

5    Q    Would you state your name please?

6    A    Scarlet MacGeorge.

7    Q    And what is your position?

8    A    Accounts payable.

9    Q    Okay.  And so with regard to the accounts payable, did

10   you go back and look at the average utility bills for the

11   Debtor to come up with some amounts?

12   A    Yes, sir.

13   Q    Okay.  And are you the one that put together the

14   exhibit that's attached to the motion that has the monthly

15   payment as to its amounts?

16   A    Yes, sir.

17   Q    Okay.  And that is actually -- you don't have it in

18   front of you, but it's 34-2, which that is a total of about

19   $37,749.  Got Cirro Energy, city water City of Houston, but

20   that's something you personally know.

21             (Debtor's Exhibit 34-2 marked for identification)

22   A    Yes, sir.

23   Q    And you can testify that those are the average payables

24   for the utilities on a monthly basis.

25   A    Yes, sir.

Page 9

1    Q    Okay.  Now, do you know what has happened with the

2    prior amounts and how the Debtor was behind on utilities?

3    A    Well, we're just behind this one month.  It was

4    scheduled to be cut off on Friday, but I requested an

5    extension.  So it's now scheduled to be cut off tomorrow.

6    Q    Was it scheduled to be cut off because there was more

7    than one month past due, or how far back?

8    A    Nope, just this one month is past due.

9    Q    Okay.  So with regard to the deposits in the prior

10   case, do you know anything about those?

11   A    I do not.

12   Q    Okay.

13           MR. BAKER:  I have no further questions for this

14   witness.  And I -- well, I take that back, Your Honor.

15   Could we admit Exhibit number 34-2, which is the average

16   monthly utilities?

17           THE COURT:  Is there any objection to 34-2?

18   Hearing none, all right, 34-2 is admitted.  Anything

19   further, Mr. Baker?

20           (Debtor's Exhibit 34-2 admitted into evidence)

21           MR. BAKER:  Not for this witness, no.

22           THE COURT:  Do you have any other witnesses?

23           MR. BAKER:  No.

24           THE COURT:  Okay.  Ms. MacGeorge, is that correct?

25           THE WITNESS:  Yes, sir.

```
 1                THE COURT:  All right.  So you have to excuse me,
 2      but I know little or nothing about this debt, okay?  So bear
 3      with me while I ask you a bunch of questions.  All right.  I
 4      assume that this is some sort of retail establishment like a
 5      shopping center?
 6                THE WITNESS:  It's not.  It's an office building.
 7                THE COURT:  An office building.
 8                THE WITNESS:  High-rise office building.
 9                THE COURT:  So it's an office building.
10                THE WITNESS:  Yeah.
11                THE COURT:  All right.  How big is the building?
12                THE WITNESS:  It's about 200 and -- it's 11
13      stories, 290,000 square feet approximately.
14                THE COURT:  Okay.  All right.  How many tenants
15      does it have?
16                THE WITNESS:  We've got not many tenants.  There's
17      maybe 10, 12 I'm guessing.
18                THE COURT:  Okay.  And so let's talk about the
19      utilities, which is what I'm interested in.  Who provides
20      utilities to the office building?
21                THE WITNESS:  Cirro Energy.
22                THE COURT:  And that's electricity?
23                THE WITNESS:  Yes, sir.
24                THE COURT:  And how much do you owe to Cirro
25      Energy right now?
```

Page 11

```
 1                    THE WITNESS:  Right now we owe them 22,928.87.

 2                    THE COURT:  Okay.  And that is from when to when?

 3      Do you know?

 4                    THE WITNESS:  We do know.  From 10/5 to 11/5.

 5                    THE COURT:  And so we also owe from 11/5 to 12/5,

 6      I'm assuming, right?

 7                    THE WITNESS:  We do, but I don't have that bill.

 8                    THE COURT:  Would you assume that it's going to be

 9      about the same amount of money?

10                    THE WITNESS:  Yes.  It will be very close.

11                    THE COURT:  So then we're at least almost halfway

12      into the next billing cycle going now from 12/5 to 1/5, I'm

13      assuming.  Would that be correct?

14                    THE WITNESS:  Right.

15                    THE COURT:  All right.  Cirro Energy is

16      electricity.  Water I'm assuming as well?

17                    THE WITNESS:  City of Houston.

18                    THE COURT:  All right.  And how much to the City

19      of Houston?

20                    THE WITNESS:  Right now $6,126.47.

21                    THE COURT:  And that's from when to when?

22                    THE WITNESS:  That is from 10/12 to 11/13.

23                    THE COURT:  Same issue with them.  You're going to

24      owe for 11/13 to 12/13 --

25                    THE WITNESS:  Yes, sir.
```

Page 12

```
1              THE COURT:  -- correct?
2              THE WITNESS:  Yes, sir.
3              THE COURT:  All right.  And then from 12/13 to
4    1/13 at some point in time.  Those bills always about the
5    same as well?
6              THE WITNESS:  You know, the water fluctuates a
7    little bit more.  It's been as high as 8, little over 8,000.
8    It's just up and down.
9              THE COURT:  Okay.  Other than electricity and
10   water, who else is there?
11             THE WITNESS:  Well, we have our security system,
12   fire and safety system.
13             THE COURT:  Mm hm.
14             THE WITNESS:  Data Watch.
15             THE COURT:  Okay.  And how much do you owe them?
16             THE WITNESS:  Data Watch is $1,490.81.
17             THE COURT:  Mm hm.
18             THE WITNESS:  We have Logics Fiber Network.
19             THE COURT:  So let's do one thing --
20             THE WITNESS:  Okay.
21             THE COURT:  Security systems, we owe them from
22   when to when?
23             THE WITNESS:  This is 12/1 to 12/31.
24             THE COURT:  That's much better off than the
25   (indiscernible).
```

Page 13

```
1                THE WITNESS:  Yes, sir.  Yes.
2                THE COURT:  Okay.  All right.  And the next one
3     that's due?
4                THE WITNESS:  ADT.
5                THE COURT:  And how much do you owe to ADT?
6                THE WITNESS:  $86.16.
7                THE COURT:  And what period of time is that for?
8                THE WITNESS:  11/28 to 12/27.
9                THE COURT:  Okay.  That sounds pretty good to me.
10    Who else?  Anyone else?
11               THE WITNESS:  We've got Kings III.
12               THE COURT:  Say that again?  Who is that?
13               THE WITNESS:  Kings --
14               THE COURT:  Kings?
15               THE WITNESS:  -- III.  Now, I'm current on that
16    bill.  That's just a utility bill.  It's fire and safety,
17    but I am current on that bill.
18               THE COURT:  Fire and safety?
19               THE WITNESS:  Yes, sir.
20               THE COURT:  All right.
21               THE WITNESS:  And I'm current for the quarterly
22    bill, so I've already paid for the quarter.
23               THE COURT:  All right.  Is there anyone else?
24               THE WITNESS:  Just the AT&T Internet, and that's
25    approximately $300.  We just signed up with AT&T so I don't
```

Page 14

```
1    even have a bill from them yet, but I'm expecting one any
2    time.
3              THE COURT:  And so that will be for December?
4              THE WITNESS:  Yes, sir.
5              THE COURT:  So to get us through the end of
6    December, at least by my rough calculations, we need -- bear
7    with me one second.  Somewhere around $66,000?
8              THE WITNESS:  Yes, sir.
9              THE COURT:  Okay.  Where's the money going to come
10   from?
11             THE WITNESS:  I don't know, sir.
12             THE COURT:  All right.  Mr. Fitzmaurice, you want
13   to cross-examine the witness?
14             MR. FITZMAURICE:  Briefly, Your Honor.
15               CROSS-EXAMINATION OF SCARLET MACGEORGE
16   BY MR. FITZMAURICE:
17   Q    Ms. MacGeorge, when you were answering the Court's
18   questions, you were referring to some documents I can see
19   you have in front of you.  What are those?
20   A    They're invoices.
21   Q    Okay.
22             MR. FITZMAURICE:  So I guess as a procedural
23   matter, Your Honor, we would ask to have copies of those and
24   perhaps have them entered in the record since they're the
25   basis of the witness' testimony.  They weren't previously
```

Page 15

 1   produced to us.  They're not on an exhibit list.

 2           THE COURT:  If you want to see them, I'd be happy

 3   for you to look at them.  That's fine.

 4   BY MR. FITZMAURICE:

 5   Q    Ms. MacGeorge, how long have you -- withdrawn.  Do you

 6   actually work for the Debtor, or do you work for the

 7   Debtor's management company?

 8   A    The Debtor's management.

 9   Q    And that's Jetall?

10   A    Correct.

11   Q    Okay.  How long have you worked at Jetall?

12   A    About a year and a half.

13   Q    Okay.  And you're familiar with the fact that the

14   Debtor had previously filed bankruptcy earlier this year?

15   A    I am.

16   Q    And that the case was dismissed about November 1st?

17   A    I don't know when it was dismissed.

18   Q    Do you know what the status of the utility bills were

19   at the time that that case was dismissed?

20   A    No.

21   Q    You know why the bills weren't paid in November?

22   A    Why they weren't paid in November?  Well, I guess it

23   depends on the due dates here.  It was the end of November

24   when the light bill was actually due, that just the funds

25   had been tight.  And then I can't pay anything once they go

1   bankrupt.

2   Q    And in your answer, you reference the light bill.  Is

3   that the Cirro?

4   A    Yes.

5   Q    Okay.  And that bill -- we're referring to the one that

6   covers the period October 5 to November 5?  Is that -- wait,

7   is that the one you were referring to?

8   A    Right.

9   Q    Okay.  And does that bill have an actual due date on

10  it?

11  A    It does.

12  Q    And when is that?

13  A    11/27.  And then I have one with the cutoff date.

14  Q    And it's your testimony that the bill wasn't paid by

15  November 27th because the Debtor lacked the funds to do so?

16  A    It was tight.

17  Q    I'm sorry.  Is that a yes or a no?

18  A    I couldn't tell you what the account balance was at the

19  time.

20  Q    When it comes time for bills to get paid, is there

21  someone who tells you what bills can get paid, what bills

22  can't get paid?

23  A    No.

24  Q    Is it -- is that your job to make that determination?

25  A    It is.

1   Q    And then so can you tell me why you made the

2   determination not to pay Cirro Electric prior to November

3   27th?

4   A    Well, I have to prioritize all the bills that we have

5   the best that I can.  And sometimes they're late, and

6   sometimes they're not.

7   Q    Can you recall what other bills were prioritized ahead

8   of Cirro Electric around the end of November?

9   A    No.  I'd be guessing.

10  Q    And we don't want you to guess.

11  A    Okay.

12  Q    Say if you recall.  Now, I have the same questions with

13  respect to the water bill for the City of Houston.

14  A    Mm hm.

15  Q    Again, focusing just on the bill that covers the period

16  October 12 to November 12 --

17  A    It's --

18  Q    I'm sorry.  It's through the 13th?

19  A    (Indiscernible).

20  Q    Thank you.  What's the due date for that?

21  A    12/5.

22  Q    Okay.  12/5 was the date the Debtor filed.

23  A    Correct.

24  Q    Okay.  So did you make the determination not to pay

25  that bill prior to 12/5?

Page 18

1    A    Well, it just didn't get paid.  I don't know if I

2    determined not to pay it, but I hadn't paid it yet.  So then

3    I was unable to.

4    Q    Once the petition got filed.

5    A    Correct.

6    Q    I think -- and I apologize if I'm repeating a question

7    that the Court asked you, but I think the Court -- just to

8    be clear, the money that is required to pay these

9    outstanding amounts that are past due as well as amounts

10   that are due within the next 30 or 60 days, do you know

11   where that money is coming from?

12   A    I do not.

13   Q    Has anyone told you that that money would be available

14   to pay those bills?

15   A    I can't confirm.  I've not been informed.  I don't

16   know.

17            MR. FITZMAURICE:  Nothing further, Your Honor.

18            THE COURT:  Thank you.  Mr. (Indiscernible), sir?

19            MR. MACNAUGHTON:  MacNaughton.

20            THE COURT:  MacNaughton.  Do you want to -- do you

21   have any questions?

22            MR. MACNAUGHTON:  I actually wasn't, but now I

23   have one.

24            THE COURT:  Okay.

25            CROSS-EXAMINATION OF SCARLET MACGEORGE

Page 19

```
1    BY MR. MACNAUGHTON:

2    Q    Good afternoon.  I understand you don't know where the

3    money is going to come from to pay this -- these December

4    bills.  Do you also keep track of account receivable as well

5    for the Debtor?

6    A    Yes.

7    Q    So do you have any list of who's paying into the

8    Debtor?

9    A    Who's paying rent?

10   Q    Yeah.

11   A    Yes, our tenants.  Mm hm.

12   Q    Okay.  Do -- so you don't have any funds available from

13   rent paying into the Debtor to pay for your utilities?

14   A    I can't pay out of that account.

15   Q    Okay.  In other words because it's the Debtor's

16   account.  Okay.

17            MR. MACNAUGHTON:  No further questions, Your

18   Honor.

19            THE COURT:  Thank you.  Ms. Whitworth?

20            MS. WHITWORTH:  Thank you, Judge.  I have one

21   clarification to make sure I understand what is happening.

22                CROSS-EXAMINATION OF SCARLET MACGEORGE

23   BY MS. WHITWORTH:

24   Q    My name is Jana Whitworth.  I'm sorry I'm not there in

25   the courtroom today.  I represent the United States Trustee.
```

Page 20

1    So Judge Norman went through the past due bills in

2    (indiscernible).  What was that number?  Do you recall?  Was

3    it 60, 68,000?  What -- do you remember the total amount?

4    A    I think he said 66 (indiscernible) --

5              THE COURT:  I said 66 roughly.

6              MS. WHITWORTH:  Okay.  So 66,000.

7    BY MS. WHITWORTH:

8    Q    And that's for the past due, but the motion that has

9    been filed today is asking for a deposit to segregate funds

10   going forward.  Is that correct?

11   A    I don't know the answer to --

12   Q    Ma'am, do you --

13   A    -- that question.

14             THE COURT:  She said she doesn't know the answer

15   to that question.  Let's go forward.

16             MS. WHITWORTH:  Okay.  Well, I have no other

17   questions, Judge.

18             THE COURT:  Mr. Baker?

19             MR. BAKER:  Nothing further, Your Honor.

20             THE COURT:  Okay.  Thank you.

21             THE WITNESS:  Thank you.

22             THE COURT:  All right, Mr. Baker.  Anything else?

23             MR. BAKER:  Your Honor, just to tell the Court the

24   equity is going to provide funds.  They're not going to --

25   it's not going to be a loan.  The (indiscernible).  They're

Page 21

1    just going to invest the money in -- they're going to set up

2    -- they haven't done it yet.  They're going to set up a

3    separate bank account.  All the money that is coming into

4    the Debtor at this point in time is coming into the DIP

5    account.  That is staying (indiscernible).  They're not

6    going to pay anything out of it until we set up a separate

7    account to fund the money to make the payments.

8         THE COURT:  So basically we're going to have a

9    third-party pay off post-petition utility bills.

10        MR. BAKER:  That's correct.

11        THE COURT:  Okay.  And you want me to enter an

12   order that says utility deposits are how much?  Nothing?

13        MR. BAKER:  No, we put on there $37,749 based on

14   the average.  And there's an amount for each particular

15   Creditor.

16        THE COURT:  All right.  So I'm looking at the

17   order.  It says one half of Debtor's average monthly cost to

18   utility services calculated based on utility payments made

19   in the months prior to the petition date in four equal

20   installments it looks like.  Is that the order you want me

21   to sign?  I mean, I'm looking at Order 54.

22        MR. BAKER:  I understand.  That's the order that

23   was submitted.  The Debtor does not have a problem with the

24   total amount submitted.  We can do this by the end of the

25   week.  It would be the amount of the deposits that we have.

1    I can change the order on 34-2.

2          THE COURT:  So I'm still struggling with what it

3    is you want me to grant.

4          MR. BAKER:  Grant the order and provide that the

5    Debtor will put up $37,749.23 for the utility account in the

6    amount set forth on 34-2 for each particular Creditor.

7    Actually segregate the accounts I think is what -- we added

8    or changed the order (indiscernible).

9          THE COURT:  Okay.  Unfortunately, the proposed

10   order doesn't have anything attached to it at all.  I

11   understand what you want me to do, but you can't file an

12   order and then reference -- I don't think it references that

13   ECF number at all.

14         MR. BAKER:  I can stay and we do it right now,

15   Your Honor, and get it uploaded.

16         THE COURT:  All right.  So let me hear from any

17   party about the concerns about the order, what the order

18   says.  Go ahead, sir.

19         MR. FITZMAURICE:  Thank you, Your Honor.  Again,

20   Patrick Fitzmaurice from Pillsbury for National Bank of

21   Kuwait.  Looking at the form of order attached at Docket

22   Number 54, we -- the opening paragraph, the last two

23   sentences reference there's been no objection that was

24   filed.  And so everything in the motion is deemed accepted,

25   but we did actually file an objection.  And there's been a

1    record here that was made, so we would request that those

2    provisions be removed.

3            In addition to requiring a specific amount to be

4    set up, we think the order should also include the

5    information about who's paying and how they're paying and

6    where the money's going to go and make the pay.  If there's

7    going to be a segregated deposit set up, you know, where's

8    that going to be?  I think all of that information needs to

9    be provided as much for the utilities benefit as for the

10   other parties in the case.

11           THE COURT:  All right.  Does any other party --

12   Ms. Whitworth, do you have anything you want to say at this

13   point in time?

14           MS. WHITWORTH:  Jana Whitworth for the U.S.

15   Trustee for the record, Judge.  I agree that it's -- the

16   order's a little bit vague.  I do -- we did ask that the

17   Debtor --

18           THE COURT:  That would be an understatement.

19           MS. WHITWORTH:  That there -- when the -- when Mr.

20   Baker references equity, equity is going to pay, who is

21   equity?  Who is that?  Who is the person responsible for

22   that?  And where is the money coming from?  There's --

23   they've made the statement in the withdrawal they don't need

24   cash collateral.  This is not a cheap building to run.

25   Where is that money coming from?

1               And it's -- how viable is that source?  And who --

2     how do we know it's going to go forward for how many months?

3     What's the total amount?  You know, I agree we don't want to

4     jeopardize the utilities, but it sounds like we're kind of

5     in shallow waters right now on the utilities, what's owed.

6     That's already up to $100,000 if you count the 66 plus the

7     35 that's need to -- for the deposit.  So who -- where is

8     that $100,000 coming from, Judge?  I think that it needs to

9     be very clear.

10              THE COURT:  All right.  Thank you.  Mr.

11    MacNaughton, do you have anything to say?  Do you have any

12    comments on this?

13              MR. MACNAUGHTON:  Your Honor, we would like to

14    have the utilities paid.  We would like the building to

15    operate for a tenant would like to have it operate.  We

16    understand the concerns, and we see the concerns of who

17    exactly -- where the money is coming from.  We don't want it

18    to come from the DIP account, but we do -- we would like to

19    see that there is some sort of guarantee or assurance the

20    utilities are going to be paid however the Court deems fit.

21              THE COURT:  All right.  Thank you, sir.

22              MR. MACNAUGHTON:  Thank you.

23              THE COURT:  Mr. Baker?

24              MR. BAKER:  Your Honor, we have no objection in

25    meeting with Ms. Whitworth, the United States Trustee, and

```
 1   going through and laying this out for her.  There are some

 2   concerns about laying out a lot of information for various

 3   parties in this case as a result of what's happened in the

 4   past when things were disclosed.  But we don't have any

 5   problem if we were to get together with her and provide the

 6   information to her so she feels comfortable.  If she's got a

 7   concern, she could bring it back to court, and I think we

 8   can provide enough information to her where she feels

 9   comfortable that there is a viability and it is all being

10   done properly.

11         THE COURT:  I don't think that I am particularly

12   concerned about where the money comes from.  If someone

13   wants to pour this money down the deep dark hole, I could

14   care less.  Okay?  As long as they have a claim in this case

15   and they're just basically giving away free money, let's

16   take it, all right?  I am concerned about the amount that

17   you want to put up that's not sufficient, okay?

18         MR. BAKER:  Okay.

19         THE COURT:  And I am also concerned that it needs

20   to be held not by you or anyone else, but by the actual

21   utility companies, okay?

22         MR. BAKER:  Okay.

23         THE COURT:  So here's what I'm going to do.  I'm

24   going to enter an order, but it's going to require that you

25   make utility deposits directly to these utility companies,
```

1    all right?

2            MR. BAKER:  No problem.

3            THE COURT:  The problem is I'm not sure that I

4    have a total grasp of addresses of these companies.  Let me

5    see what I've got as far as in the motion.

6            MR. BAKER:  I thought they were on the service

7    list, but if not we can provide (indiscernible) information.

8            THE COURT:  That's all right.  If they're on the

9    service list, then we're good.  So we've got -- let me just

10   look to make sure.  So I've got Cirro Energy.  I've got City

11   of Houston.  I've got ADT, Kings III.  I've got them.  And

12   is Data Watch, is that the security system?  That's Data

13   Watch, correct?

14           MR. BAKER:  Yes, Your Honor.

15           THE COURT:  All right.  And I've got addresses for

16   all of the companies.  All right.  Let's go back and look at

17   the order.  All right, Mr. Baker.  I want a proposed order

18   that eliminates the paragraph at the bottom that talks about

19   there's no objection or written response, all right?

20           MR. BAKER:  All right.

21           THE COURT:  All right.  In Paragraph 4, you can

22   delete the language about one half of the Debtor's average

23   payment cost.  You could put in a list of all the people who

24   basically are owed money, including Cirro Energy, City of

25   Houston, Data Watch, ADT, Kings III, and APT.  And I'll fill

1    in amounts that need to be deposited.  And then I'll sign

2    the order basically providing that once you've made those

3    deposits, they may not terminate service without approaching

4    the court first, which hopefully will protect the Debtor.

5              MR. BAKER:  Right.

6              THE COURT:  All right?

7              MR. BAKER:  The deposit amounts, (indiscernible)

8    on 34-2 or other numbers?

9              THE COURT:  You're going to leave it blank and I'm

10   going to put those amounts in there once I look at

11   everything, all right?

12             MR. BAKER:  No problem.

13             THE COURT:  Okay?  All right.  So is there

14   anything else that I can assist any of the parties with at

15   this point in time realizing that there may be other motions

16   that are filed in the case?  All right.  Then we're done for

17   today.  Thank you so much.

18             MR. BAKER:  Thank you, Your Honor.

19             CLERK:  All rise.

20        (Proceedings adjourned at 3:00 p.m.)

21

22

23

24

25

Page 28

```
 1                        CERTIFICATION

 2

 3     I certify that the foregoing is a correct transcript from

 4     the electronic sound recording of the proceedings in the

 5     above-entitled matter.

 6

 7     Sonya N. Ledanski Hyde

 8

 9

10     Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  December 26, 2023
```

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**

In Re:   Galleria 2425 Owner, LLC                     Case No.: 23−34815
         Debtor

                                                      Chapter: 11

---

## <u>NOTICE OF FILING OF OFFICIAL TRANSCRIPT</u>

An official transcript has been filed in this case and it may contain information protected under the
E-Government Act of 2002, and Fed. R. Bank. P. 9037.

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court.
To comply with privacy requirements of Fed. R. Bank. P. 9037, the parties must ensure that certain protected
information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing
the transcript's docket number, the item's location by page and line, and including only the following portions
of the protected information. This statement must be filed within 21 days of the transcript being filed. A
suggested form for the statement of redaction is available at <u>https://www.txs.uscourts.gov/</u>.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address.

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the
instruction on our website at <u>https://www.txs.uscourts.gov/</u> or by calling (713) 250−5500 . A party is only
responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for
compliance.

Nathan Ochsner
Clerk of Court

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-34815 (JPN) |
| GALLERIA 2425 Owner, LLC | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | § | |

---

NATIONAL BANK OF KUWAIT, S.A.K.P, NEW YORK BRANCH'S
MOTION PURSUANT TO 11 U.S.C. § 1112(b) TO CONVERT
CHAPTER 11 CASE TO CHAPTER 7

---

## NEGATIVE NOTICE PURSUANT TO LOCAL RULE 9013-1

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute.**

**If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 24 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

**There will be a hearing on this motion on January 31, 2024, at 11:00 a.m. (central) in Courtroom 403, 515 Rusk, Houston, Texas 77002.**

**TO THE HONORABLE JEFFREY P. NORMAN, U.S. BANKRUPTCY JUDGE:**

000912

National Bank of Kuwait, S.A.K.P. New York Branch ("NBK") files this motion to convert this Chapter 11 case to one under Chapter 7 (the "Motion"), and in support for the Motion, submits the *Declaration of Charles C. Conrad* attached as Exhibit A and represents as follows.

### JURISDICTION AND VENUE

1.       The Court has jurisdiction over this matter under 28 U.S.C. §§ 157(b)(2) and 1334. Venue is proper under 28 U.S.C. § 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2), and the Court has authority to enter a final order granting the relief requested. The bases for the relief requested are section 1112(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 1017 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule(s)") and the Local Rules of the United States Bankruptcy Court for the Southern District of Texas ("Local Rule(s)").

### RELIEF REQUESTED

2.       NBK seeks entry of an order in the form attached as Exhibit B (the "Proposed Order") converting this Chapter 11 case to one under Chapter 7 of the Bankruptcy Code.

### INTRODUCTION

3.       Chapter 7 conversion is warranted because this case was filed in bad faith, the cause factors for conversion are met, and the best interests of creditors will be served by the immediate appointment of a Chapter 7 trustee to manage the estate's affairs.  Just thirty-four (34) days after its first bankruptcy case was dismissed, the Debtor filed this case (as in the first) to avoid the imminent foreclosure of its sole asset located at 2425 West Loop South, Houston, Texas 77027 (the "Property").  Nothing has changed since dismissal of the first bankruptcy case.

4.       The Debtor is a serial filer that misuses the legal system to prevent NBK from exercising its rights and remedies under the parties' loan documents and is still managed by an

000913

ineffective team led by its principal owner, Mr. Ali Choudhri.  The Debtor also has no reasonable prospect of reorganization because it lacks the ability to pay any of its non-insider creditors and there are no new assets available for distribution to creditors.  Rental income from the Property has shrunk from the projections the Debtor submitted in its first bankruptcy case only a few short weeks ago, and the Property is encumbered by NBK's first lien securing a matured debt of about $63.6 million.  NBK's secured interest has eroded due to unpaid statutory tax liens and will erode even further if the Debtor's 2023 real estate taxes of approximately $587,554.00 are not paid by the end of January.  Even worse, the Debtor cannot pay NBK interest as required in single asset real estate cases, which was largely why Judge Lopez dismissed the first bankruptcy case.

5.      Chapter 7 liquidation is warranted and is the best option under the circumstances, and a Chapter 7 Trustee is needed now because management has proven that it cannot, or will not, operate the Property and the Debtor in a way that maximizes, or even preserves, value.

<div align="center">BACKGROUND</div>

**A.      Galleria's Bankruptcy Filings**

6.      On December 5, 2023, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, its second bankruptcy petition in just five (5) months. The first bankruptcy case was filed on July 5, 2023 under the case caption *In re Galleria 2425 Owner, LLC*, Case No. 23-60036 (CML) ("*Galleria I*") and was dismissed on November 1, 2023 by the Honorable Christopher M. Lopez on the court's own motion.  As of the date of hereof, no trustee, examiner or official committee of unsecured creditors has been appointed in this case.

**B.      Ownership, Management and Operations**

7.      The Debtor's direct membership interests are held by Galleria 2425 JV, LLC ("Galleria JV"), and both the Debtor and Galleria JV are purportedly under common ownership

<div align="center">3</div>

and control of Mr. Ali Choudhri ("Mr. Choudhri").  The Debtor's sole asset is the Property from which the Debtor generates substantially all of its supposed income.  The Property is reportedly managed by Mr. Dward Darjean and Jetall Companies, Inc. ("Jetall"), a company Mr. Choudhri owns and controls, and a tenant on the Property that does not pay rent.

**C.    NBK's Loan to the Debtor**

8.    On May 23, 2018, NBK loaned the Debtor $51,675,000 (the "Loan") to acquire the Property from 2425 WL LLC, another entity Mr. Choudhri owns and controls.  *See* Loan Agreement § 2.1.  NBK holds a first-priority lien on the Property,[1] and the Loan is secured by, among other things: (i) the Property, as well as all Improvements and Chattels (each as defined in the Deed of Trust); (ii) all leases in respect of the Property; (iii) all monies, bank accounts, accounts receivables, contract rights, other rights and any other intangible assets relating to the rental, operation and ownership of the Property; and (iv) all proceeds and replacements of the foregoing and of the other mortgaged property.  *See* Deed of Trust at 2-3.

9.    The Note had a five-year term and provided for interest only payments with principal due at maturity, May 23, 2023.  *See* Note § 1.  Among other things, the Loan Agreement required the Debtor to use loan proceeds to fund the Interest Reserve Account, as defined thereunder, in the amount of $2.5 million and pay costs and expenses incurred in connection with the closing of the Loan.  *See* Loan Agreement § 5.32.  The Interest Reserve Account was funded on or around the Closing Date with a deposit of a portion of the proceeds of the Loan.

---

[1] The Loan and proceeds thereof are evidenced by the (i) Loan Agreement between NBK and the Debtor dated May 23, 2018 (the "Loan Agreement"), (ii) Promissory Note dated May 23, 2018 executed by the Debtor and payable to NBK (the "Note"), and (iii) Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing dated May 23, 2018, recorded RP 2018-235600 in the Real Property Records of Harris County, Texas (the "Deed of Trust", and together with the Loan Agreement, the Note, the "Loan Documents").  *See* ECF No. 44, Exs. A-C.

000915

10.     The Loan Agreement also required the Debtor to pay or reimburse NBK for all actual costs and expenses (including reasonable third-party attorneys' fees and disbursements) incurred in connection with, among other things, enforcing the obligations or collecting payments due from the Debtor in respect of the Loan.  *See* Loan Agreement § 16.4.  The Loan Documents permit NBK to accelerate the Loan upon the occurrence and continuation of an Event of Default and exercise all rights and remedies thereunder, including foreclosing the Property (*see* Loan Agreement § 10.2; Deed § 2.01).

11.     On April 1, 2020, the Debtor defaulted on the Loan by failing to make the required payment of interest due that day; instead, the Debtor made only a partial payment.  The Debtor did not make any further interest payments (and has not made any principal payments) after April 1, 2020.  After the Debtor's default, on each payment date NBK applied the funds in the Interest Reserve Account to pay interest due until the account was depleted on March 6, 2021.  On June 29, 2021, NBK sent a letter to the Debtor informing the Debtor of the existence of an Event of Default under the Loan Documents and notifying the Debtor, among other things, of NBK's intent to accelerate the Loan if the default was not cured by July 12, 2021.  Various litigation maneuvers occurred for almost the next twelve months.

12.     In August 2022, the Debtor, NBK, Mr. Choudhri and Naissance Galleria, LLC (an entity Mr. Choudhri claims to control by assignment from its original owner and the mezzanine lender for the Property) entered into a confidential settlement agreement that, among other things, included dismissals with prejudice or releases of all claims by the Debtor, Naissance Galleria, LLC and Mr. Choudhri against NBK and afforded the Debtor numerous months to pay off the Loan in a discounted amount provided that such payment was made on or before a specified payment date. Under the settlement, Mr. Choudhri assigned to NBK certain tax liens on the Property for tax years

5

2019 and 2020 (the "Tax Liens"), which he acquired from Caz Creek TX II, LLC ("Caz Creek II") pursuant to the Assignment of Tax Lien dated May 24, 2021 and recorded in RP-2021-508701 of the Official Public Records in Harris County, Texas.[2]  The Debtor defaulted under the settlement by failing to comply with its payment terms and thus NBK has retained the Tax Liens.

13.    On March 28, 2023, NBK noticed the Property for foreclosure sale and filed a request in state court to have a receiver appointed over the Property until it could be sold at public auction.  On April 11, 2023, the day before the hearing on NBK's receivership motion, the Debtor filed a request for a temporary restraining order (TRO(s)) in state court seeking to prevent the court from appointing a receiver and to stop the pending foreclosure.  On April 12, 2023, at the hearing on NBK's receivership motion, and in response to arguments by Debtor's counsel, the state court gave the Debtor several more months from the specified payment date to July 3, to make the required discounted payment to NBK under the settlement agreement.  During this extended period of performance, however, the state court required the Debtor to make three payments of $80,000 each to NBK, and the state court directed that any failure to make such payments would entitle NBK to foreclose.  However, even if the Debtor did timely make each $80,000 payment, the state court ordered that NBK could post the Property for a foreclosure sale on June 13, 2023, so that the statutory required notice period of 21-days could be provided.  NBK did so on June 13, 2023, in accordance with the state court's order, and the Property was posted for foreclosure on July 5, 2023 (the "Initial Petition Date").

---

[2]  Caz Creek II acquired the Tax Liens from certain taxing units pursuant to its rights under tax lien contracts entered into with the Debtor on January 31, 2020 and April 30, 2021 (the "Tax Lien Contracts").  The Tax Lien Contracts obligated Caz Creek II to pay the Debtor's 2019 and 2020 property tax obligations, which was secured by transfer of the Tax Liens from certain taxing units.  After payment of the tax obligations, the Tax Liens were transferred to Caz Creek II by certain taxing units under a certified statement of transfer of tax lien.  *See* Conrad Decl., Ex. 2.

000917

14.     Despite failing to make the last $80,000 payment due on June 15, 2023, as ordered by the state court at the April 12, 2023 hearing, the Debtor nevertheless filed two more requests for TROs seeking to prevent that foreclosure (one on July 3, 2023, and the other on July 5, 2023). Each TRO was rejected by the state court. Minutes before the July 5 foreclosure sale, the Debtor filed *Galleria I*.

**D.     Galleria I**

15.     After *Galleria I*'s bankruptcy filing, NBK moved to dismiss the case because it was filed in bad faith (to prevent foreclosure of the Property) and the Debtor had no reasonable hope of a successful reorganization.  A day before the hearing on NBK's motion, the Debtor filed a proposed chapter 11 plan and later filed a disclosure statement.

16.     The Plan designated claims and interests[3] into eight classes and proposed that: (i) certain priority claims will be paid in full on the effective date of the Plan; (ii) Caz Creek II's tax lien claim of $698,006.68 will be paid over 120 months on an annual interest rate of 10.95%; (iii) 2425 WL LLC's insider claim will be treated as either a secured or unsecured claim; (iv) unsecured claims for repair and maintenance will be paid in full in eight quarterly payments; (v) other unsecured claims will be paid a *pro rata* share of $200,000 in eleven quarterly payments, and (vi) equity interests will be cancelled and an affiliated investor (*i.e.*, Mr. Choudhri or individuals related to him) will contribute $2.5 million to the Plan.

---

[3]  Among others, these proofs of claim were filed in *Galleria I*: (i) NBK for the Loan and Tax Liens in the amount of $63,552,988.79 and $1,696,384.85, respectively, *see* Conrad Decl., Exs. 1 and 2; (ii) Caz Creek TX, LLC for acquired tax liens in the amount of $807,099.36, *see id.*, Ex. 3; (iii) Jetall for services rendered in the amount of $2,134,469.99, *see id.*, Ex. 4, (iv) Mr. Choudhri for paying a bond for the Debtor in the amount of $960,000, *see id.*, Ex. 5, and (v) 2425 WL LLC for a loan in the amount of $25,092,415.80 and evidenced by a deed of trust that was not attached to the claim, *see id.*, Ex. 6.  Mr. Darjean filed the 2425 WL LLC claim even though Mr. Choudhri owns and controls the entity.  Without supporting documentation, no one could test whether the insider claim is a loan or equity.

17.     The Plan arranged NBK's approximately $63.6 million claim into two classes based on the Debtor's $18.6 million valuation of the Property. The Plan proposed that NBK's unsecured claim would receive the same treatment as other unsecured claims, and its secured claim will be paid in full in ten (10) years after the effective date of the Plan at an annual interest rate of 6% until the secured amount is refinanced or the Property is sold.  The Plan omitted NBK's Tax Liens and proposed to reinstate the Loan without payment of default interest.[4]  The Debtor proposed to fund the Plan through rental income over a projected period of time and the $2.5 million equity contribution, which Mr. Choudhri similarly proposed in another SARE case concerning one of his properties.[5]

18.     In *Galleria I*, the Debtor submitted a profit and loss statement showing rent projections for the period of August 2023 to December 2023.  For October and November 2023, the Debtor projected rent income for the Property of $229,579.02.   But, those projections have fallen short.  On December 18, 2023, the Debtor filed a profit and loss statement in this case which showed that rental income for October and November has been $97,530.08 and $121,985.11, respectively, a shortfall of about $130,000 and $108,000, respectively.  This statement also showed an aggregate loss for 2023 to date of $51,024.48.  Notably, this loss does not include any loan payments to NBK (interest payments on the Loan at the non-default rate total about $353,980.93 per month) or any payments of real estate taxes (which total about $500,000 or more per year).

---

[4]  The proposed reinstatement of the Loan under the Plan was at odds with the Debtor's proposal to bifurcate NBK's claim into an unsecured deficiency claim and a secured claim with new payment and interest terms.

[5]  The Plan did not disclose the equity sponsor. Galleria West Loop Investments, an entity owned and controlled by Mr. Choudhri, filed for bankruptcy in January 2023 and proposed to fund its chapter 11 plan with, among other things, a $2.5 equity contribution from an affiliated investor named 50BH Acquisition, LLC.  *See In re Galleria West Loop Investments, LLC*, Case No. 23-50027 (CAG) (Bankr. W.D. Tex. Jun. 15, 2023), ECF No. 69 ("Equity will be reissued to the new equity holder based on a $2.5 million contribution of new equity.  The equity contribution is being made by an affiliated investor called 50BH Acquisition, LLC").

000919

19.     At the September 22, 2023 hearing on NBK's motion to dismiss, Judge Lopez

denied the motion without prejudice but expressed serious concerns about *Galleria I*, noting that:

> There's a fundamental problem with this case.  I'm not sure it can be fixed.
> And that's where we're going. . . .
>
> I'm like, and I'm really uncomfortable.  It's driving all of these problems
> that I have with the budget, which is, you know, is rent supposed to be free
> for Jetall?   Is it, you know, are they not supposed to be collected 19,000,
> you know, is the $19,000 fee really a pass-through fee?  I don't trust what
> I'm seeing.   And it makes me uncomfortable that I don't have an
> independent party telling me these answers. . . .
>
> I'm just telling you I'm uncomfortable with the lack of transparency. And
> I'm not saying it's there, but there's -- we don't have an independent here,
> and I don't know how to proceed. And it's going to flow.  It's going to get
> worse as my inquiry goes on . . . . We haven't talked about feasibility of a
> plan. . . .
>
> I don't trust the numbers. I don't trust the books. I don't have a true
> independent who can tell me what we've got going on here.
>
> I do have that Jetall is everywhere. And Mr. Choudhri is everywhere on
> these documents in some sense or another. I don't have enough today to get
> me comfortable, but when it comes to -- so I'm going to deny the motion to
> dismiss without prejudice. <u>If I find out that I get uncomfortable and say what
> you already know that I'm already on edge. I won't hesitate to convert the
> case or do something on my own and I have the authority to do it</u>. . . .
>
> So this case continues, but the case continues under really tight timelines
> and under really strict costs. And I don't like the position that I put you in.
> I just don't. I don't like the position I put others in. I do know as we get
> closer to the 90 days, they didn't raise it, but someone's going to have to
> start talking about interest payments and where this goes on the debt. If this
> case – I know there's a plan on file and I know what the Code says. <u>I got to
> make sure if we get there in the next two months that there's really, really a
> good market test, and in true independent looked at this</u>. . . .
>
> <u>And maybe we can all meet in about 30 days and see what this case really
> goes in the same way. It's just a – It's an extension</u>. I don't really know
> what I'm going to do yet, but I do know what I'm not doing today.

Conrad Decl., Ex. 7 at 119:22-25; 120:25-121:7; 124:23-125:5; 125:12-14; 199:25-200:8; 202:20-

203:5; 204:17-20.

000920

20.     During a subsequent status conference on November 1, 2023, Judge Lopez, on his

own motion, dismissed *Galleria I* and noted:

> THE COURT: The Court's already held a hearing on a motion to dismiss
> the case based upon, among other things, the amount of money it would
> take to continue this case. The Court denied it based on the evidence
> presented to the Court at the time. . . . But for this case to continue there's
> going to have to be a lot of money. <u>I'm going to have to require NBK to get
> paid interest</u>. There's just not enough money in the budget, this Debtor is
> going to run out of money really fast. . . . The only way this case survives
> is if I don't require NBK to be paid any interest on that loan pending the
> resolution of State Court matters, the matters of plan confirmation, and I'm
> unwilling to do that, <u>which makes this case immediately administratively
> insolvent</u>. . . .
>
> This Debtor doesn't have enough money to pay even a half a month of
> interest on the secured loan and it would take until early 2024 to go deal
> with that. <u>I'm dismissing this case effective today under Section 1112(b) for
> cause</u>.

Conrad Decl., Ex. 8 at 64:8-65:8-8; 68:19-23.

**E.     Post-Galleria I**

21.     After *Galleria I*'s dismissal, NBK noticed the Property for foreclosure on

December 5, 2023.  Prior to that scheduled foreclosure sale, the Debtor filed several requests for

TROs in state court, all of which were denied,[6] and appealed those denials through the state court

system, including a request to the Texas Supreme Court.  All of those appeals were likewise

denied.  On December 5, 2023 (the "<u>Second Petition Date</u>"), just minutes before the scheduled

foreclosure sale of the Property, the Debtor filed this second bankruptcy case.  As of the Initial

Petition Date, the Debtor owed NBK $63,552,988.79 under the Loan Documents consisting of:[7]

---

[6]  Mr. Choudhri himself filed an intervention in the Debtor's state court proceeding seeking a TRO to enjoin
foreclosure; and Naissance Galleria, LLC (as directed by Mr. Choudhri) added NBK to the existing lawsuit against
Azeemah Zaheer to forestall foreclosure efforts. Both TROs were denied.

[7]  *See* ECF No. 44, Ex. D. The Payoff Statement is provided for illustrative purposes, and NBK reserves the right to
supplement the amount as permitted under the Loan Documents to reflect additional fees and costs incurred since
the Initial Petition Date.

10

| Unpaid Principal Balance: | $51,675,000.00 |
| Past Due Interest at Default Rate: | $8,521,760.78 |
| Unreimbursed Legal Fees: | $4,318,187.09 |
| Credits | $(961,959.08) |
| **TOTAL AMOUNT DUE:** | $63,552,988.79 |

<u>**ARGUMENT**</u>

**A.    Cause Exists to Convert this Chapter 11 Case to a Case under Chapter 7**

22.    Section 1112(b) of the Bankruptcy Code allows a bankruptcy court to convert a chapter 11 case to a case under chapter 7.  *See* 11 U.S.C. § 1112(b).  Historically, bankruptcy courts had discretion to convert a case to chapter 7 under section 1112(b) but the statute was amended to mandate conversion of a chapter 11 case to chapter 7 on a finding of "cause."  *See also In re Riverbend Cmty., LLC*, Case No. 11-11771 (KG), 2012 WL 1030340, at *3 n.6 (Bankr. D. Del. Mar. 23, 2012) ("Congressional intent that 'shall' really does mean 'must' in the convert or dismiss provision is readily apparent.  In 2005, Congress removed the word 'may' from Section 1112(b) and substituted 'shall' if a moving party establishes 'cause.' Congress clearly intended to make conversion or dismissal mandatory upon proof of 'cause.'") (internal citation omitted); *see also* 7 Collier on Bankruptcy ¶ 1112.04[4] (16th ed. 2023) ("If cause is established and unusual circumstances are not found by the court, the statute requires conversion to chapter 7").

23.    Section 1112(b) contains multiple factors that constitute "cause" for conversion, including (i) "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," (ii) gross mismanagement of the estate, (iii) failure to comply with the Bankruptcy Rules, and (iv) "inability to effectuate substantial confirmation of a confirmed plan." 11 U.S.C. §§ 1112(b)(4)(A), (B), (F) and (M).  Any of these factors warrants conversion to prevent the debtor "'from gambling on the enterprise at the creditors' expense when

11

there is no hope of rehabilitation.'"  *Loop Corp. v. United States Tr.*, 379 F.3d 511, 516 (8th Cir. 2004) (quoting *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995)).

24.     Although section 1112(b) does not include "lack of good faith, courts have also incorporated lack of good faith into section 1112 because the Bankruptcy Code implicitly requires that chapter 11 petitions be filed in good faith."  *See In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986); *In re GEL, LLC*, 495 B.R. 240, 246 (Bankr. E.D.N.Y. 2012) ("[I]t is well established that bad faith may serve as a ground for dismissal [or conversion] of a bankruptcy petition." [internal quotation marks and citations omitted]). "The good faith standard protects the integrity of the bankruptcy courts and prohibits a debtor's misuse of the process where the overriding motive is to delay creditors without any possible benefit, or to achieve a reprehensible purpose through manipulation of the bankruptcy laws." *In re Elmwood Dev. Co.*, 964 F.2d 508, 510 (5th Cir. 1992).

**B.     This Case Should Be Converted to Chapter 7 for Lack of Good Faith Because There is No Valid Purpose for Reorganization or Unforeseen Change in Circumstances**

25.     The good faith inquiry generally requires courts to "examine the facts and circumstances germane to each particular case," and their determination "depends largely upon [an] on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities." *Elmwood*, 964 F.2d at 510.[8]  However, when "a debtor requests Chapter 11 relief for a second time, the good faith inquiry must focus on whether the second petition was filed to contradict the initial bankruptcy proceedings." *Id.* at 511.  In other words, a court's analysis must

---

[8]   Some, but not all, of the factors that courts have examined in making a determination of bad faith include: (i) the debtor has one asset and such asset is encumbered by creditors' liens; (ii) the debtor has engaged in improper pre-petition conduct; (iii) the debtor's property has been posted for foreclosure, and the debtor has tried unsuccessfully to prevent this foreclosure; (iv) the filing of bankruptcy enabled the debtor to evade court orders; (v) the debtor employs few or zero employees other than its principals; (vi) there is little cash flow or source of income to sustain a reorganization; and (vii) there are few, if any, unsecured creditors.  *See Little Creek*, 779 F.2d at 1073.

000923

focus on whether "unforeseen changed circumstances" contributed to the debtor's second bankruptcy filing. *Id.* at 511, n.11. *See id.* at 513 (bankruptcy court properly dismissed second bankruptcy filing that "was not filed in good faith" because the debtor "had neither the purpose nor the ability to effectuate a reorganization plan" and there were no unforeseen change in circumstances); *In re Triumph Christian Ctr., Inc.*, 493 B.R. 479, 489 (Bankr. S.D. Tex. 2013) (second bankruptcy filing may "be justified if unanticipated changed circumstances exist" (citing *Elmwood*, 964 F.2d at 512)); *In re Spectee Grp., Inc.*, 185 B.R. 146, 156 (Bankr. S.D.N.Y. 1995) (awarding sanctions against the debtor and its president because the second bankruptcy case was filed in bad faith to frustrate the secured creditor's efforts to foreclose, and the debtor did not show any unanticipated change in circumstances since the first bankruptcy case).

26.     It is obvious here that this case was filed in bad faith as nearly every single *Little Creek* factor is met, and "[a]ny other motive ascribed to the filing of the instant case[] is nothing more than 'transparent fiction.'" *GEL*, 495 B.R. at 248.  Both *Galleria I* and this case were filed the same day as NBK's scheduled foreclosure sales to delay and frustrate NBK's efforts in exercising its foreclosure rights under the Loan Documents.  The Debtor could have appealed or sought reconsideration of the dismissal order in *Galleria I* but it refused to and, instead, filed several TROs and had a hearing on its request for a temporary injunction through the state court system to forestall the foreclosure after *Galleria I*'s dismissal.  Those applications were denied, as were the Debtor's subsequent appeals, including the Debtor's emergency petitions to the 14th Court of Appeals of Texas and to the Supreme Court of Texas to stay the foreclosure sale.

27.     In *Galleria I*, Judge Lopez observed that there was "[n]o way [the] case could proceed" and that "[t]he only way [*Galleria I*] survives is if [he did not] require NBK to be paid any interest on th[e] loan pending the resolution of State Court matters, the matters of plan

13

confirmation," and he was "unwilling to do that, which [made *Galleria I*] immediately administratively insolvent." Conrad Decl., Ex. 8 at 65:4-8. Nothing has changed. The Debtor still has no employees, the Property is encumbered by statutory tax liens and NBK's lien, there are very few non-insider unsecured creditors, and the Debtor cannot fund its operations and make required payments during chapter 11 from its cash flow. There is simply no valid purpose for reorganization here.

28.     Moreover, there is no unforeseen change in circumstances that justifies the filing of this case. Courts have found an unforeseen change in circumstances where (i) unexpected events may doom or frustrate a debtor's ability to perform under a confirmed plan such that plan confirmation must be revisited, (ii) a change in law may affect the debtor's interests in a property, (iii) termination of service by major counterparty crucial to a debtor's efforts to reorganize, or (iv) substantial adverse judgments. *See In re Caviata Attached Homes, LLC*, 481 B.R. 34, 46-47 (B.A.P. 9th Cir. 2012) ("Examples of unforeseen changed circumstances in the above cases include a change in federal law affecting tenancy of an apartment building, termination of service by major airlines which had provided vital customers for an airport hotel, lost crops due to hail, cattle and pasture lost due to fire, and substantial adverse judgments") (collecting cases).

29.     The Debtor fails each one of these tests as the Plan in *Galleria I* was never confirmed, there is no change in any federal or state law that has affected the Debtor's interests in the Property, and NBK is unaware of any major trade party that terminated or threatened to terminate its service to the Debtor. Even if the denials of the Debtor's TRO and temporary injunction requests are considered "substantial adverse judgments," the results were not unforeseeable but rather - predictable - because the requests were made to the same state court judge who knew the history of the parties' disputes and warned the Debtor that any future TROs

14

or filings relating to the confidential settlement may warrant sanctions for frivolous filings. *See Galleria I*, ECF No. 33 at 7.

30.     Further, *Galleria I*'s chapter 11 petition mirrors this case's chapter 11 petition because the creditors and claims are substantially the same. Management also has not changed considering that Mr. Darjean signed the Debtor's original and amended chapter 11 petitions and, upon information and belief, Mr. Choudhri still owns and controls the Debtor, and NBK is not aware of any alternative financing or new assets available for distribution to creditors. Moreover, the Debtor's financial capacity or ability to fund a chapter 11 case or a chapter 11 plan has not improved since *Galleria I* was dismissed.

31.     In sum, the facts and the Debtor's prepetition conduct clearly establish that this case was filed in bad faith. That alone should be enough to convert this case to a case under Chapter 7.

## C.     Cause Exists for Conversion under 11 U.S.C. §§ 1112(b)(4)(A), (B), (F) and (M)

32.     In the alternative, the Court should convert this case to a case under Chapter 7 because cause exists to do so under Bankruptcy Code sections 1112(b)(4)(A), (B), (F) and (M).

        a.     11 U.S.C. § 1112(b)(4)(A)

                i.     *Substantial Loss and Diminution to the Estate*

33.     Section 1112(b)(4)(A) requires the movant to demonstrate that (1) there is a substantial or continuing loss to or diminution of the estate and (2) the absence of a reasonable likelihood of rehabilitation. *See In re TMT Procurement Corp.*, 534 B.R. 912, 918 (Bankr. S.D. Tex. 2015). The loss to the estate may be substantial or continuing, but it need not be both. *See In re Creekside Senior Apartments, L.P.*, 489 B.R. 51, 61 (B.A.P. 6th Cir. 2013) (finding cause under section 1112(b)(4) where debtors were losing value and had no path to reorganization). Courts evaluate substantial or continuing loss or diminution of the estate by looking "beyond a debtor's financial statements and mak[ing] a full evaluation of the present condition of the estate."

15

*In re Moore Constr. Inc.*, 206 B.R. 436, 437-8 (Bankr. N.D. Tex. 1997).  A loss is also substantial or continuing where the debtor continues to experience a negative cash flow after the bankruptcy filing. *See, e.g.*, *Loop Corp.*, 379 F.3d at 515-16 (8th Cir. 2004) ("Under the interpretation of § 1112(b)(1) consistently used in bankruptcy courts, this negative cash flow situation alone is sufficient to establish 'continuing loss to or diminution of the estate.'" (quoting § 1112(b)(4)(A))); 7 Collier, *supra*, ¶1112.04[6][a] (section 1112(b)(4)(A) "tests whether, after the commencement of the case, the debtor has suffered or continued to experience a negative cash flow, or, alternatively, declining asset values.").

34.    The Debtor's estate faces substantial or continuing loss or diminution in value if post-petition taxes are not paid. *See, e.g.*, *In re Hassen Imports P'ship*, No. 13-1042, 2013 WL 4428508, at *13-14 (B.A.P. 9th Cir. Aug. 19, 2013) (affirming conversion to chapter 7 because and non-payment of interest and penalties on delinquent property taxes and property tax accrual "established a continuing loss to, or diminution of, the estate."); *Moore Constr.*, 206 B.R. at 438-39 (chapter 7 conversion warranted after the court was "strongly influenced by the mounting post-petition tax debt" and "non-payment of post-petition tax debt, combined with financial statements that show a current inability to make a profit constitute[d] a continuing loss to or diminution to the estate."); *In re Telemark Mgmt. Co.*, 41 B.R. 501, 507 (Bankr. W.D. Wis. 1984) (unpaid postpetition taxes of $500,000 was evidence of continuing loss to or diminution of the debtor's estate).

35.    In Texas, property tax collection begins on October 1, and taxpayers have until January 31 to pay property taxes to appropriate taxing authorities without penalty or interest.  *See* Tex. Prop. Tax Code. § 32.01(a).  Thereafter, all unpaid property taxes become delinquent and penalties and interest are added to the original base tax amount until taxes are paid.  *See id.* §

000927

31.02(a).  A statutory tax lien automatically attaches to the Property for unpaid property taxes and takes priority over NBK's first-lien Deed of Trust.  *See id.* §§ 32.01(d), 32.05(b).

36.     The Debtor's 2023 estimated property taxes is approximately $587,554.00,[9] and taxing authorities assess a 12% interest rate on unpaid property taxes.  *See* ECF No. 44, Exhibit E. Although the Bankruptcy Code allows the Debtor to defer payments for secured tax claims, interest and penalties will accrue if the 2023 property taxes remain unpaid by the end of January 2024. The Debtor cannot make the payment based on projections submitted in *Galleria I* that would cause it to operate at negative cash flow if the estimated taxes are paid, and "any negative cash flow-including that resulting only from administrative expenses-effectively comes straight from the pockets of the creditors."  *Loop Corp.*, 379 F.3d at 516.

37.     The Debtor has not paid property taxes since 2019, all of which Caz Creek II agreed to pay except, at least so far, for 2023.  Unpaid property taxes have eroded the foreclosure value of NBK's secured interest in the Property and that erosion will continue to increase by $167,656.35 per month plus 12% interest.  *See In re Monroe Park*, 17 B.R. 934, 939 (D. Del. 1982) ("Obviously, any accruing property taxes . . . on the mortgaged property, which were not paid by Monroe Park during the pendency of the bankruptcy proceedings, would erode the value of Metropolitan's secured interest.  Because claims based on such unpaid fees would be superior to the mortgage lien, they would effect a decline in Metropolitan's security.").  Worse, while NBK believes that the Debtor's estate is already administratively insolvent, it most certainly would be if the estate must pay any of the 2023 estimated property taxes, operating expenses, ***and*** make monthly interest payments to NBK because it cannot confirm a plan in a reasonable time, let alone all three.

---

[9] *See* https://harris.trueprodigy-taxtransparency.com/taxTransparency/property/192847/0.

000928

*ii.     Absence of a Reasonable Likelihood of Rehabilitation*

38.     A debtor is unlikely to reasonably rehabilitate if it "lacks income," "lacks operating funds," or "lacks employees, capital, or "continuing revenue-generating activity.'' *In re Bay Area Material Handling, Inc.*, 76 F.3d 384, 1996 WL 29262, at *2 (9th Cir. 1996) (affirming conversion of chapter 11 case to chapter 7); *see also In re Macon Prestressed Concrete Co.*, 61 B.R. 432, 436 (Bankr. M.D. Ga. 1986) ("If it is apparent that the debtor has no profitable core around which to structure a plan of reorganization, if the debtor is faced with continuing losses, and if the debtor's assets are declining in value, the best interest of creditors may require the court to order liquidation of the debtor's estate under Chapter 7.").

39.     There is no reasonable likelihood that the Debtor can rehabilitate. Its financial position continues to deteriorate, and its financial projections from only a few short months ago have proven to be overly optimistic.  And this is all without any payments to NBK or to the taxing authorities.  The Court need not delay conversion when, as here, there is "no more than a 'hopeless and unrealistic prospect' of rehabilitation," and this case is being run for Mr. Choudhri's benefit – not creditors.  *In re Econ. Cab & Tool Co. Inc.,* 44 B.R. 721, 724 (Bankr. D. Minn. 1984).[10]

40.     For the foregoing reasons, cause exists under section 1112(b)(4)(A) for conversion.

   b.   <u>11 U.S.C. § 1112(b)(4)(B) - Evidence of Gross Mismanagement</u>

41.     Section 1112(b)(4)(B) provides that cause to convert exists when there has been gross mismanagement of the estate and focuses on postpetition conduct only.  *See* 11 U.S.C.

---

[10] *See also Tenn. Publ'g Co. v. Am. Nat'l Bank*, 299 U.S. 18, 22 (1936) ("However honest in its efforts the debtor may be, and however sincere its motives, the District Court is not bound to clog its docket with visionary or impracticable schemes for resuscitation."); *In re Johnston*, 149 B.R. 158, 162 (B.A.P. 9th Cir. 1992) (affirming chapter 7 conversion because where "there is no reasonable possibility of an effective reorganization, the bankruptcy court is not compelled to wait a certain period of time, to the detriment of creditors, before ordering conversion of the case."); *In re Macon Prestressed Concrete Co.*, 61 B.R. 432, 436 (Bankr. M.D. Ga. 1986) (on conversion, "the debtor should be given a fair opportunity to reorganize, but the debtor should not be permitted to continue in a futile effort to reorganize.").

000929

§ 1112(b)(4)(D). A debtor "owes a fiduciary duty to its creditors," and "[g]ross mismanagement of the estate is a breach of that duty." *See In re Ozcelebi*, 639 B.R. 365, 388 (Bankr. S.D. Tex. 2022).

42.     Days ago, the Debtor filed an emergency cash collateral motion for a hearing on December 15.  In connection with this motion, Mr. Choudhri declared under penalty of injury that "[t]he Debtor requires the use of cash collateral to continue operation of the Property and will suffer irreparable harm and immediate harm" if the cash collateral motion was not granted, and that "an immediate and critical need exits for the Debtor to obtain funds in order to continue operating the Property, and *without such funds*, the Debtor will not be able to pay its direct operating expenses, maintain the Property, or obtain goods and services" to carry out the business. *See* ECF No. 43-3, ¶ 9 (emphasis added).[11]  Nevertheless, the Debtor withdrew the motion immediately after NBK filed its omnibus objection without any compelling reason other than Debtor's counsel "word" that the estate will be funded by an undisclosed party without any evidence of such funding and on what terms and conditions it is to be made.

43.     The Debtor's reluctance and eleventh-hour refusal to deal with cash collateral issues in favor of an unidentified third-party funding source is problematic. And further, "scapegoating and blatant lying constitute gross mismanagement of the estate" because it leaves the "Court and all parties in interest with an inaccurate picture of Debtor's financial condition." *Ozcelebi*, 639 B.R. at 395.  *See also* Conrad Decl., Ex. 7 at 125:12-14 (Even Judge Lopez stated, "I don't trust the numbers. I don't trust the books. I don't have a true independent who can tell me what we've got going on here."); *In re 210 W. Liberty Holdings, LLC*, No. 08-677, 2009 WL 1522047, at * 6 (Bankr. N.D. W.Va. May 29, 2009) (finding that the debtor grossly mismanaged

---

[11]  Mr. Choudhri did not appear at the hearing on the Debtor's cash collateral motion, demonstrating even more gamesmanship by the Debtor, its management team and its purported owner.

the estate by failing to collect rent and allowing third parties to pay its expenses without any disclosure or court approval authorizing "receipt of the benefit of the[] post-petition transactions.").

44.     For the foregoing reasons, cause exists under section 1112(b)(4)(B) for conversion.

c.     11 U.S.C. § 1112(b)(4)(F) - Failure to Timely File Schedules and SOFAs

45.     Section 1112(b)(4)(F) states that cause exists it convert a chapter 11 case for the "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to" chapter 11 case. *See also* Local Rule 1017-2(a)(1) ("a case may be dismissed for want of prosecution" under Bankruptcy Rule 1017 for "late schedules filed by the debtor"). Bankruptcy Rule 1007 requires a debtor to file its schedules and statement of financial affairs ("SOFAs") within 14 days after the bankruptcy filing, which was due December 19, 2023 in this case. *See* Fed. R. Bankr. P. 1007(c). Even after the deadline had passed and the Court's December 20 denial of the Debtor's *untimely* request for an extension to file its schedules and SOFAs, the Debtor did not promptly file its schedules and SOFAs until December 23, 18 days after the Second Petition Date. *See* ECF Nos. 63, 64 and 70. The Debtor is clearly not serious about reorganizing and this tardiness is inexcusable, especially when the Debtor filed its schedules and SOFAs *just* five months ago in *Galleria I* but chose to pursue adversary cases instead.

46.     For these reasons, cause exists under section 1112(b)(4)(F) for conversion.

d.     11 U.S.C. § 1112(b)(4)(M) - A Plan Cannot be Confirmed

47.     Conversion is appropriate if a debtor cannot "effectuate substantial consummation of a confirmed plan," which "may well turn on practical considerations, including whether confirmation can be achieved." *In re Babayoff*, 445 B.R. 64, 76 (Bankr. E.D.N.Y. 2011). *See also Loop Corp.*, 379 F.3d at 515 n.2 (discussing bankruptcy court's skepticism about whether any plan would be confirmable as grounds for cause to convert) (citing *In re Fossum*, 764 F.2d 520, 521-

22 (8th Cir. 1985) ("A finding that the [debtors] were unable to effectuate any plan which would be confirmable is a proper basis for dismissal of the [debtors'] chapter 11 case.")); *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989) (a debtor cannot effectuate a plan where it "lacks the ability to formulate a plan or to carry one out."); *In re Lamar Estates, Inc.*, 6 B.R. 933, 936-37 (Bankr. E.D.N.Y. 1980) (debtors' inability to effectuate a plan is cause for chapter 7 conversion).

48.     Cause exists to convert this case under section 1112(b)(4)(M) because the Debtor cannot confirm a new plan under sections 1129(a)(11) and 1129(b)(2), regardless of whether NBK makes a section 1111(b) to treat its claim as fully secured, because the Debtor lacks sufficient funds to make the required payments under either scenario. *See In re Woodbrook Associates*, 19 F.3d 312, 317 (7th Cir. 1994) ("The very purpose of § 1112(b) is to cut short this plan and confirmation process where it is pointless."); *In re Jones*, 152 B.R. 155, 174 (Bankr. E.D. Mich. 1993) ("an undersecured creditor can defend itself against strip down by making the § 1111(b)(2) election").

49.     If NBK's claim is bifurcated into secured and unsecured claims, NBK would control the unsecured class because of the potential size of its deficiency claim. *See, e.g.*, *In re Local Union 722 Int'l Bhd. of Teamsters*, 414 B.R. 443, 453 (Bankr. N.D. Ill. 2009) (section 1112(b) was present where plan confirmation was impossible because a single creditor held 70% of the unsecured debt and objected to the plan because his claim was impaired); *In re B & B W. 164th St. Corp.*, 147 B.R. 832, 842 (Bankr. E.D.N.Y. 1992) (cause under section 1112(b) was present where plan confirmation impossible over objection of creditor who controlled over one-third of a class). Thirteen creditors filed proofs of claim by the October 31, 2023 general bar date in *Galleria I*. Excluding Jetall, 2425 WL LLC and Mr. Choudhri's insider claims (which may be subordinated under any new plan and regardless, whose claims cannot be considered when

21

determining the acceptance of an impaired class of claims under section 1129(b)(10)),[12] the unsecured claims totaled approximately $1.9 million.  Although NBK disagreed with the Debtor's $18.6 million valuation of the Property, if that valuation is accepted, NBK would have a deficiency claim of approximately $45 million.

50.     Further, any new plan would be patently unconfirmable because the Debtor lacks the funding to make the required payments to NBK, let alone any other creditor.   For example, to reinstate the Loan, which it must try to do as there is no conceivable prospect that the Debtor could pay off NBK's more than $63 million loan balance when the Debtor asserts the Property is worth less than $19 million, the Debtor must cure[13] any existing payment defaults under the Loan Documents and these amounts total approximately $10.31 million.

51.     For the foregoing reasons, cause exists under section 1112(b)(4)(M) for conversion.

**D.     Conversion to Chapter 7 is in the Best Interests of Creditors**

52.     After cause is established, the Court must decide whether conversion is in the best interests of creditors and the estate a bankruptcy court may deny conversion only if unusual circumstances exist such that conversion is not in the best interests of creditors and the estate.  *See In re Shea, Ltd.*, 545 B.R. 529, 535 (Bankr. S.D. Tex. 2016); 11 U.S.C. § 1112(b)(2).

53.     Chapter 7 conversion is in the best interest of creditors because the estate needs an independent party to manage and make decisions for the Debtor as existing management has proved not to be up to the task.  Mr. Darjean lacks any knowledge about the Debtor's finances because, in his words, he does not "*handle the finances*."  Conrad Decl., Ex. 7 at 113:4 (emphasis added).  In another case concerning another one of Mr. Choudhri's properties, this Court found

---

[12]  *See*, *supra*, n.3.

[13]  *See, e.g.*, *In re Golden Seahorse LLC*, 652 B.R. 593, 616 (Bankr. S.D.N.Y. 2023) (ruling that chapter 11 debtor must pay the secured lender default-rate interest before reinstatement of a loan under its proposed chapter 11 plan).

000933

that Mr. Darjean had "an appalling lack of knowledge as to what's going to happen in th[e] case as far as a reorganization is concerned.  He can't tell me anything about the single asset real estate that effectively is the only way this Debtor reorganizes." Conrad Decl., Ex. 9 at 154:7-11.  Same here.

54.     Mr. Choudhri lacks independence, and his or Jetall's continued management is not in the best interests of the Debtor or its creditors.  Under current management, property taxes have accrued and have remain unpaid for nearly *five* years and since 2021, NBK also has not been paid any interest for the Loan advanced to the Debtor.  Further, it appears that there is no intention of reorganizing the Debtor, but rather an intent to use this Court (again) as a last resort to hold the Property.  As this Court said, "that's not what bankruptcy is for.  Bankruptcy is a shield.  The automatic stay is a shield.  It's not a sword." Conrad Decl., Ex. 9 at 153:3-4.  Given the history of the Debtor's misconduct, conversion is in the best interest of creditors, and the estate and will provide the potential for a greater recovery than dismissal.

55.     In sum, the best interests of creditors will be served by Chapter 7 conversion and appointment of a Chapter 7 trustee, who can manage and make independent decisions for the Debtor and decide whether to sell the Property and investigate, litigate, and settle any potential avoidance actions or claims against any of the Debtor's insiders.  *See, e.g.*, *In re Team Sys. Int'l LLC*, 640 B.R. 296, 320-21 (Bankr. D. Del. 2022) (conversion was in the best interests of creditors where a chapter 7 trustee could pursue any estate causes of action, including insider wrongdoing).

56.     For the foregoing reasons, cause exists to covert this case to chapter 7 because (i) this case was filed in bad faith and there is no unforeseen change in circumstance that justifies the filing, (ii) the estate is being grossly mismanaged and may suffer substantial or continuing losses

000934

and there is no reasonable likelihood that the Debtor can rehabilitate, (iii) the Debtor cannot effectuate a plan without NBK's support, and (iv) conversion is in the best interests of creditors.

<u>NOTICE</u>

57.    Notice of this Motion has been provided to: (a) the Office of the United States Truste for the Southern District of Texas; (b) counsel to Naissance Galleria, LLC; (c) proposed counsel to the Debtor; (d) any party that has requested notice pursuant to Bankruptcy Rule 2002, and (e) the Debtor's mailing matrix.  NBK submits that no other or further notice is required.

<u>CONCLUSION</u>

WHEREFORE, NBK respectfully requests that the Court enter the Proposed Order granting (i) the relief requested in the Motion and (ii) other relief as is just and proper.

000935

DATED: December 27, 2023          **PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Charles C. Conrad*
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010-1028
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

-   *and*   -

Andrew M. Troop  (Bar No. MA547179)
Patrick E. Fitzmaurice*
Kwame O. Akuffo*
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

*Admitted *pro hac vice*

**Counsel for National Bank of Kuwait, S.A.K.P., New York Branch**

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 27, 2023, a true and correct copy of this document was served via the Court's CM/ECF system on the Debtor and its counsel of record and all others who are deemed to have consented to ECF electronic service, and also by mailing, first class, postage prepaid, to each of the parties on the attached mailing matrix.

*/s/ Charles C. Conrad*
Charles C. Conrad

## **Exhibit A**

Declaration of Charles C. Conrad

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 23-34815 (JPN)** |
| **GALLERIA 2425 Owner, LLC** | § | |
| | § | **Chapter 11** |
| **Debtor.** | § | |
| | § | |

---

**DECLARATION OF CHARLES C. CONRAD IN SUPPORT OF NATIONAL BANK OF KUWAIT, S.A.K.P, NEW YORK BRANCH'S MOTION PURSUANT TO 11 U.S.C. § 1112(b) TO CONVERT CHAPTER 11 CASE TO CHAPTER 7**

---

Pursuant to 28 U.S.C. § 1746, I, Charles C. Conrad, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct:

1.      I am a partner at the law firm of Pillsbury Winthrop Shaw Pittman LLP, counsel to National Bank of Kuwait, S.A.K.P. New York Branch, as administrative agent and secured lender.

2.      I am duly admitted to practice before the United States Court of Appeals for the Fifth Circuit, United States District Court for the Northern District of Texas, United States District Court for the Southern District of Texas, United States District Court for the Western District of Texas, and the United States District Court for the Eastern District of Texas.

3.      I submit this declaration in support of the *National Bank of Kuwait, S.A.K.P. New York Branch's Motion Pursuant to 11 U.S.C. § 1112(b) to Convert Chapter 11 Case to Chapter 7.*

4.      Attached as <u>Exhibit 1</u> is a true and correct copy of Proof of Claim No. 9-1 filed by NBK in *Galleria.*[1]

5.      Attached as <u>Exhibit 2</u> is a true and correct copy of Proof of Claim No. 10-1 filed by NBK in *Galleria I.*

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

6. Attached as <u>Exhibit 3</u> is a true and correct copy of Proof of Claim No. 11-1 filed by Caz Creek TX LLC in *Galleria I*.

7. Attached as <u>Exhibit 4</u> is a true and correct copy of Proof of Claim No. 17-1 filed by Jetall Companies, Inc. in *Galleria I*.

8. Attached as <u>Exhibit 5</u> is a true and correct copy of Proof of Claim No. 18-1 filed by Ali Choudhri in *Galleria I*.

9. Attached as <u>Exhibit 6</u> is a true and correct copy of Proof of Claim No. 19-1 filed by 2425 WL LLC filed in *Galleria I*.

10. Attached as <u>Exhibit 7</u> is a true and correct copy of the redacted September 22, 2023 Hearing Transcript.

11. Attached as <u>Exhibit 8</u> is a true and correct copy of the November 1, 2023 Hearing Transcript.

12. Attached as <u>Exhibit 9</u> is a true and correct copy of the March 8, 2023 Hearing Transcript in *In re Houston Real Estate Properties LLC*, Case No. 22-32998 (JPN), ECF No. 82 (Bankr. S.D. Tex. Mar. 13, 2023).

Dated: December 27, 2023                    */s/ Charles C. Conrad*
Houston, Texas                                   Charles C. Conrad

000939

## EXHIBIT 1

| Fill in this information to identify the case: |
|---|

| Debtor 1 | Galleria 2425 Owner LLC |
|---|---|
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Southern District of Texas |
| Case number | 23-60036 (CML) |

Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1: Identify the Claim

| 1. Who is the current creditor? | National Bank of Kuwait, S.A.K.P., New York Branch |
|---|---|
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor |

| 2. Has this claim been acquired from someone else? | ☑ No |
|---|---|
| | ☐ Yes. From whom? |

| 3. Where should notices and payments to the creditor be sent? | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|---|
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Charles Conrad | |
| | Name | Name |
| | Two Houston Center, 909 Fannin, Suite 2000 | |
| | Number        Street | Number        Street |
| | Houston            TX        77010 | |
| | City            State        ZIP Code | City            State        ZIP Code |
| | Contact phone (713) 276 7600 | Contact phone |
| | Contact email charles.conrad@pillsburylaw.com | Contact email |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |

| 4. Does this claim amend one already filed? | ☑ No | |
|---|---|---|
| | ☐ Yes. Claim number on court claims registry (if known) _____ | Filed on _____ MM / DD / YYYY |

| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No |
|---|---|
| | ☐ Yes. Who made the earlier filing? |

Official Form 410                        Proof of Claim

000941
page 1

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____63,552,988.79    **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Money loaned; see Addendum to Proof of Claim

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

000942

Official Form 410    **Proof of Claim**    page 2

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
|---|---|---|
| | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   10/27/23
           MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Michael | C. | Carter |
|---|---|---|---|
| | First name | Middle name | Last name |

| Title | Vice President |
|---|---|

| Company | National Bank of Kuwait, S.A.KP. New York Branch |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 299 Park Avenue | | |
|---|---|---|---|
| | Number    Street | | |
| | New York | NY | 10171 |
| | City | State | ZIP Code |

| Contact phone | (212) 303-9800 | Email | michael.carter@nbkny.com |
|---|---|---|---|

060943

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-60036 (CML) |
| GALLERIA 2425 Owner, LLC | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | § | |

## ADDENDUM TO PROOF OF CLAIM

1.    National Bank of Kuwait, S.A.K.P. New York Branch ("NBK"), as administrative agent and lender, files this Proof of Claim against Galleria 2425 Owner, LLC (the "Debtor") in the amount of $63,552,988.79.

## **THE CLAIM**

2.    On May 23, 2018, NBK loaned the Debtor approximately $51,675,000 (the "Loan") to acquire certain real property and improvements commonly known as 2425 West Loop South Houston, Texas 77027 (the "Property").  Loan Agreement § 2.1.  The Loan is secured by, among other things, a first-priority lien on the Property and proceeds thereof and is evidenced by the (i) Loan Agreement between NBK and Galleria dated May 23, 2018 (the "Loan Agreement"),[1] (ii) Promissory Note dated May 23, 2018 executed by the Debtor and payable to NBK (the "Note"),[2] and (iii) Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing dated May 23, 2018, recorded at record number RP2018-235600 in the Real Property Records of Harris County, Texas[3] (the "Deed of Trust;" and together with the Loan Agreement, the Note and all documents relating to the Loan, the "Loan Documents").

---

[1] The Loan Agreement is attached as Exhibit A.
[2] The Note is attached as Exhibit B.
[3] The Deed of Trust is attached as Exhibit C.

3.      Pursuant to the Deed of Trust, the Loan is secured by, among other things: (i) the Property, as well as all Improvements and Chattels (each as defined in the Deed of Trust); (ii) all Leases in respect of the Property; (iii) all monies, bank accounts, accounts receivables, contract rights, other rights and any other intangible assets relating to the rental, operation and ownership of the Property; and (iv) all proceeds and replacements of the foregoing and of the other mortgaged property.  *See* Deed of Trust at 2-3.

4.      The Note had a five-year term and provided for interest only payments with principal due at maturity, May 23, 2023.  Note § 1.  Among other things, the Loan Agreement required the Debtor to use loan proceeds to fund the Interest Reserve Account, as defined thereunder, in the amount of $2.5 million and pay costs and expenses incurred in connection with the closing of the Loan.  *See* Loan Agreement § 5.32. The Interest Reserve Account was funded on or around the Closing Date with a deposit of a portion of the proceeds of the Loan.  The Loan Agreement also required the Debtor to pay or reimburse NBK for all actual costs and expenses (including reasonable third-party attorneys' fees and disbursements) incurred in connection with, among other things, enforcing the obligations or collecting payments due from the Debtor in respect of the Loan.  *See* Loan Agreement § 16.4.

5.      Upon the occurrence and continuation of an Event of Default, the Loan Documents permit NBK to accelerate the Loan (*see* Loan Agreement § 10.2; Deed § 2.01), and exercise all rights and remedies provided for in the Loan Documents, including, without limitations, foreclosing on the Property (*see* Loan Agreement § 10.2; Deed § 2.01).

6.      On April 1, 2020, the Debtor defaulted on the Loan by failing to make the required payment of interest due that day; instead the Debtor made only a partial payment. The Debtor did

2

000945

not make any further interest payments (and has not made any principal payments) after April 1, 2020.

7.   After Galleria's default, on each payment date NBK applied the funds in the Interest Reserve Account to pay interest due until the account was depleted on March 6, 2021.  On June 29, 2021, NBK sent a letter to the Debtor informing the Debtor of the existence of an Event of Default under the Loan Documents and notifying the Debtor, among other things, of NBK's intent to accelerate the Loan if the default was not cured by July 12, 2021.

8.   The Debtor did not cure the default and NBK thereafter posted the Property for foreclosure on September 14, 2021 according to its rights and remedies under the Deed of Trust and Section 9:604(a) of the Texas Business and Commerce Code. On or about October 5, 2021, the Debtor filed an action against NBK in the 281st Judicial District Court of Harris County, Texas, under Cause No. 2021-63370, seeking a temporary restraining order enjoining NBK from foreclosing on the Property.

9.   On or about August 22, 2022, NBK, the Debtor, Naissance Galleria, LLC and the Debtor's principal Ali Choudhri entered into a confidential settlement agreement (the "**Settlement Agreement**").[4]  Among other things, under the terms of the Settlement Agreement, the Debtor granted NBK a general release of all claims, known or unknown the Debtor had against NBK. The Debtor also acknowledged its defaults under the Loan Documents, that an Event of Default existed under the Loan Documents and further acknowledged that, as of August 22, 2022, it owed NBK without reduction or setoff the amount of $60,212,816.90.

---

[4]  A copy of the Settlement Agreement was filed under seal in connection with the *Reply In Support of National Bank of Kuwait's Motion to Dismiss* (Redacted).  *See* Docket No. 61. The Settlement Agreement is omitted from this Proof of Claim because it is confidential.

000946

10. Under the terms of the Settlement Agreement, NBK agreed to provide the Debtor with a release of claims it held against the Debtor relating to the Loan and the Loan Documents if, within 210 days of the Settlement Date the Debtor made the Settlement Payment or if one of the Purchase Option Parties made the Purchase Option Payment. However, under the Settlement Agreement to the extent that neither the Settlement Payment nor the Purchase Option Payment were made by the Payment Date, a Settlement Default would exist and NBK would have the right to exercise all of its rights and remedies under the Settlement Agreement and the Loan Documents, including the right to foreclose on the Property.

11. Neither the Settlement Payment nor the Purchase Option Payment were made by the Payment Date such that a Settlement Default existed and has continued since the Payment Date. On March 27, 2023, NBK served Debtor a written notice of default and issued a notice of foreclosure on March 28, 2023.

12. As of the Petition Date, the Debtor owed NBK $63,552,988.79 under the Loan Documents consisting of:[5]

| | |
|---|---|
| Unpaid Principal Balance: | $51,675,000.00 |
| Past Due Interest at Default Rate: | $8,521,760.78 |
| Unreimbursed Legal Fees: | $4,318,187.09 |
| Credits | $(961,959.08) |
| **TOTAL AMOUNT DUE:** | $63,552,988.79 |

## RESERVATION OF RIGHTS

13. NBK reserves the right to amend or supplement this Proof of Claim, including, without limitation, the right to: (i) add documents; (ii) assert indemnity, contribution, or similar rights, claims or defenses; and/or (iii) change priority and fix, increase, or amend in any respect

---

[5] The Payoff Statement is attached as Exhibit D.

000947

the amounts and claims referred to herein. NBK further reserves the right to file additional proofs of claim for additional claims, including, without limitation, claims for administrative expenses and all other claims, at law or in equity, arising prior to, on, or after the Debtor's petition date (i.e., July 5, 2023).

14.     NBK reserves the right to amend or supplement this Proof of Claim if it deems it necessary and appropriate, for any reason, including to add costs or expenses that have been incurred but not yet billed or that are allowable at law, equity, or otherwise. NBK further reserves any rights to recoupment and setoff, and, if appropriate, may exercise such rights without further order of the Court and without amending this Proof of Claim.

15.     NBK does not waive any rights at law or equity or any rights or causes of action that NBK has or may have against any person, including but not limited to the Debtor and its affiliates. The Proof of Claim is not intended to be, and shall not be construed as: (i) an election of remedies; (ii) a waiver of any defaults; (iii) an admission as to the jurisdiction of this Court and/or a waiver to contest the jurisdiction of this Court; (iv) a waiver of the right to trial by jury in this Court or any other court in any proceeding, notwithstanding the designation or not of any matter as a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (v) a waiver of the contractual right to arbitration; (vi) a release NBK's right to have any and all final orders in any and all non-core matters or proceedings entered only after a de novo review by a United States District Court judge; (vii) a waiver of the right to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding which may be commenced in these cases against or otherwise involving NBK; or (viii) a waiver or limitation of any rights, remedies, claims or interests of NBK.

000948

## NOTICES

16.    All objections, notices, requests or any other filings or submissions relating to this

Proof of Claim should be sent to each of the following:

Charles C. Conrad
Ryan Steinbrunner
Pillsbury Winthrop Shaw Pittman LLP
Two Houston Center
909 Fannin, Suite 2000
Houston, Texas 77010-1028
Tel: 713-276-7600
Fax: 713-276-76734
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

Andrew M. Troop
Patrick E. Fitzmaurice
Andrew V. Alfano
Kwame O. Akuffo
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, NY 10019-6131
Tel: 212-858-1660
Fax: 212-973-7435
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
andrew.alfano@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

000949

# **EXHIBIT A**

LOAN AGREEMENT

Dated as of May 23, 2018

among

GALLERIA 2425 OWNER, LLC,

as Borrower,

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH,

as Administrative Agent,

and

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, and certain other lenders who may now or later be made party hereto,

collectively, as Lenders

000951

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS; PRINCIPLES OF CONSTRUCTION ........................................................... 1

    Section 1.1. Definitions .................................................................................................... 1
    Section 1.2. Interpretation ............................................................................................... 12

ARTICLE II GENERAL TERMS ......................................................................................................... 13

    Section 2.1. Loan Commitment; Extension ..................................................................... 13
    Section 2.2. Interest Rate and Loan Payments ................................................................ 13
    Section 2.3. Usury Savings .............................................................................................. 14

ARTICLE III CONDITIONS PRECEDENT .......................................................................................... 14

    Section 3.1. Representations and Warranties; Compliance with Conditions..................... 14
    Section 3.2. Delivery of Loan Documents; Title Policy; Due Diligence Items................. 14
    Section 3.3. Related Documents ...................................................................................... 16
    Section 3.4. Organizational Documents ........................................................................... 16
    Section 3.5. Opinions of Counsel .................................................................................... 16
    Section 3.6. Taxes and Other Charges ............................................................................ 16
    Section 3.7. Completion of Proceedings .......................................................................... 16
    Section 3.8. Payments ..................................................................................................... 16
    Section 3.9. Transaction Costs ........................................................................................ 16
    Section 3.10. No Material Adverse Change ..................................................................... 16
    Section 3.11. Leases ........................................................................................................ 17
    Section 3.12. Tenant Estoppel Certificate........................................................................ 17
    Section 3.13. SNDA ........................................................................................................ 17
    Section 3.14. Tax Lot...................................................................................................... 17
    Section 3.15. Borrower's and Guarantor's Financials ...................................................... 17
    Section 3.16. Acquisition of Property .............................................................................. 17
    Section 3.17. Further Documents .................................................................................... 17
    Section 3.18. Interest Reserve Deposit............................................................................. 17

ARTICLE IV REPRESENTATIONS AND WARRANTIES.................................................................... 17

    Section 4.1. Organization................................................................................................ 17
    Section 4.2. Status of Borrower ...................................................................................... 18
    Section 4.3. Validity of Documents ................................................................................. 18
    Section 4.4. No Conflicts ................................................................................................ 18
    Section 4.5. Litigation .................................................................................................... 18
    Section 4.6. Agreements ................................................................................................. 18
    Section 4.7. Solvency ..................................................................................................... 19
    Section 4.8. Full and Accurate Disclosure ...................................................................... 19
    Section 4.9. ERISA Compliance ..................................................................................... 19
    Section 4.10. Not a Foreign Person ................................................................................. 20
    Section 4.11. Enforceability ............................................................................................ 20
    Section 4.12. Business Purposes ...................................................................................... 20
    Section 4.13. Compliance ................................................................................................ 20
    Section 4.14. Financial Information ................................................................................. 20
    Section 4.15. Illegal Activity ........................................................................................... 20
    Section 4.16. Separate Tax and Zoning Lot..................................................................... 20

# TABLE OF CONTENTS
continued

Section 4.17. Federal Reserve Regulation ................................................................. 20
Section 4.18. Investment Company Act ..................................................................... 21
Section 4.19. No Change in Facts or Circumstances; Disclosure ............................. 21
Section 4.20. Special Purpose Entity ......................................................................... 21
Section 4.21. Intellectual Property ............................................................................ 21
Section 4.22. Embargoed Person ............................................................................... 21
Section 4.23. Patriot Act ............................................................................................ 22
Section 4.24. No Contractual Obligations ................................................................. 22
Section 4.25. Shareholders of Borrower .................................................................... 22
Section 4.26. Survival ................................................................................................ 23
Section 4.27. Leases ................................................................................................... 23
Section 4.28. Landmark Status .................................................................................. 23
Section 4.29. Broker .................................................................................................. 23

ARTICLE V COVENANTS ...................................................................................................... 23

Section 5.1. Existence; Compliance With Legal Requirements ................................ 23
Section 5.2. Maintenance and Use of Project ........................................................... 24
Section 5.3. Waste ..................................................................................................... 24
Section 5.4. Taxes and Other Charges ...................................................................... 24
Section 5.5. Litigation ............................................................................................... 26
Section 5.6. Access to the Project ............................................................................. 27
Section 5.7. Notice of Default ................................................................................... 27
Section 5.8. Cooperate in Legal Proceedings ........................................................... 27
Section 5.9. Performance of Obligations .................................................................. 27
Section 5.10. Awards; Insurance Proceeds ............................................................... 27
Section 5.11. Financial Reporting ............................................................................. 27
Section 5.12. Estoppel Statement .............................................................................. 28
Section 5.13. Management of Project ........................................................................ 28
Section 5.14. Liens ..................................................................................................... 29
Section 5.15. Debt Cancellation ................................................................................ 29
Section 5.16. Zoning .................................................................................................. 29
Section 5.17. ERISA .................................................................................................. 30
Section 5.18. No Joint Assessment ........................................................................... 30
Section 5.19. Alterations ............................................................................................ 30
Section 5.20. Reciprocal Easement Agreement ........................................................ 30
Section 5.21. Notices ................................................................................................. 30
Section 5.22. Curing .................................................................................................. 30
Section 5.23. Limitation on Securities Issuances ...................................................... 31
Section 5.24. Limitations on Distributions ............................................................... 31
Section 5.25. Contractual Obligations ...................................................................... 31
Section 5.26. Additional Indebtedness ...................................................................... 31
Section 5.27. Restrictions on Leasing ....................................................................... 31
Section 5.28. Debt Service Coverage Ratio .............................................................. 32
Section 5.29. Loan-to-Value Ratio ............................................................................ 33
Section 5.30. UCC Searches ...................................................................................... 33
Section 5.31. Updated/New Appraisal ....................................................................... 33
Section 5.32. Interest Reserve Account ..................................................................... 33
Section 5.33. Mezzanine Loan ................................................................................... 34

# TABLE OF CONTENTS
continued

ARTICLE VI ENTITY COVENANTS ........................................................................... 34

    Section 6.1. Single Purpose Entity/Separateness ................................................... 34
    Section 6.2. Change of Name, Identity or Structure ............................................. 35
    Section 6.3. Business and Operations ..................................................................... 36

ARTICLE VII NO SALE OR ENCUMBRANCE ....................................................... 36

    Section 7.1. Transfer Definitions ............................................................................. 36
    Section 7.2. No Sale/Encumbrance ......................................................................... 36
    Section 7.3. Administrative Agent's Rights ........................................................... 37
    Section 7.4. Assumption ............................................................................................ 37

ARTICLE VIII INSURANCE; CASUALTY; CONDEMNATION; RESTORATION ........................... 37

    Section 8.1. Insurance ............................................................................................... 37
    Section 8.2. Insurance Escrow; Payment by Administrative Agent ................... 41
    Section 8.3. Casualty ................................................................................................. 42
    Section 8.4. Condemnation ....................................................................................... 44

ARTICLE IX INTENTIONALLY OMITTED ............................................................ 45

ARTICLE X EVENTS OF DEFAULT; REMEDIES .................................................. 45

    Section 10.1. Event of Default .................................................................................. 45
    Section 10.2. Remedies .............................................................................................. 48

ARTICLE XI REPLACEMENT OF LENDERS ......................................................... 48

ARTICLE XII SECONDARY MARKET; ASSIGNMENT; PARTICIPATION ........................ 49

    Section 12.1. Assignment; Participation ................................................................. 49
    Section 12.2. Intralinks .............................................................................................. 51

ARTICLE XIII AGENT ................................................................................................ 51

    Section 13.1. Appointment, Powers and Immunities ............................................ 51
    Section 13.2. Reliance by Administrative Agent .................................................... 53
    Section 13.3. Purchase of Disapproving Lender's Interest .................................... 53
    Section 13.4. Rights of Administrative Agent as Lender ...................................... 54
    Section 13.5. Indemnification ................................................................................... 54
    Section 13.6. Non-Reliance on Administrative Agent and Other Lenders ......... 55
    Section 13.7. Failure to Act ...................................................................................... 55
    Section 13.8. Action by Administrative Agent ....................................................... 55
    Section 13.9. Successor Administrative Agent ....................................................... 56
    Section 13.10. Sharing ............................................................................................... 56
    Section 13.11. Pro Rata Treatment and Payments ................................................ 56
    Section 13.12. Lenders Pro Rata Shares ................................................................ 57
    Section 13.13. Disbursement of Proceeds by Administrative Agent .................... 57
    Section 13.14. Amendments Concerning Agency Function ................................. 58
    Section 13.15. Events of Default .............................................................................. 58
    Section 13.16. Defaulting Lender ............................................................................. 59
    Section 13.17. Servicing Fee ..................................................................................... 61

000954

## TABLE OF CONTENTS
continued

ARTICLE XIV INDEMNIFICATIONS ...... 61

    Section 14.1. General Indemnification ...... 61
    Section 14.2. Intangible Tax Indemnification ...... 61
    Section 14.3. ERISA Indemnification ...... 61
    Section 14.4. Survival ...... 62

ARTICLE XV NOTICES ...... 62

    Section 15.1. Notices ...... 62

ARTICLE XVI FURTHER ASSURANCES ...... 62

    Section 16.1. Replacement and Corrective Documents ...... 62
    Section 16.2. Further Acts, Etc ...... 63
    Section 16.3. Changes in Tax, Debt, Credit and Documentary Stamp Law ...... 63
    Section 16.4. Expenses ...... 64

ARTICLE XVII WAIVERS ...... 64

    Section 17.1. Remedies Cumulative; Waivers ...... 64
    Section 17.2. Modification, Waiver in Writing ...... 64
    Section 17.3. Delay Not a Waiver ...... 65
    Section 17.4. Trial by Jury ...... 65
    Section 17.5. Waiver of Notice ...... 65
    Section 17.6. Remedies of Borrower ...... 65
    Section 17.7. Waiver of Marshalling of Assets ...... 65
    Section 17.8. Waiver of Statute of Limitations ...... 66
    Section 17.9. Waiver of Counterclaim ...... 66

ARTICLE XVIII GOVERNING LAW ...... 66

    Section 18.1. Choice of Law ...... 66
    Section 18.2. Severability ...... 67
    Section 18.3. Preferences ...... 68

ARTICLE XIX MISCELLANEOUS ...... 68

    Section 19.1. Survival ...... 68
    Section 19.2. Administrative Agent's Discretion ...... 68
    Section 19.3. Headings ...... 68
    Section 19.4. Cost of Enforcement ...... 68
    Section 19.5. Schedule Incorporated ...... 68
    Section 19.6. Offsets, Counterclaims and Defenses ...... 68
    Section 19.7. No Joint Venture or Partnership; No Third Party Beneficiaries ...... 69
    Section 19.8. Publicity ...... 70
    Section 19.9. Conflict; Construction of Documents; Reliance ...... 70
    Section 19.10. Actions, Approvals and Determinations ...... 70
    Section 19.11. Entire Agreement ...... 71
    Section 19.12. Certain Additional Rights of Lenders ...... 71
    Section 19.13. Counterparts ...... 71

iv

TABLE OF CONTENTS
continued

EXHIBIT A - Borrower's Organizational Structure

EXHIBIT B - Form of Assignment and Assumption Agreement

SCHEDULE 13.12 - Amount of Loan Attributable to Lender

SCHEDULE 15.1 - Lenders' Offices, Addresses for Notices

v

000956

## LOAN AGREEMENT

THIS LOAN AGREEMENT dated as of May 23, 2018 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "Agreement"), among (1) GALLERIA 2425 OWNER, LLC, a Delaware limited liability company, having an address at 3139 W Holcombe Blvd #845, Houston, Texas 77025 ("Borrower"), (2) the Lenders (as hereinafter defined), and (3) NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch, having an address at 299 Park Avenue, New York, New York 10171, as administrative and collateral agent for the Lenders (in such capacity, and together with its successors and assigns, "Administrative Agent").

RECITALS:

WHEREAS, Lenders have agreed to make a certain $51,675,000.00 loan to Borrower (the "Loan"); and

WHEREAS, the Loan shall be (i) governed by this Agreement, (ii) evidenced by the Note (as hereinafter defined), and (iii) secured by the Deed of Trust (as hereinafter defined).

NOW THEREFORE, in consideration of the making of the Loan by the Lenders and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

ARTICLE I
DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1. Definitions. For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"Access Laws" shall mean, collectively, the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all other federal, state and local laws, regulations, rules, statutes, ordinances, orders and decrees related to handicapped access, including, without limitation, the American with Disabilities Act Accessibility Guidelines for Buildings and Facilities.

"Action Notice" shall have the meaning set forth in Section 13.15 hereof.

"Actual Proceeds" shall have the meaning set forth in Section 8.3 hereof.

"Administrative Agent Loan Documents" shall have the meaning set forth in Section 13.1 hereof.

"Affiliate" shall mean, as to any specified Person, (a) any Person that directly or indirectly through one or more intermediaries Controls, is Controlled by or is under common Control with such Person, (b) any Person owning or controlling 10% or more of the outstanding voting securities of or other ownership interests in such Person, (c) any officer, director, partner, employee or member (direct or indirect and no matter how remote) of such Person, (d) if such Person is an individual, any entity for which such Person directly or indirectly acts as an officer, director, partner, owner employee or member, (e) any entity in which such Person (together with the members of his family if the Person in question is an individual) owns, directly or indirectly through one or more intermediaries an interest in any class of stock (or other beneficial interest in such entity) of 10% or more, (f) any immediate family member of such Person, (g) with respect to any Borrower or Guarantor, any other Borrower or Guarantor, or (h) with respect to any Borrower or Guarantor, any direct or indirect owner of an interest in such Borrower or Guarantor.

"<u>Affiliated Manager</u>" shall have the meaning set forth in <u>Section 7.1</u> hereof.

"<u>Agent Discretion Standard</u>" shall have the meaning set forth in <u>Section 13.15</u> hereof.

"<u>Annex</u>" shall have the meaning set forth in <u>Section 4.23</u> hereof.

"<u>Applicable Percentage</u>" shall have the meaning set forth in <u>Section 8.3</u> hereof.

"<u>Appraised Value</u>" shall have the meaning set forth in <u>Section 5.29</u> hereof.

"<u>Approving Lenders</u>" shall have the meaning set forth in <u>Section 13.3</u> hereof.

"<u>Assignee</u>" shall have the meaning set forth in <u>Section 12.1</u> hereof.

"<u>Assignment of Agreements, Licenses, Permits and Contracts</u>" shall mean the Assignment of Agreements, Licenses, Permits and Contracts dated as of the Closing Date, made by Borrower to Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>Assignment of Interest Rate Agreement</u>" shall mean, with respect to any Interest Rate Protection Product entered into between Borrower and a third-party, an Assignment of Interest Rate Agreement made by Borrower to Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>Assignment of Leases and Rents</u>" shall mean the absolute assignment by Borrower to Administrative Agent of the Property Income with respect to the Property and the Project pursuant to that certain Absolute Assignment of Leases and Rents dated as of the Closing Date made by Borrower to Administrative Agent, on behalf of Lenders, encumbering the Project, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>Award</u>" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Project.

"<u>Balance</u>" shall have the meaning set forth in <u>Section 8.3</u> hereof.

"<u>Benefit Plan</u>" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA, Section 412 of the Internal Revenue Code or Section 302 or 303 of ERISA, that is or, within any of the preceding six (6) plan years was, sponsored, maintained or contributed to by Borrower or any of its Subsidiaries or ERISA Affiliates (or by any Person that was a ERISA Affiliate within the last six (6) years), or with respect to which Borrower or any of its Subsidiaries or ERISA Affiliates has any liability, whether actual or contingent.

"<u>Benefit Plan Investor</u>" shall mean any of the following: (a) an "employee benefit plan" (within the meaning of Section 3(3) of ERISA), whether or not it is subject to ERISA and including governmental and foreign plans, (b) a "plan" as defined in Section 4975 of the Internal Revenue Code of 1986, as amended, or (c) a Person whose underlying assets include "plan assets" of the foregoing by reason of investment by an employee benefit plan or plan in such Person.

"<u>Borrower Materials</u>" shall have the meaning set forth in <u>Section 12.2</u> hereof.

"<u>Borrower Members</u>" shall have the meaning set forth in <u>Section 4.1</u> hereof.

"Borrower Operating Agreement" shall mean Borrower's Amended and Restated Limited Liability Company Agreement dated as of May 23, 2018, as the same may hereafter be amended in accordance with the terms and provisions hereof.

"Business Day" shall have the meaning set forth in the Note.

"Casualty" shall have the meaning set forth in Section 8.3 hereof.

"Closing Date" shall mean the date hereof.

"Condemnation" shall mean a temporary or permanent taking by any Governmental Authority as the result, in lieu or in anticipation, of the exercise of the right of condemnation or eminent domain, of all or any part of the Project, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Project or any part thereof.

"Consented Assignee" shall have the meaning set forth in Section 12.1 hereof.

"Contractual Obligation" shall mean as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking, to which such Person is a party or by which it or any of its property is bound, or any provision of the foregoing.

"Control" shall have the meaning set forth in Section 7.1 hereof.

"Control Account Agreement" means that certain Control Account Agreement dated as of May 18, 2018 and effective as of the Closing Date, entered into by and among Borrower, Administrative Agent and Frost Bank, a Texas state bank, with respect to Borrower's deposit account, as more particularly described therein.

"Coverage Advance" shall have the meaning set forth in Section 13.11 hereof.

"Creditors' Rights Laws" shall mean with respect to any Person any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"DSCR" shall have the meaning set forth in Section 5.28 hereof.

"DSCR Threshold" shall have the meaning set forth in Section 5.28 hereof.

"Debt" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note, together with all interest accrued and unpaid thereon and all other sums due to Lenders in respect of the Loan under the Note, this Agreement, the Deed of Trust or any other Loan Document.

"Debt Service" shall mean, with respect to any particular period of time, scheduled interest and principal payments under the Note and/or this Agreement.

"Debt Service Payments" shall have the meaning set forth in Section 13.12 hereof.

"Deed of Trust" shall mean that certain Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing dated as of the Closing Date made by Borrower to Salima Umatiya, as trustee, for the benefit of Administrative Agent, on behalf of Lenders, in the principal amount of $51,675,000.00, encumbering the Project, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Default" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"Defaulting Lender" shall have the meaning set forth in Section 13.16 hereof.

"Defaulting Lender's Interest" shall have the meaning set forth in Section 13.16 hereof.

"Disapproving Lenders" shall have the meaning set forth in Section 13.3 hereof.

"Dollars" or "$" shall mean lawful money of the United States of America.

"Eligible Assignee" shall have the meaning set forth in Section 12.1 hereof.

"Embargoed Person" shall have the meaning set forth in Section 4.22 hereof.

"Engineering Report" shall mean any written report resulting from the property condition assessments of the Project delivered to Administrative Agent in connection with the Loan.

"Environmental Indemnity Agreement" shall mean that certain Environmental Indemnity Agreement dated as of the Closing Date made by Borrower and Guarantor in favor of Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Environmental Report" shall mean any written report resulting from the environmental site assessments of the Project delivered to Administrative Agent in connection with the Loan.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and any successor statutes thereto and applicable regulations issued pursuant thereto in temporary or final form.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with Borrower, is treated as a single employer under Section 414(b), (c), (m) or (o) of the Internal Revenue Code.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Benefit Plan (other than an event for which the 30 day notice period is waived); (b) a failure to satisfy the minimum funding standards of Section 412 of the Internal Revenue Code or Section 302 of ERISA, whether or not waived; (c) the filing pursuant to Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standards with respect to any Benefit Plan; (d) a failure to make any required installment under Section 430(j) of the Internal Revenue Code with respect to any Benefit Plan; (e) a failure to make any required contribution to a Multiemployer Plan when due; (f) the incurrence by Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Benefit Plan; (g) the receipt by Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Benefit Plan or Benefit Plans or to appoint a trustee to administer any Benefit Plan; (h) the incurrence by Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Benefit Plan or Multiemployer Plan; (i) the receipt by Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability; (j) a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, or in endangered or critical status within the meaning of Section 432 of the Internal Revenue Code or Title IV of ERISA; (k) a determination that any Benefit Plan is in "at risk" status (as defined in Section 430 of the Internal Revenue Code or Section 303 of ERISA); or (l) the imposition of a

Lien under the Internal Revenue Code or ERISA on the assets of Borrower, any Subsidiary or any ERISA Affiliate, or Borrower or any Subsidiary or ERISA Affiliate has been notified in writing that such a Lien will be imposed on the assets of Borrower, Subsidiary or ERISA Affiliate.

"Event of Default" shall have the meaning set forth in Section 10.1 hereof.

"Excess Funds" shall have the meaning set forth in Section 8.3 hereof.

"Existing Leases" means (i) the Key Tenant Lease, (ii) the Jetall Lease, (iii) the Regus Lease, (iv) Official Lease Agreement, dated October 3, 2012, by and between G3 Visas & Passports, Inc., as tenant, and Borrower, as successor-in-interest to Seller, as landlord, as amended by First Amendment to Lease Agreement, (v) Lease Agreement, dated November 1, 2014, by and between PEM Offshore, Inc., a Texas corporation, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, as amended by First Amendment to Lease Agreement, (vi) Lease Agreement, dated November 1, 2014, by and between PrimeLending, a PlainsCapital Company, a Texas Corporation, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, as amended by First Amendment to Lease Agreement, (vii) Lease Agreement, dated December 2016, by and between SIBS International, Inc. a Texas corporation, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, (viii) Lease Agreement, dated November 1, 2014, by and between Uptown Cosmetic and Implant Dentistry/Dr. Robert Velasco, DDS, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, (ix) Lease Agreement, dated December 1, 2015, by and between Vasso's Bar and Grill, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, and (x) Lease Agreement, dated January 1, 2015, by and between Wallis State Bank, as tenant, and Borrower, as successor-in-interest to Seller, as landlord; as each has been and may hereafter be amended, extended, restated and assigned in accordance with the terms and provisions of this Agreement.

"FATCA" shall mean (i) Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to the foregoing and (ii) any similar law adopted by any non-U.S. Governmental Authority pursuant to an intergovernmental agreement between such non-U.S. jurisdiction and the United States.

"Federal Funds Rate" shall mean, for any day, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to NBK on such day on such transactions as determined by Administrative Agent.

"Fee Letter" shall mean that certain Fee Letter dated as of the Closing Date between Borrower and NBK.

"Financial Statements" shall have the meaning set forth in Section 5.11 hereof.

"Governmental Authority" shall mean any court, board, agency, department, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, municipal, city, town, special district or otherwise) whether now or hereafter in existence.

"Guarantor" shall mean Bradley Parker, an individual.

"Guaranty" shall mean that certain Guaranty, dated as of the Closing Date, made by Guarantor for the benefit of Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Indemnified Liabilities" shall have the meaning set forth in Section 14.1 hereof.

"Indemnified Parties" shall mean (a) Lenders, (b) Administrative Agent, (c) any prior owner or holder of the Loan or Participations in the Loan, (d) any servicer or prior servicer of the Loan, (e) any Participant or Assignee or any prior Participant or Assignee of the Loan, (f) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Participant or Assignee or other third party, (g) any receiver or other fiduciary appointed in a foreclosure or other Creditors' Rights Laws proceeding, (h) any officers, directors, shareholders, partners, member, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing, and (i) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Deed of Trust.

"Inspector" shall have the meaning set forth in Section 8.3 hereof.

"Insurance Certificates" shall have the meaning set forth in Section 8.1(b) hereof.

"Insurance Premiums" shall have the meaning set forth in Section 8.1(b) hereof.

"Insurance Proceeds" shall have the meaning set forth in Section 8.3 hereof.

"Intercreditor Agreement" shall mean that certain Intercreditor Agreement, dated as of the Closing Date, by and between Administrative Agent, Lenders and Mezzanine Lender.

"Interest Rate" shall have the meaning set forth in the Note.

"Interest Rate Protection Products" shall mean any interest rate hedging agreement(s) relating to the Loan entered into by Borrower, any Lender or any Affiliate of any Lender, including, without limitation, any Transaction (as defined in any ISDA Master Agreement), and any interest rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or index swap or option bond, note or bill option, interest rate option, forward foreign exchange transaction, cap, collar, or floor transaction, currency swap, cross currency swap, swap option, currency option, or any similar transaction, including, without limitation, under any ISDA Master Agreement, entered into by Borrower, any Lender or any affiliate of Lenders.

"Interest Reserve Account" shall have the meaning set forth in Section 3.18 hereof.

"Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Involuntary Rate" shall have the meaning set forth in the Note.

"ISDA Master Agreement" shall mean any Master Agreement published by the International SWAP Dealers Association, Inc. or commonly used by swap dealers, as the same may be amended by any Lender or any Affiliate of such Lender.

"Jetall Lease" shall mean that certain Lease Agreement dated April 1, 2016 by and between Jetall Companies, Inc., as tenant, and Borrower, as successor-in-interest to Seller, as landlord.

"Judgment Amount" shall have the meaning set forth in Section 13.15 hereof.

"Key Principal" shall mean, collectively, Azeemeh Zaheer, an individual, and NCRE.

"Key Tenant" shall mean Specialty Retailers, Inc., a Texas corporation.

"Key Tenant Lease" shall mean that certain Office Lease Agreement, dated as of May 27, 2015, by and between Key Tenant and Borrower, as successor-in-interest to Seller, as landlord.

"Lease" shall mean the Existing Leases and any lease entered into by Borrower, as landlord, for all or any portion of the Project.

"Legal Requirements" shall mean all statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower or the Project or any part thereof, or the construction, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses, authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting Borrower or the Project or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Project or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"Lender Interest Rate" shall have the meaning set forth in Section 13.11 hereof.

"Lender(s)" shall mean, individually and collectively, any financial institution that either (a) is listed on the signature pages hereof as a "Lender" or (b) from time to time becomes a party hereto pursuant to the terms and provisions of this Agreement, in each case together with its successors.

"Lien" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Project, any portion thereof or any interest therein, including, without limitation, any conditional sale or the title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanics', materialmens' and other similar liens and encumbrances.

"Loan" shall have the meaning set forth in the Recitals.

"Loan Documents" shall mean, collectively, this Agreement, the Note, the Deed of Trust, the Assignment of Leases and Rents, the Guaranty, the Environmental Indemnity Agreement, the Assignment of Agreements, Licenses, Permits and Contracts, the Subordination of Management Agreement, the Fee Letter, the Intercreditor Agreement, the Control Account Agreement, any Assignment of Interest Rate Agreement entered into after the Closing Date and any and all other documents, agreements and certificates executed and/or delivered in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time. Loan Documents shall also include any Interest Rate Protection Product or ISDA Master Agreement.

"Losses" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement of whatever kind or nature (including, but not limited to, legal fees and other costs of defense).

"LTVR" shall have the meaning set forth in Section 5.29 hereof.

"LTVR Threshold" shall have the meaning set forth in Section 5.29 hereof.

"Management Agreement" shall mean, with respect to the Project, that certain Property Management Agreement dated on or about the Closing Date by and between Borrower and Manager, pursuant to which such Manager is to provide management, leasing and other services with respect to the Project, as the same may be amended, restated, replaced, supplemented or otherwise modified in accordance with the terms of this Agreement.

"Manager" shall mean (a) Boxer Property Management Corporation, a Texas corporation, (b) a Qualified Manager, or (c) any other management organization prior to whose employment as manager of the Project, such employment shall have been approved by Administrative Agent, which approval shall not be unreasonably delayed, conditioned or denied.

"Material Lease" shall mean (i) the Key Tenant Lease, (ii) the Regus Lease, (iii) the Jetall Lease, and (iv) any Lease which (A) individually or in the aggregate (with respect to such Tenant and its Affiliates) cover more than 20,000 square feet of the Improvements, (B) provide the Tenant under such Lease with an option or other preferential right to purchase all or any portion of the Project, or (C) the Tenant under such Lease is an Affiliate of the Borrower.

"Maturity Date" shall have the meaning set forth in the Note.

"Maximum Rate" shall have the meaning set forth in the Note.

"Mezzanine Borrower" shall mean the Sole Member.

"Mezzanine Lender" shall mean Naissance Galleria, LLC, a Cayman Islands limited liability company.

"Mezzanine Loan" shall mean the $16,100,000 loan made by Mezzanine Lender to Mezzanine Borrower, secured by the Mezzanine Pledge Agreement.

"Mezzanine Loan Agreement" shall mean that certain Mezzanine Loan Agreement, dated as of the Closing Date, by and between Mezzanine Lender and Mezzanine Borrower.

"Mezzanine Loan Documents" shall have the meaning given to the term "Loan Documents" in the Mezzanine Loan Agreement.

"Mezzanine Pledge Agreement" shall mean that certain Pledge and Security Agreement, dated as of the Closing Date, by and between Mezzanine Borrower and Mezzanine Lender.

"Multiemployer Plan" shall mean a multiemployer plan as defined in Section 3(37) of ERISA as to which Borrower or any ERISA Affiliate contributes or, within the last six (6) years, contributed or had any obligation to contribute or otherwise has any obligation or liability, whether actual or contingent.

"NCRE" shall mean Naissance Capital Real Estate, LLC, a Delaware limited liability company.

"NBK" shall mean National Bank of Kuwait, S.A.K.P., New York Branch.

"Net Operating Income" shall mean the difference between:

(a)     the sum of (i) actual rent collections for the period in question from Tenants and other Persons paying rent to Borrower *plus* (ii) any miscellaneous income actually received by Borrower from the Project. Net Operating Income shall not include any amounts paid by a Tenant under any Lease, including without limitation, the Existing Leases, for reimbursement of operating costs and expenses (including Taxes); and

(b)     actual operating expenses for the period in question (not including non-recurring expenses such as leasing commissions, tenant improvement costs, bonuses paid to managers for turning over space at the Project, and other renovation expenses), other than: (i) Debt Service due under the Note and (ii) all operating costs and expenses (including Taxes) payable by a Tenant under any Lease, including, without limitation, the Existing Leases. Any refunds or rebates to operating expenses are to be applied and credited against the applicable operating expenses for the period that such operating expenses were incurred.

"<u>Note</u>" shall mean that certain Promissory Note dated as of the Closing Date in the original principal amount of the Loan made by Borrower to Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>OECD</u>" shall mean the Organization for Economic Cooperation and Development.

"<u>OFAC</u>" shall mean the Office of Foreign Assets Control, Department of the Treasury.

"<u>Organizational Documents</u>" shall mean, as to any Person, the certificate of incorporation and by-laws with respect to a corporation; the articles of organization (or the equivalent of such items under applicable state law) and operating agreement with respect to a limited liability company; the certificate of limited partnership and partnership agreement with respect to a limited partnership, or any other organizational or governing documents of such Person.

"<u>Other Charges</u>" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Project, now or hereafter levied or assessed or imposed against the Project or any part thereof.

"<u>Participant</u>" shall have the meaning set forth in <u>Section 12.1</u> hereof.

"<u>Participations</u>" shall have the meaning set forth in <u>Section 12.1</u> hereof.

"<u>Patriot Act</u>" shall have the meaning set forth in <u>Section 4.23</u> hereof.

"<u>Permitted Encumbrances</u>" shall mean, with respect to the Project, collectively, (a) Liens, if any, for Taxes imposed by any Governmental Authority not yet due and payable or delinquent, (b) Liens for Taxes being contested in accordance with <u>Section 5.4(d)</u>, (c) Liens, if any, for mechanics, materialmen or laborers which are fully bonded over in accordance with <u>Section 5.4(c)</u>, (d) Liens set forth on Schedule B of the Title Policy, and (e) such other encumbrances as Administrative Agent has approved or may approve in writing in Administrative Agent's sole and absolute discretion.

"<u>Permitted Transfers</u>" shall mean the following:

(a)     a Lease entered into in accordance with the terms and conditions of the Loan Documents;

(b)     provided that no Event of Default shall then exist and be continuing, any transfer, Sale or Pledge of an interest in Borrower or any Restricted Party to any Person provided that:

(i)     such transfer shall not (x) cause the transferee (other than Key Principal), together with its Affiliates, to acquire Control of Borrower or Sole Member or to acquire or increase its direct or indirect interest in Borrower or in Sole Member to an amount which equals or exceeds forty-nine percent (49%) of the equity interests in Borrower or Sole Member, or (y) result in Borrower or Sole Member no longer being Controlled by Key Principal;

(ii)    after giving effect to such Transfer, Key Principal(s) shall continue to Control the day to day operations of Borrower and continue to own at least 51% of all equity interests (direct or indirect) in Borrower; and

(iii)    Borrower shall continue to be a single purpose entity in accordance with Section 6.1 and Sole Member shall continue to be the sole managing member of Borrower;

(c)    provided that no Event of Default shall then exist and be continuing, a transfer for estate planning purposes of any Key Principal's direct or indirect interests in Borrower to the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal, or to a trust for the benefit of such Key Principal or for the benefit of the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal so long as immediately following such transfer, Key Principals continue to Control the day to day operations of Borrower.

"Person" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any other entity, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Pre-Approved Accounting Firm" shall mean Pannell Kerr Forster of Texas, P.C.

"Plans" shall have the meaning set forth in Section 8.3 hereof.

"Platform" shall have the meaning set forth in Section 12.2 hereof.

"Policies" shall have the meaning set forth in Section 8.1(b) hereof.

"Policy" shall have the meaning set forth in Section 8.1(b) hereof.

"Prepayment Premium" shall have the meaning set forth in the Note.

"Prohibited Transfer" shall have the meaning set forth in Section 7.2(a) hereof.

"Project" shall mean the Property and that certain 281,590 rentable square foot office building located at the Property, and all other buildings and structures thereon, and all easements, rights, privileges and appurtenances (including, without limitation, any air or development rights, if any) thereunto belonging or in any way appurtenant, and all of the estate, right, title, interest, claim or demand whatsoever of Borrower therein, and all estates, rights, titles, interests, privileges, tenements, hereditaments, and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Property, either in law or in equity, in possession or expectancy, now or hereafter acquired.

"Property" shall mean that certain parcel of land located at 2425 West Loop South, City of Houston, County of Harris, State of Texas.

"Property Income" shall mean all rents, income, issues, profits, security deposits and other benefits to which Borrower may now or hereafter be entitled from the Project.

"Provided Information" shall have the meaning set forth in Section 12.1 hereof.

"Pro Rata Share" shall have the meaning set forth in Section 13.12 hereof.

"PSA" shall mean the Contract of Sale dated as of April 16, 2018 by and between Sole Member and Seller, as assigned by Sole Member to Borrower pursuant to that certain Assignment and Assumption of Contract dated as of the Closing Date.

"Purchase Price" shall have the meaning set forth in Section 13.3 hereof.

"Qualified Manager" shall mean a property manager which (i) is a reputable and experienced professional management company having at least five (5) years' experience in the management of commercial properties with similar uses as the Project and in the jurisdiction in which the Project is located, (ii) has, for at least three (3) years prior to its proposed engagement as "Manager", managed at least five (5) properties of the same property type, quality and size as the Project, and (iii) is not the subject of a bankruptcy or similar insolvency proceeding. For the avoidance of doubt, an Affiliate of the Manager initially named in this Agreement shall be deemed to be a "Qualified Manager" for purposes of this Agreement.

"Regus Lease" shall mean the Lease Agreement dated February 29, 1995, as amended by Amendment No. 1 to Lease Agreement dated July 28, 1997, Amendment No. 2 to Lease Agreement dated February 26, 2001, Amendment No. 3 to Lease Agreement effective as of January 1, 2005, Amendment No. 4 to Lease Agreement effective as of October 3, 2011, Amendment No. 5 to Lease Agreement effective as of October 3, 2011, Amendment No. 6 to Lease Agreement effective as of September 11, 2012 and Amendment No. 7 to Lease Agreement effective as of November 15, 2012, by and between RGN-Houston XXXIX, as successor-in-interest to Abby Executive Suites, West Loop, Inc. and Abby Office Centers, Uptown, Ltd., as tenant, and Borrower, as successor-in-interest to Seller, as landlord.

"Required Lenders" shall have the meaning set forth in Section 13.2 hereof.

"Restoration Account" shall have the meaning set forth in Section 8.3 hereof.

"Restoration Work" shall have the meaning set forth in Section 8.3 hereof.

"Restricted Party" shall have the meaning set forth in Section 7.1 hereof.

"Sale or Pledge" shall have the meaning set forth in Section 7.1 hereof.

"Seller" shall mean 2425 West Loop, LP, a Texas limited partnership.

"Servicer" shall have the meaning set forth in Section 12.1 hereof.

"Servicing Fee" shall have the meaning set forth in Section 13.17 hereof.

"SNDA" shall mean a Subordination, Non-Disturbance and Attornment Agreement.

"Sole Member" shall mean Galleria 2425 JV, LLC, a Delaware limited liability company, the sole member of Borrower.

"State" shall mean, with respect to the Project, the state in which the Project or any part thereof is located, and with respect to Borrower, the state of Borrower's organization.

"Subordination of Management Agreement" shall mean, during such time as a Management Agreement may be in place, that certain Assignment and Subordination of Management Agreement among Administrative Agent, Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

4161624-v7\CHIDMS1

"Subsidiary" shall mean any corporation, partnership, limited liability company or other entity in which a Person holds an equity interest which is more than twenty percent (20%) of the equity classes issued by such entity.

"Syndication" shall have the meaning set forth in Section 12.1 hereof.

"Taxes" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied, assessed, or imposed against the Project (or any part thereof).

"Telecom Leases" shall mean leases with telecommunications providers or their affiliates or agents for the installation and maintenance of communication equipment, including, without limitation, antennas, at the Property.

"Tenant" shall mean any Person leasing, subleasing or otherwise occupying any portion of the Project under a Lease or other occupancy agreement with Borrower or any predecessor-in-interest to Borrower.

"Term" shall have the meaning set forth in the Note.

"Title Company" shall have the meaning set forth in Section 3.2 hereof.

"Title Policy" shall have the meaning set forth in Section 3.2 hereof.

"UCC" or "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in the State.

"West Loop" shall mean Galleria West Loop Investments II, LLC, a Texas limited liability company.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.2. Interpretation. Unless the context of this Agreement otherwise clearly requires, the following rules of construction shall apply to this Agreement and each of the Loan Documents:

(a)     Number; Inclusion. To the extent the context so requires, references to the plural include the singular, references to the singular include the plural, and references to the part include the whole; "or" has the inclusive meaning represented by the phrase "and/or"; and "including" has the meaning represented by the phrase "including, without limitation,";

(b)     Determination. References to "determination" of or by Administrative Agent or Lenders shall be deemed to include good-faith estimates by Administrative Agent or Lenders (in the case of quantitative determinations), and good-faith beliefs by Administrative Agent or Lenders (in the case of qualitative determinations), and such determination shall be conclusive absent manifest error;

(c)     Construction. This Agreement and all other Loan Documents shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement and all such other Loan Documents to be drafted. If any words or phrases in this Agreement or any other Loan Document shall have been stricken out or otherwise eliminated, whether or not any other words or phrases have been added, this Agreement and all such other Loan Documents shall be construed as if the words or phrase so stricken out or otherwise eliminated were never included herein or therein and no implication or inference shall be drawn from the fact that said words or phrases were so stricken out or otherwise eliminated;

12

(d)     <u>Agent's or Lenders Discretion and Consent</u>. Whenever Administrative Agent or Lenders are granted the right herein or in any Loan Document to make any decision or determination, to exercise any right, remedy or power or otherwise to act in its or their sole discretion or to grant or withhold consent, such right shall be exercised in good faith utilizing generally accepted commercial practices for transactions similar to the transaction that is the subject matter of this Agreement or such Loan Document (as the case may be);

(e)     <u>Documents Taken as a Whole</u>. The words "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement or in any Loan Document refer to this Agreement or such Loan Document as a whole and not to any particular provision of this Agreement or such Loan Document;

(f)     <u>Headings</u>. The section and other headings contained in this Agreement or any Loan Document and the table of contents (if any) preceding this Agreement or any Loan Document are for reference purposes only and shall not control or affect the construction of this Agreement or such Loan Document or the interpretation thereof in any respect;

(g)     <u>Implied References to this Agreement</u>. Article, section, subsection, clause, schedule and exhibit references are to this Agreement unless otherwise specified;

(h)     <u>Persons</u>. Reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Agreement or by such Loan Document, as the case may be, and reference to a Person in a particular capacity excludes such Person in any other capacity;

(i)     <u>Modifications to Documents</u>. Reference to any agreement (including this Agreement and any Loan Document, together with the schedules and exhibits hereto or thereto), document or instrument means such agreement, document or instrument as amended, modified, replaced, substituted for, superseded or restated at the relevant time;

(j)     <u>From, To and Through</u>. Relative to the determination of any period of time, "from" means "from and including," "to" means "to but excluding," and "through" means "through and including"; and

(k)     <u>Shall; Will</u>. References to "shall" and "will" are intended to have the same meaning.

<div align="center">

ARTICLE II
GENERAL TERMS

</div>

Section 2.1. <u>Loan Commitment; Extension</u>.

(a)     Subject to the terms, provisions, covenants and conditions of this Agreement, Lenders shall make the Loan to Borrower in an amount equal to FIFTY ONE MILLION SIX HUNDRED SEVENTY FIVE THOUSAND AND NO/100THS DOLLARS ($51,675,000.00).

(b)     The Loan shall be secured by the Deed of Trust, the Assignment of Leases and Rents, and the other Loan Documents.

(c)     Borrower shall use the proceeds of the Loan to (i) partially finance Borrower's acquisition of the Project, (ii) make a deposit into the Interest Reserve Account, and (iii) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Administrative Agent.

Section 2.2. <u>Interest Rate and Loan Payments</u>.

<div align="center">13</div>

      (a)     The Loan shall bear interest at the per annum rates set forth in the Note.

      (b)     Borrower hereby agrees to make principal and interest payments as set forth in the Note.

      (c)     All payments to be made by Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by Borrower hereunder and under the other Loan Documents shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's office in Dollars and in immediately available funds not later than 2:00 p.m. EST on the date specified herein. All payments received by the Administrative Agent after 2:00 p.m. EST shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

      Section 2.3. <u>Usury Savings</u>. This Agreement and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lenders to either civil or criminal liability as a result of being in excess of the Maximum Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Rate, the Interest Rate or the Involuntary Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Rate and all previous payments in excess of the Maximum Rate shall be deemed to have been payments in reduction of principal, without premium, and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lenders for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

ARTICLE III
CONDITIONS PRECEDENT

The obligation of Lenders to enter into this Agreement and make the Loan hereunder is subject to the fulfillment by Borrower and Guarantor or waiver by Administrative Agent of the following conditions precedent no later than the Closing Date.

      Section 3.1. <u>Representations and Warranties; Compliance with Conditions</u>. The representations and warranties of Borrower and Guarantor contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date, and Administrative Agent shall have determined that no Default or an Event of Default shall have occurred and be continuing nor shall any Default or Event of Default occur immediately following the Closing Date and Borrower and Guarantor shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on its part to be observed or performed.

      Section 3.2. <u>Delivery of Loan Documents; Title Policy; Due Diligence Items</u>.

      (a)     <u>Deed of Trust, Loan Agreement, Note and Guaranty</u>. Administrative Agent shall have received (i) from Borrower fully executed and acknowledged counterparts of the Deed of Trust and Assignment of Leases and Rents, and evidence that the Uniform Commercial Code financing statement has been delivered to the Title Company for recording and/or filing, in the judgment of Administrative

14

Agent, so as to effectively create upon such recording and/or filing valid and enforceable Liens upon the Project, of first priority, in favor of Lenders, and (ii) from Borrower and Guarantor, as applicable, fully executed counterparts of this Agreement, the Note, the Guaranty and all of the other Loan Documents.

(b)    <u>Policy; Title Policy</u>. Administrative Agent shall have received a paid title insurance policy (the "<u>Title Policy</u>"), in the amount of the Deed of Trust, issued by a title company(ies) (the "<u>Title Company</u>") acceptable to Administrative Agent and dated as of the Closing Date. Such Title Policy shall (A) provide coverage for the full amount of the Loan, (B) insure Lenders that the Deed of Trust insured by such Title Policy creates a valid, perfected lien on the Project of first priority and that Borrower is the sole owner of a valid fee estate in and to the Project, free and clear of all exceptions from coverage other than the standard exceptions and exclusions from coverage, (C) provide full coverage against mechanics' liens (filed and inchoate), (D) contain such endorsements and affirmative coverages as Administrative Agent may reasonably request, and (E) name Administrative Agent as the insured. The Title Policy shall be assignable. Administrative Agent also shall have received evidence that all premiums in respect of such Title Policy have been paid.

(c)    <u>Survey</u>. Administrative Agent shall have received a current title survey for the Property, certified to the Title Company and Lenders and their successors and assigns, in form and content satisfactory to Administrative Agent and prepared by a professional and properly licensed land surveyor satisfactory to Administrative Agent. Such survey shall reflect the same legal description contained in the Title Policy referred to in <u>Section 3.2(b)</u> hereof and shall include, among other things, a metes and bounds description of the real property comprising part of the Project satisfactory to Administrative Agent. The surveyor's seal shall be affixed to the survey and the surveyor shall provide a certification for the survey in form and substance acceptable to Administrative Agent.

(d)    <u>Insurance</u>. Administrative Agent shall have received copies of the certificates of insurance for the Policies required hereunder, together with such Acord forms as Administrative Agent shall require, satisfactory to Administrative Agent in Administrative Agent's sole and absolute discretion, and, evidence of the payment of all Insurance Premiums payable for the existing policy period.

(e)    <u>Encumbrances</u>. Borrower shall have taken or caused to be taken such actions in such a manner so that Lenders have a valid and perfected first Lien as of the Closing Date on the Project and Administrative Agent shall have received satisfactory evidence thereof, subject to Permitted Encumbrances.

(f)    <u>Lien Searches</u>. Borrower shall have delivered to Administrative Agent certified search results pertaining to Borrower, Guarantor and such other Persons as reasonably required by Administrative Agent for state and federal tax liens, bankruptcy, judgment, litigation and state and local UCC filings.

(g)    <u>Environmental Report</u>. Administrative Agent shall have received an Environmental Report in respect of the Project, which report shall be satisfactory to Administrative Agent in all respects.

(h)    <u>Engineering Report</u>. Administrative Agent shall have received an Engineering Report in respect of the Project, which report shall be satisfactory to Administrative Agent in all respects (including, without limitation, indicating that there exists no material deferred maintenance at the Project).

(i)    <u>Appraisal</u>. Administrative Agent shall have received an appraisal for the Project, which appraisal shall be prepared by an MAI appraiser and satisfactory in form and substance to Administrative Agent (including, without limitation, providing for a loan-to-value ratio of not greater than

fifty-three and seven-tenths percent (53.7%), based on (i) the "as-is" value of the Project and (ii) the original principal balance of the Loan).

        (j)     [Intentionally Omitted]

Section 3.3. <u>Related Documents</u>. Each additional document not specifically referenced herein, but relating to the transactions contemplated herein, shall have been duly authorized, executed and delivered by all parties thereto and at Administrative Agent's written request, Administrative Agent shall have received and approved certified copies thereof.

Section 3.4. <u>Organizational Documents</u>. Administrative Agent shall have received (a) certified copies of all Organizational Documents related to Borrower and Guarantor, as applicable, which must be acceptable to Administrative Agent, in Administrative Agent's sole and absolute discretion, and (b) such other evidence of the formation, structure, existence and/or good standing of Borrower and Guarantor and such other Persons as Administrative Agent may request, in Administrative Agent's sole and absolute discretion, including, without limitation, good standing or existence certificates, resolutions authorizing the entering into of the Loan and the granting of the Deed of Trust and incumbency certificates as may be requested by Administrative Agent.

Section 3.5. <u>Opinions of Counsel</u>. Administrative Agent shall have received opinions of counsel with respect to (i) formation, existence and good standing of Borrower and Guarantor, as applicable, (ii) due execution, authority, enforceability of the Loan Documents, and (iii) such other matters as Administrative Agent may reasonably require. All such opinions shall be in form, scope and substance reasonably satisfactory to Administrative Agent and Lenders' counsel in their sole and absolute discretion.

Section 3.6. <u>Taxes and Other Charges</u>. Borrower shall have paid all Taxes and Other Charges (including any in arrears) relating to the Project.

Section 3.7. <u>Completion of Proceedings</u>. All corporate and other proceedings taken or to be taken in connection with the transactions contemplated by this Agreement and other Loan Documents and all documents incidental thereto shall be satisfactory in form and substance to Administrative Agent, and Administrative Agent shall have received all such counterpart original or certified copies of such documents as Administrative Agent may reasonably request.

Section 3.8. <u>Payments</u>. All payments, deposits or escrows required to be made or established by Borrower under this Agreement, the Note and the other Loan Documents on or before the Closing Date shall have been paid.

Section 3.9. <u>Transaction Costs</u>. Except as otherwise expressly provided herein, Borrower shall have paid or reimbursed Administrative Agent and Lenders for all reasonable third party out of pocket expenses actually incurred in connection with the underwriting, negotiation, and closing of the Loan, including, without limitation, title insurance premiums and other title company charges; registration, filing and similar fees, taxes and charges; transfer, deed, stamp, mortgage recording or documentary taxes or similar fees or charges; actual costs of third-party reports, including, without limitation, environmental studies, credit reports, appraisals, surveys, underwriting and origination expenses; and all reasonable legal fees and expenses charged by counsel to Lenders and Administrative Agent.

Section 3.10. <u>No Material Adverse Change</u>. There shall have been no material adverse change in the financial condition or business condition of the Project, Borrower or any other Person contributing to the operating income and operations of the Project since the date of the most recent financial statements and/or other information delivered to Administrative Agent. The income and expenses of the Project, the occupancy and leases thereof, and all other features of the transaction shall be as represented to Lenders

and Administrative Agent without material adverse change. Neither Borrower nor Guarantor shall be the subject of any bankruptcy, reorganization, or insolvency proceeding.

Section 3.11. <u>Leases</u>. Administrative Agent shall have received copies of all Leases affecting the Project, which shall be satisfactory in form and substance to Administrative Agent.

Section 3.12. <u>Tenant Estoppel Certificate</u>. Administrative Agent shall have received, or shall receive within fifteen (15) Business Days of the Closing Date, a tenant estoppel certificate from each Tenant under a Material Lease, addressed to Administrative Agent, in form and substance satisfactory to Administrative Agent in all respects. Failure by Borrower to deliver such tenant estoppel certificates within such time period shall constitute an Event of Default.

Section 3.13. <u>SNDA</u>. Administrative Agent shall have received, or shall receive within fifteen (15) days of the Closing Date, an SNDA executed by Key Tenant with respect to the Key Tenant Lease, in form and substance satisfactory to Administrative Agent in all respects. Failure by Borrower to deliver such SNDA within such time period shall constitute an Event of Default.

Section 3.14. <u>Tax Lot</u>. Administrative Agent shall have received evidence that the Property constitutes one or more separate tax lots, which evidence shall be satisfactory to Administrative Agent in all respects.

Section 3.15. <u>Borrower's and Guarantor's Financials</u>. Administrative Agent shall have received copies of Borrower's and Guarantor's most recent financial statements.

Section 3.16. <u>Acquisition of Property</u>. Administrative Agent shall have received evidence of the purchase price for the Project to be paid by Borrower and evidence that Borrower invested, upon acquisition of the Project, the required equity.

Section 3.17. <u>Further Documents</u>. Administrative Agent or Administrative Agent's counsel shall have received such other and further approvals, opinions, documents and information as Administrative Agent or Administrative Agent's counsel may have requested in form and substance satisfactory to Administrative Agent and Administrative Agent's counsel.

Section 3.18. <u>Interest Reserve Deposit</u>. Borrower shall have established a deposit account in the name of Borrower with Administrative Agent (the "<u>Interest Reserve Account</u>"), into which Borrower shall have deposited an amount equal to $2,500,000.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lenders and Administrative Agent as of the Closing Date that:

Section 4.1. <u>Organization</u>. Borrower (a) has been duly organized and is validly existing and in good standing with requisite power and authority to own its properties and to transact the businesses in which it is now engaged, (b) is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, businesses and operations, (c) possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its properties and to transact the businesses in which it is now engaged, and the sole business of Borrower is the ownership and management of the Project, and (d) has full power, authority and legal right to mortgage the Project pursuant to the terms of the Loan Documents and has full power, authority and legal right to keep and observe all of the terms of the Loan Documents to which it is a party. Borrower represents and warrants that the chart attached hereto as <u>Exhibit A</u> sets forth an accurate listing

17

of the direct and indirect owners of all of the equity interests in Borrower (the "Borrower Members"). For the avoidance of doubt, "Borrower Members" shall include Sole Member, NCRE and West Loop.

Section 4.2. <u>Status of Borrower</u>. Borrower's exact legal name is correctly set forth on the first page of this Agreement, on the Deed of Trust, and on any UCC-1 Financing Statements filed in connection with the Loan. Borrower is an organization of the type specified on the first page of this Agreement. Borrower is organized under the laws of the State of Delaware and authorized to do business under the laws of the State of Texas. Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less, the entire period of the existence of Borrower) the address of Borrower set forth on the first page of this Agreement. Borrower may designate a change of principal place of business and chief executive office by written notice to Administrative Agent by certified mail, return receipt requested, postage prepaid, at least thirty (30) days before such change of principal place of business and chief executive office is to become effective.

Section 4.3. <u>Validity of Documents</u>. Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents. This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Borrower and Guarantor, as applicable, and constitutes the legal, valid and binding obligations of Borrower and Guarantor, as applicable, enforceable against Borrower and Guarantor, as applicable, in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

Section 4.4. <u>No Conflicts</u>. The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower and Guarantor, as applicable, will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower and Guarantor, as applicable, pursuant to the terms of any agreement or instrument to which Borrower and Guarantor is a party or by which any of Borrower's or Guarantor's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or Guarantor or any of Borrower's or Guarantor's properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower and Guarantor, as applicable, of this Agreement or any of the other Loan Documents has been obtained and is in full force and effect.

Section 4.5. <u>Litigation</u>. To the best of Borrower's knowledge, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to Borrower's knowledge, threatened against or affecting Borrower, Guarantor or the Project, which actions, suits or proceedings, if determined against Borrower, Guarantor or the Project, could materially adversely affect the condition (financial or otherwise) or business of Borrower or Guarantor or the condition or ownership of the Project.

Section 4.6. <u>Agreements</u>. Neither Borrower nor Guarantor is a party to any agreement or instrument or subject to any restriction which would materially and adversely affect Borrower, such Guarantor or the Project, or Borrower's or such Guarantor's business, properties or assets, operations or condition, financial or otherwise. To Borrower's and Guarantor's actual knowledge, neither Borrower nor Guarantor are in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which Borrower or

Guarantor is a party or by which Borrower, Guarantor or the Project is bound. Borrower has no material financial obligations under any agreement or instrument to which Borrower is a party or by which Borrower or the Project is otherwise bound, other than (a) obligations incurred in the ordinary course of the ownership, leasing and operation of the Project and (b) obligations under the Loan Documents.

Section 4.7. <u>Solvency</u>. Neither Borrower nor Guarantor has entered into the transaction or executed the Note, this Agreement, the Guaranty or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor, and Borrower and Guarantor have each received reasonably equivalent value in exchange for their respective obligations under such Loan Documents. No petition in bankruptcy has been filed against Borrower or Guarantor in the last ten years, and neither Borrower nor Guarantor in the last ten years has made an assignment for the benefit of creditors or taken advantage of any Creditors' Rights Laws. Neither Borrower nor Guarantor is contemplating either the filing of a petition by it under any Creditors' Rights Laws or the liquidation of all or a major portion of Borrower's or such Guarantor's assets or property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against Borrower or Guarantor.

Section 4.8. <u>Full and Accurate Disclosure</u>. No material statement of fact made by or on behalf of Borrower or Guarantor in this Agreement or in any of the other Loan Documents or in any other document or certificate delivered by or on behalf of Borrower or Guarantor contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no material fact presently known to Borrower or Guarantor which has not been disclosed to Administrative Agent and Lenders which adversely affects, nor as far as Borrower or the applicable Guarantor can reasonably foresee, might adversely affect, the Project or the business, operations or condition (financial or otherwise) of Borrower or Guarantor.

Section 4.9. <u>ERISA Compliance</u>.

(a)     Borrower covenants, represents and warrants that (i) Borrower is not and will not be a Benefit Plan Investor, (ii) neither Borrower nor any of its Subsidiaries or ERISA Affiliates maintains or contributes to, or has at any time maintained or contributed to, or has any liability, whether actual or contingent, under, a plan subject to Section 302 or Title IV of ERISA or to Section 412 of the Internal Revenue Code, (iii) neither Borrower nor any of its Subsidiaries or ERISA Affiliates has ever contributed to or had an obligation to contribute to any Multiemployer Plan. None of the Benefit Plans are part of, or have at any time been part of, a multiple employer welfare arrangement, as that term is defined in Section 3(40) of ERISA, (iv) no Benefit Plan is or was at any time a multiple employer plan, as described in Section 413(c) of the Internal Revenue Code or Sections 4063 or 4064 of ERISA, and (v) neither Borrower nor any of its Subsidiaries or ERISA Affiliates has ever contributed to or had an obligation to contribute to any such plan.

(b)     No ERISA Event has occurred or is reasonably expected to occur. No employee welfare benefit plan within the meaning of §3(1) or §3(2)(B) of ERISA of Borrower or any Subsidiary, provides benefit coverage subsequent to termination of employment except as required by Title I, Part 6 of ERISA or applicable state insurance laws. Each Benefit Plan is in material compliance with ERISA, the Internal Revenue Code and any applicable law. Each Benefit Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service for all required amendments regarding its qualification thereunder that considers the law changes incorporated in the plan sponsor's most recently expired remedial amendment cycle determined under the provisions of Rev. Proc. 2007-44, and nothing has occurred subsequent to the issuance of such termination letter which would prevent, or cause the loss of, such qualification.

Section 4.10. <u>Not a Foreign Person</u>. Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the Internal Revenue Code.

Section 4.11. <u>Enforceability</u>. The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or Guarantor including, without limitation, the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and neither Borrower nor Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect thereto. No Default or Event of Default exists under or with respect to any Loan Document.

Section 4.12. <u>Business Purposes</u>. The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

Section 4.13. <u>Compliance</u>. To the best of Borrower's knowledge, and other than as contained in any searches requested by or on behalf of Administrative Agent in connection with the Loan, Borrower and the Project, and the use and operation of the Project, comply in all material respects with all Legal Requirements, including, without limitation, building ordinances and codes and the Americans with Disabilities Act. To the best of Borrower's knowledge, neither Borrower nor Guarantor is in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority and neither Borrower nor Guarantor has received any written notice of any such default or violation. There has not been committed by Borrower or Guarantor or, to Borrower's knowledge, any other Person in occupancy of or involved with the operation or use of the Project any act or omission affording any Governmental Authority the right of forfeiture as against the Project or any part thereof or any monies paid in performance of Borrower's or Guarantor's obligations under any of the Loan Documents.

Section 4.14. <u>Financial Information</u>. All financial data, including, without limitation, the balance sheets, statements of cash flow, and statements of income and operating expense, that have been delivered to Administrative Agent in respect of Borrower, Guarantor and/or to Borrower's knowledge the Project (a) are true, complete and correct in all material respects as of the date of such information, (b) accurately represent the financial condition of Borrower, Guarantor and/or the Project, as applicable, as of the date of such reports, and (c) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with a modified accrual accounting method or such other method satisfactory to Administrative Agent throughout the periods covered, except as disclosed therein. Borrower has no contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a material adverse effect on the Project or the current and/or intended operation thereof, except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of the Borrower, Guarantor or, to Borrower's knowledge, the Project from that set forth in said financial statements.

Section 4.15. <u>Illegal Activity</u>. No portion of the Project has been or shall be purchased by Borrower with proceeds of any illegal activity and no part of the proceeds of the Loan will be used in connection with any illegal activity.

Section 4.16. <u>Separate Tax and Zoning Lot</u>. The Property constitutes a distinct parcel or parcels for purposes of zoning and of taxes, assessments and impositions (public or private) and are not otherwise considered as part of a larger single lot which includes property other than the Property for purposes of zoning or of taxes, assessments or impositions (public or private).

Section 4.17. <u>Federal Reserve Regulation</u>. Borrower shall use the proceeds of the Loan for the purposes set forth in <u>Section 2.1(c)</u> hereof and not for any illegal activity. No part of the proceeds of the

4161624-v7\CHIDMS1

Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or prohibited by the terms and conditions of this Agreement or the other Loan Documents.

Section 4.18. <u>Investment Company Act</u>. Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) [Reserved]; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

Section 4.19. <u>No Change in Facts or Circumstances; Disclosure</u>. All information submitted by Borrower, Guarantor or Borrower's or Guarantor's agents to Administrative Agent and in all financial statements, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are accurate, complete and correct in all material respects as of the date of such item. There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or might materially and adversely affect the Project or the business operations or the financial condition of Borrower or Guarantor. Borrower and Guarantor have disclosed to Administrative Agent all material facts and have not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading. With respect to any representations, warranties, or statements of fact which are specifically qualified in this Agreement as being true and correct to the best of Borrower's knowledge, the representation and warranty set forth in this <u>Section 4.19</u> shall be, to the best of Borrower's knowledge, true and correct as of the Closing Date.

Section 4.20. <u>Special Purpose Entity</u>. Borrower meets all of the requirements of <u>Article VI</u> hereof as of the Closing Date.

Section 4.21. <u>Intellectual Property</u>. All trademarks, trade names and service marks necessary to the business of Borrower as presently conducted or as Borrower contemplates conducting Borrower's business are in good standing and, to the extent of Borrower's actual knowledge, uncontested. To the best of Borrower's knowledge, Borrower has not infringed, is not infringing, and has not received notice of infringement with respect to asserted trademarks, trade names and service marks of others. To Borrower's knowledge, there is no infringement by others of trademarks, trade names and service marks of Borrower.

Section 4.22. <u>Embargoed Person</u>. To the best of Borrower's knowledge, as of the Closing Date and at all times throughout the term of the Loan, including after giving effect to any transfers of interests permitted pursuant to the Loan Documents or the Mezzanine Loan Documents, (a) none of the funds or other assets of Borrower or Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any Person or government subject to trade restrictions under U.S. law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower (whether directly or indirectly), is prohibited by law or the Loan made by Lenders is in violation of law ("<u>Embargoed Person</u>"); (b) no Embargoed Person has any interest of any nature whatsoever in Borrower with the result that the investment in Borrower (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the funds of Borrower have been derived from any unlawful activity with the result that the investment in Borrower (whether directly or indirectly) is prohibited by law or the Loan is in violation of law.

Section 4.23. <u>Patriot Act</u>. All capitalized words and phrases and all defined terms used in the USA Patriot Act of 2001, 107 Public Law 56 (October 26, 2001) and in other statutes and all orders, rules and regulations of the United States government and its various executive departments, agencies and offices related to the subject matter of the Patriot Act, including Executive Order 13224 effective September 24, 2001 (collectively referred to in this Section only as the "<u>Patriot Act</u>") are incorporated into this Section. Each of Borrower and Borrower Members hereby represent and warrant that (a) Borrower, Guarantor and Borrower Members and each and every Person affiliated with Borrower, or that to Borrower's or Borrower Members' knowledge has an economic interest in Borrower or Borrower Members, or, to Borrower's or Borrower Members' knowledge, that has or shall have an interest in the transaction contemplated by this Agreement or in the Project or shall participate, in any manner whatsoever, in the Loan, is, to the extent required so that the Loan in not in violation of applicable Legal Requirements, <u>and</u> (b) Borrower, Guarantor and each Person actively involved in the management of Borrower or the Project is: (i) not a "blocked" Person listed in the Annex to Executive Order Nos. 12947, 13099 and 13224 and all modifications thereto or thereof (the "<u>Annex</u>"); (ii) in full compliance with the requirements of the Patriot Act and all other requirements contained in the rules and regulations of the OFAC; (iii) to the extent applicable, operated under policies, procedures and practices, if any, that are in compliance with the Patriot Act and available to Administrative Agent for Administrative Agent's review and inspection during normal business hours and upon reasonable prior notice; (iv) not in receipt of any notice from the Secretary of State or the Attorney General of the United States or any other department, agency, or office of the United States claiming a violation or possible violation of the Patriot Act; (v) not listed as a Specially Designated Terrorist or as a "blocked" Person on any lists maintained by the OFAC pursuant to the Patriot Act or any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of the OFAC issued pursuant to the Patriot Act or on any other list of terrorists or terrorist organizations maintained pursuant to the Patriot Act; (vi) not a Person who has been determined by competent authority to be in violation of any of the prohibitions contained in the Patriot Act; and (vii) not controlled by or now acting or will in the future act for or on behalf of any Person named in the Annex or any other list promulgated under the Patriot Act or any other Person who has been determined to be in violation of the prohibitions contained in the Patriot Act. Borrower covenants and agrees that in the event Borrower or Guarantor receives any notice that Borrower (or any of Borrower's beneficial owners), Guarantor or any other Person related to or affiliated with Borrower, Guarantor or the Project become listed on the Annex or any other list promulgated under the Patriot Act or is indicted, arraigned, or custodially detained on charges involving money laundering or predicate crimes to money laundering, Borrower shall immediately notify Administrative Agent. It shall be an Event of Default hereunder if Borrower or any other party to any Loan Document becomes listed on any list promulgated under the Patriot Act or is indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering.

Section 4.24. <u>No Contractual Obligations</u>. Other than the Loan Documents, the Mezzanine Loan Documents, the Borrower Operating Agreement, the Management Agreement, the Existing Leases, the PSA pursuant to which Borrower is acquiring the Property, and certain Contractual Obligations to operate and manage the Project that are necessary and customary for properties similar to the Project, as of the date of this Agreement, Borrower is not subject to any Contractual Obligations and has not entered into any agreement, instrument or undertaking by which Borrower or Borrower's assets are bound, or has incurred any indebtedness (other than the Loan), and prior to the date of this Agreement, Borrower has not entered into any Contractual Obligation, or any agreement, instrument or undertaking by which it or its assets are bound or incurred any indebtedness (other than the Loan).

Section 4.25. <u>Shareholders of Borrower</u>. One hundred percent (100%) of the membership interests of Borrower are owned by the Sole Member.

Section 4.26. <u>Survival</u>. Borrower acknowledges and agrees that, unless expressly provided otherwise, all of the representations and warranties of Borrower and Guarantor set forth in this Agreement and in the other Loan Documents shall survive for so long as any portion of the Debt remains owing to Lenders. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower and Guarantor shall be deemed to have been relied upon by Lenders notwithstanding any investigation heretofore or hereafter made by Lenders or on its behalf.

Section 4.27. <u>Leases</u>. As of the Closing Date, there are no Leases pursuant to which any Person other than Borrower has any right, title or interest in the Project other than under the Existing Leases.

Section 4.28. <u>Landmark Status</u>. No portion of the Project is designated by or registered with any governmental authority as historic or landmark buildings or any other similar designation or registration and Borrower shall not attempt or cooperate to obtain or effect any such designation or registration.

Section 4.29. <u>Broker</u>. Borrower represents and warrants to Administrative Agent and Lenders that Borrower has not dealt with any broker with respect to the transaction contemplated hereby and, by accepting the Loan, Borrower agrees forever to indemnify and hold Administrative Agent and Lenders harmless from and against any and all claims or suits for compensation, commissions, fees or otherwise (and all Losses related thereto) that may be asserted or made by any broker or Person claiming to have dealt with or to have been employed by Borrower or Borrower's representatives in connection with the brokering of the Loan.

<div align="center">

ARTICLE V
COVENANTS

</div>

From the Closing Date and until repayment of the Debt in full and performance in full of all obligations of Borrower and Guarantor under the Loan Documents or the earlier release of the Lien of the Deed of Trust (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lenders that:

Section 5.1. <u>Existence; Compliance With Legal Requirements</u>.

(a)     Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply in all material respects with all Legal Requirements applicable to Borrower and the Project. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording any Governmental Authority the right of forfeiture as against the Project or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

(b)     Borrower agrees that the Project shall at all times comply, to the extent applicable, with the Access Laws in all material respects. Notwithstanding any provisions set forth herein or in any other documents regarding Administrative Agent's approval or alterations of the Project, Borrower shall not alter the Project in any manner which would increase Borrower's responsibilities for compliance with the applicable Access Laws in any material respect without the prior written approval of Administrative Agent. The foregoing shall apply to tenant improvements constructed by Borrower or by any of Borrower's Tenants. Administrative Agent may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer or other Person acceptable to Administrative Agent. Borrower agrees to give prompt notice to Administrative Agent of the receipt by Borrower of any complaints related to violations of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

<div align="center">23</div>

(c)     Notwithstanding any other provision of this Section, Borrower shall not be deemed to be in default solely by reason of Borrower's failure to comply with any applicable Legal Requirement so long as, in Administrative Agent's judgment, each of the following conditions is satisfied: (i) Borrower is engaged in and diligently pursuing in good faith administrative or judicial proceedings appropriate to contest the validity or amount of such law, rule regulation or order; (ii) Borrower's compliance with such law, rule, regulation or order would necessarily and materially prejudice Borrower's prospects for success in such proceedings; (iii) noncompliance with any such law, rule, regulation or order will not result in the loss or forfeiture of the Project or any other collateral for the Loan or any interest of Administrative Agent therein or result in any fines or other punitive actions or any insurance coverage; and (iv) Borrower deposits with Administrative Agent, as security for any payment or performance which may ultimately be required, a sum equal to the amount of any fine, assessment or charge plus the interest, penalties, and other costs which Administrative Agent reasonably estimates are likely to become payable if Borrower's contest is unsuccessful. If Administrative Agent determines that any one or more of such conditions is not satisfied or is no longer satisfied, Borrower shall comply with the law, rule regulation or order in question, within thirty (30) days after Administrative Agent gives notice of such determination.

Section 5.2. <u>Maintenance and Use of Project</u>. Borrower shall maintain the Project in a good and safe condition and repair. The improvements and the Borrower's personal property required for the use of the Project shall not be removed, demolished or materially altered without the written consent of Administrative Agent; *provided*, *however*, that Administrative Agent's consent shall not be required (a) in connection with any removal, demolition or alteration permitted to be made by a Tenant under an Existing Lease without Borrower's consent under the applicable Existing Lease, or required to be made by Borrower under an Existing Lease, and (b) as otherwise set forth in <u>Section 5.19</u>. If under applicable zoning provisions the use of all or any portion of the Project is or shall become a nonconforming use, Borrower shall not cause or permit the nonconforming use to be discontinued or the nonconforming improvement to be abandoned without the express written consent of Administrative Agent. Borrower shall not establish any condominium or cooperative regime with respect to the Project without the prior written consent of Administrative Agent, nor shall Borrower initiate, join in or consent to any change in any private restrictive covenant, zoning ordinance or other public or private restrictions, limiting or defining the uses which may be made of the Project or any portion thereof.

Section 5.3. <u>Waste</u>. Borrower shall not commit or suffer any intentional material waste of the Project or make any change in the use of the Project which shall in any way invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Project or the security for the Loan. Borrower shall not, without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Project, regardless of the depth thereof or the method of mining or extraction thereof, except as may be required by law or in accordance with the orders of any Governmental Authorities having jurisdiction thereof.

Section 5.4. <u>Taxes and Other Charges</u>.

(a)     Borrower shall pay, or cause to be paid, all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Project or any part thereof as the same become due and payable. Borrower shall furnish to Administrative Agent receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent. Borrower shall not suffer and shall promptly pay and discharge or bond any Lien or charge whatsoever which may be or become a Lien or charge against the Project, and shall pay for all utility services provided to the Project prior to delinquency.

(b)     Borrower shall not be obligated to make any deposit for Taxes as hereinafter provided until (i) Administrative Agent makes demand therefor following a Default and (A) any Tenant under a Material Leases is not paying such Taxes in accordance with the terms and provisions of its respective Material Lease, or (B) any Tenant under a Material Lease is in default under such Material Lease, or (ii) the continuance of an Event of Default hereunder of under any of the other Loan Documents. Upon the occurrence of the events described in clauses (i) and (ii) of the immediately preceding sentence, Borrower shall pay to Administrative Agent, upon the request of Administrative Agent, at the time of each payment of an installment of interest and/or principal under the Note, an additional amount which, together with all other such monthly payments, is sufficient to discharge the obligations for payment of Taxes and Other Charges one (1) month prior to the date the same shall become due. The determination of the amount so payable and of the fractional part thereof to be deposited with Administrative Agent, so that the aggregate of such deposits shall be sufficient for this purpose, shall be made by Administrative Agent in Administrative Agent's sole but reasonable discretion. Such amounts shall be held by Administrative Agent not as a trust fund and without interest (except as may be required by law) and shall be applied to the payment of the obligations in respect of which such amounts were deposited, in such order or priority as Administrative Agent shall determine, on or before the respective dates on which the same or any of them would become delinquent. During the continuance of an Event of Default, the balance of any such amounts held by Administrative Agent may be used and applied for any purpose authorized pursuant to this Agreement or any other Loan Document, including, without limitation, payment of the Debt in any order Administrative Agent may deem appropriate. If, one (1) month prior to the date any of the aforementioned Taxes or Other Charges may be paid without interest or penalty, the amounts then on deposit shall be insufficient for the payment of such obligation in full, Borrower shall, within ten (10) days after demand, deposit the amount of the deficiency with Administrative Agent. Nothing herein contained shall be deemed to affect any right or remedy of Administrative Agent or Lenders under any provisions of this Agreement or the Deed of Trust or of any statute or rule of law to pay any such amount and to add the amount so paid, together with interest at the Involuntary Rate, to the Debt. So long as Administrative Agent requires Borrower to pay Administrative Agent the deposits provided for in this paragraph and for so long as Borrower complies therewith, the obligation for direct payment of Taxes and Other Charges set forth in Subsection 5.4(a) hereof shall be suspended. Notwithstanding anything to the contrary contained herein, Administrative Agent shall not require Borrower to make such deposits for water and sewer charges if such charges are calculated on a metered basis.

(c)     Borrower shall pay or bond so as to remove as a lien of record, from time to time when the same shall become due, all lawful claims and demands of mechanics, materialmen, laborers, and others which, if unpaid, might result in, or permit the creation of, a lien on the Project or any part thereof, or on the revenues, rents, issues, income and profits arising therefrom and in general will do or cause to be done everything necessary so that the Liens of the Deed of Trust shall be fully preserved, at the sole cost and expense of Borrower and without expense to Administrative Agent or Lenders.

(d)     Notwithstanding any other provision of this Section, Borrower shall not be deemed to be in default solely by reason of Borrower's failure to pay any Taxes so long as, in Administrative Agent's sole judgment, reasonably exercised, each of the following conditions is satisfied:

(i)     Borrower or a Tenant is engaged in and diligently pursuing in good faith administrative or judicial proceedings appropriate to contest the validity or amount of such Tax;

(ii)     [Intentionally Omitted];

(iii) Nonpayment of such Tax will not result in the loss or forfeiture of any property encumbered by the Deed of Trust or any of the other Loan Documents or any interest of Administrative Agent therein; and

(iv) Borrower deposits with Administrative Agent, as security for such payment which may ultimately be required, a sum equal to the amount of the disputed Taxes plus the interest, penalties, and other costs which Administrative Agent reasonably estimates are likely to become payable if Borrower's contest is unsuccessful.

If Administrative Agent determines, in Administrative Agent's sole judgment, reasonably exercised, that any one or more of such conditions is not satisfied or is no longer satisfied, Borrower shall pay the Tax in question, together with any interest and penalties thereon, within ten (10) days after Administrative Agent gives notice of such determination. After Administrative Agent has received evidence of such payment, Administrative Agent shall release any security held for such payment of Taxes pursuant to Section 5.4(d)(iv).

(e) Borrower shall pay any taxes, except income, gross receipts and other taxes determined by reference to the amount of interest and other sums payable under the Loan Documents, imposed on Administrative Agent or Lenders by reason of Administrative Agent's or Lenders' ownership of this Agreement, the Note or the Deed of Trust as a result of any change in Legal Requirements (or any change in the application, interpretation or enforcement of existing Legal Requirements) effected after the date of this Agreement, provided that the Administrative Agent or applicable Lender shall at the time be assessing such taxes upon all of its similarly situated borrowers; provided further that Borrower shall not be required to pay any U.S. federal withholding taxes imposed under FATCA as a result of the failure by a Lender to comply with the applicable provisions of FATCA.

(f) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Accordingly, prior to the date that any Lender becomes a party hereto, such Lender shall deliver to the Borrower such certificates, documents or other evidence, as required by the IRS Code or Treasury Regulations issued pursuant thereto (including Internal Revenue Service Forms W-9, W-8ECI, W-8BEN, W-8BEN-E, W-8EXP and W-8IMY as applicable, or appropriate successor forms), properly completed, currently effective and duly executed by such Lender establishing that payments to it hereunder and under the Note are (i) not subject to United States Federal backup withholding tax and (ii) not subject to United States Federal withholding tax under the Internal Revenue Code. Each such Lender shall (x) deliver further copies of such forms or other appropriate certifications on or before the date that any such forms expire or become obsolete and after the occurrence of any event requiring a change in the most recent form delivered to the Borrower and (y) obtain such extensions of the time for filing, and renew such forms and certifications thereof, as may be reasonably requested by the Borrower.

Section 5.5. Litigation. Borrower shall give prompt written notice to Administrative Agent of any litigation or governmental proceedings pending or threatened in writing against Borrower or Guarantor which might materially adversely affect Borrower's condition (financial or otherwise) or business or the Project of which Borrower has knowledge.

Section 5.6. <u>Access to the Project</u>. Borrower shall permit agents, representatives and employees of Administrative Agent and Lenders to inspect the Project or any part thereof at reasonable hours upon reasonable advance written notice, except in the event of an emergency, in which case no advance notice is necessary.

Section 5.7. <u>Notice of Default</u>. Borrower shall promptly advise Administrative Agent of (a) any material adverse change in the condition (financial or otherwise) of Borrower or the Project, (b) the occurrence of an Event of Default under any Loan Document or (c) an "Event of Default" under any Mezzanine Loan Document (as defined therein).

Section 5.8. <u>Cooperate in Legal Proceedings</u>. Borrower shall, at Borrower's sole cost and expense, cooperate fully with Administrative Agent and Lenders with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lenders hereunder or any rights obtained by Lenders under any of the other Loan Documents and, in connection therewith, permit Administrative Agent and Lenders, at Administrative Agent's or Lenders' sole election, to participate in any such proceedings.

Section 5.9. <u>Performance of Obligations</u>. Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision to be observed and performed by Borrower under this Agreement and the other Loan Documents and any other agreement or instrument affecting or pertaining to the Project and any amendments, modifications or changes thereto.

Section 5.10. <u>Awards; Insurance Proceeds</u>. Borrower shall cooperate with Lenders in obtaining for Lenders the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Project in accordance with the terms and provisions of the Loan Documents, and Administrative Agent and Lenders shall be reimbursed for any reasonable, third party expenses incurred in connection therewith (including attorneys' fees and disbursements) out of such Awards or Insurance Proceeds.

Section 5.11. <u>Financial Reporting</u>.

(a)    Borrower shall keep proper books of record and account with respect to the Project and its leases and subleases, in accordance with a modified accrual accounting method or such other method satisfactory to Administrative Agent and in a manner acceptable to Administrative Agent, in Administrative Agent's sole and reasonable discretion.

(b)    Borrower shall furnish to Administrative Agent the following:

(i)    within ninety (90) days after the close of each fiscal or calendar year of Borrower, as applicable, annual financial statements audited by a "Big Four" accounting firm, the Pre-Approved Accounting Firm, or other independent certified public accountant acceptable to Administrative Agent, which financial statements shall include, without limitation, a balance sheet, a statement of income and expenses, and a projected profit and loss statement for the next fiscal or calendar year, as applicable, disclosing all earnings and expenses with respect to Borrower and the Project (collectively, the "<u>Financial Statements</u>"), together with a certificate from an officer of Borrower certifying that such annual Financial Statements fairly present the financial condition of Borrower and the Project;

(ii)    within forty-five (45) days after the close of each quarter of its fiscal year, a quarterly statement including a balance sheet and statement of profits and losses with respect to the Project;

(iii)    copies of any operating statements or the like when Borrower is required to submit such information to any Governmental Authority;

(iv)     promptly following any request therefor, copies of any notices described in Section 101(j) of ERISA that Borrower or any of its Subsidiaries or ERISA Affiliates may provide with respect to any Benefit Plan, copies of any documents described in Section 101(k) of ERISA that Borrower or any of its Subsidiaries or ERISA Affiliates may request with respect to any Multiemployer Plan, copies of any notices described in Section 101(1) of ERISA that Borrower or any of its Subsidiaries or ERISA Affiliates may request with respect to any Multiemployer Plan and any information that Borrower or any of its Subsidiaries or ERISA Affiliates may request with respect to any Multiemployer Plan in connection with Section 4221(e) of ERISA; provided, that if Borrower or any of its Subsidiaries or ERISA Affiliates has not requested such documents or notices from the administrator or sponsor of the applicable Benefit Plan or Multiemployer Plan, Borrower, the Subsidiary or the ERISA Affiliate, as applicable, shall promptly, upon the request of Administrative Agent, make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof; and

(v)     such other information respecting the business, properties or the condition or operations, financial or otherwise, of Borrower and/or the Project as Administrative Agent may from time to time reasonably request.

(c)     All Financial Statements and other deliverables of Borrower required under this Section 5.11 shall be (i) prepared in accordance with generally accepted accounting principles or such other method satisfactory to Administrative Agent, (ii) delivered in duplicate, and (iii) certified by Borrower as being true, complete and correct.

Section 5.12. Estoppel Statement. After request by Administrative Agent, Borrower shall within fifteen (15) Business Days furnish Administrative Agent with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the rate of interest on the Note, (iii) the unpaid principal amount of the Note, (iv) the date installments of interest were last paid, (v) any offsets or defenses to the payment of the Debt, if any, and (vi) that the Note, this Agreement, the Deed of Trust and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification. In the event any Governmental Authority requires the same, Lenders shall deliver a similar statement to Borrower.

Section 5.13. Management of Project. In the event a Management Agreement shall be in effect at any time, Borrower hereby covenants and agrees as follows:

(a)     Borrower shall (i) promptly perform and observe all of the covenants required to be performed and observed by Borrower under the Management Agreement and do all things necessary to preserve and to keep unimpaired Borrower's material rights thereunder; (ii) promptly notify Administrative Agent of any material default under the Management Agreement of which Borrower is aware; (iii) promptly deliver to Administrative Agent a copy of any notice of default or other material notice received by Borrower under the Management Agreement; and (iv) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement.

(b)     If at any time, (i) a Manager shall become insolvent or a debtor in a bankruptcy proceeding, (ii) an Event of Default has occurred and is continuing or (iii) a default has occurred and is continuing under the Management Agreement and Borrower has the right thereunder to terminate the Management Agreement on account thereof, Borrower shall, at the request of Administrative Agent, terminate the applicable Management Agreement upon thirty (30) days prior notice to such Manager and replace such Manager with a Qualified Manager (without the need for the approval of Administrative

28

Agent) or a manager selected by Borrower and approved in writing by Administrative Agent, in Administrative Agent's reasonable discretion.

(c)     Borrower shall not, without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld, (i) surrender, terminate or cancel the Management Agreement or otherwise replace any Manager or enter into any other management agreement with respect to the Project; (ii) reduce or consent to the reduction of the term of the Management Agreement; (iii) increase or consent to the increase of the amount of any charges under the Management Agreement; or (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Management Agreement in any material respect. In the event that Borrower replaces a Manager at any time during the term of Loan pursuant to this subsection, such Manager shall be approved by Administrative Agent in writing.

(d)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Manager initially named in this Agreement may (i) transfer its interest in any Management Agreement for the management of the Project to any Affiliate of such Manager, (ii) transfer shares or equity interests in Manager or Manager's equity owners (including, without limitation, the issuance of treasury stock, or the creation or issuance of a new class of stock or membership interests, in either case in the context of an initial public offering or in the context of a subsequent offering of equity securities), (iii) sell all or substantially all of such Manager's assets, and (iv) merge or consolidate with another entity without, in each case, the approval of Administrative Agent or the same constituting an Event of Default under this Agreement; *provided*, *however*, if any of the actions described in clauses (ii), (iii) or (iv) shall cause such Manager to be unable to perform the functions required to be performed and observed by Manager under the Management Agreement, Borrower shall, at the request of Administrative Agent, terminate the applicable Management Agreement upon thirty (30) days prior notice to such Manager and replace such Manager with a Qualified Manager (without the need for the approval of Administrative Agent) or a manager selected by Borrower and approved in writing by Administrative Agent, in Administrative Agent's reasonable discretion.

(e)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the resignation, removal or replacement of Manager shall not be an Event of Default under this Agreement or require the approval of Administrative Agent so long as Borrower shall appoint or retain a substitute Manager that is a Qualified Manager.

Section 5.14. <u>Liens</u>. Borrower shall not, without the prior written consent of Administrative Agent, create, incur, assume or suffer to exist any Lien on any portion of the Project or permit any such action to be taken, other than the Permitted Encumbrances, the Deed of Trust, the Assignment of Leases and Rents and any other liens created by the Loan Documents. Neither Borrower nor any other Person shall take any action that would impair the Lien created under this Agreement, the Deed of Trust or any other Loan Document.

Section 5.15. <u>Debt Cancellation</u>. Borrower shall not cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business, other than rent abatements or concessions in the ordinary course of business.

Section 5.16. <u>Zoning</u>. Borrower shall not initiate or affirmatively consent to any zoning classification or reclassification of any portion of the Project or seek any variance under any existing or future zoning ordinance or use or permit the use of any portion of the Project in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Administrative Agent.

29

Section 5.17. <u>ERISA</u>. Borrower covenants and agrees to deliver to Administrative Agent such certifications or other evidence from time to time throughout the term of the Loan, as reasonably requested by Administrative Agent that Borrower is not and will not be a Benefit Plan Investor.

Section 5.18. <u>No Joint Assessment</u>. Borrower shall not suffer, permit or initiate the joint assessment of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

Section 5.19. <u>Alterations</u>. Administrative Agent's prior written approval shall be required in connection with any material alterations to any improvements at or on the Project, except for (a) alterations to Tenant spaces required to be undertaken by Borrower under a Lease, or permitted to be undertaken by such Tenant without Borrower's consent under its Lease, (b) alterations required by Legal Requirements, and (c) ordinary non-structural improvements, alterations and maintenance and structural repairs, the cost of which is $750,000 or less (in the aggregate in any twelve (12) month period). With respect to an Existing Lease, to the extent that Administrative Agent's prior approval is required under this <u>Section 5.19</u>, Administrative Agent shall grant or withhold its consent to any alterations proposed thereunder subject to the standard of consent applicable to the landlord under the applicable Existing Lease.

Section 5.20. <u>Reciprocal Easement Agreement</u>. Borrower shall not enter into any reciprocal easement agreement without Administrative Agent's prior written consent.

Section 5.21. <u>Notices</u>. Borrower shall give notice, or cause notice to be given, to Administrative Agent promptly upon the occurrence, or the receipt of notice, of:

(a)     any Event of Default or, to Borrower's knowledge, any event that would with the giving of notice or passage of time would constitute an Event of Default;

(b)     any default or event of default under any Contractual Obligation of Borrower that, to the knowledge of Borrower, could reasonably be expected to have a material adverse effect on Borrower, the ability of Borrower to perform Borrower's obligations under the Loan Documents or the rights and remedies of Lenders under the Loan Documents;

(c)     any material litigation or proceeding affecting Borrower, Guarantor or the Project but only to the extent such litigation could be reasonably expected to have a material adverse effect on Borrower, Guarantor or the Project, the ability of Borrower or Guarantor to perform their obligations under the Loan Documents or the rights and remedies of Lenders under the Loan Documents;

(d)     a change in the business, operations or financial or other condition or prospects of Borrower or Guarantor which could reasonably be expected to have a material adverse effect on Borrower the ability of Borrower or such Guarantor to perform Borrower's or such Guarantor's obligations under the Loan Documents or the rights and remedies of Administrative Agent and Lenders under the Loan Documents; or

(e)     any ERISA Event.

Section 5.22. <u>Curing</u>. Administrative Agent and Lenders shall have the right, but shall not have the obligation, following ten (10) days' notice to Borrower and an opportunity to cure, to exercise Borrower's rights to satisfy or fully bond over any Liens, claims or judgments against the Project. Borrower shall reimburse Lenders and Administrative Agent on demand for any and all actual costs

incurred by Lenders or Administrative Agent in connection with satisfying any Liens, claims or judgments against the Project.

Section 5.23. <u>Limitation on Securities Issuances</u>. None of Borrower or any of Borrower Members shall issue any additional membership interests or other securities, other than those that have been issued as of the Closing Date to the extent that such issuance would violate the provisions of <u>Section 7.2</u>, without the prior written consent of Administrative Agent, which consent may be withheld by Administrative Agent in Administrative Agent's sole and absolute discretion. For the avoidance of doubt, this <u>Section 5.23</u> shall not apply to the issuance, reissuance or replacement of certificates evidencing membership interests existing as of the Closing Date in accordance with the Mezzanine Loan Documents.

Section 5.24. <u>Limitations on Distributions</u>. Following the occurrence and during the continuance of (i) an Event of Default or (ii) a default by Borrower or the Key Tenant under the Key Tenant Lease, Borrower shall not make any distributions to Sole Member or any Borrower Members or any other Person. Except as aforesaid, there shall be no limitation on the making of any distributions to Borrower Members so long as no Event of Default or default under the Key Tenant Lease shall have occurred and be continuing.

Section 5.25. <u>Contractual Obligations</u>. Other than the Loan Documents, the Mezzanine Loan Documents, the Borrower Operating Agreement (and the membership interests in Borrower issued pursuant thereto) and the other documents described in <u>Section 4.24</u>, neither Borrower nor any of Borrower's assets shall be subject to any Contractual Obligations, and Borrower shall not enter into any agreement, instrument or undertaking by which Borrower or Borrower's assets are bound, other than those Contractual Obligations to operate, manage and Lease the Project that are necessary and customary for properties similar to the Project.

Section 5.26. <u>Additional Indebtedness</u>. Except as provided in <u>Section 6.1(g)</u> hereof, Borrower shall not suffer or incur any additional debt, obligations as lessee under a capitalized lease or contingent liabilities without the prior written consent of Administrative Agent, which consent may be withheld by Administrative Agent in Administrative Agent's sole and absolute discretion.

Section 5.27. <u>Restrictions on Leasing</u>. Borrower shall (i) not execute a Material Lease which shall not have been submitted to and approved by Administrative Agent except for Telecom Leases, (ii) not alter, modify or change the terms of any Material Lease except in the ordinary course of business and provided such alteration, modification or change does not have a material adverse financial effect on Borrower, (iii) not give any consent or exercise any option unless required by the terms of any Lease approved by Administrative Agent, (iv) not cancel or terminate any Material Lease or accept a surrender or tenant buyout thereof except in the event of default by the Tenant thereunder, (v) not consent to any assignment of or subletting under any Material Lease, unless the same shall be in accordance with its terms and such terms have been approved by Administrative Agent, (vi) not collect any of the rents, income and profits arising or accruing under any Leases or from the Project for more than one (1) month in advance of the time when the same shall become due, (vii) not execute any other assignment of Borrower's interest in the Leases or any assignment of rents arising or accruing from the Leases or from the Project; (viii) observe and promptly and faithfully perform or cause to be performed all of the covenants, conditions and agreements contained in all Leases in all material respects, (ix) at all times do all things reasonably necessary in the exercise of sound business judgment to compel performance by the lessee under each Lease of all obligations, covenants and agreements by such lessee to be performed thereunder, (x) not do or permit to be done anything to materially impair the security of any Lease, (xi) at Administrative Agent's request, assign and transfer to Administrative Agent any and all subsequent Leases upon all or any part of the Project, and (xii) execute and deliver at the reasonable request of Administrative Agent all such further assurances and assignments in the Project as Administrative Agent

shall from time to time require. None of the foregoing restrictions set forth in clauses (i) through (vii) of this Section shall be done or suffered to be done without in each instance obtaining the prior written consent of Administrative Agent, and any of such acts done without the prior written consent of Administrative Agent shall be null and void.  For purposes of clarity, the Existing Leases and the terms therein have been approved by Administrative Agent.

(a)      Tenant Estoppel Certificates. Borrower shall deliver to Administrative Agent upon the written request of Administrative Agent (made not more often than once in any calendar year), an updated tenant estoppel certificate from any Tenant at the Project addressed to Administrative Agent, in form and substance satisfactory to Administrative Agent in all respects.

(b)      Copies of Leases. Within ten (10) Business Days of any such request, Borrower shall submit to Administrative Agent or Administrative Agent's counsel true and complete copies of all Leases for the Project including all amendments thereto or extensions thereof, and any guarantees thereof.

(c)      Subordination and Attornment. Each Lease hereafter entered into shall be subordinate to the lien of the Deed of Trust, to all advances under the Deed of Trust and to any renewals, extensions, modifications or consolidations thereof, and shall provide that, in the event of the enforcement by Lenders of the remedies provided for by law, by this Agreement or by the Deed of Trust, the lessee thereunder shall, upon request of any Person succeeding to the interest of Borrower as a result of such enforcement, automatically become the lessee of and shall attorn to said successor in interest, without change in the terms or other provisions of such Lease; *provided*, *however*, that said successor in interest shall not be bound by (i) any payment of rent or additional rent for more than one (1) month in advance, except prepayments in the nature of security for the performance by said lessee of its obligations under said Lease, or (ii) any amendment or modification of the Lease made without the consent of Administrative Agent or such successor in interest, unless such consent is not required pursuant to this Section 5.27. Each Lease shall also provide that, upon request by said successor in interest, such lessee shall execute and deliver an instrument or instruments confirming such attornment.  Administrative Agent, on behalf of Lenders, shall enter into a commercially reasonable SNDA with Tenants under future Leases upon request, from time to time.

Section 5.28. Debt Service Coverage Ratio.

(a)      At all times during the term of the Loan, the Project must maintain a minimum debt service coverage ratio ("DSCR") of 1.20:1.00 ("DSCR Threshold"). The DSCR shall be tested on an annual basis commencing on December 31, 2018 and on each December 31 thereafter during the term of the Loan. The DSCR shall be calculated as the ratio of (i) Net Operating Income for the prior twelve-month period immediately preceding the measurement date, *to* (ii) actual scheduled principal and interest payments under the Loan for the prior trailing twelve-month period immediately preceding the measurement date. With respect to the calculation of DSCR as aforesaid, until the first (1st) anniversary of the Closing Date, Debt Service and Net Operating Income shall be calculated on the basis of actual Debt Service and Net Operating Income for such partial year period and such amounts shall be annualized by Administrative Agent for purposes of calculating the DSCR.

(b)      The certificate of Administrative Agent as to any DSCR calculation shall, absent manifest error, be final, conclusive and binding on Borrower.

(c)      If, on any annual measurement date, the DSCR is below the DSCR Threshold, Borrower may, at Borrower's option, pay down the Loan (without payment of any Prepayment Premium) by an amount necessary for Borrower to effectively achieve the DSCR Threshold immediately following delivery of such pay down (any amount so paid down may not be reborrowed). Borrower shall deliver the pay down to Administrative Agent within fifteen (15) days following notice from Administrative Agent

that such DSCR Threshold has not been met. Borrower's failure to deliver the pay down within such time period such that DSCR Threshold is achieved shall be an Event of Default.

Section 5.29. <u>Loan-to-Value Ratio</u>.

(a) The Project must maintain a maximum loan-to-value ratio ("<u>LTVR</u>") of 60.0% ("<u>LTVR Threshold</u>") at all times. The LTVR shall be tested by Administrative Agent on an annual basis, commencing on December 31, 2018 and on each December 31 thereafter during the term of the Loan, and shall be calculated as the ratio of (i) the outstanding principal balance under the Loan *to* (ii) the Appraised Value of the Project. For the purpose of this covenant, "<u>Appraised Value</u>" shall mean the market value of the Project according to the latest FIRREA appraisal performed by an appraiser appointed by Borrower and reasonably acceptable to Administrative Agent, which appraisals shall be performed annually by December 31st of each calendar year.

(b) The certificate of Administrative Agent as to any LTVR calculation shall, absent manifest error, be final, conclusive and binding on Borrower.

(c) If, on any annual measurement date, the LTVR exceeds the LTVR Threshold, Borrower may, at Borrower's option, pay down the Loan (without payment of any Prepayment Premium) by an amount necessary for Borrower to effectively achieve the LTVR Threshold immediately following delivery of such pay down (any amount so paid down may not be reborrowed). Borrower shall deliver the pay down to Administrative Agent within fifteen (15) days following notice from Administrative Agent that the LTVR Threshold has not been achieved. Borrower's failure to deliver the pay down within such time period such that LTVR Threshold is achieved shall be an Event of Default.

Section 5.30. <u>UCC Searches</u>. Borrower and Guarantor hereby agree that Administrative Agent shall have the right to order UCC, judgment and lien searches against Borrower and Guarantor at any time at Borrower's sole cost and expense. Borrower shall also be responsible for all actual out-of-pocket costs incurred by Administrative Agent to continue the UCC-1 Financing Statements delivered by Borrower in favor of Administrative Agent from time to time.

Section 5.31. <u>Updated/New Appraisal</u>. Borrower hereby acknowledges and agrees that Borrower shall order (or, at Administrative Agent's election, Administrative Agent may order) an updated or new appraisal of the Project (a) annually, in connection with Administrative Agent's test of the LTVR Threshold, at Borrower's sole cost and expense, (b) upon the occurrence of an Event of Default, at Borrower's sole cost and expense, and (c) at any other time, at Administrative Agent's sole cost and expense. Any such appraisal shall be performed by an appraiser appointed by Borrower and reasonably acceptable to Administrative Agent, and Administrative Agent may from time to time require that the appraiser who performs a particular appraisal be different than the appraiser who performed the prior appraisal.

Section 5.32. <u>Interest Reserve Account</u>. Borrower shall maintain the Interest Reserve Account for the term of the Loan, which Interest Reserve Account shall be under the sole dominion and control of Administrative Agent. The Interest Reserve Account shall have a title evidencing the foregoing in a manner reasoning acceptable to Administrative Agent. Borrower hereby grants to Administrative Agent, for the benefit of Lenders, a first-priority security interest in the Interest Reserve Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Administrative Agent, for the benefit of Lenders, a perfected first priority security interest in the Interest Reserve Account. All costs and expenses for establishing and maintaining the Interest Reserve Account (or any successor thereto) shall be paid by Borrower. All monies now or hereafter deposited into the Interest Reserve Account shall be deemed additional security for the Debt. Borrower shall not alter or modify the Interest Reserve Account without the prior written consent of Administrative Agent.

Borrower shall not draw upon the Interest Reserve Account during the term of the Loan (for the purpose of making interest payments or otherwise). Upon the occurrence of an Event of Default due to Borrower's failure to timely make any interest payment, Administrative Agent shall apply funds on deposit in the interest reserve against amounts owing to Lenders under this Agreement, and shall notify Borrower whether sufficient funds were available in the Interest Reserve Account to cure such Event of Default. For the avoidance of doubt, Borrower shall be required to make separate interest payments pursuant to the terms of the Note, regardless of whether there are funds in the Interest Reserve Account on deposit with Administrative Agent.

Section 5.33. <u>Mezzanine Loan</u>. Borrower shall not cause, suffer or permit Mezzanine Borrower to enter into any cancellation, termination, modification, change, supplement, restatement, alteration or amendment of any Mezzanine Loan Document. Without limitation of any other covenant set forth in this Agreement, Borrower shall deliver to Administrative Agent, within two (2) Business Days, any notice of default or other material notice, statement or report given or received by any party under the Mezzanine Loan Documents.

ARTICLE VI
ENTITY COVENANTS

Section 6.1. <u>Single Purpose Entity/Separateness</u>. Until the Debt has been paid in full, Borrower represents, warrants and covenants that Borrower has not and shall not:

(a)     engage in any business or activity other than the ownership of the Project and any activities incidental thereto;

(b)     acquire or own any assets other than (i) the Project, and (ii) such incidental personal property as may be necessary for the ownership of the Project;

(c)     merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(d)     fail to observe all organizational formalities or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable Legal Requirements of the jurisdiction of its organization or formation, or amend, modify, terminate or fail to comply with the provisions of its Organizational Documents;

(e)     form or own any Subsidiary or make any investment in any Person;

(f)     commingle its assets with the assets of any other Person;

(g)     incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation) other than (i) the Loan and/or (ii) trade and operational indebtedness incurred in the ordinary course of business with trade creditors, provided such indebtedness is (A) unsecured, (B) not evidenced by a note, (C) on commercially reasonable terms and conditions, and (D) due not more than ninety (90) days past the date incurred and paid on or prior to such date;

(h)     fail to maintain its records, books of account, bank accounts, financial statements, accounting records and other entity documents separate and apart from those of any other Person;

(i)     enter into any contract or agreement with any general partner, member, shareholder, principal, guarantor of the obligations of Borrower or any Affiliate of the foregoing, except

upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arm's length basis with unaffiliated third parties;

(j) maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(k) assume or guaranty the debts of any other Person, hold itself out to be responsible for the debts of any other Person, or otherwise pledge its assets for the benefit of any other Person or hold out its credit as being available to satisfy the obligations of any other Person, provided however, that this subsection (k) shall not be deemed to prohibit Borrower from pledging assets to secure its own obligations as required or permitted by the Loan Documents;

(l) make (i) any loans or (ii) any advances (except with respect to distributions to its shareholders, partners or members, as applicable, which are not otherwise prohibited under this Agreement) to any Person;

(m) fail to file its own tax returns or file a consolidated federal income tax return with any Person (unless prohibited or required, as the case may be, by applicable Legal Requirements);

(n) fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or fail to correct any known misunderstanding regarding its separate identity;

(o) fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; *provided*, *however*, in no event shall this subsection (o) require any equity owner to make additional capital contributions to Borrower (it being acknowledged, however, that a failure of Borrower to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations shall be a Default hereunder irrespective of such equity owner's lack of an obligation to make additional capital contributions to Borrower);

(p) (i) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any Creditors' Rights Laws (unless filed by Administrative Agent), (ii) seek or consent to the appointment of a receiver, liquidator or any similar official, (iii) take any action that might cause such entity to become insolvent, or (iv) make an assignment for the benefit of creditors;

(q) fail to allocate shared expenses (including, without limitation, shared office space and services performed by an employee of an Affiliate) among the Persons sharing such expenses and to use separate invoices and checks;

(r) fail to remain solvent or pay its own liabilities (including, without limitation, salaries of its own employees) only from its own funds; *provided*, *however*, in no event shall this subsection (r) require any equity owner to make additional capital contributions to Borrower (it being acknowledged, however, that a failure of Borrower to remain solvent or pay its own liabilities (including, without limitation, salaries of its own employees) only from its own funds shall be a Default hereunder irrespective of such equity owner's lack of an obligation to make additional capital contributions to Borrower); and

(s) acquire obligations or securities of its partners, members, shareholders or other affiliates, as applicable.

Section 6.2. <u>Change of Name, Identity or Structure</u>. Borrower shall not change or permit to be changed (a) Borrower's name, (b) Borrower's identity (including Borrower's trade name or names), (c)

Borrower's principal place of business set forth on the first page of this Agreement, the Deed of Trust or any UCC-1 Financing Statements, (d) the corporate, partnership, limited liability company or other organizational structure of Borrower, (e) Borrower's state of organization, or (f) Borrower's organizational identification number, without in each case notifying Administrative Agent of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Administrative Agent. In addition, Borrower shall not change or permit to be changed any Organizational Documents of such person if such change would adversely impact the covenants set forth in <u>Section 6.1</u> hereof. Borrower shall execute and deliver to Administrative Agent, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement amendment reasonably required by Administrative Agent to establish or maintain the validity, perfection and priority of the security interest granted herein. At the request of Administrative Agent, Borrower shall execute a certificate in form satisfactory to Administrative Agent listing the trade names under which Borrower intends to operate under, and representing and warranting that Borrower does business under no other trade name. If Borrower does not now have an organizational identification number and later obtains one, or if the organizational identification number assigned to Borrower subsequently changes, Borrower shall promptly notify Administrative Agent of such organizational identification number or change.

Section 6.3. <u>Business and Operations</u>. Borrower shall remain in good standing under the laws of each State as, and to the extent, the same are required for the ownership, maintenance, management and operation of the Project. Borrower shall not enter into any line of business other than the ownership of the Project and ancillary purposes in connection therewith, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business.

<div align="center">

ARTICLE VII
NO SALE OR ENCUMBRANCE

</div>

Section 7.1. <u>Transfer Definitions</u>. For purposes of this <u>Article VII</u>, an "<u>Affiliated Manager</u>" shall mean any managing agent in which Borrower, Guarantor or any Affiliate of such Persons has directly or indirectly, any legal, beneficial or economic interest; "<u>Control</u>" shall mean, for any Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise; "<u>Restricted Party</u>" shall mean Borrower, any Affiliated Manager, or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, any Affiliated Manager, or any non-member manager; and a "<u>Sale or Pledge</u>" shall mean a voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, lien, pledge, assignment, grant of any options with respect to, or any other transfer or disposition of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) a legal or beneficial interest.

Section 7.2. <u>No Sale/Encumbrance</u>.

(a) Other than Permitted Transfers, until the Debt is paid in full, Borrower shall not cause or permit a Sale or Pledge of the Project or any part thereof or any legal or beneficial interest therein nor permit a Sale or Pledge of an interest in any Restricted Party (in each case, a "<u>Prohibited Transfer</u>") without the prior written consent of Administrative Agent, which shall not be unreasonably withheld, conditioned or delayed.

(b) A Prohibited Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Project or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Project for other than

<div align="center">36</div>

actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in Borrower's right, title and interest in and to any leases or any rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general or limited partner or any profits or proceeds relating to such partnership interests or the creation or issuance of new partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of any member or any profits or proceeds relating to such membership interest; (vi) if a Restricted Party is a trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; (vii) the removal or the resignation of a Manager (including, without limitation, an Affiliated Manager) other than in accordance with Section 5.13 hereof.

Section 7.3. <u>Administrative Agent's Rights</u>. Administrative Agent reserves the right to condition the consent to a Prohibited Transfer requested hereunder upon (a) a modification of the terms hereof and an assumption of the Note and the other Loan Documents as so modified by the proposed transferee, (b) receipt of payment of a transfer fee equal to $5,000 and all of Lenders' and Administrative Agent's out-of-pocket expenses actually incurred in connection with such Prohibited Transfer, (c) to the extent applicable to such proposed transferee, the proposed transferee's continued compliance with the covenants set forth in this Agreement (including, without limitation, the covenants in Article VI and the other Loan Documents), (d) a new manager for the Project and a new management agreement satisfactory to Administrative Agent (if applicable), and (e) the satisfaction of such other conditions and/or legal opinions as Administrative Agent shall determine in Administrative Agent's reasonable discretion to be in the interest of Lenders. All reasonable expenses incurred by Lenders and Administrative Agent shall be payable by Borrower whether or not Administrative Agent consents to the Prohibited Transfer. Lenders shall not be required to demonstrate any actual impairment of Lenders' security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Prohibited Transfer made without Administrative Agent's prior written consent. This provision shall apply to each and every Prohibited Transfer, whether or not Administrative Agent has consented to any previous Prohibited Transfer.

Section 7.4. <u>Assumption</u>. Other than as expressly permitted in this Agreement, Borrower hereby acknowledges and agrees that no transfer of all or any portion of the Project to, and the related assumption of the Loan by, any Person shall be permitted under this Agreement.

ARTICLE VIII
INSURANCE; CASUALTY; CONDEMNATION; RESTORATION

Section 8.1. <u>Insurance</u>.

(a)     Borrower shall obtain and maintain at all times policies of insurance as follows:

(i)     comprehensive "all risk" or "special causes of loss" insurance, including, without limitation, fire, flood, earthquake, terrorism, vandalism, malicious mischief and such other hazards as may be reasonably specified by Administrative Agent for the mutual benefit of Borrower and Administrative Agent and which is customarily maintained for like properties, including the improvements and the fixtures (other than trade fixtures) at the Project, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations,

underground utilities and footings) and provided that earthquake and flood may have a sub limit reasonably acceptable to Administrative Agent; (B) containing a replacement cost endorsement and an agreed amount endorsement with respect to such improvements and fixtures (other than trade fixtures) and/or an endorsement waiving all coinsurance provisions; (C) providing for no deductible in excess of $100,000 or such other amount reasonably acceptable to Administrative Agent, for all such insurance coverage; and (D) if any of the improvements or the use of the Project shall at any time constitute legal nonconforming structures or uses, providing coverage for contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements and containing an "Ordinance or Law Coverage" or "Enforcement" endorsement. In addition, Borrower shall obtain, or cause to be obtained: (x) if any portion of the improvements is currently or at any time in the future located in a "special flood hazard area" designated by the Federal Emergency Management Agency, flood hazard insurance in an amount equal to $10,000,000 in excess of the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended; and (y) earthquake insurance in amounts and in form and substance reasonably satisfactory to Administrative Agent as determined by a probable maximum loss study or other acceptable assessment of expected maximum loss, not to exceed the amount of indebtedness, in the event the Project is located in an area with a high degree of seismic risk provided that the insurance pursuant to clauses (x) and (y) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this subsection (i) and further provided that regardless of the flood or seismic zone, Administrative Agent may require reasonable limits of insurance covering such risks;

(ii)     Commercial General Liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Project, with such insurance (A) to be on the so-called "occurrence" form with a general aggregate limit of not less than $2,000,000 per location and a per occurrence limit of not less than $1,000,000; (B) to continue at not less than the aforesaid limit until required to be changed by Administrative Agent in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations; (3) independent contractors; and (4) contractual liability;

(iii)     loss of rents insurance or business income insurance, as applicable, (A) covering all risks required to be covered by the insurance provided for in subsection (i) above; (B) which provides that after the physical loss to the improvements and fixtures (other than trade fixtures) occurs, the loss of rents or income, as applicable, will be insured until such completion of Restoration and notwithstanding that the policy may expire prior to the end of such period; and (C) which contains an extended period of indemnity endorsement which provides that after the physical loss to the improvements and personal property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of at least six (6) months from the date that the Project is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period. The amount of such loss of rents or business income insurance, as applicable, shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross income from the Project for the succeeding period of coverage required above. All proceeds payable to Lenders pursuant to this subsection shall be held by Lenders and shall be applied to the obligations secured by the Loan Documents with any remaining balance promptly payable to Borrower; *provided*, *however*, that nothing herein contained shall be deemed to relieve Borrower of Borrower's obligations to pay the obligations secured by the Loan Documents on the respective dates of payment provided for in the Note, this Agreement and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such loss of rents or business income insurance, as applicable;

(iv)    at all times during which structural construction, demolition, structural repairs or structural alterations are being made with respect to the improvements, and only if the property coverage form does not otherwise apply,

(A)    owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy;

(B)    the insurance provided for in subsection (i) above written in a so-called Builder's Risk Completed Value form (1) on a non-reporting basis, (2) against "all risks" insured against pursuant to subsection (i) above, (3) including permission to occupy the Project, (4) with an agreed amount endorsement waiving co-insurance provisions, and (5) including coverage for so-called "soft costs" and delayed completion loss of income; and

(C)    Borrower shall ensure, or cause to be insured, that the general contractor maintains (1) commercial general liability coverage, including products and completed operations coverage that shall be continuously renewed for the statutory period during which claims can be made following completion of the project, (2) automobile liability insurance (including owned, hired and non-owned liability) and (3) umbrella/excess liability insurance with no less than $25,000,000, or such other amount reasonably acceptable to Administrative Agent, in limits per occurrence and in the annual aggregate per project, and in addition Borrower shall ensure, or cause to be insured, that all trade contractors provide similar liability insurance coverage with umbrella liability limits that are commensurate with the risks presented by their operations at the site as determined by the general contractor. All parties engaged in work on the improvements or on any restoration shall maintain any workers' compensation and employer's liability insurance required by law in force for all workers on the job. A certificate of insurance shall be issued to Borrower and Administrative Agent, naming each as Additional Insured (except with respect to workers' compensation and employer's liability), and evidencing all insurance required in this subsection. Borrower and Administrative Agent shall be named as Additional Insured with respect to the general contractor's ongoing operations and completed operations by endorsements satisfactory to Administrative Agent. Such insurance shall be primary and any other insurance maintained by the additional insured shall be excess only and not contributing with this insurance;

(v)    workers' compensation, subject to the statutory limits of the State, and employer's liability insurance in respect of any work or operations on or about the Project, or in connection with the Project or its operation (if applicable);

(vi)    comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Administrative Agent on terms consistent with the commercial property insurance policy required under subsection (i) above;

(vii)    excess liability insurance in an amount not less than $25,000,000 per occurrence and in the aggregate per location, or such other amount reasonably acceptable to Administrative Agent, per occurrence and per location, on terms consistent with the commercial general liability insurance required under subsection (ii) above; and

(viii)    upon sixty (60) days' written notice, such other reasonable insurance and in such reasonable amounts as Administrative Agent from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Project located in or around the region in which the Project is located.

(b)    All insurance provided for in <u>Section 8.1(a)</u> hereof shall be obtained under valid and enforceable policies (collectively, the "<u>Policies</u>" or in the singular, the "<u>Policy</u>"), and shall be in such forms and in such amounts as required above, and shall be subject to the reasonable approval of Administrative Agent as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the State and having a claims paying ability rating of "A" or better by at least two rating agencies (one of which shall be S&P) and/or a general policy rating of "A" or better and a financial class of VIII or better by A.M. Best Company, Inc.; *provided*, *however*, any insurance company with a rating below A:X must have a positive or stable outlook according to A.M. Best Company, Inc. The Policies described in <u>Section 8.1(a)</u> hereof shall designate Administrative Agent and Lenders and their successors and assigns as mortgagee, additional insured and/or loss payee as deemed appropriate by Administrative Agent. Borrower shall deliver to Administrative Agent certificates evidencing renewal of the Policies (such certificates, the "<u>Insurance Certificates</u>") and renewal policies accompanied by evidence satisfactory to Administrative Agent of payment of the premiums due with respect to the policies (the "<u>Insurance Premiums</u>"), within thirty (30) days after the expiration dates of such Policies.

(c)    Any blanket property insurance Policy shall specifically allocate to the Project the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Project in compliance with the provisions of <u>Section 8.1(a)</u> hereof.

(d)    All Policies provided for or contemplated by <u>Section 8.1(a)</u> hereof shall, in the case of Policies providing for (i) property damage, boiler and machinery, terrorism, flood and earthquake insurance, provide that the loss thereunder shall be payable to Administrative Agent, as mortgagee and loss payee, and (ii) commercial general liability insurance, name Administrative Agent as additional insured.

(e)    All Policies provided for in <u>Section 8.1(a)</u> hereof shall contain clauses or endorsements to the effect that:

(i)    no act or negligence of Borrower or anyone acting for or on behalf of Borrower or of any Tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance with respect to Administrative Agent and Lenders;

(ii)    the property damage insurance Policies, including boiler and machinery, earthquake, flood and terrorism, if separately provided, shall not be materially changed (other than to increase the coverage provided thereby) or canceled without at least thirty (30) days' prior written notice to Administrative Agent and any party named therein as an additional insured;

(iii)    the issuers thereof shall give written notice to Administrative Agent if the Policies have not been renewed ten (10) Business Days prior to their expiration;

(iv)    Administrative Agent and Lenders shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder, provided that the insurer need not waive the requirement that the premium be paid in order for a claim to be paid and further shall provide that Administrative Agent (for the benefit of Lender) is permitted to make payments to effect the continuation of such policy upon notice of cancellation due to non-payment of premiums;

(v)    the Policies do not contain an exclusion for acts of terrorism; and

(vi)     any claim or defense any property damage insurance company may have against Borrower to deny payment of any claim by Borrower thereunder shall not be effective against Administrative Agent and Lenders (and affirmatively providing that the insurance company will pay the proceeds of such Policy to Administrative Agent notwithstanding any claim or defense of the insurance company against Borrower) and such Policies shall also contain a standard "Waiver of Subrogation" endorsement.

(f)     If at any time Administrative Agent is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Administrative Agent shall have the right, upon not less than five (5) Business Days' notice to Borrower (except in the event of an emergency or an imminent lapse or loss of insurance coverage), to take such action as Administrative Agent deems necessary to protect Lenders' interest in the Project, including, without limitation, obtaining such insurance coverage as Administrative Agent in Administrative Agent's reasonable discretion deems appropriate. All premiums incurred by Administrative Agent or Lenders in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Administrative Agent upon demand and shall bear interest at the Involuntary Rate.

(g)     Borrower shall not take out separate insurance concurrent in form or contributing (in the event of a loss) to the insurance required to be maintained under this Section 8.1. Borrower may, however, carry, or permit Tenants to carry, insurance for the Project in addition to required insurance, but only if such additional insurance: (i) does not violate or entitle the carrier to assert any defense or disclaim any primary coverage under any required insurance; (ii) mutually benefits Borrower or Tenants, as the case may be, and Administrative Agent, as their interests may appear; and (iii) otherwise complies with this Agreement; *provided*, *however*, Administrative Agent reserves the right to approve any insurance provided by any other Tenant.     Notwithstanding the foregoing, Administrative Agent hereby acknowledges that the insurance coverages held by the Tenants as of the Closing Date are acceptable to Administrative Agent.

Section 8.2. Insurance Escrow; Payment by Administrative Agent. Borrower shall not be obligated to make any deposit or payment for insurance premium payment obligations, as hereinafter provided, until Administrative Agent makes demand therefor following an Event of Default and (i) any Tenant under a Material Lease is not paying such premiums in accordance with the terms and provisions of its respective Lease, or (ii) any Tenant under a Material Lease is in default under such Lease. Subject to the foregoing, upon notice from Administrative Agent, Administrative Agent shall have the right to require that Borrower pay to Administrative Agent at the time of each payment of an installment of interest and/or principal under the Note, an additional amount sufficient to discharge the premium payment obligations under this Article VIII when they become due. The determination of the amount so payable and of the fractional part thereof to be deposited with Administrative Agent, so that the aggregate of such deposits shall be sufficient for this purpose, shall be made by Administrative Agent in Administrative Agent's reasonable discretion. Such amounts shall be held by Administrative Agent not as a trust fund and without interest (except as required by applicable law) and shall be applied to the payment of the obligations in respect of which such amounts were deposited, in such order or priority as Administrative Agent shall reasonably determine, on or before the respective dates on which the same or any of them would become due. After acceleration of the Debt, the balance of any such amounts held by Administrative Agent may be used and applied for any purpose authorized pursuant to Article II of the Deed of Trust and Section 10.2 hereof including, without limitation, payment of the Debt in any order Administrative Agent may deem appropriate. If, one (1) month prior to the date any of the aforementioned obligations are due, the amounts then on deposit shall be insufficient for the payment of such obligation in full, Borrower shall, within ten (10) days after written demand, deposit the amount of the deficiency with Administrative Agent. Nothing herein contained shall be deemed to affect any right or

41

remedy of Administrative Agent or Lenders under any provisions of this Agreement or of any statute or rule of law to pay any such amount and to add the amount so paid, together with interest at the Involuntary Rate, to the Debt.

      Section 8.3. <u>Casualty</u>. If the Project shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "<u>Casualty</u>"), Borrower shall give prompt notice of such damage to Administrative Agent and Administrative Agent shall have the right to join Borrower in adjusting any loss. In addition, after the entry of any decree of foreclosure of the Deed of Trust, any purchaser at foreclosure sale or the decree creditor, as the case may be, shall also have the right to join in the adjustment of any such losses. Any moneys received as payment for any loss under any such insurance (the "<u>Insurance Proceeds</u>") shall be paid, subject to the terms of the Existing Leases, over to Administrative Agent to be applied, at Administrative Agent's option, either to (i) prepayment of the Note and other sums due under the Loan Documents or (ii) to the extent reasonably practicable, the reimbursement of Borrower from time to time of expenses incurred by Borrower in connection with the restoration of the Project ("<u>Restoration Work</u>") upon terms otherwise satisfactory to Administrative Agent. Administrative Agent and Lenders shall have the right to participate in the adjustment of all claims for Insurance Proceeds. Borrower shall promptly commence and diligently prosecute the restoration of the Project whether or not the Insurance Proceeds are made available to Borrower. Borrower shall pay all costs of such restoration whether or not such costs are covered by insurance. Provided and on condition that no Event of Default has occurred and is continuing, any prepayment of the Debt by application of Insurance Proceeds shall not be subject to any Prepayment Premium, however, Borrower shall be obligated to pay any breakage costs or other similar losses incurred or suffered by Administrative Agent and Lenders as a result of such prepayment.

      Notwithstanding the foregoing, and subject to the terms of subsection (f) hereof, if Administrative Agent agrees to make the Insurance Proceeds, less the reasonable and actual out-of-pocket cost, if any, to Administrative Agent of obtaining and disbursing such Insurance Proceeds (including, without limitation, reasonable attorneys' fees and disbursements and costs allocable to inspecting the Restoration Work and the Plans) for the repair and restoration of the Project ("<u>Actual Proceeds</u>") available to the Borrower (not by way of application against and readvancement of loan funds under the Deed of Trust but solely as a security fund from which to reimburse Borrower for or permit Borrower to pay directly the costs of such repair and restoration), then Administrative Agent shall make the Actual Proceeds available to Borrower and Borrower shall complete the Restoration work in accordance with the following terms, provisions and conditions:

          (a)     If the Project should be damaged or destroyed by fire or other casualty, Borrower shall promptly upon insurance settlement, which settlement shall be diligently pursued by Borrower, commence the Restoration Work. Administrative Agent shall, subject to the terms of Subsection (b) below, deposit the proceeds of settlement in an interest-bearing account (the "<u>Restoration Account</u>") in a branch of any federally-insured bank as Administrative Agent may determine, in Administrative Agent's sole and absolute discretion. Borrower shall, as provided below, pay or cause to be paid all expenses in connection with such repair and restoration of the Project so that the Project, at all times, shall be and remain free and clear from any and all Liens.

          (b)     If the Insurance Proceeds are less than or equal to $750,000, Administrative Agent shall deliver such Insurance Proceeds to Borrower to perform the Restoration Work. If the Insurance Proceeds are greater than $750,000, Administrative Agent shall make 90% of the Actual Proceeds available to Borrower as provided in subsection (c) below and the final 10% of the Actual Proceeds (the "<u>Balance</u>") available to Borrower as provided in subsection (d) below. Borrower shall utilize such Actual Proceeds only for the purposes of performing the Restoration Work and for no other purpose whatsoever, except as hereinafter set forth. If the estimated costs of the Restoration Work shall exceed the Actual Proceeds, the difference (the "<u>Excess Funds</u>") shall be deposited in the Restoration

Account. Such Excess Funds shall be applied toward the Restoration Work prior to the application of the Actual Proceeds, all in accordance with the disbursement procedures hereinafter provided. Any unexpended Actual Proceeds remaining after completion of the Restoration Work shall be paid over to Borrower, provided no Event of Default exists or is continuing.

(c)     Any Actual Proceeds held by Administrative Agent shall be paid by Administrative Agent to Borrower from time to time as the Restoration Work progresses, subject to the following terms, provisions and conditions:

(i)     If the Restoration Work is structural or if the cost of the Restoration Work is reasonably estimated to exceed $750,000, the Restoration Work shall be supervised by a registered architect or engineer and inspected by a consultant engaged by Administrative Agent at the sole cost and expense of Borrower (the "Inspector"). Before Borrower commences any Restoration Work, other than temporary Restoration Work to protect property or prevent interference with business, Administrative Agent shall have been furnished with and shall have approved (which approval shall not be unreasonably withheld or delayed) (i) an estimate of the cost of the Restoration Work accompanied by an architect's certification as to such costs and (ii) appropriate plans and specifications ("Plans") for the Restoration Work, it being nevertheless understood that said Plans shall provide for Restoration Work so that, upon completion thereof, the Project shall be comparable in character and equal in value and general utility to the Project prior to the damage or destruction. Borrower shall furnish Administrative Agent with evidence satisfactory to Administrative Agent that all portions of the Project so restored and/or repaired and their contemplated use fully comply with all Legal Requirements;

(ii)     Each request for payment shall be made upon seven (7) days' prior notice to Administrative Agent and shall be accompanied by certificates to be made by the Inspector or, if none shall be required, by an officer of Borrower, stating (aa) that all of the Restoration Work completed has been done in compliance with the approved Plans, if any be required under subsection (c)(i) above, and all Legal Requirements, (bb) that the sum requested is justly required to reimburse Borrower for payments by Borrower, or is justly due to the contractor, subcontractors, materialmen, laborers, engineers, architects or other Persons rendering services or materials for the Restoration Work (giving a brief description of such services and materials), and that (prior to the final completion of the Restoration Work) the requested payment does not exceed the greater of (x) the amount of the requested payment less the retainage required pursuant to the applicable general contract or subcontract or (y) 90% of the value of the Restoration Work performed which is the subject of the requested payment (hereinafter called the "Applicable Percentage") and that all sums previously paid out by Administrative Agent do not exceed the Applicable Percentage of the aggregate value of the Restoration Work done to the date of such certificate, (cc) that if the sum requested is to cover payment relating to repair and restoration of personal property required or relating to the Project, that title to the personal property items covered by the request for payment is vested in Borrower and (dd) that the amount of Actual Proceeds remaining in the hands of Administrative Agent shall be sufficient upon completion of the Restoration Work to pay for the same in full free and clear of Liens. Additionally, each request for payment shall contain a statement signed by an officer or authorized signatory of Borrower approving both the Restoration Work done to date and the Restoration Work covered by the request for payment in question; and

(iii)     Each request shall be accompanied by (aa) invoices or receipts, (bb) waivers of lien reasonably satisfactory to Administrative Agent covering that part of the Restoration Work for which payment or reimbursement is being requested and (cc) if required by Administrative Agent, a search prepared by the Title Company or other evidence satisfactory to Administrative Agent that there has not been filed with respect to the Project any mechanic's or other lien or instrument for the retention of title in respect of any part of the Restoration Work not discharged of record, or that will not be discharged in connection with the requested payment, by payment, bonding or otherwise. If available,

Administrative Agent may, at Administrative Agent's option, require an endorsement to the Title Policy insuring the continued priority of the lien of the Deed of Trust as to all sums advanced hereunder, such endorsement to be paid for by Borrower.

(d)     The Balance shall be paid to Borrower only after the Restoration Work has been fully completed and within seven (7) days following the furnishing by Borrower to Administrative Agent of (i) a copy of any certificate or certificates required by law to render occupancy and full operation of the Project legal and (ii) a certification by the Inspector, if applicable, as to completion in accordance with the approved Plans and Legal Requirements and an architect's certificate of completion in the form of AIA-G703.

(e)     At all times during the conduct of the Restoration Work, Borrower shall, at Borrower's sole cost and expense, obtain and cause to be maintained workmen's compensation and public liability insurance in amounts necessary to protect Borrower, Administrative Agent and Lenders from all liabilities, damages, claims or demands arising out of any accident or occurrence causing injury or death to any Person or property whatsoever. All insurance shall be with responsible insurance companies, licensed and authorized to transact business in the State of Texas and shall be written in forms, amounts and by companies reasonably satisfactory to Administrative Agent. The originals or certified copies of all Policies, together with original certificates or evidence thereof, shall be delivered to Administrative Agent. Renewals of such Policies shall be delivered to Administrative Agent at least ten (10) days before any such Policies shall expire. Nothing contained herein shall relieve Borrower from any requirement of this Agreement regarding the insuring of the Project.

(f)     Notwithstanding the terms and provisions of subsections (b), (c) and (d) hereof, in the event that (i) Borrower fails to commence the Restoration Work or to proceed diligently and continuously to completion of the Restoration Work, subject to force majeure delays, within twelve (12) months from the date the Project was damaged or destroyed, (ii) the damage or destruction occurs during the last six (6) months of the term of the Note, unless, in Administrative Agent's reasonable judgment, the required Restoration Work is capable of being completed by not later than ninety (90) days prior to the Maturity Date, (iii) the required Restoration Work is not capable of being completed within eighteen (18) months from the date the Project was damaged or destroyed, in Administrative Agent's reasonable judgment (provided rent or business interruption insurance is in effect for the entire period of reconstruction), or (iv) an Event of Default is continuing, the terms, provisions and condition of subsections (b), (c) and (d) hereof shall not apply and Administrative Agent's option as to the application of Insurance Proceeds shall continue to apply. During the continuance of an Event of Default, Insurance Proceeds may be applied by Administrative Agent in any manner determined by Administrative Agent in its sole and absolute discretion.

Section 8.4. Condemnation. Borrower shall promptly give Administrative Agent notice of the actual or threatened commencement of any proceeding for the Condemnation of the Project of which Borrower has knowledge and shall deliver to Administrative Agent copies of any and all papers served in connection with such proceedings. Administrative Agent and Lenders may participate in any such proceedings, and Borrower shall from time to time deliver to Administrative Agent all instruments requested by Administrative Agent to permit such participation. Borrower shall, at Borrower's sole cost and expense, diligently prosecute any such proceedings, and shall consult with Administrative Agent, Administrative Agent's attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. In the event of such condemnation proceedings, the Award payable is hereby assigned to and shall be paid to Administrative Agent. Administrative Agent shall be under no obligation to question the amount of any such Award and may accept the same in the amount in which the same shall be paid. The proceeds of any Award so received shall (except for a temporary taking the Award for which shall be paid over to Borrower), at the option of Administrative Agent, and in the absence of an

Event of Default, either be (i) applied to the prepayment of the Note and other sums due under the Loan Documents, or (ii) to the extent reasonably practicable, paid over to Borrower from time to time for expenses incurred by Borrower in the restoration of the Project and upon terms otherwise satisfactory to Administrative Agent, in Administrative Agent's sole and absolute discretion. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lenders, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lenders shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. To the extent the Project can be restored or repaired following any condemnation, and to the extent Borrower shall be entitled or permitted to do the same, if the Project or any portion thereof is taken by a condemning authority, Borrower shall promptly commence and diligently prosecute the restoration of the Project whether or not such Award is made available to Borrower. If the Project is sold, through foreclosure or otherwise, prior to the receipt by Lenders of the Award, Lenders shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt. Notwithstanding anything to the contrary contained herein, to the extent that the Project can be restored or repaired following any condemnation, as determined by Required Lenders in their sole and absolute good faith discretion, the awards or proceeds from any such condemnation shall be disbursed and paid over to Borrower in the same manner as set forth in Section 8.3 hereof with respect to Insurance Proceeds.

ARTICLE IX
INTENTIONALLY OMITTED

ARTICLE X
EVENTS OF DEFAULT; REMEDIES

Section 10.1. Event of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a)  if any portion of the Debt is not paid within five (5) days after the date the same is due, or if the entire Debt is not paid on or before the Maturity Date;

(b)  if Borrower shall fail to pay any other sum hereunder or under any of the other Loan Documents when and as the same shall become due and payable and such failure shall not be cured within fifteen (15) days after notice from Administrative Agent;

(c)  if the Policies are not kept in full force and effect, or if the Insurance Certificates or certified copies of the Policies are not delivered to Administrative Agent as provided in Section 8.1 hereof;

(d)  if Borrower breaches any covenant with respect to itself contained in Article VI hereof or if Borrower breaches any covenant contained in Article VII hereof, and same is not cured, if capable of being cured, within thirty (30) days after notice;

(e)  if any representation or warranty of any Person comprising Borrower or Guarantor, or with respect to, Borrower, Guarantor or any member, general partner, principal or beneficial owner of Borrower, made herein, in any other Loan Document, or in any certificate, report, financial statement or other instrument or document furnished to Administrative Agent at the time of the

45

closing of the Loan or during the term of the Loan shall have been false or misleading in any material respect when made;

(f)     if (i) Borrower or Guarantor shall commence any case, proceeding or other action (A) under any Creditors' Rights Laws, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Borrower or Guarantor shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower or Guarantor any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) other than an involuntary proceeding commenced by Administrative Agent or any Lender, there shall be commenced against Borrower or Guarantor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) Borrower or Guarantor shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) Borrower or Guarantor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

(g)     if there should occur a default which is not cured within the applicable grace or cure period, if any, under any other deed of trust encumbering all or part of the Project regardless of whether any such other deed of trust is prior or subordinate to the Deed of Trust or upon default in the performance of any term, provision, covenant or condition, which is not cured within the applicable grace or cure period, if any, under the notes evidencing such deeds of trust or any other documents executed in connection therewith; it being further agreed by Borrower that an Event of Default hereunder shall constitute an event of default under any such other deed of trust in respect of the Project held by Administrative Agent;

(h)     if Borrower shall be in default beyond applicable notice and grace periods under any other loan or financing arrangement between Borrower and any Lender, whether now or hereafter existing;

(i)     if any federal tax lien is filed against Borrower, Guarantor, Borrower Members or the Project and same is not discharged of record or bonded within thirty (30) days after the same is filed;

(j)     if a judgment is filed against Borrower, Guarantor, Borrower Members or the Project which (x) is in excess of $500,000 or (y) in the reasonable judgment of Administrative Agent would materially interfere with such Person's ability to perform its obligations under the Loan Documents to which it is a party, and which is not stayed, vacated, bonded or discharged within thirty (30) days after the same is filed;

(k)     if any Lien is filed or recorded against the Project or any interest therein *with the consent of Borrower* (but without the consent of Administrative Agent), and such Lien is not released within a period of five (5) days of the filing or recording thereof;

(l)     with the exception of Permitted Encumbrances, if any Lien is filed or recorded against the Project or any interest therein without the consent of Borrower or Administrative Agent and such Lien is not removed, discharged or bonded to the satisfaction of Administrative Agent within thirty (30) days of such filing or recording;

(m)     if Borrower, Guarantor or any Borrower Member shall breach any of the terms of:

    (i)     Section 5.14 (Liens);

    (ii)     Section 5.19 (Alterations);

    (iii)     Section 5.21 (Notices);

    (iv)     Section 5.23 (Limitations on Securities Issuances);

    (v)     Section 5.24 (Limitations on Distributions);

    (vi)     Section 5.25 (Contractual Obligations);

    (vii)     Section 5.26 (Additional Indebtedness);

    (viii)     Section 5.27 (Restrictions on Leasing);

    (ix)     Section 5.28 (Debt Service Coverage Ratio);

    (x)     Section 5.29 (Loan-to-Value Ratio);

    (xi)     Section 7.2 (No Sale/Encumbrance)

(n)     [Reserved.];

(o)     if Borrower or Guarantor shall continue to be in default under any other term, covenant or condition of this Agreement or any of the Loan Documents for more than ten (10) days after notice from Administrative Agent in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Administrative Agent in the case of any other default, provided that if such default cannot reasonably be cured within such thirty (30)-day period and Borrower or the applicable Guarantor shall have commenced to cure such default within such thirty (30)-day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30)-day period shall be extended for so long as it shall require Borrower or the applicable Guarantor in the exercise of due diligence to cure such default, it being agreed that no such extension shall (i) apply in the event of a default under Section 5.4 or Section 8.1 of this Agreement or (ii) be for a period in excess of one hundred (100) days in the aggregate;

(p)     if a default should occur under any Interest Rate Protection Product entered into by Borrower;

(q)     if there shall occur a default or event of default under the Guaranty which is not cured within any applicable grace or cure period, if any, or the Guaranty shall fail for any reason to be in full force of effect;

(r)     if there shall occur a default or event of default under the Environmental Indemnity Agreement which is not cured within any applicable grace or cure period, if any, or the Environmental Indemnity Agreement shall fail for any reason to be in full force of effect;

(s)     if an ERISA Event shall have occurred that, in the opinion of the Administrative Agent, when taken together with all other ERISA Events that have occurred, results in or could reasonably be expected to result in liability to Borrower in excess of $500,000;

47

(t)     if Borrower shall file a notice limiting the maximum principal amount that may be secured by the Deed of Trust to a sum less than the maximum principal amount set forth in <u>Section 3.12</u> thereof; or

(u)     if there shall be an Event of Default under the Mezzanine Loan Agreement or any other Mezzanine Loan Document by Mezzanine Borrower or any other Person obligated thereunder.

Section 10.2. <u>Remedies</u>.

(a)     Upon the occurrence of an Event of Default (other than an Event of Default described in <u>Section 10.1(f)</u> hereof) and at any time thereafter that such Event of Default is continuing Administrative Agent and/or Lenders may, in addition to any other rights or remedies available to Administrative Agent or Lenders pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Administrative Agent or Lenders deem advisable to protect and enforce Lenders' rights against Borrower, Guarantor and in the Project, including, without limitation, declaring the Debt to be immediately due and payable, and Administrative Agent and/or Lenders may enforce or avail themselves of any or all rights or remedies provided in the Loan Documents and may exercise all the rights and remedies of a secured party under the UCC, as adopted and enacted by the State where the Project is located, against Borrower, Guarantor and the Project, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in <u>Section 10.1(f)</u> hereof, the Debt and all other obligations of Borrower and Guarantor hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

(b)     Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Administrative Agent or Lenders against Borrower or Guarantor under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or Guarantor or at law or in equity may be exercised by Lenders at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Administrative Agent or Lenders shall have commenced any foreclosure proceeding or other action for the enforcement of Lenders' rights and remedies under any of the Loan Documents with respect to the Project. Any such actions taken by Administrative Agent or Lenders shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Administrative Agent or Lenders may determine in Administrative Agent's or Lenders' sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Administrative Agent or Lenders permitted by law, equity or contract or as set forth herein or in the other Loan Documents.

ARTICLE XI
REPLACEMENT OF LENDERS

If Borrower is entitled to replace a Lender pursuant to the Note (i.e., pursuant to (i) subsection (e) of the section titled "Increased Costs", or (ii) the section titled "Illegality"), Borrower may, upon notice to such Lender and Administrative Agent, replace such Lender by causing such Lender to assign its rights and obligations under this Agreement and the Note to one or more Eligible Assignees reasonably acceptable to Borrower and Administrative Agent. Borrower shall or shall cause the replacement lender to pay in full all principal, interest, fees and other amounts owing to such Lender through the date of replacement. The Lender being replaced and the replacement lender shall execute and deliver an Assignment and Assumption Agreement in the form attached hereto as <u>Exhibit B</u>. A Lender shall not be required to make any such assignment if, prior thereto, as a result of a waiver by such Lender or otherwise,

the circumstances entitling the Borrower to require such assignment cease to apply. If a Lender being replaced refuses to execute and deliver such Assignment and Assumption Agreement or otherwise comply with this <u>Article XI</u>, such Lender hereby appoints Administrative Agent as its attorney-in-fact to do so on such Lender's behalf. Administrative Agent shall distribute an amended Schedule 13.12, which shall thereafter be incorporated into this Agreement, to reflect adjustments to Lenders and their respective amount of the Loan.

<div align="center">

ARTICLE XII
SECONDARY MARKET; ASSIGNMENT; PARTICIPATION

</div>

Section 12.1. <u>Assignment; Participation</u>.

(a)      Any non-Defaulting Lender (as defined in <u>Section 13.16</u> hereof) may at any time grant to one or more parties (each a "<u>Participant</u>") participating interests in its Pro Rata Share (as hereinafter defined) of the Loan (the "<u>Participations</u>") and Lenders may syndicate the Loan ("<u>Syndication</u>"). In the event of any such grant by a Lender of a Participation to a Participant, such Lender shall remain responsible for the performance of such Lender's obligations hereunder, and Borrower and Administrative Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder. Any agreement pursuant to which any Lender may grant a Participation shall provide that such Lender shall retain the sole right and responsibility to enforce the obligations of Borrower, as the case may be, hereunder and under any other Loan Document, including, without limitation, the right to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document.

(b)      A Lender may at any time assign (x) to any Eligible Assignee with the consent of Administrative Agent, which consent shall not be unreasonably delayed, conditioned or denied, (y) to any other party with the consent of Administrative Agent, which consent may be withheld by Administrative Agent in Administrative Agent's sole and absolute discretion; *provided*, *however*, that as long as no Event of Default has occurred and is continuing, Borrower's consent shall also be required for an assignment pursuant to clauses (x) and (y) (each such assignee set forth in (x) and (y) above, a "<u>Consented Assignee</u>"), or (z) without such consent, to one or more Eligible Assignees which are affiliates, subsidiaries or a parent of a Lender (each Consented Assignee or subsidiary, affiliate or parent bank or institution, an "<u>Assignee</u>") all or a proportionate part of all of such Lender's rights and obligations under this Agreement and the Note, and such Assignee shall assume rights and obligations, pursuant to an Assignment and Assumption Agreement substantially in the form annexed hereto as <u>Exhibit B</u> and made a part hereof executed by such Assignee and the assigning Lender (duplicate executed originals of which shall be delivered to Borrower to the extent available). Upon (i) execution and delivery of such instrument, (ii) payment by such Assignee to the assigning Lender of an amount equal to the purchase price agreed between such Lender and such Assignee and (iii) with respect to a Consented Assignee, payment by such Assignee to Administrative Agent of a fee, for Administrative Agent's own account, in the amount of $5,000, such Assignee shall be a party to this Agreement and shall have all the rights and obligations of a Lender as set forth in such Assignment and Assumption Agreement, and the assigning Lender shall be released from such Lender's obligations hereunder to a corresponding extent, and no further consent or action by any party shall be required. If the Assignee is not incorporated under the laws of the United States or a state thereof, it shall, prior to the first date on which interest or fees are payable hereunder for its account, deliver to Borrower and Administrative Agent certification reasonably acceptable to Borrower as to exemption from deduction or withholding of any United States federal income taxes. Borrower shall not be required to reimburse any Lender for taxes or reimburse any Lender for any withholding due to such Lender's failure to deliver such certification, or due to the validity of such certification. Notwithstanding anything contained herein to the contrary, no Lender shall have the right to assign less than $5,000,000 of such Lender's interest under this Agreement and the other Loan

<div align="center">49</div>

Documents. For the purposes hereof, an "Eligible Assignee" shall mean any of (a) a commercial bank organized under the laws of the United States, or any state thereof or the District of Columbia, and having total assets in excess of $1,000,000,000; (b) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof or the District of Columbia, and having a net worth of at least $100,000,000, calculated in accordance with generally accepted accounting principles; (c) a commercial bank organized under the laws of any other country which is a member of the OECD, or a political subdivision of any such country and having total assets in excess of $1,000,000,000, provided that such bank is acting through a branch or agency located in the country in which it is organized or another country which is also a member of the OECD; (d) the central bank of any country which is a member of the OECD; (e) any other assignee that, in the reasonable judgment of Administrative Agent, is a reputable institutional investor with substantial experience in lending and originating loans similar to the Loan, or in purchasing, investing in or otherwise holding such loans, having a financial net worth of at least $100,000,000 and (f) any non-Defaulting Lender or any affiliate, subsidiary or parent of any non-Defaulting Lender. Neither Borrower, Guarantor nor any Affiliate or Subsidiary of Borrower or Guarantor shall be Eligible Assignee or Participant. Notwithstanding anything to the contrary contained herein, any Lender may at any time pledge or assign a security interest in all or any portion of its rights under the Loan, the Note and the other Loan Documents to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations under the Loan, the Note or any other Loan Document or substitute any such pledgee or assignee for such Lender as a party to the Loan, the Note or any Loan Document.

(c)     Borrower, Guarantor, Administrative Agent and Lenders shall execute such modifications to the Loan Documents as shall, in the reasonable judgment of Administrative Agent, be necessary or desirable in connection with assignments in accordance with the foregoing provisions of this Section 12.1 and which do not adversely affect Borrower or Guarantor or Borrower's or Guarantor's obligations or rights under the Loan Documents (other than to a de minimis extent).

(d)     Any Lender may at any time assign all or any portion of such Lender's rights under this Agreement and the Note to a Federal Reserve Bank. No such assignment shall release the transferor Lender from its obligations hereunder.

(e)     Borrower recognizes that in connection with a Lender's selling of Participations or making of assignments, any or all documentation, financial statements, appraisals and other data, or copies thereof, relevant to Borrower, Guarantor or the Loan may be exhibited to and retained by any such Participant or Assignee or prospective Participant or Assignee. Borrower hereby consents to the release of any and all Borrower information to such parties, and holds Administrative Agent and Lenders harmless from any and all liability due to the release of Borrower's financial information by Administrative Agent or any Lender to any such party. Administrative Agent and Lenders shall instruct such Participant or Assignee to keep such information confidential but Administrative Agent and Lenders shall have no liability if such Participant or Assignee fails to do so.

(f)     Borrower and Guarantor agree to cooperate with Lenders in connection with any sale or transfer of the Loan, Syndication or any Participation created pursuant to this Article XII. At the request of the holder of the Note and, to the extent not already required to be provided by Borrower or Guarantor under this Agreement, Borrower and Guarantor shall take such reasonable actions for the benefit of, and use reasonable efforts to provide information not in the possession of, the holder of the Note in order to satisfy the market standards (which may include such holder's delivery of information with respect to Borrower, Guarantor and the Project to any Participant or Assignee or prospective Participant or Assignee) to which the holder of the Note customarily adheres or which may be reasonably required in the marketplace in connection with such sales or transfers, including, without limitation, to:

50

(i)     provide (x) updated financial, budget and other information with respect to the Project, Borrower, Guarantor and Manager and (y) modifications and/or updates to the appraisals, market studies, Environmental Reports (including Phase I reports and, if appropriate, Phase II reports) of the Project obtained in connection with the making of the Loan (all of the foregoing being referred to as the "Provided Information"), together, if customary, with appropriate verification and/or consents of the Provided Information;

(ii)    make non-material changes to the Organizational Documents of Borrower, Guarantor or its principals;

(iii)   upon reasonable prior notice, permit site inspections, appraisals, market studies and other due diligence investigations of the Project, as may be reasonably requested by the holder of the Note or as may be necessary in connection with the Participations or Syndications;

(iv)    make the representations and warranties with respect to the Project, Borrower, Guarantor, Manager and the Loan Documents as such Persons have made in the Loan Documents and such other representations and warranties with respect to the Project, Borrower, Guarantor and Manager, as may be reasonably requested by the holder of the Note;

(v)     execute such amendments to the Loan Documents as may be requested by the holder of the Note including, without limitation, bifurcation of the Loan into two or more components and/or separate notes and/or creating a senior/subordinate note structure; *provided*, *however*, that Borrower and Guarantor shall not be required to modify or amend any Loan Document if such modification or amendment would (x) change the interest rate or the stated maturity set forth in the Note, except in connection with a bifurcation of the Loan which may result in varying fixed interest rates and amortization schedules, but which shall have the same initial weighted average coupon of the original Note, (y) in the reasonable judgment of Borrower modify or amend any other economic term of the Loan, or (z) in the reasonable judgment of Borrower or Guarantor increase Borrower's or Guarantor's obligations and liabilities under the Loan Documents, other than to a *de minimis* extent; and

(vi)    have reasonably appropriate personnel participate in a bank meeting and/or presentation for the potential Participants or Lenders.

(g)     At the option of Lenders, the Loan may be serviced by a servicer/trustee selected by Lenders ("Servicer") and Lenders may delegate all or any portion of Lenders' responsibilities under this Agreement and the other Loan Documents to such servicer/trustee pursuant to a servicing agreement between Lenders and such servicer/trustee. Lenders shall provide Borrower with notice of same. At no time shall there be more than one (1) Servicer.

(h)     All third party costs and expenses incurred by Borrower, Guarantor or Lenders in connection with Borrower's or Guarantor's complying with the requests and requirements made under this Article XII shall be paid by Lenders (and not by Borrower).

Section 12.2. Intralinks. Borrower hereby acknowledges that Administrative Agent will make available to Lenders all information provided by or on behalf of Borrower or Guarantor hereunder or under the other Loan Documents (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks® or another similar electronic system (the "Platform").

ARTICLE XIII
AGENT

Section 13.1. Appointment, Powers and Immunities.

51

(a)     Each Lender hereby designates, appoints and authorizes Administrative Agent to act as agent hereunder and under the other Loan Documents to which Administrative Agent is a party in its capacity as Administrative Agent (this Agreement and such other Loan Documents, the "Administrative Agent Loan Documents") with such powers as are specifically delegated to Administrative Agent by the terms of this Agreement and such Loan Documents, together with such other powers as are reasonably incidental thereto. Administrative Agent (a) shall have no duties or responsibilities except those expressly set forth in this Agreement and in the other Administrative Agent Loan Documents, and shall not by reason of this Agreement or any other Administrative Agent Loan Document be a trustee or fiduciary for any of Lenders; (b) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose Administrative Agent to liability or that is contrary to any Loan Document or applicable law; (c) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity; (d) shall not be responsible to Lenders for or have any duty to ascertain or inquire into (i) any recitals, statements, representations or warranties contained in this Agreement, any other Administrative Agent Loan Document, or in any certificate or other document referred to or provided for in, or received by any Lenders under, this Agreement or any other Administrative Agent Loan Document, (ii) the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Administrative Agent Loan Document or any other document referred to or provided for herein or therein, (iii) any failure by Borrower to perform any of such party's obligations hereunder or thereunder, or (iv) the satisfaction of any condition set forth herein, other than to confirm receipt of items expressly required to be delivered to Administrative Agent; and (e) shall not be responsible to Lenders for any action taken or omitted to be taken by Administrative Agent hereunder or under any other Administrative Agent Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith, except for Administrative Agent's own gross negligence or willful misconduct or the failure of Administrative Agent to follow the directions of the Required Lenders or all of the Lenders, as the case may be, as provided for herein.

(b)     To the extent that any action is to be taken, any information is to be delivered to or by any Lender, any determination is to be made, or any consent is to be given or withheld by any Lender, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Administrative Agent or any successor agent thereto at the direction of the Required Lenders or all of the Lenders, as the case may be, as provided for herein.

(c)     Administrative Agent may employ agents and attorneys-in-fact and shall not be responsible for the negligence or misconduct of any such agents or attorneys-in-fact selected by Administrative Agent in good faith. Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by Administrative Agent. Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory provisions of this Section 13.1 shall apply to any such sub-agent and to the Affiliates of Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

(d)     Administrative Agent may deem and treat the payee of any note as the holder thereof for all purposes hereof unless and until Administrative Agent shall have been notified of the assignment thereof.

Section 13.2. Reliance by Administrative Agent. Administrative Agent shall be entitled to rely upon, and shall incur no liability under or in respect of any of the Loan Documents by acting upon, any certification, consent, warranty, notice or other paper, instrument or communication (including any thereof by telephone, telecopy, e-mail, telex, telegram or cable) believed by Administrative Agent in good faith to be genuine and authentic and to have been signed or sent by or on behalf of the proper Persons, and upon advice and statements of legal counsel, independent accountants or other experts selected by Administrative Agent in good faith. As to any matters not expressly provided for by this Agreement or any other Administrative Agent Loan Document, Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder or thereunder in accordance with instructions given by Lenders holding sixty-six and two-thirds percent (66 2/3%) or more of the outstanding principal balance of the Loan (the "Required Lenders"), and such instructions of Administrative Agent and any action taken or not taken pursuant thereto shall be binding on all Lenders. Notwithstanding anything contained herein to the contrary, the consent of all of the Lenders (other than a Defaulting Lender) shall be required before Administrative Agent may take or not take any action with respect to the following:

(a)     any increase or decrease in the total principal amount of the Loan;

(b)     reductions in any interest rate (other than default rate interest) applicable to the Loan or any fees (other than late fees) required under this Agreement or any other Loan Document;

(c)     the extension of the Maturity Date of the Note or the due date of any payment due under the Note (other than default interest or late fees);

(d)     the release of all or substantially all of the Project (except as provided for herein and in the other Loan Documents);

(e)     the release of Borrower or Guarantor from Borrower's or such Guarantor's obligations under this Agreement or any other Loan Document; and

(f)     any amendment or modification of any of the provisions of Article XII or this Article XIII.

In the event Administrative Agent sends a notice to any Lender recommending any action (or inaction) to be taken under this Agreement or any other Loan Document and such Lender does not respond to Administrative Agent within ten (10) Business Days of the date of Administrative Agent's notice to such Lender, such Lender shall be deemed to have consented to the action (or inaction) being recommended by Administrative Agent.

Section 13.3. Purchase of Disapproving Lender's Interest.

(a)     In the event Administrative Agent makes a recommendation to Lenders to take any action requiring unanimous consent pursuant to Section 13.2 hereof (which recommendation may be made at any time and for any number of times), and one or more Lenders approve such recommendation (the "Approving Lenders") and one or more Lenders disapprove such recommendation (the "Disapproving Lenders"), one or more of the Approving Lenders shall have the right (but not the obligation), in such Approving Lender's sole and absolute discretion, to purchase the interest of the Disapproving Lender in full within thirty (30) days of such disapproval, upon the payment to Administrative Agent of all principal, accrued interest, default interest (but not the payment of any

53

applicable prepayment premium) due to such Disapproving Lender hereunder, and all amounts advanced by such Disapproving Lender as protective advances under the Deed of Trust as of the date of sale (collectively, the "Purchase Price"), whereupon such Disapproving Lender shall accept payment. In such event, and concurrently with the payment of the Purchase Price, such Disapproving Lender shall assign all of such Disapproving Lender's right, title and interest in and to the Loan and the Loan Documents to the Approving Lender purchasing such Disapproving Lender's interest, without recourse, representation, warranty or covenant, express or implied, of any kind or nature whatsoever, except that such Disapproving Lender has not assigned or encumbered such Lender's rights in the Loan and the Loan Documents.

(b)     Any sale pursuant to Section 13.3(a) hereof shall be made pursuant to documents reasonably satisfactory to Administrative Agent and the purchasing Approving Lender which shall provide, among other things, that the purchasing Approving Lender shall assume all of the obligations of such Disapproving Lender thereafter accruing under the Loan Documents and indemnify such Disapproving Lender from any claims or causes of actions that may arise after the closing date of such sale in connection with the Loan Documents (other than any claims or causes of action that may arise or be brought by Borrower or any third party as the result of the gross negligence or willful misconduct of such Disapproving Lender). The purchasing Approving Lender's right to purchase such Disapproving Lender's interest may be exercised by notice to Administrative Agent of the purchasing Approving Lender's intention to do so and payment by wire transfer of the Purchase Price.

(c)     If there is more than one Approving Lender that elects to purchase a Disapproving Lender's interest in the Loan, Administrative Agent shall apportion such Disapproving Lender's interest among such Approving Lenders in proportion to their Pro Rata Share.

Section 13.4. <u>Rights of Administrative Agent as Lender</u>. With respect to its interest in the Loan, Administrative Agent in its capacity as a Lender hereunder shall have the same rights and powers hereunder as any other Lender and may exercise the same as though it were not acting as Administrative Agent, and the terms "Lender" and "Lenders" shall include Administrative Agent in its capacity as a Lender. Administrative Agent and Administrative Agent's affiliates may (without having to account therefor to any Lender) accept deposits from, lend money to (on a secured or unsecured basis), and generally engage in any kind of banking, trust or other business with Borrower (and any of Borrower Affiliates) as if it were not acting as Administrative Agent. Lenders and Lenders' Affiliates may (without having to account therefor to any other Lender or Administrative Agent) accept deposits from, lend money to (on a secured or unsecured basis), and generally engage in any kind of banking, trust or other business with Borrower (and any affiliates of them) as if it were not acting as Lender hereunder.

Section 13.5. <u>Indemnification</u>.

(a)     Lenders agree to indemnify Administrative Agent (to the extent not reimbursed by Borrower and Guarantor hereunder and without limiting any obligations of Borrower hereunder) ratably, in accordance with their Pro Rata Shares, for any and all reasonable costs, fees, expenses, advances, interest, payments and claims of any kind and nature whatsoever that may be imposed on or incurred by Administrative Agent arising out of or by reason of any investigation in or in any way relating to or arising out of this Agreement or the transactions contemplated hereby (including, without limitation, the actual out-of-pocket costs and expenses that Administrative Agent is obligated to pay hereunder) or the servicing, administration and/or enforcement of the Loan, this Agreement and/or the Loan Documents (collectively, "Costs") provided that no Lender shall be liable for any of the foregoing Costs to the extent such Costs arise from the gross negligence or willful misconduct of Administrative Agent (as determined by a court of competent jurisdiction from which all appeal has been exhausted) or the failure of Administrative Agent to follow the directions of the Required Lenders or all of the Lenders, as the case

may be. The foregoing indemnity shall survive the payment of the obligations owing hereunder and the termination or non-renewal of this Agreement.

(b)     Any request by Administrative Agent for reimbursement of Costs shall be in the form of a certificate from Administrative Agent to each Lender as to the nature and amount for which Administrative Agent claims reimbursement from Lenders pursuant to this Section 13.5. Any such request shall include reasonable evidence that such Costs meet the criteria set forth in Subsection 13.5(a) hereof and have been incurred by Administrative Agent.

(c)     Any Costs which are required to be reimbursed by Lenders to Administrative Agent in accordance with this Section 13.5 and which are not reimbursed to Administrative Agent within three (3) Business Days after demand therefor in accordance with Subsection 13.5(b) hereof shall accrue interest at the Federal Funds Rate from and after the fourth (4th) Business Day after the date that such reimbursement request was made through and including the date of reimbursement by such Lender.

(d)     Any Costs which are subsequently recovered from Borrower or any other Person shall be returned to each Lender in proportion to the Pro Rata Share of said Costs previously remitted by each Lender to Administrative Agent.

Section 13.6. Non-Reliance on Administrative Agent and Other Lenders. Each Lender agrees that such Lender has, independently and without reliance on Administrative Agent or any of the other Lenders, and based on such documents and information as such Lender has deemed appropriate, made such Lender's own credit analysis of Borrower and has made such Lender's own decision to enter into this Agreement and the other Loan Documents and that such Lender shall, independently and without reliance upon Administrative Agent or any of the other Lenders, and based on such documents and information as such Lender shall deem appropriate at the time, continue to make such Lender's own analysis and decisions in taking or not taking action under this Agreement and the other Loan Documents. Other than determining whether payments due to Administrative Agent under the Loan Documents have in fact been made, Administrative Agent shall not be required to keep itself informed as to the performance or observance by Borrower of any term or provision of this Agreement or any of the other Loan Documents or any other document referred to as provided for herein or therein or to inspect the properties or books of Borrower. Administrative Agent shall provide each Lender with any information received by Administrative Agent from Borrower which is required to be provided to Lenders hereunder and with a copy of any notice of default received by Administrative Agent from Borrower or any Lender. Except for notices, reports and other documents expressly required to be furnished to Lenders by Administrative Agent hereunder or under any other Administrative Agent Loan Document, Administrative Agent shall not have any duty or responsibility to provide any Lender with any other credit or other information concerning the affairs, financial condition or business of Borrower that may come into the possession of Administrative Agent.

Section 13.7. Failure to Act. Except for action expressly required of Administrative Agent hereunder or under any of the other Administrative Agent Loan Documents, Administrative Agent shall in all cases be fully justified in failing or refusing to act hereunder and thereunder unless Administrative Agent shall receive further assurances to Administrative Agent's complete satisfaction from Lenders of their indemnification obligations under Section 13.5 hereof against any and all liability and expense that may be incurred by Administrative Agent by reason of Administrative Agent taking or continuing to take or failing to take any such action.

Section 13.8. Action by Administrative Agent. Each of the entities comprising Lenders hereby appoints Administrative Agent and each of the other Lenders as agent and bailee for the purpose of perfecting the security interests in and liens upon the Project, in accordance with Article 9 of the Uniform

Commercial Code in effect in the State where the Project is located or the State where Borrower is organized, can be perfected only by possession (or where the security interest of a secured party with possession has priority over the security interest of another secured party). Each Lender hereby appoints Administrative Agent as such Lender's attorney-in-fact for the purpose of executing the Loan Documents (other than this Agreement) on such Lender's behalf.

Section 13.9. <u>Successor Administrative Agent</u>. Administrative Agent may resign as Administrative Agent upon thirty (30) days' written notice to Lenders. If Administrative Agent resigns under this Agreement, Lenders (other than the Lender which is the Administrative Agent resigning) shall appoint from among the other Lenders a successor agent for Lenders. If no successor agent is appointed prior to the effective date of the resignation of Administrative Agent, Administrative Agent may appoint, after consulting with Lenders (other than the Lender which is the Administrative Agent resigning), a successor agent from among such other Lenders. Upon the acceptance by the Lender so selected of such Lender's appointment as successor agent hereunder, such successor agent shall succeed to all of the rights, powers and duties of the retiring Administrative Agent and the term "Administrative Agent" as used herein and in the other Loan Documents shall mean such successor agent and the retiring Administrative Agent's appointment, powers and duties as Administrative Agent shall be terminated. After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this <u>Article XIII</u> shall inure to such retiring Administrative Agent's benefit as to any actions taken or omitted by such retiring Administrative Agent while such retiring Administrative Agent was Administrative Agent under this Agreement. If no successor agent has accepted appointment as Administrative Agent by the date which is thirty (30) days after the date of a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nonetheless thereupon become effective and Lenders shall perform all of the duties of Administrative Agent hereunder until such time, if any, as the Lenders (other than the Lender which has resigned as Administrative Agent) appoint a successor agent as provided for above. The resigning Administrative Agent shall have continuing liability for any act of gross negligence or willful misconduct committed by Administrative Agent during the period such Administrative Agent was the Administrative Agent under this Agreement.

Section 13.10. <u>Sharing</u>. If at any time or times any Lender shall receive (i) by payment, foreclosure, setoff or otherwise, any proceeds of the Project or other collateral or any payments with respect to the obligations of Borrower to such Lender arising under, or relating to, this Agreement or any of the Loan Documents except for any such proceeds or payments received by such Lender from Administrative Agent or otherwise pursuant to the terms of this Agreement, or (ii) payments from Administrative Agent hereunder in excess of such Lender's ratable portion of the relevant distributions by Administrative Agent hereunder, such Lender shall promptly turn the same over to Administrative Agent, in kind, and with such endorsements as may be required to negotiate the same to Administrative Agent, or in same day funds, as applicable, for the account of all of the Lenders and for application to the obligations hereunder in accordance with the applicable provisions of this Agreement.

Section 13.11. <u>Pro Rata Treatment and Payments</u>.

(a)   <u>Funding by Lenders; Presumption by Administrative Agent</u>. With respect to any advance required or deemed necessary by Administrative Agent under this Agreement or any other Loan Document (each, a "<u>Coverage Advance</u>"), Administrative Agent shall give each Lender not less than three (3) Business Days' notice by telephone and facsimile specifying the amount of the Coverage Advance, the date of the Coverage Advance and each Lender's Pro Rata Share of such Coverage Advance. Each Lender shall wire transfer to Administrative Agent immediately available federal funds equal to such Lender's Pro Rata Share of each Coverage Advance by 11:00 a.m. (New York City time) on the day of the Coverage Advance as set forth in the notice. Unless Administrative Agent shall have received notice from a Lender prior to the proposed date of any Coverage Advance that such Lender will not make

4161624-v7\CHIDMS1

001012

available to Administrative Agent such Lender's Pro Rata Share of such Coverage Advance, Administrative Agent may assume that such Lender has made such Pro Rata Share available on such date in accordance with this Section and may, in reliance upon such assumption, make available to Borrower a corresponding amount. In such event, if a Lender has not in fact made its Pro Rata Share of the applicable Coverage Advance available to Administrative Agent, then the applicable Lender and Borrower severally agree to pay to Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to Borrower to but excluding the date of payment to Administrative Agent, at (i) in the case of a payment to be made by such Lender, a rate (the "Lender Interest Rate") equal to the greater of (x) the sum of (1) the Federal Funds Rate in effect from time to time and (2) one percent (1%) per annum and (y) a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation, and (ii) in the case of a payment to be made by Borrower, the Interest Rate. If Borrower and such Lender shall pay such interest to Administrative Agent for the same or an overlapping period, Administrative Agent shall promptly remit to Borrower the amount of such interest paid by Borrower for such period. If such Lender pays its Pro Rata Share of the applicable Coverage Advance to Administrative Agent, then the amount so paid shall constitute such Lender's Pro Rata Share of the applicable Coverage Advance. Any payment by Borrower shall be without prejudice to any claim Borrower may have against a Lender that shall have failed to make such payment to Administrative Agent.

(b)      Notices. Notices to each Lender shall be delivered in accordance with the terms and provisions of Section 15.1 hereof.

Section 13.12. Lenders Pro Rata Shares. Each Lender shall be entitled to receive, and Administrative Agent shall transfer to each Lender, each Lender's Pro Rata Share of all payments received and collected by Administrative Agent pursuant to the Loan Documents on account of principal and interest (collectively, "Debt Service Payments") and other sums, whether received from Borrower or any third party, excluding, however, any sums payable to Administrative Agent on account of expenses incurred by Administrative Agent for which Borrower is obligated to reimburse Administrative Agent pursuant to the Loan Documents to the extent that any Lender has not made a payment on account thereof pursuant to Section 13.5 hereof. For the purposes hereof, "Pro Rata Share" means, with respect to any Lender, the percentage obtained by dividing (a) the principal amount of the Loan attributable to such Lender as set forth on Schedule 13.12 annexed hereto and made a part hereof, as adjusted for any repayments of principal received by such Lender pursuant to this Agreement, by (b) the then outstanding aggregate principal amount of the Loan.

Section 13.13. Disbursement of Proceeds by Administrative Agent.

(a)      Administrative Agent shall hold each Lender's Pro Rata Share of any proceeds payable under the Loan, however received, as agent of and in trust for each of such Lenders subject to each of such Lenders' rights with respect thereto as herein set forth.

(b)      All sums received and collected by Administrative Agent pursuant to the Loan Documents on account of Debt Service Payments and other sums which are collected by 11:00 a.m. (New York City time) shall be paid to each Lender on the date of collection; all such sums collected by Administrative Agent after 11:00 a.m. (New York City time) shall be paid to each Lender on or before the next succeeding Business Day. Administrative Agent shall allocate and disburse to each Lender all payments received in proportion to each Lender's Pro Rata Share. All payments made by Administrative Agent to Lenders shall be made by deposit of immediately available funds pursuant to the wiring instructions set forth on the signature page hereof or as otherwise set forth in a written notice delivered from any Lender to Administrative Agent.

4161624-v7\CHIDMS1

001013

(c)     Unless Administrative Agent shall have received notice from Borrower prior to the date on which any payment is due to Administrative Agent for the account of the Lenders hereunder that Borrower will not make such payment, Administrative Agent may assume that Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption and pursuant to the foregoing paragraphs, distribute to the Lenders the amount due. In such event, if Borrower has not in fact made such payment or for any reason such payment is required to be returned to Borrower or paid to any other Person pursuant to any bankruptcy or insolvency law, any sharing clause in the Loan Documents or otherwise, then each of the Lenders severally agrees to repay to Administrative Agent forthwith on demand the amount so distributed to such Lender, without interest thereon, unless Administrative Agent is required to return such amount with interest thereon, in which case, with interest thereon at the Lender Interest Rate for each day from and including the date such amount is distributed to such Lender to but excluding the date of payment to Administrative Agent, unless such payment was made as a result of the gross negligence or willful misconduct of Administrative Agent, in which case Lenders shall not pay any interest on such payment.

(d)     The transfer of funds to any Lender by Administrative Agent is made on a nonrecourse basis. Administrative Agent shall have no duty or obligation whatsoever to make any payments to any Lender except from corresponding payments received by Administrative Agent from Borrower or any other Person pursuant to the Loan Documents.

Section 13.14. <u>Amendments Concerning Agency Function</u>. Notwithstanding anything to the contrary contained in this Agreement, Administrative Agent shall not be bound by any waiver, amendment, supplement or modification of this Agreement or any other Loan Document which affects Administrative Agent's duties, rights, and/or functions hereunder or thereunder unless Administrative Agent shall have given Administrative Agent's prior written consent thereto.

Section 13.15. <u>Events of Default</u>.

(a)     Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Event of Default unless and until Administrative Agent has received written notice from a Lender or Borrower specifying such Event of Default.

(b)     In the event of the occurrence of an Event of Default and if Administrative Agent, in Administrative Agent's sole and absolute discretion, determines that any action is to be taken by Administrative Agent on behalf of Lenders in connection therewith, Administrative Agent shall send a notice (the "<u>Action Notice</u>") to each Lender recommending a course of action (which may include a recommendation to refrain from taking any action) and Lenders shall promptly consult in good faith to either confirm Administrative Agent's suggested course of action (or inaction) or to arrive at a course of action which shall be mutually acceptable to all Lenders in their reasonable discretion. Such course of action shall address, amongst other issues, (i) the exercise of remedies and the manner in which a foreclosure or additional remedies shall be conducted, (ii) the interests of all of the Lenders at a foreclosure sale or auction and whether Lenders or their nominees shall succeed to title to the Project or any other collateral and (iii) issues pertaining to the operation, management, maintenance, leasing and/or the sale of the Project or any other collateral. Administrative Agent shall promptly and diligently implement any such agreed upon course of action (or inaction) on behalf of Lenders. Notwithstanding anything to the contrary contained herein, if Lenders are unable to agree on a course of action (or inaction) within ten (10) Business Days of the date of the Action Notice, Administrative Agent shall have the right (but not the obligation), upon notice to Lenders, to take such course of action (or refrain from taking such action) as Administrative Agent deems appropriate and Administrative Agent may continue to proceed on such course of action, or refrain from taking such action, until Administrative Agent receives notice to the contrary from the Required Lenders ("<u>Agent Discretion Standard</u>"). Provided and on condition that

4161624-v7\CHIDMS1

001014

Administrative Agent has acted in accordance with this <u>Subsection 13.15(b)</u> and the Agent Discretion Standard, Lenders hereby acknowledge and agree that Administrative Agent shall have no obligation to take any action unless failure to do so would be grossly negligent or rise to the level of willful misconduct.

(c)     Provided that Lenders have agreed to a foreclosure or auction in accordance with <u>Subsection 13.15(b)</u> hereof (or Administrative Agent has exercised the Agent Discretion Standard), upon a foreclosure sale or auction and subject to the terms and provisions of this Agreement, Administrative Agent shall have the right to bid at the foreclosure sale or auction on behalf of Lenders. Any bid entered by Administrative Agent in an amount not in excess of the total indebtedness due under the Note plus expenses and all other amounts which are recoverable from the proceeds of the sale (collectively, the "<u>Judgment Amount</u>") shall be deemed to have been entered on behalf and for the benefit of Lenders, and, if such bid is the successful bid, Administrative Agent shall cause a referee's deed (as to the Project) or the applicable title instrument (as to all other collateral) to be issued to Administrative Agent (or Administrative Agent's nominee) in trust for Lenders, and Administrative Agent (or Administrative Agent's nominee) shall hold title subject to the terms and provisions of <u>Subsection 13.15(d)</u> and <u>Subsection 13.15(e)</u> hereof on behalf of, and as trustee for, Lenders.

(d)     Administrative Agent and Lender hereby acknowledge and agree that if title to (i) the Project or (ii) any other collateral is obtained by Administrative Agent (or Administrative Agent's nominee) for the benefit of Administrative Agent and Lenders, such asset(s) shall not be held as a permanent investment, but shall be marketed and sold as soon as possible, taking into account then current economic and market conditions. Subject to <u>Subsection 13.15(b)</u> hereof, each Lender shall, upon demand therefor from time to time, contribute such Lender's Pro Rata Share of all costs, fees and expenses (including, without limitation, attorney's fees and disbursements) suffered or incurred by Administrative Agent (or Administrative Agent's nominee) in connection with the operation, management, maintenance, leasing and/or sale of all or any part of the Project or any other collateral. Funds received from the ownership, operation or sale of the Project or any other collateral (net of operating expenses or transaction costs in connection with such ownership, operation or sale) shall constitute Debt Service Payments and shall be applied first, to reimburse Administrative Agent for any Costs, and thereafter, in accordance with <u>Section 13.13</u> hereof. Lenders shall consult with Administrative Agent and attempt to determine a mutually acceptable course of action relating to, but not limited to, the management, operation and leasing of the Project and any other collateral as well as the sale of the Project and any other collateral; *provided*, *however*, if Lenders cannot agree on a mutually acceptable course of action, Administrative Agent shall have the right (but not the obligation) to apply the Agent Discretion Standard upon notice to Lenders.

(e)     Notwithstanding anything to the contrary contained herein, each Lender shall have the right to enter a bid in an amount in excess of the Judgment Amount and, if such bid is the successful bid, such Lender shall acquire the Project or other collateral, as the case may be, for such Lender's own account and, provided and on the condition that the non-bidding party is, by not later than the date of delivery to the bidding party (or such bidding party's nominee) of the referee's deed or other title instrument, paid in full all amounts owed to the non-bidding party under the Loan and this Agreement, the non-bidding party shall have no further interest in the Project or other collateral, as the case may be, and the terms and provisions of <u>Subsection 13.15(b)</u> hereof shall be null and void and of no further force or effect.

Section 13.16. <u>Defaulting Lender</u>.

(a)     In addition to the rights and remedies that may be available to Administrative Agent or Borrower under this Agreement or applicable law, if at any time any Lender has not performed such Lender's obligations under this Agreement or any of the other Loan Documents (a "<u>Defaulting</u>

Lender") and such default continues for twenty (20) days after notice, such Defaulting Lender's right to participate in the administration of the Loan, this Agreement and the other Loan Documents, including, without limitation, any right to vote in respect of, to consent to or to direct any action or inaction of Administrative Agent or to be taken into account in the calculation of the Required Lenders, shall be suspended while such Lender remains a Defaulting Lender. If any Lender is a Defaulting Lender because such Lender has failed to make timely payment to Administrative Agent of any amount required to be paid to Administrative Agent hereunder, in addition to other rights and remedies which Administrative Agent or Borrower may have under the immediately preceding provisions or otherwise, Administrative Agent shall be entitled (i) to collect interest from such Defaulting Lender on such delinquent payment for the period from the date on which the payment was due until the date on which the payment is made at the Lender Interest Rate, (ii) to withhold or setoff and to apply in satisfaction of the defaulted payment and any related interest, any amounts otherwise payable to such Defaulting Lender under this Agreement or any other Loan Document until such defaulted payment and related interest has been paid in full and such default no longer exists and (iii) to bring an action or suit against such Defaulting Lender in a court of competent jurisdiction to recover the defaulted amount and any related interest. Any amounts received by Administrative Agent in respect of a Defaulting Lender shall not be paid to such Defaulting Lender and shall be held uninvested by Administrative Agent and either applied against the purchase price of such Defaulting Lender's interest in the Loan under Subsection 13.16(b) hereof or paid to such Defaulting Lender upon the default of such Defaulting Lender being cured.

(b)       Any Lender that is not a Defaulting Lender shall have the right, but not the obligation, in such Lender's sole and absolute discretion, to acquire all of a Defaulting Lender's interest in the Loan (the "Defaulting Lender's Interest") during the continuance of the applicable default. Upon any such purchase, the Defaulting Lender's Interest and the Defaulting Lender's rights hereunder (but not the Defaulting Lender's liability in respect thereof or under the Loan Documents or this Agreement to the extent the same relate to the period prior to the effective date of the purchase) shall terminate on the date of purchase, and the Defaulting Lender shall promptly execute all documents reasonably requested to surrender and transfer such interest to the purchaser thereof, including an assignment substantially in form and substance as set forth in Exhibit B annexed hereto and made a part hereof. The purchase price for the Defaulting Lender's Interest shall be equal to the amount of the principal balance of the Loan outstanding and owed by Borrower to the Defaulting Lender. The purchaser shall pay to the Defaulting Lender in immediately available funds on the date of such purchase the principal of and accrued and unpaid interest and fees with respect to the Defaulting Lender's Interest (it being understood that such accrued and unpaid interest and fees may be paid pro rata to the purchasing Lender and the Defaulting Lender by the Administrative Agent at a subsequent date upon receipt of payment of such amounts from Borrower). Prior to payment of such purchase price to a Defaulting Lender, Administrative Agent shall apply against such purchase price any amounts retained by Administrative Agent pursuant to the last sentence of Subsection 13.16(a) hereof. The Defaulting Lender shall be entitled to receive amounts owed to such Defaulting Lender by Borrower under the Loan Documents which accrued prior to the date of the default by the Defaulting Lender, to the extent the same are received by Administrative Agent from or on behalf of Borrower. There shall be no recourse against any Lender or Administrative Agent for the payment of such sums except to the extent of the receipt of payments from any other party or in respect of the Loan.

(c)       Nothing contained in this Section 13.16 or elsewhere in this Agreement shall release or in any way limit a Defaulting Lender's obligations as a Lender hereunder and/or under any other of the Loan Documents. Further, a Defaulting Lender shall indemnify and hold harmless Borrower, Administrative Agent and each of the non-Defaulting Lenders from any claim, loss, or costs incurred by Borrower, Administrative Agent and/or the non-Defaulting Lenders as a result of a Defaulting Lender's failure to comply with the requirements of this Agreement, including, without limitation, any and all additional losses, damages, costs and expenses (including, without limitation, attorneys' fees and

disbursements) incurred by Borrower, Administrative Agent and/or any Lender as a result of and/or in connection with (i) any enforcement action brought by Borrower and/or Administrative Agent against a Defaulting Lender and (ii) any action brought against Borrower, Administrative Agent and/or Lenders by a Defaulting Lender. The indemnification provided above shall survive any termination of this Agreement.

Section 13.17. <u>Servicing Fee</u>. Administrative Agent shall be entitled, on a monthly basis, to a servicing fee in an amount to be determined by Administrative Agent based on a percentage of the outstanding principal balance of the Loan (the "<u>Servicing Fee</u>"). Lenders hereby irrevocably authorize Administrative Agent to deduct the Servicing Fee monthly from the Debt Service Payments to be made to Administrative Agent.

<div align="center">

ARTICLE XIV
INDEMNIFICATIONS

</div>

Section 14.1. <u>General Indemnification</u>. Borrower shall indemnify, defend and hold harmless the Indemnified Parties, or Borrower shall cause the Indemnified Parties to be indemnified, defended and held harmless, from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any accident, injury to or death of Persons or loss of or damage to property occurring in, on or about the Project or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Project or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Project or any part thereof; (d) any failure of the Project to be in compliance with any applicable Legal Requirements or (e) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the Loan (collectively, the "<u>Indemnified Liabilities</u>"); *provided*, *however*, that Borrower shall not have any obligation to Lenders hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of Administrative Agent or Lenders. To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Lenders. Administrative Agent agrees that, so long as the Existing Leases shall continue to be in full force and effect, Borrower's indemnification, defense and holding harmless obligations to the Indemnified Parties under this <u>Section 14.1</u> may be satisfied by the applicable Tenants under the corresponding obligations of the Existing Leases; *provided*, *however*, the foregoing shall not act to, or be deemed to, release, relinquish or relieve Borrower from Borrower's obligations to indemnify the Indemnified Parties in accordance with the terms of this <u>Section 14.1</u> to the extent that the Tenant(s) fail, refuse, delay or are otherwise unable or unwilling to do so.

Section 14.2. <u>Intangible Tax Indemnification</u>. Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any stamp or similar intangible tax on the making of the Deed of Trust, the Note or any of the other Loan Documents, excluding, for purposes of clarity, any income, franchise or other similar taxes, or U.S. federal withholding taxes imposed under FATCA as a result of the failure by a Lender to comply with the applicable provisions of FATCA.

Section 14.3. <u>ERISA Indemnification</u>. Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation,

<div align="center">61</div>

defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Administrative Agent's sole and absolute discretion) that Administrative Agent or Lenders may incur, directly or indirectly, as a result of a default under <u>Section 4.9</u> or <u>Section 5.17</u> hereof.

Section 14.4. <u>Survival</u>. The obligations and liabilities of Borrower under this <u>Article XIV</u> shall fully survive indefinitely notwithstanding any termination, satisfaction, or assignment of the Deed of Trust.

<div align="center">

ARTICLE XV

NOTICES

</div>

Section 15.1. <u>Notices</u>. All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested, or (b) expedited prepaid overnight delivery service, either commercial or United States Postal Service, with proof of attempted delivery, addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section):

| | |
|---|---|
| If to Lenders: | See address and telephone number specified for such Lender on <u>Schedule 15.1</u> |
| If to Administrative Agent: | National Bank of Kuwait, S.A.K.P., New York Branch<br>299 Park Avenue<br>New York, New York 10171<br>Attention: Corporate Finance |
| With a copy to: | Baker & McKenzie LLP<br>300 E. Randolph St., Suite 5000<br>Chicago, Illinois 60601<br>Attention: Mona Dajani, Esq. |
| If to Borrower: | Galleria 2425 Owner, LLC<br>3139 W Holcombe Blvd #845<br>Houston, Texas 77025<br>Attention: Azeemeh Zaheer |
| With copies to: | Polsinelli<br>2950 Harwood Street, Suite 2100<br>Dallas, Texas 75201<br>Attention: Brian Bullard, Esq. |

A notice shall be deemed to have been given: (i) in the case of hand delivery, at the time of delivery; (ii) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; or (iii) in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day.

<div align="center">

ARTICLE XVI

FURTHER ASSURANCES

</div>

Section 16.1. <u>Replacement and Corrective Documents</u>. Upon receipt of an affidavit of an officer of Administrative Agent as to the loss, theft, destruction or mutilation of the Note or any other Loan

Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Document, Borrower and Guarantor shall issue, in lieu thereof, a replacement Note or other Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor. Borrower and Guarantor hereby consent and agree that in the event that any of the Loan Documents misstate or inaccurately reflect the true and correct terms and provisions of the Loan and said misstatement or inaccuracy is due to the unilateral mistake on the part of Lenders or Administrative Agent, mutual mistake on the part of any of Administrative Agent, Lenders, Borrower and Guarantor or clerical error, then in such event Borrower and Guarantor shall, within thirty (30) days after written request of Administrative Agent and in order to correct such misstatement or inaccuracy, execute such new documents as Administrative Agent may deem necessary to remedy said inaccuracy or mistake.

Section 16.2. <u>Further Acts, Etc</u>. Subject to <u>Article XII</u> hereof, Borrower and Guarantor shall, at the cost and expense of Borrower and Guarantor, and without expense to Lenders or Administrative Agent, do, execute, acknowledge and deliver all and every further acts, deeds, conveyances, assignments, security agreements, control agreements, notices of assignments, transfers and assurances as Administrative Agent shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lenders the rights hereby granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower or Guarantor may be or may hereafter become bound to convey or assign to Lenders, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing or registering of the Deed of Trust, or for complying with all Legal Requirements. Borrower and Guarantor, on demand, shall deliver, and in the event Borrower or Guarantor shall fail to so deliver, hereby authorizes Administrative Agent to file, in the name of Borrower and Guarantor, one or more financing statements and financing statement amendments to evidence more effectively, perfect and maintain the priority of the security interest of Lenders in the Project. Borrower and Guarantor grant to Lenders and Administrative Agent an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lenders or Administrative Agent at law and in equity, including, without limitation, such rights and remedies available to Lenders or Administrative Agent pursuant to this <u>Section 16.2</u>.

Section 16.3. <u>Changes in Tax, Debt, Credit and Documentary Stamp Law</u>.

(a)     If any law is enacted or adopted or amended after the date of this Agreement which deducts the Debt from the value of the Project for the purpose of taxation with the result that taxes are imposed on the Lenders, Borrower shall pay the tax, with interest and penalties thereon, if any, other than U.S. federal withholding taxes imposed under FATCA as a result of the failure by a Lender to comply with the applicable provisions of FATCA. If Lenders are advised by counsel chosen by Lenders that the payment of such tax by Borrower would be unlawful or taxable to Lenders (unless any such tax is reimbursed by Borrower) or unenforceable or provides the basis for a defense of usury then Lenders shall have the option by written notice of not less than one hundred twenty (120) days to declare the Debt immediately due and payable. Borrower shall not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Project, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Project, or any part thereof, for real estate or personal property tax purposes by reason of the Deed of Trust or the Debt if such claim, credit or deduction has the effect of imposing a tax on Lenders. If such claim, credit or deduction shall be required by law, Lenders shall have the option, by written notice of not less than one hundred twenty (120) days, to declare the Debt immediately due and payable.

(b)     If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, the Deed of Trust, or any

of the other Loan Documents or impose any other tax or charge on the same, Borrower shall pay for the same, with interest and penalties thereon, if any.

Section 16.4. <u>Expenses</u>. Borrower covenants and agrees to pay or reimburse, as applicable, Lenders and Administrative Agent upon receipt of written notice from Administrative Agent for all actual costs and expenses (including reasonable third party attorneys' fees and disbursements) incurred by Administrative Agent and Lenders in accordance with this Agreement in connection with (a) the preparation, negotiation, execution and delivery of this Agreement, the Deed of Trust and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower and Guarantor (including, without limitation, any opinions reasonably requested by Administrative Agent as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Project); (b) Borrower's and Guarantor's ongoing performance of and compliance with Borrower's and Guarantor's agreements and covenants contained in this Agreement, the Deed of Trust and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (c) [Reserved.] (d) subject to <u>Article XII</u> hereof, the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents; (e) securing Borrower's and Guarantor's compliance with any requests reasonably made pursuant to the provisions of this Agreement; (f) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Administrative Agent all required legal opinions, and other similar expenses reasonably incurred in creating and perfecting the Lien in favor of Lenders pursuant to this Agreement, the Deed of Trust and the other Loan Documents; (g) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower or Guarantor, this Agreement, the other Loan Documents, the Project, or any security given for the Loan; and (h) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Project or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings.

ARTICLE XVII
WAIVERS

Section 17.1. <u>Remedies Cumulative; Waivers</u>. The rights, powers and remedies of Administrative Agent and Lenders under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Administrative Agent or Lenders may have against Borrower or Guarantor pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lenders' rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lenders may determine in Lenders' sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower or Guarantor shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

Section 17.2. <u>Modification, Waiver in Writing</u>. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower or Guarantor therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower or

Guarantor shall entitle Borrower or such Guarantor to any other or future notice or demand in the same, similar or other circumstances.

Section 17.3. <u>Delay Not a Waiver</u>. Neither any failure nor any delay on the part of Administrative Agent or Lenders in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Administrative Agent and Lenders shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 17.4. <u>Trial by Jury</u>. BORROWER, ADMINISTRATIVE AGENT AND LENDERS EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, ADMINISTRATIVE AGENT AND LENDERS, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF LENDERS, ADMINISTRATIVE AGENT AND BORROWER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER, ADMINISTRATIVE AGENT AND LENDERS.

Section 17.5. <u>Waiver of Notice</u>. Borrower and Guarantor shall not be entitled to any notices of any nature whatsoever from Administrative Agent or Lenders except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Administrative Agent or Lenders to Borrower and Guarantor and except with respect to matters for which Borrower or Guarantor is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice. Borrower hereby expressly waives the right to receive any notice from Administrative Agent or Lenders with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Administrative Agent or Lenders to Borrower.

Section 17.6. <u>Remedies of Borrower</u>. In the event that a claim or adjudication is made that Administrative Agent or Lenders or Administrative Agent's or Lenders' agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Administrative Agent, Lenders or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that Administrative Agent, Lenders and Administrative Agent's and Lenders' agents shall not be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Administrative Agent or Lenders have acted reasonably shall be determined by an action seeking declaratory judgment. Administrative Agent and Lenders agrees that, in such event, it shall cooperate in expediting any action seeking injunctive relief or declaratory judgment.

Section 17.7. <u>Waiver of Marshalling of Assets</u>. To the fullest extent permitted by law, Borrower for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower and

other Persons with interests in Borrower, and of the Project, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lenders under the Loan Documents to a foreclosure of the Deed of Trust for the collection of the Debt without any prior or different resort for collection or of the right of Lenders to the payment of the Debt out of the net proceeds of the Project in preference to every other claimant whatsoever.

Section 17.8. <u>Waiver of Statute of Limitations</u>. Borrower hereby expressly waives and releases, to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its other obligations set forth in the Loan Documents.

Section 17.9. <u>Waiver of Counterclaim</u>. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lenders or Administrative Agent or Lenders' or Administrative Agent's agents.

<div align="center">

ARTICLE XVIII
GOVERNING LAW

</div>

Section 18.1. <u>Choice of Law</u>.

(i)  THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDERS AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT THE DEED OF TRUST, THE ASSIGNMENT OF LEASES AND RENTS AND THE OTHER LOAN DOCUMENTS (OTHER THAN WITH RESPECT TO LIENS AND SECURITY INTERESTS IN PROPERTY WHOSE PERFECTION AND PRIORITY IS COVERED BY ARTICLE 9 OF THE UCC (INCLUDING, WITHOUT LIMITATION, THE ACCOUNTS) WHICH SHALL BE GOVERNED BY THE LAW OF THE JURISDICTION APPLICABLE THERETO IN ACCORDANCE WITH SECTIONS 9-301 THROUGH 9-307 OF THE UCC AS IN EFFECT IN THE STATE OF NEW YORK) SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROJECT IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE

<div align="center">66</div>

LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW EXCEPT AS SPECIFICALLY SET FORTH ABOVE.

        (ii)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ADMINISTRATIVE AGENT, ANY LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY AT ADMINISTRATIVE AGENT'S OR LENDERS' OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:

> Capitol Services, Inc.
> 1218 Central Avenue, Suite 100
> Albany, NY 12205

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS TOGETHER WITH WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. BORROWER (I) SHALL GIVE PROMPT NOTICE TO ADMINISTRATIVE AGENT OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

        (iii)    Borrower, Administrative Agent and Lenders hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably submit to the exclusive jurisdiction of any New York State or Federal court sitting in New York County over any suit, action or proceeding arising out of or relating to this Agreement, and each such party hereby agrees and consents that, in addition to any methods of service of process provided for under applicable law, all service of process in any such suit, action or proceeding in any New York State or Federal court sitting in New York County may be made by certified or registered mail, return receipt requested, directed to such party at the address indicated on the first page of this Agreement or in Section 15.1 hereof, as applicable, and service so made shall be complete three (3) days after the same shall have been so mailed.

        Section 18.2. Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 18.3. <u>Preferences</u>. Lenders shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower or Guarantor hereunder in connection with any payment deemed to be fraudulent or an impermissible preference payment under applicable Legal Requirements. To the extent Borrower or Guarantor makes a payment or payments to Lenders, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Creditors' Rights Laws, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lenders.

ARTICLE XIX
MISCELLANEOUS

Section 19.1. <u>Survival</u>. This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the entering into by Lenders of this Agreement and the execution and delivery to Lenders of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower shall inure to the benefit of the successors and assigns of Lenders.

Section 19.2. <u>Administrative Agent's Discretion</u>. Whenever pursuant to this Agreement, Administrative Agent exercises any right given to Administrative Agent to approve or disapprove, or any arrangement or term is to be satisfactory to Administrative Agent, the decision of Administrative Agent to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the reasonable discretion of Administrative Agent.

Section 19.3. <u>Headings</u>. The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 19.4. <u>Cost of Enforcement</u>. In the event (a) that the Deed of Trust is foreclosed in whole or in part, (b) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or Guarantor or any of Borrower Members, Borrower's constituent Persons or Subsidiaries or an assignment by Borrower or Guarantor or any of Borrower Members, Borrower's constituent Persons or Subsidiaries for the benefit of its creditors, or (c) Lenders exercise any of its other remedies under this Agreement or any of the other Loan Documents, Borrower shall be chargeable with and agrees to pay all costs of collection and defense, including attorneys' fees and costs, incurred by Lenders, Administrative Agent or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

Section 19.5. <u>Schedule Incorporated</u>. The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 19.6. <u>Offsets, Counterclaims and Defenses</u>. Any assignee of Lenders' interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower or Guarantor may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower or such Guarantor in any action or proceeding brought by any

such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

Section 19.7. No Joint Venture or Partnership; No Third Party Beneficiaries.

(a)       Borrower, Administrative Agent and Lenders intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower, Guarantor, Administrative Agent and Lenders nor to grant Administrative Agent or Lenders any interest in the Project other than that of secured party, Lenders or lender. Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably waives and relinquishes all claims, demands, counterclaims and/or defenses alleging the existence of any partnership, joint venture or other fiduciary relationship between Administrative Agent or Lenders and Borrower and Borrower shall hold Lenders, Administrative Agent, Lenders' and Administrative Agent's successors and assigns, harmless from and against any and all losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments and any other fees, costs and expenses that Administrative Agent or Lenders may sustain as a result of any such allegation by any Person whatsoever.

(b)       This Agreement and the other Loan Documents are solely for the benefit of Lenders, Administrative Agent and Borrower and Guarantor and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lenders, Administrative Agent and Borrower and Guarantor any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lenders to enter into this Agreement and make the financial accommodations provided for hereunder are imposed solely and exclusively for the benefit of Lenders and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lenders will refuse to enter into this Agreement or make the financial accommodations provided for hereunder in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Administrative Agent or Lenders if, in Administrative Agent's or Lenders' sole discretion, Administrative Agent or Lenders deem it advisable or desirable to do so.

(c)       The shareholders, general partners, members, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Project, and Lenders are relying solely upon such expertise and business plan in connection with the ownership and operation of the Project.

(d)       Notwithstanding anything to the contrary contained herein, Lenders are not undertaking the performance of any obligations with respect to any agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents of Borrower.

(e)       By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lenders or Administrative Agent pursuant to this Agreement, the Deed of Trust, the Note or the other Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lenders and Administrative Agent shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lenders or Administrative Agent.

(f)       Borrower and Guarantor recognize and acknowledge that in accepting this Agreement, the Note, the Deed of Trust and the other Loan Documents, Lenders are expressly and primarily relying on the truth and accuracy of the representations and warranties set forth in Article IV of

this Agreement without any obligation to investigate the Project and notwithstanding any investigation of the Project by Administrative Agent; that such reliance existed on the part of Lenders prior to the date hereof, that the warranties and representations are a material inducement to Lenders in entering into this Agreement and making the financial accommodations provided for hereunder; and that Lenders would not be willing to enter into this Agreement and make the financial accommodations provided for hereunder and accept this Agreement, the Note, the Deed of Trust and the other Loan Documents in the absence of the warranties and representations as set forth in Article IV of this Agreement.

Section 19.8. Publicity. All news releases, publicity or advertising by Borrower, Guarantor or Borrower's Affiliates through any media intended to reach the general public which refers to the Loan, Lenders, or any of Lenders' Affiliates shall be subject to the prior written approval of Administrative Agent, not to be unreasonably withheld. Administrative Agent and Lenders shall be permitted to make any news, releases, publicity or advertising by Lenders or Lenders' Affiliates through any media intended to reach the general public which refers to the Loan, the Project, Borrower, Guarantor and Borrower's Affiliates without the approval of Borrower or any such Persons in a "tombstone", advertisement or other written description or loan summary in an industry periodical, journal or newspaper or at industry events or conferences, provided that such references are limited to the following matters: (i) the principal amount of the Loan, (ii) the term of the Loan, (iii) the location of the Project, (iv) whether the interest rate of the Loan is fixed or variable and (v) the identity of Borrower. All other news-releases, publicity or advertising by Lenders shall be subject to Borrower's prior written approval, which approval shall not be unreasonably withheld or delayed. Borrower also agrees that Lenders and Administrative Agent may share any information pertaining to the Loan with third-parties in connection with the sale or transfer of the Loan or any Participations thereof.

Section 19.9. Conflict; Construction of Documents; Reliance. In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Administrative Agent or Lenders or any parent, subsidiary or Affiliate of Administrative Agent or Lenders. Lenders shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lenders of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lenders' or Administrative Agent's exercise of any such rights or remedies. Borrower acknowledges that Lenders engage in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

Section 19.10. Actions, Approvals and Determinations. Wherever in this Agreement it is provided that (a) as a condition precedent to Borrower's undertaking certain action, Borrower shall be required to obtain Administrative Agent's consent or approval or (b) Administrative Agent shall have the right to make a determination (including, without limitation, a determination as to whether a matter is satisfactory to Administrative Agent), or if Borrower shall request that Administrative Agent or Lenders take any action, then, unless expressly provided to the contrary in the applicable provision of this Agreement, the decision whether to grant such consent or approval or to take the requested action, or the determination in question, shall be in the sole and exclusive discretion of Administrative Agent and Lenders and shall be

4161624-v7\CHIDMS1

final and conclusive. Wherever in this Agreement it is stated that any consent or approval shall not be unreasonably withheld or that a determination to be made by Administrative Agent or Lenders shall be subject to a specified standard, then, if a court of competent jurisdiction determines, without right to further appeal, that the consent or approval shall be deemed granted or the standard shall be deemed met, as the case may be, then Administrative Agent or Lenders, at the request of Borrower, shall deliver to Borrower written confirmation thereof. The obtaining of such consent or approval or determination that such standard has been met shall be Borrower's sole and exclusive remedy with respect to the subject matter of this section, and under no circumstance shall Administrative Agent or Lenders, or Administrative Agent's or Lenders' counsel or anyone else acting or purporting to act on Administrative Agent's or Lenders' behalf have any liability (whether in damages or otherwise) with respect thereto. In any instance in which Borrower requests, or any Loan Document provides, that Administrative Agent or Lenders shall consider granting Administrative Agent's or Lenders' consent or approval or making a determination or taking some other action, Borrower shall, upon demand, pay all actual out-of-pocket costs, expenses and reasonable attorneys' fees and disbursements incurred by Administrative Agent and Lenders in connection therewith.

Section 19.11. <u>Entire Agreement</u>. This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written between Borrower, Administrative Agent and Lenders are superseded by the terms of this Agreement and the other Loan Documents.

Section 19.12. <u>Certain Additional Rights of Lenders</u>. Notwithstanding anything which may be contained in this Agreement to the contrary, Lenders shall have:

(a)     the right to designate any party to receive payment of all fees, costs and expenses otherwise payable to Lenders under this Agreement or the other Loan Documents;

(b)     the right to routinely consult with and advise Borrower's, management regarding the significant business activities and business and financial developments of Borrower. Consultation meetings should occur on a regular basis with Administrative Agent or Lenders having the right to call special meetings at any reasonable times;

(c)     the right, without restricting any other right of Administrative Agent or Lenders under this Agreement (including any similar right), to restrict, upon the occurrence and continuance of an Event of Default, Borrower's payments of management consulting director or similar fees to affiliates of Borrower (or their personnel); and

(d)     the right, without restricting any other rights of Administrative Agent or Lenders under this Agreement (including any similar right), to restrict the transfer to voting interests in Borrower held by its shareholders, members or partners (as the case may be), and the right to restrict the transfer of interests in such shareholder, member or partner (as the case may be), except for any transfer that is expressly permitted hereunder.

Section 19.13. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed to be an original, and all such counterparts together constitute but one and the same agreement. In addition, the parties may execute separate signature pages, and such signature pages (and/or signature pages which have been detached from one or more duplicate original copies of this Agreement) may be combined and attached to one or more copies of this Agreement so that such copies shall contain the signatures of all of the parties hereto.

[balance of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

<div style="text-align:center">

BORROWER:

**GALLERIA 2425 OWNER, LLC**,
a Delaware limited liability company

</div>

By:    Galleria 2425 JV, LLC,
        a Delaware limited liability company,
        its sole member

        By:    Naissance Capital Real Estate, LLC,
                a Delaware limited liability company,
                its Managing Member

        By: _____
        Name: Azeemeh Zaheer
        Title:  Managing Member

<div style="text-align:center">

[SIGNATURES CONTINUE ON NEXT PAGE]

</div>

<div style="text-align:center">

[Signature Page to Loan Agreement]

</div>

ADMINISTRATIVE AGENT AND LENDER:

**NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH**, a banking corporation organized under the laws of Kuwait, acting through its New York branch

By: _____

Name: _____

Title: _____
Arlette Kittaneh
Executive Manager

By: _____

Name: _____
Michael G. McHugh

Title: _____
Executive Manager

EXHIBIT A

BORROWER'S ORGANIZATIONAL STRUCTURE

[see attached]



# The Galleria – Houston, Texas (Master Chart)



001031

EXHIBIT B

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of the ____ day of _____, 20__, made by and between [NAME OF ASSIGNING BANK] ("Assignor") and [NAME OF ASSIGNEE] ("Assignee").

Preliminary Statement

1.      This Agreement relates to that certain Loan Agreement (as the same may be amended from time to time, the "Loan Agreement") dated as of May 23, 2018 made by and among (1) Galleria 2425 Owner, LLC, a Delaware limited liability company ("Borrower"), (2) the lender(s) party thereto (each, a "Lender" and collectively, "Lenders"), and (3) National Bank of Kuwait, S.A.K.P., New York Branch ("Administrative Agent"). All capitalized terms not otherwise defined herein shall have the respective meanings set forth in the Loan Agreement.

2.      Subject to the terms and conditions set forth in the Loan Agreement, Assignor has a pro-rata share of the Loan equal to _____ percent (_____%) in an aggregate principal amount of $_____ ("Assignor's Loan Commitment").

3.      The aggregate outstanding principal amount under Assignor's Loan Commitment at the commencement of business on the date hereof is $_____,

4.      Assignor desires to assign to Assignee all of the rights of Assignor under the Loan Agreement and the other Loan Documents (as defined in the Loan Agreement) in respect of a portion of Assignor's Loan Commitment, such portion being in an amount equal to $_____, which relates to a Pro-Rata Share of the Loan of _____ percent (_____%) (the "Assigned Loan Commitment"); and Assignee desires to accept assignment of such rights and assume the corresponding obligations from Assignor on such terms.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, the parties hereto agree as follows:

SECTION 1.  Assignment. Assignor hereby assigns and sells to Assignee all of the rights of Assignor under the Loan Agreement and the other Loan Documents in and to the Assigned Loan Commitment, and Assignee hereby accepts such assignment from Assignor and assumes all of the obligations of Assignor under the Loan Agreement and the other Loan Documents with respect to the Assigned Loan Commitment. Upon the execution and delivery hereof by Assignor, Assignee, Administrative Agent and the payment of the amount specified in Section 2 hereof required to be paid on the date hereof, (1) Assignee shall, as of the commencement of business on the date hereof, succeed to the rights and obligations of a Lender under the Loan Agreement and the other Loan Documents with a Pro-Rata Share of the Loan equal to the percentage applicable to the Assigned Loan Commitment and (2) the Pro-Rata Share of Assignor shall, as of the commencement of business on the date hereof, be reduced correspondingly and Assignor released from its obligations under the Loan Agreement and the other Loan Documents to the extent such obligations have been assumed by Assignee. Assignor represents and warrants that it (x) owns the Assigned Loan Commitment free and clear of all liens and other encumbrances and (y) is legally authorized to enter into and perform this Agreement. Except as provided in the immediately preceding sentence, the assignment provided for herein shall be without representation or warranty by, or recourse to, Assignor.

SECTION 2. <u>Payments</u>. As consideration for the assignment and sale contemplated in Section 1 hereof, Assignee shall pay to Assignor on the date hereof, in immediately available funds, an amount equal to $_____. Each of Assignor and Assignee hereby agrees that if it receives any amount under the Loan Agreement or any of the other Loan Documents which is for the account of the other party hereto, it shall receive the same for the account of such other party to the extent of such other party's interest therein and shall promptly pay the same to such other party.

SECTION 3. <u>Consents; Notices</u>. If required pursuant to <u>Article XII</u> or <u>Article XIII</u> of the Loan Agreement, this Agreement is conditioned upon the consent of Administrative Agent. The execution of this Agreement by Administrative Agent is evidence of this consent. Assignee has designated its address for notices below.

SECTION 4. <u>Non-Reliance on Assignor</u>. Assignor makes no representation or warranty in connection with, and shall have no responsibility with respect to, the solvency, financial condition, or statements of Borrower or any other party to any Loan Document, or the validity and enforceability of the obligations of Borrower or any other party to a Loan Document in respect of the Loan Agreement or any other Loan Document. Assignee acknowledges that it has, independently and without reliance on Assignor, and based on such documents and information as it has deemed appropriate, made its own analysis of the collateral for the Loan, credit analysis of Borrower and decision to enter into this Agreement and will continue to be responsible for making its own independent appraisal of the collateral for the Loan and of the business, affairs and financial condition of Borrower and the other parties to the Loan Documents.

SECTION 5. <u>Governing Law</u>. This Agreement shall be governed by, and construed and enforced in accordance with the Laws of the State of New York without reference to principles of conflicts of law.

SECTION 6. <u>Counterparts</u>. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

SECTION 7. <u>Certain Representations and Agreements by Assignee</u>. Assignee represents that it is legally authorized to enter into and perform this Agreement. In addition, Assignee hereby represents that it is entitled to receive any payments to be made to it under the Loan Agreement or hereunder without the withholding of any tax and agrees to furnish the evidence of such exemption as specified therein and otherwise to comply with the provisions of the Loan Agreement and the other Loan Documents.

SECTION 8. <u>Reliance By Borrower</u>. This Agreement shall be binding upon, enforceable by and inure to the benefit of Borrower, its successors and assigns.

[balance of page intentionally left blank]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first above written.

ASSIGNOR:

By: _____
     Name:
     Title:

ASSIGNEE:

By: _____
     Name:
     Title:

Assignee's Address for Notices:

[Assignee]
[Address]
Attention: _____
Telephone: (___) _____

ADMINISTRATIVE AGENT:

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch

By: _____
     Name:
     Title:

Exh. B-3

SCHEDULE 13.12

Amount of Loan Attributable to Lender

| Lender | Amount of Loan Attributable to Lender |
|--------|----------------------------------------|
| NBK | $51,675,000.00 |

SCHEDULE 15.1

Lenders' Offices, Addresses for Notices

| | |
|---|---|
| If to NBK: | National Bank of Kuwait, S.A.K.P., New York Branch |
| | 299 Park Avenue |
| | New York, New York 10171 |
| | Attention: Corporate Finance |
| | |
| With a copy to: | Baker & McKenzie LLP |
| | 300 E. Randolph St., Suite 5000 |
| | Chicago, IL 60601 |
| | Attention: Mona Dajani, Esq. |

**EXHIBIT B**

PROMISSORY NOTE

$51,675,000.00                                              Date: May 23, 2018

THIS PROMISSORY NOTE (this "Note") made as of May 23, 2018, by GALLERIA 2425 OWNER, LLC, a Delaware limited liability company, having an address at 3139 W Holcombe Blvd #845, Houston, Texas 77025 ("Borrower"), to NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch, having an office at 299 Park Avenue, New York, New York 10171, as administrative and collateral agent (in such capacity, together with its successors and assigns, "Administrative Agent") for the Lenders (as defined in the Loan Agreement referred to below). *Capitalized terms used but not defined in this Note shall have the meanings assigned to them in the Loan Agreement.*

1.  Covenant to Pay

FOR VALUE RECEIVED, without grace, except as expressly provided for herein and in the Loan Agreement, Borrower does hereby covenant and promise to pay to the order of Administrative Agent, on behalf of Lenders, at Administrative Agent's office at 299 Park Avenue, New York, New York 10171 or at such other place as Administrative Agent may designate to Borrower in writing from time to time, in legal tender of the United States, the principal amount of FIFTY ONE MILLION SIX HUNDRED AND SEVENTY-FIVE THOUSAND AND 00/100 DOLLARS ($51,675,000.00) (the "Principal Balance"), together with interest on the unpaid portion of said Principal Balance at the applicable Interest Rate (as hereinafter defined) calculated in accordance with the terms hereof, from the date the Principal Balance is advanced to Borrower until the Principal Balance and all interest accrued thereon shall be fully paid. The period from the date hereof through and including the Maturity Date is hereinafter referred to as the "Term."  "Maturity Date" means May 23, 2023.

2.  Interest Rate

(a)     During the Term, the rate at which interest shall be calculated under this Note (the "Interest Rate") shall be:

i. Commencing on May 24, 2018 and including May 28, 2018, the Interest Rate shall be a rate equal to the sum of (i) 2.75% (the "Interest Rate Markup") plus (ii) the Weekly LIBOR Rate (as hereinafter defined) as of two (2) London Business Days (as hereinafter defined) prior to the date hereof;

ii.  Commencing on May 29, 2018 through and including May 31, 2021, the Interest Rate shall be a fixed rate equal to five and sixty-four hundredths percent (5.64%) per annum (the "<u>Fixed Rate</u>");

iii.  Commencing on June 1, 2021 and continuing on the first (1st) day of each LIBOR Period (as hereinafter defined) thereafter, as applicable (each, a "<u>Rate Adjustment Date</u>"), the Interest Rate shall be recalculated to an adjustable rate equal to the sum of (i) the Interest Rate Markup <u>plus</u> (ii) the LIBOR Rate (as hereinafter defined) for the applicable LIBOR Period (as hereinafter defined) as of two (2) London Business Days (as hereinafter defined) prior to each applicable Rate Adjustment Date.

(b)  Borrower hereby acknowledges and agrees that Borrower shall not have more than three (3) LIBOR contracts outstanding at any one time during the Term.

(c)  During the Term, the LIBOR Period shall be a period of 30 days, except as adjusted pursuant to the definition of "LIBOR Period."

(d)  The certificate of Administrative Agent as to any Interest Rate and the interest amounts payable by Borrower pursuant thereto shall, absent manifest error, be final, conclusive and binding on Borrower.

(e)  As used herein, the following terms shall have the indicated meanings:

<u>Alternate Rate</u> - a per annum rate equal to (i) the Interest Rate Markup *plus* (ii) the Prime Rate (as hereinafter defined) *less* (iii) one percent (1%).

<u>Business Day</u> - a day other than (i) a Saturday, Sunday or (ii) other day on which commercial banks in New York, New York are authorized or required by law to close.

<u>LIBOR Period</u> - the period commencing on June 1, 2021 or any Rate Adjustment Date (as the case may be) and ending on, as applicable, the day immediately prior to the next succeeding payment date or the day immediately prior to the payment date of the calendar month that is one (1) month thereafter; <u>provided</u>, <u>however</u>, that if a payment date would occur on a day that is not a Business Day, the LIBOR Period to which such payment date relates shall be extended to the day immediately prior to the next succeeding Business Day. To the extent that the preceding clause results in the extension of a LIBOR Period, Administrative Agent shall have the right (but not the obligation) to shorten or extend, respectively, the succeeding LIBOR Period so that it shall end on a day that numerically corresponds to the intended payment date indicated in this Note and minimize breakage and/or avoid early termination of

2

any LIBOR contract; provided, however, that no LIBOR Period shall extend beyond the earlier to occur of (i) the Maturity Date or (ii) the date the Loan is otherwise due and payable pursuant to the terms and provisions hereof.  For the avoidance of doubt, the intended payment date is the first calendar day of each calendar month.

LIBOR Rate - the rate per annum (rounded upward, if necessary, to the nearest 1/1000 of 1%) at which United States Dollar deposits are offered in the London interbank market as displayed on the Bloomberg L.P., page "BBAM" or any page that replaces BBAM, two (2) London Business Days prior to the first day of the applicable LIBOR Period, for deposits in immediately available funds, in lawful money of the United States, of amounts substantially comparable to the outstanding Principal Balance for the LIBOR Period, divided by a percentage equal to 100% minus the stated maximum rate of all reserves required to be maintained against "Eurocurrency Liabilities" as specified in Regulation D (or against any other category of liabilities which includes deposits by reference to which the interest rate on LIBOR-based loans is determined) on such date to any member bank of the Federal Reserve System. Notwithstanding any provision above, the practice of rounding to determine the LIBOR Rate may be discontinued at any time in Administrative Agent's sole discretion.  Notwithstanding the foregoing, in no event shall the LIBOR Rate be less than 0%.

London Business Day - any day on which dealings in United States dollar deposits are carried on by banking institutions in the London interbank market.

Prime Rate - a fluctuating interest rate per annum which shall at all times be equal to the rate of interest announced publicly by NBK in New York from time to time, as NBK's prime rate. In the event NBK does not announce its prime rate, the Prime Rate shall be the prime rate as set forth in *The Wall Street Journal* from time to time.

Regulation D - Regulation D of the Board of Governors of the Federal Reserve System as in effect from time to time, including, without limitation, any successor or other regulation or official interpretation of said Board of Governors relating to reserve requirements applicable to member banks of the Federal Reserve System.

Weekly LIBOR Rate - the rate per annum (rounded upward, if necessary, to the nearest 1/1000 of 1%) at which United States Dollar deposits are offered in the London interbank market as displayed on the Bloomberg L.P., page "BBAM" or any page that replaces BBAM, two (2) London Business Days prior to the date hereof, for deposits in immediately available funds, in lawful money of the United States, of amounts substantially comparable to the outstanding Principal Balance for a one week period, divided by a percentage equal to 100% minus the stated maximum rate of all reserves

3

required to be maintained against "Eurocurrency Liabilities" as specified in Regulation D (or against any other category of liabilities which includes deposits by reference to which the interest rate on LIBOR-based loans is determined) on such date to any member bank of the Federal Reserve System. Notwithstanding any provision above, the practice of rounding to determine the LIBOR Rate may be discontinued at any time in Administrative Agent's sole discretion. Notwithstanding the foregoing, in no event shall the LIBOR Rate be less than 0%.

3.  Increased Costs

(a)  If, after the date of this Note, any change in applicable law or regulation or in the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof (whether or not having the force of law), and which change is applicable generally to other financial institutions (each, a "Change in Law"), shall (i) change the basis of taxation of payments to any Lender of the Principal Balance or interest due and owing under this Note or any fees or other amounts payable hereunder (other than changes in respect of taxes imposed on the overall net income of such Lender), (ii) subject any Lender to any tax of any kind whatsoever with respect to this Note or the Loan, or (iii) impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of or credit extended by any Lender or shall impose on any Lender any other condition affecting this Note, and the result of any of the foregoing shall or would be to increase the cost to any Lender of making or maintaining the Loan or to reduce the amount of any sum received or receivable by any Lender hereunder (whether of principal, interest or otherwise), Administrative Agent may, at any time, notify Borrower of the additional amount required to compensate such Lender for such increased cost or reduced amount and Borrower shall pay to Administrative Agent on behalf of such Lender such additional amount or amounts as shall compensate such Lender for such additional costs incurred or reduction suffered.

(b)  If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such capital or on the capital of such Lender's holding company, if any, as a consequence of such Lender's participation in the Loan to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to Borrower shall be conclusive absent manifest error. Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, _provided_ that Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than six (6) months prior to the date that such Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     Any Lender affected by increased costs as set forth above shall use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any portion of the Loan affected by such event, provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding such increased costs.  If the affected Lender is not able to avoid such increased costs by designating another lending office, then Borrower shall have the right to replace the affected Lender with a new Lender in accordance with the terms and provisions of the Loan Documents.

(f)     The Increased Cost provisions of this Note shall be without duplication of the provisions of Section 5.4 or Section 16.3 of the Loan Agreement.

4.     Illegality

If Administrative Agent shall notify Borrower that the introduction of, or any change in, or in the interpretation of, any law or regulation makes it unlawful, or any central bank or other Governmental Authority asserts that it is unlawful, for any Lender to perform such Lender's obligations hereunder, then Borrower shall either (i) prepay in full the entire unpaid Debt within ninety days (such date to be adjusted to minimize or avoid breakage) after notice from Administrative Agent, without Prepayment Premium or yield maintenance of any kind or (ii) replace the affected Lender with a new Lender in accordance with the terms and provisions of the Loan Documents. In addition, if Administrative Agent notifies Borrower that by reason of circumstances affecting the London interbank market for United States dollar deposits there does not exist adequate and reasonable means for ascertaining the LIBOR Rate for any LIBOR Period, then, commencing on the last day of the then existing LIBOR Period therefor, the Interest Rate

5

shall automatically be and remain at the per annum rate at all times equal to the Alternate Rate, which Interest Rate shall be adjusted concurrently with each adjustment in the Alternate Rate until Administrative Agent shall notify Borrower that the circumstances causing the suspension of the use of the LIBOR Rate no longer exist.

5.    Calculation of Interest

Interest shall be computed on the basis of actual days over a three hundred sixty (360) day calendar year (except that interest computed by reference to the Alternate Rate shall be computed on the basis of a three hundred sixty five (365) day calendar year, or a three hundred sixty six (366) day calendar year in a leap year) and shall continue to accrue and be payable on the outstanding Principal Balance to but excluding the date of repayment thereof in full.

6.    Payment of Indebtedness

Borrower shall make payments of interest under this Note as follows and said payments shall be applied upon receipt thereof:

(a)    Interest shall be paid monthly, in arrears, on the first Business Day (i) of each calendar month, if the applicable Interest Rate for such payment is the Fixed Rate in accordance with Section 2(a)(i) above; or (ii) following the applicable one (1)-month LIBOR Period (which payment date, for the avoidance of doubt, is intended to be the first calendar day of each calendar month, subject to adjustment in accordance with the definition of LIBOR Period), for the period of such LIBOR Period, if the applicable Interest Rate for such payment is being calculated with reference to the LIBOR Rate in accordance with Section 2(a)(ii) above; notwithstanding the foregoing, interest for the period commencing on the date hereof and ending on May 31, 2018 shall be paid in advance on the date hereof; and

(b)    On the Maturity Date the entire unpaid Principal Balance, together with all interest accrued thereon and all other Debt, shall be due and payable and repaid in full.

7.    Security

This Note is governed and/or secured by, inter alia, the following documents, each dated as of the date hereof: (i) that certain Loan Agreement made by and among Borrower, Administrative Agent and Lenders (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement"), (ii) that certain Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing made by Borrower to Salima Umatiya, as trustee, for the

benefit of Administrative Agent (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Deed of Trust"), encumbering the premises known as and located at 2425 West Loop South, City of Houston, State of Texas (the "Property"), (iii) that certain Absolute Assignment of Leases and Rents made by Borrower for the benefit of Administrative Agent encumbering the Property (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Assignment of Leases"), and (iv) those certain other documents defined as "Loan Documents" in the Loan Agreement, which documents specify various defaults upon the happening of which all sums due and owing under this Note may be declared immediately due and payable.

8.  Prepayment

(a) Provided no Event of Default exists, Borrower shall have the right to prepay the Principal Balance, in whole, or in part (but if in part, then in minimum increments of $100,000 (or $1,000,000 if an Interest Rate Protection Product in the form of an interest rate swap is then in effect)), upon not less than thirty (30) days' prior written notice (the "Prepayment Notice") to Administrative Agent specifying the date on which prepayment is to be made (the "Prepayment Date") and the amount of any such prepayment (the "Prepayment Amount"). On the Prepayment Date, Borrower shall pay (i) the Prepayment Amount, (ii) interest accrued and unpaid on the Prepayment Amount to and including the last day of the month in which the Prepayment Date occurs, (iii) in the event the Prepayment Amount equals the entire outstanding Principal Balance, all other unpaid Debt, (iv) the cost of unwinding, modifying or terminating any Interest Rate Protection Product then in effect ("Unwinding Costs"), and (v) the then applicable Prepayment Premium (as hereinafter defined). As used herein, "Prepayment Premium" shall mean: (A) if all or any portion of the Debt is prepaid within the first twelve (12) months following the date hereof, an amount equal to 1.50% of the amount so prepaid, and (B) if all or any portion of the Debt is prepaid within the period from and after the date which is twelve (12) months following the date hereof but before the date which is twenty-four (24) months following the date hereof, an amount equal to 1.00% of the amount so prepaid. If all or any portion of the Debt is prepaid after the date which is twenty-four (24) months following the date hereof, no Prepayment Premium shall be due.

(b) If any Prepayment Notice is given, the entire Prepayment Amount specified therein (together with the applicable Prepayment Premium, Unwinding Costs and all other sums referred to above) shall be due and payable on the Prepayment Date set forth therein.

(c) Any partial prepayment made hereunder shall be applied against the Principal Balance in inverse order of maturity (i.e., so as to reduce the final payments of principal due and owing hereunder

7

and not result in any reduction in or deferment of the monthly payments of principal due and owing hereunder).

(d)     Payment of the entire outstanding Principal Balance following an acceleration of the same shall be deemed to be a voluntary prepayment to which the Prepayment Premium and Unwinding Costs shall be applicable.

(e)     Notwithstanding any other provision of this Section, no Prepayment Premium shall be payable with respect to any prepayment occurring as a result of the application of any Insurance Proceeds or Awards under the Loan Agreement.

9.     Waivers

Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably (i) waives presentment and demand for payment, notice of dishonor, protest and notice of protest of this Note, (ii) agrees to pay all costs of collection when incurred by Administrative Agent and Lenders, including, but not limited to, reasonable attorneys' fees and disbursements (which costs may be added to the amount due under this Note and be receivable therewith) and (iii) agrees to perform and comply with each of the terms, provisions, covenants and conditions contained in this Note, the Loan Agreement, the Deed of Trust and any of the other Loan Documents on the part of Borrower to be observed or performed.

10.     No Release

No (a) release by Administrative Agent of any portion of the Mortgaged Property (as defined in the Deed of Trust) or any other collateral being held as security for the payment by Borrower of the Debt, (b) granting by Administrative Agent of an extension of time for payment of this Note, or any installment thereof, or (c) alteration, amendment or waiver of any term, provision, covenant or condition of this Note or any Loan Document shall release, discharge, modify, change or affect the liability of Borrower under this Note or any of the other Loan Documents. The right to plead any and all statutes of limitations as a defense to any demand on this Note, or any guaranty hereof, or any agreement to pay the same, or any demand secured by the Deed of Trust, or any and all obligations and liabilities arising out of or in connection with this Note, the Loan Agreement or any of the other Loan Documents, is expressly waived by Borrower, and any endorsers and/or guarantors of this Note, to the fullest extent permitted by law.

11.     Writings

This Note may not be waived, changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

12.    Event of Default

It is hereby expressly agreed that the entire Debt shall, then or at any time thereafter, without notice (except as may be provided herein, in the Loan Agreement or in the Deed of Trust), become immediately due and payable at the option of Administrative Agent on the happening of any Event of Default and, in such event, the Deed of Trust may be foreclosed. All of the terms, provisions, covenants and conditions contained in the Loan Agreement, the Deed of Trust, the Assignment of Leases and the other Loan Documents which are to be kept and performed by Borrower are hereby made part of this Note to the same extent and with the same force and effect as if they were fully set forth in this Note. Failure to exercise such option or any other rights Administrative Agent may, in the event of any such Event of Default, be entitled to, shall not constitute a waiver of the right to exercise such option or any other rights in the event of any subsequent Event of Default, whether of the same or different nature.

13.    Late Charge

If any sum payable under this Note (but excluding, however, the final installment of the Principal Balance) is not paid within five (5) days of its due date, Borrower shall pay upon demand a late payment charge ("Late Charge") of two cents ($.02) for each dollar ($1) of such unpaid sum to defray the expenses incurred by Administrative Agent or Lenders in handling and processing such delinquent payment, and such amount shall be secured by the Deed of Trust and the Loan Documents. Nothing contained herein shall be deemed to constitute a waiver or modification of the due date on which such sums are due and payable.

14.    Involuntary Rate

In addition to any Late Charge which may be due under this Note, if the Debt is declared immediately due and payable by Administrative Agent pursuant to the provisions of this Note or any of the Loan Documents, or if any installment of principal or interest is not paid when due, or if the Debt is not paid in full on the Maturity Date, or if any other Event of Default shall have occurred, Borrower shall thereafter pay interest on the Principal Balance from the date of any of such events, as the case may be, until the date the installment of interest or principal is paid, the Debt is paid in full, or until such Event of Default is cured, at a rate (the "Involuntary Rate") equal to the lesser of (i) the Prime Rate plus two percent (2%) per annum or (ii) the Maximum Rate (as hereinafter defined), provided that there shall be no

9

automatic reduction to the Maximum Rate if Borrower is barred by law from availing itself in any action or proceeding of the defense of usury or if Borrower is barred or exempted from the operation of any law limiting the amount of interest that may be paid for the Loan or use of money or in the event this transaction, because of its amount or purpose or for any other reason, is exempt from the operation of any statute limiting the amount of interest that may be paid for the Loan or use of money.

15.     Maximum Rate

In the event the interest provisions or any exactions provided for herein or in the Loan Agreement, the Deed of Trust or in any of the other Loan Documents shall result, because of the monthly reduction of principal or for any other reason, at any time during the Term in an effective rate of interest which, for any month, transcends the limit of the usury or any other law applicable to the Loan (the "Maximum Rate"), all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice between or by any party hereto, be applied in reduction of the Principal Balance immediately upon receipt of such moneys by Administrative Agent with the same force and effect as though Borrower had specifically designated such extra sums to be so applied to reduction of the Principal Balance and Administrative Agent had agreed to accept such extra payment(s) as a premium-free prepayment, provided that no Prepayment Premium shall be payable in connection with any such reduction of the Principal Balance. In no event shall any agreed to or actual exaction as consideration for the Loan transcend the limits imposed or provided by the law applicable to this transaction or Borrower in the jurisdiction in which the land is located for the use or detention of money or for forbearance in seeking its collection.

16.     Application of Payments

If at any time Administrative Agent receives from Borrower a payment or prepayment in an amount that is less than all amounts then due, Administrative Agent may apply that payment or prepayment to amounts then due in any manner and in any order determined by Administrative Agent, in Administrative Agent's sole and absolute discretion. Borrower agrees that neither Administrative Agent's acceptance of a payment or prepayment from Borrower in an amount that is less than all amounts then due, nor Administrative Agent's application of such payment or prepayment in the manner authorized in the immediately preceding sentence, shall be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.

17.     Notices

4153909-v7\CHIDMS1

001047

All notices, demands, requests, consents and other communications which are required or permitted to be given under this Note shall be sufficiently given when given as set forth in the Loan Agreement.

18.    <u>Applicable Law</u>

This Note shall be construed in accordance with and be governed by the laws of the State of New York without reference to principles of conflicts of law. Borrower hereby agrees to submit to personal jurisdiction in all state and federal courts located in the State and County of New York in any action or proceeding relating to this Note, the Loan Agreement, the Deed of Trust or any of the other Loan Documents. In furtherance of such agreement, Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably appoints Capitol Services, Inc., having an address at 1218 Central Avenue, Suite 100, Albany, NY 12205, as general agent ("<u>Agent</u>") for Borrower for receipt of service of process in any such action or proceeding (and Administrative Agent may make service upon Borrower and/or such Agent). Service of any summons and complaint or other process in any such action or proceeding and any notice of sale or other notices may be made upon Borrower and/or Agent by registered or certified mail, return receipt requested, Borrower and Agent hereby waiving personal service thereof, or as may otherwise be permitted by law.

19.    <u>Waiver of Trial By Jury</u>

Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Note, the Loan Agreement, the Deed of Trust or any of the other Loan Documents.

20.    <u>Right to Transfer Note</u>

Administrative Agent and Lenders may transfer this Note and their rights hereunder in accordance with Article XII of the Loan Agreement.

21.    <u>Purchase of Note</u>.

In lieu of prepaying the Note in whole, Borrower shall have the right to purchase this Note, and the liens securing same ("<u>Lender's Liens</u>") upon not less than thirty (30) days' prior written notice to Lender, specifying the date on which such purchase is to occur (the "<u>Note Purchase Date</u>"). The purchase price for the Note shall be an amount equal to the Prepayment Amount that Borrower would be required to pay pursuant to Section [__] if prepaying the Note in whole on the Note Purchase Date. For the avoidance of doubt, the purchase price shall include then-current Principal Balance, accrued but unpaid

interest, any applicable Prepayment Premium, Unwinding Costs, Late Charges or other charges owing on the Note, plus any other Debt or amounts owed to Administrative Agent or Lenders pursuant to the terms of the Loan Documents as of such Note Purchase Date, as reasonably determined by Administrative Agent. Upon receipt of such amounts, Administrative Agent and Lender shall execute and deliver to Borrower a recordable assignment of note and lien instrument ("Note Assignment") with respect to the Note and Lender's Liens being acquired. The purchase of the Note by Borrower shall be on an as-is basis, other than as expressly set forth in the Note Assignment, which representations and warranties shall be limited to the principal balance of the Note, and that Lender is the owner and holder of the Note and Lender's Liens, subject to no liens or security interests in favor of any third party, and has the full legal right and authority to sell the Note and Lender's Liens. It is expressly acknowledged and agreed by Borrower that the right granted in this Note is a right to purchase the Note and Loan in full and not in part, and, if the Loan is evidenced by more than one promissory note, Borrower shall not acquire one note without acquiring all notes evidencing the Loan, and Lender shall not sell or assign its interest in one note without selling or assigning its interest in all notes evidencing the Loan. Prior to assigning, granting a participation in or syndication all or any part of the Note, Lender agrees to provide Borrower thirty (30) Business Days' prior notice thereof.

22.     Joint and Several

If Borrower consists of more than one person or party, the obligations and liabilities of each such person or party hereunder shall be joint and several.

23.     Power

Borrower (and the undersigned representatives of Borrower, if any) represents that Borrower has full power, authority and legal right to execute and deliver this Note and that the payment of the Debt constitutes a valid and binding obligation of Borrower.

24.     Form

Whenever used in this Note, the singular number shall include the plural, the plural the singular, and the words "Lender(s)", "Borrower" and "Administrative Agent" shall include their respective successors and assigns.

25.     Right of Set Off

If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted

by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of Borrower against any and all of the obligations of Borrower now or hereafter existing under this Note, the Loan Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Note, the Loan Agreement or any other Loan Document and although such obligations of Borrower are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender and its respective Affiliates under this paragraph are in addition to other rights and remedies (including other rights of setoff) that such Lender or its respective Affiliates may have. Each Lender agrees to notify Borrower and Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

26.     Construction

        This Note shall be construed without regard to any presumption or other rule requiring construction against the party causing this Note to be drafted. To the extent any term herein conflicts with any term of the Loan Agreement, the Loan Agreement shall control.

27.     Administrative Agent

        To the extent that any action is to be taken, any information is to be delivered to or by Lenders, any determination is to be made, or any consent is to be given or withheld by Lenders, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Administrative Agent or any successor agent thereto.

28.     Heirs, Successors and Assigns

        All of the terms, provisions, covenants and conditions of this Note shall apply to, bind and inure to the benefit of, the heirs, executors, administrators, successors and assigns of Borrower, Lenders and Administrative Agent, respectively.

[balance of page intentionally left blank]

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the day and year first above written.

<div style="margin-left: 40%;">

BORROWER:

**GALLERIA 2425 OWNER, LLC,**
a Delaware limited liability company

By:    Galleria 2425 JV, LLC,
        a Delaware limited liability company,
        its sole member

        By:    Naissance Capital Real Estate, LLC,
                a Delaware limited liability company,
                its Managing Member

                By: _____
                Name: Azeemeh Zaheer
                Title:  Managing Member

</div>

# **<u>EXHIBIT C</u>**

001052

RP-2018-235600

RP-2018-235600
05/30/2018 ER $124.00

THIS INSTRUMENT WAS PREPARED BY
AND UPON RECORDING RETURN TO:

Baker & McKenzie LLP
300 E. Randolph St., Suite 5000
Chicago, IL 60601
Attention: Mona Dajani, Esq.

AFTER RECORDING RETURN TO:
Trans**A**ct TITLE

GF #: 12000490

<u>DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND PROFITS, SECURITY
AGREEMENT AND FIXTURE FILING</u>

by

GALLERIA 2425 OWNER LLC, a Delaware limited liability company,
whose address is 3139 W Holcombe Blvd #845, Houston, Texas 77025,
Grantor,

to

Salima Umatiya,
with an address of 245 Commerce Green Blvd., Suite 151, Sugar Land, TX 77478,
Trustee,

for the benefit of

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation
organized under the laws of Kuwait, acting through its New York branch, as administrative and
collateral agent,

whose address is having an office at 299 Park Avenue, New York, New York 10171,
Beneficiary

THIS DEED OF TRUST IS ALSO A FIXTURE FILING UNDER SECTION 9.502(b) OF THE
TEXAS BUSINESS AND COMMERCE CODE.

001053

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

<u>DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND PROFITS, SECURITY AGREEMENT AND FIXTURE FILING</u>

THIS DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND PROFITS, SECURITY AGREEMENT AND FIXTURE FILING made as of May 23, 2018 made by GALLERIA 2425 OWNER LLC, a Delaware limited liability company, having an address at 3139 W Holcombe Blvd #845, Houston, Texas 77025 ("Grantor"), in favor of Salima Umatiya, an individual, having an address at 245 Commerce Green Blvd., Suite 151, Sugar Land, TX 77478 (together with its successors and assigns, "Trustee"), as Trustee for the benefit of NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch, having an office at 299 Park Avenue, New York, New York 10171, as administrative and collateral agent (in such capacity, together with its successors and permitted assigns, "Beneficiary") for the Lenders (as defined in the Loan Agreement referred to below).

<div align="center">WITNESSETH:</div>

A.      Lenders are this day making a term loan to Grantor in the principal amount of $51,675,000.00 (the "Loan"), which loan shall be governed by that certain Loan Agreement dated of even date herewith made by and among Grantor, Beneficiary and Lenders (as the same may be amended, restated or otherwise modified from time to time, the "Loan Agreement");

B.      Beneficiary is the holder of a Promissory Note (as the same may be amended, restated, consolidated, split, severed or otherwise modified from time to time, the "Note"), dated as of even date herewith, given by Grantor, as maker, to Beneficiary, as payee, in the original principal amount of $51,675,000.00; and

C.      Beneficiary has requested, and Grantor has agreed, to secure Grantor's obligations under the Note by giving Beneficiary a first priority lien encumbering the Mortgaged Property (as hereinafter defined).

<div align="center">CERTAIN DEFINITIONS</div>

Unless the context otherwise specifies or requires, the following terms shall have the meanings herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms.

"Chattels" means all fixtures, fittings, appliances, apparatus, equipment, machinery and articles of personal property and additions thereto and replacements thereof (other than those owned by lessees, contractors or licensees), now or at any time hereafter affixed to, attached to, placed upon, or used in any way in connection with the complete and comfortable present or future use, enjoyment, occupancy or operation of the Improvements on the Premises.

"Debt" shall mean the outstanding principal amount set forth in, and evidenced by, the Loan Agreement and the Note, together with all interest accrued and unpaid thereon and all other sums due to Administrative Agent or Lenders in respect of the Loan under the Note, the Loan Agreement, this Deed of Trust or any other Loan Document.

4162651-v5\CHIDMS1

RP-2018-235600

"Deed of Trust" means this Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing, as the same may be amended, restated, consolidated, split, severed or otherwise modified from time to time.

"Deed of Trust Amount" means the maximum principal amount secured by this Deed of Trust as of the date hereof, i.e., $51,675,000.00.

"Events of Default" means the events and circumstances described as such in Section 2.01 hereof.

"Improvements" means all structures or buildings, and replacements thereof, to be erected or now or hereafter located upon the Premises, including all equipment, apparatus, machinery and fixtures of every kind and nature whatsoever forming part of said structures or buildings.

"Loan" means the $51,675,000.00 loan governed by the Loan Agreement, evidenced by the Note and secured by this Deed of Trust.

"Premises" means all that certain plot, piece or parcel of land situated, lying and being in the City of Houston, County of Harris and State of Texas, described on **Exhibit A** annexed hereto and made a part hereof, including all of the Improvements, easements, rights, privileges and appurtenances (including, without limitation, any air or development rights) thereunto belonging or in anywise appertaining, and all of the estate, right, title, interest, claim or demand whatsoever of Grantor therein and in the rights-of-way, gores of land, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, tenements, hereditaments, and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining thereto, either in law or in equity, in possession or expectancy, now or hereafter acquired.

All terms of this Deed of Trust which are not defined above shall have the meaning set forth elsewhere in this Deed of Trust or, if not set forth in the Deed of Trust, in the Loan Agreement.

NOW, THEREFORE, Grantor, in consideration of the premises and in order to secure the payment of the Debt and any sums due under any Interest Rate Protection Product and the performance and observance of all of the provisions of this Deed of Trust, the Loan Agreement, the Note and the other Loan Documents, hereby irrevocably GRANTS, TRANSFERS, CONVEYS, CONFIRMS, PLEDGES and ASSIGNS, all of its present and future estate, rights, title, interest and claim, either in law or in equity, of, in and to the following property (collectively, the "Mortgaged Property"), whether now owned or held or hereafter acquired, to Trustee for the benefit of Beneficiary, TO HAVE AND TO HOLD, IN TRUST FOR THE BENEFIT OF BENEFICIARY UPON THE STATUTORY CONDITION AND WITH THE STATUTORY POWER OF SALE:

(i) the Premises;

(ii) the Improvements;

(iii) the Chattels;

(iv) all proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims, including, without limitation, proceeds of insurance and condemnation awards, and all rights of Grantor to refunds of real estate taxes and assessments and the reasonable attorney's fees, costs and disbursements incurred by Beneficiary or Lenders in connection with the collection of such award or payment;

(v) all Leases now or hereafter entered into and all right, title and interest of Grantor thereunder, including, without limitation, cash or securities deposited thereunder to secure performance

RP-2018-235600

4162651-v5\CHIDMS1

001055

by the Tenants of their obligations thereunder, whether such cash or securities are to be held until the expiration of the terms of such Leases or applied to one or more of the installments of rent coming due immediately prior to the expiration of such terms, including, further, the right during the continuance of an Event of Default, to receive and collect the rents thereunder;

(vi) all proceeds of (or return of any unearned premiums on) any insurance policies covering all or any part of the Premises, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof, for damage to the Premises;

(vii) all monies, funds, bank accounts, deposit accounts, accounts receivable, contract rights, other rights and any other intangible assets derived from or related to the rental, operation or ownership of the Premises or any part thereof, and all the agreements, instruments or documents evidencing or relating to any of the same, whether or not identified to or known by Beneficiary or Lenders;

(viii) all trade names, trademarks, logos, copyrights, good will and books and records relating to or used in connection with the operation of the Mortgaged Property or any part thereof;

(ix) to the extent assignable, all contracts from time to time executed by Grantor or any manager or agent on Grantor's behalf relating to the ownership, management, leasing, sale, marketing, construction, maintenance, repair, operation, occupancy or financing of the Mortgaged Property or any part thereof and all agreements relating to the purchase or Lease of any portion of same; all consents, licenses, building permits, certificates of occupancy and other governmental approvals relating to construction, completion, occupancy, use or operation of the Mortgaged Property or any part thereof; and all drawings, plans, specifications and similar or related items relating to the Mortgaged Property;

(x) all so-called "air rights," bulk development rights, floor area, floor area ratio, zoning rooms and other rights and privileges now or hereafter appurtenant to the Premises and Improvements or any part thereof, as defined in, under or with respect to the zoning and building codes or ordinances of all applicable jurisdictions and the regulations and interpretations thereunder or thereof, whether or not transferable, and any or all of the same that may now or hereafter be acquired for use with the Premises or Improvements; and

(xi) all proceeds and replacements of and substitutions for all or any of the foregoing.

As to any of the Mortgaged Property aforesaid which does not form a part and parcel of the real estate, this Deed of Trust is and is hereby deemed to be, as well, a Security Agreement under the Uniform Commercial Code for the purpose of creating hereby a security interest in such property, which is hereby granted to Beneficiary as "Secured Party" (as said quoted term is defined in the Uniform Commercial Code), securing the Debt and all other obligations set forth herein.

TO HAVE AND TO HOLD unto Beneficiary, its successors and assigns forever and Grantor does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND the title to the Mortgaged Property unto Trustee.

## ARTICLE I.
### REPRESENTATIONS, WARRANTIES AND COVENANTS OF GRANTOR

Grantor represents, warrants and covenants as follows:

SECTION 1.01. Title; No Encumbrances. Grantor warrants title to the Mortgaged Property subject to no lien, charge or encumbrance except such encumbrances as are listed as exceptions to title in the Title Policy; that Grantor owns the Chattels free and clear of liens and claims; and that this Deed of Trust is and shall remain a valid first priority lien on the Mortgaged Property subject only to the exceptions

3

RP-2018-235600

referred to above. Grantor has full power and lawful authority to mortgage the Mortgaged Property in the manner and form herein done or intended hereafter to be done. Grantor shall preserve such title, and shall forever warrant and defend the same to Beneficiary and Grantor shall forever warrant and defend the validity and priority of the lien hereof against the claims of all persons and parties whomsoever.

SECTION 1.02. Related Mortgage Documents; Further Assurances. Grantor shall, at Grantor's sole cost and expense, and without expense to Beneficiary, do, execute, acknowledge and deliver all and every such further agreements, documents, acts, deeds, conveyances, mortgages, estoppel certificates, financing statements, continuation statements, assignments, notices of assignment, subordinations, transfers and assurances as Beneficiary shall from time to time reasonably require, for the better clarifying, assuring, conveying, assigning, transferring and confirming unto Beneficiary the property and rights hereby conveyed or assigned or intended now or hereafter so to be, or which Grantor may be or may hereafter become bound to convey or assign to Beneficiary, or for carrying out the intention or facilitating the performance of the terms, provisions, covenants and conditions of this Deed of Trust, or for filing, registering or recording this Deed of Trust or any of the other Loan Documents and, on demand, shall execute and deliver, and hereby authorizes Beneficiary to execute and file in Grantor's name, to the extent Beneficiary may lawfully do so, one or more financing statements, continuation statements, chattel mortgages or comparable Deed of Trusts, to evidence more effectively the lien of this Deed of Trust upon the Chattels.

SECTION 1.03. Filing and Recording of Mortgage Documents.

(a) Recording. Grantor forthwith upon the execution and delivery of this Deed of Trust, and thereafter from time to time, shall cause this Deed of Trust and any Deed of Trust creating a lien or evidencing the lien of this Deed of Trust upon the Chattels and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien of this Deed of Trust upon, and the interest of Beneficiary in, the Mortgaged Property, provided that no such instrument of further assurance shall materially increase the obligations of Grantor under this Deed of Trust.

(b) Recording Fees. Grantor shall pay all filing, registration or recording fees, and all expenses incident to the execution and acknowledgment of this Deed of Trust, any mortgage supplemental hereto, any Deed of Trust or financing statement with respect to the Chattels, and any instrument of further assurance or continuation, and all federal, state, county, and municipal stamp taxes and other taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Loan Agreement, the Note, this Deed of Trust, any mortgage supplemental hereto, any Deed of Trust or financing statement with respect to the Chattels or any instrument of further assurance or continuation.

SECTION 1.04. Manner of Payment. Grantor shall punctually pay the principal and interest and all other sums to become due in respect of the Note at the time and place and in the manner specified in the Note, according to the true intent and meaning thereof, all in any coin or currency of the United States of America which at the time of such payment shall be legal tender for the payment of public and private debts.

SECTION 1.05. Compliance With Law.

(a) Grantor shall comply with all laws, regulations, rules, statutes, ordinances, orders and decrees of any federal, state and local governmental authority or court applicable to the Mortgaged Property or any part thereof (including, without limitation, all applicable zoning, environmental, and energy-related laws and Access Laws (as hereinafter defined)) (collectively, "Legal Requirements").

4

4162651-v5\CHIDMS1

001057

(b)    (i) Grantor agrees that the Premises shall at all times comply to the extent applicable with the requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all other federal, state and local laws, regulations, rules, statutes, ordinances, orders and decrees related to handicapped access including, without limitation, the American with Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively, "Access Laws").

(ii)    Notwithstanding any provisions set forth herein or in any other documents regarding Beneficiary's approval or alterations of the Premises, Grantor shall not alter the Premises in any manner which would increase Grantor's responsibilities for compliance with the applicable Access Laws without the prior written approval of Beneficiary. The foregoing shall apply to tenant improvements constructed by Grantor or by any of Grantor's Tenants. Beneficiary may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer, or other person acceptable to Beneficiary.

(iii)    Grantor agrees to give prompt notice to Beneficiary of the receipt by Grantor of any complaints related to violations of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

(c)    Notwithstanding any other provision of this Section 1.05, Grantor shall not be deemed to be in default solely by reason of Grantor's failure to comply with any Legal Requirements as aforesaid so long as, in Beneficiary's sole judgment, reasonably exercised, each of the following conditions is satisfied:

(i)    Grantor is engaged in and diligently pursuing in good faith administrative or judicial proceedings appropriate to contest the validity or amount of such Legal Requirements;

(ii)    [Intentionally Omitted];

(iii)    Noncompliance with any such Legal Requirements will not result in the loss or forfeiture of any property encumbered hereby or any interest of Beneficiary therein or result in any fines or other punitive actions or the loss of any insurance coverage; and

(iv)    Grantor deposits with Beneficiary, as security for any payment or performance which may ultimately be required, a sum equal to the amount of any fine, assessment or charge plus the interest, penalties, and other costs which Beneficiary estimates are likely to become payable if Grantor's contest is unsuccessful.

If Beneficiary determines, in Beneficiary's sole judgment, reasonably exercised, that any one or more of such conditions is not satisfied or is no longer satisfied, Grantor shall comply with the Legal Requirements in question, within fifteen (15) days after Beneficiary gives notice of such determination.

SECTION 1.06. Future Acquisitions. All right, title and interest of Grantor in and to all extensions, improvements, betterments, renewals, substitutions and replacements of, and all additions and appurtenances to, the Mortgaged Property, hereafter acquired by or released to Grantor, or constructed, assembled or placed by Grantor on the Mortgaged Property, and all conversions of the security constituted thereby, immediately upon such acquisition, release, construction, assembling, placement or conversion, as the case may be, and in each such case, without any further mortgage, conveyance, assignment or other act by Grantor, shall become subject to the lien of this Deed of Trust as fully and completely, and with the same effect, as though now owned by Grantor and specifically described in the granting clause hereof, but at any and all times Grantor shall execute and deliver to Beneficiary any and all such further assurances, mortgages, conveyances or assignments thereof as Beneficiary may

5

4162651-v5\CHIDMS1

001058

reasonably require for the purpose of expressly and specifically subjecting the same to the lien of this Deed of Trust.

SECTION 1.07. Beneficiary's Right To Cure Defaults. If Grantor shall fail to perform or comply with any of the representations, warranties and covenants contained in Sections 1.01, 1.03 or elsewhere herein, then upon five (5) days' notice to Grantor (which notice shall not be required to be delivered in the event of an emergency), Beneficiary may make advances to perform the same on its behalf, and all sums so advanced, with interest at the Involuntary Rate, shall immediately be due from Grantor to Beneficiary, and shall be added to the Debt and shall be secured by this Deed of Trust. The provisions of this Section 1.07 shall not prevent any default in the observance of any of the representations, warranties and covenants contained in said Sections 1.01, 1.03 or elsewhere herein from constituting an Event of Default.

SECTION 1.08. Legal Proceedings. Whether or not an Event of Default has occurred and exists, Beneficiary shall have the right, but not the duty or obligation, to intervene or otherwise participate in, prosecute or defend at any legal or equitable proceedings (including, without limitation, any eminent domain proceedings) which, in Beneficiary's reasonable discretion, affect the Mortgaged Property, the Leases or any of the rights created hereunder the reasonable out-of-pocket cost of which shall be reimbursed by Grantor to Beneficiary and shall be secured by this Deed of Trust.

SECTION 1.09. Assignment of Leases. Grantor hereby absolutely and unconditionally assigns and transfers to Beneficiary the Leases and the Property Income. Grantor shall not otherwise assign, transfer or encumber in any manner the Leases or the Property Income or any portion thereof. Grantor shall have a license to collect and use the Property Income as the same becomes due and payable and to amend, supplement or modify the Leases in accordance with and as permitted under the Loan Agreement and to exercise Grantor's rights thereunder, so long as no Event of Default is continuing, but may not collect any Property Income more than thirty (30) days in advance of the date the same becomes due. The assignment in this Section 1.09 shall constitute an absolute and present assignment of the Leases and the Property Income, and not an assignment for security, and the existence or exercise of the Grantor's conditional license to collect Property Income shall not operate to subordinate this assignment to any subsequent assignment. The exercise by Beneficiary or Trustee of any of its rights or remedies under this Section 1.09 shall not be deemed or construed to make Beneficiary or Trustee a mortgagee-in-possession.

SECTION 1.10. Insurance. Grantor agrees, at Grantor's sole cost and expense, to keep the Mortgaged Property insured, at all times throughout the term of this Deed of Trust, in accordance with Article VIII of the Loan Agreement.

## ARTICLE II.
## EVENTS OF DEFAULT AND REMEDIES

SECTION 2.01. Events of Default. If an Event of Default shall occur and is continuing under the Loan Agreement, then, and in every such case Beneficiary, Lenders and/or Trustee may exercise any remedy available at law or in equity, including, but not limited to, those listed below and those listed in the Loan Agreement and the other Loan Documents, in such sequence and in such combination as Beneficiary may determine in Beneficiary's sole and absolute discretion:

(a) Acceleration. Upon the occurrence of any Event of Default, the entire principal amount of the indebtedness evidenced by the Note and all other Debt together with accrued interest thereon at the Involuntary Rate shall, subject to the terms of the Loan Agreement and the Note, at the option of Beneficiary exercised while such Event of Default is continuing, without demand or notice of any kind to Grantor or any other person, become immediately due and payable. All the provisions of the Loan Agreement are incorporated herein for all purposes as if set forth in full herein.

6

4162651-v5\CHIDMS1

RP-2018-235600

(b)  **Remedies Cumulative**. No remedy or right of Beneficiary hereunder or under the Loan Agreement, the Note or any of the other Loan Documents, or otherwise, or available under applicable law or in equity, shall be exclusive of any other right or remedy, but each such remedy or right shall be in addition to every other remedy or right now or hereafter existing under any such document or under applicable law or in equity. No delay in the exercise of, or omission to exercise, any remedy or right accruing on any Event of Default shall impair any such remedy or right or be construed to be a waiver of any such Event of Default or an acquiescence therein, nor shall it affect any subsequent Event of Default of the same or a different nature. Every such remedy or right may be exercised concurrently or independently, and when and as often as may be deemed expedient by Beneficiary. All obligations of Grantor, and all rights, powers and remedies of Beneficiary, expressed herein shall be in addition to, and not in limitation of, those provided by law or in equity or in the Loan Agreement, the Note or any other Loan Documents or any other written agreement or instrument relating to any of the Debt or any security therefor.

(c)  **Foreclosure; Appointment of Receiver**.

(i)  **Non-Judicial Foreclosure**. If the unpaid principal amount of or interest on the Debt or any part thereof shall have become due and payable (whether at maturity or as an installment of combined principal and/or interest or by reason of any prepayment requirement or by declaration or acceleration or otherwise) and shall not have been paid, Beneficiary or other holder of the Note may proceed with foreclosure by directing Trustee or his successor or substitute in trust to proceed as hereafter authorized to sell, assign, transfer and deliver the whole or, from time to time, any part of the Mortgaged Property, or any interest in any part thereof, by advertisement and sale in accordance with applicable law. Trustee shall execute and deliver to the purchaser at any such sale a trustee's deed conveying the property so sold, but without any covenant or warranty, expressed or implied. The recitals in such trustee's deed of any matters or facts shall be prima facie proof of the truthfulness thereof. Any Person, including Beneficiary, may bid at the sale. Trustee shall apply the proceeds of the sale in the following order:

*First*: To the payment of the costs and expenses of such sale (including the charges of advertising, sale and conveyance, including a commission to Trustee then acting, any amounts necessary to pay impositions or prior liens, the cost of evidence of title and the costs and expenses, if any, of taking possession of, retaining custody over, repairing, managing, operating, maintaining and preserving the Mortgaged Property or any part thereof prior to such sale), all reasonable costs and expenses incurred by Trustee, Beneficiary or any other Person in obtaining or collecting any insurance proceeds, condemnation awards or other amounts received by Beneficiary, all reasonable costs and expenses of any receiver of the Mortgaged Property or any part thereof, and any taxes, assessments, impositions or other charges or expenses prior to the security interest or lien of this Deed of Trust, which Trustee or Beneficiary may consider it necessary or desirable to pay;

*Second*: To the payment of all amounts of principal and interest (including post-petition interest to the extent such interest is a liability) at the time due and payable on the Debt outstanding at the time (whether due by reason of maturity or by prepayment or by declaration or acceleration or otherwise), including interest at the Involuntary Rate on any overdue principal and (to the extent permitted under applicable law) on any overdue interest;

*Third*: The balance, if any, held by Trustee after payment in full of all amount referred to in subdivisions *First* and *Second*, above, shall be paid to the Person or Persons entitled to receive such proceeds.

(ii)  **Judicial Foreclosure**. If an Event of Default is continuing, Beneficiary at any time may, at its election, proceed at law or in equity or otherwise to enforce the payment of the Debt

7

4162651-v5\CHIDMS1

001060

in accordance with the terms hereof and thereof and to foreclose the lien of this Deed of Trust as against all or any part of the Mortgaged Property and to have the same sold under the judgment or decree of a court of competent jurisdiction. Beneficiary shall be entitled to recover in such proceedings all reasonable costs incident thereto, including reasonable trustee's fees and reasonable attorneys' fees and expenses in such amounts as may be fixed by the court.

(iii)  Appointment of Receiver.  If an Event of Default is continuing, Beneficiary shall, as a matter of right and without regard to the adequacy of any security for the indebtedness secured hereby or the solvency of Grantor, be entitled to the appointment of a receiver for all or any part of the Mortgaged Property, whether such receivership be incidental to a proposed sale of the Mortgaged Property or otherwise, and Grantor hereby consents to the appointment of such a receiver and will not oppose any such appointment.

(d)  Possession of the Premises; Remedies for Leases and Rents.  Grantor hereby waives all right to the possession, income, and rents of the Premises during the continuance of any Event of Default, and Beneficiary is hereby expressly authorized and empowered, at and following any such occurrence, to enter into and upon and take possession of the Premises or any part thereof. If any Event of Default is continuing, then, whether before or after institution of legal proceedings to foreclose the lien of this Deed of Trust or before or after the sale thereunder, Beneficiary shall be entitled, in its sole and absolute discretion, to do all or any of the following: (i) enter and take actual possession of the Premises, the Property Income, the Leases and other Mortgaged Property relating thereto or any part thereof personally, or by its agents or attorneys, and exclude Grantor therefrom; (ii) with or without process of law, enter upon and take and maintain possession of all of the documents, books, records, papers and accounts of Grantor relating thereto; (iii) as attorney-in-fact or agent of Grantor, or in its own name as mortgagee and under the powers herein granted, hold, operate, manage and control the Premises, the Property Income, the Leases and other Mortgaged Property relating thereto and conduct the business, if any, thereof either personally or by its agents, contractors or nominees, with full power to use such measures, legal or equitable, as in its sole and absolute discretion or in the discretion of its successors or assigns may be deemed proper or necessary to enforce the payment of the Property Income, the Leases and other Mortgaged Property relating thereto (including actions for the recovery of rent, actions in forcible detainer and actions in distress of rent); (iv) cancel or terminate any Lease or sublease for any cause or on any ground which would entitle Grantor to cancel the same; (v) elect to disaffirm any Lease or sublease made subsequent hereto or subordinated to the lien hereof; (vi) make all necessary or proper repairs, decorations, renewals, replacements, alterations, additions, betterments and improvements to the Premises that, in its discretion, may seem appropriate; (vii) insure and reinsure the Mortgaged Property for all risks incidental to Beneficiary's possession, operation and management thereof; and (viii) receive all such Property Income and proceeds, and perform such other acts in connection with the management and operation of the Mortgaged Property, as Beneficiary in its discretion may deem proper, Grantor hereby granting Beneficiary full power and authority to exercise each and every one of the rights, privileges and powers contained herein at any and all times while any Event of Default is continuing without notice to Grantor or any other Person. Beneficiary, in the exercise of the rights and powers conferred upon it hereby, shall have full power to use and apply the Property Income to the payment, in such order as Beneficiary may determine, of or on account of any one or more of the following: (a) to the payment of the operating expenses of the Premises, including the actual out-of-pocket cost of management and leasing thereof (which shall include reasonable compensation to Beneficiary and its agents or contractors, if management be delegated to agents or contractors, and it shall also include lease commissions and other compensation and expenses of seeking and procuring tenants and entering into leases), established claims for damages, if any, and premiums on insurance hereinabove authorized; (b) to the payment of taxes, charges and special assessments, the out-of-pocket costs of all repairs, decorating, renewals, replacements, alterations, additions, betterments and improvements of the Mortgaged Property,

8

4162651-v5\CHIDMS1

RP-2018-235600

including the out-of-pocket cost from time to time of installing, replacing or repairing the Mortgaged Property, and of placing the Mortgaged Property in such condition as will, in the judgment of Beneficiary, make it readily rentable; and (c) to the payment of any Debt. The entering upon and taking possession of the Premises, or any part thereof, and the collection of any Property Income and the application thereof as aforesaid shall not cure or waive any Event of Default theretofore or thereafter occurring or affect any notice of Default hereunder or invalidate any act done pursuant to any such Event of Default or notice, and, notwithstanding continuance in possession of the Premises or any part thereof by Beneficiary or a receiver and the collection, receipt and application of the Property Income, Beneficiary shall be entitled to exercise every right provided for in this Deed of Trust or by law or in equity during the continuance of an Event of Default. Any of the actions referred to in this Section 2.01(d) may be taken by Beneficiary irrespective of whether any notice of Default has been given hereunder and without regard to the adequacy of the security for the indebtedness hereby secured.

(e)     Personal Property. If any Event of Default is continuing, Beneficiary may exercise from time to time any rights and remedies available to it under the Loan Documents or applicable law upon default in payment of indebtedness, including, without limitation, those available to a secured party under the Uniform Commercial Code of the state where the goods are located. Grantor shall, promptly upon request by Beneficiary, assemble the Mortgaged Property and make it available to Beneficiary at such place or places, reasonably convenient for both Beneficiary and Grantor, as Beneficiary shall designate. Grantor hereby expressly waives, to the fullest extent permitted by applicable law, any and all notices, advertisements, hearings, or process of law in connection with the exercise by Beneficiary of any of its rights and remedies while an Event of Default is continuing. If any notification of intended disposition of the Mortgaged Property is required by law, such notification, if mailed, shall be deemed reasonably and properly given if mailed by registered or certified mail, return receipt requested, at least ten (10) business days before such disposition, postage prepaid, addressed to Grantor either at the address shown below or at any other address of Grantor appearing on the records of Beneficiary. Without limiting the generality of the foregoing, whenever there exists an Event of Default hereunder, Beneficiary may, with respect to so much of the Mortgaged Property as is personal property under applicable law, to the fullest extent permitted by applicable law, without further notice, advertisement, hearing or process of law of any kind, (i) notify any Person obligated on the Mortgaged Property to perform directly for Beneficiary its obligations thereunder, (ii) enforce collection of any portion of the Mortgaged Property by suit or otherwise, and surrender, release or exchange all or any part thereof or compromise or extend or renew for any period (whether or not longer than the original period) any obligations of any nature of any party with respect thereto, (iii) endorse any checks, drafts or other writings in the name of Grantor to allow collection of the Mortgaged Property, (iv) take control of any proceeds of the Mortgaged Property, (v) enter upon any premises where any of the Mortgaged Property may be located and take possession of and remove such Mortgaged Property and render all or any part of the Mortgaged Property unusable, all without being responsible for loss or damage, (vi) sell any or all of the Mortgaged Property, free of all rights and claims of Grantor therein and thereto, at any lawful public or private sale and on such terms as Beneficiary deems advisable and (vii) bid for and purchase any or all of the Mortgaged Property at any such public or private sale. Any proceeds of any disposition by Beneficiary of any of the Mortgaged Property may be applied by Beneficiary to the payment of expenses in connection with the Mortgaged Property, including attorneys' fees and legal expenses, and any balance of such proceeds shall be applied by Beneficiary toward the payment of such portion of the Debt and in such order of application as Beneficiary may from time to time elect. Without limiting the foregoing, Beneficiary may exercise from time to time any rights and remedies available to it under the Uniform Commercial Code or other applicable law as in effect from time to time or otherwise available to it under applicable law. Grantor hereby expressly waives presentment, demand, notice of dishonor, protest and notice of protest in connection with the Note and, to the fullest extent permitted by applicable law, any and all other notices, demands, advertisements, hearings or process of law in connection with the exercise by Beneficiary of

9

RP-2018-235600

any of its rights and remedies hereunder. Grantor hereby constitutes Beneficiary its attorney-in-fact with full power of substitution to take possession of the Mortgaged Property while any Event of Default is continuing and, as Beneficiary in its sole and absolute discretion deems necessary or proper, to execute and deliver all instruments required by Beneficiary to accomplish the disposition of the Mortgaged Property; this power of attorney is a power coupled with an interest and is irrevocable while any portion of the Debt is outstanding. Grantor shall remain liable for any deficiency resulting from the sale of the Mortgaged Property and shall pay such deficiency forthwith upon demand, and Beneficiary's right to recover such deficiency shall not be impaired by the sale or other disposition of the Mortgaged Property without required notice. Expenses of retaking, holding, preparing for sale, selling or the like will first be paid from the proceeds before the balance will be applied toward any portion of the Debt.

(f)     No Liability on Beneficiary or Lenders. Either Beneficiary or Trustee may cure any breach or default of Grantor, and if it chooses to do so in connection with any such cure, Beneficiary or Trustee may also enter the Premises and/or do any and all other things which it may in its sole and absolute discretion consider necessary and appropriate to protect the security of this Deed of Trust. Such other things may include, without limitation: appearing in and/or defending any action or proceeding which purports to affect the security of, or the rights or powers of Beneficiary or Trustee under, this Deed of Trust; paying, purchasing, contesting or compromising any encumbrance, charge, lien or claim of lien which in Beneficiary's or Trustee's sole judgment is or may be senior in priority to this Deed of Trust, such judgment of Beneficiary or Trustee to be conclusive as among the parties to this Deed of Trust; obtaining insurance and/or paying any premiums or charges for insurance required to be carried under the Loan Agreement; otherwise caring for and protecting any and all of the Premises; and/or employing counsel, accountants, contractors and other appropriate persons to assist Beneficiary or Trustee. Beneficiary and Trustee may take any of the actions permitted hereunder either with or without giving notice to any person. Notwithstanding anything contained herein, Beneficiary shall not be obligated to perform or discharge, and does not hereby undertake to perform or discharge, any obligation, duty or liability of Grantor, whether hereunder, under any third party agreements or otherwise. Neither Beneficiary nor Lenders shall have responsibility for the control, care, management or repair of the Premises (including, but not limited to, use, storage, manufacture, discharge or transportation of hazardous waste or substances including, without limitation, Hazardous Materials (as defined in the Environmental Indemnity Agreement), by Grantor) or be responsible or liable for any negligence in the management, operation, upkeep, repair or control of the Premises resulting in loss, injury or death to any tenant, licensee, employee, stranger or other Person. No liability shall be enforced or asserted against Beneficiary or Lenders in its exercise of the powers granted to it under this Deed of Trust, and Grantor expressly waives and releases any such liability. Should Beneficiary or Lenders incur any such liability, loss or damage under any third party agreements or under or by reason hereof, or in the defense of any claims or demands, Grantor agrees to reimburse Beneficiary or Lenders within five (5) Business Days upon demand for the full amount thereof, including costs, expenses and attorneys' fees. Such sums shall bear interest at the Involuntary Rate from the date of each such amount is due by Beneficiary or Lenders and shall be paid by Grantor to Beneficiary forthwith upon demand by Beneficiary, and shall be secured by this Deed of Trust, and Beneficiary shall have, in addition to any other right or remedy of Beneficiary, the same rights and remedies in the event of non-payment of any such sums by Grantor as in the case of a default by Grantor in the payment of any installment of principal or interest due and payable under the Loan Agreement.

<div align="center">

**ARTICLE III.**
**MISCELLANEOUS**

</div>

SECTION 3.01. Severability. In the event any one or more of the provisions contained in this Deed of Trust, the Loan Agreement or the Note shall for any reason be held to be invalid, illegal or

<div align="center">

10

</div>

4162651-v5\CHIDMS1

RP-2018-235600

unenforceable in any respect, such invalidity, illegality, or unenforceability shall, at the option of Beneficiary, not affect any other provision of this Deed of Trust, but this Deed of Trust shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein or therein.

SECTION 3.02. Notices. All notices hereunder and under any applicable law pertaining hereto shall be in writing and shall be deemed sufficiently given or served for all purposes when delivered as provided for in the Loan Agreement.

SECTION 3.03. Heirs, Successors and Assigns. All of the grants, covenants, terms, provisions and conditions of this Deed of Trust shall run with the land and shall apply to, bind and inure to the benefit of, the heirs, executors, administrators, successors and assigns of Grantor, the heirs, executors, administrators, successors and assigns of Trustee, and the heirs, executors, administrators, successors and assigns of Beneficiary.

SECTION 3.04. Counterparts. This Deed of Trust may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same deed of trust.

SECTION 3.05. Future Mortgage Taxes. In the event of the passage after the date of this Deed of Trust of any law of the State of Texas deducting from the value of real property for the purpose of taxation any lien or encumbrance thereon or changing in any way the laws for the taxation of mortgages or debts secured by mortgages for state or local purposes or the manner of the collection of any such taxes, and imposing a tax, either directly or indirectly, on this Deed of Trust, the Loan Agreement, the Note or the Debt, Grantor shall, if permitted by law, pay any tax imposed as a result of any such law within the statutory period or within fifteen (15) days after demand by Beneficiary, whichever is less; *provided, however*, that if, in the opinion of the attorneys for Beneficiary, Grantor is not permitted by law to pay such taxes, Beneficiary shall have the right, at Beneficiary's option, to declare the Debt due and payable, without prepayment premium, on a date specified in a prior notice to Grantor of not less than thirty (30) days.

SECTION 3.06. Stamp Tax. If at any time the United States of America, any state thereof or any governmental subdivision of any such state, shall require revenue or other stamps to be affixed to the Loan Agreement, the Note or this Deed of Trust, Grantor shall pay for the same, with interest and penalties thereon, if any.

SECTION 3.07. Cover Sheet. The information set forth on the cover of this Deed of Trust is hereby incorporated herein.

SECTION 3.08. Governing Law.

(a)     THIS DEED OF TRUST WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY GRANTOR TO BENEFICIARY IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS DEED OF TRUST AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES (I) THE PROVISIONS FOR THE CREATION,

11

RP-2018-235600

PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS (OTHER THAN WITH RESPECT TO LIENS AND SECURITY INTERESTS IN PROPERTY WHOSE PERFECTION AND PRIORITY IS COVERED BY ARTICLE 9 OF THE UCC (INCLUDING, WITHOUT LIMITATION, THE ACCOUNTS) WHICH SHALL BE GOVERNED BY THE LAW OF THE JURISDICTION APPLICABLE THERETO IN ACCORDANCE WITH SECTIONS 9-301 THROUGH 9-307 OF THE UCC AS IN EFFECT IN THE STATE OF NEW YORK) AND (II) THE ENFORCEMENT OF THE RIGHTS CREATED BY THE ABSOLUTE ASSIGNMENT OF LEASES AND RENTS OF EVEN DATE HEREWITH SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE MORTGAGED PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW AND EXCEPT AS SET FORTH IN THE IMMEDIATELY PRECEDING SENTENCE, GRANTOR HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS DEED OF TRUST AND THE NOTE, AND THIS DEED OF TRUST AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST GRANTOR OR BENEFICIARY ARISING OUT OF OR RELATING TO THE DEBT OR THIS DEED OF TRUST MAY AT BENEFICIARY'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND GRANTOR WAIVES ANY OBJECTIONS WHICH GRANTOR MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GRANTOR HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. GRANTOR DOES HEREBY DESIGNATE AND APPOINT:

Capitol Services, Inc.
1218 Central Avenue, Suite 100
Albany, NY 12205

AS GRANTOR'S AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON GRANTOR'S BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO GRANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GRANTOR, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. GRANTOR (I) SHALL GIVE PROMPT NOTICE TO BENEFICIARY OF ANY CHANGED ADDRESS OF GRANTORS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF GRANTOR'S AUTHORIZED

12

4162651-v5\CHIDMS1

RP-2018-235600

RP-2018-235600

AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

SECTION 3.09.Joint and Several Liability. If Grantor consists of more than one person or party, the obligations and liabilities of each such person or party hereunder shall be joint and several.

SECTION 3.10.Variable Rate. The Note contains provisions for a variable rate of interest, and reference to such provisions is made hereby.

SECTION 3.11.Purchase Money Deed of Trust. Grantor hereby agrees and acknowledges that Grantor borrowed the Deed of Trust Amount to finance Grantor's purchase of the Mortgaged Property.

SECTION 3.12:Maximum Secured Amount/Future Advances. This Deed of Trust shall secure the payment of any amounts advanced from time to time under the Loan Documents, or under other documents stating that such advances are secured hereby, whether such advances are obligatory or to be made at the option of the Lenders, or otherwise, to the same extent as if such future advances were made on the date of the execution of this Deed of Trust, although there may be no advance made at the time of execution of this Deed of Trust and although there may be no indebtedness outstanding at the time any advance is made. The lien of this Deed of Trust shall be valid as to any and all future obligations and Debt arising under or in connection with this Deed of Trust from the time of its filing for record in the recorder's or registrar's office of the county in which the Premises is located, which future obligations and Debt shall have the same priority as if all such future obligations and Debt were made on the date of execution hereof. Nothing in this Section or in any other provision of this Deed of Trust shall be deemed an obligation on the part of Beneficiary to make any future advances of any sort. At all times, regardless of whether any loan proceeds have been disbursed, this Deed of Trust shall secure (in addition to any loan proceeds disbursed from time to time) the payment of any and all expenses and advances due to or incurred by Beneficiary in connection with the Debt to be secured hereby and which are to be reimbursed by Grantor under the terms of this Deed of Trust. The total amount of indebtedness may increase or decrease from time to time, as provided in the Loan Agreement. This Deed of Trust is intended to and shall be valid and have priority over all subsequent liens and encumbrances, including statutory liens, excepting solely taxes and assessments levied on the Premises.

SECTION 3.13.Interest Rate Protection Product. Grantor acknowledges and agrees that any amounts now or hereafter due and owing from Grantor to Beneficiary arising from or in connection with any Interest Rate Protection Product, now existing or hereafter entered into between Grantor and Beneficiary, and any out-of-pocket costs incurred by Beneficiary in connection therewith, including, without limitation, any interest, expenses, fees, penalties or other charges associated with any obligations undertaken by Beneficiary to hedge or offset Beneficiary's obligations pursuant to such Interest Rate Protection Product, or the termination of any such obligations, shall be (i) deemed additional interest and/or a related expense (to be determined in the sole discretion of Beneficiary) due in connection with the principal amount of the Debt secured by this Deed of Trust, (ii) included (in the manner described above) as part of the Debt secured by this Deed of Trust, and secured by this Deed of Trust to the full extent thereof, and (iii) included in any judgment in any proceeding instituted by Beneficiary or its agents against Grantor for foreclosure of this Deed of Trust or otherwise.

SECTION 3.14.Administrative Agent. To the extent that any action is to be taken, any information is to be delivered to or by Lenders, any determination is to be made, or any consent is to be given or withheld by Lenders, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Beneficiary, as administrative agent under the Loan Agreement or any successor agent thereto.

13

001066

SECTION 3.15.<u>Acts by Trustee</u>. At any time upon written request of Beneficiary, payment of its fees and (in case of full reconveyance, for cancellation and retention) presentation of this Deed of Trust and the appropriate instruments evidencing the Debt for endorsement and without affecting the liability of any person for the payment of the Debt, Trustee may: (a) consent to the making of any map or plat of the Premises; (b) join in granting any easement or creating any restriction thereon; (c) join in any subordination or other agreement affecting this Deed of Trust or the lien or charge thereof; or (d) reconvey, without warranty, all or any part of the Premises, as provided in <u>Section 3.20</u> hereof. The recitals in any reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof. Grantor agrees to pay a reasonable trustee's fee for full or partial reconveyance, together with a recording fee if Trustee, at its option, elects to record said reconveyance. Trustee may resign by instrument in writing filed in the office of county clerk or applicable recorder or registrar of deeds in which this Deed of Trust shall have been recorded or filed.

SECTION 3.16.<u>Successor Trustee</u>. In the event of the resignation, refusal or inability of Trustee to act or at the option of Beneficiary, with or without any reason, Beneficiary is authorized either in its own name or through an attorney or attorney-in-fact appointed for the purpose by written instrument duly recorded and without any formality other than a designation in writing of a successor or substitute trustee, to appoint a successor or substitute trustee who shall thereupon become vested with and succeed to all the rights, title and powers given to Trustee herein named, the same as if the successor or substitute trustee had been named original Trustee herein; and such right to appoint a successor or substitute trustee shall exist as often as and whenever Beneficiary desires.

SECTION 3.17.<u>Covenants of Trustee</u>. Trustee covenants faithfully to perform the trust herein created, being liable, however, only for its own gross negligence or misconduct and that of the employees and agents of Trustee.

SECTION 3.18.<u>Employment of Agents</u>. Trustee, or anyone acting in its stead, shall have, in its discretion, authority to employ all proper agents and attorneys in the execution of this trust and in the conducting of any sale made pursuant to the terms hereof, and to pay for such services rendered out of the proceeds of the sale of the Premises, should any be realized; and if no sale be made or if the proceeds of sale be insufficient to pay the same, then Grantor hereby undertakes and agrees to pay the costs of such services rendered to Trustee. Trustee may rely on any document believed by it in good faith to be genuine. All money received by Trustee shall, until used or applied as herein provided, be held in trust, but need not be segregated (except to the extent required by law), and Trustee shall not be liable for interest thereon.

SECTION 3.19.<u>Indemnification of Trustee or Beneficiary</u>. If Trustee or Beneficiary shall be made a party to or shall intervene in any action or proceeding affecting the Premises or the title thereto, or the interest of Trustee or Beneficiary under this Deed of Trust, except for any action or proceeding arising out of the willful misconduct or, to the extent prohibited by law, the gross negligence of Trustee or Beneficiary, Trustee and Beneficiary shall be reimbursed by Grantor, immediately and without demand, for all reasonable costs, charges and attorneys' fees incurred by them or any of them in any case, and the same shall become so much additional indebtedness secured hereby.

SECTION 3.20.<u>Defeasance</u>. Upon full payment of all indebtedness secured hereby and satisfaction of the entire Debt in accordance with their respective terms and at the time and in the manner provided, and when Beneficiary and Lenders have no further obligation to make any advance, or extend any credit hereunder, under the Note or any of the other Loan Documents, Beneficiary shall request Trustee in writing to reconvey the Premises, and shall surrender this Deed of Trust and all notes and instruments evidencing the Debt to Trustee. When Trustee receives Beneficiary's written request for reconveyance and all fees and other sums owing to Trustee by Grantor, Trustee shall reconvey the

14

RP-2018-235600

Premises, or so much of it as is then held under this Deed of Trust, without warranty to the person or persons legally entitled to it. Such person or persons shall pay any costs of recordation. In the reconveyance, the grantee may be described as "the person or persons legally entitled thereto," and the recitals of any matters or facts shall be conclusive proof of their truthfulness absent manifest error. Neither Beneficiary nor Trustee shall have any duty to determine the rights of persons claiming to be rightful grantees of any reconveyance.

SECTION 3.21. Maximum Interest. It is expressly stipulated and agreed to be the intent of Grantor and Beneficiary at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on the Debt (or applicable United States federal law to the extent that it permits Beneficiary to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If the applicable law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to the Note, any of the Loan Documents or any other communication or writing by or between Grantor and Beneficiary related to the Debt or to the transaction or transactions that are the subject matter of the Loan Documents, (ii) contracted for, charged, taken, reserved or received by reason of Beneficiary's exercise of the option to accelerate the maturity of the Note and/or any other portion of the Debt, or (iii) Grantor will have paid or Beneficiary will have received by reason of any voluntary prepayment by Grantor of the Note and/or any other portion of the Debt, then it is Grantor's and Beneficiary's express intent that all amounts charged in excess of the maximum amount of interest permissible by applicable law (the "Maximum Lawful Rate") shall be automatically cancelled, ab initio, and all amounts in excess of the Maximum Lawful Rate theretofore collected by Beneficiary shall be credited on the principal balance of the Note and/or any other portion of the Debt (or, if the Note and all other Debt have been or would thereby be paid in full, refunded to Grantor), and the provisions of the Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; *provided, however*, if the Note has been paid in full before the end of the stated term of the Note, then Grantor and Beneficiary agree that Beneficiary shall, with reasonable promptness after Beneficiary discovers or is advised by Grantor that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to Grantor and/or credit such excess interest against any other portion of the Debt then owing by Grantor to Beneficiary. Grantor hereby agrees that as a condition precedent to any claim seeking usury penalties against Beneficiary, Grantor will provide written notice to Beneficiary, advising Beneficiary in reasonable detail of the nature and amount of the violation, and Beneficiary shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Grantor or crediting such excess interest against the Note and/or any other portion of the Debt then owing by Grantor to Beneficiary. All sums contracted for, charged, taken, reserved or received by Beneficiary for the use, forbearance or detention of any of the Debt, including any portion of the Debt evidenced by the Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the stated term of the Note and/or any other portion of the Debt (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of the Note and/or any other portion of the Debt does not exceed the Maximum Lawful Rate from time to time in effect and applicable to the Note and/or any other portion of the Debt for so long as any portion of the Debt is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Beneficiary to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

SECTION 3.22. STATE SPECIFIC PROVISIONS

15

(a) <u>Inconsistencies</u>. In the event of any inconsistencies between the terms and conditions of this Article and the other provisions of this instrument, the terms and conditions of this Article shall control and be binding.

(b) <u>Section 1.09</u> is amended by adding the following:

Without in any way limiting or restricting any of Beneficiary's rights, benefits or privileges hereunder, Beneficiary and Grantor hereby expressly agree that Beneficiary shall be entitled to all of the rights, benefits and privileges provided for in the Texas Assignment of Rents Act, Chapter 64 of the Texas Property Code, as amended from time to time.

(c) During the continuance of an Event of Default, it shall thereupon be the duty of the above named Trustee, or its successor or substitute, as hereinafter provided, to enforce this trust at the request of Beneficiary (which request need not be presumed) and to sell the Mortgaged Property with or without first having taken possession of the same and in whole or in part, as the Trustee, or its successor or substitute, may elect (all rights to a marshalling of assets of Grantor being expressly waived hereby) to the highest bidder for cash at public auction at the county courthouse of any County in which the Mortgaged Property is situated, in the area of such courthouse designated for real property foreclosure sales in accordance with applicable law (or in the absence of any such designation, in the area set forth in the notice of sale hereinafter described) on the first Tuesday of any month between the hours of 10:00 A.M. and 4:00 P.M. (commencing at the time stated in the hereinafter described notice of sale or not later than three hours after that time), after giving notice of the time, place and terms of sale and the Mortgaged Property to be sold by (i) the Trustee, or its successor or substitute, or any authorized agent of the foregoing filing a copy of the notice thereof in the office of the County Clerk of each County where the Mortgaged Property is situated and by posting written or printed notice thereof at least twenty-one (21) days preceding the date of said sale at the County Courthouse door of each County where the Mortgaged Property is located, and (ii) the holder of the Debt secured by this Deed of Trust or any authorized agent of such holder, at least twenty-one (21) days preceding the date of said sale, serving written notice of such proposed sale by certified mail on each debtor obligated to pay the Debt secured by this Deed of Trust evidenced by the Notes according to the records of Beneficiary. Service of such notice to each debtor shall be completed upon deposit of the notice enclosed in a postpaid wrapper, properly addressed to each debtor at the most recent address as shown by the records of Beneficiary, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service. After such sale, the Trustee, or its successor or substitute, shall make due conveyance with general warranty to the purchaser or purchasers and the Grantor binds itself, its heirs, assigns, executors, administrators, successors and legal representatives to warrant and forever defend the title of such purchaser or purchasers. Any abstract of title to the Mortgaged Property furnished in connection with the Loan shall be delivered and become the property of the purchaser at said sale. In the event a foreclosure hereunder shall be commenced by the Trustee or its substitute or successor, Beneficiary may at any time before the sale of the Mortgaged Property, direct the said Trustee, or its successor or substitute, to abandon the sale, and may then institute suit for the collection of the Notes and the other secured indebtedness, and for the foreclosure of this Deed of Trust. It is agreed that if Lender should institute a suit for the collection of the Note or any other secured indebtedness and for the foreclosure of this Deed of Trust, Beneficiary may at any time before the entry of a final judgment in said suit dismiss the same, and require the Trustee, its substitute or successor to sell the Mortgaged Property in accordance with the provisions of this Deed of Trust.

(d) With respect to the Personal Property, Beneficiary is hereby irrevocably appointed the true and lawful attorney of the Grantor (coupled with an interest), in its name and stead, to

16

4162651-v5\CHIDMS1

001069

make all necessary conveyances, assignments, transfers and deliveries of the Personal Property, and for that purpose Beneficiary may execute all necessary instruments of conveyance, assignment, transfer and delivery, and may substitute one or more persons with such power, Grantor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Notwithstanding the foregoing, Grantor, if so requested by Beneficiary, shall ratify and confirm any such sale or sales by executing and delivering to Lender or to such purchaser or purchasers all such instruments as may be advisable, in the judgment of Beneficiary, for such purpose, and as may be designated in such request. To the extent permitted by law, any such sale or sales made under or by virtue of this Section 3.22(d) shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law, or in equity, of Grantor in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Grantor and against any and all persons claiming or who may claim the same, or any part thereof, from, through or under Grantor. Upon any sale made under or by virtue of this Section 3.22(d), Trustee, or its successor or substitute, or Beneficiary may, to the extent permitted by law, bid for and acquire the Mortgaged Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the debt secured by this Deed of Trust the net sales price after deducting therefrom the expenses of the sale and the cost of the auction and any other sums which Beneficiary is authorized to deduct by law or under this Deed of Trust. At any sale pursuant to this Section 3.22(d), whether made under power herein granted, the Texas Property Code, the Texas Business and Commerce Code, or any other legal enactment, or by virtue of any judicial proceeding or any other legal right, remedy or recourse, it shall not be necessary for Beneficiary or Trustee, or its successor or substitute, to be physically present, or to have constructive possession of, the Mortgaged Property, and the title to and right of possession of any such property shall pass to the purchaser thereof as completely as if the same had been actually presented and delivered to the purchaser at such sale.

(e) During the continuance of an Event of Default, Beneficiary shall have the right and option to proceed with foreclosure in satisfaction of such item or items by directing the Trustee, or its successor or substitute as hereinafter provided, to proceed as if under a full foreclosure, conducting the sale as herein provided, and without declaring the whole debt secured by this Deed of Trust due, and provided that if sale is made because of default as hereinabove mentioned, such sale may be made subject to the unmatured part of the Note and the Debt secured by this Deed of Trust, and it is agreed that such sale, if so made, shall not in any manner affect any other obligations secured by this Deed of Trust, but as to such other obligations this Deed of Trust and the liens created hereby shall remain in full force and effect just as though no sale had been made under the provisions of this Section 3.22(e). It is further agreed that several sales may be made hereunder without exhausting the right of sale for any other breach of any of the obligations secured hereby, it being the purpose to provide for a foreclosure and sale of the Mortgaged Property for any matured portion of any of the Debt secured hereby or other items provided for herein without exhausting the power to foreclose and to sell the Mortgaged Property for any other part of the debt secured hereby whether matured at the time or subsequently maturing.

(f) The Trustee, or its successor or substitute, hereunder shall have the right to sell the Mortgaged Property in whole or in part and in such parcels and order as he may determine, and the right of sale hereunder shall not be exhausted by one or more sales, but successive sales may be had until all of the Mortgaged Property has been legally sold. In the event any sale hereunder is not completed or is defective in the opinion of Beneficiary or the holder of any part of the Debt secured hereby, such sale shall not exhaust the power of sale hereunder, and Beneficiary or such holder shall have the right to cause a subsequent sale or sales to be made by the Trustee or any successor or substitute Trustee. Likewise, Beneficiary on behalf of Lender may become the purchaser at any such sale if it is the highest bidder, and shall have the right, after paying or accounting for all costs of said sale or sales, to credit the amount of the bid upon the amount of the debt secured hereby, in lieu of cash payment.

17

RP-2018-235600

RP-2018-235600

(g)     It shall not be necessary for the Trustee, or its successor or substitute, to have constructively in its possession any part of the real or personal property covered by this Deed of Trust, and the title and right of possession of said property shall pass to the purchaser or purchasers at any sale hereunder as fully as if the same had been actually present and delivered. Likewise, on foreclosure of this Deed of Trust whether by power of sale herein contained or otherwise, Grantor or any person claiming any part of the Mortgaged Property by, through or under Grantor, shall not be entitled to a marshalling of assets or a sale in inverse order of alienation.

(h)     The recitals and statements of fact contained in any notice or in any conveyance to the purchaser or purchasers at any sale hereunder shall be prima facie evidence of the truth of such facts, and all prerequisites and requirements necessary to the validity of any such sale shall be presumed to have been performed.

(i)     Any sale under the powers granted by this Deed of Trust shall be a perpetual bar against Grantor, its heirs, successors, assigns and legal representatives.

(j)     In the event of a foreclosure under the powers granted by this Deed of Trust, Grantor, and all other persons in possession of any part of the Mortgaged Property shall be deemed tenants at will of the purchaser at such foreclosure sale and shall be liable for a reasonable rental for the use of the Mortgaged Property; and if any such tenants refuse to surrender possession of the Mortgaged Property upon demand, the purchaser shall be entitled to institute and maintain the statutory action of forcible entry and detainer and procure a writ of possession thereunder, and Grantor expressly waives all damages sustained by reason thereof.

(k)     To the extent permitted under applicable law, Grantor shall not, and will not, apply for, avail itself of, insist upon or plead or in any manner claim or take advantage of any appraisement, homestead, valuation, stay, extension or exemption laws, or any so called "*Moratorium Laws*", now existing or hereafter enacted, in order to prevent or hinder the enforcement or foreclosure of this Deed of Trust, but hereby waives the benefit of such laws. Grantor, for itself and all who may claim through or under Grantor, waives any and all right to have the property and estates comprising the Mortgaged Property marshaled upon any foreclosure of the lien hereof and agrees that any court having jurisdiction to foreclose such lien may order the Mortgaged Property sold as an entirety. Grantor hereby expressly waives any and all rights of reinstatement and redemption, if any, from sale pursuant to a foreclosure of this Deed of Trust on behalf of Grantor, and each and every person claiming by, through or under Grantor. The waiver of statutory rights contained set forth above specifically includes a waiver of all provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time). In the event an interest in any of the Mortgaged Property is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code, and to the extent permitted by law, Beneficiary shall be entitled to seek a deficiency judgment from Grantor, any guarantor of the debt secured by this Deed of Trust and any other party obligated on obligations secured hereby (each an "Obligor") equal to the difference between the amount owing on the obligations secured hereby and the amount for which the Mortgaged Property was sold pursuant to judicial or nonjudicial foreclosure sale. Grantor expressly recognizes that this section constitutes a waiver of the above cited provisions of the Texas Property Code which would otherwise permit Grantor and other persons against whom recovery of deficiencies is sought independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Mortgaged Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Grantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Mortgaged Property for

18

001071

purposes of calculating deficiencies owed by Grantor or any other Obligor against whom recovery of a deficiency is sought.

(l)     To the extent, notwithstanding the provisions of Section 3.22(k) above, Section 51.003 of the Texas Property Code, or any amendment thereto or judicial interpretation thereof, requires that the "fair market value" of the Mortgaged Property shall be determined as of the foreclosure date in order to enforce a deficiency against Grantor or any other party liable for the repayment of the obligations secured by this Deed of Trust, the term "fair market value" shall include those matters required by law and shall also include the additional factors as follows:

(i)     The Mortgaged Property is to be valued "AS IS, WHERE IS" and "WITH ALL FAULTS" and there shall be no assumption of restoration of or refurbishment of the Mortgaged Property after the date of foreclosure;

(ii)     There shall be an assumption of a prompt resale of the Mortgaged Property for an all cash sales price by the purchaser at the foreclosure so that no extensive holding period should be factored into the determination of "fair market value" of the Mortgaged Property;

(iii)     An offset to the fair market value of the Mortgaged Property, as determined hereunder, shall be made by deducting from such value the reasonable estimated closing costs relating to the sale of the Mortgaged Property including but not limited to brokerage commissions, title policy expenses, tax prorations, escrow fees, and other common charges which are incurred by a seller of real property similar to the Mortgaged Property; and

(iv)     After consideration of the factors required by law and those required above (including the addition of any income to be generated by the Mortgaged Property), an additional discount factor shall be calculated based upon the estimated time it will take to effectuate a sale of the Mortgaged Property so that the "fair market value" as so determined is discounted to be as of the date of the foreclosure of the Mortgaged Property.

(m)     The Mortgaged Property forms no part of any property owned, used or claimed by Grantor as a residence or business homestead and is not exempt from forced sale under the laws of the State of Texas. Grantor hereby disclaims and renounces each and every claim to the Mortgaged Property as a homestead.

(n)     Pursuant to the Uniform Commercial Code, this Deed of Trust shall be effective as a Financing Statement filed as a fixture filing from the date of its filing for record covering and including any and all fixtures of every kind and type affixed to all or any portion of the Property or forming part of all or any portion of the Improvements. The name and address of Borrower, as debtor, and Lender (where information concerning the security interest granted hereby may be obtained), as secured party, are as set forth on the first page of this Deed of Trust. The above described goods are or are to become fixtures related to the Property and the Improvements of which Borrower is record title owner. This Deed of Trust shall also be effective as a financing statement covering minerals or the like (including oil and gas) and accounts subject to Section 9.103(e) of the Uniform Commercial Code, as amended.

(o)     **EACH OF THE PARTIES HERETO SPECIFICALLY ACKNOWLEDGES AND AGREES (i) THAT IT HAS A DUTY TO READ THIS DEED OF TRUST AND THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS HEREOF, (ii) THAT IT HAS IN FACT READ THIS DEED OF TRUST AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS DEED OF TRUST, (iii) THAT IT HAS BEEN REPRESENTED BY LEGAL COUNSEL OF ITS**

19

4162651-v5\CHIDMS1

RP-2018-235600

CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS DEED OF TRUST AND HAS RECEIVED THE ADVICE OF SUCH COUNSEL IN CONNECTION WITH ENTERING INTO THIS DEED OF TRUST, AND (iv) THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS DEED OF TRUST PROVIDE FOR (A) CERTAIN WAIVERS AND FOR (B) THE ASSUMPTION BY ONE PARTY OF, AND/OR RELEASE OF THE OTHER PARTY FROM, CERTAIN LIABILITIES THAT SUCH PARTY MIGHT OTHERWISE BE RESPONSIBLE FOR UNDER THE LAW. EACH PARTY HERETO FURTHER AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY SUCH PROVISIONS OF THIS DEED OF TRUST ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT SUCH PROVISIONS ARE NOT "CONSPICUOUS."

NOTICE PURSUANT TO SECTION 26.02(e) OF THE TEXAS BUSINESS AND COMMERCE CODE: THE NOTE, THIS DEED OF TRUST AND THE OTHER SECURITY DOCUMENTS CONSTITUTE A WRITTEN LOAN AGREEMENT (AS DEFINED IN SECTION 26(a)(2) OF THE TEXAS BUSINESS AND COMMERCE CODE, AS AMENDED) AND REPRESENT THE FINAL AGREEMENT AND UNDERSTANDING BETWEEN THE BENEFICIARY, THE LENDERS AND THE OTHER RESPECTIVE PARTIES HERETO AND THERETO AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS BETWEEN SUCH PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR CONTEMPORANEOUS OR SUBSEQUENT AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

### NOTICE OF INDEMNIFICATION

(p)    GRANTOR AND BENEFICIARY EACH HEREBY ACKNOWLEDGE AND AGREE THAT THIS DEED OF TRUST CONTAINS CERTAIN INDEMNIFICATION OBLIGATIONS AND COVENANTS.

[remainder of page intentionally left blank]

RP-2018-235600

20

4162651-v5\CHIDMS1

IN WITNESS WHEREOF, this Deed of Trust has been duly executed by Grantor as of the day first above written.

<div style="text-align: right;">

GRANTOR:

**GALLERIA 2425 OWNER, LLC,**
a Delaware limited liability company

By:    Galleria 2425 JV, LLC,
         a Delaware limited liability company,
         its sole member

         By:    Naissance Capital Real Estate, LLC,
                a Delaware limited liability company,
                its Managing Member

                By: _____
                Name: Azeemeh Zaheer
                Title: Managing Member

</div>

RP-2018-235600

[Signature Page to Deed of Trust]

## ACKNOWLEDGMENT

STATE OF _Texas_ )
 )ss.
COUNTY OF _Harris_ )

On _May 23,_ 2018 before me ___Shelina Jamani___ personally appeared _Azeemeh Zaheer_ ,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person, whose
name is subscribed to the within instrument and acknowledged to me that he executed the same in his
authorized capacity, and that by his signature on the instrument the person or the entity upon behalf of
which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____          (Seal)



SHELINA JAMANI
Notary Public, State of Texas
Comm. Expires 05-09-2019
Notary ID 128607783

RP-2018-235600

[Signature Page to Deed of Trust]

EXHIBIT A
PROPERTY DESCRIPTION

Real property in the City of Houston, County of Harris and State of Texas, described as follows:

Tract 1: Fee Tract

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING;

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM. WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X"

[Exhibit A - Property Description]

FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

NOTE: WE ARE PROHIBITED FROM INSURING ANY INACCURACY IN STATEMENT AS TO THE QUANTITY OF LAND CONTAINED WITHIN THE BOUNDARIES OF THE LAND DESCRIBED IN SCHEDULE A.

TRACT 2 EASEMENT TRACT: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND GRANTED BY VI IAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385 ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X" FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF BEGINNING;

[Exhibit A - Property Description]

RP-2018-235600

001077

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61 FEET ALONG THE NORTHERLY LINE OF TRACT 1 TO AN "X" SET ON THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE NORTHERLY LINE OF TRACT 1, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085 SQUARE FEET OF LAND MORE OR LESS.

TRACT 3 EASEMENT TRACT: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE SOUTHERN BOUNDARY LINE OF TRACT 1, SAID EASEMENT CREATED AND GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING, WHENCE THE SOUTHEAST CORNER OF TRACT 1 BEARS NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE SOUTHERLY LINE OF TRACT 1, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP;

[Exhibit A - Property Description]

RP-2018-235600

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE SOUTHWEST CORNER FOR TRACT 1 FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND AT THE SOUTHEAST CORNER OF TRACT 1;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG THE A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

TRACT 4 EASEMENT TRACT: 28 FOOT ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT 1, CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT 1;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

[Exhibit A - Property Description]

RP-2018-235600

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

TRACT 5 EASEMENT TRACT: 5 FOOT STORM SEWER EASEMENT

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT UN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS

[Exhibit A - Property Description]

RP-2018-235600

001080

RP-2018-235600

# Pages 29

05/30/2018 08:41 AM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

STAN STANART

COUNTY CLERK

Fees   $124.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.

*Stan Stanart*

COUNTY CLERK
HARRIS COUNTY, TEXAS

001081

Case 4:24-cv-01746 Document 44 Filed on 06/18/24 in TXSD (Page 301 of 856

# **EXHIBIT D**



**National Bank of Kuwait** SAKP
*New York Branch*
299 Park Ave. 17th Fl.
New York   NY   10171
USA

| | |
|---|---|
| TEL | 212-303-9800 |
| FAX | 212-319-8269 |
| ABA | ▮▮▮▮ |
| SWIFT | ▮▮▮▮ |

## LOAN PAYOFF STATEMENT

February 6, 2023

To:        GALLERIA 2425 OWNER, LLC
Scarlet MacGeorge        (scarlet.M▮▮▮
Ali                            Ali @▮▮▮
Jennifer MacGeorge       (jennife▮▮▮.
                               NYCorpBankingGr▮

RE:        **GALLERIA 2425 OWNER, LLC**
            USD 51.675MM 5 Year Term Loan

**Dear All,**

 The total  amount due to repay the loan in full, effective March 1, 2023, is $61,714,063.38.   If repayment were to occur after March 1, 2023, please adjust the amount due by the per diem interest amount of $13,995.31 for each day beyond March 1, 2023.

 Please remit payment via the wiring instructions noted below.

Wiring Instructions
Bank Name:        Bank of America New York:
Swift Code:        ▮▮▮▮
ABA/Routing No.:   ▮▮▮▮
Account Name:      National Bank of Kuwait, New York
Bank Account #     ▮▮▮▮
Swift Code:        ▮▮▮▮
F/O:               National Bank of Kuwait, Grand Cayman Branch
Ref Account No.:   ▮▮▮▮
Attention:         Loan Operations Department
Reference:         Galleria 2425 Owner, LLC

Should you have any questions concerning the above, please contact the undersigned at (212) 303-9820

Regards,

Robert Looft                          Craig Kennedy
National Bank of Kuwait               National Bank of Kuwait
Loan Operations Supervisor            Head of Operations
Tel: (212) 303-9820                   Tel: (212) 303-9827
Email: robert.loof▮▮▮                 Email: craig.kennedy▮▮▮

# EXHIBIT 2

001084

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case:</strong></td></tr>
</table>

| | |
|---|---|
| Debtor 1 | Galleria 2425 Owner LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Southern District of Texas |
| Case number | 23-60036 (CML) |

Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

## Part 1:  Identify the Claim

| | |
|---|---|
| 1. Who is the current creditor? | National Bank of Kuwait, S.A.K.P., New York Branch<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes. From whom? _____ |

| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|---|
| | Charles Conrad<br>Name | <br>Name |
| | Two Houston Center, 909 Fannin, Suite 2000<br>Number      Street | <br>Number      Street |
| | Houston            TX         77010<br>City            State       ZIP Code | <br>City            State       ZIP Code |
| | Contact phone (713) 276 7600 | Contact phone _____ |
| | Contact email charles.conrad@pillsburylaw.com | Contact email _____ |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | |

| | | |
|---|---|---|
| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____ | Filed on _____<br>MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes. Who made the earlier filing? _____ | |

**Part 2:**     **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br><br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____ |

---

7. **How much is the claim?**     $ _____ 63,552,988.79    **Does this amount include interest or other charges?**

        ☐ No

        ☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

8. **What is the basis of the claim?**

    Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

    Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

    Limit disclosing information that is entitled to privacy, such as health care information.

    _Money loaned; see Addendum to Proof of Claim_____

---

9. **Is all or part of the claim secured?**

    ☐ No

    ☑ Yes.   The claim is secured by a lien on property.

       **Nature of property:**

       ☑ Real estate. If the claim is secured by the debtor's principal residence, file a _Mortgage Proof of Claim Attachment_ (Official Form 410-A) with this _Proof of Claim._

       ☐ Motor vehicle

       ☐ Other. Describe: _____

       **Basis for perfection:** _____

       Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

       **Value of property:**         $_____

       **Amount of the claim that is secured:**    $_____

       **Amount of the claim that is unsecured:**   $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

       **Amount necessary to cure any default as of the date of the petition:**    $_____

       **Annual Interest Rate** (when case was filed) _____ %

       ☐ Fixed

       ☐ Variable

---

10. **Is this claim based on a lease?**

    ☑ No

    ☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

---

11. **Is this claim subject to a right of setoff?**

    ☑ No

    ☐ Yes. Identify the property: _____

---

001086

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | | |
|---|---|---|---|
| | ☐ Yes. *Check one:* | | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $_____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:  Sign Below

| The person completing this proof of claim must sign and date it. FRBP 9011(b). | *Check the appropriate box:* |
|---|---|

☑  I am the creditor.

☐  I am the creditor's attorney or authorized agent.

☐  I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐  I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  10/27/23
                  ‾MM‾/‾DD‾/‾YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Michael | C. | Carter |
|---|---|---|---|
| | First name | Middle name | Last name |

| Title | Vice President |
|---|---|

| Company | National Bank of Kuwait, S.A.KP. New York Branch |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 299 Park Avenue | | |
|---|---|---|---|
| | Number        Street | | |
| | New York | NY | 10171 |
| | City | State | ZIP Code |

| Contact phone | (212) 303-9800 | Email | michael.carter@nbkny.com |
|---|---|---|---|

Case 23-60036 Document 4-4 Filed 06/13/24 in TXSB Page 307 of 856
Case 24-60-01746 Document 4-4 Filed 06/13/24 in TXSB Document Addendum to Proof of Claim
Page 1 of 6

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| In re: | § |
| | §    Case No. 23-60036 (CML) |
| GALLERIA 2425 Owner, LLC | § |
| | §    Chapter 11 |
| Debtor. | § |
| | § |

## ADDENDUM TO PROOF OF CLAIM

1.    National Bank of Kuwait, S.A.K.P. New York Branch ("NBK") files this Proof of Claim against Galleria 2425 Owner, LLC (the "Debtor") for Tax Liens (defined herein) against the Property in the amount of $1,696,384.85 currently held by NBK.

## THE CLAIM

2.    On May 23, 2018, NBK loaned the Debtor approximately $51,675,000 (the "Loan") to acquire certain real property and improvements commonly known as 2425 West Loop South Houston, Texas 77027 (the "Property"). Loan Agreement § 2.1. The Loan is secured by, among other things, a first-priority lien on the Property, and proceeds thereof, and is evidenced by the (i) Loan Agreement between NBK and the Debtor dated May 23, 2018, (ii) Promissory Note dated May 23, 2018 executed by the Debtor and payable to NBK, and (iii) Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing dated May 23, 2018, recorded at record number RP2018-235600 in the Real Property Records of Harris County, Texas.

3.    Section 32.01 of the Texas Property Tax Code provides that a lien automatically attaches to real property for unpaid taxes by the property owner. *See* Prop. Tax Code § 32.01(d). The property owner may authorize a third party to pay those taxes by entering into a contract for

the payment of taxes.  *See id.* §§ 32.06(a-1), 32.065(a).  If a third party pays property taxes pursuant to such a contract, the taxing unit must issue a certified statement transferring the tax lien to the third-party.  *See id.* § 32.06(b); *see also id.* § 32.06(a-2) (a tax lien may be transferred to the party that pays delinquent taxes for the property owner as described under section 32.06(a-1)). Under Texas law and the terms of the contract for the payment of taxes, after the transfer, the property owner is obligated to pay the transferee the tax lien amount. *See* § 32.065.  If the property owner defaults on those obligations, the transferee may foreclose the tax lien pursuant to sections 32.06(c) and 32.065(c) of the Property Tax Code.  *See* §§ 32.06(c), 32.065(c).

4.     NBK understands that on January 31, 2020, the Debtor and Caz Creek TX II, LLC ("Caz Creek II") executed a tax lien contract ("2020 Tax Lien Contract"), which was recorded at record number RP-2020-237529 of the Official Public Records in Harris County, Texas.[1] The 2020 Tax Lien Contract incorporates by reference the terms of an unrecorded Tax Payment Agreement dated January 31, 2020, related to a tax obligation against the Property in the amount of $845,366.97 (the "2019 Tax Obligation"). The 2020 Tax Lien Contract authorized Caz Creek II to pay the 2019 Tax Obligation and, in return, Caz Creek II obtained the transfer of a tax lien on the Property from the taxing authority.  *See* Ex. A ¶ 1.  On February 11, 2020, after Caz Creek paid the 2019 Tax Obligation, the City of Houston transferred the tax lien for the 2019 tax year to Caz Creek II (the "2019 Tax Lien").[2]

5.     On April 30, 2021, the Debtor and Caz Creek II executed a tax lien contact (the "2021 Tax Lien Contract," and together with the 2020 Tax Lien Contract, the "Tax Lien Contracts"), which was recorded at record number RP-2021-252144 of the Official Public

---

[1]  A copy of the 2019 Tax Lien Contract is attached as Exhibit A.
[2]  A copy of the Certified Statement of Transfer of Tax Lien (2019) is attached as Exhibit B.

Records in Harris County, Texas. The 2021 Tax Lien Contract incorporates by reference the terms of an unrecorded Tax Payment Agreement dated April 30, 2021, related to a tax obligation against the Property associated with the 2020 tax year (the "2020 Tax Obligation").[3] The 2021 Tax Lien Contract also states that Caz Creek II advanced to the Debtor $845,366.97 to consolidate funds advanced for liens previously transferred by the Debtor in the 2020 Tax Lien Contract.

6. The 2021 Tax Lien Contract authorized Caz Creek II to pay the 2020 Tax Obligation and, in return, Caz Creek II obtained the transfer of a tax lien on the Property from the taxing authority. *See* Ex. C ¶ 1. On May 5, 2021, after Caz Creek II paid the 2020 Tax Obligation in the amount of $853,914.94, the City of Houston transferred the tax lien for tax year 2020 to Caz Creek II (the "2020 Tax Lien," and together with the 2019 Tax Lien, the "Tax Liens").[4]

7. The Tax Lien Contracts each provide that the Debtor "shall pay to the Tax Lien Transferee [i.e., Caz Creek] the Tax Obligation." *See* Exs. A and B ¶ 1.

8. The Debtor's principal Ali Choudhri acquired the 2019 Tax Lien from Caz Creek II pursuant to an Assignment of Tax Lien, dated May 24, 2021, which was recorded at record number RP-2021-508701 of the Official Public Records in Harris County, Texas ("2019 Tax Lien Assignment").[5] The 2019 Tax Lien Assignment shows a balance due of $845,366.97. Mr. Choudhri acquired the 2020 Tax Lien from Caz Creek II pursuant to an Assignment of Tax Lien, dated August 26, 2021, which was recorded at record number RP-2021-508702 of the Official Public Records in Harris County, Texas (the "2020 Tax Lien Assignment," and together with

---

[3] A copy of the 2020 Tax Lien Contract is attached as Exhibit C.

[4] A copy of the Certified Statement of Transfer of Tax Lien (2020) is attached as Exhibit D.

[5] A copy of the Assignment of Tax Lien for 2019 is attached as Exhibit E.

001090

2019 Tax Lien Assignment, the "<u>Assignments</u>").[6]  The 2020 Tax Lien Assignment shows a balance due of $868,704.35.  The Assignments were recorded on September 3, 2021.

9.       On or about August 22, 2022, NBK, the Debtor, Naissance Galleria, LLC and Mr. Choudhri entered into a confidential settlement agreement (the "<u>Settlement Agreement</u>").[7] Among other things, in accordance with the terms of the Settlement Agreement, Mr. Choudhri assigned the Tax Liens to NBK pursuant to an Assignment of Tax Liens (the "<u>NBK Assignment</u>"), which was recorded with the Official Public Records in Harris County, Texas ((Instrument No(s).: RP-2021-252144 and RP-2020-237529).[8]  The NBK Assignment provides that Mr. Choudhri "hereby transfers, assigns, grants, and conveys unto [NBK], effective the date first written above and subject to the terms set forth in that certain Confidential Settlement Agreement involving Choudhri and NBK dated August 22, 2022 (the "Settlement Agreement"), the Note, Liens, and any and all other related loan documents, including other agreements, instruments and other collateral which evidence, secure or otherwise relate to Choudhri's right, title or interest in the Note and Liens." NBK Assignment at 1.

10.      Under the Settlement Agreement, once NBK received payment of the Settlement Payment or the Purchase Option Payment (as those terms are defined therein), NBK was required to reassign the Tax Liens to Mr. Choudhri.  Neither the Settlement Payment nor the Purchase Option Payment has been made.

11.      As of the Petition Date, NBK's claim on account of the Tax Liens is in the total amount of $1,696,384.85.

---

[6]  A copy of the Assignment of Tax Lien for 2020 is attached as <u>Exhibit F</u>.

[7]   A copy of the Settlement Agreement was filed under seal in connection with the *Reply In Support of National Bank of Kuwait's Motion to Dismiss* (Redacted).  *See* Docket No. 61. The Settlement Agreement is omitted from this Proof of Claim because it is confidential.

[8]  A true and correct copy of the NBK Assignment of Tax Liens is attached as <u>Exhibit G</u>.

001091

## **RESERVATION OF RIGHTS**

12.     NBK reserves the right to amend or supplement this Proof of Claim, including, without limitation, the right to: (i) add documents; (ii) assert indemnity, contribution, or similar rights, claims or defenses; and/or (iii) change priority and fix, increase, or amend in any respect the amounts and claims referred to herein. NBK further reserves the right to file additional proofs of claim for additional claims, including, without limitation, claims for administrative expenses and all other claims, at law or in equity, arising prior to, on, or after the Debtor's petition date (i.e., July 5, 2023).

13.     NBK reserves the right to amend or supplement this Proof of Claim if it deems it necessary and appropriate, for any reason, including to add costs or expenses that have been incurred but not yet billed or that are allowable at law, equity, or otherwise. NBK further reserves any rights to recoupment and setoff, and, if appropriate, may exercise such rights without further order of the Court and without amending this Proof of Claim.

14.     NBK does not waive any rights at law or equity or any rights or causes of action that NBK has or may have against any person, including but not limited to the Debtor and its affiliates. The Proof of Claim is not intended to be, and shall not be construed as: (i) an election of remedies; (ii) a waiver of any defaults; (iii) an admission as to the jurisdiction of this Court and/or a waiver to contest the jurisdiction of this Court; (iv) a waiver of the right to trial by jury in this Court or any other court in any proceeding, notwithstanding the designation or not of any matter as a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (v) a waiver of the contractual right to arbitration; (vi) a release NBK's right to have any and all final orders in any and all non-core matters or proceedings entered only after a de novo review by a United States District Court

001092

judge; (vii) a waiver of the right to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding which may be commenced in these cases against or otherwise involving NBK; or (viii) a waiver or limitation of any rights, remedies, claims or interests of NBK.

## NOTICES

15.     All objections, notices, requests or any other filings or submissions relating to this Proof of Claim should be sent to each of the following:

<div align="center">

Charles C. Conrad
Ryan Steinbrunner
Pillsbury Winthrop Shaw Pittman LLP
Two Houston Center
909 Fannin, Suite 2000
Houston, Texas 77010-1028
Tel: 713-276-7600
Fax: 713-276-76734
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

Andrew M. Troop
Patrick E. Fitzmaurice
Andrew V. Alfano
Kwame O. Akuffo
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, NY 10019-6131
Tel: 212-858-1660
Fax: 212-973-7435
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
andrew.alfano@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

</div>

001093

# **EXHIBIT A**

RP-2020-237529
06/04/2020   ER   $42.00

## TAX LIEN CONTRACT ("Contract")

| | |
|---|---|
| **Date:** | 01/31/2020 |
| **Loan Number:** | 20018213 |
| **Property Owner:** (whether one or more) | Galleria 2425 Owner LLC<br>2425 West Loop South, Suite 350<br>Houston, TX 77027 |
| **Tax Lien Transferee:** | Caz Creek TX II, LLC<br>14800 Landmark Blvd, Suite 400<br>Dallas, TX 75254 |
| **Tax Payment Agreement:** | Date:   01/31/2020 |
| | Tax Obligation:  $845,366.97 (original amount) |

**Property** (including any improvements) located in **Harris County**, Texas and described as follows:

SEE EXHIBIT "A" WHICH IS ATTACHED HERETO.

Located at: 2425 W. Loop S, Houston, TX 77027

1.   Pursuant to § 32.06, Texas Tax Code, Property Owner by execution of a sworn document did authorize Tax Lien Transferee to pay ad valorem taxes, penalties, interest and costs due on the Property to certain taxing units. Such sworn authorization permits the taxing units to transfer the tax liens on the Property to Tax Lien Transferee to secure payment of the Tax Obligation.  Property Owner also executed the Tax Payment Agreement, and under its terms Property Owner shall pay to Tax Lien Transferee the Tax Obligation.  The terms of the Tax Payment Agreement are incorporated herein.

2.   In compliance with § 32.06 and § 32.065, Texas Tax Code, this Contract further secures the special tax lien against the Property transferred to Tax Lien Transferee for the Tax Obligation and secures the payment of all amounts previously or hereafter advanced, charged, or incurred in connection with transferred lien(s), this Contract, the Tax Payment Agreement, or modifications thereof, as agreed to by Property Owner, including taxes, penalties, interest, costs, fees, post-closing costs and fees, or other charges as permitted by law.  Tax Lien Transferee is subrogated to rights, liens, remedies, and equities of the taxing units paid, and the same are renewed and extended by this Contract until all obligations under the Tax Payment Agreement are satisfied and paid in full.

3.   An "Event of Default" is any failure by Property Owner to perform under this Contract or the Tax Payment Agreement.  Upon an Event of Default, Tax Lien Transferee may proceed to foreclose its tax lien under any method provided in § 32.06(c), Texas Tax Code.  In accordance with section 32.06, Texas Tax Code, Property Owner hereby waives the requirement that Tax Lien Transferee wait one year from the date the tax lien transfer is recorded before instituting foreclosure following a default and acceleration. This Contract shall not restrict Tax Lien Transferee from pursuing any remedy to which it is otherwise entitled by law.

4.   This Contract shall be recorded in each county in which the Property is located.  When the context requires, singular nouns and pronouns include the plural.







Musa Hussain, authorized signer for Naissance Capital Real Estate, LLC, as Member of Galleria JV, LLC, as Member of Galleria Owner, LLC

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on July 31  2020 by Musa Hussain, authorized signer for Naissance Capital Real Estate, LLC, as Member of Galleria JV, LLC, as Member of Galleria Owner, LLC.

STEPHANIE A. GALLEGOS
Notary Public, State of Texas
Comm. Expires 12-29-2023
Notary ID 125186127

Notary Public, State of Texas

AFTER RECORDING, RETURN DOCUMENT TO: Caz Creek TX II, LLC, 14800 Landmark Blvd Suite 400, DALLAS, TX 75254

RP-2020-237529

Contract   Page 2

001096

Page 3 of 8   Friday, August 19, 2022

County Clerk Harris County, Texas

RP-2020-237529

GALLERIA 2425 OWNER LLC

PARCEL I.D. #0451400060400

# EXHIBIT "A"

**Tract 1:**

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING;

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X" FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED

001097



County Clerk Harris County, Texas

RP-2020-237529

TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;
THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385
ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST,
SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF
BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

**TRACT 2: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT**

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS
A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE
NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND
GRANTED BY VIVIAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT
EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN
GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND
DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO
PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH
VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO.
20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND
BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF
WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468
ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY
TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND
THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R.
HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61
FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO
THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD
FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS
WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385
ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X"
FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF
BEGINNING;

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61
FEET ALONG THE NORTHERLY LINE OF TRACT I TO AN "X" SET ON THE
EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54
FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE NORTHERLY LINE OF TRACT I, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085 SQUARE FEET OF LAND MORE OR LESS.

**TRACT 3**: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE SOUTHERN BOUNDARY LINE OF TRACT I, SAID EASEMENT CREATED AND GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO HN PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING, WHENCE THE SOUTHEAST CORNER OF TRACT I BEARS NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE SOUTHERLY LINE OF TRACT 1, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP;

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE SOUTHWEST CORNER FOR TRACT I FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50 FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND

County Clerk Harris County, Texas

RP-2020-237529

AT THE SOUTHEAST CORNER OF TRACT I;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

**TRACT 4:  28 FOOT ROADWAY AND PEDESTRIAN EASEMENT**

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT I, CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO HN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT I;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

RP-2020-237529

County Clerk Harris County, Texas

<u>TRACT 5</u>: **5 FOOT STORM SEWER EASEMENT**

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT HN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS.

RP-2020-237529

RP-2020-237529

# Pages 8

06/04/2020 01:56 PM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

CHRIS HOLLINS

COUNTY CLERK

Fees $42.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



COUNTY CLERK
HARRIS COUNTY, TEXAS

001102



I, Teneshia Hudspeth, County Clerk of Harris County, Texas certify that these pages
are a true and correct copy of the original record filed and recorded in my office,
electronically or hard copy, as it appears on this date.

Witness my official hand and seal of office
This August 19, 2022

Teneshia Hudspeth, County Clerk
Harris County, Texas

Any provision herein which restrict the sale, rental or use of the described Real Property because of color or race is invalid and
unenforceable under the Federal Law. Confidential information may have been redacted from the document in compliance with the
Public Information Act.



# EXHIBIT B



# ANN HARRIS BENNETT

Tax Assessor-Collector

03/11/2020   ER   $20.00

**STATE OF TEXAS**                          §

**COUNTY OF HARRIS**                     §                                      Date: February 11, 2020

### CERTIFIED STATEMENT OF TRANSFER OF TAX LIEN

| | |
|---|---|
| Account Number: | 045-140-006-0400 |
| Legal Description: | TR 31D ABST 836 W WHITE |
| Street Address (if applicable): | 2425 W LOOP S |
| Taxing Unit(s): | City Of Houston, Harris County, Harris County Dept. Of Education, Harris County Flood Control Dist, Harris County Hospital District, Houston Community College System, Houston I.S.D., Port Of Houston Authority |
| Tax Year(s) Paid: | 2019 |
| Amount Paid for Transfer (including taxes, penalties, interest and collection costs): | $844,387.97 |
| Property Owner(s)' Name(s): | GALLERIA 2425 OWNER LLC |
| | 3139 W HOLCOMBE BLVD APT 845 |
| Transferee's Name: | CAZ CREEK TX II, LLC |
| Transferee's Street Address: | 14800 LANDMARK BLVD STE 400 |
| | DALLAS TX 75254 |

I, Ann Harris Bennett, Tax Assessor-Collector for Harris County, and for all taxing units for which the Office of the Harris County Tax Assessor-Collector collects ad valorem taxes, certify that the above named transferee or transferee's agent ("Transferee") has made payment of the amount listed above to the above named taxing units on the property described above as consideration for a transfer of the tax lien(s), and that the tax lien(s) held by taxing units on the property for the tax years listed above are hereby transferred to Transferee in accordance with Texas Tax Code §32.06. I have issued a receipt to Transferee in conjunction with this certification reflecting the payment for the transfer in the amount of taxes, penalties, interest, and collection costs.



Ann Harris Bennett
Harris County Tax Assessor-Collector

BY: _____
                   Deputy

AFTER RECORDING, RETURN TO:
CAZ CREEK TX II, LLC
14800 LANDMARK BLVD STE 400
DALLAS TX 75254

RP-2020-112204



RP-2020-112204

## SWORN DOCUMENT AUTHORIZING TRANSFER OF TAX LIEN

| | | |
|---|---|---|
| STATE OF TEXAS | § | After recording, return to: |
| | | Caz Creek TX II, LLC |
| COUNTY OF HARRIS | § | 14800 Landmark Blvd, Suite 400 |
| | | Dallas, TX 75254 |

Before me, the undersigned notary, on this day personally appeared Musa Hussain, authorized signer for Naissance Capital Real Estate, LLC, as Member of Galleria JV, LLC, as Member of Galleria Owner, LLC, known to me to be the person(s) whose name(s) is/are subscribed below, and being duly sworn, upon oath deposed and stated as follows:

"My name is Musa Hussain, authorized signer for Naissance Capital Real Estate, LLC, as Member of Galleria JV, LLC, as Member of Galleria Owner, LLC. I am over 18 years of age and am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct. I or the entity I represent owns the real property described as follows:

| | |
|---|---|
| Account No. or Property ID No.: | '0451400060400 |
| Legal Description: | TR 31D ABST 836 W WHITE |
| Street Address, if applicable: | 2425 W LOOP S  HOUSTON  TX 77027 |
| Amount Paid for Transfer: | $ 844,387.97  (including taxes, penalties, interest, & collection costs) |
| Tax Year(s): | 2019 |
| Transferee's Name: | Caz Creek TX II, LLC |
| OCCC Property Tax License Lender No.: | 1800062523-161548 |
| Transferee's Street Address: | 14800 Landmark Blvd, Suite 400, Dallas, TX 75254 |

"Pursuant to Texas Tax Code §32.06, I hereby authorize the above-named transferee or transferee's agent (the "Transferee"), to pay all taxes, penalties, interest, and collection costs imposed by any and all local taxing units or their agents on the real property, described above, for the tax years listed above. I further authorize and direct the tax assessor-collector(s) for said taxing units to issue a tax receipt with the collector's seal of office or notarized signature to the Transferee and to certify that the taxes and any penalties and interest on the subject property and collection costs have been paid by the transferee on behalf of the owner, and the tax lien on the owner's property has been transferred to the Transferee."

"I have been given notice that if this property is my homestead and I am disabled, I may be eligible for a tax deferral under Texas Tax Code §33.06."

*Property Owner*
*OR Authorized*
*Representative*
    Name:   Musa Hussain, authorized signer for Naissance Capital Real Estate, LLC, as Member of Galleria JV, LLC, as Member of Galleria Owner, LLC

Date Signed: 1/31/2020

STATE OF TEXAS
COUNTY OF HARRIS

Subscribed and sworn to before me on 1/31/2020 by Musa Hussain, authorized signer for Naissance Capital Real Estate, LLC, as Member of Galleria JV, LLC, as Member of Galleria Owner, LLC.

NOTARY PUBLIC, STATE OF TEXAS

STEPHANIE A. GALLEGOS
Notary Public, State of Texas
Comm. Expires 12-29-2023
Notary ID 125186127

Account # 20018213 (County)
Current: 01/31/2020 / Original: //

001106



RP-2020-112204

# Pages 3

03/11/2020 02:45 PM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

DIANE TRAUTMAN

COUNTY CLERK

Fees  $20.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



COUNTY CLERK
HARRIS COUNTY, TEXAS

001107





I, Teneshia Hudspeth, County Clerk of Harris County, Texas certify that these pages
are a true and correct copy of the original record filed and recorded in my office,
electronically or hard copy, as it appears on this date.

Witness my official hand and seal of office
This August 19, 2022

Teneshia Hudspeth, County Clerk
Harris County, Texas

Any provision herein which restrict the sale, rental or use of the described Real Property because of color or race is invalid and
unenforceable under the Federal Law. Confidential information may have been redacted from the document in compliance with the
Public Information Act.



001108

# **EXHIBIT C**

001109

RP-2021-252144
05/07/2021   ER   $42.00

# TAX LIEN CONTRACT ("Contract")

| | |
|---|---|
| **Date:** | 04/30/2021 |
| **Loan Number:** | TX20120037CC |
| **Property Owner:** (whether one or more) | Galleria 2425 Owner LLC<br>1001 W Loop<br>Houston, Texas 77027 |
| **Tax Lien Transferee:** | Caz Creek TX II LLC<br>14800 Landmark Blvd, Suite 400<br>Dallas, TX 75254 |
| **Tax Payment Agreement:** | Date:   04/30/2021 |
| | Tax Obligation:   $1,704,813.08 (original amount) |

**Property** (including any improvements) located in **Harris County**, Texas and described as follows:

SEE EXHIBIT "A" WHICH IS ATTACHED HERETO.

Located at: 2425 W Loop S, Houston, Texas 77027

1.  Pursuant to § 32.06, Texas Tax Code, Property Owner by execution of a sworn document did authorize Tax Lien Transferee to pay ad valorem taxes, penalties, interest and costs due on the Property to certain taxing units. Such sworn authorization permits the taxing units to transfer the tax liens on the Property to Tax Lien Transferee to secure payment of the Tax Obligation. Property Owner also executed the Tax Payment Agreement, and under its terms Property Owner shall pay to Tax Lien Transferee the Tax Obligation. The terms of the Tax Payment Agreement are incorporated herein.

2.  In compliance with § 32.06 and § 32.065, Texas Tax Code, this Contract further secures the special tax lien against the Property transferred to Tax Lien Transferee for the Tax Obligation and secures the payment of all amounts previously or hereafter advanced, charged, or incurred in connection with transferred lien(s), this Contract, the Tax Payment Agreement, or modifications thereof, as agreed to by Property Owner, including taxes, penalties, interest, costs, fees, post-closing costs and fees, or other charges as permitted by law. Tax Lien Transferee is subrogated to rights, liens, remedies, and equities of the taxing units paid, and the same are renewed and extended by this Contract until all obligations under the Tax Payment Agreement are satisfied and paid in full.

3.  An "Event of Default" is any failure by Property Owner to perform under this Contract or the Tax Payment Agreement. Upon an Event of Default, Tax Lien Transferee may proceed to foreclose its tax lien under any method provided in § 32.06(c), Texas Tax Code. In accordance with section 32.06, Texas Tax Code, Property Owner hereby waives the requirement that Tax Lien Transferee wait one year from the date the tax lien transfer is recorded before instituting foreclosure following a default and acceleration. This Contract shall not restrict Tax Lien Transferee from pursuing any remedy to which it is otherwise entitled by law.

4.  This Contract shall be recorded in each county in which the Property is located. When the context requires, singular nouns and pronouns include the plural.

5.  In addition to the funds advanced to transfer property tax liens, the Transferee also advanced a portion of the funds to consolidate funds advanced for liens previously transferred by the Property Owners and secured by the contract(s) dated, for funds advanced of, recorded under document no(s). and existing transferred property tax liens recorded under document no(s). listed below:

| Date | Funds Advanced | Contract Recording # | TLT Recording #s |
|---|---|---|---|
| 01/31/2020 | $845,366.97 | RP-2020-237529. | RP-2020-112204. |

all in the Real Property Records of Harris County, Texas. Transferee is subrogated to the rights of any lienholder paid. All such existing liens are carried forward in full force and effect to secure the Tax Payment Agreement. Property Owners agree that this Contract preserves and extends the superior priority of all such existing liens, and that all such liens may be enforced to secure payment of the Tax Payment Agreement under the terms and conditions of this Contract and §32.06 and §32.065, Texas Tax Code.

001110





Ali Choudhri, Manager of Galleria West Loop Investments II, LLC, as
Member of Galleria 2425 JV, LLC, as Member of Galleria 2425
Owner, LLC

STATE OF TEXAS
COUNTY OF TRAVIS

    This instrument was acknowledged before me on **April 30, 2021** by Ali Choudhri, Manager of Galleria West
Loop Investments II, LLC, as Member of Galleria 2425 JV, LLC, as Member of Galleria 2425 Owner, LLC.

ERIC ANDRES RODRIGUEZ
Notary ID #132670331
My Commission Expires
September 10, 2024

Notary Public, State of TEXAS

**AFTER RECORDING, RETURN DOCUMENT TO: Caz Creek TX II LLC, 14800 Landmark Blvd, Suite 400, Dallas, TX 75254**

GALLERIA 2425 OWNER LLC

PARCEL I.D. #0451400060400

# EXHIBIT "A"

County Clerk Harris County, Texas

RP-2021-252144

**Tract 1:**

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING:

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X" FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED



Case 4:24-cv-01746 Document 54-4 Filed on 06/18/24 in TXSD Page 332 of 856
Case 4:24-cv-01746 Document 54-4 Filed on 07/05/18/24 in TXSD Page 332 of 856

Page 4 of 8    Friday, August 19, 2022

TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;
THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385
ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST,
SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF
BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

**TRACT 2:** **20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT**

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS
A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE
NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND
GRANTED BY VIVIAN L, SMITH, INDIVIDUALLY AND AS INDEPENDENT
EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN
GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND
DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO
PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH
VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO.
20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND
BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF
WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468
ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY
TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND
THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R.
HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61
FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO
THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD
FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS
WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385
ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X"
FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF
BEGINNING;

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61
FEET ALONG THE NORTHERLY LINE OF TRACT I TO AN "X" SET ON THE
EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54
FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

RP-2021-252144

County Clerk Harris County, Texas

001113

RP-2021-252144

THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE
NORTHERLY LINE OF TRACT I, NORTH 87 DEGREES 44 MINUTES 46 SECONDS
EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00
FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085
SQUARE FEET OF LAND MORE OR LESS.

TRACT 3: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS
A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE
SOUTHERN BOUNDARY LINE OF TRACT I, SAID EASEMENT CREATED AND
GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO HN
PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY
EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL
WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY
CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY
METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF
WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468
ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY
TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND
THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R.
HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61
FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO
THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING,
WHENCE THE SOUTHEAST CORNER OF TRACT I BEARS NORTH 02 DEGREES 23
MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE
SOUTHERLY LINE OF TRACT 1, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS
WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST
LOOP;

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54
FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE
SOUTHWEST CORNER FOR TRACT I FROM WHICH A FOUND RAILROAD SPIKE
BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50
FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND

RP-2021-252144

AT THE SOUTHEAST CORNER OF TRACT I;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

TRACT 4: 28 FOOT ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT I, CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO HN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT I;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

**TRACT 5: 5 FOOT STORM SEWER EASEMENT**

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT HN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS.

RP-2021-252144

001116

RP-2021-252144

# Pages 8

05/07/2021 11:43 AM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

TENESHIA HUDSPETH

COUNTY CLERK

Fees  $42.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



COUNTY CLERK
HARRIS COUNTY, TEXAS

001117





I, Teneshia Hudspeth, County Clerk of Harris County, Texas certify that these pages
are a true and correct copy of the original record filed and recorded in my office,
electronically or hard copy, as it appears on this date.

Witness my official hand and seal of office
This August 19, 2022

*Teneshia Hudspeth*

Teneshia Hudspeth, County Clerk
Harris County, Texas

Any provision herein which restrict the sale, rental or use of the described Real Property because of color or race is invalid and
unenforceable under the Federal Law. Confidential information may have been redacted from the document in compliance with the
Public Information Act.



# **EXHIBIT D**

001119

Page 1 of 3   Friday, August 19, 2022   County Clerk Harris County, Texas

# ANN HARRIS BENNETT

Tax Assessor-Collector

05/20/2021   ER   $22.00
RP-2021-280403

RP-2021-280403

STATE OF TEXAS                    §

COUNTY OF HARRIS                  §                         Date: May 5, 2021

## CERTIFIED STATEMENT OF TRANSFER OF TAX LIEN

Account Number:              045-140-006-0400
Legal Description:           TR 31D ABST 836 W WHITE

Street Address (if applicable):   2425 W LOOP S
Taxing Unit(s):              City Of Houston, Harris County, Harris County Dept. Of Education, Harris County
                             Flood Control Dist, Harris County Hospital District, Houston Community College
                             System, Houston I.S.D., Port Of Houston Authority
Tax Year(s) Paid:            2020
Amount Paid for Transfer
(including taxes, penalties,
interest and collection costs):   $853,914.94
Property Owner(s)' Name(s):   GALLERIA 2425 OWNER LLC
                             11509 S LOU AL DR
Transferee's Name:           CAZ CREEK TX II, LLC
Transferee's Street Address:   14800 LANDMARK BLVD STE 400
                             DALLAS TX  75254

I, Ann Harris Bennett, Tax Assessor-Collector for Harris County, and for all taxing units for which the Office
of the Harris County Tax Assessor-Collector collects ad valorem taxes, certify that the above named transferee
or transferee's agent ("Transferee") has made payment of the amount listed above to the above named taxing
units on the property described above as consideration for a transfer of the tax lien(s), and that the tax lien(s)
held by taxing units on the property for the tax years listed above are hereby transferred to Transferee in
accordance with Texas Tax Code §32.06. I have issued a receipt to Transferee in conjunction with this
certification reflecting the payment for the transfer in the amount of taxes, penalties, interest, and collection
costs.



                             Ann Harris Bennett
                             Harris County Tax Assessor-Collector

                             BY: _____
                                            Deputy

AFTER RECORDING, RETURN TO:
CAZ CREEK TX II, LLC
14800 LANDMARK BLVD STE 400
DALLAS TX  75254

1.25

001120

# SWORN DOCUMENT AUTHORIZING TRANSFER OF TAX LIEN

STATE OF TEXAS          §          <u>After recording, return to:</u>
                                                    Caz Creek TX II LLC

COUNTY OF HARRIS          §          14800 Landmark Blvd, Suite 400
                                                    Dallas, TX 75254

Before me, the undersigned notary, on this day personally appeared Ali Choudhri, Manager of Galleria West Loop Investments II, LLC, as Member of Galleria 2425 JV, LLC, as Member of Galleria 2425 Owner, LLC, known to me to be the person(s) whose name(s) is/are subscribed below, and being duly sworn, upon oath deposed and stated as follows:

"My name is Ali Choudhri, Manager of Galleria West Loop Investments II, LLC, as Member of Galleria 2425 JV, LLC, as Member of Galleria 2425 Owner, LLC. I am over 18 years of age and am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct. I or the entity I represent owns the real property described as follows:

| | |
|---|---|
| Account No. or Property ID No.: | '0451400060400 |
| Legal Description: | TR 31D ABST 836 W WHITE |
| Street Address, if applicable: | 2425 W Loop S Houston Texas 77027 |
| Amount Paid for Transfer: | $893,914.94 (including taxes, penalties, interest, & collection costs) |
| Tax Year(s): | 2020 |
| Transferee's Name: | Caz Creek TX II LLC |
| OCCC Property Tax License Lender No.: | 1800062523-161548 |
| Transferee's Street Address: | 14800 Landmark Blvd, Suite 400, Dallas, TX 75254 |

"Pursuant to Texas Tax Code §32.06, I hereby authorize the above-named transferee or transferee's agent (the "Transferee"), to pay all taxes, penalties, interest, and collection costs imposed by any and all local taxing units or their agents on the real property, described above, for the tax years listed above. I further authorize and direct the tax assessor-collector(s) for said taxing units to issue a tax receipt with the collector's seal of office or notarized signature to the Transferee and to certify that the taxes and any penalties and interest on the subject property and collection costs have been paid by the transferee on behalf of the owner, and the tax lien on the owner's property has been transferred to the Transferee.

"I have been given notice that if this property is my homestead and I am disabled, I may be eligible for a tax deferral under Texas Tax Code §33.06."

*Property Owner OR Authorized Representative*      Name:    Ali Choudhri, Manager of Galleria West Loop Investments II, LLC, as Member of Galleria 2425 JV, LLC, as Member of Galleria 2425 Owner, LLC      Date Signed

STATE OF TEXAS
COUNTY OF TRAVIS

Subscribed and sworn to before me on _____ by Ali Choudhri, Manager of Galleria West Loop Investments II, LLC, as Member of Galleria 2425 JV, LLC, as Member of Galleria 2425 Owner, LLC.

_____
NOTARY PUBLIC, STATE OF TEXAS

Loan # TX20120037CC (Entity 1)
Current: 04/30/2021

RP-2021-280403

Page 2 of 3    Friday, August 19, 2022    County Clerk Harris County, Texas

001121



RP-2021-280403

RP-2021-280403
# Pages 3
05/20/2021 12:20 PM
e-Filed & e-Recorded in the
Official Public Records of
HARRIS COUNTY
TENESHIA HUDSPETH
COUNTY CLERK
Fees   $22.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



COUNTY CLERK
HARRIS COUNTY, TEXAS

001122





I, Teneshia Hudspeth, County Clerk of Harris County, Texas certify that these pages
are a true and correct copy of the original record filed and recorded in my office,
electronically or hard copy, as it appears on this date.

Witness my official hand and seal of office
This August 19, 2022

*Teneshia Hudspeth*

Teneshia Hudspeth, County Clerk
Harris County, Texas

Any provision herein which restrict the sale, rental or use of the described Real Property because of color or race is invalid and
unenforceable under the Federal Law. Confidential information may have been redacted from the document in compliance with the
Public Information Act.



# EXHIBIT E

001124

Case 4:24-cv-01746 Document 74-4 Filed on 06/13/25 in TXSD Page 344 of 856
Case 4:24-cv-01746 Document 74-4 Filed on 06/13/25 in TXSD Page 344 of 856
RP-2021-508701
09/03/2021 ER $42.00

**ASSIGNMENT OF TAX LIEN**

Secured by Section 32.06 Tax Lien Transfer

Date: May 24, 2021

| Holder of Note(s) and Lien(s) ('Transferor'): CAZ CREEK TX II, LLC 14800 Landmark Blvd, Suite 400 Dallas, TX 75254 | Transferee: ALI CHOUDHRI 1001 West Loop South, Suite 700 Houston, TX 77027 | Note: Tax Payment Agreement dated as of the Loan Date made by Borrower in favor of Transferor in the amount of the Original Balance |
| --- | --- | --- |
| Borrower: Galleria 2425 Owner, LLC | Original Balance: $845,366.97 | Loan Date: January 31, 2020 |
| Maturity Date: February 1, 2030 | First Payment Date: March 1, 2020 | Tax Account Number(s): 0451400060400 |
| Lien: | | |
| Tax Lien Contract Recorded as Instrument No(s).: RP-2020-237529, Real Property Records of Harris County, TX | Tax Lien Transfer Recorded as Instrument No(s).: RP-2020-112204, Real Property Records of Harris County, TX | County: Harris County, TX |
| Property: | | |
| Property Address: 2425 West Loop South, Houston, TX 77027 | | |
| The Property is more particularly described as follows: See attached EXHIBIT "A". | | |

For a good and valuable consideration paid, the receipt and sufficiency of which is hereby acknowledged, Transferor hereby transfers, assigns, grants, and conveys unto Transferee, effective the date first written, the Note, Liens, and any and all other related loan documents, including other agreements, instruments and other collateral which evidence, secure or otherwise relate to Transferor's right, title or interest in the Note and Lien.

THIS ASSIGNMENT IS DELIVERED WITHOUT RECOURSE, REPRESENTATION, OR EXPRESS OR IMPLIED WARRANTY OF ANY KIND OR ANY RESPONSIBILITY OR LIABILITY WHATSOEVER.

TRANSFEROR:

**CAZ CREEK TX II, LLC**

By: _____

Ken Frisbie, Senior Vice President

STATE OF TEXAS          §
COUNTY OF DALLAS     §

This instrument was acknowledged before me on May 24, 2021 by Ken Frisbie as authorized representative of Caz Creek TX II, LLC, a Texas limited liability company, on behalf of said company.

_____
Notary Public State of Texas

After recording, return to:
Ali Choudhri
1001 West Loop South, Suite 700


RUTH AURORA CARCAMO
My Notary ID # 132965060
Expires March 4, 2025



Houston, TX 77027

RP-2021-508701

Page 3 of 8 Friday, August 19, 2022 County Clerk Harris County, Texas

RP-2021-508701

## EXHIBIT "A"
### Legal Description

**Tract 1:**

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING:

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X" FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED

(continued on next page)

TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;
THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385
ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST
SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF
BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

## TRACT 2: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS
A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE
NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND
GRANTED BY VIVIAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT
EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN
GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND
DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO
PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH
VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO.
20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND
BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF
WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468
ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY
TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND
THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R.
HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61
FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO
THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD
FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS
WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385
ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X"
FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF
BEGINNING;

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61
FEET ALONG THE NORTHERLY LINE OF TRACT I TO AN "X" SET ON THE
EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54
FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

(continued on next page)

001128



THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE
NORTHERLY LINE OF TRACT I, NORTH 87 DEGREES 44 MINUTES 46 SECONDS
EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00
FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085
SQUARE FEET OF LAND MORE OR LESS.

**TRACT 3: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT**

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS
A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE
SOUTHERN BOUNDARY LINE OF TRACT I, SAID EASEMENT CREATED AND
GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO HN
PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY
EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL
WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY
CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY
METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF
WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468
ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY
TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND
THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R.
HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61
FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO
THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING,
WHENCE THE SOUTHEAST CORNER OF TRACT I BEARS NORTH 02 DEGREES 23
MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE
SOUTHERLY LINE OF TRACT 1, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS
WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST
LOOP;

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54
FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE
SOUTHWEST CORNER FOR TRACT I FROM WHICH A FOUND RAILROAD SPIKE
BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50
FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND

(continued on next page)



RP-2021-508701

AT THE SOUTHEAST CORNER OF TRACT I;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02
FEET ALONG A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468
ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE
POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF
LAND, MORE OR LESS.

## TRACT 4: 28 FOOT ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY
28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT I,
CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT
. DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO HN
: PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY
EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL
WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY
CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY
METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY
LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF
A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE
COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO.
S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY
HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO.
R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00
FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE
EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52
SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT I;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00
FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND
IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED
BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61
FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL
TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE
WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE
FEET (CALLED 5,740) OF LAND MORE OR LESS.

(continued on next page)

RP-2021-508701

**TRACT 5: 5 FOOT STORM SEWER EASEMENT**

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT HN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS.

RP-2021-508701

RP-2021-508701

\# Pages 8

09/03/2021 03:07 PM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

TENESHIA HUDSPETH

COUNTY CLERK

Fees  $42.00

County Clerk Harris County, Texas

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



COUNTY CLERK
HARRIS COUNTY, TEXAS

001132





I, Teneshia Hudspeth, County Clerk of Harris County, Texas certify that these pages
are a true and correct copy of the original record filed and recorded in my office,
electronically or hard copy, as it appears on this date.

Witness my official hand and seal of office
This August 19, 2022

*Teneshia Hudspeth*

Teneshia Hudspeth, County Clerk
Harris County, Texas

Any provision herein which restrict the sale, rental or use of the described Real Property because of color or race is invalid and
unenforceable under the Federal Law. Confidential information may have been redacted from the document in compliance with the
Public Information Act.



# **EXHIBIT F**

001134

RP-2021-508702

UNOFFICIAL COPY

09/03/2021   ER   $38.00

## ASSIGNMENT OF TAX LIEN
### Secured by Section 32.06 Tax Lien Transfer

Date: August 26, 2021

| Holder of Note(s) and Lien(s) ('Transferor'):<br>**CAZ CREEK TX II, LLC**<br>14800 Landmark Blvd, Suite 400<br>Dallas, TX 75254 | Transferee:<br>**ALI CHOUDHRI**<br>1001 West Loop South, Suite 700<br>Houston, TX 77027 | Note:<br>Tax Payment Agreement dated as of the Loan Date made by Borrower in favor of Transferor in the amount of the Original Balance |
|---|---|---|
| Borrower:<br>Galleria 2425 Owner, LLC | Revised Balance:<br>$868,704.35 | Loan Date:<br>April 30, 2021 and **modified** on June 1, 2021 |
| Maturity Date:<br>May 31, 2031 | First Payment Date:<br>June 1, 2021 | Tax Account Number(s):<br>0451400060400 |
| Lien:<br>Tax Lien Contract Recorded as Instrument No(s).: **RP-2021-252144**, Real Property Records of Harris County, TX | Tax Lien Transfer Recorded as Instrument No(s).:<br>**RP-2021-280403**, Real Property Records of Harris County, TX | County:  Harris County, TX |
| Property: | | |
| Property Address: 2425 West Loop South, Houston, TX 77027 | | |
| The Property is more particularly described as follows: See attached <u>EXHIBIT "A"</u>. | | |

For a good and valuable consideration paid, the receipt and sufficiency of which is hereby acknowledged, Transferor hereby transfers, assigns, grants, and conveys unto Transferee, effective the date first written, the Note, Liens, and any and all other related loan documents, including other agreements, instruments and other collateral which evidence, secure or otherwise relate to Transferor's right, title or interest in the Note and Lien. Transferor warrants that the Lien(s) is valid against Property in the priority indicated and the above loan information is true and correct.

TRANSFEROR:
**CAZ CREEK TX II, LLC**

By: _____
     Ken Frisbie, Senior Vice President

STATE OF TEXAS                    §
COUNTY OF HARRIS                  §

This instrument was acknowledged before me on August 2∅ᵗʰ 2021 by August as authorized representative of Caz Creek TX II, LLC, a Texas limited liability company, on behalf of said company.

_____
Notary Public State of Texas

After recording, return to:
Ali Choudhri
1001 West Loop South, Suite 700
Houston, TX 77027

STEPHANIE ALVAREZ
ID #131078509
My Commission Expires
April 06, 2025

001135

RP-2021-508702

**EXHIBIT "A"**
**Legal Description**

Tract 1:

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM
WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING
THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL
WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO.
20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD.
UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY
METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE
WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468
ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY
TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE
SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R.
HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61
FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO
THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD
FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING
THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT
OF BEGINNING;

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO
THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87
DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE
EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE
SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM WHICH A
FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF
INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17
SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST
CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT
UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS
FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN
DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998
ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE
SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X"
FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED

(continued on next page)

TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;
THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385
ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST
SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF
BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

**TRACT 2: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT**

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS
A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE
NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND
GRANTED BY VIVIAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT
EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN
GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND
DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO
PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH
VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO.
20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND
BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF
WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468
ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY
TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND
THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R.
HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61
FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO
THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD
FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS
WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385
ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X"
FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF
BEGINNING;

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61
FEET ALONG THE NORTHERLY LINE OF TRACT I TO AN "X" SET ON THE
EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54
FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

(continued on next page)

RP-2021-508702

THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE
NORTHERLY LINE OF TRACT I, NORTH 87 DEGREES 44 MINUTES 46 SECONDS
EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00
FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085
SQUARE FEET OF LAND MORE OR LESS.

**TRACT 3**: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS
A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE
SOUTHERN BOUNDARY LINE OF TRACT I, SAID EASEMENT CREATED AND
GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO HN
PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY
EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL
WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY
CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY
METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF
WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468
ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY
TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND
THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R.
HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61
FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO
THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING,
WHENCE THE SOUTHEAST CORNER OF TRACT I BEARS NORTH 02 DEGREES 23
MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE
SOUTHERLY LINE OF TRACT 1, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS
WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST
LOOP;

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54
FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE
SOUTHWEST CORNER FOR TRACT I FROM WHICH A FOUND RAILROAD SPIKE
BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50
FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND

(continued on next page)

001138

AT THE SOUTHEAST CORNER OF TRACT I;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

TRACT 4: 28 FOOT ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT I, CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO HN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT I;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

(continued on next page)

RP-2021-508702

**TRACT 5: 5 FOOT STORM SEWER EASEMENT**

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT HN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED|LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS.

RP-2021-508702

UNOFFICIAL COPY

RP-2021-508702

# Pages 7

09/03/2021 03:07 PM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

TENESHIA HUDSPETH

COUNTY CLERK

Fees $38.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.

COUNTY CLERK
HARRIS COUNTY, TEXAS

001141

**EXHIBIT G**

001142

**ASSIGNMENT OF TAX LIENS**
Secured by Section 32.06 Tax Lien Transfer

Date: August 26, 2022

| Holder of Note and Lien ("Transferor"): Ali Choudhri 1001 West Loop South, Suite 700 Houston, TX 77027 | Transferee ("Transferee"): National Bank of Kuwait, S.A.K.P., New York Branch 299 Park Avenue New York, NY 10171 | Note (the "Note"): Tax Payment Agreement dated as of the Loan Date made by Borrower in favor of Caz Creek TX II, LLC (the "Original Transferor") in the amount of the Original Balance |
|---|---|---|
| Borrower: Galleria 2425 Owner, LLC | Original Balance: $1,696,384.85 | Maturity Date: February 1, 2030 |
| | | Tax Account Number(s): 0451400060400 |
| Liens (the "Liens"): | | |
| Tax Lien Contract Recorded as Instrument No(s).: RP-2020-237529, Real Property Records of Harris County, TX | Tax Lien Transfer Recorded as Instrument No(s).: RP-2020-112204, Real Property Records of Harris County, TX | First Assignment of Tax Lien Recorded as Instrument No(s): RP-2021-508701, Real Property Records of Harris County, TX |
| Tax Lien Contract Recorded as Instrument No(s).: RP-2021-252144, Real Property Records of Harris County, TX | Tax Lien Transfer Recorded as Instrument No(s).: RP-2021-280403, Real Property Records of Harris County, TX | First Assignment of Tax Lien Recorded as Instrument No(s): RP-2021-508702, Real Property Records of Harris County, TX |
| County: Harris County, TX | | |
| Property Address and Description: 2425 West Loop South, Houston, TX 77027 and more particularly described in Exhibit A attached hereto and incorporated by reference herein (the "Property"). | | |

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Transferor hereby transfers, assigns, grants, and conveys unto Transferee, effective the date first written above and subject to the terms set forth in that certain Confidential Settlement Agreement involving Transferor and Transferee dated August 22, 2022 (the "Settlement Agreement"), the Note, Liens, and any and all other related loan documents, including other agreements, instruments and other collateral which evidence, secure or otherwise relate to Transferor's right, title or interest in the Note and Liens. Transferor warrants that the Liens are valid against the Property in the priority indicated and the above loan information is true and correct. Transferee warrants that, pursuant to the Settlement Agreement, it will not take any actions during the "Foreclosure Forbearance Period" (as such term is defined in the Settlement Agreement) to: (a) foreclose upon, extinguish, or otherwise invalidate the Liens, or (b) merge the Note or Liens into the outstanding amount owed pursuant to that certain Loan Agreement between Transferee and Galleria 2425 Owner, LLC dated May 23, 2018.

**Transferor:**

Ali Choudhri

By: _____
    Ali Choudhri

STATE OF TEXAS      §
COUNTY OF HARRIS    §

This instrument was acknowledged before me on August 31st, 2022 by Ali Choudhri on behalf of himself individually.



Notary Public State of Texas

**After recording, return to:**
National Bank of Kuwait, S.A.K.P., New York Branch
c/o Charles C. Conrad
Pillsbury Winthrop Shaw Pittman, LP
909 Fannin St., Suite 2000
Houston, TX 77010

SCARLET MACGEORGE
My Notary ID # 124519627
Expires April 9, 2023

2

001144

# **EXHIBIT 3**

001145

<table>
<tr><td colspan="2" style="background:black;color:white"><b>Fill in this information to identify the case:</b></td></tr>
<tr><td>Debtor 1</td><td>Galleria 2425 Owner, LLC</td></tr>
<tr><td>Debtor 2<br>(Spouse, if filing)</td><td></td></tr>
<tr><td>United States Bankruptcy Court for the:</td><td>Southern District of Texas</td></tr>
<tr><td>Case number</td><td>23-60036</td></tr>
</table>

## Official Form 410

# Proof of Claim

12/15

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

### Part 1:   Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | Caz Creek TX, LLC<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes.  From whom? _____ |
| 3. **Where should notices and payments to the creditor be sent?**<br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br>c/o Howard Marc Spector<br>Name<br>12770 Coit Road, Suite 850<br>Number     Street<br>Dallas          TX          75251<br>City          State          ZIP Code<br><br>Contact phone 214-365-5377<br>Contact email hspector@spectorcox.com | **Where should payments to the creditor be sent?** (if different)<br>Caz Creek TX, LLC<br>Name<br>14800 Landmark Blvd. Ste. 400<br>Number     Street<br>Dallas          TX          75254<br>City          State          ZIP Code<br><br>Contact phone 214-420-5950<br>Contact email kfrisbie@cazcreek.com |

(table continued)

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

| | |
|---|---|
| 4. **Does this claim amend one already filed?** | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known) _____     Filed on ____ / __ / ____<br>MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes.  Who made the earlier filing? _____ |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: 　0　　0　　7　　1

**7. How much is the claim?**  $ _____807,099.36  **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Money Loaned

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: 　Form 410A not required for statutory liens

**Basis for perfection:**　Statutory Lien

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ 17,500,000.00

**Amount of the claim that is secured:** $ 807,099.36

**Amount of the claim that is unsecured:** $ _____0.00 (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ 50,375.35

**Annual Interest Rate** (when case was filed) 17.00 %

☑ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

001147

| Official Form 410 | **Proof of Claim** | page 2 |
|---|---|---|

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check all that apply:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   10/31/2023
                   MM / DD / YYYY

_____
Signature

Print the name of the person who is completing and signing this claim:

| | | | |
|---|---|---|---|
| Name | Ken Frisbie | | |
| | First name | Middle name | Last name |
| Title | Senior Vice President | | |
| Company | Caz Creek TX, LLC | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 14800 Landmark Blvd., Suite 400 | | |
| | Number       Street | | |
| | Dallas | TX | 75254 |
| | City | State | ZIP Code |
| Contact phone | 214-420-5950 | Email | kfrisbie@cazcreek.com |

001148

## RESERVATION OF RIGHTS PURSUANT TO 11 U.S.C. § 506(b)

The Proof of Claim submitted by Creditor does not include amounts accruing after the filing of the bankruptcy case for interest on the claim, or any reasonable fees, costs or charges provided for under the agreement between the Creditor and the Debtor or State statute under which Creditor's claim arose.  Creditor hereby reserves the right to submit such amounts to the Debtor or the Bankruptcy Court and to augment the amounts claimed on the Proof of Claim, consistent with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. Additional amounts may include default interest irrespective of whether a contractual default occurred pre-petition.



# PAYOFF STATEMENT

| | |
|---|---|
| DATE | 7/26/2023 |
| PROPERTY OWNER NAME | Galleria 2425 |
| PROPERTY ADDRESS | 2425 W Loop |
| TAX EASE LOAN NUMBER | TX22020071CC |
| LOAN DATE | 2/21/2020 |
| INTEREST RATE | 17.00% |
| PRINCIPAL BALANCE | $697,948.72 |
| PER DIEM | $325.07 |
| ACCRUED INTEREST | $107,121.56 |
| LATE FEES | $1,919.08 |
| NSF FEES | $0.00 |
| PREPAY PENALTY | $0.00 |
| PREP FEE | $0.00 |
| RELEASE OF LIEN FEE | $110.00 |
| ATTORNEY FEES | $0.00 |
| PAYOFF GOOD THROUGH | 7/5/2023 |
| **PAYOFF AMOUNT** | **$807,099.36** |

**PAYMENTS MAY BE MADE BY CERTIFIED FUNDS OR WIRE TRANSFER**

**TO PAY BY CERTIFIED CHECK OR MONEY ORDER, MAKE CHECKS PAYABLE TO CC2 HOLDINGS LLC AND SEND PAYM**

| REGULAR MAIL ONLY: | OVERNIGHT MAIL BY SPECIAL COURIERS: |
|---|---|
| CC2 Holdings, LLC | CC2 Holdings, LLC |
| Dept 0434 | Lockbox 890434 |
| PO Box 120434 | 1501 North Plano Rd. Suite 100 |
| Dallas, TX 75312-0434 | Richardson, TX 75081 |

**TO PAY BY WIRE TRANSFER, USE THE FOLLOWING INFORMATION:**

| BANK INFORMATION | | BENEFICIARY INFORMATION | |
|---|---|---|---|
| Bank Name: | East West Bank | Account Name: | CC2 Holdings, LLC |
| Bank Routing/ABA: | 322070381 | Account Type: | Demand Deposit Account |
| Bank Address: | 9300 Flair Drive, 4th Fl. | Account Number: | 8003146605 |
| | El Monte, CA 91731 | Beneficiary Address: | 14800 Landmark Blvd Sui |
| | | | Dallas, TX 75254 |

Per Diem interest is noted to allow precise calculation of the payoff amount, as of the day payment is received by Tax Ease (we do not accept po
Please calculate the payoff carefully, and call our office at 972-233-4929 or email us at servicing@taxease.com if you have any questions. Tax Ea
the right to revise this payoff, if errors were made, if a payment included was returned for any reason, if additional fees are assessed, etc.

This statement and any attachments are intended for the exclusive use of the person or entity to which it is addressed, and may contain confide
privileged information. If the reader of this statement is not the intended recipient or his/her authorized agent, the reader is hereby notified th
dissemination, distribution or copying of this statement is prohibited. If you received this statement in error, please advise the sender by reply
and destroy this statement immediately.

# Tax Payment Agreement

| | |
|---|---|
| **Date:** | 02/21/2022 |
| **Loan Number:** | TX22020071CC |
| **Property Owner:** (whether one or more) | Galleria 2425 Owner LLC |
| **Address:** | 11509 S Lou Al Dr<br>Houston, Texas 77024 |
| **Tax Lien Transferee:** **Place for Payment** | CC2 TX LLC<br>14800 Landmark Blvd, Suite 400<br>Dallas, TX 75254 |
| **Tax Obligation:** | $698,006.68 |
| **Annual Interest Rate:** | 10.95% |
| **Property Address:** | 2425 W Loop S, Houston, Texas 77027 |

**Promise to Pay:** Property Owner promises to pay to the order of Tax Lien Transferee at the Place for Payment and according to the Terms of Payment.

**Terms of Payment:** The Tax Obligation, together with interest thereon, is due and payable in equal monthly installments of **$9,595.30 on day 1 of each month**, beginning 03/01/2023, and continuing until 03/01/2032 ("Maturity Date"). Payments will be applied in the following order to: 1) amounts Property Owner owes to Tax Lien Transferee other than principal and interest, 2) interest due, and then 3) principal. Interest shall be calculated on the outstanding principal balance using simple interest on a 365/365 day year basis. Reduction of the principal balance of the Tax Obligation shall first reduce any amounts of the Tax Obligation not deemed to be funds advanced under Section 32.06(e), Texas Tax Code. Annual Interest Rate on due or matured, unpaid amounts shall be the 17.00%

**Security for Payment:** This Tax Payment Agreement is secured by 1) tax lien(s) on the Property, which liens have been or will be transferred from taxing unit(s) to the Tax Lien Transferee and 2) a Tax Lien Contract ("Contract") of even date herewith between Property Owner and Tax Lien Transferee.

**Prepayment:** Maker may prepay, at any time and from time to time, all or a portion of the amount owed hereunder (i) from the date of this Note until (12 Months) after the note date for a prepayment fee equal to (1)% of the amount prepaid, and (ii) thereafter with no prepayment penalty. Property Owner must notify Tax Lien Transferee in writing that a payment is intended as a prepayment. Tax Lien Transferee may apply a prepayment to unpaid payment obligations before applying the prepayment to reduce the Tax Obligation of this Tax Payment Agreement.

**Interest:** Interest on the obligation evidenced by this Tax Payment Agreement will not exceed the maximum rate or amount of legal interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the Tax Obligation or, if the Tax Obligation has been paid, refunded. On any acceleration or required or permitted prepayment, any excess interest will be canceled automatically as of the acceleration or prepayment or; if the excess interest has already been paid, credited on the Tax Obligation or, if the Tax Obligation has been paid; refunded. This provision overrides any conflicting provisions in this Tax Payment Agreement and all other instruments concerning the Tax Obligation.

**Late and NSF Charges:** If any part of the Property Owner's monthly installment remains unpaid after the 10th day after the date the installment is due, Property Owner shall pay a late fee equal to 5% of the scheduled installment. If Property Owner tenders a payment for an amount due to Tax Lien Transferee by check or otherwise, which is returned unpaid for insufficient funds, Property Owner will reimburse the Tax Lien Transferee $30.00 per tender.

**Events of Default:** Except as prohibited by law, any of the following shall be an Event of Default hereunder:

    (a)   the failure of Property Owner to timely pay the Tax Obligation and interest thereon or otherwise perform, observe, and comply with the terms of this Tax Payment Agreement;

    (b)   the failure of Property Owner to perform, observe, and comply with any covenant, agreement or condition of the Contract;

    (c)   condemnation of a sufficient part of the Property as to materially affect the value of the Property;

    (d)   the occurrence of an event of default in any other Tax Payment Agreement or similar document made by Property Owner with Tax Lien Transferee or a related entity; or

**Waiver:** Except as otherwise stated herein or in the Contract, Property Owner waives the right of all demands for payment, presentations of payment, notices of intention to accelerate maturity, protest, and notices of protest, to the extent permitted by law.

**Enforcement Expenses:** To the extent permitted by Texas Finance Code §351.0021, Property Owner promises to pay upon demand reasonable and necessary attorney's fees and court and other costs if this Tax Payment Agreement is placed in the hands of an attorney to foreclose the liens securing the Tax Payment Agreement or as permitted by the US Bankruptcy Code for the Property Owner's voluntarily filed bankruptcy petition.

**Remedies:** Tax Lien Transferee shall have all rights, remedies and recourses available at law or equity, which rights (a) shall be cumulative and concurrent; (b) may be pursued separately, successively or concurrently against Property Owner under this Tax Payment Agreement or against the Property, or against any one or more of them, at the sole discretion of Tax Lien Transferee; (c) may be exercised as often as occasion therefor shall arise, and the exercise or failure to exercise any of them shall not be construed as a waiver or release thereof or of any other right, remedy or recourse; and (d) are intended to be, and shall be, nonexclusive. No action by Tax Lien Transferee in the enforcement of any rights, remedies or recourses under this Tax Payment Agreement or otherwise at law or equity shall be deemed to cure any Event of Default.  In accordance with applicable laws and procedures Tax Lien Transferee may pursue any of the following as a remedy for Property Owner's default:

    (a)   foreclosure remedies pursuant to Section 32.06, Texas Tax Code; or

    (b)   any other remedy allowed by law.

**Waiver of one year waiting period:** In accordance with 32.06, Texas Tax Code, Property Owner hereby waives the requirement that Tax Lien Transferee wait one year from the date the tax lien transfer is recorded before instituting foreclosure following a default and acceleration.

**Collateral Maintenance and Protection:**

    (a)   Property Maintenance: Property Owner shall at all times maintain, preserve and keep the Property in good repair and condition and from time to time make all necessary and proper repairs and replacements and not commit or permit any waste on or of the Property and not do anything to the Property that may materially impair its value.

    (b)   Insurance: Property Owner shall maintain, in a form acceptable to Tax Lien Transferee, an insurance policy that a) covers all improvements for their full insurable value as determined when the policy is issued and renewed, unless Tax Lien Transferee approves a smaller amount in writing; b) provides fire and extended coverage, including windstorm coverage; c) protects Tax Lien Transferee with a standard mortgagee clause; d) provides flood insurance at any time the Property is in a flood hazard area; and e) contains such other coverage as Tax Lien Transferee may reasonably require.  Property Owner shall comply at all times with the requirements of any coinsurance clause and deliver the insurance policy to Tax Lien Transferee within ten days of the date of this Tax Payment Agreement and deliver renewals to Tax Lien Transferee at least fifteen (15) days before expiration.

    (c)   Hazardous Materials: Property Owner shall not cause or permit the Property to be used as a site for the use, generation, manufacture, storage, treatment, release, discharge, disposal, transportation or presence of any Hazardous Materials except in compliance with all applicable state and federal Hazardous Materials Laws; and Property Owner shall comply and cause the Property to comply with all Hazardous Materials Laws. Property Owner shall promptly notify Tax Lien Transferee in writing of: (i) the discovery of any Hazardous Materials on, under or about the Property; (ii) any knowledge by Property Owner that the Property does not comply with any Hazardous Materials laws; (iii) any Hazardous Materials claims; and (iv) any knowledge of Property Owner with respect to the discovery of any occurrence or condition involving Hazardous Materials in, on or under the real property adjoining or in the vicinity of the Property.  In response to the presence of any Hazardous Materials on, under or about the Property, Property Owner shall immediately take, at Property Owner's sole expense, all remedial action required by any Hazardous Materials Laws or any judgment, consent decree, settlement or compromise in respect to any Hazardous Materials claims.

    (d)   Compliance with Laws: Property Owner shall promptly comply with all governmental laws, ordinances and regulations applicable to the Property and Property Owner's use and operation of the Property

    (e)   Lien Priority: The liens securing payment of the Tax Obligation shall be maintained by Property Owner to constitute the priority lien of a property tax lien against the entire Property.

    (f)   Tax Payments: Property Owner shall pay or cause to be paid before delinquent, all subsequent taxes and assessments of every character in respect of the Property, or any part thereof, and promptly thereafter deliver to Tax Lien Transferee evidence reasonably satisfactory to Tax Lien Transferee of the timely payment of such taxes and assessments.

    (g)   Delinquent Tax Suits: To the extent permitted by Texas Finance Code §351.0021, if Tax Lien Transferee appears in a delinquent tax suit against the Property and incurs legal fees and costs for such representation, Tax Lien Transferee shall be reimbursed by Property Owner for the legal fees and costs it has incurred in protecting its interest in the Property.

    (h)   Due on Sale: Property Owner shall not transfer all or any part of the Property without Tax Lien Transferee's prior written consent.

    (i)   Release of Collateral: Tax Lien Transferee may release, regardless of consideration, any part of the Property without, as to the remainder, in any way impairing, affecting, subordinating or releasing the lien or security interests created in or evidenced by the transfer of tax liens and the Contract or their stature as a priority lien on the Property.

    (j)   Inspection of Property: Tax Lien Transferee shall have the right to inspect the Property to assure Property Owner's compliance with the requirements of this Tax Payment Agreement.

    (k)   Tax Lien Transferee may cure any default by Property Owner for obligations herein concerning the Property, and Property Owner shall reimburse Tax Lien Transferee immediately for the expense of such cure..

**Notices:** Unless applicable law requires a different method, any notice that must be given under this Tax Payment Agreement will be given by delivering it or by mailing it by first class mail to at the address above for the party or at a different address if given to the other party by written notice.

**Joint and Several:** Each Property Owner is responsible for all obligations represented by this Tax Payment Agreement.  When the context requires, singular nouns and pronouns include the plural.

001152

**Jurisdiction:** This Tax Payment Agreement is construed under the laws of the State of Texas, without regard to choice of law rules of any jurisdiction.

THIS WRITTEN TAX PAYMENT AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

Ali Choudhri, Manager of Galleria West Loop Investments II, LLC, as
Member of Galleria 2425 JV, LLC, as Member of Galleria 2425 Owner,
LLC

001153

## TAX LIEN CONTRACT ("Contract")

| | |
|---|---|
| **Date:** | 02/21/2022 |
| **Loan Number:** | TX22020071CC |
| **Property Owner:** (whether one or more) | Galleria 2425 Owner LLC 11509 S Lou Al Dr Houston, Texas 77024 |
| **Tax Lien Transferee:** | CC2 TX LLC 14800 Landmark Blvd, Suite 400 Dallas, TX 75254 |
| **Tax Payment Agreement:** | Date:    02/21/2022 |
| | Tax Obligation:  $698,006.68 (original amount) |

**Property** (including any improvements) located in **Harris County**, Texas and described as follows:

SEE EXHIBIT "A" WHICH IS ATTACHED HERETO.

Located at: 2425 W Loop S, Houston, Texas 77027

    1.    Pursuant to § 32.06, Texas Tax Code, Property Owner by execution of a sworn document did authorize Tax Lien Transferee to pay ad valorem taxes, penalties, interest and costs due on the Property to certain taxing units. Such sworn authorization permits the taxing units to transfer the tax liens on the Property to Tax Lien Transferee to secure payment of the Tax Obligation. Property Owner also executed the Tax Payment Agreement, and under its terms Property Owner shall pay to Tax Lien Transferee the Tax Obligation. The terms of the Tax Payment Agreement are incorporated herein.

    2.    In compliance with § 32.06 and § 32.065, Texas Tax Code, this Contract further secures the special tax lien against the Property transferred to Tax Lien Transferee for the Tax Obligation and secures the payment of all amounts previously or hereafter advanced, charged, or incurred in connection with transferred lien(s), this Contract, the Tax Payment Agreement, or modifications thereof, as agreed to by Property Owner, including taxes, penalties, interest, costs, fees, post-closing costs and fees, or other charges as permitted by law. Tax Lien Transferee is subrogated to rights, liens, remedies, and equities of the taxing units paid, and the same are renewed and extended by this Contract until all obligations under the Tax Payment Agreement are satisfied and paid in full.

    3.    An "Event of Default" is any failure by Property Owner to perform under this Contract or the Tax Payment Agreement. Upon an Event of Default, Tax Lien Transferee may proceed to foreclose its tax lien under any method provided in § 32.06(c), Texas Tax Code. In accordance with section 32.06, Texas Tax Code, Property Owner hereby waives the requirement that Tax Lien Transferee wait one year from the date the tax lien transfer is recorded before instituting foreclosure following a default and acceleration. This Contract shall not restrict Tax Lien Transferee from pursuing any remedy to which it is otherwise entitled by law.

    4.    This Contract shall be recorded in each county in which the Property is located. When the context requires, singular nouns and pronouns include the plural.

001154

Ali Choudhri, Manager of **Galleria** West Loop Investments II, LLC, as
Member of Galleria 2425 JV, LLC, as Member of Galleria 2425
Owner, LLC

STATE OF TEXAS
COUNTY OF HARRIS

    This instrument was acknowledged before me on 02 / 04 / 2022 by Ali Choudhri, Manager of Galleria West
Loop Investments II, LLC, as Member of Galleria 2425 JV, LLC, as Member of Galleria 2425 Owner, LLC.

_____
Notary Public, State of TEXAS

**AFTER RECORDING, RETURN DOCUMENT TO: CC2 TX LLC, 14800 Landmark Blvd, Suite 400, Dallas, TX 75254**

# TAX LIEN AFFIDAVIT

Lender: CC2 TX LLC                              Loan Date: 02/21/2022

Loan Number: TX22020071CC              Loan Amount: $698,006.68

Borrowers:    Galleria 2425 Owner LLC

SWORN STATEMENTS

BEFORE ME, the undersigned authority, on this day personally appeared **Ali Choudhri, Manager of Galleria West Loop Investments II, LLC, as Member of Galleria 2425 JV, LLC, as Member of Galleria 2425 Owner, LLC**, who, being by me first duly sworn, on oath individually stated:

1.  "I have personal knowledge of all facts stated in this affidavit."
2.  "All documents and information provided to Tax Lien Transferee to obtain a tax lien transfer are accurate and true to the best of my knowledge."
3.  "I have been advised that I could obtain the assistance of counsel for this property tax payment agreement transaction. I read the closing documents and disclosures provided to me and either understand such documents or sought the assistance of legal counsel."
4.  "I did not hire nor did I receive any legal advice from Harrison & Duncan, PLLC, Attorneys at Law ("Attorneys") in this transaction. I understand that the attorneys solely represent CC2 TX LLC in this Property Tax transaction and that the Attorneys prepared the repayment documents. We also understand that we have the right to have our own attorney review the closing documents."

"STATEMENT UNDER OATH

I hereby swear under oath that the representation and warranties referred to and set forth above are true and correct. I understand that this Tax Lien Affidavit and Agreement is part of the property tax payment agreement documentation and will be relied upon by the Tax Lien Transferee."

Ali Choudhri, Manager of Galleria West Loop Investments
II, LLC, as Member of Galleria 2425 JV, LLC, as Member
of Galleria 2425 Owner, LLC

STATE OF TEXAS
COUNTY OF HARRIS

SUBSCRIBED AND SWORN TO BEFORE ME on 02 | 24 | , 20 22

Notary Public, State of TEXAS

001156

# EXHIBIT 4

001157

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case:</strong></td></tr>
<tr><td>Debtor 1</td><td>Galleria 2425 Owner, LLC</td></tr>
<tr><td>Debtor 2<br>(Spouse, if filing)</td><td></td></tr>
<tr><td colspan="2">United States Bankruptcy Court for the: Southern District of Texas</td></tr>
<tr><td>Case number</td><td>23-60036</td></tr>
</table>

## Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1: Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | Jetall Companies, Inc.<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? _____ |
| 3. **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Jetall Companies, Inc.<br>Name<br>1001 W Loop S    Ste 700<br>Number      Street<br>Houston          TX        77027<br>City          State        ZIP Code<br><br>Contact phone  713-822-0075<br>Contact email  scarlet.m@jetallcompanies.com<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br>_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | **Where should payments to the creditor be sent?** (if different)<br><br>Name<br>Number      Street<br>City          State        ZIP Code<br><br>Contact phone<br>Contact email |
| 4. **Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____<br>MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____2,134,469.99. **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

services performed.

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $_____

Amount of the claim that is secured: $_____

Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $_____

Annual Interest Rate (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition. $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

001159

Official Form 410          **Proof of Claim**          page 2

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $_____

☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $_____

☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.  $_____

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☐ I am the creditor.

X̲ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  10/31/2023
                  MM / DD / YYYY

/s/ Dward Darjean
Signature

Print the name of the person who is completing and signing this claim:

| Name | Dward | | Darjean |
|---|---|---|---|
| | First name | Middle name | Last name |

| Title | |
|---|---|

| Company | Jetall Companies, Inc. |
|---|---|
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |

| Address | 1001 West Loop South Ste 700 | | |
|---|---|---|---|
| | Number     Street | | |
| | Houston | TX | 77027 |
| | City | State | ZIP Code |

| Contact phone | 832-280-5448 | Email | dward.d@jetallcompanies.com |
|---|---|---|---|

001160

# **EXHIBIT 5**

001161

**Fill in this information to identify the case:**

Debtor 1    Galleria 2425 Owner, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Southern District of Texas

Case number   23-60036

## Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1:   Identify the Claim

**1. Who is the current creditor?**

Ali Choudhri
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Ali Choudhri
Name

1001 West Loop South, Ste 700
Number    Street

Houston      TX      77027
City      State      ZIP Code

Contact phone 713-789-7654

Contact email legal@jetallcompanies.com

**Where should payments to the creditor be sent?** (if different)

Name

Number    Street

City      State      ZIP Code

Contact phone

Contact email

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM   / DD   / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____960,000.00  **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

bond payment on behalf of the Debtor

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $_____

Amount of the claim that is secured: $_____

Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $_____

Annual Interest Rate (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition. $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

001163

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $ _____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   10/31/2023
                   MM / DD / YYYY

/s/ Ali Choudhri
Signature

Print the name of the person who is completing and signing this claim:

| | | |
|---|---|---|
| Name | Ali | Choudhri |
| | First name    Middle name | Last name |
| Title | | |
| Company | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | |
| Address | 1001 West Loop South Ste 700 | |
| | Number    Street | |
| | Houston | TX    77027 |
| | City | State    ZIP Code |
| Contact phone | 713-789-7654 | Email legal@jetallcompanies.com |

# **EXHIBIT 6**

001165

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case:</strong></td></tr>
<tr><td>Debtor 1</td><td>Galleria 2425 Owner, LLC</td></tr>
<tr><td>Debtor 2<br>(Spouse, if filing)</td><td></td></tr>
<tr><td colspan="2">United States Bankruptcy Court for the: Southern District of Texas</td></tr>
<tr><td>Case number</td><td>23-60036</td></tr>
</table>

## Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

2425 WL LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- |
| 2425 WL LLC<br>Name | 2425 WL LLC<br>Name |
| 60 West 2nd Street<br>Number       Street | 1001 W. Loop South, Suite 700<br>Number       Street |
| Freeport            NY       11746<br>City            State       ZIP Code | Houston            TX       77027<br>City            State       ZIP Code |
| Contact phone _____ | Contact phone 832-250-0288 |
| Contact email _____ | Contact email dward.d@jetallcompanies.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____        Filed on _____
                                                                    MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ _____25,092,415.80_____  **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Deed of Trust

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** Deed of Trust

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ _____

**Amount of the claim that is secured:** $ 25,092,415.80

**Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ _____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

001167

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    10/31/2023
         MM / DD / YYYY

/s/ Dward Darjean
_____
Signature

Print the name of the person who is completing and signing this claim:

| | | | |
|---|---|---|---|
| Name | Dward | | Darjean |
| | First name | Middle name | Last name |
| Title | | | |
| Company | 2425 WL LLC | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 1001 West Loop South Ste 700 | | |
| | Number     Street | | |
| | Houston | TX | 77027 |
| | City | State | ZIP Code |
| Contact phone | 832-250-0288 | Email | dward.d@jetallcompanies.com |

001168

Official Form 410        **Proof of Claim**        page 3

# **EXHIBIT 7**

001169

1          IN THE UNITED STATES BANKRUPTCY COURT

2          FOR THE SOUTHERN DISTRICT OF TEXAS

3                    HOUSTON DIVISION

4   IN RE:                    §     CASE NO. 23-60036-11
                              §     HOUSTON, TEXAS
5   GALLERIA 2425 OWNER, LLC, §     FRIDAY,
                              §     SEPTEMBER 22, 2023
6          DEBTOR.            §     11:09 A.M. TO 6:18 P.M.

7

8               **CASH COLLATERAL HEARING AND**
                  **MOTION TO DISMISS CASE**
          **(PARTIAL TRANSCRIPT -- SEALED PORTIONS ARE REDACTED)**

9

10       BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
              UNITED STATES BANKRUPTCY JUDGE

11

12

13       APPEARANCES:                    SEE NEXT PAGE

14       ELECTRONIC RECORDING OFFICER: R. SALDANA
                                        ZILDE COMPEAN

15

16

17

18

19

20               TRANSCRIPTION SERVICE BY:

21          JUDICIAL TRANSCRIBERS OF TEXAS, LLC
               935 Eldridge Road, #144
22               Sugar Land, TX 77478
                   281-277-5325
23            www.judicialtranscribers.com

24

25    Proceedings recorded by electronic sound recording;
         transcript produced by transcription service.

2

1                          **APPEARANCES:**

2

3  FOR THE DEBTOR:                HAYWARD PLLC
                                  Melissa S. Hayward, Esq.
4                                 10501 N. Central Expressway
                                  Suite 106
5                                 Dallas, TX  75231
                                  972-755-7100
6

7  FOR NATIONAL BANK OF KUWAIT,
   S.A.K.P., NEW YORK BRANCH:     PILLSBURY WINTHROP SHAW
8                                 PITTMAN, LLP
                                  Patrick E. Fitzmaurice, Esq.
9                                 31 West 52nd St.
                                  New York, NY  10019
10                                212-858-1171

11

12 FOR THE US TRUSTEE:            OFFICE OF US TRUSTEE
                                  Jayson B. Ruff, Esq.
13                                515 Rusk St., Ste. 3516
                                  Houston, TX  77002
14                                713-718-4650

15

16 (Please also see Electronic Appearances.)

17

18

19

20

21

22

23

24

25

3

1                                **INDEX**

2

3   WITNESS:            Direct     Cross     Redirect     Recross

4   ALI CHOUDHRI
      By Ms. Hayward     27         –         100          –
5     By Mr. Fitzmaurice –         66         –            106
      By the Court       93
6
    DWARD DARJEAN
7     By Ms. Hayward     109        –         –            –
      By Mr. Fitzmaurice –         111        –            –
8     By the Court       113

9   MICHAEL CROSBY CARTER:
      By Mr. Fitzmaurice 132        –         –            –
10
    ALI CHOUDHRI
11    By Ms. Hayward     148        –         –            –
      By Mr. Fitzmaurice –         151        –            –
12    By the Court       165

13

14  EXHIBITS:                      Marked     Offered     Received

15

16  CLOSINGS:
      By Mr. Fitzmaurice           171
17    By Ms. Hayward               174

18  RULING:                        193

19
                                   ***
20

21

22

23

24

25

4

```
 1      HOUSTON, TEXAS; FRIDAY, SEPTEMBER 22, 2023; 11:09 A.M.

 2           THE COURT OFFICER:  All rise.

 3           THE COURT:  Good morning, everyone.  This is Judge

 4   Lopez.  Today is September 22nd.  I'm going to call the

 5   11:00 a.m. case.  There are about eight people on the line.

 6   I'm going to see if we can just do this where we keep

 7   everything unmuted.

 8           The case that I'm calling is 23-60036, Galleria

 9   2425 Owner, LLC here in connection with a motion to dismiss

10   and continuation of cash collateral.  I'll take appearances

11   in the courtroom.  If anyone wishes to make an appearance on

12   the phone, I'd ask that you just please wait and give me an

13   opportunity, and then I'll turn to you.

14           Why don't I take appearances in the courtroom?

15           MS. HAYWARD:  Good morning, Your Honor.  Melissa

16   Hayward and Ruth Van Meter of Hayward, PLLC, here on behalf

17   of the Debtor, it's a pleasure to be in your courtroom in

18   person for the first time.

19           THE COURT:  Thank you.  And you caught a good day.

20   Weather's not too bad in Houston.

21           MS. HAYWARD:  I'm still a little sweaty, Your

22   Honor.

23           THE COURT:  Good morning.

24           MR. FITZMAURICE:  Good morning, Your Honor.

25   Patrick Fitzmaurice and Charles Conrad from Pillsbury
```

1  Winthrop Shaw Pittman for National Bank of Kuwait.  The

2  Debtor's secured creditor.  Also happens to be my first time

3  in front of Your Honor.  And so I appreciate.

4          THE COURT:  No, It's a pleasure.  Thank you.

5          MR. FITZMAURICE:  And also, Your Honor, on the

6  phone is our colleague from New York, Kwame Akuffo.  Your

7  Honor, granted his pro hac vice motion earlier on in this

8  case.  I just wanted to note his appearance for the Record,

9  as well.

10          THE COURT:  Okay.  Great.  Thank you.

11          Mr. Ruff, I see you there.  Good morning.

12          MR. RUFF:  Yes.  Good morning, Your Honor.  Jayson

13  Ruff for the US Trustee's office.

14          THE COURT:  Okay.  Anyone else wish to make an

15  appearance?

16      (No audible response.)

17          THE COURT:  And there's no need to hit five star.

18  The line is completely unmuted.  Just please keep your phone

19  on mute if you're dialing in to listen.

20          All right.  I would want to return things to you

21  and kind of tell me where we are.

22          MS. HAYWARD:  Yes, thank you.  So, Your Honor, we

23  have, as Your Honor noted, two matters here today.  We have

24  a motion to dismiss the bankruptcy case, as well as our

25  final cash collateral hearing.  There are some housekeeping

6

1  matters I think we would like to address before we get into

2  it.

3            THE COURT:  Okay

4            MS. HAYWARD:  As Your Honor has seen, there is a

5  confidential settlement agreement that is very much at issue

6  in this case.  Some pleadings have been filed under seal.

7  And so I think we -- that confidential settlement agreement

8  will likely be discussed here today with respect to the

9  motion to dismiss.

10           So I think from a housekeeping standpoint,

11  Mr. Fritzmaurice and I just wanted to bring that issue to

12  the Court's attention.  We're not sure who all the parties

13  are that are on the phone or on the WebEx.  And so to the

14  extent that, you know, portions of this hearing may need to

15  be sealed as that settlement gets discussed.  Just wanted to

16  get Your Honor's --

17           THE COURT:  Are you comfortable with the folks in

18  the courtroom?

19           MS. HAYWARD:  Yes, Your Honor.  The folks in the

20  courtroom are all either client or all client

21  representatives or attorneys.

22           THE COURT:  Okay.  What are your thoughts,

23  Counsel?

24           MR. FITZMAURICE:  So, Your Honor, it may be the

25  case that the parties ultimately have a dispute about

1    whether or not the stay agreement should be sealed.  The
2    fact is, as we stand here today, there is a motion to seal
3    the settlement agreement.  The agreement, by its terms,
4    would, I think, require that these proceedings, at least as
5    it relates to the agreement, be sealed.  And so for purposes
6    of our hearing today, we certainly have no objection and
7    agree with Counsel that the proceedings, at least as it
8    relates to the settlement agreement, should be sealed.
9              THE COURT:  Okay.  I am -- what I think will do
10   is, you can do this one of two ways, right?  We can just --
11   I can just mute the line and parties can just talk, and we
12   don't have to put anything on the screen.  Or you all can
13   just talk about the settlement agreement without talking
14   about it.  You know, there's a couple of different ways we
15   can do this.  I don't particularly have a preference.
16             MR. FITZMAURICE:  If Your Honor doesn't mind, our
17   suggestion would be, as it relates to the two motions, that
18   we would proceed with the motion to dismiss first.  I would
19   suggest that if Your Honor is inclined to grant that motion,
20   then cash collateral doesn't matter.
21             THE COURT:  Well no, I got to go the opposite way,
22   and I'll just tell you why, I'm being honest.  I want to
23   understand if we have a case, and maybe we do, maybe we
24   don't.  I'm not saying one thing, but I'm looking at MORs,
25   and I'm looking at -- I need to understand where we are in

8

1  terms of cash and what's going on.  We -- I don't want to

2  take them separately.  I need to just kind of understand

3  kind of where we are just doing bankruptcy routine 101 stuff

4  here, and then we can kind of take up the motion to dismiss,

5  so.

6           MR. FITZMAURICE:  So -- I'm sorry.

7           THE COURT:  No, no, no.  I appreciate it.

8           MR. FITZMAURICE:  Thank you, Your Honor.  Then

9  with respect to that, at least I would suggest that we take

10 Your Honor's first suggestion, which is that when the time

11 comes to discuss the settlement agreement, I would

12 anticipate that there would be significant discussion

13 concerning its contents, as opposed to the talk about it

14 without talking about it.  I'm not sure that we're able to

15 do that.

16          THE COURT:  Okay

17          MR. FITZMAURICE:  So I suggest that we then

18 perhaps just mute the courtroom.  I don't know that we need

19 to display anything for the purposes of the screen --

20          THE COURT:  Or if you do, you know if there's a

21 doc you want me to see, we can just deal with everything in

22 the courtroom.  I can just mute the line.

23          MS. HAYWARD:  Your Honor, I think that we're doing

24 this a little bit old school today.  We all have binders.

25          THE COURT:  Okay.

9

1          MS. HAYWARD:  Paper documents.

2          THE COURT:  Okay.  All right, let's just proceed

3   that way.  I've got it, with the agreement of the parties.

4   I -- if you're comfortable with the folks in the courtroom,

5   there's no need to put anything on the screen or anything.

6   I'm not a big fan of kind of sealing, but I think we can --

7   I can mute the line and then kind of go from there.

8          MR. FITZMAURICE:  And just to note our agreement

9   for the Record with Ms. Hayward that the folks in the

10  courtroom are either attorneys for the parties or party

11  representatives.  So certainly no issue, and we wouldn't

12  have any issue at all with also with respect to Mr. Ruff

13  from the US Trustee's Office, I'm not sure if there's a way

14  for him to participate in the hearing when that issue is

15  discussed or not --

16         MR. RUFF:  I will.

17         MR. FITZMAURICE:  -- but the technology may be

18  hitting us in that regard.

19         THE COURT:  I'll leave that up to him to kind of

20  figure out what he wants to do.

21         And Mr. Ruff, you don't need to answer.  I'm just

22  giving you flexibility.  If you show up, I'm not going to

23  kick you out.

24      (Laughter)

25         MR. RUFF:  Okay.  Thank you, Your Honor.  I'll sit

1  tight for now.

2        THE COURT:  Okay.  And I will stipulate to you

3  that on the -- just so that you're comfortable, Don Mago and

4  Abby Emery are my law clerks, and they're on video.  So

5  that's who the -- that's who that is there.  So, okay.

6        Can we just talk any housekeeping in terms of

7  docs, in terms of agreement on exhibits and things of that

8  nature, or where do we stand on that?

9        MS. HAYWARD:  Your Honor, I don't know that we've

10  had any agreements on exhibits.  I think we'll just take

11  them up as they come.

12        THE COURT:  Okay.  That works for me.

13        MR. FITZMAURICE:  Your Honor, once, I'm happy to

14  spend two minutes.  We can talk about it now is that, or we

15  can, as Ms. Hayward says, take them up as they come.

16        THE COURT:  Why don't we just talk about it at the

17  10,000-foot level, kind of where the case is and kind of

18  what's been filed and things are going on?  And if you find

19  it helpful, if not, we'll just go old school, and you can

20  prove up your evidence as we go.

21        MS. HAYWARD:  Sure, Your Honor.  So the Debtor has

22  filed.  We have an exhibit -- Witness and Exhibit List for

23  today's hearings.  Those -- and may I approach, Your Honor,

24  with some --

25        (Pause in the proceedings.)

1          THE COURT:  Sure.  Is -- just confirm that you all

2   have a copy of one.

3          MR. FITZMAURICE:  Yes, Your Honor.  Thank you.

4          THE COURT:  Okay.  Thank you.

5          MS. HAYWARD:  Thank you, Your Honor.  And so with

6   respect to the exhibits that we have put submission to the

7   Court on, Your Honor, the first exhibit would be the budget,

8   the six months budget that we filed.  I think this was filed

9   back when we had originally set the final cash collateral

10  hearing, shortly after the case was filed.  Your Honor may

11  recall this case was filed on July 5th.  So it's been

12  pending a little bit more than two months.  Exhibit 2 would

13  be the interim order authorizing cash collateral.  I can't

14  imagine there would be any objection to that exhibit.

15         MR. FITZMAURICE:  Is it easier to just talk about

16  the ones that we -- I don't know -- that we necessarily have

17  objections, but that we want to just discuss?   Is that

18  easier for you, I don't want to --

19         MS. HAYWARD:  Discuss as far as?

20         MR. FITZMAURICE:  Well, so that with respect to

21  the --

22         MS. HAYWARD:  Yeah.  Come join me.

23         MR. FITZMAURICE:  Your Honor, with respect to the

24  exhibits on the -- on the Debtor's list, we don't have any

25  issue with any of them except for two.  One is Exhibit

12

1  No. 5, which is the plan.  The plan was filed last night.

2  We haven't had any time to review it.  We don't know the

3  purposes for which the Debtor seeks to introduce it today.

4  And so, at least for --

5          THE COURT:  So plan's not in.  Okay?  If they want

6  to prove it, and they can try to do it in other ways.  Okay.

7          MR. FITZMAURICE:  And then with respect to the

8  Exhibit 7, which is leases, there are two leases, I think

9  it's two, which are not signed by the Debtor.  And so to the

10  extent that those are being --

11          THE COURT:  Five and seven, they've got approval.

12          MR. FITZMAURICE:  Well, there are some -- there

13  are leases that are fully executed.  And so our issue is

14  only with respect to -- those are with respect to the lease

15  with --

16          THE COURT:  Why don't I -- I'm just not going to

17  admit -- I don't want -- I just want to admit seven, but as

18  it comes up, maybe we can -- you can just let me know if

19  you're okay with that one, and we can.  Okay?

20          MR. FITZMAURICE:  Certainly, Your Honor thank you.

21          THE COURT:  Okay.

22          MR. FITZMAURICE:  And as to the balance.  We don't

23  have --

24          MS. HAYWARD:  Okay.

25          THE COURT:  So if I'm -- I got it right.  One

13

1    through 10.  There were 10 exhibits.  Five and seven.  Seven

2    may -- portions of it may come in uncontested, but we'll

3    cross those bridges as we get there.  Depending on which

4    ones we are.  Okay.

5            MR. FITZMAURICE:  So since we're talking about

6    exhibits, may we talk about ours as well, Your Honor --

7            THE COURT:  It's fine with me.

8            MR. FITZMAURICE:  May I approach?

9            THE COURT:  Yeah, of course.

10        (Pause in the proceedings.)

11           THE COURT:  Okay.  You have, let's see, 11

12   exhibits, right?

13           MR. FITZMAURICE:  We do, Your Honor.

14           THE COURT:  Oh, no, 12.  Sorry, 12 exhibits.

15   There may be some overlap, but just from that say about

16   any --

17           MS. HAYWARD:  Yes, Your Honor.  Well, we would

18   object to the Declarations as hearsay.  So that would be

19   Exhibit 1, Your Honor.  No objection to the loan agreement,

20   loan documents.

21           THE COURT:  One and two --

22           MS. HAYWARD:  Three.

23           THE COURT:  Wait, hold on. Just -- let's just go.

24   One is out.

25           MS. HAYWARD:  One we object to is --

1          THE COURT:  Okay, two?

2          MS. HAYWARD:  Two, no objection.  That's the loan

3   document.

4          THE COURT:  Okay.

5          MS. HAYWARD:  Loan agreement.  Three is the

6   promissory note.  No objection.  Four is the deed of trust.

7   No objection.

8          THE COURT:  Four is -- wait, hold on.  I'm seeing

9   four as --

10         MR. FITZMAURICE:  These are the exhibits to the

11  Declaration --

12         MS. HAYWARD:  Oh, okay, Your Honor I think --

13         MR. FITZMAURICE:  That numbering is a little --

14         MS. HAYWARD:  Okay.  Your Honor, I apologize.  I

15  was confused about the binder, the way it was set up.  So --

16         MR. FITZMAURICE:  If I may, Your Honor?  If I may,

17  Exhibit 1 --

18         THE COURT:  That makes two of us.

19         MR. RUFF:  Okay.

20         MR. FITZMAURICE:  Exhibit 1, Your Honor, is the --

21  is a Declaration with exhibits.  Those exhibits being the

22  loan documents.

23         THE COURT:  Got it.

24         MR. FITZMAURICE:  So I think the Declaration

25  portion of Exhibit 1 there is an objection to, but the loan

1  documents portion there is not.

2          MS. HAYWARD:  Correct.

3          THE COURT:  So maybe we can just do this this way

4  then.  As to the exhibits to Declaration one, what are you

5  okay with?

6          MS. HAYWARD:  Two, three, and four, Your Honor.

7          THE COURT:  Okay, so that's --

8          MS. HAYWARD:  I'm sorry.  Two and three.

9          THE COURT:  So, loan agreement, promissory note.

10          MS. HAYWARD:  Yes.

11          THE COURT:  Okay.  And what about deed of trust?

12          MS. HAYWARD:  The deed of trust is fine, Your

13  Honor.

14          THE COURT:  Okay.

15          MS. HAYWARD:  I guess four looks to be a loan

16  payoff statement, we would object to that.  We could prove

17  that up.

18          THE COURT:  Okay.

19          MS. HAYWARD:  Exhibit 5 is actually the same as

20  the Debtor's Exhibit 10.

21          THE COURT:  Okay.  Are you okay with just

22  admitting just to make it easier?

23          MS. HAYWARD:  Yes.

24          THE COURT:  Okay.

25          MS. HAYWARD:  Yes, Your Honor.

1           THE COURT:  Okay.  And then now we're getting into

2    then I guess what is now Exhibit 2.

3           MS. HAYWARD:  So Exhibit 2, Your Honor, again,

4    same objection to the Declaration.

5           THE COURT:  Okay.

6           MS. HAYWARD:  No objection to the assignment.

7    It's actually shown on, I guess 2.1, 2.1 we'll call it.

8           THE COURT:  Okay.  So 2.1 is okay?

9           MS. HAYWARD:  Yes, Your Honor.

10          THE COURT:  Okay.

11          MS. HAYWARD:  2.2 is okay.

12          THE COURT:  Okay.

13          MS. HAYWARD:  2.3, Your Honor, is the confidential

14   settlement agreement.

15          THE COURT:  Okay.

16          MS. HAYWARD:  So, no objection to the admission of

17   that exhibit under seal.

18          THE COURT:  Admitted as such.

19          MS. HAYWARD:  Exhibit 4 is a transcript of a

20   hearing.  We object on hearsay grounds.

21          THE COURT:  Okay.  Exhibit 4 is out.

22          MS. HAYWARD:  Exhibit 5 is a State Court

23   proceeding, I think Your Honor can take notice of pleadings

24   on file in other cases.  So I'm not sure that I have an

25   objection to it being offered as a proceeding in another

17

1  case.

2          THE COURT:  You're okay with it for the fact that

3  something was filed, but not necessarily the truth of the

4  matter asserted therein?

5          MS. HAYWARD:  Yes, Your Honor.  Yes.

6          THE COURT:  Okay.

7          MS. HAYWARD:  This is our document, so.

8          THE COURT:  No.  All right.  Oh, it's your

9  document.  I got it.  Okay.

10          MS. HAYWARD:  This our pleading.

11          THE COURT:  Oh, got it.

12          MS. HAYWARD:  Same for six.  Also, our pleading.

13          THE COURT:  That's in.

14          MS. HAYWARD:  Seven, objection.

15          THE COURT:  Okay

16          MS. HAYWARD:  Eight are the Schedules, obviously

17  no objection to those, Your Honor.

18          THE COURT:  Okay.

19          MS. HAYWARD:  Nine, I believe, is going to be the

20  same as Debtor's exhibit.  Although Debtor's exhibit may

21  have more months.

22          MR. FITZMAURICE:  I think the Debtor's exhibit has

23  more months (indiscernible).

24          MS. HAYWARD:  Okay.  Slew of nine.  Okay.  So the

25  nine, Your Honor would be replaced with Debtor's Exhibit, I

1   believe, 9 --

2          THE COURT:  Okay

3          MS. HAYWARD:  -- 8.

4          THE COURT:  So 9 is not in.  We're just going to

5   go with the other one.  Okay, okay.

6          MS. HAYWARD:  Then moving on to Exhibit 3.

7   Objection.  I don't -- I think you attached the wrong

8   document to your --

9          THE COURT:  Oh, 3 is out.  What about 4?

10          MS. HAYWARD:  4, Schedules.  No objection.  5 is

11   our motion for cash collateral.  No objection.  6 is

12   Mr. Choudhri's Declaration in support of cash collateral.

13   No objection.  7 is our response to the motion to dismiss.

14   No objection.  8 is the July Monthly Operating Report.  No

15   objection.  9 is the -- is a profit and loss statement

16   covering months January through June.  So the six months

17   repetition and no objection.

18          THE COURT:  Okay.

19          MS. HAYWARD:  10 are bank statements, Your Honor.

20   I'm not sure the relevance of, but -- so I think I would ask

21   that counsel prove those up.

22          THE COURT:  Okay.

23          MS. HAYWARD:  11, Your Honor, is also -- it looks

24   like detail.  These are documents that were produced.

25          THE COURT:  Okay

1            MS. HAYWARD:  I'm in discovery again, it's a

2    lengthy document.  I'm not sure that they are relevant.  So

3    we will allow -- I think that you will need to prove those

4    up.

5            THE COURT:  Okay

6            MS. HAYWARD:  12, Your Honor, is the cash

7    collateral budget.  I think 12 is actually a compilation of

8    the Debtor's original Witness and Exhibit List.

9            THE COURT:  Okay.

10           MS. HAYWARD:  And it's actually duplicative of

11   what's already in the Debtor's exhibits.

12           THE COURT:  Okay

13           MS. HAYWARD:  So I think we can go off the

14   Debtor's exhibits on that one.

15           THE COURT:  All right.  Then there's something on

16   the back of this?

17           MS. HAYWARD:  Yes, Your Honor.  That's a Debtor

18   Exhibit 3 -- 4.

19           THE COURT:  That's the final order.  There are

20   pictures back here.

21           MS. HAYWARD:  Yes, that's Exhibit 4.  Debtor's

22   Exhibit 4, which has already been admitted.

23           THE COURT:  Okay, great.  Okay.  I just -- oh,

24   yes, yes, yes.  I see it.  Okay.

25           MR. FITZMAURICE:  Your Honor, just two responses.

1    One, objection to the bank records.  Those are the Debtor's

2    bank records.

3            THE COURT:  You can prove them up.  I'm just --

4    we're just going to go, I'm just -- which ones we agree on.

5    The other ones you can prove up.

6            MR. FITZMAURICE:  And with respect to the

7    transcript, Your Honor, we would submit that that's a

8    statement of a party opponent.

9            THE COURT:  I know, just bring it up in the

10   (indiscernible) whenever we need it.  We'll just take it up.

11   I'm just getting this flat agreement now.

12           MS. HAYWARD:  Thank you, Your Honor.

13           THE COURT:  Okay.  All righty.

14           MS. HAYWARD:  How would you like Your Honor to

15   proceed?  Would Your Honor like opening statements?   Would

16   Your Honor like go straight to the witnesses or --

17           THE COURT:  I want to go -- I want to talk

18   about --

19           MS. HAYWARD:  -- hear from the Debtor.

20           THE COURT:  I want to talk cash collateral first.

21           MS. HAYWARD:  Yes, Your Honor.

22           THE COURT:  What would be helpful for me to --

23   because I know we did a little bit of this at the beginning

24   of the case.  Can you explain to me a little bit about the

25   corporate structure of a Debtor, who owns it?

```
 1              MS. HAYWARD:  Yes, Your Honor.  Sure.  And what I
 2   would do Your Honor, I would point Your Honor the MDK's
 3   exhibits -- I'm not sure that's right.  So the Debtor, Your
 4   Honor, is an LLC.  It is 100 percent owned by an entity that
 5   is by another entity higher up that chain.  There is a
 6   mezzanine link debt, and there are several other entities.
 7   Ultimately, the beneficial owner would be Mr. Choudhri --
 8              THE COURT:  Okay
 9              MS. HAYWARD:  -- who is sitting here, and I'll
10   have you rise, Mr. Choudhri, and introduce you to the Court.
11   Mr. Choudhri is the primary principle of the Debtor,
12   ultimately.
13              THE COURT:  Okay.
14              MS. HAYWARD:  And so that's kind of the structure
15   of the Debtor.
16              THE COURT:  Who owns Jetall?  And how does
17   Jetall --
18              MS. HAYWARD:  Mr. Choudhri owns Jetall and Jetall
19   is the property management company that oversees.  So
20   Mr. Choudhri has a portfolio of met real estate throughout
21   Houston and some other areas.  Jetall is Mr. Choudhri's
22   company that operates the real estate.  And so Jetall is the
23   company that handles --
24              THE COURT:  Property manager for this --
25              MS. HAYWARD:  Property manager for this particular
```

1    property, that's correct.  That's right.

2            THE COURT:  And he probably manages some other

3    properties as well.

4            MS. HAYWARD:  That's right, Your Honor.

5            THE COURT:  And then the individual who signed the

6    petition --

7            MS. HAYWARD:  Your Honor, Mr. Dward Darjean is

8    here.

9            THE COURT:  Okay

10           MS. HAYWARD:  And he is the operations side of

11   Jetall.  So he is the person who's actually the boots on the

12   ground out at the property dealing with maintenance issues.

13   So he's more on the operations of the building with Jetall.

14           THE COURT:  Okay, okay, okay.  And so when his

15   check comes from Jetall?

16           MS. HAYWARD:  Yes, Your Honor.

17           THE COURT:  Okay.  As part of the property

18   management, he's the operator --

19           MS. HAYWARD:  Yes, Your Honor.

20           THE COURT:  -- who's on the ground?  Got it.

21           MS. HAYWARD:  Yes, Your Honor.

22           THE COURT:  Okay.  Does the Debtor have employees

23   itself?

24           MS. HAYWARD:  The Debtor itself does not have

25   employees.  All of the employees are at the Jetall level.

1   Now the Debtor may have a couple of janitorial people that

2   it issues checks to on a 1099 basis, but they're not W-2

3   employees, Your Honor.  So the employees are at the Jetall

4   level.

5            THE COURT:  Got it.

6            MS. HAYWARD:  And if Your Honor would like to see,

7   so the building we're talking about is Exhibit 4.

8            THE COURT:  Okay.  Oh, I've seen the building.  As

9   I saw the building earlier, I probably drove past it a bunch

10  of times.

11           MS. HAYWARD:  I stayed in a hotel right next to it

12  last night.  And I will tell Your Honor, it's a lovely

13  building. Mr. Choudhri will certainly explain to Your Honor,

14  but it was designed by the same person who designed the

15  Louvre.

16           THE COURT:  So who is then your client?  Who do

17  you take direction from?

18           MS. HAYWARD:  Primarily Mr. Choudhri.

19           THE COURT:  Okay.

20           MS. HAYWARD:  Yes, I take direction from

21  Mr. Choudhri.

22           THE COURT:  Does the Debtor have independent

23  (indiscernible) who -- are decisions made at the Debtor

24  level?

25           MS. HAYWARD:  Well, I think decisions are made --

1   It depends on the decision.

2           THE COURT:  I got it.  I'm sorry.  That was a

3   really bad question.  Just kind of on an operational basis.

4   This (indiscernible).  All right.  There have to be

5   decisions made at the kind of the corporate level from --

6   for -- or at the management level.  At this level, who makes

7   those decisions?  Is it Mr. Choudhri and anyone else, or is

8   it Mr. Choudhri alone?

9           MS. HAYWARD:  So I think it's Mr. Choudhri with

10  his team.  So Jetall has, you know, many employees.  It has

11  counsel -- in-house counsel, it has in-house accounting, it

12  has bookkeeping, things like that.  So there's a whole team

13  within Jetall.  And so each person sort of has their

14  specific role, right?  Mr. Darjean is the person that would

15  be in charge of property repair-type issues, and things

16  along those lines.  And Mr. Choudhri is sort of you know at

17  the top.

18          MS. HAYWARD:  Okay.  I know.  I'm just trying to

19  get a sense of -- okay, that's what I need to know.  Thank

20  you.  I'm just trying to get a sense of the 10,000-foot

21  level so just I can understand.

22          MS. HAYWARD:  Sure Your Honor and I know this is

23  kind of our first real --

24          THE COURT:  Yeah

25          MS. HAYWARD:  -- evidentiary hearing.  So I

1  understood there's some background that you know will be

2  very helpful.  And so if Your Honor would like opening

3  statements, we certainly can.  Otherwise, I'm happy to just

4  put Mr. Choudhri on the stand and we can go forward.

5          THE COURT:  I don't need any opening statements.

6  We can just get right to it.  I've read the pleadings and I

7  appreciate everyone's pleadings.  I've read everything

8  that's been on the docket that's been filed and on the

9  docket.  Obviously, I'll only consider the evidence today,

10 but I thank the parties.  I do appreciate a little bit of

11 background just to make sure that I'm -- I've got it there,

12 but you know, you can dive right into the issues then.  I'm

13 comfortable with where we are and kind of where we need to

14 go.

15         MS. HAYWARD:  Okay, perfect.

16         THE COURT:  Okay

17         MS. HAYWARD:  Well, thank you, Your Honor, for

18 that.  Then the Debtor would call Mr. Ali Choudhri to the

19 stand.

20         THE COURT:  Okay, Mr. Choudhri, why don't you --

21 why not -- you can take a seat right there.  And can you

22 raise your right hand, sir?

23         Do you swear to tell the truth, the whole truth,

24 and nothing but the truth?

25         THE WITNESS:  Yes

1          (Witness sworn.)

2          THE COURT:  Okay.  Let the Record reflect that the

3    witness has been duly sworn in.  You can have a seat, sir.

4          MS. HAYWARD:  Your Honor, may I approach the

5    witness with an exhibit binder?

6          THE COURT:  Yes, you may.

7          Mr. Choudhri, I would just ask -- sometimes

8    lawyers object and use statements.  I just ask that you give

9    me an opportunity to resolve the objection, and I'll let you

10   know if you can answer the question or if someone else has

11   to answer -- ask in a different question.  Okay?

12         THE WITNESS:  Yes, Your Honor.

13         THE COURT:  And if at any time you need a break or

14   anything, just let me know.  Okay.

15         THE WITNESS:  Can I use the restroom?

16         THE COURT:  You want to --

17         THE WITNESS:  I can wait.  I'm sorry.

18         THE COURT:  No, no, no, no.  I -- we can take a

19   few minutes if it now makes sense.  I would -- just know

20   you've been officially sworn in, so you can't talk to anyone

21   about your testimony.  So why don't we just take five

22   minutes and --

23         THE WITNESS:  (Indiscernible).

24         THE COURT:  No, no, it's completely fine.  I --

25   just required me to give you the speech now before.  So

1    we'll take a break.  I'm just going to stand up here.  I'll

2    stay up here, and we'll start at 11:40.

3              MS. HAYWARD:  Thank you, Your Honor.

4         (Court in recess from 11:34:10 a.m. to 11:39:23 a.m.)

5              THE COURT:  Let me just get started.  We're back

6    on the Record in what I'll call "Galleria 2425."

7                       DIRECT EXAMINATION

8    BY MS. HAYWARD:

9    Q    Good morning, Mr. Choudhri.

10   A    Good morning.

11   Q    Mr. Choudhri, would you introduce yourself to the

12   Court?

13   A    Yes.  My name is Ali Choudhri.

14   Q    Okay.  Mr. Choudhri, how old are you?

15   A    43.

16   Q    A couple of months older than me, right?

17   A    I think about a year.  Yeah.

18   Q    Almost a year.  Mr. Choudhri, what's your primary

19   occupation?

20   A    Investments, real estate development.  That's been all

21   what I've done since I can remember.

22   Q    Okay.  Let's talk about sort of your educational

23   history.

24   A    Sure.

25   Q    So where did you grow up?

1   A    I've been in Houston, Texas since I was three years

2   old.  My father came to Houston in 1983.  He acquired a

3   chemical plant and invested in real estate.  And I followed

4   his footsteps in the early '90s.  When I was about 12 I

5   would tag along with him to the RTC and SNL sales and I

6   learned the business from my father and then got into buying

7   and selling real estate.  I went to University of Houston

8   and been in real estate full time since '95.  I would say

9   officially since '98.  That's when I turned 18, but

10  unofficially since '95.

11  Q    Okay.  And so did your father sort of mentor you as to

12  how to be involved in real estate?  Buy, sell?

13  A    Yes.  My father was my mentor.  And I learned from him

14  and grew up in the business with him.  And so, yes.

15  Q    Okay.  And while you were learning from your father,

16  did your father have a large real estate portfolio?

17  A    He was very active.  Yes, he was very active in real

18  estate.  He was educated from the UK, London, England.  And

19  we worked together, and we were basically best friends until

20  he passed in 2012.

21  Q    Okay.  So your father passed away in 2012?

22  A    Yes.

23  Q    And after your father passed away, did you sort of take

24  the reins of the real estate?

25  A    Yes.

1  Q    Okay.  And did you -- what's your -- so you said you

2  went to the University of Houston?

3  A    Yes.

4  Q    Okay.  Do you have any other college degrees or

5  graduate degrees?

6  A    No graduate degrees.  I've just basically -- just did

7  business -- business management.  Took a lot of hours even

8  after that, architectural classes and probably an extra 100

9  hours that I didn't need on top of the 120 hours required.

10  Just auditing classes on top of that.  But it was business

11  management.  No graduate degrees.

12  Q    Okay.  You heard the Court ask some questions about

13  Jetall.

14  A    Yes

15  Q    So tell me a little bit about what Jetall is.

16  A    Jetall is a management company.  It means -- it has a

17  meaning.  It's a cast.  It's our family cast.  We're on a

18  cast system.  And it means chief.  A lot of people think

19  it's Jet all, but it -- Jetall is just one word.  And it's

20  something that is a heritage of my dad.  And it -- is the

21  property management development aspect.  It buys, sells,

22  manages, develops leases of real estate.  We've bought and

23  acquired, you know, dozens of buildings and stabilized them

24  and this particular property I got involved in over ten

25  years ago.

1  Q    Do you have a broker's license, Mr. Choudhri?

2  A    Not me personally, but we have a company that does have

3  a -- Jetall it has a brokerage license as well through a

4  record broker.  That's typically how it works.

5  Q    Okay.  Let's talk about the 2425 building.

6  A    Okay.

7  Q    Let's -- I'm going to ask you to turn to Exhibit 4.

8  A    Yes.

9  Q    All right.  Can you sort of -- well, let's talk.  So

10 when did you first become involved with the building?

11 A    It was around 2013, maybe even as early as 2012.  It

12 was owned by a fund, PCCP, and they were at the end of their

13 fund cycle, and they had to sell, and their largest tenant

14 was moving out.  Blue Cross Blue Shield.  You probably saw a

15 sign on top of the building.  It said Blue Cross Blue

16 Shield.  And they had occupied the bulk of the building, and

17 they were moving out back in 2012-13-time timeframe when I

18 acquired it.

19 Q    And so when you acquired -- well, so what entity

20 acquired the building in 2012-13.

21 A    It was an entity, 2425 West Loop, LLC --

22 Q    Okay

23 A    -- acquired the building.

24 Q    All right.

25 A    Jetall signed the contract and assigned it over to an

1  SPE which was 2425.

2  Q    Okay.  And just so I know, and the Court knows what an

3  SPE is, but just for purposes of the Record, what does SPE

4  mean?

5  A    Single Purpose Entity.

6  Q    And so 2425 was originally owned by 2425, I think you

7  said West Loop, but could it also have been WL LLC.

8  A    Subsequently, yes.  It was, 2425 WL LLC.  Yes.

9  Q    Okay.  And so talk a little bit about I guess once you

10  first got involved with the building in '12 what it was

11  like?

12  A    The building -- The entire building was a call center

13  for Blue Cross Blue Shield, and it was very Art Deco.  But

14  the building had great bones because it was designed by a

15  very famous architect, the father of modern architecture.

16  His name is or was I.M. Pei.  He passed at 103 years old.

17  He's designed two buildings in Houston only.  One of them is

18  the JPMorgan Tower, which is the tallest building in Texas,

19  and the other one is 2425 West Loop.

20        So it had -- the building had great bones, great

21  location, but it had a lot of -- lots of issues.  Elevators

22  were not functional, it wasn't sprinklered, it -- and the

23  biggest tenant had -- was basically moving out.  So it was

24  in essence an empty building.

25        And so we ended up completely renovating the

1  building, spent a significant amount of funds in the

2  building to putting in brand-new state-of-the-art

3  destination dispatch elevators, upgraded lobbies, restrooms,

4  sprinklers, X, Y, Z, whatnot, and we're able to get it

5  leased up and get it significantly stabilized with a tenant

6  that owned about 800 stores -- over 800 stores.  A tenant

7  called -- the main tenant in the building that moved in was

8  their parent company, Stage Stores.  They were on the New

9  York Stock Exchange at the time.  They owned Haley Royal,

10 Bells, Goody's, Gordmans.  And they had 800 stores and about

11 13,000 employees.  So this was their headquarters that we

12 were able to lend them and move them in.

13 Q    Okay.  Would you recall when Stage moved into the

14 building?

15        MR. FITZMAURICE:  So, Your Honor, objection.  I

16 understand granting some leeway to the Debtor to present

17 their case.  None of this has anything to do with the

18 Debtor.  This is about the predecessor.  We're here on the

19 Debtor's use of cash collateral.

20        THE COURT:  I'll allow a little bit, but at some

21 point, Ms. Hayward, get to it.

22        MS. HAYWARD:  Yes, Your Honor.

23        MR. FITZMAURICE:  Thank you.  Your Honor.

24        THE COURT:  It's all right.

25 BY MS. HAYWARD:

1  Q    So, Stage -- So how many floors is Stage?

2  A    Nine floors.

3  Q    Nine floors, okay.  And what happened to Stage?

4  A    COVID happened.  COVID was a major factor.  They were

5  going through a conversion to -- they had to deal with

6  Amazon where they're trying to convert their stores to off

7  price.  They are in small town America at 800 or 800 stores.

8  And in May 2020, they filed for bankruptcy.

9  Q    Did they reject the lease for the building?

10  A    Yes.

11  Q    And so what happened to the vacancy at the building?

12  A    The majority of the building was vacant.  And the

13  occupancy I would guess was around 10 percent at that time.

14  We had another tenant that didn't move in that had signed a

15  company called Sonder, that had signed -- I'd signed them up

16  for three floors where they were converting the building to

17  boutique hotel apartments.  Sonder is a company by Bezos

18  Expeditions, which is Jeff Bezos's family office investment.

19  So it was a startup.  And they were interested in converting

20  the building.  And then when COVID happened, literally

21  everything kind of came to a screeching halt and the

22  building was pretty much empty, and I had to -- we worked

23  hard to lease it up.

24  Q    All right.  Let's back up a little bit.  Okay.  So at

25  some point, let's talk about how did this Debtor obtain the

1  building?

2  A    This Debtor obtained the building in 2018 from the

3  other entity 2425 WL that basically provided the equity and

4  the funding at closing.

5  Q    Okay.  Let me ask you this:  Why did this Debtor

6  acquire the building?

7           MR. FITZMAURICE:  Objection, Your Honor.

8  Relevance to the Debtor's use of cash collateral?

9           THE COURT:  Yeah.  I'm more into the money.  I'm

10  kind of where we are and --

11          MS. HAYWARD:  Okay.  Your Honor.

12          THE COURT:  But --

13          MS. HAYWARD:  I mean, this goes to -- this is the

14  start of the MBK relationship, which is why I was going.

15          THE COURT:  I'll give you a leeway, but

16  essentially we're going to have to -- reason I'm allowing

17  this a little bit is that we're getting into -- I don't want

18  to repeat this if we ever get into the motion to dismiss

19  stuff.  But I do agree, at some point we need to get to the

20  budget.

21          MS. HAYWARD:  Okay.  Your Honor, if I can

22  certainly just focus on cash collateral, I guess I was --

23          THE COURT:  No, no, no.  I'll let you kind of go

24  to where we're going, but that's the emphasis.  So I'll let

25  you.

 1          MS. HAYWARD:  So does Your Honor anticipate, then

 2 I guess we'll have a hearing on cash collateral and then --

 3          THE COURT:  You know, I --

 4          MS. HAYWARD:  A different hearing on a motion to

 5 dismiss rather than do it all in one.

 6          THE COURT:  I really want to know what's going on

 7 with the money.

 8          MS. HAYWARD:  Okay.  Very good Your Honor.

 9          THE COURT:  To kind of understand things.

10          MS. HAYWARD:  Okay.

11 BY MS. HAYWARD:

12 Q    Well, so, Mr. Choudhri, so it sounds like after the

13 Stage Stores filed bankruptcy, the building became pretty

14 vacant.  Let's talk about sort of, I guess historically, the

15 financials of the building from COVID until now.  Can you

16 give the Court a little bit of an idea of, you know, what it

17 looked like when Stage Stores filed bankruptcy leading up to

18 where we are now?

19 A    Absolutely.  It was significantly negative cash flow,

20 and it was a tough market, but we were able to secure

21 tenants' prospects that, unfortunately, we didn't get as

22 fast as we wanted because there's reasons.  And I can go

23 into those reasons, or I can just --

24 Q    I just kind of --

25 A    Okay.  Sorry.  Yeah.  I don't want to go off.

1  Q     Yeah.  Let's just try to kind of give sort of a more

2  global picture of sort --

3  A     Sure.

4  Q     -- of what has happened since COVID --

5  A     Sure.

6  Q     -- to where we are now.

7  A     Kind of high level despite the challenges.  And there

8  were many challenges, we've been able to lease up the

9  building significantly.  We've moved into a company called

10 DC Partners, St Christopher Holdings, they're a developer in

11 Houston.  They built -- they own the Thompson Hotel.

12 They're building the Allen, and they're one of the largest

13 EB 5 groups.

14         So I was able to pursue them and bring them into

15 the building.  They've leased an entire floor, which is

16 27,000 square feet on a 10-year lease.  That's a new deal

17 we've done.  There's another co-working business that's

18 owned by a group of physicians.  They own a lot of ER

19 centers, and they've -- they've taken space in the building.

20 And we've renewed several tenants.  And we've also signed

21 leases with other groups like Bankable Equity.  And Metwall

22 is another tenant --

23 Q     And Mr. Choudhri, I'm going to ask you to turn to

24 Debtor's Exhibit 8.

25             THE COURT:  And let me just note, if we get into

1  the document that we said we weren't going to deal with, one

2  thing I can do, and I want you to think about this, is I can

3  mute the entire line and just unmute Mr. Ruff's line, but we

4  can put nothing on.  That may work.  He doesn't have to come

5  up here --

6            MS. HAYWARD:  No, that would be --

7            THE COURT:  And I can control that.  So if we end

8  up having to go there, that's probably what I think I may

9  do.  And just mute everyone's line.  And have Mr. Ruff

10 unmute.  And I can control who's listening.  And it would

11 the only line that we have, and it's almost kind of like the

12 same thing, I -- just giving everyone the option on that.

13           MS. HAYWARD:  Sure, Your Honor

14           THE COURT:  Okay.

15           MR. FITZMAURICE:  That seems sensible.

16           MS. HAYWARD:  Yeah, I think that works just fine,

17 Your Honor.

18           THE COURT:  Thank you.

19 BY MS. HAYWARD:

20 Q    All right.  Mr. Choudhri, I'm showing you Exhibit 8.

21 Are these the Debtor's rent rolls?

22 A    Yes, ma'am.  Looks like it.

23 Q    Okay.  And so these are rent rolls, it looks like from

24 January through September.  Can you just -- in looking at

25 these, you know, how has the Debtor progressed in leasing up

1  the building over the last, you know, this year?

2  A    It has been significantly leased up.  Our occupancy is

3  over 50 percent.  Before, we were around 10.  It's gone up

4  over 100,000 square feet of lease up.  And we also have

5  additional leases like Regis and IWG, which is the parent

6  company of Regis.  They were actually in the building before

7  many years ago, and they're now interested in coming back.

8  So we're -- we've significantly leased up the building.

9  I've personally moved into the building to support it and

10  physically be there and be available at a whim's notice to

11  show space and showcase the space in the building.  And it's

12  really worked.  That's how we were able to, I believe, land

13  a lot of these tenants.

14  Q    Okay.  And so when you say you personally moved in, who

15  is you?

16  A    My, or the management company.  And we've always been

17  supportive to being flexible, to leasing up the space and

18  kind of like -- if you have like a, you know, if you're like

19  a model home kind of environment where someone can come in,

20  and they can see the space and see what it could be, and

21  it's a showroom.

22  Q    Okay.  And so with respect to Jetall, which is the

23  management company, right?

24  A    Yes, ma'am.

25  Q    Okay.  (Coughs)  Excuse me, Your Honor.  So with

1   respect to Jetall then.  Jetall -- does Jetall have a lease

2   with the Debtor?

3   A    It does.

4   Q    Okay.  And historically, how has that lease worked?

5   A    It's been a flexible lease to basically put tenants

6   first.  So Jetall had signed a lease around 2015 in the

7   building, and there was a tenant that wanted to move in, a

8   tenant called Verbex.  It's a kind of crypto exchange

9   company, and they took some space, but they didn't take the

10  entire floor.  And so Jetall made -- basically gave them the

11  space.

12           So -- and then when they actually -- unfortunately

13  didn't fulfill and move in, Jetall signed -- we signed a

14  lease with a company called Sonder.  And Sonder wanted the

15  eighth floor, and they took three floors in the building and

16  COVID occurred and they -- that's a claim we do have against

17  Sonder to collect on that.  So then there was -- so Jetall

18  is basically trying to support the building and float it

19  around to support it in any way it can.

20  Q    Let's look a little bit at the cash collateral budget

21  that was submitted in this case.

22           Sorry, Your Honor.  Something --

23           THE COURT:  No worries.

24           MS. HAYWARD:  -- set my allergies off a little

25  bit.

1        THE COURT:  I'm sorry.  What was the --

2   BY MS. HAYWARD:

3   Q    That would be -- let's look at Exhibit 1.  Okay.  Can

4   we just walk a little bit through sort of these operating

5   expenses and what they are?

6   A    Sure.  Service contracts, payroll, you know, something

7   else I want to mention that Jetall actually advanced payroll

8   because the building at, you know, at certain points could

9   you know -- just for years there was negative cash flow.  So

10  I personally and Jetall funded things that were necessary.

11  So the --

12  Q    Well let's take, for example, I see on this budget,

13  there's administration costs.  You see that at the very

14  bottom?

15  A    Yes.

16  Q    Okay.  And so who -- it looks like there's detail

17  talking about property manager, assistant property manager,

18  are those -- who are those employees of?

19  A    Jetall companies advances the employees for and

20  historically has, as well.

21  Q    Okay.  Has Jetall been charging management fees or been

22  paid management fees for managing this property?

23  A    I don't believe so.  I believe there may be some

24  management fees historically that are accounted for.  I

25  don't believe they've been paid for that, what's owed.

1  Q     Is there a management agreement with Jetall?

2  A     Yes.

3  Q     Under that management agreement does Jetall or is

4  Jetall typically entitled to charge commissions with respect

5  to rental space?

6            MR. FITZMAURICE:  Your Honor, objection, best

7  evidence rule.  We should be able to look at the management

8  agreement for its contents.  Otherwise, we are trying to

9  testify from memory as to what the contract says.

10           THE COURT:  We're about one or two questions away

11  from there.  I agree with you.  He can answer.

12           THE WITNESS:  There -- when we bring, or you know,

13  bring leases in management, we're entitled to that.  But we

14  have not collected.

15  BY MS. HAYWARD:

16  Q     Are there management fees in the cash collateral budget

17  that's shown as Exhibit 1?

18  A     No.  We've not put any management --

19  Q     Okay.

20  A     -- fees on (indiscernible).

21  Q     With respect to the amounts that are shown in Exhibit 1

22  of these amounts.  Are any of these amounts something that's

23  not directly related to the maintenance or repair of the

24  building?

25  A     Absolutely not.

1  Q    Now you see the rental income from August through

2  December that's projected rental income.  We see a jump, I

3  guess, in September to October.  Why is that?

4  A    Because there are leases that are starting to pay in

5  this environment and really, office world, you're going to

6  have a lease and you're going to have abatement of rent.

7  And then the rents kick in for new tenants typically.

8  Tenants cannot get rent concessions and -- or use TI's as

9  credits for rents, things like that.  So once that burns

10  off, then the rent starts coming in.  So we're on an upward

11  projection of more revenue coming in than was there.  So the

12  building is significantly more leased than it was before.

13  Q    And as far as you know, looking at, I guess, these

14  numbers.  Has the Debtor -- I believe you said the Debtor is

15  in negotiations with Regis, for example.  Has the Debtor

16  entered -- is the Debtor have any new leases that are going

17  to further increase revenue?

18  A    Yes, the Debtor has signed -- the Debtor has a lease

19  signed by Bankable Equities, which is an insurance company

20  and they've taken the entire sixth floor.  DC Partners does

21  have a right of first refusal on contiguous floors and

22  they've stated that they're not pursuing or not going to

23  waive that.  So that is a new lease.  There is a restaurant

24  lounge on the lobby floor and there's other restaurants that

25  we've talked to, some steakhouses that are interested in

1   ground level.

2            So we -- the plan is to really make this building

3   not just office, but truly mixed use where you have

4   restaurants, retail and office.  So there's more of an

5   experience, more of an ecosystem.  And it's in phase two of

6   the River Oaks District is right behind the building and

7   that's happening as well.   So that's a big positive.  And

8   then there's parking revenue that's coming in as well in the

9   future based on new leases that are being done and that have

10  been done. So we have actual leases that are signed, that

11  weren't signed before since the last few months actually.

12  Q    And I'm going to ask you to turn to Exhibit 7, if you

13  would, Mr. Choudhri.  What is Exhibit 7?

14  A    Exhibit 7 is a tenant, Ghassan Yasser TBA Boho Lounge.

15  This is --

16  Q    Well, Exhibit 7 is pretty --

17  A    Oh.

18  Q    -- bulky.

19  A    Okay.  Oh, I see what you -- okay, so Exhibit 7 has

20  several leases within Exhibit 7.  So -- but the first lease

21  on top is a new lease for the restaurant space on the first

22  floor.

23  Q    Okay.  And this is the Boho lease?

24  A    Yes.

25  Q    Okay.  And then if you would turn to sort of the back,

1   you'll see that there's some page numbers on the bottom left

2   side of each page.

3   A    Yes, ma'am.

4   Q    If you'll turn to page No. 000449.

5   A    Okay.  Sorry.  Just bear with me.  Okay.  I'm here.

6   Q    Okay.  What is 000449?

7   A    This a new lease we have for Level 6, for the sixth

8   floor, called Bankable Equity.

9   Q    Okay.

10  A    Is an insurance company.

11  Q    And how much space is this new lease taking?

12  A    27,000 square feet.

13  Q    Okay.  And under this lease -- so is that an entire

14  floor?

15  A    It is an entire floor.

16  Q    When was this lease -- when did the tenant sign this

17  lease?

18  A    It's been under negotiation for a while, but it was

19  signed last week.

20          MS. HAYWARD:  Your Honor, we would move for the

21  admission of Exhibit 7, which is copies of the various

22  leases tenants that have signed -- that tenants have signed

23  with respect to the property.

24          MR. FITZMAURICE:  So, Your Honor, we object with

25  respect to the two leases that we've talked about.  They're

1  not leases that are signed by the Debtor, and they are not

2  enforceable obligations by their terms with respect to the

3  remaining leases, the signatures, and with those two as

4  well, but also with respect to the other leases.  The

5  execution of those leases by the tenants hasn't been

6  established.  And so we object to this exhibit.

7          THE COURT:  What's your response, Counsel?

8          MS. HAYWARD:  Well, Your Honor, I think the

9  witness has testified that these are the leases.  I can

10  certainly walk through each lease and talk about whether or

11  not it's been executed by the tenant.

12          THE COURT:  Yeah.  But you have a copy of the

13  executed version or not?  You've just giving me an executed

14  version.

15          MS. HAYWARD:  I'm sorry.  Do I have?

16          THE COURT:  Do you have it?  In other words, what

17  you're going to try -- are you going to try to authenticate

18  the document by saying it's been signed by the other party?

19          MS. HAYWARD:  Yes.

20          THE COURT:  Even though there's not a signature

21  here?

22          MS. HAYWARD:  It's been signed by the tenant, Your

23  Honor.

24          THE COURT:  It's -- I'm saying that it's not been

25  signed by the other party, right?

1          MS. HAYWARD:  The Debtor?

2          THE COURT:  Yeah.  You're saying it hasn't been

3   signed by the Debtor?   The version that I'm looking at

4   here.

5          MS. HAYWARD:  Correct.  The version you're looking

6   at has not been signed yet by the Debtor.  But what --

7   they're being offered to show that the Debtor has these

8   leases in place that can -- that are supporting the

9   property, Your Honor.

10         THE COURT:  I'm not sure they're supporting

11  anything at this point.  If they're unsigned, what am I

12  doing?  What am I looking at?

13         MS. HAYWARD:  Well, first off, Your Honor, we're

14  only talking -- there's only two leases in here.  Those are

15  the brand-new leases.

16         THE COURT:  Okay.

17         MS. HAYWARD:  All right.  So --

18         THE COURT:  Why don't we separate them?

19         MS. HAYWARD:  Okay, let's separate them.  The new

20  leases.  So if we take out of Exhibit 7, I guess.

21         THE COURT:  Well, I guess maybe the way of doing

22  this is, for the leases that are here.  I can admit the fact

23  that there are signed leases dated as of this date, but have

24  no legal effect, right?  I -- or to my knowledge, or I can

25  admit that there's something here, but not that the other

1  side is actually signed, that the Debtor has actually signed

2  these or intends to sign them.  I think is the way to --

3           MR. FITZMAURICE:  I think with respect to the Boho

4  lease and the Bankable lease, I agree with you, Your Honor.

5  Our objection is to the extent these exhibits are offered to

6  prove that this is an enforceable obligation and that is

7  revenue that the Debtor is entitled to as a result of those

8  leases.  Given the fact that they're not executed, we would

9  have -- oh, I'm sorry.

10           THE COURT:  I think parties can argue to the legal

11  effect of them, right?

12           MR. FITZMAURICE:  Yes Your Honor

13           THE COURT:  But they -- they're signed by one

14  side.  Maybe we'll do that.  To the extent that the document

15  has -- in 7 has not been fully executed by both parties and

16  the ones that are -- those two leases that are unexecuted.

17  They say what they say, but they remain unsigned.  I don't

18  have fully signed copies.  So the legal effect of those

19  documents will be for me to determine as a matter of law.

20           MR. FITZMAURICE:  Thank you, Your Honor.  And with

21  respect to the remaining leases, I don't think that the

22  Debtor can establish the witnesses' familiarity with the

23  signatures of the tenants to prove up that those are, in

24  fact, the tenants' signatures on those leases.  I would

25  submit that to the extent that those other leases are signed

1    by the Debtor, the Debtor can presumably prove up its part

2    of that lease.  But it's not clear that it can establish

3    that the tenant's signature.

4              MS. HAYWARD:  Your Honor, respectfully, the Debtor

5    doesn't -- the Debtor can authenticate the leases, as these

6    are the leases that the Debtor has with respect to these

7    properties that are the business records of the Debtors,

8    they were pulled through --

9              THE COURT:  Why don't you just prove up the

10   business record exception?

11             MS. HAYWARD:  Okay, but they -- but we're talking

12   authenticity here, right?

13             THE COURT:  I think you can --

14             MS. HAYWARD:  That's a different issue.

15             THE COURT:  No, no.  But I think he can -- I think

16   these documents have been properly authenticated.  I think

17   the question is, are they admissible now?

18   BY MS. HAYWARD:

19   Q    Mr. Choudhri, these documents within Exhibit 7, are

20   these documents that Galleria 2425 Owner LLC would maintain

21   in the regular course of its business?

22   A    Yes.  And I've signed these leases.

23   Q    Okay.  Are these documents or these leases -- the

24   leases that govern the various tenants that are currently

25   occupying the property or in the process of beginning their

1   occupation of the property?

2   A    Yes.

3   Q    Are these leases something that at the very core, I

4   guess, of 2425's business?

5   A    Yes.

6   Q    The leases they are these the signed copies of the

7   leases that Jetall maintains in its files?

8   A    Yes.  And these two new leases are also executed.

9   Q    Who typically has been executing these leases?

10  A    Typically, I'll execute them or an authorized manager

11  will.  And this is what we keep in our books and records of

12  leases and operating agreements and contracts.

13          MS. HAYWARD:  Again, Your Honor would move for the

14  admission of Exhibit 7.

15          MR. FITZMAURICE:  Your Honor, objection.  We think

16  that the Debtor has established that these are Jetall's

17  books and records that Jetall maintains.  I don't know that

18  Debtor has established that it maintains them in the

19  ordinary course of its business --

20          UNIDENTIFIED MALE:  It's all bullshit.

21          THE COURT:  Well.

22          MS. HAYWARD:  What?

23          THE COURT:  Hold on a second, folks.

24          THE COURT:  I'm going to remind everyone, if

25  you're on the line, you're dialing into Federal Court.  And

1   I will treat it as if you're speaking in my courtroom.  I

2   don't know -- no idea who spoke, but the level of disrespect

3   that was just shown to this Court and to this process, I'm

4   muting the line.  And if I find out who it is, I'm going to

5   subpoena them in here to really explain to me who they think

6   they are.  You don't have open phone lines in my courtroom,

7   being able to say those kind of words.

8            So whoever it is, I don't know what you're talking

9   about.  I don't even know if you're dialing into this

10  hearing.  But I assure you, if I find out who you are,

11  you're coming in, and we're going to have a conversation

12  about what you said.  I'm muting the line and I -- my

13  sincere apologies to the parties.  I don't know what's going

14  on, but it won't be tolerated.  I'm muting the line.

15           Mr. Ruff, why don't you just unmute the line?  Why

16  don't you just hit five star?

17       (Conference muted.)

18           THE COURT:  That's it.

19           Mr. Ruff, did I get you?

20           MR. RUFF:  You did, Your Honor.  Thank you.

21           THE COURT:  Okay.  My law clerks are on the line,

22  hit five star.

23           Okay, let's proceed.

24           MS. HAYWARD:  Thank you, Your Honor, that's the

25  most exciting thing that might happen today.

1          MR. FITZMAURICE:  So again, I apologize for

2   interrupting.

3          THE COURT:  No.

4          MR. FITZMAURICE:  I just want to make sure that

5   the objection gets resolved before we continue.

6          MS. HAYWARD:  Yes.

7          THE COURT:  No, no, I'm going to overrule the

8   objection.  They come in.

9          MR. FITZMAURICE:  Thank you.

10  BY MS. HAYWARD:

11  Q    Mr. Choudhri, do you believe that the amounts that are

12  listed in the Debtor's six-month budget, which is attached,

13  which is Exhibit 1 here --

14  A    One?

15  Q    -- are necessary to the preservation of the building

16  and the tenancy of the building?

17  A    Yes.  Yes, ma'am.

18  Q    What happens -- what could happen if the Debtor didn't

19  pay for elevator maintenance, for example?

20  A    That's life and safety.  It's a basic requirement that

21  we need to operate and run the building.

22  Q    Okay.  Are there any expenses that are listed in this

23  budget that you would not consider to be necessary to the

24  operation of the building?

25  A    No.

1          MS. HAYWARD:  Your Honor, may I have a moment to

2    confer with co-counsel, please?

3          THE COURT:  Yes, please.

4       (Pause in the proceedings.)

5          MS. HAYWARD:  And Your Honor, I just want to be

6    clear that this testimony is just for cash collateral,

7    rather than getting into the motion to dismiss.

8          THE COURT:  Yeah.  Yeah, it is.

9          MS. HAYWARD:  Okay.  Your Honor, then at this

10   point, I would pass the witness.

11         THE COURT:  Okay.  We need to talk about the

12   budget.  And we haven't talked about the budget,

13   Ms. Hayward.  We haven't talked about the budget.  And I'm

14   concerned about the budget.

15         MS. HAYWARD:  Exhibit 1, Your Honor.

16         THE COURT:  Whenever you're talking about for the

17   next couple of months, I'm concerned about the budget or

18   where the money or how accurate the budget is.

19         MS. HAYWARD:  Okay, Your Honor.

20         THE COURT:  In other words, the proposed cash

21   collateral order seeks to provide a replacement lein, right?

22         MS. HAYWARD:  Yes, Your Honor.

23         THE COURT:  Right.  When I look at the MOR that

24   was filed last month, I look at the EMOA that was filed this

25   month.  I'm having trouble understanding or reconciling the

1  budgets that's been attached with the MORs that have been on

2  file and how they work.

3           In other words, you take out 20,000 of cash, which

4  no one has done for the utilities yet, which my order

5  requires.  We've got a really big fight ahead of us.  And I

6  don't understand where the money's coming from to pay for

7  that and then also to pay adequate protection to the secured

8  creditor.

9           MS. HAYWARD:  Well, Your Honor, right now we have,

10 you know, the cash collateral budget proposed for

11 replacement liens as the property gets leased up.

12 Obviously, revenue --

13          THE COURT:  But it didn't work last month.

14          MS. HAYWARD:  I'm sorry, Your Honor.

15          THE COURT:  It didn't work, right?  In terms of

16 what was projected, in terms of what was actually provided.

17 It didn't work.  You look at the MOR.  The MOR showed that

18 the Debtor had -- your July MOR didn't coincide with what

19 this budget shows.

20          MS. HAYWARD:  Well, Your Honor, the July MOR was

21 covering July 5th.

22          THE COURT:  Through the end of the day.

23          MS. HAYWARD:  Through the end of the month.

24          THE COURT:  Right.

25          MS. HAYWARD:  So rents typically would come in

1  pre-petition.  So the July MOR is only covering post-

2  petition.

3          THE COURT:  But it only showed what you covered,

4  right?  In other words, your budget, even looking at August,

5  how much money do you have now?  It's all in -- it's all in

6  evidence.  I can ask Mr. Choudhri all of these questions.

7  But I don't understand how the budget works and how this

8  Debtor with the carve out.  And I'm concerned about the

9  level of money and the level of fight that we're going to

10 have and whether this Debtor really has enough cash.

11         MS. HAYWARD:  Well, Your Honor, I think that the

12 Debtor's plan obviously comes into play there, which

13 includes a substantial cash infusion.

14         THE COURT:  Right.  But now we're never going to

15 get into corporate governance issues.  And I'm really

16 concerned about those two.

17         MS. HAYWARD:  Corporate governance issues, Your

18 Honor?

19         THE COURT:  Uh-huh.  And I don't want to get into

20 it, but I'm concerned.

21         MS. HAYWARD:  Okay.  Well, Your Honor, I think

22 that --

23         THE COURT:  It's going to cause me to talk about

24 the settlement agreement.

25         MS. HAYWARD:  Yes, Your Honor.

1          THE COURT:  And who's --

2          MS. HAYWARD:  Well, and that's why, you know, I

3    think a lot of this is sort of intertwined.

4          THE COURT:  Let's just talk cash.  Let's just

5    assume cash.  How do you -- what's the adequate protection?

6    I don't see it -- I don't see the replacement actually

7    replacing.  In other words, there's a cash position that has

8    to be preserved.  And so use of cash -- but they have to be

9    adequately protected.  And I don't see it, and I don't see

10   that plus the carve out.  I don't see how the Debtor has

11   enough cash.

12         MS. HAYWARD:  Well, Your Honor, the adequate --

13         THE COURT:  What's your opinion?

14         MS. HAYWARD:  The adequate protection to the

15   lender, again, we're not spending cash on an ancillary.

16   We're not spending cash on things that the lender itself

17   wouldn't have to spend cash on.

18         THE COURT:  But they're still entitled to adequate

19   protection.

20         MS. HAYWARD:  They're entitled to adequate

21   protection of their interest, right?

22         THE COURT:  Uh-huh.

23         MS. HAYWARD:  But to the extent that we're

24   spending cash on things that maintain the value of their

25   underlying collateral.

1              THE COURT:  Right.

2              MS. HAYWARD:  And preserving the value of that

3    collateral and the property, then that is adequately

4    protecting.

5              THE COURT:  So why don't we look at the budget and

6    then talk about them?   Why don't we -- why don't we look at

7    your current budget?

8              MS. HAYWARD:  Okay.  Your Honor, the current

9    budget is Exhibit 1.

10             THE COURT:  So tell me how that reconciles with

11   your MORs.

12             MS. HAYWARD:  Your Honor, we've only filed --

13             THE COURT:  Let's just take the one, the most

14   recent one that you filed.

15             MS. HAYWARD:  Your Honor, I would have to pull it

16   up on my computer.

17             THE COURT:  I understand.

18             MS. HAYWARD:  I don't have it in front of me.

19             THE COURT:  I understand.

20             This is what Mr. Choudhri is going to have to

21   testify to.  What's on the MOR and then compare it to what's

22   here?

23             MS. HAYWARD:  Yes, Your Honor.

24             THE COURT:  I don't want you resting your case.

25             MS. HAYWARD:  Yes, Your Honor.  I appreciate.

1   Your Honor, may we take maybe a five-minute break, so I can

2   get set up with my laptop --

3             THE COURT:  Yeah.

4             MS. HAYWARD:  -- on the Wi-Fi.  And --

5             THE COURT:  I think that's appropriate.  It could

6   do.  You still have to talk about -- all right.  We can take

7   the break, but I want to talk about a couple of things.  I

8   want to talk about the secured creditor's debt.  I want to

9   talk about who's liable on that debt.  And then I want to

10  understand how this flows through the cash collateral order.

11            MS. HAYWARD:  Okay, Your Honor.

12            THE COURT:  That's -- I'm trying to be as open and

13  transparent as I can.  I want to take up cash collateral

14  first.  I want to understand how this really works in terms

15  of getting to the fight about the plan and if that's where

16  -- if that's where this is ultimately going to go and who's

17  going to fund that fight and how the fight continues.

18            I also -- and I have to think about in connection

19  with a motion to dismiss.  Who's looking at claims against

20  the estate may have against other parties.  And how that's

21  going to work from a corporate governance standpoint, from

22  the estate standpoint.

23            I don't want to go there, but we got to kind of

24  think about it because I think about how you get there.  And

25  then, when you get there, what you're trying to do.  And I

 1   don't want to put anyone in a bad position because I don't
 2   know what I don't know.  I just know what certain documents
 3   that are into evidence say.  And I need to think about all
 4   of that.
 5          And I think maybe we should all be thinking about
 6   a lot of things up front before we kind of get there.  But
 7   for now, I'm just thinking money, your MORs, the cash
 8   position that the Debtor has.  And then the proposed
 9   administrative burn that's going to happen to get there.
10   The proposed cash position that the Debtor has now.  What
11   we're really doing -- I don't want to get to the end of it
12   and then figure out that there's not enough cash to pay
13   administrative expenses.  And I'm really concerned about
14   that.
15          MS. HAYWARD:  Well, and I appreciate that, Your
16   Honor.
17          THE COURT:  And at the same time give -- and at
18   the same time -- I'm not worried about US Trustee fees.
19   I'll let Mr. Ruff fight about that.  But I'm concerned about
20   admin expenses, and I'm thinking about replacement lanes.  I
21   thought it was going to be a replacement lane and there's a
22   carve out for fees in connection with a real dispute that
23   could come, right?  I need to kind of understand to make
24   sure on the front end that you're really going to -- I don't
25   want you getting to the end and figuring out.

1      There wasn't anything there, or it wasn't as much

2   there.  Because if you hire, and you get to -- and you do --

3   you get hired to do work, you got to get paid.  And I don't

4   want to be in a position where that ever gets questioned.

5   At the same time, I don't want to find myself at the end of

6   a 60 days, and find myself where we're not.  The cash

7   position is kind of where it's trending.  And then there's

8   really been no replacement lane and the cash essentially is

9   gone because it went to pay for administrative expenses,

10  which I think would be appropriate.

11          MS. HAYWARD:  Your Honor, I --

12          THE COURT:  I'm just being honest with you.

13          MS. HAYWARD:  And I hear, Your Honor.

14          THE COURT:  I'm just thinking about this because

15  this is -- you know, we're talking about experts, and this

16  is going to be a real right evaluation, right?  Is what your

17  plan calls for?  And we don't need to get there.  And I'm

18  not here to try playing conformation issues and whether a

19  plan is feasible, not feasible, I don't know.  Those fights

20  are -- those are fights for another day.  The question is,

21  as we look now, is there something that can get you to the

22  ultimate dispute that you need to have?  And I need you to

23  think about of where we are going.

24          I just don't want you leaving without answering my

25  questions.  And I'm trying to be as transparent as possible,

1   not because I think you're doing anything bad or losing.

2   It's just on my mind as I walk out.  And I'd rather you know

3   what's on my mind.  And they know so that everybody can

4   answer the question.  So I need to really focus on cash

5   collateral issues.

6            So why don't we just take a few minutes.

7   Mr. Choudhri, I'd remind you that you're still under oath,

8   and you're not to discuss your testimony with anyone during

9   this time.

10           And when don't we just take a few minutes, now's

11  not the time for argument.  But I do need him to answer some

12  questions about the budget and kind of where things go.  I

13  have a full opportunity to cross, and I need -- those are

14  the questions that I'm going to ask, and I might as well --

15  I don't want to blindside anyone with questions as I start

16  talking about MORs and stuff.

17           MS. HAYWARD:  Sure, Your Honor

18           THE COURT:  Okay.  All right.  Thank you.

19      (Court in recess from 12:23:17 p.m. to 12:34:52 p.m.)

20           THE COURT:  Mr. Choudhri, come on up.  Thank you.

21           I remind you that you're still under oath.  Okay.

22           MS. HAYWARD:  Thank you, Your Honor.  Your Honor,

23  I just -- I guess I'm pulling -- I pulled the Monthly

24  Operating Report that was filed yesterday, Your Honor.  And

25  obviously, that is not included as an exhibit for today.  So

1   I'm not sure how to address the Court's concerns with it

2   other than to say that I believe that the monies that came

3   in, actually surpassed the budget.

4              THE COURT:  Okay.

5              MS. HAYWARD:  So but I'm happy to --

6              THE COURT:  No, no I mean, let's -- If those are

7   the questions that you have then I'm comfortable proceeding.

8   You can cross him.

9                   DIRECT EXAMINATION (CONT'D)

10  BY MS. HAYWARD:

11  Q   Okay.  Mr. Choudhri, with respect to -- I guess you've

12  heard the Court's -- some of the Court's concerns regarding

13  you know the Debtor and the Debtor's operations and the

14  protection of the bank.  With respect to the Debtor's

15  current cash position, does the Debtor currently have cash

16  to operate and pay the expenses for the building?

17  A   Yes.

18  Q   And with respect to any potential deficiencies, are you

19  or is Jetall willing to fund any potential deficiencies that

20  may exist until the time that we get to a plan?

21  A   Yes, I'm prepared to do that.

22  Q   Okay, would you --

23  A   And I've done that in the past.

24  Q   Okay.  Have -- with respect to any deficiencies in cash

25  that may exist going forward, are you or Jetall -- well, I

1  guess so -- you say you've been doing that in the past.

2  What do you mean by that?

3  A    In the past, we've advanced payroll, we've advanced --

4  and you know, there's been sometimes repairs that were

5  needed in the past, and we funded that to get to where we

6  are, to get the building leased up, and we're above 50

7  percent where before we're at 10 percent.  So now the

8  revenues coming in to catch up.

9  Q    Okay.  With respect to the Court's concerns about

10  administrative expense claims, just generally speaking, will

11  Jetall be willing to fund any type of Debtor-in-Possession

12  loan that would be fully subordinated in this case?

13  A    Yes.

14  Q    Would you or Jetall be willing to fund, I guess, monies

15  that might be needed to get us to confirmation?

16  A    Absolutely.  Yes.

17  Q    Would you be willing to fund those monies as capital

18  rather than as debt?

19  A    Yes.

20  Q    Is it important to you to maintain this asset and hold

21  on to this building?

22  A    Yes, it's important to be successful and pay -- you

23  know, pay the creditors and get this asset stabilized.  That

24  is extremely important.  And I've done it before and I've

25  been working hard.  We're getting to that finish line now.

1  Q    Okay and what's your understanding of did the Debtor

2  collect all of the rents last month?

3  A    Yes.

4  Q    Okay.  And did the Debtor's collection of rents last

5  month -- out of those collections, compare with the budget?

6  A    We've surpassed the budget.  I believe the budget was

7  about 128,000.  I believe we've collected 170.  Again, I'm

8  going off of memory, but I'm guessing it's around 177,000.

9  Q    Is that including both July and August?

10 A    I --

11 Q    And if you don't know that's fine.

12 A    Yeah.  You know, I know the first month wasn't the

13 whole month.  And then we have tenants that are now starting

14 to pay rent, so more revenue is going to trickle in the next

15 month -- in two months.  Based on the escalations in the

16 rent schedule.

17 Q    Okay.  So explain that please, if you would.

18 A    So for example, you sign a lease with a tenant.

19 They'll -- and it's the market, you know tenants will expect

20 sometimes three months, six months, a year in our rent

21 abatement.  And so when you sign a lease, sometimes that has

22 to burn off till they start paying rents.  And there's also

23 things like commissions that we haven't, you know, even

24 charged for just so we could get, you know, get the tenants

25 and make it successful.  And get the operation -- you know,

1  reorganized and restructured so it is successful.  And I

2  think we achieved that with the plan.

3  Q    Okay.  Do you believe that -

4  A    I'm hopeful we will achieve that with the plan

5  (indiscernible).

6  Q    Do you believe that the payment of expenses with

7  respect to the building helps or hurts the value of the

8  building?

9  A    It absolutely helps.  It preserves it and adds value.

10 Increases the value.  And as we are -- as we're increasing

11 occupancy, it's adding more and more value and the expenses

12 are pretty fixed.  I mean they're going to be there, so it

13 dissipates the -- as revenue goes up, the expenses are

14 dissipated over more occupancy, right?  Before we had very

15 little occupancy.  Now we've raised the occupancy.  So

16 that's offsetting the expenses.

17 Q    Okay.  When you say the expenses -- do the expenses

18 tend to go up with respect to, as new leases are in place?

19          MR. FITZMAURICE:  Objection to form, Your Honor.

20 We're all talking here in generalities about what could

21 happen in theory, what generally happens with respect to the

22 real estate industry.  Generally we've got specific leases.

23 We have specific -- we would have specific terms about --

24          THE COURT:  Yeah, I agree.

25          MS. HAYWARD:  I'll move on.  Thank you, Your

1   Honor.

2           Your Honor, at this time, I'll pass the witness

3   for Cross, too.

4           THE COURT:  Okay.  Thank you.

5           And in terms of timing, I've got a -- why don't

6   you go for about 20 minutes?   I got a hearing at 1:00 that

7   shouldn't last too long maybe -- and then maybe you all can

8   start thinking about when you want to take a lunch break or

9   if you want to or not.  I don't care.  Just let me know kind

10  of how much -- what you all want to do.

11          MS. HAYWARD:  Yes

12          THE COURT:  Okay.  Thank you.

13          MR. FITZMAURICE:  So I'll just ask Mr. Choudhri to

14  keep that binder there, and I'm going to have another one

15  for you.

16          THE COURT:  Okay.

17                      CROSS-EXAMINATION

18  BY MR. FITZMAURICE:

19  Q    Good afternoon, Mr. Choudhri.

20  A    Good afternoon.

21  Q    I'd like to direct your attention to Exhibit 1, the

22  Debtor's Exhibit 1.

23  A    Yes.

24  Q    Which is the bud -- the projected budget for the

25  future?

1   A    Yes.

2   Q    And in particular, the increase in rent that's

3   forecasted between September and October.  Do you see that,

4   sir?

5   A    Yes.

6   Q    Is that increase in rent associated with the proposed

7   lease with Bankable?

8   A    I would have to look and compare.  But the Bankable

9   lease is fully executed.

10  Q    Well --

11       THE COURT:  Maybe I can ask you that this way,

12  though, there is an increase of -- from 128 to 229.  What is

13  that attributed to?

14       THE WITNESS:  That's attributed to when leases

15  turn on, Your Honor.  So we have a tenant that has free rent

16  that's burning off that's been in the building.

17       THE COURT:  You know which one?

18       THE WITNESS:  GalloWorks.

19       THE COURT:  Okay.

20       THE WITNESS:  And that's a tenant that they have

21  so much free rent and that rent burns off.

22  BY MR. FITZMAURICE:

23  Q    All right.  So --

24  A    So I think the projection may be even -- the true

25  projection is going to be higher or the reality is going to

1   be higher.

2   Q    We have the exhibit in front of us.  So I'd like you to

3   turn to that portion of Exhibit 7 in the Debtor's binder

4   that's in front of you, which is like the leases, and to the

5   page that has the little numbers 452.

6   A    4 --

7            THE COURT:  Is there a way we can get it?

8   Someone can tell me which one we're going to -- is there a

9   Bates label on the bottom?

10           MR. FITZMAURICE:  Oh, yes.  I'm sorry, Your Honor.

11  That's what I was referring to.  So they're on the left-hand

12  side and it's 00452.

13           THE COURT:  And Mr. Choudhri, that sounds like

14  it's going way towards the back.

15           THE WITNESS:  Okay.

16           THE COURT:  And then --

17           THE WITNESS:  What would help if you have the rent

18  roll, that would also help me.

19           THE COURT:  All right.  You just get to answer

20  questions, Mr. Choudhri.

21           THE WITNESS:  Sorry, Your Honor.  I apologize.

22           THE COURT:  No worries.

23           MR. FITZMAURICE:  I was trying to cross-reference.

24           THE WITNESS:  444, what?

25           MR. FITZMAURICE:  452

 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  Okay.

 3              THE WITNESS:  Yes, sir.

 4   BY MR. FITZMAURICE:

 5   Q    On this page, this is -- this document --

 6   A    452.  Yes, sorry.

 7   Q    And this is a copy of the proposed lease with Bankable,

 8   correct?

 9   A    This is a signed lease.

10   Q    This lease is not signed by the Debtor, is it?

11   A    It is.

12   Q    So I'm going to ask you to look at the page that is

13   473.

14   A    Yes, sir.  Okay, 47- -- okay.

15   Q    Is there a signature by the Debtor on that page?

16   A    Not here.  But I have -- we have a fully executed

17   lease.

18   Q    So I'm going to move to strike the reference to the

19   fully executed lease since this is the exhibit that we have

20   in front of us.

21              THE COURT:  Sustained.

22   BY MR. FITZMAURICE:

23   Q    Going back, Mr. Choudhri to Page 452.

24   A    Yes, sir.

25   Q    Section 1F.

1   A    Yes, sir.

2   Q    There's a chart with lease payments there.  Do you see

3   that?

4   A    Yes, sir.

5   Q    And for the period October 1st, 2023, and

6   September 30th, 2024, monthly rent is $101,250?

7   A    Yes, sir.

8   Q    Okay.  So I'd like you, please, to go back to Exhibit 1

9   which is the budget.

10  A    Yes, sir.  Exhibit 1.  Okay.

11  Q    And I'd like you to look at the difference between the

12  October rent and the September rent -- excuse me.  The

13  September revenue and the October revenue.

14  A    Yes.

15  Q    How much is that?

16  A    September is 128,329.  October is 229,579.

17  Q    And is that difference $101,250?

18  A    That sounds about right.  Yes.

19  Q    Okay.  So does that suggest to you the difference is

20  attributable to the proposed lease with Bankable?

21  A    I would have to confirm by looking at the rent roll

22  because there's other leases, too.  So I can't, but there is

23  an increase based on lease-up.

24  Q    All right.  And the increase is the exact amount of the

25  rent that's listed in the Bankable lease, correct?

1  A    101,250.  It's pretty close, yes.  About 100 and --

2  yeah, I would say it's pretty close about 100,000.

3  Q    So please look at Page 456 of Exhibit 7.

4  A    Okay

5  Q    This is a second -- I'm looking for Section 6 of the

6  proposed Bankable lease.

7  A    Okay.

8  Q    This provision gives the tenant the right to leave the

9  property at any time in its sole discretion, correct?

10 A    This gives the landlord an option to relocate the

11 tenant within a different floor because sometimes we have

12 tenants that -- like Bechtel was interested in the entire

13 building.

14         Give me one second.

15 Q    And if it's helpful, I'll direct your attention to

16 the --

17 A    The last sentence or the second last.

18 Q    Yes, sir.

19 A    Yes, that's what this says.  Tenant's option may

20 relocate to another building with 90-day written notice to

21 landlord.  Tenants shall pay the same.  But I believe that

22 there is a -- I believe there is a condition that has to be

23 met for that.

24 Q    There is no condition here in this sentence, is there,

25 sir?

1  A     No, there's not.

2  Q     And the property that's located at 1001 West Loop

3  South, are you affiliated with that property?

4  A     Yes.

5  Q     And how about the property located at 50 Briar Hollow?

6  A     Yes.

7  Q     Okay.  So this tenant can leave one property you

8  control.  Go to another property that you control in its

9  sole discretion, right?

10 A     Again, I don't think this is the -- I know that we

11 ended up -- on our final deal, we ended up with a landlord

12 right, not a tenant right.  But that's what this says.  This

13 does say tenant may relocate, that is what this says.  But

14 I'm not.  I know the version that there's one lease, and it

15 is fully executed with Bankable.  And it does not give

16 outside the landlord the right.

17         MR. FITZMAURICE:  All right.  So again, Your Honor

18 move to strike the portions of the answer that deal with

19 proposed terms that are not included in the evidence that's

20 before the Court.

21         THE COURT:  No, I'm going to overrule it.  He's

22 going to say, what he is going to say, right?  I don't --

23 overruled.  What's his name, sir?

24         MR. FITZMAURICE:  Thank you, Your Honor.

25 BY MR. FITZMAURICE:

1  Q    Mr. Choudhri, let's talk about Jetall.

2         THE COURT:  Can I just ask a question, then?

3  Just based on what you're saying, are you saying that

4  there's a different version of this lease agreement?  Or

5  that there is a lease agreement with a different language

6  that may be executed?

7         THE WITNESS:  Yes, Your Honor.

8         THE COURT:  Okay.

9         THE WITNESS:  I know that we did -- this rings a

10 bell.  And we did have a landlord unilateral right, not a

11 tenant unilateral right.  That was in there because the

12 tenant initially wanted to go to a different building.  I

13 was able to steer them to this building.

14         THE COURT:  Okay.  Thank you.

15 BY MR. FITZMAURICE:

16 Q    Mr. Choudhri, you said earlier, I believe that one of

17 the things that Jetall does is, it funds payroll for the

18 Debtor; is that right?

19 A    Yes, sir.

20 Q    The Debtor doesn't have any employees.  Does it?

21 A    Well, that is true.  Maybe I misspoke in the word

22 payroll, but it costs -- administrative costs like a

23 property manager.  So when -- as the management company we

24 advance funds, and we've done that and so Jetall has done

25 that for the benefit of the Debtor.  But it hasn't paid --

1  technically payroll they're like, you know, employees of

2  Jetall, not -- the Debtor doesn't have employees.  So I just

3  want -- Jetall does have some W-2 like there's cleaning

4  staff technicians.  Jetall pays the engineers, and the

5  assistant engineers, the HVAC technicians, you know property

6  manager, assistant property manager for the building.

7  Q    Those people are all Jetall employees, right?

8  A    Yes, sir.

9  Q    Okay.  Thank you.  And Jetall is a tenant in the

10 property, but doesn't pay any rent, correct?

11 A    It has a lease.  But it -- but the rents have not come

12 due yet.  It has some concessions, but it's always been

13 flexible to be physically there to lease up the building.

14 That's been its priority.

15 Q    And Jetall's original lease for the property did

16 require Jetall to pay rent, didn't it?

17 A    And it did.  And it was also OTI and it didn't because

18 there was a tenant that was larger and Jetall was an

19 impediment to that larger tenant.  So then Jetall let the

20 larger tenant take the space.

21 Q    And in exchange, the lease was amended to remove any

22 rental -- rent payment obligation from Jetall, right?

23 A    As long as that tenant was paying, yes, sir.

24 Q    Is that tenant paying right now?

25 A    No, that tenant did not.  That's the whole Sonder

1  lawsuit where there's --

2  Q    And Jetall's always continuing not to pay rent?

3  A    The lease is here, and Jetall's abiding by the lease

4  that it has.  And there is free rent that does burn off just

5  like any other tenant.  That's in the lease with Jetall.

6  Q    Who negotiated that lease on behalf of the Debtor?

7  A    Who negotiated that lease?  That lease was negotiated

8  on behalf of Jetall.

9  Q    That's who.

10 A    And that's the lease that I signed, and I negotiated in

11 the Bank of Kuwait got the lease as well before it was --

12        THE COURT:  Just want to make sure we're having

13 one question, one answer.

14        MR. FITZMAURICE:  I apologize

15        THE COURT:  No worries.

16 BY MR. FITZMAURICE:

17 Q    I'm sorry.  Please continue your answer.

18 A    Sorry about that.  No, I have a bad habit of rambling,

19 and I've got to stop.  I've been advised that.  I'm going to

20 stop.  I get real nervous, and I keep going.  So I'm sorry.

21 I'm going to go.

22 Q    No worries about it.  You did pretty well yesterday.

23 A    Yes, you're very kind and polite, and I appreciate you

24 being very respectful.  Thank you.

25 Q    With respect to the Jetall lease, is it fair to say

1  that the lease was negotiated with you on both sides of the

2  transaction?

3  A    That is true.

4  Q    And that's also true with the amendment of the lease to

5  reduce the rental payment obligation to zero, correct?

6  A    The rental payment was not reduced to zero.  There is a

7  rental obligation, and we've been fulfilling it based on the

8  lease.

9  Q    And that rental obligation currently is for zero rent

10 that you paid.

11 A    Until -- I believe the rent starts, I think in October

12 or November.  Under the lease, I have to look at the -- what

13 the lease says in the schedule.  But Jetall has always been

14 flexible.  And I want to be very clear that -- and I'm still

15 saying that we're very flexible to leasing -- our priority

16 is leasing up the building.  I'm just physically there.  And

17 I moved my office and my team there, so I can be more

18 successful by leasing up the building.  And it's actually

19 paid off because we've leased the building up over 100,000

20 square feet from where it was about a year ago.

21 Q    Well, if you look at the budget, that's Debtor's

22 Exhibit No. 1 for October, November, December.  The rental

23 income is the same as it is for October.  And we just saw

24 that was fully attributable to the Bankable lease.  Right,

25 sir?

 1           MS. HAYWARD:  Objection.  Misstates the evidence.

 2           THE COURT:  Sustained.  You can ask it.  Why don't

 3  you ask another question, Counsel?

 4           MR. FITZMAURICE:  Thank you, Your Honor.

 5           THE COURT:  Is the Jetall lease in 7 somewhere.

 6           MR. FITZMAURICE:  It is not, Your Honor.

 7           THE COURT:  Okay.  Thank you.

 8  BY MR. FITZMAURICE:

 9  Q    Sir, I'm going to ask you to -- you can go ahead and

10  close the Debtor book.

11  A    Yes, sir.

12  Q    And open the other one.

13  A    Okay.

14  Q    So I'm going to ask you, sir, to please turn to -- I

15  apologize in advance.  There was admittedly a confusing

16  numbering system that we utilized here, but Exhibit 2-8,

17  which are the -- some of the Debtor's filings in this case.

18  A    2-8?

19  Q    2-8.

20           THE COURT:  You know, it might be easier if you

21  can find it for the witness.

22           MR. FITZMAURICE:  May I?

23           THE COURT:  Yeah, go ahead.  And I can look over

24  your shoulder and figure out what that means, too.

25           Ah, got it.

1  BY MR. FITZMAURICE:

2  Q    Okay.  That's right.  If you look through Exhibit 2-8

3  -- and I apologize, this is going to be even further

4  confusing.  There are numbers that are across the top of the

5  page.  And it starts with -- is this -- yes, so the front

6  page of the exhibit will say Exhibit 8, Michael Carter's

7  Declaration. And then there's a sticker on the bottom right

8  that says NBK Exhibit 2-8.

9  A    Yes, sir.

10 Q    Okay.

11 A    And we -- I guess we can talk about this, but it's

12 okay.

13 Q    And so if you look at the next page, you'll see across

14 the top there are some numbers, and it starts with one of

15 19, et cetera.

16 A    Yes, I see that.

17 Q    And if you continue on through after we get through the

18 19, we'll start with one of 15.

19 A    One of --

20 Q    So if you continue going back further into the exhibit.

21 A    One of 15 --

22 Q    One of 15.  And then I will ask you to look at the

23 page, that is 2 of 15.

24 A    15 of 19.

25 Q    No, sorry.  2 of 15.  If you keep going through the

1  exhibit.

2  A    Two of 15.  I'm sorry.  Okay.  You said two of 15.

3  Yeah.

4  Q    And I just want to make sure that the Court has been

5  able to find it as well.

6  A    Yes.  Sorry.

7          THE COURT:  No, that meant me.  Oh, I got you.

8  I'm here.

9  BY MR. FITZMAURICE:

10 Q    So sir, is this the, a portion of the Debtor's

11 Statement of Financial Affairs that were filed in this case?

12 A    Yes.

13 Q    An exhibit.  I'm sorry.  Section 4 of the Statement of

14 Financial affairs lists payments to insiders.

15 A    Yes.

16 Q    And those payments in the year prior to bankruptcy were

17 $422,253.01?

18 A    Yes.

19 Q    Okay.  And if we look at the last page of this

20 particular exhibit.

21 A    Last page, okay, 15 of 15.

22 Q    15 of 15.

23 A    Yes.

24 Q    There's a list of what those payments were and who they

25 were made to.

1   A     Yes.

2   Q     Jetall, we've talked about -- and that's an entity that

3   you control, correct?

4   A     It is.

5   Q     And then there are two others.  Galleria 2425 JV.

6   A     Yes.

7   Q     That's an entity that either directly or indirectly

8   owns equity in the Debtor?

9   A     Yes.

10  Q     And then, Galleria Loop Noteholder.  Is that also an

11  entity that directly or indirectly owns an equity in the

12  Debtor?

13  A     No, sir.  So you have Galleria 2425, LLC.  That's the

14  Debtor.  And then you have Galleria 2425 JV, that's the

15  owner of the Debtor.  That's the equity of the Debtor.

16  Q     What relation, if any, does Galleria Loop Noteholder

17  have to the Debtor?

18  A     It doesn't.

19  Q     Who, on behalf of the Debtor, is investigating the

20  potential for the recovery of these claims on behalf of the

21  Estate?

22  A     I --

23  Q     Let me ask you a different question.  Is there any

24  person on behalf of the Debtor who is investigating the

25  possibility of recovering the amounts that are listed here

1   on Exhibit 4 to the Statement of Financial Affairs from the

2   recipients of these payments in the year prior to

3   bankruptcy?

4   A    I'm not aware.  I mean, other than there are, for

5   example, like if there's a manager or an HVAC technician

6   that needs to put a part or do something, then they're paid

7   and then there, you know, Jetall's advance funds and that

8   has been reimbursed not completely.  But a lot of that is

9   what that is.  There's -- I mean, there's a lot more that

10  Jetall is advanced as far as like payroll and administrative

11  costs and things that have -- that it's not been like

12  paying, you know, janitorial and paying other expenses that

13  have been --

14  Q    Is the answer to my question, no one is investigating

15  the potential to recover the amount -- these payments that

16  are listed on Exhibit 4 to the Statement of Financial

17  Affairs.

18  A    I honestly -- I don't know the answer to that. This is

19  something you did bring up yesterday, and we did discuss it

20  with Counsel.  And this is something we are going through

21  the accounting on, which actually is significantly higher of

22  what was advanced.

23           MR. FITZMAURICE:  Your Honor, cognizant of the

24  time.  I just want to ask how Your Honor wants us to

25  proceed.  Should we continue a little further?  Should we

1   break now for your 1:00 o'clock?

2           THE COURT:  You tell me whenever you think you are

3   at a good stopping point.

4           MR. FITZMAURICE:  This is as reasonable a place as

5   any.

6           THE COURT:  Okay.  How much time do you think you

7   all need?

8           MR. FITZMAURICE:  To continue --

9           THE COURT:  Yeah.

10          MR. FITZMAURICE:  Mr. Choudhri, I'm just thinking

11  now in terms of getting you all some lunch and stuff, do you

12  think we can pick back up at 1:45?  Is that fair?   Okay.

13          THE WITNESS:  Yes, Your Honor

14          THE COURT:  I'll remind you that you're still

15  under oath, and you're just -- discuss with no one your

16  testimony, but you're certainly welcome to get something to

17  eat.  Right.  Thank you.

18          THE WITNESS:  Thank you, Your Honor.

19          THE COURT:  All righty.  I'm going to now unmute

20  the line entirely.

21      (Court in recess from 1:02:19 p.m. to 1:48:41 p.m.)

22          THE COURT:  Okay, Mr. Ruff, why don't you hit five

23  star?

24          MR. AKUFFO:  Good afternoon, Your Honor

25          THE COURT:  Okay.  Thank you.  Mr. Akuffo, who is

1    -- is he a lawyer, one of you?

2              MR. FITZMAURICE:  Yes, Your Honor, he is our

3    associate.

4              THE COURT:  Okay, if you want to he can -- Akuffo,

5    if you want to hit five star, I can unmute your line as

6    well.

7              All right, 486 number.  Who's this?

8         (No audible response.)

9              THE COURT:  486 number.  Who is this?

10             MS. HAYWARD:  Your Honor, may I step out for a --

11             THE COURT:  Of course.

12             Mr. Choudhri, good afternoon.

13             Okay, we are back on the Record in Galleria 2425.

14             Mr. Choudhri, I remind you that you're still under

15   oath, and we're ready to proceed with cross-examination.

16             THE WITNESS:  Thank you, Your Honor.

17             THE COURT:  Thank you.

18                  CROSS-EXAMINATION (CONTINUED)

19   BY: MR. FITZMAURICE

20   Q    Good afternoon, Mr. Choudhri.

21   A    Good afternoon.

22   Q    I'd like you to refer, please, to Exhibit 1.  And this

23   is again in the Debtor's book.  This is the budget.

24             THE COURT:  Is that the white binder?

25             MR. FITZMAURICE:  Yes, it is, Your Honor.

1            THE COURT:  Okay.

2    BY MR. FITZMAURICE:

3    Q    This budget is intended to account, isn't it, sir, for

4    all of the future property related expenses that were owed

5    -- that are projected to be owed for the remainder of the

6    year 2023?

7    A    Yes, I would believe so.

8    Q    How much are the annual property taxes for the

9    property?

10   A    Around 600,000.

11   Q    And those -- there's no allocation for taxes on

12   Exhibit 1.  This budget is there, sir.

13            MS. HAYWARD:  Objection, Your Honor.  I've got to

14   figure out how to say this objection, but I think it is a

15   legal issue in that property taxes 2023 or pre-petition

16   debt.

17            THE COURT:  I think I can just allow overall --

18   I'm going to allow just a question that there's nothing in

19   here about taxes.  Whether it should be or not is a whole

20   other issue.  But I think that there's nothing in here about

21   taxes.

22            MR. FITZMAURICE:  Yes, Your Honor.

23            THE COURT:  Okay.

24            MR. FITZMAURICE:  The parties can reserve rights

25   and argue implications, but the point being --

 1              THE COURT:  Got it.  Okay.

 2              THE WITNESS:  That is correct.

 3   BY MR. FITZMAURICE:

 4   Q    And it's true, sir, that in the years prior to the

 5   Debtor's bankruptcy filing, it had not been paying property

 6   taxes, correct?

 7   A    Well, it had --

 8   Q    Had not?

 9   A    It had.  It had also taken tax loans, as well.

10   Q    So the property taxes for the years 2019 and 2020 were

11   not paid, such that tax liens accrued against the property,

12   correct?

13   A    Yes, that's correct.

14   Q    And for 2021, as well, correct?

15   A    Yes.

16   Q    And the amounts of those tax liens are listed on the

17   Debtor's Schedules?

18   A    Yes, sir.

19   Q    I'm going to ask you to please take a look at Exhibit 8

20   in that same binder, which is the rent roll.

21   A    Okay.

22   Q    You have that in front of you, sir?

23   A    Yes, sir.

24   Q    And you'll notice if you turn it sideways, like I see

25   that you have, that there are numbers in black type on the

1  bottom of the page.  I'm going to ask you to look at Page 6.

2          THE COURT:  Will that be 006, sir?

3          MR. FITZMAURICE:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MR. FITZMAURICE:  Thank you.

6          THE COURT:  Thank you.  No, no, thank you.

7  BY MR. FITZMAURICE:

8  Q    You have that in front of you, sir?

9  A    Yes.

10 Q    Is this rent roll -- the amounts that are listed there

11 for rent?  Is that based on cash actually received?

12 A    Yes.

13 Q    And so for June 2023, St. Christopher Holdings paid the

14 Debtors $65,940.71?

15 A    Should be.  Yes.

16 Q    And is that the --

17 A    The rent rules are based on the leases.  So I want to

18 correct about actual -- the rent rules based on the leases

19 that we have.

20 Q    So they're not based on cash actually received?

21 A    I believe they are.  But sometimes some tenants aren't,

22 you know, exactly punctual at times as well.  But that --

23 but rent rolls are generally -- can be printed out.  And it

24 should be based on the rents coming in.  Yes.

25      Like for example, I know St. Christopher Holdings,

ALI CHOUDHRI - CROSS BY MR. FITZMAURICE                86

1   which is DC Partners.  They had some commissions that were

2   burned off last -- earlier when they signed the lease, but

3   they've now been paying the 65,940 a month.  And like

4   GalloWorks, they're not paying until their rent turns on,

5   which is not -- seems like until maybe December, which is

6   140,000 a month.

7          MR. FITZMAURICE:  I'll move to strike that

8   testimony.  There was no question pending.

9          THE COURT:  Sustained.

10  BY MR. FITZMAURICE:

11  Q    Sorry.  I'm going to ask you to shift to the other book

12  that you have in front of you.  Exhibit -- the Tab

13  Number 11.

14  A    Yeah.

15  Q    If you go to the first page of that, you'll see there's

16  a -- it's a virtual sticker, NBK Exhibit Number 11.

17  A    Yes.

18  Q    Okay

19          THE COURT:  Mr. Choudhri, can I ask you, what is

20  the -- to the extent you know, and I don't want you to

21  guess, do you know how much as of the petition date, we have

22  tax liability for 2019, 2020 and 2021 was?

23          THE WITNESS:  I have to look.

24          THE COURT:  Okay.  No, no, if you don't know, I

25  don't want you to guess.  Thank you.

1          THE WITNESS:  There were tax liens I'd transferred

2  over to the bank.

3  BY MR. FITZMAURICE:

4  Q    But -- I'm going to ask you again just to look at

5  Number 11.  If you -- unfortunately these pages are not

6  numbered.  But if you turn to what I believe is the sixth

7  page --

8  A    11.

9  Q    -- in number 11.

10 A    Okay.  One, two, three, four, five, six.  Yes.

11 Q    Just to make sure that we're looking at the same thing.

12 Do you have a copy of a check from St. Christopher Holdings

13 to the Debtor?

14 A    I don't see one.

15 Q    A little bit on.

16 A    Oh, later.  Yes.

17 Q    And on the top right of the page, it has a Number

18 31939, and the very top --

19 A    Yes sir

20 Q    -- right of the page.

21 A    Yes.

22          MR. FITZMAURICE:  Let's pause and make sure the

23 Court was able to find it as well.  Thank you, Your Honor.

24 BY MR. FITZMAURICE:

25 Q    This is the rent -- this is the check by which

1  St. Christopher Holdings paid its due rent; isn't that

2  right, sir?

3  A    Yes.

4  Q    And this is not 65,000 and some change as shown on the

5  rent roll.  That was Exhibit 8 in the Debtor's book of

6  exhibits, correct?

7  A    Correct.  I think that there's an offset on some lobby

8  work that their company did.

9          MR. FITZMAURICE:  So just again, move to strike

10 the portion of the response after, correct?

11         THE COURT:  Sustained.

12 BY MR. FITZMAURICE:

13 Q    So Mr. Choudhri, I'm going to ask you to turn again to

14 the exhibit that is the Debtor's Financial Statements and

15 Schedules.  We looked at it earlier.

16 A    Exhibit 1?

17 Q    This is in your NBK book.

18 A    Okay

19 Q    It is Exhibit 8 to the Carter Declaration.

20 A    Yes, I'm here.

21 Q    And then again referring to the numbers on the top, the

22 numbers in blue across the top of the page.  Referring to

23 Pages 7 of 19 and 8 of 19.

24 A    Yes.

25 Q    And this is a copy of the Schedule that the Debtor's

1  filed of the secured claims against the property, correct?

2  A    Yes.

3  Q    Okay.  And in Section 2.1, that's your entity, correct,

4  sir?  That was the seller of the property to the Debtor.

5  A    That's the -- yes.

6  Q    And in 2.2 has Greek lending.  That's a -- that is an

7  entity that financed the tax liens?

8  A    Yes.

9  Q    And then looking at Section 2.3, the Harris County

10 Assessors.

11 A    Yes.

12 Q    And as we talked about yesterday, my mental math is not

13 terrific.  But if you add up those two amounts in Column A,

14 it's about $1.7 million in prior year taxes accrued against

15 the property; is that correct?

16 A    It's 1.7 --

17 Q    And some change.

18 A    99.  Yeah.  Yes.

19         THE COURT:  How do you get there again, Counsel?

20         MR. FITZMAURICE:  So, Your Honor, Section 2.2 of

21 the secured creditor schedule has Greek lending 800,000.

22         THE WITNESS:  That's the tax lien.

23         MR. FITZMAURICE:  And that's a financing of tax

24 liens.  And then the assessor in the two point --

25 BY MR. FITZMAURICE:

1  Q    The amounts that are listed here on the secured

2  creditor schedule.  Those amounts do not include the tax

3  liens that were previously assigned to -- I'm going to

4  withdraw that question.

5          MR. FITZMAURICE:  And Your Honor, the next

6  question on the next line of questioning, potentially --

7  tangentially, at least, relates to issues concerning the

8  settlement agreement.  And so just I want to be overly

9  cautious on that point.

10          THE COURT:  No, I appreciate it.  We comfortable

11  in the courtroom.

12          MS. HAYWARD:  Yes, sure.

13          THE COURT:  Okay.  Nothing is to be shown on the

14  screen.  The only line that is unmuted is Mr. Ruff, and I've

15  unmuted the line for my law clerks.  That's it.  Those are

16  the only two lines, and I can assure the parties of that.

17  So we can take comfort that the line and no one -- if

18  anybody comes in, will stop immediately.  Any questioning.

19  Okay?

20          MR. FITZMAURICE:  Thank you, Your Honor.

21          THE COURT:  Okay.

22  BY MR. FITZMAURICE:

23  Q    So, again, the numbers that we just looked at on the

24  Debtor's, the claim -- the secured creditor claims.  Those

25  amounts for tax liens do not include the tax liens that were

1    assigned to National Bank of Kuwait under the settlement

2    agreement, correct?

3    A     Yes, that is correct.

4          MR. FITZMAURICE:  Just on that point, Your Honor.

5    That's it.  That was my -- and if I may have just 30

6    seconds, Your Honor, to confirm?

7          THE COURT:  Yeah.  Of course.  It's all right.

8        (Pause in the proceedings.)

9          MR. FITZMAURICE:  A couple of very brief

10   questions.

11         THE COURT:  Okay.

12   BY MR. FITZMAURICE:

13   Q     The proposed leases with Boho and Bankable, when did

14   the Debtor receive those from the tenants?

15   A     When?

16   Q     Yes.

17   A     We received those leases, I would think about

18   negotiating the Boho lease for a while now because they've

19   been working with their architect for a number of months.

20   We received that lease this week signed and then Bankable, I

21   believe was last week or sometime maybe early this week,

22   leading to the point it was signed.  It was something that

23   had been negotiated for some time.

24   Q     So those leases were received, or those proposed leases

25   were received by the Debtor just this week, a couple of days

1  before today's hearing?

2  A    I believe that's when they were -- they were signed.

3  Yes, sir.

4  Q    And as we discussed earlier, the projected potential

5  revenue from the Bankable lease is the source of the

6  Debtor's proposed increased revenue on the budget.  That's

7  reflected as Exhibit 1 in the Debtor's Exhibit 1, correct?

8          MS. HAYWARD:  Objection.  Misstates the evidence.

9          THE COURT:  He can answer.  Overruled.

10          THE WITNESS:  I don't believe that's accurate,

11  because we have another lease that we've been negotiating

12  that we're figuring if we're putting them on Level 2 or

13  Level 6.  That is also a signed lease, we actually didn't

14  put it on, because they may go to a different floor.  And so

15  when we did the projections, we did the best we could at the

16  time based on what we were.

17          MR. FITZMAURICE:  Again, I'll move to strike the

18  evidence that -- the portion that the response that relates

19  to that information, that's not in evidence.

20          THE COURT:  Sustained.

21          THE WITNESS:  I'm sorry.

22  BY MR. FITZMAURICE:

23  Q    Let's look at Exhibit -- let's look at again,

24  Exhibit 1, the difference between the -- I'm sorry.  I'll

25  let you find it, sir.

1   A     Exhibit 1.

2   Q     Exhibit 1 in the Debtor's book.

3   A     The white?

4   Q     Yes.

5   A     Okay.

6   Q     The difference between the rent income in September and

7   the rental income in October is exactly the same as the

8   monthly rent for October.  That's listed in the draft

9   proposed Bankable lease that's included as part of

10  Exhibit 7.

11  A     Okay.  Yes.

12          MR. FITZMAURICE:  Nothing further, Your Honor.

13          THE COURT:  Just have a couple of questions.

14                          EXAMINATION

15          THE COURT:  When I look at the budget -- let me go

16  to the budget.

17          MR. FITZMAURICE:  Exhibit 1.

18          THE COURT:  So I don't see here.  These are the

19  amounts, right?  Where on this budget does it reflect

20  expenses paid to the property manager or does it, Jetall?

21          THE WITNESS:  It does not.

22          THE COURT:  It does not

23          THE WITNESS:  We are not charging.

24          THE COURT:  You're not charging?  Okay.  Where

25  does it reflect budgeting for professional fees?   If it

1  does or it doesn't.

2          THE WITNESS:  I believe that would be

3  administration.

4          THE COURT:  Right.  Under administration.  Where

5  do you see that line?  I apologize.  Oh, administration.

6  The 19,000?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  That seems to see under the notes that

9  it's for all this other stuff.  That's what administration

10  was property manager, assistant property manager.  That's

11  what got me a little confused, is that you said you didn't

12  -- weren't paying Jetall, but maybe I misunderstood.

13  Corporate history --

14          THE WITNESS:  Sure.

15          THE COURT:  -- for 19,000 there.

16          THE WITNESS:  So the 19,000, Your Honor, is for

17  the -- just, so I'm clear, we're not paying any management

18  fees.  So if you hire Hines or CBRE, they get a management

19  fee.  But we are bearing the cost of engineers and property

20  managers.

21          THE COURT:  Kind of pass-through cost.

22          THE WITNESS:  Yes, sir.  That's all that is.

23          THE COURT:  Okay.  No, no, no.  I just wanted to

24  make sure that I understood.  You're not getting a fee.

25          THE WITNESS:  No, yeah.  Zero fees.

1          THE COURT:  But there are -- there could be an

2     amount paid to Jetall but Jetall isn't paying out certain

3     kind of A&R or assistant property manager or accounting

4     admin assistant.

5          THE WITNESS:  Correct.  For example, we have like

6     an engineer that we share the cost to break it down.  So we

7     have a HVAC engineer, for example, and so we pay him and

8     then and then that's a pass-through.

9          THE COURT:  Okay.

10         THE WITNESS:  That they're doing work for the

11    Debtor through the management company.

12         THE COURT:  Got it.

13         MR. FITZMAURICE:  Your Honor, I'm sorry to

14    interrupt, but just with respect to the witness testimony.

15    We have some (indiscernible) we refer to the Debtor --

16         THE COURT:  Sorry.

17         MR. FITZMAURICE:  -- or to the Jetall.

18         THE WITNESS:  Yeah.  So the Debtor Jetall

19    companies, it's paying the HVAC techs, maintenance

20    engineers, you know, the accountant.  And then that's -- I'm

21    sorry about we -- you're right.  So that's Jetall companies,

22    but that is a cost -- a straight cost that the Debtor is

23    paying to cover those costs.

24         THE COURT:  Sorry, can you explain that again?  I

25    just want to make sure I'm following you.

1         THE WITNESS:  So there's staff that's there,

2    that's managing the building.  And that pass, it's a

3    straight pass-through so that they're employees of Jetall

4    and then, but it's a cost for the Debtor, right?   So it's,

5    you know, you have to --

6         THE COURT:  The cost -- money.  Yeah.

7         THE WITNESS:  But no fees.  It's just a direct

8    cost.  The exact cost what to run the building -- to run the

9    Debtor or the Debtor's asset, which is the building.

10        THE COURT:  So if there's a conflict between

11   Jetall and the Debtor, who makes that decision.  And who

12   solely works for the Debtor in terms of management?  Is that

13   -- would that be you?

14        THE WITNESS:  So, yes.

15        THE COURT:  You're wearing multiple hats.  And I

16   understand that because you run multiple businesses is what

17   you do.  And I don't -- I understand that's the way the

18   industry works.  But if there was a decision to be made on

19   behalf of the estate, who then makes it?

20        THE WITNESS:  The --

21        THE COURT:  On behalf of this Debtor Galleria

22   2425.  Like where does the buck stop in terms of decision-

23   making?

24        THE WITNESS:  The buck would stop with me.

25        THE COURT:  Okay.

1            THE WITNESS:  In terms of decisions, it's SSP, and

2    it's -- my entity manages it, Your Honor.

3            THE COURT:  Are you owed money by the Debtor?

4            THE WITNESS:  Yes.

5            THE COURT:  How much?

6            THE WITNESS:  I don't have the exact number.  I

7    know it's about nine.  There was a bond that had to be paid

8    and there were principal pay downs that had to be paid in

9    advance those.  I believe it's about 960,000.

10            THE COURT:  Okay.

11            THE WITNESS:  And there's funds owed to Jetall

12   from before.

13            THE COURT:  And how much do you think that is?

14            THE WITNESS:  It's quite a bit.  I --

15            THE COURT:  Is it in the Schedules anywhere, do

16   you think?  I wouldn't expect -- I wouldn't -- I don't want

17   you flipping through documents.  Just if you know.  You

18   know, I'm just asking.

19            THE WITNESS:  My team helps with this, so I don't

20   know if it's in here.

21            THE COURT:  No, no, no.  If you don't know, you

22   don't know.  I don't want you --

23            THE WITNESS:  I know there's a proof of claim that

24   we're supposed to be working on.

25            THE COURT:  Okay.  And I don't want you to talk

1  about any conversations with your client or anything like

2  that.  So who represents Jetall?  If anyone?

3          THE WITNESS:  Yes, we have Counsel for Jetall,

4  James Pope.

5          THE COURT:  All right.  Counsel -- and who

6  represents -- Okay.  Anyone who represents you individually?

7          THE WITNESS:  I have a different --

8          THE COURT:  I apologize.  That's a really bad

9  question.  If anyone represent you in connection with this

10  case?

11          THE WITNESS:  No, Your Honor.

12          THE COURT:  Okay.  No, no, I'm just asking.  I'm

13  just trying to get some --

14          THE WITNESS:  Sorry.

15          THE COURT:  No, no, no, no.  I apologize.  I

16  should ask better questions.

17          THE WITNESS:  I should have better answers.

18          THE COURT:  No, no, no, no.

19          THE WITNESS:  I'm so sorry.

20          THE COURT:  You're being honest.  I appreciate it.

21          And how much free cash do you think the Debtor

22  has?  Which cash do you think the Debtor has on hand right

23  now?  The last time you checked.

24          THE WITNESS:  Maybe a couple of hundred thousand

25  dollars.

1           THE COURT:  A couple of hundred thousand?

2           THE WITNESS:  Yes, sir.

3           MS. HAYWARD:  Your Honor, I think that's probably

4   a question better sent to Mr. Darjean, who's sort of more in

5   the operations and also on the Debtor's witness list.

6           THE COURT:  No, no, I can -- if he doesn't know,

7   he doesn't know.  I just --

8           THE WITNESS:  And we have some anticipated funds

9   that are coming in pretty soon.

10          THE COURT:  Who does the accounting for the

11  Debtor?

12          THE WITNESS:  We've used Anderson tax, but

13  bookkeeping is being handled by Scarlett.

14          THE COURT:  I'm sorry.  Who's that?

15          THE WITNESS:  A bookkeeper.

16          THE COURT:  A bookkeeper.  Was she with Jetall?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Okay.  So it's in-house.

19          THE WITNESS:  In-house, but we have outside CPA

20  firms that go through what we do.

21          THE COURT:  Okay.  Anyone working on the Debtor

22  now -- for the Debtor's books now, any of these outside

23  consultants?

24          THE WITNESS:  We've talked about that to bring

25  outside consultants in, but because of the bankruptcy, we

1    haven't incurred that yet.

2              THE COURT:  Understood.  Okay.  Thank you very

3    much.

4              Do you have any more questions for this witness?

5              MS. HAYWARD:  Just a few, Your Honor.

6              THE COURT:  Okay, Sure.

7                        REDIRECT EXAMINATION

8    BY MS. HAYWARD:

9    Q    Mr. Choudhri, I'm going to ask you to turn to

10   Exhibit 7.

11   A    Yes.

12             MS. HAYWARD:  I'm sorry, Your Honor.  In the white

13   binder.

14             THE COURT:  Okay.

15   BY MS. HAYWARD:

16   Q    And would you turn to the document that's Bates number

17   000418

18   A    418.

19   Q    Yes.

20   A    Okay.

21   Q    What is that, Mr. Choudhri?

22   A    This is a lease.

23   Q    Whose lease?

24   A    Between 2425 and Jetall that was executed.

25   Q    Okay.  And I'll ask you to turn a few pages back to

1   000408.

2   A      408.

3   Q      Yes.

4   A      Okay.

5   Q      Okay.  And then what are these?  And just that page in

6   the next couple of pages.

7   A      These are amendments to the lease.

8   Q      Okay.  So earlier when the Court asked whether the

9   Jetall lease was included in the exhibit and the answer was

10  no; was that accurate?

11  A      No.

12          THE COURT:  Which page is it?

13          MS. HAYWARD:  Sorry, Your Honor.  Zero.  So the

14  lease itself starts on 00416.

15          THE COURT:  Ah, thank you.

16          MS. HAYWARD:  And then the amendments are actually

17  in front of the lease.

18          THE COURT:  What's the latest amendment?

19          MS. HAYWARD:  The latest amendment, I believe, is

20  the third, Your Honor.

21          THE COURT:  Right.

22          MS. HAYWARD:  Which is on 1, 2 --000412

23          THE COURT:  412?

24          MS. HAYWARD:  Yes.

25          THE COURT:  That'd be -- perfect.  Thank you.

 1  BY MS. HAYWARD:

 2  Q    And Mr. Choudhri, I'm also going to ask you now to turn

 3  to 000456

 4  A    456?

 5  Q    Yes.  And I want to look at the relocation termination

 6  language that Counsel showed you earlier.

 7  A    Yes.

 8  Q    Okay.  What was the landlord's purpose in including

 9  language like that in a lease?

10          MR. FITZMAURICE:  Objection, Your Honor.

11  Relevance.  The purpose of the --

12          THE COURT:  No, no.  I don't want you to testify.

13  I'm just asking you --

14          MR. FITZMAURICE:  I object to relevance.

15          THE COURT:  What's --

16          MS. HAYWARD:  Your Honor, Counsel made an issue of

17  this provision being in a lease.  And so to the extent that

18  there's a business reason for this provision to be in the

19  lease, I think that counsel has opened the door to that and

20  made it relevant.

21          THE COURT:  Yeah, I agree.  You can answer.

22          MR. FITZMAURICE:  Thank you, Your Honor.

23          THE WITNESS:  So it's been my experience that, for

24  example, this building has always had large tenants like

25  Blue Cross Blue Shield that had the majority of the building

1  and Stage Stores.  And so there are some large tenants out

2  there which historically we had like that 100 or 200,000

3  square feet, big chunks.  And so we want to always maintain

4  flexibility to relocate a tenant within the building or have

5  the -- you know, or have the ability to -- for example,

6  Bechtel did have interest in the past for the entire

7  building.  Then our predicament is, what do we do with the

8  tenants that are there for getting a better credit, tenant

9  like Bechtel?  So we've -- and we did something similar in

10  the DC Partners lease as well, where we put a termination

11  relocation option.  That would be the landlord within the

12  building.

13          MR. FITZMAURICE:  But Your Honor.  We've just

14  objected move to strike (indiscernible).

15          THE COURT:  Overruled.

16  BY MS. HAYWARD:

17  Q    Mr. Choudhri, has -- does the Debtor have projections

18  with respect to the property and how it is anticipated to

19  perform going forward?

20  A    Yes.

21  Q    Were those projections included as part of the Debtor's

22  plan of reorganization?

23  A    Yes.  According to Chapter 11 plan.

24  Q    Did those projections account for the new leases that

25  the Debtor has been able to procure since it filed

1  bankruptcy?

2  A    Yes.

3  Q    And with respect to those new leases that the Debtor

4  has been able to procure since it filed for bankruptcy, how

5  long have those leases been in negotiations for?

6             MR. FITZMAURICE:  Objection Your Honor.

7  Relevance.  Your Honor had previously indicated we're not

8  trying confirmation of plan or feasibility of the

9  prospective cash collateral and --

10            THE COURT:  I'm going to allow it.  But we are

11  talking about contracts that aren't signed in this deal,

12  right?

13            MS. HAYWARD:  Your Honor, the exhibits are not

14  signed by the Debtor.  I mean --

15            THE COURT:  We will have whatever legal relevance

16  they have as opposed to this and in connection with the use

17  of cash collateral.  But I don't have a signed copy.

18            THE WITNESS:  I'm sorry, your question.  I

19  apologize.

20  BY MS. HAYWARD:

21  Q    Does the Debtor intend to sign the leases?

22  A    I have signed the leases -- I have signed leases.  And

23  the ones that I signed on those two are not here.  And the

24  Jetall lease does have a schedule of payments that are going

25  to turn on soon as well that are here.

1  Q    And is Jetall on a position to make those payments?

2  A    Yes.

3  Q    Is Jetall in a position to fund this bankruptcy case as

4  needed to get to the point of plan confirmation if needed?

5  A    Absolutely.  And I'm personally fully committed and

6  have been for since the building has been empty.  Now we've

7  leased it upward at the -- at the --

8  Q    And --

9  A    -- 10 yard line.

10        MR. FITZMAURICE:  So Your Honor, the same

11  objection and the same motion to strike in terms of where --

12        THE COURT:  We're going to get to all of it.  I

13  just want it all to come in.

14        MR. FITZMAURICE:  Thank you, Your Honor.

15        THE COURT:  I'm okay with it.

16        THE WITNESS:  Sorry, I'll stop.

17  BY MS. HAYWARD:

18  Q    And -- with respect to --

19        THE COURT:  Go ahead.

20  BY MS. HAYWARD:

21  Q    With respect to the items listed on the budget, are

22  those items necessary to maintain the current tenancy,

23  that's at the building?

24  A    Yes.

25  Q    Does the current tenancy being at the building impact

1  the value of the building and the bank's collateral?

2  A    Yes.

3  Q    To the extent that the tenants of the building are

4  unhappy because the building falls into disrepair or

5  maintenance isn't being paid for, do you believe that would

6  increase or decrease the value of the building?

7  A    The building is in disrepair and the tenants aren't

8  happy with decreased value.

9            MS. HAYWARD:  Pass the witness.

10           THE COURT:  Any additional questions?

11           MR. FITZMAURICE:  Your Honor, just with respect to

12  two items that Your Honor asked about.

13           THE COURT:  Either you got questions for him or

14  not?

15           MR. FITZMAURICE:  I do, Your Honor.

16           THE COURT:  Okay.

17           MR. FITZMAURICE:  Thank you.

18                     RECROSS-EXAMINATION

19  BY MR. FITZMAURICE:

20  Q    Mr. Choudhri, you recall that the Court asked you

21  whether you were owed any money by the Debtor?

22  A    Yes.

23  Q    And does the Debtor include on its Schedules a general

24  unsecured claim for you of $960,000?

25  A    I believe so, yes, sir.

1  Q    And does it also include a secured claim of about

2  $24 million for, 2425 WL LLC?

3  A    Not for me, but --

4  Q    For that entity?

5  A    For that -- yes, sir.  Which was on the closing

6  statement with NBK back in 18.

7           MR. FITZMAURICE:  So again, Your Honor, objection

8  to --

9           THE COURT:  It's okay.  I'm going to allow it.

10          MR. FITZMAURICE:  Thank you, Your Honor.

11 BY MR. FITZMAURICE:

12 Q    You recall the Court also asked you whether or not you

13 were personally represented in connection with this matter.

14 Do you recall that?

15 A    Yes.

16 Q    You recall yesterday I took your deposition?

17 A    Yes, sir.

18 Q    And there was an attorney who was present in that -- in

19 the deposition room, Mr. Pope?

20 A    Yes.

21 Q    And you recall that I suggested that he should be

22 excused.

23 A    Later he left.

24 Q    During your deposition, he stayed, correct?

25 A    But he came in and then he left.

1  Q    Because he said he represented you personally, right?

2  A    He does represent me and he represents Jetall.

3           MR. FITZMAURICE:  Nothing further, Your Honor.

4           THE COURT:  Okay.  Thank you.  Okay, sir, thank

5  you very much for your time.

6           THE WITNESS:  Thank you.

7        (Witness steps down.)

8           THE COURT:  Wait until about 3:00 I've got a short

9  matter that'll last ten minutes and 15 minutes.  Maybe we

10 can go until 3:00, take a break, and then keep going.

11          MS. HAYWARD:  Okay, Your Honor.

12          Debtor calls Mr. Dward Darjean.

13          THE COURT:  Mr. Darjean, come on up.  Is it okay

14 if the binders stay up there for Mr. Darjean?

15          MS. HAYWARD:  Oh, yes.

16          THE COURT:  I just want to be sure the parties are

17 okay with that.  Okay.

18          But the folks who are going to come into the surge

19 line matter, I'm going to take it up at 3:00 p.m., surge a

20 line at 3:00 p.m.  Thank you.

21          Mr. Darjean, you please raise your right hand.  Do

22 you swear to tell the truth, the whole truth, and nothing

23 but the truth?

24          THE WITNESS:  Yes

25        (Witness sworn.)

1          THE COURT:  Okay.  Please have a seat.  Well, just

2    let the Record note that the witness has been duly sworn in.

3                     DIRECT EXAMINATION

4    BY MS. HAYWARD:

5    Q    Good afternoon, Mr. Darjean.

6    A    Hello.

7    Q    Would you please introduce yourself to the Court?

8    A    Yes.  My name is Dward Darjean.

9    Q    And Mr. Darjean, how are you employed?

10   A    By Jetall.

11   Q    And what do you do for Jetall?

12   A    Operations manager, property management.

13   Q    Okay.  So tell the Court a day in the life of Dward

14   Darjean.

15   A    My focus is on the tenants.  Making sure that they're

16   -- they're happy and comfortable and willing and ready to

17   pay rent.  So that entails making sure that the building is

18   comfortable, temperature, taking care of any emergencies,

19   plumbing leaks.  Anything.  I deal directly with the

20   tenants.  They all have my cell phone number.

21   Q    And with respect to the Debtor's Monthly Operating

22   Reports, who prepares those?

23   A    I do.

24   Q    And how do you prepare those?

25   A    I have a template that I use, and then I get printouts

1  of the bank statements and I physically write out the

2  template using the bank statements.

3  Q    And do you know how much cash the Debtor had on hand as

4  of the end of August?

5  A    The end of August, I think it was -- we collected 144k.

6  We spent 66 approximately -- with the previous month's

7  balance, I think it's approximately 134k, something like

8  that.

9  Q    And you said how much did the Debtor collected rent in

10  August?

11  A    144, I think.  144,000.

12  Q    And Mr. Darjean, I'll have you look to -- in the white

13  binder, if you would go to Exhibit 1?

14  A    Okay.

15  Q    Are you familiar with the expenses that are listed on

16  Exhibit 1?

17  A    Yes.

18  Q    And in your opinion, are these expenses necessary in

19  order to continue the operation of the business or the

20  building and maintain the tenant base?

21  A    Yes.

22  Q    What happens if the Debtor doesn't pay its utilities?

23  A    The building could be shut down.

24  Q    What happens if the Debtor doesn't pay for janitorial?

25  A    The tenants will not be happy.

DWARD DARJEAN - DIRECT BY MS. HAYWARD                    111

1   Q    What happens if the Debtor doesn't pay for elevator

2   repairs and maintenance?

3   A    Technically, the Fire Marshal's Department can shut the

4   building down.

5   Q    So in your opinion, are these expenses necessary to

6   preserve the value of the property?

7   A    Yes.

8            MS. HAYWARD:  Pass the witness.

9            THE COURT:  Thank you.

10           Cross.

11                       CROSS-EXAMINATION

12  BY MR. FITZMAURICE:

13  Q    Good afternoon, sir.

14  A    Good afternoon.

15  Q    How much of your time is spent working for the Debtor,

16  as opposed to other properties that are managed by Jetall?

17  A    About 33 percent.

18  Q    So about a third for the Debtor.  Two-thirds for other

19  properties?

20  A    Correct.

21  Q    With respect to the other employees of Jetall who are

22  involved in the operation of the Debtor's business at the

23  property, how much of their time -- is there a rough

24  estimate you can give the Court of how much of their time is

25  spent at the Debtor's property versus other properties?

1          MS. HAYWARD:  Objection.  Outside the scope.

2          THE COURT:  Overruled.

3          THE WITNESS:  I'm sorry, could you ask it again.

4   BY MR. FITZMAURICE:

5   Q    Yeah.  It was a bad question.

6   A    It's okay

7   Q    For those other employees of Jetall who do work for the

8   Debtor.  Do you have a rough idea that you can give to the

9   Court how much of their time is spent on the Debtor's

10  property versus other properties that are managed by Jetall?

11  A    It's all different depending on -- you mentioned Jetall

12  employees -- I manage the maintenance technicians.  So I'd

13  say about the same as I spend.  About a third on 2425.

14  Q    Who is responsible for allocating the costs of those

15  services between the Debtor and the other entities that

16  Jetall manages?

17  A    The cost of the services?   Which services?

18  Q    But you've been in the courtroom this afternoon, and

19  you heard that Mr. Choudhri testify concerning the pass-

20  through costs, that Jetall incurs that the Debtor is paying.

21  A    Okay.

22  Q    Did you recall hearing that?

23  A    Yes.

24  Q    Okay.  So who determines how much of those pass-through

25  costs are charged to the Debtor as opposed to other entities

1  that Jetall manages?

2  A    We have an in-house bookkeeper, maybe.  And -- but I

3  don't know for sure if she could make decisions on what goes

4  where.  I don't handle the finances.

5           MR. FITZMAURICE:  Thank you.  Nothing further.

6                          EXAMINATION

7           THE COURT:  So how do you receive a paycheck?

8  When you receive a paycheck, who does it come from, and what

9  does it say on the check?

10          THE WITNESS:  It comes through the payroll company

11 paychecks, but Jetall

12          THE COURT:  like an ADT, but then the name of the

13 actual --

14          THE WITNESS:  Jetall.

15          THE COURT:  Jetall?

16          THE WITNESS:  Jetall Companies.

17          THE COURT:  And do you see your -- does your

18 paycheck come from -- how do you know how much you got paid

19 from managing this property in terms of the work that you're

20 doing?

21          THE WITNESS:  No, it's just -- I have a salary.

22          THE COURT:  Have a salary.  Okay.  And what other

23 work do you do?  Can you just kind of describe to me what

24 you do on a day-to-day basis?

25          THE WITNESS:  Sure, sure.

1          THE COURT:  Just for this center.  I should have

2    asked you a better question.  Just for this center.

3          THE WITNESS:  Sure, I can even give specific

4    examples from today, but my main role is to make sure that,

5    Number 1, the temperature in the building is comfortable.

6    So I actually have my maintenance technician come in at

7    5:00 o'clock in the morning.  Sometimes overnight the HVAC

8    system might catch up to itself and trip off.

9          THE COURT:  Got it.

10          THE WITNESS:  So some mornings the temperature

11   could be uncomfortable.  So we start really early in the

12   morning checking the temperature.

13          THE COURT:  Thank you.

14          And anything else?  Who -- if you had a tenant,

15   and you pick any one of them doesn't pay their rent, who is

16   like responsible for going after the tenant and making sure

17   that rent is paid?  Does that fall within your --

18          THE WITNESS:  Yes.  Sometimes, yes.

19          THE COURT:  Okay

20          THE WITNESS:  They -- everybody in the house knows

21   that I have a good relationship with the tenants, so if

22   something is behind, I have a nice way of going in and

23   getting the money.

24          THE COURT:  How long have you been doing this job?

25          THE WITNESS:  15 years.

1            THE COURT:  Oh, wow.  That's fantastic.  If

2    something -- well, assuming if something breaks down, and if

3    there's something goes wrong with the HVAC or something,

4    it's your job to then go find -- get the appropriate folks

5    to kind of come in --

6            THE WITNESS:  Correct.  Yes.

7            THE COURT:  To make sure that everything goes --

8            THE WITNESS:  Correct.

9            THE COURT:  Okay.  Thank you very much, sir.

10            THE WITNESS:  No problem.

11            THE COURT:  Oh, go ahead.

12        (Witness steps down.)

13            MS. HAYWARD:  Your Honor, with that the Debtor

14    rests.

15            THE COURT:  Okay.

16            MS. HAYWARD:  On cash collateral.

17            THE COURT:  Okay

18            MR. FITZMAURICE:  In terms of the presentation of

19    evidence, Your Honor, nothing further.  We submit that if

20    the Court would like -- if the Court would be aided, we

21    suggest some argument (indiscernible).

22            THE COURT:  I want to interrupt you.  I just want

23    to make sure the record was closed with respect to cash

24    collateral.

25            MS. HAYWARD:  Yes, Your Honor.  The Record is

1  closed with respect to cash collateral.

2          THE COURT:  Okay.  Oh.  All right, let's proceed

3  to the other argument now.  I'm ready, I just want -- we

4  needed to have a clean record on this because I need to know

5  exactly what you're asking to do and what you're willing to

6  do.  We're going to have to proceed again, with respect to

7  their organization, I can give you thoughts on cash

8  collateral, but I'm --

9          MR. FITZMAURICE:  Your Honor, it's the --

10          THE COURT:  Let me just kind -- just let me just

11  get this out.

12          I'm concerned about the lack of independence that

13  the Debtor has.  And it just flows through the entire case.

14  I'm concerned about the amount of cash that the Debtor has

15  or intends to go.  I understand that there are potentially

16  signed leases, but the record before me shows that those

17  leases aren't here.

18          So I've got a budget that shows that it could go

19  up, but it doesn't.  I have a Debtor who's controlled as of

20  now.  Maybe you can move me around, too.  I have a Debtor

21  whose primary decision maker is someone who sits largest --

22  potentially the largest unsecured creditor.

23          Looking at that, an unsecured creditor is now

24  saying that they're willing to the extent that there's any

25  shortfalls to the budget, that they're willing to fund it.

1  I also have that same individual is also the owner of one of

2  the largest creditors, not just unsecured creditors

3  personally.

4          I don't know who represents the estate and how --

5  I'm concerned about the independence and how the estate can

6  conduct itself.

7          I think no one can fault you, Ms. Hayward. You put

8  on a hell of a presentation and the work shows.  I'm

9  concerned about the budget.  I don't -- I think the budget

10  shows what can be projected.  But it doesn't provide

11  adequate protection subject to the carve out.  I don't think

12  there's enough cash to justify a carve out in this case, and

13  I don't want to proceed without one.

14          MS. HAYWARD:  Your Honor, may I address that?

15          THE COURT:  I'm also concerned about -- yeah.  No,

16  no, absolutely.

17          MS. HAYWARD:  So and I know --

18          THE COURT:  I'm just going to -- I'm really

19  concerned about the lack of independence, and who you would

20  need to bring in.  You can make it independent and then

21  really get to the budget, and it's going to hit it hard.

22  But I've got to make a decision today based upon the

23  evidence that I've got, and I'm really concerned about that,

24  Ms. Hayward.

25          MS. HAYWARD:  Okay.  Well, Your Honor, I would --

1    first let me address the administrative expenses in the

2    carve out side of things.  I know I have not practiced much

3    in front of Your Honor.

4              THE COURT:  No, no.  I mean, but money is money,

5    right?

6              MS. HAYWARD:  Sure, Your Honor.  But I will also

7    say that my business model throughout my career, since

8    leaving big law has always been to try to preserve and save

9    Debtors.  And so most of my cases, I tend to receive my fees

10   through a payment plan -- through a plan.

11             And so that's -- I just want Your Honor to be

12   aware of that.  And I appreciate, Your Honor, being

13   concerned about the payment of you know administrative fees

14   in this case.  But to the extent that, you know, I am more

15   than happy to not include a carve out of fees with respect

16   to cash collateral budget, I guess is my point on that.

17             THE COURT:  What happens when we -- you're

18   essentially using the cash collateral budget to also show

19   that you're going to provide adequate protection.  The

20   extent of diminution of their extent, their collateral, and

21   the building, right?  It's all.  And we're here on cash

22   collateral.  But you can kind of hear.

23             MS. HAYWARD:  Sure.

24             THE COURT:   Normally you would get interest.

25             MS. HAYWARD:  Well, to the extent there's a

1  diminution in the value of the collateral, right?

2          THE COURT:  All right

3          MS. HAYWARD:  But the -- this money --

4          THE COURT:  I got three years of no-tax payments.

5          MS. HAYWARD:  Yes, Your Honor.  We also have you

6  know, that is -- we also have COVID, right?  Which has

7  affected, obviously, the office industry and office

8  buildings.

9          THE COURT:  Right.  Now I'm back to my

10 independence principle.

11          MS. HAYWARD:  Well, Your Honor, I would respect --

12          THE COURT:  If somebody disagrees with

13 Mr. Choudhri in connection with the assets of the estate,

14 who makes that call?  Nobody.  So we're going to it's a

15 fundamental problem.  The largest -- one of the largest

16 unsecured creditors, at least on the Schedules.  I'm not

17 saying he's done anything bad.  I don't know Mr. Choudhri.

18 I'm just looking at what I'm looking at.  A large -- the

19 largest unsecured creditor with almost a million dollar

20 claim.  Now -- was also on some other papers.

21          So who's going to make decisions about what's in

22 the best interest of the Debtor to file a plan?  There's a

23 fundamental problem with this case.  I'm not sure it can be

24 fixed.  And that's where we're going.  You want to get to

25 where you're going.  And it presumes the fact that where

1    we're going is the way we should go.  And I don't have

2    confidence in the independence of those decisions.

3              MS. HAYWARD:  Your Honor, I guess I would

4    respectfully submit that the counter to that argument is

5    that the fact that Mr. Choudhri is an unsecured creditor,

6    doesn't that give credence to --

7              THE COURT:  Makes me more uncomfortable?

8              MS. HAYWARD:  But doesn't that -- isn't the

9    counter to that there's more motivation to make sure that

10   unsecured creditors get paid in this case?

11             THE COURT:  No, it tells me there's a conflict.

12             MS. HAYWARD:  I'm not sure, Your Honor.

13             THE COURT:  There's a conflict -- makes me feel

14   like there's a conflict that we can't reconcile today.  In

15   other words, right?  The largest -- never heard of an

16   unsecured creditor.  A large unsecured creditor, making

17   decisions about what the plan looks like and whether that's

18   the best course of action for a Debtor in connection with a

19   case.  I don't know.  And then we start looking at other

20   documents that will get into, it makes me even more

21   uncomfortable.

22             MS. HAYWARD:  Well Your --

23             THE COURT:  But you've done a fantastic job, and

24   you don't need me to tell you that you already know it.

25             There's a conflict here.  I'm like, and I'm really

1    uncomfortable.  It's driving all of these problems that I

2    have with the budget, which is, you know, is rent supposed

3    to be free for Jetall?  Is it, you know, are they not

4    supposed to be collected 19,000, you know, is the $19,000

5    fee really a pass-through fee?  I don't trust what I'm

6    seeing.  And it makes me uncomfortable that I don't have an

7    independent party telling me these answers.

8              I got two folks who work for a property management

9    company.  One of them is the owner.  But I've got another

10   one who's running a property management company who's about

11   as honest as they come.  They're working for 15 years.  I've

12   got no reason to doubt anything he's saying.

13             I have no reason to doubt what Mr. Choudhri is

14   saying, but it does raise the problem.  I don't -- I'm

15   uncomfortable with the information that I'm receiving.

16             I've got two leases that haven't been signed.

17   I've got a Debtor who's paying 19,000 a month to a

18   management company on pass-through.  They're also there

19   rent-free.  But there's a lease that says they're supposed

20   to pay rent.  I'm uncomfortable with the lack of

21   independence here.

22             There's not a party -- an independent fiduciary,

23   who's just working for the estate.  And I -- so it's hard

24   for me to trust the numbers.  It's hard for me to trust the

25   numbers.  It's hard for me to trust.  You know, I think

1    there's going to be enough cash and that the replacement

2    lien really works.  I'm uncomfortable.

3           I'm uncomfortable and I don't want to create a

4    situation where you're banking on cash to pay for you in

5    connection with a plan.  I don't want that.  That's

6    uncomfortable.  That's not the way 327 and 330 work.  It's

7    accrued on the books they're going to have to pay it or if

8    somebody else comes on, they're going to have to pay it.

9           I don't know.  It's the problem I've got, and it's

10   going to flow through everything today.  And I don't know --

11   it only gets more complicated as we get to the next chapter,

12   which is why I wanted to see if the first chapter worked.

13          MS. HAYWARD:  And I understand Your Honor's

14   concern.  I guess the only thing I can say in response to

15   that is that, you know, I think it's pretty common,

16   especially when you have real estate ventures such as this,

17   right?  Where you're going to have these types of issues.

18   It's common in bankruptcies where --

19          THE COURT:  No, it's not common to have, at least

20   in my experience, but your experience may be different.

21   Maybe all the million-dollar claims are legit and they have

22   to be paid.  Maybe all the payments to Jetall are fine.

23   Maybe you don't have the doc that we can't discuss on the

24   files.  That's what makes everything different.

25          You don't have the largest -- one of the largest

123

1   unsecured creditors. There is always got to be a layer of

2   independence in there.

3          Yes, sometimes they own the company, but there's

4   someone who manages that I can look to and say, who's

5   investigating everything?  Who's telling me that this plan

6   is the right plan?  You know, is the plan, the right plan?

7   I don't know.  It depends on who you -- whose perspective

8   you're looking at, right?  That's the -- I don't know if

9   it's in the best interest of the estate because the estate

10  doesn't have someone who I can look to, who you can look to,

11  to say this is in the best interest of the estate to propose

12  this plan as drafted.  I don't know.  That's the problem

13  we've got, right?  And it's --

14          MS. HAYWARD:  But doesn't any plan that proposes

15  something to creditors?  Unsecured creditors, building

16  creditors, creditors scheduled who are owned money --

17          THE COURT:  Talking about a plan that pays Crims

18  (phonetic) that proposes them, pays other creditors

19  unsecured, and then an unknown investor who's affiliated

20  with those parties are going to -- it's going to come in and

21  make an investment, right?

22          MS. HAYWARD:  Correct.

23          THE COURT:  I don't know if that's the best thing

24  or not.  I know it works for them.

25          MS. HAYWARD:  Well, the alternative would be that

124

1  the bank forecloses on the property and then --

2          THE COURT:  Maybe that's what -- I don't know.

3  Maybe that's what's in the best interest of the estate.

4  That's what I'm saying.  I don't have someone.  And

5  Mr. Darjean certainly can't tell me that based upon what he

6  just told me.  He cannot testify to that plan --

7          MS. HAYWARD:  Correct.

8          THE COURT:  -- based upon what he did.  But he

9  signed it.  He signed a document now, right?  He's now under

10 penalty of perjury for signing a plan.

11          If he can honestly say these things, Mr. Darjean

12 it's been put in a very bad position.  I like him.  I think

13 he's honest.  He's a manager.  You can't testify to

14 feasibility of a plan or that the release is in here.  The

15 proposed compromises are that these proposed classes are

16 appropriate.  He manages three properties he's got.  We --

17 there's a lack of independence here.  And I'm uncomfortable

18 with it.

19          And I don't want to start opening doors where I

20 start making payments and then -- statements, and then folks

21 start quoting me in other pleadings and other courts.  I'm

22 not doing that because I'm not finding anything.  And

23 everybody better be really clear about that.  I'm just

24 telling you I'm uncomfortable with the lack of transparency.

25 And I'm not saying it's there, but there's -- we don't have

1  an independent here, and I don't know how to proceed.

2  And it's going to flow.  It's going to get worse as my

3  inquiry goes on.  And I'm going to get more and more

4  uncomfortable because we haven't discussed what we need to

5  discuss.  We haven't talked about feasibility of a plan.

6           I know you've been working really hard, and I'm

7  trying to be as open and honest as I can.

8           MS. HAYWARD:  And I appreciate Your Honor's

9  comments.

10          THE COURT:  I don't know how to proceed.  I think

11  you all you need to tell me what you want, what you need or

12  what the alternative is if I say no.  I don't trust the

13  numbers.  I don't trust the books.  I don't have a true

14  independent who can tell me what we've got going on here.  I

15  don't know if -- you all are going to have to tell me what

16  to do.  I assure you all that no one believes more in the

17  power of a Debtor to have an effort to reorganize than me.

18  I can assure everyone of that.

19          I believe firmly in the ability of a Debtor to

20  reorganize and Debtor having a fair shot and the automatic

21  stay protecting that right and property of the estate,

22  giving a Debtor a breathing spell to reorganize.  I firmly

23  believe that Debtors should have a breathing spell and an

24  opportunity to reorganize and have a shot to put together

25  whatever they think is in the best interest of the estate.

1              I believe professionals who do work should be paid

2    for their work.  I think sometimes predators run the risk of

3    sometimes moving too quickly without giving Debtors an

4    opportunity.

5              I believe at the same time, the estate has to have

6    independence.  That's what makes the process work.  There

7    has to be someone who the Court can look to.  I think I've

8    got to be able to resolve these conflicts that I see, and

9    I'm not comfortable proceeding without resolving the

10   conflicts and don't want folks to take.  I don't want more

11   folks to really think about taking the stand.  And I'm not

12   sure Mr. Choudhri should take the stand, but if he wants to,

13   he can talk about the other stuff.  I'm comfortable with him

14   talking about cash.

15             Maybe there's a conflict there.  Maybe his lawyer

16   should be here.  I don't know.  I don't want him testifying

17   unless he knows fully aware.  Maybe there are no risks.  I'm

18   just making all this up.  But certainly, I'm concerned about

19   lack of independence in the conflicts that I'm seeing here.

20   I don't know what to do.

21             MS. HAYWARD:  Your Honor, I know, Your Honor, has

22   a 3:00 o'clock.  Perhaps this would be a good time to recess

23   and allow me to discuss with my client some of the Court's

24   comments.

25             THE COURT:  It's a 3:00 o'clock after I finish.

1   We're just going to take up the other one.  We will put

2   Mr. Choudhri, back on the stand.  If that's what you choose

3   to call, or you choose to call.  I'll let you put your

4   evidence on.  But the Record is closed as to the cash

5   collateral.  I'll rule on that, and then we'll take up the

6   other one.

7        I didn't want -- reason I did it that way is I

8   didn't want, one, I wanted to just make sure people were

9   aware of my concerns before we started.  I don't want to

10  blindside anyone and, two, I don't want there to be a murky

11  record as to what I'm looking at for cash collateral and

12  then blend it all in.  So things that have nothing to do

13  with cash collateral get discussed in one way or another.

14       Yeah, let's just take a 10-minute break, and then

15  I'll call the 3:00 o'clock.  I'm told the 3:00 o'clock will

16  last 15 minutes.  Parties are more than welcome to stay in

17  here.  If you want to leave, you're more than welcome to.  I

18  will start back up in this one.

19       Well, why don't I finish?  And then my goal is

20  3:25.  But we'll see.  You know, things are always

21  uncontested until somebody shows up at a hearing, so I don't

22  know what I'll look at.

23       Okay.  Thank you.

24       MS. HAYWARD:  Thank you, Your Honor.

25       MR. FITZMAURICE:  Thank you.

```
 1            THE COURT OFFICER:  All rise
 2        (Court in recess from 2:52:18 p.m. to 3:23:42 p.m.)
 3            THE COURT OFFICER:  All rise.
 4            THE COURT:  Please be seated.
 5            MS. HAYWARD:  Your Honor, may I go get -- knock on
 6    the conference room?
 7            THE COURT:  Please be seated.  I'm doing double
 8    duty today.
 9        (Pause in the proceedings.)
10            MR. FITZMAURICE:  Apologies for being late, Your
11    Honor.
12            THE COURT:  Oh, no, no, no.  I said, like around
13    3:30.  There's no.
14            Okay.  Wait.  I'm going to mute the line again.
15        (Conference muted.)
16            THE COURT:  Okay.  Just give me a second.  Let me
17    turn on my camera.
18            Okay, Ms. Hayward, how do you wish to proceed?
19            MS. HAYWARD:  Your Honor, I think we do wish to
20    proceed today.
21            THE COURT:  Okay.
22            MS. HAYWARD:  I have heard Your Honor's comments.
23            THE COURT:  Okay.
24            MS. HAYWARD:  I think.  All I can say is that it
25    is very clear that this Debtor and Mr. Choudhri wants to
```

1    fight to try to save this asset.

2            And I hear the Court's comments, and I think that

3    there are ways to potentially address them that we can

4    continue talking toward.  But ultimately, in the end of the

5    day, the question is, is this a reorganizable Debtor, right?

6    Is there a plan here that's in the best interest of the

7    estate?  Is there something that is good for all creditors

8    of the estate?

9            I believe that Mr. Choudhri would be willing to

10   subordinate debt to insiders under any plan.  I believe that

11   Mr. Choudhri would also be willing to appoint a chief

12   restructuring officer to act as sort of the independent

13   fiduciary with respect to how this case proceeds and to cede

14   control of the Debtor's decision-making abilities with

15   respect to this bankruptcy.

16           All I can say, though, is that there is a plan on

17   file that provides for payment of property creditors in

18   full, which is about $300,000.  There's a plan on file that

19   has new money coming in to fund.  The continued operations

20   of this property while it gets stabilized.

21           And I guess the only other thing I would say to

22   Your Honor, I heard, Your Honor, about valuation issues.  I

23   don't know whether there are valuation issues here, at least

24   with respect to the property the Debtor is relying on in

25   appraisal and appraised value at this point.

130

 1          So there may not be an issue as to the value.  And
 2   there's also no issue and no question that this property,
 3   you know, the secured debt is not worth the value, the
 4   property, right?  The property is they are underwater,
 5   meaning this the NBK's debt, the property is worth less than
 6   what they are owed, irrespective of the number that's used.
 7          And so the question I also agree with Your Honor,
 8   that I believe strongly in a Debtor's right to reorganize
 9   strongly in being able to utilize the Bankruptcy Code.
10          THE COURT:  Who represents the Debtor?
11          MS. HAYWARD:  Who represents the Debtor?   I
12   represent the Debtor.
13          THE COURT:  You are the lawyer for the Debtor.
14          MS. HAYWARD:  Right, Right.  Well, I'm sorry.
15   When you said who represents --
16          THE COURT:  I appreciate.  That's a fair question.
17          MS. HAYWARD:  Who represents the Debtor?
18          THE COURT:  I mean, right now, as we sit here
19   right now.
20          MS. HAYWARD:  Right now, as we sit here today,
21   it's Mr. Choudhri.  It's Mr. Choudhri.
22          THE COURT:  All right.  Let's get him on the
23   stand.
24          MS. HAYWARD:  Okay.
25          THE COURT:  Mr. Choudhri, why don't you come on

1  back up?

2           Before we -- just to be clear, whenever we talk

3  about the issue that -- someone let me know, I'm just going

4  to play it safe, Mr. Ruff, and I'm just going to -- I'm just

5  going to mute this line.  I just want to be super, super,

6  super careful.  Make sure I don't do anything.

7           Mr. Choudhri, let me have you raise your right

8  hand?  Do you swear to tell the truth, the whole truth, and

9  nothing but the truth?

10          THE WITNESS:  Yes.

11      (Witness sworn.)

12          THE COURT:  Okay.  Note that the witness has been

13 duly sworn.  Thank you.

14          MR. FITZMAURICE:  So, Your Honor, are you

15 intending for us to go in our motion to dismiss?  Our first

16 witness would be Mr. Carter.  It's the extent of our

17 proceeding currently what they looking at -- sorry, adjust

18 the microphone.

19          THE COURT:  No, no.  Maybe I should, you know --

20          MR. FITZMAURICE:  It's the extent that we're going

21 to -- we have -- again for the Record, Your Honor, all of

22 the same concerns that Your Honor does with respect to cash

23 collateral.

24          THE COURT:  I just want to talk in terms of

25 evidence, I need to -- shut me down on this one.  Or is he

1    up?   How are you calling those?

2            MR. FITZMAURICE:  We are calling Mr. Carter as

3    our --

4            THE COURT:  I'm so sorry.  I'm going to have you

5    sit down.  I'm so sorry.  I'm so sorry.

6            Where is Mr. Carter? Here, Mr. Carter.  That's

7    who I should have called.  I apologize.  I had Choudhri in

8    my head, and I should have called Carter.  I apologize.

9    Just go ahead and have a seat.

10           Are you all okay with proceeding?

11           MR. FITZMAURICE:  We are, Your Honor

12           THE COURT:  Okay.  All right.  Mr. Carter, why

13   don't you come on up?  Let me have you raise your right

14   hand.

15           Do you swear to tell the truth, the whole truth,

16   and nothing but the truth?

17           THE WITNESS:  I do.

18       (Witness sworn.)

19           THE COURT:  Okay.  Have a seat, please.

20           You all okay with the binder still being up here?

21           MR. FITZMAURICE:  Yes.  Your Honor, thank you.

22                     DIRECT EXAMINATION

23   BY MR. FITZMAURICE:

24   Q    And Mr. Carter, I suspect that I'll be asking you

25   predominantly about the binder with the black cover.

1   A    Okay.

2   Q    You have two in front of you.  One with a white cover

3   and one with a -- one with a black cover.

4           Mr. Carter, can you state your full name for the

5   Record, please?

6   A    Michael Crosby Carter.

7   Q    And are you currently employed, Mr. Carter?

8   A    Yes.

9   Q    Who are you employed by?

10  A    National Bank of Kuwait, New York Branch.

11  Q    Any connection with your employment for National Bank

12  of Kuwait, New York Branch, are you familiar with an entity

13  called Galleria 2425 Owner LLC?

14  A    Yes.

15  Q    How are you familiar with that entity?

16  A    I'm the account officer on that loan.

17  Q    Is it okay with you if I refer to Galleria 2425 Owner

18  LLC as the Debtor for purposes of your testimony today?

19  A    Yes.

20  Q    If I say the Debtor, you understand that's what I'm

21  referring to.

22           Okay.  And then are -- so you are National Bank of

23  Kuwait, New York Branches particularly the loan officer?

24  A    Yes.

25  Q    And National Bank of Kuwait, New York Branch extended

1  that loan to the Debtor.

2  A    Yes.

3  Q    And I'm going to ask you, please, to turn to in the

4  black binder the document that is at Exhibit 1.

5  A    Exhibit 1 or the --

6  Q    The end of that.

7  A    -- Declaration.

8  Q    So if you look at the bottom right-hand corner, you

9  should see a yellow sticker, and it should say NBK Exhibit

10  No. 1.

11  A    Yes.

12  Q    You recognize that document?

13  A    Yes.

14  Q    What is it?

15  A    This was my Declaration

16  Q    And you signed this Declaration on July 20th, 2023?

17  A    Yes.

18  Q    And it was submitted to the Court here in connection

19  with the National Bank of Kuwait's motion to dismiss the

20  Debtor's bankruptcy case?

21  A    Yes.

22  Q    You know, the factual information that is included in

23  the Declaration, do you know that information to be true of

24  your own personal knowledge?

25  A    Yes.

1  Q   Did you review books and records of the National Bank

2  of Kuwait in connection with preparing the Declaration that

3  is Exhibit No. 1?

4  A   Yes.

5  Q   And then again, you believe all of the contents of

6  Exhibit No. 1 to be true?

7  A   Yes.

8  Q   I'm going to ask you, please, to turn to the document

9  that is marked as Exhibit No. 2.

10  A   The promissory note?

11  Q   So let me see.  Let's walk through this together,

12  because as you may have heard this morning, our,

13  unfortunately, our numbering system was not a monument of

14  clarity.

15  A   All right.

16  Q   So Exhibit No. 1 is your Declaration that we just

17  reviewed, and it has attached to it five exhibits which you

18  will see tabs on the side one, two, three, four, five.  And

19  then after you get to Number 5, the next tab, admittedly

20  confusingly, is two.

21  A   I got you.

22  Q   And then if we turn to that, you'll see on the bottom

23  right-hand corner, there's a yellow sticker that says NBK

24  Exhibit No. 2.  Do you see that?

25  A   Yes.

1  Q     You recognize this document?

2  A     Yes.

3  Q     What is it?

4  A     This was a Statement that was also filed.

5  Q     And is this a Declaration that you submitted, in this

6  case, on September 15th of this year?

7  A     Yes.

8  Q     And do you believe the contents of -- sorry, withdrawn.

9        Do you know the contents of this Declaration to be true

10 from your own personal knowledge?

11 A     Yes.

12 Q     Did you review the bank's books and records in

13 connection with the preparation of this Declaration?

14 A     Yes.

15 Q     Your Honor, I offer the Exhibit 1 and 2 for evidence.

16         THE COURT:  Any objection?

17         MS. HAYWARD:  Your Honor, there's hearsay.  On

18 this -- they're out-of-court statements offered for the

19 truth of the matter asserted.  This witness (indiscernible)

20 testify, but Declarations by him are not admissible.  It's

21 hearsay.

22         THE COURT:  I agree.  Proceed.

23 BY MR. FITZMAURICE:

24 Q     Are you aware, Mr. Carter, of a loan that exists

25 between National Bank of Kuwait as Lender and the Debtor as

1  borrower?

2  A    Yes.

3  Q    Do you know when that loan was entered into?

4  A    May of 2018.

5  Q    Do you know generally what the terms of that loan are?

6  A    Well, they there was a loan for roughly 52 million and

7  change for five years.

8          MS. HAYWARD:  Your Honor, may I?  Since, Your

9  Honor, has sustained the objection.  May we remove the

10  Declarations from the exhibit binder in front of the witness

11  so that he may not rely upon them and part of his testimony?

12          THE COURT:  You can't look at the Declaration,

13  sir.  You can't look at your Declaration.  You can only

14  answer the questions that are in front of you.

15          THE WITNESS:  Okay.

16          THE COURT:  All right.  So close the binder.

17  Unless the witness -- and unless you're pointing him to

18  another exhibit, he can't look at the -- so you can answer

19  the question.

20  BY MR. FITZMAURICE:

21  Q    So are you familiar, Mr. Carter, with the terms of the

22  loan between NBK and the Debtor?

23  A    It was a loan for roughly, over 52 million for five

24  years.

25  Q    It was a five-year term?

1  A     Yes.

2  Q     Do you know what the payment terms were?

3  A     I'm not sure what you're asking.

4  Q     Was the Debtor under the terms of the loan, was the

5  Debtor required to make principal and interest payments?

6          MS. HAYWARD:  Objection.  Best evidence rule.  The

7  loan documents speak for themselves.

8          THE COURT:  He can answer if he knows.

9          THE WITNESS:  Well, it had monthly interest.  And

10 it was a, what we call a bullet loan pay to maturity.

11 BY MR. FITZMAURICE:

12 Q     Did the Debtor comply with those payment terms?

13 A     Up until roughly March, April of 2020.

14 Q     What happened in March or April of 2020?

15 A     Stopped making payments.  There was an interest reserve

16 that had been established at the closing, and then those --

17 that interest reserve was tapped on a monthly basis until

18 those funds expired in roughly April of 2021.  And we did

19 not receive any payments after that.

20 Q     And what, if anything, did the bank do as a result of

21 the Debtor's default under the loan?

22 A     We sent a default notice, acceleration, and eventually

23 we filed for foreclosure.

24 Q     Was the bank successful at that time in foreclosing on

25 the property?

1   A    No, it was put off through filings by the borrower with

2   the Court.

3   Q    Were the claims relating to those filings by the

4   borrower, where those eventually are resolved by the

5   parties?

6   A    Not sure what you're referring to.

7   Q    Let me ask it to you this way:  Did the parties

8   ultimately enter into a settlement agreement?

9   A    The parties did ultimately come to a settlement

10  agreement.

11          MR. FITZMAURICE:  So I think, Your Honor, at this

12  point, we're going to talk about the terms of that

13  agreement.

14          THE COURT:  Okay.  Just give me one moment.  I am

15  (indiscernible) yourself.  And want no one to listen to

16  anything else.  No one should be able to listen to what you

17  talk about.  I need all the audio (indiscernible), right?

18          Mr. Ruff, can you hear anything I'm saying?

19      (No audible response.)

20          THE COURT:  All right.  Mr. Ruff, can you hear me?

21      (No audible response.)

22          THE COURT:  Can you hear me, Mr. Ruff?  Okay, hold

23  on a second.  Put a thumbs up if you can hear me.  Can you

24  hear me now?  Can you hear me now, Mr. Ruff?

25      (No audible response.)

```
 1              THE COURT:  Don, if you're on, Abby, if you're on,

 2   if you can hear me?  Okay.  That's how we're proceeding.

 3            (REDACTED SEALED portion from 3:39 p.m. to 4:05 p.m.)

 4          (Court in recess from 3:53:42 p.m. to 4:05:14 p.m.)

 5              THE COURT OFFICER:  All rise.

 6              THE COURT:  Just so we are all on the same page,

 7   Ms. Hayward, the line is completely open, so everybody can

 8   hear what we are saying right now.

 9              MS. HAYWARD:  Okay, thank you, Your Honor.

10              THE COURT:  Okay

11              MR. FITZMAURICE:  At this point, Your Honor, the

12   Debtor would call Mr. Choudhri to the stand.

13              THE COURT:  Okay.  Mr. Choudhri, come on up.

14   Mr. Choudhri, just so we have a clean Record, let me have

15   you raise your right hand for the third time.

16          Do you swear to tell the truth, the whole truth,

17   and nothing but the truth?

18              THE WITNESS:  Yes.

19        (Witness sworn.)

20              THE COURT:  Okay.  And I will note that

21   Mr. Choudhri has been super sworn in for the Record.

22              MS. HAYWARD:  Third time's the charm, Your Honor.

23              THE COURT:  Yes, exactly right.  He is all the way

24   covered on the swearing.  Okay.

25                         DIRECT EXAMINATION
```

1  BY MS. HAYWARD:

2  Q    All right.  Good afternoon, Mr. Choudhri.

3       Mr. Choudhri, I want to talk to you a little bit about

4  the Debtor's plan of reorganization in this case.  Can you,

5  in broad term, sort of describe what the Debtor is proposing

6  as a plan?

7  A    The Debtor is proposing to fund at least 2.5 million as

8  new equity paying the secured paying the unsecureds.

9  Q    Do you know how much the unsecured creditors are

10 getting paid?  Generally speaking, under the Debtor's plan?

11 A    I believe the -- it's about 300,000 and within the next

12 for the trades.  And then there's a total of about $10

13 million, I think it adds up to about ten, $10 million.  And

14 then the secured is getting paid with the property value.

15 Q    Okay.  When you say a total of $10 million, so do you

16 recall how the plan structures payments to unsecured?

17 A    I don't have the plan in front of me and I don't have a

18 -- we have a projection and -- and a budget built into it.

19 Q    Okay.  And how are payments made monthly?  Quarterly,

20 annually.  Do you recall?

21 A    I believe they're made quarterly.  Quarterly payments

22 and the taxes are paid.

23 Q    Do you recall -- I mean generally speaking, the

24 property as it sits today, and as it sits within the next

25 ten months, does the property project the cash flow?

1  A     Yes.

2  Q     Within the next ten months?

3  A     Yes.

4  Q     Do you agree with or do you know whether there's a

5  necessity for --

6  A     Actually, I want to clarify that.  I believe that it's,

7  and I'm going off of memory, and I'm sorry.  If I had the

8  plan, I could better describe it in front of me.  I believe

9  it starts shooting off lots of cash flow, positive cash flow

10 in month 17 or 18, if I'm not mistaken.

11 Q     Would you agree with me, or is there a need for funding

12 in order to get the property to stabilization?

13 A     Yes

14 Q     Why is that?

15 A     Based on the occupancy of the building and to lease up

16 the building and carry it as the tenants start paying in the

17 and the rents start coming in because there's a stair step.

18 Q     And with respect to the valuation of the building, the

19 Debtor has used a valuation of, I believe -- or where did

20 the Debtor's valuation come from?

21 A     We reviewed two appraisals from the -- from the Bank of

22 Kuwait, the Commission, Cushman Wakefield.  And I believe

23 one might have been for around 16 and the other one was for

24 around 18.  So I believe we had put on at 17, I think it was

25 18.6 and 16, and we picked 17.5.

1    Q    I'm going to ask you to turn to Exhibit 10 in the white

2    binder in front of you.

3    A    Yes.

4    Q    Is this NBK's appraisal as of May 3rd, 2023?

5    A    Yes.

6    Q    And is this the basis of the Debtor's valuation of the

7    property?

8    A    Yes.

9    Q    And I'll ask you to turn to page which is 00005 of the

10   appraisal.

11   A    Yes.

12   Q    Can you see that according to the appraisal, what is

13   the market value as is?

14   A    18.6 million.

15   Q    Is that the number the Debtor used in its plan?

16   A    Yes.  It used 18.6 in the plan, but it used a slightly

17   different number on the Schedules.

18   Q    Where's the money coming to fund the equity that -- the

19   new equity contribution that's required to get the property

20   to where it's currently cash flowing?

21   A    From family members and affiliates that have deposited

22   funds in an account for this -- for this investment.

23   Q    Mr. Choudhri, why are you willing to propose a plan and

24   put $2.5 million of new money into this Debtor to save this

25   property?

1          MR. FITZMAURICE:  Objection.  Ms. Hayward puts the

2    witness testimony concerning the source of financing for the

3    Debtor.

4          MS. HAYWARD:  Okay.  Let me -- I'll rephrase.

5          THE COURT:  I'll sustain that.  Okay.

6          MS. HAYWARD:  I'll rephrase.

7    BY MS. HAYWARD:

8    Q    Mr. Choudhri, why are you or your affiliated friends

9    and family and affiliates willing to put an additional

10   $2.5 million into this Debtor to fund a plan and go forward?

11   A    Because it will maximize the value for the estate and

12   what the Creditors get.  And there's lots of value once it's

13   stabilized, and it'll shoot off lots of cash upon

14   stabilization.  And so even the Cushman appraisal has a

15   $51 million prospective value on stabilization.  So I think

16   the value will go up.  And the Creditors will be paid, the

17   unsecureds along with the secured.

18   Q    And if -- well.  Let me ask you --

19         THE COURT:  When you say the unsecureds are going

20   to get paid.  What do you mean by that?

21         THE WITNESS:  I'm going personally behind at the

22   end of the line for any --

23         THE COURT:  No, no.  I'm just asking when you mean

24   the unsecureds are going to get paid, what are you what do

25   you mean by that?

 1          THE WITNESS:  There's unsecured creditors that

 2   have a list that I can --

 3          THE COURT:  Do you mean just generally all

 4   unsecured creditors?

 5          THE WITNESS:  Yes, Your Honor.

 6          THE COURT:  Okay.  Thank you very much.  I just

 7   wanted to make sure that I was -- okay.  Thank you.

 8          THE WITNESS:  I think there's six classes, if I

 9   recall, on the plan, and I'm going off memory.

10          THE COURT:  No, no, no.  I just.  I just want to

11   make sure that we were all operating on the same

12   information.  Thank you.

13   BY MS. HAYWARD:

14   Q    Do unsecured trade under the plan are creditors who

15   have claims that are related to providing maintenance or

16   repairs or things respecting the property?

17   A    They get paid 100 percent.

18   Q    Okay.  And what about the rest of the unsecured

19   creditors?

20   A    They get paid every, I believe, it's based on payments

21   that are made from the cash flow that the building will get

22   based on the leases.

23   Q    And do you know how much that class of creditors will

24   be paid under the plan?  If you know if you don't, I don't

25   want you to guess.

1   A    I know.  I just don't remember it exactly.  If it's

2   possible, I can have a copy of the --

3   Q    Okay.

4   A    Sorry.

5   Q    It's all right.

6   A    What I recall was around -- sorry.

7   Q    Now, Mr. Choudhri, I'm going to ask you to look at

8   Exhibit 6.

9   A    Yes.

10  Q    What is Exhibit 6?

11  A    Exhibit 6 is a lawsuit, it's an adversary against the

12  Bank of Kuwait on behalf of the Debtor.

13  Q    And in general terms, high-level terms, what is the

14  Debtor's allegation about?  What is the basis of this

15  lawsuit?   What does this lawsuit allege?

16  A    Breach of the settlement agreement.

17  Q    Okay.

18  A    And banks interferes.  But for theirs, we would have

19  been able to 100 percent pay them the settlement amount.

20  Can I talk about this?

21  Q    Okay.  Wait until I ask a question.

22  A    Sorry.  Just on the -- and if you want me to hit the

23  button, just let me know when it's done.

24  Q    Yeah, let's -- Your Honor.  I think this is probably an

25  appropriate time to hit the button.

```
 1              THE COURT:  All right.  It's time to hit the
 2    button time, folks.  Hold on.  Well I want my law clerks to
 3    (indiscernible), I'm going to mute this line, confirm that
 4    as we start to talk that you can't hear anything.  If at any
 5    point you do hear any of this discussion, let me know
 6    immediately.  Okay?
 7              Mr. Ruff, can you hear me?  Okay.  Thank you.
 8    Let's proceed.
 9         (REDACTED SEALED portion from 4:15:56 p.m. to 4:17:30
10    p.m.)
11    BY MS. HAYWARD:
12    Q    Mr. Choudhri, with respect to the adversary proceeding
13    that's been filed and in general terms, but without
14    disclosing actual confidential information from the
15    settlement agreement, what is the Debtor allege that NBK has
16    done?
17    A    The Debtor alleges that but for their interference, we
18    and the Debtor would have been successful in paying the full
19    settlement amount.  And I can get into a lot more details if
20    you want to (indiscernible).
21    Q    Well, I just -- I want more of, like a high level.  You
22    know, what exactly does the Debtor believe NBK did to
23    interfere with its attempts to perform under the settlement
24    agreement?
25              THE WITNESS:  Your Honor, I would like to --
```

1        THE COURT:  All right.  It would be time.

2        THE WITNESS:  (Indiscernible).

3        THE COURT:  Okay, we're muted.

4     (REDACTED SEALED portion from 4:18:28 p.m. to 4:20:51

5  p.m.)

6        THE COURT:  We're back live.

7        MS. HAYWARD:  Thank you, Your Honor.

8                    DIRECT EXAMINATION

9  BY MS. HAYWARD:

10 Q    Mr. Choudhri, does the Debtor allege that NBK has

11 engaged in a pattern of interfering with the Debtor's

12 ability to operate the property and pay debt?

13 A    Absolutely.

14 Q    Okay.

15 A    Absolutely.

16 Q    Mr. Choudhri, if it's necessary to get a plan confirmed

17 in this case.  Are you and entities that you control willing

18 to subordinate debt and not receive payment under a plan?

19 A    Yes.

20 Q    Are you and your entities willing to waive debt in

21 order to get a plan confirmed in this case if that's

22 required?

23 A    Yes.

24 Q    Are you and your entities willing to appoint an

25 independent third party to come in and make decisions with

1    respect to this bankruptcy case on behalf of the Debtor?

2    A    Yes.

3    Q    Are you willing to fund that?

4    A    Yes.

5    Q    Are you willing to fund the expenses associated with

6    the property for the next few months until such time as we

7    get to plan confirmation?

8    A    Yes.

9    Q    And in funding those amounts, would you be willing to

10   subordinate the repayment of any amounts funded to after the

11   plan term?

12   A    Yes.

13   Q    Would you be willing to include any of those amounts as

14   equity contributions rather than as loans?

15   A    Yes.

16   Q    So basically, are you saying that you're willing to do

17   what it takes to try to save this property?

18   A    Yes, I'm willing.  I've worked very hard, and I'm

19   willing to do whatever it takes.  And we've finally gotten

20   lease up and momentum to where we're very close, and I

21   believe the plan that we've presented is very feasible and

22   we're open to doing what it takes to make it work.

23   Q    Mr. Choudhri, why -- do you believe that the Debtor has

24   a real dispute with the NBK?

25   A    Absolutely.

150

1   Q     Has the Debtor had a real dispute with NBK for quite

2   some time?

3   A     Yes.  And I can get into that, too.

4   Q     As the Debtor manufactured a dispute against NBK to try

5   to move forward?

6   A     Absolutely not.  Absolutely not.

7   Q     Why did the Debtor file this case?

8   A     Just to protect and restructure the property, to

9   restructure the Debtor, and to stop NBK with their agenda

10  since the issue started of taking the property.

11  Q     Does the Debtor allege or believe that NBK wishes to

12  take control of the property?

13  A     They want the property.  Mr. Barrera (phonetic) told me

14  they want the property from Kuwait.  They want this

15  property.

16          MR. FITZMAURICE:  Your Honor, I (indiscernible).

17          MS. HAYWARD.  I think it was an admission of a

18  party opponent.

19          THE COURT:  I don't know what it is.  It just says

20  what it says.  It's just an unsupported allegation.

21          MS. HAYWARD:  And I'll pass the witness.

22          THE COURT:  Thank you.

23          Proceed to Cross-Examination.

24          MR. FITZMAURICE:  Thank you, Your Honor.

25                          CROSS-EXAMINATION

                                                              001319

1   BY MR. FITZMAURICE:

2   Q    Good afternoon, Mr. Choudhri.

3   A    Afternoon.

4   Q    I'd like you to -- If you don't already have it, please

5   open in front of you the Exhibit Number 6, the complaint.

6   A    Yes.

7   Q    You are personally a plaintiff in this complaint,

8   correct?

9   A    Yes.

10  Q    And so is the mezzanine lender as well?

11  A    Yes.

12  Q    And the claims that are asserted in the complaint those

13  are the same claims that the Debtor has been asserting

14  against National Bank of Kuwait for the past several years,

15  right?

16  A    No.

17  Q    And those are the same claims that were released in the

18  settlement agreement, right?

19  A    No.

20  Q.   So some of them are the same claims that were released

21  in the settlement agreement, right?

22  A    I'm not sure if there are some -- there are claims from

23  -- that led up to that and then claims that came after that.

24  Q    All of the claims that would exist that predate the

25  settlement agreement were released by the settlement

1  agreement, correct?

2          MS. HAYWARD:  Objection.  Calls for a legal

3  conclusion.

4          THE COURT:  Sustained.

5  BY MR. FITZMAURICE:

6  Q    Mr. Choudhri, I'd ask you to take a look, please, at --

7          THE COURT:  Before you leave, can somebody just

8  explain to me who is, just so we have a clear record,

9  Mason's Galleria LLC?  Can -- Mr. Choudhri, can you tell me

10 who that is?

11         THE WITNESS:  That is the mezzanine lender for the

12 JV, which the JV is the Galleria Owner.  Then you have the

13 JV LLC, and then you have Mason's Galleria, which is a

14 mezzanine lender.

15         THE COURT:  And what is the connection between --

16 do you have any connection to the mezzanine lender?

17         THE WITNESS:  Yes.

18         THE COURT:  And what is your connection with the

19 mezzanine lender?

20         THE WITNESS:  I'm the managing member.

21         THE COURT:  You're the managing member of the

22 mezzanine lender?

23         THE WITNESS:  Yes.

24         THE COURT:  Okay.  Thank you.

25 BY MR. FITZMAURICE:

1  Q    Sir, I'd like you to please look at Exhibit B to the --

2  I'm sorry.  So again, both Exhibit 6, the Exhibit's --

3  A    The adversary complaint.

4  Q    -- Exhibit B to the adversary complaint.

5          THE COURT:  Can you just tell me what -- took the

6  first page of that?  Oh, it's Exhibit B.

7          MR. FITZMAURICE:  Oh, it's -- if you're referring

8  to the Bates numbers at the bottom, it's 000038.

9          THE COURT:  38?

10          MR. FITZMAURICE:  38.

11          THE COURT:  Okay.

12          MR. FITZMAURICE:  Thank you.

13          THE COURT:  Thank you.  I'm just trying to -- yes,

14  make it a little easier on both of our eyes.

15          MR. FITZMAURICE:  Sorry.

16          THE COURT:  No, no.  Go ahead.

17  BY MR. FITZMAURICE:

18  Q    Do you recognize this document, Mr. Choudhri?

19  A    Yes.

20  Q    What is it?

21  A    This is a letter of agreement between Caldwell Soames

22  and Galleria 2425 Owner LLC.

23  Q    Is Caldwell Soames the hedge fund that you referred to

24  earlier?

25  A    Yes.

ALI CHOUDHRI - CROSS BY MR. FITZMAURICE                    154

1  Q    And you assert that the National Bank of Kuwait

2  interfered with the Debtor's ability to close this

3  transaction?

4  A    Correct.  And with other transactions as well.

5  Q    Let's focus on this transaction.  The terms of the

6  transaction were that an entity affiliated with Caldwell

7  Soames was going to acquire the property, is that right?

8  A    That is -- that is correct.

9  Q    Was the valuation of the property about $100 million?

10 A    The appraisal when the property was fully stabilized

11 was 101 million by the Bank of Kuwait.

12 Q    And that was in 2018, right?

13 A    I believe it was in 2019 before -- pre-COVID.  You're

14 right.  This is pre-COVID.

15 Q    What I'm asking is the valuation of the property for

16 purposes of the Soames Caldwell -- Soames Caldwell -- the

17 Caldwell Soames transaction, the value of the property was

18 $100 million, correct?

19 A    I don't know if that's the value of the property.  This

20 deal was acquiring 45 -- I'm sorry, 55 percent.  There

21 wasn't a value for the -- actually, I think there is a value

22 in it's north of that.  So it's 35 million in funds paid

23 now.  And then the Debtor or the, you know, 24 -- 25 would

24 carry 40 million for 20 years at 7 percent.  And then the

25 borrower would retain 45 percent, and they would also lease

1  and take over, you know, several floors.  And they have a

2  company that are moving from California to Houston that

3  would occupy the building.  That's an affiliate of the fund.

4  Q    So Caldwell Soames is going to pay $35 million in cash?

5  A    Yes.

6  Q    It was going to -- there would be a $40 million note

7  that would be owed to the Debtor payable 7 percent per year.

8  A    Yes.

9  Q    And the Debtor was going to retain 45 percent of the

10 equity in the property?

11 A    Correct.

12 Q    And this was as of January of 2023?

13 A    Yes.

14 Q    And this was the transaction that the bank interfered

15 with.

16 A    This was -- the fact that the information was

17 disclosed, and I can get more.  But this is a transaction.

18 It is not the transaction.

19 Q    The Caldwell Soames had a diligence period before

20 closing any transaction, correct?

21 A    They had anticipated -- they were supposed to close in

22 by the end of Feb.

23 Q    So I'll refer you, sir, to Section 3 of this letter.

24 A    Yes, sir.

25 Q    3(a), Caldwell Soames has a 30-day period to negotiate

1   A    That's correct.

2   Q    And then 3(c), during that period, Galleria will

3   reasonably accommodate the representative appointed by CSI

4   to inspect the records and accounts of Galleria?

5   A    Correct.

6   Q    Okay.  And that was -- that inspection was during the

7   30-day period after this contract was supposedly signed?

8   A    Yes.

9   Q    Okay.  Please look at Exhibit 10.  That's the

10  appraisal.

11  A    Okay.

12  Q    And referring to the Bates Page 0005.

13  A    Yes, I'm here.

14  Q    The appraisal indicates that as is value of the

15  property is $18.6 million, correct?

16  A    Correct.

17  Q    And the as is value of just the land with the building

18  removed was more, correct?

19  A    Yes.

20  Q    If you turn the Page 0007.

21  A    Okay.

22  Q    Do you see that there's a reference to a prior

23  valuation?

24  A    I'm not, but I do recall the bank had a prior

25  valuation.

1   Q    So Page 0007 --

2   A    Yes, the top of it.

3   Q    -- on the left-hand side, it says changes from prior

4   valuation.

5   A    Yes.

6   Q    Do you see that text on the left-hand column, sir?

7   A    Yes.

8   Q    Second paragraph -- end of the second paragraph, the

9   September 20, 2021 valuation reflected a change from the

10  April 19, 2020 -- 2021 valuation?

11  A    Correct.

12  Q    And that was down $2.3 million?

13  A    Yes.

14  Q    The September 20, 2021 value was 20.4 million

15  A    Yes, that's what this says.

16  Q    And is it -- your actually -- is it actually your

17  testimony that with the property worth somewhere between 20

18  and $18 million, that Caldwell Soames is going to pay $100

19  million for it?

20  A    The valuation is based on the buyer, based on leasing,

21  and they were taking space in the building.  We also had

22  Microsoft toward the building.  And if Microsoft did sign

23  the lease, the building would be worth $150 million.  So

24  it's subjected to the buyer and what their purposes are.

25  And if the building is fully leased up, it's obviously worth

1    more, just like when it was leased up, it was appraised for

2    over 100 million.

3    Q    Microsoft did not lease the entire building, did they?

4    A    And that's one of our historical issues about lease

5    approvals in the past.

6    Q    With respect to the State Court disputes between the

7    parties, do you recall that in sometime in March of this

8    year, the National Bank of Kuwait posted the property for

9    foreclosure?

10            MS. HAYWARD:  Objection, Your Honor.  Beyond the

11   scope, I'm not sure that I addressed the State Court

12   proceedings at all in my direct.

13            THE COURT:  You can respond.

14            MR. FITZMAURICE:  Well, Your Honor, there was

15   significant testimony about the State Court proceedings

16   between the parties.  That was that there was significant

17   testimony concerning the State Court proceedings, the

18   litigation, the nature of the claims between the parties.

19            THE COURT:  What's the question again you were

20   asking?

21            MR. FITZMAURICE:  Did NBK post the property for

22   foreclosure in March of 2021?  The next -- the next question

23   relates to the proceeding that was filed as a result of

24   that.

25            MS. HAYWARD:  Your Honor, I limited my questions

1    to the adversary proceeding that was filed.  I believe those

2    questions were with respect to Mr. Carter's testimony.

3            THE COURT:  Yeah, I think that's right.  I'll

4    sustain the objection.

5    BY MR. FITZMAURICE:

6    Q    Do you know if the Debtor told the State Court Judge

7    that NBK should be allowed to foreclose on the property if

8    the settlement payment wasn't made by July 3rd?

9            MS. HAYWARD:  Objection.  Beyond the scope.

10           THE COURT:  I'm going to overrule that.  You can

11   answer.

12           THE WITNESS:  No.  I'm aware that the bank did

13   post the property for foreclosure in May.  And the Court

14   allowed us more time and the bank, I believe -- I believe.

15   And, but after the property was posted and passed several

16   people when the property was publicly posted were told by

17   emails by Pillsbury that the property will be posted in July

18   and that that created another problem with our

19   (indiscernible) viable and effective marketability of the

20   property when buyers were told it was going to be posted in

21   the future.

22   Q    Do you know who Jim Wetwiska is?

23   A    Yes, he's with Akin Gump.

24   Q    He's Counsel for the Debtor?

25   A    Yes.

1  Q    And did he tell the Court that if and -- that if the

2  Debtor had more time to raise the settlement funds, that any

3  issues with respect to the disclosure of the settlement

4  terms would be cured?

5  A    No.

6  Q    Did Mr. Wetwiska also tell the State Court that if the

7  Debtor did not sell the property -- excuse me, that if the

8  Debtor did not come up with the funds, the settlement funds

9  by July 3rd, that the Court should throw them out?

10 A    There was conversations not exactly that.  And I can --

11 I can -- like if you allow me to tell you what I remember.

12 Q    I'd ask you to just answer the question, sir.

13 A    I recall that -- I'm trying to answer the question

14 without rambling, and I have a bad habit again.  So your

15 question is, did Jim Wetwiska tell the Court that we could

16 be thrown out if we didn't make the settlement payment along

17 those lines?

18 Q    By July 3rd?

19 A    And I believe there was a conversation in April about

20 that.  And then the problem was -- is when the sale was

21 passed, as people were told to sell, would be posted again

22 and that that is -- that created issues.

23 Q    And in fact, the State Court specifically authorized

24 NBK to post the property for foreclosure in July of 2023; is

25 that right?

1   A     That was after they had told buyers that they -- that

2   they -- I feel like I can't get out and explain it right.

3   So I'm struggling with your question.

4   Q     Let me ask you a different one and maybe that would be

5   helpful.  In the April hearing, did the State Court

6   specifically authorize National Bank of Kuwait to post the

7   property for foreclosure in July?

8   A     I don't recall that exactly, but I believe it was --

9   that the State Court said that if we didn't make the

10  payment, that the bank would be allowed to move forward.

11  And then when we went back, and we had the buyers and we --

12  and they posted, and then they told the buyers they're going

13  to post in the future, and they passed that.  And the judge

14  says that they couldn't have done that.  And that's what

15  created the issues.

16  Q     Well, and in fact, the State Court Judge specifically

17  authorized the National Bank of Kuwait to post the property

18  on June 13th, 2023, in order to comply with the state notice

19  requirements in the Texas State Foreclosure Statute; is that

20  right?

21  A     I -- yes, I think that is correct.  But I do want to --

22  I won't clarify.  Sorry.

23  Q     Yes.  Those rules require 21 days --

24  A     Twenty-one days

25  Q     -- foreclosure.

1   A     First Tuesday of the month.  Yes, sir.

2   Q     And for July the 1st Tuesday of the month was the 4th,

3   correct?

4   A     Yes

5   Q     And so the sale was scheduled for the morning of the

6   5th.  I'm sorry, the morning of Wednesday, July 5th, as the

7   next day?

8   A     I recall what the judge said that they shouldn't tell

9   people they're going to post before they post after they

10  passed the May sale.

11  Q     The Court specifically authorized the National Bank of

12  Kuwait to post the property for foreclosure in June of this

13  year, correct?

14  A     No, I don't remember.  It's possible -- I think the one

15  -- the state --

16           MR. FITZMAURICE:  Your Honor, may I just confer

17  for one moment?

18           THE COURT:  Of course.

19      (Pause in the proceedings.)

20  BY MR. FITZMAURICE:

21  Q     So unfortunately, sir, I'm going to have to ask you to

22  look through the confusing NBK binder one more time.

23  A     Yes, sir.

24  Q     So let's -- I apologize for this, but let's do it

25  together to make sure that we get to the same spot.  If you

1   open up the binder, the first one is Tab 1, which is the

2   Carter Declaration.  There are then five exhibits to that.

3   And then after number five, you come to Exhibit No. 2, the

4   first page of which --

5   A    Is it the first two or the second two?

6   Q    So on the -- if you look at the -- if you go back to

7   that --

8              THE COURT:  I think the second two.

9              MR. FITZMAURICE:  The second to the little yellow

10  sticker says --

11             THE WITNESS:  2-2?

12             MR. FITZMAURICE:  -- Exhibit Number 2.  And then

13  I'm looking for Exhibit 2-4.

14             THE COURT:  So maybe the third.

15             THE WITNESS:  Okay.  This is a transcript.

16  BY MR. FITZMAURICE:

17  Q    This is a transcript of the proceedings in the State

18  Court on April 12th, 2023.  You look at the first page of

19  it.

20  A    Yes.

21             MR. FITZMAURICE:  Your Honor, this -- yeah.  I'm

22  -- exactly what I'm about to do.  Your Honor, the transcript

23  indicates on its face that it's sealed.  And I'm going to

24  ask the witness about the contents of some of the

25  information here, so we may have to hit the button.

1          THE COURT:  Okay.

2          (REDACTED SEALED portion from 4:42:31 p.m. to 4:44:15

3     p.m.)

4          THE COURT:  Okay.  Thank you.

5     BY MR. FITZMAURICE:

6     Q    And so, Your Honor, I would like to -- Mr. Choudhri,

7     please direct your attention to Page 45 of the -- and do you

8     see on Page 45 of the transcript, there's a reference to

9     Mr. Wetwiska?

10    A    Mr. Wetwiska, yes.

11    Q    Yes.  And here on Page 45, isn't Mr. Wetwiska telling

12    the Court that the Debtor needs 60 to 90 additional days --

13         THE COURT:  No, no, no,

14         MR. FITZMAURICE:  For impeachment purposes, Your

15    Honor?

16         MS. HAYWARD:  Objection.

17         MR. FITZMAURICE:  Your Honor, the witness

18    testified this did not happen.

19         THE COURT:  But you haven't offered -- you haven't

20    told me why you're doing this, right?  Now you just read

21    from a document where we were using the document to refresh

22    recollection.  Now you're doing it for impeachment.  But

23    we're -- you've got to kind of tell me what you're doing

24    because it doesn't flow naturally from the last question.

25         MR. FITZMAURICE:  I apologize, Your Honor.  And so

1   just to be clear.

2          THE COURT:  I think that's what I'm saying.  We're

3   standing up.  Probably beat you to the punch.

4          MS. HAYWARD:  Thank you, Your Honor.

5          THE COURT:  Go ahead.

6          MR. FITZMAURICE:  To be clear, Your Honor,

7   offering this portion of Exhibit 45 -- I'm sorry, this

8   portion of Page 45 of NBK Exhibit 2.4 for impeachment

9   purposes.

10          THE COURT:  But for what question?  Didn't it pass

11   already?

12          MR. FITZMAURICE:  I asked the witness whether or

13   not Mr. Wetwiska made certain statements to the Court.  He

14   said no.

15          MS. HAYWARD:  Objection misstates the witness's

16   testimony.

17          THE COURT:  I'm going to sustain the objection.

18   We can move on with that.  There's none of that's going to

19   move me one way or the other.

20          MR. FITZMAURICE:  Thank you, Your Honor.

21          THE COURT:  All right.  I just have a couple of

22   questions for you, Mr. Choudhri, and these are clarifying

23   questions.

24                        EXAMINATION

25          BY THE COURT:  Can you just restate what is your

1  connection with Caz Creek Holdings II LLC, if any?

2          THE WITNESS:  There are no connections other than,

3  Your Honor, in the past that when there were --

4          THE COURT:  Can you just speak into the mic?  I

5  want to make sure that we can hear you.

6          THE WITNESS:  Sorry.

7          THE COURT:  I apologize.

8          THE WITNESS:  There is no connection other than

9  Caz Creek is owned by the Hunt companies.  It's also known

10  as Tax-Ez.  They do tax loans, and so they made tax loans.

11          THE COURT:  Got it.

12          THE WITNESS:  And then I acquired -- so they

13  wouldn't because folks were trying to buy those tax loans

14  from tax loans from Caz Creek, and then I assigned them to

15  the Bank of Kuwait.

16          THE COURT:  So when -- so what's your -- what was

17  your involvement in the preparation of the plan that was on

18  file?  The Chapter 11 plan that got filed.  Did you have any

19  involvement in that?

20          THE WITNESS:  I did.

21          THE COURT:  Okay.  So the plan describes a secured

22  claim by Caz Creek for about $698,000 --

23          THE WITNESS:  Yes.

24          THE COURT:  -- right?  Is that a debt that will be

25  paid to Caz Creek or to another entity?  That's why I'm

 1  getting a little -- I know something got assigned that, and

 2  I was just trying to make sure that I was clear about kind

 3  of what was happening.

 4          THE WITNESS:  I know, it's kind of confusing.  So

 5  there are prior years of taxes and tax liens that are not on

 6  the Schedules because those were -- those were tax loans

 7  that I bought.  And then I assign those to the bank under

 8  the settlement agreement.  The settlement agreement has --

 9          THE COURT:  Hold on.  What you're talking about

10  the settlement agreement?

11          THE WITNESS:  Sorry.

12          THE COURT:  Go ahead.  Got it.  So that's not the

13  698 that --

14          THE WITNESS:  No, that's not --

15          THE COURT:  The 698, is there any connection?

16          THE WITNESS:  Zero.

17          THE COURT:  Okay.

18          THE WITNESS:  No connection.  That's a --

19          THE COURT:  That's a completely separate --

20          THE WITNESS:  That's --

21          THE COURT:  -- tax payment?

22          THE WITNESS:  That's a tax loan that was obtained.

23          THE COURT:  Okay.

24          THE WITNESS:  And, but there were prior years that

25  I bought, and then I assigned them over to the Bank of

 1  Kuwait.

 2            THE COURT:  Perfect.  Thank you.

 3            And then the entity 2425 WL LLC, any connection

 4  with that entity?

 5            THE WITNESS:  That's an entity I have an interest

 6  in.

 7            THE COURT:  Okay.  And what is your interest in

 8  that entity?

 9            THE WITNESS:  I hold a majority interest in that

10  entity.

11            THE COURT:  Okay.

12            THE WITNESS:  That entity on the closing

13  statement, when the -- when --

14            THE COURT:  No.  I just need -- I'm just trying to

15  make sure that I have everything in my --

16            THE WITNESS:  Yeah.

17            THE COURT:  Okay.

18            THE WITNESS:  2425 is, is the entity that will be

19  subordinate under -- that will be -- that's something

20  we're --

21            THE COURT:  So the --

22            THE WITNESS:  Sorry.

23            THE COURT:  No, no, no.

24            THE WITNESS:  I keep talking, sorry.

25        (Pause in the proceedings.)

1            THE COURT:  What, to your knowledge, was

2    Mr. Darjean's knowledge or involvement in the preparation of

3    the plan, if any?  I don't want to get into any

4    conversations with the Debtor, with your Counsel -- or I

5    should say I don't.

6            THE WITNESS:  Well, it was a collective team

7    effort with the Counsel, with Mr. Darjean, with Scarlett.

8    We have a CPA that we work with.  That's, you know --

9            THE COURT:  The in-house CPA?

10           THE WITNESS:  Yes.

11           THE COURT:  Okay.

12           THE WITNESS:  Yes, Your Honor.  And then we also

13   have -- We'll rely on Anderson.  I've used Anderson Tax, but

14   it was me, Mr. Darjean, Counsel in putting together the plan

15   and --

16           THE COURT:  And what is Mr. Darjean's role as the

17   manager of Galleria 2425?

18           THE WITNESS:  He signed leases, he manages day-to-

19   day.  He's been -- my dad hired him a long time ago.  He's

20   been a representative and a manager for various entities

21   where he's -- has very good customer service and has run

22   companies.

23           THE COURT:  My understanding is that he's an

24   employee of Jetall?

25           THE WITNESS:  Yes, sir.  Okay.  That is correct.

1          THE COURT:  Okay.

2          THE WITNESS:  He's had other roles, but that has

3   been his primary role.

4          THE COURT:  Okay.  Thank you.

5          Just want to make sure that there are a number of

6   entities and some of them have, you know, closing letters or

7   close.  And I just want to make sure that I'm following, and

8   I have a clear understanding of every entity.  And just to

9   be -- you don't have -- see this is the part I help you out.

10  You don't have to add anything.  I just -- That was me

11  saying that's why I'm asking these questions.  That wasn't a

12  question for you.  It's just more of a statement.

13         Thank you very much.  I have no questions.  No

14  further questions.

15         Counsel, do you have any additional questions?

16         MS. HAYWARD:  No, Your Honor.

17         THE COURT:  Okay.  Thank you.

18         Okay.  Thank you very much for your time, sir.

19     (Witness steps down.)

20         MS. HAYWARD:  With that, Your Honor, the Debtor,

21  rests.

22         THE COURT:  Okay.  Thank you very much.

23         All right.  Why don't you give me close?  I'll

24  give you a few minutes if you want to close, Counsel.

25         MR. FITZMAURICE:  Thank you, Your Honor.  Patrick

1  Fitzmaurice from Pillsbury.

2       THE COURT:  The line is completely unmuted.  I

3  just want to make sure that we were all clear about when we

4  talked about stuff.  If you want me to hit the button, I'll

5  hit the button at a certain point.  But maybe we can just do

6  it at a very specific time and kind of have it there.  Okay?

7       MR. FITZMAURICE:  I'll do that.  Your Honor, I

8  have notes in front of me, so I'll know when I'm getting to

9  an appropriate spot.

10                 CLOSING BY MR. FITZMAURICE

11       MR. FITZMAURICE:  Again, Patrick Fitzmaurice from

12  Pillsbury for National Bank of Kuwait.

13       The National Bank of Kuwait believes that the

14  Debtor's case should be -- the bankruptcy case should be

15  dismissed because it does not serve a valid reorganizational

16  purpose.  Instead, the case exists for the sole purpose of

17  allowing the Debtor to remain in possession of the property

18  to enrich the Debtor's principal at creditors' expense.

19       Your Honor heard evidence today concerning the

20  loan that was entered into between the parties.  The loan

21  was five years interest only, loan funded an interest

22  reserve account at closing.  In April of 2020, the Debtor

23  short-paid the interest that was due and didn't make another

24  payment, and has not made another payment on account of the

25  loan since that time.  The National Bank of Kuwait applied

1  the interest reserve until that was exhausted in March of

2  2020 -- 2021, as was its right.  The bank then began

3  enforcement proceedings.

4       State Court litigation ensued between the parties.

5  That litigation was resolved by virtue of the settlement

6  agreement that was entered into in August of 2022.

7       At this point, I'll pause, Your Honor.  I'm about

8  to talk about some of the terms of the agreement.

9       (REDACTED SEALED portion from 4:54:06 p.m. to 4:59:00

10 p.m.)

11      MR. FITZMAURICE:  But, Your Honor, the Debtor

12 filed an adversary proceeding just before the hearing today.

13 The adversary proceeding asserts claims that are released by

14 the settlement agreement.

15      THE COURT:  Well, why do you say that?  What

16 claim would be released?

17      MR. FITZMAURICE:  Your Honor, may I

18 (indiscernible) pick up?

19      THE COURT:  Sure.

20    (Pause in the proceedings.)

21      MR. FITZMAURICE:  Well, let me say it this way,

22 Your Honor, because I would -- looking at the causes section

23 of the complaint, they appear to relate to post-settlement

24 conduct.  The allegations throughout the complaint relate to

25 pre-settlement conduct, and there are no viable claims with

1   respect to those allegations.

2           THE COURT:  Do you believe that there could be

3   some stuff that's in there that could be subject to the

4   waiver?

5           MR. FITZMAURICE:  That's right, Your Honor.

6           THE COURT:  Okay.  Go ahead.  I just wanted to

7   make sure.  Thank you.

8           MR. FITZMAURICE:  I submit, Your Honor, that what

9   has happened here is that the Debtor got an incredibly

10  generous proposal from the bank that failed to live.  It

11  failed to comply with it.  It brought litigation in State

12  Court.  It lost that litigation, making exactly the same

13  arguments.

14          THE COURT:  Go ahead.

15          MR. FITZMAURICE:  Making exactly the same

16  arguments it seeks to make here and is effectively just

17  asking Your Honor for a do-over to bring the State Court

18  litigation that it lost here in the hopes that this Court

19  would give it a different result.  That's not a valid

20  reorganizational purpose.  It's not an appropriate use of

21  Chapter 11.  It's not an appropriate use of this Court.

22          Happy to answer any questions Your Honor has.

23          THE COURT:  No questions.  Thank you very much.

24          MS. HAYWARD:  Thank you, Your Honor.  Melissa

25  Hayward on behalf of the Debtor.

174

```
 1                  CLOSING BY MS. HAYWARD
 2          MS. HAYWARD:  I'm going to start by saying that
 3  the Debtor hasn't lost any State Court litigation.  There
 4  were TRO requests that courts adjudicated, but the ultimate
 5  merits of claims have never been determined by the State
 6  Court vis-à-vis the Debtor (indiscernible).  So the idea
 7  that the Debtor has lost litigation, some sort of res
 8  judicata that this has been determined by a Court is simply
 9  not accurate.
10          We're here today because this Debtor is struggling
11  and trying to protect its asset.  And I told the Court that
12  I believe very strongly in the Debtor's ability to
13  reorganize, and I believe very strongly in the provisions of
14  the Bankruptcy Code, including 506 and the treatment of
15  creditors.  I believe very strongly that a Debtor should
16  have a fighting chance as long as it's within the bounds of
17  the Bankruptcy Code.
18          So let's turn to -- and I'm going to focus
19  primarily on the motion to dismiss, because that's sort of
20  what carries the day here.  And so we have a motion to
21  dismiss in which NBK alleges that it was this case was filed
22  in bad faith.  And NBK looks to *Little Creek* and cites to
23  all the various factors.
24          And I would submit to the Court that *Little Creek*,
25  which was decided prior to Congress's creation of a single
```

1   asset real estate case, that the idea -- I know of very few

2   single asset real estate cases that are filed, that are not

3   filed on the eve of a foreclosure.  Typically, that is the

4   cause of a single asset case.

5              And so I don't dispute that this Debtor filed this

6   case to stop this foreclosure.  I don't dispute that this

7   Debtor has been involved in litigation with NBK for a very

8   long time.  But that doesn't mean that the litigation has no

9   merit.  That doesn't mean that the Debtor isn't entitled to

10  its day in court.  And I will say to the Court and I will

11  use broad terms, but I will say that clearly some of the

12  disputes between the Debtor and NBK had merit because

13  there's a settlement agreement.

14             Now was this case filed in bad faith or was this

15  case filed for a valid reorganization purpose?  Here, there

16  is a plan on file.  That plan provides value to the estate.

17  It allows the Court to determine the amount of NBK's secured

18  claim.  It allows new equity money to come in to prop up

19  this building and keep tenants happy, allow Mr. Darjean to

20  continue his great relationships with the tenants that he

21  has developed over decades.

22             There is a plan that provides full payment to

23  trade creditors who are with respect to the property.  There

24  is a plan that provides a substantial multi-million dollar

25  return to the unsecured creditors other than the property.

1           Your Honor has heard from Mr. Choudhri today that

2  he's willing to do what it takes because he loves this

3  building.  Right or wrong --

4           THE COURT:  He also doesn't want to get sued by

5  the estate, right?

6           MS. HAYWARD:  Your Honor, that's assuming that

7  there are claims and causes of action by the estate against

8  Mr. Choudhri.

9           THE COURT:  I totally agree.  But who's going to

10 look at them?

11          MS. HAYWARD:  Well, Your Honor, NBK is perfectly

12 capable of looking at them.

13          THE COURT:  So you're telling me the estate

14 shouldn't look at it?

15          MS. HAYWARD:  No, Your Honor.  I'm not saying that

16 the estate shouldn't look at.

17          THE COURT:  So who looks at it on behalf of the

18 estate?

19          MS. HAYWARD:  Well, Your Honor, I look at them on

20 behalf of the estate, for one --

21          THE COURT:  You can.

22          MS. HAYWARD:  -- but I certainly can't make

23 decisions.

24          THE COURT:  Who makes -- who analyzes Chapter 5

25 causes of action?

```
 1              MS. HAYWARD:  Well, Your Honor --
 2              THE COURT:  Who is going to authorize you to look
 3   at that and spend the money to go do it?  I'm not saying
 4   there's anything there.  I don't know.
 5              MS. HAYWARD:  Well, Your Honor, I guess --
 6              THE COURT:  Who analyzes that?  Where's the
 7   independence?
 8              MS. HAYWARD:  And I hear Your Honor on that.  And
 9   again, I think that the Debtor is more than -- Mr. Choudhri
10   will appoint somebody to do that, if that's what --
11              THE COURT:  If that secured creditor who's going
12   to appoint somebody to then analyze claims looking at them
13   and then pay for it, that's what you're asking, right?
14   You're saying Mr. Choudhri is going to pay for someone who
15   he selects to then analyze claims against him?
16              MS. HAYWARD:  Well, Your Honor, it can be --
17              THE COURT:  Or against any of his other entities.
18              MS. HAYWARD:  It can be a third-party selection.
19   I mean, that's --
20              THE COURT:  Who's paying for it?
21              MS. HAYWARD:  Mr. Choudhri stated he would.
22              THE COURT:  That's the problem, right?  Well, it's
23   tricky.  That's conflicts.
24              MS. HAYWARD:  Is it a conflict that because
25   Mr. Choudhri --
```

1          THE COURT:  Or is the best thing for me to do to

2    appoint a Chapter 11 Trustee?

3          MS. HAYWARD:  To look into perhaps an Examiner,

4    Your Honor?

5          THE COURT:  No, I didn't say examine.  I said a

6    Chapter 11 Trustee.  Who's running?  Where's the

7    independence that this estate has?  I'm not saying the

8    estate should sue Mr. Choudhri.  Mr. Choudhri hadn't told me

9    anything that warrants me jumping out there.

10          What I'm saying is there are -- your largest

11    unsecured creditor is also who has -- who has been paid over

12    $400,000 as an insider, listed on the Schedules, party to

13    one of the largest secured creditors, is also now willing to

14    fund a plan.  I don't -- I'm telling you, I'm just

15    conflicted as to where we are and what we're doing here.

16          MS. HAYWARD:  And I hear you.

17          THE COURT:  And I don't know if this is in the

18    best interest of the estate.  I don't know if I don't know

19    if the management should be managing.  Maybe they should,

20    but I don't know.  There's three years of tax debt on these

21    books.  Is that a good decision or not?  I don't -- what I'm

22    saying is I don't know what I don't know, but I don't have

23    anybody who can tell me they're going to go look at this

24    stuff and make determinations as to what is really in the

25    best interest of the estate.  I don't have it and I don't

1    know -- I don't know.  The lawsuit could have merit.  Could

2    have a lot of merit.

3            MS. HAYWARD:  Well, I'm --

4            THE COURT:  I just -- I'm concerned about the

5    conflicts here.

6            MS. HAYWARD:  And I hear Your Honor on that.

7            THE COURT:  An adversary proceeding in which two

8    out of the three parties, are all entities are owned by

9    Mr. Choudhri.  Who's representing the estate in that

10   lawsuit?   Is that the estate initiated the lawsuit?

11           Who made the decision on behalf of the estate to

12   file the adversary?  That's the problem that we've got.  I

13   don't know.  I don't know if the Debtor should be a part of

14   the adversary.  Maybe they should, maybe they shouldn't.  I

15   don't have an independent.  I do know that everywhere

16   Mr. Choudhri drafts the plan, Mr. Choudhri is involved in

17   the drafting of the plan.  The largest unsecured creditor,

18   an insider, is drafting the plan.

19           MS. HAYWARD:  Your Honor, insiders are always

20   involved in drafting the plans.

21           THE COURT:  No, no, no.  Not potential cause of

22   action.  No, not like this.  No, they don't.

23           MS. HAYWARD:  Your Honor, I mean, is the issue

24   that Mr. Choudhri is a creditor?

25           THE COURT:  There's a lot going on.

180

1          MS. HAYWARD:  I mean, because if Mr. Choudhri is
2   being a creditor is the problem, then -- but Mr. Choudhri is
3   also equity, right?  So equity typically will be controlling
4   a Debtor-in-Possession.  So I understand what the Court is
5   saying, but I also struggle with it.
6          THE COURT:  No, you don't.  Ms. Hayward, we don't
7   have an independent.  We don't have an independent here.  We
8   don't have any independents here.  That's what different
9   that's the difference between this case and every other
10  case.  That's the difference between this case and every
11  other case of this size and magnitude.
12         Smaller cases, I got it.  You know, you got a
13  small Debtor who's involved and they may owe him this kind
14  of money, but management, Debtor, finances, everything
15  involves.  I don't feel comfortable.  I don't feel
16  comfortable with the books.  I don't feel comfortable with
17  anything that I'm seeing.  This -- we got a problem here,
18  and I'm not comfortable.
19         MS. HAYWARD:  And I hear, Your Honor, and I don't
20  know how to remedy that.
21         THE COURT:  In other words, you know, did
22  Mr. Choudhri draft the plan?  I don't even want to put
23  Mr. Darjean on the stand.  I didn't want to.  He's a good
24  man.
25         Oh, did the Debtor -- is this plan is in the best

1   interest?  I don't know.  But maybe that's not the test for

2   today either, right?  It doesn't mean that you have to --

3   all that is for another day.

4          The question is:  Is there a plan capable?  Do we

5   get from A to B?  And the question is who's going to pay for

6   it?  And you're telling me that it's the largest unsecured

7   creditor who's going to make an equity infusion into it.

8   He's willing to do it.  I'm not comfortable with that.

9          MS. HAYWARD:  For current equity he's willing to

10   do it.  Again, I struggle with this concept that there's a

11   difference between because he's a creditor or because he's

12   equity.

13          THE COURT:  Is there a potential causes of action

14   against Mr. Choudhri?  He's involved in every one of these

15   pieces of litigation.  He signed documents.  He's also

16   suing.  This isn't it -- this is more.

17          MS. HAYWARD:  Your Honor, how is this any

18   different from any other business in which equity is

19   controlling the Debtor?

20          THE COURT:  How many times do you have a

21   confidential settlement agreement involving three parties?

22   Two out of the three are involved with this amount of money.

23   Causes of actions is flowing.  What this case does benefit

24   for sure is allow current equity to try to keep the company.

25   That's what this plan is designed to do.

182

1          MS. HAYWARD:  Yes, Your Honor.

2          THE COURT:  Is that in the best interest of the

3     estate?  I don't know.  We don't have an independent here.

4     This is different than Subchapter 5.  Single asset real

5     estate case and I got it.  But there are conflicts

6     everywhere, and I'm concerned about the conflicts.

7          I'm concerned about what I've heard about why

8     we're here and how we got here because that's what makes

9     this case different.  I got it.  You're telling me that a

10    single asset, real estate market went bad, COVID went bad.

11    The company went in.  The current owner is there.  He's an

12    equity holder.  I got it.  Is that what we have here?

13         MS. HAYWARD:  Well, what Your Honor heard is that

14    COVID happened, and the largest tenant filed for bankruptcy.

15    The building was vacant.  I mean, obviously, the financial

16    struggles of the Debtor are understandable in light of the

17    current financial situation of the world and the posture of

18    where things were.  I mean, so it shouldn't be surprising

19    that this Debtor has not cash flowed for a while.  And when

20    Stage Stores, which occupies the vast majority of the

21    building, files bankruptcy and rejects that lease, you have

22    a vacant building.

23         THE COURT:  That's not what this Debtor filed.

24    That's not why you all told me this Debtor filed.

25         MS. HAYWARD:  No, no, no.  That's not why this

1   Debtor filed today.  But that is when Your Honor says we

2   look back to 2020, 2021, 2022 tax debt.  We look back, we

3   see that there is a vacant -- there's property that's been

4   largely vacant for a long time, and the Debtor has

5   endeavored to lease that property up.  There are costs

6   associated with that.  The Debtor has carried those costs,

7   or at least the equity of the Debtor has carried those

8   costs.

9          THE COURT:  Was it right for Jetall to make

10  payments to itself and not pay any of its taxes?

11         MS. HAYWARD:  But, Your Honor, there's no --

12         THE COURT:   On behalf of the property management

13  company?

14         MS. HAYWARD:  But there's no testimony -- there's

15  no evidence here before this Court as to what those payments

16  were for.

17         THE COURT:  I didn't say they were

18  (indiscernible).

19         MS. HAYWARD:  Those payments could have been for,

20  you know, the HVAC guy.  Those payments -- so, again, we're

21  making assumptions.

22         THE COURT:  I'm not making any assumptions.  I'm

23  just asking why for three years there hasn't been any tax

24  payments.

25         MS. HAYWARD:  Because the property has been

1   operating at a loss.

2          THE COURT:  That's not what you're telling me

3   today.

4          MS. HAYWARD:  That is what I'm telling.  Your

5   Honor, I am absolutely saying the property has been

6   operating at a loss.  The property -- the plan requires

7   $2.5 million of new equity to come in order to get the

8   property to cash flow.  The property clearly operates at a

9   loss.  The tax loans was a way to finance and avoid having

10  to pay giant amounts because you can get tax loans right to

11  and pay interest on them.

12         THE COURT:  Sure.

13         MS. HAYWARD:  So it is a type of financing, a type

14  of capital financing.  So I don't -- it's not any -- this is

15  something that's pretty common, I think, in the single asset

16  real estate world, especially in a COVID world where you

17  have an office building that's struggling with its vacancy

18  rates.

19         THE COURT:  Yeah.

20         MS. HAYWARD:  And so, Your Honor, I submit to the

21  Court that I hear Your Honor's issues.  I do.  I hear Your

22  Honor's concerns.  But we're here today on a motion to

23  dismiss whether this case was filed in bad faith and whether

24  or not there's a prospect of reorganization.  I would submit

25  to the Court that the answer to both of those questions is

1  no.

2          The case was not filed in bad faith.  The case was

3  filed to maintain the property, allow current equity a

4  fighting chance to save the property from foreclosure, and

5  it was filed and there is a viable plan on file.  Now,

6  whether that viable plan on file ultimately gets confirmed

7  is a fight for another day.  But --

8          THE COURT:  You have the cash, Ms. Hayward.  What

9  if I deny the motion, but don't let you use any cash?   What

10  are you going to do?

11         MS. HAYWARD:  Mr. Choudhri is going to have to

12  decide whether he's going to fund money into the Debtor.

13         THE COURT:  I'm not letting Mr. Choudhri put any

14  money into this estate until I have independence.  It's not

15  going to happen.  Either we have independence or we don't.

16  That's the problem that you've got.  And I keep saying it,

17  and I'm not saying you've done anything.  You've been you've

18  been as admirable as they come, but no one is going to put a

19  dollar into this estate until there's independence, until I

20  know why it is.  If Mr. Choudhri puts money in, he's going

21  to say he's going to be certainly entitled to certain rights

22  in connection with putting up the money.

23         MS. HAYWARD:  What if Mr. Choudhri decides that he

24  believes this much in this property, and he cares this much

25  about this property that he is willing to put in capital.

1  That is not an admin claim, that is not a claim against the

2  estate.  It is simply equity.

3           THE COURT:  The real question is whether, not

4  really dismissal, but whether to appoint a Chapter 11

5  Trustee.  That gets Mr. Ruff involved.  And then he goes and

6  finds somebody, but then they start running the business.

7  And that's the problem.  I'm not sure that makes sense.  I'm

8  not sure it's in the best interests of the estate.  That

9  gives me independence.

10          MS. HAYWARD:  Well, if Your Honor appoints a

11 Chapter 11 Trustee, then there is no money, right?

12          THE COURT:  I don't know who's going to pay for

13 it.

14          MS. HAYWARD:  That's right.  Then there is no

15 money.

16          THE COURT:  Then we're back to dismissal or

17 conversion.  I don't think conversion gives me independence.

18 I'm not sure that makes much sense either.  That's where we

19 are.  We got a problem here.

20          I see your point, but it feels different.  It is

21 different.  And a single asset owner putting in -- coming

22 in, putting a company into bankruptcy to save a foreclosure

23 and wants a chance to try to pay off.  Is that -- this is

24 different because the owner is also the manager.  He also is

25 also one of the largest secured creditors.  He also -- the

1    owner is also party to a settlement agreement.  That's not

2    typical.

3              MS. HAYWARD:  Your Honor, I respectfully think

4    when you're dealing with companies like Jetall and real

5    estate people, right, Gene Phillips in Dallas with

6    Transcontinental, I mean, this is real estate investors.

7    This is sort of a model, right?  I mean, this is not

8    uncommon for a real estate investor who has a portfolio of

9    real estate assets to have an insider management company.

10             THE COURT:  Completely agree.

11             MS. HAYWARD:  It's not uncommon for them to have

12   funded money and be owed money.

13             THE COURT:  Completely agree.

14             MS. HAYWARD:  It's not uncommon for them to fight

15   for their equity.  So I really.  I hear you, Your Honor.

16   But I respectfully disagree that this is different from any

17   other typical conglomerate type real -- single real estate

18   -- asset real estate case where ultimately equity is the one

19   making decisions.  Equity is the one proposing and deciding

20   what the plan looks like.  Whether they're owed money by the

21   Debtor or not, debt gets subordinated to insiders all the

22   time.  So the fact that Mr. Choudhri is a creditor --

23             THE COURT:  Okay.  But someone's going to have to

24   investigate claims here.  No getting around it.  I don't

25   know what's going to do it.  I'm not comfortable.  I'm not

188

1    saying there's anything there, but someone has to look,

2    someone has to look under in every case.  And I got it.

3    Sometimes there's no need to investigate in real estate

4    conglomerate cases.  You don't have the hair that this case

5    has.  There are potential claims and causes of action.

6    There's no one to look at them.  And that gives me some

7    concern.  I don't know what I don't know, and I'm concerned.

8         MS. HAYWARD:  Well, the Debtor, I think, has the

9    obligation to analyze causes of action, clearly.  And Your

10   Honor knows from private practice that much of the work of a

11   plan, for example, is also done through counsel.  Much of

12   that investigation is done with counsel, and there has to be

13   disclosures and a Disclosure Statement regarding.

14        Now we're talking about transfers to a management

15   company that are listed and disclosed in a SOFA.  That is

16   not something uncommon when you have an insider management

17   company.  And I understand Your Honor, I hear Your Honor,

18   but also when there is a plan in place that provides

19   substantial value to creditors.  Many times Debtors,

20   especially closely held Debtors that are -- have common

21   management and insider management, do not pursue those.  And

22   they put enough money in.

23        This plan has 2.5 million coming in and proposes

24   millions of dollars of payments over a ten-year term to

25   creditors.  And there can be no question that this Debtor

1  has not cash flowed for a very long time.

2          THE COURT:  Yes.

3          MS. HAYWARD:   I mean, that is the evidence before

4  the Court.  The evidence before the Court is that Stage

5  Stores filed bankruptcy at the beginning of COVID, and it

6  destroyed the vacancy at the property and that it has been

7  slowly been built up.

8          THE COURT:  It's a different story.  There's a

9  different story here and you know it if you're really good.

10         MS. HAYWARD:  Your Honor, the different story,

11 there's no evidence to the different story.  There's no

12 evidence.  This is conjecture to a different story.

13         THE COURT:  (Indiscernible).

14         MS. HAYWARD:  There's nothing before this Court

15 right now other than $400,000 paid to a management company,

16 a property management company for a Debtor that has been

17 managing this property.

18         THE COURT:  Do you really want me to go there?

19 Do you really want me to go there?

20         Is that really all there is?

21         MS. HAYWARD:  Your Honor only knows what Your

22 Honor knows, right?

23         THE COURT:  Sure.

24         MS. HAYWARD:  That's presented in the Court.

25         THE COURT:  Oh, no, I'm not talking about it.  I'm

1   just throwing my stuff on the Record.

2           MS. HAYWARD:  No, no, no, no.  And that's what I'm

3   saying.  But Your Honor, on the Record, only gets what

4   parties present to you on the Record.

5           THE COURT:  That's all I got.  It's all I'm

6   talking about.

7           MS. HAYWARD:  And there are always more details

8   that don't come in.  There are always more stories to be

9   told.  Your Honor gets a snapshot today in a few hours of a

10  dispute that has been going on for a very long time.  And so

11  I just -- I would ask Your Honor to keep that in mind when

12  Your Honor makes a decision here today.

13          That what Your Honor has before you are leases,

14  Your Honor has a property that appears to be improving.

15  Your Honor has a property.  Your Honor can clearly see.  I

16  mean, even just if Your Honor takes Mr. Dward's testimony

17  here today -- Mr. Darjean's testimony.  This property has

18  been -- there are people that care about this property.

19  There are people who have been trying to keep this property.

20          This is -- when Your Honor looks to the evidence,

21  Your Honor sees that there is a dispute between the Debtor

22  and its secured creditor that, yes, this property is managed

23  by insiders.  Yes, there's a lot of debt with respect to

24  this property, but that's no different than what's going on

25  with every single office building across this country.

1          THE COURT:  That's where we disagree.  I only know

2  what I only know, right?

3          MS. HAYWARD:  Yes, Your Honor.

4          THE COURT:  And you can't make that statement,

5  either.  It's going to stick to the Record.  I mean, where

6  you can have the cash to get to the next 60 days and find

7  somebody who's independent.  Where's that money coming from?

8  And it's not coming from Mr. Choudhri.  Tell me where the

9  money is going to come from.

10          MS. HAYWARD:  Money to fund the property and money

11  to fund an independent person to review, I mean, Your Honor,

12  the only money available is from equity.  I mean, that's --

13          THE COURT:  And why not?

14          MS. HAYWARD:  So if equity is not able to pay

15  for --

16          THE COURT:  Likely

17          MS. HAYWARD:  An independent person, then there it

18  -- Your Honor has posed a question that has no answer or at

19  least no acceptable answer that I can give.

20          THE COURT:  I don't know who's looking out for

21  Galleria 2425.  I know who's looking out for equity.  But I

22  don't know who's looking out for Galleria 2425.  That's the

23  problem I've got.  I don't know who's looking out for

24  Galleria 2425.  Every transaction that's being described in

25  this plan benefits not just the insider at 2425, but other

1  entities related to Galleria 2425 that are owned by

2  Mr. Choudhri, right?  It's different.  Right?

3          MS. HAYWARD:  Why?  I'm not sure I understand Your

4  Honor's -- Mr. Choudhri stated that he would subordinate or

5  waive all of that.

6          THE COURT:  He didn't say that.  He would -- yes,

7  he would.  Owed him $1 million.  I would subordinate a

8  million dollar claim if I got to keep a company, too.  It's

9  -- in other words, maybe the $2 million ought to be coming

10 from other places, and maybe they shouldn't.  But Debtors

11 have to be Debtors.  I don't have independence here.  I'm

12 troubled.  I'm just telling you, I'm troubled.

13         MS. HAYWARD:  And Your Honor, I hear Your Honor on

14 that.  And I guess the only thing I can say is that in every

15 small business case or closely held --

16         THE COURT:  And I deal with a bunch of them.

17         MS. HAYWARD:  -- there's never that independence.

18 It's always the Debtor being controlled by equity.  It is

19 always equity making decisions.  And so I just -- I struggle

20 to see how this is any different.

21         THE COURT:  Okay.  Thank you.

22         Does anyone else wish to address the Court?

23         MR. FITZMAURICE:  Nothing further from National

24 Bank of Kuwait, Your Honor.

25         THE COURT:  Okay.  Maybe about 10 minutes.  I'll

1    come back at 5:45, and I'll give you a decision.  Thank you.

2              THE COURT OFFICER:  All rise.

3         (Court in recess from 5:26:55 p.m. to 5:57:01 p.m.)

4              THE COURT OFFICER:  All rise.

5              THE COURT:  Please be seated.

6                        COURT'S RULING

7              THE COURT:  All righty.  Appreciate everyone's

8    arguments.  I appreciate the patience of everyone here.  I'm

9    going to take -- answer.  I'll talk about both motions at

10   the same time.  The motion to dismiss the case filed at --

11   in connection filed by the Bank of Kuwait in connection with

12   this case, I'm going to find there's been proper notice and

13   consideration of the -- of the motion before the Court, as

14   well as the final cash collateral -- final use of cash

15   collateral.  We're talking about case Number 23-60036.  The

16   original motion was filed on July 20th.

17             There's been more than proper notice.  Numerous

18   stipulations between the parties.  I'm going to find that

19   this is a core proceeding under 28 USC 157.  Court has

20   jurisdiction under 28 USC 1334.

21             The Court has considered the evidence presented

22   before the Court, and I'm going to talk a little bit about

23   the motion to dismiss and then dovetail into the cash

24   collateral motion.  I'm going to cite a little law and then

25   we'll kind of get into the evidence.  The Movant here

1  basically seeks dismissal of the bankruptcy cases under

2  Section 1112(b) of the Bankruptcy Court -- Bankruptcy Code.

3          The Court has authority to -- says that the Code

4  says the Court shall dismiss the case under cause unless the

5  Court determines that the appointment of a Trustee under

6  Section 11404 or an Examiner is in the best interest of the

7  estate.  1112(b)(4) contains what's considered a non-

8  exclusive list of what constitutes cause for purposes of

9  dismissal.

10         But the Fifth Circuit in the *Little Creek*

11 decision, Fifth Circuit, 1986 case 7791068, and also note

12 that the *Humble Place Joint Venture*, 936 F.2d 814, Fifth

13 Circuit 1991 case, basically says the term cause gives the

14 Court flexibility to Bankruptcy Courts and can include a

15 finding that a filing has been in bad faith.  So that's kind

16 of where we are.

17         The textual definition just provides cause in and

18 of itself.  It provides the Court flexibility after a Movant

19 has satisfied initial burden of a prima facie showing of a

20 lack of good faith and the burden would shift to the Debtor

21 to demonstrate good faith.

22         There's also been a lot of talk -- also inside and

23 outside of this District in connection with using the term

24 valid reorganization purpose, or if there is a good faith,

25 there's a valid bankruptcy purpose.  That's the term some

1    courts have used.  There's been a lot of that discussion in

2    connection with *Arrow* and *LTL* in terms of kind of the

3    standard.  If I do find that there's cause, the Code

4    determines that I got to dismiss the case unless the

5    appointment of an Examiner is in the best interest of the

6    estate.

7           So we didn't turn to the evidence that was

8    presented to the Court.  The Court has considered in

9    connection with the motion to dismiss the event presented by

10   Mr. Carter.  Mr. Carter testified as to a lack of payment

11   that has been made in connection with this, and there's a

12   settlement agreement that is public that's in connection

13   with an adversary of the terms of it are under seal.  I'm

14   just saying that this area is public knowledge that there

15   was a settlement between Mr. Choudhri, the mezzanine lender,

16   and the Debtor here and the bank.

17          And then there was a default.  And there have been

18   -- there's been testimony and I haven't seen any evidence of

19   it.  But there was testimony about TROs that were entered in

20   connection and that the bankruptcy case was precipitated

21   upon July 3rd deadline to make a payment.  If not, there

22   would be a foreclosure on July 5th.  And that's kind of

23   where we are.

24          Mr. Carter testified primarily about the debt and

25   his understanding about the debt and their desire about what

1    he would do if -- which would be seek to foreclose.

2           That was the evidence that was presented here in

3    connection with this.  I thought Mr. Carter was incredibly

4    credible and there certainly is an outstanding debt.  It's

5    also reflected in the Debtor's Statement of Financial

6    Affairs that there is a debt owed to the bank and that there

7    is a tax lien that as well and other secured debt.  The

8    Court itself inquired about Chapter 5 causes of action,

9    expressed concerns about independence in a -- in this case

10   and whether there is someone truly looking out for the

11   estate.

12          Testimony that the Court heard on behalf of

13   Galleria 2425 noted that there is a plan on file and the

14   plan does propose to treat all classes of claims in

15   connection with the case and as well as make an equity

16   infusion by a third party who is an affiliate of -- I think

17   for me, there may be -- the Record is unclear to me whether

18   it's an affiliate of Mr. Choudhri and Mr. Jetall or Jetall.

19          But I think -- I'm not sure it might be a

20   distinction without a difference.  I just know for the

21   Record that I'm just very well the Court is hazy on it, but

22   it's an affiliate of one -- of either Mr. Choudhri or

23   Jetall.  So there's also issues, matters represented with

24   respect to the use of cash collateral.  There's a budget.

25   The Court expressed concerns about the budget.  And that's

1    kind of the scope of the evidence.

2          So I don't -- but I don't think there's any

3    dispute that there were State Court litigation and that

4    there was a settlement agreement to pay a sum and that sum

5    was not paid.  And then the Debtor filed for bankruptcy and

6    the bank was entitled to seek foreclosure.

7          And there's a plan on file that has been signed.

8    There's also litigation and adversary proceeding that has

9    been commenced.  The question is, you know, is there a

10   bankruptcy purpose, right?  Let me just use that to the

11   extent that constitutes cause as a factor.

12         I note a couple of things.  I pushed Ms. Hayward

13   on transparency in connection with this case.  I don't have

14   any evidence of fraud.  I don't have any evidence of -- I

15   don't have anything that just jumps out and says, boy,

16   things have gotten bad.  And I got someone who didn't pay --

17   a couple of folks who didn't pay and they don't deny it.  I

18   don't have fraud or strong allegations of fraud.

19         Well, what I would call bigger fraud or little

20   fraud.  And there's no -- there -- I don't have evidence as

21   well of gross mismanagement by the management company.

22   There certainly is something to be looked at if Jetall is

23   not paying rent.  Maybe they're supposed to, maybe they're

24   not.

25         I think Mr. Darjean, he hasn't done anything

1    wrong.  I haven't heard anything that he's been doing

2    anything.  There are payments to insiders.  I don't have any

3    evidence that any of that constitutes bad faith or sometimes

4    those -- as there's testimony, at least on the Record, that

5    those payments could be the result of pass-through.  I don't

6    know if it's true or not, but they don't have anything that

7    just because there were a number of payments and I do know

8    that there are -- they're in -- the sequence of them seems

9    to signify that there are certain pace that in and of

10   itself.

11          Probably something Mr. Ruff will ask for at the

12   341 hearing and stuff.  And I'm not sure I don't have

13   evidence that there's been just flat out fraud here or

14   mismanagement.  So you know, when I look at bankruptcy

15   purpose that the Debtor is proposing is saying -- they're

16   saying they want to put a plan together.  And then they want

17   to -- they put one.  They want to kind of go relatively

18   quickly and try to get a hearing and see if they want to go.

19          If there's is a bankruptcy purpose, I think

20   foreclosure -- failure to file on the eve of foreclosure in

21   and of itself, can certainly be looked at.  It feels like in

22   some instances this is a two-party dispute, but in some

23   instances, it's not.  There's a tax lien out there and it

24   has significant funds.  I am concerned about the lack of

25   payment for it and why it wasn't paid.  And I haven't heard

1  an answer.

2       I didn't get any testimony elicited that it was

3  mismanagement on behalf of -- or that there was some

4  litigation tactic or something.  I'm just making something

5  up.  I didn't hear anything.  I just know it wasn't paid.

6  But that's all I've got.

7       So I don't have enough evidence to dismiss this

8  case at this time.  I'm going to say a couple of things.  I

9  think there's a -- when you look at the *Little Creek*

10  factors, to the extent that I don't think there's cause and

11  I just want to be really careful with -- there's certainly

12  history here.  But I don't think that there's sufficient

13  cause.  And I got a lot of flexibility here.

14      Maybe there's something there, but maybe there's

15  not.  That's what I've got to kind of -- I'm going to go

16  there.  There are certainly factors, but I think factors in

17  every case are different.  I think we just have to kind of

18  look at that and say what it is.

19      I think Mr. Carter testified credibly that there

20  is a debt.  There's a debt owed and that the debt has not

21  been paid and that there was a settlement agreement and that

22  there was a default under the settlement agreement and the

23  Debtor filed for bankruptcy.  All right, that's what I've

24  got.

25      I do have that Jetall is everywhere.  And

1  Mr. Choudhri is everywhere on these documents in some sense

2  or another.  I don't have enough today to get me

3  comfortable, but when it comes to -- so I'm going to deny

4  the motion to dismiss without prejudice.

5          If I find out that I get uncomfortable and say

6  what you already know, that I'm already on edge.  I won't

7  hesitate to convert the case or do something on my own and I

8  have the authority to do it.

9          We're just not there.  We had enough today.  There

10  is a plan on file, but no one challenged the plan.  No one

11  challenged the filing.  It's in the pleadings, but it's not

12  in evidence in terms of the ability to make the payments and

13  the feasibility.  None of that got challenged.

14          Oh, I know I've got to rule based upon the

15  evidence that's in front of me.  I do need you all to think

16  about a couple of things.  I think cash collateral continues

17  to give me a great amount of concern.  I think the use of

18  cash collateral should be restricted only to the necessary

19  cost to maintain the estate.  It's not going to be a carve

20  out and I won't approve a carve out.  And that gives me a

21  lot of concern.

22          Let's say what -- I don't know how anybody's going

23  to -- I don't even want to talk about litigation in the

24  adversary proceeding until someone tells me how it's going

25  to get paid.

201

1            We talk a lot about Mr. Choudhri putting in more

2   money and whether he's comfortable doing that.  I thought

3   about that, a lot.  And here's what I'm willing to do.

4   Mr. Choudhri can put in the money, if he wants to.  But I

5   think you all got to get comfortable with one thing for me,

6   and I'm not going to move off of this because I think it's

7   the right answer under the Code.  The Debtor is proposing a

8   plan in which there's equity, in an equity infusion of

9   $2.5 million.  That's got to get market tested by an

10  independent person.

11           I don't know if somebody wants to come in and put

12  a lot of money.  And if they do, someone's going to have to

13  tell me.  You may say.  But that's what I think that's the

14  interesting part.  I think that's going to come on your end.

15  Someone is going to have to market-test this.  You know, no

16  one's just going to get a free ride to come get to run this

17  plan up because I don't know if this time.

18           Maybe somebody wants to put $10 million.  Maybe

19  somebody wants to buy this building.  Maybe they think

20  Jetall should run the building.  Maybe they think they

21  shouldn't.  I don't know.  I'm just saying that if equity is

22  going to get wiped out and somebody is going to come in and

23  get put $2.5 million, I know somebody's going to have to

24  really market test that for me and tell me that that's

25  really that can be done.

202

1          And then somebody's going to have to prove to me,

2    and if there's an 1111(b) election that may or may not come,

3    that those payments can get made under the plan and that

4    this case really can -- this plan really can be feasible.

5    But the market testing by an independent, I'm not

6    compromising on that because I think that's what the Code

7    would demand.

8          If equity is not receiving anything and if

9    creditors aren't getting paid 100 percent in full.  That's

10   the price of it.  Creditors aren't going to get paid in full

11   and somebody's going to put in money.

12         We got to get the most.  And if somebody wants to

13   buy this building and I don't know if anybody does,

14   everything may be negotiated, but somebody's going to have

15   to convince me that this is market tested.  And if

16   somebody's going to have to convince me that there's enough

17   money to fund even potential litigation and just see what

18   that feels like, a State Court litigation to me when I got

19   there.

20         So this case continues, but the case continues

21   under really tight timelines and under really strict costs.

22   And I don't like the position that I put you in.  I just

23   don't.  I don't like the position I put others in.

24         I do know as we get closer to the 90 days, they

25   didn't raise it, but someone's going to have to start

1    talking about interest payments and where this goes on the

2    debt.  If this case -- I know there's a plan on file and I

3    know what the Code says.  I got to make sure if we get there

4    in the next two months that there's really, really a good

5    market test, and a true independent looked at this.

6           You know, somebody wants to go buy this.  I don't

7    know if they do or not, but there's an estate here.  And

8    that's going to be the challenge.  I think that's where I

9    think the true independence would come from here and not

10   whether this Chapter 5 cause of action.  I think people can

11   look into that, Mr. Ruff give us 341.  He's got his set of

12   questions and I don't get involved in 341 US Trustee stuff.

13          But I think we all need to meet in the next 30

14   days and kind of see where we are.  And I'll let my case

15   manager get a date for you all.

16          So I got -- things have broken down the

17   communication for obvious reasons.  And I think some people

18   are really going to do what I -- what I'm talking about

19   doing, what I'm talking about, what I think the Code

20   requires.  I think it's going to require communication, at

21   least between the lawyers.  That's at least for the next

22   30 days.  Everyone's in it.

23          You-all can sit around and fight whether there's

24   going to be a valuation fight or not.  But I do have

25   unsecured creditors that aren't going to get paid in full.

1  And that's the challenge of the plan.  They weren't -- I'm

2  just telling you now.  That's inside and outside of 1111B.

3  It's going to have to get a good test and you're going to

4  have to figure out how to do that and get me comfortable

5  that it's truly, truly, truly independent and it says

6  someone is going to let people know that there's a building

7  that people can put a lot of money into and figure out what

8  they want to do.

9       Maybe nobody shows up.  But if somebody does, then

10  I think it's going to create a market and maybe the market

11  is there, maybe it's not.  That's why I just need to -- I

12  don't know what I don't know.  But I do know based on the

13  evidence today, it's not enough cause to dismiss this case.

14  But I do know we're going have to really look at those

15  payments and that's probably going to require a level of

16  transparency.

17       And maybe we can all meet in about 30 days and see

18  what this case really goes in the same way.  It's just a --

19  It's an extension.  I don't really know what I'm going to do

20  yet, but I do know what I'm not doing today.  And that's

21  dismissing the case on the use of cash collateral.

22       I think I'm looking at your budget.

23     (Pause in the proceedings.)

24       THE COURT:  This budget works.  But if you start

25  firing up the adversary, it doesn't.  And that's the problem

1  you got.

2         MS. HAYWARD:  I'm sorry.  Your Honor, I didn't

3  hear that.

4         THE COURT:  If you start firing up stuff on the

5  adversary and start really pushing, and we start getting

6  into scheduling and fights about the adversary proceeding.

7  And then the budget, in my opinion, doesn't work.  And

8  that's so -- that's why I'm saying we need to take a look in

9  the next 30 days and I -- that's going to require you to do

10  real work.  That's going to require other people to do real

11  work.

12         And that's why I'm saying you-all need to -- I'm

13  not asking you to agree.  What I am asking is over the next

14  30 days how this can be done independently reviewed.  To

15  determine whether it's an independent assessment that needs

16  to get done.  And I'm not talking about just Chapter 5.  I'm

17  talking about just the plan that you have on file, if you

18  really want to go, and you want to go at a fast pace.

19  That's the thing that you're going to have to really look

20  into.

21         And you will also going to have to convince me

22  that anything you're giving up, that you look at it, and it

23  makes sense, to give up.

24         So that's my ruling.  You-all have a good day.

25         MS. HAYWARD:  Thank you, Your Honor.

1          THE COURT CLERK:  All rise.

2       (Proceeding adjourned at 6:18:32 p.m.)

3                    *  *  *  *  *

4          *I certify that the foregoing is a correct*

5    *transcript to the best of my ability produced from the*

6    *electronic sound recording of the proceedings in the above-*

7    *entitled matter.*

8    */S/ MARY D. HENRY*

9    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

10   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

11   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

12   *JTT TRANSCRIPT #67707 REDACTED*

13   *DATE:  OCTOBER 20, 2023*

14

15

16

17

18

19

20

21

22

23

24

25

# **EXHIBIT 8**

001376

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 23-60036-11 |
| | § | HOUSTON, TEXAS |
| GALLERIA 2425 OWNER, LLC, | § | WEDNESDAY, |
| | § | NOVEMBER 1, 2023 |
| DEBTOR. | § | 10:04 A.M. TO 11:40 A.M. |

**STATUS CONFERENCE**

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

**APPEARANCES:**

| | |
|---|---|
| FOR DEBTOR, GALLERIA 2425 OWNER, LLC: | HAYWARD, PLLC<br>Melissa S. Hayward, Esq.<br>10501 N. Central Expressway<br>Suite 106<br>Dallas, TX 75231<br>972-755-7100 |
| FOR NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH: | PILLSBURY WINTHROP SHAW PITTMAN<br>Charles C. Conrad, Esq.<br>909 Fannin Street,<br>Suite 2000<br>Houston, TX 77010<br>713-276-7626 |
| | PILLSBURY WINTHROP SHAW PITTMAN<br>Patrick Fitzmaurice, Esq.<br>Kwame Akuffo, Esq.<br>31 West 52nd Street<br>New York NY 10016<br>212-858-1171 |
| FOR THE US TRUSTEE: | OFFICE OF THE US TRUSTEE<br>Jayson B. Ruff, Esq.<br>515 Rusk Avenue, Suite 3516<br>Houston, TX 77002<br>713-718-4650 |
| FOR ARI CHOUDHRI: | AKIN GUMP STRAUSS HAUER & FELD<br>Jim Wetwiska, Esq.<br>1111 Louisiana Street<br>44th Floor<br>Houston, TX 77002<br>713-220-5899 |
| FOR NAISSANCE GALLERIA, LLC: | ATTORNEY AT LAW<br>David Tang, Esq.<br>9801 Westheimer Road<br>Houston, TX 77042<br>832-287-3227 |
| | THE POPE LAW FIRM<br>James Q. Pope, Esq.<br>6161 Savoy Drive, Suite 1125<br>Houston, TX 77036<br>713-449-4481 |
| ALSO PRESENT: | Sarah Cox |

1          **HOUSTON, TEXAS; WEDNESDAY, NOVEMBER 1, 2023; 10:04 A.M.**

2          THE COURT:  All right.  Good morning, everyone.

3    This is Judge Lopez.  I'm going to call the 10:00 a.m. case.

4    Today is November 1, you know, 23-60036, Galleria 2425 Owner,

5    LLC, here on a status conference, an application to employ,

6    and I'm sure other stuff.  Why don't we just take appearances

7    in the courtroom, and then we'll continue?

8          MS. HAYWARD:  Good morning, Your Honor.  Melissa

9    Hayward here for the Debtor.

10         THE COURT:  Okay.  Good morning, Mr. Hayward.  Good

11   to see you.

12         Mr. Ruff, good morning.

13         MR. RUFF:  Good morning, Your Honor.  Jayson Ruff on

14   behalf of the United States Trustee.

15         THE COURT:  Good morning.

16         MR. CONRAD:  Good morning, Your Honor.  Charles

17   Conrad on behalf of National Bank of Kuwait, along with

18   (indiscernible).

19         THE COURT:  Good morning to both of you.

20         MR. WETWISKA:  Good morning, Your Honor.  I'm Jim

21   Wetwiska, Akin Gump.  I am here for Mr. Choudhri, and I don't

22   know if I'll need to speak, not speak today.  But as I've

23   witnessed in this proceeding and other proceedings that some

24   of these lawyers are involved in, you don't know how things

25   are going to unfold.  So I'm just here today --

4

1              THE COURT:  In his personal capacity?

2              MR. WETWISKA:  In his personal capacity.  And I've

3       represented him in his personal capacity in the underlying --

4       well, not in his personal capacity, but I was involved in the

5       underlying lawsuit.

6              THE COURT:  The State Court litigation?

7              MR. WETWISKA:  Yes.

8              THE COURT:  Okay.

9              MR. WETWISKA:  So in the State Court litigation

10      between Galleria 2425 and the Bank of Kuwait.

11             THE COURT:  Oh, that underlying lawsuit.

12             MR. WETWISKA:  That underlying case.

13             THE COURT:  Got it.

14             MR. WETWISKA:  So I'm --

15             THE COURT:  There's another one out there with

16      Naissance and I just wanted to be sure --

17             MR. WETWISKA:  Exactly.

18             THE COURT:   -- just wanted to make sure I was

19      clear.

20             MR. WETWISKA:  I'm not involved in the Naissance and

21      I'm not a counsel for Naissance, and frankly I see that there

22      is competing people claiming they are counsel for Naissance,

23      which is a motion that was filed yesterday too.

24             THE COURT:  Yeah.

25             MR. WETWISKA:  So I may be able to get some

1    clarification of that also.

2              THE COURT:  Okay.  Perfect.  Thank you very much.

3              MR. WETWISKA:  Thank you, Your Honor.

4              THE COURT:  Anyone else on the line with to make an

5    appearance?

6              MR. TANG:  Your Honor, this is David Tang for

7    Naissance Galleria.  I'm just observing today, but I saw

8    Mr. Wetwiska make an appearance.  So I'm just observing, but

9    if the Court has any questions regarding the Naissance part of

10   it today, I'm here to answer it if you need me, Your Honor.

11             THE COURT:  Thank you very much.  I do have a couple

12   of questions.

13             MR. TANG:  Yes, Your Honor.

14             THE COURT:  You know, we're just here on a status

15   conference on some of this stuff and so I need to kind of

16   understand.

17             Anyone else wish to make an appearance?

18             MS. COX:  Sarah Cox, Your Honor, appearing on behalf

19   of (indiscernible).

20             THE COURT:  Okay.  Good morning.

21             Anyone else?

22             MR. FITZMAURICE:  Good morning, Your Honor.  Patrick

23   Fitzmaurice also on the line from Pillsbury for National Bank

24   of Kuwait.  And also on the line with me is my colleague,

25   Kwame Akuffo also from Pillsbury for National Bank of Kuwait.

1           THE COURT:  All right.  Good morning.

2           Okay.  Why don't we -- yes, that's the smart thing,

3   why don't I turn things over to you, Ms. Hayward.  Good

4   morning.

5           MS. HAYWARD:  Your Honor, I love to be in control.

6       (Laughter.)

7           MS. HAYWARD:  Well, Your Honor, I guess we're here

8   on both the status conference and obviously my contested

9   employment application.

10          THE COURT:  Uh-huh.

11          MS. HAYWARD:  So I'm not sure how Your Honor wishes

12  to take up those issues.

13          THE COURT:  Why don't we talk status conference

14  first.

15          MS. HAYWARD:  Sure.

16          THE COURT:  I have thoughts on your employment

17  application and -- but maybe we can just kind of just talk at

18  the 10,000 foot level kind of where things are and --

19          MS. HAYWARD:  Very well.

20          THE COURT:   -- and how this -- anyway, yeah, why

21  don't we.

22          MS. HAYWARD:  So from the Debtor's perspective, you

23  know, we are in a Chapter 11 bankruptcy.  We are looking to

24  move forward and confirm a plan of reorganization.  So we have

25  filed that plan, we have filed a disclosure statement and we

1     have a setting on the disclosure statement for November 29.

2               THE COURT:  Right.  But I said you couldn't go

3     forward, the plan as proposed, because you have -- you've got

4     to be able to market test it.  So how do plan on proceeding?

5               MS. HAYWARD:  Well, Your Honor, I guess --

6               THE COURT:  In other words, I'm not letting you put

7     that out there without it being market tested.

8               MS. HAYWARD:  When Your Honor says market tested,

9     I'm a little unclear as to --

10              THE COURT:  In other words, there's an equity

11    contribution in there that -- there has to be disclosure as to

12    how you reach that number in the analysis that was done to

13    reach it.

14              MS. HAYWARD:  Your Honor, it's not an equity -- I

15    mean it's not -- it's not purchasing -- I mean there is no

16    equity.  Right?  We have a debtor --

17              THE COURT:  If he retains the ownership.  Right?

18    Right?  There's an absolutely priority rule.  Right?

19              MS. HAYWARD:  Yes, Your Honor.

20              THE COURT:  We all know it applies -- so how does --

21    how does Choudhri own the entity?  That's the essence.  Right?

22    So he's essentially going to make a contribution.

23              MS. HAYWARD:  Well, I believe the way the plan's

24    structured there's a new entity that's coming in --

25              THE COURT:  Right.

8

1          MS. HAYWARD:   -- to take over the equity.

2          THE COURT:  Right.

3          MS. HAYWARD:  But the --

4          THE COURT:  So tell me -- tell me where that number

5    comes from.

6          MS. HAYWARD:  The number comes from is because

7    that's the amount needed to fund the plan.

8          THE COURT:  That's why I'm saying.  So but is there

9    someone that's willing to put more.  In other words, that's

10   why I'm saying, is it market tested.

11         MS. HAYWARD:  Well, to put more for what purpose I

12   guess.  The money --

13         THE COURT:  A provided rate of distribution.

14         MS. HAYWARD:  Well, if that's --

15         THE COURT:  In other words, if somebody wants to go

16   out and buy this entity, put money in to control it, how do --

17   who's the -- who's the -- that's what I said at the last

18   hearing, who's the right -- who's the owner.  Right?  Why does

19   someone get to choose the amount of money that they need to

20   put in just to fund it, and you're going to own a building

21   that everyone is saying is worth a lot of money.  Right?  So

22   what are you -- so in other words that has to get market

23   tested.

24         MS. HAYWARD:  Well, Your Honor, I guess the building

25   everyone is saying is worth $18 million.  Right?

1          THE COURT:  Uh-huh.

2          MS. HAYWARD:  So it's worth less than -- and so --

3          THE COURT:  But everybody's saying it's worth 18

4    million now but in other words why -- I'm not letting anyone -

5    - you don't just get to come in as a new buyer to come in and

6    say, Here's what's going to get to come in without that piece

7    getting market tested.  In every Chapter 11 case somebody

8    wants to come in and buy the entity, buy the equity of the

9    company, it's got to get market tested.

10          And so here in this case we don't -- we didn't have

11   a robust procedure, we're having someone come in and they're

12   saying, Here's how much it's going to cost to run it, I got

13   that, I'm not disputing the number, but maybe they want to put

14   more money in, maybe there's -- there has to be a process

15   where it gets market tested.

16          MS. HAYWARD:  Isn't that process a competing plan,

17   or --

18          THE COURT:  No.

19          MS. HAYWARD:   -- something along those lines?

20          THE COURT:  No, no, because the Debtor -- how are

21   you going to put together a competing plan when you're the

22   only one that can propose one?

23          MS. HAYWARD:  Well, that's certainly a fair point,

24   Your Honor, at this point.

25          THE COURT:  I'm also really concerned about the

1      adversary.  And I will tell you, why don't I just get to it, I

2      think your -- I think your retention application could have

3      used additional disclosure, but I'm not sure based upon

4      everything that I've read, and maybe people can convince me

5      otherwise, that that creates such a conflict that I think you

6      should be disqualified.

7              I think it would have been good to know that, you

8      know, there was an entity that filed and that you may have had

9      a connection with, some even tangential connection with an

10     entity that filed in the Western District, and that entity

11     being listed.  I think I'd like to know what most judges want

12     to know about all that stuff on the front end so that you can

13     avoid stuff on the back end.  But you did disclose in a

14     sentence that there were other connections.  I just think that

15     sometimes it's probably even easier to just say, by the way,

16     one of them is one that filed in the Western District so

17     that --

18              MS. HAYWARD:  Understood.

19              THE COURT:  And I think -- I think you've been, as

20     you've always been, incredibly straight up and very

21     forthcoming with the Court.  So I don't question your

22     credibility, I don't question what you put on paper.  Whether

23     that influences you one way or the other, right, is a question

24     that we would need to decide.

25              But I think the lack of disclosure itself I'm not

1    sure is disqualifying.  It's not like -- you said it, you just

2    didn't say it in such a -- in a more robust way and I think it

3    probably could have suffered from that.

4            But I'm more concerned -- in other words, at today's

5    hearing if someone could tell me that because that sentence

6    wasn't in there and that somehow you were hiding it, someone's

7    going to have to really tell me that you were hiding it

8    intentionally, and that, you know, bad things were

9    consequences of it.  You know, it would have to be a really

10   strong allegation for me to get really uncomfortable on 327

11   grounds.

12           Okay?  I've just got --

13           MS. HAYWARD:  Sure, Your Honor.

14           THE COURT:  -- so I'll say that up front.

15           MS. HAYWARD:  Yeah, and I appreciate that, Your

16   Honor, and I think in my original application I disclosed that

17   I had represented --

18           THE COURT:  No, no, you did.

19           MS. HAYWARD:  -- you know, other single asset real

20   estate entities in their own Chapter 7 and --

21           THE COURT:  There are --

22           MS. HAYWARD:  -- Chapter 11 case.

23           THE COURT:  -- yeah, there I am.  I'm more

24   concerned about the amount of cash that this Debtor has.  It's

25   gone up for sure when you look at the MORs.

1        I'm concerned about the amount of cash that this

2    Debtor has.  The adversary itself, I was really concerned

3    about Mr. Pope's letter that he wrote back.  I'm really, you

4    know, I'm really concerned about some of the statements

5    Mr. Pope made, and if it turns out to be true, and I've got --

6    I have questions, maybe Mr. Tang and others can answer them

7    for me, when the State Court litigation was filed, the timing

8    between the hearing that the State Court had and when the

9    adversary proceeding was filed.

10        In other words, I got it, I know why this case was

11    filed, there was a foreclosure scheduled.

12        There's someone that needs to put their phone on

13    mute, it sounds like there's an ambulance in the back.  If

14    that's you, that's you.

15        There was an adversary -- I know why this case was

16    filed.

17        Folks, if that's you with an ambulance in the back,

18    which tells me that you're likely in New York because I grew

19    up there --

20        (Laughter.)

21        THE COURT:  -- put your phone on mute.  It's not

22    that complicated.  Hold on a second --

23        (Pause in the proceedings.)

24        THE COURT:  There was a -- I know why this case was

25    filed, and there was an adversary proceeding started in this

13

1     court on September 19.  I know who you represented, so that's

2     not really my --  but Naissance is a party to that lawsuit,

3     but Naissance also has filed -- or --

4                 MS. HAYWARD:  Right.

5                 THE COURT:   -- again, depending on who controls

6     Naissance also started a State Court action, and I don't know

7     when the State Court action started.  But presumably there was

8     a hearing which then prompted the State Court to then kind of

9     tweak a proposed order and issue a temporary injunction.

10                MS. HAYWARD:  Yes, Your Honor.

11                THE COURT:  I want to know when that State Court

12    hearing started and when that hearing was held. That helps me

13    understand it because there was an adversary started at 5:49

14    p.m. on September 19.  What I need to understand is when that

15    State Court hearing was held.  Was it held on the 20th, was it

16    held on the 19th that someone held a hearing and said, We

17    better get something in before the Judge rules.  Those are 2

18    different issues, so I just need to understand the timing of

19    when that hearing occurred.

20                I'm muting all the lines because -- hold on a

21    second.  There's a 917 number, I've un-muted you, if there's

22    another party that wishes to be heard?

23         (No audible response.)

24                THE COURT:  But you've got to place your phone on

25    mute if un-mute you.

14

1          So as part of this status conference I need to

2     understand when that State Court lawsuit was filed and who

3     were the lawyers representing I guess the opposition to -- I

4     forgot Mr. Tang's client's name -- oh, there it is --

5          MS. HAYWARD:  Well, let me back up, Your Honor.  My

6     understanding is that the lawsuit was actually filed by

7     Naissance under Mr. Choudhri's control to obtain a temporary

8     restraining order against Azeema Zahire (phonetic) --

9          THE COURT:  Okay.

10         MS. HAYWARD:  -- from representing that she --

11         THE COURT:  Was the owner.

12         MS. HAYWARD:  -- was the owner.  Right.  And so

13    there was -- and Mr. Pope is here, he can certainly speak to

14    this, but --

15         THE COURT:  Mr. Pope, why don't you come on up?

16         MS. HAYWARD:  -- Jerry Alexander I believe was the

17    lawyer representing Naissance in that State Court action.  The

18    Court had a hearing I believe and then the TI was issued the

19    day that --

20         THE COURT:  When was the hearing held, Mr. Pope?

21         (Pause in the proceedings.)

22         MR. POPE:  Okay.  It lasted for a few days, the TI

23    hearing was held on I think it was the 5th --

24         THE COURT:  When did it end?

25         MR. POPE:  The 7th of September.

1       THE COURT:  It ended on September 7?

2       MR. POPE:  It ended on September 7, Your Honor.  But

3   we had competing requests for injunctive relief.  If I can

4   back it up just a little so you could have some context.  We

5   were in efforts to protect the building and went down and

6   sought a temporary retraining order in State Court.  While

7   there, and I was representing the Galleria 2425 in that

8   application for a temporary restraining order.

9       THE COURT:  There's a couple of them, which one, the

10  JD?

11      MS. HAYWARD:  This Debtor.

12      THE COURT:  This Debtor.

13      MR. POPE:  Oh, this debtor, Your Honor.

14      THE COURT:  Okay.

15      MS. HAYWARD:  This was to stop the foreclosure that

16  NBK and those did.

17      THE COURT:  Ah.  Got it.  Got it.  Okay.

18      MR. POPE:  Okay.  And I was representing the Debtor

19  at that time.  While present at that hearing it was -- we had

20  to come back another day, David Tang appeared on behalf of

21  Naissance claiming an interest in the Debtor and also

22  attempting to stop the foreclosure by way of his own temporary

23  restraining order.  That was the first time we had any notice

24  that there was someone else claiming an interest in Naissance,

25  let alone claiming that Naissance had an interest in the

16

1      Debtor.

2              So once we left that proceeding we did some digging

3      on the Harris County District Clerk and found out that David

4      Tang had not only appeared in that case, but had filed 2 other

5      lawsuits on behalf of Naissance suing 2 other entities.  One

6      was suing the Bank of Kuwait, so there's a Naissance versus

7      Bank of Kuwait happening in the State Court, then there's 1

8      Naissance versus Brad Parker in the State Court -- in State

9      Court right now also.  Each had -- 1 had been filed in June, 1

10     in July.

11             THE COURT:  No, Brad Parker is -- does he have -- is

12     it just an independent lawsuit or is it something connecting

13     with --

14             MS. HAYWARD:  It's connected here, Your Honor.

15     There's, like I said, a lot of water under this bridge.

16             THE COURT:  Okay.  So Brad Parker --

17             MS. HAYWARD:  Mr. Parker was the -- if Your Honor

18     has looked at some of the exhibits and part of the

19     employment --

20             THE COURT:  I know the name rang a bell.

21             MS. HAYWARD:  Yes, he was the person who assigned

22     his interest to Mr. Choudhri in 2019.

23             THE COURT:  Okay, got it, got it, got it, got it,

24     got it.  Yeah, okay.  Thank you.

25             MR. POPE:  So those things were happening.  So once

17

1    we found out those things were happening and in light of the

2    assignment that we knew that we had that said Mr. Choudhri had

3    the control of Naissance, we then went and filed an

4    application for temporary restraining order against Azeema

5    Zahire, because during that hearing as we're observing she

6    mentions that she has opened bank accounts in the name of

7    Naissance recently, after being silent for years, after having

8    other litigation happening that included NBK, that included

9    the other parties where Naissance had come up and who owns

10   Naissance had come up for years.

11        Unfortunately for Mr. Tang and his client, when they

12   showed up for the application for emergency TRO, it happened

13   to be in front of Judge Weems who had also been presiding over

14   the matters with NBK and she was familiar with the Naissance

15   issue and told Mr. Tang, I am not inclined to believe you that

16   your client has any control over Naissance because we've been

17   here for years.

18        Where was she when they attempted to foreclose,

19   where was she when Mr. Choudhri was throwing all of his money

20   toward this Debtor to protect it and preserve it, where was

21   she when he was making the building better, where was she when

22   he was doing all these things to make this Debtor in the

23   position where it can actually sustain itself and propose a

24   confirmable plan, where was she?  It appeared that she had

25   been lurking in the shadows until Mr. Choudhri spends all his

1    hard earned time and money getting it together and then pops

2    up and says, Hey, I have some type of control.

3           They even tried to do a motion to show authority

4    against us in the State Court action recently, to which we

5    replied and said no.  that temporary injunction did not grant

6    Azeema Zahire any control.  It merely did its best, as poorly

7    drafted as it is, to preserve the status quo.

8           THE COURT:  Poorly drafted enough to get the

9    control.

10          MR. POPE:  It doesn't give the control.

11          THE COURT:  Well, it says she can't -- you all can't

12    do anything without here.

13          MR. POPE:  It does not change ownership, it does not

14    change who the managing member is.

15          THE COURT:  No, but it just -- it tells me that

16    there has to be a fight about that at some point.

17          MR. POPE:  There is a fight, and the judge set a

18    trial for January to finish that fight, and the judge denied

19    the motion to show authority.

20          THE COURT:  So --

21          MR. POPE:  I have a copy of that --

22          THE COURT:  No, no, no, I know that -- well, I

23    didn't know that, but what I'm saying is I agree with you, it

24    just says one cannot go forward -- you can't take any actions

25    without her --

19

1          MR. POPE:  Which is what --

2          THE COURT:  That's why I was trying to figure out

3     why this was -- in other words, yet the Court indicated -- so

4     the court hearings end on the 7th, is that right, somewhere

5     around the 9th, 7th?

6          MR. POPE:  That's correct.  But she took her time

7     putting an order in because we had also a competing TI she had

8     to decide if she was going to hear, we had motions to

9     disqualify (indiscernible) --

10          THE COURT:  Right.  But I'm saying, in other words

11     she didn't -- she didn't rule from the bench, she just said --

12     she took the matter under advisement and then issued something

13     on the 21st?

14          MR. POPE:  Issued something on the 21st.  And we

15     assumed, because we had been asking several times that she not

16     enter any order for either party until she heard our competing

17     temporary injunction.  She did agree on the Record that we

18     still had our temporary injunction, we had only defended

19     against Azeema Zahire's request for relief.  And our hearing

20     on our temporary injunction is actually set now for November

21     13.  We have been waiting to have that happen.

22          THE COURT:  What are you requesting in your

23     competing TI?

24          MR. POPE:  We're requesting in our competing TI that

25     her attorneys and Ms. Azeema Zahire quits doing what they're

20

1    doing now, showing up in Bankruptcy Court and claiming that

2    she has an ownership interest, claiming that they continue to

3    open bank accounts.

4              THE COURT:  Why don't people have the ability to

5    come into court and claim stuff before me?  I don't understand

6    what that means.

7              MR. POPE:  Well, in the same sense that they would

8    like for us to not file any adversary proceedings without her

9    permission, we don't think they should be filing any lawsuits

10   or proceedings, making any declarations when that --

11             THE COURT:  Do you think 2 wrongs make it right?

12             MR. POPE:  No, and that's why we have done nothing

13   else.  Once the judge issued that order --

14             THE COURT:  But you're asking a party not to avail

15   itself, or not to -- you're asking a State Court to say, Don't

16   come -- don't do anything in front of Lopez is what you're

17   asking.

18             MR. POPE:  Well, what I'm asking is that we have our

19   opportunity to finish adjudicating that issue in the State

20   Court proceeding.

21             THE COURT:  Mr. Pope, did you understand what you

22   just said?  Did you really understand what you just said?  I

23   think you want an order preventing someone from making an

24   argument, and what if I say come in, are they -- do they --

25   are they just -- are you going to tell me that State Court's

1    going to stop me from telling someone to come in if I have

2    questions?

3              MR. POPE:  Let me -- let me correct what I'm saying.

4    I may have worded it very poorly.

5              THE COURT:  Okay.

6              MR. POPE:  Because what I'm saying is not that they

7    can't come here and make an argument before Your Honor.  What

8    we don't want is they filed 2 State Court actions already in

9    addition.  We want to make sure they're not out there filing

10   any other State Court actions in the name of Naissance.  We're

11   not certain if that's happening or not, you know, we don't

12   know what they're doing.

13             THE COURT:  You're saying someone has to ultimately

14   adjudicate the Naissance issue and everything ought to pause

15   until the Naissance issue is -- I guess the ownership of

16   Naissance is resolved.

17             MR. POPE:  Right.  In the same sense that we're here

18   airing our concerns about who controls, I believe they can air

19   their concerns about who controls, but as far as filing

20   lawsuits --

21             THE COURT:  But you all filed a lawsuit knowing that

22   a judge could rule the other way, in front of me.

23             MR. POPE:  We did, Your Honor, before --

24             THE COURT:  I'm just saying, right, so whether it

25   was a TI.  So and then it gets issued and then no one informs

22

1    me.  I've got to wait for another party to come into court to

2    tell me that there's a State Court order out there.  I've got

3    to wait for NBK to come in and tell me that there's a State

4    Court order saying that you all can't proceed without a third

5    party.  That's what happened.

6          That is exactly what happened, and that's what

7    troubles me.  Right?  Like how come, you know, how come you

8    didn't come in here -- you, who appear in front of me all the

9    time, how come you didn't come in here and write a letter and

10   say, Judge, full disclosure to the Court, this adversary

11   proceeding, we're going to have to have at least a status

12   conference on it because this order got issued and it affects

13   my ability to proceed, to do anything in connection with my

14   client.  But I've got to wait for NBK to file something a

15   couple of days later to then come and tell me, and you weren't

16   even at -- it just -- I don't understand that.  That's what

17   troubles me.

18         I agree with you somebody's going to have to decide

19   the issue.  And you all are writing letters back and forth

20   about what can happen and what can't happen, but no one is

21   coming in front of me saying, Here's how we're going to decide

22   the issue, here's what we're going to do.  And that's --

23   that's disappointing to me.

24         Mr. Ruff, anybody reach out to you about when this

25   issue got issued?  Like knowing -- knowing --

1          MR. RUFF:  No.

2          THE COURT:  -- it's the --

3          MR. RUFF:  No, Your Honor.

4          THE COURT:  -- it's just --

5          MR. RUFF:  We saw it when it was filed with the

6     Court.

7          THE COURT:  Yeah.  And so I mean to me that's

8     different than the issue in front of -- the issue with

9     Ms. Hayward's application where she writes a sentence and

10    someone is saying, Well, hey, you could have said more.  But

11    you said something, you certainly disclosed that you

12    represented -- you haven't hid anything from me.

13         I just feel like that part is just -- I'm not sure

14    it's -- I don't know what to do with the adversary but we

15    can't go forward with it until somebody decides the issue, I

16    agree with you there.  But now I'm stuck with an adversary

17    proceeding where nothing can happen because a State Court has

18    to finally adjudicate the issue, because it won't be me.

19    There's not money in this estate to go adjudicate that

20    issue.  The estate maybe has 100 grand in there, minus Ms. --

21    minus about 135 in cash.  Someone still needs to back out the

22    utility deposit that I've asked for for months.  Now we take

23    out 20 something grand, you've got 100 grand, back out

24    Ms. Hayward's work.  I don't know.  Can't prosecute the

25    adversary proceeding, so what do we do?  I don't want to spend

24

1        a whole lot of time on the Hayward application, I want to

2        spend the time on, assuming we get past that, what am I

3        looking at?  I'm looking at a case that can't go forward on

4        any front.

5              MS. HAYWARD:  Your Honor, well --

6              THE COURT:  I'm not letting you go forward on plan

7        confirmation because if the Naysmith (phonetic 10:27:28] issue

8        gets decided the other way, and maybe the State Court says

9        more than what she -- maybe more than what she or he said

10       before.  And maybe Naysmith -- I don't know, maybe Naissance

11       comes back and says more.

12             I don't know where -- I don't know what I don't

13       know, I just know that this case freezes and then it creates

14       an issue as to what happens.  Do I let the building just sit

15       out there and like control -- or what do we do with this case.

16       That's the real crux of the issue.  That's the real crux, and

17       who's going to start paying interest on the loan?  Now we've

18       got to start getting into adequate protection issues.

19             MR. RUFF:  Your Honor, I've been thinking a lot of

20       the same thing.  Jayson Ruff on behalf of the United States

21       Trustee's office just for the Record.  I've been thinking a

22       lot of the same things, and I mean I don't --

23             THE COURT:  Let me just correct, I keep saying

24       Naysmith, I've been thinking of the Heissman trophy recently.

25       It's Naissance, Naissance, Naissance, Naissance, Naissance --

1           (Laughter.)

2           MR. RUFF:  I'd rather be thinking about football,

3    Your Honor.

4           I don't know how this case moves forward quite

5    frankly, and depending on what happens today we very well may

6    just make it a little easy for Your Honor and file a motion to

7    dismiss or convert depending on, you know, where we're at.  If

8    the Debtor -- if I am able to convince Your Honor today that,

9    you know, on my motion and the Debtor's without counsel, then

10   maybe we can stage it as -- or the Court can set a show cause

11   in a short period of time ahead to allow the Debtor to get

12   replacement counsel if that happens.

13          Either way, Your Honor, I think we have a bunch of

14   issues that make this case very, very difficult to go forward

15   because at the end of the day you take the counsel issue out

16   of it, I don't think this estate has an independent fiduciary

17   acting on its behalf.  What we have is, and some of that

18   evidence has come out in prior hearings and I think some of

19   the evidence will come out today, is we have Mr. Choudhri at

20   the end of the road who's pulling the strings for the mezz

21   lender, for the Debtor, for the Debtor's management company,

22   for interrelated parties, and -- but we don't have anybody

23   who's just deciding solely for the Debtor.

24          We don't have a chief restructuring -- we don't have

25   a trustee that's just looking out for the interests of the

1    Debtor alone and not thinking how do they impact the equity

2    and the equity alone.  I don't know how we get around that

3    given where we're at and what we've already learned in this

4    case from prior hearings, from evidence that has been put into

5    the Record in prior hearings.

6              THE COURT:  Ms. Hayward would tell me that if that's

7    the case, then there can be no single asset real estate cases.

8    That's what she's going to say.  I don't even have to look at

9    her, I don't what she's going to say because at some point

10   you've got the owner of Sam's Pizza, right, Sam is running the

11   show and so, you know, you -- Sam is an independent fiduciary,

12   Sam's got -- right?  Sam may own the building and so Sam's

13   Pizza may own the building and so Sam's -- the only thing

14   Sam's got is the building and so you've got Sam.  But that's

15   the case.

16             MS. HAYWARD:  Your Honor, I think we engaged in this

17   discussion at the hearing on the motion to dismiss that --

18             THE COURT:  I am also right that Sam doesn't get to

19   tell me, I'm going to form a new entity and then that new

20   entity's going to put this amount of money in and that's what

21   I'm going to go forward on the plan and everybody can vote on

22   it because I've structured it in a way that the plan works.

23             MR. RUFF:  Your Honor, if I may, every case --

24             THE COURT:  Right.  Sam in a SubChapter 5 went up

25   and put all of his disposal income for the next 3 to 5 years

1    to go pay off debt, unless Sam can convince me that NBK's debt

2    isn't good, but that's litigation that Sam then got in this

3    budget.

4              MR. RUFF:  Your Honor, again, if I may, every case

5    is unique and has its own facts and circumstances.  I'm not

6    trying to say that every single asset real estate case where

7    you just have an owner and it's just a small thing or whatever

8    can't file and confirm a plan.  That's not at all what I'm

9    saying.  I'm talking about the --

10             THE COURT:  I know.

11             MR. RUFF:  -- unique facts and circumstances --

12             THE COURT:  The unique facts and circumstances --

13             MR. RUFF:  -- of this case.

14             THE COURT:  -- of this case is that Sam can't, in

15    my hypo Sam can't pay the rent.

16             MR. RUFF:  Correct.

17             THE COURT:  Sam can't pay the loan while the case is

18    pending, because that's a big loan that's at issue.  And in

19    this case --

20             MR. RUFF:  And I think Your Honor's --

21             THE COURT:  -- Galleria wants to unwind a really

22    severely prejudiced -- this isn't like I admit that I owe 50

23    million bucks, this is there's issues related to the 50

24    million and I need to have a full out litigation on it, and at

25    the same time layered on top of it I have a party -- or

1    there's a temporary injunction where the -- where someone

2    theoretically could pull the plug on this entire case and who

3    owns that entity who controls the string will ultimately be

4    decided by a State Court and I don't know when.  That's the

5    problem I've got with this case, and that could be early 2024.

6    And I'm not keeping this case going, I'm not keeping -- I'm

7    not going to confirm a plan knowing that ownership is a

8    dispute.  Can't go forward on that.  Right?

9         Can't go forward on an adversary proceeding with

10   Naissance, and I can't keep NBK out there without any payments

11   on their loan, not even any interest on adequate protection.

12   But the minute that opens up, the minute I start settling

13   scheduling this case gets really expensive and this case

14   becomes administratively insolvent before we even know

15   anything.

16        In other words, this case really needs to get the

17   issues that are before this Court, and then the other thing is

18   I don't decide any of that stuff.  Somebody's going to have to

19   decide all that stuff, but it's already teed up in front of a

20   State Court who's already set hearings.

21        Therein I think lies the issue.  I think it's the --

22   I agree with you, it's the factors, it's the layer and

23   ownership and fights about it and I don't want to -- I don't

24   want to -- Naissance's owner, who it is I don't know.

25   Mr. Tang's client has a dispute with Mr. Choudhri.  I don't

1    know who's right or wrong, I haven't heard a thing, I don't

2    know what is going on.

3            I know that there's State Courts who are hearing it.

4    Right?  It's a little troubling in an order that someone says

5    that a check could be fraud but that doesn't mean it is.  It

6    means she just said, I'm going to issue -- she or he issued a

7    temporary order and said, We're going to come back and figure

8    it out.  Right?  Just means that let's just freeze things,

9    that's what -- that's what the State Court did was just kind

10   of freeze stuff and say, Okay, nobody can do anything on their

11   own, which is why you're coming in saying, By the way, that

12   means you too, to the other side.  That means you all can't do

13   anything either.

14           And I've got someone who wrote a disclosure

15   statement that I'm sure if I put on the stand would be

16   uncomfortable answering questions about the disclosure

17   statement and so I'm -- but he's a really good person and I

18   don't want to do that.  But if I asked him the intricate parts

19   on what 1129 stand for, he'd be a really good person who would

20   have a really hard time answering those questions and the

21   intricacies and the treatment of certain creditors under a

22   plan, and I don't want to subject that individual to that

23   stuff.

24           My gut tells me I need to dismiss this case and

25   allow you all to refile it when those issues get resolved, and

1    you all can fight in the State Court and let that go away and
2    let this case refile in the Houston Division and everybody can
3    kind of tee it up when it's ready.

4         And I don't want to make findings, I think -- I
5    don't think -- Ms. Hayward's an excellent lawyer, I don't want
6    to take that issue up, and I think she would win anyway.  I
7    don't think -- I think you would win on a retention
8    application fight.  I think it's just 70 grand and a whole lot
9    of stuff to happen, and I can't deal -- I can't touch this
10   till 2024, but NBK is stuck out there without the ability to
11   do that, no one's going to pay interest on that loan, it's way
12   too much.

13        Can't proceed on the adversary.  But I would need to
14   proceed on the adversary, and I can't put out a plan -- how do
15   I decide what a plan issue is when Naissance -- the State
16   Court could come back and say, You know what, Azeema runs
17   everything, and she's going to file something after plan
18   confirmation and then come back and say, Hey, by the way, I
19   didn't want to do any of this.  We've got problems.

20        MR. RUFF:  Your Honor, I think you're correct on
21   that and I think you're 100 percent correct on the market
22   testing.  How do you get -- you can't just, the owner, say,
23   I'm going to pay this for it and not -- I mean how does that
24   serve the interest of the other creditors who are losing?
25   Someone else might be able to come in and say, Well, no, I'll

1    take more for it.  NBK might say, No, I would love to be able

2    to credit bid on the property and just take the property,

3    because it is a single asset real estate case, that is the

4    asset.

5           THE COURT:  And they're saying like, By the way,

6    like I own this thing already.

7           MR. RUFF:  Right.

8           THE COURT:  Yeah, it's just layered in.  But the

9    ultimately person who -- the question is who do they negotiate

10    with?  While this issue gets decided who does NBK deal with.

11    Right?  Who does any creditor deal with?  Who does

12    Mr. Choudhri deal with, you know, and me?

13           Like who has -- who has the ultimate authority here

14    is a real issue and I don't want to -- you know, the last

15    thing I want is to try something in front of me where people

16    then come out and put people on the stand but what they're

17    really trying is the fight in front of State Court.  That's

18    going to trouble me to death, and that's what you don't want

19    either.

20           They're going to -- because Mr. Choudhri's going to

21    hit the stand and then it's going to be -- but really what --

22    the questions that somebody could ask him have everything to

23    do with nothing in front of me, it's to try to get stuff so

24    they can role a transcript out there and say, This is what

25    happened in State Court, and vice versa.

1          That's where we're headed, because the lawsuit

2     that's going to get tried isn't the one that's going to deal

3     with plan confirmation.  It's going to deal with -- or in

4     connection with this case.  Everybody's going to try to look

5     for gems that they can then run into a State Court in

6     connection with the Naissance fight.  And I don't feel like

7     doing that.

8          I think you've got real good lawyers and I think

9     everybody ought to just preserve their rights and run this --

10    and go to State Court and figure out where things go.

11    Conversion doesn't make any sense to me.  I'm not going -- and

12    a poor trustee's going to get stuck here in this situation

13    where we are.

14         I don't know if Mr. Tang's client's right or wrong,

15    but I do think you have your day in court.  Go have your day

16    in court and if you all run the show and the State Court gives

17    you the building, come file in the Houston Division and we'll

18    start this all over again.

19         But I don't know where we are now.  I'm troubled.

20    And the amount of cash, you hear my thoughts on the plan.

21    Maybe another judge will disagree with me, but that's the way

22    I feel about the -- if you're going to -- if you're going to

23    come out there and ask that, then I think at least in either

24    in a disclosure statement or in something in connection with

25    the plan you've got to tell me and it's got to be based more

33

1    than here's what it's going to take to wind it down.

2             If no one else wants it, I get it, that makes

3    perfect sense.  But if there's a fight about it, then I think

4    people need to have that fight.  And I don't know who's going

5    to fund it, you know.

6             MR. RUFF:  Well, just given the way things have

7    gone, Your Honor, I don't think it would be a consensual plan

8    at this point and, at least as proposed, and so that's why

9    it's an issue.

10            THE COURT:  Oh.

11            MS. HAYWARD:  Your Honor, may I just clarify --

12            THE COURT:  Yeah, maybe I ought to stay quiet and

13   just allow you just to talk, I've been talking a lot here.

14            MS. HAYWARD:  I just want to clarify a couple of

15   points.

16            THE COURT:  Okay.

17            MS. HAYWARD:  Number 1, right now Naissance doesn't

18   control anything with respect to this Debtor.

19            THE COURT:  Agree.

20            MS. HAYWARD:  Okay.  There is a dispute as to

21   whether Mr. Tang can -- actually represents Naissance.  Right?

22            THE COURT:  Correct.

23            MS. HAYWARD:  There is a dispute as to who the

24   proper parties are with respect to Naissance.  So that issue -

25   - and that issue is going to be decided in the State Court --

1          THE COURT:  Uh-huh.

2          MS. HAYWARD:   -- notwithstanding we've got these

3    new lawyers purporting to represent Naissance now coming into

4    this Court filing motions, filing proofs of claim, making

5    demands.  I certainly understand that Naissance cannot move

6    forward with the adversary, but the Debtor can.

7          THE COURT:  Yeah, but here's the problem is that the

8    allegation is fraud by check, or fraud, not fraud by check,

9    fraud.  Right?  That someone signed something fraudulently and

10   it involves Mr. Choudhri.  If it were true that Mr. Choudhri

11   filed a lawsuit where Mr. Pope was representing him and it

12   was -- I'm not saying Mr. Pope would have known about it, but

13   I would have to open up such an inquiry to find out.  If it

14   turned out that that were true, I would stop everything

15   because you -- the Debtor would then have -- the Debtor would

16   have causes of action.

17          It's just going to get really confusing.  There's

18   really serious allegations in there.  Right?  It's not just

19   default under a loan agreement, there's -- there are

20   allegations of fraud, and I think I would have -- if that were

21   the case, based upon the allegations that are made in the

22   adversary proceeding, I may myself have a duty to report

23   certain things, to start inquiries on my own, and I don't feel

24   like doing that.  I don't think I'm -- I don't think I'm there

25   yet (indiscernible) have to figure that out.

1        In other words, if somebody's -- if Mr. Pope filed

2    an adversary proceeding on behalf of Choudhri and Naissance,

3    and it turns out that, and I don't know if it's true or not,

4    I'm using it, if it turns out that the assignment was

5    fraudulently made, now I've got something filed under 9011 in

6    my court where someone claimed to have authority to do

7    something, and that's gets really uncomfortable so we can't

8    proceed, the Debtor can't proceed, Mr. Choudhri can't proceed

9    until I figure out the answer to that question.

10       Those are serious allegations in there, and I don't

11   want to -- I'm not trying a lawsuit with Mr. Choudhri involved

12   if Mr. Choudhri filed something with -- and if Naissance is

13   wrong about your allegations about Mr. Choudhri, then I have

14   to deal with them too.

15       MS. HAYWARD:  Well, Your Honor, it's not Naissance

16   making those allegations.  Right?  It's Ms. Zahire.

17       THE COURT:  Ms. Zahire, you're right.

18       MS. HAYWARD:  It's Ms. Zahire.

19       THE COURT:  If Ms. Zahire came into may court on

20   allegations like that, then I'd have to deal with that too.

21   That, in other words -- but I can't act like someone didn't

22   just say certain things in open court, in Federal Court, and

23   act like I can't -- I have to deal with it.  But there's

24   strong allegations about what happens and the good faith of

25   the filing of the case and if a -- filing of a plan.  It's

36

1    gets fairly complicated because whoever controls Naissance,

2    they technically control certain things that happen in this

3    case.

4              MS. HAYWARD:  Maybe.

5              THE COURT:  Maybe.  No, I --

6              MS. HAYWARD:  Maybe.

7              THE COURT:   -- agree with you, maybe.

8              MS. HAYWARD:  Maybe, but there's a lot of steps that

9    have to happen to get to that endgame.  Right?  And --

10             THE COURT:  Maybe.

11             MS. HAYWARD:  Maybe.

12             THE COURT:  In other words --

13             MS. HAYWARD:  And --

14             THE COURT:   -- what I'm saying is if -- and I don't

15   know if there is or not, and again, I don't -- it's just a

16   really serious allegation that has to get resolved and I think

17   the State Court is already looking into it and is in the best

18   position to resolve it.  But if that gets resolved in a

19   certain way, then this case gets really bad.

20             MR. CONRAD:  (Indiscernible) on behalf of the bank

21   (indiscernible) a little bit.  I don't know if you can hear me

22   okay or not.

23             THE COURT:  All right.

24             MR. CONRAD:  But Charles Conrad on behalf of

25   National Bank of Kuwait.  Just to correct what Ms. Hayward

1    said, I think she said that Naissance isn't involved in this

2    at all.  It's really a fight -- again, we're not involved in

3    this, we're the ones that found -- or was tracking that State

4    Court litigation on the Harris County Court's website, found

5    that an injunction was issued and of course we brought it to

6    the Court's attention.

7            But Naissance as I understand it is the

8    (indiscernible) and its just a question about like who

9    controls it.  Right?  There's an assignment, or purported

10    assignment --

11            THE COURT:  Whether there's $16 million down on the

12    books or not.

13            MR. CONRAD:  Exactly.  But in -- but whether or not

14    they can foreclose on it, but it's who controls it.  And

15    Mr. Choudhri, you know, she right, she filed a lawsuit, or

16    Mr. Pope did back in July, you know, on behalf of Naissance

17    against Ms. Zahire saying that I stopped acting on behalf of

18    Naissance.  But now Ms. Zahire claims that that assignment

19    that Mr. Choudhri relied upon he gave that to us too in, you

20    know, negotiation of the settlement agreement we entered into

21    a year ago.

22            THE COURT:  What I'm saying --

23            MR. CONRAD:  But that was so we -- so --

24            THE COURT:   -- it seems to me everybody ought to

25    keep their powder dry and not use anything that I say in a

1    transcript one way or the other, to be used one way or the

2    other, because that's what I'm saying, I don't know what I

3    don't know.  And I want to be very clear, if anyone were to

4    run to a State Court and say, Lopez insinuated anything, this

5    is the sentence that you quote and say, Lopez is not saying

6    anything one way or the other.  I don't know what I don't

7    know.

8           But I know everybody ought to keep their powder dry

9    and go fight about this issue in State Court to determine what

10   it is because I can't proceed with this case.  I have a $60

11   million loan, does it exist or not?  How do I confirm a plan

12   one way or the other whether that debt exists and then what's

13   the treatment of this claim, whether it gets resolved or not.

14   But that issue will not be resolved because either the debt

15   exists or it doesn't.  It's not an amount -- I can determine

16   the number, someone's got to determine whether it exists or

17   not.

18          Because if Mr. Choudhri's right and that debt

19   doesn't exist, then I will enforce it as a non-enforceable --

20   you know, I can then look at that, I can make that call.  But

21   litigating about what that is, the State Court's already

22   dealing with that and I don't want to -- I don't want to

23   insinuate anything or to imply anything, and I don't know if

24   Ms. Zahire is right or wrong, but I do know things get dicey

25   if I get involved, and it doesn't -- I don't need to.  But the

1    problem is this case cannot proceed.  How do I deal with a $60
2    million debt, how do I deal with your client's debt, how do I
3    deal with the adversary proceeding, how do I deal with any of
4    this?
5          And that's not me skirting the disclosure issues
6    that Ms. Hayward -- I just think -- I've told Ms. Hayward, and
7    I think you should say more.  Right?  But that doesn't mean --
8    that doesn't disqualify you.  I'm not saying -- the trustee
9    hasn't put on any evidence.  Maybe what the trustee's going to
10   try and say -- is going to make me say -- drop my jaw and say,
11   You got it.
12         I don't know.  I'm just saying assuming she wins,
13   I've still got to deal with a really big problem which is what
14   does tomorrow look like.  And I'd rather deal with -- and I'm
15   going to have to deal with tomorrow one way or the other,
16   whether it's -- if they have no counsel or if she shows up
17   tomorrow or this Debtor shows up with counsel tomorrow, I
18   don't know, I just know that I'm going to have to deal with
19   this issue regardless of who is the lawyer representing the
20   Debtor one way or the other, whether it's Ms. Hayward or not.
21   I'm just dealing with the 10,000 foot -- the 10,000 issue.
22         MR. CONRAD:  Your Honor, you're spot on.  Sometimes
23   I take the path of least resistance, and if I have a corporate
24   debtor with no counsel, then --
25         THE COURT:  No, but --

40

1          MR. CONRAD:   -- it's easier to get a case dismissed

2     but --

3          THE COURT:   -- you have a job to do too.

4          MR. CONRAD:   -- ultimate -- well, that too, and

5     ultimately I just think this case should be dismissed.  The

6     Naissance thing is important not just for the debt, Your

7     Honor.  If the Naissance -- depending on which way it goes,

8     Naissance is actually purportedly one of the members, although

9     I know it's in dispute, one of the members of the direct

10    owner, the Galleria 2425 JV --

11         THE COURT:  JV.

12         MR. CONRAD:   -- of the Debtor.  So the whole

13    authorization of the bankruptcy even being filed is at risk --

14         THE COURT:  Oh, I know that.

15         MR. CONRAD:   -- depending on how that outcome --

16         THE COURT:  But the people -- and again, I'll say

17    this too, I agree with you, I also recognize, which I know

18    Ms. Hayward didn't tell me, is that a lot of times people for

19    bankruptcy and people get to fight about, you know, whether I

20    was the proper party that should have filed it or not, and the

21    cases continue and courts can resolve that issue.  Right?  I

22    get that.  That happens all the time in cases, and we see it

23    all the time.

24         But I agree with you, it's a complicating factor.  I

25    just can't confirm a plan.  I would have to decide that issue

41

1      to then determine whether I can confirm the plan.  I'd have to

2      decide the ability to file issue, proper filing issue before

3      the --

4              MR. CONRAD:  Which would necessarily I think need a

5      determination on the Naissance, we'll just call it the

6      Naissance dispute --

7              THE COURT:  But that doesn't mean --

8              MR. CONRAD:   -- that's going on in the State Court.

9              THE COURT:   -- and that doesn't mean that at the

10     time that the case was filed that anyone did anything wrong

11     either.  Right?  Because later a court could determine that.

12     I don't want anyone to imply that Ms. Hayward, you know,

13     signed a document that was improper or that she shouldn't

14     have.  I'm not implying that at all.  I'm being really clear

15     about that.  Now I can be quoted on that.

16             MS. HAYWARD:  Thank you, Judge.

17             THE COURT:  I can decide that issue.  Right?  You

18     know people --

19             MS. HAYWARD:  But, Your Honor, we're conflating

20     different entities.

21             THE COURT:  No, no, I agree.

22             MS. HAYWARD:  I mean Naissance does not -- the

23     Naissance entity up here that Mr. Tang purportedly represents,

24     Mr. Pope has represented, does not own an interest in the

25     Debtor, does not own an interest in the JV.

42

1        THE COURT:  It's collateral.  Right?

2        MS. HAYWARD:  It's collateral, right.  So there's

3    no issue as to whether the Debtor had authority to file.

4        THE COURT:  Agree.

5        MS. HAYWARD:  Okay.  The Debtor had authority to --

6        THE COURT:  Yeah, that's why I'm going there.

7        MS. HAYWARD:  Yeah.  So I just -- I want to make

8    clear that Naissance, as the US Trustee just --

9        THE COURT:  Yeah, yeah, that's right.  And they

10   hadn't foreclosed on their collateral --

11       MS. HAYWARD:  Right.

12       THE COURT:   -- so you don't own it --

13       MS. HAYWARD:  So they don't own -- this entity does

14   not own an interest in any of the Debtor upstream.  And so I

15   just want to make sure --

16       THE COURT:  Wait, no, no, no --

17       MS. HAYWARD:   -- that the Record's clear on that so

18   that, you know, the issue is not -- there should not be an

19   issue as to whether this Debtor had authority to file the

20   case.

21       THE COURT:  Yeah.

22       MR. RUFF:  Well --

23       MR. CONRAD:  That's not exactly clear, Your Honor.

24       THE COURT:  No, no, no, but what I'm saying is I --

25       MR. RUFF:  It's an issue --

1          THE COURT:  What I'm saying is --

2          MR. RUFF:   -- it's unclear.

3          THE COURT:   -- what I can say with confidence based

4     upon what I know, I don't -- I think you all -- there's issues

5     about where Naissance sits and what they're doing and what

6     they have control over, and whether there's a $60 million debt

7     that's owed by this Debtor or not, I think that's an issue.

8     In other words, you know, whether there was a cancellation of

9     debt, did the assignment cancel debt and all that stuff.

10    There was a loan --

11         MS. HAYWARD:  But it wasn't debt to the Debtor, Your

12    Honor.

13         THE COURT:  I know, but there's issues --

14         MS. HAYWARD:  So the Debtor would never owe that

15    debt.

16         THE COURT:  The mezz debt?

17         MS. HAYWARD:  Right.  The mezz debt is at a higher

18    level, the Debtor does not have any privity --

19         THE COURT:  No, no, no, but what I'm saying is but

20    then -- but in other words if the debt exists, then they would

21    have a right to foreclose on their collateral, don't you

22    think?

23         MS. HAYWARD:  Which is the JV, higher up.

24         THE COURT:  Right?  But then --

25         MS. HAYWARD:  Right?

44

1          THE COURT:   -- but then that could -- essentially
2     it could have a domino effect that could come find me.  I
3     agree with you, this case can -- this case -- those debts are
4     at a higher level.
5          MS. HAYWARD:  And would never trickle down to the
6     Debtor.
7          THE COURT:  That I don't know.  I don't know about
8     that.  But you may be right about that.  I just don't have
9     evidence about that one way or the other.
10          MS. HAYWARD:  Right.  But I mean but that's -- I
11    mean it's a mezz debt that is secured by equity interests in
12    entities above the deck.
13          MR. CONRAD:  That's not correct.  It's a debt
14    secured by equity in the Debtor itself.  So the Debtor has --
15          THE COURT:  That's what you're -- that's what I'm
16    saying, I don't know --
17          MR. CONRAD:  Right.
18          THE COURT:   -- because people have been fighting
19    about that and I don't know the answer to that question.
20    That's an issue that would have to get -- someone would have
21    to make a call about whether is this Debtor involved in that
22    collateral package one way or the other.  I don't know, that's
23    a secured creditor fight that people can have --
24          MR. WETWISKA:  That's --
25          THE COURT:   -- people have that all the time.

1   Right?

2           MS. HAYWARD:  Sure.

3           THE COURT:  Is this part of the DIP package or not.

4           Counsel, I know you wanted to say something.

5           MR. WETWISKA:  But, no, Your Honor, it's just that

6   this Galleria 2425 who NBK has been dealing with in litigation

7   for over 2 years, and throughout that entire 2-year time

8   period Ms. -- what's her last name, Azeema Zahire never

9   stepped up into that lawsuit to say, Oh, hey, I have something

10  to do with Naissance and Naissance doesn't want to go forward

11  or Naissance has some issue with Galleria 2425.

12          Okay.  That's for a 2-year time period, and that's

13  because Mr. Choudhri, who's my client, was spending money out

14  of his own pocket to fund the building during COVID, to fund

15  the building during '21, '22 and through '23, and spent a lot

16  of money that NBK was well aware of.  Okay.  NBK entered into

17  a settlement agreement with 2425.  All right.  Well aware of

18  all of that NBK made those choices.  And then things happened

19  after that settlement agreement was signed.  Still not with

20  Azeema showing up and saying Naissance is going to do

21  something.

22          THE COURT:  Uh-huh.

23          MR. WETWISKA:  I will say by the way none of that

24  happens.  Now Mr. Tang and Mr. Drinnon, who have a 10-year

25  history of litigation against Mr. Choudhri, it's very

46

1       personal.  You heard Mr. Drinnon in the last hearing say he

2       gets hired because he has some speciality in suing

3       Mr. Choudhri.  That's what he said on the Record.

4                    THE COURT:  I remember.

5                    MR. WETWISKA:  And that's because he represents

6       Asama Abdulateef (phonetic) who has -- whatever personal

7       issues between Mr. Choudhri and Mr. Abdulateef have been going

8       back to 2009.  My point that I'm getting to, Your Honor, is

9       this is just flame throwing.  What is happening here is

10      Mr. Tang and Mr. Drinnon are like, Oh, wait, we have -- let's

11      throw onto the fire, let's create these issues, let's get

12      Azeema, and unfortunately the Court doesn't have all the

13      background.

14                   THE COURT:  But here's the question, do I need all

15      the background or do I realize that this Debtor has 50 grand

16      or, you know, 90 grand and these issues are going to swallow

17      it all up --

18                   MR. WETWISKA:  No, but I don't -- and I don't think

19      that's the case because I don't think these issues are going

20      to swallow it up.

21                   THE COURT:  Well, let me just -- I -- well, that's -

22      - you and I can just disagree on that --

23                   MR. WETWISKA:  Well, the --

24                   THE COURT:   -- because I don't think I can keep

25      this case going, as a matter of bankruptcy law I think they've

1    got to pay interest to that secured creditor while the case is

2    going, and that's going to swallow it up in a month, month and

3    a half.  You won't make it to 2024 if I say you've got to pay

4    interest to that secured creditor while this -- while these

5    issues get resolved.  Because I'm not letting that plan go

6    forward --

7                THE WETWISKA:  But what --

8                THE COURT:   -- because you've got to market test

9    it.  In other words, math wins on this one.

10                MR. WETWISKA:  Okay.  Well, if it's -- it can be

11    market tested, we can do it, but let me ask the Court this

12    question, we may not have power but what if there is at least

13    some court ordered mediation with respect to --

14                THE COURT:  I don't order mediation among parties, I

15    just don't.  I don't.  I don't force them in large cases,

16    small cases, medium cases.  I don't force people --

17                MR. WETWISKA:  It's just that --

18                THE COURT:   -- to mediation.

19                MR. WETWISKA:   -- this one issue is because someone

20    says it's not their signature after 4 years --

21                THE COURT:  I'm not so --

22                MR. WETWISKA:   -- is now throwing a wrench --

23                THE COURT:   -- it's not.  There's been a wrench --

24                MR. WETWISKA:   -- in what would otherwise --

25                THE COURT:   -- I guess what I've been saying is

1    there's been a wrench since the beginning of this case on

2    money.  Well before they showed up.  This plan can't go

3    forward.  And the problem is, is that the litigation now can't

4    go forward.  I agree with you, there's a wrench, but the

5    wrench got thrown -- the State Court has said nothing can

6    happen, and that's what I mean.

7            The State Court issued the order, that's what froze

8    everything in my opinion.  It complicated everything.  The

9    State Court freezing -- I agree, she doesn't have power, but

10   no one can do anything without her now.

11           MR. CONRAD:  And our concern is the freezing, like

12   how long.  I mean I know the trial setting --

13           THE COURT:  I can't --

14           MR. CONRAD:   -- according to Mr. Pope is in

15   January.

16           THE COURT:   -- in other words now I have cash

17   collateral issues.

18           MR. CONRAD:  Right.  And it could be, you know,

19   continued, there could be an appeal, I mean this could be --

20           THE COURT:  I have adequate protection issues of the

21   building itself and the loan.

22           MS. HAYWARD:  But, Your Honor, to the extent that

23   Ms. Zahire or anyone else want to come in and try to bid for

24   the equity in the Debtor, I mean that is certainly something

25   available to people to do.  But the timing here is clearly

49

1        suspect.

2                THE COURT:  On a lot of fronts.

3                MS. HAYWARD:  On a lot of fronts.  But the timing

4        here between NBK, and I'll represent to Your Honor that this

5        is something that would come out through discovery, but I'm

6        not sure that NBK and these lawyers here aren't working

7        together --

8                MR. WETWISKA:  That's ridiculous.

9                MS. HAYWARD:   -- to get to where we are right now.

10       And --

11               THE COURT:  They may be.  I don't know.

12               MS. HAYWARD:  But that -- but that's a problem, Your

13       Honor.  A problem because we have lawyers who we don't know

14       whether they actually represent the entities they're

15       purporting to represent.

16               THE COURT:  That's what they say about you,

17       Ms. Hayward.

18               MS. HAYWARD:  Well --

19               THE COURT:  That's the problem.  Right?

20               MS. HAYWARD:  But --

21               THE COURT:  Right?  In other words, they're saying

22       who is -- who is representing Galleria 2425 Owner and who's

23       looking for loss -- litigation.  Are they -- who is looking

24       for potential causes of action on behalf of Galleria 2425,

25       who's analyzing those potential lawsuits?

1          MS. HAYWARD:  Your Honor, I am, and I filed one on

2     behalf of the Debtor against NBK.

3          THE COURT:  Yeah, all right.  You know where I'm

4     going.  I don't want to go there.

5          MS. HAYWARD:  But Your Honor stated at the last

6     hearing there was no (indiscernible).  Your Honor had a list

7     of payments disclosing a SOFA to a management company.  There

8     was no evidence of fraud presented to the Court.  There was no

9     evidence of wrongdoing presented to the Court.  That's where

10    we go back to, and here we are now at a status conference

11    later and it's like those same issues keep percolating even

12    though there's no evidence in the Record of any of it.

13         Again, this idea -- of course Mr. Choudhri controls

14    this Debtor.  This is a single asset case, it's a family-run

15    business, and there's no reason why this Debtor shouldn't be

16    able to try to reorganize.  Your Honor recognized that trying

17    to save equity is a valid reorganization purpose.  And, you

18    know, I've got all of these creditors now coming in here and

19    trying to throw wrenches into things, and I understand.  But

20    there are mechanisms under the Bankruptcy Code to address

21    these issues.

22         And if Your Honor wants and equity auction, we can

23    do an equity auction.

24         THE COURT:  You don't have the money for it, to

25    continue that plus the litigation, plus they're going to have

1   to get interest if we do all that.  That's the problem.

2                MS. HAYWARD:  Your Honor, we have a plan on file --

3                THE COURT:  Your plan --

4                MS. HAYWARD:   -- that is confirmable in my

5   opinion --

6                THE COURT:  I understand you think --

7                MS. HAYWARD:   -- if it's market -- if we market

8   test it with Your Honor.

9                THE COURT:  Who's going to pay for that market

10  testing while you pay interest to that secured creditor?

11               MS. HAYWARD:  Well, Your Honor, I don't believe the

12  Code states that interest -- as long as a plan is on file, it

13  has to be confirmed within a certain amount of time.

14               THE COURT:  Oh, no, no, but, yeah, but you --

15               MS. HAYWARD:  Right?

16               THE COURT:  You're -- how are -- Ms. Hayward, I --

17               Folks, I -- you filed a plan that has a number on a

18  wind down issue.  If you try that issue, it would require

19  market testing.  Market testing would require several months

20  to market test, so you would have to then not just reach out

21  to 1 party, you would have to then reach it, figure something

22  out like hire a realtor, like go out and really shop this

23  thing and figure out, Anybody want this building, and what are

24  you willing to pay for it.

25               And in the meantime someone would have to pay -- I

52

1    would require NBK to get paid during that period, at least

2    interest on the loan.  Like we're not -- this isn't like a 30-

3    day plan.  It just can't happen that way.  I know it got filed

4    really fast, because I know that's what the Code says, and you

5    were smart and you got in there, you had to pay interest so

6    you didn't -- but how do you then -- but your plan isn't

7    seeking to pay them.

8         Your plan isn't, you know, I'm going to sell the

9    assets to someone.  You're selling it for wind down value, for

10   wind down costs is exactly what you're doing.  In other words,

11   Choudhri's entity is going to put up -- and there's nothing

12   wrong with that, I'm not saying he did anything wrong, what

13   I'm saying is somebody's putting up an amount of money, so

14   what it would take to get through this case.  Right?  To wind

15   this issue.

16        There's a pot of money in there.  The question is,

17   is someone willing to put more in there and how do we then

18   resolve all of these issues until that goes there.  I'm

19   looking at the pledge agreement too, and that pledge agreement

20   has a lot of issues in there as to what is collateral or not,

21   102-5.  There's a lot of issues to get fought, and 50, you

22   know, 70 grand, how many grand's going to get taken for 1

23   month of interest to your client?

24             MS. HAYWARD:  Your Honor --

25             THE COURT:  I don't have anything to qualify it in

53

1    State Court issues.  I don't know.  There's just a lot of
2    confusing stuff, and my gut tells me that I need to dismiss
3    this case and let you all go figure this out in State Court,
4    because there's not enough here, and there's real concerns
5    that I have, and the concerns that I have are going to cost a
6    lot of time and money to address, and I'd rather let everybody
7    go to State Court, figure all these issues out and take it
8    there because NBK's going to need interest payments if we're
9    going to go really sort all this out.

10   And I don't know if we have the time or money to do
11   it.  That's the issue.  We were already on the verge of no
12   cash on the interest and we're going to get into adequate
13   protection on a building with no loan payments with an entity
14   that hasn't been paid in a long time.  You're going to run out
15   of money real fast, and that's the question.

16   I'm not saying they need to go foreclose.  I mean
17   whatever rights people have under state law they have, and I
18   don't want to cast dispersions one way or the other, or make
19   any -- make findings one way or the other.  But it just seems
20   to me that you just look at the big picture issue.

21   I don't -- and I don't want somebody coming back to
22   me, because I would really dismiss it out hand -- outright,
23   that this Debtor didn't have a right to file and Ms. Hayward
24   did anything wrong.  I think that would be a silly waste of
25   time and money.  I wouldn't even hear it.  I wouldn't even

54

1    hear the lawsuit, I'd just dismiss it right away.  I wouldn't

2    even take it up.  The question of that would be ridiculous to

3    me based upon everything that I know.

4            I just think you all need to go to State Court and

5    go decide the Naissance issue, go decide the State Court

6    issues, the issues I think Mr. Choudhri deserves.  He's got

7    obviously a great lawyer and I think these issues can get

8    sorted out in State Court one way or the other.  But this

9    bankruptcy case is going to essentially be on freeze for the

10   next 5 months until I decide some of these issues.

11           Did someone file something in my court that implies

12   other stuff?  Did someone represent to me that they were the

13   mezz lender under oath and they really weren't the mezz -- in

14   control of the mezz lender?  I don't know how I proceed

15   without that, without going forward.

16           Those are like serious allegations, and I think they

17   were set in front of me, but I don't -- but I don't -- right

18   now I've got to like deal with stuff like this and I can't go

19   forward without it.  So I think the easiest thing for me to do

20   is to protect everyone and just dismiss the case.  You know, I

21   think the case can -- you know, if parties want to come back

22   after this issue is decided, file it in the Houston Division

23   and a judge can take it up.

24           But right now there's nothing to do and I'm going to

25   freeze everything anyway, so I don't know -- I don't know what

55

1    people are -- what people could do.  We can't go forward.

2              MS. HAYWARD:  Your Honor, may I just make a --

3              THE COURT:  Yeah --

4              MS. HAYWARD:   -- a couple of points?

5              THE COURT:  Yeah, absolutely.

6              MS. HAYWARD:  Okay.  Number 1, I hear Your Honor

7    about the market testing.  I'm not sure that I quite agree

8    with it respectfully --

9              THE COURT:  I understand.

10             MS. HAYWARD:   -- in that this is a cram down plan

11   based on collateral value and undisputed collateral value.

12   Right?  We have a building that has an appraisal that NBK

13   commissioned that sets a value of that building.

14             MR. CONRAD:  Okay.  Can I rebut that real quick?

15             THE COURT:  No, no, no --

16             MR. CONRAD:  That's not --

17             THE COURT:   -- what -- let me -- I know people have

18   to -- but let me just throw a hypothetical at you.  Okay?

19             MS. HAYWARD:  Yes, Your Honor.

20             THE COURT:  Say someone comes in and says, I want to

21   pay 50 million bucks, I'm just making up a number, 100

22   million --

23             MS. HAYWARD:  Okay.

24             THE COURT:   -- bucks, okay, I'm making up a number.

25             MS. HAYWARD:  Then Your Honor's going to value the

56

1      building.

2                  THE COURT:  No, no, but I'm saying but who --

3      somebody has to go out there and figure out whether someone

4      wants to put more money in, because then that pays them more,

5      even if -- even under a cram down plan they get paid, they get

6      paid more of their money.  Right?  In other words there's a

7      cram down plan and if you're going to cram someone down,

8      you're not going to pay them 100 percent on the effective

9      date, then to me you've got to market test because you can't

10     just say, Here's the value of the collateral, here's how much

11     money somebody's going to put in, either you want it, you've

12     got to put more in.

13                 It's got to be market tested.  Maybe someone wants

14     to pay the -- maybe the -- someone has to look out for the

15     estate and say, I want to pay my creditors as much as

16     possible, here's an amount of money that, right, yeah, you're

17     crammed down under, you know, 506 crams you down and you just

18     lose on that point, but boy, I've got you 70 percent and not

19     the other part.

20                 MS. HAYWARD:  But, Your Honor, if that's the case,

21     then it goes to the value of the collateral.  Right?  I mean

22     Your Honor decides the value of the collateral and typically

23     you have --

24                 THE COURT:  And the --

25                 MS. HAYWARD:   -- competing appraisals.

57

1              THE COURT:  You have competing appraisals, right.

2    But who's then going to determine the amount of money that --

3    who owns this thing at the end of the day?

4              MS. HAYWARD:  Well, but again, that's why the plan -

5    - the plan proposes, as filed, right --

6              THE COURT:  Uh-huh.

7              MS. HAYWARD:   -- bifurcate the debt to NBK --

8              THE COURT:  Uh-huh.

9              MS. HAYWARD:   -- and to put $2-1/2 million in t

10   stabilize the building and then millions of dollars get paid

11   to creditors from --

12             THE COURT:  What if somebody wants to put 10 in,

13   what if somebody wants to put more money in?  In other words

14   how do we know --

15             MS. HAYWARD:  But the Bankruptcy Code doesn't -- I

16   mean that's why the -- that's a competing plan, isn't it --

17             THE COURT:  It's not --

18             MS. HAYWARD:   -- Judge?

19             THE COURT:   -- no.  No.  No.

20             MS. HAYWARD:  How is that -- that's a competing --

21   because the money going in is not the money going to

22   creditors.  The money going in is what's needed to fund the

23   plan.  The plan proposes certain treatment to creditors.

24             THE COURT:  What's NBK's distribution under the

25   plan?

58

1          MS. HAYWARD:  I don't know off the --

2          THE COURT:  Assuming you win on everything.

3          MS. HAYWARD:   -- off the top of my head I don't,

4     but it's --

5          THE COURT:  Less than full?

6          MS. HAYWARD:  Less than -- no, under and 1111(b)

7     election we believe it does pay them in the full amount of

8     the --

9          THE COURT:  I don't know --

10          MS. HAYWARD:   -- settled debt.

11          THE COURT:   -- they get to choose 1111(b) election,

12    so let's just say there's no 1111(b) election.

13          MS. HAYWARD:  Okay.  It still pays them -- it pays

14    the full value of their secured claim certainly.

15          THE COURT:  Over how many years?

16          MS. HAYWARD:  Your Honor, I've slept a little bit

17    since I prepared the plan, but I don't think it's --

18          THE COURT:  I haven't slept in 3 weeks.

19          MS. HAYWARD:  I have no doubt, Your Honor.  Your

20    Honor, I can pull a number --

21          THE COURT:  No, I'm just saying -- say somebody

22    wants to come in and say, I want to pay it, I want to pay it

23    all now.

24          MS. HAYWARD:  Your Honor, I think it was a 10-year

25    interest --

59

1          THE COURT:  10-year.  Say somebody wants to come in

2     and pay it in 2?  Right?  Like that's the -- it's -- that's

3     the point, you've got to -- you can't just propose, Here's

4     what we're going to do and here's -- my insider entity is

5     going to own this company, but --

6          MS. HAYWARD:  But --

7          THE COURT:  -- Ms. Hayward, you're never going to

8     get me there.  You're never going to get me there, and I know

9     I'm right on this one.  We can just agree to disagree.  But I

10    know that this case can't go forward as drafted, and I know

11    that they'd be entitled to interest to it while this issue

12    gets decided.

13         And I'm not even going to ask the questions about

14    decisions that were made in connection with the settlement.

15    There's just so many things, so many questions that I would

16    have to get decided.  Right?  There's a settlement agreement,

17    someone puts in a lot of money, but then also doesn't pay a

18    lot of taxes, decisions that were made then just -- there's

19    just so much going on, we're just never going to get there in

20    a month, month and a half.

21         I'm looking at the, Page 2.  Let me just take a look

22    at something.

23         (Pause in the proceedings.)

24         THE COURT:  Well, I think whoever they are I think

25    under 1112 the Court, on request of a party-in-interest, but

60

1    105 says -- 105 says that nothing prevents the Court from

2    considering things based on the circumstances, where we are,

3    where the Court finds itself is Galleria 2425 Owner, LLC was

4    filed on July 5 to avoid a foreclosure.  Nothing wrong with

5    that, it happens all the time in Bankruptcy Court.

6         Based upon the Court's review the petition was filed

7    by the manager, of course heard no evidence that the manager

8    didn't have authority, corporate authority to file.  The

9    manager then filed a disclosure statement and a plan.

10        MS. HAYWARD:  Your Honor, I believe Mr. Choudhri

11   signed the disclosure statement.

12        THE COURT:  Mr. Choudhri signed the disclosure

13   statement.  Are you sure about that?  Let's find out.  I'm

14   going to look it up real quick.  Disclosure statement.

15        (Pause in the proceedings.)

16        THE COURT:  Oh, he sure did.  I take that back.

17   Mr. Choudhri filed, the owner, the manager.  Well, I guess

18   there's 2 managers.

19        MS. HAYWARD:  Yes, Your Honor.

20        THE COURT:  Is the manager who filed --

21        MS. HAYWARD:  Your Honor, the corporate resolution

22   that was signed prior to the petition date pointed to both

23   Mr. Choudhri and Mr. Darjeen (phonetic) as the managers of

24   the -- and is designated officers for purposes of the

25   bankruptcy filing.

1           THE COURT:  All right.  No, I find nothing wrong

2      with that based upon what I have in front of me.  Mr. Darjeen

3      filed the plan, signed the plan.

4           MS. HAYWARD:  Yes, Your Honor.

5           THE COURT:  I don't want to ask that -- I think -- I

6      like Mr. Darjeen a lot.  Mr. Darjeen I think is a good man and

7      I'm not going to ask him.  When the petition was filed by

8      Mr. Darjeen, Mr. Darjeen filed a Chapter 11 plan.  And I'm

9      sure he's well familiar with the intricacies of that Chapter

10     11 plan and everything in it and what the Section 1129

11     standards are in connection with plan confirmation.  I'm sure

12     he's well familiar with that.

13          Mr. Choudhri filed the disclosure statement.  The

14     Debtor filed with approximately, I don't know, $56,000 worth

15     of cash.  As of the last MOR filed the Debtor probably has

16     135,000 in cash minus 20,000, a little over 20,000 that the

17     Debtor is required for a utility deposit that is still -- to

18     my knowledge has not been provided yet to utilities, which

19     means that the lights could be shut off at any moment.  But

20     that's a quick remedy.

21          State Court, in an unrelated case involving

22     Ms. Zahire and Naissance and Mr. Choudhri, issued a temporary

23     injunction on September 21, not allowing a party to an

24     adversary proceeding to proceed.  So it's like there are

25     additional matters set before the status -- I mean if there is

1      a question as to who owns Naissance, Naissance is a lender to
2      Galleria 2425 JV, LLC.  There's a dispute about who the owner
3      is and whether there were statements made.
4            There was an assignment under fraud.  The Court
5      makes no findings about that one way or the other, just based
6      on the temporary injunction, that's what it says.  I would
7      note that there were statements made in this Court in
8      connection with the cash collateral hearing as to whether that
9      was the case or not as well.
10           There's a pledge agreement as well, and the
11     underlying loan between Naissance and Galleria 2425, at least
12     on its face purports to provide this Debtor as 100 percent of
13     it being the collateral, 100 percent equity interest as
14     collateral on its face.  Whether parties can dispute that or
15     not, I'm just saying what it says on its face.
16           So the Court finds itself, whether there's going to
17     be additional hearings in adversary between Galleria 2425.
18     Naissance is a defendant in this case, but it can't proceed
19     because the other Naissance, Ms. Zahire, has indicated, at
20     least verbally to this Court, that they don't intend to
21     proceed with the adversary and have filed a motion confirming
22     that they can proceed in another court to exercise their
23     rights under the temporary injunction.
24           So the underlying adversary proceed that is pending
25     before the Court -- well, that just breaches the confidential

63

1    settlement agreement between NBK and other -- the Debtor and

2    other parties, tortious interference with business relation,

3    fraudulent inducement, so it's really serious, and a

4    fraudulent conveyance action.  There's not enough money to

5    proceed with that lawsuit based upon where the Court is, and

6    administrative costs, and I believe in lawyers who do good

7    work and have followed the Code should be paid.

8            This case quickly runs into a situation where there

9    is a plan on file, there's a disclosure statement on file,

10   this Court is not comfortable proceeding with that with --

11   based on all the issues that are proceeding in this case.

12   There are issues about ownership of the Debtor's parent which

13   may or may not affect the underlying lawsuit here.  It sounds

14   like there was a freeze put in by the State Court.

15           But there's time and then there's money.  There

16   would need to be a judicial determination, a contested

17   confirmation hearing.  And litigation, the litigation can't

18   continue which freezes the Court.  There would need to be a

19   contested confirmation hearing.  And there's not enough money

20   to do all of that.

21           And there's State Court issues involving fraud.

22   This Court could take them up.  But really the State Court's

23   already in the best position to deal with many of these

24   issues, and the parties are essentially asking the Court to

25   allow them to proceed in State Court.  Whether Ms. Zahire has

64

1    any right to anything, whether she's done everything right, I

2    don't -- I have no idea and are making no findings one way or

3    the other about what Ms. Zahire's rights are.  If it turns out

4    that she didn't have a right to do any of what she did, that's

5    going to be a real problem, and I think the State Court would

6    be in a position to address those issues here.

7            (Pause in the proceedings.)

8            THE COURT:  The Court's already held a hearing on a

9    motion to dismiss the case based upon, among other things, the

10   amount of money it would take to continue this case.  The

11   Court denied it based on the evidence presented to the Court

12   at the time.

13           NBK now seeks and files objections along with the

14   United States Trustee as to whether Ms. Hayward's qualified to

15   serve as Debtor's counsel under Section 327 of the Bankruptcy

16   Code.  The Court has not taken that issue up.

17           But for this case to continue there's going to have

18   to be a lot of money.  I'm going to have to require NBK to get

19   paid interest.  There's just not enough money in the budget,

20   this Debtor is going to run out of money really fast.  And the

21   Court's in the position where it's going to have to take it

22   all, or none, even if we're going to take it up all and deal

23   with allegations where somebody has made a representation to

24   this Court, or potentially made -- maybe say potentially made

25   representations to this Court that could be really tricky.

1          Interest on the loan to NBK at the non-default rate

2     is about $353,000 a month.  On the default based on the

3     evidence presented at the cash collateral, it was about

4     $447,000 a month.  The only way this case survives is if I

5     don't require NBK to be paid any interest on that loan pending

6     the resolution of State Court matters, the matters of plan

7     confirmation, and I'm unwilling to do that, which makes this

8     case immediately administratively insolvent.

9          No way this place could proceed.  The Court would

10    have to deal with serious allegations that were made in this

11    Court.  The Court would have to deal with whether there's

12    certain debt, whether this Debtor is subject to certain -- is

13    collateral under the debt, who the owner, who controls the

14    parent, what the parent wants to do, a lot going on here.

15         The allegations that are alleged, the Court would

16    have to really do a lot of finding and it would require a lot

17    more investigation.  I don't know.  Mr. Choudhri's involved in

18    litigation at the State Court level involving Naissance

19    alleging some strong allegations, I don't need to get into

20    them because I don't want to, but here Mr. Choudhri is listed

21    as an unsecured creditor to the tune of $960,000.  He also

22    controls a number of entities that are owed nmoney, and

23    Mr. Darjon (sic) filed these under penalty of perjury,

24    assuming he did his diligence.  He's a good man.

25         The Debtor has filed a plan but that plan cannot

1    proceed, not with all the pending allegations that are going,

2    not with all the required time and cost that would be

3    existent, including a market test of what the Debtor's

4    proposing to do, which is to allow the equity interest in this

5    Debtor to proceed to an insider.  And I mentioned on the first

6    day that that would need to be market tested because it

7    involves an insider, and there's a lot of fights going on.

8    And all that tells me is there would need to be funds payable

9    to deal with that litigation, and all it's going to eat into

10   is potential recovery.

11          A lot of investigations that would need to happen.

12   I think in closed cases, especially with the amount of money

13   involved and the amount of time and money involved, someone

14   would need to get me comfortable that they've looked into

15   these issues to make sure that unsecured claims are due and

16   proper, that they shouldn't be questioned, the amount of any

17   of them.

18          I raised a lot of issues about preference claims,

19   and I think they don't need to be brought in every case.  I

20   think someone just has to look at them to see what the issue

21   is there.  The issue here is that the allowed Class 7, the

22   allowed interest of the equity and interest on it are going to

23   be cancelled and they're going to be reissued to a new equity

24   holder based on a $2.5 million contribution.  For $2.5 million

25   you could own this company.

1        And that's what they want to go forward on, and I'm

2    not going to allow them to do it.  Where did that number come

3    from?  Based on this, is there a better number out there?  Is

4    there someone willing to put more money in to pay unsecured

5    creditors more money, general unsecured claims.  This milks

6    large general unsecured claims here as well.

7        This isn't a 2-party dispute.  There's a lot of

8    parties involved in this case, and I don't think you can do

9    any of that, and we can't get there without paying any

10   interest on at least several months of interest to Bank of

11   Kuwait.  I would have to revisit my entire cash collateral

12   order, I would have to revisit adequate protection to a

13   secured creditor while the State Court litigation plays itself

14   out, while allegations about fraud are taken out, some of

15   which could play -- find themselves here in front of this

16   Court based on representations that were made to me.

17       All of that, the timing of this case, the fact that

18   a plan could not even be considered until well into early

19   2024, the fact that I would require -- if to do that I would

20   require interest payments to be going to the secured creditor,

21   not just because this is a single asset real estate case, as

22   you can file a plan where you could pay interest, but in this

23   case based on all these allegations and all this confusion and

24   all this -- and the investigations that would need to go

25   forward, the secured creditor I think would be entitled to a

1    plan, because you can't confirm this plan quickly.

2         You can't get quickly to plan confirmation based

3    upon the issues that I've identified.  And there would have to

4    be investigations.  All right.  Some Court's going to have to

5    do it.  The State Court's already taking it up.  And this

6    Debtor is in no position to pay one month, or even a half a

7    month of interest to secured creditor.  Secured creditor

8    hadn't been paid in quite some time.

9         I don't -- before the Court spends the time and the

10   expense questioning, and I would note that the only way

11   secured creditor -- you know, while the Court spends the time

12   and the money taking up lawyer fees where Ms. Hayward would

13   have to defend herself, and I believe in her success, will

14   have a right to be paid.

15        Maybe she wins, maybe she loses.  If she loses, then

16   this case gets immediately dismissed, I've got to give --

17   because to then take time to go find new counsel, and you

18   still have to pay interest.  But if Ms. Hayward wins they've

19   now taken enough money.  This Debtor doesn't have enough money

20   to pay even a half a month of interest on the secured loan and

21   it would take until early 2024 to go deal with that.

22        I'm dismissing this case effective today under

23   Section 1112(b) for cause.  I would also note that this case

24   was filed in Victoria.  In connection with this I don't see a

25   connection with Victoria as well.  The cost to transfer this

69

1    case to the Houston Division and potentially assign the Chief

2    Judge to go find a new -- yeah, I'd still would need to pay

3    interest.  There's a lot of moving pieces here.

4           Maybe I would have transferred it to myself, I'd

5    note that, that I think I have the ability to do that in

6    certain cases.  And I'd just note that if this case does get

7    refiled I think the Houston Division is probably the right

8    division based upon the way the local rules have now been

9    amended to read.  I find nothing wrong with the filing.  I

10   find Ms. Hayward and done nothing wrong.

11          I don't think Mr. Pope has done anything wrong, but

12   I would tell Mr. Pope, I hold you in great regard.  I think

13   you've got to come to me and tell me if something gets filed

14   on, because I hold you in such high regard.  You appear in

15   front of me routinely, that means you've got to show up and

16   tell me stuff when stuff happens sooner.  I don't like hearing

17   it from third parties.  It makes me wonder stuff.  But

18   sometimes it's just a timing issue, so I don't want to read

19   too much into that.

20          This case cannot proceed without interest being paid

21   based on the investigation.  And I know I'm repeating myself.

22   I'm just stressing the issues here.

23          I make no finding about Mr. Choudhri, I make no

24   finding about Ms. Zahire.  Everybody has their rights.  I'm

25   going to let you all deal with this stuff in State Court.

70

1          The Court comes back, I make no findings about the

2     settlement agreement, the validity of the settlement

3     agreement, where things stand and who has a right to and what

4     the circumstances were, whether the allegations in the

5     adversary proceeding had merit, whether they have no merit,

6     the circumstances why payments weren't made during the

7     pandemic, why tax claims were allowed to accrue at such a

8     level, whether people could have done more.  I know the

9     lawyers didn't do anything wrong, and I'll leave it there.

10          I've never done this, I hope to never do it again,

11     but I think it's the right call in connection with this case,

12     and so that's my ruling, I've done it on my own.

13          MS. HAYWARD:  Your Honor, may the Debtor request

14     that Your Honor defer entry of an order for 10 days to see if

15     the parties can reach a resolution on the Naissance issue to

16     allow this case to move forward?

17          THE COURT:  No, I'm going to issue my order, and

18     then I'm going to let you all -- if you reach something, just

19     file something and ask me to reconsider, and I'll do it.

20          MS. HAYWARD:  I would also, Your Honor, just so that

21     the Record is very clear, I apologize --

22          THE COURT:  Uh-huh.

23          MS. HAYWARD:   -- that to the extent that --

24          THE COURT:  That was a contact issue, that wasn't me

25     rolling my eyes or anything, I was just -- I apologize, I know

1    it made you --

2              MS. HAYWARD:  Great, Your Honor.  I thought you were

3    rolling your eyes at me and I was going to stop.

4              THE COURT:  No, no, no, I appreciate it.  No, no,

5    no, no, I appreciate it.  That was just a contact issue.  I

6    apologize, I want to be really clear about that.

7              MS. HAYWARD:  I just want, for the Record, to say

8    that to the extent that -- and I appreciate Your Honor's

9    concern about payment of fees in this case, but one thing I

10   will tell Your Honor is that I have committed to this case and

11   so I see that as my risk.  Okay.  And I just want to make sure

12   the Record reflects that.  Number 2 --

13             THE COURT:  I agree.  No, I know, you're -- you

14   don't -- you don't abandon ship.  I know that about you, and I

15   know that you would have done your -- fulfilled your ethical,

16   and what you would consider to be your duty to your clients.

17   I'm doing this, not you.

18             MS. HAYWARD:  Yes, I understand, Your Honor.  I also

19   believe I take cases that -- I believe in justice.  Okay.  I

20   believe in justice and I fight for justice.  I also want to

21   point out that to the extent that interest payments were

22   required to be paid to NBK, there's obviously a dispute as to

23   the amount of that debt.  And so the $350,000 number that Your

24   Honor has stated I believe would be based upon a calculation

25   of the stated loan documents rather than the settlement

72

1    amount --

2            THE COURT:  No, no, no, I agree.

3            MS. HAYWARD:   -- which would be very different.

4            THE COURT:  I agree.  I agree with you there.  I'm

5    just saying when you're dealing with a debtor who has like

6    100,000 in cash maybe, I don't know, let's just say 110, that

7    number's going to get swallowed up in a month or 2 regardless

8    of what it is, and that doesn't even allow for admin costs to

9    be considered.  I agree with you, the loan documents say 350

10   and there was a settlement agreement, but people are fighting

11   about the settlement agreement, where there's interference

12   about the settlement agreement.

13           I've got to come up with a number one way, and I'm

14   not letting lawyers -- I've got it, lawyers take their risk

15   and I'm not -- those are administrative costs as well of the

16   estate and the answer isn't zero while -- say that number --

17   say we've even allocated 80,000, 100,000 under the settlement

18   agreement, you -- one month it's still done.

19           MS. HAYWARD:  Unless, Your Honor, someone is willing

20   to put in additional money to fund that to get to

21   confirmation, which I believe we stated at the motion to

22   dismiss hearing that Mr. Choudhri was willing to fund money to

23   keep this case going.

24           THE COURT:  Right.  But that's going to require then

25   looking into Choudhri.  And that's what I mean, it's a

1        revolving door.

2                MS. HAYWARD:  Your Honor, I will tell the Court that

3        Mr. Choudhri here has nothing to hide, and welcomes his --

4                THE COURT:  I'm not saying he does.

5                MS. HAYWARD:   -- day in court.

6                THE COURT:  I'm not saying he doesn't.  I'm not

7        saying he does, I'm not saying he doesn't.  I just think it's

8        required in every case, especially with -- there's a case

9        where unsecured creditors are going to get paid X amount, and

10       you have an unsecured creditor -- an insecure claim for

11       $960,000 stated on the books.  I think somebody gets to look

12       at that.

13               MS. HAYWARD:  Well, Your Honor --

14               THE COURT:   And it just makes your request -- plus

15       potential preference issues, plus -- and they could all be

16       legit is what I'm saying.  But now there's allegations of

17       fraud flowing out there and there's allegations of other stuff

18       going on.  It just takes a lot of time and money to get to the

19       right answer, that's what I mean.  That's all I'm saying.  I'm

20       not implying anything.

21               I don't want anyone to run to a State Court and say,

22       Lopez is implying -- I'm just saying all of that takes time

23       and money, and the minute I start opening up the door and

24       saying, What are the admin costs in this case, what is NBK

25       supposed to get paid, we've run out of money and it happens in

74

1    the nmonth of November.  What are we doing?  We don't get to

2    plan confirmation, plus the market testing that I'm going to

3    require, plus a contested confirmation.  It just -- you look

4    at it, there's -- the minute I open up interest on any amount

5    you're done, this case is administratively proceeding.

6              And the adversary proceeding cannot proceed, which

7    has really strong allegations that may be Mr. Choudhri wins

8    all or them.  I can't -- Naissance I don't know whether they

9    would come in or not, but the Debtor and Mr. Choudhri maybe

10   they win all of that stuff.  I don't know.  But there's got to

11   be money for it though.

12             MS. HAYWARD:  Understood, Your Honor.  I also just

13   want to point out that under the plan unsecured creditors are

14   getting paid.  All of the claims with respect to the building

15   are paid in full early in the plan --

16             THE COURT:  Uh-huh.

17             MS. HAYWARD:   -- and then the Debtor is paying

18   another several million dollars on account of the NBK

19   deficiency and the other creditor claims that are out there.

20             THE COURT:  Uh-huh.

21             MS. HAYWARD:  Plus paying NBK monthly.

22             THE COURT:  For 10 years.

23             MS. HAYWARD:  Yes, but with an amortization, it's

24   not --

25             THE COURT:  No, no, I agree.

page_number

1          MS. HAYWARD:   -- it's not, you know --

2          THE COURT:  But what I'm saying --

3          MS. HAYWARD:   -- negative amortization.

4          THE COURT:  That's what I'm saying, it's the 2.5

5    mil.  Right?  But if somebody injects 10 million, you've got a

6    whole different animal.

7          MS. HAYWARD:  Well, I get Your Honor, I hear that

8    that's Your Honor's position, I don't -- I respectfully

9    disagree.

10          THE COURT:  I know you do.

11          MS. HAYWARD:  I mean I think that under the Code I'm

12    entitled to bifurcate claims and come up with a plan that

13    proposes something to pay creditors.

14          THE COURT:  I just think when you -- you know, but

15    you talk to insiders.  We're talking about what happens to the

16    equity interest, I'm not talking about bifurcation of claims,

17    I'm talking about equity interest.

18          MS. HAYWARD:  Yes, Your Honor, and equity --

19    somebody is coming in and willing to fund the $2-1/2 million

20    that is needed in order for the building to be stabilized.  So

21    they are fronting the payments that are going to creditors.

22    If Your Honor looks at the projections --

23          THE COURT:  No, I'm looking at all that.

24          MS. HAYWARD:   -- the building runs at a deficit for

25    the next 2 years.

1          THE COURT:  Well --

2          MS. HAYWARD:  So that's the --

3          THE COURT:   -- we're just going to agree to

4     disagree, Ms. Hayward.  I got it, it's -- I'm not saying --

5     it's really smart, it's just not market tested.  It's really

6     smart on paper, it checks all the boxes.  This checks -- it

7     checks all the boxes.  I got you.  You're going to run out of

8     money.  You won't get there.  You won't get to plan

9     confirmation.  You can't even survive on a contested plan

10    confirmation based on the amount of money that we've got here.

11    You don't.  You don't, because they're going to have pay

12    interest till we get there.

13          I'm going to have to figure out what's happening in

14    the adversary proceeding.  And if somebody lied to me on the

15    stand, I'm not saying anybody did, but if somebody did, it

16    turns out that something happened, somebody lied to me on the

17    stand, things get really uncomfortable around here.  And I

18    think everybody ought to go figure all that stuff out in State

19    Court.

20          And I don't put any weight to what Mr. Drinnon told

21    me.  I don't put any weight to what Mr. Tang told me.  I don't

22    put any weight to anything else.  I haven't taken a lick of

23    evidence.  It's just like a pleading, people get to say stuff.

24    I take it seriously though.  We have to think of it here, but

25    that's not happening.  Those are allegations that the lawyers

1        have ethical duties to make statements in front of Court that

2        are based on ethical duties, but I don't know.

3               But we -- somebody's going to have to then tell me,

4        We looked at insider claims based on all these allegations and

5        we find no evidence, somebody's going to have to -- like

6        that's what happens in cases.  That's what I mean, somebody's

7        going to have to tell me, I looked at the insider issues and,

8        yeah, I'm aware of all these allegations that are being made

9        and we think they're clean.

10              That's what I mean, somebody's got to do that.

11       That's the independent fiduciary part.  And I'm not saying you

12       haven't done it, I'm saying that's what would be required for

13       me to then make the finding that the plan was filed in good

14       faith and without, by any means, forbidden by law.  And I

15       can't make that finding because that's going to require time

16       and money, again, because there's allegations out there and

17       I've got to -- someone's going to have to deal with them, and

18       it could be me, or someone's going to have present a report to

19       me or some testimony.  And they did, maybe Mr. Darjon is the

20       guy to do it.  That's going to require time and money and

21       that's going to require interest, that's what I mean so.

22              MS. HAYWARD:  Then I would ask Your Honor to enter

23       an order that the Debtor must come up with -- either file some

24       kind of subordinated DIP motion or something and start paying

25       interest in a certain amount.  I mean, again, Your Honor,

78

1   we're trying to save this asset.

2          THE COURT:  No, I know, and you can --

3          MS. HAYWARD:  If this case gets dismissed because of

4   Mr. Tang and Mr. Drinnon --

5          THE COURT:  It's not being dismissed for Mr. Tang

6   and Mr. Drinnon, it's dismissed -- it's being dismissed for

7   far more than that.  If that's the case, you haven't heard me.

8   I'm saying we -- it's going to take time and money to resolve

9   a lot of issues, and it's entirely based on me saying no

10  interest to NBK.  Not 1, not 1, not 1/2, not 100, not 200

11  grand, nothing.

12         And if that's the case, then no money -- no

13  administrative costs to you, or to anyone else who works on

14  this case.  Or to anyone else who would be hired to provide

15  valuation testimony.  And I'm unwilling to do that.  I'm

16  unwilling to do that.  And the plan proposes, you know, that

17  an insider is going to receive -- is going to make a $2-1/2

18  million contribution and they're going to get the equity.  And

19  that's going to require some time and work to get me

20  comfortable.

21         If that's the case, then that's going to require

22  interest payments.   People are entitled to adequate

23  protection.  And everything hinges on me holding everything

24  and not doing anything until I decide this issue, and we run

25  out of money really fast, and I'm unwilling to do it.

1          So you have my reasons, they'll be on the Record,

2    and I'll just enter an order saying for the reasons stated on

3    the Record this case is dismissed.  And it's not about

4    Mr. Tang, it's about the allegations.  It's about allegations,

5    it's about interest, time, market testing under a plan, a

6    lawyer who's willing to go out there and risk not being paid,

7    but that doesn't mean that there's not an administrative

8    expense.

9          I don't know.  And I do know we can't proceed on the

10   adversary because of Naissance, and that issue has to get

11   resolved.  And I have an adversary proceeding right now where

12   all 3 are still there, and that can't proceed.  There's a

13   State Court injunction saying Naissance can't proceed.  I

14   don't -- why don't you all go fight about it.  Maybe they come

15   back -- it's just a freeze, but you can't -- but the problem

16   is they freeze the whole thing because they're involved in it.

17         So that's my ruling.  Thank you.

18         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

19    (Hearing adjourned 11:40 a.m.)

20

21

22

23

24

25                      * * * * *

80

1          I certify that the foregoing is a correct transcript

2     to the best of my ability produced from the electronic sound

3     recording of the proceedings in the above-entitled matter.

4        /S./  MARY D. HENRY

5     CERTIFIED BY THE AMERICAN ASSOCIATION OF

6     ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

7     JUDICIAL TRANSCRIBERS OF TEXAS, LLC

8     JTT TRANSCRIPT #67838

9     DATE FILED:  NOVEMBER 7, 2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# **<u>EXHIBIT 9</u>**

```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
 2                           HOUSTON DIVISION

 3                              )  CASE NO: 22-32998-jpn
      HOUSTON REAL ESTATE       )
 4    PROPERTIES,               )  Houston, Texas
                                )
 5            Debtor.           )  Wednesday, March 8, 2023
                                )
 6                              )  11:14 AM - 3:18 PM
                                )
 7    ------------------------------)

 8
                                 TRIAL
 9
                BEFORE THE HONORABLE JEFFREY P. NORMAN
10                 UNITED STATES BANKRUPTCY JUDGE

11
      APPEARANCES:
12
      For Osama Abdullatif,
13    et al.:              RODNEY LEE DRINNON
                           MICHAEL J. DURRSCHMIDT
14                         Hirsch & Westheimer, PC
                           1415 Louisiana, 36th Floor
15                         Houston, TX 77027

16    For the Debtor:      RON SATIJA
                           Hayward, PLLC
17                         7600 Burnet Road, Suite 530
                           Austin, TX 78757
18
      For the U.S. Trustee:  JANA SMITH WHITWORTH
19                         Office of the United States Trustee
                           515 Rusk Street, Suite 3516
20                         Houston, TX 77002

21    For Skaneatele rdX,
      LLC:                 BENNETT GREG FISHER
22                         Lewis Brisbois Bisgaard & Smith
                           24 Greenway Plaza, Suite 1400
23                         Houston, TX 77046

24

25
```

```
1   Court Reporter:           TRACEY CONRAD

2   Courtroom Deputy:         TRACEY CONRAD

3   Transcribed by:           Veritext Legal Solutions
                              330 Old Country Road, Suite 300
4                             Mineola, NY 11501
                              Tel: 800-727-6396
5

6

7   Proceedings recorded by electronic sound recording;
    Transcript produced by transcription service.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                            INDEX

 2    WITNESSES              DIRECT   CROSS   REDIRECT   RECROSS

 3    DWARD DARJEAN

 4       By Mr. Durrscmidt 19                 99

 5       By Mr. Fisher              79                    104

 6       By Ms. Whitworth           87

 7       By Mr. Satija              90                    107

 8    OSAMA ABDULLATIF

 9       By Mr. Fisher      111

10       By Mr. Satija              130

11    EXHIBITS                              RECEIVED

12    Exhibit 63-32                         34

13    Exhibit 63-12                         48

14    Exhibit 63-26                         57

15    Exhibit 63-27                         62

16    Exhibit 63-28                         67

17    Exhibit 63-29                         69

18    Exhibits 63-1, 63-2, 63-3, and 63-4   73

19    Exhibit 63-3                          75

20    Exhibit 63-5                          77

21

22

23

24

25
```

```
 1              HOUSTON, TEXAS; WEDNESDAY, MARCH 8, 2023; 11:14 AM

 2                         (Call to Order)

 3              THE COURT:  The next case is Houston Real Estate

 4    Properties, 22-32998.  Appearances, please.

 5              MR. DURRSCHMIDT:  Good morning, Your Honor.

 6    Michael Durrschmidt and Kim Lewinski with Hirsch and

 7    Westheimer.

 8              MR. DRINNON:  And Rodney Drinnon on behalf of

 9    Osama Abdullatif and Abdullatif and Companies.

10              THE COURT:  Thank you.

11              MR. FISHER:  Good morning, Judge.  Bennett Fisher,

12    F-I-S-H-E-R, on behalf of Skaneateles.  And I am new to the

13    case, but I have spent a lot of time learning how to

14    pronounce Skaneateles, and I always feel like if I know

15    nothing else I should know who my client is, and it is

16    Skaneateles.

17              THE COURT:  Thank you.

18              MS. WHITWORTH:  Good morning, Judge Norman.  Jana

19    Whitworth on behalf of the United States Trustee.

20              THE COURT:  Thank you, Ms. Whitworth.

21              MR. SATIJA:  Online, Your Honor, Ron Satija,

22    (indiscernible) on behalf of the Debtor.

23              THE COURT:  All right.  There are two matters

24    before the Court.  There's a motion to extend to extend the

25    specific period, and then a motion to join a Chapter 11
```

```
 1   Trustee.  Let me turn first to the motion to extend

 2   exclusivity.

 3            Generally, as a rule, what I do in these sorts of

 4   circumstances is whenever there is a motion to extend the

 5   exclusivity period, I always typically extend once unless

 6   there is an objection, and then I don't extend.  And the

 7   reason for that is very, very simple.  It doesn't stop the

 8   Debtor from filing a plan, it just allows other parties to

 9   do so.  As a practical matter, we want to confirm the best

10   plan so if someone else wants to file a plan, I'll let them.

11   Okay?  The exclusive period is run, I'm going to deny the

12   motion at ACF number 54 on that bases, based purely on

13   policy, based purely on the fact that I don't think it

14   prejudices any part of it.  All right?

15            So let's move to the motion to appoint a Chapter

16   11 trustee.  I think, Mr. Durrschmidt, that is your motion.

17   Do you want to give me a status of where we are on that

18   motion?

19            MR. DURRSCHMIDT:  Yes.  Thank you, Your Honor.

20   The -- we filed a motion to appoint a trustee.  The Debtor

21   filed a response last night at about 4:30.  And Skaneateles

22   filed some response this morning, and then we filed a reply

23   this morning.

24            MR. FISHER:  Skaneateles.

25            MR. DURRSCHMIDT:  Whatever.  Choudhri's mother.
```

001462

1       THE COURT:  I'm going to probably slaughter it as

2  well.  So, go ahead.

3       MR. DURRSCHMIDT:  So, yes.  We need to -- to move

4  forward.  We had subpoenaed the Debtor's principle to appear

5  in the courthouse today.  He's not here.  It -- it looks

6  like he may be on the screen.  And we're ready to go

7  forward, and I think that, you know, when the Court's ready,

8  I'll make my opening argument.

9       THE COURT:  All right.  There was, at least I

10  think from Mr. Fisher, some sort of response that perhaps he

11  had just recently been retained and he needed additional

12  time.  So, Mr. Fisher, because we're on video and everybody

13  needs to see you, you need to move to the podium.  So, tell

14  me what your position is at this point in time.  Apparently,

15  you are opposed.

16       MR. FISHER:  Yes, Your Honor.  I think that

17  Skaneateles would be prejudiced by, kind of, an appointment

18  of a trustee, whether it's under Chapter 7 or Chapter 11.

19  But more than anything else, I do need some time to be able

20  to get more familiar with the facts.  I see an awful lot of

21  fraud allegations back and forth.  I need to look at those

22  on behalf of the secure creditor.

23       We just got hired, and there's a hearing on a

24  motion to dismiss by the Debtor, I noticed, on April 5th.

25  That's a short time away.  There's insurance on the

```
1     property.  There's no allegation that the property's going

2     to be wasting away by any means.  And so, I ask that the

3     Court reset this motion at the same time as the motion to

4     dismiss, and then the Court's got plenty of choices.  It

5     would have the whole (indiscernible) in front of it at that

6     point after hearing some testimony, and -- and after I've

7     got an -- opportunity to -- to brief the issue or moreover,

8     review the facts.  Then the Court can decide either to

9     appoint a trustee under 7 or 11 or dismiss the case.

10         THE COURT:  Let me hear from Ms. Whitworth if she

11    takes a position.

12         MS. WHITWORTH:  Your Honor, the trustee doesn't

13    take a position on the continuance of the hearing.  There is

14    insurance, the (indiscernible) are up to date, and all of

15    the fees have been paid.

16         THE COURT:  Okay.  Mr. Durrschmidt, let's talk

17    about whether we should give Mr. Fisher and Mr. Fisher's

18    client a little more time.  And I don't want to give them

19    until April.  But, as a practical matter, he did just

20    appear.

21         MR. DURRSCHMIDT:  Yes.  But let's -- let's

22    consider what the secured creditor is.  The secured creditor

23    is a secured creditor who's deed of trust was filed post-

24    petition, not pre-petition.  The secured creditor is an

25    insider.  The secured creditor is Ali Choudhri's mother's
```

1   company.

2              And so, this idea that, you know, Mr. Fisher may

3   be new to the case, but certainly, all the other players

4   have been involved in the case forever.  And I think this

5   ties back to -- you know, this whole idea of appointing a

6   trustee ties back to if you look at the schedules, and you

7   look at the amended schedules, and you look at the way

8   things have been stated as, oh, these are our assets, no,

9   they're not our assets, even if you look at the reply that

10  was filed last night by the Debtor, the Debtor says, this is

11  a single asset case.  Well, if you look at the schedules,

12  it's not.

13             And you've got -- so what you've got -- you don't

14  have a secure creditor because the lien was filed post-

15  petition.  You've got an insider who has a voidable post-

16  petition transfer, which this demonstrates once again why a

17  trustee needs to be appointed so that somebody -- some adult

18  can get in the room, objectively look at what's going on.

19  So I don't think that there's any need for continuance.

20             If there -- if they've got a secured lien, they've

21  got a secured lien.  Whether the trustee's appointed or the

22  trustee's not appointed doesn't make any difference in the

23  position.  If they're unsecured with a voidable lien,

24  they're still in the same position.  So, there's no

25  prejudice to this creditor, if this creditor exists.

1          And by the way, Your Honor, I would point out that

2     if this creditor is even a creditor and advanced $450,000 to

3     the Debtor within 90 days of the bankruptcy, where did that

4     money go?  It's not scheduled.  It's nowhere in the

5     statement of financial affairs.  There's no payment of

6     anybody else by the proceeds.  There's no deposit into a

7     bank account.  In fact, there is no bank account.

8          This is a Debtor that has no money, has no income,

9     has no employees, has no business operations.  And by the

10    way, who's paying the insurance?  Because the Debtor can't

11    be paying the insurance, somebody else has to be paying the

12    insurance.  Who's mowing the lawn?  Who's maintaining the

13    property?

14         The Debtor doesn't have any proceeds.  That's why

15    we need a trustee.  And I think there's no point and there's

16    no prejudice to whatever this creditor is whether secured,

17    unsecured, or nonexistent.  But we need a -- we need a

18    trustee to come in here and look at what's going on with the

19    operations in this business and look at it objectively and

20    tell us what the assets are and what the liabilities are

21    because right now, we don't know.

22         MR. COURT:  Mr. Fisher, I'll let you respond to

23    that before I go back to the Debtor's counsel for his -- his

24    comments as well.  Go ahead.

25         MR. FISHER:  Sure.  Thank you, Your Honor.  First

1    of all, Mr. Durrschmidt raises the very issues that I need

2    to go look at on behalf of the secured creditor.  And, you

3    know, without regard to the air quotes that I saw Mr.

4    Durrschmidt when he talked about a secured creditor, my

5    understanding is -- and I have not had an opportunity to

6    review the documents -- but my understanding is that the

7    deed of trust was executed prior to the filing of the

8    bankruptcy and then the only thing that happened afterwards

9    is that the creditor filed the deed of trust with the

10    property records.  I -- that's what I'm led to believe.

11          But in terms of their being an adult in the room,

12    I think there already is at least two adults in the room,

13    Your Honor, and the US Trustee's Office.  And then,

14    secondarily, in terms of somebody looking into these issues,

15    that's one of the things that I need to look into.  I need

16    to protect Skaneateles, the secured creditor in this case,

17    and make sure that, you know, the property doesn't get sold

18    out from under it for less than the value.

19          I think it was Mr. Durrschmidt's client that is

20    alleging that the property is not worth an excess of the

21    amount of the debt.  And if that's the case, then we have to

22    make sure that they -- if the trustee was -- was to be

23    appointed, we wouldn't have any control over how the sale

24    process took place.  I want to have an opportunity to be

25    able to look at all the issues and then respond back to the

```
 1    Court, even if it's only two weeks and we don't wait until
 2    April 5th.  Thank you.
 3              THE COURT:  Thank you, Mr. Durrschmidt.
 4              Mr. Satija, do you have any comments you want to
 5    make on the record relative to the continuance at this point
 6    in time?
 7              MR. SATIJA:  Was that directed to me, Your Honor?
 8              THE COURT:  Yup.  That's you.
 9              MR. SATIJA:  Yes.  Thank you, Your Honor.  Ron
10    Satija on behalf of the Debtor.  Your Honor, this -- this is
11    a very small case with -- with no operations.  There's
12    really no money to hire a Chapter 11 trustee.  So the
13    question really would be conversion.
14              And the -- the Debtor filed to protect the
15    property.  The properties, you know, that were owned by the
16    Debtor, and -- and the structure that originally was in the
17    midst of their contested litigation at the time, the
18    Abdullatif party, and I'm sure the Court is aware, you know,
19    having read all the pleadings.  The Abdullatif parties have
20    been superseded in the state court.  This represented in my
21    response, and then my motion to dismiss.
22              There's 1.9 million dollars that is in the state
23    court registry.  There was 1.6 million dollars in
24    compensatory damages, and there's probably about 500,000 in
25    prejudgment interest that -- that -- that isn't necessarily,
```

1    you know, that -- that essentially, we're fighting over

2    $200,000 at this point.  So, you know, there's -- there's

3    things the trustee were appointed to -- you know, right now,

4    the claim is superseded.  I think the claim is objectionable

5    under Section 502.

6            But my question becomes, what -- what would a

7    trustee do at that point?  Is the trustee going to sale the

8    property and, you know, it pays off -- you know, determines

9    whether the situation is a secured creditor, payoff, you

10   know, the back claim plus something else, I guess showing

11   something for Abdullatif until the end of the -- until the

12   end of the appeal or -- or, you know, try and sell it, you

13   know, to the -- to the detriment of the -- the Debtor's

14   principal and -- and other issues.  So, you know, I don't

15   think an appointment of trustee is -- is very useful.  And

16   the Debtor continues to urge dismissal.

17           Further, I'm very disturbed by the letter that I

18   received yesterday from Mr. Abdullatif that from

19   (indiscernible) that he is seeking to blame a number of

20   alter ego claims in this court against -- in other

21   litigations that he has with the Debtor's principal, Mr.

22   Choudhri.  And Your Honor, that -- that is utterly

23   disproportionate to the size of this case.  I mean, again,

24   we're talking about right now a debt of $200,000 to Mr.

25   Abdullatif.  He took 1.8 million dollars from the court

```
 1    registry.  He has 1.9 million dollars right now cash in the

 2    registry that -- that supersedes his judgment and that he

 3    gets, if he -- if he wins the appeal.  So, I don't -- and

 4    then -- and my understanding is the Napoleon and McGowen

 5    properties that were scheduled on the Debtor's schedule have

 6    actually recently been sold.  I just found that out this

 7    morning.  So that's something that I need to confirm as

 8    well.

 9              So, I don't see the urgency of appointment of a

10    trustee.  The Debtor continues to urge dismissal.  The --

11    the main creditor has been superseded.  And the Debtor wants

12    to move forward and restructure the remaining property that

13    it can do so, you know, during the -- the superseding and

14    then -- and then figure out a way to pay off Mr. Abdullatif

15    after the -- the appeal is determined.  You know, no -- no

16    one's going anywhere.  No property is disappearing.  No

17    property is -- is diminishing in value.  The property is

18    insured.  It just doesn't make any sense at this time, Your

19    Honor.

20              THE COURT:  All right.  Thank you.  All right.  So

21    here's what I'm going to do.  I'm going to let Mr.

22    Durrschmidt make an opening statement and present evidence.

23    And then, Mr. Fisher, at the completion of that evidence,

24    I'll let you argue again for a continuance.

25              But I think that given the factual allegations
```

1   that are swinging back and forth between the parties, I need

2   to hear some sort of evidence to take a position on where

3   I'm going and what I'm going to do.  So, Mr. Durrschmidt,

4   with that, let me let you make an opening statement.  I'll

5   let you present your evidence.  And then, I'll hear from Mr.

6   Fisher at that point in time as to perhaps giving him some

7   more time to respond to whatever allegations you might make

8   or what -- evidence you may present.  All right?  Go ahead.

9           MR. DURRSCHMIDT:  Thank you, Your Honor.  Your

10   Honor, this is a -- in reality, a single asset piece of

11   property.  So it's a one-lot 5,000 square foot.  It's got a

12   house on it, but it's not occupied.  I think the idea was

13   that it's going to get torn down, and some development money

14   would -- would come at some point in time.

15           The case was filed after a jury verdict, but prior

16   to court -- same court entering judgment.  The Debtor filed

17   the case, used the case as a sword, removed the state court

18   case.  This Court sent it back.  The Debtor then sought to

19   impose the stay.  The Court sent it back.  And the state

20   court has now issued the judgment.

21           The Debtor initially filed schedules, and then

22   less than two weeks later filed amended schedules.  Added

23   two more pieces of property, added a promissory note, listed

24   all types of new assets, which, you know, how you could

25   forget those or ignore those in such a small case.  And

1   then, the reply yesterday goes back and says, no, no,

2   there's only one piece of property.

3          So, you've got -- now you've got Debtor's counsel

4   making a statement under Rule 11 that there's one piece of

5   property, and you've got schedules that show three pieces of

6   property.  Well, that can't both be true.  So you've either

7   got somebody that's perjured themselves when they completed

8   the schedules, or you've got an attorney that's violated

9   Rule 11.  Because they're totally inconsistent statements.

10         And so, the Debtor initially utilized the stay to

11   try and thwart the state court.  Once that stopped and was

12   no longer effective, they didn't do anything.  They sat

13   there and did their thing.  The other thing is the -- again,

14   the secured creditor, the one that's got the lien that was

15   filed post-petition, isn't -- isn't a secured creditor.

16   It's a company that's owned by Ali Choudhri's mother.  Ali

17   Choudhri is the 100 percent owner.

18         This Court has denied this Debtor the ability to

19   have -- engage the litigation counsel it sought to have.

20   And those -- that counsel withdrew from the state court

21   litigation, and this Court denied that because of the

22   conflicts.  And so, this Debtor who sits here and says,

23   well, we're going to appeal.  Well, how are they going to

24   appeal?  They don't have a lawyer.  They don't -- they

25   haven't come to this Court to seek permission for a lawyer.

 1    There was a bond posted at the state court, which the

 2    Debtor's lawyer now says, you know, the Defendant's posted a

 3    bond.  Now, I think the bond was posted by Ali Choudhri's

 4    mother.  It's not posted by Ali Choudhri, because Ali

 5    Choudhri's filed a in forma pauperis alleging that he's

 6    multimillion dollars insolvent.  And the Debtor certainly

 7    didn't come to this Court and get permission to incur debt

 8    or to have sufficient money to post a 1.7-million-dollar

 9    bond.

10          So who -- who was the bond posted by?  And who is

11    going to prosecute this appeal?  And this whole idea that

12    there's going to be a plan based on somehow coming up with

13    an appeal when there's no counsel is -- is ridiculous.  So

14    you've got -- you've got an insider client, and the Debtor

15    is scheduled as an insider client.  They've listed that

16    creditor as an insider.

17          We know from the filing of the deed of trust that

18    it was filed post-petition.  So we know the lien is at least

19    avoidable.  The Debtor says that the debt is $450,000.

20    Although we were promised to get a copy of the promissory

21    note from the Debtor's counsel at the 341 meeting, we've

22    never gotten a copy of the note.  The deed of trust does not

23    reflect the amount of the net of the Debtor's SOFA and the

24    Debtor's schedules do not list where $450,000 ever came into

25    the Debtor, how it was used, which creditors got paid off.

001473

1    $450,000 is more than $600.  Therefore, under the SOFA it

2    needed to be reflected.  The deed of trust was executed

3    within 90 days of the bankruptcy.  And therefore, the debt

4    would have been incurred within 90 days of the bankruptcy.

5            So there's all of these questions about the

6    validity of a $450,000 loan.  There's questions about the

7    value of the Debtor's assets.  It's on the HCAD Harris

8    County Appraisal District at 450, give or take.  They

9    evaluated it 750.  The value's easily determined by a sale.

10           The Debtor's done nothing to try to sell the

11   property, try to develop the property, try to obtain

12   financing.  The Debtor's done nothing.  The exclusivity

13   period has expired, and there's numerous questions with

14   insider transactions, using the bankruptcy as a sword and

15   not as a shield, listing assets, scheduling assets that they

16   don't own.  And for all those reasons, and that's just the

17   tip of the iceberg, there needs to be a trustee appointed to

18   come in and say, what are the assets, what are the debts,

19   what's the value of the property?  What's the best thing for

20   this Debtor, this Debtor, and these legitimate creditors?

21   They didn't.

22           Now, the Debtor's counsel says, oh, well, the

23   judgment has been superseded.  The judgment is for far in

24   excess of the 1.7 million dollars.  The claim that's filed

25   is 2.2 million dollars.  In this case, there's a million and

```
 1    eight up.  So there's a $400,000 gap.  If the secured
 2    creditor didn't advance money, if they don't have a lien, a
 3    sale of 801 Malone pays the ad valorem taxes and pays the
 4    legitimate -- partially pays the legitimate creditor the
 5    value of the debt, and this case is over.
 6            Additionally, the Trustee, as an objective third
 7    party, can come in and say, you know, we don't need to
 8    appeal.  We shouldn't appeal.  This litigation, it is true,
 9    it's been going on for a long time.  There needs to be an
10    objective party to look at this from the Debtor's standpoint
11    and say, what is the bundle of our assets?  What is the
12    bundle of our liabilities?  And how best do we resolve and
13    liquidate this case and be done with it?  And that's why the
14    appointment of a trustee is necessary, Your Honor.
15            THE COURT:  Okay.  Why don't you go ahead and call
16    your next witness?
17            MR. DURRSCHMIDT:  I would call Dward Darjean.
18            THE COURT:  Mr. Dward Darjean, are you present?
19            MR. DARJEAN:  Yes, I am.
20            THE COURT:  All right.  I need you to turn on your
21    video camera, sir.  There you go.  And if you can get as
22    close to that camera and centered in that camera, I would
23    appreciate it.  I'd like to see your face, and everyone in
24    the courtroom would like to see you as well.  All right.
25    Thank you, sir.  All right.  Let me have you raise your
```

1    right and to be sworn, please.

2              Do you swear or affirm to tell the truth, the

3    whole truth, and nothing but the truth, so help you God?

4              MR. DARJEAN:  I do.

5              THE COURT:  All right.  Thank you, sir.  Go ahead,

6    Mr. Durrschmidt.

7              DIRECT EXAMINATION OF DWARD DARJEAN

8    BY MR. DURRSCHMIDT:

9    Q    Mr. Darjean, could you state your full name for the

10   record, please?

11   A    Dward Darjean.

12   Q    And how are you related to the Debtor?

13   A    I -- manager.

14   Q    All right.  And are you the sole manager?

15   A    I would say yes.

16   Q    And when did you become the sole manager?

17   A    I've been the manager for -- on and off for -- for

18   years.

19   Q    Well, on this -- on this stint, when did you become the

20   manager?  This most recent stint.

21   A    About a year ago.

22   Q    And when -- so that would have been March of 2022?

23   A    April 2022.

24   Q    And when was the first time that you were a manager for

25   this entity?

```
 1   A    I want to say going back to 2010.  Maybe 2009, or 2010.
 2   Q    All right.  Let's go back to 2009.  Do you recall that
 3   Houston Real Estate Properties filed a Chapter 11 in 2009?
 4   A    Yes.  Yes.  I remember.
 5   Q    And were you involved with the Debtor then?
 6   A    I wasn't a part of that bankruptcy proceeding, no.
 7   Q    That was not my question.  My question was, were you
 8   involved with the Debtor back then?
 9   A    I managed the properties, yes.
10   Q    Okay.  Are you familiar with the bankruptcy schedules
11   in that case?
12   A    No.
13   Q    Do you know when the Debtor acquired 801 Malone?
14   A    I would say a few years ago.  Yeah.  (Indiscernible) a
15   few years back.
16        MR. DURRSCHMIDT:  Your Honor, if I could have the
17   Court pull up the exhibits.
18        THE COURT:  You can connect and project if you'd
19   like.  Are you connected now?
20        MS. LEWINSKI:  Yes.
21        THE COURT:  Hold on.  One second.  The problem is
22   going to be because he is --
23        MR. DURRSCHMIDT:  What's the -- what was the
24   filing number?
25        MS. LEWINSKI:  63-32.
```

```
 1          THE COURT:  Bear with me for one second.  He needs

 2   to be able to see it.  In order to do that, I've got to do

 3   this.  Yeah.  That's not going to work, unfortunately,

 4   because of the way the system is and he's not here.

 5          MR. DURRSCHMIDT:  That's why we subpoenaed him to

 6   appear in the courtroom, Your Honor.

 7          THE COURT:  Then let's just do this.  It's Exhibit

 8   32 dash -- 63-32?

 9          MR. DURRSCHMIDT:  63-32, Your Honor.  Yes, sir.

10          THE COURT:  Okay.  Wait a minute.  Hold on, one

11   second.  All right.  Mr. Darjean, you should be able to see

12   the exhibit now.  And you can manipulate it by dragging it

13   at the bottom and making it larger or smaller, and I'll page

14   through it as you need me to.

15          MR. DURRSCHMIDT:  So, Your Honor, if you could go

16   to the next page, please?

17          MS. LEWINSKI:  That one's still on my --

18          MR. DURRSCHMIDT:  Hmm?

19          MS. LEWINSKI:  I think I'm still connected.

20          THE COURT:  Oh.  Bear with me.  He can see it.

21   Because he's not connected to what you're connected to.  But

22   there it goes.

23          MR. DURRSCHMIDT:  All right.

24   BY MR. DURRSCHMIDT:

25   Q    Mr. Darjean, this is the special warranty deed
```

1    regarding 801 Malone Street, correct?

2    A    Yeah.  It would appear so.  Yes.

3    Q    And up in the upper righthand corner, it has a

4    recording date of April 24, 2009.  Do you see that?

5    A    Yes.

6    Q    And if you go to the second page, the deed was executed

7    on March 31, 2009.  Do you see that?

8    A    Yes.

9    Q    And again, down on the lower righthand corner, it shows

10    the recording date of April 24th from Harris County --

11    County Clerk; do you see that?

12    A    No.  I don't see that.  Oh, okay.  Yeah.  It appears to

13    be -- yes, April 24th, 2009.

14    Q    Okay.  And on the left -- lower left corner, it shows

15    that the return of this document was to Houston Real Estate

16    Properties at 1415 North Road; do you see that?

17    A    Yes.

18    Q    Okay.  Can you explain to the Court why this property

19    was not scheduled by this Debtor in its May 5, 2009

20    bankruptcy case?

21         MR. FISHER:  Objection, Your Honor.  Relevance.

22         MR. DARJEAN:  No.  I don't know.

23         THE COURT:  Hold on.  Mr. Darjean, when you hear

24    an objection, you need to hold off and wait to let me rule

25    on the objection.  And then we'll go from there.  So, that

```
 1    answer's not on the record at this point in time.  Mr.
 2    Fisher, do you want to make your objection again so I can
 3    rule on it?
 4          MR. FISHER:  Yes, Your Honor.  I'm objecting on
 5    the basis of relevance for today's proceedings and to this
 6    bankruptcy case.  That's a case that apparently arose 14
 7    years ago, and we're here today.
 8          If there was -- if it was a recent case that was
 9    dismissed with the same set of circumstances, then perhaps.
10    But we don't have that here.  We've got a case 14 years ago,
11    and Mr. Durrschmidt's trying to make some point that I think
12    is maybe more prejudicial than probative.
13          THE COURT:  I'm going to give Mr. Durrschmidt a
14    little bit of leeway because this is just preliminary.  But
15    I would urge you to re urge -- your -- your objection at a
16    later point in time.
17          Mr. Darjean, you can answer the question now.
18    I'll overrule the objection.
19          MR. DARJEAN:  Could you repeat the question?  I'm
20    sorry.
21    BY MR. DURRSCHMIDT:
22    Q    Yes.  Do you know why this piece of property, 801
23    Malone, was not listed in the May 5, 2009, bankruptcy case
24    of this Debtor, Houston Real Estate Properties?
25    A    No.  I do not know.
```

```
1   Q    And this property, 801 Malone, is the only piece of
2   property that this debtor currently owns; isn't that
3   correct?
4   A    I -- I -- there was -- there was other pieces of
5   property that were scheduled.  I'm not sure of the status of
6   those properties.
7   Q    Okay.  Let's -- let's break the -- let's break the
8   question down.  Does the Debtor still own 801 Malone?
9   A    Yes.
10  Q    Is 801 Malone the only piece of property that is owned
11  by the Debtor?
12  A    It's -- it's complicated.  But I don't know how to
13  answer that.
14  Q    I think yes or no would be appropriate.
15  A    There -- like I said, there were other properties that
16  we put down on the schedule.  I can't do it yes or no
17  because basically there were deeds and -- and all of that
18  gets thrown into question status.  There were deeds that
19  were signed by Osama, deeded nine properties to Houston Real
20  Estate Properties.
21  Q    Okay.  Let -- let's -- hold on.  You're way beyond my
22  question now.  So, you don't know whether 801 Malone is the
23  only piece of property owned by this Debtor?
24  A    No.
25  Q    Is it -- that's your testimony, right?  You don't know?
```

```
 1    A    Correct.

 2    Q    Okay.  And the schedules -- the amended schedules show

 3    two other pieces of real estate owned by this Debtor, don't

 4    they?

 5    A    Correct.

 6    Q    And you signed those schedules under penalty of

 7    perjury, didn't you?

 8    A    Correct.

 9    Q    Okay.  And those schedules filed in this case were

10    filed after the jury verdict in the Harris County

11    litigation, correct?

12    A    If -- I -- I don't have the verdict in front of me.  I

13    can't recall the dates, but --

14    Q    All right.  You're the manager of this Debtor, right?

15    A    Yes.

16    Q    All right.  And Houston Real Estate was a defendant in

17    the Harris County litigation, correct?

18    A    Yes.

19    Q    And that was a jury trial, correct?

20    A    Correct.

21    Q    And that jury trial lasted for several days?

22    A    Yes, sir.

23    Q    And how many days did you attend trial?

24    A    Several -- several days.

25    Q    Did you attend every day of the trial?
```

1    A    No.

2    Q    So who else was at the courthouse during trial

3    representing this Debtor in that case?

4    A    That -- that I witnessed?  Who was representing Houston

5    Real Estate Properties?  The attorney on file was Tony

6    Buzbee, I believe.

7    Q    And who was the individual that was -- the manager that

8    was there observing on behalf of this Debtor?

9    A    If I'm understanding the question correctly, I would

10   say Ali Choudhri.

11   Q    Okay.  So Ali Choudhri was there representing Houston

12   Real Estate Properties during the pendency of that trial?

13   A    From what I -- I think he was -- yes, I -- I think he

14   was represented as the manager in the trial.

15   Q    Okay.  Now, earlier, you said you were the sole manager

16   of Houston Real Estate.  So, are you a sole manager, or are

17   you a joint-manager with Mr. Choudhri?

18   A    I -- I can't remember what my response was earlier.  I

19   -- I'm the manager, and maybe during the trial Ali was

20   represented as a member.  I can't remember my -- my response

21   earlier, but I -- I think I am the manager, and during the

22   trial, if that's your question, Ali was a member of Houston

23   Real Estate Properties.

24   Q    All right.  And that jury verdict awarded all of the

25   other -- there was nine other properties, awarded the other

1    properties to Osama Abdullatif; isn't that correct?

2    A    Not that I'm aware of.

3    Q    Okay.  But you're aware of the final judgment now?

4    A    I think I -- I've kind of read -- read through it a

5    little bit.

6    Q    Okay, well -- all right, so you're the manager of this

7    company, and you've, kind of, read through the judgment?  Is

8    that what you're testifying to?

9    A    Yeah.  I've been focusing on the -- I've been focusing

10   on the -- on the bankruptcy aspect, not the court trial.

11   Q    What -- what bankruptcy --

12   A    I -- I guess I'm --

13   Q    -- what -- what bankruptcy aspects have you been

14   concentrating on?

15   A    I mean, I'm -- I'm just saying that -- that you were

16   asking questions about the state court, and I thought I was

17   here to talk about the bankruptcy.

18   Q    Okay.  One of the other assets that you listed on the

19   schedules is a promissory note allegedly due to the Debtor,

20   correct?

21   A    Correct.

22   Q    And isn't that promissory note determined by the jury

23   verdict to have been fraudulent and nonexistent?

24   A    I -- that doesn't sound like -- I don't know.  I -- I

25   can't make that -- a legal conclusion.

```
 1   Q    Well, no, you don't need to.  The question was, didn't

 2   the jury find that the promissory note was nonexistent?

 3            MR. FISHER:  Objection.

 4            MR. DARJEAN:  No, they did not.

 5            THE COURT:  Mr. Fisher, if you want to make an

 6   objection, go ahead.

 7            MR. FISHER:  Yeah.  Once again, Your Honor,

 8   objection to the relevancy of this.  First of all, that case

 9   is under appeal.  Second of all, there's probably documents

10   that speak for themselves.

11            And if I could, Judge, just -- and I don't want

12   to, you know, suggest that Mr. Durrschmidt can do something

13   else besides conduct a 2004 examination in this courtroom.

14   But certainly, these questions can be asked at a different

15   time and a different forum.  And certainly, after I've had a

16   better opportunity to prepare and know what's -- what all

17   the facts are and what all the background is.

18            THE COURT:  As to relevance, I'll overrule that

19   objection.  As to the document speaking for itself, I'll

20   sustain that objection.

21            MR. DURRSCHMIDT:  Well, I think that -- may I

22   respond, Your Honor?

23            THE COURT:  You can.  Go ahead.

24            MR. DURRSCHMIDT:  The purpose of this is to

25   demonstrate that he hasn't got a clue what he's doing as a
```

1    representative for the Debtor.

2         THE COURT:  You -- you can do that another way.

3    I'll still sustain the objection.  Thank you.

4    BY MR. DURRSCHMIDT:

5    Q    There is a -- on the schedules, there's a $450,000 deed

6    of trust lien that you reflect on the schedules; do you

7    recall that?

8    A    Yes.

9    Q    And who is that lien in favor of?

10   A    Skaneateles, I believe.

11   Q    Okay.  And who is the principal of -- Skaneateles?

12   A    Principal -- I -- I've seen the formation documents,

13   Ian Cain -- Ian Cain was listed on there.

14   Q    I'm sorry, what?

15   A    On the formation documents that I've seen for

16   Skaneateles, I've seen the name Ian Cain.

17   Q    Do you recall during your 341 testimony that you said

18   that it was owned by Ali Choudhri's mother?

19   A    Yes.  I remember.

20   Q    Okay.  And so, Ali Choudhri's mother is the principal

21   of Skaneateles, right?

22   A    No.  When you say principal -- I don't -- I don't know

23   an official title or anything.  I -- I thought you were

24   meaning -- I just directed my memory straight to the

25   formation documents that I saw, and I saw Ian Cain's name.

1    Q    Okay.  And did the borrow -- did the Debtor borrow

2    money from Skaneateles?

3    A    Yes.

4    Q    When?

5    A    I don't recall exactly when.

6    Q    How much?

7    A    It would be the same amount that we listed on the

8    schedules.

9    Q    Okay.  And what did the Debtor do with that money?

10   A    I - I don't -- I don't recall.  There were loans that

11   were several pages.

12   Q    Okay, when -- when the Debtor borrowed that money,

13   where was the money deposited?

14   A    I don't know.

15   Q    Did the Debtor have a bank account prepetition?

16   A    Not that I know of.

17   Q    Does the Debtor have a bankruptcy account post-

18   petition?

19   A    I'm sorry, could you say that again?

20   Q    Yes.  Does the Debtor have a bankruptcy -- does -- does

21   the Debtor have a bank account post-petition?

22   A    Yes.

23   Q    And does it have any money on deposit in that bank

24   account?

25   A    I believe, no.

```
 1   Q    I'm -- I heard in opening arguments, and I think it's
 2   reflected on the monthly operating reports that the property
 3   at 801 Malone is insured; is that correct?
 4   A    Correct.
 5   Q    Who pays for the insurance policy?
 6   A    I don't recall offhand.
 7   Q    Does the Debtor pay for the insurance?
 8   A    No.
 9   Q    Is the insurance paid on a monthly or quarterly basis,
10   or is it paid annually?
11   A    Annually.  I want to say that the policy was paid in
12   full.  I can't remember.
13   Q    So you don't know whether it was paid in full or not?
14   A    I -- I requested financing, but I don't know if it was
15   paid in full or not.
16   Q    And --
17   A    I -- I think it was.
18   Q    If you -- if you sought financing, who did you seek
19   financing from?
20   A    No, no, no.  We're talking about the insurance policy,
21   correct?
22   Q    Yes, sir.
23   A    From what I recall, it's been paid.  It's been paid in
24   full for the year.
25   Q    Okay.  And who paid it?
```

```
 1    A    I don't know.

 2    Q    But not the Debtor?

 3    A    Correct.

 4    Q    Does somebody maintain the lawn?

 5    A    Yes.

 6    Q    And who does that?

 7    A    He's an individual that -- that handles landscaping for

 8    all the properties that I manage.

 9    Q    All right.  And who pays for him to maintain the lawn?

10    A    I -- perhaps it's (indiscernible) Companies.  I'm not

11    exactly sure.

12    Q    But it's not the Debtor?

13    A    Correct.

14    Q    And (indiscernible) Companies, that's Ali Choudhri's

15    company, correct?

16    A    Correct.

17    Q    Okay.  Let's go back to the loan from Skaneateles.

18    Tell me who -- tell me which creditors got paid from the

19    proceeds of that loan.

20    A    There was a first lien on the property, I think on

21    Malone, that was paid in 2021.  And there was a second lien

22    that was paid in the summertime of 2022.

23    Q    All right.  The first lien, who paid the first lien?

24    In 2021.

25    A    I didn't hear that last part.
```

```
 1   Q    Who paid the first lien?  Was that Ali Choudhri?  Is
 2   that why he's -- he's reflected as a creditor?  Or was it
 3   Skaneateles?
 4   A    I would say it was Samo Saujeri.
 5   Q    And who's that?
 6   A    Ali's mom.
 7   Q    Okay.  And -- and who had -- who do you think had the
 8   first lien?
 9   A    I don't remember the parent's name.
10   Q    Okay.  And the lien that got paid off in 2022, who was
11   that?
12   A    Planet Home Lending.
13   Q    I'm sorry, who?
14   A    Planet Home Lending.
15        THE COURT:  Mr. Durrschmidt, I'm going to
16   interrupt you for just one second.  I need to go log onto a
17   National Conference of Bankruptcy Judges board meeting and
18   tell them that I'm not going to participate because I'm
19   going to be here.
20        So, I'm going to run over there to do that, I'll
21   run right back.  Don't anybody move.  But I need to go tell
22   them that I'm not going to be able to be present.  I'll be
23   right back.
24        (Recess)
25        THE COURT:  All right.  I apologize for having to
```

```
 1    take that small break.  I'm on the -- the board of directors

 2    of the National Conference of Bankruptcy Judges.  They are

 3    having a meeting right now, which I am obviously not

 4    participating in.  So they now know that.  So if we can

 5    resume the hearing.  Mr. Darjean, I will remind you that you

 6    are still under oath.  Mr. Durrschmidt, go ahead.

 7              MR. DURRSCHMIDT:  Thank you, Your Honor.  Before I

 8    forget, Your Honor, I would move to admit Exhibit 32, which

 9    is the special warrantee deed I was talking to Mr. Darjean

10    about.

11              THE COURT:  And that's actually 32 -- 63 dash --

12              MR. DURRSCHMIDT:  63-32.

13              THE COURT:  -- 32.

14              MR. DURRSCHMIDT:  Yes, sir.

15              THE COURT:  Any objections from any parties to the

16    admission of 63-32?

17              MS. WHITWORTH:  No objection, Judge.

18              MR. FISHER:  No objection.

19              THE COURT:  Mr. Satija, do you have any objections

20    to 63-32?  You're muted, sir.

21              MR. SATIJA:  No, Your Honor.  Sorry about that.

22              THE COURT:  63-32 is admitted.

23              (Exhibit 63-32 entered into evidence.)

24              THE COURT:  Thank you, Mr. Durrschmidt.  You may

25    proceed.
```

```
 1              MR. DURRSCHMIDT:  Thank you.  Your Honor, could we
 2    put up 63-17, please?
 3              THE COURT:  It's projected.
 4    BY MR. DURRSCHMIDT:
 5    Q    Mr. Darjean, can you see what has been put up on the
 6    screen as Exhibit 63-17?
 7    A    I can see most of it, yes.
 8    Q    And this is the deed of trust from Houston Real Estate
 9    Properties to Skaneateles, right?
10    A    Correct.
11    Q    And this deed of trust has a date of September 25,
12    2022?
13    A    Correct.
14    Q    And if you look at the top, highlighted in yellow, it
15    reflects a recording where the Harris County real property
16    records of 2022-544457, and it reflects it was recorded on
17    November 9, 2022.  Do you see that?
18    A    Yes.  I see that.  But I -- I didn't handle the
19    recording of that document.
20    Q    I didn't ask you.  I just wanted to know if you saw the
21    date.  And --
22    A    Okay.
23    Q    -- if you turn to the last page of that exhibit --
24    actually, I guess, the second to the last page.
25              THE COURT:  Is that the page you want, Mr.
```

1   Durrschmidt?

2          MR. DURRSCHMIDT:  Yes, sir.  Thank you.

3   BY MR. DURRSCHMIDT:

4   Q    Do you see the notary on this reflects a September 25

5   notary?

6   A    Yes, sir.

7   Q    And that is your signature on that document?

8   A    Correct.

9   Q    Okay.  And when you negotiated the terms of the note

10  and the deed of trust, who did you negotiate that with?

11  A    I'm not understanding the question.

12  Q    Okay, well, you, on behalf of the Debtor, signed a note

13  --

14  A    Yes.

15  Q    -- and the deed of trust, correct?

16          THE COURT:  Bear with me.  Mr. Fisher, do you need

17  a hardcopy of this?

18          MR. FISHER:  I do have an extra copy, Your Honor.

19          MR. DURRSCHMIDT:  Yeah.  There is one

20  (indiscernible).

21          MR. FISHER:  Yes.  (Indiscernible).

22  BY MR. DURRSCHMIDT:

23  Q    So, the question was, who did you negotiate the terms

24  of the note and the deed of trust with?

25  A    Ali.

1    Q    Ali Choudhri?

2    A    Correct.

3    Q    And what are the terms of the promissory note?

4    A    Ali handled, you know, all of the -- the terms, and

5    everything on -- on the document.

6    Q    What do you mean, Ali handled the terms of the note?

7    A    The note was -- you were asking about who was -- was

8    negotiated -- or I'm sorry.  If you could state your

9    question again.

10   Q    Yeah.  So, I asked who negotiated the note, and you

11   said Ali Choudhri did.

12   A    Between Ali, and -- and Ian Cain, I believe, they --

13   they worked together on the note.

14   Q    So you're not sure, you're -- are you speculating?

15   A    Ali Choudhri and Ian Cain.

16   Q    Okay.  And who did Ian Cain represent?

17   A    I wasn't there, sir. I'm sorry.

18   Q    Okay.

19   A    (Indiscernible).

20   Q    Okay, so you -- you weren't present during the

21   negotiation of the note and the deed of trust?

22   A    Ali handled most of everything.

23   Q    All right.  But you were -- you testified that you were

24   the manager of the Debtor at that point in time, correct?

25   A    Yes, I was.

1    Q    Okay.  And, in fact, your signature on the deed of

2    trust reflects that title as manager, correct?

3    A    Yeah.  It's not on the screen anymore.  But yes, I

4    believe so, yes.

5    Q    Okay.

6               MR. DURRSCHMIDT:  If you could go to the first

7    page of that.

8               THE COURT:  Sure.  (Indiscernible)?

9               MR. DURRSCHMIDT:  Exhibit 63-17, please, Your

10   Honor?

11              THE COURT:  I took it down only because when I do

12   that sometimes, the -- the witnesses' video freezes.  First

13   page?

14              MR. DURRSCHMIDT:  Yes, sir.  Yes.  Thank you.

15   BY MR. DURRSCHMIDT:

16   Q    So, I had earlier asked you what the terms of the

17   promissory note were, because as you'll see on that

18   highlighted, in the middle of the first page of this deed of

19   trust, the terms of the promissory note simply say, as

20   provided in the note.  Do you see that?

21   A    I believe I have a copy.  Okay.  Yes, I see that.

22   Q    Okay.  And when is the maturity of the note?

23   A    Give me a second.  I think I have a copy that I'm going

24   to refer to.

25   Q    I don't want you referring to any documents.

```
 1              THE COURT:  Mr. Darjean, I need to tell you this,
 2    you are not allowed, at this point in time, to look at any
 3    other document other than a document that the Court presents
 4    to you.  You also may not have anyone else in the room with
 5    you coaching you or telling you what to testify to.  So,
 6    please, don't look at any other document.
 7              Thank you.  Go ahead, Mr. Durrschmidt.
 8    BY MR. DURRSCHMIDT:
 9    Q    Mr. Darjean, is there anybody else in the room with
10    you?
11    A    No, sir.
12    Q    I couldn't understand you.
13    A    No, sir.
14    Q    Okay.  So, do you know what the maturity date of the
15    note is?
16    A    It was a 12-month loan, I guess.  I think it was a
17    (indiscernible).
18    Q    But you're guessing.  You don't know.
19    A    It's a one-year loan.  I'm sorry, sir.
20    Q    Okay.  Is it -- does it call for monthly interest
21    payments?
22              MR. FISHER:  Objection, Your Honor.
23              THE COURT:  Hold on, Mr. Darjean.  What's the
24    objection?
25              MR. FISHER:  First of all, if there is a document,
```

```
1    then that document will speak for itself.  I haven't seen
2    one presented.  Second of all, you know, if the witness
3    doesn't know, he doesn't know.  But I think that there's
4    probably a better way to get to the answer.
5             THE COURT:  I'm going to overrule the objection.
6    Go ahead and answer the question, Mr. Darjean.
7             MR. DARJEAN:  What was the question again?
8    BY MR. DURRSCHMIDT:
9    Q    Does the note require monthly interest payments?
10   A    No.
11   Q    At what address is the note payable?
12   A    I think the -- I -- I don't know offhand, without
13   looking at the note, sir.
14   Q    All right.
15   A    The note is several pages long.
16            MR. DURRSCHMIDT:  Your Honor, I would move to
17   admit Exhibit 63-17.
18            THE COURT:  Any objections to 63-17 from any
19   party?
20            MS. WHITWORTH:  No objection.
21            MR. FISHER:  No objection.
22            THE COURT:  All right.  There are no objections.
23   63-17 is admitted.  Thank you.
24            MR. DURRSCHMIDT:  Your Honor, could you turn to
25   63-12, please?
```

1          THE COURT:  It's up.

2          MR. DURRSCHMIDT:  Thank you, Your Honor.

3    BY MR. DURRSCHMIDT:

4    Q    Mr. Darjean, 63-12 is the final judgment in the case of

5    Osama Abdullatif, et al. v. Ali Choudhri and Houston Real

6    Estate Parties in the 334th District Court, Harris County,

7    cause number 2013-41273.  Do you see that?

8    A    I see the first page, yes.

9    Q    Okay.

10   A    Or maybe it's the second page.  I'm not sure.

11         MR. SATIJA:  Your Honor, I object (indiscernible).

12         THE COURT:  What's the basis of your objection?

13         MR. SATIJA:  The judgment was amended multiple

14   times after it was issued, and I would like to

15   (indiscernible) the last page to figure out which version of

16   the judgment that we're dealing with.

17         THE COURT:  Let's see the last page.

18         MR. SATIJA:  This is -- this is not the most

19   recent, Your Honor.  The most recent one (indiscernible) I

20   think March 4th or something, just a couple of days ago.

21   So, this is not correct.

22         THE COURT:  Mr. Durrschmidt, you want to respond

23   to that?

24         MR. DURRSCHMIDT:  This is the latest one I have,

25   and this is certainly a judgment that was entered on

```
1    November 10th and then amended on December 30th.  And so, I
2    think with regard to the questions that I'm going to ask
3    him, I think it's relevant.
4              THE COURT:  All right, I'll overrule the objection
5    (indiscernible) if you want to introduce a later judgment,
6    you're free to do so.  Go ahead.
7              MR. SATIJA:  Thank you, Your Honor.
8    BY MR. DURRSCHMIDT:
9    Q    Mr. Darjean, do you know how the judgment was amended
10   from the first time it was entered?
11   A    No, I did not.
12   Q    Do you know how the judgment was amended in March of
13   this year?
14   A    I don't know if that's a legal conclusion.  I don't - -
15   Mr. Jim, he would -- he would know the answer to that.
16   Q    Who?
17   A    Mr. Jim.  I don't know how to pronounce his last name.
18   He should be in the courtroom.
19             MR. WETWISKA:  That would be me, Your Honor, Jim
20   (indiscernible) who -- I am involved in the appeal at the
21   trial court.
22             THE COURT:  All right.  That's fine.  Thank you.
23   You can --
24             MR. WETWISKA:  Thank you, Your Honor.
25   BY MR. DURRSCHMIDT:
```

```
 1   Q    And who does he represent?

 2   A    Houston Real Estate Properties.

 3   Q    He -- it's your testimony he represents Houston Real

 4   Estate Properties?

 5   A    Yes.

 6   Q    Okay.  And what law firm is he with?

 7   A    Akin Gump.

 8   Q    And is there an order approving his retention out of

 9   this court?

10   A    I don't know.

11   Q    Well, if you don't know, who would know?

12             MR. WETWISKA:  I would know.

13             MR. DURRSCHMIDT:  Well, I know, too.

14             MR. WETWISKA:  I would know, Your Honor.

15             MR. SATIJA:  Your Honor, may I object?  I need to

16   object for a moment to just respond (indiscernible).  There

17   is appellate counsel for Houston Real Estate Properties that

18   has recently appeared but not filed in the application of

19   (indiscernible) --

20             THE COURT:  Bear with me.  That's a speaking

21   objection.  If you want to make an objection, I'm willing to

22   hear it, but that's not an objection.  That's an argument.

23             MR. SATIJA:  Understood.  Thank you, Your Honor.

24             THE COURT:  All right.

25             MR. SATIJA:  No objection then to the question.
```

1              THE COURT:  Thank you.

2    BY MR. DURRSCHMIDT:

3    Q    Mr. Darjean, did you read this judgment that's in front

4    of -- well, it was in front of you?  It's 63-12.

5              THE COURT:  I apologize, Mr. Durrschmidt.  What

6    happens is he keeps freezing up --

7              MR. DURRSCHMIDT:  I know.

8              THE COURT:  -- and I want to be able to see his

9    face (indiscernible) so just -- I apologize.

10             MR. DURRSCHMIDT:  No, that's fine, Your Honor.  I

11   understand.

12             THE COURT:  Go ahead.

13   BY MR. DURRSCHMIDT:

14   Q    Mr. Darjean, did you read this judgment?

15   A    Not word for word.  No, I did not.

16   Q    Did you read the jury verdict?

17   A    Not the entire document, no.

18   Q    All right.  If we could look at the second page of this

19   judgment?  All right.  You see that top paragraph?  So, of

20   the eight days of trial, how many days were you in court?

21   A    Perhaps four or five.

22   Q    All right.  And you see Finding No. 2 is that Houston

23   Real Estate Properties committed fraud against Abdullatif?

24   Do you see that?

25             MR. FISHER:  Objection, Your Honor.

1          THE COURT:  What's your objection?

2          MR. FISHER:  Objection is once again, this

3    document speaks for itself.

4          THE COURT:  I'll overrule that objection.  It's

5    right in front of me.  Go ahead.

6    BY MR. DURRSCHMIDT:

7    Q    Do you see that, sir?

8    A    Yes.

9    Q    All right.  So, that was the finding of the -- of the -

10   - that was the jury finding was that Houston Real Estate

11   Properties defrauded Mr. Abdullatif, correct?

12   A    I don't know if you're asking for a legal conclusion.

13   Q    I'm not.  That's their finding, correct?

14   A    I don't know, sir.

15   Q    All right.  And if you look at Category 5, it says

16   Abdullatif and Choudhri did not enter into a promissory note

17   dated February 10, 2010 in the amount of $1.5 million.  Do

18   you see that?

19   A    I see that.

20   Q    And that's the note that you scheduled on behalf of

21   Houston Real Estate Properties allegedly due to Houston Real

22   Estate Properties from Mr. Abdullatif, isn't it?

23   A    I was present when Mr. Abdullatif signed that document.

24   Q    My question was this is the note that shows up in the

25   schedules of Houston Real Estate Properties as an asset of

1   Houston Real Estate Properties being a note from Mr.

2   Abdullatif to Houston Real Estate Properties for a million

3   five.  This is that note, correct?

4   A    If you show me the document, then --

5   Q    I'm showing you the document.

6   A    And you were asking me about the promissory note?

7   Q    I'm asking you about Item No. 5 in the first paragraph.

8   A    Okay.  And the question again?

9        MR. SATIJA:  Objection.  Objection, Your Honor,

10  relevance.

11       THE COURT:  I'll overrule that objection.

12  BY MR. DURRSCHMIDT:

13  Q    This is the note that's scheduled in the Houston Real

14  Estate Properties as an asset being a note from Mr.

15  Abdullatif to Houston Real Estate Properties, correct?  Is

16  that a yes?

17  A    Without looking at the note, I mean, I just want to be

18  certain.

19       THE COURT:  Well, Mr. Darjean, it seems to me you

20  file -- and I'm listening to testimony and I'm trying to

21  understand how you don't have knowledge, but you signed

22  schedules that says there's a million five receivable.  How

23  many million five receivables can there be?

24       THE WITNESS:  No, I understand that.  If that's

25  the question, then I would say agree.  It just sounded like

1    he was asking another question that I didn't --

2          THE COURT:  There's only one --

3          THE WITNESS:  -- really understand.

4          THE COURT:  There's only one, right?  There's not

5    multiple ones?

6          THE WITNESS:  Oh, I mean, I don't know.  I think

7    during the hearing I remember Osama testifying that there

8    might have been a different note.

9          THE COURT:  All right.  So, let me ask the

10   question.  Where did you get the information to put the note

11   into the schedules?  Where did it come from?

12         THE WITNESS:  I've known about the promissory note

13   since it was executed --

14         THE COURT:  Excuse me, sir, I --

15         THE WITNESS:  -- back in 2010.  I'm sorry?

16         THE COURT:  Sir, you've known about it since 2010,

17   the 2010 that's referenced in the judgment?

18         THE WITNESS:  Yes.

19         THE COURT:  Okay.  Go ahead.

20         MR. DURRSCHMIDT:  Judge, I would move to admit 63-

21   12.

22         THE COURT:  Any objection to 63-12 subject to Mr.

23   Satija basically providing another form of judgment if it's

24   been amended again?  Any objections?

25         MS. WHITWORTH:  No objection, Judge.

```
1              MR. FISHER:  I would object again on the grounds

2    that, number one, I'm not sure of its relevance as --

3              THE COURT:  How is it not relevant, Mr. Fisher, if

4    he scheduled the debt for a million five (indiscernible)

5    schedules and this is the debt, how is it not relevant?

6              MR. FISHER:  It's disputed.

7              THE COURT:  That doesn't make it not relevant.  It

8    makes it disputed, doesn't it?

9              MR. FISHER:  It does.

10             THE COURT:  All right.  Then I'll overrule the

11   objection.

12             (Exhibit 63-12 entered into evidence.)

13             MR. DURRSCHMIDT:  Could you put up 63-26, please,

14   Your Honor?

15   BY MR. DURRSCHMIDT:

16   Q    Mr. Darjean, before you on the screen is Exhibit 63-25.

17   Do you see that?

18   A    Yes, I see it (indiscernible) summary of assets.

19   Q    Yes, and --

20   A    And (indiscernible).

21   Q    Yes, and do you recognize this form?

22   A    Yes.

23   Q    And did you sign this form?

24   A    I didn't sign that page particularly, I don't believe.

25   I don't see the bottom of the page.
```

1          MR. DURRSCHMIDT:  Your Honor, could you go to the

2    last page of 63-12, please, which is 11 of 11?

3    BY MR. DURRSCHMIDT:

4    Q    Okay.  You see the last page of Exhibit 63-25?

5    A    Yes, sir.

6    Q    And you see your electronic signature down there on the

7    page?

8    A    Yes, sir.

9    Q    Do you know if you actually signed that with a wet

10   signature with a pen?

11   A    I recall signing most of these with a wet signature,

12   yes.

13   Q    All right.

14          MR. DURRSCHMIDT:  Your Honor, if we could go back

15   to the first page, please?

16   BY MR. DURRSCHMIDT:

17   Q    All right.  This is the original schedules.  This is

18   the first schedules that were filed by the Debtor, correct,

19   on October 27, 2022?

20   A    I don't know if that's the original or not.

21   Q    Okay.  How many schedules --

22   A    But yeah --

23   Q    Go ahead, I'm sorry.

24   A    On the top it says that it was filed on October 27th.

25   Q    Right.  How many schedules were filed in this case?

```
 1   A    I don't recall specifically.  I know that it was -- I
 2   know that it was an original schedule and then there was an
 3   amended schedule.
 4   Q    Okay.  All right.  And you'll see on that first page,
 5   there's listed real estate, $750,000.  Do you see that?
 6   A    Yes.
 7   Q    And do you know what asset that is off the top of your
 8   head?
 9   A    801 Malone.
10   Q    Okay.  And then there's 300 -- $3 million of personal
11   property.  Do you see that?
12   A    Yes.
13   Q    And do you know what that was?
14   A    That is the 30 percent of the promissory note.
15   Q    It's 30 percent of the promissory note?
16   A    Of the entire value of the note.  It was listed as 30
17   percent.
18   Q    Okay.  And so, when you say the entire amount of the
19   note, we're talking about the $1.5 million note from 2010
20   plus interest; is that what you're doing?
21   A    No.
22   Q    How do you get 30 percent equals $3 million?
23   A    The -- 10 percent of the -- if the total value on the
24   note was $10 million, then the (indiscernible) was -- did I
25   say 30 percent?  Maybe (indiscernible) 3 percent, sorry.
```

1          THE COURT:  I missed the last part of that

2     testimony.  You want to repeat it for me?

3          THE WITNESS:  I may have said 30 percent.  I meant

4     3 percent.

5          THE COURT:  Three percent.  Is that what you said?

6          THE WITNESS:  (Indiscernible) percent.  Thirty

7     percent.

8     BY MR. DURRSCHMIDT:

9     Q    Okay.  So, where's -- how's the 10 -- how does the --

10    where's the $10 million figure come from?

11    A    The entire note.

12    Q    Okay.  The note --

13    A    (Indiscernible) interest that accrued.

14    Q    All right.  The note  we were looking at was a million

15    and a half dollar note, correct?

16    A    Correct.

17    Q    Okay.  So, how did the million and a half note become

18    $10 million?

19    A    Interest over 10 years, 12 years, however many years.

20    The note itself talked about the 18 percent (indiscernible)

21    interest and how that (indiscernible).

22    Q    Okay.  So, it's your testimony that the $1.5 million

23    note with interest became a $10 million obligation, and how

24    did the Debtor --

25    A    Correct.

1    Q    Okay.  And how did the Debtor get 30 percent of that?

2    A    It was (indiscernible).

3    Q    I'm sorry?

4    A    The 30 percent?

5    Q    Yes.

6    A    From Ali Choudhri.

7    Q    What do you mean, from Ali Choudhri?

8    A    The promissory note was for -- was between Ali Choudhri

9    and Osama Abdullatif.

10   Q    Okay.  And you scheduled this on October 27th?

11   A    That's what they documented.  It says it was October

12   27th.

13   Q    Okay.  And this was -- the jury verdict, if you

14   remember, from the judgment was August 19th.  They found

15   that note to be non-existent, and yet three months later

16   under penalty of perjury you scheduled a $3 million

17   obligation from Mr. Abdullatif to Houston Real Estate

18   Properties, correct?

19        MR. SATIJA:  I object, Your Honor.  I object, Your

20   Honor.  The judgment was entered after the day the schedules

21   were filed.  He plainly referred to that in 63-12.  I mean,

22   he's trying to -- he's trying to make a different date

23   relevant.

24        THE COURT:  All right, Mr. Durrschmidt, I'm

25   concerned that the judgment that I saw was signed after

1  these schedules were filed.  So, I'm going to sustain the

2  objection at this point in time (indiscernible) go back to

3  your testimony.  Thank you.

4      MR. DURRSCHMIDT:  Judge, could you go back to 63-

5  12, please?

6      THE COURT:  Sure.

7      MR. DURRSCHMIDT:  If we go to the second page, the

8  top paragraph, Your Honor?  This exhibit is in evidence.

9  So, the first paragraph says that after an eight-day jury

10 trial on August 19th, the jury returned and they made these

11 findings.  So, my question to him was after the jury

12 verdict, after the jury found that the note in Paragraph 5

13 Abdullatif and Choudhri did not enter into a note, three

14 months later he scheduled that.  It's not the date of the

15 judgment.  It's the date of the jury verdict.

16     THE COURT:  He also testified he didn't read the

17 jury verdict and there's no testimony at this point in time

18 tying him to he knew about this part of the schedule, so if

19 you want to clear it up, you can, but right now I'm

20 sustaining the objection.

21     MR. DURRSCHMIDT:  All right.

22 BY MR. DURRSCHMIDT:

23 Q   Mr. Darjean, is it your testimony that you did not read

24 the jury verdict?

25 A   I didn't read the entire document, no.

1    Q   Were you in the courtroom when the jury returned its

2    verdict?

3    A   No.

4    Q   Who on behalf of Houston Real Estate was in the

5    courtroom when the jury returned its verdict?

6    A   Ali Choudhri.

7    Q   Can you do the calculations for us as to how that --

8    how the Debtor has an interest in $3 million on a note due

9    from Mr. Abdullatif as reflected in your schedules?

10          MR. SATIJA:  Objection.  The petitioner already

11    asked that, and the Debtor already answered.  The rep

12    already answered.

13          THE COURT:  I'll overrule that objection.  I

14    disagree with that objection.  Go ahead and answer the

15    question, sir.

16          THE WITNESS:  I'm sorry.  If you could re-answer?

17    Re-ask the question?

18    BY MR. DURRSCHMIDT:

19    Q   Yes, sir.  I wanted the calculations on how you came up

20    with $3 million due to the Debtor from Mr. Abdullatif on the

21    $1.5 million note.

22    A   The note itself documents the interest rate, and

23    calculated according to the note, that's how I came up with

24    that number.

25    Q   Okay.  Let's do some simple math.  If the note was at

1    20 percent and it's 1.5, annual interest would be $300,000 a

2    year; do you agree with me?

3    A    I don't -- I don't know.

4    Q    You don't know?  Okay.  And if it's $300,000 a year

5    since February of 2010, that's 12 years, that would be

6    $3,600,000, correct?

7            MR. SATIJA:  Objection, Your Honor.  He's

8    calculating simple interest, and I don't see this note in

9    front of us to know if it's compound.  (Indiscernible) he's

10   got to demonstrate the basis behind that mask.

11           THE COURT:  I'll sustain the objection as to --

12           MR. SATIJA:  I'm not very good with

13   (indiscernible).

14           THE COURT:  I sustained the objection.  It assumes

15   facts not in evidence.

16   BY MR. DURRSCHMIDT:

17   Q    Did you do the calculation, Mr. Darjean, to come up

18   with the $3 million figure?

19   A    No, I did not.

20   Q    Who did?

21   A    I don't know.

22   Q    You don't know?  Is that what you said?  You don't

23   know?

24   A    Correct.

25   Q    You signed a document under penalty of perjury listing

```
 1    an obligation owed to the Debtor of $3 million and you don't

 2    know where it came from?

 3    A    At the time of the state court hearing, it was being

 4    handled by Tony Buzbee's law firm.

 5    Q    No, sir.  You filed this -- you signed these schedules.

 6    You filled out these schedules, correct?

 7    A    Correct.

 8    Q    Okay.  Where did you get the number for $3 million to

 9    put in the schedule?

10    A    I saw --

11              MR. SATIJA:  Objection.

12              THE COURT:  What's the objection, Mr. Satija?

13              MR. SATIJA:  Objection withdrawn, Your Honor.

14              THE COURT:  Thank you.  Answer the question, sir.

15              THE WITNESS:  Tony Buzbee's firm.  Tony Buzbee

16    calculated that.

17              MR. DURRSCHMIDT:  All right.  Your Honor, if you

18    could go to 63-27, please?  Hold on.  Did I -- I wanted to

19    introduce 63-26 if I haven't.  I think I have not.

20              THE COURT:  No, you have not.  Any objections to

21    63-26?

22              MS. WHITWORTH:  No, Judge.

23              MR. FISHER:  No objection.

24              MR. SATIJA:  Can the Court show that one more

25    time, please?
```

```
 1              THE COURT:  Sure.  It's a final judgment.  No,
 2    excuse me, it's not.
 3              MR. DURRSCHMIDT:  It's original schedules.
 4              MR. SATIJA:  Oh, no objection, Your Honor.
 5              THE COURT:  (Indiscernible) 25.  All right.  63-26
 6    --
 7              MR. SATIJA:  No objection, Your Honor.
 8              THE COURT:  It's admitted.  Thank you.
 9              (Exhibit 63-26 entered into evidence.)
10              THE COURT:  Which exhibit do you want to go to
11    now, Mr. --
12              MR. DURRSCHMIDT:  I'm sorry, 63-27, Your Honor.
13    BY MR. DURRSCHMIDT:
14    Q    Mr. Darjean, you see Exhibit 63-27?  Do you see that on
15    the screen?
16    A    Form 206?
17    Q    Yes, sir.
18    A    Yes.
19    Q    All right.  And this is the amendment to the schedules
20    that was filed on November 9 in this bankruptcy case,
21    correct?
22    A    I believe so.  Yes.
23    Q    All right.  And you likewise signed this schedule under
24    penalty of perjury, correct?
25    A    I believe so, yes.
```

1    Q    And these schedules were filed -- so, the other

2    schedules were filed October 27th, and these were filed on

3    November 9th, so less than two weeks later, correct?

4    A    Yes.

5    Q    All right.  And if you look at the second page of

6    Exhibit 63-27, now there are three pieces of property

7    listed.  Do you see that?

8    A    Yes.

9    Q    What made you add the 2501 Napoleon and the 3459

10   McGowen properties to the schedules?

11   A    During that time, we had reviewed the transcripts from

12   the state court case, and Mr. Abdullatif testified that he

13   had deeded all nine properties to (indiscernible) and on

14   advice of counsel as well.  That's why we added those.

15   Q    All right.  When you said all nine properties, why did

16   you only listen two additional?

17   A    Because the other properties had been sold already.

18   Q    All right.  And the nine properties that you have just

19   testified about were the nine properties exclusive of the

20   801 Malone that were scheduled in the 2009 bankruptcy of

21   Houston Real Estate Properties, correct?

22   A    Correct.

23   Q    When was the last time that Houston Real Estate

24   Properties paid the ad valorem taxes on 2501 Napoleon?

25   A    I don't know the answer.

1   Q    When was the last time that Houston Real Estate

2   Properties paid the ad valorem taxes on 3459 McGowen?

3   A    I don't know.

4   Q    When were --

5   A    (Indiscernible) were paid from (indiscernible).

6   Q    I'm sorry, what?

7   A    I do know that some taxes were paid, but it's been a --

8   it's been a while.  I'm not -- I didn't mean to come across

9   as saying that Houston Real Estate Properties never paid

10  taxes on those properties, because they did, but as far as

11  when, I don't -- I don't remember the last payment.

12  Q    When is the last time that Houston Real Estate

13  Properties received any income from 2501 Napoleon?

14  A    2501 Napoleon was a -- yeah, I don't -- I don't know

15  the answer to that question (indiscernible).

16  Q    When was the last time that -- all right, when is the

17  last time that Houston Real Estate Properties received any

18  income on 3459 McGowen?

19  A    It's been a while but -- it's been -- it's been a

20  while.

21  Q    When is the last time that Houston Real Estate

22  Properties received any income from any source?

23  A    I don't know.

24  Q    Years?

25  A    Yes, I would say so.  Yes.

1   Q    You said that the other seven of the nine properties

2   had been sold previously, correct?

3   A    Correct.

4   Q    And did Houston Real Estate Properties receive any of

5   the proceeds of those sales?

6   A    No.

7   Q    All right.  If you turn to the next page, you see in

8   response to question No. 77 on that form, you've now added

9   $1.8 million and some change as a claim to funds at the

10  registry of the court, correct?

11  A    Correct.

12  Q    What made you decide to add this to the schedules?

13  A    There is an appeal going on.

14  Q    Okay.  But --

15  A    (Indiscernible) --

16  Q    But how does that necessarily mean that Houston Real

17  Estate Properties owns $1.8 million in the registry of the

18  state court?

19  A    (Indiscernible) Akin Gump, he can kind of help with the

20  answer to that question.  He's in the -- in the courtroom.

21  Q    But sir, he's not on the stand.  You're on the stand.

22  You're the one that signed the schedules.  I need to know

23  why you put a $1.8 million asset on the Debtor's schedules.

24  A    I know that the case is on appeal.

25  Q    Okay.  The question is, why did you put a $1.8 million

1    asset on the Debtor's schedules?

2    A    I don't -- I don't know if that's a legal question or

3    not.

4    Q    You filled out the --

5    A    The sale --

6    Q    You filled out these schedules, correct?

7    A    Yes, the -- I was trying to add some more details.  I'm

8    not trying to frustrate you.

9    Q    No but hold on.  Let me ask -- let me ask the question

10   and you answer, please.  You filled out these schedules?

11   A    Yes.

12   Q    And less than two weeks after the original schedules,

13   you decided to add a $1.8 million asset to the Debtor's

14   schedules, correct?

15   A    Those were funds held in the Court from the sales of

16   the properties.

17   Q    Which properties?

18   A    The nine properties that I referred to earlier.

19   Actually the seven, the seven properties.  Those properties

20   were sold and those funds were put in the Court's registry.

21   Q    All right.  And so those properties were sold.  Who

22   bought those properties?

23   A    I don't know.

24   Q    You don't know.  Who sold the properties?

25   A    Mr. Abdullatif.

```
 1   Q    Okay.  So, Mr. Abdullatif sold seven properties and the

 2   proceeds were $1.8 million?

 3   A    To the best of my knowledge, yes.

 4   Q    All right.  Why didn't you put that on the original

 5   schedules?

 6   A    I mentioned earlier (indiscernible).

 7   Q    I don't think so, but why did you amend them?

 8   A    We had a chance to review the -- we had a chance to

 9   review the transcript from the state court case on

10   (indiscernible).

11   Q    But wouldn't the judgment be what you should be

12   reviewing and not the transcript?

13   A    Just took the advice of counsel.

14   Q    Advice of which counsel?

15   A    Mr. (indiscernible).

16   Q    With Akin Gump?

17   A    No, Mr. (indiscernible).

18   Q    Oh, the Debtor -- okay, I got you.

19        MR. DURRSCHMIDT:  Judge, I would move to admit

20   Exhibit 63-27.

21        THE COURT:  Any objection to 63-27?

22        MS. WHITWORTH:  No, Judge.

23        MR. FISHER:  No objection.

24        THE COURT:  Exhibit's admitted.  Thank you.

25        (Exhibit 63-27 entered into evidence.)
```

```
1              MR. DURRSCHMIDT:  Judge, if you could put up 63-

2    28?

3    BY MR. DURRSCHMIDT:

4    Q    Mr. Darjean, do you have a phone in your presence?

5    A    Yes, I'm audible on the phone.

6              THE COURT:  He's (indiscernible).

7              THE WITNESS:  In other words, I dialed in for

8    instructions.

9    BY MR. DURRSCHMIDT:

10   Q    Are you getting -- are you getting text messages from

11   anybody?

12   A    I have my personal phone (indiscernible) text messages,

13   but it was personal.

14   Q    Okay.  All right.  Before you is 63-28.  Do you see

15   that?

16   A    Yes.

17   Q    And this is the statement of financial affairs that you

18   completed and signed under penalty of perjury on behalf of

19   Houston Real Estate Properties, correct?

20   A    Correct.

21   Q    If you look at Part 1 on that form, see it's in black

22   and it's on the left-hand side right below statement of

23   financial affairs; you see that?  Questions 1 and 2.

24   A    Yes, I do.

25   Q    All right.  And this asks for gross revenues from the
```

1    business and you've checked nothing, correct?

2    A    Correct.

3    Q    And then if you look at Question No. 3, it asks for

4    payments within 90 days before the bankruptcy case.  Do you

5    see that?

6    A    (Indiscernible) payments or transfers including expense

7    reimbursements to any creditor?

8    Q    Do you see --

9    A    (Indiscernible).  Yes.

10   Q    All right, and you said none.

11   A    Yes.

12   Q    And then in Paragraph 4 --

13        THE COURT:  Mr. Darjean, I'm going to ask you

14   again to reposition your camera.  I have a great view of

15   your forehead, but that's all I'm seeing.  And you have a

16   very nice-looking forehead, I might add, but I'd like to see

17   your face.

18        THE WITNESS:  I'm sorry.

19        THE COURT:  Go ahead.

20        THE WITNESS:  Okay.

21        THE COURT:  Thank you.

22        THE WITNESS:  It's a little shaky.

23   BY MR. DURRSCHMIDT:

24   Q    In Question No. 4, it asks about payments or transfers

25   made within one year before the case was filed for the

1    benefit of an insider, correct?

2    A     Correct.

3    Q     And you listed none?

4    A     Correct.

5    Q     But we've already determined that Skaneateles is an

6    insider, correct?

7    A     I don't -- I don't know if we've established that.

8    Q     All right.  Your Honor, could you go back to 63-26,

9    please?  Page 6 of 11.  Sir, this is the Exhibit 63-26, Page

10   6 of 11.  It's a Schedule D listing creditors who have a

11   secured claim.  In Category 2.1 is Skaneateles and in the

12   middle column there is a question, is the creditor an

13   insider or related party, and the answer is yes.  Do you see

14   that?

15   A     If any of the creditors have claims -- okay.  Secured,

16   yes, I see the answer.  Yes.

17   Q     All right.  Now, Your Honor, if we could go back to 63-

18   28, please?  All right.  And if we were looking at Paragraph

19   4, right, and it requests payments or other transfers to

20   insiders, and you listed none, correct?

21   A     I'm sorry, I'm just reviewing the question.  Yes, I see

22   where I listed -- no, I see it.

23   Q     Okay.  And we've already established that a deed of

24   trust was signed by you on behalf of the Debtor in September

25   immediately before the bankruptcy case, right?

```
 1   A    Correct.

 2   Q    And that (indiscernible) a lien allegedly to

 3   Skaneateles, correct?

 4   A    I'm sorry.  Could you repeat the question?

 5   Q    Yeah, the deed of trust -- the purpose of the deed of

 6   trust was to convey a lean to Skaneateles.

 7   A    Correct.

 8   Q    All right.  Now, you testified earlier that in the

 9   summer of 2022, certain creditors got paid from the proceeds

10   of the loan, right?

11   A    Yeah.  I mean, the question wasn't exact, but yeah, in

12   the summer of 2022, I testified that Planet Home Lending had

13   been paid off.

14   Q    And what day was that?

15   A    I don't know, summer, summertime.

16   Q    All right.  And who issued the check?

17   A    Actually, I believe it was a wire.  I don't know if it

18   was a check.

19   Q    Okay.  And who issued the wire?

20   A    I don't know.

21        MR. DURRSCHMIDT:  Judge, I'd move to admit 63-28.

22        THE COURT:  Any objections to 63-28 which is the

23   (indiscernible)?

24        MS. WHITWORTH:  No, Judge.

25        MR. FISHER:  No objection.
```

1      THE COURT:  All right.  It's admitted.  Thank you.

2      (Exhibit 63-28 entered into evidence.)

3      MR. DURRSCHMIDT:  Your Honor, if you could go to

4  Exhibit 63-29, please?

5  BY MR. DURRSCHMIDT:

6  Q   Sir, on your screen is Exhibit 63-29.  Do you see that?

7  A   Yeah, I see the Form 207.

8  Q   All right.  And this is the amended statement of

9  financial affairs that you completed on behalf of Houston

10  Real Estate Properties and signed under penalty of perjury,

11  correct?

12  A   Correct.  I believe this is the amended version.

13  Q   And Your Honor, if we could go to Page 3 of 7, please?

14  And if you look at Part 6, Question 11, one of the

15  amendments to this statement of financial affair was to

16  reflect that the Debtor's counsel was actually paid the

17  retainer by Jetall Company, Inc., correct?

18  A   Correct.

19  Q   And again, Jetall Company, Inc., is Ali Choudhri's

20  company?

21  A   Correct.

22  Q   And you are an employee of Jetall Company, aren't you?

23  A   Correct.

24  Q   And what others -- what job do you do for Jetall

25  Company?

1    A    I manage the properties.

2    Q    You manage whose properties?

3    A    The property that -- I mean, Ali -- I work for Ali

4    Choudhri.

5    Q    And you manage Ali Choudhri's properties?

6    A    Correct.

7    Q    And how much of your week is spent up working managing

8    Ali Choudhri's properties?

9    A    Work week, 95 percent of my work week.

10    Q    Full-time job?

11    A    Yes.

12    Q    All right.  And who do you report to at Jetall

13    Companies?

14    A    I have -- I have a coworker that I work hand in hand

15    with, but mainly I report to Ali Choudhri.

16    Q    And you're totally dependent on your salary to do what

17    Ali Choudhri tells you to do?  He's your supervisor.

18    A    If you could restate that question?  I'm sorry.

19    Q    Ali Choudhri is your supervisor?

20    A    Correct.

21            MR. DURRSCHMIDT:  Judge, I'll move to admit 63-29.

22            THE COURT:  Any objections to 63-29, the amended

23    statement of financial affairs?  Excuse me, I'll get it out.

24            MS. WHITWORTH:  No, Judge.

25            MR. FISHER:  No objection.

```
 1              THE COURT:  63-29 is admitted.  Thank you.

 2              (Exhibit 63-29 entered into evidence.)

 3    BY MR. DURRSCHMIDT:

 4    Q    Mr. Darjean, is it fair to say that Houston Real Estate

 5    Properties has no employees?

 6    A    Yes, I'd say that's fair.

 7    Q    And it has no income?

 8    A    Correct, none.

 9    Q    And there are no tenants in the 801 Malone property?

10    A    Correct.

11    Q    The McGowen property and the Napoleon property, do you

12    know if there's any tenants in those properties?

13    A    No, I don't.

14    Q    And the Debtor's concept to deal with 801 Malone is to

15    tear down the house and develop that property?

16    A    Yes.

17    Q    And what does the development look like?

18    A    It's a multi-story.  It's going to be converted multi-

19    story for like micro apartments.

20    Q    And how many micro apartments?

21    A    Between 20 and 30.

22    Q    Twenty and 30 apartments on a 5,000-square-foot lot?

23    A    Yeah.  I believe the rendering that I saw it's a multi-

24    story development.

25    Q    And how much is that going to cost?
```

```
 1    A    I don't -- I don't have the financial plan in front of
 2    me, but it's -- I don't know the specific number.
 3    Q    Will that require any permitting from the city?
 4    A    Of course.
 5    Q    Do you have the permitting yet?
 6    A    No, sir.  The vacant house is still -- is still there.
 7    Your Honor, I ran out of water.  I didn't know that I would
 8    be testifying for almost two hours.  Can I -- can I have a
 9    break or?
10         THE COURT:  I think that's reasonable under the
11    circumstances.  So, let's do this.  It is about 4 after the
12    hour.  We will reconvene at 1:15.  Everybody stretch their
13    legs and I'll see you back in about 11 minutes.  All right.
14    Thank you.
15         (Recess)
16         THE COURT:  All right.  It's 1:15 exactly.  We are
17    back on the record.  We are waiting for Mr. Darjean to be on
18    the line and for other parties to come back into the
19    courtroom.  We will sit here patiently for a few minutes
20    until my patience runs out.
21         MR. FISHER:  With this case, it could be very
22    quick.
23         THE COURT:  Mr. Darjean, are you on the line?
24         There he is.  He's back.  All right, Mr. Darjean.
25    I'll remind you again that you are still under oath.  We
```

001527

```
1    took a short break.  Mr. Durrschmidt, he's your witness.

2              MR. DURRSCHMIDT:  Thank you, Your Honor.

3    BY MR. DURRSCHMIDT:

4    Q    All right.  When we broke, we were talking about the

5    development of the property, and we were talking about

6    permits, and I think you testified the permits are -- not

7    been obtained yet?

8    A    Correct.

9    Q    And the wastewater off of this property, is that going

10   to require a special permit for the amount of wastewater

11   you're contemplating?

12   A    I'm not sure yet.  I haven't gotten to that point.

13   Q    Okay.  So, at what point are you with the development?

14   A    We are lining up (indiscernible).

15   Q    I'm sorry, lining up what?

16   A    The house is still on site.

17   Q    Yes, sir.

18   A    It's a vacant house.

19             THE COURT:  Mr. Darjean, when you moved last, you

20   moved the camera.  If you could move it back to where it

21   was?  Thank you, sir.  I appreciate that.

22   BY MR. DURRSCHMIDT:

23   Q    Did you just say that you were lining up investors?

24   A    No, sir.  Just -- the house is vacant and it's --

25   that's the point where we're at.  I have to demo it first,
```

1    and then, you know, that's the first step.  We can't do

2    anything with the existing structure in place.

3    Q    And how much is it going to cost to demo the house?

4    A    Maybe 20 grand, I would guess.

5    Q    And where's that money going to come from?

6    A    I don't know.

7    Q    Okay.

8          MR. DURRSCHMIDT:  Your Honor, could you put up 63-

9    1?  And Your Honor, maybe there's a quicker way to do this.

10   Exhibit 63-1, -2, -3, and -4 are the monthly operating

11   reports of the -- that are filed at Docket 39, 51, 52, and

12   55.  And I'm happy to go through and get him to identify

13   them, but if counsel would stipulate and not object to their

14   introduction, I would save some time.

15         THE COURT:  And I'm assuming that they're being

16   introduced for the purpose of the fact that there's no

17   operations, there's no cash, no expenses?  I reviewed them

18   before.  So --

19         MR. DURRSCHMIDT:  Yes, sir.

20         THE COURT:  -- is there any objection to me

21   admitting in evidence 63-1 -- let me make sure I've got this

22   right -- 63-39, 51, 52 and 53?  Is --

23         MR. DURRSCHMIDT:  Which is -- it's -- I'm sorry,

24   Your Honor.  It's 63-1, 2, 3, and 4.

25         THE COURT:  One -- oh, okay, 1, 2, 3, and 4.

1        MR. DURRSCHMIDT:  Yeah, and the docket numbers are

2    the actual MORs that I was --

3        THE COURT:  All right.  Any objections to

4    admitting the monthly operating reports, which basically

5    show no activity, 63-1, 2, 3, and 4?  Any objections?

6        MS. WHITWORTH:  No objections, Judge?

7        MR. FISHER:  Anything that's been filed I have no

8    objection to.

9        THE COURT:  All right.

10       MR. FISHER:  (Indiscernible) filed by the Debtor

11   is part of the bankruptcy case.

12       THE COURT:  It's admitted.  All right.  Thank you.

13   They're admitted, Mr. Durrschmidt.  Thank you.

14       (Exhibits 63-1, 63-2, 63-3, and 63-4 entered into

15   evidence.)

16       MR. DURRSCHMIDT:  Thank you very much.  Your

17   Honor, if you could pull up 63-6, please?

18   BY MR. DURRSCHMIDT:

19   Q   Mr. Darjean, have you seen this order denying the

20   application to employ Clark Hill?

21       MR. FISHER:  He appears to have frozen again, Your

22   Honor.

23       THE COURT:  Excuse me?

24       THE WITNESS:  I didn't read it, but I think I

25   glanced through it in looking through the exhibits.

```
 1              THE COURT:  I didn't hear what you said.  I

 2    apologize.

 3              MR. FISHER:  He appears to have frozen on the

 4    screen.  Sorry.

 5              THE WITNESS:  Yeah.  Yeah, I lost some audio on

 6    your end as well.  I lost some of your audio.

 7              THE COURT:  Whenever I share, Sometimes it freezes

 8    up, technology being what it is.  Next time, Mr. Darjean, I

 9    welcome you to come to court.  Let me share this again.

10    Here we go.

11    BY MR. DURRSCHMIDT:

12    Q    Mr. Darjean, this is 63-6.  This is the order denying

13    the application of employee Clark Hill.  Have you seen this

14    order?

15    A    Just briefly.

16    Q    Okay.  And who was Clark Hill?

17    A    I believe Attorney (indiscernible) I believe.

18    Q    Okay, this -- these were the attorneys representing

19    Houston Real Estate Properties in the state court

20    litigation?

21    A    I believe so.  I mean, well, in the state court

22    litigation it was Tony Buzbee's firm.

23              MR. DURRSCHMIDT:  Your Honor, I'll move to admit

24    63-6 as a court order.

25              THE COURT:  Any objections to 63-6?
```

```
 1              MS. WHITWORTH:  No, Judge.

 2              MR. FISHER:  No objection.

 3              THE COURT:  All right.  It's admitted.  Thank you.

 4              (Exhibit 63-3 entered into evidence.)

 5              MR. DURRSCHMIDT:  Could you go back to 63-5,

 6    please, Your Honor?

 7              THE COURT:  Certainly.

 8    BY MR. DURRSCHMIDT:

 9    Q    Mr. Darjean, in front of you is the Debtor's

10    application to employ Clark Hill, which is Exhibit 63-5.  Do

11    you see that?

12    A    Yes, sir.

13    Q    Okay.  And you see on the second page, Paragraph 3 and

14    4, it says that Clark Hill represented the Debtor pre-

15    petition and post-trial matters in the state court lawsuit?

16    Do you see that?

17    A    Yes, sir.

18    Q    And in Paragraph 5, the Debtor wished to employ Clark

19    Hill as special counsel and down in Paragraph 8, lead

20    counsel will be Jadd Masso; you see that?

21    A    Yes, sir.

22    Q    And do you know who Jadd Masso is?

23    A    Yes.  He was an attorney.  He was working the case.

24    Q    And who was he representing?

25    A    Houston Real Estate and Ali Choudhri.
```

1    Q    So, he's representing both Houston Real Estate and Ali

2    Choudhri?

3    A    I would -- I would say yes.

4    Q    Okay.

5    A    I don't know.

6    Q    All right.  And then --

7              MR. SATIJA:  Objection, Your Honor.  The document

8    has a disclosure attached to it, and those matters are

9    addressed in the -- in the disclosure, so the document in

10   that regard will speak for itself.

11             THE COURT:  I will admit 63-5, the document speaks

12   for itself, but Mr. Darjean can also testify to it.  Go

13   ahead.

14   BY MR. DURRSCHMIDT:

15   Q    Clark Hill has now withdrawn from the representation in

16   the post-trial matters for the Debtor in the state court

17   action, correct?

18   A    According to the documents you showed me.

19   Q    Okay.  So, you don't know whether they continue to

20   represent the Debtor or not?

21   A    No, I do not.

22   Q    Okay.  Do you know who else --

23   A    (Indiscernible).

24   Q    Pardon me?

25   A    No.

```
 1   Q    Do you know who else might be representing the Debtor

 2   in the post-trial matters in the appeal?

 3   A    The attorneys?

 4   Q    Yes, sir.

 5   A    Representing Houston Real Estate Properties?

 6   Q    Yes, sir.

 7   A    Mr. Jim with Akin Gump.

 8   Q    Okay.  Have you ever had --

 9   A    And -- I'm sorry.  Go ahead.

10   Q    Have you ever had any discussions with Mr. Jim at Akin

11   Gump?

12   A    Yes.

13   Q    When?

14   A    Sporadically on and off, whenever it's needed to kind

15   of get clarification on legal matters.

16            MR. DURRSCHMIDT:  You did admit 63-5?

17            THE COURT:  Yes.  63-5 is admitted.

18            (Exhibit 63-5 entered into evidence.)

19            MR. DURRSCHMIDT:  Thank you, Your Honor.  Could we

20   go to 63-7, please?

21   BY MR. DURRSCHMIDT:

22   Q    Sir, in front of you is Exhibit 63-7, which is a proof

23   of claim.  I think it's an amended proof of claim that was

24   filed by Harris County.  Have you seen this document before?

25   A    I'm not -- yeah, I'm not exactly sure if I've seen this
```

1    particular document.

2    Q    Are you reviewing the documents that get filed in the

3    Houston Real Estate Properties bankruptcy case?

4    A    Yes, sir.  There's a lot of them.  So, if I'm -- if I

5    miss a page or two in my memory, I apologize.

6    Q    Okay.  This is the amended proof of claim that was

7    filed by Harris County, correct?

8    A    Proof of claim.  I don't know, sir.

9         MR. DURRSCHMIDT:  Your Honor, I'd ask the Court to

10   take judicial notice of the proof of claim filed by Harris

11   County at 63-7, claims Docket No. 1, Claim No. 1.

12        THE COURT:  I'll take judicial notice of all

13   claims that are filed in the case, and this is a copy of

14   Claim No. 1.  Thank you.

15        MR. DURRSCHMIDT:  Thank you, Your Honor.  Judge,

16   I'll pass the witness.

17        THE COURT:  All right.  Let me go to Mr. Fisher

18   first, then I'll go to the U.S. Trustee and then I'll go

19   back to Mr. Satija.  Go ahead, Mr. Fisher.

20        MR. FISHER:  Thank you, Your Honor.  Your Honor,

21   once again, Bennett Fisher on behalf of Skaneateles, and I'm

22   sure like the Court I'm learning as we're going here, and

23   I've heard a few things and a few things that will trigger

24   some inquiry on my part, not the first of which is who knew

25   what and when and where.

```
 1              THE COURT:  I'm just -- at this point in time,
 2    I'll let you argue all you want when we're done, but let's
 3    just cross-examine Mr. Darjean, which is really why I called
 4    you up here.
 5              MR. FISHER:  Okay.
 6              THE COURT:  Okay.  So, cross-examination.  He
 7    seems to have disappeared for some reason.
 8              MR. FISHER:  Well, Judge, if I may defer my
 9    examination until I have a chance to argue again
10    (indiscernible) giving me a couple of weeks to get up to
11    speed?
12              THE COURT:  I don't think I want to do that, Mr.
13    Fisher.  I'd like you to cross-examine this witness because
14    I don't know how I evaluate your request for a continuance
15    until I hear what he has to say through your testimony.
16              MR. FISHER:  Okay.
17              THE COURT:  All right?  So, but he needs to come
18    back online.  He (indiscernible).  There he goes.  So, go
19    ahead.
20              CROSS-EXAMINATION OF DWARD DARJEAN
21    BY MR. FISHER:
22    Q    Mr. Darjean, my name is Bennett Fisher.
23    A    Yes, sir.
24    Q    And I represent Skaneateles.  Sir, we've never met
25    before, have we?
```

```
 1    A    No, sir.

 2    Q    We've never spoken on the phone?

 3    A    No, sir.

 4    Q    We've never exchanged text messages or e-mails?

 5    A    No, sir.

 6    Q    Okay.  But you understand that I represent Skaneateles,

 7    who is a creditor, in fact a secured creditor in this case,

 8    correct?

 9    A    Yes, sir.

10         THE COURT:  Bear with me.  Something just went

11    haywire.  Okay.  Go ahead.  It came back.

12    BY MR. FISHER:

13    Q    So, I've only got a few questions for you.  You say you

14    reviewed all the schedules before you signed them, correct?

15    A    Correct.

16    Q    All right.  But you had some advice in helping you

17    determine what some of those numbers are on the schedules?

18    A    Yes, sir.

19    Q    All right.  And do you claim to be the person who's got

20    the most knowledge of all of the information on all of the

21    schedules and all the statement of financial affairs that

22    have been filed in this case?

23    A    No, sir.  I would say Ali has -- is more knowledgeable

24    about all of these matters.

25    Q    All right.  But when you reviewed these documents, you
```

1    believed them to be true and correct at the time that you

2    signed the schedules and the statement of financial affairs?

3    A    Yes, sir.

4    Q    Okay.  And when the schedules and statement of

5    financial affairs were amended, that was based upon

6    information that various third parties gave you?

7    A    That is correct.

8    Q    All right.  Did you testify at all in the state court

9    lawsuit?

10   A    No, I did not.

11   Q    okay.  Did -- who's the person who probably worked

12   closest with the attorneys in the state court lawsuit?

13   A    Ali Choudhri.

14   Q    Okay.  Do you know whether he testified or not?

15   A    Yes, he did.

16   Q    Okay.  Now with respect to those properties that were

17   transferred back to the Debtor according to Mr. Abdullatif,

18   do you know about those -- anything at all about those

19   properties?

20   A    Yes, sir.

21   Q    Okay.  And --

22   A    In exchange -- in exchange for the deeds, Mr.

23   Abdullatif was issued 20 percent of the debt.

24   Q    Okay.  And when did that take place?

25   A    Years ago.

1    Q    All right.  And then those properties were sold?

2    A    (Indiscernible).

3    Q    I'm going to withdraw that.

4    A    I'm sorry.  I --

5    Q    Seven of those nine properties were then sold?

6    A    Yes.

7    Q    When were they sold?

8    A    When were they sold?

9    Q    Yes, sir.

10   A    I don't know the dates.

11   Q    Well, would you say it was within the last year?

12   A    No.  Before then.

13   Q    Okay.  But then within the last year, two of the

14   properties that were remaining out of the nine were sold,

15   correct?

16   A    Correct.

17   Q    Okay.  And do you remember the amount of the proceeds

18   of the sale of those two properties?

19   A    The seven properties, it's 1.8 and change.

20   Q    And that's reflected on Exhibit 27, Page 3 as I -- as I

21   recall, correct?  In other words, that's in the -- that's on

22   the schedules that were filed on November 9th, the amended

23   schedules?

24   A    Yes, I believe so.

25        THE COURT:  Mr. Fisher, I'm (indiscernible) need

```
 1    me to.

 2              MR. FISHER:  I'm sorry?

 3              THE COURT:  I'm happy to project to the witness if

 4    you need me to.

 5              MR. FISHER:  Judge, if you could possibly put up

 6    then Exhibit 27, Page 3, that would be helpful I think.

 7              THE COURT:  All right.  So, just so the record's

 8    clear, 63-27?

 9              MR. FISHER:  Yes, Your Honor.

10              THE COURT:  (Indiscernible) Page 3.

11              MR. FISHER:  Page 3.

12              THE COURT:  Is that what you want to see, Mr.

13    Fisher?  Oh, I'm sorry, I'm not sharing.  I apologize.

14              MR. FISHER:  Yes, Your Honor.  I can't -- it looks

15    like that number rhymes with $1,800,394.38.  I can't really

16    make it out.  I got the hard copy, though.

17              THE COURT:  It's 63-27, Page --

18              MR. FISHER:  Page 3.

19              THE COURT:  -- 3 of 5.

20              MR. FISHER:  Page 3 of 5, correct.

21    BY MR. FISHER:

22    Q    All right.  So, Mr. Darjean, is that the amount of

23    money that was realized from the sale of the last two pieces

24    of property?

25    A    No, sir.
```

1    Q    How much was realized from the -- from the sale of the

2    last two pieces of property?

3    A    I don't know.  It was just (indiscernible) my

4    knowledge.  They were just -- maybe a week or so ago they

5    were just sold from the last two pieces of property.

6    Q    All right, and tell me how the $1.8 million ended up in

7    the registry of the court or why?

8    A    The sale of the first seven properties.

9    Q    I got it.

10   A    The sale of the first seven properties.

11   Q    Okay.  So, those -- that amount of money was deposited

12   in the registry of the court.  Do you remember on what date?

13   A    No, I don't.

14   Q    What year?

15   A    Just -- I don't know.

16   Q    Was it around the time of the trial in state court?

17   A    Yes, I would say so.  Yes.

18   Q    All right.  Now, as we're sitting here today, do you

19   know what happened to those funds or whether they're still

20   in the registry of the court in state district court?

21   A    I believe Osama removed those funds.

22   Q    Okay.  Do you know how he removed those funds while

23   there was an appeal pending?

24   A    I don't know how he did it.

25   Q    All right.  Is -- do you know if it's the Debtor's

1   position that that amount of money is the property of the

2   Debtor?

3   A    Yes, that's why I put it in the schedules.

4   Q    Okay.  Now, let's go to Skaneateles' claim.  It's your

5   understanding that Skaneateles has a valid claim for

6   $450,000?

7   A    Yes.

8   Q    And that there's a valid deed of trust that was

9   executed sometime in September of 2022?

10  A    Yes.

11  Q    Okay.  And you don't know why that deed of trust wasn't

12  filed until a month or so later?

13  A    No, I don't.

14  Q    Okay.  But from the Debtor's standpoint, that's a valid

15  and existing liquidated and undisputed debt?

16  A    Yes, sir.

17  Q    Okay.

18          MR. FISHER:  Your Honor, may I take a moment,

19  please?

20          THE COURT:  Sure.

21          MR. FISHER:  Thank you, Your Honor.  May I

22  proceed?

23          THE COURT:  Sure.

24  BY MR. FISHER:

25  Q    Mr. Darjean, are you aware that the judgment in state

```
 1   court is under appeal?

 2   A    Yes, it is.

 3   Q    And are you aware that that appeal bond was filed on

 4   behalf of Mr. Choudhri as well as the Debtor?

 5   A    Yes.

 6   Q    And are you aware -- I think you've seen the judgment.

 7   The judgment is jointly and severally against both Houston

 8   Real Estate Properties and Mr. Choudhri, correct?

 9   A    Correct.

10   Q    And Mr. Choudhri was able to post the bond or somebody

11   posted it for him and that bond covered both judgment

12   Debtors, correct?

13   A    Correct.

14   Q    And both Mr. Choudhri and Houston Real Estate

15   Properties disagreed with some of the findings by the jury

16   in the state court case?

17   A    Correct.

18   Q    Okay.

19             MR. FISHER:  Pass the witness, Judge.

20             THE COURT:  All right.  Let me go to Ms.

21   Whitworth.  Does Ms. Whitworth have any questions of the

22   witness?

23             MS. WHITWORTH:  Yes, Your Honor.  I have a few

24   questions, if I may?

25             THE COURT:  Go ahead.  Please.
```

```
 1              CROSS-EXAMINATION OF DWARD DARJEAN

 2   BY MS. WHITWORTH:

 3   Q    Good afternoon, Mr. Darjean.  I'm Jana Whitworth.  I'm

 4   the lawyer who spoke with you on behalf of the United States

 5   Trustee during your 341, the meeting of creditors that we

 6   conducted back in November of last fall.  It was nice to see

 7   you on camera although not the person.

 8   A    Yes.

 9   Q    I want to focus -- a lot of this talk -- a lot of your

10   questions have been around the pre-filing, the litigation.

11   I want to go back to the bankruptcy case if we may?  You

12   filed a motion on behalf -- the Debtor filed a motion asking

13   to dismiss and it mentions in the motion that there'll be a

14   short time that a plan will be filed and that there's been a

15   lot of hard work on the plan.  So, I want to ask you, what

16   is the plan exactly?  What is the Debtor's plan to

17   reorganize?

18   A    Well, immediately the plan is to have Skaneateles pay

19   the taxes while we -- yeah.  (Indiscernible).  Skaneateles

20   is actually one of the main lenders on funding the --

21   funding the project.

22   Q    So, your testimony is that Skaneateles is going to fund

23   a plan going forward for the Debtor?

24   A    Correct.

25   Q    And how much money is Skaneateles going to provide to
```

1    the Debtor to fund the plan?

2    A    I don't know off the top of my -- like, if I had to

3    guess, I -- I don't know.  We're finalizing -- we're ready

4    to actually get ready to finalize the actual plan and we

5    were -- depending on the outcome of today, if we need to

6    file the plan, we can do so very, very quickly.

7    Q    Can you walk me through the numbers?  Your testimony

8    earlier was that it would cost $20,000 to demolish the

9    existing structures; is that correct?

10   A    Yeah.  I -- yes, ma'am.

11         THE COURT:  Ms. Whitworth, can I interrupt you?

12   (Indiscernible) that camera so that we can actually see Ms.

13   Whitworth?

14         MS. WHITWORTH:  Oh, I'm sorry.  I can -- I can

15   move, Judge.  It's probably easier for me to me, Your Honor.

16   I apologize.

17         THE COURT:  Thank you.  I'd like -- that's fine.

18         MS. WHITWORTH:  I'm leaning left.

19   BY MS. WHITWORTH:

20   Q    So, what other expenses does the Debtor anticipate

21   incurring?  Walk me through the process.  You testified

22   earlier, Mr. Darjean, that you're going to develop the

23   property.  Are there -- are there plans?  Are there

24   architectural designs?  How much is all this going to cost?

25   And where are you in that phase?

```
 1    A    Yes.  Yes, we're -- the plans are being finalized and
 2    we are ready to file the plans.
 3    Q    The architectural plans?
 4    A    Yes.
 5    Q    And how much do you anticipate that expense to be?
 6    A    For the project or the -- or the expense of the
 7    architectural plans?
 8    Q    The architectural plans, sir.
 9    A    I'd guess maybe --
10    Q    I'm sorry, you cut out Mr. Darjean.
11    A    I -- the architect has already been paid.
12    Q    Oka.  That's good information to know.
13    A    Yes.
14    Q    So, that's not an expense that will come out of the
15    estate.  So, what other expenses do you --
16    A    Correct.
17    Q    I mean, your testimony -- you've got to help me out
18    here.  Your testimony is that you're very close to getting a
19    plan finalized, but you're not giving me any numbers.  Can
20    you give me any numbers?
21    A    Mr. Ali Choudhri is (indiscernible) on that.  He has
22    more knowledge as far as the contractors and the -- and the
23    entire -- he's the developer.  I'm a manager, so I don't
24    want to speak out of turn.  But I mean, I could get that
25    information for sure.
```

```
 1              MS. WHITWORTH:  Your Honor, I don't have any more
 2    questions.
 3              THE COURT:  All right.  Thank you, Ms. Whitworth.
 4    Mr. Satija, it's your witness.
 5              MR. SATIJA:  Thank you, Your Honor.
 6              CROSS-EXAMINATION OF DWARD DARJEAN
 7    BY MR. SATIJA:
 8    Q    Mr. Darjean, how many times would you estimate that we
 9    have either talked on the phone or seen each other by Zoom
10    since we met back on October 7th versus the first time we
11    spoke back on October 6th or 7th or whatever it was?
12    A    About 50.
13    Q    That's probably about right.  And Mr. Darjean, when you
14    and I have spoken about the bankruptcy plan, now, you're
15    aware that the bankruptcy plan is separate from the
16    development plan; is that correct?
17    A    Correct.
18    Q    And when we've spoken about the bankruptcy plan, I've
19    mentioned numbers like 1129(a)(9) and things like that and
20    requirements to confirm a plan?
21    A    Correct.
22              MR. DURRSCHMIDT:  Judge, I'd object to leading.
23              THE COURT:  Mr. -- I'll sustain the objection.
24    You can't lead the witness.
25              MR. SATIJA:  Thank you, Your Honor.  Okay.
```

```
 1   BY MR. SATIJA:

 2   Q    Do you remember our discussion about the specific terms

 3   of the plan for (indiscernible)?

 4   A    The immediate plan or the development plan?

 5   Q    The immediate plan.

 6   A    The immediate plan is to have Skaneateles take care of

 7   the taxes that become due.

 8   Q    Okay.  And do you know for what period that is?

 9   A    I can't recall --

10   Q    Okay.

11   A    -- the period that -- yeah.

12   Q    Okay, that's fair.  That's fair.  I mean -- I mean, I

13   may put myself on to talk about the plan later if the judge

14   will permit me, but all right, let's turn -- let's turn back

15   to some of these documents and issues that have

16   (indiscernible) during your testimony.

17           So, first of all, you testified earlier that you

18   were responsible to prepare the schedules in connection --

19   in connection with me, your counsel; is that correct?

20   A    Correct.

21   Q    And when you prepared the amended schedules, you added

22   two properties that you believed were owned by

23   (indiscernible); is that correct?

24   A    Correct.

25           MR. FISHER:  Judge, he's leading again.
```

```
 1            THE COURT:  Yeah, you can't lead the witness and
 2    so I'll sustain the objection.  Please don't lead the
 3    witness.
 4            MR. SATIJA:  Okay.  Thank you, Your Honor.  I
 5    apologize.
 6    BY MR. SATIJA:
 7    Q    When you amended the schedule, did you add any
 8    additional properties?
 9    A    Yes, I did, two properties, Napoleon and McGowen.
10    Q    Okay.  And, how --
11            MR. SATIJA:  Well, I'm going to -- I'm going to
12    share my screen for a moment, Your Honor --
13            THE COURT:  Go ahead.
14            MR. SATIJA:  -- if I may?  Okay.
15    BY MR. SATIJA:
16    Q    Okay.  This is it.  All right.  Can you see that
17    screen?
18    A    Yes, sir.
19    Q    Is it -- is it visible?
20    A    Yeah.
21    Q    Is it large enough for you to read?
22    A    Yes.
23    Q    And what does it say at the top there?
24    A    Special warranty deed.
25            THE COURT:  I can make that bigger or smaller.  I
```

1    think that's the biggest I can go.

2    BY MR. SATIJA:

3    Q    Okay.  And then do you see which property this is for

4    (indiscernible) --

5    A    2501 Napoleon.

6    Q    And if Your Honor -- actually, I think I can get there

7    myself.  Do you see the signature line here?

8    A    Yes, I do.

9    Q    And do you think that's Osama Abdullatif's signature?

10   A    Yes, I do.

11            MR. DURRSCHMIDT:  Judge, he's leading again.

12            MR. SATIJA:  Okay.

13            THE COURT:  Again, I'm going to give you one more

14   chance.

15            MR. SATIJA:  Okay.

16            THE COURT:  Don't lead the witness anymore.  I'm

17   going to cut you off.

18            MR. SATIJA:  I apologize, Your Honor.  I will -- I

19   will try my best not to, and I will -- thank you.

20   BY MR. SATIJA:

21   Q    Whose signature is that there on the line?

22   A    Osama Ali Abdullatif.  I think I testified earlier that

23   I was actually present when he signed the promissory note.

24   So, I know it's his signature.

25   Q    Were you present when he signed these deeds?

1    A    Yes.

2    Q    Okay.  So, I'm going to go to the next page, and what

3    does it say at the top here?

4    A    Special warranty deed.

5    Q    And do you see which property this one's for?

6    A    Not yet.  Okay.  Now, I can see it.  It's for 3459

7    McGowen.

8    Q    Okay.  And were you aware of these deeds at the time

9    that you amended the schedules?

10   A    Yes.  I'm sorry.  I had to get rid of a phone call.

11   Can you ask that again?

12   Q    Were you aware of these deeds at the time that you

13   (indiscernible) the schedules, the amended schedules?

14   A    The amended schedules, yes.  Yes.

15   Q    Okay.  Thank you.  And so, when you prepared the

16   amended schedules, were they true and accurate?

17   A    To the best of my knowledge.

18   Q    And if you were going to change the schedules today,

19   like if you were going to amend them, would you leave the

20   properties on there, the two properties, or would you take

21   them off?

22   A    I would leave them on.

23   Q    Why is that?

24   A    Because Osama deeded the property back to Houston Real

25   Estate Properties, and those were the -- at the time of the

1    filing, those were the only two properties that had not been

2    sold.

3    Q    Okay.  Fair enough.  Let me see if I have the statement

4    of financial affairs here.

5             MR. SATIJA:  All right.  So, Your Honor, I think I

6    should -- before we go anywhere, sorry, I should offer these

7    two deeds into evidence as Debtor's Exhibits 1 and 2.

8             THE COURT:  That would be really great, but you

9    can't do that if you haven't filed them on ECF because

10   that's the only way I can admit an exhibit.  So, if they're

11   on the record somewhere, I can look at them and admit them.

12   If they're not on file, I can't admit them and I won't.

13            MR. SATIJA:  I believe, Your Honor, that they're

14   of record in the adversary proceeding that was in the

15   dismissed adversary perhaps in -- I don't know if that -- if

16   that helps me at all.  In 22 --

17            THE COURT:  Well, it only helps you if you can

18   direct me to an ECF filing number.

19            MR. SATIJA:  I am going to --

20            THE COURT:  And (indiscernible) as long as I can

21   make reference to it on the record.

22            MR. SATIJA:  Thank you, Your Honor.  It may take

23   me a moment to pull those up from the adversary, and I would

24   like to continue my questioning of the Debtor

25   (indiscernible) --

```
 1              THE COURT:  You don't (indiscernible) so go ahead,
 2    please.
 3              MR. DURRSCHMIDT:  Your Honor?
 4              THE COURT:  Yeah.
 5              MR. DURRSCHMIDT:  Could we -- I have not been able
 6    to look at this whole document, and before we move off of
 7    this, could we see the whole document?
 8              THE COURT:  Well, it's not in evidence at this
 9    point in time.
10              MR. DURRSCHMIDT:  But he's going to offer it at
11    some point.
12              THE COURT:  And if he does, at least then -- I
13    can't even print it.
14              MR. DURRSCHMIDT:  I --
15              THE COURT:  I (indiscernible) look at it.
16              MR. DURRSCHMIDT:  I want to see if there's a
17    notary on it.  I can't tell.
18              THE COURT:  Why don't you go to the end of the
19    document to show if there's a notary on it?
20              MR. DURRSCHMIDT:  That's what I wanted to see.
21              THE COURT:  Okay.
22              MR. SATIJA:  There's not.
23              MR. DURRSCHMIDT:  Yeah.
24              MR. SATIJA:  (Indiscernible) I'll move on and I'll
25    come back to the document admission at the conclusion of --
```

```
 1              THE COURT:  I don't know how you're going to get
 2    that into evidence unless you're a better evidentiary person
 3    than I am given the fact that it's not notarized but go
 4    ahead.
 5              MR. SATIJA:  Oh.  No, Your Honor, I'm not offering
 6    it for -- and again, I'll take this up when I have
 7    (indiscernible) --
 8              THE COURT:  Move along, please.  Thank you.
 9              MR. SATIJA:  Okay.  All right.
10    BY MR. SATIJA:
11    Q    Mr. Darjean, I'm going to refer your attention to the
12    statement of financial affairs that was filed in this case
13    on November 9, 2022.  Do you see this document?
14    A    Yes.
15    Q    And I believe it was already admitted into evidence.
16    I think it was maybe 63-28 or 29.
17              MR. DURRSCHMIDT:  It's 63-28, Your Honor.
18              MR. SATIJA:  Thank you.
19    BY MR. SATIJA:
20    Q    And I'm going to bring you down to a question that -- I
21    believe it was Question 11 that Mr. Durrschmidt directed
22    your attention to before.  Do you see this Question No. 11
23    on my screen?
24    A    Yes.
25    Q    And did HREP make any payments to any entity directly
```

1    prior to the filing of the bankruptcy?

2    A    Not to my knowledge.  No.

3    Q    HREP didn't -- did HREP have a bank account?

4    A    Not to my knowledge, no.

5    Q    Okay.  So, when Mr. Durrschmidt asked you before --

6    make sure I ask this question without any leadingness to it.

7    So, did HREP transfer anything to the pre-petition

8    lienholders or did some other entity transfer that?

9    A    We're talking about payments?

10   Q    Yes.

11   A    I would say HREP did not transfer any payments.

12   Q    Okay.  So, in your view, the statement of financial

13   affairs is accurate?

14   A    Correct.

15   Q    Oh, sorry.  Is the statement of financial affairs

16   accurate in your view?

17   A    Yes.

18   Q    Let me see.  I have three more questions.  Do you know

19   -- do you know if another appellate attorney has been hired

20   by HREP?

21   A    (Indiscernible) yes.  Yes.

22   Q    Do you know (indiscernible)?

23   A    (Indiscernible).

24   Q    Okay.  And was he hired -- when was he hired?

25   A    I don't know.  Todd Smith.  I'm not sure of the exact

1    date.  Maybe recently, I guess.

2    Q    Okay.  Would you say it was recently or would you say

3    it was a long time ago?

4    A    Recently.

5    Q    And if recently, would you say in the last 30 days?

6    A    That would be my guess, yes.

7    Q    Okay.

8         MR. SATIJA:  I don't have any other questions for

9    this witness at this time, Your Honor.  I'll pass the

10   witness.

11        THE COURT:  All right, thank you.  Let's go back

12   to Mr. Durrschmidt to see if he has any redirect.

13        MR. DURRSCHMIDT:  Just a few, Your Honor.

14        THE COURT:  Go ahead.

15        REDIRECT EXAMINATION OF DWARD DARJEAN

16   BY MR. DURRSCHMIDT:

17   Q    Let's pick up on the last question there, this

18   appellate attorney.  Who hired this appellate attorney?

19   A    Ali Choudhri.

20   Q    Okay.  So, Ali Choudhri hired an appellate attorney for

21   Houston Real Estate Properties to prosecute the appeal on

22   behalf of the Debtor.  Is that your testimony?

23   A    What was that last portion of the question?  I'm sorry.

24   Q    Ali Choudhri hired an appellate attorney for Houston

25   Real Estate Properties to prosecute the appeal?

```
 1    A    I guess so.  Yes, I -- yes.

 2    Q    Have you seen the engagement letter?

 3    A    No, I have not.

 4    Q    Do you know what firm this person is with?

 5    A    No, not offhand.

 6    Q    And you said the person's name was Todd Smith?

 7    A    Correct.

 8    Q    Okay.  In response to Ms. Whitworth's questions, you

 9   were talking about an architect and you said the architect

10   has been paid for the development of 801 Malone, correct?

11    A    Correct.

12    Q    And who paid the architect?

13    A    Ali handles all of that.

14    Q    So, you don't know --

15    A    I don't know if Ali paid him directly.

16    Q    Okay.  So, you don't know who paid him?

17    A    No, I don't.

18    Q    Do you know when they -- when the architect was paid?

19    A    A while ago.

20    Q    Thirty days, 60 --

21    A    I don't know, maybe a few months.

22    Q    Two months?  So, post --

23    A    Maybe a few months.

24    Q    After the bankruptcy?

25    A    Before.
```

1    Q    Before the bankruptcy.  Do you know how much?

2    A    No, I don't.

3    Q    Mr. Fisher asked you about the bond and said the bond

4    was put up on behalf of the Debtor.  Do you recall that?

5    A    Yes.

6    Q    And you testified the Debtor -- that the bond was put

7    up on behalf of the Debtor, correct?

8    A    Correct.

9    Q    What was the arrangement that enabled the Debtor to get

10   the bond posted on its behalf?

11   A    The arrangement to -- the arrangement?  I'm sorry.

12   Q    Yes, sir.  The arrangement to get the bond put up on

13   behalf of the Debtor.  What was the arrangement?

14   A    That was one of the proceeds from the sale of the

15   properties.

16   Q    What was the proceeds of the properties?

17   A    This -- the 1.8 million.

18   Q    Okay.

19   A    I think I --

20   Q    We're talking about the bond that was put up by

21   Skaneateles, right?

22   A    Oh, no, no, I'm sorry.  You confused me.  I thought we

23   were talking about the 1.8 in the Court's registry from the

24   sale of the seven properties.

25   Q    No, we're talking about the --

1    A    I'm sorry.

2    Q    We're talking about the bond to prosecute the appeal.

3         MR. SATIJA:  Objection, Your Honor.  Mr. Fisher

4    asked earlier to limit questions that relate to the state

5    court litigation (indiscernible) regarding the bankruptcy,

6    and he has already testified that he is not that familiar

7    with all of the issues related to the state court

8    litigation.

9         THE COURT:  I'll overrule that objection.  Again,

10   I don't think it's really an objection as much as it is

11   cross-examination.  Go ahead.

12   BY MR. DURRSCHMIDT:

13   Q    So, again Mr. Darjean, what is the arrangement between

14   the Debtor and entity that put up the bond money so that the

15   Debtor could prosecute the appeal?

16   A    Ali arranged that.  I'm not familiar with it.

17   Q    Okay.  So, if the Debtor loses the appeal and Osama

18   Abdullatif takes the bond money, how much money will the

19   Debtor owe to the entity that put up the bond?

20   A    I don't think there was an arrangement.

21   Q    Well, you just said you didn't know and now you're

22   saying there isn't one.

23   A    I said I don't think there is one.  I'm not sure, so.

24   Q    So, was this a gift?

25   A    I don't know, sir.

1    Q    I thought you were the manager.

2    A    Yes, sir.

3    Q    Do you know who actually paid for the bond?

4    A    No, I do not.

5    Q    You do understand that you have an ongoing obligation

6    to amend your schedules and statement of financial affairs?

7    A    (Indiscernible) yes.

8    Q    Do you think that Mr. Abdullatif owns 20 percent of the

9    Debtor?  Yes, he was given 20 percent in exchange for the

10   deeds of the property to be issued to Houston Real Estate

11   Properties.

12   Q    The Debtor is an LLC, correct?

13   A    Houston Real Estate Properties, LLC, yes.

14   Q    Okay.  And how many meetings has Mr. Abdullatif been

15   invited to for the Debtor?

16   A    I don't know the answer to that.

17   Q    When is the last time that Houston Real Estate

18   Properties had a meeting?

19   A    I don't know off the top of my head.

20          MR. DURRSCHMIDT:  I'll pass the witness, Your

21   Honor.

22          THE COURT:  Thank you.  Let's go back to Mr.

23   Fisher.

24          MR. FISHER:  Thank you, Your Honor.  May I

25   proceed?

```
1                    THE COURT:  You may.

2                    RECROSS-EXAMINATION OF DWARD DARJEAN

3     BY MR. FISHER:

4     Q    All right.  Mr. Darjean, I'm just trying to listen

5     carefully.  You really don't know how the bond was posted or

6     who posted the bond for that state court judgment, correct?

7     A    Ali made those arrangements.

8     Q    Okay.  So, the question was of you.  You don't know.

9     A    Correct, I don't.

10    Q    Okay.  So, I'm not going to put words in your mouth.

11    Let me go on then to something that you probably should

12    know, which is the development of the property on Malone

13    that my client has a security interest in, okay?  You're

14    familiar with that property?

15    A    Yes, sir.

16    Q    Okay.  And when you talk about a plan for the Debtor,

17    the Debtor doesn't have any money to develop that property,

18    does it?

19    A    No.

20    Q    So, the Debtor's going to have to joint venture with

21    either/or -- and/or Skaneateles and/or one of Ali Choudhri's

22    other companies, correct?

23    A    Correct.

24    Q    All right.  Has that been discussed?

25    A    (Indiscernible) the plans?  Yes.
```

```
 1   Q    Okay.  All right.  Now, the only other thing that I

 2   heard that I need to ask you about has to do with the

 3   transfer back of the properties, those nine properties, from

 4   Mr. Abdullatif.  Now, when he transferred those properties

 5   back, he got in return or in exchange on in consideration

 6   for those properties 20 percent of HREP, correct?  The

 7   Debtor.

 8   A    Correct.

 9   Q    Okay.  So, was the plan at that time that there would

10   be a joint venture between HREP and then another party?

11   A    Yes.

12   Q    Okay.  Because HREP never had enough money to develop

13   any or all of those properties, correct?

14   A    Well, I believe the -- yes, correct.

15   Q    All right.  But those properties ended up getting sold,

16   right?

17   A    Correct.

18   Q    All right.  And the first seven were sold at some

19   point.  About $1.8 million was put in the registry of the

20   Court from those sales, correct?

21   A    Correct.

22   Q    All right.  And we don't know where that money is

23   today, but what about the last two properties?  Were they

24   sold recently?

25   A    I think within the last week or so.
```

1    Q    And who sold them?

2    A    My guess is Osama.

3    Q    Did he have title to those properties?

4    A    No.  The properties were deeded to HREP.

5    Q    Well, then how did Mr. Abdullatif then sell HREP's

6    properties, especially considering that HREP is in Chapter

7    11?  And I don't think I've seen any order from this Court

8    authorizing those sales.  Can you explain that?

9    A    No.  We objected but he -- I don't know how he was able

10   to sell the properties, because we objected to the sale of

11   those remaining two properties.  That's why I put them in

12   the schedules, in the amended schedules.

13             MR. FISHER:  All right.  Pass the witness, Judge.

14             THE COURT:  Thank you, Mr. Fisher.  Ms. Whitworth,

15   back to you.

16             MS. WHITWORTH:  No questions, Judge.

17             THE COURT:  Mr. Satija?

18             MR. SATIJA:  Your Honor, yeah, I do have one

19   question for Mr. Darjean.

20             RECROSS-EXAMINATION OF DWARD DARJEAN

21   BY MR. SATIJA:

22   Q    Mr. Darjean, did the Debtor incur a debt or pledge any

23   property for the bond in the state court?

24   A    No.

25             MR. SATIJA:  That's my question, Your Honor.

         1              THE COURT:  All right.  Mr. Durrschmidt?

         2              MR. DURRSCHMIDT:  No further questions, Your

         3    Honor.

         4              THE COURT:  All right.  So, I think at this point

         5    in time, Mr. Darjean, you're excused.

         6              All right.  Mr. Durrschmidt, do you have any other

         7    witnesses?

         8              MR. DURRSCHMIDT:  No, sir.

         9              THE COURT:  All right.  Mr. Fisher, I'll go to

        10    you.  Do you have any witnesses?

        11              MR. FISHER:  Can I reurge my motion?

        12              THE COURT:  You may.  And let's concentrate on --

        13    let's assume that I give you a week or two weeks to continue

        14    to matter, what you possibly expect to tell me or find out

        15    that I haven't already heard.

        16              MR. FISHER:  Sure.  I think I'd like to find out a

        17    little bit more about those properties that have been sold

        18    and the $1.8 million that was in the registry of the Court,

        19    who had right to it, who had title to the properties, and

        20    what happened.

        21              THE COURT:  Let me -- let me just interrupt you

        22    for a minute.  Isn't that really an issue as this Court has

        23    said over and over and over again for the state court and

        24    the appeals court?  Because basically everything that

        25    happened as it relates to the properties, the sales, the

1    funds, that's all been remanded to the state court.  Why do

2    I have any interest in that at all?

3            MR. FISHER:  Because those properties belong to

4    the Debtor.

5            THE COURT:  They belong to the Debtor if the state

6    court says they do.  If the state court says they don't,

7    they don't.

8            MR. FISHER:  The state --

9            THE COURT:  That's my view of the matter right

10    now.

11            MR. FISHER:  But the state court matter is under

12    appeal.

13            THE COURT:  And it may be, and we can let the

14    appeal play out, okay?  But that's not something that I'm

15    going to interject myself into, and I think the appeal needs

16    to play out no matter what happens.  Okay?  It's going to.

17    I'm going to let it happen.  Okay?

18            But again, what happened in the state court

19    happened in the state court.  If it was supposed to happen

20    in the district court, then the appeals court will say yes.

21    If not, they'll say no, okay?  And at that point in time, we

22    potentially could have a viable Debtor if you went on

23    appeal, and maybe that needs to just happen.  But what are

24    you going to tell me that I don't already know?

25            MR. FISHER:  Well, my first answer to that is, I

```
 1   don't know what I don't know yet.  I just got in the case.
 2        THE COURT:  Okay.  Well, I've been in the case
 3   since October 7, 2022.  So, again, what are you going to
 4   tell me that I don't know?  Because I've been in the case a
 5   long time, and if you don't know, then I tell you, I don't
 6   think there's anything you're going to find out, and I'll
 7   make a judgment call that you're not going to find anything
 8   else out that I don't know.
 9        MR. FISHER:  I want to be able to put forth the
10   rights that my client, the creditor, has so that the
11   property is not allowed to be sold by a trustee for less
12   than the amount of the debt.  That's why (indiscernible).
13        THE COURT:  Any (indiscernible) sale that takes
14   place under a Trustee is going to be approved by me.  They
15   don't have willy-nilly rights to just go sell property,
16   okay?  So, make another argument that makes sense.
17        MR. FISHER:  Well, there's an awful lot of times
18   that I've seen down here where a Trustee will sell property
19   to the highest bidder at that time.  It's still a distressed
20   sale.  It's a forced sale.  And at that point, you don't get
21   fair market value.
22        THE COURT:  But it's the best that we can do under
23   the circumstances.  That's why we're in bankruptcy court.
24        MR. FISHER:  Exactly.  And that's why I'm asking
25   for another couple of weeks so I can figure out whether
```

```
1    there's more value in the property, either from a joint
2    venture standpoint --
3             THE COURT:  If it's sold, there'll be some sort of
4    bidding process.  It'll be marketed.  You have all the
5    opportunities to do that later on in the case.  Okay?  I'm
6    not going to deprive you of any of the rights that your
7    client has at this point in time.  I'm just trying to figure
8    out why I should delay making some sort of decision based on
9    something that you may or may not be able to find out in the
10   next two weeks.
11            MR. FISHER:  Because nothing bad is going to
12   happen in the next two weeks.  The property is not going
13   anywhere.  It's not deteriorating.  It's not losing value.
14   There's insurance on the property.  There's nothing to be --
15   there's no damage, there's no harm by giving me another week
16   or two to be able to figure out who said what to whom and
17   when and who deeded what to whom and what happened to
18   certain funds.
19            THE COURT:  Okay, I'll take that.  Anything else?
20            MR. FISHER:  If that's good enough, I'll stop.
21            THE COURT:  I mean, I'm going to deny your
22   request, but if you have anything else to say, you can tell
23   me.  I'm not going to continue the matter.  I'm just not,
24   okay?
25            MR. FISHER:  Judge, I'm hamstrung.  My client is
```

1    hamstrung.  They're a creditor.  They've got a right to be

2    heard.

3              THE COURT:  I disagree wholeheartedly.  You can

4    take -- you have just interjected yourself into the process.

5    You have the ability to basically be involved in the case

6    from this point forward.  I strongly disagree.

7              All right, so we're back to where we were.  Do you

8    have a witness?

9              MR. FISHER:  Yeah.  I would call Mr. Abdullatif.

10             THE COURT:  Mr. Latif, you want to come forward?

11             MR. ABDULLATIF:  Yes, sir.

12             THE COURT:  Come forward.  Stand at the podium.

13   I'm going to swear you in.  Once I've sworn you in, you can

14   be seated.  Please raise your right hand, sir.  Do you swear

15   or affirm to tell the truth, the whole truth, and nothing

16   but the truth so help you God?

17             MR. ABDULLATIF:  Yes, sir, I do.

18             THE COURT:  Then be seated, sir.

19             MR. ABDULLATIF:  Thank you.

20             THE COURT:  Bear with me for one second.  We have

21   lost the witness camera.  There it is.  We're back.  Thank

22   you.  All right, Mr. Fisher, you may begin.

23             MR. FISHER:  Thank you.

24             DIRECT EXAMINATION OF OSAMA ABDULLATIF

25   BY MR. FISHER:

1    Q    Please state your full name for the record.

2    A    My name is Osama Abdullatif.

3    Q    Sir, how long have you been involved in any kind of

4    business relationship at all with the Debtor?

5    A    My relationship started at the end of 2009, beginning

6    2010 all the way until recently when the state court agreed

7    to allow us to try the case for the claims I had.

8    Q    Okay.  Now, you understand those claims are under

9    appeal?

10   A    The court -- the judgment is under appeal right now.

11   Yes.

12   Q    Okay.  And that appeal is perfected?

13   A    The appeal has been -- the judgment has been

14   superseded.

15   Q    Okay.  Tell me about the business relationship that

16   you've had with the Debtor going back to 2009 briefly.

17   A    I can't do it briefly.  I already testified to all that

18   in the state court in front of a jury and (indiscernible).

19   But how briefly you want to be?  I can tell you from the

20   beginning of the time that started in October 2009 until I

21   went to trial.

22   Q    Okay.  How is it --

23         MR. DURRSCHMIDT:  Judge, I'm going to object to

24   relevance, because the issue before the Court is the

25   appointment of a Trustee, and he's going back talking about

```
 1    a relationship that Mr. Abdullatif had with the Debtor.

 2    It's got nothing to do with whether or not this Court should

 3    appoint a Trustee.  It's totally irrelevant.

 4            THE COURT:  Just like I gave Mr. Durrschmidt a

 5    little bit of leeway, I'm going to give you the same leeway,

 6    Mr. Fisher, but again, I'm really primarily concerned as it

 7    relates to the appointment of the Trustee, what's happened

 8    since October 7, 2022, which is when the case was filed.

 9            But you have some leeway.  Go ahead.  Give me some

10    background.

11    BY MR. FISHER:

12    Q    You developed real estate with Houston Real Estate

13    Properties?

14    A    I did not develop.  I purchased properties for Houston

15    Real Estate Properties.

16    Q    So, you were just a buyer or a seller or both?

17    A    I was a buyer of the properties back in 2010 when the

18    properties were (indiscernible) from the bankruptcy.

19    Q    Okay.

20    A    And I was -- during that period of time, I purchased a

21    (indiscernible) that was the subject of the bankruptcy

22    dismissal back in 2005.  So, I was (indiscernible) at one

23    point and I was (indiscernible) -- I'm sorry.

24    Q    And you transferred back nine properties to Houston

25    Real Estate Properties sometime in 2010?
```

```
 1   A     No, sir, I did not.  That was --

 2   Q     2012?  What time?

 3   A     -- that was never consummated.  There was a

 4   (indiscernible) agreement to be done that Mr. Ali Choudhri

 5   (indiscernible) and that was the issue.  That's why

 6   (indiscernible) and the transcript speak for it.  S

 7   Q     Okay.  I'm sorry.  There was some sort of an agreement.

 8   I didn't understand that.

 9   A     There was an agreement at one point that was never

10   consummated that they would (indiscernible) to loan.  I

11   would transfer the properties back to Houston Real Estate

12   Property and become 20 percent.  That was -- that was to be

13   done back in 2010.  That never happened.

14   Q     Weren't there deeds that were executed by you?

15   A     There were deeds that were -- there were deeds

16   (indiscernible) prepared and signed by me subject to the

17   payment of the loan and collecting of rent and conditions

18   that was related to the (indiscernible) agreement that Ali

19   Choudhri decided not to go through with it and destroyed and

20   refused to present it after I (indiscernible).

21   Q     Did you --

22   A     I'm sorry.  I did not finish my answer.

23   Q     Go ahead.

24   A     And that was done in the state court and I presented my

25   case to the jury.
```

1    Q    Okay.

2    A    And the (indiscernible) at issue --

3    Q    Well, that's under appeal, though, isn't it?

4    A    But the jury have rendered a verdict.  The jury have

5    decided.  The judgment has been entered.  The judgment is

6    suspended and that judgment (indiscernible) appeal.

7    Q    You deposited after that $1.8 million into the registry

8    of the Court, did you not?

9    A    (Indiscernible).

10    Q    Yes or no, sir?

11    A    I sold the properties.  There's a court order that was

12    issued in January 2020, and based on that court order there

13    was a condition where I deposit the money or the proceeds

14    after the lienholder was paid into the (indiscernible)

15    court, and it was also (indiscernible).

16    Q    So, that's a yes?

17    A    Yes, I did sell the properties in accordance with the

18    court order, and I followed the court order in the state

19    court until the trial proceeded.

20    Q    Was that your request to sell the properties?

21    A    I own the properties and I was -- I filed a motion

22    asking the Court to allow us to sell the property to pay an

23    existing lienholder that was in place on the properties in

24    2020.

25    Q    Okay.  And when you filed that motion, did you not

```
 1    enter into an agreement that you would sell the properties
 2    but deposit the proceeds into the registry of the court?
 3    A    No, I didn't have an agreement.  I had a court order to
 4    follow.  There was a court order (indiscernible) that I
 5    followed to sell the property (indiscernible) that existed,
 6    the existing property taxes that was due, (indiscernible)
 7    the court based on the claim that Ali Choudhri claimed that
 8    he had a $1.5 million promissory note that he falsified or
 9    fabricated, and that was to satisfy the loan.
10             MR. FISHER:  Objection, Your Honor.  Now he's
11    testifying beyond my question.
12             MR. ABDULLATIF:  Well, that's --
13             MR. FISHER:  It's not responsive.
14             MR. DURRSCHMIDT:  I'm sorry, Judge.
15             THE COURT:  It's your own witness.  If you want to
16    impeach your own witness, that's fine, but go ahead and ask
17    your question.
18             MR. FISHER:  Well, I'm calling him as a hostile
19    witness, Judge.
20             THE WITNESS:  I am not a hostile witness.  You can
21    call me as a witness.  I don't know what a hostile witness
22    (indiscernible).  Okay.
23             THE COURT:  If you want to call him as a hostile
24    witness, you better prove him up as a hostile witness,
25    because I'm not sure that he is hostile, but that's
```

 1    (indiscernible).

 2              THE WITNESS:  Thank you, Your Honor.

 3    BY MR. FISHER:

 4    Q    Do you have any claims against the Debtor, Houston Real

 5    Estate Properties?

 6    A    In the state court?

 7    Q    Right here in this court here.

 8    A    Right here?  Right here I'm a judgment holder

 9    (indiscernible) creditor that was -- (indiscernible).

10    Q    Do you object to Skaneateles' claim of a secured

11    position in this bankruptcy case?

12    A    Absolutely.  It's very -- it's fraudulent

13    (indiscernible) fees and it's fabricated and it's outside

14    the work that Ali Choudhri does.

15              MR. FISHER:  Your Honor, I ask that I be allowed

16    to treat the witness as hostile.

17              THE COURT:  You better do a better job than that.

18    No.

19    BY MR. FISHER:

20    Q    So, you're accusing Skaneateles of fraud?

21    A    I accuse Ali Choudhri of fraud.

22    Q    No, sir.  I don't represent Ali Choudhri.  I represent

23    Skaneateles, and I'm asking you if you accusing Skaneateles

24    of fraud.

25              MR. DURRSCHMIDT:  Judge, there is no relevance to

1    the appointment of a Trustee as to whether or not he's

2    accusing another creditor of anything.  That's got nothing

3    to do with this.

4          THE COURT:  Let's move on to 10/07/22 and past,

5    Mr. Fisher.

6    BY MR. FISHER:

7    Q    How did you get the $1.8 million out of the registry of

8    the court?

9    A    I got a judgment.  I got a court order.  The judgment -

10   - if you read it, it says order of the clerk to release the

11   money to Abdullatif.  I went to the district clerk,

12   submitted my judgment.  They called me up (indiscernible)

13   check.

14   Q    The judgment was not final, was it?

15   A    The judgment was final judgment.

16   Q    No, sir, the judgment was not final at that point, was

17   it?

18   A    The judgment was final at that point.  Yes, sir.  It

19   was not appealed yet.  It was final.  (Indiscernible) the

20   final judgment.

21   Q    Right, but the judgment -- 30 days had not passed from

22   the time that the judge signed the order, correct?

23   A    The judgment -- I did not make the call.  I gave the

24   judgment to somebody (indiscernible) clerk (indiscernible)

25   attorneys and their staff and they released the money, and

1    the Court is aware of that money being released to me.  The

2    Court did not (indiscernible) if you read that judgment, it

3    doesn't have, and it says three days release the money to

4    Abdullatif, because I was the only one had ownership of the

5    property.

6              THE WITNESS:  I'm really sorry, Judge.  My mouth

7    is dry.

8              MR. FISHER:  Judge --

9              THE WITNESS:  (Indiscernible) water, so I need

10   some water (indiscernible).

11             MR. FISHER:  Judge, I would ask the Court to put

12   up Exhibit 12, please.

13             THE COURT:  Are you talking ECF-12 which is the

14   notice of (indiscernible) filing fees or --

15             MR. FISHER:  No, sir, 63-12.

16             THE COURT:  Thank you.

17             MR. FISHER:  Mr. Durrschmidt, can you please get

18   your client some water?

19             MR. DURRSCHMIDT:  She's running downstairs to get

20   it.

21             MR. FISHER:  Okay, thank you.

22   BY MR. FISHER:

23   Q    Sir, water's on its way.

24   A    Thank you.

25   Q    Sure.  All right.  You've seen this judgment before.

```
 1   This judgment was admitted in the proceedings today as
 2   Exhibit 63-12, correct?
 3   A    Yes, sir.
 4   Q    All right.  Turn to the last page, if you would, or
 5   Judge, if you would, please, turn to the last page of this
 6   exhibit.  You see the date on this -- the first time that
 7   the judge signed this order?
 8   A    Yes, sir, I see it.
 9   Q    November 21, 2022?
10   A    Yes, sir.  (Indiscernible).
11   Q    What was the date that you removed the funds from the
12   registry of the court?
13   A    (Indiscernible) was actually after the judgment was
14   signed after the judgment became (indiscernible) because we
15   received from the Court (indiscernible) --
16   Q    I didn't ask you that.  I asked you what was the date
17   that you removed the funds from the registry of the Court?
18   A    I don't recall the date, sir.  I submitted the judgment
19   to the (indiscernible) clerk and (indiscernible) to release
20   the money based on the -- based on the paragraph -- the
21   first paragraph I think of the judgment to see when the
22   money could be released.  We go back to the (indiscernible)
23   judgment (indiscernible).
24   Q    All right.  Who helped you remove these funds from the
25   registry of the Court before the judgment was final?
```

```
 1              MR. DURRSCHMIDT:  Judge, again, where's the

 2    relevance to this as to the appointment of a Trustee?

 3              THE COURT:  Again, Mr. Fisher, I'm going to ask

 4    you to move to the date of filing.  You're now -- well, this

 5    happened post-petition, didn't it?  Go ahead.

 6              MR. FISHER:  Yes.  Yes, it did.

 7              THE COURT:  Ask the question.  I'll overrule the

 8    objection.

 9              MR. FISHER:  Thank you.

10    BY MR. FISHER:

11    A    Yes, sir.  I don't recall the date, but as soon as the

12    judgment was signed and it became a court record, my

13    (indiscernible) submitted to the district clerk and said

14    (indiscernible) there for the funds to be released to the

15    owner of the property.

16    Q    Okay.  Who's that lawyer?

17    A    (Indiscernible) -- my lawyer is (indiscernible).

18    Q    I'm sorry?

19    A    (Indiscernible) trial lawyer.

20    Q    Okay.  And so, he removed the funds before the judgment

21    was filed?

22    A    (Indiscernible) he did not remove the funds.

23    (Indiscernible) released the funds to me.  I didn't remove

24    the money.  (Indiscernible) show them the judgment,

25    submitted it.  They examined it.  They told me come back --
```

1    they told -- they actually (indiscernible) come back, they

2    told -- they actually (indiscernible) come back the next day

3    or a few days and then I went to pick up the money when they

4    had my check available.

5    Q    All right.  Do you remember whether that was post-

6    petition, after petition was filed?

7    A    I cannot remember the date of the -- but I have

8    probably -- it was a check from (indiscernible) so I would

9    have a -- I have a copy of it to ensure the date it was

10   released.

11             MR. FISHER:  Your Honor, may I take a couple of

12   minutes?

13             THE COURT:  Sure.

14             MR. FISHER:  May I proceed?

15             THE COURT:  You may.

16             MR. FISHER:  Thank you.

17             THE COURT:  I think we have water for the witness.

18   If they want to come up here and give it to him, that's

19   fine.

20             MR. FISHER:  Yeah.  Thank you (indiscernible).

21   Let the record reflect that water was (indiscernible).

22             BAILIFF:  Here you go, sir.  (Indiscernible).

23   BY MR. FISHER:

24   Q    Sir, the last two properties of those nine were sold in

25   the last couple of months?

1    A    Yes.

2    Q    When?

3    A    It's in the last 30 days.

4    Q    Thirty days.

5    A    In the last 30 days, yes.

6    Q    To who?

7    A    To a buyer.  I don't know the buyer.  The property

8    (indiscernible) in the market for a while, and I

9    (indiscernible) actually with the last -- when the Court

10   dismissed the motion they filed here -- I'm sorry, in the

11   adversary when the motion was dismissed and the

12   (indiscernible) were removed that they were wrongfully filed

13   (indiscernible) that's when I sold the properties.

14   Q    I just asked you when the properties were sold.

15   A    Within the last 30 days.

16   Q    Okay.  And then to who was the -- let's take them one

17   at a time.  2501 Napoleon was one of those properties?

18   A    Yes.

19   Q    Okay.  Who bought that property?

20   A    They were sold to the same buyer.  They actually -- two

21   pieces (indiscernible) each other so they were under

22   (indiscernible) one contract.

23   Q    Okay.  2501 Napoleon and 3459 McGowen are adjacent

24   properties?

25   A    They are adjacent properties.  They are within the same

```
 1    (indiscernible).

 2    Q    Okay.  Yeah, no I understand.  I'm just asking to be

 3    sure.  Now, who's the seller of the property?

 4    A    The owner of the properties, Osama Abdullatif.

 5    Q    Okay.  So, you personally?

 6    A    I am the owner of the properties.  Yes, sir.

 7    Q    Okay.  And who's the buyer?

 8    A    I'm sorry.  I didn't finish my answer if you don't

 9    mind.  I'm the owner of the properties since 2010.

10    Q    Okay.

11    A    And I sold them.

12    Q    And who was the buyer?

13    A    I cannot recall the buyer name.  It's an entity, but it

14    was -- the company was (indiscernible) by the title company

15    and the agents, they had it listed on the market for many

16    months, was (indiscernible) development, one of the

17    companies that -- the listing agent, but I cannot remember

18    the buyer name.

19    Q    I'm sorry.  What development company listed it?

20    A    Womack Development.

21    Q    Can you spell that?

22    A    No.  (Indiscernible) I think development, A-C-K.

23    Q    Were they a part owner of the property or you're the

24    only owner?

25    A    No, they are the listing agent, sir.
```

001581

1   Q    Okay.  So, the listing agent is Womack Development?

2   Okay.  And how much did you receive for those two

3   properties?

4   A    The properties were sold for 700,000.

5   Q    And is it your testimony that you have no idea who the

6   buyer is?

7   A    Well, I do have an idea.  I just cannot remember their

8   name because it's an LLC (indiscernible) know them, never

9   met them or anything, but they were going through the market

10  (indiscernible).

11  Q    Sure.

12  A    It was -- I'm sorry, it was an open market sale.  It

13  was not a private sale.

14  Q    Okay.  Who were the members of the LLC, if you know?

15  A    I have no idea.

16  Q    You never bet them before?

17  A    Never met them even with the sale.  They went

18  (indiscernible) I go to the (indiscernible) company.  I sign

19  mine as the seller and they fund -- they released the sale.

20  Q    Okay.  And what did you do with the proceeds?

21  A    I deposited them it in my account.

22  Q    Okay.  Do you still have those proceeds in your

23  account?

24  A    Yes, sir.

25  Q    Okay.  And the 1.8 million that you withdrew from the

```
 1   registry of the Court back in November, what did you do with
 2   that money?
 3   A    I deposited it in my account.
 4   Q    Is that money still in your account?
 5   A    Yes, it is.
 6   Q    Okay.
 7           MR. FISHER:  Pass the witness, Judge.
 8           THE COURT:  All right.  Let's go to Ms. Whitworth.
 9           MS. WHITWORTH:  (Indiscernible).
10           THE COURT:  Mr. Satija, are you still there?
11           MR. WETWISKA:  Your Honor, I have a few questions.
12           THE COURT:  And who are you?
13           MR. WETWISKA:  Sure.  My name is Jim Wetwiska, and
14   I represent Mr. Choudhri, and Mr. Choudhri is a member of
15   HREP and he has an interest in this proceeding.
16           MR. DURRSCHMIDT:  We object.  I mean, if --
17           THE COURT:  Let's do -- let's do one thing at a
18   time.  You didn't appear when the case was first called,
19   which is problematic.  You haven't participated to this
20   point.  Now you want to interject yourself into these
21   proceedings.  Tell me why I should do that?
22           MR. WETWISKA:  your honor, when the case was first
23   called, I understood it to be with (indiscernible) motion
24   and I had nothing to do with that.  I didn't know if this
25   motion was going to be heard today, and you guys started
```

```
 1    right into it.  It's my fault.  At that time, I should have
 2    jumped in when you moved into that motion.  I didn't want to
 3    interrupt it, but what I do want to address today are very
 4    specific things that have happened after the filing of the
 5    bankruptcy petition in this court.  And I -- and I will --
 6              THE COURT:  Go ahead.
 7              MR. WETWISKA:  And there's no prejudice to them.
 8    Thank you, Your Honor.  Mr. Abdullatif --
 9              THE COURT:  I'm not -- I haven't let you do that
10    yet.  I haven't decided I'm going to let you --
11              MR. WETWISKA:  I apologize.  I thought you said go
12    ahead.
13              THE COURT:  No, I did not.
14              MR. WETWISKA:  I apologize.  So, Your Honor, what
15    -- so --
16              THE COURT:  So, tell me -- tell me --
17              MR. WETWISKA:  Sure.
18              THE COURT: -- on the record what it is you're
19    going to have this witness testify to, and I'll determine
20    whether I'm going to let you ask questions or not.
21              MR. WETWISKA:  Okay.  You want me to --
22              THE COURT:  Give me some sort of proffer.  Let's
23    do it like that.  Go ahead.
24              MR. WETWISKA:  Your Honor, what I'm going to cover
25    are the -- most specifically what I'm going to cover is what
```

1    has happened with efforts by Mr. Abdullatif to collect on

2    the judgment, what actions have been taken to potentially

3    interfere with this Court's order that were -- specifically

4    with respect to no abstract being filed, with respect to

5    that judgment.  What I'm going to do is ask Mr. Abdullatif

6    very specific questions about statements that were made by

7    the Debtor and whether or not he disputes certain of those

8    statements, because as I understand today, part of what

9    you're doing is assessing what's been taking place with the

10   Debtor and the Debtor's filings up to this time, and I'm

11   going to keep my questions limited to that time period.

12        I'm not going to get into prior time periods, but

13   I'm going to keep my questions limited to what's happened

14   with respect to the abstract, filing of an abstract, efforts

15   to enforce a judgment, even though there's a supersedeas on

16   file, efforts that have been taken by Mr. Abdullatif

17   potentially at the district clerk's office to cancel

18   supersedeas bonds, but all things that do impact the

19   Debtor's position with respect to Debtor's property.

20        And so, there are two very important things.  You

21   ask Mr. Fisher earlier why you should care about those

22   properties, and I get your position with respect to what

23   happens in the state court's going to happen with the state

24   courts, but it is an important position with respect to what

25   representations have made -- have been made to this Court by

```
 1    the Debtor and why, because what the Debtor wants to lead

 2    this Court to believe is there has been no basis for some of

 3    the statements made such as why the two properties were

 4    included, what happened to the $1.8 million, and more

 5    importantly what has taking place with respect to

 6    enforcement.

 7             So, I'm going to limit it, Your Honor.

 8             THE COURT:  Let me hear from Mr. Durrschmidt.

 9             MR. DURRSCHMIDT:  Judge, they filed -- the Debtor

10    filed last night or this morning the motion for contempt

11    based on the supersedeas and the actions that may or may not

12    be taking place in the state court and that matter will get

13    calendared and scheduled and a hearing will be held.

14             He doesn't need at this point in time to argue

15    that.  It's not before the Court.  This witness is unable to

16    testify about -- from personal knowledge about what the

17    Debtor has or hasn't been doing during the pendency of the

18    bankruptcy case and whether or not a Trustee should be

19    appointed.

20             Mr. Darjean has already testified sufficiently

21    that there should be a Trustee appointed.  All they're

22    trying to do is get another bite at the apple with regards

23    to things that have already taken place in the state court.

24    They've already filed pleadings in state court, and this is

25    just an overlap of things that are already taking place in
```

1    state court.

2              He hasn't participated.  He hasn't filed a notice

3    of appearance.  It was very clear what this matter was about

4    from the instant it began.  He didn't make an argument at

5    opening.  He has not participated.  He shouldn't be allowed

6    to participate now and his questions are totally irrelevant.

7              THE COURT:  And I think that given what I've heard

8    so far, I'm not going to allow you to ask wit -- any

9    questions of this witness, given the fact that you didn't

10   appear in the case and you now want to interject yourself.

11   So, I'm going to disallow any sort of questions from you at

12   this point in time.

13             Mr. Satija, it's your witness at this point in

14   time.

15             MR. SATIJA:  Thank you, Your Honor.  I appreciate

16   it.

17                  CROSS-EXAMINATION OF OSAMA ABDULLATIF

18   BY MR. SATIJA:

19   Q    Mr. Abdullatif, my name is Ron Satija and I represent

20   HREP, Houston Real Estate Properties, in the bankruptcy

21   court.  I don't think we ever met before.  Have we met

22   before?

23   A    No.

24   Q    Okay.  Well, (indiscernible) finally meet you -- glad

25   to finally meet you.  I've seen your name a lot.  Are you

1    familiar with the documents that were filed in the state

2    court proceeding?

3    A      Talking about the one they've been trying or the ones

4    (indiscernible)?

5    A      Let me -- let me bring your attention --

6            THE COURT:  Bear with me.  You've got somebody who

7    wants to make an objection, so make your objection on the

8    record.

9            MR. DURRSCHMIDT:  Your Honor, we're going into the

10   state court matters and we're past the state court matters.

11   What we're talking about is what is this Debtor doing in

12   this bankruptcy case that justifies the appointment of the

13   Trustee.  We don't need to be talking about and it's totally

14   irrelevant to be talking about what has been taking place in

15   the state court.  If there's an issue, those pleadings have

16   been filed and that'll come up in the appropriate time at

17   the appropriate place.  This is not that time.

18           THE COURT:  All right.

19           MR. FISHER:  May I respond?

20           THE COURT:  It's not your -- not your witness at

21   this point in time, so no, you can't.  Sit down.

22           MR. FISHER:  Thank you.

23           THE COURT:  You want to respond to that, Mr.

24   Satija?

25           MR. SATIJA:  Yes, Your Honor, thank you.  No, I am

1    only here to talk about the bankruptcy.  I have

2    (indiscernible) to the state court documents because they

3    underlie our -- the accuracy of the schedules and

4    (indiscernible) ever filed in the bankruptcy supporting Mr.

5    Darjean's testimony previously.  But they fully related to

6    this bankruptcy.  There's -- I'm not involved with the state

7    court.  You know, I don't want to ask any questions about

8    what's going on there.  I'm only asking questions related to

9    the bankruptcy.

10            THE COURT:  All right. So, let's limit your

11   questions to what's in the schedules, please.  Thank you.

12            MR. SATIJA:  Your Honor, I -- that's not going to

13   work, because the --

14            THE COURT:  Either make it work or don't ask

15   questions.

16            MR. SATIJA:  Okay.  I'll see what I can do.  Hang

17   on.  Let me pull those up.  All right.  I'm going to show

18   the Debtor my screen.

19            THE COURT:  Go ahead.

20            MR. SATIJA:  Or sorry, the witness.  My apologies.

21   The witness.

22   BY MR. SATIJA:

23   Q    Mr. Abdullatif, can you see the documents that are --

24   that are on screen right now?

25   A    Yes, I can.

 1    Q    Okay.  And are you familiar with these addresses that

 2    are on the screen?  2501 Napoleon and 3459 McGowen?

 3    A    Yes, I am.

 4    Q    Okay.  And when you were asked earlier by Mr. Fisher, I

 5    believe you said that you had five deeds on these properties

 6    in favor of HREP?

 7    A    They were never consummated, and the agreement that we

 8    had was never consummated and finalized, and I owned those

 9    properties at that time.

10         MR. SATIJA:  Objection, nonresponsive.

11    BY MR. SATIJA:

12    Q    Did you sign deeds to HREP related to those properties?

13    A    So, if you look at -- based on what -- based on exactly

14    what (indiscernible) testified in front of a jury for the

15    whole week of 12 regarding this issue, there was --

16    (indiscernible) were part of an agreement that was supposed

17    to be done in December of 2010, and there was no claim of

18    ownership (indiscernible) years by history of said property

19    in that claim, and those deeds were part of a set of

20    agreement that was done at that time that was never

21    finalized and consummated.  And there was no claim of

22    ownership for those properties over the other properties in

23    the last 12 years and even in the trial itself.  That was

24    (indiscernible).  There was no claim by (indiscernible) --

25    Q    Mr. Abdullatif --

```
 1    A    I did not finish my answer.
 2    Q    Mr. Abdullatif, let me -- let me cut you off.  I'm
 3    going to object.  It's mostly responsive.  I appreciate that
 4    -- oh, I'm sorry, Your Honor.
 5              THE COURT:  If you want a rule on an objection,
 6    you need to wait.
 7              THE WITNESS:  Yes, sir.
 8              THE COURT:  And if you don't want me to rule on
 9    it, I don't care.
10              MR. SATIJA:  I apologize.  I apologize, Your
11    Honor.
12    BY MR. SATIJA:
13    Q    So, Mr. Abdullatif, I do understand that entire history
14    that you're saying, but I'm asking a very specific question.
15    For whatever purpose you signed those deeds, you did sign
16    those deeds in 2010, I believe it was, correct?
17    A    I signed those deeds to be finalized with the agreement
18    that we had that I testified to, and they were to be
19    consummated only for certain (indiscernible) agreement is
20    met and that never happened.  (Indiscernible) refused that
21    analogy because (indiscernible) because Ali Choudhri
22    actually refused it because (indiscernible) fabricated
23    (indiscernible) against me.  (Indiscernible) from 2013 until
24    (indiscernible) back in August 2022.  So, those deeds were
25    never consummated as (indiscernible) agreement.  They were
```

1    prepared by Ali Choudhri and his attorneys and they were

2    (indiscernible) agreement that we testified to in state

3    court for a whole week.

4    Q    Thank you, Mr. Abdullatif.  Can you see the screen in

5    front of you now?

6    A    Yes, I can.

7    Q    And do you see these documents, the document

8    (indiscernible) file stamped 2203326 at the top?

9    A    Yes, I do.

10    Q    And do you where it says -- and what does it say here

11    at the top?

12    A    Special quarantine.

13    Q    And hold on, let me take this -- let me get a different

14    -- I believe it's on Page 10.  My apologies.  And this one,

15    what does this one say at the top?  Mr. Abdullatif, what

16    does this document say at the top?

17    A    It says case number, document, file and Bates number.

18    Q    Thank you.  And the title of the document here?

19    A    Special (indiscernible).

20    Q    Thank you.  And the address here for the

21    (indiscernible)?

22    A    2501 Napoleon, Houston, Texas 77004.

23    Q    And (indiscernible) from you, correct?

24    A    Yes.

25    Q    And it's to Houston Properties, LLC?

```
 1    A    Yes.

 2    Q    Okay.  Let me scroll down to the next page.  Is this

 3    your signature on that deed?

 4    A    Yes, it is.

 5         MR. SATIJA:  Okay.  Your Honor, now I would like

 6    to offer this warranty deed as Debtor's Exhibit 1.

 7         MR. DURRSCHMIDT:  I object, Your Honor.  It's not

 8    notarized.  It's not recorded, and the state court has

 9    already tried this issue and found that these properties

10    were not transferred back to this Debtor, and this is not a

11    proper document for being admitted.

12         THE COURT:  Again, Mr. Satija, I'll say to you,

13    I'm not sure how you get this in evidence.  I'm going to

14    sustain the objection.  I don't think it's admissible.

15         MR. SATIJA:  Your Honor, it's not offered for the

16    truth of the information that is contained in the document.

17    It is not -- it is not offered as an instrument that

18    (indiscernible) actually deeded to HREP, but it is offered

19    as to the knowledge and intent of the Debtor's

20    representative when he completed the amended

21    (indiscernible).

22         THE COURT:  All right.  I think that its --

23         MR. SATIJA:  (Indiscernible) --

24         THE COURT:  -- probative value is outweighed by

25    its prejudicial effect.  I'll deny admission at this point
```

```
 1   in time.  Thank you.  Move along.
 2           MR. SATIJA:  Okay.  Thank you, Your Honor.
 3   BY MR. SATIJA:
 4   Q   All right.  Mr. Abdullatif, I have a letter on the
 5   screen, and I think I can -- I can expand this.  Can you see
 6   it a little bit better now?
 7   A   Yes, I can.
 8   Q   Okay.  And do you see that this is a letter that was
 9   sent yesterday to me?
10   A   I see the date on it and I see your name.  Yes.
11   Q   Okay.  And do you see your name here?
12   A   Yes, I do.
13   Q   Okay.  So, are you represented by (indiscernible) LLP?
14   A   In this case as a judgment holder against
15   (indiscernible) Companies, Inc., me and other judgment
16   holders, yes, I am.
17   Q   Okay.  And what was your purpose in sending me this
18   letter?
19   A   I'm sorry.  I (indiscernible) your question.
20           MR. DURRSCHMIDT:  Judge, that mischaracterized.
21   He didn't send this letter.
22           THE COURT:  What?
23           THE WITNESS:  I'm sorry.  I didn't send --
24           THE COURT:  Bear with me for one second.
25           THE WITNESS:  Yes, sir.
```

```
1               THE COURT:  You mischaracterized it.  He didn't

2      send this letter to you.  You want to ask your question

3      again?  He had nothing to do --

4               MR. SATIJA:  (Indiscernible) Your Honor.

5               THE COURT:  Go ahead.

6      BY MR. SATIJA:

7      Q    What was the purpose of your lawyer sending me this

8      letter?

9               MR. DURRSCHMIDT:  Objection.  Attorney-client

10     privilege.

11              THE COURT:  All right.  I'll sustain the objection

12     as to privilege.

13     BY MR. SATIJA:

14     Q    Why do you think that these cases that are listed here

15     -- why do you think these parties listed here are relevant

16     to this bankruptcy?

17              MR. DURRSCHMIDT:  Objection.  Attorney-client

18     privilege.

19              THE COURT:  Mr. Durrschmidt --

20              MR. SATIJA:  Your Honor --

21              THE COURT:  Bear with me for one second.

22              MR. DURRSCHMIDT:  One, I think he should have

23     filed the witness list and he should've filed exhibit list,

24     which he didn't do.  This is not on his list.  Two, it's got

25     nothing to do with the conduct of the Debtor from the filing
```

1    until now.  This has to do with an obligation that somebody

2    is imposing upon the Debtor to investigate certain things

3    that somebody has raised to the Debtors and Debtor's lawyer.

4    This is nothing more than saying here we think you have an

5    obligation to look at this stuff, and we got this yesterday.

6    He has an obligation to look at it, and he can look at it,

7    and if he doesn't want to look at it, then we can have a

8    Chapter 7 Trustee look at it.  But again, it's got nothing

9    to do with what the Debtor has or hasn't done today.  This

10   is something that the Debtor is going to have to do going

11   forward.  This is not looking back.  It's irrelevant.

12          THE COURT:  Mr. Satija, what's the relevance?  I'm

13   struggling with that particular part of your question.

14          MR. SATIJA:  First of all, Your Honor, I would

15   object to Durrschmidt (indiscernible) speaking objections.

16   I mean, that's something that he could -- he could say.  But

17   you know, it's -- the first objection that he made was that

18   this letter (indiscernible) the relevance of these parties

19   to the -- to the bankruptcy is attorney-client privilege,

20   and I don't -- I don't see that.

21          THE COURT:  He didn't actually make that

22   objection.  (Indiscernible) did.

23          MR. SATIJA:  Okay.  Okay.  Thank you.  Thank you.

24   And then -- and then second, it is absolutely relevant,

25   because Your Honor had said just a couple minutes ago you

1   want to see the state court appeal play out.  This is not --

2   I mean, just the fact that this letter is sent shows that

3   Mr. Abdullatif is going to bring a huge amount of litigation

4   into this bankruptcy case.

5        And it's not like -- the best thing that this

6   Court can do (indiscernible) that the case be dismissed and

7   let these people have these lawsuits away from this court

8   and (indiscernible) involves -- you know, let me appeal play

9   out.  If the Debtor wins, Debtor wins.  (Indiscernible) at

10  that point, but this is -- this is really going to change

11  and vastly increase the --

12       THE COURT:  Mr. Satija, at this point in time, I'm

13  going to sustain Mr. Durrschmidt's objection as to

14  relevance.  It's not relevant to any issues before me

15  relative to the appointment of a Trustee, and I'm going to

16  ask you again to move along, please.  Thank you.

17       MR. SATIJA:  Yes, Your Honor.  Thank you.

18  BY MR. SATIJA:

19  Q   Mr. Abdullatif, did you submit a request for abstract

20  of judgment to the state court clerk against HREP?

21       MR. FISHER:  I'm going to --

22       THE COURT:  We're rehashing the same issue, Mr.

23  Satija.  This is -- this is an issue not about what this

24  witness has done or this -- the parties who are opposing it.

25  It's what -- about what the Debtor's done and whether a

```
 1    Trustee should be appointed.  So, if you want to focus on

 2    that issue, I'm having to let you go on.  But if you want to

 3    rehash what's happened in state court, I don't want to hear

 4    it.  And if you continue down this path, you will find --

 5    you will feel my wrath.

 6             MR. SATIJA:  Give me just a second, Your Honor.

 7    I'm trying to see if I have any other questions that are

 8    directly related to the bankruptcy for Mr. Abdullatif.

 9             THE COURT:  I'd ask that you stop sharing your

10    screen.

11             MR. SATIJA:  Oh.  Yes, Your Honor.  I'm so sorry.

12    BY MR. SATIJA:

13    Q    Mr. Abdullatif, what is your understanding of the --

14    what is your understanding of what happens in this

15    bankruptcy if you win the appeal?

16             MR. FISHER:  Objection.  I think that calls for

17    speculation and it's totally irrelevant.

18             THE COURT:  Again, I don't see how what he thinks

19    about this Debtor that he's not really related to has any

20    relevance at all, Mr. Satija.  Move along.

21             MR. SATIJA:  Okay.  I don't have any further

22    questions, Your Honor, of this witness.

23             THE COURT:  All right.  Thank you.  All right.

24    Mr. Durrschmidt?

25             MR. DURRSCHMIDT:  No questions, Your Honor.
```

```
 1                THE COURT:  All right.  Mr. Fisher?

 2                MR. FISHER:  Nothing further.

 3                THE COURT:  Ms. Whitworth?

 4                MS. WHITWORTH:  Nothing, Judge.

 5                THE COURT:  All right.  Then you're excused.

 6   Thank you.

 7                THE WITNESS:  Thank you, Judge.

 8                THE COURT:  All right.  All right, Mr. Fisher, do

 9   you have any other witnesses you want to call?

10                MR. FISHER:  No, Your Honor.

11                THE COURT:  All right, thank you.  Ms. Whitworth?

12                MS. WHITWORTH:  We have no witnesses, Your Honor.

13                THE COURT:  Okay.  Mr. Satija, do you have any

14   witnesses you want to call?

15                MR. SATIJA:  I do not, Your Honor.

16                THE COURT:  All right.  So, let me hear first --

17   everyone's rested.  Let me hear first from the U.S.T. and

18   what their position is relative to this, and if they don't

19   want to take a position, that's fine.  I understand, but.

20                MS. WHITWORTH:  Your Honor, initially -- Jana

21   Whitworth for the U.S. Trustee.  Initially, the Trustee did

22   not have a position.  Our hope was that a plan would be able

23   to go forward at the 341.  There was talk of financing loft

24   apartments.  It sounded feasible.

25                Unfortunately, the testimony of the Debtor rep was
```

```
 1    not persuasive.  Unfortunately, Mr. Darjean couldn't answer
 2    a straight question on anything to do with how he came up
 3    with the calculations for the schedules to the statement of
 4    financial affairs, to how the claim was going to be
 5    proposed.  We keep hearing about Mr. Ali Choudhri, and
 6    surprisingly, the man with the most information about how
 7    the Debtor is going to go forward isn't here today.
 8            So, Your Honor, we -- the U.S. Trustee would take
 9    the position that the Court needs to take action and either
10    move forward with the appointment of a Chapter 11 Trustee or
11    a Chapter 7 Trustee, and in taking that into consideration,
12    Your Honor, based on the schedules and the information
13    available, it doesn't look like there is a lot of money to
14    go around to pay the expenses of the administration of a
15    Chapter 11.
16            My notes reflect, Judge, that -- I've looked up
17    while we were here the appraisal district for 2022 came in a
18    little bit higher than the 450 when the case was filed.
19    It's 461 and 422.  That doesn't take into account Mr.
20    Fisher's clients purportedly, 450, then we've got I think
21    24,000 on file as claimed by the Appraisal District for
22    Harris County.  I pulled up for the 2023 taxes.  It's more
23    or less about $12,000.
24            So, there's not a lot of equity available to
25    administer an estate, Judge.  So, the Trustee would
```

1    recommend file -- converting to a Chapter 7, Your Honor,

2    based on those facts and the testimony of the Debtor

3    representative, Judge.

4         THE COURT:  All right.  Let me hear from Mr.

5    Durrschmidt.  It's his motion.  Technically, he should be

6    able to open and close.  So -- and you can address my major

7    concern is how do we pay a Trustee if we appoint a Trustee,

8    because I think at the end of the day, there's not a whole

9    lot of money in this estate irrespective of what happens

10   with the claims.

11        MR. DURRSCHMIDT:  Yes, sir.

12        THE COURT:  And I think that's a concern for me at

13   this point in time.

14        MR. DURRSCHMIDT:  Judge, if you look at the

15   secured claim with the air quotes Mr. Fisher opposes so

16   vehemently, there is no secured claim.  The deed of trust

17   may have been signed prior to the bankruptcy, but it was

18   filed post-petition.  It's voidable.  So, the Trustee is

19   going to be able to void that secured lien.  It's going to

20   be an unsecured client.  And you know, the question is going

21   to be were monies advanced, and if they were advanced, how

22   were they advanced?  Where were they advanced to?

23        And surprisingly, we still don't know the answer

24   to that question.  So, I think you've got a -- the Debtor's

25   valued it at 750, (indiscernible) has it at 450.  It's going

1    to be somewhere in between there.  I don't think there's a

2    secured claim.  I don't actually think that any monies were

3    advanced.  I don't think there was any debt owed prior to

4    the case.  I think we're going to find out that that is a

5    (indiscernible) transaction, and I think that just like a

6    lot of the information that's on the schedules, it's going

7    to be false.  So, I think that there's going to be value to

8    pay the Trustee from the real estate.

9              The other thing that I find abhorrent about this

10   case is the schedules and then the amended schedules and the

11   just total lack of logical support for much of that, that's

12   been scheduled, and I think it would be a travesty for this

13   Court to dismiss the case with that conduct having occurred.

14             And I think that part of having the Chapter 7

15   Trustee come in and look at this is to look at this $3

16   million claim, this million-eight claim, these three pieces

17   of property.  I am confident that the Trustee's going to

18   walk away from this saying there's only one piece of

19   property.

20             As the Debtor's counsel in his response last night

21   admitted, there is only one piece of property here, but

22   somebody should investigate.  The integrity of the

23   bankruptcy system demands that there be, as I said earlier,

24   an adult to look at this and to look and see what has

25   transpired and why it's transpired, and I think that the

001602

1    value is going to come under the real estate.  I think the

2    Trustee is going to get paid by liquidating, as you said

3    earlier, conducting an auction, and we'll find out what

4    5,000 square feet in Rice Military is worth today, and I

5    think the Trustee will get paid from those proceeds.

6         I think the deed is unenforceable, and I just

7    think the testimony of Mr. Darjean in comparison to some of

8    the pleadings that were filed by the Debtor's counsel demand

9    that somebody look and see what the heck was going on,

10   because this is not the way we should be doing this.

11        We're all dependent on truthful schedules,

12   truthful testimony, truthful 341 meetings, and this system

13   will break down if we don't have that.  So, I think there's

14   -- I think there's money to pay.  I think the case should be

15   converted to a Chapter 7, not only because there's going to

16   be money to pay a Trustee, which I think there will be, but

17   the integrity of the system demands that we get a resolution

18   as to what happened here, because this is wrong.

19        THE COURT:  All right.  Thank you.  Mr. Fisher,

20   I'll hear from you.

21        MR. FISHER:  Thank you, Your Honor.  Well, I agree

22   with Mr. Durrschmidt that the integrity of the system is

23   critical and important.  I do note that there is a motion on

24   file where the integrity of the system as it applies to this

25   case can be examined by this Court, and today is not the

1    time.

2         What I would suggest, though, is that we look at

3    the choices that are in front of the Court, and as I'm

4    learning about this case, it seems like the Court's got

5    three choices, none of which have to occur today.  One is

6    appoint a Trustee under Chapter 11.  We heard from the U.S.

7    Trustee's Office.  Convert to Chapter 7 or dismiss.  The

8    motion for dismiss -- the motion to dismiss this case is set

9    April 5th.  The Court can set an earlier hearing if it -- if

10   it would like, and I'd reiterate that there has been no

11   evidence and no testimony that suggested any harm will come

12   to the property between now and April 5th or next week or

13   two weeks from now.

14        Second, as I've asked from the beginning of

15   today's proceedings, is to give me an opportunity to assert

16   the rights of Skaneateles, and I believe that we -- that

17   Skaneateles has a couple of options given that we go

18   forward.  One is that Skaneateles can file a plan, and No. 2

19   is that if the case continues, Skaneateles can also file a

20   motion to life the stay and foreclose on its interest to the

21   extent that it felt threatened or feels threatened.

22        In terms of evidence, I heard a lot of testimony

23   from Mr. Durrschmidt but not a whole lot from any witnesses

24   that would suggest that the -- that the secured interest of

25   Skaneateles is somehow fraudulent or shouldn't be recognized

1     or at this point should be voided.

2          I heard testimony from the witness -- the only

3     witness that we heard from (indiscernible) who said that the

4     Debtor recognizes that security interest.  I didn't hear

5     anything to the contrary from the other witness, so -- Mr.

6     Abdullatif.

7          So, I would suggest that as of right now, at

8     least, that the finding ought to be that the -- that the

9     security interest and the debt of Skaneateles be respected.

10    But beyond that, I'm going to ask again that to the extent

11    that Mr. Durrschmidt is concerned that something untoward

12    has occurred and is sanctionable and is contemptible, that

13    hearing is set for another day, and to the extent that the

14    motion to dismiss maybe a good viable option for all the

15    parties in interest, or even if it's -- if it's left up to

16    the Court that the Court have an opportunity to hear

17    testimony and evidence about why a motion to dismiss is or

18    is not appropriate.

19         So, I'd ask that we -- that the Court defer a

20    conclusion today based upon the other motions that are

21    pending, and that we go forward with those other motions so

22    that all of the rights for all the creditors can be heard.

23         Thank you, Judge.

24         THE COURT:  All right.  Thank you.  Let me hear

25    from Mr. Satija.

```
 1          MR. SATIJA:  Your Honor, thank you.  Well, I'm sad
 2     (indiscernible) Mr. Durrschmidt and talking about the
 3     schedules.  I have been practicing bankruptcy law for 20
 4     years.  This is going to be my 20th anniversary of
 5     practicing bankruptcy law, and I never envisioned myself
 6     becoming a bankruptcy lawyer even through law school, but I
 7     have come to love this practice.
 8          And one of the things that I love about the
 9     practice is that it is a balance, that it's one of the few
10     areas of law where there's compassion towards the Debtor and
11     it's an amazing -- the code is an amazing system that seeks
12     to balance the interests of the Debtors and the creditors
13     and government entities, other parties, and I believe very
14     strongly in the integrity of the system, and I believe very
15     strongly that Debtors should file accurate schedules.
16          As Mr. Darjean said, I met with him probably 50
17     times, and this -- and we looked at many documents.  We put
18     down our -- the numbers and the assets based on those
19     documents and based on, you know, his thoughts and based on
20     Mr. Choudhri's thoughts, and it's a weird case in the sense
21     that there was a lot of action in the state court, and it's
22     -- a lot of that bleeds into, you know -- you know, did
23     this, you know, case or that case -- and the situation has
24     changed since the judgment has entered.
25          You know, so the Debtor may have some kind of
```

1    equitable interest in those (indiscernible) and McGowen

2    properties pending resolution of the appeal.  The Debtor may

3    have some kind of equitable interest in the -- in the note,

4    and perhaps the value should be adjusted, and certainly a

5    Chapter 7 Trustee will be able to sort through that if a

6    Trustee is appointed, and you know, figure out

7    (indiscernible) whatever he or she needs to sell.

8         But the Debtor does urge dismissal, and the reason

9    for that is that this -- the Debtor (indiscernible) filed to

10   protect its property.  I know Mr. Durrschmidt is saying I

11   only said one property and that there's some admission

12   there, but you know, the Debtor filed to protect this

13   property.  The judgment has now been superseded.  We do have

14   a discussion with Skaneateles going forward to fund the plan

15   to satisfy 1129, what is it, (a)(9) -- (a)(8) and (a)(9)

16   regarding the taxing authorities paying them (indiscernible)

17   during the course of the -- during the course of the

18   pendency of the appeal and then making a determination of

19   how Skaneateles wants to proceed in terms of, you know,

20   further investment and buying out, you know, whatever Mr.

21   Abdullatif's claim is at that point.

22        So, I mean, that's kind of the Chapter 7 and the

23   Chapter 11 options from our point of view, but again, we do

24   urge dismissal because the matter has been superseded at

25   this point.  Chapter 7 or Chapter 11 Trustee is going to be

1    stuck with figuring out kind of what happens during the

2    appeal and who do they pay.

3         The Abdullatif claim, I cited some case law in my

4    response to the motion to appoint the Trustee.  The

5    Abdullatif claim is -- can be paid under 502(b).  It's

6    unenforceable against the Debtor, and there's the Texas

7    Supreme Court case that's cited in the bankruptcy case that

8    I've cited.

9         And so, I don't see a lot of purpose in going

10   forward with this bankruptcy.  And again, the Debtor would

11   urge dismissal at this point.

12        THE COURT:  All right.  Thank you.  Mr.

13   Durrschmidt, you get to close.  It's your motion if you have

14   anything else you want to tell me.

15        MR. DURRSCHMIDT:  Thanks, Your Honor.  We filed

16   the motion to appoint a Chapter 11 Trustee, and I think that

17   Ms. Whitworth is right.  It's -- the Chapter 11 is not going

18   to work.  I think the Debtors filed their motion to dismiss.

19   They admitted there's diminution to the state.  There -- you

20   know, the testimony today is there's one piece of property.

21   It's going to -- you know, I mean, there's no way this

22   Debtor is going to be able to develop that property pursuant

23   to a plan.

24        And so, I think a conversion to a Chapter 7 which

25   was the alternative relief we requested is appropriate.  I

1    think that, you know, even listening to Debtor's counsel

2    just now, he's talking about maybe there's an equitable

3    interest here, maybe there's an equitable interest there.

4    You know, these things never should have been scheduled.

5    They were scheduled.  There's a part of a note of $1.5

6    million note that the state court has found was not

7    enforceable that, you know, ballooned to $10 million.

8            Dismissal is going to be detrimental to the

9    unsecured creditors here, because they're going to allow

10   Skaneateles, Ali Choudhri's mom -- let's not ignore what's

11   going on here.  This is the Ali Choudhri show and they're

12   going to then be able to do what they need to season and get

13   that lien properly blessed because the requisite time will

14   have gone by.

15           They invited everybody here.  This is not a party.

16   You don't get to invite everybody here and say I don't like

17   you guys anymore, we want to leave.  They opened this case.

18   They drug us in here.  They used it as a sword to try and

19   disrupt the state court.  They used it as a litigation

20   tactic.  It has blown up in their face.  They need to live

21   with that consequence, and part of living with that

22   consequence is living with the statements that were made in

23   the schedules and the statement of financial affairs.

24           And I think, you know, I'll go back to the

25   integrity of the system.  If we allow people to do this and

1    we allow them to file the kind of schedules that we've filed

2    here for the purpose of delaying, harassing, obstructing,

3    that's not what bankruptcy is for.  Bankruptcy is a shield.

4    The automatic stay is a shield.  It's not a sword.  There's

5    value here to pay a Trustee.  This case needs to be

6    converted to a 7.  Trustee needs to be appointed.  Trustee

7    needs to figure out whether the appeal has legs or it

8    doesn't.

9            I mean, we've got counsel being engaged to

10   represent the Debtor without a court order.  The laundry

11   list of things that have gone on in this case that shouldn't

12   have gone on is longer than my arm.  And so, a Chapter 7

13   Trustee needs to be appointed and this case needs to be

14   converted to a 7.  Thank you.

15           THE COURT:  Thank you.  All right.  These are my

16   findings of fact and conclusions of law.  Let me start by

17   saying that the issue of appointing a Chapter 11 Trustee or

18   converting the case to Chapter 7 really relies very heavily

19   on the Debtor's ability -- purported ability to reorganize.

20           And here, the Court is faced with a Debtor that

21   basically has no income, no expenses.  It functionally

22   doesn't operate, and as best I can tell from the testimony,

23   it's never operated.  It's been in a bankruptcy since

24   October 7, 2022.  Five months in, we have creditors

25   complaining and there's been no testimony to support that

1   the Debtor will be able to reorganize.  There's nothing

2   definite that the Court's heard that indicates that the

3   Debtor will ever be able to reorganize.  And at this point

4   in time, five months in, you would expect to hear definitive

5   testimony from someone who can tell me something about what

6   the plan is going forward, but I've heard nothing.

7           Mr. Darjean has an appalling lack of knowledge as

8   to what's going to happen in this case as far as

9   reorganization is concerned.  He can't tell me anything

10  about the single asset real estate that effectively is the

11  only way this Debtor reorganizes.

12          I just think that given what I've heard,

13  irrespective of all the state court litigation, this is a

14  Debtor who filed a case based on litigation tactics.  It

15  didn't like what happened to it in state court.  It came

16  running over here expecting to get some sort of relief.

17          I don't think I had any option but to remand the

18  case.  You don't have a jury trial, get a judgment, and then

19  run over to bankruptcy and say I get a do-over.  It doesn't

20  work like that.

21          And it could possibly work like that if there was

22  some sort of possibility that the Debtor could reorganize,

23  but I just don't see it and I've had no evidence to support

24  that this Debtor could reorganize.  And it's critically

25  important that the one person, Mr. Choudhri, Ali Choudhri,

1    the one person who could come here and tell me everything

2    that I should need to know about this case and why this case

3    should move forward and what can happen with this lot and

4    how the Debtor reorganizes is absent, hasn't testified, and

5    there is just too much of a commingling between the parties.

6    These transfers don't make any sense.  And as a practical

7    matter, this is a case that should be converted to a Chapter

8    7, because as Mr. Durrschmidt said, there is an integrity to

9    the system that this Court needs to uphold, and it upholds

10   it by converting this case to Chapter 7.

11             I thank everyone for their appearance today.  I

12   probably have not made everyone in this courtroom happy, but

13   I call it as I see it, which is what I am obligated to do.

14   I'm also obviously making my decision taking what the

15   Trustee -- the chapter -- the U.S.T. said in the case and

16   urging that the case be converted to Chapter 7.  It is their

17   urging that I think that got me over the point for

18   conversion to Chapter 7.

19             I thank everyone for appearing.  We're adjourned.

20             CLERK:  All rise.

21             (Proceedings adjourned at 3:18 p.m.)

22

23

24

25

001612

```
 1                          I N D E X

 2

 3                          RULINGS

 4                                           Page       Line

 5    Case Converted to Chapter 7, GRANTED    155        8

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

001613

```
 1                         CERTIFICATION
 2
 3     I certify that the foregoing is a correct transcript from
 4     the electronic sound recording of the proceedings in the
 5     above-entitled matter.
 6
 7     Sonya M. Ledanski Hyde
 8
 9
10     Sonya Ledanski Hyde
11
12
13
14
15
16
17
18
19
20     Veritext Legal Solutions
21     330 Old Country Road
22     Suite 300
23     Mineola, NY 11501
24
25     Date:  March 13, 2023
```

## **Exhibit B**

Proposed Order

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-34815 (JPN) |
| GALLERIA 2425 Owner, LLC | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | § | |

## ORDER CONVERTING CHAPTER 11 CASE TO CHAPTER 7

Upon the motion (the "Motion") of NBK[1] to convert the above-captioned Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue of this Motion being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and adequate notice of, and the opportunity for a hearing on, the Motion having been given; and it appearing that no other or further notice need be provided; and this Court having found that the relief requested in the Motion and provided for herein is in the best interest of the Debtor and its creditors, and other parties in interest; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon the record herein, and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED**:

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

1.      The above-captioned case is converted to a case under Chapter 7 of the Bankruptcy

Code.

2.      The United States Trustee is directed to appoint a Chapter 7 Trustee in this case.


Signed: _____, 2024                    _____

                                                 Jeffery P. Norman
                                                 United States Bankruptcy Judge

2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re   : | § | Case No. 23-34815 (JPN) |
| | § | |
| GALLERIA 2425 OWNER LLC, | § | (Chapter 11) |
| | § | |
| Debtor. | § | |

## NOTICE OF HEARING

**PLEASE TAKE NOTICE** that a hearing on *National Bank of Kuwait, S.A.K.P., New York Branch's Motion Pursuant to 11 U.S.C. § 1112(b) to Convert Chapter 11 Case to Chapter 7* (ECF 72) is scheduled to be held on **January 31, 2024**, beginning at **11:00 a.m. prevailing central time** before the Honorable Jeffrey P. Norman in Courtroom 403, 515 Rusk, Houston, Texas 77002.

Parties may appear in person or virtually.   Video participation is available at www.gotomeet.me/JudgeNorman.  You must connect by telephone to hear the audio.  The Court's conference call number is **(832) 917-1510**, conference code **174086**.  Further instructions and information can be found at the Court's website: https://www.txs.uscourts.gov/page/united-states-bankruptcy-judge-jeffrey-p-norman.

Date: January 4, 2024

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

By: */s/ Charles C. Conrad*

    Charles C. Conrad
    Texas Bar No. 24040721
    Ryan T. Steinbrunner
    Texas Bar No. 24093201
    Reed C. Trechter
    Texas Bar No. 24129454
    Two Houston Center
    909 Fannin, Suite 2000
    Houston, TX 77010-1028
    Telephone: 713-276-7600
    Facsimile: 713-276-7634
    charles.conrad@pillsburylaw.com
    ryan.steinbrunner@pillsburylaw.com
    reed.trechter@pillsburylaw.com

    *--and--*

    Andrew M. Troop
    Federal Bar No. MA547179
    Patrick E. Fitzmaurice*
    Kwame O. Akuffo*
    31 West 52nd Street
    New York, NY 10019-6131
    Telephone: 212-858-1000
    Facsimile: 212-858-1500
    patrick.fitzmaurice@pillsburylaw.com
    kwame.akuffo@pillsburylaw.com

    *Admitted Pro Hac Vice*

    ***Counsel for National Bank of Kuwait, S.A.K.P., New York Branch***

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 4, 2024, a true and correct copy of this document was served via the Court's CM/ECF system on all counsel of record who are deemed to have consented to electronic service, and also by mailing, first class, postage prepaid, to each of the parties on the attached mailing matrix.

    */s/ Charles C. Conrad*
    Charles C. Conrad

2

001619

Label Matrix for local noticing
0541-4
Case 23-34815
Southern District of Texas
Houston
Wed Jan  3 14:53:44 CST 2024

2425 WL, LLC
2425 West Loop South 11th floor
Houston, TX 77027-4304

CC2 TX, LLC
c/o Howard Marc Spector
Spector & Cox, PLLC
12770 Coit Road Suite 850
Dallas, TX 75251-1364

City of Houston
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

Galleria 2425 Owner, LLC
1001 West Loop South 700
Houston, TX 77027-9084

(p)HARRIS COUNTY ATTORNEY'S OFFICE
P O BOX 2928
HOUSTON TX 77252-2928

Houston Community College System
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

Houston ISD
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

National Bank of Kuwait, S.A.K.P., New York

4
United States Bankruptcy Court
PO Box 61010
Houston, TX 77208-1010

2425 WL, LLC
13498 Pond Springs Rd.
Austin, TX 78729-4422

ADT
PO Box 382109
Pittsburgh, PA 15251-8109

Ali Choudhry
1001 West Loop South 700
Houston, TX 77027-9084

Ash Automated Control Systems, LLC
PO Box 1113
Fulshear, TX 77441-2013

CFI Mechanical, Inc
6109 Brittmoore Rd
Houston, TX 77041-5610

CNA Insurance Co
PO Box 74007619
Chicago, IL 60674-7619

Caz Creek Lending
118 Vintage Park Blvd No. W
Houston, TX 77070-4095

Cirro Electric
PO Box 60004
Dallas, TX 75266

City of Houston
PO Box 1560
Houston, TX 77251-1560

City of Houston
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

Comcast
PO Box 60533
City of Industry, CA 91716-0533

Datawatch Systems
4520 East West Highway 200
Bethesda, MD 20814-3382

Environmental Coalition Inc
PO Box 1568
Stafford, TX 77497-1568

Ferguson Facilities Supplies
PO Box 200184
San Antonio, TX 78220-0184

Firetron
PO Box 1604
Stafford, TX 77497-1604

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062-7917

Gulfstream Legal Group
1300 Texas St
Houston, TX 77002-3509

HNB Construction, LLC
521 Woodhaven
Ingleside, TX 78362-4678

Harris County Tax Assessor
PO Box 4622
Houston, TX 77210-4622

Houston Community College System
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

001620

Houston ISD
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

Kings 111 Emergency Communications
751 Canyon Drive, Suite 100
Coppell, TX 75019-3857

Lexitas
PO Box Box 734298 Dept 2012
Dallas, TX 75373-4298

Logix Fiber Networks
PO Box 734120
Dallas, TX 75373-4120

MacGeorge Law Firm
2921 E 17th St Blgd D Suite 6
Austin, TX 78702-1572

Mueller Water Treatment
1500 Sherwood Forest Dr.
Houston, TX 77043-3899

National Bank of Kuwait
299 Park Ave. 17th Floor
New York, NY 10171-0023

Nationwide Security
2425 W Loop S 300
Houston, TX 77027-4205

Nichamoff Law Firm
2444 Times Blvd 270
Houston, TX 77005-3253

TKE
3100 Interstate North Cir SE  500
Atlanta, GA 30339-2296

US Trustee
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002-2604

Waste Management
PO Box 660345
Dallas, TX 75266-0345

Zindler Cleaning Service Co
2450 Fondren 113
Houston, TX 77063-2314

James Q. Pope
The Pope Law Firm
6161 Savoy Drive
Ste 1125
Houston, TX 77036-3343

Reese W Baker
Baker & Associates
950 Echo Lane
Suite 300
Houston, TX 77024-2824

Rodney Drinnon
McCathern Houston
2000 W Loop S
Ste. 1850
Houston, TX 77027-3744

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Harris County, ATTN: Property Tax Division
Harris County Attorney's Office
P.O. Box 2928
Houston, TX 77252-2928 United States

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)2425 West Loop, LLC

End of Label Matrix
Mailable recipients    45
Bypassed recipients     1
Total                  46

001621

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

IN RE:                                                        CHAPTER  **11**
**Galleria 2425 Owner, LLC**

DEBTOR(S)                                                    CASE NO   **23-34815-H5-11**

## LIST OF EQUITY SECURITY HOLDERS

| Registered Name of Holder of Security Last Known Address or Place of Business | Class of Security | Number Registered | Kind of Interest Registered |
|---|---|---|---|
| **Galleria 2425 JV LLC**<br>6501 West Chester Ave<br>Houston, Texas 77005 | | | Member 100% |
| **Galleria West Loop Investments II, LLC**<br>1001 West Loop South, Ste 700<br>Houston, Texas 77027 | | | 100% of Galleria 2425 JV LLC |

**DECLARATION UNDER PENALTY OF PERJURY**
**ON BEHALF OF A CORPORATION OR PARTNERSHIP**

I, the _____**Manager**_____ of the _____**Nonpublic Corporation**_____
named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date: **01/10/2024**_____     Signature: /s/ Ali Choudhri_____
                                                                    *Ali Choudhri, Manager*

001622

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 23-34815 (JPN)** |
| **GALLERIA 2425 Owner, LLC** | § | |
| | § | **Chapter 11** |
| Debtor. | § | |
| | § | |

**LIMITED OBJECTION OF NATIONAL BANK OF KUWAIT, S.A.K.P, NEW YORK BRANCH TO APPLICATION TO EMPLOY ATTORNEYS**

**TO THE HONORABLE JEFFREY P. NORMAN, U.S. BANKRUPTCY JUDGE:**

National Bank of Kuwait, S.A.K.P. New York Branch ("NBK") hereby files this limited objection and reservation of rights to the Debtor's *Application to Employ Attorney*s (the "Application") [ECF No. 67] Reese W. Baker and Baker & Associates ("Baker") as general bankruptcy counsel. In support of its Limited Objection, NBK respectfully states as follows:

## LIMITED OBJECTION

*The Application Provides Insufficient Information Concerning Baker's Retention and Compensation*

NBK objects to the Application because there is insufficient information to evaluate the propriety of counsel's retention because the Application includes insufficient information concerning payment of counsel's fees.

The Application states that Baker received a retainer from Galleria Loop Note Holder, LLC ("GLNH") in the amount of $15,000.00 on November 17, 2023, and applied a percentage of the retainer for prepetition fees and expenses.  Application ¶ 9.  GLNH is not an entity in the Debtor's ownership structure; instead, it is an entity under common ownership and control of Mr. Choudhri, the Debtor's ultimate principal. The Application further provides that "the Debtor or the owner of

the Debtor" will pay Baker's professional fees and expenses, and that "the owner of the Debtor has guaranteed the payments of the fees and expenses of the Debtor to Baker." Application ¶ 10.

But the Debtor cannot pay Baker's professional fees and expenses because its only source of revenue are the rents it receives from tenants in the property and those funds are NBK's cash collateral; NBK does not consent to the use of its cash collateral for payment of any estate professional fees and expenses. *See* ECF No. 44 ¶ 17. Further, the Debtor withdrew its request that the Court authorize the use of cash collateral to pay professional fees. *See* ECF No. 52.

While the Application states that "the owner of the Debtor" has guaranteed payment of counsel fees, the Application does not identify who that owner is, nor does it include a copy of this purported guarantee or any evidence that such owner has the requisite funds to make the payments it has purportedly obligated itself for. To make things more confusing, the Application states that "another person or entity has agreed to deposit with the Firm additional amounts each month of approximately the fees for the services provided" but does not disclose who this other person or entity is, what relationship they do or do not have with the Debtor, its affiliates or principal or any work Baker may have done for this 'person or entity' in the past. Without this information, the Court and parties in interest lack sufficient information to determine the propriety of Baker's retention and any agreements that have been made to compensate Baker.

## <u>NOTICE</u>

Notice of this Limited Objection has been provided to: (a) the Office of the United States Truste for the Southern District of Texas; (b) counsel to Naissance Galleria, LLC; (c) proposed counsel to the Debtor; (d) any party that has requested notice pursuant to Bankruptcy Rule 2002, and (e) the Debtor's mailing matrix.  NBK submits that no other or further notice is required.

<u>C</u><small>ONCLUSION</small>

WHEREFORE, NBK requests that the Court enter the proposed order attached as <u>Exhibit</u>

<u>A</u> granting (i) the relief requested in the Objection and (ii) other relief as is just and proper.

DATED: January 12, 2024      **PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Charles C. Conrad*
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010-1028
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

-  *and*  -

Andrew M. Troop  (Bar No. MA547179)
Patrick E. Fitzmaurice*
Kwame O. Akuffo*
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

*Admitted *pro hac vice*

***Counsel for National Bank of Kuwait, S.A.K.P., New York Branch***

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that on January 12, 2024, a true and correct copy of this document was served via the Court's CM/ECF system on the Debtor and its counsel of record and all others who are deemed to have consented to ECF electronic service, and also by mailing, first class, postage prepaid, to each of the parties on the attached mailing matrix.

*/s/ Charles C. Conrad*
Charles C. Conrad

001625

Label Matrix for local noticing
0541-4
Case 23-34815
Southern District of Texas
Houston
Fri Jan 12 10:45:27 CST 2024

2425 WL, LLC
2425 West Loop South 11th floor
Houston, TX 77027-4304

CC2 TX, LLC
c/o Howard Marc Spector
Spector & Cox, PLLC
12770 Coit Road Suite 850
Dallas, TX 75251-1364

City of Houston
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

Galleria 2425 Owner, LLC
1001 West Loop South 700
Houston, TX 77027-9084

(p)HARRIS COUNTY ATTORNEY'S OFFICE
P O BOX 2928
HOUSTON TX 77252-2928

Houston Community College System
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

Houston ISD
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

National Bank of Kuwait, S.A.K.P., New York

4
United States Bankruptcy Court
PO Box 61010
Houston, TX 77208-1010

2425 WL, LLC
13498 Pond Springs Rd.
Austin, TX 78729-4422

ADT
PO Box 382109
Pittsburgh, PA 15251-8109

Ali Choudhry
1001 West Loop South 700
Houston, TX 77027-9084

Ash Automated Control Systems, LLC
PO Box 1113
Fulshear, TX 77441-2013

CFI Mechanical, Inc
6109 Brittmoore Rd
Houston, TX 77041-5610

CNA Insurance Co
PO Box 74007619
Chicago, IL 60674-7619

Caz Creek Lending
118 Vintage Park Blvd No. W
Houston, TX 77070-4095

Cirro Electric
PO Box 60004
Dallas, TX 75266
RETURN TO SENDER, FOE

City of Houston
PO Box 1560
Houston, TX 77251-1560

City of Houston
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

Comcast
PO Box 60533
City of Industry, CA 91716-0533

Datawatch Systems
4520 East West Highway 200
Bethesda, MD 20814-3382

Environmental Coalition Inc
PO Box 1568
Stafford, TX 77497-1568

Ferguson Facilities Supplies
PO Box 200184
San Antonio, TX 78220-0184

Firetron
PO Box 1604
Stafford, TX 77497-1604

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062-7917

Gulfstream Legal Group
1300 Texas St
Houston, TX 77002-3509
RETURN TO SENDER, FOE

HNB Construction, LLC
521 Woodhaven
Ingleside, TX 78362-4678

Harris County Tax Assessor
PO Box 4622
Houston, TX 77210-4622

Houston Community College System
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064 001626

Houston ISD
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

Kings 111 Emergency Communications
751 Canyon Drive, Suite 100
Coppell, TX 75019-3857

Lexitas
PO Box Box 734298 Dept 2012
Dallas, TX 75373-4298

Logix Fiber Networks
PO Box 734120
Dallas, TX 75373-4120

MacGeorge Law Firm
2921 E 17th St Blgd D Suite 6
Austin, TX 78702-1572

Mueller Water Treatment
1500 Sherwood Forest Dr.
Houston, TX 77043-3899

National Bank of Kuwait
299 Park Ave. 17th Floor
New York, NY 10171-0023

Nationwide Security
2425 W Loop S 300
Houston, TX 77027-4205

Nichamoff Law Firm
2444 Times Blvd 270
Houston, TX 77005-3253

TKE
3100 Interstate North Cir SE  500
Atlanta, GA 30339-2296

US Trustee
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002-2604

Waste Management
PO Box 660345
Dallas, TX 75266-0345

Zindler Cleaning Service Co
2450 Fondren 113
Houston, TX 77063-2314

James Q. Pope
The Pope Law Firm
6161 Savoy Drive
Ste 1125
Houston, TX 77036-3343

Reese W Baker
Baker & Associates
950 Echo Lane
Suite 300
Houston, TX 77024-2824

Rodney Drinnon
McCathern Houston
2000 W Loop S
Ste. 1850
Houston, TX 77027-3744

        The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
        by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Harris County, ATTN: Property Tax Division
Harris County Attorney's Office
P.O. Box 2928
Houston, TX 77252-2928 United States

        The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)2425 West Loop, LLC

End of Label Matrix
Mailable recipients    45
Bypassed recipients     1
Total                  46

001627

## **Exhibit A**

Proposed Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 23-34815 (JPN)** |
| **GALLERIA 2425 Owner, LLC** | § | |
| | § | **Chapter 11** |
| **Debtor.** | § | |
| | § | |

---

**ORDER DENYING APPLICATION TO EMPLOY ATTORNEYS**

---

CAME ON FOR CONSIDERATION Debtor's *Application to Employ Attorneys* (the "Application") [ECF No. 67] on December 22, 2023. Having considered the Application, any responses or objections to the Application, the record in this matter, and all other evidence before it, and after due deliberation, the Court finds that good cause exists to deny the Application. Accordingly, it is ORDERED that, for the reasons stated on the record, the Application is DENIED.

Signed: _____, 2024

_____
Jeffery P. Norman
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 23-34815 (JPN) |
| GALLERIA 2425 Owner, LLC. | § | |
| Debtor | § | Chapter 11 |

**RESPONSE TO NATIONAL BANK OF KUWAIT, SAKP NEW YORK'S MOTION PURSUANT TO 11 USC SEC. 1112(B) TO CONVERT CHAPTER 11 CASE TO CHAPTER 7**

TO THE HONORABLE U.S. BANKRUPTCY JUDGE:

COMES NOW 2425 WL, LLC ("Respondent") and files this Response to National Bank of Kuwait's Motion to Convert Chapter 11 Case to Chapter 7 and would show as follows:

1.  Respondent admits the allegations of para. 1.

2.  Respondent denies the allegations of para. 2.

3.  Respondent denies the allegations of para. 3.

4.  Respondent denies the allegations of para. 4.

5.  Respondent denies the allegations of para. 5.

6.  Respondent admits the allegations of para. 6, except that Respondent denies that this is the second case in five months.

7.  Respondent generally admits the allegations of para. 7.

8.  Respondent generally admits the allegations of para. 8. Respondent reserves the right to dispute Movant's characterization of the documents.

9.  Respondent generally admits the allegations of para. 9. Respondent reserves the right to dispute Movant's characterization of the documents.

001630

10. Respondent generally admits the allegations of para. 10. Respondent reserves the right to dispute Movant's characterization of the documents.

11. Respondent lacks information sufficient to admit or deny the allegations of para. 11.

12. Respondent lacks information sufficient to admit or deny the allegations of para. 12.

13. Respondent admits that the property was posted for foreclosure and that an application for temporary restraining order was filed as alleged in para. 13..

14. Respondent admits that the first bankruptcy case was filed as alleged in para. 14..

15. Respondent admits the allegations of para. 15.

16. Respondent generally admits the allegations of para. 16 but reserves the right to dispute Movant's summary.

17. Respondent admits that Movant's claim was bifurcated but would show that the valuation was based on the amount claimed by Movant in its motion to dismiss. Respondent denies the rest of para. 17.

18. Respondent denies the allegations of para. 18.

19. Respondent admits the allegations of para. 19.

20. Respondent admits the allegations of para. 20.

21. Respondent admits the allegations of para. 21, except that Respondent lacks knowledge of the specific amount owed to Movant.

001631

22. Respondent denies the allegations of para. 22. The statute does not mandate conversion on a finding of cause.

23. Respondent admits that section 1112 contains a list of possible grounds for a finding of cause as alleged in para. 23.

24. Respondent admits that, as alleged in para. 24, courts in the Fifth Circuit have found that lack of good faith is grounds for relief under section 1112 but that it has never endorsed a formulaic reading of the so-called *Little Creek* factors.

25. Respondent admits the first sentence of para. 25 and denies the remainder of para. 25. Movant misrepresents the *Elmwood* case. The changed circumstances test applies where a plan is confirmed in one case and then a second case is filed which would modify or contradict the original plan. It does not apply in the situation where a second case is filed after the first case is dismissed without confirmation of a plan.

26. Respondent denies the allegations of para. 26. It is not bad faith to seek bankruptcy relief when a lender seeks to foreclose on real property.

27. Respondent admits that Judge Lopez made the statements attributed to him but denies the remainder of para. 27.

28. Respondent denies the allegations of para. 28.

29. Respondent denies the allegations of para. 29.

30. Respondent denies the allegations of para. 30.

31. Respondent denies the allegations of para. 31.

32. Respondent denies the allegations of para. 32.

33. Respondent denies the allegations of para. 33.

34. Respondent denies the allegations of para. 34.

35. Respondent denies the allegations of para. 35.

36. Respondent denies the allegations of para. 36.

37. Respondent denies the allegations of para. 37.

38. Respondent denies the allegations of para. 38.

39. Respondent denies the allegations of para. 39.

40. Respondent denies the allegations of para. 40.

41. Respondent denies the allegations of para. 41

42. Respondent denies the allegations of para. 42.

43. Respondent denies the allegations of para. 43.

44. Respondent denies the allegations of para. 44.

45. Respondent denies the allegations of para. 45.

46. Respondent denies the allegations of para. 46.

47. Respondent denies the allegations of para. 47.

48. Respondent denies the allegations of para. 48.

49. Respondent denies the allegations of para. 49.

50. Respondent denies the allegations of para. 50.

51. Respondent denies the allegations of para. 51.

52. Respondent denies the allegations of para. 52.

001633

53. Respondent denies the allegations of para. 53.

54. Respondent denies the allegations of para. 54.

55. Respondent denies the allegations of para. 55.

56. Respondent denies the allegations of para. 56.

57. Respondent admits the allegations of para. 57.

58. Respondent holds a second lien upon the Debtor's real property. It has an economic interest to protect to avoid having its interest extinguished in a foreclosure.

59. Movant has requested conversion of the case to Chapter 7. Conversion is not in the best interest of creditors. A Chapter 7 Trustee will not administer an asset solely for the benefit of secured creditors. Unless Movant is offering to release its lien so that funds could be paid to other creditors, a Chapter 7 trustee would not administer this asset.

60. In *Galleria I*, Judge Lopez provided a road map of steps that could be taken to get to a confirmable plan. While the undersigned counsel did not participate in the first case, it appears that Judge Lopez found that a subsequent case could be successful if certain conditions were met. The Debtor should be given an opportunity to follow Judge Lopez's roadmap. Notwithstanding the Bank's dire depiction of the conditions of this case, circumstances have changed. The frivolous dispute over control of the equity in the Debtor is closer to a resolution. Even if it was not, a plan could be proposed in which Respondent's

001634

second lien wiped out existing equity. Additionally, Debtor's management has agreed to fund operating expenses without the use of cash collateral. This means that the Debtor's revenues are accruing for the benefit of the lienholder. Additionally, rents are likely to improve as concessions granted to raise occupancy burn off.

DATED: January 19, 2024

Respectfully Submitted,

**BARRON & NEWBURGER, P.C.**
7320 N. MoPac Expwy., Suite 400
Austin, Texas 78731
Tel: (512) 476-9103

By:     */s/ Stephen W. Sather*
Stephen W. Sather
State Bar No.

**ATTORNEYS FOR
CREDITOR, 2425 WL,LLC**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing Response was served on the 19th day of January 19, 2024 to the parties on the attached list.

*/s/ Stephen W. Sather*
Stephen W. Sather

Label Matrix for local noticing
0541-4
Case 23-34815
Southern District of Texas
Houston
Fri Jan 19 14:00:30 CST 2024

2425 WL, LLC
2425 West Loop South 11th floor
Houston, TX 77027-4304

CC2 TX, LLC
c/o Howard Marc Spector
Spector & Cox, PLLC
12770 Coit Road Suite 850
Dallas, TX 75251-1364

City of Houston
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

Galleria 2425 Owner, LLC
1001 West Loop South 700
Houston, TX 77027-9084

(p)HARRIS COUNTY ATTORNEY'S OFFICE
P O BOX 2928
HOUSTON TX 77252-2928

Houston Community College System
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

Houston ISD
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

National Bank of Kuwait, S.A.K.P., New York

4
United States Bankruptcy Court
PO Box 61010
Houston, TX 77208-1010

2425 WL, LLC
13498 Pond Springs Rd.
Austin, TX 78729-4422

ADT
PO Box 382109
Pittsburgh, PA 15251-8109

Ali Choudhry
1001 West Loop South 700
Houston, TX 77027-9084

Ash Automated Control Systems, LLC
PO Box 1113
Fulshear, TX 77441-2013

CFI Mechanical, Inc
6109 Brittmoore Rd
Houston, TX 77041-5610

CNA Insurance Co
PO Box 74007619
Chicago, IL 60674-7619

Caz Creek Lending
118 Vintage Park Blvd No. W
Houston, TX 77070-4095

Cirro Electric
PO Box 60004
Dallas, TX 75266

City of Houston
PO Box 1560
Houston, TX 77251-1560

City of Houston
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

Comcast
PO Box 60533
City of Industry, CA 91716-0533

Datawatch Systems
4520 East West Highway 200
Bethesda, MD 20814-3382

Environmental Coalition Inc
PO Box 1568
Stafford, TX 77497-1568

Ferguson Facilities Supplies
PO Box 200184
San Antonio, TX 78220-0184

Firetron
PO Box 1604
Stafford, TX 77497-1604

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062-7917

Gulfstream Legal Group
1300 Texas St
Houston, TX 77002-3509

HNB Construction, LLC
521 Woodhaven
Ingleside, TX 78362-4678

Harris County Tax Assessor
PO Box 4622
Houston, TX 77210-4622

Houston Community College System
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

001636

Houston ISD
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

Kings 111 Emergency Communications
751 Canyon Drive, Suite 100
Coppell, TX 75019-3857

Lexitas
PO Box Box 734298 Dept 2012
Dallas, TX 75373-4298

Logix Fiber Networks
PO Box 734120
Dallas, TX 75373-4120

MacGeorge Law Firm
2921 E 17th St Blgd D Suite 6
Austin, TX 78702-1572

Mueller Water Treatment
1500 Sherwood Forest Dr.
Houston, TX 77043-3899

National Bank of Kuwait
299 Park Ave. 17th Floor
New York, NY 10171-0023

Nationwide Security
2425 W Loop S 300
Houston, TX 77027-4205

Nichamoff Law Firm
2444 Times Blvd 270
Houston, TX 77005-3253

TKE
3100 Interstate North Cir SE  500
Atlanta, GA 30339-2296

US Trustee
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002-2604

Waste Management
PO Box 660345
Dallas, TX 75266-0345

Zindler Cleaning Service Co
2450 Fondren 113
Houston, TX 77063-2314

James Q. Pope
The Pope Law Firm
6161 Savoy Drive
Ste 1125
Houston, TX 77036-3343

Reese W Baker
Baker & Associates
950 Echo Lane
Suite 300
Houston, TX 77024-2824

Rodney Drinnon
McCathern Houston
2000 W Loop S
Ste. 1850
Houston, TX 77027-3744

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Harris County, ATTN: Property Tax Division
Harris County Attorney's Office
P.O. Box 2928
Houston, TX 77252-2928 United States

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)2425 West Loop, LLC

End of Label Matrix
Mailable recipients    45
Bypassed recipients     1
Total                  46

001637