

DEPOSITION EXHIBIT 3

| | |
|---|---|
| From: | azeemeh@naissancecapital.co.uk |
| To: | "Michael Carter" <Michael.Carter@nbkny.com> |
| Date: | 4/30/2019 3:56:40 AM |
| Subject: | Re: operating statement |

Good morning, Michael, they were paying rent, they just didn't pay it on time.

**From:** Michael Carter <Michael.Carter@nbkny.com>
**Date:** Monday, 29 April 2019 at 20:57
**To:** Azeemeh Zaheer <azeemeh@naissancecapital.co.uk>
**Subject:** RE: operating statement

By the way, is there any particular reason they have not been paying rent, other than the fact that they are also the owner.

**From:** Azeemeh Zaheer [mailto:azeemeh@naissancecapital.co.uk]
**Sent:** Monday, April 29, 2019 3:55 PM
**To:** Michael Carter <Michael.Carter@nbkny.com>
**Subject:** Re: operating statement

I just landed in london - will need to get to my PC.

*Ms Azeemeh Zaheer*

*Naissance Capital Real Estate Ltd*
*Michelin House*
*81 Fulham Road, South Kensington*
*London SW3 6RW*

*+447572449800*
*azeemeh@naissancecapital.co.uk*
*www.naissancecapital.co.uk*

On Apr 29, 2019, at 8:49 PM, Michael Carter <Michael.Carter@nbkny.com> wrote:

When was that paid?

**From:** Azeemeh Zaheer [mailto:azeemeh@naissancecapital.co.uk]
**Sent:** Monday, April 29, 2019 3:47 PM
**To:** Michael Carter <Michael.Carter@nbkny.com>
**Subject:** Re: operating statement

Circa $700k.

We will get the outstanding arrears.

*Ms Azeemeh Zaheer*

*Naissance Capital Real Estate Ltd*
*Michelin House*
*81 Fulham Road, South Kensington*
*London SW3 6RW*

*+447572449800*

1    REPORTER'S RECORD

2    VOLUME 2 OF 3 VOLUME(S)

3    TRIAL COURT CAUSE NO(S).  2019-61734

4

5  GROVE ENTERPRISES, LLC.      §  IN THE DISTRICT COURT OF
        Plaintiff(s)          §
6                              §
   VS.                        §
7                              §
   DALIO HOLDINGS I, LLC,      §  HARRIS COUNTY, TEXAS,
8  BRADLEY STEVEN PARKER AND   §
   XENIA BIGGS, AS TRUSTEE,    §
9        Defendant(s)         §
                              §
10  VS.                        §
                              §
11  HAROLD GIBSON POLK, JR.,    §
        Third-Party Defendant   §  189TH JUDICIAL DISTRICT

12

13

14          **MOTION FOR TEMPORARY INJUNCTION**
        _____

15

16

17          BE IT REMEMBERED that on the **30th** day of

18  **Septmeber, 2019**, the following proceedings came on to be

19  heard in the above-entitled and numbered cause before

20  the Honorable Scot "dolli" Dollinger, Judge presiding

21  for 189th Civil District Court, Houston, Harris County,

22  Texas:

23          Proceedings reported by computerized shorthand

24  machine.

25

1              <u>A P P E A R A N C E S:</u>

2    **ATTORNEY FOR THE PLAINTIFF AND THIRD PARTY DEFENDANT:**

3    *The Junell Law Firm, PC*

4    <u>Mr. Mark Junell</u>
     State Bar No. 24032610
5    1903 Briarmead Drive
     Houston, Texas 77057
6    Phone: (713)397-5530
     mark@junellfirm.com
7
     -AND-
8
     *Pendergraft & Simon*
9
     <u>Mr. Paul Simon</u>
10   State Bar No. 24003276
     2777 Allen Pkwy, Suite 800
11   Houston, Texas  77019
     Phone:  (713)528-8555
12   psimon@pendergraftsimon.com

13

14   **ATTORNEY FOR THE DEFENDANT:**

15   *Pennell Law Firm, PLLC*

16   <u>Mr. Kevin Pennell</u>
     State Bar No. 24046607
17   19 Briar Hollow Lane, Suite 110
     Houston, Texas 77027
18   Phone: (713)965-7568
     kevin@pennellfirm.com
19

20

21

22

23

24

25

I N D E X:

September 30, 2019                           Volume 1

PLAINTIFF'S WITNESSES:
                        Direct    Cross    Voir Dire

Mr. Harold Polk.............. 6        47        XX
                             85        XX        XX

                                               PAGE

Plaintiff rests.................................. 89

Motion for directed verdict...................... 89


DEFENDANT'S WITNESSES:
                        Direct    Cross    Voir Dire

Ms. Azeemeh Zaheer
(Via video).................. 92       101        XX
                            109        XX        XX


                        EXHIBITS

PLAINTIFF'S EXHIBITS:

No.    Description                  Offered    Admitted

1    Realtors Commercial Contract..    5          6

2    Corporate Resolution of
     Signing Authority.............    5          6

3    Real Estate Appraisal Report..    5          6


DEFENDANT'S EXHIBITS:

No.    Description                  Offered    Admitted

1    Realtors Commercial Contract..    5          6

2    Tenancy Schedule I............    5          6

3    Real Estate Appraisal Report..    5          6

DEFENDANT'S EXHIBITS:

| No. | Description | Offered | Admitted |
|-----|-------------|---------|----------|
| 4 | Jetall e-mail dated 1-10-19... | 62 | 62 |
| 5 | Warranty Deed................. | 5 | 6 |
| 6 | Deed of Trust and Security Agreement..................... | 5 | 6 |
| 7 | Deed of Trust and Security Agreement..................... | 5 | 6 |
| 8 | Promissory note............... | 5 | 6 |
| 10 | Dalio letter dated 7-17-19.... | 5 | 6 |
| 11 | Broadmark letter dated 8-9-19. | 5 | 6 |
| 12 | Munsch/Hardt letter dated 8-12-19...................... | 5 | 6 |
| 13A | Notice of Trustee's Sale...... | 5 | 6 |
| 13B | Roman Law Firm letter dated 9-10-19...................... | 5 | 6 |
| 13C | Envelope...................... | 5 | 6 |
| 14 | Notice of Foreclosure Sale.... | 5 | 6 |
| 17 | Equity Pledge and Assignment Agreement..................... | 5 | 6 |
| 18 | Deed of Trust and Security Agreement..................... | 5 | 6 |
| 19 | Deed of Trust and Security Agreement..................... | 5 | 6 |
| 20 | e-mail from Polk to Brett dated 2-6-19................. | 5 | 6 |
| 21 | Substitute Trustee's Deed..... | 5 | 6 |
| 22 | Foreclosure Sale Deed......... | 5 | 6 |
| 23 | Promissory Note............... | 5 | 6 |

1                   P R O C E E D I N G S:

2    September 30, 2019                        Volume 2

3                   THE COURT:  On the record.  Let's see.

4    Cause No. 2019-61734, Grove Enterprises against Dalio

5    Holdings I, LLC, and others.  This is a hearing on the

6    issuance of a temporary injunction.

7                   Raise your right hand.

8                   (Witness is duly sworn)

9                   THE COURT:  All right.  You may be

10   seated.  If counsel will make their announcements,

11   please, and then you may inquire.

12                   MR. JUNELL:  Thank you.  For the

13   Plaintiff, Mark Junell.

14                   MR. PENNELL:  Kevin Pennell for Dalio.

15   And, Judge, we have -- counsel have agreed to pre-admit

16   some of the exhibits.

17                   THE COURT:  All right.  Go ahead.  You

18   can make your statement.

19                   MR. PENNELL:  Plaintiff's Exhibits 1, 2,

20   3, 12 and 13 are admitted.  And Defendant Dalio's

21   Exhibits 1, 2, 3, 5, 6, 7, 8, 10, 11, 12, 13, 14, 17,

22   18, 19, 21, 22, and 23.  Exhibit 23 is not an our

23   exhibit list.  Those are all admitted.  Exhibit 23 is at

24   the back of the binder.  It's the promissory note

25   between Grove Enterprises and BRELF II, LLC.

1          **THE COURT:**  Those are all admitted into

2     evidence as stated.  It will be helpful -- if you do

3     have an exhibit list checking all those off to give to

4     the court reporter after the hearing, that will be very

5     helpful.

6          **MR. PENNELL:**  Got it.  Thank you, Judge.

7          **MR. JUNELL:**  May I proceed, Judge?

8          **THE COURT:**  Yes, you may.

9          <u>**MR. HAROLD POLK,**</u>

10    having been first duly sworn, testifies as follows:

11          <u>DIRECT EXAMINATION</u>

12    <u>BY MR. JUNELL:</u>

13        Q.    Would you please introduce yourself.

14        A.    Harold Polk.

15        Q.    Harold, what do you do for a living?

16        A.    Real estate.

17        Q.    Pull that microphone a little bit closer to

18    you.  And when I'm talking to you, if you can, speak up.

19    Mostly my hearing is bad, but the court reporter needs

20    to get everything.

21              What kind of real estate do you do?

22        A.    Real estate of like industrial and homes

23    and --

24        Q.    Okay.  And I'm going to skip all of the other

25    preliminary background information.  Let's just talk

1   about the property located at 411. We'll call that the

2   411 property, okay?

3       A.   Yes.

4       Q.   How did you first come to hear about this

5   property being for sale?

6       A.   It was around November I had court on a

7   receivership on a building of 812 Main Street, downtown

8   Houston, and in that we were going for the approval to

9   be signed off by the judge, and I wind up -- the judge

10   wind up allowing J.W. Marriott to bid on the property in

11   court, and I wound up losing that bid in the process.

12             And after that, the lender was very upset

13   because they put all of the time into the deal and got

14   that approved and spent a lot of money on getting that

15   approved and we didn't have a deal.

16             So I wind up reaching out to Ali with

17   Jetall, and he told me he knew of someone that had a

18   property, and I told him that I needed a property with

19   equity. And, you know, it was kind of a situation to

20   where I needed, you know, liquidity and get the deal

21   closed with the lender. And he told me about the 411

22   building.

23       Q.   And if you would, please, speak up a little

24   bit louder because I'm still having trouble hearing you.

25   So when you said say "Ali," who is Ali?

1      A.    Ali Choudhri.

2      Q.    Okay.  And did Mr. Choudhri tell you about the

3   building located at 411 North Sam Houston Parkway?

4      A.    Yes, sir.

5      Q.    Okay.  And was that a building that you

6   understood he had some sort of ownership interest in?

7      A.    No, sir.

8              MR. PENNELL:  Objection, hearsay.

9              THE COURT:  Overruled.

10             MR. JUNELL:  I asked what he understood.

11             THE COURT:  Yep, you can answer.

12             THE WITNESS:  No, sir.

13     Q.    (By Mr. Junell) And this was in November of

14   2018.

15     A.    Yes, sir.

16     Q.    Okay.  And then so did talks progress between

17   you and Mr. Choudhri or anyone else about purchasing the

18   building located at 411?

19     A.    Yes.

20     Q.    Okay.  And who were you talking to?

21     A.    Brad Parker, and then I was introduced to

22   Zeke Agha, who's the owner, to my understanding, of

23   Dalio at the time.

24     Q.    Okay.  Were you still talking with

25   Mr. Choudhri?

1        A.   Yes.

2        Q.   Okay.  So would it be fair to say that the

3   three people that you had most of the discussions with

4   before your purchase of the building was this person

5   Zeke Agha, Ali Choudhri and Brad Parker?

6        A.   Yes.

7        Q.   Okay.  Who is Brad Parker?  Who do you

8   understand him to be?

9        A.   Brad parker is a -- he worked for Jetall.

10       Q.   And what is Jetall; do you know?

11       A.   Jetall was a real estate firm that owned

12   office space.

13       Q.   Okay.

14       A.   Around --

15       Q.   And did -- Mr. Choudhri, was he one of the

16   owners of Jetall?

17       A.   Yes.

18       Q.   Was Mr. Parker an employee of Mr. Choudhri?

19       A.   Yes.

20       Q.   And about how long did these discussions take

21   place about the 411 building?

22       A.   Took place about -- over a course of two weeks

23   because I had -- it was right before Thanksgiving.

24       Q.   Did you go visit the property?

25       A.   Yes.

1     Q.    More than once?

2     A.    Yes.

3     Q.    All right.  And did you go visit the property

4  because you wanted to do an inspection of it?

5     A.    I did.  And I -- I walked the property with

6  Zeke and he had kind of walked me and showed me some

7  things about the property and told me that they put a

8  new roof, that they had done some things with the fire

9  system, and the only thing that the building needed at

10  that time was A/C, air conditioning unit.

11     Q.    Okay.  So Zeke tells you, when you're walking

12  the property, that the building is going to need a new

13  A/C system?

14     A.    Correct.

15     Q.    And did they tell you, at all, anything at

16  that point in time about how many tenants the building

17  had and what the monthly rentals were?

18     A.    Yes.  Later he told me that it was like

19  30 percent occupied and that some of the tenants, you

20  know, just wanted to get the new A/C.  And he also

21  submitted to me like an e-mail stating that he was in

22  talks with other tenants to occupy the property.

23     Q.    Okay.  And did he tell you how much the

24  property was earning or how much the property could earn

25  on a monthly basis with these tenants that were in the

1  building?

2     A.   Yes.  Brad Parker had sent the rent roll.

3     Q.   Okay.  But this was before this.

4     A.   Oh.

5     Q.   I'm talking about during the discussions.

6     A.   He did tell me that it was a good building and

7  that it was bringing in income.  It just needed the new

8  A/Cs.

9     Q.   Okay.  Did you ever have any conversations

10  with a person by the name of Azeemeh Zaheer?

11     A.   Never heard of her until after I looked up

12  Dalio and seen that she was the owner of Dalio, but I

13  never had any dealings with her or even knew who she

14  was.

15     Q.   So you never met -- to this day you've never

16  met Azeemeh Zaheer?

17     A.   No.

18     Q.   And did you sign any agreements or engage in

19  any contracts with Ms. Zaheer prior to your purchase of

20  this building?

21     A.   No.

22     Q.   Okay.  Let's look at Exhibit No. 2.  I'm just

23  going to put this on the ELMO here.

24          **MR. PENNELL:**  That's Grove Exhibit 2,

25  Plaintiff's Exhibit 2?

1           **MR. JUNELL:**  Yes.  There we go.  Judge,

2  can you see that?

3           **THE COURT:**  Yeah.  Do you want it up

4  there?  I can put it up there.

5           **MR. JUNELL:**  No, as long as he can see

6  it.

7           **THE COURT:**  And the witness can too.

8  It's in the box.

9           **MR. JUNELL:**  Okay.  Perfect.

10      Q.    (By Mr. Junell) The signature at the bottom of

11  this page, Azeemeh Zaheer, do you now understand her to

12  be the president of Dalio Holdings I?

13      A.    Yes.

14      Q.    And this signature right above it, where it

15  says "Mirza Z. Agha," is that the same person that you

16  were talking about, Zeke?

17      A.    Yes.

18      Q.    Back when you were having these initial

19  conversations, did you think that Zeke was the owner of

20  Dalio?

21      A.    Yes.

22      Q.    And did Mr. -- or did Zeke, at any time, lead

23  you to believe that he had the authority to represent

24  Dalio or to act on its behalf?

25      A.    Yes.

1      Q.    And ultimately the purchase contract that you

2    signed when you bought the building was signed by Zeke;

3    was it not?

4      A.    Correct.

5      Q.    Let's look at that.  This is Exhibit No. 1.

6    I'm going to turn to page 13 of Exhibit No. 1.  And this

7    is the signature block on the purchase contract.  Do you

8    recognize this?

9      A.    Yes.

10      Q.    Over here on the right, is that your

11    signature?

12      A.    Yes.

13      Q.    And on the left, who's signature is that?

14      A.    Zeke's, Mirza Agha.

15           **MR. JUNELL:**  And for the court reporter,

16    the spelling is M-I-R-Z-A, middle initial is Z, and the

17    last name is A-G-H-A.

18      Q.    (By Mr. Junell) So Zeke signed the purchase

19    agreement on behalf of Dalio when you bought this

20    building?

21      A.    Yes.

22      Q.    Let's go to the first page.  The seller of the

23    building is Dalio Holdings I, LLC?

24      A.    Yes.

25      Q.    And Grove Enterprises, LLC, is the buyer.  Is

 1   that you?

 2       A.   Yes.

 3       Q.   So Grove Enterprises is buying this building

 4   from Dalio.  Did you know how long Dalio had owned the

 5   building prior to your purchase of it?

 6               **MR. PENNELL:**  Objection, relevance.

 7               **THE COURT:**  Overruled.  You can answer.

 8               **THE WITNESS:**  No.

 9       Q.   (By Mr. Junell) Did you know anything else

10   about who owned the property prior to Dalio owning it?

11       A.   No.

12               **MR. PENNELL:**  Objection, relevance.

13               **THE COURT:**  Overruled.

14       Q.   (By Mr. Junell) The purchase price is listed

15   on the contract at the bottom of page 1, and it's

16   seven-and-a-half million dollars.  Is that the purchase

17   price that was agreed to between Grove Enterprises and

18   Dalio for the purchase of the property, 411 North Sam

19   Houston Parkway?

20       A.   Yes.

21       Q.   Once you decided you were going to buy the

22   building, what kind of due diligence did you do to

23   determine whether or not you were going to agree to pay

24   seven-and-a-half million dollars for this building?

25       A.   The lender had ordered an appraisal.

1      Q.    Okay.  What else?

2      A.    The rental income seemed substantial for the

3  building, and I also looked at the building and, you

4  know, I seen that it did need A/Cs, so I knew I would

5  have to replace the A/C units that was on the roof.  And

6  it was a really nice building from the way it showed on

7  the exterior.

8      Q.    Okay.  And did you go -- you visited the

9  building?

10     A.    Yes.  And also the -- Ali had sent the e-mail

11  stating that Lincoln Properties was investing 120

12  million over the next ten years into the area.  So, you

13  know, with someone spending that type of moneys on it, I

14  thought that it would be a sound investment along with

15  income and the property and where it was positioned.

16     Q.    Did Dalio provide you -- prior to the sale of

17  this building, did they provide you financial statements

18  or income statements on this building?

19     A.    Yes.

20     Q.    Did they provide you rent rolls that showed

21  the tenants that were in the building?

22     A.    Yes.

23     Q.    Do you know whether or not Dalio provided

24  those same documents to the appraiser who was doing an

25  appraisal on the building?

1      A.    That's who provided the appraisal of the

2  documents was Brad Parker.

3      Q.    Okay.  So let's look at Plaintiff's Exhibit

4  No. 3.  Do you recognize this document?

5      A.    Yes.  That's the appraisal.

6      Q.    This is the appraisal that was done prior to

7  the purchase?

8      A.    Yes.

9      Q.    Okay.  And on the second page of this, what's

10  the date of the report?

11      A.    December the 26th.  Actually December

12  the 31st.  The date of value was December the 26th.

13      Q.    Okay.  How -- how close was this in time to

14  the actual closing of the building?

15      A.    It was a month before.

16      Q.    Okay.  You ended up closing on the building in

17  January of 2019, right?

18      A.    Yes.

19      Q.    Is this a picture of the building right here?

20  Just for context, is that the building?

21      A.    Yes.

22      Q.    Okay.  On page VII, the title of this is

23  called "Salient Facts and Conclusions."

24             Do you see that?

25      A.    Yes.

1      Q.    Towards the bottom of that page there's a

2  section that's called "Occupancy."

3                Do you see that?

4      A.    Yes.

5      Q.    Okay.  What did that tell you when you saw

6  that number?

7      A.    That it was 38 percent occupied.

8      Q.    So is -- the appraiser is -- believes that the

9  property is 38 percent occupied at the time he generated

10 this report?

11     A.    Yes.

12     Q.    Okay.  And is this number the same number that

13 Zeke and Brad Parker and Mr. Choudhri were telling you

14 the occupancy was prior to the sale?

15     A.    Yes.

16     Q.    At any time in this November, December time

17 period were you ever informed that the occupancy was

18 something less than 38 percent?

19     A.    No.

20     Q.    Did you believe that the building had value at

21 an occupancy of 38 percent?

22     A.    Yes.

23     Q.    I mean, that you could make the business work?

24     A.    Yes, because the rental income it would be

25 able to support the financial obligation.

1    Q.   Okay.  So on page 18 it says, "Property

2  History."

3             Did you see this section?

4    A.   Yes.

5    Q.   And there's a sentence in here that says, "Due

6  to reasons of confidentiality we were unable to confirm

7  with the owner the nature of the transaction or details

8  to the sale, such as the sales price."  This is -- this

9  is prior to Dalio, when Dalio acquired the property.

10  The appraiser is saying they don't even know how much

11  they got it for.

12    A.   Correct.

13    Q.   Did you ever hear a number of how much Dalio

14  acquired the property for, either at foreclosure or

15  purchase?

16             **MR. PENNELL:**  Objection, relevance.

17             **THE COURT:**  Overruled.

18             **THE WITNESS:**  No.

19    Q.   (By Mr. Junell) Did anybody tell you anything

20  about the history of how Dalio came to acquire that

21  property six months earlier?

22             **MR. PENNELL:**  Objection, hearsay.

23             **THE COURT:**  Overruled.

24             **MR. JUNELL:**  I'm sorry.  Answer Harold.

25             **THE WITNESS:**  No.

1      Q.    (By Mr. Junell) On page 68 there's a couple

2    photographs of a tenant and one of the spaces.  Do you

3    see that?

4      A.    Yes.

5      Q.    Okay.  And if you zoom in on the sign here,

6    one of the tenants -- this one is -- is it Tucker

7    Energy?

8      A.    Correct.

9      Q.    Okay.  And Tucker Energy ended up leaving

10   right around the same time that you bought this

11   building?

12     A.    Correct.

13     Q.    Okay.  Did you ever have any dealings with

14   Tucker Energy prior to the purchase of the building?

15              Did you ever talk to them at all?

16     A.    No.

17     Q.    Do you know why Tucker Energy left the

18   building?

19     A.    No.

20     Q.    On page 164 is we see the -- the page that

21   says "411 North Sam Houston Capex."  Do you see that?

22     A.    Yes.

23     Q.    Tell the Judge what that -- what that is for?

24     A.    This is a report that states what type of work

25   needed to be done and the capital expenditures that

1    would need to take place in order to bring the building

2    up to market.

