IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-34815 (JPN) |
| GALLERIA 2425 Owner, LLC | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | § | |

---

### NATIONAL BANK OF KUWAIT, S.A.K.P, NEW YORK BRANCH'S EXPEDITED MOTION FOR SERVICE OF SUBPOENA BY U.S. MARSHAL'S OFFICE

---

### <u>NEGATIVE NOTICE PURSUANT TO LOCAL RULE 9013-1</u>

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute.**

**If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 24 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

**Expedited relief has been requested. If the Court considers the motion on an emergency basis, then you will have less than 21 days to answer. If you object to the requested relief or if you believe that the emergency consideration is not warranted, you should file an immediate response.**

**TO THE HONORABLE JEFFREY P. NORMAN, U.S. BANKRUPTCY JUDGE:**

National Bank of Kuwait, S.A.K.P. New York Branch ("NBK") files this motion requesting service of subpoena by the U.S. Marshal's office on the individual Ali Choudhri (the "Motion"), and in support of the Motion represents as follows.

**JURISDICTION AND VENUE**

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157(b)(2) and 1334. Venue is proper under 28 U.S.C. § 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2), and the Court has authority to enter a final order granting the relief requested. The bases for the relief requested are section 105(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 9016 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule(s)") and the Local Rules of the United States Bankruptcy Court for the Southern District of Texas ("Local Rule(s)").

**RELIEF REQUESTED**

2.      NBK seeks entry of an order in the form attached as Exhibit A (the "Proposed Order") authorizing the U.S. Marshal's Service ("USMS") to serve the subpoena attached as Exhibit B upon the individual Ali Choudhri for him to appear and give testimony at the hearing currently scheduled for January 31, 2024, on NBK's *Motion Pursuant to 11 U.S.C. § 1112(b) to Convert Chapter 11 Case to Chapter 7* [ECF 72] (the "Motion to Convert"). Exhibit B includes a completed USMS-285 form utilized by USMS for service of process.

**BACKGROUND**

3.      On December 27, 2023, NBK filed its Motion to Convert.

4.      On January 12, 2024, counsel for NBK reached out via email to Debtor's counsel, Reese Baker, inquiring if he would accept service of three subpoenas for the January 31 hearing, including the one for Mr. Choudhri.  *See* email attached as Exhibit C.  NBK's counsel sent a second

2

email to Mr. Baker on January 19 again asking him to accept service of the subpoenas. To date, Mr. Baker has not responded to either email from NBK's counsel.

5. Beginning on January 16, 2024, NBK requested a process server to attempt service of the three subpoenas for the January 31 hearing, including the one for Mr. Choudhri. The first attempt at service was completed on January 17, 2024. *See* email attached as <u>Exhibit D</u>.

6. Further attempts at service on Mr. Choudhri were made on January 22. *See* email attached as <u>Exhibit E</u>. At that time, Mr. Choudhri was located by the process server and refused to accept service unless service was being made by a Sheriff or a Constable Officer:

| 3rd service attempt | I went to the address. I spoke to this gated community security guard, Officer Taylor, who contacted the resident at that address on the phone; Mr. ALI CHOUDHRI answered and wanted to know more about the documents. I handed them to the security guard and told him about the subpoena's whereabouts, but in the end, he told her to deny me access to the property. Officer Taylor told me sorry but they would not allow my entry to the property by the resident's request unless I were a Sheriff or a Constable Officer. |
|---|---|

7. For the reasons stated above, NBK now moves the Court for service of the subpoena on Mr. Choudhri by the U.S. Marshal's Service ("USMS"). The USMS is authorized by statute to effectuate service, including service of subpoenas, in civil matters. *See* 28 U.S.C. § 566(c). NBK requests expedited consideration of this matter as the underlying hearing at which Mr. Choudhri's testimony is sought is currently scheduled for Wednesday January 31, 2024 at 11:00 a.m.

001900

## CONCLUSION

WHEREFORE, NBK respectfully requests that the Court enter the Proposed Order granting (i) the relief requested in the Motion and (ii) other relief as is just and proper.

DATED: January 25, 2024

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Charles C. Conrad*
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010-1028
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

*-   and   -*

Andrew M. Troop  (Bar No. MA547179)
Patrick E. Fitzmaurice*
Kwame O. Akuffo*
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

*Admitted pro hac vice*

***Counsel for National Bank of Kuwait, S.A.K.P., New York Branch***

4

001901

**CERTIFICATE OF SERVICE**

The undersigned certifies that on January 25, 2024, a true and correct copy of this document was served via the Court's CM/ECF system on the Debtor and its counsel of record and all others who are deemed to have consented to ECF electronic service, and also by mailing, first class, postage prepaid, to each of the parties on the attached mailing matrix.

*/s/ Charles C. Conrad*
Charles C. Conrad

001902

Label Matrix for local noticing
0541-4
Case 23-34815
Southern District of Texas
Houston
Thu Jan 25 17:34:15 CST 2024

2425 WL, LLC
2425 West Loop South 11th floor
Houston, TX 77027-4304

CC2 TX, LLC
c/o Howard Marc Spector
Spector & Cox, PLLC
12770 Coit Road Suite 850
Dallas, TX 75251-1364

City of Houston
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

Galleria 2425 Owner, LLC
1001 West Loop South 700
Houston, TX 77027-9084

(p)HARRIS COUNTY ATTORNEY'S OFFICE
P O BOX 2928
HOUSTON TX 77252-2928

Houston Community College System
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

Houston ISD
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

National Bank of Kuwait, S.A.K.P., New York

4
United States Bankruptcy Court
PO Box 61010
Houston, TX 77208-1010

2425 WL, LLC
13498 Pond Springs Rd.
Austin, TX 78729-4422

ADT
PO Box 382109
Pittsburgh, PA 15251-8109

Ali Choudhry
1001 West Loop South 700
Houston, TX 77027-9084

Ash Automated Control Systems, LLC
PO Box 1113
Fulshear, TX 77441-2013

CFI Mechanical, Inc
6109 Brittmoore Rd
Houston, TX 77041-5610

CNA Insurance Co
PO Box 74007619
Chicago, IL 60674-7619

Caz Creek Lending
118 Vintage Park Blvd No. W
Houston, TX 77070-4095

Cirro Electric
PO Box 60004
Dallas, TX 75266

City of Houston
PO Box 1560
Houston, TX 77251-1560

City of Houston
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

Comcast
PO Box 60533
City of Industry, CA 91716-0533

Datawatch Systems
4520 East West Highway 200
Bethesda, MD 20814-3382

Environmental Coalition Inc
PO Box 1568
Stafford, TX 77497-1568

Ferguson Facilities Supplies
PO Box 200184
San Antonio, TX 78220-0184

Firetron
PO Box 1604
Stafford, TX 77497-1604

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062-7917

Gulfstream Legal Group
1300 Texas St
Houston, TX 77002-3509

HNB Construction, LLC
521 Woodhaven
Ingleside, TX 78362-4678

Harris County Tax Assessor
PO Box 4622
Houston, TX 77210-4622

Houston Community College System
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

001903

Houston ISD
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

Kings 111 Emergency Communications
751 Canyon Drive, Suite 100
Coppell, TX 75019-3857

Lexitas
PO Box Box 734298 Dept 2012
Dallas, TX 75373-4298

Logix Fiber Networks
PO Box 734120
Dallas, TX 75373-4120

MacGeorge Law Firm
2921 E 17th St Blgd D Suite 6
Austin, TX 78702-1572

Mueller Water Treatment
1500 Sherwood Forest Dr.
Houston, TX 77043-3899

National Bank of Kuwait
299 Park Ave. 17th Floor
New York, NY 10171-0023

Nationwide Security
2425 W Loop S 300
Houston, TX 77027-4205

Nichamoff Law Firm
2444 Times Blvd 270
Houston, TX 77005-3253

TKE
3100 Interstate North Cir SE  500
Atlanta, GA 30339-2296

US Trustee
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002-2604

Waste Management
PO Box 660345
Dallas, TX 75266-0345

Zindler Cleaning Service Co
2450 Fondren 113
Houston, TX 77063-2314

James Q. Pope
The Pope Law Firm
6161 Savoy Drive
Ste 1125
Houston, TX 77036-3343

Reese W Baker
Baker & Associates
950 Echo Lane
Suite 300
Houston, TX 77024-2824

Rodney Drinnon
McCathern Houston
2000 W Loop S
Ste. 1850
Houston, TX 77027-3744

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Harris County, ATTN: Property Tax Division
Harris County Attorney's Office
P.O. Box 2928
Houston, TX 77252-2928 United States

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)2425 West Loop, LLC

End of Label Matrix
Mailable recipients    45
Bypassed recipients     1
Total                  46

001904

# **Exhibit A**

Proposed Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 23-34815 (JPN)** |
| **GALLERIA 2425 Owner, LLC** | § | |
| | § | **Chapter 11** |
| **Debtor.** | § | |
| | § | |

---

### ORDER AUTHORIZING SERVICE OF SUBPOENA BY U.S. MARSHAL'S OFFICE

Upon the Motion[1] of NBK requesting service of subpoena by the U.S. Marshal's office; any responses thereto, and the arguments of counsel, if any, it is hereby **ORDERED**:

That the U.S. Marshal's office is authorized and ordered to serve the subpoena attached hereto as <u>Exhibit A</u> upon the individual Ali Choudhri at any time before January 31, 2024, and at wherever location he may be found.

Signed: _____, 2024

_____
Jeffery P. Norman
United States Bankruptcy Judge

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

# **EXHIBIT A**

# UNITED STATES BANKRUPTCY COURT

Southern _____ District of _____ Texas

In re Galleria 2425 Owner, LLC
_____
Debtor

Case No. _____ 23-34815 _____

*(Complete if issued in an adversary proceeding)*

Chapter _____ 11 _____

_____
Plaintiff
v.
_____
Defendant

Adv. Proc. No. _____

## SUBPOENA TO APPEAR AND TESTIFY
## AT A HEARING OR TRIAL IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: Ali Choudhri, 1001 West Loop South, Suite 700Houston, TX 77027
_____
*(Name of person to whom the subpoena is directed)*

☑ **YOU ARE COMMANDED** to appear in the United States Bankruptcy Court at the time, date, and place set forth below to testify at a hearing or trial in this bankruptcy case (or adversary proceeding). When you arrive, you must remain at the court until the judge or a court official allows you to leave.

| PLACE United States Bankruptcy Court for the Southern District of Texas 515 Rusk, Houston, TX 77002 | COURTROOM 403 |
|---|---|
| | DATE AND TIME 01/31/24    11:00 am |

You must also bring with you the following documents, electronically stored information, or objects *(leave blank if not applicable)*:

_____

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: __ 01/12/24 __

CLERK OF COURT

_____        OR        _____
Signature of Clerk or Deputy Clerk                              *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
National Bank of Kuwait, S.A.K.P., , who issues or requests this subpoena, are:
Charles C. Conrad Two Houston Center, 909 Fannin, Suite 2000, Houston, Texas 77010; charles.conrad@pillsburylaw.com; (713) 276-7600

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

001908

## PROOF OF SERVICE
**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☒ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

        I declare under penalty of perjury that this information is true and correct.

Date: _____

                                 _____
                                                    *Server's signature*

                                 _____
                                           *Printed name and title*

                                 _____
                                              *Server's address*

Additional information concerning attempted service, etc.:

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
     (i) is a party or a party's officer; or
     (ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
   (A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   (B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
   *(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   *(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
   *(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     (i) fails to allow a reasonable time to comply;
     (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
     (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     (iv) subjects a person to undue burden.
   *(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     (i) disclosing a trade secret or other confidential research, development, or commercial information; or

     (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   *(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   *(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   *(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   *(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   *(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
   *(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     (i) expressly make the claim; and
     (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   *(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

**U.S. Department of Justice**
United States Marshals Service

# PROCESS RECEIPT AND RETURN

*See "Instructions for Service of Process by U.S. Marshal"*

| | |
|---|---|
| PLAINTIFF<br>In re: Galleria 2425 Owner LLC | COURT CASE NUMBER<br>23-34815 |
| DEFENDANT<br>National Bank of Kuwait, S.A.P.C., New York Branch | TYPE OF PROCESS<br>service of subpoena to testify |

| | |
|---|---|
| **SERVE AT** { | NAME OF INDIVIDUAL, COMPANY, CORPORATION, ETC. TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN<br>Ali Choudhri<br>ADDRESS *(Street or RFD, Apartment No., City, State and ZIP Code)*<br>11511 Gallant Ridge Lane, Houston, Texas 77028 |

| SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW | |
|---|---|
| Charles Conrad<br>Pillsbury Winthrop Shaw Pittman LLP<br>909 Fannin Suite 2000<br>Houston, TX 77010, charles.conrad@pillsburylaw.com, 713-276-7600 | Number of process to be served with this Form 285 — 1<br>Number of parties to be served in this case — 1<br>Check for service on U.S.A. |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE *(Include Business and Alternate Addresses, All Telephone Numbers, and Estimated Times Available for Service)*:

1001 West Loop South, Suite 700, Houston, Texas 77027, Monday-Friday, 8AM - 6PM
2425 West Loop South, Suite 1100, Houston, Texas 77027, Monday-Friday, 8AM - 6PM

| Signature of Attorney other Originator requesting service on behalf of: | ☐ PLAINTIFF<br>☒ DEFENDANT | TELEPHONE NUMBER<br>713-276-7600 | DATE<br>1/25/2024 |
|---|---|---|---|

## SPACE BELOW FOR USE OF U.S. MARSHAL ONLY - DO NOT WRITE BELOW THIS LINE

| I acknowledge receipt for the total number of process indicated.<br>*(Sign only for USM 285 if more than one USM 285 is submitted)* | Total Process | District of Origin<br>No. | District to Serve<br>No. | Signature of Authorized USMS Deputy or Clerk | Date |
|---|---|---|---|---|---|

I hereby certify and return that I ☐ have personally served , ☐ have legal evidence of service, ☐ have executed as shown in "Remarks", the process described on the individual, company, corporation, etc., at the address shown above on the on the individual, company, corporation, etc. shown at the address inserted below.

☐ I hereby certify and return that I am unable to locate the individual, company, corporation, etc. named above *(See remarks below)*

| Name and title of individual served *(if not shown above)* | Date | Time | ☐ am<br>☐ pm |
|---|---|---|---|
| Address *(complete only different than shown above)* | Signature of U.S. Marshal or Deputy | | |

*Costs shown on attached USMS Cost Sheet >>*

REMARKS

001911 Form USM-285
Rev. 03/21

# INSTRUCTIONS FOR COMPLETING USM-285, PROCESS RECEIPT AND RETURN

- The Form USM-285 is a five-copy form set designed as a control document for process served by a U.S. Marshal or designee. Process may include, but is not limited to, a summons and complaint, subpoena, writ, or court order. The United States Marshals Service (USMS) is authorized by law (28 U.S.C. § 1921) to charge fees for the service of process. The amount of fees charged is established by regulation (28 C.F.R. § 0.114). Except in cases where the litigant has been granted permission by the court for waiver of prepayment of fees and costs, the USMS must request advance payment of the estimated fees and expenses for service of process.

- Please type or print legibly. Submit one copy of the Form USM-285 and one copy of each process for each individual, company, corporation, government agency, etc., to be served or property to be seized.

- In cases where the court has directed the USMS to effect service of a summons and complaint upon an officer or agent of the United States Government, submit a copy of the summons and complaint and Form USM-285 for each officer or agent upon whom service is desired. Submit two (2) additional copies of the summons and complaint for service upon the Government of the United States. The U.S. Marshal or designee will serve one copy upon the U.S. Attorney and will forward the other copy to the Attorney General of the United States. (When the applicable box is checked, completion of the final signature block by the U.S. Marshal or designee certifies service on the U.S. Attorney and the U.S. Attorney General, regardless of whether other defendants on the summons were served). Failure to provide sufficient copies will delay service of the summons.

- Mark all applicable check boxes and use the "Special Instructions" to advise of any information that will assist the USMS in expediting service. You are responsible for providing accurate and sufficient information that will identify the individual or entity to be served or the property to be seized.

- If more than one item of process and Form USM-285 is submitted on a single case, the U.S. Marshal or designee will receipt for all of them on the first Form USM-285. You will receive for your records the "Acknowledgment of Receipt" copy for all the USM-285 forms you submit. When the process is served, you will receive the "Notice of Service" copy. This copy will be identical to the return to the Clerk of the U.S. District Court.

- Upon completion of all services, you will receive a "Billing Statement" copy of Form USM-285. You should return this "Billing Statement" copy to the USMS, together with your payment, in the form of a certified or bank check payable to the U.S. Marshal, for any amounts still owed. Alternatively, the USMS will accept cash. The USMS will not accept personal checks.

# EXHIBIT B

001913

# UNITED STATES BANKRUPTCY COURT

_____Southern_____ District of _____Texas_____

In re Galleria 2425 Owner, LLC
_____
Debtor

*(Complete if issued in an adversary proceeding)*

_____
Plaintiff
v.
_____
Defendant

Case No. _____23-34815_____

Chapter _____11_____

Adv. Proc. No. _____

## SUBPOENA TO APPEAR AND TESTIFY
## AT A HEARING OR TRIAL IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: Ali Choudhri, 1001 West Loop South, Suite 700 Houston, TX 77027
_____
*(Name of person to whom the subpoena is directed)*

■ **YOU ARE COMMANDED** to appear in the United States Bankruptcy Court at the time, date, and place set forth below to testify at a hearing or trial in this bankruptcy case (or adversary proceeding). When you arrive, you must remain at the court until the judge or a court official allows you to leave.

| PLACE United States Bankruptcy Court for the Southern District of Texas 515 Rusk, Houston, TX 77002 | COURTROOM 403 |
|---|---|
| | DATE AND TIME 01/31/24    11:00 am |

You must also bring with you the following documents, electronically stored information, or objects *(leave blank if not applicable)*:

 

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: __01/12/24__

CLERK OF COURT

_____          OR          _____
Signature of Clerk or Deputy Clerk                          *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
National Bank of Kuwait, S.A.K.P., , who issues or requests this subpoena, are:
Charles C. Conrad Two Houston Center, 909 Fannin, Suite 2000, Houston, Texas 77010; charles.conrad@pillsburylaw.com; (713) 276-7600

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

001914

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☒ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the
witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .


I declare under penalty of perjury that this information is true and correct.

Date: _____


_____
*Server's signature*


_____
*Printed name and title*


_____
*Server's address*


Additional information concerning attempted service, etc.:

001915

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…
**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

**U.S. Department of Justice**
United States Marshals Service

# PROCESS RECEIPT AND RETURN
*See ["Instructions for Service of Process by U.S. Marshal"](#)*

| PLAINTIFF | COURT CASE NUMBER |
|---|---|
| In re: Galleria 2425 Owner LLC | 23-34815 |

| DEFENDANT | TYPE OF PROCESS |
|---|---|
| National Bank of Kuwait, S.A.P.C., New York Branch | service of subpoena to testify |

| | NAME OF INDIVIDUAL, COMPANY, CORPORATION, ETC. TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN |
|---|---|
| **SERVE AT** { | Ali Choudhri |
| | ADDRESS *(Street or RFD, Apartment No., City, State and ZIP Code)* |
| | 11511 Gallant Ridge Lane, Houston, Texas 77028 |

| SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW | | |
|---|---|---|
| Charles Conrad | Number of process to be served with this Form 285 | 1 |
| Pillsbury Winthrop Shaw Pittman LLP | Number of parties to be served in this case | 1 |
| 909 Fannin Suite 2000 | Check for service on U.S.A. | |
| Houston, TX 77010, charles.conrad@pillsburylaw.com, 713-276-7600 | | |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE *(Include Business and Alternate Addresses, All Telephone Numbers, and Estimated Times Available for Service):*

1001 West Loop South, Suite 700, Houston, Texas 77027, Monday-Friday, 8AM - 6PM
2425 West Loop South, Suite 1100, Houston, Texas 77027, Monday-Friday, 8AM - 6PM

| Signature of Attorney other Originator requesting service on behalf of: | ☐ PLAINTIFF ☒ DEFENDANT | TELEPHONE NUMBER | DATE |
|---|---|---|---|
| *(signature)* | | 713-276-7600 | 1/25/2024 |

## SPACE BELOW FOR USE OF U.S. MARSHAL ONLY - DO NOT WRITE BELOW THIS LINE

| I acknowledge receipt for the total number of process indicated. *(Sign only for USM 285 if more than one USM 285 is submitted)* | Total Process | District of Origin No. | District to Serve No. | Signature of Authorized USMS Deputy or Clerk | Date |
|---|---|---|---|---|---|

I hereby certify and return that I ☐ have personally served , ☐ have legal evidence of service, ☐ have executed as shown in "Remarks", the process described on the individual, company, corporation, etc., at the address shown above on the on the individual, company, corporation, etc. shown at the address inserted below.

☐ I hereby certify and return that I am unable to locate the individual, company, corporation, etc. named above *(See remarks below)*

| Name and title of individual served *(if not shown above)* | Date | Time | ☐ am ☐ pm |
|---|---|---|---|

| Address *(complete only different than shown above)* | Signature of U.S. Marshal or Deputy |
|---|---|

*Costs shown on [attached USMS Cost Sheet](#) >>*

REMARKS

Form USM-285
Rev. 03/21

# INSTRUCTIONS FOR COMPLETING USM-285, PROCESS RECEIPT AND RETURN

- The Form USM-285 is a five-copy form set designed as a control document for process served by a U.S. Marshal or designee. Process may include, but is not limited to, a summons and complaint, subpoena, writ, or court order. The United States Marshals Service (USMS) is authorized by law (28 U.S.C. § 1921) to charge fees for the service of process. The amount of fees charged is established by regulation (28 C.F.R. § 0.114). Except in cases where the litigant has been granted permission by the court for waiver of prepayment of fees and costs, the USMS must request advance payment of the estimated fees and expenses for service of process.

- Please type or print legibly. Submit one copy of the Form USM-285 and one copy of each process for each individual, company, corporation, government agency, etc., to be served or property to be seized.

- In cases where the court has directed the USMS to effect service of a summons and complaint upon an officer or agent of the United States Government, submit a copy of the summons and complaint and Form USM-285 for each officer or agent upon whom service is desired. Submit two (2) additional copies of the summons and complaint for service upon the Government of the United States. The U.S. Marshal or designee will serve one copy upon the U.S. Attorney and will forward the other copy to the Attorney General of the United States. (When the applicable box is checked, completion of the final signature block by the U.S. Marshal or designee certifies service on the U.S. Attorney and the U.S. Attorney General, regardless of whether other defendants on the summons were served). Failure to provide sufficient copies will delay service of the summons.

- Mark all applicable check boxes and use the "Special Instructions" to advise of any information that will assist the USMS in expediting service. You are responsible for providing accurate and sufficient information that will identify the individual or entity to be served or the property to be seized.

- If more than one item of process and Form USM-285 is submitted on a single case, the U.S. Marshal or designee will receipt for all of them on the first Form USM-285. You will receive for your records the "Acknowledgment of Receipt" copy for all the USM-285 forms you submit. When the process is served, you will receive the "Notice of Service" copy. This copy will be identical to the return to the Clerk of the U.S. District Court.

- Upon completion of all services, you will receive a "Billing Statement" copy of Form USM-285. You should return this "Billing Statement" copy to the USMS, together with your payment, in the form of a certified or bank check payable to the U.S. Marshal, for any amounts still owed. Alternatively, the USMS will accept cash. The USMS will not accept personal checks.

# **EXHIBIT C**

001919

| **From:** | Fitzmaurice, Patrick E. |
| **To:** | reese.baker@bakerassociates.net; courtdocs@bakerassociates.net |
| **Cc:** | Conrad, Charles C.; Jones, Nancy J. |
| **Subject:** | Galleria 2425 Owner - Jan 31 hearing |
| **Date:** | Friday, January 12, 2024 12:55:11 PM |
| **Attachments:** | Galleria II - Dward Darjean Trial Subpoena.pdf |
| | Galleria II - Scarlett MacGeorge Trial Subpoena.pdf |
| | Galleria II - Ali Choudhri Trial Subpoena.pdf |
| | image0338d4.PNG |
| | image49cb2e.PNG |

Reese,

In connection with NBK's motion to convert, we intend to put on testimony from debtor representatives, Ali Choudhri, Scarlett McGeorge, and Dward Darjean. Attached are trial subpoenas for their testimony. Will you accept service of those subpoenas?
Please let us know by Monday.

Thanks.

**Patrick E. Fitzmaurice** | Partner
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street | New York, NY 10019-6131
t +1.212.858.1171 | m +1.917.608.8497
patrick.fitzmaurice@pillsburylaw.com | website bio

AUSTIN   BEIJING   HONG KONG   HOUSTON   LONDON   LOS ANGELES
MIAMI   NASHVILLE   NEW YORK   NORTHERN VIRGINIA   PALM BEACH
SACRAMENTO   SAN DIEGO   SAN FRANCISCO   SHANGHAI
SILICON VALLEY   TAIPEI   TOKYO   WASHINGTON, DC



# UNITED STATES BANKRUPTCY COURT

_Southern_ _____ District of _____ _Texas_

In re Galleria 2425 Owner, LLC
_____
Debtor

_(Complete if issued in an adversary proceeding)_

_____
Plaintiff
v.
_____
Defendant

Case No. _____ 23-34815 _____

Chapter _____ 11 _____

Adv. Proc. No. _____

## SUBPOENA TO APPEAR AND TESTIFY
## AT A HEARING OR TRIAL IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: Ali Choudhri, 1001 West Loop South, Suite 700Houston, TX 77027
_____
_(Name of person to whom the subpoena is directed)_

■ **YOU ARE COMMANDED** to appear in the United States Bankruptcy Court at the time, date, and place set forth below to testify at a hearing or trial in this bankruptcy case (or adversary proceeding). When you arrive, you must remain at the court until the judge or a court official allows you to leave.

| PLACE United States Bankruptcy Court for the Southern District of Texas 515 Rusk, Houston, TX 77002 | COURTROOM 403 |
|---|---|
| | DATE AND TIME 01/31/24    11:00 am |

You must also bring with you the following documents, electronically stored information, or objects _(leave blank if not applicable)_:

_____

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: __ 01/12/24 __

CLERK OF COURT

_____
Signature of Clerk or Deputy Clerk

OR

_Charles Conrad_ _(signature)_

_____
_Attorney's signature_

The name, address, email address, and telephone number of the attorney representing _(name of party)_ National Bank of Kuwait, S.A.K.P., | , who issues or requests this subpoena, are:
Charles C. Conrad Two Houston Center, 909 Fannin, Suite 2000, Houston, Texas 77010; charles.conrad@pillsburylaw.com; (713) 276-7600

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

001921

# PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☑ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .


I declare under penalty of perjury that this information is true and correct.

Date: _____

                                                    _____
                                                                    *Server's signature*

                                                    _____
                                                                    *Printed name and title*

                                                    _____
                                                                    *Server's address*


Additional information concerning attempted service, etc.:

001922

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:

(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*

*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*

*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*

*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

# UNITED STATES BANKRUPTCY COURT

Southern _____ District of _____ Texas

In re Galleria 2425 Owner, LLC
_____
Debtor

*(Complete if issued in an adversary proceeding)*

_____
Plaintiff

v.

_____
Defendant

Case No. ___ 23-34815 ___

Chapter ___ 11 ___

Adv. Proc. No. _____

## SUBPOENA TO APPEAR AND TESTIFY
## AT A HEARING OR TRIAL IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: Dward Darjean, 1001 West Loop South, Suite 700 Houston, TX 77027
_____
*(Name of person to whom the subpoena is directed)*

■ **YOU ARE COMMANDED** to appear in the United States Bankruptcy Court at the time, date, and place set forth below to testify at a hearing or trial in this bankruptcy case (or adversary proceeding). When you arrive, you must remain at the court until the judge or a court official allows you to leave.

| PLACE United States Bankruptcy Court for the Southern District of Texas 515 Rusk, Houston, TX 77002 | COURTROOM 403 |
|---|---|
| | DATE AND TIME 01/31/24   11:00 am |

You must also bring with you the following documents, electronically stored information, or objects *(leave blank if not applicable)*:

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: __ 01/12/24 __

CLERK OF COURT

_____          OR          _____
Signature of Clerk or Deputy Clerk                              *Attorney's signature*

The name, address, email, and telephone number of the attorney representing *(name of party)*
National Bank of Kuwait, S.A.K.P., ᵢ , who issues or requests this subpoena, are:
Charles C. Conrad Two Houston Center, 909 Fannin, Suite 2000, Houston, Texas 77010; charles.conrad@pillsburylaw.com; (713) 276-7600

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

001924

## PROOF OF SERVICE
**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: _____
on *(date)* _____ .

☑ I served the subpoena by delivering a copy to the named person as follows: _____
_____
_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____
_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

001925

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…
**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

# UNITED STATES BANKRUPTCY COURT

_____ Southern _____     District of _____ Texas _____

In re Galleria 2425 Owner, LLC
_____
Debtor

*(Complete if issued in an adversary proceeding)*

_____
Plaintiff
v.
_____
Defendant

Case No. _____ 23-34815 _____

Chapter _____ 11 _____

Adv. Proc. No. _____

## SUBPOENA TO APPEAR AND TESTIFY
## AT A HEARING OR TRIAL IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: Scarlett MacGeorge, 1001 West Loop South, Suite 700, Houston, TX 77027
_____
*(Name of person to whom the subpoena is directed)*

■ **YOU ARE COMMANDED** to appear in the United States Bankruptcy Court at the time, date, and place set forth below to testify at a hearing or trial in this bankruptcy case (or adversary proceeding). When you arrive, you must remain at the court until the judge or a court official allows you to leave.

| PLACE United States Bankruptcy Court for the Southern District of Texas 515 Rusk, Houston, TX 77002 | COURTROOM 403 |
|---|---|
| | DATE AND TIME 01/31/24     11:00 am |

You must also bring with you the following documents, electronically stored information, or objects *(leave blank if not applicable)*:

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 01/12/24

CLERK OF COURT

OR     *Chaz g thnd*

_____
*Signature of Clerk or Deputy Clerk*

_____
*Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
National Bank of Kuwait, S.A.K.P., I , who issues or requests this subpoena, are:
Charles C. Conrad Two Houston Center, 909 Fannin, Suite 2000, Houston, Texas 77010; charles.conrad@pillsburylaw.com; (713) 276-7600

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

001927

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .


I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*


Additional information concerning attempted service, etc.:

001928

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…
**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

# EXHIBIT D

## Please DO NOT reply to this email. Click **HERE** to reply.

*We can serve you better by keeping all of your requests organized in our order file instead of our Inbox...so please help us by clicking above instead of replying to this email.*

Hi Nancy ,

Our server has completed the first attempt. See notes below.

| Service on: | ALI CHOUDHRI<br>1001 WEST LOOP SOUTH, SUITE 700, HOUSTON, TX 77027 (Map) |
| --- | --- |
| With the following document(s): | SUBPOENA TO APPEAR AND TESTIFY AT A HEARING OR TRIAL IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING), WITNESS FEE CHECK |
| Date of 1st attempt: | Wednesday, January 17, 2024 at 10:20 AM |
| Server Note: | I went to the address and the lights were off, no one answered the door. I spoke to the next door neighbors at suite 709, who told me, they had not seen people in that office in several months, and there is not management office on-site. |
| What happens next: | We will be making three additional attempts by 5:00 PM on Wednesday, January 24, 2024.<br><br>If you have any additional questions or information, please let us know.<br><br>You can always check the current status on our website HERE. |
| Order #: | 318338-1 |

| Texas easy-serve, LLC | 713 655 7239 | www.easy-serve.com |
| --- | --- | --- |
| We also provide Courier Service through our affiliate Mach 5 Couriers. | | |

001931

# EXHIBIT E

001932

| From: | donotreply@easy-serve.com |
|---|---|
| To: | Jones, Nancy J. |
| Subject: | Order status (Ref: C/M #054391-0000008, Cause#: 23-34815, Plaintiff: IN RE GALLERIA 2425 OWNER, LLC, Service on: ALI CHOUDHRI, Order#: 318338-1) |
| Date: | Tuesday, January 23, 2024 9:16:21 AM |

## Please DO NOT reply to this email. Click **HERE** to reply.

*We can serve you better by keeping all of your requests organized in our order file instead of our Inbox...so please help us by clicking above instead of replying to this email.*

Hi Nancy,

Please see below.

Thanks,

John

| Status for order 318338-1 | |
|---|---|
| Service To: | ALI CHOUDHRI |
| Your Reference: | C/M #054391-0000008 |

| | |
|---|---|
| **1/17/2024 10:20** | **1001 WEST LOOP SOUTH, SUITE 700, HOUSTON, TX 77027** |
| 1st service attempt | I went to the address and the lights were off, no one answered the door. I spoke to the next door neighbors at suite 709, who told me, they had not seen people in that office in several months, and there is not management office on-site. |
| **1/22/2024 10:00** | **2425 WEST LOOP SOUTH SUITE 1100, HOUSTON, TX 77027** |
| 2nd service attempt | I went to the address but could not access the 11th floor as you need a card to access the 10th floor and then transfer to the 11th floor. I spoke to the building security guard, who contacted the management office by text message, and they replied Mr. DWARD DARJEAN was at 1001 West Loop South Suite 700 right now and that he would take all the documents. I went there, but the door remained locked, and the lights were off. I knocked at the front door several minutes in case someone was there. Some of the neighbors came out and told me again that no one had been to that office in several months, and the maintenance lady told me the same thing that no one offices at suite 700, and the management people come to check the building or to show the offices once in a while only. I went back to 2425 West Loop South and told the security guard, who texted them again and included my phone number, but no one answered. She went to check on the 11th floor, as she told me she could not allow me to go there but came and told me no one was at the office as most of the Jet All management people work from home. |
| **1/22/2024 19:00** | **11511 GALLANT RIDGE LANE, HOUSTON, TX 77028** |
| 3rd service attempt | I went to the address. I spoke to this gated community security guard, Officer Taylor, who contacted the resident at that address on the phone; Mr. ALI CHOUDHRI answered and wanted to know more about the documents. I handed them to the security guard and told him about the subpoena's whereabouts, but in the end, he told her to deny me access to the property. Officer Taylor told me sorry but they would not allow my entry to the property by the resident's request unless I were a Sheriff or a Constable Officer. |
| **[No date] [No time]** | |
| 4th service attempt | |

001933

# Please DO NOT reply to this email. Click **HERE** to reply.

*We can serve you better by keeping all of your requests organized in our order file instead of our Inbox...so please help us by clicking above instead of replying to this email.*

Hi Nancy ,

Our server has completed the first attempt. See notes below.

| Service on: | ALI CHOUDHRI<br>1708 RIVER OAKS BLVD, HOUSTON, TX 77019 (Map) |
|---|---|
| With the following document(s): | SUBPOENA TO APPEAR AND TESTIFY AT A HEARING OR TRIAL IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING), WITNESS FEE CHECK |
| Date of 1st attempt: | Monday, January 22, 2024 at 8:02 PM |
| Server Note: | Per Adam with property security no knowledge of the subject and stated the current owners name is Ahmed. I could not find a neighbor to verify residence and no vehicles are present. |
| What happens next: | We will be making three additional attempts by 11:59 PM on Friday, January 26, 2024.<br><br>If you have any additional questions or information, please let us know.<br><br>You can always check the current status on our website HERE. |
| Order #: | 318338-4 |

| Texas easy-serve, LLC | 713 655 7239 | www.easy-serve.com |
|---|---|---|
| We also provide Courier Service through our affiliate Mach 5 Couriers. | | |

001934

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-34815 (JPN) |
| **GALLERIA 2425 Owner, LLC** | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | § | |

## ORDER AUTHORIZING SERVICE OF SUBPOENA BY U.S. MARSHAL'S OFFICE

Upon the Motion[1] of NBK requesting service of subpoena by the U.S. Marshal's office; any responses thereto, and the arguments of counsel, if any, it is hereby **ORDERED**:

That the U.S. Marshal's office is authorized and ordered to serve the subpoena attached hereto as <u>Exhibit A</u> upon the individual Ali Choudhri at any time before January 31, 2024, and at wherever location he may be found.

Signed: January 26, 2024

_____
Jeffrey P. Norman
United States Bankruptcy Judge

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

# EXHIBIT A

001936

# UNITED STATES BANKRUPTCY COURT

_____Southern_____ District of _____Texas_____

In re Galleria 2425 Owner, LLC
_____
Debtor

_(Complete if issued in an adversary proceeding)_

_____
Plaintiff

v.

_____
Defendant

Case No. _____23-34815_____

Chapter _____11_____

Adv. Proc. No. _____

## SUBPOENA TO APPEAR AND TESTIFY
## AT A HEARING OR TRIAL IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: Ali Choudhri, 1001 West Loop South, Suite 700Houston, TX 77027
_____
_(Name of person to whom the subpoena is directed)_

■ **YOU ARE COMMANDED** to appear in the United States Bankruptcy Court at the time, date, and place set forth below to testify at a hearing or trial in this bankruptcy case (or adversary proceeding). When you arrive, you must remain at the court until the judge or a court official allows you to leave.

| PLACE United States Bankruptcy Court for the Southern District of Texas 515 Rusk, Houston, TX 77002 | COURTROOM 403 |
| --- | --- |
| | DATE AND TIME 01/31/24     11:00 am |

You must also bring with you the following documents, electronically stored information, or objects _(leave blank if not applicable)_:

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: __01/12/24__

CLERK OF COURT

OR

_____        _____
Signature of Clerk or Deputy Clerk        _Attorney's signature_

The name, address, email address, and telephone number of the attorney representing _(name of party)_
National Bank of Kuwait, S.A.K.P., |  , who issues or requests this subpoena, are:
Charles C. Conrad Two Houston Center, 909 Fannin, Suite 2000, Houston, Texas 77010; charles.conrad@pillsburylaw.com; (713) 276-7600

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

001937

# PROOF OF SERVICE
**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☒ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .


I declare under penalty of perjury that this information is true and correct.

Date: _____

_____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information concerning attempted service, etc.:

001938

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

    (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

    (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

        (i) is a party or a party's officer; or

        (ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:

    (A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

    (B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*

    *(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

    *(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

        (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

        (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*

    *(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

        (i) fails to allow a reasonable time to comply;

        (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

        (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

        (iv) subjects a person to undue burden.

    *(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

        (i) disclosing a trade secret or other confidential research, development, or commercial information; or

        (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

    *(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

        (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

        (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

    *(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

    *(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

    *(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

    *(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*

    *(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

        (i) expressly make the claim; and

        (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

    *(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

**U.S. Department of Justice**
United States Marshals Service

# PROCESS RECEIPT AND RETURN

*See "Instructions for Service of Process by U.S. Marshal"*

| PLAINTIFF | COURT CASE NUMBER |
|---|---|
| In re: Galleria 2425 Owner LLC | 23-34815 |

| DEFENDANT | TYPE OF PROCESS |
|---|---|
| National Bank of Kuwait, S.A.P.C., New York Branch | service of subpoena to testify |

**SERVE AT** {

NAME OF INDIVIDUAL, COMPANY, CORPORATION, ETC. TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN

Ali Choudhri

ADDRESS *(Street or RFD, Apartment No., City, State and ZIP Code)*

11511 Gallant Ridge Lane, Houston, Texas 77028

| SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW | |
|---|---|
| Charles Conrad<br>Pillsbury Winthrop Shaw Pittman LLP<br>909 Fannin Suite 2000<br>Houston, TX 77010, charles.conrad@pillsburylaw.com, 713-276-7600 | Number of process to be served with this Form 285 — 1 |
| | Number of parties to be served in this case — 1 |
| | Check for service on U.S.A. |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE *(Include Business and Alternate Addresses, All Telephone Numbers, and Estimated Times Available for Service):*

1001 West Loop South, Suite 700, Houston, Texas 77027, Monday-Friday, 8AM - 6PM
2425 West Loop South, Suite 1100, Houston, Texas 77027, Monday-Friday, 8AM - 6PM

| Signature of Attorney other Originator requesting service on behalf of: ☐ PLAINTIFF ☒ DEFENDANT | TELEPHONE NUMBER | DATE |
|---|---|---|
| | 713-276-7600 | 1/25/2024 |

## SPACE BELOW FOR USE OF U.S. MARSHAL ONLY - DO NOT WRITE BELOW THIS LINE

| I acknowledge receipt for the total number of process indicated. *(Sign only for USM 285 if more than one USM 285 is submitted)* | Total Process | District of Origin No. | District to Serve No. | Signature of Authorized USMS Deputy or Clerk | Date |
|---|---|---|---|---|---|

I hereby certify and return that I ☐ have personally served , ☐ have legal evidence of service, ☐ have executed as shown in "Remarks", the process described on the individual, company, corporation, etc., at the address shown above on the on the individual, company, corporation, etc. shown at the address inserted below.

☐ I hereby certify and return that I am unable to locate the individual, company, corporation, etc. named above *(See remarks below)*

| Name and title of individual served *(if not shown above)* | Date | Time | ☐ am ☐ pm |
|---|---|---|---|

| Address *(complete only different than shown above)* | Signature of U.S. Marshal or Deputy |
|---|---|

*Costs shown on attached USMS Cost Sheet >>*

REMARKS

Form USM-285
Rev. 03/21

# INSTRUCTIONS FOR COMPLETING USM-285, PROCESS RECEIPT AND RETURN

- The Form USM-285 is a five-copy form set designed as a control document for process served by a U.S. Marshal or designee. Process may include, but is not limited to, a summons and complaint, subpoena, writ, or court order. The United States Marshals Service (USMS) is authorized by law (28 U.S.C. § 1921) to charge fees for the service of process. The amount of fees charged is established by regulation (28 C.F.R. § 0.114). Except in cases where the litigant has been granted permission by the court for waiver of prepayment of fees and costs, the USMS must request advance payment of the estimated fees and expenses for service of process.

- Please type or print legibly. Submit one copy of the Form USM-285 and one copy of each process for each individual, company, corporation, government agency, etc., to be served or property to be seized.

- In cases where the court has directed the USMS to effect service of a summons and complaint upon an officer or agent of the United States Government, submit a copy of the summons and complaint and Form USM-285 for each officer or agent upon whom service is desired. Submit two (2) additional copies of the summons and complaint for service upon the Government of the United States. The U.S. Marshal or designee will serve one copy upon the U.S. Attorney and will forward the other copy to the Attorney General of the United States. (When the applicable box is checked, completion of the final signature block by the U.S. Marshal or designee certifies service on the U.S. Attorney and the U.S. Attorney General, regardless of whether other defendants on the summons were served). Failure to provide sufficient copies will delay service of the summons.

- Mark all applicable check boxes and use the "Special Instructions" to advise of any information that will assist the USMS in expediting service. You are responsible for providing accurate and sufficient information that will identify the individual or entity to be served or the property to be seized.

- If more than one item of process and Form USM-285 is submitted on a single case, the U.S. Marshal or designee will receipt for all of them on the first Form USM-285. You will receive for your records the "Acknowledgment of Receipt" copy for all the USM-285 forms you submit. When the process is served, you will receive the "Notice of Service" copy. This copy will be identical to the return to the Clerk of the U.S. District Court.

- Upon completion of all services, you will receive a "Billing Statement" copy of Form USM-285. You should return this "Billing Statement" copy to the USMS, together with your payment, in the form of a certified or bank check payable to the U.S. Marshal, for any amounts still owed. Alternatively, the USMS will accept cash. The USMS will not accept personal checks.

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| GALLERIA 2425 OWNER, LLC, | § | CASE NO.  23-34815 |
| | § | |
| DEBTOR. | § | CHAPTER 11 |

## UNITED STATES TRUSTEE'S LIMITED OBJECTION AND RESERVATION OF RIGHTS TO DEBTOR'S APPLICATION TO EMPLOY ATTORNEYS [ECF 67]

### *Responds and Objects the Pleading Filed at [ECF 67]*

TO THE HONORABLE JEFFREY P. NORMAN, UNITED STATES BANKRUPTCY JUDGE:

KEVIN M. EPSTEIN, the United States Trustee for Region 7 (the "U.S. Trustee), files this *Limited Objection and Reservation of Rights to Debtor's Application to Employ Attorneys [ECF 67]* (the "Limited Objection") responding and objecting, pursuant to 11 U.S.C. § 327, to the *Debtor's Application to Employ Attorneys* [ECF 67] (the "Application"), because the U.S. Trustee submitted comments and requested revisions to the proposed retention order to which the Debtor has not responded, and states as follows:

### I. Procedural and Factual Background

1.      On December 5, 2023, (the "Petition Date"), Galleria 2425 Owner, LLC (the "Debtor") filed a voluntary petition for relief under Chapter 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").  This Court has not appointed a Trustee or Examiner, nor has an official committed been established in this Chapter 11 proceeding.  On January 10, 2024, the meeting of creditors was held and concluded.

2.      This is a single asset real estate case, pursuant to 11 U.S.C. §101(51B).  The Debtor owns a commercial high-rise office building located at 2425 West Loop South, Houston, Texas

001942

77027.

3.       On December 22, 2023, Debtor filed the Application seeking authority to retain and employ the Reese W. Baker and Baker & Associates (collectively, "Baker") as its attorney in all matters arising in or related to this case, effective as of December 6, 2023.

4.       On January 26, 2024, the U.S. Trustee submitted written comments to the Application and requested specific revisions to the proposed Order to conform the Debtor's retention and employment of Baker, as counsel, to the requirements of 11 U.S.C. §§ 327 and 330. As of the date of this Limited Objection, Debtor has failed to respond to the U.S. Trustee's written comments and requested revisions.  Accordingly, the U.S. Trustee files this Limited Objection to reserve its right to seek additional time and information from the Debtor to support its Application.

## II.  Limited Objection

5.       To be clear, the U.S. Trustee does not object to the Debtor's retention and employment of Baker.

6.       With respect the terms of the proposed Order, however, the U.S. Trustee has numerous issues and, in connection with those terms, has requested revisions.  To date, the Debtor has failed to respond to those requested revisions.

7.       Accordingly, the U.S. Trustee objects to entry of the proposed Order [ECF 67-1] without implementation of the U.S. Trustee's requested revisions.

## III.  Reservation of Rights

8.       The U.S. Trustee reserves his right to supplement and/or amend this Limited Objection and to raise additional or further objections to the Application, at or prior to the hearing on the Application, or any other relevant hearing.

001943

## IV. Prayer

WHEREFORE, the U.S. Trustee prays that the Court: (a) sustain this Limited Objection; (b) continue the U.S. Trustee's objection deadline to the Application to a date acceptable to the U.S. Trustee so as to allow the U.S. Trustee to adequately respond to Debtor's response to the comments and requested revisions; and (c) grant such other and further relief as the Court deems just and equitable.

Dated: January 26, 2024

Respectfully submitted,

KEVIN M. EPSTEIN
UNITED STATES TRUSTEE
Region 7
Southern and Western Districts of Texas

By:/s/ *Jana Smith Whitworth*
   Jana Smith Whitworth
   Trial Attorney
   SBOT No. 00797435/Fed ID 20656
   515 Rusk Avenue, Suite 3516
   Houston, TX 77002
   Telephone: (713) 718-4650
   Facsimile: (713) 718-4670
   Email: Jana.Whitworth@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served by electronic means on all PACER participants, as listed below, on January 26, 2024.

By: /s/ *Jana Smith Whitworth*
   Jana Smith Whitworth

001944

Label Matrix for local noticing
0541-4
Case 23-34815
Southern District of Texas
Houston
Fri Jan 26 17:36:41 CST 2024

2425 WL, LLC
2425 West Loop South 11th floor
Houston, TX 77027-4304

CC2 TX, LLC
c/o Howard Marc Spector
Spector & Cox, PLLC
12770 Coit Road Suite 850
Dallas, TX 75251-1364

City of Houston
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

Galleria 2425 Owner, LLC
1001 West Loop South 700
Houston, TX 77027-9084

(p)HARRIS COUNTY ATTORNEY'S OFFICE
P O BOX 2928
HOUSTON TX 77252-2928

Houston Community College System
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

Houston ISD
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

National Bank of Kuwait, S.A.K.P., New York

4
United States Bankruptcy Court
PO Box 61010
Houston, TX 77208-1010

2425 WL, LLC
13498 Pond Springs Rd.
Austin, TX 78729-4422

ADT
PO Box 382109
Pittsburgh, PA 15251-8109

Ali Choudhry
1001 West Loop South 700
Houston, TX 77027-9084

Ash Automated Control Systems, LLC
PO Box 1113
Fulshear, TX 77441-2013

CFI Mechanical, Inc
6109 Brittmoore Rd
Houston, TX 77041-5610

CNA Insurance Co
PO Box 74007619
Chicago, IL 60674-7619

Caz Creek Lending
118 Vintage Park Blvd No. W
Houston, TX 77070-4095

Cirro Electric
PO Box 60004
Dallas, TX 75266

City of Houston
PO Box 1560
Houston, TX 77251-1560

City of Houston
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

Comcast
PO Box 60533
City of Industry, CA 91716-0533

Datawatch Systems
4520 East West Highway 200
Bethesda, MD 20814-3382

Environmental Coalition Inc
PO Box 1568
Stafford, TX 77497-1568

Ferguson Facilities Supplies
PO Box 200184
San Antonio, TX 78220-0184

Firetron
PO Box 1604
Stafford, TX 77497-1604

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062-7917

Gulfstream Legal Group
1300 Texas St
Houston, TX 77002-3509

HNB Construction, LLC
521 Woodhaven
Ingleside, TX 78362-4678

Harris County Tax Assessor
PO Box 4622
Houston, TX 77210-4622

Houston Community College System
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

001945

Houston ISD
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

Kings 111 Emergency Communications
751 Canyon Drive, Suite 100
Coppell, TX 75019-3857

Lexitas
PO Box Box 734298 Dept 2012
Dallas, TX 75373-4298

Logix Fiber Networks
PO Box 734120
Dallas, TX 75373-4120

MacGeorge Law Firm
2921 E 17th St Blgd D Suite 6
Austin, TX 78702-1572

Mueller Water Treatment
1500 Sherwood Forest Dr.
Houston, TX 77043-3899

National Bank of Kuwait
299 Park Ave. 17th Floor
New York, NY 10171-0023

Nationwide Security
2425 W Loop S 300
Houston, TX 77027-4205

Nichamoff Law Firm
2444 Times Blvd 270
Houston, TX 77005-3253

TKE
3100 Interstate North Cir SE  500
Atlanta, GA 30339-2296

U.S. Trustee's Office
515 Rusk, Suite 3516
Houston, Texas 77002-2604

US Trustee
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002-2604

Waste Management
PO Box 660345
Dallas, TX 75266-0345

Zindler Cleaning Service Co
2450 Fondren 113
Houston, TX 77063-2314

James Q. Pope
The Pope Law Firm
6161 Savoy Drive
Ste 1125
Houston, TX 77036-3343

Reese W Baker
Baker & Associates
950 Echo Lane
Suite 300
Houston, TX 77024-2824

Rodney Drinnon
McCathern Houston
2000 W Loop S
Ste. 1850
Houston, TX 77027-3744


The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).


Harris County, ATTN: Property Tax Division
Harris County Attorney's Office
P.O. Box 2928
Houston, TX 77252-2928 United States


The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.


(u)2425 West Loop, LLC

End of Label Matrix
Mailable recipients    46
Bypassed recipients     1
Total                  47

001946

LOAN AGREEMENT

Dated as of May 23, 2018

among

GALLERIA 2425 OWNER, LLC,

as Borrower,

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH,

as Administrative Agent,

and

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, and certain other lenders who may now or later be made party hereto,

collectively, as Lenders

1

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS; PRINCIPLES OF CONSTRUCTION ..........................................................1

    Section 1.1. Definitions ................................................................................1
    Section 1.2. Interpretation..........................................................................12

ARTICLE II GENERAL TERMS ......................................................................................13

    Section 2.1. Loan Commitment; Extension ................................................13
    Section 2.2. Interest Rate and Loan Payments...........................................13
    Section 2.3. Usury Savings ..........................................................................14

ARTICLE III CONDITIONS PRECEDENT .......................................................................14

    Section 3.1. Representations and Warranties; Compliance with Conditions....................14
    Section 3.2. Delivery of Loan Documents; Title Policy; Due Diligence Items...............14
    Section 3.3. Related Documents..................................................................16
    Section 3.4. Organizational Documents .....................................................16
    Section 3.5. Opinions of Counsel ...............................................................16
    Section 3.6. Taxes and Other Charges ........................................................16
    Section 3.7. Completion of Proceedings .....................................................16
    Section 3.8. Payments.................................................................................16
    Section 3.9. Transaction Costs....................................................................16
    Section 3.10. No Material Adverse Change.................................................16
    Section 3.11. Leases ...................................................................................17
    Section 3.12. Tenant Estoppel Certificate...................................................17
    Section 3.13. SNDA ....................................................................................17
    Section 3.14. Tax Lot..................................................................................17
    Section 3.15. Borrower's and Guarantor's Financials .................................17
    Section 3.16. Acquisition of Property..........................................................17
    Section 3.17. Further Documents ...............................................................17
    Section 3.18. Interest Reserve Deposit........................................................17

ARTICLE IV REPRESENTATIONS AND WARRANTIES....................................................17

    Section 4.1. Organization............................................................................17
    Section 4.2. Status of Borrower ..................................................................18
    Section 4.3. Validity of Documents .............................................................18
    Section 4.4. No Conflicts.............................................................................18
    Section 4.5. Litigation ................................................................................18
    Section 4.6. Agreements..............................................................................18
    Section 4.7. Solvency..................................................................................19
    Section 4.8. Full and Accurate Disclosure ..................................................19
    Section 4.9. ERISA Compliance..................................................................19
    Section 4.10. Not a Foreign Person .............................................................20
    Section 4.11. Enforceability........................................................................20
    Section 4.12. Business Purposes..................................................................20
    Section 4.13. Compliance ...........................................................................20
    Section 4.14. Financial Information ............................................................20
    Section 4.15. Illegal Activity ......................................................................20
    Section 4.16. Separate Tax and Zoning Lot.................................................20

4161624-v7\CHIDMS1

## TABLE OF CONTENTS
continued

Section 4.17. Federal Reserve Regulation ............................................................................. 20
Section 4.18. Investment Company Act ................................................................................. 21
Section 4.19. No Change in Facts or Circumstances; Disclosure ......................................... 21
Section 4.20. Special Purpose Entity ..................................................................................... 21
Section 4.21. Intellectual Property ......................................................................................... 21
Section 4.22. Embargoed Person ............................................................................................ 21
Section 4.23. Patriot Act ......................................................................................................... 22
Section 4.24. No Contractual Obligations .............................................................................. 22
Section 4.25. Shareholders of Borrower ................................................................................. 22
Section 4.26. Survival .............................................................................................................. 23
Section 4.27. Leases ................................................................................................................. 23
Section 4.28. Landmark Status ............................................................................................... 23
Section 4.29. Broker ................................................................................................................ 23

ARTICLE V COVENANTS .................................................................................................... 23

Section 5.1. Existence; Compliance With Legal Requirements ............................................ 23
Section 5.2. Maintenance and Use of Project ........................................................................ 24
Section 5.3. Waste .................................................................................................................... 24
Section 5.4. Taxes and Other Charges .................................................................................... 24
Section 5.5. Litigation .............................................................................................................. 26
Section 5.6. Access to the Project ............................................................................................ 27
Section 5.7. Notice of Default .................................................................................................. 27
Section 5.8. Cooperate in Legal Proceedings ......................................................................... 27
Section 5.9. Performance of Obligations ................................................................................ 27
Section 5.10. Awards; Insurance Proceeds .............................................................................. 27
Section 5.11. Financial Reporting ............................................................................................ 27
Section 5.12. Estoppel Statement ............................................................................................. 28
Section 5.13. Management of Project ....................................................................................... 28
Section 5.14. Liens .................................................................................................................... 29
Section 5.15. Debt Cancellation ............................................................................................... 29
Section 5.16. Zoning ................................................................................................................. 29
Section 5.17. ERISA .................................................................................................................. 30
Section 5.18. No Joint Assessment .......................................................................................... 30
Section 5.19. Alterations .......................................................................................................... 30
Section 5.20. Reciprocal Easement Agreement ...................................................................... 30
Section 5.21. Notices ................................................................................................................ 30
Section 5.22. Curing ................................................................................................................. 30
Section 5.23. Limitation on Securities Issuances ................................................................... 31
Section 5.24. Limitations on Distributions .............................................................................. 31
Section 5.25. Contractual Obligations ..................................................................................... 31
Section 5.26. Additional Indebtedness .................................................................................... 31
Section 5.27. Restrictions on Leasing ..................................................................................... 31
Section 5.28. Debt Service Coverage Ratio ............................................................................ 32
Section 5.29. Loan-to-Value Ratio .......................................................................................... 33
Section 5.30. UCC Searches .................................................................................................... 33
Section 5.31. Updated/New Appraisal ..................................................................................... 33
Section 5.32. Interest Reserve Account ................................................................................... 33
Section 5.33. Mezzanine Loan ................................................................................................. 34

# TABLE OF CONTENTS
continued

ARTICLE VI ENTITY COVENANTS ...................................................................................... 34

    Section 6.1. Single Purpose Entity/Separateness ......................................................... 34
    Section 6.2. Change of Name, Identity or Structure .................................................... 35
    Section 6.3. Business and Operations ........................................................................... 36

ARTICLE VII NO SALE OR ENCUMBRANCE ................................................................... 36

    Section 7.1. Transfer Definitions .................................................................................. 36
    Section 7.2. No Sale/Encumbrance ............................................................................... 36
    Section 7.3. Administrative Agent's Rights .................................................................. 37
    Section 7.4. Assumption ................................................................................................ 37

ARTICLE VIII INSURANCE; CASUALTY; CONDEMNATION; RESTORATION ........... 37

    Section 8.1. Insurance ................................................................................................... 37
    Section 8.2. Insurance Escrow; Payment by Administrative Agent .............................. 41
    Section 8.3. Casualty .................................................................................................... 42
    Section 8.4. Condemnation ........................................................................................... 44

ARTICLE IX INTENTIONALLY OMITTED ....................................................................... 45

ARTICLE X EVENTS OF DEFAULT; REMEDIES ............................................................. 45

    Section 10.1. Event of Default ...................................................................................... 45
    Section 10.2. Remedies ................................................................................................. 48

ARTICLE XI REPLACEMENT OF LENDERS .................................................................... 48

ARTICLE XII SECONDARY MARKET; ASSIGNMENT; PARTICIPATION .................... 49

    Section 12.1. Assignment; Participation ....................................................................... 49
    Section 12.2. Intralinks ................................................................................................. 51

ARTICLE XIII AGENT ......................................................................................................... 51

    Section 13.1. Appointment, Powers and Immunities .................................................... 51
    Section 13.2. Reliance by Administrative Agent ........................................................... 53
    Section 13.3. Purchase of Disapproving Lender's Interest ............................................ 53
    Section 13.4. Rights of Administrative Agent as Lender ............................................... 54
    Section 13.5. Indemnification ....................................................................................... 54
    Section 13.6. Non-Reliance on Administrative Agent and Other Lenders ..................... 55
    Section 13.7. Failure to Act ........................................................................................... 55
    Section 13.8. Action by Administrative Agent .............................................................. 55
    Section 13.9. Successor Administrative Agent .............................................................. 56
    Section 13.10. Sharing ................................................................................................... 56
    Section 13.11. Pro Rata Treatment and Payments ......................................................... 56
    Section 13.12. Lenders Pro Rata Shares ....................................................................... 57
    Section 13.13. Disbursement of Proceeds by Administrative Agent .............................. 57
    Section 13.14. Amendments Concerning Agency Function ........................................... 58
    Section 13.15. Events of Default ................................................................................... 58
    Section 13.16. Defaulting Lender .................................................................................. 59
    Section 13.17. Servicing Fee ......................................................................................... 61

# TABLE OF CONTENTS
continued

ARTICLE XIV INDEMNIFICATIONS ............................................................................. 61

    Section 14.1. General Indemnification ................................................................. 61
    Section 14.2. Intangible Tax Indemnification...................................................... 61
    Section 14.3. ERISA Indemnification ................................................................. 61
    Section 14.4. Survival ......................................................................................... 62

ARTICLE XV NOTICES ............................................................................................... 62

    Section 15.1. Notices .......................................................................................... 62

ARTICLE XVI FURTHER ASSURANCES ..................................................................... 62

    Section 16.1. Replacement and Corrective Documents........................................ 62
    Section 16.2. Further Acts, Etc ........................................................................... 63
    Section 16.3. Changes in Tax, Debt, Credit and Documentary Stamp Law ......... 63
    Section 16.4. Expenses ....................................................................................... 64

ARTICLE XVII WAIVERS ............................................................................................ 64

    Section 17.1. Remedies Cumulative; Waivers..................................................... 64
    Section 17.2. Modification, Waiver in Writing .................................................... 64
    Section 17.3. Delay Not a Waiver ....................................................................... 65
    Section 17.4. Trial by Jury .................................................................................. 65
    Section 17.5. Waiver of Notice............................................................................ 65
    Section 17.6. Remedies of Borrower ................................................................... 65
    Section 17.7. Waiver of Marshalling of Assets ................................................... 65
    Section 17.8. Waiver of Statute of Limitations .................................................... 66
    Section 17.9. Waiver of Counterclaim ................................................................ 66

ARTICLE XVIII GOVERNING LAW ............................................................................ 66

    Section 18.1. Choice of Law ............................................................................... 66
    Section 18.2. Severability ................................................................................... 67
    Section 18.3. Preferences .................................................................................... 68

ARTICLE XIX MISCELLANEOUS ............................................................................... 68

    Section 19.1. Survival ......................................................................................... 68
    Section 19.2. Administrative Agent's Discretion ................................................. 68
    Section 19.3. Headings ....................................................................................... 68
    Section 19.4. Cost of Enforcement ...................................................................... 68
    Section 19.5. Schedule Incorporated ................................................................... 68
    Section 19.6. Offsets, Counterclaims and Defenses ............................................ 68
    Section 19.7. No Joint Venture or Partnership; No Third Party Beneficiaries ...... 69
    Section 19.8. Publicity........................................................................................ 70
    Section 19.9. Conflict; Construction of Documents; Reliance ............................. 70
    Section 19.10. Actions, Approvals and Determinations ....................................... 70
    Section 19.11. Entire Agreement......................................................................... 71
    Section 19.12. Certain Additional Rights of Lenders .......................................... 71
    Section 19.13. Counterparts................................................................................. 71

4161624-v7\CHIDMS1

001951

# TABLE OF CONTENTS
continued

EXHIBIT A - Borrower's Organizational Structure

EXHIBIT B - Form of Assignment and Assumption Agreement

SCHEDULE 13.12 - Amount of Loan Attributable to Lender

SCHEDULE 15.1 - Lenders' Offices, Addresses for Notices

v

<u>LOAN AGREEMENT</u>

THIS LOAN AGREEMENT dated as of May 23, 2018 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "<u>Agreement</u>"), among (1) GALLERIA 2425 OWNER, LLC, a Delaware limited liability company, having an address at 3139 W Holcombe Blvd #845, Houston, Texas 77025 ("<u>Borrower</u>"), (2) the Lenders (as hereinafter defined), and (3) NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch, having an address at 299 Park Avenue, New York, New York 10171, as administrative and collateral agent for the Lenders (in such capacity, and together with its successors and assigns, "<u>Administrative Agent</u>").

RECITALS:

WHEREAS, Lenders have agreed to make a certain $51,675,000.00 loan to Borrower (the "<u>Loan</u>"); and

WHEREAS, the Loan shall be (i) governed by this Agreement, (ii) evidenced by the Note (as hereinafter defined), and (iii) secured by the Deed of Trust (as hereinafter defined).

NOW THEREFORE, in consideration of the making of the Loan by the Lenders and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

ARTICLE I
DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1. <u>Definitions</u>. For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"<u>Access Laws</u>" shall mean, collectively, the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all other federal, state and local laws, regulations, rules, statutes, ordinances, orders and decrees related to handicapped access, including, without limitation, the American with Disabilities Act Accessibility Guidelines for Buildings and Facilities.

"<u>Action Notice</u>" shall have the meaning set forth in <u>Section 13.15</u> hereof.

"<u>Actual Proceeds</u>" shall have the meaning set forth in <u>Section 8.3</u> hereof.

"<u>Administrative Agent Loan Documents</u>" shall have the meaning set forth in <u>Section 13.1</u> hereof.

"<u>Affiliate</u>" shall mean, as to any specified Person, (a) any Person that directly or indirectly through one or more intermediaries Controls, is Controlled by or is under common Control with such Person, (b) any Person owning or controlling 10% or more of the outstanding voting securities of or other ownership interests in such Person, (c) any officer, director, partner, employee or member (direct or indirect and no matter how remote) of such Person, (d) if such Person is an individual, any entity for which such Person directly or indirectly acts as an officer, director, partner, owner employee or member, (e) any entity in which such Person (together with the members of his family if the Person in question is an individual) owns, directly or indirectly through one or more intermediaries an interest in any class of stock (or other beneficial interest in such entity) of 10% or more, (f) any immediate family member of such Person, (g) with respect to any Borrower or Guarantor, any other Borrower or Guarantor, or (h) with respect to any Borrower or Guarantor, any direct or indirect owner of an interest in such Borrower or Guarantor.

"Affiliated Manager" shall have the meaning set forth in Section 7.1 hereof.

"Agent Discretion Standard" shall have the meaning set forth in Section 13.15 hereof.

"Annex" shall have the meaning set forth in Section 4.23 hereof.

"Applicable Percentage" shall have the meaning set forth in Section 8.3 hereof.

"Appraised Value" shall have the meaning set forth in Section 5.29 hereof.

"Approving Lenders" shall have the meaning set forth in Section 13.3 hereof.

"Assignee" shall have the meaning set forth in Section 12.1 hereof.

"Assignment of Agreements, Licenses, Permits and Contracts" shall mean the Assignment of Agreements, Licenses, Permits and Contracts dated as of the Closing Date, made by Borrower to Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Interest Rate Agreement" shall mean, with respect to any Interest Rate Protection Product entered into between Borrower and a third-party, an Assignment of Interest Rate Agreement made by Borrower to Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Leases and Rents" shall mean the absolute assignment by Borrower to Administrative Agent of the Property Income with respect to the Property and the Project pursuant to that certain Absolute Assignment of Leases and Rents dated as of the Closing Date made by Borrower to Administrative Agent, on behalf of Lenders, encumbering the Project, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Award" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Project.

"Balance" shall have the meaning set forth in Section 8.3 hereof.

"Benefit Plan" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA, Section 412 of the Internal Revenue Code or Section 302 or 303 of ERISA, that is or, within any of the preceding six (6) plan years was, sponsored, maintained or contributed to by Borrower or any of its Subsidiaries or ERISA Affiliates (or by any Person that was an ERISA Affiliate within the last six (6) years), or with respect to which Borrower or any of its Subsidiaries or ERISA Affiliates has any liability, whether actual or contingent.

"Benefit Plan Investor" shall mean any of the following: (a) an "employee benefit plan" (within the meaning of Section 3(3) of ERISA), whether or not it is subject to ERISA and including governmental and foreign plans, (b) a "plan" as defined in Section 4975 of the Internal Revenue Code of 1986, as amended, or (c) a Person whose underlying assets include "plan assets" of the foregoing by reason of investment by an employee benefit plan or plan in such Person.

"Borrower Materials" shall have the meaning set forth in Section 12.2 hereof.

"Borrower Members" shall have the meaning set forth in Section 4.1 hereof.

"Borrower Operating Agreement" shall mean Borrower's Amended and Restated Limited Liability Company Agreement dated as of May 23, 2018, as the same may hereafter be amended in accordance with the terms and provisions hereof.

"Business Day" shall have the meaning set forth in the Note.

"Casualty" shall have the meaning set forth in Section 8.3 hereof.

"Closing Date" shall mean the date hereof.

"Condemnation" shall mean a temporary or permanent taking by any Governmental Authority as the result, in lieu or in anticipation, of the exercise of the right of condemnation or eminent domain, of all or any part of the Project, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Project or any part thereof.

"Consented Assignee" shall have the meaning set forth in Section 12.1 hereof.

"Contractual Obligation" shall mean as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking, to which such Person is a party or by which it or any of its property is bound, or any provision of the foregoing.

"Control" shall have the meaning set forth in Section 7.1 hereof.

"Control Account Agreement" means that certain Control Account Agreement dated as of May 18, 2018 and effective as of the Closing Date, entered into by and among Borrower, Administrative Agent and Frost Bank, a Texas state bank, with respect to Borrower's deposit account, as more particularly described therein.

"Coverage Advance" shall have the meaning set forth in Section 13.11 hereof.

"Creditors' Rights Laws" shall mean with respect to any Person any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"DSCR" shall have the meaning set forth in Section 5.28 hereof.

"DSCR Threshold" shall have the meaning set forth in Section 5.28 hereof.

"Debt" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note, together with all interest accrued and unpaid thereon and all other sums due to Lenders in respect of the Loan under the Note, this Agreement, the Deed of Trust or any other Loan Document.

"Debt Service" shall mean, with respect to any particular period of time, scheduled interest and principal payments under the Note and/or this Agreement.

"Debt Service Payments" shall have the meaning set forth in Section 13.12 hereof.

"Deed of Trust" shall mean that certain Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing dated as of the Closing Date made by Borrower to Salima Umatiya, as trustee, for the benefit of Administrative Agent, on behalf of Lenders, in the principal amount of $51,675,000.00, encumbering the Project, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>Default</u>" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"<u>Defaulting Lender</u>" shall have the meaning set forth in <u>Section 13.16</u> hereof.

"<u>Defaulting Lender's Interest</u>" shall have the meaning set forth in <u>Section 13.16</u> hereof.

"<u>Disapproving Lenders</u>" shall have the meaning set forth in <u>Section 13.3</u> hereof.

"<u>Dollars</u>" or "<u>$</u>" shall mean lawful money of the United States of America.

"<u>Eligible Assignee</u>" shall have the meaning set forth in <u>Section 12.1</u> hereof.

"<u>Embargoed Person</u>" shall have the meaning set forth in <u>Section 4.22</u> hereof.

"<u>Engineering Report</u>" shall mean any written report resulting from the property condition assessments of the Project delivered to Administrative Agent in connection with the Loan.

"<u>Environmental Indemnity Agreement</u>" shall mean that certain Environmental Indemnity Agreement dated as of the Closing Date made by Borrower and Guarantor in favor of Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>Environmental Report</u>" shall mean any written report resulting from the environmental site assessments of the Project delivered to Administrative Agent in connection with the Loan.

"<u>ERISA</u>" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and any successor statutes thereto and applicable regulations issued pursuant thereto in temporary or final form.

"<u>ERISA Affiliate</u>" shall mean any trade or business (whether or not incorporated) that, together with Borrower, is treated as a single employer under Section 414(b), (c), (m) or (o) of the Internal Revenue Code.

"<u>ERISA Event</u>" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Benefit Plan (other than an event for which the 30 day notice period is waived); (b) a failure to satisfy the minimum funding standards of Section 412 of the Internal Revenue Code or Section 302 of ERISA, whether or not waived; (c) the filing pursuant to Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standards with respect to any Benefit Plan; (d) a failure to make any required installment under Section 430(j) of the Internal Revenue Code with respect to any Benefit Plan; (e) a failure to make any required contribution to a Multiemployer Plan when due; (f) the incurrence by Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Benefit Plan; (g) the receipt by Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Benefit Plan or Benefit Plans or to appoint a trustee to administer any Benefit Plan; (h) the incurrence by Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Benefit Plan or Multiemployer Plan; (i) the receipt by Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability; (j) a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, or in endangered or critical status within the meaning of Section 432 of the Internal Revenue Code or Title IV of ERISA; (k) a determination that any Benefit Plan is in "at risk" status (as defined in Section 430 of the Internal Revenue Code or Section 303 of ERISA); or (l) the imposition of a

4

Lien under the Internal Revenue Code or ERISA on the assets of Borrower, any Subsidiary or any ERISA Affiliate, or Borrower or any Subsidiary or ERISA Affiliate has been notified in writing that such a Lien will be imposed on the assets of Borrower, Subsidiary or ERISA Affiliate.

"Event of Default" shall have the meaning set forth in Section 10.1 hereof.

"Excess Funds" shall have the meaning set forth in Section 8.3 hereof.

"Existing Leases" means (i) the Key Tenant Lease, (ii) the Jetall Lease, (iii) the Regus Lease, (iv) Official Lease Agreement, dated October 3, 2012, by and between G3 Visas & Passports, Inc., as tenant, and Borrower, as successor-in-interest to Seller, as landlord, as amended by First Amendment to Lease Agreement, (v) Lease Agreement, dated November 1, 2014, by and between PEM Offshore, Inc., a Texas corporation, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, as amended by First Amendment to Lease Agreement, (vi) Lease Agreement, dated November 1, 2014, by and between PrimeLending, a PlainsCapital Company, a Texas Corporation, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, as amended by First Amendment to Lease Agreement, (vii) Lease Agreement, dated December 2016, by and between SIBS International, Inc. a Texas corporation, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, (viii) Lease Agreement, dated November 1, 2014, by and between Uptown Cosmetic and Implant Dentistry/Dr. Robert Velasco, DDS, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, (ix) Lease Agreement, dated December 1, 2015, by and between Vasso's Bar and Grill, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, and (x) Lease Agreement, dated January 1, 2015, by and between Wallis State Bank, as tenant, and Borrower, as successor-in-interest to Seller, as landlord; as each has been and may hereafter be amended, extended, restated and assigned in accordance with the terms and provisions of this Agreement.

"FATCA" shall mean (i) Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to the foregoing and (ii) any similar law adopted by any non-U.S. Governmental Authority pursuant to an intergovernmental agreement between such non-U.S. jurisdiction and the United States.

"Federal Funds Rate" shall mean, for any day, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to NBK on such day on such transactions as determined by Administrative Agent.

"Fee Letter" shall mean that certain Fee Letter dated as of the Closing Date between Borrower and NBK.

"Financial Statements" shall have the meaning set forth in Section 5.11 hereof.

"Governmental Authority" shall mean any court, board, agency, department, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, municipal, city, town, special district or otherwise) whether now or hereafter in existence.

"Guarantor" shall mean Bradley Parker, an individual.

"Guaranty" shall mean that certain Guaranty, dated as of the Closing Date, made by Guarantor for the benefit of Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Indemnified Liabilities" shall have the meaning set forth in Section 14.1 hereof.

"Indemnified Parties" shall mean (a) Lenders, (b) Administrative Agent, (c) any prior owner or holder of the Loan or Participations in the Loan, (d) any servicer or prior servicer of the Loan, (e) any Participant or Assignee or any prior Participant or Assignee of the Loan, (f) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Participant or Assignee or other third party, (g) any receiver or other fiduciary appointed in a foreclosure or other Creditors' Rights Laws proceeding, (h) any officers, directors, shareholders, partners, member, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing, and (i) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Deed of Trust.

"Inspector" shall have the meaning set forth in Section 8.3 hereof.

"Insurance Certificates" shall have the meaning set forth in Section 8.1(b) hereof.

"Insurance Premiums" shall have the meaning set forth in Section 8.1(b) hereof.

"Insurance Proceeds" shall have the meaning set forth in Section 8.3 hereof.

"Intercreditor Agreement" shall mean that certain Intercreditor Agreement, dated as of the Closing Date, by and between Administrative Agent, Lenders and Mezzanine Lender.

"Interest Rate" shall have the meaning set forth in the Note.

"Interest Rate Protection Products" shall mean any interest rate hedging agreement(s) relating to the Loan entered into by Borrower, any Lender or any Affiliate of any Lender, including, without limitation, any Transaction (as defined in any ISDA Master Agreement), and any interest rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or index swap or option bond, note or bill option, interest rate option, forward foreign exchange transaction, cap, collar, or floor transaction, currency swap, cross currency swap, swap option, currency option, or any similar transaction, including, without limitation, under any ISDA Master Agreement, entered into by Borrower, any Lender or any affiliate of Lenders.

"Interest Reserve Account" shall have the meaning set forth in Section 3.18 hereof.

"Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Involuntary Rate" shall have the meaning set forth in the Note.

"ISDA Master Agreement" shall mean any Master Agreement published by the International SWAP Dealers Association, Inc. or commonly used by swap dealers, as the same may be amended by any Lender or any Affiliate of such Lender.

"Jetall Lease" shall mean that certain Lease Agreement dated April 1, 2016 by and between Jetall Companies, Inc., as tenant, and Borrower, as successor-in-interest to Seller, as landlord.

"<u>Judgment Amount</u>" shall have the meaning set forth in <u>Section 13.15</u> hereof.

"<u>Key Principal</u>" shall mean, collectively, Azeemeh Zaheer, an individual, and NCRE.

"<u>Key Tenant</u>" shall mean Specialty Retailers, Inc., a Texas corporation.

"<u>Key Tenant Lease</u>" shall mean that certain Office Lease Agreement, dated as of May 27, 2015, by and between Key Tenant and Borrower, as successor-in-interest to Seller, as landlord.

"<u>Lease</u>" shall mean the Existing Leases and any lease entered into by Borrower, as landlord, for all or any portion of the Project.

"<u>Legal Requirements</u>" shall mean all statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower or the Project or any part thereof, or the construction, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses, authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting Borrower or the Project or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Project or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"<u>Lender Interest Rate</u>" shall have the meaning set forth in <u>Section 13.11</u> hereof.

"<u>Lender(s)</u>" shall mean, individually and collectively, any financial institution that either (a) is listed on the signature pages hereof as a "Lender" or (b) from time to time becomes a party hereto pursuant to the terms and provisions of this Agreement, in each case together with its successors.

"<u>Lien</u>" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Project, any portion thereof or any interest therein, including, without limitation, any conditional sale or the title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanics', materialmens' and other similar liens and encumbrances.

"<u>Loan</u>" shall have the meaning set forth in the Recitals.

"<u>Loan Documents</u>" shall mean, collectively, this Agreement, the Note, the Deed of Trust, the Assignment of Leases and Rents, the Guaranty, the Environmental Indemnity Agreement, the Assignment of Agreements, Licenses, Permits and Contracts, the Subordination of Management Agreement, the Fee Letter, the Intercreditor Agreement, the Control Account Agreement, any Assignment of Interest Rate Agreement entered into after the Closing Date and any and all other documents, agreements and certificates executed and/or delivered in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time. Loan Documents shall also include any Interest Rate Protection Product or ISDA Master Agreement.

"<u>Losses</u>" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement of whatever kind or nature (including, but not limited to, legal fees and other costs of defense).

"<u>LTVR</u>" shall have the meaning set forth in <u>Section 5.29</u> hereof.

"<u>LTVR Threshold</u>" shall have the meaning set forth in <u>Section 5.29</u> hereof.

"Management Agreement" shall mean, with respect to the Project, that certain Property Management Agreement dated on or about the Closing Date by and between Borrower and Manager, pursuant to which such Manager is to provide management, leasing and other services with respect to the Project, as the same may be amended, restated, replaced, supplemented or otherwise modified in accordance with the terms of this Agreement.

"Manager" shall mean (a) Boxer Property Management Corporation, a Texas corporation, (b) a Qualified Manager, or (c) any other management organization prior to whose employment as manager of the Project, such employment shall have been approved by Administrative Agent, which approval shall not be unreasonably delayed, conditioned or denied.

"Material Lease" shall mean (i) the Key Tenant Lease, (ii) the Regus Lease, (iii) the Jetall Lease, and (iv) any Lease which (A) individually or in the aggregate (with respect to such Tenant and its Affiliates) cover more than 20,000 square feet of the Improvements, (B) provide the Tenant under such Lease with an option or other preferential right to purchase all or any portion of the Project, or (C) the Tenant under such Lease is an Affiliate of the Borrower.

"Maturity Date" shall have the meaning set forth in the Note.

"Maximum Rate" shall have the meaning set forth in the Note.

"Mezzanine Borrower" shall mean the Sole Member.

"Mezzanine Lender" shall mean Naissance Galleria, LLC, a Cayman Islands limited liability company.

"Mezzanine Loan" shall mean the $16,100,000 loan made by Mezzanine Lender to Mezzanine Borrower, secured by the Mezzanine Pledge Agreement.

"Mezzanine Loan Agreement" shall mean that certain Mezzanine Loan Agreement, dated as of the Closing Date, by and between Mezzanine Lender and Mezzanine Borrower.

"Mezzanine Loan Documents" shall have the meaning given to the term "Loan Documents" in the Mezzanine Loan Agreement.

"Mezzanine Pledge Agreement" shall mean that certain Pledge and Security Agreement, dated as of the Closing Date, by and between Mezzanine Borrower and Mezzanine Lender.

"Multiemployer Plan" shall mean a multiemployer plan as defined in Section 3(37) of ERISA as to which Borrower or any ERISA Affiliate contributes or, within the last six (6) years, contributed or had any obligation to contribute or otherwise has any obligation or liability, whether actual or contingent.

"NCRE" shall mean Naissance Capital Real Estate, LLC, a Delaware limited liability company.

"NBK" shall mean National Bank of Kuwait, S.A.K.P., New York Branch.

"Net Operating Income" shall mean the difference between:

(a) the sum of (i) actual rent collections for the period in question from Tenants and other Persons paying rent to Borrower *plus* (ii) any miscellaneous income actually received by Borrower from the Project. Net Operating Income shall not include any amounts paid by a Tenant under any Lease, including without limitation, the Existing Leases, for reimbursement of operating costs and expenses (including Taxes); and

(b)    actual operating expenses for the period in question (not including non-recurring expenses such as leasing commissions, tenant improvement costs, bonuses paid to managers for turning over space at the Project, and other renovation expenses), other than: (i) Debt Service due under the Note and (ii) all operating costs and expenses (including Taxes) payable by a Tenant under any Lease, including, without limitation, the Existing Leases. Any refunds or rebates to operating expenses are to be applied and credited against the applicable operating expenses for the period that such operating expenses were incurred.

"Note" shall mean that certain Promissory Note dated as of the Closing Date in the original principal amount of the Loan made by Borrower to Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"OECD" shall mean the Organization for Economic Cooperation and Development.

"OFAC" shall mean the Office of Foreign Assets Control, Department of the Treasury.

"Organizational Documents" shall mean, as to any Person, the certificate of incorporation and by-laws with respect to a corporation; the articles of organization (or the equivalent of such items under applicable state law) and operating agreement with respect to a limited liability company; the certificate of limited partnership and partnership agreement with respect to a limited partnership, or any other organizational or governing documents of such Person.

"Other Charges" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Project, now or hereafter levied or assessed or imposed against the Project or any part thereof.

"Participant" shall have the meaning set forth in Section 12.1 hereof.

"Participations" shall have the meaning set forth in Section 12.1 hereof.

"Patriot Act" shall have the meaning set forth in Section 4.23 hereof.

"Permitted Encumbrances" shall mean, with respect to the Project, collectively, (a) Liens, if any, for Taxes imposed by any Governmental Authority not yet due and payable or delinquent, (b) Liens for Taxes being contested in accordance with Section 5.4(d), (c) Liens, if any, for mechanics, materialmen or laborers which are fully bonded over in accordance with Section 5.4(c), (d) Liens set forth on Schedule B of the Title Policy, and (e) such other encumbrances as Administrative Agent has approved or may approve in writing in Administrative Agent's sole and absolute discretion.

"Permitted Transfers" shall mean the following:

(a)    a Lease entered into in accordance with the terms and conditions of the Loan Documents;

(b)    provided that no Event of Default shall then exist and be continuing, any transfer, Sale or Pledge of an interest in Borrower or any Restricted Party to any Person provided that:

(i)    such transfer shall not (x) cause the transferee (other than Key Principal), together with its Affiliates, to acquire Control of Borrower or Sole Member or to acquire or increase its direct or indirect interest in Borrower or in Sole Member to an amount which equals or exceeds forty-nine percent (49%) of the equity interests in Borrower or Sole Member, or (y) result in Borrower or Sole Member no longer being Controlled by Key Principal;

9

(ii)    after giving effect to such Transfer, Key Principal(s) shall continue to Control the day to day operations of Borrower and continue to own at least 51% of all equity interests (direct or indirect) in Borrower; and

(iii)    Borrower shall continue to be a single purpose entity in accordance with <u>Section 6.1</u> and Sole Member shall continue to be the sole managing member of Borrower;

(c)    provided that no Event of Default shall then exist and be continuing, a transfer for estate planning purposes of any Key Principal's direct or indirect interests in Borrower to the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal, or to a trust for the benefit of such Key Principal or for the benefit of the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal so long as immediately following such transfer, Key Principals continue to Control the day to day operations of Borrower.

"<u>Person</u>" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any other entity, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"<u>Pre-Approved Accounting Firm</u>" shall mean Pannell Kerr Forster of Texas, P.C.

"<u>Plans</u>" shall have the meaning set forth in <u>Section 8.3</u> hereof.

"<u>Platform</u>" shall have the meaning set forth in <u>Section 12.2</u> hereof.

"<u>Policies</u>" shall have the meaning set forth in <u>Section 8.1(b)</u> hereof.

"<u>Policy</u>" shall have the meaning set forth in <u>Section 8.1(b)</u> hereof.

"<u>Prepayment Premium</u>" shall have the meaning set forth in the Note.

"<u>Prohibited Transfer</u>" shall have the meaning set forth in <u>Section 7.2(a)</u> hereof.

"<u>Project</u>" shall mean the Property and that certain 281,590 rentable square foot office building located at the Property, and all other buildings and structures thereon, and all easements, rights, privileges and appurtenances (including, without limitation, any air or development rights, if any) thereunto belonging or in any way appurtenant, and all of the estate, right, title, interest, claim or demand whatsoever of Borrower therein, and all estates, rights, titles, interests, privileges, tenements, hereditaments, and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Property, either in law or in equity, in possession or expectancy, now or hereafter acquired.

"<u>Property</u>" shall mean that certain parcel of land located at 2425 West Loop South, City of Houston, County of Harris, State of Texas.

"<u>Property Income</u>" shall mean all rents, income, issues, profits, security deposits and other benefits to which Borrower may now or hereafter be entitled from the Project.

"<u>Provided Information</u>" shall have the meaning set forth in <u>Section 12.1</u> hereof.

"<u>Pro Rata Share</u>" shall have the meaning set forth in <u>Section 13.12</u> hereof.

001962

"<u>PSA</u>" shall mean the Contract of Sale dated as of April 16, 2018 by and between Sole Member and Seller, as assigned by Sole Member to Borrower pursuant to that certain Assignment and Assumption of Contract dated as of the Closing Date.

"<u>Purchase Price</u>" shall have the meaning set forth in <u>Section 13.3</u> hereof.

"<u>Qualified Manager</u>" shall mean a property manager which (i) is a reputable and experienced professional management company having at least five (5) years' experience in the management of commercial properties with similar uses as the Project and in the jurisdiction in which the Project is located, (ii) has, for at least three (3) years prior to its proposed engagement as "Manager", managed at least five (5) properties of the same property type, quality and size as the Project, and (iii) is not the subject of a bankruptcy or similar insolvency proceeding. For the avoidance of doubt, an Affiliate of the Manager initially named in this Agreement shall be deemed to be a "Qualified Manager" for purposes of this Agreement.

"<u>Regus Lease</u>" shall mean the Lease Agreement dated February 29, 1995, as amended by Amendment No. 1 to Lease Agreement dated July 28, 1997, Amendment No. 2 to Lease Agreement dated February 26, 2001, Amendment No. 3 to Lease Agreement effective as of January 1, 2005, Amendment No. 4 to Lease Agreement effective as of October 3, 2011, Amendment No. 5 to Lease Agreement effective as of October 3, 2011, Amendment No. 6 to Lease Agreement effective as of September 11, 2012 and Amendment No. 7 to Lease Agreement effective as of November 15, 2012, by and between RGN-Houston XXXIX, as successor-in-interest to Abby Executive Suites, West Loop, Inc. and Abby Office Centers, Uptown, Ltd., as tenant, and Borrower, as successor-in-interest to Seller, as landlord.

"<u>Required Lenders</u>" shall have the meaning set forth in <u>Section 13.2</u> hereof.

"<u>Restoration Account</u>" shall have the meaning set forth in <u>Section 8.3</u> hereof.

"<u>Restoration Work</u>" shall have the meaning set forth in <u>Section 8.3</u> hereof.

"<u>Restricted Party</u>" shall have the meaning set forth in <u>Section 7.1</u> hereof.

"<u>Sale or Pledge</u>" shall have the meaning set forth in <u>Section 7.1</u> hereof.

"<u>Seller</u>" shall mean 2425 West Loop, LP, a Texas limited partnership.

"<u>Servicer</u>" shall have the meaning set forth in <u>Section 12.1</u> hereof.

"<u>Servicing Fee</u>" shall have the meaning set forth in <u>Section 13.17</u> hereof.

"<u>SNDA</u>" shall mean a Subordination, Non-Disturbance and Attornment Agreement.

"<u>Sole Member</u>" shall mean Galleria 2425 JV, LLC, a Delaware limited liability company, the sole member of Borrower.

"<u>State</u>" shall mean, with respect to the Project, the state in which the Project or any part thereof is located, and with respect to Borrower, the state of Borrower's organization.

"<u>Subordination of Management Agreement</u>" shall mean, during such time as a Management Agreement may be in place, that certain Assignment and Subordination of Management Agreement among Administrative Agent, Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

001963

"<u>Subsidiary</u>" shall mean any corporation, partnership, limited liability company or other entity in which a Person holds an equity interest which is more than twenty percent (20%) of the equity classes issued by such entity.

"<u>Syndication</u>" shall have the meaning set forth in <u>Section 12.1</u> hereof.

"<u>Taxes</u>" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied, assessed, or imposed against the Project (or any part thereof).

"<u>Telecom Leases</u>" shall mean leases with telecommunications providers or their affiliates or agents for the installation and maintenance of communication equipment, including, without limitation, antennas, at the Property.

"<u>Tenant</u>" shall mean any Person leasing, subleasing or otherwise occupying any portion of the Project under a Lease or other occupancy agreement with Borrower or any predecessor-in-interest to Borrower.

"<u>Term</u>" shall have the meaning set forth in the Note.

"<u>Title Company</u>" shall have the meaning set forth in <u>Section 3.2</u> hereof.

"<u>Title Policy</u>" shall have the meaning set forth in <u>Section 3.2</u> hereof.

"<u>UCC</u>" or "<u>Uniform Commercial Code</u>" shall mean the Uniform Commercial Code as in effect in the State.

"<u>West Loop</u>" shall mean Galleria West Loop Investments II, LLC, a Texas limited liability company.

"<u>Withdrawal Liability</u>" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.2. <u>Interpretation</u>. Unless the context of this Agreement otherwise clearly requires, the following rules of construction shall apply to this Agreement and each of the Loan Documents:

(a) <u>Number; Inclusion</u>. To the extent the context so requires, references to the plural include the singular, references to the singular include the plural, and references to the part include the whole; "or" has the inclusive meaning represented by the phrase "and/or"; and "including" has the meaning represented by the phrase "including, without limitation,";

(b) <u>Determination</u>. References to "determination" of or by Administrative Agent or Lenders shall be deemed to include good-faith estimates by Administrative Agent or Lenders (in the case of quantitative determinations), and good-faith beliefs by Administrative Agent or Lenders (in the case of qualitative determinations), and such determination shall be conclusive absent manifest error;

(c) <u>Construction</u>. This Agreement and all other Loan Documents shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement and all such other Loan Documents to be drafted. If any words or phrases in this Agreement or any other Loan Document shall have been stricken out or otherwise eliminated, whether or not any other words or phrases have been added, this Agreement and all such other Loan Documents shall be construed as if the words or phrase so stricken out or otherwise eliminated were never included herein or therein and no implication or inference shall be drawn from the fact that said words or phrases were so stricken out or otherwise eliminated;

12

(d)     Agent's or Lenders Discretion and Consent. Whenever Administrative Agent or Lenders are granted the right herein or in any Loan Document to make any decision or determination, to exercise any right, remedy or power or otherwise to act in its or their sole discretion or to grant or withhold consent, such right shall be exercised in good faith utilizing generally accepted commercial practices for transactions similar to the transaction that is the subject matter of this Agreement or such Loan Document (as the case may be);

(e)     Documents Taken as a Whole. The words "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement or in any Loan Document refer to this Agreement or such Loan Document as a whole and not to any particular provision of this Agreement or such Loan Document;

(f)     Headings. The section and other headings contained in this Agreement or any Loan Document and the table of contents (if any) preceding this Agreement or any Loan Document are for reference purposes only and shall not control or affect the construction of this Agreement or such Loan Document or the interpretation thereof in any respect;

(g)     Implied References to this Agreement. Article, section, subsection, clause, schedule and exhibit references are to this Agreement unless otherwise specified;

(h)     Persons. Reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Agreement or by such Loan Document, as the case may be, and reference to a Person in a particular capacity excludes such Person in any other capacity;

(i)     Modifications to Documents. Reference to any agreement (including this Agreement and any Loan Document, together with the schedules and exhibits hereto or thereto), document or instrument means such agreement, document or instrument as amended, modified, replaced, substituted for, superseded or restated at the relevant time;

(j)     From, To and Through. Relative to the determination of any period of time, "from" means "from and including," "to" means "to but excluding," and "through" means "through and including"; and

(k)     Shall; Will. References to "shall" and "will" are intended to have the same meaning.

ARTICLE II
GENERAL TERMS

Section 2.1. Loan Commitment; Extension.

(a)     Subject to the terms, provisions, covenants and conditions of this Agreement, Lenders shall make the Loan to Borrower in an amount equal to FIFTY ONE MILLION SIX HUNDRED SEVENTY FIVE THOUSAND AND NO/100THS DOLLARS ($51,675,000.00).

(b)     The Loan shall be secured by the Deed of Trust, the Assignment of Leases and Rents, and the other Loan Documents.

(c)     Borrower shall use the proceeds of the Loan to (i) partially finance Borrower's acquisition of the Project, (ii) make a deposit into the Interest Reserve Account, and (iii) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Administrative Agent.

Section 2.2. Interest Rate and Loan Payments.

13

001965

(a)     The Loan shall bear interest at the per annum rates set forth in the Note.

(b)     Borrower hereby agrees to make principal and interest payments as set forth in the Note.

(c)     All payments to be made by Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by Borrower hereunder and under the other Loan Documents shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's office in Dollars and in immediately available funds not later than 2:00 p.m. EST on the date specified herein. All payments received by the Administrative Agent after 2:00 p.m. EST shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

Section 2.3. <u>Usury Savings</u>. This Agreement and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lenders to either civil or criminal liability as a result of being in excess of the Maximum Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Rate, the Interest Rate or the Involuntary Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Rate and all previous payments in excess of the Maximum Rate shall be deemed to have been payments in reduction of principal, without premium, and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lenders for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

ARTICLE III
CONDITIONS PRECEDENT

The obligation of Lenders to enter into this Agreement and make the Loan hereunder is subject to the fulfillment by Borrower and Guarantor or waiver by Administrative Agent of the following conditions precedent no later than the Closing Date.

Section 3.1. <u>Representations and Warranties; Compliance with Conditions</u>. The representations and warranties of Borrower and Guarantor contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date, and Administrative Agent shall have determined that no Default or an Event of Default shall have occurred and be continuing nor shall any Default or Event of Default occur immediately following the Closing Date and Borrower and Guarantor shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on its part to be observed or performed.

Section 3.2. <u>Delivery of Loan Documents; Title Policy; Due Diligence Items</u>.

(a)     <u>Deed of Trust, Loan Agreement, Note and Guaranty</u>. Administrative Agent shall have received (i) from Borrower fully executed and acknowledged counterparts of the Deed of Trust and Assignment of Leases and Rents, and evidence that the Uniform Commercial Code financing statement has been delivered to the Title Company for recording and/or filing, in the judgment of Administrative

Agent, so as to effectively create upon such recording and/or filing valid and enforceable Liens upon the Project, of first priority, in favor of Lenders, and (ii) from Borrower and Guarantor, as applicable, fully executed counterparts of this Agreement, the Note, the Guaranty and all of the other Loan Documents.

(b)  <u>Policy; Title Policy</u>. Administrative Agent shall have received a paid title insurance policy (the "<u>Title Policy</u>"), in the amount of the Deed of Trust, issued by a title company(ies) (the "<u>Title Company</u>") acceptable to Administrative Agent and dated as of the Closing Date. Such Title Policy shall (A) provide coverage for the full amount of the Loan, (B) insure Lenders that the Deed of Trust insured by such Title Policy creates a valid, perfected lien on the Project of first priority and that Borrower is the sole owner of a valid fee estate in and to the Project, free and clear of all exceptions from coverage other than the standard exceptions and exclusions from coverage, (C) provide full coverage against mechanics' liens (filed and inchoate), (D) contain such endorsements and affirmative coverages as Administrative Agent may reasonably request, and (E) name Administrative Agent as the insured. The Title Policy shall be assignable. Administrative Agent also shall have received evidence that all premiums in respect of such Title Policy have been paid.

(c)  <u>Survey</u>. Administrative Agent shall have received a current title survey for the Property, certified to the Title Company and Lenders and their successors and assigns, in form and content satisfactory to Administrative Agent and prepared by a professional and properly licensed land surveyor satisfactory to Administrative Agent. Such survey shall reflect the same legal description contained in the Title Policy referred to in <u>Section 3.2(b)</u> hereof and shall include, among other things, a metes and bounds description of the real property comprising part of the Project satisfactory to Administrative Agent. The surveyor's seal shall be affixed to the survey and the surveyor shall provide a certification for the survey in form and substance acceptable to Administrative Agent.

(d)  <u>Insurance</u>. Administrative Agent shall have received copies of the certificates of insurance for the Policies required hereunder, together with such Acord forms as Administrative Agent shall require, satisfactory to Administrative Agent in Administrative Agent's sole and absolute discretion, and, evidence of the payment of all Insurance Premiums payable for the existing policy period.

(e)  <u>Encumbrances</u>. Borrower shall have taken or caused to be taken such actions in such a manner so that Lenders have a valid and perfected first Lien as of the Closing Date on the Project and Administrative Agent shall have received satisfactory evidence thereof, subject to Permitted Encumbrances.

(f)  <u>Lien Searches</u>. Borrower shall have delivered to Administrative Agent certified search results pertaining to Borrower, Guarantor and such other Persons as reasonably required by Administrative Agent for state and federal tax liens, bankruptcy, judgment, litigation and state and local UCC filings.

(g)  <u>Environmental Report</u>. Administrative Agent shall have received an Environmental Report in respect of the Project, which report shall be satisfactory to Administrative Agent in all respects.

(h)  <u>Engineering Report</u>. Administrative Agent shall have received an Engineering Report in respect of the Project, which report shall be satisfactory to Administrative Agent in all respects (including, without limitation, indicating that there exists no material deferred maintenance at the Project).

(i)  <u>Appraisal</u>. Administrative Agent shall have received an appraisal for the Project, which appraisal shall be prepared by an MAI appraiser and satisfactory in form and substance to Administrative Agent (including, without limitation, providing for a loan-to-value ratio of not greater than

001967

fifty-three and seven-tenths percent (53.7%), based on (i) the "as-is" value of the Project and (ii) the original principal balance of the Loan).

        (j)     [Intentionally Omitted]

Section 3.3. <u>Related Documents</u>. Each additional document not specifically referenced herein, but relating to the transactions contemplated herein, shall have been duly authorized, executed and delivered by all parties thereto and at Administrative Agent's written request, Administrative Agent shall have received and approved certified copies thereof.

Section 3.4. <u>Organizational Documents</u>. Administrative Agent shall have received (a) certified copies of all Organizational Documents related to Borrower and Guarantor, as applicable, which must be acceptable to Administrative Agent, in Administrative Agent's sole and absolute discretion, and (b) such other evidence of the formation, structure, existence and/or good standing of Borrower and Guarantor and such other Persons as Administrative Agent may request, in Administrative Agent's sole and absolute discretion, including, without limitation, good standing or existence certificates, resolutions authorizing the entering into of the Loan and the granting of the Deed of Trust and incumbency certificates as may be requested by Administrative Agent.

Section 3.5. <u>Opinions of Counsel</u>. Administrative Agent shall have received opinions of counsel with respect to (i) formation, existence and good standing of Borrower and Guarantor, as applicable, (ii) due execution, authority, enforceability of the Loan Documents, and (iii) such other matters as Administrative Agent may reasonably require. All such opinions shall be in form, scope and substance reasonably satisfactory to Administrative Agent and Lenders' counsel in their sole and absolute discretion.

Section 3.6. <u>Taxes and Other Charges</u>. Borrower shall have paid all Taxes and Other Charges (including any in arrears) relating to the Project.

Section 3.7. <u>Completion of Proceedings</u>. All corporate and other proceedings taken or to be taken in connection with the transactions contemplated by this Agreement and other Loan Documents and all documents incidental thereto shall be satisfactory in form and substance to Administrative Agent, and Administrative Agent shall have received all such counterpart original or certified copies of such documents as Administrative Agent may reasonably request.

Section 3.8. <u>Payments</u>. All payments, deposits or escrows required to be made or established by Borrower under this Agreement, the Note and the other Loan Documents on or before the Closing Date shall have been paid.

Section 3.9. <u>Transaction Costs</u>. Except as otherwise expressly provided herein, Borrower shall have paid or reimbursed Administrative Agent and Lenders for all reasonable third party out of pocket expenses actually incurred in connection with the underwriting, negotiation, and closing of the Loan, including, without limitation, title insurance premiums and other title company charges; registration, filing and similar fees, taxes and charges; transfer, deed, stamp, mortgage recording or documentary taxes or similar fees or charges; actual costs of third-party reports, including, without limitation, environmental studies, credit reports, appraisals, surveys, underwriting and origination expenses; and all reasonable legal fees and expenses charged by counsel to Lenders and Administrative Agent.

Section 3.10. <u>No Material Adverse Change</u>. There shall have been no material adverse change in the financial condition or business condition of the Project, Borrower or any other Person contributing to the operating income and operations of the Project since the date of the most recent financial statements and/or other information delivered to Administrative Agent. The income and expenses of the Project, the occupancy and leases thereof, and all other features of the transaction shall be as represented to Lenders

and Administrative Agent without material adverse change. Neither Borrower nor Guarantor shall be the subject of any bankruptcy, reorganization, or insolvency proceeding.

Section 3.11. <u>Leases</u>. Administrative Agent shall have received copies of all Leases affecting the Project, which shall be satisfactory in form and substance to Administrative Agent.

Section 3.12. <u>Tenant Estoppel Certificate</u>. Administrative Agent shall have received, or shall receive within fifteen (15) Business Days of the Closing Date, a tenant estoppel certificate from each Tenant under a Material Lease, addressed to Administrative Agent, in form and substance satisfactory to Administrative Agent in all respects. Failure by Borrower to deliver such tenant estoppel certificates within such time period shall constitute an Event of Default.

Section 3.13. <u>SNDA</u>. Administrative Agent shall have received, or shall receive within fifteen (15) days of the Closing Date, an SNDA executed by Key Tenant with respect to the Key Tenant Lease, in form and substance satisfactory to Administrative Agent in all respects. Failure by Borrower to deliver such SNDA within such time period shall constitute an Event of Default.

Section 3.14. <u>Tax Lot</u>. Administrative Agent shall have received evidence that the Property constitutes one or more separate tax lots, which evidence shall be satisfactory to Administrative Agent in all respects.

Section 3.15. <u>Borrower's and Guarantor's Financials</u>. Administrative Agent shall have received copies of Borrower's and Guarantor's most recent financial statements.

Section 3.16. <u>Acquisition of Property</u>. Administrative Agent shall have received evidence of the purchase price for the Project to be paid by Borrower and evidence that Borrower invested, upon acquisition of the Project, the required equity.

Section 3.17. <u>Further Documents</u>. Administrative Agent or Administrative Agent's counsel shall have received such other and further approvals, opinions, documents and information as Administrative Agent or Administrative Agent's counsel may have requested in form and substance satisfactory to Administrative Agent and Administrative Agent's counsel.

Section 3.18. <u>Interest Reserve Deposit</u>. Borrower shall have established a deposit account in the name of Borrower with Administrative Agent (the "<u>Interest Reserve Account</u>"), into which Borrower shall have deposited an amount equal to $2,500,000.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lenders and Administrative Agent as of the Closing Date that:

Section 4.1. <u>Organization</u>. Borrower (a) has been duly organized and is validly existing and in good standing with requisite power and authority to own its properties and to transact the businesses in which it is now engaged, (b) is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, businesses and operations, (c) possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its properties and to transact the businesses in which it is now engaged, and the sole business of Borrower is the ownership and management of the Project, and (d) has full power, authority and legal right to mortgage the Project pursuant to the terms of the Loan Documents and has full power, authority and legal right to keep and observe all of the terms of the Loan Documents to which it is a party. Borrower represents and warrants that the chart attached hereto as <u>Exhibit A</u> sets forth an accurate listing

17

001969

of the direct and indirect owners of all of the equity interests in Borrower (the "Borrower Members"). For the avoidance of doubt, "Borrower Members" shall include Sole Member, NCRE and West Loop.

Section 4.2. Status of Borrower. Borrower's exact legal name is correctly set forth on the first page of this Agreement, on the Deed of Trust, and on any UCC-1 Financing Statements filed in connection with the Loan. Borrower is an organization of the type specified on the first page of this Agreement. Borrower is organized under the laws of the State of Delaware and authorized to do business under the laws of the State of Texas. Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less, the entire period of the existence of Borrower) the address of Borrower set forth on the first page of this Agreement. Borrower may designate a change of principal place of business and chief executive office by written notice to Administrative Agent by certified mail, return receipt requested, postage prepaid, at least thirty (30) days before such change of principal place of business and chief executive office is to become effective.

Section 4.3. Validity of Documents. Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents. This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Borrower and Guarantor, as applicable, and constitutes the legal, valid and binding obligations of Borrower and Guarantor, as applicable, enforceable against Borrower and Guarantor, as applicable, in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

Section 4.4. No Conflicts. The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower and Guarantor, as applicable, will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower and Guarantor, as applicable, pursuant to the terms of any agreement or instrument to which Borrower and Guarantor is a party or by which any of Borrower's or Guarantor's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or Guarantor or any of Borrower's or Guarantor's properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower and Guarantor, as applicable, of this Agreement or any of the other Loan Documents has been obtained and is in full force and effect.

Section 4.5. Litigation. To the best of Borrower's knowledge, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to Borrower's knowledge, threatened against or affecting Borrower, Guarantor or the Project, which actions, suits or proceedings, if determined against Borrower, Guarantor or the Project, could materially adversely affect the condition (financial or otherwise) or business of Borrower or Guarantor or the condition or ownership of the Project.

Section 4.6. Agreements. Neither Borrower nor Guarantor is a party to any agreement or instrument or subject to any restriction which would materially and adversely affect Borrower, such Guarantor or the Project, or Borrower's or such Guarantor's business, properties or assets, operations or condition, financial or otherwise. To Borrower's and Guarantor's actual knowledge, neither Borrower nor Guarantor are in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which Borrower or

001970

Guarantor is a party or by which Borrower, Guarantor or the Project is bound. Borrower has no material financial obligations under any agreement or instrument to which Borrower is a party or by which Borrower or the Project is otherwise bound, other than (a) obligations incurred in the ordinary course of the ownership, leasing and operation of the Project and (b) obligations under the Loan Documents.

Section 4.7. <u>Solvency</u>. Neither Borrower nor Guarantor has entered into the transaction or executed the Note, this Agreement, the Guaranty or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor, and Borrower and Guarantor have each received reasonably equivalent value in exchange for their respective obligations under such Loan Documents. No petition in bankruptcy has been filed against Borrower or Guarantor in the last ten years, and neither Borrower nor Guarantor in the last ten years has made an assignment for the benefit of creditors or taken advantage of any Creditors' Rights Laws. Neither Borrower nor Guarantor is contemplating either the filing of a petition by it under any Creditors' Rights Laws or the liquidation of all or a major portion of Borrower's or such Guarantor's assets or property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against Borrower or Guarantor.

Section 4.8. <u>Full and Accurate Disclosure</u>. No material statement of fact made by or on behalf of Borrower or Guarantor in this Agreement or in any of the other Loan Documents or in any other document or certificate delivered by or on behalf of Borrower or Guarantor contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no material fact presently known to Borrower or Guarantor which has not been disclosed to Administrative Agent and Lenders which adversely affects, nor as far as Borrower or the applicable Guarantor can reasonably foresee, might adversely affect, the Project or the business, operations or condition (financial or otherwise) of Borrower or Guarantor.

Section 4.9. <u>ERISA Compliance</u>.

(a)    Borrower covenants, represents and warrants that (i) Borrower is not and will not be a Benefit Plan Investor, (ii) neither Borrower nor any of its Subsidiaries or ERISA Affiliates maintains or contributes to, or has at any time maintained or contributed to, or has any liability, whether actual or contingent, under, a plan subject to Section 302 or Title IV of ERISA or to Section 412 of the Internal Revenue Code, (iii) neither Borrower nor any of its Subsidiaries or ERISA Affiliates has ever contributed to or had an obligation to contribute to any Multiemployer Plan. None of the Benefit Plans are part of, or have at any time been part of, a multiple employer welfare arrangement, as that term is defined in Section 3(40) of ERISA, (iv) no Benefit Plan is or was at any time a multiple employer plan, as described in Section 413(c) of the Internal Revenue Code or Sections 4063 or 4064 of ERISA, and (v) neither Borrower nor any of its Subsidiaries or ERISA Affiliates has ever contributed to or had an obligation to contribute to any such plan.

(b)    No ERISA Event has occurred or is reasonably expected to occur. No employee welfare benefit plan within the meaning of §3(1) or §3(2)(B) of ERISA of Borrower or any Subsidiary, provides benefit coverage subsequent to termination of employment except as required by Title I, Part 6 of ERISA or applicable state insurance laws. Each Benefit Plan is in material compliance with ERISA, the Internal Revenue Code and any applicable law. Each Benefit Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service for all required amendments regarding its qualification thereunder that considers the law changes incorporated in the plan sponsor's most recently expired remedial amendment cycle determined under the provisions of Rev. Proc. 2007-44, and nothing has occurred subsequent to the issuance of such termination letter which would prevent, or cause the loss of, such qualification.

Section 4.10. <u>Not a Foreign Person</u>. Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the Internal Revenue Code.

Section 4.11. <u>Enforceability</u>. The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or Guarantor including, without limitation, the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and neither Borrower nor Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect thereto. No Default or Event of Default exists under or with respect to any Loan Document.

Section 4.12. <u>Business Purposes</u>. The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

Section 4.13. <u>Compliance</u>. To the best of Borrower's knowledge, and other than as contained in any searches requested by or on behalf of Administrative Agent in connection with the Loan, Borrower and the Project, and the use and operation of the Project, comply in all material respects with all Legal Requirements, including, without limitation, building ordinances and codes and the Americans with Disabilities Act. To the best of Borrower's knowledge, neither Borrower nor Guarantor is in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority and neither Borrower nor Guarantor has received any written notice of any such default or violation. There has not been committed by Borrower or Guarantor or, to Borrower's knowledge, any other Person in occupancy of or involved with the operation or use of the Project any act or omission affording any Governmental Authority the right of forfeiture as against the Project or any part thereof or any monies paid in performance of Borrower's or Guarantor's obligations under any of the Loan Documents.

Section 4.14. <u>Financial Information</u>. All financial data, including, without limitation, the balance sheets, statements of cash flow, and statements of income and operating expense, that have been delivered to Administrative Agent in respect of Borrower, Guarantor and/or to Borrower's knowledge the Project (a) are true, complete and correct in all material respects as of the date of such information, (b) accurately represent the financial condition of Borrower, Guarantor and/or the Project, as applicable, as of the date of such reports, and (c) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with a modified accrual accounting method or such other method satisfactory to Administrative Agent throughout the periods covered, except as disclosed therein. Borrower has no contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a material adverse effect on the Project or the current and/or intended operation thereof, except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of the Borrower, Guarantor or, to Borrower's knowledge, the Project from that set forth in said financial statements.

Section 4.15. <u>Illegal Activity</u>. No portion of the Project has been or shall be purchased by Borrower with proceeds of any illegal activity and no part of the proceeds of the Loan will be used in connection with any illegal activity.

Section 4.16. <u>Separate Tax and Zoning Lot</u>. The Property constitutes a distinct parcel or parcels for purposes of zoning and of taxes, assessments and impositions (public or private) and are not otherwise considered as part of a larger single lot which includes property other than the Property for purposes of zoning or of taxes, assessments or impositions (public or private).

Section 4.17. <u>Federal Reserve Regulation</u>. Borrower shall use the proceeds of the Loan for the purposes set forth in <u>Section 2.1(c)</u> hereof and not for any illegal activity. No part of the proceeds of the

Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or prohibited by the terms and conditions of this Agreement or the other Loan Documents.

Section 4.18. <u>Investment Company Act</u>. Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) [Reserved]; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

Section 4.19. <u>No Change in Facts or Circumstances; Disclosure</u>. All information submitted by Borrower, Guarantor or Borrower's or Guarantor's agents to Administrative Agent and in all financial statements, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are accurate, complete and correct in all material respects as of the date of such item. There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or might materially and adversely affect the Project or the business operations or the financial condition of Borrower or Guarantor. Borrower and Guarantor have disclosed to Administrative Agent all material facts and have not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading. With respect to any representations, warranties, or statements of fact which are specifically qualified in this Agreement as being true and correct to the best of Borrower's knowledge, the representation and warranty set forth in this <u>Section 4.19</u> shall be, to the best of Borrower's knowledge, true and correct as of the Closing Date.

Section 4.20. <u>Special Purpose Entity</u>. Borrower meets all of the requirements of <u>Article VI</u> hereof as of the Closing Date.

Section 4.21. <u>Intellectual Property</u>. All trademarks, trade names and service marks necessary to the business of Borrower as presently conducted or as Borrower contemplates conducting Borrower's business are in good standing and, to the extent of Borrower's actual knowledge, uncontested. To the best of Borrower's knowledge, Borrower has not infringed, is not infringing, and has not received notice of infringement with respect to asserted trademarks, trade names and service marks of others. To Borrower's knowledge, there is no infringement by others of trademarks, trade names and service marks of Borrower.

Section 4.22. <u>Embargoed Person</u>. To the best of Borrower's knowledge, as of the Closing Date and at all times throughout the term of the Loan, including after giving effect to any transfers of interests permitted pursuant to the Loan Documents or the Mezzanine Loan Documents, (a) none of the funds or other assets of Borrower or Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any Person or government subject to trade restrictions under U.S. law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower (whether directly or indirectly), is prohibited by law or the Loan made by Lenders is in violation of law ("<u>Embargoed Person</u>"); (b) no Embargoed Person has any interest of any nature whatsoever in Borrower with the result that the investment in Borrower (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the funds of Borrower have been derived from any unlawful activity with the result that the investment in Borrower (whether directly or indirectly) is prohibited by law or the Loan is in violation of law.

Section 4.23. <u>Patriot Act</u>. All capitalized words and phrases and all defined terms used in the USA Patriot Act of 2001, 107 Public Law 56 (October 26, 2001) and in other statutes and all orders, rules and regulations of the United States government and its various executive departments, agencies and offices related to the subject matter of the Patriot Act, including Executive Order 13224 effective September 24, 2001 (collectively referred to in this Section only as the "<u>Patriot Act</u>") are incorporated into this Section. Each of Borrower and Borrower Members hereby represent and warrant that (a) Borrower, Guarantor and Borrower Members and each and every Person affiliated with Borrower, or that to Borrower's or Borrower Members' knowledge has an economic interest in Borrower or Borrower Members, or, to Borrower's or Borrower Members' knowledge, that has or shall have an interest in the transaction contemplated by this Agreement or in the Project or shall participate, in any manner whatsoever, in the Loan, is, to the extent required so that the Loan in not in violation of applicable Legal Requirements, <u>and</u> (b) Borrower, Guarantor and each Person actively involved in the management of Borrower or the Project is: (i) not a "blocked" Person listed in the Annex to Executive Order Nos. 12947, 13099 and 13224 and all modifications thereto or thereof (the "<u>Annex</u>"); (ii) in full compliance with the requirements of the Patriot Act and all other requirements contained in the rules and regulations of the OFAC; (iii) to the extent applicable, operated under policies, procedures and practices, if any, that are in compliance with the Patriot Act and available to Administrative Agent for Administrative Agent's review and inspection during normal business hours and upon reasonable prior notice; (iv) not in receipt of any notice from the Secretary of State or the Attorney General of the United States or any other department, agency, or office of the United States claiming a violation or possible violation of the Patriot Act; (v) not listed as a Specially Designated Terrorist or as a "blocked" Person on any lists maintained by the OFAC pursuant to the Patriot Act or any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of the OFAC issued pursuant to the Patriot Act or on any other list of terrorists or terrorist organizations maintained pursuant to the Patriot Act; (vi) not a Person who has been determined by competent authority to be in violation of any of the prohibitions contained in the Patriot Act; and (vii) not controlled by or now acting or will in the future act for or on behalf of any Person named in the Annex or any other list promulgated under the Patriot Act or any other Person who has been determined to be in violation of the prohibitions contained in the Patriot Act. Borrower covenants and agrees that in the event Borrower or Guarantor receives any notice that Borrower (or any of Borrower's beneficial owners), Guarantor or any other Person related to or affiliated with Borrower, Guarantor or the Project become listed on the Annex or any other list promulgated under the Patriot Act or is indicted, arraigned, or custodially detained on charges involving money laundering or predicate crimes to money laundering, Borrower shall immediately notify Administrative Agent. It shall be an Event of Default hereunder if Borrower or any other party to any Loan Document becomes listed on any list promulgated under the Patriot Act or is indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering.

Section 4.24. <u>No Contractual Obligations</u>. Other than the Loan Documents, the Mezzanine Loan Documents, the Borrower Operating Agreement, the Management Agreement, the Existing Leases, the PSA pursuant to which Borrower is acquiring the Property, and certain Contractual Obligations to operate and manage the Project that are necessary and customary for properties similar to the Project, as of the date of this Agreement, Borrower is not subject to any Contractual Obligations and has not entered into any agreement, instrument or undertaking by which Borrower or Borrower's assets are bound, or has incurred any indebtedness (other than the Loan), and prior to the date of this Agreement, Borrower has not entered into any Contractual Obligation, or any agreement, instrument or undertaking by which it or its assets are bound or incurred any indebtedness (other than the Loan).

Section 4.25. <u>Shareholders of Borrower</u>. One hundred percent (100%) of the membership interests of Borrower are owned by the Sole Member.

Section 4.26. <u>Survival</u>. Borrower acknowledges and agrees that, unless expressly provided otherwise, all of the representations and warranties of Borrower and Guarantor set forth in this Agreement and in the other Loan Documents shall survive for so long as any portion of the Debt remains owing to Lenders. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower and Guarantor shall be deemed to have been relied upon by Lenders notwithstanding any investigation heretofore or hereafter made by Lenders or on its behalf.

Section 4.27. <u>Leases</u>. As of the Closing Date, there are no Leases pursuant to which any Person other than Borrower has any right, title or interest in the Project other than under the Existing Leases.

Section 4.28. <u>Landmark Status</u>. No portion of the Project is designated by or registered with any governmental authority as historic or landmark buildings or any other similar designation or registration and Borrower shall not attempt or cooperate to obtain or effect any such designation or registration.

Section 4.29. <u>Broker</u>. Borrower represents and warrants to Administrative Agent and Lenders that Borrower has not dealt with any broker with respect to the transaction contemplated hereby and, by accepting the Loan, Borrower agrees forever to indemnify and hold Administrative Agent and Lenders harmless from and against any and all claims or suits for compensation, commissions, fees or otherwise (and all Losses related thereto) that may be asserted or made by any broker or Person claiming to have dealt with or to have been employed by Borrower or Borrower's representatives in connection with the brokering of the Loan.

ARTICLE V<br>COVENANTS

From the Closing Date and until repayment of the Debt in full and performance in full of all obligations of Borrower and Guarantor under the Loan Documents or the earlier release of the Lien of the Deed of Trust (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lenders that:

Section 5.1. <u>Existence; Compliance With Legal Requirements</u>.

(a)     Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply in all material respects with all Legal Requirements applicable to Borrower and the Project. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording any Governmental Authority the right of forfeiture as against the Project or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

(b)     Borrower agrees that the Project shall at all times comply, to the extent applicable, with the Access Laws in all material respects. Notwithstanding any provisions set forth herein or in any other documents regarding Administrative Agent's approval or alterations of the Project, Borrower shall not alter the Project in any manner which would increase Borrower's responsibilities for compliance with the applicable Access Laws in any material respect without the prior written approval of Administrative Agent. The foregoing shall apply to tenant improvements constructed by Borrower or by any of Borrower's Tenants. Administrative Agent may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer or other Person acceptable to Administrative Agent. Borrower agrees to give prompt notice to Administrative Agent of the receipt by Borrower of any complaints related to violations of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

23

(c)     Notwithstanding any other provision of this Section, Borrower shall not be deemed to be in default solely by reason of Borrower's failure to comply with any applicable Legal Requirement so long as, in Administrative Agent's judgment, each of the following conditions is satisfied: (i) Borrower is engaged in and diligently pursuing in good faith administrative or judicial proceedings appropriate to contest the validity or amount of such law, rule regulation or order; (ii) Borrower's compliance with such law, rule, regulation or order would necessarily and materially prejudice Borrower's prospects for success in such proceedings; (iii) noncompliance with any such law, rule, regulation or order will not result in the loss or forfeiture of the Project or any other collateral for the Loan or any interest of Administrative Agent therein or result in any fines or other punitive actions or any insurance coverage; and (iv) Borrower deposits with Administrative Agent, as security for any payment or performance which may ultimately be required, a sum equal to the amount of any fine, assessment or charge plus the interest, penalties, and other costs which Administrative Agent reasonably estimates are likely to become payable if Borrower's contest is unsuccessful. If Administrative Agent determines that any one or more of such conditions is not satisfied or is no longer satisfied, Borrower shall comply with the law, rule regulation or order in question, within thirty (30) days after Administrative Agent gives notice of such determination.

Section 5.2. <u>Maintenance and Use of Project</u>. Borrower shall maintain the Project in a good and safe condition and repair. The improvements and the Borrower's personal property required for the use of the Project shall not be removed, demolished or materially altered without the written consent of Administrative Agent; *provided*, *however*, that Administrative Agent's consent shall not be required (a) in connection with any removal, demolition or alteration permitted to be made by a Tenant under an Existing Lease without Borrower's consent under the applicable Existing Lease, or required to be made by Borrower under an Existing Lease, and (b) as otherwise set forth in <u>Section 5.19</u>. If under applicable zoning provisions the use of all or any portion of the Project is or shall become a nonconforming use, Borrower shall not cause or permit the nonconforming use to be discontinued or the nonconforming improvement to be abandoned without the express written consent of Administrative Agent. Borrower shall not establish any condominium or cooperative regime with respect to the Project without the prior written consent of Administrative Agent, nor shall Borrower initiate, join in or consent to any change in any private restrictive covenant, zoning ordinance or other public or private restrictions, limiting or defining the uses which may be made of the Project or any portion thereof.

Section 5.3. <u>Waste</u>. Borrower shall not commit or suffer any intentional material waste of the Project or make any change in the use of the Project which shall in any way invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Project or the security for the Loan. Borrower shall not, without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Project, regardless of the depth thereof or the method of mining or extraction thereof, except as may be required by law or in accordance with the orders of any Governmental Authorities having jurisdiction thereof.

Section 5.4. <u>Taxes and Other Charges</u>.

(a)     Borrower shall pay, or cause to be paid, all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Project or any part thereof as the same become due and payable. Borrower shall furnish to Administrative Agent receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent. Borrower shall not suffer and shall promptly pay and discharge or bond any Lien or charge whatsoever which may be or become a Lien or charge against the Project, and shall pay for all utility services provided to the Project prior to delinquency.

(b)        Borrower shall not be obligated to make any deposit for Taxes as hereinafter provided until (i) Administrative Agent makes demand therefor following a Default and (A) any Tenant under a Material Leases is not paying such Taxes in accordance with the terms and provisions of its respective Material Lease, or (B) any Tenant under a Material Lease is in default under such Material Lease, or (ii) the continuance of an Event of Default hereunder of under any of the other Loan Documents. Upon the occurrence of the events described in clauses (i) and (ii) of the immediately preceding sentence, Borrower shall pay to Administrative Agent, upon the request of Administrative Agent, at the time of each payment of an installment of interest and/or principal under the Note, an additional amount which, together with all other such monthly payments, is sufficient to discharge the obligations for payment of Taxes and Other Charges one (1) month prior to the date the same shall become due. The determination of the amount so payable and of the fractional part thereof to be deposited with Administrative Agent, so that the aggregate of such deposits shall be sufficient for this purpose, shall be made by Administrative Agent in Administrative Agent's sole but reasonable discretion. Such amounts shall be held by Administrative Agent not as a trust fund and without interest (except as may be required by law) and shall be applied to the payment of the obligations in respect of which such amounts were deposited, in such order or priority as Administrative Agent shall determine, on or before the respective dates on which the same or any of them would become delinquent. During the continuance of an Event of Default, the balance of any such amounts held by Administrative Agent may be used and applied for any purpose authorized pursuant to this Agreement or any other Loan Document, including, without limitation, payment of the Debt in any order Administrative Agent may deem appropriate. If, one (1) month prior to the date any of the aforementioned Taxes or Other Charges may be paid without interest or penalty, the amounts then on deposit shall be insufficient for the payment of such obligation in full, Borrower shall, within ten (10) days after demand, deposit the amount of the deficiency with Administrative Agent. Nothing herein contained shall be deemed to affect any right or remedy of Administrative Agent or Lenders under any provisions of this Agreement or the Deed of Trust or of any statute or rule of law to pay any such amount and to add the amount so paid, together with interest at the Involuntary Rate, to the Debt. So long as Administrative Agent requires Borrower to pay Administrative Agent the deposits provided for in this paragraph and for so long as Borrower complies therewith, the obligation for direct payment of Taxes and Other Charges set forth in Subsection 5.4(a) hereof shall be suspended. Notwithstanding anything to the contrary contained herein, Administrative Agent shall not require Borrower to make such deposits for water and sewer charges if such charges are calculated on a metered basis.

(c)        Borrower shall pay or bond so as to remove as a lien of record, from time to time when the same shall become due, all lawful claims and demands of mechanics, materialmen, laborers, and others which, if unpaid, might result in, or permit the creation of, a lien on the Project or any part thereof, or on the revenues, rents, issues, income and profits arising therefrom and in general will do or cause to be done everything necessary so that the Liens of the Deed of Trust shall be fully preserved, at the sole cost and expense of Borrower and without expense to Administrative Agent or Lenders.

(d)        Notwithstanding any other provision of this Section, Borrower shall not be deemed to be in default solely by reason of Borrower's failure to pay any Taxes so long as, in Administrative Agent's sole judgment, reasonably exercised, each of the following conditions is satisfied:

(i)        Borrower or a Tenant is engaged in and diligently pursuing in good faith administrative or judicial proceedings appropriate to contest the validity or amount of such Tax;

(ii)        [Intentionally Omitted];

(iii)    Nonpayment of such Tax will not result in the loss or forfeiture of any property encumbered by the Deed of Trust or any of the other Loan Documents or any interest of Administrative Agent therein; and

(iv)    Borrower deposits with Administrative Agent, as security for such payment which may ultimately be required, a sum equal to the amount of the disputed Taxes plus the interest, penalties, and other costs which Administrative Agent reasonably estimates are likely to become payable if Borrower's contest is unsuccessful.

If Administrative Agent determines, in Administrative Agent's sole judgment, reasonably exercised, that any one or more of such conditions is not satisfied or is no longer satisfied, Borrower shall pay the Tax in question, together with any interest and penalties thereon, within ten (10) days after Administrative Agent gives notice of such determination.  After Administrative Agent has received evidence of such payment, Administrative Agent shall release any security held for such payment of Taxes pursuant to <u>Section 5.4(d)(iv)</u>.

(e)    Borrower shall pay any taxes, except income, gross receipts and other taxes determined by reference to the amount of interest and other sums payable under the Loan Documents, imposed on Administrative Agent or Lenders by reason of Administrative Agent's or Lenders' ownership of this Agreement, the Note or the Deed of Trust as a result of any change in Legal Requirements (or any change in the application, interpretation or enforcement of existing Legal Requirements) effected after the date of this Agreement, provided that the Administrative Agent or applicable Lender shall at the time be assessing such taxes upon all of its similarly situated borrowers; provided further that Borrower shall not be required to pay any U.S. federal withholding taxes imposed under FATCA as a result of the failure by a Lender to comply with the applicable provisions of FATCA.

(f)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Accordingly, prior to the date that any Lender becomes a party hereto, such Lender shall deliver to the Borrower such certificates, documents or other evidence, as required by the IRS Code or Treasury Regulations issued pursuant thereto (including Internal Revenue Service Forms W-9, W-8ECI, W-8BEN, W-8BEN-E, W-8EXP and W-8IMY as applicable, or appropriate successor forms), properly completed, currently effective and duly executed by such Lender establishing that payments to it hereunder and under the Note are (i) not subject to United States Federal backup withholding tax and (ii) not subject to United States Federal withholding tax under the Internal Revenue Code.  Each such Lender shall (x) deliver further copies of such forms or other appropriate certifications on or before the date that any such forms expire or become obsolete and after the occurrence of any event requiring a change in the most recent form delivered to the Borrower and (y) obtain such extensions of the time for filing, and renew such forms and certifications thereof, as may be reasonably requested by the Borrower.

Section 5.5. <u>Litigation</u>. Borrower shall give prompt written notice to Administrative Agent of any litigation or governmental proceedings pending or threatened in writing against Borrower or Guarantor which might materially adversely affect Borrower's condition (financial or otherwise) or business or the Project of which Borrower has knowledge.

Section 5.6. <u>Access to the Project</u>. Borrower shall permit agents, representatives and employees of Administrative Agent and Lenders to inspect the Project or any part thereof at reasonable hours upon reasonable advance written notice, except in the event of an emergency, in which case no advance notice is necessary.

Section 5.7. <u>Notice of Default</u>. Borrower shall promptly advise Administrative Agent of (a) any material adverse change in the condition (financial or otherwise) of Borrower or the Project, (b) the occurrence of an Event of Default under any Loan Document or (c) an "Event of Default" under any Mezzanine Loan Document (as defined therein).

Section 5.8. <u>Cooperate in Legal Proceedings</u>. Borrower shall, at Borrower's sole cost and expense, cooperate fully with Administrative Agent and Lenders with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lenders hereunder or any rights obtained by Lenders under any of the other Loan Documents and, in connection therewith, permit Administrative Agent and Lenders, at Administrative Agent's or Lenders' sole election, to participate in any such proceedings.

Section 5.9. <u>Performance of Obligations</u>. Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision to be observed and performed by Borrower under this Agreement and the other Loan Documents and any other agreement or instrument affecting or pertaining to the Project and any amendments, modifications or changes thereto.

Section 5.10. <u>Awards; Insurance Proceeds</u>. Borrower shall cooperate with Lenders in obtaining for Lenders the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Project in accordance with the terms and provisions of the Loan Documents, and Administrative Agent and Lenders shall be reimbursed for any reasonable, third party expenses incurred in connection therewith (including attorneys' fees and disbursements) out of such Awards or Insurance Proceeds.

Section 5.11. <u>Financial Reporting</u>.

(a) Borrower shall keep proper books of record and account with respect to the Project and its leases and subleases, in accordance with a modified accrual accounting method or such other method satisfactory to Administrative Agent and in a manner acceptable to Administrative Agent, in Administrative Agent's sole and reasonable discretion.

(b) Borrower shall furnish to Administrative Agent the following:

(i) within ninety (90) days after the close of each fiscal or calendar year of Borrower, as applicable, annual financial statements audited by a "Big Four" accounting firm, the Pre-Approved Accounting Firm, or other independent certified public accountant acceptable to Administrative Agent, which financial statements shall include, without limitation, a balance sheet, a statement of income and expenses, and a projected profit and loss statement for the next fiscal or calendar year, as applicable, disclosing all earnings and expenses with respect to Borrower and the Project (collectively, the "<u>Financial Statements</u>"), together with a certificate from an officer of Borrower certifying that such annual Financial Statements fairly present the financial condition of Borrower and the Project;

(ii) within forty-five (45) days after the close of each quarter of its fiscal year, a quarterly statement including a balance sheet and statement of profits and losses with respect to the Project;

(iii) copies of any operating statements or the like when Borrower is required to submit such information to any Governmental Authority;

001979

(iv)     promptly following any request therefor, copies of any notices described in Section 101(j) of ERISA that Borrower or any of its Subsidiaries or ERISA Affiliates may provide with respect to any Benefit Plan, copies of any documents described in Section 101(k) of ERISA that Borrower or any of its Subsidiaries or ERISA Affiliates may request with respect to any Multiemployer Plan, copies of any notices described in Section 101(1) of ERISA that Borrower or any of its Subsidiaries or ERISA Affiliates may request with respect to any Multiemployer Plan and any information that Borrower or any of its Subsidiaries or ERISA Affiliates may request with respect to any Multiemployer Plan in connection with Section 4221(e) of ERISA; provided, that if Borrower or any of its Subsidiaries or ERISA Affiliates has not requested such documents or notices from the administrator or sponsor of the applicable Benefit Plan or Multiemployer Plan, Borrower, the Subsidiary or the ERISA Affiliate, as applicable, shall promptly, upon the request of Administrative Agent, make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof; and

(v)     such other information respecting the business, properties or the condition or operations, financial or otherwise, of Borrower and/or the Project as Administrative Agent may from time to time reasonably request.

(c)     All Financial Statements and other deliverables of Borrower required under this Section 5.11 shall be (i) prepared in accordance with generally accepted accounting principles or such other method satisfactory to Administrative Agent, (ii) delivered in duplicate, and (iii) certified by Borrower as being true, complete and correct.

Section 5.12. Estoppel Statement. After request by Administrative Agent, Borrower shall within fifteen (15) Business Days furnish Administrative Agent with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the rate of interest on the Note, (iii) the unpaid principal amount of the Note, (iv) the date installments of interest were last paid, (v) any offsets or defenses to the payment of the Debt, if any, and (vi) that the Note, this Agreement, the Deed of Trust and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification. In the event any Governmental Authority requires the same, Lenders shall deliver a similar statement to Borrower.

Section 5.13. Management of Project. In the event a Management Agreement shall be in effect at any time, Borrower hereby covenants and agrees as follows:

(a)     Borrower shall (i) promptly perform and observe all of the covenants required to be performed and observed by Borrower under the Management Agreement and do all things necessary to preserve and to keep unimpaired Borrower's material rights thereunder; (ii) promptly notify Administrative Agent of any material default under the Management Agreement of which Borrower is aware; (iii) promptly deliver to Administrative Agent a copy of any notice of default or other material notice received by Borrower under the Management Agreement; and (iv) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement.

(b)     If at any time, (i) a Manager shall become insolvent or a debtor in a bankruptcy proceeding, (ii) an Event of Default has occurred and is continuing or (iii) a default has occurred and is continuing under the Management Agreement and Borrower has the right thereunder to terminate the Management Agreement on account thereof, Borrower shall, at the request of Administrative Agent, terminate the applicable Management Agreement upon thirty (30) days prior notice to such Manager and replace such Manager with a Qualified Manager (without the need for the approval of Administrative

28

Agent) or a manager selected by Borrower and approved in writing by Administrative Agent, in Administrative Agent's reasonable discretion.

(c)     Borrower shall not, without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld, (i) surrender, terminate or cancel the Management Agreement or otherwise replace any Manager or enter into any other management agreement with respect to the Project; (ii) reduce or consent to the reduction of the term of the Management Agreement; (iii) increase or consent to the increase of the amount of any charges under the Management Agreement; or (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Management Agreement in any material respect. In the event that Borrower replaces a Manager at any time during the term of Loan pursuant to this subsection, such Manager shall be approved by Administrative Agent in writing.

(d)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Manager initially named in this Agreement may (i) transfer its interest in any Management Agreement for the management of the Project to any Affiliate of such Manager, (ii) transfer shares or equity interests in Manager or Manager's equity owners (including, without limitation, the issuance of treasury stock, or the creation or issuance of a new class of stock or membership interests, in either case in the context of an initial public offering or in the context of a subsequent offering of equity securities), (iii) sell all or substantially all of such Manager's assets, and (iv) merge or consolidate with another entity without, in each case, the approval of Administrative Agent or the same constituting an Event of Default under this Agreement; *provided*, *however*, if any of the actions described in clauses (ii), (iii) or (iv) shall cause such Manager to be unable to perform the functions required to be performed and observed by Manager under the Management Agreement, Borrower shall, at the request of Administrative Agent, terminate the applicable Management Agreement upon thirty (30) days prior notice to such Manager and replace such Manager with a Qualified Manager (without the need for the approval of Administrative Agent) or a manager selected by Borrower and approved in writing by Administrative Agent, in Administrative Agent's reasonable discretion.

(e)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the resignation, removal or replacement of Manager shall not be an Event of Default under this Agreement or require the approval of Administrative Agent so long as Borrower shall appoint or retain a substitute Manager that is a Qualified Manager.

Section 5.14. <u>Liens</u>. Borrower shall not, without the prior written consent of Administrative Agent, create, incur, assume or suffer to exist any Lien on any portion of the Project or permit any such action to be taken, other than the Permitted Encumbrances, the Deed of Trust, the Assignment of Leases and Rents and any other liens created by the Loan Documents. Neither Borrower nor any other Person shall take any action that would impair the Lien created under this Agreement, the Deed of Trust or any other Loan Document.

Section 5.15. <u>Debt Cancellation</u>. Borrower shall not cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business, other than rent abatements or concessions in the ordinary course of business.

Section 5.16. <u>Zoning</u>. Borrower shall not initiate or affirmatively consent to any zoning classification or reclassification of any portion of the Project or seek any variance under any existing or future zoning ordinance or use or permit the use of any portion of the Project in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Administrative Agent.

Section 5.17. <u>ERISA</u>. Borrower covenants and agrees to deliver to Administrative Agent such certifications or other evidence from time to time throughout the term of the Loan, as reasonably requested by Administrative Agent that Borrower is not and will not be a Benefit Plan Investor.

Section 5.18. <u>No Joint Assessment</u>. Borrower shall not suffer, permit or initiate the joint assessment of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

Section 5.19. <u>Alterations</u>. Administrative Agent's prior written approval shall be required in connection with any material alterations to any improvements at or on the Project, except for (a) alterations to Tenant spaces required to be undertaken by Borrower under a Lease, or permitted to be undertaken by such Tenant without Borrower's consent under its Lease, (b) alterations required by Legal Requirements, and (c) ordinary non-structural improvements, alterations and maintenance and structural repairs, the cost of which is $750,000 or less (in the aggregate in any twelve (12) month period). With respect to an Existing Lease, to the extent that Administrative Agent's prior approval is required under this <u>Section 5.19</u>, Administrative Agent shall grant or withhold its consent to any alterations proposed thereunder subject to the standard of consent applicable to the landlord under the applicable Existing Lease.

Section 5.20. <u>Reciprocal Easement Agreement</u>. Borrower shall not enter into any reciprocal easement agreement without Administrative Agent's prior written consent.

Section 5.21. <u>Notices</u>. Borrower shall give notice, or cause notice to be given, to Administrative Agent promptly upon the occurrence, or the receipt of notice, of:

     (a)     any Event of Default or, to Borrower's knowledge, any event that would with the giving of notice or passage of time would constitute an Event of Default;

     (b)     any default or event of default under any Contractual Obligation of Borrower that, to the knowledge of Borrower, could reasonably be expected to have a material adverse effect on Borrower, the ability of Borrower to perform Borrower's obligations under the Loan Documents or the rights and remedies of Lenders under the Loan Documents;

     (c)     any material litigation or proceeding affecting Borrower, Guarantor or the Project but only to the extent such litigation could be reasonably expected to have a material adverse effect on Borrower, Guarantor or the Project, the ability of Borrower or Guarantor to perform their obligations under the Loan Documents or the rights and remedies of Lenders under the Loan Documents;

     (d)     a change in the business, operations or financial or other condition or prospects of Borrower or Guarantor which could reasonably be expected to have a material adverse effect on Borrower the ability of Borrower or such Guarantor to perform Borrower's or such Guarantor's obligations under the Loan Documents or the rights and remedies of Administrative Agent and Lenders under the Loan Documents; or

     (e)     any ERISA Event.

Section 5.22. <u>Curing</u>. Administrative Agent and Lenders shall have the right, but shall not have the obligation, following ten (10) days' notice to Borrower and an opportunity to cure, to exercise Borrower's rights to satisfy or fully bond over any Liens, claims or judgments against the Project. Borrower shall reimburse Lenders and Administrative Agent on demand for any and all actual costs

incurred by Lenders or Administrative Agent in connection with satisfying any Liens, claims or judgments against the Project.

Section 5.23. <u>Limitation on Securities Issuances</u>. None of Borrower or any of Borrower Members shall issue any additional membership interests or other securities, other than those that have been issued as of the Closing Date to the extent that such issuance would violate the provisions of <u>Section 7.2</u>, without the prior written consent of Administrative Agent, which consent may be withheld by Administrative Agent in Administrative Agent's sole and absolute discretion. For the avoidance of doubt, this <u>Section 5.23</u> shall not apply to the issuance, reissuance or replacement of certificates evidencing membership interests existing as of the Closing Date in accordance with the Mezzanine Loan Documents.

Section 5.24. <u>Limitations on Distributions</u>. Following the occurrence and during the continuance of (i) an Event of Default or (ii) a default by Borrower or the Key Tenant under the Key Tenant Lease, Borrower shall not make any distributions to Sole Member or any Borrower Members or any other Person. Except as aforesaid, there shall be no limitation on the making of any distributions to Borrower Members so long as no Event of Default or default under the Key Tenant Lease shall have occurred and be continuing.

Section 5.25. <u>Contractual Obligations</u>. Other than the Loan Documents, the Mezzanine Loan Documents, the Borrower Operating Agreement (and the membership interests in Borrower issued pursuant thereto) and the other documents described in <u>Section 4.24</u>, neither Borrower nor any of Borrower's assets shall be subject to any Contractual Obligations, and Borrower shall not enter into any agreement, instrument or undertaking by which Borrower or Borrower's assets are bound, other than those Contractual Obligations to operate, manage and Lease the Project that are necessary and customary for properties similar to the Project.

Section 5.26. <u>Additional Indebtedness</u>. Except as provided in <u>Section 6.1(g)</u> hereof, Borrower shall not suffer or incur any additional debt, obligations as lessee under a capitalized lease or contingent liabilities without the prior written consent of Administrative Agent, which consent may be withheld by Administrative Agent in Administrative Agent's sole and absolute discretion.

Section 5.27. <u>Restrictions on Leasing</u>. Borrower shall (i) not execute a Material Lease which shall not have been submitted to and approved by Administrative Agent except for Telecom Leases, (ii) not alter, modify or change the terms of any Material Lease except in the ordinary course of business and provided such alteration, modification or change does not have a material adverse financial effect on Borrower, (iii) not give any consent or exercise any option unless required by the terms of any Lease approved by Administrative Agent, (iv) not cancel or terminate any Material Lease or accept a surrender or tenant buyout thereof except in the event of default by the Tenant thereunder, (v) not consent to any assignment of or subletting under any Material Lease, unless the same shall be in accordance with its terms and such terms have been approved by Administrative Agent, (vi) not collect any of the rents, income and profits arising or accruing under any Leases or from the Project for more than one (1) month in advance of the time when the same shall become due, (vii) not execute any other assignment of Borrower's interest in the Leases or any assignment of rents arising or accruing from the Leases or from the Project; (viii) observe and promptly and faithfully perform or cause to be performed all of the covenants, conditions and agreements contained in all Leases in all material respects, (ix) at all times do all things reasonably necessary in the exercise of sound business judgment to compel performance by the lessee under each Lease of all obligations, covenants and agreements by such lessee to be performed thereunder, (x) not do or permit to be done anything to materially impair the security of any Lease, (xi) at Administrative Agent's request, assign and transfer to Administrative Agent any and all subsequent Leases upon all or any part of the Project, and (xii) execute and deliver at the reasonable request of Administrative Agent all such further assurances and assignments in the Project as Administrative Agent

31

shall from time to time require. None of the foregoing restrictions set forth in clauses (i) through (vii) of this Section shall be done or suffered to be done without in each instance obtaining the prior written consent of Administrative Agent, and any of such acts done without the prior written consent of Administrative Agent shall be null and void. For purposes of clarity, the Existing Leases and the terms therein have been approved by Administrative Agent.

(a)     <u>Tenant Estoppel Certificates</u>. Borrower shall deliver to Administrative Agent upon the written request of Administrative Agent (made not more often than once in any calendar year), an updated tenant estoppel certificate from any Tenant at the Project addressed to Administrative Agent, in form and substance satisfactory to Administrative Agent in all respects.

(b)     <u>Copies of Leases</u>. Within ten (10) Business Days of any such request, Borrower shall submit to Administrative Agent or Administrative Agent's counsel true and complete copies of all Leases for the Project including all amendments thereto or extensions thereof, and any guarantees thereof.

(c)     <u>Subordination and Attornment</u>. Each Lease hereafter entered into shall be subordinate to the lien of the Deed of Trust, to all advances under the Deed of Trust and to any renewals, extensions, modifications or consolidations thereof, and shall provide that, in the event of the enforcement by Lenders of the remedies provided for by law, by this Agreement or by the Deed of Trust, the lessee thereunder shall, upon request of any Person succeeding to the interest of Borrower as a result of such enforcement, automatically become the lessee of and shall attorn to said successor in interest, without change in the terms or other provisions of such Lease; *provided*, *however*, that said successor in interest shall not be bound by (i) any payment of rent or additional rent for more than one (1) month in advance, except prepayments in the nature of security for the performance by said lessee of its obligations under said Lease, or (ii) any amendment or modification of the Lease made without the consent of Administrative Agent or such successor in interest, unless such consent is not required pursuant to this <u>Section 5.27</u>. Each Lease shall also provide that, upon request by said successor in interest, such lessee shall execute and deliver an instrument or instruments confirming such attornment. Administrative Agent, on behalf of Lenders, shall enter into a commercially reasonable SNDA with Tenants under future Leases upon request, from time to time.

Section 5.28. <u>Debt Service Coverage Ratio</u>.

(a)     At all times during the term of the Loan, the Project must maintain a minimum debt service coverage ratio ("<u>DSCR</u>") of 1.20:1.00 ("<u>DSCR Threshold</u>"). The DSCR shall be tested on an annual basis commencing on December 31, 2018 and on each December 31 thereafter during the term of the Loan. The DSCR shall be calculated as the ratio of (i) Net Operating Income for the prior twelve-month period immediately preceding the measurement date, *to* (ii) actual scheduled principal and interest payments under the Loan for the prior trailing twelve-month period immediately preceding the measurement date. With respect to the calculation of DSCR as aforesaid, until the first (1st) anniversary of the Closing Date, Debt Service and Net Operating Income shall be calculated on the basis of actual Debt Service and Net Operating Income for such partial year period and such amounts shall be annualized by Administrative Agent for purposes of calculating the DSCR.

(b)     The certificate of Administrative Agent as to any DSCR calculation shall, absent manifest error, be final, conclusive and binding on Borrower.

(c)     If, on any annual measurement date, the DSCR is below the DSCR Threshold, Borrower may, at Borrower's option, pay down the Loan (without payment of any Prepayment Premium) by an amount necessary for Borrower to effectively achieve the DSCR Threshold immediately following delivery of such pay down (any amount so paid down may not be reborrowed). Borrower shall deliver the pay down to Administrative Agent within fifteen (15) days following notice from Administrative Agent

that such DSCR Threshold has not been met. Borrower's failure to deliver the pay down within such time period such that DSCR Threshold is achieved shall be an Event of Default.

Section 5.29. <u>Loan-to-Value Ratio</u>.

(a)     The Project must maintain a maximum loan-to-value ratio ("<u>LTVR</u>") of 60.0% ("<u>LTVR Threshold</u>") at all times. The LTVR shall be tested by Administrative Agent on an annual basis, commencing on December 31, 2018 and on each December 31 thereafter during the term of the Loan, and shall be calculated as the ratio of (i) the outstanding principal balance under the Loan *to* (ii) the Appraised Value of the Project. For the purpose of this covenant, "<u>Appraised Value</u>" shall mean the market value of the Project according to the latest FIRREA appraisal performed by an appraiser appointed by Borrower and reasonably acceptable to Administrative Agent, which appraisals shall be performed annually by December 31st of each calendar year.

(b)     The certificate of Administrative Agent as to any LTVR calculation shall, absent manifest error, be final, conclusive and binding on Borrower.

(c)     If, on any annual measurement date, the LTVR exceeds the LTVR Threshold, Borrower may, at Borrower's option, pay down the Loan (without payment of any Prepayment Premium) by an amount necessary for Borrower to effectively achieve the LTVR Threshold immediately following delivery of such pay down (any amount so paid down may not be reborrowed). Borrower shall deliver the pay down to Administrative Agent within fifteen (15) days following notice from Administrative Agent that the LTVR Threshold has not been achieved. Borrower's failure to deliver the pay down within such time period such that LTVR Threshold is achieved shall be an Event of Default.

Section 5.30. <u>UCC Searches</u>. Borrower and Guarantor hereby agree that Administrative Agent shall have the right to order UCC, judgment and lien searches against Borrower and Guarantor at any time at Borrower's sole cost and expense. Borrower shall also be responsible for all actual out-of-pocket costs incurred by Administrative Agent to continue the UCC-1 Financing Statements delivered by Borrower in favor of Administrative Agent from time to time.

Section 5.31. <u>Updated/New Appraisal</u>. Borrower hereby acknowledges and agrees that Borrower shall order (or, at Administrative Agent's election, Administrative Agent may order) an updated or new appraisal of the Project (a) annually, in connection with Administrative Agent's test of the LTVR Threshold, at Borrower's sole cost and expense, (b) upon the occurrence of an Event of Default, at Borrower's sole cost and expense, and (c) at any other time, at Administrative Agent's sole cost and expense. Any such appraisal shall be performed by an appraiser appointed by Borrower and reasonably acceptable to Administrative Agent, and Administrative Agent may from time to time require that the appraiser who performs a particular appraisal be different than the appraiser who performed the prior appraisal.

Section 5.32. <u>Interest Reserve Account</u>. Borrower shall maintain the Interest Reserve Account for the term of the Loan, which Interest Reserve Account shall be under the sole dominion and control of Administrative Agent. The Interest Reserve Account shall have a title evidencing the foregoing in a manner reasoning acceptable to Administrative Agent. Borrower hereby grants to Administrative Agent, for the benefit of Lenders, a first-priority security interest in the Interest Reserve Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Administrative Agent, for the benefit of Lenders, a perfected first priority security interest in the Interest Reserve Account. All costs and expenses for establishing and maintaining the Interest Reserve Account (or any successor thereto) shall be paid by Borrower. All monies now or hereafter deposited into the Interest Reserve Account shall be deemed additional security for the Debt. Borrower shall not alter or modify the Interest Reserve Account without the prior written consent of Administrative Agent.

Borrower shall not draw upon the Interest Reserve Account during the term of the Loan (for the purpose of making interest payments or otherwise). Upon the occurrence of an Event of Default due to Borrower's failure to timely make any interest payment, Administrative Agent shall apply funds on deposit in the interest reserve against amounts owing to Lenders under this Agreement, and shall notify Borrower whether sufficient funds were available in the Interest Reserve Account to cure such Event of Default. For the avoidance of doubt, Borrower shall be required to make separate interest payments pursuant to the terms of the Note, regardless of whether there are funds in the Interest Reserve Account on deposit with Administrative Agent.

Section 5.33. <u>Mezzanine Loan</u>. Borrower shall not cause, suffer or permit Mezzanine Borrower to enter into any cancellation, termination, modification, change, supplement, restatement, alteration or amendment of any Mezzanine Loan Document. Without limitation of any other covenant set forth in this Agreement, Borrower shall deliver to Administrative Agent, within two (2) Business Days, any notice of default or other material notice, statement or report given or received by any party under the Mezzanine Loan Documents.

ARTICLE VI
ENTITY COVENANTS

Section 6.1. <u>Single Purpose Entity/Separateness</u>. Until the Debt has been paid in full, Borrower represents, warrants and covenants that Borrower has not and shall not:

(a) engage in any business or activity other than the ownership of the Project and any activities incidental thereto;

(b) acquire or own any assets other than (i) the Project, and (ii) such incidental personal property as may be necessary for the ownership of the Project;

(c) merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(d) fail to observe all organizational formalities or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable Legal Requirements of the jurisdiction of its organization or formation, or amend, modify, terminate or fail to comply with the provisions of its Organizational Documents;

(e) form or own any Subsidiary or make any investment in any Person;

(f) commingle its assets with the assets of any other Person;

(g) incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation) other than (i) the Loan and/or (ii) trade and operational indebtedness incurred in the ordinary course of business with trade creditors, provided such indebtedness is (A) unsecured, (B) not evidenced by a note, (C) on commercially reasonable terms and conditions, and (D) due not more than ninety (90) days past the date incurred and paid on or prior to such date;

(h) fail to maintain its records, books of account, bank accounts, financial statements, accounting records and other entity documents separate and apart from those of any other Person;

(i) enter into any contract or agreement with any general partner, member, shareholder, principal, guarantor of the obligations of Borrower or any Affiliate of the foregoing, except

34

upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arm's length basis with unaffiliated third parties;

(j)     maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(k)     assume or guaranty the debts of any other Person, hold itself out to be responsible for the debts of any other Person, or otherwise pledge its assets for the benefit of any other Person or hold out its credit as being available to satisfy the obligations of any other Person, provided however, that this subsection (k) shall not be deemed to prohibit Borrower from pledging assets to secure its own obligations as required or permitted by the Loan Documents;

(l)     make (i) any loans or (ii) any advances (except with respect to distributions to its shareholders, partners or members, as applicable, which are not otherwise prohibited under this Agreement) to any Person;

(m)     fail to file its own tax returns or file a consolidated federal income tax return with any Person (unless prohibited or required, as the case may be, by applicable Legal Requirements);

(n)     fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or fail to correct any known misunderstanding regarding its separate identity;

(o)     fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; *provided*, *however*, in no event shall this subsection (o) require any equity owner to make additional capital contributions to Borrower (it being acknowledged, however, that a failure of Borrower to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations shall be a Default hereunder irrespective of such equity owner's lack of an obligation to make additional capital contributions to Borrower);

(p)     (i) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any Creditors' Rights Laws (unless filed by Administrative Agent), (ii) seek or consent to the appointment of a receiver, liquidator or any similar official, (iii) take any action that might cause such entity to become insolvent, or (iv) make an assignment for the benefit of creditors;

(q)     fail to allocate shared expenses (including, without limitation, shared office space and services performed by an employee of an Affiliate) among the Persons sharing such expenses and to use separate invoices and checks;

(r)     fail to remain solvent or pay its own liabilities (including, without limitation, salaries of its own employees) only from its own funds; *provided*, *however*, in no event shall this subsection (r) require any equity owner to make additional capital contributions to Borrower (it being acknowledged, however, that a failure of Borrower to remain solvent or pay its own liabilities (including, without limitation, salaries of its own employees) only from its own funds shall be a Default hereunder irrespective of such equity owner's lack of an obligation to make additional capital contributions to Borrower); and

(s)     acquire obligations or securities of its partners, members, shareholders or other affiliates, as applicable.

Section 6.2. <u>Change of Name, Identity or Structure</u>. Borrower shall not change or permit to be changed (a) Borrower's name, (b) Borrower's identity (including Borrower's trade name or names), (c)

Borrower's principal place of business set forth on the first page of this Agreement, the Deed of Trust or any UCC-1 Financing Statements, (d) the corporate, partnership, limited liability company or other organizational structure of Borrower, (e) Borrower's state of organization, or (f) Borrower's organizational identification number, without in each case notifying Administrative Agent of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Administrative Agent. In addition, Borrower shall not change or permit to be changed any Organizational Documents of such person if such change would adversely impact the covenants set forth in <u>Section 6.1</u> hereof. Borrower shall execute and deliver to Administrative Agent, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement amendment reasonably required by Administrative Agent to establish or maintain the validity, perfection and priority of the security interest granted herein. At the request of Administrative Agent, Borrower shall execute a certificate in form satisfactory to Administrative Agent listing the trade names under which Borrower intends to operate under, and representing and warranting that Borrower does business under no other trade name. If Borrower does not now have an organizational identification number and later obtains one, or if the organizational identification number assigned to Borrower subsequently changes, Borrower shall promptly notify Administrative Agent of such organizational identification number or change.

Section 6.3. <u>Business and Operations</u>. Borrower shall remain in good standing under the laws of each State as, and to the extent, the same are required for the ownership, maintenance, management and operation of the Project. Borrower shall not enter into any line of business other than the ownership of the Project and ancillary purposes in connection therewith, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business.

ARTICLE VII
NO SALE OR ENCUMBRANCE

Section 7.1. <u>Transfer Definitions</u>. For purposes of this <u>Article VII</u>, an "<u>Affiliated Manager</u>" shall mean any managing agent in which Borrower, Guarantor or any Affiliate of such Persons has directly or indirectly, any legal, beneficial or economic interest; "<u>Control</u>" shall mean, for any Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise; "<u>Restricted Party</u>" shall mean Borrower, any Affiliated Manager, or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, any Affiliated Manager, or any non-member manager; and a "<u>Sale or Pledge</u>" shall mean a voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, lien, pledge, assignment, grant of any options with respect to, or any other transfer or disposition of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) a legal or beneficial interest.

Section 7.2. <u>No Sale/Encumbrance</u>.

(a)     Other than Permitted Transfers, until the Debt is paid in full, Borrower shall not cause or permit a Sale or Pledge of the Project or any part thereof or any legal or beneficial interest therein nor permit a Sale or Pledge of an interest in any Restricted Party (in each case, a "<u>Prohibited Transfer</u>") without the prior written consent of Administrative Agent, which shall not be unreasonably withheld, conditioned or delayed.

(b)     A Prohibited Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Project or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Project for other than

36

actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in Borrower's right, title and interest in and to any leases or any rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general or limited partner or any profits or proceeds relating to such partnership interests or the creation or issuance of new partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of any member or any profits or proceeds relating to such membership interest; (vi) if a Restricted Party is a trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; (vii) the removal or the resignation of a Manager (including, without limitation, an Affiliated Manager) other than in accordance with <u>Section 5.13</u> hereof.

Section 7.3. <u>Administrative Agent's Rights</u>. Administrative Agent reserves the right to condition the consent to a Prohibited Transfer requested hereunder upon (a) a modification of the terms hereof and an assumption of the Note and the other Loan Documents as so modified by the proposed transferee, (b) receipt of payment of a transfer fee equal to $5,000 and all of Lenders' and Administrative Agent's out-of-pocket expenses actually incurred in connection with such Prohibited Transfer, (c) to the extent applicable to such proposed transferee, the proposed transferee's continued compliance with the covenants set forth in this Agreement (including, without limitation, the covenants in <u>Article VI</u> and the other Loan Documents), (d) a new manager for the Project and a new management agreement satisfactory to Administrative Agent (if applicable), and (e) the satisfaction of such other conditions and/or legal opinions as Administrative Agent shall determine in Administrative Agent's reasonable discretion to be in the interest of Lenders. All reasonable expenses incurred by Lenders and Administrative Agent shall be payable by Borrower whether or not Administrative Agent consents to the Prohibited Transfer. Lenders shall not be required to demonstrate any actual impairment of Lenders' security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Prohibited Transfer made without Administrative Agent's prior written consent. This provision shall apply to each and every Prohibited Transfer, whether or not Administrative Agent has consented to any previous Prohibited Transfer.

Section 7.4. <u>Assumption</u>. Other than as expressly permitted in this Agreement, Borrower hereby acknowledges and agrees that no transfer of all or any portion of the Project to, and the related assumption of the Loan by, any Person shall be permitted under this Agreement.

ARTICLE VIII<br>INSURANCE; CASUALTY; CONDEMNATION; RESTORATION

Section 8.1. <u>Insurance</u>.

(a)     Borrower shall obtain and maintain at all times policies of insurance as follows:

(i)     comprehensive "all risk" or "special causes of loss" insurance, including, without limitation, fire, flood, earthquake, terrorism, vandalism, malicious mischief and such other hazards as may be reasonably specified by Administrative Agent for the mutual benefit of Borrower and Administrative Agent and which is customarily maintained for like properties, including the improvements and the fixtures (other than trade fixtures) at the Project, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations,

37

underground utilities and footings) and provided that earthquake and flood may have a sub limit reasonably acceptable to Administrative Agent; (B) containing a replacement cost endorsement and an agreed amount endorsement with respect to such improvements and fixtures (other than trade fixtures) and/or an endorsement waiving all coinsurance provisions; (C) providing for no deductible in excess of $100,000 or such other amount reasonably acceptable to Administrative Agent, for all such insurance coverage; and (D) if any of the improvements or the use of the Project shall at any time constitute legal nonconforming structures or uses, providing coverage for contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements and containing an "Ordinance or Law Coverage" or "Enforcement" endorsement. In addition, Borrower shall obtain, or cause to be obtained: (x) if any portion of the improvements is currently or at any time in the future located in a "special flood hazard area" designated by the Federal Emergency Management Agency, flood hazard insurance in an amount equal to $10,000,000 in excess of the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended; and (y) earthquake insurance in amounts and in form and substance reasonably satisfactory to Administrative Agent as determined by a probable maximum loss study or other acceptable assessment of expected maximum loss, not to exceed the amount of indebtedness, in the event the Project is located in an area with a high degree of seismic risk provided that the insurance pursuant to clauses (x) and (y) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this subsection (i) and further provided that regardless of the flood or seismic zone, Administrative Agent may require reasonable limits of insurance covering such risks;

(ii) Commercial General Liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Project, with such insurance (A) to be on the so-called "occurrence" form with a general aggregate limit of not less than $2,000,000 per location and a per occurrence limit of not less than $1,000,000; (B) to continue at not less than the aforesaid limit until required to be changed by Administrative Agent in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations; (3) independent contractors; and (4) contractual liability;

(iii) loss of rents insurance or business income insurance, as applicable, (A) covering all risks required to be covered by the insurance provided for in subsection (i) above; (B) which provides that after the physical loss to the improvements and fixtures (other than trade fixtures) occurs, the loss of rents or income, as applicable, will be insured until such completion of Restoration and notwithstanding that the policy may expire prior to the end of such period; and (C) which contains an extended period of indemnity endorsement which provides that after the physical loss to the improvements and personal property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of at least six (6) months from the date that the Project is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period. The amount of such loss of rents or business income insurance, as applicable, shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross income from the Project for the succeeding period of coverage required above. All proceeds payable to Lenders pursuant to this subsection shall be held by Lenders and shall be applied to the obligations secured by the Loan Documents with any remaining balance promptly payable to Borrower; *provided*, *however*, that nothing herein contained shall be deemed to relieve Borrower of Borrower's obligations to pay the obligations secured by the Loan Documents on the respective dates of payment provided for in the Note, this Agreement and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such loss of rents or business income insurance, as applicable;

(iv)     at all times during which structural construction, demolition, structural repairs or structural alterations are being made with respect to the improvements, and only if the property coverage form does not otherwise apply,

(A)     owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy;

(B)     the insurance provided for in subsection (i) above written in a so-called Builder's Risk Completed Value form (1) on a non-reporting basis, (2) against "all risks" insured against pursuant to subsection (i) above, (3) including permission to occupy the Project, (4) with an agreed amount endorsement waiving co-insurance provisions, and (5) including coverage for so-called "soft costs" and delayed completion loss of income; and

(C)     Borrower shall ensure, or cause to be insured, that the general contractor maintains (1) commercial general liability coverage, including products and completed operations coverage that shall be continuously renewed for the statutory period during which claims can be made following completion of the project, (2) automobile liability insurance (including owned, hired and non-owned liability) and (3) umbrella/excess liability insurance with no less than $25,000,000, or such other amount reasonably acceptable to Administrative Agent, in limits per occurrence and in the annual aggregate per project, and in addition Borrower shall ensure, or cause to be insured, that all trade contractors provide similar liability insurance coverage with umbrella liability limits that are commensurate with the risks presented by their operations at the site as determined by the general contractor. All parties engaged in work on the improvements or on any restoration shall maintain any workers' compensation and employer's liability insurance required by law in force for all workers on the job. A certificate of insurance shall be issued to Borrower and Administrative Agent, naming each as Additional Insured (except with respect to workers' compensation and employer's liability), and evidencing all insurance required in this subsection. Borrower and Administrative Agent shall be named as Additional Insured with respect to the general contractor's ongoing operations and completed operations by endorsements satisfactory to Administrative Agent. Such insurance shall be primary and any other insurance maintained by the additional insured shall be excess only and not contributing with this insurance;

(v)     workers' compensation, subject to the statutory limits of the State, and employer's liability insurance in respect of any work or operations on or about the Project, or in connection with the Project or its operation (if applicable);

(vi)     comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Administrative Agent on terms consistent with the commercial property insurance policy required under subsection (i) above;

(vii)     excess liability insurance in an amount not less than $25,000,000 per occurrence and in the aggregate per location, or such other amount reasonably acceptable to Administrative Agent, per occurrence and per location, on terms consistent with the commercial general liability insurance required under subsection (ii) above; and

(viii)     upon sixty (60) days' written notice, such other reasonable insurance and in such reasonable amounts as Administrative Agent from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Project located in or around the region in which the Project is located.

(b)     All insurance provided for in <u>Section 8.1(a)</u> hereof shall be obtained under valid and enforceable policies (collectively, the "<u>Policies</u>" or in the singular, the "<u>Policy</u>"), and shall be in such forms and in such amounts as required above, and shall be subject to the reasonable approval of Administrative Agent as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the State and having a claims paying ability rating of "A" or better by at least two rating agencies (one of which shall be S&P) and/or a general policy rating of "A" or better and a financial class of VIII or better by A.M. Best Company, Inc.; *provided*, *however*, any insurance company with a rating below A:X must have a positive or stable outlook according to A.M. Best Company, Inc. The Policies described in <u>Section 8.1(a)</u> hereof shall designate Administrative Agent and Lenders and their successors and assigns as mortgagee, additional insured and/or loss payee as deemed appropriate by Administrative Agent. Borrower shall deliver to Administrative Agent certificates evidencing renewal of the Policies (such certificates, the "<u>Insurance Certificates</u>") and renewal policies accompanied by evidence satisfactory to Administrative Agent of payment of the premiums due with respect to the policies (the "<u>Insurance Premiums</u>"), within thirty (30) days after the expiration dates of such Policies.

(c)     Any blanket property insurance Policy shall specifically allocate to the Project the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Project in compliance with the provisions of <u>Section 8.1(a)</u> hereof.

(d)     All Policies provided for or contemplated by <u>Section 8.1(a)</u> hereof shall, in the case of Policies providing for (i) property damage, boiler and machinery, terrorism, flood and earthquake insurance, provide that the loss thereunder shall be payable to Administrative Agent, as mortgagee and loss payee, and (ii) commercial general liability insurance, name Administrative Agent as additional insured.

(e)     All Policies provided for in <u>Section 8.1(a)</u> hereof shall contain clauses or endorsements to the effect that:

(i)     no act or negligence of Borrower or anyone acting for or on behalf of Borrower or of any Tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance with respect to Administrative Agent and Lenders;

(ii)     the property damage insurance Policies, including boiler and machinery, earthquake, flood and terrorism, if separately provided, shall not be materially changed (other than to increase the coverage provided thereby) or canceled without at least thirty (30) days' prior written notice to Administrative Agent and any party named therein as an additional insured;

(iii)     the issuers thereof shall give written notice to Administrative Agent if the Policies have not been renewed ten (10) Business Days prior to their expiration;

(iv)     Administrative Agent and Lenders shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder, provided that the insurer need not waive the requirement that the premium be paid in order for a claim to be paid and further shall provide that Administrative Agent (for the benefit of Lender) is permitted to make payments to effect the continuation of such policy upon notice of cancellation due to non-payment of premiums;

(v)     the Policies do not contain an exclusion for acts of terrorism; and

(vi)   any claim or defense any property damage insurance company may have against Borrower to deny payment of any claim by Borrower thereunder shall not be effective against Administrative Agent and Lenders (and affirmatively providing that the insurance company will pay the proceeds of such Policy to Administrative Agent notwithstanding any claim or defense of the insurance company against Borrower) and such Policies shall also contain a standard "Waiver of Subrogation" endorsement.

(f)   If at any time Administrative Agent is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Administrative Agent shall have the right, upon not less than five (5) Business Days' notice to Borrower (except in the event of an emergency or an imminent lapse or loss of insurance coverage), to take such action as Administrative Agent deems necessary to protect Lenders' interest in the Project, including, without limitation, obtaining such insurance coverage as Administrative Agent in Administrative Agent's reasonable discretion deems appropriate. All premiums incurred by Administrative Agent or Lenders in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Administrative Agent upon demand and shall bear interest at the Involuntary Rate.

(g)   Borrower shall not take out separate insurance concurrent in form or contributing (in the event of a loss) to the insurance required to be maintained under this Section 8.1. Borrower may, however, carry, or permit Tenants to carry, insurance for the Project in addition to required insurance, but only if such additional insurance: (i) does not violate or entitle the carrier to assert any defense or disclaim any primary coverage under any required insurance; (ii) mutually benefits Borrower or Tenants, as the case may be, and Administrative Agent, as their interests may appear; and (iii) otherwise complies with this Agreement; *provided*, *however*, Administrative Agent reserves the right to approve any insurance provided by any other Tenant.   Notwithstanding the foregoing, Administrative Agent hereby acknowledges that the insurance coverages held by the Tenants as of the Closing Date are acceptable to Administrative Agent.

Section 8.2. <u>Insurance Escrow; Payment by Administrative Agent</u>. Borrower shall not be obligated to make any deposit or payment for insurance premium payment obligations, as hereinafter provided, until Administrative Agent makes demand therefor following an Event of Default and (i) any Tenant under a Material Lease is not paying such premiums in accordance with the terms and provisions of its respective Lease, or (ii) any Tenant under a Material Lease is in default under such Lease. Subject to the foregoing, upon notice from Administrative Agent, Administrative Agent shall have the right to require that Borrower pay to Administrative Agent at the time of each payment of an installment of interest and/or principal under the Note, an additional amount sufficient to discharge the premium payment obligations under this <u>Article VIII</u> when they become due. The determination of the amount so payable and of the fractional part thereof to be deposited with Administrative Agent, so that the aggregate of such deposits shall be sufficient for this purpose, shall be made by Administrative Agent in Administrative Agent's reasonable discretion. Such amounts shall be held by Administrative Agent not as a trust fund and without interest (except as required by applicable law) and shall be applied to the payment of the obligations in respect of which such amounts were deposited, in such order or priority as Administrative Agent shall reasonably determine, on or before the respective dates on which the same or any of them would become due. After acceleration of the Debt, the balance of any such amounts held by Administrative Agent may be used and applied for any purpose authorized pursuant to Article II of the Deed of Trust and <u>Section 10.2</u> hereof including, without limitation, payment of the Debt in any order Administrative Agent may deem appropriate. If, one (1) month prior to the date any of the aforementioned obligations are due, the amounts then on deposit shall be insufficient for the payment of such obligation in full, Borrower shall, within ten (10) days after written demand, deposit the amount of the deficiency with Administrative Agent. Nothing herein contained shall be deemed to affect any right or

41

remedy of Administrative Agent or Lenders under any provisions of this Agreement or of any statute or rule of law to pay any such amount and to add the amount so paid, together with interest at the Involuntary Rate, to the Debt.

Section 8.3. <u>Casualty</u>. If the Project shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "<u>Casualty</u>"), Borrower shall give prompt notice of such damage to Administrative Agent and Administrative Agent shall have the right to join Borrower in adjusting any loss. In addition, after the entry of any decree of foreclosure of the Deed of Trust, any purchaser at foreclosure sale or the decree creditor, as the case may be, shall also have the right to join in the adjustment of any such losses. Any moneys received as payment for any loss under any such insurance (the "<u>Insurance Proceeds</u>") shall be paid, subject to the terms of the Existing Leases, over to Administrative Agent to be applied, at Administrative Agent's option, either to (i) prepayment of the Note and other sums due under the Loan Documents or (ii) to the extent reasonably practicable, the reimbursement of Borrower from time to time of expenses incurred by Borrower in connection with the restoration of the Project ("<u>Restoration Work</u>") upon terms otherwise satisfactory to Administrative Agent. Administrative Agent and Lenders shall have the right to participate in the adjustment of all claims for Insurance Proceeds. Borrower shall promptly commence and diligently prosecute the restoration of the Project whether or not the Insurance Proceeds are made available to Borrower. Borrower shall pay all costs of such restoration whether or not such costs are covered by insurance. Provided and on condition that no Event of Default has occurred and is continuing, any prepayment of the Debt by application of Insurance Proceeds shall not be subject to any Prepayment Premium, however, Borrower shall be obligated to pay any breakage costs or other similar losses incurred or suffered by Administrative Agent and Lenders as a result of such prepayment.

Notwithstanding the foregoing, and subject to the terms of subsection (f) hereof, if Administrative Agent agrees to make the Insurance Proceeds, less the reasonable and actual out-of-pocket cost, if any, to Administrative Agent of obtaining and disbursing such Insurance Proceeds (including, without limitation, reasonable attorneys' fees and disbursements and costs allocable to inspecting the Restoration Work and the Plans) for the repair and restoration of the Project ("<u>Actual Proceeds</u>") available to the Borrower (not by way of application against and readvancement of loan funds under the Deed of Trust but solely as a security fund from which to reimburse Borrower for or permit Borrower to pay directly the costs of such repair and restoration), then Administrative Agent shall make the Actual Proceeds available to Borrower and Borrower shall complete the Restoration work in accordance with the following terms, provisions and conditions:

(a) If the Project should be damaged or destroyed by fire or other casualty, Borrower shall promptly upon insurance settlement, which settlement shall be diligently pursued by Borrower, commence the Restoration Work. Administrative Agent shall, subject to the terms of Subsection (b) below, deposit the proceeds of settlement in an interest-bearing account (the "<u>Restoration Account</u>") in a branch of any federally-insured bank as Administrative Agent may determine, in Administrative Agent's sole and absolute discretion. Borrower shall, as provided below, pay or cause to be paid all expenses in connection with such repair and restoration of the Project so that the Project, at all times, shall be and remain free and clear from any and all Liens.

(b) If the Insurance Proceeds are less than or equal to $750,000, Administrative Agent shall deliver such Insurance Proceeds to Borrower to perform the Restoration Work. If the Insurance Proceeds are greater than $750,000, Administrative Agent shall make 90% of the Actual Proceeds available to Borrower as provided in subsection (c) below and the final 10% of the Actual Proceeds (the "<u>Balance</u>") available to Borrower as provided in subsection (d) below. Borrower shall utilize such Actual Proceeds only for the purposes of performing the Restoration Work and for no other purpose whatsoever, except as hereinafter set forth. If the estimated costs of the Restoration Work shall exceed the Actual Proceeds, the difference (the "<u>Excess Funds</u>") shall be deposited in the Restoration

42

Account. Such Excess Funds shall be applied toward the Restoration Work prior to the application of the Actual Proceeds, all in accordance with the disbursement procedures hereinafter provided. Any unexpended Actual Proceeds remaining after completion of the Restoration Work shall be paid over to Borrower, provided no Event of Default exists or is continuing.

(c)     Any Actual Proceeds held by Administrative Agent shall be paid by Administrative Agent to Borrower from time to time as the Restoration Work progresses, subject to the following terms, provisions and conditions:

(i)     If the Restoration Work is structural or if the cost of the Restoration Work is reasonably estimated to exceed $750,000, the Restoration Work shall be supervised by a registered architect or engineer and inspected by a consultant engaged by Administrative Agent at the sole cost and expense of Borrower (the "Inspector"). Before Borrower commences any Restoration Work, other than temporary Restoration Work to protect property or prevent interference with business, Administrative Agent shall have been furnished with and shall have approved (which approval shall not be unreasonably withheld or delayed) (i) an estimate of the cost of the Restoration Work accompanied by an architect's certification as to such costs and (ii) appropriate plans and specifications ("Plans") for the Restoration Work, it being nevertheless understood that said Plans shall provide for Restoration Work so that, upon completion thereof, the Project shall be comparable in character and equal in value and general utility to the Project prior to the damage or destruction. Borrower shall furnish Administrative Agent with evidence satisfactory to Administrative Agent that all portions of the Project so restored and/or repaired and their contemplated use fully comply with all Legal Requirements;

(ii)     Each request for payment shall be made upon seven (7) days' prior notice to Administrative Agent and shall be accompanied by certificates to be made by the Inspector or, if none shall be required, by an officer of Borrower, stating (aa) that all of the Restoration Work completed has been done in compliance with the approved Plans, if any be required under subsection (c)(i) above, and all Legal Requirements, (bb) that the sum requested is justly required to reimburse Borrower for payments by Borrower, or is justly due to the contractor, subcontractors, materialmen, laborers, engineers, architects or other Persons rendering services or materials for the Restoration Work (giving a brief description of such services and materials), and that (prior to the final completion of the Restoration Work) the requested payment does not exceed the greater of (x) the amount of the requested payment less the retainage required pursuant to the applicable general contract or subcontract or (y) 90% of the value of the Restoration Work performed which is the subject of the requested payment (hereinafter called the "Applicable Percentage") and that all sums previously paid out by Administrative Agent do not exceed the Applicable Percentage of the aggregate value of the Restoration Work done to the date of such certificate, (cc) that if the sum requested is to cover payment relating to repair and restoration of personal property required or relating to the Project, that title to the personal property items covered by the request for payment is vested in Borrower and (dd) that the amount of Actual Proceeds remaining in the hands of Administrative Agent shall be sufficient upon completion of the Restoration Work to pay for the same in full free and clear of Liens. Additionally, each request for payment shall contain a statement signed by an officer or authorized signatory of Borrower approving both the Restoration Work done to date and the Restoration Work covered by the request for payment in question; and

(iii)     Each request shall be accompanied by (aa) invoices or receipts, (bb) waivers of lien reasonably satisfactory to Administrative Agent covering that part of the Restoration Work for which payment or reimbursement is being requested and (cc) if required by Administrative Agent, a search prepared by the Title Company or other evidence satisfactory to Administrative Agent that there has not been filed with respect to the Project any mechanic's or other lien or instrument for the retention of title in respect of any part of the Restoration Work not discharged of record, or that will not be discharged in connection with the requested payment, by payment, bonding or otherwise. If available,

4161624-v7/CHIDMS1

Administrative Agent may, at Administrative Agent's option, require an endorsement to the Title Policy insuring the continued priority of the lien of the Deed of Trust as to all sums advanced hereunder, such endorsement to be paid for by Borrower.

(d)　　The Balance shall be paid to Borrower only after the Restoration Work has been fully completed and within seven (7) days following the furnishing by Borrower to Administrative Agent of (i) a copy of any certificate or certificates required by law to render occupancy and full operation of the Project legal and (ii) a certification by the Inspector, if applicable, as to completion in accordance with the approved Plans and Legal Requirements and an architect's certificate of completion in the form of AIA-G703.

(e)　　At all times during the conduct of the Restoration Work, Borrower shall, at Borrower's sole cost and expense, obtain and cause to be maintained workmen's compensation and public liability insurance in amounts necessary to protect Borrower, Administrative Agent and Lenders from all liabilities, damages, claims or demands arising out of any accident or occurrence causing injury or death to any Person or property whatsoever. All insurance shall be with responsible insurance companies, licensed and authorized to transact business in the State of Texas and shall be written in forms, amounts and by companies reasonably satisfactory to Administrative Agent. The originals or certified copies of all Policies, together with original certificates or evidence thereof, shall be delivered to Administrative Agent. Renewals of such Policies shall be delivered to Administrative Agent at least ten (10) days before any such Policies shall expire. Nothing contained herein shall relieve Borrower from any requirement of this Agreement regarding the insuring of the Project.

(f)　　Notwithstanding the terms and provisions of subsections (b), (c) and (d) hereof, in the event that (i) Borrower fails to commence the Restoration Work or to proceed diligently and continuously to completion of the Restoration Work, subject to force majeure delays, within twelve (12) months from the date the Project was damaged or destroyed, (ii) the damage or destruction occurs during the last six (6) months of the term of the Note, unless, in Administrative Agent's reasonable judgment, the required Restoration Work is capable of being completed by not later than ninety (90) days prior to the Maturity Date, (iii) the required Restoration Work is not capable of being completed within eighteen (18) months from the date the Project was damaged or destroyed, in Administrative Agent's reasonable judgment (provided rent or business interruption insurance is in effect for the entire period of reconstruction), or (iv) an Event of Default is continuing, the terms, provisions and condition of subsections (b), (c) and (d) hereof shall not apply and Administrative Agent's option as to the application of Insurance Proceeds shall continue to apply. During the continuance of an Event of Default, Insurance Proceeds may be applied by Administrative Agent in any manner determined by Administrative Agent in its sole and absolute discretion.

Section 8.4. <u>Condemnation</u>. Borrower shall promptly give Administrative Agent notice of the actual or threatened commencement of any proceeding for the Condemnation of the Project of which Borrower has knowledge and shall deliver to Administrative Agent copies of any and all papers served in connection with such proceedings. Administrative Agent and Lenders may participate in any such proceedings, and Borrower shall from time to time deliver to Administrative Agent all instruments requested by Administrative Agent to permit such participation. Borrower shall, at Borrower's sole cost and expense, diligently prosecute any such proceedings, and shall consult with Administrative Agent, Administrative Agent's attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. In the event of such condemnation proceedings, the Award payable is hereby assigned to and shall be paid to Administrative Agent. Administrative Agent shall be under no obligation to question the amount of any such Award and may accept the same in the amount in which the same shall be paid. The proceeds of any Award so received shall (except for a temporary taking the Award for which shall be paid over to Borrower), at the option of Administrative Agent, and in the absence of an

Event of Default, either be (i) applied to the prepayment of the Note and other sums due under the Loan Documents, or (ii) to the extent reasonably practicable, paid over to Borrower from time to time for expenses incurred by Borrower in the restoration of the Project and upon terms otherwise satisfactory to Administrative Agent, in Administrative Agent's sole and absolute discretion. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lenders, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lenders shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. To the extent the Project can be restored or repaired following any condemnation, and to the extent Borrower shall be entitled or permitted to do the same, if the Project or any portion thereof is taken by a condemning authority, Borrower shall promptly commence and diligently prosecute the restoration of the Project whether or not such Award is made available to Borrower. If the Project is sold, through foreclosure or otherwise, prior to the receipt by Lenders of the Award, Lenders shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt. Notwithstanding anything to the contrary contained herein, to the extent that the Project can be restored or repaired following any condemnation, as determined by Required Lenders in their sole and absolute good faith discretion, the awards or proceeds from any such condemnation shall be disbursed and paid over to Borrower in the same manner as set forth in Section 8.3 hereof with respect to Insurance Proceeds.

ARTICLE IX
INTENTIONALLY OMITTED

ARTICLE X
EVENTS OF DEFAULT; REMEDIES

Section 10.1. Event of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a)       if any portion of the Debt is not paid within five (5) days after the date the same is due, or if the entire Debt is not paid on or before the Maturity Date;

(b)       if Borrower shall fail to pay any other sum hereunder or under any of the other Loan Documents when and as the same shall become due and payable and such failure shall not be cured within fifteen (15) days after notice from Administrative Agent;

(c)       if the Policies are not kept in full force and effect, or if the Insurance Certificates or certified copies of the Policies are not delivered to Administrative Agent as provided in Section 8.1 hereof;

(d)       if Borrower breaches any covenant with respect to itself contained in Article VI hereof or if Borrower breaches any covenant contained in Article VII hereof, and same is not cured, if capable of being cured, within thirty (30) days after notice;

(e)       if any representation or warranty of any Person comprising Borrower or Guarantor, or with respect to, Borrower, Guarantor or any member, general partner, principal or beneficial owner of Borrower, made herein, in any other Loan Document, or in any certificate, report, financial statement or other instrument or document furnished to Administrative Agent at the time of the

closing of the Loan or during the term of the Loan shall have been false or misleading in any material respect when made;

(f)      if (i) Borrower or Guarantor shall commence any case, proceeding or other action (A) under any Creditors' Rights Laws, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Borrower or Guarantor shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower or Guarantor any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) other than an involuntary proceeding commenced by Administrative Agent or any Lender, there shall be commenced against Borrower or Guarantor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) Borrower or Guarantor shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) Borrower or Guarantor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

(g)      if there should occur a default which is not cured within the applicable grace or cure period, if any, under any other deed of trust encumbering all or part of the Project regardless of whether any such other deed of trust is prior or subordinate to the Deed of Trust or upon default in the performance of any term, provision, covenant or condition, which is not cured within the applicable grace or cure period, if any, under the notes evidencing such deeds of trust or any other documents executed in connection therewith; it being further agreed by Borrower that an Event of Default hereunder shall constitute an event of default under any such other deed of trust in respect of the Project held by Administrative Agent;

(h)      if Borrower shall be in default beyond applicable notice and grace periods under any other loan or financing arrangement between Borrower and any Lender, whether now or hereafter existing;

(i)      if any federal tax lien is filed against Borrower, Guarantor, Borrower Members or the Project and same is not discharged of record or bonded within thirty (30) days after the same is filed;

(j)      if a judgment is filed against Borrower, Guarantor, Borrower Members or the Project which (x) is in excess of $500,000 or (y) in the reasonable judgment of Administrative Agent would materially interfere with such Person's ability to perform its obligations under the Loan Documents to which it is a party, and which is not stayed, vacated, bonded or discharged within thirty (30) days after the same is filed;

(k)      if any Lien is filed or recorded against the Project or any interest therein *with the consent of Borrower* (but without the consent of Administrative Agent), and such Lien is not released within a period of five (5) days of the filing or recording thereof;

(l)      with the exception of Permitted Encumbrances, if any Lien is filed or recorded against the Project or any interest therein without the consent of Borrower or Administrative Agent and such Lien is not removed, discharged or bonded to the satisfaction of Administrative Agent within thirty (30) days of such filing or recording;

46

(m)     if Borrower, Guarantor or any Borrower Member shall breach any of the terms of:

     (i)     Section 5.14 (Liens);

     (ii)     Section 5.19 (Alterations);

     (iii)     Section 5.21 (Notices);

     (iv)     Section 5.23 (Limitations on Securities Issuances);

     (v)     Section 5.24 (Limitations on Distributions);

     (vi)     Section 5.25 (Contractual Obligations);

     (vii)     Section 5.26 (Additional Indebtedness);

     (viii)     Section 5.27 (Restrictions on Leasing);

     (ix)     Section 5.28 (Debt Service Coverage Ratio);

     (x)     Section 5.29 (Loan-to-Value Ratio);

     (xi)     Section 7.2 (No Sale/Encumbrance);

(n)     [Reserved.];

(o)     if Borrower or Guarantor shall continue to be in default under any other term, covenant or condition of this Agreement or any of the Loan Documents for more than ten (10) days after notice from Administrative Agent in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Administrative Agent in the case of any other default, provided that if such default cannot reasonably be cured within such thirty (30)-day period and Borrower or the applicable Guarantor shall have commenced to cure such default within such thirty (30)-day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30)-day period shall be extended for so long as it shall require Borrower or the applicable Guarantor in the exercise of due diligence to cure such default, it being agreed that no such extension shall (i) apply in the event of a default under Section 5.4 or Section 8.1 of this Agreement or (ii) be for a period in excess of one hundred (100) days in the aggregate;

(p)     if a default should occur under any Interest Rate Protection Product entered into by Borrower;

(q)     if there shall occur a default or event of default under the Guaranty which is not cured within any applicable grace or cure period, if any, or the Guaranty shall fail for any reason to be in full force of effect;

(r)     if there shall occur a default or event of default under the Environmental Indemnity Agreement which is not cured within any applicable grace or cure period, if any, or the Environmental Indemnity Agreement shall fail for any reason to be in full force of effect;

(s)     if an ERISA Event shall have occurred that, in the opinion of the Administrative Agent, when taken together with all other ERISA Events that have occurred, results in or could reasonably be expected to result in liability to Borrower in excess of $500,000;

(t)     if Borrower shall file a notice limiting the maximum principal amount that may be secured by the Deed of Trust to a sum less than the maximum principal amount set forth in <u>Section 3.12</u> thereof; or

(u)     if there shall be an Event of Default under the Mezzanine Loan Agreement or any other Mezzanine Loan Document by Mezzanine Borrower or any other Person obligated thereunder.

Section 10.2. <u>Remedies</u>.

(a)     Upon the occurrence of an Event of Default (other than an Event of Default described in <u>Section 10.1(f)</u> hereof) and at any time thereafter that such Event of Default is continuing Administrative Agent and/or Lenders may, in addition to any other rights or remedies available to Administrative Agent or Lenders pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Administrative Agent or Lenders deem advisable to protect and enforce Lenders' rights against Borrower, Guarantor and in the Project, including, without limitation, declaring the Debt to be immediately due and payable, and Administrative Agent and/or Lenders may enforce or avail themselves of any or all rights or remedies provided in the Loan Documents and may exercise all the rights and remedies of a secured party under the UCC, as adopted and enacted by the State where the Project is located, against Borrower, Guarantor and the Project, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in <u>Section 10.1(f)</u> hereof, the Debt and all other obligations of Borrower and Guarantor hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

(b)     Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Administrative Agent or Lenders against Borrower or Guarantor under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or Guarantor or at law or in equity may be exercised by Lenders at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Administrative Agent or Lenders shall have commenced any foreclosure proceeding or other action for the enforcement of Lenders' rights and remedies under any of the Loan Documents with respect to the Project. Any such actions taken by Administrative Agent or Lenders shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Administrative Agent or Lenders may determine in Administrative Agent's or Lenders' sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Administrative Agent or Lenders permitted by law, equity or contract or as set forth herein or in the other Loan Documents.

ARTICLE XI
REPLACEMENT OF LENDERS

If Borrower is entitled to replace a Lender pursuant to the Note (i.e., pursuant to (i) subsection (e) of the section titled "Increased Costs", or (ii) the section titled "Illegality"), Borrower may, upon notice to such Lender and Administrative Agent, replace such Lender by causing such Lender to assign its rights and obligations under this Agreement and the Note to one or more Eligible Assignees reasonably acceptable to Borrower and Administrative Agent.  Borrower shall or shall cause the replacement lender to pay in full all principal, interest, fees and other amounts owing to such Lender through the date of replacement.  The Lender being replaced and the replacement lender shall execute and deliver an Assignment and Assumption Agreement in the form attached hereto as <u>Exhibit B</u>.  A Lender shall not be required to make any such assignment if, prior thereto, as a result of a waiver by such Lender or otherwise,

48

the circumstances entitling the Borrower to require such assignment cease to apply. If a Lender being replaced refuses to execute and deliver such Assignment and Assumption Agreement or otherwise comply with this <u>Article XI</u>, such Lender hereby appoints Administrative Agent as its attorney-in-fact to do so on such Lender's behalf. Administrative Agent shall distribute an amended Schedule 13.12, which shall thereafter be incorporated into this Agreement, to reflect adjustments to Lenders and their respective amount of the Loan.

ARTICLE XII
SECONDARY MARKET; ASSIGNMENT; PARTICIPATION

Section 12.1. <u>Assignment; Participation</u>.

(a)     Any non-Defaulting Lender (as defined in <u>Section 13.16</u> hereof) may at any time grant to one or more parties (each a "<u>Participant</u>") participating interests in its Pro Rata Share (as hereinafter defined) of the Loan (the "<u>Participations</u>") and Lenders may syndicate the Loan ("<u>Syndication</u>"). In the event of any such grant by a Lender of a Participation to a Participant, such Lender shall remain responsible for the performance of such Lender's obligations hereunder, and Borrower and Administrative Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder. Any agreement pursuant to which any Lender may grant a Participation shall provide that such Lender shall retain the sole right and responsibility to enforce the obligations of Borrower, as the case may be, hereunder and under any other Loan Document, including, without limitation, the right to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document.

(b)     A Lender may at any time assign (x) to any Eligible Assignee with the consent of Administrative Agent, which consent shall not be unreasonably delayed, conditioned or denied, (y) to any other party with the consent of Administrative Agent, which consent may be withheld by Administrative Agent in Administrative Agent's sole and absolute discretion; *provided*, *however*, that as long as no Event of Default has occurred and is continuing, Borrower's consent shall also be required for an assignment pursuant to clauses (x) and (y) (each such assignee set forth in (x) and (y) above, a "<u>Consented Assignee</u>"), or (z) without such consent, to one or more Eligible Assignees which are affiliates, subsidiaries or a parent of a Lender (each Consented Assignee or subsidiary, affiliate or parent bank or institution, an "<u>Assignee</u>") all or a proportionate part of all of such Lender's rights and obligations under this Agreement and the Note, and such Assignee shall assume rights and obligations, pursuant to an Assignment and Assumption Agreement substantially in the form annexed hereto as <u>Exhibit B</u> and made a part hereof executed by such Assignee and the assigning Lender (duplicate executed originals of which shall be delivered to Borrower to the extent available). Upon (i) execution and delivery of such instrument, (ii) payment by such Assignee to the assigning Lender of an amount equal to the purchase price agreed between such Lender and such Assignee and (iii) with respect to a Consented Assignee, payment by such Assignee to Administrative Agent of a fee, for Administrative Agent's own account, in the amount of $5,000, such Assignee shall be a party to this Agreement and shall have all the rights and obligations of a Lender as set forth in such Assignment and Assumption Agreement, and the assigning Lender shall be released from such Lender's obligations hereunder to a corresponding extent, and no further consent or action by any party shall be required. If the Assignee is not incorporated under the laws of the United States or a state thereof, it shall, prior to the first date on which interest or fees are payable hereunder for its account, deliver to Borrower and Administrative Agent certification reasonably acceptable to Borrower as to exemption from deduction or withholding of any United States federal income taxes. Borrower shall not be required to reimburse any Lender for taxes or reimburse any Lender for any withholding due to such Lender's failure to deliver such certification, or due to the validity of such certification. Notwithstanding anything contained herein to the contrary, no Lender shall have the right to assign less than $5,000,000 of such Lender's interest under this Agreement and the other Loan

49

Documents. For the purposes hereof, an "Eligible Assignee" shall mean any of (a) a commercial bank organized under the laws of the United States, or any state thereof or the District of Columbia, and having total assets in excess of $1,000,000,000; (b) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof or the District of Columbia, and having a net worth of at least $100,000,000, calculated in accordance with generally accepted accounting principles; (c) a commercial bank organized under the laws of any other country which is a member of the OECD, or a political subdivision of any such country and having total assets in excess of $1,000,000,000, provided that such bank is acting through a branch or agency located in the country in which it is organized or another country which is also a member of the OECD; (d) the central bank of any country which is a member of the OECD; (e) any other assignee that, in the reasonable judgment of Administrative Agent, is a reputable institutional investor with substantial experience in lending and originating loans similar to the Loan, or in purchasing, investing in or otherwise holding such loans, having a financial net worth of at least $100,000,000 and (f) any non-Defaulting Lender or any affiliate, subsidiary or parent of any non-Defaulting Lender. Neither Borrower, Guarantor nor any Affiliate or Subsidiary of Borrower or Guarantor shall be Eligible Assignee or Participant. Notwithstanding anything to the contrary contained herein, any Lender may at any time pledge or assign a security interest in all or any portion of its rights under the Loan, the Note and the other Loan Documents to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations under the Loan, the Note or any other Loan Document or substitute any such pledgee or assignee for such Lender as a party to the Loan, the Note or any Loan Document.

(c)      Borrower, Guarantor, Administrative Agent and Lenders shall execute such modifications to the Loan Documents as shall, in the reasonable judgment of Administrative Agent, be necessary or desirable in connection with assignments in accordance with the foregoing provisions of this Section 12.1 and which do not adversely affect Borrower or Guarantor or Borrower's or Guarantor's obligations or rights under the Loan Documents (other than to a *de minimis* extent).

(d)      Any Lender may at any time assign all or any portion of such Lender's rights under this Agreement and the Note to a Federal Reserve Bank. No such assignment shall release the transferor Lender from its obligations hereunder.

(e)      Borrower recognizes that in connection with a Lender's selling of Participations or making of assignments, any or all documentation, financial statements, appraisals and other data, or copies thereof, relevant to Borrower, Guarantor or the Loan may be exhibited to and retained by any such Participant or Assignee or prospective Participant or Assignee. Borrower hereby consents to the release of any and all Borrower information to such parties, and holds Administrative Agent and Lenders harmless from any and all liability due to the release of Borrower's financial information by Administrative Agent or any Lender to any such party. Administrative Agent and Lenders shall instruct such Participant or Assignee to keep such information confidential but Administrative Agent and Lenders shall have no liability if such Participant or Assignee fails to do so.

(f)      Borrower and Guarantor agree to cooperate with Lenders in connection with any sale or transfer of the Loan, Syndication or any Participation created pursuant to this Article XII. At the request of the holder of the Note and, to the extent not already required to be provided by Borrower or Guarantor under this Agreement, Borrower and Guarantor shall take such reasonable actions for the benefit of, and use reasonable efforts to provide information not in the possession of, the holder of the Note in order to satisfy the market standards (which may include such holder's delivery of information with respect to Borrower, Guarantor and the Project to any Participant or Assignee or prospective Participant or Assignee) to which the holder of the Note customarily adheres or which may be reasonably required in the marketplace in connection with such sales or transfers, including, without limitation, to:

(i)      provide (x) updated financial, budget and other information with respect to the Project, Borrower, Guarantor and Manager and (y) modifications and/or updates to the appraisals, market studies, Environmental Reports (including Phase I reports and, if appropriate, Phase II reports) of the Project obtained in connection with the making of the Loan (all of the foregoing being referred to as the "Provided Information"), together, if customary, with appropriate verification and/or consents of the Provided Information;

(ii)      make non-material changes to the Organizational Documents of Borrower, Guarantor or its principals;

(iii)      upon reasonable prior notice, permit site inspections, appraisals, market studies and other due diligence investigations of the Project, as may be reasonably requested by the holder of the Note or as may be necessary in connection with the Participations or Syndications;

(iv)      make the representations and warranties with respect to the Project, Borrower, Guarantor, Manager and the Loan Documents as such Persons have made in the Loan Documents and such other representations and warranties with respect to the Project, Borrower, Guarantor and Manager, as may be reasonably requested by the holder of the Note;

(v)      execute such amendments to the Loan Documents as may be requested by the holder of the Note including, without limitation, bifurcation of the Loan into two or more components and/or separate notes and/or creating a senior/subordinate note structure; *provided*, *however*, that Borrower and Guarantor shall not be required to modify or amend any Loan Document if such modification or amendment would (x) change the interest rate or the stated maturity set forth in the Note, except in connection with a bifurcation of the Loan which may result in varying fixed interest rates and amortization schedules, but which shall have the same initial weighted average coupon of the original Note, (y) in the reasonable judgment of Borrower modify or amend any other economic term of the Loan, or (z) in the reasonable judgment of Borrower or Guarantor increase Borrower's or Guarantor's obligations and liabilities under the Loan Documents, other than to a *de minimis* extent; and

(vi)      have reasonably appropriate personnel participate in a bank meeting and/or presentation for the potential Participants or Lenders.

(g)      At the option of Lenders, the Loan may be serviced by a servicer/trustee selected by Lenders ("Servicer") and Lenders may delegate all or any portion of Lenders' responsibilities under this Agreement and the other Loan Documents to such servicer/trustee pursuant to a servicing agreement between Lenders and such servicer/trustee. Lenders shall provide Borrower with notice of same. At no time shall there be more than one (1) Servicer.

(h)      All third party costs and expenses incurred by Borrower, Guarantor or Lenders in connection with Borrower's or Guarantor's complying with the requests and requirements made under this Article XII shall be paid by Lenders (and not by Borrower).

Section 12.2. Intralinks. Borrower hereby acknowledges that Administrative Agent will make available to Lenders all information provided by or on behalf of Borrower or Guarantor hereunder or under the other Loan Documents (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks® or another similar electronic system (the "Platform").

ARTICLE XIII
AGENT

Section 13.1. Appointment, Powers and Immunities.

(a)     Each Lender hereby designates, appoints and authorizes Administrative Agent to act as agent hereunder and under the other Loan Documents to which Administrative Agent is a party in its capacity as Administrative Agent (this Agreement and such other Loan Documents, the "Administrative Agent Loan Documents") with such powers as are specifically delegated to Administrative Agent by the terms of this Agreement and such Loan Documents, together with such other powers as are reasonably incidental thereto. Administrative Agent (a) shall have no duties or responsibilities except those expressly set forth in this Agreement and in the other Administrative Agent Loan Documents, and shall not by reason of this Agreement or any other Administrative Agent Loan Document be a trustee or fiduciary for any of Lenders; (b) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose Administrative Agent to liability or that is contrary to any Loan Document or applicable law; (c) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity; (d) shall not be responsible to Lenders for or have any duty to ascertain or inquire into (i) any recitals, statements, representations or warranties contained in this Agreement, any other Administrative Agent Loan Document, or in any certificate or other document referred to or provided for in, or received by any Lenders under, this Agreement or any other Administrative Agent Loan Document, (ii) the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Administrative Agent Loan Document or any other document referred to or provided for herein or therein, (iii) any failure by Borrower to perform any of such party's obligations hereunder or thereunder, or (iv) the satisfaction of any condition set forth herein, other than to confirm receipt of items expressly required to be delivered to Administrative Agent; and (e) shall not be responsible to Lenders for any action taken or omitted to be taken by Administrative Agent hereunder or under any other Administrative Agent Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith, except for Administrative Agent's own gross negligence or willful misconduct or the failure of Administrative Agent to follow the directions of the Required Lenders or all of the Lenders, as the case may be, as provided for herein.

(b)     To the extent that any action is to be taken, any information is to be delivered to or by any Lender, any determination is to be made, or any consent is to be given or withheld by any Lender, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Administrative Agent or any successor agent thereto at the direction of the Required Lenders or all of the Lenders, as the case may be, as provided for herein.

(c)     Administrative Agent may employ agents and attorneys-in-fact and shall not be responsible for the negligence or misconduct of any such agents or attorneys-in-fact selected by Administrative Agent in good faith. Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by Administrative Agent. Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory provisions of this Section 13.1 shall apply to any such sub-agent and to the Affiliates of Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

002004

(d)    Administrative Agent may deem and treat the payee of any note as the holder thereof for all purposes hereof unless and until Administrative Agent shall have been notified of the assignment thereof.

Section 13.2. Reliance by Administrative Agent. Administrative Agent shall be entitled to rely upon, and shall incur no liability under or in respect of any of the Loan Documents by acting upon, any certification, consent, warranty, notice or other paper, instrument or communication (including any thereof by telephone, telecopy, e-mail, telex, telegram or cable) believed by Administrative Agent in good faith to be genuine and authentic and to have been signed or sent by or on behalf of the proper Persons, and upon advice and statements of legal counsel, independent accountants or other experts selected by Administrative Agent in good faith. As to any matters not expressly provided for by this Agreement or any other Administrative Agent Loan Document, Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder or thereunder in accordance with instructions given by Lenders holding sixty-six and two-thirds percent (66 2/3%) or more of the outstanding principal balance of the Loan (the "Required Lenders"), and such instructions of Administrative Agent and any action taken or not taken pursuant thereto shall be binding on all Lenders. Notwithstanding anything contained herein to the contrary, the consent of all of the Lenders (other than a Defaulting Lender) shall be required before Administrative Agent may take or not take any action with respect to the following:

(a)    any increase or decrease in the total principal amount of the Loan;

(b)    reductions in any interest rate (other than default rate interest) applicable to the Loan or any fees (other than late fees) required under this Agreement or any other Loan Document;

(c)    the extension of the Maturity Date of the Note or the due date of any payment due under the Note (other than default interest or late fees);

(d)    the release of all or substantially all of the Project (except as provided for herein and in the other Loan Documents);

(e)    the release of Borrower or Guarantor from Borrower's or such Guarantor's obligations under this Agreement or any other Loan Document; and

(f)    any amendment or modification of any of the provisions of Article XII or this Article XIII.

In the event Administrative Agent sends a notice to any Lender recommending any action (or inaction) to be taken under this Agreement or any other Loan Document and such Lender does not respond to Administrative Agent within ten (10) Business Days of the date of Administrative Agent's notice to such Lender, such Lender shall be deemed to have consented to the action (or inaction) being recommended by Administrative Agent.

Section 13.3. Purchase of Disapproving Lender's Interest.

(a)    In the event Administrative Agent makes a recommendation to Lenders to take any action requiring unanimous consent pursuant to Section 13.2 hereof (which recommendation may be made at any time and for any number of times), and one or more Lenders approve such recommendation (the "Approving Lenders") and one or more Lenders disapprove such recommendation (the "Disapproving Lenders"), one or more of the Approving Lenders shall have the right (but not the obligation), in such Approving Lender's sole and absolute discretion, to purchase the interest of the Disapproving Lender in full within thirty (30) days of such disapproval, upon the payment to Administrative Agent of all principal, accrued interest, default interest (but not the payment of any

53

002005

applicable prepayment premium) due to such Disapproving Lender hereunder, and all amounts advanced by such Disapproving Lender as protective advances under the Deed of Trust as of the date of sale (collectively, the "Purchase Price"), whereupon such Disapproving Lender shall accept payment. In such event, and concurrently with the payment of the Purchase Price, such Disapproving Lender shall assign all of such Disapproving Lender's right, title and interest in and to the Loan and the Loan Documents to the Approving Lender purchasing such Disapproving Lender's interest, without recourse, representation, warranty or covenant, express or implied, of any kind or nature whatsoever, except that such Disapproving Lender has not assigned or encumbered such Lender's rights in the Loan and the Loan Documents.

(b)     Any sale pursuant to Section 13.3(a) hereof shall be made pursuant to documents reasonably satisfactory to Administrative Agent and the purchasing Approving Lender which shall provide, among other things, that the purchasing Approving Lender shall assume all of the obligations of such Disapproving Lender thereafter accruing under the Loan Documents and indemnify such Disapproving Lender from any claims or causes of actions that may arise after the closing date of such sale in connection with the Loan Documents (other than any claims or causes of action that may arise or be brought by Borrower or any third party as the result of the gross negligence or willful misconduct of such Disapproving Lender). The purchasing Approving Lender's right to purchase such Disapproving Lender's interest may be exercised by notice to Administrative Agent of the purchasing Approving Lender's intention to do so and payment by wire transfer of the Purchase Price.

(c)     If there is more than one Approving Lender that elects to purchase a Disapproving Lender's interest in the Loan, Administrative Agent shall apportion such Disapproving Lender's interest among such Approving Lenders in proportion to their Pro Rata Share.

Section 13.4.   Rights of Administrative Agent as Lender. With respect to its interest in the Loan, Administrative Agent in its capacity as a Lender hereunder shall have the same rights and powers hereunder as any other Lender and may exercise the same as though it were not acting as Administrative Agent, and the terms "Lender" and "Lenders" shall include Administrative Agent in its capacity as a Lender. Administrative Agent and Administrative Agent's affiliates may (without having to account therefor to any Lender) accept deposits from, lend money to (on a secured or unsecured basis), and generally engage in any kind of banking, trust or other business with Borrower (and any of Borrower Affiliates) as if it were not acting as Administrative Agent. Lenders and Lenders' Affiliates may (without having to account therefor to any other Lender or Administrative Agent) accept deposits from, lend money to (on a secured or unsecured basis), and generally engage in any kind of banking, trust or other business with Borrower (and any affiliates of them) as if it were not acting as Lender hereunder.

Section 13.5.   Indemnification.

(a)     Lenders agree to indemnify Administrative Agent (to the extent not reimbursed by Borrower and Guarantor hereunder and without limiting any obligations of Borrower hereunder) ratably, in accordance with their Pro Rata Shares, for any and all reasonable costs, fees, expenses, advances, interest, payments and claims of any kind and nature whatsoever that may be imposed on or incurred by Administrative Agent arising out of or by reason of any investigation in or in any way relating to or arising out of this Agreement or the transactions contemplated hereby (including, without limitation, the actual out-of-pocket costs and expenses that Administrative Agent is obligated to pay hereunder) or the servicing, administration and/or enforcement of the Loan, this Agreement and/or the Loan Documents (collectively, "Costs") provided that no Lender shall be liable for any of the foregoing Costs to the extent such Costs arise from the gross negligence or willful misconduct of Administrative Agent (as determined by a court of competent jurisdiction from which all appeal has been exhausted) or the failure of Administrative Agent to follow the directions of the Required Lenders or all of the Lenders, as the case

may be. The foregoing indemnity shall survive the payment of the obligations owing hereunder and the termination or non-renewal of this Agreement.

(b)     Any request by Administrative Agent for reimbursement of Costs shall be in the form of a certificate from Administrative Agent to each Lender as to the nature and amount for which Administrative Agent claims reimbursement from Lenders pursuant to this Section 13.5. Any such request shall include reasonable evidence that such Costs meet the criteria set forth in Subsection 13.5(a) hereof and have been incurred by Administrative Agent.

(c)     Any Costs which are required to be reimbursed by Lenders to Administrative Agent in accordance with this Section 13.5 and which are not reimbursed to Administrative Agent within three (3) Business Days after demand therefor in accordance with Subsection 13.5(b) hereof shall accrue interest at the Federal Funds Rate from and after the fourth (4th) Business Day after the date that such reimbursement request was made through and including the date of reimbursement by such Lender.

(d)     Any Costs which are subsequently recovered from Borrower or any other Person shall be returned to each Lender in proportion to the Pro Rata Share of said Costs previously remitted by each Lender to Administrative Agent.

Section 13.6. Non-Reliance on Administrative Agent and Other Lenders. Each Lender agrees that such Lender has, independently and without reliance on Administrative Agent or any of the other Lenders, and based on such documents and information as such Lender has deemed appropriate, made such Lender's own credit analysis of Borrower and has made such Lender's own decision to enter into this Agreement and the other Loan Documents and that such Lender shall, independently and without reliance upon Administrative Agent or any of the other Lenders, and based on such documents and information as such Lender shall deem appropriate at the time, continue to make such Lender's own analysis and decisions in taking or not taking action under this Agreement and the other Loan Documents. Other than determining whether payments due to Administrative Agent under the Loan Documents have in fact been made, Administrative Agent shall not be required to keep itself informed as to the performance or observance by Borrower of any term or provision of this Agreement or any of the other Loan Documents or any other document referred to as provided for herein or therein or to inspect the properties or books of Borrower. Administrative Agent shall provide each Lender with any information received by Administrative Agent from Borrower which is required to be provided to Lenders hereunder and with a copy of any notice of default received by Administrative Agent from Borrower or any Lender. Except for notices, reports and other documents expressly required to be furnished to Lenders by Administrative Agent hereunder or under any other Administrative Agent Loan Document, Administrative Agent shall not have any duty or responsibility to provide any Lender with any other credit or other information concerning the affairs, financial condition or business of Borrower that may come into the possession of Administrative Agent.

Section 13.7. Failure to Act. Except for action expressly required of Administrative Agent hereunder or under any of the other Administrative Agent Loan Documents, Administrative Agent shall in all cases be fully justified in failing or refusing to act hereunder and thereunder unless Administrative Agent shall receive further assurances to Administrative Agent's complete satisfaction from Lenders of their indemnification obligations under Section 13.5 hereof against any and all liability and expense that may be incurred by Administrative Agent by reason of Administrative Agent taking or continuing to take or failing to take any such action.

Section 13.8. Action by Administrative Agent. Each of the entities comprising Lenders hereby appoints Administrative Agent and each of the other Lenders as agent and bailee for the purpose of perfecting the security interests in and liens upon the Project, in accordance with Article 9 of the Uniform

Commercial Code in effect in the State where the Project is located or the State where Borrower is organized, can be perfected only by possession (or where the security interest of a secured party with possession has priority over the security interest of another secured party). Each Lender hereby appoints Administrative Agent as such Lender's attorney-in-fact for the purpose of executing the Loan Documents (other than this Agreement) on such Lender's behalf.

Section 13.9. <u>Successor Administrative Agent</u>. Administrative Agent may resign as Administrative Agent upon thirty (30) days' written notice to Lenders. If Administrative Agent resigns under this Agreement, Lenders (other than the Lender which is the Administrative Agent resigning) shall appoint from among the other Lenders a successor agent for Lenders. If no successor agent is appointed prior to the effective date of the resignation of Administrative Agent, Administrative Agent may appoint, after consulting with Lenders (other than the Lender which is the Administrative Agent resigning), a successor agent from among such other Lenders. Upon the acceptance by the Lender so selected of such Lender's appointment as successor agent hereunder, such successor agent shall succeed to all of the rights, powers and duties of the retiring Administrative Agent and the term "Administrative Agent" as used herein and in the other Loan Documents shall mean such successor agent and the retiring Administrative Agent's appointment, powers and duties as Administrative Agent shall be terminated. After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this <u>Article XIII</u> shall inure to such retiring Administrative Agent's benefit as to any actions taken or omitted by such retiring Administrative Agent while such retiring Administrative Agent was Administrative Agent under this Agreement. If no successor agent has accepted appointment as Administrative Agent by the date which is thirty (30) days after the date of a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nonetheless thereupon become effective and Lenders shall perform all of the duties of Administrative Agent hereunder until such time, if any, as the Lenders (other than the Lender which has resigned as Administrative Agent) appoint a successor agent as provided for above. The resigning Administrative Agent shall have continuing liability for any act of gross negligence or willful misconduct committed by Administrative Agent during the period such Administrative Agent was the Administrative Agent under this Agreement.

Section 13.10. <u>Sharing</u>. If at any time or times any Lender shall receive (i) by payment, foreclosure, setoff or otherwise, any proceeds of the Project or other collateral or any payments with respect to the obligations of Borrower to such Lender arising under, or relating to, this Agreement or any of the Loan Documents except for any such proceeds or payments received by such Lender from Administrative Agent or otherwise pursuant to the terms of this Agreement, or (ii) payments from Administrative Agent hereunder in excess of such Lender's ratable portion of the relevant distributions by Administrative Agent hereunder, such Lender shall promptly turn the same over to Administrative Agent, in kind, and with such endorsements as may be required to negotiate the same to Administrative Agent, or in same day funds, as applicable, for the account of all of the Lenders and for application to the obligations hereunder in accordance with the applicable provisions of this Agreement.

Section 13.11. <u>Pro Rata Treatment and Payments</u>.

(a)     <u>Funding by Lenders; Presumption by Administrative Agent</u>. With respect to any advance required or deemed necessary by Administrative Agent under this Agreement or any other Loan Document (each, a "<u>Coverage Advance</u>"), Administrative Agent shall give each Lender not less than three (3) Business Days' notice by telephone and facsimile specifying the amount of the Coverage Advance, the date of the Coverage Advance and each Lender's Pro Rata Share of such Coverage Advance. Each Lender shall wire transfer to Administrative Agent immediately available federal funds equal to such Lender's Pro Rata Share of each Coverage Advance by 11:00 a.m. (New York City time) on the day of the Coverage Advance as set forth in the notice. Unless Administrative Agent shall have received notice from a Lender prior to the proposed date of any Coverage Advance that such Lender will not make

available to Administrative Agent such Lender's Pro Rata Share of such Coverage Advance, Administrative Agent may assume that such Lender has made such Pro Rata Share available on such date in accordance with this Section and may, in reliance upon such assumption, make available to Borrower a corresponding amount. In such event, if a Lender has not in fact made its Pro Rata Share of the applicable Coverage Advance available to Administrative Agent, then the applicable Lender and Borrower severally agree to pay to Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to Borrower to but excluding the date of payment to Administrative Agent, at (i) in the case of a payment to be made by such Lender, a rate (the "<u>Lender Interest Rate</u>") equal to the greater of (x) the sum of (1) the Federal Funds Rate in effect from time to time and (2) one percent (1%) per annum and (y) a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation, and (ii) in the case of a payment to be made by Borrower, the Interest Rate. If Borrower and such Lender shall pay such interest to Administrative Agent for the same or an overlapping period, Administrative Agent shall promptly remit to Borrower the amount of such interest paid by Borrower for such period. If such Lender pays its Pro Rata Share of the applicable Coverage Advance to Administrative Agent, then the amount so paid shall constitute such Lender's Pro Rata Share of the applicable Coverage Advance. Any payment by Borrower shall be without prejudice to any claim Borrower may have against a Lender that shall have failed to make such payment to Administrative Agent.

(b)     <u>Notices</u>. Notices to each Lender shall be delivered in accordance with the terms and provisions of <u>Section 15.1</u> hereof.

Section 13.12. <u>Lenders Pro Rata Shares</u>. Each Lender shall be entitled to receive, and Administrative Agent shall transfer to each Lender, each Lender's Pro Rata Share of all payments received and collected by Administrative Agent pursuant to the Loan Documents on account of principal and interest (collectively, "<u>Debt Service Payments</u>") and other sums, whether received from Borrower or any third party, excluding, however, any sums payable to Administrative Agent on account of expenses incurred by Administrative Agent for which Borrower is obligated to reimburse Administrative Agent pursuant to the Loan Documents to the extent that any Lender has not made a payment on account thereof pursuant to <u>Section 13.5</u> hereof. For the purposes hereof, "<u>Pro Rata Share</u>" means, with respect to any Lender, the percentage obtained by dividing (a) the principal amount of the Loan attributable to such Lender as set forth on <u>Schedule 13.12</u> annexed hereto and made a part hereof, as adjusted for any repayments of principal received by such Lender pursuant to this Agreement, by (b) the then outstanding aggregate principal amount of the Loan.

Section 13.13. <u>Disbursement of Proceeds by Administrative Agent</u>.

(a)     Administrative Agent shall hold each Lender's Pro Rata Share of any proceeds payable under the Loan, however received, as agent of and in trust for each of such Lenders subject to each of such Lenders' rights with respect thereto as herein set forth.

(b)     All sums received and collected by Administrative Agent pursuant to the Loan Documents on account of Debt Service Payments and other sums which are collected by 11:00 a.m. (New York City time) shall be paid to each Lender on the date of collection; all such sums collected by Administrative Agent after 11:00 a.m. (New York City time) shall be paid to each Lender on or before the next succeeding Business Day. Administrative Agent shall allocate and disburse to each Lender all payments received in proportion to each Lender's Pro Rata Share. All payments made by Administrative Agent to Lenders shall be made by deposit of immediately available funds pursuant to the wiring instructions set forth on the signature page hereof or as otherwise set forth in a written notice delivered from any Lender to Administrative Agent.

(c)     Unless Administrative Agent shall have received notice from Borrower prior to the date on which any payment is due to Administrative Agent for the account of the Lenders hereunder that Borrower will not make such payment, Administrative Agent may assume that Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption and pursuant to the foregoing paragraphs, distribute to the Lenders the amount due. In such event, if Borrower has not in fact made such payment or for any reason such payment is required to be returned to Borrower or paid to any other Person pursuant to any bankruptcy or insolvency law, any sharing clause in the Loan Documents or otherwise, then each of the Lenders severally agrees to repay to Administrative Agent forthwith on demand the amount so distributed to such Lender, without interest thereon, unless Administrative Agent is required to return such amount with interest thereon, in which case, with interest thereon at the Lender Interest Rate for each day from and including the date such amount is distributed to such Lender to but excluding the date of payment to Administrative Agent, unless such payment was made as a result of the gross negligence or willful misconduct of Administrative Agent, in which case Lenders shall not pay any interest on such payment.

(d)     The transfer of funds to any Lender by Administrative Agent is made on a nonrecourse basis. Administrative Agent shall have no duty or obligation whatsoever to make any payments to any Lender except from corresponding payments received by Administrative Agent from Borrower or any other Person pursuant to the Loan Documents.

Section 13.14. <u>Amendments Concerning Agency Function</u>. Notwithstanding anything to the contrary contained in this Agreement, Administrative Agent shall not be bound by any waiver, amendment, supplement or modification of this Agreement or any other Loan Document which affects Administrative Agent's duties, rights, and/or functions hereunder or thereunder unless Administrative Agent shall have given Administrative Agent's prior written consent thereto.

Section 13.15. <u>Events of Default</u>.

(a)     Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Event of Default unless and until Administrative Agent has received written notice from a Lender or Borrower specifying such Event of Default.

(b)     In the event of the occurrence of an Event of Default and if Administrative Agent, in Administrative Agent's sole and absolute discretion, determines that any action is to be taken by Administrative Agent on behalf of Lenders in connection therewith, Administrative Agent shall send a notice (the "<u>Action Notice</u>") to each Lender recommending a course of action (which may include a recommendation to refrain from taking any action) and Lenders shall promptly consult in good faith to either confirm Administrative Agent's suggested course of action (or inaction) or to arrive at a course of action which shall be mutually acceptable to all Lenders in their reasonable discretion. Such course of action shall address, amongst other issues, (i) the exercise of remedies and the manner in which a foreclosure or additional remedies shall be conducted, (ii) the interests of all of the Lenders at a foreclosure sale or auction and whether Lenders or their nominees shall succeed to title to the Project or any other collateral and (iii) issues pertaining to the operation, management, maintenance, leasing and/or the sale of the Project or any other collateral. Administrative Agent shall promptly and diligently implement any such agreed upon course of action (or inaction) on behalf of Lenders. Notwithstanding anything to the contrary contained herein, if Lenders are unable to agree on a course of action (or inaction) within ten (10) Business Days of the date of the Action Notice, Administrative Agent shall have the right (but not the obligation), upon notice to Lenders, to take such course of action (or refrain from taking such action) as Administrative Agent deems appropriate and Administrative Agent may continue to proceed on such course of action, or refrain from taking such action, until Administrative Agent receives notice to the contrary from the Required Lenders ("<u>Agent Discretion Standard</u>"). Provided and on condition that

Administrative Agent has acted in accordance with this <u>Subsection 13.15(b)</u> and the Agent Discretion Standard, Lenders hereby acknowledge and agree that Administrative Agent shall have no obligation to take any action unless failure to do so would be grossly negligent or rise to the level of willful misconduct.

(c)     Provided that Lenders have agreed to a foreclosure or auction in accordance with <u>Subsection 13.15(b)</u> hereof (or Administrative Agent has exercised the Agent Discretion Standard), upon a foreclosure sale or auction and subject to the terms and provisions of this Agreement, Administrative Agent shall have the right to bid at the foreclosure sale or auction on behalf of Lenders. Any bid entered by Administrative Agent in an amount not in excess of the total indebtedness due under the Note plus expenses and all other amounts which are recoverable from the proceeds of the sale (collectively, the "<u>Judgment Amount</u>") shall be deemed to have been entered on behalf and for the benefit of Lenders, and, if such bid is the successful bid, Administrative Agent shall cause a referee's deed (as to the Project) or the applicable title instrument (as to all other collateral) to be issued to Administrative Agent (or Administrative Agent's nominee) in trust for Lenders, and Administrative Agent (or Administrative Agent's nominee) shall hold title subject to the terms and provisions of <u>Subsection 13.15(d)</u> and <u>Subsection 13.15(e)</u> hereof on behalf of, and as trustee for, Lenders.

(d)     Administrative Agent and Lender hereby acknowledge and agree that if title to (i) the Project or (ii) any other collateral is obtained by Administrative Agent (or Administrative Agent's nominee) for the benefit of Administrative Agent and Lenders, such asset(s) shall not be held as a permanent investment, but shall be marketed and sold as soon as possible, taking into account then current economic and market conditions. Subject to <u>Subsection 13.15(b)</u> hereof, each Lender shall, upon demand therefor from time to time, contribute such Lender's Pro Rata Share of all costs, fees and expenses (including, without limitation, attorney's fees and disbursements) suffered or incurred by Administrative Agent (or Administrative Agent's nominee) in connection with the operation, management, maintenance, leasing and/or sale of all or any part of the Project or any other collateral. Funds received from the ownership, operation or sale of the Project or any other collateral (net of operating expenses or transaction costs in connection with such ownership, operation or sale) shall constitute Debt Service Payments and shall be applied first, to reimburse Administrative Agent for any Costs, and thereafter, in accordance with <u>Section 13.13</u> hereof. Lenders shall consult with Administrative Agent and attempt to determine a mutually acceptable course of action relating to, but not limited to, the management, operation and leasing of the Project and any other collateral as well as the sale of the Project and any other collateral; *provided*, *however*, if Lenders cannot agree on a mutually acceptable course of action, Administrative Agent shall have the right (but not the obligation) to apply the Agent Discretion Standard upon notice to Lenders.

(e)     Notwithstanding anything to the contrary contained herein, each Lender shall have the right to enter a bid in an amount in excess of the Judgment Amount and, if such bid is the successful bid, such Lender shall acquire the Project or other collateral, as the case may be, for such Lender's own account and, provided and on the condition that the non-bidding party is, by not later than the date of delivery to the bidding party (or such bidding party's nominee) of the referee's deed or other title instrument, paid in full all amounts owed to the non-bidding party under the Loan and this Agreement, the non-bidding party shall have no further interest in the Project or other collateral, as the case may be, and the terms and provisions of <u>Subsection 13.15(b)</u> hereof shall be null and void and of no further force or effect.

Section 13.16.  <u>Defaulting Lender</u>.

(a)     In addition to the rights and remedies that may be available to Administrative Agent or Borrower under this Agreement or applicable law, if at any time any Lender has not performed such Lender's obligations under this Agreement or any of the other Loan Documents (a "<u>Defaulting</u>

Lender") and such default continues for twenty (20) days after notice, such Defaulting Lender's right to participate in the administration of the Loan, this Agreement and the other Loan Documents, including, without limitation, any right to vote in respect of, to consent to or to direct any action or inaction of Administrative Agent or to be taken into account in the calculation of the Required Lenders, shall be suspended while such Lender remains a Defaulting Lender. If any Lender is a Defaulting Lender because such Lender has failed to make timely payment to Administrative Agent of any amount required to be paid to Administrative Agent hereunder, in addition to other rights and remedies which Administrative Agent or Borrower may have under the immediately preceding provisions or otherwise, Administrative Agent shall be entitled (i) to collect interest from such Defaulting Lender on such delinquent payment for the period from the date on which the payment was due until the date on which the payment is made at the Lender Interest Rate, (ii) to withhold or setoff and to apply in satisfaction of the defaulted payment and any related interest, any amounts otherwise payable to such Defaulting Lender under this Agreement or any other Loan Document until such defaulted payment and related interest has been paid in full and such default no longer exists and (iii) to bring an action or suit against such Defaulting Lender in a court of competent jurisdiction to recover the defaulted amount and any related interest. Any amounts received by Administrative Agent in respect of a Defaulting Lender shall not be paid to such Defaulting Lender and shall be held uninvested by Administrative Agent and either applied against the purchase price of such Defaulting Lender's interest in the Loan under Subsection 13.16(b) hereof or paid to such Defaulting Lender upon the default of such Defaulting Lender being cured.

(b)        Any Lender that is not a Defaulting Lender shall have the right, but not the obligation, in such Lender's sole and absolute discretion, to acquire all of a Defaulting Lender's interest in the Loan (the "Defaulting Lender's Interest") during the continuance of the applicable default. Upon any such purchase, the Defaulting Lender's Interest and the Defaulting Lender's rights hereunder (but not the Defaulting Lender's liability in respect thereof or under the Loan Documents or this Agreement to the extent the same relate to the period prior to the effective date of the purchase) shall terminate on the date of purchase, and the Defaulting Lender shall promptly execute all documents reasonably requested to surrender and transfer such interest to the purchaser thereof, including an assignment substantially in form and substance as set forth in Exhibit B annexed hereto and made a part hereof. The purchase price for the Defaulting Lender's Interest shall be equal to the amount of the principal balance of the Loan outstanding and owed by Borrower to the Defaulting Lender. The purchaser shall pay to the Defaulting Lender in immediately available funds on the date of such purchase the principal of and accrued and unpaid interest and fees with respect to the Defaulting Lender's Interest (it being understood that such accrued and unpaid interest and fees may be paid pro rata to the purchasing Lender and the Defaulting Lender by the Administrative Agent at a subsequent date upon receipt of payment of such amounts from Borrower). Prior to payment of such purchase price to a Defaulting Lender, Administrative Agent shall apply against such purchase price any amounts retained by Administrative Agent pursuant to the last sentence of Subsection 13.16(a) hereof. The Defaulting Lender shall be entitled to receive amounts owed to such Defaulting Lender by Borrower under the Loan Documents which accrued prior to the date of the default by the Defaulting Lender, to the extent the same are received by Administrative Agent from or on behalf of Borrower. There shall be no recourse against any Lender or Administrative Agent for the payment of such sums except to the extent of the receipt of payments from any other party or in respect of the Loan.

(c)        Nothing contained in this Section 13.16 or elsewhere in this Agreement shall release or in any way limit a Defaulting Lender's obligations as a Lender hereunder and/or under any other of the Loan Documents. Further, a Defaulting Lender shall indemnify and hold harmless Borrower, Administrative Agent and each of the non-Defaulting Lenders from any claim, loss, or costs incurred by Borrower, Administrative Agent and/or the non-Defaulting Lenders as a result of a Defaulting Lender's failure to comply with the requirements of this Agreement, including, without limitation, any and all additional losses, damages, costs and expenses (including, without limitation, attorneys' fees and

60

002012

disbursements) incurred by Borrower, Administrative Agent and/or any Lender as a result of and/or in connection with (i) any enforcement action brought by Borrower and/or Administrative Agent against a Defaulting Lender and (ii) any action brought against Borrower, Administrative Agent and/or Lenders by a Defaulting Lender. The indemnification provided above shall survive any termination of this Agreement.

Section 13.17. <u>Servicing Fee</u>. Administrative Agent shall be entitled, on a monthly basis, to a servicing fee in an amount to be determined by Administrative Agent based on a percentage of the outstanding principal balance of the Loan (the "<u>Servicing Fee</u>"). Lenders hereby irrevocably authorize Administrative Agent to deduct the Servicing Fee monthly from the Debt Service Payments to be made to Administrative Agent.

ARTICLE XIV
INDEMNIFICATIONS

Section 14.1. <u>General Indemnification</u>. Borrower shall indemnify, defend and hold harmless the Indemnified Parties, or Borrower shall cause the Indemnified Parties to be indemnified, defended and held harmless, from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any accident, injury to or death of Persons or loss of or damage to property occurring in, on or about the Project or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Project or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Project or any part thereof; (d) any failure of the Project to be in compliance with any applicable Legal Requirements or (e) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the Loan (collectively, the "<u>Indemnified Liabilities</u>"); *provided*, *however*, that Borrower shall not have any obligation to Lenders hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of Administrative Agent or Lenders. To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Lenders. Administrative Agent agrees that, so long as the Existing Leases shall continue to be in full force and effect, Borrower's indemnification, defense and holding harmless obligations to the Indemnified Parties under this <u>Section 14.1</u> may be satisfied by the applicable Tenants under the corresponding obligations of the Existing Leases; *provided*, *however*, the foregoing shall not act to, or be deemed to, release, relinquish or relieve Borrower from Borrower's obligations to indemnify the Indemnified Parties in accordance with the terms of this <u>Section 14.1</u> to the extent that the Tenant(s) fail, refuse, delay or are otherwise unable or unwilling to do so.

Section 14.2. <u>Intangible Tax Indemnification</u>. Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any stamp or similar intangible tax on the making of the Deed of Trust, the Note or any of the other Loan Documents, excluding, for purposes of clarity, any income, franchise or other similar taxes, or U.S. federal withholding taxes imposed under FATCA as a result of the failure by a Lender to comply with the applicable provisions of FATCA.

Section 14.3. <u>ERISA Indemnification</u>. Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation,

61

defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Administrative Agent's sole and absolute discretion) that Administrative Agent or Lenders may incur, directly or indirectly, as a result of a default under <u>Section 4.9</u> or <u>Section 5.17</u> hereof.

Section 14.4. <u>Survival</u>. The obligations and liabilities of Borrower under this <u>Article XIV</u> shall fully survive indefinitely notwithstanding any termination, satisfaction, or assignment of the Deed of Trust.

ARTICLE XV

NOTICES

Section 15.1. <u>Notices</u>. All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested, or (b) expedited prepaid overnight delivery service, either commercial or United States Postal Service, with proof of attempted delivery, addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section):

| | |
|---|---|
| If to Lenders: | See address and telephone number specified for such Lender on <u>Schedule 15.1</u> |
| If to Administrative Agent: | National Bank of Kuwait, S.A.K.P., New York Branch<br>299 Park Avenue<br>New York, New York 10171<br>Attention: Corporate Finance |
| With a copy to: | Baker & McKenzie LLP<br>300 E. Randolph St., Suite 5000<br>Chicago, Illinois 60601<br>Attention: Mona Dajani, Esq. |
| If to Borrower: | Galleria 2425 Owner, LLC<br>3139 W Holcombe Blvd #845<br>Houston, Texas  77025<br>Attention: Azeemeh Zaheer |
| With copies to: | Polsinelli<br>2950 Harwood Street, Suite 2100<br>Dallas, Texas 75201<br>Attention: Brian Bullard, Esq. |

A notice shall be deemed to have been given: (i) in the case of hand delivery, at the time of delivery; (ii) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; or (iii) in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day.

ARTICLE XVI

FURTHER ASSURANCES

Section 16.1. <u>Replacement and Corrective Documents</u>. Upon receipt of an affidavit of an officer of Administrative Agent as to the loss, theft, destruction or mutilation of the Note or any other Loan

62

Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Document, Borrower and Guarantor shall issue, in lieu thereof, a replacement Note or other Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor. Borrower and Guarantor hereby consent and agree that in the event that any of the Loan Documents misstate or inaccurately reflect the true and correct terms and provisions of the Loan and said misstatement or inaccuracy is due to the unilateral mistake on the part of Lenders or Administrative Agent, mutual mistake on the part of any of Administrative Agent, Lenders, Borrower and Guarantor or clerical error, then in such event Borrower and Guarantor shall, within thirty (30) days after written request of Administrative Agent and in order to correct such misstatement or inaccuracy, execute such new documents as Administrative Agent may deem necessary to remedy said inaccuracy or mistake.

Section 16.2. <u>Further Acts, Etc</u>. Subject to <u>Article XII</u> hereof, Borrower and Guarantor shall, at the cost and expense of Borrower and Guarantor, and without expense to Lenders or Administrative Agent, do, execute, acknowledge and deliver all and every further acts, deeds, conveyances, assignments, security agreements, control agreements, notices of assignments, transfers and assurances as Administrative Agent shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lenders the rights hereby granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower or Guarantor may be or may hereafter become bound to convey or assign to Lenders, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing or registering of the Deed of Trust, or for complying with all Legal Requirements. Borrower and Guarantor, on demand, shall deliver, and in the event Borrower or Guarantor shall fail to so deliver, hereby authorizes Administrative Agent to file, in the name of Borrower and Guarantor, one or more financing statements and financing statement amendments to evidence more effectively, perfect and maintain the priority of the security interest of Lenders in the Project. Borrower and Guarantor grant to Lenders and Administrative Agent an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lenders or Administrative Agent at law and in equity, including, without limitation, such rights and remedies available to Lenders or Administrative Agent pursuant to this <u>Section 16.2</u>.

Section 16.3. <u>Changes in Tax, Debt, Credit and Documentary Stamp Law</u>.

(a)  If any law is enacted or adopted or amended after the date of this Agreement which deducts the Debt from the value of the Project for the purpose of taxation with the result that taxes are imposed on the Lenders, Borrower shall pay the tax, with interest and penalties thereon, if any, other than U.S. federal withholding taxes imposed under FATCA as a result of the failure by a Lender to comply with the applicable provisions of FATCA. If Lenders are advised by counsel chosen by Lenders that the payment of such tax by Borrower would be unlawful or taxable to Lenders (unless any such tax is reimbursed by Borrower) or unenforceable or provides the basis for a defense of usury then Lenders shall have the option by written notice of not less than one hundred twenty (120) days to declare the Debt immediately due and payable. Borrower shall not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Project, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Project, or any part thereof, for real estate or personal property tax purposes by reason of the Deed of Trust or the Debt if such claim, credit or deduction has the effect of imposing a tax on Lenders. If such claim, credit or deduction shall be required by law, Lenders shall have the option, by written notice of not less than one hundred twenty (120) days, to declare the Debt immediately due and payable.

(b)  If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, the Deed of Trust, or any

of the other Loan Documents or impose any other tax or charge on the same, Borrower shall pay for the same, with interest and penalties thereon, if any.

Section 16.4. <u>Expenses</u>. Borrower covenants and agrees to pay or reimburse, as applicable, Lenders and Administrative Agent upon receipt of written notice from Administrative Agent for all actual costs and expenses (including reasonable third party attorneys' fees and disbursements) incurred by Administrative Agent and Lenders in accordance with this Agreement in connection with (a) the preparation, negotiation, execution and delivery of this Agreement, the Deed of Trust and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower and Guarantor (including, without limitation, any opinions reasonably requested by Administrative Agent as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Project); (b) Borrower's and Guarantor's ongoing performance of and compliance with Borrower's and Guarantor's agreements and covenants contained in this Agreement, the Deed of Trust and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (c) [Reserved.] (d) subject to <u>Article XII</u> hereof, the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents; (e) securing Borrower's and Guarantor's compliance with any requests reasonably made pursuant to the provisions of this Agreement; (f) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Administrative Agent all required legal opinions, and other similar expenses reasonably incurred in creating and perfecting the Lien in favor of Lenders pursuant to this Agreement, the Deed of Trust and the other Loan Documents; (g) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower or Guarantor, this Agreement, the other Loan Documents, the Project, or any security given for the Loan; and (h) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Project or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings.

ARTICLE XVII
WAIVERS

Section 17.1. <u>Remedies Cumulative; Waivers</u>. The rights, powers and remedies of Administrative Agent and Lenders under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Administrative Agent or Lenders may have against Borrower or Guarantor pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lenders' rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lenders may determine in Lenders' sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower or Guarantor shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

Section 17.2. <u>Modification, Waiver in Writing</u>. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower or Guarantor therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower or

Guarantor shall entitle Borrower or such Guarantor to any other or future notice or demand in the same, similar or other circumstances.

Section 17.3. <u>Delay Not a Waiver</u>. Neither any failure nor any delay on the part of Administrative Agent or Lenders in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Administrative Agent and Lenders shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 17.4. <u>Trial by Jury</u>. BORROWER, ADMINISTRATIVE AGENT AND LENDERS EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, ADMINISTRATIVE AGENT AND LENDERS, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF LENDERS, ADMINISTRATIVE AGENT AND BORROWER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER, ADMINISTRATIVE AGENT AND LENDERS.

Section 17.5. <u>Waiver of Notice</u>. Borrower and Guarantor shall not be entitled to any notices of any nature whatsoever from Administrative Agent or Lenders except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Administrative Agent or Lenders to Borrower and Guarantor and except with respect to matters for which Borrower or Guarantor is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice. Borrower hereby expressly waives the right to receive any notice from Administrative Agent or Lenders with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Administrative Agent or Lenders to Borrower.

Section 17.6. <u>Remedies of Borrower</u>. In the event that a claim or adjudication is made that Administrative Agent or Lenders or Administrative Agent's or Lenders' agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Administrative Agent, Lenders or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that Administrative Agent, Lenders and Administrative Agent's and Lenders' agents shall not be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Administrative Agent or Lenders have acted reasonably shall be determined by an action seeking declaratory judgment. Administrative Agent and Lenders agrees that, in such event, it shall cooperate in expediting any action seeking injunctive relief or declaratory judgment.

Section 17.7. <u>Waiver of Marshalling of Assets</u>. To the fullest extent permitted by law, Borrower for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower and

65

other Persons with interests in Borrower, and of the Project, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lenders under the Loan Documents to a foreclosure of the Deed of Trust for the collection of the Debt without any prior or different resort for collection or of the right of Lenders to the payment of the Debt out of the net proceeds of the Project in preference to every other claimant whatsoever.

Section 17.8. <u>Waiver of Statute of Limitations</u>. Borrower hereby expressly waives and releases, to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its other obligations set forth in the Loan Documents.

Section 17.9. <u>Waiver of Counterclaim</u>. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lenders or Administrative Agent or Lenders' or Administrative Agent's agents.

ARTICLE XVIII
GOVERNING LAW

Section 18.1. <u>Choice of Law</u>.

(i) THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDERS AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT THE DEED OF TRUST, THE ASSIGNMENT OF LEASES AND RENTS AND THE OTHER LOAN DOCUMENTS (OTHER THAN WITH RESPECT TO LIENS AND SECURITY INTERESTS IN PROPERTY WHOSE PERFECTION AND PRIORITY IS COVERED BY ARTICLE 9 OF THE UCC (INCLUDING, WITHOUT LIMITATION, THE ACCOUNTS) WHICH SHALL BE GOVERNED BY THE LAW OF THE JURISDICTION APPLICABLE THERETO IN ACCORDANCE WITH SECTIONS 9-301 THROUGH 9-307 OF THE UCC AS IN EFFECT IN THE STATE OF NEW YORK) SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROJECT IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE

LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW EXCEPT AS SPECIFICALLY SET FORTH ABOVE.

(ii) ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ADMINISTRATIVE AGENT, ANY LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY AT ADMINISTRATIVE AGENT'S OR LENDERS' OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:

> Capitol Services, Inc.
> 1218 Central Avenue, Suite 100
> Albany, NY 12205

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS TOGETHER WITH WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. BORROWER (I) SHALL GIVE PROMPT NOTICE TO ADMINISTRATIVE AGENT OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

(iii) Borrower, Administrative Agent and Lenders hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably submit to the exclusive jurisdiction of any New York State or Federal court sitting in New York County over any suit, action or proceeding arising out of or relating to this Agreement, and each such party hereby agrees and consents that, in addition to any methods of service of process provided for under applicable law, all service of process in any such suit, action or proceeding in any New York State or Federal court sitting in New York County may be made by certified or registered mail, return receipt requested, directed to such party at the address indicated on the first page of this Agreement or in Section 15.1 hereof, as applicable, and service so made shall be complete three (3) days after the same shall have been so mailed.

Section 18.2. Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 18.3. <u>Preferences</u>. Lenders shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower or Guarantor hereunder in connection with any payment deemed to be fraudulent or an impermissible preference payment under applicable Legal Requirements. To the extent Borrower or Guarantor makes a payment or payments to Lenders, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Creditors' Rights Laws, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lenders.

ARTICLE XIX<br>MISCELLANEOUS

Section 19.1. <u>Survival</u>. This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the entering into by Lenders of this Agreement and the execution and delivery to Lenders of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower shall inure to the benefit of the successors and assigns of Lenders.

Section 19.2. <u>Administrative Agent's Discretion</u>. Whenever pursuant to this Agreement, Administrative Agent exercises any right given to Administrative Agent to approve or disapprove, or any arrangement or term is to be satisfactory to Administrative Agent, the decision of Administrative Agent to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the reasonable discretion of Administrative Agent.

Section 19.3. <u>Headings</u>. The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 19.4. <u>Cost of Enforcement</u>. In the event (a) that the Deed of Trust is foreclosed in whole or in part, (b) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or Guarantor or any of Borrower Members, Borrower's constituent Persons or Subsidiaries or an assignment by Borrower or Guarantor or any of Borrower Members, Borrower's constituent Persons or Subsidiaries for the benefit of its creditors, or (c) Lenders exercise any of its other remedies under this Agreement or any of the other Loan Documents, Borrower shall be chargeable with and agrees to pay all costs of collection and defense, including attorneys' fees and costs, incurred by Lenders, Administrative Agent or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

Section 19.5. <u>Schedule Incorporated</u>. The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 19.6. <u>Offsets, Counterclaims and Defenses</u>. Any assignee of Lenders' interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower or Guarantor may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower or such Guarantor in any action or proceeding brought by any

68

such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

Section 19.7. <u>No Joint Venture or Partnership; No Third Party Beneficiaries</u>.

(a)     Borrower, Administrative Agent and Lenders intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower, Guarantor, Administrative Agent and Lenders nor to grant Administrative Agent or Lenders any interest in the Project other than that of secured party, Lenders or lender. Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably waives and relinquishes all claims, demands, counterclaims and/or defenses alleging the existence of any partnership, joint venture or other fiduciary relationship between Administrative Agent or Lenders and Borrower and Borrower shall hold Lenders, Administrative Agent, Lenders' and Administrative Agent's successors and assigns, harmless from and against any and all losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments and any other fees, costs and expenses that Administrative Agent or Lenders may sustain as a result of any such allegation by any Person whatsoever.

(b)     This Agreement and the other Loan Documents are solely for the benefit of Lenders, Administrative Agent and Borrower and Guarantor and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lenders, Administrative Agent and Borrower and Guarantor any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lenders to enter into this Agreement and make the financial accommodations provided for hereunder are imposed solely and exclusively for the benefit of Lenders and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lenders will refuse to enter into this Agreement or make the financial accommodations provided for hereunder in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Administrative Agent or Lenders if, in Administrative Agent's or Lenders' sole discretion, Administrative Agent or Lenders deem it advisable or desirable to do so.

(c)     The shareholders, general partners, members, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Project, and Lenders are relying solely upon such expertise and business plan in connection with the ownership and operation of the Project.

(d)     Notwithstanding anything to the contrary contained herein, Lenders are not undertaking the performance of any obligations with respect to any agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents of Borrower.

(e)     By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lenders or Administrative Agent pursuant to this Agreement, the Deed of Trust, the Note or the other Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lenders and Administrative Agent shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lenders or Administrative Agent.

(f)     Borrower and Guarantor recognize and acknowledge that in accepting this Agreement, the Note, the Deed of Trust and the other Loan Documents, Lenders are expressly and primarily relying on the truth and accuracy of the representations and warranties set forth in <u>Article IV</u> of

this Agreement without any obligation to investigate the Project and notwithstanding any investigation of the Project by Administrative Agent; that such reliance existed on the part of Lenders prior to the date hereof, that the warranties and representations are a material inducement to Lenders in entering into this Agreement and making the financial accommodations provided for hereunder; and that Lenders would not be willing to enter into this Agreement and make the financial accommodations provided for hereunder and accept this Agreement, the Note, the Deed of Trust and the other Loan Documents in the absence of the warranties and representations as set forth in <u>Article IV</u> of this Agreement.

Section 19.8. <u>Publicity</u>. All news releases, publicity or advertising by Borrower, Guarantor or Borrower's Affiliates through any media intended to reach the general public which refers to the Loan, Lenders, or any of Lenders' Affiliates shall be subject to the prior written approval of Administrative Agent, not to be unreasonably withheld. Administrative Agent and Lenders shall be permitted to make any news, releases, publicity or advertising by Lenders or Lenders' Affiliates through any media intended to reach the general public which refers to the Loan, the Project, Borrower, Guarantor and Borrower's Affiliates without the approval of Borrower or any such Persons in a "tombstone", advertisement or other written description or loan summary in an industry periodical, journal or newspaper or at industry events or conferences, provided that such references are limited to the following matters: (i) the principal amount of the Loan, (ii) the term of the Loan, (iii) the location of the Project, (iv) whether the interest rate of the Loan is fixed or variable and (v) the identity of Borrower. All other news-releases, publicity or advertising by Lenders shall be subject to Borrower's prior written approval, which approval shall not be unreasonably withheld or delayed. Borrower also agrees that Lenders and Administrative Agent may share any information pertaining to the Loan with third-parties in connection with the sale or transfer of the Loan or any Participations thereof.

Section 19.9. <u>Conflict; Construction of Documents; Reliance</u>. In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Administrative Agent or Lenders or any parent, subsidiary or Affiliate of Administrative Agent or Lenders. Lenders shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lenders of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lenders' or Administrative Agent's exercise of any such rights or remedies. Borrower acknowledges that Lenders engage in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

Section 19.10. <u>Actions, Approvals and Determinations</u>. Wherever in this Agreement it is provided that (a) as a condition precedent to Borrower's undertaking certain action, Borrower shall be required to obtain Administrative Agent's consent or approval or (b) Administrative Agent shall have the right to make a determination (including, without limitation, a determination as to whether a matter is satisfactory to Administrative Agent), or if Borrower shall request that Administrative Agent or Lenders take any action, then, unless expressly provided to the contrary in the applicable provision of this Agreement, the decision whether to grant such consent or approval or to take the requested action, or the determination in question, shall be in the sole and exclusive discretion of Administrative Agent and Lenders and shall be

final and conclusive. Wherever in this Agreement it is stated that any consent or approval shall not be unreasonably withheld or that a determination to be made by Administrative Agent or Lenders shall be subject to a specified standard, then, if a court of competent jurisdiction determines, without right to further appeal, that the consent or approval shall be deemed granted or the standard shall be deemed met, as the case may be, then Administrative Agent or Lenders, at the request of Borrower, shall deliver to Borrower written confirmation thereof. The obtaining of such consent or approval or determination that such standard has been met shall be Borrower's sole and exclusive remedy with respect to the subject matter of this section, and under no circumstance shall Administrative Agent or Lenders, or Administrative Agent's or Lenders' counsel or anyone else acting or purporting to act on Administrative Agent's or Lenders' behalf have any liability (whether in damages or otherwise) with respect thereto. In any instance in which Borrower requests, or any Loan Document provides, that Administrative Agent or Lenders shall consider granting Administrative Agent's or Lenders' consent or approval or making a determination or taking some other action, Borrower shall, upon demand, pay all actual out-of-pocket costs, expenses and reasonable attorneys' fees and disbursements incurred by Administrative Agent and Lenders in connection therewith.

Section 19.11. <u>Entire Agreement</u>. This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written between Borrower, Administrative Agent and Lenders are superseded by the terms of this Agreement and the other Loan Documents.

Section 19.12. <u>Certain Additional Rights of Lenders</u>. Notwithstanding anything which may be contained in this Agreement to the contrary, Lenders shall have:

(a) the right to designate any party to receive payment of all fees, costs and expenses otherwise payable to Lenders under this Agreement or the other Loan Documents;

(b) the right to routinely consult with and advise Borrower's, management regarding the significant business activities and business and financial developments of Borrower. Consultation meetings should occur on a regular basis with Administrative Agent or Lenders having the right to call special meetings at any reasonable times;

(c) the right, without restricting any other right of Administrative Agent or Lenders under this Agreement (including any similar right), to restrict, upon the occurrence and continuance of an Event of Default, Borrower's payments of management consulting director or similar fees to affiliates of Borrower (or their personnel); and

(d) the right, without restricting any other rights of Administrative Agent or Lenders under this Agreement (including any similar right), to restrict the transfer to voting interests in Borrower held by its shareholders, members or partners (as the case may be), and the right to restrict the transfer of interests in such shareholder, member or partner (as the case may be), except for any transfer that is expressly permitted hereunder.

Section 19.13. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed to be an original, and all such counterparts together constitute but one and the same agreement. In addition, the parties may execute separate signature pages, and such signature pages (and/or signature pages which have been detached from one or more duplicate original copies of this Agreement) may be combined and attached to one or more copies of this Agreement so that such copies shall contain the signatures of all of the parties hereto.

[balance of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

**GALLERIA 2425 OWNER, LLC,**
a Delaware limited liability company

By:    Galleria 2425 JV, LLC,
       a Delaware limited liability company,
       its sole member

       By:    Naissance Capital Real Estate, LLC,
           a Delaware limited liability company,
           its Managing Member

       By: _____
       Name: Azeemeh Zaheer
       Title:  Managing Member

[SIGNATURES CONTINUE ON NEXT PAGE]

ADMINISTRATIVE AGENT AND LENDER:

**NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH**, a banking corporation organized under the laws of Kuwait, acting through its New York branch

By: _____

Name: _____

Title: _____

> Arlette Kittaneh
> Executive Manager

By: _____

Name: _____ Michael G. McHugh

Title: _____ Executive Manager

[Signature Page to Loan Agreement]

EXHIBIT A

BORROWER'S ORGANIZATIONAL STRUCTURE

[see attached]



# The Galleria – Houston, Texas (Master Chart)



002027

EXHIBIT B

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of the ____ day of _____, 20__, made by and between [NAME OF ASSIGNING BANK] ("Assignor") and [NAME OF ASSIGNEE] ("Assignee").

Preliminary Statement

1.      This Agreement relates to that certain Loan Agreement (as the same may be amended from time to time, the "Loan Agreement") dated as of May 23, 2018 made by and among (1) Galleria 2425 Owner, LLC, a Delaware limited liability company ("Borrower"), (2) the lender(s) party thereto (each, a "Lender" and collectively, "Lenders"), and (3) National Bank of Kuwait, S.A.K.P., New York Branch ("Administrative Agent"). All capitalized terms not otherwise defined herein shall have the respective meanings set forth in the Loan Agreement.

2.      Subject to the terms and conditions set forth in the Loan Agreement, Assignor has a pro-rata share of the Loan equal to _____ percent (_____%) in an aggregate principal amount of $_____ ("Assignor's Loan Commitment").

3.      The aggregate outstanding principal amount under Assignor's Loan Commitment at the commencement of business on the date hereof is $_____,

4.      Assignor desires to assign to Assignee all of the rights of Assignor under the Loan Agreement and the other Loan Documents (as defined in the Loan Agreement) in respect of a portion of Assignor's Loan Commitment, such portion being in an amount equal to $_____, which relates to a Pro-Rata Share of the Loan of _____ percent (_____%) (the "Assigned Loan Commitment"); and Assignee desires to accept assignment of such rights and assume the corresponding obligations from Assignor on such terms.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, the parties hereto agree as follows:

SECTION 1.  Assignment. Assignor hereby assigns and sells to Assignee all of the rights of Assignor under the Loan Agreement and the other Loan Documents in and to the Assigned Loan Commitment, and Assignee hereby accepts such assignment from Assignor and assumes all of the obligations of Assignor under the Loan Agreement and the other Loan Documents with respect to the Assigned Loan Commitment. Upon the execution and delivery hereof by Assignor, Assignee, Administrative Agent and the payment of the amount specified in Section 2 hereof required to be paid on the date hereof, (1) Assignee shall, as of the commencement of business on the date hereof, succeed to the rights and obligations of a Lender under the Loan Agreement and the other Loan Documents with a Pro-Rata Share of the Loan equal to the percentage applicable to the Assigned Loan Commitment and (2) the Pro-Rata Share of Assignor shall, as of the commencement of business on the date hereof, be reduced correspondingly and Assignor released from its obligations under the Loan Agreement and the other Loan Documents to the extent such obligations have been assumed by Assignee. Assignor represents and warrants that it (x) owns the Assigned Loan Commitment free and clear of all liens and other encumbrances and (y) is legally authorized to enter into and perform this Agreement. Except as provided in the immediately preceding sentence, the assignment provided for herein shall be without representation or warranty by, or recourse to, Assignor.

SECTION 2. <u>Payments</u>. As consideration for the assignment and sale contemplated in Section 1 hereof, Assignee shall pay to Assignor on the date hereof, in immediately available funds, an amount equal to $_____. Each of Assignor and Assignee hereby agrees that if it receives any amount under the Loan Agreement or any of the other Loan Documents which is for the account of the other party hereto, it shall receive the same for the account of such other party to the extent of such other party's interest therein and shall promptly pay the same to such other party.

SECTION 3. <u>Consents; Notices</u>. If required pursuant to <u>Article XII</u> or <u>Article XIII</u> of the Loan Agreement, this Agreement is conditioned upon the consent of Administrative Agent. The execution of this Agreement by Administrative Agent is evidence of this consent. Assignee has designated its address for notices below.

SECTION 4. <u>Non-Reliance on Assignor</u>. Assignor makes no representation or warranty in connection with, and shall have no responsibility with respect to, the solvency, financial condition, or statements of Borrower or any other party to any Loan Document, or the validity and enforceability of the obligations of Borrower or any other party to a Loan Document in respect of the Loan Agreement or any other Loan Document. Assignee acknowledges that it has, independently and without reliance on Assignor, and based on such documents and information as it has deemed appropriate, made its own analysis of the collateral for the Loan, credit analysis of Borrower and decision to enter into this Agreement and will continue to be responsible for making its own independent appraisal of the collateral for the Loan and of the business, affairs and financial condition of Borrower and the other parties to the Loan Documents.

SECTION 5. <u>Governing Law</u>. This Agreement shall be governed by, and construed and enforced in accordance with the Laws of the State of New York without reference to principles of conflicts of law.

SECTION 6. <u>Counterparts</u>. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

SECTION 7. <u>Certain Representations and Agreements by Assignee</u>. Assignee represents that it is legally authorized to enter into and perform this Agreement. In addition, Assignee hereby represents that it is entitled to receive any payments to be made to it under the Loan Agreement or hereunder without the withholding of any tax and agrees to furnish the evidence of such exemption as specified therein and otherwise to comply with the provisions of the Loan Agreement and the other Loan Documents.

SECTION 8. <u>Reliance By Borrower</u>. This Agreement shall be binding upon, enforceable by and inure to the benefit of Borrower, its successors and assigns.

[balance of page intentionally left blank]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first above written.

ASSIGNOR:


By: _____
    Name:
    Title:


ASSIGNEE:


By: _____
    Name:
    Title:

Assignee's Address for Notices:


[Assignee]
[Address]
Attention: _____
Telephone: (___) _____


ADMINISTRATIVE AGENT:

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch


By: _____
    Name:
    Title:

SCHEDULE 13.12

Amount of Loan Attributable to Lender

| Lender | Amount of Loan Attributable to Lender |
|--------|---------------------------------------|
| NBK | $51,675,000.00 |

## 2425 W Loop S

*Year 2023*
180 Day Projection

### Profit and Loss Report

| Revenue | | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec-23 |
|---|---|---|---|---|---|---|
| Rent Income | | $128,329.02 | $128,329.02 | $229,579.02 | $229,579.02 | $229,579.02 |
| **Net Income** | | **$128,329.02** | **$128,329.02** | **$229,579.02** | **$229,579.02** | **$229,579.02** |
| **Operating Expenses** | | | | | | |
| **Service Contract** | | $690.73 | $690.73 | $690.73 | $690.73 | $690.73 |
| Smart Office Automation | $650.00 | | | | | |
| Culligan of Houston | $40.00 | | | | | |
| **Fire Safety** | | $2,182.59 | $2,182.59 | $2,182.59 | $2,182.59 | $2,182.59 |
| ADT | $79.04 | | | | | |
| Logix Fiber Network | $405.00 | | | | | |
| Kings 111 Emergey Communications | $316.00 | | | | | |
| Datawatch | $1,382.55 | | | | | |
| **Repairs & Maintenance** | | $12,207.99 | $12,207.99 | $12,207.99 | $12,207.99 | $12,207.99 |
| TK Elevator Maintenance | $3,542.25 | | | | | |
| TK Elevator Repairs | $72,446.82 | $11,000.00 | $7,000.00 | $21,000.00 | $16,723.41 | $16,723.41 |
| Ferguson Facilities | $1,000.00 | | | | | |
| Maintenance Crew | $5,665.74 | | | | | |
| Supplies (Various Stores) | $2,000.00 | | | | | |
| T&R Mechanical* | $26,542.56 | $7,680.00 | $9,791.21 | | | |
| L&C Electrical- Life Safety* | $35,000.00 | | $5,000.00 | $10,000.00 | $10,000.00 | $10,000.00 |
| **Security** | | $8,214.34 | $8,214.34 | $8,214.34 | $8,214.34 | $8,214.34 |
| Nationwide Security | $7,770.19 | | | | | |
| Door Locks (5th Floor) | $1,200.00 | $1,200.00 | | | | |
| **Cleaning & Maintenance** | | $6,910.88 | $6,910.88 | $6,910.88 | $6,910.88 | $6,910.88 |
| Zindler Janitorial | $2,110.88 | | | | | |
| Janitorial Labor (2) | $4,800.00 | | | | | |
| **Utilities** | | $35,000.00 | $35,000.00 | $35,000.00 | $35,000.00 | $35,000.00 |
| Cirro electric | $27,500.00 | | | | | |
| City of Houston water | $7,500.00 | | | | | |
| **Insurance** | | $17,627.61 | $17,627.61 | $17,627.61 | $17,627.61 | $17,627.61 |
| CNA Insurance (Prop Ins) | $16,250.77 | | | | | |
| First Insurance | $1,376.84 | | | | | |
| **Telephone & Internet** | | $1,629.00 | $1,629.00 | $1,629.00 | $1,629.00 | $1,629.00 |
| Comcast | $329.00 | | | | | |
| Phone | $1,300.00 | | | | | |
| **Other Expense** | | $1,875.00 | $1,875.00 | $1,875.00 | $1,875.00 | $1,875.00 |
| Mueller Water Treatment | $475.00 | | | | | |
| Waste Management | $400.00 | | | | | |
| Other | $1,000.00 | | | | | |
| **Licenses & Permits** | | $620.33 | | | | |
| City of Houston Permit | $620.33 | | | | | |
| **Tenant Improvement** | $107,946.13 | | | $35,982.04 | $35,982.04 | $35,982.04 |
| **Administration*** | | $19,395.87 | $19,395.87 | $19,395.87 | $19,395.87 | $19,395.87 |
| **Total Operating Expenses** | | **$126,234.34** | **$127,525.22** | **$172,716.05** | **$168,439.46** | **$168,439.46** |
| **Operating Profit (Loss)** | | **$2,094.68** | **$803.80** | **$56,862.97** | **$61,139.56** | **$61,139.56** |

*Notes

T&R Mechanical-HVAC Repair

L&C Electrical-Emerg Light repairs

Administration
   Property Manager
   Asst Property Manager
   Accounting A/R A/P
   Accounting Data Entry
   Admin Asst

# Exhibit 1

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
July 13, 2023
Nathan Ochsner, Clerk

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

|  |  |
|---|---|
| **In re:** | |
| **GALLERIA 2425 OWNER LLC,** | **Case No. 23-60036** |
| | **Chapter 11** |
| **Debtor.** | |

## INTERIM ORDER AUTHORIZING
## DEBTOR TO USE CASH COLLATERAL

**CAME ON** for consideration on this date *Debtor's Emergency Motion for Interim and Final Orders Authorizing the Debtor to Use Cash Collateral* (the "**Motion**") filed by Galleria 2425 Owner LLC (the "**Debtor**"), the debtor-in-possession in the above-captioned bankruptcy case.

Upon consideration of the Motion, the Court finds that all required parties have been served with notice thereof and that the Motion is well-taken and that the relief sought therein should be, and hereby is, **GRANTED**. Accordingly, it is hereby found that:

1. **Petition Date**. On July 5, 2023 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**"). The Debtor continues to operate and manage its business as "debtor in possession" pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2. **Jurisdiction and Venue**. This Court has jurisdiction over this case and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

3. **Single Asset Real Estate**. The Debtor's primary asset is a Class A office building located at 2425 West Loop South, Houston, Texas 77027(the "**Property**"). The Property is fully covered by commercial property and liability insurance.

4. **Committee Formation**. No examiner or statutory committee has been appointed in the Bankruptcy Cases pursuant to §§ 1102 or 1104 of the Bankruptcy Code.

5. **The Prepetition Loan Documents**. National Bank of Kuwait, S.A.K.P., New York Branch ("**NBK**") asserts that the Debtor was indebted to NBK under a prepetition loan (the "**Prepetition Loan**") and that the Debtor's obligations under the Prepetition Loan (the "**Prepetition Obligation**") are evidenced by, among others, the following loan documents (collectively, the "**Prepetition Loan Documents**"):

**Exhibit 2**

      i.   that certain Loan Agreement by and among NBK and the Debtor, dated May 23, 2018;

      ii.   that certain Promissory Note executed by the Debtor in favor of NBK, dated May 23, 2018;

      iii.   that certain Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing, dated May 23, 2018, recorded RP-2018-235600 in the Real Property Records of Harris County, Texas covering the Property; and

6. **Prepetition Liens**. NBK asserts that the Prepetition Loan Documents are secured by various instruments, assignments, and certificates, including deeds of trust, which: (a) were filed of record in appropriate jurisdictions; and (b) granted NBK first-priority, properly perfected, senior liens and security interests (the "**Prepetition Liens**") upon and in all of the Debtor's personal and real property, fixtures, improvements, and rents and proceeds derived therefrom, including, but not limited to, Cash Collateral (as hereinafter defined) related to the Property, including, but not limited to, all Leases (as defined by the Assignment), all leases, subleases or subsubleases, lettings, licenses, concessions or other agreements made a part hereof (whether written or oral and whether now or hereafter in effect), pursuant to which any Person (as defined by the Assignment) is granted a possessory interest in, or a right to use or occupy, all or any portion of any space in that certain lot or piece of land related to the Property, all Rents (as defined by the Assignment), all rents, rent equivalents, income, receivables, revenues, receipts, insurance proceeds, deposits and profits arising from the Leases and renewals thereof together with all rents, rent equivalents, income, fees, receivables, accounts, profits (including, but not limited to, all oil and gas or other mineral royalties and bonuses), charges for services rendered and any and all payments and consideration of whatever form or nature received by the Debtor or its agents or employees from any and all sources relating to the use, enjoyment and occupancy of the Property and all proceeds related thereto, as further described by the Prepetition Loan Agreements (the "**Prepetition Collateral**"). NBK asserts that it has a valid, properly perfected, first priority lien on the Debtor's rental proceeds derived from the leasing and operation of the Property, and other rights to such payment (collectively, the "**Rental Proceeds**"), which constitute cash collateral pursuant to section 363(a) of the Bankruptcy Code (the "**Cash Collateral**"). NBK asserts that, by virtue of the Prepetition Liens and by operation of section 552(b) of the Bankruptcy Code, NBK holds a first priority security interest in post-petition revenues from the Prepetition Collateral collected by the Debtor, whether now in the Debtor's (or persons in privity with the Debtor or appointed chapter 7 or 11 trustee) possession, custody, or control, or in which the Debtor's estate will obtain an interest during the pendency of this bankruptcy case.

7. **Irreparable Harm**. The Debtor requires the use of cash collateral to continue the operation of its business and will suffer irreparable and immediate harm if it is not granted the relief requested herein. An immediate and critical need exists for the Debtor to obtain funds in order to continue operating the Property, and without such funds, the Debtor will not be able to pay its direct operating expenses, maintain the Property, or obtain goods and services needed to carry on its business during this sensitive period in a manner that will

avoid irreparable harm to the Debtor's estate. The Debtor's ability to use Cash Collateral is vital to the confidence of the Debtor's tenants, vendors, and suppliers of goods and services to the Property and to the preservation and maintenance of the going concern value of the Debtor's estate.

8. The value of the Cash Collateral may diminish as the Debtor operates and uses and expends Cash Collateral, and creditors with a secured interest in Cash Collateral are entitled to adequate protection of their respective interests in the Debtor's use of Cash Collateral.

9. **Cause Shown**. Good cause has been shown for the entry of this Order. The Debtor believes that it is in the best interests of the Debtor's estate and its creditors to utilize the Cash Collateral subject to the terms and conditions set forth herein. The Debtor believes use of the Cash Collateral subject to the terms and conditions set forth herein is a proper exercise of its business judgment. NBK does not consent to the use of any Cash Collateral, except on the terms and conditions as specified herein. The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are expected to provide adequate protection for NBK's interests in the Prepetition Collateral under this Order.

10. **Notice**. The Court finds that the notice to the U.S. Trustee and the Debtor's creditors was sufficient under the circumstances. Entry of this Order is justified and appropriate under the circumstances and is in the best interest of the estate. Use of Cash Collateral as provided herein is being authorized to avoid immediate and irreparable harm.

**IT IS THEREFORE ORDERED AND ADJUDGED** as follows:

11. The Motion is **GRANTED** as set forth herein.

12. **Use of Cash Collateral**. The Debtor is hereby authorized in the interim to use Cash Collateral only in the amounts and for the expenses and disbursements set forth in the Budget attached as **Exhibit A**, and Cash Collateral shall not be used for any other purpose or in any other amount, subject to the Budget Variance as defined below. The Debtor shall not incur expenses nor use Cash Collateral in an amount that exceeds by more than five percent (5%) the total expenses provided in the Budget ("**Budget Variance**") without first obtaining NBK's consent in writing or approval of this Court. Any legal and professional fees set forth in the Budget remain subject to interim and final allowance by this Court and remain subject to all applicable provisions of the Bankruptcy Code and the Bankruptcy Local Rules, including, sections 327 and 330 of the Bankruptcy Code.

13. **Adequate Protection**. Subject to the Carve-Out (defined below), as partial adequate protection and in the same priority and to the same extent and validity as existed prepetition, NBK is hereby granted: (a) automatic perfected replacement liens (the "**Replacement Liens**") on all Rental Proceeds, accounts, and receivables related to the use or occupancy of the Property that are now owned or hereafter acquired by the Debtor (the "**Collateral**"); and (b) superpriority administrative claims (the "**Superiority Claims**") pursuant to sections 361(2), 361(3), 503(b)(1), 507(a)(2), and 507(b) of the Bankruptcy Code. The Replacement Liens granted herein shall not attach to any Chapter 5 causes of

action under the Bankruptcy Code. The Replacement Liens and the Superpriority Claims are granted solely to the extent that the Debtor's use of Cash Collateral results in a diminution in value of the Prepetition Collateral securing the Prepetition Obligation and shall constitute legal, valid, binding, fully perfected, and non-avoidable obligations of the Debtor's estate, enforceable against the Debtor's estate and its respective successors and assigns, including, without limitation, any successor trustee(s) or other estate representative(s) in the bankruptcy case or any subsequent or superseding proceedings under chapter 7 or chapter 11 of the Bankruptcy Code (a "**Subsequent Proceeding**"), in accordance with the terms of this Order. No obligation, payment, transfer, or grant of a security interest under this Order shall violate the automatic stay under section 362 of the Bankruptcy Code or be avoidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity.

14. **Carve Out**. The "Carve-Out" shall mean, in this Order and subject to the entry of a final order approving the Motion: (a) all fees and expenses incurred by the Debtor's professionals that are approved by the Court pursuant to section 330 of the Bankruptcy Code (the "**Professionals**"); (b) statutory liens of ad valorem taxing authorities; and (c) quarterly fees owed to the Office of the United States Trustee. The Carve-Out may only be used for the payment of fees and expenses as provided herein and of estate professionals to the extent approved by order of this Court. Nothing herein shall be construed to impair the ability of NBK or any party-in-interest to object or contest any objection to any fees, expenses, reimbursement, or compensation sought by the estate professionals, nor shall anything herein be construed to affect the rights of any party-in-interest to file an application for the allowance of fees and expenses.

15. **Insurance**. As additional partial adequate protection, the Debtor shall maintain adequate insurance coverage on the Prepetition Collateral and the Collateral, as required under the Prepetition Loan Documents, or any loan document, note, agreement, letter agreement, security agreement, guarantee, or other documents executed by the Debtor in favor of NBK, (collectively, the "**Insurance**"). The Debtor shall maintain or name NBK as mortgagee, lender loss payee, and/or additional insured under the insurance policies.

16. **Termination of Use of Cash Collateral**. The Debtor is authorized to use Cash Collateral in accordance with this Order until the earlier of the following (the "**Termination Date**"): (i) five (5) business days after notice by a creditor with an interest in Cash Collateral to the Debtor of any Termination Event (as defined herein), unless within such five day period the Debtor has cured such Termination Event or unless waived by such creditor, (ii) the date of the dismissal of Debtor's bankruptcy case or the conversion of Debtor's bankruptcy case to a case under chapter 7 of the Bankruptcy Code, or (iii) the date of appointment of a trustee in Debtor's chapter 11 bankruptcy case.

17. **Termination Events**. The Debtor shall immediately cease using Cash Collateral after the Cure Period upon the occurrence of any of the following events (each a "**Termination Event**"):

    i.   The Debtor violates any terms of this Order;

    ii.   The failure by Debtor to pay when due operating expenses incurred after the Petition Date;

    iii.   The failure by the Debtor to maintain the Insurance;

    iv.   The occurrence of the effective date or consummation date of a plan of reorganization for Debtor;

    v.   The entry by this Court or any other court of an order reversing, staying, or vacating this Order or amending, supplementing, or otherwise modifying in any material manner the protections granted to Debtor in this Order; or

    vi.   The entry by this Court of an order granting relief from the automatic stay imposed by section 362 of the Code to any entity other than Debtor that permits such entity to exercise foreclosure or disposition rights with respect to the Prepetition Collateral.

18. Upon the occurrence of any Termination Event of this Order (each a "**Notice Termination Event**"), NBK shall provide to the Debtor written notice of such Notice Termination Event, which shall be accomplished by email. If the Debtor has failed to fully and completely cure any such Notice Termination Event to NBK's satisfaction within five (5) business days after delivery of notice of the Notice Termination Event by NBK's counsel (the "**Cure Period**"), then without any further act, notice or action by NBK or any further notice, hearing, act or order of this Court, the Debtor's authority to use Cash Collateral and any and all obligations of NBK under this Order shall terminate. Upon such termination, the Debtor shall immediately cease making any use or disbursement of the Cash Collateral until further order from this Court or permission from NBK.

19. **No Payments on Prepetition Debts**. The Debtor is prohibited from paying any indebtedness or transferring property to vendors, contractors, customers, or other persons whose debt may have been incurred prior to the Petition Date, except upon separate order of the Court.

20. **Reporting Requirements**. No later than fourteen (14) days after entry of this Order, the Debtor shall email counsel to NBK the following items:

    i.   Copies of bank account statements (including copies of all bank statements since the Petition Date), including copies of all checks, wires, and deposit documents for the six month period preceding the Petition Date;

    ii.   Copies of the Debtor's monthly rent rolls and rent aging reports for the six months prior to the Petition Date;

21. **Access to Information**. No later than fourteen (14) days after entry of this Order, the Debtor shall provide counsel to NBK with:

    i. Copies of all current leases with tenants of the Property; and

    ii. Copies of the Debtor's financial statements regarding revenue and expenses during the preceding one-hundred eighty (180) days of the Petition Date.

22. **Modification of Automatic Stay**. Upon the expiration of a Cure Period following the occurrence of a Termination Event, NBK may file a motion seeking to modify the automatic stay under section 362 of the Bankruptcy Code to permit NBK to exercise any and all remedies under the Prepetition Loan Documents including, without limitation, to proceed with the foreclosure of the Property. Parties-in-interest must receive at least five days' notice of the hearing on any such motion filed by NBK seeking relief from the automatic stay.

23. **Protection of Existing Collateral**. Collateral, including Cash Collateral, shall not be used or sold other than in the ordinary course unless the Debtor obtains the approval of this Court.

24. **Notice**. Within five (5) business days after entry of this Order, the Debtor's counsel shall serve a copy of this Order on: (a) the Office of the United States Trustee; (b) counsel to NBK, Charles C. Conrad (charles.conrad@pillsburylaw.com) and Andrew M. Troop (andrew.troop@pillsburylaw.com); (c) all creditors known to the Debtor who have or may assert liens against the Debtor's assets; and (d) all parties-in interest who have filed a notice of appearance.

25. **Reservation of Rights**. NBK shall not be limited or prohibited by this Order or otherwise in seeking additional adequate protection for the use of Cash Collateral as provided herein or any other appropriate relief. Further, except as expressly stated herein, nothing in this Order is intended to or shall modify any terms or rights of the Prepetition Loan Documents. Furthermore, NBK shall have the right, but not the obligation, to credit bid in any sale of the Debtor's assets, up to the full amount of NBK's secured claim. Additionally, nothing in this Order shall prevent NBK from filing a subsequent pleading in this bankruptcy case requesting: (a) to discontinue use of Cash Collateral for any reason not discussed or contemplated in this Order; and/or, (b) relief from the automatic stay.

26. The protections afforded to NBK under this Order, and any actions taken pursuant thereto, shall survive the entry of an order converting this bankruptcy case to chapter 7 of the Bankruptcy Code, and the Replacement Liens and the Superpriority Claims (pursuant to sections 503(b), 507(a)(2), and/or 507(b) of the Bankruptcy Code, or otherwise), to the extent applicable, if any, shall continue in this proceeding and in any such Subsequent Proceeding, and the Replacement Liens and Superpriority Claims shall maintain their priority as provided by this Order until the Prepetition Obligation have been indefeasibly satisfied in full.

27. The consent of NBK to this Order does not constitute a waiver of any pre-petition default(s) or Event(s) of Default under the Prepetition Loan Documents.

28. **Final Hearing.** A final hearing on the Motion shall be held on **August 1, 2023 at 11:00 a.m.** The Debtor shall provide notice of such final hearing on the parties listed in the Notice paragraph above. Such notice shall be deemed sufficient pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure. No further notice of the Motion is necessary.

29. **Findings and Conclusions**. To the extent any findings of fact may constitute conclusions of law, and vice versa, they are hereby deemed as such.

30. **Immediate Effect**. This Order shall take effect immediately on execution hereof, notwithstanding any application of Federal Rules of Bankruptcy Procedure 4001(a)(3), 6004(h), 7062, or 9014.

31. **Retention of Jurisdiction**. The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Interim Order.

32. **Necessary Action**. The automatic stay under section 362 of the Bankruptcy Code is hereby modified, as necessary, to permit NBK to take any and all necessary and appropriate actions to implement the terms of this Interim Order.

Signed:  July 13, 2023

Christopher Lopez
United States Bankruptcy Judge

## 2425 W Loop S

*Year 2023*
30 Day Projection

### Profit and Loss Report

| Revenue | | Jul-23 |
|---|---|---|
| Rent Income | | $123,086.45 |
| **Net Income** | | **$123,086.45** |
| **Operating Expenses** | | |
| **Service Contract** | | $690.73 |
| Smart Office Automation | $650.00 | |
| Culligan of Houston | $40.00 | |
| **Fire Safety** | | $2,182.59 |
| ADT | $79.04 | |
| Logix Fiber Network | $405.00 | |
| Kings 111 Emergey   Communications | $316.00 | |
| Datawatch | $1,382.55 | |
| **Repairs & Maintenance** | | $12,207.99 |
| TK Elevator | $3,542.25 | |
| Ferguson Facilities | $1,000.00 | |
| Maintenance Crew | $5,665.74 | |
| Supplies (Various Stores) | $2,000.00 | |
| **Security** | | $7,770.19 |
| Nationwide Security | $7,770.19 | |
| **Cleaning & Maintenance** | | $6,910.88 |
| Zindler Janitorial | $2,110.88 | |
| Janitorial Labor (2) | $4,800.00 | |
| **Utilities** | | $35,000.00 |
| Cirro electric | $27,500.00 | |
| City of Houston water | $7,500.00 | |
| **Insurance** | | $17,627.61 |
| CNA Insurance | $16,250.77 | |
| First Insurance | $1,376.84 | |
| **Telephone & Internet** | | $1,629.00 |
| Comcast | $329.00 | |
| Phone | $1,300.00 | |
| **Other Expense** | | $1,875.00 |
| Mueller Water Treatment | $475.00 | |
| Waste Management | $400.00 | |
| Other | $1,000.00 | |
| **Licenses & Permits** | | $350.00 |
| City of Houston Permit | $350.00 | |
| **Total Operating Expenses** | | **$86,243.99** |
| **Operating Profit (Loss)** | | **$36,842.46** |

**Exhibit 1**   002040

|  |  |
|---|---|
| In re: | |
| **GALLERIA 2425 OWNER LLC,** | **Case No. 23-60036**<br>**Chapter 11** |
| **Debtor.** | |

## FINAL ORDER AUTHORIZING
## DEBTOR TO USE CASH COLLATERAL

**CAME ON** for consideration on this date *Debtor's Emergency Motion for Interim and Final Orders Authorizing the Debtor to Use Cash Collateral* (the "**Motion**") filed by Galleria 2425 Owner LLC (the "**Debtor**"), the debtor-in-possession in the above-captioned bankruptcy case.

Upon consideration of the Motion, the Court finds that all required parties have been served with notice thereof and that the Motion is well-taken and that the relief sought therein should be, and hereby is, **GRANTED**. Accordingly, it is hereby found that:

1. **Petition Date**. On July 5, 2023 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**"). The Debtor continues to operate and manage its business as "debtor in possession" pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2. **Jurisdiction and Venue**. This Court has jurisdiction over this case and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

3. **Single Asset Real Estate**. The Debtor's primary asset is a Class A office building located at 2425 West Loop South, Houston, Texas 77027(the "**Property**"). The Property is fully covered by commercial property and liability insurance.

4. **Committee Formation**. No examiner or statutory committee has been appointed in the Bankruptcy Cases pursuant to §§ 1102 or 1104 of the Bankruptcy Code.

5. **The Prepetition Loan Documents**. National Bank of Kuwait, S.A.K.P., New York Branch ("**NBK**") asserts that the Debtor was indebted to NBK under a prepetition loan (the "**Prepetition Loan**") and that the Debtor's obligations under the Prepetition Loan (the "**Prepetition Obligation**") are evidenced by, among others, the following loan documents (collectively, the "**Prepetition Loan Documents**"):

Exhibit 3

     i.   that certain Loan Agreement by and among NBK and the Debtor, dated May 23, 2018;

    ii.   that certain Promissory Note executed by the Debtor in favor of NBK, dated May 23, 2018;

   iii.   that certain Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing, dated May 23, 2018, recorded RP-2018-235600 in the Real Property Records of Harris County, Texas covering the Property; and

6. **Prepetition Liens**. NBK asserts that the Prepetition Loan Documents are secured by various instruments, assignments, and certificates, including deeds of trust, which: (a) were filed of record in appropriate jurisdictions; and (b) granted NBK first-priority, properly perfected, senior liens and security interests (the "**Prepetition Liens**") upon and in all of the Debtor's personal and real property, fixtures, improvements, and rents and proceeds derived therefrom, including, but not limited to, Cash Collateral (as hereinafter defined) related to the Property, including, but not limited to, all Leases (as defined by the Assignment), all leases, subleases or subsubleases, lettings, licenses, concessions or other agreements made a part hereof (whether written or oral and whether now or hereafter in effect), pursuant to which any Person (as defined by the Assignment) is granted a possessory interest in, or a right to use or occupy, all or any portion of any space in that certain lot or piece of land related to the Property, all Rents (as defined by the Assignment), all rents, rent equivalents, income, receivables, revenues, receipts, insurance proceeds, deposits and profits arising from the Leases and renewals thereof together with all rents, rent equivalents, income, fees, receivables, accounts, profits (including, but not limited to, all oil and gas or other mineral royalties and bonuses), charges for services rendered and any and all payments and consideration of whatever form or nature received by the Debtor or its agents or employees from any and all sources relating to the use, enjoyment and occupancy of the Property and all proceeds related thereto, as further described by the Prepetition Loan Agreements (the "**Prepetition Collateral**"). NBK asserts that it has a valid, properly perfected, first priority lien on the Debtor's rental proceeds derived from the leasing and operation of the Property, and other rights to such payment (collectively, the "**Rental Proceeds**"), which constitute cash collateral pursuant to section 363(a) of the Bankruptcy Code (the "**Cash Collateral**"). NBK asserts that, by virtue of the Prepetition Liens and by operation of section 552(b) of the Bankruptcy Code, NBK holds a first priority security interest in post-petition revenues from the Prepetition Collateral collected by the Debtor, whether now in the Debtor's (or persons in privity with the Debtor or appointed chapter 7 or 11 trustee) possession, custody, or control, or in which the Debtor's estate will obtain an interest during the pendency of this bankruptcy case.

7. **Irreparable Harm**. The Debtor requires the use of cash collateral to continue the operation of its business and will suffer irreparable and immediate harm if it is not granted the relief requested herein. An immediate and critical need exists for the Debtor to obtain funds in order to continue operating the Property, and without such funds, the Debtor will not be able to pay its direct operating expenses, maintain the Property, or obtain goods and services needed to carry on its business during this sensitive period in a manner that will

avoid irreparable harm to the Debtor's estate. The Debtor's ability to use Cash Collateral is vital to the confidence of the Debtor's tenants, vendors, and suppliers of goods and services to the Property and to the preservation and maintenance of the going concern value of the Debtor's estate.

8. The value of the Cash Collateral may diminish as the Debtor operates and uses and expends Cash Collateral, and creditors with a secured interest in Cash Collateral are entitled to adequate protection of their respective interests in the Debtor's use of Cash Collateral.

9. **Cause Shown**. Good cause has been shown for the entry of this Order. The Debtor believes that it is in the best interests of the Debtor's estate and its creditors to utilize the Cash Collateral subject to the terms and conditions set forth herein. The Debtor believes use of the Cash Collateral subject to the terms and conditions set forth herein is a proper exercise of its business judgment. NBK does not consent to the use of any Cash Collateral, except on the terms and conditions as specified herein. The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are expected to provide adequate protection for NBK's interests in the Prepetition Collateral under this Order.

10. **Notice**. The Court finds that the notice to the U.S. Trustee and the Debtor's creditors was sufficient under the circumstances. Entry of this Order is justified and appropriate under the circumstances and is in the best interest of the estate. Use of Cash Collateral as provided herein is being authorized to avoid immediate and irreparable harm.

### IT IS THEREFORE ORDERED AND ADJUDGED as follows:

11. The Motion is **GRANTED** as set forth herein.

12. **Use of Cash Collateral**. The Debtor is hereby authorized in the interim to use Cash Collateral only in the amounts and for the expenses and disbursements set forth in the Budget attached as **Exhibit A**, and Cash Collateral shall not be used for any other purpose or in any other amount, subject to the Budget Variance as defined below. The Debtor shall not incur expenses nor use Cash Collateral in an amount that exceeds by more than five percent (5%) the total expenses provided in the Budget ("**Budget Variance**") without first obtaining NBK's consent in writing or approval of this Court. Any legal and professional fees set forth in the Budget remain subject to interim and final allowance by this Court and remain subject to all applicable provisions of the Bankruptcy Code and the Bankruptcy Local Rules, including, sections 327 and 330 of the Bankruptcy Code.

13. **Adequate Protection**. Subject to the Carve-Out (defined below), as partial adequate protection and in the same priority and to the same extent and validity as existed prepetition, NBK is hereby granted: (a) automatic perfected replacement liens (the "**Replacement Liens**") on all Rental Proceeds, accounts, and receivables related to the use or occupancy of the Property that are now owned or hereafter acquired by the Debtor (the "**Collateral**"); and (b) superpriority administrative claims (the "**Superpriority Claims**") pursuant to sections 361(2), 361(3), 503(b)(1), 507(a)(2), and 507(b) of the Bankruptcy Code. The Replacement Liens granted herein shall not attach to any Chapter 5 causes of

action under the Bankruptcy Code. The Replacement Liens and the Superpriority Claims are granted solely to the extent that the Debtor's use of Cash Collateral results in a diminution in value of the Prepetition Collateral securing the Prepetition Obligation and shall constitute legal, valid, binding, fully perfected, and non-avoidable obligations of the Debtor's estate, enforceable against the Debtor's estate and its respective successors and assigns, including, without limitation, any successor trustee(s) or other estate representative(s) in the bankruptcy case or any subsequent or superseding proceedings under chapter 7 or chapter 11 of the Bankruptcy Code (a "**Subsequent Proceeding**"), in accordance with the terms of this Order. No obligation, payment, transfer, or grant of a security interest under this Order shall violate the automatic stay under section 362 of the Bankruptcy Code or be avoidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity.

14. **Carve Out**. The "Carve-Out" shall mean, in this Order and subject to the entry of a final order approving the Motion: (a) all fees and expenses incurred by the Debtor's professionals that are approved by the Court pursuant to section 330 of the Bankruptcy Code (the "**Professionals**"); (b) statutory liens of ad valorem taxing authorities; and (c) quarterly fees owed to the Office of the United States Trustee. The Carve-Out may only be used for the payment of fees and expenses as provided herein and of estate professionals to the extent approved by order of this Court. Nothing herein shall be construed to impair the ability of NBK or any party-in-interest to object or contest any objection to any fees, expenses, reimbursement, or compensation sought by the estate professionals, nor shall anything herein be construed to affect the rights of any party-in-interest to file an application for the allowance of fees and expenses.

15. **Insurance**. As additional partial adequate protection, the Debtor shall maintain adequate insurance coverage on the Prepetition Collateral and the Collateral, as required under the Prepetition Loan Documents, or any loan document, note, agreement, letter agreement, security agreement, guarantee, or other documents executed by the Debtor in favor of NBK, (collectively, the "**Insurance**"). The Debtor shall maintain or name NBK as mortgagee, lender loss payee, and/or additional insured under the insurance policies.

16. **Termination of Use of Cash Collateral**. The Debtor is authorized to use Cash Collateral in accordance with this Order until the earlier of the following (the "**Termination Date**"): (i) five (5) business days after notice by a creditor with an interest in Cash Collateral to the Debtor of any Termination Event (as defined herein), unless within such five day period the Debtor has cured such Termination Event or unless waived by such creditor, (ii) the date of the dismissal of Debtor's bankruptcy case or the conversion of Debtor's bankruptcy case to a case under chapter 7 of the Bankruptcy Code, or (iii) the date of appointment of a trustee in Debtor's chapter 11 bankruptcy case.

17. **Termination Events**. The Debtor shall immediately cease using Cash Collateral after the Cure Period upon the occurrence of any of the following events (each a "**Termination Event**"):

    i.   The Debtor violates any terms of this Order;

    ii.  The failure by Debtor to pay when due operating expenses incurred after the Petition Date;

    iii. The failure by the Debtor to maintain the Insurance;

    iv.  The occurrence of the effective date or consummation date of a plan of reorganization for Debtor;

    v.   The entry by this Court or any other court of an order reversing, staying, or vacating this Order or amending, supplementing, or otherwise modifying in any material manner the protections granted to Debtor in this Order; or

    vi.  The entry by this Court of an order granting relief from the automatic stay imposed by section 362 of the Code to any entity other than Debtor that permits such entity to exercise foreclosure or disposition rights with respect to the Prepetition Collateral.

18. Upon the occurrence of any Termination Event of this Order (each a "**Notice Termination Event**"), NBK shall provide to the Debtor written notice of such Notice Termination Event, which shall be accomplished by email. If the Debtor has failed to fully and completely cure any such Notice Termination Event to NBK's satisfaction within five (5) business days after delivery of notice of the Notice Termination Event by NBK's counsel (the "**Cure Period**"), then without any further act, notice or action by NBK or any further notice, hearing, act or order of this Court, the Debtor's authority to use Cash Collateral and any and all obligations of NBK under this Order shall terminate. Upon such termination, the Debtor shall immediately cease making any use or disbursement of the Cash Collateral until further order from this Court or permission from NBK.

19. **No Payments on Prepetition Debts**. The Debtor is prohibited from paying any indebtedness or transferring property to vendors, contractors, customers, or other persons whose debt may have been incurred prior to the Petition Date, except upon separate order of the Court.

20. **Modification of Automatic Stay**. Upon the expiration of a Cure Period following the occurrence of a Termination Event, NBK may file a motion seeking to modify the automatic stay under section 362 of the Bankruptcy Code to permit NBK to exercise any and all remedies under the Prepetition Loan Documents including, without limitation, to proceed with the foreclosure of the Property. Parties-in-interest must receive at least five days' notice of the hearing on any such motion filed by NBK seeking relief from the automatic stay.

21. **Protection of Existing Collateral**. Collateral, including Cash Collateral, shall not be used or sold other than in the ordinary course unless the Debtor obtains the approval of this Court.

22. **Reservation of Rights**. NBK shall not be limited or prohibited by this Order or otherwise in seeking additional adequate protection for the use of Cash Collateral as provided herein or any other appropriate relief. Further, except as expressly stated herein, nothing in this Order is intended to or shall modify any terms or rights of the Prepetition Loan Documents. Furthermore, NBK shall have the right, but not the obligation, to credit bid in any sale of the Debtor's assets, up to the full amount of NBK's secured claim. Additionally, nothing in this Order shall prevent NBK from filing a subsequent pleading in this bankruptcy case requesting: (a) to discontinue use of Cash Collateral for any reason not discussed or contemplated in this Order; and/or, (b) relief from the automatic stay.

23. The protections afforded to NBK under this Order, and any actions taken pursuant thereto, shall survive the entry of an order converting this bankruptcy case to chapter 7 of the Bankruptcy Code, and the Replacement Liens and the Superpriority Claims (pursuant to sections 503(b), 507(a)(2), and/or 507(b) of the Bankruptcy Code, or otherwise), to the extent applicable, if any, shall continue in this proceeding and in any such Subsequent Proceeding, and the Replacement Liens and Superpriority Claims shall maintain their priority as provided by this Order until the Prepetition Obligation have been indefeasibly satisfied in full.

24. The consent of NBK to this Order does not constitute a waiver of any pre-petition default(s) or Event(s) of Default under the Prepetition Loan Documents.

25. **Findings and Conclusions**. To the extent any findings of fact may constitute conclusions of law, and vice versa, they are hereby deemed as such.

26. **Immediate Effect**. This Order shall take effect immediately on execution hereof, notwithstanding any application of Federal Rules of Bankruptcy Procedure 4001(a)(3), 6004(h), 7062, or 9014.

27. **Retention of Jurisdiction**. The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Interim Order.

28. **Necessary Action**. The automatic stay under section 362 of the Bankruptcy Code is hereby modified, as necessary, to permit NBK to take any and all necessary and appropriate actions to implement the terms of this Interim Order.

DATED:_____

_____
CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

# Exhibit 4



2425 W Loop S
Central to the River Oaks District and Galleria



## ICONIC GALLERIA OFFICE SPACE
## AVAILABLE IMMEDIATELY

BUILDING & MONUMENT
SIGNAGE AVAILABLE

RESPONSIVE
OWNERSHIP



002047

# AMENITIES

**AMENITIES INCLUDE**

• Updated natural outdoor courtyard setting for outdoor breaks and brainstorming
• Continuous window line offers natural light and expansive panoramic views
• The Tri-be. a high-end fitness center with locker rooms and showers,offering community driven yoga, massage and fitness options
• A breathtaking 11-story +10,000 square foot ground floor lobby, bathed in natural light and featuring bespoke furniture for breaks, meetings and available to tenants for pre-arranged social functions
• On-site management & courtesy officer
• 24-hour secure keycard access
• Multi-level parking garage / free valet parking for visitors and guests
• Lobby recently renovated and available for tenant events
• Available for immediate occupancy available with Herman Miller furniture and CAT 6 data cabling in place
• New prime ground floor tenant lounge and conference facility
•Retina scanners for building and floor access
•Jetvan Shuttle





**AREA AMENITIES**

• The Galleria & Memorial Park
• Abundant shopping, hotels & banks nearby
• Easy access to 610 Loop, I-10, I-69 & Westpark Tollway
• On METRO bus route
• Adjacent to Hotel Derek, new Equinox hotel, and River Oaks District
• Walkable to Galleria and new METRO Post Oak Bus Rapid Transit
• Over 15 restaurants in walking distance






















> " Architecture is the very mirror of life. You only have to cast your eyes on buildings to feel the presence of the past,
> the spirit of a place; they are the reflection of society. "
>
> - Ieoh Ming Pei

Known for his creative use of modernist architecture in combination with natural elements and open spaces, I.M. Pei is celebrated for iconic designs such as the Louvre Pyramid in Paris, the Bank of China Tower in Hong Kong, the JFK Library in Boston, Herbert Johnson Museum of Art in Cornell University, Doha Islamic Arts Museum, Ronald Regan Building in Washington DC, the First International Bank of Israel in Tel Aviv, University Plaza in New York, The Landmark in Irvine, California and the NASCAR Hall of Fame... Just to name a few!



Louvre Pyramid. Paris, France.



Museum of Islamic Art. Doha, Qatar.



Bank of China Tower. Hong Kong.



2425 has an onsite Wellness Collective called Tri.be. We believe that a healthy mind and body create a better working environment. Located on the third floor, Tri.be is a boutique wellness community for our tenants, with holistic wellness services. All 2425 tenants are eligible for a subsidized membership that include unlimited classes such as HIIT, MAT, BARRE, YOGA, YOGA BURN and MEDITATION. The wellness collective will also be inviting in wellness practitioners specializing in diet, acupuncture, massage, hypnotherapy, mediation, reiki, and more.





# READY TO GO

Available for immediate occupancy - Plug and Play 200,000 SF contiguous floors with available Herman Miller furniture and CAT 6 cabling in place.



**Typical Floor Plan**
151– Workstations
11– Offices
10 – Conference/Huddle







002051



## CONTACT US

### VISIT

Area Map

**2425 West Loop South, Houston, TX 77027**





| Galleria 2425 Owner, LLC | | |
|---|---|---|
| **Balance Sheet** | | |
| **As of December 5, 2023** | | |
| | **Total** | |
| **ASSETS** | | |
| **Current Assets** | | |
| **Bank Accounts** | | |
| **Business Checking - Operating** | 67,153.82 | |
| **Deposits and Prepayments** | 161,348.41 | |
| **Petty Cash** | 0.00 | |
| **Trust Acct (0868) - 3** | 0.00 | |
| **Total Bank Accounts** | $ 228,502.23 | |
| **Accounts Receivable** | | |
| **Accounts Receivable** | 105,250.00 | |
| **Total Accounts Receivable** | $ 105,250.00 | |
| **Other Current Assets** | | |
| | | |
| | | |
| **Total Advanced Client Costs** | $ 0.00 | |
| | | |
| | 0.00 | |
| **Uncategorized Asset** | 0.00 | |
| **Undeposited Funds** | 0.00 | |
| **Total Other Current Assets** | $ 0.00 | |
| **Total Current Assets** | $ 333,752.23 | |
| **Fixed Assets** | | |
| **Fixed Assets** | | |
| **Real Property** | 17,500,000.00 | |
| **Furniture and Fixtures** | | |
| **Legal Texts** | | |
| **Phones** | | |
| **Software** | | |
| **Total Fixed Assets** | $ 17,500,000.00 | |
| **Total Fixed Assets** | $ 17,500,000.00 | |
| **TOTAL ASSETS** | $ 17,833,752.23 | |
| **LIABILITIES AND EQUITY** | | |
| **Liabilities** | 0.00 | |
| **Current Liabilities** | 0.00 | |
| **Accounts Payable** | | |
| **Accounts Payable - Operating** | 1,341,959.94 | |
| **Total Accounts Payable** | $ 1,341,959.94 | |
| **Other Current Liabilities** | | |
| **Client Trust Liability** | | |
| **Firm Funds** | | |
| **IOLTA Interest** | | |

| | | |
|---|---|---|
| **Total Client Trust Liability** | $ | **0.00** |
| **PPP LOAN** | | 0.00 |
| **Total Other Current Liabilities** | $ | **0.00** |
| **Total Current Liabilities** | $ | **1,341,959.94** |
| **Long-Term Liabilities** | | 52,850,479.33 |
| **Long-Term Liabilities** | | 25,092,415.80 |
| **Total Long-Term Liabilities** | $ | **77,942,895.13** |
| **Total Liabilities** | $ | **79,284,855.07** |
| **Equity** | | |
| | | |
| | | |
| **Opening Balance Equity** | | |
| **Shareholder Distributions** | | |
| **Net Income** | | |
| **Total Equity** | $ | **0.00** |
| **TOTAL LIABILITIES AND EQUITY** | $ | **79,284,855.07** |
| | | |
| | | |
| | | |
| Subject to revisions and review by CPA | | |
| The amounts of the debt are in dispute | | |

## 2425 W
*Year 2023*

## Profit and Loss Report

| | Jan-23 | Feb-23 | Mar-23 | Apr-23 | May-23 | Jun-23 | Jul-23 | Aug-23 | Sep-23 | Oct-23 | Nov-23 | Dec 1-5 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | |
| Rent Income | $126,356.93 | $192,866.39 | $127,403.74 | $127,467.50 | $127,444.55 | $90,815.04 | $123,207.69 | $149,723.10 | $137,906.45 | $97,530.08 | $121,985.11 | $112,810.23 |
| | | | | | | | | | | | | |
| **Net Sales** | **$126,356.93** | **$192,866.39** | **$127,403.74** | **$127,467.50** | **$127,444.55** | **$90,815.04** | **$123,207.69** | **$149,723.10** | **$137,906.45** | **$97,530.08** | **$121,985.11** | **$112,810.23** |
| **Cost of Goods Sold** | | | | | | | | | | | | |
| Materials | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Labor | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Overhead | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | | | | | | | | | |
| **Total Cost of Goods Sold** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** |
| **Gross Profit** | **$126,356.93** | **$192,866.39** | **$127,403.74** | **$127,467.50** | **$127,444.55** | **$90,815.04** | **$123,207.69** | **$149,723.10** | **$137,906.45** | **$97,530.08** | **$121,985.11** | **$112,810.23** |
| **Operating Expenses** | | | | | | | | | | | | |
| Service Contract | $559.04 | $14.07 | $1,419.33 | $11.57 | $1,320.54 | $11.57 | $0.00 | $579.61 | $588.53 | $820.76 | $27.02 | |
| Fire Safety | | $333.82 | $2,571.33 | $1,915.07 | $5,390.47 | $451.15 | $401.24 | $5,480.55 | $1,865.70 | $1,900.41 | $1,091.34 | |
| Repairs & Maintenance | $595.92 | $7,720.39 | $24,331.18 | $1,181.58 | $35,851.39 | $11,543.60 | $1,625.96 | $15,579.21 | $13,622.47 | $31,440.04 | $3,976.38 | $5,470.98 |
| Security | $8,504.66 | $4,084.27 | $12,234.14 | $2,963.89 | $7,446.52 | $4,557.33 | $4,109.17 | $11,854.46 | $11,166.58 | $14,285.17 | $3,934.89 | $3,810.40 |
| Cleaning & Maintenance | $13,665.23 | $8,661.60 | $7,990.17 | $6,709.86 | $10,743.14 | $9,842.28 | $2,182.20 | $19,680.06 | $21,064.46 | $24,152.47 | $14,060.51 | $2,834.25 |
| Broker Commissions | $65,940.71 | $65,940.71 | $65,940.71 | $65,940.71 | $89,925.71 | | | | | | | |
| Professional Fees | | $2,383.15 | $8,864.82 | $4,564.42 | $20,366.25 | $12,835.00 | $31,700.00 | $0.00 | | $0.00 | $83,161.71 | |
| Utilities | $5,155.91 | $28,163.21 | $27,786.55 | $34,216.75 | $25,572.81 | $32,561.33 | $32,681.81 | $37,536.24 | $31,482.68 | $35,074.55 | $7,982.04 | |
| Insurance | $1,381.84 | $65,761.73 | $17,627.61 | $33,908.38 | $1,381.84 | $17,632.61 | $17,627.61 | $17,679.61 | $17,647.61 | | $1,885.57 | |
| Telephone & Internet | $233.11 | $0.00 | $228.45 | $486.28 | $248.34 | $0.00 | $506.75 | $1,145.66 | $1,145.66 | $1,145.92 | $259.10 | $903.64 |
| Other Expense | $2,833.99 | $35.00 | | $475.00 | $950.00 | | | $507.00 | $1,912.00 | $1,053.00 | $609.00 | |
| Fire Damage | | | | | | | | $1,978.36 | $8,800.00 | $16,271.91 | | |
| Management Fee/Admin | $0.00 | $0.00 | $15,265.09 | $5,096.15 | $0.00 | $10,195.56 | $15,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| Administration | | | | | | | | $19,385.87 | $19,385.87 | $19,385.87 | $19,385.87 | |
| Licenses & Permits | $407.29 | | $809.71 | $595.27 | $908.55 | | | | | $450.00 | | |
| **Total Operating Expenses** | **$99,277.70** | **$183,097.95** | **$185,069.09** | **$158,064.93** | **$200,105.56** | **$99,630.43** | **$105,834.74** | **$129,428.27** | **$121,859.92** | **$138,508.19** | **$152,645.34** | **$13,019.25** |
| **Operating Profit (Loss)** | **$27,079.23** | **$9,768.44** | **-$57,665.35** | **-$30,597.43** | **-$72,661.01** | **-$8,815.39** | **$17,372.95** | **$20,294.83** | **$16,046.53** | **-$40,978.11** | **-$30,660.23** | **$99,790.98** |
| *Add: Other Income* | | | | | | | | | | | | |
| Interest Income | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Other Income | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Profit (Loss) Before Taxes** | **$27,079.23** | **$9,768.44** | **-$57,665.35** | **-$30,597.43** | **-$72,661.01** | **-$8,815.39** | **$17,372.95** | **$20,294.83** | **$16,046.53** | **-$40,978.11** | **-$30,660.23** | **$99,790.98** |
| Less Distributions | | | | | | | | | | | | |
| **Net Profit (Loss)** | **$27,079.23** | **$9,768.44** | **-$57,665.35** | **-$30,597.43** | **-$72,661.01** | **-$8,815.39** | **$17,372.95** | **$20,294.83** | **$16,046.53** | **-$40,978.11** | **-$30,660.23** | **$99,790.98** |

002055

**2425 W Loop S**

Annual Expense Increase Factor

| Building Net Rentable SF | | | 284,577 | | 284,577 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Plan Month | | | | | | | | 1 | 2 | 3 |
| | Annual Amount Per Cushman Wakefield | Per SF per Cushman Wakefield | Debtor Adjustments * | Annual Amount after adjustments | Per SF After Debtor Adjustments | Monthly Amount after adjustments | | Apr-24 | May-24 | Jun-24 |
| Base Rent Revenue | $ 5,351,488 | $ 18.81 | $ 1,500,000 | $ 6,851,488 | $ 24.08 | $ 570,957 | | $ 569,154 | $ 569,154 | $ 569,154 |
| Absorption and Turnover Vacancy | $ (4,561,848) | $ (16.03) | $ 3,753,534 | $ (808,314) | $ (2.84) | $ (67,359) | | $ (156,929) | $ (156,878) | $ (156,878) |
| Base Rent Abatements | $ (440,197) | $ (1.55) | $ (1,229,453) | $ (1,669,650) | $ (5.87) | $ (139,138) | | $ (286,950) | $ (286,950) | $ (226,950) |
| **Scheduled Base Rental Revenue** | **$ 349,443** | **$ 1.23** | **$ 4,024,081** | **$ 4,373,524** | **$ 15.37** | **$ 364,460** | | **$ 125,275** | **$ 125,326** | **$ 185,326** |
| | | | | | | | | | | |
| **Total Reimbursement Revenue** | **$ 105,634** | **$ 0.37** | **$ (105,634)** | **$ -** | **$ -** | **$ -** | | | | |
| | | | | | | | | | | |
| Misc. Income | $ 4,559 | $ 0.02 | | $ 4,559 | $ 0.02 | $ 380 | | $379.92 | $0.00 | $379.92 |
| Parking Income | $ 15,375 | $ 0.05 | | $ 15,375 | $ 0.05 | $ 1,281 | | $1,281.25 | $0.00 | $1,281.25 |
| **Total Gross Revenue** | **$ 475,011** | **$ 1.67** | **$ 3,918,447** | **$ 4,393,458** | **$ 15.44** | **$ 366,122** | | **$ 126,936** | **$ 125,326** | **$ 186,988** |
| | | | | | | | | | | |
| General Vacancy | | | | $ - | $ - | $ - | | | | |
| Collection Loss | $ (4,750) | $ (0.02) | | $ (4,750) | $ (0.02) | $ (396) | | | | |
| **Effective Gross Revenue** | **$ 470,261** | **$ 1.65** | **$ 3,918,447** | **$ 4,388,708** | **$ 15.42** | | | **$125,274.51** | **$125,326.38** | **$185,326.38** |
| | | | | | | | | | | |
| Cleaning & Maintenance | $ 230,167 | $ 0.81 | | $ 230,167 | $ 0.81 | $ 19,181 | | $19,180.58 | $19,180.58 | $19,180.58 |
| Marketing and Advertising | | | $ 60,000 | $ 60,000 | $ 0.21 | $ 5,000 | | $5,000.00 | $5,000.00 | $5,000.00 |
| Management Fee/Admin | $ 14,108 | $ 0.05 | | $ 14,108 | $ 0.05 | $ 1,176 | | $1,175.67 | $1,175.67 | $1,175.67 |
| Repairs & Maintenance | $ 875,074 | $ 3.07 | | $ 875,074 | $ 3.07 | $ 72,923 | | $72,922.83 | $72,922.83 | $72,922.83 |
| Utilities | $ 460,333 | $ 1.62 | | $ 460,333 | $ 1.62 | $ 38,361 | | $38,361.08 | $38,361.08 | $38,361.08 |
| Administration | $ 510,460 | $ 1.79 | $ (390,460) | $ 120,000 | $ 0.42 | $ 10,000 | | $10,000.00 | $10,000.00 | $10,000.00 |
| Insurance | $ 131,261 | $ 0.46 | $ 80,263 | $ 211,524 | $ 0.74 | $ 17,627 | | $17,627.00 | $17,627.00 | $17,627.00 |
| Property Taxes | $ 500,000 | $ 1.76 | $ (34,000) | $ 466,000 | $ 1.64 | $ 38,833 | | $38,833.33 | $38,833.33 | $38,833.33 |
| Non Recoverable | $ 29,169 | $ 0.10 | | $ 29,169 | $ 0.10 | $ 2,431 | | $2,430.75 | $2,430.75 | $2,430.75 |
| **Total Operating Expense** | **$ 2,750,572** | **$ 9.67** | **$ (284,197)** | **$ 2,466,375** | **$ 8.67** | **$ 205,531** | | **$205,531.25** | **$206,045.08** | **$206,560.19** |
| | | | | | | | | | | |
| **Net Operating Income** | **$ (2,280,311)** | **$ (8.01)** | | **$ 1,922,333** | **$ 6.76** | | | **$ (80,257)** | **$ (80,719)** | **$ (21,234)** |
| | | | | | | | | | | |
| Reserve | $ 72,923 | $ 0.26 | | $ 72,923 | $ 0.26 | $ 6,077 | | $6,076.92 | $6,076.92 | $6,076.92 |
| Tenant Improvements | $ 2,040,736 | $ 7.17 | $ (1,800,000) | $ 240,736 | $ 0.85 | $ 20,061 | | $20,061.33 | $20,061.33 | $20,061.33 |
| Leasing Commissions | $ 543,558 | $ 1.91 | $ (400,000) | $ 143,558 | $ 0.50 | $ 11,963 | | $11,963.17 | $11,963.17 | $11,963.17 |
| **Total Leasing and Capital Cost** | **$ 2,657,217** | **$ 9.34** | **$(2,200,000)** | **$ 457,217** | **$ 1.61** | **$ 38,101** | | **38,101** | **38,101** | **38,101** |
| | | | | | | | | | | |
| **Cashflow before Debt Service** | **$ (4,937,528)** | | | **$ 1,465,116** | **$ 5.15** | **$ (243,633)** | | **(118,358)** | **(118,820)** | **(59,335)** |

**2425 W Loop S**

Annual Expense Increase Factor

| Building Net Rentable SF | | 284,577 | | | 284,577 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Plan Month** | | | | | | | 1 | 2 | 3 |
| | Annual Amount Per Cushman Wakefield | Per SF per Cushman Wakefield | Debtor Adjustments * | Annual Amount after adjustments | Per SF After Debtor Adjustments | Monthly Amount after adjustments | Apr-24 | May-24 | Jun-24 |

**Plan Payments**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Administrative Claims | | | | | | | $10,000.00 | $10,000.00 | $10,000.00 |
| Class 1 Claims: Priority Claims (TBD) | | | | | | | $8,333.33 | $8,333.33 | $8,333.33 |
| Class 2 Claims: Allowed Secured and Priority Claims of Taxing Authorities (Harris County) | | | | | | | $76,302.05 | $76,302.05 | $76,302.05 |
| Class 3 Claims: Allowed Secured Claims of Caz Creek II | | | | | | | $9,595.29 | $9,595.29 | $9,595.29 |
| Class 4 Claims: Allowed Secured Claim of NBK | | | | | | | $120,202.66 | $120,202.66 | $120,202.66 |
| Class 6 Claims: Repairs and Maintenance | | | | | | | $25,323.92 | $25,323.92 | $25,323.92 |
| Class 7 Claims: General Unsecured Claims | | | | | | | $0.00 | $0.00 | $0.00 |
| Conditional Payments - NBK (80% of Net Free cashflow | | | | | | | | | |
| **Total Plan Payments** | | | | | | | $ 249,757 | $ 249,757 | $ 249,757 |
| | | | | | | | | | |
| **Net Cashflow** | | | | | | | $ (368,115) | $ (368,577) | $ (309,092) |
| | | | | | | | | | |
| **Cumulative Cash balance** | $ 2,000,000 | | | | | | $1,631,884.60 | $1,263,307.23 | $954,214.76 |

* Support for Debtor Adjustments provided by supporting leases and actual invoices

**2425 W Loop S**

Annual Expense Increase Factor

**Building Net Rentable SF**

| Plan Month | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|
| | Jul-24 | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 | Jan-25 | Feb-25 |
| Base Rent Revenue | $ 569,154 | $ 569,154 | $ 569,154 | $ 619,620 | $ 619,620 | $ 620,870 | $ 783,489 | $ 783,489 |
| Absorption and Turnover Vacancy | $ (55,628) | $ (55,628) | $ (55,628) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) |
| Base Rent Abatements | $ (226,950) | $ (226,950) | $ (125,700) | $ (60,700) | $ (60,700) | $ (60,700) | $ (35,700) | $ (35,700) |
| **Scheduled Base Rental Revenue** | **$ 286,576** | **$ 286,576** | **$ 387,826** | **$ 530,463** | **$ 530,463** | **$ 531,713** | **$ 719,331** | **$ 719,331** |
| | | | | | | | | |
| **Total Reimbursement Revenue** | | | | | | | | |
| | | | | | | | | |
| Misc. Income | $0.00 | $379.92 | $0.00 | $379.92 | $0.00 | $379.92 | $0.00 | $379.92 |
| Parking Income | $0.00 | $1,281.25 | $0.00 | $1,281.25 | $0.00 | $1,281.25 | $0.00 | $1,281.25 |
| **Total Gross Revenue** | **$ 286,576** | **$ 288,238** | **$ 387,826** | **$ 532,124** | **$ 530,463** | **$ 533,374** | **$ 719,331** | **$ 720,992** |
| | | | | | | | | |
| General Vacancy | | | | | | | | |
| Collection Loss | | | | | | | | |
| **Effective Gross Revenue** | **$286,576.38** | **$286,576.38** | **$387,826.38** | **$530,462.68** | **$530,462.68** | **$531,712.68** | **$719,330.93** | **$719,330.93** |
| | | | | | | | | |
| Cleaning & Maintenance | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 |
| Marketing and Advertising | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 |
| Management Fee/Admin | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 |
| Repairs & Maintenance | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 |
| Utilities | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 |
| Administration | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 |
| Insurance | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 |
| Property Taxes | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 |
| Non Recoverable | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 |
| **Total Operating Expense** | **$207,076.59** | **$207,594.28** | **$208,113.27** | **$208,633.55** | **$209,155.14** | **$209,678.02** | **$210,202.22** | **$210,727.72** |
| | | | | | | | | |
| **Net Operating Income** | **$ 79,500** | **$ 78,982** | **$ 179,713** | **$ 321,829** | **$ 321,308** | **$ 322,035** | **$ 509,129** | **$ 508,603** |
| | | | | | | | | |
| Reserve | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 |
| Tenant Improvements | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 |
| Leasing Commissions | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 |
| **Total Leasing and Capital Cost** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** |
| | | | | | | | | |
| **Cashflow before Debt Service** | **$ 41,398** | **$ 40,881** | **$ 141,612** | **$ 283,728** | **$ 283,206** | **$ 283,933** | **$ 471,027** | **$ 470,502** |

**2425 W Loop S**

Annual Expense Increase Factor

**Building Net Rentable SF**

| Plan Month | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|
| | Jul-24 | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 | Jan-25 | Feb-25 |
| **Plan Payments** | | | | | | | | |
| Administrative Claims | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 |
| Class 1 Claims: Priority Claims (TBD) | $8,333.33 | $8,333.33 | $8,333.33 | $8,333.33 | $8,333.33 | $8,333.33 | $8,333.33 | $8,333.33 |
| Class 2 Claims: Allowed Secured and | $76,302.05 | $76,302.05 | $76,302.05 | $76,302.05 | $76,302.05 | $76,302.05 | $76,302.05 | $76,302.05 |
| Class 3 Claims: Allowed Secured Cla | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 |
| Class 4 Claims: Allowed Secured Cla | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 |
| Class 6 Claims: Repairs and Mainten | $25,323.92 | $25,323.92 | $25,323.92 | $25,323.92 | $25,323.92 | $25,323.92 | $25,323.92 | $25,323.92 |
| Class 7 Claims: General Unsecured G | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Conditional Payments - NBK (80% of | | | | | | | | |
| **Total Plan Payments** | $ 249,757 | $ 249,757 | $ 249,757 | $ 249,757 | $ 249,757 | $ 249,757 | $ 249,757 | $ 249,757 |
| **Net Cashflow** | $ (208,359) | $ (208,877) | $ (108,146) | $ 33,970 | $ 33,449 | $ 34,176 | $ 221,270 | $ 220,745 |
| **Cumulative Cash balance** | $745,855.88 | $536,979.32 | $428,833.76 | $462,804.23 | $496,253.11 | $530,429.10 | $751,699.15 | $972,443.69 |

* Support for Debtor Adjustments pro

**2425 W Loop S**

Annual Expense Increase Factor

Building Net Rentable SF

| Plan Month | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
|---|---|---|---|---|---|---|---|---|
| | Mar-25 | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 | Oct-25 |
| Base Rent Revenue | $ 783,489 | $ 783,489 | $ 783,489 | $ 783,489 | $ 783,489 | $ 783,489 | $ 810,012 | $ 810,012 |
| Absorption and Turnover Vacancy | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) |
| Base Rent Abatements | $ (35,700) | $ (35,700) | $ (35,700) | $ (35,700) | $ (35,700) | $ (35,700) | $ (35,700) | $ (35,700) |
| **Scheduled Base Rental Revenue** | **$ 719,331** | **$ 719,331** | **$ 719,331** | **$ 719,331** | **$ 719,331** | **$ 719,331** | **$ 745,854** | **$ 745,854** |
| | | | | | | | | |
| **Total Reimbursement Revenue** | | | | | | | | |
| | | | | | | | | |
| Misc. Income | $0.00 | $379.92 | $0.00 | $379.92 | $0.00 | $379.92 | $0.00 | $379.92 |
| Parking Income | $0.00 | $1,281.25 | $0.00 | $1,281.25 | $0.00 | $1,281.25 | $0.00 | $1,281.25 |
| **Total Gross Revenue** | **$ 719,331** | **$ 720,992** | **$ 719,331** | **$ 720,992** | **$ 719,331** | **$ 720,992** | **$ 745,854** | **$ 747,516** |
| | | | | | | | | |
| General Vacancy | | | | | | | | |
| Collection Loss | | | | | | | | |
| **Effective Gross Revenue** | **$719,330.93** | **$719,330.93** | **$719,330.93** | **$719,330.93** | **$719,330.93** | **$719,330.93** | **$745,854.43** | **$745,854.43** |
| | | | | | | | | |
| Cleaning & Maintenance | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 |
| Marketing and Advertising | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 |
| Management Fee/Admin | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 |
| Repairs & Maintenance | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 |
| Utilities | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 |
| Administration | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 |
| Insurance | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 |
| Property Taxes | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 |
| Non Recoverable | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 |
| **Total Operating Expense** | **$211,254.54** | **$211,782.68** | **$212,312.14** | **$212,842.92** | **$213,375.02** | **$213,908.46** | **$214,443.23** | **$214,979.34** |
| | | | | | | | | |
| **Net Operating Income** | **$ 508,076** | **$ 507,548** | **$ 507,019** | **$ 506,488** | **$ 505,956** | **$ 505,422** | **$ 531,411** | **$ 530,875** |
| | | | | | | | | |
| Reserve | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 |
| Tenant Improvements | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 |
| Leasing Commissions | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 |
| **Total Leasing and Capital Cost** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** |
| | | | | | | | | |
| **Cashflow before Debt Service** | **$ 469,975** | **$ 469,447** | **$ 468,917** | **$ 468,387** | **$ 467,854** | **$ 467,321** | **$ 493,310** | **$ 492,774** |

**2425 W Loop S**

Annual Expense Increase Factor

**Building Net Rentable SF**

| Plan Month | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
|---|---|---|---|---|---|---|---|---|
| | Mar-25 | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 | Oct-25 |
| **Plan Payments** | | | | | | | | |
| Administrative Claims | $10,000.00 | | | | | | | |
| Class 1 Claims: Priority Claims (TBD) | $8,333.33 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Class 2 Claims: Allowed Secured and | $76,302.05 | $76,302.05 | $76,302.05 | $76,302.05 | $76,302.05 | $76,302.05 | $76,302.05 | $76,302.05 |
| Class 3 Claims: Allowed Secured Clc | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 |
| Class 4 Claims: Allowed Secured Clc | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 |
| Class 6 Claims: Repairs and Mainten | $25,323.92 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Class 7 Claims: General Unsecured ( | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Conditional Payments - NBK (80% of | | | | | | | | |
| **Total Plan Payments** | $ 249,757 | $ 206,100 | $ 206,100 | $ 206,100 | $ 206,100 | $ 206,100 | $ 206,100 | $ 206,100 |
| **Net Cashflow** | $ 220,218 | $ 263,347 | $ 262,817 | $ 262,287 | $ 261,754 | $ 261,221 | $ 287,210 | $ 286,674 |
| **Cumulative Cash balance** | $1,192,661.41 | $1,456,008.25 | $1,718,825.63 | $1,981,112.22 | $2,242,866.72 | $2,504,087.77 | $2,791,297.55 | $3,077,971.23 |

* Support for Debtor Adjustments prc

**2425 W Loop S**

Annual Expense Increase Factor

**Building Net Rentable SF**

| Plan Month | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 |
|---|---|---|---|---|---|---|---|---|---|
| | Nov-25 | Dec-25 | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 |
| Base Rent Revenue | $ 810,012 | $ 811,325 | $ 811,325 | $ 811,325 | $ 811,325 | $ 811,325 | $ 811,325 | $ 811,325 | $ 811,325 |
| Absorption and Turnover Vacancy | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) |
| Base Rent Abatements | $ (35,700) | $ (35,700) | $ (35,700) | $ (35,700) | $ (35,700) | $ (35,700) | $ - | $ - | $ - |
| **Scheduled Base Rental Revenue** | **$ 745,854** | **$ 747,167** | **$ 747,167** | **$ 747,167** | **$ 747,167** | **$ 747,167** | **$ 782,867** | **$ 782,867** | **$ 782,867** |
| | | | | | | | | | |
| **Total Reimbursement Revenue** | | | | | | | | | |
| | | | | | | | | | |
| Misc. Income | $0.00 | $379.92 | $0.00 | $379.92 | $0.00 | $379.92 | $0.00 | $379.92 | $0.00 |
| Parking Income | $0.00 | $1,281.25 | $0.00 | $1,281.25 | $0.00 | $1,281.25 | $0.00 | $1,281.25 | $0.00 |
| **Total Gross Revenue** | **$ 745,854** | **$ 748,828** | **$ 747,167** | **$ 748,828** | **$ 747,167** | **$ 748,828** | **$ 782,867** | **$ 784,528** | **$ 782,867** |
| | | | | | | | | | |
| General Vacancy | | | | | | | | | |
| Collection Loss | | | | | | | | | |
| **Effective Gross Revenue** | **$745,854.43** | **$747,166.93** | **$747,166.93** | **$747,166.93** | **$747,166.93** | **$747,166.93** | **$782,866.93** | **$782,866.93** | **$782,866.93** |
| | | | | | | | | | |
| Cleaning & Maintenance | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 |
| Marketing and Advertising | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 |
| Management Fee/Admin | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 |
| Repairs & Maintenance | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 |
| Utilities | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 |
| Administration | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 |
| Insurance | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 |
| Property Taxes | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 |
| Non Recoverable | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 |
| **Total Operating Expense** | **$215,516.79** | **$216,055.58** | **$216,595.72** | **$217,137.21** | **$217,680.05** | **$218,224.25** | **$218,769.81** | **$219,316.74** | **$219,865.03** |
| | | | | | | | | | |
| **Net Operating Income** | **$ 530,338** | **$ 531,111** | **$ 530,571** | **$ 530,030** | **$ 529,487** | **$ 528,943** | **$ 564,097** | **$ 563,550** | **$ 563,002** |
| | | | | | | | | | |
| Reserve | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 |
| Tenant Improvements | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 |
| Leasing Commissions | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 |
| **Total Leasing and Capital Cost** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** |
| | | | | | | | | | |
| **Cashflow before Debt Service** | **$ 492,236** | **$ 493,010** | **$ 492,470** | **$ 491,928** | **$ 491,385** | **$ 490,841** | **$ 525,996** | **$ 525,449** | **$ 524,900** |

| 2425 W Loop S | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Annual Expense Increase Factor | | | | | | | | |
| **Building Net Rentable SF** | | | | | | | | |
| **Plan Month** | **20** | **21** | **22** | **23** | **24** | **25** | **26** | **27** | **28** |
| | **Nov-25** | **Dec-25** | **Jan-26** | **Feb-26** | **Mar-26** | **Apr-26** | **May-26** | **Jun-26** | **Jul-26** |

| **Plan Payments** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Administrative Claims | | | | | | | | | |
| Class 1 Claims: Priority Claims (TBD) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Class 2 Claims: Allowed Secured and | $76,302.05 | $76,302.05 | $76,302.05 | $76,302.05 | $76,302.05 | $0.00 | $0.00 | $0.00 | $0.00 |
| Class 3 Claims: Allowed Secured Clc | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 |
| Class 4 Claims: Allowed Secured Clc | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 |
| Class 6 Claims: Repairs and Mainter | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Class 7 Claims: General Unsecured ( | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $200,000.00 | $0.00 |
| Conditional Payments - NBK (80% of | | | | | | | $282,048.56 | $281,775.10 | $281,500.95 |
| **Total Plan Payments** | $ 206,100 | $ 206,100 | $ 206,100 | $ 206,100 | $ 206,100 | $ 129,798 | $ 411,847 | $ 611,573 | $ 411,299 |
| | | | | | | | | | |
| **Net Cashflow** | $ 286,136 | $ 286,910 | $ 286,370 | $ 285,828 | $ 285,285 | $ 361,043 | $ 114,149 | $ (86,124) | $ 113,602 |
| | | | | | | | | | |
| **Cumulative Cash balance** | $3,364,107.45 | $3,651,017.39 | $3,937,387.18 | $4,223,215.49 | $4,508,500.95 | $4,869,544.27 | $4,983,693.47 | $4,897,569.20 | $5,011,170.79 |

\* Support for Debtor Adjustments prc

**2425 W Loop S**
Annual Expense Increase Factor
**Building Net Rentable SF**

| Plan Month | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 |
|---|---|---|---|---|---|---|---|---|---|
| | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 | Jan-27 | Feb-27 | Mar-27 | Apr-27 |
| Base Rent Revenue | $ 811,325 | $ 837,848 | $ 837,848 | $ 837,848 | $ 837,848 | $ 837,848 | $ 839,226 | $ 839,226 | $ 839,226 |
| Absorption and Turnover Vacancy | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) |
| Base Rent Abatements | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Scheduled Base Rental Revenue** | **$ 782,867** | **$ 809,390** | **$ 809,390** | **$ 809,390** | **$ 809,390** | **$ 809,390** | **$ 810,769** | **$ 810,769** | **$ 810,769** |
| | | | | | | | | | |
| **Total Reimbursement Revenue** | | | | | | | | | |
| | | | | | | | | | |
| Misc. Income | $379.92 | $0.00 | $379.92 | $0.00 | $379.92 | $0.00 | $379.92 | $0.00 | $379.92 |
| Parking Income | $1,281.25 | $0.00 | $1,281.25 | $0.00 | $1,281.25 | $0.00 | $1,281.25 | $0.00 | $1,281.25 |
| **Total Gross Revenue** | **$ 784,528** | **$ 809,390** | **$ 811,052** | **$ 809,390** | **$ 811,052** | **$ 809,390** | **$ 812,430** | **$ 810,769** | **$ 812,430** |
| | | | | | | | | | |
| General Vacancy | | | | | | | | | |
| Collection Loss | | | | | | | | | |
| **Effective Gross Revenue** | **$782,866.93** | **$809,390.43** | **$809,390.43** | **$809,390.43** | **$809,390.43** | **$809,390.43** | **$810,768.56** | **$810,768.56** | **$810,768.56** |
| | | | | | | | | | |
| Cleaning & Maintenance | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 |
| Marketing and Advertising | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 |
| Management Fee/Admin | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 |
| Repairs & Maintenance | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 |
| Utilities | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 |
| Administration | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 |
| Insurance | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 |
| Property Taxes | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 |
| Non Recoverable | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 |
| **Total Operating Expense** | **$220,414.69** | **$220,965.73** | **$221,518.14** | **$222,071.94** | **$222,627.12** | **$223,183.69** | **$223,741.65** | **$224,301.00** | **$224,861.75** |
| | | | | | | | | | |
| **Net Operating Income** | **$ 562,452** | **$ 588,425** | **$ 587,872** | **$ 587,318** | **$ 586,763** | **$ 586,207** | **$ 587,027** | **$ 586,468** | **$ 585,907** |
| | | | | | | | | | |
| Reserve | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 |
| Tenant Improvements | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 |
| Leasing Commissions | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 |
| **Total Leasing and Capital Cost** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** | **$ 38,101** |
| | | | | | | | | | |
| **Cashflow before Debt Service** | **$ 524,351** | **$ 550,323** | **$ 549,771** | **$ 549,217** | **$ 548,662** | **$ 548,105** | **$ 548,925** | **$ 548,366** | **$ 547,805** |

**2425 W Loop S**

Annual Expense Increase Factor

**Building Net Rentable SF**

| Plan Month | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 |
|---|---|---|---|---|---|---|---|---|---|
| | **Aug-26** | **Sep-26** | **Oct-26** | **Nov-26** | **Dec-26** | **Jan-27** | **Feb-27** | **Mar-27** | **Apr-27** |

**Plan Payments**

Administrative Claims

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Class 1 Claims: Priority Claims (TBD) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Class 2 Claims: Allowed Secured and | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Class 3 Claims: Allowed Secured Cla | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 |
| Class 4 Claims: Allowed Secured Cla | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 |
| Class 6 Claims: Repairs and Mainten | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Class 7 Claims: General Unsecured C | $0.00 | $200,000.00 | $0.00 | $0.00 | $200,000.00 | $0.00 | $0.00 | $200,000.00 | $0.00 |
| Conditional Payments - NBK (80% of | $281,226.12 | $294,212.35 | $293,936.14 | $293,659.25 | $293,381.66 | $293,103.37 | $293,513.46 | $293,233.78 | $292,953.40 |
| **Total Plan Payments** | $ 411,024 | $ 624,010 | $ 423,734 | $ 423,457 | $ 623,180 | $ 422,901 | $ 423,311 | $ 623,032 | $ 422,751 |

| **Net Cashflow** | $ 113,327 | $ (73,687) | $ 126,037 | $ 125,760 | $ (74,518) | $ 125,204 | $ 125,614 | $ (74,666) | $ 125,054 |
|---|---|---|---|---|---|---|---|---|---|

| **Cumulative Cash balance** | $5,124,497.55 | $5,050,810.53 | $5,176,847.32 | $5,302,607.20 | $5,228,089.49 | $5,353,293.50 | $5,478,907.60 | $5,404,242.02 | $5,529,296.06 |
|---|---|---|---|---|---|---|---|---|---|

* Support for Debtor Adjustments pro

**2425 W Loop S**

Annual Expense Increase Factor
**Building Net Rentable SF**

| Plan Month | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 |
|---|---|---|---|---|---|---|---|---|---|
| | May-27 | Jun-27 | Jul-27 | Aug-27 | Sep-27 | Oct-27 | Nov-27 | Dec-27 | Jan-28 |
| Base Rent Revenue | $ 839,226 | $ 839,226 | $ 839,226 | $ 839,226 | $ 865,750 | $ 865,750 | $ 865,750 | $ 865,750 | $ 865,750 |
| Absorption and Turnover Vacancy | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) |
| Base Rent Abatements | $   - | $   - | $   - | $   - | $   - | $   - | $   - | $   - | $   - |
| **Scheduled Base Rental Revenue** | $ 810,769 | $ 810,769 | $ 810,769 | $ 810,769 | $ 837,292 | $ 837,292 | $ 837,292 | $ 837,292 | $ 837,292 |
| | | | | | | | | | |
| **Total Reimbursement Revenue** | | | | | | | | | |
| | | | | | | | | | |
| Misc. Income | $0.00 | $379.92 | $0.00 | $379.92 | $0.00 | $379.92 | $0.00 | $379.92 | $0.00 |
| Parking Income | $0.00 | $1,281.25 | $0.00 | $1,281.25 | $0.00 | $1,281.25 | $0.00 | $1,281.25 | $0.00 |
| **Total Gross Revenue** | $ 810,769 | $ 812,430 | $ 810,769 | $ 812,430 | $ 837,292 | $ 838,953 | $ 837,292 | $ 838,953 | $ 837,292 |
| | | | | | | | | | |
| General Vacancy | | | | | | | | | |
| Collection Loss | | | | | | | | | |
| **Effective Gross Revenue** | $810,768.56 | $810,768.56 | $810,768.56 | $810,768.56 | $837,292.06 | $837,292.06 | $837,292.06 | $837,292.06 | $837,292.06 |
| | | | | | | | | | |
| Cleaning & Maintenance | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 |
| Marketing and Advertising | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 |
| Management Fee/Admin | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 |
| Repairs & Maintenance | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 |
| Utilities | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 |
| Administration | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 |
| Insurance | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 |
| Property Taxes | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 |
| Non Recoverable | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 |
| **Total Operating Expense** | $225,423.91 | $225,987.47 | $226,552.43 | $227,118.82 | $227,686.61 | $228,255.83 | $228,826.47 | $229,398.54 | $229,972.03 |
| | | | | | | | | | |
| **Net Operating Income** | $ 585,345 | $ 584,781 | $ 584,216 | $ 583,650 | $ 609,605 | $ 609,036 | $ 608,466 | $ 607,894 | $ 607,320 |
| | | | | | | | | | |
| Reserve | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 |
| Tenant Improvements | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 |
| Leasing Commissions | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 |
| **Total Leasing and Capital Cost** | $ 38,101 | $ 38,101 | $ 38,101 | $ 38,101 | $ 38,101 | $ 38,101 | $ 38,101 | $ 38,101 | $ 38,101 |
| | | | | | | | | | |
| **Cashflow before Debt Service** | $ 547,243 | $ 546,680 | $ 546,115 | $ 545,548 | $ 571,504 | $ 570,935 | $ 570,364 | $ 569,792 | $ 569,219 |

**2425 W Loop S**

Annual Expense Increase Factor

**Building Net Rentable SF**

| Plan Month | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 |
|---|---|---|---|---|---|---|---|---|---|
| | **May-27** | **Jun-27** | **Jul-27** | **Aug-27** | **Sep-27** | **Oct-27** | **Nov-27** | **Dec-27** | **Jan-28** |
| **Plan Payments** | | | | | | | | | |
| Administrative Claims | | | | | | | | | |
| Class 1 Claims: Priority Claims (TBD) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Class 2 Claims: Allowed Secured and | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Class 3 Claims: Allowed Secured Clc | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 |
| Class 4 Claims: Allowed Secured Clc | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 |
| Class 6 Claims: Repairs and Mainten | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Class 7 Claims: General Unsecured C | $0.00 | $200,000.00 | $0.00 | $0.00 | $200,000.00 | $0.00 | $0.00 | $200,000.00 | $0.00 |
| Conditional Payments - NBK (80% of | $292,672.33 | $292,390.55 | $292,108.06 | $291,824.87 | $304,802.72 | $304,518.12 | $304,232.80 | $303,946.76 | $303,660.01 |
| **Total Plan Payments** | $ 422,470 | $ 622,188 | $ 421,906 | $ 421,623 | $ 634,601 | $ 434,316 | $ 434,031 | $ 633,745 | $ 433,458 |
| **Net Cashflow** | $ 124,773 | $ (75,509) | $ 124,209 | $ 123,926 | $ (63,097) | $ 136,619 | $ 136,333 | $ (63,953) | $ 135,761 |
| **Cumulative Cash balance** | $5,654,069.03 | $5,578,560.21 | $5,702,768.91 | $5,826,694.42 | $5,763,597.78 | $5,900,216.54 | $6,036,549.97 | $5,972,597.37 | $6,108,358.02 |

* Support for Debtor Adjustments prc

**2425 W Loop S**

Annual Expense Increase Factor

**Building Net Rentable SF**

| Plan Month | 47 | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 |
|---|---|---|---|---|---|---|---|---|---|
| | Feb-28 | Mar-28 | Apr-28 | May-28 | Jun-28 | Jul-28 | Aug-28 | Sep-28 | Oct-28 |
| Base Rent Revenue | $ 867,197 | $ 867,197 | $ 867,197 | $ 867,197 | $ 867,197 | $ 867,197 | $ 867,197 | $ 893,720 | $ 893,720 |
| Absorption and Turnover Vacancy | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) |
| Base Rent Abatements | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Scheduled Base Rental Revenue** | $ 838,739 | $ 838,739 | $ 838,739 | $ 838,739 | $ 838,739 | $ 838,739 | $ 838,739 | $ 865,263 | $ 865,263 |
| | | | | | | | | | |
| **Total Reimbursement Revenue** | | | | | | | | | |
| | | | | | | | | | |
| Misc. Income | $379.92 | $0.00 | $379.92 | $0.00 | $379.92 | $0.00 | $379.92 | $0.00 | $379.92 |
| Parking Income | $1,281.25 | $0.00 | $1,281.25 | $0.00 | $1,281.25 | $0.00 | $1,281.25 | $0.00 | $1,281.25 |
| **Total Gross Revenue** | $ 840,400 | $ 838,739 | $ 840,400 | $ 838,739 | $ 840,400 | $ 838,739 | $ 840,400 | $ 865,263 | $ 866,924 |
| | | | | | | | | | |
| General Vacancy | | | | | | | | | |
| Collection Loss | | | | | | | | | |
| **Effective Gross Revenue** | $838,739.09 | $838,739.09 | $838,739.09 | $838,739.09 | $838,739.09 | $838,739.09 | $838,739.09 | $865,262.59 | $865,262.59 |
| | | | | | | | | | |
| Cleaning & Maintenance | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 |
| Marketing and Advertising | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 |
| Management Fee/Admin | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 |
| Repairs & Maintenance | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 |
| Utilities | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 |
| Administration | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 |
| Insurance | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 |
| Property Taxes | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 |
| Non Recoverable | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 |
| **Total Operating Expense** | $230,546.96 | $231,123.33 | $231,701.14 | $232,280.39 | $232,861.09 | $233,443.24 | $234,026.85 | $234,611.92 | $235,198.45 |
| | | | | | | | | | |
| **Net Operating Income** | $ 608,192 | $ 607,616 | $ 607,038 | $ 606,459 | $ 605,878 | $ 605,296 | $ 604,712 | $ 630,651 | $ 630,064 |
| | | | | | | | | | |
| Reserve | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 |
| Tenant Improvements | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 |
| Leasing Commissions | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 |
| **Total Leasing and Capital Cost** | $ 38,101 | $ 38,101 | $ 38,101 | $ 38,101 | $ 38,101 | $ 38,101 | $ 38,101 | $ 38,101 | $ 38,101 |
| | | | | | | | | | |
| **Cashflow before Debt Service** | $ 570,091 | $ 569,514 | $ 568,937 | $ 568,357 | $ 567,777 | $ 567,194 | $ 566,611 | $ 592,549 | $ 591,963 |

**2425 W Loop S**

Annual Expense Increase Factor

**Building Net Rentable SF**

| Plan Month | 47 | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 |
|---|---|---|---|---|---|---|---|---|---|
| | Feb-28 | Mar-28 | Apr-28 | May-28 | Jun-28 | Jul-28 | Aug-28 | Sep-28 | Oct-28 |
| **Plan Payments** | | | | | | | | | |
| Administrative Claims | | | | | | | | | |
| Class 1 Claims: Priority Claims (TBD) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Class 2 Claims: Allowed Secured and | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Class 3 Claims: Allowed Secured Clc | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 |
| Class 4 Claims: Allowed Secured Clc | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 |
| Class 6 Claims: Repairs and Mainten | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Class 7 Claims: General Unsecured ( | $0.00 | $200,000.00 | $0.00 | $0.00 | $200,000.00 | $0.00 | $0.00 | $200,000.00 | $0.00 |
| Conditional Payments - NBK (80% of | $304,096.06 | $303,807.88 | $303,518.98 | $303,229.35 | $302,939.00 | $302,647.92 | $302,356.12 | $315,325.34 | $315,032.07 |
| **Total Plan Payments** | $ 433,894 | $ 633,606 | $ 433,317 | $ 433,027 | $ 632,737 | $ 432,446 | $ 432,154 | $ 645,123 | $ 444,830 |
| **Net Cashflow** | $ 136,197 | $ (64,091) | $ 135,620 | $ 135,330 | $ (64,960) | $ 134,749 | $ 134,457 | $ (52,574) | $ 147,133 |
| **Cumulative Cash balance** | $6,244,554.73 | $6,180,463.24 | $6,316,082.86 | $6,451,412.85 | $6,386,452.48 | $6,521,201.05 | $6,655,657.80 | $6,603,083.78 | $6,750,216.49 |

* Support for Debtor Adjustments pro

| 2425 W Loop S | | | | | |
|---|---|---|---|---|---|
| Annual Expense Increase Factor | | | | | |
| **Building Net Rentable SF** | | | | | |
| **Plan Month** | **56** | **57** | **58** | **59** | **60** |
| | **Nov-28** | **Dec-28** | **Jan-29** | **Feb-29** | **Mar-29** |
| Base Rent Revenue | $ 893,720 | $ 893,720 | $ 893,720 | $ 893,720 | $ 893,720 |
| Absorption and Turnover Vacancy | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) | $ (28,458) |
| Base Rent Abatements | $ - | $ - | $ - | $ - | $ - |
| **Scheduled Base Rental Revenue** | $ 865,263 | $ 865,263 | $ 865,263 | $ 865,263 | $ 865,263 |
| | | | | | |
| **Total Reimbursement Revenue** | | | | | |
| | | | | | |
| Misc. Income | $0.00 | $379.92 | $0.00 | $379.92 | $0.00 |
| Parking Income | $0.00 | $1,281.25 | $0.00 | $1,281.25 | $0.00 |
| **Total Gross Revenue** | $ 865,263 | $ 866,924 | $ 865,263 | $ 866,924 | $ 865,263 |
| | | | | | |
| General Vacancy | | | | | |
| Collection Loss | | | | | |
| **Effective Gross Revenue** | $865,262.59 | $865,262.59 | $865,262.59 | $865,262.59 | $865,262.59 |
| | | | | | |
| Cleaning & Maintenance | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 | $19,180.58 |
| Marketing and Advertising | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 |
| Management Fee/Admin | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 | $1,175.67 |
| Repairs & Maintenance | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 | $72,922.83 |
| Utilities | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 | $38,361.08 |
| Administration | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 | $10,000.00 |
| Insurance | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 | $17,627.00 |
| Property Taxes | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 | $38,833.33 |
| Non Recoverable | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 | $2,430.75 |
| **Total Operating Expense** | $235,786.45 | $236,375.91 | $236,966.85 | $237,559.27 | $238,153.17 |
| | | | | | |
| **Net Operating Income** | $ 629,476 | $ 628,887 | $ 628,296 | $ 627,703 | $ 627,109 |
| | | | | | |
| Reserve | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 | $6,076.92 |
| Tenant Improvements | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 | $20,061.33 |
| Leasing Commissions | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 | $11,963.17 |
| **Total Leasing and Capital Cost** | $ 38,101 | $ 38,101 | $ 38,101 | $ 38,101 | $ 38,101 |
| | | | | | |
| **Cashflow before Debt Service** | $ 591,375 | $ 590,785 | $ 590,194 | $ 589,602 | $ 589,008 |

| 2425 W Loop S | | | | | |
|---|---|---|---|---|---|
| Annual Expense Increase Factor | | | | | |
| **Building Net Rentable SF** | | | | | |
| **Plan Month** | 56 | 57 | 58 | 59 | 60 |
| | **Nov-28** | **Dec-28** | **Jan-29** | **Feb-29** | **Mar-29** |
| **Plan Payments** | | | | | |
| Administrative Claims | | | | | |
| Class 1 Claims: Priority Claims (TBD) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Class 2 Claims: Allowed Secured and | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Class 3 Claims: Allowed Secured Cla | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 | $9,595.29 |
| Class 4 Claims: Allowed Secured Cla | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 | $120,202.66 |
| Class 6 Claims: Repairs and Mainten | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Class 7 Claims: General Unsecured C | $0.00 | $200,000.00 | $0.00 | $0.00 | $0.00 |
| Conditional Payments - NBK (80% of | $314,738.07 | $314,443.34 | $314,147.87 | $313,851.66 | $313,554.71 |
| **Total Plan Payments** | $ 444,536 | $ 644,241 | $ 443,946 | $ 443,650 | $ 443,353 |
| **Net Cashflow** | $ 146,839 | $ (53,456) | $ 146,249 | $ 145,952 | $ 145,655 |
| **Cumulative Cash balance** | $6,897,055.20 | $6,843,599.17 | $6,989,847.68 | $7,135,799.98 | $7,281,455.33 |

* Support for Debtor Adjustments pro



**2425 W Loop S**
Central to the River Oaks District and Galleria



ICONIC  GALLERIA  OFFICE  SPACE
AVAILABLE IMMEDIATELY

BUILDING & MONUMENT
SIGNAGE AVAILABLE

RESPONSIVE
OWNERSHIP



092072

# AMENITIES

## AMENITIES INCLUDE

• Updated natural outdoor courtyard setting for outdoor breaks and brainstorming
• Continuous window line offers natural light and expansive panoramic views
• The Tri-be. a high-end fitness center with locker rooms and showers,offering community driven yoga, massage and fitness options
• A breathtaking 11-story +10,000 square foot ground floor lobby, bathed in natural light and featuring bespoke furniture for breaks, meetings and available to tenants for pre-arranged social functions
• On-site management & courtesy officer
• 24-hour secure keycard access
• Multi-level parking garage / free valet parking for visitors and guests
• Lobby recently renovated and available for tenant events
• Available for immediate occupancy available with Herman Miller furniture and CAT 6 data cabling in place
• New prime ground floor tenant lounge and conference facility
•Retina scanners for building and floor access
•Jetvan Shuttle





## AREA AMENITIES

• The Galleria & Memorial Park
• Abundant shopping, hotels & banks nearby
• Easy access to 610 Loop, I-10, I-69 & Westpark Tollway
• On METRO bus route
• Adjacent to Hotel Derek, new Equinox hotel, and River Oaks District
• Walkable to Galleria and new METRO Post Oak Bus Rapid Transit
• Over 15 restaurants in walking distance









002073













> " Architecture is the very mirror of life. You only have to cast your eyes on buildings to feel the presence of the past,
> the spirit of a place; they are the reflection of society. "
>
> — Ieoh Ming Pei

Known for his creative use of modernist architecture in combination with natural elements and open spaces, I.M. Pei is celebrated for iconic designs such as the Louvre Pyramid in Paris, the Bank of China Tower in Hong Kong, the JFK Library in Boston, Herbert Johnson Museum of Art in Cornell University, Doha Islamic Arts Museum, Ronald Regan Building in Washington DC, the First International Bank of Israel in Tel Aviv, University Plaza in New York, The Landmark in Irvine, California and the NASCAR Hall of Fame... Just to name a few!



Louvre Pyramid. Paris, France.



Museum of Islamic Art. Doha, Qatar.



Bank of China Tower. Hong Kong.



2425 has an onsite Wellness Collective called Tri.be. We believe that a healthy mind and body create a better working environment. Located on the third floor, Tri.be is a boutique wellness community for our tenants, with holistic wellness services. All 2425 tenants are eligible for a subsidized membership that include unlimited classes such as HIIT, MAT, BARRE, YOGA, YOGA BURN and MEDITATION. The wellness collective will also be inviting in wellness practitioners specializing in diet, acupuncture, massage, hypnotherapy, mediation, reiki, and more.





002075

# READY TO GO

Available for immediate occupancy - Plug and Play 200,000 SF contiguous floors with available Herman Miller furniture and CAT 6 cabling in place.



**Typical Floor Plan**
151– Workstations
11– Offices
10 – Conference/Huddle









## CONTACT US

### VISIT

Area Map

2425 West Loop South, Houston, TX 77027





| | |
|---|---|
| In re: | § |
| | §   **Case No. 23-34815 (JPN)** |
| **GALLERIA 2425 Owner, LLC** | § |
| | §   **Chapter 11** |
| Debtor. | § |
| | § |

### NATIONAL BANK OF KUWAIT, S.A.K.P, NEW YORK BRANCH'S OMNIBUS REPLY IN SUPPORT OF MOTION PURSUANT TO 11 U.S.C. § 1112(b) TO CONVERT CHAPTER 11 CASE TO CHAPTER 7

**TO THE HONORABLE JEFFREY P. NORMAN, U.S. BANKRUPTCY JUDGE:**

National Bank of Kuwait, S.A.K.P. New York Branch ("NBK") replies (the "Reply") to 2425 WL, LLC's and the Debtor's responses (the "Responses") (ECF Nos. 78 and 80, respectively) to NBK's[1] motion to convert this Chapter 11 case to one under Chapter 7 (the "Motion") (ECF No. 72). As support, NBK represents as follows.

### PRELIMINARY STATEMENT

The Debtor's bankruptcy case, filed barely a month after its first was dismissed for cause, should be converted to a case under Chapter 7 because there is a substantial and continuing diminution of the estate and because the Debtor cannot confirm a plan. Rather than address these issues, the Responses seek to distract the Court with spurious claims about NBK's alleged conduct from years ago – any claim relating to which was released and dismissed with prejudice by the Debtor in 2022 – and claims about other parties and their counsel that have no bearing whatsoever on the issues raised by the Motion.

---

[1]   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

There is no dispute that, at a minimum, the Debtor's estate has continued to suffer losses and/or diminish due to the Debtor's inability or refusal to pay its property tax obligations. Indeed, the Debtor has not paid any taxes for the 2019, 2020, 2021, 2022 and 2023 tax years. Those tax liens, or the loans that were obtained to pay them, accrue interest at rates as high as 17%. Rather than attempt to service that debt, the Debtor has instead paid fees to insiders thereby deepening the Debtor's losses.

There is also no dispute that the Debtor cannot confirm a plan here. The Debtor seeks to reorganize, with existing equity keeping its interests. To do that, NBK's loan, and the loans owed relating to the Debtor's tax obligations, need to be reinstated and all pre-petition defaults cured. The Debtor lacks the funds to make those payments, which total nearly $9 million to NBK alone, a huge sum considering the Debtor values the Property at only $17.5 million.

The case should be converted to one under Chapter 7 of the bankruptcy code.

## REPLY

As stated in the Motion, Section 1112(b) of the Bankruptcy Code provides that "the court *shall* convert a case" for cause. *See* 11 U.S.C. § 1112(b)(1) (emphasis added). Once cause is demonstrated, conversion is *mandatory* absent unusual circumstances or other exceptions to conversion (which are absent here). *See* Motion at ¶ 22.

### A. Cause Exists For Conversion

NBK submits that the Motion established cause for conversion on at least two grounds: first, cause exists under Section 1112(b)(4)(A) because there is a substantial or continuing loss to, or diminution of, the estate due to the Debtor's failure to pay property taxes for the past 5 years and the continued accrual of interest – which has also not been paid – on the loans that initially satisfied certain of those tax obligations. Indeed, rather than pay any amounts towards

2

that interest or principal debt, the Debtor instead paid insiders like Jetall, a company owned by the Debtor's ultimate equity holder, Mr. Choudhri, more than $329,000 in the one-year period before this case was filed. *See* ECF 70-2.

The Debtor did not pay 2019, 2020 or 2021 real estate taxes but rather entered into tax payment contracts with Caz Creek TX II, LLC, for the 2019 and 2020 taxes, and CC2 TX LLC (with Caz Creek TX II, LLC, the "<u>Tax Lien Purchasers</u>") for the 2021 taxes, to pay those taxes on the Debtor's behalf. Under Texas law, the Tax Lien Purchasers obtained tax liens against the Property from the taxing authority and have the right to foreclose that lien if the tax obligations are not paid. Pursuant to the Debtor's contracts with the Tax Lien Purchasers, interest accrues on these tax obligations at 17% per year. *See* ECF 72-4. The schedules, statements and other materials filed by the Debtor show that no amounts have been paid on account of these obligations.

The Debtor has also not paid 2022 and 2023 real estate taxes to the Houston Independent School District, the City of Houston, nor the Houston Community College System. Penalties and interest for unpaid real estate taxes is 12%. *See* Motion at ¶ 36. Combined, penalties and interest on the 2022 real estate taxes have accrued by a total of approximately $254,331.06 and will increase further if those taxes remain unpaid by the end of this month. *See* Proofs of Claim Nos. 1-1, 2-1 and 3-1. Similarly, penalties and interest for the 2023 real estate taxes will accrue after the end of this month by a total of approximately $34,096.60.

The Debtor's failure to pay real estate taxes, and the interest that continues to accrue on those unpaid amounts, constitutes continued diminution of the estate, and erosion of the liquidation and distribution value of the Debtor's assets for creditors. *See, e.g.*, *In re Burgess*, No. 11-1257, 2013 WL 5874616, at *2 (Bankr. N.D. W. Va. Oct. 30, 2013) (finding diminution

3

of the estate where accrual of unpaid real estate taxes eroded the value to unsecured creditors and jeopardized the debtor's ownership interest in the properties); *In re Spencerport Dev., LLC*, No. 14-21154 PRW, 2014 WL 6886637, at *2 (Bankr. W.D.N.Y. Dec. 4, 2014) (finding substantial and continuing loss to and diminution of the estate for multiple reasons, including accrual of prepetition real estate taxes in the amount of $575,0000).

But, the Debtor's losses and the diminution of its estate are not limited to its failure to make tax payments. The Debtor's first monthly operating report shows an operating loss of more than $50,000 based in part on a revenue shortfall of more than $130,000. The Debtor previously projected rental income of $229,579.02 in December 2023. *See* Motion at ¶ 18. The December Monthly Operating Report filed by the Debtor reported that rent income for that month was $97,774, reflecting a shortfall of $131,805.02 from the Debtor's projection. *See* ECF No. 79. Once expenses were paid, and amounts accrued for ad valorem taxes are included, the MOR reflects an operating loss of $52,588. Incredibly, the Debtor has also failed to pay the United States Trustee **$345** for quarterly fees owed in the first bankruptcy case (*see* Proof of Claim No. 4-1).

### B. There Is No Reasonable Likelihood of Rehabilitation And The Debtor Cannot Confirm a Plan

The Debtor cannot confirm a plan, and the Court is not required to wait until a plan and disclosure statement is filed to make that determination. *See In re Woodbrook Associates*, 19 F.3d 312, 317 (7th Cir. 1994) ("The very purpose of § 1112(b) is to cut short this plan and confirmation process where it is pointless.") *See also In re Irasel Sand, LLC*, 569 B.R. 433, 442 (Bankr. S.D. Tex. 2017) (likelihood of rehabilitation absent because the debtor could not operate profitably without third party financing and no prospects such financing was presented to the court); *Quarles v. U.S. Tr.*, 194 B.R. 94, 97 (W.D. Va. 1996) (no likelihood of rehabilitation

4

002081

when debtor was generating no profits and reorganization depended on speculative outcomes); *In re Cont'l Holdings*, 170 B.R. 919, 931 (Bankr. N.D. Ohio 1994) (there was no likelihood of rehabilitation when debtor lacked a reasonably certain source of income). *In re LS. Good & Co.*, 8 B.R. 315, 318 (Bankr. N.D.W. Va. 1980) (likelihood of rehabilitation did not exist because the court was "unaware of any sources offering to lend the capital essential to the rehabilitation" of the debtor.); 7 Collier on Bankruptcy ¶ 1112.04[6][(a)[ii] (16th ed. 2023) ("Visionary schemes that entail risk to creditors without any reasonable probability of success usually warrant prompt conversion to chapter 7.").

The plan and confirmation process would be pointless here because the Debtor cannot confirm a plan over NBK's objection. First, the Debtor is administratively insolvent as it lacks the funds to fund its operations, let alone the huge amounts of capital that would be required for it to effectively reorganize. The Debtor denies its administrative insolvency on the basis of "the investment of funds into the equity of the Debtor post filing," ECF No. 80 at ¶ 77, but there is no evidence of any such investment, nor is there any evidence of an agreement relating to such financing. Without a firm understanding of the source and validity of the Debtor's supposed funding, to the extent it even exists, the Court and parties in interest should assume such funding could disappear at any time. Certainly, such effectively non-existent funding is an insufficient basis on which to confirm a plan.

The Debtor also argues that "it has funds" and that it does "not lack income, operating funds or other means to reorganize." ECF No. 80 ¶¶ 77, 78. But, these conclusory assertions are belied by its own filings. The Debtor's December 2023 MOR shows both that revenues have failed to match projections and that the Debtor is operating at a loss, even without paying any administrative expense or any interest, let alone principal, on its numerous secured debts.

002082

The 'alternative facts' with which the Debtor is operating are perhaps best shown by its assertion that Jetall "is paying rent and has been paying rent." ECF No. 80 at ¶ 29. Notably, the supposed proof of that claim is not a bank statement, canceled check, wire confirmation or other actual evidence of payment, but rather an email <u>from almost five years ago</u> in which Ms. Zaheer told NBK that Jetall was paying rent, albeit late. ECF No. 80-8. That might have been true then but that says nothing about what is happening now. And, what is happening now is that Jetall and the Debtor, with Mr. Choudhri on both sides of the negotiations, amended Jetall's lease to provide for zero rent. *See* September 22, 2023 Hr'g Tr. at 74:2-5 ("Q. And Jetall's always continuing not to pay rent? A. The lease is here, and Jetall's abiding by the lease that it has. And there is free rent that does burn off just like any other tenant. That's in the lease with Jetall."); 74:25-75:3 ("Q. With respect to the Jetall lease, is it fair to say that the lease was negotiated with you on both sides of the transaction? A. That is true.").

## C. The Debtor Cannot Confirm A Plan Because It Cannot Reinstate Its Secured Loans

While it has not yet filed a plan in this case, the Debtor has made clear that, like the plan it filed in its first case, the Debtor intends to propose a plan that allows existing equity to keep its interests and does not involve a payoff or refinancing of existing secured debt. Necessarily such a plan involves the reinstatement of that secured debt. But, in order to reinstate secured debt, the Debtor will have to pay pre-petition default interest. *See In re Golden Seahorse LLC*, 652 B.R. 593 (Bankr. S.D.N.Y. 2023); *In re Moody Nat. SHS Houston H, LLC*, 426 B.R. 667, 672-73 (Bankr. S.D. Tex. 2010) (to reinstate a loan under a plan, the debtor must pay default interest to the extent required by contract and permitted by state law); *In re Sagamore Partners, Ltd.*, 620 F. App'x 864, 869 (11th Cir. 2015) (debtor must pay secured lender default-rate interest prior to reinstatement of the loan under the chapter 11 plan); *In re Moshe*, 567 B.R. 438, 444-45 (Bankr. E.D.N.Y. 2017) (same); *In re 1 Ashbury Ct. Partners, L.L.C.*, No. 11-10131, 2011 WL 4712010,

6

at *4-5 (Bankr. D. Kan. Oct. 5, 2011) (finding that the creditor was "entitled to default interest from the date of default"). For NBK's loan alone, those sums total nearly $9 million. *See* ECF 72-2 (NBK proof of claim); July 20, 2023 *Declaration of Michael Carter* (*see Galleria I* ECF No. 33-2).

There is no realistic possibility that the Debtor can propose a feasible plan that reinstates NBK's loan and pays NBK default interest of nearly $9 million, then the Property, according to the Debtor, is worth only $17,500,000. The Debtor's inability to propose a feasible plan is alone cause for conversion. *In re Ramreddy, Inc.*, 440 B.R. 103, 113 n.26 (Bankr. E.D. Pa. 2009) (noting that the inability to propose a feasible plan, by itself, constitutes cause for conversion).

**D. The Debtor Has Not Demonstrated Unusual Circumstances or Other Exceptions that Justify Denial of the Motion**

Once cause for conversion under Section 1112(b) is established, a debtor opposing conversion has a significant burden to overcome. First, the debtor must identify "unusual circumstances" showing that conversion is not in the best interest of creditors and the estate. Second, the debtor must establish that there is a reasonable likelihood that a plan will be confirmed within a reasonable time.[2] Third, the debtor must show that it has a reasonable justification for its act or omission that constitutes "cause" for conversion, and fourth that such cause will be cured within a reasonable time. *See* 11 U.S.C. §§ 1112(b)(2)(A) and (B).

Although the term 'unusual circumstances' is not defined in the Bankruptcy Code, the phrase "contemplates facts that are not common to chapter 11 cases generally." *In re Triumph Christian Ctr., Inc.*, 493 B.R. 479, 496 (Bankr. S.D. Tex. 2013). The unusual circumstances inquiry is fact intensive, and courts have found unusual circumstances where a plan proposes "to

---

[2] Where cause exists under Section 1112(b)(4)(M), such a showing by the debtor is not possible and conversion is mandatory.

002084

pay all creditors in full as of the effective date of the plan." *Id.*; *see also In re Orbit Petroleum, Inc.*, 395 B.R. 145, 149 (Bankr. D.N.M. 2008) ("A plan which proposes to pay all creditors in full on the effective date is an unusual circumstance sufficient to deny conversion or dismissal even in the face of demonstrated cause. Creditors and the estate will be far better off if the plan is confirmed than if the case were dismissed or converted.").

The Responses include no evidence or argument concerning any unusual circumstances here. Instead, they waste the Court's time and seek to distract by reference to other cases and matters that have no relevance to the Debtor's financial condition or its ability to confirm a plan.

### E. The Debtor's Remaining Arguments Are Without Merit

To the extent the Responses attempt to address the merits of the Motion, they appear to argue that (i) the Debtor has claims against NBK that it can setoff, in whole or in part, against NBK's secured claims; and (ii) that conversion benefits only NBK and harms other creditors. Neither argument has any merit.

While NBK asserts that the Debtor's claims against it are entirely without merit, they are also irrelevant to the conversion analysis. Section 558 of the Bankruptcy Code preserves for the estate those defenses the pre-petition debtor would have, including setoff rights. But, the Debtor has already acknowledged – in its settlement agreement with NBK – that as of August 22, 2022, it owed NBK $60,212,816.90 "without defenses, setoffs, claims, counterclaims or deductions of any nature whatsoever, all of which are hereby expressly waived." In any event, to the extent that the Debtor's claims against NBK have any merit – and they clearly do not – those claims can be investigated and, if appropriate pursued, by a chapter 7 trustee.

As stated, the Debtor also argues that conversion would only benefit NBK because NBK's foreclosure (presumably, the Debtor means NBK's credit bid at a Section 363 sale conducted by the chapter 7 trustee) would wipe out other creditors. NBK's foreclosure may

8

wipe out other creditors, but conversion of this case to chapter 7 would, finally, install an independent fiduciary to review – for the benefit of creditors – the Debtor's pre-petition transactions, including transactions involving insiders. This investigation could result in substantial claims for the benefit of creditors. Also, to the extent that a 363 sale, or the chapter 7 trustee's abandonment of the Property to NBK, occurs that would benefit, not harm, creditors.

The Debtor has been a very poor steward of the Property, vendors, utility providers and taxing authorities have not been paid while the Debtor continues to run the Property into the grounds and transfer funds to insiders instead of legitimate creditors. A foreclosure or other transfer of the Property stops that immediately. While in that circumstance the Debtor's insiders can no longer use the Property as their personal piggy bank, there is no question that conversion and the related installation of an independent fiduciary to manage the estate will benefit creditors.

In sum, the Debtor has not come forward with any legitimate grounds on which to deny conversion here. There is no question that conversion is in the best interest of creditors and NBK respectfully requests that its Motion be granted.

### NOTICE

Notice of this Reply has been provided to: (a) the Office of the United States Truste for the Southern District of Texas; (b) counsel to Naissance Galleria, LLC; (c) proposed counsel to the Debtor; (d) any party that has requested notice pursuant to Bankruptcy Rule 2002, and (e) the Debtor's mailing matrix. NBK submits that no other or further notice is required.

002086

<u>**CONCLUSION**</u>

WHEREFORE, NBK respectfully requests that the Court enter the Proposed Order granting (i) the relief requested in the Motion and (ii) other relief as is just and proper.

DATED: January 29, 2024

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Charles C. Conrad*
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010-1028
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

-    *and*   -

Andrew M. Troop  (Bar No. MA547179)
Patrick E. Fitzmaurice*
Kwame O. Akuffo*
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

*Admitted *pro hac vice*

***Counsel for National Bank of Kuwait, S.A.K.P., New York Branch***

002087

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 29, 2024, a true and correct copy of this document was served via the Court's CM/ECF system on the Debtor and its counsel of record and all others who are deemed to have consented to ECF electronic service, and also by mailing, first class, postage prepaid, to each of the parties on the attached mailing matrix.

<u>    <i>/s/ Charles C. Conrad</i>    </u>
Charles C. Conrad

002088

Label Matrix for local noticing
0541-4
Case 23-34815
Southern District of Texas
Houston
Mon Jan 29 15:08:09 CST 2024

2425 WL, LLC
2425 West Loop South 11th floor
Houston, TX 77027-4304

CC2 TX, LLC
c/o Howard Marc Spector
Spector & Cox, PLLC
12770 Coit Road Suite 850
Dallas, TX 75251-1364

City of Houston
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

Galleria 2425 Owner, LLC
1001 West Loop South 700
Houston, TX 77027-9084

(p)HARRIS COUNTY ATTORNEY'S OFFICE
P O BOX 2928
HOUSTON TX 77252-2928

Houston Community College System
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

Houston ISD
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

National Bank of Kuwait, S.A.K.P., New York

4
United States Bankruptcy Court
PO Box 61010
Houston, TX 77208-1010

2425 WL, LLC
13498 Pond Springs Rd.
Austin, TX 78729-4422

ADT
PO Box 382109
Pittsburgh, PA 15251-8109

Ali Choudhry
1001 West Loop South 700
Houston, TX 77027-9084

Ash Automated Control Systems, LLC
PO Box 1113
Fulshear, TX 77441-2013

CFI Mechanical, Inc
6109 Brittmoore Rd
Houston, TX 77041-5610

CNA Insurance Co
PO Box 74007619
Chicago, IL 60674-7619

Caz Creek Lending
118 Vintage Park Blvd No. W
Houston, TX 77070-4095

Cirro Electric
PO Box 60004
Dallas, TX 75266

City of Houston
PO Box 1560
Houston, TX 77251-1560

City of Houston
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

Comcast
PO Box 60533
City of Industry, CA 91716-0533

Datawatch Systems
4520 East West Highway 200
Bethesda, MD 20814-3382

Environmental Coalition Inc
PO Box 1568
Stafford, TX 77497-1568

Ferguson Facilities Supplies
PO Box 200184
San Antonio, TX 78220-0184

Firetron
PO Box 1604
Stafford, TX 77497-1604

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062-7917

Gulfstream Legal Group
1300 Texas St
Houston, TX 77002-3509

HNB Construction, LLC
521 Woodhaven
Ingleside, TX 78362-4678

Harris County Tax Assessor
PO Box 4622
Houston, TX 77210-4622

Houston Community College System
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

Houston ISD
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

Kings 111 Emergency Communications
751 Canyon Drive, Suite 100
Coppell, TX 75019-3857

Lexitas
PO Box Box 734298 Dept 2012
Dallas, TX 75373-4298

Logix Fiber Networks
PO Box 734120
Dallas, TX 75373-4120

MacGeorge Law Firm
2921 E 17th St Blgd D Suite 6
Austin, TX 78702-1572

Mueller Water Treatment
1500 Sherwood Forest Dr.
Houston, TX 77043-3899

National Bank of Kuwait
299 Park Ave. 17th Floor
New York, NY 10171-0023

Nationwide Security
2425 W Loop S 300
Houston, TX 77027-4205

Nichamoff Law Firm
2444 Times Blvd 270
Houston, TX 77005-3253

TKE
3100 Interstate North Cir SE  500
Atlanta, GA 30339-2296

U.S. Trustee's Office
515 Rusk, Suite 3516
Houston, Texas 77002-2604

US Trustee
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002-2604

Waste Management
PO Box 660345
Dallas, TX 75266-0345

Zindler Cleaning Service Co
2450 Fondren 113
Houston, TX 77063-2314

James Q. Pope
The Pope Law Firm
6161 Savoy Drive
Ste 1125
Houston, TX 77036-3343

Reese W Baker
Baker & Associates
950 Echo Lane
Suite 300
Houston, TX 77024-2824

Rodney Drinnon
McCathern Houston
2000 W Loop S
Ste. 1850
Houston, TX 77027-3744

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Harris County, ATTN: Property Tax Division
Harris County Attorney's Office
P.O. Box 2928
Houston, TX 77252-2928 United States

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)2425 West Loop, LLC

End of Label Matrix
Mailable recipients    46
Bypassed recipients     1
Total                  47

002090

Akin Gump Strauss Hauer & Feld LLP
1111 Louisiana Street
44th Floor
Houston, TX 77002

T  +1 713.220.5800
F  +1 713.236.0822
akingump.com



**Jim Wetwiska**
+1 713.250.2177/fax: +1 713.236.0822
npetree@akingump.com

June 28, 2023

**VIA EMAIL**

Charles C. Conrad
Pillsbury Winthrop Shaw Pittman LLP
Two Houston Center
909 Fannin, Suite 2000
Houston, Texas 77010

> Re:   *Galleria 2425 Owner LLC v. National Bank of Kuwait, S.A.K.P.*, Cause No. 2021-63370 in the 281st Judicial District Court of Harris County, Texas

Charles,

Galleria is in the process of funding the Settlement Payment / Purchase Option Payment to NBK under the Confidential Settlement Agreement dated August 22, 2022 (the "Confidential Settlement Agreement").[1]  To facilitate this, can you please provide the following information and documentation by 1:00 pm CST today:

1. Confirmation of the specific amount of the Settlement Payment / Purchase Option Payment for satisfaction or purchase of the Loan Documents by July 3, 2023.  Based on the Settlement Agreement and the Court's order, our calculation is that this amount is $27 million less the $801,509.42 Down Payment less each of the $80,000 monthly payments made by Galleria to NBK this year.  Please confirm that this is correct.

2. Drafts of the following documents in forms that are acceptable to NBK:

    a. A Loan Purchase and Sale Agreement

    b. Assignment of NBK's lien and the Tax Liens

    c. Allonge

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed in the Confidential Settlement Agreement.



Charles C. Conrad
June 28, 2023
Page 2

Thank you very much for your time and prompt attention to this matter.  Please do not hesitate to contact me if you have any questions on these items.

Best regards,

*/s/ Jim Wetwiska*

Jim Wetwiska

## LOAN PURCHASE AND SALE AGREEMENT

**THIS LOAN PURCHASE AND SALE AGREEMENT** (this "**Agreement**") is made this [] th day of July, 2023 (the "**Effective Date**"), between **National Bank of Kuwait, S.A.K.P.** ("**Seller**") and [] ("**Purchaser**").

## RECITALS

A: Reference is hereby made to that certain loan in the original principal amount of $51,675,000.00 made by Seller as Lender to Galleria 2425 Owner, LLC, a Delaware limited liability company ("**Borrower**") as of May 23, 2018 (the "**Loan**") pursuant to that certain Loan Agreement dated as of May 23, 2018, between Borrower and Seller (the "**Loan Agreement**") and the other Loan Documents (as defined below).

B: Seller has agreed to sell, and Purchaser has agreed to purchase, all of Seller's right, title and interest in, to and under the Loan and the Loan Documents pursuant to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual agreement set forth herein and for other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged). Purchaser and Seller agree as follows:

1. <u>PURCHASE AND SALE.</u>

(a) Subject to an in accordance with the terms and conditions of this Agreement, Seller hereby agrees to sell, assign and deliver to Purchaser, and Purchaser agrees to purchase and accept from Seller all of Seller's right, title, and interest in, to and under the Loan and the Loan Documents for an amount equal to $26,038,490.58 (the "**Purchase Price**") payable by Purchaser in immediately available funds via wire transfers to accounts designated by Seller on Exhibit []. Such sale and purchase is without recourse to Seller, and except as expressly provided in Section 4 of this Agreement, is without representation or warranty by Seller.

(b) In addition to payment of the Purchase Price to Seller on or prior to the Effective Date, Purchaser will deliver the following closing documents to Seller on or prior to the Effective Date:

i. An Assignment and Assumption Agreement of the Loan and Loan Documents (the "**Loan Assignment**") in the form of <u>Exhibit C-1</u> attached hereto, executed by Purchaser; and

ii. An Acknowledgement, Waiver and Release in the form of <u>Exhibit C-2</u> attached hereto executed by Borrower, Guarantor and Mezzanine Lender.

(c)    Seller will deliver the following closing documents to Purchaser on or prior to the Effective Date but in any event after Seller's receipt of the Purchase Price as described in Section 1(a) and Exhibit ==[]==:

       i.    The original Promissory Note made by Borrower in favor of Seller (the "**Note**") and an endorsement of the Note from Seller to Purchaser in the form of <u>Exhibit B</u> attached hereto (the "**Allonge**");

       ii.    The Loan Assignment, executed by Seller;

       iii.    An Assignment of Deed of Trust in the form of <u>Exhibit C-3</u> attached hereto, executed by Seller; and

       iv.    Copies of the Loan Documents (as defined below) (other than the originals of the Note delivered by Seller in accordance with this <u>Section 1(c)</u>);

2.    <u>CONDITIONS PRECEDENT</u>.  Seller's obligation to sell, transfer, assign, grant, and convey the Loan and Loan Documents to Purchaser shall be subject to the conditions that (a) Purchaser's representations and warranties in this Agreement are true and correct on the Effective Date, (b) Purchaser shall have complied in all material respects with all covenants required by this Agreement to be complied with by it on or before the Effective Date, (c) Seller shall have received this Agreement and the other documents set forth in Section 1(b), duly executed on behalf of Purchaser to the extent contemplated by Section 1(b), and (d) Seller shall have received payment of the Purchase Price from Purchaser.

3.    <u>SALE NOT LOAN</u>.  Seller and Purchaser intend that the transfer of Seller's right, title and interest in and to the Loan and the Loan Documents pursuant to this Agreement shall constitute a purchase and sale and not a loan.  Seller's and Purchaser's records shall reflect such transfer as a sale and purchase.  Nothing herein contained shall be deemed or construed to create a co-partnership or joint venture between the parties hereto.

4.    <u>SELLER'S REPRESENTATIONS</u>.  Seller represents and warrants to Purchaser, as of the Effective Date, that:

(a)    Seller (i) is duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is in good standing under such laws, and (iii) has full power and authority to execute, deliver and perform its obligations under this Agreement. Seller is the sole legal and beneficial owner of and has good title to the Loan and the Loan Documents, free and clear of any lien, security interest, pledge, or other charge, claim or encumbrance.

(b)    <u>Exhibit A </u>is a true and correct listing of the Loan Documents (collectively, the "**Loan Documents**").

5.    <u>PURCHASER'S REPRESENTATIONS, WARRANTIES AND AGREEMENTS</u>.  Purchaser represents and warrants to, and covenants with, Seller as of the Effective Date that:

4853-6820-3629.v2
002094

(a)     Purchaser is a [] corporation/limited liability company/limited partnership/other, validly existing and in good standing under the laws of [].  Purchaser has the full power, authority, and legal right to purchase, acquire and own the Loan and the Loan Documents and to perform its obligations thereunder. Purchaser has the full power, authority and legal right, and has taken all action necessary, to execute and deliver this Agreement and the Loan Assignment.

(b)     The execution and delivery of this Agreement and the Loan Assignment by Purchaser, and Purchaser's performance and compliance with the terms of those agreements, will not (i) violate any Purchaser's organizational documents, or (ii) constitute a default under, or result in the breach of, any contract, agreement or other instrument to which Purchaser is a party or which may be applicable to Purchaser or Purchaser's assets.

(c)     No consent, approval, authorization or order of any court of governmental agency or body is required for the execution, delivery and performance by Purchaser of this Agreement or the Loan Assignment, or compliance by Purchaser therewith, or if required, such approval has been obtained.

(d)     Purchaser has not filed any petition seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any law relating to bankruptcy or insolvency, nor has any such petition been filed against Purchaser.  No general assignment of Purchaser's property has been made for the benefit of creditors, and no receiver, master, liquidator or trustee has been appointed for Purchaser or any of its properties.  Purchaser is not insolvent and the consummation of the transactions contemplated by this Agreement shall not render Purchaser insolvent.  Purchaser has, as of the date hereof, sufficient capital or net worth to meet its respective obligations.  Purchaser has liquidated financial resources adequate to consummate the transactions contemplated herein.

(e)     Purchaser has not dealt with any financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement.

6.     "As-Is" LOAN SALE.

(a)     Other than, the express representations and warranties set forth in this Agreement, the Loan is being sold, transferred and assigned to Purchaser "AS-IS, WHERE IS, AND WITH ALL FAULTS". Purchaser hereby acknowledges that none of Seller nor any other person or entity has made any representations or warranties with respect to the Loan or the other Loan Documents (except as expressly provided herein), and that, except to the extent provided herein, none of Seller nor any other person or entity shall have any responsibility for (i) the collectability of the Loan, (ii) the validity, enforceability or legal effect of any of the Loan Documents, (iii) the validity, sufficiency, priority or effectiveness of any lien created by the Loan Documents, (iv) the financial condition of Borrower or any guarantor(s) or the ability of any such party to perform their respective obligations under the Loan Documents, (v) the existence or nonexistence of any default or event of default under the Loan Documents, (vi) rights of offset, deductions, negotiability or holder in due course status, or the accuracy or completeness of the matters disclosed, represented or warranted by any party in the Loan Documents, (vii) the

3

condition of the Loan or the Loan or the value or income potential of the Loan, the Property (as defined in the Loan Documents) or any collateral for the Loan, (viii) the adequacy of the collateral for the Loan or (ix) the state of title to the Property or any other collateral pledged in respect of the Loan. Without in any way limiting the generality of the foregoing, except as expressly provided herein, Seller has not made, does not make or undertake, and expressly disclaims any representation, warranty or obligation, expressed or implied, as to any characteristic or other matter affecting or related to the Property, including the presence of any toxic or hazardous waste or substance in the Property or any other environmental or other matters related to the physical condition of the Property (both surface and subsurface). Purchaser assumes all risk of loss in connection with the Loan from and after the date hereof. Purchaser hereby approves and acknowledges that Seller has made available to Purchaser all of the Loan Documents, and that Purchaser has reviewed such Loan Documents and the terms of the Loan.

(b)     Each of Seller and Purchaser acknowledges that it has, independently and without reliance upon the other party (except for the representations and warranties of the other party expressly set forth herein) and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to sell or purchase (as applicable) the Loan and it accepts responsibility therefor. Purchaser acknowledges that Seller has not provided Purchaser, and Purchaser has not relied on or used in any other way, any credit analysis of Borrower (or any affiliate thereof) or the Properties prepared by Seller or any investigation or assessment of risk with respect to the Loan prepared by Seller.

7.     GOVERNING LAW: SUBMISSION TO JURISDICTION.

THIS AGREEMENT AND THE RIGHTS, DUTIES, OBLIGATIONS AND RESPONSIBILITIES OF THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS AND DECISIONS OF THE STATE OF NEW YORK. THE PARTIES HERETO INTEND THAT THE PROVISIONS OF SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW SHALL APPLY TO THIS AGREEMENT. EACH OF THE PARTIES HERETO IRREVOCABLY (I) SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK FOR THE PURPOSE OF ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT; (II) WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF ANY INCONVENIENT FORUM IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT; (III) AGREES THAT A FINAL JUDGMENT IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW; (IV) CONSENTS TO SERVICE OF PROCESS UPON IT BY MAILING A COPY THEREOF BY CERTIFIED MAIL ADDRESSED TO IT AS PROVIDED FOR NOTICES HEREUNDER; AND (V) WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

4

8.     COUNTERPARTS: ENTIRE AGREEMENT; FACSIMILE.     This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  This Agreement and the other Loan Assignment constitute the entire agreement between Seller and Purchaser with respect to the transactions described herein, notwithstanding any prior negotiations, understandings or agreements.  This Agreement may be signed by any one or more of the parties hereto by facsimile or e-mail transmission, any such facsimile or e-mail transmission to be treated for all purposes as an original.

9.     COSTS.  Notwithstanding any provision contained herein to the contrary, each party agrees to pay all of its own legal fees, costs and expenses that have been incurred in connection with the this Agreement.

10.     NOTICES.  All demands, notices and communications hereunder shall be in writing sent by hand or reputable overnight courier addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this Section 10.  Any such notice, demand, request, consent, approval or other communication shall be deemed to have been received: (a) on the date of delivery by hand if delivered during business hours on a business day (otherwise on the next business day) and (b) on the next business day if sent by an overnight commercial courier.  Notices to Seller shall be directed to []. Notice to Purchaser shall be directed to [].

11.     SEVERABILITY OF PROVISIONS.  Any part, provision, representation, warranty or covenant of this Agreement that is prohibited or unenforceable or is held to be void or unenforceable in any particular jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.

12.     SUCCESSORS AND ASSIGNS: SURVIVAL. This Agreement shall bind and inure to the benefit of and be enforceable by Seller and its successors and assigns.

**[NO FURTHER TEXT ON THIS PAGE]**

4853-6820-3629.v2
002097

**IN WITNESS WHEREOF,** the undersigned parties have each executed this Agreement as of the date first above written.

**SELLER:**

**NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH,**

By: _____
  Name:
  Title:

By: _____
  Name:
  Title:

**PURCHASER:**

**[]**

By: _____
  Name:
  Title:

**EXHIBIT A**

**LOAN DOCUMENTS**

1. Loan Agreement

2. Promissory Note

3. Deed of Trust

4. Assignment of Leases and Rents

5. Guaranty

6. Environmental Indemnity Agreement

7. Assignment of Agreements, Licenses, Permits and Contracts

8. Subordination of Management Agreement

9. Fee Letter

10. Intercreditor Agreement

11. Control Account Agreement

4853-6820-3629.v2
002099

**<u>EXHIBIT B</u>**

**ALLONGE**

## NOTE ALLONGE

**ENDORSEMENT** to that certain Promissory Note, dated as of May 23, 2018, in the stated principal amount of FIFTY-ONE MILLION SIX HUNDRED SEVENTY-FIVE THOUSAND AND 00/100 DOLLARS ($51,675,000.00), made by **GALLERIA 2425 OWNER, LLC**, a Delaware limited liability company, in favor of **NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH** (together with its successors and assigns, **"Assignor"**).

Pay to the order of **[],** having an address at [] (**"Assignee"),** without recourse, representation or warranty, express or implied, except as set forth in that certain Loan Purchase and Sale Agreement, dated as of July [__], 2023, entered into among Assignor and Assignee.

[Signature page follows.]

DATE: As of July [_], 2023

**NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH,**

By: _____
 Name:
 Title:

By: _____
 Name:
 Title:

## EXHIBIT C-1

## LOAN ASSIGNMENT AND ASSUMPTION AGREEMENT

# LOAN ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS LOAN ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "**Agreement**") is made as of the [_____] day of July, 2023, between **NATIONAL BANK OF KUWAIT, S.A.K.P.** ("**Assignor**"), and **[]**, ("**Assignee**").

## RECITALS:

**WHEREAS**, pursuant to that certain Loan Agreement, dated as of May 23, 2018, (the "**Loan Agreement**"), among Assignor, as lender, and Galleria 2425 Owner, LLC, a Delaware limited liability company ("**Borrower**"), as borrower, Assignor made a loan to Borrower in the principal amount of $51,675,000.00, which Loan is evidenced, in part, by that certain Promissory Note, dated as of May 23, 2018, in the principal amount of $51,675,000.00, made by Borrower in favor of Assignor (the "**Loan**"); and

**WHEREAS**, pursuant to that certain Loan Purchase and Sale Agreement, dated July [__], 2023, entered into between Assignor and Assignee (the "**Sale Agreement**"), Assignee has agreed to purchase from Assignor, and Assignor has agreed to sell to Assignee, all of Assignor's right, title and interest in and to the Loan pursuant to and in accordance with the terms of the Sale Agreement.

**NOW, THEREFORE**, in consideration of the covenants, agreements, representations and warranties of Assignor and Assignee set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of Assignor and Assignee, Assignor and Assignee do hereby agree as follows:

1.      Defined terms are indicated herein by initial capital letters. Initially capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

2.      Assignor hereby assigns to Assignee all of its right, title, and interest in and to (a) the Loan, (b) the Loan Documents and (c) all proceeds of the foregoing (collectively, the "**Transferred Asset**"), subject in each case to the terms and provisions of the Loan Agreement.

3.      Assignee hereby accepts the foregoing assignment of all of Assignor's right, title, and interest in and to the Transferred Asset and hereby assumes and agrees to fulfill, perform and discharge, from and after the date hereof, all of the various commitments, obligations and liabilities of Assignor under the Transferred Asset accruing from and after the date hereof and hereby agrees to be bound by the terms and provisions thereof, to the same effect as if Assignee had been Assignor under the Loan Agreement.

4.      Except as set forth in the Sale Agreement, the assignments contemplated herein are made without representation or warranty, express or implied and without recourse to the Assignor in any manner whatsoever.

5.      This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

6.      THIS AGREEMENT AND THE RESPECTIVE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE.

7.      This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, together, shall be deemed one agreement.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, each of the undersigned has caused this Agreement to by duly executed as of the dated first written above.

**ASSIGNOR:**

**NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH,**

By: _____
  Name:
  Title:

By: _____
  Name:
  Title:

**ASSIGNEE:**

[]

By: _____
  Name:
  Title:

# EXHIBIT C-2

## ACKNOWLEDGEMENT, WAIVER AND RELEASE

## <u>ACKNOWLEDGMENT, WAIVER AND RELEASE AGREEMENT</u>

This Acknowledgment, Waiver and Release Agreement is made and entered into as of July 3, 2023 (the "**Effective Date**"), by any between National Bank of Kuwait, S.A.K.P., New York Branch ("**Lender**"), Galleria 2425 Owner, LLC ("**Borrower**"), Naissance Galleria, LLC ("**Mezz Lender**") and Ali Choudhri ("**Choudhri**;" Borrower, Mezz Lender and Choudhri shall be collectively referred to as the "**Owner Parties**")

## RECITALS

A.      Pursuant to that certain Loan Agreement dated as of May 23, 2018 between Lender and Borrower (the "**Loan Agreement**"), Lender has made a certain loan in the original principal amount $51,675,000.00 (the "**Loan**") which Loan is evidenced by, among other things, that certain promissory note dated as of May 23, 2018 from Borrower to Lender in the original principal amount of $51,675,000.00 (the "**Note**").

B.      Pursuant to a Confidential Settlement Agreement dated as of August 22, 2022 (the "**Settlement Agreement**"), Lender and the Owner parties resolved certain disputes between them related to the Loan and the Loan Agreement.

C.      Among other things, the Settlement Agreement provides for the payment by Borrower of the Settlement Payment to Lender and the payment by the Purchase Option Parties of the Purchase Option Payment to Lender.

NOW, THEREFORE, in consideration of the premises and mutual agreement set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Lender and the Owner Parties agree as follows:

## 1.      <u>ACKNOWLEDGEMENT AND AGREEMENT OF LOAN TRANSFER</u>

a.      Each of the Owner Parties agrees and confirms that it (i) had the opportunity to exercise its respective right to make the Settlement Payment and/or the Purchase Option Payment, as the case may be, (ii) has chosen not to make such payment; and (iii) as a result has waived and forfeited its right to make such payments under the Settlement Agreement.

b.      [] ("**Purchaser**") has exercised the right under the Settlement Agreement to make the Settlement Payment/Purchase Option Payment to Lender and that Purchaser and Lender have entered into a Loan Purchase and Sale Agreement dated as of [] July, 2023 (the "**Loan Purchase Agreement**").

c.      As of the effective date of the Loan Purchase Agreement, Purchaser shall be the 'Lender' within the meaning of the Loan Documents.

d.      To the extent required by the Loan Documents, the Owner Parties hereby expressly acknowledge, consent and agree to the purchase, transfer and assignment of the Loan and the Loan Documents to Purchaser.

## 2.      <u>RELEASE</u>

a.    Each of the Owner Parties **RELEASES, ACQUITS AND FOREVER DISCHARGES** Lender and all of its present or past parents, subsidiaries, divisions, partners, affiliates, shareholders, unit holders, employees, officers, directors, representatives, agents, investigators, attorneys, assigns, executors, administrators, lenders, lien holders, creditors, financing institutions, banks, and insurers from all claims, both known and unknown, accrued or not accrued, from the beginning of time until the date of this Agreement, including, but not limited to, any all claims relating to the Loan, the Loan Agreement and all lawsuits and litigation claims among the parties including, without limitation

- Galleria 2425 Owner, LLC v National Bank of Kuwait, S.A.K.P., New York Branch, Cause No. 2023-22748, in the District Court of Harris County, Texas, 281st District Court; and
- Galleria 2425 Owner, LLC v National Bank of Kuwait, S.A.K.P., New York Branch et al., Cause No. 2021-63370, in the District Court of Harris County, Texas, 281st District Court.


### 3.    <u>MISCELLANEOUS</u>

a.    No person or entity not a party to this Agreement shall be deemed to be a third-party beneficiary of this Agreement.

b.    This Agreement may only be amended by an instrument in writing signed by the parties.

c.    The parties agree that this Agreement may be executed in counterpart originals, each of which shall constitute an original, and all of which together shall constitute one and the same agreement.

d.    This agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and there are no other agreements, written or oral, express or implied, related to the matters set forth herein. This agreement may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.

IN WITNESS WHEREOF, the parties have executed the Agreement as of the date first above written.

**LENDER:**

**NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH,**

By: _____
  Name:
  Title:

By: _____
  Name:
  Title:

**BORROWER:**

**GALLERIA 2425 OWNER, LLC**

By: _____
  Name:
  Title:

**MEZZ LENDER:**

**NAISSANCE GALLERIA, LLC,**

By: _____

  Name:

  Title:

**ALI CHOUDHRI:**

By: _____

## EXHIBIT C-3

## ASSIGNMENT OF DEED OF TRUST

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## ASSIGNMENT OF DEED OF TRUST

For value received, the undersigned grants, assigns and transfers to [_____], a [_____] liability company, all beneficial interest under that certain Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing dated as of May 23, 2018, executed by Galleria 2425 Owner LLC, a Delaware limited liability company, as Grantor, to Jeffrey L. Gilman, an individual, as Trustee (pursuant to that certain Appointment of Substitute Trustee dated as of April 4, 2023 and recorded on April 5, 2023, as Document No. 2023-120668), for the benefit of National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch, as Beneficiary, and recorded on May 30, 2018, as Document No. 2018-235600, in the Official Public Records of Real Property of Harris County, Texas.

Together with the note or notes therein described and secured thereby, the money due and to become due thereon, with interest, and all rights accrued or to accrue under said Deed of Trust including the right to have reconveyed, in whole or in part the real property described therein.

ASSIGNOR:

NATIONAL BANK OF KUWAIT, S.A.K.P.,
NEW YORK BRANCH,

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

STATE OF _____    )
                              ) SS
COUNTY OF _____     )


On _____, before me, _____, Notary Public, personally appeared _____ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.


I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct.


Witness my hand and official seal.


_____    [Seal]
(Signature)




STATE OF _____    )
                              ) SS
COUNTY OF _____     )


On _____, before me, _____, Notary Public, personally appeared _____ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.


I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct.


Witness my hand and official seal.


_____    [Seal]
(Signature)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | |
| **GALLERIA 2425 OWNER LLC,** | **Case No. 23-34815**<br>**Chapter 11** |
| **Debtor** | |

## DEBTOR'S RESPONSE TO NATIONAL BANK OF KUWAIT, S.A.K.P, NEW YORK BRANCH OMINBUS REPLY IN SUPPORT OF MOTIONTO CONVERT CASE TO A CHAPTER 7 CASE

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Galleria 2425 Owner LLC (the "Debtor"), debtor-in-possession in the above-captioned bankruptcy case, files this Response to the National Bank of Kuwait, S.A.K.P., New York Branch ("NBK") to Omnibus Reply in Support of Motion to Convert Case to a Chapter 7 case [Doc #89] (the "Reply") and in support of which it would respectfully show as follows:

1.      The Debtor continues to state that the NBK's Motion to Convert [Doc #72] should be rejected because the bankruptcy case was filed in good faith, there is not substantial and continuing diminution of the estate, and the Debtor can confirm a plan. NBK continues to seek to have this case converted to a chapter 7 for one main reason – an attempt to inexpensively and quickly resolve the material and significant claims of the Debtor against NBK. NBK breached the Settlement Agreement between the Debtor and NBK by interfering with the Debtor's rights to lease and sell the Property.

2.      The Debtor has or will shortly file a plan to pay amounts to NBK and also all other creditors. The proposed plan is confirmable.

3.      Section 1112(b)(2) provides that a case shall not be converted if there is a reasonable likelihood that a plan will be confirmed within a reasonable time. The exceptions are

for small businesses. No cause has been established and no cause has occurred.

4. To the contrary, the Debtor has several significant leases that improve the value of the Property. The Property has been well maintained. The value of the Property should be increasing, not diminishing.

5. The tax liabilities for this year are prepetition taxes that may be paid in the plan. The taxes are being paid in the plan. The fact that a debtor has not paid property taxes is not a basis for conversion.

6. Section 1112(b)(4)(A) provides that cause includes "substantial or continuing loss to or diminution of the estate **and** the absence of a reasonable likelihood of rehabilitation;" [emphasis added]. The Debtor is obtaining leases and improving the Property and can demonstrate a reasonable likelihood of rehabilitation. The test is not a definitive and absolute rehabilitation but a "reasonable likelihood."

7. NBK has not presented the complete facts. The projections take into account offsets and tenant improvements. The amounts used by NBK do not include such amounts.

8. The Debtor has obtained funds to continue to operate and pay expenses. The Debtor will have shortly an account with approximately $2.4mm in funds for operations. Such amount will allow the Debtor to have funds for well over 12 months and allow time to new leases and current leases to begin paying.

9. Contrary to the allegations of NBK, the Debtor can and should confirm a plan soon. The Debtor is ready and willing to move forward on a prompt basis to plan confirmation. The sooner a plan is confirmed, the easier for the Debtor to lease space.

10. At this time, the Debtor continues to encounter issues with large and good tenants being reluctant to enter leases when the status of the Property may change due to actions of NBK. The Debtor has requested subordination agreements ("SNDA") for new and existing tenants but

NBK has not responded. NBK has not responded in the past and has not responded recently on SNDA's.

11.     NBK continues to argue that the Debtor cannot propose a plan. A plan to pay NBK the value of the Property as the secured claim and the deficiency as an unsecured claim is a feasible and reasonable plan.

12.     The Debtor is not required to establish "unusual circumstances." NBK has not established that cause exists. NBK is presuming that "cause" exists in the arguments for "unusual circumstances."

13.     Jetall is performing under its lease agreement. NBK had positive comments regarding Jetall in its internal credit memorandums on the loan to the Debtor.

14.     If this case were converted to a chapter 7 case, the likelihood that a chapter 7 trustee would pursue claims is without merit. The chapter 7 trustee is charged with liquidating assets. Most chapter 7 trustees will sell claims, if anyone wants to buy them, for significantly less than the value of the claims.

15.     The Debtor has ongoing litigation with significant merit against NBK. NBK materially and significantly breached the settlement agreement.

16.     In an effort to address the issues of claims of the estate, claims against the estate, and transfers and claims of insiders, the Debtor will agree to review and submit an application to employ a Chief Restructuring Officer. The Debtor will agree to interview, check conflicts, and file an application to employ a chief restructuring officer

17.     Again, the Debtor believes that the motion to convert to a chapter 7 only benefits NBK and not any other creditors. The Debtor will agree to promptly seek and file a motion to employ a chief restructuring officer.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests this Court deny the motion of the National Bank of Kuwait, S.A.K.P., New York Branch to convert this case to a case under chapter 7 and for such other and further relief as to which the Debtor may be entitled and which may be just and proper.

Dated: January 30, 2024

Respectfully submitted,

*/s/Reese W. Baker*
Reese W. Baker
Texas Bar No. 01587700
Sonya Kapp
TX Bar No. 11095395
Nikie Marie Lopez-Pagan
TX Bar No. 24090233
Baker & Associates
950 Echo Lane, Suite 300
Houston, Texas 77024
713-869-9200
713-869-9100 (fax)
**COUNSEL FOR THE DEBTOR**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 30, 2024, a true and correct copy of the foregoing document was delivered to the Electronic Filing Service for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Reese W. Baker*
Reese W. Baker

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>**GALLERIA 2425 OWNER LLC,**<br><br>    **Debtor.** | **Case No. 23-34815**<br>**Chapter 11** |

## GALLERIA 2425 OWNER LLC'S
## CHAPTER 11 PLAN OF REORGANIZATION

Galleria 2425 Owner LLC (the "Debtor"), submits this *Chapter 11 Plan of Reorganization* (this "Plan") pursuant to section 1121(a) of the United States Bankruptcy Code (11 U.S.C. 101, *et seq.,* the "Bankruptcy Code").

## ARTICLE I.
## INTRODUCTION AND BACKGROUND

Galleria 2425 Owner LLC is a Texas limited liability company founded in 2018. The Debtor's primary asset is a parcel of developed real property located at 2425 West Loop South, Houston, Texas.

On December 5, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), commencing the above-styled Bankruptcy Case (the "Bankruptcy Case"). Since the Petition Date, the Debtor has continued to operate and manage its business as "debtor-in-possession" pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been requested by any party in interest or appointed in the Debtor's Bankruptcy Case pursuant to section 1104 of the Bankruptcy Code.

The Debtor files this Plan to reorganize its financial affairs and hopes that the Plan, as it may hereafter be amended, modified, or restated, in whole or in part, will be confirmed on a consensual basis through acceptance by all Classes of Creditors entitled to vote on the Plan. In the event that one or more of the Debtor's Creditor Classes fails to accept the Plan, the Debtor will request the Court to confirm the Plan on a consensual basis through acceptance by all classes of creditors entitled to vote on the Plan. In the event that one or more of the Debtor's creditor classes fails to accept the Plan, the Debtor will request the Court to confirm the Plan under Section 1129(b) of the Bankruptcy Code.

# ARTICLE II.
## DEFINITIONS

**A.**     <u>Defined Terms</u>. For purposes of this Plan and the accompanying Disclosure Statement, the following terms shall have the meaning set forth in this Article II, unless context clearly requires another meaning.

2.1     <u>Accounting Expenses</u>: Expenses incurred by the Debtor for the maintenance of its books and records, preparation of the Debtor's financial reports, marketing materials, tax returns and fulfillment of reporting and auditing obligations to its lenders and other parties.

2.2     <u>Administrative Expense</u>: Any cost or expense of administration of the Chapter 11 case under subsections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the estate of the Debtor, any actual and necessary expenses of operating the business of the Debtor, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code (including any claims for substantial contribution under section 503(b)(3)(D) and any 503(b)(9) claims based upon goods received by the Debtor within 20 days of the Petition Date), and any fees or charges assessed against the estate of the Debtor under section 1930, chapter 123 of title 28 of the United States Code.

2.3     <u>Allowed</u> when used with respect to a Claim (other than an Administrative Expense), means a Claim (a) to the extent it is not Contested; or (b) a Contested Claim, proof of which was filed timely with the Bankruptcy Court, and (i) as to which no objection was filed by the Objection Deadline, or (ii) as to which an Objection was filed by the Objection Deadline, to the extent, if any, such Claim is ultimately allowed by a Final Order; provided however, if a Claim is to be determined in a forum other than the Bankruptcy Court, such Claim shall not become Allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court. "Allowed," when used with respect to an Administrative Expense, shall mean an Administrative Expense approved by application to the Bankruptcy Court.

2.4     <u>Allowed Administrative Priority Claims</u>: The Allowed Claims of: (i) all administrative expenses of the Debtor's Chapter 11 case allowable under Section 503(b) of the Bankruptcy Code, including Professional Compensation and Reimbursement Claims; (ii) all Allowed Unsecured Claims entitled to priority under Section 507(a)(3) and (4) of the Bankruptcy Code for wages, salaries, vacation, severance, sick pay or commissions; (iii) all priority tax claims of governmental units, exclusive of those tax claims defined as "Allowed Tax Claims" herein; (iv) all quarterly fees and other expenses payable to the United States Trustee in connection with the administration of the Debtor's Chapter 11 case.

2.5     <u>Allowed Claim</u>: A claim against the Debtor: (i) in respect of which a Proof of Claim has been timely filed with the Bankruptcy Court by the Bar Date, or, with leave of the Bankruptcy Court and without objection by any party in interest, late filed, and as to which neither the Debtor nor any party in interest files an objection or as to which the claim is allowed by Final Order of the Bankruptcy Court, or (ii) scheduled in the list of creditors, as the same may have been amended, prepared and filed with the Bankruptcy Court pursuant to Bankruptcy Rule 1007(b) and not listed

as disputed, contingent or unliquidated as to amount, as to which no objection to the allowance thereof has been filed, or as to which any such objection has been adjudicated and determined by an order or judgment which is no longer subject to appeal or certiorari proceeding and as to which no appeal or certiorari proceeding is pending.

2.6     Allowed Priority Claim: A Priority Claim to the extent that it is or has become an Allowed claim, but which, in any event, will be reduced by the amount of any offsets, credits, or refunds to which the Debtor shall be entitled on the Confirmation Date.

2.7     Allowed Priority Tax Claim: A Priority Tax Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits or refunds to which the Debtor shall be entitled on the Confirmation Date.

2.8     Allowed Interest: An equity security Interest in or against the Debtor: (i) in respect of which a Proof of Interest has been timely filed with the Bankruptcy Court by the Bar Date, or, with leave of the Bankruptcy Court and without objection by any party in interest, late filed, and as to which neither the Debtor nor any party in interest files an objection or as to which the interest is allowed by Final Order of the Bankruptcy Court; or (ii) scheduled in the list of Equity Holders in the Debtor, as the same may have been amended, prepared and filed with the Bankruptcy Court pursuant to Bankruptcy Rule 1007(a)(3), as to which no objection to the allowance thereof has been filed, or as to which any such objection has been adjudicated and determined by an order or judgment which is no longer subject to appeal or certiorari proceeding and as to which no appeal or certiorari proceeding is pending.

2.9     Allowed Secured Claim: A Secured Claim to the extent that it is allowed by Final Order in an amount equivalent to the value of any perfected Collateral held to secure such claim.

2.10     Allowed Tax Claims: The Allowed Claim of all Allowed Unsecured Claims of governmental units to the extent entitled to priority under Section 507(a)(7) of the Bankruptcy Code, if any.

2.11     Allowed Unsecured Claim: An Unsecured Claim against the Debtor: (i) in respect of which a Proof of Claim has been timely filed with the Bankruptcy Court by the Bar Date, or, with leave of the Bankruptcy Court and without objection by any party in interest, late filed, and as to which neither the Debtor nor any party in interest files an objection or as to which the claim is allowed by Final Order of the Bankruptcy Court; or (ii) scheduled in the list of creditors, as the same may have been amended, prepared and filed with the Bankruptcy Court pursuant to Bankruptcy Rule 1007(b) and not listed as disputed, contingent or unliquidated as to amount, as to which no objection to the allowance thereof has been filed, or as to which any such objection has been adjudicated and determined by an order or judgment which is no longer subject to appeal or certiorari proceeding and as to which no appeal or certiorari proceeding is pending. This definition includes all claims deemed unsecured and deficiency claims pursuant to Section 506(a) of the Bankruptcy Code.

2.12     Assets: shall mean and include all right, title, and interest in and to all property of every type or nature owned or claimed by the Debtor as of the Petition Date, together with all such

property of every type or nature subsequently acquired by the Debtor through the Effective Date, whether real or personal, tangible or intangible, and wherever located, and including, but not limited to, property as defined in section 541 of the Bankruptcy Code. Without limiting the generality of the foregoing, this shall include all claims, causes of action or remedies to pierce the corporate veil of the Debtor, to ignore the corporate structure of the Debtor or arising under Chapter 5 of the Bankruptcy Code.

2.13    Bankruptcy Case: The bankruptcy case styled and numbered *In re: Galleria 2425 Owner LLC*; Case No. 23-60036, pending in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division.

2.14    Bankruptcy Code: The United States Bankruptcy Code, Title 11, United States Code, 11 U.S.C. § 101 *et seq*.

2.15    Bankruptcy Court: The United States Bankruptcy Court for the Southern District of Texas, Victoria Division, having jurisdiction over this Chapter 11 case, or the United States District Court for the Southern District of Texas acting as a court of bankruptcy.

2.16    Bankruptcy Rules: The Federal Rules of Bankruptcy Procedure.

2.17    Bar Date: The final date for filing Proofs of Claim, as directed by either the Bankruptcy Court or otherwise established pursuant to Bankruptcy Rule 3003(c)(3).

2.18    Business Day: Any day other than Saturday, Sunday, a legal holiday, or a day on which national banking institutions in Texas are authorized or obligated by law or executive order to close.

2.19    Cash: Legal tender of the United States of America or equivalents thereof, which may be conveyed by check or wire transfer.

2.20    Claim: Either: (i) a right to payment from the Debtor and/or its Estate, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (ii) any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor and/or its Estate, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured.

2.21    Claimant: The holder of a Claim.

2.22    Class: A category of holders of Claims or Interests which are substantially similar to the other Claims or Interests in such class.

2.23    Collateral: Any Asset subject to a valid and enforceable Lien to secure payment of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

2.24    Confirmation Date: The date upon which the Bankruptcy Court shall enter the Confirmation Order, provided that, if the Confirmation Order or consummation of the Plan is stayed or enjoined pending appeal, the Confirmation Date shall be the date that a Final Order vacating, terminating, annulling, or dissolving such stay or injunction is entered or on which such stay or injunction expires and is no longer in force or effect.

2.25    Confirmation Order: An Order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code, as such Order may be amended, modified, or supplemented.

2.26    Contested: When used with respect to a Claim, means a Claim: a) that is listed in the Schedules of the Debtor as disputed, contingent, or unliquidated, or in the amount of $0.00 or unknown; b) that is listed in the Schedules of the Debtor as undisputed, liquidated, and not contingent and as to which a proof of Claim has been filed with the Bankruptcy Court, to the extent the proof of Claim amount exceeds the scheduled amount; c) that is not listed in the Schedules of the Debtor, but as to which a proof of Claim has been filed with the Bankruptcy Court; d) any Claim as to which an objection has been or may be timely filed and which Claim has not been Allowed by a Final Order; or (e) any Claim for which the proof of Claim is filed after the Bar Date.

2.27    Corporation Documents: The Debtor's organizational certificates and documents, including its partnership agreement, as the same may have heretofore been amended, modified, supplemented, or restated in whole or in part, and as such Corporation Documents are amended and modified by the provisions of and/or in further implementation of this Plan.

2.28    Creditor: Any person described in section 101(10) of the Bankruptcy Code.

2.29    Cure: The distribution of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption or assumption and assignment of an executory contract or unexpired lease, pursuant to Bankruptcy Code section 365(b), in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties, under such executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable bankruptcy law.

2.30    Debtor or Debtor-in-Possession: Galleria 2425 Owner, LLC.

2.31    Disallowed: When used with respect to all or any part of a Claim or Interest, means that portion of a Claim or Interest to which an Objection or motion to disallow has been sustained by a Final Order or, as to a Contested Claim, any portion thereof which is not allowed by a Final Order of the Bankruptcy Court.

2.32    Distributions: The assets, property, or payments required to be distributed or paid to holders of Allowed Claims under the Plan.

2.33    Distribution Agent: The Reorganized Debtor.

2.34    Disclosure Statement: The *Disclosure Statement Pursuant to 11 U.S.C. § 1125 in Support of the Debtor's Plan of Reorganization* filed by the Debtor, as same may be modified, amended, restated, or supplemented from time to time in whole or in part in accordance with the Bankruptcy Code.

2.35    Effective Date: The date upon which the conditions precedent set forth in Article 9.1 of this Plan shall be satisfied or waived.

2.36    Estate: The bankruptcy estate of the Debtor in this Bankruptcy Case created pursuant to section 541 of the Bankruptcy Code.

2.37    Executory Contracts: Any and all unexpired leases or executory contracts to which the Debtor is a party and which are subject to Section 365 of the Bankruptcy Code.

2.38    Final Order: An order of the Bankruptcy Court or any other court of competent jurisdiction which has not been reversed, stayed, modified, amended, vacated, or otherwise altered and in respect of which all applicable time periods for filing an appeal or seeking review of such order shall have expired so that such order has become final in accordance with the Bankruptcy Rules.

2.39    Galleria 2425 Owner, LLC:  The Debtor in this Bankruptcy Case.

2.40    General Unsecured Claim: Any Claim that is not secured by a valid and enforceable Lien against any Asset, but excluding always therefrom all: (a) Administrative Expenses; (b) Priority Claims; (c) Priority Tax Claims; and (d) Secured Claims.

2.41    Gross Revenues: Revenues generated from, *inter alia*: (i) the Debtor's operations; (ii) any other miscellaneous operating sources, (iii) interest received by the Debtor from the investment of its funds, (iv) security and other deposits which are forfeited to the Debtor by the parties making such deposits, and (v) utility and other deposits which are refunded to the Debtor. The term "Gross Revenues" shall not include: (i) insurance loss proceeds or payments; (ii) any award or other payment made by any governmental unit or authority in conjunction with the exercise or any right of eminent domain or condemnation; (iii) any proceeds from any sale, refinancing, exchange, or other disposition of the Property; (iv) any payments made on account of any easements or access rights granted by Debtor which are not material to the operation of the Property; or (v) any capital contributions made to the Debtor by any Equity Holder.

2.42    Insider: Any Person described in section 101(31) of the Bankruptcy Code.

2.43    Interests: Any equity or ownership interest in the Debtor including all stock of any class in the Debtor.

2.44    Lien: Any mortgage, lien, charge, security interest, encumbrance, or other security device of any kind affecting any Asset.

2.45    Loan: That certain loan originally made to the Debtor, by National Bank of Kuwait, S.A.K.P. on May 23, 2018.

2.46    NBK: National Bank of Kuwait, S.A.K.P., New York Branch.

2.47    Net Cash Flow:  Net cash after payment of all expenses, secured debts, and plan payments.

2.48    Net Proceeds of Sale or Refinancing: The gross proceeds received from the sale or refinancing of the Property, less the customary and reasonable costs incurred by the Reorganized Debtor to third parties to consummate the sale or refinancing of the Property, including, without limitation, real estate brokerage commissions, origination and discount points, accounting and legal fees, title company charges, and survey fees.

2.49    Objection: Includes (a) an objection to the allowance of a Claim interposed by any party entitled to do so within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, and (b) as to any Taxing Authority, shall include a proceeding commenced under section 505 of the Bankruptcy Code to determine the legality or amount of any tax.

2.50    Objection Deadline: Such date, if any, after the Effective Date as may be fixed by the Bankruptcy Court for the filing of objections to Claims.

2.51    Person: An individual, corporation, association, joint stock company, joint venture, trust, unincorporated organization, governmental unit, agency, or other subdivision thereof, or any other entity.

2.52    Petition Date: July 5, 2023, the date upon which the Debtor filed its Voluntary Petition seeking relief under Chapter 11 of the Bankruptcy Code.

2.53    Plan: This Plan of Reorganization and all addenda, exhibits, schedules, and other attachments hereto, as amended, modified, restated, supplemented, or altered in whole or in part from time to time.

2.54    Pre-Petition Loan Documents: All documents that evidence or relate to the Loan.

2.55    Priority Claim: Any Claim entitled to priority under Sections 507(a)(2) through (6) inclusive of the Bankruptcy Code.

2.56    Priority Tax Claim: A Claim of a governmental unit of the kind specified in subsection 507(a)(8) of the Bankruptcy Code.

2.57    Professional: Those persons retained pursuant to an order of the Bankruptcy Court in accordance with sections 327 and 1103 of the Bankruptcy Code or who are entitled to compensation or reimbursement pursuant to sections 503(b)(3)(D) or 506(b) of the Bankruptcy Code.

2.58    Professional Compensation and Reimbursement Claim: A Claim of a Professional for compensation and reimbursement of costs and expenses for services rendered after the Filing Date and prior to and including the Effective Date, including for substantial contribution under section 503(b)(3)(D) of the Bankruptcy Code.

2.59    Property: That certain real property located at 2425 West Loop South, Houston, Texas 77027.

2.60    Proof of Claim: A written claim or form filed with the Bankruptcy Court pursuant to Bankruptcy Rule 3003.

2.61    Pro Rata Share: The proportion that the amount an Allowed Claim (not yet paid) bears to the aggregate amount of all Allowed Claims (not yet paid) with respect to any specific Class, including Contested Claims, but not including Disallowed Claims as calculated on the Initial Distribution Date or Subsequent Distribution Date, as applicable.

2.62    Reorganized Debtor: The holder of the equity after the Effective Date. On the Effective Date, the equity of the Debtor will be canceled and reissued to the Reorganized Debtor, which may be the same entity or any other entity designated by the current Equity Interest Holders.

2.63    Schedules: The Schedules and Statement of Financial Affairs filed by the Debtor in this Bankruptcy Case, as the same may have been or may hereafter be amended, supplemented, modified, or restated in whole or in part.

2.64    Secured Claim: A Claim that is secured by a Lien which is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, on property in which the Estate has an interest, or a Claim that is subject to setoff under section 553 of the Bankruptcy Code; to the extent of the value of the holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable; as determined by a Final Order pursuant to section 506(a) of the Bankruptcy Code, or in the case of setoff, pursuant to section 553 of the Bankruptcy Code, or in either case as otherwise agreed upon in writing by the Debtor or the Reorganized Debtor and the Holder of such Claim. The amount of any Claim that exceeds the value of the Holder's interest in the Estate's interest in property or the amount subject to setoff shall be treated as a General Unsecured Claim.

2.65    Secured Creditor: A Creditor holding a Secured Claim.

2.66    Secured Tax Claim: Any ad valorem tax Claim that arises or is deemed to have arisen on or before the Petition Date, irrespective of the date on which such Claim is assessed or due, to the extent such Claim constitutes a Secured Claim.

2.67    Tax Claim: Any Claim for or relating to any type or form of taxes, whether assessed by the United States of America, the IRS or any Taxing Authority, including without limitation property, ad valorem, excise, sales, fuel, income or franchise taxes, and whether the tax is assessed against the Debtor as taxpayers or as holders of trust fund taxes.

2.68    Taxing Authority: Any federal, state, or local governmental unit having jurisdiction as to Debtor or its property and authority to assess, levy, and collect taxes.

2.69    Unsecured Claim: A Claim other than an Administrative Expense, a Priority Claim, a Priority Tax Claim, or a Secured Claim.

2.70    Unsecured Creditor: A Creditor holding an Unsecured Claims.

In addition to the foregoing definitions, any term used in this Plan that is defined in the Bankruptcy Code, including section 101 thereof, shall have the meaning ascribed to such term in the Bankruptcy Code wherever used in this Plan, except to the extent that such term is otherwise defined in this Plan or the meaning ascribed to such term in the Bankruptcy Code would contradict or be inconsistent with the use of such term in this Plan.

**B.    Interpretation.** Unless otherwise specified, all section, article and exhibit references in this Plan are to the respective section in, article of, or exhibit to, the Plan as the same may be amended, waived, or modified from time to time. The headings in the Plan are for convenience and reference only and shall not limit or otherwise affect the provisions hereof. The rules of interpretation set forth in Bankruptcy Code section 102 shall apply to the Plan.

**C.    Other Terms.** The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. References herein to "after notice and hearing" or other similar language shall have the same meaning as in Bankruptcy Code section 102(1).

**D.    Exhibits.** All Exhibits to the Plan are incorporated into the Plan by this reference and shall be deemed to be a part of the Plan is if set forth in full herein. Holders of Claims and Interests may obtain a copy of the Exhibits to this Plan, once filed, by a written request sent to the following address: Baker & Associates, 950 Echo Lane, Ste 300, Houston, Texas 77024, Attn:  Reese W. Baker,    Fax    713-869-9100,    email:    courtdocs@bakerassociates.net    and reese.baker@bakerassociates.

### ARTICLE III.
### GENERAL TERMS AND CONDITIONS

This Plan shall be subject to the following general terms and conditions:

3.1.    Securities Laws: Any Distributions to a Creditor pursuant to this Plan, or any retention of any property or interest pursuant to this Plan, which may be deemed to be a "security" subject to any applicable laws, rules, or regulations governing the issuance or distribution thereof shall be exempt from registration in accordance with the provisions of Section 1145 of the Bankruptcy Code to the extent permitted thereunder.

3.2.    Time for Filing Claims: All claimants (except for Creditors whose Claims were scheduled as undisputed, liquidated, and non-contingent in the Schedules) shall be required to file a Proof of Claim prior to the Bar Date in order to participate in any Distribution made under this

Plan or to have such Claim allowed by the Bankruptcy Court. Any Claim asserted pursuant to Section 507(a)(1) other than Claims made pursuant to Section 330 of the Bankruptcy Code, shall be filed within ten (10) days prior to the first date scheduled by the Bankruptcy Court for commencement of the hearing to be held on the Confirmation of the Plan.

3.3. <u>Amendments and Modifications</u>: This Plan may be amended, modified, supplemented, restated, or altered in whole or in part upon request, motion, or application of the Debtor at any time prior to Confirmation without notice and hearing and without additional disclosure pursuant to Section 1125 of the Bankruptcy Code if the Court finds and concludes that any such amendment, modification, supplement, restatement, or other alteration does not materially and adversely affect any Creditor or any Claim.

**ARTICLE IV.**
**EXECUTION OF THE PLAN**

4.1 <u>Funding</u>: The funds used for the repayment of Claims or other Distributions to be made under the Plan will come from the income generated from the Property, the new equity contribution, plus any other available funds or property that the Reorganized Debtor may otherwise possess on or after the Effective Date, including, without limitation, any such funds or property which may be provided through additional capital contributions, and the proceeds of any sale, refinancing, or other disposition of the Debtor's Assets.

4.2 <u>Disputed Claims or Interests</u>: Notwithstanding any other provision of this Plan, any Claim or Interest which is disputed, unliquidated, or contingent as of any date on which a Distribution is to be made shall not participate in or otherwise receive any such Distribution until a Final Order has been entered allowing such Claim or Interest.

**ARTICLE V.**
**TREATMENT OF ADMINISTRATIVE EXPENSES**

5.1 <u>Administrative Expenses.</u> All Administrative Expense Claims against the Debtor entitled to priority status pursuant to Bankruptcy Code section 507(a)(2) shall be treated as follows:

a) <u>Time for Filing Administrative Expense Claims</u>**.** The Holder of any Administrative Expense Claim, including an Administrative Expense Claim for any liability incurred in the ordinary course of business of the Debtor, but not including any Professional Fee Claim, must file with the Bankruptcy Court and serve on the Reorganized Debtor and its counsel an application seeking the Allowance of such Administrative Expense Claim within thirty (30) days after the Effective Date. Failure to timely and properly file an application as required herein shall result in such Administrative Expense Claim being forever barred and discharged.

b) <u>Time for Filing Professional Fee Claims</u>. All Professionals or other persons or entities requesting compensation or reimbursement of expenses pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503(b) and 1103 for services rendered before the Effective Date including, without limitation, any compensation

requested by any Professional or any other person or entity for making a substantial contribution in this Bankruptcy Case, shall file and serve on the Reorganized Debtor an application for final allowance of compensation and reimbursement of expenses within thirty (30) days after the Effective Date. Any professional fees and reimbursable expenses incurred by the Reorganized Debtor on or after the Effective Date may be paid without application to the Bankruptcy Court.

c) <u>Allowance of Administrative Expenses</u>. An Administrative Expense Claim with respect to which an application has been properly filed as provided for herein shall become an Allowed Administrative Expense Claim if no objection is filed within thirty (30) days after the filing and service of the application. If an objection is filed within such thirty (30) day period, the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent Allowed by a Final Order of the Bankruptcy Court. An Administrative Expense Claim that is (i) a Professional Fee Claim with respect to which an application has been properly filed in accordance with this Plan, or (ii) sought by a person or entity for making a substantial contribution in this Bankruptcy Case, with respect to which an appropriate application has been properly filed in accordance with this plan, shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order of the Bankruptcy Court.

d) <u>Payment of Allowed Administrative Expenses</u>. Each Holder of an Allowed Administrative Expense Claim against the Debtor shall receive, at the Reorganized Debtor's option: (i) payment in full in Cash on account of such Allowed Administrative Expense Claim on the later of the Effective Date or the date on which such Administrative Expense Claim is Allowed; or (ii) the amount of such holder's Allowed Administrative Expense Claim in accordance with the ordinary business terms of such expense or cost, or (iii) such other treatment as may be agreed to in writing by such Holder and the Reorganized Debtor or as ordered by the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Reorganized Debtor is authorized to pay in the ordinary course of business any Administrative Expense Claim representing a liability incurred in the ordinary course of business by the Debtor.

5.2   <u>United States Trustee's Fees</u>. All outstanding fees payable to the United States Trustee pursuant to 28 U.S.C. §1930(a)(6) shall be paid in full by the Reorganized Debtor on the Effective Date and thereafter as the same may become due.

## ARTICLE VI.
## <u>CLASSIFICATION OF CLAIMS AND INTERESTS</u>

For purposes of this Plan, the Claims of Creditors and the Interests of Equity Holders are divided into the following Classes:

6.1   <u>Class 1 Claims: Certain Priority Claims.</u> Allowed Claims entitled to priority treatment pursuant to Bankruptcy Code sections 507(a)(1), (a)(4), (a)(5), (a)(6), (a)(7), (a)(9), and (a)(10).

6.2     Class 2 Claim: Secured and/or Priority Claim(s) of Taxing Authorities. The Allowed Secured Claims of Taxing Authorities or Allowed Claims of Taxing Authorities that are entitled to priority treatment under Bankruptcy Code sections 507(a)(8).

6.3     Class 3 Claims: Secured Claim of Caz Creek II, LLC.  The Allowed Secured Claims of Caz Creek II, LLC.

6.4     Class 4 Claim: Secured Claim of National Bank of Kuwait, S.A.K.P., New York Branch. The Allowed Secured Claim of National Bank of Kuwait, S.A.K.P., New York Branch.

6.5     Class 5 Claim: Secured Claim of 2425 WL, LLC.  The Allowed Secured Claim of 2425 WL, LLC.

6.6     Class 6: Holders of Unsecured Claims for Property Repair and Maintenance. Allowed Unsecured Claims arising from the provision of repair or maintenance services to the Property.

6.7     Class 7: Holders of General Unsecured Claims other than Property Repair and Maintenance. Allowed General Unsecured Claims other than Class 6 Claims.

6.8     Class 8: Equity Interest Holders. The Allowed Interests of the Equity Interest Holders.

## ARTICLE VII.
## IMPAIRMENT OF CLASSES

All Classes are impaired by the Plan, as such impairment is determined and defined in Section 1124 of the Bankruptcy Code.

## ARTICLE VIII.
## TREATMENT OF CLAIMS AND INTERESTS

Upon Confirmation, the holders of Claims or Interests in the Classes of Creditors and Equity Holders established by this Plan shall receive the following treatment in full satisfaction of their respective Claims or Interests:

8.1     Class 1 Claims: Certain Priority Claims. Allowed Administrative and Priority Claims entitled to priority treatment pursuant to Section 507(a)(1), (a)(6), (a)(7), (a)(9), and (a)(10) of the Bankruptcy Code shall receive, at the Reorganized Debtor's option: (i) payment in full in cash on account of such Priority Claim without interest when such Claim is Allowed; (ii) the amount of such holder's Allowed Claim paid in twelve equal monthly payments, with the first payment due and payable on the fifth Business Day of the first month that is more than 30 days after the Effective Date; (iii) the amount of such holder's Allowed Claim in accordance with the ordinary business terms of such expense or cost; or (iv) such other treatment as may be agreed to

in writing by such priority Creditor and the Reorganized Debtor or as ordered by the Bankruptcy Court.

8.2      <u>Class 2 Claim: Secured or Priority Claim(s) of Taxing Authorities.</u> Except to the extent that the holder of a Secured or Priority Tax Claim agrees to different treatment, the Allowed Secured or Priority Claim of all Tax Claims shall be paid in accordance with 11 U.S.C. § 1129(a)(9)(c) with the first payment due and payable on the fifth Business Day of the first month that is more than 30 days after the Effective Date. The Debtor, in its sole discretion, will either pay such Claims: (i) on the Effective Date; or (ii) when such taxes become due and payable under the laws of the applicable taxing jurisdiction; or (iii) with quarterly deferred cash payments including applicable interest over a period not exceeding two years from the Petition Date of a value, as of the Effective Date, equal to the Allowed Claim.

All Tax Claims shall remain subject to section 505 of the Bankruptcy Code. The Reorganized Debtor shall retain the right to a determination of the amount or legality of any tax pursuant to section 505 of the Bankruptcy Code as to any Tax Claim. The Reorganized Debtor may seek relief pursuant to section 505 of the Bankruptcy Code as a part of, and in conjunction with, any objection to any Tax Claim.

With respect to Allowed Secured Tax Claims, the interest rate paid upon such Claims shall be the rate of interest determined under applicable non-bankruptcy law.

Post-petition property taxes will be paid when such taxes become due and payable under the laws of the applicable taxing jurisdiction.

Nothing herein shall prohibit the Debtor or the Reorganized Debtor from selling the Property at any time provided that the remaining unpaid portion of the Allowed Secured Claim of a Taxing Authority holding an interest in the Property shall be paid in full at such time.

Class 2 Claims are impaired by the Plan.

8.3      <u>Class 3 Claim: Secured Claims of Caz Creek Holdings II, LLC</u>. The Allowed Secured Claim of Caz Creek shall be Allowed in the amount of $698,006.68 and shall be paid through 120 payments with interest at a rate of 10.95% for a monthly payment of $9,595.30.

The first monthly payment will be due and payable on the first Business Day of the first month that is more than 30 days after the Effective Date and on the first Business Day of each respective month thereafter. To the extent that the Debtor misses any payment due to Caz Creek on account of the Allowed Secured Claims as provided herein, Caz Creek shall send written notice of such missed payment to Debtor and its counsel, and the Debtor shall have five business days from the date of its receipt of such notice to make such missed payment before a default may be deemed to have occurred hereunder.

Any perfected liens or security interests securing the Allowed Secured Claims will be preserved and continued. Caz Creek shall, upon payment and satisfaction of the Allowed Secured Claims in full as provided herein, execute releases of any remaining encumbrances upon the

Property in a form satisfactory to the Reorganized Debtor and deliver same to the Reorganized Debtor or its designee.

The written agreements by and between Caz Creek and the Debtor will remain the same, except to the extent that the terms therein are modified by this Plan, and such agreements will be deemed to be modified to comport with this Plan.

All defaults and events of default existing as of the Petition Date and as of the Effective Date shall be deemed cured and waived, and all amounts owed will be deaccelerated and paid in accordance with the terms of this Plan. Except as provided by this Plan, no default interest, late charges, or other penalties arising or accruing after the Petition Date shall be required to be paid to Caz Creek, provided, however, that Caz Creek shall be entitled to charge, collect, and receive late charges and other amounts provided by the written agreements between the Debtor and Caz Creek in the event of the Debtor's failure to timely make a payment to Caz Creek on the Allowed Secured Claims under this Plan after Confirmation.

Nothing herein shall prohibit the Reorganized Debtor from refinancing, selling, or otherwise disposing of the Property at any time, provided that the remaining unpaid portions of the Allowed Secured Claim shall be paid in full at such time. No prepayment penalty will be due with respect to any prepayment of the Allowed Secured Claim.

Class 3 Claims are Impaired by the Plan.

8.4     Class 4: National Bank of Kuwait, S.A.K.P., New York Branch.  The Allowed Secured Claim of the NBK shall be paid in full within ten years of the Effective Date by either the refinancing of the remaining unpaid portion of the Allowed Secured Claim of NBK or the sale of the Property.  Until such time as the remaining unpaid portion of the Allowed Secured Claim of NBK is refinanced or otherwise satisfied, which shall occur by no later than one hundred twenty (120) months from the Effective Date, the Reorganized Debtor shall make monthly payments to NBK comprised of interest at the rate of weekly LIBOR plus 2.75% per annum along with principal amortized over a thirty (30) year term.  The first monthly payment will be due and payable on the fifth Business Day of the first month that is more than 30 days after the Effective Date and on the fifth Business Day of each respective month thereafter.

The Allowed Secured Claim of NBK will be determined by the value of NBK's interest in the Collateral securing such Allowed Claim, which value will be determined by agreement of the parties or by the Bankruptcy Court following a valuation proceeding in accordance with the Bankruptcy Code.  Based on the appraisal by Cushman & Wakefield dated July 5, 2023 and obtained by NBK, the Debtor has used the Cushman & Wakefield value of $18,600,000.  As such, and because the respective taxing authorities and tax lenders hold a higher priority lien on the properties, the Debtor believes that NBK's Allowed Secured Claim will be an amount equal to the difference between the value of the Property less the outstanding property taxes and senior debt owed with respect to the Property, or approximately $16,000,000.  The Debtor therefore believes that NBK's claim is undersecured and that NBK will have a deficiency claim against the Debtor's Estate, which amount will be included and treated as a Class 7 general unsecured claim under the Plan.

The first monthly payment will be due and payable on the first Business Day of the first month that is more than 30 days after the Effective Date and on the first Business Day of each respective month thereafter. To the extent that the Debtor misses any payment due to NBK on account of its Allowed Secured Claim as provided herein, NBK shall send written notice of such missed payment to Debtor and its counsel, and the Debtor shall have five business days from the date of its receipt of such notice to make such missed payment before a default may be deemed to have occurred hereunder.

Any perfected liens or security interests securing NBK's Allowed Secured Claim will be preserved and continued. NBK shall, upon payment and satisfaction of its Allowed Secured Claim in full as provided herein, execute releases of any remaining encumbrances upon the Property in a form satisfactory to the Reorganized Debtor and deliver same to the Reorganized Debtor or its designee within three (3) business days of payment in full.

The written agreements by and between NBK and the Debtor will remain the same, except to the extent that the terms therein are modified by this Plan, and such agreements will be deemed to be modified to comport with this Plan.

All defaults and events of default existing as of the Petition Date and as of the Effective Date shall be deemed cured and waived, and all amounts owed will be deaccelerated and paid in accordance with the terms of this Plan. Except as provided by this Plan, no default interest, late charges, or other penalties arising or accruing after the Petition Date shall be required to be paid to NBK, provided, however, that NBK shall be entitled to charge, collect, and receive late charges and other amounts provided by the written agreements between the Debtor and NBK in the event of the Debtor's failure to timely make a payment to NBK on its Allowed Secured Claim under this Plan after Confirmation.

Nothing herein shall prohibit the Reorganized Debtor from refinancing, selling, or otherwise disposing of the Property at any time, provided that the remaining unpaid portion of NBK's Allowed Secured Claim shall be paid in full at such time. No prepayment penalty will be due with respect to any prepayment of NBK's Allowed Secured Claim.

Class 4 Claims are Impaired by the Plan.

8.5    Class 5: Secured Claim of 2425 WL, LLC. The Allowed Secured Claim of 2425 WL, LLC, will be determined by the value of 2425 WL LLC's interest in the Collateral securing such Allowed Claim, which value will be determined by agreement of the parties or by the Bankruptcy Court following a valuation proceeding in accordance with the Bankruptcy Code. Based on the appraisal by Cushman & Wakefield dated July 5, 2023, obtained by NBK, the Debtor has used the Cushman & Wakefield value of $18,600,000. As such, and because the respective taxing authorities, tax lenders, and NBK hold a higher priority lien on the properties, the Debtor believes that NBK's Allowed Secured Claim will be an amount equal to the difference between the value of the property less the outstanding property taxes and senior debt owed with respect to the Property.  The Debtor therefore believes that 2425 WL, LLC, is wholly unsecured and will be included and treated as a Class 6 general unsecured claim under the Plan.

8.6     Class 6: Holders of Unsecured Claims for Property Repair and Maintenance. Allowed Unsecured Claims arising from the provision of repair or maintenance services to the Property and the U.S. Trustee fee from the prior case of $345 shall be paid 100% of the Allowed amount without interest in eight (8) consecutive equal quarterly payments. The first quarterly payment will be due and payable on the first Business Day of the first calendar quarter that is more than 30 days after the Effective Date and on the first Business Day of each respective calendar quarter thereafter.

Class 6 Claims are impaired by the Plan.

8.7     Class 7: General Unsecured Claims.

The Reorganized Debtor will pay a total of 100% of these creditors' claims. Each September 15, beginning September 15, 2024, the Debtor will send these creditors the year-end financial statement for the previous calendar year. After all ordinary and necessary expenses, payment to Classes 1, 2 and 3 above, and after income taxes owed by the Debtor, these creditors will receive 50% of the Net Cash Flow, if any, of the Reorganized Debtor. Beginning on the following September 15, December 15, March 15, and June 15, each year these creditors will receive a quarterly pro-rata payment from the Reorganized Debtor of the 50% of Net Cash Flow. The Reorganized Debtor will continue distributing the year-end financial reports to these creditors and making the quarterly payments of 50% of Net Cash Flow to these creditors, if any, for as many years as it takes to pay these creditors in full. In the event of any failure of the Reorganized Debtor to timely distribute the financial statements or make its required plan payments to these creditors prior to delinquency, which shall constitute an event of default under the Plan as to these creditors, they shall send notice of such default to the Reorganized Debtor. If the default is not cured within thirty (30) days of the date of such notice, these creditors may proceed to collect all amounts owed pursuant to state law without further recourse to the Bankruptcy Court. These creditors are only required to send two (2) notices of default, and upon the third event of default, these creditors may proceed to collect all amounts owed under state law without recourse to the Bankruptcy Court and without further notice. If these creditors are paid in more than five years, these creditors will receive the federal judgment interest rate of 4.79%. At the end of five years from September 15, 2024, interest will be added to the unpaid portion of these creditors' claims, and the creditors will earn interest on a go-forward basis until their claims are paid in full. If the Property is sold, all remaining claim amounts will be paid on the closing of a sale of the Property.

Class 7 Claims are impaired by the Plan.

8.8     Class 8: Equity Interest Holders. The Class 8 Allowed Interests of the Equity Interest Holders will continue, provided that the Equity Interest Holders will contribute the amount of approximately $2.5 million of new equity. The equity contribution is being made by an affiliated investor who may receive an interest in the Equity from the current Equity Interest Holders.

The Debtor has or will establish a bank account with approximately $2,500,000 in funds (the "Funds") at Wells Fargo Bank (or such other bank that is an approved depository)(the "Account"). The Funds will be made available by a person or entity that is not the Debtor. The

Funds will be available for use by the Debtor for the Property. The Funds will be available for use by the Debtor only under the following conditions:

1. The current management of the Debtor remains unchanged. The current management of the Debtor is Galleria 2425 JV, LLC.
2. The current management of Galleria 2425 JV, LLC remains unchanged. The current management of Galleria 2425 JV, LLC is Galleria West Loop Investments II, LLC.
3. Ali Choudhri continues as the person in charge of Galleria 2425 JV and Galleria West Loop Investments II, LLC.
4. Ali Choudhri or Dward Darjean are the only authorized persons to sign checks and remove funds from the Account.
5. The Debtor remains in the current chapter 11 case.
6. The current chapter 11 case is not dismissed or converted to another chapter.
7. No chapter 11 trustee is appointed by the court or the U.S. Trustee for the Debtor.
8. There are not any unreasonable restrictions imposed or placed on the Debtor with regard to the leasing of space in the Property.
9. If a plan is confirmed for the Debtor, the plan must be one that is proposed by the Debtor and not another entity.
10. Jetall Corporation continues to be the manager for the Property.

If any of the above conditions change, then(1) the Funds will no longer be available for use by the Debtor, (2) the Funds will automatically revert to the person or entity that provided the Funds, and (3) the use of the Funds by the Debtor or any other person or entity shall immediately terminate.

Class 8 Interests are impaired by the Plan and are deemed to reject the Plan.

## ARTICLE IX.
## ACCEPTANCE OR REJECTION OF THE PLAN

9.1     <u>Classes Entitled to Vote</u>. Each impaired Class of Claims that will receive or retain property or any interest in property under this Plan shall be entitled to vote to accept or reject this Plan as provided in the Disclosure Statement Order or any other Order.

9.2     <u>Acceptance by Impaired Classes of Claims</u>. An impaired Class of Claims shall have accepted this Plan if:

a. the Holders (other than any Holder designated pursuant to Bankruptcy Code section 1126(e)) of at least two-thirds (2/3) in dollar amount of the Allowed Claims actually voting in such Class have voted to accept this Plan; and

b. the Holders (other than any Holder designated pursuant to Bankruptcy Code section 1126(e)) of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept this Plan.

9.3    <u>Cramdown</u>. The Debtor requests Confirmation of this Plan under Bankruptcy Code section 1129(b). The Debtor reserves the right to modify this Plan to the extent, if any, that Confirmation pursuant to Bankruptcy Code section 1129(b) requires modification, or for any other reason in its discretion.

## ARTICLE X.
## <u>MEANS OF IMPLEMENTATION</u>

10.1    <u>Conditions Precedent to Effective Date</u>. The Plan shall not become effective, and the Effective Date shall not occur, unless and until the following condition(s) shall have been satisfied or waived in the Debtor's sole and absolute discretion: the Confirmation Order, in a form and substance reasonably acceptable to the Debtor, shall have become a Final Order and shall, among other things (i) confirm this Plan, (ii) find that the Debtor has acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code as set forth in Bankruptcy Code § 1125(e), and (iii) find that the Debtor is authorized to take all actions and consummate all transactions contemplated under this Plan.

10.2    <u>Distribution Agent</u>. The Distribution Agent shall be the Reorganized Debtor. The Distribution Agent shall place all available funds into the various accounts established pursuant to this Plan and is authorized to make Plan distributions from such accounts. The Distribution Agent will serve until all distributions required under the Plan have been made, whereupon the Distribution Account will be closed, and no further actions are required to consummate the Plan. Appointment of the Distribution Agent herein is in a manner consistent with the interests of the holders of Claims and Interests and public policy. All documents, writings, authorizations or matters requiring the consent of, execution by, or signature of the Debtor or Reorganized Debtor may be consented to, executed by, or signed by the Distribution Agent, whose signature, execution, or consent is hereby deemed authorized, enforceable and binding without further order of the Court. A certified copy of the Confirmation Order may be filed in any deed record, government or public record keeping place as authentication of the signature and authority of the Distribution Agent to consent to, execute, or sign any writing or document of the Debtor and Reorganized Debtor herein.

10.3    <u>Vesting of Assets</u>. As of the Effective Date, all Assets owned by the Debtor shall be transferred to, and vested in, the Reorganized Debtor free and clear of all Liens, Claims, Interests, and any and all other rights, title, or interest, except as expressly set forth in this Plan.

10.4    <u>Amendments to Corporate Documents</u>. As of the Effective Date, the Debtor's organizational documents shall be deemed amended and revised to the extent necessary to comply with and reflect the transactions contemplated by the Plan.

10.5    <u>Assumption of Allowed Claims</u>. As of the Effective Date, the Reorganized Debtor shall assume the liability for and obligation to perform and make all Distributions or payments on account of all Allowed Claims in the manner provided in this Plan.

10.6    <u>Attorneys' Fees and Costs</u>. To the extent any holder of a Secured Claim asserts a right to attorneys' fees and costs pursuant to section 506(b) of the Bankruptcy Code, unless otherwise agreed between the Debtor or Reorganized Debtor and such Secured Creditor, the allowance of such fees and expenses shall be handled as set forth in this paragraph. Within twenty (20) days after the Effective Date, the Secured Creditor shall file an application with the Bankruptcy Court for allowance of such fees and expenses. Within twenty (20) days after such application is filed, the Reorganized Debtor may file any objections thereto, and the Secured Creditor shall file any response within ten (10) days thereafter. If the Secured Creditor and the Reorganized Debtor are unable to reach agreement, the matter shall then be submitted to the Bankruptcy Court for determination on no less than twenty (20) days-notice of the hearing.

10.7    <u>Post-Petition Taxes and Insurance</u>. Funds for payment of post-petition property taxes and insurance will be held by the Reorganized Debtor and deposited as part of the Debtor's monthly operating expenses into the applicable accounts established pursuant to this Plan and will be paid when such taxes and/or insurance become due and payable.

## ARTICLE XI.
## <u>PROCEDURES FOR THE TREATMENT OF</u>
## <u>CONTESTED AND CONTINGENT CLAIMS</u>

11.1    <u>Objection Deadline</u>. All objections to Claims shall be served and filed by the Objection Deadline, if one is set by the Bankruptcy Court, although nothing contained herein shall require the fixing of an Objection Deadline; provided, however, the Objection Deadline shall not apply to Claims which are not reflected in the claims register, including any alleged informal Proofs of Claim. If an Objection Deadline is fixed, it may be extended one or more times by the Bankruptcy Court pursuant to a motion filed on or before the then applicable Objection Deadline. Any Contested Claims may be litigated to Final Order. The Reorganized Debtor may compromise and settle any Contested Claim without the necessity of any further notice or approval of the Bankruptcy Court. Bankruptcy Rule 9019 shall not apply to any settlement of a Contested Claim after the Effective Date.

11.2    <u>Responsibility for Objecting to Claims</u>. The Reorganized Debtor shall have the sole right and responsibility for objecting to the allowance of Claims following the Effective Date.

11.3    <u>Distributions on Account of Contested Claims</u>. No distribution shall be made on account of a Contested Claim prior to the time such Claim is Allowed, if at all. Until such time as a contingent Claim becomes fixed and absolute by a Final Order allowing such Claim, such Claim shall be treated as a Contested Claim for purposes of estimates, allocations, and distributions under

the Plan. Any contingent right to contribution or reimbursement shall continue to be subject to Bankruptcy Code section 502(e).

11.4    No Waiver of Right to Object. Except as expressly provided in the Plan, nothing contained in the Disclosure Statement, the Plan, or the Confirmation Order shall waive, relinquish, release, or impair the Reorganized Debtor's right to object to any Claim.

11.5    Bankruptcy Code section 505. All Tax Claims shall remain subject to Bankruptcy Code section 505. The Reorganized Debtor shall retain the right to a determination of the amount or legality of any tax pursuant to Bankruptcy Code section 505 as to any Tax Claim. The Reorganized Debtor may seek relief pursuant to Bankruptcy Code section 505 as a part of, and in conjunction with, any objection to any Tax Claim.

11.6    Allowance of Contested Claims. This section shall apply to all Contested Claims. Nothing contained in the Plan, Disclosure Statement, or Confirmation Order shall change, waive or alter any requirement under applicable law that the Holder of a Contested Claim must file a timely Proof of Claim, and the Claim of any such Contested Creditor who is required to file a Proof of Claim and fails to do so shall be discharged and shall receive no distribution under the Plan. The adjudication and liquidation of Contested Claims is a determination and adjustment of the debtor/creditor relationship, and is therefore an exercise of the Bankruptcy Court's equitable power to which the legal right of trial by jury is inapplicable. The Holder of any Contested Claim shall not have a right to trial by jury before the Bankruptcy Court in respect of any such Claim. Exclusive venue for any proceeding to determine any Contested Claim shall be in the Bankruptcy Court or a court of competent jurisdiction located in Harris County, Texas. Contested Claims shall each be determined separately, except as otherwise ordered by the Bankruptcy Court. Texas Rule of Civil Procedure 42 and Federal Rule of Civil Procedure 23 shall not apply to any proceeding to determine any Contested Claim. The Reorganized Debtor shall retain all rights of removal to federal court as to any proceeding to determine any Contested Claim.

11.7    Allowance of Certain Claims. All Contested Claims shall be liquidated and determined as follows:

a.    Application of Adversary Proceeding Rules. Unless otherwise ordered by the Bankruptcy Court or provided by the Bankruptcy Rules, any objection to a Contested Claim shall be treated as a contested matter subject to Bankruptcy Rule 9014. However, any party may move the Bankruptcy Court to apply the rules applicable to adversary proceedings to any Claim Objection. The Reorganized Debtor, however, may at its election, make and pursue any objection to a Claim in the form of an adversary proceeding.

b.    Scheduling Order. Unless otherwise ordered by the Bankruptcy Court, or if an objection to any Claim is pursued as an adversary proceeding, a scheduling order shall be entered as to each objection to a Claim. The Reorganized Debtor shall tender a proposed scheduling order with each objection and include a request for a scheduling conference for the entry of a scheduling order. The scheduling order may include (i) a discovery cut-off date; (ii) deadlines to amend pleadings; (iii) deadlines for designation of and objections to experts; (iv) deadlines to exchange witness and exhibit lists and for objections to the same and (v) such other

matters as may be appropriate. The provisions on a scheduling order are not intended to supersede the local bankruptcy rules in the Southern District of Texas on claim objections.

11.8    <u>Substantial Consummation</u>. All distributions of any kind made to any Creditor after Substantial Consummation, and any and all other actions taken under this Plan after Substantial Consummation, shall not be subject to relief, reversal, or modification by any court unless the implementation of the Confirmation Order is stayed by an order granted under Bankruptcy Rule 8005.

11.9    <u>Retention of Claims and Causes of Action</u>. Except to the extent explicitly released in this Plan, all claims, causes of action, rights of setoff, and other legal and equitable defenses of the Debtor and its Estate, including the Debtor's claims against NBK and any claims arising under any of the Debtor's real property leases, are preserved for the benefit of the Reorganized Debtor. No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement as to any claim or cause of action against them as an indication that the Reorganized Debtor will not pursue such claim or cause of action. Such claims and causes of action include, without limitation: (i) all rights, claims, and causes of action pursuant to Bankruptcy Code sections 502, 510, 544, 545, and 546; all preference claims under Bankruptcy Code section 547; all fraudulent transfer claims under Bankruptcy Code section 548 and applicable state law; all claims relating to post-petition transactions under Bankruptcy Code section 549; and all claims recoverable under Bankruptcy Code section 550; (ii) all rights of offset or recoupment and all counterclaims against any Claimant; (iii) the claims and causes of action listed in the Disclosure Statement; and (iv) the claims and causes of action listed in the Schedules. For the avoidance of doubt, the Debtor's claims against NBK are preserved as currently pled or as may be amended or supplemented.

# ARTICLE XII.
## RETENTION OF JURISDICTION

Until this Chapter 11 case is closed, the Court shall retain jurisdiction of all matters arising under, or related to, these proceedings, including, but not limited to:

(a)    ensuring that the purpose and intent of the Plan are carried out;

(b)    consideration of any modification of the Plan under Section 1127 of the Code or modification of the Plan after substantial consummation, as defined in Section 1101(2) of the Code;

(c)    hearing and determining all claims, controversies, suits, and disputes against the Debtor;

(d)    hearing, determining, and enforcing all claims or causes of action which may exist on behalf of the Debtor or its estate;

(e)    hearing and determining all controversies, suits, and disputes that may arise in connection with the interpretation of the Plan;

(f)     hearing and determining all objections to claims, controversies, suits, and disputes that may be pending as of or initiated after the Effective Date;

(g)     enforcing and interpreting, by injunction or otherwise, the terms and conditions of the Plan;

(h)     entering any Order, including injunctions, necessary to enforce the rights, titles, interests, and powers of the Debtor and to impose such limitations, restrictions, terms, and conditions as may be necessary or helpful to carry out the purposes and intent of the Plan;

(i)     entering an Order concluding and terminating this Chapter 11 case;

(j)     correcting or curing any defect, omission, inconsistency, conflict, or error in the Plan or Confirmation Order as may be necessary or helpful to carry out the purposes and intent of the Plan;

(k)     considering and acting on any matters consistent with the Plan as may be provided in the Confirmation Order; and

(l)     considering the rejection of Executory Contracts that have not been rejected prior to Confirmation and adjudicating any claims for damages with respect to such rejection.

**ARTICLE XIII.**
**EXECUTORY CONTRACTS**

This Plan shall constitute a motion to reject all Executory Contracts and Leases other than real property leases between the Debtor and its tenants. All real property leases and maintenance contracts are assumed.

**ARTICLE XIV.**
**EFFECT OF CONFIRMATION**

14.1     Effect of Confirmation; Discharge. Confirmation of the Plan shall discharge the Debtor from all claims that arose before the Confirmation Date. After Confirmation, the rights and remedies of any Creditor or Equity Holder shall be governed and limited by the Plan, which shall be binding upon the Debtor, its estate, the Reorganized Debtor, Creditors, Equity Holders, and all other parties in interest, regardless of whether any such Person voted to accept the Plan, and the Pre-Petition Loan Documents shall be deemed to have been amended to comport with the treatment being accorded to NBK herein. All defaults and events of default existing as of the Petition Date and as of the Effective Date shall be deemed cured, and any defaults and events of default resulting from the confirmation of the Plan, the occurrence of the Effective Date, and/or the actions and transactions contemplated by the Plan, including the payments to be made under the Plan and changes in ownership and control effectuated by the Plan, shall be waived and of no effect.

14.2     Injunction. From and after the Effective Date, all holders of Claims shall be and are hereby permanently restrained and enjoined from: (a) commencing or continuing in any manner,

any action or other proceeding of any kind with respect to any such Claim against the Reorganized Debtor or the Assets; (b) enforcing, attaching, collecting, or recovering on account of any Claim by any manner or means, any judgment, award, decree, or order against the Reorganized Debtor or the Assets except pursuant to and in accordance with this Plan; (c) creating, perfecting, or enforcing any encumbrance of any kind against either the Assets or the Reorganized Debtor; (d) asserting any control over, interest, rights or title in or to any of the Assets except as provided in this Plan; (e) asserting any setoff, or recoupment of any kind against any obligation due the Reorganized Debtor as assignees, except upon leave of the Bankruptcy Court or except as authorized by section 553 of the Bankruptcy Code; and (f) performing any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; provided, however, that this injunction shall not bar any Creditor from asserting any right granted pursuant to this Plan; provided, further, however, that each holder of a Contested Claim shall be entitled to enforce its rights under the Plan, including seeking Allowance of such Contested Claim pursuant to the Plan.

14.3    Automatic Stay. The stay imposed pursuant to Bankruptcy Code section 362(a) shall remain in full force and effect, except as modified or conditioned by prior Order of the Bankruptcy Court, until the Effective Date. Immediately upon the Effective Date, the stay imposed pursuant to Bankruptcy Code section 362(a) shall terminate, and the discharge and injunction provisions of sections 13.1 and 13.2 hereof shall become immediately effective.

## ARTICLE XV.
## SUBSTANTIAL CONSUMMATION

For purposes of this Plan, substantial consummation shall occur upon the commencement of distributions under the Plan.

## ARTICLE XVI.
## MISCELLANEOUS PROVISIONS

16.1    Corporate Allocations. Any and all adjustments and reallocations among the Equity Holders of the Debtor resulting from the Confirmation of this Plan shall be deemed effective as of the Effective Date for corporate and tax purposes.

16.2    No Double Recovery. No Creditor or other party in interest shall be entitled to a double recovery on account of any Allowed Claim or Interest.

16.3    Compliance with Tax Requirements. The Debtor shall comply with all withholding and reporting requirements imposed by federal, state, and local taxing authorities and any distributions hereunder shall be subject to such requirements, if any.

16.4    Revocation and Withdrawal of Plan. The Debtor reserves the right to revoke or withdraw this Plan at any time prior to the Confirmation Date.

16.5    Headings: Headings and captions are used in this Plan for convenience and reference only and such headings and captions shall not constitute a part of the Plan for any other

purpose or to otherwise affect the meaning or interpretation of any term, provision, or condition of the Plan.

16.6    Entire Agreement: The Plan sets forth the entire agreement and understanding among the parties relating to the subject matter of the Plan and the satisfaction of all Claims and interests provided in the Plan. No party shall be bound by any terms, conditions, definitions, warranties, restrictions, understandings, agreements, representations, obligations, or other requirements except for those expressly provided in the Plan, which shall supersede all prior discussions, documents, instruments, understandings, and agreements regarding the subject of the Plan.

16.7    Orders in aid of Confirmation: Pursuant to Sections 105, 1141, 1142, and 1143 of the Bankruptcy Code, the Bankruptcy Court may enter one or more orders in aid of Confirmation of this Plan.

DATED: January 30, 2024.

Respectfully submitted,

**GALLERIA 2425 OWNER, LLC**

By:  */s/ Ali Choudhri*
       Ali Choudhri
       **MANAGER OF GALLERIA 2425 OWNER, LLC**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | |
| **GALLERIA 2425 OWNER LLC,** | **Case No. 23-34815** |
| | **Chapter 11** |
| Debtor. | |

**DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF
GALLERIA 2425 OWNER LLC'S CHAPTER 11 PLAN OF REORGANIZATION**

**THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION FOR USE IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OF REORGANIZATION DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT ARE NOT INTENDED AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED HEREIN BE RELIED UPON FOR ANY PURPOSE BEFORE A CONDITIONAL DETERMINATION BY THE BANKRUPTCY COURT THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY GALLERIA 2425 OWNER, LLC (THE "DEBTOR"), AND DESCRIBES THE TERMS AND PROVISIONS OF THE DEBTOR'S PLAN OF REORGANIZATION (THE "PLAN"). ANY TERM USED IN THIS DISCLOSURE STATEMENT THAT IS NOT DEFINED HEREIN HAS THE MEANING ASCRIBED TO THAT TERM IN THE PLAN.**

**<u>IF YOU ARE A CREDITOR OF THE DEBTOR AND/OR HAVE A CLAIM, PLEASE DO NOT DISCARD THESE DOCUMENTS AND REVIEW THEM IN FULL, AS YOUR CLAIM IS LIKELY BEING TREATED IN THE DEBTOR'S PLAN.</u>**

DATED: January 30, 2024

**DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF
GALLERIA 2425 OWNER, LLC'S CHAPTER 11 PLAN OF REORGANIZATION**     **PAGE 1 OF 43**

002144

ALL HOLDERS OF CLAIMS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. ALL SUMMARIES OF THE PLAN AND OTHER STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN, ANY SUPPLEMENTS TO THE PLAN AND THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE DATE HEREOF, UNLESS OTHERWISE STATED HEREIN, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF. MOREOVER, THERE MAY BE ERRORS IN THE STATEMENTS AND/OR FINANCIAL INFORMATION CONTAINED HEREIN AND/OR ASSUMPTIONS UNDERLYING SUCH STATEMENTS AND/OR FINANCIAL INFORMATION. THE DEBTOR AND ITS ADVISORS EXPRESSLY DISCLAIM ANY OBLIGATION TO UPDATE OR CORRECT ANY SUCH FINANCIAL INFORMATION OR ASSUMPTIONS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT AND THE PLAN DESCRIBED HEREIN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. TO THE EXTENT ANY RIGHTS, NOTES, OR INTERESTS ISSUED PURSUANT TO THE PLAN ARE DEEMED SECURITIES, NEITHER THE OFFER NOR THE ISSUANCE OF ANY SUCH SECURITIES PURSUANT TO THE PLAN HAS BEEN REGISTERED UNDER THE 1933 ACT OR ANY SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS. ANY SUCH OFFER OR ISSUANCE IS BEING MADE IN RELIANCE ON THE EXEMPTIONS FROM REGISTRATION SPECIFIED IN SECTION 1145 OF THE BANKRUPTCY CODE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT AND THE EXHIBITS HERETO DO NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS

AND SHALL BE INADMISSIBLE FOR ANY PURPOSE ABSENT THE EXPRESS WRITTEN CONSENT OF THE DEBTOR AND THE PARTY AGAINST WHOM SUCH INFORMATION IS SOUGHT TO BE ADMITTED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR, THE REORGANIZED DEBTOR, OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO CONSTITUTE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR.

## DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS

This Disclosure Statement includes information regarding certain "forward-looking statements" within the meaning of Section 27A of the 1933 Act and Section 21E of the Securities Exchange Act of 1934, as amended, all of which are based upon various estimates and assumptions that the Debtor believes to be reasonable as of the date hereof. These statements involve risks and uncertainties that could cause actual future outcomes to differ materially from those set forth in this Disclosure Statement. Such risks and uncertainties include, but are not limited to:

- Litigation risks and uncertainties;
- Costs associated with the Debtor's restructuring efforts, including its Chapter 11 filing; and
- Claim and liability estimates.

You should understand that the foregoing as well as other risk factors discussed in this Disclosure Statement could cause future outcomes to differ materially from those expressed in such forward-looking statements. Given the uncertainties, you are cautioned not to place undue reliance on any forward-looking statements in determining whether to vote in favor of the Plan or to take any other action. The Debtor undertakes no obligation to update or revise information concerning the Debtor's restructuring efforts or its cash position or any forward-looking statements to reflect events or circumstances that may arise after the date of this Disclosure Statement, except as required by law.

# I.
## SUMMARY OF THE PLAN

Galleria 2425 Owner, LLC (the "Debtor") owns that certain real property located at 2425 West Loop South, Houston, Texas (the "Property"). The assets of the Debtor constitute "single asset real estate" as that term is defined in Bankruptcy Code § 101(51B).

Generally speaking, the Plan provides for the payment as described below to Claims against the Debtor. Allowed Interests of the Equity Interest Holders will be cancelled and terminated on the Effective Date, and equity will be reissued to the new equity holder based on a $2.5 million contribution of new equity to fund the Plan. The funds to be used for the payment of Allowed Claims or other Distributions to be made under the Plan will come from the income generated from the Property, the new equity contribution, plus any other available funds or property that the Reorganized Debtor may otherwise possess on or after the Effective Date, including, without limitation, any such funds or property which may be provided through additional capital contributions and the proceeds of any sale, refinancing, or other disposition of the Debtor's Assets.

# II.
## CONSIDERATIONS IN PREPARATION OF THE DISCLOSURE STATEMENT AND PLAN; DISCLAIMERS

BECAUSE ACCEPTANCE OF THE PLAN WILL CONSTITUTE ACCEPTANCE OF ALL THE PROVISIONS THEREOF, HOLDERS OF CLAIMS ARE URGED TO CONSIDER CAREFULLY THE INFORMATION REGARDING TREATMENT OF THEIR CLAIMS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED.

THE DEBTOR PRESENTLY INTENDS TO SEEK TO CONSUMMATE THE PLAN AND TO CAUSE THE EFFECTIVE DATE TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PLAN. THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR.

TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED, AND ACTUALLY RECEIVED BY THE VOTING DEADLINE. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE ENCOURAGED TO READ AND CONSIDER CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN.

*****

**THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED**

TO THE PLAN, ANTICIPATED EVENTS IN THE BANKRUPTCY CASE, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT THE SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE PLAN OR CERTAIN DOCUMENTS (AND HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD REFER TO THE PLAN AND SPECIFIED DOCUMENTS IN THEIR ENTIRETY AS ATTACHED HERETO), STATUTORY PROVISIONS, EVENTS, OR INFORMATION. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO REVIEW THE ENTIRE PLAN. IN THE EVENT ANY PROVISION OF THIS DISCLOSURE STATEMENT IS FOUND TO BE INCONSISTENT WITH A PROVISION OF THE PLAN, THE PROVISION OF THE PLAN SHALL CONTROL.

IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN, HOLDERS OF CLAIMS MUST RELY UPON THEIR OWN EXAMINATION OF THE DEBTOR AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

*****

EXCEPT AS SET FORTH HEREIN, NO PERSON HAS BEEN AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OTHER THAN, IN THE EVENT ANY RIGHTS OR INTERESTS ISSUED PURSUANT TO THE PLAN ARE DEEMED SECURITIES, SUCH SECURITIES TO WHICH IT RELATES, OR AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES IN ANY JURISDICTION IN WHICH, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE DATE HEREOF, UNLESS OTHERWISE STATED HEREIN, AND NEITHER THE DELIVERY OF THIS DISCLOSURE

STATEMENT NOR, IN THE EVENT ANY RIGHTS OR INTERESTS ISSUED PURSUANT TO THE PLAN ARE DEEMED SECURITIES, THE DISTRIBUTION OF ANY SECURITIES PURSUANT TO THE PLAN WILL, UNDER ANY CIRCUMSTANCE, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF, OR SUCH OTHER DATE AS DESCRIBED HEREIN. ANY ESTIMATES OF CLAIMS OR EQUITY INTERESTS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE AMOUNTS OF CLAIMS OR EQUITY INTERESTS DETERMINED BY THE DEBTOR OR ULTIMATELY ALLOWED BY THE BANKRUPTCY COURT, AND AN ESTIMATE SHALL NOT BE CONSTRUED AS AN ADMISSION OF THE AMOUNT OF SUCH CLAIM.

INFORMATION INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT SPEAKS AS OF THE DATE OF SUCH INFORMATION OR THE DATE OF THE REPORT OR DOCUMENT IN WHICH SUCH INFORMATION IS CONTAINED OR AS OF A PRIOR DATE AS MAY BE SPECIFIED IN SUCH REPORT OR DOCUMENT. ANY STATEMENT CONTAINED IN A DOCUMENT INCORPORATED BY REFERENCE HEREIN SHALL BE DEEMED TO BE MODIFIED OR SUPERSEDED FOR ALL PURPOSES TO THE EXTENT THAT A STATEMENT CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY OTHER SUBSEQUENTLY FILED DOCUMENT WHICH IS ALSO INCORPORATED OR DEEMED TO BE INCORPORATED BY REFERENCE, MODIFIES OR SUPERSEDES SUCH STATEMENT. ANY STATEMENT SO MODIFIED OR SUPERSEDED SHALL NOT BE DEEMED, EXCEPT AS SO MODIFIED OR SUPERSEDED, TO CONSTITUTE A PART OF THIS DISCLOSURE STATEMENT.

A.    Disclosure Statement; Construction

This Disclosure Statement has been prepared to comply with section 1125 of the Bankruptcy Code and is hereby transmitted by the Debtor to holders of Claims and Equity Interests for use in the solicitation of acceptances from the holders of Claims (the "Solicitation") of the Plan. **Unless otherwise defined in this Disclosure Statement, capitalized terms used herein have the meanings ascribed to them in the Plan.**

For purposes of this Disclosure Statement, the following rules of interpretation shall apply: (i) whenever the words "include," "includes" or "including" are used, they shall be deemed to be followed by the words "without limitation," (ii) the words "hereof," "herein," "hereby" and "hereunder" and words of similar import shall refer to this Disclosure Statement as a whole and not to any particular provision, and (iii) article, section and exhibit references are to this Disclosure Statement unless otherwise specified.

The purpose of this Disclosure Statement is to provide "adequate information" to Persons who hold Claims to enable them to make an informed decision before exercising their right to vote to accept or reject the Plan. By order of the Bankruptcy Court (the "Disclosure Statement Order"), this Disclosure Statement was approved and held to contain adequate information.

THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN. THE MATERIAL CONTAINED HEREIN IS INTENDED SOLELY FOR THE USE BY HOLDERS OF CLAIMS AND EQUITY INTERESTS IN EVALUATING THE PLAN AND BY HOLDERS OF CLAIMS IN VOTING TO ACCEPT OR REJECT THE PLAN AND, ACCORDINGLY, MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN THE DETERMINATION OF HOW TO VOTE ON THE PLAN. THE PLAN IS SUBJECT TO NUMEROUS CONDITIONS AND VARIABLES AND THERE CAN BE NO ASSURANCE THAT THE PLAN, IF CONFIRMED, WILL BE EFFECTUATED.

**B.**     **Sources of Information**

Except as otherwise expressly indicated, the portions of this Disclosure Statement describing the Debtor, its business, property and management, and the Plan have been prepared from information furnished by the Debtor. Unless an information source is otherwise noted, the statement was derived from information provided by such parties. **The Debtor's management has prepared financial projections that are attached as exhibits to this Disclosure Statement. A large portion of the assumptions in those financial projections are based solely upon management's industry experience, judgment, and expectations. The assumptions used to derive any of the pro forma operating results are based on the Debtor's historical experience, industry information available to management, and management's experience in owning, operating, and rehabilitating similar properties.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECTED TO A CERTIFIED AUDIT AND IS BASED, IN PART, UPON INFORMATION PREPARED BY PARTIES OTHER THAN THE DEBTOR. THEREFORE, ALTHOUGH THE DEBTOR HAS MADE EVERY REASONABLE EFFORT TO BE ACCURATE IN ALL MATERIAL MATTERS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT ALL THE INFORMATION CONTAINED HEREIN IS COMPLETELY ACCURATE.**

Certain of the materials contained in this Disclosure Statement may have been taken directly from other readily accessible documents or are digests of other documents. While the Debtor has made every effort to retain the meaning of such other documents or portions that have been summarized, the Debtor urges that any reliance on the contents of such other documents should depend on a thorough review of the documents themselves. In the event of a discrepancy between this Disclosure Statement and the actual terms of a document, the actual terms of such document shall control.

The Debtor has compiled information without professional comment, opinion or verification and does not suggest comprehensive treatment has been given to matters identified herein. Each Creditor and holder of an Equity Interest is urged to independently investigate any such matters prior to reliance.

No statements concerning the Debtor, the value of its property, or the value of any benefit offered to the holder of a Claim or Equity Interest in connection with the Plan should be relied upon other than as set forth in this Disclosure Statement. In arriving at your decision, you should not rely on any representation or inducement made to secure your acceptance or rejection that is contrary to information contained in this Disclosure Statement, and any such additional representations or inducements should be reported to counsel for the Debtor: Reese Baker, Baker & Associates, 950 Echo Lane, Ste 300, Houston, Texas 77024, Telephone 713-869-9200.

# III.
# INTRODUCTION

## A.     Filing of the Debtor's Chapter 11 Bankruptcy Case

On December 5, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"), initiating the above-captioned bankruptcy case (the "Bankruptcy Case").

Since the Petition Date, the Debtor has remained in possession of its property and has continued to manage its business as debtor-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108. No trustee, examiner, or committee of unsecured creditors has been appointed in the Debtor's Bankruptcy Case.

The Debtor files this Plan to reorganize its financial affairs and hopes that the Plan, as it may hereafter be amended, modified, or restated, in whole or in part, will be confirmed on a consensual basis through acceptance by all Classes of Creditors entitled to vote on the Plan. In the event that one or more of the Debtor's Creditor Classes fails to accept the Plan, the Debtor will request the Court to confirm the Plan on a consensual basis through acceptance by all classes of creditors entitled to vote on the Plan. In the event that one or more of the Debtor's creditor classes fails to accept the Plan, the Debtor will request the Court to confirm the Plan under Section 1129(b) of the Bankruptcy Code.

## B.     Purpose of Disclosure Statement

This Disclosure Statement is submitted in accordance with section 1125 of the Bankruptcy Code for the purpose of soliciting acceptances of the Plan from holders of certain Classes of Claims. The only Creditors whose acceptances of the Plan are sought are those whose Claims are "impaired" by the Plan, as that term is defined in section 1124 of the Bankruptcy Code and who are receiving distributions under the Plan. Holders of Claims that are not "impaired" are deemed to have accepted the Plan.

The Debtor has prepared this Disclosure Statement pursuant to the provisions of section 1125 of the Bankruptcy Code, which requires that a copy of the Plan, or a summary thereof, be submitted to all holders of Claims against, and Equity Interests in, the Debtor, along with a written Disclosure Statement containing adequate information about the Debtor of a kind, and in

sufficient detail, as far as is reasonably practicable, that would enable a hypothetical, reasonable investor typical of Creditors and holders of Equity Interests to make an informed judgment in exercising their right to vote on the Plan.

Section 1125 of the Bankruptcy Code provides, in pertinent part:

(b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the Debtor or an appraisal of the Debtor's assets.

\* \* \*

(d) Whether a disclosure statement required under subsection (b) of this section contains adequate information is not governed by any otherwise applicable non-bankruptcy law, rule, or regulation, but an agency or official whose duty is to administer or enforce such a law, rule, or regulation may be heard on the issue of whether a disclosure statement contains adequate information. Such an agency or official may not appeal from, or otherwise seek review of, an order approving a disclosure statement.

(e) A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the Debtor, of an affiliate participating in a plan with the Debtor, or of a newly organized successor to the Debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities.

Approval of this Disclosure Statement is required by the Bankruptcy Code and does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan, or as to the value or suitability of any consideration offered there under. Such approval does indicate, however, that the Bankruptcy Court has determined that the Disclosure Statement meets the requirements of section 1125 of the Bankruptcy Code and contains adequate information to permit the holders of Allowed Claims, whose acceptance of the Plan is solicited, to make an informed judgment regarding acceptance or rejection of the Plan.

**THE DEBTOR BELIEVES THAT THE PLAN AND THE TREATMENT OF CLAIMS THEREUNDER IS IN THE BEST INTERESTS OF CREDITORS, AND URGES THAT YOU VOTE TO ACCEPT THE PLAN.**

This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission, nor has the Commission passed upon the accuracy or adequacy of the statements contained herein. Any representation to the contrary is unlawful.

This Disclosure Statement and the appendices to it contain forward-looking statements relating to business expectations, asset sales and liquidation analysis. Business plans may change as circumstances warrant. Actual results may differ materially as a result of many factors, some of which the debtor has no control over.

## C. Hearing on Confirmation of the Plan

The Bankruptcy Court has set _____, 2024 at _____.m., prevailing central time, as the time and date for the hearing (the "Confirmation Hearing") to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied. Once commenced, the Confirmation Hearing may be adjourned or continued by announcement in open court with no further notice. Holders of Claims against the Debtor may vote on the Plan by completing and delivering the enclosed Ballot to: Reese W. Baker, Baker & Associates, 950 Echo Lane, Ste. 300, Houston, Texas 77024 Telephone: 713-869-9200. **Ballots must be actually received on or before 5:00 p.m., prevailing central time, on _____, 2024.** If the Plan is rejected by one or more impaired Classes of Creditors or holders of Equity Interests, the Plan, or a modification thereof, may still be confirmed by the Bankruptcy Court under section 1129(b) of the Bankruptcy Code (commonly referred to as a "cramdown") if the Bankruptcy Court determines, among other things, that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting Class or Classes of creditors or holders of Equity Interests impaired by the Plan. The procedures and requirements for voting on the Plan are described in more detail below.

## IV.
## EXPLANATION OF CHAPTER 11

## A. Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Pursuant to Chapter 11, a debtor-in-possession attempts to reorganize its business and financial affairs for the benefit of the debtor, its creditors, and other parties-in-interest.

The commencement of a Chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in property as of the date the petition is filed. Unless the Bankruptcy Court orders the appointment of a trustee, sections 1101, 1107 and 1108 of the Bankruptcy Code provide that a Chapter 11 debtor may continue to operate its business and control the assets of its estate as a "debtor-in-possession," as the Debtor in this Bankruptcy Case has since the Petition Date.

The filing of a Chapter 11 petition also triggers the automatic stay, which is set forth in section 362 of the Bankruptcy Code. The automatic stay essentially halts all attempts to collect on

prepetition claims against or debts owed by a debtor or to otherwise interfere with the debtor's business or its estate.

Formulation of a plan of reorganization is the principal purpose of a Chapter 11 case. A plan sets forth the means for satisfying the claims of creditors against and interests of equity holders in the debtor. Unless a trustee is appointed, only the debtor may file a plan during the first 120 days of a Chapter 11 case (the "Exclusivity Period"). After the Exclusivity Period has expired, a creditor or any other party-in-interest may file a plan, unless the debtor files a plan within the Exclusivity Period. If a debtor files a plan within the Exclusivity Period, the debtor is given 60 additional days (the "Solicitation Period") to solicit acceptances of its plan. Section 1121(d) of the Bankruptcy Code permits the Bankruptcy Court to extend or reduce the Exclusivity Period and the Solicitation Period upon a showing of adequate "cause." The Debtor's Exclusivity Period in this Bankruptcy Case has expired.

## B.    Plan of Reorganization

A plan of reorganization provides the manner in which a debtor will satisfy the claims of its creditors. After the plan of reorganization has been filed, the holders of claims against or interests in a debtor are permitted to vote on whether to accept or reject the plan. Chapter 11 does not require that each holder of a claim against or interest in a debtor vote in favor of a plan of reorganization in order for the plan to be confirmed. At a minimum, however, a plan of reorganization must be accepted by a majority in number and two-thirds in amount of those claims actually voting from at least one class of claims impaired under the plan. The Bankruptcy Code also defines acceptance of a plan of reorganization by a class of interests (equity securities) as acceptance by holders of two-thirds of the number of shares actually voted.

Classes of claims or interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and, thus, are not entitled to vote. Acceptances of the Plan in this Bankruptcy Case are being solicited only from those persons who hold Claims in an impaired Class (other than Classes of Claims that are not receiving any distribution under the Plan). A Class is "impaired" if the legal, equitable, or contractual rights attaching to the Claims or Equity Interests of that Class are modified. Modification does not include curing defaults and reinstating maturity or payment in full in cash.

Even if all classes of claims and interests accept a plan of reorganization, the Bankruptcy Court may nonetheless still deny confirmation. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and, among other things, the Bankruptcy Code requires that a plan of reorganization be in the "best interests" of creditors and shareholders and that the plan of reorganization be feasible. The "best interests" test generally requires that the value of the consideration to be distributed to claimants and interest holders under a plan may not be less than those parties would receive if that debtor were liquidated under a hypothetical liquidation occurring under Chapter 7 of the Bankruptcy Code. A plan of reorganization must also be determined to be "feasible," which generally requires a finding that there is a reasonable probability that the debtor will be able to perform the obligations incurred under the plan of reorganization and that the debtor will be able to continue operations without the need for further financial reorganization.

DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF
GALLERIA 2425 OWNER, LLC'S CHAPTER 11 PLAN OF REORGANIZATION                    PAGE 11 OF 43

002154

The Bankruptcy Court may confirm a plan of reorganization even though fewer than all of the classes of impaired claims and interests accept it. In order for a plan of reorganization to be confirmed despite the rejection of a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan of reorganization does not discriminate unfairly and that the plan is fair and equitable with respect to each impaired class of claims or interests that has not accepted the plan of reorganization.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class if, among other things, the plan provides: (a) that each holder of a claim included in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

The Bankruptcy Court must further find that the economic terms of the plan of reorganization meet the specific requirements of section 1129(b) of the Bankruptcy Code with respect to the particular objecting class. The proponent of the plan of reorganization must also meet all applicable requirements of section 1129(a) of the Bankruptcy Code (except section 1129(a)(8) if the proponent proposes to seek confirmation of the plan under the provisions of section 1129(b)). These requirements include the requirement that the plan comply with applicable provisions of the Bankruptcy Code and other applicable law, that the plan be proposed in good faith, and that at least one impaired class of creditors has voted to accept the plan.

## V.
## VOTING PROCEDURES; REQUIREMENTS FOR CONFIRMATION

If you are in one of the Classes of Claims whose rights are affected by the Plan (see "Description of the Plan" below), it is important that you vote. **If you fail to vote, your rights may be jeopardized.**

### A. "Voting Claims": Parties Entitled to Vote

Pursuant to the provisions of section 1126 of the Bankruptcy Code, holders of Claims or Equity Interests that are (i) allowed, (ii) impaired, and (iii) that are receiving or retaining property on account of such Claims or Equity Interests pursuant to the Plan, are entitled to vote either for or against the Plan (hereinafter, "Voting Claims"). Accordingly, in this Bankruptcy Case, any holder of a Claim classified in Classes 1, 2, 3, 4, 5, and 6 of the Plan may have a Voting Claim and should have received a Ballot for voting (with return envelope) in these Disclosure Statement and Plan materials (hereinafter, the "Solicitation Package") since these are the Classes consisting of impaired Claims that are receiving property. Holders of Claims in Class 7 and Class 8 Interests are impaired, will not receive any distributions under the Plan, and are deemed to reject the Plan.

As referenced in the preceding paragraph, a Claim must be allowed to be a Voting Claim. The Debtor filed schedules in this Bankruptcy Case listing Claims against the Debtor. To the extent a Creditor's Claim was listed in the Debtor's schedules, and was not listed as disputed, contingent,

or unliquidated, it is deemed "allowed." Any Creditor whose Claim was not scheduled, or was listed as disputed, contingent, or unliquidated, must have timely filed a proof of claim in order to have an "allowed" Claim. Absent an objection to that proof of claim, it is deemed "allowed." In the event that any proof of claim is subject to an objection by the Debtor as of or during the Plan voting period (an "Objected-to Claim"), then, by definition, it is not "allowed" for purposes of section 1126 of the Bankruptcy Code, and is not to be considered a Voting Claim entitled to cast a Ballot. Nevertheless, pursuant to Bankruptcy Rule 3018(a), the holder of an Objected-to Claim may petition the Bankruptcy Court, after notice and hearing, to allow the Claim temporarily for voting purposes in an amount that the Bankruptcy Court deems proper. Allowance of a Claim for voting purposes, and disallowance for voting purposes, does not necessarily mean that all or a portion of the Claim will be allowed or disallowed for distribution purposes.

**By enclosing a Ballot with the Solicitation Package, the Debtor is not representing that you are entitled to vote on the Plan.**

**B.** **Return of Ballots**

If you are a holder of a Voting Claim, your vote on the Plan is important. Completed Ballots should either be returned in the enclosed envelope or sent to counsel for the Debtor at the following address:

> Reese W. Baker
> Baker & Associates
> 950 Echo Lane, Ste. 300
> Houston, Texas 77024
> Email: courtdocs@bakerassociates.net
> Fax: 713-869-9100

**C.** **Deadline for the Submission of Ballots**

**Ballots must actually be received at the address listed above, whether by mail or hand-delivery, by _____, 2024 at 5:00 p.m., prevailing central time, (the "Ballot Return Date"). Any Ballots received after that time will not be counted. Any Ballot that is not executed by a person authorized to sign such Ballot will not be counted. If you have any questions regarding the procedures for voting on the Plan, contact counsel for the Debtor: Reese W. Baker, Baker & Associates, 950 Echo Lane, Ste 300, Houston, Texas 77024; Telephone: 713-869-9200.**

**THE DEBTOR URGES ALL HOLDERS OF VOTING CLAIMS TO VOTE IN FAVOR OF THE PLAN.**

**D.** **Confirmation of Plan**

**1.** **Solicitation of Acceptances.** The Debtor is soliciting your vote. The cost of any solicitation by the Debtor will be borne by the Debtor. No other additional

compensation shall be received by any party for any solicitation other than as disclosed to the Bankruptcy Court.

No representations or assurances, if any, concerning the Debtor (including, without limitation, its future business operations) or the Plan are authorized by the Debtor other than as set forth in this Disclosure Statement. Any representations or inducements made by any person to secure your vote that are other than herein contained should not be relied upon by you in arriving at your decision, and such additional representations or inducements should be reported to counsel for the Debtor for such action as may be deemed appropriate.

This is a solicitation solely by the Debtor and is not a solicitation by any Equity Holder, attorney, or accountant for the Debtor. The representations, if any, made herein are those of the Debtor and not of such Equity Holders, attorneys, or accountants, except as may be otherwise specifically and expressly indicated.

Under the Bankruptcy Code, a vote for acceptance or rejection of a plan may not be solicited unless the claimant has received a copy of a disclosure statement approved by the Bankruptcy Court prior to, or concurrently with, such solicitation. This solicitation of votes on the Plan is governed by section 1125(b) of the Bankruptcy Code. Violation of section 1125(b) of the Bankruptcy Code may result in sanctions by the Bankruptcy Court, including disallowance of any improperly solicited vote.

2.  **Requirements for Confirmation of the Plan.** At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court may enter an order confirming the Plan. For the Plan to be confirmed, section 1129 requires that the Bankruptcy Court find, among other things, that:

(a) the Plan complies with the applicable provisions of the Bankruptcy Code;

(b) the Debtor has complied with the applicable provisions of the Bankruptcy Code;

(c) the Plan has been proposed in good faith and not by any means forbidden by law;

(d) any payment or distribution made or promised by the Debtor or by a person issuing securities or acquiring property under the Plan for services or for costs and expense in connection with the Plan has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(e) the Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or

voting trustee of the Debtor, an affiliate of the Debtor participating in a plan with the Debtor, or a successor to the Debtor under the Plan; the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors and holders of Equity Interests and with public policy; and the Debtor has disclosed the identity of any insider that will be employed or retained by the Reorganized Debtor and the nature of any compensation for such insider;

(f)     any government regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval;

(g)     with respect to each impaired Class of Claims or Equity Interests, either each holder of a Claim or Equity Interest of the Class has accepted the Plan or will receive or retain under the Plan on account of that Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code; or, if section 1111(b)(2) of the Bankruptcy Code applies to the Claims of a Class, that each holder of a Claim of that Class will receive or retain under the Plan on account of that Claim property of a value, as of the Effective Date, that is not less than the value of that holder's interest in the Debtor's interest in the property that secures that Claim;

(h)     each Class of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan;

(i)     except to the extent that the holder of a particular Administrative Claim or Priority Claim has agreed to or the Bankruptcy Code authorizes a different treatment of its Claim, the Plan provides that Administrative Claims and Priority Claims shall be paid in full on the Effective Date or the date on which it is Allowed;

(j)     if a Class of Claims or Equity Interests is impaired under the Plan, at least one Class of Claims or Equity Interests that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Equity Interest in that Class; and

(k)     confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

**Disclosure Statement under 11 U.S.C. § 1125 in Support of**
**Galleria 2425 Owner, LLC's Chapter 11 Plan of Reorganization**                    **Page 15 of 43**
002158

The Debtor believes that the Plan satisfies all of the statutory requirements of the Bankruptcy Code and that the Plan was proposed in good faith. The Debtor believes it has complied or will have complied with all the requirements of the Bankruptcy Code.

**3.** **Acceptances Necessary to Confirm the Plan.** Voting on the Plan by each holder of a Claim or Equity Interest is important. Chapter 11 of the Bankruptcy Code does not require that each holder of a Claim or Equity Interest vote in favor of the Plan in order for the Court to confirm the Plan. Generally, to be confirmed under the acceptance provisions of Section 1126(a) of the Bankruptcy Code, the Plan must be accepted by each Class of Claims that is impaired under the Plan by Class members holding at least two thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class actually voting in connection with the Plan; in connection with a Class of Equity Interests, more than two-thirds (2/3) of the shares actually voted must accept to bind that Class. A Class of Equity Interests that is impaired under the Plan accepts the Plan if more than two-thirds (2/3) in amount actually voting vote to accept the Plan. Even if all Classes of Claims and Equity Interests accept the Plan, the Bankruptcy Court may refuse to confirm the Plan.

**4.** **Cramdown.** In the event that any impaired Class of Claims or Equity Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or equity interests. "Fair and equitable" has different meanings for holders of secured and unsecured claims and equity interests:

(a) with respect to a secured claim, "fair and equitable" means either (i) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal to the allowed amount of its claims with a present value as of the effective date of the plan at least equal to the value of such secured creditor's interest in the property securing its liens, (ii) property subject to the lien of the impaired secured creditor is sold free and clear of that lien, with that lien attaching to the proceeds of sale, and such lien proceeds must be treated in accordance with clauses (i) and (iii) hereof, or (iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan;

(b) with respect to an unsecured claim, "fair and equitable" means either (i) each impaired creditor receives or retains property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan; and

(c)     with respect to an equity interest, "fair and equitable" means either (i) each impaired equity interest receives or retains, on account of that equity interest, property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which the holder is entitled, any fixed redemption price to which the holder is entitled, or the value of the equity interest; or (ii) the holder of any equity interest that is junior to the equity interest of that class will not receive or retain under the plan, on account of that junior equity interest, any property.

In the event one or more Classes of impaired Claims or Equity Interests rejects or is deemed to have rejected the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired Class of Claims or Equity Interests.

The Debtor believes that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims and Equity Interests. All Classes are impaired by the Plan.

# VI.
# BACKGROUND OF THE DEBTOR

## A.     Nature of the Debtor's Business

Galleria 2425 Owner, LLC is a Texas limited liability company founded in 2018. The Debtor's primary asset is a Class A office building located at 2425 West Loop South, Houston, Texas 77027(the "Property"). As an office building, the Property was greatly affected by the Covid pandemic—indeed, during the pandemic, one of the Property's largest tenants filed for bankruptcy and ultimately rejected its lease at the Property, leading to significant vacancies. Since then, the Debtor has worked hard to increase the occupancy of the Property, and the Property currently has a large number of commercial tenants from which Debtor derives its income.

## B.     The Debtor's Indebtedness and Creditors

As of the Petition Date, the Debtor's property was encumbered by a Deed of Trust to National Bank of Kuwait S.A.K.P. ("NBK"). The Property is the collateral for the Loan.

NBK and the Debtor have been involved in significant litigation over the years, and most recently regarding a 2022 settlement agreement between the parties. The Debtor contends that NBK breached the settlement agreement and has filed an adversary proceeding against NBK in which it asserts various claims, including claims for lender liability and tortious interference. NBK contends that the Debtor breached the settlement agreement and that it should be permitted to foreclose on the Property.

The Debtor's remaining debt is generally comprised of (a) claims of taxing authorities; (b) a secured claim of Caz Creek Lending; (c) a secured claim of 2425 WL, LLC; (d) any deficiency claim owed to the Lender; (e) unsecured claims for property repair and maintenance; and (f) unsecured creditors providing services with respect to the Property.

## C. Existing and Potential Litigation.

### 1. Litigation.

The Debtor was engaged in litigation with National Bank of Kuwait in Harris County under Cause No. 2021-63370 when this bankruptcy case was filed. The case in state court is still ongoing. In addition, the Debtor filed an adversary proceeding against NBK in the bankruptcy case (23-03263) in which the Debtor asserts various claims, including claims for lender liability and tortious interference. The adversary proceeding is ongoing. The litigation involving NBK is based on the facts set forth below:

a. In 2018, NBK loaned certain funds to Debtor. There have been various disputes between the Debtor and NBK about the timeliness of payments and the extent and validity of NBK's security, but the main issues between the Debtor and NBK involve the continued interference by NBK with the Debtor's ability to lease the Property to produce revenue and Debtor's ability to sell the Property to pay NBK. Every time NBK has so interfered, it has then blamed the Debtor for the Debtor's inability supposedly to meet some of the loan terms.

b. For example, in 2021, the owner of the Debtor had the Property "sold" for a purchase price of $85 million, more than enough to clear NBK's debt. The purchase would have paid off not only NBK, but left the Debtor and the others with significant value. NBK, rather than approve and allow the sale to close, issued a formal notice of default to the Debtor and its intent to accelerate the loan on June 29, 2021, while the SIBS International deal was in progress, killing that deal.

c. The same was true with regard to NBK's interference with the Debtor's attempt to lease space in the Property to provide revenue so it could operate and make loan payments. By August 2021, this situation had become untenable due to NBK's refusal to approve new tenants and new leases that the Debtor on August 13, 2021 sent NBK a detailed letter regarding lease-up and renewal prospects for discussions, none of which NBK would approve.

d. On August 16, 2021 counsel for the Debtor sent an email to NBK forwarding multiple leases for approval that NBK had failed to approve or even respond to. NBK continued to refuse to approve the leases.

e. This lack of approval, or finding obstacles to approve, was not new. In September 2019, Related Group had reached out to lease the parking garage located at the Property to be used for overflow, for parking up to 110 spaces. NBK's authorized representative Michael Carter would not approve the lease, which would have generated a great deal of revenue for the Debtor.

f. The situation became so untenable that in September 2021, Debtor initiated a lawsuit against NBK.

g. In good faith, even during the pendency of this litigation, the Debtor was still trying to get tenants into the building and get NBK's approval for new leases. On July 2, 2022, the Debtor sent NBK five leases for approval, which NBK did not approve.

h. The parties litigated for eleven (11) months until August 22, 2022, when they entered into a Confidential Settlement Agreement. The Debtor will submit the Confidential

Settlement Agreement to the Court *in camera* at the appropriate time. The breach of the Settlement Agreement by NBK is not only actionable, but was also devastating to Debtor. NBK has prevented Debtor's successful performance under agreements it has with NBK, including the Confidential Settlement Agreement.

i. The Confidential Settlement Agreement permitted a timeframe in which Debtor could sell the Property. The Debtor was successful in receiving a Letter of Intent dated January 17, 2023 to purchase the building from Caldwell Soames. While the negotiations were ongoing, NBK took actions which interfered with the continuation and closing of that transaction, including issuing a notice of foreclosure on March 29, 2023 in breach of the Confidential Settlement Agreement. The Debtor believes that that action occurred intentionally to prevent the sale. The sale would have cleared the NBK debt as it stood at that time and left great value for the other parties. Debtor believes that NBK recognized that greater value and wanted to take it for itself by foreclosure in a "loan to own" gambit.

j. There are many factual inaccuracies that NBK represents to courts and continues into the bankruptcy proceedings. For example, in its Motion to Dismiss the Debtor's prior Bankruptcy case, while it is true that temporary restraining orders were filed to attempt to prevent a foreclosure by NBK and its takeover of the Property, they were also granted.

k. Additionally, NBK posted the Property for foreclosure in early 2023, and against an extended grace period that a State Court had given Debtor, which chilled the bidding process and interest in the Property completely. Properties posted for foreclosure are not easily sellable, especially for fair market value. Debtor believes that NBK knew this and did it on purpose to prevent the Debtor from successfully selling the Property and paying off the loan, so NBK could foreclose and become the owner of the Property.

l. Not the least of the misstatements that NBK makes about the Debtor are those statements that the Debtor has not made any payments to NBK since March 6, 2021.

m. The opposite is true. Representatives of NBK have admitted in writing that the following payments have been made to NBK well after March 6, 2021:

> -$801,509.42 paid by Debtor to NBK on August 27, 2022;
> -$80,000 paid by Debtor to NBK on April 18, 2023;
> -$80,000 paid by Debtor to NBK on May 10, 2023.

n. These payments are almost One Million Dollars ($1,000,000) that not only does NBK not give credit to the Debtor for having made the payments, but again saying exactly the opposite that no payments (zero) have been made since March 6, 2021.

o. After NBK's disclosures of the terms of the Confidential Settlement and the wrongful posting for foreclosure during an extension of that agreement, potential buyers of the Property disappeared. Apparently the potential purchasers became potential purchasers of the NBK Note and began negotiating with NBK. NBK materially breached the Confidential Settlement Agreement and interfered with these potential purchases and with these business relationships.

The Debtor and other entities were also engaged in litigation in state court with a former tenant, Sonder USA Inc. in which the Debtor contends that Sonder USA, Inc. breached its real property lease at the Property. The case is still ongoing. The Debtor cannot estimate recovery at this time.

The Debtor is indirectly involved in litigation where Naissance Galleria, LLC has sued Zaheer in state court. The case had been removed to the bankruptcy case of the Debtor and has now been remanded back to state court.

## 2. Potential Litigation.

While the Debtor has no immediate or definite plans to file any further litigation, the Debtor nevertheless retains the right to pursue all causes of action post-confirmation, including but not limited to the above litigation, under the Plan, along with any additional litigation that may arise between the Debtor and its various tenants under governing real property leases.

The Debtor may have claims against other persons or entities as set forth in the Statement of Financial Affairs including without limitation, Claims and causes of action against Azeemeh Zaheer, Osama Abdulatiff, Rodney Drinnon and/or David Tang. The Debtor reserves the right to pursue any or all of these claims.

## 3. Preservation of Rights of Action.

### (a) Litigation Not Yet Commenced.

The Plan preserves all causes of action, unless expressly otherwise released, and provides for them to be transferred to the Reorganized Debtor on the Effective Date of the Plan. The causes of action include certain avoidance actions and other claims that the Debtor holds against third parties. The Estate holds the following causes of action, among others, all of which shall be preserved and transferred to the Reorganized Debtor (unless expressly otherwise released by the Plan):

### (b) Preferences, Fraudulent Transfers and Other Avoidance Actions.

Pursuant to section 547 of the Bankruptcy Code, a debtor may recover certain preferential transfers of property, including Cash, made while insolvent during the ninety days immediately prior to the filing of its bankruptcy petition with respect to preexisting debts to the extent the transferee received more than it would have in respect of the preexisting debt had the transferee not received the payment and had the debtor been liquidated under chapter 7 of the Bankruptcy Code. In the case of "insiders," the Bankruptcy Code provides for a one-year preference period.

Transfers made in the ordinary course of the debtor's and the transferee's business according to their ordinary business terms are generally not recoverable. Furthermore, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension may constitute a defense, to the extent of any new value, against any otherwise recoverable transfer of property. If a preferential transfer were recovered by the

debtor, the transferee would have a general unsecured claim against the debtor to the extent of the debtor's recovery.

Under section 548 of the Bankruptcy Code and various state laws, a debtor may recover certain prepetition transfers of property, including the grant of a security interest in property, made while insolvent to the extent the debtor receives less than fair value for such property. In addition, avoidance actions exist under sections 544, 545, 549 and 553(b) of the Bankruptcy Code that allow a debtor to avoid and/or recover certain property.

**(c)**     <u>Other causes of action</u>.

      **(1)**     <u>Investigation of causes of action</u>.

The Reorganized Debtor will continue the investigation, analysis, and pursuit of causes of action against a number of persons or entities, relating to, among other things, the following:

Any lawsuits for, or in any way involving, the collection of accounts receivable;

Any litigation or lawsuit initiated by the Debtor that is currently pending, whether in the Bankruptcy Court, before the American Arbitration Association, or any other court or tribunal;

Any and all causes of action against any customer or vendor who has improperly asserted or taken action through setoff or recoupment; and

Any and all actions, whether legal, equitable, or statutory in nature, arising out of, or in connection with, the Debtor's business operations.

In addition, there may be numerous other causes of action which currently exist or may subsequently arise that are not set forth in the Plan or Disclosure Statement, because the facts upon which such causes of action are based are not fully or currently known by the Debtor and as a result, cannot be raised during the pendency of the Bankruptcy Case (collectively, "Unknown Causes of Action"). The failure to list any such Unknown Cause of Action in the Plan or the Disclosure Statement is not intended to limit the rights of the Reorganized Debtor to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtor or the Reorganized Debtor (as applicable). The Reorganized Debtor will pursue Unknown Causes of Action to the extent they become known in its discretion.

      **(2)**     <u>Preservation of All causes of action Not Expressly Settled or Released</u>.

The Debtor has attempted to disclose herein certain material causes of action including avoidance actions and other actions that they may hold against third parties. However, the Debtor has not concluded the investigation and analysis of all potential claims and causes of action against third parties. It is the contemplation of the Plan that such investigation and analysis will continue post-Confirmation by the Reorganized Debtor. You should not rely on the omission of the disclosure of a claim or cause of action to assume that the Debtor holds no claim or cause of action against any third-party, including any Creditor that may be reading this Disclosure Statement and/or casting a Ballot.

Unless expressly released by the Plan or by an order of the Bankruptcy Court, any and all such claims or causes of action against third parties are specifically reserved and will vest in or be transferred to the Reorganized Debtor, including but not limited to any such claims or causes of action relating to any counterclaims, demands, controversies, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, legal proceedings, equitable proceedings, and executions of any nature, type, or description, avoidance actions, preference actions, fraudulent transfer actions, strong-arm power actions, state law fraudulent transfer actions, improper assignments of interest, negligence, gross negligence, willful misconduct, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, control, interference with contractual and business relationships, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, misuse of collateral, wrongful release of collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful recoupment, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies, equitable subordination, debt recharacterization, substantive consolidation, securities and antitrust laws violations, tying arrangements, deceptive trade practices, breach or abuse of any alleged fiduciary duty, breach of any special relationship, course of conduct or dealing, obligation of fair dealing, obligation of good faith, at law or in equity, in contract, in tort, or otherwise, known or unknown, suspected or unsuspected.**

The Reorganized Debtor may pursue claims, including the following claims and causes of action, all of which shall be preserved for the benefit of the Reorganized Debtor:

- Preference claims under section 547 of the Bankruptcy Code;

- Fraudulent transfer and other avoidance claims arising under sections 506, 542 through 551, and 553 of the Bankruptcy Code and various state laws, including, but not limited, to claims against any recipients of transfers included in the Debtor's Statements of Financial Affairs;

- Unauthorized post-petition transfer claims including, without limitation, claims under section 549 of the Bankruptcy Code;

- Claims and causes of action asserted in current litigation, whether commenced pre- or post-petition, including all litigation referenced in the Debtor's Statements of Financial Affairs;

- Counterclaims asserted in current litigation;

- Potential claims set forth in the Debtor's Schedule B;

- All claims and causes of action that the Debtor may hold against any current or previous tenant; and

- Actions against any taxing authority with respect to the contest of any taxes assessed against any of the Properties.

DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF
GALLERIA 2425 OWNER, LLC'S CHAPTER 11 PLAN OF REORGANIZATION          PAGE 22 OF 43

002165

The Reorganized Debtor may pursue all persons, entities, or defendants described in this Disclosure Statement for all claims and causes of action described herein that are not resolved by the Debtor prior to the Effective Date. Pursuit of a claim or cause of action may include, but not be limited to, service of a demand letter, settlement negotiation, pursuit of litigation, and any other means available to the Reorganized Debtor to obtain a resolution of such claim or cause of action. In the event the Reorganized Debtor is not able to resolve any claims and causes of action described in the Disclosure Statement, the Reorganized Debtor will escalate its pursuit of claims and causes of action by any means authorized under the Plan, Disclosure Statement, and applicable law, including litigation in such forum as the Reorganized Debtor deems appropriate. Resolution of the claims and causes of action described in this Disclosure Statement by the Reorganized Debtor shall be in accordance with the requirements and procedures set forth in the Plan.

Except as otherwise ordered by the Bankruptcy Court and subject to any releases in the Plan, on the Effective Date, the Reorganized Debtor shall be transferred all causes of action, and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the causes of action. Except as otherwise ordered by the Bankruptcy Court or expressly released in the Plan, the Reorganized Debtor shall be vested with authority and standing to prosecute any causes of action.

The Debtor's failure to identify a claim or cause of action herein is specifically not a waiver of any claim or cause of action. The Debtor will not ask the Bankruptcy Court to rule or make findings with respect to the existence of any cause of action or the value of the entirety of the Estate at the Confirmation Hearing; accordingly, except claims or causes of action which are expressly released by the Plan or by an Order of the Bankruptcy Court, the Debtor's failure to identify a claim or cause of action herein shall not give rise to any defense of any preclusion doctrine, including, but not limited to, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches with respect to claims or causes of action which could be asserted against third parties, including holders of Claims against or Equity Interests in the Debtor who may be reading this Disclosure Statement and/or casting a Ballot, except where such claims or causes of action have been explicitly released in the Plan or the Confirmation Order.

In addition, the Debtor and the Reorganized Debtor expressly reserve the right to pursue or adopt any claim alleged in any lawsuit in which the Debtor is a party.

**PLEASE TAKE NOTICE THAT, WITH THE EXCEPTION OF THOSE CAUSES OF ACTION THAT ARE EXPRESSLY RELEASED OR WAIVED UNDER THE TERMS OF THE PLAN, ALL CAUSES OF ACTION OF THE DEBTOR AND ITS ESTATE, WHETHER OR NOT SPECIFIED HEREIN, WILL BE PRESERVED AND TRANSFERRED TO THE REORGANIZED DEBTOR PURSUANT TO THE PLAN. THE LACK OF DISCLOSURE OF ANY PARTICULAR CAUSE OF ACTION SHALL NOT CONSTITUTE, NOR BE DEEMED TO CONSTITUTE, A RELEASE OR WAIVER OF SUCH CAUSE OF ACTION, AS THE DEBTOR INTENDS FOR THE PLAN TO PRESERVE AND TRANSFER TO THE REORGANIZED DEBTOR ANY AND ALL CAUSES OF ACTION HELD BY THE DEBTOR AND ITS ESTATE AS OF THE EFFECTIVE DATE OF THE PLAN.**

# VII.
## PRE- AND POST-PETITION OPERATIONS

## A.  Events Leading to the Debtor's Bankruptcy Filing

The Debtor's primary asset is a Class A office building located at 2425 West Loop South, Houston, Texas 77027(the "Property").  The Property is fully covered by commercial property and liability insurance.

As of the Petition Date, the Debtor was allegedly indebted to National Bank of Kuwait, S.A.K.P., New York Branch ("NBK") pursuant to a loan made to the Debtor by NBK (the "Loan"). The Loan is evidenced by, *inter alia*: (i) a *Loan Agreement* by and between the Debtor and NBK dated May 23, 2018; (ii) a *Promissory Note* dated May 23, 2018 made by the Debtor; and (iii) that certain *Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing* dated May 23, 2018 by and between the Debtor and NBK; and (iv) a 2022 settlement agreement between the parties (collectively, the "Loan Documents"). The Loan is allegedly secured by various instruments, including a deed of trust and UCC-1 financing statements, which were allegedly filed of record in appropriate jurisdictions. Collateral for the Loan includes, *inter alia*, the Property and rents received from the operation of the Property.

## B.  Events Transpiring After Bankruptcy

The Debtor filed for bankruptcy protection under Chapter 11 in order to protect and preserve the Property and its ability to pay creditors by enabling it to reorganize and restructure its financial affairs to fund operations and payments to creditors. In order to satisfy the Lender's and other creditors' claims, the Debtor may market the Property for sale to a third party or seek refinancing of Lender's claim from other lenders. The Debtor will continue to manage and operate the Property until any potential refinancing or sale is closed.

The Debtor had filed a prior case in July of 2023 that was dismissed on November 1, 2023. The dismissal occurred, from the perspective of the Debtor, by wrongful actions of Zaheer and her attorneys in a document filed for her on or about October 31, 2023.  The argument was made that Zaheer still the owner/manager of Naissance Galleria, LLC and had the ability to control the Debtor. The claim contradicts her emails and signed documents that she had relinquished her control of the Debtor in 2021.

After the dismissal, the Debtor's Property was again posted for foreclosure for December 5, 2023 by NBK.  Due to foreclosure posting and to reorganize and protect the equity,  the Debtor filed this bankruptcy case.

### 1.  Professionals Being Paid by the Debtor and Fees to Date

      a.    Professionals Employed by the Debtor. The Debtor has employed the law firm of Baker & Associates ("Baker") as its Chapter 11 bankruptcy counsel.

DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF
GALLERIA 2425 OWNER, LLC'S CHAPTER 11 PLAN OF REORGANIZATION                    PAGE 24 OF 43

002167

b. <u>Fees to Date.</u> The Debtor's professionals have not filed fee applications seeking approval of any fees and expenses incurred in this case through the date of this Disclosure Statement. Baker received a retainer from an entity that is not the Debtor in the amount of $20,000 for payment of its professional fees and expenses. The Debtor estimates that the aggregate amount of professional fees and expenses incurred by Baker through the middle of January of 2024 to be approximately $65,000.

2. **<u>Operations During the Bankruptcy Case.</u>** The Debtor has continued to operate its business and the Property during the pendency of the Bankruptcy Case. Copies of the Debtor's operating reports, which are filed with the Bankruptcy Court pursuant to Rule 2015(a)(3) of the Federal Rules of Bankruptcy Procedure, are available from the Bankruptcy Court. The most recent operating report is attached hereto.

On January 30, 2024, the Debtor filed its *Plan of Reorganization* [Docket No. ____] (the "Plan"), which provided for, *inter alia*, that the Lender's allowed secured claim shall be paid in full along with interest the Reorganized Debtor shall make monthly payments to NBK at the rate of weekly LIBOR plus 2.75% per annum along with principal amortized over a thirty (30) year term. The allowed secured tax claims of the taxing authorities shall be paid in accordance with 11 U.S.C. § 1129(a)(9)(D) over five years from the Petition Date, and the allowed secured claim of Caz Creek Holdings 2 LLC will be paid through 120 consecutive monthly payments with interest at a rate of 10.95%. **Allowed Unsecured Claims arising from the provision of repair or maintenance services to the Property** shall be paid 100% of the Allowed amount without interest in eight (8) consecutive equal quarterly payments. General unsecured claims that are not Class 6 Claims **shall receive full payment of their Allowed Claims as set forth herein.**

**VIII.**
**<u>DESCRIPTION OF THE PLAN</u>**

A. **<u>Introduction</u>**

A summary of the principal provisions of the Plan and the treatment of Allowed Claims and Equity Interests is set forth in the first part of this Disclosure Statement. The summary is qualified in its entirety by the Plan.

B. **<u>Designation of Claims and Equity Interests</u>**

The following is a designation of the Classes of Claims and Equity Interests under the Plan. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in another Class or Classes to the extent that any remainder of the Claim or Equity Interest qualifies within the description of such other Class or Classes. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released or otherwise satisfied before the Effective Date; a Claim or Equity Interest which is not an Allowed Claim or Allowed Equity Interest is not in any Class. Notwithstanding anything to the contrary contained in the Plan, no distribution shall be made on account of any Claim or Equity Interest which is not an Allowed Claim or Allowed Equity Interest.

| Class | Voting Status |
| --- | --- |
| Priority Claims | |
| Class 1: Certain Priority Claims | Impaired |
| | |
| Secured Claims | |
| Class 2: Secured Claim of Taxing Authorities | Impaired |
| Class 3: Secured Claim of Caz Creek Holdings 2, LLC | Impaired |
| Class 4: Secured Claim of National Bank of Kuwait | Impaired |
| Class 5: Secured Claim of 2425 WL, LLC | Impaired |
| | |
| Unsecured Claims | |
| Class 6: Unsecured Claims for Property Repair and Management | Impaired |
| Class 7: General Unsecured Claims | Impaired |
| | |
| Equity Interest Holders | |
| Class 8: Equity Interest Holders | Impaired |

## C.  Treatment of Claims and Interests

**Class 1: Certain Priority Claims**. Allowed Administrative and Priority Claims entitled to priority treatment pursuant to Section 507(a)(1), (a)(6), (a)(7), (a)(9), and (a)(10) of the Bankruptcy Code shall receive, at the Reorganized Debtor's option: (i) payment in full in cash on account of such Priority Claim without interest when such Claim is Allowed; (ii) the amount of such holder's Allowed Claim paid in twelve equal monthly payments, with the first payment due and payable on the fifth Business Day of the first month that is more than 30 days after the Effective Date; (iii) the amount of such holder's Allowed Claim in accordance with the ordinary business terms of such expense or cost; or (iv) such other treatment as may be agreed to in writing by such priority Creditor and the Reorganized Debtor or as ordered by the Bankruptcy Court.

The Debtor does not believe that any Class 1 Claims exist.

**Class 2:** Secured or Priority Claim(s) of Taxing Authorities. Except to the extent that the holder of a Secured or Priority Tax Claim agrees to different treatment, the Allowed Secured or

Priority Claim of all Tax Claims shall be paid in accordance with 11 U.S.C. § 1129(a)(9)(c) with the first payment due and payable on the fifth Business Day of the first month that is more than 30 days after the Effective Date. The Debtor, in its sole discretion, will either pay such Claims: (i) on the Effective Date; or (ii) when such taxes become due and payable under the laws of the applicable taxing jurisdiction; or (iii) with quarterly deferred cash payments including applicable interest over a period not exceeding two years from the Petition Date of a value, as of the Effective Date, equal to the Allowed Claim.

All Tax Claims shall remain subject to section 505 of the Bankruptcy Code. The Reorganized Debtor shall retain the right to a determination of the amount or legality of any tax pursuant to section 505 of the Bankruptcy Code as to any Tax Claim. The Reorganized Debtor may seek relief pursuant to section 505 of the Bankruptcy Code as a part of, and in conjunction with, any objection to any Tax Claim.

With respect to Allowed Secured Tax Claims, the interest rate paid upon such Claims shall be the rate of interest determined under applicable non-bankruptcy law. Post-petition property taxes will be paid when such taxes become due and payable under the laws of the applicable taxing jurisdiction.

Nothing herein shall prohibit the Debtor or the Reorganized Debtor from selling the Property at any time provided that the remaining unpaid portion of the Allowed Secured Claim of a Taxing Authority holding an interest in the Property shall be paid in full at such time.

Class 2 Claims are impaired by the Plan.

Class 3 Claim: Secured Claims of Caz Creek Holdings II, LLC. The Allowed Secured Claim of Caz Creek shall be Allowed in the amount of $698,006.68 and shall be paid through 120 payments with interest at a rate of 10.95% for a monthly payment of $9,595.30.

The first monthly payment will be due and payable on the first Business Day of the first month that is more than 30 days after the Effective Date and on the first Business Day of each respective month thereafter. To the extent that the Debtor misses any payment due to Caz Creek on account of the Allowed Secured Claims as provided herein, Caz Creek shall send written notice of such missed payment to Debtor and its counsel, and the Debtor shall have ten (10) business days from the date of its receipt of such notice to make such missed payment before a default may be deemed to have occurred hereunder.

Any perfected liens or security interests securing the Allowed Secured Claims will be preserved and continued. Caz Creek shall, upon payment and satisfaction of the Allowed Secured Claims in full as provided herein, execute releases of any remaining encumbrances upon the Property in a form satisfactory to the Reorganized Debtor and deliver same to the Reorganized Debtor or its designee.

The written agreements by and between Caz Creek and the Debtor will remain the same, except to the extent that the terms therein are modified by this Plan, and such agreements will be deemed to be modified to comport with this Plan.

All defaults and events of default existing as of the Petition Date and as of the Effective Date shall be deemed cured and waived, and all amounts owed will be deaccelerated and paid in accordance with the terms of this Plan. Except as provided by this Plan, no default interest, late charges, or other penalties arising or accruing after the Petition Date shall be required to be paid to Caz Creek, provided, however, that Caz Creek shall be entitled to charge, collect, and receive late charges and other amounts provided by the written agreements between the Debtor and Caz Creek in the event of the Debtor's failure to timely make a payment to Caz Creek on the Allowed Secured Claims under this Plan after Confirmation.

Nothing herein shall prohibit the Reorganized Debtor from refinancing, selling, or otherwise disposing of the Property at any time, provided that the remaining unpaid portions of the Allowed Secured Claim shall be paid in full at such time. No prepayment penalty will be due with respect to any prepayment of the Allowed Secured Claim.

**Class 3 Claims are Impaired by the Plan.**

Class 4: National Bank of Kuwait, S.A.K.P., New York Branch.  The Allowed Secured Claim of NBK shall be paid in full within ten years of the Effective Date by either the refinancing of the remaining unpaid portion of the Allowed Secured Claim of NBK or the sale of the Property. Until such time as the remaining unpaid portion of the Allowed Secured Claim of NBK is refinanced or otherwise satisfied, which shall occur by no later than one hundred twenty (120) months from the Effective Date, the Reorganized Debtor shall make monthly payments to NBK comprised of interest at the at the rate of weekly LIBOR plus 2.75% per annum along with principal amortized over a thirty (30) year term.  The first monthly payment will be due and payable on the fifth Business Day of the first month that is more than 30 days after the Effective Date and on the fifth Business Day of each respective month thereafter.

The Allowed Secured Claim of NBK will be determined by the value of NBK's interest in the Collateral securing such Allowed Claim, which value will be determined by agreement of the parties or by the Bankruptcy Court following a valuation proceeding in accordance with the Bankruptcy Code.  Based on the appraisal by Cushman & Wakefield dated July 5, 2023 and obtained by NBK, the Debtor has used the Cushman & Wakefield value of $18,600,000.  As such, and because the respective taxing authorities and tax lenders hold a higher priority lien on the properties, the Debtor believes that NBK's Allowed Secured Claim will be an amount equal to the difference between the value of the properties less the outstanding property taxes and senior debt owed with respect to the Property, or approximately $16,000,000.  The Debtor therefore believes that NBK's claim is undersecured and that NBK will have a deficiency claim against the Debtor's Estate, which amount will be included and treated as a Class 7 general unsecured claim under the Plan.

The first monthly payment will be due and payable on the first Business Day of the first month that is more than 30 days after the Effective Date and on the first Business Day of each respective month thereafter. To the extent that the Debtor misses any payment due to NBK on account of its Allowed Secured Claim as provided herein, NBK shall send written notice of such missed payment to Debtor and its counsel, and the Debtor shall have ten (10) business days from

the date of its receipt of such notice to make such missed payment before a default may be deemed to have occurred hereunder.

Any perfected liens or security interests securing NBK's Allowed Secured Claim will be preserved and continued. NBK shall, upon payment and satisfaction of its Allowed Secured Claim in full as provided herein, execute releases of any remaining encumbrances upon the Property in a form satisfactory to the Reorganized Debtor and deliver same to the Reorganized Debtor or its designee.

The written agreements by and between NBK and the Debtor will remain the same, except to the extent that the terms therein are modified by this Plan, and such agreements will be deemed to be modified to comport with this Plan.

All defaults and events of default existing as of the Petition Date and as of the Effective Date shall be deemed cured and waived, and all amounts owed will be deaccelerated and paid in accordance with the terms of this Plan. Except as provided by this Plan, no default interest, late charges, or other penalties arising or accruing after the Petition Date shall be required to be paid to NBK, provided, however, that NBK shall be entitled to charge, collect, and receive late charges and other amounts provided by the written agreements between the Debtor and NBK in the event of the Debtor's failure to timely make a payment to NBK on its Allowed Secured Claim under this Plan after Confirmation.

Nothing herein shall prohibit the Reorganized Debtor from refinancing, selling, or otherwise disposing of the Property at any time, provided that the remaining unpaid portion of NBK's Allowed Secured Claim shall be paid in full at such time. No prepayment penalty will be due with respect to any prepayment of NBK's Allowed Secured Claim.

Class 4 Claims are Impaired by the Plan.

**Class 5: Secured Claim of 2425 WL, LLC.** The Allowed Secured Claim of 2425 WL, LLC will be determined by the value of 2425 WL LLC's interest in the Collateral securing such Allowed Claim, which value will be determined by agreement of the parties or by the Bankruptcy Court following a valuation proceeding in accordance with the Bankruptcy Code. Based on the appraisal by Cushman & Wakefield dated July 5, 2023 and obtained by NBK, the Debtor has used the Cushman & Wakefield value of $18,600,000. As such, and because the respective taxing authorities, tax lenders, and NBK hold a higher priority lien on the properties, the Debtor believes that 2425 WL is wholly unsecured, and its claim will be included and treated as a Class 6 general unsecured claim under the Plan.

Class 6: Holders of Unsecured Claims for Property Repair and Maintenance. Allowed Unsecured Claims arising from the provision of repair or maintenance services to the Property shall be paid 100% of the Allowed amount without interest in eight (8) consecutive equal quarterly payments. The first quarterly payment will be due and payable on the first Business Day of the first calendar quarter that is more than 30 days after the Effective Date and on the first Business Day of each respective calendar quarter thereafter.

Class 6 Claims are impaired by the Plan.

Class 7: General Unsecured Claims. Class 7: General Unsecured Claims. Allowed General Unsecured Claims that are not Class 6 Claims shall receive payments equal to a total of 100% of these creditors' claims. Each September, beginning September 15, 2024, the Debtor will send these creditors the year-end financial statement for the previous calendar year. After all ordinary and necessary expenses, payment to Classes 1, 2 and 3 above, and after income taxes owed by the Debtor, these creditors will receive 50% of the Net Cash Flow, if any, of the Reorganized Debtor. Beginning on the following September 15, December 15, March 15, and June 15, each year these creditors will receive a quarterly pro-rata payment from the Reorganized Debtor of the 50% of Net Cash Flow. The Reorganized Debtor will continue distributing the year-end financial reports to these creditors and making the quarterly payments of 50% of Net Cash Flow, to these creditors, if any, for as many years as it takes to pay these creditors in full. In the event of any failure of the Reorganized Debtor to timely distribute the financial statements or make its required plan payments to these creditors prior to delinquency, which shall constitute an event of default under the Plan as to these creditors, they shall send notice of such default to the Reorganized Debtor. If the default is not cured within thirty (30) days of the date of such notice, these creditors may proceed to collect all amounts owed pursuant to state law without further recourse to the Bankruptcy Court. These creditors are only required to send two (2) notices of default, and upon the third event of default, these creditors may proceed to collect all amounts owed under state law without recourse to the Bankruptcy Court and without further notice. If these creditors are paid in more than five years, these creditors will receive the federal judgment interest rate of 4.79%. At the end of five years from September 15, 2024, interest will be added to the unpaid portion of these creditors' claims, and the creditors will earn interest on a go-forward basis until their claims are paid in full. If the Property is sold, all remaining claim amounts will be paid on the closing of a sale of the Property.

Class 7 Claims are impaired by the Plan.

Class 8: Equity Interest Holders. The Class 8 Allowed Interests of the Equity Interest Holders will continue, provided that the Equity Interest Holders will contribute the amount of approximately $2.5 million of new equity. The equity contribution is being made by an affiliated investor who may receive an interest in the Equity from the current Equity Interest Holders.

The Debtor has or will establish a bank account with approximately $2,500,000 in funds (the "Funds") at Wells Fargo Bank (or such other bank that is an approved depository)(the "Account"). The Funds will be made available by a person or entity that is not the Debtor. The Funds will be available for use by the Debtor for the Property. The Funds will be available for use by the Debtor only under the following conditions:

1. The current management of the Debtor remains unchanged. The current management of the Debtor is Galleria 2425 JV, LLC.
2. The current management of Galleria 2425 JV, LLC remains unchanged. The current management of Galleria 2425 JV, LLC is Galleria West Loop Investments II, LLC.
3. Ali Choudhri continues as the person in charge of Galleria 2425 JV and Galleria West Loop Investments II, LLC.

4. Ali Choudhri or Dward Darjean are the only authorized persons to sign checks and remove funds from the Account.

5. The Debtor remains in the current chapter 11 case.

6. The current chapter 11 case is not dismissed or converted to another chapter.

7. No chapter 11 trustee is appointed by the court or the U.S. Trustee for the Debtor.

8. There are not any unreasonable restrictions imposed or placed on the Debtor with regard to the leasing of space in the Property.

9. If a plan is confirmed for the Debtor, the plan must be one that is proposed by the Debtor and not another entity.

10. Jetall Corporation continues to be the manager for the Property.

If any of the above conditions change, then (1) the Funds will no longer be available for use by the Debtor, (2) the Funds will automatically revert to the person or entity that provided the Funds, and (3) the use of the Funds by the Debtor or any other person or entity shall immediately terminate.

Class 8 Interests are impaired by the Plan.

**D.    Plan Administration.**

1. **Funding of Plan.** The funds used for the repayment of Claims or other Distributions to be made under the Plan will come from the income generated from the Property, the new equity contribution, plus any other available funds or property that the Reorganized Debtor may otherwise possess on or after the Effective Date, including, without limitation, any such funds or property which may be provided through additional capital contributions, and the proceeds of any sale, refinancing, or other disposition of the Debtor's Assets.

2. **Distribution Procedures and Distribution Agent.** The Debtor will serve as the Distribution Agent. The Distribution Agent will serve until all distributions required under the Plan have been made, whereupon the Distribution Account will be closed, and no further actions are required to consummate the Plan. Appointment of the Distribution Agent herein is in a manner consistent with the interests of the holders of Claims and Interests and public policy. A certified copy of the Confirmation Order may be filed in any deed record, government or public record keeping place as authentication of the signature and authority of the Distribution Agent to consent to, execute, or sign any writing or document of the Debtor and Reorganized Debtor herein.

3. **Disputed Claims or Interests.** Notwithstanding any other provision of this Plan, any Claim or Interest which is disputed, unliquidated, or contingent as of any date on which a Distribution is to be made shall not participate in or otherwise receive any such Distribution until a Final Order has been entered allowing such Claim or Interest.

**E.    Treatment of Executory Contracts and Unexpired Leases.**

This Plan shall constitute a motion to reject all Executory Contracts and Leases other than real property leases between the Debtor and its tenants and that certain Gold Service Agreement by and between the Debtor and ThyssenKrupp Elevator Corporation. All real property leases and the Gold Service Agreement by and between the Debtor and ThyssenKrupp Elevator Corporation are assumed by the Debtor under the Plan.

**F.**     **Means for Execution and Implementation of the Plan.**

**1.**     **Post-Confirmation Management of the Reorganized Debtor.**

The Manager of the Reorganized Debtor shall be the Equity Interest Holders. On the Effective Date, the Reorganized Debtor shall be authorized and directed to take all necessary and appropriate actions to effectuate the transactions contemplated by the Plan and the Disclosure Statement.

**2.**     **Preservation of Rights of Action.** Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, all rights pursuant to sections 502, 510, 544, 545, and 546 of the Bankruptcy Code, all preference claims under section 547 of the Bankruptcy Code, all fraudulent transfer claims pursuant to section 548 of the Bankruptcy Code, all claims relating to post-petition transactions under section 549 of the Bankruptcy Code, all claims recoverable under section 550 of the Bankruptcy Code, and all claims and causes of action asserted in current litigation, whether commenced pre- or post-petition, and all potential litigation referenced herein and in the Debtor's schedules and statement of financial affairs, including litigation against NBK, Sonder USA Corporation, and others described herein are hereby preserved and retained for enforcement by the Reorganized Debtor, in its sole and absolute discretion, subsequent to the Effective Date. In addition, all claims, rights, remedies, and causes of action that the Debtor may hold against a current or previous tenant at the Property with respect to a real property lease are hereby preserved and retained for enforcement by the Reorganized Debtor, in its sole and absolute discretion, subsequent to the Effective Date. The Reorganized Debtor shall also be vested with and retain all rights of offset or recoupment and all counterclaims against any Claimant. The Reorganized Debtor shall retain and may enforce the rights of the Debtor to object to Claims on any basis. The Reorganized Debtor may pursue any and all rights, remedies, actions, proceedings, and similar actions against any of the judgment debtors obligated and liable in respect of the judgment. The Reorganized Debtor may pursue those rights of action, as appropriate, in accordance with what is in the best interests of the Reorganized Debtor.

**3.**     **Objections to Claims.** Except as otherwise provided for herein, or as otherwise ordered by the Bankruptcy Court after notice and a hearing, all objections to Claims shall be served and filed by the Objection Deadline, if one is set by the Bankruptcy Court, although nothing contained herein shall require the fixing of an Objection Deadline; provided, however, the Objection Deadline shall not apply to Claims which are not reflected in the claims register, including any alleged informal proofs of claim. If an Objection Deadline is fixed, it may be extended one or more times by the Bankruptcy Court pursuant to a motion filed on or before the then applicable Objection Deadline. Any Contested Claims may be litigated to Final Order. The

Reorganized Debtor may compromise and settle any Contested Claim without the necessity of any further notice or approval of the Bankruptcy Court. Rule 9019 of the Federal Rules of Bankruptcy Procedure shall not apply to any settlement of a Contested Claim after the Effective Date.

## G. Conditions to Effectiveness of the Plan

1. **Conditions to Effectiveness.** The Plan shall not become effective, and the Effective Date shall not occur, unless and until the following condition(s) shall have been satisfied or waived in the Debtor's sole and absolute discretion: the Confirmation Order, in a form and substance reasonably acceptable to the Debtor, shall have become a Final Order and shall, among other things (i) confirm this Plan, (ii) find that the Debtor have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code as set forth in Bankruptcy Code § 1125(e), and (iii) find that the Debtor is authorized to take all actions and consummate all transactions contemplated under this Plan.

2. **Waiver of Conditions.** The Debtor may waive any condition set forth in the Plan at any time, without notice, without leave of or order of the Court, and without any formal action other than proceeding to consummate the Plan.

## H. Effects of Plan Confirmation

1. **Binding Effect.** The provisions of this Plan shall bind all holders of Claims and equity Interests and their respective successors and assigns, whether or not they accept this Plan. On and after the Effective Date, except as expressly provided in this Plan, all holders of Claims, Liens and equity Interests shall be precluded from asserting any Claim, cause of action or Liens against the Debtor, the estate, the Reorganized Debtor or their respective property and assets based on any act, omission, event, transaction, or other activity of any kind that occurred or came into existence prior to the Effective Date.

2. **Moratorium, Injunction and Limitation of Recourse for Payment.** From and after the Effective Date, all holders of Claims shall be permanently restrained and enjoined from: (a) commencing or continuing in any manner, any action or other proceeding of any kind with respect to any such Claim against the Reorganized Debtor or the Assets; (b) enforcing, attaching, collecting, or recovering on account of any Claim by any manner or means, any judgment, award, decree, or order against the Reorganized Debtor or the Assets except pursuant to and in accordance with this Plan; (c) creating, perfecting, or enforcing any encumbrance of any kind against either the Assets or the Reorganized Debtor; (d) asserting any control over, interest, rights or title in or to any of the Assets except as provided in this Plan; (e) asserting any setoff, or recoupment of any kind against any obligation due the Reorganized Debtor as assignee, except upon leave of the Bankruptcy Court or except as authorized by section 553 of the Bankruptcy Code; and (f) performing any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; provided, however, that this injunction shall not bar

any Creditor from asserting any right granted pursuant to this Plan; provided, further, however, that each holder of a Contested Claim shall be entitled to enforce its rights under the Plan, including seeking Allowance of such Contested Claim pursuant to the Plan.

Confirmation of the Plan shall also discharge the Debtor from all claims that arose before the Confirmation Date. After Confirmation, the rights and remedies of any Creditor or Equity Holder shall be governed and limited by the Plan, which shall be binding upon the Debtor, its estate, the Reorganized Debtor, Creditors, Equity Holders, and all other parties in interest, regardless of whether any such Person voted to accept the Plan, and the Pre-Petition Loan Documents shall be deemed to have been amended to comport with the treatment being accorded to the Lender under the Plan. All defaults and events of default existing as of the Petition Date and as of the Effective Date shall be deemed cured, and any defaults and events of default resulting from the confirmation of the Plan, the occurrence of the Effective Date, and/or the actions and transactions contemplated by the Plan, including the payments to be made under the Plan and changes in ownership and control effectuated by the Plan, shall be waived and of no effect.

The automatic stay pursuant to section 362 of the Bankruptcy Code, except as previously modified by the Bankruptcy Court, shall remain in effect until the Effective Date of the Plan as to the Debtor and all Assets. As of the Effective Date, the discharge and injunction in paragraphs 12.1 and 12.2 of the Plan shall become effective.

3. **Revesting.** On the Effective Date, equity will be canceled and reissued to the new equity holder, and the Debtor will be vested with all the property of its estate free and clear of all Claims and other interests of Creditors and Equity Holders, except as provided in the Plan; provided, however, that the Debtor shall continue as a debtor-in-possession under the Bankruptcy Code until the Effective Date, and, thereafter, the Reorganized Debtor may conduct its business free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Court.

4. **Other Documents and Actions.** The Debtor and Reorganized Debtor may execute such documents and take such other action as is necessary to effectuate the transactions provided for in the Plan.

5. **Term of Injunctions or Stays.** Unless otherwise provided, all injunctions or stays provided for in the Debtor's Bankruptcy Case pursuant to sections 105 or 362 of the Bankruptcy Code or otherwise and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

I. **Confirmability of Plan and Cramdown.**

The Debtor requests confirmation under section 1129(b) of the Bankruptcy Code. The Debtor reserves the right to modify the Plan to the extent, if any, that confirmation of the Plan under section 1129(b) of the Bankruptcy Code requires modification.

## J.    Retention of Jurisdiction.

The Plan provides for the Bankruptcy Court to retain the broadest jurisdiction over the Bankruptcy Case as is legally permissible so that the Bankruptcy Court can hear all matters related to the consummation of the Plan and the claims resolution process. Until the Bankruptcy Case is closed, the Court shall retain exclusive jurisdiction of all matters arising under, or related to, these proceedings, including, but not limited to, the jurisdiction to:

a.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured, or unsecured status of any Claim not otherwise Allowed under the Plan, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any objections to the allowance or priority of Claims;

b.    hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 327, 328, 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code for professional fees and expenses incurred on or before the Effective Date;

c.    hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

d.    effectuate performance of and payments under the provisions of the Plan and enforce remedies upon any default under the Plan;

e.    hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Bankruptcy Case, or the causes of action retained by the Debtor in the Plan;

f.    enter such orders as may be necessary or appropriate to execute, enforce, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

g.    hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

h.   consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in the Plan or in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

i.   issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

j.   enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

k.   hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

l.   enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Bankruptcy Case (whether or not the Bankruptcy Case has been closed);

m.   except as otherwise limited herein, recover all Assets of the Debtor and property of the Estate, wherever located;

n.   hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

o.   hear and determine all disputes involving the existence, nature, or scope of the Debtor's discharge;

p.   hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

q.   enter a final decree closing the Bankruptcy Case.

## K.   <u>Assumption of Allowed Claims</u>

As of the Effective Date, the Reorganized Debtor shall assume the liability for and obligation to perform and make all Distributions or payments on account of all Allowed Claims in the manner provided in this Plan.

## L.   <u>Attorneys' Fees and Costs</u>

To the extent any holder of a Secured Claim asserts a right to attorneys' fees and costs pursuant to section 506(b) of the Bankruptcy Code, unless otherwise agreed between the Debtor or Reorganized Debtor and such Secured Creditor, the allowance of such fees and expenses shall be handled as set forth in this paragraph. Within twenty (20) days after the Effective Date, the Secured Creditor shall file an application with the Bankruptcy Court for allowance of such fees and expenses. Within twenty (20) days after such application is filed, the Reorganized Debtor may file any objections thereto, and the Secured Creditor shall file any response within ten (10) days thereafter. If the Secured Creditor and the Reorganized Debtor are unable to reach agreement, the matter shall then be submitted to the Bankruptcy Court for determination on no less than twenty (20) days-notice of the hearing.

**M.** **Exemption from Transfer Taxes and Recording Fees**

In accordance with Bankruptcy Code § 1146(a), none of the issuance, transfer or exchange of any securities under the Plan, the release of any mortgage, deed of trust or other Lien, the making, assignment, filing or recording of any lease or sublease, the vesting or transfer of title to or ownership of any of the Debtor's interests in any property, or the making or delivery of any deed, bill of sale or other instrument of transfer under, in furtherance of, or in connection with the Plan, including the releases of Liens contemplated under the Plan, shall be subject to any document recording tax, stamp tax, conveyance fee, sales or use tax, bulk sale tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment in the United States. The Confirmation Order shall direct the appropriate federal, state and/or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**N.** **Modification of Plan**

The Plan may be amended, modified, supplemented, restated, or altered in whole or in part upon request, motion, or application of the Debtor at any time prior to Confirmation without notice and hearing, and without additional disclosure pursuant to Bankruptcy Code section 1125, if the Court finds and concludes that any such amendment, modification, supplement, restatement, or other alteration does not materially and adversely affect any Creditor or any Claim. After the Confirmation Date and prior to the Effective Date, the Debtor may, under Bankruptcy Code § 1127(b): (i) amend the Plan so long as such amendment shall not materially and adversely affect the treatment of any holder of a Claim, (ii) institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and (iii) amend the Plan as may be necessary to carry out the purposes and effects of the Plan so long as such amendment does not materially or adversely affect the treatment of holders of Claims or Equity Interests under the Plan; provided, however, prior notice of any amendment shall be served in accordance with the Federal Rules of Bankruptcy Procedure or an order of the Bankruptcy Court.

**O.** **Waiver of Stay**

***Disclosure Statement under 11 U.S.C. § 1125 in Support of***
***Galleria 2425 Owner, LLC's Chapter 11 Plan of Reorganization***                    ***Page 37 of 43***
002180

Notwithstanding Rules 3002(e), 6004(h), and 6006(d) of the Federal Rules of Bankruptcy Procedure, the Debtor shall be authorized to consummate the Plan and the transactions and transfers contemplated thereby immediately upon and after entry of the Confirmation Order.

# IX.
# FEASIBILITY OF THE PLAN

## A.    Feasibility

The Debtor believes that the Plan is feasible.  The funds to be used for the payment of Claims or other Distributions to be made under the Plan will come from the Debtor's Cash on hand, the income generated from the Property, the new equity contribution, any additional equity contributions made by the new equity holder, and the net proceeds of any sale, refinancing or other disposition of the Debtor's Assets.

1.    **Projections.** The Debtor's projections are attached to this disclosure statement as **Exhibit 1**.

2.    **Rent Roll.**  The Debtor has attached its current and past rent rolls for the Property as **Exhibit 2.**

3.    **Past Financial Information.**  Prior financial information of the Debtor is attached to this disclosure statement as **Exhibit 3.**

## B.    Alternatives to Confirmation of the Plan

There are three possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan: (a) the Bankruptcy Court could dismiss the Debtor's Bankruptcy Case, (b) the Debtor's Bankruptcy Case could be converted to a liquidation case under Chapter 7 of the Bankruptcy Code, or (c) the Bankruptcy Court could consider an alternative plan of reorganization proposed by some other party.

1.    **Dismissal.** If the Debtor's Bankruptcy Case were to be dismissed, the Debtor would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code. The Lender would then have the right to exercise its rights as a secured creditor to seek to foreclose on the Property.

2.    **Chapter 7 Liquidation.** If the Plan is not confirmed, it is possible that the Debtor's Bankruptcy Case will be converted to a case under Chapter 7 of the Bankruptcy Code, in which event a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. Whether a bankruptcy case is one under Chapter 7 or Chapter 11, secured creditors, Administrative Claims, and Priority Claims are entitled to be paid in cash and in full before unsecured creditors receive any funds.

**Disclosure Statement under 11 U.S.C. § 1125 in Support of**
**Galleria 2425 Owner, LLC's Chapter 11 Plan of Reorganization**                    **Page 38 of 43**
002181

If the Debtor's Bankruptcy Case were converted to Chapter 7, the present Priority Claims may have a priority lower than priority claims generated by the Chapter 7 case, such as the Chapter 7 trustee's fees or the fees of attorneys, accountants and other professionals engaged by the trustee.

The Debtor believes that liquidation under Chapter 7 would result in significantly less distributions to unsecured creditors and to Administrative and Priority Claimants.

According to a May 2023 appraisal conducted by NBK, the Property is worth $18,600,000 and the liquidation value is $16,000,000. Thus, the Property is worth far less than the secured debt against it, including NBK and Secured Tax Claims, and NBK would likely be permitted to exercise its rights as a secured creditor to foreclose on the Property in a Chapter 7 liquidation. While NBK would pay any Secured Tax Claims upon a foreclosure, NBK would receive much less through foreclosure than the amounts proposed to be paid to it under the Plan, and the Debtor's other creditors, both secured and unsecured, would not receive any distributions from the Property.

Even if NBK were not allowed to foreclose and the Debtor's Assets were liquidated, and if a receiver or trustee were appointed to supervise the liquidation of the Debtor's Assets, there would be significant costs associated with such liquidation, and such costs would increase due to fees and charges for such persons, including brokers retained to sell the Property and attorneys retained to pursue potential litigation claims. It is unlikely that the liquidation of the Debtor's Assets would be sufficient to enable a Trustee to make any significant distribution to unsecured creditors because Administrative and Priority Claims, Secured Tax Claims, and the Lender's Secured Claim would consume all of such proceeds. Moreover, the timing of any distribution to unsecured creditors would be conditioned upon the ability to liquidate the Debtor's litigation claims against NBK, Sonder, and others, and potential Avoidance Actions that could take years to resolve.

In 2022 due to continuing issues between the Debtor and NBK, the parties entered into a confidential settlement agreement. The litigation involving NBK is described in more detail above. The Debtor believes that if this case is converted to a Chapter 7 case, the litigation may have a much less value due to a chapter 7 trustee possibly selling the litigation claims.

During the ninety (90) days prior to the Petition Date, the Debtor made payments to various non-insider creditors and vendors that provided services to the Property. The Debtor believes those payments were made in the ordinary course of its business and are also subject to potential new value defenses. Therefore, the Debtor does not believe that such payments are subject to avoidance and recovery by the Debtor's estate as preferential transfers pursuant to Sections 547 and 550 of the Bankruptcy Code.

During the years preceding the Petition Date, the Debtor also made payments to insiders, including Jetall Companies, Inc. There is a written property management agreement between the Debtor and Jetall Companies, Inc. under which Jetall Companies, Inc. is entitled to property management fees equal to the greater of 4% of gross receipts or $14,750.00 a month, construction management fees, and reimbursements for other expenditures, including employees that provide services to the Property. Jetall contends that the Debtor owes it significant amounts in unpaid management fees, commissions, and expense reimbursements. Thus, a Chapter 7 Trustee's ability to recover Avoidance Actions against insiders is uncertain and would require significant time and expense. A Chapter 7 Trustee may or may not decide to pursue the Debtor's litigation claims. A Chapter 7 Trustee may elect to "sell" the litigation claims for a small amount of money and limit any recovery to the unsecured creditors.

Under the Plan, Administrative, Secured Claims, and Priority Tax Claims are paid in full and Unsecured Creditors will receive more than $2.3 million in distributions, rendering the Plan far better than a Chapter 7 liquidation.

3.    **Confirmation of an Alternative Plan.** If the Plan is not confirmed, it is possible that a creditor or third party would file and pursue confirmation of an alternative plan. The Debtor's does not believe that any creditor or third party is likely to propose an alternative reorganization plan. The Debtor believes the Plan provides the best prospect for reorganizing the Debtor and maximizing creditor recoveries that can be achieved quickly. The Debtor believes that any material delay in the Debtor's exit from bankruptcy will harm its business and lessen creditor recoveries. By exiting bankruptcy, the Debtor will eliminate the expense of being in bankruptcy.

# X.
# RISK FACTORS

The primary risk factor associated with the Plan is the Debtor's ability to lease and collect rents with respect to the property. While there can be no assurance that the Debtor will be able to lease the property in the current depressed market, the Debtor will be able to sell the Property in the event that the Debtor is unable to stabilize the Property.

Section 1129 of the Bankruptcy Code provides certain requirements for a Chapter 11 plan to be confirmed. Parties-in-interest may object to confirmation of a plan based on an alleged failure to fulfill these requirements or other reasons. The Debtor believes that the Plan complies with the requirements of the Bankruptcy Code.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code

because each class of Claims and Equity Interests encompass Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests in each such class.

The Debtor cannot ensure it will receive enough acceptances to confirm the Plan. But, even if the Debtor does receive enough acceptances, there can be no assurance that the Bankruptcy Court will confirm the Plan. Even if enough acceptances are received and, with respect to those Classes deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which as a court of equity may exercise substantial discretion, may choose not to confirm the Plan or may require additional solicitations or consents prior to confirming the Plan. Section 1129 of the Bankruptcy Code requires, among other things, that the value of distributions to dissenting holders of Claims and Equity Interests may not be less than the value such holders would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. Although the Debtor believes that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Debtor's ability to propose and confirm an alternative plan is uncertain. Confirmation of any alternative plan under Chapter 11 of the Bankruptcy Code would likely take significantly more time and result in delays in the ultimate distributions to the holders of Claims. If confirmation of an alternative plan is not possible, the Debtor would likely be liquidated under Chapter 7. Based upon the Debtor's analysis, liquidation under Chapter 7 would result in distributions of reduced value, if any, to holders of Claims and Equity Interests.

Consummation of the Plan is conditioned upon, among other things, entry of the Confirmation Order approving any transactions contemplated thereunder. As of the date of this Disclosure Statement, there can be no assurance that any or all of the foregoing conditions will be met or that the other conditions to consummation, if any, will be satisfied. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and effectuated and the liquidation completed.

Although the Debtor believes that the Effective Date may occur within a reasonable time following the Confirmation Date, there can be no assurance as to such timing.

## XI.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

### A.   General

Under the Internal Revenue Code of 1986, as amended (the "Tax Code"), there could be certain significant federal income tax consequences associated with the Plan described in this Disclosure Statement. Certain of these consequences are discussed below. Due to the unsettled nature of certain of the tax issues presented by the Plan, the differences in the nature of Claims of the various creditors, their taxpayer status, residence and methods of accounting (including creditors within the same creditor class) and prior actions taken by creditors with respect to their Claims, as well as the possibility that events or legislation subsequent to the date hereof could change the federal tax consequences of the transactions, the tax consequences described below are subject to significant considerations applicable to each creditor.

**HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS RESPECTING THE INDIVIDUAL TAX CONSEQUENCES OF THE TRANSACTIONS, CONTEMPLATED UNDER OR IN CONNECTION WITH THE PLAN, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES**.

**B.    Tax Consequences to the Debtor**

Material tax consequences may exist with respect to the Debtor under the Plan. To the extent any of its debts are discharged under the Plan, the Debtor does not believe such discharge will result in any "discharge of indebtedness" income, although other tax attributes of the Debtor, such as the amount of its net operating loss carrybacks or carryovers may be reduced or affected thereby.

**C.    Tax Consequences to Creditors**

The tax consequences of the implementation of the Plan to a creditor will depend in part upon whether the creditor's present debt constitutes a "security" for federal income tax purposes, the type of consideration received by the creditor in exchange for its Allowed Claim, whether the creditor reports income on the accrual or cash basis, whether the creditor receives consideration in more than one tax year of the creditor, whether the creditor is a resident of the United States, and whether all the consideration received by the creditor is deemed to be received by that creditor in an integrated transaction.

**D.    Creditors Receiving Solely Cash**

A creditor who receives cash in full satisfaction of its Claim may be required to recognize gain or loss on the exchange. The creditor may recognize gain or loss equal to the difference between the amount realized in respect of such Claim and the creditor's tax basis in the Claim.

**E.    Backup Withholding**

Under the Tax Code, interest, dividends and other "reportable payments" may, under certain circumstances, be subject to "backup withholding". Withholding generally applies if the holder: (a) fails to furnish his social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.

## XII.
## CONCLUSION

This Disclosure Statement has attempted to provide information regarding the Debtor's estate and the potential benefits that might accrue to holders of Claims against and Equity Interests in the Debtor under the Plan as proposed. The Plan is the result of the effort of the Debtor and its advisors and management to pay allowed claims against them. The Debtor believes that the Plan

is feasible and will provide holders of Claims against the Debtor far greater benefits than those that would be received by liquidating the Debtor's Assets, or by any alternative plan. The Debtor, therefore, hereby urges you to vote in favor of the Plan.

**Whether or not you expect to attend the Confirmation Hearing, which is scheduled to commence on _____, 2024 at _____.m., prevailing central time, you must sign, date, and mail your Ballot as soon as possible for the purpose of having your vote count at such hearing. All Ballots must be returned to counsel for the Debtor: Reese W. Baker, Baker & Associates, 950 Echo Lane, Ste 300, Houston, Texas 77024. All Ballots must be returned on or before 5:00 p.m., prevailing central time, on _____, 2024. Any ballot which is illegible or which fails to designate an acceptance or rejection of the Plan will not be counted.**

Dated: January 30, 2024

Respectfully submitted,

**GALLERIA 2425 OWNER, LLC**

By: */s/ Ali Choudhri* _____
      Ali Choudhri
      **MANAGER OF GALLERIA 2425 OWNER, LLC**

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

**TRANSCRIPT ORDER**

**FOR COURT USE ONLY**

**DUE DATE:**

*Please Read Instructions:*

| 1. NAME Charles Conrad | 2. PHONE NUMBER (713) 276-7600 | 3. DATE 1/31/2024 | |
|---|---|---|---|
| 4. DELIVERY ADDRESS OR EMAIL charles.conrad@pillsburylaw.com | 5. CITY Houston | 6. STATE TX | 7. ZIP CODE 77010 |

| 8. CASE NUMBER 23-34815 | 9. JUDGE Norman | DATES OF PROCEEDINGS | |
|---|---|---|---|
| | | 10. FROM 1/31/2024 | 11. TO 1/31/2024 |
| 12. CASE NAME In re Galleria 2425 Owner, LLC | | LOCATION OF PROCEEDINGS | |
| | | 13. CITY Houston | 14. STATE TX |

**15. ORDER FOR**

| ☐ APPEAL | ☐ CRIMINAL | ☐ CRIMINAL JUSTICE ACT | ☒ BANKRUPTCY |
|---|---|---|---|
| ☐ NON-APPEAL | ☐ CIVIL | ☐ IN FORMA PAUPERIS | ☐ OTHER |

16. TRANSCRIPT REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☐ OPENING STATEMENT (Plaintiff) | | | |
| ☐ OPENING STATEMENT (Defendant) | | | |
| ☐ CLOSING ARGUMENT (Plaintiff) | | ☐ PRE-TRIAL PROCEEDING (Spcy) | |
| ☐ CLOSING ARGUMENT (Defendant) | | | |
| ☐ OPINION OF COURT | | | |
| ☐ JURY INSTRUCTIONS | | ☒ OTHER (Specify) | |
| ☐ SENTENCING | | Hearing | January 31, 2024 |
| ☐ BAIL HEARING | | | |

**17. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| ORDINARY | ☐ | ☐ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| EXPEDITED | ☐ | ☐ | NO. OF COPIES | | |
| 3-Day | ☒ | ☐ | NO. OF COPIES | | |
| DAILY | ☐ | ☐ | NO. OF COPIES | | |
| HOURLY | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | | | | | |

| CERTIFICATION (18. & 19.) By signing below, I certify that I will pay all charges (deposit plus additional). | ESTIMATE TOTAL | 0.00 |
|---|---|---|

| 18. SIGNATURE /s/ Charles Conrad | PROCESSED BY |
|---|---|
| 19. DATE 1/31/2024 | PHONE NUMBER |
| TRANSCRIPT TO BE PREPARED BY Veritext Legal Solutions | COURT ADDRESS |

| | DATE | BY | | |
|---|---|---|---|---|
| ORDER RECEIVED | | | | |
| DEPOSIT PAID | | | DEPOSIT PAID | |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES | 0.00 |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT | 0.00 |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE | 0.00 |

002187

DISTRIBUTION:    COURT COPY    TRANSCRIPTION COPY    ORDER RECEIPT    ORDER COPY

# INSTRUCTIONS

## GENERAL

**Use.** Use this form to order the transcription of proceedings. Complete a separate order form for each case number for which transcripts are ordered.

**Completion**. Complete Items 1-19. Do *not* complete shaded areas which are reserved for the court's use.

**Order Copy.** Keep a copy for your records.

**Submitting to the Court.** Submit the form in the format required by the court.

**Deposit Fee.** The court will notify you of the amount of the required deposit fee which may be mailed or delivered to the court. Upon receipt of the deposit, the court will process the order.

**Delivery Time.** Delivery time is computed from the date of receipt of the deposit fee or for transcripts ordered by the federal government from the date of receipt of the signed order form.

**Completion of Order.** The court will notify you when the transcript is completed.

**Balance Due.** If the deposit fee was insufficient to cover all charges, the court will notify you of the balance due which must be paid prior to receiving the completed order.

## SPECIFIC

Items 1-19.    These items should always be completed.

Item 8.    Only one case number may be listed per order.

Item 15.    Place an "X" in each box that applies.

Item 16.    Place an "X" in the box for each portion requested. List specific date(s) of the proceedings for which transcript is requested. Be sure that the description is clearly written to facilitate processing. Orders may be placed for as few pages of transcript as are needed.

Item 17.    *Categories.* There are six (6) categories of transcripts which may be ordered. These are:

        *Ordinary*. A transcript to be delivered within thirty (30) calendar days after receipt of an order. (Order is considered received upon receipt of the deposit.)

        *14-Day*. A transcript to be delivered within fourteen (14) calendar days after receipt of an order.

        *Expedited*. A transcript to be delivered within seven (7) calendar days after receipt of an order.

        *3-Day*. A transcript to be delivered within three (3) calendar days after receipt of an order.

        *Daily*. A transcript to be delivered following adjournment and prior to the normal opening hour of the court on the following morning whether or not it actually is a court day.

        *Hourly*. A transcript of proceedings ordered under unusual circumstances to be delivered within two (2) hours.

        *Realtime*. A draft unedited transcript produced by a certified realtime reporter as a byproduct of realtime to be delivered electronically during proceedings or immediately following adjournment.

**NOTE**: Full price may be charged only if the transcript is delivered within the required time frame. For example, if an order for expedited transcript is not completed and delivered within seven (7) calendar days, payment would be at the 14-day *delivery* rate, and if not completed and delivered within 14 calendar days, payment would be at the ordinary delivery rate.

        *Ordering*. Place an "X" in each box that applies. Indicate the number of additional copies ordered.

        *Original*. Original typing of the transcript. An original must be ordered and prepared prior to the availability of copies. The original fee is charged only once. The fee for the original includes the copy for the records of the court.

        *First Copy*. First copy of the transcript after the original has been prepared. All parties ordering copies must pay this rate for the first copy ordered.

        *Additional Copies*. All other copies of the transcript ordered by the same party.

Item 18.    Sign in this space to certify that you will pay all charges. (This includes the deposit plus any additional charges.)

Item 19.    Enter the date of signing.

Shaded Area. Reserved for the court's use.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 23-34815 |
| GALLERIA 2425 OWNER, LLC, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | CHAPTER 11 |
| | § | |

### ORDER ABATING MOTION TO CONVERT TO CHAPTER 7
### AND APPOINTING CHAPTER 11 TRUSTEE

Before the Court is the Motion to Convert (ECF No. 72) filed by National Bank of Kuwait; S.A.K.P. Hearing was held on January 31, 2024. For the reasons stated on the record the Court sua sponte **ORDERS** the appointment of a Chapter 11 Trustee.

The United States Trustee shall confer with the debtor and determine if there are sufficient funds available from the debtor or third parties to fund a Chapter 11 Trustee. Should sufficient funds not be available, or the United States Trustee is unable to find a suitable candidate then the Trustee shall so report.

Should a Trustee not be appointed then the Court will convert the case sua sponte to Chapter 7.

**SO ORDERED**.

SIGNED 01/31/2024

_____

Jeffrey Norman
United States Bankruptcy Judge

1 / 1

002189

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 23-34815** |
| **GALLERIA 2425 OWNER, LLC,** | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | **CHAPTER 11** |
| | § | |

**ORDER ABATING APPLICATION TO EMPLOY (ECF NO. 67)**

Hearing was held on January 31, 2024. The Court requires the applicant to disclose the source and amount of his retainer before approval of the Application to Employ. The debtor shall file such disclosure on the docket and file a proposed order for employment that contains a signature as to form by the United States Trustee. Pending the required disclosure and submission of a proposed form of order, a ruling on the Application to Employ is abated.

**SO ORDERED.**

SIGNED 02/01/2024

_____
Jeffrey Norman
United States Bankruptcy Judge

002190

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 23-34815** |
| **GALLERIA 2425 OWNER, LLC,** | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | **CHAPTER 11** |

<u>**ORDER ABATING RULINGS**</u>

Based on the Court's order appointing a Chapter 11 Trustee (ECF No. 99) filed in this case on January 31, 2024, this Court abates the rulings on any pending matters, and all matters filed by the debtor, until after the Chapter 11 Trustee has been appointed.

**SO ORDERED**.

SIGNED 02/01/2024

_____
Jeffrey Norman
United States Bankruptcy Judge

002191