```
 1                 UNITED STATES BANKRUPTCY COURT
                   SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION

 3                              )  CASE NO:
                                )
 4    GALLERIA 2425 OWNER,       )  Houston, Texas
                                )
 5            Debtor.            )  Wednesday, January 31, 2024
                                )
 6                              )  11:00 AM TO 4:31 PM
      ------------------------------)

 7

 8                              TRIAL

 9         BEFORE THE HONORABLE JEFFREY P. NORMAN
               UNITED STATES BANKRUPTCY JUDGE
10

11    APPEARANCES:

12    For Galleria 2425      REESE W. BAKER
      Owner:                 Baker & Associates
13                           950 Echo Lane, Suite 300
                             Houston, TX 77024
14
      For U.S. Trustee:      JANA SMITH WHITWORTH
15                           United States Department Of Justice
                             515 Rusk Street, Suite 3516
16                           Houston, TX 77002

17    For National Bank      RYAN STEINBRUNNER
      of Kuwait:             PATRICK FITZMAURICE
18                           CHARLES CLAYTON CONRAD
                             Pillsbury Winthrop Shaw Pittman LLP
19                           909 Fannin, Suite 2000
                             Houston, TX 77010
20
      For 2425 WL, LLC:      STEPHEN WAYNE SATHER
21                           Barron Newburger, PC
                             7320 N. Mopac Expressway, Suite 400
22                           Austin, TX 78731

23    For 2425 West          JAMES ROBERT MACNAUGHTON
      Loop, LLC:             Porter & Powers, PLLC
24                           5900 Memorial Drive, Suite 305
                             Houston, TX 77027
25
```

Page 2

```
1    Court Reporter:         TRACEY CONRAD

2    Courtroom Deputy:       TRACEY CONRAD

3    Transcribed by:         Veritext Legal Solutions
                             330 Old Country Road, Suite 300
4                            Mineola, NY 11501
                             Tel: 800-727-6396
5

6

7    Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                              INDEX

 2    WITNESS(ES)             D    CX    RD    RC

 3    Dward Darjean

 4         By Mr. Fitzmaurice  26          67

 5         By Ms. Whitworth          60

 6         By Mr. Sather             66

 7    Ali Choudhri

 8         By Mr. Fitzmaurice  69

 9         By Mr. Whitworth          81          189

10         By Mr. Baker        88          199

11         By Mr. Sather             183

12    Faisal Shah

13         By Mr. Steinbrunner       208

14                        E X H I B I T S

15    Exhibit                                        Page

16    Exhibit 87-24                                  44

17    Exhibit 87-39                                  48

18    Exhibit 88-1                                   103

19    Exhibit 90-9                                   131

20    Exhibit 90-7                                   137

21    Exhibit 87-2                                   141

22    Exhibit 88-18                                  189

23

24

25
```

1      HOUSTON, TEXAS; WEDNESDAY, JANUARY 31, 2024; 11:00 A.M.

2                          (Call to Order)

3           CLERK:  All rise.  Please be seated.

4           THE COURT:  Good morning.  We're back on the

5      record for Wednesday, January the 31st, 2024.  There's one

6      matter set at 11 a.m.  That is Galleria 2425 Owner, LLC.

7      Appearances, please.

8           MR. BAKER:  Your Honor, Reese Baker on behalf of

9      the Debtor, Galleria 2425 Owner.

10          THE COURT:  Thank you, Mr. Baker.

11          MS. WHITWORTH:  Jana Whitworth on behalf of the

12     United States Trustee, Judge.

13          THE COURT:  Thank you, Ms. Whitworth.

14          MR. FITZMAURICE:  Good morning, Your Honor.

15     Patrick Fitzmaurice and Ryan Steinbrunner from Pillsbury on

16     behalf of the Debtor's secured creditor, National Bank of

17     Kuwait.

18          THE COURT:  Thank you.

19          MR. SATHER:  Morning, Your Honor.  Stephen Sather

20     for 2425 WL, LLC, a creditor.

21          THE COURT:  Thank you, sir.  Take it there's going

22     to be no one appearing by video today?

23          MR. SATHER:  I'm not aware of anybody.

24          MR. FITZMAURICE:  Same, Your Honor.

25          THE COURT:  All right.

1          AUTOMATED VOICE:  Conference muted.

2          THE COURT:  Is there anyone on the line?  I'm not

3     logged on (indiscernible) an appearance?

4          CLERK:  I don't know who Audrey Hornischer is.

5     She was on video, but she didn't say anything and Ms.

6     (indiscernible) is just listening in.

7          THE COURT:  Let me (indiscernible) make sure

8     there's no one else who wants to appear.

9          AUTOMATED VOICE:  Conference unmuted.

10          THE COURT:  I just unmuted the conference line in

11     case there is anyone who wanted to make an appearance in

12     this case, you know, talking specifically about Galleria

13     2425 Owner LLC.  I just terminated videos.  I didn't think

14     that anyone was going to appear remotely.  Is there anyone

15     on the line who wants to make an appearance?

16          MR. MacNAUGHTON:  Robert MacNaughton, on behalf of

17     2425 West Loop LLC, a tenant and party in interest.

18          THE COURT:  All right, are you going to appear by

19     video, sir, or are you listening in?

20          MR. MacNAUGHTON:  Just listening in.

21          THE COURT:  All right.  That's fine.  We're going

22     to mute the telephone lines at this point in time.  I'll

23     note your appearance for the record.

24          MR. MacNAUGHTON:  Thank you.

25          THE COURT:  Thank you.  Two matters before the

1    Court, an application to employ as well as the motion to
2    convert.  Mr. Baker, why don't you address your motions, the
3    earlier of the two motions, and then I'll move on to the
4    motion to convert.  And again, an objection by the UST, if I
5    remember correctly.
6          MR. BAKER:  With regard -- excuse me, Your Honor -
7    - to the objection by the United States Trustee, they
8    presented me with the form of an order.  I have looked at
9    it.  I have just had a chance -- but I'm okay with the form
10   that I can upload, if the Court does approve.
11         THE COURT:  So --
12         MS. WHITWORTH:  Do you want us at the podium,
13   Judge, or --
14         THE COURT:  Right now, that's fine.
15         MS. WHITWORTH:  Okay.  Your Honor, we -- I had
16   talked to Mr. Baker and he has agreed to implement the
17   revisions that we requested, so we would withdraw our
18   limited object.  We just were letting the Court know that we
19   hadn't heard back and that (indiscernible) the entry of the
20   order that was submitted.
21         THE COURT:  So, can I just say that we'll submit
22   an agreed order within 14 days on your motion to --
23   application to the Court?
24         MR. BAKER:  That's fine --
25         MR. FITZMAURICE:  Your Honor, the National Bank of

1    Kuwait did file a limited objection.

2         THE COURT:  Did?

3         MR. FITZMAURICE:  We did.

4         THE COURT:  Okay.  So let's go ahead and address

5    that objection now.  Mr. Baker?

6         MR. BAKER:  Your Honor, I am not -- they object

7    because they say I'm have disclosed where I'm getting my

8    funds from.  I don't believe I have to disclose that.

9    They're not from the Debtor.  I can make that representation

10   to the Court, and I am not planning on getting any

11   compensation paid by the Debtor unless I submit a  fee

12   application.  One of their objections is they don't agree to

13   any funds being paid from the Debtor for my fees.  That's

14   fine.  I have to present a fee application at that point in

15   time.  They can object to it.  I'm not going to get any

16   money from the Debtor unless I submit a request for a

17   retainer or request to get paid.  And so I don't -- my

18   understanding is those are the two limited objections.

19        THE COURT:  Mr. Fitzmaurice.

20        MR. FITZMAURICE:  Thank you, Your Honor.  With

21   respect to the source of the funds, we think that the

22   identity of the source of the funds is a necessary component

23   to the application so that the Court can determine whether

24   or not there is a conflict between whoever that is and the

25   Debtor's interests.  It's particularly important here where

1    the Debtor doesn't have any employees, doesn't have anyone

2    who represents its own interests.

3             Every person that works for the Debtor that you're

4    going to hear from today that has filed -- that has filed

5    anything with the Court or that has signed any of the

6    submissions that the Debtor has made to the Court, they all

7    work for someone else and it may be that those parties have

8    interests that are adverse to the interests of the estate.

9    And without identifying who the source of that money is, the

10   Court can't really determine and the parties in interest

11   can't really determine whether or not there would -- whether

12   or not there would be a conflict.

13            THE COURT:  All right.  Is that your entire

14   objection at this point in time?

15            MR. FITZMAURICE:  It is, Your Honor.

16            THE COURT:  All right.  Mr. Baker, if you want to

17   be employed, you need to tell me where the funds came from.

18   That simple.

19            MR. BAKER:  All right.

20            THE COURT:  All right?  So if you want to file

21   some sort of disclosure on the record, I'm happy after a

22   suitable notice period to let anybody basically object based

23   on that disclosure.  I'll sign the order.  But you need to

24   make a disclosure.  You need to make a complete disclosure

25   of all your connections, and that includes who's paying you.

1    Okay?

2           MR. BAKER:  That's fine.  I'll do that.

3           THE COURT:  Thank you.  All right.  So what I'll

4    do is I will abate the application to employ until Mr. Baker

5    makes some sort of disclosure who's paying him and then I'll

6    send a response period and then I'll grant the motion or not

7    grant motion after that response (indiscernible).  All

8    right.  Mr. Fitzmaurice, it's your motion to convert,

9    correct?

10          MR. FITZMAURICE:  May I approach the podium, Your

11   Honor?

12          THE COURT:  You may.

13          MR. FITZMAURICE:  Thank you.

14          THE COURT:  And just so the parties are aware,

15   (indiscernible).  I want -- everyone needs to know that I

16   have a flight to Laredo this afternoon because I'm in Laredo

17   tomorrow.  So, I'll let you go as long as I can then I'll

18   cut you off, and we will this, but it'll be by video from,

19   I'll be sitting in Laredo.  Okay?  Go ahead.

20          MR. FITZMAURICE:  Just on that point, Your Honor,

21   can you give us a sense as to when --

22          THE COURT:  I need to be out of here by 12:30.

23          MR. FITZMAURICE:  Okay.  And then we would

24   continue tomorrow by video?

25          THE COURT:  (indiscernible).

1              MR. FITZMAURICE:  Okay.

2              THE COURT:  Okay?

3              MR. FITZMAURICE:  So, tomorrow afternoon by video.

4    Thank you, Your Honor.

5              THE COURT:  Thank you.

6              MR. FITZMAURICE:  Your Honor, we're here now on

7    the National Bank of Kuwait's motion to convert this case

8    from a Chapter 11 case to one under Chapter 7.  Our motion

9    lays out several different grounds that are the basis of our

10   motion, but I really want to focus on just two of them

11   today.  The first is the substantial continuing loss or

12   diminution of the estate and the Debtor's inability to

13   confirm a plan.  And that's -- that last piece is both part

14   of 1112(b)(2)(4)(A), but also an independent ground under

15   Subsection M.

16              With respect to the loss and diminution of value

17   of the estate, I think it's best exemplified by the Debtor's

18   failure to pay taxes over the last five years.  Debtor

19   hasn't paid taxes -- it hasn't paid (indiscernible), taxes,

20   property taxes for 2019, 2000, 2021, 2022, and I'll

21   represent to Your Honor I looked this morning on the

22   records.  My colleague helped me figure out how to do that,

23   the Harris County Assessor's Office, and it shows as of this

24   morning that the 2023 taxes have not yet been paid.

25              For the 2019, 2020 taxes, the Debtor obtained tax

1     lien loans from the Caz Creek entity to pay off those taxes.

2     The Debtor hasn't paid those loans.  As far as we -- hasn't

3     paid anything towards those loans.  We haven't seen any

4     evidence at all ever of any payment on account of those

5     loans.  Instead, what happened is the Debtor's principal,

6     Mr. Choudhri, acquired those loans personally.

7             Now, you're going to hear from the Debtor with

8     respect to the feasibility of the plan.  You're going to

9     hear from the Debtor about how, oh, there's money available

10    from equity.  All right, equity is going to contribute money

11    and it's all going to be okay.  But when you hear those --

12    when you hear that argument, you know, I ask Your Honor to

13    consider that the last time the Debtor had the opportunity,

14    the last time equity had the opportunity, it decided to

15    prefer itself over the interest of the Debtor.

16            Mr. Choudhri acquired those taxes in his own name.

17    The Debtor has scheduled a claim for Mr. Choudhri of more

18    than $6 million.  At the 341 meeting -- sorry, the schedule

19    itself says those amounts reflect the tax payments.  At the

20    341 meeting, Mr. Choudhri testified that that's what that

21    those amounts were for.  The taxes for those years are about

22    a million-six.  Interest is a powerful thing, but that still

23    -- it still seems like it would be off.  I'm not sure how

24    that 1.6 gets to 6 million.  Perhaps, the testimony, you

25    know, here today will be helpful in -- for us trying to

1    figure all of that out.

2            And this isn't the only time that we've seen the

3    Debtor prefer equity over its own interests or over the

4    interests of the estate and over creditors.  Your Honor may

5    recall that the Debtor filed the case in July.  That case

6    was heard by Judge Lopez.  It was dismissed on November 1st.

7    This case was filed on December 5th.

8            In the short period between November 1st and

9    December 5th, the Debtor made, and they've scheduled it,

10   $118,000 in payments to Mr. Choudhri's company General,

11   which they've -- we've heard is the manager of the property.

12   There's no indication as to what those payments were for,

13   but rather than pay third-party creditors, rather than pay

14   amounts towards the tax liens, they instead pay themselves.

15           With respect to the 2021 taxes, those taxes were

16   again satisfied by a loan from the Caz Creek entity.  That

17   entity has filed a claim.  The claim indicates no amounts

18   were paid and default interest on that loan accrues at 17

19   percent.

20           Your Honor, we were here a month or so ago on the

21   Debtor's utility motion and Your Honor heard Ms. MacGeorge

22   testify about the Debtor's financial condition and how

23   precarious it was and that the Debtor didn't have enough

24   money to pay its bills.  And one of the reasons for the

25   relief that was sought in that motion was because utilities

1   hadn't been paid, needed to be paid, because the Debtor

2   didn't have enough money.  Well, at the same time the Debtor

3   didn't have enough money to pay the utilities or any other

4   creditors, they were paying Mr. Choudhri's company $118,000.

5          As I said a moment ago, Your Honor, all of this is

6   important for us to consider in connection with the motion

7   to convert, because again, the Debtor has no employees.

8   There is no person who is looking out for the Debtor's

9   interests.  Everyone works for an affiliated entity.

10  Everyone works for either Jetall or one of the other

11  businesses that Mr. Choudhri owns.  You're going to hear

12  testimony today, Your Honor, from Dward Darjean who is the

13  manager of the -- who is the Debtor's manager.  Manages the

14  property.  Signed the petition, signed the schedules and

15  statements.

16         Mr. Darjean also works for Jetall.  In the first

17  Galleria case, he also signed Jetall's proof of claim.  He

18  also signed the proof of claim for the second lien lender,

19  who's appearing here today, which entity is also owned by

20  Mr. Choudhri.  One of the reasons that the bank thinks the

21  case should be converted to one under Chapter 7, is this

22  estate is crying out for an adult in the room.  It's crying

23  out for an independent fiduciary who is only looking out --

24  who has fiduciary duties to all creditors and is only

25  looking out for other credit -- for the estate as a whole

1    rather than Mr. Choudhri and his interests.

2         With respect to the 2022 taxes -- again, focused

3    on taxes for purposes of the loss and diminution of value in

4    the estate.  With respect to those taxes, they haven't been

5    paid.  The relevant taxing authorities have filed claims.

6    The interest continues to accrue on those amounts.  Interest

7    has continued to accrue during the course of this case.

8    That was being accrued during the first case as well and in

9    the interim period when Jetall was taking on the entities.

10        The Debtors have made filings in this case and in

11   the first bankruptcy case, profit and loss statements,

12   financial projections, other financial information

13   concerning the Debtor's performance year over year.  Those

14   statements are entirely consistent in two -- they are

15   entirely consistent with each other in two ways.  Number

16   one, they show the Debtor's poor financial performance and

17   that it is losing money.  It has lost money all year long.

18        During the course of this bankruptcy case, it has

19   lost money.  Those records also show that the financial

20   projections that the Debtor made in the first case, they've

21   fallen way short.  In the first case, the Debtor told Judge

22   Lopez in October, November, and December, we're going to

23   make more than $200,000 in rental income.  But the evidence

24   shows they've fallen far, far short of that.  And in

25   December, the first month of this bankruptcy case, they

1   received basically half that amount.

2           I assume throughout the course of the hearing, the

3   Debtor's going to present evidence of their expected future

4   performance, and undoubtedly that expected future

5   performance will be incredibly rosy.  It's my experience and

6   it might be Your Honor's as well, that real estate

7   developers are the most optimistic people in the world.

8           THE COURT:  Debtor (indiscernible).

9           MR. FITZMAURICE:  And when I -- when Your Honor

10  hears that evidence, I think Your Honor needs to consider --

11  and we would, you know, submit that Your Honor should

12  consider what has happened in the last few months.  The

13  Debtor have consistently put forward financial projections.

14  They have consistently failed to meet them.  And what's more

15  important with respect to the projections that are being put

16  forward now, is there is literally no evidence of them.

17          Your Honor, in the materials that have been

18  submitted, we use as exhibits in the hearing today, there is

19  one lease for one tenant.  I think it's Mr. McDonald's

20  tenant, who's on the line.  The lease does not call for

21  $500,000 in rent that the Debtor is saying in April just a

22  few short months away, that's how much they're going to

23  make.

24          There is no evidence to support any of that.

25  There are no leases.  There are no letters of intent.  There

1   were no commitments.  There is no evidence of any kind that

2   the Debtor is going to be able to make these incredible

3   realty financial projections that it has been failing to

4   make for the last several months.

5           I would suggest, Your Honor, the Debtor's entire

6   plan -- I don't mean that the plan within the bankruptcy

7   context, but the business plan, relies on its, you know,

8   asserted ability to somehow strip, cram down, subordinate,

9   eliminate the claim of the National Bank of Kuwait on

10  account of the Debtor's loan, the loan the bank made to the

11  Debtor.

12          And the response is littered with information

13  concerning these supposed (indiscernible).  Three points,

14  Your Honor.  First, there is a settlement agreement between

15  parties.  Anything that happened before that, those claims

16  have been released, they've been waived, and any lawsuits

17  were dismissed with prejudice.  First.

18          Second, any claims that postdate the settlement,

19  the Debtor's counsel stood up in front of the state court

20  after the -- back in -- they had failed to comply with their

21  obligations of the settlement agreement.  The bank posted

22  the property for foreclosure, once the payment date had

23  lapsed.  They filed an application in front of the state

24  court judge, in front of Judge Weems in Harris County and

25  Debtor's counsel stood up and said, Judge, I'm representing

1   to you as an officer of the Court, if we get some more time

2   to comply with our obligations under the settlement

3   agreement, if we get 60 more days, all of our claims, all of

4   our problems, all of our issues, they are all resolved.

5   Judge Weems, over our objection, gave them that additional

6   time and said to the Debtor, I'll give you the time that you

7   want, maybe more time, frankly, than 60 days that counsel

8   asked for, on the condition that you make monthly payments,

9   $80,000.

10       They made the first two.  They didn't make the

11   third one.  Filed the property, posted the property for

12   foreclosure.  Another TRO, denied, led to the first

13   bankruptcy case.  That case was dismissed.  Another round of

14   temporary injunction requests, litigation throughout the

15   state court system.  When all of those were denied, second

16   bankruptcy.

17       So, Your Honor, any claims that the Debtor has

18   against the bank have been waived, released, discharged.

19   They don't exist.  But if somehow they do, if somehow they

20   have survived, isn't that exactly the job of a Chapter 7

21   Trustee, to investigate those claims, to bring them if it's

22   appropriate, to find financing for them?  I mean, if these

23   claims -- if these claims were so great, there would be

24   lawyers lining up to take them on a contingency fee basis

25   against them -- against the Debtor.

1        The bank welcomes the Chapter 7 Trustee's

2    investigation.  We're happy to talk to the Chapter 7

3    Trustee, share what we know about the claims, and that

4    independent fiduciary who was acting for the benefit of all

5    creditors, all stakeholders, can make the termination, do

6    those claims have merit or do they not, and proceed on that

7    basis.  That, Your Honor, is how we think this case should

8    proceed.

9        THE COURT:  Thank you, sir.  Mr. Baker.

10        MR. BAKER:  Your Honor, to start off, the Debtor

11    is agreeable to having a chief restructuring officer

12    appointed by this Court.  Debtor would like a period of time

13    to interview and come up with one.  I've already talked to

14    Drew McManigle.  He had a conflict.  I've talked to him

15    (indiscernible) person in Austin.  I put some emails out

16    after some conversations with Ms. Whitworth yesterday.  Just

17    some recommendations she had (indiscernible).  Debtor is

18    willing to get a chief restructuring officer put in place

19    and will move forward on that as promptly as possible.

20        So try to eliminate the concerns that I think --

21    that have been raised, although I don't think they're

22    correct, but we would like somebody else to be able to come

23    in and say that.

24        Now, let me go back.  With regard to the taxes,

25    it's interesting.  The taxing authorities have already filed

1    claims in this case.  They're really only (indiscernible)

2    filed.  They have filed claims for '22 and '23.  No other

3    years.  (indiscernible) claims.  Well, he correctly stated

4    that Mr. Choudhri bought the '20 and '21 taxes liens.  They

5    were conveyed to the National Bank of Kuwait.  What he

6    failed to tell you is that the National Bank of Kuwait today

7    right now as we stand here, unless he's going to say the

8    settlement agreement is not effective and they've got to

9    give it back to us, they have legal title to the tax lien.

10          Okay?  Already paid.  Okay, so the only claim

11   taxes outstanding right now, are the '22 and '23, based upon

12   the claim.  Yes, the Debtor went in and got some tax lien

13   loans.  Those were a direct result of the actions of the

14   National Bank of Kuwait.  Now, the other thing he failed to

15   tell you is that yes, the Debtor was given more time last

16   year to put together a plan to buy it out.  The Debtor had

17   two people, two entities, that were willing to fund the

18   plan.  They needed documents for the National Bank of

19   Kuwait.

20          On the Thursday night before the foreclosure, it

21   was on July 4th -- actually was on July 5th -- they get an

22   email saying we'll get these documents to you the next day.

23   So, the Friday before the foreclosure is the first time, the

24   first time that the National Bank of Kuwait complied with

25   this agreement to give to the Debtor loan documents to buy

1    the loan.  Well, just surprise, surprise, the lender said,

2    we don't have enough time.  This is July 4th weekend.  We

3    can't get this done that quickly.  But they were available.

4    They went to a mediation later on in July.  There was

5    another person that was willing to pay the bank off.  The

6    bank has refused to take any of this and to cooperate in any

7    form or fashion.

8         What you're going to also hear is testimony that

9    the National Bank of Kuwait refused to approve any leases at

10   all, even though they've been sent to the National Bank of

11   Kuwait.  They gave an oral approval to this company called

12   Sonder that was going to take one or two floors, and then

13   when the Debtor went back and tried to get some tenant

14   improvements, the National Bank of Kuwait came back, oh, you

15   didn't get that approval in writing, so you're in default.

16   That's how they started off posting the property for

17   default.  They gave him an oral approval, then they said,

18   oh, well, that wasn't in writing.

19        Okay.  Now, the Debtor has got -- the Debtor has

20   done a remarkable job, which you'll hear in his testimony

21   that the building right now has leases for about 70 percent

22   of the building.  Okay?  The tenants are not all payment

23   because they are tenant improvements, rent concessions.

24   They're involved in the actual payment of rent.

25        The monthly operating report, we submitted it,

```
 1    does have it, but the tenant improvements and the rent
 2    concessions are going to fall out after three to six to nine
 3    months over a period of time, different ones.  Plus, Mr.
 4    Choudhri has got another prospective tenant, Regis, which
 5    wants to come in and take two floors.  Another prospective
 6    tenant which is a -- it's a group involved with the Dole
 7    pineapple, Dole family, that wants to take another floor or
 8    at least a significant part of it.
 9            They have got -- he's done an incredible job of
10    getting this building leased.  He took -- he bought the
11    building.  His company bought the building when Blue Cross
12    Blue Shield was in.  It was in -- the building was in very
13    bad shape.  It was built about 40 years ago by IMK, one of
14    the two buildings in Houston was designed by IMK.  He bought
15    it.  Blue Cross moved out, almost an empty building.
16            He got the building back up to 91.5 percent
17    occupancy.  Okay.  Unfortunately, Stage Stores was in there,
18    had a large part of it.  They filed bankruptcy.  He tried to
19    buy the company out of bankruptcy.  Was not able to, but
20    Stage Stores moved completely out.  He's now got the
21    building back.  Okay?  And with regard to the claims out
22    there, we do have some potential attorneys up in Dallas that
23    are willing to take it on a contingency basis.  Haven't
24    finalized it yet, but a conversion of this case to Chapter 7
25    makes no sense.
```

1        Who benefits?  The National Bank of Kuwait.

2    They're the only ones that benefit.  What's going to happen,

3    the Chapter 7 Trustee's going to (indiscernible) the

4    property back to the National Bank of Kuwait.  They're going

5    to want to sell the claims.  They're not going to pursue

6    them.  They'll want to sell.  And this Court's well aware of

7    people who come in and make offers.

8        We think that at this point in time, putting a

9    chief restructuring officer in place, we can address all

10   these issues (indiscernible), can help dramatically and put

11   in place a system where you got an independent fiduciary

12   overlooking all these things, being able to report back to

13   the Court and give the Debtor a chance to do this because

14   what the National Bank of Kuwait has done -- and I'm pretty

15   astounded at the things they have done in this case over the

16   last couple of years to try to get this property back.

17       They haven't tried to cooperate with the Debtor.

18   They've taken every step to try to get a foreclosure going.

19   If they had really wanted to try to settle this thing, when

20   the deal -- when the Debtor was given an additional 90 days

21   in March or April, the Debtor started making requests for

22   the loan documents so they could sell the loan and get

23   somebody to take it over.  They made the request for three

24   months.

25       They got a draft of a document the Friday before

1   foreclosure, and even said it was subject to the approval of

2   the National Bank of Kuwait.  That kind of lender putting

3   millions and millions and millions of dollars in over the

4   (indiscernible).  So, Your Honor, we don't think it's a

5   benefit to anybody at all but the National Bank of Kuwait,

6   because that helps get them out of the litigation.

7        We think that they should be extremely concerned

8   about the litigation that's going on, because of the bad

9   things they've done.  And so we have agreed to move forward

10  to get a chief restructuring officer put in place.  We got a

11  plan.  Projections are going to get put on the plan.  We've

12  got the -- Mr. Norris who has looked at all the financial

13  projections who can testify that based on his review of all

14  the financial information, there's plenty of money to make

15  this plan work.  We can put together a confirmable plan.

16       We ask you deny the motion (indiscernible), Your

17  Honor.  Thank you.

18       THE COURT:  All right.  Mr. Fitzmaurice, you have

19  a witness to call?  You want to make --

20       MR. SATHER:  May I, Your Honor?

21       THE COURT:  Sure, go ahead.

22       MR. SATHER:  Stephen Sather for 2425 WL, LLC.  You

23  know, it's a nice building.  I can see why the bank would

24  like to own it.  But what we're looking at, the remedy

25  requested of conversion to Chapter 7, does not ensure that

1    there is a "responsible adult in the room" running things,

2    because Chapter 7 Trustees don't operate office buildings,

3    and given the fact that the bank has an appraisal showing

4    that they are under secured, a Trustee would not operate

5    that building.  And so, if we are wanting to keep the

6    company operating, we need to remain in Chapter 11.

7           And with the ad valorem taxes, there is a discreet

8    amount that is accruing in interest every month that can be

9    -- provide the adequate protection for, and with respect to

10   the fact that they didn't pay the '23 taxes, they're

11   prepetition taxes.  They couldn't pay them after the case

12   was filed.

13          You know, this is a case where there's been a plan

14   filed in less than 60 days.  The appropriate remedy is to

15   accept Mr. Baker's suggestion of employing a chief

16   restructuring officer and giving him as much power as

17   necessary, letting the plan process play out.

18          THE COURT:  Ms. Whitworth.

19          MS. WHITWORTH:  Thank you, Judge Norman.  Jana

20   Whitworth on behalf of the United States Trustee.  Your

21   Honor, my instructions from my client are to listen and

22   learn today.  I will let the Court know that the Trustee is

23   very, very concerned about the appearance of a fiduciary --

24   independent fiduciary on behalf of the Debtor.  There's

25   money flowing through all the different entities that are

1   it's not been explained.  I've been working with Mr. Baker

2   to get documents.  I'm still waiting on an accounting on

3   property management company who also happens to be a tenant.

4        The other issue that my client is concerned about

5   is feasibility.  If you look at the numbers, the Debtor

6   testified and the schedules reflect the value of this

7   property is $18 million more or less at this point.  Based

8   upon the documents that are on file from this case and the

9   case before, you've got secured claims totaling over $67

10  million and insider claims of $34 million.

11       So, we have questions about that and we're not

12  taking a position at the beginning of testimony, but I did

13  want to make an opening to let the Court know what my

14  client's biggest concerns --

15       THE COURT:  Ms. Whitworth, I would say this.  You

16  probably know more about the case at this juncture than I

17  do, so hopefully by the end of evidence, you'll be able to

18  make that recommendation.  Thank you.

19       MS. WHITWORTH:  Thank you, Your Honor.

20       THE COURT:  Anyone else want to say anything?  All

21  right.  Mr. Fitzmaurice, call your first witness.

22       MR. FITZMAURICE:  Thank you, Your Honor.  National

23  Bank of Kuwait calls Dward Darjean.

24       THE COURT:  Mr. Darjean, you want to come forward,

25  please?  Come to the podium, sir.  I'll swear you in.  Want

1    to make sure you correctly -- giving the correct spelling of

2    your name.  Please raise -- stand in front of the microphone

3    right there.  Please raise your right hand.  Do you swear or

4    affirm to tell the truth, the whole truth, and nothing but

5    the truth, so help you God?

6              THE WITNESS:  Yes.

7              THE COURT:  All right.  Spell your name for the

8    record, sir.

9              THE WITNESS:  D-W-A-R-D, last name, D-A-R-J-E-A-N.

10             THE COURT:  Thank you very much.  Please be

11   seated.  Mr. Fitzmaurice, you can begin your examination.

12             MR. FITZMAURICE:  Thank you, Your Honor.

13             THE COURT:  Are you going to be projecting from

14   that podium?

15             MR. FITZMAURICE:  Your Honor, I understood that

16   Your Honor controls.

17             THE COURT:  I do, but I just wanted to turn on, if

18   you want to project from over there.

19             MR. FITZMAURICE:  I'm happy just to --

20             THE COURT:  Okay, fine.  Go ahead.

21             MR. FITZMAURICE:  Thank you, Your Honor.

22             THE COURT:  (indiscernible).

23             MR. FITZMAURICE:  Thank you, Your Honor.

24                  DIRECT EXAMINATION OF DWARD DARJEAN

25   BY MR. FITZMAURICE:

1    Q    Good morning, Mr. Darjean.

2    A    Good morning.

3    Q    Do you have a position with the Debtor, sir?

4    A    Yes.

5    Q    Are you the manager?

6    A    Yes.

7    Q    Are you the property manager for the property located

8    at 2425 West Loop South?

9    A    Yes, sir

10   Q    Is there a difference, in your mind, between being the

11   manager of the property and being the manager of an entity

12   that owns the property?

13   A    I would say yes.

14   Q    And what is that difference?

15   A    Being a property manager is more hands on.  Being the

16   manager and the representation of the Debtor is a higher

17   level.  That's my best explanation.