3         Q.   Okay.  So this was a statement of what kind of

4    capital expenses -- expenditures need to be made in

5    order to repair the building after you purchased it?

6         A.   Correct.

7         Q.   So you knew ahead of time that you were going

8    to have to put a new A/C system in or an HVAC system

9    when you purchased the building?

10        A.   Correct.

11        Q.   And have you done that?

12        A.   Yes.

13        Q.   How much money did you spend on putting in a

14   new HVAC system?

15        A.   We spent over almost half a million dollars on

16   that property.

17                    **THE COURT:**  Is that just for the HVAC?

18                    **THE WITNESS:**  HVAC was like 300.

19                    **THE COURT:**  Okay.

20        Q.   (By Mr. Junell) Okay.  And I'll talk to you at

21   the end a little bit about the other expenses.  We'll

22   come back around to that.

23                    On page 166 of this appraisal is a

24   document that says "Tenancy Schedule."  Do you see that?

25        A.   Yes.

1      Q.    Is this the rent roll?

2      A.    Correct.

3      Q.    Okay.  So -- I'm sorry.  Was this rent roll --

4   this was provided by Dalio or Mr. Parker or

5   Mr. Choudhri?

6      A.    It was provided by Brad Parker.

7      Q.    Okay.  And he gave this not just to you, but

8   he also gave it to the appraiser who was doing the

9   evaluation?

10     A.    Correct, and the lender.

11     Q.    And what?

12     A.    The lender.

13     Q.    And the lender.  And the lender is who?

14     A.    Broadmark.

15     Q.    Okay.  I'm going to zoom in real close because

16  this one is a little hard to read.  The second one on

17  here is -- do you see that?

18     A.    McClenney Moseley & Associates.

19     Q.    McClenney Moseley Associates?

20     A.    Correct.

21     Q.    They're listed as a tenant on the rent roll?

22     A.    Yes.

23     Q.    Are they a tenant of this building today?

24     A.    No.

25     Q.    They've moved out?

1        A.    Correct.

2        Q.    And they sued you.  So they sued the building,

3   didn't they?

4        A.    They sued North Belt, Dalio, myself, Land

5   Park, which was a management company I had hired after I

6   acquired the building.

7        Q.    And that lawsuit is still active?

8        A.    To my understanding it's still active on other

9   parties, but they settled with myself and removed Land

10  Park from that lawsuit as well.  But they're still suing

11  North Belt and Dalio.

12       Q.    Did you -- were you ever told prior to buying

13  this building that McClenney Moseley, the law firm, was

14  having problems with its leases and was going to either

15  vacate the premises or file a lawsuit against the

16  building?

17       A.    No.

18       Q.    Okay.  Did you ever hear about that at all?

19       A.    No.

20       Q.    When did you first learn there was any type of

21  problem with McClenney Moseley?

22       A.    Once they filed the lawsuit.

23       Q.    And you received it?

24       A.    Correct.

25       Q.    Okay.  Let's go to the next one.

1          A.    Zander Homes.

2          Q.    Zander Homes.  They're listed as a tenant on

3     this rent roll?

4          A.    Yes.

5          Q.    Is Zander Homes still a tenant?

6          A.    No.

7          Q.    And Zander Homes moved out shortly after you

8     purchased the building?

9          A.    Correct.

10         Q.    Okay.  If we go down two more, do you see

11    that?  I don't know if you can read that or not.  Can

12    you read that?  I have a cleaner copy that we'll look

13    at.

14                This is Koasati Construction Company.

15    Are they listed as a tenant --

16         A.    Yes.

17         Q.    -- in the rent roll?

18         A.    Correct.

19         Q.    And are they a tenant of the building

20    currently?

21         A.    No.

22         Q.    Did they move out before you bought the

23    building?

24         A.    Yes.

25         Q.    Did Brad Parker, Mr. Choudhri, or anyone at

1  Dalio ever tell you that Koasati Construction, prior to
2  this appraisal being done and prior to the closing --
3  scratch that.
4           Prior to this appraisal being done, did
5  they ever tell you that Koasati Construction was having
6  problems with its lease and intended to vacate the
7  building?
8       A.   No.
9       Q.   At some point you were let know in an e-mail
10  that Koasati Construction was leaving and that was right
11  before closing?
12       A.   Correct.
13       Q.   Okay.  Let's look at the next page of the rent
14  roll.  Covenant Global, was that a tenant that was
15  listed on the rent roll?
16       A.   Yes.
17       Q.   And are they a tenant of the building anymore?
18       A.   No.
19       Q.   Were you ever told anything about any kind of
20  dispute that Covenant had or the fact that they were
21  going to leave the building?
22       A.   No.
23       Q.   Did you believe that Covenant was an income
24  producing tenant --
25       A.   Yes.

1          Q.    -- at the time you bought the building?

2          A.    Yes.

3          Q.    Tucker Energy Services, we talked about them.

4    They're listed as a tenant.  Were they a tenant -- are

5    they a tenant of the building now?

6          A.    No.

7          Q.    And then Cunningham Lindsey is listed as a

8    tenant on this rent roll, correct?

9          A.    Correct.

10         Q.    And they're not a tenant anymore?

11         A.    No.

12         Q.    In fact, Cunningham Lindsey ended up walking

13   their lease several years early, correct?

14         A.    Correct.

15         Q.    And they also filed a lawsuit?

16         A.    Correct.

17         Q.    Is that lawsuit pending?

18         A.    No, it's been settled.

19         Q.    Okay.  And did you ever receive any proceeds

20   from the settlement for that lawsuit?

21         A.    No.

22         Q.    Okay.  So they sued Dalio or Office North

23   Belt, the prior owner?

24         A.    Correct.

25         Q.    And that lawsuit settled after you closed this

1  building?

2      A.   Correct.

3      Q.   So you should have been the owner of that

4  lease?

5      A.   Correct.

6      Q.   And they went ahead and settled the lawsuit

7  for a lease that they no longer owned?

8      A.   That's correct.  The leases were to transfer

9  when I acquired the building, and, as I found out later,

10  that they had filed the lawsuit prior to me taking

11  ownership of the building, and the lawsuit was settled

12  in June or July of this year, and it was like 600,000

13  left on their lease.

14      Q.   Cunningham Lindsey left the building six

15  months before you bought it, right?

16      A.   Yes.

17      Q.   And yet their name is still on this rent roll

18  that was provided to the appraiser in December of 2018?

19      A.   Correct.

20      Q.   And they moved out in July of 2018 or

21  somewhere in that time period?

22      A.   That was the year prior.

23      Q.   Okay.  And did anyone at Dalio or

24  Mr. Choudhri, Mr. Parker, ever tell you that Cunningham

25  Lindsey had filed a lawsuit on its lease?

1      A.    No.

2      Q.    Okay.  Did -- when you bought this building,

3  did Mr. Parker give you a copy of the Cunningham lease?

4      A.    Yes.

5      Q.    Did you assume and believe at the time that

6  they were going to be a paying tenant in this building?

7      A.    Correct.

8      Q.    And, ultimately, when that case was settled,

9  you received no proceeds from it?

10     A.    No, sir.

11     Q.    And I'm going to zoom in.  This is page 168 of

12 the appraisal.  And it's a little blurry.  I'm looking

13 at this line right here.  Do you see that?

14     A.    Yes.

15     Q.    Can you see what that says?  It says "Occupied

16 Area."

17     A.    Correct.

18     Q.    I can read it a little better when it's on the

19 paper.  And it gives you a square footage.  And over

20 here there's a number.  Can you read that number?

21     A.    38.0.

22     Q.    01?

23     A.    One.

24     Q.    So this -- this sheet that was given to the

25 appraiser in December was stating that the occupancy of

1    the building was 38.01 percent?

2       A.    Correct.

3                THE COURT:  Is the square footage, what,

4    about 115,000?

5                MR. JUNELL:  Of rentable space?

6                THE COURT:  Yes.

7                MR. JUNELL:  Yes, about 114 or so.

8                THE COURT:  Okay.

9                MR. JUNELL:  And this number, it says

10   43,000 or so is occupied.

11               THE COURT:  Square feet?

12               MR. JUNELL:  Square feet, that's right.

13      Q.    (By Mr. Junell) And it didn't turn -- we're

14   going to skip ahead real quick.  It didn't turn out that

15   38 percent was occupied, was it?

16      A.    No, sir.

17      Q.    What's the actual occupancy more like after

18   all these tenants have left, after you bought this

19   building?

20      A.    Like 19 percent.

21      Q.    So the next page is that we're looking at is

22   page 171, and this is a pro forma that was provided to

23   the appraiser.  Do you see that?

24      A.    Yes.

25      Q.    Did you look at that?

1       A.    Yes.

2       Q.    Okay.  And this says that -- this lists base

3   rental income of $1.9 million in a year?

4       A.    Correct.

5       Q.    And does that work out to be about a $160,000

6   a month in rental income?

7       A.    Yes.

8       Q.    And the building, how much income does the

9   building actually make?

10      A.    Currently?

11      Q.    Yeah, on a monthly basis.

12      A.    About 20,000.

13      Q.    Okay.  So that's different than the 160,000

14  that might be represented in this pro forma?

15      A.    Correct.

16      Q.    Okay.  So did you rely on the representations

17  that were made to you regarding the rent that the office

18  was supposed to generate?

19      A.    Yes.

20      Q.    Okay.  And did you rely on the income

21  statements that were provided to you by Dalio?

22      A.    Yes.

23      Q.    Okay.  Let's look at Plaintiff's Exhibit

24  No. 4.  This is an income statement.  Was this given to

25  you by somebody?

1      A.    Brad Parker.

2      Q.    Brad Parker.  And he gave this to you prior to

3  the sale?

4      A.    Yes.

5      Q.    Okay.  The date up at the top of this says,

6  "November the 28th, 2018."  Do you see that?

7      A.    Yes.

8      Q.    Okay.  And this income statement is for

9  January through December of 2017, right?

10      A.    Correct.

11      Q.    So it shows all the income and financials for

12  the year 2017?

13      A.    Correct.

14      Q.    Okay.  And the total rental income, what does

15  it say?

16      A.    $736,752.60.

17      Q.    Okay.  And does that work to be about $61,000

18  a month worth in rent?

19      A.    Yes.

20      Q.    Now, if we go to the third page of that same

21  statement, they give us the 2018 numbers.  Do you see

22  that?

23      A.    Correct.

24      Q.    And the period on this doesn't go the whole

25  year because it only is up through Q-3.  They haven't

 1    run the Q-4 numbers I guess.  Do you see how it says

 2    January of '18 through September of '18?

 3        A.    Yes.

 4        Q.    And what does it list the rental income at for

 5    2018?

 6        A.    $407,311.28.

 7        Q.    And what does that come out to per month?

 8        A.    About 52,000.

 9        Q.    Okay.  And you said that the property actually

10    earns you only about 20,000 a month?

11        A.    Correct.

12        Q.    Less than half of this number?

13        A.    Yes.

14        Q.    Is that correct?

15        A.    Yes.

16        Q.    This is Exhibit 5.  This is an e-mail that was

17    sent to you by who?

18        A.    Brad Parker.

19        Q.    And remind us, Brad Parker is an employee of

20    Jetall.  He doesn't work for Dalio, does he?

21        A.    No.

22        Q.    Do you know why Mr. Parker was e-mailing you

23    all these financial statements on behalf of Dalio?

24        A.    No.  He just said that he was helping out with

25    the transaction is what he said.

1    Q.    Okay.  And he works for Mr. Choudhri.  He's

2    Mr. Choudhri's employee?

3    A.    Correct.

4    Q.    Okay.  And on January 7th, 2019, he sends an

5    e-mail.  And what does he attach to that e-mail?

6    A.    Here's the updated rent roll.

7    Q.    Okay.  And how -- how -- how early was this

8    before you actually closed on the building?

9          How close in time were we?

10    A.    About three days.  The lender had requested an

11    updated rent roll.

12    Q.    Okay.  So the lender had requested the updated

13    rent roll and Mr. Parker is sending it to you on

14    January 7th of 2019?

15    A.    Correct.

16    Q.    All right.  And he attached a spreadsheet?

17    A.    Yes.

18    Q.    And that spreadsheet was the same tenancy

19    schedule that we just looked at, right?

20    A.    Correct.  That was on the appraisal.

21    Q.    Okay.  It happened to be the same one that was

22    attached to the appraisal from the month earlier?

23    A.    Correct.

24    Q.    And did it still list all these tenants,

25    McClenney Moseley, Zander Homes, Koasati Construction,

1   Covenant Global, Tucker Energy and Cunningham Lindsey?

2        A.   Yes.

3        Q.   And none of those tenants are in the building

4   today, correct?

5        A.   No.

6        Q.   And this rent roll that Mr. Parker sent you on

7   January 7th still showed that the occupancy of the

8   building was 38 percent?

9        A.   Correct.

10       Q.   And it's not -- it was not 38 percent at that

11  time?

12       A.   No.

13       Q.   Did Mr. Parker ever tell you that Cunningham

14  Lindsey was engaged in a lawsuit over the lease on the

15  building and that that might effect your value of the

16  building?

17       A.   No.

18       Q.   Did he ever tell you at all that they were in

19  any kind of dispute?

20       A.   No.

21       Q.   Did Mr. Parker ever tell you that any of the

22  tenants were having problems with a lease or with the

23  property at all or any kind of complaints?

24       A.   No.

25       Q.   Okay.  Did he ever tell you that Cunningham

1   Lindsey had left the property because they claimed

2   constructive eviction?

3        A.   No.

4        Q.   This is Exhibit No. 7.  And up here this is --

5   the date is January 4th, 2019, so it's the same week as

6   the one we just saw.  And tell me what this is.

7        A.   This is the e-mail that was sent with all of

8   the leases.

9        Q.   Okay.  This is a Dropbox link that Brad Parker

10  sent you?

11       A.   Correct.

12       Q.   And when you click this link, what does it do?

13       A.   It gives you a list of all of the current

14  leases for the building.

15       Q.   Okay.  It's a folder that has all of the

16  tenants with their leases in there, right?

17       A.   Yes.

18       Q.   So you can look at the leases and see how long

19  the lease goes for and who the tenant is and determine

20  what the -- what the rentals are going to be?

21       A.   Correct.

22       Q.   Were the leases for all six of those tenants,

23  Covenant Global, Koasati, Tucker, Cunningham Lindsey,

24  McClenney Moseley, all those entities, were all those

25  leases in this file?

1      A.    Yes.

2      Q.    So on January 4th, 2019, did Mr. Parker send

3  you the leases for all these tenants that are now gone?

4      A.    Correct.

5      Q.    Okay.  This is Exhibit No. 9.  This is a

6  letter that was sent or could you tell the court what

7  this is.

8      A.    "Notice to Property Owner/Landlord Requesting

9  Immediate Repairs," September the 20th, 2018.

10     Q.    Okay.  And this is a letter that was sent that

11 says, "We are officially taking a second step in

12 notifying you of ongoing problems in our office

13 building."

14            MR. PENNELL:  Judge, I'm going to object

15 as hearsay to this document.  If he wants to try to

16 admit it and then ask the witness about it, that's fine.

17 But until then it's hearsay.

18            THE COURT:  What exhibit number is it?

19            MR. JUNELL:  It's Exhibit No. 9.

20            MR. PENNELL:  Plaintiff's 9.

21            THE COURT:  Plaintiff's 9.

22            MR. PENNELL:  Yes.

23            MR. JUNELL:  I'm not offering it for the

24 truth of the matter asserted.

25            MR. PENNELL:  He's still got to be able

 1 | to authenticate it.

 2 | THE COURT:  Yeah, I need more foundation.

 3 | MR. JUNELL:  Your Honor, I'm asking him

 4 | if he was ever made aware -- when he was made aware of

 5 | these complaints, not the fact that whether the

 6 | complaints had any merit but just what he knew and what

 7 | he wasn't told about it.

 8 | MR. PENNELL:  Same objection.

 9 | THE COURT:  Overruled.  You can answer

10 | the question.  You're not admitting it into evidence

11 | right now?

12 | MR. JUNELL:  No, that's fine.

13 | THE COURT:  Okay.  You can ask him about

14 | it.

15 | Q.   (By Mr. Junell) Mr. Polk, did you ever -- were

16 | you ever told prior to your purchase of this building

17 | that a bunch of the tenants had gotten together and

18 | banded together to write a letter to the owners of the

19 | property?

20 | A.   No.

21 | Q.   Were you aware or were you ever told by anyone

22 | that the tenants that were in the building had serious

23 | complaints about the condition of the building and the

24 | management of the building prior to your purchase?

25 | A.   No.

1    Q.   If the tenants wrote a letter in September of

2  2018, how many months before your closing was that?

3  Four months?

4    A.   Four months.

5    Q.   So four months before you bought the building,

6  how many tenants are on this letter?  Can you tell?

7    A.   One, two, three, four, five, six, seven.

8    Q.   Okay.  So seven tenants are signing a letter

9  to Dalio, the owner, saying that the building condition

10  is unacceptable, and Dalio never told you about this.

11    A.   No.

12    Q.   Okay.  This top tenant, Zander Homes, is a

13  tenant that's moved out, correct?

14    A.   Correct.

15    Q.   Covenant Global Logistics, the second tenant,

16  is also a tenant that's now moved out?

17    A.   Correct.

18    Q.   McClenney Moseley is a tenant that's moved out

19  and sued?

20    A.   Correct.

21    Q.   Okay.  And then do you know who this one is?

22    A.   Suite 280.  They're still there.  It's a

23  doctor.

24    Q.   Tucker Energy, the second to the last one down

25  there, is also a tenant that's moved out?

1      A.    Correct.

2      Q.    Okay.  And you were never made aware of the

3  condition of this -- of the property with regard to the

4  tenants' complaints about it prior to your purchase?

5      A.    No.

6      Q.    When did you first find out about this letter?

7      A.    When Cunningham Lindsey was suing me because

8  they had left, they vacated the property.

9      Q.    Okay.

10      A.    One of the tenants, I think it was -- it was

11  an attorney firm, McClenney Moseley & Associates.

12      Q.    This is Exhibit 10.  Do you recognize this?

13      A.    Yes.

14      Q.    Tell the court what this is.

15      A.    This is a letter that came from Zander Homes

16  stating that they were vacating the property.

17      Q.    Okay.  This letter was actually sent to you,

18  right?

19      A.    Correct.

20      Q.    And it was copied to Dalio and Land Park and

21  it was sent February 7th.  That's after you bought the

22  building.

23      A.    Correct.

24      Q.    And do you see this second sentence, it says,

25  "While we have already formally met with and notified

1  the previous owner of Dalio Holdings, LLC, on or about
2  January 10th in our office suite in 210, this letter is
3  as a secondary due diligence for you as a new property
4  owner of our intentions."

5          **MR. PENNELL:**  Objection, hearsay.

6          **THE COURT:**  Overruled.

7      Q.   (By Mr. Junell) Were you ever made aware that
8  Zander Homes had already met with Dalio prior to your
9  purchase of the building to complain about the condition
10 and the management of the building?

11     A.   No.

12         **MR. PENNELL:**  Objection, hearsay.

13         **THE COURT:**  Overruled.

14         **THE WITNESS:**  No.

15     Q.   (By Mr. Junell) And when did you first find
16 out about this letter from Zander Homes about their
17 intention to vacate the property?

18     A.   February.  When they were moving out, they
19 submitted another letter stating why they were moving
20 out because of the previous letter that was sent out on
21 September 20th of 2018.

22     Q.   Okay.  And it says, "The ongoing breaches of
23 contracts by the building's property owners and property
24 management company has potentially cost us over
25 $1.25 million lost revenue during this period."

1           Did they ever tell you that prior to your

2    purchase?

3        A.    No.

4        Q.    And the next sentence says that they notified

5    the previous owners and Jetall Properties and then Dalio

6    of the ongoing issues, and then they all sent that group

7    tenant letter, but you were never made aware of any of

8    that?

9        A.    No.

10              **MR. PENNELL:**  Objection, hearsay.

11              **THE COURT:**  Overruled.

12       Q.    (By Mr. Junell) Were you ever made aware that

13   Zander Homes had any type of problem with its lease or

14   the condition of the property with regard to how it was

15   managed prior to your purchase?

16       A.    No.

17       Q.    And Zander Homes is no longer a tenant?

18       A.    No, they're not there anymore.

19       Q.    But they were a tenant that was listed on the

20   rent roll that was provided by Mr. Parker on January

21   7th?

22       A.    Yes.

23       Q.    And after you -- Mr. Parker sent you an e-mail

24   that at some point discussed the fact that Cunningham

25   Lindsey had vacated the premises and was delinquent.  Do

1  you remember that or you've seen it now?

2      A.   I've seen it, but vaguely.

3      Q.   How close to the closing was that e-mail?

4      A.   Like two days before, like really close.  It

5  was -- actually that e-mail was sent on a tread that we

6  were talking about closing docs and when the docs were

7  going to be to the title company to close.

8      Q.   Okay.  Did you ever -- are you aware of

9  whether or not Mr. Parker ever notified the lender,

10  Broadmark or BRELF, of the fact that a bunch of these

11  tenants had already left the property?

12      A.   No.

13      Q.   Do you know whether or not Mr. Parker ever let

14  the lender know that -- that at least one tenant had

15  already filed a lawsuit on the property?

16      A.   No.

17      Q.   Do you know whether or not Mr. Parker ever

18  notified the appraiser, the guy who did the evaluation

19  of this building, whether or not these tenants had

20  actually vacated the premises?

21      A.   No.

22      Q.   Do you know whether or not Mr. Parker ever

23  provided an updated rent roll to you, to the lender, or

24  to the appraiser regarding the fact that the tenants had

25  left the property?

1      A.    No.

2      Q.    Okay.  To date, have you ever received an

3  updated rent roll from Mr. Parker that showed tenants

4  that were out of the property?

5      A.    No.

6      Q.    Was one of the obligations that you were

7  supposed to be given the security deposits of the

8  tenants?

9      A.    Yes.

10     Q.    Okay.  So each tenant who signs a lease with

11  an office building, a commercial building like this, has

12  to put down a security deposit?

13     A.    Correct.

14     Q.    And when you purchased the building, it was

15  Dalio's obligation to turn those security deposits over

16  to you?