18   Q    Thank you, sir.  As the manager of the debtor, do you

19   have any specific duties and responsibilities?

20   A    I don't -- I can give examples, yes or no, if you have

21   any specific scenarios for me.

22   Q    Well, you work for the Debtor?  Are you employed by the

23   Debtor?

24   A    No, sir.

25   Q    You're employed by Jetall, right?

1   A     Correct.

2   Q     And that's the Mr. Choudhri's company?

3   A     Correct.

4   Q     And on behalf of Jetall, you do some work at the

5   Debtor's property, right?

6   A     Correct.

7   Q     And then you do some work at other properties that

8   Jetall manages that are owned by Mr. Choudhri?

9   A     Correct.

10  Q     You agree -- would you agree with me that you actually

11  work for Mr. Choudhri?

12  A     Yes.

13  Q     You signed the Debtor's petition in this case, correct?

14  A     Yes.

15  Q     And you signed the schedules and statement of financial

16  affairs that are filed here?

17  A     Yes.

18  Q     Okay.  And you also filed a proof of claim that Jetall

19  -- you also signed, excuse me, the proof of claim that

20  Jetall filed in the first bankruptcy case, right?

21  A     Yes.  I think -- yes.

22  Q     And you also signed the proof of claim for 2425 WL LLC

23  entity, the second lien lender in the first case, right?

24  A     In the first case, that was months ago.  If I take a

25  look at it, I can verify if I did.

```
 1              MR. FITZMAURICE:  Your Honor, this should be
 2   Document 87-17.
 3              THE COURT:  Generally, I don't present your
 4   exhibits.  I'll do it for you this time, but next time, you
 5   need to present them yourself.
 6              MR. FITZMAURICE:  I apologize, Your Honor.  I
 7   misunderstood how the -- what the procedure was.  I
 8   understood that there was -- that the Court controls --
 9              THE COURT:  No.
10              MR. FITZMAURICE:  -- the exhibits.
11              THE COURT:  87, what?  Eighteen?
12              MR. FITZMAURICE:  87-17.
13   BY MR. FITZMAURICE:
14   Q    Sir, do you see in front of you the proof of claim for
15   2425 WL LLC?
16   A    Yes.
17   Q    And you see your name on there where it says -- where,
18   your name down there at the bottom as the person signing on
19   behalf of the entity?
20   A    Yes.
21   Q    Okay.  How much time do you spend at each of the
22   various properties that you manage?
23   A    This particular, 2425, the past few months I've been
24   spending about 70 to 75 percent of my time there.
25   Q    How about prior to that?
```

1    A    Prior to that, it was a little less.

2    Q    Do you recall telling me when you testified in the

3    first case that you spent about a third of your time at 2425

4    and a third of each of the other two properties that you --

5    A    Yes, sir.  Yes.  That's what I just -- yes.

6    Q    And that was in September, right?

7    A    I believe so, yes.

8    Q    Okay.  How do you avoid conflicts in your job between

9    various entities that you work for, various properties that

10   you manage?

11   A    We never had any issues.

12   Q    How do you know that the amount Jetall asserted as a --

13   in its proof of claim was the right amount?

14   A    I looked at some documents and that was my best guess

15   that it was correct.

16   Q    Your best guess that it was correct?  What documents

17   did you look at?

18   A    In the first bankruptcy, whatever was submitted.  I

19   looked at all those documents.

20   Q    What documents did you look at to satisfy yourself that

21   Jetall was owed $2.4 million by the Debtor?

22   A    There were just discussions about where that dollar

23   amount came from.

24   Q    Discussions with who?

25   A    The attorney back then, Mrs. Hayward.

1   Q    Ms. Hayward?

2   A    Correct.

3   Q    Do you have any idea Ms. Hayward knew what the right

4   amount was of the Jetall claim?

5   A    We spent a lot of time going over everything.

6   Q    Well, that's what I'm trying to figure out, sir.

7   What's the "everything"? What are the things that you went

8   over to determine in your own mind on behalf of Jetall that

9   $2.4 million claims was appropriate?

10  A    All of the financials, all of the projections and

11  everything.  We worked hand in hand with Mrs. Woodward --

12  I'm sorry, Mrs. Hayward.

13  Q    You can't identify for me a single document that you

14  reviewed that supports the $2.4 million claim, can you?

15  A    It was a few months ago.  I mean -- I'm sorry.

16  Q    In this case, the Debtor scheduled a claim for Jetall,

17  right?

18  A    Can you repeat?

19  Q    Sure.  In this case, the Debtor's schedules include a

20  claim for Jetall, correct?

21  A    I believe so, yes.

22  Q    Okay.  So what'd you do to satisfy yourself that that

23  claim was valid?

24  A    Basically same process with Mr. Baker.

25  Q.   So, you convinced yourself on behalf of Jetall that

1    $2.4 million was the right claim when you filed it in the

2    first case.  And then you convinced yourself on behalf of

3    the Debtor that $2.4 million was the right amount to

4    schedule in this case?

5    A    I don't really understand that question as far as me

6    convincing myself.

7    Q    Sure.

8    A    I don't want to say anything inappropriate.

9    Q    No, I understand.  I definitely don't want that either,

10   sir.  When you filed the proof of claim, the claim is filed

11   under penalty of perjury, correct?

12   A    Correct.

13   Q    All right, so you've got to satisfy yourself that the

14   $2.4 million claim you file on Jetall's behalf was in fact

15   appropriate, right?

16   A    Yes.

17   Q    And you did something to convince yourself that that

18   was the case, right?

19   A    Like I testified, yes.

20   Q    Okay.  And the schedules that that the Debtor filed

21   that you signed are also signed under penalty of perjury,

22   correct?

23   A    Yes.

24   Q    Okay.  And you did something, again, to convince

25   yourself that you could actually make that determination

1    under penalty of perjury, that this claim was in fact a

2    valid claim that Jetall had against the estate, correct?

3    A    With the assistance of counsel, yes.

4    Q    Okay. And what I'm trying to figure out is, was there

5    different information that you looked at on behalf of Jetall

6    than the information that you looked at on behalf of the

7    Debtor?

8    A    I don't remember exactly.  Like I said, the first case

9    was months ago and I never really drew a correlation between

10   the first case and this case.  We just sat down with the

11   attorneys, single process.  But if I did the exact same

12   thing or something different, I don't recall.

13   Q    You understand that Jetall received $118,000 from the

14   Debtor in November 2023, right?

15   A    I believe that's true and correct, but I don't handle

16   the finances myself.  So it's not a transaction that I

17   personally witnessed or had anything to do with.

18   Q    Well, but you signed the Debtor's statement of

19   financial --

20   A    Correct.

21   Q    -- affairs.

22   A    Correct.

23   Q    Which includes those payments.

24   A    Correct.

25   Q    Who approved those payments on behalf of the Debtor?

1   A    We have an in-house bookkeeper perhaps, but she works a

2   similar capacity as I do for Jetall.

3   Q    Right, so she also works for Jetall?

4   A    Correct.

5   Q    Right, so Jetall approved the payments to itself?

6   A    I don't have the answer specifically for that.

7   Q    And can you tell me who, looking out solely for the

8   Debtor's interest, approved the payments to Jetall?

9   A    I wasn't involved in that.

10   Q    Is there any person that you know who looks out solely

11   for the Debtor's interest?

12   A    Specifically what type of interest for the Debtor?

13   Q    Is there any person who is only interested in

14   protecting the Debtor's interest as opposed to someone who

15   also works for Jetall or the second lien lender or at one of

16   Mr. Choudhri's other properties?

17   A    Mr. Choudhri.

18   Q    Mr. Choudhri works at -- he owns Jetall, right?

19   A    Yeah, but you were asking about the Debtor's interest.

20   Mr. Choudhri looks out for the Debtor's interest.

21   Q    But he also owns Jetall, correct?

22   A    Yes.

23   Q    And he also ultimately owns the other properties that

24   you work at for Jetall, correct?

25   A    Yes.

1   Q    And he also ultimately owns the 2425, the second lender

2   as well, correct?

3   A    That's a little complicated.  I think there was some

4   testimony as far as ownership, but -- yeah, I don't want to

5   misspeak.

6   Q    As far as you know, who owns the second lien lender?

7   A    I would say that the organizational chart that was

8   submitted in this case would be correct.

9   Q    So, I want to make sure that -- I think we're talking

10  past each other, and I just want to make sure.  I apologize

11  for asking bad questions.  Gallery 2425 Owner LLC is the

12  Debtor here, correct?

13  A    Yes.

14  Q    That entity is owned by the JV entity, correct?

15  A    I believe so, but -- yeah, the organizational chart

16  reflects it.

17  Q    So, I am not talking about that.

18  A    Okay.

19  Q    I am talking about the prior owner of the building that

20  sold the building to the Debtor and that has a second lien

21  loan on the property.

22  A    Yes, that's represented, I believe, by Mr. Sather.

23  Q    Exactly right.  That's the entity that I'm talking

24  about.

25  A    Okay.

```
1    Q    And so my question is, who owns that entity?

2    A    I -- legally, I don't know if I could make a conclusion

3    about that.

4    Q    You filed a proof of claim on that entity's behalf,

5    right?

6    A    Yes, sir.

7    Q    We just looked at that, right?  And you don't know

8    who's in charge?

9    A    I -- it was the organizational chart that was

10   submitted.  I agree with the organizational chart.

11   Q    Okay, but this entity is not in the organizational

12   chart, right, because it's not part of the Debtor's

13   ownership structure, right?  This is an entity that sold the

14   building to the Debtor, right?

15   A    Yes.

16   Q    So, it's not in the ownership structure, right?

17   A    Yes.

18   Q    And it's not part of the chart, right?

19   A    Okay.

20   Q    And it has a second lien on the property, correct?

21   A    Correct.

22   Q    About 25 million principal amount, something like that?

23   A    Correct.

24   Q    Okay.  And you filed the proof of claim in the first

25   case on behalf of that entity, correct?
```

1   A      I believe so, yes.

2   Q      Okay.  And we actually -- that's what we just looked

3   at, correct?

4   A      Yes.

5   Q      Who told you to do that?

6   A      I work hand in hand with the attorneys on everything.

7   We went through everything.  I didn't make any decisions on

8   my own without counsel, so --

9   Q      How did you know that claim was valid?

10  A      What do you mean?  There were documents.  There's -- I

11  sat down and I put my eyes on all the documents.

12  Q      Is your understanding, the Debtor has not paid property

13  taxes in five years?

14  A      I wouldn't agree with that.

15  Q      Did the Debtor pay taxes in 2019?

16  A      There was testimony earlier about the years 2020 and

17  2021, alternative arrangements that were made for taxes.

18  Q      So, I'll have to quibble with you a little bit, sir.

19  There hasn't been any testimony today except for yours.

20  You're (indiscernible) witness, correct?

21  A      Sorry.

22  Q      The Debtor did not pay 2019 taxes, correct?  Those

23  taxes were paid by somebody else and the Debtor obtained a

24  loan for that amount, correct?

25  A      I would agree with that, yes.

1    Q    Okay.  And the same for 2020?

2    A    Yes.

3    Q    And the same for 2021?

4    A    I believe so, yes.

5    Q    And the Debtor has not made any payments on account of

6    those loans, correct?

7    A    Personally, I'm not in a position to say yes or no.

8    I'm not sure.

9    Q    And the 2022 taxes are still outstanding, correct?

10   A    I believe so, yes.

11   Q    And those amounts continue to accrue interest?

12   A    I believe so, yes.

13   Q    Do you have any idea how much is outstanding on the

14   2022 taxes?

15   A    Not off the top of my head.

16   Q    If I told you about a million dollars, does that sound

17   right?

18   A    Not sure.

19   Q    Okay.  And the 2023 taxes are due today, correct?

20   A    I would -- yes.

21   Q    And they haven't been paid, right?

22   A    I don't think so.

23   Q    When the Debtor acquired the subject property, it took

24   out a loan from National Bank of Kuwait, correct?

25   A    Was I present at that time?

```
1    Q    Do you know whether that's true?

2    A    I believe so, yes.

3    Q    Okay.  And do you know if that loan was about $51

4    million?

5    A    Sounds correct.

6    Q    And at some point, the Debtor -- sorry.  Withdrawn.  Do

7    you know what the payment terms of that loan are?

8    A    I've seen, but I'm -- it's not something that I focus

9    on.

10   Q    Well, let me ask you specifically.  Do you know whether

11   during the term of the loan, the Debtor was required to make

12   interest only payments?

13   A    I do not know.

14   Q    Okay.  Do you know whether the Debtor at some point

15   defaulted on his payment obligations to the bank?

16   A    I do now know.

17   Q    Are you aware of the Debtor making any payments to the

18   bank?

19   A    I believe there were payments made.

20   Q    Okay.  When were they made?

21   A    Regarding to -- in regards to the loan itself, I'm not

22   sure.

23   Q    Can you recall any single payment being made to the

24   bank on account of the loan?

25   A    Again, I don't handle finances in this particular case.
```

1   I don't know.

2   Q    Who does handle the finances?

3   A    What timeframe are we referring to?

4   Q    Fair question.  Let's talk about during the 2018 to

5   2020 timeframe.

6   A    I would not know the answer to that.

7   Q    Okay.  When did you first become involved with the

8   Debtor?

9   A    I was working for Mr. Choudhri when he acquired the

10  property.

11  Q    So, I think that's a little bit of a different -- think

12  that's an answer to a little bit of a different question.

13  But we can go with that.  Do you recall when Mr. Choudhri

14  first acquired the property?

15  A    I think it was 2012.  I think.  Somewhere around there.

16  Q    And that was through an entity that's other than the

17  Debtor, correct?

18  A    I don't recall.

19  Q    Did you have a role of any kind with that entity?

20  A    No.

21  Q    Were you involved in managing the property at that

22  time?

23  A    Yes.

24  Q    And are you aware that at some point in 2018, the

25  property was sold from one business that Mr. Choudhri owns

1  to the Debtor, which is another business that Mr. Choudhri

2  owns?

3  A     I've seen some documents, yes.

4  Q     And was it at that point that you said you first became

5  involved with the project?

6  A     No, not in 2018.  No, sir.

7  Q     When did you first become involved with the property?

8  A     Like I mentioned, I was working for Mr. Choudhri at the

9  very beginning when he acquired the property.

10  Q     Right, but then I asked you if you had any role at the

11  -- when you were managing the property and you said no.  So

12  what I'm trying to figure out is when did you first get

13  involved in managing the property (indiscernible)?

14  A     Okay, I think I -- if I misunderstood the question, I'm

15  sorry.

16  Q     It probably was a bad question, so I apologize.

17  A     I think what I was referring to was in 2018, I was not

18  -- I was not affiliated with the property.

19  Q     So, when did you first become affiliated?

20  A     I rejoined the organization in 2022.

21  Q     So, you said rejoined the organization?

22  A     Yes.  I came back to work for Jetall in 2022.

23  Q     So, there was a prior period of time where you worked

24  for Jetall and you stopped and you came back?

25  A     Correct.

```
 1   Q    Thank you.  So, when did you stop?

 2   A    2018.

 3   Q    Why did you stop?

 4   A    I was engaged at the time and my fiancée had a

 5   restaurant.  She became ill.  Subsequently passed away.

 6   Q    I'm sorry for your loss.

 7   A    I opened up a second location and I spent a few years

 8   grooming my stepson to take over the restaurant and he's

 9   done that.

10   Q    That's fantastic.  I'm sorry for your loss.

11   A    Thank you.

12   Q    So, what caused you to come back to work for Jetall?

13   A    As soon as my stepson had a grasp on the restaurants, I

14   was comfortable.  I have a long history working for Mr.

15   Choudhri.

16   Q    Did you previously work for his father as well?

17   A    Yes.

18   Q    And this was 2022 that you came back to the property?

19   A    Correct.

20   Q    Okay.  And what did you -- what were your duties and

21   responsibilities when you came back in 2022?

22   A    My official title is operations manager.

23   Q    What does that entail?

24   A    Property maintenance, tenant relations, basically

25   making sure that the tenants are happy.
```

1          MR. FITZMAURICE:  So, Your Honor, I'm at a point

2    in time where I want to go through a number of exhibits with

3    the witness understanding -- can I just take a minute to get

4    myself set up over here?

5          THE COURT:  Just plug in over here and I'll turn

6    it on and you can pull up the document and start presenting.

7          MR. FITZMAURICE:  Thank you, Your Honor.

8          (Pause)

9          MR. FITZMAURICE:  Thank you, everyone, for your

10   indulgence while --

11         THE COURT:  No problem.

12         MR. FITZMAURICE:  -- work through our issues.

13   BY MR. FITZMAURICE:

14   Q    Mr. Darjean, do you recall that in the first bankruptcy

15   case, the Debtor submitted a projection of its rental

16   income?

17   A    It looks to be -- yeah, it looks to be.  Yes.

18   Q    And that projection estimated that for October,

19   November, and December, the Debtor would receive $229,579.02

20   in rental income for each month?

21   A    Yes, that's what the document says.

22   Q    Okay.  Do you recall what the Debtor actually received?

23   A    Not off the top of my head.

24   Q    Do you know how this document was prepared?

25   A    Several people worked on it.

1    Q    What was prepared from the Debtor's books and records?

2    Was it prepared from the Debtor's books and records?

3    A    I believe so, but -- yeah, several people worked on

4    this document including myself.

5                MR. FITZMAURICE:  So, Your Honor, we move for the

6    admission of -- this is one page of a larger exhibit. We're

7    actually only interested in this one page.  So, we move for

8    the admission of just this --

9                THE COURT:  87-24, is that correct?

10               MR. FITZMAURICE:  87-24, Your Honor.

11               THE COURT:  Page 1?

12               MR. FITZMAURICE:  Page 1.  Any objections to 87-

13   24-1 -- or Page 1, excuse me.

14               MR. BAKER:  No, but I think there may be -- well,

15   I do on the perspective this has got 21 pages and those

16   pages may help give some further explanation to the rental

17   income, because I believe there's information in here --

18               THE COURT:  If you want optional completeness, if

19   you want the entire document admitted, I'm happy to do that,

20   Mr. Baker.

21               MR. BAKER:  Yes. I --

22               MR. FITZMAURICE:  No objection.

23               THE COURT:  All right, then let's do that.  I'll

24   admit 87-24.

25               (Exhibit 87-24 entered into evidence)

```
 1              THE COURT:  Let me do one thing real quick.  It

 2   seems to me that this here is going to go on quite a while

 3   and I'd like to give you guys as much time as humanly

 4   possible this afternoon.  That means me trying to move back

 5   my flight to a later flight.

 6              Let me step down from the bench and see if I can

 7   staff work on that and that way I don't have to cut you off

 8   in 30 minutes and bring you back tomorrow at one.  You may

 9   have to come back at one anyway, but at least if I can do,

10   like, three o'clock rather than 12:30, we'll be better off.

11   So, I'm going to step down for two minutes, see what they

12   can do.  I'll be right back.  All right?

13              MR. FITZMAURICE:  Appreciate that, Your Honor.

14   Thank you.

15              CLERK:  All rise.

16              (Recess)

17              MR. FITZMAURICE:  Back on, Your Honor?

18              THE COURT:  Go ahead.

19              MR. FITZMAURICE:   Thank you.

20   BY MR. FITZMAURICE:

21   Q    So Mr. Darjean, we were just looking at the profit and

22   loss or projected income that the Debtor submitted in the

23   first case.  Do you recall that?  You recall that?  Okay, so

24   now, let's look at the profit and loss report the Debtor

25   submitted in this case, referring to Document 87-39.  You
```

1   recognize this document, sir?  Does this first page appear

2   to be a balance sheet for the Debtor?

3   A    Yes, sir.  I've seen it.

4   Q    Okay.  And scroll down to the next page.  The balance

5   sheet continues.  And then I want to ask you questions about

6   the third page.  You recognize this to be profit and loss

7   report for the year 2023 that the Debtor submitted in this

8   case?

9   A    I believe yes.  I've seen it.

10   Q    All right.  And for October, it reflects rent income of

11   $97,530.08, correct?

12   A    Correct.

13   Q    And that's much less than Debtor was projecting during

14   Galleria 1, first bankruptcy case, correct?

15   A    I would say so, yes.

16   Q    Okay.  And for November of 2023, rental income was

17   $121,985.11.  Do you see that?

18   A    Yes.

19   Q    Also much less than what was originally projected,

20   correct?

21   A    Yes.

22   Q    And the same for -- I don't need to read out the

23   numbers, but the same for December of 2023, correct, that

24   rental income was much less than expected, right?

25   A    Much less.  Yes.

```
 1   Q     Thank you.  So sir, you signed the -- I think we talked
 2   about this, so apologize if I'm going over old ground.  You
 3   signed the Debtor's schedules and statements of financial
 4   affairs in this case, correct?
 5   A     Yes.
 6   Q     Okay.  My colleague is pulling it up.  We're going to
 7   show you -- we're going to show those to you now.
 8             MR. FITZMAURICE:  Sorry, Your Honor.  I apologize.
 9   I moved off too quickly.
10             THE COURT:  87-39 (indiscernible), if that's what
11   you're --
12             MR. FITZMAURICE:  Yes, and -- for admission of
13   that, Your Honor.
14             THE COURT:  Any objection to 87-39?  Mr. Baker?
15             MR. BAKER:  I thought 87-39 was the balance sheet.
16   That's not what you got.
17             MR. FITZMAURICE:  That's the first page.  It's the
18   balance sheet and then it's this profit and loss.
19             MR. BAKER:  I don't have an objection to the
20   balance sheet.  I'm not -- was that profit and loss attached
21   to it?
22             MR. FITZMAURICE:  Yes.
23             MR. BAKER:  It was filed?
24             MR. FITZMAURICE:  It was filed in (indiscernible).
25             MR. BAKER:  Okay.  No objection.
```

1          THE COURT:  It's admitted and thank you.

2          (Exhibit 87-39 entered into evidence)

3     BY MR. FITZMAURICE:

4     Q    Sir, you have in front of you a document that includes

5     the Debtor's schedules and statement of financial affairs.

6     Do you see that?

7     A    Yes.

8     Q    And then all the boxes are checked -- that are checked

9     there, those are the documents that appear after this first

10    page, right?

11    A    Yes.

12    Q    Okay.  And these documents are signed by you under

13    penalty of perjury, correct?

14    A    I see my signature on this page, yes, sir.

15    Q    And you see across the top, it says "Declaration Under

16    Penalty of Perjury"?

17    A    Yes, sir.

18    Q    And then above your signature, you see that it says, "I

19    declare under penalty of perjury the foregoing is true and

20    correct"?

21    A    Yes, sir.

22    Q    So, let's look at the -- let's look at the next page,

23    please, which is Official Form 204.  This is schedule of the

24    Debtor's 20 largest unsecured creditors.  Is that right?

25    A    Yes, sir.

1    Q    Why did the Debtor schedule Caz Creek Lending as an

2    unsecured claim?

3    A    With advice of counsel.

4    Q    Caz Creek Lending is the tax lien lender, right?

5    A    Yes.

6    Q    And so -- and the tax lien lender takes an assignment

7    of the tax lien from the taxing authority?

8    A    I can't speak on that.

9    Q    Okay.  Number 3, City of Houston.  You know why that's

10   filed as a -- I'm sorry, scheduled as an unsecured claim?

11   A    I don't.  It doesn't give a description, so I have to

12   look at the backup.

13   Q    Let's look at line number 11.  The Houston Community

14   College System indicates on the form here it's a tax lien.

15   You see that, sir?

16   A    Yes.

17   Q    You know why this one is scheduled as an unsecured

18   claim?

19   A    With the advice of counsel.

20   Q    How about number 12, the Houston Independent School

21   District.

22   A    Same.

23          THE COURT:  Hold on one second.

24          I'm sorry, go ahead.

25          MR. FITZMAURICE:  Thank you, Your Honor.

1          THE COURT:  I was able to push my flight back, so

2     we'll be able to go (indiscernible).

3          MR. FITZMAURICE:  Thank you, Your Honor.  I'm sure

4     on behalf of all the parties, we appreciate Your Honor's

5     accommodation.

6     BY MR. FITZMAURICE:

7     Q    Looking at Line 15, now the claim is disputed.  That's

8     -- I'm not going to ask you about that, but these are for

9     the tax liens, right, the Mr. Choudhri acquired in that

10    order, signed, the National Bank of Kuwait under the

11    settlement agreement between the parties, right?

12    A    I'd have to look at the backup documents as to exactly

13    where those numbers came from.

14    Q    Well, at least that's what's indicated --

15    A    That's what it says.  Yes.

16         MR. FITZMAURICE:  So, I'm going to ask my

17    colleague to scroll through this document to the Schedule

18    E/F, creditors who have unsecured claim, Page 2 of 10.

19    Okay, thank you.

20    BY MR. FITZMAURICE:

21    Q    So, do you see there, sir, Section 3.3 lists Mr.

22    Choudhri?

23    A    Yes.

24    Q    And it's $6.7 million?

25    A    Correct.

1    Q    And it's indicated as additional amounts owed for tax

2    liens?

3    A    Yes.

4    Q    What's the basis of that claim?

5    A    I have to see the backup documents, but we went through

6    documents and came up with that number.

7    Q    Mr. Choudhri acquired the tax liens and transferred

8    them to the National Bank of Kuwait, correct?

9    A    I believe so.

10   Q    How could he be owed $6.7 million, then, on account of

11   those claims that he transferred?

12   A    Can I --

13   Q    Yes, please.  I'll ask it again.  I'm going to go back

14   to question just to make sure.  The tax liens that Mr.

15   Choudhri acquired, he assigned to the National Bank of

16   Kuwait, correct?  At least, that's what it indicates on the

17   page that we looked at a minute ago, right?

18   A    I believe that's what the document said, yes.

19   Q    So how is it that he could be owed $6.7 million on

20   account of tax liens that he transferred to the bank?

21   A    I don't know if that calls for a legal conclusion on my

22   part, but I'm not able to answer.  Like I said, we went

23   through documents and came up with that dollar amount.

24   Q    As you sit here today, you have no understanding of the

25   basis of this claim, correct?

1    A     I wouldn't say that, sir.

2    Q     What's the basis of the claim, then?

3    A     With the advice of counsel, we came up with this

4    document and those figures and we agreed that it was

5    appropriate.  If there was something that needs to be

6    amended, you know, I might get with counsel, but this is

7    what we agreed to.

8    Q     So, you declared under penalty of perjury that this was

9    correct because Mr. Baker told you to?

10   A     I don't do anything without converging everyone's

11   opinion as far as what's correct or not.

12   Q     Right, but this is $6.7 million that's scheduled as a

13   general unsecured claim that you affirmed under penalty of

14   perjury was true, meaning you have a basis to believe that

15   he was actually owed these amounts.  But as you sit here

16   today, you don't know why?

17   A     No, I agree with the document.  I signed off on it.

18   Q     And the basis of the claim is because counsel told you?

19   A     I guess I'm just not understanding the question as far

20   as what you're saying basis, and --

21   Q     Why does the Debtor owe Mr. Choudhri $6.7 million for

22   additional amounts owed for tax liens, as indicated in

23   Section 3.3 of the schedule?

24   A     Yeah, I definitely know that Mr. Choudhri would be a

25   better person to ask that question.

1    Q    Well, but you're the one who signed it.

2    A    I understand.

3    Q    And so I'm asking you why you believe under penalty of

4    perjury that the Debtor who you represent and work for owes

5    Mr. Choudhri $6.7 million on account of tax liens?

6    A    Those tax liens were mentioned earlier today, and I

7    believe that from everything that I've seen they're valid.

8    I believe this document is valid.

9    Q    So, the document indicates the tax liens that Mr.

10   Choudhri acquired were transferred to the bank, but somehow

11   the Debtor owes Mr. Choudhri $6.7 million on account of

12   those same tax liens, and both those things are true?

13   A    I don't know if that calls for a legal conclusion or

14   not.

15   Q    I'm asking -- I'm sorry.  I didn't mean to cut you off.

16   I apologize.  I'm asking you what you think.  I'm not asking

17   you to give a legal opinion or for legal advice.  I'm asking

18   you as a representative of the Debtor who signed this

19   document, if you believe that to be true, that both things

20   are true.  Mr. Choudhri acquired tax liens, transferred them

21   to the bank, and yet somehow he's still owed $6.7 million on

22   account of them, even though he doesn't own (indiscernible).

23

24   A    Still sounds like you're asking me to make a legal

25   conclusion that I'm not prepared --

1   Q    Why does the Debtor think it owes Mr. Choudhri $6.7

2   million?

3   A    We discussed the Caz Creek items before and there was a

4   tax lien.  Mr. Choudhri acquired those tax liens, but as I

5   mentioned before, this happened during a period of time when

6   I, you know, when I wasn't present.

7   Q    No, I'll agree with you, sir, that the Caz Creek loan

8   Mr. Choudhri's obtaining the benefit of those, acquiring

9   those tax liens, that happened prior to your involvement

10  with the Debtor.  I'll agree with you there.  And those tax

11  liens were assigned to the bank under the settlement

12  agreement between those parties, correct?

13  A    I have -- I don't believe I was present when all of

14  that happened.

15  Q    But again, at least that's what the schedule that we

16  looked at earlier says, correct?

17  A    I believe so.

18  Q    Okay.  And so your testimony is that you weren't there

19  for any of that, but you were there for this and you were

20  there to sign this document --

21  A    Yes.

22  Q    -- attesting that it was true, and what I'm -- and I

23  apologize that I keep asking the same question, but what I'm

24  trying to understand is, at the time that you filed it, why

25  did you believe that was true?

1    A     With corporate counsel discussion.

2    Q     So --

3    A     I didn't make the decision on my own.

4    Q     Which corporation?  You said corporate counsel.  What

5    company?  Who was the lawyer that gave you the advice?

6    A     For this particular document in this case?

7    Q     Yes, sir.  For this particular document.  Who is the

8    lawyer that gave you the advice that this was a legitimate

9    debt owed to Mr. Choudhri?

10   A     For this particular case that we're discussing today?

11   Q     This document which is an --

12         MR. BAKER:  Your Honor, I believe I'm going to

13   object to the extent this is -- he's asking for

14   communications with an attorney.  It's attorney-client

15   discussion.

16         THE COURT:  Not who gave the advice is not

17   privileged, no.  What the advice was is privileged, but who

18   gave it is not.  You may answer the question, sir.

19         THE WITNESS:  So, if it's regarding this

20   particular case and not the previous case, just the document

21   that I'm looking at, I would say when we worked with Mr.

22   Baker on it.

23   BY MR. FITZMAURICE:

24   Q     As far as you are aware, does Mr. Baker represent any

25   entities other than the Debtor that are affiliated with Mr.

1    Choudhri?

2    A    I'm not sure.

3              MR. FITZMAURICE:  So, I'm going to ask my

4    colleague to scroll back up into the document to the

5    Schedule D, creditors who have claim secured by property.

6    And the first page, Page 1.  (indiscernible), thank you.

7    BY MR. FITZMAURICE:

8    Q    You recognize this, sir?

9    A    Yes.

10   Q    And this is the -- for lack of a better description,

11   the list of all of the Debtor's secured creditors?

12   A    Yes.

13   Q    And so the first entity that's listed there is 2425 WL

14   LLC?

15   A    Yes.

16   Q    And it indicates there there's a -- that that entity

17   has a lien on real property owned by the Debtor/

18   A    Correct.

19   Q    And that's the property at 2425 West Loop South?

20   A    Correct.

21   Q    Okay.  There were other parties who assert a lien on

22   the property, correct?

23   A    Specifically?

24   Q    Does the bank of -- does National Bank of Kuwait assert

25   a lien against the same property?

1    A    I would believe so, yes.

2    Q    And does the -- does Caz Creek assert a lien against

3    the property by virtue of this tax lien?

4    A    I don't know.

5    Q    How about the taxing authorities?  Do they have

6    statutory liens against the property?