17     A.    Correct.

18     Q.    Did they do that?

19     A.    No.

20     Q.    Did you receive any money at all for any

21  security deposits?

22     A.    No.

23     Q.    And have you received any settlement funds at

24  all from any of the delinquent rent amounts for any of

25  these tenants that vacated earlier?

1      A.   No.

2      Q.   So if Tucker Energy or Koasati or Cunningham

3  Lindsey, if they paid Dalio any money for vacating the

4  property early, you never saw a dime of that?

5      A.   No.

6      Q.   Let's -- we're going to wrap it up here.  And

7  tell the Judge what type of improvements you've made to

8  the property since you've taken ownership.

9      A.   Since I've taken ownership I've had the air

10  conditioners, the air handlers on the roof, all three of

11  them have been replaced; the coils have been replaced;

12  the A/C units, the blower fans, have been PMed.  The

13  fire suppressant system and sprinkler system, there was

14  pipes that were bust and corroded.  I've had those

15  replaced.  The electrical control system for the fire

16  sprinkler system has been replaced.  All of the security

17  precautions, as far as the fire extinguishers that were

18  out of date, have been updated.  I've put a new roof on

19  the control room, what housed the electrical

20  transformers, that was leaking, that I was told that the

21  roof, you know, had just been repaired and also the roof

22  on the building had been repaired, and that's incorrect.

23  I was waiting for my A/C units to be, you know,

24  replaced, and I had to put a new roof on the building.

25  And we've done a lot of exterior work.  We've, you know,

1  upgraded a lot of the building's, you know, security

2  precautions as well.  Cameras are in place as well.

3       Q.   Okay.  And why did you do all that?

4            What's the purpose behind doing all that?

5       A.   Because I felt as if I can, you know, turn the

6  building around and show the tenants that are still

7  there that I'm not like the previous management company

8  that was there, that I do, you know, believe in progress

9  and I wanted them to see my work and let my work speak

10  for me as to, you know, just owning a property and not

11  doing anything.

12       Q.   So are you actively -- as Grove Enterprises,

13  are you actively taking steps to improve the property

14  today?

15       A.   Correct.

16       Q.   And knowing what you know now versus what you

17  knew back in January, would you have purchased this

18  building if you'd known all the true facts?

19       A.   Of course not.

20       Q.   Do you believe that the building is worth or

21  valued much less than it was actually sold to you for?

22       A.   Yes.

23       Q.   Okay.  And I know that you're not a real

24  estate appraiser, but what in your estimation would be

25  the decrease in value based on the fact that all these

1    tenants have left?

2              **MR. PENNELL:**  Objection, foundation,

3    Judge.

4              **THE COURT:**  Overruled.  You can answer.

5              **THE WITNESS:**  More than half, at least 3

6    to $4 million because a good aspect of it, the building

7    value, came in on the rent rolls and the financial

8    wherewith all of the building to support the debt.

9         Q.    (By Mr. Junell) Okay.  And the debt service on

10   this building is about how much per month?

11        A.    $46,000 a month.

12        Q.    And how much money do you generate in rental

13   income?

14        A.    $20,000.

15        Q.    So you've been coming out of pocket or pulling

16   money from other properties in order to try and rehab

17   this building and keep the building afloat while you try

18   to get new tenants?

19        A.    Correct.

20        Q.    If the property is foreclosed tomorrow or in

21   the future by Dalio, how will that harm you?

22        A.    I lose the asset and also I'm on the line for

23   as a personal guarantee with the first lienholder.  And,

24   you know, all of the work that I've put into it, the

25   relationships that were made and bridged from tenants

1    that are still there on premises, you know, would be

2    ruined.

3         Q.    And I know that when we were here last time,

4    you were delinquent with the first lienholder, BRELF.

5    Have you made a payment to them to bring that note back

6    into good standing?

7         A.    Yes.  I made a 193,000 -- I believe it's

8    193,500 something, 38, or somewhere in there.

9         Q.    When was that payment made?

10        A.    That was made Thursday morning.

11        Q.    Okay.  So Thursday last week?

12        A.    Correct.

13        Q.    And as we sit here today, is your loan in good

14   standing with that lender?

15        A.    It is in good standing providing the fact that

16   everything is still in place as far as me, you know,

17   having ownership of it.  They've threatened to call the

18   note if anything else happens.

19        Q.    Okay.  And as I understand it, the foreclosure

20   proceeding that BRELF had initiated against you has been

21   stopped because of your payment?

22        A.    Partially.  They are still if -- it's been,

23   you know, suspended, but they are still willing to file

24   foreclosure on the property if I have no ownership of

25   the property.

 1      Q.    Is it your understanding that if Dalio is
 2 allowed to go forward with the foreclosure then BRELF
 3 will reactivate or reinstitute its foreclosure of the
 4 property at the same time?
 5                  **MR. PENNELL:**  Objection, hearsay.
 6                  **THE COURT:**  Overruled.  You can answer
 7 what you believe they're going to do.
 8                  **THE WITNESS:**  Yes.
 9                  **MR. JUNELL:**  Pass the witness.
10                  **THE COURT:**  Cross?
11                  <u>CROSS-EXAMINATION</u>
12 <u>BY MR. PENNELL:</u>
13      Q.    Mr. Polk, if I understood your testimony --
14 let me back up.  You're an experienced commercial real
15 estate investor, correct?
16      A.    I wouldn't say -- to somewhat, yes.
17      Q.    How many other commercial properties have you
18 bought or sold?
19      A.    About three.
20      Q.    Three other properties?
21      A.    Correct.
22      Q.    What are those other properties?
23      A.    I have property in New Jersey.  I have
24 property downtown Houston, and commercial property in
25 the Grove area, Groves, Texas.

1      Q.   The property downtown Houston, what is that

2  address?

3      A.   It's 917 Main Street.

4      Q.   And then what was the other one in Texas?

5      A.   It's just land.  It's commercial land.

6      Q.   Okay.  And those are the only three properties

7  you've bought or sold in your --

8      A.   You're forgetting that property in New Jersey.

9  That's the third.

10      Q.   Okay.  So other than 917 main, the commercial

11  lot, it's undeveloped?

12      A.   It's partially developed.

13      Q.   Where is that?

14      A.   In Groves, Texas.

15      Q.   Grove?

16      A.   Yes.

17      Q.   Like Grove Enterprises?

18      A.   Correct.

19      Q.   Okay.  And then the property in New Jersey.

20  You have never done any other commercial real estate

21  deals; is that correct?

22      A.   Correct.

23      Q.   Okay.  But you have bought and sold commercial

24  real estate before, correct?

25      A.   Correct.

1    Q.    And you know what an estoppel is, correct?

2    A.    I didn't know what an estoppel was until this

3  transaction.

4    Q.    Do you know what an estoppel is now?

5    A.    Yes.

6    Q.    An estoppel is what the tenant signs so that a

7  buyer has some confidence that the tenant is happy,

8  correct?

9    A.    Correct.

10    Q.    And if I understood your testimony, you signed

11  the contract, which is Grove -- I'm sorry Dalio

12  Exhibit 1, which is -- if you look at that binder in

13  front of you, it's Exhibit 1.

14    A.    How is it labeled?

15    Q.    It says --

16    A.    Oh, yeah.

17    Q.    So you signed that in November, correct?

18    A.    Correct.

19    Q.    And you testified that Zeke Agha was somebody

20  that you dealt with in terms of getting access to the

21  property, correct?

22    A.    He was stating that he was the owner, correct.

23    Q.    Okay.  And you understood he was acting on

24  behalf of the owner, correct?

25    A.    No.

```
 1          Q.   You did not understand that?
 2          A.   No.  He presented himself as the owner.
 3          Q.   Okay.  And you dealt with him as though he
 4   represented the owner, correct?
 5          A.   As the owner.
 6          Q.   Okay.  So -- but you dealt with him, correct?
 7          A.   Correct.
 8          Q.   And you met with him at the property, correct?
 9          A.   Correct.
10          Q.   And you had a chance to inspect the property,
11   correct?
12          A.   Correct.
13          Q.   And you had a chance to talk to the tenants,
14   correct?
15          A.   No.
16          Q.   You did not have a chance to talk to the
17   tenants?
18          A.   No.
19          Q.   Did anybody tell you you couldn't talk to the
20   tenants?
21          A.   Zeke.
22          Q.   Zeke said you are not allowed to talk to the
23   tenants?
24          A.   Yes.
25          Q.   Okay.  Did Zeke -- did you get tenant
```

1    estoppels?

2         A.    We received some of them.

3         Q.    You received some of them.  And you knew you

4    did not have all of them when you went to closing,

5    correct?

6         A.    That's correct.

7         Q.    Okay.  And you knew that Cunningham Lindsey

8    did not -- had not given you an estoppel, correct?

9         A.    Can I explain?

10        Q.    I'm sorry?

11        A.    Can I explain?

12        Q.    No.  I just want yes or no if you knew that

13   Cunningham Lindsey had not given you an estoppel,

14   correct?

15             **THE COURT:**  Your counsel can come back

16   behind and give context to your answer.  Just yes or no,

17   if you can.

18             **THE WITNESS:**  Yes.

19        Q.    (By Mr. Pennell) And you knew that Zander

20   Homes had not signed an estoppel, correct?

21        A.    No.

22        Q.    Let me -- flip to the back of the notebook.

23   There's an exhibit --

24        A.    Which page?

25        Q.    Go all the way to the back.  Keep going.  All

1   right.  There should be a piece of paper in the back

2   pocket.  Keep going.  All right.  Is there -- is there a

3   piece of paper in that pocket?  All right.  Now, that's

4   Dalio Exhibit No. 23.

5              All right.  Now, Dalio Exhibit 23 is a

6   promissory note that you signed to Broadmark, which goes

7   by BRELF, correct?

8        A.   Correct.

9        Q.   All right.  Now, if you flip to page 6 of 7,

10  do you see a signature there?

11       A.   Correct.

12       Q.   And that's your signature, right?

13       A.   Yes.

14       Q.   And if you look at page -- I'm sorry.

15  Paragraph 25, which is almost immediately above that, it

16  says, "Borrower has 21 days from funding date to collect

17  estoppels from the remaining four tenants:  Cunningham

18  Lindsey, US, Zander Homes, Croy Homes, and Covenant

19  Global, or it is in immediate default trigger."

20              Did I read that correctly?

21       A.   Correct.

22       Q.   And you signed this on or about January 11th,

23  2019, correct?

24       A.   Correct.

25       Q.   Which was a week before you closed, correct?

1      A.   Correct.

2      Q.   So when you went to closing, you knew that you

3  did not have estoppels from these tenants, correct?

4      A.   That's because they told me that the tenants

5  were out of town, and it was still during like the

6  holidays so, you know, they wouldn't be able to sign the

7  estoppels then, so that's why the lender put this

8  provision in the note.

9           **MR. PENNELL:**  Objection, nonresponsive,

10  Judge.

11           **THE COURT:**  Sustained.  It needs to be

12  yes or no, and then your lawyer can follow up to give

13  context, if necessary.

14      Q.   (By Mr. Pennell) So you knew that you did not

15  have estoppels from these four tenants, correct?

16      A.   Correct.

17      Q.   And you closed any way, correct?

18      A.   Correct.

19      Q.   So let me direct your attention back to

20  Exhibit 1, which is the contract.  If you flip to

21  page -- it's going to be the fourth page.  It's Section

22  7.

23           You bought the property as is, correct?

24  That's at the top of page 7, it has this "whereas."

25      A.   That's the condition of the property.

1      Q.    Yes.  And so you knew you were buying it as

2    is.  Nobody lied to you as to the condition of the

3    property, correct?

4              **MR. JUNELL:**  Objection, form.

5              **THE COURT:**  Overruled.  You can answer.

6    Do you think anybody lied to you about the condition of

7    the property?

8              **THE WITNESS:**  Well, when it comes to the

9    condition, are we speaking about the physical being of

10   the property?

11     Q.    (By Mr. Pennell) Correct.

12     A.    The physical and not the leases?

13     Q.    I'm not talking about the leases.  I'm just

14   talking about the sticks and bricks.

15     A.    Correct.

16     Q.    Okay.  And so you had an opportunity to

17   inspect it, correct?

18     A.    I did, correct.

19     Q.    And you actually did go out and inspect it,

20   correct?

21     A.    I did.

22     Q.    Okay.  And you've got pictures in your

23   appraisal that shows things about the property.  Let's

24   look at page 164 of the appraisal.  I'm sorry, not 164

25   page 64.

1      THE COURT:  I think the evidence is is

2  that he knew that the building needed about $360,000

3  worth of repairs at the time of the purchase.

4      MR. PENNELL:  Correct.

5      Q.   (By Mr. Pennell) Isn't that correct, Mr. Polk?

6      A.   That is correct.

7      Q.   Okay.  And if you look at page 64, you see the

8  picture in the upper left and the bottom right?

9      A.   Correct.

10      Q.   And so do you see the temporary chillers that

11  are installed and then the tubes going from the bottom

12  to the top of the building?

13      A.   Yes.

14      Q.   And you knew when you closed that you were

15  going to have to fix that, right?

16      A.   That's correct.

17      Q.   You knew that was part of the value that you

18  were bringing was that Dalio didn't want to bother with

19  this and you were going to come in and make things

20  better, at least as far as the A/C was concerned,

21  correct?

22      A.   Correct.

23      Q.   And, now, you testified that you put several

24  thousand dollars into this deal, correct?

25      A.   Correct.

1      Q.   Did that money come out of your pocket or did

2  that money come from the first lienholder, Broadmark?

3      A.   It was escrow.

4      Q.   So is that coming from your pocket or coming

5  from the first lienholder?

6      A.   I signed for the notes.

7      Q.   Okay.  But you didn't go out-of-pocket?

8      A.   No.

9      Q.   You borrowed that money, correct?

10     A.   That's correct.

11     Q.   And you knew you were going to have to borrow

12  that money when you closed?

13     A.   Correct.

14     Q.   Who is H. Capital Real Estate?

15     A.   It's a broker.

16     Q.   And does that company have any affiliation

17  with you?

18     A.   They are a mortgage broker.

19     Q.   So is that a yes or a no?

20     A.   They are the mortgage broker that -- yes.

21     Q.   So you're affiliated with them?

22     A.   I'm not affiliated with them.  They financed

23  the building.  They found a lender for the property and

24  I know of them.

25     Q.   Did you walk away from closing with a check?

1        A.    The H Capital.

2        Q.    No.  Did you, Harold Polk, either through

3   Grove or individually or through a brokerage company,

4   did you leave closing with money?

5        A.    You're talking about H Capital as a broker?

6        Q.    I'm trying to figure out --

7        A.    Yes, they did.  They did.

8        Q.    Okay.  And do you have an interest in that

9   company?

10       A.    No.

11       Q.    So -- okay.  So did you, Harold Polk, or Grove

12  or any company leave closing with a check?

13       A.    The company did, yes.

14       Q.    Which company?

15       A.    The companies that are on the HUDD.

16       Q.    I'm asking about companies that you own or

17  have an interest in or you personally.  I'm just trying

18  to figure out if you got money out of closing.

19       A.    Yes.

20       Q.    How much money did you get out of closing?

21       A.    I think it was like 200,000 or so.  It's on

22  the HUDD.

23       Q.    And did you put any money into closing?

24       A.    Yes.

25       Q.    Okay.  How much did you personally -- I'm not

1  talking about money you borrowed.  I'm talking about

2  money that came out of your pocket as opposed to signing

3  a note?

4         A.    You're asking what I put into it?

5         Q.    I'm asking how much money did Harold Polk --

6                    THE COURT:  Your capital investment.

7                    THE WITNESS:  Oh, my capital investment

8  was like a hundred and some thousand.

9         Q.    (By Mr. Pennell) And so you ended up making

10 money at closing, correct?

11        A.    Not making money, no.

12        Q.    Well, if you put in a hundred and you walked

13 away with two hundred, you made money on the closing,

14 correct?

15        A.    That was for the payments.

16        Q.    That was for what?

17        A.    That was for payments.

18        Q.    What was?  I'm not following you.

19        A.    You're asking me for the money that came out

20 at closing.  I said that was for payments that didn't go

21 into my pocket.

22        Q.    Payments for what?

23        A.    The property, mortgage payments.

24        Q.    Okay.

25        A.    Mortgage payments.

1    Q.   I'll move on because I know we're running out
2    of time.
3              When you bought the property, did you
4    plan to replot it?
5    A.   Yes.
6    Q.   And did you plan to sell a portion of that to
7    a hotel developer?
8    A.   Yes.
9    Q.   And you were going to hopefully get about 4
10   million for that, right?
11   A.   Correct.
12   Q.   Okay.  And so did you replot it?
13   A.   I couldn't.
14   Q.   Okay.  So you could have but you didn't?
15   A.   That's not correct.
16   Q.   Okay.  Let me ask the question this way:  You
17   bought it intending to replot it, carve out a portion,
18   sell that to a hotel developer for 4 million, correct?
19   A.   Correct.
20   Q.   And that would have been money that you made
21   on the deal, correct?
22   A.   Correct.
23   Q.   Did you ever replot it?
24   A.   It couldn't be replotted.
25   Q.   No.  Let me -- I'm sorry.  I don't mean to

 1  interrupt, but --

 2              THE COURT:  Take it in pieces.  You

 3  didn't replat it.

 4              THE WITNESS:  No.

 5      Q.    (By Mr. Pennell) Did you replat it?

 6      A.    No.

 7      Q.    Okay.

 8              THE COURT:  Why not?

 9              THE WITNESS:  Because City rules that

10  like for the parking for a hotel you have to have so

11  much space for a parking, and it wouldn't have been

12  allotted for having parking for the office space and the

13  hotel.

14      Q.    (By Mr. Pennell) All right.  So let me direct

15  your attention now to Exhibit 4, Dalio Exhibit 4.  It's

16  in the white binder.  All right.

17              Did you receive -- did you and Brad --

18  strike that.  I understood from your testimony you and

19  Brad Parker communicated regularly about this deal,

20  correct?

21      A.    Correct.

22      Q.    And you understood Brad Parker was acting on

23  behalf of Jetall companies, correct?

24      A.    Correct.

25      Q.    And that they had some sort of relationship

1    with Dalio, the seller, correct?

2        A.   Yes.

3        Q.   Okay.  And so if you look about two-thirds of

4    the way down on Exhibit 4, on January the 9th, 2019, at

5    4:12 p.m., do you see where I'm at?

6        A.   January the 9th?  I see January the 10th.

7        Q.   Okay.  Go down below that.

8        A.   Oh, at the very bottom.

9            **MR. PENNELL:**  May I approach, Judge?

10           **THE COURT:**  Three lines down.

11           **THE WITNESS:**  I see it.  I see it.

12       Q.   (By Mr. Pennell) Now underneath that it says,

13   "Thanks, Harold.  We are working on the estoppels ahead

14   of receiving the closing documents.  As discussed, we

15   won't be getting estoppels for Cunningham Lindsey,

16   parentheses, (ESI), closes parentheses, or Koasati given

17   they have vacated and are delinquent, period.  Might

18   also have issues with Tucker Energy who is listed as MTM

19   or month-to-month on the rent roll."

20           Did I read that correctly?

21       A.   Yes.

22       Q.   Now, if I understood your testimony on direct,

23   you admitted that you got an e-mail from Brad Parker

24   shortly before closing, correct?

25       A.   Correct.

1    Q.    Is this that e-mail?

2    A.    Yes.

3         **MR. PENNELL:**  Judge, I move to offer

4    Exhibit -- Dalio Exhibit 4 into evidence.

5         **MR. JUNELL:**  Objection, hearsay.  There's

6    no one here that can prove it up.  Brad Parker, the

7    Defendant in this case, is not here today.

8         **THE COURT:**  Overruled.  I'll admit it.

9         **MR. PENNELL:**  Okay.

10    Q.    (By Mr. Pennell) So as of January the 9th you

11    knew that you weren't going to be getting estoppels for

12    Cunningham Lindsey, Koasati, and that you might also

13    have issues with Tucker Energy, correct?

14    A.    Correct.

15    Q.    And then if we look at the promissory note

16    that you signed with Ralph earlier, there were -- you

17    also knew that you didn't have estoppels from Zander

18    Homes, Croy Homes or Covenant Global, correct?

19    A.    Correct.

20    Q.    So you're closing on a commercial building

21    without estoppels from one, two, three, four, five, six

22    tenants, if I'm counting correctly; is that correct?

23    A.    I don't know what you're counting.

24    Q.    All right.  Well, I'll just list them out.

25    Cunningham Lindsey is one; Koasati is two; Tucker Energy

1   is three; Zander Homes is four; Croy Homes is five; and

2   Covenant Global is six.

3       A.    Okay.

4       Q.    So you knowingly closed on this building

5   without tenant estoppels from six of the tenants,

6   correct?

7       A.    It wasn't presented that way.

8       Q.    Okay.  My question is:  You closed on this

9   building, and at the time you closed, you knew you

10  didn't have estoppels from these six tenants, correct?

11      A.    That's incorrect because the lender asked for

12  an e-mail and there was only four as to the promissory

13  note here.  It only stated four.

14      Q.    Okay.

15      A.    And that's the only four that we were --

16      Q.    But then in that Exhibit 4 there's two more.

17  So at a minimum you were missing four estoppels,

18  correct?

19      A.    That's correct.

20      Q.    Okay.  But you thought you could make money on

21  the deal even knowing that these four tenants that are

22  listed in the note hadn't given you an estoppel?

23      A.    Provided that the rent rolls that they sent

24  with the $52,000 was correct.  This was sent on the

25  9th after we had went through approval and the

1   appraisals that were ordered by the lender.  And then

2   the rent roll was just sent out on January the 9th -- I

3   mean, the 7th, prior to this e-mail.  This e-mail is a

4   chain from we were speaking about closing docs, and then

5   this was sent in that, those closing docs.

6                MR. PENNELL:  Judge, I'm going to object

7   as nonresponsive.

8                THE COURT:  Sustained.  Next question.

9        Q.   (By Mr. Pennell) Now, the deed was signed

10  January the -- strike that.

11               Let me direct your attention to

12  Exhibit 7.  You gave Dalio a Deed of Trust on 411,

13  correct?