7    A    I don't know.

8    Q    Okay.  You see here on the bottom of the -- on the

9    bottom of this page, there's a question.  "Do multiple

10   creditors have an interest in the same property?"  Do you

11   see that, sir?

12   A    Yes.

13   Q    And you checked yes.

14   A    Yes.

15   Q    Okay.  And then next to yes, it says, "Specify with

16   respect to each creditor, a relative priority."  You see

17   that?

18   A    I see that.

19   Q    Okay. So does the Debtor think that 2425 WL LLC is the

20   first lien lender against the property?

21   A    I didn't say that.

22   Q    Isn't that what this says?

23   A    Well, I don't know if that number one instigates or

24   basically -- I don't have -- I don't have an answer for

25   that.  I mean, if there was a mistake made, then maybe we

1    can amend it.

2    Q    The form says, "Specify each creditor including this

3    creditor and its relative priority."  So, this form is

4    asking you for everybody who claims a lien against the

5    property, list them in the order of the priority of their

6    claims.

7    A    Correct.

8    Q    Okay.  And you listed 2425 WL first, the National Bank

9    of Kuwait second, Caz Creek Lending third, National Bank of

10   Kuwait again fourth, and then the taxing authority is after

11   that.  Do you see that?

12   A    Yes.

13   Q    You think that's correct?

14   A    I don't know.  I think the document's correct based --

15   yes.  I think it's correct.

16   Q    Just a couple more, sir.  You testified at the 341

17   meeting in this case?

18   A    Yes.

19   Q    And one of the questions that you were asked was

20   concerning the Debtor's authority to file this case; do you

21   recall that?

22   A    Yes.

23   Q    And do you recall there were questions about what --

24   about the existence of a corporate resolution.

25   A    Yes.

1  Q    And has that been provided to the U.S. Trustee's

2  Office?

3  A    It was provided to Mr. Baker.  I'm assuming that it was

4  provided.

5  Q    So, you gave Mr. Baker a corporate resolution that

6  authorized the filing of this bankruptcy case?  And I want

7  to be clear, not the first one, this one.

8  A    Yes.

9        MR. FITZMAURICE:  That's all I have, Your Honor,

10  thank you.

11        THE COURT:  Mr. Baker, you're up next.  I'm going

12  to step down for just the same two seconds to figure out

13  what they've done with my flight, how long we can go to, and

14  then deal with cascades of what that does with the rest of

15  my schedule.  I'll be back in less than five minutes.  Let's

16  just come back at 12:30.  Okay?  Thank you.

17        MR. BAKER:  Thank you, Your Honor.

18        CLERK:  All rise.

19        (Recess)

20        THE COURT:  All right, Mr. Baker, you're up.  And

21  just so the parties know, they put me on a very, very late

22  flight.  We're good until five o'clock.

23        MR. BAKER:  I'm going to reserve my questions

24  until I put him on on my case.

25        THE COURT:  That's fine.  Thank you.

```
 1              MS. WHITWORTH:  Your Honor, I have a couple of
 2    questions.
 3              THE COURT:  Sure, go ahead.  And I'll give Mr.
 4    Sather, too, if he's got questions.  You have questions?
 5              MR. SATHER:  I do.
 6              CROSS EXAMINATION OF DWARD DARJEAN
 7    BY MS. WHITWORTH:
 8    Q    Hi, Mr. Darjean.  I'm Jana Whitworth.  We met earlier
 9    in other cases.  It's good to see you again.
10    A    Yes, sir -- yes, ma'am, I'm sorry.
11    Q    It's okay.  I don't have the exhibits with me but I
12    think that Mr. Fitzmaurice showed you the proof of claim
13    that was filed by Mr. Choudhri in the prior case?
14              MS. WHITWORTH:  I believe it's -- if I can -- you
15    would indulge me?
16              MR. FITZMAURICE:  Yes --
17              MS. WHITWORTH:  I think it's your Exhibit I?
18    BY MS. WHITWORTH:
19    Q    The testimony earlier, and they showed you to the
20    schedules, that in this case, the Houston case, Mr. Choudhri
21    is scheduled as having a claim against the Debtor in his
22    individual behalf against the Debtor for $6,771,000.  Do you
23    recall that testimony?
24    A    Yes.
25    Q    And then there were a lot of questions asking about how
```

1  did you as the Debtor representative who signed off on those

2  schedules, how did you come up with that figure; do you

3  recall that --

4  A   Yes.

5  Q   -- testimony, Mr. Darjean?  You mentioned that you

6  looked at documents but you didn't really -- it might be my

7  notes are bad.  Please forgive me.  But was there a

8  management agreement between the Debtor or any sort of

9  agreement contracts or anything between Mr. Choudhri and the

10  Debtor to substantiate that 6.7 million?

11  A   I'm not sure.

12  Q   Okay.  Okay, so looking at this, this is the proof of

13  claim that was filed in the Victoria case by Mr. Choudhri.

14  You can see that.  Can you scroll up to the next page,

15  please?  Okay.  So, this shows a claim of $960,000.  Is that

16  correct?

17  A   That's what it shows, yes.

18  Q   Okay.  So that is a -- and go up one more if you don't

19  mind to show the signature page and the date of that claim.

20  So, that claim was October 31st of 2023, 690,000 or 960,000,

21  excuse me.  But less than 60 days later, the Debtor

22  schedules a debt owed to Mr. Choudhri individually of almost

23  $7 million.  Do you see the discrepancy?  Is there -- do you

24  know what happened between this time and the time that you

25  scheduled the 6,771,000.

```
 1   A    I see that Mr. Choudhri signed off on this document.

 2   Q    Sure.

 3   A    The document says what it says, but I believe that the

 4   dollar figure in this case was substantiated as well, so --

 5   Q    The 6,771,000?

 6   A    Yes.

 7   Q    You stand by that number on behalf of the Debtor?

 8   A    I -- yes, I believe until something else -- until I'm

 9   able to see that a mistake was made, but for right now, yes,

10   I agree with the document I signed off on.

11   Q    Okay, well, that leads me to my next question --

12   A    Yes, ma'am.

13   Q    -- and the concern that the Trustee has.  Is there

14   anyone on behalf of the Debtor who would take the initiative

15   and say these two things don't match up in a 60-day period.

16   There's no documents here.  There's no documents that you've

17   identified for the 6,700,000.  Who on behalf of the Debtor

18   is going to question that and file an objection to that and

19   dig deeper to make Mr. Choudhri produce evidence to

20   substantiate his claim against the Debtor?

21   A    I believe Mr. Baker mentioned earlier that we were in

22   agreement with getting a CRO to substantiate every --

23   Q    I'll ask you about that in a minute.  But as this case

24   stands today --

25   A    Yes.
```

1   Q    Who would stand up on behalf of the Debtor and question

2   them and demand evidence to substantiate?  Is there anyone?

3   A    I mean, we're talking about two different cases, two

4   different documents and -- but as far who, I haven't had a

5   chance to speak with counsel about this specific question,

6   so I'm not sure how to answer it.

7   Q    Okay.  And the same goes with Jetall.  There's a

8   difference in what was claimed in the Victoria case.  Again,

9   I don't have the exhibits because I didn't know this was

10  going to turn this way.  The exhibits show a certain amount

11  that was claimed by Jetall in the Victoria case.  Do you

12  happen to know how much Jetall claimed in the Victoria case,

13  Mr. Darjean?

14  A    Not off the top of my head.

15  Q    I believe they claimed, if I recall your testimony, it

16  was about 2,204,000.  Does that sound about right?

17  A    I believe so.

18  Q    Okay, so this was scheduled in this case is 2,329,000

19  which is an which is an increase, plus your earlier

20  testimony you talked about the SOFA, the statement of

21  financial affairs, there was a disclosure that in between

22  the first case and this case, 118,000 was paid out.  Is that

23  correct?

24  A    Yes, I believe I answered the question about that.

25  Q    Okay.  Now, I'm taking from mine, that I did all these

1    numbers here.

2    A    Yeah.

3    Q    So, the original claim was 2.2 and then other 2.2 that

4    was owed, 118,000 was paid, so you think that number would

5    go down, right?

6    A    I understand your point.

7    Q    And now there's an additional -- you know, it's that,

8    the number that's claimed in the schedules.  So my point is

9    these numbers don't match up, right?  There's questions.

10   So, who at the Debtor is going to go fight Jetall to make

11   them substantiate these claims?

12   A    I mean, the numbers weren't just made up --

13   Q    I'm not saying they are.  I'm just -- my concern is

14   there's discrepancies.  You would admit there's some

15   discrepancies.  There's questions.

16   A    I'm sure we can answer them.

17   Q    So, but my point is, who's going to ask those

18   questions?  Who's going to make an objection and request

19   that this be disclosed?

20   A    Like I said, my earlier point is that if you're asking

21   for today to get these questions answered, I have to confer

22   with Mr. Reese, but yeah, I just haven't had a chance to

23   speak with counsel regarding that specific question.

24   Q    So, the point that you're making, and correct me if I'm

25   wrong, is that at this point in time, there's really no

1    person to do that but you are suggesting that an independent

2    chief restructuring officer come in and you could make that

3    person -- you would give them the free rein to become the

4    fiduciary on behalf of the Debtor without ties to any of the

5    other entities; is that your point that you're making?  I

6    don't want to put words in your mouth.  This is your sworn

7    testimony.

8    A    Yes, we've had discussions on our side of doing just

9    what you described.

10   Q    Okay.  So, that leaves me -- the next question is, you

11   were in the courtroom and you heard about the questions

12   about who's paying Mr. Baker, right?

13   A    Yes.

14   Q    So, who -- if there's money that the Debtor can't pay

15   Mr. Baker's attorney's fees to administer the this case and

16   represent the Debtor, how can the Debtor afford a CRO?

17   A    I don't think this.  I have never had any issues with

18   items -- especially important items not getting paid.

19   That's just --

20   Q    What would be the source of the funds to pay -- you

21   understand, that a chief restructuring officer is going to

22   probably cost upwards of $100,000 for case like this.

23   A    Okay.  Yes.

24   Q    So where is the Debtor -- what is going to be the

25   source of funds for the Debtor?  Does the Debtor generate

1    sufficient funds and is your under secured creditors, the

2    taxing entities, the Bank of Kuwait, are they going to agree

3    to that?  How is this going to happen?

4    A    Mr. Choudhri would definitely be able to get into

5    details as far as the specifics as far as funding.

6    Q    Okay.  So you're just going to pass that to Mr.

7    Choudhri to testify as that issue?

8    A    Yeah, he -- that's -- it's more appropriate for him.

9    Q    Okay.

10             MS. WHITWORTH:  Those are all the questions I

11   have, Judge.  Thank you.

12             THE COURT:  All right, Mr. Sather.

13             MR. SATHER:  Did I do this correctly?

14             THE COURT:  You should be -- I have the podium

15   connected, so if you're all connected to the right -- there

16   you go.

17             MR. SATHER:  Is that right?  Okay.

18                CROSS EXAMINATION OF DWARD DARJEAN

19   BY MR. SATHER:

20   Q    Mr. Darjean, you were asked questions about my client

21   2425 WL LLC.  I'd like to direct your attention to Document

22   No. 95, the plan of reorganization filed in this case and

23   Paragraph 8.5.  You see where it says that -- sorry, I'm

24   having trouble -- that "the allowed secure claim of 2425 WL

25   LLC will be determined by the value of 2425 LLC's interest

1    in the collateral securing such allowed claim."  You see

2    that?

3    A    Yes.

4    Q    And then a little further below, it says "As such, and

5    because the respective tax authorities, tax lenders and NBK

6    hold a higher priority lien on the properties, the Debtor

7    believes that NBK's allowed secured claim will be an amount

8    equal to the difference between the value of the property,

9    less the outstanding property taxes and senior debt owed

10   with respect to property; the Debtor therefore believes that

11   2425 WL LLC is wholly unsecured."  You see that?

12   A    Yes.

13   Q    And when we were looking at the page of the schedules

14   earlier, did you notice that it referred to 2425 WL as a

15   second lien?

16   A    Yes.

17   Q    And a second lien is not a first lien, is it?

18   A    Correct.

19           MR. SATHER:  Pass the witness.

20           THE COURT:  Mr. Fitzmaurice?

21           MR. FITZMAURICE:  Briefly, Your Honor.

22           THE COURT:  Okay.

23           MR. FITZMAURICE:  Apologize, (indiscernible).

24           THE COURT:  It'll take a minute to connect.

25              REDIRECT EXAMINATION OF DWARD DARJEAN

```
1    BY MR. FITZMAURICE:

2    Q    So, this is the plan that counsel was just asking you

3    about.  Do you see that?

4    A    Yes.

5    Q    Okay.  The last sentence on Page 15 of 24, the end of

6    it.  Right?  "The claim of 2425 will be treated as a Class 6

7    general unsecured claim under the plan."  Do you see that?

8    A    Yes.

9    Q    And then if you look below, Section 8.6.  Do you see

10   that?

11   A    Yes.

12   Q    And that provides that Class 6 general unsecured claims

13   would pay 100 percent of the allowed amount in eight

14   consecutive equal quarterly payments; do you see that?

15   A    Yes.

16   Q    How is the Debtor -- how does the Debtor have the money

17   to pay 2425 WL LLC more than $25 million in eight equal

18   payments?

19   A    I've seen this document itself.  I didn't really

20   examine it 100 percent, but I have glanced at this document,

21   so I'm not prepared to answer.

22   Q    Does the Debtor have the ability today to pay 2425 WL

23   LLC $25 million over eight payments?

24   A    I don't know.  Possibly yes.

25   Q    Where does that money come from?
```

1    A    That's a question for Mr. Choudhri.

2              MR. FITZMAURICE:  Thank you.  Nothing further.

3              THE COURT:  Mr. Baker?

4              MR. BAKER:  I'm going to reserve my questions.

5              THE COURT:  Ms. Whitworth?

6              MS. WHITWORTH:  No further question, Judge.

7              THE COURT:  Mr. Sather?

8              MR. SATHER:  Nothing further.

9              THE COURT:  All right, thank you.  All right, you

10   can step down.  (indiscernible) may step down.  Mr.

11   Fitzmaurice, next witness.

12             MR. FITZMAURICE:  National Bank of Kuwait calls

13   Ali Choudhri.

14             THE COURT:  Mr. Choudhri, please come up to the

15   podium.  I will swear you in and you can be seated.

16   (indiscernible) the microphone there.  I'll swear you in.

17   (indiscernible) paperwork with you up there.  Thank you.

18   Please raise your right hand to be sworn.  Do you swear or

19   affirm to tell the truth, the whole truth, and nothing but

20   the truth, so help you God?

21             THE WITNESS:  Yes.

22             THE COURT:  Please be seated, sir.  Mr.

23   Fitzmaurice, you may proceed at your leisure.

24             MR. FITZMAURICE:  Thank you, Your Honor.

25             DIRECT EXAMINATION OF ALI CHOUDHRI

1   BY MR. FITZMAURICE:

2   Q    Mr. Choudhri, good afternoon.

3   A    Good afternoon.

4   Q    Mr. Choudhri, were you served with a subpoena to appear

5   here today on -- for National Bank of Kuwait?

6   A    I was not.

7   Q    You know, we tried to serve you with a subpoena, right?

8   A    No.  I became aware of that -- I became aware from a

9   tenant that somebody was trying to serve a subpoena at one

10  of my tenants' properties, but I was planning on being here

11  and I'm here.

12  Q    So, you're aware that we --

13  A    But I was not served and nobody attempted to serve me.

14  Q    You're aware that we twice asked Mr. Baker to accept

15  service of the subpoena for you to testify on behalf of

16  National Bank of Kuwait today?

17  A    I'm not aware of that.  I was planning on being here.

18  Q    And you're aware that we had to make a motion to the

19  Court to authorize the U.S. Marshal to attempt service on

20  you?

21  A    I'm not.

22  Q    And you're aware that --  are you aware that Mr. Baker

23  spoke to the marshal and refused to accept service of the

24  subpoena or to tell the marshal where you were?

25  A    I'm not aware of that.

```
1   Q    Are you the principal equity owner of the Debtor?

2   A    Yes.

3   Q    And you're also the owner of Jetall?

4   A    I'm the president of Jetall.

5   Q    You also own the equity in Jetall?

6   A    Yes.

7   Q    Okay.  And you were also the principal owner of 2425

8   WL, the second lien lender?

9   A    Yes.

10   Q    As it stands here today, who is the person who looks

11   out solely for the Debtor's interests?

12   A    I do.

13   Q    You also -- how can you do that when you also own

14   Jetall who has claims against the Debtor?  You also

15   individually have claims against the Debtor in at least

16   three capacities.

17   A    It's -- I don't know what that's -- what issue there is

18   with that.  I personally funded the $960,000 settlement.  I

19   own tax liens that I assigned to the bank, that the bank

20   says the settlement agreement doesn't exist anymore, is what

21   -- and so I've advanced the funds and I've been accounting

22   for everything that's -- that I've advanced.  Jetall in the

23   bank's loan, when we made the loan, they were very impressed

24   with Jetall and our ability to lease up the building.  So --

25   Q    Sir -- I'm going to ask you to -- you have very able
```

```
 1   counsel, so I'm going to ask -- who can ask you questions
 2   and you can -- to extent that the judge admits your
 3   testimony, you can tell your story as you wish to when Mr.
 4   Baker is asking the questions.  I just want to know who is
 5   the person that is not affiliated with another entity that
 6   is solely looking out for the Debtor's interests?
 7   A    This is a single purpose and (indiscernible) like other
 8   companies I have ownership -- they have ownership, they've
 9   managed the property, a single purpose, it's a family
10   business.  I took over from my father.  I'm looking out
11   after it and I have a counsel Mr. Baker who reviews
12   everything.  We discuss everything and if there's an issue
13   then, we're happy to address it and be fully transparent.
14       There's absolutely no -- you know, there's just kind of
15   innuendo and (indiscernible) but there's absolutely nothing.
16   And I'm willing to be completely transparent about
17   everything.  So at the end of the day, it would be me who is
18   the representative for the Debtor and yes, I'm also the
19   representative for the management company and, you know,
20   that's not a secret.  Also the other lien holder that the
21   ban approved for 2425 WL to have a lien at closing.
22           MR. FITZMAURICE:  So, you know, I'll move to
23   strike the answer as nonresponsive.
24           THE COURT:  I'll sustain the objection.
25   BY MR. FITZMAURICE:
```

1    Q    The Debtor scheduled a general unsecured claim for you

2    of about $6.7 million, correct?

3    A    Yes, that's correct.

4    Q    And you believe the Debtor owes you $6.7 million on

5    account of that lien?

6    A    That is pending the --

7    Q    Yes or no?  Does the Debtor owe you $6.7 million on

8    account of the claim that it scheduled?

9    A    Subject to the disputed settlement agreement and I can

10   discuss that.

11   Q    I'm not interested --

12   A    Yes, sir.

13   Q    Yes, you believe that the Debtor owes you that amount,

14   that amount of money?

15   A    Which at the creditor hearing, we explained to you that

16   --

17   Q    Sir, yes or no.

18   A    Yes.

19   Q    Do you believe the Debtor owes you that money?

20   A    Yes.

21   Q    Okay.  Do you also believe the Debtor owed Jetall about

22   $2.4 million?

23   A    Yes, that's --

24   Q    And you also believe the Debtor owns your other entity

25   2425 WL, $25-ish million on account of its junior lien?

1    A    On account of what was on the closing statement the

2    bank approved, plus the accrued interest which is accounted

3    for.  Yes.

4    Q    Has the -- has that entity filed a claim in either case

5    indicating the amount of that interest?

6    A    I believe we provided some information to Mr. Baker

7    who's provided Ms. Whitworth, but I'm not sure what's been

8    filed as far as the breakdown, but it's on the closing

9    statement when the loan was made.

10   Q    I'm not asking about when the loan was made.  I'm

11   asking now --

12   A    Yes, sir.

13   Q    -- in the first bankruptcy case, 2425 filed a proof of

14   claim, correct?

15   A    I did.

16   Q    And Mr. Darjean signed that proof of claim, correct?

17   A    I believe he did, yes.

18   Q    And the proof of claim accounted for both the principal

19   amount of what 2425 WL believes is the loan as well as

20   interest, correct?

21   A    Yes.

22   Q    And that proof of claim doesn't include any breakdown

23   of principal or interest, does it?

24   A    I don't know if it has a breakdown or not.  I think,

25   based on the amount that was owed, we disclosed it on there

1  and I believe the Bank of Kuwait has disclosed what they

2  believe they're owed including interest and principal.  And

3  so we --

4  Q    I'll agree with you there, sir.

5  A    We did the same thing, what 2425 (indiscernible).

6  Q    How much do you think the property is worth?

7  A    Well, I, as you know, we had a couple of offers.  We

8  had a contract --

9  Q    Sir, how much do you think the property is worth?

10  A    Well, right now, I don't have an opinion as I sit here

11  today, because we have signed -- are signing additional

12  leases.  We have the Dole family --

13  Q    Okay.

14  A    -- taking --

15  Q    The answer is that you don't know.  That's fine, sir.

16  Again, Mr. Baker can ask you whatever further questions are

17  necessary or appropriate.  The answer is, you don't know how

18  -- you don't have an opinion as of today?

19  A    I've seen a report from Cushman & Wakefield that the

20  Bank of Kuwait did.

21  Q    I have, too.  That's an appraisal that Cushman did,

22  correct, sometime last summer?

23  A    In July last year, about six months ago.

24  Q    Yeah, and that was right before the then scheduled

25  foreclosure sale on July 5th?

```
1    A    I don't know when -- I believe the date of the
2    appraisal is July.  I don't know the exact date in July.
3    Q    And the Debtor's first bankruptcy case was filed on
4    July 5th, correct?
5    A    July 5th, yes.
6    Q    And that was the date of the scheduled foreclosure
7    sale?
8    A    It was, yes.
9    Q    And the Debtor's second bankruptcy case was filed on
10   December 5th?
11   A    December 5th.
12   Q    Also the date of the scheduled foreclosure sale?
13   A    Yes.
14   Q    Do you recall what the value of the property was in the
15   Cushman & Wakefield appraisal?
16   A    Eighteen -- I think there were two values.  One is 18.
17   One is 6 million and there was another one that's 16
18   million.  That's a liquidation value.
19   Q    And do you recall that the appraisal was based on
20   leases that were in place a year or two prior?
21   A    I'm not aware.  I believe that there is a -- I believe
22   Ms. Whitworth took a deposition or there may have been a
23   deposition that Mr. Wetwiska took.
24   Q    Sir, if the answer is you're not aware, that's --
25   A    -- trying to think.  (indiscernible).  I don't recall.
```

1    I'd have to go back and look.

2    Q    Well, then let me ask you -- let me ask it to you this

3    way.  Is it your view that since July 2023, the Debtor's

4    financial position has improved?

5    A    Since July 2023, yes.

6    Q    And is that because the Debtor in -- according to you

7    has entered into a whole bunch of brand new leases?

8    A    That is absolutely a significant part.

9    Q    And so those -- and those new leases would drive up the

10   value of the property, correct?

11   A    Yes.

12   Q    So, why does the plan that you signed last night still

13   use the old liquidation value from the Cushman & Wakefield

14   appraisal?

15   A    Because that is the latest value reviewed and it's -- I

16   can talk about it, but without getting into what Mr. Baker

17   and I discussed, you know, we've -- I believe we've even

18   offered more than that to you, but it's not been accepted.

19   So, the plan is -- and I believe that there's some errors in

20   the plan that I just noticed, too.

21   Q    Well, the question (indiscernible) filed before the

22   hearing today, so it's understandable that there might be

23   some typos or other errors.

24   A    No, we've been working on the plan for about a month

25   and the typo was Class 7 versus Class 6.

1   Q    And so basically, because the testimony from Mr.

2   Darjean where he testified that the insider claim was going

3   to be paid in full in eight months, now that's a typo

4   (indiscernible) should be --

5            MR. SATHER:  Objection, Your Honor.  That's

6   misstating the testimony.

7            THE COURT:  I'll sustain the objection.  Thank

8   you.

9            THE WITNESS:  So, I think --

10  BY MR. FITZMAURICE:

11  Q    There's no question pending.  Sorry.  The Court

12  sustained the objection to my question,  So, my question is,

13  why does the Debtor use -- you signed the plan and

14  disclosure statement that were filed last night?

15  A    I did.  Yes, sir.

16  Q    So, why is it that the plan uses the old Cushman &

17  Wakefield appraisal which is by definition stale, since the

18  Debtor has entered into a whole bunch of new leases for the

19  property?  Why is that the right value?

20  A    You know, I don't know if that's the right value.

21  Don't know.  I don't know as I sit here.  I mean, I believe

22  that is the latest report we had seen, which is six months

23  old, and Mr. Baker made sure (indiscernible) the office

24  market (indiscernible) and the amount of funds to inject to

25  make all this work.  And since then, we have hired --

1          MR. FITZMAURICE:  Again, move to strike, Your

2    Honor --

3          THE COURT:  Just object to being nonresponsive --

4          MR. FITZMAURICE:  Object to nonresponsive.

5          THE COURT:  I'll sustain the objection.  Thank

6    you.  This will go a whole lot quicker and you'll impress me

7    a whole lot more if you listen to the question --

8          THE WITNESS:  Sorry.

9          THE COURT:  -- and you answer directly.

10          THE WITNESS:  Sorry.

11          THE COURT:  If you don't, you're just going to

12    make me mad.  You're going to make him mad.  And Mr. Baker

13    has every opportunity to ask every question he wants to and

14    he's longwinded.  I know he will.  Okay?  So, listen to the

15    question and answer.  Go ahead.

16    BY MR. FITZMAURICE:

17    Q    Do you understand, Mr. Choudhri, that if the value of

18    the property was higher, that the Debtor would have to make

19    larger payments to National Bank of Kuwait under the

20    proposed plan?

21    A    I'm not aware of that.  I'm not aware of

22    (indiscernible).

23    Q    Whatever payments the Debtor is making, those are all

24    coming out of your pocket, right?

25    A    No.

1    Q    They're coming out of the equity owner of the entity of

2    the Debtor, which is an entity that you also own?

3    A    Well, the Debtor is not advancing the funds.  That is

4    true.

5    Q    Who is?

6    A    Well, this is something we spoke to Ms. Whitworth about

7    and if I --

8    Q    Sir, who is?

9    A    It is an affiliate and the concern, candidly, as you

10   know, with the people we're in communication with attacked

11   the people that are investing --

12          MR. FITZMAURICE:  I don't know anything of the

13   sort.  Objection as nonresponsive.

14          THE COURT:  I'll sustain the objection.  Thank

15   you.  Listen to the question and answer, sir.  You're not

16   making any friends with me.

17          THE WITNESS:  Sorry.  Is there a way I can

18   disclose that in camera?

19   BY MR. FITZMAURICE:

20   Q    There's no question pending, sir.

21   A    Okay.

22   Q    The proposed equity funding under the plan is being

23   contributed by an affiliate of the Debtor, correct?

24   A    Yes.

25   Q    And that is an entity that you have control over,

1    correct?

2    A    No.

3    Q    Who does?

4    A    A family member.

5    Q    Of yours?

6    A    Yes, sir.

7    Q    What interest do you have in the entity that is funding

8    the plan?

9    A    I don't.

10   Q    It's your family member who is responsible for making

11   the payment under the plan.  Yes?

12   A    Yes, the --

13   Q    The payments that were required to be made to the bank

14   are large -- are higher because the value of the property is

15   higher, then that family member would have to come out of

16   pocket more money, correct?

17   A    Sure.  They're an investor.  It's -- sorry.  Yes.

18            MR. FITZMAURICE:  Nothing further, Your Honor.

19            THE COURT:  Thank you.

20            THE WITNESS:  I apologize.

21            THE COURT:  Mr. Baker?

22            MR. BAKER:  I'm going to reserve my questions to

23   my case.

24            THE COURT:  All right.  Ms. Whitworth.

25               CROSS EXAMINATION OF ALI CHOUDHRI

 1   BY MS. WHITWORTH:

 2   Q    Good afternoon, Mr. Choudhri.  I'm Jana Whitworth.  We

 3   spoke on the phone, but I think this is the first time we

 4   get to meet face to face.  Nice to meet you.

 5   A    Yes.  How are you?

 6   Q    Good.  As you heard me in my opening statement, my

 7   client is United States Trustee and his concern is the

 8   apparent lack of a fiduciary to stand in the shoes of the

 9   Debtor to look out for the best interests of the Debtor.

10   And it's my -- let me pull my spreadsheet out.  I pulled up

11   the prior case, the Victoria case, and looked at the proofs

12   of claim that had been filed, and there's been discussion

13   about the 690 that you filed a proof of claim individually.

14   And then, there was a proof of claim on behalf of -- bear

15   with me -- Jetall companies in the amount of 2,204,801 and

16   then the 2425 WL LLC as a second lead of 25 million for a

17   total, it looks like a total of $34 million of claims that

18   you or your entities -- that entities that you own have

19   claims of $34 million against the Debtor.  Does that sound

20   about right?

21   A    Yes.

22   Q    Okay.  And if there were questions about the

23   calculation of how those numbers were calculated, the bases

24   of those, the legality, if those claims are legal, if

25   there's defenses against those claims, if there's setoffs

1   against those claims, who would stand in the shoes of the

2   Debtor to fight you and your entities about those issues?

3   A   I believe it would be me, but I would be willing -- Mr.

4   Baker, he's reviewed everything, feels comfortable with

5   everything.  I've also made a statement and I stand behind

6   it.  I'm willing to have all of those affiliated claims

7   being subordinate to everybody else and be at the last of

8   the line.

9   Q   That's not answering my question.  Would you -- would

10   that be you or would you appoint a CRO?  They've mentioned a

11   CRO.

12   A   Yes.  Yes, ma'am.  Yes, ma'am. I am absolutely fine

13   bringing in a chief restructuring officer and I think that

14   was a discussion that was had and believe there's a motion

15   to filed and we started that process.

16   Q   And would you be willing to, as part of the agreement,

17   number one, pay for it?  Would you --

18   A   Yes.

19   Q   -- deposit funds into an account that the Court would

20   approve to be billed against, like a retainer or something,

21   to be billed against by the -- a CRO if the Court so

22   appointed one?

23   A   Yes.

24   Q   And would you enter into an agreement with the CRO that

25   would basically put them as a fiduciary and terminate your

1    ability to sign?  Basically, he would stand in your shoes as

2    the manager of the Debtor.

3    A    I'm not sure if I understand all of that.  What was

4    explained to me by Mr. Baker was someone else coming in,

5    chief restructuring officer reviewing everything and even if

6    there are claims that are there, then I believe the Debtor

7    could sell those claims and auction those claims, if they

8    are real claims and legitimate.

9    Q    Let me interrupt you.  That's really not what I'm

10   asking you.  What I'm asking you is, what if the CRO, for

11   instance, let's say your claim for either 960,000 or 6.7

12   million, and decides that that's a fraudulent claim and --

13   would you -- do you understand that the CRO would have the

14   ability to file an objection and litigate the validity of

15   that and the amount of that claim?

16   A    I absolutely get that.  And I wouldn't have an issue

17   with that.  I would not have an issue that -- if I may --

18   sorry.  There's no question.  I was going to say something,

19   but stopped.

20        MS. WHITWORTH:  Okay, thank you.  Judge, I don't

21   have any other questions at this time.

22        THE COURT:  Thank you.  (indiscernible) Mr.

23   Sather?

24        MR. SATHER:  No questions at this time, Your

25   Honor.

1            THE COURT:  All right.  So, anything

2    (indiscernible) Mr. Fitzmaurice?

3            MR. FITZMAURICE:  No, nothing further, Your Honor.

4            THE COURT:  All right.  You may step down, sir.

5    I'm not sure if you're excused or not.  You may be called

6    again, but you can step down.