14       A.   Yes.

15       Q.   All right.  And you also gave Dalio deeds of

16  trust on two other properties one was 929 Kirby Drive.

17               MR. JUNELL:  What exhibit are you looking

18  at?

19               THE COURT:  7.

20               MR. PENNELL:  Well, Exhibit 7 and then

21  also Exhibits 19 and 20.

22               THE COURT:  Okay.

23               MR. PENNELL:  I'm sorry.  Exhibit 18 and

24  19, I'm sorry.  So Exhibits 7, 18 and 19.

25               THE COURT:  Okay.

1      Q.    (By Mr. Pennell) Those are deeds of trust on

2   411 North Belt, Kirby Law Office, which is Main Street,

3   and 929 Kirby Drive, correct?

4      A.    Correct.

5      Q.    And you signed a three-and-a-half million

6   dollar note to Dalio, correct?

7      A.    Correct.

8      Q.    And that's Exhibit 8.  Look at Exhibit 8.  I

9   know it's a lot of flipping around.

10     A.    And what page is that?

11     Q.    It's Exhibit 8.  Just find the 8 tab.  And

12   Exhibit 8 is a note that you signed, correct?

13     A.    Correct.

14     Q.    And it's in three -- the amount is

15   approximately 3.5 million, correct?

16     A.    But it doesn't have a date on here.

17     Q.    Yeah, but if you look at the last page where

18   it's signed, it's notarized on January the 18th, 2019,

19   on the last page.

20               Do you see that?

21     A.    This is January.

22     Q.    Look at the top of the last page.  We're under

23   "Acknowledgments, State of Texas, County of Harris, on

24   this, the --" 17th is crossed out, and it says 18th.

25     A.    Correct.

1      Q.    Okay.  So Exhibit 8 is Dalio's promissory note

2   for 3.5 million.  And is that your signature on the

3   proceeding page?

4      A.    Yes.

5      Q.    Okay.  And so this note was secured by three

6   properties, 929 Kirby, 917 Main and 411 North Belt,

7   correct?

8      A.    Correct.

9      Q.    Now, if you look at Exhibit 20 -- well, strike

10  that.

11              Did you own 917 Main Street at that time?

12     A.    Yes.

13     Q.    And was that loan -- was that property secured

14  by a loan?

15     A.    Correct.

16     Q.    Deed of trust?

17     A.    Yes.

18     Q.    And was that loan in default?

19     A.    Not at the time.  Ali knew about all of the

20  dealings, even with the 929.  I was working with the

21  lender on trying to get those properties either

22  refinanced or inject more capital.  That's why I did

23  this deal.

24              **MR. PENNELL:**  Objection, nonresponsive.

25              **THE COURT:**  Overruled.  Next question.

1      Q.    (By Mr. Pennell) So your testimony is that the

2    Main Street property and the Kirby Street property you

3    owned both of those on January the 18th when you signed

4    the promissory note?

5      A.    Yes.

6      Q.    And your testimony is you owned both of them

7    when you signed the deeds of trust?

8      A.    In January, yes.

9      Q.    Okay.  So let me direct you now to Exhibit 21,

10   Dalio Exhibit 21.  I want to direct you to the last

11   page, actually the next to the last page where it says,

12   "Exhibit A."  And the last line on that page it says,

13   "Property address is commonly known as 929 Kirby Drive,

14   Houston, Texas, 77019."

15     A.    Which page is that?

16     Q.    It's on the next to the last page of Exhibit

17   21.

18     A.    Uh-huh.

19     Q.    It says, "Exhibit A," at the top.

20          MR. JUNELL:  What's the title of the

21   document you're looking at?

22          MR. PENNELL:  It's "Substitute Trustee's

23   Deed," Dalio Exhibit 21.

24          THE WITNESS:  This was on January the

25   19th?

1    Q.    (By Mr. Pennell) That's when it was recorded.

2  Correct.

3    A.    January the 10th.

4    Q.    Yeah.  So right now I'm just trying to show

5  you where it says, "929 Kirby Drive," on the page.

6          **MR. PENNELL:**  Can I approach, Judge?

7          **THE COURT:**  Yes.

8    Q.    (By Mr. Pennell) All right.  Right there.  All

9  right.  So I'm looking at page Exhibit A of Dalio

10  Exhibit 21, the last line of Exhibit A.  Can you read

11  that?

12    A.    "Property address is commonly known as 929

13  Kirby Drive."

14    Q.    Okay.  And if you flip back to the first page,

15  it's a Substitute Trustee's Deed, correct?

16    A.    Correct.

17    Q.    And so if you look on the top of page 2, it

18  says that there was an auction on January the 2nd, 2019.

19  It's the third line from the top of page 2.

20          Do you see that?

21    A.    Yes.

22    Q.    Okay.  And so if you look down, there's

23  language of conveyance where the trustee conveys 929

24  Kirby to the winning auction vender.  Do you understand

25  that?

1      A.    Yes.

2      Q.    Okay.  And so the date of the auction was

3  January 2nd.  We talked about that.  The date of this

4  deed is January the 10th, 2019.

5            Do you see that?

6      A.    Yes.

7      Q.    And you signed the deeds of trust on January

8  the 18th, correct?

9      A.    Yes.

10     Q.    So at the time you signed the deed of trust

11 for 929 Kirby you didn't even own it; is that correct?

12     A.    That's not correct because the lender was

13 still working with me on this deal, and they were

14 waiting for me to get payment to them on this deal.

15     Q.    Do you own 929 Kirby now?

16     A.    No.

17     Q.    Okay.  Because it's been foreclosed?

18     A.    Correct.

19     Q.    Okay.  And that was one of the pieces of

20 collateral for the loan?

21     A.    Correct.

22     Q.    And then if you look at Dalio Exhibit 22 --

23 and I'm going to streamline this a little just because

24 we're running short on time.

25            Dalio Exhibit 22 is a Foreclosure Sale

1   Deed for the Kirby loft, which is the property at 917

2   Main.

3        A.    Correct.

4        Q.    And do you own 917 Main anymore?

5        A.    I still do.

6        Q.    You own 917 Main?

7        A.    Yes.

8        Q.    Even though there's a foreclosure sale deed

9   here?

10       A.    Yes.  I do have -- I just refinanced 917 Main,

11   the basement.  But the second floor, the lender is

12   actually allowing me to pay that off.

13       Q.    So it was foreclosed and then you reacquired

14   it?

15       A.    Correct.

16       Q.    How much have you paid Dalio on the 3.5

17   million?

18       A.    Zero.  Can I explain?

19       Q.    No.

20            THE COURT:  Your lawyer can address that

21   if he wants to.

22            MR. PENNELL:  Give me just a second,

23   Judge.  Let me flip through here and make sure I'm not

24   forgetting anything.

25       Q.    (By Mr. Pennell) Oh, yeah.  Let me direct your

1  attention back to Exhibit 1, the Dalio Exhibit 1.  Did

2  you read this contract before you signed it?

3            Actually, you know what?  You don't even

4  need to look at it.  I'll just point it out to the Judge

5  later.

6            Did you read the contract before you

7  signed it?

8       A.    Yes.

9       Q.    Did you understand it?

10      A.    Not all of it in its entirety.

11      Q.    Is it your position in this lawsuit that

12  because you didn't understand it in its entirety that

13  you're not bound by it?

14      A.    Not correct.

15      Q.    Okay.  So you understand you're bound by this

16  even if you didn't completely understand it?

17      A.    Correct.

18      Q.    And is it your understanding that if you

19  close, you waive your claims because you closed instead

20  of terminating the contract and moving on to the next

21  deal?

22            Do you understand that?

23            **MR. JUNELL:**  Objection, calls for a legal

24  conclusion.

25            **MR. PENNELL:**  We can look at the

1  contract, if we need to, Judge.

2          **THE COURT:**  Overruled.  You can state

3  your understanding of how things work.

4          **THE WITNESS:**  To my understanding on the

5  transaction that I was buying a property in the

6  condition it was in as far as the A/Cs, not the leases

7  that's in the contract, states transfer over as well and

8  its entirety.

9      Q.   (By Mr. Pennell) Okay.  And the contract gives

10 you the right to demand estoppels, correct?

11     A.   Correct.

12     Q.   And you closed knowing that at least four of

13 six tenants who left did not sign estoppels.  We covered

14 that, right?

15     A.   Can I explain that?

16          **THE COURT:**  Your lawyer can address that.

17          **MR. PENNELL:**  Just answer the question.

18          **THE WITNESS:**  Yes.

19     Q.   (By Mr. Pennell) Okay.  And so -- okay.  Did

20 you notify Dalio that you didn't think they were

21 entitled to foreclosure before you filed this lawsuit?

22     A.   Yes.

23     Q.   Did you demand mediation?

24     A.   I tried to meet with Ali.

25          **MR. PENNELL:**  I'm going to object as

 1   nonresponsive.

 2       Q.   (By Mr. Pennell) You understand that in the --

 3            **MR. PENNELL:**  Did you rule on that

 4   objection, Judge?  I didn't hear if you did.

 5            **THE COURT:**  I'm sorry.  I missed it.

 6            **MR. PENNELL:**  I objected to his answer as

 7   nonresponsive.

 8            **THE COURT:**  Sustained.  Sorry.

 9       Q.   (By Mr. Pennell) So you understand that the

10   contract requires that you mediate before you file suit?

11   Do you understand that?

12       A.   That's if no fraud was committed.

13       Q.   So is that -- that's a yes if no fraud was

14   committed?

15       A.   Correct.

16       Q.   Okay.  So your position is because there's

17   fraud you don't have to abide by the contract?

18       A.   I tried to meet with Ali, and --

19            **THE COURT:**  Just answer that question.

20            **THE WITNESS:**  Correct.

21            **THE COURT:**  Your lawyer -- okay.  Thank

22   you.  Your lawyer can come back and give context if he

23   wants to.

24       Q.   (By Mr. Pennell) Now, I didn't see any

25   documents that your attorney brought of these

1    communications with you and Ali Choudhri.  Do you know

2    if you brought copies of those?

3         A.   I tried to meet in person.

4              **THE COURT:**  Did you bring copies?

5              **THE WITNESS:**  Copies of me --

6              **THE COURT:**  Of those, what, e-mails?

7         Q.   (By Mr. Pennell) I don't know.  However you

8    communicated with Mr. Choudhri, did you bring copies of

9    that?

10        A.   I have it in my phone where I tried to meet

11   with him and we were texting.

12             **MR. JUNELL:**  There are not exhibits to

13   that.

14             **MR. PENNELL:**  Okay.  That's -- that's all

15   I needed to know.

16        Q.   (By Mr. Pennell) Did you understand this was a

17   distressed asset when you bought it?

18        A.   What the A/Cs?  Yes.

19        Q.   And you understood that you're going to have

20   to invest some money and do some work to get it up and

21   going?

22        A.   Correct.

23        Q.   Did you ever complain to the first lienholder

24   that they were treating you unfairly and that they were

25   inhibiting your ability to turn the property around?

1        A.    When we first closed and the insurance --

2              **THE WITNESS**:  Can I answer that question,

3    Your Honor?

4              **THE COURT**:  Yeah.

5              **THE WITNESS**:  When we first closed on the

6    property, the insurance company did not send in an

7    invoice to the title company, and the insurance was not

8    paid on the property.  So, therefore, the lenders were

9    kind of forced the property into default because there

10   was no insurance because the insurance wasn't collected

11   on the property.

12             And when they did that, they required

13   that I put insurance on the property immediately and

14   make that payment.  When I didn't make that payment,

15   they -- before I made the payment, they were trying to

16   get me to sign off the rents in a lock box and I felt

17   that that would hinder my ability to properly bring an

18   asset into good standing because if I had no rents I

19   wouldn't be able to pay the management company nor the

20   ongoing expense in trying to revamp the property in the

21   interim.  So I felt that they were trying to constrain

22   me then, and that's the only reason why I stated that.

23        Q.    (By Mr. Pennell) Okay.  So let me direct your

24   attention to Dalio Exhibit 20.  All right.  Is this a

25   true and correct copy of that e-mail that you were just

1  testifying about?

2      A.   Correct.

3           MR. PENNELL:  Okay.  Judge, move to admit

4  Dalio 20 into evidence.

5           MR. JUNELL:  Objection, hearsay.

6           THE COURT:  Overruled.  20 is admitted

7  into evidence.

8      Q.   (By Mr. Pennell) All right.  So in this

9  document you claimed to Broadmark about their

10  interfering in your relationship with your tenants,

11  correct?

12     A.   Yes.

13     Q.   And you tell them that because that they're

14  not releasing funds for you to fix up -- fix the HVAC,

15  you're in danger of losing the building, correct?

16     A.   That wasn't the funds for the HVAC.  This

17  e-mail communication was in reference to the -- the

18  e-mail that was sent out because of the insurance issue.

19  But, yes, this is -- this is the e-mail I sent out,

20  correct.

21           MR. PENNELL:  Okay.  I'm going to object

22  to that answer as nonresponsive.

23           THE COURT:  Overruled.

24     Q.   (By Mr. Pennell) Okay.  So if you look on page

25  2 of Exhibit 20 at the top, the paragraph -- the first

 1  line is "Hope you are not a loan to own shop."

 2              Do you see that?

 3      A.   Correct.

 4      Q.   And then the last sentence of that paragraph,

 5  "Thus far, the second lienholder has been very

 6  accommodating and fair and you failing to release funds

 7  for HVAC and delays could cause a domino effect," and

 8  put you in default with them.

 9              Did I read that correctly?

10              **THE COURT:**  Did he read that correctly?

11  That's the question.

12              **THE WITNESS:**  Correct.

13      Q.   (By Mr. Pennell) Okay.  And so the first

14  lienholder was holding money from the HVAC from you and

15  you were unhappy about it, correct?

16      A.   Correct.

17      Q.   And when you bought this property, you didn't

18  have your own funds.  You were going to borrow the money

19  from Broadmark to fix the HVAC, correct?

20      A.   The money was the escrow, correct.

21      Q.   Okay.  So you -- but you didn't have your own

22  money.  This was coming from the first lender, correct?

23      A.   Incorrect.

24      Q.   When you said it was put into escrow --

25      A.   You just said I didn't have my own money.  I

1  did have my own money.

2      Q.    To fix up the HVAC.

3      A.    The money was escrowed through the loan

4  prefaces.

5      Q.    So you put that money in.  That money didn't

6  come from Broadmark.

7      A.    That money was set aside in escrow.

8      Q.    You personally put that money in.  That money

9  is not part of the Broadmark loan.

10      A.    That was part of the loan.

11      Q.    That was part of the loan?

12      A.    Correct.

13      Q.    Okay.  Thank you.

14            And then you also say you can't develop

15  the replat and do that, and that was part of your plan

16  to resell the property?

17      A.    Correct.

18      Q.    And so when you bought it, you were planning

19  to sell part of it to the hotel developer.  Why didn't

20  you research to see if this would be a suitable tract

21  for a hotel?

22      A.    Because the building had its own parking

23  garage and the land that was there was -- seemed

24  adequate at the time.

25      Q.    Okay.  But why -- why didn't you dig deeper

1    and make sure before I commit to this, I need to make

2    sure that I can carve this whatever -- replat it and

3    sell it -- sell part of it to the hotel?

4         A.    I received a short answer on the

5    redevelopment.  But once the surveyor got to going in

6    with The City, they wouldn't allow it.

7         Q.    But what's a survey cost, like 5,000?

8         A.    Yes.

9         Q.    And you couldn't have surveyed it beforehand

10   and figured that out before you committed to this?

11        A.    It takes at least three months to resurvey a

12   property.

13        Q.    Okay.  So you signed the contract in November.

14   You were in such a hurry to close -- was this important

15   to you being able to sell part of it to the hotel?

16        A.    Yes.

17        Q.    Okay.  And so it was important to you but it

18   wasn't so important that you would actually do your due

19   diligence on the front end and make sure you could do

20   this before you actually closed; is that correct?

21        A.    I did receive an answer, a short answer, that

22   stated that it possibly could be done.

23        Q.    From whom?

24        A.    A surveyor, a property surveyor.

25        Q.    So you got a short answer from a property

1   surveyor that said, "Yes", and you got a long answer

2   after you closed that said, "No"?

3       A.   Correct, because they were under the

4   impression that part of the footage on the service road

5   where the grassy area is could be utilized as parking as

6   well and it can't.  It has easements on it.

7               MR. PENNELL:  Object as nonresponsive to

8   everything after "No".

9               THE COURT:  Overruled.

10      Q.   (By Mr. Pennell) Now, if I understood your

11  testimony on direct, the property is losing

12  approximately, what, 20 something thousand per month?

13      A.   No.  It's actually about 30 to 40 from what

14  the rent roll stated.

15      Q.   Okay.  So what's it cost to service Broadmark?

16      A.   46,000.

17      Q.   And you're getting approximately 20,000 in

18  rent?

19              THE COURT:  26, I think he said.

20      Q.   (By Mr. Pennell) 26,000 in rent?

21      A.   20, 20,000 in rent.

22      Q.   Okay.  20,000 in rent.

23      A.   26 would be if you subtracted 20 from the 46.

24      Q.   So every month you're going into -- you're

25  short $20,000, correct?

1      A.    A little bit over 20.

2      Q.    Do you have the money to turn this thing

3  around?

4      A.    Yes.

5      Q.    Where is that money going to come from?

6      A.    Myself personally.

7      Q.    Do you have enough assets to turn this thing

8  around?

9      A.    Yes.

10      Q.    Why haven't you done this before now?

11      A.    What do you mean?  I've been in the process of

12  turning the asset around.  It's just I've gotten into a

13  financial restraint with the property and I had to pull

14  moneys out of another asset to take care of this.

15      Q.    So if I understood your testimony on direct --

16  strike that.  So if you have all this -- these assets

17  available, you could pay a bond of $50,000, correct?

18      A.    No.

19      Q.    So you have assets available to refurbish the

20  building but you don't have the money to post a $50,000

21  bond?

22      A.    That's because the moneys have to go to pay

23  for the building.  If I was to pay a bond, that would

24  hinder my financial wherewith all to put the moneys back

25  into the building.

1       Q.   Do you admit that you owe Dalio money?

2               MR. JUNELL:  Objection, calls for a legal

3   conclusion on the status of the claims of the lawsuit.

4               THE COURT:  Overruled.  You can tell him

5   what you think your position is.

6               THE WITNESS:  No, I don't.

7       Q.   (By Mr. Pennell) And that's because you think

8   they defrauded you?

9       A.   Correct.

10      Q.   So you get to keep the property.  You get to

11  walk away from your note Scott free.  That's what you

12  think should happen in this case.

13              MR. JUNELL:  Objection, assumes facts not

14  in evidence.

15              THE COURT:  Stop.  Stop.

16              MR. JUNELL:  Objection, assumes facts not

17  in evidence.

18              THE COURT:  You can answer.  Overruled.

19  You can answer.

20              THE WITNESS:  I still have a $4.8 million

21  note.

22      Q.   (By Mr. Pennell) To Broadmark?

23      A.   Correct.

24      Q.   But you bought the property from Dalio?

25      A.   Correct.

1    Q.    And you haven't paid them a penny?

2    A.    Correct.

3    Q.    And the property presumably has some value or

4  you wouldn't want it anymore?

5    A.    Provided that the rent rolls were correct.

6    Q.    Okay.  But the property still has value now

7  because you still want it, correct?

8    A.    I would like to keep an asset I put money

9  into, correct.

10    Q.    Okay.  So the property still has value now

11  because if you didn't, you would be willing to walk

12  away, correct?

13    A.    I am willing to rescind the deal.

14           **MR. PENNELL:**  Objection, nonresponsive.

15           **THE COURT:**  Overruled.

16    Q.    (By Mr. Pennell) So --

17           **THE COURT:**  You're arguing with him right

18  now.

19           **MR. PENNELL:**  Fair enough.  I get it,

20  Judge.

21           **THE COURT:**  And he's not required to

22  negotiate under oath.

23           **MR. PENNELL:**  I understand.

24           **THE COURT:**  I think this -- I think this

25  carcass is picked clean.

1           MR. PENNELL:  I think you're probably

2    right, Judge.

3           THE COURT:  That's not a comment on the

4    weight of the evidence.

5           MR. PENNELL:  No.  I understand.  I

6    understand.  You got the point.

7           THE COURT:  Yes, sir.  We've been going

8    an hour and ten minutes.

9           MR. PENNELL:  Yeah, I understand, Judge.

10   Before I pass, I just need to make sure I covered

11   everything.

12          THE COURT:  Your lawyer is going to have

13   some redirect probably.

14       Q.   (By Mr. Pennell) Oh, Mr. Polk, is your address

15   3117 Seventh Street, Port Arthur, Texas, 77642?

16       A.   No.

17       Q.   Has that ever been your address?

18       A.   It was the address previously.

19       Q.   Have you ever given notice of your new

20   address?

21       A.   I haven't.

22       Q.   What is your new address?

23       A.   It's -- I use the 917 Main Street or the 411

24   for business purposes.

25       Q.   Is there a suite on 917 Main Street?

1       A.   Yes.

2       Q.   What's the suite?

3       A.   It's B-1.

4       Q.   B, Bravo 1?

5       A.   Correct.

6       Q.   Did -- you testified about the security

7    deposits.  Did Dalio -- was there -- were there any

8    discussions with Dalio about that?

9       A.   Yes.

10      Q.   And what were those discussions?

11      A.   They said that they didn't have them.

12      Q.   Dalio said they didn't have them?

13      A.   Correct.

14           **MR. PENNELL:**  Judge, I'll pass the

15    witness.

16           **THE COURT:**  Redirect?

17           **MR. JUNELL:**  Briefly.

18                REDIRECT EXAMINATION

19    BY MR. JUNELL:

20      Q.   Dalio got money on this sale, didn't they?

21      A.   Correct.

22      Q.   And when he says that you never paid Dalio

23    anything, Dalio walked away from this deal with $5

24    million in their pocket, correct?

25      A.   It was about 4.5 million.

1          Q.    Okay.  And that was paid from the first

2    lienholder?

3          A.    Correct.

4          Q.    Broadmark?

5          A.    Correct.

6          Q.    And they paid that money via wire transfer or

7    otherwise to Dalio?

8          A.    Correct.

9          Q.    So Dalio got out of this transaction with

10   four-and-a-half million dollars or more in cash?