7            Mr. Fitzmaurice, you have another witness?

8            MR. FITZMAURICE:  We have nothing further, Your

9    Honor.

10           THE COURT:  All right, thank you.  You rest.  Mr.

11   Baker?

12           MR. BAKER:  Your Honor, I'd ask the Court at this

13   point in time to consider denying the motion.  There has

14   been, as far as I can tell, no proof that meets any of the

15   requirements for cause, number one.  Number two, the Debtor

16   has testified that he is agreeable to getting a CRO and

17   understands a CRO will have control of everything.  That CRO

18   would be an independent fiduciary.  There are basically two

19   bases that the that National Bank of Kuwait put forward for

20   the conversion.

21           Number one is substantial diminution of value.

22   That's solely based on tax liens and there are only two

23   years of tax liens that are outstanding, and we have a case

24   (indiscernible) dramatically over the years, and that --

25   those are included in the plan.

```
 1              Number two, there was these allegations that the

 2    Debtor cannot confirm a plan.  Well, there's been no proof

 3    that the Debtor cannot confirm a plan, at all.  None put on.

 4    And they've got the burden of proof to show that there is

 5    cause to do it.  So, Your Honor, I believe that if the Court

 6    would order the Debtor to move forward to get a CRO

 7    appointed and pay for it, that there's no -- I don't see any

 8    reason for this.  I don't think they've put on any evidence

 9    at this point in time to meet (indiscernible).

10              THE COURT:  I would disagree with you in that

11    regard for a number of reasons.  The schedules are a mess.

12    The plan that's filed, basically has a typo in it that's

13    pretty substantial.  Mr. Darjean is not a very believable

14    witness.  He knows as little, as much -- I mean, his lack of

15    knowledge is to this point somewhat appalling.  Okay?  So

16    I'm going to disagree with you wholeheartedly.  So, if you

17    have something you want to prove up, please do so.  So, I'm

18    going to deny your motion.

19              MR. BAKER:  Okay.  All right.  Okay, I'm going

20    call Mr. Norris.

21              THE COURT:  All right.  Mr. Norris, please come

22    forward.  Please raise your right hand and be sworn.  Do you

23    swear or affirm to tell the truth, the whole truth, and

24    nothing but the truth, so help you God?

25              THE WITNESS:  Yes, I do.
```

 1              THE COURT:  Please be seated, sir.

 2              MR. FITZMAURICE:  So, Your Honor, we would object

 3     to Mr. Norris.  He's not on their list.  We don't know who he

 4     is, what he's here to testify about.

 5              MR. BAKER:  I think he's on the list.

 6              THE COURT:  Mr. Baker?  Show me.

 7              MR. FITZMAURICE:  Isn't this theirs?  Your Honor,

 8     I'm referring to the document that was filed at -- Document

 9     No. 88 on the docket.

10              THE COURT:  (indiscernible) make a determination

11     of what's going to go on (indiscernible).

12              MR. BAKER:  Your Honor, it appears I made a

13     mistake, did not list him.

14              THE COURT:  All right, then he may not be called

15     as a witness.  Thank you.  You may step down, sir.  Thank

16     you.  I sustain the objection.  Mr. Baker, next witness.

17              MR. BAKER:  Call Mr. Choudhri.

18              THE COURT:  Mr. Choudhri, come on up.  You're

19     still under oath.  I promised you'd get an opportunity to

20     tell your story.  Now, it's your time.  You're under oath.

21     Just have a seat.  Thank you.

22              THE WITNESS:  (indiscernible).

23              That goes to Mr. Baker.  That's the only --

24     question, answer.  That's the way this works.  Go ahead, Mr.

25     Baker.

```
 1              MR. BAKER:  Does it matter if I sit here or --

 2              THE COURT:  Why don't you do it from the podium,

 3      please.  It's just easier for me to track.  The podium is

 4      turned on.

 5                  DIRECT EXAMINATION OF ALI CHOUDHRI

 6      BY MR. BAKER:

 7      Q    Okay, Mr. Choudhri, let's start off with the tax liens.

 8      There's an argument that the Debtor has not paid any taxes

 9      since 2019.  What taxes have not been paid to the taxing

10      authority at this point in time, that you're aware of?

11      A    The taxes for this year have not been paid.

12      Q    Okay.  And '22 and '23?

13      A    Yes, sir.

14      Q    Okay.  And in fact, the three taxing authorities have

15      filed claims that only show '22 and '23 taxes as being

16      unpaid; is that your understanding?

17      A    Yes.

18      Q    The City of Houston, Houston ISD, and the Houston

19      Community College System; is that right?

20      A    Yes.

21      Q    Okay.  So, the argument that you have -- the tax that

22      the Debtor -- the taxes haven't been paid since 2019 is not

23      correct, is it?

24      A    No.

25      Q    Okay.  So there is a statement that continues to be
```

1   made that the Debtor's not paid the taxes.  Well, who

2   actually paid some of those taxes?

3   A    I paid the taxes.

4   Q    Okay.  So, as a matter of fact, you pay taxes for '20

5   and '21, correct?

6   A    Not correct.

7   Q    Okay.

8   A    There was a brief (indiscernible) with Sonder.  The

9   bank approved it (indiscernible) said we're in default and

10  the lease is null and void because it wasn't approved in

11  writing.  Once we (indiscernible).  This is an 84,000 square

12  foot lease.  At that point, a loan needed to be obtained to

13  pay the taxes and so there was a loan obtained by the Debtor

14  with Caz Creek.

15  Q    Okay.

16  A    And that happened a couple of times, and then the

17  largest tenant went bankrupt, a 200,000 foot tenant, and the

18  building essentially was vacant as it was when I bought it

19  the first time in 2012.  And once the largest tenant filed

20  bankruptcy and rejected the lease and the building was

21  empty, that's when I got more hands involved and started

22  leasing up the building, getting tenants, but we were not

23  getting any approvals, zero approvals on any leases, and we

24  weren't getting any subordination (indiscernible) that

25  tenants required.  (indiscernible) lots of large leases that

1    we weren't able to be (indiscernible).  And so that then led

2    to the lawsuit, the settlement, and the bank has taken a

3    position the settlement doesn't exist anymore.  Since the

4    last year, we (indiscernible).

5    Q    Let me back up.  Let me kind of catch up.  2020 and

6    2021 tax liens were signed -- you owned the tax liens before

7    the settlement with the National Bank of Kuwait, correct?

8    A    Yes.

9    Q    And you assigned those -- so they were paid.  Those

10   taxes had been paid and there was tax lien --

11   A    Yes.

12   Q    By Caz Creek, I guess was one of the entities.  You

13   bought them from the taxing -- the lender that had made the

14   claim.

15   A    Yes, I bought them.  Yes.

16   Q    And you assigned those over to the National Bank of

17   Kuwait?

18   A    Pursuant to a settlement agreement with the Bank of

19   Kuwait.  Yes.

20   Q    Okay, so '20 and the '21 taxes have been fully paid.

21   Right now, the National Bank of Kuwait owns those liens,

22   right, or at least in theory?

23   A    Right.  That's the confusion, because --

24   Q    Okay, just, let me ask you this.  So, there's a claim

25   listed in the schedules by you for about $6.7 million for

1    tax liens.

2    A    Correct.

3    Q    Why do you say -- why list that in the schedules?

4    A    Because the bank's position is the settlement agreement

5    and it's on the record in a Court hearing that they made

6    that representation, and I think they attached it as an

7    exhibit.  It's on June the 12th, 2023 that the settlement

8    agreement doesn't exist any longer and so it's our position

9    if it doesn't exist they don't get to keep -- if that

10   agreement doesn't exist, we don't get to keep the tax liens.

11         Now, if the agreement exists, then I believe that --

12   and if they're not in breach of the settlement agreement, I

13   believe the tax liens are theirs because I assigned the tax

14   liens.  There is a loan agreement would with Caz Creek and

15   the Debtor and the tax lien -- the tax loans had a amount

16   that that has a (indiscernible) in it, so we calculated that

17   amount on the proof of claim.

18   Q    Okay.

19   A    But that is based on the -- I don't believe I am owed

20   that, if the settlement is complied with and the settlement

21   agreement exists.  But because the bank took that position,

22   we then -- I took the position that well, then the

23   settlement agreement doesn't exist you don't get tax liens.

24   Q    So, there was a representation made to the state court

25   the settlement agreement had been breached or that it just

1    did not exist?

2    A    This -- the representation I read several times by Mr.

3    Conrad, Mr. Patrick's partner, is that the settlement

4    agreement doesn't exist anymore.  It doesn't exist.  It's

5    gone.  It doesn't exist.  And that's -- and even after that,

6    we -- I have evidenced where we we're prepared to wire and

7    fund the settlement and --

8            MR. FITZMAURICE:  Objection, Your Honor.  If

9    there's documentary evidence -- if there's documentary

10   evidence of a wire or something else that's -- then it

11   should be here.  The witness' testimony concerning some

12   document that may or may not exist is not useful to the

13   Court.

14           THE COURT:  I'll sustain the objection.  Go ahead.

15   BY MR. BAKER:

16   Q    Okay.  Let's go back to the taxes.  Back to the taxes.

17   The tax liens for -- the taxes for '20 and '21 were paid and

18   then you bought those tax liens, so those were fully paid,

19   right?

20   A    Yes.  Assuming that they were (indiscernible) the

21   settlement agreement.

22   Q    Well, no, no.  The taxes were paid.

23   A    The taxes were paid.

24   Q    Tax lien you conveyed to National Bank of Kuwait in --

25   A    Yes.

1    Q    -- in settlement?

2    A    Yes, sir.

3    Q    From your perspective, the National Bank of Kuwait has

4    taken the position that the settlement agreement no longer

5    exists.  They didn't argue it was breached, but they said no

6    longer exist, so it's your position if that's the case then

7    those tax liens should come back to you?

8    A    Correct.

9    Q    Okay.  So that's why in the schedules there's listed

10   that amount of the tax lien?  Is that how that got there?

11   A    Yes.

12   Q    Okay, and you when through (indiscernible), so did the

13   tax lien documents provide for a payment over time?

14   A    Yes.

15   Q    Okay, and approximately how long, you recall -- if you

16   recall?

17   A    I think it was 10 or 15 years.  It's between the Debtor

18   and Caz Creek.

19   Q    Okay.  And so if the tax liens are paid off early, is

20   there additional amounts are owed?

21   A    Yes, unless that's waived.

22   Q    Okay.  So, you did a calculation based on the

23   documents, the tax lien that you owned to come up with the

24   6.7 million?

25   A    Correct.

1    Q     Now --

2    A     -- number unless it's waived, then it's a lower number.

3    Q     Okay.  So now, Ms. Whitworth showed you a proof of

4    claim that was filed that had amount for bond, $986,000.  Is

5    that --

6    A     Nine sixty.

7    Q     Nine sixty, okay.  Let me ask you, what is that about?

8    A     When the Debtor obtained the settlement agreement, in

9    the settlement agreement, I funded it, advanced $960,000.

10   And there's -- well, let me back up.  There were a series of

11   payments made to the registry of the Court that I advanced

12   for the Debtor in the state court case.

13        And then once the settlement agreement was reached, the

14   bank wanted additional payments and they wanted me to sign

15   off on transferring those funds to them as a down payment

16   towards the option to purchase the note from them in the

17   settlement agreement.  And so those funds were advanced to

18   the Debtor under the settlement agreement, which included

19   the funds for the bond that I advanced, which totaled

20   960,000.

21   Q     So that's --

22   A     Which is a credit off the loan amount --

23   Q     That's separate and apart from the tax liens; is that

24   right?

25   A     they're two totally separate things, so there's three

1   related -- let me see, four related.  One is the selling

2   entity, which is 2425 WL which is the second lien holder.

3   Q    Okay.

4   A    which is reflected on the closing statement that the

5   bank approved when the loan was obtained.  And then the

6   second item is the tax lien.  That's the -- on the proof of

7   claim.  And the third one that's different is the advance

8   that I made for the 960,000, which is for the bond that I

9   paid for the Debtor in the Court, in the -- under the

10  settlement agreement.

11  Q    Okay.

12  A    And there are some documents they've attached that,

13  that I think will be helpful, that they recently attached to

14  exhibit, too.

15  Q    Okay.  Okay, so --

16  A    So, the 960 is different than the tax lien.  They're

17  two separate -- different, and I have proof of those wires

18  and all of that.

19  Q    Okay.  So let's go back to claim for WL, about 20 --

20  about $25 million.

21  A    Yes.

22  Q    How did that originate and where did that come from?

23  A    So, twenty -- so Mona Dajani with Pillsbury and our

24  attorney, Bruce Merwin with Holland and Knight, back when in

25  2018, there were a series of lis pendens filed a guy named

1    Osama Abdullatif through this -- he got an (indiscernible) a

2    divorce case that four years later got finalized with the

3    Court finding that I was already divorced in 2012.

4        So, in 2015, this woman named Hera Azar through Osama

5    Abdullatif filed a lawsuit and lists 39 companies, all my --

6    a bunch of my entities, family members, and 2425 property

7    had a lis pendens and when the Bank of Kuwait wanted to

8    finance this property, Mona Dajani through the Bank of

9    Kuwait, the attorney and my attorney, they wanted to not

10   structure it as a refi, but a -- but set up a newco because

11   the divorce was not over in 2018.  The divorce did end.  I

12   didn't have my final judgment until 2019 when the Court

13   found I'm divorced as of 2012.

14       So I was under this cloud where someone was claiming

15   they were married to me and they weren't, and I had all

16   these lis pendens on all these properties that we had gotten

17   expunged but she would keep filing it again.  So the bank

18   wanted -- so the bank reviewed all of this and they reviewed

19   the files and I have all of this evidence, I think.  Again,

20   I'm sorry, I didn't think we were getting into all of that

21   today, but I know they discussed it.

22       So at that point, the bank structured the deal and

23   there is a loan memo that the bank provided us that they

24   use, that they did before they closed the loan that broke

25   all the -- a lot of the structure down, and so that's when

1    Galleria 2425 Owner was established and 2425 WL sold the

2    property to Galleria 2425 Owner in 2018.  And the bank's

3    appraisal at the time was I think 101 million and the loan

4    was around 50, I believe.

5         And then there were several million they held in escrow

6    for interest reserves, which we have an issue with how that

7    was exhausted and spent.  Now, we haven't done an accounting

8    of that, which is one of the issues.  But in 2018, there is

9    a seller carry for $14.8 million and that is the second

10   lien, so that was the seller that sold the property to the

11   Galleria 2425 Owner.

12        And when you look at the closing statement that the

13   bank approved, it's on there and all the cash from the

14   transaction came from that, from that 2425.  And so that's

15   all reflected on there.  So, that's how the second week came

16   to be on the 2425 (indiscernible) the property.

17   Q    Okay, so --

18   A    So, it's about 14.8 million plus interest and on proof

19   of claim, Ms. Whitworth, I think, is right.  It was not

20   broken down or, I think it was Mr. Fitzmaurice.

21   Q    Okay.  So, let me kind of tie into that.  You were

22   shown Section 8.5 of the plan that was filed.

23   A    Yes.

24   Q    -- had 2425 WL's claim being treated in Class 6, which

25   says it's going to get 100 percent payment.  Is that

1    correct?

2    A    I believe it should say Class 7.

3    Q    Okay.

4    A    (indiscernible).

5    Q    So, Class 6 was the vendors and materials, the work on

6    the building, right?

7    A    Correct, yes.

8    Q    Class 7 is just the total general unsecured claims?

9    A    Yes.

10   Q    So, you've agreed that the claim of 2425

11   (indiscernible) treated in Class d7?

12   A    Yes.

13   Q    Under Class 7.  Now, and you were planning going back

14   and fixing that in the plan; is that correct?

15   A    Correct.  Yes.

16   Q    Okay.  Okay.  Now, there were some discussions about

17   issues in the schedules.  It may not be completely

18   consistent, right?  Are you planning on going back and

19   getting those complete?

20   A    Yes.  Absolutely.  If there's any issues, we should fix

21   those.

22   Q    Okay.  Now, with regard to the property, there's -- the

23   allegations are that there's a significant diminution in the

24   value of the property because the taxes (indiscernible).

25   Okay?  You understand that, right?

1    A    Yes, I heard that.

2    Q    Okay.  And two taxes have not been paid are '22 and

3    '23.  Those are both included in the plan; is that correct?

4    A    Yes.

5    Q    And from your perspective, those will get paid, right?

6    A    Yes.

7    Q    Okay.  This is Exhibit 88-1.  See that?

8    A    Yes.

9    Q    You recognize that?

10   A    I do.

11   Q    Okay, and what is that?

12   A    This is a projections a CPA has been working on for

13   about a month now.

14   Q    Did you work with them significantly to put these

15   together?

16   A    I did.  I actually did, and he interviewed tenants and

17   --

18   Q    Okay.

19   A    -- investors.

20   Q    And so you've looked at these and you believe at least

21   from the perspective of presenting revenues and expenses

22   right now, those are correct?

23   A    Yes.

24         MR. BAKER:  Okay.  Now, Your Honor, I'd like to

25   move to admit 88-1.

1          THE COURT:  Any objection to 88-1?

2          MR. FITZMAURICE:  Your Honor, yes, we object on

3     the basis we don't understand where any of the information

4     in here comes from.  There are no underlying documents to

5     support any of the numbers on here.  So, we're not sure

6     where any of this, where any of it comes from, and it's

7     being offered for -- it seems to be being offered for the

8     truth that this is -- that these numbers are real and

9     they're actually going to happen.  The Debtors are going to

10    make this money.  There's no basis in evidence for us to say

11    that.

12         MR. BAKER:  Your Honor, these are projections.

13    These are not (indiscernible).

14         THE COURT:  Let's do this.  Tell me where the

15    projections came from, lay a better predicate, and then I'll

16    admit them as projections only.

17         MR. BAKER:  Okay.

18         THE COURT:  Let's do something more than you've

19    done relative to laying some sort of foundation.

20         MR. BAKER:  Okay.  Okay.

21    BY MR. BAKER:

22    Q    Mr. Choudhri, these projections, the information for

23    these projections, where did that come?  Let me ask you.

24    Did you provide the information to help put these together?

25    A    I did.

1    Q    Okay.  And you reviewed all the information that you

2    provided to Mr. Norris to help put these together; is that

3    correct?

4    A    That's correct.

5    Q    Okay.  And so, you looked at all that information, you

6    believe, and understood that all to be true and correct at

7    the time?

8    A    Yes.

9    Q    Okay.  Now, you provided this information to Mr.

10   Norris?

11   A    Yes.

12   Q    And he put it together.  Did you review that after he

13   put it together?

14   A    I did.

15   Q    Do you help him make changes and corrections to it

16   after it was put together?

17   A    Yes.

18   Q    Okay.  And so, you worked with Mr. Norris based upon

19   all the information from your books and records of the

20   company, the management company for the property, put this

21   together?

22   A    Yes.

23   Q    And in doing that, does that include all the current

24   (indiscernible) the property?

25   A    yes.

1    Q    Okay.  And did you look at the amounts being paid under

2    the current leases?

3    A    Yes.

4    Q    And when the tenant improvements and rate concessions

5    would fall off?

6    A    Yes.

7    Q    And then, did you also look at potential future leases?

8    A    Yes.

9    Q    Okay.  And so you provided the information on the

10   future leases to Mr. Norris?

11   A    I did.

12   Q    And that was all based upon your information as far as

13   your belief, as far as what's going to happen in the future?

14   A    Yes.

15   Q    Okay.  And then from your knowledge, did Mr. Norris

16   verify any of these number?

17   A    Yes, he did.

18   Q    Okay.  And --

19   A    Independently verified them.

20   Q    Okay.  So, he talked to prospective tenants and current

21   tenants and other things that he did to verify the numbers?

22   A    Yes.

23   Q    Okay.  And you also look at it again and verified the

24   numbers?

25   A    Yes.

```
 1              MR. BAKER:  Okay.  So, Your Honor, I would
 2    (indiscernible) admit exhibit now.
 3              MR. FITZMAURICE:  So, objection again, Your Honor.
 4              THE COURT:  Which -- first of all, you said
 5    exhibit.  You've got to tell me which exhibit number it is.
 6              MR. BAKER:  Okay, 88-1.
 7              THE COURT:  Now I'll hear your objections.
 8              MR. FITZMAURICE:  So, two, Your Honor.  One is Mr.
 9    Baker asked the witness whether the information was based on
10    the books and records of the management company, not the
11    Debtor.  Secondly, if this information is based on leases or
12    other contracts, why don't we have them?  Why aren't they
13    here, being introduced in evidence, if any of this
14    information is based on existing contracts or commitments or
15    letters of intent or anything else?  If there's an agreement
16    that supports this, the Court should have it in front of it
17    so it could be examined.
18              THE COURT:  All right, so here's what I'm going to
19    do.  I'm going to admit 88-1 as a projection.  I think all
20    of the objections have been made by the bank's counsel
21    probably more to weight and at this point in time, given
22    what's on the paper, I'm not sure it has much weight, but
23    Mr. Baker, I'll let you do whatever you want to do relative
24    to cleaning that up.  So, it's admitted.
25              (Exhibit 88-1 entered into evidence)
```

1          MR. BAKER:  Okay.

2     BY MR. BAKER:

3     Q     Okay, Mr. Choudhri.  What is the current occupancy of

4     the building with tenants who have signed leases,

5     approximately?

6     A     Seventy percent.

7     Q     Okay.  Now, are all those tenants currently paying

8     rent?

9     A     No.

10    Q     Okay.  And why not?

11    A     There are concessions, free rent periods for

12    (indiscernible) tenants, tenant improvement allowances.

13    Tenants are allowed to build out their space, things of that

14    sort.  So, it doesn't kick in at the same time.  There is a

15    schedule that that does kick in as the concessions burn off.

16    Q     Okay.  And did you help put a schedule together or did

17    you get a schedule of rent payments?

18    A     That's based on the leases.

19    Q     Okay.

20    A     And it's based on -- the projections are also based on

21    Regis taking two floors.  There's also another tenant that's

22    a biotech company and their representative is here today.

23    They own (indiscernible) and they're taking significant

24    space as a biotech company (indiscernible).

25    Q     Okay.  So, let's go back to Regis.  Have you been

1    personally involved in trying --

2              THE COURT:  Let me ask Mr. Choudhri a question.

3    So, if I understand your testimony, the base revenue also

4    includes leases that have yet to signed?

5              THE WITNESS:  No, Your Honor.

6              THE COURT:  Well, that's what you've kind of said.

7    So I want to make sure.  So, I look at April 24, I'm looking

8    at -- your screen's gone blank.

9              MR. BAKER:  I'm sorry.

10             THE COURT:  April '24, it shows 469,154 in base

11   revenue.

12             THE WITNESS:  I stand -- sorry.  I -- my fault,

13   Your Honor.  I was not totally prepared to go over the

14   projections because I didn't work on the projections, Mr.

15   Norris did, and I thought he was going to --

16             THE COURT:  That's the reason I'm asking

17   questions.

18             THE WITNESS:  So I apologize.

19             THE COURT:  So bear with me.  So, the 569 --

20             THE WITNESS:  Can I --

21             THE COURT:  No.  I'm going to ask questions.  Does

22   the 569,154 base rent revenue include leases that have yet

23   to be signed?

24             THE WITNESS:  (indiscernible).

25             MR. BAKER:  I'm sorry, Your Honor, I --

```
 1                 THE COURT:  Mr. Baker, just -- I'm looking it up

 2      on the computer.  He needs to put it back up.

 3                 THE WITNESS:  Is it possible I can have a copy of

 4      it, Mr. Baker?

 5                 MR. BAKER:  I'm going to pull it back up.  Just a

 6      minute, here.

 7                 THE COURT:  If he can't do it, I'll show it to

 8      you.  So, look at April '24.  It's at the very top.

 9                 THE WITNESS:  April?

10                 THE COURT:  April '24, 569,154.  Very top like,

11      base rent revenue, April '24.

12                 THE WITNESS:  Yes, sir.

13                 THE COURT:  Okay.  Does that include leases that

14      have not yet been signed?

15                 THE WITNESS:  No.

16                 THE COURT:  Okay.  How many leases are in the

17      569,154?

18                 THE WITNESS:  How many?  I would have to --

19                 THE COURT:  Do you know?

20                 THE WITNESS:  Yes.  I just don't have --

21                 THE COURT:  If you know, tell me.  If you don't

22      know, don't tell me.

23                 THE WITNESS:  I can count them.  We have two,

24      three, four -- approximately seven.  Seven or eight leases.

25                 THE COURT:  There's a big difference between seven
```

1    or eight when you're talking.  Do you know how many leases

2    that includes?  Yes or no.

3              THE WITNESS:  Not exactly, no.

4              THE COURT:  Okay.

5              THE WITNESS:  Without --

6              THE COURT:  Bear with me.  Listen to the question

7    and answer.

8              THE WITNESS:  Sorry.

9              THE COURT:  It says, (indiscernible) and turnover

10   vacancy of 156,929.  How is that number projected, if you

11   know?

12             THE WITNESS:  I would have to look at the complete

13   document.

14             THE COURT:  If you know.

15             THE WITNESS:  Not offhand.

16             THE COURT:  Okay.  Base rent abatements of

17   286,950.  Tell me what that is.

18             THE WITNESS:  That's typically the rent

19   concessions or sometimes tenants may use TI allowances.

20             THE COURT:  How many of the leases have rent --

21   base rent abatements in them?

22             THE WITNESS:  Let's see.  At least one, two, three

23   -- three.

24             THE COURT:  And how long do they go out?

25             THE WITNESS:  I think the latest one

1    (indiscernible) about a year-and-a-half.

2             THE COURT:  So, typically, they're what?  How much

3    of the rent?

4             THE WITNESS:  Well, the -- well, it depends,

5    because they vary.  It's not a typical --

6             THE COURT:  So, give me a typical rent abatement.

7    What is -- how much is it?

8             THE WITNESS:  So, a tenant may get $30 in TI foot

9    credit.  A tenant could get up to $100 a tenant

10   (indiscernible) as is leases.

11            THE COURT:  Okay.  All right.

12            THE WITNESS:  So, it's by the foot and we'll give

13   those funds or they can use those funds to offset rents in

14   lieu of those funds, Your Honor.

15            THE COURT:  So, you're not building out any spaces

16   and building that into the rent -- to the abatements rather

17   than doing that.

18            THE WITNESS:  Mostly we've been successful with

19   that.  We have, like, a tenant I believe that's on the phone

20   is a tenant that will -- they have a $300,000 TI that they

21   would be (indiscernible) once they build out their space.

22            THE COURT:  So they're paying for it and then

23   you're crediting it back?

24            THE WITNESS:  Yes, sir.

25            THE COURT:  Okay.  Go ahead, Mr. Baker.

```
 1          MR. BAKER:  Okay.

 2   BY MR. BAKER:

 3   Q     Now, have you been involved in current lease

 4   negotiations directly?

 5   A     Absolutely.

 6   Q     Okay.  What potential tenants have you been talking to

 7   about coming into the building?

 8   A     We have -- we've been in negotiations and we finalized

 9   an agreement that -- to lease two full floors of the

10   building to a company called IWG, International Work Group.

11   They're the largest work -- shared workspaces in the world,

12   about 20 times the size of Wework.  They've actually taken

13   over some Wework spaces, centers, and their subsidiary name

14   is Regis is (indiscernible) name that we know, but the

15   parent company is IWG.  So they're taking two floors spaces.

16   I'm sorry, Signature Brand, which is the first Signature in

17   Texas which is more higher end.

18          And then the other one is going to be Regis, which is a

19   more standard.  So that's a gentleman named Ed Castillo

20   who's the managing director.  And then the other one we have

21   a Chinese company that's intestate stage in lease

22   negotiation phase.  Then there's a third lease which is a

23   company called Vaxanix.  They're a biotech company and they

24   provided me information on them in the deck and it's a

25   company owned by the Murdock family, the Dole family.  And
```

1   they are committed and they (indiscernible) improved.  Mr.

2   Shah is their representative and they've approved to move

3   forward on a lease as well.

4   Q    Okay.

5   A    Then there's additional leases.  There's a 2,400 square

6   foot space lease for a law firm.  There is another company

7   called Prismecs, P-R-I-S-M-E-C-S, plastics company.  And

8   there is a -- there's another small lease as well that we're

9   working on.  We've also had discussions to resolve and reset

10   the lease with Sonder and that's not part of any of our

11   projections, but that's a real possibility.  That's the

12   tenant that signed a lease and then because of COVID, they

13   didn't move in, and when we are in negotiations to resolve

14   that.

15   Q    Okay.  So on the lease, I'm going to back up a bit.

16   One of your entities bought the building about 2012, '13?

17   A    2012, yes.

18   Q    2012.  And at that time, who was the principal tenant?

19   A    The main tenant in the building was a company called

20   Blue Cross Blue Shield.

21   Q    Okay.  And then they -- after you bought the building

22   or right around the same time, did they move out?  What

23   happened?

24        MR. FITZMAURICE:  Objection.  Relevance, Your

25   Honor.

1          THE COURT:  I'll sustain the objection.

2          MR. BAKER:  Your Honor, this is -- I'm trying to

3    establish --

4          THE COURT:  I've sustained the objection, Mr.

5    Baker.  Move on.

6          MR. BAKER:  Okay.  Okay.

7    BY MR. BAKER:

8    Q    So, when they moved out, okay, did you then start

9    releasing the property again?

10         MR. FITZMAURICE:  Same objection, Your Honor.

11         THE COURT:  I'll sustain the objection again, Mr.

12   Baker.  I'm not really interested in what happened way then.

13   I don't think it affects what I'm going to do now.  Go

14   ahead.

15         MR. BAKER:  Okay.  Okay.

16   BY MR. BAKER:

17   Q    So big tenant (indiscernible) the property in stages,

18   correct?

19         MR. FITZMAURICE:  Same objection, Your Honor.

20         THE COURT:  Again, Mr. Baker, I'm not worried

21   about what happened in the past.  We're here today.  I'm

22   worried about what's happening going forward.

23         MR. BAKER:  Well --

24         THE COURT:  I'll sustain the objection.

25         MR. BAKER:  Okay.  Okay.

1   BY MR. BAKER:

2   Q    Okay, today, as you stand, the building is about 70

3   percent occupied.  If you get all of these other leases in

4   place, what will the occupancy be at that point in time?

5   A    Like 89 percent of what projecting, 85 to 90 percent.

6   Q    Okay.  Now, that occupancy rate with the amounts that

7   are in the new leases, is it your opinion at that Debtor

8   will have enough money to pay back under its proposed plan?

9   A    Absolutely.

10  Q    Okay.

11  A    We've been successful with leasing up the building over

12  the last 18 months.

13  Q    So, how long have you been involved in leasing

14  properties in buildings?

15  A    I was (indiscernible) with my dad since I was -- I grew

16  up going to RTC and (indiscernible) buying properties with

17  him and he was my mentor.  So I've been involved in over 50

18  office buildings and buying, leasing up, selling,

19  stabilizing.  So, I've been doing this since -- for over 20

20  years.

21  Q    Okay.  Do you recognize the front page that I put up on

22  the screen?

23  A    I do.

24  Q    Where is that?

25  A    This is --

1           MR. FITZMAURICE:  Objection, Your Honor.

2     Relevance.  2018.

3           THE COURT:  What's the relevance, Mr. Baker?

4           MR. BAKER:  Your Honor, this gets back into

5     National Bank of Kuwait's view of Jetall and the actions and

6     the abilities of the Debtor and Jetall, principal Jetall,

7     and Mr. Choudhri to lease properties which goes directly to

8     the point of, can the Debtor confirm a plan and is the

9     Debtor capable of doing this, and this really helps show --

10    it is from 2018, but it shows what was going on in 2018 in

11    respect to National Bank of Kuwait.

12          THE COURT:  (indiscernible).  I'm going to sustain

13    the objection.  Go ahead.