11         A.    Correct.

12         Q.    Correct?

13         A.    Yes.

14         Q.    And a promissory note from you?

15         A.    Correct.

16         Q.    For another couple of million dollars?

17         A.    That's correct.

18         Q.    The only other thing I want to talk to you

19   about --

20              **THE COURT:**  I thought it was 3.5.

21              **MR. JUNELL:**  Well, it's 3.5, but two of

22   it was related to the purchase of this building.

23              **THE COURT:**  Okay.

24         Q.    (By Mr. Junell) And the other debt came from

25   another -- another transaction, correct?

1       A.    It was like 1.5 on this one and the 2 million

2    is from another transaction.

3                 **THE COURT**:  Okay.

4       Q.    (By Mr. Junell) That Ali Choudhri just

5    combined into one promissory note?

6       A.    Correct.

7       Q.    That didn't have anything to do with this

8    transaction?

9       A.    No.

10      Q.    Okay.  So you don't owe Dalio $3.5 million for

11   the purposes of just this 411 building?

12      A.    No, I didn't.

13      Q.    Okay.  The estoppels, he asked you about why

14   you would engage in a transaction when you were missing

15   some tenant estoppels.  Explain the circumstances of

16   what -- what you were being told and why those estoppels

17   were not there?

18      A.    I was told by Brad that some of the -- the

19   tenants, the ones that weren't able to provide

20   estoppels, was still out because, you know, the December

21   and then January, the new year, and they wouldn't be

22   able to provide estoppels, so that's why the lender made

23   it a condition in the note to provide those estoppels

24   within 21 days.  And then after that, I received an

25   e-mail from Zeke stating that he gave me a copy of the

1  check from Croy Homes and Zander Homes stating that they

2  had paid their rents.

3       Q.   Okay.  And so in the week prior to the

4  closing, like the date of January 7th, the date that

5  Brad Parker sent you this updated rent roll, did you

6  believe at that time that you were going to be getting

7  estoppels from all these tenants that were on that list?

8       A.   Yes.

9       Q.   Did they ever tell you on January 7th, when

10  they sent this updated rent roll, that there were

11  tenants who you were never going to get estoppels from?

12       A.   No.

13       Q.   And ultimately on January 9th, Brad sent you a

14  quick little e-mail that says that Cunningham Lindsey is

15  not going to have an estoppel, right?

16       A.   Correct.

17       Q.   And because they've left the premises and

18  they're delinquent -- did he tell you when they left?

19       A.   No.

20       Q.   Did he tell you that they'd already been out

21  for seven months?

22       A.   No.

23       Q.   Did he tell you that they'd already sued?

24       A.   No.

25       Q.   Did he tell you how delinquent they were,

1    that, in fact, they owed $600,000 on their lease?

2        A.    No.

3        Q.    Were there any numbers at all discussed with

4    any of these tenants?

5        A.    No.

6        Q.    Okay.  And do you know whether or not

7    Brad Parker ever notified the lender, Broadmark, that

8    these tenants had vacated the building and that they

9    weren't going to give these estoppels?

10       A.    No, he didn't.

11       Q.    Do you know whether or not Brad Parker or

12   anyone at Dalio ever notified the appraiser that the

13   appraisal might be changed because of these tenants

14   couldn't deliver these estoppels?

15       A.    No.

16               **MR. JUNELL:**  Pass the witness.

17               **THE COURT:**  Cross?

18               **MR. PENNELL:**  Nothing further, Judge.

19               **THE COURT:**  All right.  You may step

20   down, Mr. Polk.  Call your next witness.

21               **MR. JUNELL:**  Plaintiff rests.

22               **THE COURT:**  All right.

23           DEFENDANT'S MOTION FOR DIRECTED VERDICT

24               **MR. PENNELL:**  Judge, I want to move for a

25   directed verdict on the issue of unclean hands.  He

1    submitted collateral for the $3.5 million note of 929

2    Kirby, and the evidence is that he did not own that

3    property at the time he signed the deed of trust.  So

4    he -- if he's fudging collateral that he doesn't own, he

5    may have a claim for money damages, but he's certainly

6    not entitled to injunctive relief because he's got

7    unclean hands.

8              **MR. JUNELL:**  He testified that he was in

9    the process of trying to refinance that.  I don't know

10   how you move for directed verdict on unclean hands

11   anyway or what the intent was.  That goes to the weight,

12   not credibility.  But he definitely was working with

13   them and he testified and the evidence was presented

14   that he was attempting to refinance the property during

15   that time period.

16             **THE COURT:**  Yeah, Motion for directed

17   Verdict is denied.  Call your first witness.

18             **MR. PENNELL:**  Azeemeh Zaheer.  Oh, okay.

19   Dylan McGrath.  Let me see if I can get him on the

20   phone.

21             **THE COURT:**  Need a break?

22             **MR. PENNELL:**  Yes, please.

23             **THE COURT:**  Yes, let's take a break.  How

24   long do you need, 15 minutes?

25             (Off the record, break taken)

1          THE COURT:  Let's go back on the record.

2    I'm giving the nonmovant 30 minutes to put on their

3    case-in-chief.  I'm asking you to waive your cross for

4    now to give them the maximum time to put their evidence

5    on.  If I feel like I need more from you, I may ask you

6    to ask some questions.

7          MR. JUNELL:  I'm going to try to limit it

8    really short.

9          THE COURT:  Yeah, right.  Keep it short.

10   Go ahead.  State who you're calling.  Call your first

11   witness.

12         MR. PENNELL:  Dalio calls Azeemeh Zaheer

13   and we're trying to get her on the screen with volume so

14   that everybody can hear her.

15         THE COURT:  Yeah, all we need to do is

16   hear her more than anything else.

17         MR. PENNELL:  Sure, understood.  But it

18   would be better if you could see her as well.

19         Azeemeh, can you hear us?

20         THE COURT:  I can see her.

21         MR. PENNELL:  Hi, Azeemeh.  Can you hear

22   us?

23         MS. ZAHEER:  Yeah, I can hear you.

24         MR. PENNELL:  Okay.  Can everybody hear

25   her?

1          **THE COURT:**  Yep.  I need you to raise

2     your right hand.

3                    (Witness is duly sworn)

4          **THE COURT:**  All right.  Proceed.

5          <u>**MS AZEEMEH ZAHEER,**</u>

6     having been first duly sworn, testifies as follows:

7                    <u>DIRECT EXAMINATION</u>

8     <u>BY MR. PENNELL:</u>

9          Q.    All right.  Would you state your name.

10         A.    Azeemeh Zaheer.

11         Q.    What is your relationship with Dalio?

12         A.    I am the chief executive.

13         Q.    And could you briefly summarize your

14    educational background?

15         A.    Sure.  I have -- went to school at University

16    of St. Thomas and then I have a finance degree from MIT,

17    real estate finance, and a Harvard real estate

18    development qualification as well.

19         Q.    And can you summarize your professional

20    background?

21         A.    I worked in investment banking for over

22    20 years.  I live in London, and I specialize in real

23    estate investment banking.  I have done over 3 billion

24    worth of transactions, and I have a very strong subject

25    matter expertise in real estate.  I teach real estate

1   finance to women in Saudi Arabia and other female led

2   education programs.

3       Q.   Okay.  And did Dalio ever own the building at

4   411 North Belt?

5       A.   Yes.

6       Q.   And can you describe 411 North Belt in terms

7   of what the building was like, if the tenants were

8   happy, unhappy, that sort of thing?

9       A.   Well, I had Mirza Agha, Zeke.  He managed the

10  property and he was there on a day-to-day basis.  He had

11  very strong, good relationship with the tenants.  Some

12  of them came to visit with me periodically.  There were

13  a lot of issues with the building that we were dealing

14  with, and we had told Mr. Polk about that.  But the --

15  the building was a value-added transaction.  It wasn't

16  something that you would take and hold on to income for.

17  That was sort of the risk.

18               I have met Mr. Polk as well.  I think

19  that was a lie in the beginning.  He came to my office

20  at Westheimer with Zeke and he was with somebody else,

21  and we had a conversation before in January.

22      Q.   Okay.  And you've mentioned Zeke a couple

23  times.  Was Zeke authorized to represent Dalio in

24  connection with this transaction?

25      A.   Yes, of course, because I travel a lot and I

 1  am not often in Texas, so I have to have somebody on the

 2  ground there.

 3      Q.   Okay.  And who is Jetall?

 4      A.   Jetall is a company that I have asked to help

 5  me with all of the dealings with the -- with the sale.

 6  They had property managed the building prior.  They had

 7  found Mr. Polk and brought him to do the deal with us,

 8  so they were involved, and we instructed them to be

 9  involved.

10          They were -- Jetall previously was

11  represented by Paul Simon.  I am a bit surprised to see

12  him there because his wife also manages the property so

13  I'm wondering what that --

14          **MR. JUNELL:**  Objection, nonresponsive.

15          **THE COURT:**  Sustained.  Need you to just

16  answer the question yes or no and then -- or describe as

17  deemed fit and then move on.

18      Q.   (By Mr. Pennell) And so is it unusual for a

19  property manager to help the owner sell the building?

20      A.   No.

21      Q.   And why is that?

22      A.   Because they know the building inside out.

23  They -- they have been exposed to the building for many

24  years, and they would have a greater understanding of

25  everything that's happening there.  So it's not unusual.

1      Q.    And so the fact that Brad Parker was

2   communicating with Harold Polk, was he authorized to do

3   that on behalf of Dalio?

4      A.    Yes, he was.

5      Q.    Okay.  I'm sorry.  Were you done?

6      A.    No.  No.  That's it.

7      Q.    Okay.  Now, you said something earlier about a

8   value-added.  What does "value-added" mean?

9      A.    So there's four different ways you acquire

10  real estate.  And they keep on talking about the

11  appraisal and the rent, but the rent is innocuous

12  because if the rent was, you know, fully in sort of

13  place, it would have been worth the 9.4 million, which

14  the appraiser had put in.  The appraiser had based the

15  9.4 million on an income sales approach.  When you look

16  at an income sales approach that means that it's based

17  on rental income.

18                  The 7.5 was based on a value-add

19  strategy.  It was not based on the tenancies of the

20  lease.  So you would take into account sort of, you

21  know, the current income.  But whenever you look at

22  these things, you have to get your lawyer to look at all

23  the leases because there's many different types of

24  leases, modified gross leases, triple net leases, double

25  net leases, and that basically tells you what the risk

1    profile is for each of the tenants.

2                    So we have never acquired a building

3    where we will underwrite on income without going through

4    due diligence on each of the leases with our buyers.  So

5    the appraisal was based not on an income sales approach,

6    which is clear.  It is written quite evidently.  It was

7    based on a value-add strategy, which is what the 7.5

8    represented.  In the appraisal as well, it said that the

9    larger tenant, Tucker, was on a month-to-month lease and

10   that the Capex that would be required to change this

11   building around would fall -- the onus would fall on the

12   new owner.

13        Q.   So the value-add sale is when the buyer comes

14   in and puts in basically sweat and equity to improve the

15   value of the building by rolling up their sleeve?

16        A.   That's absolutely correct.  If Mr. Polk were

17   to have bought this building, considering the income,

18   the purchase price would have been a lot higher than the

19   7.5.

20        Q.   Okay.  And so was the sale supposed to be as

21   is?

22        A.   Absolutely.  So the PSA was signed in

23   November 2018.  The deal actually wasn't closed until

24   the end of January 2019.  And the PSA specifically

25   states as is where is.

1              So, I mean, in that, too, he was supposed

2    to give us over 300,000, and this is really all

3    upsetting because that was -- that was supposed to be

4    rolled up, given to us, but we actually allowed him to

5    keep that so he could do the value-add strategy and have

6    been super accommodating to help him through the

7    process.  So he actually got this building for free.

8    He's been using other people's money, including ours and

9    the senior bank, to kind of sort of fix it up.

10              **MR. JUNELL:**  Objection, nonresponsive.

11              **THE COURT:**  Overruled.

12              **THE WITNESS:**  We did not receive any

13    cash.  The money that was given out was paid -- paid off

14    the via a lien to Icon Bank.  The rest was sort of

15    given, rolled up to Mr. Polk to do his value-add

16    strategy, which he was quite confident he could turn

17    around for millions with the sale of the hotel.

18         Q.    And so, if I understood correctly, Dalio did

19    not walk away from closing with money.  All the money

20    that went to, quote, unquote, "Dalio," actually went to

21    pay off the debt on the building?

22         A.    That's correct.

23         Q.    So how much has Dalio received from Mr. Polk

24    for this building?

25         A.    Nothing.  Absolutely nothing.

1    Q.    Thank you.  And so the only thing Dalio got

2    for the building was a note for 3.5 million, correct?

3    A.    That's correct.

4    Q.    And was the note secured?

5    A.    Yes.

6    Q.    By what?

7    A.    By the collateral he's put in, which I have

8    come to understand that is largely not valid.  So we are

9    in a very unsafe position.

10    Q.    And so there was the 411 North Belt, which the

11    first lender has posted for foreclosure, 929 Kirby and

12    917 Main Street.  Do you know what happened to 929 Kirby

13    and 917 Main?

14    A.    No.

15    Q.    Okay.  Did Dalio receive an equity pledge from

16    Mr. Polk as part of this deal?

17    A.    He had pledged to pay back -- he signed a

18    promissory note to pay back --

19    Q.    So let me do it this way.  I'm going to hold

20    this document up to the camera.  I'm hoping you can see

21    it.  This is Dalio Exhibit 17.  Can you see that?

22    A.    Yes.

23    Q.    And what is Dalio Exhibit 17?

24    A.    Equity Pledge and Assignment Agreement.

25    Q.    Okay.  And so in this document --

1            THE COURT:  What's the exhibit number?

2            MR. PENNELL:  Dalio 17.

3            THE COURT:  Thank you.

4      Q.   (By Mr. Pennell) Is this a true and correct

5  copy of the equity pledge?

6      A.   Yes.

7            MR. PENNELL:  Judge, I offer Exhibit 17

8  into evidence.

9            MR. JUNELL:  She hasn't proved anything

10 up.  She just read the title on it.  It's hearsay.

11           THE COURT:  It's admitted.

12           THE WITNESS:  It's not hearsay.

13           MR. PENNELL:  It's okay.  It's okay.

14 It's been admitted.

15     Q.   (By Mr. Pennell) So in this document Mr. Polk

16 pledges his ownership interest in the entities that own

17 those three buildings, correct?

18     A.   Correct.

19     Q.   Okay.  And so is Grove Enterprises, slash,

20 Polk, are they in default under the promissory note?

21     A.   They are.

22     Q.   And have they paid anything under the

23 promissory note?

24     A.   No.

25     Q.   Had Dalio known that Mr. Polk did not own any

1  of the three properties that were pledged as collateral,

2  would it have closed and accepted those properties as

3  collateral?

4              MR. JUNELL:  Objection, assumes facts not

5  in evidence.

6              THE COURT:  Overruled.

7              MR. PENNELL:  I'm sorry?

8              THE WITNESS:  No.  No, we wouldn't have.

9      Q.   (By Mr. Pennell) And what happens if the first

10  lienholder forecloses?

11      A.   If the first lien forecloses, then the equity

12  gets wiped out, which is -- and we have a possibility of

13  getting wiped out completely as well, so...

14              MR. PENNELL:  Okay.  Pass the witness.

15              THE COURT:  Cross?

16              MR. JUNELL:  Yes.

17              MR. PENNELL:  Hang on.  Should I turn the

18  laptop so she can see Mr. Junell as he's questioning

19  her?

20              THE COURT:  Sure.  Do it.

21              THE WITNESS:  It's 2:00 a.m. here, so...

22              MR. JUNELL:  Can you hear me if I talk

23  right here?

24              THE WITNESS:  I can hear you perfectly

25  fine.  Thank you.

1              **MR. JUNELL:**  Okay.

2                    <u>CROSS-EXAMINATION</u>

3    <u>BY MR. JUNELL:</u>

4         Q.   What was your involvement in the transaction?

5         A.   I am the CO of Dalio.  I assigned Mirza Agha

6    to act on my behalf.

7         Q.   Did you play any part at all in the sale of

8    this building?

9         A.   Yes, I had to approve it.

10        Q.   You approved what?

11        A.   I approved the sale of the building.  I

12   understood the terms.  I completely was aware that Brad

13   sent an e-mail, which I asked him to fully disclose all

14   of the issues with the tenants, which he did.

15        Q.   Did you instruct Mr. Parker to send the

16   financial statements and the rent rolls?

17        A.   I instructed him to provide all the

18   information.

19        Q.   What information?

20        A.   Pardon?

21        Q.   What information did you instruct Mr. Parker

22   to send?

23        A.   I instructed Brad to send anything that

24   Mr. Polk needed for the closing or for the -- for the

25   loan.

1    Q.   Did you instruct Mr. Parker to send a rent

2    roll in January of 2019?

3    A.   I instructed Mr. Parker to disclose all the

4    information with the rent roll.

5    Q.   Okay.  Did you instruct Mr. Parker to only

6    include tenants that were actually in the building?

7    A.   No.  Brad told the true and correct picture of

8    the tenants in the building.

9    Q.   Oh.  So is it your position that Mr. Parker

10   gave accurate information to Broadmark and accurate

11   information to the appraiser when he turned over the

12   rent rolls?

13   A.   I believe that Brad gave information that had

14   our tenants in there with some -- we had some, you know,

15   provisions in place, and he completely disclosed.  I

16   mean, I was speaking with Zeke.  Harold knew everything

17   in there.

18   Q.   Let me rephrase the question.  Is it your

19   position that Brad Parker gave accurate information to

20   Broadmark and to the appraiser regarding the tenants

21   that were in the building?

22   A.   You know what?  It's 2:00 a.m.  I don't recall

23   to hand what the exact conversation was or what was

24   given because I am abroad.  But I know that we

25   instructed all of the information to be given and it was

1    properly given.  He was -- he was aware that these

2    tenants were not there.  He visited the building.

3         Q.   Okay.  But you've -- you've seen the rent roll

4    that Mr. Parker provided, correct?

5         A.   I've seen it, yes.

6         Q.   Okay.  Are you aware that there are six

7    tenants on that rent roll that are no longer in the

8    building?

9         A.   Mr. Polk was aware as well.  Yes, we provided

10   that information.

11        Q.   Mr. Polk's already testified.

12             **MR. PENNELL:**  Judge, can the witness

13   finish her answer?

14             **THE COURT:**  Well, she needs to answer yes

15   or no and then stop.

16        Q.   (By Mr. Junell) Okay.  Are you aware that the

17   income statements that were provided showed income of

18   the property at being around 50 or $60,000 per month?

19        A.   I don't recall that.

20        Q.   Okay.  You're -- is it your testimony to this

21   court that in December of 2018, in the month before this

22   building was sold to Harold Polk and Grove Enterprises,

23   that the rent on the building was 50 or $60,000 per

24   month?

25        A.   We had a pro forma.  I'm not sure of the exact

1  number of the rent that was put in.  I don't do the

2  accounting.

3      Q.    You would agree with me that the income

4  statement and the pro forma that was turned over to the

5  appraiser and to Broadmark was incorrect?

6      A.    The -- the -- the building was sold as is

7  where is.  I'm not sure of what was correct or was not

8  correct.  But you have to do your own projections.  I'm

9  not there to do Mr. Polk's projections.

10      Q.    Is it -- is it your belief --

11      A.    No.  I actually -- whatever was provided to

12  him was a pro forma and pro forma has projections, so...

13      Q.    Is it your belief that because a building is

14  sold as is where is that allows a seller to disclose

15  false information?

16      A.    We did not disclose false information and, of

17  course, I don't.

18      Q.    Okay.  Well, in fact, you did disclose false

19  information.  Mr. Parker disclosed false information to

20  the lender and to the appraiser on January 7th.  Do you

21  agree with that?

22          **MR. PENNELL:**  Objection, argumentative.

23          **THE WITNESS:**  No.

24          **THE COURT:**  Overruled.

25          **THE WITNESS:**  Do you know what a pro

1  forma is on real estate?  Do you know what that means?

2          MR. JUNELL:  Excuse me.  I'm sorry?

3          THE WITNESS:  Do you know what a pro

4  forma is?

5          MR. JUNELL:  Sure.

6          THE WITNESS:  A pro forma is projections.

7  It's not a true and accurate description of anything.

8      Q.   (By Mr. Junell) But you provided more than a

9  pro forma.  You also provided income statements for 2017

10 and 2018, correct?

11     A.   Okay.  I have to look at the -- what was

12 provided.

13     Q.   Okay.  And you said that Dalio didn't receive

14 any money on this transaction.  How much was the debt to

15 Icon?

16     A.   It was four-and-a-half million.

17     Q.   Okay.  And so you were able to use all that

18 money to extinguish a liability that belonged to Dalio,

19 correct?

20     A.   It was debt on the building, so he just

21 exchanged debt for debt.

22     Q.   Well, it was debt on the building that

23 Dalio -- was on Dalio's balance sheet, correct?

24     A.   That's correct.

25     Q.   So you did receive money.  You received

1  four-and-a-half million dollars that allowed you to

2  extinguish a debt that was being held by Dalio?

3       A.   We would be quite happy to keep the debt and

4  send it on.  I mean, we didn't have to sell this

5  building to Mr. Polk.  The money -- we did not receive

6  money.  Icon Bank received the money.

7       Q.   Well, you may not have received the actual

8  cash, but you received the money that was sent -- went

9  to Icon Bank on your behalf to extinguish a debt that

10  you owed Icon Bank, correct?

11       A.   So he agreed to pay 7.5, and that's what he

12  paid, and that money was used to buy -- was to pay the

13  debt, yes.

14       Q.   Did any money -- did any money at all, even a

15  dollar, go to Ali Choudhri or Jetall?

16       A.   No.

17       Q.   Okay.

18       A.   Not to my -- not to the best of my knowledge.

19       Q.   So is your testimony is today that

20  Mr. Choudhri and Jetall received zero dollars as a

21  result of this transaction?

22       A.   As far as I'm aware, yes.  I have no idea if

23  they received money or not.

24       Q.   Okay.  And Zeke, who we talked about earlier,

25  the person who's the agent, he's actually your father,

1    isn't he?

2         A.    Yes, he is.

3         Q.    And did you ever date Mr. Choudhri?

4              MR. PENNELL:  Objection, Judge.

5         Q.    (By Mr. Junell) Do you have a relationship

6    with him?