14          MR. BAKER:  I'm sorry?

15          THE COURT:  I'm going to sustain the objection.

16          MR. BAKER:  Your Honor, I'll just go back and say

17    part of this --

18          THE COURT:  I don't want to -- I don't want to

19    hear an argument with this.  (indiscernible) question the

20    witness.

21          MR. BAKER:  Okay.  Okay.

22    BY MR. BAKER:

23    Q   So, Mr. Choudhri, with regard to your ability and

24    Jetall's ability to lease these properties, what have you

25    done in the past and recently to demonstrate your ability to

1    lease up this building?

2    A    I believe we have a very good track record with leasing

3    up this building. I have moved in lots of tenants. PC

4    Partners (indiscernible) leases, so I believe we have a

5    great track record. When I acquired the building through

6    (indiscernible) entity, it was empty and it was very de-

7    gentrified. It was a call center.

8        Spent over $20 million to renovate and upgrade,

9    upgrading the building, bringing it to code, fully

10    sprinklering it, putting in the elevators, redoing the

11    lobbies, and repurposing the building. We inverted the

12    hallways. Signed the lease with Stage Doors, a 200,000 foot

13    tenant, moved them in, signed several other leases, got --

14    moved the bank in. Got the (indiscernible).

15        And when -- during COVID, we lost our largest tenant

16    and the building's occupancy went down to 15 percent and the

17    challenges that I had, it's a lack of cooperation with the

18    banker approving any leases and even today, even as of last

19    week, they're refusing to provide us any subordination for

20    tenants and that is when we -- that, for the last few

21    months, has affected, because tenants are concerned about

22    moving into a building without an SNDA in the event there's

23    a foreclosure.

24           MR. FITZMAURICE: So --

25           THE WITNESS: So, we've had lots of success

1    leasing up.

2              THE COURT:  (indiscernible).

3              MR. FITZMAURICE:  Objection.  I didn't want to

4    interrupt.  Objection, Your Honor, with respect to hearsay

5    concerning things that supposedly happened last week,

6    conversations with tenants, information about SNDA --

7              THE COURT:  I'll sustain the objection.

8              MR. FITZMAURICE:  Thank you, Your Honor.

9    BY MR. BAKER:

10   Q    Okay.  You've been directly involved in leasing the

11   property.  Is Mr. Darjean involved in that also?

12   A    Yes.

13   Q    Okay.  And so right now, the occupancy of the building

14   stands about 70 percent signed leases?

15   A    Seventy percent of signed leases, not including leases

16   we are at the verge of signing.

17   Q    Okay.

18   A    One of them with a company known as Vaxanix which is a

19   significant biotech company.

20   Q    Okay.  And so --

21             THE COURT:  Mr. Baker, hold on for just one

22   second.  I don't know who's on the phone, but apparently the

23   phone line hung up and there are people trying to connect,

24   so let us dial real quick.

25             AUTOMATED VOICE:  Hello.  Please enter your six

1   digit -- welcome to (indiscernible) conference.  Please

2   enter -- we will now connect you to your call.  There are

3   four attendees of this conference.

4           THE COURT:  Okay, go ahead, Mr. Baker.

5   BY MR. BAKER:

6   Q    So, with regard to being able put forth a plan, it's

7   your belief based upon your long history of being involved

8   in leasing properties that you can get this building leased

9   out and have more than sufficient revenue to cover the

10  payments under the proposed plan?  That --

11  A    Absolutely, and I'm betting and really want it because

12  I believe in it.

13  Q    Okay.  Now, the new tenants that you're talking to,

14  from your perspective are they credit worthy?

15  A    Absolutely.

16  Q    Okay.  Do you have any indication that they would not

17  pay?

18  A    No.

19  Q    Okay.  And to your knowledge, at least at this point in

20  time, are all the current tenants who are in the property

21  paying according to their lease terms?

22  A    Yes, except one of the tenants is behind or concerned

23  about the bankruptcy and the -- getting a subordination and

24  if they're going to get their TI dollars.

25  Q    So, what effect has the bankruptcy had on getting

1    tenants to move in?

2    A    Without a reorganization is -- it's a very challenging

3    market.  So, it is really -- with the bankruptcy and without

4    a path with a plan, -- you know, tenants are concerned of

5    making a big investment in the building.  If the Bank of

6    Kuwait is going to foreclose.  And without a subordination,

7    you know, just a major concern of not getting leases, that's

8    impacting lease up, for sure.

9    Q    So, how quickly would you like to get to a confirmation

10    hearing?

11    A    ASAP.  (indiscernible).  My family member has deposited

12    the funds in escrow in a bank account, earmarked for the

13    plan, to fund the plan.  So, as soon as we can get there, I

14    would like to get there as soon as possible.

15    Q    Okay.  I've got a document in front of you, 88-12.  See

16    that?

17    A    Yes.

18    Q    Okay.  Okay, so what is that?

19          MR. FITZMAURICE:  Objection, Your Honor.

20          THE COURT:  Let me look at it first.  What's the

21    objection?

22          MR. FITZMAURICE:  I think the -- counsel would

23    have to establish the witness' -- the basis for the witness'

24    knowledge that this document -- what this document is that

25    has no identifying marks on it whatsoever.

1           MR. BAKER:  I was --

2           THE COURT:  Mr. Baker, you can lay a predicate if

3   you want to or try to lay a predicate if you want to.

4           MR. BAKER:  Okay.

5   BY MR. BAKER:

6   Q    Mr. Choudhri, what is this document?

7           MR. FITZMAURICE:  Objection.  That was the same

8   question in the --

9           THE COURT:  He can lay a predicate as to what it

10  is, how he knows first.

11          MR. BAKER:  Okay.  Okay.

12  BY MR. BAKER:

13  Q    How do you know about this document?

14  A    This is a bank statement.

15          MR. FITZMAURICE:  Objection.

16          THE COURT:  He hasn't admitted -- asked it be

17  admitted into evidence.  He's got to lay a predicate first

18  and then we'll go from there.  Go ahead.

19  BY MR. BAKER:

20  Q    Okay.  It's a bank statement.  Where did you get this

21  bank statement?

22  A    I obtained this bank statement from my mom.

23  Q    Obtained from your mom.  Okay.  And it's a bank

24  statement from what bank?

25  A    Metro Bank.

1    Q    Okay.  And who put the money in the account?

2    A    The funds belong to an entity that she owns.

3    Q    Are any of these funds at all remotely coming from the

4    Debtor?

5    A    No.

6    Q    Okay.  So, these funds were funds of hers in an entity

7    that she owns that has nothing to do with the Debtor?

8    A    Correct.

9    Q    Is that correct?  Right.  And so, you got this bank

10   statement from your mother.

11   A    Yes.

12   Q    Why does it -- been blacked out, information on there?

13   A    Because we have -- there's been a number of investors

14   who have been concerned about the attack by this Ms. Zaheer

15   and the bank and the situation with Osama Abdul Latif, and

16   so --

17            MR. FITZMAURICE:  Objection, Your Honor.  Hearsay

18   as to concerns by people.

19            THE COURT:  I'll sustain the objection as to

20   hearsay.

21   BY MR. BAKER:

22   Q    Okay.  Okay, so let's go back.  This bank statement was

23   -- how did you get this?

24   A    She handed it to me.

25   Q    Okay.  Are you personally familiar with this account?

1    A    Yes.

2    Q    Okay.  And so, are you personally familiar that at

3    least on the date of this statement, this statement is

4    correct?

5    A    Yes.

6            MR. BAKER:  All right.  Your Honor, I move to

7    admit 88-12.

8            MR. FITZMAURICE:  So, objection, Your Honor.

9    There's no basis for anyone to determine --

10           THE COURT:  Foundation, hearsay.  I'll sustain the

11   objection.

12           MR. FITZMAURICE:  Thank you, Your Honor.

13           THE COURT:  It's not admissible this way, not

14   through this witness.

15           MR. BAKER:  Okay.  Okay.

16   BY MR. BAKER:

17   Q    So, let me ask you this.  How much money does the

18   Debtor have right now that's available that the Debtor plans

19   on getting brought into the use of the Debtor's operation?

20   A    Approximately two-and-a-half million.

21   Q    Okay.  And is that -- are those funds also supposed to

22   come from your mother, an entity of your mother's?

23   A    Yes.

24   Q    Okay.  And she is committed to making those funds

25   available?

1   A    Yes.

2   Q    Okay.  All right.  And so, from the first -- these

3   funds are available from the operation of the Debtor going

4   forward.  Approximately how long does that allow the Debtor

5   to operate until it gets to a break even basis?

6   A    I would have to look at the projections, but I believe

7   we would be breaking even around month 12 or 13.  There's

8   one scenario, assuming with additional leases and one

9   scenario without, and one scenario assuming we would

10   discount some of the (indiscernible) leases as well, just as

11   a stress test.  So, it's anywhere from 11 or 12 months.  I

12   think there was one that would be as early as eight months

13   and one that was as late as 25 months.

14   Q    Okay.

15   A    With a slower rent, but based on a kind of sensitivity

16   to other analysis and the stress test of, kind of a

17   balancing act of lease up, tenant improvements, and the

18   liability of the credit worthiness of the tenants and right

19   now, we have some very good tenants that we think are --

20   like Regis would be -- could completely skew our

21   projections, but if the building was what we anticipate, we

22   could easily get to around -- to 8 million in revenue, but

23   we've been very concerned with (indiscernible) not hit those

24   numbers.

25   Q    Okay.  You said Regis would skew your projections.  How

1    would it skew?

2    A    Upward.  We're not including lots of tenants that we

3    believe we're going to sign.  That -- we're not including

4    those.

5    Q    Okay.

6    A    So, I think it could be -- I believe it's -- I believe

7    it's very conservative.  I believe it's going to be better.

8    That's -- I'm very confident in that, being able to lease up

9    its building and lease hundreds of thousands of square feet.

10   Q    And you've owned a number of other buildings in the

11   past; is that correct?

12   A    Yes.

13   Q    That you have rented out and currently renting out; is

14   that right?

15   A    Yes.

16   Q    So, this is not the only building you're involved in?

17   A    Correct.

18   Q    Okay.  Now, let's go back --

19   A    But the most challenging part, office environment

20   (indiscernible).

21   Q    So, when you say the most challenging environment, from

22   what perspective?

23   A    Well, this particular building, challenges have been

24   the Bank of Kuwait and the other challenges, there's a lot

25   of office space and it's, you know, the office market is

```
 1   definitely challenging, and buildings have to be repurposed
 2   quite a bit.  And there's a lot of -- post COVID, there's a
 3   lot of people who don't want to go in the office anymore.
 4   So, those are factors that are definitely more challenging.
 5   So, you have to work way, way harder to get tenants than you
 6   did before COVID.  And the challenging -- you know, not
 7   having cooperation, simple things like, we like a form SNDA
 8   for a tenant.  That's definitely more challenges than I've
 9   faced before.
10   Q    Okay.  And when you say SNDA, what do you mean?
11   A    Subordination, non-disturbance agreement.  A lot of
12   tenants require an SNDA from the lender and I've seen emails
13   where we requested subordination agreement --
14            MR. FITZMAURICE:  Objection, Your Honor.  Hear --
15            THE COURT:  Objection for -- it's okay to object.
16   Could you tell me why you're objecting?
17            MR. FITZMAURICE:  I'm sorry, yeah.  Hearsay, Your
18   Honor, as to the --
19            THE COURT:  I'll sustain the objection --
20            MR. FITZMAURICE:  Thank you.
21            THE COURT:  -- hearsay.  Thank you.
22   BY MR. BAKER:
23   Q    Have you gotten any communications from the National
24   Bank of Kuwait that they would agree to a subordination
25   agreement with any tenants?
```

1  A    No.

2  Q    Okay.  Have you asked your attorneys to request

3  subordination agreement from the National Bank of Kuwait?

4  A    Repeatedly.

5  Q    Okay.  To your knowledge, you've never gotten any

6  responses, neither your or your attorney have ever gotten

7  responses to requests for subordination?

8  A    That is absolutely correct.

9         MR. FITZMAURICE:  Objection, Your Honor.  Lacks

10  foundation.  The point is whether a request was actually

11  made and there's no evidence of that.

12         THE COURT:  I'll overrule the objection.

13         MR. BAKER:  Thank you, Your Honor.

14  BY MR. BAKER:

15  Q    Okay.  Now, there was a discussion about what happened

16  last year with the National Bank of Kuwait, right?  And

17  there was a -- when was this confidential settlement

18  agreement entered into, approximately?

19  A    September -- believe it was around August 22 of 2022.

20  Q    Okay.  And I won't get into the terms of the settle --

21  confidential settlement agreement specifically, but after

22  that, did you have some type of an agreement worked out to

23  sell the property?

24  A    Yes.

25  Q    Okay.  And what happened and why did that agreement not

1    go through, from your perspective, from your opinion?

2    A    From my perspective, the confidentiality of the

3    agreement was violated and two, the agreement required a

4    loan (indiscernible) provided.  It was not provided.  After

5    repeatedly being requested that it be provided, until --

6         MR. FITZMAURICE:  Objection, Your Honor.  Hearsay

7    as to the repeated requests.

8         THE COURT:  I'll sustain the objection.  You can't

9    tell me what other people said or told you, just what you

10   know.  Go ahead.  Rephrase the question.

11        MR. BAKER:  Okay.

12   BY MR. BAKER:

13   Q    So, let's go back, because the property posted for

14   foreclosure back in March of 2023, approximately,

15   (indiscernible) do you recall?

16   A    (indiscernible).  Yes.  Yes.

17   Q    Okay.  So --

18   A    I know, I believe it was mid-April.

19   Q    Okay.  And then -- so at that point in time --

20   A    It was posted in March for an April sale.

21   Q    Okay.  2023?

22   A    Yes.

23   Q    So, at that point in time, on your instructions, the

24   Debtor went in to state court to seek a -- some type of

25   restraining order on the foreclosure sale; is that correct?

1    A    Yes.

2    Q    Okay.  And was the Debtor successful?

3    A    Yes.

4    Q    Okay.  Now, as part of that, what was the National Bank

5    of Kuwait supposed to do?

6    A    Comply with the settlement agreement.

7    Q    Okay.  So, did you have entities or persons that wanted

8    to buy the property at that point in time?

9    A    Yes.

10   Q    Okay.  And so, one of the things that was needed was

11   some type of a loan -- sale agreement from the National Bank

12   of Kuwait to give to these potential buyers; is that a fair

13   summary?

14   A    Kind of conflates two separate (indiscernible).  One,

15   there's a buyer for the property.

16   Q    Okay.

17   A    -- entity where they want to buy into the entity and

18   acquire 55 percent with a -- with some (indiscernible), if

19   you like.

20   Q    No.

21   A    And then separate and apart from that, there's a loan

22   sale that was needed.  Security State Bank of Texas had

23   approved the loan, to finance the loan, to buy the loan.

24             MR. FITZMAURICE:  Objection, Your Honor.  Hearsay.

25             THE COURT:  I'll sustain the objection.

1    (indiscernible) documentation so that I can see it.  Can't

2    testify as to that.  Go ahead.  Ask a new question.

3    BY MR. BAKER:

4    Q    Okay.  Okay.  Was the property posted again for

5    foreclosure in July?

6    A    It was.

7    Q    Okay.  When, to your knowledge, did you receive any

8    communications from the National Bank of Kuwait with regard

9    to the documentation necessary to complete the transaction?

10            THE COURT:  Which transaction?

11            MR. BAKER:  The transaction to get an investor in

12   to pay off the National Bank of Kuwait (indiscernible)?

13            MR. FITZMAURICE:  Objection.  Lacks foundation.

14            THE COURT:  Sustain the objection.

15   BY MR. BAKER:

16   Q    Okay.  Under the confidential settlement agreement, was

17   there a -- did that confidential settlement agreement

18   provide that if, in fact, an entity or somebody paid the

19   National Bank of Kuwait a certain amount of money, they

20   would either release their loan or transfer their lien?

21            MR. FITZMAURICE:  Objection, Your Honor.  I don't

22   know why we're testifying as to the contents of the document

23   that's here.  The Court can look at it.

24            THE COURT:  I think the document speaks for

25   itself, Mr. Baker, so if you want to (indiscernible) look at

1   it, I'm more than happy.  It's on the record.

2          MR. BAKER:  Okay.

3          THE COURT:  You can't see it, but I can because

4   it's filed under seal.

5          MR. BAKER:  Okay.  So, I'm not exactly sure what

6   to do with that if it's filed under seal.

7          THE COURT:  I can look at it.  I can show it to

8   the party if no one's going to object.  I haven't ruled on

9   the motion to seal it yet.  I don't know what's in it.

10          MR. BAKER:  Well, I would like to open it up, if

11   we could open it up, so that we could see it.

12          THE COURT:  Let me ask the bank.  Do they have any

13   objection it me showing it to the witness?

14          MR. FITZMAURICE:   None, Your Honor.  In fact, we

15   have no objection to the document being publicly filed.

16   Your Honor will see that it indicates that it's confidential

17   and the motion to seal was on that basis, because we don't

18   want to -- right, we don't want to publicly file something

19   that shouldn't be, but we have no objection if the Debtor

20   consents to the public disclosure.

21          THE COURT:  Any objection to me opening and

22   showing the Debtor?

23          MR. BAKER:  No.

24          THE COURT:  All right.

25          THE WITNESS:  Well, wait a second now.  I just

1   want to make sure.

2           THE COURT:  There's a confidential settlement

3   agreement.

4           THE WITNESS:  Yes, Your Honor.

5           THE COURT:  Filed under seal with this Court.

6   Okay?  Everybody seems to be -- wants you to testify what's

7   in it.  I'm happy to open it and show it to everybody, but

8   once it's in the record, it's in the record.

9           THE WITNESS:  Sure.  Is it possible that I see it

10  and (indiscernible) not publicly, because this is a

11  confidential --

12          THE COURT:  I'm either going to let it in or I'm -

13  - this is not a Court where we basically hide behind

14  (indiscernible).  It's either going to be a public record or

15  it's not going to be a public record.

16          THE WITNESS:  The concern I have, just for me

17  personally, Your Honor, is that --

18          THE COURT:  I understand your concerns and I'm

19  telling you, it'll either be public record or it won't.  I'm

20  not going to basically -- so if you want to talk to Mr.

21  Baker about that for a second before we make that decision,

22  feel free.  You want to talk to him?

23          THE WITNESS:  Please.

24          THE COURT:  Okay.  I'll step down for ten minutes.

25          MR. BAKER:  All right.  Thank you, Your Honor.

```
1              THE COURT:  I'll come back at 2:20.

2              CLERK:  All rise.

3              (Recess)

4              CLERK:  All rise.

5              THE COURT:  Please be seated.  All right, Mr.

6    Baker, what's the decision?

7              MR. BAKER:  We're not going to waive the

8    confidentiality and --

9              THE COURT:  All right.

10             MR. BAKER:  -- not agree to --

11             THE COURT:  As you go along, don't ask him

12   questions about it, because I don't want you to open the

13   door.

14             MR. BAKER:  Okay.

15             THE COURT:  All right?

16             MR. BAKER:  Okay.

17             THE COURT:  Go ahead.

18             MR. BAKER:  Okay.  Okay.

19   BY MR. BAKER:

20   Q    All right, I'd ask you to look at the document in front

21   of you is 90-9.  Do you recognize that?

22   A    Yes.

23   Q    Okay, and what is that?

24   A    This is foreclosure sale agreement.

25   Q    Okay.  And approximately when did you receive this?
```

```
 1    A     Friday, June -- Friday before July 4th.
 2              MR. BAKER:  Okay.  Your Honor, I move to admit 90-
 3    9.
 4              THE COURT:  Any objections to 90-9?
 5              MR. FITZMAURICE:  No objection, Your Honor.
 6              THE COURT:  It's admitted.
 7              (Exhibit 90-9 entered into evidence)
 8    BY MR. BAKER:
 9    Q     Okay.  Okay.  And so June 29 -- when was the property
10    posted for foreclosure?
11    A     July the 5th.  It was a Wednesday.  It's the only
12    Wednesday.  Usually, it's Tuesday, but because of July 4th,
13    July 4th fell on a Tuesday, so it was Wednesday.
14    Q     Okay.
15    A     July the 5th.  So whatever that Friday was before July
16    the 4th.
17    Q     So, when you got that, what happened at that point in
18    time with the proposed transaction?
19              MR. FITZMAURICE:  Objection, Your Honor.  Lacks
20    foundation as to proposed transaction.
21              THE COURT:  Excuse me, sir.  I didn't hear you.
22              MR. FITZMAURICE:  Sorry, lacks foundation as to
23    proposed transaction.
24              THE COURT:  I'll sustain the objection.  Go ahead,
25    Mr. Baker.
```

```
1              MR. BAKER:  Okay.

2    BY MR. BAKER:

3    Q    So, at that point in time, what type of transaction was

4    the Debtor trying to get done?

5    A    A loan sale.

6    Q    Okay.

7    A    To acquire the loan, and I personally, being part of

8    that, would be a -- the loan with would be acquired by --

9    from the National Bank of Kuwait and that the National Bank

10   of Kuwait would assign tax liens as part of that

11   (indiscernible).

12   Q    So how long had you personally been involved in trying

13   to get that done?

14   A    Since March -- since March timeframe.

15   Q    Okay.  And had you personally or through your attorney

16   been asking for documents from the National Bank of Kuwait

17   since that time?

18   A    Yes --

19             MR. FITZMAURICE:  Objection.  Lacks foundation and

20   hearsay.

21             THE COURT:  All right, I'll sustain the objection.

22   BY MR. BAKER:

23   Q    Okay, let me go back.  Had you personally been involved

24   with your attorney in asking the National Bank of Kuwait to

25   provide documentation to allow you to complete the
```

1   transaction for someone to acquire the loan from the

2   National Bank of Kuwait?

3   A     Yes --

4        MR. FITZMAURICE:  Same objections, Your Honor.

5   It's the same question.

6        THE COURT:  I'll sustain the objection.

7   BY MR. BAKER:

8   Q    Okay.  After March of 2023, were there attempts to try

9   to get confidential settlement agreement done with National

10  Bank of Kuwait, by you through your attorney?

11  A     Yes.

12  Q    Okay.  And so, when, to your knowledge, was the first

13  time that either you or your attorney got documents back

14  from the National Bank of Kuwait that would allow you to

15  complete the settlement agreement?

16  A     Well, I believe we never did.  The only thing that came

17  close was Friday before the -- before July 4th and I think

18  Friday, June 29th, if I'm not mistaken.

19       MR. FITZMAURICE:  So, objection, Your Honor.

20  Counsel is asking about a settlement agreement and the

21  witness is testifying about a loan sale agreement that we

22  just looked at and was admitted into evidence.

23       THE COURT:  You're going to have to give me a

24  little more background on what's happening, because there's

25  some sort of agreement or settlement I know nothing about,

1    Mr. Baker --

2              MR. BAKER:  Okay.

3              THE COURT:  And the Debtor -- I need a foundation

4    of what we're talking about.

5              MR. BAKER:  Okay.

6    BY MR. BAKER:

7    Q    Okay, so let's go back in March 2023, when you went

8    with your attorney and got a restraining order to restrain

9    the foreclosure sale by the National Bank of Kuwait.  Right?

10   At that point in time, did you have any discussions or were

11   there discussions to put in place some provisions to allow

12   time for you to get a deal done with the National Bank of

13   Kuwait?

14   A    Yes.

15   Q    Okay.  And at that point in time, then, did you move

16   forward with trying to get that transaction done?

17   A    Yes.

18   Q    Okay.  And -- go back and ask you, were there documents

19   that were needed to get that transaction done?

20   A    Yes.

21   Q    Okay.  Is one of those documents this 90-9 document,

22   the loan purchase and sale agreement?

23   A    Yes.

24   Q    Okay. And why was that needed?

25   A    That was needed pursuant to the agreement, it was

1    needed to complete the transaction to acquire the loan and

2    take the Bank of Kuwait out.

3    Q    Okay.  And this would've taken the National Bank of

4    Kuwait out completely?

5    A    Yes.

6    Q    Okay.  And so, you can see here on the first part it

7    has brackets and purchaser, right?

8    A    Yes.

9    Q    Okay.  And it has at the top right, execution version.

10   Is that correct?

11   A    Yes.

12   Q    Okay.  And so, is this what you got from the National

13   Bank of Kuwait somewhere around June 29 or 30?

14   A    It was a Friday.  I believe that is June -- let's see,

15   4th, 3rd, 2nd, 1st -- Friday, June 30th.

16   Q    Okay.

17   A    And with -- what I received had a statement that this

18   is not the final.  It's still subject to the bank's

19   approval.

20   Q    Okay.  And --

21   A    That was something that was being requested as early as

22   March, a loan sale agreement to complete the loan sale.

23        MR. FITZMAURICE:  Objection, Your Honor.  Lacks

24   foundation and hearsay as the request since March.

25        THE COURT:  Sustain the objection.  If there's

1    something in March, show me something in March.

2              MR. BAKER:  Well, Your Honor, he's testified that

3    they had an agreement in March and they were trying to get

4    that agreement.

5              THE COURT:  What agreement?  I mean, there's no

6    foundation.  You say agreement.  There's no agreement before

7    me.

8              MR. BAKER:  Okay.

9              THE COURT:  You lay foundation.

10             MR. BAKER:  Well, therein lies the problem, Your

11   Honor, because --

12             THE COURT:  Well, that's your client's problem.

13   It's not my problem.  You can lay the foundation and let me

14   look at it or not.  Okay?  But you can't have it both ways.

15             MR. BAKER:  Okay.

16   BY MR. BAKER:

17   Q    Okay, I'm going to ask you to look at Document 90-7.

18   Okay?  Can you identify that document?

19   A    This is a letter from Jim Wetwiska with Akin Gump to

20   Charles Conrad of Pillsbury.

21   Q    Okay.  And who's Jim Wetwiska?

22   A    Jim Wetwiska represents Galleria 2425 Owner LLC, the

23   Debtor's counsel.

24   Q    Okay.  And was this drafted by your attorney at that

25   point in time?

1   A    Yes.

2   Q    Was it -- was this done on your behalf, at your

3   request?

4   A    Yes.

5   Q    And is this evidence, at least to your understanding,

6   of what was going on at the time?

7   A    We continued to request the loan sale agreement.  We

8   were running out of time --

9          MR. FITZMAURICE:  Objection, Your Honor.  Lacks

10   foundation and hearsay as to continued requests over time.

11          THE COURT:  Sustain the objection.  You want to

12   admit?

13          MR. BAKER:  I'd like to admit 90-7, Your Honor.

14          MR. FITZMAURICE:  No objection, Your Honor.

15          THE COURT:  90-7 is admitted.  Thank you.

16          (Exhibit 90-7 entered into evidence)

17          MR. BAKER:  Okay.

18   BY MR. BAKER:

19   Q    Okay.  So, let's look at this letter.  "Charles,

20   (indiscernible) is in the process of funding the settlement

21   payment/purchase option payment indicated in the

22   confidential settlement agreement dated August 22, 2022."

23   Correct?

24   A    Yes.

25   Q    Okay, then he asks for specific information, correct?

1    A    Yes.

2    Q    One of the things on there, number two, "Drafts of the

3    following documents and forms that are acceptable to NBK."

4    What is the first -- what is (indiscernible)?

5    A    The loan purchase and sale agreement.

6    Q    Okay.  So, as of -- best of your knowledge, as of June

7    28th when this written, you didn't have anything, did you?

8    A    No.

9    Q    Okay.  Okay.  Now --

10   A    That's why we're asking.  We needed it no later than

11   today at 1 p.m.

12   Q    Okay.  Okay.  Now, 2B on there is an assignment of

13   NBK's lien and tax lien.  So, what was that all about?

14   A    So, that's part of the tax lien that we were talking

15   about earlier where I assigned the tax liens to the Bank of

16   Kuwait and they were to assign those back and also assign

17   the lien that they held.

18   Q    Okay.  So --

19   A    Then that would get them out.

20   Q    So, did you have someone available to fund this?

21   A    Yes.

22   Q    Okay.  And what happened after June 28 -- June 2023?

23   A    I believe on Friday, we received a draft, finally.  The

24   auction was on Tuesday -- I'm sorry, not Tuesday, but

25   Wednesday because of July 4th on that Tuesday, and there

1    just wasn't enough time to get this done and what was

2    received was a draft loan sale agreement (indiscernible)

3    statement that is not final and it's not approved by the

4    Bank of Kuwait yet and we needed a final, what was approved,

5    so the transaction could be completed.  Without that,

6    without an acceptable loan sale agreement to the bank that

7    was acceptable, could not move forward.

8    Q    Okay.  So, at least from your perspective, you had a

9    deal done to take them out then, and National Bank of Kuwait

10   basically obstructed that ability (indiscernible)?

11   A    Yes --

12           MR. FITZMAURICE:  Objection.  Leading.

13           THE COURT:  Sustain the objection.

14           MR. BAKER:  Okay.  I'll re-ask.

15   BY MR. BAKER:

16   Q    At that point in time, you thought you had a deal done

17   to take National Bank of Kuwait out.  What happened?

18   A    Just our -- the continuous pattern frustrating the --

19   just lack of cooperation to get it done.  Just an

20   unwillingness --

21           MR. FITZMAURICE:  Objection, Your Honor.  Lacks

22   foundation.

23           THE COURT:  I'll sustain the objection.

24   BY MR. BAKER:

25   Q    Okay.  How long had you been involved at that point in

1    time with the National Bank of Kuwait?

2    A    For --

3    Q    For this property?

4    A    For about five years.

5    Q    Okay.  So, you personally were involved on behalf of

6    the Debtor with the National Bank of Kuwait for about five

7    years at that time.

8    A    Yes.

9    Q    Okay.  Now, during that time period, were you trying to

10   lease the property?

11   A    Yes.

12   Q    Okay.  And what was required in order for you to get a

13   lease approved by the National Bank of Kuwait?

14            MR. FITZMAURICE:  Objection, Your Honor.

15   Relevance with respect to timing, but also if there's a

16   requirement, it's in an agreement which would speak for

17   itself.

18            THE COURT:  I'll sustain the objection.

19            MR. BAKER:  Okay. .  Okay, I'm going to go over --

20   this is 87-2.  I can't tell (indiscernible).

21            MR. FITZMAURICE:  I think it's 87-2.

22   BY MR. BAKER:

23   Q    Okay.  So, looking at this, what is this?

24   A    It appears to be a loan agreement.

25   Q    Between who and who?

1    A    It says Galleria 2425 Owner and National Bank of

2    Kuwait.

3    Q    Okay, so that's the Debtor.  It's not the National Bank

4    of Kuwait, New York branch as administrative agent and then

5    National Bank of Kuwait and certain other lenders as the

6    lenders, correct?

7    A    (indiscernible).

8              MR. BAKER:  Your Honor, move to admit this

9    document.

10             THE COURT:  Any objections to 87-2?

11             MR. FITZMAURICE:  No, Your Honor.

12             THE COURT:  87-2 is admitted.  Thank you.

13             (Exhibit 87-2 entered into evidence)

14   BY MR. BAKER:

15   Q    To your knowledge, did the loan agreement have

16   provisions or requirements in it with regard to putting new

17   leases in place?

18   A    Yes.

19   Q    Okay.  Okay.  Okay, I think I've got you, 5.27.  See

20   that, restrictions on leasing?

21   A    Yes.

22   Q    Okay.  Borrower, which is the Debtor, correct?

23   A    Yes.

24   Q    Okay, "shall not execute a material lease which shall

25   not have been submitted to and approved by the

1   administrative agent except for telecom leases."  Right?

2   A    Yes.

3   Q    "Not alter, modify, or change the terms of any material

4   lease except in the ordinary course of business," correct?

5   A    Yes.

6   Q    Number 3, "(indiscernible) consider, exercise any

7   option unless required by the terms of lease approved by

8   administrative agent," right?