7              THE COURT:  Overruled.

8              THE WITNESS:  What kind of question is

9    that?  What relevance does my personal life have

10   anything to do --

11             THE COURT:  Overruled.  She doesn't have

12   to answer that.

13             THE WITNESS:  -- with the bloody loan.  I

14   mean, it's completely -- it's inappropriate.

15             MR. PENNELL:  So, Judge, you said she

16   does not have to answer.

17             THE COURT:  Yeah, she doesn't have to

18   answer.  Let's focus on the issue.

19             THE WITNESS:  Would you ask a man these

20   questions?

21             MR. JUNELL:  It's okay.  You don't have

22   to answer the question.  We've already determined that.

23        Q.    (By Mr. Junell) If -- does Dalio own any other

24   properties right now?

25             MR. PENNELL:  Judge, I'm going to object

1    on relevance grounds.  We're not here on other

2    properties.

3                   **THE COURT:**  Yeah, sustained.

4        Q.   (By Mr. Junell) Why were you asking

5    Brad Parker, who's an employee of another company, to do

6    anything with regard to this transaction?

7        A.   The same reason why I would ask Hines or Boxer

8    to do anything.  They're property managers.

9                   Do you know the difference between a

10   property manager and an asset manager?  They have

11   completely different functions.

12       Q.   (By Mr. Junell) Was Jetall a property manager

13   of this building?

14       A.   I used to manage the property for many years.

15       Q.   In January 2019, were they a property manager

16   for this building?

17       A.   Yeah, they were managing the property.

18       Q.   Okay.  So you actually -- Dalio paid Jetall

19   money to manage the property in January of 2019?

20       A.   No.  There is -- there is consideration.  We

21   paid Kandra (phonetic) Paul's wife.

22       Q.   Okay.  And my question is is why the rent

23   rolls and the leases and all the information came from

24   Brad Parker and not from you at Dalio?

25                   **MR. PENNELL:**  Objection, asked and

1    answered.

2                    THE COURT:  Sustained.

3                    MR. JUNELL:  Pass the witness.

4                    THE COURT:  Redirect?

5                    MR. PENNELL:  Just one question on

6    redirect.

7                    REDIRECT EXAMINATION

8    BY MR. PENNELL:

9        Q.   Ms. Zaheer, there were questions about Zeke.

10   Where is Zeke right now?

11       A.   He lives in Malaysia.

12       Q.   And do you know what the time difference is

13   between Malaysia and Houston?

14       A.   It's actually completely the opposite.  So

15   it's like 12 hours, I think.

16                   MR. PENNELL:  Nothing further.

17                   THE COURT:  All right.  Anything else?

18                   MR. JUNELL:  Nothing, Your Honor.

19                   THE COURT:  Next witness.

20                   MR. PENNELL:  Let me see if I can get

21   Bill McGrath on the phone, Judge.

22                   THE COURT:  Where is he?

23                   MR. PENNELL:  Well, he was here and then

24   he had another engagement.

25                   THE COURT:  Where did he go?

1        **MR. PENNELL:**  So I'm going to try and

2    call him right now.

3                    **THE COURT:**  Okay.

4                    **MR. JUNELL:**  Your Honor --

5                    **THE COURT:**  You have eight minutes.  I'll

6    give you some leeway if we get him on the line.

7                    **MR. JUNELL:**  This guy who he's asking

8    about now wasn't involved at all during the real estate

9    sale and can't testify about any of the representation.

10                   **THE COURT:**  Let's see if we can get him.

11                   **MR. PENNELL:**  No, he's not answering.

12   So, Judge...

13                   **THE COURT:**  Any other witnesses?

14                   **MR. PENNELL:**  No other witnesses, and let

15   me move to adjourn until tomorrow morning, so I can

16   hopefully get him because he was here earlier, but, you

17   know, there were other matters and so he couldn't stay

18   all day.

19                   **THE COURT:**  Why don't you do a summary of

20   what you anticipate his testimony would be.

21                   **MR. PENNELL:**  Offer of proof.  He would

22   testify that -- he was the property manager for

23   Mr. Polk.  He would testify that Mr. Polk took all the

24   money out.  He never paid any of the bills, including

25   Mr. McGrath.  He didn't pay any of the expenses for

1  maintaining the property.  All he did was basically suck

2  the property -- suck all the money out and then leave

3  the tenants unhappy.  That's the summary of his

4  testimony.

5              THE COURT:  While Mr. Polk was the owner?

6              MR. PENNELL:  Correct.

7              THE COURT:  Okay.

8              MR. JUNELL:  We would also bring forth

9  those two guys are in a lawsuit against each other right

10  now, a separate matter.  They're adverse to each other

11  in a separate lawsuit.  He was the property manager who

12  has since filed a lawsuit against Harold over amounts

13  that he claims are owed, so -- and he did not work at

14  the company or the building at the time of the sale.  So

15  regarding the fraud and the representations and all that

16  sort of stuff, he can't --

17              THE COURT:  That's all post-transaction

18  work.  Is that right?

19              MR. PENNELL:  Correct.  It's all

20  post-transaction, but it will still be relevant on what

21  Mr. Polk was doing with the assets, if he's just

22  bleeding the building dry or if he's actually putting

23  money into it because if I understood his testimony, all

24  the money to fix it up came from the lender.  And then

25  if he's getting money that's on top of what he's

1   testified to and he's just taking it out, that would go

2   to the unclean hands argument and everything else.

3                    THE COURT:  But he did pour half a

4   million into the property, right?

5                    MR. PENNELL:  Well, but that money came

6   from the first lender.

7                    THE COURT:  Yeah, I understand that.

8                    MR. PENNELL:  So -- and so just so the

9   record's clear, let me say it's 8:00 o'clock.

10                   THE COURT:  That's part of the loan.

11                   MR. PENNELL:  Correct.  Now, let me just

12  say it's 8:00 o'clock p.m.  I want to move to adjourn

13  this hearing until tomorrow morning so I can hopefully

14  present Mr. McGrath's testimony live.

15                   MR. JUNELL:  We would object to that.  We

16  need to finish this up now.

17                   THE COURT:  Yeah, any other witnesses

18  that you would otherwise call?

19                   MR. PENNELL:  No, Judge.

20                   THE COURT:  Okay.  I'm going to deny that

21  motion, and I am going to -- I'm going to grant the TRO

22  but on this condition, and I want to share this

23  condition with y'all so that we can work on appropriate

24  language.  Okay.  In this second to the last paragraph

25  it says, "Are enjoined from taking any other action with

1  regard to --" and now it goes over to the last

2  page "-- any foreclosure of the property, including

3  posting the property or foreclosure on any future date,

4  unless the court orders otherwise," and I want to add

5  this language --

6           MR. JUNELL:  Before you could say that,

7  is this the order that was filed today, the proposed

8  temporary injunction order?

9           THE COURT:  Yes.

10          MR. JUNELL:  It was filed today.  It's

11 slightly amended from the one that was filed two weeks

12 ago.

13          THE COURT:  I'm pretty sure it's the one

14 today.  No.  Let me double check, just a second.  9/30,

15 yeah, it's the one that was filed today.

16          MR. JUNELL:  Okay.  Good.

17          THE COURT:  What I want to add to that

18 line there -- you see where I am, the second to the last

19 paragraph, "Unless the court orders otherwise," you see

20 that?

21          MR. PENNELL:  Bear with me one second.

22          THE COURT:  I want to add this language,

23 "Provided the first lien note held by BRELF remains

24 current.  Should the first lien, slash, note go into

25 default and the first lienholder posts the property for

1  foreclosure, Defendants may petition the court to modify

2  this injunction."  The only problem I have with that is

3  Mr. Simon's statement that, you know, they're reserving

4  to foreclosure tomorrow.

5           MR. SIMON:  I actually just texted them.

6  Are we off the record?

7           MR. PENNELL:  No, I want this on the

8  record, Judge.

9           THE COURT:  Well, I mean, sure.  That's

10  fine.

11           MR. SIMON:  I just texted him to let them

12  know that, and I was waiting to hear what the conditions

13  were going to be so I could let them know that --

14           THE COURT:  Which is basically that

15  they're not going to foreclosure.

16           MR. SIMON:  Correct.

17           THE COURT:  Right?  But once they post

18  and express that intention of foreclosing, then you can

19  come in here and say, "Judge, I'm about to lose my

20  equity," and seek modification of the injunction.

21           MR. PENNELL:  But if they've already said

22  they can foreclosure tomorrow -- and I know they said

23  they won't if we're not allowed to foreclosure -- but

24  they've already posted, and then now they have this

25  letter that they said earlier was binding and now

1   they're saying apparently it's not.

2           THE COURT:  Well, that's what I'm --

3   that's what I'm concerned about.  That's why I'm

4   bringing this language to your attention because I don't

5   want to grant this --

6           MR. JUNELL:  We can get him on the line

7   right now, and he'll tell you what's --

8           MR. SIMON:  I think there's a simple work

9   around.

10          THE COURT:  I mean, I could -- I could --

11  I mean, I could take that -- well, I mean, if I take

12  that language out and they foreclosure tomorrow, right,

13  and they kill your equity, I don't want that to happen.

14          MR. PENNELL:  But they're not a party.

15          MR. SIMON:  He just texted me.  Thank

16  you.  He is not going to foreclose.  That's what he just

17  e-mailed me, excuse me, not text.

18          THE COURT:  I guess this is called the

19  little bit of trust, but, I mean --

20          MR. JUNELL:  Well, if they do, they can

21  run back down here and we can fix it and undo it.

22          MR. PENNELL:  I don't know that I agree

23  with that.  But, Judge, can I ask what the bond is going

24  to be for the temporary injunction?

25          THE COURT:  I'm just going to keep it

1  what it is, so that we don't have to --

2           MR. PENNELL:  $1,000 bond on a

3  three-and-a-half million note that's fully matured?

4           THE COURT:  Yep.  And the parties are

5  ordered to mediate this case by October 20th, 2019, with

6  a mediator of their choosing.

7           MR. JUNELL:  By what date?  October 20th?

8           THE COURT:  It's so ordered.  October

9  20th, right.

10           MR. PENNELL:  Is the thousand dollar

11  bond, that's the one they posted for the TRO.  That acts

12  as the bond for the temporary injunction?

13           THE COURT:  Yes.

14           MR. PENNELL:  Okay.  So they don't have

15  to post a separate bond?

16           THE COURT:  Right.  That way it's

17  effective immediately.  If we had time to post more

18  bond, I'd consider that, but this way this is in effect.

19           MR. PENNELL:  And is the temporary

20  injunction going to go through the time of trial or is

21  it just for one month?

22           THE COURT:  I'm not going to put a

23  limitation on it because that will give the parties

24  incentive to mediate and see where things are.  Because,

25  I mean, if things go south, eventually the first

1   lienholder is going to post.  That's what's going to

2   start happening.  I mean, the note is going to go in

3   default.  The first note's going to go into default.

4   And once that's happened, I think that's your green

5   light to say, Judge, things have changed.  They're in

6   default.  I'm being threatened by losing my equity.  You

7   got to let me go foreclose.  And if that's what's going

8   down, then I would probably let you do that.

9            MR. PENNELL:  Understood.  But if we

10  foreclosure at the same time as the first lienholder,

11  then the effect is the same.  I mean, it might as well

12  be as if you kept the injunction in place because we're

13  going to be wiped out either way.  This is the only way

14  we have of possibly preserving our equity.

15            THE COURT:  I understand.  And, you know,

16  but they put on prima facia case that Mr. Polk was

17  misled into the transaction.  And if he prevails, you

18  know, then he has legal remedies, but he needs to keep

19  his ownership position to minimize his losses.  You

20  know, this is just a bad deal that went bad.  And y'all

21  need to work with each other to try to make it better,

22  if you can.  I wish I could fix all problems.

23            MR. PENNELL:  The deadline to mediate

24  was?

25            THE COURT:  October 20th.

1      MR. JUNELL:  So is this -- is this an

2   order that you're going to sign right now that we could

3   get a copy of?  I think I'm going to have to go down to

4   the trustee sale tomorrow just to make sure that whoever

5   the substitute trustee is doesn't go forward.

6      MR. PENNELL:  And, Judge, just so you

7   know, you had signed an order at the last -- last time

8   we were down here.  It never made its way on to the

9   clerk's website.  It was an order denying the motion for

10  protective order as to BRELF.  You denied it without

11  prejudice and you signed it, but it never appeared on

12  the clerk's website.

13      THE COURT:  Let me see what I can find?

14      (Off the record)

15      (Whereupon, the proceedings were

16  concluded.)

17

18

19

20

21

22

23

24

25

1  THE STATE OF TEXAS          )
                               )
2  COUNTY OF HARRIS            )

3         I, Amanda L. King, Official Court Reporter in

4  and for the 189th District Court of Harris County, State

5  of Texas, do hereby certify that the above and foregoing

6  contains a true and correct transcription of all

7  portions of evidence and other proceedings requested in

8  writing by counsel for the parties to be included in

9  this volume of the Reporter's Record, in the

10 above-styled and numbered cause, all of which occurred

11 in open court or in chambers and were reported by me.

12        I FURTHER CERTIFY that this Reporter's Record

13 of the proceedings truly and correctly reflects the

14 exhibits, if any, admitted by the respective parties.

15        I FURTHER CERTIFY that the total cost for the

16 preparation of this Reporter's Record is  $1,530.50 and

17 was paid/ **will be paid** by   Defendant.

18        WITNESS MY OFFICIAL HAND this, the  13th  day

19 of July, 2020.

20                          /s/ Amanda L. King
                          Amanda L. King, Texas CSR 6618
21                        Expiration Date:  07/31/2021
                          Official Court Reporter
22                        189th District Court
                          Harris County, Texas
23                        201 Caroline, 12th Floor
                          Houston, Texas 77002
24                        (832)927-2329.
                          amanda_king@justex.net
25

| | | |
|---|---|---|
| **GROVE ENTERPRISES, LLC** | § | **IN THE COUNTY CIVIL** |
| **Plaintiff** | § | |
| | § | |
| **vs.** | § | **COURT AT LAW NO. 1** |
| | § | |
| **DALIO HOLDINGS I, LLC** | § | |
| **Defendant** | § | |
| **v.** | § | |
| | § | |
| **HAROLD GIBSON POLK, JR.** | § | **HARRIS COUNTY, TEXAS** |
| **Third-Party Defendant** | | |

## Plaintiff's Request to Inspect Original Documents

Plaintiff Grove Enterprises, LLC, and Third Party Defendant Harold Polk ("collectively "Movants") served their request to inspect original documents and would show the Court as follows:

Defendant DALIO is countersuing Movants for $3,520.206.70 pursuant to a purported promissory note signed by the Movants. Attached is a copy of the alleged promissory note that Defendants have filed in trial court's records as "***Dalio Exh. 8***" and other real property public records.

Based on information and belief, DALIO, through its owner/agent(s) Azeemeh Zaheer, Mirza Agha, Zeke Agha, and/or Brad Parker have forged the promissory note and caused to be introduced into evidence fake evidence.

Specifically, the purported promissory is six (6) pages with the first page and signatory/notary pages unnumbered. Specifically the first page is as follows:

HF 8179114v.2 

The second through fourth pages show a specific page number as follows:

- 2 - 

………..

- 3 - 

………..

- 4 - 

Notably, the footer from the first page, ***"HF 8179114v.2"*** is missing from the remaining five (5) pages.

Lastly, the signature page purportedly containing the Movants' signatures has a vast space that could have included the notary affirmation.  However, the notary affirmation and seal is on the last page.  These are the hallmarks of a forged document and phony evidence.

Regardless, Movants would respectful request that Defendants be ordered to produce all original documents for Movants to inspect at a neutral location and other just and equitable relief the Court deems proper.

Respectfully submitted,

_____
 David Tang, Esq.
**State Bar No. 24014483**
6711 Stella Link, #343
West University Place, Texas 77005
(832) 287-2129
(832) 217-3227 – Fax
Email: dtangattorney@gmail.com
**Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

     I hereby certify that a true and correct copy of the above and foregoing was served in accordance with the Texas Rules of Civil Procedure on all parties/counsel of record by placing same in the United States mail, certified mail, return receipt requested, by hand delivery or by telecopier, on July 19, 2020.

_____

DAVID TANG

Dalio

Exh. 8

## PROMISSORY NOTE

$3,520,206.70

Houston, Texas
_____
(Date)

    **FOR VALUE RECEIVED, HAROLD GIBSON POLK, JR.** ("Polk"), an individual with an address at 917 Main Street, Houston, Texas 77002, and **GROVE ENTERPRISES, LLC** ("Grove"), a Texas limited liability company with an address of 3117 7th Street, Port Arthur, Texas 77642, jointly and severally as makers ("Borrowers"), hereby unconditionally promise to pay to the order of **Dalio Holdings I, LLC**, a Delaware limited liability company, having an address at 3139 W Holcombe Blvd #845, Houston, TX 77025 ("Lender"), or at such other place as the holder hereof may from time to time designate in writing, the maximum principal sum of **THREE MILLION FIVE HUNDRED TWENTY THOUSAND TWO HUNDRED and SIX AND 70/100 DOLLARS ($3,520,206.70)** in lawful money of the United States of America with interest thereon to be computed from the date of this Note at the Applicable Interest Rate, and to be paid in accordance with the terms of this Note, the 411 Deed of Trust, the 917 Deed of Trust and the 929 Deed of Trust (the "Deeds of Trust"), dated as of the date hereof, between Borrowers and Lender (the "Loan Agreement"). All capitalized terms not defined herein shall have the meanings set forth in the Pledge Agreement or the Deeds of Trust, as the case may be. This Note, the Pledge Agreement and the Deeds of Trust are sometimes collectively referred to as the "Loan Documents" or singly as "Loan Document."

### ARTICLE 1 - Payment Terms

    Borrowers agree to pay the principal sum of this Note, together with all accrued and unpaid interest thereon, all at the stated regular rate of fifteen percent (15.00%) per annum (the "Applicable Rate") on or before July 15, 2019 (the "Maturity Date"). Commencing February 15, 2019 and continuing on the 15th of each subsequent month until the Maturity Date, Borrower agrees to pay to Lender interest-only payments based on the principal sum of this Note and the Applicable Rate.

    Upon any prepayment or repayment (including in connection with an acceleration of the Loan), made on or before the stated Maturity Date, Borrowers shall pay to Lender on the date of such prepayment or repayment (or an acceleration of the Loan) the Spread Maintenance Premium applicable thereto. All Spread Maintenance Premium payments hereunder shall be deemed to be earned by Lender upon the funding of the loan which is the subject of this Note. The "Spread Maintenance Premium" means, with respect to any prepayment of principal (or acceleration of the Loan) on or before the stated Maturity Date (and, for the avoidance of doubt, a repayment on the stated Maturity Date shall also require the payment of Spread Maintenance Premium) an amount equal to the product of the following: (A) the amount of such repayment (or the amount of principal so accelerated), multiplied by (B) the Spread, multiplied by (C) a fraction (expressed as a percentage) having a numerator equal to the number of months' difference between the date such prepayment occurs) or the next succeeding payment date through which interest has been paid by Borrowers, and a denominator equal to twelve (12); provided, however, that the Spread Maintenance Premium shall be waived, but only if Borrowers tender the full amount due and owing hereunder on or before March 31, 2019.

If Borrowers fail to pay the amount stated in the preceding paragraph, together with all accrued and unpaid interest thereon on or before the Maturity Date, Borrower shall pay to Lender additional interest at the Default Rate of the lesser of eighteen percent (18.00%) per annum (the "Default Rate") or the maximum amount allowed by the laws for the State of New York.

## ARTICLE 2 - Default And Acceleration

The Debt shall without notice become immediately due and payable at the option of Lender if any payment of principal or interest required in this Note is not paid on or prior to the date when due or if not paid on the Maturity Date or on the happening of any other Event of Default and in addition, Lender shall be entitled to receive interest on the entire unpaid principal sum at the Default Rate pursuant to the terms of the Loan Agreement. This Article 2, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

## ARTICLE 3 - Loan Documents

This Note is secured by the Pledge Agreement and the Deeds of Trust. All of the terms, covenants and conditions contained in any other Loan Document are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Document which gives the Mezzanine the greatest protection or right shall govern.

## ARTICLE 4 - Savings Clause

This Note and the other Loan Documents are subject to the express condition that at no time shall Borrowers be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Note or any other Loan Document, Borrowers are at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

## ARTICLE 5 - No Oral Change

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrowers or Lender, but only by

001857

an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 6 - Waivers

Borrowers and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, notice of intent to accelerate, notice of acceleration, protest, notices of protest and/or of non-payment and any and all other notices of any kind except any such notice expressly required by this Note. No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note or any other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrowers, and any other Person who may become liable for the payment of all or any part of the Debt, under this Note, the Loan Agreement or the other Loan Documents.

No notice to or demand on Borrowers shall be deemed to be a waiver of the obligation of Borrowers or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents. In the case of Grove, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the members comprising Grove, and the term "Borrower" as used herein, shall include any alternate or successor limited liability company, but any predecessor limited liability company shall not thereby be released from any liability. (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, corporation or limited liability company which may be set forth in any Loan Document.)

## ARTICLE 7 - Transfer

Upon the transfer of this Note, Borrowers hereby waiving notice of any such transfer, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter accruing from and after the date of the transfer; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE 8 - Governing Law

This Note shall be governed in accordance with the laws of the State of New York.

## ARTICLE 9 - Notices

All notices or other written communications hereunder shall be delivered to the respective addresses for each such party shown hereinabove, unless the party to whom notice is directed has given notice that its address has changed and provided the party from whom notice

001858

is given its new address. Any notice delivered to Polk but not separately delivered to Grove shall be deemed delivered to Grove upon delivery to Polk and vice versa.

<h2 style="text-align:center">ARTICLE 10 -</h2>

[Intentionally omitted.]

<h2 style="text-align:center">ARTICLE 11 - Liability</h2>

The obligations and liabilities of each Borrower hereunder shall be joint and several.

**[NO FURTHER TEXT ON THIS PAGE]**

- 4 -

001859

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the day and year first above written.

**BORROWER:**

**GROVE ENTERPRISES, LLC**, a Texas limited liability company

By:

    **Its Manager**

By: _____

Harold Gibson Polk, Jr.