9   A    Yes.

10  Q    And it goes on.  Okay, so you could not execute a

11  material lease, which I presume -- we go back up and look

12  at, that was any lease of any significance which has not

13  been submitted to and approved by administrative agent.

14  Right?

15  A    Correct, yeah.

16  Q    Okay.

17  A    We couldn't --

18  Q    Okay, so --

19  A    -- leases without their prior written --

20  Q    It goes on here.  Okay, so what type of issues did you

21  have with getting consent from the National Bank of Kuwait

22  to get leases approved?

23       MR. FITZMAURICE:  Objection, Your Honor, as to

24  timing and also hearsay as to any correspondence between the

25  parties on this issue.  The -- relevance as to time.

1             THE COURT:  -- your question as to timing so

2     you're not (indiscernible) over the entire 2018 to 2023 term

3     and I'll let you rephrase your question.

4             MR. BAKER:  Okay.  Okay.

5     BY MR. BAKER:

6     Q    Did the Debtor have issues getting consent from the

7     National Bank of Kuwait for leases at any time from 2018

8     going forward?

9             MR. FITZMAURICE:  Objection, Your Honor.

10            THE COURT:  -- understand the question.  You said

11    '18 going forward?

12            MR. BAKER:  2018, from the time the loan agreement

13    was signed.

14            THE COURT:  Okay, go ahead.

15            MR. FITZMAURICE:  Your Honor, vague as to issues.

16    Also --

17            THE COURT:  I'll sustain the objection.  Be more

18    specific.  You want to talk about specific leases, specific

19    (indiscernible) being rejected or not being approved, that's

20    what I want to hear, not generalities.

21            MR. BAKER:  Okay.  Okay.

22    BY MR. BAKER:

23    Q    Okay, Let's talk about specific leases.  All right?

24    There was a lease with Sonder, correct?

25    A    Correct.

1    Q    Proposed lease with Sonder, correct?

2    A    That is correct.

3    Q    Okay, and Sonder was going to take about how much

4    square footage of the property?

5    A    Eighty-four -- hold on.  Let me see.  About 80,000

6    square feet.  Three floors of the building.

7    Q    Okay.  And when did Sonder want to move in?

8    A    Sonder wanted to -- Sonder wanted to move in around the

9    end of twenty -- it was 2019.

10        MR. FITZMAURICE:  So, objection, Your Honor, to

11   questions and answers -- testimony concerning Sonder.

12   Given the timing, we're here about what's happening now and

13   going forward, not what happened in 2019.

14        THE COURT:  Besides, isn't there -- there's been

15   an allegation made that any time after May of 2020, there

16   were mutual releases done.  I'm not sure I understand why it

17   would even be relevant to what we're talking about.

18        MR. BAKER:  Well, okay.  We're talking about

19   leases and issues the Debtor had with leases.  Okay.

20   Whether those were waived or not -- settlement agreement no

21   longer exists, then there are no leases.

22        THE COURT:  I don't know whether it exists or not,

23   because I haven't seen it.

24        MR. BAKER:  I don't, either.  I don't, either.  I

25   don't even know if it exists, but -- and here's

```
 1    (indiscernible).  We're asking about what type of issues did
 2    they have and you want a specific lease, so I'm going back
 3    to a specifical lease.
 4              THE COURT:  Okay.  I'm going to sustain the
 5    objection.  Let me tell you what I am interested in.  This
 6    is a second filing with a case that basically was dismissed
 7    for cause after its filing on July 5th, 2023.  All right?
 8              MR. BAKER:  Okay.
 9              THE COURT:  So, I'm really worried about what
10    happened after the case got dismissed for cause.  I'm not
11    really worried about what happened in 2017.
12              MR. BAKER:  Okay.  Okay.
13    BY MR. BAKER:
14    Q    Have there been any issues since November 1st, 2023
15    with trying to get new tenants in the property?
16              MR. FITZMAURICE:  Objection, Your Honor.  Lacks
17    foundation, best evidence, hearsay with respect to the
18    correspondence between the parties concerning this, and also
19    vague as to issues.
20              THE COURT:  Sustain the objection.  Let's be more
21    specific, Mr. Baker.  You've got specific examples, I want
22    to hear them.  I really do.  But I don't want to hear
23    generalities of whatever.
24              MR. BAKER:  Okay.
25    BY MR. BAKER:
```

1   Q    Do you have any specific issues that have occurred with

2   attempting to lease the property and National Bank of Kuwait

3   since November 1, 2023?

4              MR. FITZMAURICE:  Your Honor, vague as to issues.

5              THE COURT:  I'm going to sustain the objection.

6   Mr. Choudhri, this case was dismissed in November -- the

7   first case was filed July 5th, 2023 because of the

8   foreclosure, because of you not being able to deal with the

9   loan that you wanted to take the bank out.  I understand all

10  of that.  Okay?  The case was dismissed by Judge Lopez for

11  cause.  Record specifically says for cause.  Okay?

12             Since the case was dismissed in November of 2023,

13  did you present any leases to the bank that the bank

14  rejected?

15             THE WITNESS:  No, Your Honor.  We didn't present

16  any leases --

17             THE COURT:  Into the microphone, please.

18             THE WITNESS:  No, Your Honor, we have not

19  presented any leases.  We've only asked for the SNDA form

20  for the tenants that have approached us to lease space

21  which, they're not willing to without an SNDA.

22             THE COURT:  And where is their obligation to

23  execute that release, given what they're owed?  Is there an

24  obligation somewhere that I should be aware of?

25             THE WITNESS:  Yes, Your Honor.

```
 1                THE COURT:  Where is it?

 2                THE WITNESS:  It's in the settlement agreement.

 3                THE COURT:  Which I haven't seen and can't see,

 4     because you won't let me.

 5                THE WITNESS:  Well, I think you should see it,

 6     then.  I'm so sorry.

 7                THE COURT:  Go ahead, Mr. Baker.

 8                THE WITNESS:  I'd like you to have the whole

 9     story.

10                THE COURT:  Okay.  I've given it back to your

11     lawyer.  Go ahead.

12                MR. BAKER:  Okay.

13     BY MR. BAKER:

14     Q    Okay.  Okay.  Since the case was dismissed on November

15     1 -- there was a hearing on November 1 before Judge Lopez,

16     correct?

17     A    Yes.  I was there.

18     Q    Day before the hearing, were there documents that were

19     filed in that case?

20     A    Yes.  The Halloween motion.

21     Q    Okay.

22     A    On October 31st.

23     Q    And who filed that motion?

24                MR. FITZMAURICE:  Objection, Your Honor.

25                THE WITNESS:  -- Brennan --
```

```
1              THE COURT:  What's the objection?

2              MR. FITZMAURICE:  Hearsay as to the contents -- I

3     mean, (indiscernible) hearsay as to the contents of whatever

4     this is, lacks foundation.  The documents would speak for

5     themselves.

6              THE COURT:  I'll agree with all of that.  I'll

7     sustain the objection, Mr. Baker, and I'm not going to go

8     back and revisit what Judge Lopez did or didn't do, if

9     that's what you're asking me to do.

10             MR. BAKER:  No, I'm not.  I'm trying to get -- I

11    mean, you said Judge Lopez dismissed it for cause.

12             THE COURT:  He did.

13             MR. BAKER:  Okay.  So the cause --

14             THE COURT:  The record speaks for itself as to why

15    it was dismissed.  I don't need to hear any evidence about

16    that.

17             MR. BAKER:  Okay.

18             THE COURT:  Go ahead.

19             MR. BAKER:  Okay.

20    BY MR. BAKER:

21    Q    Okay, so what has happened in the state court, some of

22    the actions involving the same parties after November 1,

23    2023?

24             MR. FITZMAURICE:  Objection, Your Honor.  Again,

25    that -- those pleadings would speak for themselves.
```

1        THE COURT:  Sustain the objection.

2        MR. BAKER:  Your Honor --

3        THE COURT:  Introduce something, and I'm not sure

4   what relevance it has to what I'm going to do today, but I'm

5   not going to allow that.  Go ahead.

6        MR. BAKER:  Okay.  Okay.  Okay.

7        THE WITNESS:  (indiscernible).

8        THE COURT:  Mr. Baker gets to ask questions.  Go

9   ahead.

10  BY MR. BAKER:

11  Q    Mr. Choudhri, the Debtor has proposed a plan and filed

12  a disclosure statement, correct?

13  A    Yes.

14  Q    Okay.  The Debtor is going to provide financial

15  information in the next several days to substantiate all

16  that.  In fact, part of that financial information has

17  already been admitted as an exhibit; is that correct?

18        MR. FITZMAURICE:  Objection, leading.

19        THE COURT:  Sustain the objection.

20        MR. BAKER:  Okay.

21        THE COURT:  (indiscernible).

22        MR. BAKER:  Okay.

23  BY MR. BAKER

24  Q    So, okay.  Remember this document, Mr. Choudhri?

25  A    Yes.

1    Q    8801.  This has been admitted into evidence, correct?

2    A    Yes.

3    Q    Okay.  And these are financial projections, correct?

4    A    Yes.

5    Q    Okay.  And is it your intention to go back and fine

6    tune those to make those as accurate as possible?

7    A    Yes.  We'll (indiscernible) CPA for that.

8    Q    Okay.  And after you do that, those will be filed as

9    part (indiscernible) the plan; is that your intention at

10    this point in time?

11    A    Yes.

12    Q    Okay.  And that can be done in the next several days;

13    is that correct?

14    A    (indiscernible).

15    Q    Okay.  And those would also be part of the financial

16    disclosures for the disclosure statement; would that be your

17    understanding?

18          MR. FITZMAURICE:  Objection.  Vague.  Those.

19          THE COURT:  I'll overrule the objection.

20    BY MR. BAKER:

21    Q    Okay.  So it's your contention that at least with the

22    financial projections in the plan, the Debtor has the

23    ability to move forward and confirm a plan; is that your --

24    A    Yes.

25    Q    -- belief?  All right.  Now, one of the other

1    allegations -- and I want to go back (indiscernible) --

2    there's been a substantial diminution of value of the

3    property.  Okay, do you believe there's been -- in your

4    opinion, do you believe there's been a substantial

5    diminution in value of the property?

6          MR. FITZMAURICE:  Objection, Your Honor, relevance

7    as to his opinion.

8          THE COURT:  I'll --

9          MR. FITZMAURICE:  And also lacks foundation as to

10   the basis --

11         THE COURT:  -- his opinion --

12         MR. FITZMAURICE:  Thank you, Your Honor.

13         THE COURT:  I'll overrule that objection.

14   BY MR. BAKER:

15   Q    Okay.

16   A    No, it's been created.  We've created value, added --

17   there's been more value added.

18   Q    Okay, and how's that?

19   A    With additional leases and --

20         MR. FITZMAURICE:  So, objection, Your Honor, as to

21   testimony concerning leases that aren't in evidence.

22         THE COURT:  I'll sustain that objection.

23   BY MR. BAKER:

24   Q    Okay.  Well, you testified as far as potential leases,

25   correct?

1    A    Yes.

2    Q    Okay.  So, if those potential leases are actually

3    executed and move forward, then what would that do to the

4    value of the building?

5    A    Increase the -- continue to increase the value.

6    Q    Okay.  And so, from your perspective, has there been a

7    substantial diminution in value?

8    A    No.

9    Q    Okay.  Now, what the code says is a substantial

10   diminution in value and an inability to rehabilitate.  Okay,

11   so what type of rehabilitation you believe the Debtor has?

12   A    Your question is what?  What kind -- sorry.

13   Q    Okay.  What type of actions could the Debtor take to

14   address any alleged substantial diminution in value?

15   A    Well, I think an assessment through a CRO would

16   obviously be helpful and I'd be open to it.  It's engaged a

17   CPA who has reviewed leases, interviewed tenants,

18   prospective tenants, and evaluated the lease up of the

19   building.

20   Q    Okay.

21   A    We've negotiated the utilities down with a contract --

22          MR. FITZMAURICE:  Objection, Your Honor.  Hearsay.

23          THE COURT:  I'll sustain the objection.

24   BY MR. BAKER:

25   Q    Okay.  Okay, what other things has the Debtor done to

1   potentially provide for an increase in value?

2   A    Well, I think the Regis lease is a significant lease.

3        MR. FITZMAURICE:  Objection, Your Honor.

4   Testimony concerning leases that aren't in evidence.

5        THE COURT:  I'll sustain the injection as to any

6   sort of testimony regarding a lease that I haven't seen.

7        MR. BAKER:  Okay.  Okay.

8   BY MR. BAKER:

9   Q    Let me ask you this.  Have you had personal

10  conversations with people from Regis?

11  A    Yes.

12  Q    Okay, and based upon your personal conversations, what

13  is your opinion as far as what may happen with Regis?

14       MR. FITZMAURICE:  Objection, Your Honor.  Hearsay.

15  The whole point is to get in what the Regis --

16       THE COURT:  I'll sustain --

17       MR. FITZMAURICE:  Thank you.

18       THE COURT:  -- objection.

19  BY MR. BAKER:

20  Q    Okay.  Okay.  Besides -- let me go back.  You've been

21  involved in leasing buildings for years and years and years,

22  correct?

23  A    Yes.

24  Q    Okay.  Based upon your history of leasing buildings,

25  what do you believe is the reasonable likelihood of getting

1   this building leased out (indiscernible)?

2   A    Very high likelihood.  We're already very confident

3   it'll be leased up.

4   Q    Okay.  And you say leased up --

5   A    -- leased up -- it's already been leased up and as the

6   tenants start paying the rents, the rent will increase and

7   it will be more healthier and stronger.  I (indiscernible)

8   200,000 square foot Stage and DC Partners is another tenant

9   that I moved in.

10          MR. FITZMAURICE:  Objection, Your Honor.

11          THE COURT:  I'll sustain the objection.

12          MR. BAKER:  Okay.

13   BY MR. BAKER:

14   Q    Let me ask you, since the last case was dismissed,

15   since November 1st of 2023, have you personally been

16   involved in new lease negotiations?

17   A    Yes.

18   Q    Okay.  And you believe those new lease negotiations

19   should translate into new leases in the property?

20   A    Absolutely.

21   Q    Okay.  And when do you anticipate that you may be able

22   to get these additional leases of the property?

23   A    It's pending as we speak.  I believe within the next

24   short order.  For example, Vaxanix --

25          MR. FITZMAURICE:  Okay, so then, Your Honor,

1   objection with respect to testimony concerning the leases

2   and agreements.

3          THE COURT:  I'll sustain the objection.  And

4   you're being repetitive, Mr. Baker.

5          MR. BAKER:  Okay.

6          THE COURT:  You don't really need to --

7          MR. BAKER:  Okay.

8          THE COURT:  -- beat it down.

9          MR. BAKER:  Okay.

10          THE COURT:  If you have something new you want to

11   tell me, but I'm hearing the same thing over and over and

12   over.

13          MR. BAKER:  Okay.  Okay.  Your Honor, I have no

14   further questions right now.

15          THE COURT:  All right.  Then let me to go bank's

16   counsel to see if they have cross examination.

17          MR. FITZMAURICE:  We do, Your Honor.  With Your

18   Honor's permission, my colleague --

19          THE COURT:  That's fine.

20          MR. FITZMAURICE:  Thank you, Your Honor.

21          THE COURT:  Come on up.  Sir, let me get your

22   name, just because I didn't get Mr. Fitzmaurice's co-

23   counsel's name when you made your announcement.  Go ahead.

24          MR. STEINBRUNNER:  Thank you, Your Honor.  Ryan

25   Steinbrunner on behalf of National Bank of Kuwait.

1              THE COURT:  Thank you.  Go ahead.

2              MR. STEINBRUNNER:  Thank you, Your Honor.

3    BY MR. STEINBRUNNER:

4    Q    Good afternoon, Mr. Choudhri.

5    A    Afternoon.

6    Q    I want to start with the portion of your testimony that

7    you just gave with respect to the letter from your lawyer,

8    Jim Wetwiska.  You recall that?

9    A    Yes.

10             MR. STEINBRUNNER:  Okay.  And Your Honor, I

11   believe that is --

12             THE COURT:  Need to reconnect over here.

13             MR. STEINBRUNNER:  That is -- it's going to be

14   nine -- 90-7.  Yep.

15             MR. FITZMAURICE:  I think it's 90.

16             MR. STEINBRUNNER:  Ninety.  Yeah.  90-7.

17             THE COURT:  90-7, I think it was.

18   BY MR. STEINBRUNNER:

19   Q    Okay.  And we see this is a letter dated June 28, 2023,

20   correct?

21   A    Yes.

22   Q    Okay.  I believe both in your testimony and your lawyer

23   in his opening statement said that there were repeated

24   requests for months for the loan purchase and sale

25   agreement, assignment liens, the loan, all the things that

1    are in this letter from NBK, correct?

2    A    From NBK?

3    Q    That you had testified that -- and I think your lawyer

4    had also stated that you had been requesting these, this

5    information from NBK for months, correct?

6    A    Yes, Mr. Wetwiska requested it and he also testified to

7    that.

8    Q    Mr. Wetwiska testified to that?

9    A    He can come testify to that.

10   Q    Okay.  Well, he's not here, correct?

11   A    He said he could be here, even (indiscernible), but --

12   because Mr. Fitzmaurice mentioned him, he said that's not

13   accurate.  He can come down here.

14   Q    Okay.  Now, my question is that you stated under oath

15   and your lawyer here stated in his opening that you had been

16   requesting this information for months, correct?

17   A    Yes.

18   Q    Okay.  This is the only written document that you know

19   of that ever requested this information from NBK, correct?

20   A    Incorrect.

21   Q    What other document, post the April 12th hearing on the

22   TRO other than this this letter dated June 28, 2023, do you

23   have where you're requesting this information from NBK?

24   A    I don't have any documents with me here, but I'm aware

25   that Mr. Wetwiska was in communication and exchanged

1    communications with Mr. Conrad as early as March 2023.

2    Q    Okay, so even though you were aware of these, this

3    information from your lawyer from March 2023, you don't have

4    that today?

5    A    I was not aware that today was to discuss the

6    settlement.  And if it was, then I think we would have been

7    more prepared for that and have our witnesses for that.  So,

8    my counsel informed me today was specifically for

9    confirmability or diminution (indiscernible) plan or what

10   was being asked by y'all.

11   Q    Mr. Choudhri, I'm not asking about the settlement.  I'm

12   asking about representations that your lawyer made and

13   representations that you made in his opening statement about

14   the fact that you didn't pay -- you couldn't pay NBK in

15   advance of July 5th foreclosure, but you didn't receive this

16   document from -- these documents from NBK despite your

17   repeated requests.  That's what I'm talking about.  And the

18   only letter that you have in writing today that evidences

19   that you ever requested this information from NBK is dated

20   June 28, 2023, correct?

21   A    This, I believe, is not -- I believe the only

22   communication -- and I'm not sure what exhibits --

23   Q    My question is, in evidence today, Mr. Choudhri, not

24   about other evidence that you might think exists outside of

25   the record today.

1    A    Right.  I'm not aware of us having all the documents

2    for the claim with this breach of the settlement with the

3    Bank of Kuwait today.  That's -- that is -- we didn't

4    believe we were here to try that today, so we did not -- I

5    don't believe we have the -- all of the communications and

6    exhibits that would be relative to the breach of settlement

7    by the Bank of Kuwait.

8    Q    Mr. Choudhri, nowhere in this letter does it say that

9    there have been numerous requests on the part of Galleria or

10   Mr. Wetwiska for this information.  Doesn't say that

11   anywhere in this letter, does it?

12   A    It does not.

13   Q    It also doesn't say, pursuant to any agreement of any

14   kind, which I believe you testified existed, please provide

15   us this information.  Doesn't mention any agreement or

16   obligations on the part of NBK to produce this information,

17   correct?

18   A    It says, "Under the confidential statement agreement

19   dated August 22nd, to facilitate this, can you please

20   provide all information and documentation by 1 p.m. today?"

21   Because it was asked over and over.  That's why this is an

22   accelerate -- this is why it's a deadline of we need this

23   today.

24   Q    Okay, Mr. Choudhri. You just read it, kind of.  You --

25   I'll read it for you.  It says, "Galleria is in the process

1    of funding the settlement payment" --

2    A    Correct.

3    Q    -- "purchase option pursuant to the confidential

4    settlement agreement."  It doesn't say that this -- these

5    documents that are being requested are an obligation of the

6    bank pursuant to that agreement.  Doesn't say that, correct?

7    A    I'm sorry.  It says under -- my understanding of the

8    agreement is that this is an obligation of the bank.  They

9    have to do that under the settlement agreement, and I

10   believe it says, under the confidential settlement

11   agreement.  So, it -- I take that to mean pursuant to or

12   under.

13   Q    Again, process of funding the settlement payment under

14   the confidential settlement agreement, correct?

15   A    That's what it says.

16   Q    Okay.  And you complained to the Court and I think your

17   lawyer has done the same thing, that these requests were

18   made and NBK never responded until the Friday before,

19   correct?  Friday before the July 5th foreclosure, correct?

20   A    The first time we received any sort of loan sale

21   agreement, and Mr. Wetwiska can testify to this and I'm

22   sorry --

23   Q    Mr. Wetwiska is not here and I'm asking your personal

24   knowledge.

25   A    Yeah, and my personal knowledge is what I received was

1   a email that says this is not a final form.  This is a

2   draft.  On Friday right before the foreclosure sale.

3   Q    Perfect.  I'll ask you about that.

4         MR. STEINBRUNNER:  Would you turn to 90-8?

5   BY MR. STEINBRUNNER:

6   Q    This is an email from Charles Conrad the very next day

7   after the June 28th letter, which is the only letter we have

8   in the record of you ever requesting this information of

9   NBK.  Within 24 hours, Mr. Conrad says, "Jim (indiscernible)

10  attached are drafts of the following documents:  loan

11  purchase and sale agreement which includes the

12  (indiscernible), assignment of deed of trust, and assign of

13  tax liens.  These drafts remain subject to NBK review and

14  comment."  Did I read that correctly?

15        MR. BAKER:  Objection, Your Honor.  Counsel is

16  shouting.

17        THE COURT:  Take it down a notch.

18        MR. STEINBRUNNER:  I'll back up a little bit, too.

19  Might help.

20  BY MR. STEINBRUNNER:

21  Q    Did I read that correctly?

22  A    I'm sorry --

23  Q    Sure.  The very next day from the June 28th letter from

24  Wetwiska, Mr. Conrad responds, "Jim (indiscernible),

25  attached are drafts of the following documents:  loan

1   purchase and sale agreement which includes the

2   (indiscernible), assignment of deed of trust, assignment of

3   tax liens.  These drafts remain subject to NBK's review and

4   comment."  Did I read that correctly?

5   A    You did read that correctly.

6   Q    So, Mr. Conrad is responding with the documents that

7   Mr. Wetwiska requested in writing within 24 hours, correct?

8   A    No (indiscernible).

9   Q    Are you saying that June 29th is not the next, the

10  following day after June 28th?

11  A    The -- Mr. Wetwiska had many communications with Mr.

12  Conrad.

13  Q    I'm not -- I'm asking about the June 28th letter.

14  A    Yes.

15  Q    That was the very next day, correct?

16  A    The request, that letter was at 8 a.m.  This is the

17  following that 5:42 p.m. with a -- with the statement, Mr.

18  Conrad made the statement on the phone as well that this is

19  not the final form of the loan sale agreement and this email

20  says the same, and so that was --

21  Q    My question is, this is the very next day, correct?

22  A    This is the very next day of the prior -- last

23  communication, but there were more communications before

24  that.

25  Q    Mr. Choudhri, in your email -- I'm sorry, in your

1   lawyer's letter to Mr. Choudhri or at any time before that,

2   for that matter, did you ever disclose the name of this

3   funder or buyer who's going to be actually making this

4   payment obligation on behalf of the Debtor?  Did you ever

5   disclose that name?

6   A    Yes.  In fact, I provided proof of funds to you with

7   Diana Marshall.

8   Q    Mr. Choudhri, what are you talking about?  Are you

9   talking about in June -- on June 28th?

10   A    On the day that we had -- I believe on July the 5th, we

11   were in, like, a mediation or something and they wanted to

12   get the final settlement agreement from you, and Diana

13   Marshall was the mediator that I was present and Charles

14   Conrad was present and the funder was present as well.

15        So, we had actually two sources that were prepared and

16   I have those communications and letters from those.  I

17   didn't bring them today.  I didn't think that this was for -

18   - we're trying the breach of the settlement agreement case

19   here and I did not bring those exhibits, but I have the

20   communications from the lender that will prove exactly what

21   I'm saying, and if the Court allows us, I can bring that.  I

22   just --

23   Q    You don't have it here today?

24   A    I wasn't aware we needed that for today.  I was advised

25   this is not -- that this, today is not about the settlement

1   agreement and the issues surrounding settlement agreement.

2   This is as it relates to -- this is not the adversary or

3   whatever all the issues ---

4   Q    Well, Mr. Choudhri, you understand that your lawyer in

5   the responses they filed and in his opening statement

6   contends that part of the reason why that this plan can be

7   confirmed is that there's going to be obviously a major

8   reduction in payment because they take -- in the loan that

9   NBK lends to the Debtor because they are taking the position

10   that the settlement agreement was breached.  True?

11          MR. BAKER:  Your Honor, objection.  That is not

12   what the plan says.  He is completely misstating the

13   documents.  I want to object to him making statements that

14   are absolutely incorrect.

15          THE COURT:  I have not looked at the plan.  I

16   don't know what the plan says.  Let's -- I'm going to ask

17   you to rephrase your question.

18   BY MR. STEINBRUNNER:

19   Q    Mr. Choudhri, I -- in response to your comment about

20   you not knowing that the settlement agreement was going to

21   be an issue, in your response to our motion to convert, the

22   representations that have been made before the Court or that

23   the settlement agreement was breached by NBK and therefore

24   those claims weren't released, so the amount that is owed

25   under the settlement agreement are not owed.  True?  That is

1   your position, correct?

2   A    I apologize.  I wasn't following.  Can you repeat your

3   question?

4   Q    It is your position that the settlement agreement was

5   breached and that therefore this offsets the amount that is

6   owed to NBK, correct?

7   A    What offsets the amount owed to NBK?

8   Q    Your -- let me back up.  It is your position, the

9   Debtor's position, that the amounts that are owed pursuant

10  to the settlement agreement are not owed and in fact are --

11  should be offset because there was a breach on the part of

12  NBK, correct?

13  A    It's the Debtor's position -- I think we're complaining

14  there's two different things.  We have a -- we have a lender

15  liability lawsuit for the breach of the settlement agreement

16  with Bank of Kuwait.  I think you attached it as an exhibit,

17  the June 12 transcript.  Mr. Conrad states repeatedly and

18  he's taken the position the settlement agreement doesn't

19  exist.

20       And so that is a real issue and it affects the tax

21  lien.  It affects -- because I signed individually the

22  settlement agreement as an individual and as a creditor, and

23  I signed on behalf of the Debtor.  And so the settlement and

24  the assignment of the tax lien has affected, and that's --

25  and it's hard for me to explain that, maybe, and I'm not

1    (indiscernible).

2    Q    Sure.  I'm going to move on, because I have a couple

3    questions I think will clear this up.

4    A    So there is a June 12th transcript that I believe y'all

5    have recently added as an exhibit --

6    Q    I don't have a question pending.  I'll get there.  Mr.

7    Choudhri, in your discussion with your attorney before the

8    Court, you had stated that after this alleged breach of the

9    settlement agreement on the part of NBK, there was a hearing

10   before Judge Weems in which you said it was -- a successful

11   hearing in which you were given more time to comply with the

12   settlement terms; is that fair?

13   A    I don't believe it was a successful hearing,

14   necessarily, because the bank wrongfully posted the property

15   for foreclosure and Judge Weems said, you shouldn't be

16   telling people that you're going to post it in the future,

17   because Charles Conrad was emailing the potential buyers

18   that they're posting the property in the future and that

19   affected the ability for us to move forward with those

20   buyers.

21   Q    Mr. Choudhri, the Court, the 281st District Court,

22   Judge Weems, she never said that there was a wrongful

23   posting of foreclosure.  She never said that, did she?

24   A    She said -- and I'll refer to the transcript because I

25   was at that hearing.  She said, you should not be telling --

```
 1   first of all, our contention is the Bank of Kuwait breached
 2   the settlement agreement in March -- Feb or March, I believe
 3   it was, because we had a buyer.  We had a signed agreement
 4   with the buyer.  The buyer came to know from the bank of --
 5   the details of the settlement agreement, which is why we are
 6   very hesitant to waive that because --  but Mr. Conrad, when
 7   we went to Court, Judge Weems sealed the courtroom and said,
 8   you can't talk about it.
 9        And Mr. Conrad explained that you guys posted the
10   property for foreclosure.  It wasn't supposed to be posted
11   for foreclosure, and then you passed the sale and you
12   weren't going to post it.  I made additional -- we made
13   additional payments so you would not post the property for
14   foreclosure.  There was number, I believe, 160,000 in
15   addition to the 800,000 paid, and --
16   Q    Mr. Choudhri, I'll -- I have the transcript right here.
17   We'll -- I'm (indiscernible) ask you about what the judge
18   actually said.
19             MR. BAKER:  Wait, wait, wait.  Your Honor, I'm
20   going to object.  This transcript has on it, sealed.  I
21   don't see anything --
22             THE COURT:  It's not in evidence.  So --
23             MR. BAKER:  Well, I --
24             THE COURT:  -- in evidence, I'm not looking at it.
25   So, don't worry.
```

1          MR. BAKER:  Well --

2          THE COURT:  I mean, object -- you can -- if he

3     wants to go into it, you can raise an objection when that

4     happens.

5          MR. BAKER:  Okay.

6          MR. STEINBRUNNER:  Thank you.  At this time, Your

7     Honor, I'd like to show 90-1.  And Your Honor, the document

8     that has been filed with the Court has been redacted, so --

9          MR. BAKER:  Your Honor, this says sealed on it.  I

10    don't believe until -- unless we've got some order from the

11    Court that says this can be used, that this -- and we object

12    to this, being a document from the state court that's

13    sealed.

14         MR. STEINBRUNNER:  And obviously, Your Honor,

15    they've made references to what the judge said at this

16    hearing.  It's obviously very relevant and I'm not going to

17    be going through any of the confidential terms.  That has

18    been filed with the Court and those confidential terms have

19    been redacted.

20         MR. BAKER:  Well, Your Honor --

21         THE COURT:  Bear with me for one second.  I need

22    to look at it, Mr. Baker.

23         Does anyone know, was there an order sealing this

24    document, this transcript?  Is that the reason it says

25    sealed on it?  Do we know?

1          MR. BAKER:  Your Honor, I don't know.  I wasn't

2     there, but I -- the problem I've got is --

3          THE COURT:  There's nothing in the introduction,

4     at least, that says this is a sealed -- was it a sealed

5     hearing?

6          MR. STEINBRUNNER:  Your Honor, I don't believe

7     that there was ever a formal motion to seal it.  I believe

8     what happened at the beginning is that there was discussions

9     about the settlement agreement or discussions that there

10    would be discussion about the settlement agreement, and so

11    the Court asked everybody not to -- you know, was not a

12    party, to leave the room and that the hearing would be

13    conducted --

14         THE COURT:  So under abundance of caution, I'm

15    going to exclude any sort of testimony about this transcript

16    that says sealed on the front, not knowing what to do and I

17    don't want to commit error.  All right?  Thank you.

18    BY MR. STEINBRUNNER:

19    Q    Mr. Choudhri, do you recall your attorney Jim Wetwiska

20    instructing Judge Weems that the Debtor just needed 60, 90 -

21    - 60 to 90 days longer to comply with the settlement

22    agreement, which gave them the ability to recover from the

23    alleged breach that occurred?  Do you recall that?

24    A    Not the way you say, but I recall things that were

25    said, but not in that context.