Its Manager

_____

**HAROLD GIBSON POLK, JR.**, Individually

## ACKNOWLEDGMENTS

STATE OF TEXAS      §
                               §

COUNTY OF HARRIS    §

On this the 14th day of January 2019, before me, a Notary Public, personally appeared **HAROLD GIBSON POLK, JR.**, who acknowledged himself to be (i) an individual borrower, and (ii) the Manager of **GROVE ENTERPRISES, LLC**, a Texas limited liability company, the other of the Borrowers herein, and, being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing the name of **GROVE ENTERPRISES, LLC**, by himself as its Manager.

In witness whereof I hereunto set my hand and official seal.



NOTARY PUBLIC

Print Name: Richard Melamed

My Commission Expires: 7-21-20

RICHARD MELAMED
My Notary ID # 5664024
Expires July 21, 2020

1                    IN THE UNITED STATES BANKRUPTCY COURT

2                    FOR THE SOUTHERN DISTRICT OF TEXAS

3                             HOUSTON DIVISION

4    IN RE:                          §      CASE NO. 21-60082-11
                                     §      HOUSTON, TEXAS
5    GROVER ENTERPRISES, LLC,        §      WEDNESDAY,
                                     §      SEPTEMBER 22, 2021
6             DEBTOR.                 §      11:00 A.M. TO 11:47 A.M.

7

8                       MOTION HEARING (VIA ZOOM)

9            BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                  UNITED STATES BANKRUPTCY JUDGE

10

11

12        APPEARANCES:                       SEE NEXT PAGE

13        ELECTRONIC RECORDING OFFICER: KIMBERLY PICOTA

14

15        (Recorded via CourtSpeak)

16

17

18

19

20                    TRANSCRIPTION SERVICE BY:

21              JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                     935 Eldridge Road, #144
22                    Sugar Land, TX 77478
                         281-277-5325
23                 www.judicialtranscribers.com

24

25    Proceedings recorded by electronic sound recording;
         transcript produced by transcription service.

1                        APPEARANCES (VIA ZOOM):

2

3   FOR THE DEBTOR:              TRAN SINGH, LLP
                                Brendon Singh, Esq.
4                               2502 La Branch Street
                                Houston, TX  77004
5                               832-975-7300

6

    FOR SETH KRETZER:           LAW OFFICE OF SETH KRETZER
7                               Seth Kretzer, Esq.
                                440 Louisiana St, Ste 1440
8                               Houston, TX  77002
                                713-775-3050
9
                                JAMES W. VOLBERDING
10                              James Volberding, Esq.
                                110 North College Avenue
11                              Suite 1850
                                Tyler, TX 75702
12                              903-597-6622

13  FOR US TRUSTEE:             OFFICE OF THE U.S. TRUSTEE
                                Jayson Ruff, Esq.
14                              515 Rusk St., Ste. 3516
                                Houston, TX 77002
15                              713-718-4650

16  FOR BRMK LENDING, LLC:      MUNCSH HARDT KOPF AND HARR
                                John Cornwell, Esq.
17                              Sameer Karim, Esq.
                                Aynsley Young, Esq.
18                              700 Milam Street, Suite 2700
                                Houston, TX  77002
19                              713-222-4066

20  ALSO APPEARING:             Michael Chang
                                David Tang
21                              Brad Shepherd

22

23

24  (Please also see Electronic Appearances.)

25

3

1    HOUSTON, TEXAS; WEDNESDAY, SEPTEMBER 22, 2021; 11:00 A.M.

2            THE COURT:  Okay.  Good morning, everyone.  This

3    is Judge Lopez.  Today is September 22nd.  I'm going to call

4    the 11:00 a.m. docket, and that is 21-60082 Grove

5    Enterprises, LLC.  Here, originally, on a status conference

6    that was requested, but since then there was an emergency

7    motion to dismiss this case by Mr. Seth Kretzer, I believe

8    is the receiver.

9            So let me go ahead and just take appearances and

10   let's see -- is someone here on behalf of the Debtor?

11           MR. SINGH:  Yes, Your Honor.  Brendon Singh on

12   behalf of Grove Enterprises --

13           THE COURT:  Okay.

14           MR. SINGH:  -- in the bankruptcy case.

15           THE COURT:  Good morning, sir.

16           I also ordered Mr. Michael Chang to be present for

17   today.  Is Mr. Chang here, Michael Chang?

18           MR. SINGH:  He is, Your Honor.  Mr. Chang is here

19   on and on the line and on the video.

20           THE COURT:  I see him.  I see him on video.  Good

21   morning, sir.  Thank you for the -- thank you.

22           MR. CHANG:  Thank you.

23           THE COURT:  Okay.

24           Mr. Kretzer, I'll go ahead and take your

25   appearance.

1          MR. KRETZER:  Good morning, Your Honor.  Seth

2    Kretzer state court-appointed Receiver.

3          THE COURT:  Okay.

4          And Mr. Ruff, good morning.

5          MR. VOLBERDING:  And Your Honor, my name is James

6    Volberding.  I am representing Mr. Kretzer.  I'm his law

7    partner.

8          THE COURT:  Ah, perfect.  Good morning, sir.

9          MR. VOLBERDING:  Thank you, sir.

10         THE COURT:  Okay.  Mr. Ruff, now I'll let you go.

11         MR. RUFF:  Yeah.  Good morning, Your Honor.  Jason

12   Ruff on behalf of the U.S. Trustee.

13         THE COURT:  Okay.  Mr. Cornwell, do you wish to

14   make an appearance?

15         MR. CORNWELL:  I do, Your Honor.  Thank you.  John

16   Cornwell on behalf of BRMK Lending, LLC.  -- the most --

17         THE COURT:  Mr. Cornwell, I know who you're

18   representing through the pleading, but I couldn't hear you

19   too clearly.  Do you mind just stating it again?  At least

20   to me it was breaking up on my end.

21         MR. CORNWELL:  Of course, Your Honor.  This is

22   John Cornwell, again, representing BRMK Lending, LLC.  And

23   Your Honor, also on phone Sameer Karim, one of my litigation

24   colleagues that has had the fortune of being involved

25   through the history of this case.  And on phone and by video

1   is another litigation colleague Aynsley Young all on behalf

2   of BRMK Lending.

3           THE COURT:  Okay.  Good morning.

4           Does anyone else wish to make an appearance this

5   morning in connection with this case?

6           MR. TANG:  Your Honor, My name is David Tang.  I

7   represent Harold Poke and Grove Enterprises in some state

8   district court actions.  I'm their lawyer before this

9   purported and disputed assignment that they pulled out last

10  week to stop the foreclosure.  So I'm trying to figure out

11  where I stand in all this, because we kind of joined in the

12  receiver's motion.  I got a copy of the pleading -- the

13  complete pleading last night from everybody.  I wasn't on

14  any emailing list.  Not anybody's fault or anything it just

15  again just me didn't activate my bankruptcy account, again.

16          THE COURT:  Yeah.  No, no, no.

17          MR. TANG:  -- my pace account.

18          THE COURT:  Understood.  And thank you.  And to

19  the extent that there is somebody who wishes to make an

20  appearance today that would need to file a pro hoc, that is

21  waived today.  You're free to appear today, this is an

22  emergency motion, and I just think what we're discussing is

23  really important.  So there's no need to file anything or

24  have to worry about any of that today.  Okay.

25          MR. TANG:  Thank you -- I appreciate --

1          MR. SHEPHERD:  Good morning.

2          THE COURT:  Good morning, Mr. Shephard.

3          MR. SHEPHERD:  Good morning, I'm Branch Shephard

4   and I represent -- in the state court litigation.

5          THE COURT:  Did you say Daiyo (phonetic)?

6          MR. SHEPHERD:  Yes, sir.  Daiyo Holdings and --

7   Daiyo as a junior lien holder it's important to be around.

8          THE COURT:  Okay.  Good morning.  Does anyone else

9   wish to make an appearance?

10         And for those that are on the line, there's no

11  need to hit five-star your line is completely unmuted, and I

12  hope to keep it that way just to let the parties speak.  I

13  just ask everyone to please keep your phone on mute until

14  it's your turn to speak, so that way we can just minimize

15  background noise.  So anyone else wish to make an appearance

16  and there's no need to hit five-star?

17         Okay.  Mr. Singh, why don't you just talk to me

18  kind of about this case at the 10,000-foot level?

19         MR. SINGH:  Happily, Your Honor.

20         THE COURT:  Starting there and kind of where we

21  are and then I will turn to Mr. Volberding --

22         How do I pronounce your last name, sir?  I want to

23  make sure I got it right.  Is it Volberding?  You're on

24  mute, sir.  I muted you and I told you I -- sorry about

25  that.

1          MR. VOLBERDING:  I apologize.  Volberding, you did

2   it exactly right.  Mr. V. is perfectly fine --

3          THE COURT:  No, no, Volberding --

4          MR. VOLBERDING:  -- that works just as well.

5          THE COURT:  -- I just want to make sure I

6   pronounce it correctly.  I'm going to be very respectful.

7   So thank you very much.  So I'll turn to you next and then

8   I've got a couple of comments before we officially get

9   started, okay?

10          MR. VOLBERDING:  Thank you, sir.

11          MR. SINGH:  All right.

12          THE COURT:  Mr. Singh, good morning.

13          MR. SINGH:  Thank you, Your Honor.

14          So Your Honor, this is sort of -- I requested a

15   status conference and we took a little bit of time just so

16   we set the stage.  When this case was filed it sort of had a

17   lot of tentacles to it and so we -- I was able to reach out

18   to Mr. Cornwell for the first lien hold in this case.  I

19   actually got a chance to speak to Mr. Tang and Mr. Polk and

20   I reached out to their receiver a little bit later on but

21   wasn't able to get ahold of him at that time.

22          So here is sort of where this is.  The main -- and

23   this has gone on for some time and the litigation has gone

24   on pretty far.  The main issue, I think, we have before the

25   court and I had sort of extensive conversations with the USD

1  and I think everyone involved on whether authority to sort

2  of put the company into bankruptcy again.  So here's sort of

3  when it's --

4          So the main documents that we have that are at

5  issue here are a couple loan agreements and one from 2017,

6  pledge of assignment of equity interest and a pledge of

7  assignment of equity interest in 2019.  And before I go any

8  further, Mr. Tang and Mr. Polk -- just so I have -- the

9  Court understands where they are, they believe that all of

10  the documents including these documents and the documents

11  from the first lien holder, Mr. Cornwell's client, they --

12  allegations from their standpoint is that all of those

13  documents are fake and fraudulent, at least they weren't

14  supposed to be done to a certain extent.  So just so that

15  when we're talking about them, that's their stance so the

16  Court understands where they're coming from.

17          The steps forward in the state court, lots of

18  things went on in the state court, and the second lien

19  holder on this -- property in 2019, let me back up a little

20  bit just so everyone is clear.  2019 there was a deal to

21  purchase 411 North Main which is sort of the property that's

22  at issue here.  That property was originally supposed to be

23  bought -- the pleadings and the documents are somewhere

24  between I think the contract says $7.5 million.  That

25  contract was supposed to be funded by Mr. Cornwell's client

1  Broadmark or BMRK [sic] I just know them as Broadmark.  BMRK
2  [sic] put in sort of approximately about $408 million, Mr.
3  Polk was supposed to then put in $305 million.  Something
4  happened and a really large contention of what happened at
5  the title company in terms of documents being signed days
6  they were supposed to be signed.

7          But the best that I can sort of unravel is that
8  Mr. Polk signed some documents on January 11th, 2019.  It
9  was supposed to fund the other half of the loan, that didn't
10  happen, the documents went back and forth over the next
11  week, and the deal eventually closed I think somewhere
12  around the 18th or the 17th and the confusion in the
13  documents are sort of just bad.  Some of the documents --
14  the documents all had the 7th -- January 17th of 2019, and
15  some of them were marked out and then 18 was written in.  So
16  the documents are sort of bad and that's sort of I think
17  where a lot of this comes about.

18          Along with those documents, is a pledge agreement
19  in '19 and there was a deal with Mr. Polk, an entity back in
20  2017, when he pledged all of his interest in Grove
21  Enterprises to two different companies, at the time, all
22  basically controlled by -- for today's hearing let's say Mr.
23  Chang's sort of in control of those.  There's another
24  individual Ali Chandry (phonetic) who technically runs them,
25  but Mr. Chang is sort of the manager of those companies.

1          So what happened?  After trying to foreclose and I

2    think the state court -- the state court appointed a

3    receiver to collect rent on these properties and they were

4    sort of kicking back and forth.  And the state court didn't

5    really make a decision on whether the documents were

6    fraudulent or not, but the state court said it can go

7    foreclose.  So both of these of properties -- both lien

8    holders, first and second, posted the property for

9    foreclosure and my clients ended up looking at getting

10   advice from corporate counsel on whether the -- whether they

11   can accept the pledge and assignment and what that would do.

12          From sort of 10,000-foot level the position is

13   that they accepted those pledges, both the '17 and the '19

14   on the basis that just out of abundance of caution, we're

15   going to accept the interest in both.  They then became 100

16   percent interest holder in Grove Enterprises which then they

17   held a meeting and removed Mr. Polk and appointed Mr. Chang,

18   and then Mr. Chang put the company into bankruptcy.

19          THE COURT:  So, Mr. Singh -- Mr. Singh, let me ask

20   you.  Is there a governing security agreement that governs

21   when a pledge can be used or under what instances or do

22   these documents -- we're not talking evidence.  I just want

23   to understand your position.  So there was a default that

24   occurred and then, if I were then to look at the assignments

25   and the pledges, they would then indicate when someone could

1    use this as default?  Or is there another document out there

2    that governs that?  I just want to understand what it is

3    that -- it's you-all's position.

4           If I understand it correctly, that these documents

5    allowed the assignment to occur upon some event, that event

6    occurred, Mr. Change was then assigned all of the rights and

7    interest to Grove, Mr. Polk was then put out, and then Mr.

8    Chang authorized the filing of the bankruptcy case, is that

9    correct?

10          MR. SINGH:  That's basically correct.  There are

11   some names differences obviously, but not Mr. Chang

12   specifically but a different company.  But Yes, Your Honor.

13          THE COURT:  Correct.

14          MR. SINGH:  In general --

15          THE COURT:  Correct.  I agree.

16          MR. SINGH:  -- in general, yes.  The documents --

17   the pledge agreements are such that if there's a default and

18   in 2018 -- for the '17 default in 2018, Mr. Polk signed an

19   acknowledgement that the 2017 loan that was in default was

20   in default.  And again, just so that I'm clear, I'm not

21   trying to mislead the Court or anything, Mr. Polk believes

22   all of those documents or at least the -- all of those

23   documents that I'm talking about right now are fraudulent

24   documents just so that it doesn't seem like I'm not -- I'm

25   disregarding that argument.

1          THE COURT:  No, no, no.  I understand.  Okay.

2   Thank you.

3          MR. SINGH:  And so yeah, unfortunately we would

4   hope that -- have better documents in terms of something

5   that sort of lays that out, but the lead -- the pledge and

6   assignment agreement does have in the event of default then

7   they can in essence accept those pledges and assignments.

8   And so the basic argument is --

9          THE COURT:  Mr. Singh, are you sure about that?

10         MR. SINGH:  -- Your Honor --

11         THE COURT:  You sure about that?

12         MR. SINGH:  And that's sort of when we filed the

13  bankruptcy my belief is that it was.  I am just a bankruptcy

14  lawyer, but corporate counsel has sort of gone through the

15  process and said, yes that's sort of how that works and

16  that's the belief that Mr. Chang and I have and that's sort

17  of how we're operating.

18         THE COURT:  Okay.

19         MR. SINGH:  Why I set this status conference

20  initially was, I sort had gone through that process with Mr.

21  Cornwell.  We had talked about first let's figure it out,

22  what we do -- is there a global settlement, is there a way

23  to get this resolved?  And so what we had looked at was and

24  that's sort of how it was filed, the CRO motion was sort of

25  put in place.  That was more of a -- this is where we

1  thought this fight was going to come from when I talked to

2  Mr. Cornwell was this is -- I don't know that we -- we have

3  our positions they have their positions, it's different than

4  our position.  And so if they listen as we're going down

5  that road let's figure out because the company still needs

6  be up and running.  We were hoping to get a status

7  conference last week but when I spoke to Mr. Chang -- Mr.

8  Tang he was going to be out of town --

9            THE COURT:  Yeah.

10            MR. SINGH:  -- so that's the reason for the

11  later --

12            THE COURT:  Right.

13            MR. SINGH:  I want to make sure -- and what I was

14  hoping to do today, Your Honor, was set a hearing on a date

15  that everyone could come and say all the things they want to

16  say about authority to file, we can tee that up, the Court

17  could make a decision on that -- we could be right, we could

18  be wrong -- the Court makes a --

19            THE COURT:  Right.

20            MR. SINGH:  -- decision.  And then from there we

21  go where we go and everyone has the ability to kind of say

22  what they want to say and enough time to get all the things

23  on plate and get all the things on board.  And but I think

24  this has been --

25            THE COURT:  So Mr. Singh, let me ask you one

1    question.

2              MR. SINGH:  Uh-hu.

3              THE COURT:  I get that, and I think that makes

4    sense.  Talk to me about the September 3rd filing petition.

5    That's going to come up so you might as well give me the

6    10,000-foot level.  I don't see any signatures on that

7    petition and that's been raised -- so why don't you tell me

8    about that.

9              MR. SINGH:  So that was -- that was a purely a

10   mess up in my office.  That was a September 7th, we got all

11   the documents probably about an hour before the case was

12   filed, and I just uploaded the wrong document.  So I had

13   everything, but the document -- if the Court looks I think

14   it got filed somewhere on eight minutes before.  We had

15   filed -- I can file the signatures.  I have them.  It's just

16   I didn't actually realize we filed the wrong document just

17   because we were moving so quickly.

18             THE COURT:  Right.

19             MR. SINGH:  That is purely my fault on that

20   document being filed.

21             THE COURT:  So let me ask you as well, the

22   estimated assets that are checked on either this one or the

23   amended, says 0 to 50,000.  I think in the motion, I know

24   I'm jumping ahead -- there's a CRO motion where you're

25   seeking to sell something for about half a million.  So

1   what's -- I'm just trying to understand the size of the

2   case.

3            MR. SINGH:  So and this is --- and just the way we

4   came in, in terms of because -- again it's undisputed Mr.

5   Polk was running this company but for and until those liens

6   -- those assignments were accepted.  So the main

7   (indiscernible) that we know of and I have a motion to

8   extend the deadline but I didn't file -- when this motion

9   came down, I sort of said, okay, let me pause on all of

10  those.  And I don't want it to look as though I'm trying to

11  railroad over anyone in terms of their ability to come fight

12  and say no this -- should be dismissed and so I have all of

13  those.  One of them is how (indiscernible).  The second is a

14  motion to extend time.

15           The main asset that I believe is here is the

16  building at 411 North Main that the receiver is collecting

17  all the rent on.  At this moment in time, I believe from the

18  receiver's notices in the state court, there's approximately

19  $200,000 worth of rent that the receiver is collecting.  The

20  value of that building is sort of at this point in time

21  contested I guess -- it was sold in 2019, for 7.5 million.

22  The appraisal at the moment is 4.2 million, is my

23  understanding, and there's a huge leak and a roof problem

24  that's going to cause about $500,000.

25           So when I got onto the case one of the hopes was

1  that with Mr. Cornwell's client is that we would -- my

2  client would be willing to do a DIP loan, get the roof

3  fixed, get the place sort of pinned up sort of say and then

4  sell it for enough to pay off all the DIP.  And that's sort

5  of what we were rounding about before I spoke to Mr. Chang

6  and he sort of -- he told me that their stance of the

7  documents were not accurate or fraudulent documents.

8           THE COURT:  Got it.

9           MR. SINGH:  And so --

10          THE COURT:  Okay.

11          MR. SINGH:  -- that's sort of why I sort of paused

12  and backed up because I didn't want it to seem as though we

13  were just sort of plowing forward and didn't listen to all

14  the folks that we sort of circled up with and again I'll

15  just go over the --

16          THE COURT:  I understand.

17          MR. SINGH:  -- and sort of given that same

18  overview of here's where I think we are, here's where -- I

19  want everyone to be able to come tell the Court what it is

20  they want to tell them, they have their day in Court, and

21  they have the opportunity to make all of those statements.

22  We can then defend those statements.  We win or we lose, and

23  then we go on down the road.  But the CRO motion I wanted to

24  make sure I copied, because there are things -- there's rent

25  being collected and things being there.

1          There is a state court receiver, but the state

2    court receiver -- in the state court receiver appointment

3    only allows them to do a certain thing, mainly collect rent,

4    try to make a settlement, allow the foreclosure, pay

5    utilities.  And so when I spoke with Mr. Cornwell in terms

6    of someone who one had the ability to do it, and two sort

7    off had the cost structure that I think we're looking at the

8    same rate as the receiver $350 -- we pitched -- we talked

9    about folks that would be in that range, that had some

10   bankruptcy experience that would be able to do what needed

11   to be done.  And we sort of coalesced on Mr. Quinn

12   (phonetic) and that's how he came about.

13          And that's primarily just because we wanted --

14   that was more of a we wanted someone that -- both of the

15   parties --

16          THE COURT:  Okay

17          MR. SINGH:  -- in this litigation, like most

18   litigation, don't like each other, no one likes each other.

19   Fortunately Mr. Cornwell has a pretty good relationship and

20   so we sort of talked that through and we thought that would

21   have been a good way to go, and that's why that motion got

22   filed.  But I still think the lynch pin issue is the

23   authority and then we can push all those things.  Because if

24   the Court finds that we did have authority and we are wrong,

25   then I think that none of the other motions matter.  If

1  although the Court finds that we are right and we have the

2  authority, then we don't want to wait on some of those

3  things to get going and that's sort of how we have that teed

4  up in that manner, Your Honor.

5            THE COURT:  Yeah.  Yeah.  I get it.  Okay.

6            Mr. Volberding, let me give you an opportunity to

7  tell me anything you want, respond how you want, the floor

8  is yours.