1    Q    Okay.

2    A    And I can explain (indiscernible).

3    Q    And the Court gave you that 60 to 90 days, correct?

4    A    Yes, the Court did give us additional time for

5    additional payment, but Mr. Conrad stated that the

6    settlement doesn't exist anymore and --

7    Q    My question is, the Court gave you that time, correct?

8    A    Yes.

9    Q    Okay.

10    A    Yes.  That is true, yes.

11    Q    And in those 60 to 90 days, actually, July 5th, I

12    believe was 105 days.  Do you have any reason to dispute

13    that?

14    A    Yes.

15    Q    You're saying it's correct or you're saying you dispute

16    it?

17    A    I dispute it's that, it's 105 days.

18    Q    Do you know how much time it was from the March 20th

19    date in which -- to July 5th?  You know how many days that

20    is?

21    A    I believe we had a hearing in April.  I believe the

22    dispute was when the settlement agreement was breached by

23    the bank, and I believe -- I feel like, as far as the

24    timing, it remains a -- the hearing was a hearing in April.

25    There was a hearing in June.

1    Q    I'm just asking about the days.  Do you know how many

2    days it was from the date -- the settlement payment to the

3    date that the Court extended it to?  Do you know how much

4    time that is?

5    A    Well, the settlement payment --

6    Q    It was more than 90 days, correct?

7    A    Well, the settlement payment would only be credited

8    when certain actions were taken by the bank.  The bank had

9    to do certain things, and then the settlement payment -- but

10   if the bank did not honor those things, then the settlement

11   payment did not come, and that was the issue.  And that's

12   the adversary case we have now.

13   Q    Are you talking the settlement payment on -- settlement

14   agreement, when you're saying terms?  Payment didn't --

15   wasn't to be made until certain conditions were met by NBK?

16   A    Correct.  The bank --

17        MR. STEINBRUNNER:  Okay.  Your Honor, at this

18   time, I would like to move to actually discuss the

19   settlement agreement so we can stop talking about the terms

20   without actually referencing it.

21        MR. BAKER:  We're not agreeing to waive, Your

22   Honor.

23        THE COURT:  And I'm not -- at this point in time,

24   I don't want to take that issue up.

25        MR. STEINBRUNNER:  Okay.

```
 1              THE COURT:  I mean, I think that there is a really

 2   viable argument that it should be unsealed, but now is not

 3   the time or the place to do it.

 4              MR. STEINBRUNNER:  Okay.

 5   BY MR. STEINBRUNNER:

 6   Q    Mr. Choudhri, regardless, there was never a payment

 7   made by the Debtor or anyone on behalf of the Debtor to NBK

 8   on or before July 5th, correct?

 9   A    Incorrect.

10   Q    Was the full settlement payment or the settlement

11   payment or the payment that the Court had given the

12   extension of time, the full settlement payment made on or

13   before July 5th to the Bank of Kuwait?

14   A    The entire settlement, again --

15   Q    Yes or no?  Was the full amount paid to NBK on or

16   before July 5th?

17   A    Not the full amount, no.

18   Q    Okay.  And there was a TRO held that day, correct, on

19   July 5th?

20   A    Yes.

21   Q    That was denied, correct?

22   A    Yes.

23   Q    And the Debtor then filed the bankruptcy, correct?

24   A    Yes.

25   Q    Okay.  And there's never been any payments made to NBK
```

1    with respect to that settlement agreement since, correct?

2    A    There was about a million dollars that NBK took out of

3    the settlement -- from the settlement agreement.

4    Q    I'm talking from July 5th to today.

5    A    No.

6    Q    There were no payments.  Okay, thank you.  Mr.

7    Choudhri, you had discussed -- and I don't want to belabor

8    the point too much -- these proposed leases that you

9    represented to the Court that you're hoping to execute in

10   the future.  Remember -- recall that discussion?

11   A    Yes.

12   Q    IWG, you don't have a written lease agreement with

13   them, correct?

14   A    We do have an agreement with them.

15   Q    You do?  And is that in the record?

16   A    Unfortunately, I don't think that -- I'm not sure what

17   we submitted (indiscernible) from the judge.  We don't have

18   leases in the record.

19   Q    Okay, Regis.

20   A    We can get the leases in the record.

21   Q    Okay, Regis.

22   A    We have them here.  We just brought them.  We have the

23   -- unfortunately, we don't have them in the record.  If

24   we're allowed by the judge, we can put them in the record.

25   Q    You don't have a written lease agreement with Regis,

1    correct?

2    A    We do.

3    Q    Is that in the record?

4    A    I'm not sure what is in the record or not in the

5    record.  I understand from Judge Norman that the leases that

6    are not -- leases are not in the record, but we have -- I --

7    within 30 minutes, I can --

8    Q    Sitting here today right now, you don't have any -- a

9    written lease agreement with Regis that you can show the

10   Court, correct?

11   A    I -- yes, I have it.  I can show the Court --

12   Q    In the record?

13   A    Again, Mr. Baker, I'm not sure what he has submitted in

14   the record or not, but I -- we do have --

15   Q    You mentioned there is a Chinese company?

16   A    Yes.

17   Q    And what is the name of that company?

18   A    Mr. Darjean has the exact name.  They -- they're one of

19   the largest contractors in China.  They built the

20   (indiscernible).

21   Q    What is the name?

22   A    I don't have the name.  I have the name on the lease.

23   Q    Okay.  If you don't know, it's fine.

24   A    It's a name.  I've met with them.  I have a draft of a

25   lease and we have it on the desk (indiscernible) the name.

1   Q    That lease is in the record, correct?

2   A    It's not a signed lease yet.

3   Q    It's not a signed lease.

4   A    No, it's not a signed lease.

5   Q    Okay.

6   A    It is a pending lease.

7   Q    You said there's a Vaxanix?

8   A    Yes.

9   Q    You have a signed lease with Vaxanix?

10  A    No, but I have the representative of Vaxanix who's

11  sitting in the courtroom and he, I believe, was designated

12  as a witness.

13  Q    Yeah, but you don't have a signed lease with Vaxanix in

14  the record, correct?

15  A    Not at this point.  Not --

16  Q    Okay.

17  A    -- at this moment.

18  Q    And you don't have a letter of intent that's been

19  signed that's in the record of the Court, correct?

20  A    We only have a draft of a lease that we've been

21  negotiating.  We don't have a signed lease or -- at this

22  moment.

23  Q    You then mentioned that this wasn't -- you don't have a

24  lease, I don't believe, or a signed lease.  You also

25  mentioned Sonder, correct?

1    A    Yes.  That's correct.

2    Q    Okay.  And is this the same Sonder that you -- that was

3    the Sonder in 2021 that you were negotiating leases with in

4    2021?

5    A    No.

6    Q    This is a different Sonder?

7    A    No.  This is -- I just want to get the dates right,

8    because I don't -- everyone's saying dates, and so there

9    were, in 2020, in Feb 2020, the permit was obtained by the

10   City of Houston for Sonder.  The Sonder lease was signed in

11   2019.

12   Q    My question is, is this the same Sonder from 2020 that

13   you are expecting or at least hoping to expect, sign a lease

14   moving forward?

15   A    Well, not sign a lease.  We already have a signed lease

16   with them.  The problem is, is they -- when COVID happened,

17   they did not move in and at least back to now, were --

18   Q    But you don't have the signed lease -- okay.  So,

19   you're saying, they didn't move in because of COVID.  Is

20   that your testimony?

21   A    They did not move in.  COVID occurred.  They did not

22   move in.  And in fact, I think we were in a deposition, you

23   took their deposition in the (indiscernible) case and that

24   is part of our claim and now they've come around during our

25   --

1    Q    Question is, my testimony that they didn't -- your

2    statement that they didn't move in due to COVID.  That's

3    your statement, correct?

4    A    No, no.  Let me be very, very clear.  I believe they

5    made many excuses at that time, but the delays for them to

6    move -- had they moved in before COVID, it would have been

7    fine.  We had a signed estoppel by then.  But when COVID

8    happened, they decided not to move forward with their lease

9    for a number of reasons that they raised, one of them being

10   permitting, which they had a permit, but now Justice Tom

11   Phillips who represents my other companies against Sonder,

12   we've had discussions where there is a real, viable deal on

13   the table where Sonder will resume their release and we --

14   and a potential, would waive the back obligations and

15   resolve that issue and settle that issue with Sounder with

16   having them move in the building and resuming their lease.

17   Q    When you say settle that issue, you sued Sonder,

18   correct?

19   A    We compelled arbitration and that got --

20   Q    You sued Sonder, correct?

21   A    Yes.

22   Q    Yes.  And in fact, in your lawsuit against Sonder, you

23   claim that they fraudulently provided information concerning

24   their intentions under the lease.  That's -- correct, that's

25   your lawsuit against Sonder?

1   A    Yes.  Well, I think there's a number of -- because they

2   signed the lease and COVID occurred and they came up with

3   reasons not to move forward with the lease and --

4   Q    And they sued you, too, correct?

5   A    That is correct.

6   Q    They sued you personally, correct?

7   A    We had five different leases with Sonder.

8   Q    They sued you with respect to the 2425 lease, correct?

9   A    There are -- yes, there are five leases and ---

10  Q    They sued you with respect to the 2425 lease, correct?

11  A    That's correct.

12  Q    Right.  And in fact, in their lawsuit against you, they

13  also sued you for fraud, correct?

14  A    There's lot of allegations that are made.  Yes.

15  Q    All right.  And that's the same tenant that you're

16  telling the Court today is -- you expect to move in at some

17  point here in the future and start paying rent?

18  A    That's not part of our projections, but that is -- that

19  -- and we're not including that in our projections, but that

20  is a tenant to resolve the issue of what happened with COVID

21  because they have litigation with lots of landlords.

22  Q    You said that none of your tenants --

23         MR. BAKER:  Objection.  Counsel's interrupting.

24         MR. STEINBRUNNER:  I didn't mean to interrupt.

25         THE COURT:  Let him --

```
 1              MR. STEINBRUNNER:  I'm sorry --

 2              THE COURT:  Thank you.

 3   BY MR. STEINBRUNNER:

 4   Q    Sorry.

 5   A    Yeah, that -- sorry (indiscernible) go fast.

 6   Q    You --

 7   A    (indiscernible).

 8   Q    You then said post November 2023, that you -- any of

 9   the tenants that you wanted to have sign new leases, they --

10   none of them want to have SNDAs; is that correct?

11   A    No.   None of them want to have SNDAs?  I don't --

12   Q    I'm sorry.  I want to clear up your testimony.  You

13   said that there were no lease agreements or any prospective

14   lease agreements that were signed post November 2023,

15   correct?  November 1st?

16   A    Post November?

17   Q    First?

18   A    No.  No.

19   Q    Okay.

20   A    That's incorrect.  We signed leases.

21   Q    Since November 1st, 2023?

22   A    Yes.

23   Q    And have you asked NBK to approve any leases post

24   November 1st, 2023?

25   A    We have not asked NBK to approve leases post November -
```

1   – pursuant to the settlement agreement.  We're not required

2   to.  It spells it out.

3   Q    But you're not even required to ask for their

4   permission.  You can just do it, correct?

5   A    That is correct; however, it does say that tenants who

6   require SNDAs, the bank is required to provide SNDAs for the

7   tenants who require SNDAs.

8   Q    And you haven't requested that from the bank?

9   A    We have.  We repeatedly requested.

10   Q    Do you have a single written correspondence, sitting

11   here today, since November 1st, 2023 when you requested this

12   from the bank?

13   A    Absolutely.

14   Q    And is that in the record?

15   A    Mr. Baker has communications between the Bank of Kuwait

16   where he's repeating -- where he's requested that.  It's

17   just, deaf ears.  No response.

18   Q    So your statement is, Mr. Baker's made these requests

19   since November 1st, 2023 to NBK?

20   A    I've also asked Mr. Conrad when I met him in the 281st.

21   I asked him, we're getting leased up, but one of the things

22   I need y'all's help with is SNDAs. We have to work together

23   if we're going to get the --

24   Q    Is any of this in writing?

25   A    I believe Mr. Wetwiska sent emails.  I know -- I've

1    also seen Mr. Baker's email where he's requested an SNDA and

2    Mr. Baker has that email.  I've seen it myself.

3    Q    So Mr. Wetwiska and Mr. Reese, both since November 1st,

4    have sent emails requesting SNDAs?

5    A    I know Mr. Wetwiska has requested SNDAs.  I don't know

6    the exact timeframe of those SNDAs, when he's requested

7    those, but it has been after the settlement agreement,

8    because one of the handicaps for tenants --

9    Q    If you don't know, that's fine, don't know the answer.

10   A    I'm sorry?  I'll --

11   Q    Mr. Choudhri, I'll finish up some of (indiscernible).

12   Do you believe that a U.S. Trustee is more than qualified to

13   investigate any of the proposed claims that you say that the

14   Debtor may have against NBK?

15   A    You know, I don't know.  I mean, I know that Mr.

16   Alexander, who is willing to do this on a contingency

17   against --

18   Q    My question is, do you (indiscernible) Trustee.

19   A    Your question?

20   Q    The Trustee.  I'm asking about the Trustee.

21   A    Which Trustee?

22   Q    The -- any U.S. Trustee, that if this case is converted

23   --

24              MR. BAKER:  Objection.

25   BY MR. STEINBRUNNER:

1    Q    -- to Chapter 7, the Chapter 7 Trustee, you believe

2    they'd be qualified to investigate and verify any claims the

3    Debtor may have against NBK?

4              MR. BAKER:  Your Honor, I'm going to object.  He's

5    asking -- I'm not sure what he's asking.  He's asking about

6    the U.S. Trustee's Office.  I'm not aware if they even do

7    that.

8              THE COURT:  I think he's confused.  I think the

9    question he means to ask is about a Chapter 7 Trustee.  So

10   ask the question again.  Mister -- before he does that, Mr.

11   Choudhri, I want to make sure I understand because I either

12   misheard or didn't hear your testimony correctly.  Since the

13   dismissal of the first bankruptcy for cause, I thought I had

14   asked you if you had signed any new leases and you said no.

15   Now, I think you're telling the Court that yes, you have

16   some leases.

17             THE WITNESS:  Yes, Your Honor.

18             THE COURT:  Okay.  So, since November 1st, 2023

19   how many leases have you signed?

20             THE WITNESS:  Two leases.

21             THE COURT:  For how much space?

22             THE WITNESS:  For around -- one is for about 3,000

23   square feet.

24             THE COURT:  And the other?

25             THE WITNESS:  Six hundred square feet.

 1             THE COURT:  Okay.  All right.  Go ahead.

 2    BY MR. STEINBRUNNER:

 3    Q    And just to clarify, I'm sorry, my question was with

 4    respect to the Chapter 7 Trustee.  Do you have any reason to

 5    doubt that a Chapter 7 Trustee would not be qualified to

 6    investigate any claims the Debtor may have against NBK?

 7             MR. BAKER:  Objection.  Lack of foundation.  How

 8    would he know?

 9             THE COURT:  Calls for a legal conclusion I don't

10    think he's qualified to make.  I'll sustain the objection.

11             MR. STEINBRUNNER:  Okay.  Your Honor, I have no

12    question.  I'll pass.

13             THE COURT:  All right.  Let's go to -- do you have

14    question?

15             MR. SATHER:  Do I?  Yes.

16             THE COURT:  Come on over.

17             MR. SATHER:  Although, are we skipping over Ms.

18    Whitworth?

19             THE COURT:  We'll come to her last.

20             MR. SATHER:  Okay.  Very good.

21             THE COURT:  Just takes a second.

22             CROSS EXAMINATION OF ALI CHOUDHRI

23    BY MR. SATHER:

24    Q    All right.  Mr. Choudhri, I'd like to direct your

25    attention to Exhibit 88-8 -- 18, excuse me, 88-18.  Do you

1    recognize this as a true and accurate representation of the

2    building we've been talking about all day?

3    A    Yes.

4    Q    And going through, does this depict the atrium as you

5    go in?

6    A    Yes.

7    Q    And then are these more representative photographs

8    showing what this building looks like today?

9    A    Yes.

10   Q    Now, I know that buildings can be classified as Class A

11   Class B, Class C.  Do you know what class this building is

12   considered to be?

13   A    I would classify it as Class A.

14   Q    Okay.  Now, after the bankruptcy was dismissed, the

15   first bankruptcy was dismissed in November, how quickly did

16   the bank move to foreclose?

17   A    They posted it for December.

18   Q    All right.  And so, that didn't give you a lot of time

19   to make changes or improvements, did it?

20   A    No.

21            MR. STEINBRUNNER:  Objection, leading.

22            MR. SATHER:  That was leading, so --

23            THE COURT:  I'll sustain the objection.

24            MR. SATHER:  All right.  I apologize.

25   BY MR. SATHER:

1   Q    All right.  Would you agree with -- well, no.  The

2   Court can do the math.  Now, what have you done since

3   November 1st to improve the financial operations of the

4   property?

5   A    We have engaged in lease-up. We are working with a

6   number of tenants, test fits, to push that along.  We're

7   locating tenants to take space as is.  We -- I've had

8   discussions with this significant biotechnology company and

9   they have approved to move forward with a lease.  So, I have

10   had a number of meetings with them.  The name of the company

11   is Vaxanix and they've acquired additional companies.  So

12   they need a lot more space and that -- the question is, how

13   much more space will they need.

14        But they've expressed to me that they're prepared to

15   sign a lease within 45 days and that's a significant lease

16   that could really turn into a large occupancy in the

17   building.  In addition to that, there is a Chinese national

18   company that is interested in moving forward with a large

19   lease in the building as well.  We did get clarification

20   from Judge Manor on that issue that (indiscernible) Judge

21   Lopez about the allegation of forgery on the Naissance

22   Galleria, that that was one of the factors.

23        MR. STEINBRUNNER:  Objection to this as lack of

24   foundation, relevance.

25        THE COURT:  I'll sustain the objection.

1    BY MR. SATHER:

2    Q    I'm just asking you -- and maybe I was unclear, but I

3    was just asking you about business-wise, what you've done to

4    improve the operations.  And you mentioned a number of

5    leases.  Have the actions that you've taken there improved

6    or harmed the value of the property?

7    A    It's improved the value of the property.  We also have

8    a considerable amount of recent prospects, one of which is

9    called the Cellar of Houston, which is a tenant that --

10              MR. STEINBRUNNER:  Your Honor --

11              THE WITNESS:  -- signed --

12              MR. STEINBRUNNER:  Object.  Lack of foundation.

13   Talking about prospects that aren't in evidence.

14              THE COURT:  I'll sustain the objection.

15              THE WITNESS:  Sorry.

16   BY MR. SATHER:

17   Q    Okay.  All right.  Now, are you personally involved in

18   these efforts to obtain new tenants?

19   A    Absolutely.  Yes, I am.

20   Q    And based on your experience in the Houston office

21   market, are conditions relatively better or worse for

22   business climate and attracting new tenants?

23   A    I believe with a rate drop and people are starting to

24   come back to work and I believe the environment seems to be

25   -- especially the location we are, but office is definitely

```
 1   challenging --

 2              MR. STEINBRUNNER:  Your Honor, I'm going to have

 3   to objection again to speculation and now he's giving an

 4   expert opinion on the market.

 5              THE COURT:  I'll sustain the objection.  Thank

 6   you.

 7   BY MR. SATHER:

 8   Q    Now, it costs money to operate a business -- the

 9   building, doesn't it?

10   A    Yes.

11   Q    Now, when you came in on the motion for use of cash

12   collateral, you agreed to hold that down, correct?

13   A    We did.

14   Q    And so, does that mean that you are paying expenses

15   without use of cash collateral?

16   A    That's correct.

17   Q    And who is paying those expenses?

18   A    Through an affiliate, through my family, I am.

19   Q    Okay.  And have you signed any -- are you asking for

20   that money to be paid back or do you consider that to be

21   more in the nature of a capital contribution?

22   A    It's capital.  It's not a loan.

23   Q    And why would you be advancing money to the Debtor

24   without having the ability to get paid back?

25              MR. STEINBRUNNER:  Your Honor, objection.
```

1    Misstates his testimony.  He didn't say it was him advancing

2    the money.

3              THE COURT:  I'll sustain the objection.

4              MR. SATHER:  Okay.  Well, actually, I think he

5    did.

6              THE COURT:  Said it was an affiliate.

7              MR. SATHER:  Okay.

8    BY MR. SATHER:

9    Q    Now, the counsel who was up here before me -- and I

10   apologize, I don't --

11             MR. STEINBRUNNER:  Steinbrunner.

12   BY MR. SATHER:

13   Q    -- recall his name -- asked about suing the bank.  Have

14   you sought out legal representation to sue the bank?

15   A    Yes.

16   Q    But does your plan depend upon obtaining a financial

17   recovery from the bank or would that just be icing on the

18   cake?

19   A    Rely -- it's not -- the plan doesn't rely on that.

20             MR. SATHER:  I would move admission of 88-18.

21             MR. STEINBRUNNER:  That's the pictures?

22             MR. SATHER:  Yes.

23             MR. STEINBRUNNER:  I mean, I would lightly object

24   on relevance grounds, but --

25             THE COURT:  I'll admit it.  That's fine.  Thank

1    you.

2              (Exhibit 88-18 entered into evidence)

3              MR. SATHER:  I'll pass the witness.

4              THE COURT:  Thank you.  Ms. Whitworth, maybe you

5    can provide some clarity.

6              MS. WHITWORTH:  I'm going to try to do these

7    exhibits, figure this out, Judge.  Bear with me.

8              THE COURT:  No.

9              MS. WHITWORTH:  I did it.

10             RECROSS EXAMINATION OF ALI CHOUDHRI

11   BY MS. WHITWORTH:

12   Q   Mr. Choudhri, I'm going to ask you, at -- this is the -

13   - let's see.

14             THE COURT:  Is it possible I can get a hard copy

15   of this, Mr. Baker?

16             MR. BAKER:  I don't have a hard copy.

17   BY MS. WHITWORTH:

18   Q   This was admitted earlier.  This is a -- the projection

19   was admitted as a projected income, and I just want to make

20   sure, you know, I'm a lawyer doing math here, just make sure

21   I understand these figures.  So, is it your testimony -- let

22   me go up to -- that in April, April 2024 which is in two

23   months, I guess, that at the end of the day, the Debtor is

24   going to have a net operating loss of 118,000?  Is that

25   correct?

1    A    Yes.

2    Q    And this is based on the current tenants that are in

3    the building today; is that correct?

4    A    Yes.

5    Q    Does this include the two leases that you signed up

6    that you just described to Judge Norman between November and

7    the filing of the case -- and today?

8    A    I don't believe it does.  I believe we discounted some

9    of the leases to be very conservative as Mr. Norris insisted

10   on --

11   Q    Is it -- are they in there or not?  Yes or no?

12   A    No, ma'am.

13   Q    Okay, thank you.  So, how much, the two leases, the

14   3,000 square feet and the 600 square feet, how much more per

15   month will that -- those two leases add to this figure?

16   A    About 9,500 a month.

17   Q    Okay.  So, it's not going to really put a dent in the

18   loss of the 118,000.  It'll be 110,000?

19   A    That's correct.

20   Q    Okay.

21   A    Based on these projections, which don't include a lot -

22   Q    Okay.

23   A    (indiscernible).

24   Q    So --

25            THE COURT:  Mr. Choudhri, as I understand your

1    plan -- correct me if I'm wrong -- you're going to run a

2    deficiency for quite some time under the terms of your

3    proposed plan, but you would fund that deficiency with the

4    an inflow of $2.4 million?

5              THE WITNESS:  Absolutely.  Yes, Your Honor.

6              THE COURT:  And it's your -- eventually hoping to

7    get to a place where the rental income basically puts you in

8    in the black?

9              THE WITNESS:  Yes.  Exactly.

10             THE COURT:  Go ahead.

11             THE WITNESS:  Exactly.

12   BY MS. WHITWORTH:

13   Q    Okay.  Let's talk about the plan.  I had that up

14   pursuant to -- so this is the plan.  This is the document

15   filed in a docket, Document 95 which is your plan.  You talk

16   -- you just told the judge you're going to fund two point --

17   or some entity, related entity that you have is going to

18   fund $2.5 million into the Debtor.  However, it's not just

19   going to fund the plan.  There are a lot of restrictions on

20   the use of that money.  All of these restrictions, one

21   through ten, have to be met in order for those funds to be

22   available to the Debtor; is that correct?  Am I reading this

23   correct?

24   A    It -- you know, yes.  That's what this plan says.

25   (indiscernible).  The idea is -- I'm actually flexible

1    making it work --

2    Q    But the question is this.  Is this the plan?  Are these

3    the requirements to use the money, one through ten?

4    A    Yes.

5    Q    I'm sorry.  It's been a long day.

6    A    Sorry.

7         THE COURT:  Let me ask you this question because

8    actually I just saw this for the first time.  I think

9    there's a very strong argument, Mr. Choudhri, to let me sua

10   sponte appoint a Chapter 11 Trustee.  Okay?  And I've just

11   seen for the first time that one of your restrictions is no

12   Chapter 11 Trustee appointed.  Okay?

13        It seems to me from all of the evidence that we've

14   gone around and around and told me a bunch of stuff I don't

15   need to know, the major problem I'm having right now is,

16   probably the problem the Trustee is having, is we've got no

17   independent Debtor.  We have a Debtor who is being run by

18   creditors of the Debtor, which doesn't work in Chapter 11.

19   That's a big problem.  Okay, and nothing you've said has

20   addressed that problem.  Nothing at all.  Okay?

21        So, if I blow up your plan by appointing a Chapter

22   11 Trustee, what are you going to do?

23        THE WITNESS:  I would have to visit with the, you

24   know, the investors -- the investor and say, hey --

25        THE COURT:  It's your mother, right?

 1              THE WITNESS:  Yeah, and basically -- and family

 2      members are wanting to put even more money in, because we

 3      believe in it and I would have to figure out kind of what

 4      they're going to do and how it makes sense, because

 5      candidly, Your Honor, I'm -- I completely am okay with

 6      transparency.  And I'm sorry that I didn't sell the

 7      property, carry the debt.

 8              THE COURT:  don't need an explanation

 9      (indiscernible).  So your response to me is, if I appoint a

10      Chapter 11 Trustee, this case may get torpedoed, it may not,

11      depending upon your family members?

12              THE WITNESS:  Your Honor, honestly, I would just

13      have to look at the -- what -- how the plan would be

14      adjusted and if Your Honor would just give us some time,

15      we'd figure that out.

16              THE COURT:  Okay.  Thank you.  go ahead.

17      BY MS. WHITWORTH:

18      Q    You mentioned -- earlier, I noticed in the questioning

19      you would not testify that you personally as the owner of

20      the owner of the owner of the building, do not have an

21      opinion on the value of the building.  Do you recall that?

22      A    I do, because I -- it does change, but as I sit here,

23      I'm sure I could have an opinion.  I just --

24      Q    Do you have an opinion today of the value of this

25      building?

1    A    My personal opinion, and maybe I'm, like, Mr. Patrick

2    said, a little more optimistic or as (indiscernible), as the

3    judge says.  I believe there is value based on --

4    Q    Do you have an opinion?  Mr. Choudhri, do you have an

5    opinion of value?  Yes or no.

6    A    Yes, I have.

7    Q    And what is that value?

8    A    I'm not prepared to give you a value right this second.

9    I could assimilate an opinion of value.  I just didn't come

10   in here prepared for --

11   Q    Okay.  You -- strike that.  Never mind.  Just strike

12   that.  You -- and I have notes here that you -- and maybe I

13   misheard -- that you spent $20 million to repurpose the

14   building and you gave a list of different things.  Did --

15   after -- what -- is that right?  Did the Debtor put $20

16   million into this building?  And if so, when?

17   A    The creditor did, and it -- I was referring to what's

18   also confirmed by the Bank of Kuwait's loan memo, that they

19   verified --

20   Q    For $20 million put in improvements in this building?

21   A    Yes.  Yes.

22   Q    And when was that?

23   A    Around 2016.  Around 2015, 2016 and maybe 2017.

24   Q    Okay.

25   A    And then I -- there's additional monies put in, in

1    addition to the 20 million after the Bank of Kuwait loan

2    (indiscernible).

3    Q    So after -- that was in May of 2018; is that correct?

4    A    2018.

5    Q    So, there's 20 million that was put into this building

6    in 2016, 2017, plus additional money that was put into the

7    building into the improvements in 2018.

8    A    After 2018.  I --

9    Q    After 2018.

10   A    I would have to look at the schedule of how much was

11   spent when.

12   Q    What is your recollection of -- so it's 20 million plus

13   how much, more or less?

14   A    Well, the 20 million is the improvements after the

15   purchase of the building to -- in capital expenses into the

16   building like sprinklerizing the building, putting in new

17   elevators, and et cetera, et cetera.  But since that's

18   happened, there's been additional investment, I would say --

19   and I don't want to guess.  I want to be precise.  I would

20   really have to calculate that.

21   Q    Give me an estimate?  And I'm talking about the time

22   period from 2018.  So, but let me be clear about your

23   testimony, because you say one thing and then I hear

24   something else.  So let me ask you this.  You said you

25   purchased the building or the testimony is that you

1    purchased the building -- and I say you, being the Debtor or

2    the Debtor's predecessor entity, 2425 WL LLC purchased the

3    building in 2012.  Is that correct?  I think that's what Mr.

4    Darjean testified to.

5    A    I, through 2425 was -- purchased the property --

6    Q    Okay.

7    A    -- in 2012.

8    Q    Okay.

9    A    And there was a -- and then there was a 2017, 2425 WL.

10   In 2018, 2425 WL sold the property to --

11   Q    To the Debtor.

12   A    -- Galleria 2425 Owner, the Debtor.

13   Q    Got it.

14   A    And then did a seller carry and --

15   Q    Okay, I don't -- that's -- title issue is it went from

16   2425 WL LLC --

17   A    To Galleria.

18   Q    -- to Galleria.

19   A    Yes, ma'am.

20   Q    So the Debtor.

21   A    Yes, ma'am, to the Debtor.

22   Q    So, when it -- between 2012 and then 2016, were any

23   capital improvements made?

24   A    Yes.

25   Q    Is that part of the $20 million that you testified to

1   earlier or is that a different chunk of change that went

2   into the building?

3   A    So, the money that --

4   Q    I'm just trying to identify your testimony.  That $20

5   million is a lot of money and it's more than what the -- on

6   the schedules, the value of the property.  So, if $20

7   million actually went into the building itself, not the

8   dirt, but the building, I'm just trying to get my head

9   wrapped around how -- where did that money go, where did the

10  value of those improvements go?

11  A    Well, for example, this was the largest lease done and

12  there was over $6.5 million commissions paid to CBRE when

13  Stage Stores signed their lease.  There was also TIs done.

14  Q    No, no.  The -- I'm talking about the building itself,

15  not the leases, not the tenants.  The actual building

16  itself.  $20 million capital improvement into the building.

17  Was that 2016 and 2017?

18  A    It would have been sprinkled over the years from the

19  time that my entity purchased the building up to the time

20  that the loan was obtained by Stage Doors.  Sorry, Stage

21  Doors.  It's been long (indiscernible).  Up until the time

22  the deal was closed with the Bank of Kuwait, so --

23  Q    That's 2018?

24  A    Correct.  So during that time, I can't sit here and

25  tell you exactly how much was spent every year off the top

1    of my head.

2    Q    You testified $20 million was put to repurpose the

3    building.

4    A    There was $20 million --

5    Q    When did you do that?

6    A    Over a period of years.

7    Q    Okay.  Okay.  Let's move on.  You testified that

8    between November 1st, 2023 and the date you filed this case,

9    which would be December 5th, you took action to protect the

10   building and enhance the building.  Would you consider the

11   payment of -- looking for your SOFA.  Would you consider

12   paying out $118,000 to Jetall, a sister affiliated company,

13   assisted and helped improve the value of the building when

14   taxes were owed, when insurance was owed, when the expenses

15   -- operating expenses were owed?  I'm trying to find the

16   disclosure on that.  How did that $118,000 disbursement out

17   of the Debtor's bank account to Jetall assist in increasing

18   the value of the building?