9            MR. VOLBERDING:  Thank you, sir.  Can you hear me?

10           THE COURT:  Yeah.

11           MR. VOLBERDING:  -- Can you hear me okay, sir?

12           THE COURT:  Yeah.  And again, at this point I

13  don't want to -- you don't have to kind of introduce any

14  evidence, I don't want to get into that, I just want to kind

15  of keep it high level and give you an opportunity to address

16  the Court.  Thank you.

17           MR. VOLBERDING:  Yes, sir.  High level, very high

18  level.  I think what is before you, Judge Lopez, is this.

19  Is that a second tier creditor -- a second tier secured

20  creditor who lost in state court twice, in two different law

21  suits, who did not file a motion for a new trial, who did

22  not seek relief from either of the two Houston Court of

23  Appeals is seeking to make an end run around those state

24  court rulings.  And is seeking, as a creditor, to come in

25  and do an involuntary bankruptcy action against the debtor

1  in violation of all the strictures of section 303.  I based

2  that ascertain on really three concepts.  Three high level

3  concepts here.

4        Number one, is that I'm going to use Chawdry

5  (phonetic) as the party here, because I think that's what's

6  really driving all of these.  Mr. Chawdry, his claims, if

7  you want to use that term broadly, his claims to seize Grove

8  and therefore seize the six-story office building, are all

9  barred by state law procedure and substandard law.  I've

10  laid that out in the motion in my response.  And I note you

11  very well understand that state law controls.  There's state

12  law property, there is no federal property rules, and I so I

13  know you're familiar with those rules.  But all of that

14  litigation X where he had the opportunity to litigate this

15  so-called claim, based on these so-called equity release

16  agreements.  He waived them, he defaulted them, they were

17  mandatory counter claims, none of these documents are

18  recorded, we didn't see any of these documents until

19  yesterday when Mr. Singh filed them.  There has been two

20  years of litigation with discovery, all the standard request

21  for production, interrogatories, pleadings, factual

22  assertions, an affidavit is in the record from Mr. Chawdry,

23  none of this has been said.  So I can -- at a high-level

24  state law bars -- state law and procedure bars what he's

25  trying to do today.

1              Second, the 2009 purported equity pledge

2    agreement is invalid on its face.  You can tell that, it

3    doesn't have certain language that's missing, it's missing

4    an assignee of the pledge.  It doesn't have any procedures

5    for this so called activations that they've invented, this

6    term called activation that I've never heard of before.

7    None of these procedures exist in this purported 2009 equity

8    pledge agreement.  And that's the lynch pin of why they're

9    here, is this so-called agreement which I think you can and

10   should ignore.

11             And third, the 2017, purported equity pledge

12   agreement is invalid as well.  Putting aside whether it was

13   legitimate at the time, subsequent in this in the 2019

14   refinancing in which the parties signed new agreements,

15   signed new documents, provided new consideration, suddenly

16   it (indiscernible) into litigation in 2019 and whatever

17   existed in 2017 is by the boards, so neither of these equity

18   pledge agreements are valid.  One is invalid on its face,

19   the other invalid by (indiscernible) if it was invalid -- if

20   it was actually valid at the time.

21             I will stop there, subject to your questions, sir.

22             THE COURT:  Yeah.  Thank you very much.

23             Mr. Cornwell --

24             MR. SHEPHERD:  -- I know Your Honor --

25             THE COURT:  -- is there anything you wish to say?

1          MR. SHEPHERD:  -- I would like to say a couple of

2   things in response to Mr. Volberding.

3          THE COURT:  All right.  Just tell me --

4          I'll get to you.  I'll get to you.

5          MR. SHEPHERD:  -- things about the state court --

6          THE COURT:  I want to go to Mr. Cornwell next and

7   then I'll go to --

8          MR. SHEPHERD:  Yes, sir.

9          THE COURT:  -- you, Mr. Shepherd, I promise.

10          MR. CORNWELL:  Thank you very much, Your Honor.  I

11   appreciate an opportunity -- I'll keep it very brief.  I

12   certainly agree with -- Mr. Volberding said if not all and

13   even a whole lot of what Mr. Singh said.  I think the

14   representations about discussions we've had, about what this

15   case might look like at this stage in bankruptcy your

16   absolutely right.  I've got nothing but positive glowing

17   things to say about Mr. Quinn.  And frankly the need, if we

18   remain in bankruptcy for some intermediary to take the keys

19   to the car, and I think there will be a time, if we get past

20   today, and maybe the next hearing to discuss that.  But I'll

21   just leave that as all those statements have been said and

22   look forward to working with the parties if we get there.

23          I will say that the lender, Broadmark, as we're

24   affectionally referred to, is very concerned about this

25   last-minute foreclosure stoppage with documents that we had

1  never heard of before.  And we've seen them now, because the

2  debtor -- the purported debtor filed them last night, and

3  we've got some real questions about whether they're

4  effective, whether they're authentic, and frankly just the

5  timeline of how all this happened, in light of the fact that

6  through several different state court proceedings, as

7  recently as July and August -- I think there were five

8  different hearings where all or most of the parties before

9  Your Honor, right now -- were participant relating

10  specifically to foreclosure and the underlying loan

11  documents between us and Grove and the second lien holder in

12  Grove, and the pledge or authority to act was never once

13  raised.  And so we've got some concerns.

14         On top of that, Your Honor, we've got some real

15  concerns, now that a bankruptcy has been filed what's

16  happening at the property.  I understand and very much

17  appreciate that Mr. Kretzer has continued his role as

18  receiver and I talked to Mr. Singh about that and I don't

19  believe the purported debtor, I can't find the right

20  phraseology here Your Honor has allowed that to happen

21  without objection.  I think it's frankly best for all

22  parties involved that the properties actively managed.  But

23  anything we can do today to make sure that everybody knows

24  their role and that the property is safe and value is

25  protected, Broadmark would very much appreciate.

1          THE COURT:  Thank you.

2          Mr. Shepherd.

3          MR. SHEPHERD:  Yes.  Can you hear me okay, Judge?

4          THE COURT:  Yes.

5          MR. SHEPHERD:  Thank you.  I wanted to clear up a

6    couple of things Mr. Volberding represented.

7          One of the things he said is that there's been

8    some kind -- at least it sounded like there's been some kind

9    of adjudication of these lawsuits.  There are four lawsuits

10   that have been filed among the parties.  Two by Mr. Polk

11   himself, one by Broadmark, and one by Daiyo.  And none of

12   the lawsuits have been fully adjudicated.  There has been

13   absolutely no ruling on any of the substantive matters in

14   any of those cases.  They were in four different courts, and

15   the 2019 lawsuit had gotten delayed on account of COVID and

16   an arbitration that ultimately did not go forward, because

17   the arbitrator recused herself.

18         And it gets back before Judge Dollinger in the

19   189th Harris County District Court.  And all of the parties

20   are now, by virtue of a motion that Daiyo filed to try and

21   streamline the litigation, because it was in four different

22   courts -- over objection from all parties, Daiyo

23   consolidated, sought to consolidate all four cases into the

24   first filed lawsuit in Judge Dollinger's court in the 189.

25   All of those cases are now consolidated, those cases were

1   going forward, and Broadmark with full steam ahead was

2   attempting to foreclose, even though Mr. Polk had sued Daiyo

3   alleging forgery, sued in the separate lawsuit, which

4   actually we just recently found out about, because nobody

5   had even disclosed this to us.

6           Second lawsuit Grove filed was against the title

7   company, alleging that the title company forged documents.

8   So all the people that forged documents, but nevertheless he

9   admits he still owes three-and-a-half million dollars to

10  Daiyo.  Even at one point was alleging that the Broadmark

11  loan documents were also forged.  So there's a lot of things

12  being bounced around out there, but Mr. Volberding says

13  there's been some kind of ruling that were against Daiyo or

14  something has been adjudicated.  There is absolutely not a

15  single thing that has been adjudicated in any of these cases

16  except for the denial of temporary injunction.  Which while

17  we still disagree with that, all of the in fighting going on

18  with the parties, that's the only thing that's been ruled

19  on.  But there's been absolutely no adjudication of any

20  different substance of fact in any of these cases.

21           THE COURT:  Thank you.

22           Anyone else wish to address the Court?

23           MR. TANG:  If I may real briefly, Your Honor.

24           THE COURT:  Yes, sir.  Just state your name for

25  the record, just we've got a clean a record.

1          MR. TANG:  Thank you, Your Honor.  David Tang for

2    the -- how do I word this -- for Harold Polk and Grove

3    Enterprises before the (indiscernible) assignment was -- the

4    (indiscernible) before the assignment.

5          Your Honor, I want to clarify just a little bit of

6    what Mr. Sheperd had said.  Mr. Branch Shepherd had said.

7    There's actually -- let me start with a 10,000 foot and go

8    down, maybe that's easier.  I think that's how this is

9    proceeding.

10          Your Honor, broadly speaking there's two equity

11    pledge assignments, 2017 and 2019.  I'm going to take the

12    2019, first because, in relation to time, it relates more

13    this transaction, because the transaction (indiscernible)

14    over the loss of most (indiscernible) is around that time.

15    The 2017 pledge, you know, had nothing to do with this

16    building -- the 2019 pledge was purported executed on

17    January 17th.  We're saying that's a forgery by itself.

18    That equity pledge agreement.  The equity -- the 2019,

19    equity pledge agreement is condition on a payment of a

20    promissory note, Your Honor --

21          THE COURT:  Hold on a second, I want to --

22          MR. TANG:  -- that was reported --

23          THE COURT:  -- I want to make sure I hear you

24    correctly.  You're saying that which document is a forgery?

25          MR. TANG:  The 2019 equity pledge agreement, Your

 1  Honor.

 2          THE COURT:  Okay.  Thank you.

 3          MR. TANG:  The one that I think everybody's been

 4  talking about.  The one that's more in relation to the

 5  actual property that we manage right now.

 6          THE COURT:  Okay.  Okay.

 7          MR. TANG:  And then so the 2019 equity pledge

 8  agreement, you know, is I guess was activated I guess, it

 9  comes into effect if my client defaults on a promissory

10  note.  What it says in the equity pledge agreement if I

11  remember it right.  And the promissory note is worth an

12  amount roughly 3.5 million.  That promissory note, Your

13  Honor, which is Exhibit No. 5 I believe in Mr. Singh's

14  response to the receiver's motion to appear, that -- clearly

15  notarized by a man named Richard Milliman (phonetic), Your

16  Honor, is his name.

17          I took Mr. Milliman's deposition, one of these

18  companion lawsuits that Mr. Shepherd was talking about.  If

19  I remember correctly he says I don't know what this document

20  is, I don't remember notarizing it.  I said let me see a

21  notary book.  I did not keep a notary book, David, so I

22  can't help -- David, me, David Tang that's in question.  He

23  said I did not keep a notary book.  Well he says, I don't

24  recognize this document.  And that's my signature, that's my

25  stamp, but I don't remember seeing it.  And he goes on to

1  detail -- why don't you remember signing the -- he goes

2  promissory notes aren't typically notarized in the course of

3  business.  You know, (indiscernible) my client before

4  (indiscernible) I did not sign that promissory note for $3.5

5  million.  That's not a signature.  But it's notarized like

6  it was.  The notary has stated in his deposition -- I don't

7  remember notarizing that.  I don't have a book to even show

8  you, David, that Mr. Polk was in front of me when I

9  notarized it -- purportedly notarized it, right.

10         So what's just a little bit more muddled than this

11  is as I sued the title company, Your Honor, right, they

12  produced another promissory note around the same day for

13  $1.5 million.  Now I'm getting a little bit closer to the

14  ground level here, Your Honor, but I just feel it's

15  important to talk about that particular set of

16  circumstances.  There's another promissory note made to

17  Daiyo's favor very much like the 3.5 million that's

18  purportedly signed by my client, but the notary -- in there,

19  right, is blank.  But they purport it has a signed

20  signature, but it has a different amount on there right.

21  And I believe it's dated January the 11th.

22         So the equity pledge agreement that they're

23  putting in front of you, Your Honor, the 2019, is based on

24  $3.5 million note that the notary cannot verify that he

25  notarized, has suspicions about it, and (indiscernible)

1  didn't sign it and then we look at the same week of that

2  transaction, there's a second promissory note that is nearly

3  identical to the one that they produced for 1.5 million that

4  purportedly has my client's signature, but the notary stamp

5  there is a notary (indiscernible) is not filled in nor

6  signed.  But it's the same (indiscernible) that was

7  purportedly signed on the 18th.  That is -- and I'm not

8  being critical, Your Honor --

9          THE COURT:  Okay.

10          MR. TANG:  As I'll now in closing -- documents --

11          THE COURT:  Hold on.  Hold on.  I think there's

12  some background noise, if everyone can please put your

13  phones on mute.  Not you Mr. Tang, just everyone else, I

14  think I heard some papers rattling.  I couldn't hear you to

15  well.  Okay.  Go ahead, sir.  In closing.

16          MR. TANG:  No.  Like I said -- the person

17  (indiscernible) everything I just wish the title company and

18  everybody would use staples.  There seems to be a lot of

19  documents floating around these days, right.

20          THE COURT:  Okay.  Thank you, sir.

21          MR. TANG:  And so -- and so there seems to be two

22  conflicting notes that remain the basis of the pledge,

23  different numbers, the bottom line is my client didn't sign

24  either one of them.  The one that's notarized, the notary

25  has said I don't even remember notarizing that, I don't

1  remember Harold being in front of me on the 17th or the

2  18th.  Because Harold was in front of me on the 11th not the

3  17th or 18th.  And so up on a macro level and a little bit

4  down into the rows that's our contention on the 2019 pledge

5  agreement, Your Honor.

6          THE COURT:  Okay.  Thank you.

7          MR. TANG:  Do you have any questions for me, Your

8  Honor -- 2017 or --

9          THE COURT:  No.  No.  I want to hear from the U.S.

10  Trustee.  Mr. Ruff.

11          MR. RUFF:  Good morning, Your Honor.  So I think

12  our view, really I think the proposal by Mr. Singh to --

13  this authority to file is a gating issue, anything else

14  should probably be pushed off until that is resolved.  And

15  then, you know, we would be happy to take those other

16  matters in order.

17          THE COURT:  Here's what I'm going to do folks, and

18  here's the gating issue for me.  Is that there was a

19  petition filed on the 7th and it was unsigned by both the

20  client and the lawyer.  And that essentially the filing of

21  that petition initiated the automatic stay, right?  But

22  there was no authority -- no one signed a petition under

23  penalty of perjury, but the lawyers filed and so that's a

24  certification in and of itself.  And there's dating errors

25  on the petition itself.  Those errors then continue to the

1  filing on the 13th.  From there those documents are signed

2  under penalty of Perjury by both Mr. Chang and Ms. Tran --

3         But folks if someone could put their phones on

4  mute, I'm really asking.  The reality is folks is that --

5         UNIDENTIFIED FEMALE:  Okay.  Oh.  Okay.

6         THE COURT:  Just a second.

7         UNIDENTIFIED FEMALE:  -- we were going to be on

8  this though, I was on the right link, right?  Okay.  Good.

9  All right.  All right.

10         THE COURT:  I apologize.

11         UNIDENTIFIED FEMALE:  Well yeah -- hang on let's

12  see what -- let me see if there's anything on --

13         THE COURT:  Just a second folks.

14         UNIDENTIFIED FEMALE:  -- Patrick know.

15         UNIDENTIFIED MALE:  I didn't see them on there --

16  did you see them on there?

17         UNIDENTIFIED FEMALE:  No.

18         UNIDENTIFIED MALE: Let's see -- no they're not on

19  there anyways.

20         THE COURT:  That might have done it.  Can

21  everybody still hear me?  Okay.  Appreciate it.

22         So bankruptcy rule 1008 says that all petitions

23  shall be verified, and the initial one wasn't verified.  But

24  it might have saved everyone from me asking some really hard

25  questions about things that are to come.  Because all

1  petitions are signed under penalty of perjury by and under

2  rule 90(11) for the attorneys in which 90(11)(b) says that

3  by presenting to the Court whether by signing, filing a

4  petition, or another motion the attorney is certifying it

5  has not been presented for any improper purpose, but it's

6  signed to the best of the presenter's knowledge,

7  information, and belief formed after an inquiry reasonable

8  under the circumstances that it wasn't filed for

9  frivolousness, for an improper purpose, to harass, that the

10  claims in the legal contentions therein are supported by

11  law.  That the allegations and other factual contentions

12  have evidentiary support, or specifically so identified or

13  likely to have evidentiary support after a reasonable

14  opportunity for further investigation or discovery, and any

15  denials are warranted.  Right.

16        And filing a bankruptcy petition is a little

17  different than just filing a motion in which can be

18  corrected.  So, I'm just saying this for the non-bankruptcy

19  folks.  Typically bankruptcy rules require that one file a

20  heading to look in a certain way or to contain a proposed

21  order -- all those can be corrected without violating 90(11)

22  but the rules -- when one looks at the advisory committee

23  rules and I'm looking at the ones in 1997 say that the safe

24  harbor doesn't apply to a petition, because -- right the

25  automatic stay comes in has far reaching implications,

1   right?  Because now creditors can't exercise it, so it's a

2   little different than fixing a heading or adding a proposed

3   order later or you know, adding another signature.  So that

4   means a lot.

5           So to me there was a filing on the 7th that was

6   improper, and it was later attempted to be amended, but you

7   can't amend what should have never existed in the first

8   place.  So I'm dismissing this bankruptcy case for failure

9   to file a petition correctly on the 7th that had

10  implications through the automatic stay.

11          If folks decide to file this case again, I just

12  want everybody to really look at what they think they have,

13  on both sides, and really look at what the assignments say

14  and what folks are telling me that they say, and what those

15  pledges say on its face, and if there's a default what

16  people get under the 2019 and how the membership interests

17  are defined and if there's some other documents out there, I

18  don't --

19          You know, Mr. Tang you talked about you know,

20  really, really -- I call it some real serious territory.

21  And everybody should really take a hard look because folks

22  are going to start -- if this case gets filed again -- and

23  it may get filed this afternoon in Houston, I don't know --

24  but everybody better take a hard look, because I'll be

25  looking really hard at what folks are alleging on the

1  petition and who signed the petition, and what authority

2  they think they have and whether it's reasonable, and what

3  are the implications of filing a petition, and what

4  information they've done and how they did it.

5        I want folks to really look at the -- I want folks

6  to look at the Texas UCC law, I want folks to look exactly

7  at these -- what they're going to ask me to do.  And if

8  other folks are going to make allegations in this case about

9  fraud, right, I'm going to take those allegations really

10 serious as well.  And everybody -- and I don't know where

11 this goes, but I think everybody ought to take a really hard

12 look, because if there is fraud, that's going to have to get

13 addressed, right?  And it's going to get addressed in a

14 manner that I'm not sure folks are going to want -- you

15 know, I'll deal with it.

16        If there are allegations -- unfounded allegations

17 of fraud and they're just being thrown around, then that's

18 going to get addressed as well.  I think I'm giving everyone

19 a fair opportunity, but this case cannot continue because

20 the petition wasn't originally signed correctly and 1008 --

21 Bankruptcy Rule 1008 has to mean something.

22        You can't file an unsigned petition and then you

23 know, seven days later correct it, right?  Because you know,

24 it just throws -- what do the -- what do the schedules do,

25 when did the automatic stay really go into effect?  And

1   folks are really acting like it was the seventh, but that's

2   really not the case.  But maybe creditors have the ability

3   to exercise remedies past the seventh and were unable to do

4   it because there was an unsigned petition, and that has

5   consequences.

6           And so I want everyone to really do the diligence

7   that is required and really look at these documents the way

8   I have.  And I'm telling you, some of you-all are reading

9   these documents in a way that I just -- I don't -- when I

10  just look at the plain language of them, I don't see it.  So

11  everybody has to get really comfortable about what you did

12  and the steps that you took.  And whether they're permissive

13  or not.

14          Maybe's there a reasonable basis for it.  Can it

15  get into evidence, no one cited a statute to me, so we never

16  got there?  So I don't need to start asking really hard

17  questions on all sides, but maybe everybody can take it and

18  do the diligence now, because this case should have never --

19  never even get here, because there wasn't an original

20  petition that could not be amended.  That's the way I read

21  bankruptcy rule 1008.

22          So Mr. Singh, you know, I take very seriously that

23  your firm -- you know, you say it was a mistake or an error

24  and I get it, I mean that happens.  But here's the chance

25  and you said you got the docs in a timely manner, and you

1  were relying on corporate counsel and all that, I just

2  everybody ought to know that when they sign something -- and

3  I'm not just talking to Mr. Singh, I'm talking to everyone

4  here, because folks are filing some really strong words with

5  some really strong language in each one of these pleadings

6  and if you sign it, I'm going to hold you to it.  And maybe

7  there's a reasonable basis to do it, maybe there's not.

8  That's not for me today.

9         So I know everybody had a bunch of evidence

10 presented, but I think the bankruptcy rules mean something

11 and I've got to -- and to me a voluntary petition may have

12 helped some parties today as a matter of fact based upon

13 where this could have gone.  And I don't have to ask

14 questions of a bunch of different parties today.

15        So I'm just going to enter a very short order

16 saying for the reasons stated on the record this bankruptcy

17 case is dismissed.  And if it gets refiled, we'll take up

18 all these issues.  And we'll have the hearing that we talked

19 about, we just can't have it today.  I'm uncomfortable

20 allowing the automatic stay to have continued from January

21 -- excuse me, from September the 7th, because technically

22 that meant that the schedules were due today or yesterday,

23 and we never got that.  And I don't want folks filing more

24 things under penalty of perjury in responding to it, or

25 making stronger allegations or having hearings in which

1  folks are going to -- you know, start throwing around words.

2  Everybody you've got a chance to go do some diligence,

3  everybody on all sides.  And maybe we see each other, maybe

4  we don't.  I wish everyone a good day.

5        I'll just enter a very short order, thank you.

6  We're adjourned.

7      (Proceeding adjourned at 11:47 a.m.)

8                        *  *  *  *  *

9        *I certify that the foregoing is a correct*

10 *transcript to the best of my ability due to the condition of*

11 *the electronic sound recording of the ZOOM/telephonic*

12 *proceedings in the above-entitled matter.*

13 */S/ MARY D. HENRY*

14 *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

15 *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

16 *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

17 *JTT TRANSCRIPT #64583*

18 *DATE FILED:  SEPTEMBER 28, 2021*

19

20

21

22

23

24

25