19   A    Well, there's a lease that was executed after the -- in

20   the last -- in October.  I can't recall when.  It might have

21   been -- I think it was September or October, there was a

22   lease signed with an insurance company called Bankable

23   Equity, that wanted to go into another building that we

24   manage and we -- because we're trying to fill this building

25   up, we showed them both buildings and they liked this

1    building and we gave them more incentive and made some

2    sacrifices, so Jetall did make some sacrifices to hold that

3    tenant.  That's how much we believe in the building.

4    Q    -- have documents to show that?

5    A    Yes.

6    Q    Are they in evidence today?

7    A    We have a ledger of every payment, everything, Ms.

8    Whitworth.  We have signed leases and I -- you know, I

9    didn't know we (indiscernible) signed leases today in the

10   record.  But we have them here and I have the signed leases

11   on -- that I brought to Court.

12            MS. WHITWORTH:  I don't have any other questions,

13   Judge.  I pass the witness.

14            THE COURT:  Thank you.  Let me go back to Mr.

15   Steinbrunner.  Do you have any questions?

16            MR. STEINBRUNNER:  No further questions, Your

17   Honor.

18            THE COURT:  Mr. Baker?

19                REDIRECT EXAMINATION OF ALI CHOUDHRI

20   BY MR. BAKER:

21   Q    Okay, there's been a comment made that you've not

22   really addressed the issues of the conflicts.  Okay?  But I

23   think you correctly addressed that in saying that.  Let me

24   just confirm.  You're going to move forward to get a CRO, a

25   chief restructuring officer, who could come in and oversee

1    and manage the company to alleviate these issues with

2    conflicts.  Is that correct?

3    A    That's correct.

4    Q    Okay.  So, that directly addresses the issues of the

5    conflicts of you being involved in everything at that point

6    in time, doesn't it?

7             MR. STEINBRUNNER:  Objection, Your Honor.  Asks

8    for a legal conclusion.

9             THE COURT:  I'll sustain the objection.

10            MR. BAKER:  I'm sorry, I didn't follow the

11   objection.

12            THE COURT:  Calls for a legal conclusion and I

13   sustained it.  You've asked him specifically if that would

14   alleviate the issues of conflict of interest --

15            MR. BAKER:  Oh --

16            THE COURT:  It asks for a legal conclusion.  I

17   sustained his objection.

18            MR. BAKER:  Okay.  Okay.

19   BY MR. BAKER:

20   Q    Well, if you were to get a chief restructuring officer,

21   is it your understanding that you would let them manage the

22   company, have signatory authority, and address the issues

23   for the company?

24   A    Yes.

25   Q    Okay.  Okay, so let me go back.  There were questions

1   asked of you about your attorney making a representation

2   that in 60 or 90 days back in, I think March or April, you'd

3   get everything cleaned up.  What happened to cause that time

4   period not to be sufficient?

5   A    The continuing interference with the bank, with our

6   ability to (indiscernible) the deal that we made.

7        MR. STEINBRUNNER:  Objection, Your Honor.  Hearsay

8   and talking about a deal they made that's not in evidence.

9        THE COURT:  I'll sustain the objection.

10       MR. BAKER:  Your Honor, this is --

11       THE COURT:  I sustained the objection, Mr. Baker,

12   move along.  And I'm not sure, even if I would let it in,

13   it's not going to make any -- it's really not going to have

14   any effect on how I rule.

15       MR. BAKER:  Okay.  Okay.  No further questions,

16   Your Honor.

17       THE COURT:  Mr. Sather?

18       MR. SATHER:  No questions, Your Honor.

19       THE COURT:  Ms. Whitworth?

20       MS. WHITWORTH:  No more questions, Judge.  Thank

21   you.

22       THE COURT:  Back to you.

23       MR. STEINBRUNNER:  No more question, Your Honor.

24       THE COURT:  Thank you, sir.  I think you can step

25   down.

1              MR. BAKER:  Thank you.

2              THE COURT:  All right, Mr. Baker, you have another

3    witness?

4              MR. BAKER:  Yes.  I call Mr. Faisal Shah.

5              THE COURT:  Well, let's do this.  Let me ask you

6    this, because I have to get -- I have to be out of her by

7    five and I've got other things to do.  Are you going to be

8    finished in the next 30 minutes?

9              MR. BAKER:  Yes.

10             THE COURT:  Okay. All right.  Come on up.

11             MR. FITZMAURICE:  So, Your Honor, I would object

12   to the witness.  We'd like a offer of proof, perhaps, of

13   what his testimony is.  I think it's going to be that he

14   might be a tenant at some point in the future, and we would

15   have all the same objections that we've had throughout the

16   day in terms of foundation and admissibility of testimony

17   without there actually being a lease in evidence, and of

18   course, there is not.

19             THE COURT:  Mr. Baker?

20             MR. BAKER:  Your Honor, this is a direct

21   representative of a potential tenant and I think he can tell

22   the Court exactly what is going on with regard to a proposed

23   lease.  It's not speculation.  This is from the tenant

24   himself.  This is not testimony --

25             THE COURT:  The lease isn't in evidence.  Right?

1    I don't have it in front of me to look at, right?

2              MR. BAKER:  Correct.

3              THE COURT:  Okay.  Then why don't you do this?

4    Why don't you proffer his testimony and I'll decide if want

5    it.  I'll let you call him.  Go ahead.

6              MR. BAKER:  Okay.

7              THE COURT:  Sit down, sir.

8              MAN:  Yes, sir.

9              MR. BAKER:  Your Honor, what he would testify to

10   is that he is a representative of the proposed new tenant.

11             THE COURT:  Who is?

12             MR. BAKER:  Think it's -- I can't pronounce it.

13             THE COURT:  This a pharmacy company

14   (indiscernible)?

15             MR. BAKER:  I think it's (indiscernible).

16             THE COURT:  Okay.

17             MR. SHAH:  Vaxanix.

18             MR. BAKER:  Vaxanix.  Okay.  It's a strange one,

19   I'm sorry.  And that they are go a point where they believe

20   they're going to go forward and execute a lease and move in

21   and that they are satisfied with the -- they like the

22   building.  They like the space and they want to move forward

23   with (indiscernible).

24             THE COURT:  And do you know what the value of that

25   lease is?

1          MR. BAKER:  When you say value --

2          THE COURT:  Yeah, to the Debtor.  Do you know what

3    the lease terms are?

4          MR. BAKER:  I do not.

5          THE COURT:  Okay.

6          MR. BAKER:  He can testify to that.

7          THE COURT:  Call him forward.  Let's -- I'm going

8    to examine him real quick.

9          MR. BAKER:  Sure.

10          THE COURT:  Come on forward, sir.  Please raise

11   your right hand and be sworn.  Do you swear or affirm to

12   tell the truth, the whole truth, and nothing but the truth,

13   go help you God?

14          THE WITNESS:  Yes, Your Honor.

15          THE COURT:  Please be seated.  (indiscernible).

16   Don't worry.  I'm not the village idiot.  All right.  Talk

17   into the microphone.  Can I get you state your name for the

18   record, sir?

19          THE WITNESS:  Yes, sir.  My -- sorry.

20          THE COURT:  Don't need to yell.

21          THE WITNESS:  Yes, sir.  My name is Faisal, that's

22   F-A-I-S-A-L.  My last name is Shah, spelled S-H-A-H.

23          THE COURT:  Okay.  All right.  Mr. Shah, you are a

24   representative of which company?

25          THE WITNESS:  Your Honor, I'm an attorney and I am

1    the outside general counsel for Immunicom --

2              THE COURT:  Spell that for me?

3              THE WITNESS:  I-M-M-U-N-I-C-O-M, Immunicom, Inc.,

4    a Delaware corporation.

5              THE COURT:  All right.

6              THE WITNESS:  That is being acquired by Vaxanix,

7    V-A-X-A-N-I-X, second word is Bio, B-I-O, Limited, L-T-D,

8    period, a Nevada corporation.  And I'm handling the --

9              THE COURT:  So--

10             THE WITNESS:  -- acquisition.

11             THE COURT:  You are outside general counsel,

12   though, for Immunicom?

13             THE WITNESS:  For Immunicom, which will become a

14   division --

15             THE COURT:  At some point in time, but right now,

16   that's who you represent?

17             THE WITNESS:  That's correct.  The deal is signed.

18   The asset purchase agreement is signed.

19             THE COURT:  Okay.  All right.  So, have you

20   personally been in negotiation with this Debtor for a lease?

21             THE WITNESS:  Yes.

22             THE COURT:  Okay.  All right.  When did those

23   negotiations (indiscernible) negotiations begin?

24             THE WITNESS:  October.

25             THE COURT:  Of?

1                    THE WITNESS:  Of 2023.

2                    THE COURT:  All right.  And how much space is your

3        client thinking about leasing?

4                    THE WITNESS:  Immediately, one-half of one floor.

5                    THE COURT:  Do you know how many square feet that

6        is?

7                    THE WITNESS:  It's roughly 11,000, something like

8        that.

9                    THE COURT:  One half.  Okay.  And when would that

10       lease begin?

11                   THE WITNESS:  Approximately 60 days.

12                   THE COURT:  All right.  And what are the least

13       terms?

14                   THE WITNESS:  We would pay market.  We could do a

15       five-year lease with -- we'd want another five year renewal

16       option on top of that.

17                   THE COURT:  Five year lease, five year renewal.

18       When you say market, what do you think market is?

19                   THE WITNESS:  We've been told that we would be

20       shown what -- well, we -- this is what we've asked for.  We

21       think that market is around 40 bucks.

22                   THE COURT:  Okay.  And you've heard -- what about

23       buildout and then credits for buildout?  How's that going to

24       work?

25                   THE WITNESS:  Sure.  So -- and all of this is in

1   the context of Vaxanix's CEO, who's based in New York, Mark

2   Germain, visiting, Houston in October with the Immunicom CEO

3   who was here from San Diego.  They made the decision that

4   the back office, the Vaxanix should be staffed and built out

5   in Houston as a cost saving measure because the companies

6   have operations on the east coast and west coast.  And so

7   they came.  They walked the building.  They looked at the

8   area.

9              THE COURT:  You're giving me a narrative.  I don't

10  want a narrative.

11             THE WITNESS:  Sure.  sorry.

12             THE COURT:  So what sort of base rent abatements

13  are going to be in that lease?

14             THE WITNESS:  They want some months of free rent.

15  They want --

16             THE COURT:  Some months can mean one month.  It

17  can mean ten months.  Can you be more definitive?

18             THE WITNESS:  We want at least three.

19             THE COURT:  Okay.

20             THE WITNESS:  Yeah.

21             THE COURT:  Anything else?

22             THE WITNESS:  And then we want to buildout to be

23  included.  Buildout that we need.  We've been to the 11th

24  floor, so the buildout we need is no walls moved around, but

25  we need partitions put up because there's --

1               THE COURT:  How much --

2               THE WITNESS:  -- a lot of empty space.

3               THE COURT:  -- the cost of that/

4               THE WITNESS:  We don't know.  It would be on the

5       landlord.  We've described what we want to the landlord and

6       we've asked the landlord for (indiscernible) and rendition

7       showing.

8               THE COURT:  Has there been any draft lease drafted

9       at this point in time?

10              THE WITNESS:  No.  I'm waiting on a term sheet

11      from them.

12              THE COURT:  All right.  I'll let anyone cross

13      examine, but only on what I've just asked.  Anyone want to

14      ask anything?

15              MR. SATHER:  Your Honor, no, but was the witness

16      sworn?

17              THE WITNESS:  Yes.

18              THE COURT:  He was.

19              MR. SATHER:  Sorry.  I -- it's been a long day.

20              MR. STEINBRUNNER:  Your Honor, just a couple

21      questions.

22              THE COURT:  Sure.  Come on.  That's what we're

23      here for.

24                   CROSS EXAMINATION OF FAISAL SHAH

25      BY MR. STEINBRUNNER:

1    Q    Just to clarify.

2    A    Yes, sir,.

3    Q    And it's Mr. Shah, correct?

4    A    Yes, sir.

5    Q    Okay.  You said there's no term sheet currently?

6    A    I have requested one and I'm instructed by Vaxanix's

7    CEO to get not just a term sheet.  He's instructed me to get

8    a lease.

9    Q    Okay.  And when did you make that request?

10   A    Conversation started in October.  The request, I made

11   it directly to Mr. Choudhri.  I think it's been almost two

12   months.

13   Q    Two months ago?

14   A    Yes.

15   Q    And have you received a response with the term sheet?

16   A    No.  I'm told it's -- I'm told that the -- that we'll

17   get a draft lease and I have also asked for an SNDA, because

18   Mr. Choudhri informed me about the situation with the

19   building, and that's something that was concerning us.  And

20   (indiscernible).

21   Q    And just one -- maybe one last question.  There's no

22   letter of intent or is there a letter of intent on your

23   behalf with the -- a signed letter of intent with the

24   Debtor?

25   A    I believe I have sent -- I believe, I'm not entirely

1    certain, I believe I have sent an email to Mr. Choudhri

2    requesting lease and those very general terms that I

3    described, that I thought would function as a letter of

4    intent.

5    Q    Okay.  My last question is, subject to whatever

6    negotiations you have (indiscernible), Vaxanix or Immunicom,

7    you can walk away from this opportunity at any point in

8    time, correct?

9    A    Vaxanix and Immunicom can walk away at any time from

10   the building.

11            MR. STEINBRUNNER:  No more question, Your Honor.

12            THE COURT:  Anyone else?  Mr. Baker?

13            MR. BAKER:  I'm not sure I heard this, but if you

14   get a lease and everything gets signed, how quickly does

15   your client want to move in?

16            THE COURT:  Sixty days.  He answered the question.

17            MR. BAKER:  Okay.

18            THE COURT:  Thank you.

19            MR. BAKER:  that's all.

20            THE COURT:  Anything else?  Thank you, sir.

21   You're excused.

22            THE WITNESS:  Thank you.

23            THE COURT:  Thank you for coming.

24            THE WITNESS:  Thank you.

25            THE COURT:  Mr. Baker.

1          MR. BAKER:  Nothing else, Your Honor.

2          THE COURT:  All right.  All right, Ms. Whitworth,

3     I want to hear from you.  You've now heard what I've heard

4     and what you have to tell me, I think, it is really, really

5     important and what you'd like to see me do.  So, I'll hear

6     from you and then I'll hear from all the other parties, but

7     I want to hear from you first.

8          MS. WHITWORTH:  Judge, Jana Whitworth on behalf of

9     the United States Trustee.  Your Honor, I've worked on this

10    case for a while.  I conferred with my colleague, Mr. Jason

11    Rund who represented the U.S. Trustee in the prior case, to

12    get his -- all the information to make sure I had the whole

13    picture.

14         I have worked with Mr. Baker's office to get

15    documents, bank statements, corporate documents.  I have

16    never received a -- there's a few things missing, and that's

17    -- where the holes are, is where the concerns arise.  Number

18    one is the fiduciary issue.  All of these entities are

19    inextricably intertwined.  Money flows under the bank

20    statements from one entity to another entity.  I mean, you

21    just look at the SOFA.

22         They disclosed it, in due faith -- I mean, in good

23    faith, they disclosed it, but still, there's no underlying

24    management agreement.  There's no accounting for the money

25    that goes back and forth between all these entities.

1          Just, the Trustee is very, very concerned about

2    the fact that there doesn't appear to be a fiduciary

3    standing in the shoes of the Debtor to investigate all of

4    these transactions and also investigate the claim of the

5    breach.  If the bank breached some settlement agreement and

6    the Debtor is entitled to a setoff, that's something that

7    needs to be looked at, too, that a Chapter 7 Trustee could

8    review.

9          And then the other issue, Judge, is feasibility.

10    We can't get a -- the property is obviously worth more than

11    the 18.5 that's in the schedules.  The taxing authority has

12    it valued at 26 million which, you know, it's taxing

13    authority, but still.

14          And then again, we've got a building that there's

15    no evidence of how much it's truly worth.  We've got

16    projections from the Debtor itself that it's going to run in

17    the negatives for many months.  The plan that they want to

18    rely on under, you know, the -- to rebut the presumption of,

19    of converting under 1112(b)(1) doesn't make sense.  It's --

20    the plan itself is limiting, you noticed it yourself, Judge,

21    that basically the Debtor stays in control.  They're going

22    to give the money, but there's so many strings that it just

23    doesn't appear to be a feasible plan.

24          So at this point in time, Judge, I would recommend

25    that the Court either sua sponte appoint a Chapter 11

1    Trustee -- but at that point, who's going to pay for it?  If

2    the property is that far in the hole with the sixty -- if

3    the bank's proof of claim is sustainable, there's no setoffs

4    involved, this is like $67 million.

5           THE COURT:  Here's my thought process and I'm just

6    going to talk out loud on the record.  So, my original

7    thought is, let's appoint a Chapter 11 Trustee.  If the

8    Debtor then -- I mean, if the Debtor then wants to fund the

9    Trustee and see if they can make a go of it, then I've given

10   them an opportunity to do what they say they're going to do.

11          And if there's no money, then the Chapter 11

12   Trustee can come to me and say, Judge, convert the case.

13   Okay.  But I think that's where I'm headed, okay, just

14   because I think it's the middle road.  It doesn't kick the

15   Debtor out on the street.  But by the same token, it gives

16   an independent party with no conflicts of interest an

17   opportunity to tell me what's really going on because I'm

18   not sure I know what's really going on.  I'm not sure, you

19   know what's going on.

20          MS. WHITWORTH:  No, I don't, Judge.  That's the

21   problem.

22          THE COURT:  Okay.  So, let me hear from the movant

23   first.

24          MS. WHITWORTH:  Can I make one suggestion, Judge?

25          THE COURT: Sure.

```
1                MS. WHITWORTH:  I'm sorry.  I don't want to abuse

2      my --

3                THE COURT:  No, that's fine.

4                MS. WHITWORTH:  If we do a Chapter 11 Trustee, and

5      of course the U.S. Trustee stands ready, willing, and able

6      to comply with whatever you order us to do, Judge.  You know

7      that.

8                THE COURT:  You know the best person to appoint,

9      hopefully.

10               MS. WHITWORTH:  That's the thing, is my guys are

11     going to look at this case and they're going to see --

12               THE COURT:  well --

13               MS. WHITWORTH:  -- the numbers and they're going

14     to want to know.  So what my thought process in analyzing

15     this earlier was, if maybe part of the appointment process,

16     the judge -- the Court requires some sort of report or

17     accounting, a short term report by the Chapter 11 Trustee on

18     feasibility.  And that way -- it's just a thought, Judge,

19     just to try to make it more marketable for us to go find

20     somebody to take that role, say look, you know, we've got --

21     and maybe even include --

22               THE COURT:  The Debtor has some cash.

23               MS. WHITWORTH:  That -- they have cash, Judge, in

24     -- but it's subject to the bank's cash collateral.  I

25     understand, Judge.
```

1          THE COURT:  Okay.

2          MS. WHITWORTH:  It's just a thought.  It's just a

3     thought.  Thank you.

4          THE COURT:  All right.  I appreciate it.  All

5     right.  Mr. Fitzmaurice or Mr. Steinbrunner, whoever wants

6     to go.

7          MR. FITZMAURICE:  Thank you, Your Honor.  Patrick

8     Fitzmaurice from Pillsbury on behalf of the National Bank of

9     Kuwait.  Your Honor has heard, I think, perhaps more than

10    expected, a lot of argument and evidence on a lot of

11    different issues, some of it actually relevant to the

12    motion.  Much of it not, at least in my view.

13         I think if we sift through the noise, here's where

14    we are.  The Debtor hasn't paid taxes in five years.  Now,

15    the Debtor says, well, those taxes were paid, sure by

16    somebody else, pursuant to a loan and that party acquires

17    the tax lien.  Those amounts still have to be paid.  They

18    don't just go away because somebody else paid them for the

19    Debtor -- for the Debtor.  They still have to be paid.  They

20    just get paid to somebody else.

21         I'll note that the plan does not call for the

22    payment of the tax liens that were transferred to National

23    Bank of Kuwait under the settlement agreement.  So, the

24    Debtor hasn't paid taxes in five years.  The Debtor has

25    operated at a loss for the entire year.  The Debtor has come

1    forward with projections, time after time, and time after

2    time has not come close to meeting them.  October, November,

3    and December revenues were half of what they were supposed

4    to be.

5            There is no evidence that supports feasibility of

6    the plan.  There isn't a lease, a letter of intent, a

7    commitment, anything that would support the ability of the

8    Debtor to confirm a plan going forward.  There is simply

9    nothing.  Your Honor, I have specific issues that I could

10   argue, point out with respect to the plan in terms of

11   classification and so on.  We're going to put that to the

12   side for now.

13           I heard Your Honor loud and clear about where

14   you're leaning, and obviously we'll follow whatever

15   direction that the Court takes and the Court gives us.  The

16   concern that we have is that we're going to be right back

17   here, having spent a bunch of money on Chapter 11, in very

18   short order.  The idea that there's going to be an

19   independent fiduciary who's going to operate the business

20   for some period of time for the benefit of all creditors,

21   that's something we are totally in favor of, that we

22   completely support.

23           We do think, although rarely -- it's not usual --

24   we do think that's a thing that a Chapter 7 Trustee could do

25   in this case.  And the Chapter 7 Trustee can decide what to

1   do with the property, what do to with the leases that are,

2   let's say, in process.  What to do with the prospective

3   claims that exist against the bank and against the insiders.

4   It is very classic Chapter 7 Trustee job responsibility to

5   investigate those claims, bring them up --  bring them if

6   appropriate and if they are as valuable as everyone says

7   they are, then lawyers will be lining up to take those cases

8   on.

9          We welcome the opportunity to discuss the merits

10  of those claims with the Trustee if one is appointed.  I

11  have nothing further, Your Honor.

12          THE COURT:  Thank you.  Mr. Baker?

13          MR. BAKER:  Your Honor, I understand what the

14  Court is saying, okay, as far as appointing a Chapter 11

15  Trustee.  Biggest concern I've got is this happened in

16  another case.  The U.S. Trustee has a problem getting

17  somebody in, and so what we would like the Court to consider

18  as an alternative is to let the Court or let the Debtor work

19  (indiscernible) work, find a chief restructuring officer

20  that we could put in that has the same duties as a Chapter

21  11 Trustee and the same responsibilities.

22          The last time this happened, I was told that we

23  had no input in what happened.  So, you know, in another

24  case, they took somebody from the Chapter 7 panel who's bot

25  a totally different (indiscernible) in what goes on.  Close

1  it down.  Okay?  I had to spend a lot of time talking to the

2  attorney for the Chapter 7 Trustee (indiscernible) the

3  Chapter 11 Trustee, (indiscernible) convincing them not just

4  to (indiscernible) down.  A whole lot of time.

5         So, it makes a lot of sense to work with Ms.

6  Whitworth to find somebody who's a CRO who would have the

7  same responsibilities and duties as a Chapter 11 Trustee,

8  somebody that understands the business.  This is going to

9  take somebody that understands the business, knows what's

10  going on, and really wants to work to make the deal work.

11  This is not an easy task.  The Debtor said that they've got

12  money.

13         You know, there is uncontested testimony before

14  this Court as far as the leases, the financial projections,

15  and everything else.  There's no other testimony that the

16  bank has put on to contradict Mr. Choudhri's testimony about

17  this being a viable feasible plan.  Now, the Court can make

18  its own decisions, but you take $2.5 million and you look at

19  it, there is no question, the Debtor has got the ability to

20  fund this going forward.  We're not arguing about the

21  fiduciary.

22         That's why the Debtor is specifically agreeing to

23  let a chief restructuring officer come in and deal with it.

24  So, we would as the Court to seriously consider that.  A

25  chief restructuring officer will work very diligently and

1    I'd work with Ms. Whitworth to find somebody, get that done.

2    This is a very feasible plan that can occur, if they get the

3    leases in, which they believe they will, and Mr. Choudhri

4    and Jetall have been very good at getting buildings filled

5    up.

6            This building started off.  When Blue Cross moved

7    out, they got up to over ninety -- about 92 percent

8    occupancy.  Then when Stages left, it dropped down to 15

9    percent.  They're up to 70, almost -- if they get a couple

10   of these other leases, they're at 88 percent.  So they're

11   back again.  Okay?  So what is Mr. Choudhri's issues?

12   That's why he had to help, get a chief restructuring officer

13   (indiscernible).  I mean, that's the biggest concern that I

14   have got.  And the U.S. Trustee's office does an excellent

15   job, but their pool of people to pull from to do this is

16   limited as far as people that know what's going on and do

17   this.

18           Mr. McManigle would be an excellent choice but

19   he's already been requested and he's got a conflict and I'm

20   not aware of anybody that really does what he does who's on

21   the Trustee panel.  So, that's why it would make sense to

22   allow the Debtor quickly get a CRO in place and then go

23   forward and to demonstrate to this Court we can actually get

24   a plan put together and make it work.  The Debtor can do

25   that.  The Debtor can do that.

1          I don't want to go back and rehash what happened

2     in front of Judge Lopez's Court, but there were some things

3     that came up in Judge Lopez's Court at the last minute that

4     had a very significant impact, we believe, on what happened

5     in the case and those are being addressed right now.

6          So, you know, we'd like to ask the Court to allow

7     the Debtor to move forward, to give the Debtor a time period

8     to get a CRO in place, and if a CRO is not put in place,

9     then the U.S. Trustee can appoint a Chapter 11 Trustee.

10          THE COURT:  Thank you.  Mr. Sather, you have

11    anything to say?

12          MR. BAKER:  Your Honor, Mr. Choudhri as a

13    creditor, a party in interest, would also like to address

14    the Court.

15          THE COURT:  No.

16          MR. BAKER:  Okay.

17          THE COURT:  Thank you.

18          MR. SATHER:  Just starting with the basics, Your

19    Honor, on the motion to dismiss or convert.  The burden is

20    on the moving party, the creditor.  They promised us they

21    were going to show two things, loss or diminution to the

22    estate and inability to confirm a plan.  When it comes to

23    loss or diminution to the estate, all they've shown is

24    failure to pay property taxes, without showing how that

25    diminishes the estate, and the estate was not created until

1   the bankruptcy case was filed on December 5th.  So, I don't

2   think that has been shown.

3          Inability to confirm a plan, I don't think that at

4   this early stage, they have met their burden.  We are less

5   than 60 days in, and they would -- at this stage, they would

6   need to show that there was no confirmable plan that could

7   be proposed in this case.  You know, pretty much how most

8   Chapter 11 cases work, is you file your plan and it goes

9   through revisions.

10          And so the fact -- we don't expect the first plan

11   that is filed to be perfect, but there's certainly some good

12   raw material to work with here, and the fact that there is

13   someone willing to put in $2.5 million to make this work and

14   the fact that they are presently funding the operations of

15   the Debtor does speak a lot about the ability to get to a

16   resolution here.

17          Now, Ms. Whitworth has done a good job of showing

18   the need for an independent fiduciary.  I've got -- I have a

19   CRO candidate who I liked, who I worked with in another

20   case, Angelo DeCaro.  I believe he would be qualified to be

21   a Chapter 11 Trustee also, but you know, there are concerns

22   with having a fiduciary and I think that is a solvable

23   problem and not one that mandates dismissal or conversion.

24          And finally, I'd just say the idea that a Chapter

25   7 Trustee is going to do anything other than abandon the

1    property, and not pursue the claims, seems unpersuasive to

2    me.   You know, Chapter 7 Trustee don't operate businesses.

3    They are not permitted to administer a case for the benefit

4    of a secured creditor.  They can't propose a plan.  At best,

5    they can try to sell the property, but it doesn't look like

6    there is equity above and beyond the debt, so that there

7    wouldn't be an incentive for a 7 Trustee to sell.

8         And as far as a Chapter 7 Trustee investigating

9    the claims against the bank, that really only makes sense in

10   a reorganization because if it's just going to be an offset

11   against the debt, there's no incentive for a 7 Trustee to

12   pursue it.  And so, I think that dismissing or converting --

13   well, converting would be -- benefit one creditor and harm

14   all the others.  So I think that's a bad idea.

15        THE COURT:  Thank you.  All right.  Here's what

16   the Court is going to do.  Court makes the following finding

17   of facts and conclusion of law.  The Court clearly

18   understands the value differential between the business'

19   continued operation or its liquidation, and for that reason,

20   I don't think at this point in time a conversion to a

21   Chapter 7 is appropriate.

22        I have a Debtor who is in his second bank -- or a

23   Debtor that's in its second bankruptcy case, where the first

24   case was dismissed for cause.  All I've seen relative to

25   financials are conflicting financials between two cases that

1    you can easily read to support a fact that the Debtor can't

2    fund a plan.  I have a plan and disclosure statement filed

3    yesterday that has, I'll just say, glitches, incomplete

4    financials, and a Debtor who wants time to fix those

5    financials.

6              And I will say from the record that there's been a

7    change in circumstances from the dismissal of the first case

8    to this case that's material, I don't think I've heard any

9    evidence that supports that.  I'll note that the first case

10   was filed on July 5th, 2023.  The second case was filed on

11   December 5th, 2023.

12             The major problem is I have conflicts of interest

13   in this case.  I don't have an independent Debtor.  I have

14   management, basically approving payments to itself.  Okay?

15   The schedules in this case are inconsistent.  There's

16   discrepancies.  And what I basically have is creditors of

17   the Debtor running the Debtor, which doesn't work.  All

18   right?

19             So, I'm not aware of any Fifth Circuit authority

20   that allows me to do this, but I'm certainly aware of Ninth

21   Circuit authority that gives me the authority to appoint a

22   Chapter 11 Trustee sua sponte.  I'm going to do that.  I'm

23   going to cite you to a case at 76 F.3d 256, 258 for the

24   authority to do that.  I'm doing it based on what I've just

25   read into the record.

1          I'm going to give the Debtor an opportunity, if

2     they want, to kick money in to pay a Chapter 11 Trustee if

3     they think they can make a good go of it.  If someone's

4     going to pay that Chapter 11 Trustee and if you're willing

5     to put $2.4 million into a plan to confirm a plan, you can

6     decide whether you want to pay a Chapter 11 Trustee to

7     decide if this is going to go or not.

8          If you don't, and we can't find a Chapter 11

9     Trustee, I'll convert the case to Chapter 7.  All right?

10    I'll draft an order based on what I just read into the

11    record.  I would spend more time, but we are now past my

12    4:30 cutoff to go to Laredo and I'm going to run out the

13    door and run to the airport, and I will see all of you all

14    later.  Thank you.

15          CLERK:  All rise.

16          (Proceedings adjourned at 4:31 p.m.)

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2

 3                    RULINGS

 4                                   Page       Line

 5   Employment Application, ABATED    9          2

 6

 7   Motion to Appoint CRO, DENIED     85         13

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                         CERTIFICATION

2

3     I certify that the foregoing is a correct transcript from

4     the electronic sound recording of the proceedings in the

5     above-entitled matter.

6

7

8

9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 5, 2024
```

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**

In Re:  Galleria 2425 Owner, LLC                    Case No.: 23−34815
        Debtor

                                                    Chapter: 11

_____

### <u>NOTICE OF FILING OF OFFICIAL TRANSCRIPT</u>

An official transcript has been filed in this case and it may contain information protected under the E-Government Act of 2002, and Fed. R. Bank. P. 9037.

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R. Bank. P. 9037, the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at https://www.txs.uscourts.gov/.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address.

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at https://www.txs.uscourts.gov/ or by calling (713) 250−5500 . A party is only responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.

                                        Nathan Ochsner
                                        Clerk of Court

000227